## DECLARATION REGARDING JURY SELECTION PRACTICES

1. I currently serve as the Director of the Federal Death Penalty Resource Counsel Project, assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts. I have served as Resource Counsel since the inception of the Resource Counsel Project (RCP) in January, 1992. The Project is funded and administered under the Criminal Justice Act by the Defender Services Office of the Administrative Office of the United States Courts.

2. My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases. This effort includes the collection of data on the initiation and prosecution of federal capital cases.[1]

3. In order to carry out the duties entrusted to me, I maintain a comprehensive

---

[1] The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50. A recent update to the Report stated: "Many judges and defense counsel spoke with appreciation and admiration about the work of Resource Counsel. Judges emphasized their assistance in recruiting and recommending counsel for appointments and their availability to consult on matters relating to the defense, including case budgeting. Defense counsel found their knowledge, national perspective, and case-specific assistance invaluable."
http://www.uscourts.gov/FederalCourts/AppointmentOfCounsel/Publications/UpdateFederalDeathPenaltyCases.aspx

list of federal death penalty prosecutions and information about these cases. I accomplish this by internet news searches, by reviewing dockets and by downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, orders and opinions by the District Court and by telephonic or in-person interviews with defense counsel or consultation with chambers. The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. I have personally assisted appointed counsel in voir dire in the following federal capital trials: *United States v Richard Tipton, et al.,* (E.D. Va. No. 3-92-CR-68); *United States v. John Javilo McCullah* (E.D. OK. CR-92-032-S); *United States v. Michael Murray* (M.D. Penn. No. 1:CR-92-200); *United States v. Jean Claude Oscar, et al.* (E.D. Va. 93-CR-131-Morgan); *United States v. Stacey Culbert* (E.D. Mich. No. CR-92-81127); *United States v. Louis Jones* (N.D. Texas No. 6-95 CR 0015-C); *United States v. Orlando Hall* (N.D. Tex. No. 4:94-CR-121-Y); *United States v. Bruce Webster* (N.D. Tex. No. 4:94-CR-121-Y) and *United States v. Len Davis* (E.D. La. No. 94-381). I have observed portions of the jury selections in other cases: *United States v. Thomas Pitera* (E.D. N.Y. No. CR 90-0424 (RR)) and *United States v. Dennis B. Moore* (W.D. Mo. No. CR 94-00194-01-12-CR-W-9)*.* I have selected federal capital trial juries as counsel of record. *United States v.*

*Quinones and Rodriguez* (S.D. NY CR No. 00 CR 0761 (JSR)) and *United States v. Valerie Friend* (S.D. WV CR No. 2:05-00107).  I have assisted in preparing defense counsel for jury selection in other cases: *United States v. Jason De la Torre* (D.N.M. No. CR 95-538-MV); *United States v. Timothy McVeigh* (W.D. OK CR No. M-95-98-H) (Alley) on change of venue to (D. CO CR No. 96-CR-68-M) (Matsch); *United States v. Theodore Kaczysnki* (E.D. CA. No. CR-S-96-259) and *United States v. Angela Johnson* (N.D. IA CR No. 00 CR 3034-MWB).

### A.  Attorney Questioning

5.  In the vast majority of federal capital trials, attorneys are permitted to ask the jury questions.  As of January 15, 2016, jury selection has begun 230 times in a federal capital case.  Attorney questioning of potential jurors was allowed in 189 (or 82%) of these trials (189/230).[2]

### B.  Jury Questionnaires

6.  In the vast majority of cases, jury questionnaires containing additional questions beyond those found in standard questionnaires have been used in order to reduce the amount of in-court time necessary to select a jury.

---

[2] In one trial, attorney questioning was permitted for a defendant for almost half of the jury panel, then was stopped (*Battle*).  In three other cases, attorney questioning was not allowed initially, but then was allowed (*Acosta-Martinez/Rivera-Alejandro* (D PR), *Bobbitt/Jones* (ED VA) and *Tsarnaev* (D MA)).

7. In all but 11 of these trials, the district court ordered or approved a juror questionnaire which asked questions in addition to the standard questions. In a few of these 230 trials, there was no request for use of an extensive questionnaire. In a majority of the 219 trials where a questionnaire was used (95%, 219 of 230), the questionnaire was extensive.[3]

8. The reason that so many district judges approve the use of prospective juror questionnaires, including extensive questionnaires, is that it conserves precious judicial resources by eliminating the need for time-consuming in-person questioning on a variety of topics.[4] Rather, district court judges have chosen to use an expanded questionnaire as a tool to identify specific areas that may require testimony by potential jurors.

9. Appellate courts have rejected claims in federal capital cases that voir dire was inadequate, in part relying upon the district court's use of in-depth questionnaires. *See,*

---

[3] Five of the "expanded" questionnaires were very brief.

[4] *The Benchbook for United States District Court Judges*, §3.01 "Death Penalty Procedures," Pretrial ¶(A)(5), p. 117 (March 2000 rev), suggests consideration of "having veniremembers complete a jury questionnaire" prior to a federal capital trial and providing the same to counsel. This is the reason the *Resource Guide for Managing Capital Cases*, Chapter III A1, p. 33 (Federal Judicial Center, 2002) states: "All the judges we interviewed used questionnaires." The Guide also states: "Nearly all federal judges who have had a death penalty trial to date have used a written jury questionnaire." *Id.,* Chapter III A2, p. 34. "Most questionnaires have been in the range of ten to fifteen pages." *Id.*

*e.g., United States v. McVeigh,* 153 F.3d 1166, 1208 (10th Cir. 1998) ("an extensive questionnaire"); *United States v. Ortiz,* 315 F.3d 873, 888 (8th Cir. 2002) ("a questionnaire of 103 questions")*.*

### C. Individual and Sequestered Voir Dire

10. Similarly, relatively few judges have declined to conduct individual, sequestered (away from other potential jurors) voir dire, *at least on the issue of punishment views* in federal death penalty cases.[5] To our knowledge, judges refused individual, sequestered (private - apart from other jurors) voir dire on the issue of the death penalty 31 times.[6] So, 87% of federal judges conduct "private" individual questioning of potential jurors *at least on the issue of capital punishment views* (199 of 230)*.*

11. Punishment questioning in a group setting carries with it 1) a danger that other jurors, who listen to the answers of fellow potential jurors, may be contaminated

---

[5] The *Benchbook for United States District Court Judges*, §3.01, ¶(A)(7), p. 119, recommends that punishment questions be posed individually "at sidebar ..." *See also Chambers to Chambers,* Vol. 10, No. 1, pp. 3-7 (Federal Judicial Center 1995). The *Resource Guide for Managing Capital Cases,* Chapter III A3a, p. 36, states that all the district judges interviewed used a combination of group (for general issues) and individual (for death penalty issues) voir dire. Of course, group voir dire is well suited and time efficient for non-sensitive topics – although some judges have conducted all questioning in private and individually.

[6] Five judges permitted individual questions in private "as necessary."

5

or improperly influenced by those responses and thus 2) may shade their answers based on what they hear and 3) is demonstrably inferior in identifying biased jurors and 4) requires repeated exposure to questions about the death penalty which presume guilt and creates a less than neutral jury.

12.   In those federal cases where the district court required small group questioning, sensitive issues (the death penalty, exposure to pretrial publicity or racial or ethnic attitudes) often end up requiring some questioning out of the hearing of other jurors, usually at the bench.  In the end, the process is not time efficient, particularly if there is no questionnaire allowing counsel and the court to focus on troublesome topics.  Rather than bring individual jurors in on a scheduled basis for questioning, the group approach often requires a large panel of jurors to sit idly (whether they can hear the answers of other jurors or not). This unnecessarily wastes the time of many citizens, as opposed to setting up an individual interview schedule, which creates the least imposition on each citizen.

I declare under the penalty of perjury under the laws of the United States of American, 28 U.S.C. §1746, that the foregoing is true and correct.

Executed this 18th day of January, 2016.

                                            /s/ Kevin McNally