IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

UNITED STATES OF AMERICA       )
                               )
          v.                          )          CASE NO.: 2:15-CR-472
                               )
DYLANN STORM ROOF              )

### MOTION TO DISMISS INDICTMENT
### AND MEMORANDUM IN SUPPORT

      Counsel for the defendant Dylann Storm Roof hereby move that the Court dismiss the indictment against him on the grounds that the statutes on which it is based exceed the authority of the federal government under the Commerce Clause and the Thirteenth Amendment, and violate the Due Process Clause of the Fifth Amendment.  Specifically, the motion alleges that:

(1)  18 U.S.C. § 247(a)(2) is an unconstitutional exercise of Congress' power under the Commerce Clause;

(2)  18 U.S.C. § 249 (a)(1) is an unconstitutional exercise of Congress' power under the Thirteenth Amendment; and

(3)  the residual clause of 18 U.S.C. § 924(c)(3) is void for vagueness under the Supreme Court's decision in *Johnson v. United States*, -- U.S. --, 135 S. Ct. 2551 (June 26, 2015), and the proposed predicate offenses in this case do not qualify under the elements clause.

      Before setting out these constitutional claims, counsel wish to emphasize that this motion is being made only because the statutes at issue form the basis of the government's request for the death penalty.

Should the government's death notice be withdrawn at any point in the future, the defendant will withdraw this motion and plead guilty as charged to all counts in the indictment.[1]

## Factual Background

On June 18, 2015, Mr. Roof was arrested by authorities in North Carolina, pursuant to an arrest warrant issued by the State of South Carolina. He was transferred to South Carolina custody later that day and charged with various state offenses stemming from the shooting deaths of nine people, and injury of three more, at the Emanuel AME Church in Charleston, S.C., on June 17, 2015. Mr. Roof was later charged in federal court with related offenses, including obstruction of religious exercise resulting in death (18 U.S.C. § 247(a)(2)), hate crime acts resulting in death (18 U.S.C. § 249(a)(1)), and use of a firearm in connection with a crime of violence resulting in death (18 U.S.C. § 924(j)). Unlike in many federal cases, in which the state prosecution is dismissed in favor of federal prosecution, or in which the federal case is charged only after the state case, the federal and state cases here were charged concurrently, and the state case is scheduled for trial on January 17, 2017. In the state case, as in the federal case, Mr. Roof faces a potential sentence of death or life in prison without release.

The federal indictment alleges that:

- sometime prior to June 17, 2015, Mr. Roof placed on the website www.lastrhodesian.com a manuscript and photographs that expressed his racist beliefs (¶4);

- on the evening of June 17, 2015, he drove to the Emanuel AME Church to attack African-American Bible study participants at the church (¶5);

---

[1] As the Court is aware, Counts 13-21 (obstruction of religious exercise resulting in death) and 25-33 (use of a firearm during and in relation to a crime of violence resulting in death) are death-eligible by statute. Counts 1-9 (hate crime acts resulting in death) may form the predicates for counts 25-33, which are based on commission of a "crime of violence;" therefore, these counts are relevant to death-eligibility, even though they are not themselves death-eligible. To the extent that counts 1-9 and 13-21 are invalid, so are Counts 10-12 (hate crime acts) and 22-24 (obstruction of religious exercise), even though they are not death eligible either.

- he chose this church because it had a predominantly African-American membership (¶5);

- he decided to attack African-American churchgoers in order to increase racial tensions and to seek retribution for wrongs he believed African-Americans had committed against white people (¶6);

- he attended a Bible study group at Emanuel AME Church on the evening of June 17, 2015 (¶9);

- he entered the Emanuel AME Church building with his Glock, model 41, .45 caliber pistol and eight loaded magazines (¶8); and that,

- while parishioners were engaged in Bible study, he drew his pistol and opened fire (¶10).

The indictment further alleges that all of these acts were committed in the State of South Carolina.  Dkt. 2.

## I.   18 U.S.C. § 247(a)(2) is an unconstitutional exercise of Congress' power under the Commerce Clause.

Title 18 U.S.C. § 247 provides:

(a)  Whoever, in any of the circumstances referred to in subsection (b) of this section – … (2) intentionally obstructs, by force or threat of force, any person in the enjoyment of that person's free exercise of religious beliefs . . . shall be punished.

(b)  The circumstances referred to in subsection (a) are that the offense is in or affects interstate or foreign commerce.

Counts 13-21 of the indictment charge Mr. Roof with Obstruction of Exercise of Religion Resulting in Death under 18 U.S.C. § 247(a)(2) & (d)(1), and Counts 22-24 of the indictment charge him with Obstruction of Exercise of Religion Involving an Attempt to Kill and Use of a Dangerous Weapon under 18 U.S.C. § 247(a)(2) & (d)(1), (3).  These provisions exceed the limits of Congress' power to criminalize non-economic intrastate offenses under the Commerce Clause, and this is unaffected by Congress's having included a perfunctory interstate commerce element in the statute.  Those counts of the indictment therefore must be dismissed.

### A.  The statute is facially invalid.

The Commerce Clause delegates to Congress the power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."  U.S. Const. art I, § 8, cl. 3.  Pursuant to this power, Congress may regulate three categories of activities:

(1) "the use of the channels of interstate commerce";

(2)  "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and

(3)  "those activities having a substantial relation to interstate commerce."

*United States v. Morrison*, 529 U.S. 598, 609 (2000) (citing *United States v. Lopez*, 514 U.S. 549, 558-59 (1995)).

The Supreme Court has emphasized that although only a rational basis is required to support Congress's exercise of its Commerce Clause authority, there must be limits on Congress' authority, in order to maintain a distinction between "what is truly national and what is truly local."  *Lopez*, 514 U.S. at 557, 567-78.  The Court has repeatedly expressed concern that "[w]ere the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory."  *Id.* at 577 (Kennedy, J., concurring).  The federal government's assertion of authority here, through § 247(a)(2), exemplifies these concerns.  The indictment does not allege any commercial or economic motivation for the defendant's crimes, nor does it allege any resultant substantial effect on interstate commerce.  Nonetheless, Mr. Roof is subject to federal criminal prosecution for offenses carrying a possible penalty of death under the Federal Death Penalty Act.

In assessing the validity of a statute such as § 247(a)(2) under the Commerce Clause, the Court examines:

4

- whether the statute relates to commerce or an economic activity;

- whether the statute contains a jurisdictional element;

- whether Congress made any interstate commerce findings in enacting the legislation; and

- whether the link between the activity being regulated and an effect on interstate commerce is attenuated.

*See Morrison,* 529 U.S. at 610-13; *Lopez*, 514 U.S. at 561, 562; *see also United States v. Buculei*, 262 F.3d 322, 328 (4th Cir. 2001). These factors, however, are not necessarily dispositive. *See Morrison*, 529 U.S. at 614 ("Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so."). After considering these factors, the Court must conclude that the conduct encompassed by § 247(a)(2) actually reaches interstate commerce in some manner. *See United States v. Ballinger*, 395 F.3d 1218, 1230 (11th Cir. 2005).[2]

**1. 18 U.S.C. § 247(a)(2) does not regulate commerce or an economic activity.**

The obstruction of religious exercise statute is a criminal statute aimed not at regulation of commerce or economic activity, but at punishing offenders who interfere with the practice of religion by force or threat of force. As discussed further below, *see* Part A.2, this statutory provision contains no reference to commerce or economic activity other than a boiler-plate jurisdictional element. It is therefore analogous to the statutes at issue in *Lopez* and *Morrison*, both of which were struck down by the Supreme Court. *Lopez* involved the Gun-Free School Zones Act, which criminalized possession of firearms in schools, 514 U.S. at 551; *Morrison* involved the Violence Against Women Act, which permitted a civil remedy for the victims of gender-related violence, 529 U.S. 601-02. Neither statute involved channels, instrumentalities, persons, or

---

[2] This is a question of first impression in the Fourth Circuit, and – it appears, at least as to § 247(a)(2) – nationally.

things in interstate commerce, and – the Supreme Court held – neither had a substantial effect on interstate commerce. *Morrison*, 529 at 617-18; *Lopez*, 514 U.S. at 561, 567. As the Court concluded in *Morrison*, "we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." 529 U.S. at 618.

In contrast, the statutes that the Supreme Court and the Fourth Circuit have held to pass Commerce Clause muster are more obviously economic in nature. For example, in *Gonzalez v. Raich*, the Supreme Court approved the Controlled Substances Act as regulating activities, including intrastate drug dealing, that are "quintessentially economic." 554 U.S. 1, 25 (2005) (contrasting Controlled Substances Act to Gun-Safe Schools Act). In *United States v. Gibert*, 677 F.3d 613 (4th Cir. 2012), the Fourth Circuit upheld an animal fighting statute, 7 U.S.C. § 2156, which makes it a crime to "sponsor or exhibit an animal in an animal fighting venture." Despite the particular animal-derby's intrastate nature, the Fourth Circuit held that the sporting and entertainment aspects of the venture created a not just a *sufficient* nexus to interstate commerce, but one that was "visible to the naked eye." 677 F.3d at 619-20, 624, 625. *See also Buculei*, 262 F.3d at 330 (upholding statute criminalizing production of child pornography against Commerce Clause challenge because "Congress is regulating the very thing . . . for which an interstate market exists").

Because § 247(a)(2) does not regulate commerce or any economic activity, but rather obstruction of religious exercise – a criminal activity – Congress exceeded its authority under the Commerce Clause in enacting it.

**2. 18 U.S.C. § 247(a)'s jurisdictional element is so broad as to be meaningless.**

Although a jurisdictional element such as the one provided in § 247(b) ("[t]he circumstances referred to in subsection (a) are that the offense is in or affects interstate or foreign commerce") does not automatically render a statute constitutional, it may "lend support" for that conclusion. *Morrison*, 529 U.S. at 613. Such an element "might limit [the statute's] reach to a discrete set of [cases] that additionally have an explicit connection with or effect on interstate commerce." *Lopez*, 514 U.S. at 562. As a practical matter, however, jurisdictional elements have not operated to limit the reach of Congress' power. Rather, since *Lopez*, lower courts have tended automatically to accept that any statute containing a jurisdictional element is constitutional. *See, e.g., United States v. Kline*, 494 Fed. App'x 323, 325 (4th Cir. 2012) (citing cases).

The Court should not accept that approach, particularly when the jurisdictional element in § 247 is so broad as to be meaningless. By contrast to the jurisdictional elements in many other statutes, the one here simply identifies *all* the ways in which Congress may exercise its Commerce Clause power: over activities "in" (channels or instrumentalities) or "affecting" (having a substantial effect on) interstate commerce. 18 U.S.C. § 18 U.S.C. 247(b). *Compare, e.g.,* 18 U.S.C. 1201(a)(2) (covering kidnapping occurring "within the special maritime and territorial jurisdiction of the United States"); 18 U.S.C. §1958(a) (covering murders for hire under separate "travel" and "facilities" prongs); 18 U.S.C. § 1962 (covering corruption by organizations "engaged in, or the activities of which affect, interstate or foreign commerce"); 18 U.S.C. § 2119 (covering carjacking involving motor vehicle that has been transported, shipped or received in interstate commerce). It is difficult to imagine what activities would be outside Congress' power to regulate under § 247's construction of the commerce element. *Cf. National Fed'n of Indep. Bus. v. Sebelius*, -- U.S. --, 132 S. Ct. 2566, 2643 (2012) (Scalia, J., dissenting) (cautioning

against application of a Commerce Clause test that "extend[s] federal power to virtually all human activity"). Because the jurisdictional element here is so broad that it offers no limiting principle, the Court should not afford it weight in the constitutional analysis.

### 3. Congress made limited findings regarding effect on interstate commerce, and those it did make exclude prosecutions like this one.

In enacting § 247, Congress made virtually no findings regarding the effect of obstruction of religious exercise on interstate commerce. When the first version of the law was passed in 1986, the House Report on the bill emphasized the need for Congress to "send a strong signal that religiously-motivated violence will not be tolerated." H.R. Rep. No. 99-820 at 6 (Sept. 12, 1988). Its only reference to interstate commerce was an assertion of Congress's authority to regulate activities having a substantial effect on interstate commerce. *Id.* Reports on subsequent amendments to the law also largely focused on the harms caused by violence against religion or religious organizations, without discussing any effect of that violence on interstate commerce. *See* H.R. Rep. No. 104-621 at 2-4 (June 19, 1996); S. Rep. No. 100-324 at 2-3, 5 (April 27, 1988).[3]

Congress did receive testimony about the effects of church arson on interstate commerce caused by destruction of church property and the resulting impact on services provided in places of worship. *See*, *e.g.*, 142 Cong. Rec. 91, at S6517 (June 19, 1996). This testimony, however, relates to § 247(a)(1), not § 247(a)(2), the subsection under which Mr. Roof is charged. Moreover, as with previous versions of the law, there are no specific findings regarding interstate com-

---

[3] Section 247(b) was amended in 1996 to expand and simplify the commerce element so as to permit more prosecutions. *See* P.L. 104-155, Church Arson Prevention Act of 1996. The accompanying report does contain discussion of the need to do so and of the effectiveness of the type of broad jurisdictional element adopted. See H.R. Rep. 104-621 at 3, 7 (June 17, 1996).

merce in the church arson bill.  *See* P.L. 104-155 (H.R. 3525), 110 Stat. 1392, Church Arson Pre-

vention Act of 1996 (July 3, 1996) at § 2, pt. 4 (finding only that the problem is "sufficiently …

interstate" to require federal action").

Because Congress made no specific findings regarding interstate commerce in enacting §

247(a)(2), this factor weighs against its constitutionality.

### 4.   The link between obstruction of religious activity and commerce is too attenu-ated to support federal jurisdiction.

In *Morrison*, the Supreme Court "reject[ed] the argument that Congress may regulate

noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on inter-

state commerce."  529 U.S. at 617.  In doing so, the Court was recognizing the principle that

"[t]he regulation and punishment of intrastate violence that is not directed at the instrumentali-

ties, channels, or good involved in interstate commerce has always been the province of the

states."  *Id.*  As a result, just this term, the Court issued a reminder that, "'thus far in our Nation's

history our cases have upheld Commerce Clause regulation of intrastate activity only where that

activity is economic in nature.'"  *Taylor v. United States*, -- S. Ct. --, 2016 WL 3369420, at *5

(June 20, 2016) (quoting *United States v. Morrison*, 529 U.S. at 613.).  As discussed, § 247(a)(2)

plainly regulates intrastate activity that is non-economic.

The activity being regulated has no substantial effect on interstate commerce either.  Any

connection to interstate commerce that might be imagined here – such as intrastate travel on an

interstate highway to the site of the crime, or use of goods purchased in interstate commerce to

commit the crime, or use of email or the internet in researching or publicizing it – would be suf-

ficient today to render virtually any crime federal.  *Cf.* Andrew St. Laurent, *Reconstituting*

*United States v. Lopez: Another Look at Federal Criminal Law*, 31 Colum. J.L. & Soc. Probs.

61, 112 (1998) ("A purely nominal jurisdictional requirement ... does nothing to prevent the

shifting of the [federal-state] balance ... [a]s virtually all criminal actions ... involve the use of

some object that has passed through interstate commerce."). And any consequence to interstate

commerce from a § 247(a)(2) offense is too "attenuated" under *Lopez* and *Morrison* to qualify as

a substantial effect. *Morrison*, 529 U.S. at 612 (citing *Lopez*, 514 U.S. at 563-67). Indeed, even

in the arson context, the Fourth Circuit has held that the fact that a building is a church, and in

that capacity is involved in various activities that may implicate interstate commerce, is not suffi-

cient to establish a substantial effect on interstate commerce. *See United States v. Carr*, 271 F.3d

172, 179 (4th Cir. 2001) (citing in- and out-of-circuit cases); *see also United States v. Odom*, 252

F.3d 1289, 1296-97 (11th Cir. 2001) (finding donations from out of state, purchase of Bibles and

prayer books out of state, and indirect contributions to out-of-state church organization "too pas-

sive, too minimal and too indirect to substantially affect interstate commerce").[4]

Because of the lack of any firm link between obstruction of exercise of religion and inter-

state commerce, § 247(a)(2) represents an unconstitutional assertion of Congress' authority.

**5.  Invalidation of the federal statute does not mean that the covered conduct must go unpunished.**

Some twenty-nine states, including South Carolina, have statutes addressing obstruction

of religion in some fashion. *See* Exhibit A, State Religious Obstruction Statutes (attached).

Some of these laws, including South Carolina's, are neither as broad nor as severe as the federal

law. Some, however, cover similar conduct, and include similar penalties. *See, e.g.*, Ind. Code

Ann. § 35-50-2-9(18)(A) & (B), amended by 2016 Ind. Legis. Serv. P.L. 25-2016 (S.E.A. 141)

---

[4] *But see United States v. Terry*, 257 F.3d 366, 369 (4th Cir.2001) (holding that church's opera-
tion of daycare facility was sufficient to establish interstate commerce nexus).

(permitting death sentence when murder is committed in a building that is primarily used for religious worship and at a time when persons are present for religious worship or education). Given the states' unquestioned authority and demonstrated willingness to legislate in this area, South Carolina's choice not to enact a similar law therefore need not influence this Court's decision regarding the federal statute or the indictment in this case.[5]

### B.  The statute is invalid as applied in this case.

Although the facial validity of § 247 is an issue of first impression in the Fourth Circuit, two other courts have considered and declined similar challenges to § 247(a)(1) – the damage to religious property provision of the statute.[6]  Section 247(a)(2) offers less connection to interstate commerce than (a)(1) – which at least is directed at property, and damage thereto – making the decisions regarding that provision less persuasive.  Should this Court determine that (a)(2) is facially valid, however, it should still dismiss the charged counts because the provision is unconstitutional as applied in this case.

The indictment describes no connection between the defendant's actions under § 247(a)(2) and interstate commerce; it simply asserts that there was one.  *See* DE 2 ¶¶ 16, 18

---

[5] As the Court is aware, the State is proceeding against the defendant under South Carolina's longstanding murder statutes, S.C. Code §§ 16-3-10, -20, which carry equally severe punishments even though they do not include obstruction of religious exercise as an essential element of the offense.  Based on the State's filings, however, it appears that proof of the religious context for this offense will be part of the proof at the state trial.  *See* State of South Carolina v. Dylann Storm Roof, Indictment Nos. 2015-GS-10-04115-24, 2015-GS-10-04186-88, Notice of Evidence in Aggravation at 3-4 (attached as Exhibit B to this motion).

[6] *See United States v. Ballinger*, 395 F.3d 1218, 1230 (11th Cir. 2005) (en banc); *United States v. Grassie*, 237 F.3d 1199, 1208-09 (10th Cir. 2001).  For the reasons stated in Part A, defense counsel submit that these decisions were in error.  In addition, subdivision (a)(1), aimed at destruction of property, is more clearly connected to interstate commerce than subdivision (a)(2), which is aimed at obstruction of religious exercise.

("The acts of Defendant DYLANN STORM ROOF . . . were in and affected interstate commerce."). In fact, the crimes were entirely intrastate. Mr. Roof lived in South Carolina, all of the alleged preparation for the crime took place in South Carolina, and the crime was committed in South Carolina. The only potential links to interstate commerce alluded to in the indictment are the use of the internet and the use of a gun and ammunition that had been manufactured out-of-state (¶¶ 4, 8). Courts accept such *de minimis* connections to interstate commerce when the activity being regulated is economic in nature. *See, e.g., United States v. Malloy*, 568 F.3d 166, 180 (4th Cir. 2009) (finding child pornography statute constitutional as applied, despite local production, because camera and film had traveled in interstate commerce and production is an economic activity with an effect on interstate commerce) (citing cases). The Court should not accept the *de minimis* connection here, however, when both the activity of religious exercise and its obstruction are both wholly outside the realm of commerce, and the alleged activity by the defendant was otherwise purely local in nature.

*United States v. Ballinger*, 395 F.3d 1218 (11th Cir.2005), in which a divided, *en banc* Eleventh Circuit denied an as-applied challenge to § 247(a)(1) by a defendant who had committed a "four-state church-arson spree," provides an instructive contrast. *See* 395 F.3d 1236. Ballinger traveled on interstate highways from Indiana to Georgia (through Kentucky and Tennessee), purchasing gasoline and other fire-starting supplies and staying in hotels along the way. He committed three church arsons en route to Georgia, five more during the course of his temporary stay in Georgia, and another three on the way home to Indiana – for a total of eleven. In all, he spent almost a month on the road. *Id.* at 1223-24. Even under these circumstances, Ballinger's proved to be a close case, earning dissents from Judges Tjoflat, Birch, and Hill.

The majority effectively conceded that the government could not demonstrate a substantial effect on interstate commerce from Ballinger's actions. *Id.* at 1235-36. But it held that "[t]ravel to the site of the fire and procurement of the materials for the specific purpose of burning a church are necessary and indispensable steps in committing arson. *When the arsonist takes these steps in interstate commerce*, his offense falls within Congress' power to regulate the channels and instrumentalities of interstate commerce." *Id.* at 1236 (emphasis added). The majority said that Ballinger's case "classically depict[ed] arson in interstate commerce." *Id.* at 1235. This case is quite the opposite, involving no interstate activity whatsoever.

The dissenters would have held that even Ballinger's conduct – involving interstate travel and obtaining goods in interstate commerce – was beyond Congress' power, because the Commerce Clause confers "'no power to punish one who travels in interstate commerce merely because he has the intention of committing an illegal or immoral act at the conclusion of the journey.'" *Id.* at 1245 (Tjoflat, J., dissenting) (quoting *Caminetti v. United States*, 242 U.S. 470, 491 (1917)). The dissenters also emphasized that § 247 essentially criminalizes "a local crime," often one related to property. *Id.* at 1248 (Birch, J., dissenting). After an examination like the one conducted here in Part A, they concluded that "[t]he statute is Congress' attempt to punish the intrastate activity of church burning, not the use of the interstate highway to reach the church." *Id.* at 1256 (Hill, J., dissenting) ("Merely because Congress chose to prohibit church arson that is 'in' interstate commerce does not mean that there is such a crime.").

The facts here do not approach the multi-state activity that occurred in *Ballinger*. Because the alleged obstruction of religious exercise in this case does not have sufficient – perhaps *any* – connection to interstate commerce, application of the statute is unconstitutional, and Counts 13-21 and 22-24 should be dismissed.

Given the total silence of the indictment on this essential element of the offense, defense counsel separately have filed a motion for a bill of particulars, to require the government to outline its intended proof on this point.  *See* Fed. R. Crim. P. 7(f); *United States v. Schembari*, 484 F.2d 931, 934-35 (4th Cir. 1973) ("It is settled that the purpose of a bill of particulars is to enable a defendant to obtain sufficient information on the nature of the charge against him so that he may prepare for trial, minimize the danger of surprise at trial, and enable him to plead his acquittal or conviction in bar of another prosecution for the same offense.").

### C.  The jurisdictional element in § 247(a)(2) is unconstitutionally vague and overbroad.

A further Commerce Clause-related defect in § 247(a)(2) is that its jurisdictional element, § 247(b), is void for vagueness. *See United States v. Johnson*, 135 S.Ct. 2551 (2015). A statutory provision violates due process when its language is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Id.* at 2556. This requirement is "well-recognized … consonant alike with ordinary notions of fair play and the settled rules of law." *Id.* (citing *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).

In *Johnson*, the Supreme Court considered whether the residual clause in the Armed Career Criminal Act ("ACCA") was unconstitutionally vague. That statute imposes an increased mandatory minimum sentence upon a defendant with three prior convictions for a "violent felony," which is defined, in part, to include any felony that "involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B).  In deciding whether the residual clause should apply, the Supreme Court explained that a court must "picture the kind of conduct that the crime involves in 'the ordinary case,' and to judge whether that abstraction presents a serious potential risk of physical injury." *Johnson*, 135 S. Ct. at 2557.  Based upon

these features, the Supreme Court concluded that "[w]e are convinced that the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges." *Id.* The Supreme Court struck down the clause as unconstitutional because it denied due process of law. *Id.*

The statutory provision at issue in this case suffers from the same deficiencies as the ACCA residual clause. Particularly problematic is the jurisdictional element requiring courts and individuals to determine whether a criminal act "substantially affects interstate commerce." This language requires two inquiries. First, one must estimate the effect of the criminal act on interstate commerce. Second, one must determine if the effect is enough (*i.e.*, is it substantial). These inquiries are similar to those found constitutionally troubling by the Supreme Court in *Johnson* in that they require individuals and courts to guess at the results of the criminal conduct (either the risk of injury, in *Johnson*, or the effect on interstate commerce, here). Additionally, courts have struggled to establish a clear standard for the term "substantially affect interstate commerce," further providing evidence of vagueness. *Id.*; *see also United States v. Morrison*, 529 U.S. 598, 613 (2000); *United States v. Jones*, 529 U.S. 848 (2000).

For these reasons, the court should conclude that the jurisdictional element in § 247(b) is void for vagueness.

**II.     18 U.S.C. § 249(a)(1) is an unconstitutional exercise of Congress' Thirteenth Amendment authority.**

Unlike § 247, which was enacted pursuant to Congress' power under the Commerce Clause, § 249(a)(1) was enacted pursuant to Congress' power to enforce the Thirteenth Amendment. *See* Pub. L. No. 111-84, 123 Stat. 2838, 2842, Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009 (Oct. 28, 2009) at § 4702. Passed in the aftermath of the Civil

War, the Thirteenth Amendment provides that "neither slavery nor involuntary servitude . . . shall exist within the United States . . . ."  The amendment was intended:

> to abolish slavery of whatever name and form and all its badges and incidents; to render impossible any state of bondage; to make labor free, by prohibiting that control by which the personal service of one man is disposed of or coerced for another's benefit, which is the essence of involuntary servitude.

*Bailey v. State of Alabama*, 219 U.S. 219, 241 (1911).  Section Two of the amendment gives Congress enforcement power to achieve these aims "by appropriate legislation."  U.S. Const., Amend XIII, § 2.

The term "appropriate legislation" provides the Constitution's limitation on the Congressional power conferred by the Thirteenth Amendment and other similar provisions.  The federal government may exercise only such power as the Constitution delegates to it.  *See McCulloch v. Maryland*, 17 U.S. 316, 405 (1819). "All powers not granted to it by that instrument are reserved to the States or to the people." *United States v. Cruikshank*, 92 U.S. 542, 551 (1875).  The Supreme Court recently reaffirmed these long-standing principles of law in *United States v. Comstock*, -- U.S. --, 130 S. Ct. 1949, 1956 (2010), explaining that Congress' exercise of its legislative authority is "appropriate" only when it accommodates the sovereign interests of the states.[7] Preeminent among those sovereign state interests is the police power.  *See Medina v. California*, 505 U.S. 437, 445 (1992) ("The Supreme Court has consistently held that crime prevention as well as criminal prosecution are police powers; these are state powers not to be infringed by the Federal Government").   Because it fails to respect the police power, § 249(a)(1) is not an "appropriate" exercise of Congress's power under the Thirteenth Amendment.

---

[7] *Comstock* is but one in a line of recent cases, including *Lopez* and *Morrison*, discussed above, and the other cases discussed in this Part, in which the Court has emphasized the importance of federalism concerns.

Even at the time of § 249(a)(1)'s enactment, Congress recognized that the states were exercising their police power to combat racially-motivated crime. In fact, the legislative record offers virtually no evidence that states were failing to adequately punish these offenses. *See The Matthew Shepard Hate Crimes Prevention Act of 2009: Hearing Before the Senate Committee on the Judiciary*, 111th Cong., 1st Sess. (June 25, 2009) ("S. Hrg."). Forty-five states had hate-crime laws at the time, and no data indicated a lack of enforcement, even in those states that did not. (S. Hrg. 7-8, 14, 62, 171).[8] Indeed, the murderers of Matthew Shepard and James Byrd, Jr., for whom the act was named, received sentences of either life in prison or death.

Under these circumstances, § 249(a)(1), despite its laudable goals, cannot withstand constitutional scrutiny, because it affords the federal government virtually unchecked discretion to prosecute crimes already being punished by the states.

1. **Because there was no need for federal intervention, and no tailoring of that intervention, § 249(a) is not an appropriate exercise of Congressional authority under the circumstances and therefore violates the Thirteenth Amendment.**

The Supreme Court has concluded that Congress has the power under § 2 of the Thirteenth amendment "*rationally* to determine what are the badges and the incidents of slavery and the authority to translate that determination into *effective* legislation." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968) (emphasis added). *Jones* involved a challenge to Congress' authority to enact 42 U.S.C. § 1982, which created a private right of action against discrimination in housing. That the Court accepted Congress' authority in enacting § 1982 as having a rational basis and being appropriately addressed to the identified harm cannot be read to confer unbridled power on Congress under the amendment.[9] Rather, courts must determine whether challenged

---

[9] For this reason, the holdings in *United States v. Cannon*, 750 F.3d 492, 505 (5th Cir. 2014), and *United States v. Hatch*, 722 F.3d 1193, 1205 (10th Cir. 2013), were incorrect in holding that

legislation is "appropriate" under the circumstances. U.S. Const., Amend XIII, § 2. In *Jones*, for example, the Supreme Court carefully examined the legislative record and relied on it in upholding § 1982.

The Supreme Court's recent federalism jurisprudence offers several means of determining the appropriateness of legislation, all of them aimed at the question whether Congress' action is narrow, tailored, and authorized by the Constitution. The *McCulloch* test, applied in *Comstock*, offers the classic formulation:

> Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.

*McCulloch,* 17 U.S. at 421. Thus, in approving Congress' authority under the Necessary and Proper clause to provide for civil commitment of sexually dangerous prisoners in 18 U.S.C. §4248, the Court pointed to multiple ways in which § 4248 protects state interests. *See Comstock*, 130 S. Ct. at 1962-64. Congress acted within the scope of its authority, the Court concluded, in light of the statute's narrow scope, which prevented infringement on the state police power. *Id.* at 1964-65.

The Court's recent case law on the Fourteenth and Fifteenth amendments –which were enacted at the same time as the Thirteenth, and contain virtually identical enforcement provisions[10] – similarly emphasizes rationality and narrowing, in light of federalism concerns.

---

*Jones* precluded them from finding § 249(a)(1) unconstitutional. Notably, despite this misreading of *Jones*, the *Hatch* court found the arguments raised here to be "worthwhile questions." 722 F.3d at 1204. Only one other appeals court has addressed the constitutionality of § 249(a)(1), but that case did not raise the same issues. *See United States v. Maybee*, 687 F.3d 1026, 1031 (8th Cir. 2012).

[10] The three Reconstruction Amendments have substantively identical enforcement clauses. They state, respectively: Congress shall have power to enforce this article by appropriate legislation,

"[P]rophylactic legislation designed to enforce the Reconstruction Amendments must 'identify conduct transgressing the … substantive provisions' it seeks to enforce and be tailored 'to remedying or preventing such conduct.'"  *Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193, 225 (2009) (quoting *Florida Prepaid Postsecondary Ed. Expense Bd. v. College Savings Bank*, 527 U.S. 627, 639 (1999)). As the Court explained with respect to the law at issue in *Austin*, Congressional legislation "imposes current burdens and must be justified by current needs." *Id.* at 203.

The Court relied on a similar approach in *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997).  There, the Court held that in order to establish as "appropriate" legislation enacted pursuant to § 5 of the Fourteenth Amendment, a court must find "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."  The Court concluded that the Religious Freedom Restoration Act's ("RFRA") provisions were "so out of proportion to a supposed remedial or preventive object" that RFRA "cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Id.* at 532. The Court pointed to the lack of support in the record for the concerns claimed to have prompted the enactment of RFRA.  *Id.* at 530-31.  *See also Kimel v. Fla. Bd. Of Regents*, 528 U.S. 62 (2000) (invalidating Age Discrimination in Employment Act as exceeding Congress's authority under § 5 of the Fourteenth Amendment, relying on *Boerne* test).

Under any of these standards, § 249(a)(1) is unconstitutional, because the legislative record established no need or narrowing of the means to address that need.  Under these circumstances, the statute is not "appropriate" under the circumstances.  *See Shelby County v. Holder*,

---

U.S. Const., Amend. XIII, § 2; The Congress shall have power to enforce, by appropriate legislation, the provisions of this article, U.S. Const., Amend. XIV, § 5; and The Congress shall have power to enforce this article by appropriate legislation. U.S. Const., Amend. XV, § 5.

133 S. Ct. 2612 (2013) (invalidating Voting Rights Act's coverage formula under a simple ra-

tionality – or appropriateness – standard). The Thirteenth Amendment gives Congress no inde-

pendent power to legislate against slavery's badges or incidents; it can only do so if such legisla-

tion is tethered to the goal of enforcing the § 1 ban on slavery (as all race-related laws passed

during the Reconstruction Era arguably were). Because of its lack of relationship to effectuating

the goals of §1 of the Thirteenth Amendment, Section 249(a)(1) is not authorized by § 2. *Cf.*

*Shelby*, 133 S. Ct. at 2628-31.

### 2. The certification process does not rescue § 249(a)(1) from its constitutional infirmity, because that process sets no practical limits on federal prosecutions.

The government may argue that § 249(b)(1)'s certification requirement is the kind of

limit on federal power that the cases discussed above contemplate. Its purpose was, concededly,

to "ensure the federal government will assert its new hate crimes jurisdiction only in a principled

and properly limited fashion." H.R. No. 86, 111th Cong., 1st Sess. (Apr. 27, 2009) at 5, 14. The

provision requires the Attorney General to certify, before a prosecution is undertaken, that (a) the

state does not have jurisdiction; (b) the state has requested the federal government to assume ju-

risdiction; (c) the verdict or sentence obtained in state court left the federal interest in eradicating

hate crimes unfulfilled; and (d) a federal prosecution is in the public interest and necessary to se-

cure substantial justice. *See* 18 U.S.C. § 249(b)(1). This provision is inadequate, because it be-

stows virtually unlimited discretion on the executive branch of the federal government. Indeed,

this case proves the point that the certification requirement does not impose any meaningful

limit.

The Department of Justice repeatedly assured Congress that § 249 would be merely a

"backstop" for state prosecutions, used only in "rare instances–where there is an inability or an

unwillingness by [a] State or local jurisdiction to proceed . . ." (S. Hrg. 14). Attorney General

Holder asserted that "[t]he certification provision in proposed 18 U.S.C. § 249(b) will not provide the Attorney General with unlimited authority" and told Congress that "the Department's discretion is limited to cases in which justice is not adequately served at the state level." (S. Hrg. 67-68). The United States Attorneys' Manual Dual and Successive Prosecution policy, Holder maintained, would preclude "a federal prosecution following a state prosecution arising from the same incident unless the matter involves a 'substantial federal interest' that the state prosecution has left 'demonstrably unvindicated,' and the prosecution is approved by the designated Assistant Attorney General." (Citing United States Attorneys' Manual § 9-2.031) (S. Hrg. 68-69).

Section 249(b)(1) provides limited means by which the government's certification may be held to account.  Here, for instance, the state *is* prosecuting Mr. Roof, and it is doing so in a manner that vindicates any arguable federal interest, by seeking the most severe possible penalty under federal *or* state law, and by alleging the racial motivation for the crime in support of that penalty.  *See State of South Carolina v. Dylann Storm Roof*, Indictment Nos. 2015-GS-10-04115-24, 2015-GS-10-04186-88, Notice of Evidence in Aggravation at 3-4 (attached as Exhibit B to this motion).  Nonetheless, the Attorney General certified this case for prosecution – and did so long before the state case was concluded.  In this respect, the federal government's prosecution of Mr. Roof has proceeded very differently from The Department's representations to Congress about how the government would apply § 249.

The government's conduct here is the fulfillment of Senator Hatch's prediction that § 249(b)(1) would have no limiting effect on federal jurisdiction, because "the Attorney General would have unlimited authority to certify prosecutions under this legislation." (S.Hrg. 67).  It therefore does not provide the kind of safeguard that renders § 249(a)(1) "appropriate."

3. **If the Court finds § 249(a)(1) constitutional, it should substantively review the government's certification decision and find federal prosecution under § 249 to be unwarranted.**

Should the Court find § 249(a)(1) constitutional, it should substantively review the government's certification decision, and find federal prosecution under § 249 to be unwarranted, in light of the circumstances discussed. The Fourth Circuit has authorized judicial review of whether certification is in the federal interest in other contexts, including federal prosecution of juveniles. *See United States v. Juvenile Male #1*, 86 F.3d 1314, 1318 (4th Cir. 1996). In *Juvenile Male #1*, the Fourth Circuit held that "the 'substantial interest' and other prongs of the certification statute act as a limits on the federal courts' jurisdiction to act in this sphere." *Id.* "[W]e can and must first satisfy ourselves that our jurisdiction has been properly invoked." *Id.* at 1321. Even if the Court accepts that the certification requirements in § 249(b)(1) are facially adequate, they are certainly not met in this case.

III. **Counts 25-33 must be dismissed under *Johnson v. United States*, because the predicate offenses alleged under 18 U.S.C. §§ 924(c)(3) and 924(j) do not qualify as crimes of violence.**

The indictment charges nine counts of use of a firearm to commit murder during and in relation to a crime of violence, under 18 U.S.C. § 924(c) & (j) (Counts 25-33). Section 924(j) provides that "Any person who, in the course of a violation of subsection (c), causes the death of a person through the use of the firearm, shall – (1) if the killing is a murder … , be punished by death or by imprisonment any term of years or for life." Section 924(c) makes it a federal crime to, "during and in relation to a crime of violence … use or carr[y] a firearm …." Section 924(c)(3) defines a "crime of violence" as:

an offense that is a felony and—

(A)  has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (B)  that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

The underlying crimes of violence alleged here are the violations of 18 U.S.C. § 249(a)(1), charged in Counts 1-9, and the violations of § 247(a)(2), charged in Counts 13-21.  *See* Dkt. 2 at ¶ 20.[11]  Following the Supreme Court's decision in *Johnson v. United States*, -- U.S. --, 135 S. Ct. 2551, 2557 (2015), however, neither offenses under § 249(a)(1) nor those under § 247(a)(2) qualify as crimes of violence.  Counts 25-33 must therefore be dismissed.

*Johnson* struck down as void for vagueness the second part of a nearly identical definition of "violent felony" in the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(2)(B)(ii) ("the residual clause").[12]  Under *Johnson*, the materially indistinguishable definition at issue here – § 924(c)(3)(B) (also referred to as a residual clause) –  must also be stricken.  Indeed, two circuits have already held that *Johnson* requires striking a provision in 18 U.S.C. § 16(b) that has exactly the same language as § 924(c)(3)(B).  *See United States v. Vivas-Ceja*, 808 F.3d 719 (7th Cir. 2015); *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015).  Since neither § 249(a)(1) nor § 247(a)(2) qualifies as a crime of violence under § 924(c)(3)(A) ("the force clause"), because neither requires the use, attempted use, or threatened use of *physical* force as defined under that provision, the § 924(j) counts must be dismissed.

---

[11] For ease of reference, these statutory provisions are spelled out on pages 25 (§ 247(a)(2)) and 27 (§ 249(a)(1)).

[12] The ACCA definition reads:  "the term 'violent felony' means any crime punishable by a term of imprisonment of more than one year . . . , that – (ii) is burglary, arson, extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."  18 U.S.C. § 924(e)(2)(B).

**A. Neither a hate crimes act under § 249(a)(1), nor obstruction of religious exercise under § 247(a)(2), qualifies as a "crime of violence" under the § 924(c) force clause.**

The Supreme Court defined the term "physical force" under § 924(c)(3)(A) in *[Curtis] Johnson v. United States*, 559 U.S. 133, 140 (2010) ("*Curtis Johnson*"):  "physical force" means "violent force"; that is, "strong physical force . . . capable of causing physical pain or injury to another person."  Thus, in order to qualify as predicate crimes of violence under § 924(j), §§ 249(a)(1) & 247(a)(2) must require the use, attempted use, or threatened use of *violent* physical force.

In determining this, courts employ the "categorical approach," looking only to the statutory definition of an offense – its elements – and not to the particular facts underlying it.  *See Descamps v. United States*, -- U.S. --, 133 S. Ct. 2276, 2283 (2013); *United States v. Royal*, 731 F.3d 333, 341-42 (4th Cir. 2013).[13]  Under the categorical approach, an offense only qualifies as a "crime of violence" if all the criminal conduct covered by the statute – "including the most innocent conduct" – matches or is narrower than the "crime of violence" definition.  *See United States v. Torres-Miguel*, 701 F.3d 165, 167 (4th Cir. 2012).  *See also Mathis v. United States*, -- S. Ct. --, 2016 WL 3434400, at *3-4 (discussing and reaffirming basic tenets of categorical approach).

In a narrow range of cases, a court may look beyond the legal definition of the offense to a small list of judicial documents to determine whether the offense qualifies under the categorical approach.  This is known as the "modified categorical approach," and it applies only if the statute

---

[13] Although much of the law in this area refers to the ACCA, the same categorical approach applies in determining whether an offense qualifies as a "crime of violence" under § 924(c)'s definition.  *See United States v. Fuertes*, 805 F.3d 485, 498 (4th Cir. 2015).

at issue is "divisible." *Descamps*, 133 S. Ct. at 2283. A statute is divisible if it describes alternative elements, "thereby defin[ing] multiple crimes." *Mathis*, 2016 WL3434400, at *4. It does not apply when a statute merely describes alternative means of satisfying a single element. *Id*. at *5. Elements, as distinguished from means, are factual circumstances of the offense that the jury must find unanimously and beyond a reasonable doubt. *Id.* at *10; *see also Omargharib v. Holder*, 775 F.3d 192, 198-99 (4th Cir. 2014).

### 1. Section 247(a)(2) may not serve as a § 924(j) predicate under the force clause, because it does not require the use or attempted use of violent physical force.

Section 247(a)(2) provides that: "[w]hoever … (2) intentionally obstructs, by force or threat of force, any person in the enjoyment of that person's free exercise of religious beliefs . . ." may – if death results – be sentenced to life, any term of years, or death. The statute may at first glance appear to qualify as a crime of violence because of its use of the phrase "by force or threat of force." "Force" is a term of art in this context, however. Section 247(a)(2) does not require *violent physical force*, as required by precedent in this area; instead, the offense may be committed by simple force, which may be satisfied by the merest touching. *Cf. Curtis Johnson*, 559 U.S. 133,138-39 (2010) (discussing definitions of "force").

In enacting § 247, Congress did not provide a definition of "force," but it offered in justification for the legislation examples of religious obstruction ranging from "simple vandalism" to "more dangerous acts of destruction." H.R. Rep. 99-820 at 1 (Sept. 12, 1986). There are few published opinions addressing § 247(a)(2), and none of them address the definition of "force" as used in the statute. Nor do any standard jury instructions define the term (although there are instructions describing the elements of § 247(a)(1)).

In elaborating on religious obstruction, however, Congress described various ways in which the statute might be violated without the use or attempted use of violent physical force.

For instance, the House Report notes as examples of obstruction defacing buildings or religious texts, and assault.  *See* H.R. Rep. 99-820 at 1-2.  All of these acts may be accomplished by force, but without violent physical force.  *Cf. Royal*, 731 at 341-2 (holding that Maryland second degree assault is not a categorical crime of violence because it reaches any unlawful touching).  *Compare United States v. McNeal*, 818 F.3d 141, 153 (4th Cir. 2016) (finding bank robbery to be crime of violence because it requires taking by "force and violence").

Assaultive conduct is a particularly useful example.  Recently, the Fourth Circuit held that North Carolina common law robbery was not a violent felony under the ACCA.  *See United States v. Gardner*, -- F.3d --, 2016 WL 2893881, at *7 (4th Cir. May 18, 2016).  The Court reasoned that because the act of pushing the victim could sustain a conviction under state law, North Carolina common law robbery did not necessarily require the use, attempted use, or threatened use of violent physical force under *Curtis Johnson*.  *Id.* Pushing or restraining a victim could as easily constitute obstruction by force under § 247(a)(2), putting the provision at issue here outside § 924(c)'s definition of "crime of violence" under the force clause.

The indictment's citation to § 247(d)(1), which provides for a death sentence "if death results" from the obstruction of religious exercise, has no bearing on this analysis.  As the Fourth Circuit has held, death may "result" from activity that does not reach the threshold of use or threatened use of violent physical force under the force clause.  *See United States v. Torres-Miguel*, 701 F.3d 165, 168 (4th Cir. 2012) ("of course, a crime my result in death or serious injury without involving use of physical force").  *Torres-Miguel* cited poisoning as one example involving no use of physical force, but it is possible to conceive others which might more likely present under § 247(a)(2), such as blockading the entrance to a church or spreading hazardous chemicals in a parking lot.  *Cf. United States v. Perez-Vargas*, 414 F.3d 1282, 1286 ("[S]everal examples

[exist] of third degree assault that would not threaten the use of physical force: … intentionally placing a barrier in front of a car causing an accident, or intentionally exposing someone to hazardous chemicals.").

Because § 247(a)(2) does not require the use or attempted use of violent physical force, it is not a crime of violence under § 924(c)(3)(A), and may not serve as a predicate under § 924(j).

**2.   Section 249(a)(1) may not serve as a § 924(j) predicate under the force clause, because it does not require the use or attempted use of violent physical force.**

Section 249(a)(1) provides that:

> Whoever … willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person … (B) shall be imprisoned for any term of years or for life, fined in accordance with this title, or both, if— (i)   death results from the offense.

The elements of a § 249(a)(1) offense are:  (1) that the defendant willfully causes or attempts to cause; (2) bodily injury to any person; (3) because of their actual or perceived race, color, religion, or national origin.  *See United States v. Cannon*, 750 F.3d 492, 505 (5th Cir. 2014).  As with § 247(a)(2), these elements do not categorically require the use, attempted use, or threatened use of violent physical force (*Curtis Johnson* force).  As a result, § 249(a)(1) may not serve as a predicate offense to § 924(j) under the force clause.

As discussed with respect to § 247(a)(2), "causing" injury is insufficient to establish violent physical force.  *See supra* p. 26 (citing *Torres-Miguel*, 701 F.3d at 168).  Supporting this proposition, the "injury" specified in § 249 may be anything from a bruise, to an illness, to "any other injury to the body, no matter how temporary."  *See* 18 U.S.C. § 249(c)(1) (defining "bodily

injury" pursuant to 18 U.S.C. § 1365(h)(4)).[14] This construction corresponds exactly to the poisoning example given in *Torres-Miguel*, or any of the other examples cited therein. *See* 701 F.3d at 168; *see also Perez-Vargas*, 414 F.3d at 1287 (citing assault examples).

The means cited in the statute – "through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device" – do not change the analysis. As the Supreme Court recently explained in *Mathis*, alternative methods of committing an offense are not determinative; only elements carry weight under the categorical approach. *See* 2016 WL 3434400, at *10-11. The Fourth Circuit's recent decision in *Royal* applied this rationale to find that Maryland second degree assault was categorically a crime of violence. Because a conviction for second degree assault requires only the unanimous finding that "the defendant caused offensive physical contact with, or harm to, the victim," – that is, the jury need not be unanimous as to which – "offensive physical contact" and "physical harm" are means, not elements. 731 F.3d at 341. Likewise, a defendant may be convicted of the crime defined in § 249(a)(1) without a finding as to any of the listed means, and without proof of the use, attempted use, or threatened use of violent physical force. *See Cannon*, 750 F.3d at 505.

Because § 247(a)(2) does not require the use or attempted use of violent physical force, it is not a crime of violence under § 924(c)(3)(A), and may not serve as a predicate under § 924(j).

**B. Section 924(c)(3)'s residual clause is unconstitutionally vague.**

Since the statutes at issue here fail to qualify as "crimes of violence" under § 924(c)(3)'s force clause, the remaining question is whether the offenses can qualify as a "crimes of violence" under § 924(c)(3)' s residual clause. They cannot under *Johnson*. *Johnson*'s holding that the

---

[14] "Injury" under § 1365(h) is: "(A) a cut, abrasion, bruise, burn, or disfigurement; (B) physical pain; (C) illness; (D) impairment of the function of a bodily member, organ, or mental faculty; or (E) any other injury to the body, no matter how temporary."

ACCA's "residual clause" is unconstitutionally vague applies equally to the "crime of violence" definition in § 924(c)(3)' s residual clause, which suffers the same flaws that compelled the Supreme Court to declare the ACCA's residual clause void for vagueness. Using § 924(c)(3)(B) to categorize a predicate conviction as a "crime of violence" therefore violates due process.

1. **Johnson expressly overruled the "ordinary case" approach to determining whether a felony qualifies as a "Crime of Violence."**

In addition to invalidating the residual clause in the ACCA, *Johnson* invalidated the process by which courts categorize prior convictions as violent felonies under the Act. In *Johnson*, the Supreme Court held that the ACCA residual clause is unconstitutionally vague because *the process* by which courts categorize prior convictions as violent felonies is too "wide-ranging" and "indeterminate." 135 S. Ct. at 2557. As a result, the ACCA "both denies fair notice to defendants and invites arbitrary enforcement by judges." *Id. Johnson* concluded that the Supreme Court's four previous attempts to articulate a workable test to determine whether a felony falls under the ACCA residual clause had failed. *Id.* at 2558-59. "Grave uncertainty" therefore surrounded the method of determining the risk posed by the "judicially imagined 'ordinary case'." 135 S. Ct. at 2557.

The residual clause "requires a court to picture the kind of conduct that the crime involves 'in the ordinary case,' and to judge whether that abstraction presents a serious risk of potential injury." 135 S. Ct. at 2557. (citation omitted). This approach derives from *James v. United States*, 550 U.S. 192 (2007), in which the Court held that, under the residual clause, "[w]e do not view [the categorical] approach as requiring that every conceivable factual offense covered by a statute must necessarily present a serious potential risk of injury before the offense can be deemed a violent felony. . . . Rather, the proper inquiry is whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to

another." *Id.* at 208 (citations omitted). "As long as the offense is of a type that, by its nature, presents a serious risk of injury to another, it satisfies the requirements of [the ACCA's] residual clause." *Id.* at 209. *Johnson* concluded, however, that there was no "generally applicable test that prevents the risk comparison required by the residual clause from devolving into guesswork and intuition." *Id.* at 2559.

The same must be true of § 924(c)(3)'s residual clause. The constitutionality of the ACCA residual clause would not have been in question if the statute had required the jury to determine the risk based on the individual facts in the case. *Id.* The Court explained that it was not doubting any statute that "require[s] gauging the riskiness of conduct in which an individual defendant engages on a particular occasion." *Johnson* at 2561 (emphasis added). Because the quantum of risk under § 924(c)(3)'s residual clause is assessed based on the ordinary case, like the ACCA's residual clause, it is constitutionally doomed.

### 2. *Johnson* means that § 924(c)(3)(B) is unconstitutionally vague.

The statutory phrase at issue in this case is essentially the same as the ACCA residual clause. Courts regularly compare the residual clause in the ACCA to the clause at issue here.[15] *See, e.g., Chambers*, 555 U.S. at 133, n.2 (2009) (citing circuit splits on § 16(b) in the context of a residual clause case because § 16(b) "closely resembles ACCA's residual clause") (Alito, J., concurring); *United States v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) (relying on an ACCA case to interpret the definition of a crime of violence under § 924(c)(3)(B)); *United States v. Aragon*, 983 F.2d 1306, 1314 (4th Cir. 1993) (same).[16]

---

[15] The comparison tends to be to 18 U.S.C. § 16(b), but that statute's residual clause is identical to § 924(c)(3)(B).

[16] *See also Addo v. Attorney General*, 355 Fed. App'x 672, 677 (3d Cir. 2009) (non-precedential) ("The inquiry under § 16(b) and under the ACCA are analogous ...."); *United States v. Keelan*,

To be sure, 18 U.S.C. § 924(e)(2)(B)(ii) and 18 U.S.C. § 924(c)(3)(B) are not identical.[17]

But the differences have no impact on the constitutional analysis. *See Viva-Cejas*, 808 F.3d at

722; *Dimaya*, 803 F.3d at 1114-15. Although the risk at issue in the ACCA is a risk of injury,

and the risk at issue in § 924(c) is a risk that force will be used, this difference is immaterial to

the due process problem and has no impact on the application of the *Johnson* decision.[18]  The

Court's holding did not turn on the type of risk, but rather on how a court assesses and quantifies

the risk.[19] That inquiry is the same under both the ACCA and § 924(c). Both statutes require

---

786 F.3d 865, 871 n.7 (11th Cir. 2015) (describing the ACCA otherwise clause and § 16(b) "analogous"); *Roberts v. Holder*, 745 F.3d 928, 930-31 (8th Cir. 2014) (using both ACCA cases and § 16(b) cases to define the same "ordinary case" analysis); *United States v. Sanchez-Espinal*, 762 F.3d 425, 432 (5th Cir. 2014) (despite the fact that the ACCA talks of risk of injury and § 16(b) talks of risk of force, "we have previously looked to the ACCA in deciding whether offenses are crimes of violence under § 16(b)").

[17] In pertinent part, the ACCA residual clause defines a "violent felony" as an offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). Section 924(c)(3)(B) defines a crime of violence as one that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

[18] *See Jimenez-Gonzales v. Mukasey*, 548 F.3d 557, 562 (7th Cir. 2008) (noting that, "[d]espite the slightly different definitions," the Supreme Court's respective analyses of the ACCA and § 16(b) perfectly mirrored each other). *See also United States v. Gomez-Leon*, 545 F.3d 777 (9th Cir. 2008); *United States v. Coronado-Cervantes*, 154 F.3d 1242, 1244 (10th Cir. 1998); *United States v. Kirk*, 111 F.3d 390, 394 (5th Cir. 1997); *United States v. Bauer*, 990 F.2d 373, 374 (8th Cir. 1993) (describing the differences between the statutes as "immaterial").

[19] Of course, many federal and state criminal laws include "risk" standards that employ adjectives similar to those in the ACCA and § 924(c), such as "substantial", "grave", and "unreasonable". And the Supreme Court in *Johnson* said it did not mean to call most of these into question. But, as Justice Scalia's majority opinion observed, that is because the vast majority of such statutes require gauging the riskiness of conduct in which an individual defendant engages on a particular occasion; in other words, applying such a standard to "real-world conduct."  By contrast, the ACCA's residual clause, and § 924(c)(3) too, require it to be applied to "an idealized ordinary case of the crime," an "abstract inquiry" that "offers significantly less predictability." *Johnson*, 135 S. Ct. at 2558.

courts first to picture the "ordinary case" embodied by a felony,[20] and then decide if it qualifies

as a crime of violence by assessing the risk posed by the "ordinary case." *See Dimaya*, 803 F.3d

at 1116.

The Fourth Circuit has applied the ordinary case analysis in a recent § 924(c) case. *See*

*United States v. Fuertes*, 805 F.3d 485, 500 n.6 (4th Cir. 2015) (applying ordinary case analysis

in § 924(c) context). Courts regularly apply it with respect to 18 U.S.C. § 16(b), which is identi-

cal in its language to § 924(c). *See Avila*, 770 F.3d at 1107 (applying ordinary case analysis in §

16(b) context). Since § 16(b) and § 924(c)(3)(B) are identical, it makes sense – although the

Fourth Circuit has thus far reserved the question, *see Fuertes*, 805 F.3d at 499 n.5 – that the "or-

dinary case" analysis must apply to § 924(c), as well, rendering its residual clause invalid under

*Johnson*.[21] Indeed, in litigating *Johnson*, the government, through the Solicitor General, agreed

---

[20] Both the ACCA and § 924(c)(3)(B) require courts to discern what the ordinary case of a crime is by examining the elements using a categorical approach. *See, e.g., United States v. Butler*, 496 Fed. App'x 158, 161 n.4 (3d Cir. 2012); *Evans v. Zych*, 644 F.3d 447, 453 (6th Cir. 2011); *United States v. Serafin*, 562 F.3d 1104, 1108 (10th Cir. 2009); *United States v. Green*, 521 F.3d 929, 932 (8th Cir. 2008); *United States v. Acosta*, 470 F.3d 132, 134 (2d Cir. 2006). *United States v. Amparo*, 68 F.3d 1222, 1225 (9th Cir. 1995). Courts may not consider the factual means of committing any given offense, but must consider the nature of the offense in the "ordinary case," regardless of whether the ACCA, § 924(c)(3)(B), or § 16(b) is at issue.

[21] Other courts likewise require the ordinary case analysis when the statutory language of § 16(b) (and thus § 924(c)(3)(B)) is at issue. *See, e.g., Keelan*, 786 F.3d at 871 (following the "uniform rule" of "all other circuits to have examined the issue" and adopting "ordinary case" analysis for § 16(b)); *United States v. Ramos-Medina*, 706 F.3d 932, 938 (9th Cir. 2012) (citing *James* as the source of the "ordinary case" analysis required by § 16(b)); *Van Don Nguyen v. Holder*, 571 F.3d 524, 530 (6th Cir. 2009) (considering § 16(b) and concluding that " [t]he proper inquiry is one that contemplates the risk associated with the proscribed conduct in the mainstream of prosecu-tions brought under the statute."); *United States v. Sanchez-Garcia*, 501 F.3d 1208, 1213 (10th Cir. 2007) (same).

that the phrases at issue in *Johnson* and here pose the same problem. In noting that the definitions of a crime of violence in both § 924(c)(3)(B) and § 16(b) are identical, the Solicitor General stated:

> Although Section 16 refers to the risk that force will be used rather than that injury will occur, it is equally susceptible to petitioner's central objection to the residual clause: Like the ACCA, Section 16 requires a court to identify the ordinary case of the commission of the offense and to make a commonsense judgment about the risk of confrontations and other violent encounters.

*Johnson v. United States*, S. Ct. No. 13-7120, Supplemental Brief of Respondent United States at 22-23 (available at 2015 WL 1284964 at *22-*23). The Solicitor General was right. Section 924(c)(3)(B) and the ACCA are essentially the same and contain the same flaws. This Court should hold the government to that concession, which is consistent with the Fourth Circuit's approach.

Section 924(c)(3)(B), like the ACCA residual clause, thus requires the "ordinary case" analysis to assess the risk involved in a predicate offense, and how risky that ordinary case is. Since this is the identical analytical step that brought down the ACCA residual clause, § 924(c)'s residual clause cannot survive constitutional scrutiny either. As a consequence, 924(c)'s residual clause cannot be used to support a conviction under § 924(j).

**CONCLUSION**

The crimes at issue here are extremely grave, but under the Constitution they are not properly charged.  The defendant therefore requests that the indictment be dismissed.

Respectfully submitted,

s/ *Sarah S. Gannett*
Sarah S. Gannett
Assistant Federal Public Defender
Federal Public Defender for the District of Arizona
850 W. Adams St., Suite 201
Phoenix, AZ 85007
(602) 382-2862
sarah_gannett@fd.org

David I. Bruck
Washington & Lee School of Law
Lexington VA 24450
540-458-8188
bruckd@wlu.edu

Michael P. O'Connell
PO Box 828
Mt. Pleasant, SC 29464
843-577-9890
moconnell@stirlingoconnell.com

Attorneys for Dylann S. Roof

34