IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

**FILED UNDER SEAL**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 2:15-CR-472 |
| | ) | |
| DYLANN STORM ROOF | ) | |

**MOTION TO SUPPRESS STATEMENTS AND EVIDENCE
AND MEMORANDUM IN SUPPORT**

The defendant Dylann Storm Roof, through counsel, hereby moves pursuant to the Fourth and Fifth Amendments to the United States Constitution to suppress statements taken and evidence seized by law enforcement. Specifically, the motion alleges:

(1) The defendant's statement should be suppressed because his *Miranda* waiver and the statement itself were involuntary.

(2) Certain seizures from Mr. Roof's car were unreasonable, requiring suppression, because they exceeded the scope of the warrant.

(3) Certain items seized from the home of Amy Roof and Danny Beard should be suppressed because the search warrant does not establish reason to believe that any evidence of the crime would be found on the seized items.

In addition, despite the existence of controlling Fourth Circuit authority, the defense wishes to preserve for further review by the Fourth Circuit and the Supreme Court its

1

contention that the media searches conducted were overbroad, and that suppression of the evidence discovered in the process is required.

Before setting out these constitutional claims, counsel wish to emphasize that this motion is being made only because the defense has been compelled to proceed to trial by the government's notice of intent to seek the death penalty.  Should the government's death notice be withdrawn at any point in the future, Mr. Roof will withdraw this motion and plead guilty as charged to all counts in the indictment.

### I.     Mr. Roof's post-arrest statement should be suppressed because both the *Miranda* waiver and the statement itself were involuntary.

Because the defense has not yet completed its evaluation of Mr. Roof's physical and mental condition, we are not prepared at this time to proceed to hearing on the voluntariness aspects of the motion to suppress.  The videotape of the defendant's interrogation reveals unusual behaviors by Mr. Roof that raise concerns regarding the voluntariness of his waiver and custodial confession, but we are still in the process of assessing the potential significance of these behaviors in light of his mental health status.  The defense therefore requests that the Court hold this portion of the motion in abeyance pending a further defense submission.  Meanwhile, to comply with the Court's order of July 9, 2016 (Dkt. No. 180), requiring filing of motions to suppress by July 18, 2016, we offer this summary of the material facts and governing law as they are currently known to us.

### A. Neither the *Miranda* waiver nor the statement may be considered voluntary, in light of the tactics employed by the police and Mr. Roof's particular vulnerability to them.

Under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), and the Fifth Amendment to the United States Constitution, a defendant's waiver of his rights against self-incrimination and to have counsel present during custodial interrogation, as well as any statement he gives, must be voluntary. The government has the burden to prove, by a preponderance of the evidence, that the defendant's *Miranda* waiver and statement were voluntarily given. *See Colorado v. Connelly*, 479 US 157, 168 (1996); *United States v. Dodier*, 630 F.2d 232, 235 (4th Cir. 1980). The defendant's actions "must have been voluntary in the sense that [they were] the product of free and deliberate choice rather than intimidation, coercion or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The analysis for voluntariness of *Miranda* waivers and the voluntariness of statements, is the same: "whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired" due to coercive police conduct. *See United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002) (quoting *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987), and *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)).[1]

A finding of coercion does "not depend upon actual violence by a government agent . . . ." *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991). Rather, in determining whether a defendant's will has been overborne or his capacity for self-determination impaired, courts must examine "the totality of the circumstances," including "the characteristics of the defendant, the setting of the interview, and the details of the

---

[1] For *Miranda*, there is a second inquiry: "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Burbine*, 475 U.S. at 421. This is addressed at Part I.B.

3

interrogation." *Pelton*, 293 F.2d at 1071.  A variety of factors may be considered, such as: the youth of the accused; his lack of education; his low intelligence; the length and conditions of his detention and questioning; and the deprivation of food or sleep.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (citing cases).

    Here, there are indicia both that the defendant's will was overborne and that his capacity for self-determination was impaired.  This is not a case in which the defendant was physically or verbally abused.  However, the discovery provided to date reveals some coercive tactics and – importantly – leaves questions that must be answered before the Court can be assured that Mr. Roof's *Miranda* waiver and statement were voluntarily given.  For instance, according to video of his arrest,[2] Mr. Roof, who is barely 5'9" and 120 pounds – was surrounded by five much larger police officers.  They ordered him out of his car and frisked him, then handcuffed him and took him to a patrol car for transport.  Before putting him in the car, however, they subjected him to a second, very physically aggressive pat-down search.  Once he was in the car, several of the officers openly celebrated his arrest with high-fives, fist pumps, and gestures directed at the car he was sitting in.

    Although the video helpfully reveals these coercive tactics, *cf. Cristobal*, 293 F.3d at 141, there is much it does not reveal.  The only sound in the video is inside the car, so there is no recording of anything the officers said to the defendant.  In addition, during

---

[2] *See* US-VID-025 (submitted as Exhibit 1); US-VID-026 (submitted as Exhibit 2).  These exhibits, along with the video of the defendant's statement (submitted as Exhibit 3), have been submitted to the Court on flash drives.  Copies have been provided to the government and lodged with the Clerk's Office.

4

much of the encounter outside the car, the officers are standing between the camera and Mr. Roof, making it impossible to see what is happening to him.  Finally, the camera is turned off during transport, so there is no record of any conversation that may have occurred between the officer driving and the defendant while en route to the police station.

Once at the police station, recordings did not resume until the defendant was seated in the interrogation room, pending questioning.  *See* Video Statement of Dylann Roof (submitted as Exhibit 3).[3]  A period of between two to three hours elapsed, while Mr. Roof sat silently, shackled, under police watch.[4]  While the video reveals that law enforcement officers provided Mr. Roof with some lunch and a bottled water, and that they spoke to him in a friendly manner while he was seated handcuffed at a table under the watch of an armed guard, it is also true that armed police officers and FBI agents repeatedly came in and out of the room without providing him with any information about what would happen to him, and without commencing questioning.  *Compare Pelton*, 835 F.2d at 1073 (noting that interviews were conducted by "unarmed agents in a public hotel, not in a 'police office or in a hostile or unusual environment,'" and that "the defendant was allowed to use the telephone, move freely about the questioning room, and leave unaccompanied for brunch") (internal citation omitted).  Once the interrogation began, the agents involved used long, leading questions.

---

[3] A transcript of the statement also is attached, for the Court's convenience.  *See* Exhibit 4.
[4] Mr. Roof is arrested at 10:38 a.m., and his statement begins at 1:38 p.m.

Mr. Roof was vulnerable to the coercive tactics employed here, for a number of reasons, including:

- youth, *see generally*, Lawrence Steinberg, *A Social Neuroscience Perspective on Adolescent Risk-Taking*, 28 Developmental Rev. 78-136 (Mar. 2008) (discussing progression of brain development in young people through their twenties);

- lack of sleep, *see generally* Mark Blasgrove, *Effects of Length of Sleep Deprivation on Interrogative Suggestibility*, 2(1) Journal of Experimental Psychology: Applied, 48-59 (Mar. 1996);[5]

- mental health and neurological issues, *see* Dkt. No. 245 (Defendant's 12.2 Notice).

In combination, these "personal characteristics" combine to "provide[] support for a finding that [Mr. Roof's] will was overborne." *Pelton*, 835 F.2d at 1073-74. The defense reserves argument on the manner in which his will was overborne, pending completion of our mental condition evaluation.

### B. The government cannot establish Mr. Roof's knowing and intelligent waiver of his Miranda rights, in light of his mental condition.

A *Miranda* "waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." *Burbine*, 475 U.S. at 421 (internal citation omitted). The defense reserves argument on this point, pending completion of our mental condition evaluation.

---

[5] Mr. Roof can be seen on the video nodding off just before the interrogation begins.

## II. Various Fourth Amendment violations require the suppression of evidence seized in the course of the investigation.

In the course of the investigation, South Carolina law enforcement and the FBI searched Mr. Roof's car, the two homes in which he lived, and issued warrants for various electronic media purportedly associated with Mr. Roof. Most of these items were searched pursuant to warrants issued by South Carolina judicial officials. Several of those warrants were flawed for one reason or another, requiring suppression of the evidence seized in connection with them.

### A. Certain seizures from Mr. Roof's car were unreasonable, requiring suppression, because they exceeded the scope of the warrant.

In order to be valid under the Fourth Amendment, a search warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The purpose of this particularity requirement is to avoid "a general, exploratory rummaging in a person's belongings." *Andresen v. Maryland*, 427 U.S. 463, 480 (1976) (internal quotation marks omitted). *See generally Stanford v. Texas*, 379 U.S. 476, 481-85 (1965) (describing history and purpose of particularity requirement).[6] A sufficiently particular warrant describes the items to be seized in such a manner that it leaves nothing to the discretion of the officer executing the warrant. *See Marron v. United States*, 275 U.S. 192, 196 (1927). Any search conducted pursuant to a warrant is limited in scope by the terms of the warrant's authorization. *Walter v. United*

---

[6] Put another way, searching officers may be said to have disregarded the terms of a warrant when they engage in "indiscriminate fishing" for evidence. *United States v. Chen*, 979 F.2d 714, 717 (9th Cir.1992).

7

*States*, 447 U.S. 649, 656 (1980) (plurality); *see also United States v. Squillacote*, 221 F.3d 542, 555 (4th Cir. 2000).

Prior to searching the defendant's car following his arrest, police properly sought a warrant. The warrant authorized police to seize: "Any and all evidence to include, but not limited to, latent prints, hairs, DNA, fibers, fluids, blood, or other biological evidence; weapons, weapon components, ammunition, projectiles; and/or any photographs, cellular devices, contraband, narcotics, U.S. currency, and/or documents, clothing, and articles of identification that could aid in the criminal investigation of Murder." *See* SLED Warrant for Hyundai Elantra, attached at Exhibit 5. Police, however, seized virtually everything found in the car, including three flash drives, a laptop computer, a GPS device, and six DVDs/CDs.[7] *See* Warrant Return, attached at Exhibit 6. These items were not contemplated by the warrant, their connection to the "Murder" would not have been apparent during the search, and their seizure is indicative of the fishing expedition in which law enforcement was engaged. *See United States v. Legg,* 18 F.3d 240, 242 (4th Cir.1994) ("the seizure of items not described in the warrant violates the Fourth Amendment").

Since the defendant was in custody and had confessed by the time the warrant was issued and the search was conducted, there was no need to proceed with the unauthorized seizures. Law enforcement could have awaited proper authorization. The failure to do so requires suppression.

---

[7] A warrant that contemplated seizing electronic media should have read "documents and data." *Cf. United States v. Okun*, 2009 WL 255624, at *11 (E.D. Va. Feb. 2, 2009).

B. **Certain items seized from the home of Amy Roof and Danny Beard must be suppressed because the search warrant does not establish reason to believe that any evidence of the crime would be found on them**.

An essential requirement of the Fourth Amendment is that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that [contraband or evidence of a crime] will be found in the place to be searched." *United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993); *see also United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (finding that warrant adequately described basis for belief that evidence of marijuana trafficking would be found at residence).

Immediately following the offense, law enforcement conducted a consent search of the home of the defendant's mother, Amy Roof and her partner, Danny Beard, and a separate consent search of the home of the defendant's father, Bennett Roof. According to the search warrant affidavit prepared for a subsequent search of Amy Roof and Danny Beard's home, law enforcement obtained evidence in these searches, including: a camera shared by the defendant and Amy Roof, a forensic image of a computer shared by the defendant and Bennett Roof, and multiple photographs of Amy Roof and Danny Beard's home, depicting various items of interest to law enforcement (*e.g.*, computers, flash drives, VCR tapes, and floppy disks). Based on the consent search, law enforcement obtained a search warrant to recover the objects depicted in the photographs and other evidence of the crimes now alleged in the indictment. *See* Search Warrant for Roof/Beard Home, attached at Exhibit 7. The warrant affidavit indicated that substantial

evidence already had been collected from the electronic media seized from the defendant's car and his parents' homes.

Under these circumstances, the affidavit for the search of the Roof/Beard home should have identified *why* law enforcement expected to find *additional* evidence there. The circumstances suggested the opposite: the defendant took with him in his car a computer and three flash drives, plus a journal and handwritten notes, all of which were recovered after the shooting. From law enforcement's interaction with Bennett Roof, it appeared that the defendant conducted desktop computer work there. And Amy Roof had already turned over her camera, which she shared with the defendant.[8] Contrary to the boilerplate assertions in Attachment B to the warrant affidavit for the Roof/Beard home, the mere existence of additional electronic media in the house does not automatically provide reason to believe that additional evidence of the crime would be contained on it. If that were so, all of the electronic media in any home would be automatically subject to search in every case. *Cf. United States v. Weber*, 923 F.2d 1338, 1344 (9th Cir. 1990) (rejecting use of boilerplate allegations in child pornography investigation).

To the contrary, the Constitution requires that law enforcement state reason to believe that contraband will be found in the place to be searched. Because it failed to do so with respect to the search of the Beard/Roof home, the items seized there[9] must be suppressed.

### C. The defense wishes to preserve the point that the media searches conducted were overbroad, requiring suppression of the evidence

---

[8] Amy Roof told police that she shared "electronic devices" with the defendant. *See* Exhibit 7.
[9] *See* warrant return, attached as Exhibit 8.

> **discovered in the process, for further review by the Fourth Circuit and the Supreme Court.**

The "central concern underlying the Fourth Amendment" is "the concern about giving police officers unbridled discretion to rummage at will among a person's private effects." *Arizona v. Gant*, 556 U.S. 332, 345 (2009). In fact, the Amendment was the "founding generation's response" to indiscriminate searches under general warrants, which had given customs inspectors blanket authority to search where they pleased for smuggled goods. *Riley v. California*, 134 S. Ct. 2473, 2494 (2014); *see Stanford v. State of Texas*, 379 U.S. 476, 481 (1965). To bring an end to this practice, the framers required that police discretion be limited by warrants "particularly" describing "the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; *Maryland v. Garrison*, 480 U.S. 79, 84-85 (1987).

As a function of the particularity requirement, police must not "unreasonably expand the scope" of a search beyond what the warrant authorizes. *Stabile*, 633 F.3d at 241. They may not, for example, "search for false tax documents by viewing the suspect's home video collection." *United States v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013). Rather, the particularized "description of items to be seized limits the scope of the search to areas where those items are likely to be discovered." *United States v. Mann*, 592 F.3d 779, 782 (7th Cir. 2010) (suppressing portion of child pornography uncovered in search for digital images evidencing voyeurism).

Today, most of the Circuits require minimization in the inspection of electronic media, reasoning that police must "avoid searching files of the type not identified in the

11

warrant" and that the "search method must be tailored to meet allowed ends." *United States v. Stabile*, 633 F.3d 219, 238-39 (3d Cir. 2011) (citing cases); *United States v. Richards*, 659 F.3d 527, 538-39 (6th Cir. 2011) (same). Here, there is no evidence that law enforcement limited its searches of electronic media to areas where evidence was likely to be found. The warrants for the various media searches contain no procedures at all for minimizing the intrusiveness of the investigation.[10] Because the searches were unreasonably expansive, the digital evidence recovered in connection with these warrants should be suppressed.

However, alone among the courts of appeals,[11] the Fourth Circuit has adopted the rule that a computer search warrant always authorizes "cursory" review of the content of each file. *United States v. Williams*, 592 F.3d 511, 521-22 (4th Cir. 2010) ("[T]he warrant impliedly authorized officers to open each file on the computer and view its contents, at least cursorily, to determine whether the file fell within the scope of the warrant's authorization."). The defense recognizes that *Williams* forecloses relief here,

---

[10] This claim applies to all searches of digital media, including the warrants relating to the searches of the digital media seized from the car and from the Roof/Beard home, and to any phone or social media searches.

[11] *Compare Stabile*, 633 F.3d at 238-39; *Richards*, 659 F.3d at 538-39. *Accord United State v. Mann*, 592 F.3d 779, 786 (7th Cir. 2010) (police must ensure search is "narrowly tailored to uncover only those things described"); *United States v. Galpin*, 720 F.3d 436, 452 (2d Cir. 2013) (holding that the inspection should be no broader than necessary); *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1177 (9th Cir. 2010) (en banc) (noting that the digital context requires courts to exercise "greater vigilance… in striking the right balance between the government's interest in law enforcement and the right of individuals to be free from unreasonable searches and seizures.").

and raises this issue solely in order to preserve it for further review by the Fourth Circuit and the Supreme Court.

## CONCLUSION

For the foregoing reasons, the defense requests that the Court suppress statement and evidence at issue here. A hearing is requested on this motion.

Respectfully submitted,

s/ *Sarah S. Gannett*
Sarah S. Gannett
Assistant Federal Public Defender
Federal Public Defender for the District of Arizona
850 W. Adams Street, Suite 201
Phoenix, AZ 85007
602-382-2862
sarah_gannett@fd.org

David I. Bruck
Washington & Lee School of Law
Lexington VA 24450
540-458-8188
bruckd@wlu.edu

Attorneys for Dylann S. Roof