IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

**FILED UNDER SEAL**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO.: 2:15-CR-472 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| DYLANN STORM ROOF | ) | |

**MOTION TO SUPPRESS WRITINGS AND MEMORANDUM IN SUPPORT**

On or about August 3, 2015, government employees entered the defendant's jail cell, without his knowledge, and removed, photocopied and provided to federal prosecuting authorities a 31-page handwritten document containing extremely sensitive, confidential, case-related material. The defendant had written this material in response to questions posed by his defense counsel and to guide future discussions between them regarding his thought processes. The document was photocopied from the defendant's private notepad by a government investigator and then returned to the defendant's cell and replaced there in a manner that effectively concealed from the defendant the fact that his private papers had been seized and copied. Indeed, the fact of the seizure remained unknown to the defendant and his counsel until counsel learned of it from an attorney for the government 18 days after it occurred, on Friday, August 21, 2015.

1

This seizure and subsequent copying and dissemination of the defendant's personal and confidential papers violated the defendant's Fourth Amendment protection against unreasonable searches and seizures, the attorney-client privilege, and his Sixth Amendment right to counsel. By this motion, the defense requests that this Court prohibit all direct or derivative use by the government of the document. The defense also seeks a hearing regarding the circumstances surrounding this unlawful search and seizure and other remedial and prophylactic relief, including sealing the document and enjoining law enforcement from referring to the document or sharing its contents in any way with third parties.

## FACTUAL BACKGROUND

The information that follows is based on information and belief and represents what defense counsel have ascertained to date based on the discovery and the defense investigation.

The defendant was arrested in Shelby, North Carolina on June 18, 2015, and charged with having committed nine murders the previous evening at the Emanuel African Methodist Episcopal ("AME") Church in the City of Charleston. He waived extradition, was flown to Charleston the same day, and has been continuously held at the Charleston County Detention Center ("CCDC") since June 18, 2015, pending trial in this Court and in the Charleston County Court of General Sessions. Prosecutors are seeking the death penalty in both jurisdictions.

When Mr. Roof arrived at CCDC, a member of the Criminal Intelligence Unit of the Charleston County Sheriff's Office, Laura Mosher, immediately began reading and copying all of his incoming and outgoing mail, and transmitting it to the FBI. This is unusual; in ordinary cases, inmate mail receives only a cursory review for contraband by non-law enforcement officers. On or about August 3, 2015, Mosher read a letter addressed by the defendant to his sister that contained an extensive quotation. Officer Mosher researched the quotation, which turned out to be from Johann Wolfgang von Goethe's well-known novel "The Sorrows of Young Werther," a copy of which the defendant possessed in his cell.[1] In her research, Mosher learned that the book told a story of unrequited love, ended with the protagonist's suicide, and that its publication in the 18th Century was followed by a spate of suicides.[2] Mosher took the letter to the jail's Chief Deputy, Willis Beatty, who briefly placed Mr. Roof on a "15-minute watch," which required officers to check on him every fifteen minutes. The jail mental health staff quickly determined that the defendant was not suicidal and this "watch" was abandoned later the same day.

Meanwhile, without the supervisory authority required under such circumstances, and contrary to the direction of Chief Deputy Beatty, members of the Criminal Intelligence Unit also searched the defendant's cell, even though he had already been

---

[1] The book was permitted reading in the Charleston County Detention Center. It had been mailed from the book seller to the jail consistent with jail regulations and approved by the jail for delivery to the defendant.

[2] The quotation in the letter does not itself refer to suicide or suicidal ideation.

3

secured elsewhere. That search, conducted by Mosher's direct subordinates, was far more intrusive than jail policy permits under these circumstances, had no rational relationship to any legitimate security purpose, and led to the discovery of the document at issue here. *See* Exhibit 1. Mosher's subordinate, Lisa Bloodworth, took possession of the defendant's notepad and, rather than simply ascertaining it contained no contraband or potentially dangerous items, as might be expected in a targeted safety check, elected to read through it, and removed it from his housing unit to copy it. The copy was delivered to Mosher, who forwarded a copy to the FBI as relevant to the criminal investigation. There was no claim that the document, which was returned to Mr. Roof's cell after being copied, was contraband or posed any threat to Mr. Roof or the institution.

The seized document was written as part of the defendant's communication with his attorneys and was maintained with the defendant's other personal items. At the time that law enforcement officers of the Charleston County Sheriff's Department obtained and copied the defendant's notepad, Mr. Roof was being represented by two lawyers in this Court, and by two lawyers in state court. The writings addressed numerous topics that had been discussed by the defendant and his counsel between June 18 and August 3, 2015, including the significance of various facts in his life history, his background, ideas, beliefs, habits, preferences, and opinions, and about the events at the Emanuel AME Church on June 17, 2015. The defendant prepared the document in order to organize his thoughts so that he could provide accurate and consistent answers to the repeated

questions that his lawyers had been asking him, and its contents reflect that. He explains and expands on certain facts and ideas about which he was in conversation with counsel and describes his disagreement with others. The defendant did not intend to send the document to anyone, or to disclose its contents to anyone – except for members of his defense team – and there is no evidence that he did.

An FBI "taint" reviewer ultimately delivered the document to the federal prosecution team after unilaterally deciding that it was not privileged, and federal prosecutors shared a copy with the state prosecutors.

## LEGAL ARGUMENT

The evidence will show that CCDC staff manufactured an excuse to rummage through the defendant's protected legal materials in search of evidence that could be used against him at his criminal trial. No medical or security rationale justified reading, copying, or providing to the FBI the contents of the defendant's notepad, which – in the end – was surreptitiously returned to his cell and left there in its original condition, presumably to avoid any awareness by the defendant and his counsel of this surveillance and seizure. The Court should suppress the illegally-obtained document on two grounds:

(1) The warrantless and surreptitious seizure of the document from his cell violated the defendant's rights under the Fourth Amendment to the United States Constitution.

(2) The seizure and dissemination of the documents violated the defendant's attorney-client privilege, and his Sixth Amendment right to have confidential communications with his lawyers and to confer with them in preparing his defense.

I. **The seizure and reproduction of the journal was unreasonable under the Fourth Amendment, because it was demonstrably unrelated to any legitimate security concern.**

At the outset, the defendant acknowledges that Fourth Amendment protections are far narrower in a jail setting than elsewhere. While it is true that in most circumstances, prisoners have no reasonable expectation of privacy in their cells, *see Hudson v. Palmer*, 468 U.S. 517 (1984), such is not the case where the inmate is a pre-trial detainee and the search is undertaken for the specific purpose of seizing evidence to be used in a prosecution rather than to promote jail security.

It is obvious from the surreptitious nature of the search that it was not motivated by, and cannot be justified by, the requirements of jail security. The copied document could not have been contraband, nor did it pose any threat to staff or inmates at the jail, because it was returned to the defendant's cell after it was copied. There can be no explanation for this other than that jail staff had fulfilled their prosecutorial, investigative motive. Those who seized and copied the document evidently did not want the defendant or his counsel to know what had transpired, and one may infer that the responsible authorities hoped in restoring the status quo following the seizure that their stealth might allow for the seizure of still more incriminating evidence in the future.

Under these circumstances, and because the defendant is a pretrial detainee rather than an already-sentenced prison inmate, the search can be justified neither by the authority of jail personnel to ensure institutional order and security, *Bell v. Wolfish*, 441

6

U.S. 520 (1979), nor by the Supreme Court's broad declaration, in a case involving sentenced prisoners, that "the Fourth Amendment has no applicability to a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 536 (1984). This precedent cannot "insulate from review actions taken in bad faith and for no legitimate purpose." *Whitley v. Albers*, 475 U.S. 312, 322 (1986); *see also Williams v. Benjamin*, 77 F.3d 756, 765 (4th Cir. 1996).

*Hudson* was a civil rights action brought by an inmate who was serving a sentence in a Virginia state prison. A corrections officer entered his cell for a shakedown search and in the course of the search destroyed some documents. The district court granted summary judgment in favor of the officer on the prisoner's claim that the search was unreasonable. The court of appeals reversed, holding that the Fourth Amendment prohibited searches of individual prisoners' cells unless "'done pursuant to an established program of conducting random searches of single cells or groups of cells reasonably designed to deter or discover the possession of contraband' or upon reasonable belief that the particular prisoner possessed contraband." *Id*. at 522 (internal citation omitted). On certiorari, the Supreme Court reversed, finding that the exigencies of prison security in a state penitentiary were simply incompatible with the existence of a Fourth Amendment right of privacy in a convicted prison inmate's cell. *Id. at* 536.

Despite its seemingly broad sweep, *Hudson v. Palmer* did not decide the applicability of the Fourth Amendment to pretrial detainees, since *Hudson* involved a convicted, sentenced prisoner. Five years before *Hudson*, in *Bell v. Wolfish,* 441 U.S. 520

(1979), the Court had rejected a group of pretrial detainees' Fourth Amendment challenges to visual body-cavity searches and "shakedown" cell inspections conducted outside the inmates' presence. But the *Bell* Court stopped short of declaring that the Fourth Amendment had no application in the context of pretrial confinement. Rather, *Bell* carefully limited its ruling to the Fourth Amendment claims before it, and assumed without deciding that pretrial detainees retain "a diminished expectation of privacy."

> It may well be argued that a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell and that therefore the Fourth Amendment provides no protection for such a person. *Cf. Lanza v. New York*, 370 U.S. 139, 143-144 (1962). In any case, given the realities of institutional confinement, any reasonable expectation of privacy that a detainee retained necessarily would be of a diminished scope. *Id.*, at 143. Assuming, *arguendo*, that a pretrial detainee retains such a diminished expectation of privacy after commitment to a custodial facility, we nonetheless find that the room-search rule does not violate the Fourth Amendment.

441 U.S. at 556-557.

Read together, then, *Bell v. Wolfish* and *Hudson v. Palmer* leave room for some residual expectation of privacy in the personal notes and papers of a pretrial detainee. More specifically, the Supreme Court's cases leave open the question of whether the broad authority of jail staff to conduct searches to ensure institutional order and security may enlisted as a pretext for rifling through the private papers of pretrial detainees in search of evidence with which to convict them at trial. *Cf. Florida v. Wells*, 495 U.S. 1, 4 (1990). In *United States v. Cohen*, 796 F.2d 20 (2d Cir. 1986), the Second Circuit, faced

with circumstances like those presented here, found that pretrial detainees do retain some Fourth Amendment protection in the personal papers within their prison cells.

In *Cohen*, the defendant was in pre-trial confinement. Approximately a year before his trial, a correctional officer entered the defendant's cell to conduct a so-called "contraband" search. This search lasted approximately 30 minutes and consisted entirely of an examination of the defendant's papers. A short time later, the officer returned and examined the defendant's papers for another hour. The prosecuting Assistant U.S. Attorney later admitted that he had initiated the "contraband search" by the jail staff. He had directed the jail authorities "to look for certain types of documents that may have contained the names and phone numbers of other of the defendant's co-conspirators and witnesses who [the defendant] had already contacted and was still in the process of trying to contact." *Id.* at 21.

A detective used the information gathered by the correctional officer to establish probable cause for a search warrant of the defendant's cell. A magistrate issued a warrant that authorized the seizure of all "written non-legal materials belonging to the defendant." Pursuant to the search warrant, the correctional officer and a detective "seized numerous sheets of paper from the defendant's cell which included witness lists, notes on specific charges, personal matters, notes on conversations with his attorneys and a piece of paper upon which the government contended the defendant was practicing his handwriting." *Id.* at 21.

The defendant moved to suppress the documents seized. The district court suppressed some of the material on Sixth Amendment grounds but refused to suppress the remaining papers (that were not related to attorney-client communications) or to declare the search unlawful on Fourth Amendment grounds. *Id.* On appeal, the defendant challenged the warrantless search of his cell by the lone correctional officer as an unreasonable search in violation of the Fourth Amendment. He further challenged the search conducted pursuant to the search warrant since the probable cause upon which the warrant had issued originated from the lone correctional officer's unlawful warrantless search.

The government relied on *Hudson v. Palmer*, *supra,* for the proposition that the Fourth Amendment provides no protection for a prisoner's claim of a privacy right in his jail cell. However, the Second Circuit found that *Hudson* did not control. The court acknowledged "that when a prison restriction infringes upon a specific constitutional guarantee, it should be evaluated in light of institutional security," and that since "security is the main objective of prison administration[,] prison officials must have broad latitude to adopt rules that protect the safety of inmates and corrections personnel and prevent escape or unlawful entry." *Id*. at 21-22. The court also acknowledged the holding in *Hudson* that prisoners have no Fourth amendment rights in prison cells.

The Second Circuit framed the question before it as follows: "We are left then with deciding whether the consistent holdings of the Supreme Court in the several

decisions recited mean that a pre-trial detainee retains no Fourth Amendment rights, regardless of the circumstances underlying the search. This is the view the government urges." *Id.* at 23.  The court, however, declined to adopt the government's position and reversed the district court's refusal to suppress the fruits of the search of the defendant's cell.  The court held that "the search [was not] even colorably motivated by institutional security concerns.  The Supreme Court in *Hudson* did not contemplate a cell search intended solely to bolster the prosecution's case against a pretrial detainee awaiting his day in court." *Id.*     This case is similar to *Cohen*.  In seizing Mr. Roof's notepad, reproducing it, and returning it, staff did not display even a colorable motivation relating to institutional security.  Any concern about Mr. Roof's safety could have been addressed simply by the most cursory physical inspection of the notepad by ordinary detention officers tasked only with the defendant's safety. Instead, intelligence officers who were focused on the defendant's case and who had prioritized reviewing all his mail themselves intervened in this suicide check and used it as an opportunity to read what the defendant was writing, including materials relating to the defense of his case.  *Cf. Nordstrom v. Ryan,* 762 F.3d 903, 910-11 (9th Cir. 2014) (authorizing inspection of an inmate's outgoing mail, in his presence, "to make sure it does not contain, for example, a map of the prison yard, the time of guards' shift changes, escape plans, or contraband").

The only difference between this case and *Cohen* is that in *Cohen*, the prosecutor admitted to sending jail staff to search Cohen's cell to obtain evidence.  *See* 796 F.2d at

11

21. Here, the discovery provided to the defense does not acknowledge this. However, the defense investigation has revealed facts supporting a similar investigative motive:

- Beginning immediately after the defendant's arrival in Charleston, Officer Mosher (an intelligence officer) collected and read all of the defendant's mail, a task usually assigned to non-law enforcement officers. She also regularly copied it and sent it to the FBI.

- Officer Mosher has maintained regular communication with state and federal law enforcement, throughout the defendant's stay at the Detention Center.

- After Officer Mosher reported the *Sorrows of Young Werther* quotation, Detention Center Chief Deputy Willis Beatty ordered a "15 minute watch" on the defendant – a procedure requiring only that unit personnel look in on him periodically, as a precautionary measure.

- Officer Mosher's staff nonetheless undertook a suicide "watch," which required that the defendant be removed from his cell and dressed in a "suicide gown." It also required officers to box up his belongings and remove anything that might "pose a threat to the inmate's safety." *See* Al Cannon Detention Center Suicide Screening Policies, attached at Exhibit 2, at 4-5.

- Officer Mosher's staff conducted a full search of the defendant's cell – in contravention of the Suicide Screening Policies – which included seizing and reviewing all of his legal documents and writings. Bloodworth, a member of Mosher's team, then copied the defendant's writings – without notice to him – and had the originals returned to his cell. Staff did not maintain the writings (or any of the defendant's belongings) in a box, as required by the Policies. *See id.*

- Mosher swiftly delivered the contested writings to the FBI as relevant to the criminal investigation. There was no allegation that the writings posed a threat to the defendant or the institution. Indeed, as noted, they were surreptitiously returned to his cell.

- Mental health professionals saw the defendant that same day, found that he was not suicidal, and removed any suicide precautions.

12

- Later, the FBI sent an subpoena *duces tecum* to the Detention Center for materials related to the defendant (including, belatedly, the writings at issue here). In response, Mosher sent a directive to her staff to gather the requested material, commenting, "[i]f we need to toss his cell *again* so be it." (emphasis added).

- The FBI delivered the document to the federal prosecutors, who in turn delivered it to the state prosecutors.

The defense believes that a hearing will likely produce additional support for the defendant's contention that the surreptitious seizure in this case was conducted to gather evidence against him. The circumstances that are already known – particularly that the notepad was of so little security concern that it was returned to Mr. Roof's cell after it was reproduced – bring this case within the ambit of *Cohen*, and dictate the same result. *Compare United States v. Clark*, 2002 WL 31368922, at *5 (S.D. Ohio Oct. 2, 2002) (following *Cohen*, finding initial search justified by security concerns, but finding Fourth Amendment violation for failure to follow institutional procedure and disclosing material to law enforcement).

## II.  The seizure and reproduction of the notepad violated the attorney-client privilege and Sixth Amendment, because the notepad contained writing intended to aid the defendant in communication with his defense team.

Even if the document at issue had been lawfully seized on the grounds that a pretrial detainee has no reasonable Fourth Amendment expectation of privacy in his papers, the seized document was nevertheless protected by the attorney-client privilege, and its dissemination to state and federal prosecutors violated the defendant's Sixth

Amendment right to counsel. This is so because the document is privileged, having been created in response to numerous confidential attorney-client discussions about the subject matter it contained, and with the purpose of promoting the defendant's privileged communications with his attorneys.

Whether the seizure violated the defendant's Sixth Amendment rights involves a wholly separate inquiry from the question of whether the Fourth Amendment protected the document from seizure. "An inmate does not . . . knowingly waive an attorney-client privilege with respect to documents retained in [his] cell simply because there is no reasonable expectation of privacy in those documents for Fourth Amendment purposes. Rather, the two inquiries are independent of each other." *United States v. DeFonte*, 441 F.3d 92, 94 (2d Cir. 2006). Prisoners are not completely stripped of constitutional protections while incarcerated. *See Wolff v. McDonnell*, 418 U.S. 539, 575-576 (1974). They retain the right to assistance of counsel, which includes having confidential communications with their attorneys and an attorney-client relationship free of government interference. *Nordstrom,* 762 F.3d at 910; *Mastrian v. McManus*, 554 F.2d 813, 821 (8th Cir. 1977). Any other rule would, inhibit the free exchange of information between attorneys and their detained clients. *See Nordstrom*, 762 F.3d at 911(citing *Weatherford v. Bursey*, 429 U.S. 545, 554 n.4 (1977)). Despite the many restrictions and deprivations of privacy that are incident to pretrial detention, a jail is not – and the defendant's jail cell must not become -- a Panopticon of such total surveillance that

14

detainees lose the ability to think and organize their thoughts about their own legal predicament free from aggressive government monitoring.

In *United States v. DeFonte*, 441 F.3d 92 (2d Cir. 2006), the Second Circuit encountered facts very similar to those here. In that case, a female jail inmate (Collazos) sought a protective order to prevent the disclosure to a criminal defendant of a journal that she had kept "during her time of incarceration, recording, *inter alia*, incidents involving [the defendant] and conversations with both her attorney and government prosecutors." The court described the journal as containing two types of writings. "First, Collazos memorialized certain private conversations between Collazos and her attorney. Second, Collazos also recorded various events in her daily life, namely incidents involving DeFonte and discussions with prosecutors. Collazos claims that the second group of entries were made for the purpose of later discussions with her attorneys." *Id*. at 95.

The court quickly sustained Collazos's claim of privilege as to the first category of writing, which consisted of her notes on meetings with her own attorney. As the second, the court acknowledged that the journal had never been delivered to Collazos's attorney, and thus the "various events in her daily life" that she intended to convey to her attorney were never, in fact, communicated to her counsel. The district court had viewed this lack of an actual communication as dispositive, and had ruled that it was not protected by the attorney-client privilege. But the court of appeals disagreed, observing that "an outline of

what a client wishes to discuss with counsel – and which is subsequently discussed with one's counsel – would seem to fit squarely within our understanding of the scope of the privilege." *Id.* at 96.

The document surreptitiously lifted from the defendant's cell in this case was, in effect, a summary of topics which the defendant (1) had already discussed, (2) intended to further discuss, and (3) subsequently did discuss with his attorneys, and the reasoning of *DeFonte* is equally applicable here. *Accord United States v. Allen*, 2016 WL 315928, at *2 (S.D.N.Y. 2016) (following *DeFonte* in recognizing attorney-client privilege for client's notes, whether or not communicated to attorney); *People v. Rolark,* 2013 WL 2278083 (Mich. App. 2013) (same, in finding privilege for jail inmate's outline of matters he intended to discuss with a potential new attorney, even though he had not yet contacted or retained the attorney); *People v. McRae,* 959 N.E.2d 1254 (Ill. App. 2011) (same, observing that the inmate's failure to keep his still-undelivered letter to counsel in an envelope marked "legal mail" did not, in and of itself, amount to a waiver of the attorney-client privilege).

In short, the writing was no less privileged as an attorney-client communication because it was not so identified (*e.g.*, marked as "mail" to be physically sent his attorneys), but rather represented the defendant's private efforts to memorialize his answers to questions that his attorneys were posing in the course of many confidential

attorney-client conferences beginning immediately after his arrest.[3]  The document was written by the defendant as an integral part of the process of consultation with counsel, and was never made public or knowingly disclosed to anyone.  In the setting that jail authorities found and seized it, the document's relationship to the preparation of Mr. Roof's defense was obvious.  There is no constitutional requirement that such documents be expressly labelled as attorney-client documents, nor does any rule or regulation of the Charleston County Detention Center create such a requirement.

"The guiding principle in determining whether or not there exists a privileged attorney-client relationship is the intent of the client. The key question in determining the existence of a privileged communication is 'whether the client reasonably understood the conference to be confidential.'"  *Kervik v. Goldstein*, 724 F.2d 844, 849 (1st CCA 1984), quoting MCCORMICK ON EVIDENCE, § 91 at 189 (1972).  The defendant, isolated in a segregation cell, had the right to create a private document to help him memorialize and organize his thoughts so he could effectively communicate confidences with the lawyers working on his case and better respond to their questions about his actions, statements, thought processes, and mental status.  He never intended that anyone else would actually see the document.  He did intend that the information in the document he would discuss with his lawyers would be kept confidential, and for his part, he did what he could to keep

---

[3] It is not surprising that the document contains statements that feed the government's theory of the case, nor that it contains what may appear to be oddly personal, non-legal details.  Both the nature of the charges and the defendant's own interests are commonly parts of the conversation between death-eligible clients and their counsel.

it confidential.

Once it is acknowledged that the defendant's writing was protected by the attorney-client privilege, having been created as part of the preparation of his legal defense, the violation of his Sixth Amendment right to the assistance of counsel is clear. *Bishop v. Rose,* 701 F.2d 1150 (6th Cir. 1983) (prosecution violated defendant's right to counsel when it impeached his trial testimony with a preliminary draft of his letter to defense counsel that had been seized during a valid, non-pretextual search of his jail cell). In *Weatherford v. Bursey*, 429 U.S. 545, (1977), the Supreme Court enunciated several factors in determining whether an intrusion into the attorney-client relationship has produced a Sixth Amendment violation. Three of these factors are relevant to this case: whether the invasion of the attorney-client relationship was intentional, whether the Government used the evidence to the defendant's "substantial detriment" (or used evidence derived from the intrusion), and whether the defendant was prejudiced. 429 U.S. at 554-556.

In this case, the invasion was clearly intentional, and the government will likely use the evidence both in preparing and in presenting its case at trial. For obvious reasons, the evidence obtained through the seizure of the defendant's private papers, prepared by him in connection with his attorney-client conferences, could not be more prejudicial, and the defendant is therefore entitled to the relief he seeks. *Cf. United States v. Morrison*, 449 U.S. 361, 365-66 (1981) (requiring showing of "demonstrable prejudice or

substantial threat thereof" to support request for remedy for violation of Sixth Amendment right).

## **RELIEF REQUESTED**

For the foregoing reasons, the defendant asks this Court for the following relief:

1. To maintain this motion and pleadings or other documents relating to it under seal, so as to avoid irreparable damage to the defendant's right to a fair trial by an unbiased and impartial jury.

2. To conduct an *in camera* hearing on this motion, to further develop the evidence regarding the circumstances of the search and seizure at issue.

3. To suppress the document at issue here and exclude from evidence any and all documents secretly taken by state or federal government employees from the defendant's cell.

4. To prohibit any person having knowledge of the seizure or the contents of the defendant's writings that are the subject of this motion from further disclosing it to any witness or any other unauthorized person. Those persons who have disclosed the contents of the defendant's writing shall be required to detail what was disclosed and the name of the person that it was disclosed to.

5. To require the government to demonstrate, upon motion of the defendant, that any evidence offered at trial did not derive, directly or indirectly, from information obtained as a result of the unlawful seizure and copying of the defendant's writings.

6. To require all state and federal prosecutorial and law enforcement agencies and all employees of such agencies ("employees" includes elected officials) to return to the defendant's lawyers all documents and copies of documents unlawfully obtained from the defendant's cell, and to retain no such documents or copies.

Respectfully submitted,

s/ *Sarah S. Gannett*
Sarah S. Gannett
Assistant Federal Public Defender
Federal Public Defender for the District of Arizona
850 W. Adams Street, Suite 201
Phoenix, AZ 85007
602-382-2862
sarah_gannett@fd.org

David I. Bruck
Washington & Lee School of Law
Lexington VA 24450
540-458-8188
bruckd@wlu.edu

Attorneys for Dylann S. Roof