IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 2:15-CR-472 |
| | ) | |
| DYLANN STORM ROOF | ) | |

**DEFENDANT'S MOTION TO STRIKE THE DEATH PENALTY
AS A POSSIBLE PUNISHMENT IN THIS CASE**

The defendant, through counsel, submits the following challenges to the

constitutionality of the death penalty generally and aspects of the Federal Death Penalty

Act. The defense acknowledges that certain of these challenges are foreclosed by

Supreme Court or Fourth Circuit precedent, but we wish to preserve them for further

review by those courts in light of developing law, including those changes that reflect

"the evolving standards of decency that mark the progress of a maturing society." *Trop v.

Dulles*, 356 U.S. 86, 101 (1958).

The facts of this case are indisputably grave. But if, as we contend here, the

FDPA is unconstitutional, no one can be lawfully sentenced to death or executed under it,

no matter what his crimes. *See Furman v. Georgia,* 408 U.S. 238 (1972) (invalidating all

pending death sentences in the United States without case-by-case examination of the

facts or proceedings in each case). For this reason, this motion does not address the facts

of the crimes for which the defendant has been charged.

1

Before setting out our constitutional claims, counsel wish to emphasize that this motion, which raises *only* questions related to the death penalty, is being filed solely as a result of the government's decision to seek the defendant's execution rather than accepting his proffered pleas of guilty and willingness to accept multiple sentences of life imprisonment without possibility of release.  Should the government's death notice be withdrawn at any point in the future, Mr. Roof will withdraw this motion and plead guilty as charged to all counts in the indictment.  Moreover, many of the issues raised here deal with concerns specific to capital jury trials, all of which may still be avoided should the government withdraw its insistence, Dkt. No. 182, that the defendant be tried and sentenced by a jury.

## I.    The death penalty – in and of itself – constitutes an unconstitutional punishment.

In *Glossip v. Gross*, -- U.S. --, 135 S. Ct. 2726 (2015), Justices Breyer and Ginsburg issued a call for reconsideration of the constitutionality of the death penalty, aligning themselves with several other justices who have expressed similar views in the four decades since the Court reversed its earlier decision that capital punishment violates the Eighth Amendment. *See* 135 S. Ct. at 2755-80 (2015) (Breyer and Ginsburg, JJ., dissenting).[1]  In support of their conclusion that "the death penalty, in and of itself, now

---

[1] Justice Breyer recently urged again that the Court reconsider the constitutionality of the death penalty, in his dissent from the denial of certiorari in *Brooks v. Alabama*, 136 S. Ct. 708 (Mem.) (Jan. 21, 2016) ("The unfairness inherent in treating this case differently from others which used similarly unconstitutional procedures only underscores the need to reconsider the validity of capital punishment under the Eighth Amendment. *See Glossip v. Gross*, 576 U.S. __ 135 S.Ct. 2726, 2755–56 (2015) (Breyer, J., dissenting).").

likely constitutes a legally prohibited 'cruel and unusual punishmen[t],'" Justice Breyer, who authored the joint dissent, wrote:

> In 1976, the Court thought that the constitutional infirmities in the death penalty could be healed; the Court in effect delegated significant responsibility to the States to develop procedures that would protect against those constitutional problems. Almost 40 years of studies, surveys, and experience strongly indicate, however, that this effort has failed. Today's administration of the death penalty involves three fundamental constitutional defects: (1) serious unreliability, (2) arbitrariness in application, and (3) unconscionably long delays that undermine the death penalty's penological purpose. Perhaps as a result, (4) most places within the United States have abandoned its use. I shall describe each of these considerations, emphasizing changes that have occurred during the past four decades. For it is those changes, taken together with my own 20 years of experience on this Court, that lead me to believe that the death penalty, in and of itself, now likely constitutes a legally prohibited "cruel and unusual punishmen[t]." U.S. Const., Amdt. 8.

*Id.* at 2755-56.[2]

Less than two months later, the Connecticut Supreme Court, relying heavily on Justices Breyer's analysis, held that "the death penalty… is so out of step with our contemporary standards of decency as to violate the state constitutional ban on excessive and disproportionate punishment." *State v. Santiago*, 318 Conn. 1, 45-46, 122 A.3d 1 (Conn. 2015), *reconsideration denied*, 319 Conn. 912 (2015).[3]  The Connecticut Supreme

---

[2] We do not repeat here Justice Breyer's thorough and detailed analysis (more than 40 pages in length); rather, we offer a summary for the Court's convenience.

[3] Although decided on state constitutional grounds, *Santiago* ruled that "when construing the state constitutional freedom from cruel and unusual punishment, we broadly adopt the framework that the federal courts have used to evaluate eighth amendment challenges." *Santiago*, 318 Conn. at 45-46.

Court cited the *Glossip* dissent for a number of factual and legal propositions critical to the *Santiago* holding, including:

- "[n]otably, by 2012, less than 2 percent of the nation's counties accounted for all of the death sentences imposed nationwide" (318 Conn. at 80);

- "between 1973 and 1995, state and federal courts found errors in more than two thirds of the capital cases that they reviewed" (*id.* at 93 n.96);

- "[s]tatistical analyses have demonstrated to a near certainty that innocent Americans have been and will continue to be executed in the post-*Furman* era" (*id.* at 104); and

- "court[s], not legislature[s] ultimately must determine whether capital punishment comports with evolving standards of decency because [these] are quintessentially judicial matters ... [that] concern the infliction—indeed the unfair, cruel, and unusual infliction—of a serious punishment [on] an individual. " (*id.* at 138-39).

The first Federal Death Penalty Act ("FDPA") case to address the realities of the modern death penalty as outlined in the *Glossip* dissent was *United States v. Sampson*, 2015 WL 7962394, at *20 (D. Mass. Dec. 2, 2015). There, although the court denied the defendant's multiple challenges to the FDPA on the pre-*Glossip* record presented in that case, it nevertheless concluded, citing the *Glossip* dissent and its own prior ruling on the issue, that "[t]he court remains concerned … about the potential rate of error in federal capital cases generally and the risk of the execution of the innocent particularly."

Since then, *Glossip*'s call for reconsideration of the constitutionality of the death penalty has been raised in other FDPA cases,[4] most recently in *United States v. Fell*,

---

[4] *See, e.g.*, *United States v. James Watts*, 4:14-cr-40063-JPG-1 (S.D. Ill.), Dkt. 150.  This motion remains pending.

4

5:01-cr-00012-GWC-1 (D. Vt.), where the court conducted a nine-day evidentiary hearing on the constitutionality of the Federal Death Penalty Act that concluded on July 21, 2016. In *Fell*, the court received testimony on all of the issues outlined in Justice Breyer's opinion, and so developed a comprehensive and up-to-date record of the FDPA's Fifth and Eighth Amendment deficiencies, including:

> (1) The rate of error, *i.e.*, the high number mistakes by judges, prosecutors, police, or defense counsel, requiring new trials or sentencing hearings – and sometimes exonerations;

> (2) The arbitrariness in the FDPA's application, *i.e.*, how the exercise of prosecutorial and juror discretion results in regional, racial, and gender disparities in which defendants receive the death penalty;

> (3) The unavoidable delay built into the process, intended to protect against that error, but which has failed to do so, and which undermines the purpose of capital punishment, often at the expense of victim family members; and

> (4) Abandonment of use of the death penalty in most states under evolving standards of decency.

Counsel are informed that the record of the *Fell* hearing will be available by the end of August for this Court's consideration in connection with this motion.

In light of the recent developments outlined in the *Glossip* and *Santiago* opinions, as supplemented by the factual showing made at the *Fell* hearing, this Court should rule that the federal death penalty constitutes a legally prohibited, arbitrary, cruel and unusual punishment prohibited by both the Fifth and Eighth Amendments.

II.     **The FDPA is unconstitutional because it fails to provide a structure that permits a reasoned choice between a sentence of life without the possibility of release and execution.**

When the Supreme Court reinstated the death penalty in 1976, it did so subject to the requirement that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976). That pronouncement followed from *Furman v. Georgia*, which had held that "as a result of giving the sentencer unguided discretion to impose or not to impose the death penalty for murder, the penalty was being imposed discriminatorily, wantonly and freakishly, and so infrequently that any given death sentence was cruel and unusual." *Id.* at 220–21 (footnote omitted).

The essential components of the new "guided discretion" scheme – under which the American death penalty system still operates – were that the pool of death eligible defendants would be narrowed in an objective way, and that every eligible defendant would then be entitled to individualized sentencing in which his or her character and background were put into evidence and the jury given unfettered discretion to exercise mercy. As more thoroughly discussed in Justice Breyer's dissent in *Glossip* and the Connecticut Supreme Court's decision in *Santiago*, and as demonstrated at the evidentiary hearing in *Fell*, this delicate balance of discretion and objective reliability has proved unattainable.

6

Members of the Supreme Court identified the legal tension in this balancing act more than twenty years ago, and have struggled with it since.  Arguing that *Furman* and *Lockett* "cannot be reconciled," Justice Scalia announced in 1990, that he would no longer enforce the requirement of individualized sentencing.  *Walton v. Arizona*, 497 U.S. 639, 664 (1990).  Justice Thomas took a similar position in 1993.  *See Graham v. Collins*, 506 U.S. 461, 479 (1993).  And Justice O'Connor also expressed concern with the difficulty of achieving consistency while allowing the consideration of individual characteristics.  *See California v. Brown*, 479 U.S. 538 (1987).

Most famously, in 1994, Justice Blackmun announced that "[f]rom this day forward, I no longer shall tinker with the machinery of death."  *Callins v. Collins*, 510 U.S. 1141 (1994) (Blackmun, J., dissenting from denial of certiorari).  He explained:

> For more than 20 years I have endeavored-indeed, I have struggled-along with a majority of this Court, to develop procedural and substantive rules that would lend more than the mere appearance of fairness to the death penalty endeavor. Rather than continue to coddle the Court's delusion that the desired level of fairness has been achieved and the need for regulation eviscerated, I feel morally and intellectually obligated to concede that the death penalty experiment has failed.

*Callins*, 510 U.S. at 1145.  Justice Blackmun noted that "discretion could not be eliminated from capital sentencing without threatening the fundamental fairness due a defendant when life is at stake," because "evolving standards of decency required due consideration of the uniqueness of each individual defendant when imposing society's ultimate penalty."  *Id.* at 1147-49.  *See also Woodson v. North Carolina*, 428 U.S. 280, 301 (1976) (plurality opinion).  Instead, "[e]xperience has shown that the consistency and

rationality promised in *Furman* are *inversely related* to the fairness owed the individual when considering a sentence of death.  A step towards consistency is a step away from fairness."  *Callins*, 510 U.S. at 1147–49.  *See also Woodson*, 428 U.S. at 301 (plurality opinion)

If the inherently conflicting commands that the "sentencer's discretion to impose death must be closely confined, but the sentencer's discretion not to impose death (to extend mercy) must be unlimited," have confounded the Justices who developed them, it should not be surprising that they have proven impossible for jurors to follow. The most comprehensive study to date on the actual process by which death sentences are meted out is by the Capital Jury Project, a research program by a consortium of universities on how people who served on actual capital juries made the life and death decisions in those cases.[5]  In June of 2007, New Mexico State District Judge Garcia dismissed a death notice in a case, in part because of the findings of the CJP.[6]  Those findings demonstrate jurors' multiple difficulties with the guided discretion scheme, including:

- the jurors' disturbing propensity (more than 50% of the time) to decide the penalty issues before the penalty phase begins, thereby effectively excluding mitigation from the sentencing calculus;

- a lack of juror understanding of what constitutes mitigation, and how it relates to the jurors' sentencing function;

- a widespread lack of understanding of the instructions given by the judge; and

---

[5] More information on the Capital Jury Project, which interviewed nearly 2000 jurors from more than 350 trials in over a dozen states, is available at http://www.albany.edu/scj/13189.php.
[6] *State v. Dominguez*, D-0101-CR-200400521, *State v. Good*, D-0101-CR-00522, order entered June 8, 2007.

- evidence that the jury decision-making process in death penalty cases is so flawed as to violate constitutional principles.

The CJP specifically identified "seven deadly sins" of capital juries and jury selection procedure that unfairly increase the likelihood of a death verdict:

1. premature decision-making;[7]

2. death bias;[8]

3. mitigation impairment;[9]

4. a widespread belief that death is mandatory in some cases;[10]

5. evasion of responsibility for sentencing decisions;[11]

6. the persistence of race as a factor in sentencing decisions;[12] and

---

[7] The CJP found that 30.3% of jurors had decided to vote for death before the penalty phase had even begun. *See* William J. Bowers, Wanda J. Foglia, *Still Singularly Agonizing*, 39 Crim. Law Bulletin 51, 57 (2003).

[8] Many of the jurors who survived death-qualification and decided capital cases probably should have been excluded as jurors who would automatically vote for the death penalty. *Id.* at 62. "Over half of the CJP jurors indicated that death was the only punishment they considered acceptable for murder committed by someone previously convicted of murder (71.6%); a planned or premeditated murder (57.1%); or a murder in which more than one victim is killed (53.7%)." *Id.* Furthermore, about 10% of the CJP jurors admitted that the questions during voir dire designed to ferret out these prejudices made them more likely to think the defendant "must be" or "probably was" guilty and deserved to be sentenced to die. *Id.* at 65.

[9] "[A] great many people who actually served as capital jurors did not understand the instructions they were supposed to be following." *Id.* at 65. For example, 49.2% of CJP jurors thought that mitigating evidence had to be proven beyond a reasonable doubt. *Id.* at 69.

[10] Half of the CJP jurors erroneously believed that the death penalty was required if the evidence showed that the crime was "heinous, vile, or deprived" or that the defendant would be "dangerous in the future." *Id.* at 72.

[11] For example, only 29.8% of CJP jurors believed that the jury was strictly responsible in the 10 states where a jury's decision is binding on the trial judge. *Id.* at 75.

[12] In the 70 cases studied where there was a black defendant and a white victim, "the percentage of death sentences was 30% when there were less than five white male jurors, but rose to 70.7%

7. the belief that life sentences will not result in lengthy incarcerations.[13]

Worse, studies also show that jury instructions do little to ameliorate these concerns. *See* C. Haney, L. Sontag and S. Constanzo, *Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death*, 50 Journal of Social Issues 49 (1994). The authors of the Haney study interviewed 57 capital jurors from nineteen death penalty trials conducted under a California statute very similar to the FDPA. Contrary to the bromide that jurors are presumed to follow instructions, *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *United States v. Francisco*, 35 F.3d 116, 119 (4th Cir. 1994), the authors found that – in this context – jurors either failed to apply or misapplied the instructions:

- one third of the jurors sampled focused on the nature of the crime in a way that essentially created a legally spurious presumption for death;

- for many of the jurors, the absence of mitigation was the only reason given for the imposition of a death sentence, shifting the burden to the accused;

- the jurors misused the instructions to limit their consideration of some of the evidence admitted during the penalty phase, and to insulate them from the impact of their decision;

- many of the jurors dismissed mitigation evidence outright because they believed that mitigation evidence failed to "fit

---

when there were five or more white male jurors on the jury." *Id.* at 77.

[13] "Many of the CJP jurors volunteered that they believed they had to vote for death to ensure that the defendant would not get back on the streets." *Id.* at 83. "But even more troublesome is the evidence that some jurors do not believe judges when they are told there is no parole from a life sentence." *Id.* at 84.

into" the rubric contained in the instructions, thereby indicating a failure to understand what constituted mitigating evidence;

- 80% of the jurors refused to consider mitigation evidence because it did not directly reduce the defendant's responsibility for the crime;

- 60% of the jurors rejected mitigation evidence because it did not completely account for the defendant's actions;

- less than one third of the jurors demonstrated a workable understanding of what constituted mitigation evidence; and

- 80% of the juries that returned death verdicts did so believing that life imprisonment without the possibility of parole did not mean life without parole.

Other research has demonstrated similarly widespread misunderstandings of the sentencing function in general, and of mitigation in particular, among jurors deciding death penalty cases. *See, e.g.*, C. Haney and M. Lynch, *Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions*, Law and Human Behavior, Vol. 18, No. 4, pp. 411–36 (1994); Peter M. Tiersma, *Dictionaries and Death: Do Capital Jurors Understand Mitigation?*, Utah Law Review 1, 10-43 (1995); J. Luginbuhl, *Comprehension of Judges' Instructions in the Penalty Phase of a Capital Trial: Focus on Mitigating Circumstances*, 16  Law and Human Behavior 203 (April 1992); M. Constanzo and S. Constanzo, *Jury Decision Making in the Capital Penalty Phase: Legal Assumptions, Empirical Findings and a Research Agenda*, 16 Law and Human Behavior 185 (1992). These and other studies show that jurors in death penalty cases misunderstand what they are permitted to consider much more often than not, and

that instructions rarely cure these misunderstandings. *See* Bowers & Foglia, *Still Singularly Agonizing, supra,* at 68–69.

Because death is different from other forms of punishment, courts have long recognized the greater need for the reliability of the process by which the jury arrives at a sentence. *See Woodson*, 428 U.S. at 303-05 (op. of Stewart, Powell & Stevens, JJ.). A death penalty sentencing scheme that presents an unreasonable likelihood that the jurors will misunderstand their role and their assignments violates the Eighth Amendment and the Due Process Clause. *See Cf. Simmons v. South Carolina*, 512 U.S. 154 (1994) (establishing entitlement under Due Process Clause to instruction that "life" sentence means life without parole); *Godfrey*, 446 U.S. at 427 (holding that Eighth Amendment requires specificity and clarity in guiding juror discretion). Jurors must be provided an environment that permits a reasoned, informed decision about the appropriate sentence. *Cf. Boyde v. California*, 494 U.S. 370, 380 (1990) (holding that reversal is required when there is a "reasonable likelihood" that jury misunderstood instruction so as to improperly limit consideration of mitigating evidence).

The Capital Jury Project's findings demonstrate that although the FDPA may have been designed with as much care as possible under the circumstances, the capital sentencing process that the statute provides is constitutionally inadequate in practice. The results of jurors' good-faith grappling with the law – arbitrary, biased, and erroneous death verdicts – are intolerable as a matter of due process and proportional punishment.

III.    **"Death-qualifying" the jury violates the rights of both the defendant and prospective jurors, as well as the plain language of the federal law governing jury selection.**

This Court has directed the parties to confer and file jointly if possible, but separately if necessary, a proposed jury questionnaire by August 15, 2016. Dkt. 254 at 4. A significant issue in the questionnaire, and in the jury selection process as a whole, is likely to be the "death qualification" of the jury – the means by which conscientious objectors to the death penalty are systematically excluded prior to selection of the petit jury that will decide the defendant's case. The defendant objects to the death-qualification process as a violation of the right to due process under the Fifth Amendment, of the right to a fair trial before an impartial jury drawn from a fair cross section of the community under the Fifth and Sixth Amendments, and of the right against cruel and unusual punishment under the Eighth Amendment. In addition, excluding jurors with a reverence for life violates the plain language of 18 U.S.C. § 3592(a). Finally, the death qualification process likely violates the excluded jurors' First Amendment rights of free exercise of religion and the separation of church and state, and Fifth Amendment due process of law.[14] Although the Supreme Court and the Fourth Circuit have decided cases addressing aspects of death qualification, the issues addressed here are of first impression.

*Witherspoon v. Illinois* provides no basis for removing jurors based upon their

---

[14] The defendant has standing to assert the First and Fifth Amendment rights of the excluded jurors. *See Powers v. Ohio*, 499 U.S. 400, 413-16 (1991) (holding that criminal defendant has standing to challenge systemic exclusion of a third-party group in the jury selection process).

opposition to the death penalty, but rather operates as a limitation on the government's power to exclude. *Witherspoon v. Illinois*, 391 U.S. 510, 522-23 (1968) ("[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can be constitutionally put to death at the hands of a tribunal so selected.").

While *Uttecht v. Brown*, 551 U.S. 1 (2007), *Lockhart v. McCree*, 476 U.S. 162 (1986), and *Wainwright v. Witt*, 469 U.S. 412, 424 (1985), upheld state court decisions removing jurors based upon their opposition to the death penalty, none of these cases *requires* removal of such jurors. In federal court, not only is there no statutory basis for removing jurors based upon their opposition to the death penalty, but the law provides for an expansive opportunity (and obligation) to serve on a jury:

> It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

28 U.S.C. § 1861.

The removal of jurors based upon their opposition to the death penalty results in a jury that is not drawn from a fair cross-section of the community. It is well understood that, thanks to death-qualification, "capital juries are more likely to be white, older, predominantly male, Protestant, and less educated than other criminal juries, than the society from which they were picked." Richard Salgado, Note,

*Tribunals Organized To Convict: Searching for a Lesser  Evil in the Capital Juror Death-Qualification Process in* United States v. Green, 2005 B.Y.U. L.  Rev. 519, 520, 529-30 (2005) (discussing studies). In addition, numerous studies have indicated  that death-qualified guilt-phase juries are less favorable to defendants than more broadly-constituted juries. *See e.g.*, Erik Lillquist, *Absolute Certainty and the Death Penalty*, 42 Am.  Crim. L. Rev. 45, 88 (2005) (describing a "robust scholarly consensus that death-qualification of  jurors  lowers the effective standard of  proof in criminal cases."); *See* Susan D. Rozelle, *The Principled Executioner: Capital Juries' Bias and the Benefits of True  Bifurcation*, 38 Ariz. St. L.J. 769, 784–85 (2006) (using C J P  data collected from 1201 capital  jurors  and  more  than  350  actual  trials  to  conclude  that death-qualified  jurors  hold  "disproportionately punitive orientations toward crime and criminal justice").[15]

In his concurring opinion in *Baze v. Rees*, 553 U.S. 35 (2008), Justice Stevens explained that these conviction and punishment biases call death penalty verdicts into question:

> Of special concern to me are rules that deprive the defendant of a trial by jurors  representing  a  fair  cross  section  of  the community.  Litigation  involving  both  challenges for cause and peremptory challenges has persuaded me that the process  of obtaining a "death qualified jury" is really a procedure that has the purpose and  effect of obtaining a jury that is biased in favor of conviction. The prosecutorial  concern  that  death  verdicts  would rarely be returned by 12 randomly selected  jurors should be viewed as objective evidence supporting the conclusion that the

---

[15] Although Mr. Roof has confessed and offered to plead guilty, he is  nevertheless entitled to a fair trial before an impartial jury drawn from a fair cross-section of the  community on all issues relevant to his death penalty eligibility.  *See generally Ring v. Arizona*,  536 U.S. 584 (2002).

penalty is excessive.

553 U.S. at 84 (Stevens, J., concurring); *see also Uttecht v. Brown*, 551 U.S. 1, 35 (2007) (Stevens, J., dissenting) (explaining that "[m]illions of Americans oppose the death penalty," and that "[a] cross section of virtually every community in the country includes  citizens who firmly believe the death penalty is unjust but who nevertheless are qualified to serve  as jurors in capital cases").  In *Lockhart v. McCree*, 476 U.S. 162, 165 (1986), however, the Court had concluded  that  death-qualification did not violate the fair cross-section requirement for a jury because the process of  excluding  a  group defined  exclusively  by  their  death  penalty  attitudes  did  not  involve  the  systematic exclusion of a distinctive  group in the community.

Thirty years later, empirical evidence unavailable at  the time of *Lockhart v. McCree* demonstrates that excluding people who do not believe in the death penalty means that members of protected classes – women and racial minorities – *are* excluded.  *See* Emily Hughes, *The Empathic Divide in Capital Trials: Possibilities for Social Neuroscientific  Research*, 2011 Mich. St. L. Rev. 541, 559 (2011) (noting, since *Lockhart*, development of a "rich body of social science  evidence augmenting and complicating the intersection of bias and capital juror decision  making."). *See also* Mona Lynch, *Institutionalizing Bias: The  Death  Penalty,  Federal  Drug Prosecutions,  and  Mechanisms of Disparate Punishment*, 41 Am. J. Crim. L. 91, 121 (2013) (identifying same problems in the federal system).  As a result, courts have begun to recognize that the legal calculus must change, to insure the inclusion of jurors

from all backgrounds.  *See  United States v. Green*, 343 F. Supp. 2d 23, 33 (D. Mass. 2004),  *supplemented*, 348 F. Supp. 2d 1 (D. Mass. 2004), *mandamus granted, opinion vacated by United States v. Green*, 407 F.3d 434 (1st Cir. 2005); *State v. Ramseur*, 524 A.2d 188, 252 n.54 (N.J. 1987).[16]

Jurors who refuse to consider mitigation, or who would always impose the death penalty,  frustrate a defendant's right to an impartial jury, *see Morgan v. Illinois*, 504  U.S.  719,  727  (1992), but since the government enjoys no Sixth Amendment right, jurors who oppose the death penalty are simply expressing the  conscience of the community.  *See generally Live Free And Nullify: Against Purging Capital Juries of Death Penalty Opponents*, 127 Harv. L. Rev. 2092 (2014) (discussing the historical role of jurors and the development of death qualification).  In fact, the FDPA specifically contemplates that jurors "in determining whether a  sentence  of  death  is  to  be imposed  on  a  defendant,  shall  consider *any  mitigating  factor*." 18 U.S.C. § 3592(a) (emphasis added).  The statute further provides that each juror shall consider  "other factors  in  the  defendant's  background,  record,  or  character . . .  that mitigate  against imposition  of the death penalty." 18 U.S.C. § 3592(a)(8).  Thus,  that  a  juror  may  view human  life  as  sacred  and  thus  be  inclined  to  believe  that  defendant's existence as a human being, in and of itself, is a decisive mitigating factor,  cannot be considered a basis for disqualification under the federal death statute.

---

[16] *See also In re United States*, 426 F.3d 1, 7-9 (1st Cir. 2005) (noting "cause for concern" in the lower proportional representation of African-Americans among qualified potential jurors and remarking that the district court "has always been free to revise its jury plan in compliance with the statute" to address this concern).

Because the practice of death qualifying a jury has no constitutional or statutory underpinnings, distorts the jury function, introduces arbitrariness into capital sentencing and increases the influence of racism and sexism on the death determination, there is no justification for maintaining it. Even if the Court were to reject the defense argument that there is no basis for "death qualifying" generally, however, there would still remain one category of opinions that cannot constitutionally provide a basis for exclusion. Exclusion of jurors on the basis of their death-penalty views often reflects jurors' religious convictions – whether they favor the government ("eye for an eye") or the defendant (religious beliefs that do not permit a juror to vote for execution). Excluding those jurors violates the First Amendment's Free Exercise and Establishment clauses, as well as Art. IV, cl. 3 ("no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States").[17]

For example, if a proposed juror is Catholic, Quaker, or any sect of any other religion, and adamantly opposed to the death penalty, "death qualification" effectively discriminates against that juror's religion. No rule (*e.g.*, "conscientious scruples" against death) should be used to sanction religious discrimination. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ("At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons.").

---

[17] The No Religious Test Clause appears to have been subsumed into the First Amendment, because few cases discuss it separately.

18

The defense therefore requests that the Court issue an order precluding the government from removing jurors based upon their views on the death penalty. Alternatively, the defense asks the Court to require the Government to demonstrate a compelling purpose justifying the removal of jurors based upon their religious or moral views. *Cf. Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) ("The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.").

IV.     **The Court should strike the death notice – at least as to Counts 25-33 – because the pursuit of the death penalty in this case violates the separation of powers, given Congress's decision not to authorize a death sentence for federal hate crimes.**

When Congress passed the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, 18 U.S.C. § 249 ("HCPA"), it was only after serious consideration of whether the statute should include a provision authorizing imposition of the death penalty. Ultimately, Congress chose to include a maximum penalty of life in prison, not death. *See* 18 U.S.C. § 249(a)(1)(B), (a)(2)(A)(ii). In this case, the government's decision to charge the § 249(a)(1) counts (Counts 1-9) as predicates to the § 924(j) counts (Counts 25-33), *see* Dkt. 2 at 9, and to offer "racially motivated killing" as a non-statutory aggravating factor, *see* Dkt. 164 at 6, violates the Constitutional doctrine of separation of powers. The Court should strike the death notice, at least insofar as it relates to the hate crimes charges, out of respect for the separation of powers and the legislative process that produced the law as enacted.

The Constitution is divided into three articles that define the powers of the legislative, executive, and judicial branches. *See* U.S. Const., arts. I-III. Each of these branches must invoke its specific, independent power for the criminal justice system to function: Congress must criminalize the conduct, the executive must prosecute, and the judiciary must oversee the trial, conviction and sentence. *Cf. Mistretta v. United States*, 488 U.S. 361, 363 (1989) ("Congress, of course, has the power to fix the sentence for a federal crime ….."). The separation of powers is violated when one branch assumes the power of another, without an express delegation of that power. *See Clinton v. City of New York*, 524 U.S. 417 (1998) (Stevens, J., concurring) ("Liberty is always at stake when one or more of the branches seek to transgress the separation of powers.").

The original version of the HCPA did not contain a death penalty provision. When the HCPA passed the Senate, however, an amendment was offered, adding the death penalty as a possible sentence for crimes such as the ones charged here. This engendered significant controversy among supporters of the Act, many of whom were not supporters of the death penalty. Tyler Lewis, *Leadership Conference on Civil Rights, Senate Adds Death Penalty Amendment to Kill Hate Crimes Legislation* (July 20, 2009), *available at* http://www.civilrights.org/archives/2009/07/531-sessions.html. Ultimately, following conference committee negotiations, the death penalty amendment was removed from the Senate bill, and the HCPA was enacted with the current maximum penalty of life imprisonment. *See* H.R. Conf. Rep. No. 288, 111th Cong., 1st Sess. (2009) at 901.

In this case, despite Congress's deliberate decision not to provide for the death penalty in HCPA prosecutions, the government has effectively amended the statute to permit a death sentence to be imposed.  First, it has charged the HCPA violations as predicate offenses to the 18 U.S.C. § 924(j) counts, which do provide for a death sentence; and second, it has noticed a non-statutory aggravating factor regarding "racially-motivated killing," invoking the underpinnings of the HCPA in the death penalty selection process.[18]  In this manner, the government has managed an end-run around Congress's constitutional power to fix the maximum sentence.  The prosecutorial authority must not be permitted to legislate in this manner.

Although the Fourth Circuit has addressed separation of powers challenges to the FDPA before, it has never addressed a situation like this, in which the government has sought to impose a punishment that Congress has specifically – after consideration – chosen *not* to authorize.  In prior cases, the Circuit has reviewed only allegations of improper delegation, *i.e.*, that Congress should not have granted prosecutors the authority to define non-statutory aggravating factors at all.  *See, e.g., United States v. Higgs*, 353 F.3d 281, 321-22 (2003) (challenging structure of FDPA as affording unlimited discretion to prosecutors in identifying and defining non-statutory aggravating factors).  Although we preserve that claim below, it is not our claim here.  The separation of

---

[18] The HCPA, 18 U.S.C. § 249(a)(1), reads:  Whoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person . . . (B) shall be imprisoned for any term of years or for life, fined in accordance with this title, or both, if— (i) death results from the offense.

21

powers violation here is far more menacing, because it involves the assumption of power

by one branch, rather than mere unlawful delegation.

The Court should not permit the government to invade the province of the

legislative branch by manipulating the charging and selection processes to invoke the

death penalty for a crime as to which Congress explicitly rejected capital punishment.

The death notice – at least as to Counts 25-33 – should be stricken.

## V.  Certain non-statutory aggravating factors are duplicative, because they separately count identical conduct as justifying a death sentence, in violation of the separation of powers and the Eighth Amendment.

The government has noticed five non-statutory aggravating factors that are

duplicative, either of the substantive crimes in the indictment, or of each other.  These

are:

> (1)    Attempt to Incite Violence.  In preparation for, in committing, and subsequent to the acts of violence, the Defendant attempted to incite violent action by others.

> (2)    Victim Impact.  DYLANN STORM ROOF caused injury, harm, and loss to the individuals that he killed as well as to the family, friends, and co-workers of those individuals.  The injury harm, and loss caused by DYLANN STORM ROOF with respect to each victim is evidenced by the victim's personal characteristics and by the impact of the victim's death upon his or her family, friends, and co-workers.

> (3)    Endangering the safety of others.  DYLANN STORM ROOF endangered the safety of one or more persons in addition to the victims of the murders charged in the Indictment in the commission of these offenses.

> (4)    Racially motivated killing.  DYLANN STORM ROOF has expressed hatred and contempt towards African Americans, as well as other groups, and his animosity towards African

22

Americans played a role in the murders charged in the Indictment.

(5)    Selection of Victims.  DYLANN STORM ROOF targeted men and women participating in a Bible-study group at the Emanuel AME Church in order to magnify the societal impact of the offenses charged in the indictment.

Dkt. 164 at 5-6.  Where a non-statutory aggravating factor is duplicative of a substantive offense, its allegation violates the separation of powers, because Congress has already determined which conduct warrants the death penalty in enacting the criminal code and the FDPA's statutory aggravating factors.  Congress's delegation of authority to allege non-statutory aggravators cannot be said to involve re-alleging conduct that has already been taken into account.  In addition, where a non-statutory aggravating factor is duplicative of another non-statutory aggravating factor, its allegation violates the Eighth Amendment, because asking the jury to weigh the same information risks skewing the penalty selection by double counting.

**A.    The non-statutory aggravating factors regarding endangering safety, racial motivation, and selection of victims are duplicative of the underlying crimes and not encompassed by the statutory aggravating factors, and their allegation therefore violates the separation of powers and the Eighth Amendment.**

The allegation of non-statutory aggravating factors that restate aspects of the offenses charged in the indictment – racial motivation (Counts 1-9, hate crimes); selection of victims (Counts 1-9, 13-21; obstruction of religious exercise); and attempt (Counts 10-12, 22-24) – creates two constitutional problems.  First, their allegation violates the separation of powers, because Congress did not authorize the government to

23

assert these facts as aggravating; and second, their allegation violates the Eighth Amendment, because – since they add nothing to the underlying conviction – they do not narrow the class of offenders subject to the death penalty.

The legal principle of separation of powers is discussed above in Point IV. The defense acknowledges, but wishes to preserve for further review by the *en banc* Court and the Supreme Court, that the Fourth Circuit has ruled that the FDPA's use of non-statutory aggravating factors does not – on the whole – violate the separation of powers. *See Higgs*, 353 F.3d at 321-22 (holding that affording prosecutors the ability to identify and define non-statutory aggravating factors does not constitute impermissible delegation of legislative power). The argument here is different, however.

In *Higgs*, the Fourth Circuit found that "[t]he prosecutor's discretion with regard to defining what is a death-eligible offense is wholly circumscribed" by the conviction and the FDPA's requirements that the jury find an intent factor and a statutory aggravating factor. "Only after the selection of those critical, legislatively-defined factors is made is the prosecutor afforded discretion to argue that *additional* nonstatutory aggravators combine … to outweigh any mitigating factors …." *Id.* at 321 (emphasis added). In this case, nothing "additional" is being added. Rather, the government proposes to ask the jury to reconsider facts regarding the convictions that are not statutory aggravating factors authorized by Congress. *Compare* 18 U.S.C. § 3592(c)(1), (5)-(9), (11), (13)-(14), (16) (listing offense-related statutory aggravating factors). Since Congress has not done so, the prosecution – as a representative of the executive branch – may not be

permitted to do so either. *Cf. United States v. Johnson*, 915 F. Supp. 2d 958, 1019 (N.D. Iowa 2013) ("defining a single uncharged incident of distribution of a controlled substance as a 'non-statutory aggravating factor,' where two or more convictions are required to establish the 'statutory aggravating factor,' seems to me to be something of an 'end run' around the statute").

More importantly, it is an "end-run" around the Eighth Amendment. To satisfy the Eighth Amendment, an aggravator must "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 876-78 (1982). *See also Lewis v. Jeffers*, 497 U.S. 764, 776-78 (1990) (holding that aggravating circumstances must provide principled basis to distinguish those sentenced to death from those imprisoned for murder). The non-statutory aggravators involving racial motivation, selection of victims, and attempt (endangering the safety of others) do no more than restate the offenses charged, which does nothing to distinguish the convicted offender.

*Lowenfield v. Phelps*, 484 U.S. 231 (1988), does not preclude Eighth Amendment relief. There, the Supreme Court found no violation in submitting a duplicative aggravating factor because the narrowing function had already occurred at the guilt phase, due to the structure of the Louisiana statute at issue. *See* 484 U.S. at 246 (noting that, at guilt-innocence phase, jury was required under Louisiana law to select between five types of first degree murder). The FDPA, of course, operates differently, employing aggravating factors to narrow the class of those subject to the death penalty. *See United*

25

*States v. Llera Plaza*, 179 F. Supp. 2d 464, 483 (E.D. Pa. 2001) (observing that, under the

FDPA, "[i]f this [narrowing] function is to be accomplished, the simple repetition of the

crime of which a defendant has already been convicted cannot properly be used as a[]

[statutory] aggravating factor").

In combination, the separation of powers and Eighth Amendment issues involved

with these aggravators require that the Court strike them from the death notice.

**B.  The non-statutory aggravating factors regarding attempt to incite violence, endangering safety, racial motivation, selection of victims, and victim impact are duplicative of each other in various respects, resulting in potential double counting, which would violate the Fifth and Eighth Amendments.**

Aggravating factors that duplicate each other are impermissible, because they

"run[] a clear risk of skewing the weighing process in favor of the death penalty and

thereby causing it to be imposed arbitrarily and therefore unconstitutionally."  *See United*

*States v. Tipton*, 90 F.3d 861, 899 (4th Cir. 1996) (finding harmless error in duplicative

aggravating factors).  *See also Jones v. United States*, 527 U.S. 373, 398-99 (1999)

(plurality op.) (assuming, without deciding, that double counting is impermissible, but

finding harmless error).  Here, there are multiple non-statutory aggravating factors that

duplicate each other in various respects.  These factors should be stricken from the death

notice, or – at a minimum – the Court should require the government to narrow its

evidence to avoid double-counting, *cf. United States v. Hammer*, 25 F. Supp. 2d 518,

539-540 (M.D. Pa. 1998) (holding that defendant's prior conviction could not be used to

26

help establish statutory aggravating factor and to also support nonstatutory aggravating factor of "additional . . . serious acts of violence").

Several factors address the alleged motive for the crime, including "racial motivation", "selection of victims", and "attempt to incite violence." All of these factors implicate the same evidence: for example, as described in one portion of the indictment, "by attacking African-American parishioners, Defendant DYLANN STORM ROOF wanted to increase racial tensions across the Nation ...." Dkt. 2 at 2. The three separate non-statutory aggravating factors relating to this allegation are simply three different ways of referring to the same facts. This creates the possibility that "the jury [would] assess the weight of the [] circumstances it [finds] on an unfair quantitative basis that g[i]ve[s] [three]-fold effect to what was essentially a single factor." *Tipton*, 90 F.3d at 900.

Similarly, depending on the evidence offered in support, the factors "attempt to incite violence", "endangering safety", and "victim impact" may amount to three different ways of referring to the same allegations. At least one court has found that the related "serious injury to surviving victims" aggravating factor was impermissibly duplicative of victim impact. *See United States v. Bin Laden*, 126 F. Supp. 2d 290, 300-301 (S.D.N.Y. 2001). In fact, in *Bin Laden*, the court refused to permit the two aggravating factors, even though the government attempted to reserve "victim impact" only for the deceased victims. *See id.* Here, the three categories are at least as duplicative.

Moreover, the factors at issue are so interrelated and of such an emotional nature that whatever fine distinctions the government might attempt to make between them, the danger of confusing, misleading, or prejudicing the jury is too high to risk. *See* 18 U.S.C. § 3593(c) (providing that "information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury"). The government may not be permitted to proceed on all of them.

**VI.  The Supreme Court's decision *Hurst v. Florida* requires the Court to reevaluate Circuit precedent regarding *Apprendi v. New Jersey* issues in FDPA cases.**

Since the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), defendants in FDPA cases have been asserting a series of Fifth and Sixth Amendment challenges to the charging and sentencing procedures under the Act. Pertinent here, these challenges include: (1) that the jury should be required to make its finding that the aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death, 18 U.S.C. § 3593(e), beyond a reasonable doubt; and (2) that any non-statutory aggravating factors should be submitted to the grand jury, because – like statutory aggravating factors – they are elements of the capital offense. The Fourth Circuit has denied these challenges. *See United States v. Runyon*, 707 F.3d 475, 515-16 (4th Cir. 2013); *United States v. Lighty*, 616 F.3d 321, 367-68 (4th Cir. 2010). The Supreme Court's recent decision in *Hurst v. Florida*, -- U.S. --, 136 S. Ct. 616 (2016), however, calls into question Fourth Circuit precedent, requiring a fresh look by this

Court.  *Cf. United States v. Collins*, 415 F.3d 304, 311 (4th Cir. 2005) (noting that intervening Supreme Court precedent permits decision making contrary to precedent).

In *Hurst*, the Supreme Court held that, under *Apprendi* and *Ring v. Arizona*, 536 U.S. 584 (2002), sentencing procedures that Florida had used for more than forty years violated the Sixth Amendment right to jury trial.   *Hurst* has already led one jurisdiction to reexamine its sentencing procedures in capital cases. The Delaware Supreme Court, which had previously held that "*Ring* does not extend to the weighing phase," *Brice v. State*, 815 A. 2d 314, 322 (Del. 2003), has agreed to decide whether the Sixth Amendment requires that weighing be conducted by a jury, unanimously beyond a reasonable doubt.  *See Rauf v. State*, No. 39, 2016 (Del. Jan. 28, 2016) (en banc), attached as Exhibit 1, at 4.

Before *Hurst*, some state courts had held that the weighing of aggravating and mitigating circumstances is a determination of fact for purposes of *Apprendi*, whereas federal courts reached the opposite conclusion (though sometimes over dissenting opinions).  In *Hurst*, however, Justice Sotomayor spoke for seven Justices in characterizing the weighing required by Florida law as a finding of *fact*.  This warrants considering again the proper treatment under the Constitution of the weighing required by the FDPA.  In light of *Hurst*, there is no sound basis to treat that weighing as outside the scope of the *Apprendi* doctrine.

In *Hurst*, the Supreme Court reversed a death sentence under Florida's sentencing scheme and declared that scheme unconstitutional.  Under pre-*Hurst* Florida law, after an

evidentiary hearing, a jury made a "recommendation" of life or death.  But the judge was still required to hold a separate hearing and determine "whether sufficient aggravating circumstances existed to justify imposing the death penalty" – the jury's recommended sentence was merely "advisory."  This, the Supreme Court held, is forbidden, because "[t]he Sixth Amendment requires a jury, not a judge, to find each *fact* necessary to impose a sentence of death." 136 S. Ct. at 619-21 (emphasis added):

> Florida concedes that *Ring* required a jury to find every fact necessary to render Hurst eligible for the death penalty. . . . [Yet t]he State fails to appreciate the central and singular role the judge plays under Florida  law. . . . [T]he Florida sentencing statute does not make a defendant eligible for death until "*findings by the court* that such person shall be punished by death." Fla. Stat. § 775.082(1) (emphasis added). The trial court alone must find "the facts ... [t]hat sufficient aggravating circumstances exist" and "[t]hat there are insufficient mitigating  circumstances  to  outweigh  the aggravating  circumstances."   § 921.141(3); *see Steele*, 921 So.2d, at 546. . . . The State cannot now treat the advisory recommendation by  the  jury  as  the  necessary  factual  finding that *Ring* requires.

*Id.* at 622 (emphasis added) (second set of ellipses in original).  This demonstrates that the Court viewed the trial judge's weighing determination as a finding of a fact for purposes of *Apprendi*.   The Fifth and Sixth Amendments require that such finding be made beyond a reasonable doubt.  *See Alleyne v. United States*, -- U.S. --, 133 S. Ct. 2151, 2158 (2013); *Ring*, 536 U.S. at 610 (Scalia, J., concurring) ("[A]ll facts essential to imposition of the level of punishment that the defendant receives  – whether the statute calls them elements of the offense, sentencing factors, or Mary Jane – must be found by the jury beyond a reasonable doubt.")

30

The Supreme Court's other recent decision in *Kansas v. Carr*, -- U.S. --, 136 S. Ct. 633 (2016), is not to the contrary. The question before the Court in *Carr* was whether the Eighth Amendment required a state court to affirmatively instruct the jury that mitigating circumstances "need not be proved beyond a reasonable doubt." *Carr* answered that question in the negative. *Id.* at 637.  In dictum, the Court expressed "doubt" about whether it was possible to apply "a standard of proof to the mitigating factor determination," and observed that "the ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy — the quality of which, as we know, is not strained." *Id.* at 642.  This does not undo the reasoning of *Hurst*.  *Carr* was an Eighth Amendment and not a Sixth Amendment case, and nowhere mentioned *Apprendi* or its progeny.   *Carr*'s Eighth Amendment challenge was directed not to the issue of weighing, but to the standard of proof governing mitigating factors. The Court's dictum does  not change the fact that, as it observed in *Hurst*, the weighing of aggravating and mitigating factors is required before a defendant can be sentenced to death under Florida's (and the federal) sentencing scheme.  More importantly, the actual instruction to the jury in *Carr* that the Court found compatible with the Eighth Amendment "ma[de] clear that both the existence of aggravating circumstances and the conclusion that they outweigh mitigating circumstances *must be proved beyond a reasonable doubt.*" *Id.* at 643 (emphasis added). Accordingly, *Carr* cannot stand for the proposition that the Sixth Amendment does not require a "beyond a reasonable doubt" weighing instruction.

It follows from *Hurst,* and the reality that weighing is fact-finding, that non-statutory aggravating factors must be alleged in the indictment.  Although the FDPA is silent as to the grand jury, it has become settled since *Ring* that statutory aggravating factors must be found by the grand jury (and that procedure was followed in this case).  But the government proposes also to submit to the jury in support of a death sentence six non-statutory aggravating factors.  *See* Dkt. 164.  A death verdict may only be returned after the jury has determined the presence of aggravating factors – both statutory and non-statutory – and determined that they sufficiently outweigh any mitigating factors.  *See* 18 U.S.C. § 3593(e).  As a practical matter, non-statutory aggravating factors are critical to juries' imposition of death in FDPA cases.  *Cf.* Scott E. Sundby, *A life and Death Decision:  A Jury Weighs the Death Penalty* 19-20, 121 (2005) (describing examples of influence of non-statutory aggravating factors).   The grand jury too must be afforded the opportunity to pass on the non-statutory aggravating factors.  *See Apprendi*, 530 U.S. at 476 ("[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.") (internal quotation marks and citation omitted).

In light of *Hurst*, the defense requests that the Court reconsider Fourth Circuit precedent on these important Fifth and Sixth Amendment matters.

32

VII.  **The defense preserves for further review by the *en banc* Fourth Circuit and the Supreme Court certain other challenges.**

The defense acknowledges that the Fourth Circuit has decided the following issues, but raises them here to preserve them for further review in the event of a conviction at trial.

- The rules of evidence should be applied at the penalty phase hearing, in order to assure the fairness and reliability of the proceeding. The FDPA's provision that the rules of evidence do not apply violates the Fifth, Sixth, and Eighth Amendments to the Constitution. *But see United States v. Umana*, 750 F.3d 320, 346-48 (4th Cir. 2014) (holding that Confrontation Clause does preclude the introduction of hearsay at penalty phase hearing); *United States v. Fulks*, 454 F.3d 410, 437-38 (4th Cir. 2006) (rejecting constitutional challenge to failure of FDPA to require application of rules of evidence at penalty phase hearing).

- The "substantial planning and premeditation" statutory aggravating factor is unconstitutionally vague, because the term "substantial" is not precise enough in meaning to channel the factfinder's discretion. *But see United States v. Jackson*, 327 F.3d 273, 301 (4th Cir. 2003); *United States v. Tipton*, 90 F.3d 861, 895-96 (4th Cir. 1996).

## CONCLUSION

This Court should declare the FDPA unconstitutional and order that this case proceed as a non-capital case. Such a ruling would permit the defendant to enter his

guilty plea and proceed to a sentencing hearing at which – after the Court had heard from any survivors or victim family members who might wish to speak – he would be sentenced to life in prison without the possibility of release, and this prosecution would conclude.

Respectfully submitted,

s/ *Sarah S. Gannett*
Sarah S. Gannett
Assistant Federal Public Defender
Federal Public Defender for the District of Arizona
850 W. Adams Street, Suite 201
Phoenix, AZ 85007
602-382-2862
sarah_gannett@fd.org

David I. Bruck
Washington & Lee School of Law
Lexington VA 24450
540-458-8188
bruckd@wlu.edu

Kimberly C. Stevens
Capital Resource Counsel
Assistant Federal Public Defender for the District of Oregon
1070-1 Tunnel Road, Suite 10-215
Asheville, NC 28805
336-788-3779
kim_stevens@fd.org

Attorneys for Dylann S. Roof