IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 2:15-CR-472 |
| | ) | |
| DYLANN STORM ROOF | ) | |

**DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO
MOTION TO STRIKE THE DEATH PENALTY
AS POSSIBLE PUNISHMENT IN THIS CASE**

The defendant, through counsel, replies as follows to the government's response, Dkt. No. 320, to his Motion to Strike the Death Penalty as Possible Punishment, Dkt. 291. The government's response does not engage with the evidence demonstrating that the death penalty is unreliable, arbitrary, and so complicated that jurors frequently misapply it. As argued in our motion, this empirical evidence, which is only now being considered by the courts, requires reconsideration of the decades-old precedent cited by the government. In a prosecution as consequential as this one, the Court should not countenance procedures that are proven to be flawed, particularly when the government offers no remedy for the many problems we have identified, while insisting on a jury sentencing proceeding that the defendant has offered to waive.

**I.     The Court should reconsider the constitutionality of the Federal Death Penalty Act.**

Of course, as the government emphasizes, under law dating from forty years ago, "the death penalty is constitutional." Dkt. No. 320 at 1. However, as Justice Breyer wrote

1

in *Glossip v. Gross*, on behalf of himself and Justice Ginsburg, in the forty years since the Court upheld the death penalty, based on newly-fashioned procedures that it believed would produce fair and reliable results, "[t]he circumstances and the evidence of the death penalty's application have changed radically …. Given those changes … it is now time to reopen the question." 135 S. Ct. 2726, 2755 (2015) (Breyer, Sotomayor, JJ, dissenting). *See also* Alan Turner, "Six Capital Stays Fuel Speculation on Future of Death Penalty," Houston Chronicle (Sept. 8, 2016), available at http://www.houstonchronicle.com/news/houston-texas/houston/article/Six-capital-stays-fuel-speculation-on-future-of-9210220.php, attached at Exhibit 1 (quoting Capital Punishment Center director Jordan Steiker: "Quite likely in the foreseeable future the (Supreme) Court would find the death penalty unconstitutional . . . .").

Regardless how well-settled a given body of law may be, there often comes a time when it changes. This has occurred with regard to the death penalty before, as the Court first struck down and then reinstituted capital punishment. *See Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976). And it has occurred in other contexts as well. For example, more than twenty-five years after it upheld the constitutionality of the mandatory United States Sentencing Guidelines in *Mistretta v. United States*, 488 U.S. 361 (1989), the Court announced in *Booker v. United States*, 543 U.S. 220 (2005), that those same mandatory Guidelines were unconstitutional. And in the decade since then, there has developed a new body of post-*Booker* sentencing law.

Few courts wish to be on the vanguard of new developments in the law. As Justice O'Connor remarked in her dissent in *Blakely v. Washington*, 542 U.S. 296 (2004),

the precursor to *Booker*, in which the Court invalidated a mandatory state guidelines scheme, "Prior to today, only one court had ever applied *Apprendi* [*v. New Jersey*, 530 U.S. 466 (2000)] to invalidate application of a guidelines scheme." 542 U.S. 296 (2004). But one court did.[1] And here, the situation is different. In contrast to the *Apprendi* cases, which were based purely on a novel interpretation of law, the Court has before it a large body of empirical evidence that has eroded and undermined the basis for hitherto-controlling precedent. That is, contrary to the assumption made by the Supreme Court in *Gregg* about the future effectiveness of newly-designed capital sentencing statutes, the record now establishes that guided-discretion capital sentencing schemes such as the FDPA do *not* avoid arbitrary and capricious, wanton and freakish application of the death penalty. *Cf.* 428 U.S. at 206-07.

Where the material facts surrounding the relevant legal claims have changed, "an issue is not foreclosed by Supreme Court precedent because the Supreme Court has not decided the matter in dispute. Rather, the district court is deciding a distinguishable case and controversy." *United States v. Sampson*, 2015 WL 7962394, at *4 (D. Mass. Oct. 28, 2015). Indeed, when the Supreme Court decided *Gregg*, "the Court also implicitly

---

[1] Justice O'Connor continued: "*Compare State v. Gould*, 271 Kan. 394, 23 P.3d 801 (2001), *with, e.g.*, *United States v. Goodine*, 326 F.3d 26 (C.A.1 2003); *United States v. Luciano*, 311 F.3d 146 (C.A.2 2002); *United States v. DeSumma*, 272 F.3d 176 (C.A.3 2001); *United States v. Kinter*, 235 F.3d 192 (C.A.4 2000); *United States v. Randle*, 304 F.3d 373 (C.A.5 2002); *United States v. Helton*, 349 F.3d 295 (C.A.6 2003); *United States v. Johnson*, 335 F.3d 589 (C.A.7 2003) (per curiam); *United States v. Piggie*, 316 F.3d 789 (C.A.8 2003); *United States v. Toliver*, 351 F.3d 423 (C.A.9 2003); *United States v. Mendez–Zamora*, 296 F.3d 1013 (C.A.10 2002); *United States v. Sanchez*, 269 F.3d 1250 (C.A.11 2001); *United States v. Fields*, 251 F.3d 1041 (C.A.D.C.2001); *State v. Dilts*, 336 Or. 158, 82 P.3d 593 (2003); *State v. Gore*, 143 Wash.2d 288, 21 P.3d 262 (2001); *State v. Lucas*, 353 N.C. 568, 548 S.E.2d 712 (2001); *State v. Dean*, No. C4–02–1225, 2003 WL 21321425 (Ct. App. Minn., June 10, 2003) (unpublished opinion)."

acknowledged that future developments might challenge the basis of its decision." *United States v. Sampson,* 275 F. Supp. 2d 49, 72 (2003) (citing *Gregg*, 428 U.S. at 187 (joint opinion of Stewart, Powell, and Stevens, JJ.)) (denying challenge to FDPA).

In further support of our challenge to *Gregg*'s continuing precedential validity, we submit with this reply transcripts and exhibits from a comprehensive hearing on the constitutionality of the death penalty held this summer before the Honorable Geoffrey W. Crawford, in *United States v. Donald Fell*, 01-cr-00012-GWC-01 (D. Vt. July 11-21, 2016), which we discussed in our motion, *see* Dkt. No. 291 at 4-5. These materials address, among other things, how the Federal Death Penalty Act in particular manifests the flaws identified in our motion, Dkt. No. 291 at 2-12.[2] And they validate – in reports

---

[2] S*ee* Report of Carol Steiker, J.D., attached at Exhibit 2, at 3-5 (discussing flaws in Model Penal Code-based death penalty statutes, including FDPA); Transcript of Testimony of Carol Steiker, attached at Exhibit 21, at 8-76 (same); Report of Richard Dieter, J.D., attached at Exhibit 3, at 6, 8-12 (discussing Death Penalty Information Center statistics on arbitrariness of death penalty and that FDPA is "not immune" from flaws leading to such arbitrariness); Report of Lisa Greenman, J.D., attached at Exhibit 4, at 12-15 (discussing impact of expenditures by counsel on outcomes in federal capital trials); Transcript of Testimony of Lisa Greenman, attached at Exhibit 22, at 241-47, Exhibit 23, at 13-18, 36-37 (same); Report of Kevin McNally, J.D., attached at Exhibit 5 (discussing data on frequency of federal death prosecutions, sentencings, and executions; race of defendants; and race and gender of victims); Transcript of Testimony of Kevin McNally, at Exhibit 23, at 154, 162-73 (same); Report of Scott Sundby, J.D., attached at Exhibit 6, (discussing ways Capital Jury Project ("CJP") research raises concerns about operation of federal capital punishment system, particularly unreliability and arbitrariness of jury verdicts); Transcript of Testimony of Scott Sundby, attached at Exhibit 22, at 164-97 (same); Report of Wanda Foglia, J.D., attached at Exhibit 7 (discussing methodology of CJP studies, findings, and application to Federal Death Penalty Act); Transcript of Testimony of Wanda Foglia, attached at Exhibit 21, at 159-218, Exhibit 22, at 7-39 (same); Report of Craig Haney, Ph.D., J.D., attached at Ex. 8, at 40-50 (discussing problems with death qualification, including in federal court); Transcript of Testimony of Craig Haney, attached at Exhibit 19, at 184-218 (same). The reports and transcripts of testimony of additional defense experts Thomas Reidy and Michael Radelet are attached as Exhibits 9, 10, and 20. A report by Dr. Lauren Cohen Bell was also admitted at the hearing and discussed by Kevin McNally; she did not testify. Her report is attached as Exhibit 11. The transcript of Richard Dieter's testimony is also included at Exhibit 23, beginning at page 100. Counsel have obtained a complete set of the Fell hearing exhibits, but we

and testimony by the most prominent experts in the field, and based on the most current information – the contentions in our motion and in Justice Breyer's *Glossip* dissent.[3]

The government's insistence that jurors will follow instructions, Govt. Resp. at 3, has now been shown empirically to be incorrect, and the cases the government cites are outdated.[4] No matter how "conventional and understandable" or "commonsense" the terms used appear to be, the fact is that instructions "misle[a]d" jurors into sentencing defendants to death, *id.* (citing *Tuilaepa v. California*, 512 U.S. 967, 975-76 (1994); *Boyde v. California*, 494 U.S. 370, 380 (1990)). *See also* Dkt. 291 at 10-12; Ex. 7, at 29-32 (report of Wanda Foglia); Ex. 22, at 7-17 (Wanda Foglia testimony that juror failure to understand death penalty jury instructions is not "simply a linguistic problem" that could be solved if we "simplify language or vocabulary"). The government has not identified, nor are we aware of, any instructions that adequately address the problems described in the cited studies. To the contrary, the research suggests this is impossible:

> [T]he significant percentages [of jurors] failing to understand instructions in every state indicate that the emotionally charged atmosphere of a death penalty trial and the complexities of the

---

have not included them in the record, due to their volume. Should the Court wish to see any or all of them, we will provide them upon request.

[3] We have also included, for the Court's convenience, the testimony and expert reports submitted by the government. *See* Exhibits 12-18, 24-26. The transcript of the final day of testimony from the government's experts is not yet available, but will be provided by undersigned counsel upon receipt from counsel for Fell. We submit that the government experts' reports, testimony, and the exhibits they discussed, are far less weighty and persuasive than those of the defense experts.

[4] The government cites a string of more recent district court cases, but these are all based on the same, older Supreme Court authority. Many involve simple jury instructional challenges, as opposed to the evidence-based challenge raised here. And only one post-dates *Glossip*. None consider the *Fell* record, which has only just been become available.

5

> process the U.S. Supreme Court has established seem to make it impossible to provide instructions that all jurors will understand and that will effectively guide their discretion. I am familiar with the jury instructions that are used in federal cases and I believe the problems identified in the various State instructions are present in the federal instructions.

Ex. 7, at 29-30 (report of Wanda Foglia). Notably, rather than recommend improvements to address this problem, the American Law Institute withdrew the Model Penal Code death penalty provision – on which the FDPA is modeled – from the Code. *See* Ex. 21, at 59 (testimony of Carol Steiker discussing the ALI decision to withdraw the Model Penal Code death penalty provision).

Because it cannot be implemented in a manner that avoids arbitrary, capricious and irrevocable results, the FDPA is unconstitutional and must be stricken as a possible penalty in this case.

## II. Seating a fair jury requires abandoning the process of "death qualification," which the government appears to concede disproportionately excludes women, racial minorities, and members of various religious groups, and skews the jury toward conviction and death sentences.

The government does not – and cannot – deny that the process of death qualification results in the exclusion of women, racial minorities, and various religious groups from jury service, and skews the jury toward conviction and death sentences. *See* Dkt. 291 at 16-18. *See also* Ex. 8, at 40-50 (report of Craig Haney). This is because, as explained in Professor Craig Haney's report for the *Fell* hearing, pro-death penalty jurors – who tend to be disproportionately male, white, and Protestant – are more likely to survive the death-qualification process than are jurors who have moral reservations about

6

the death penalty. *Id.* at 42-43.[5] Given the well-established correlation between demographics and death penalty views, *see, e.g., Gallup*, "Who Supports the Death Penalty," (November 16, 2014), *available at* http://www.deathpenaltyinfo.org/gallup-poll-who-supports-death-penalty (describing large gender, racial, and religious disparities in support for death penalty), it is evident that the exclusion of protected groups by the death-qualification procedure is both systematic and disproportionate in the manner contemplated by the Court's ruling in *Lockhart v. McCree*, 479 U.S. 162, 175-76 (1986). Although death qualification may not have been "instituted" as a means to foreclose participation by certain citizens, *id.*, it has become that.

When the Supreme Court decided *Wainwright v. Witt*, 469 U.S. 412, 423 (1985), and its progeny, it did not have before it evidence showing that exclusion of protected groups from jury service by death qualification had become a systematic concern. Nor did it understand that a process it approved to insure impartiality would result in juries that were slanted to favor one side. *See* Ex. 8, at 46-47 (noting evolution of empirical record since 1986, and concluding, "it is my professional opinion that the available research establishes beyond any doubt that the death qualification process produces biasing effects on the group of jurors eligible to serve in capital cases"). The district court's opinion in *United States v. McCluskey*, No. 10-2734-JCH (Dkt. No. 320-1), adds nothing to the government's argument here, as it relies on old precedent that should be

---

[5] These matters are also discussed in Professor Haney's testimony. *See* Ex. 19, at 184-218. For ease of reference, we direct the Court primarily to his report.

7

reconsidered in light of new evidence and the commands of the Sixth Amendment and federal law regarding jury service.

Under these circumstances, death qualification fails the *Tilton v. Richardson* test regarding free exercise of religion. *See* 403 U.S. 672, 678 (1971). It cannot be justified as having a legitimate secular purpose when it functions to skew the jury in favor of conviction and death sentences and to prevent racial minorities, women, and people of faith from serving. It fosters government entanglement with religion because it encourages and even requires federal judges and prosecutors to interrogate private citizens about their religious beliefs. And it has the effect of inhibiting religion, because it forces citizens to choose between jury service in the most serious cases and adherence to their most closely-held religious, spiritual and moral values.

For all these reasons, the Court should reject any jury-selection process which posits jurors' willingness to sentence the defendant to death as a precondition for service.[6]

### III. Congress's decision not to authorize the death penalty for hate crimes is different from the examples cited by the government, and the government's disregard of that decision here violates the Separation of Powers Doctrine.

The government fails to acknowledge that in enacting the Hate Crimes Prevention Act (18 U.S.C. § 249) in response to the brutal murders of Matthew Shepard and James Byrd, Congress expressly decided not to approve capital punishment. *See* Dkt. No. 291

---

[6] Our submissions at Dkt. Nos. 313 and 317 address the other jury qualification issues raised in the government's response.

8

at 21. That distinguishes this case from the examples cited in the government's response, because none of the statutes at issue in those examples contains a clear indication of Congress's intent to avoid death penalty prosecutions. To be sure, Congress did authorize capital punishment in 18 U.S.C. § 924(j), which also addresses certain murder cases. This does not mean, however, that Congress meant to authorize *the government* to transform § 249 cases, in which capital punishment is not authorized, into death penalty prosecutions, via § 924(j). Permitting that result upends the delicate political compromise that made possible the Matthew Shepard and James Byrd, Jr., Hate Crimes Prevention Act of 2009.

*United States v. Batchelder*, 442 U.S. 114 (1979), cited by the government for the proposition that it may charge in this manner, is distinguishable in at least two ways. First, the statute in *Batchelder* involved a difference in sentence of only three years, not life and death. The Court emphasized this in finding no "positive repugnancy between the provisions." 442 U.S. at 122. Such a finding is not possible here, where Congress rejected the punishment called for in § 924(j) in enacting § 249. Second, in *Batchelder*, the prosecution *chose between* the two statutes at issue, whereas here, the government has prosecuted under both, leveraging one statute to gain an advantage Congress did not intend under another. This is not exercise of ordinary prosecutorial discretion, as contemplated by *Batchelder*. *Cf.* 442 U.S. at 118, 123-24.[7]

---

[7] Nor, as we argued in our motion to dismiss the indictment, was it necessary, since the state is pursuing the death penalty against the defendant. *See* Dkt. No. 233.

9

This is unlike a drug, bank robbery or carjacking case in which the government seeks to enhance the punishment for an already-serious offense under § 924(j) because the offender killed the victim with a firearm during the crime. Here, the underlying statute, 18 U.S.C. § 249, already contemplates the possibility that death will be caused by the use of a firearm,[8] but Congress chose life without the possibility of release as the highest possible penalty. This Court should not permit the government to disrupt that scheme by means of its indictment power.

IV. **The government's non-statutory aggravating factors should be precluded as duplicative, or in the alternative, the government should be required to proffer its proof in order to prevent prejudicial duplication in its penalty phase presentation and argument.**

The government appears to misunderstand our argument regarding the legality of the non-statutory aggravating factors. *See* Dkt. 291 at 22-28.[9] Put simply: Assuming a conviction and penalty phase, certain facts that are part of the conviction – the elements of the offense, for example – will already have contributed to the defendant's eligibility for sentencing. In the FDPA, Congress authorized certain statutory aggravating factors to

---

[8] 18 U.S.C. § 249 reads:
>Whoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person—
>**(A)** shall be imprisoned not more than 10 years, fined in accordance with this title, or both; and
>**(B)** shall be imprisoned for any term of years or for life, fined in accordance with this title, or both, if—
>**(i)** death results from the offense.

[9] We have preserved but do not submit anything further on the non-delegation argument. *See* Dkt. No. 291 at 23.

10

establish eligibility for the death penalty. Many of these factors also relate to circumstances of the offense (e.g., here, multiple killings, substantial planning and premeditation, and vulnerable victims). *See* Dkt. 291 at 24-25. In *Higgs*, the Fourth Circuit clarified that the FDPA permits the government then to allege "additional" nonstatutory aggravators relating to the defendant's character or the circumstances of the offense. Our position is that these should neither be duplicative of the elements of the offense nor facts that Congress could have included among the statutory aggravating factors, but did not. *See Jones v. United States,* 527 U.S. 373, 398 (1999); *United States v. Higgs*, 353 F.3d 281, 321 (4th Cir. 2003).

We explained in our motion the manner of impermissible overlap here. In arguing the appropriateness of *statutory* aggravating factors that duplicate elements of the offense, Govt. Response at 23-24, the government misses the point. Such duplication is permissible because it is authorized by Congress (which determines the statutory aggravating factors). Once Congress has spoken on the aspects of the crime to be considered, however, the government may not redesignate *additional* offense elements as non-statutory aggravating factors. That is, the government may not make racial motivation – an element of the offense that Congress chose not to make a statutory aggravating factor – a *non*-statutory aggravating factor. Nor may the government include two non-statutory aggravating factors that bear on the same issue, e.g., racially-motivated killing and selection of victims, both of which highlight the defendant's choice to target African-American worshippers at Emanuel AME Church. *See United States v. McCullah*, 76 F.3d 1087, 1111-12 (10th Cir. 1996).

11

We fail to see the distinctions offered in the government's response between the non-statutory aggravators we identified as duplicative. In the event the Court determines not to strike any of them, however, we request that the Court require the government to proffer its evidence and argument before any penalty phase commences, to insure that the defendant will suffer no prejudicial double-counting.

V. **The government too readily dismisses the implications of *Hurst*, which has already caused one state court to abandon its death penalty scheme.**

As the government acknowledges, albeit in a footnote, the impact of the Supreme Court's decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016), is already being felt in courts around the country. Govt. Resp. at 32 n.20. To be sure, there is disagreement on the meaning of *Hurst*. *Id.* That is not surprising, given the history of this litigation, recounted in our motion and in the government's briefing. One of the opinions in *Rauf v. State*, 2016 WL 4224252 (Del. Aug. 2, 2016), however, signed by the Chief Justice and two others, demonstrates the changing view on this subject. Although the issue was not at the heart of the decision, the justices' comments bear on the weighing beyond a reasonable doubt question being argued here:

- Past case law … is in sharp tension with the central reasoning of *Hurst* and its predecessors such as *Apprendi v. New Jersey* ….

- [We are] unable to discern in the Sixth Amendment any dividing line between the decision that someone is eligible for death and the decision that he should in fact die….

- [We] also conclude that the Delaware death penalty statute is inconsistent with the Sixth Amendment to the extent that it does not require a unanimous jury to make the key discretionary findings necessary to impose a death sentence

12

>by employing a beyond a reasonable doubt standard….

*Id.* at *3-4 (Strine, CJ, Holland, Seitz, JJ).

The government's litany of examples of how *Hurst* used the term "fact"– an attempt to undercut our argument that weighing is fact-finding – actually shows that the Court is moving toward a broader construction of the term, something that is obvious from the trajectory of its decisions. The government's failure to address the social science surrounding how jurors make decisions at the selection phase, *see* Dkt. No. 291 at 32, is more telling with regard to this argument. "Weighing" is not merely an abstract, moral judgment. It involves concrete facts submitted for findings by jurors. Research demonstrates the jurors are influenced by this information. The law therefore requires that it be proved beyond a reasonable doubt. *Cf. Ring v. Arizona*, 536 U.S. 584, 610 (2002) (Scalia, J., concurring) ("[A]ll facts essential to imposition of the level of punishment that the defendant receives – whether the statute calls them elements of the offense, sentencing factors, or Mary Jane – must be found by the jury beyond a reasonable doubt.").

## CONCLUSION

For the foregoing reasons and those set forth in our original motion, the Court should reevaluate the constitutionality and implementation of the Federal Death Penalty Act, and should bar the death penalty as a possible punishment in this case.

Respectfully submitted,

s/ *Sarah S. Gannett*
Sarah S. Gannett
Assistant Federal Public Defender
Federal Public Defender for the District of Arizona
850 W. Adams Street, Suite 201
Phoenix, AZ 85007
602-382-2862
sarah_gannett@fd.org

David I. Bruck
Washington & Lee School of Law
Lexington VA 24450
540-458-8188
bruckd@wlu.edu

Kimberly C. Stevens
Capital Resource Counsel
Assistant Federal Public Defender for the
District of Oregon
1070-1 Tunnel Road, Suite 10-215
Asheville, NC 28805
336-788-3779
kim_stevens@fd.org


Attorneys for Dylann S. Roof