IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

**FILED UNDER SEAL**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO.: 2:15-CR-472 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| DYLANN STORM ROOF | ) | |

## DEFENDANT'S OBJECTIONS TO THE COURT'S PROPOSED CASE-SPECIFIC QUESTIONNAIRES AND PRELIMINARY INSTRUCTIONS

The Court has directed the parties to review the Court's proposed case-specific questionnaire and preliminary instructions, and to submit any objections in writing, under seal, by September 15, 2016. Dkt. Nos. 365 & 366. Having reviewed the proposed materials, the defendant, through counsel, submits the following objections. In connection with these objections, the defendant requests that the Court consider his filing today in response to the government's Motion in Limine to Preclude "Mercy" Instruction, Dkt. No. 356. *See* Dkt. No. 380. We also request that the Court consider the prior filings that bear on the issues addressed in the questionnaire, including:

- Dkt. No. 214, which discusses the importance of the manner of questioning;

- Dkt. Nos. 291 & 368, which discuss the ways in which jurors may misunderstand death penalty procedures;

1

- Dkt. No. 303, which discusses the reasons that reasonably informative and probing death penalty questions are particularly required;

- Dkt. Nos. 330, 338 & 343, which discuss the need for juror questioning to address publicity; and

- Dkt. No. 344, which demonstrates the potential impact of publicity in this case.

The defense further requests that counsel be afforded an opportunity to be heard at a chambers conference as specified below.

## BACKGROUND

On August 15, 2016, following a process of negotiation, the parties submitted a proposed case-specific jury questionnaire that represented the parties' best effort to submit a reasonable but appropriately searching inquiry of the jurors' views on key issues in this case. The parties disagreed in certain areas which were identified to the Court both in redline and in separate submissions. Despite the relatively modest nature of the written questioning proposed by the parties, the Court has proposed further cuts to the questionnaire that we submit will reduce its utility as a way to qualify only fair and impartial jurors.

Attached as exhibits to this pleading are twelve case-specific jury questionnaires approved by various United States district judges for use in capital cases around the country. Some are from high-profile cases like this one, which received significant publicity; some are from less notorious cases. Those questionnaires – all of which were actually submitted and filled out by many

hundreds of prospective jurors – illustrate the breadth and depth of questioning

that other courts have deemed appropriate and necessary in capital cases.

These questionnaires have several things in common:

- They use open-ended questions, which encourage jurors to share their honestly-held beliefs fully and completely. *See Morgan v. Illinois*, 504 U.S. 719, 735 (1993) ("As to general questions of fairness and impartiality, such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed"). *See also* Questionnaire in *United States v. Kaczynski*, attached at Exhibit 6 (posing not a single closed-ended question).

- They explore pre-trial publicity in an open-ended manner, especially in high-profile cases such as this one. *See, e.g.,* Exhibit 6 (*Kaczynski*) at Qs 30-32; 34; 35; 41; 109-114; Exhibit 8 (*United States v. Moussaoui*) at Qs 89-90, 100-101; Exhibit 12 (*United States v. Rudolph*), at Qs 94-105. In keeping with this approach, we request that jurors not be asked in the written questionnaire whether they can be fair and impartial; rather, we ask that the Court explore further, through the questionnaire and then in person, what the jurors' beliefs are and the strength of those beliefs. Following that process, the Court will be able to make an informed determination whether jurors' beliefs may truly be set aside.

- Broad-ranging questioning on death penalty views is common. Review of the attached questionnaires demonstrates how streamlined the proposed defense questions submitted by the parties on August 15, 2016 actually are. As we have explained in more detail elsewhere, these questions are critical to identifying jurors who can fairly evaluate the sentencing options. *See* Dkt. No. 313 (addressing appropriateness of defense questions 43, 46 and 49-52); Dkt. Nos. 291 & 368 (describing jurors' difficulty understanding death penalty instructions).

- The questionnaires are lengthy, thorough, and filled with open-ended questions. They do not require the jurors to determine on their own, without skilled follow-up questioning by the Court, whether they are capable of being "fair and impartial." In fact, the proposed questionnaire here – even with the additional questions proposed by the defense – is shorter than the ones we attach as examples.

We appreciate that the Court has edited some of our questions to make them more succinct, and of course we do not object to those edits. However, we continue to believe that the *content* of all of the questions we submitted is necessary to the process of selecting a fair and impartial jury consistent with the demands of the Fifth, Sixth and Eighth Amendments.

We outline below our specific objections to the Court's proposed questionnaire, using the question numbers from Dkt. No. 365, followed by reference to the question numbers contained in the proposed questionnaire submitted by the parties on August 15, 2016 (Redline with Govt and Defense Proposals), where helpful.

## DEFENSE OBJECTIONS

1.    Dkt. No. 365 Page 1, Instruction 6: We request that the Court insert "partner" in the definition of immediate family. The purpose of jury selection is to get the jurors to give honest and detailed responses. They should be encouraged to provide information about their partners just as they would their spouses. This also affords respect to individuals in domestic partnerships. Even the *Kaczynski* court, in a case that occurred 19 years ago, used the word "partner" throughout the questionnaire. *See* Exhibit 6.

2.    Dkt. No. 365, Page 3: We object to removal of the description of the case offered in the joint submission. Jurors must be provided sufficient detail about facts of the case, in plain English, to ensure that they are answering questions in proper context. *See* Dkt. No. 313. *See also* Exhibit 3, at p. 5 (*United States v. Watland*) (describing offense in questionnaire as follows: "The indictment in this case charges Mr. Watland with the premeditated killing of Mark James Baker on August 10, 2008. It is alleged that Mr. Watland murdered Mr. Baker at the United States Penitentiary in Florence,

Colorado…. If a sentencing trial takes place, the government may present evidence of other incidents, including that in 2004, in the State of Maine, Mr. Watland killed an individual named Wayne Crowley and that in 2006, Mr. Watland conspired with his wife to attempt to escape from the Maine prison where he was serving a sentence for the murder of Wayne Crowley. As part of the conspiracy to escape, Mr. Watland attempted to have a gun smuggled into the prison which Maine state officials believe he intended to use to take hostages and kill guards and inmates. Additional evidence may be presented to show that Mr. Watland has committed repeated acts of violence while in custody, threatened witnesses, and demonstrated a willingness to take human life without remorse").

3.      Dkt. No. 365, Q5A (added by the Court): We join the government in objecting to having to produce a witness list at this time. See Dkt. No. 381 (Govt. Notice of Objections). Dkt. No. 223, the Order Amending Scheduling Deadlines, ordered the parties to produce witness lists as follows: The Government, October 10, 2016 (Paragraph 1); The Defendant, October 17, 2016 (Paragraph 2). The parties are not prepared to produce lists any sooner. Any witness lists produced now would necessarily be over-inclusive, and would likely be under-inclusive, as well. The jurors can be provided accurate lists to review beginning on November 7, 2016. This is the most efficient way to proceed, since jurors might encounter witnesses between now and voir dire, making another discussion of witness lists necessary on that date anyway.

4.      Dkt. No. 365, Q8: We object to the form of this question. Our Q10 is submitted in proper open-ended form, designed to provoke jurors to respond with their actual opinions. Questions about jurors' ability to be fair and impartial should be asked only after individual voir dire on the opinions are expressed and further explored. A question, in writing, inquiring about a juror's ability to be "fair and impartial" will only prompt an answer designed to please the audience. Dkt. No. 214 at 5-7 (discussing manner in which jurors defer to perceived

Court preferences in responding to questioning).

5.    Dkt. No. 365, Q10: We request that the Court insert "have you or any member of your immediate family or household."  We do not object to the limiting time-frame of 5 years.

6.    Dkt. No. 365, Q11:  We do not object to this question, but we request that the Court add back in:  "even if it was not reported to others?", because – in our experience – jurors sometimes think this question refers only to reported crimes.

7.    Dkt. No. 365, Q12:  We do not object to this question, which is the same as our Q19.  We do, however, request that our Q20 be submitted as a follow-up to the Court's Q12.

8.    Dkt. No. 365, Q15A and B:  We object to the expert testimony question on the ground that it is cabined by "ability to be fair and impartial" language.  We request that the Court instead use our questions 18, 67A and 67B.  These are consistent with the form of questions submitted in other cases.  *See* Exhibits 1 (*United States v. Candelerio*) at Q89, 3 (*United States v. Watland*) at Q81, 4 (*United States v. Lecco*) at Qs 163-66, 5 (*United States v. McCluskey*) at Q20, 6 (*Kaczynski*) at Qs 93-95, 7 (*United States v. Lujan*) at Q79.

9.    Dkt. No. 365 Q19: We do not object to this question.  We request, however, that the Court insert our Questions 24, 25, 26, 27, 28, 29 and 30, after the Court's Q19. The questionnaires we have reviewed contain questioning along these lines, and the follow-up questioning is necessary to understand the strength and depth of the jurors' beliefs.  *See supra* p. 3; *see also* Exhibit 1 at Qs 24-29, 3 at Qs 90-96, 9 (*United States v. Naeem Williams*) at Q17, 10 (*United States v. Ritz Williams*) at Qs 42-27, 12 (*United States v. O'Reilly*) at Qs 63-67.  It is helpful to obtain this background prior to individual voir dire to assist with in-person questioning.[1]  As noted in prior filings,

---

[1] This is especially true where, as here, the Court proposes to conduct individual voir dire. The parties need to be prepared to submit questions to the Court in advance, and the responses to the questionnaire will assist in that.

juror questioning is essential in addressing publicity in high-profile questions like this one.  *See* Dkt. Nos. 330, 338, 343.

10.    Dkt. No. 365, Q 21:  We object to this question, which inquires whether jurors can "set aside" what they have learned before the trial.  We request that our original Q24-30 be added back in to the questionnaire in order to explore the strength of the impact of the information on the jurors.  The Court then can determine, through individual questioning, how best to evaluate the jurors' responses.

11.    365, Q 22: We object to this question, which emphasizes jurors' ability to be fair and impartial, regardless of exposure to publicity. With the deletion of our questions 24-30, the parties will not know the basis for jurors' opinions.  Although a juror's view on her ability to be fair and impartial may be one piece of information for consideration by the Court and the parties, it should not be dispositive – especially this early in the jury selection process, and given research showing that jurors may misunderstand the governing law.  *See* Docket No. 331 (summarizing research, and cases relying on it, showing that jurors may answer questions like this believing their answers to be correct, when in fact they have misunderstood the foundational legal issues involved).

12.    Dkt. No. 365, Q24: We do not object to this question, which is the same as our question 37.  We do object, however, to the Court's deletion of the parties' joint submission (at page 3) of a description of the case and the charges. The questionnaires we have reviewed frequently contain such a description.  *See* Exhibit 1 at pp. 8-9; 2 at p. 9; 3 at p. 4; 5 at p. 1; 9 at p. 4; 10 at pp. 5-6; 11 at p. 12; 12 at p. 17.  Such a description is indispensable for reliable death-qualification and life-qualification, and to appreciate the true impact of exposure to pre-trial publicity on potential jurors.  *See* Dkt. No. 313.

13.    Dkt.  No. 365, Q27: We object to this question because it does not shed light on the nature of the prospective juror's relationship to Emanuel AME Church.  As noted, understanding this in advance of

individual voir dire will facilitate effective individual questioning.

14.    Dkt. No. 365, page 12, PENALTY PHASE SECTION:  In the Court's description of the penalty phase, we object to leaving out: "No matter what the evidence of the facts of a case, the law never requires a jury to sentence a defendant to death."  We have filed today a response to the government's Motion in Limine to Preclude "Mercy" Instruction, which establishes that the "death is not required" language accurately reflects the operation of the FDPA, is authorized by Circuit precedent, and is consistent with federal practice.  *See* Dkt. No. 380. The questionnaires attached at Exhibits 1 at p. 11; 2 at p. 11; 3 at p. 26; 5 at p. 19; 7 at p. 22; 9 at p. 21; 10 at p. 31; 12 at p.19, illustrate that courts commonly include this language.

15.    We object to the Court's deletion of our question 43, which asks, "What are the sources of your beliefs about the death penalty? Please describe?"  Many of the questionnaires we are submitting to the Court include this precise question.  *See* Exhibits 3 at Q130; 4 at Q183, 6 at Qs 103-05, 12 at Q80.  Others ask closely-related questions.  *See* 2 at Q88, 7 at Q116, 8 at Q130, 9 at Q62, 10 at p. 32, 11 at Q134-35.  It is important that all parties and the Court have a basic understanding of the depth and the strength of the jurors' beliefs regarding the penalties of death and life imprisonment in order to properly evaluate challenges for cause, and for the parties to intelligently exercise peremptory strikes if necessary.  The written answers to these questions will help the parties determine what individual follow-up questions should be submitted to the jurors on this important issue.

16.    We object to the deletion of our question 46 ("Do you believe, for any reason based in religion (such as the adage 'an eye for an eye' or for any other religious reason), that death should always be the punishment for an intentional killing of another human being?").  This question is appropriate because it asks jurors to identify whether they have a disqualifying view about the death penalty.  *See*

Dkt. No. 313 (citing cases addressing need for questioning on this point). *See also* Exhibits 5 at Q85(g), 6 at Q104, 12 at Q84.

17. Dkt. No. 365, Q32A ("Do you presently have an opinion whether the defendant, Dylann Roof, should or should not receive the death penalty?"): We do not object to this question. We do, however, object to Q32B. As above, rather than asking jurors whether they can be fair and impartial, we request that the Court simply ask what opinions the jurors hold.

We respectfully request that the Court substitute our original question 32: "As a result of what you have seen, read or heard about this case, or what you have learned or already know about the case from any source, have you formed an opinion:

a. that the defendant, Dylann Roof, is guilty? Yes / No
b. that the defendant, Dylann Roof, should receive the death penalty? Yes/No
c. that whoever committed the crimes charged in this case should receive the death penalty? Yes/no"

*See* Exhibit 3 at Q144-45. If necessary, we wish to be heard with respect to this question in place of the Court's Q32A and B. Subsection (c), in particular, is needed to avoid unedifying responses to Q32(b) that allow a juror to conceal an inflexible, preconceived opinion that the defendant should be sentenced to death because the juror has not yet heard the evidence to establish that the defendant is, in fact, the perpetrator. As *Morgan* established, individual questioning must determine whether – assuming a defendant has been convicted of a capital offense for which there is no guilt phase defense available – the juror believes that the death penalty is the only appropriate penalty for that crime. The defendant's proposed question 32, with its three sub-parts, begins to examine that issue.

18. We object to the deletion of our questions 49, 50, 51, 52, which inquire whether the jurors' have an opinion whether the death penalty should be imposed upon conviction for the offenses charged

9

in this case. Our prior filing in Dkt. No. 331 addresses this issue, and why *Morgan v. Illinois*, 504 U.S. 719 (1992), requires such questioning. Many of the questionnaires we have submitted contain similar questions. *See* Exhibits 1 at Qs 39, 41-42; 2 at Qs 76, 83-84, 89; 3 at Qs 110-117; 120-125, 136; 4 at Qs 182-207; 5 at 72, 78, 85; 6 at Qs 107-08; 8 at Qs 135, 140.

19.   365, Q36: We prefer our questions 56 and 57, which are broader. In particular, 36B should track the language of our question 57 ("Have you had any experience or interaction with individuals, groups, websites (e.g., the Daily Stormer, Stormfront, lastrhodesian.com, etc.), publications, meetings or protests that would be considered to be related to white supremacists or 'white nationalists'?"), in order to capture viewpoints that may be of concern with respect to jurors' ultimate ability to be fair and impartial.

20.   Dkt. No. 365, Q37: We do not object to this question. We do, however, prefer that the Court include examples such as those listed in our question 58, because jurors may be unfamiliar with the term "white nationalist".

21.   We object to the deletion of our question 59 ("Have you, or has anyone close to you, been victimized or affected in any way by any extremist group?"). This is comparable to asking about victims of crime (well-understood to be important in criminal cases). However, this question addresses a different type of victimization that is pertinent in this case, but which jurors may not consider to be covered by the victims-of-crime question. Related questions were asked in several of the questionnaires we have submitted. *See* Exhibits 1 at Qs 62, 66; 2 at Q22; 6 at Qs 83, 99, 126; 7 at Qs 92-93; 8 at Qs 82-83; 11 at p. 4.

22.   We object to the deletion of our question 61 ("A 'hate crime' is a crime motivated by the victim's race, color, ethnic background, religion, or sexual orientation. Have you, or anyone you know, been the victim of a 'hate crime' or have you witnessed a hate crime taking place?"). As with question 59, this question seeks to identify

a potential source of bias pertinent to the charges in this case. For examples of similar questions, see Exhibits 1 at Qs 62, 66; 4 at Q110; 6 at Qs 99, 110; 8 at Q49, 11 at p. 4.

23.    We object to the deletion of our question 62, which asks about religious faith. As discussed in Dkt. No. 291, many religious faiths have tenets that bear on death qualification. *See* Exhibits 1 at Qs 53-54; 3 at Qs 50-54; 4 at 15, 54-59; 5 at Qs 28, 39-42; 7 at Qs 53-57; 8 at Qs 39, 72-74; 10 at p. 22; 11 at p. 7; 12 at Q25.

24.    With respect to the Court's preliminary instructions, Dkt. No. 366, we object only to the failure, on page 3, in subsection "C", to include language reflecting that the death penalty is never required. *See* Dkt. No. 380.

Finally, we respectfully request a chambers conference to afford the parties an opportunity to discuss with the Court the major objections set forth here, and in particular the death penalty questions, the use of open-ended questions, and the appropriateness of "can you be fair?" questions at this early stage of the jury qualification process.

<div style="margin-left: 40%;">

Respectfully submitted,

*s/ David I. Bruck*
David I. Bruck
Washington & Lee School of Law
Lexington VA 24450
540-458-8188
bruckd@wlu.edu

Kimberly C. Stevens
Capital Resource Counsel
Assistant Federal Defender, District of Oregon
1070-1 Tunnel Road, Suite 10-215
Asheville, NC 28805
(336) 788-3779
kim_stevens@fd.org

Sarah S. Gannett
Assistant Federal Public Defender
Federal Public Defender for the District of Arizona
850 W. Adams Street, Suite 201
Phoenix, AZ 85007
602-382-2862
sarah_gannett@fd.org

Attorneys for Dylann S. Roof

</div>