1

1    IN THE DISTRICT COURT OF THE UNITED STATES
         DISTRICT OF SOUTH CAROLINA
2              CHARLESTON DIVISION

3    UNITED STATES OF AMERICA,    )         2:15-CR-472
                                  )
4                  Plaintiff      )         Charleston,
                                  )         South Carolina
5    VS                           )         September 20, 2016
                                  )
6    DYLANN STORM ROOF,           )
                                  )
7                  Defendant      )

8              TRANSCRIPT OF HEARING
      BEFORE THE HONORABLE RICHARD M. GERGEL,
9          UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Plaintiff:    MR. JULIUS NESS RICHARDSON
                           Assistant U.S. Attorney
12                         U.S. Attorneys Office
                           1441 Main Street, Suite 500
13                         Columbia, South Carolina 29201

14                         MARY J. HAHN
                           Assistant U.S. Attorney
15                         U.S. Department of Justice
                           601 D Street NW, Room 5200
16                         Washington, DC 20003

17                         MR. NATHAN STUART WILLIAMS
                           Assistant U.S. Attorney
18                         U.S. Attorneys Office
                           P.O. Box 876
19                         Charleston, South Carolina 29401

20                         STEPHEN CURRAN
                           Assistant U.S. Attorney
21                         601 D Street NW, Room 5805
                           Washington, DC 20004

22

23

24

25

```
 1
 2    For the Defendant:        SARAH S. GANNETT
                                 Assistant Federal Public Defender
 3                               Arizona Federal Public
                                 Defenders Office
 4                               850 West Adams Street, Suite 201
                                 Phoenix, Arizona 85007

 5                               MR. DAVID I. BRUCK, Esq.
                                 Virginia Capital Case Clearinghouse
 6                               Washington and Lee School of Law
                                 Lexington, Virginia 24450
 7
                                 MS. EMILY PAAVOLA, ESQ.
 8                               Justice 360
                                 900 Elmwood Avenue, Suite 101
 9                               Columbia, South Carolina 29201

10                               MS. KIMBERLY STEVENS, ESQ.
                                 1070-1 Tunnel Road, Suite 10-215
11                               Asheville, NC 28805

12

13

14

15

16

17

18

19

20

21

22

23    Court Reporter:          Amy C. Diaz, RPR, CRR
                                P.O. Box 835
24                              Charleston, SC 29402

25              Proceedings recorded by mechanical shorthand,
       Transcript produced by computer-aided transcription.
```

1          THE COURT:  Okay.  We are in the second day of a

2     suppression hearing in the matter of *United States vs. Roof.*

3          Could counsel identify themselves for the record,

4     please?

5          MR. CURRAN:  Steve Curran for the Government, and

6     Jay Richardson and Nathan Williams and Mary Hahn, Your Honor.

7          THE COURT:  Good.  Thank you.

8          MS. GANNETT:  Good morning, Your Honor.  Sarah

9     Gannett, David Bruck, Kimberly Stevens, Emily Paavola and

10    Ms. Newman, our paralegal.

11         THE COURT:  Very good.

12         Okay.  Let me first confirm, what witnesses are the

13    parties planning to call today?

14         MS. GANNETT:  Your Honor, on the part of Mr. Roof,

15    we plan two brief witnesses from the sheriff's department,

16    Captain Robertson from the detention center, Sergeant Shaw

17    and then Mr. Pennington.

18         THE COURT:  And what are Robertson's and Shaw's

19    positions and what are their roles in this?

20         MS. GANNETT:  Captain Robertson is the captain of

21    the Security Threat Analysis Group with the sheriff's

22    department, and he is the supervisor to Ms. Knapp.

23         THE COURT:  I recall the testimony about him, yes.

24         MS. GANNETT:  And his testimony will be very brief,

25    but just his relationship to Ms. Knapp on the day of the

4

1    search.  And then Sergeant Shaw is employed at the detention

2    center and his testimony will be about his involvement in the

3    search.

4              THE COURT:  Okay.  Does the Government plan to call

5    any witnesses?

6              MR. CURRAN:  No, Your Honor.

7              THE COURT:  Okay.  Ms. Gannett, let me first address

8    the issue, I saw the filing of the waiver from the defendant

9    in this case.

10              MS. GANNETT:  Yes, Your Honor.

11              THE COURT:  And I saw in the footnote from in your

12    supplemental filing in the records to Rule 502(d), something

13    I never as a lawyer knew was in the Federal Rules, apparently

14    no other federal judge in America knows it either, because

15    it's cited three times in the history of the rules,

16    particularly in criminal areas.  And it seems to contemplate

17    some type of protective order that is then enforceable in

18    other courts.

19              Do you sort of read it that way, as well?

20              MS. GANNETT:  I don't know if I read it as a

21    protective order, but it seems to contemplate some kind of

22    order by the Court.

23              THE COURT:  Do I hear a motion from you for such a

24    protective order?

25              MS. GANNETT:  It was our understanding that the

1     Court entered such an order at the last hearing.

2              THE COURT:  We ought to be a little more formal if

3     we are trying to enforce this.  You make that motion?

4              MS. GANNETT:  Yes, Your Honor.

5              THE COURT:  And you ask that the testimony of

6     Mr. Pennington not be deemed a waiver of the attorney-client

7     privilege?

8              MS. GANNETT:  That's correct.

9              THE COURT:  What's the Government's position on that

10    oral motion?

11             MR. RICHARDSON:   We have no objection, Your Honor.

12             THE COURT:  Very good.  The Court grants the motion,

13    unobjected motion.  And I will also enter a brief written

14    order so that you will actually have a piece of paper that

15    you can show other courts should that come up.

16             I do find -- just say orally -- I know there is some

17    split authority on this, but I found the Virginia District

18    Court case reasoning made plenty of sense, and it's a logical

19    extension of the *Simmons* principle that you should not have

20    to waive the privilege to prove the existence of it; and in

21    that regard, I grant the motion.

22             Now, I want to make sure that the defendant was

23    fully apprised of his right to testify and to be here and

24    that he knowingly and intelligently waived those rights

25    because I don't want this to be an issue at some future time.

```
 1                So Ms. Gannett, I first want to confirm that the
 2       defendant understood that he had a right to testify at this
 3       hearing.
 4                MS. GANNETT:  Your Honor, I'm going to have
 5       Mr. Bruck address that.
 6                THE COURT:  Thank you.
 7                Mr. Bruck?
 8                MR. BRUCK:   The answer to the question is yes, he
 9       did understand that he had a right.  We discussed this fully
10       with him.
11                THE COURT:  And you fully apprised him of both his
12       right to testify and not to testify?
13                MR. BRUCK:  Yes, I did.
14                THE COURT:  And he understood that his testimony
15       under Simmons would not be a waiver of his attorney-client
16       privilege?
17                MR. BRUCK:  Yes.
18                THE COURT:  And not withstanding all the
19       considerations, he gave you a clear and unequivocal waiver of
20       his right to testify; is that correct?
21                MR. BRUCK:  Yes.
22                THE COURT:  And then in terms of his presence here,
23       you apprised him of his right to be present?
24                MR. BRUCK:  Yes.
25                THE COURT:  And you apprised him of his right not to
```

1    be present, correct?

2              MR. BRUCK:   We did.

3              THE COURT:   And having been fully apprised of his

4    rights, he unequivocally told you he did not wish to be

5    present?

6              MR. BRUCK:   Yes, he did tell us.

7              THE COURT:   The written waiver is a formalization of

8    his knowing and intelligent waiver of both those rights; is

9    that correct?

10             MR. BRUCK:   Yes, sir.

11             THE COURT:   Okay.  With that, let's call the first

12   witness.

13             Ms. Gannett?

14             MS. GANNETT:   Thank you, Your Honor.

15             THE COURT:   You are going to need to get my court

16   security officer to help you here.

17             THE CLERK:   You can come right here to be sworn.

18   There is a Bible right here.  Please place your left hand on

19   the Bible, raise your right.

20             State your full name for the record, please.

21             THE WITNESS:   Thomas Robertson, Jr.

22   THEREUPON:

23                       THOMAS ROBERTSON, JR.,

24   Called in these proceedings and after having been first duly

25   sworn testifies as follows:

ROBERTSON - DIRECT

1              THE CLERK:  You may be seated.

2              THE COURT:  We've got to do something about that

3    microphone.  Everybody hits that on the way in.

4                        DIRECT EXAMINATION

5    MS. GANNETT:

6     Q. Good morning, Captain Robertson.

7     A. Good morning, ma'am.

8     Q. What is your occupation, sir?

9     A. I'm a captain with the Charleston County Sheriff's

10   Office.

11    Q. And how many years have you held that position?

12    A. I have been at the Charleston County Sheriff's Office

13   almost fire years.  Prior to that, I retired out of the City

14   of Charleston Police Department.

15    Q. How long were you with the City of Charleston Police

16   Department?

17    A. I'm embarrassed to tell you this, probably about

18   33 years.

19    Q. What is your position in the chain of command at the

20   sheriff's department?

21    A. I'm in charge of the Security Threat Analyst Unit.

22    Q. Okay.  And what are your responsibilities in that

23   position?

24    A. I primarily do all the operational plans.  I do the

25   security details.  We have all the threat assessments for

9

ROBERTSON - DIRECT

1   major events that are occurring within Charleston County, and
2   of course the analysts, both the criminal analysts and the
3   analysts themselves, work for me.
4    Q. And one of the analysts who worked for you in August of
5   2015 was Lauren Mosher, now Lauren Knapp?
6    A. Yes, ma'am.
7    Q. I'm going to show you what's been marked as Defendant's
8   Exhibit 46 and ask you if you recognize that document.
9    A. I did after you showed it to me this morning.
10   Q. Right.  We talked about that document this morning.  And
11   that is an organizational chart --
12   A. Yes.
13   Q. -- of the sheriff's department --
14   A. Yes, ma'am.
15   Q. -- is that correct?
16   A. Both the law side and the detention side, yes, ma'am.
17   Q. Can you explain what you mean when you say "the law side"
18   and "the detention side"?
19   A. Unique about the Charleston County Sheriff's Office is
20   you've got the detention side that deals with the detention
21   center itself, and the law side, we do all the investigations
22   and the patrol functions for the county.
23   Q. And is your office on the law side or the detention side?
24   A. On the law side.
25   Q. And does that chart reflect where your office is situated

ROBERTSON - DIRECT

1    in the organizational chart?

2     A. Yes, ma'am.

3     Q. And can you point out where on the chart your office is

4    situated?

5     A. Right here highlighted in yellow.

6     Q. Right there highlighted.

7            And can you also point out where the detention

8    center is situated on that chart?  I should have highlighted

9    that for you, too.  I apologize.  Does it help if I direct

10    you?

11     A. No, ma'am.  I told you earlier, I forgot my reading

12    glasses.  But it's on the right-hand side of the chart.

13     Q. The right-hand side of the chart?

14     A. Yes, ma'am.

15     Q. Do you recall on August 3rd of 2015 a conversation with

16    then Analyst Mosher -- is it okay if we refer to her as

17    Analyst Knapp now that she's changed her name?

18     A. Please.  Yes, ma'am.

19     Q. With Analyst Knapp about a letter that she had identified

20    from Dylann Roof?

21     A. A letter that was presented to her through the detention

22    personnel, yes, ma'am.

23     Q. And she brought that letter to your attention?

24     A. Yes, ma'am.

25     Q. Could you please explain what you did at that time?

ROBERTSON - DIRECT

1    A. Once we decided what was referenced to, we notified my

2    chain of command.  We asked for a meeting to be held so we

3    could bring it to their attention.  We met.  It was the

4    determination at that time that Mr. Roof would be put under

5    suicide watch for his own protection, and they activated that

6    that afternoon.

7    Q. So could you identify who your chain of command is,

8    please?

9    A. Back then my immediate chain of command would have been

10   the Sheriff, the Assistant Sheriff, Chief John Clark and then

11   Major Mike Stanley.

12   Q. And it's the command staff on the -- that is the command

13   staff on the law side --

14   A. Law side.  Yes, ma'am.

15   Q. -- at the sheriff's department?

16          And they issued an order at that point?

17   A. Sometime after we left, yes, ma'am, they made the

18   determination to do the order for the psychological

19   evaluations and then the suicide watch, yes, ma'am.

20   Q. And to whom was that order directed?

21   A. To the detention side of the sheriff's office.

22   Q. And did you have any further involvement at that point?

23   A. No, ma'am.

24   Q. Thank you, sir.

25          THE COURT:  Cross-examination.

ROBERTSON - CROSS

1           MS. GANNETT:  Your Honor, I would like to move the

2    admission of that document.

3           THE COURT:  Any objection to Defendant's 46?

4           MR. CURRAN:  Just one question for the witness.

5                         CROSS-EXAMINATION

6    BY MR. CURRAN:

7     Q. That document, Captain Robertson, indicated it was valid

8    as of July of this year.  Is that the same chain of command

9    for you as in August of last year?

10    A. Yes, sir.

11           MR. CURRAN:  No objection, Your Honor.

12           THE COURT:  Very good.  Defendant's Exhibit 46 is

13    admitted without objection.

14           (Thereupon, Defendant's Exhibit Number 46 was

15    admitted into evidence.)

16    Q. All right.  Captain Robinson, you indicated that

17    Ms. Knapp came to you with a letter on August 3rd of 2015,

18    correct?

19    A. Yes, sir.

20    Q. And what did she relay to you about that letter?

21    A. She said that the letter was brought to her attention

22    through the -- it was presented to her by some of the staff

23    in the detention center.  In reviewing the material, she saw

24    some writing that was concerning to her.  She did some

25    research on the writing, found out where it indicated

ROBERTSON - CROSS

1    suicidal watch.  She came to me with that information.  We

2    decided at that time to notify the chain of command to bring

3    in their input to us and let them make a decision where they

4    wanted to go with it from there.

5    Q. Did she express any concern to you other than the

6    possibility that it indicated Mr. Roof might be at risk of

7    suicide?

8    A. No, sir.  Not that I recall.

9    Q. For example, did she mention to you at any time a desire

10   to search his cell for evidence related to his case?

11   A. No, sir.  She never searched the room at all, his cell.

12   Q. And Ms. Knapp, she works for you, correct?

13   A. Yes, sir.

14   Q. In the Security Threats Analysis Division, right?

15   A. Yes, sir.

16   Q. Does she have any authority to put someone on suicide

17   watch?

18   A. No, sir.

19   Q. Does she have the authority to order that an inmate's

20   cell be searched?

21   A. No, sir.

22   Q. And you took that to the informal command staff, correct?

23   A. Yes, sir.

24   Q. Do you recall whether, one way or the other, whether

25   Chief Beatty was there?

14

ROBERTSON - CROSS

1     A. I want to say he was, yes, sir, because there was a

2     discussion in there about the process they were going to

3     undertake.  And once the determination was made, we basically

4     left the room and they made the determination after that,

5     yes, sir.

6     Q. All right.  So the determination wasn't made in your

7     presence?

8     A. Well, pretty much it was, yes, sir, but we left.  And

9     then I know they talked a little bit more informally about

10    it.  But then the next thing we knew that they had placed him

11    on a suicide watch, yes, sir.

12    Q. And your recollection is that involves folks on the law

13    side and from the detention center?

14    A. Just the detention side.  The decision was made by both

15    because Chief Beatty is also under the chain of command of

16    the Assistant Sheriff, as well as the Sheriff, with the three

17    of their decisions that he go into a suicide watch.  It was

18    made jointly, yes, sir.

19    Q. Is it accurate to say that they had a discussion in your

20    presence and that from that discussion you believe you knew

21    what the decision was going to be, but the decision was

22    actually made after you left?

23    A. Yes, sir.

24    Q. All right.  So you don't know who specifically made the

25    decision to put him on suicide watch, do you?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

ROBERTSON - REDIRECT

1    A. The initial conversation, I believe, was between the

2    Sheriff, the Assistant Sheriff and Chief Beatty, yes, sir.

3    Q. Okay.  And at that meeting, was there any discussion of a

4    need to search Mr. Roof's cell that did not -- let me strike

5    that.  Was there any discussion with respect to Mr. Roof of

6    concerns other than his potential suicide risk?

7    A. Not that I can recall, no, sir.

8    Q. Was there any discussion of a need or desire to search

9    his cell for evidence at that meeting?  Let me ask you the

10   question again.

11          Was there any discussion at that informal command

12   staff meeting of a desire to search his cell for the purpose

13   of gathering evidence related to his case?

14   A. No, sir.

15          MR. CURRAN:  No further questions, Your Honor.

16          THE COURT:  Any redirect?

17          MS. GANNETT:  Yes, Your Honor, thank you.

18                    REDIRECT EXAMINATION

19   BY MS. GANNETT:

20   Q. Captain Robertson, Chief Beatty has the authority to

21   order a suicide watch on his own without consulting command

22   staff, does he not?

23   A. I would assume, yes, ma'am.

24   Q. And that decision can be made in the detention center

25   itself, correct?

ROBERTSON - REDIRECT

1      A. Ma'am, I can only say I assume because I don't have

2      anything to do with the detention side.

3      Q. Okay.  Does -- to your knowledge, is the law side

4      consulted regarding every suicidal inmate at the jail?

5      A. No, ma'am.

6      Q. Okay.  Sir, has the command staff ever discussed

7      collecting evidence from Dylann Roof's cell?

8      A. Not to my knowledge, no, ma'am.

9              MS. GANNETT:  Thank you, sir.

10             THE COURT:  You may step down.  You are free to

11     leave.  Thank you.

12             MS. GANNETT:  We are going to call the Sergeant at

13     this point, and Ms. Paavola is collecting him.

14             THE COURT:  Very good.  Thank you.

15             THE CLERK:  Place your left hand on the Bible, raise

16     your right.

17             State your full name for the record, please.

18             THE WITNESS:  Tyrone Shaw.

19     THEREUPON:

20                          SERGEANT TYRONE SHAW,

21          Called in these proceedings and after having been

22     first duly sworn testifies as follows:

23             THE CLERK:  You may be seated.

24                          DIRECT EXAMINATION

25     BY MS. GANNETT:

17

ROBERTSON - REDIRECT

1    Q. Good morning, Sergeant Shaw.

2    A. Good morning.

3    Q. Would you please tell the Court how you are employed?

4    A. I'm a sergeant over the Special Operations Group over at

5    the Sheriff Al Canon Detention Center.

6    Q. What is the Special Operations Group?

7        THE COURT:  Could you move the microphone just a

8    little closer to you?

9        THE WITNESS:  Is that better?

10   Q. What is the Special Operations Group?

11   A. It is the -- we handle mostly all of the -- any sort of

12   response that happens at the jail.  So the primary response

13   team at the jail.  We deal with fire and assaults and things

14   like that.

15   Q. I think you described to me the other day sort of like

16   what we used to call a tactical response group

17   A. Yeah.  We are the newer version of the "Tac Team" that we

18   had at the jail, um-hum.

19   Q. Were you in that position in August of 2015?

20   A. I was a member, yes, ma'am.

21   Q. You were a member at that time?

22   A. Um-hum.

23   Q. Okay.  And so did you participate in a search of Dylann

24   Roof's cell on August 3rd of 2015?

25   A. Yes.  As a supervisor, housing supervisor.

SHAW - DIRECT

1    Q. As a supervisor.  Okay.

2           And did you and -- was it Officer McGlocklin at that

3    time?

4    A. Operator McGlocklin.

5    Q. Sorry.  Operator McGlocklin go into Dylann Roof's cell on

6    that day?

7    A. Yes.

8    Q. What was the condition of his cell on that day?  Was it

9    messy, tidy?

10   A. It was pretty tidy, neat.

11   Q. When you went into the cell, did -- did he ask you any

12   questions about what was going on?

13   A. Just one question.

14   Q. What did he ask?

15   A. "Why am I being put on" -- or "what's happening?"

16   Q. What is happening?  And what did you tell him?

17   A. You are going to suicide watch.

18   Q. And did he cooperate with you?

19   A. Yes.

20   Q. What happened next?

21   A. We performed a strip search on him, placed him in a

22   suicide gown and inventoried his personal property.

23   Q. When you say "inventoried his personal property," was he

24   in the cell at the time you did that?

25   A. Yes.

19

SHAW - DIRECT

1    Q. He was?

2    A. Um-hum.

3    Q. Okay.  And how did the inventory occur?  What was the

4    process by which you inventoried his belongings?

5    A. We just took out -- took out of his cell everything that

6    an inmate is not permitted to have while on suicide watch.

7    So things like his shampoo or shoes or juice, bottles of

8    juice or soda, chips, commissary, things like that.

9    Q. And did you take out his personal belongings or were

10    other jail employees also involved in taking things out of

11    his cell?  Did you and Officer -- Operator McGlocklin or were

12    other jail employees involved?

13    A. The only thing that we took out were, like I said, like

14    his shampoo or commissary or things like that.  But we didn't

15    take control of anything like mail or books or letters or

16    anything like that.

17    Q. Who took control of the things like mail and books and

18    letters?

19    A. Outside of the cell, our Security Threat Group took

20    possession of those things, but I can't remember who actually

21    physically took them out of the cell --

22    Q. Okay.

23    A. -- on that day.

24    Q. Okay.  Well, when we spoke the other day, did you -- do

25    you remember telling me that you took the shampoo and juice

SHAW - DIRECT

1    bottles and other things of that nature out of the cell and

2    the Security Threat Group took the papers and books and other

3    written materials out of the cell?

4     A. No.  I remember -- we took possession of the shampoo and

5    things like that.  I do remember them taking possession of

6    those items when they were already packed up outside of the

7    cell, but I don't recall who physically took them out of the

8    cell for them to take possession of it.

9     Q. Well, who else was in the cell besides you and Operator

10   McGlocklin?

11    A. Just -- and Mr. Roof.

12    Q. So --

13    A. At the time of the search anyway.

14    Q. So who else could have packed them up and taken them out

15   of the cell if it wasn't you and Operator McGlocklin?

16    A. Like I said, I don't remember.  I don't remember if we

17   physically packed them up or if the security group physically

18   packed them up, but -- I can't recall.  I don't know.

19    Q. You can't recall.

20          THE COURT:  But Sergeant, one of the two of you did

21   that, correct?

22          THE WITNESS:  It could have been us or it could have

23   been the Security Threat Group or it could have even been the

24   unit officer, but during that time from August of 2015, I

25   honestly can't remember who physically packed up his books

SHAW - DIRECT

1     and his mail.

2        Q. You do have a specific recollection of packing up the

3     shampoo and the juice --

4        A. Yes, ma'am.

5        Q. -- and other personal items of that nature?

6        A. Um-hum.

7        Q. And you do not have a personal recollection of packing up

8     the papers and the books --

9        A. No.

10       Q. -- and those items?  Okay.

11           Once the materials were -- all the personal

12    belongings were out of the cell -- well, strike that.

13           Did Mr. Roof remain in the cell the entire time?

14       A. While --

15       Q. While you were there conducting the search?

16       A. No.  I believe he came out for a brief moment and we

17    placed him right back inside the same cell, yeah.

18       Q. Okay.  How often does the Security Threats Group

19    participate in a suicide watch search?

20       A. Not often.  Not very often.

21       Q. Okay.  You were interviewed by the Government in

22    connection with this same topic?

23       A. Um-hum.

24       Q. By the FBI agent and some government lawyers, correct?

25       A. Yes, ma'am.

SHAW - DIRECT

1    Q. And Operator Thicket was present.  Is she an operator or

2    officer?

3    A. Operator.

4    Q. I don't know all the --

5    A. Operator Thicket.

6    Q. Operator Thicket was present for that, as well?

7    A. Yes, ma'am.

8    Q. And you told them this at this time?

9    A. Yes, sir.

10   Q. And Operator Thicket concurred or agreed with all the

11   same things that you are testifying to today, correct?

12   A. She had a little bit more memory that I couldn't recall

13   from that day, but she gave her own statements about, you

14   know, things that occurred on that day.  She wasn't allowed

15   inside the cell, so she had her own recollection of the

16   events of that day.

17   Q. She did not go in the cell with you?

18   A. No.  She's a female.  We had to do a strip search.

19          MS. GANNETT:  Okay.  Thank you.

20          THE COURT:  Cross-examination, Mr. Curran?

21                    CROSS-EXAMINATION

22   BY MR. CURRAN:

23   Q. Good morning, Sergeant Shaw.

24   A. Good morning.

25   Q. One point of clarification.  On the day in question,

SHAW - REDIRECT

1    August 3rd, 2015, you were not there as a SOG member, you

2    were there as a housing officer, correct?

3    A. As a supervisor, housing supervisor.

4    Q. So you may have been associated with the SOG at that

5    time, but your duties that day were as a housing supervisor?

6    A. Yes, sir.

7    Q. Okay.  And you mentioned that you searched the cell and

8    you interacted with Mr. Roof because he was being put on

9    suicide watch, correct?

10   A. Yes.

11   Q. Who ordered you to do that?

12   A. Directly I got a call from my housing lieutenant who told

13   me to go and place him on suicide watch.

14   Q. Did they mention anything other than a need or a concern

15   with respect to Mr. Roof regarding suicide?

16   A. No.

17   Q. Did anybody ask you or mention to you that his cell

18   needed to be searched for evidence related to his case?

19   A. No.

20   Q. And you said you can't recall whether one of the officers

21   took the materials out, or STG went in and took the materials

22   out that day, correct?

23   A. Yes.  Correct.

24   Q. For what purpose would -- strike that.  You also

25   indicated that STG, the Security Threat Group personnel, are

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

SHAW - REDIRECT

1    not involved in suicide watches very often, correct?

2    A. Correct.

3    Q. How many suicide watches are there at the jail on any

4    particular day in your experience?

5    A. A few.  On any given day, maybe two to five or so, just

6    depends.

7    Q. So the STG members are not called out for every one of

8    those suicide watches, correct?

9    A. No, sir.

10   Q. When are they called out, in your experience?

11   A. Normally it's when we have a high profile inmate or an

12   inmate who is -- has a big influence in gangs, where they

13   would have to document the gang paraphernalia or things like

14   that.

15   Q. Is that one of the reasons they would go into a cell, to

16   document gang paraphernalia?

17   A. Yes, sir.

18   Q. So is this accurate, STG does not come out for every

19   suicide watch, but for high profile and gang-related

20   detainees, they do come out?

21   A. Yes, sir.

22   Q. And they are present for the search?

23   A. Yes, sir.

24   Q. And do they -- and in those circumstances, they do take

25   possession of the inmate's effects, correct?

SHAW - RECROSS

1    A. Yes, sir.

2    Q. At any time that day did anybody indicate to you that

3    there was a desire or a need to search Mr. Roof's cell for

4    evidence related to his case?

5    A. No, sir.

6            MR. CURRAN:  No further questions, Your Honor.

7            I said that too fast, Your Honor.

8            (Pause in proceedings.)

9            MR. CURRAN:  No further questions, Your Honor.

10           THE COURT:  Thank you.

11           Anything on redirect, Ms. Gannett?

12                    REDIRECT EXAMINATION

13   BY MS. GANNETT:

14   Q. Sir, you testified that the Security Threats Group may

15   have been involved because Mr. Roof is a high profile inmate;

16   is that correct?

17   A. Yes, ma'am.

18   Q. You also made reference to gang membership.  Mr. Roof is

19   not considered a gang member in the sense of being a member

20   of some organization like the Aryan Brotherhood or an

21   organization like that, correct?

22   A. Um, restate the question.

23   Q. Mr. Roof is not considered by the detention center, to

24   your knowledge, to be a member of a gang organization,

25   correct?

REDIRECT - REDIRECT

1    A. Not to my knowledge.  I wouldn't know.

2              MS. GANNETT:  Thank you.

3              MR. CURRAN:  One question, Your Honor?

4              THE COURT:  Yes.

5    BY MR. CURRAN:

6    Q. Who makes that determination with respect to whether

7    someone like Mr. Roof is considered to be associated with a

8    gang?

9    A. I wouldn't know.

10   Q. That's not a decision you make?

11   A. No, sir.

12   Q. That is not necessarily something that is within your

13   normal sphere of knowledge?

14   A. No, sir.

15   Q. And you don't know one way or the other whether he's

16   considered by the detention center to be associated with a

17   gang, do you?

18   A. No, sir.

19   Q. Okay.

20             THE COURT:  Sergeant, let me ask you:  During this

21   period where things were being removed from the defendant's

22   cell, was Mr. Roof there that entire time when things were

23   being carried out of his cell?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  So he could observe -- you don't

1    remember specifically who took books and letters and so

2    forth, but he was present when that occurred; is that

3    correct?

4            THE WITNESS:  Yes, sir.  That is common practice,

5    yes, sir.

6            THE COURT:  Okay.  Thank you.

7            Any questions occasioned by the Court's question,

8    first from the Government?

9            MR. CURRAN:  No, Your Honor.

10           THE COURT:  From the defense?

11           MS. GANNETT:  No, Your Honor.  In connection with

12   that question -- well, maybe there is, Your Honor.

13           THE COURT:  That's why I asked you and gave you a

14   chance.

15           MS. GANNETT:  There is, Your Honor.  I'm sorry.

16           THE COURT:  You are supposed to say yes, and

17   anything you ask I'm supposed to figure out if it is or not.

18           MS. GANNETT:  My brain doesn't work as fast as my

19   mouth sometimes, Your Honor.

20    Q. Sir, could you please clarify Mr. Roof's location

21   throughout the time of the -- that you were present for

22   the -- during the search?  You said at first he was in the

23   cell and you questioned him.  That occurred in the cell -- or

24   he questioned you, and that occurred in the cell, correct?

25    A. Um-hum.

1    Q. Okay.  And then after that you dressed him out, correct?

2    A. Inside the cell, yeah.

3    Q. Inside the cell also?

4    A. Yes.

5    Q. And after that you began the search; is that correct?

6    A. Yes.

7    Q. And he was still in the cell at that point?

8    A. I believe he was.

9    Q. Okay.  At what point did he step outside the cell, if you

10   remember?

11   A. I don't remember.

12   Q. Okay.  So would it refresh your recollection to look

13   at -- well, actually -- excuse me.

14   Q. Would it refresh your recollection about Mr. Roof's

15   location to know -- did you look at the report that the FBI

16   did on your interview with them?

17         MR. CURRAN:  I don't think he's indicated his

18   recollection needs to be refreshed.  He's testified --

19         THE COURT:  What is the --

20         MR. CURRAN:  -- what he recalls.

21         THE COURT:  What is the issue that you think he

22   might wish to refresh his recollection?

23         MS. GANNETT:  Where Mr. Roof was located.

24         THE COURT:  The way you do it, Ms. Gannett, is you

25   hand him the statement and you ask him, "Would you please

1    review it?" And "Does it refresh your recollection?"

2             MS. GANNETT:  That's fine, Your Honor.

3    Q. I'm showing you what's been marked as Defendant's

4    Exhibit 36.  This is the report of the FBI interview and it

5    discusses where Mr. Roof was located.  When you review that,

6    does it refresh your recollection at the bottom of the page

7    of where Mr. Roof was located during the event?

8    A. Okay.  It says he was outside of the cell.

9             MR. CURRAN:  Objection, Your Honor.  It's not for

10   him to read.

11            THE COURT:  What you do, Sergeant, is you read it

12   and then if it refreshes your recollection --

13            THE WITNESS:  Oh, okay.

14            THE COURT:  -- then you can state what you now

15   remember based upon reading the statement.

16            THE WITNESS:  Okay.  During the portion of the

17   search, while we were searching -- there was two searches

18   that had to take place.  So we had to take his personal

19   belongings, which is the shampoo and things like that, and

20   also his more personal property, such as mail and books and

21   things of that nature.  So there were two searches going on.

22   I know that we had him inside the cell during his shampoo and

23   things like that, but as far as his books and things like

24   that, I believe he was outside of the cell.  While the

25   Security Threat Group, or whomever was inside the cell, he

1    probably wasn't permitted to be inside the cell along with

2    them.

3         THE COURT:  He probably would or would not be?

4         THE WITNESS:  Would not be.

5         THE COURT:  And when he -- where he was standing,

6    could he see into the cell?

7         THE WITNESS:  More than likely, yes, sir.  Just

8    because it was his belongings and they would be touching or

9    taking possession of his personal belongings, he would be

10   visually in line to see.

11        THE COURT:  What they were --

12        THE WITNESS:  What they were doing.

13        THE COURT:  When they came out, would they walk past

14   him with whatever they had taken?

15        THE WITNESS:  Yes, sir.

16        THE COURT:  Okay.  Now, Mr. Curran, any questions

17   occasioned by the Court's questions?

18        MR. CURRAN:  For me?

19        THE COURT:  I'm asking you first.

20        MR. CURRAN:  No, Your Honor.

21        THE COURT:  Yes, Ms. Gannett?

22    Q. Was that the point in time when his personal belongings

23   were placed in a box and removed from the cell, the writings

24   and other books were placed in a box?  You mentioned a box

25   earlier?

SHAW - REDIRECT

1    A. Yes, that could have been.  Could have been the time.

2    Q. So when they came out of the cell with his personal

3    belongings and would have walked past him, his belongings

4    would have been in a box?

5    A. Yeah, of some sort, yeah, or something to carry it in,

6    maybe because he had a lot of stuff.  So --

7    Q. It would have been inside something at that point?

8    A. Yes.

9         MS. GANNETT:  Thank you.

10         MR. CURRAN:  One brief question.

11         THE COURT:  Yes.

12    Q. So when he goes back into the cell, what is left in the

13    cell?

14    A. Nothing.

15    Q. Everything has been taken out?

16    A. Everything.

17    Q. And it's been taken out in front of him?

18    A. Yes, sir.

19         MR. CURRAN:  Thank you.

20         THE COURT:  Thank you.  Sergeant, you may step down.

21    You are free to leave.

22         State your full name for the record, please.

23         THE WITNESS:  David Ashley Thurmond Pennington.

24

25

SHAW - REDIRECT

1    THEREUPON:

2                MR. DAVID ASHLEY THURMOND PENNINGTON,

3    Called in these proceedings and after having been first duly

4    sworn testifies as follows:

5                THE CLERK:  You may be seated.

6                            DIRECT EXAMINATION

7    BY MS. GANNETT:

8     Q. Good morning, Mr. Pennington.

9     A. Good morning.

10    Q. For the record, since I think everyone here knows, would

11    you please state your occupation?

12    A. I'm the Ninth Circuit Public Defender.

13    Q. And how long have you been in that position?

14    A. It was created by the legislature in '08, and I was the

15    first one selected.

16    Q. And would you please describe your prior employment

17    history briefly?

18    A. I started out as a Richland County public defender in

19    1980.  Then went to Chicago where I was a federal public

20    defender for four years in the Northern District of Illinois.

21             Then after that I came back to Charleston where I

22    was selected by Michael O'Connell as his deputy for the

23    public defender's office, which was the Charleston County

24    Public Defender.

25             After a year and a half, Michael went to the Federal

PENNINGTON - DIRECT

1    Defender, and I became the director and acted as the director

2    of the office for 11 years.

3         I went into private practice in '02 with Michael and

4    Ann, and then set up the Noisette Foundation working on

5    re-entry for a couple of years, three years.

6         And then was asked to come back as the Director of

7    the Charleston Public Defender.  And then the legislature

8    converted that into a circuit defender situation.

9    Q. In the -- in those positions that you have been in for

10   those 20-some years, have you handled capital cases before

11   this one?

12   A. I have.

13   Q. Can you describe that experience, please?

14   A. Sure.  When Michael left in '91 as director, I took over

15   some capital cases that he was working on.  And I basically

16   took all the capital cases that were assigned to indigent

17   defendants in Charleston County for those 11 years.  And then

18   subsequent to that, when I came back in '08, I inherited the

19   ones that were in the office from Jennifer Shealy, and have

20   continued to handle all the capital work in our office to the

21   present.

22   Q. In addition to that experience in capital cases, have you

23   had any training in capital case work?

24   A. Yes.  I have attended trainings going back as early as

25   1980 or '81 as a young public defender just to sort of learn

PENNINGTON - DIRECT

1    what it was about.  When I began to be first chair -- because

2    previously I had assisted Michael to some extent -- but when

3    I became first chair, I began to go to annual trainings that

4    were put on by the National Defender Association or other

5    similar entities.  I've also been to the Scheck Meister, I

6    think it's a two-week program in California, for trial

7    practice in capital litigation.  I have been to the Denver

8    voir dire training and I have attended South Carolina

9    specific trainings that were put on by the South Carolina

10   Office of Indigent Defense who has a capital defense

11   division.  And they brought in folks from out of state to

12   provide training that was specific to South Carolina.

13   Q. Does any of that training involve working with clients?

14   A. Certainly, yes.

15   Q. And in what areas?

16   A. Well, one of the big shifts in capital litigation is that

17   everyone knows as lawyers that you have to have -- you have a

18   duty to know your client, to understand their case and to

19   form relationships and loyalty and all of that.  Capital

20   litigation is criminal defense on steroids.  What you have to

21   do is to recognize that you are in sort of a desperate

22   situation more often than not factually.  And what you are

23   going to do is a complete social history of a client to

24   understand exactly who they are and where they came from and

25   why they think and behave the way they do for purposes of

PENNINGTON - DIRECT

1    both the factual defense of the case, but also for purposes

2    of mitigation.

3         And over the last 35 years, the standard has

4    steadily become clearer as most, I think, eloquently stated

5    by the ABA Guidelines that the South Carolina Supreme Court

6    has referenced favorably, which basically called for defense

7    counsel to form a very tight personal relationship with the

8    client so that you can get them to relax and open up.  It's

9    often very difficult because the clients often have

10   impairment and are also under extreme stress.

11   Q. In the experience that you've had in capital cases in

12   your practice, have you worked directly with clients?

13   A. Yes.

14   Q. How frequently?

15   A. Basically that's where the -- everything starts, and so

16   it's been in all of my cases I've worked directly with

17   clients.

18   Q. We are here today in the matter of Dylann Roof.  Would

19   you please explain your connection to this case?

20   A. Okay.  The night of the 17th of June 2015, I began to

21   recognize that a serious multiple murder case had occurred

22   and began to track the news media.

23        The next morning I went to the office and I

24   continued to track the news media and recognized that they

25   had a suspect.  I then contacted the State Capital Defense

PENNINGTON - DIRECT

1    Division that I told you about a moment ago, spoke to Boyd
2    Young, and it was determined that we needed to look into who
3    the suspect was.
4        Boyd was able to learn that this person had been
5    arrested in Lexington County and had representation,
6    contacted that lawyer, and the lawyer asked Boyd to reach out
7    to Mr. Roof once he was arrested to determine the need for
8    further representation.   I then also contacted my
9    administrative judge who last year was Kristi Harrington, and
10   got approval that I would be authorized to go and do
11   indigency screening upon an arrest.
12       In Charleston County, we have a very unusual
13   situation in that the clerks decades ago, the Clerk of Court,
14   has asked that the public defender agency actually do the
15   indigency screening of defendants.
16       So I have a staff of people that work for me and I
17   have indigency screeners at the jail.   But in serious cases,
18   high profile cases, we will get involved as quickly as
19   possible.
20       I learned later that same morning of the 18th that
21   he had been apprehended in Shelby, North Carolina, and I got
22   in my car and started driving to North Carolina.   I got just
23   to the outskirts of Charlotte when I learned that Mr. Roof
24   had been flown back to South Carolina.
25       So I turned around and drove back from there to the

PENNINGTON - DIRECT

1    detention center here in Charleston where I had a meeting

2    with Mr. Roof.

3    Q. Okay.  So that was on the 18th?

4    A. Right.  The night of his arrest.

5    Q. Where you had a meeting with Mr. Roof?

6    A. That is correct.

7    Q. And can you please explain how your role developed from

8    there.

9    A. Okay.  I had -- we filled out a financial declaration so

10   that we could determine that he would qualify.  And I asked

11   him about whether other family members would likely be able

12   to afford to hire counsel.  And he indicated that they would

13   not, in his opinion.

14        So I commenced active representation at that moment

15   and began to talk with him about what was going on without

16   getting into too many specifics.  I looked at both legal and

17   factual issues with him that night.  And then I had followup

18   conversations with him both before and after his initial bond

19   hearing, which occurred the next day, which would have been,

20   I guess, the 19th of June, 2015.

21   Q. Were you ultimately appointed to represent him?

22   A. You know, in Charleston there are no formal orders of

23   appointment.  Essentially, if the person is deemed indigent

24   by us, the screeners, then we are deemed lawyers.  Obviously

25   the private Bar can step in at any point, but there is no

PENNINGTON - DIRECT

1      formal appointment.  However, I did appear as his

2      representative, as his lawyer, at that initial bond setting;

3      and in fact, I had had a meeting with Judge Nicholson and the

4      Solicitor prior to that -- prior to that bond hearing in

5      Judge Nicholson's office about this case where my

6      representation had been approved.

7              Judge Nicholson -- I omitted that on the way to

8      North Carolina, I got a call, or a text or an e-mail, I can't

9      remember which, I happened to go to the restroom and I

10     noticed that Judge Nicholson had been appointed by the Chief

11     Justice to have what would be exclusive jurisdiction in this

12     matter.  And so I contacted Judge Nicholson to verify that it

13     was acceptable for me to go and continue in the indigency

14     screening process.  And he actually signed an order to that

15     effect.  So I guess, yes, I was appointed.

16      Q. So is it at that point you considered yourself to be one

17     of the lawyers for Mr. Roof?

18      A. Right.  I was his first lawyer.

19      Q. On the 18th or on the 19th, what time did you consider

20     yourself to be his lawyer?

21      A. At the completion of the screening, which would have been

22     on the 18th.

23      Q. And so you mentioned some meetings on the 18th and some

24     meetings leading up to the bond hearing.  Did you continue to

25     meet with Mr. Roof during the period between June 18th and

PENNINGTON - DIRECT

1    August 3rd of 2015?

2     A. I did.

3     Q. How frequently were you meeting with him during that

4    time?

5     A. I went back and reconstructed from my calendar, my little

6    pocket calendar and my notes and other records that we've

7    made in the case, that I met with Mr. Roof 15 times over that

8    period.

9     Q. And --

10    A. Some of that would have been video conferencing.  We have

11    the capacity to video conference with the jail, so a couple

12    of those visits were on video.

13    Q. For what purposes were you meeting with him at that time?

14    A. It was a matter of initiating a capital defense.  So it

15    the a blend of many things.  We had hearings to prepare for

16    in that initial bond hearing.  We -- there were -- there was

17    word from the media -- and we were following the media every

18    day -- that the Federal Court was likely to be involved.  I

19    got involved also with speaking with Bill McGuire.  Bill

20    McGuire is the chief of the Capital Defense Unit trial unit

21    at the Office of Indigent Defense.  And he and Boyd Young and

22    I discussed next steps.

23         In those meetings with Mr. Roof, I was asking him

24    about what happened and why it happened and trying to gather

25    as much history as I could without being off putting.  It's a

PENNINGTON - DIRECT

1    little bit of a dance when you are doing capital defense

2    because clients are often very, very distrustful of appointed

3    counsel.  Public defenders are viewed as being worth exactly

4    what people pay for them, which is nothing; and the fact that

5    we are compensated by the State creates a further conflict.

6    The fact that there can be a sense that from people in the

7    jail that, you know, you really want to get your own lawyer,

8    we work at a disadvantage.  And so I had to very cautiously

9    establish my credibility, and also was realizing that

10    Mr. Roof was somewhat shy and cautious about revealing all of

11    his background and history, and not sure why I wanted to know

12    these things.  He was nervous that I was going to start

13    analyzing him psychologically or start being critical of him

14    in some way.  And so he was very cautious into getting too

15    much of that.  It took time and multiple meetings.

16    Q. Were other attorneys meeting with him during that time,

17    as well?

18    A. I was the dominant lawyer, yes.  Bill Boyd and I and

19    David Bruck, that I had spoken with him potentially being

20    involved in the case, met with him, and also Ann Walsh, who

21    is the local Chief Federal Defender, had meetings with him

22    after I spoke with her.

23    Q. Do you have any record of the visits by all these

24    attorneys to the defendant at that time?

25    A. From all my personal records, yes.  Plus we generated a

PENNINGTON - DIRECT

1      document that captures that period that you've described

2      between the event, June 18th and August 3rd.

3       Q. How is that document generated?

4       A. As I said, I looked at my personal calendars, and also my

5      handwritten notes from my meetings with Mr. Roof, and also

6      from other records that I began to generate, you know, like

7      court records where we were in court together.  There was

8      actually a hearing in state court that occurred during that

9      interval, and there was preparation for what was the federal

10      arraignment during that period.

11      Q. And did the other attorneys do the same thing, to your

12      knowledge?

13      A. Yes.  We were working together and communicating with one

14      another.

15      Q. I'm going to show you what's been marked as Defendant's

16      Exhibit 11.  Is this the document to which you are referring?

17      A. Yes, it is.

18      Q. And did that document adequately reflect, so far as you

19      understand it, your meetings and the meetings of other team

20      members with Mr. Roof during that period from June 18th to

21      August 3rd of 2015?

22      A. It does.

23          MS. GANNETT:  Your Honor, I would move the admission

24      of Defendant's Exhibit 11.

25          THE COURT:  Any objection?

PENNINGTON - DIRECT

1          MR. CURRAN:  No objection, Your Honor.

2          THE COURT:  Defendant 11 is admitted without

3    objection.

4          (Thereupon, Defendant's Exhibit Number 11 was

5    received in evidence.)

6    Q. Do you know for what purpose or purposes the other

7    attorneys were meeting with the defendant during that time?

8    A. Well, in South Carolina you have a right to counsel, and

9    so my anticipation was, is that Bill McGuire, at the very

10   least, would be appointed as my co-counsel in this case on

11   the state side.  And then in my conversations with David

12   Bruck, there was an exploration of who was going to be his

13   legal representative in Federal Court.  I also had

14   conversations with Ann Walsh in the same vein.

15         And ultimately -- there were many conversations.  It

16   was sort of, How are we going to deal with this?  And

17   ultimately Ann elected that she had too many other

18   responsibilities and duties and David was appointed.  So I

19   was talking with all of them and they were meeting with

20   Mr. Roof, as this diagram or this chart kind of reveals.

21   Q. Are you able, without revealing attorney-client privilege

22   information, to describe the topics of conversation in your

23   meetings with the defendant?

24   A. They were comprehensive.  I was asking questions that

25   related to the -- of what happened and why what happened and

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

PENNINGTON - DIRECT

1    the underpinning, the motivations and the logic that went

2    into that.  I was asking about his parents, his family

3    background, his education, his medical history, his school

4    history.  And we were also -- it wasn't just me gathering

5    information about him, there was a lot of information sharing

6    about the process and what were these charges, and who were

7    these judges, and how is this going to work?  And answering

8    his questions.  And also, there were discussions about him in

9    his new setting in the detention center.  There were

10   extensive conversations about how he could protect

11   confidentiality and so I would stress that at every meeting

12   as I always do.

13   Q. Let me have you pause there for a moment and let's talk

14   about that.

15   A. Okay.

16   Q. What conversations did you have with the defendant about

17   protecting confidentiality at the detention center?

18   A. Okay.  Over the years, I've sort of monitored what goes

19   on in terms of the detention center and likely ways in which

20   things can for the defendant be disclosed and end up as

21   evidence.

22        So in every meeting, including this meeting with a

23   new client, I talk to them about a variety of things;

24   specifically the fact that the jail phone calls are now

25   monitored and recorded and are made available to the

PENNINGTON - DIRECT

1      Government or the State simply with a subpoena, with no

2      showing of probable cause.  That the jail mail is also

3      screened by the front office, or I should say kind of the

4      lobby officers of the detention center.  So that mail that's

5      coming in is reviewed for contraband and for content and mail

6      that's going out is reviewed in the same way.

7              I also spent a good deal of time talking about

8      clients about not talking about their case with other

9      cellmates or detainees.  It wasn't so much an issue in this

10     situation because Mr. Roof was being housed in a unit that

11     called for him to be segregated from other detainees, but I

12     talked to him about not talking, you know, when people go by

13     his door and that kind of thing, and also not talking to the

14     detention officers, that that was an issue.

15             The jail had also -- in later conversations, the

16     jail was relying on video conferencing.  And I told him

17     essentially in his conversations with his family that he

18     should not be talking about his case, that now is not the

19     time for that to be going on and that he should try to limit

20     conversations.

21             We learned later that, around January of this year,

22     the jail started recording those conversations, which are now

23     being shared with prosecutors, similar to the jail phone

24     calls.  We didn't know that at the beginning, however.

25      Q. In orienting him to these aspects of life in custody, did

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

PENNINGTON - DIRECT

1    you talk to him about how to -- or do you talk to clients

2    generally about how to protect the attorney-client privilege

3    and the confidentiality of case-related materials?

4     A. Yes and no.  Up to this case, this has been not an issue

5    at all.  The jail has been very good about respecting what

6    are called case-related materials or the client's papers.

7    And so up until this case we -- I encourage my clients to

8    accept discovery and to actively work on their case by making

9    notes and pen and paper notes and sort of organizing their

10   thoughts to be able to bring to me.  Because one way of kind

11   of dealing with all this dead time and not going crazy,

12   particularly when you are in administrative segregation, is

13   to work actively on your case.  So you would like them to do

14   little chores and activities and be engaged with you.

15          So my discussions with him was that we are going to

16   get you copies of documents at various times and don't share

17   those with other people.

18    Q. Did you talk to him about how to preserve and of

19   confidentiality of anything he might write down, give him any

20   instructions about that?

21    A. Essentially that was my advice right there.  There was no

22   further advice.  Maybe what you are aiming is at that time I

23   did not say you should write attorney-client privilege or

24   anything like that because it didn't ever seem necessary to

25   me, given the history of the jail and its care.  It's a

PENNINGTON - DIRECT

1    pretrial detention facility and the detention officers have
2    always respected the fact that detainees have cases that they
3    are actively working on.  And we've never had a situation
4    where the detainees' materials have been reviewed and copied
5    in this manner.
6           The only time it's come up has been in scenarios
7    where there has been improper communications.  I had a
8    capital case where a detainee was sending what are called
9    kites, which is the rules of the jail, don't let you
10   communicate with other cellmates, particularly if you are in
11   the segregated part of the jail.  And so in that case, the
12   detainees were sending messages, somehow tossing the
13   messages.  And those were intercepted and then they went
14   through a taint review for Sixth Amendment concerns, and then
15   were turned over to the solicitor who then made them a part
16   of the case.   But that's the only instance that I've had
17   where this jail has engaged in review of what would be
18   case-related materials.
19    Q. Were you aware of any policy at the jail requiring any
20   special confidentiality --
21    A. To my knowledge there was no restriction or guidance to
22   the Bar or to the detainees about having to mark their legal
23   materials as legal materials.  I don't think there -- and
24   having reviewed the documents that we subpoenaed in our state
25   court defense of this matter, I can't find any indication of

PENNINGTON - DIRECT

1    that at that time.

2     Q. So rushing back to topics that we've discussed with the

3    defendant more generally, were there any topics that were off

4    limits in your conversations with him?

5     A. No.  The only thing that was off limits was is that I

6    didn't want to push too hard.  What I asked him to do was

7    essentially to talk with me about matters that seemed

8    pertinent and relevant, but it was very wide-ranging.  And so

9    I -- in my conversations with him, I wanted to know how this

10    happened and why this happened, and why he felt compelled to

11    do what he did.  So we talked about that a lot.

12     Q. I'm going to show you what's been marked on the docket as

13    Exhibit 299-1 and ask you if you are familiar with this

14    document

15     A. Yes.  I've seen this document; and in fact, this -- I

16    have a copy of it, very similar -- this is what would be the

17    online document that he posted, the defendant posted on the

18    Last Rhodesian website.

19     Q. When did you become aware of this document?

20     A. On the Saturday after Mr. Roof's arrest, I was following

21    the news and talking with other lawyers.  And it became clear

22    that there was a reporter somewhere who had been searching

23    the Internet and had uncovered this website, and then posted

24    these documents and photographs of Dylann Roof revealing what

25    you see here.

PENNINGTON - DIRECT

1    Q. And is this something that you discussed with the

2    defendant?

3    A. Yes.  Once we -- I spent most of that Saturday trying to

4    figure out how to download pieces and part of it, and then

5    sharing it with my co-counsel and getting their advice.  And

6    then the following week would have been when I would have

7    talked with Mr. Roof about this.

8    Q. Did you only talk to him that one week?

9    A. No.  This was an ongoing conversation.  I mean, obviously

10   this is revealing in some ways about more of the details of

11   his thinking, so it was a great way to expand in that

12   discussion.

13        MS. GANNETT:  Ms. Ravenel-Bright, do you have a copy

14   of Exhibit 268-1 or did I use my other --

15        THE COURT:  261-1.

16        MS. GANNETT:  I have it.  I don't know if I

17   submitted one or if I should use my copy.

18   Q. I'm showing you what's been accepted as, from the docket,

19   as 268-1.  Do you recognize that document?

20   A. I do.  This is what would be Dylann's notepad that

21   appears that I received from him at the detention center

22   around August 21st of 2015.

23   Q. And when did you first learn of the existence of this

24   document?

25   A. Best of my recollection is, is that David Bruck was in

PENNINGTON - DIRECT

1    town, and we were meeting with people.  And he got a call

2    from the U.S. Attorney's Office revealing that there had been

3    a document that had been copied and was going to be sent to

4    David as part of early disclosure, evidentiary disclosure.

5    And then David and I discussed it at some length, and it was

6    a -- it was very concerning to us that it seemed to relate

7    and implicate all of our conversations.  So we composed a

8    letter -- actually he composed it and I sent it to Solicitor

9    Wilson -- in which we expressed our concerns that this had

10   been a breach of his privacy rights under the Fourth

11   Amendment and the Sixth Amendment right to counsel privilege.

12    Q. And did you send a similar letter to the federal

13   prosecutors?

14    A. I can't recall if David did.  I didn't, but I think David

15   may have.

16    Q. I'm going to show you what's been marked as Defendant's

17   Exhibits 9 and 12.  And I'm going to first show you

18   Defendant's Exhibit -- I'm first going to show you

19   Defendant's Exhibit 12 and ask you if you recognize that

20   document.

21    A. Yes.  This is an e-mail by me to Scarlet Wilson and her

22   Chief Deputy Bruce Durant and another senior solicitor with

23   copies to Michael O'Connell and Bill McGuire, which is

24   basically an e-mail version of this letter to her.

25    Q. And that's the letter that you just described to us?

PENNINGTON - DIRECT

1    A. Yes, it is.

2    Q. And I'm going to show you what's been marked as

3    Defendant's Exhibit 9 and ask you if that refreshes your

4    recollection about whether a similar letter was sent to the

5    federal prosecutors.

6    A. It does.  Right.  I was copied on this e-mail that day to

7    Mr. Richardson.  So it refreshes my recollection that this

8    was sent.

9    Q. And you said you are copied on the e-mail that --

10    A. That's correct.  Right.

11    Q. Did you speak to the defendant about the document that is

12    identified as 268-1?

13    A. I did.  I went to the detention center, because I was

14    concerned, upset that this was going on, to find out more.

15    And I discussed it with him.  He was surprised that there was

16    a document that had been copied.  And I asked him if he still

17    had it and he said he did.  And so I arranged with the SOG

18    team to take Mr. Roof back to his cell and to retrieve it,

19    and then bring it out to me, which he passed through -- there

20    is a little slot that the officers can open up for us, unlock

21    it and pass the document.  And I've retained it until I gave

22    it to you and I understand it's been moved into evidence.

23        MS. GANNETT:  Ms. Ravenel-Bright, could I have

24    Defendant's Exhibit 27, please?

25        THE COURT:  What date was that?

51

PENNINGTON - DIRECT

1          THE WITNESS:  August 21st.

2          THE COURT:  August 21st.

3    Q. I'm showing you what's been marked as Defendant's

4    Exhibit 27.  Do you recognize that?

5    A. This is Dylann's notepad with his notes.

6    Q. And is that the same document that you received on, did

7    you say August 21st?

8    A. I believe so, yes.

9    Q. You said that he was surprised that the document had been

10   taken.  Do I understand you to say he did not know that a

11   copy had been made of that document?

12   A. No, he had no idea.

13   Q. What did he tell you about that document?

14   A. Over the course of our conversations with Dylann about

15   this, it appears that what he was doing -- he was -- we were

16   asking lots of questions about the whys of what he did.  And

17   he would explain himself, and we would get pieces of it, and

18   we kept going back to that conversation.  I kept going back

19   to that topic.

20          When I talked to Dylann expressly about what this

21   was about, he said that early on in my representation of him,

22   he had wanted to try to essentially remember what his frame

23   of mind was at the time because that was so critical.  That

24   is what I kept asking him about about, what led up to this.

25   He wanted to remember clearly what his thinking was and to

PENNINGTON - DIRECT

1    organize those thoughts.  We did not at that time have access

2    to a journal that, or a notebook that was in his car that

3    essentially elaborated more on the ideas that were posted on

4    the Internet.  And so in some ways this appears to be to,

5    from what Dylann was saying, is he was trying to recreate

6    that for us to understand what he was thinking about; and

7    also to react to specific questions that we were asking.  In

8    many ways the document is a mirror of our conversations.

9     Q. And did he ever show you that document prior to when he

10   gave it to you on the 21st?

11    A. No, he did not -- as far as I know, he had never brought

12   it out actually during a visit.

13    Q. Did you talk about it before he gave it to you on the

14   21st?

15    A. We talked about the content.  Most of the content was

16   familiar, but he didn't talk about having written it down,

17   no.

18    Q. Did he ever use writings in your meetings?

19    A. Yes.  He would come sometimes prepared with certain

20   topics that he was interested in, that he knew that we would

21   be interested in, as well.  And so he would come with a

22   little slip of paper where he would make -- have made notes,

23   but he did not bring the entire document.

24    Q. You mentioned that he wanted to organize and preserve his

25   thoughts for you.  Did he ever show signs in his

PENNINGTON - DIRECT

1   conversations with you of returning to topics that had been

2   discussed or asking followup questions or did he ever show

3   signs that he was doing that?

4    A. Many times.  Obviously, this was a central concern of

5   ours in terms of understanding Dylann and why he had these

6   sort of fixed beliefs about things.  And so we were very

7   concerned about what was -- what compelled him to take the

8   actions that he took, why he felt compelled to do what he

9   did.  And so it was fascinating and important, because we

10   knew it was going to tie into an examination of his mental

11   health and his life history, and how he saw things was really

12   the most central topic.  There is a lot of other things being

13   discussed, like the logistics of what is a Federal

14   Indictment, and other things related to the handling of the

15   case.  Also, we were talking to him about his family and

16   encouraging him to have contact with his family and there

17   were other more mundane topics, but this was a pretty key

18   part.

19          Also, you spend a lot of time just trying to warm up

20   to people, so you ask him about things like their movies or

21   how they spend their free time, what they love and what they

22   care about and those type things to try to forage some sort

23   of relationship.  So some of those conversations are also

24   reflected in these notes.

25    Q. Would you direct the Court to some places in the notes

PENNINGTON - DIRECT

1  where you see conversations that you had with the defendant

2  reflected?

3   A. I brought with me a highlighted copy that it's easier for

4  me to reference.

5           THE WITNESS:  I don't know if the Court -- does the

6  Court want me to open this up?

7           THE COURT:  You can use yours.  That would be just

8  fine.

9           THE WITNESS:  Okay.  Great.  And I'm sorry.  Your

10  question is refer to what?

11   Q. If you could point out places in the document where you

12  noticed -- you don't have to be exhaustive, but if you point

13  out some examples of conversations that you had with the

14  defendant are reflected in this document?

15   A. Well, you can kind of look through this and see that

16  almost every topic is something that we talked with Dylann

17  about, whether it was the paragraphs that relate to Jews or

18  Hispanics or blacks or Asians, Muslims, each topic, Slavs,

19  Russians.  We talked about all of those specific topics.  We

20  talked specifically about how whites had reacted to the, what

21  he perceived as the violence being perpetrated against them,

22  and how they were perceived or pretending that they didn't

23  understand that they were under attack.  We talked about

24  again why he felt compelled to take physical action in light

25  of his sense that the white community was under attack and

PENNINGTON - DIRECT

 1    why that was necessary.  We talked about his views on

 2    homosexuality and feminism.  The whole thing really.  We

 3    talked about many of the movies that are listed here:  "Pride

 4    and Prejudice," "Romper Stomper," "The Notebook," "Titanic,"

 5    "12 Years a Slave," "Cinderella," the movie that had come out

 6    right before this that he had seen.  We talked about people

 7    who are actors in movies and who should be actors in movies

 8    that is referred to in the document.  We talked about the

 9    specific shootings.

10         And there is reference made in here of, for example,

11    his desire not to shoot the little girl that was in the

12    church, and his view that he was not attempting to shoot

13    those other people who were not shot, and that he was

14    bothered that he was being charged in the state court with

15    the attempted murder of those individuals.

16         As we get further into the document, there is even

17    more specificity about content that is directly kind of

18    related to our conversations.  There was the stuff about the

19    fact that we had had a tip that he, after his being detained

20    in the county jail, had been crying in his cell.  And we

21    followed up on that by interviewing some detention officers.

22    And eventually we asked Dylann about it.  And Dylann was very

23    fervent in saying that that was not true, even though I'm not

24    entirely certain that it's not true.  And so he stressed in

25    this how ridiculous it was that that --

PENNINGTON - DIRECT

1          THE COURT:  Had that been publically reported?

2          THE WITNESS:  No.  There are parts in here where he

3     clarifies.  Dylann is very particular about language.  That's

4     one of his unusual qualities is that he is very particular

5     about being quoted in exactly the language that is used.  And

6     so there had been a reference someone had made to the idea of

7     that blacks were "taking over the country."  And so as you

8     see in this, there is a direct reference to our conversation

9     about the fact that that was a misquote, that he never used

10    that term.  Even though it was kind of, it seemed to me,

11    interpreting what he was saying.  He was being very

12    technical.  But that reflected what was being said and what

13    was on his mind at the time in our conversations.  We

14    discussed exactly what he said and didn't say to Ty Sanders,

15    who is one of our victims during the shooting.  He disputed

16    that this had been a manifesto that he had posted on Last

17    Rhodesian because he had called it a text.  We talked about

18    that.

19          And then there was reported in the media, and we had

20    discussed with Dylann, the idea that a friend of his,

21    African-American friend, or some friend of his, had said that

22    he had intended to go to the College of Charleston and shoot

23    people there.  And he took offense at that, said that there

24    was no basis for that, disputed what that friend said.

25          THE COURT:  And I recall that that was in the press.

PENNINGTON - DIRECT

1    Did he have access, Mr. Pennington, to the press?

2            THE WITNESS:  Not that I recall.  But as time went

3    on, his family provided enough money that he could get a

4    radio.  So he does and did listen a lot to AM radio and NPR.

5    But my recollection was --

6            THE COURT:  I'm really interested, I think, up to

7    August 3rd.  You don't think he had a radio then?

8            THE WITNESS:  I don't think he did.  I think he

9    largely gleans from what he got to us.  We would come to him

10   with topics and things that we had seen in the media.

11           THE COURT:  When you asked him these things, for

12   instance the tearfulness, did he have trouble answering that

13   he did not cry or did he answer that that was not true?

14           THE WITNESS:  He was not angry, but he was kind of

15   resentful and affirmative.  And part of this is that he's a

16   complex young man to talk to.  And I think that he believed,

17   or it appeared that he thought that we were trying to make

18   him look weak or something like that.

19           THE COURT:  I understand.

20           But the question was he didn't -- you raised certain

21   issues, like let's just take hypothetically his view of

22   Hispanics.  Did he volunteer that?  Did he talk to you or did

23   he have trouble describing that to to you?

24           THE WITNESS:  He would when prompted.  He did not

25   sit me down like you would in a classroom and run through

PENNINGTON - DIRECT

1   these things.  I would ask and probe and you would get more.

2              THE COURT:  You at some point had access to the Last

3   Rhodesian website?

4              THE WITNESS:  The first full week from his arrest

5   until that point on we had that document.

6              THE COURT:  Did you have access to the statements

7   seized in the vehicle before August 3rd?

8              THE WITNESS:  No.  That came in state discovery

9   around October.

10             THE COURT:  Thank you.  I'm sorry.

11             Ms. Gannett, please continue.

12  BY MS. GANNETT:

13   Q. I want to direct your attention -- and I know that the

14  highlighted document you have, I think, doesn't have page

15  numbers -- but was there a discussion in that document about

16  self-medication and psychology and can you share with the

17  Judge that piece of it?

18   A. Well, it's, I think, toward the back.  And there is --

19  one of the things that you run into with Dylann and all these

20  folks, when you start getting particular about asking about

21  their history, they are wondering, "Why are you asking me

22  this?"  "Where is this going?"  And, "Are you trying to make

23  me look crazy?"  Or, "Are you trying to insinuate something?"

24             So in the course of that kind of conversation,

25  Dylann said explicitly that he really didn't believe in the

PENNINGTON - DIRECT

1    idea of psychology, or really psychiatry, and that seemed to

2    boil down mostly to some of the Freudian ideas that he had

3    run across on the Internet that he thought were not accurate.

4    And he was concerned about the defense team -- where we were

5    going with this.  He didn't want to embarrass himself and he

6    didn't want to embarrass his family by getting some sort of a

7    label.

8    Q. And did you also talk to him about drug use and

9    self-medication?

10   A. We did.  We talked about drug use and what was going on.

11   And he downplayed any substance abuse at the time initially.

12   Later he revealed that he had had something to drink before

13   he went into the church; and later in other further

14   conversations we got into some of his historic drug use.

15   Q. Is the discussion of drug use and self-medication

16   reflected in that Document 68-1?

17   A. I think he talks about the fact that that does not -- he

18   didn't do this because he was on drugs and didn't want that

19   to be somehow viewed was a, Oh, he was drunk or high and

20   that's why he did what he did.

21        THE COURT:  Let me ask you this:  On the drug use,

22   did he seem to have trouble acknowledging to you that he used

23   drugs?

24        THE WITNESS:  It depends on the context.  Yes, at

25   times.  I think initially it was not volunteered.  And with

PENNINGTON - DIRECT

1    regard to, as I indicated just a moment ago, it did not come

2    out that he had had something to drink until several meetings

3    into our discussion.

4            THE COURT:  But in terms of the idea is that once

5    you were talking with him and he would develop some level of

6    trust, he acknowledged to you that he from time to time used

7    drugs?

8            THE WITNESS:  Yes.

9            THE COURT:  And he didn't seem to be reluctant to

10   acknowledge -- I remember in the statement he says something

11   to that effect, "I didn't do it because I had a problem."  "I

12   like getting high."  Is that the kind of communication you

13   had gotten from him?

14           THE WITNESS:  Essentially, yes, sir.

15   BY MS. GANNETT:

16    Q. I think I would like to move from the writings at this

17   point to what happened after the discovery and after you

18   received the tablet.  Did you then conduct an investigation

19   about the circumstances of the search?

20    A. I did.  Yes.  I got with my -- actually, I discussed it

21   with the other lawyers in the case first, but then ultimately

22   decided that the best course of action was to call Chief

23   Willis Beatty and ask to meet with him.  And so I have an

24   investigator by the name of Art DeJovena, and Mr. DeJovena

25   and I had an appointment, had a meeting with Chief Beatty on

PENNINGTON - DIRECT

1     the 15th of September, and then a followup meeting on the

2     17th of September.

3      Q. And did you memorialize that meeting in any fashion?

4      A. Yes.  I made handwritten notes at the time, along with

5     Art made notes, and together we put together this memorandum

6     so it could be shared with other people about what we

7     learned.

8      Q. I'm showing you what's been marked as Defendant's

9     Exhibit 23.  Do you recognize that document?

10      A. This is the memorandum that I prepared.  It has some

11     parts that are redacted that were sort of like strategic

12     thinking discussions that were tacked on at the end that were

13     not recitations of what was said.

14      Q. But otherwise, it reflects the investigative memorandum

15     that you prepared following your meetings with Chief Beatty?

16      A. It does.

17      Q. And there were other people involved in those meetings,

18     as well, correct?

19      A. In terms of my preparation of this memo?

20      Q. No.  Other people that you met with in addition to Chief

21     Beatty on the 17th of September?

22      A. Well, in the -- in the second meeting we had Lauren

23     Mosher Knapp, who was present all throughout the meeting.

24     That was a set up meeting where the Chief brought Ms. Mosher

25     into it, in their conference room, and then roughly about

PENNINGTON - DIRECT

1      halfway through Ms. Bloodworth came in.

2              MS. GANNETT:  Your Honor, I would move admission of

3      Defendant's 23.

4              MR. CURRAN:  Objection, Your Honor.  The witness is

5      here and available to testify about those meetings.  There's

6      not any reason --

7              THE COURT:  Obviously this is a suppression hearing,

8      the formal Rules of Evidence don't apply.  You can

9      cross-examine him and I will allow you to do that.  But I'm

10     going to admit it for whatever value it has, and I will look

11     forward to your cross-examination.

12             Defendant 23 is admitted over objections.

13             (Thereupon, Defendant's Exhibit Number 23 was

14     received in evidence.)

15     Q. So I would like to talk about what you learned during

16     that interview of Chief Beatty; and in particular, what you

17     learned about the suicide interventions that took place

18     during -- during the day of August 3rd, 2015.

19             To begin with, did the Chief explain to you sort of

20     how suicide intervention generally happens at the jail?

21     A. He did.

22     Q. And what did he tell you?

23     A. In the first meeting he went through sort of a three-part

24     policy that they had at the time on how they dealt with folks

25     where they thought that they might be at risk.  The first was

PENNINGTON - DIRECT

1    called a 15-minute watch.  And that was essentially just

2    alerting the detention officers in the unit to go by the cell

3    and look in every 15 minutes and maintain a log of that

4    contact to make sure that the detainee is okay.

5         The second is, is what I call suicide precautions.

6    That is, where essentially you have the defendant dressed in

7    a suicide gown, which looks a little bit like a blanket.  And

8    they are removed from their cell and they are -- anything

9    that could be a threat to the person is removed from their

10   cell.  And then they are evaluated for purposes of whether

11   they actually constitute a suicide threat.

12        Then there is a third iteration, which occurs when

13   there is really more of an awareness, a certainty, if you

14   will, that there is a suicide threat scenario underway.  And

15   there they actually take the same detainee, but they move him

16   into the medical unit where they have this special spot where

17   they can watch them, have an officer right there.  And they

18   remove all stuff from around them.  And so that is the more

19   rigorous version of the suicide watch.

20   Q. And when you interviewed Chief Beatty, did he tell you

21   what type of suicide intervention was ordered with respect to

22   Dylann Roof on August 3rd?

23   A. He did.  He described that there had been a meeting at

24   the sheriff's office that morning, and that this had been

25   brought to his attention, and that he thought that what was

PENNINGTON - DIRECT

1    called for was this 15-minute precautionary check or

2    15-minute watch.  And so that is what he had ordered.

3     Q. And did he have an explanation for -- well, strike that.

4    Did he say whether he ordered a search of the defendant's

5    cell?

6     A. He said he didn't.  He did not.  He said that somehow

7    that the order had been changed in such a way that the staff

8    beneath him had gone in and conducted the, what are called

9    suicide precautions, where they put the guy in the gown and

10   go through the things in his cell.

11    Q. And did you revisit that question with him on the 17th?

12    A. We did.  I was particularly concerned about the seizure

13   of this document, its copying and its being put back.  So I

14   was paying particular attention to that topic.  And so Chief

15   Beatty was very cooperative and was willing to meet again,

16   actually bringing in Ms. Mosher.

17           And so we met in the same -- in his conference room

18   with her two days later, and again with my detective, or

19   investigator Art DeJovena.  And we went through exactly the

20   same conversation, where Chief did the talking and described

21   that he had ordered what was a 15-minute watch, and that he

22   was not sure how the order had been changed to being this

23   suicide precaution approach.

24    Q. And did either Ms. Mosher Knapp or Ms. Bloodworth comment

25   on that description during the meeting?

PENNINGTON - DIRECT

1    A. They did not.

2    Q. I want to return to, for a moment, to the writings.  I

3    think there is one area that we did not explore, and that's

4    with respect to your conversation with the defendant about

5    his purpose in writing the document.

6         Did he talk to you about what his intentions were

7    with respect to sharing or not sharing the document?

8    A. I asked him specifically when we first got it, I said,

9    "What were you going to do with this?"  "Were you going to

10   send this out?"  "What were you going to do with it?"  He

11   said he was not going to send it to anyone.  It was not in

12   any kind of shape to be sent out, that it was his notes, his

13   way of remembering clearly what had happened so he could talk

14   to us.

15        MS. GANNETT:  Thank you.

16        (Pause in proceedings.)

17                        CROSS-EXAMINATION

18   BY MR. CURRAN:

19   Q. Good morning, Mr. Pennington.

20   A. Yes, sir.  Good morning.

21   Q. You know how this goes, correct?

22   A. Yes.

23        THE COURT:  You do not know, Mr. Curran, how many

24   lawyers would like to line up and be having this

25   conversation.

66

PENNINGTON - CROSS

1              THE WITNESS:  Probably have a lineup down the

2      street.

3              MR. CURRAN:  I'm sure many of them could do better

4      than I.

5       Q. Just a followup on some questions on some of the topics

6      that you raised today.  And if you will bear with me, I've

7      got to figure out from my scrawl that I was taking here.

8      It's almost as indecipherable as your investigator's

9       A. Okay.  Sorry about that.

10      Q. That's okay.  All right.  Mr. Pennington, the -- I guess

11      the gist of your testimony here today is that you have looked

12      at the statement, Defendant's Exhibit 1, and you look in

13      there and you see that there is a parallel with things that

14      you were talking about, correct?

15      A. You are talking about between the Last Rhodesian and the

16      jail?

17      Q. No.  I'm talking about things that you were talking about

18      with your client, as well as things that show up in the jail

19      notepad, correct?

20      A. Yes, there are.  Yes.

21      Q. And there are also significant parallels between what is

22      in the jail notepad and what is in the website manifesto,

23      correct?

24      A. Yes, sir.

25      Q. And I understand that it's -- your testimony is that you

PENNINGTON - CROSS

1    did not get the car writing until sometime later, but there

2    is also significant overlap between what's in the jail

3    writing and in the car journal, correct?

4     A. Correct.

5     Q. So a number of the things that you mentioned that you

6    were talking to him about, he had -- he was already talking

7    about, correct?

8     A. In the Last Rhodesian website?

9     Q. You have access to the confession?

10     A. Yes.

11     Q. You have access to the car journal?

12     A. We did not have access during this time period.

13     Q. You do now, though?

14     A. Yes.

15     Q. He certainly had access to the car journal, right?

16     A. Certainly.  He wrote it.

17     Q. And he was present for the confession?

18     A. Yes.

19     Q. And he prepared what has been termed the website

20    Manifesto.  I understand he disputes that terminology, but he

21    prepared that, correct?

22     A. Yes.

23     Q. And all of -- many of those topics appear in all three of

24    those unprivileged writings and conversations, correct?

25     A. Yes.

PENNINGTON - CROSS

1    Q. Christianity.  He talks about that in the car journal,
2    correct?
3    A. Right.
4    Q. Homosexuality?
5    A. Right.
6    Q. Blacks, Jews?
7    A. Right.
8    Q. The need for a race war?
9    A. Right.
10   Q. The Hispanics?
11   A. Yes.
12   Q. Black on white crime?
13   A. Yes.
14   Q. All of those things he had already at least three times
15   before this writing had, without any prompting -- a
16   confession may have had some prompting -- but without -- at
17   least two times without any prompts, he had already decided
18   that he needed to express that view himself on his own,
19   correct?
20   A. He left the journal in his car for sure.  He definitely
21   published the Last Rhodesian website and he did talk to the
22   FBI, so yes.
23   Q. And the journal, in fact, has a reference to the
24   lastrhodesian.com, correct?
25   A. I can't recall, but it probably does.

PENNINGTON - CROSS

1              THE COURT:  It does.

2    Q. And you know from the confession that he didn't expect to

3    live that night, did he?

4    A. That's correct.

5    Q. And he's told you that himself, too, that when he walked

6    out of there, he expected the police to be there?

7    A. That's right.  You are right.

8    Q. And on the last -- in the car journal, which would have

9    been found in his car if he had been killed, right?  There

10   was a sign post, wasn't there, taking you right to the Last

11   Rhodesian, correct?

12   A. Yes, that's correct.

13   Q. And in the Last Rhodesian, he talked about almost

14   everything that is in the jail writing, as well, correct?

15   A. Well, this -- it's 30 pages long, so there is a good more

16   detail, but a lot of the same themes, topics, philosophy is

17   there in the Last Rhodesian page.

18   Q. On at least three occasions before this writing, he has

19   either made those statements or written it down in a

20   nonprivileged manner, correct?

21   A. Right.

22   Q. So apparently your client does not really have any

23   aversion to making those views known, does he?

24   A. He had aversion to revealing things that we were talking

25   about.  He's a very obedient kind of client in the sense that

PENNINGTON - CROSS

1    he was following our directions as to those comments.  But

2    you are correct in so far as that the content of the

3    materials were definitely out there.

4        Q. And substantial overlap.  Let's take movies, for example.

5    You talked about him with movies, correct?

6        A. We did.  I did.

7        Q. And there are references to the movies in the jail

8    writing, correct?

9        A. Yes, sir.

10       Q. And in fact, in the closing aspects of the website

11   manifesto he quotes from two movies, doesn't he?

12       A. From the -- I don't recall.

13       Q. Would you like me to provide you a copy?

14       A. Sure.  You are talking about the Last Rhodesian?

15       Q. I believe you actually have that there.

16       A. I do.  I have the exhibit.

17       Q. If you would refer to the explanation, an explanation.

18   It begins by saying, to take a saying from a film, and then

19   there is a quote from "American History X," correct?

20       A. Yes, sir.  I didn't know that that is where it was from,

21   but it's a quote from a movie for sure.

22       Q. And then, "To take a saying from my favorite film" --

23   even if -- and then it goes on to put another quote?

24       A. Yes, sir.

25       Q. So he's already writing back then about films and other

PENNINGTON - CROSS

1    types of topics, not just the case-related topics, but things

2    that show up in the jail journal that you also discussed,

3    correct?

4     A. Yes, sir.

5     Q. And that's -- that's not unusual, is it?  I mean, you

6    told us that your -- one of the things you do as a capital

7    defender is you want to know what is different, you want to

8    know everything you can about your client?

9     A. Yes, sir.

10    Q. You take that website manifesto and then you ask him

11    about all those things, correct?

12    A. Yes, sir.

13    Q. Things that he's already talked about publically?

14    A. Yes.

15    Q. Things that are already out there in a nonprivileged

16    format?

17    A. Right.

18    Q. So it's not a surprise that they show up once again in

19    the jailhouse writing, is it?

20    A. No.

21    Q. All right.  The -- you mentioned that your client had a

22    radio, correct?

23    A. At some point along the way he got enough money that he

24    got it.  I don't remember exactly when.

25    Q. And in fact, that's something you can get from the jail,

72

PENNINGTON - CROSS

1    correct?

2    A. Yes.

3    Q. And in fact, he got that radio on July 6th of 2015,

4    didn't he?

5    A. I don't know.

6    Q. All right.  Do you have any reason to believe he didn't

7    get it on July 6th?

8            THE COURT:  He said he didn't know.  If you want to

9    show him something, why don't you show him that.

10           THE WITNESS:  Yes, sir.  I now see it, and it looks

11   like it's July 6th of 2015.

12           THE COURT:  What is that Exhibit Number?

13           MR. CURRAN:  That would be Government's Exhibit 13,

14   Your Honor.

15           THE COURT:  Is there an objection to Government

16   Exhibit 13?

17           MS. GANNETT:  No, Your Honor.

18           THE COURT:  Government Exhibit 13 is admitted

19   without objection.

20           MR. CURRAN:  Thank you, Your Honor.

21           (Thereupon, Government Exhibit Number 13 was

22   received in evidence.)

23   Q. And you've already testified, Mr. Pennington, that your

24   client listens to the news, doesn't he?

25   A. Yes.

PENNINGTON - CROSS

1    Q. He listens to NPR?

2    A. Yes.

3    Q. And AM radio?

4    A. Yes.

5    Q. All right.  And it is fair to say that between July 6th,

6    2015 and August 3rd, 2015, on the radio in Charleston there

7    was pretty much saturation coverage of the murders at AME,

8    correct?

9    A. There was a lot of coverage.

10   Q. A lot of coverage.  So many, if not all of the things

11   that you were talking to him about, were also in the media,

12   correct?

13   A. Some of them were, yes.

14   Q. Comments like, I think you mentioned his friend, there

15   was an African-American fellow who had some comments?

16   A. That's correct.

17   Q. And Mr. Roof referenced that.  You talked to Mr. Roof

18   about that, correct?

19   A. I did.

20   Q. You heard about it in the news, correct?

21   A. I sure did.

22   Q. He had access to the same news, didn't he?

23   A. That I don't know.  I read it in the paper.  I didn't

24   hear about it on the radio.

25   Q. Do you have any reason to believe that it wouldn't be on

PENNINGTON - CROSS

1      the radio, something of that nature?

2       A. My experience is that the radio is much more sparse than

3      the detail that you get from the print media.

4       Q. Fair enough.  You didn't ask him specifically whether he

5      listened -- whether he got that from the radio?  You asked

6      him those questions?

7       A. I think we brought it to his attention.

8       Q. But he had access to a radio and he was listening to

9      coverage of the incident, wasn't he?

10      A. Yes.

11      Q. Something of interest to him?

12      A. Yes.

13      Q. You also mentioned, for example, something that you

14     talked to him about, psychology, right?  And his issues about

15     psychology?

16      A. Um-hum.

17      Q. That is also in his prior writings, isn't it?  It's in

18     the car journal, isn't it?

19      A. I believe so, yes.

20      Q. Homosexuality.  That is also in there, correct?

21      A. Yes.

22      Q. Now, you mentioned that you went to Mr. Roof's -- you

23     went to the detention center -- let me back up, see if I got

24     the chronology of this correct.  Let's turn to August 21st

25     when you found out about the writing.  That's the first time

PENNINGTON - CROSS

1    you found out about this notepad, correct?

2     A. Right.

3     Q. He hadn't told you that he had had this notepad?

4     A. No, he hadn't.

5     Q. He had shown up to meetings with you with writings --

6     A. Um-hum.

7     Q. -- correct?

8     A. He had.

9     Q. When he wanted to talk to you about something, he would

10    show up with that and you would talk about that, right?

11    A. Small scraps of paper.

12    Q. Right.  But he would show up to you with writings.  No

13    jail rule that says he couldn't have taken that notepad with

14    him, correct?

15    A. No.  He was just very self-conscious in the sense that

16    he, I think, was rather guarded in so far as what he would

17    bring because he always takes it out of his pocket.

18    Q. Um-hum.

19    A. This would not have fit in his pocket.

20    Q. Right.  But there is no rule that says he couldn't have

21    taken this with him?

22    A. There is no rule at all.

23    Q. And this laid out his world view, correct?

24    A. To some extent, yes.

25    Q. And the -- so you first found out about this from contact

PENNINGTON - CROSS

1    from the Federal Government, right?

2     A. Right.

3     Q. From Mr. Richardson?

4     A. I believe so.

5     Q. And that that was a call that morning, correct?

6     A. Right.  To Mr. Bruck.

7     Q. Next you they think conferred with Mr. Bruck and your

8    fellow counsel about what you want to do about that, correct?

9     A. Right.  Exactly.

10    Q. And after that you sent a letter to the Solicitor?

11    A. Yes.

12    Q. And let me back up for a second.  You -- make sure I got

13   the sequence all right.  So you sent a letter to the

14   solicitor and also to the U.S. Attorney's Office, correct?

15    A. Correct.

16    Q. And in that letter you told him that you believe that

17   this document was privileged?

18    A. Yes.

19    Q. And you asked for a number of things to be done --

20    A. Right.

21    Q. -- with respect to this, correct?

22    A. Yes, sir.

23    Q. And then later that day you went to the jail and you met

24   with your client, correct?

25    A. I believe so, yes.

PENNINGTON - CROSS

1    Q. And you actually received a copy of it from him at that

2    time?

3    A. Actually, I got the original from him.

4    Q. So you got the --

5    A. Correct.

6    Q. You got the original from him.  So at the time that you

7    sent that letter in the morning where you claimed it was

8    privileged, you hadn't actually seen the document?

9    A. To the best of my recollection, that's right.

10    Q. You made the determination that was privileged before you

11    even looked at it and made the kind of painstaking comparison

12    that you have done for the Court today?

13    A. You know, I'm trying to remember the day, because I

14    remember that we sent this at the end of the day.  I can't

15    recall --

16    Q. Actually, it's in front of you.  Why don't you take a

17    look at it and refresh your recollection as to when you sent

18    it.

19    A. All right.  This was sent at 12:40.

20    Q. So shortly after -- 40 minutes after noon?

21    A. Right.  The Scarlet Wilson was sent at 3:48 PM.

22    Q. Right.  So the first notification, the one that had been

23    sent, the letter to the Federal Government and to Scarlet

24    Wilson, that was at 12:40 PM, correct?  That was before you

25    had a copy of the document, correct?

PENNINGTON - CROSS

1    A. I believe so.

2    Q. And you talked about -- you discussed with your client at

3    that point the writing, correct?

4    A. We had -- I did.

5    Q. You brought it to his attention, correct?

6    A. I did.

7    Q. And you had had conversations with counsel that morning,

8    correct?

9    A. I think so, yes.

10    Q. And you were concerned about this writing, correct?

11    A. Yes.

12    Q. And you expressed those concerns to your client, didn't

13    you?

14    A. Well, what I expressed to him was, "Did you have a

15    document and do you know what they are talking about, that

16    some kind of document was seized that talked about your

17    writings about this case?"

18    Q. And that's a pretty damaging document, isn't it?

19    A. As you indicated, sort of a recreation of the journal,

20    but it was damaging in so far as it shows his post-arrest

21    thinking.

22    Q. Exactly.

23    A. So it becomes an endorsement of ideas to us that were a

24    part of our attorney-client relationship.  So, yes, it is

25    damaging.

79

PENNINGTON - CROSS

1    Q. And you -- quite naturally, you discussed that with him,

2    the fact that it was damaging, correct?

3    A. I didn't get into the whys and wherefores with him at

4    that time, no.  That came later as I began to work on the

5    case more.  Because that day we were I think eager to get

6    something put out there to the U.S. Attorney and to the

7    Solicitor.

8    Q. You had already put something out to the U.S. Attorney

9    and the Solicitor, you just told us that, and that's what the

10   e-mail indicates.  It went out at 12:40?

11   A. I have to admit, I'm fuzzy about that.  Because like I

12   said, I hadn't seen this, or I didn't remember this part of

13   it.  What I remembered was my part in the subsequent e-mail

14   that was modified for Scarlet Wilson.  Because I know I was

15   back at my office on that Friday afternoon and then we sent

16   that at that time.

17   Q. So there was a conversation from -- between Mr.

18   Richardson and Mr. Bruck, correct?

19   A. Right.  And I believe David may have actually sent this

20   on his own.  In other words, I then followed his lead later

21   with Scarlet.

22   Q. So that was on -- that was on August 21st --

23   A. Right.

24   Q. -- correct?  And then there was a conversation between

25   you and counsel to say, to discuss what this means for your

PENNINGTON - CROSS

1    case --

2     A. Right.

3     Q. -- correct?

4     A. Right.

5     Q. And then that e-mail goes out with that letter.  That

6    letter took some time to draft, correct?  And it goes out at

7    12:40, and you've already testified earlier when first asked

8    that your recollection is that you got the document from him

9    later that day, correct?

10    A. Right.  That's my recollection.  I have -- I'll check my

11   notes.

12              (Pause in proceedings.)

13              MR. CURRAN:  Your Honor, to the extent that we

14   haven't, we would ask to move that exhibit we showed him with

15   the radio receipt into the record.

16              THE COURT:  The regular receipt?  I thought we had

17   done that.

18              MR. CURRAN:  Government's 13.

19              THE COURT:  I always -- it's already in.  I've

20   already admitted it.

21    Q. You mentioned that you met with Chief Beatty --

22    A. I did.

23    Q. -- correct?

24    A. Yes, sir.

25    Q. And that what your notes actually say isn't that his

PENNINGTON - CROSS

1    subordinates changed the order, but they misinterpreted his

2    order, correct?

3       A. That's correct.  That's what I put in my memo.

4       Q. I think you testified changed in your memo which you made

5    contemporaneously, correct?

6       A. Right.  That's correct.

7       Q. You said that the Chief said they misinterpreted?

8       A. Yes.

9       Q. The Chief said in any of those conversations or any of

10   the officers present tell you that there was any reason to

11   search the cell other than concerns about suicide risk?

12      A. They described what happened.  They just said that they

13   went in and did the search based on their direction to do so.

14      Q. Right.  But at any point did they indicate that they had

15   a concern other than his mental health?

16      A. No.

17      Q. All right.  So for example, they didn't -- strike that.

18              MR. CURRAN:  The Court's indulgence.

19              THE COURT:  Yes.  Take your time.

20              (Pause in proceedings.)

21      Q. Some additional questions.  If you will indulge me,

22   Mr. Pennington?

23      A. Sure.

24      Q. We were talking about the document a little while ago.

25   And I'm sure we can agree on the document speaks for itself,

PENNINGTON - CROSS

1    to some extent, correct?

2     A. It does.

3     Q. I'm sure we can agree on a number of things.  One, there

4    are no legal markings on this document, are there?

5     A. You mean like showing that it's a formal court document

6    or something like that?

7     Q. Nothing on it that says it's legal, that it's for legal

8    purposes --

9     A. No.

10     Q. -- correct?

11     A. It does not.

12     Q. And generally that is advice that you give your clients,

13    that if they are going to do that they should put markings on

14    it?

15     A. Absolutely not.

16     Q. You never tell them to write something on it that it's

17    legal?

18     A. It's never been an issue, it's now certainly my policy

19    and I've done it since then, but up to now it has not been

20    required or necessary or called for, or even suggested.

21     Q. Okay.  You will agree, will you not, that it's not

22    addressed to you or to any of his other counsel, is it?

23     A. It's not.

24     Q. In fact, there is nothing in the document either that

25    says it's being written for his attorneys, is there?

PENNINGTON - CROSS

1     A. It just says that he wants to clarify what his thoughts

2     were.  And so in some ways I see that as being addressed to

3     us, but it's ambiguous.

4     Q. It doesn't say that, does it?

5     A. It doesn't say that.

6     Q. What it says is he wants to make some clarifications,

7     right?

8     A. Right.

9     Q. Everything in that clarification section is stuff that

10    was also being presented on the news, isn't it?

11    A. It's more of a reflection of what he put into his

12    journal.  In other words, it's a way of sort of

13    recapitulating what had been in his journal.

14    Q. My point is, the things that were listed in his

15    clarifications -- my question is, those are also things that

16    were being discussed in the news during the period when he

17    had access to a radio, correct?

18    A. I wouldn't agree with that, given the fact that there is

19    all kinds of detailed conversations about Jews and other

20    folks.  It is a much more detailed account of his views than

21    was being discussed popularly in the news.

22    Q. Well, I agree that it is more detailed.  My question is,

23    the topics are in the news, correct?

24    A. Yes, sir.

25    Q. All the topics in here.  And particularly in the

PENNINGTON - CROSS

1    clarification section, those are things he could have heard

2    on the news, correct?

3    A. Some of them, yes.

4    Q. And they are more detailed than the website manifesto,

5    correct?

6    A. It is.

7    Q. And more detailed than the car journal, correct?

8    A. It is.

9    Q. And from June 18th to August 3rd, 2015, your client was

10   confined 23 hours a day, one hour of recreation, correct?

11   A. Yes, sir.

12   Q. Plenty of time on his hands to write, didn't he?

13   A. Lots of time.

14   Q. Plenty of time on his hands to listen to the radio and

15   hear about his case, correct?

16   A. Once he got it, yes.

17   Q. Which we established was June 6th, correct?

18         THE COURT:  July.

19         MR. CURRAN:  I'm sorry.  July 6th.

20         THE COURT:  Everyone is being real precise about the

21   dates.

22   Q. So back to the writing.  There is nothing in there --

23   there is extensive discussion about his racial world view,

24   correct?

25   A. Yes, sir.

PENNINGTON - CROSS

1    Q. There is nothing in there that says, "I'm writing this to

2    collect my thoughts for my attorney," correct?

3    A. Not in that language, no.

4    Q. There is no discussion of any meetings with his counsel?

5    A. No, there is not.

6    Q. There is not even any mention of attorneys anywhere in

7    the document, is there?

8    A. No.

9    Q. Now, as you mentioned, you were meeting regularly with

10    Mr. Roof at this time, correct?

11    A. Yes, sir.

12    Q. It's natural.  It's a high profile case, correct?

13    A. Yes, sir.

14    Q. And you were shown a document that in which you listed

15    your meetings or listed meetings with defense attorneys

16    between his arrest and August 3rd, correct?

17    A. Correct.

18    Q. And that document shows 15 meetings with you?

19    A. Right.

20    Q. And 18 meetings total, round about?

21    A. I believe that's right.

22    Q. And you were not present for all of those meetings, were

23    you?

24    A. I was not.

25    Q. And is it accurate to say that after August 3rd, you were

PENNINGTON - CROSS

1    having a similar level of meetings with him?

2    A. There were numbers of meetings that have continued up to

3    the present.

4    Q. Okay.  Roughly the same pace?

5    A. Not always the same pace.  That was a pretty intense

6    period.  That was about twice a week.  It's gotten down to

7    where it's about once a week now for me.

8    Q. But on Friday before the document was found, he was

9    indicted in Federal Court, correct?

10   A. That's right.

11   Q. All right.  Significant change in the events, correct?

12   A. Yes, sir.

13   Q. And he's meeting also with his federal defense attorneys,

14   too, correct?

15   A. He sure is.

16   Q. You documented some of that?

17   A. Um-hum.

18   Q. So significant number of meetings in August with your

19   client --

20   A. Yes.

21   Q. -- correct?

22   A. Yes.

23   Q. And the existence of the -- let me strike that.  And you

24   weren't present for all of those meetings, were you?

25   A. No.

PENNINGTON - CROSS

1    Q. And you don't know what was discussed at those meetings,

2    do you?

3    A. We get the memoranda -- or we started at some point along

4    the way to get memoranda from each other about what was said.

5    "Not clear.  You would have to be specific about a meeting."

6    And I have to go back to my computer.  So I would get reports

7    about what was being said for every meeting, but I certainly

8    wasn't there for the verbatim --

9    Q. Okay.

10   A. -- conversation.

11   Q. Fair to say there was a significant number of meetings

12   between August 3rd and August 21st, correct?

13   A. There would have been, yes.

14   Q. And I think you have testified, have you not, that you

15   did not know of this writing until August 21st --

16   A. That's right.

17   Q. -- correct?  Mr. Roof had never told you that it even

18   existed, correct?

19   A. That's correct.

20   Q. So he did not -- and you knew about the suicide.  Did you

21   know about the suicide watch search?

22   A. What I had learned was is that there had -- in the

23   interval between August 3rd and my discovery of this writing

24   from the call from Mr. Richardson, he had reported that

25   something had gone on in the jail involving the book that had

PENNINGTON - CROSS

1    been seized from him, the Tales of Young Werther or "The

2    Sorrows of Young Werther," so I had some inkling of that.

3    Q. So he told you about that?

4    A. The book.

5    Q. Did he tell you that the book had been taken from him?

6    A. Yes, he did tell me that.

7    Q. So he did discuss the fact that he knew -- did he tell

8    you that his cell had been searched?

9    A. He did not -- let me think for a second.  I'm trying to

10    remember exactly what he talked about during that interval

11    period.  The -- there had been some discussion about the

12    letter that had been received by his sister and the family.

13    I had some questions about what the letter was about.  And so

14    I talked with Dylann about the specifics of the letter.  And

15    it appeared that they had gone into his cell and gone through

16    it and removed the book.

17    Q. And he told you that?

18    A. Yes.

19    Q. So he told you that his cell had been searched?

20    A. Yes.

21    Q. And he told you that things had been removed from his

22    cell including --

23    A. First he knew the book.

24    Q. -- the book, right?

25    A. And there was also some drawings that I think he thought

PENNINGTON - CROSS

1    had been taken.

2     Q. And did he tell you that one of the drawings that was

3    taken came from his jail notepad?

4     A. He did not.

5     Q. If one of the drawings was taken from his jail notepad,

6    he would have known, in fact, his jail notepad had been

7    exposed to the jail officials, correct?

8     A. I don't believe that he knew.  It was a complete shock to

9    him based on his demeanor when I went to him that there had

10    been something removed from that.

11     Q. Well, he knew his cell had been searched?

12     A. Yes.

13     Q. You knew his documents had been gone?

14     A. He knew some drawings were missing.

15     Q. Books were missing --

16     A. A book.

17     Q. -- right?  A book, at least one book.  He didn't tell you

18    more books were missing?

19     A. No.

20     Q. So he knew his cell had been searched.  He knew his

21    documents had been reviewed and things had been taken?

22                MS. GANNETT:  Objection.

23                THE COURT:  What's the objection?

24                MS. GANNETT:  It's -- Your Honor, I think he knew --

25    I object to the breadth of that question.

PENNINGTON - CROSS

1           THE COURT:  I think the witness can handle it.

2    Overruled.  I have great confidence in Mr. Pennington.

3           THE WITNESS:  Thinking back, because some of this is

4    stuff I hadn't thought about since last year, he may have

5    also recognized -- I'm trying to remember -- there was

6    something about some other books may have been taken, as

7    well.  So I want to be fair and answer your question

8    completely.  And so he was aware of those things.  Now, your

9    question to me was?  Please restate.

10   Q. Well, he -- so he told you about these -- he told you

11   during that period that his cell had been searched?

12   A. Yes.

13   Q. That books had been taken from him?

14   A. Right.

15   Q. And that writings had been taken from him, correct?

16   A. Drawings?

17   Q. Drawings.  I'm using -- indulge me.  I'm using writings

18   to include a drawing.

19           THE COURT:  I think it's worthwhile to do the

20   difference.

21   Q. So drawings had been taken from him, as well?

22   A. Right.  There was some, as you know, that were like eight

23   and a half by 11 drawings that had gone missing after that.

24   So I think that he was aware of that for sure.

25   Q. But he was surprised, according to you, on August 21st to

PENNINGTON - CROSS

1    learn that the notepad had been copied, correct?

2     A. He was very surprised.

3     Q. Well, apparently between August 3rd and 21st, knowing

4    that his cell had been searched, knowing that books had been

5    taken, knowing that writings -- drawings had been taken, he

6    wasn't terribly concerned about the exposure of the content

7    of that notepad to jail officials, was he?

8     A. No.

9     Q. All right.  Now, you -- it sounds like you've had a

10   pretty long career as a public defender.

11    A. Yes, sir.

12    Q. Starting in 1980 --

13    A. Yes, sir.

14    Q. -- is that correct?

15    A. Um-hum.

16    Q. And you are now actually the Defender for the Ninth

17   Circuit?

18    A. For Berkeley and Charleston.

19    Q. Have been since 2008?

20    A. Yes, sir.

21    Q. It's fair to say that this is your life's work?

22    A. It is.

23    Q. And trial work is pretty difficult, isn't it?

24    A. It keeps me busy.

25    Q. Keeps us all busy.  Capital trials, they are pretty

PENNINGTON - CROSS

1    difficult, as well, correct?

2     A. They are very difficult.

3     Q. And this line of work, I'm sure you will agree, requires

4    personal sacrifices, doesn't it?

5     A. Well, it all depends on how you measure it.  I think it's

6    a privilege to do what we do.  But it does require -- it

7    certainly makes my wife suffer a lot of sacrifice, and my

8    children.

9     Q. Like many government attorneys, it's the work that

10   matters to you, correct?

11    A. I try to maintain a balance, like I'm sure you do; but,

12   yes, the work matters to me.  It does.

13    Q. There is time it affects your family.  There is financial

14   sacrifices.  The reason we do -- the reason many government

15   attorneys do this sort of work is because they care deeply

16   about the work they do, correct?

17    A. Yes, sir.

18    Q. And that's true of you, as well?

19    A. It is.  Yes, sir.

20    Q. It's a great deal of responsibility to be the Public

21   Defender for the Ninth Circuit, isn't it?

22    A. It sure is.

23    Q. And it's a great deal of responsibility that's on your

24   shoulders and this team's in this case, correct?

25    A. Yes, sir.

PENNINGTON - CROSS

1      Q. And in this case the Government, the State of South

2   Carolina and the Federal Government have charged your client

3   with the death penalty offense, correct?

4    A. Yes, sir.

5    Q. And that's important to you in your job, correct?

6    A. Sure.

7    Q. And your duty as a public defender, as any attorney, is

8   to advocate as zealously as you can on his behalf, correct?

9    A. Yes, sir.

10    Q. His life is literally on the line in this case, isn't it?

11    A. It is.

12    Q. Now, part of your job is to try and keep out of evidence

13   things that are bad for your client, correct?

14    A. When appropriate, yes.

15    Q. When appropriate?

16    A. There is a lot of evidence here that is coming in no

17   matter what I do.

18    Q. But fair to say that part of your duty is to zealously

19   advocate to try to keep things out of -- damaging things out

20   of evidence if you can?

21    A. Again, when appropriate.  When you think that there is a

22   constitutional violation.

23    Q. All right.  And that is particularly true trying to keep

24   things out of evidence if it's evidence that you think might

25   be important to a jury when it's making the life or death

PENNINGTON - CROSS

1   decision, correct?

2    A. Certainly, yes.

3    Q. And I think we can agree -- well, we wouldn't all be

4   here -- that the jail writing is not a good piece of evidence

5   for your client in that regard, is it?

6    A. It's not.

7    Q. The jury is not likely to look very favorably on the

8   views your client expressed?

9    A. I think it's very damaging and very prejudicial as to the

10  punishment likely to be imposed.

11   Q. Things like saying Hitler should be inducted as a saint,

12  correct, that's not a good piece of evidence?

13   A. Not -- no, it's not good.

14   Q. Discussing the desire for racial eugenics and reinstating

15  Apartheid, those are not good evidence for your client,

16  correct?

17   A. No, not good.

18   Q. And it's particularly -- I think you already mentioned

19  this earlier -- particularly tough evidence for your client

20  because this was written after the offense, correct?

21   A. That is correct.

22   Q. And it includes statements like he has no regret for what

23  he did?

24   A. That's very damaging.

25   Q. And it's your duty to advocate as zealously as you can to

PENNINGTON - CROSS

1    try to keep that out of the trial, correct?

2     A. Protect his constitutional rights.

3          MR. CURRAN:  No further questions at this time, Your

4    Honor.

5          THE COURT:  Redirect?

6                   REDIRECT EXAMINATION

7    BY MS. GANNETT:

8     Q. Mr. Pennington, would you briefly describe what a

9    mitigation investigation entails?

10    A. Um, it involves understanding your client's entire life

11    history, including his medical, his educational, his family,

12    essentially in capital litigation.  I've heard it spoken of

13    that you talk to any person that has ever dealt with or

14    talked with your client in order to form a coherent

15    understanding, both for the defense lawyers and for any

16    relevant experts, and ultimately for the jury, so that there

17    can be a compelling explanation of the mitigation of what

18    is -- how the jury should view your client more favorably or

19    less culpably or with more mercy.

20    Q. Does it sometimes involve engaging experts to look at

21    your clients's mental health for substance abuse history?

22    A. It always does in this kind of case.

23    Q. When you meet with a client to discuss his new capital or

24    potentially capital charges, do you sometimes explain to them

25    what a mitigation investigation entails?

PENNINGTON - REDIRECT

1        A. Normally we try to stay away -- I try to stay away from

2        that because that usually invokes resistance.  Instead what

3        you try to do is as delicately as possible just gather the

4        information and answer questions as they become -- come up in

5        the client's mind as to the whys you are asking all this

6        information.  Eventually you do get to the point where you go

7        over sort of how this system works, what the finders of fact

8        need to know and why the information you are gathering is so

9        important.

10       Q. Did you start those discussions in this case in the

11       period of June 18th and August 3rd?

12       A. I had made Mr. Roof aware of the fact that the -- this

13       could be potentially a capital case, and I had very

14       delicately begun to ask about his history, and continue to do

15       so.  I don't remember having an in-depth conversation laying

16       out the idea of what a case in mitigation looks like at that

17       time.

18       Q. Had you sought releases of information from him?

19       A. Yes.  He signed releases for me the first night that I

20       met him.

21       Q. So did that include for medical and mental health

22       information?

23       A. It did.

24       Q. Did the defendant give you any timeframe during which he

25       was doing most of the writing that is contained in

97

PENNINGTON - REDIRECT

1    Exhibit 268-1?

2     A. I think when it became -- I asked him about when he wrote

3    it and he revealed that when it became clear to him that we

4    were asking about all these things and that he needed to

5    remember details, that he started it shortly after his

6    arrest.

7     Q. When you -- you said that you learned about this document

8    from a telephone call between Mr. Richardson and Mr. Bruck.

9    Did I hear you to say that that occurred in the morning?

10    A. You know, it's hard --

11    Q. Best of your recollection?

12    A. I don't want to misstate facts.  I have this vague idea

13    that when I met David early afternoon on that Friday the

14    21st, that David had the information.  We had a meeting with

15    someone else, a potential -- a lawyer in the case, and then

16    this was revealed.  And then we immediately went into a sort

17    of setting about gathering it and putting together our

18    response.

19    Q. When you say "gathering it," you mean?

20    A. Gathering our response to what was being said.

21    Q. Would it surprise you to learn that the jail log would

22    reflect that you went straight to the jail after learning

23    this information to see what you could find out from your

24    client?

25    A. No, that's exactly what happened.  In other words, we

PENNINGTON - REDIRECT

1    wanted to know and we wanted to be able to see what was going

2    on.

3            THE COURT:  Do you have a time for that?

4            Ms. Gannett?

5            MS. GANNETT:  Your Honor, our records reflect that

6    Mr. Pennington went to the jail in the late morning.

7            THE COURT:  You've got a precise time?

8            MS. GANNETT:  I thought it was --

9            MR. CURRAN:  Your Honor, if they want to call a

10   witness.

11           MS. GANNETT:  By 11:35 he had been and --

12           THE COURT:  Let me suggest this:  This is kind of

13   sort of, you know, Do you remember kind of thing.  Listen, we

14   are a little informal here, but we've got to have -- these

15   times may end up being material.  So to the extent you've got

16   jail log information or anything that can just -- that we can

17   get, just by the end of the day submit it to us under seal,

18   so I can -- I can sort out these, if we had a timeline, these

19   times for a timeline.

20           Mr. Pennington, you are asking him a very precise,

21   both of y'all, a very precise detail about the order of a

22   series of things that happened in one day, and it's sometimes

23   hard a year later to remember exactly the sequence.  So let's

24   not rely on his memory.  He's exhausted that.  We've got a

25   couple of times.  Let's get the time he went to the jail.

99

PENNINGTON - REDIRECT

1          MR. CURRAN:  At this time I think it would be

2     important for these representations to be documented either

3     by the log or whatnot, because the Government's recollection

4     is that it was late morning when they were actually informed

5     of this.

6          THE COURT:  Well, what -- again --

7          MS. GANNETT:  We'll be happy to get the document,

8     Your Honor.

9          THE COURT:  I mean, we have a couple of times.  We

10    have a document at 12:40 from Mr. Bruck to Mr. Richardson

11    attaching a letter.  That's at 12:40 PM.  And that letter

12    raises these issues.  Now, the question is, I guess the point

13    is, were they raising it before they knew the substance?

14    Well, I'm not quite sure how critical that is, because

15    frankly, good lawyers are going to raise a damaging -- every

16    defense they can the moment they can even conceive it and

17    later back off if they have to.  It's not a huge deal to me

18    that they've done that.  The -- but I do think it's -- let's

19    have the chronology.  Let's get it precise and then we know

20    it and don't have to debate about Mr. Pennington's fading

21    memory about exact times that are maybe 45 minutes apart.

22          THE WITNESS:  Your Honor I can say with clarity that

23    if we didn't have the document, I would not have known about

24    the surreptitious copying.  So the one thing that is

25    absolutely clear is in the text of the letter, the e-mail to

PENNINGTON - REDIRECT

1        the Solicitor, we make reference to the fact that it was

2        surreptitiously copied.  I would have only known that after I

3        had obtained the document and spoken to Mr. Roof.

4                THE COURT:  I think this is all going to be settled

5        by when we get your time in and out of the detention center

6        that day.  That is one place that we can count on we've got

7        good records.

8                MR. BRUCK:  Whether we can obtain the record by the

9        end of the day, we are going to go out there.

10               THE COURT:  Do the best you can.  And Mr.

11       Richardson, you can assist him in some way if he needs help

12       with that, in facilitating cooperation with those folks?

13               MR. RICHARDSON:  We will do everything we can,

14       which is we can send our own subpoena.  But other than send

15       them a subpoena, I'm just telling you we are not going to get

16       any better cooperation on that issue than they are.

17               THE COURT:  Well, I don't know if that reflects the

18       fact they are giving good cooperation to Mr. Bruck or no

19       cooperation to both of you.  I don't know what that means.

20               MR. RICHARDSON:  We'll leave that to the Judge.

21               THE COURT:  Yes.

22       BY MS. GANNETT:

23        Q. So Mr. Pennington, you said that when you were speaking

24       with the defendant about the search of his cell, that he

25       raised the issue of certain things that had been taken from

PENNINGTON - REDIRECT

1    him.  Did he ever receive those items back?

2     A. To my knowledge he did not get "The Sorrows of Young

3    Werther" back or any of the other books that we are talking

4    about.

5     Q. What about the drawings?

6     A. I don't believe that he's gotten them back, but I can't

7    say for certain.

8     Q. And the notepad, however, he did get back, correct?

9     A. The notepad.

10     Q. He gave it to you?

11     A. He never knew it was gone in the sense of -- I guess he

12    knew that officers had been there, but as far as he was

13    concerned, it was still his legal papers.

14     Q. You discussed the movies that you and the defendant

15    talked about together.  Was there a connection between the

16    movie "Cinderella" and "The Last Rhodesian" or the car

17    journal or any of the other conversations about his political

18    beliefs that you were having?

19     A. Um, part of my -- my recollection of this is that I was

20    intrigued that he had been to see that movie by himself, and

21    seen the movie more than once in the theater in the days

22    preceding this incident.  And that he has a very sentimental

23    taste when it comes to literature and movies and that kind of

24    thing.  And so I remember asking him.  And I have not

25    recently reconstructed precisely when he said he went.  I do

PENNINGTON - REDIRECT

1    know that he went to the movies in the days preceding or

2    maybe the day of the incident or the day before.  Somewhere

3    in that timeframe.

4    Q. Turning to what I believe is the last page of the

5    Document 268-1, does it reflect some information about music?

6    A. Are we talking about the jail writings?

7    Q. Yes.  Sorry.

8    A. Toward the end are there references to music?

9    Q. To music.

10   A. Right.  There are three pieces that are mentioned, or at

11   least there is something called the "Night Price," I don't

12   know what that is.  There is a Haydn symphony and then there

13   is Monday 8 Classic Cinema.  So those were -- I do not

14   specifically remember talking to him about those three items.

15   Q. You have not talked to him about music?

16   A. I did know his taste in music.

17   Q. So you did talk to him about music?

18   A. We talked about that he had often -- he liked a variety

19   of things, but among the things he liked was classical music.

20   Q. Okay.  So you were talking with him about music and you

21   just hadn't discussed those particular pieces?

22   A. Not those particular pieces, no.

23   Q. At that time as of August 3rd you had not discussed those

24   particular pieces?

25   A. That is correct.

PENNINGTON - REDIRECT

1            MS. GANNETT:  Thank you.

2            THE COURT:  Mr. Curran, do you have anything else?

3            MR. CURRAN:  Very briefly, Your Honor.

4            THE COURT:  Go right ahead.  And let me alert y'all,

5    at trial we are going to do -- a little more relaxed here --

6    but we are going to do, you know, direct, cross and one

7    redirect.  We don't have a ping pong match going, so -- but

8    here obviously I'm going to be a little more relaxed, okay?

9            MR. CURRAN:  Yes, Your Honor.  Thank you.

10                      RECROSS-EXAMINATION

11   BY MR. CURRAN:

12    Q. And it's just one topic, one question.  You were just

13   talking about the fact that on what is Bates stamped 019557,

14   what you were just referring to in the jail writing --

15    A. The three musical things?

16    Q. The three musical things.  There is a number of things in

17   this writing -- well, there is a lot of things that you

18   talked about with him that don't show up in here, correct?

19    A. That's true.

20    Q. Earlier you mentioned, you were going through the topics,

21   you said it was comprehensive, correct?

22    A. The jail writings were more comprehensive.

23    Q. No.  What you talked about you said was pretty

24   comprehensive because that's part of your job in a case like

25   this, correct?

PENNINGTON - RECROSS

1    A. Yes, sir.

2    Q. You talked to him about many things?

3    A. I did.

4    Q. That don't show up in here, correct?

5    A. Yes, sir.

6    Q. You talked to him, for example, about his school history?

7    A. I did.

8    Q. There is no reference of school history in this writing,

9    correct?

10   A. No.

11   Q. You talked to him about the Judges in his case, correct?

12   A. To some extent.

13   Q. No reference to any of the Judges in his case?

14   A. No.

15   Q. No direct reference to his case really in the document at

16   all, other than the attempted murder charges, correct?

17   A. Well, it's -- you have to understand that the reasons,

18   the motives for what he did was very much a part of his case.

19   And so in the asking of why you felt compelled to do what you

20   did, this is sort of the answer to that question.

21   Q. I understand your answer there, but my question was:

22   There is no direct reference of -- other than those attempted

23   murder charges and his displeasure of that -- there is no

24   direct reference to the Judges to his case, to the evidence

25   or anything, it's all inferred by you from the fact that

PENNINGTON - RECROSS

1        it's -- there is a parallel between, what you believe a

2        parallel between what is in here and what you talked about,

3        correct?

4         A. Well, the page that talks about clarifications does

5        mention the witness that we talked about earlier, and there

6        is stuff about if he receives life in prison, he might be

7        eventually, or eventually be pardoned.  So it's -- there are

8        a few references to more than just his views.

9         Q. All of which, as we talked about earlier, was being

10        discussed in the media at the time, correct?

11         A. The stuff about being pardoned was not.

12         Q. Life imprisonment?

13         A. You know, I suppose that the media was talking about the

14        idea that this could be a capital case, so, yeah.  I don't

15        know life imprisonment so much as the death penalty.

16         Q. And the stuff about the witness, that was also something

17        being discussed in the media, too?  We talked about that

18        earlier?

19         A. We did.

20         Q. The core of my question is you talked about many things,

21        and many of them do not show up in here, including no direct

22        discussion about his case, other than life imprisonment and

23        the potential attempted murder charges, correct?  I'm talking

24        about a direct reference.

25         A. I think that is fair to say.

PENNINGTON - RECROSS

1    Q. It's all your inference, based on how you read this

2    document, correct?  Compared to what you talked about with

3    him?

4    A. Well, because I was working with him so actively, to me

5    it seemed like a mirror of those conversations, but you are

6    right.  I can't say that -- it's certainly not like a

7    transcript of our conversation or him taking notes actively

8    during our meetings.

9    Q. And we talked about this earlier, there is no direct

10   reference to any of that in here, correct?

11   A. No direct reference to?

12   Q. To your meetings, to counsel, to --

13   A. Well, you know, when he says at the very beginning, "I

14   would like to finish my writing my opinions."  "I was unable

15   to finish before."  "I was in a hurry."  "I would like to

16   make some clarifications."  And in my view, he's talking to

17   us in making these clarifications and to himself to get his

18   information organized.  So --

19   Q. But he doesn't --

20        THE COURT:  Is that where you got the inference from

21   that he was writing for you, from that sentence?

22        THE WITNESS:  Not entirely.  Not at all.  You have

23   to take the whole thing in toto.

24        MR. CURRAN:  No further questions, Your Honor.

25        THE COURT:  Mr. Pennington, let me ask you a couple

PENNINGTON - RECROSS

1    of questions.  I've obviously read the two statements.  And

2    when I say "the two statements," to be precise, the one that

3    is in the Last Rhodesian and the one found in his vehicle,

4    which I assume from reading it, I infer that he thought he

5    was going to die and he was leaving sort of a last will and

6    testament; is that fair?

7              THE WITNESS:  Yes, sir.

8              THE COURT:  Both of those he expected to be

9    publically disclosed; is that fair?

10             THE WITNESS:  I think so.

11             THE COURT:  Then he sits down and he confesses on

12   this -- with the FBI agents, correct?

13             THE WITNESS:  Yes, sir.

14             THE COURT:  And I've listened to that interrogation.

15   And in all of those, he is very free flowing in expressing

16   his opinions and ideas, is he not?

17             THE WITNESS:  Pretty much.

18             THE COURT:  He doesn't seem to hesitate really much

19   at all to discuss his philosophy, correct?

20             THE WITNESS:  When he meets with the FBI, my

21   recollection of that interview is that he is much more

22   guarded.  It's not like these writings where he does give

23   information, it's consistent with the whys and the

24   wherefores, but he's not nearly as forthcoming about his

25   global views.

1          THE COURT:  The first two, at least, statements, he
2     seems unusually -- perhaps you are not prepared for it --
3     unusually articulate about why he did these things, correct?
4          THE WITNESS:  Yeah.  That's correct.
5          THE COURT:  And he doesn't seem to need a lot of
6     special writing to organize his thoughts.  They come out very
7     coherently and clearly, do they not?
8          THE WITNESS:  Yes, sir.
9          THE COURT:  And when you questioned him, among the
10    things you were using him to question him were these
11    publically -- these statements intended for public
12    consumption.  You used those to build on your questions
13    yourself, did you not?
14         THE WITNESS:  We did not have the --
15         THE COURT:  The first statement, you relied upon
16    that?
17         THE WITNESS:  Yes.
18         THE COURT:  And so you knew that he wasn't
19    particularly keeping those conversations public, he had
20    already disclosed them?
21         THE WITNESS:  He didn't reveal those to us until we
22    discovered them.  Once we had the Last Rhodesian website, it
23    became more open and forthcoming.
24         THE COURT:  Did you at any time in your discussion
25    with him indicate any sympathy you had for white people

1    rebelling against minorities?  Did you ever give him any

2    discussion that you were personally sympathetic to his cause?

3              THE WITNESS:  At any point --

4              THE COURT:  At any point.

5              THE WITNESS:  -- during my representation?

6              THE COURT:  I'm concerned about August 3rd.  Did you

7    indicate to him at any point that you thought that you were

8    a -- you were sympathetic to his personal philosophy?

9              THE WITNESS:  At some point -- and I can't say when

10   in my conversations with him -- I have told him that I could

11   see that he was sincere and that he was being direct and that

12   he seemed to really believe what he believed.

13             THE COURT:  But did you indicate -- would he be --

14   when he makes a call, he makes several -- let me see if I can

15   lay my hands on it quickly.  He makes -- he says, "We also

16   need to remember that no one is stopping us, we are only

17   stopping each other."  Is he telling -- is that to you?

18             THE WITNESS:  Insofar --

19             THE COURT:  Are you a person who will help him

20   further this cause of acting more forcefully in terms of a

21   race war that he sees coming?  Would he have reason to be

22   writing you about that?

23             THE WITNESS:  Yes.  I think that his view of our

24   representation would be to show the reliability of his

25   conclusions.  In other words, one of the problems that he has

1    with this fixation is that he believes what he's saying; and

2    therefore, there is a bit of, during our confidential

3    conversations, him essentially persuading us of the

4    reliability and accuracy of his point of view.

5            THE COURT:  You indicated to him, "Yes, we are part

6    of the team.  We want to fight this race war with you."

7            THE WITNESS:  Of course not.

8            THE COURT:  I didn't think so.  Because it seems to

9    me that both of those other statements and this one seem

10   uniquely focused on a larger audience and seeking to persuade

11   a point of view.  And I don't doubt he has been trying to

12   persuade you, but the idea that he is private and

13   confidential and seeking to keep a secret about these

14   thoughts, it seems the evidence is actually to the contrary.

15           THE WITNESS:  Judge, from my experience here is that

16   he has been very obedient and compliant with our

17   instructions.  So I believe that these were ways in which he

18   was continuing and fostering our conversation.  He could have

19   put this out at any point after the 3rd and didn't.

20           THE COURT:  I understand that.

21           But it just seems to me, hearing all this and

22   hearing your discussion today, that this was not something he

23   was ashamed of or wanted to keep a secret.  He was actually

24   quite proud of what he did.  And one of the resistance he had

25   to some of the anticipated defense of mental health, it was

1    suggested that something is wrong with him, that he didn't

2    want any suggestion that there was anything wrong with him.

3    He was proud of what he did.

4              THE WITNESS:  I would say that he is more

5    complicated than the sort of the swaggering, prideful person

6    that you are describing.

7              THE COURT:  Well, I'm just -- and I've never met the

8    man, I'm simply taking -- I have these writings.

9              Let me ask you something else.  His opening

10   statement, you quoted -- and I was really quite fascinated --

11   I thought he was writing to us.  He says, "I would like to

12   finish writing my opinions I was unable to finish before

13   because I was in a hurry to get to Charleston."  Do you think

14   he was writing to you in that manifesto before he committed

15   these acts?

16             THE WITNESS:  I believe -- do I think he was

17   writing --

18             THE COURT:  Was he writing the lawyers before,

19   because he seems to --

20             THE WITNESS:  No, of course not.

21             THE COURT:  And if he's simply completing a personal

22   statement he had already begun, and it didn't have a purpose

23   to clarify his thoughts or to communicate better with his

24   lawyers, then that, you would acknowledge to me, that would

25   not be protected by the privilege?  You agree with that,

1    don't you?

2         THE WITNESS:  The way I see this is that he has

3    habits and ways that he thinks, and so he likes to write

4    things down.  He had written it down in a journal once.  We

5    didn't have that journal, and so he recapitulated the journal

6    so he could give us the same kind of feedback that we didn't

7    have, even though we are going over the same ground.

8         THE COURT:  He didn't give you the statement.  He

9    talked to you -- I mean, I'm just struck that -- perhaps I

10   shouldn't have been surprised by this -- but I guess I didn't

11   think -- how articulate he was in expressing these particular

12   views.  He's, you know, he's not a particularly -- doesn't

13   have a lot of formal education.

14        THE WITNESS:  No.  He's very verbal.

15        THE COURT:  But he's not only very -- well, you

16   know, orally verbal, I don't know if you mean, but he writes,

17   you know, people may find his thoughts, they seem very

18   thought through in his own way.  He has a coherent set of

19   thoughts.  It's not a bunch of random thoughts.  They seem to

20   constitute a rather comprehensive philosophy.  You agree with

21   that?

22        THE WITNESS:  I think that is what he was trying to

23   recapture for us.

24        THE COURT:  When you say "recapture," it's already

25   there in the original Last Rhodesian.

1          THE WITNESS:  This is far more complete in so far

2     as --

3          THE COURT:  Right.

4          THE WITNESS:  In some ways, it's almost as if he's

5     rewriting -- if you put the journal from the car side by

6     side, what you see is he's really repeating the same

7     information.

8          THE COURT:  Well, if it wasn't confidential in the

9     car, why is it confidential when he just repeats it?

10          THE WITNESS:  Because what we are doing, you have to

11     take it in the context we were in.  He had been arrested.  We

12     don't know what is going on and we are trying to get him to

13     reveal to us what is going on.  And so we are covering a lot

14     of the same ground.  And this is a young man who, despite of

15     his verbal skills, has certain distinct kind of handicaps.

16     So he uses this writing as a method to sort of get himself --

17     so he's got his little working document, so to speak, and

18     then he doesn't -- he doesn't come in and just recite it to

19     us.  He reveals what he wants to reveal to us.  So I think he

20     was both testing us to see what we were going to do and how

21     we were going to react and whether we are really on his side,

22     and this was for him sort of this working document.

23          THE COURT:  But this is not a document he told you

24     he was preparing while he was doing it?

25          THE WITNESS:  That's right.

1          THE COURT:  And he never consulted it while in your

2    presence?

3          THE WITNESS:  No, he didn't bring it to us as far as

4    I know.

5          THE COURT:  And he seemed surprised when you brought

6    it to his attention that you knew about it?

7          THE WITNESS:  That's right.

8          THE COURT:  Any questions occasioned by the Court's

9    questions from the Government?

10          MR. CURRAN:  No, Your Honor.

11          THE COURT:  From the defense?

12          MS. GANNETT:  No, Your Honor.

13          THE COURT:  Thank you, Mr. Pennington, I appreciate

14    your assistance.

15          THE WITNESS:  Here are the exhibits.

16          THE COURT:  Thank you.  And we appreciate your

17    assistance as the Public Defender.

18          THE WITNESS:  Sure.

19          THE COURT:  Does the defense have any further

20    witnesses?

21          MS. GANNETT:  No further witnesses, Your Honor.  I'm

22    told that I have not admitted -- requested admission of

23    Defendant's 9, 12 and 36.

24          THE COURT:  Hold it a second.  Let's -- 9 -- I have

25    9, and what -- Ms. Eunice, do we have 9 and 12?  I don't know

1    what 36 --

2              MS. GANNETT:  36 -- so 36 I did not actually move.

3              THE COURT:  We can fix that right now.

4              MS. GANNETT:  So we could fix that right now.  So

5    that is the 302 of Sergeant Shaw.

6              MR. CURRAN:  We would object to that, Your Honor.

7    The witness --

8              THE COURT:  It was offered for --

9              MS. GANNETT:  It was offered to refresh his

10   recollection, but given that the Rules of Evidence don't

11   apply in this hearing, we think it would be useful.

12             THE COURT:  For whatever it's worth, I'm going to

13   admit it.  So over the objection -- so any objection to 9 and

14   12 from the Government?

15             MR. CURRAN:  I'm sorry, Your Honor?

16             THE COURT:  Yes.

17             MR. RICHARDSON:   None, Your Honor.

18             THE COURT:  Mr. Richardson already spoke for you.

19   Hope you didn't make a mistake.  Exhibits 9 and 12 are

20   admitted without objection.  Exhibit 36 is admitted over the

21   objection of the Government.

22             Any other witnesses the defense has?

23             (Thereupon, Defendant's Exhibit numbers 9, 12 and 36

24   were received in evidence.)

25             MS. GANNETT:  No thank you, Your Honor.

1              THE COURT:  Any witnesses the Government has?

2              MR. RICHARDSON:   None, Your Honor.

3              THE COURT:  Okay.  Folks, I'm glad, if you want to

4    give me argument, I have read all of your briefs.  If you

5    want to add anything, I'll be glad to hear from you if

6    someone wishes to make a further statement, though I'm pretty

7    familiar with the legal standards and the facts here.

8              Anything further from the Government? Do you wish to

9    make any argument?

10             MR. CURRAN:  None, Your Honor.

11             MS. GANNETT:  I would like to make just one point.

12             THE COURT:  You can make two.  We are --

13             MS. GANNETT:  Hopefully just one.  With respect to

14   the questioning that the Court did of Mr. Pennington --

15             THE COURT:  Yes.

16             MS. GANNETT:  -- at the end of the examination

17   there.

18             And really that is that I think that the -- there is

19   really no difference here, from our perspective, between the

20   conversations that a lawyer would have with a client over any

21   statement that is at issue in a case.  And that the fact that

22   the client is not ashamed of the statement or that the

23   statement is not a secret doesn't bear on whether the

24   conversation between the lawyer and the client about the

25   statement or materials that the client is using to prepare

1    for a conversation with the lawyer about the statement, those

2    things -- that doesn't -- it doesn't bear on whether those

3    are confidential or not.

4         THE COURT:  If he thought it was an expectation of

5    confidentiality, that was the point.  You know, the more

6    difficult issue, it seems to me for the defense, is to sort

7    out just what was the defendant's purpose in preparing this.

8    And he, in my view, states the purpose in the document

9    itself.  And he does not need to write attorney-client

10   confidential to make it such.  I completely agree with that.

11   But the law is very clear that if he is just writing it for

12   himself, it's not protected.  And he announces to us at the

13   beginning of this statement that he is trying to finish

14   something he's already started and he had to go commit these

15   acts and that interrupted his completion.

16         Now, that is not the final statement of it, but I

17   tried to alert you earlier, that is a pretty, you know, very

18   specific statement of intent.  And I agree with you that just

19   because it may be public information and then he has a

20   conversation with his lawyer, you know, well, that's waived,

21   no, that will be within the attorney-client privilege.  But

22   if he's simply -- you know, Ms. Gannett, he just doesn't seem

23   to me to be needing a lot of writing like this to organize

24   his thoughts.  He's got -- they are all organized.  I just --

25   I don't see the evidence that he did that here for that

1    purpose.  What I see is he has -- that he wants to make a

2    personal statement, he was making it.  He tried to make his

3    final statement because he thought he was going to get killed

4    that night; and when he didn't, he had a lot of time on his

5    hands and he finished it.

6         And, you know, I have poured over this statement in

7    an effort to look to any inference that it was for the

8    purpose of the lawyers, and I'm going to read it again.  I'm

9    going to go back after hearing all this evidence, I'm going

10   to read everything again, because sometimes you will see

11   something in the light -- you know, over the Government's

12   objection, I wanted to hear what Mr. Pennington said.  I

13   thought it was a material piece of evidence that I ought to

14   consider.

15        MS. GANNETT:  I think the piece of it that is

16   helpful with respect to the sort of the preface to these

17   writings is that the lawyers were asking him about this stuff

18   and questioning him about this stuff.

19        THE COURT:  The whole world was asking him about

20   this.  That's the problem.  The whole world wants to know why

21   this man did this, and he tried to answer it before he did

22   it, okay?  He was trying to explain himself because he just

23   did not -- and, you know, listen, I don't want to get into

24   y'all's management of this client -- I appointed Mr. Bruck

25   because he has a lot of experience in managing complicated

1    defendants; but, you know, he's very resistant -- on these

2    documents, at least, maybe y'all have gotten more cooperation

3    since then -- he does not want to look like he is some kind

4    of kook.  He wants to act like he knew exactly what he was

5    doing and he was proud of it.

6            MS. GANNETT:  So without commenting of our

7    capability, but I think that is precisely the point is that

8    this document was designed to persuade his lawyers what his

9    motivation was.

10           THE COURT:  I just -- you know, Ms. Gannett, I don't

11   see it.  He doesn't show it to them.  He doesn't use it to

12   consult --

13           MS. GANNETT:  Well --

14           THE COURT:  Many of these ideas are already

15   introduced.  I just, you know, the suggestion he's doing it

16   for you just doesn't resonate in these documents.  But don't

17   push me too hard.  I want to go back and I want to re-read it

18   again in light of Mr. Pennington's testimony.

19           MS. GANNETT:  And we are due to do that also in

20   light of the preponderance standard which is a low standard

21   comparatively.

22           THE COURT:  Yes, sir, Mr. Curran?

23           MR. CURRAN:  You look like you are ready to wrap up.

24           THE COURT:  I'll do anything you need to do.

25           MR. CURRAN:  I want to make one brief point, and it

1    relates to something that came up today here, and it's not in

2    the briefing, and that is Mr. Pennington's testimony about

3    what his client told him about the purpose for the statement.

4    And it's the Government's -- of the writing -- and it's the

5    Government's position that that is not a reliable -- that's

6    not a reliable statement.

7         THE COURT:  Well, it's after the fact.  It -- let me

8    finish.  It is after the fact.  It is after he knows it's of

9    huge consequence.  And it's got to be viewed in light of the

10   circumstances in which this opinion was allegedly expressed.

11        I would also note that Mr. Pennington never

12   precisely said what his client said to him, okay?  What

13   exactly did he say?  I listened several times trying to hear

14   that.  And a lot of this is Mr. Pennington's inference of

15   what the client intended.

16        And, listen, y'all were kind of getting on

17   Mr. Pennington about being a committed defense lawyer.

18   That's exactly what he is supposed to do, okay?  And you hear

19   things and see things when you are a part of something in a

20   way that if you are not, it may not strike you that way.  So,

21   you know, I don't really feel myself partisan here, I've got

22   to hear the evidence.

23        So I understand the circumstances under which it was

24   raised and the sort of self-serving nature about saying why

25   after the fact I did it when it sort of fits into a narrative

1   to support the suppression of the document.  I've just got to

2   weigh all that.

3          MR. CURRAN:  We understand, Your Honor.  And that is

4   just exactly the point that we wanted to make.  And as you

5   are aware, there is Fourth Circuit case law talking about the

6   inherent unreliability of post hoc statements of subjective

7   intent.

8          THE COURT:  It's also called commonsense, right?

9          MR. CURRAN:  *United States vs. Braxton.*

10         THE COURT:  We don't need case law to know that that

11   is commonsense.

12         Very good.  Anything else counsel needs to raise

13   with me?  Any concerns you have?

14         MR. BRUCK:   A question --

15         THE COURT:  Yes, sir.

16         MR. BRUCK:  -- about next week.  We are trying to

17   determine to what extent we are going to be free to meet

18   other appointments or requests for our time during the week

19   of the 26th.  My limited experience with this sort of

20   proceeding is that it's an hour in the morning and an hour in

21   the afternoon and we are done when the jury goes out, but I

22   don't know that that is the way it's going to work here.

23         THE COURT:  We are doing it four times a day.

24         MR. BRUCK:   Four times a day.

25         THE COURT:  So, you know, I'm like you, Mr. Bruck,

1    I'm a little -- I don't really work -- I've never done a week

2    of such things, and so I'm a little bit myself uncertain how

3    long it's going to take.  But I would think that each of

4    these two-hour slots we'll spend not less than an hour

5    getting through it, so going out of the courthouse and

6    getting back, if you are intending to be here, probably be

7    kind of challenging.

8              MR. BRUCK:   That's all I needed to know.

9              THE COURT:  We put a pretty demanding schedule on

10   ourselves.  And my plan, of course, is, as stated in my

11   order, when we hit 700 questionnaires, we are finished.  And

12   believe me, I don't want to do this longer than I have to,

13   just like you don't want to sit here any longer than you have

14   to.  You've got other things you want to do.  But we'll do it

15   until we get -- and let me just say this, I don't think it's

16   going to happen -- if suddenly for some reason we get 600

17   instead of 700, that's not the end of the world.  But I do

18   intend to stop at 700.  And where we are on the juror number

19   at that point, we'll send everybody else home.  If that is

20   Wednesday, that's Wednesday, if it's Friday, it's Friday.

21             MR. BRUCK:   As far as Monday and Tuesday, we are

22   spoken for all day.

23             THE COURT:  You are spoken for.  And I wouldn't be

24   making too many lunch plans that week.  I think you are --

25             MR. BRUCK:   It wasn't lunch plans.

1          THE COURT:  Some long lost friend -- do it after

2     5 -- that you are planning to catch up with.

3          MR. BRUCK:   It was not lunch plans that we are

4     asking about.

5          THE COURT:  I know y'all are busy.  Everybody is

6     busy, believe me, we've all got enough on our plate here.  I

7     will see you next Monday.

8          MR. RICHARDSON:   Your Honor, this may be

9     overabundance of caution, and I had a judge once complain

10     that all the Government's lawyers weren't here for every

11     hearing.  I assume that is not a problem here.

12          THE COURT:  No.  Absolutely not.  Let me just say

13     this for both of you, I mean, both of you have got more to do

14     on this case than you can shake a stick at, right?  Everybody

15     is busy.  And if y'all want to just assign one attorney each

16     to be here, believe me, there will -- if there were more than

17     one judge, I would not be here, but there is just one of me.

18     I keep telling my law clerks, y'all got part of the docket,

19     I've got the whole thing.  I've got to do this every time.

20     So I can't go anywhere.  But don't -- you know, there is not

21     really a speaking role for y'all.  You are just sort of like

22     a silent movie.  You are going to be sitting there while I do

23     this.  You know, obviously there are going to be interactions

24     with people who are going to end up on your jury and you want

25     to observe that, people's conduct, behavior, statement, it's

1    maybe not that reliable, at least we all who drew juries know

2    how you do that.  That that is helpful.  But no, the answer

3    very clearly, Mr. Richardson, as long as you have each got

4    one lawyer here, you've got one enough, okay?  And everybody

5    else is surplus in my view.

6              MR. RICHARDSON:   Thank you, Your Honor.

7              THE COURT:  Mr. Bruck, I know you had talked about

8    Mr. Roof coming.  Don't feel obligated to have him here for

9    everything.  If you want him here for everything, that is his

10   right to be here for that, but don't feel obligated to have

11   him here at every one.  Am I correct you will have him -- the

12   plan is to have him here September 26th?

13             MR. BRUCK:   Yes.  Our thinking is that before these

14   questionnaires are filled out it's important for the jury to

15   see him.  But we may, obviously if our thinking changes, we

16   won't keep it to ourselves.

17             THE COURT:  I'm just saying.  And people have been

18   talking to me about these crowds coming for individual voir

19   dire, yeah, maybe the first day, okay?  It's going to get so

20   tedious, people are going to just say, please, save me from

21   this.  But I'm just saying for everybody here, there are

22   things -- what we are doing here is important.  I'm going to

23   ask those seven questions because I don't want to waste all

24   our time processing questionnaires of people who will not be

25   serving, and we know that, so I'm trying to get those out of

1    the way.  And we want to get those questionnaires done so we

2    can hopefully, you know -- I notice y'all have a lot of

3    agreement about people striking, right?  There wasn't a

4    lot -- it was a fairly consistent view y'all had.  And

5    hopefully we'll get down to that.  And our goal is to get to

6    a strike list of 70, and then we are going to -- we'll draw a

7    jury with 12 jurors and six alternates and we are starting

8    the trial.

9              MR. RICHARDSON:   Thank you, Your Honor.

10             THE COURT:  I'll see you next Monday.  If you need

11   me before then, let me know.

12                     *****     *****     *****

13

14   I certify that the foregoing is a correct transcript from the

15   record of proceedings in the above-titled matter.

16

17

18

19   --------------------------

20

21   Amy C. Diaz, RPR, CRR             September 21, 2016

22   S/  Amy Diaz

23

24    THOMAS ROBERTSON, JR.                           7

25    DIRECT EXAMINATION                              8

1    MS. GANNETT

2    CROSS-EXAMINATION                                          12

3    BY MR. CURRAN

4    Defendant's Exhibit Number 46                              12

5    SERGEANT TYRONE SHAW                                       16

6    DIRECT EXAMINATION                                         16

7    BY MS. GANNETT

8    CROSS-EXAMINATION                                          22

9    BY MR. CURRAN

10   MR. DAVID ASHLEY THURMOND PENNINGTON                       32

11   DIRECT EXAMINATION                                         32

12   BY MS. GANNETT

13   Defendant's Exhibit Number 11                              42

14   Defendant's Exhibit Number 23                              62

15                    CROSS-EXAMINATION                         65

16   BY MR. CURRAN

17   Government Exhibit Number 13                               72

18   RECROSS-EXAMINATION                                        103

19   BY MR. CURRAN

20   Defendant's Exhibit numbers 9, 12 and 36                  115

21

22

23   REDIRECT EXAMINATION                                       15

24   BY MS. GANNETT

25