## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Criminal No. 2:15-472-RMG |
| | ) | |
| v. | ) | **ORDER** |
| | ) | **UNDER SEAL** |
| Dylann Storm Roof. | ) | |
| | ) | |

This matter comes before the Court on Defendant's first motion to suppress (Dkt. No. 266), which seeks to suppress Defendant's post-arrest statement to law enforcement, certain items seized from Defendant's car, and certain items seized from the home of Amy Roof. For the reasons set forth below, the Court denies the motion.

## I.     Background

Defendant Dylann Roof is accused of killing nine persons and attempting to kill three other persons at the Emanuel African Methodist Episcopal Church in Charleston, South Carolina on June 17, 2015. Defendant was arrested on June 18, 2015 at approximately 10:40 a.m. He was then transported to a police station, where, after waiving his *Miranda* rights, he was interrogated by two FBI agents[1] from approximately 1:40 p.m. to 3:40 p.m. (Mot. Suppress Ex. 3 (video).) The interview was video recorded. (*Id.*) Defendant's car was searched pursuant to search warrants. (Dkt. Nos. 266-2, 266-3, 298-2.) Police also performed consent searches of the home of Defendant's mother, Amy Roof, and the home of Defendant's father, Ben Roof. Police later conducted another search of Ms. Roof's home pursuant to a search warrant. (Dkt. Nos. 298-3, 298-4.) On July 20, 2016, Defendant moved to suppress his recorded post-arrest statement, evidence from the search of his car, and evidence from the second search of Ms. Roof's home.

---

[1] This Order hereinafter uses the term "police" to encompass any state or federal law enforcement officer.

## II.    Legal Standard

When a defendant seeks to suppress the results of a facially valid search warrant, the defendant bears the burden to show a violation of some constitutional or statutory right justifying suppression. *See United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981); *see also Rakas v. Illinois*, 439 U.S. 128, 132 n.1 (1978); *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979).

"Where a defendant seeks to suppress a statement under *Miranda v. Arizona*, 384 U.S. 436 (1966), the government bears the burden of establishing by a preponderance of the evidence that the statement was not the product of custodial interrogation conducted in the absence of *Miranda* warnings." *United States v. Hunter*, 63 F. Supp. 3d 614, 619 (E.D. Va. 2014) (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)). The Government must meet its burden by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

## III.    Discussion

### A.    Defendant's Post-Arrest Statement

Statements given to the police must be voluntary, and a defendant's waiver of his rights against self-incrimination must be voluntary and knowing. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A waiver or statement is given voluntarily if it is "voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). A waiver or statement is not voluntary if "the defendant's will has been overborne or his capacity for self-determination critically impaired." *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002) (internal quotation marks omitted). Courts examine "the totality of the circumstances," including "the characteristics of the defendant, the setting of the interview, and the details of the interrogation" to determine whether a defendant's will has been overborne or his capacity for self-determination impaired. *United States v. Pelton*, 293 F.2d

-2-

1067, 1071 (4th Cir. 1987). A *Miranda* waiver also must be made knowingly, meaning that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Burbine*, 475 U.S. at 421.

Defendant asserts his waiver and statement to police were involuntary because his characteristics left him so vulnerable to the interview tactics used that "his will was overborne" by those tactics—that he was particularly vulnerable to interrogation because of his youth, a lack of sleep, and "mental health and neurological issues."[2] (Dkt. No. 266 at 6.) The Court has reviewed the video recording and transcript of Defendant's interview. (Mot. Suppress Ex. 3 (video), Dkt. No. 266-1 (transcript).) Defendant was well treated. He was provided food and water. He was not subjected to any form of violence or intimidation. Defendant himself stated that his statements were voluntary and that there was no coercion whatsoever:

> DR [Dylann Roof]: Okay. I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing, no promises or threats have been made to me and no pressure or coercion of any kind has been used against me by anyone.
>
> CJ [FBI Special Agent Craig Januchowski]: Okay. Having, having all these rights in mind do you wish to speak to us?
>
> DR: Oh sure.

(Dkt. No. 266-1 at 4.) In fact, Defendant was an effusive interviewee who was eager to explain his actions and motives:

---

[2] Defendant asked to reserve arguments regarding the impact of his mental health on his capacity to waive his *Miranda* rights voluntarily and knowingly, and to speak voluntarily with police, pending completion of an evaluation of his mental condition. (Dkt. No. 266 at 6.) Defendant has subsequently stated he has no evidence to present regarding his mental health. (Dkt. No. 312 at 1.) Thus, Defendant has chosen not to argue that his post-arrest statements were involuntary because he lacked capacity to waive his rights voluntarily and knowingly, or that some mental health issue made him so vulnerable that otherwise acceptable interview practices overpowered his will.

MS [FBI Special Agent Michael Stansbury]: Well, well that, that goes to my next question. Why did you have to do it?

DR: Um, I had to do it.

MS: How come? I mean, that's what I don't, that's what I don't know.

DR: Um, well, I had to do it because, somebody had to do something. Because, you know, black people are killing white people every day on the streets and they rape, they rape white women, a hundred white women a day. That's a FBI statistic from 2005. You know that's 10 years ago. It might even be more now, who knows. It sounds unrealistic but you break it down that's two a state, it's really not unrealistic at all. It could probably be more. You know, the fact of the matter is, what I did is so miniscule to what they're doing to white people every day, all the time and just because that doesn't get on the news, doesn't mean it's not happening, you know. Everybody knows that the news is biased for black people. You know we can pretend it's not but we know it is.

CJ: Dylann, (clears throat) you said you had to do this cause, so basically what you're . . .

DR: I had to do it because nobody else is going to do it. Nobody else is brave enough to do anything about it, you know. Back in the late 80's and early 90's, you know we had skinheads and stuff like that. There's no skinheads left, there's no KKK. The KKK never did anything anyway.

(Dkt. No. 266-1 at 11–12.) As shown above, Defendant provided detailed statements at the slightest prompting from police, who did not subject him to any coercive pressure. Defendant's demeanor during the interview was relaxed, cordial, and even jovial. (*See* Dkt. No. 266-1 at 6, 7, 12, 13, 18, 25, 27, 30, 32, 33, 34, 35, 36, 39, 40, 42, 44, 47, 50, 51, 54, 68, 71, 73, 79, 80 (Defendant laughing).) In sum, no reasonable person could view the interview of Defendant as an exercise in coercion.

Furthermore, the Court rejects Defendant's arguments insofar as they rest on his youth (Defendant was 21 years old at the time of the interview) or lack of sleep (the interview occurred in the afternoon, within three hours of his arrest). Police interviewed an adult murder suspect who voluntarily waived his *Miranda* rights and agreed to speak with them; the interview occurred within three hours of arrest, during the early afternoon, and lasted only two hours. There is no

merit to the argument that such an interview nonetheless violates the Constitution because Defendant might have been sleepy (there is no allegation police deprived Defendant of sleep) or because Defendant is a young adult.

**B.    Items Seized from Defendant's Automobile**

A search warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A sufficiently particular warrant describes the items to be seized in a manner leaving nothing to the discretion of the officer executing the warrant. *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010). Any search conducted pursuant to a warrant "is limited in scope by the terms of the warrant's authorization." *Id.* (internal quotation marks omitted). "But the terms of the warrant are not to be interpreted in a 'hypertechnical' manner. Rather, they should be read with a 'commonsense and realistic' approach, to avoid turning a search warrant into a 'constitutional straight jacket.'" *Id.* (citations omitted).

Before searching Defendant's car following his arrest, police obtained a search warrant authorizing seizure of "Any and all evidence to include, but not limited to, latent prints, hairs, DNA, fibers, fluids, blood, or other biological evidence; weapons, weapon components, ammunition, projectiles; and/or any photographs, cellular devices, contraband, narcotics, U.S. currency, and/or documents, clothing, and articles of identification that could aid in the criminal investigation of Murder." (Dkt. No. 266-3.) Defendant argues that the seizure of three flash drives, a laptop computer, a GPS device, and six DVDs or CDs was outside the terms of the search warrant. But photographs and documents are commonly stored as digital data on flash drives, laptop computers, and optical disks—those items, therefore, are plainly within the terms of the search warrant. *See United States v. Reyes*, 798 F.2d 380, 383 (10th Cir. 1986) (holding that "in the age of modern technology and commercial availability of various forms of items, a [search] warrant could not be expected to describe with exactitude the precise form the records would

take"); *cf. Ark. Chronicle v. Murphy*, 183 F. App'x 300, 306 (4th Cir. 2006) ("We cannot and should not tie the hands of law enforcement by expecting an investigative officer to know the exact format electronically stored evidence will take."). The Court finds printed maps found within the car would be within the terms of the search warrant as "documents . . . that could aid in the criminal investigation." It follows that the GPS navigation device, which is essentially a set of digitized maps and a screen for displaying those maps, must also be within those terms.

Further, the warrant describes evidence that could aid in the investigation of murder, "to include, but not limited to" documents and photographs. So even if the terms "documents" and "photographs" are somehow construed to exclude documents and photographs stored on electronic media, if the electronic media could "aid in the criminal investigation" they fall within the terms of the warrant, and those terms are sufficiently particular because they limit the search to evidence related to a particular crime. *See, e.g., Andresen v. Maryland*, 427 U.S. 463, 479–82 (1976); *United States v. Ladd*, 704 F.2d 134 (4th Cir. 1983).

Defendant's argues this "strips 'particularity' of any meaning" because "[e]very warrant, of course, seeks items that could aid in the investigation of some crime." (Dkt. No. 312 at 2.) That argument misapprehends the purpose of the Fourth Amendment's particularity requirement. The Constitution forbids general warrants—"a general, exploratory rummaging in a person's belongings"—because such warrants were used by the English Crown as a means of public oppression, rather than as an "aid in the investigation of some crime." *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971); *Stanford v. Texas*, 379 U.S. 476, 481–85 (1965). Where there is probable cause to believe that a particular crime has been committed, and that evidence of that particular crime may be found at a particular place, a warrant that authorizes a search of that particular place for evidence relating to that particular crime is sufficiently particular. *See United*

-6-

*States v. Anthony*, 4 F.3d 986 (4th Cir. 1993) (unpublished per curiam) ("The warrant in the instant case limited the agents' search to evidence relating to the commission of a particular crime . . . we cannot say that the warrant failed to provide that degree of specificity required . . . .").

Thus, the items Defendant seeks to suppress were lawfully seized as being items particularly described by the terms of a valid search warrant. The Court denies the motion to suppress those items.

### C.    Items Seized from the Home of Amy Roof

Search warrants may issue only on probable cause. U.S. Const. amend. IV. Police conducted a consent search of the home of Defendant's mother, Amy Roof, on June 18, 2015 (the day after the attack); on June 27, 2015, police obtained a search warrant to seize certain items not seized during that consent search. (Dkt. No. 266-7 at 5.) Defendant argues Attachment B to the affidavit supporting the June 27, 2015 warrant contains mere "boilerplate assertions" that fail to establish probable cause for the search because they do not explain "*why* law enforcement expected to find *additional* evidence there"—meaning evidence additional to that obtained from Defendant's car, from the home of Defendant's father, and from the earlier search of Ms. Roof's home. (Dkt. No. 266 at 10.)

However, Attachment B is just an attachment to the affidavit listing items to be seized. The affidavit itself explains, in considerable detail, the developments in the investigation after the June 18, 2015 search of Ms. Roof's home leading investigators to believe items not seized during that search might contain evidence of crime. (Aff. of Joseph Hamski ¶¶ 15–16, 18–23, Dkt. No. 266-7 at 13–16.) Defendant's assertion that the seizure of items seized from Ms. Roof's home pursuant to the search warrant violated his Fourth Amendment rights therefore is without merit, and the Court denies Defendant's motion to suppress those items.

**D.    Breadth of the Searches of Electronic Media**

Defendant argues the Government's searches of his electronic media were overly broad. (Dkt. No. 266 at 10.)  In this Circuit, a search warrant regarding a computer "authorize[s] officers to open each file on the computer and view its contents." *Williams*, 592 F.3d at 521–22.  The Court therefore concludes that the searches of Defendant's electronic media were not overly broad. Defendant admits that Fourth Circuit case law forecloses this claim in this Court.  (Dkt. No. 266 at 10.)

**IV.    Conclusion**

For the foregoing reasons, the Court **DENIES** Defendant's first motion to suppress (Dkt. No. 266).

    **AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Court Judge

September 28, 2016
Charleston, South Carolina