IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Criminal No. 2:15-472-RMG |
| | ) | |
| v. | ) | **ORDER** |
| | ) | **UNDER SEAL** |
| Dylann Storm Roof. | ) | |
| _____ | ) | |

This matter comes before the Court on Defendant's second motion to suppress (Dkt. No. 268), which seeks to suppress certain writings seized from Defendant's jail cell. For the reasons set forth below, the Court denies the motion.

I.  **Background**

Defendant Dylann Roof is accused of killing nine persons and attempting to kill three other persons at the Emanuel African Methodist Episcopal Church ("Mother Emanuel") in Charleston, South Carolina on June 17, 2015. Defendant was arrested on June 18, 2015, and since then has been held in pretrial detention at the J. Al Cannon Detention Center ("Charleston Jail") in Charleston County, South Carolina. While there, certain of Defendant's writings were seized from his jail cell, copied, and provided to the prosecution in this case. On July 20, 2016, Defendant moved to suppress those writings, asserting that the seizure violated his Fourth Amendment rights and the attorney-client privilege. The Court held a suppression hearing on September 1, 2016, which continued on September 20, 2016.

A.  **Defendant's Writings**

Shortly before the June 17, 2015 attack, Defendant posted a manifesto to the website lastrhodesian.com. That manifesto describes Defendant's views concerning persons of various races, ethnicities, and religions. It concludes,

An Explanation

> To take a saying from a film, "I see all this stuff going on, and I dont see anyone doing anything about it. And it pisses me off." To take a saying from my favorite film, "Even if my life is worth less than a speck of dirt, I want to use it for the good of society.".
>
> I have no choice. I am not in the position to, alone, go into the ghetto and fight. I chose Charleston because it is most historic city in my state, and at one time had the highest ratio of blacks to Whites in the country. We have no skinheads, no real KKK, no one doing anything but talking on the internet. Well someone has to have the bravery to take it to the real world, and I guess that has to be me.
>
> Unfortunately at the time of writing I am in a great hurry and some of my best thoughts, actually many of them have been to be left out and lost forever. But I believe enough great White minds are out there already.
>
> Please forgive any typos, I didnt have time to check it.

(Dkt. No. 299-1 at 6 (errors in original).) After arresting Defendant, police searched Defendant's car and recovered a notepad containing a handwritten account of his ideology that is extremely similar to the manifesto he published on lastrhodesian.com and that refers to lastrhodesian.com. That writing concludes,

> No one else has any responsibility for what I have done.
>
> I planned and went about it completely alone.
>
> I repeat, do not try and punish other people for my action because you couldn't punish me. This is wrong and cruel.

(Dkt. No. 299-2 at 25 (errors in original).)

While detained in the Charleston Jail, Defendant continued to write. Under the circumstances described below, Charleston Jail officials seized from Defendant's cell another notebook containing a handwritten account of his ideology. That writing begins,

> I would like to finish writing my opinions. I was unable to finish before because I was in a hurry to get to Charleston. I would also like to make some clarifications.

(Dkt. No. 268-1 at 2.) It goes on to describe opinions very similar to those Defendant allegedly published on lasthrodesian.com and to those in the notebook recovered from his car. Interspersed with those ideological opinions, however, are statements on the attack at Mother Emanuel, *e.g.*,

> I am 21 years old and I don't play pretend. I couldn't go another day without doing something, I couldn't live with myself seeing these things happen to my people and doing nothing about it. Sometimes sitting in my cell, I think about how nice it would be to watch a movie, or eat some good food, or drive my car somewhere, but then I remember how I felt when I did these things, and how I knew I had to do something. And then I realize it was worth it. I would rather live imprisoned knowing I took action for my race than to live with the future of sitting idle. It isn't up to me anymore. I did what I could do, I've done all I can do. I did what I thought would make the biggest wave. And now the fate of our race sits in the hands of my brothers who continue to live freely. I would like to make it crystal clear. I do not regret what I did. I am not sorry. I have not shed a tear for the innocent people I killed.

(Dkt. No 268-1 at 10–11 (errors in original); *see also id.* at 18 ("During the shooting I said 'you blacks are killing white people everyday and raping white women everyday.'").)

### B.  Seizure of Writings from Defendant's Jail Cell

Lauren Knapp (*née* Mosher) is an analyst who works with the Charleston Jail. (Dkt. No. 386 at 16:7–16, 17:9–19.) Although she has a background in law enforcement, she is employed in a civilian capacity at the jail. (*Id.* 18:8–11.) One of her duties is to review inmate mail. (*Id.* 24:8–25:10.) The jail routinely screens the mail of inmates who are believed to be associated with hate groups. (Dkt. No. 299-4 at 1.) Defendant was categorized as potentially belonging to a hate group. (*Id.*) An incident in which a Washington resident had offered a letter from Defendant for auction was an additional reason for Ms. Knapp to inspect Defendant's mail. (Dkt. No. 386 at 28:17–29:7.)

On August 3, 2016, Ms. Knapp reviewed a letter from Defendant to his sister. (*Id.* 29:8–30:5.) She found the letter contained language suspiciously atypical of inmate writings. (*Id.* 30:14–31:3.) By searching for the first line of the suspicious language on the internet, Ms. Knapp

determined the source of the suspect language was *The Sorrows of Young Werther*, by Johann Wolfgang von Goethe. (*Id.* 31:4–25.) She also learned the novel describes a young man who commits suicide and had inspired so many suicides that the phenomenon of imitation suicide is named the Werther effect. (*Id.* 32:13–23.)

Ms. Knapp informed her supervisor, Captain Thomas Robertson, of her discovery. (*Id.* 34:6–7; Dkt. No. 437 at 10:19–24.) Captain Robertson alerted the jail's senior leadership, who held a staff meeting about the letter. (Dkt. No. 386 at 34:6–14; Dkt. No. 437 at 10:25–11:14.) In response to the information discovered by Ms. Knapp, Chief Deputy Willis Beatty, administrator of the Charleston Jail, ordered Defendant placed under the jail's suicide prevention protocol. (Dkt. No. 386 at 195:18–23; Dkt. No. 437 at 11:15–21.) As part of that protocol, Defendant's cell was searched by Detention Officers Lisa Bloodworth and Shelly Green. (Dkt. No. 386 at 128:25–19.) During that search, Officer Bloodworth discovered a small pad of paper with multiple pages of writing and neo-Nazi symbols. (*Id.* 151:20–152:1.) Because of the neo-Nazi symbols, Officer Bloodworth believed the writings might be gang or hate group related, so she forwarded the notepad to Ms. Knapp. (*Id.* 41:17–21, 141:3–142:8.)

Ms. Knapp inspected the notepad and discovered Defendant's writings. (*Id.* 39:4–25.) She felt the writings were potential evidence, so she photocopied the notepad and notified her supervisors. (*Id.*) Ms. Knapp returned the notepad to Officer Bloodworth, who returned it to Defendant because it was not considered contraband. (*Id.* 44:16–45:2, 165:25–166:10.) Later that same day, Defendant was evaluated by Dr. Elizabeth Leonard, who is contracted to provide mental health services for the Charleston Jail. (*Id.* 113:11–25.) After meeting with Defendant, Dr. Leonard determined that Defendant was not at risk of harming himself and removed him from the suicide protocol. (*Id.* 118:4–119:1.) The following day, August 4, 2015, Ms. Knapp provided a

copy of Defendant's writings to FBI Agent Clint Pierce. (*Id.* 55:3–24.) The U.S. Attorney issued a subpoena for the writings on August 19, 2015. (*Id.*)

## II.  Legal Standard

"At a hearing on a motion to suppress, the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Abdallah*, --- F. Supp. 3d ----, 2016 WL 3965206, at *1 (E.D. Va. July 22, 2016). Generally, the burden of proof is on the defendant who seeks to suppress the evidence. *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981). Once the defendant establishes a basis for his suppression motion, the burden shifts to the Government. *United States v. Matlock*, 415 U.S. 164, 177–78 n.14 (1974). The party bearing the burden must meet it by a preponderance of the evidence. *Id.* When the Court receives evidence on a motion to suppress, the exclusionary rules of evidence, other than rules of privilege, are inapplicable. *Id.* at 175. The Court may receive evidence that would be inadmissible under the Federal Rules of Evidence and give such evidence whatever weight the Court determines appropriate. *Id.*

## III.  Discussion

### A.  The Fourth Amendment

Defendant argues the seizure of his writings from his cell violated his Fourth Amendment right to be secure from unreasonable searches and seizures. The Court finds no merit in that argument because an incarcerated person has no reasonable expectation of privacy. "[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001). Conversely, "a Fourth Amendment search does not occur—even when the explicitly protected location of a house is concerned—unless the individual manifested a subjective expectation of privacy in the object

of the challenged search and society [is] willing to recognize that expectation as reasonable." *Id.* (internal quotation marks omitted). The defendant bears the burden of showing that his expectation of privacy in the area searched was reasonable.[1] *United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007). In *Hudson v. Palmer*, the Supreme Court held that inmates categorically have no reasonable subjective expectation of privacy and "that the Fourth Amendment has no applicability to a prison cell." 468 U.S. 517, 536 (1984). The *Hudson* decision overturned a Fourth Circuit decision holding an inmate retained a "limited privacy right" in his cell entitling him to protection from searches conducted solely to harass or humiliate. *Id.* at 521–22. Subsequently, in *United States v. Jeffus*, the Fourth Circuit, citing *Hudson*, held a search of a pretrial detainee's jail cell, allegedly to obtain his personal papers as evidence against him and with no other legitimate purpose, was permissible because there was no expectation of privacy in a jail cell. 22 F.3d 554, 559 (4th Cir. 1994). That search had discovered incriminating letters between Jeffus and his co-conspirators. *Id.* Authorities had a warrant for the search, but the warrant was not relevant to the court's reasoning: Jeffus sought remand to the district court to consider the appropriateness of the warrant, but the Fourth Circuit refused because as a prisoner Jeffus had no privacy expectation to violate. *Id.*

Defendant's argument to the contrary relies principally on the Second Circuit's decision in *United States v. Cohen*, 796 F.2d 20 (2d Cir. 1986). In that case, the Second Circuit reversed a district court's refusal to suppress papers seized from a pretrial detainee's cell on Fourth

---

[1] Defendant's post-hearing brief begs the question in asserting the "government bears the burden of proof to show by a preponderance of the evidence that the seizure of the defendant's writings was reasonable under the Fourth Amendment." (Dkt. No. 435 at 1.) The burden of proof initially is on the defendant who seeks to suppress evidence. *Dickerson*, 655 F.2d at 561. The burden shifts to the Government only if the defendant establishes a basis for his suppression motion—*i.e.*, a reasonable expectation of privacy. *See Matlock*, 415 U.S. at 177–78 n.14.

Amendment grounds, stating, "[t]he Supreme Court in *Hudson* did not contemplate a cell search intended solely to bolster the prosecution's case against a pretrial detainee awaiting his day in court." *Id.* at 23. The prosecutor in *Cohen* admitted that he had initiated the search by jail staff with intent to discover evidence. *Id.* at 21. Defendant asserts the same is true regarding the search of Defendant's cell on August 3, 2016, except that the Government refuses to confess the purported true motive for the search: "The only difference between this case and *Cohen* is that in *Cohen*, the prosecutor admitted to sending jail staff to search Cohen's cell to obtain evidence." (*See* Dkt. No. 268 at 11–13.)

The Fourth Circuit's decision in *Jeffus*, not the Second Circuit's decision in *Cohen*, is binding precedent in this Circuit. *Jeffus* holds that a pretrial detainee has no reasonable subjective expectation of privacy regarding papers seized from his cell. 22 F.3d at 559. This Court is bound by that decision.[2] But Defendant's motion would fail even if *Cohen* and not *Jeffus* controlled the decision. Even if Defendant had some residual expectation of privacy while detained at the Charleston Jail, the seizure of his writings would not violate that expectation. Defendant does not challenge the premise "that pretrial detainees have no privacy interest in routine jail searches." (Dkt. No. 312 at 7.) In other words, Defendant concedes, as he must, that a search of his jail cell pursuant to policies necessary to proper jailhouse administration does not violate the Fourth Amendment. That is exactly what happened here.

---

[2] Not only is *Jeffus* binding, it is also a more persuasive reading of *Hudson*: *Hudson* holds that the nature of a prison (or jail) does not permit inmates any reasonable expectation of privacy, not that a criminal conviction somehow creates a *de jure* loss of Fourth Amendment rights. *See* 468 U.S. at 525–27. No other circuit has adopted the *Cohen* holding, and even the Second Circuit has backed away from it. *See Willis v. Artuz*, 301 F.3d 65 (2d Cir. 2002) (holding that a warrantless search of a cell to bolster a prosecution was permissible where the defendant was serving a carceral sentence pursuant to unrelated prior convictions); *see also, e.g., United States v. Hogan*, 539 F.3d 916 (8th Cir. 2008) (same); *United States v. Reece*, 28 F.3d 114 (10th Cir. 1994) (table) (same).

Jail officials observed a letter from Defendant extensively quoted from a book *synonymous* with suicide. *See* David P. Phillips, *The Influence of Suggestion on Suicide: Substantive and Theoretical Implications of the Werther Effect*, 39 Am. Soc. Rev. 340, 340 (1974) (coining the term "Werther Effect"). The administrator of the jail, Chief Beatty, responded by ordering an evaluation of Defendant under established suicide prevention policy. (Dkt. No. 386 at 180:18–19.) He had no real choice in the matter—he could not simply ignore a letter from an inmate referencing suicide. (*See id.* 124:7–16.) The evaluation essentially consisted of a search of Defendant's cell, "to ensure there was nothing in there that he could hurt himself with" (*id.* 196:6–8), and an evaluation by a psychiatrist. When those actions revealed Defendant was not at risk of suicide, he was promptly removed from suicide watch that same day.

Defendant's argument that his brief placement on suicide watch was a pretext to search his cell for evidence conflicts with the evidence presented at the suppression hearing. Defendant argues Chief Beatty in fact did not order a search of Defendant's cell, and that Ms. Knapp effectively ordered the search because she had an "investigative purpose." (Dkt. No. 435 at 3–4.). But Chief Beatty *testified*, "I ordered him to be put on a suicide watch and his cell to be searched," and Ms. Knapp *testified*, "I was not investigating." (Dkt. No. 386 at 37:18–21, 186:13–14.) Defendant's only evidence to the contrary is testimony from his state defense counsel, Ashley Pennington, that Chief Beatty met with Defendant's lawyers and admitted he never ordered a search of Defendant's cell and that the search occurred because of a misinterpretation of his orders (and an office memorandum to the same effect that Mr. Pennington prepared sometime after the meeting). (Dkt. No. 437 at 60:16–64:23.) Mr. Pennington's testimony and memorandum are contradicted by Chief Beatty's statement to the FBI and by Chief Beatty's testimony at the suppression hearing. (Dkt. No. 299-4 at 2–3; Dkt. No. 386 at 186:13–206:3.) The Court must

credit Chief Beatty's consistent and unequivocal testimony and FBI statement over a second-hand account of unsworn statements made during a meeting with defense counsel.

Defendant also makes much of certain petty details of the execution of the search of his cell: the "Security Threat Group" participated in the search; Defendant's papers were examined separately from personal effects like shampoo and juice bottles; staff members could not, a year later, remember who was standing where or who packed what into a box. (*See* Dkt. No. 435 at 3–4; Dkt. No. 437 at 18:23–22:18, 27:20–31:9) Defendant argues these details suggest an ulterior motive for the search. (Dkt. No. 435 at 3–4.) That argument is unpersuasive because there is nothing unusual about the manner in which Defendant's cell was searched. The Security Threat Group is "normally" called in "when we have a high profile inmate" and Mr. Roof is the highest-profile inmate at the Charleston Jail. (Dkt. No. 437 at 24:7–23.) The examination of personal papers is a search for evidence of suicidal ideation; the examination of personal effects is a search for items that could be used for suicide. It is natural that they would be searched separately. Although Defendant asserts, "It strains credulity that staff would be unable to recall roles and responsibilities in an incident involving such a high-profile inmate and such a significant seizure," the opposite is true. It would strain credulity if staff *did* recall "roles and responsibilities"—by which Defendant means the most mundane details, *e.g.*, was Defendant standing just inside or just outside his cell during every moment of the search. (*See* Dkt. No. 437 at 27:20–30:2.) Mr. Roof is a high-profile inmate, but for Charleston Jail staff he is an inmate they see every day. Staff searching his cell then had no idea the search was an "incident" or the seizure "significant." Suicide watches occur several times a day at the jail. (*Id.* 24:3–6.) That staff members do not remember mundane details about this particular suicide watch over a year later enhances their credibility in asserting there was nothing unusual about it.

-9-

The Court therefore finds Charleston Jail officials were motivated by legitimate jail administration policies when placing Defendant Dylann Roof on suicide watch on August 3, 2015 and when searching his cell that same day. No investigative or prosecutorial agency was involved with the decision to place Defendant on suicide watch or to search his cell. Even if Defendant had a reasonable expectation of privacy in his jail cell, the Government would meet its burden to show that the seizure of Defendant's writings was reasonable.

## B.  Attorney-Client Privilege

Defendant also argues that the seizure of his writings from his cell violated the attorney-client privilege. The attorney-client privilege is a bedrock principle of the adversary system. *See United States v. Lentz*, 419 F. Supp. 2d 820, 826 (E.D. Va. 2005). The privilege encourages full and frank communication between attorneys and clients by protecting such communications from disclosure. "The privilege recognizes that sound legal advice and informed advocacy serves the public interest, that such advice or advocacy depends upon the lawyer's being fully informed by the client, and that this occurs only where the client feels secure that communications with counsel will not be disclosed." *Id.* "While recognizing the fundamental importance of the privilege, courts have nonetheless been careful not to stretch its application to circumstances beyond its rationale." *Id.* Hence, the privilege applies only if:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982). The proponent of the attorney-client privilege bears the burden to demonstrate its applicability by establishing "not only that an

attorney-client relationship existed, but also that the particular communications at issue are privileged and that the privilege was not waived." *In re Grand Jury Subpoena*, 341 F.3d 331, 333–35 (4th Cir. 2003).

"[B]ecause this privilege impedes the full and free discovery of the truth, it must be narrowly construed and recognized only to the very limited extent that excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Id.* (internal quotation marks omitted). A critical limitation on the scope of the attorney-client privilege is the requirement that privileged communications have the purpose of facilitating the provision of legal services by counsel. Documents need not be addressed to an attorney to be privileged. *See Veolia Water Sols. & Techs. Support v. Siemens Indus., Inc.*, 63 F. Supp. 3d 558, 567 (E.D.N.C. 2014). Handwritten notes are privileged, even if never delivered to counsel, if their purpose was to facilitate communications with counsel. *See Graves v. Deutsche Bank Secs., Inc.*, Civ. No. 07-5471-BSJ, 2011 WL 721558, at *2 (S.D.N.Y. Feb. 10, 2011). But, on the other hand, a handwritten diary about the matter under litigation is not privileged, even if delivered to counsel, if its purpose is not to communicate with counsel. *Clark v. Va. Paper Co.*, Civ. No. 77-1832, 1978 WL 13931, at *8 (D.S.C. May 3, 1978).

These principles, applied here, compel the Court to find the attorney-client privilege does not attach to Defendant's seized writings. The writings bear no indicia suggesting any legal privilege. They are not labeled as legal documents. They do not discuss cases pending against him, except that he apparently feels insulted by the pending attempted murder charges. (*See* Dkt. No. 268-1 at 16.) They do not discuss issues for trial. They do not discuss court dates. They do not discuss any meetings with counsel. They do not mention counsel at all. *Cf. Veolia Water Sols.*

*& Techs. Support*, 63 F. Supp. 3d at 569 (rejecting privilege claim because the "document itself does not state this or suggest that legal advice is being sought").

Most importantly, Defendant's purpose in writing was not to assist counsel in the provision of legal services. There is no ambiguity regarding Defendant's purpose. Defendant clearly states his purpose is to expound his racist beliefs and motives for posterity. (Dkt. No. 268-1 at 2 ("I would like to finish writing my opinions. I was unable to finish before because I was in a hurry to get to Charleston.").) The writings continue Defendant's published manifesto, which he could not complete because of his need to attack Mother Emanuel. (Dkt. No. 299-1 at 6 ("Unfortunately at the time of writing I am in a great hurry and some of my best thoughts, actually many of them have been to be left out and lost forever.").). Defendant's first-person exhortations for white people to continue his murder of innocents cannot be reconciled with any argument that his writings were meant for legal counsel defending him on charges of murdering innocents. (*See, e.g.*, Dkt. No. 268-1 at 4 ("[W]e have to do something before they [Hispanics] completely overrun us."); *id.* at 11 ("It isn't up to me anymore. I did what I could do, I've done all I can do. I did what I thought would make the biggest wave. And now the fate of our race sits in the hands of my brothers who continue to live freely."); *id.* at 23 ("In other words, now we have to get revenge.").) The contents of Defendant's writings resoundingly rebut any claim of privilege.

In support of Defendant's privilege claim, his state court defense counsel, Mr. Pennington, did not testify he asked Defendant to prepare the writings at issue. He did not testify he knew Defendant had prepared the writings. He merely testified that "in some ways [he] see[s] [the writings] as being addressed to [counsel], but it's ambiguous." (Dkt. No. 437 at 83:1–3.) Although Defendant clearly stated his purpose was to "finish writing my opinions I was unable to finish before because I was in a hurry to get to Charleston," which Mr. Pennington admits could not be

-12-

a continuation of opinions meant for counsel (*Id.* 111:7–20), he nonetheless finds ambiguity because the writings' subject matter somewhat mirrors his conversations with Defendant. The writings may mirror conversations Mr. Pennington had with Defendant—there is no record of Defendant's conversations with his counsel—but, as Mr. Pennington admits, the writings also mirror Defendant's published manifesto and the statement recovered from his car. (*Id.* 62:25–63:7.) They also mirror—and appear to respond to—media reports at the time. (*See id.* 73:5–74:10.) Mr. Pennington testified Defendant "does and did listen a lot to AM radio and NPR." (*Id.* 57:2–5.) Defendant had access to a radio from July 6, 2015. (*Id.* 84:14–19.)

Even if the writings in some way may reflect subjects discussed with counsel, rather than subjects discussed on the radio, that does not establish that they are communications with counsel, or that Defendant's purpose in writing them was something other than his stated purpose. Defendant argues counsel must "form a very tight personal relationship with" a capital defendant, so the scope of attorney-client discussions may go far beyond what one would commonly recognize as case-related subjects. (*Id.* 35:3–10; *see also* Dkt. No. 435 at 5.) For example, Mr. Pennington testified that he spoken with Defendant about his favorite movies as a "warm up" to "forge some sort of relationship" with him. (Dkt. No. 437 at 52:24–53:24.) The writings include a list of Defendant's favorite movies. (Dkt. No. 268-1 at 13–14.) But Mr. Pennington did not ask Defendant to write the writings at issue, he was not aware that Defendant did so, Defendant did not bring the writings to any meeting with counsel, and there is no evidence Defendant wrote out a list of movies to prepare for a meeting with counsel about movies. (Dkt. No. 437 at 74:22–76:4.) For privilege to attach, documents must be confidential communications with counsel for facilitating legal services, or, at least, documents facilitating those communications. *Jones*, 696 F.2d at 1072. If counsel asks a defendant about his favorite movies as a "warm up" exercise, it

does not follow that any list of movies the defendant may thereafter scribble in his cell is privileged. More importantly, items like the list of Defendant's favorite movies are immaterial to this case. There is no suggestion that Mr. Pennington asked Defendant to finish his manifesto as a warm up exercise—or for any other reason. Defendant's "warm up" argument becomes irrelevant when applied to relevant evidence.

Defendant also argues his failure to publish anything since his arrest or to "discuss[] any of the ideas contained in the seized materials on the phone or on video conference from [the jail]" is evidence he did not intend a public audience for the writings seized from his cell. (Dkt. No. 435 at 6; *see also* Dkt. No. 437 at 65:2–14.) It is true that as an inmate in the Charleston Jail, Defendant is not in a position to publish anything. But he did "discuss . . . the ideas contained in the seized materials" "in the time between June 17, 2015 and August 3, 3015." (*See* Dkt. No. 435 at 6.) Defendant voluntarily—enthusiastically—discussed at length his views on race with the FBI agents who interviewed him immediately after his June 18, 2015 arrest. (*See* Dkt. No. 266-1.) That interview is another link in Defendant's chain of manifestos. First, he wrote a manifesto published online, interrupted because "at the time of writing I am in a great hurry and some of my best thoughts, actually many of them have been to be left out and lost forever." (Dkt. No. 299-1 at 6.) Second, he wrote a "last will and testament" manifesto found in his car and concededly intended for public disclosure. (*See* Dkt. No. 437 at 106:25–107:7.) Third, he gave a spoken manifesto to the FBI in response to the question "why did you have do it." (Dkt. No. 266-1 at 11.) Fourth, he wrote a jailhouse manifesto in which Defendant "would like to finish writing my opinions" which "I was unable to finish before because I was in a hurry to get to Charleston." (Dkt. No. 268-1 at 2.) Of those manifestos, none was a confidential communication, none was a communication with counsel, none was intended to facilitate legal services, and, therefore, none

was privileged. The Court finds the attorney-client privilege therefore does not attach to the writings seized from Defendant's jail cell on August 3, 2015.

### C.    The Sixth Amendment

Defendant also argues that his Sixth Amendment rights would be violated if the Government were to use an intentional invasion of his attorney-client relationship to his detriment. Because the Court finds that there was no invasion of Defendant's attorney-client relationship, it cannot reach Defendant's Sixth Amendment argument.

### IV.   Conclusion

For the foregoing reasons, the Court **DENIES** Defendant's second motion to suppress (Dkt. No. 268).

**AND IT IS SO ORDERED.**

_____
Richard Mark Gergel
United States District Court Judge

September 28, 2016
Charleston, South Carolina