```
 1                    IN THE DISTRICT COURT OF THE UNITED STATES
                          DISTRICT OF SOUTH CAROLINA
 2                            CHARLESTON DIVISION

 3      UNITED STATES OF AMERICA,    )          2:15-CR-472
                                     )
 4                    Plaintiff      )          Charleston,
                                     )          South Carolina
 5      VS                           )          July 18, 2006
                                     )
 6      DYLANN STORM ROOF,           )
                                     )
 7                    Defendant      )

 8                           TRANSCRIPT OF HEARING
                   BEFORE THE HONORABLE RICHARD M. GERGEL,
 9                    UNITED STATES DISTRICT JUDGE

10      APPEARANCES:

11      For the Plaintiff:      MR. JULIUS NESS RICHARDSON
                                Assistant United States Attorney
12                              1441 Main Street
                                Suite 500
13                              Columbia, SC 29201

14                              MR. STEPHEN CURRAN
                                U.S. Department of Justice
15                              Civil Rights Division
                                601 D Street NW
16                              Patrick Henry Building
                                Room 5808
17                              Washington DC 20004

18
        For the Defendant:      MR. DAVID I. BRUCK
19                              Virginia Capital Case Clearinghouse
                                Washington and Lee School of Law
20                              Charleston, SC 29402

21                              MS. KIMBERLY STEVENS
                                1070 I Tunnel Road
22                              Suite 10-215
                                Asheville, NC 28805

23

24

25
```

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1

2          MS. SARAH GANNETT
           Arizona Federal Public Defender's
           Office
3          850 West Adams Street
           Suite 201
4          Phoenix, AZ 85007

5

6

7                    *   *   *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Court Reporter:      Amy C. Diaz, RPR, CRR
23                   P.O. Box 835
                     Charleston, SC 29402
24

           Proceedings recorded by mechanical shorthand,
25    Transcript produced by computer-aided transcription.

3

1          THE COURT:  This is a chambers conference in *United*
2    *States vs. Roof*, 2:15-472.    Could counsel identify
3    themselves for the record.
4          MR. RICHARDSON:  Jay Richardson from the District of
5    South Carolina.
6          MR. CURRAN:  Stephen Curran from the civil rights
7    division.
8          MR. BRUCK:   I'm David Bruck, and with me is Kim
9    Stevens and Sarah Gannett.
10          THE COURT:  Very good.
11          Folks, I wanted to have a little bit of a discussion
12    where I was not in public giving a primer for prospective
13    jurors and how to get out of jury service.  So I wanted to
14    talk a little bit about these things and tell you a little
15    bit about where our thinking is.   Jeff Cargil, our court
16    jury administrator, has been having lots of consultations
17    around the country with colleagues trying to sort out a way
18    to make this thing work.   Let me say to you the one thing
19    that cannot happen, we cannot summon a certain number of
20    people and by the time we go through all the disqualifying
21    work we don't have enough jurors.   That is not an option
22    that is acceptable, okay?  And the chances are we are going
23    to get exactly the number is also highly improbable.   So
24    what's likely is we are going to summon a lot more than we
25    need, and that's okay, but we've got to have ways to address

1    that because we don't want to be processing 3,000 or 2,000

2    juror questionnaires.    Y'all will all have a nervous

3    breakdown trying to do case-specific questionnaires.

4            How do we do this?  Let me just say a couple of

5    things.  When we are trying to estimate from our prior

6    experience how many people will actually kind of get through

7    the gauntlet, it is almost unknowable to us.   Why is that?

8    Because, number one, we don't have a lot of six- to

9    eight-week trials in this district.  Secondly, we don't have

10   a lot of six- to eight-week trials during Thanksgiving and

11   Christmas, and we don't have a lot of trials which have the

12   massive pretrial publicity.  So we are in a little ways

13   flying blind here.  And, David, you've got a little bit of

14   experience in Boston, but whether that actually -- whatever

15   experience they had actually tells us anything about here,

16   we'll find out after the fact.  So that's the problem.

17           So I have been trying in my own head to figure out a

18   way in which we predictability oversummon jurors, but we have

19   ways to which we trim them down and a way that is random,

20   etcetera, and which guarantees us an adequate pool.    After

21   a lot of discussion, I've determined I want 700 case-specific

22   questionnaires completed because we are trying to get a pool

23   of 70 people.  I want -- I feel a high degree of confidence

24   that having 700 will allow us to do that.  I'll talk to you

25   in a minute how we deal with it when it's probably too many,

1    but that's okay, too.

2              We will begin in late September.  Under our plan,

3    we'll begin summoning people to this courthouse to complete

4    those questionnaires.  And we don't know exactly how -- we

5    have all -- it's very complicated in terms of how many people

6    we can bring to the capacity, it's not just the capacity of

7    the courtroom, security, getting people through the door,

8    it's complicated.  And talking to my marshals, talking to my

9    clerks, we figured all -- that we probably here in this

10   courthouse cannot process more than like 320 people a day.

11   That is like 80 at 9:00, 80 at 1 and 80 at 3:00.  And, you

12   know, there would be a brief exchange between the Court and

13   this group, pool of veniremen and women, and we would then

14   have them do the case-specific questionnaire.  When we hit

15   700 completed questionnaires, we are going to stop.  So

16   that's going to be the first break.  We don't know how long

17   that will take, but we'll get to 700.  They are going to be

18   summoned by juror number.  Number 1 gets called first, and we

19   are going to do it in order, a random system consistently

20   applied.  When we get to 700 we are going to stop.

21   Individual voir dire later.  When we hit 70 for a strike

22   list, we stop.   We are going to create the strike list.

23   That's it.  We are done.   We've got 70 qualified people,

24   we've got a strike list, we quit.   And will we leave a lot

25   of people out?  You are darn right we will, because -- so

1    I've said to Jeff Cargil I need 700 people, he says I need to

2    summons for 1,000 people, is what he tells me.  I need to

3    summons 3,000.  I told him underestimating is not an option.

4    We cannot have that happen, okay?

5          So I just wanted to tell you that it's not a

6    conclusion I particularly like, but the one thing we cannot

7    have is to go through all this crazy selection process and

8    end up without a pool to strike.  I mean, that's not

9    acceptable.  So I wanted to tell you that we are -- and then

10   the question is, how do we in a reasonable way, consistent

11   with the statutes and our jury plan, how do we trim that list

12   back a little bit?  And I have been thinking about it.

13         First of all, we are going to get the standard

14   questionnaire.  There are always people who basically

15   disqualify themselves on that and they disqualify themselves

16   because they will say, like in a gun case, "I can't be fair

17   regarding a gun."  I don't think we ought to have a question

18   that that person should not sit on our jury, okay?  Or "I

19   can't be fair to law enforcement," or here is the one I never

20   accept, "I won't listen to the Judge," okay?  Runaway jury,

21   okay?  So it's a pretty light touch, but there will be some

22   that go away.  And I'm building into the process where y'all

23   will confer and produce a strike list.  Sometimes it is so

24   obvious that the lawyers on both sides, they come up with a

25   strike list that's completely the same.  The people just

1       obviously shouldn't go any further.

2             Sometimes I have prosecutors -- Jay, you are not

3       going to believe this -- who think someone who sounds

4       incredibly unfair to a defendant would still be -- should

5       still be on the jury, and I strike those.  But generally, so

6       I will have y'all do single -- to notice me if you think

7       somebody ought to be struck.  I will probably be pretty

8       reluctant to strike them, but I would certainly look at it.

9       I'm hoping y'all can get together so we get those people out

10      of the way who we know aren't sitting.

11            Now, when we come in for the case-specific

12      questionnaire, I always start my jury selection with a series

13      of basic questions about their availability and

14      qualification.  I don't want people who are ill, death,

15      can't sit through something, who are having surgery at that

16      time, all -- we go ahead -- and they haven't already asserted

17      that; and surprisingly, a lot of people don't take advantage

18      of that.  They come to court and they tell me that.  I want

19      to screen them out because I don't want them to complete a

20      case-specific questionnaire if we know they cannot serve.

21            Now, folks, we've got a real -- a real challenge

22      here, and that is undue burden for the length of time.  I'm

23      worried about people who we are asking them around

24      Thanksgiving and Christmas not to work, and I'm conscious of

25      the fact there are -- I mean, let me tell you, commonly even

1    for a one- or two-week trial, say, "I'm a commissioned

2    salesman, I'll just go broke if I can't work for that long."

3    Or, "I own my own business and I make 80 percent of my income

4    during Christmas, I can't be gone," okay?

5          So we'll -- I'm going to put them -- it's going to

6    be -- y'all are going to be present.  We are going to do

7    individual, but I will ask those questions, because I don't

8    want to put those people through doing a case-specific

9    questionnaire, it doesn't accomplish anything.  And again, I

10   think we don't have to have too heavy a hand on disqualifying

11   people, but I think it's just impractical to be having people

12   processed and y'all spend all of your time getting ready and

13   people that couldn't serve anyway.

14         I'm going to do some initial screening.  And then

15   those who I have not removed usually are going to have to ask

16   me to be exempt.  I'm not going to invite them to be exempt.

17   If they ask to be exempted and I determine there is undue

18   burden or for some reason that they can't be fair, then I'm

19   going to -- then we will not have them fill out the

20   case-specific questionnaire.  So that 700 we'll get will be

21   real people.  They are not people who a bunch of them are

22   going to go away.

23         What I need to think through is -- and I think

24   we'll, you know, we'll do more of this later, obviously, is

25   on the individual voir dire about their ability to be fair in

9

 1    this particular case.  But I do -- y'all tell me, how do you

 2    feel about me raising anything at that point before the

 3    case-specific questionnaire or would we rather do it at the

 4    individual voir dire basis?

 5            MR. BRUCK:   This is when they are physically here

 6    before they fill out the questionnaire?

 7            THE COURT:  Correct.   Is there anybody -- do we

 8    want to let the case-specific questionnaire do its job and

 9    then we will strike them or do we want to ask anything

10    beforehand?

11            MR. BRUCK:   Of course, how do you -- people are

12    going to know this is a big deal.

13            THE COURT:  Obvious, yeah.

14            MR. BRUCK:   How do you avoid it sort of inviting

15    people to come up and say, "I have a work-related" --

16            THE COURT:  I mean, I intended to tell them this is

17    *United States vs. Roof*.  I intend to tell them a little bit

18    about -- we'll talk about dates, but I -- to keep them from

19    being completely spooked, I'm going to tell them there are

20    certain dates around Thanksgiving and around Christmas and

21    New Years we will not be holding court, because otherwise

22    I'll lose everybody.   So we'll work out among ourselves

23    about what I will say; but otherwise, I'm going to lose

24    everybody.   But I do have to tell them that, David, and --

25            MR. BRUCK:   Yeah.

1          THE COURT:  I would like the questionnaire to help

2     us guide people who can't be fair, but will I be getting

3     people who just say, "I think they ought to let you execute

4     the SOB," this kind of stuff, I never let them do in front, I

5     make them come forward to tell me that.   But I wasn't really

6     planning, unless y'all want me to.   I think the

7     questionnaire will help us get to that.   Don't you figure?

8          MR. BRUCK:   This is only hardship.

9          THE COURT:  Hardship.  And they have a right under

10    our plan, if they are over 70 -- I have never had anyone over

11    70 ask for that exemption -- they have a right to it.

12    People who have served on a petty or federal grand jury in

13    the last two years, I've never had anybody assert that one.

14    The vacation thing is going to be problematic.   And we'll --

15    people who have nonrefundable tickets, that is kind of easy.

16    But do we really want on our jury people who say, "I have

17    been saving money for two years to take my kid to Disney

18    World at Christmas and you are going to make me take off,"

19    I'm going to tell them you are going to get a couple days off

20    for Christmas, we won't come back until January.   I'm saying

21    do we want people like that on the jury?   Maybe we'll save

22    that for individual voir dire.

23          I have a standard question about personal hardship

24    that includes travel plans that cannot be changed.   Have you

25    bought a nonrefundable ticket?   A lot of people say, "I have

1    bought a ticket, "We bought them three months ago and we are

2    going to," so and so.   And, you know, I would not require

3    people to eat their holiday ticket to be on this jury.   So

4    again, we are having enough where I don't think we are going

5    to lose -- but there will be some people.   I am going to do

6    some level of screening on personal hardship, basically, and

7    then we'll have them fill out the questionnaire, we'll have

8    700 and then we'll come back and do individual.

9            MR. BRUCK:   If I understand, the reason you are

10   thinking about doing a preliminary hardship screening is to

11   try to get a more solid group.

12           THE COURT:   I think a real list.   I think you are

13   wasting your time to have to pour over all of these and a

14   third of them are going to be let out anyway.   Just doesn't

15   accomplish anything.   It's just one of those things where I

16   think we all want to use the most efficient way of doing

17   that.

18           So now let me talk to you about Area C versus the

19   state-wide venire.   The way I read the rule, we are supposed

20   to, of course, follow the jury plan, unless there is a really

21   good reason not to.   So, yes, if the defendant says, I want

22   Area C, that's fine, okay?

23           Now, here is the question:   Do you really want Area

24   C?   Because if we end up and can't draw a jury out of our

25   pool -- and it will take us months to restart this process --

1    to get this process back in, need I say more.

2            MR. BRUCK:    To whom do you refer?

3            THE COURT: So I just say to you, recognizing that

4    the plan builds in a deference to the local venire, do you

5    really want that, Mr. Bruck?

6            MR. BRUCK:    We are confident we will get a jury.

7            THE COURT: I'm fine.    I just want to give you that

8    one last way to change your mind if that's what you want.

9            Now let's talk about 12.2 procedures for just a

10    minute.    I've spent a fair amount of time thinking about

11    this.    You know, a typical district judge doesn't deal with

12    12.2, right?  Who has ever read this thing?  Jay might read

13    it for entertainment.    Who bothers to read this stuff?

14            MR. RICHARDSON:    My five-year-old is really engaged

15    in it.

16            THE COURT:  And then the interplay with Rule 16 is

17    so interesting.    And just, what does it mean?  But I have --

18    I read with interest the defense's argument about concern

19    about firewall counsel.

20            And here is sort of -- and I've spent a lot of time

21    reading the history, and this is sort of where I've sort of

22    come down with this, is that 12.2 is a very sort of careful,

23    maybe not perfect balancing between the interests of the

24    Government and having its right to rebut a mental health

25    claim of a defendant, and the defendant's right not to have

1    his Fifth Amendment rights basically testifying against

2    himself.   It's a tough balance.   And this is the way it has

3    sort of come out.   And the process is nobody gets it until

4    guilt.   The defendant says, "Yes, I want to do mental

5    health," and then you get the -- everybody then gets to see

6    the Government's examination.   That's the process.   And so

7    in some ways the defendant drives the train a little bit,

8    both in timing and whether anyone ever gets to it anyway.

9    They say, "Hey, I'm not going to pursue mental health."

10   Well, that kind of informs me in a couple of ways.

11          I know that there are a bunch of cases that have

12   firewall counsel.   There is much to recommend, as a

13   practical matter, firewall counsel.   And many defense lawyers

14   in capital cases, able, competent lawyers have waived the

15   12.2 procedures because they want the report early

16   themselves.   Not only does the Government want it, they want

17   it because it helps them plan their case.   They know the case

18   is not about guilt, it's about sentencing, and they do that

19   with their eyes open and -- but it's their call because the

20   rule really allows that.   And to be honest, I've gone back

21   and read that rule over and over, and it says no government

22   lawyer gets it.   And I think no government -- in a capital

23   case you read that literally.   And that means in every case

24   I found, and Mr. Bruck really focuses us, no one has done

25   firewall counsel where I can find that it wasn't consented

1    to.

2        MR. BRUCK:    The Government did find one case out of

3    the hundreds.

4        THE COURT:  So I'm just sort of -- I just think

5    that -- and no, nothing on the defense, their job in tough

6    cases is to make everybody square the corner and not round

7    the corner, right?  You've got to do it.  And I'm just not

8    going to walk in when the rule says one thing and do

9    something else.   I think it would be -- frankly, to be

10   honest, David, I think it would be prudent for you to get it

11   early and prudent to do what other folks have done, but I can

12   see it's a judgment call on your part.   And if you want to

13   insist on your 12.2 rights, your client has the right to

14   that, okay?   End of discussion.   So no firewall counsel if

15   that's the way you wish it.

16        And then that raises the whole Rule 16 summary.

17   How does -- how do we do this summary of the expert of the

18   defendant?  Because under Rule 12.2, that is not given until

19   the Government has produced its report do you get the

20   examining report of the defendant's expert.   If you get the

21   summary, you just get the crib notes of the expert opinion.

22   And I know Rule 16 does not give us a specific timeframe.

23   There is this whole debate in a number of cases that 16 --

24   12.2 trumps 16 and all this stuff.  Let me tell you where I'm

25   coming down.  The Rule 16 summary will be required to be

 1    produced after the guilt phase, after the guilt.  So the

 2    defendant is found guilty, you get the report and a summary

 3    to the extent -- I just think that's just the way it is.   So

 4    you would not have to disclose -- the defendant would not

 5    have to disclose his expert summary until he were found

 6    guilty of -- regarding the mental health testimony until

 7    after.

 8              Mr. Bruck, you seem concerned.

 9              MR. BRUCK:   That's a new one.   I think the

10    general -- I mean, I don't want to argue with the Court after

11    you've ruled -- but the general rule has been that 12.2 does

12    trump Rule 16 on mental health.   There is no Rule 16

13    summary.

14              THE COURT:  I'm not sure it matters.   Does it

15    matter?  Because if you give it in the report --

16              MR. BRUCK:   Once we reconfirm, once we reconfirm.

17              THE COURT:   That's it.   Only then.

18              MR. BRUCK:   Okay.   So it's just -- the report is

19    accompanied by a summary, for whatever that is worth.

20              THE COURT:   Whatever it's worth.

21              MR. BRUCK:   I'm sorry.

22              THE COURT:   I was wondering why you were arguing

23    with me.

24              MR. RICHARDSON:   Keep talking.   Keep talking.

25              MR. BRUCK:   Okay.

1                    THE COURT:  Does that make sense?

2                    MR. BRUCK:   Yes.

3                    THE COURT:  And I'm just -- I sort of see where

4        everybody is coming from.  And I have a lot of sympathy for

5        the Government's position about the need to prepare its

6        defense, but I didn't strike that balance, whoever -- you

7        know, the rules strike that balance.   And I see why at times

8        everybody has reached the conclusion, everybody getting it

9        earlier is in the common interests.  If it's not in the case

10       here, fine.   That also gets us to the whole issue about the

11       mitigation notice.   I buy it that the defendant ought to at

12       some point disclose his mitigation notice.   If you do it

13       before the guilt is determined, it's just a backdoor way of

14       getting the opinion of the expert.   I mean, that's all you

15       are doing.   It's form over substance.   And I read 12.2, the

16       balance struck is that's after guilt.

17                    So the answer to all that roundabout way is is that

18       y'all are going to get a lot of notice after the guilt phase

19       and y'all are going to have to be quick on your feet.   But

20       think about bankruptcy lawyers, they do $100 billion worth of

21       stuff in such a short period of time.   They get notice and

22       have to try it the next day.   I wouldn't have personally

23       written the rules that way, but that's the way they are

24       written, and that's the way I'm going to enforce it.   Those

25       are the things I really wanted to talk -- many other

1    issues -- but I'm going to do them in open court.    Those are

2    the things I didn't particularly want.   The question here,

3    Mr. Buck -- and let me put it to you -- are you sure, in

4    light of what I have said, you do not wish to follow the

5    track of agreeing to an earlier disclosure with everybody

6    getting it earlier than the guilt phase?   Is that something

7    you do not wish to do?

8            MR. BRUCK:   We do not wish to do that.

9            THE COURT:   That's fine.   Everybody has got to

10   exercise their judgment about what works best in that case,

11   and I think they are right to do that.   Now, having

12   discussed those, is there anyone that has any particular

13   concerns about what I said?

14           MR. RICHARDSON:   I hate to be particularly like,

15   you know, unimportant and sort of, you know, picky, but it

16   strikes me, if we are going to do the full analysis about

17   undue burden and availability for the groups of 80, that

18   trying to do four groups of 80 in a single day is an

19   aggressive schedule.   To do that questioning and then fill

20   out the case-specific questionnaire in a --

21           THE COURT:   Now remember now, remember, we will --

22   I'm sorry.   Leaving one little piece out.   Once I do my

23   pieces when -- I do this to a group of about 80 all the time.

24   We move them to another room and --

25           MR. RICHARDSON:   I didn't understand that piece.

1            THE COURT:  They are in another room.

2            MR. RICHARDSON:   We don't have to wait for them to

3       finish.

4            THE COURT:  Does that --

5            MR. RICHARDSON:   That answers that question.

6            THE COURT:  And I think we are doing -- I think the

7       way we -- Lena can tell me this, but we -- I think we've got

8       them in Courtroom V and they do it from VI to V, so they go

9       to another room to do the questionnaire.  And I wanted to do

10      that because they wanted to put out more space and be a

11      little more comfortable for people as they are filling them

12      out.   And we thought about, one point about the jury

13      selection room, I'm going to tell you we've got victims we

14      are trying to accommodate.   We've got limited space that we

15      are trying to figure out exactly how that goes.

16            But, Jay, the shorthand is they leave the -- they

17      leave my presence to go to a place to fill out the

18      questionnaire.

19            MR. RICHARDSON:   I think that makes perfect sense.

20            THE COURT:  I'm going to be basically going -- you

21      didn't express concern about the Court going for like 320,

22      doing this all day.

23            MR. RICHARDSON:   I have great confidence in the

24      Court's ability to do whatever it is it wants.   I'm more

25      concerned about this side of the table than that one.

1          THE COURT:  Well, I think that -- and folks, listen,

2     I know we are going to produce a lot more jurors than we

3     need, okay?  So be it.   But we are going to draw a jury and

4     we are going to have one ready to go.  And let's talk a

5     second about how long we are expecting trial to take.   Guilt

6     phase.  I'm not going to ask y'all about jury selection

7     because who knows, right?  We'll figure that one out.   But

8     guilt phase, how long do we anticipate that to take, and then

9     sentencing phase, how long do we anticipate that to take?

10          MR. RICHARDSON:   I think when we talk about guilt

11     phase -- and we've had some conversations about this, but to

12     say that it's -- buckle down is obviously a gross

13     overstatement -- I think we are fairly confident we are going

14     to do it in less than two weeks.  Can we do it in a single

15     week?  That seems pretty aggressive.

16          THE COURT:  By the way, these questions are not

17     designed to rush you, and I'm not trying to rush my jury.

18     And I want to make sure that whatever setting, my jury

19     doesn't feel rushed.  So we are going to set up a schedule

20     that -- I'm not trying to press anyone.   Let me just say,

21     Jay, for those who have not tried cases in front of me, I

22     expect the next witness to be in the queue ready to go.   I

23     cannot tell you how much time is lost by people waiting

24     15 minutes while they are going to find the witness at the

25     Starbucks.   We are not doing that.   They are going to be

1    out there, the next witness.  And to the extent the evidence

2    is uncontested, I urge people to go ahead and premark them

3    and get them in by stipulation.   That saves a tremendous

4    amount of time.  But the answer is, I'm going to give you all

5    the time you need and nothing else.  But there are things I'm

6    going to insist upon in terms of respecting the jury, and

7    that is that we are ready to go, one witness after another.

8         And I've got to get a feel from a jury about how

9    much they can take.   That's going to be another issue when

10   something is particularly emotional, it may be difficult.

11   Some courts have gone four days instead of five.  They said

12   it was too much for the jury to go five days.   I think we've

13   got to watch the jury and make our own judgments about that.

14   My preference is to get as much -- to do this at a regular

15   pace, but if we can't, if the jury can't tolerate it, we are

16   going to respect that.   And I will ask them -- I always say,

17   you know, we would like to start -- usually the first thing,

18   I bring them in at 10, how does everybody feel getting here

19   at 9?  Sometimes people say, can it be 9:30, but they

20   generally want -- they know that accumulated over a week or

21   two that starts really mattering, that time matters.   And so

22   I will, you know, we'll have a better feel of predicting how

23   long to go.

24         One question is if we feel like we are making

25   progress and the jury can tolerate, could you consider a

1    Saturday or two just as a way of getting the case finished.

2    Again, I wouldn't want to prejudge that because I would want

3    to watch my jury and raise it with them and see how they will

4    feel.   It may be very inconvenient for them.

5                    MR. BRUCK:   The lawyers.

6                    THE COURT:   Kill the lawyers.

7                    MR. RICHARDSON:   I think if we know that, the

8    challenge for us is only the scheduling of witnesses and

9    bringing them in.

10                    THE COURT:   Listen, and --

11                    MR. RICHARDSON:   On a Friday afternoon, we would

12    like to have court on Saturday is going to be a challenging

13    endeavor, but --

14                    THE COURT:   I understand that.   And my hunch is the

15    jury won't be able to take it.   It's not -- but I do want

16    to -- so how about sentencing?

17                    MR. RICHARDSON:   I think, I suspect -- and I'm not

18    trying to speak for David -- but I suspect the guilt phase is

19    simpler because it's more going to be a one-sided story, at

20    least my estimation in using those dates, those frames is

21    there is not an extensive defense case and there is not

22    extensive day-long cross-examinations.   I think the

23    sentencing phase is much more difficult to anticipate.   I

24    think, from the Government's side, you know, I think it's the

25    same kind of timeframe for us.

 1                    THE COURT:  Two weeks.

 2                    MR. RICHARDSON:    Two weeks.   We hope to do the

 3          guilt phase in less than that time, but I think we are

 4          probably two weeks on the sentencing.

 5                    MR. BRUCK:   It's early to say, but I think two

 6          weeks is ballpark.

 7                    THE COURT:  Is that your presentation?

 8                    MR. BRUCK:  Yeah.

 9                    THE COURT:  So we are talking basically six weeks

10          for trial, is that what we are talking about?  Two weeks,

11          four weeks, six weeks.  Does that sound -- so --

12                    MR. BRUCK:   Plus a break in between, right?

13                    THE COURT:  And the question sort of is when we do

14          that, you know, I don't know how long jury selection is going

15          to start, is going to take, but it seems --

16                    MR. BRUCK:  You haven't asked for our estimate on

17          that.  We think the Government is being optimistic.

18                    THE COURT:  What's the Government's estimate?

19                    MR. BRUCK:   Two, maybe one.

20                    MR. RICHARDSON:   Two to three weeks.

21                    MR. BRUCK:   Now we are getting closer.

22                    MR. RICHARDSON:   I'm listening to you guys.  Y'all

23          are telling me it's going to be six weeks.

24                    THE COURT:  By the way, guys, whatever it is, it is.

25                    MR. BRUCK:   You are trying to estimate.

1      THE COURT:  It's not like we are all going fishing

2   when it's over, the boat is waiting for us.

3      MR. RICHARDSON:   I might be, Judge.

4      THE COURT:  You might be.

5      So it sounds like to me we are probably talking

6   about jury selection allowing us to sort of basically,

7   hopefully be finished before Thanksgiving, we start

8   November 7th, that would be about two and a half weeks.

9      MR. BRUCK:   Around Thanksgiving.  Maybe a little

10  bit more to do afterwards.

11      THE COURT:  And then whatever it is we might think

12  about doing the guilt phase before Christmas, and come back

13  in January and do -- I don't -- I'm not crazy -- I'm going to

14  break about two days before Christmas and I'm not coming back

15  until after January.   You cannot get a jury if you don't do

16  that.   Does that make sense?

17      MR. BRUCK:   By the way, it sounds like the ship has

18  sailed on our preference for strike as you go, but -- because

19  you've indicated --

20      THE COURT:  You know, you want to go and change

21  everything we do, David.   We just do it a certain way, and

22  it may not be the greatest way, but it works for us, we are

23  familiar with it.   And you are asking us to go -- you are

24  like change our skates right before the Olympics.

25      MR. BRUCK:   That's what you get from appointing a

```
 1        lawyer from out of town, but I mean --
 2              THE COURT:  Let me say, I've done it both ways
 3        myself as a lawyer, okay?  And what I never liked as a
 4        practitioner was I was using up my peremptories and I had no
 5        idea what the rest of the pool looked like.
 6              MR. BRUCK:   It's the same for both sides.
 7              THE COURT:  It is, but --
 8              MR. BRUCK:   We might be done sooner.
 9              THE COURT:  Your client is fighting for his life,
10        the other guys are prosecuting the case, okay?  So it's a lot
11        to be -- it's a lot to be in the blind about.
12              MR. BRUCK:   Right.
13              THE COURT:  So I personally think it's fairer to
14        know the pool.   It is a little more work to do, but at least
15        you can -- you can knowingly utilize your peremptories.
16              MR. BRUCK:   I only mention it because it may well
17        affect how long jury selection takes.
18              THE COURT:  I get it.   But I think this is -- you
19        know, unless -- I'm continuously rethinking things, but we do
20        it this way, and I just sort of -- I'm used to getting it
21        done, and I think that's what we are going to do.
22              Now, one thing you will see in our order we'll issue
23        is I noticed that somebody wanted to put -- we would need
24        like 64 on the strike list, and then somebody wanted -- I
25        think somebody said they wanted up to 70; is that right?
```

1          MR. RICHARDSON:   We suggested including a few extra

2     just --

3          THE COURT:  I don't have a problem with that.

4          MR. RICHARDSON:   Unknown.

5          THE COURT:  The way it works, and we do it routinely

6     here is -- because we'll have a strike list that will be the

7     right number, but then the Government will stand up and say,

8     I've used up all my peremptories and we have no more strikes,

9     okay?  And what we do is we tell them if there are like three

10    still on the list, the bottom three on the list are the ones

11    on the strike list that are the ones that go.   We go from

12    the top and we go -- take out everything that is struck.

13    When we get to here will be 12 plus six.  When we hit 18,

14    that's the jury, okay?  And I tell people that because

15    sometimes you might not want to waste -- see, they don't

16    really know that.  Nobody knows until the Government stands

17    up and says, I'm not striking anymore.   But it might suggest

18    not bothering to be striking people at the very bottom.   You

19    might in terms of strategic, everybody knows that that's the

20    way the game is going to be played.

21          Anything y'all want to tell me about or talk to me

22    about?

23          MR. RICHARDSON:   One question on the strike list.

24    David had suggested keeping the jurors on the strike list in

25    their juror number order.   And that is not -- typically

speaking, my experience has been that judges do a random

reshuffle.

THE COURT:  We do a random -- the computer does a

random and will produce the names and that's just -- so we

have the pool and then we understand our obligation is to

randomly pull from that pool.  So we don't do it -- so we

randomly do it.  What you are suggesting is, after we do

that, is to put them in some kind of juror --

MR. BRUCK:  No.  What we were assuming that this

would be done in the 3,000 would be in an order from one to

3,000, and that will be the juror number and that will be the

order in which they will be voir dired.  Many will be

missing.

THE COURT:  We'll continue voir dire and we are

going to be bringing them in in order of the jury.  So --

MR. BRUCK:  The order is fixed.

THE COURT:  At the end of 3,000 you --

MR. BRUCK:  The order is fixed from the beginning.

THE COURT:  Correct.  The 70 gets randomized.  At

the end they get -- that last 70 gets randomized because you

would go -- the normal way and the way traditionally was you

go into a box, a blind guy would pull and that would be the

list.

MR. BRUCK:  Okay.  It was not done that way in

Boston.  We kept the order and that allowed -- I mean, you

1    are talking about having an understanding of sort of --

2            MR. RICHARDSON:    Seventy.  Once you get it to 70,

3    if you randomize it at 70, I don't think that --

4            THE COURT:  What's the big deal?  This is your

5    strike list.  You get the list.  I don't think --

6            MR. RICHARDSON:   It's just knowing, I don't have a

7    position.

8            THE COURT:  It's a randomized list, because if you

9    don't randomize it, then you are kind of predetermining the

10   last on the list.  And I understand our obligation is to keep

11   it random.  And the other reason is that the jurors get a new

12   number.  Y'all strike off of a random number.

13           MR. RICHARDSON:   Random number 7 which corresponds

14   with 30.

15           THE COURT:  Juror number 7 always thinks he got

16   struck.  I was struck, I heard my name struck.  No, you

17   weren't struck.  That was a different list.

18           MS. STEVENS:   Once you get to 70, you randomize

19   that and then we get a new list with random numbers?

20           THE COURT:  Correct.

21           MS. GANNETT:  And when is that new list generated?

22           THE COURT:  When we finally get to 70.  That's your

23   strike list.

24           MS. GANNETT:   How far in advance of the final

25   strikes is that prepared?

1              THE COURT:  Actually, we form -- we have to think

2      about that.  We normally give them 15 minutes.

3              MR. RICHARDSON:   Sometimes they will give us

4      25 minutes.

5              THE COURT:  Go in another room for just a minute.

6      We'll work out something.

7              MR. RICHARDSON:   Government two, will that new list

8      reference back to their old number?

9              THE COURT:  Yes.  Actually, the list has two

10     numbers on it.  So the far left is the new random number, to

11     the right is the juror number.

12             MR. RICHARDSON:   I'll send everybody an example of

13     one.  They are in every case we do.  I'll send you one

14     we've used.

15             THE COURT:  What we'll do is give y'all some more

16     than I normally do, give a little more time for people to go

17     through and process that; and, you know, we allow y'all

18     overnight.  We won't do it the same day.  And then we'll

19     bring y'all to court and we'll strike, okay?  Does that make

20     sense?

21             MR. RICHARDSON:   One small housekeeping matter with

22     respect to the brief sizes, can we ask the Court to not

23     require us to file motions for oversized briefs?

24             THE COURT:  I have no problem -- I have no problem

25     with y'all filing briefs whatever length you want, I just

29

quit reading at page 35.

        MR. RICHARDSON:  Fair.  As long as you know that on the front end.

        THE COURT:  The important stuff, it's like the jurors at the end of the --

        MR. CURRAN:  We file multiple 35 pages.

        THE COURT:  That's right, or 35-page replies, right?  But you do not need to file motions.

        MR. RICHARDSON:  I didn't think so.  I just -- that's out of an abundance of caution.

        THE COURT:  Anything else?

        MR. BRUCK:  I have a couple of small things like that.  When is -- we may have some exhibits that are privileged discovery that we would like to submit along with the suppression motions.  Do we need to file a motion to seal?

        THE COURT:  Yes.  We've got to -- when you say "privilege," you are trying to keep them from the Government or are you trying to keep them from the --

        MR. BRUCK:  No.  This is government discovery.

        THE COURT:  Let me tell you something, there is a process for sealing, a motion to seal.  Eunice, you have -- is it a rule or how do we --

        MR. RICHARDSON:  The local rule.

        THE COURT:  And you just file a motion and I grant

1    it.   I mean -- and I will tell you all, obviously the things

2    that by statute are confidential, right?  But the things that

3    I'm sealing, things beyond that, because you think it affects

4    the defendant's right to a fair trial, the day after whatever

5    verdict there is in this, I'm going to unseal everything.   I

6    mean, I think the public has a right to know.   So if there

7    is something -- y'all might want to think ahead of time --

8    that you really don't want, any circumstances it's not

9    covered by the statute, like compensation and so forth, y'all

10   need to let me know that and I'll consider it.  But sealing

11   anything is sort of -- I have an intuitive hesitancy to do

12   that in any regard.

13        MR. BRUCK:   Well, to be clear, there are two -- one

14   is we have a motion that we are proposing to be under seal,

15   that's an investigation motion having to do with confession,

16   the video of the confession itself.

17        THE COURT:  We are going to seal that.

18        MR. BRUCK:   I'm sorry?

19        THE COURT:  We are going to seal that.   We don't

20   have to go through hoops about that.

21        But let me just say this because the press -- I

22   mean, the Fourth Circuit has issued these decisions on the

23   press's right to access, so you need to go through the

24   formalities of doing it and having me authorize the sealing.

25        MR. BRUCK:   And the second matter is that we would

1    like to have the entire motion to suppress some writings that

2    were found in the jail completely under seal.  The very fact

3    of the motion itself would disclose very prejudicial

4    information.

5             THE COURT:  Let me ask you this:  What's the

6    Government's -- I know a little bit, I frankly know it from

7    Judge Nicholson told me about it, but what is y'all's

8    position on that, on the stuff --

9             MR. RICHARDSON:   With respect to the sealing or

10    respect to the --

11             THE COURT:  To some writing in the --

12             MR. RICHARDSON:   We think it's plainly admissible.

13             THE COURT:  Is it allegedly -- what I had heard was

14    it had -- it was written for the lawyers, is that what --

15             MR. RICHARDSON:   We think there is strong support

16    that that is not the case.   I think that will be what we are

17    litigating.

18             THE COURT:  That's the issues.

19             MR. BRUCK:   That is one of the issues.  There is

20    also a Fourth Amendment, a residual Fourth Amendment issue.

21             THE COURT:  That's why -- if I had all the easy

22    questions -- I want to thank y'all for that.  That is another

23    one of those great --

24             MR. RICHARDSON:   We don't have any problem with

25    respect to the sealing of it.  I think it's probably prudent

1    and we are happy to consent to it being filed under seal.    I

2    think for jury selection, even in our scenario, I think we

3    would rather it be under seal.  We think it would likely

4    affect jury selection given the information that is contained

5    in it.

6            MR. BRUCK:  Okay.  Well, we will file a motion.

7            The last item is that we have determined that we

8    really need two more days to get these in.  They are due

9    today.

10            THE COURT:  You have them.

11            MR. BRUCK:  Thank you.  Okay.  I hadn't had a

12    chance to check with the Government.

13            MR. RICHARDSON:   We are fine.

14            THE COURT:  Adair, would you do something about

15    that? We had a motion for two additional days.  The motion is

16    granted.

17            Do I have a motion to seal this?

18            MR. RICHARDSON:   You do from the Government.

19            THE COURT:  Is there a consent? Mr. Bruck, do you

20    join in that?

21            MR. BRUCK:   Yes.

22            THE COURT:  That motion is granted.

23                         *****      *****      *****

24

25

1

2      I certify that the foregoing is a correct transcript from the

3      record of proceedings in the above-titled matter.

4

5

6

7      ---------------------------

8

9      Amy C. Diaz, RPR, CRR                October 25, 2016

10     S/  Amy Diaz

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25