```
 1                    IN THE DISTRICT COURT OF THE UNITED STATES
                          DISTRICT OF SOUTH CAROLINA
 2                            CHARLESTON DIVISION

 3       UNITED STATES OF AMERICA,    )           2:15-CR-472
                                      )
 4                      Plaintiff     )           Charleston,
                                      )           South Carolina
 5       VS                           )           November 2, 2016
                                      )
 6       DYLANN ROOF,                 )
                                      )
 7                      Defendant     )

 8                    TRANSCRIPT OF SEALED EX PARTE HEARING
                    BEFORE THE HONORABLE RICHARD M. GERGEL,
 9                      UNITED STATES DISTRICT JUDGE

10

11       APPEARANCES:              MR. DAVID I. BRUCK, ESQ.
                                   Virginia Capital Case Clearinghouse
12                                 Washington and Lee School of Law
                                   Lexington, Virginia 24450
13
                                   MS. KIMBERLY STEVENS, ESQ.
14                                 1070-1 Tunnel Road
                                   Suite 215
15                                 Asheville, North Carolina 28805

16

17

18

19

20

21

22

23

24
         Court Reporter:           Amy C. Diaz, RPR, CRR
25                                 P.O. Box 835
                                   Charleston, SC 29402
```

1          THE COURT:  We are gathered here at the request of

2     defense counsel for an ex parte discussion regarding a

3     matter, presumably about the defendant.

4          I'll be glad to hear from you, Mr. Bruck.

5          MR. BRUCK:   Thank you, Your Honor.  I appreciate

6     your making this time for us.

7          As I indicated in my message to the Court, we do not

8     have a current emergency, but there was enough happening that

9     was potentially significant that I didn't think we should

10    just keep it to ourselves and let you be surprised next week

11    if things develop further.

12         Essentially, the client -- by way of background, I

13    think I mentioned last time we were on the record we have a

14    diagnosis of autism spectrum disorder, a diagnosis of anxiety

15    disorder, and our experts are both convinced that our client

16    has some symptoms of psychosis.  There is a good deal of

17    mental, according to our read of the situation, of

18    substantial mental impairment that is affecting his behavior;

19    and most certainly, we think his interaction with us.  This

20    has been going on for a long time from the very beginning of

21    the representation, but as the case comes up to trial and as

22    we have finalized our assessment and disclosed to the

23    client --

24         THE COURT:  Your trial plan.

25         MR. BRUCK:  -- in more detail our trial plan, things

1    have become more acute.  The precipitating -- he this week

2    became very oppositional with us.  He has told us, in fact he

3    has shown us or read for us, a letter that he intends to send

4    to the prosecution, basically complaining that we have

5    mistreated him and our --

6              THE COURT:  On what basis?

7              MR. BRUCK:  Well, I maybe should back up and tell

8    you the precipitating event was the evaluation with Dr.

9    Dietz.  And --

10             THE COURT:  Remind me.  That's the fellow who --

11             MR. BRUCK:  That is the prosecution's --

12             THE COURT:  12.2, right.

13             MR. BRUCK:  Who is a nationally renowned --

14             THE COURT:  I know who he is.  But didn't use the

15   guy you were worried about.

16             MR. BRUCK:  He's the other guy.  There are two.

17   And this is the other one.

18             Dr. Dietz's evaluation -- and we are having of

19   course to reconstruct it through our client, so consider the

20   source -- but there are some things that are unmistakably

21   true.  He informed us that he had gone through with our

22   client not only the Government's exhibits that have been --

23   of which we have been given notice, photographs and so forth.

24             THE COURT:  He went through with the defendant?

25             MR. BRUCK:  With the client, yes, with the

1    defendant.  But he also went through the exhibits and
2    photographs that we have provided to the Government in
3    accordance with the Court's order to disclose on
4    October 17th, our initial exhibit list.  And as Dr. Dietz
5    told Mr. Roof such things as that he interpreted the fact
6    that we had provided the Government with a series of
7    photographs that we took during an inspection of the
8    defendant's car, and he theorized for Mr. Roof that what we
9    are trying to do is to depict him as a homeless crazy person.
10   That was Dr. Dietz's interpretation of our choice of
11   photographs.
12           THE COURT:  I'll be honest with you, now, I don't
13   know Dr. Dietz, but it almost sounds like your client's
14   interpretation of what Dr. Dietz was trying to accomplish.
15           MR. BRUCK:   We'll never know.
16           THE COURT:  Because we didn't --
17           MR. BRUCK:   One of the things that our client is --
18           THE COURT:  You can thank Mr. Roof for that.  I was
19   with you on videotaping it.
20           MR. BRUCK:   But that is -- he told us that towards
21   the end of the evaluation Dr. Dietz informed him, and I
22   quote, "I cannot find anything wrong with you."
23           THE COURT:  Right.  I can tell you that Dr. Dietz
24   didn't say that.  I mean, so -- but that's okay.  Because
25   what is important is not what Dr. Dietz said, but your

1    client's perception of what Dr. Dietz --

2             MR. BRUCK:   I have to say, based on my familiarity

3    with Dr. Dietz's work, I am not at all confident that he did

4    not say that, but --

5             THE COURT:  Fair enough.

6             MR. BRUCK:   -- but the important thing is that

7    Mr. Roof is 100 percent certain that Dr. Dietz has given him

8    a clean bill of health.  Dr. Dietz did inform him, and we

9    know this because there is no other possible source, that we

10   intended to call an expert who would testify about living

11   with autism.  He is -- one of our experts is a person with

12   autism, a very --

13            THE COURT:  I remember that, yes.

14            MR. BRUCK:   -- celebrated, widely-published author

15   and expert teacher and consultant.  And we had not informed

16   our client of a number of these things precisely because we

17   didn't want it to interfere with or affect the Government's

18   evaluation and his willingness to cooperate with the

19   Government's evaluation.  We thought that the more

20   information we disclosed ahead of the Government's

21   evaluation, the less likelihood that our client would

22   cooperate with the Government.

23            THE COURT:  If he didn't cooperate, potentially blow

24   up the defense.

25            MR. BRUCK:   Create problems for everybody.

1          As a result, Dr. Dietz was the person to unveil much

2     of what we intend to do in our case in mitigation.

3          THE COURT:  Is your client aware that you intend to

4     have this autism spectrum defense and there is something

5     wrong with him?

6          MR. BRUCK:  He is now.  I mean, he knew that --

7     there have been discussions about this over several months.

8          THE COURT:  Well, you know, Mr. Bruck, anybody can

9     read his various writings to know how much he holds in

10     contempt this approach to evaluating himself, okay?

11          MR. BRUCK:  Right.

12          THE COURT:  That he personally believes there is

13     nothing wrong with himself, and that the world is at fault,

14     not himself.  So I have wondered how he was going to sit

15     there and listen to a defense which he likely has complete

16     contempt for.

17          And here is the other great question:  What happens

18     when -- you asked me to colloquy him about whether he's going

19     to testify or not?

20          MR. BRUCK:  He -- that -- I think there is a very

21     deceptive picture of this man's condition that comes from his

22     writings.  He is like a precocious ten-year-old child.  He is

23     in court paralyzed with anxiety.  He will not testify.  He

24     will not want to testify.  He is afraid to look up during the

25     proceedings.

1          When we were in court to discuss the trial schedule

2    on June 17th, when the proceedings were over, he asked me

3    what the prosecutor looked like.  And I said, "Well, you were

4    right there."  He said, "I didn't turn my head to look at Mr.

5    Richardson during those proceedings."  He was following them

6    with great care because he was very upset that I did not

7    answer your questions as quickly as Mr. Richardson did about

8    my ability to be ready.  This is autism.  It is all over.  He

9    is a geyser of autistic symptoms, and it is masked and was

10   largely for a long time.  It was masked for us by the fact

11   that he is verbally adept.  He is like a precocious

12   10-year-old.

13          THE COURT:  Is he verbally adept orally or only in

14   writing?

15          MR. BRUCK:  He can speak fairly fluently.  He has

16   repetitive patterns, and some of them are -- you can detect

17   them.  I just did a word search for the phrase, "You know

18   what I'm saying?"  In his confession to the FBI he used it 38

19   times.  So he has patterns of speech which are repetitive in

20   a way that is a sort of soft side of his autism spectrum

21   disorder.  But he speaks fluently.

22          THE COURT:  I take it you are here because you are

23   worried that your client may be rebelling against the defense

24   your team has sought to advance?

25          MR. BRUCK:  Yes.  And in a way that -- I mean,

1    rebelling isn't -- he is forming an alliance in his own mind

2    with the prosecution.  I think that would be the way to

3    describe it.

4            THE COURT:  Does he view himself as being the person

5    they are describing?  As an intentional killer who set out on

6    a racial mission to create a crazy war?  That is their view.

7            MR. BRUCK:   Well, I mean, you have his writings.  I

8    don't -- he is -- his fundamental motivation -- it's so hard

9    to convey.  We have -- it would misstate what he's like for

10    me to say -- answer that question yes.

11            What he -- when he explains why he doesn't want an

12    autism spectrum disorder case in mitigation or his anxiety

13    disorder or his psychosis -- and he has these schematic

14    delusions about his body and that one half of his body is

15    developed more than the other because all of the hormones

16    have pooled on one side.  This is documented for four or

17    five years.  He -- the reason he is upset about it is that it

18    will be put on his Wikipedia page.  It's not a question of a

19    political agenda, of a belief that, you know, history will

20    look at him different, it is that concrete, his Wikipedia

21    page will have something about autism and that is

22    embarrassing; not undermining, not politically adverse,

23    embarrassing.

24            His greatest fear that he keeps repeating over and

25    over again is that he will have blushing attacks in the

1    courtroom.  And when I say, Well, what is so bad about that?

2    He can't answer it, but it is obvious that it is

3    self-evidently intolerable that he would have what are, in

4    fact, very severe blushing attacks in court.

5          So what he -- what he may be doing is sending a

6    letter to the prosecution which will accuse us of misconduct,

7    which may also accuse our autism specialist of being coached

8    by us, or told what her opinions should be by us.  Whether he

9    would then ask for some relief from the Court, I have no

10   idea.

11         I just want the Court to know that ever since Dr.

12   Dietz' evaluation he has had a very substantial mood change,

13   and is intermittently oppositional with us, defiant.  Then he

14   goes back to being rather childlike.  Then he goes back to a

15   long discussion of the clothes that he wants to wear.  He has

16   this preoccupation with these physical sensations of how

17   things feel on his skin and his waist and whether his pants

18   touch his shoes.  So that is the client we are dealing with.

19   And I simply --

20         THE COURT:  Let me say this:  I have wondered from

21   the first reading of these various writings of his whether he

22   would ever tolerate a defense you would assert.  I have

23   wondered in my own mind that the obvious defense would be

24   fundamentally reprehensible to him.  And that he did this, in

25   his own words -- this is in writing at least --

1    intentionally, willfully.  He sheds no tear for anybody.

2    He's proud of what he did.  And this defense suggests there

3    is something wrong with him, okay?

4         MR. BRUCK:    Yes.

5         THE COURT:  And whether Dr. Dietz was going to tell

6    him that, Mr. Bruck, he was going to hear it in the

7    courtroom.

8         MR. BRUCK:    No, he was going going to hear it from

9    us.

10        THE COURT:  So I wouldn't fixate on Dietz because

11   this crisis was coming from the moment you personally first

12   read those documents.

13        MR. BRUCK:    Well --

14        THE COURT:  And you knew the defense you and your

15   team would mount, okay?

16        MR. BRUCK:    Yes.  Now, I don't mean to suggest that

17   we are surprised by this.  This is a stage of the case for

18   which we have been planning and thinking and seeking expert

19   assistance for many months.  We knew that when the evaluation

20   was done we were going to have to discuss with him what our

21   expert's findings were.  We knew that he would be very upset

22   about it --

23        THE COURT:  That might be an understatement.

24        MR. BRUCK:    -- for the reasons that I have

25   described.  This is a person with such severe anxiety and

1    social phobia, and it's -- we always knew this would be

2    difficult to tolerate.   What -- what we are concerned about

3    now, other than -- is not only that he may, you know -- I

4    think if he writes a letter to the Government or even if he

5    writes a letter to the Court, that may not amount to that

6    much in terms -- I don't know that he would do very much

7    after that in terms of, you know, attempting to fire us, or I

8    certainly don't see that he has the capacity to be defiant in

9    court or to in some way try to disrupt the proceedings.  We

10   do think that he could -- the basic conundrum is that the

11   very facts about his mental condition that are mitigating may

12   have already impeded and may continue to impede the

13   ability -- his ability to have those facts considered.

14          THE COURT:  You are not the first defense lawyer in

15   a case where, with a client with issues, for the client

16   having no insight of those issues, to be deeply offended by

17   the defense.  I would dare say you've had other clients

18   yourself --

19          MR. BRUCK:   Yes, I have.

20          THE COURT:  -- who have had that very same

21   situation.  This may be the most complex of those you've ever

22   confronted.

23          MR. BRUCK:   It most certainly is, and the hardest

24   to figure out, and the one that has taken me the longest.

25          There is -- as I said when Ms. Stevens and I were

1    here with you last time -- there is nothing about him that is

2    intuitive.  What you see is not what you get with this young

3    man, and that's vague, but it is something for us all to keep

4    in mind.

5            THE COURT:  Well, here is sort of the scenario.  At

6    some point he writes the Government.  I would presume the

7    Government would promptly file something with me containing

8    that document.  When I have situations arise where a

9    defendant is unhappy with his or her lawyer, I hold a hearing

10   in camera.  I send the prosecutor out and I have a hearing,

11   and I allow the defendant to voice concerns, and I hear from

12   counsel, and I make a decision about whether I should remove

13   counsel, if that's his request.  You know, he is supposed to

14   be the master of his case, right?  It's a little complicated,

15   but that generally is the concept, one is the master of his

16   case.  So he could attempt to fire you and try to

17   self-represent.  You tell me his social anxiety would

18   probably prevent him from doing that, and I would have to

19   make an evaluation whether he has the competency to

20   self-represent.

21           MR. BRUCK:  I think his *Faretta* right has probably

22   about run its course, it's probably too late.

23           THE COURT:  Even if it hadn't, whether he would have

24   the personal capacity to self-represent.

25           So, you know, I appreciate you mentioning it.  I'm

1    hardly surprised.  I frankly thought that you hadn't fully

2    disclosed all that to him because of him blowing up, hoping

3    to kind of do it in small pieces.  And I wasn't going to be

4    surprised in the middle of trial that he starts raising cane

5    with you about why are these people saying I'm crazy, right?

6    Because I know who your experts are, okay?  I know what their

7    defense is, and that is completely contrary to his view,

8    which is that psychiatry is a bunch of bunk, right?  And it

9    undermines what he thinks are important values in

10    civilization.  Having a psychiatric breakdown and analyze

11    people and making brave men seem weak.  I mean, I sort of

12    took that all from his own writings.  Yeah.  You kind of

13    walked right into it, Mr. Bruck.

14            MR. BRUCK:  Well, yes.  I mean, you know, if we

15    have to sort all of this out in the course of a blowup over

16    our representation, that will be the time to do it.  But I

17    really do want to emphasize that we are quite convinced that

18    what are being described as his views are better understood

19    as his symptoms.  I mean, they are views.  They are things he

20    believes.

21            THE COURT:  I hear you.  I know exactly what you are

22    saying.  And at one point I might have to address that issue;

23    but, you know, I'm sure client management is a lot of things

24    you teach young lawyers in handling capital cases.  It's one

25    of the most challenging parts of this work.

1           MR. BRUCK:   We mentioned the last time we were

2      here, thinking about accommodations for his issues, and I

3      said then, or Ms. Stevens said then, we weren't ready to ask

4      you for anything yet, and we are still not, because it

5      remains to be seen how he does on the first day of jury

6      selection.

7           THE COURT:  May I just ask -- and I don't, by

8      voicing this, don't seek to suggest to you one way or the

9      other on this -- but if, in fact, his presence in court

10     causes extreme anxiety, doesn't -- is it really necessary for

11     him to sit there for two-and-a-half weeks during individual

12     voir dire?

13          MR. BRUCK:   Well, as with the filling out of the

14     questionnaires, we felt that the jurors are going to take it

15     a lot more seriously if they see there is a real person

16     there.

17          THE COURT:  They are going to see him during trial.

18          MR. BRUCK:   Yes.

19          THE COURT:  I'm just saying to you that this process

20     is going to be very tedious, right?  I mean, that is going to

21     be --

22          MR. BRUCK:   Right.

23          THE COURT:  And it's going to be as if he's not in

24     the room, right?  We are going to be asking questions that,

25     as if he is not sitting there in terms of the juror's ability

1    to respond, you know, attitudes on different things.  So I

2    just wonder, you know, whether you might, in light of your

3    client management problems now, whether having him there,

4    sitting there, which is not required, is something that, you

5    know, on balance now that you are having this.  I suggest

6    it's something you consider.

7         MR. BRUCK:    I can assure you that we are

8    considering it.  And we -- and we certainly considered

9    whether or not to tell him that we needed him to be in the

10   courtroom for the questionnaires.  On balance, we think that

11   was a very good decision on our part that --

12        THE COURT:  They've all looked at him now, sat there

13   for several hours looking at him.  They are going to have him

14   during, you know, the case in chief, and then the sentencing

15   phase.  So they are going to get plenty of looking at him.

16   Either way is fine with me.  I don't have a dog in it.  I'm

17   just saying that if you have a lot of social anxiety, you are

18   now essentially doubling his court time by doing this.

19        MR. BRUCK:    Well --

20        MS. STEVENS:  If I may briefly?  He is anxious

21   whether he's in the jail right now or whether he's in the

22   courtroom with us.  And we do believe that it will affect the

23   quality of the jurors' responses to your questioning on the

24   death penalty and some of their -- the candor and the honesty

25   of the responses when he's in the room.

1          THE COURT:  Listen, my view is if y'all think it's a

2     good thing, suits me fine.  I just raise it because -- I

3     mean, I could observe his stress of just being there for

4     routine matters.

5          MS. STEVENS:  We may change that position.

6          MR. BRUCK:   There is also -- part of the reason we

7     think it was very good to have him there before is that he is

8     beginning to have some sense of what it is to be in court,

9     and that he may be more able to tolerate and manage his

10    anxiety with practice.  So, but I --

11         THE COURT:  Whatever y'all do suits me fine.

12         MR. BRUCK:  I completely hear what you are saying.

13         THE COURT:  It's going to be pretty tedious.

14         MS. STEVENS:  As you pointed out before, Your Honor,

15    it is the most structured part of the trial and allows him to

16    acclimate somewhat in a structured way.  That may not be our

17    experience when we get in there, but --

18         THE COURT:  We'll see.

19         MS. STEVENS:  More predictable.

20         THE COURT:  It's simpler.  Nobody -- I'm the only

21    one really talking, right?  But I want you to think about

22    this, Mr. Bruck, you know, we -- part of our procedure is I

23    send the prospective juror out, are there any followup

24    questions?  You start talking about something that kind of

25    goes to your defense.  You may have client management

1    problems of your client being offended by what you are asking

2    me to ask the jurors.

3         MR. BRUCK:  Well, these are things that have to be

4    broached if we are going to have a trial, and --

5         THE COURT:  So maybe a little anecdote, having a

6    little, you know, exposure as a way to immunize him from it.

7    I'm just saying to you, you know, I don't want it interfering

8    with your ability --

9         MR. BRUCK:  I appreciate that.

10         THE COURT:  -- to have followup questions.  Because

11    he may say, "Why do you need to ask that question," or, "Why

12    do you want that?"  So just whatever it is suits me.  I'm

13    kind of agnostic about it.  I just observe it as a -- and I

14    get the idea that the more the pool sees him, they may, you

15    know, view him as a person, right?  That's the thinking.

16         MR. BRUCK:  Well, because we have been listing all

17    the reasons to have him in court, please don't think that we

18    are not giving very serious consideration, obviously, to

19    leave him at the jail or to doing a little of each.

20         THE COURT:  You are free -- he can come one

21    afternoon and not come back a couple of days.  Whatever he

22    wants to do.  I think it is a non-issue in my view.  He's

23    free to come and go as he wishes.

24         MR. BRUCK:  Well, thank you.

25         The -- when talking about accommodations, we may

1    find that what he needs is less time in court, and I don't

2    mean for jury selection, I mean period, the shorter days, a

3    day off for Friday, we'll see.  And we are not asking for

4    anything now, but we do hope -- and I'll admit that if that

5    is what he needs, we would be more than happy to ask for it,

6    because we are working at a pace ourselves that exceeds our

7    capacity, and are exhausted and the trial hasn't already even

8    started, and --

9         THE COURT:  It doesn't show in your work.

10         MR. BRUCK:   Well, it will, I'm sure.  We are

11    dragging.

12         But in any event, it -- and part of the -- you know,

13    part of what had been so stressful for us is the amount of

14    time and work and consultation and thought that goes into

15    dealing with this quite impaired client.  It's not -- these

16    are things that are obviously invisible to the Court, but

17    they take up most of our time.  And what you see above the

18    surface is --

19         THE COURT:  You know I have not second guessed your

20    time.

21         MR. BRUCK:   I know.

22         THE COURT:  I have not second guessed it.

23         MR. BRUCK:    I appreciate that.

24         But in any event, it -- these are -- you know, I

25    sort of wanted the Court to have some sense of that, you

1     know, if we find that he needs more time to unwind, to be by

2     himself, to not be looked at -- which is really his

3     obsession, people looking at him -- there will be testimony

4     about, you know -- I think I've mentioned to you about his

5     delusions about his face is deformed and that he can't bear

6     for people to look at his face or to see photographs of his

7     face.  He was not able to allow the neuropsychologist to

8     take, you know --

9            THE COURT:  Let's stop you right there.  If he -- if

10    you have a witness testifying to that, to those what you just

11    shared with me, it would hardly surprise me that you would

12    have that --

13           MR. BRUCK:   Yes.

14           THE COURT:  I would think he would have a great deal

15    of difficulty processing that sitting in the courtroom with

16    everybody turning and looking at him.

17           MR. BRUCK:  He may.

18           THE COURT:  I'm just saying those are deeply

19    personal things they are saying.

20           MR. BRUCK:   His mother is going to say this.  It's

21    going to be very hard for him.

22           THE COURT:  I mean, it just -- I mean, this is why I

23    said get off the Dietz thing.  This thing is coming.  You are

24    going to have to deal with it.  You are going to have the

25    people who he knows best, who I presume are going to come in

1    and talk about him and his behaviors, and that he did this

2    because there is something wrong with him as opposed to

3    something right about that, okay?

4           MR. BRUCK:   Yes.

5           THE COURT:   That seems very different from his moral

6    order, as he's written it, right?  How things ought to be

7    organized in the world.  So, you know, I've got a feeling we

8    are going to be revisiting this throughout the trial.  And I

9    don't fault your defense, I can understand it, the defense he

10    would want would be not very effective.  I did it and I'm

11    proud of it, right?

12           MR. BRUCK:   Yes.  He may also say, just to sort of

13    fill out what his -- what may be coming, he may say that he

14    wants the death penalty; but if he says that, it's not in the

15    way that it sounds.  He does not want the death penalty in

16    State Court, he only wants the death penalty, if he decides

17    he does, and it varies from day-to-day, in Federal Court.

18    Because he thinks the only important issue is what prison

19    he's held in when these proceedings are over.  He doesn't

20    really seem to grasp that he will be executed if he gets the

21    death penalty.  He believes that there will be some change

22    which will result in his being released and possibly given a

23    high position of authority like Governor of South Carolina.

24    And this is why, you know, we think we have a whole

25    complexity of psychological issues.  But this --

1          THE COURT:  You are the expert on this.  You know

2      that many executions occur because the client directs the

3      dismissal of appeals, right?

4          MR. BRUCK:  Yes.

5          THE COURT:  That is a well-known phenomena.

6          MR. BRUCK:  Yes.  He has no intention of waiving

7      his appeals because this will give enough time for the world

8      to turn upside down.  And he has -- he has been informed that

9      it took Timothy McVeigh six years from his crime to his

10     execution.  And like most information, this then becomes a

11     fixed immovable belief that he is guaranteed six years

12     minimum no matter what happens.

13         THE COURT:  Didn't McVeigh request --

14         MR. BRUCK:  Only in the end.  Probably shortened

15     the process by about a year.  But so it's like this is how

16     everything works in his mind.  It's a six-year fixed period

17     of time minimum, maybe longer, which will allow all kinds of

18     miraculous events to occur in the meantime.

19         So this is all in the background of the things that

20     he and, you know, thinks about Dr. Dietz and about the

21     Government, the prosecutors, who he now, I think, more and

22     more feels are really his lawyers, and the people on his

23     side, and so forth.

24         THE COURT:  Is he free to mail letters?  I mean,

25     would they, from the detention center if he asked to mail a

```
 1          letter, would they mail it to the prosecutor?
 2                  MR. BRUCK:   They would mail it to the prosecutor,
 3          yes, or he would give it to one of the jail officers.   The
 4          jail officer who sees -- he refers to Dr. Dietz as his friend
 5          constantly.
 6                  THE COURT:  He does.
 7                  MR. BRUCK:   He calls him "my friend."
 8                  THE COURT:  Dr. Dietz.
 9                  MS. STEVENS:  Our client.
10                  MR. BRUCK:   Our client calls Dr. Dietz "my friend".
11          His other friend -- this is what I mean about he comes across
12          like a ten-year-old.
13                  MS. STEVENS:  He came in and said, "He's my friend
14          and you two are not."
15                  MR. BRUCK:   And the other person that he
16          continually insists is his friend is Lisa Bloodworth, the
17          analyst at the sheriff's department who testified.
18                  THE COURT:  I remember her.
19                  MR. BRUCK:   So he -- if he decides to send a letter
20          to the Government, I think what he will do is give it to
21          Ms. Bloodworth.
22                  THE COURT:  We can assure her that she will forward
23          it to the Government.
24                  MR. BRUCK:   Well, but she would not do anything to
25          harm him, he says, because she is nice to him, she brings him
```

```
1    things, she smiles at him.  This is the level of

2    comprehension.  It --

3              THE COURT:  Just to clarify, do you mean the Officer

4    Bloodworth who I believe is a CO, not the analyst?

5              MR. BRUCK:  I'm sorry.  Ms. Bloodworth is not an

6    analyst, she is an officer. Lisa Bloodworth who testified at

7    the suppression hearing.  His way of evaluating whether

8    people are friends or not, other than this wrinkle, is

9    whether they smile.  He is a person who -- I mean, the best

10   way of describing it is that other people are a language that

11   he neither understands nor speaks.  That is autism and that

12   is what we are seeing.

13             THE COURT:  You have a right to mount your defense

14   until you are removed, you know.  And if he objects, I'll

15   have a hearing and determine what we do about that.

16             MR. BRUCK:  Right.

17             THE COURT:  You may resolve at some point for some

18   of this testimony he need not be in the courtroom.

19             MR. BRUCK:  Right.

20             THE COURT:  You have a right to do that.  I would

21   have a hearing before we did it, but it may be -- you know,

22   if he's agreeable not to be present, that may be another

23   option.  You know, you believe it's a meritorious defense the

24   jury should hear, and if that is, in fact, so then we want to

25   make sure the jury hears it, right?  I mean --
```

1          MR. BRUCK:  Yes.  Well, I appreciate that.  And

2     that's another thing we have thought about whether he would

3     be able to tolerate things if he wasn't there; on the other

4     hand, that carries a cost.

5          THE COURT:  Yeah.  I had -- I had a defendant who

6     had a great deal of anxiety being in court, and every morning

7     and every day after lunch I brought him into the courtroom --

8     he was in my cell downstairs, he watched it on TV.  He could

9     handle that, he just couldn't handle being in the courtroom.

10    And I would say, you are welcome to come back in at any time.

11    He was making comments.  If you could just not make comments,

12    I'll let you back in.  And for about eight days I did it

13    twice a day during the trial.  He never wanted to come in.

14    We can do that.  I mean, and his lawyer mounted as good a

15    defense as he possibly could have, but better than the one

16    that the client wanted, okay?  He was convicted, but I'm just

17    saying to you, I just have -- I can see a conflict with you

18    offering his mother to say there is something wrong with him,

19    right?

20          MR. BRUCK:  Yes.

21          MS. STEVENS:  I think one thing I observed the week

22    of the 26th sitting with him, the predictable days, the

23    predictable time that it took for each session we were doing,

24    the shorter days, and the two-and-a-half day week, I think

25    was a really good thing.  Not that we can continue on that.

1          THE COURT:  We can't do that.

2          MS. STEVENS:  But the --

3          THE COURT:  Jurors' lives.

4          MS. STEVENS:  It's the predictability of the break

5    you have mentioned that we would take, those things are

6    helpful.

7          THE COURT:  Just to remind y'all, we start hopefully

8    at 9:00 in the morning.  We take a break in an hour and a

9    half.  We come back after about a 20-minute break.  We come

10   back for an hour and a half, an hour and a half for lunch.  I

11   try to be as predictable as I can.  My jurors need to know.

12   And so there will be -- I will try to maintain a pretty

13   consistent regularity that ought to make him feel like he is

14   kind of in the groove in terms of what the day is like.  I

15   can't do two-and-a-half day weeks.  I can't do half a day

16   trials.  We are tying jurors up for enough of their lives.

17   We just can't do it.

18         But let's sort of feel, you know, I think this -- we

19   have got to see how the jurors react to what they can

20   tolerate, right?  I mean, you have been through a number of

21   these cases.  They are pretty emotional experiences for the

22   jury, right?

23         MR. BRUCK:  This one sure will be.

24         THE COURT:  So we'll just have to pace it.  I don't

25   want to prejudge it.  I watch my jury.  You know, you guys

1    have a client, the Government has a client, my client is the

2    jury, okay?  I want a fair trial and I want my jurors to be

3    in a state of mind that they can render a fair and just

4    decision.  So I'm going to watch out for them.

5              MR. BRUCK:   Okay.  Well, thank you for hearing us.

6              There are a couple of housekeeping issues.  We got

7    the response about the possibility of a feed to the jury

8    room, that that is something that you don't think is

9    practical.

10              THE COURT:  Correct.

11              MR. BRUCK:   We -- in the nature of -- I mean, maybe

12    it just plain is totally impossible.

13              THE COURT:  We've explored it.  Drop it.  It's

14    through the server, security, can't be done.

15              MR. BRUCK:   The wrinkle is because there is so much

16    public interest in this case and such a mob that will be in

17    the courtroom, the normal ability to have people that are

18    helping the defense see what is going on.

19              THE COURT:  Between the overflow room and the

20    courtroom, your people should be able to monitor what's going

21    on.  I know they would rather be -- by the way, I got y'all

22    this room, the sort of work room.

23              MR. BRUCK:   We appreciate that.

24              THE COURT:  I got that for y'all.  And now, you

25    know, you want to plug into my server, we are not doing that;

1    and, I mean, the AO would have, like -- Administrative Office

2    would have a heart attack if I did that.

3              MS. STEVENS:  That room is wonderful.  Thank you.

4              THE COURT:  Your people will have to go into the

5    overflow room.  There are other issues in terms of I've not

6    let the state prosecutors be on the front row, I'll put them

7    in the back.  I didn't want them cowering over the jury.

8    There are things we've tried to do to balance these

9    interests.  I do have a lot of victims.  You know, you are

10   accused of killing nine people, you get lots of victims,

11   right?  Can't complain too much about the number of victims

12   here.  And we don't have a lot of slots.  And I have fought

13   hard to preserve as many public slots as possible.

14             And to the extent your defense team is in line

15   early, they will be in the primary courtroom.  I mean, they

16   have a right to wait in line with everybody else, and they

17   have a right to be in the overflow room.  And it should --

18   that should work out fine.  And you are getting daily

19   transcripts.  So another thing I have allowed, okay?

20             MR. BRUCK:   I appreciate that, as well.

21             MS. STEVENS: Daily transcripts are wonderful for

22   trial.

23             THE COURT:  Anything else as far as mechanics that

24   we need to get covered?

25             MR. BRUCK:  Well, thank you very much for making

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    this time for us.

2              THE COURT:  Glad to do it.  Appreciate your efforts.

3                        *****      *****      *****

4

5

6

7    I certify that the foregoing is a correct transcript from the

8    record of proceedings in the above-titled matter.

9

10

11

12    ---------------------------

13

14    Amy C. Diaz, RPR, CRR              November 15, 2016

15    S/  Amy Diaz

16

17

18

19

20

21

22

23

24

25