# EXHIBIT 1




By Michael N. Burt
& John T. Philipsborn

We start with the assumption, formulated from common experience, that certain persons accused of crime can express an understanding of the nature of the charges and proceedings against them, but remain incompetent under the relevant legal definitions. Such persons suffer from a ". . . mental condition . . . such that [he or she] lacks the capacity . . . to consult with counsel and to assist in preparing [his or her] defense."[1]

Indeed, the United States Constitution requires that the accused have sufficient present ability to consult with [his or her lawyer] with a reasonable degree of rational understanding."[2]

For years now, the practice has been to allow most — if not all — of the evidence of client incompetence to be developed through a risky and irrational division of labor which is usually accepted by mental health professionals and lawyers alike.

We have observed that courts are content in many cases to leave competence determinations in the hands of psychiatrists and psychologists, who, depending on the specific competence issue involved, may be truly unable to make them. Yet, judges and lawyers seem content with this situation, because it simplifies a profound process — the assessment of a person's mental condition (properly a medical, psychiatric or psychological issue) as as it relates to the defense of a particular case (a matter which in some cases should be left to lawyers). Our bottom line is that these types of competence assessments should be based on a cooperative and thorough review of the facts by lawyers and mental health professionals.

Though it may smack of unfairness to say so, the fact is that in certain cases the basis for adjudication of competence issues essentially amounts to what experienced forensic psychiatrists have called "drive-by evaluations." In such cases, after receiving notification from a court, a psychiatrist or psychologist sees an incarcerated person once briefly, and then issues a report. The report will usually contain an assessment of the accused's basic neurological functioning and orientation in the three spheres and may mention observations of the accused's apparent understanding of the charges, the function of the judge, and the function of the lawyers. It may then conclude, based on this evaluation, that the accused is competent.

Not only do such reports ignore a great deal of the literature on competence assessments, but they ignore the pertinent law. In *Godinez v. Moran*,[3] the United

States Supreme Court held that there is no distinction between competence to enter a guilty plea and competence to stand trial. Its analysis weighed the ingredients that go into decisions necessary to consider a guilty plea or prepare for trial. According to the United States Supreme Court, these include:

A. whether to waive the privilege against self-incrimination;

B. whether to take the witness stand;

C. whether to waive the right to trial by jury;

D. in consultation with counsel whether to decline to cross-examine certain witnesses;

E. whether to put on a defense;

F. how to raise one or more affirmative defenses.[4]

As the court put it, "in sum, all criminal defendants — not merely those who plead guilty — may be required to make important decisions once criminal proceedings have been initiated. And while the decision to plead guilty is undeniably a profound one, it is no more complicated than the sum total of decisions that a defendant may be called upon to make during the course of trial."[5]

It has been said that:

> competency to stand trial . . . is perhaps the most important issue at the interface of the criminal justice and mental health systems [citations omitted] because of the numbers of defendants involved and the potential impact of decisions about competency on defendants' lives. Although competency is a legal issue ultimately determined by the courts, recommendations by mental health professionals exert tremendous influence on judicial determinations [citations omitted] with rates of agreement typically exceeding 90%. [Citations omitted.][6]

Yet, in a recently published article, several scholars from various backgrounds representing the Universities of South Florida, Virginia, and Massachusetts concluded that except for their recent work, ". . . there has been no systematic investigation of attorney-client interactions and the role played by defendants in making decisions about the defense and disposition of the case."[7] Indeed, how many forensic psychiatrists or psychologists have ever defended a criminal case? How many have conducted the investigation and/or client interviews necessary to ascertain possible defenses and decide on the methods and witnesses necessary to present them? This has led to what has been described as the interdisciplinary fitness review — which has been proposed to enhance the depth of competency analysis.

**Using Various Disciplines To Assess Competence**

In a case in which the focus is on a client's ability to assist counsel, one of the most evident issues is whether the assessing professional, usually a psychiatrist or psychologist, really knows what would normally go into the defense of the case. As noted above in *Godinez*, the United States Supreme Court sets forth a number of tasks that client and lawyer will consult on in a case.

The inquiry in any given case is both case and client specific. Is this a case in which the client is the only percipient witness to the events that led to the charges? Is this a case in which the client will have to explain his or her state of mind at the time of certain key events? Is the lawyer depending on the client to describe the names and whereabouts of certain key witnesses to assist in the investigation? Are there certain specific issues such as the implications of the entry of the plea of not guilty by reason of insanity, which must be explained to, and understood by, the client before further legal action is taken in a court of record?

If the answer to these questions is yes, then the nature and quality of the client's interaction with the lawyer on these topics will form part of the core of a competence assessment.

The issue at hand is explored in a series of questions and answers asked during the course of a mock trial, conducted during a meeting of the American College of Forensic Psychiatry, which was used as a demonstration of how one might approach a competence trial/hearing in which the client's ability to assist in the preparation of the defense is at issue. The accused was charged with murder. He had a history of institutionalization. He had been declared incompetent by one of his first lawyers in this case, and that lawyer withdrew from representing him. After several evaluations were conducted, the matter went to trial. The questioner is Michael Burt in the role of lawyer for the accused at the competence trial, and the responding expert is Dr. George Woods as one of the examining psychiatrists:

Q. And just in general, what, in your opinion, must the client be able to do in order to assist counsel in conducting his defense? Is it simply a matter of being able to talk to the lawyer?

A. No. Cooperation is not assistance. And I think that is what often gets confused.

Q. And . . . who do you need to consult to find out what the client must do in order to assist counsel in conducting his defense?

A. Well, it's my professional opinion that you'd have to recognize and yourself be able to understand certain aspects of the legal proceedings that the client is in, what theories of law pertain [to] the client's defense, and also understand other matters before you can determine if the client can rationally assist in preparing the defense with his attorney.[8]

Q. And besides being able to communicate with the attorney, what other functions are involved in being able to rationally assist counsel? Can you give me some examples of what you're talking about?



MICHAEL N. BURT *is a head trial attorney in the San Francisco Public Defender's Office. He has been involved in the litigation of a number of complex cases involving mental state and competency issues, including the "Nightstalker" cases, and the first defense of Lyle Menendez.*



JOHN T. PHILIPSBORN, *in private practice in San Francisco, has been involved in the litigation of competency issues and competence to stand trial standards in the federal and state courts, and has written for and lectured to forensic psychiatrists and lawyers on competency issues.*

*This article is based on one originally published in the* CACJ Forum, *published by the California Attorneys for Criminal Justice.*

A. You have to be able to weigh legal options. I think you have to be able to help develop strategies. You have to understand certain aspects of the case as they pertain to your particular defense.

Q. Do you, in your opinion, have to be able to apprise what the outcomes of the case may be?

A. Yes.

Q. Do you have to be able to understand the disposition and the fines and the penalties that are possible?

A. Yes.

Q. Do you have to be able to understand the legal defenses?

A. That's correct.

Q. Do you have to be able to comprehend instructions and advice from the attorney?

A. That's correct.

Q. Does the client have to demonstrate the ability to make decisions after receiving the advice?

A. Yes.

Q. Does competence also include an ability to maintain relationship with the attorney, so as to be able to help plan and carry out legal strategy?

A. I believe so.

Q. Do you understand it to mean the ability to follow testimony for contradictions or errors?

A. I think that's necessary.

Q. Does it involve the ability to testify relevantly and be cross-examined, and during cross-examination to provide answers logically connected to the questions?

A. I think that is true as well.

Q. And does competence involve the ability to tolerate stress while in trial, while awaiting trial, and to be able to avoid acting out in court?

A. Yes. That's part of having to go to court — to deal with this type of situation.[9]

Not all courts will allow a psychiatrist to testify about the items set forth above, which explains the following important exchange:

[by Michael Burt]

Q. In your opinion, is a psychiatrist the sole person who is able to assess whether or not a client is able to perform the functions that I have just listed?

[by Dr. Woods]

A. Well, in agreement with the objection made by Mr. Cling [the prosecutor], I certainly do not believe that a psychiatrist is the final arbiter of competency. In fact, competency is a legal conclusion. It is not a clinical conclusion.

This testimony was based on the well-established, but often forgotten, principle that:

> Medical opinion about the defendant's condition should be only one of the factors relevant to the determination of competency. A defendant's

AFTI
PU MAY
p 38

abilities must be measured against the specific demands trial will make upon him and psychiatrists have little familiarity with either trial procedure or the complexities of a particular indictment.[10]

In other words, as was most recently emphasized by the United States Supreme Court, "The legal definitions of 'insanity' and 'competency' their psychiatric counterparts . . . vary substantially from legal definitions . . . which must 'take into account such issues as . . . competency' need not mirror those advanced by the medical profession."[11] For this very reason, "counsel's first-hand evaluation of a defendant's ability to consult on his case and to understand the charges and proceedings against him may be as valuable as an expert psychiatric opinion on his competency."[12,13] Thus, in the mock trial, Dr. Woods has properly deferred some of the necessary opinion-making/rendering to a person trained and knowledgeable about the requirements of putting on a defense in a given type of case, or in a particular case; that is, a trial lawyer with experience in preparing and putting on the defense in criminal cases.

To date, commentary on this issue has focused on the role of defense counsel actually assigned to try the issue of guilt or innocence. Most prominently, the interdisciplinary team of lawyers and mental health experts authoring the American Bar Association's Criminal Justice Mental Health Standards (1984) has taken the position that the trial lawyer properly may elect to testify at the competency hearing or be required to respond to pertinent questions by the court.[14] The premise on which the standard rests is that "(c)ounsel is perhaps the most knowledgeable witness concerning that branch of the incompetency doctrine focusing on a criminal defendant's ability to communicate with counsel."[15]

"A defense attorney not only is in close and continuing communication with a client, but he or she also knows the extent to which presentation of substantive and factual defenses may turn on the client's ability to understand them and assist counsel in advancing them."[16]

Standard 7-4.8(b)(i) thus recommends that "(d)efense counsel may elect to relate to the court personal observations of and conversations with the defendant to the extent that counsel does not disclose confidential communications or violate the attorney-client privilege . . . ."[17]

In practice, however, the trial lawyer may be hard pressed to offer effective competency hearing testimony without referring to the contents of otherwise confidential attorney-client communications. The problem is compounded by the fact that the presumptively incompetent client may not be in a position to competently assert or waive the attorney-client privilege.[18] Even putting these issues aside, the commentary to Standard 7-4.8 warns that "the ethically permissible act of becoming a witness is not lightly to be engaged in, particularly because of the strain it might place on the attorney-client relationship if a defendant observes defense counsel apparently testifying against the client's best interests as the client perceives them."[19,20]

We propose that in order to avoid such strain on the attorney-client relationship, one good approach in these situations is to allow the psychiatric-psychological expert to consult with an attorney-expert who can explain, either in general terms, how the defense of a particular type of case would normally be conducted, or how, in a specific case, it is likely that a defense lawyer would put together the defense. The recommendation here is that the consultation be with an attorney-expert other than the one undertaking the defense.

The attorney expert could serve both as a consultant to the mental health expert and, in appropriate cases, as an expert witness at the competency hearing.[21]

The advantage of the consultation between psychiatric and legal expert, as proposed, is that the competency litigation is left in the hands of the trial lawyer, who is most familiar with the complexities and problems inherent in a given attorney-client interaction. The trial lawyer is also in the best position, without strain to the attorney-client relationship, to utilize the legal expert to lay out the basic requirements of the case law, the specific defenses available in a given case, the types of communication that necessarily should occur for effective representation of the client; this includes but is not limited to, information germane to the conduct of an investigation, to the preparation of the case, and to the preparation and presentation of the defense.

An interesting counterpoint to our proposal was an answer given by Dr. Fred Rosenthal, who played the role of a court-appointed psychiatrist in the mock trial described above, and whose role was to describe the point of view often taken by psychiatrists on the issue of competency. The questions here are by Michael Burt, the answers by Dr. Fred Rosenthal, M.D., Ph.D.:

Q. So you're looking at the question of competence in the abstract, isn't that true?

A. No, I'm looking at the question in a general sense, not in the abstract. I think, as I have tried to explain, mental competency is not defined in my opinion as specific reactions to specific situations. The psychiatrist is developing an opinion on the man's ability, or the woman's ability, to mentally function in a general way. And then that functioning is applied, of course, to the court situation. But I think it is a mistake to think that you can make this decision specifically on a basis of some individual reactions, such as how the person might or might not relate to a particular attorney. I think that the psychiatrist who espoused this position that you need to have an attorney involved, is really dealing with a very difficult question and "passing the buck," if you'll pardon my terminology.

Q. That's your individual view?

A. Yes. And that's why I'm in here. To give an opinion. And I think that the psychiatrist is better equipped, in general, to assess mental states and mental functioning. It avoids the conclusion by saying, "Well, we need to get an attorney involved." It seems to me it's a way of avoiding the responsibility that the psychiatrist has.

Q. But you are aware that there are persons in your profession who advocate the interdisciplinary approach, which would take into account the evaluations and opinions of attorneys, correct?

A. Yeah, there are people who have different opinions in my field. I mean, that's part of any field. And I respect those opinions. I'm just saying that my opinion differs.

[Later in the questioning.]

Q. Doctor, in this particular case, if . . . information from a person trained in the law with experience in criminal defense, was available, you wouldn't ignore it, would you?

A. No, I wouldn't ignore anything that's available. I'm just saying that I

think, again, this material might or might not be useful, but when you make a statement and say you cannot reach a conclusion about mental competency without the assistance of an attorney-expert, I just don't agree with that.

But, what are the alternatives? "A determination of competence or incompetence is functional in nature, context-dependent and pragmatic in orientation, and should be viewed as such by both courts and mental health and mental retardation professionals."[22] Certainly, mental health professionals, working in isolation from the legal profession, have not yet provided the "gold standard" for determining competence, as is revealed in the following exchange between counsel and expert [Michael Burt and Dr. Woods]:

Q. Is there, based on your knowledge of medical standards and psychiatric standards, a single test for examination that psychiatrists can perform to determine whether someone is competent or incompetent?

A. No, there is not.

Q. Have there been attempts to come up with tests that attempt to assess whether a person is legally competent or incompetent?

A. Since 1974, there have been a number of competency assessment instruments and other measures of competence or competency tests that have been developed. They have been studied to various degrees. . . .

Here, Dr. Woods and Michael Burt then went on to outline one of the problems that seems to characterize the field. Indeed, there have been a number of instruments, or sets of standards, standardized questions and the like that have been promulgated. Some have originated with individuals, others with working groups, or multidisciplinary teams. But, as the most recent review of the pertinent literature points out, "despite this considerable array of instruments, each has shortcomings that limit its utility."[23] More specifically, this interdisciplinary group of authors (Steven Hoge et al.) point out:

> Each of the existing measures includes some relevant legal content; however, none was derived from a coherent theory of the legal construct of competence. . . . None of the measures currently available yields quantitative indices of discrete competence-related abilities. Most measures are limited to items that assess a defendant's current cognitive understanding of various facets of his or her case or the anticipated legal proceedings (usually trial proceedings); none systematically poses problems relating to decisions that a defendant might face or assesses ability to reason about these issues (*e.g.*, weighing alternative courses of action) or assesses the defendant's beliefs or perceptions concerning how he or she will be treated by various authorities in the criminal justice system.[24]

In a sophisticated effort to fill this void, the participants in the MacArthur Adjudicative Competence Study have presented a new forensic assessment research instrument that is based on a comprehensive legal theory of competence and contains the structural and content features

*(Continued on page 55)*

Legal Dimensions
PU Film MAY p49

## Client Competence:

(Continued from page 26)

found lacking in prior instruments.[25] Significantly, the research group relied extensively on its own lawyer member, and reviews of successive drafts of the instrument by members of a network with particular legal expertise to ensure that the instrument contained legal content of appropriate breadth and depth.[26]

The authors provide convincing, empirical support for their conclusion that the new instrument "appears to have high construct validity as a research measure of a defendant's adjudicative competence . . . ."[27] Still, the authors stress several limitations of what they admit is an instrument for use in empirical research on adjudicative competence, and not for use in the actual practice of forensic evaluation.[28] Most importantly:

> The Mac SAC-CD does not purport to assess all dimensions thought relevant to "competence to stand trial. "In particular, as a predominantly cognitive assessment device, the Mac SAC-CD does not attempt to assess a defendant's behavioral ability to conform his or her demeanor to standards appropriate for a courtroom, and it does not attempt to assess a defendant's interpersonal ability to cooperate with a specific defense attorney. In addition, since the administration of the Mac SAC-CD is standardized, it does not take into account relevant contextual variables that may arise in a given case, such as unusual factual or legal complexity. . . that may be relevant to the determination of competence.[29]

In other words, the best current thinking from the mental health profession itself is that "a purely objective test for competence determination is neither possible nor desirable," and that "(c)linical judgments are not the 'gold standard' for determining competence."[30] Absent such a standard, the door remains open for an approach that some forensic psychiatrists and psychologists, and lawyers, have endorsed for some time — namely, the enlisting of an attorney-expert to at least inform the trier of fact of some of the contextual variables that may arise in a given case.

Not all agree with this approach, however. In the mock trial that we are drawing from, an initial objection was voiced by the prosecutor. This objection is often made and often significant:

> Your Honor, with regard to the admissibility of the testimony of Mr. Katz [the proposed attorney-expert], our position is identical to that of the prosecution in *Mickle* [the reference here is to a California Supreme Court case, *People v. Mickle* 54 Cal-3d 140, 180-186 (1991)]. The prosecution feels that the state of the law in California is that there is not a varying scale of competence on the issue of whether a person can rationally assist counsel, depending upon the severity of the charges or consequences of those charges. Additionally . . . the People would make a second objection, to the competence of Mr. Katz to testify. Really, his opinion, or his assessment, with regard to the defendant's ability to assist counsel is not relevant to the issue. The law, Penal Code Section 1367 is very specific and indicates that any inability to assist must be the result of the defendant's mental incompetence and it's my position, or at least my understanding, based on the representations of Mr. Katz's background and qualifications, that he is not competent to give any testimony whatsoever with regard to the defendant's mental incompetence.

Indeed, Peter Cling[31] voiced an objection which focuses on two misperceptions about the role of an attorney-expert in competency determination. The first misperception is that the attorney-expert is somehow advocating a varying scale of competence, depending upon the severity of the charges or consequences of those charges. In fact, the standard of competence *always* remains the same, but because a determination of competence or incompetence is "functional in nature, context dependent and pragmatic in orientation,"[32] the nature and severity of the charges, as well as a host of other contextual variables, must be taken into account in any assessment of competency.

The second misperception is that because the attorney-expert is not a mental health expert qualified to render diagnostic opinions, it follows the expert has no helpful testimony to render at all. It is significant that the California Supreme Court in *Mickle* did not fall prey to this illogic, preferring instead to ground their opinion in part on the fact that nothing in the offer of proof


It's An Anniversary Celebration!

NACDL
1958-1998
Forty Years
Fighting for Justice

At our 1998 Annual meeting in Denver, NACDL will celebrate it's 40th Anniversary.

Join us!

Mark your calendar now for August, 1998.

You Can Help Us Prepare for the Celebration!

1. Submit a design for a 40th Anniversary Emblem for the Association. (All entries become property of NACDL).

2. Dig out Association memorabilia and photos. (All will be returned to you after copying.)

3. If you remember a great moment in NACDL history, please write to us about it.

Send to:
Irwin Schwartz
710 Cherry St.
Seattle, WA 98104
ischwartz@compuserve.com

indicated that the expert would describe the particular facts or complexities of the case.[33]

Against this background, in the mock trial, defense lawyer Michael Burt (joined by co-counsel John Philipsborn) proposed to call a very experienced criminal defense lawyer as an expert witness on aspects of competence issues — whose background included more than 30 years of practice, the representation of thousands of clients, and the conduct of over 300 trials. He had been involved in the defense of about 50 murder cases, had taught at a variety of academic institutions, and, among other things, had qualified as an expert on the defense of criminal cases 15 to 20 times. This expert (Lou Katz) was called by the defense in this case specifically to explain what information he, as a criminal defense lawyer, needed to have from the client. Over objection, he was allowed to testify, and indicated the following:

> Well, in any criminal case, but especially a homicide case, I need a complete history from the client, and a complete history goes back to when and where the person was born, the education, employment history, medical history, and social history from date of birth. This means a complete history of their family relationships, and the relationships they developed after they left home. I need a complete history of medical issues including possible drug usage. And these are all things that I need before I even talk about the facts of the case, or learn anything from the client about what he or she may remember about the facts surrounding the case.

In further explaining what he feels needs to be discussed with clients, Mr. Katz noted:

> . . . I explain to the client that I need the client's cooperation to help me prepare a proper defense, and to investigate the case. I also explain to the client that during the course of proceedings, during the course of our relationship, I may need to come back to talk to the client about a number of different defense issues. These may include mental state defenses, or whatever type of defense the facts indicate we will need to prepare to the charges.

Asked whether in his view the issue of case disposition, or possible settlement, needs to be explored, Mr. Katz answered:

> . . . The reality is that plea bargaining enters into the range of available dispositions of the case. That requires that the client understand the consequences of a plea bargain, and what I can do for the client. It requires me to explain to the client what defense we have, how that defense may work, and to explain what might occur if we lose — in such a way that the client and I can discuss the possibility of a disposition or settlement. This is true especially in a homicide case because the consequences are so serious. They often involve life, or perhaps life without parole. Thus, my analysis of the facts of the case, the relative chances that I feel we have to obtain a lesser sentence at trial. The chances that we may have in negotiations, is something that I have to discuss in connection with the client.

In addition to testifying in general terms about his opinions of interactions that are important in an attorney-client relationship given a certain type of case, Mr. Katz had been asked to observe the interaction between the accused in this case and his lawyer. In particular, he had been asked to observe, over the course of three meetings, interaction that covered attempts to obtain a history, including a medical history, from the client, and then attempts to discuss the range of dispositions and results that might occur in the case.

After cross-examining expert witness Katz to establish that he did not have any medical degrees, the prosecutor then took another focus, using Katz and his expertise to demonstrate the following:

> Q. There are some clients that require a lot of time and attention, more than others, in building up a relationship of trust of the type that you've described?
>
> A. Oh, definitely yes.
>
> Q. And in your experience, are there some clients with whom one can never achieve that desired level of trust that you've established and defined?
>
> A. I must concede that, yes.

The questioning moved on:

> Q. In your observations of the discussions between Mr. Miller [the fictional client], Mr. Philipsborn, and Mr. Burt, did you observe either Mr. Burt or Mr. Philipsborn ask questions? And I'm not asking for the content of the questions.
>
> A. Yes, I did.
>
> Q. In any instance, did you observe Mr. Miller answer the questions?
>
> A. In most instances, the answers I heard were inappropriate.
>
> Q. I'm not asking for your assessment of the appropriateness of the answer. I'm asking whether you observed Mr. Miller answer the questions?
>
> A. I did.
>
> Q. And did you ask questions?
>
> A. Yes, I did.
>
> Q. And he gave answers to you, right?
>
> A. Yes he did give me answers, but in context, they were not inappropriate, and I can explain. They were not responsive to my questions.

We contrast this testimony to that "role-played" by Dr. Fred Rosenthal, and another experienced forensic psychiatrist. Dr. Rosenthal, in the role of an expert appointed by the court to make the competence assessment, true to the position that he was asked to take, began from the premise that a psychiatrist would abdicate his/her responsibility by not arriving at an opinion on a competence issue. Using the hypothetical client involved, Dr. Rosenthal testified about the wealth of information that he reviewed and then indicated that he had found the hypothetical client to be a schizophrenic, paranoid type. Having been asked to review a portion of the history between attorney and client that indicated that the client had caused certain "difficulties" because of his behavior, and presentation, Dr. Rosenthal was asked if he could conclude "that he's unable to assist in the conduct of his defense?"

> A. Not at all. And of course you have to understand that the way I approach competency examinations is by dealing with them as answering the question of whether someone has the ability to assist counsel, and to understand the proceedings — not whether they are actually doing it, or whatev-

er their actual behavior is. Because sometimes their behavior does not coincide with their ability and their mental capacity, and so the question is more difficult. And I think that a psychiatrist is required to decide whether the person has the potential ability to be competent. Whether they actually assist counsel or not is a separate question, and may not have anything to do with competency.

Q. So, in your opinion, the ability to assist counsel is not synonymous with an inclination to assist counsel?

A. Not at all. And certainly there are situations where, for whatever reason, the defendant does not relate well to counsel, and will not cooperate. But they have the potential to cooperate. And that's the question I think that the psychiatrist is asked to address.

Michael Burt cross-examined Dr. Rosenthal to establish that Dr. Rosenthal had eliminated malingering as an issue at least insofar as the diagnosis of schizophrenia went. But then Burt honed in on some of the problems caused by the hypothetical client's delusional system, raising the question of whether the client's reluctance to reveal things about himself to his lawyers was a product of his mental disorder. Burt then went on as follows:

Q. You were aware that he refused to give his consent to a time waiver, to allowing his lawyer to get more time to prepare the case, at the Municipal Court level, isn't that true?

A. Yes, that was true.

Q. Wasn't that refusal to waive time related to his delusional belief that other persons had killed his wife and there was really no need for the process to go on any longer, despite the fact that the lawyer was explaining that he needed more time to prepare the case?

A. Well he does feel he is innocent, and that he doesn't need to spend a lot of time to prove his innocence.

Q. Well not only does he feel he's innocent, he has a belief that there is a conspiracy aimed at keeping him locked up, isn't that true?

A. Yes he did talk about such a conspiracy.

Q. And that's a false belief, is it not?

A. That's a false belief, right.

Q. So, in addition to refusing to waive time, he's refusing to confer with his present attorneys because according to his delusional belief system, there is no need to talk to the lawyers because the facts are obvious, isn't that true?

A. Well, my understanding is that he did not refuse to discuss things with his lawyer, but he has been reluctant to reveal some aspects of his history, and some aspects of what he is thinking about.

Q. Well his first lawyer declared a doubt as to his competency, correct?

A. Yes.

Q. And are you saying as a psychiatrist that you do not credit that opinion in any way?

A. Well I am not sure that I understand your question. The attorney raised the question of competency. That's the reason the court ordered a competency examination. But when an attorney raises that question, that doesn't immediately prove that the man is incompetent.

Q. No, but it's something that you totally disregarded in forming your opinion as to this man's competency — in other words you disregarded the fact that a professional who has interacted with the defendant on a continuous basis has indicated doubt as to his competency, right?

A. I'm not sure what you mean by completely disregard. I know that there may be many reasons why attorneys raise this question. Often it has very little to do with a man's actual mental condition. It may have something to do with strategic aspects of the defense. I don't disregard it, but I don't necessarily consider it as a valid judgment on whether the man is competent or not.

**Recommended Approach**

We do not purport to answer some of the rather rhetorical questions raised by the tenor of the testimony that you have read — from all three of the expert witnesses called in this trial. For those of you who have never encountered a competency hearing in which the very qualifications of the experts testifying were generally questioned, you now have some brief descriptions of the nature of the questions likely to be asked. Particularly for medical/psychological experts and/or lawyers who accept the notion that only mental health professionals are to be enlisted as experts on the issue of competence, the above scenario suggests certain alternatives — and the reasons for them.

Indeed, there are lawyers who call a wide range of witnesses in competency hearings, including lay persons who have known the accused for some period of time and are visiting him in jail, jail staff who often have logged in jail disciplinary rule violations or observations that may be germane to a competency determination. Jail psychiatric staff also often keep such notes and logs. Many persons awaiting trials are observed by family members, visitors — a number of 'outsiders' who may have insight into their conditions. If anything, this writing is intended to ask psychiatrists, psychologists, and the lawyers working with them whether the most useful information on competence has been developed and presented in a given case.

As noted in the introduction of this article, in the absence of an attorney-expert, in many cases a trier of fact on the issue of competence will be at a loss to define what it is the defense lawyer needs to know in an effort to develop the case. Here, as you can see in our example, the client is described as having a diagnosable mental disorder, and the case history revealed that the disorder had been ongoing for some time. Thus, part of the importance of Lou Katz's testimony was that he established that in any case, a competent defense lawyer would take a relatively extensive history from the client — a history which in this case the client was described as reluctant to provide to the lawyers. That was one of the ingredients which caused the lawyers to question their client's competence.

Some will no doubt side with the prototypical psychiatrist and court expert played by Dr. Fred Rosenthal, who, for the sake of representing one point of view in the debate, took a position often taken in courts by forensic mental health experts — which is that they are able to render full opinions on competence issues without resorting to other experts. On the other hand, Dr. George Woods took a different approach, noting that he would prefer to enrich the body of information developed for the trier of fact by enlisting a wide array of professionals. Dr. Woods also deferred to a lawyer to explain what a rea-

sonably effective criminal defense lawyer does to prepare a case and what kind of interaction he or she expects to have with a client both in general terms and then in terms pertinent to a specific case. Not all judges would allow such testimony, but its usefulness is clear given the educational and professional differences between what mental health professionals and lawyers do in the court process.

If there is any further advice that can be given to the forensic experts, lawyer experts, and representing lawyers alike, it is that competence assessments, particularly where the issue is the ability to assist in a rational manner, are sufficiently complex that it makes sense to be quite familiar with all the relevant literature — the requirements of the case law, of the standards such as the ABA Criminal Justice Mental Health Standards, the requirements of competence spelled out in the many competence assessment instruments available, and reports and articles on the fruit of research on competence issues in courts. If experts and lawyers alike assume that the United States Supreme Court means to continue to follow the pronouncements it has made in some of the case law quoted in this article, then it is evident that (a) a lawyer's complete deference to a mental health professional in this arena is risky at best and perhaps representative of professional ineffectiveness, and (b) for the medical or psychological expert, reliance on a relatively brief interview without more may well be uncovered by a skillful and knowledgeable lawyer to be an insufficient foundation for the expression of an opinion on the issue of competence.

**NOTES**

1. Drope v. Missouri 1975 420 U. S. 162.

2. Dusky v. United States 362 U.S. 402 (1960)[per curiam]; *see also*, Cooper v. Oklahoma ___ U.S. ___, 116 S. Ct. 1373, 1383 (1966) ("The test for competence to stand trial is whether the defendant has the present ability to understand the charges against him and communicate effectively with counsel.").

3.___ U.S. ___, 113 S. Ct. 2680 (1993).

4. *Id*., at 2686.

5. *Ibid*.

6. Nicholson and Johnson, *Prediction of Competency to Stand Trial: Contribution of Demographics, Type of Offense, Clinical Characteristics and Psycholegal Ability*, (1991) 14 *International Journal of Law and Psychiatry* 2887.

7. N. Poythress, et al., *Client Abilities to Assist Counsel and Make Decisions in Criminal Cases*, 18 *Law and Human Behavior* (1994) 437, 439.

8. Dr. Woods was asked to review the foundation for his opinion prior to these questions. The foundation included a review of specific case law and literature on the attorney-client relationship in criminal cases.

9. The foregoing questions and answers were based in large part of a 21-item competency checklist from the Group for the Advancement of Psychiatry, *Misuse of Psychiatry in Criminal Courts: Competency to Stand Trial* (1974) 896-97. The Group has cautioned that the list is meant only to identify areas of inquiry and should not leave the impression that "enormous legal sophistication is required of both psychiatrist and defendant." *Id*., at 896-97. Whatever the merits of this position in 1974, it is apparent to any seasoned criminal defense lawyer practicing in the 1990s that the 21 items on the Group's checklist represent minimal ingredients to effective representation.

10. Note, *Incompetency To Stand Dial* (1967) 81 *Harv.L.Rev*. 454, 457-58. The Note's focus on psychiatrists' ignorance of trial procedure actually understates the problems facing the clinician. It is now generally recognized that the "trial" for which defendant has to be competent is not merely the formal adjudication hearing. "It refer(s) also to the full trial process, from arraignment through the development of defense strategy, plea bargaining, pleading, and other steps prior to a possible trial of the facts." Thomas Grisso, *Pretrial Clinical Evaluations in Criminal Cases: Past Trends and Future Directions* (1996) 23 *Criminal Justice and Behavior* 90, 92.

11. Kansas v. Hendricks, ___ U.S. ___, 117 S. Ct. 2072, 2081 (1997).

12. United States v. David 511 F2d 355, 360 (D. C. Cir. 1975)

13. One commentator has suggested that in a given case, "not only might the testimony of the defense counsel be admissible on the issue of competence, it might well be essential." Mickenberg, *Competency To Stand Dial and the Mentally-Retarded Defendant: The Plain Need for a Multi-Disciplinary Solution to a Multi-Disciplinary Problem (1981)* 17 Cal.W.Rev. 365, 386.

14. *See*, Standard 7-4.8, *supra*, pp. 207-208.

15. *Id*., p.166

16. *Id*., pp. 211-212.

17. *Id*., p. 208.

18. The California Supreme Court decided otherwise in People v. Mickle (1991) 54 Cal.3d 140. There, following a guilty verdict, trial counsel declared a doubt as to the client's ability to assist in the punishment phase of a capital case. The trial court suspended proceedings and appointed new counsel who proceeded to call trial counsel as a witness at the competency trial. When trial counsel indicated he could not testify without a waiver of the attorney-client privilege, the client asserted the privilege and the trial court found that based upon the presumption of competency, the client was competent to assert the privilege. Trial counsel was then not permitted to testify. The California Supreme Court upheld this ruling on appeal.

One suggested solution to this dilemma is adoption of a rule of use and derivative use immunity for all client-based testimony at the competency hearing. ABA Criminal Justice Mental Health Standard 7-4.6 recommends such a rule, citing as authority Estelle v. Smith 451 U.S. 454 (1981). *See also*, United States v. Nguyen 962 F. Supp. 1221 (N.D. Cal. 1997) (statements made by defendant during competency hearing cannot be used against him at trial and defendant is entitled to ruling on this issue before he submits to a competency evaluation.) Notwithstanding this recommendation, trial counsel's concerns about the applicability, scope, and practical utility of a rule of use immunity may inhibit counsel's use of confidential communications at a competency hearing. For example, in a high-profile case, even if use if use immunity is recognized, will harmful client disclosures nevertheless reach the jury pool through the media? The alternative of closed, secret competency hearings seems unlikely.

19. *Id*., p.213

20. The Commentary seems focused on cases like *Mickle* where the client is adamantly opposed to being found incompetent. But even in cases where the client is not opposed to such a finding, trial counsel's testimony at a competency hearing, especially if it is unsuccessful, may place considerable strain on the attorney-client relationship.

21. A variation of this approach was attempted unsuccessfully in *People v. Mickle, supra*. There, competency counsel elicited from the prosecution's experts that they had never appeared as witnesses in the penalty phase of a capital trial and knew little about the evidence typically admitted therein. Counsel then proposed to call as a rebuttal witness an attorney-expert who was prepared to testify about the kind of cooperation needed between a capital defendant and counsel. The trial court excluded this evidence and the California Supreme Court upheld this ruling, reasoning that "(b)oth psychiatrists made it clear that the concerns (the attorney-expert) might discuss did not affect their assessment of defendant's mental capacity to stand trial . . . (and) nothing in the offer of proof indicated that (the expert) would describe the particular facts or complexities of this case." 54 Cal. 3d at 185. Both of these concerns can easily be met. Trial counsel can educate his or her psychiatrist about the case law and legal and mental health commentary on the desirability and necessity of using attorney evaluations in the competency process. For example, a leading handbook for mental health professionals and lawyers recommends that "the clinician needs to know how much interaction there has been between attorney and client and what the quality of that interaction has been. We strongly recommend that clinicians routinely seek such information from attorneys representing defendants referred for competency evaluations . . . . " Gary Melton, et al., *Psychological Evaluations for the Courts: A Handbook for Mental Health Professionals and Lawyers* (1987) p. 87. Trial counsel must also educate the attorney-expert about the particular facts and complexities of the case.

22. ABA Criminal Justice Mental Health Standards, Commentary to Standard 7-4. 1, *supra,* p. 175.

23. Steven Hoge, Richard Bonnie, Norman Poythress, John Monahan, Marlene Eisenberg, and Thomas Feucht Havior, *The MacArthur Adjudicative Competence Study: Development and Validation of a Research Instrument* (1997) 21 *Law and Human Behavior* 141, p.143.

24. *Id*., pp. 143-144

25. *Id*.,p. 145.

26. *Id*., p. 147.

27. *Id*., p. 174.

28. *Id*., p. 176.

29. *Id*., p. 174.

30. *Id*., pp. 173, 175.

31. Peter Cling is a senior Deputy District Attorney for the County of San Francisco where, for a number of years, he prosecuted homicide cases.

32. ABA Standards, *supra,* p. 175)

33. 54 Cal.3d at 185.