# EXHIBIT 2

International Journal of Law and Psychiatry 32 (2009) 127–133

Contents lists available at ScienceDirect

International Journal of Law and Psychiatry




# When is a capitally charged defendant incompetent to stand trial?

David Freedman *

Capital Resource Counsel Project, 217 W 15th Street, Little Rock, AR 72202, United States

**ARTICLE INFO**

Keywords:
Competence to stand trial
Death penalty
Interactive dialogue
Functional abilities

**ABSTRACT**

Competence to stand trial is a functional test rather than a bright line test, which therefore requires a case and fact specific assessment of a client's abilities in context. This article discusses competence in the context of capital trial cases. There are serious potential pitfalls for the client when raising incompetence and the decision to do so must be based on the specific ways in which the client's mental illness interferes with specific abilities to communicate with counsel and understand the proceedings. This article addresses counsel's duties in the context of assessing competence, but focuses on the little addressed issue of what abilities a client must have and what tasks a client must participate in so as to be engaged in a competent manner. It also discusses the types of conditions which may interfere with competence to stand trial.

© 2009 Elsevier Ltd. All rights reserved.

Competence to stand trial is a functional test rather than a bright line test, which therefore requires a case and fact specific assessment of a client's abilities in context. This article discusses competence in the context of capital trial cases. There are serious potential pitfalls for the client when raising incompetence and the decision to do so must be based on the specific ways in which the client's mental illness interferes with specific abilities to communicate with counsel and understand the proceedings. This article addresses counsel's duties in the context of assessing competence, but focuses on the little addressed issue of what abilities a client must have and what tasks a client must participate in so as to be engaged in a competent manner. It also discusses the types of conditions which may interfere with competence to stand trial.

It has been almost 50 years since the United States Supreme Court set out in simple language the standard for assessing competence to stand trial: Whether a criminal defendant has sufficient present ability to consult with counsel with a reasonable degree of rational understanding and has a rational and factual understanding of the proceedings.[1] That standard is fundamental to due process, with an exceptionally long history in common law.[2] And "for the defendant, the consequences of an erroneous determination of competence are dire. Because he lacks the ability to communicate effectively with counsel, he may be unable to exercise other 'rights deemed essential to a fair trial.'"[3]

Nevertheless, both defense counsel and the trial courts, more often than not, defer to the judgment of defendant competence of mental health professionals.[4] Although informed by expert testimony, however, the determination of a defendant's competence rests squarely with the trial court because that determination is both a legal and factual one.[5] The role of mental health experts in the determination of competency is in assessing how a client functions, his capacities and impairments, not in reaching the ultimate opinion as to competency to stand trial.[6]

Defense counsel's view of, and experience with, the defendant, while not determinative, can be an essential component of the assessment.[7] Yet, the role of the defense team in the determination of competence, both in theory and in practice, is often severely

---

* Tel.: +1 501 412 2784; fax: +1 415 358 5540.
E-mail address: freedman99@earthlink.net.

[1] Dusky v. United States, 362 U.S. 402 (1960).
[2] See, Rohan (Ex rel Gates) v. Woodward, 344 F.3d 803 (2003), for review of the historical precedents of competence.
[3] Cooper v. Oklahoma, 517 U.S. 348, 364 (1996) quoting: Riggins v. Nevada, [504 U.S. 127, 139, (1992)] (Kennedy, J., concurring in judgment).

[4] See e.g., Zapf, P., Hubbard, K., Cooper, V., Wheeles, M., and Ronan, K. (2004) "Have courts abdicated their responsibility for determination of competency to stand trial to clinicians?" Journal of Forensic Psychology Practice 4(1) 27-44 (review of research indicating that courts agree with mental health expert recommendations over 90% of the time, and in this study, finding the court endorsed the mental health expert recommendation in 99.7% cases studied).
[5] Drope v. Missouri, 420 U.S. 162 (1975).
[6] See Maggio v. Fulford, 462 U.S. 111, 199 (1983) (White, J., conc. op.) ("Our cases have treated the ultimate question whether a defendant is competent to stand trial as at least a mixed question of law and fact," citing Drope v. Missouri, 420 U.S. at 174-175 and Pate v. Robinson, 383 U.S. 375 (1966)). Similarly, the consensus of most forensic mental health evaluators is that experts should refrain from offering opinion on the ultimate legal question, instead describing the symptoms and behaviors relevant to the legal question. Kirk Heilbrun, Principles of Forensic Mental Health Assessment, at pp. 219-226 (Kluwer Press, New York 2001); Melton, Petrila, Poythress, and Slobogin (1997) Psychological Evaluations for the Courts, 2nd Edition, The Guilford Press: New York at pp. 17, 129.
[7] Hernandez v. Ylst, 930 F.2d 714, 718 (9th Cir. 1990) ("while the opinion of counsel certainly is not determinative, a defendant's counsel is in the best position to evaluate a client's comprehension of the proceedings"). For counsel's participation to be meaningful, however, pre-supposes that counsel has attended the appropriate training sessions to learn about mental illness and the identification of symptoms.

0160-2527/$ – see front matter © 2009 Elsevier Ltd. All rights reserved.
doi:10.1016/j.ijlp.2009.02.001

lacking.[8] Dusky set out a number of abilities and capacities required of a criminal defendant[9], yet it is the present ability to communicate with counsel based on a reasonable degree of rational understanding prong that has proven significantly more difficult to assess than the rational and factual understanding prong. How, exactly, are lawyers, judges and mental health professionals expected to assess the communication prong of the standard? There is little agreement as to what abilities ought to be required, how to assess them or even who bears responsibility for making the assessment. Most mental health professionals have little legal knowledge and few have, nor should they be expected to obtain, an understanding or proficiency in criminal defense representation, especially capital case representation. How, then, can they be expected to determine whether a defendant has sufficient ability to effectively communicate with counsel about a specific case? Similarly, most lawyers and judges have little training on mental illness or in determining what symptoms are significantly interfering with communication or a basic understanding of the cognitive and behavioral processes of decision-making and communication.

Yet, competence to stand trial determinations rest primarily on the assessment of what a criminal defendant must be able to do with counsel. As a result, mental health professionals typically conduct clinical interview-based assessments or choose from among a small group of competence assessment instruments, some of which address specific rights (e.g., competency to confess)[10] or specific knowledge (factual understanding e.g., the role of the judge or the prosecutor in a case)[11] or whether by self-report the defendant describes the relationship with counsel as sub-standard.[12] When a defendant is first adjudged to be incompetent, some of these same mental health professionals attempt to "teach" competency.[13] But courses designed to educate defendants are aimed at the factual understanding prong of competence, not the communication and decision-making prong.

It is a significantly more difficult assessment problem to determine whether a defendant with the symptoms and behaviors consistent with a mental disease, defect or other brain dysfunction is impaired in his or her ability to consult with counsel with a reasonable degree of rational understanding than to teach a person to parrot responses on factual process.

So what and how, exactly, is it that a competent defendant communicates with counsel concerning? And what is counsel's responsibility as distinct from the defendant's?

## 1. Counsel's obligations

U.S. Supreme Court Justice Kennedy, in defining why the requirement for competence was fundamental, explained: "Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross examine witnesses, and the right to testify on ones own behalf or to remain silent without penalty for doing so."[14] The Court acknowledged that it was not possible to represent an incompetent defendant in a constitutionally effective manner. Counsel's duties include some form of interaction and consultation with a competent client, which, although not spelled out by the Court in their competence to stand trial cases, is suggested through the *Strickland* line of cases.[15] Therein lies the intersection, for counsel, between counsel's duties and the incompetent client.

These expectations of counsel, unlike those of a capitally charged defendant, are well established by professional standards and case law. First, counsel has the obligation to develop defenses, evaluate the strength of the case, guide the investigation and present the case in the courtroom. Counsel also has the obligation to ensure that the client is involved in decisions, which includes providing advice and information, including advice and information about decisions reserved to the competent client to make in a knowing, intelligent and rational manner.

Second, the American Bar Association has set out the tasks which, at a minimum, are constitutionally required of counsel in a capital case include engaging in an ongoing interactive dialogue.[16] This dialogue must be more than simply keeping the client informed or complacent. The notion of interaction sets an expectation of mutuality and progression, although not necessarily agreement. The standards do not require that counsel and the client achieve consensus, rather that differences be discussed, understood and decisions made based from the mutual understanding of the places of agreement and disagreement.

Counsel must engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case. These are said to include the factual investigation, legal issues, defense theories, presentation of the defense case, potential dispositions of the case, litigation deadlines and schedules, relevant aspects of the client's life and interactions as well as courtroom presentation and demeanor.[17] Counsel's duties in a capital case are clear and specific, involving complexities unique to the bifurcated process and the needs of both phases viewed as a whole.[18]

What of counsel's duties when counsel suspects the defendant to be incompetent to stand trial? One set of studies found that in a majority of (non-capital) cases, where an attorney suspected a client was incompetent, the attorney did not send the client for formal

---

[8] John T. Philipsborn (2004) *Searching for Uniformity in Adjudications of the Accused's Competence to Assist and Consult in Capital Cases*, Psychology, Public Policy and the Law, 417, 428 10(4).

[9] The "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding–and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky* 362 U. S. 402. [It is worth noting that *Dusky* reversed a determination by a federal trial court that the defendant was competent based on mental health testimony that he was oriented to time and place and had some recollection of the events.]

[10] For a review of competence to confess measures, see: Richard Rogers, Mary Jordan, and Kimberly Harrison (2004a) "A critical review of published competency-to-confess measures" Law and Human Behavior 28(6) 707-18 and Thomas Grisso's "Reply" 719-24.

[11] For a review of instruments, see Melton et al. (1997) Psychological Evaluations for the Court, 2nd Edition, (pp. 139-50) The Guilford Press: New York.

[12] For example, the MacArthur Competence Assessment Tool - Criminal Adjudication (1999) Poythress et al., Professional Manual, Psychological Assessment Resources Inc. (clinical judgment used to assess defendant's reasoning and relationship to counsel) and the Evaluation of Competency to Stand Trial - Revised (2004b) Rogers, Tillbrook and Sewell, Professional Manual, Psychological Assessment Resources Inc. ("assess the defendant's perception of the nature and quality" of the relationship with counsel).

[13] See, e.g., Bertman et al. (2003) Effect of an individualized treatment protocol on restoration of competency in pretrial forensic inpatients, J Am Acad Psychiatry Law 31 (1) 27-35 and Charles Scott (2003) "Commentary: A road map for research in restoration of competency to stand trial 36-43.

[14] *Riggins v. Nevada*, 504 U.S. 127, at 139, 140 (J. Kennedy, concurring).

[15] *Strickland v. Washington*, 466 U.S. 668 (1984).

[16] Guideline 10.5, Relationship with the Client, American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. February 2003).

[17] Id.

[18] *Wiggins v. Smith*, 539 U.S. 510, (2003) (Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.); *Williams v. Taylor*, 529 U.S. 362, (2000) (defense counsel in a capital case has an obligation to conduct a thorough investigation of the defendant's background); *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2000) ("To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present and explain the significance of all the available mitigating evidence."); *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999) ("it is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase"); *Stouffer v. Reynolds*, 168 F.3d 1115, 1167 (10th Cir. 1999) ("in a capital case the attorney's duty to investigate all possible lines of defense is strictly observed").

D. Freedman / International Journal of Law and Psychiatry 32 (2009) 127–133     129

evaluation.[19] This may be for a variety of reasons, including that the time spent in adjudicating competence is potentially longer than the maximum sentence to which the client is eligible to be sentenced or because of limited resources and high case loads.[20]

Capital cases present a different set of concerns than non-capital cases for lawyers. Especially in jurisdictions where resources are scarce, defense counsel may be tempted to raise a doubt as to a defendant's competence as a ruse to obtain a free evaluation of their client's functioning with the intent of using that information at a penalty phase or to raise questions of *mens rea*. In fact, based on anecdotal reports and post-conviction records, it is the common practice in some jurisdictions to obtain a free mental health evaluation by having a client evaluated for competency. The trick in these situations, however, is invariably played on the client. First, sending a client to a state hospital or federal medical center to be evaluated for competency may interfere with the development of trust and rapport that is essential to competent representation. Second, the client may well be held and observed for an extended period of time during which the defense has restricted access to the client. Third, competence to stand trial is not a substitute assessment for mitigation development as the questions being clinically assessed are vastly different. Fourth, such a practice puts the client at risk for rebuttal evidence which, although limited in scope, can be used by the prosecution. Fifth, such evaluations will inevitably be based on less information, and thereby be less reliable, than can be accomplished when the defense investigation is thorough and competently undertaken. Sixth, state hospital opinions are biased towards law enforcement and prosecution. Finally, state hospital doctors are typically not specialists, carry extensive caseloads and are underfunded. They therefore conduct assessments not particular to the symptoms and impairments of a particular client but rather conduct surface assessments without pursuing depth or nuance.[21]

This final point is the most important because when defense counsel chooses to send a client to a state or federal facility for evaluation, it suggests that counsel is seeking short-cuts to the extensive and thorough investigation required of them. As Lieber and Foster set out, the widely accepted standard for mental health evaluations in capital cases requires at a minimum:

> an accurate medical, developmental, psychological and social history. Historical biopsychosocial data must be obtained not only from the accused, but from independent and multiple sources to provide an adequate data base of convergent validity as well as a complete physical and neurological examination, a complete psychiatric examination, and neuropsychological and other medically and psychometrically appropriate tests.[22]

Whereas defense counsel must consult about and participate in the testing and assessment components of a client's assessment, it is primarily counsel's responsibility to develop the accurate and comprehensive biopsychosocial history on which the mental health professionals rely. In every capital case, accusations of malingering are likely to be made and the best evidence to disprove malingering when it is wrongly suspected is the onset and course of a client's mental illness as detailed by records and witnesses other than the client. That is because the history and course of the mental illness, when it predates the onset of litigation, provides important evidence to overcome the suspicion that the litigation is providing an incentive to malinger.[23]

Further, counsel's duty to establish a relationship with the client includes an obligation to observe behavioral, physical and psychological symptoms through the interactions with the client. For instance, a client who is unable to retain specific information provided by counsel over time may simply be adverse to the information or the client may be mentally retarded or suffer from memory deficits. Counsel's duties include careful observation over time, efforts to work around such barriers until they can no longer be avoided, and then, identifying the appropriate experts to consult. Perhaps, simply altering the interaction could accommodate some communication problems, repeating the same information in different ways, providing both verbal and written materials, or providing an outline of what the communication would cover. The purpose, of course, is for counsel to have tried, repeatedly, to make progress in the development of the case and the relationship before considering whether the communication is too impaired.

Moreover, the time spent with the client when these observations are being undertaken is also the time during which the attorney gets to know the client and the ways in which the client sees and experiences the world. This is, in part, what must be presented to the jury as part of the humanizing piece of a capital case, a part which indicates to the jury that the client is more than simply the perpetrator of a terrible murder. This time spent with the client is also critical because counsel who suspects a client to be incompetent to stand trial must have concrete and specific examples of how and where the failure in communication impeded the preparation of the case. What specifically did counsel need to accomplish through the interactive dialogue which was not accomplished?

Although tempting, it is not appropriate for counsel to simply declare the doubt to the court before this investigative and legal work is undertaken. To do so leaves counsel without knowledge about fundamental aspects of the client's abilities and limitations, without sufficient collateral information, and without practical experience in attempting to sort through the difficulties. In short, prior to declaring a doubt about a client's competence, counsel must prepare for the litigation that will follow.

Moreover, counsel in capital cases has the duty to think strategically about the consequences of raising a doubt about client incompetence because the client may then be exposed to court or prosecution experts. Extensive litigation to limit access to the client may be required in competence settings, sometimes resulting in the government gaining access to hours of unprotected access to a client who still may face a penalty phase. Such pitfalls must be thoroughly considered and weighed before moving for a competence hearing.

Despite counsel's role and constitutionally mandated duties in the adjudication of competence to stand trial, that determination is ultimately an assessment of the capacities of the criminal defendant, not of counsel's performance. Certainly the seriousness of the charges and complexity of the litigation has long been viewed as important to assessing what a defendant must be able to do—but the tasks necessary for a defendant's competent participation have largely

---

[19] Poythress, Bonnie, Monahan, Otto ,and Hoge (2002) Adjudicative Competence: The MacArthur Studies, Vol 15 Perspectives in Law and Psychology, Kluwer Press: NY.

[20] Id. It is worth noting that while the issues of competence in capital and non-capital criminal cases are ostensibly the same from the perspective of the law, they are not identical from the perspective of counsel's duties or the client's interests. The differences can be important as the MacArthur study noted because in non-capital cases, an incompetent client's liberty interests may be better protected by not raising the client's competence. The focus herein is on the calculations in the capital context, although most of the discussion is also relevant to non-capital cases.

[21] In a recent case (2007), a state hospital doctor stated that in their hospital's practice, post-traumatic stress disorder was considered no more significant than nicotine addiction (*personal interview*).

[22] Lieber and Foster (1994) The mental health evaluation in capital cases: Standards of practice, American Journal of Forensic Psychiatry 15 (4) 43-64.

[23] Malingering, the "intentional production of false or grossly exaggerated physical or psychological symptoms" should be suspected when the assessment is conducted in the medico-legal context according to the DSM-IV-TR (American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, 4th Edition Text Revision (2000) Washington DC: American Psychiatric Association at p.739). Evidence which demonstrates that the symptoms pre-date the medico-legal context address that concern.

been left to counsel to determine and widely ignored in the adjudication of competence.

This is the other, and more crucial, question of competence, then: what must a criminal defendant be able to do, at a minimum, in relation to counsel in his/her own defense in order to meet the Dusky standard of communicating with counsel based on a rational understanding?

## 2. A competent defendant's participation

The courts have given some guidance on this question although it remains vaguely defined. Some fundamental rights are reserved by the courts solely to the rational defendant: the right to testify, the right to plead guilty, the right to represent him/herself. These rights are predicated on the client being engaged first in the interactive dialogue with counsel, but are the rights which a defendant exercises regardless – so long as the defendant is competent.[24] These rights, however, are not the beginning and end of competent defendant's participation in the criminal adjudication. In Cooper, the Court stated: "With the assistance of counsel, the defendant also is called upon to make myriad smaller decisions concerning the course of his defense."[25] Yet, this definition offers only a little more than the original view expressed in Dusky. Certainly, "myriad smaller decisions" could include some decisions and not others, but more relevantly, the term implies support for the notion of the interactive dialogue defined by the ABA rather than establishing specific rights and decisions which must be met.[26]

In Sell, in which the Supreme Court ruled on forcibly medicating a non-dangerous pre-trial defendant, they raised the question as to whether antipsychotic medication would "sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions."[27] This language recognizes two critically important, and previously underacknowledged, pieces of the competency puzzle: can the defendant appropriately communicate with counsel in the real-world setting of a trial and can the defendant appropriately manage his or her demeanor in the courtroom. Although not expressly addressing competence to stand trial, the language in Sell provides insight into what is expected of a defendant in order to meet the constitutional threshold of fairness.

When asked, many criminal defense attorneys express a desire for a client who is utterly passive: one who sits quietly by, allows counsel to conduct the preparation, courtroom and trial, and does as instructed.[28] However, both competent and incompetent defendants may do this, the difference being that a competent defendant is engaged, although quiet, until the appropriate time and an incompetent defendant is not engaged in the interactive dialogue. Allowing an attorney to exercise legal judgment is not a hallmark of incompetence, rather it is the failure to engage with the attorney in the process that signals a breakdown. As the Ninth Circuit held: "competence to stand trial does not consist merely of passively observing the proceedings. Rather, it requires the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense."[29]

These rulings define the very core of competence to stand trial: the mental acuity to see, hear, digest and communicate in interactive dialogue with counsel to make myriad small and large decisions

including during the rapidly changing environment of trial. In a recent law review article, Terry Maroney discussed the complex processes of cognitive and emotional functioning necessary for "decisional competence" in the adjudicative setting.[30] Decisional competence is the ability necessary to meaningfully arrive at a reasoned choice among the options available.[31] Decisional competence can be understood as incorporating both the required "rationality" and the "communicative" prongs of Dusky, meaning that the client has both the ability to rationally make decisions which minimally protect his or her self-interests and the ability to rationally communicate those decisions. This is critical because decision-making then incorporates both the process of making and articulating, not simply the statement of conclusion.[32] Thus, for instance, it is not enough for a client to state a willingness to plead guilty without some assessment of his or her understanding of the factual basis for the plea and its consequences.

Moreover, the tasks which a competent client must be able to perform ultimately amount to a pro-active engagement in the process of litigation. Competent defendants cannot simply be reactive to what happens in court or to documents presented because capital trials require more than a simple testing of the prosecution's pieces of evidence; they are also the presentation of affirmative defenses, of the human qualities of the defendant, of the ways in which he/she sees and experiences the world, of the fears, hopes and complexity of this one human life, and of how and why the life-course of the individual brought them to this moment of facing a jury which will consider his or her life. Even for an innocent client, the process of humanizing is a requirement which demands more than a review of the prosecution's case because an explanation must be offered as to how this defendant came to be charged even though he/she is innocent.

What is required of a competent defendant, as the Odle court suggests, is the ability to engage in an interactive dialogue which is built upon a sufficient identification, evaluation, weighing and adaptation of the pieces of the case as they relate to each other and to the defense strategies. Without this, a capitally charged client is little more than a lamb led to slaughter before a jury. A capital defendant must be able to both rationally identify, review, compare, assess, weigh and adapt pieces of case-related information *and* to communicate that to counsel.[33] The rational component of this communication is crucial too, since many defendants are able to repeat back over-learned information, without being engaged with the substance and import of it, in a rational manner.

One way of understanding what a competent defendant must be able to do is to consider the thinking process of decision-making and higher level verbal functioning itself. Courts are very much verbal arena, ones which are fast-paced and often technically driven. A competent client does not need to be or become a lawyer, however, but has to be engaged sufficiently in the process to be able to communicate with counsel based on a rational understanding.

The abilities and capacities necessary to do that include, at a minimum: 1) having an awareness of a problem and its scope, including placing the problem within its broad context; 2) evaluating the problem, including how one piece relates to other pieces of the problem; 3) formulation of steps to resolve the problem or parts of it; 4) choosing between different options by weighing and considering the likely outcome of those steps; 5) weighing and considering the consequences, both positive and negative of those steps; 6) initiating the steps towards resolution of the problem; 7) evaluation and reconsideration of the steps chosen as the process occurs, including

---

[24] Where the client is unable to rationally engage in the interactive dialogue, he or she would be incompetent to make these decisions.
[25] *Cooper v. Oklahoma*, 517 U.S. 348, 364 (1996).
[26] *Godinez v. Moran* 509 U.S. 389 (1993) (stating that there is only a single standard for competence, applied at every stage of a case. It also confirmed that decision-making and rational understanding are indistinguishable.
[27] *Sell v. United States* 539 U.S. 166, 185 (2003).
[28] Informal communication with selected, experienced capital defense lawyers.
[29] *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001).

[30] Terry A. Maroney "Emotional Competence, "Rational Understanding," and the Criminal Defendant" 43 American Criminal Law Review 1375 (Fall 2006).
[31] *Id.* citing to *Godinez v. Moran* 509 U.S. 389 (1993).
[32] *Id.* at 1390-1.
[33] Richard Bonnie (1993) The competence of criminal defendants: Beyond Dusky and Drope, University of Miami Law Review 47:539-601 (describing competence abilities as falling into two categories: decisional competence and competence to assist counsel).

D. Freedman / International Journal of Law and Psychiatry 32 (2009) 127–133         131

how the attempt to resolve one problem may cause others within the broad context; 8) modification of the steps based on the evaluation and re-weighing of the likely outcomes and consequences, the indications of success or failure, and new information gained; 9) comparing the results to the goal; and 10) storing the information gained from this process such that it can be referred to and re-evaluated later when additional problems occur, additional information is added, or the context is altered.[34]

To understand the significance of these 10 tasks, it is useful to consider a capital case in three general areas: A) the preservation of constitutional rights; B) trial preparation, which includes factual development, motions and review of prosecution evidence, development of mitigation and defense themes; and, C) the trial itself, including testimony at guilt and penalty phases, the defense case at guilt and penalty, and courtroom processes.

Dusky and its progeny are clear that the preservation of fundamental rights is one of the cornerstones of the assessment of competence to stand trial, in that the defendant must have both a factual and rational understanding of the process. The ten points above suggest the ways in which a defendant must be able to evaluate the options of preserving or waiving her/his rights. For instance, in deciding whether to testify at the guilt phase or the penalty phase, a defendant must assess how his/her testimony fits within the overall approach to the case; how his/her testimony is likely to be received by others; whether he/she has the verbal capacity and skill to express his/her thoughts adequately; whether he/she can withstand cross-examination while maintaining appropriate courtroom behavior; how cross-examination will affect how the testimony is received; how others, especially counsel, perceive these issues and how those views should or could inform the determination being made; and reconsidering the decisions as other evidence is presented at trial. While the decision itself may be appear to be a very simple yes or no assertion, or waiver of constitutionally protected rights, the process of consideration, evaluation and weighing is the predicate to the decision being rational and therefore to competency.

The process of trial preparation is more even complicated than the assertion or waiver of rights because it requires many more issues to be considered, weighed and assessed simultaneously, in a rapidly paced and constantly changing environment. For instance, the review of discovery materials is a single component of the preparation of a capital trial. Its purpose may include gaining from and sharing with the client factual information, but it may also be that the process of reviewing discovery with a client establishes trust (in that the investigation which comes from discovery review demonstrates counsel's commitment and honesty); allows the attorney to observe the functioning and abilities of the client; and provides a basis for common understanding of the scope, strengths and weaknesses of the case. This does not mean that counsel and the defendant must come to share a single view of the evidence or arrive at consensus on each issue, but rather, the process of reviewing discovery leads to a way of communicating even when the client and defense team disagree about the significance, or lack thereof, of some evidence.

The review of discovery is a way to develop mutual understandings with or without mutual agreement. For instance, in a non-litigation setting, a doctor could (and should) form an understanding of a patient's delusional system without either talking the patient out of the delusion or appearing to share it; at the same time, the patient may come to see the benefits of medication without having to agree that the delusion is a false belief not shared by others. This is a similar common ground to that which counsel establishes with a competent defendant.

Another issue raised about the review of discovery has been that some competent criminal defendants choose not disclose facts of the offense to counsel. This certainly happens. The question however, is not the end-point–the lack of disclosure–but rather the process by which the lack of disclosure has resulted. Determining competence requires an assessment of whether the decision has been made after the defendant successfully engages counsel in an interactive dialogue and goes through the 10 tasks of assessment or not. If so, then a competent client could make a choice, wisely or not, to refuse to discuss the offense or pieces of discovery. If, in the alternative, the failure to disclose results from a decisional and/or communicative incompetence, then the client is not competent to proceed.

In capital cases this is more critical because the standard of care for attorneys has long required that the presentation of guilt and penalty phases be consistent and uniform in strategy and theme. This means that the approach to the discovery must be considered in light of the approach to the presentation at penalty phase. The process of reviewing discovery with a client, when that client is competent, is much more importantly about establishing patterns of communication, trust and understanding to move forward than it is about the client's ability to read the discovery itself.

For a client who, for instance, appears to have great difficulty in weighing and evaluating the significance of pieces of evidence, it may be nearly impossible for counsel to reach a common ground. As the ten points above suggest, identifying the problem is only the first step in rationally considering and communicating, and identifying the significant evidence from the insignificant evidence can be understood as the identification of the problem. Without that first step, the next nine steps become impossible.

Finally, as noted in Sell, the trial may be rapid and the demeanor of the defendant critical; testimony sometimes feels interminable and the ability of a competent defendant to attend to the issues coming out through direct and cross-examination may be tested. Thus, back to the interactive dialogue in which the client can ask questions of counsel regarding the testimony and potentially bring to bear his or her own knowledge and ideas on the course of that testimony.

What are the types of functional and behavioral impairments, then, that may put at risk the necessary abilities that divide the competent from the incompetent? Melton et al. (1997) suggest that the most pervasive form of illness found in those adjudicated to be incompetent is psychosis. Psychosis is a broad category of illness and certainly not all people with psychosis are incompetent to stand trial. In fact, the simple presence of a mental illness is necessary but not sufficient in determining incompetence.

Psychosis is a common finding in those ruled incompetent because, for some people with psychotic thinking, the interference with reality perception is blatantly obvious. For instance, the commonly thought of psychotic who is attending to voices in his/her head rather than to the examiner is easy to identify as impaired. Thus, in one of the few studies comparing competency referred and non-referred clients, the most important predictor of referral was disorganized speech.[35] Disorganized speech is a difficult symptom to overlook, even for attorneys who have essentially no training in mental health. Yet, what of more difficult symptoms to identify? For instance, what of the defendant with a substantially impaired cognitive functioning? In Atkins, the Supreme Court specifically

---

[34] See generally on the issue of executive functioning, behavior and dysfunction: Bruce Miller and Jeffrey Cummings, eds. (2006) The Human Frontal Lobes: Functions and Disorder, 2nd Ed. New York: Guilford Press; Orrin Devinsky and Mark D'Esposito (2004) Neurology of cognitive and behavioral disorder (pp302-29) New York: Oxford Press; Jeffrey Cummings and Michael Mega (2003) Neuropsychiatry and behavioral neuroscience (pp. 128-45) New York: Oxford Press; David Lichter and Jeffrey Cummings (eds.) (2001) Frontal-subcortical circuits in psychiatric and neurological disorders New York: Guilford Press; Robert Sbordone (2000) The executive functions of the brain. In G. Groth-Marnat (Ed.) Neuropsychological assessment in clinical practice: A practical guide to test interpretation and integration (pp.437-456) New York: Wiley.

[35] Lisa Berman and Yvonne Osborne (1980) Attorneys' referrals for competency to stand trial evaluations: Comparisons of referred and nonreferred clients, Behavioral Science and Law 5:373.

132    D. Freedman / International Journal of Law and Psychiatry 32 (2009) 127–133

noted that while the diagnosis of mental retardation was a bar to execution, it was not a bar to prosecution.[36] This does not mean that all people with mental retardation are competent to stand trial; rather, it established no bright line, diagnostically driven test for incompetence, leaving in place the functional assessment previously required.

The abilities required to be competent, as noted, may implicate a vast number of symptoms and illnesses. Take psychosis, the diagnosis most often found in those adjudicated incompetent, as an example. What are the symptoms that define the illness? DSM-IV-TR defines psychosis as referring to the presence of a set of symptoms, but the symptoms vary across the specific diagnostic categories.[37] Where a mental health professional must determine which of the symptoms are present so as to arrive at a differential diagnosis, for competence, the question that must be answered is instead how the present symptoms interfere with functioning. Thus, disorganized thinking (technically referred to as formal thought disorder), perhaps the hallmark symptom of schizophrenia, manifests in very different ways. Thought disorder may show itself as a poverty of speech (a restriction in the amount of spontaneous speech, often coinciding with the negative symptoms of schizophrenia) or as pressured speech (an increase in the amount of spontaneous speech and the pace of that speech) or as poverty of content (where there is sufficient or extra production of words but they are unnecessary or not useful in conveying an idea).[38] The observable symptoms are very different and the difficulties faced in the interactive dialogue are very different, but the potential for interference in specific settings (and therefore the question of competence) is the same. Thus, how the symptom interferes or does not interfere with the interactive dialogue is critical.

However, while much of the focus in competency determinations has been on psychotic thinking, a plethora of physical and psychological conditions can interfere with competence to stand trial. If the question of competence is, as suggested, one of a person's functional ability to engage in the interactive dialogue, a number of conditions must be considered, including, at the least:

*Executive functions*: which are the neurocognitive processes that initiate and inhibit movement and behaviors, constitute the abilities to plan, initiate new tasks, stop, judge, assess options and consequences, reason, self-monitor and self-regulate, and recognize social cues; they also encompass language processing, mental flexibility, reasoning (deductive and inductive), working memory, abstract thinking, incorporating new information, and strategic inquiry. In short, executive functions are the very capacities necessary to be competent, although, oddly, they are rarely measured or tested when evaluations are conducted.

*Mood Disorders*: include both depression and mania. Depression has been shown to result in sadness, loss of interest, anxiety, irritability, a sense of hopelessness, attention and concentration impairments, and suicidal thoughts. Similarly, a host of physical symptoms often accompanies depression: fatigue or lethargy, sleep problems, headache, gastrointestinal problems, appetite changes, and general body aches and pains. Mania results in abnormally and persistently elevated or irritable mood that lasts at least a week and includes grandiosity, decreased need for sleep, pressured talking, flights of ideas, distractibility, increased goal directed activity, excessive involvement in pleasurable activities. During manic episodes, clients may be especially difficult to keep focused on the day in and day out work of preparing litigation as well as difficult to communicate with rationally.[39]

*Anxiety Disorders*: include both anxiety and Post-traumatic Stress disorders. With anxiety, people often experience somatic symptoms which can make it difficult to attend to other stimuli, panic attacks, obsessive and/or compulsive behaviors, avoidance, irrational fears (often with awareness of the irrationality), low self-esteem, poor social skills and poor social judgment. For people who have been exposed to significant traumatic events (whether they develop all the symptoms of PTSD or not), functional impairments may include: dissociation, a loss of a sense of future, difficulty developing trusting relationship (e.g., with counsel), difficulty interpreting social cues, intrusive thoughts, difficulty comprehending the emotional content of language and situations, difficulty regulating affect, impaired attention and concentration, difficulty believing in or planning of the future, and the development of hypervigilant behaviors.

*Language Abilities*: include receptive and expressive language deficits, as well as fluency impairments. Associated with learning and language disorders are slowed information processing speeds, low self-esteem and deficits in social skills.

*Medication*: as Sell recognized, medications can have an observable effect which may undermine competency by slowing responses to fast moving proceedings, by altering how the client looks and acts, or by interfering with communication. Medications, not just medications used for restoration to competence purposes as discussed in Sell, may have side effects that interfere with competence.

*Medical conditions*: Many medical conditions can adversely affect a person's ability to undertake the 10 necessary steps of rational communication and participation. Among others, Dementia's, Parkinson's, Huntington's, Wilson's, and Fahr's Diseases, strokes, seizure disorders may all have an adverse impact on functioning.

*Cognitive ability:* which may include both people with mental retardation and people who have IQ's higher than the MR cut-off but function in a substantially impaired manner, as well as people where the cause of the impairment is known (traumatic brain injury, exposure to lead, neurotoxins or fetal-alcohol, or genetic disorders). Cognitive ability includes such capacities as memory and recall; organizing concepts and understanding how things relate to each other; communication (receptive and expressive language); and flexibility in dealing with new information and a capacity to engage with new information. Although ruling that people with mental retardation may be competent, in Atkins, the Court noted:

> Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others.[40]

These are the disabilities that may also render some people with cognitive impairment functionally not competent in the specific context of working with counsel. Typically, cognitively impaired people attempt to mask their illnesses, often by making decisions which have long-term negative consequences but in the short-term permit them to avoid being fully assessed; they may confabulate (filling in details to portray a coherent story despite not having actual knowledge of details provided); and often exhibit passivity, compliance and deference (likely to agree with interviewer in effort to please) in the face of a lack of understanding and competence; exhibit rigidity in the face of contradictory evidence; and, as the hallmark of low cognitive ability, they have a fundamental lack of comprehension.

For those familiar with capital representation, this abbreviated list may be familiar as the types of conditions which are routinely uncovered during the investigation into potential penalty phase

---

[36] *Atkins v. Virginia*, 536 U.S. 304 (2002).
[37] American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, 4th Edition Text Revision (2000) Washington DC: American Psychiatric Association at p 297.
[38] Nancy Andreasen (1986) Scale for the Assessment of Thought, Language, and Communication (TLC) Schizophrenia Bulletin 12 (3) 473-82.
[39] However, see Maroney (*Op cit*) for a discussion of how courts have largely rejected depression as a significant contributor to incompetence.

[40] *Atkins v. Virginia*, 536 U.S. 304 (2002), at 318.

themes. In fact, the functionality test of Dusky, that is, the prong that requires the assessment of how the mental illness causes the inability to communicate with counsel rationally, also goes to explaining how the client experiences and makes sense of the world. This investigation and effort to develop a coherent understanding of the how the client functions, then, is fundamentally to the process of preparing for a capital trial as well as grasping whether a client is competent to proceed to trial.

Finally then, the role of mental health professionals changes within this understanding of competence to stand trial: to assess and describe the symptoms of specific mental illness and the functional impairments that derive. That is, the mental health professional's role is to tease out the areas in which the observed symptom(s) interferes with functioning and to describe the mechanism by which this occurs and the potential for treatment or remediation. This task is often obscured currently in the process of assessment and opinion forming, but it is the task that only mental health professionals are suited to undertake.

This understanding of competence also pulls the role of counsel back to the safety of professional standards and effective assistance as mandated by the Constitution. Counsel has a duty both to assess the capacity of a client to engage in the tasks required and also to track the specific places and ways in which the symptoms interfere. Counsel also then has a duty to attempt to work with and around these impediments, with the assistance of mental health consultants, prior to declaring a doubt about the client's competency. And finally, counsel has a duty, once that doubt is declared, to obtain the services of an attorney expert who can assist the court in understanding what is expected both from counsel and the client which is not possible in this specific set of circumstances to accomplish. Such an expert may act like a Strickland expert in offering the court insight and guidance both on the expectations of counsel and the client as well as on the barriers in the specific case.[41]

### 3. Conclusion

Competence to stand trial is a functional test rather than a bright line test, which therefore requires a case and fact specific assessment of a client's abilities in context. While there are serious pitfalls to raising incompetence, and while the decision to do so must be based on the specific ways in which the client's mental illness interferes with specific abilities to communicate with counsel, it is also clear that some of our clients are functionally unable to engage in the interactive dialogue required—that is, they are unable to see, hear and digest the trial related information and communicate with counsel about that information. Nevertheless, these issues require pursuit in a coherent and thorough manner because the outcome of trying a capital case in which the client is unable to participate is an appalling affront to due process.

### References

Cases:

Atkins v. Virginia, 536 U.S. 304 (2002)
Caro v. Calderon, 165 F.3d 1223 (1999)
Cooper v. Oklahoma, 517 U.S. 348, 364 (1996)
Drope v Missouri, 420 U.S. 162 (1975)
Dusky v. United States, 362 U.S. 402 (1960)
Godinez v. Moran 509 U.S. 389 (1993)
Hernandez v. Ylst, 930 F.2d 714 (1990)
Maggio v. Fulford, 462 U.S. 111 (1983)
Mayfield v. Woodford, 270 F.3d 915 (2000)
Odle v. Woodford, 238 F.3d 1084 (2001)
Pate v. Robinson, 383 U.S. 375 (1966)
Riggins v. Nevada, 504 U.S. 127 (1992)
Rohan (Ex rel Gates) v. Woodward, 334 F.3d 803 (2003)
Sell v. United States 539 U.S. 166, 185 (2003)
Strickland v. Washington, 466 U.S. 668 (1984)
Stouffer v. Reynolds, 168 F.3d 1115 (1999)
United States v Duhon, 104 F. Supp. 2d 663 (2000)
Wiggins v. Smith, 539 U.S. 510 (2003)
Williams v. Taylor, 529 U.S. 362 (2000)

Articles:

Andreasen, N. (1986). Scale for the assessment of thought, language, and communication (TLC). *Schizophrenia Bulletin, 12*(3), 473–482.
American Bar Association (2003, Februaryy). (rev. ed.). Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases Washington DC: American Bar Association.
American Psychiatric Association (2000). *Diagnostic and Statistical Manual of Mental Disorders*, 4th Edition Text Revision, Washington DC: American Psychiatric Association.
Berman, L., & Osborne, Y. (1980). Attorneys' referrals for competency to stand trial evaluations: Comparisons of referred and nonreferred clients. *Behavioral Science and Law, 5*(3), 373–380.
Bertman, L., Thompson, J., Jr., Waters, W., Estupinan-Kane, L., Martin, J., & Russell, L. (2003). Effect of an individualized treatment protocol on restoration of competency in pretrial forensic inpatients. *Journal of the American Academy of Psychiatry and the Law, 31*(1), 27–35.
Bonnie, R. (1993). The competence of criminal defendants: Beyond Dusky and Drope. *University of Miami Law Review, 47*, 539–601.
Burt, M., & Philipsborn, J. (1998, June 22). *Assessment of Client Competence: A Suggested Approach.* Washington, D.C.: The Champion, NACDL.
Cummings, J., & Mega, M. (2003). *Neuropsychiatry and behavioral neuroscience.* New York: Oxford Press.
Devinsky, O., D, & Esposito, M. (2004). *Neurology of cognitive and behavioral disorder.* New York: Oxford Press.
Grisso, T. (2004). Reply. *Law and Human Behavior, 28*(6), 719–724.
Heilbrun, K. (2001). *Principles of Forensic Mental Health Assessment.* New York: Kluwer Press.
Lichter, D., & Cummings, J. (Eds.). (2001). *Frontal-subcortical circuits in psychiatric and neurological disorders* New York: Guilford Press.
Lieber, D., & Foster, D. (1994). The mental health evaluation in capital cases: Standards of practice. *American Journal of Forensic Psychiatry, 15*(4), 43–64.
Maroney, T. (2006). Emotional Competence, "Rational Understanding," and the Criminal Defendant. *American Criminal Law Review, 43*, 1375.
Melton, G., Petrila, J., Poythress, N., & Slobogin, C. (1997). *Psychological Evaluations for the Courts* (2nd Ed.). New York: The Guilford Press.
Miller, B., & Cummings, J. (Eds.). (2006). *The Human Frontal Lobes: Functions and Disorder*, 2nd Ed. New York: Guilford Press.
Philipsborn, J. (2004). Searching for uniformity in adjudications of the accused's competence to assist and consult in capital cases. *Psychology, Public Policy and the Law, 10*(4), 417–442.
Poythress, N., Bonnie, R., Monahan, J., Otto, R., & Hoge, S. (2002). *Adjudicative Competence: The MacArthur StudiesPerspectives in Law and Psychology, Vol. 15* NY: Kluwer Press.
Poythress, N., Nicholson, R., Otto, R., Edens, J., Bonnie, R., Monahan, J., et al. (1999). *MacArthur competence assessment tool—Criminal adjudication.* Professional Manual Odessa, FL: Psychological Assessment Resources Inc.
Rogers, R., Jordan, M., & Harrison, K. (2004a). A critical review of published competency-to-confess measures. *Law and Human Behavior, 28*(6), 707–718.
Rogers, R., Tillbrook, E., & Sewell, K. (2004b). *Evaluation of competency to stand trial—Revised.* Professional Manual Lutz, FL: Psychological Assessment Resources Inc.
Sbordone, R. (2000). The executive functions of the brain. In G. Groth-Marnat (Ed.), *Neuropsychological assessment in clinical practice: A practical guide to test interpretation and integration* (pp. 437–456). New York: Wiley.
Scott, C. (2003). Commentary: A road map for research in restoration of competency to stand trial. *Journal of the American Academy of Psychiatry and the Law, 31*(1), 36–43.
Zapf, P., Hubbard, K., Cooper, V., Wheeles, M., & Ronan, K. (2004). Have courts abdicated their responsibility for determination of competency to stand trial to clinicians? *Journal of Forensic Psychology Practice, 4*(1), 27–44.

---

[41] See, *US v. Duhon*, 104 F. Supp. 2d 663 (2000) appointing an attorney expert and citing to Michael Burt and John Philipsborn "Assessment of Client Competence: A Suggested Approach" The Champion, June 22, 1998, NACDL.