1

1    IN THE DISTRICT COURT OF THE UNITED STATES
               DISTRICT OF SOUTH CAROLINA
2                  CHARLESTON DIVISION

3    UNITED STATES OF AMERICA,    )        2:15-CR-472
                                  )
4              Plaintiff          )        Charleston,
                                  )        South Carolina
5    VS                           )        November 7, 2016
                                  )
6    DYLANN ROOF,                 )
                                  )
7              Defendant          )

8         TRANSCRIPT OF SEALED EX PARTE HEARING
       BEFORE THE HONORABLE RICHARD M. GERGEL,
9          UNITED STATES DISTRICT JUDGE

10

11   APPEARANCES:            MR. DAVID I. BRUCK, ESQ.
                             Virginia Capital Case Clearinghouse
12                           Washington and Lee School of Law
                             Lexington, Virginia 24450
13
                             MS. KIMBERLY STEVENS, ESQ.
14                           1070-1 Tunnel Road
                             Suite 215
15                           Asheville, North Carolina 28805

16                           MS. SARAH GANNETT
                             Arizona Federal Public
17                           Defender's Office
                             850 West Adams Street
18                           Suite 201
                             Phoenix, AZ 85007
19
                             MS. EMILY PAAVOLA
20                           Justice 360
                             900 Elmwood Avenue
21                           Suite 101
                             Columbia, SC 29201

22

23

24

25   Court Reporter:         Amy C. Diaz, RPR, CRR
                             P.O. Box 835
                             Charleston, SC 29402

1          THE COURT:  I want to confirm, first of all, with

2     the matter of *United States vs. Roof*, I want to confirm that

3     all persons present are either defense counsel, the defendant

4     or court personnel.

5          MR. BRUCK:  Yes, sir, Your Honor, also members of

6     the defense team that are not technically counsel but are

7     here on our request.

8          THE COURT:  You know, I've closed this proceeding,

9     Mr. Bruck, and basically we are going to have those permitted

10    to stay are counsel of record.  So anyone who is not counsel

11    of record in this case must leave.

12         MR. BRUCK:  If I may, Your Honor?  We have two

13    research counsel who are in close consulting relationship who

14    have been assisting us.

15         THE COURT:  Mr. Bruck, there is a very narrow

16    limited group here.  I've closed the proceedings.  This is a

17    very serious matter.  Anyone who is not counsel of record

18    must leave.

19         MR. BRUCK:  If you would note our objection.

20         THE COURT:  I note your objection.

21         MR. BRUCK:  We need some help on this, but thank

22    you.

23         THE COURT:  How many counsel are here, Mr. Bruck?

24         MR. BRUCK:  I'm sorry?

25         THE COURT:  How many counsel are left?  Why don't

1    you identify -- why don't counsel that are here identify
2    themselves for the record.
3             MS. STEVENS:  Kimberly Stevens for the defendant.
4             MS. PAAVOLA:  Emily Paavola.
5             MS. GANNETT:  Sarah Gannett.
6             THE COURT:  Okay.  This is occasioned by a letter
7    the defendant wrote to the prosecutors which the Court was
8    provided a copy of over the weekend, and I need to question
9    the defendant.
10            Mr. Roof, would you mind coming to the podium? Let's
11   just you and I talk from there.
12            And Ms. Ravenel, will you swear the defendant,
13   please?
14            THE CLERK:  Please place your left hand on the
15   Bible, raise your right.
16            THE COURT:  Do we have a Bible there?  Right here.
17   Just hand him the Bible there.
18            Thank you.
19   THEREUPON:
20                  MR. DYLANN STORM ROOF,
21   Called in these proceedings and after having been first duly
22   sworn testifies as follows:
23            THE COURT:  Good morning, Mr. Roof.  I'm going to
24   ask you some questions about this letter and matters raised
25   by the letter.  If I ask you a question you don't understand,

1    would you ask me to rephrase it?

2            THE DEFENDANT:  Yes, sir.

3            THE COURT:  And we want to take all the time it

4    takes, so don't feel rushed in any of your answers.

5            The -- do you have a copy of the letter with you?

6            THE DEFENDANT:  Yes.

7            THE COURT:  Okay.  I'm going to be referring to it

8    and I want to make sure you have access to it.

9            First of all, an obvious question, you were the

10   author of that letter?

11           THE DEFENDANT:  Yes, I was.

12           THE COURT:  And you begin the letter by indicating

13   that you do not consent or endorse the defense of your

14   counsel.

15           First of all, what is that defense that you are

16   referring?

17           THE DEFENDANT:  Okay.  Well, maybe it's not a

18   defense, but it's the mitigation, right?

19           THE COURT:  Right.  Whatever that language is, what

20   specifically regarding the mitigation evidence do you object?

21           THE DEFENDANT:  The mental health stuff.

22           THE COURT:  And when you say "mental health stuff,"

23   what is that?

24           THE DEFENDANT:  From what I understand they are

25   going to say that there is something wrong with me.

1           THE COURT:  Okay.

2           THE DEFENDANT:  Mentally.

3           THE COURT:  Do you know what they are going to say?

4           THE DEFENDANT:  Yeah, but I don't even want to

5    acknowledge it.

6           THE COURT:  By telling me what you understand they

7    are going to say is not a recognition that it is true -- see,

8    I don't know -- you see, Mr. Roof, it's not -- I'm not aware

9    of what the defense is here.  It hasn't been offered to me.

10   So I need your explanation concerning what is that mental

11   health defense and why you object to it?

12          THE DEFENDANT:  They are going to say I have

13   autism --

14          THE COURT:  Okay.

15          THE DEFENDANT:  -- but I don't.

16          THE COURT:  Okay.  And first of all, is there any

17   other part of the mental health defense other than the autism

18   issue?

19          THE DEFENDANT:  Um, I think that's it.

20          THE COURT:  Okay.  And what about the claim you have

21   autism do you object?  I mean, do you know anything about

22   autism?

23          THE DEFENDANT:  Yeah.

24          THE COURT:  Tell me what you know about it.

25          THE DEFENDANT:  Oh, my gosh, it's -- I know what it

1    is.

2            THE COURT:  Well, I need some help, because see, we

3    are going to talk about what your understanding is and then

4    you get to explain to me why that doesn't apply to you.  And

5    I need to understand what you believe autism is and then you

6    can explain to me why you don't think you have that.

7            THE DEFENDANT:  Okay.  What I think autism is is

8    when somebody can't recognize social cues.

9            THE COURT:  Okay.

10            THE DEFENDANT:  And, I mean, that is --

11            THE COURT:  And is there any other aspect you

12    understand about autism, other than a person does not

13    recognize social cues?

14            THE DEFENDANT:  I can't think of --

15            THE COURT:  Well, I know you are a movie lover, as I

16    am.  Did you ever see the movie *Imitation Game* about the

17    gentleman who had been to the computer, didn't really use the

18    term autism in that --

19            THE DEFENDANT:  What is the guy's name?

20            THE COURT:  I can't remember his name now, but he

21    was a British guy.

22            THE DEFENDANT:  I didn't watch it.

23            THE COURT:  Okay.  It suggests some of the social

24    cues that doesn't actually call it autism.  Do you -- and you

25    believe that that is not a valid diagnosis for you?

```
 1                    THE DEFENDANT:  No.  It's not.

 2                    THE COURT:  And why is that?

 3                    THE DEFENDANT:  Because what I think is happening is

 4        that they are getting -- they are getting -- they're

 5        mistaking my personality traits for autism, you see what I'm

 6        saying?  But I don't -- I don't have autism.  Because I know,

 7        I recognize everything, you see what I'm saying?  And I don't

 8        want them to say that because it's not true.

 9                    THE COURT:  Okay.  And have you shared that view

10        that you don't believe you have autism?

11                    THE DEFENDANT:  Yes.

12                    THE COURT:  Have you had a chance to talk to the

13        doctors who evaluated you to know why they believe you have

14        autism?

15                    THE DEFENDANT:  Um, I've talked to one of them.

16                    THE COURT:  Okay.  And was that an autism expert?

17                    THE DEFENDANT:  Yes.

18                    THE COURT:  Okay.  And did you share with him your

19        belief you did not have autism?

20                    THE DEFENDANT:  Yes.  It's a woman.

21                    THE COURT:  It's a woman.  Okay.

22                    What was her response to that?

23                    THE DEFENDANT:  She says I'm wrong.

24                    THE COURT:  It's her opinion you didn't?

25                    THE DEFENDANT:  Right.  But she told me herself that
```

1    if she hadn't had the information from when I was a kid that

2    she wouldn't have been able to diagnose me.  So if she was

3    judging me now, she wouldn't have been able to say I have

4    autism.

5                THE COURT:  Okay.

6                THE DEFENDANT:  So --

7                THE COURT:  Usually mental health diagnoses are

8    based on the entire life, not just on the immediate

9    information.  Do you -- have you advised your lawyers that

10   you do not wish to have the autism defense asserted?

11               THE DEFENDANT:  Yes.

12               THE COURT:  And what has been their response?

13               THE DEFENDANT:  They are going to do it anyway.

14               THE COURT:  Well, did they listen to your concerns

15   about it?

16               THE DEFENDANT:  Yes, they listened.

17               THE COURT:  Okay.  And did they tell you why they

18   wanted to do it?

19               THE DEFENDANT:  Yes, because they think it would

20   help me.

21               THE COURT:  Okay.  Do they appear themselves to

22   believe it?

23               THE DEFENDANT:  Um, yeah, I think they do.

24               THE COURT:  Okay.  And they think -- they tell you

25   it will be beneficial to you in your case, correct?

1           THE DEFENDANT:  Correct.

2           THE COURT:  And you mentioned in the letter that the

3    defense is a lie and is fraudulent.

4           THE DEFENDANT:  Right.

5           THE COURT:  Would it also be fair to say it could be

6    just a difference of opinion?

7           THE DEFENDANT:  No, because I don't think -- I think

8    that they are doing this -- the point I was trying to make is

9    that I think -- I don't know how to say this -- I don't

10   really think they believe I have autism.

11          THE COURT:  Okay.

12          THE DEFENDANT:  I think they are just taking

13   whatever they can and using whatever they can, you see what

14   I'm saying?  Because they don't have anything else to use.

15          THE COURT:  Well, you mentioned that there is no

16   defense.  I think you used the term "I have no real defense."

17          THE DEFENDANT:  Right.

18          THE COURT:  And no defense, by that I mean a defense

19   by the lawyers or the Court.  What would be your defense,

20   Mr. Roof?  If you could control the defense, what would you

21   want -- what would you want to have said?

22          THE DEFENDANT:  I don't want any defense.

23          THE COURT:  Tell me what you mean by that.

24          THE DEFENDANT:  Okay.  If I could -- if I had the

25   choice, what I would do is let the prosecution present their

1    evidence and that's it.

2         THE COURT:  Well, there are two stages of this, one

3    of them is guilt or innocence and then there is the sentence,

4    correct?  You understand there are two proceedings?

5         THE DEFENDANT:  Right.

6         THE COURT:  What do you want Mr. Bruck to do or your

7    counsel to do regarding that first phase?  Innocence or

8    guilt?

9         THE DEFENDANT:  Um, you mean what do I want to

10   plead?

11        THE COURT:  Right.

12        THE DEFENDANT:  Guilty.

13        THE COURT:  Well, have you told defense counsel that

14   you wish to plead guilty?

15        THE DEFENDANT:  Yes.  I think they -- I think I have

16   to be guilty.

17        THE COURT:  Well, no.  The defense -- up to this

18   point the plea is not guilty.

19        THE DEFENDANT:  Oh, I think I have to plead not

20   guilty because it's a death penalty case, right?

21        THE COURT:  Well, regardless of whether you plead

22   guilty or not guilty, Mr. Roof, we have to have a trial

23   regarding the sentencing.

24        THE DEFENDANT:  Right.

25        THE COURT:  Your lawyers, I'm sure, have given you

1    advice why they believe you should plead not guilty, but that

2    is ultimately your decision, Mr. Roof.

3              THE DEFENDANT:  But I was under the impression that

4    I had to plead not guilty because you can't plead guilty to a

5    death penalty, you see what I'm saying?

6              THE COURT:  You would only plead guilty to the

7    crime.  The death penalty would have to be imposed by the

8    jury decision after a trial.  There are two phases.  So there

9    is no requirement you plead guilty.  Your lawyers have given

10   you advice, maybe very good advice, to plead not guilty.

11   They may have very good reasons for that, but it is your

12   decision.  Do you understand that?

13             THE DEFENDANT:  Yes.

14             THE COURT:  And it is not uncommon in cases where

15   there is not really a contest about whether the defendant is

16   guilty or not, that he does not plead guilty.

17             MR. BRUCK:   If Your Honor please, we need to note

18   an objection.  We think at this point the Court may be

19   invading an area that is -- that only counsel should be

20   discussing.

21             THE COURT:  You may say that, but it's raised by

22   this letter, Mr. Bruck.  That's the concern I have.

23             MR. BRUCK:   If you will note our objection.

24             THE COURT:  I will note your objection.

25             So it is -- so if you controlled your situation, if

1    you did not have to defer to the advice of your lawyers, what

2    would you want to do?

3         THE DEFENDANT:  Okay.  I want -- in the sentencing,

4    I would want the prosecution to present all their evidence

5    and then not present any mitigating evidence.

6         THE COURT:  Well, let me say this, your letter

7    probably accurately describes the law, that your lawyers have

8    the right to offer mitigating evidence that they think is

9    best because that is a strategic decision we allow, the

10   Courts allow defense counsel to make.  So that is why I think

11   it's important for them to know what you would prefer.

12        But you understand if only the Government offered

13   evidence and you offered no mitigation evidence, there would

14   be a high degree of probability that you would have the death

15   penalty imposed?  Your lawyers are trying to help you,

16   Mr. Roof.  They are trying to marshal a defense for you.

17        THE DEFENDANT:  I get that.  But the problem is what

18   is the -- in other words, if the price is that people think

19   I'm autistic, then it's not worth it.  You see what I'm

20   saying?

21        THE COURT:  Well, whether people think you are

22   autistic or not, what does that have to do with whether you

23   would get the death penalty?  I mean, if in fact -- I have no

24   opinion about this, Mr. Roof, you and I are having the first

25   conversation we've had here, I have no opinion about this --

but if, in fact, your autism experts are right, that your
lawyers are right, wouldn't you want the jury to have that
information to make the best decision?

THE DEFENDANT:  No.  No.  No.

THE COURT:  Why is that?

THE DEFENDANT:  Because I don't want them to think
I'm autistic.

THE COURT:  Well, if they -- would you rather die
than be labeled autistic?

THE DEFENDANT:  Yes.

THE COURT:  And can you explain why that is so?

THE DEFENDANT:  Because it's -- I have to be careful
what I say -- but it's just not good for me if I'm labeled
autistic.  That's all.

THE COURT:  But I'm not understanding why that would
be so.

THE DEFENDANT:  If I tell you why, I might get
myself in trouble.

THE COURT:  Well, I'm not sure I understand that.  I
need an explanation of why you believe being labeled autistic
would get you in trouble.  You need to explain that to me,
Mr. Roof.

THE DEFENDANT:  What I'm saying is if I told you why
I don't want to be labeled autistic, it might get me in
trouble.

1          THE COURT:  In what way?  You are in a lot of

2     trouble right now, Mr. Roof.

3          THE DEFENDANT:  Yeah, I know, but -- I can't say.

4          THE COURT:  Well, I need an explanation because I

5     have to evaluate this issue and I need to understand -- I

6     know --

7          THE DEFENDANT:  If they say I have autism, it's like

8     they are trying to discredit me.

9          THE COURT:  Well, having a diagnosis would discredit

10    you?

11         THE DEFENDANT:  Yes.

12         THE COURT:  In what way?  What are you worried about

13    being discredited for?

14         THE DEFENDANT:  That's what I'm saying.  I can't

15    talk about it.  I can't say.

16         THE COURT:  But I don't understand, and I need your

17    help in understanding.  We did this private here so you would

18    not have to be speaking publically about this, Mr. Roof, but

19    you need to help me understand why being labeled autistic

20    would be -- would discredit you.

21         THE DEFENDANT:  I just really don't think it's a

22    good idea for me to say why.

23         THE COURT:  I want to direct you to tell me why

24    because I need to evaluate this in terms of this -- what's

25    been raised here.

1          THE DEFENDANT:  Because if they say -- if -- if

2     people think I have autism, you see what I'm saying?  It

3     discredits the reason why I did the crime.  You see what I'm

4     saying?

5          THE COURT:  Okay.  It makes the -- I've obviously

6     read your writings, the three writings, I have read them.

7     And I take it you don't want to think -- you don't want

8     others to think that you did these things because there was

9     something wrong with you?

10          THE DEFENDANT:  Exactly.

11          THE COURT:  And you are willing to have the case

12     tried before a jury with essentially no defense so people

13     won't think that?

14          THE DEFENDANT:  Yes.

15          THE COURT:  And you are prepared to face the death

16     penalty to avoid anyone thinking that?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Mr. Roof, you might understand that I am

19     troubled -- I'm trying to figure out why being labeled

20     something would be worse than death.  Could you explain that

21     to me, being labeled autistic is worse than death?

22          THE DEFENDANT:  Because once you've got that label,

23     there is no point in living anyway.  You see what I'm saying?

24          THE COURT:  Well, there are many people with autism

25     who are high-functioning, well-adjusted people.  I don't know

1    if you have it or not, Mr. Roof.

2            THE DEFENDANT:  That is what my lawyers tell me,

3    what you just said.

4            THE COURT:  I'm sorry?

5            THE DEFENDANT:  What you just said is what my

6    lawyers are trying to tell me in order to get me to accept

7    it.

8            THE COURT:  Okay.  I mean, there are -- there are

9    just, you know, obviously a number of people who have autism

10   who are highly successful people.  I understand one of them

11   has been retained by your attorneys, one of the most renowned

12   experts in the field.

13           THE DEFENDANT:  Yeah.  They brought him to talk to

14   me.

15           THE COURT:  Did they?  Okay.

16           THE DEFENDANT:  But I didn't talk to him.

17           THE COURT:  I mean, obviously -- how old are you

18   now, sir?

19           THE DEFENDANT:  Twenty-two.

20           THE COURT:  You are 22 years old.  You are both

21   young and you don't have any specific training in these

22   areas.  Is it possible that the people with training might

23   actually have an insight into something you don't have?  They

24   might know something that you don't even know about yourself?

25           THE DEFENDANT:  You mean the experts?

1          THE COURT:  The experts.  I mean, is that possible?

2          THE DEFENDANT:  It's possible in theory, but not --

3     not in this case.

4          THE COURT:  What motivated you to write the

5     prosecutors?  I must say, I have been 40 years in this

6     business and I've never heard anybody doing that.  What

7     possessed you to do that?

8          THE DEFENDANT:  Okay.  My motivation was for them to

9     present the evidence.

10          THE COURT:  You don't want them presented as

11     evidence, you don't want the lawyers -- your lawyers to

12     present the autism defense?

13          THE DEFENDANT:  No.  No.  No.  When I wrote the

14     letter --

15          THE COURT:  You want the prosecutors to be able to

16     use your letter?

17          THE DEFENDANT:  I want the prosecution to present my

18     letter as evidence.

19          THE COURT:  So to defeat any autism mitigation

20     evidence?

21          THE DEFENDANT:  Right.

22          THE COURT:  Because you would rather face the death

23     penalty than be called autistic?

24          THE DEFENDANT:  Right.  And that's why I wrote to

25     the prosecution and not to the Court, or to you.  You see

```
1   what I'm saying?
2           THE COURT:  Sure.  You weren't sure I would give it
3   to anybody?
4           THE DEFENDANT:  Right.
5           THE COURT:  So your view of what your lawyers should
6   be doing is you would go through the trial with no defense
7   and no mitigation evidence and then the jury would simply
8   make a decision?
9           THE DEFENDANT:  Right.  But I mean, I just have a
10  hard time with the idea that I don't get to make the
11  decisions.  You see what I'm saying?  I think that they
12  should do whatever I tell them to do.
13          THE COURT:  You know, there is a whole body of law
14  out there on capital cases and about the right of the
15  defendant to control certain defenses.  It won't be
16  surprising to you that there is some people who have been
17  tried, who have been charged with capital offenses who
18  actually have mental disorders and they are embarrassed about
19  having those disclosed at trials.  You can understand that.
20  So the law has developed that in those areas the defense
21  lawyer, that's called a strategic decision and it's left to
22  the lawyer and not to the client.  I mean, that is just what
23  the law is.
24          So your letter is in that way correct that they can
25  offer it.  And what you have now tried to do is undermine
```

```
1    that offering of that evidence by writing the prosecutors and
2    saying that it's all a lie.
3              THE DEFENDANT:  Exactly.
4              THE COURT:  Well, do you want the jury to impose the
5    death penalty?
6              THE DEFENDANT:  Um, I really don't have a
7    preference.
8              THE COURT:  Well, these lawyers are sworn to defend
9    you.  Have they been courteous to you?
10             THE DEFENDANT:  Yeah, but I think that they are just
11   doing it so I don't get upset.
12             THE COURT:  You mean they are trying -- they are
13   being nice to keep you from complaining?
14             THE DEFENDANT:  Yeah.  And sometimes they just tell
15   me what I want to hear.
16             THE COURT:  Okay.  And do they -- are they working
17   hard for you?
18             THE DEFENDANT:  They say they are.
19             THE COURT:  Let me just say, I've seen a lot of the
20   filings, they are working pretty hard, Mr. Roof.  They are
21   working a lot harder to keep you alive than you may be
22   willing to have them do, but they are working really hard for
23   you, and they are very devoted to your case.  So, you know,
24   I'm -- and I want the jury, this is me, I want a fair trial,
25   and I want the jury to hear all evidence that might be
```

1    important to consider before it makes the decision.  And if

2    we undermine that evidence by having them not hear whatever

3    mental health evidence there is, which I haven't heard yet

4    either, we are just not allowing the jury to get all the

5    information they need to make a fair decision.

6            So my concern is to get them -- I understand you

7    don't believe that to be, but if there are people who are

8    experts who think it is potentially important information,

9    don't you think the jury should receive all the information

10   so they can make the best decision?

11           THE DEFENDANT:  Yeah, but like I said in my letter,

12   there were other experts that, as far as I know, they are not

13   going to, um, have testify.

14           THE COURT:  That's not uncommon in these cases.

15   They have a variety of theories and they have the evaluations

16   and then they pick one that makes the most sense.

17           THE DEFENDANT:  That's what I'm saying, they are

18   picking the one that said I had autism.

19           THE COURT:  Because perhaps they believe -- I mean,

20   Mr. Bruck has told you, or others have told you, they believe

21   that defense, haven't they?  They didn't think there --

22           THE DEFENDANT:  Yes.

23           THE COURT:  I mean, there could be just an honest

24   disagreement, correct?  Between you and your lawyers on this?

25           THE DEFENDANT:  Right.

1           THE COURT:  I mean, so I'm just -- I'm just -- I

2      just, you know, I just want the best information to get to

3      the jury.  And even though you might not think it right,

4      don't you think it's good for the jury to hear if other

5      people, who have expertise in this area, don't you think they

6      should hear that evidence -- and believe me, the Government

7      may offer evidence against it -- and then they can have all

8      the information to make the best decision?

9           THE DEFENDANT:  No, I don't think that's a good

10     idea.

11          THE COURT:  Okay.  So your preference would be

12     simply to put up no defense.  Is there a defense?  You are

13     saying that there was no defense which the Court or the

14     lawyers would want you to -- what would be the defense you

15     would assert, Mr. Roof?

16          THE DEFENDANT:  I can't talk about it.  I have no

17     defense that anyone would present.

18          THE COURT:  Well, you are entitled to assert your

19     defense.  I mean, what would be the defense you would want to

20     assert?  If you could control it, what would you want to say?

21          THE DEFENDANT:  I wouldn't be able to say it anyway.

22          THE COURT:  Why is that?

23          THE DEFENDANT:  Because I just can't do it.

24          THE COURT:  I don't understand that response.  Why

25     can't you say what the defense is you would like to assert?

1    Why can't you say it to me?

2              THE DEFENDANT:  Well, I haven't really thought about

3    it.

4              THE COURT:  Well, surely you have thought about what

5    you wrote when you said, "I'm not" -- you say here, "I have

6    no defense that my lawyers would present or that would be

7    acceptable to the Court."  What would be the defense that is

8    not acceptable to the Court?

9              THE DEFENDANT:  I can't say.

10              THE COURT:  You don't know or you just don't want to

11    say?

12              THE DEFENDANT:  Well, I mean, both.  I would have to

13    think about it.  I would have to -- I would have to -- if I

14    was going to -- in other words, if I was going to make my own

15    defense, I would have to think about it.

16              THE COURT:  Well, is there -- do you have a thought

17    about what -- if you don't want the autism defense, is there

18    something you would want them to say instead?  I'm not asking

19    for the full defense, but what would you want to say?

20              THE DEFENDANT:  It would be counterproductive for

21    them to say anything.  That would just make it worse.

22              THE COURT:  You think the explanation would be worse

23    than -- your real explanation would be worse than any

24    defense, than saying anything at all?

25              THE DEFENDANT:  My -- my idea of a defense -- well,

1     what -- the defense that I would present would just make it
2     worse.  That's what I'm saying.
3              THE COURT:  And how would it -- explain how that
4     would make it worse.
5              THE DEFENDANT:  Because it would aggravate things.
6              THE COURT:  Because?
7              THE DEFENDANT:  I can't say.
8              THE COURT:  Well, let me ask it this way:  I've read
9     your jail writings, would it be along the lines what you
10    wrote in jail?
11             THE DEFENDANT:  No, those don't really tell.  Nobody
12    was supposed to see that.
13             THE COURT:  How about "The Last Rhodesian," would it
14    be along the lines of what you posted there?
15             THE DEFENDANT:  That's even worse than the jail
16    writings.  I mean, it's not the idea, it's just the writing
17    is really bad.
18             THE COURT:  Well, I'm -- one of the important issues
19    I have to evaluate is an issue regarding whether there is
20    another defense that you are not being allowed to present.  I
21    need to know that.
22             You see, Mr. Roof, I'm struggling with you don't
23    like the defense of the lawyers and that I have to evaluate
24    all this.  Is there a defense out there that is not being
25    asserted?  And I know you don't think I would think much of

1    that defense, but at least I knew it, to know the general

2    nature of it, so I can evaluate this matter.

3            THE DEFENDANT:  No.  There isn't any other defense.

4            THE COURT:  Okay.  Mr. Roof, you have been charged

5    with the murder of nine persons resulting in the death of

6    nine persons and the intent to murder three others.  Do you

7    feel like that the charges against you -- I'm not asking you

8    if they are true or not -- do you understand that if they

9    were true, that would be wrong to do?

10           THE DEFENDANT:  Yes.

11           THE COURT:  Do you feel like you understand -- when

12   you were communicating with your counsel, do you feel like

13   you understand their position, that you have sort of an

14   understanding of why they want to do what they are doing?

15           THE DEFENDANT:  Yes, I understand completely.

16           THE COURT:  You just don't agree with it, but you

17   understand it?

18           THE DEFENDANT:  Right.  I understand.

19           THE COURT:  And you are able to communicate with

20   counsel and y'all are able to talk to each other, correct?

21           THE DEFENDANT:  Correct.

22           THE COURT:  And you understand, when I just talked

23   to you about these proceedings, you, you know, the different

24   phases.  You understand what we are doing in these court

25   proceedings?  You understand what we are doing, correct?

1          THE DEFENDANT:  Right.

2          THE COURT:  Okay.  That's sufficient questioning.

3          Mr. Bruck, is there any followup you would like

4    to -- anything anybody from your team would like to ask

5    Mr. Roof?

6          MR. BRUCK:  No, sir.

7          THE COURT:  Okay.  I'm going to have the marshals

8    remove Mr. Roof and take him back.

9          Thank you, Mr. Roof.

10          THE DEFENDANT:  Thank you.

11          (Proceedings heard outside the presence of the

12    defendant.)

13          THE COURT:  Mr. Bruck?  Are you going to speak for

14    the defense?

15          MR. BRUCK:  Yes, sir.

16          THE COURT:  Okay.  Let's start with the letter then.

17    I'm going to move to the issue of competency after that.

18          Have you shared with the defendant your defense?

19          MR. BRUCK:  Yes.

20          THE COURT:  And the mitigation experts?

21          MR. BRUCK:  Yes.  I should say that we are in the

22    process of having him meet with our experts now, so that

23    process is not completed.  We waited until the prosecution

24    evaluation was over to do that, but we have let him know as

25    we came closer to trial in a general way what we were going

1    to present.  We have also shown him every exhibit and told

2    him about every witness, and we have shared with him a very

3    large number of memos, summaries of witness testimony for the

4    defense.

5              THE COURT:  He has shared with you his resistance to

6    a defense -- a mitigation evidence on autism; is that

7    correct?

8              MR. BRUCK:   Yes.

9              THE COURT:  And you have heard him out fully?

10             MR. BRUCK:   Yes.

11             THE COURT:  And you have nonetheless resolved that

12   it is in his best interests to assert that defense; is that

13   correct?

14             MR. BRUCK:   Yes.  And I should clarify that we have

15   talked to him much more about autism than about the other

16   mental health aspects of his defense, partly simply because

17   of the scheduling it is, and was until today, our plan for

18   him to meet with our forensic psychiatrist tomorrow morning

19   at 8:30, in which at that meeting she was going to fully

20   explain to him what her anticipated testimony --

21             THE COURT:  What would be the nature of that

22   testimony?  Obviously I only have had brief glimpses of the

23   defense.  So share with me what the forensic psychiatrist

24   would say.

25             MR. BRUCK:   Her report is not complete, but in a

1    very general way, it is our expectation that her testimony

2    will be to confirm the diagnosis of autism, to testify that

3    Mr. Roof suffers from a severe and crippling anxiety disorder

4    and suffers from delusions; that is to say he is psychotic in

5    various respects.  The -- in other words, he has comorbid

6    mental illnesses.  I could go on in greater detail about

7    this, but an overall outline, those are -- that there is also

8    evidence in his history of depression.  So I think we are

9    looking at four different diagnostic --

10              THE COURT:  Psychosis, depression, autism, what is

11    the fourth?

12              MR. BRUCK:   Um, severe anxiety.

13              THE COURT:  Okay.

14              MR. BRUCK:   And the psychosis takes the form of

15    nonbizarre delusions.  He does not appear to have a thought

16    disorder, and that is why there is nothing at all that is

17    bizarre, or very little --

18              THE COURT:  Well, what exactly is the nature of this

19    psychosis?

20              MR. BRUCK:   Delusions.  Delusion is a fixed false

21    belief.

22              THE COURT:  Can you give me an example?

23              MR. BRUCK:   Um, in his own -- yes.  His delusions

24    include a whole series of somatic delusions; that is to say

25    fixed false beliefs about his body.  These include that he

has a -- that his body is developed more on his left side

than his right because of the testosterone in his body has

all pooled on the left side.  This -- it has been explained

to him by both a medical doctor and a neuropsychologist in

readily understandable terms that this is impossible because

the circulatory system of the body does not allow hormones to

reside on one side and not the other.  This has no impact

whatsoever on his thinking.  He continues to adhere to his

delusion; however, as he has begun to perceive that we see

this as a sign of mental illness, he has become increasingly

guarded.  And what Your Honor did this morning is more and

more what we have encountered, which is he says, "I can't

talk about that."

Now, we are hoping that this will wax and wane to

some degree, he will find it necessary to disclose these

thoughts, because these are a window into what we think is a

serious mental illness.  So that is one somatic delusion.

He has had a long-standing somatic delusion that his

face is malformed and his forehead is unsightly.  This is the

reason for the bowled haircut.  He is afraid that anyone will

see his forehead.

To give some examples of this:  He was assaulted in

the jail last August, and the jail staff took photographs of

his face with his hair pulled back so his entire forehead can

be seen.  He looks perfectly normal except for the cuts and

1    bruises inflicted by his assailant, but he is extremely upset

2    that he allowed his photograph to be taken of his forehead.

3    He refused to cooperate with the investigation or to press

4    charges against his assailant because of the fact that it

5    would require or allow those photographs, he thinks, to

6    become public, or at least be disseminated.  And he became

7    very irate and upset when we indicated that we wished to

8    offer those photographs as part of his case in mitigation.

9          This -- other somatic delusions involve his belief,

10   which has been quite long-standing, that his hair is falling

11   out and he will soon be bald.  This is related to a very mild

12   thyroid disorder, which he actually does have, but to which

13   he has attached irrational significance for quite some time,

14   along the lines of about two years, and medical records that

15   show that he was convinced that he had this serious thyroid

16   disorder.

17         THE COURT:  Mr. Bruck, if you had this information,

18   why have you not made an earlier motion?  I mean, are you

19   claiming he was not criminally responsible for what he did?

20         MR. BRUCK:   No.

21         THE COURT:  Are you claiming he's not competent to

22   go to trial?  What are you claiming?

23         MR. BRUCK:   In light of the most recent

24   developments, we think that his mental disorder has crossed

25   the line into incompetence to stand trial.  We also most

```
1    certainly think that he has decision incompetence, that is he
2    lacks the capacity to make self-protective decisions to
3    overrule counsel about the evidence if that were something he
4    could do.
5              THE COURT:  So is it because he disagrees with your
6    mitigation defense he's now incompetent?
7              MR. BRUCK:   Not at all.  It's the reasons that
8    he --
9              THE COURT:  Well, he told me he would rather die
10   than be called autistic.  Is that a sign of some mental
11   disorder?
12             MR. BRUCK:   In his case, we think it is.  Standing
13   alone that is something that someone might, under some
14   circumstances think, although it's rather irrational or
15   self-defeating --
16             THE COURT:  Does it go to his competence?  That's my
17   question.  I mean, I asked him the direct question, "Would
18   you rather die than be called autistic?" And he said yes,
19   right?
20             MR. BRUCK:   Yes.
21             THE COURT:  Is that a sign of some mental disorder?
22             MR. BRUCK:   Yes, it is.  It -- his reason -- he is
23   subject to -- I mean, he has told us over and over again that
24   his greatest fear, his greatest concern is a crippling, he
25   refers to it as embarrassment.  He just told us his entire
```

1    life is one timeline of embarrassment.  He is talking about

2    severe anxiety.  This is anxiety so severe that he

3    essentially spent all of the time since he dropped out of

4    high school in the ninth grade in the bedroom of his mother's

5    home with the rarest forays out.  He has failed -- his

6    fear -- and I was going to get to this on my list -- you were

7    asking me about mental health symptoms, but he is a person

8    who is really unable to endure the anxiety that comes with

9    social interaction.

10         THE COURT:  But, see, Mr. Bruck, you can understand

11    the Court's skepticism when you have been representing him

12    for months now and suddenly on the eve -- you don't raise

13    this until literally the first day of jury selection.  I

14    mean, there is -- at least the Court ought to have some

15    skepticism about that, about the timing of it.

16         MR. BRUCK:  The problem that has arisen is that two

17    days before jury selection he, for the first time, wrote a

18    letter, not to the Court, but to the prosecution, and accused

19    us of all sorts of misconduct and said we should be

20    disbarred.  We felt at this point that this was -- it was

21    impossible for us to simply proceed to trial.  Prior to that

22    time, we were on a tight rope where we felt that any hope of

23    maintaining an attorney-client relationship depended on the

24    greatest discretion --

25         THE COURT:  I think y'all have -- I mean, he isn't

1    asking -- he did not ask to fire you.  He might have wanted

2    you disbarred, but he did not ask to fire you, he simply

3    doesn't want you to assert a mental health defense.  I don't

4    know if he's aware that you also want to talk about

5    depression or psychosis.  I mean, he didn't mention it to me.

6    He probably won't be crazy about those defenses, either.

7         MR. BRUCK:   He probably -- he probably won't.

8         Perhaps I should complete the list.  And of the

9    things we have observed -- but the reason, you know, it -- he

10   is a -- he exhibits conflicting traits, some of which is a

11   tendency to submit to, or to give in to anxiety, which we had

12   hoped would allow us enough latitude to present the case we

13   wanted to present.

14        Something else that has happened that has brought

15   this to a head is that while we waited to inform him of the

16   full breadth and detail of the mental health case so as not

17   to interfere with the Government's evaluation, the

18   Government's evaluator took a completely different tact and

19   became the person who informed him in the greatest detail,

20   and we think in a pejorative way, of what we intended to

21   introduce in his defense.  I noticed the Court had some

22   skepticism that Dr. Dietz did this, but we think that he did.

23        THE COURT:  The defendant wouldn't let us videotape

24   the proceeding.

25        MR. BRUCK:   We wanted it recorded, but that is

1    exactly right.

2         THE COURT:  But whether he did or didn't might be

3    kind of a false repeat here because at some point Mr. Roof

4    was going to learn that you think he has severe mental

5    disorders, something he likely will not appreciate.

6         MR. BRUCK:    Yes.  But what happened in Dr. Dietz's

7    evals, he informed the defendant, or so the defendant tells

8    us -- and I believe it's true because there were other

9    indicia of reliability here -- that -- and I quote, "I can't

10   find anything wrong with you."  What he did -- now, he was --

11   he had not completed his evaluation.  He had not had the

12   psychological testing that he went in and had Mr. Roof

13   conduct.  He had not evaluated and assessed the clinical

14   interview.  So that was either a false statement or an

15   irresponsible one if it was true.  But he indicated to our

16   client, knowing that after a day and a half that Mr. Roof did

17   not want to be depicted as mentally ill, that he thought

18   Dietz was the champion of this view.  And when we saw him

19   immediately after the evaluation, he informed us that Dr.

20   Dietz is my friend.  He has formed an alliance with Dr.

21   Dietz.

22        THE COURT:  Certainly they have a common view of the

23   mental health diagnosis apparently.

24        MR. BRUCK:   Dr. Dietz led him to believe that they

25   have a common belief.  We don't know.

1          The problem that that created was that rather than
2     our being able to work with our client, it -- the
3     relationship was blown up by the Government's evaluator.
4          THE COURT:  I'm less persuaded by that.
5          Let me ask you this:  You recognize that if I -- I
6     think you are asking me to send the defendant off about his
7     competency to be evaluated.  Is that what you are asking me
8     to do?
9          MR. BRUCK:   Yes, we are.
10          THE COURT:  And you understand that may affect the
11     order of the trial?
12          MR. BRUCK:   That's conceivable.  It, um -- I would
13     be surprised if the state court wanted to -- without knowing
14     the results of a federal competency evaluation, to just barge
15     straight ahead and put Mr. Roof on trial while that
16     evaluation is pending.  I also don't know quite how we would
17     physically do that while the federal evaluation was taking
18     place or immediately afterwards.
19          THE COURT:  They could simply schedule the trial the
20     moment he returned.
21          MR. BRUCK:   I suppose anything is possible.  It
22     would be an unseemly spectacle.
23          THE COURT:  There are no ground rules here.  The
24     only reason we went first was because you asked for a speedy
25     trial and the state trial was some months away.  Had it

```
1    already been scheduled, I wouldn't have set it aside, tried
2    to set it aside, I would have deferred to the State.  So
3    this, I'm sure you agree, what you may be asking for may
4    be -- may affect the order of the trial.  I have no idea.
5              MR. BRUCK:   You asked me about evidence of
6    delusions, and I had gotten as far as somatic delusions, he
7    has others, and they are directly relevant to the colloquy.
8              THE COURT:  Tell me about that.
9              MR. BRUCK:   The -- what he couldn't tell you about
10   his reasons -- about his reasons, the Court noted, repeatedly
11   said, "I can't tell you.  I'll get in trouble if I told you."
12             THE COURT:  I was going to ask you, do you have any
13   idea what that defense he wishes to assert is?
14             MR. BRUCK:   No.  The --
15             THE COURT:  I mean, he hasn't said to you, "I want
16   you to say X," and you won't do it?  He hasn't raised this
17   alternative defense with you?
18             MR. BRUCK:   Recently he has said he doesn't want us
19   to do anything.  There was a time when he had some idea of
20   presenting some sort of -- I should back up.  Mr. Roof has a
21   set of beliefs that he -- that stemmed from material that he
22   saw on racist sites on the Internet, which boiled down to --
23   their essence are that black people are engaged in a violent
24   assault and war to the death against white people, that this
25   is evidenced by black-on-white violent crime.  And that the
```

1    reason we don't all know about this is that there is a

2    conspiracy to suppress the news of this black-on-white crime.

3    It extends through all U.S. news media except for a handful

4    of racist and white nationalist websites.

5            He has recently, for example, told my cocounsel, Ms.

6    Stevens, that she should be very afraid because black people

7    are going to burn tires around her neck, as used to happen in

8    South Africa in times of unrest.  And he cannot bring himself

9    to why she is not as afraid of this as he is.  There were

10   times he thought if he could just convey the danger that

11   white people face to the jury, everything would become clear

12   to everybody, and he would be --

13           THE COURT:  I thought.  That's why I made reference

14   to the writings.

15           MR. BRUCK:  Yes, sir.

16           THE COURT:  It would be -- do you understand that

17   what he wants to do, if he could control the situation, would

18   be to justify his actions, try to justify his actions?

19           MR. BRUCK:  Yes.  But that gives it too much

20   rational credit.  What we are talking about is a paranoid

21   delusional belief system that he thinks is immediately

22   understandable.  Once it is sent out to people, that they

23   would get it.  The jury would get it, the Court would get it,

24   everybody would get it.  And part of this --

25           THE COURT:  Is he asking to assert that defense?

1          MR. BRUCK:   I'm sorry?

2          THE COURT:   Has he asked you to assert that defense?

3          MR. BRUCK:   Some months ago he asked, "Why can't we

4    present evidence of black-on-white crime?"   And we consulted

5    with a criminologist --

6          THE COURT:   Found out it was all untrue.

7          MR. BRUCK:   And it's all untrue.   But the very idea

8    that there is a higher rate of victimization of white women

9    by black men in rape cases and vice versa, and all of this

10   does not -- racist myths.   So there was a time when he

11   thought this could be done.   And I haven't heard really any

12   concrete ideas.

13         THE COURT:   Is that what you understood that he

14   didn't want to tell me, that's what he was talking about?

15         MR. BRUCK:   At this point I don't understand.   I no

16   longer know what his thinking is.   He has become much more

17   guarded about this.   His beliefs about the future are that

18   it -- he does not believe he's going to get executed, no

19   matter what sentence is imposed or what court, because he

20   firmly believes that there will be a white nationalist

21   takeover of the United States within roughly six, seven,

22   eight years, and when that happens, he will be pardoned.   And

23   he also believes it probable, although not certain, that he

24   will be given a high position, such as the governorship of

25   South Carolina.

```
 1                    THE COURT:  Is that one of his delusions?

 2                    MR. BRUCK:   Yes.  The -- we think it is.  And it's

 3       something again --

 4                    THE COURT:  How do you know that?  Has he shared

 5       that with you?

 6                    MR. BRUCK:   Yes.

 7                    THE COURT:  He has shared that?

 8                    MR. BRUCK:   He has told us that early on in

 9       representation.  I think he has gradually picked up on our

10       skepticism about that.  And it tends now to be more in the

11       category of things he can't talk about.  "I can't talk about

12       that."

13                    THE COURT:  How does all of this affect the crime to

14       which he is alleged to have committed?

15                    MR. BRUCK:   Well --

16                    THE COURT:  What is the relevance to it?

17                    MR. BRUCK:   The relevance is that he appears to

18       have been motivated by -- by a paranoid belief system that --

19       that explains, although in no sense does it legally justify

20       his what appears to be the irrationality of attacking --

21                    THE COURT:  You would wish to assert that in

22       mitigation?

23                    MR. BRUCK:   Absolutely, yes.  And clearly it is a

24       mitigating factor.  He is -- without understanding what is

25       going on inside of this young man's mind, it is the most
```

1    natural thing in the world for people to say, This is simply

2    the face of evil.  And --

3          THE COURT:  Here is my -- here is what I'm

4    struggling with.  I understand his -- his desire not to have

5    certain mitigation evidence offered.

6          MR. BRUCK:  Any.

7          THE COURT:  And I'm not -- I'm going to -- I regard

8    mitigation evidence to be a strategic call by counsel,

9    defense counsel, so that is not an issue here.  You have a

10   duty to listen to him, which you tell me you have, and he

11   told me that you have, and you all have an honest

12   disagreement.  So that defense will be offered.

13          Now, he has sought to torpedo that defense by

14   delivering a letter to the prosecutor.  Rather than mental

15   illness, it suggests to me pretty shrewd thinking.  If he

16   didn't want that defense to be asserted effectively, as you

17   would, another way would be he could testify at trial, which

18   would be his prerogative at some point if he wishes to say

19   that; of course, he may be the worst judge of whether he has

20   that condition, and that is for all the jury to evaluate.

21          But I haven't -- you know, I need to consider

22   whether it goes to his competency regarding, you know, the

23   competence for trial.  Because he has been able to

24   communicate with you and consult with you and understand and

25   assist in that he has, you know, offered his views, which

1    happen to be different from yours, but -- and he doesn't --

2    he says I understand the proceedings and I understand

3    rationally their position and mine, I just disagree with

4    them.  I have got to figure out why he's not competent.  Do

5    you hear what I'm saying?  Is that -- and I'm not saying that

6    it doesn't go to mitigate the crime, but does it render

7    him -- you know, at this point is he not capable of

8    assisting -- to communicate with counsel, to offer his views,

9    and to understand the proceedings around him?

10            MR. BRUCK:  If he is incapable of cooperating with

11    counsel, if the decisions that he is making are affected by

12    delusions, by fixed false beliefs, if they are the product of

13    mental illness, and for that reason he is attempting to

14    sabotage his defense, the mere fact that he has figured out

15    how to sabotage his defense doesn't mean that he's competent.

16    It is an illustration of why it is so terrible to try an

17    incompetent defendant.

18            THE COURT:  It's not an IQ test.

19            MR. BRUCK:  Exactly.  And it is hard to see what is

20    happening here because this is not a thought disorder.  It's

21    a little like it covers such a range of different types of

22    disability, and so do the other mental disorders, including

23    the psychotic symptoms that we think we are seeing.  Now, it

24    could be that our expert is wrong about psychosis and

25    delusions and the severity of --

1          THE COURT:  That is what jury trials are about.

2          MR. BRUCK:   I'm sorry?

3          THE COURT:  That is what a jury trial is all about.

4     You have the right to offer the evidence and the Government

5     has a right to contest it, and the jury gets all the

6     information and makes the best judgment it can.  That's what

7     we need.

8          MR. BRUCK:   Yes.  But we haven't gotten to that

9     point yet.  If he is allowed to sabotage his case in the way

10    he wants to do as a result of mental illness would actually,

11    if it didn't successfully prevent the jury from hearing the

12    evidence, it might interfere with the jury's ability to

13    credit what is, in fact, true and that would be --

14         THE COURT:  He's written the letter now.  It's a

15    statement by a party.  Obviously we don't have the Rules of

16    Evidence, other than some lesser version of 403 during

17    sentencing.  We haven't gotten to that issue yet as to

18    whether that statement is -- is admissible against him.

19         MR. BRUCK:   I have to tell you, if that letter were

20    to go into evidence we would all have to withdraw.  We would

21    have to have new counsel.  I mean, we cannot proceed as his

22    lawyer with a letter or a document or an admission in the

23    hands of the Government that the jury would see that

24    basically accuses his lawyers of --

25         THE COURT:  There are two parts of this letter:  One

1    of them is he rejects the defense and the other part is he

2    attacks the lawyers.  You can redact the part attacking the

3    lawyers.  It is not really arguably relevant.

4         MR. BRUCK:  We think that letter is evidence, given

5    his actual mental condition of incompetency.

6         Now, the point I was about to make is that I am not

7    the person to make that determination, and with all respect,

8    I don't think that the Court has the expertise to make it

9    either.  He needs an evaluation.  We have reached that point.

10        I could -- I have not yet --

11        THE COURT:  You can imagine my skepticism of the

12   timing.  I mean, I understand what happened this weekend

13   preceding that motion; but, you know, I have to add, am I

14   being played?  I mean, I think it's a fair question.  And I'm

15   not saying necessarily played by you, Mr. Bruck, I mean, is

16   the defendant playing us to disrupt the trial?

17        MR. BRUCK:  The answer to both questions is no.  We

18   have thought about the question of competency and have made

19   the judgment all the way along until this point that he had

20   not crossed the line.

21        THE COURT:  But one could -- devil's advocate for a

22   moment -- until he attacked you, you thought he was

23   competent.  As soon as he criticized you, he is incompetent.

24   I'm not saying I endorse that, I'm just --

25        MR. BRUCK:  I understand.  It wasn't that he

1    attacked us, it was that, among other things, he has formed

2    an alliance with the prosecution and has decided that Dr.

3    Dietz is his friend.  And all of this has made us realize

4    that his anxiety, his -- he also -- I mean, there is so much

5    here -- Doctor -- he really had convinced himself that when

6    Dr. Dietz shared his white nationalist beliefs and that it

7    was all part of -- and he was asking Dr. Dietz about his

8    ancestry, and the answer that Dr. Dietz gave fed into this

9    improbable schema which showed that Dr. Dietz was actually a

10   white nationalist himself.  So the sort of paranoid beliefs

11   are all turning into this enormous --

12          THE COURT:  So what do we do if he comes back --

13   let's just game this out for a moment.  I send him off to the

14   Bureau of Prisons and he comes back and he's competent.

15   Where do we go from there?

16          MR. BRUCK:  We do the best we can.  At least we

17   will then know -- I mean, there will be a hearing, we will --

18          THE COURT:  The trial may not be in this Court,

19   Mr. Bruck.  You understand that?

20          MR. BRUCK:  That's possible.

21          Now, I have to say that that would stress the

22   defendant enormously.  And I would like to tell you why:  The

23   reason it would be so distressing for the defendant to be

24   tried in state court is television cameras.  They have TV in

25   state court and they don't have TV in Federal Court.  The

1      reason television cameras --

2              THE COURT:  He's going to be -- at some point going

3      to be on TV, just like one day somebody is going to assert a

4      mental health defense.  I mean, these things are just

5      inevitable, right?

6              MR. BRUCK:   I'm trying to tell you why -- the one

7      thing we have done right by him is to take steps to increase

8      the likelihood that this case would be tried first in Federal

9      Court.  And the reason it mattered to him was that he did not

10     want the television camera trained on his face and his

11     forehead for the public and the world to see.  He could not

12     tolerate the anxiety and distress that that causes.  He is on

13     a different planet from the rest of us.

14             And finally it has reached the breaking point, in

15     the aftermath of Dr. Dietz's evaluation, where we had to

16     confront the fact that -- and with the letter that he finally

17     sent, we have had to confront the fact that our efforts to

18     keep him competent, to make him competent, to support and

19     encourage him so that he would be able to tolerate the stress

20     of this trial and he would be able to have a fair trial had

21     not been successful.   And that is the answer to the

22     question why now, why not earlier.  Had we raised this

23     earlier, we would have been running the risk that we could

24     have made it work if we hadn't, in effect, disclosed all of

25     our doubts about his mental condition early on.  So we were

1    darned if we do and darned if we didn't.  And I suppose we

2    are now darned, but this is the situation in which we find

3    ourselves.  We are most certainly not playing the Court.  And

4    I have to say that Mr. Roof most certainly wasn't.  This is

5    the last -- you know, if it were up to him, there would be no

6    discussion of his mental condition in any setting to anybody

7    ever.  And he would -- and that would be --

8          THE COURT:  Well, he indicated to me that he -- I

9    asked him, you know, I mean, he wants a trial.  He did not

10   say, "I want the death penalty."  He did not say that to me.

11   But he would rather get the death penalty than be called

12   autistic.

13         MR. BRUCK:  Yes, sir.  And I think it's very

14   important to note that he does not want to be executed.  He

15   does not want the death penalty.  That is to say he has

16   selected the goal of the representation and it is the same

17   goal that we have been working toward.

18         There were a couple of other things I should

19   mention.  Part of the reason that this has arisen as quite as

20   late in the process as it has, is that over the two-month

21   period in which the Government could have sent in Dr. Dietz

22   to do an eval, they waited until 13 days --

23         THE COURT:  I think you are kind of obsessed with

24   Dr. Dietz.  Leave that one alone.  His day of reckoning was

25   coming.

 1                    MR. BRUCK:   Whether he did anything wrong or not,

 2          this was an event which delayed --

 3                    THE COURT:  I understand.  But I'm saying to you,

 4          this reckoning with the defense counsel's defense and his

 5          self perception, I mean, from those -- from those writings, I

 6          knew he had contempt for psychiatry, and reading them would

 7          know he would be against a mental health defense.

 8                    Does he even know you are going to call him

 9          psychotic and delusional?

10                    MR. BRUCK:   He knows that we -- I mean, we were

11          going to fully lay out the details.

12                    THE COURT:  So the answer is he doesn't know yet.

13                    MR. BRUCK:   He knows that we have concerns about

14          his mental condition.  We have not spelled it out in detail.

15                    The -- I'm trying to review whether there is

16          other --

17                    THE COURT:  I take it the reason which you have not

18          done that is client management?

19                    MR. BRUCK:   Yes, sir.

20                    THE COURT:  And your good faith belief that because

21          of his mental condition, that this approach was necessary to

22          allow the best defense to be asserted that was possible?

23                    MR. BRUCK:   I think that is a fair statement, yes.

24                    THE COURT:  I asked him, Did it appear that you

25          appeared to believe the defense?  And he told me that his

1    lawyers did appear to credit the defense.  And I take it,

2    Mr. Bruck, you are not presuming to author what you would

3    regard as a fraudulent defense?

4            MR. BRUCK:   Absolutely not.

5            THE COURT:  You believe there is merit to this

6    defense?

7            MR. BRUCK:   Yes.

8            THE COURT:  This mitigation evidence?

9            MR. BRUCK:   Yes.

10           THE COURT:  And you would not offer it if you did

11   not?

12           MR. BRUCK:   That's correct.

13           THE COURT:  So your motion is what?

14           MR. BRUCK:   Our motion is that on grounds of a

15   reasonable, constant belief that the client may be

16   incompetent, that he be committed to the Bureau of Prisons

17   for an evaluation of his competency to stand trial.

18           I --

19           THE COURT:  You know, there is a state -- I just

20   want to say to you there is a state trial set in January.  He

21   may be returned and found competent by then.

22           MR. BRUCK:   We realize that.

23           THE COURT:  Okay.  Anything further?

24           MR. BRUCK:   I have not completed my listing of all

25   the --

1             THE COURT:  Psychiatric --

2             MR. BRUCK:  -- of all the indicia and evidence.  I

3    could do this in writing, I just want to be absolutely sure.

4             THE COURT:  You go ahead.  I didn't mean to cut you

5    off.

6             MR. BRUCK:  You didn't cut me off, we were just

7    engaged in dialogue.

8             THE COURT:  I want to save one more tree.

9             MR. BRUCK:  The -- I haven't talked very much about

10   his predefense medical history referred to the fact that the

11   somatic goes way back.

12            THE COURT:  You've got to remember, that goes to you

13   knew this all along and never raised it.  You see what I'm

14   saying?  This earlier information, I understand it somewhat

15   builds on itself, but I'm just saying to you, you have known

16   about all of this for a protracted period of time and never

17   within the deadlines filed a motion relating to this.

18            MR. BRUCK:  We did not -- I mean, I can explain why

19   this was -- every -- all the evidence of mental illness does

20   not suggest incompetency.

21            THE COURT:  That's absolutely true.

22            MR. BRUCK:  And it needs to rise to a certain

23   level.

24            THE COURT:  So what precisely tipped the bounds?

25            MR. BRUCK:  We think his alliance with the

1    prosecution, his belief that we were lying to him and

2    committing fraud, that we should have -- that we should be

3    disbarred, all of this -- his -- and coming with that a -- a

4    belief that -- or our perception that we no longer could

5    count on his cooperation or could have his cooperation in his

6    defense; that he, in effect, was adversary.

7        THE COURT:  How much cooperation do you need?  You

8    are already launching into an area that you don't need him.

9        MR. BRUCK:  Well, for example, if, for reasons

10   having to do with mental illness and mental disability, he

11   sets out to sabotage his defense over and over again, or even

12   as much as he's already done, that is a fairly good example

13   of a person who cannot assist his counsel.

14       THE COURT:  Or he simply disagrees.

15       MR. BRUCK:  It could be.  That's the differential

16   diagnosis; and, you know, none of us --

17       THE COURT:  I had anticipated -- I've told you

18   this -- I had anticipated that he was going to rebel against

19   your defense.  I mean, I didn't know how it was going to

20   manifest itself.  I can't say I would have guessed it through

21   a letter to the prosecutor, but I wouldn't have been

22   surprised if he stood up in the proceeding, or when I had the

23   colloquy if he wished to testify, and he say, Yes, I would

24   like to take the stand, I wouldn't be surprised that he was

25   going to voice some disagreement.

1          And I think you are not really surprised.  You've

2    had more encounters than I have.  And I have been limited to

3    these writings, but he has never kept any secret that he has

4    complete contempt for psychiatry or any diagnosis that he

5    didn't do it out of a principle, it was the principle

6    decision, that's what he wants to assert.

7          MR. BRUCK:   I don't think it can be --

8          THE COURT:  Rationally stated.

9          MR. BRUCK:   I don't think it can be that rationally

10   stated.  I know that's the way it appears.

11         THE COURT:  The writing appears to project a person

12   who is proud of what he did.

13         MR. BRUCK:   I'm not sure that that accurately

14   describes how he feels about it now.  He is -- there were

15   also, glimmering through your dialogue with him, some sort of

16   interesting clues.  He said -- you asked him did he want

17   to -- how the defense has tracked the jailhouse writing, and

18   he said --

19         THE COURT:  No.

20         MR. BRUCK:   "No, that was terrible."  And well,

21   what about the online?  "No, that was awful, too."  This has

22   to do with fixations on things that have nothing to do with

23   anything that makes sense.  The reason those writings were

24   terrible is not the ideas expressed in them, but the most

25   minute concerns about a misspelling here and sort of -- he

1    has -- he has fixations on the most trivial, and I would have

2    to say irrational concerns.  And they peek out as they did

3    during that colloquy.

4         If you have not had the benefit of my experience

5    trying to work with this young man and working with him for

6    quite a long time, you would have no reason to have realized

7    what that unexpected response portrayed.  At the same time he

8    now knows that the more he talks, the crazier he sounds to

9    people; and therefore, we get a lot of, "I can't talk."

10        THE COURT:  We could send him to the Bureau of

11   Prisons and he could refuse to talk to the psychiatrist.

12        MR. BRUCK:   I think he may be okay because it's the

13   Government.  So we'll see.  But the -- I just think it would

14   be an enormous leap at this point, and an unwise one.  And in

15   the end the -- in the end it really would not serve anybody's

16   interests, including the community and all of the people that

17   want this case to be tried right the first time.  When we are

18   dealing with a mental disorder or a mentally-inflicted

19   defendant, it's always hard, and this illustrates that.

20        And Ms. Gannett has just pointed me to *Indiana vs.*

21   *Edwards*, which makes the point that, and I quote:  "Mental

22   illness is itself not a unitary concept.  It can vary in

23   degree.  It can vary over time.  It interferes with an

24   individual's functioning at different times in different

25   ways."

1            This is complicated, and it varies over time.  There
2    were times when our relationship was less fraught than it is
3    now.  There were times when the issue of competency receded
4    far into the background.  But it has come -- it has come
5    forward now and we -- you know, I knew when we raised it that
6    you were going to have exactly the question, Well, you know,
7    it's a little late now, isn't it?  And, you know, we had to
8    respond to that.  But I've explained why we have -- why we
9    have this delay we have up until now and why we felt that it
10   would be our responsibility, not only to our client, but to
11   the Court if we had not raised the issue.  The -- I have been
12   trying to briefly summarize the history.  This has to do,
13   some of this we knew recently, some of it we've known for a
14   long while.

15           I should say that Mr. Roof has succeeded in
16   interfering with our ability for a while to gather
17   information from his family because his distress about being
18   labeled as mentally ill.  Eventually we were able to work
19   through that.  It took time.  And then we began to gather the
20   new evidence, the -- the information about his facial or his
21   dimorphic delusions about his face.  This turns out to be
22   much older than we thought.  When he was in middle school,
23   his mother now tells us that -- and that he -- she used to
24   have -- he used to tell her to speed up the car so the person
25   in the next car wouldn't pull up alongside and be able to see

his face.

We also heard from peers that he used to wear a
hoodie to disguise his face.  He began to self-medicate at
age 14 and 15 with all sorts of drugs, mostly seemed to allay
anxiety.  Others have said about him that he would hear
voices when he smoked marijuana.  We've heard from experts on
schizophrenia, that is a symptom which is consistent with the
the early stages.  We have to deal with the fact that we are
dealing with a young man who is at the stage where people who
are going to develop schizophrenia most often begin to
exhibit more fully --

THE COURT:  Do you have an expert who says he's
schizophrenic?

MR. BRUCK:   No.  We have an expert who says time
will tell.  There is reason to believe --

THE COURT:  Obviously that would be evaluated at the
time of any competency exam.

How do you feel about -- what is your recommendation
regarding this letter?  Obviously I'm not going to publically
release it.  What is your view in regard to the prosecutors
having it since it was mailed to them?

MR. BRUCK:   Well, we think nothing should be done
with the letter until the issue of competency is resolved.
We have -- for the reasons I've explained, the letter would
create an insurmountable conflict with counsel, which it

```
 1    would destroy our ability with the Court and with the jury
 2    and --
 3              THE COURT:  How about redacting or removing, only
 4    raising the issues about the defense?  I mean, I don't know
 5    why his feelings about you would be relevant in the case,
 6    frankly.  I mean, I don't know why that would be relevant at
 7    sentencing.  So what about just the information about that he
 8    considers the defense a lie?
 9              MR. BRUCK:  Well, we don't think the letter can be
10    assessed without the craziness part of it.  And calling us
11    liars and manipulators --
12              THE COURT:  I'm not going to keep it away from the
13    evaluator, I'm just saying at some point we are going to have
14    to grapple with this issue.  I don't need to do it yet, but
15    he has written a letter to the party opponent --
16              MR. BRUCK:  Yes.
17              THE COURT:  -- attacking his lawyers' defense.
18              MR. BRUCK:  Ms. Stevens points out if you look at
19    this letter carefully, there is no paragraph in it that
20    doesn't connect the lawyers with the defense.  So it is not
21    redactable.  I think we should really leave this for another
22    day.  I don't think --
23              THE COURT:  I think you are right.
24              MR. BRUCK:  I'm not prepared to brief it now.
25              The -- but in any event, we --
```

1          THE COURT:  I would be deeply reluctant to remove

2     counsel after the exhaustive work that has been done.  That

3     would be, in the experience acquired by doing that, that

4     would be, I think, very contrary to the defendant's

5     interests.  That doesn't mean that if he has made statements

6     which are potentially relevant to the sentencing that they

7     somehow should be excluded because of that.

8          MR. BRUCK:  I would be surprised if the prosecution

9     doesn't have gracious plenty along these lines from their own

10    evaluation.

11         THE COURT:  I would think that that is probably so.

12    I'm not sure how much they can use, frankly, in some of --

13    I'm not sure that it's usable in that way.  But this might

14    be, by taking it outside that evaluation, I'm talking about

15    the 1202 evaluation, it's only a limited use, right to rebut.

16    So I'm not sure if they could use it.  You might suggest that

17    in some ways his writings inferentially do the same thing,

18    they reject any mental health defense and it's all nonsense.

19    I think that is for another day.

20         I'm going to think about it.  I'm not sure sitting

21    here I know what I'm going to do.  I want to think about it

22    and consider all the standards.

23         MR. BRUCK:  There are a couple of points I would

24    like to put on the record.

25         THE COURT:  Go right ahead.  I'm sorry.

1          MR. BRUCK:   The record should reflect that Mr. Roof

2    wore a jail jumpsuit today to court, rather than dressing out

3    into his civilian clothes.  This is after untold hours of

4    discussions with us and an enormous amount of effort to

5    provide clothing that meets his -- that is satisfactory.  And

6    this is another one of those seemingly trivial issues that

7    occupies, seems to us, almost the majority of his concern

8    about these proceedings is how the -- how his sweaters feel,

9    the texture and color and how whether his pants touch his

10   shoes and exactly how they feel around his waist.  There is a

11   great deal of autistic symptomatology we are told by our

12   experts.  But after all of that, apparently the stress left

13   him, we can only surmise, unable to function and deal with

14   the simple act of changing into his court clothes today

15   because he appeared, and he thought, for jury selection in a

16   jail jumpsuit.

17          Again, I think I put on the record previously the

18   experience we had when he became so distressed over whether

19   or not he had done something wrong by turning his chair

20   180 degrees to face the Court as I had done, rather than

21   90 degrees to sit sideways.

22          THE COURT:  Well, see, that may be an argument in

23   favor of the autism mitigation evidence, it may have nothing

24   to do with whether he's competent or not.  It may have

25   nothing to do -- I mean, it's just -- it may merely buttress

1        your defense.  I'm just struggling to whether this goes to

2        competence or not.

3              MR. BRUCK:    I think the critical word on all of

4        that is may.  This is a very complex psychiatric picture with

5        evidence of delusions, evidence of severe anxiety.

6              THE COURT:  But you have known this from -- you've

7        known these delusions, you've known these neuroses, you've

8        known these obsessions for months and have never made an

9        objection, never made a motion regarding competence.

10              MR. BRUCK:    I've explained --

11              THE COURT:  I understand.  But I'm struggling and

12        I've got to work through it in my mind.  And the only change

13        that differs is this letter, and is that evidence of

14        competence or maybe evidence of a very shrewd move to further

15        his own desire that the defense not be used.

16              MR. BRUCK:    Excuse me.

17              (Pause in proceedings.)

18              MR. BRUCK:    If the Court -- not to do more briefing

19        than is required -- but if the Court does not come to, on its

20        own, to the view that we are urging, would you receive a

21        brief on a very short timeline?

22              THE COURT:  9 AM tomorrow morning.

23              MR. BRUCK:    Okay.  We'll have it.

24              THE COURT:  Anything further?

25              MR. BRUCK:    No.  Thank you, Your Honor.  I

1    appreciate your time.

2              THE COURT:  Thank you.

3                     *****     *****     *****

4

5    I certify that the foregoing is a correct transcript from the

6    record of proceedings in the above-titled matter.

7

8

9

10   --------------------------

11

12   Amy C. Diaz, RPR, CRR            November 7, 2016

13   S/  Amy Diaz

14

15

16

17

18

19

20

21

22

23

24

25