IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

United States of America,            )
                                     )
        vs.                          )        Criminal No. 2:15-472-RMG
                                     )
Dylann Storm Roof,                   )
                                     )
            Defendant.               )        **FINDINGS OF FACT AND**
                                     )        **CONCLUSIONS OF LAW**
_____      )              (Under Seal)

        This matter comes before the Court on the issue of Defendant's competency to stand trial.

On the morning of November 7, 2016, which was scheduled to be the first day of individual voir

dire for jury selection, defense counsel moved for Defendant to undergo a competency evaluation

pursuant to 18 U.S.C. § 4241 because, in defense counsel's view, Defendant was not competent

to stand trial. (Dkt. No. 652 at 42, 48-49). Following an ex parte hearing with Defendant and his

counsel on November 7, 2016, the Court ordered a competency examination and appointed Dr.

James C. Ballenger as the examiner. (Dkt. No. 559). An examiner's report was issued on

November 15, 2016, and the Court conducted a two-day evidentiary hearing on competency on

November 21-22, 2016. After carefully considering the factual record before the Court, the

relevant legal standards, and the arguments of counsel, the Court now finds and concludes that

Defendant is competent to stand trial under the standards set forth in 18 U.S.C. § 4241, as further

set forth below.

**Procedural History**

Defendant was indicted on July 22, 2016, in Charleston, South Carolina, on charges

arising from the murder of nine persons and attempted murder of three others at the Emanuel

African Methodist Episcopal Church in Charleston, South Carolina on June 17, 2015. (Dkt. No.

1). The thirty-three count indictment contained multiple potential capital offenses. On May 24,

2016, the Government filed notice of intent to seek the death penalty. (Dkt. No. 164).

The Court appointed David I. Bruck (hereafter "Lead Counsel"), an attorney with

extensive trial and appellate experience in capital cases, as lead counsel for Defendant on July

23, 2015. (Dkt. No. 11). The Court thereafter issued orders approving the associating of

additional trial counsel and the retaining of a variety of expert witnesses to assist in the defense

of this matter.   On May 25, 2016, Lead Counsel proposed a trial date of November 7, 2016.

(Dkt. No. 165). The parties thereafter conferred and on June 3, 2016, presented the Court a

proposed joint scheduling order with individual voir dire commencing on November 7, 2016.

(Dkt. No. 178, 178-1).

The Court conducted a status conference on June 7, 2016, and reviewed with the parties

in detail the various issues which would need to be addressed for a trial date of November 7,

2016. The Court then laid out a proposed scheduling order that the Court was prepared to issue.

Both defense counsel and the Government represented that they would be ready for trial and

could meet the requirements of the Court's proposed schedule. (Dkt. No. 207). The Court made

detailed inquiry regarding the parties' ability to meet the demands of the schedule and sought

assurances that nothing on the horizon would delay the trial if the Court adopted the November 7,

2016 trial date. The attorneys for the defense and the Government informed the Court that the

schedule was workable, and Lead Counsel assured the Court that there was nothing "reasonably foreseeable" that would cause a postponement of the trial. (*Id.* at 48-50).

Over the ensuing months, the parties timely met each motion deadline, with minor changes mutually agreeable to the Court and the parties. During this pretrial period, Defendant was evaluated by a number of mental health experts, reportedly related to potential Rule 12.2 mitigation evidence. At no time did defense counsel notify the Court that these experts or that they themselves questioned Defendant's competency to stand trial. Indeed, Lead Counsel assured the Court at a September 20, 2016 hearing on a suppression motion that he had advised Defendant of his right to attend the hearing and to testify and that Defendant had elected not to attend. To confirm that this waiver was knowing and intelligent, the Court asked Lead Counsel to confirm that Defendant had been apprised of his rights and that he gave a "clear and unequivocal waiver" of his rights. (Dkt. No. 437 at 4-7). Lead Counsel assured the Court that a knowing and intelligent waiver had been obtained with no suggestion that there was any question regarding Defendant's competency. At this point, Lead Counsel had represented Defendant for over fourteen months.

On November 5, 2016, the Court received notice that Defendant had written an unsolicited letter to the Government prosecutors. (Dkt. No. 546). In the letter, Defendant denounced and disavowed what he understood to be his attorneys' planned mental health mitigation defense in the sentencing phase of his trial. (Dkt. No. 545). Defendant stated that he had only recently learned of the proposed defense because "my attorneys purposely kept me in the dark." Defendant's letter characterized the mental health defense as a "lie" that had been developed by his attorneys without his consultation or approval. Defendant described the

-3-

defense as a "pathetic, fraudulent excuse for a defense in my name." (*Id.* at 2, 4). Defendant also stated in the letter that "I have no real defense . . . that my lawyers would present or would be acceptable to the Court." (*Id.* at 4). On November 6, 2016, defense counsel filed a motion to delay jury selection and to conduct an ex parte hearing to "permit the Court and counsel to address the disruption in the attorney-client relationship that the letter reveals." (Dkt. No. 544 at 1). Defense counsel argued in the motion that Defendant's letter to the Government prosecutors "raises serious questions regarding Defendant's competency." (*Id.* at 3).

After an in-chambers conference with Government and defense counsel on the morning of November 7, 2016, the Court canceled jury selection for November 7 and gave public notice that the Court proposed to close the ex parte hearing with Defendant and his attorneys later that morning and set a time to hear objections to the closing of the hearing. After receiving a number of objections from the media, the Government, and interested citizens, the Court closed the hearing after determining that the hearing would necessarily require disclosure of attorney client communications and that there was a substantial probability that the publicity surrounding an open hearing on this matter would prejudice Defendant's right to a fair trial and impartial jury at the commencement of jury selection. (Dkt. No. 560).

The Court began the ex parte hearing with Defendant and his counsel present. The Court requested that Defendant provide some explanation for the letter to the prosecutors. Defendant stated that it was his understanding that his lawyers intended to assert that he was autistic, a diagnosis which he vehemently disputed. Defendant explained that a defense claiming that he has some mental disease or defect "discredits the reason why I did the crime." (Dkt No. 652 at 5-15). Defendant further explained that he had tried to persuade his attorneys not to present the

-4-

defense and, when he was unsuccessful, he felt his best option was to send the letter to the prosecutors to sabotage the mental health mitigation defense. (*Id.* at 17, 24). Defendant stated that his feelings on this matter were so strong that he would rather face the death penalty than have the mental health mitigation evidence offered to the jury. (*Id.* at 13).[1]

Defendant was then excused from the hearing, and Lead Counsel summarized to the Court his concerns regarding Defendant's competence. Lead Counsel advised the Court that he expected to offer mental health testimony indicating that Defendant was autistic, suffered from "a severe and crippling anxiety disorder" and delusions, and was "psychotic in various respects." (*Id.* at 27-30). He asserted that Defendant now had "decisional incompetence" because he "lacks the capacity to make self protective decisions." Lead Counsel stated that based upon these findings and the defense teams observations he believed Defendant was not competent to stand trial. (*Id.* at 29-30).

When the Court pressed Lead Counsel regarding why he had withheld raising this issue until the weekend before jury selection, he indicated that the letter to prosecutors was the critical new development. Lead Counsel characterized the letter as Defendant's "alliance with the prosecution," motivated by "a paranoid belief system" and "fixed false beliefs" that now rendered him incapable of cooperating with his attorneys. These beliefs, according to Lead Counsel, "stemmed from material [Defendant] saw on racist sites on the Internet" and involved the concept that "black people are engaged in a violent assault and war to the death against white

---

[1] The Court has determined that the decisions regarding whether or not to call mental health experts and to offer evidence in support of mental health issues in the sentencing phase of a capital case are "strategic and tactical decisions" under the control of defense counsel. American Bar Association Standard 4-5.2. By separate order, the Court will address this issue more fully.

-5-

people, that is evidenced by black-on-white violent crime." Lead Counsel further pointed to Defendant's "belief that we were lying to him and committing fraud" as evidence of his lack of competency. (*Id.* at 35-36, 38-49). In short, Lead Counsel asserted that the letter itself was evidence of incompetence. (*Id.* at 42) ("We think that letter is evidence, given his actual mental condition[,] of incompetency").

In addressing a motion to order a competency examination and hold a competency hearing, the Court must consider "all evidence before it" and to "accept as true all evidence of possible incompetence." *United States v. Mason*, 52 F.3d 1286, 1290 (4th Cir. 1995). In light of those standards and the information provided by defense counsel on November 7, 2016, the Court determined it necessary to appoint an examiner to assess Defendant's competency and to conduct thereafter a full competency hearing. Consequently, on November 7, 2016, the Court designated Dr. James Ballenger as the court-appointed examiner and advised the parties that Dr. Ballenger would commence his evaluation the following day. The parties were invited to submit to Dr. Ballenger any evidence they thought potentially relevant to the competency evaluation. In the interim, the Court delayed jury selection until the competency evaluation and determination could be completed. (Dkt. No. 559).

### Legal Standard

A criminal defendant is not competent to stand trial only if the Court finds "that Defendant is presently suffering from a mental disease or defect" that renders him "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(d). The test for competency is whether the defendant "has a sufficient present ability to consult with his lawyer with a reasonable degree of rational

-6-

understanding" and "has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 402 (1960). A defendant must have the "capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). As the Supreme Court observed in *Godinez v. Moran*, 509 U.S. 389, 402 (1993), "[r]equiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel. While psychiatrists and scholars may find it useful to classify the various kinds and degrees of competence . . . the Due Process Clause does not impose these additional requirements."

It is well settled that "[n]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges. Likewise, neither low intelligence, mental deficiency, nor bizarre, volatile and irrational behavior can be equated with mental incompetence to stand trial." *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000). Defendant bears the burden of proving incompetence by a preponderance of the evidence. *United States v. Robinson*, 404 F.3d 850, 856 (4th Cir. 2005).

The issue of competence often arises in situations where the defendant disagrees with the strategy of his counsel, which then results in the defendant limiting his cooperation and/or communications with his attorney. The critical inquiry, as noted by the Fourth Circuit in *Bell v. Evatt*, is whether the defendant has "the *capacity* to understand, the *capacity* to assist, and the *capacity* to communicate with his counsel." 72 F.3d 421, 432 (4th Cir. 1995); *see also United States v. Battle*, 613 F.3d 258, 263 (D.C. Cir. 2010) (a conscious choice to not cooperate with

counsel does not demonstrate an inability to communicate); *United States v. Ghane*, 593 F.3d 775, 781 (8th Cir. 2010) (a defendant's dissatisfaction with his defense says little "about the defendant's mental competency to stand trial"); *United States v. Vachon*, 869 F.3d 653, 655 (1st Cir. 1989) ("[T]he legal question before the judge concerned not what [the defendant] did do. It concerned what he was able to do"). As the Eighth Circuit astutely observed in *Ghane*, if "disagreement with one's attorney" were grounds for incompetency, "our federal medical facilities would be full of defendants who were incompetent to stand trial." 593 F.3d at 781.

Further, a criminal defendant's advancement of "dubious legal views" and "inadvisable strategy" do not provide a reasonable basis, standing alone, to question a defendant's competence to stand trial. *United States v. Perez*, 603 F.3d 44, 47-48 (D.C. Cir. 2010). As the Seventh Circuit observed in *United States v. James*, a case in which the defendant asserted his incompetence based on his adherence to Moorish Science Temple beliefs, "[m]any litigants articulate beliefs that have no legal support–think of tax protesters who insist that wages are not income . . . or that only foreigners have to pay taxes." 328 F.3d 953, 955 (7th Cir. 2003). Such dubious legal positions, however, do not "imply mental instability or concrete intellect so deficient that trial is impossible. Airline pilots, dentists, and other persons of unquestioned competence have espoused ludicrous legal positions." *Id.* (internal citations omitted).

Moreover, a criminal defendant facing potentially severe consequences is not incompetent simply because he is unwilling to defer to his attorney's judgment regarding the best strategy for his defense. Thus, although one might argue that "a man in perilous circumstances should cooperate with his attorney," it does not follow that the reason for a defendant's "failure to do so must be that he was incompetent." *United States v. Tesfa*, 404 F. Supp. 1259, 1270

-8-

(E.D. Pa. 1975).

## The Examiner's Report

Dr. Ballenger, the court-appointed examiner, commenced his work evaluating the

competency of Defendant to stand trial on November 8, 2016, the day following his appointment.

Over the ensuing five days, Dr. Ballenger met with Defendant for approximately eight hours over

three different sessions. Examiner's Report ("Exam Rpt."), Court's Exhibit 1, at 20-43. Dr.

Ballenger also reviewed voluminous records submitted by the Court and the parties and had a

one-hour-and-forty-five minute telephone conference with defense counsel to discuss their

observations and opinions regarding their client's mental status. *Id.* at 2-8, 11-15.

Dr. Ballenger is one of the nation's most renowned and respected psychiatrists. He has

practiced psychiatry for over forty-five years and chaired the Department of Psychiatry and

Behavioral Sciences at the Medical University of South Carolina for seventeen years. Dr.

Ballenger has authored or edited 16 books and contributed to over 350 articles in the field of

psychiatry. He has extensive knowledge and experience in the diagnosis and treatment of anxiety

disorders and in psychotic disorders, including schizophrenia, areas highly relevant to

competency evaluation of this defendant. Dr. Ballenger is board certified in psychiatry and

forensic psychiatry. Ballenger Curriculum Vitae, Court Exhibit 2. He is currently engaged in the

private practice of psychiatry and consults and testifies across the country as a forensic

psychiatrist.[2]

---

[2] Defense counsel made much of the fact that Dr. Ballenger has limited experience in performing competency assessments in criminal cases. While this is certainly true, the Court regularly receives and reviews competency evaluations performed by Federal Bureau of Prisons psychiatrists and psychologists and other professionals who routinely perform competency evaluations. None of the competency evaluations the Court has previously reviewed remotely

Dr. Ballenger requested for Mark Wagner, Ph.D., head of Neuropsychology at the Medical University of South Carolina, to examine and test Defendant with a focus on his cognitive abilities, the possibility of malingering, and whether evidence of psychosis was present. Dr. Wagner met with Defendant on March 12, 2016, for four-and-a-half hours and administered several psychological tests.[3]  Wagner Report, Court Exhibit 3.  The parties also provided Dr. Ballenger with the results and raw data from personality tests Defendant had previously taken and an evaluation conducted in June 2015 by a board certified psychiatrist, Dr. Elizabeth Leonard, shortly after Defendant was arrested on the present charges.  Exam. Rpt. at 17-19, 45-46.

Based upon defense counsel's stated belief that Defendant was suffering from an undiagnosed psychosis, Dr. Ballenger carefully conducted his interviews with Defendant in an effort to determine whether there was a psychosis present.  He also requested Dr. Wagner's testing to address this issue, and reviewed prior assessments of Defendant in search of evidence suggesting the possible presence of a psychosis.

During his interviews with Dr. Ballenger, Defendant described himself as a political prisoner, similar to a Muslim extremist or Jihadist.  He readily acknowledged his crimes were racist acts undertaken for the purpose of "wak[ing] up white people to all of the violence black people are doing against white people every day." *Id.* at 22, 24, 50.  Defendant explained to Dr.

---

approach Dr. Ballenger's examiner's report for thoroughness, insight, and analysis.

[3] Dr. Wagner administered to Defendant the Wechsler Adult Intelligence Scale (WAIS-IV), Hopkins Verbal Learning Test-Revised (HVLT-R), Brief Visuospatial Memory Test-Revised (BVMT), and the Personality Assessment Inventory (PAI).  Court Exhibit 3 at 5.

Ballenger that "shooting up a [black] church was the most outrageous thing he could do and was a caricature of a racist act." *Id.* at 25. He also described himself as an admirer of Adolf Hitler. *Id.* at 24.

Dr. Ballenger questioned Defendant about why he was so resistant to a mental health defense. Defendant refused to respond directly to this question until the last portion of his third interview with Dr. Ballenger. He finally relented and explained that he hoped that one day there would be a white nationalist revolution and that if he was diagnosed as mentally ill or defective his acts in furtherance of that desired revolution would be discredited and his reputation as a "perfect specimen" would be destroyed. *Id.* at 41, 53-54.

Dr. Ballenger also pressed Defendant on whether he believed he would not be executed because he would be saved by a white nationalist revolution, which was a major point referenced by his attorneys to support their claim that he was psychotic. Defendant acknowledged that while he would welcome such an event, he recognized that the chance of this occurring was less than 0.5%. He also indicated that he hoped that one day the death penalty might be abolished. Defendant stated that he believed that if the jury imposed the death penalty there was an 85% chance it would be carried out. *Id.* at 21, 29.

Dr. Ballenger also noted throughout his many hours of interviews with Defendant that he lacked many of the classic signs of psychosis, including disorganized speech, speech abnormalities, and an inability to maintain eye contact. To the contrary, Dr. Ballenger observed that Defendant had organized thoughts and was relaxed, even humorous, in his interactions with his examiner. He presented in a way essentially opposite of what one would expect from a person suffering from a psychosis. *Id.* at 45-46. Dr. Ballenger also noted that his findings were

-11-

consistent with the findings of Dr. Wagner from his testing and interviewing of Defendant and with the findings of earlier personality testing.[4] Dr. Ballenger's findings were also consistent with the observations and conclusions reached by a psychiatrist in Defendant's initial assessment shortly after being admitted to the detention center following his arrest. *Id.* In the final analysis, Dr. Ballenger concluded with a reasonable degree of medical certainty that Defendant did not suffer from a psychotic process and offered evidence that his conduct was explainable by his "deep racial prejudice." *Id.* at 44-55.

Dr. Ballenger concluded that Defendant met the criteria for Social Anxiety Disorder, a Mixed Substance Abuse Disorder, a Schizoid Personality Disorder, depression by history, and a possible Autistic Spectrum Disorder. He noted that none of the diagnoses, except for the Social Anxiety Disorder and the possible Autistic Spectrum Disorder, had any potential impact on competency and then evaluated whether either of those two disorders presently affected Defendant's competency to stand trial. *Id.* at 55.

In evaluating Defendant's understanding of the nature and consequences of the criminal proceedings, one of the two prongs of the competency determination under § 4241, Dr. Ballenger referenced Defendant's quite striking results in his IQ tests. His overall intellectual function was a score of 125, which placed him in the 96th percentile. His verbal compression score was 141,

---

[4] Dr. Wagner described Defendant as "alert, oriented, appropriate, calm, cooperative, and friendly." He went on to state that "I felt he was free of psychosis, depression, mania and confusion." Wagner Rpt. at 5. The results of Dr. Wagner's psychological testing were similar to the results obtained by another psychologist, Daniel A. Martell, Ph.D., who analyzed tests administered to Defendant by Dr. Park Dietz, one of the Government's mental health experts, on October 26, 2016. *See* Exam Rpt. at 19. Dr. Ballenger's findings regarding the absence of psychosis are consistent with conclusions reached by Dr. Elizabeth Leonard, the psychiatrist at the detention center, after she evaluated Defendant on June 13 and 19, 2015. *Id.* at 45.

which placed him in the top 99.7th percentile. However, his processing speed was 100, which placed him in the 50th percentile. *Id.* at 17-18; Wagner Rpt. at 6. Dr. Ballenger further noted that Defendant was able to describe in detail the various aspects of the criminal proceeding. Thus, he concluded that with a reasonable degree of medical certainty that Defendant was "able to understand the nature and consequences of the proceedings against him." *Id.* at 58.

Dr. Ballenger then addressed in some detail the claims of defense counsel that Defendant's mental health status rendered him unable to assist appropriately in his defense. He rejected the claim of defense counsel that difficulties in the working relationship between attorney and client were caused by a psychotic process, because Dr. Ballenger found that no psychotic process was present. Dr. Ballenger also concluded that the difficulties between Defendant and his lawyers "almost completely" arose out of "his profound racial prejudice which does interfere with . . . his cooperation with his defense team." *Id.* at 63-66. Dr. Ballenger further observed that prior to being informed of the nature of his attorneys' planned mental health defense, Defendant had cooperated extensively with counsel, including reviewing exhibits and witness summaries. *Id.* at 61.

Defendant's letter to the prosecutors clearly presented difficulties in the working relationship between attorneys and client, Dr. Ballenger noted, but arose out of Defendant's deeply held feelings that he did not want his lawyers to present a mental health defense. Dr. Ballenger observed that Defendant's letter to prosecutors, rather than reflecting mental incompetence, "could be described even as a brilliant maneuver to allow him to effectively block what his attorneys were doing that he did not wish them to do. Writing the letter was a creative, well-reasoned and articulated maneuver and is an example of his ability to work in the court

-13-

room, albeit not always in concert with his attorneys." *Id.* at 61-62.

Dr. Ballenger indicated, however, that he was unable to personally make a factual determination regarding the degree of difficulty Defendant was experiencing by his appearance and conduct in the courtroom. Defense counsel asserted to Dr. Ballenger that Defendant was incompetent to stand trial because he was, allegedly, unable to communicate with attorneys in the courtroom or would present to the jury an "unflattering image" because of his social anxiety or Autism. Dr. Ballenger indicated that he had no way to assess Defendant's ability to function in the courtroom and deferred findings on that matter to the Court. *Id.* at 59-66.

### The Competency Hearing

The Court began the competency hearing by reminding counsel of the standards for incompetency under 18 U.S.C. § 4241 and the need to offer evidence relevant to those standards. In an effort to maintain a proper focus on competency, rather than unrelated mental health issues, the Court directed that each expert witness, after being qualified as an expert, first answer two questions:

1.  Do you have an opinion within a reasonable degree of medical or scientific certainty that the Defendant suffers from a mental disease or defect and, if so, state with specificity what the mental disease or defect is.

2.  Do you have an opinion within a reasonable degree of medical and scientific certainty that due to a mental disease or defect the Defendant does not have the sufficient present capacity to understand the proceedings and/or to assist counsel, and, if so, in what specific ways does the Defendant not understand the proceedings and/or cannot consult his attorneys or otherwise not assist properly in

-14-

his defense.  Competency Hearing Transcript, Day 1, at 4-5.

Over two full days, the Court received testimony from four experts.  These included (1) the court appointed examiner, Dr. James Ballenger; (2) an examining forensic psychiatrist retained by Defendant, Dr. Donna Maddox; (3) a psychologist retained by Defendant, William Stejskal, Ph.D; and (4) an Autism expert retained by Defendant, Laura Carpenter, Ph.D. Defendant, with the consent of the Government, presented the testimony of three additional witnesses by affidavit: (1) an Autism expert who examined Defendant, Rachel Loftin, Ph.D.; (2) a person diagnosed with Autism who met with the Defendant and his counsel on November 5, 2016, Mr. John Elder Robison; and (3) a psychologist who commented on some of the limitations of personality testing, John Edens, Ph.D.

It is instructive that of the six witnesses offered by Defendant in support of the claim of incompetency, five of them gave no opinion regarding whether any mental disease or defect rendered Defendant either unable to understand the proceedings or assist his counsel.[5]  One of the Autism experts, Dr. Carpenter, provided the Court background information regarding Autism but offered no opinions regarding the Defendant because she had not examined him.  Competency Hearing, Day 2 at 139-189.  Another Autism expert, Dr. Loftin, who had examined the Defendant, offered the opinion by affidavit that the Defendant had Autism but offered no opinion regarding whether his condition had any effect on his competency to stand trial. Defendant's Exhibit 12.  Another defense witness, Dr. Stejskal, attempted to conduct a competency evaluation of the Defendant but he refused to cooperate in the evaluation.  Nonetheless, Dr. Stejskal offered an opinion that the Defendant suffered from a psychotic process but was

---

[5] Only Dr. Maddox offered an opinion regarding competency.

-15-

unwilling to render an opinion that such an alleged psychosis affected the Defendant's competence. Competency Hearing, Day 2 at 189-244.[6]

The first day of the competency hearing was spent taking the testimony of Dr. Ballenger. The Court conducted brief initial questioning of Dr. Ballenger, which allowed him to set forth his qualifications and respond to the two questions presented to each expert witness. Dr. Ballenger responded to those question consistent with his examiner's report summarized above. Defense counsel then engaged in hours of cross examination, questioning Dr. Ballenger in detail about his background, prior testimony in various criminal cases, and facts large and small from the voluminous records defense counsel delivered to Dr. Ballenger for review. When the questioning finally turned to competency issues, Dr. Ballenger clearly and persuasively explained his opinions.

The second day of the competency hearing began with the testimony of Dr. Maddox, a forensic psychiatrist who had examined Defendant seven times before he sent the letter to prosecutors complaining about the defense strategy. Dr. Maddox conceded that prior to the letter being sent to the Government prosecutors, she did not question Defendant's competency to stand

_____

[6] Defense counsel complained that this weak evidentiary showing was the fault of the Court because the jury selection process (which had already involved summoning nearly 800 prospective jurors to the courthouse to complete a detailed, case specific questionnaire) should have been canceled and the Court should have sent the Defendant to the Bureau of Prisons for an evaluation that would have taken several months. Defense counsel have requested over the last year the Court's approval of costs for numerous mental health experts, none of which have been denied or limited in any way. Further, although defense counsel complained they did not have adequate time to prepare for the competency hearing, they had at least five, and sometimes six, attorneys in the competency hearing and had extensively researched the court examiner's background and prior testimony from across the country. The weakness of the defense presentation was the result not of inadequate time or resources, but the absence of credible facts to support a claim of incompetency.

-16-

trial. *Id.* at 101. She met with Defendant twice after he sent the letter to prosecutors, and found him angry and in an agitated state because of his recent discovery of his attorneys' plans to assert a mental health defense over his strenuous objections. Dr. Maddox described Defendant's words and conduct after learning of his lawyers' plans as reflecting paranoia because he believed his attorneys had schemed behind his back to develop a mental health defense. *Id.* at 47-48, 74-75, 78, 80. However, taking into consideration Defendant's stated political ideology and his stated purpose for committing the crimes for which he is charged, Defendant's response seems to the Court entirely predictable. Defendant's belief that there was an undisclosed plan by his lawyers and experts to assert a mental health defense without his knowledge from the inception of the plan has a reasonable amount of evidentiary support, making the characterization of his views as paranoia unpersuasive to the Court.[7] The practical reality is that the assertion of a mental health defense, which the Court believes any competent attorney would offer in this situation, would almost inevitably produce conflict and stress between this defendant and his lawyers. The fact that Defendant now resents the defense and is angry at his counsel is not a proper basis to declare Defendant incompetent to stand trial.

Dr. Maddox also testified that Defendant did not have a realistic understanding that he faced the death penalty because he was operating under the belief that he would be saved from that fate by a white nationalist revolution. *Id.* at 21. Dr. Ballenger closely questioned the Defendant on this issue, and Defendant stated that he fully appreciated that if a death sentence

---

[7] The Court does not question defense counsel's judgment or strategy regarding the use of mental health mitigation evidence or their approach to managing their client. This situation is challenging in the hands of the most skilled practitioner, and defense counsel have done their very best under trying circumstances.

-17-

were imposed that he would likely be executed. Exam. Rpt. at 29. As discussed below, Defendant was questioned by the Court on this issue, and the Court was persuaded that Defendant understands the seriousness and gravity of the risk of death as an outcome of his criminal trial.

The balance of the defense testimony, whether presented live in court or by affidavit, offered no expert opinions regarding Defendant's ability to understand the proceedings or his ability to assist counsel. The Court found the evidence offered regarding Autism interesting and potentially important as mitigation evidence, but never received any significant evidence that if Defendant indeed has this condition that it presently affects his understanding of the proceedings or his ability to assist counsel in his defense. As mentioned earlier, Dr. Stejskal's diagnosis of a psychotic disorder, when his visits were limited to a sixteen-minute encounter on one day and an encounter a second day that never apparently went beyond small talk before Defendant terminated the session, is less than impressive. *Id.* at 196, 203-213.[8]

---

[8] Dr. Stejskal was asked to offer an opinion regarding two thirty-minute videos of conversations between Defendant and his parents that occurred on November 19, 2016. Dr. Stejskal offered the opinion that the Defendant sounded "pre-psychotic or on the way to becoming fully psychotic." Competency Hearing, Day 2 at 231. The Court has viewed those videos in full and had the impression that Defendant was acting out because he was aware that he was being recorded. An example of this was when he indicated to his father he was unaware of what a courtroom was and what a judge did. Defendant thereafter informed his father of the pending competency hearing on Monday and, since it would be closed, it did not matter that he was wearing his jail jumpsuit. The Court is aware from its own questioning of the Defendant and from Dr. Ballenger's examination that Defendant has a reasonable understanding of the proceedings against him, including what a courtroom is and what a judge does. Dr. Ballenger observed in his evaluation that Defendant enjoyed "messing with" his evaluators, feigning to hold some view or having some thought he really did not have. Defendant acknowledged in the competency hearing that Dr. Ballenger's observations about him "messing" with people is something he enjoys doing. *Id.* at 247. Defendant also testified in the competency hearing that he intentionally acted abnormally on the videotaped visits with his parents because he knew he was being recorded. *Id.* at 246. Based upon Dr. Ballenger's careful evaluation of Defendant, the

After the presentation of the various defense witnesses, Defendant asked the Court if he could respond to the testimony without being subject to cross examination. The Government agreed that only the Court would question Defendant. In the course of his testimony, Defendant confirmed the accuracy of Dr. Ballenger's report, specifically that he fully understood the nature and consequences of the proceedings and had the capacity to communicate and assist his attorneys if he chose to do so. *Id.* at 257. Defendant confirmed that he was deeply angered by his attorneys' insistence on asserting a mental health defense and this was the source of the present conflict between himself and his defense team. He also indicated that he was fully capable of communicating with his attorneys in the courtroom by note or verbal communication.
*Id.* at 249-50, 256-57.

The Court closely questioned Defendant about whether he understood the potential risk presented by the imposition of a death sentence in his case. He confirmed that he appreciated the real risk that he would be executed if a death sentence were imposed by the jury and that he had little realistic hope that he could be saved by a white nationalist revolution or any other development. *Id.* at 254-55. Defendant's demeanor throughout the two-day competency hearing was calm and attentive, and he spoke to the Court with clear and coherent language and thoughts. His presentation and demeanor suggested to the Court no psychosis or severe mental distress. In sum, Defendant's presentation raised not the slightest question or concern regarding his competency to stand trial.

---

Court's questioning of Defendant, and the full record in this matter, including the viewing of the videotapes in question, the Court is satisfied that Defendant understands the nature and consequences of the proceedings against him and has the capacity to assist his counsel in his defense. *Id.* at 257; Exam. Rpt. at 58.

-19-

**Findings of Fact**

Based upon the full record presented at the competency hearing of November 21-22, 2016, the Court makes the following findings of fact by a preponderance of the evidence:

1.     Defendant does not presently suffer from any form of psychosis, and his diagnoses are limited to Social Anxiety Disorder, possible Autistic Spectrum Disorder, Mixed Substance Abuse Disorder, depression by history and Schizoid Personality Disorder. In reaching this conclusion, the Court gives the greatest weight to the findings of the Court's examiner, which are carefully and persuasively documented in his examiner's report. Further, Dr. Ballenger's findings are corroborated by the findings from personality testing and by previous examinations conducted by Dr. Elizabeth Leonard.

2.     Defendant's present resistance to the proposed mental health defense of his attorneys arises out of his political ideology, rather than any form of mental disease or defect.

3.     Defendant possesses a reasonable and sufficient understanding of the criminal proceedings, including the respective roles of the participants in the proceedings, the nature of the charges against him, and the potential consequences, including the possible imposition of the death penalty.

4.     Although Defendant hopes for some development that might end his exposure to a death sentence, such as the emergence of a white nationalist government that might pardon him or the abolition of the death penalty, he understands that he faces a high risk of execution if a jury returns a death sentence against him.

5.     The difficulties that Defendant and his counsel are presently experiencing arise out of his strong opposition to the assertion of a mental health defense and his attorneys'

-20-

insistence that mental health issues be presented to the jury in the mitigation phase of the trial, if that becomes necessary.

6.      Defendant's recent conduct before the Court clearly demonstrates that his social anxiety and his possible Autism do not prevent him from communicating with his counsel by note or verbally in the courtroom.  Any communication difficulties arise out of Defendant's dissatisfaction with his attorneys' defense strategy and are a conscious decision within the control of Defendant.  Defendant clearly has the capacity to communicate effectively with his counsel if he chooses to do so.

7.      Defendant's social anxiety has clearly decreased in the courtroom as he has had greater exposure, which Dr. Ballenger explained in his report was to be expected.  The Court has carefully observed Defendant while he has sat at counsel table and when he has spoken to the Court.  He is able to communicate cogently and effectively.  The Court finds that neither Autism nor anxiety prevents Defendant from understanding court proceedings or assisting his counsel in the courtroom or elsewhere.

8.      Defendant possesses the present capacity to understand court proceedings and to assist his counsel in every aspect of their representation.

### Conclusions of Law

Based upon the foregoing, the Court concludes the following as a matter of law:

1.      Defendant does not suffer from any mental disease or defect which renders him unable to understand the nature and consequences of the proceedings against him.

2.      Defendant does not suffer from any mental disease or defect which renders him unable to assist properly in his defense.

3.      Defendant is competent to stand trial under the standards set forth in 18 U.S.C. § 4241.

## Conclusion

Based upon the findings of fact and conclusions of law set forth above, the Court finds that Defendant has not carried his burden of demonstrating by the preponderance of the evidence that he is not competent to stand trial.

AND IT IS SO ORDERED.

Richard Mark Gergel
United States District Judge

November 25, 2016
Charleston, South Carolina

-22-