## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Criminal No. 2:15-472-RMG |
| | ) | |
| v. | ) | **ORDER AND OPINION** |
| | ) | |
| Dylann Storm Roof. | ) | |
| | ) | |

This matter is before the Court on Defendant's motion to dismiss the indictment (Dkt. No. 233). For the reasons set forth below, the Court denies the motion.

## I.    <u>Background</u>

On the evening of June 17, 2015, the Reverend Clementa Pinckney led a Bible study group at Emanuel African Methodist Episcopal Church ("Mother Emanuel"), attended by eleven other participants. (Dkt. No. 1 ¶ 7.) All were African-Americans. (*Id.*) Allegedly, Defendant Dylann Roof had decided to murder African-Americans while they worshipped in church to resist racial integration and to avenge wrongs committed against white people—and chose Mother Emanuel as his target because of its national prominence as the first independent African-American congregation in the South. (*See id.* ¶¶ 3–6.) That evening, he entered Mother Emanuel with a concealed Glock pistol and several magazines loaded with hollow-point bullets. (*Id.* ¶ 8.) The worshippers welcomed him into their Bible study group. (*Id.* ¶ 9.) After being welcomed to join them in prayer, he drew his pistol and murdered the Reverend Sharonda Coleman-Singleton, Cynthia Hurd, Susie Jackson, Ethel Lee Lance, the Reverend DePayne Middleton-Doctor, the Reverend Clementa Pinckney, Tywanza Sanders, the Reverend Daniel Simmons, Sr., and Myra Thompson, and attempted to murder Felicia Sanders, Polly Sheppard, and a child, K.M. (*Id.* ¶¶ 9–10.)

A month later, a federal grand jury returned a 33-count indictment charging Defendant with multiple counts of five offenses:

- Counts 1–9 allege racially motivated hate crimes resulting in death, in violation of 18 U.S.C. § 249(a)(1);

- Counts 10–12 allege racially motivated hate crimes involving an attempt to kill, in violation of 18 U.S.C. § 249(a)(1);

- Counts 13–21 allege obstruction of religious exercise resulting in death, in violation of 18 U.S.C. § 247(a)(2);

- Counts 22–24 allege obstruction of religious exercise involving an attempt to kill using a weapon, in violation of 18 U.S.C. § 247(a)(2); and

- Counts 25–33 allege use of a firearm to commit murder during a crime of violence prosecutable in federal court, in violation of 18 U.S.C. §§ 924(c) and (j).

    (Dkt. No. 1.)

Defendant has moved to dismiss the indictment.  (Dkt. No. 233.)  He argues § 249 is an unconstitutional exercise of congressional authority under the Thirteenth Amendment, § 247 is an unconstitutional exercise of congressional authority under the Commerce Clause, and the alleged violations of §§ 247 and 249 are not crimes of violence within the meaning of § 924(c).

## II.    **Legal Standard**

A motion to dismiss an indictment tests whether the indictment sufficiently charges the offense the defendant is accused of committing. *United States v. Vanderhorst*, 2 F. Supp. 3d 792, 795 (D.S.C. 2014).  Generally, a district court may not dismiss an indictment on a determination of facts: "a challenge to the sufficiency of the indictment . . . is ordinarily limited to the allegations contained in the indictment." *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) (internal

-2-

quotation marks omitted). To obtain dismissal of an indictment, therefore, a defendant must show

the allegations, even if true, fail to state an offense. *United States v. Thomas*, 367 F.3d 194, 197

(4th Cir. 2004).

## III.    Discussion

### A.    Charges Under 18 U.S.C. § 249(a)(1)

The Thirteenth Amendment, Section 1, provides, "Neither slavery nor involuntary

servitude, except as a punishment for a crime whereof the party shall have been duly convicted,

shall exist within the United States, or any place subject to their jurisdiction." Section 2 of the

Amendment provides Congress "power to enforce this article by appropriate legislation." The

Supreme Court has held Section 2 "clothed Congress with power to pass *all laws necessary and*

*proper for abolishing all badges and incidents of slavery in the United States*." *Jones v. Alfred H.*

*Mayer Co.*, 392 U.S. 409, 439 (1968) (quoting *Civil Rights Cases*, 109 U.S. 3, 20 (1883)) (internal

quotation marks omitted).

Section 4707 of the Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act of

2009 (the "Hate Crimes Act"), codified at 18 U.S.C. § 249, in relevant part provides,

> Whoever, whether or not acting under color of law, willfully causes bodily injury
> to any person or, through the use of fire, a firearm, a dangerous weapon, or an
> explosive or incendiary device, attempts to cause bodily injury to any person,
> because of the actual or perceived race, color, religion, or national origin of any
> person—
>
>      . . .
>
>      (B) shall be imprisoned for any term of years or for life . . . if—
>
>           (i) death results from the offense; or
>
>           (ii) the offense includes kidnapping or an attempt to kidnap,
>           aggravated sexual abuse or an attempt to commit aggravated sexual
>           abuse, or an attempt to kill.

18 U.S.C. § 249(a)(1).[1] When enacting the Hate Crimes Act, Congress found

> (7) For generations, the institutions of slavery and involuntary servitude were defined by the race, color, and ancestry of those held in bondage. Slavery and involuntary servitude were enforced, both prior to and after the adoption of the 13th amendment to the Constitution of the United States, through widespread public and private violence directed at persons because of their race, color, or ancestry, or perceived race, color, or ancestry. Accordingly, eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude.

Hate Crimes Act, Pub. L. 111–84, div. E, § 4702, 123 Stat. 2835, 2836 (Oct. 28, 2009). Congress also found that "[s]tate and local authorities are now and will continue to be responsible for prosecuting the overwhelming majority of violent crimes in the United States, including violent crimes motivated by bias." *Id.* Hence the Attorney General must certify that state authorities have no jurisdiction over an offense, that state authorities have requested a federal prosecution, that a state prosecution has failed, or that a federal "prosecution is in the public interest and necessary to secure substantial justice" before prosecuting an offense under § 249. 18 U.S.C. § 249(b)(1).

Defendant argues Counts 1–12 of the indictment, which charge violations of § 249(a)(1), are invalid for two reasons: Congress exceeded its authority under Section 2 of the Thirteenth Amendment when enacting § 249(a)(1) and the Attorney General's certification in this case is invalid. For the reasons set forth below, the Court holds that the Thirteenth Amendment authorizes § 249(a)(1) and that the Attorney General's certification in this case is valid.

**1.    Constitutionality of 18 U.S.C. § 249(a)(1)**

Defendant raises two distinct arguments against the constitutionality of § 249(a)(1). First, he argues § 249(a)(1) is not "appropriate legislation" enforcing the Thirteenth Amendment

---

[1] Section 249(a)(2) prohibits identical acts when motivated by "actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person crimes" and when the acts have a nexus with interstate commerce. Enacted under Commerce Clause authority, it is not at issue in this case.

"[b]ecause it fails to respect the [states'] police power" by regulating conduct that states traditionally regulate. (Dkt. No. 233 at 16.)   Second, he presents a means-ends rationality argument: "Because of its lack of relationship to effectuating the goals of § 1 of the Thirteenth Amendment, Section 249(a)(1) is not authorized by § 2 [of the Thirteenth Amendment]." (*Id.* at 20.)   Both arguments share the common factual premise that there was "no need for federal intervention" because states were adequately punishing racially motivated crimes. (*Id.* at 17.) The first argument implies an additional factual premise that § 249(a)(1) somehow interferes with state police powers to conclude that § 249(a)(1) violates a rule against unjustified interference with state police powers. The second argument essentially argues for application of the *City of Boerne v. Flores* "congruence and proportionality" test to legislation enforcing the Thirteenth Amendment and concludes § 249(a)(1) lacks the requisite "congruence" to Section 1 of the Amendment. (*See id.* at 19–20.)

The Court finds no merit in Defendant's federalism argument. Defendant does not attempt to explain how § 249(a)(1) "fails to respect" states' police powers. "Federal laws criminalizing conduct within traditional areas of state law, whether the states criminalize the same conduct or decline to criminalize it, are of course commonplace under the dual-sovereign concept and involve no infringement *per se* of states' sovereignty in the administration of their criminal laws." *United States v. Johnson*, 114 F.3d 476, 481 (4th Cir. 1997). Indeed, Congress intended the Hate Crimes Act to *assist* states' efforts against hate crimes and found that federal jurisdiction over hate crimes would assist those efforts:

> (3) State and local authorities are now and will continue to be responsible for prosecuting the overwhelming majority of violent crimes in the United States, including violent crimes motivated by bias. These authorities can carry out their responsibilities more effectively with greater Federal assistance.
>
> . . .

-5-

(9) Federal jurisdiction over certain violent crimes motivated by bias enables Federal, State, and local authorities to work together as partners in the investigation and prosecution of such crimes.

(10) The problem of crimes motivated by bias is sufficiently serious, widespread, and interstate in nature as to warrant Federal assistance to States, local jurisdictions, and Indian tribes.

Hate Crimes Act § 4702.

Given those congressional findings, with no substantive argument to the contrary, the Court finds § 249(a)(1) does not interfere with states' police powers. It is indeed difficult to imagine how a federal prohibition against hate crimes could interfere with a state's prohibition of the same conduct.

Even if § 249(a)(1) did somehow interfere with state police powers, Defendant does not explain how that could be problematic if the Thirteenth Amendment otherwise authorizes the statute. Defendant simply offers *Medina v. California* for the proposition "that crime prevention as well as criminal prosecution are police powers; these are state powers not to be infringed by the Federal Government." (Dkt. No. 233 (purporting to quote 505 U.S. 437, 445 (1992).)[2] But *Medina* does not contain the language Defendant purports to quote, nor does it contain any remotely similar language, nor does it address states' "police powers" at all. Rather, it holds that a California statute placing the burden of proof in competency hearings on the defendant comports with due process, in part "because the States have considerable expertise in matters of criminal procedure and the criminal process is grounded in centuries of common-law tradition, it is appropriate to exercise substantial deference to [state] legislative judgments in this area." *Medina*, 505 U.S. at 437. The Hate Crimes Act subjects certain private conduct to federal criminal penalty—it does not regulate

---

[2] The quotation Defendant attributes to the Supreme Court actually is from a footnote in a student's law review note: Ana Maria Gutierrez, *The Sixth Amendment: The Operation of Plea Bargaining in Contemporary Criminal Procedure*, 87 Denv. U. L. Rev. 695, 700 n.45 (2010).

-6-

state criminal procedures in any way. Further, powers the Constitution grants to Congress necessarily are not powers the Constitution exclusively reserves to the states. *United States v. Comstock*, 560 U.S. 126, 143–44 (2010). The Thirteenth Amendment grants Congress authority to enact "appropriate legislation" to abolish all "badges and incidents" of slavery. *Jones*, 392 U.S. at 409. Whether appropriate legislation in some way touches on police powers is immaterial. *Cf. Cleveland v. United States*, 329 U.S. 14, 19 (1946) ("The power of Congress over the instrumentalities of interstate commerce is plenary; it may be used to defeat what are deemed to be immoral practices; and the fact that the means used may have 'the quality of police regulations' is not consequential."). Defendant's federalism argument, ultimately, is but academic speculation. *Cf.* Jennifer McAward, *The Scope of Congress's Thirteenth Amendment Enforcement Power After City of Boerne*, 88 Wash. U.L. Rev. 77, 141 (2010) (speculating that Thirteenth Amendment legislation "raises a separate federalism concern, namely, that Congress *could* attempt to transform the Thirteenth Amendment enforcement power into a general police power at the expense of the states," which "*potentially* fosters a situation in which the federal government *could* stray beyond its enumerated powers" (emphasis added)).

Defendant's means-ends argument is more substantial but ultimately unpersuasive. In *Jones*, the Supreme Court held 42 U.S.C. "§ 1982 prohibits *all* racial discrimination, private as well as public, in the sale or rental of property, and that the statue, thus construed, is a valid exercise of the power of Congress to enforce the Thirteenth Amendment" because "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery." 392 U.S. at 413, 440. Defendant concedes—as he must—that standard governs Congress's authority under Section 2 of the Thirteenth Amendment. (*See* Dkt. No. 233 at 17.) *Jones* explicitly applies the *McCulloch* standard of rationality—appropriate means, legitimate

-7-

ends—to the Thirteenth Amendment's enforcement section. 392 U.S. at 443 (citing *McCulloch v. Maryland*, 17 U.S. 316, 421 (1819)). Defendant again concedes—as he again must—that the *McCulloch* standard controls here. (*See* Dkt. No. 233 at 18.) But he implicitly argues later decisions have "clarified," as the Government puts it, the *McCulloch* standard of appropriate means, legitimate ends to mean "tailored to a current need."[3] (*Id.* at 18–20.) In other words, Defendant does not argue *Jones* has been abrogated by later cases; rather, he argues the Court should read *Jones* consistently with later cases, where possible.

The Court agrees *Jones* should be read as consistent with later Supreme Court decisions if possible. But to the extent that *Jones* cannot be reconciled with later cases, the Court must adhere to *Jones*. The Supreme Court's "decisions remain binding precedent until [it] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Hohn v. United States*, 524 U.S. 236, 252–53 (1998). For that reason, the Court rejects Defendant's attempt to impose *Northwest Austin*'s and *Shelby County*'s current needs test on legislation enforcing the Thirteenth Amendment. *See Shelby Cty., Ala. v. Holder*, 133 S. Ct. 2612, 2622 & n.1, 2627–29 (2013) (holding the "current burdens" imposed upon states by a statute directly regulating state action, which was enacted under the Fourteenth and Fifteenth Amendments, must be justified by "current needs"); *Nw. Austin*, 557 U.S. at 203. Although the

---

[3] In support of this argument, Defendant again misattributes language to the Supreme Court. Defendant quotes "[P]rophylactic legislation designed to enforce the Reconstruction Amendments must 'identify conduct transgressing the . . . substantive provisions' it seeks to enforce and be tailed 'to remedying or preventing such conduct" as a holding of *Northwest Austin*, but that language is from Justice Thomas's dissent. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 225 (2009) (Thomas, J., concurring in the judgment in part and dissenting in part). Further, the ellipsis in the internal quotation (present in the dissent) from *City of Boerne* (via a block quotation in *Fla. Prepaid Postsecondary Ed. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 639 (1999)) omits "Fourteenth Amendment's"—an omission that implies *City of Boerne* applies to the Thirteenth Amendment.

congressional finding that there is a current need for federal hate crime legislation is compelling, congressional authority under the Thirteenth Amendment to prohibit hate crimes is not contingent on any current need. Rather, it is contingent on whether the prohibited conduct can rationally be described as a badge or incident of slavery.[4] *Jones*, 392 U.S. at 440. A total cessation of hate crimes would not compel the courts to strike down federal hate crime prohibitions as needless legislation, because that cessation could not change the historical facts of slavery in the United States.

The Government goes further to argue decisions construing congressional authority to enforce the Fourteenth Amendment are necessarily inapposite to congressional authority to enforce the Thirteenth Amendment because they rest on federalism concerns created by federal regulation of state action. (Dkt. No. 34–35.) But the relevant reasoning in the relevant Fourteenth Amendment case—*City of Boerne*—concerns separation of powers, not federalism. *See* 521 U.S. at 519–20. The gravamen of the *City of Boerne* challenge to § 249(a)(1) is that Congress's power to enforce the Reconstruction Amendments—which share essentially identical enforcement clauses—"is 'remedial,' not 'substantive'; that is, Congress does not have the authority to enforce an interpretation of the Constitution that is different from the interpretation that the Court itself would adopt." Ernest A. Young, *Is the Sky Falling on the Federal Government?  State Sovereign Immunity, the Section Five Power, and the Federal Balance*, 81 Tex. L. Rev. 1551, 1570 (2003). That the Fourteenth Amendment applies to state action whereas the Thirteenth Amendment may apply to private conduct is not essential to the argument. Congress, the argument goes, cannot enact whatever may be "appropriate" to enforce its own interpretation of the Constitution because

---

[4] Moreover, the "current need" inquiry in *Shelby County* was driven by a perceived need to justify "current burdens" on states with "current needs." As explained above, the Hate Crimes Act imposes no burden upon states.

such authority would be boundless. Because the power to enact appropriate enforcement legislation is only remedial, "[t]here must be a congruence and proportionality between" that legislation and the judicially recognized right being enforced. *City of Boerne*, 521 U.S. 518–20.

The concepts of congruence and proportionality are interrelated but separable. Congruence describes the relationship between means and ends. It requires that Congress "must identify conduct transgressing the Fourteenth Amendment's substantive provisions"—as interpreted by the judiciary—and "must tailor its legislative scheme to remedying or preventing such conduct." Evan H. Caminker, *"Appropriate" Means-Ends Constraints on Section 5 Powers*, 53 Stan. L. Rev. 1127, 1148 (2001). Proportionality additionally requires that "[t]he appropriateness of remedial measures must be considered in light of the evil presented. Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one." *City of Boerne*, 521 U.S. at 530.

A superficial tension exists between the language of *Jones* and the language of *City of Boerne* regarding congruence:

> Surely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation.

*Jones*, 392 U.S. at 440.

> Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause. Congress does not enforce a constitutional right by changing what the right is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the "provisions of [the Fourteenth Amendment]."

*City of Boerne*, 521 U.S. at 519.

But it would be incorrect to read *Jones* as holding Congress determines what constitutes a violation of the Thirteenth Amendment, contrary to the later holding from *City of Boerne* regarding the

-10-

Fourteenth Amendment. *Jones* does not suggest Congress, rather than the judiciary, is responsible for interpreting the Thirteenth Amendment. The sentence following the above excerpt from *Jones* explains:

> Nor can we say that the determination Congress has made is an irrational one. For this Court recognized long ago that, whatever else they may have encompassed, the badges and incidents of slavery—its "burdens and disabilities"—included restraints upon those fundamental rights which are the essence of civil freedom, namely, the same right . . . to inherit, purchase, lease, sell and convey property, as is enjoyed by white citizens.
>
> *Jones*, 392 U.S. at 440–41.

*Jones* accords with the congruence test later set forth in *City of Boerne*. The Supreme Court interpreted the Constitution to recognize a right—the abolition of (the right to be free from) what may rationally be described as a badge or incident of slavery—and it held a statute to be tailored to the enforcement of that right. *Id.* Any tension between *Jones* and *City of Boerne* regarding the need for congruence between the Thirteenth Amendment's substance—the abolition of slavery— and legislation enforcing abolition is merely semantic. In 1968, the abolition of the badges and incidents of slavery was loftily described as "plainly adapted" to an end that "'is legitimate' . . . 'because it is defined by the Constitution itself. The end is the maintenance of freedom.'" *Jones*, 392 U.S. at 443–44 (quoting Cong. Globe, 39th Cong., 1st Sess. 1118 (1866) (statement of Rep. Wilson)). In 1997, it would have been blandly described as "congruence . . . between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne*, 521 U.S. at 520.[5]

---

[5] *Jones* thus differs from, for example, *Katzenbach v. Morgan*, in which the Supreme Court held that the appropriateness of federal legislation enforcing the Fourteenth Amendment should be judged "[w]ithout regard to whether the judiciary would find that the Equal Protection Clause" is violated by the challenged state legislation. 384 U.S. 641, 649–50 (1966). That reasoning may indeed be difficult to reconcile with *City of Boerne*, but that is not the analysis *Jones* applied to enforcement of the Thirteenth Amendment.

Proportionality is a balancing test applicable "where a law significantly implicates competing constitutionally protected interests in complex ways." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 402 (2000). As explained above, there are no constitutionally protected interests competing with the Hate Crimes Act. "The proportionality component of *Boerne* is necessary only because the Court did not limit Congress strictly to prohibiting state conduct that a court would find unconstitutional." *Young, supra*, at 1577. Where there is nothing to balance, the proportionality component of *Boerne* is inapplicable. *See, e.g.*, *United States v. Beebe*, 807 F. Supp. 2d 1045, 1050–51 (D.N.M. 2011) (holding the Hate Crimes Act constitutional under the Thirteenth Amendment, in part by construing *City of Boerne*'s proportionality test as inapplicable to legislation targeting conduct that is *per se* unconstitutional).

*City of Boerne* thus fully accords with *Jones*—at least regarding § 249(a)(1). Legislation enforcing the Thirteenth Amendment is congruent with Section 1 of the Amendment when it targets rationally identified badges and incidents of slavery. Where, as with the Hate Crimes Act, the targeted conduct is private conduct that is *malum in se*, there are no competing constitutionally protected interests and hence no meaningful proportionality analysis. The Court need not address whether *City of Boerne* proportionality or *McCulloch* legitimate ends, appropriate means would apply to some other statute enforcing the Thirteenth Amendment that does implicate a competing constitutional interest, but observes in passing that *stare decisis* almost certainly would compel the application of the *McCulloch* standard explicitly adopted by the controlling *Jones* decision.

## 2.    Racial violence as a badge and incident of slavery

In enacting § 249(a)(1), Congress found that "[s]lavery and involuntary servitude were enforced, both prior to and after the adoption of the 13th amendment . . . through widespread public and private violence directed at persons because of their race, color, or ancestry, or perceived race, color, or ancestry" and that "eliminating racially motivated violence is an important

-12-

means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude." Hate Crimes Act § 4702. Defendant has not challenged the identification of racially motivated violence as a badge and incident of slavery, which indeed seems inarguable. *See, e.g., Beebe*, 807 F. Supp. at 1051–52 ("A cursory review of the history of slavery in America demonstrates that Congress' conclusion is not merely rational, but inescapable."). Nonetheless, to complete the analysis of the constitutionality of § 249(a)(1), the Court will briefly address whether racially motivated violence is rationally identified as a badge or incident of slavery in the United States.

Slavery in the United States was a "system made up of various component parts." *Id.* at 1051; *see also* Darrell A.H. Miller, *The Thirteenth Amendment and the Regulation of Custom*, 112 Colum. L. Rev. 1811, 1848 (2012) ("Slavery is not unitary; it is a bundle of disabilities, bound together by conventions."). Those parts, collectively, are the badges and incidents of slavery, and "[o]f the two attributes of slavery identified as badges and incidents, the 'incidents' of slavery had a far more definite and accepted legal sense than the 'badges.'" George Rutherglen, *The Badges and Incidents of Slavery and the Power of Congress to Enforce the Thirteenth Amendment*, in Promises of Liberty: The History and Contemporary Relevance of the Thirteenth Amendment 163, 164 (Alexander Tsesis ed. 2010). Incidents of slavery were the legal "disabilities imposed upon slaves in different southern states." *Id.* "Badges of slavery" was a phrase more common to antebellum political discourse than legal discourse. *Id.* at 166. It commonly referred to political subjugation. *Id.* at 166–67. Early judicial opinions construing congressional authority to enforce the Thirteenth Amendment nonetheless construed "badges" and "incidents" narrowly and synonymously, reasoning that the badges and incidents of slavery were merely those rights enjoyed by free blacks but not black slaves. *See Civil Rights Cases*, 109 U.S. at 25. But in *Jones*, the

Supreme Court recognized white supremacy—the political subjugation of African-Americans, including free blacks—as an essential custom for the maintenance of slavery and its continued existence as a "relic" of slavery:

> Just as the Black Codes, enacted after the Civil War to restrict the free exercise of those rights, were substitutes for the slave system, so the exclusion of Negroes from white communities became a substitute for the Black Codes. And when racial discrimination herds men into ghettos and makes their ability to buy property turn on the color of their skin, then it too is a relic of slavery.
>
> Negro citizens, North and South, who saw in the Thirteenth Amendment a promise of freedom—freedom to "go and come at pleasure" and to "buy and sell when they please"—would be left with "a more paper guarantee" if Congress were powerless to assure that a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands of a white man. At the very least, the freedom that Congress is empowered to secure under the Thirteenth Amendment includes the freedom to buy whatever a white man can buy, the right to live wherever a white man can live. If Congress cannot say that being a free man means at least this much, then the Thirteenth Amendment made a promise the Nation cannot keep.

392 U.S. at 441–43 (footnotes omitted).

Post-*Jones*, the "badges of slavery" have been construed as "the customs that formed and maintained this institution." *See* Miller, *supra*, at 1838, 1845–46. Such customs include housing discrimination, educational discrimination, employment discrimination, and racially motivated violence. *See, e.g.*, *Runyon v. McCrary*, 427 U.S. 160, 173–75 (1976); *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975); *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971); *Jones*, 392 U.S. at 413; *United States v. Cannon*, 750 F.3d 492, 505 (5th Cir. 2014); *United States v. Hatch*, 722 F.3d 1193, 1206 (10th Cir. 2013); *United States v. Nelson*, 277 F.3d 164, 190–91 (2d Cir. 2002). Such customs also include attacks on African-American churches. Indeed, Defendant was not the first person to attack Mother Emanuel in an effort to promote white supremacy. Mother Emanuel was founded in 1816 in protest to a white congregation's plan to build a garage on a black cemetery. Douglas R. Egerton, *The Long, Troubled History of Charleston's Emanuel AME Church*, New Republic, June 18, 2015. Charleston authorities

repeatedly closed the church—arresting and whipping congregants—because the church taught literacy to African-Americans, a threat to the institution of slavery. *Id.* In 1822, it was burned for suspected involvement with the Denmark Vesey slave revolt. Emanuel AME Church, *Church History*, http://www.emanuelamechurch.org/churchhistory.php (last visited Nov. 3, 2016). In 1834, all black churches in Charleston were outlawed as threats to slavery, and the congregation could only meet in secret. *Id.*

Another prominent badge of slavery was the ineffectiveness of laws protecting African-Americans even when such laws existed. *See, e.g.*, *North Carolina v. Boon*, Tayl. 246 (1801) (vacating conviction for murder of a slave because statutory provision that any person who "wilfully and maliciously kill[s] a slave . . . shall be adjudged guilty of murder, and shall suffer the same punishment as if he had killed a free man" was, somehow, too vague to enforce). As stated in an 1827 abolitionist treatise,

> [If murder of slaves were legal, t]he very being of the slave would be in the hands of the master. Such is not the case on the contrary, from the laws which I shall cite, it will be fully evident *that so far as regards the pages of the statue book*, the life at least of the slave, is safe from the *authorized* violence of the master. The evil is not that laws are wanting, but that they cannot be enforced—not that they sanction crime, but that they do not punish it.
>
> George M. Stroud, *Sketch of the Laws Relating to Slavery in the Several States of the United States of America* 36 (1827).

That evil—failure to punish the violence the law forbids when that violence serves the cause of white supremacy—is exactly what § 249(a)(1) remedies. It allows federal prosecution of racially motivated violent crimes when state efforts would not fully vindicate federal interests in eradicating such crimes and in securing substantial justice. *See* 18 U.S.C. § 249(b)(1). The Court therefore holds § 249(a)(1) is an attempt to abolish what is rationally identified as a badge or incident of slavery in the United States.

### 3.    The Attorney General's certification

As a prerequisite to any prosecution under § 249(a), § 249(b)(1) requires the Attorney General to certify that state authorities lack jurisdiction or have requested federal jurisdiction, that a state prosecution has failed to vindicate federal interests in eradicating hate crimes, or that a federal prosecution "is in the public interest and necessary to secure substantial justice." The Attorney General certified this prosecution "is in the public interest and necessary to secure substantial justice and the state lacks jurisdiction to bring a hate crime prosecution." (Dkt. No. 1 at 14.) Defendant challenges both the validity of the certification requirement and the validity of the certification in this case.

Defendant's constitutional challenge to the certification requirement presumes application of *Northwest Austin*'s and *Shelby County*'s current needs test to Thirteenth Amendment enforcement legislation. If that test were applicable here, and if the certification requirement were necessary to satisfy that test, then the certification requirement might be constitutionally relevant. But, as explained above, the historical facts of slavery, not current needs, justify legislation enforcing the Thirteenth Amendment. Certainly, the certification requirement more closely tailors the statute to a particular badge of slavery—ineffective enforcement of laws where the victims are African-Americans. But the certification requirement is not essential to the constitutionality of the statute because racially motivated violence is a rationally identified badge or incident of slavery. Further, the Hate Crimes Act's prohibition of racially motivated violence imposes no cognizable burden needing justification.

The intended goal of the certification requirement is, as Defendant asserts, "to 'ensure the federal government will assert its new hate crimes jurisdiction only in a principled and properly limited fashion.'" (Dkt. No. 233 at 20 (quoting H.R. Rep. No. 111-86, at 14 (2009)).) The intended means of achieving that is "a full and careful evaluation of any proposed prosecution by both career

-16-

prosecutors and by officials at the highest level in the Department . . . before Federal charges are brought." *The Matthew Shepard Hate Crimes Prevent Act of 2009: Hearing Before the S. Comm. on the Judiciary*, 111th Cong. 171 (2009) (statement of Attorney General Eric H. Holder); *cf.* 18 U.S.C. § 245(a)(1) (similarly requiring certification that a federal prosecution "is in the public interest and necessary to secure substantial justice" and explicitly forbidding delegation of the certification to lower-level officials). Nonetheless, the Fourth Circuit held the very similar certification requirement in 18 U.S.C. § 5032, prohibiting federal prosecution of juveniles unless the Attorney General certifies one or more enumerated bases for a federal prosecution, including, *inter alia*, "a substantial Federal interest in the case or the offense," requires courts to "review[] the stated reasons underlying the government's decision to proceed in federal court" against a juvenile because of a substantial federal interest in the case. *United States v. Juvenile Male No. 1*, 86 F.3d 1314, 1321 (4th Cir. 1996). The Court is compelled to agree with the Eastern District of Virginia that, "[r]egardless of the slight differences in the statutes, *Juvenile Male* opens the door to review the Attorney General's certification under the [Hate Crimes Act]." *United States v. Hill*, --- F. Supp. 3d ----, 2016 WL 1650767, at *3 (E.D. Va. Apr. 22, 2016).

But the Court also agrees that the "scope of review, however, is limited" and that the "Attorney General's decision to certify . . . deserves great deference." *Id.* at *4. No authority suggests certification restricts federal hate crimes prosecutions by requiring the Government to prove triable facts to the Court's satisfaction. The Government, not the Court, decides whether to prosecute a case. *See Greenlaw v. United States*, 554 U.S. 237, 246 (2008). Even in *Juvenile Male*, the Fourth Circuit did not remand the case to the district court for fact finding regarding the decision to proceed in federal court because an indictment charging six federal felonies, including murder and carjacking, was a substantial federal interest as a matter of law. 86 F.3d at 1321. The

-17-

thirty-three federal felonies charged against Defendant—a mass murder at a historic African-American church for the avowed purpose of reestablishing the white supremacy that was the foremost badge of slavery in America—implicate a substantial federal interest in eradicating the badges and incidents of slavery and are therefore a substantial federal interest, which would not be vindicated by an ordinary murder prosecution. (*See* Dkt. No. 1 at 14 (certifying that South Carolina lacks jurisdiction to bring a hate crimes prosecution).).

**B.      Charges Under 18 U.S.C. § 247(a)(2)**

The Commerce Clause provides Congress with power "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., art. I, § 8. The Necessary and Proper Clause provides Congress with power "To make all Laws shall be necessary and proper for carrying into Execution the foregoing Powers," which include the Commerce Clause. *Id.* The Supreme Court has "identified three broad categories of activity that Congress may regulate under its commerce power." *United States v. Lopez*, 514 U.S. 549, 558 (1995). Congress may (1) regulate the use of the channels of interstate commerce, (2) regulate and protect the instrumentalities of interstate commerce, and (3) regulate activities that have a substantial effect on interstate commerce. *Id.* at 558–59.

Section 3 of the Church Arson Prevention Act of 1996 (the "Church Arson Act") amended 18 U.S.C. § 247 to provide, in relevant part,

> (a) Whoever, in any of the circumstances referred to in subsection (b) of this section—
>
>      . . .
>
> (2) intentionally obstructs, by force or threat of force, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so;
>
> shall be punished as provided in subsection (d).

(b) The circumstances referred to in subsection (a) are that the offense is in or affects interstate or foreign commerce.

. . .

(d) The punishment for a violation of subsection (a) of this section shall be—

> (1) if death results from acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, a fine in accordance with this title and imprisonment for any term of years or for life, or both, or may be sentenced to death;

Church Arson Act, Pub. L. 104-155 § 3, 110 Stat. 1392, 1392–93 (July 3, 1996); *see* 18 U.S.C. § 247. Defendant argues Counts 13–24 of the indictment, which charge violations of § 247, are invalid because Congress exceeded its Commerce Clause authority when enacting § 247 and because the alleged connections between Defendant's offenses and interstate commerce are insufficient to place Defendant's offenses within the scope of the Commerce Clause. For the reasons set forth below, the Court holds § 247 is constitutional facially and as applied in this case.

## 1.    Facial validity of 18 U.S.C. § 247(a)(2)

Defendant asserts facial and as-applied challenges to § 247(a). Defendant argues the statute is facially invalid because it unauthorized by the Commerce Clause. "Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." *United States v. Morrison*, 529 U.S. 598, 607 (2000). Section 247(a) was enacted under Congress's power to regulate interstate commerce, enumerated in the Commerce Clause.[6] As noted above, the Commerce Clause authorizes three categories of legislation. *Lopez*, 514 U.S. at 558. Congress may regulate the use of the channels of interstate commerce, which are "interstate transportation routes through which persons and goods move." *Morrison*, 529 U.S. at 613 n.5. These channels

---

[6] Section 247(c), authorized by the Thirteenth Amendment, only concerns damage to real property and is not at issue in this case. *See* 18 U.S.C. § 247(c); Church Arson Act § 2(6), 110 Stat. at 1392.

include highways and telecommunications networks. *United States v. Ballinger*, 395 F.3d 1218, 1225–26 (11th Cir. 2005) (en banc). Congress may regulate and protect the instrumentalities of interstate commerce, which "are the people and things themselves moving in commerce, including automobiles, airplanes, boats, and shipments of goods." *Ballinger*, 395 F.3d at 1226. "Instrumentalities of commerce include, as well, pagers, telephones, and mobile phones." *Id.* (internal quotation marks omitted). Finally, Congress can regulate activities that have a substantial effect on interstate commerce. *Lopez*, 514 U.S. at 558–59. The effect a prohibited activity has on interstate commerce is evaluated under a four-factor test: (1) whether the prohibited activity is economic in nature, (2) whether the statute under consideration has an "express jurisdictional element" ensuring, through case-by-case inquiry, that particular offenses affect interstate commerce, (3) whether there are "any express congressional findings regarding the effects upon interstate commerce," and (4) whether the link between the prohibited conduct and interstate commerce is attenuated. *Morrison*, 529 U.S. at 609–613.

Defendant's arguments for the facial invalidity of § 249(a) merely track *Morrison*'s four-factor "substantial effect" test—tacitly presuming the inapplicability of the first two *Lopez* categories. (*See* Dkt. No. 233 at 5–15 (arguing that § 247(a) prohibits a non-economic activity, that its jurisdictional element is defective, that it is not supported by congressional findings regarding interstate commerce, and that the link between attacks on churches and interstate commerce is attenuated).) That presumption is unwarranted by statutory text prohibiting attacks "in or affect[ing] interstate or foreign commerce." 18 U.S.C. § 249(b). "The 'in commerce' language denotes the first two *Lopez* categories—regulation of the channels and of the instrumentalities of commerce. The 'affecting commerce' language invokes the third *Lopez* category—regulation of intrastate activities that substantially affect commerce." *Ballinger*, 395

-20-

F.3d at 1231. Defendant attempts to "read the 'in commerce' language out of the statute altogether." *Id.* at 1235. But if the prohibited act is "in" interstate commerce, then Congress has authority to prohibit it—an act "in" interstate commerce does not *also* need to have a substantial effect on interstate commerce to fall within Commerce Clause jurisdiction. *See id.* at 1230–31; (*see also* Dkt. No. 233 at 7 (Defendant apparently conceding this point)). Likewise, a prohibited act that is not "in" interstate commerce nonetheless may be prohibited if it substantially affects interstate commerce.

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Defendant's facial challenge to § 247(a) requires him to establish that under no circumstances could an attack on a church be in or substantially affect interstate commerce. That is an impossible burden. One could of course use the channels or instrumentalities of interstate commerce to attack a house of worship—for example, by mailing a bomb to a church. *See Ballinger*, 395 F.3d at 1237 (noting defendant-appellant's concession that "sending a bomb to a church by mail would place that offense in commerce, since the mail is an instrumentality of commerce"). Congress has authority to prohibit use of the mail to attack churches—just as it may prohibit use of the interstate highway system, national telecommunications networks, or the interstate market in firearms and ammunition to attack churches. Defendant asserts no contrary argument.

It also appears evident that one could substantially affect interstate commerce by attacking a church without using channels or instrumentalities of interstate commerce—for example, by attacking a church of national importance, such as Mother Emanuel. Defendant however argues that attacks on churches never satisfy the four-factor *Morrison* test for substantial effects on

.

-21-

interstate commerce. He begins by correctly observing that attacks on churches are not a type of economic activity, just as gender-motivated violence is not. In *Morrison*, the Supreme Court held the Commerce Clause did not authorize the Violence Against Women Act, which provided a civil cause of action to victims of gender-motivated violence. 529 U.S. at 618–19. The Violence Against Women Act had no jurisdictional provision requiring case-by-case proof of a sufficient interstate commerce nexus. *Id.* at 613. But § 247 does have a jurisdictional element, restricting it to conduct that has a sufficient nexus with interstate commerce. 18 U.S.C. § 247(b). Statutes prohibiting noncommercial conduct that include such jurisdictional elements are universally upheld as within Congress's Commerce Clause powers. *See, e.g.*, *United States v. Runyon*, 707 F.3d 475, 489–90 (4th Cir. 2013); *United States v. Coleman*, 675 F.3d 615, 619 (6th Cir. 2012); *United States v. Gould*, 568 F.3d 459, 470 (4th Cir. 2009); *Ballinger*, 395 F.3d at 1229; *United States v. Gilbert*, 181 F.3d 152, 158 (1st Cir. 1999); *United States v. Cobb*, 144 F.3d 319, 321 (4th Cir. 1998); *United States v. Bailey*, 112 F.3d 758, 767 (4th Cir. 1997); *United States v. Wells*, 98 F.3d 808 (4th Cir. 1996); *United States v. Baker*, 82 F.3d 273, 275 (8th Cir. 1996).

Perhaps recognizing that a valid jurisdictional element is fatal to his argument, Defendant further argues § 247's jurisdictional element is itself defectively overbroad because it identifies "*all* the ways in which Congress may exercise its Commerce Clause power." (Dkt. No. 233 at 7.). That argument is baffling. Congress explicitly stated its intent to reach "any conduct which falls within the interstate commerce clause of the Constitution." H.R. Rep. No. 104–621, at 7 (1996). The jurisdictional element would be overbroad only if it encompassed conduct *beyond* Congress's

Commerce Clause power. Defendant apparently concedes § 247's jurisdictional element does not

extend beyond the Commerce Clause.[7]

Defendant also correctly observes that Congress did not enact detailed factual findings

regarding the effect of church arsons on interstate commerce, though such findings were discussed

on the floor:

> Congress also has authority under the commerce clause to enact this legislation. As the record makes clear, the churches, synagogues, and mosques that have been the targets of arson and vandalism, serve many purpose. On Saturdays or Sundays, there are places of worship. During the rest of the week, they are centers of activity. A wide array of social services, such as inoculations, day care, aid to the homeless, are performed at these places of worship. People often register to vote, and vote at the neighborhood church or synagogue. Activities that attract people form a regional, interstate area often take place these places of worship. There is ample evidence to establish that Congress in regulating an activity that has a "substantial effect" upon interstate commerce.

142 Cong. Rec. S6522 (daily ed. June 19, 1996) (statement of Senator Kennedy).

Regardless, such findings are not required. *Lopez*, 514 U.S. at 562 ("Congress normally is not

required to make formal findings as to the substantial burdens that an activity has on interstate

commerce."). Congressional findings may weigh in favor of the validity of a statute, but the

absence of findings regarding interstate commerce cannot weigh against the validity of a statute.

*See id.* at 562–63.

Defendant's final argument is that the connection between an attack on a church and

interstate commerce is too attenuated for the attack to create a substantial effect on interstate

---

[7] Defendant's additional argument that the jurisdictional element is void for vagueness is without merit. (*See* Dkt. No. 233 at 14–15.) A criminal statute is void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008). There is no suggestion that § 247(a)'s prohibition on attacking churches is so vague that an ordinary person could not understand what is prohibited. It is not necessary for a defendant to have had knowledge of the interstate commerce nexus. *United States v. Darby*, 37 F.3d 1059, 1067 (4th Cir. 1994).

commerce. That argument is really part of his as-applied challenge, considered below. (*See* Dkt. No. 233 at 9–10 (citing facts regarding the attack on Mother Emanuel to argue attenuation in the link between that attack and interstate commerce).) To the extent Defendant raises the argument as a facial challenge, he elides the true question: although "the fact that a building is a church . . . is not sufficient to establish a substantial effect on interstate commerce" (Dkt. No. 233 at 10), the question is whether it is *possible* for an attack on a church to be in or affect interstate commerce. Congress may prohibit attacks on churches when the attacks have a nexus with interstate commerce—attacks that use interstate channels and instrumentalities of commerce subject to congressional regulation, and attacks that substantially affect interstate commerce. A statute is not facially invalid under the Commerce Clause simply because it protects churches.

Section 247 was originally enacted in 1988 "to expand the circumstances under which there could be federal prosecution for religiously motivated violence that crossed state lines." H.R. Rep. 104-621, at 3–4. The original enactment was "totally ineffective" with only one prosecution brought in an eight-year period—despite an epidemic of attacks on African-American churches in same period. *Id.*; 142 Cong. Rec. S6520–22. At hearings investigating the ineffectiveness of § 247 against increasing numbers of attacks on churches, the Department of Justice cited an "interstate commerce requirement that goes well beyond constitutional necessity" as a major impediment to prosecutions under § 247. H.R. Rep. 104–621, at 8 (statement of the Department of Justice). With the Church Arson Act of 1996, Congress amended the statute's jurisdictional provision to match similar provisions in other federal criminal statutes. *Id.* at 8–9; 142 Cong. Rec. S6521–22. To comply with *Lopez*, it provided a jurisdictional provision requiring case-by-case proof of an interstate commerce nexus. H.R. Rep. 104-621, at 7. Every reviewing appellate court has confirmed its constitutionality. *Ballinger*, 395 F.3d at 1229–30; *United States v. Grassie*, 237 F.3d

1199, 1208–09 (10th Cir. 2001). Defendant urges a dissenting construction of the Commerce Clause to reverse that amendment so that—after twenty years—the statute would again be a "totally ineffective" protection for African-American churches. The Court declines to do so.

**2.     Validity of 18 U.S.C. § 247(a)(2) as applied to Defendant**

Defendant's as-applied challenge is that even if the connections between interstate commerce and the charged offenses alleged in the indictment and further detailed in the bill of particulars ordered on Defendant's motion are assumed true, they are insufficient to place Defendant's offenses within the scope of the Commerce Clause. Defendant's argument is simply that he did not engage in interstate travel. According to Defendant, a noneconomic crime in South Carolina, committed by a South Carolina resident, and using items purchased in South Carolina, lacks an interstate commerce nexus sufficient for federal jurisdiction.

For purposes of a motion to dismiss, the Court assumes the Government's allegations to be true. *Thomas*, 367 F.3d at 197. The Government alleges Defendant attacked a worship service at Mother Emanuel, a church of national importance. (Dkt. No. 1 ¶ 3–6.) He used the internet to identify Mother Emanuel as his target, and he explained his motives via a manifesto on a website hosted by a Russian company. (Dkt. No. 277 ¶ 10.) He used the interstate highway system to travel to Mother Emanuel. (*Id.* ¶ 3.) Once there, he killed nine people by firing bullets that had traveled in interstate commerce from a handgun that had traveled in interstate commerce. (*Id.* ¶¶ 5, 7). The alleged nexuses with interstate commerce are sufficient to survive a motion to dismiss. *See, e.g., United States v. MacEwan*, 445 F.3d 237, 245 (3d Cir. 2006) ("[T]he Internet is an instrumentality and channel of interstate commerce."); *United States v. Gallimore*, 247 F.3d 134, 138 (4th Cir. 2001) ("[T]he Government may establish the requisite interstate commerce nexus by showing that a firearm was manufactured outside the state where the defendant possessed it.").

**C.    Violations of § 247 and § 249 as crimes of violence under § 924(c)**

The indictment charges nine counts of use of a firearm to commit murder during a crime

of violence prosecutable in federal court, in violation of 18 U.S.C. §§ 924(c)(3) and 924(j).  (Dkt.

No. 1, Counts 25–33.)  Section 924(c)(3) provides, in relevant part, that a person who discharges

a firearm during a "crime of violence" prosecutable in federal court shall be sentenced to a term

of imprisonment of not less than ten years.  Section 924(j) provides,

> Any person who, in the course of a violation of subsection (c), causes the death of
> a person through the use of the firearm, shall – (1) if the killing is a murder (as
> defined in section 1111), be punished by death or by imprisonment for any term of
> years or for life.

18 U.S.C. § 924(j).  The Government alleges the violations of § 249(a)(1) charged in Counts 1–9

and the violations of § 247(a)(2) charged in Counts 13–21 are qualifying predicate "crimes of

violence."  (Dkt. No. 1 ¶ 20.)  Defendant argues that, as a result of the Supreme Court's decision

in *Johnson v. United States*, 135 S. Ct. 2551 (2015), offenses under § 249(a)(1) or § 247(a)(2)

cannot qualify as "crimes of violence" within the meaning of § 924(c) and that Counts 25–33

therefore must be dismissed.

Title 18 U.S.C. § 924 is a complex amalgamation of two enactments.  *Johnson* concerned

§ 924(e), part of the Armed Career Criminals Act, as amended, which defines "violent felony."

135 S. Ct. at 2555–56.  Defendant is charged under § 924(c), part of the Gun Control Act of 1968,

as amended, which defines "crime of violence."  Both subsections have a "force clause" and a

"residual clause."  Section 924(c)(3) defines "crime of violence":

> For purposes of this subsection the term "crime of violence" means an offense that
> is a felony and--
>
>> (A) has as an element the use, attempted use, or threatened use of physical
>> force against the person or property of another, or

> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Section 924(e)(2)(B) defines "violent felony":

> (B) the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that--
>
> > (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
> >
> > (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another; and

Sections 924(c)(3)(A) and 924(e)(2)(B)(i) are the "force clauses" and §§ 924(c)(B) and

924(e)(2)(B)(ii) are the "residual clauses." As seen above, the respective forces clauses are

identical regarding force used against persons.[8]

---

[8] The different terms used in § 924 for predicate offenses—"crime of violence" and "violent felony"—are artifacts of overlapping legislative histories. Section § 924(c) is part of the Gun Control Act of 1968, a response to the assassinations of President John F. Kennedy, Senator Robert F. Kennedy, and the Reverend Martin Luther King. *United States v. Rawlings*, 821 F.2d 1543, 1545 n.6 (11th Cir. 1987). In 1984, Congress rewrote the statute and introduced the term "crime of violence." Pub. L. No. 98-473, § 1005(a), 98 Stat. 1976, 2138–39; S. Rep. No. 98-225, at 312–13 (1983). In 1986, Congress again amended the statute to define "crime of violence" as a felony that has as an element the use of physical force. Pub. L. No. 99-308, § 104(a)(2), 100 Stat. 449, 456–57 (1986). Meanwhile, in 1981, Senator Arlen Specter, motivated by the belief that a small number of habitual offenders commit a large proportion of crimes, introduced legislation to target career criminals. 129 Cong. Rec. 22,669–72 (1981) (statement of Sen. Specter). His proposal was eventually enacted in 1984 as the Armed Career Criminal Act. In 1986, after much debate, Congress settled on the term "violent felony" rather than "crime of violence" for predicate offenses under that act because "crime of violence" was recognized to encompass violent misdemeanors and § 924(e)'s penalties were too harsh to be triggered by such predicate crimes—even though the definition of "crime of violence" in § 924(c) had just been restricted to felonies. *See Hearing on H.R. 4768, the Career Criminal Amendments Act of 1986: Hearing Before the Subcomm. on Crime of the H. Comm. on the Judiciary*, 99th Cong. 21–224 (1986) (statement of Dep. Asst. Att'y Gen. James Knapp); *id.* 33–34 (statement of Bruce Lyons, National Association of Criminal Defense Lawyers); *id.* 42–47 (1986) (statement of Sen. Specter). Congress adopted a definition of "violent felony" that borrowed the force clause enacted into § 924(c) a few months earlier. *See* Career Criminals Amendment Act of 1986, § 1402(b), 100 Stat. 3207-39, 3207-39–3207-40 (1986).

*Johnson* held the § 924(e)(2)(B)(ii) residual clause to be unworkably vague under the "categorical approach" analysis required under Section 924(e). "Under the categorical approach, a court assesses whether a crime qualifies as a violent felony in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." *Johnson*, 135 S. Ct. at 2557 (internal quotation marks omitted). That is because "Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions." *Taylor v. United States*, 495 U.S. 575, 600 (1990). Also, it is impracticable for courts to reconstruct the conduct underlying prior convictions, which may occurred long ago and which may rest on guilty pleas. *Johnson*, 135 S. Ct. at 2562. "[T]he only plausible interpretation of the law, therefore, requires use of the categorical approach." *Id.* (internal quotation marks omitted). That approach "requires a court to picture the kind of conduct that the crime involves in 'the ordinary case,' and to judge whether that abstraction presents a serious potential risk of physical injury." *Id.* at 2557. In *Johnson*, the Supreme Court was "convinced that the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges. Increasing a defendant's sentence under the clause denies due process of law." *Id.*

Textual differences between the § 924(c) and § 924(e) residual clauses might be "crucial in determining whether the holding in *Johnson* reaches § 924(c)(3)"—a question now pending before the Supreme Court. *United States v. Moreno-Aguilar*, --- F. Supp. 3d ----, 2016 WL 4089563, at *2 (D. Md. Aug. 2, 2016); *see Lynch v. Dimaya*, 803 F.3d 1110 (9th Cir. 2015), *cert. granted*, 195 L. Ed. 2d 902 (U.S. Sept. 29, 2016) (No. 15-1498) (granting writ of certiorari on same question regarding identical language in 18 U.S.C. § 16(b)). But although *Johnson* held the

§ 924(e) residual clause to be void for vagueness, it did not consider the force clause. 135 S. Ct.

at 2563 ("Today's decision does not call into question application of the Act to the four enumerated

offenses, or the remainder of the Act's definition of a violent felony."). If the Hate Crimes Act and

Church Arson Act charges at issue here qualify as crimes of violence under § 924(c)'s identical

force clause, *Johnson* is irrelevant. For the reasons set forth below, the Court holds that the Hate

Crimes Act and Church Arson Act charges against Defendant do qualify as crimes of violence

under § 924(c) and so issues regarding residual clauses and *Johnson* are irrelevant to this case.

### 1.    Violation of § 249(a)(1) as a crime of violence under § 924(c)(3)(A)

To determine whether the charges under the Hate Crimes Act charge crimes of violence,

the Court applies the categorical approach, relying only on the elements of the charged offenses

and not the particular facts of any case.[9] An offense is a crime of violence if all conduct prohibited

by the statute falls within § 924(c)(3)(A)'s definition of a crime of violence, *i.e.*, it requires the

use, attempted use, or threatened use of "physical force" against another person. In the context of

the force clause, "the phrase 'physical force' means violent force—that is, force capable of causing

physical pain or injury to another person." *[Curtis] Johnson v. United States*, 559 U.S. 133, 140

(2010) ("*Curtis Johnson*").

The elements of the § 249(a)(1) offenses at issue are: (1) willful causation (2) of bodily

injury (3) because of actual or perceived race, color, religion, or national origin (4) resulting in

death. 18 U.S.C. § 249(a)(1). Defendant argues those elements prohibit conduct not requiring

---

[9] One court in this Circuit has recently held "the 'categorical approach' . . . does not apply when determining whether a crime . . . qualifies as a crime of violence pursuant to § 924(c)." *United States v. Jimenez-Segura*, --- F. Supp. 3d ----, 2016 WL 4718949, at *11 (E.D. Va. Sept. 8, 2016). That position appears foreclosed by *United States v. Fuertes*, 805 F.3d 485, 497–99 (4th Cir. 2015), *cert. denied sub nom. Ventura v. United States*, 136 S. Ct. 1220 (2016), and the parties appear to agree that the categorical approach applies here (*see* Dkt. No. 233 at 24; Dkt. No. 279 at 51).

violent force because the requisite bodily injury might be too mild to have been caused by violent force, or because bodily injury might be caused by some other "nonviolent" means. (Dkt. No. 233 at 26–27.) He cites *United States v. Torres-Miguel* for the proposition that the statute defining a crime of violence must require the "use of force" and not merely the "result of injury." 701 F.3d 165, 169 (4th Cir. 2012). *Torres-Miguel* held a California statute criminalizing threats to commit crimes that would result in bodily injury is not categorically a crime of violence because it does not require a threat to *use* physical force. *Id.* For example, one might threaten to engage in negligent conduct that would result in bodily injury. *Cf. Leocal v. Ashcroft*, 543 U.S. 1, 11 (2004) (negligence is not a "use" of physical force). According to Defendant, § 249(a) prohibits conduct that results in injury without requiring the use of force and so is not, categorically, a crime of violence.

Defendant's argument is meritless. The Supreme Court has held "the knowing or intentional causation of bodily injury necessarily involves the use of physical force." *United States v. Castleman*, 134 S. Ct. 1405, 1414 (2014). *Castleman* dealt with a domestic violence misdemeanor and so did not precisely hold that the intentional causation of bodily injury is violent force in the context of a felonious crime of violence, but *Curtis Johnson* held violent force in the context of a violent felony is "force capable of causing physical pain or injury to another person." *Curtis Johnson*, 559 U.S. at 140. Together, *Castleman* and *Curtis Johnson* hold that the knowing or intentional causation of bodily injury necessarily involves the use of violent physical force. Any felony having as an element the intentional infliction of bodily injury on another person is a crime of violence under § 924(c). Section 249(a)(1) is a felony having as an element the intentional infliction of bodily injury on another person. It was even enacted with a rule of construction stating, "This [act] applies to violent acts motivated by actual or perceived race . . . ." Hate Crimes

Act, § 4710(3). The Court sees no colorable argument that the statute prohibits any nonviolent conduct. A violation of the statute is, therefore, categorically a crime of violence under § 924(c).

## 2.    Violation of § 247(a)(2) as a crime of violence under § 924(c)(3)(A).

Defendant raises the same argument regarding the charges under the Church Arson Act—that the act does not require as an element violent physical force. The elements of the § 247(a)(2) offenses at issue are: (1) intentional (2) obstruction the victim's enjoyment of the free exercise of religious beliefs (3) by force (4) resulting in death, where the offense (5) is in or affects interstate commerce. 18 U.S.C. § 247(a)(2). Defendant recognizes the obvious problem with his argument: "The statute may at first glance appear to qualify as a crime of violence because of its use of the phrase 'by force or threat of force.'" (Dkt. No. 233 at 25.) To address that problem, Defendant rightly argues that a level of force below the violent physical force required for a "crime of violence" under § 924(c) could suffice to obstruct religious activities. For example, a peaceful candlelight vigil that prevents access to a church would not be a "crime of violence." But Defendant is charged with an intentional use of force resulting in death. Again, any felony having as an element the intentional infliction of deadly bodily injury on another person is a crime of violence under § 924(c).

Against that, Defendant can only argue that it is possible to inflict deadly injury without use of physical force. The Court disagrees. The Supreme Court holds that bodily injury is always caused by physical force and that physical force capable of causing pain or injury is violent force. *Castleman*, 134 S. Ct. at 1414; *Curtis Johnson*, 559 U.S. at 140. Defendant suggests poisoning as a means of causing death without violent force. Indeed, in *Torres-Miguel* the Fourth Circuit stated in passing that a threat to poison someone would not be a threat to use force against that person. If that is taken to express the view that murder by poison is not a violent act, it is unpersuasive *obiter dictum* this Court declines to follow. *Cf. Humphrey's Ex'r v. United States*, 295 U.S. 602,

-31-

627 (1935) ("Putting aside dicta, which may be followed if sufficiently persuasive but which are not controlling. . . ."). This Court concludes that killing parishioners by attacking their church with poison would be a violent act, no matter how surreptitious the poisoning. There is no useful distinction between slipping a deadly poison into a man's meal as he dines, or slipping a dagger into his heart as he sleeps, or shooting him in the head as he prays in church. All are forcible destructions of vital processes resulting in death, and all are categorically crimes of violence. Violation of a statute that prohibits the intentional obstruction of religious exercise by force resulting in death—*i.e.*, *by deadly force*—is categorically a crime of violence under § 924(c).

**3.     Violations of §§ 249(a)(1) and 247(a)(2) as crimes of violence under § 924(c)(3)(B)**

Because the charged violations of §§ 249 and 247 are crimes of violence under § 924(c)(3)(A), the Court does not consider any issues related to *Johnson* or § 924(c)(3)(B).

**IV.     Conclusion**

For the foregoing reasons, the Court **DENIES** Defendant's motion to dismiss the indictment (Dkt. No. 233).

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Court Judge

December 5, 2016
Charleston, South Carolina