IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 2:15-CR-00472-RMG |
| | ) | |
| v. | ) | **UNDER SEAL** |
| | ) | |
| DYLANN STORM ROOF | ) | |
| _____ | ) | |

## RESPONSE TO DEFENDANT'S MOTION IN LIMINE
## REGARDING PROPOSED GOVERNMENT EXHIBITS

By his motion in limine, the defendant seeks to preclude the jury from considering the full scope of the defendant's actions during the attack, his substantial planning and premeditation, and his racial motivation. This Court should deny this motion and evaluate each exhibit as it is presented at trial.

## I.    RELEVANT FACTUAL AND PROCEDURAL HISTORY

Given the Court's familiarity with this case, the government provides only a brief summary of facts relevant to addressing the defendant's motion.

### A.  The Defendant Carefully Cultivated His Image in an Effort to Promote his White Supremacist Ideology

Prior to the attack, Defendant decided it was important for others to understand his beliefs relating to race and the motivation for his crimes. He made clear both before and during the attack that he wanted his worldview to be widely known. This included not just a racial ideology, but an insistence on violence.

To publicize his racial ideology, in February 2015, Defendant purchased a personal web site that he titled "lastrhodesian," in reference to a former apartheid state in southern Africa. During the months leading up to the attack, the defendant took extensive steps to cultivate the

image he would promote to the world through the lastrhodesian website, including taking several trips across the state of South Carolina and thousands of photographs of himself engaged in a variety of activities.  These photographs include posing with the murder weapon, engaging in target practice, waving a Confederate flag, and desecrating an American flag, and posing at various sites with historical significance to race relations in the United States.  *See* (GX 294, photographs from Kodak camera; GX 427-455, photographs developed from film.)  In some of these photographs, the defendant posed in front of historical sites using racial symbols, such as posing at a cemetery for Confederate soldiers with his arm raised in a "Heil Hitler" salute or kneeling on the beach at Sullivan's Island with the white supremacist slogan "1488" carved in the sand.  (GX 294, photographs from Kodak camera, US-002085, 2299-2302, 6721, 6864.)

Defendant created a KKK hood from a bed sheet (GX 270) and took photographs of himself wearing it.  (GX 294, Kodak camera photos, US-006030, 6071, 6492, 6505, 6510, 6652.) He also downloaded a book about the history of the KKK.  (GX 343, Invisible Empire.)

Shortly before departing for his attack, Defendant published on the lastrhodesian website a manifesto describing his racial views and described his need to commit violent acts.  He also carefully culled through his photo collection and, from thousands of photographs he had taken, selected 60 that he thought best represented his white supremacist ideology and posted them on the website.  (GX 4, website photographs.)

The defendant also practiced drawing various white supremacist symbols and developed his own "signature" symbol that contains, among other things, swastikas and runes that are symbols used by white supremacists.  The defendant also drew a KKK member on the same paper on which he practiced drawing these white supremacist symbols.  (GX 275.)

### B.  The Defendant Purchased the Murder Weapon and Then Engaged in Extensive Target Practice

On April 27, 2016, just a few weeks before the murders, the defendant purchased the murder weapon.  In the weeks that followed, the defendant purchased ammunition and engaged in extensive target practice in preparation for the attack.  The defendant photographed and videotaped several of those practice sessions, which show him trying to hone his skills aiming and reloading the murder weapon.  *See, e.g.*, (GX 295-299 (videos of target practice), 357-359 (videos of target practice).)

## II.    ARGUMENT

### A.  The Court Should Defer Ruling on the Defendant's Motion in Limine Until the Evidence is Presented in Context at Trial

As discussed at the pretrial conference, the probative value of much of the evidence challenged by the defendant is best evaluated in the context of witness testimony and other evidence admitted at trial.  The threshold for the admission of relevant evidence is "low," and motions in limine should not be used as vehicles to resolve factual disputes or to take away the fact-finding role of the jury.  *Eclipse Packaging, Inc. v. Stewarts of Am. Inc.*, 5:14cv-00195, 2016 WL 1724360, at *1 (W.D.N.C. Apr. 29, 2016).  The better practice is "to deal with questions of admissibility as they arise in actual trial as opposed to tackling the matter in a vacuum on a motion in limine."  *Eclipse Packaging, Inc.*, 2016 WL 1724360, at *1; *United States v. Verges*, No. 1:13cr222, 2014 WL 559573, at * 3 (E.D. Va. Feb. 12, 2014) (same).

### B.  Crime Scene Evidence Is Highly Relevant to Proving the Defendant's Actions During the Attack and is Not Duplicative of Other Evidence

Defendant's objections to the crime scene evidence exemplifies why this Court should defer ruling on the issues raised in the motion in limine until trial.  The defendant objects to a series of crime scene photographs on the basis that they are unduly prejudicial and duplicative of

other evidence.  (Def.'s Mot. in Limine, Dkt. No. 738, at 2-4.)  Although the defendant would prefer that the government rely exclusively on the FARO images, these photographs (in combination with the FARO scan and other crime scene evidence) provide the jury with a full understanding of the defendant's actions that night, including the number of times he shot at each victim and the manner in which he murdered them.  The defendant should not be permitted to shield from the jury's review evidence demonstrating the methodical and deliberate manner in which he killed the victims.  Such evidence is clearly relevant to prove the crimes charged and is "necessary to complete the story of the crime on trial." *United States v. Siegel*, 536 U.S. F.3d 306, 316 (4th Cir. 2008) (internal quotation omitted).

The FARO scan evidence the government intends to present is a helpful way for the jury to view most of the crime scene evidence, but it has some limitations.  The FARO scan gives a broad overview and context of the crime scene from specific points, but it only captures specific lines of sight from a specific height and location.  It does not, however, capture evidence that may be under tables, items directly underneath the scanner, or evidence that is not within a specific line of sight for the scan.  Further, although the FARO scan can be zoomed in to give some degree of detail to the images, the crime scene photographs provide much greater resolution, which is necessary to identify smaller items such as bullet fragments, fired projectiles, bullet holes in tablecloths or floor defects caused by fired projectiles (strike marks).

The specific photographs to which the defendant objects each depict an image that the FARO scan does not capture as fully as the government's proposed exhibit:

GX 036:       This photo captures the discarded 5.11 tactical pouch from a perspective that the FARO scan does not.  Specifically, the photo permits the jury to identify the relative distance between the tactical pouch and where one of the victims would have been lying.  This,

when combined with other evidence, provides evidence of the defendant's actions with regard to that victim, including how long defendant was in the same area as the victim and providing evidence of his proximity to the victim.

GX 056:    This photo is a distal view of a spent round (GX 58) relative to a blood pattern and floor strike.  The FARO scan does not capture the necessary detail to properly identify the floor strike. The proximity of blood, the floor strike and the spent round, which are all captured in GX 056, are necessary to establish that the victim killed in that area was likely shot while lying on the ground.

GX 060:    Defendant identifies this photo as duplicative of GX 061.  However, GX 061 is the physical item identified in GX 060 photograph.

GX 069:    This photo depicts a chair next to a wall, and is taken about ten feet away. The next exhibit, GX 070, is a photo of the area under the chair, where a bullet travelled through the wall.  GX 069 is necessary to orient the jury to location of the chair depicted in GX 070. Although the FARO scan may show this chair from different angles, integrating GX 070 into the FARO is difficult, and GX 069 provides a necessary context for GX 070.

GX 082, 084, 085, 091-094, 095:  Each of these exhibits is a photo of damage caused by a fired round.  They photos show floor strikes, damage to tables (both the underside and surface), and a telephone on the ground with a bullet hole in it.  All of these photographs demonstrate that the defendant was firing at victims while they were on the ground, and the location of blood or victims in the photos is necessary to establish how close the shots were to those victims, thereby demonstrating the defendant's intent to aim at them.  A close up of a floor strike is necessary to show the detail of the strike, since the FARO scan does not capture such fine detail.  The location of the strikes is also relevant to show the location of the defendant when he shot the victims,

especially when considered in the context of gunshot wound evidence. The evidence also reflects the concentrated and deliberate way the defendant killed several victims while they were lying on the ground under tables.

Defendant's claims that these photographs are unduly prejudicial because they depict the "most graphic and disturbing aspects of the crime scene" is highly exaggerated. *Compare United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979); *see also* (Order, Dkt. No. 499 (holding that "courts have consistently held that pictures and videos of crime scenes and victims are not unfairly prejudicial to the extent that they relate to an element necessary for conviction or complete the story of the crime." (citing cases).) This case involves multiple murders, and explaining the crime scene will inevitably include evidence showing blood and the victims' bodies. The government chose a narrow set of photographs that relate to the location of specific evidence that will assist the jury understand the defendant's actions as he killed each of the victims.[1]

With regard to GX 096, the cellular phone depicted in the photo GX 095, the government has informed the defense that it does not anticipate that it will use this physical item; if that changes the government will inform defense counsel in advance of offering the item.

### C. Evidence Showing the Defendant's Racial Motivation and Planning Are Relevant and Not Unduly Prejudicial

As this Court has recognized, to prove the charged violations of § 249, the government must prove that the defendant acted "because of the actual or perceived race" of the victims. 18 U.S.C. § 249(a)(1). (Order, Dkt. No. 483, at 5.) For the capital offenses, §§ 924(j) and 1111(a),

---

[1] For example, the defendant suggests that photographs showing strikes on the tables near victims' bodies are unduly prejudicial. However, the jury will not be able to understand the relevance of a photograph that merely shows a bullet hole in a tablecloth or a strike on the table, without showing the locations of the victims in relation to those strikes.

the government must also prove that the Defendant's actions were "willful, deliberate, malicious, and premeditated." (Order, Dkt. No. 483.) Evidence of the defendant's racial motivation and planning go directly to the charged offenses, and should be admitted. (Order, Dkt. No. 483 ("[E]vidence is not *unfairly* prejudicial simply because it tends to prove the alleged offense.")

### 1. The Defendant Directly Linked His Disdain for the American Flag with His Desire to Return to a Segregated Society

Defendant seeks to exclude photographs showing him desecrating the American flag. Defendant implicitly concedes that he intended to express a message about his racial motivation through these photographs, but claims that the link between his racial motivation and these photographs "is too indirect." (Def.'s Mot. in Limine , at 6.)[2] Defendant ignores, however, that he explicitly linked his white supremacist ideology and his disrespect for the American flag in his writings and on his website.

Indeed, several of the photographs the defendant now seeks to exclude are the same images that he personally selected to post on his lastrhodesian website in an effort to promote his white supremacist ideology. (GX 4, website photographs, US-012341, 12343 (showing the defendant spitting on and burning the flag).)[3] These photographs exemplify the defendant's antagonistic views of a diverse, egalitarian United States and his preference for a return to a

---

[2] Some of the photographs the defendant seeks to exclude has probative value independent of his racial motivation and is admissible to prove the foundation for items removed from his car after his arrest. Specifically, these photographs show the contents of the defendant's car after his arrest and show where other relevant evidence was seized. For example, several photographs that the defendant seeks to exclude show the backseat of the defendant's car and depicts a bag with the packaging for ammunition, as well as empty and partially filled boxes of ammunition. (GX 125-30.) GX 224 shows the trunk of his car, from which legal pads with the defendant's handwritten notes were recovered. GX 167 and 168 show that the defendant had a Confederate flag in his car when he was arrested. That the American flags are shown in the background of these photographs should not preclude admission of these foundational photographs.

[3] The defendant's creation of the Last Rhodesian website and posting of the photographs and manifesto shortly before leaving for Charleston to commit the crime are inextricably intertwined with his commission of the crime itself.

segregated society.  On his website, the defendant juxtaposed photographs of his holding a

Confederate flag with photographs of his burning and spitting on the American flag.  (GX 4, US-

012341-43.)  His selection of these specific photographs, from hundreds of others, highlights that

the defendant himself views them to be a strong message of his white supremacist ideology and

his call to return to an era of segregation.  The defendant should not now, after publishing such

photographs on his own white supremacist website, be able to exclude them from the jury's

consideration.

In his writings, the defendant made clear that his disrespect for the American flag is

directly linked to his desire for a new political order defined by the domination of whites over

blacks such as existed in the de jure segregation era of the United States.  On his website, under

the header "Patriotism," for example, the defendant unequivocally declared: "I hate the sight of

the American flag. Modern American patriotism is an absolute joke.  People pretending like they

have something to be proud while White people are being murdered daily in the streets."  (Dkt.

No. 299-1, at 6.)  Defendant continued: "Many veterans believe we owe them something for

'protecting our way of life' of 'protecting our freedom.  But im [sic] not sure what way of life

they are talking about.  How about we protect the White race and stop fighting for the jews. . . . I

dont [sic] blame the veterans of any wars up until after Vietnam, because at least they had an

American [sic] to be proud of and fight for."  (Website, Dkt. No. 299-1, at 6); *see also id.* at 4

("Segregation was not a bad thing. . . . Integration has done nothing but brings Whites down to

level of brute animals.")

In his jailhouse manifesto, the defendant further explained his views on patriotism,

calling it a "joke" because "what is there to be patriotic about?"  The defendant denigrated the

diversity of this country, calling it "the homosexual, race traiting, self destructive, anti-White

way of life." (Dkt. 268-1, at US-019556.)  According to the defendant, veterans who have served this country "have this mystical view of America, truly a delusional view that they are fighting or have fought for an America that in reality ceased to exist long ago." (Dkt. 268, Ex. 1, at US-019547.)  The defendant's own words and actions demonstrate that to him, the desecration of the flag (and the patriotism it symbolizes) strongly conveys the depth of his antipathy for diversity and his call for a return to a segregationist past.

Although the defendant argues that these photographs are prejudicial, the Fourth Circuit has emphasized that to be excluded under FRE 403, "the evidence must be *unfairly* prejudicial and, even then, only if the unfair prejudice *substantially* outweighs the probative value of the offered evidence." *United States v. Siegel*, 536 U.S. F.3d 306, 319 (4th Cir. 2008) (emphasis in original).  Of course, all inculpatory evidence is inherently prejudicial, but "prejudicial in this manner is not unfair." *Lipford*, 203 F.3d at 269; *United States v. Kapp*, 419 F.3d 666, 677 (7th Cir. 2005) (holding that where "evidence is probative of an issue relevant to an element of the offense, it must be admitted in all but the most extreme cases," even where the probative evidence is "revolting").  Here, these photographs, which exemplify the defendant's white supremacist ideology, were taken by the defendant as he prepared for the attacks, and were personally reviewed by him to select which photos to post on his website along with his racist manifesto, are intrinsically tied to the defendant's actions leading up to the murders, and thus not unduly prejudicial.

### 2. Evidence of the Defendant's Target Practice is Highly Probative of His Planning to Commit Multiple Murders

Defendant seeks to exclude photographs and videos that the defendant took of himself posing with the murder weapon and engaged in target practice.  Without citation, Defendant states that there is "no dispute that the defendant . . . target-shot with [the murder weapon]," and

suggests that instead of seeking to admit these photographs and videos, the government could

call the defendant's friends and family to testify about his use of the murder weapon in the weeks

leading up to the murders.  It should go without saying that it is not for the defendant to dictate

the manner in which the government puts on its case.  *See United States v. Siegel*, 536 U.S. F.3d

306, 320 (4th Cir. 2008) (holding that the government has "broad discretion" in how it chooses

to prosecute crimes and should be afforded "sufficient latitude to carry its burden of proof").

 As an initial matter, there can be no serious dispute that evidence of the defendant

holding the murder weapon is highly relevant to proving the crimes of which he has been

charged.  18 U.S.C. § 249(a)(1) (willfully causing, or attempting to cause, bodily injury (*i.e.*,

death) to the victims because of race); 18 U.S.C. § 247(a)(2) (using force to obstruct the victims'

in in the free exercise of their religious beliefs, resulting in their deaths); 18 U.S.C. §§ 924(c),

924(j) (using a firearm to commit murder during and in relation to a crime of violence).

 Moreover, these videos and photographs, including their numerosity, are evidence that

the defendant's actions involved "substantial planning" and were "willful, deliberate, malicious,

and premeditated."  *See* 18 U.S.C. § 1111(a); Notice of Intent to Seek the Death Penalty (Dkt.

No. 164 (listing "substantial planning" as a gateway factor); *United States v. Jackson*, 327 F.3d

273, 301 (4th Cir. 2003) (holding that "substantial planning" under the FDPA requires a higher

degree of planning than premeditation or planning alone).  The defendant purchased the murder

weapon just a few weeks before the attack, and he confessed that he intended to murder multiple

victims in a single attack.  (Confession, Dkt. No. 266-1, at 61-62 (confirming that he planned to

kill multiple victims).)  To carry out that plan, the defendant dedicated himself to practicing

shooting the weapon, honing his skills to hit his targets and reload the weapon, in the weeks

leading up to the attacks.  The photographs and videos document the intensity with which he

practiced his shooting skills in the weeks before the attack, and the jury should be able to view the actual evidence demonstrating the frequency of his target practice. *United States v. Kennedy*, 32 F.3d 876, 885-86 (4th Cir. 1994) (holding evidence of the "preparatory stages" of the crime is admissible).[4]

Other photographs of the defendant, which show him posing with the murder weapon, are relevant to demonstrate the care with which he cultivated his image to promote his white supremacist ideology. The defendant took scores of pictures of himself posing with the weapon and then carefully curated that collection, choosing several of those photographs to post to his online manifesto. Indeed, several of the photographs the defendant seeks to exclude, including an image of the defendant pointing the weapon directly at the camera, are the same images as those he posted on his website. Contrary to the defendant's complaint, the numerosity of the photographs does not make them cumulative; rather, they are independent evidence of the defendant's intensity of focus on the creation of his website and the cultivation of the image he wanted to promote on his white supremacist website. These photographs also demonstrate the defendant's commitment to violence. Much like the videos of defendant practicing firing the gun, the defendant's posing with the murder weapon, on numerous occasions, help explain not only why the defendant was comfortable with the weapon while committing his crime, but are direct evidence of what his purposes for the gun were in the months leading up to his crimes. It is clear from this evidence that the defendant was using these photographs to determine how it would appear when he was pointing the gun at someone, and the volume of such pictures show his planning and intent to commit crimes. The defendant's claim that the photographs showing the defendant pointing the gun at the camera are "designed" to make the jurors feel menaced. Of

---

[4] Defendant's motion refers to the exhibit containing the photographs as "GX 249." The exhibit number is 294.

course, the defendant, not the government, "designed" these photographs to use on his website. Moreover, there is nothing particularly menacing about these photographs. They show the defendant posing with the weapon in his bedroom or backyard.

Evidence documenting the degree of the defendant's planning – both in practicing with his newly purchased weapon in the weeks leading up to the killings and creating a collection of photographs from which he would choose to post on his racist website – should be admissible as relevant and not unduly prejudicial.

### 3. Evidence Related to Hitler and the Ku Klux Klan Is Highly Probative of the Defendant's Racial Motivation

The defendant seeks to exclude evidence that he has endorsed the views of Hitler and the KKK. Such evidence goes directly to proving his motive for attacking the parishioners at Emanuel AME Church. (Def.'s Mot. in Limine, at 8-10.) Although the defendant claims that any association with Hitler and the KKK may be prejudicial, he fails to show how such evidence can be unduly prejudicial when he personally and unequivocally endorsed them.

Defendant proclaimed, for example, that "I believe one day that Adolf Hitler will be inducted as a Saint. I can see an icon of him in my mind." (Jailhouse writing, Dkt. 268-1, at US-019547); *see also* Confession, at 71 ("Right . . . I support Hitler, sure.") Defendant also repeatedly uses the number "88," which he explained represents "Heil Hitler," in his own symbology. (Confession, at 70.) Likewise, the defendant incorporates the swastika in every version of his own symbology. (Jailhouse writing, Dkt. No. 268-1, at US-019543; Car journal, Dkt. No. 299-2, at US-001634.) On his website, Defendant bemoaned that "[w]e have no skinheads, no real KKK, no one doing anything but talking on the internet." (Website, Dkt. No.

299, Ex. 1, at 6.); (Confession, at 40 ("well there are no skinheads.  I wish there were but there aren't.")[5]

In his motion, the defendant does not contest that the evidence he seeks to exclude accurately portrays that he gave a "Heil Hitler" salute on several different occasions during his trips to various historical race-related sites in South Carolina, such as a cemetery for Confederate soldiers; wore a KKK hood that he created from a bedsheet; drew a KKK picture on the same paper on which he practiced drawing his white supremacist symbology; downloaded a book on the history of the KKK; and arranged bullets in the shape of a swastika.  *See* (Def.'s Mot. in Limine at 8-10, 12.)  These actions, taken during the time period leading up to the attacks, are part and parcel of the Defendant's preparation and motive for the attack itself and his related desire to incite others to engage in similar acts of violence.  *See United States v. Marfo*, 572 Fed App'x 215, 226 (4th Cir. 2014) (evidence that reveals motive is admissible).

This evidence also provides context for the defendant's racial motivations, decision to engage in racially-motivated violence, and his intent to incite others to violence.  *Siegel*, 536 F.3d at 318-19 (holding that evidence that provides explanation for why a previously non-violent defendant committed murder is relevant and admissible).  *See* (Car journal, Dkt. No. 299-2, at US-01645 ("I would love for there to be a race war."); Jail writing, Dkt. No. 268-1 ("Well unless we take real, possibly violent, action, we have no future, literally."), US-019548 (discussing the possibility of implementing a eugenics program).  They would also provide greater context for Defendant's writings, including the violent underpinnings of his references to his perceived diminishment of white culture and power, and his use of the number "88" (a reference to "Heil

---

[5] *See also* (Jailhouse writing, Dkt. 268-1, at US-019539 ("Romper Stomper 1993 – best skinhead film/no moralization."  ); *id.* at US-019535 ("If in England, for example, the skinheads thought they had popular opinion support, they would and could act more brashly.")

Hitler").  (Jail writing, Dkt. No. 268-1, US-019543 (drawings including swastika and "88"), US-019546 (decrying white nationalists for failing to act).)

The defendant complains that any association with Hitler and the KKK is unduly prejudicial because he was not a member of a specific neo-Nazi group or KKK clan.[6]  Whether he was a member of a specific organization does not, however, alter the admissibility of evidence demonstrating that he endorsed their ideologies and/or adopted their symbols.  The two cases cited by the defendant do not support his argument to exclude this evidence.  In both cases, defendants challenged the admission of *expert* testimony about hate groups generally, not the admissibility of evidence that the defendants personally created.  *See United States v. JHH*, 22 F.3d 821, 829 (8th Cir. 1994); *United States v. Magleby*, 241 F.3d 1306, 1316-17 (10th Cir. 2001).  Moreover, in both cases, there was no evidence that the defendant endorsed the views of those hate groups.  *See JHH*, 22 F.3d at 829 (holding that there was no evidence that the defendants endorsed the actions of skinheads except for "their penchant for short hair, combat boots, and tattoos combined with their expression of racist attitudes"); *Magleby*, 241 F.3d at 1316-17 (holding that "the record is completely devoid of any evidence indicating or suggesting that [the defendant] was a member or sympathizer of the Ku Klux Klan or any other hate group").  Here, in stark contrast, the defendant – through his own actions, writings, and drawings – has specifically made clear that he does, in fact, endorse the views of Hitler and the KKK.

Ultimately, Defendant reveals his real concern – that the government's use of photographs may more powerfully convey to the jury his racial motivation – and suggests that the government's evidence should be confined to having witnesses "referenc[e] Hitler, the Nazis,

---

[6] It is unclear what objections the defendant has to the book, the *Invisible Empire*.  The government anticipates that the evidence at trial will demonstrate that this book was downloaded onto his father's computer.

or the KKK." (Def.'s Mot. in Limine, at 10.) The government should be allowed to provide the jury with the best evidence that explains the defendant's racial motivation for his attack and should be able to use the defendant's own drawings, actions, and photographs, not the testimony of others, to prove its case.

### D.  Forensic Computer Evidence

The defense objects to several exhibits as being voluminous because individual aspects of the voluminous exhibits are otherwise being admitted. These items are computer images (GX 293, 348) and entire FTK reports (GX 332, 334, 339).  A computer image is an exact duplicate of a media device (such as a hard drive) that requires the application of software in order to view the image content.  "FTK" (Forensic Tool Kit) is software that allows a user to view the image contents.  The government currently intends to offer GX 293, 334, 339, 348 only as a foundation for other exhibits.  If defense counsel does not object to the foundation for any exhibits obtained by the images or FTK reports in GX 293, 334, 339 and 348, the government does not anticipate seeking to introduce these four exhibits.  If the government's plans change, the government will give inform counsel in advance.

The internet history depicted in GX 332, however, has probative value independent of being a foundation for the single image depicted in GX 336.  GX 336 is an enlargement of an image file located in GX 332 that is not otherwise fully visible in GX 332.  Additional information contained in GX 332 links this image with lastrhodesian.com, the website created by the defendant.  Further, GX 332 links the internet history with "regru", a webhosting service; GX 332 and other evidence establishes that the defendant made payments to "regru."  Finally, GX 332 lists the date and time for this specific activity, supplying evidence that the defendant

accessed lastrhodesian.com just over four hours prior to the Emanuel AME shootings. Accordingly, GX 332 is an independent exhibit that should be admitted in addition to GX 336.

### E. Other Items

With little explanation, Defendant requests that the court exclude the following other items. The government responds as follows:

*First*, the government does not currently anticipate using the videotape of the crime scene (GX 24) if the FARO scan images are admitted into evidence.

*Second*, GX 427-31 are a series of photographs developed from film that was seized by investigators. The specific photos defendant seeks to exclude depict him in front of his car, wearing all black, and, in some photos, giving a military salute. One photo is taken with defendant just off camera, indicating that the defendant is taking the series of photographs himself. These photos are consistent with other photos defendant took of himself that he used for his "lastrhodesian" website. Defendant culled those photos from literally thousands of others taken in various locations, similar to GX 427-31. The volume of these photos, and the months it took to take them, are indicative of defendant's preparation of his web site, dedication to his web site, and preparation for his crimes.

These photographs are also relevant because they show defendant's car without a pro-Confederate license plate located in later pictures, evidence that he was taking photographs for white supremacist his website at a particular point in time.

In addition, these photos are relevant to show the identity of the individual who took other, relevant photos from the same roll of film. The photos defendant seeks to limit are the first in a series of that defendant took, GX 432-455. In that series, only two other photos depict defendant, so the photos defendant complains of are relevant to the identity of the person taking

the other photos.  These other photos are highly relevant, depicting the State House, the Confederate flag that flew there, and one photograph that the defense has offered as a part of Defense Exhibit 59.  Because GX 427-431 are relevant to defendant's intent, relevant to other photographs he took, and otherwise properly seized and produced, they should not be limited as cumulative and unduly prejudicial.

*Third*, GX 432-436 are photographs that the defendant took of Trinity Church in downtown Columbia.  Without explanation, the defendant claims that these photographs should be excluded pursuant to this Court's order in Dkt. No, 483.  The Court's order only addressed photographs of Branch AME church, not any other photos.  Specifically, the defense sought to suppress two photographs of Branch AME Church, and the government ultimately decided not to oppose the defendant's motion to exclude the "two photographs of the Branch AME church." (Govt's Supp. Resp., Dkt. No. 444.)  The briefing by both the defendant and the government regarding photographs of churches was specifically limited to the two photographs of Branch AME Church.[7]

When the Court issued its order regarding this issue, it stated "[t]he Government has withdrawn its opposition to Defendant's motion in limine . . . photographs of churches other than Mother Emanuel.  (Dkt. No. 444.)"  (Order, Dkt. No. 483 at 1, 3.)  Because Dkt. No. 444 only referenced the two photographs of Branch AME church, and the defendant only sought to exclude those through its motion in limine, the Court's order only pertained to the two Branch AME church photos.  Defendant's attempt to expand the Court's order beyond the scope of its order should be denied.

---

[7] These photos are also relevant in the context of other photographs developed from the camera, showing the defendant visiting other relevant sites.

*Finally*, the government does not currently anticipate seeking to admit the remaining exhibits – the death certificates, the ACDC audio recordings of the defendant's telephone calls, and the ACDC video recordings of the defendant's visits – in its case-in-chief in the guilt phase. Whether the government uses those recordings in the penalty phase will depend on the evidence presented at trial. As such, this Court should defer ruling on that evidence until the penalty phase. If the government's plans change, the government will provide notice to the Court and the defense before seeking to admit these exhibits.

## III.     CONCLUSION

For the foregoing reasons, this Court should deny the defendant's motion in limine and determine the admissibility of the evidence in the context of the trial.

Respectfully submitted,

BETH DRAKE
ACTING UNITED STATES ATTORNEY

s/ Nathan Williams
Nathan Williams (ID #10400)
Assistant United States Attorney
151 Meeting St., Ste. 200
Charleston, SC 29401
(843) 266-1671