IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

UNITED STATES OF AMERICA )
)
v. ) CASE NO.: 2:15-CR-472
)
DYLANN STORM ROOF )

### DECLARATION OF DAVID BRUCK, EMILY PAAVOLA AND KIMBERLY STEVENS

1.     The undersigned attorneys have served as both appointed counsel and standby counsel for Dylann Roof at different points throughout the jury selection and trial proceedings in this matter.  This affidavit includes our collective observations of Mr. Roof's most salient behaviors and symptoms since the conclusion of the competency hearing on November 22, 2016.

2.     On November 23, 2016, defense counsel Bruck and Stevens met with the defendant for nearly 3 ½ hours.  At this meeting, the defendant repeatedly discussed his somatic delusions (including his beliefs that parts of his body are underdeveloped, that his arms and legs are different sizes and lengths, and that his forehead is unsightly), but he insisted that these are not delusions because they are true.  Counsel said they still did not understand what was wrong with the defendant's forehead even after the defendant explained that something is wrong.  When counsel began to bring up photographs of the defendant's forehead that had been taken by the staff of the Detention Center immediately following his having been beaten by another inmate last August, he begged us not to show the photographs of his forehead, exclaiming that he didn't want to look at them.  Counsel said let's look at the photographs together and you can show us what is wrong, and the defendant said no, and to put the computer away.

3.     The defendant discussed how he believes that Judge Gergel likes him because he smiled at him and how the Court's affection for him will shift the "Universal Consciousness" in the room in his favor and will impact how other people in court will feel about him.  The defendant denied that he had ever told anyone that the testosterone

"pools" on one side of his body.  Instead, he stated that he had only ever said that the testosterone "affected" one side of his body, causing it to develop more than the other side.  It was therefore a "lie" in the defendant's mind for anyone to say that he thought his testosterone "pools" on one side.  The defendant stated that he does not believe he will be sentenced to death because "people aren't that mean" and the jurors will like him.  Even if he is sentenced to death, the defendant stated he does not believe he will be executed because he is "too special."  The defendant said that he can stop the execution by simply crying before they stick the needle in his arm.  Both counsel said that never in the history of the American death penalty had an execution ever been stopped because the defendant was crying.  The defendant said that they would stop the execution for him, and that counsel should just stop worrying about that.

4.     On November 28, 2016, this Court granted defendant's request for self-representation and the process of individual juror *voir dire* began immediately thereafter.  As standby counsel, we began to pass the defendant notes with objections and follow-up questions for the first panel of jurors.  The defendant refused to ask these questions or make objections.  At the first break, the defendant insisted that he did not need to do anything during jury selection because he could tell that the jurors liked him so he would not get the death penalty.  We repeatedly and consistently explained to the defendant that he was wrong about this assessment.  He responded, "Everyone likes me and feels sorry for me.  I won't get death."

5.     As the jury selection process wore on, we continued to pass notes to the defendant and he began to request that the Court ask a few of our suggested questions.

6.     Typically, counsel would suggest at least 5 or 6 follow-up questions per juror, and the defendant would reject most of these suggestions.  We then became more sparing with our note-passing because he was so easily overwhelmed, and instead selected our most important two or three suggestions.  We wrote the proposed questions in plain, simple English and occasionally included citations to case names for him.  The defendant rejected many of these suggestions on the basis that he did not know what to say if the judge asked him why he was objecting and this would embarrass him.  He was unwilling to simply say the word "objection" because he feared the judge would be mad at him if he could not explain further.  Despite his standby status, Mr. Bruck eventually raised this problem with the Court, framing his motion on behalf of the defendant as a request for an accommodation.

7.     The defendant expressed a desire to select potential jurors on the basis of irrelevant factors.  For example, he did not want a young, attractive woman on his jury because this would increase his anxiety.  Ultimately, this juror was seated after counsel

returned to conduct his defense on December 7.  Neither party exercised a strike on this juror.  The defendant expressed outrage over this to counsel in the courtroom, in a loud whisper, although he was smiling while expressing how upset he was with counsel over this.  He did this in the presence of the crowd in the courtroom.  He said that we did not understand how much this will bother him and that it will bother him every single day of the trial to know that she is sitting in the jury box looking at him.

8.     On the final day of jury selection, the defendant requested that standby counsel be reappointed to represent him only for the duration of the guilt-or-innocence phase.  Throughout the trial, the defendant remained fixated on unimportant details such as the fit, texture, weight and smell of his clothing. These issues occupied much of counsel's conversations with the defendant before and after court, and during mid-day breaks.  At one point during trial, the defendant discussed plans for a screenplay he hopes to have produced when he gets out of jail, including details about the musical soundtrack he hopes it will have and which instruments will be featured, including a vibraphone and strings.

9.     During the guilt phase presentation of evidence, counsel knew not to disturb the defendant as he stared straight ahead.  During the preliminary jury selection that occurred on September 26-28, 2016, the defendant told counsel not to speak with him in the presence of the jurors.  He explained that it bothers him for us to speak with him.  We spoke with him in jury selection in an effort to assist him with follow-up questions and with objections, because he was attempting to act as his own counsel.  Sometimes he was receptive to that, but often he stared straight ahead and slid our notes back to us, refusing to ask our questions.

10.    When the guilt phase resumed, and the testimony was emotional, the defendant often stared at a fixed spot on the table.  He did this even when counsel pulled the video monitors up on the table.  Rather than look at the video monitor displaying evidence, he stared straight ahead.  We knew better than to speak with him when he was doing this, as he was just going to continue to stare straight ahead.  During the competency hearing, he had repeatedly whispered to us not to talk to him or look at him.  We did not want him to engage in that behavior in front of the jury, and we left him alone.  While the jurors were in the room, he rarely engaged us by whispering to us.  When he did, it was to tell us he was upset with us (while smiling), or to talk about irrelevant details such as the length of all of the male attorneys' suit pants.  Occasionally he also whispered a request to us – such as, what was in that stack of photographs that the prosecutor just showed you? (He could have looked himself, but stared straight ahead at the table).  He was continually upset and worried about what personal photographs were going to be shown in the courtroom from his Kodak camera SD Card.

11.     During trial, the defendant was very upset with Ms. Paavola for cross-examining a witness about the state of the clothing in his car.  He told Ms. Stevens that he "hates" Ms. Paavola for asking those questions.  He was suspicious and attempted to look at Ms. Paavola's notes and other materials.  When she saw him doing this, she would just show him the items that she intended to cross-examine about, yet he continued to ask suspicious questions about Ms. Paavola's plans for cross-examination.

12.     During jury selection, while the defendant was acting pro se, the prosecution had directly handed the defendant a lengthy list of proposed witness stipulations.  The defendant became preoccupied with minor pieces of evidence and suggested irrational tradeoffs.  For example, the defendant wanted us to propose to the prosecution that he would stipulate to all of their foundational witnesses if they would not introduce his SD card in to evidence, or use his entire cell phone or its FTK report, or introduce any of the pictures of him wearing a pillowcase on his head as if it were a Klan hood.  The defendant asked counsel to relay that he would agree to these things.  The government attorneys explained that they would not engage in any such "horse trading."  The defendant's fixation and worry over the SD card being placed into evidence, photographs such as the face wash photograph or the toiletry kit from his car, and the photographs of him with a pillow-case over his head dominated his expressed thoughts to counsel at trial.

13.     When the defendant's attention was not focused on irrelevant and seemingly irrational evidentiary issues, he was focused on his antagonism toward defense counsel.  The defendant continuously expressed paranoid thoughts about his counsel.  He demanded to know exactly what questions we planned to ask on cross-examination of each of the government's witnesses and whether we planned to offer any exhibits.  Defendant insisted that counsel should "do nothing" and "stop making objections," and claimed that our efforts to defend him were causing him harm and that we were "trying to kill" him.  The defendant expressed displeasure with defense counsel's objections to testimony characterizing him as "evil," and stated that he believed the more witnesses called him evil, the more the jurors would feel sorry for him and vote for life.

14.     The defendant focused obsessively on a small number of relatively minor defense photographs depicting items from his car.  The main items in contention were photographs of plastic bottles of face wash and shampoo that had been found in his toiletries kit, and of his pillows.  He was also upset by a photograph depicting a can of Spaghetti-os.  He insisted that it was fine if the government offered photographs of these same items in evidence, but when he noticed that defense counsel was prepared to offer the government's own exhibits if the prosecution did not, he wrote a note to counsel stating "You are a liar you lied about not presenting exhibits.  If you do it a [sic] swear to

4

god you will regret it." This note is attached as Exhibit A. Ms. Paavola requested a break to confer with the defendant prior to the start of the cross-examination of the witness during which she intended to introduce the photographs. We went to the holding cell, and the defendant explained that he was going to have an "outburst" in the courtroom if defense counsel did not agree to his demands. The defendant ultimately extracted promises from defense counsel that they would not offer certain photos in evidence.

15.    The defendant's assessment of the government's case against him was consistently inaccurate and based on his fixation on minor details and his inability to understand the perceptions of others. For example, he rejected counsel's view that the reading of the journal from his car was damaging to him, and stated that he thought this testimony was "great" for him because the SLED agent who read the journal had "a nice voice." He expressed the hope that this same witness would be recalled to read the writings seized from his jail cell.

16.    During the breaks immediately following a session of court, if we asked him to recount what he had just heard in court, the defendant would often fixate on minor details – such as how the prosecutor referred to his SD card holding thousands of photographs – instead of the overall content or impact of evidence. For example, following the prosecution's opening statement, we asked him if he paid attention to the recitation of facts about each of the victims, and how Mr. Richardson laid out the order in which the guilt phase case will proceed. The defendant would just say words to the effect of "I don't know what you are talking about, but did you hear how he referred to the total number of pictures that I took? I think he is going to put the whole SD card in. He did that just to get to me." Yet the defendant could not relay the overall content of the opening statement and how it laid out in sequential order the witnesses that the government would call. The defendant could not recall the remainder of the opening statement, but was rather fixated on the details of what evidence might be used to "embarrass him," and repeatedly asked us what witnesses were going to be called next and what they had to do with anything.

17.    On the morning of closing arguments, the defendant was mainly interested in talking about the way his sweater smelled. After he entered the courtroom, and while sitting at counsel table, he whispered to Ms. Stevens while he stared straight ahead. He complained that it had been washed with too much laundry detergent and had a film all over it. Attorney Stevens told the defendant she did not see a film on his sweater. He stated that because the sweater had been washed with too much detergent, its texture was now all wrong and it smelled too strongly. He stated, "you are trying to kill me." Attorney Stevens explained that she was not trying to kill the defendant, but she was

5

sorry his sweater had been washed with too much detergent.  Closing arguments then began.

18.	After closing arguments had concluded, the defendant was angry at Mr. Bruck for giving a "bad" closing argument.  The defendant stated that the argument could have been good if Mr. Bruck had told the jury what statistics they would find if they actually Googled "black on white crime."  The defendant stated his belief that if all people were simply exposed to one hour of internet research on black on white crime, they would understand why he had to commit these crimes.  He asserted that "blacks want us all dead."

19.	After the jury returned guilty verdicts on all counts on December 15, 2016, the defendant renewed his request to self-represent, and the Court immediately granted it.  Over the holiday break, standby counsel met with the defendant to discuss his plans for conducting the penalty phase.  The defendant initially expressed interest in offering testimony from at least one mitigation witness, Father John Parker, an Orthodox priest who has visited the defendant almost every week since shortly after the offense.  The defendant signed a confidentiality waiver and consented to allow standby counsel to work with Father Parker to prepare questions that the defendant might ask him. The defendant had agreed to allow Father Parker to testify despite his expressed belief – contrary to defense counsel's repeated assurances -- that the jail had been secretly recording his many visits with Father Parker.  The defendant also appeared open to considering testimony regarding his adaptability to prison conditions and expressed a desire to object to certain victim impact testimony and to the government's proposed use of his original jail writing, which was produced by defense counsel only for the purpose of his suppression hearing, and which includes a small amount of additional material not found in the copy obtained by the government.

20.	The defendant jettisoned his plan to call Father Parker, however, after demanding that Father Parker answer only a single question: "Have you noticed any sign of mental illness in all of your time with me?"  When Father Parker declined to promise that he would answer that question in the negative, the defendant changed his mind about calling Father Parker, and later informed defense counsel that he planned to present no evidence at all.  The defendant confirmed these plans before the Court on Wednesday, December 28th, stating that he plans to do nothing to defend himself against the government's case for the death penalty, other than making an opening and closing statement.  Despite these plans, the defendant has continued to state that he hopes he will receive a life sentence.  The defendant now advises both standby counsel and his mother that his only objective is to use the penalty phase "to get back at" his former counsel by explaining in his opening statement that they are "liars."

21.  On December 27, 2016, the defendant had a video-recorded visit at the jail with his mother and Danny Beard.  On the recording the defendant informs his mother that he had requested her to visit from Columbia only so that he could ask her why she had allowed his lawyers to shop for the particular clothes he wanted to wear in court (including pants with "grey flecks"), rather continuing with her unsuccessful search to find and purchase them herself.  He also discusses his determination to represent himself at his sentencing hearing, and explains that his motive for continuing to interact with his standby counsel is to "abuse" them.  Throughout the meeting, the defendant appears unable to perceive his mother's distress at what he is telling her.  The defense experts have reviewed this recording, and are prepared to explain how it illustrates the severity of the defendant's neurodevelopmental and psychiatric disorders.

22.  On December 30, 2016, the day after the Court ordered a second competency motion in response to standby counsel's motion, Mr. Bruck went to the jail to provide the defendant with a suggested pro se motion concerning victim-impact testimony, attached here as Exhibit B.  Although the defendant had previously expressed a desire for such a motion, and had asked why defense counsel had not already provided it, he now refused to accept the document from Mr. Bruck.  He further informed Mr. Bruck that he no longer desires to have standby counsel, and he does not want to file any objections to victim-impact evidence or any other aspects of the government's case for the death penalty.  The defendant informed Mr. Bruck that he hates him, and that if he gets out of jail he plans to come to Mr. Bruck's house and kill him.

We declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of January, 2017.

_David I. Bruck_          _Emily C. Paavola_          _Kimberly C. Stevens_