Second Competency Evaluation Report

Examinee:  Dylann Roof                    Date of report:  1/1/17

Examiner:  James C. Ballenger, M.D.


Introduction:  The Honorable Richard Gergel has asked this examiner to re-examine Dylann Roof to determine his current competency to stand trial and to represent himself in the penalty phase of his capital trial.  This is in response to his stand-by counsel's "Motion of Standing Counsel for Determination of the Defendant's Current Capacity to Proceed, or in the Alternative, of his Current Capacity to Self-Represent at the Penalty Phase of his Capital Trial."  The judge's order was specific to only consider the facts which have developed since the competency hearing on November 21-22, 2016.  Although the defense expert reports were again made available and re-reviewed, they were available and included in the original competency hearing and are not substantially involved in this second competency evaluation.


Examiner:  Dr. Ballenger has been a clinical psychiatrist for over 45 years and a psychiatric expert for over 30 years.  He retired from full time academics in 2002. He had been Professor and Chairman of the Department of Psychiatry and Behavioral Sciences at the Medical University of South Carolina in Charleston, South Carolina from 1983 until 2000.  He was Founding Director of the Institute of Psychiatry (1988-2000), and also founded MUSC's substance abuse clinical and research institute, the Center for Drug and Alcohol Programs in 1994, and was its Founding Executive Director until 2000.  He is internationally recognized as an expert in psychopharmacology and the anxiety disorders and depression/bipolar

illness.  He is the author of over 350 professional papers and sixteen books.  He was board certified in psychiatry in 1977 and in forensic psychiatry in 1999, and re-certified in 2010.  He currently has a private practice of adult clinical psychiatry (65%) and forensic psychiatry (35%).

He has been admitted as an expert in state and federal courts multiple times.  He has consulted extensively with the National Institute of Mental Health, the Department of Defense, the American Psychiatric Association (APA), and the Anxiety Disorders Association of America (ADAA).  He regularly attends the American Association of Psychiatry and the Law (AAPL) annual meetings and is a member and a journal reviewer.  He has taken their four day forensic psychiatry review course twice, and Report Writing, Examination of Elderly and Neuroscience in the Courtroom courses, attended the 2010 SEAK Course for expert witnesses and in 2015 their course on How to Excel in Expert Depositions.  He generally attends yearly meetings of the APA, AAPL, ACNP, and the ADAA.  For further information about Dr. Ballenger's expertise, please refer to his CV.

Dr. Ballenger is compensated $680 per hour for his time involved in discussions with the judge, reviewing records, examining the Defendant, preparing a report, and testifying at the Defendant's is second competency hearing 1/2/17.

Records examined:

1. Sealed Findings & Conclusions of Law
2. Second Motion for Competency Hearing
3. Report by Rachel Loftin, Ph.D.
4. Report by Paul J. Moberg, Ph.D., ABPP
5. Report by Donna Schwartz Maddox, M.D.

6.  Report by John Elder Robison

Evaluation 12/31/16:

The examiner met with the Defendant at the detention center for approximately three hours.  Initially I explained that I was court ordered to re-examine him because of the issue raised about his competency.  I explained that the examination would consider only events that have occurred since his original competency determination.  Almost before we began, he asked about the color of my gray suit coat, asking whether it was a blend of black and what other color.  He then rapidly turned his attention to his irritation about his stand-by lawyers "messing with me." He asked first about the expert reports, in particular the one by Robison, questioning how he (as a severe autistic person himself) could tell if another person is autistic.  The Defendant stated he was "over this," meaning "all of these evaluations" and the continuing tactics and actions of his "stand-by counsel."  He questioned if they could call any more witnesses, and if they could cross-examine them.  He stated the question for him now is whether he can keep the record sealed, especially with the state trial coming up and as time passes.  He stated to this examiner that he had made notes on almost every page of the reports, particularly the autism expert Rachel Loftin, Ph.D.  He stated there were too many reports and that he would just comment to the examiner about his lawyers' filing motion.  He claimed that his plan for the penalty phase at this point was to call no witnesses and have no cross-examination.  However, if witnesses were called, there were things that had been said that he wanted to relate and would cross examine them to do that.  He stated that he was planning to do opening and closing statements and "my kind of defense."  He said the closing would be dramatic, but that he couldn't tell me about it.  However, both would "be good."  He stated that he was practicing the closing statement so that it would not seemed rehearsed.  He

stated he would make objections as appropriate, even though his attorneys said he would not.  This was even though (despite their claims), they knew he would, because he had told them.  He stated that the main problem was that everyone was "projecting" and asked this expert if I knew what projecting was.  He stated that all of the experts and his lawyers were projecting "their" feelings of what they would think is important, not what he thinks is important.  They think he should primarily fight for his life and that be his number one priority, and he disagrees.  He said that he has only two options (death and life in prison), and they are both "equally bad." That is why preserving his reputation is the most important issue for him, not whether he receives the death penalty or life in prison.  In reference to the two options, he started to try to list the pros and cons.  He stated that life in prison has the difficulty of no appeals and in thinking about the pros of the death penalty, he could not think of any except that he would know what prison he would go to. When this examiner asked what the negatives of the two options were, he stated that he did not really know, but they were actually quite similar to him and equally bad.  He stated that if his reputation was ruined, as he had stated to me in his previous examination, that his "life would be ruined."  He continues to feel that the only thing that is important to him is to protect his reputation.  He stated that his attorneys were ideologues about the death penalty and therefore their most important priority (not his) is to prevent the death penalty.  He states that while they accuse him of being self-destructive by not devoting all his efforts to opposing the death penalty, he feels they are self-destructive.  What they want to do would destroy the only thing that matters to him at this point, i.e. his reputation.  He stated that it is his belief that they are all "feigning ignorance" of his commitment to this and actually fully understand it, but they do so because they are so committed to their ideology.  He then returned to examining the documents and the upcoming trial.  He stated he would in fact present evidence, but all the evidence

would be "just him" and not involve witnesses.  However, he is unsure the judge will allow this strategy.  He was asked about his concerns about his clothes, and described that he had worn sweaters and gray pants during the trial.  He stated that his only concern was actually whether they were cleaned and pressed.  He asked the question "is it so strange for me to want to look good with dozens of reporters sitting just behind him?"  He asked if he had issues about his pants.  He explained that he has a short 29 inch inseam and that most pants are a 30 inch inseam.  He stated that actually they have been able to obtain 29 inch pants and they fit him well.  They do not fold and bunch up above his shoes like 30 inch inseam pants would do.  However, he did ask for them to be cleaned and ironed and questions how anyone could think that would be unreasonable.  That stimulated his response to the statement in his stand-by attorneys' filings, and stated that he was not "disconnected from anything."  He knows that he has a greater than 50% chance of receiving the death penalty in his opinion.  However, he feels that his chances would be the same if his stand-by attorneys were representing him and that he can perhaps protect his reputation better if he represents himself, rather than his attorneys.  He stated that it is his belief that even these competency hearings are sabotaging his attempts to protect his reputation.  He asked about what would happen if he were referred for an inpatient evaluation.  He asked about what the evaluation at Butner would be like.  He then told the examiner that he was wrong in my quoting him earlier that he said that Assad was a racist.  He denied that he ever said that and "how could he be a racist in a country with only Muslims."  However, the stated that the main problem with the examiner's previous report was that the Defendant denied ever using the actual word defective.  He stated that he didn't think autistic people would be the target of any reprisals from any white nationalists' revolutionary government, because there were "too many of them."  When asked if they would be subject to reprisals if there not so many, he decided

that they did not think they would be, but that I should have put what he feels are his exact words in my report. He stated that his concern with the diagnoses that I gave him was not that it would cause him problems in a future white nationalists' world, but that they were "not true." If all these diagnoses were true, he would let his attorney represent him, because he "hates lying." He can't let them represent him, because they would lie about these issues. However, the second issue was that he was preserving his reputation and his wish not for any issue to take away from the rationale he had for committing his crimes. In going through the list with the examiner's diagnoses, he agreed that he in fact does have Social Anxiety Disorder and Generalized Anxiety Disorder, and we had a small disagreement about whether he had a Mixed Substance Abuse Disorder. His principal disagreement was with whether or not he had Schizoid Personality Disorder. He stated that he had Avoidant Personality Disorder and disagreed with the Schizoid Personality Disorder, because he had read the DSM-V Manual and read that magical thinking was part of the Schizoid Personality Disorder diagnosis. We discussed what magical thinking he might have, but he disagreed with the several examples. He stated that the best way he has found to explain his thinking is the analogy of his being a Jihadist. He asked the question about why his attorneys would think he would want a Jewish woman (Dr. Loftin) from the Southern Law Institute to testify for him. She is someone who works against the white nationalist movement and is "Jewish on top of that." He talked about how he "can't win" about whether he stares at people or stares down at the floor. When he did stare at witnesses, the press commented that it was not right for him to look at victims. He stated that he feels it is not right for him to look at the victims because "I killed their son," etc. but if he looks down, he is also criticized for that. He stated he understands his stand-by attorneys' motives for their "cherry picking" comments that they emphasize. He can put himself in their shoes and see that they fit the

facts and issues that make their point, not necessarily his point or the truth. He talked about his somatic "delusions," and he stated that he thinks that they are anxiety derived and is therefore agreeing with me. He gave the analogy of someone who is self-conscious about some extra weight. He asked if they are self-conscious about a few extra pounds, isn't that the same as his being self-conscious that he has a broad forehead? He stated that he understands that his lawyers are "grasping at straws," and he even put that phrase in the letter he wrote to the prosecution. He re-stated that he did not want to meet with the autistic expert Robison and that his lawyers tricked him into it by bringing him along when he met with his lawyers. He stated he needs his lawyers to get him things (e.g. clothes), and they use that to manipulate him. He stated that he no longer wanted to work with them, because he feels it makes it more likely that he will get the death penalty. He explained this by saying that they "screwed me" so much that he doesn't want to work with them and that decreases his chances of getting an appeal. He "hates" his lead attorney, David Bruck, and if he were ever out of prison that he would try to kill him. He was concerned about involving his family, because it would be embarrassing and disrespectful to them. Specifically, he stated that he was worried about the jail videos that would be released which invaded the privacy of the people visiting him, especially his mother. He was worried that they will be disseminated after the trial, and he cannot prevent that. He stated that the non-privacy of the videos for protection issues at the jail is reasonable, but releasing them to the public is what he is trying to fight. He stated that he realized that he is fighting a losing battle, because all of the evidence is put on a court website the day after they occur. He fights with his attorney so much that he feels he is "sitting at the wrong table." He stated that most people who had done the kind of crimes that he had done are not in the situation he is in, because they are almost all dead. He stated that people who think suicide is a cowardly act are

wrong. He stated that anyone who had been in that situation realizes that it takes incredible bravery to do it, and that he was not brave enough to do it. He said that the only time that he had fully functioned as his own attorney was during jury selection, and that it was his assessment that he did a "reasonably good job." He feels that the stand-by attorneys were the ones who actually struck a series of jurors, and he disagreed with many of their decisions. He is not concerned about representing himself in the penalty phase. Even though he is new to doing it, he feels he will do it well. He stated that he will object when appropriate and plans to present evidence which he would not disclose at this point, because he hadn't made his final decisions. He realizes that he will not cross examine victims, because it doesn't look good if you cross any of these people who are the victims of his crimes. He stated it is especially true, because it would be he himself who was asking the questions. When asked about his feelings about being in front of the victims, he stated that although he "doesn't care about them," he "doesn't want to upset them either." They would be totally focused on the particular family member that they had lost and not any other issues. He asked this examiner if I had read the comment in his records about "clouds moving fast." He made clear that the interpretation that that was a psychotic idea was silly, because it just meant that the "wind was just blowing real hard." He also pointed out logically "how does that connect with an alleged psychotic process now!" He commented about his smiling and laughing "at the wrong time" according to some of the reports. He stated he thinks this issue is a mix of two things. First it is projection of what onlookers think what he is thinking about, and "how can they know what I am thinking about?" Also a lot of people smile when they are nervous or uncomfortable, and he thinks that is primarily the case. He also pointed out that he just in fact smiles a lot. He went on to talk about the comments that his stand-by attorneys have made that he is "indifferent" or "blasé" about the death penalty. He

explained again that his attitude is that both options are bad, and it's simply not worth thinking about them. He stated that he is like his father that they "don't let things bother them," and therefore neither one of them ever gets depressed. He stated clearly that his situation is like a Palestinian in an Israeli jail after killing nine people. He said the Palestinian would not be upset or have any regret, because he would have successfully done what he tried to do. When asked what he meant when he touched on the idea "I had to do it." He said he "had to" because "no one else was going to do it." When asked why he wore two pairs of pants when he worked in the summer, he explained that he wore sweat pants under his other pants. He went on to explain that this was because the edger had lost the rubber shield. Therefore it threw rocks and grass backwards and filled his shoes with dirt and little rocks until he learned to tuck his sweat pants into his shoes. When asked why so many witnesses had described that it was hard to get him to talk, he reported that he was shy as a kid, but that it was easier now that he is older. He described that it was faster for him now to become comfortable with people, and that he has no difficulties talking after he becomes comfortable with them. He went on to describe that he doesn't think his eye contact is abnormal in any way. He stated that his eye contact is related to how much confidence he is feeling at the time, how intimidating the other person is, and stated the obvious fact that "everyone looks away" occasionally. He again raised the issue that he "can't win," because if he does make eye contact, he was described by Dr. Loftin as "too intense," and that if he doesn't make eye contact, he is described as acting abnormally. He also made a jocular comment that "besides these evaluations are stressful and are not like normal conversations." He stated that it was only initially that he stated that he didn't want his lawyers to pass notes or talk to him in the court room. He gave the logical example that this first came up during the jury selection process where 80 potential jurors would be brought into the court room at

a time, and they would all be looking directly at him.  He said I was "doing my very best to not have a blushing attack."  He went on to comment on people saying they were not able to tell when he has been joking.  He said they really misunderstood that he purposely didn't want to give away that he was telling a joke by changing his facial expression.  He pointed out that this was like his father. He went on to point out that his sister's notion that he was inappropriate in describing Machiavelli's *The Prince* as a guide because it was a satire.  He pointed out that it actually says that it is a guide in the introduction, and he is well aware that it is also a satire.  He was asked if this was an example of his being precise in his language, and he said yes.  He went on to explain Dr. Loftin's comment that he was unintentionally rude with his comments about women, saying that they should not be given the right to vote.  He said of course he knew that he was being rude and that was the entire point.  He knew that zero percent of women, especially professional women, would agree with him.  It is the same kind of thing the female attorneys never agree with when he says it.  He went on to state that "what is the point of having an opinion if you don't ever tell people what that opinion is?"  He also explained the Obama example which he pointed out she had confused.  The Defendant's comment was about Obama's speech after the police shooting in Dallas.  The shooters were African American but the policemen were all white except one Hispanic.  He felt that Obama's comments that this was about police violence was completely unsympathetic and inappropriate to talk about police violence at a memorial for white policemen killed by African Americans.  When asked for examples, he gave several other where he gave normal and logical answers to questions which have been repeated as evidence of autistic pathology. When she stated that her comment that he thrust out his hand for the other puzzle pieces was illogical, because he knew what she was trying to do.  He knew that he needed the other pieces of the puzzle so he simply held out his hand and felt that

was completely logical.  He pointed out her comment that it was "literal" language when he pointed out that he did not go <u>into</u> the church.  He explained that this is important when you are confessing to the FBI, because you need to be accurate with them. He reported that he had no anecdotes to tell her, because he doesn't have any anecdotes to tell her about white nationalism.  He asked "besides this is not a social hour."  He saved the best examples for last.  He pointed out on the last page of her report she was mistaken when she pointed out that the car in France which ran into the crowd was in fact driven by a Muslim, although she pointed out to him that it was not a Muslim.  He saved the best to last in his opinion that Dr. Loftin was the one who was confused when she said that Dylann was confused about whether he had been interviewed by the Daily Stormer.  He pointed out that he was talking about Andrew who now runs the Daily Stormer, and it was quite logical that Andrew would be concerned about whether or not he was incorrectly quoted as making an anti-white statement.

<u>Second interview 1/1/17</u>:

The Defendant began the interview by asking if I had read Thomas Mann because he had started reading one of his novels but had only reached page 10.   He then went on and asked if there had ever been someone who represented themselves in a death penalty phase who actually wanted to be put to death.  He stated that at the competency hearing tomorrow that he would immediately ask the judge that his attorneys not represent him.  He stated that if the judge allowed them to cross-examine witnesses that he would like to cross-examine them too.  At the first hearing, he was not allowed to speak until the very end.  If that happened again, he would feel that his questions would be too distant from when the things were originally said and would seem petty.  He stated that there are about 30 prosecution witnesses scheduled, many of them around victim impact.  This examiner asked if

this would be difficult for him, and he stated "it won't be hard at all." He said there will be four witnesses per victim, and he thought that people would "get tired of it quickly." He said he would "sort of like it." When questioned about that, he stated that because he "did not identify with them, he didn't care." He stated that he could "appreciate and understand" what they are feeling and that they are valid feelings, but using the analogy he used yesterday of the Palestinian in prison for shooting Israelis, he stated that he simply wouldn't care. He said that he had been characterized by one of the survivors as having "vast hatred," which he denies. He stated that he was going to address the issue of hate in his closing arguments. He stated that he did not hate the individuals, but he hates what the group they represent is doing and pointed out that he had said that in his FBI confession the day he was arrested. He hates the idea of what blacks are doing in the abstract. He felt that it was "not right" for him to look closely at witnesses because it's impolite. What he is really worried about is that his manifesto from jail would be read and stated it is because it is so flawed and that it is embarrassing. This upcoming testimony will not affect him, because "I'm the guy who did it." "Why would I be sorry for what I planned and did?" He stated "you don't feel sorry for people that you don't identify with." It has no effect on him, because he did it on purpose and knew what he was doing before he did it. It would be bad if the victims were white, because he identifies with whites. What makes the act most offensive and outrageous is in fact that the victims were good people, and he planned that. This is why he liked that he was called "evil" and demonized. He feels this is funny and a "bunch of bull," because he knows he is not an evil person, but perhaps his act was. He also says that he believes the prosecutors don't believe that he is evil, but that they are doing their job. Although he thinks the lead prosecutor doesn't like him. He is separated from the "personal" and the victim impact. He stated that the trial is important, because people "are paying attention."

Although the wrong thing could be said, and he wouldn't like that.  Also the trial record is there for posterity and his long term reputation is important to him. When asked why he did not plead guilty, he was initially very confused.  He pointed out that when he confessed, he didn't even know he would have a trial and thought he would go straight to prison.  As he talked to his attorneys and the judge, he changed his mind from wanting to plead guilty to deciding not to because his appeal possibilities would be better if he pled not guilty.  The reason the appeals are important is because they would "buy him time." although he "knew his appeals would never be accepted."  He didn't even know there were two phases, and he was told that he "couldn't plead guilty to the death penalty."  The most important issues for him were that all the evidence would be presented in the penalty phase anyway, and the only difference would be he would have less chance for appeal if he initially pled guilty.  He admitted that he didn't think about any of this before the act, because he thought he would be dead after the crimes.  He then stated that he is convinced that his attorneys do understand quite well why he did it and why he seems "blasé."  This is because they have talked to him hundreds of hours about it and truly do understand, but they are not interested in his reasons or potential defenses.  He also pointed out that he believes that his lawyers are disingenuous in allowing the argument to go forward that he is autistic and using the assertion that he does not practice reciprocal humor, because they laugh at his jokes and even tell him that he is funny.  In a similar fashion, he believes they are disingenuous in presenting the idea that he had a "day of crystallization" when he said that these racial ideas explained "all" of his personal failures.  He pointed out that he had said in his journal that he did not blame blacks and Jews for his failures and that his attorneys know that.  He challenged Dr. Maddox's statements that he was paranoid when he said that he might be stabbed 150 times, because he does run the risk of being stabbed in prison.  Also, that it is not evidence of paranoia that

the white race could become extinct, but feels it is "undeniable" that it will be.  He stated that we are in fact already or soon will be the minority.  He wanted to clarify too that he was joking with his grandfather about taking a magazine test and stating that it suggested that he was schizophrenic.  He never took any test, and he was "messing with him," as he does with many people.  He also had been through the Dr. Moberg evaluation, and he pointed out that his idea that there was evidence of psychosis that the Defendant felt that he could predict the future, is preposterous because that was "completely related to his political predictions."  He also pointed out that Dr. Moberg was wrong and that he had only had one panic attack in his entire life and that he had quit marijuana at age 16.  He wanted to go over these reports because the examiner was one of the only ways he could refute these facts, because his attorneys had no interest in doing that.  He pointed out that the case that was made about his being rude to his family was not meaningful, because he "couldn't be rude to his family because they would like him anyway."  It's not really being rude, because they don't mind his actions.  He stated he would not do it if it did actually offend his family.  He stated that it is "ludicrous" to suggest that he is autistic or does not understand social cues.  He feels that he is hyper-sensitive about to social cues and always worries about whether people like him or approve of him.  He pays very close attention to the expressions on people's faces to evaluate whether they are being critical of him.  He sees this as purely related to his social anxiety, because he in fact does recognize social cues, and that he is very concerned about them.  He pointed out that he never smiled in his website photographs, because they were related to his pending crime and were therefore "supposed to be serious."  He wanted to comment about the Robison report in that Robison pointed out that in his answers to the FBI in his confession that he pointed out where people were sitting and the layout of the room, but not about the people. He made Robison's observations seem silly, because he stated that he did exactly

what the FBI asked him to do, and they did not ask him to describe the people. When asked what he would wear tomorrow, he smiled and said that he would wear his jumpsuit "because no one will be there, so it doesn't matter."

Expert examination of alleged new facts presented by the Defendant's stand-by counsel:  Judge Gergel directed that only opinions based on new behaviors or facts since the previous competency evaluation are pertinent.  Unfortunately the only new "evidence" are observations and questions offered by the Defendant's stand-by attorneys.  The examiner will comment about conclusions and supportive evidence about each of the issues that have been raised since the first competency evaluation 11/21-22/16.

I.      One issue that has been raised was whether the Defendant has the capacity to understand the issues and assist his attorneys (or the ability to communicate and cooperate with this attorneys).

        Evidence/Conclusions:

        A.  There is no change in the new examinations on 12/31/16 and 1/1/17 from this examiner's initial examination that the Defendant is fully capable of cooperating and assisting his attorneys but is choosing not to for rational and intelligent reasons where he disagrees with his attorneys.

        B.  Again, the other evidence will be from the Trier of Fact, Judge Gergel's direct observations of the Defendant during the jury selection and innocence-guilt phase of the Defendant's trial.

II.     It has been raised by the defense counsel that the Defendant's seeming refusal to take what they feel is the logical stance to primarily try to defend himself in the penalty phase implies a lack of competency.

Evidence/Conclusions:

    A. This examiner continues to find no evidence that his seeming lack of self-preservation is evidence of lack of competence. Rather, it continues to be the exact same rationale as before the first competency examination continuing into the second. The Defendant sees little to no difference between the two options and sentences and therefore he is indifferent to which one proves to be the case.

    B. This leaves him with only one motivation that matters to him and that is to preserve his reputation, even if those efforts result in him receiving the death penalty.

    C. The only strategy left to him is to try to do the only thing he feels he can influence and that is his future reputation as not having any mental health disorders or defects no matter what the consequences in the penalty phase of his trial.

III. One of the main issues his stand-by counsel raised is that in his penalty phase the Defendant plans to "call no witnesses, present no evidence, cross-examine no government witnesses, or do anything otherwise to defend himself."

    Evidence/Conclusions:

    A. Again the Defendant's primary concern is not if he is sentenced to death but how to prevent evidence about his mental health to be presented because he feels they are "lies" and incorrect.

    B. Also he reported in his current evaluation that he does plan to present evidence and cross-examine witnesses. What he does not plan to do is devote much energy to prevent the death penalty, and direct his efforts to his primary goal of presenting

his ideas and preserving his reputation and keeping his rationale for his crimes clear.

IV. His stand-by attorneys assert that their defense experts say that his various developmental and mental illness disorders "so control his decision making as to compromise his ability to assist his counsel and to represent himself." They present as evidence that he plans to present no evidence in the penalty phase of his trial. "Rather, he plans to use the penalty phase solely as an opportunity to dispel any questions about his mental health."

Evidence/Conclusions:

A. As previously stated, this examiner found no evidence that this is the case in his first evaluation and continues to find no evidence that he has developmental disabilities or mental illness that are controlling or even significantly influencing his decision making. In contrast, it appears that all of his decisions in the trial are dominated and driven by his primary racial prejudice and wish to preserve that as the sole rationale for his crimes and to protect his long term image and reputation as someone who has no mental illness. He has been completely consistent throughout his pre-trial evaluations, evaluations during his first competency trial, and during his second competency evaluation.

B. His explanation of his racist reasoning behind his acts have been highly consistent from pre-trial evaluations with Paul Moberg, Ph.D., his evaluation by this examiner for the first competency hearing, and now again in his second competency evaluation. What he has said has been completely consistent since long before the crimes, and in the months and years since the crimes,

and argues strongly that these are not a product of a "disease or defect," but of a long standing racial prejudice.

C. <u>His attorneys raised the issue that in their opinion, he is preoccupied with this clothing, implying that this is an autistic trait</u> of being concerned about textures and the sensations that his clothes produce on him. <u>However, the Defendant gives very logical reasons about his concerns about his clothing. He points out that he is in a very high profile trial in which there are dozens of reporters. He states that he "just wants to look good" and to have his clothes cleaned and pressed. He points out that "surely Mr. Bruck has his clothes cleaned and pressed before he appears before all these people." He also had a very logical explanation of why he wore two pairs of pants in his lawn maintenance job in that he wanted to prevent the edger and weed whacker from throwing rocks and debris into his shoes and on his legs. Although there may have been examples of some autistic traits as a child, there is no credible and convincing evidence that these traits have any significant effect on his competency to stand trial or to function as his own counsel at this point.</u>

V. His attorneys <u>assert that the Defendant's denial of his own incompetence shouldn't be taken as evidence that he is in fact competent.</u>

      <u>Evidence/Conclusions:</u>

        A. <u>The examiner tested the Defendant's competency and found him competent and found no diseases or defects that interfered with the Defendant's competence.</u>

B. His stand-by defense attorneys make the point that he has non-mental health mitigation evidence that he was shy and non-violent and that he has displayed good behavior in jail and therefore would be a complaint prisoner.  This examiner agrees that those issues would potentially be good mitigation evidence (as would the evidence of his difficulties as a child).  However, the Defendant disagrees with using such mitigation evidence to this examiner and to Judge Gergel despite urging him that he reconsider.  However, his rationale is straight forward in that throughout his trial, he has felt that this type evidence would potentially undermine the political reasons for his crimes and damage his future reputation.  This type of motivation and decision making is not disease or defect driven but a logical extension of his political and social beliefs.

VI. His attorneys assert that he told them to not speak to him or share notes in the court room with him.

Evidence/Conclusions:

A. The Defendant agreed that he did tell his attorneys that at the very beginning of the trial.  However, he has in fact subsequently had his attorneys speak to him and slip him notes on a regular basis.  He described that he has become considerably more comfortable in the court room now compared to his first experience with large numbers of people watching the proceedings.

B. It has surprised him that he has not had a recurrence of blushing attacks once the trial began and is now comfortable with exchanging notes, etc. in the court room.

VII.  His attorneys testify that he is overly concerned about whether certain people and the judge "like him."

Evidence/Conclusions:

A.  The Defendant admits he does care, more than most, what people think of him (second evaluation) and this is secondary to his social anxiety.

B.  This examiner has certainly seen this behavior in the Defendant but sees no evidence that this substantially affects his competence.

VIII.  His attorneys assert that the Defendant's concern about whether certain photographs are put into evidence or not is evidence of his incompetence.

Evidence/Conclusions:

A.  The Defendant does have some concern about various photos. He asserts that this is normal that he wants to put his "best foot forward" and that also he has Social Anxiety about how he looks and objects to certain photographs.  However, these issues do not rise to the level of having pertinence to whether he is competent or not.

IX.  His attorneys assert that his affect is inappropriate during particularly emotional testimony, and that his staring down during the trial, is evidence of incompetence.  They have alleged that these are examples of his "dissociating in court," paranoia, and "seemingly being under the influence of delusions."

Evidence/Conclusions:

A.  The Defendant provides a logical explanation that he has occasionally smiled and even laughed during very tense situations as well as "stared down at the floor."

B. <u>The Defendant himself provides logical and credible explanations that the intensity of much of the testimony in the guilt-innocence phase of his trial are difficult for him to deal with and upsetting.  He has stated that he often does smile because he is uncomfortable and stares down because he does not want to show the emotion that he is feeling and have people make negative conclusions about him and his feelings.</u>

C. In fact, in his pre-trial evaluation by Dr. Loftin, she commented that the Defendant "seems to smile out of nervousness" (page 28) or when "not sure what else to do."  This observation is completely consistent with the Defendant's explanation at this point.

D. <u>The examiner finds no evidence that these observations are evidence of psychosis or evidence of incompetency.</u>

<u>Summary of examiner's opinions about the alleged new evidence of the Defendant's incompetency to stand trial or to represent himself.  These all represent opinions of the examiner to a reasonable degree of medical and psychiatric certainty.</u>

In summary, this examiner finds no evidence of any change in the Defendant's competency with the single exception that he seems more competent in that, as predicted, his social anxiety, and confidence in general, have improved since the last evaluation.  As he has gained more experience in the court room, he has become less anxious and better able to function in the court room.  Again, the judge and trier of fact would have considerable amount of primary experience

watching and observing the Defendant in the court room and during times when he is functioning as his own counsel.  In this examiner's most recent examinations, he finds no new evidence of any negative change in the Defendant or in his competency.  There is no evidence of an occurrence of any "disease or defect" effecting his competence or ability to work to assist his supporting counsel.  He exhibits considerable ability to cooperate with counsel, but at this point, he has again chosen to refuse to cooperate with them, because he feels they do not represent his best interests.  Finally, this examiner finds no reason to change or amend his report or findings of competency in the initial competency hearing.


_____

   James C. Ballenger, M.D.