```
1                  IN THE DISTRICT COURT OF THE UNITED STATES
                        DISTRICT OF SOUTH CAROLINA
2                          CHARLESTON DIVISION

3

4    UNITED STATES OF AMERICA,    )          2:15-cr-00472-RMG
                                  )
5              Plaintiff,         )
                                  )
6    VS                           )
                                  )          Charleston,
7    DYLANN STORM ROOF,           )          South Carolina
                                  )          January 2, 2017
8              Defendant.         )

9

10                 TRANSCRIPT OF COMPETENCY HEARING
                BEFORE THE HONORABLE RICHARD M. GERGEL,
11                UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:     JULIUS NESS RICHARDSON
                            Assistant U.S. Attorney
14                          U.S. Attorneys Office
                            1441 Main Street, Suite 500
15                          Columbia, South Carolina 29201

16                          MARY J. HAHN
                            Assistant U.S. Attorney
17                          U.S. Department of Justice
                            601 D Street NW, Room 5200
18                          Washington, DC 20003

19                          NATHAN STUART WILLIAMS
                            Assistant U.S. Attorney
20                          U.S. Attorneys Office
                            P.O. Box 876
21                          Charleston, South Carolina

22

23                          RICHARD E. BURNS
                            Assistant U.S. Attorney
24                          U.S. Department of Justice
                            1331 F Street NW, Suite 625
25                          Washington, DC 20530
```

```
 1
                                    STEPHEN CURRAN
 2                                  Assistant U.S. Attorney
                                    U.S. Department of Justice
 3                                  601 D Street NW, Room 5808
                                    Washington, DC 20004
 4

 5      For the Defendant          SARAH S. GANNETT
                                    Assistant Federal Public Defender
 6                                  Arizona Federal Public Defenders Office
                                    850 West Adams Street, Suite 201
 7                                  Phoenix, Arizona 85007

 8                                  DAVID I. BRUCK, ESQ.
                                    Virginia Capital Case Clearinghouse
 9                                  Washington and Lee School of Law
                                    Lexington, Virginia 24450
10
                                    EMILY PAAVOLA, ESQ.
11                                  Justice 360
                                    900 Elmwood Avenue, Suite 101
12                                  Columbia, South Carolina 29201

13                                  KIMBERLY C. STEVENS, ESQ.
                                    1070-1 Tunnel Road, Suite 10-215
14                                  Asheville, North Carolina 28805

15

16                                        *   *   *

17

18

19

20

21

22
        Court Reporter:            Amy C. Diaz, RPR, CRR
23                                  P.O. Box 835
                                    Charleston, South Carolina 29402
24

25              Proceedings recorded by mechanical shorthand,
             transcript produced by computer-aided transcription
```

**INDEX TO EXAMINATIONS**

**WITNESS**                                                                              **PAGE**

JAMES C. BALLENGER, M.D.
  Examination by the Court                                                          21
  Cross-Examination by Mr. Bruck                                                    40
  Cross-Examination by Mr. Roof                                                     71
  Cross-Examination by Mr. Richardson                                              79

RACHEL LYNN LOFTIN
  Direct Examination by Mr. Bruck                                                  140
  Cross-Examination by Mr. Roof                                                    159

JOHN EDGAR PARKER III
  Direct Examination by Ms. Stevens                                               167
  Cross-Examination by Mr. Roof                                                    187
  Cross-Examination by Mr. Williams                                               194

DYLANN ROOF
  Examination by the Court                                                        197


**EXHIBITS**


**DEFENDANT'S NUMBER**                                                                   **REC'D**

1                                                                                   20
3                                                                                  184

```
 1              THE COURT:  Let me begin the proceeding by saying
 2    the only persons permitted to be present are counsel of
 3    record and the parties, but everyone else must leave.
 4              MR. BRUCK:  May I?
 5              THE COURT:  You may.
 6              MR. BRUCK:  We would ask that counsel of record
 7    include two lawyers who are counsel of record in the State
 8    proceeding for Mr. Roof; that is, Mr. Pennington and
 9    Ms. Norris who are present.
10              THE COURT:  You know, Mr. Bruck, I'm keeping victims
11    out, and I'm not allowing any -- I'm unbending in that rule.
12    Only federal counsel of record and parties are allowed to be
13    present and the witness Mr. Ballenger and the Court examiner.
14    Everyone else should leave.
15              MR. BRUCK:  I appreciate the Court did not grant
16    this motion last time, but I would also request for other
17    reasons in the interests of efficiency to allow the expert
18    witnesses to hear the testimony of other experts in this case
19    in order to be able to move things through expeditiously and
20    avoid unnecessary repetition.
21              THE COURT:  They received Dr. Ballenger's report.
22              What's the Government's view of this?
23              MR. RICHARDSON:  Your Honor, we ask they be
24    sequestered.
25              THE COURT:  Granted.
```

```
 1                MR. RICHARDSON:  Just because of the phrasing you
 2      used last time, the lead case agent, FBI agent.
 3                THE COURT:  He is a party.
 4                MR. RICHARDSON:  Thank you, Your Honor.
 5                THE COURT:  As Mr. Roof can be present, as both
 6      self-representing counsel and a party.
 7                MR. BRUCK:  If we may also have five minutes to
 8      confer with the client.  In view of the Court's statements
 9      during the closure hearing, we have a matter to take up with
10      him.
11                THE COURT:  Go right ahead, Mr. Bruck.
12                MS. STEVENS:  May we speak with him?
13                MR. ROOF:  I'm not going to talk.  I'm not going to
14      talk to them.
15                MR. BRUCK:  We'll be back soon, then.
16                THE COURT:  Okay.  Mr. Roof, just tell them that
17      when you step out, and if you would, come back in, if that's
18      your desire.
19                MS. STEVENS:  Thank you, Your Honor.
20                (Thereupon, there was a brief recess.)
21                THE COURT:  Okay.  The defendant and the standby
22      counsel are back into the courtroom.  And we are going to
23      commence this hearing.
24                Let me lay out some -- yes?
25                MR. ROOF:  Before we start, I just -- I want to say
```

1    some things.  First of all, I don't understand what right

2    they as standby counsel have to put me through another

3    competency hearing.  Besides that, I don't want them as my

4    standby counsel anymore.  I want you to dismiss them, if you

5    can, as my standby counsel, and I don't want to have standby

6    counsel.

7              THE COURT:  Okay.

8              MR. ROOF:  I don't understand why I have to be put

9    through another competency hearing just a little bit over a

10   month from my last one, and what right they have to do that

11   as my standby counsel?  And I also have one last thing.

12             THE COURT:  Yes, sir.

13             MR. ROOF:  The marshals came to the jail and gave me

14   this with some other papers.  It's a draft of something that

15   says "Defendant's Eighth Amendment motion to preclude

16   application of the death penalty under *Simmons* and *Atkins* due

17   to the defendant's youth, autism and mental illness" and in

18   the beginning it says, "The defendant through counsel files

19   this motion."

20             THE COURT:  It's not signed.  It's a draft.  They

21   have not submitted it.

22             MR. ROOF:  But you have it.

23             THE COURT:  I'm not considering it.  It's a draft.

24   I wouldn't consider it.  It's not a motion before me.  I have

25   said, Mr. Roof, that no motion can be filed on your behalf

1    without you signing it as long as you are self-representing.

2    Sit down.  Let me discuss with you -- because you raise an

3    issue that I was about to begin addressing right before you

4    stood up -- I have instructed standby counsel to serve as an

5    advisory role and to not file any motions without the consent

6    and written authorization of the defendant.

7         Standby counsel correctly cited a body of law that

8    says if they have a belief the defendant is not competent,

9    they have an ethical duty to raise that with the Court.  I

10   think that is correct.  And, yes, it's five weeks since the

11   last competency hearing.  I'm going to address what is

12   actually at issue here because we are not relitigating the

13   prior competency case.  Everything is going to be from

14   November 22nd forward because I've already ruled.  The

15   defendant as of November 22nd was competent.  We are not --

16   this is not a redo.  We are going to address new issues.

17        The defense standby counsel raised a series of

18   issues.  I thought out of an abundance of caution that I

19   should not ignore it, that it would be an issue later if I

20   did.  I took it seriously.  I asked Dr. Ballenger, the Court

21   examiner, to interrupt his personal vacation to come back to

22   Charleston, which he did -- the Court greatly appreciates his

23   service here -- and asked him to meet again with the

24   defendant.  He did.  He issued a report which says his

25   opinions have not changed as to the defendant's competence.

1    He's going to testify here today.  He's going to be subject

2    to cross-examination.

3         And I think it's important for purposes of

4    addressing this issue that for this limited purpose, I'm

5    going to allow the standby counsel to prosecute this issue.

6    I think it's important for due process that in the interests

7    of justice for this record that they do that.  And I appoint

8    them to represent the defendant's -- to represent the

9    position here.  I know it's contrary to the defendant's

10   personal desire, and for this limited purpose, does not

11   otherwise modify the standby counsel role.  But I know they

12   were anxious in filing this.

13        They were -- I want to say that I didn't think you

14   were defying -- I think you were doing what you should do.

15   And I know you went to some length citing cases because you

16   were worried about defying the Court, and I appreciate your

17   respect to the Court and why you did it.  But I agree with

18   you.  I think you had a duty to do it.  Whether there is

19   merit to it is another question.  We are going to go through

20   that.

21        But we need to establish a few ground rules.  I have

22   already mentioned one of them.  The law of the case is that

23   as of November 22nd, 2016, the defendant was competent.  If

24   there is any material change since then, I want to hear about

25   it.  No witness is going to be talking about something before

```
 1            that date because the law of the case is already established.
 2                    Now, if there is new information, I'm glad to hear
 3            that.
 4                    I received a declaration, joint declaration by
 5            counsel.  Mr. Bruck, how do you propose to present evidence?
 6            Are we looking at cross-examination by Government lawyers?  I
 7            don't like this.  How do we do this?
 8                    MR. BRUCK:  Well, we tendered that at this time,
 9            that declaration as evidence.  If the Court wishes to
10            sequester each of us individually, question us -- each of us
11            individually, we are prepared to answer the Court's
12            questions.  If the Court prefers the Government to question
13            us on the witness stand --
14                    THE COURT:  I felt like, frankly, the declaration
15            was merely a fuller statement of the motion.  That is what it
16            was intended to do, right?  And I don't have any questions.
17            I mean, I asked Dr. Ballenger to address those issues, you
18            know, to address each, and he did.  I saw in his report that
19            he addressed each of those issues.  I don't have any
20            questions for you, frankly.
21                    Mr. Richardson, what is the Government's view?
22            Because I believe you would have a right to cross-examine if
23            you wished to do so.
24                    MR. RICHARDSON:  Your Honor, we don't agree with
25            everything that is included in the declaration, and we --
```

1                    THE COURT:  Of course.

2                    MR. RICHARDSON:  We think --

3                    THE COURT:  Neither did Dr. Ballenger.

4                    MR. RICHARDSON:  -- that -- you anticipate well,

5       Your Honor.

6                    And so we think that it is most readily

7       challengeable through Dr. Ballenger's testimony as well as

8       the Court's own observation of the defendant throughout the

9       course of this proceeding.  And so we are recognizing the

10      difficulties that are raised by subjecting counsel to --

11                   THE COURT:  Why don't you reserve this discussion

12      until at the end of the proceedings, but forego it for now.

13                   MR. RICHARDSON:  That's what I would propose doing,

14      Your Honor.  At this point I think that those are issues that

15      we can flesh out based on the Court's observations.  If

16      necessary, we could submit an alternative declaration.  But I

17      think Dr. Ballenger probably will address most of that.

18                   THE COURT:  Listen, I've sat and watched the

19      defendant, okay?  I mean, and so I -- this is not

20      something -- you know, sometimes I get information.  I have,

21      like, no background in what the experts are saying.  I have

22      no independent basis to judge.  But, you know, I have made it

23      clear in my prior competency order that I observed the

24      defendant, and at that time I found him competent and that I

25      thought the comments about his lack of competence were

 1    without merit.  I mean, I made that pretty clear.  But I do
 2    think we all do ourselves a favor by not blowing off a new
 3    motion.  I opened the courthouse on a holiday, you see my
 4    marshals sitting here.  We brought everybody here to do this
 5    because it's important to do, to not cut corners, to round
 6    every corner, and to do it right.
 7              So, Mr. Bruck, tell me about what witnesses you
 8    might propose to offer.
 9              MR. BRUCK:  Yes, Your Honor.  We will anticipate
10    that the Court intends for Dr. Ballenger to testify.
11              THE COURT:  Correct.  I'm going to have him briefly
12    go through his report.  I'm going to ask him to address each
13    of those issues, that we start from about page 15 of his
14    report, and he goes through each of those sort of concerns
15    that you raised, and how he -- I'm going to ask him to walk
16    through those for us.  And after -- and I presume you are
17    going to want to cross-examine him.
18              MR. BRUCK:  Yes.
19              THE COURT:  Your cross-examination should address
20    issues since the 22nd of November.
21              MR. BRUCK:  Yes.
22              MR. ROOF:  Can I cross-examine the witnesses?
23              THE COURT:  Yes.
24              MR. ROOF:  Can I bring something up?
25              THE COURT:  Well, have a seat now, Mr. Roof.  Let's

1    finish this, and I will hear from you.

2              Yes, sir.

3              MR. BRUCK:  Our next piece of evidence, and I think

4    I made this clear, is our declaration where we will not be

5    appearing through live testimony, but I want to make it clear

6    we intend -- we want to tender that.

7              THE COURT:  You endorse the statement?

8              MR. BRUCK:  Yes, and do Ms. Stevens and Ms. Paavola.

9              THE COURT:  I understand that.  Yes.

10              MR. BRUCK:  Then we have five witnesses present here

11    today, the four experts whose declarations were attached to

12    the competency motion.  That is Dr. -- and this is the order

13    in which we propose to call them:  Dr. Loftin, Professor

14    Robison, Dr. Moburg, and Dr. Maddox.  We also intend to call

15    Father John Parker, who is the witness discussed in -- the

16    minister -- priest who had been visiting the defendant for

17    the last year and a half and whose relevance to this issue is

18    discussed in the -- in our submission by counsel.  So those

19    are five witnesses.

20              THE COURT:  Have any of these individuals examined

21    the defendant since November 22nd?

22              MR. BRUCK:  Um, Doctor -- I'm sorry.

23              Father Parker has seen the defendant several times

24    since November 22nd.  The defendant declined yesterday to see

25    Dr. Maddox and Dr. Loftin when they went to the jail to see

1   him.  The other two --

2           THE COURT:  Well, what would they be basing their

3   opinions on?  About his changes since November 22nd?

4           MR. BRUCK:  They will testify based on the facts

5   that have been made known to them through counsel.

6           THE COURT:  You mean you want them to render an

7   opinion about what you told them?

8           MR. BRUCK:  Based on the entire record, including --

9           THE COURT:  We've already since November 22nd, my

10  law of the case is the law of the case.  You are going to

11  tell me something -- we are not redoing this.  I've listened

12  to Dr. Maddox for hours.  We are not doing this again.  I've

13  ruled.  Now, if she hasn't seen him since then, I don't

14  understand what her relevance is.  She has exhaustedly told

15  me her opinion.  I have the transcript, I reread it last

16  night.  It goes on for a hundred-something pages.  I've read

17  it.  I don't need it.  I've ruled.  If you've got something

18  new -- Dr. Loftin delivered a statement I considered earlier.

19  Mr. Robison delivered a statement I considered earlier.

20  The -- Dr. Moburg did not submit a statement, but according

21  to his evaluation, it was conducted in February of 2016.

22          MR. BRUCK:  Yes, sir.  These issues go to the first

23  prong of the competency and the *Edwards* issue, which is

24  whether the defendant suffers from a mental disease or

25  defect.

```
 1              THE COURT:  I've already ruled.  As of

 2     November 22nd, I've ruled on that.  It's ruled on.  If you've

 3     got something since November 22nd, I'm all ears.  I'm not

 4     redoing a competency hearing.

 5              MR. BRUCK:  The additional evidence that has been

 6     made known to the experts include video visits from the

 7     period since November 22nd until the present, which they have

 8     observed; that is recordings of family visitation.

 9              THE COURT:  All of them are going to testify not

10     about examining the defendant, but watching a video of the

11     defendant?

12              MR. BRUCK:  Correct.  And, of course, they have now

13     seen each other's reports with the reports --

14              THE COURT:  You are going to rely on what you told

15     them, but on the reports on what you told them that they each

16     now shared with each other.  This is getting pretty far

17     afield, Mr. Bruck.

18              MR. BRUCK:  That is the -- inasmuch as the defendant

19     has made it impossible for them to reevaluate him, that is

20     the record.

21              THE COURT:  He cooperated with Dr. Ballenger who

22     doesn't have a dog in this fight.  He's a court-appointed

23     examiner.  He spent five hours with the gentleman after

24     having spent eight hours on three other occasions.  I'm

25     just -- I'm just struggling here about how -- listen, if
```

1    Father Parker wants to talk about what he's seen since

2    November 22nd, let me say I'm glad to hear from him, okay?  I

3    am glad to hear.  Having these folks talk about double and

4    triple hearsay, it just -- it's not impressive to me.  I

5    think you are trying to relitigate this issue.  Now,

6    Dr. Loftin previously did not offer -- or in her report, an

7    opinion regarding competence.  She offered an opinion that

8    the defendant had autism.

9            MR. BRUCK:  She will testify today, if permitted to

10    do so, concerning the impact of autism on the issues of

11    competency in two respects.  And I also want to flag a new

12    issue, which is the *Indiana vs. Edwards* question.  And this

13    arises in two ways:  One is that the Court in the exercise of

14    its discretion has authority, even if the defendant is

15    competent, to deny at this stage in light of the record as a

16    whole, including the statements that were made in open court.

17            THE COURT:  Of course, I considered the *Indiana*

18    *versus Edwards* issue at the time I allowed the defendant to

19    self-represent, and I issued an order to that effect.  He

20    does not, in my opinion, the information I have thus far,

21    fall into that gray defendant area described in *Edwards*.

22    It's not there.  And I know you have a view, Mr. Bruck, that

23    a defendant on trial for his life should not be allowed to

24    self-represent.  I understand that.  There is a minority

25    view, a dissenting view you cite.  You have represented that.

 1      I'm a federal district judge.  I don't make these rules, you

 2      know, and I follow them, and I -- that's not the law.  You

 3      are going to have every opportunity one day to address that

 4      issue, and you will do that.  But I'm not changing the law

 5      because that's not my role.  That's not the way we do things.

 6      So I'm applying the law as it exists, and he does have a

 7      right to self-representation.  And he does not fall into the

 8      category, from the information I have thus far, that would

 9      fall within the narrow section of *Indiana vs. Edwards*.  So

10      I'm not -- and I considered all of that testimony at the

11      competency hearing.

12              Dr. Loftin had every opportunity then, she submitted

13      a statement, I recall.  Was -- was she the one out of the

14      country?

15              MR. BRUCK:  Yeah.

16              THE COURT:  She gave a very detailed report.  We

17      have a report in.

18              MR. BRUCK:  Now --

19              THE COURT:  We had one previously from her.

20              MR. BRUCK:  It was two pages long, or three.

21              THE COURT:  It's the same -- you know, I guess y'all

22      think if you go 20 pages, then, wow, you know.  I had two

23      autism experts.  We had the one who testified, and then we

24      had -- we had Dr. Loftin.  We considered all this.

25      Dr. Ballenger said he has autism traits.  We considered all

```
1    of this.  We have been through this before.  And my -- I
2    believe my order on the Indiana -- on the issue of
3    self-representation on November 29th, which followed my
4    November 25th order -- I've done this.  That is the law of
5    the case.  If there is something different, I want to hear
6    it.  We are not redoing the competency hearing.  We are not
7    redoing my orders for the law of the case or the two orders I
8    issued on November 25th and November 29th.  New information.
9    I'm glad to do that.
10            Now, you know, I just don't know how anyone, other
11   than Father Parker, has anything to offer us other than the
12   attorneys' observations, and I have Dr. Ballenger who has
13   examined him about that.  These other folks who haven't
14   examined him, you want to have them come in and talk about a
15   video?  Is that what you want to talk about?
16            MR. BRUCK:  Well, that is -- and that is relevant to
17   issues in Dr. Ballenger's own report about the defendant's
18   representation about his perceptions and awareness of his
19   capacity to gauge other people's reactions, which are all
20   critical trial skills, which are relevant to competence.
21            THE COURT:  You know, Mr. Bruck, I've tried lots of
22   cases, and I had lawyers against me who had a certain
23   perception of their case.  I had a certain perception of my
24   case.  I was usually right -- I'm going to brag a little bit.
25   They were, I thought, wrong, but they were not incompetent.
```

```
 1    They had their views, and I had mine, okay?  That doesn't
 2    mean someone is not competent to function because they had
 3    different perceptions.  I think you are way -- taking this
 4    whole competency thinking way beyond the parameters that the
 5    law allows.  If you want to have these witnesses testify
 6    about a video, I'll take it for whatever it's worth.  Okay?
 7    I'll let you talk about that.  But I'm not letting you come
 8    in and talk about things before or something you told them,
 9    and then they are commenting on it.  That is -- that is
10    ridiculous.
11         MR. BRUCK:  Well, Your Honor, we have filed the four
12    reports.
13         THE COURT:  I read them.  I read every one of them.
14         MR. BRUCK:  We would like those marked as exhibits
15    and be considered evidence.
16         THE COURT:  I think they should be.  Yes?
17         MR. RICHARDSON:  No, we object strenuously to that.
18    These were all information that was available to those
19    experts before that hearing.  They wanted to create a report,
20    they could do so.  They didn't create a report so they
21    couldn't be cross-examined on it, so that they could prepare
22    a report after they were cross-examined on it.
23         THE COURT:  They are here to be cross-examined.  I
24    feel like I've already considered their information.  Here is
25    the question:  Dr. Ballenger made reference to it in his
```

1    report, that he had reviewed, okay?  And I think that is

2    okay.  If you want to put -- I think just for the fullness of

3    the record, but I'm not redoing this, Mr. Richardson.

4         MR. RICHARDSON:  I'm not asking to redo it, Your

5    Honor.  We think it ought to be struck.  If they wanted to

6    submit them at the competency hearing, all of that

7    information was available to them at the time of the original

8    competency hearing.  This is exactly what they've done

9    repeatedly, an attempt to relitigate after the fact, after

10   the Court has ruled, and to shove things into the record

11   after the fact.

12        THE COURT:  Well, let me say, they do that, they are

13   trying to -- you know, it's a difficult situation.  I don't

14   think -- at some point the appellate court might want to look

15   at what Dr. Ballenger is talking about when he made reference

16   to these opinions.  I think it is clear they are the same

17   opinions that this Court already addressed, okay?  I'm

18   putting that on the record.  But I think just, you know, for

19   the fullness of the record, I would allow them to attach

20   them.  I'm not going to have them come in and relitigate

21   those other issues.  Okay?

22        MR. ROOF:  Um --

23        THE COURT:  Yes, Mr. Roof?

24        MR. ROOF:  I would also just on top of that, I would

25   also like to object to them being part of the record simply

1    because, again, the reports consist of nothing but

2    observations before November the 22nd.

3             THE COURT:  That is absolutely true.

4             MR. ROOF:  That is the only objection I would have.

5             THE COURT:  Thank you.

6             Now, let's talk a little bit of order here.  We've

7    got a bit of an unusual situation.  I want the issue of

8    competency to be litigated by standby counsel.  And I appoint

9    you, Mr. Bruck, to handle that.  I want -- Mr. Roof, if he

10   wishes, has a right to cross-examine witnesses.  And I'm

11   going to allow him to do it, as well as the Government.  Does

12   anybody have any problem with that?  Okay.

13            With that, Mr. Bruck, anything further before I call

14   Dr. Ballenger?

15            MR. BRUCK:  If you will indulge me just a moment.

16            Our declaration of counsel included as Exhibit A a

17   photocopy of two notes -- three notes, and I would like to

18   submit the original as A.

19            THE COURT:  Any objection?

20            MR. RICHARDSON:  None, Your Honor.

21            THE COURT:  Very good.  Attach it as Defendant's 1.

22            (Thereupon, Defendant's Exhibit 1 introduced into

23   evidence.)

24            MR. BRUCK:  Thank you, Your Honor.

25            THE COURT:  Dr. Ballenger, would you come forward,

1    please, sir.

2              Swear him, please.

3              THE CLERK:  Place your left hand on the Bible, raise

4    your right.  State your full name for the record, please.

5              THE WITNESS:  James E. Ballenger, M.D.

6    THEREUPON:

7                   JAMES C. BALLENGER, M.D.,

8    called in these proceedings and being first duly sworn

9    testifies as follows:

10             THE CLERK:  You may be seated.

11             THE COURT:  Can you state your full name for the

12   record, please, sir.

13             THE WITNESS:  James C. Ballenger, M.D.

14             THE COURT:  And, Doctor, I will dispense with your

15   experience.  We have documented that well in the first

16   hearing, and we do not need to do that again here.  And I

17   also make reference -- I believe you made that, your CV, a

18   part of the record in the first hearing as well.

19             THE WITNESS:  Yes.

20             THE COURT:  Doctor, you revisited -- I contacted you

21   over the holidays concerning the defendant's motion for a

22   second competency hearing; is that correct?

23             THE WITNESS:  Yes.

24             THE COURT:  And you generously agreed to return to

25   South Carolina to conduct that evaluation.

 1                THE WITNESS:  Yes, I was pleased to.

 2                THE COURT:  Thanks for your service to the Court.

 3                And then did you commence to meet with the

 4      defendant?

 5                THE WITNESS:  Yes, I did.  The day after I got back,

 6      I saw Mr. Roof on Friday for about three hours and Saturday

 7      for two hours at the detention center obviously.

 8                THE COURT:  Was he cooperative in his discussions

 9      with you?

10                THE WITNESS:  He was fully cooperative.

11                THE COURT:  And did he answer all of your questions?

12                THE WITNESS:  Yes.

13                THE COURT:  And you had, I believe, a copy of the

14      defendant's -- defense counsels' -- standby counsels' motion

15      identifying the specific instances since November 22nd that

16      they believe indicated that the defendant was not competent?

17                THE WITNESS:  I did, and I based my examination in

18      my report on the issues raised in that motion.

19                THE COURT:  And did you discuss each of those issues

20      with the defendant?

21                THE WITNESS:  Yes.

22                THE COURT:  Did you do it thoroughly?

23                THE WITNESS:  Yes.

24                THE COURT:  Did you feel like he made satisfactory

25      responses?

1            THE WITNESS:  Yes, and I had satisfactory time to do

2       it.

3            THE COURT:  And the general issue, did you find any

4       material changes in your opinions previously issued in your

5       original competency report?

6            THE WITNESS:  No.

7            THE COURT:  Did you note any material changes in his

8       behavior in any way that would affect his competence in the

9       last five weeks since your last evaluation?

10           THE WITNESS:  The first answer is no, certainly

11      nothing in the negative.  As I predicted, his experience in

12      the Court has reduced his anxiety about his -- about being in

13      a social/legal formal setting like this, and so he's less

14      anxious about that and more content.

15           THE COURT:  That doesn't surprise you, though?

16           THE WITNESS:  No.

17           THE COURT:  If I -- let me hand you -- I believe

18      this is a copy of your report; is that correct, sir?  And

19      make sure that is the page that is signed at the end.  If

20      it's not, I want to make sure we have a signature page.

21           THE WITNESS:  It is not signed.

22           THE COURT:  Would you sign it?  I'll provide you a

23      pen, and you can sign it right here.

24           MR. RICHARDSON:  Just for the record, Your Honor, he

25      submitted a signature page.

1           THE COURT:  He did.  He did do that, and I just

2   wanted it for the record.  I was getting ready to mark it to

3   have this one used.  So we actually have an original

4   signature.

5           THE WITNESS:  Now you have two.

6           THE COURT:  Two.  And, Ms. Ravenel, could we mark

7   this as Court Exhibit 1?

8           THE CLERK:  Yes, sir.

9           THE COURT:  Now, Dr. Ballenger, I want to direct

10  your attention, if I might, to beginning at -- I believe it's

11  on page 15 you began, I believe, systematically going through

12  each of those issues that had been raised in the motion.  Is

13  that correct?

14          THE WITNESS:  Yes.

15          THE COURT:  And could you just address each of those

16  issues, the responses you received, and your observations and

17  your conclusions?

18          THE WITNESS:  One basic issue raised in the motion

19  and in the proceedings was whether the defendant had the

20  capacity to understand the issues and to assist his attorneys

21  capably or the ability to communicate and cooperate well.

22  And I found there was no change in these two examinations on

23  Friday and Saturday.

24          THE COURT:  In terms of his ability to do it?

25          THE WITNESS:  In his ability to do it.

1          THE COURT:  He is disturbed with his counsel?

2          THE WITNESS:  Yes, and his willingness to do it,

3     that had significantly changed.  He was much more definitive

4     in his refusal and -- to continue to work with them.  That

5     had changed substantially, and he is much less willing.

6          THE COURT:  Did he explain to you why that was so?

7          THE WITNESS:  Um, in the extension of the same

8     reasons he had before.  At this point, understandably,

9     defense counsel are trying to put together an ethically bound

10    effort to defend him; and both in the guilt, but also in the

11    death penalty phase, they want to do certain things.  He does

12    not want to do them, and he feels the continuing

13    back-and-forth, which he feels some of it is disingenuous to

14    the point even of trickery, which makes him upset and angry.

15    That has proceeded to a point there are two issues:  One, a

16    loss of trust and irritation about that; and two, increasing

17    clarity of the differences in what he wants to do and what

18    they want to do and an inability to resolve that.

19         THE COURT:  So you believe he retains the ability to

20    cooperate if he chose to do so?

21         THE WITNESS:  Absolutely.

22         THE COURT:  But he has elected, by his own choice,

23    not to cooperate because he disagrees with their actions?

24         THE WITNESS:  Yes.  And I would go a step further to

25    say that that election, that choice of his, is based on

BALLENGER - EXAMINATION BY THE COURT   26

1    logical, rational thought of his, which is completely

2    consistent with everything he said from the moment he was

3    arrested until this morning.  His reasoning is the same.  It

4    is -- I understand it better, and I think others are

5    understanding it better.  One of the things that happened in

6    my examination is that I got even better acquainted of why he

7    and his lawyers are at loggerheads, or a point of such

8    unfriendly disagreement.

9         THE COURT:  Why don't we go to the next issue,

10   number two that you raised there at the bottom of the page.

11        THE WITNESS:  And that is, and I would comment,

12   somewhat not surprising for everybody else to have trouble

13   understanding Mr. Roof's reasoning because it seems so

14   contrary to commonsense that he would not care what the

15   outcome of the penalty phase is.  He sees both options as

16   equally bad, and he doesn't care about that.  What he cares

17   about are the act, that it not be muddied or misunderstood.

18   It was a purposeful act, that he is pleased that he was

19   successful to do the way he wanted to do it, and he wants

20   that clearly understood.  He doesn't want any efforts by

21   counsel to muddy that or muddy that water.

22        And, two, his reputation in the long-term about

23   this, to not have any diagnoses, mental health diagnoses or

24   neurobehavioral defects found against him.  And then in the

25   secondary thing that I also put in a larger group, his own

BALLENGER - EXAMINATION BY THE COURT    27

1    more personal concerns about his forehead and how he looks,

2    and whether the manifesto was poorly written or has incorrect

3    grammar.  Some of his autistic traits derive kind of things

4    about whether his sweater was washed wrong.  That is what

5    he's concerned about.

6            He's not concerned -- and it has been taken as --

7    and I don't think this is surprising, but taken as evidence

8    that he must not be saying if he thinks -- if he doesn't care

9    about whether he gets the death penalty or not.  I'm sure

10   their experience has been that almost everybody that they

11   work with cares.  They don't want to not --

12           THE COURT:  Did he think he was going to survive

13   that night?

14           THE WITNESS:  He absolutely didn't.  He was

15   dumbfounded.  And, you know, his plan, careful plan, was that

16   he would be shot in the fuselage from the police after he

17   fired 77 rounds; and if not, that's why he saved a round, he

18   was going to kill himself.  What he discovered and made clear

19   again to me is that that became a very frightening thing,

20   shooting himself, that he simply didn't have the bravery, his

21   term, and he said people who think suicide is a cowardly act

22   have never actually contemplated it.  It actually requires a

23   lot of bravery to pull the trigger.

24           THE COURT:  Your statement, "The examiner finds no

25   evidence and the lack of preservation is evidence of lack of

1    competence" --

2              THE WITNESS:  That is my view in what I said in more

3    words before.

4              THE COURT:  Number three.

5              THE WITNESS:  One of the issues that standby counsel

6    has raised is in the penalty phase, he planned to, quote, to

7    call no witnesses, present no evidence, cross-examine no

8    government witnesses, or do anything otherwise to defend

9    himself.  And, again, what I found is that his primary

10   concern isn't that.  That seems odd.  Impossible to

11   understand, almost crazy to people, particularly a death

12   penalty lawyer team.  But that is right.

13              In his top four or five priorities for the death

14   penalty phase, winning -- he doesn't even know what winning

15   his death penalty phase would be, and he doesn't really care

16   about it.  But that is not even on his priority screen at

17   all.  So it puts them -- and he actually believes at this

18   point that the defense counsel is interfering with his

19   ability to do what he wants to do, and they are messing up.

20              THE COURT:  His defense?

21              THE WITNESS:  His defense and his purposes and goal

22   for the remainder of --

23              THE COURT:  And what do you understand his defense

24   to be?

25              THE WITNESS:  His defense, I would say even he --

1    from the very beginning when he tried to talk to me about it

2    in the first set of examinations, he sees that no one else

3    will see it as a defense.  He doesn't think you will allow

4    him to present it as a defense.  He feels badly that he'll be

5    presenting it in front of African-Americans, most

6    particularly those who tragically were touched by this crime,

7    but his defense is that it was a purely political act.  He

8    said Saturday, I think, that he really thinks the best way to

9    help people understand it is the analogy that he is like a

10   Palestinian terrorist, extremist who shot nine people in

11   Israel in the restaurant where he worked and is now in jail

12   for that and doesn't feel sorry, because he did exactly what

13   he wanted to successfully.  Why should he feel sorry?  He

14   realized he's killed people, and the people feel bad about

15   that, but he doesn't because he did what -- he carefully

16   planned and methodically carried out his mission, and his

17   defense is that, that it was a political act.

18            He realizes that that is not a political defense in

19   our world and --

20            THE COURT:  But he wishes to make that statement?

21            THE WITNESS:  Yes.  And he might in the penalty

22   phase.

23            THE COURT:  Now, he talked about offering no -- no

24   defense.  He -- in fact did he share with you that he does

25   intend to do an opening and a close?

BALLENGER - EXAMINATION BY THE COURT    30

1            THE WITNESS:  Yes.  He plans and has worked on them,

2     and he also plans to cross-examine witnesses.

3            THE COURT:  As needed?

4            THE WITNESS:  As needed, and to present evidence.

5     He said his kind of evidence, his evidence, and that it

6     involves witnesses, implied that that witness might be

7     himself because he didn't plan to call any witnesses, if that

8     makes sense.  Yes, he --

9            THE COURT:  He is not planning to remain silent.

10           THE WITNESS:  No.  He's planning to do -- yes.  He's

11    going to make -- he's going to cross-examine government

12    witnesses.  He's going to be active, and he's going to

13    present the best defense that he can do that he wants to

14    present, that meet his goals.

15           THE COURT:  So to the question three about not

16    calling witnesses and so forth, do you find that to be

17    evidence of incompetence?

18           THE WITNESS:  No.  I mean, he has competently --

19    been completely consistent from the day he was arrested to

20    Saturday.  When I talked to him about what his purposes, his

21    goals are, are quite consistent, and he's sticking with them

22    despite having to work hard through a complex system he

23    doesn't understand to try to do that.

24           THE COURT:  Question number four, this whole issue

25    about whether these alleged developmental disorders and

1    mental illness control his decision-making.

2        THE WITNESS:  In the motion they asserted that the

3    various developmental mental illness, disorders, quote, "so

4    controlled his decision-making as to compromise his ability

5    to" -- "ability to assist his counsel and to represent

6    himself," end of quote, and that he planned to present no

7    evidence -- quote, "He plans to use the penalty phase to

8    dispel any questions about his mental health," close quote --

9    in fact, that illustrates the dilemma.

10        In fact, that is part, not entirely what he plans to

11    do in the death penalty phase, but that is what he wants to

12    do.  He wants to continue to try to get out of the record any

13    evidence of mental illness or autism or any other defects and

14    keep out any of the things that embarrass him, like

15    photographs that he doesn't like, photographs of him with

16    pillow cases looking like Klan.  He would like to clean the

17    record up of all of that, but that's not evidence of

18    competence.  That is just, in my opinion, evidence of

19    continuing with his goal versus what his lawyers are pushing

20    and trying to accomplish for him.

21        THE COURT:  And describe -- the goal was -- I

22    believe you described it more fully in your earlier report --

23    was his racial motivation about his perception that the white

24    race is in jeopardy, and there needs to be armed resistance

25    or resistance to the country becoming a minority country --

BALLENGER - EXAMINATION BY THE COURT    32

1    white minority country.

2              THE WITNESS:  His rationale for the crimes, his

3    reasoning for the crimes was his consistently-held belief for

4    at least two years that there is black-on-white crime across

5    the world, including the United States, where blacks are

6    killing whites and raping whites, and that the media is

7    covering that up, and he wants to expose that this is

8    happening because people want -- in his thinking, go to the

9    Internet and find out it is true; in his opinion that there

10   is evidence on the Internet to do that, and the white race

11   needs to be awakened.  And the reason he feels he had to do

12   it is because no one else was doing it, and it at times was

13   becoming increasingly perilous.  He did it to call attention

14   to this.

15             He cares about what happens in this trial because

16   people are watching this trial, and the media is closely

17   watching this, and he wants the right message to get out and

18   not have it besmirched or muddied by saying that he did it

19   because he was psychotic or had somatic delusions or was

20   autistic, but that it simply be a political act, which he

21   knows and purposely planned for it to be, the most outrageous

22   political act he could think of is to kill nine nice black

23   people in their place of worship while they were worshipping,

24   knowing he didn't have anything against those nine people,

25   but knowing they would be newsworthy.

1           THE COURT:  Let's go to question number five on page

2      18.

3           THE WITNESS:  His attorneys assert that the

4      defendant's denial of his own incompetence shouldn't be taken

5      as evidence that he is not incompetent.  I certainly didn't

6      take that.  He believes he's not incompetent.  I believe he's

7      not incompetent to stand trial, and that he is competent to

8      stand trial.  So every part of my examination beginning to

9      the end was a test of his competency to stand trial.  And I

10     found the same as I did before, that I didn't find any

11     significant problem with his competence to stand trial and

12     defend himself.

13          THE COURT:  Question six addresses the issue did not

14     wish to speak to the lawyers during the -- during trial and

15     didn't always follow their advice written on notes.

16          THE WITNESS:  Yes.  He made the good point to me,

17     actually on Friday, I think, that he did in fact say that in

18     September, that he no longer believes that he can handle that

19     without embarrassing -- being embarrassed.  He can handle it

20     without having blushing attacks, which part of the things

21     that all through this is that he has been staring at one spot

22     and at times avoiding looking at witnesses, which he thinks

23     it would be impolite for him to do, but that he stares to

24     handle the emotion of all of this, that all of that does not

25     mean he's incompetent, and that he can share notes, talk to

1          his standby counsel.

2                    But he doesn't agree with much of what they want him

3          to do for two reasons:  One, they want to do again the things

4          that practicing lawyers do.  He has different agendas than

5          they do.  He doesn't want certain things to go forward.  He

6          doesn't want certain things emphasized, and also sometimes

7          he's embarrassed about doing that.  But, again, their notes

8          are, in his opinion 100, percent not on his page about what

9          he wants to do.  He said in summary -- I think it was a

10         spontaneous comment, but he said he feels like he's sitting

11         at the wrong table.

12                   He wants -- wanted in the first phase to be

13         convicted.  He said that on day one:  "I did it."  He's proud

14         he did it.  He doesn't want anybody in the flow of history to

15         mistake that Dylann Roof did this, so he's not -- he wanted

16         to be convicted in the first phase, and he doesn't care what

17         happens to him in the second phase, although he would like to

18         stay alive as long as he can.  So part of why, his strategy

19         is -- underlying is he wants to have as many appeals, which

20         he thinks are all going to be turned down, but that that will

21         keep him alive.

22                   THE COURT:  There is this thing about he doesn't

23         really think that this is serious, that he doesn't really

24         face the death penalty.  I know you spent a lot of time on

25         both the prior examinations that handle that question, and I

1    presume did it again.

2            THE WITNESS:  I did.

3            THE COURT:  Talk to me about that.

4            THE WITNESS:  Because it is something that bothers

5    his lawyers, is -- part of what they brought up is that he

6    seems blasé or indifferent to what is going on.

7            THE COURT:  And they suggested that he doesn't

8    really think he could get the death penalty.

9            THE WITNESS:  Yes, and that in some of their

10   communications that he says that people will -- people like

11   him too much to put him to death -- you like him too much --

12   that he doesn't think the prosecutor likes him, but that

13   somehow he might escape it.

14           Now, that has been there all along.  But what he

15   told me in the last evaluation, and this one extremely

16   consistently, 100 percent consistent and credibly and

17   believably, that he doesn't believe that.  His first

18   assessment was that he was 85 percent sure that he was going

19   to be executed.  This time around he said he was 50 percent

20   sure that he is going to get the death penalty at the end of

21   this next phase.  He has some hope that the death penalty

22   will be abolished and that he won't actually be executed, but

23   the fanciful notions that he'll be rescued by white

24   nationalists, revolutionaries who have taken over the

25   Government and let him out of jail, he laughs about the humor

BALLENGER - EXAMINATION BY THE COURT  36

1     involved with that, which has made me develop a hypothesis:

2      -- this is not an opinion, but in trying to understand where

3     these funny notions -- how they get into his interactions

4     with -- particularly his standby counsel, is that he likes to

5     mess with people.  He --

6          THE COURT:  Did he mess with you?

7          THE WITNESS:  Yes.  And so he says things that sound

8     insane, sound psychotic, like "The jury is going to like me

9     so much they are not going to find me guilty."  It is my

10    opinion and belief that he doesn't believe that.  What he

11    believes is from the very beginning that he would be found

12    guilty -- he wanted to be found guilty -- that he will almost

13    certainly get the death penalty, and it doesn't really matter

14    whether he gets that or life in prison.  The only real

15    difference he could stick with is that if he gets the death

16    penalty, he knows which prison he goes to, and there are more

17    appeals available in that scenario.  But, otherwise, he's

18    hard pressed to find any real differences, and it doesn't

19    make a difference to him.

20         THE COURT:  Does he appreciate the real risk that he

21    faces, the potential for death from this trial and from this

22    sentencing?

23         THE WITNESS:  I don't think he has a shred of doubt

24    about that.

25         THE COURT:  Question seven, he was overly concerned

1    about what certain people, the Judge, whether they like him.

2            THE WITNESS:  That is an issue that has been there

3    all along, and we talked about that because it was raised by

4    his standby counsel.  He does care, as he points out, much

5    more than most people, and he credibly raised the issue that

6    to say he's unaware of social cues is completely wrong.  He

7    says he is hypersensitive to facial cues about whether the

8    person is liking him, and he is overly focused on that and

9    said this is part of his anxiety -- his social anxiety

10   disorder that he acknowledges he does have, and that he is

11   overly concerned with that.

12           It is an issue in the courtroom, in my opinion, but

13   it is not a significant undermining of his competence to

14   function in the courtroom.  The phrase I use, there was no

15   evidence that this substantially affects his competence.

16   Excuse me.

17           THE COURT:  Question eight, concern about the

18   photographs.  You briefly addressed that already.  Anything

19   else you wish to add about that?

20           THE WITNESS:  Yes.  Like his third or fourth

21   motivation is that his reputation later be as good as it can

22   possibly be.  Obviously no mental illness, no autism if he

23   can get that out of the record, but also no unflattering

24   photographs.  So he's concerned about how he's dressed.  For

25   that reason, and some -- I think it's fair that some of his

1    autism traits come up, just sort of too much smoke about that

2    for it to be completely not there.  But he doesn't want an

3    unflattering photograph.  He thinks his forehead is too

4    broad.

5            He gave the excellent analogy:  It is like a woman

6    who is carrying 20 or 30 pounds too much.  She's not obese,

7    but she has too much, and he said, "Is it abnormal or really

8    weird that she is concerned about how flattering photographs

9    are or are not of her?  I mean, am I the only person who

10   cares about this stuff?"  He says, "You know, I want to look

11   nice because all of the people sitting behind me in the

12   courtroom are reporters.  They are going to talk about what I

13   wore and so forth."  That is an issue.  And so he's very

14   concerned about the photographs with the pillow case that

15   make him look like a Klan member, which he's not.  Very

16   concerned about the messiness that would be revealed in his

17   car, about the messy clothes and so forth.  He doesn't want

18   that kind of thing -- and the photographs are just the

19   leading edge of them.

20           THE COURT:  Question nine, that they noticed that he

21   would stare down, and that this was -- they were describing

22   this, standby counsel, disassociating, paranoia, and

23   seemingly being under the influence of delusions.

24           THE WITNESS:  The defendant himself provides a very

25   logical explanation about that.  He says he has smiled and

BALLENGER - EXAMINATION BY THE COURT   39

1    even laughed during very tense situations or just stared at

2    the floor trying to deal with the emotion, trying not to

3    reveal what he's feeling and not to have a blushing attack.

4    That -- yes, if he does that, and from a professional point

5    of view, that is logical.  He's uncomfortable.  A lot of

6    people smile when they are uncomfortable.  It was part of his

7    pretrial evaluation that found that too.  I don't see that as

8    a significant difficulty with his competency.

9         THE COURT:  Does it suggest to you paranoia,

10    delusional behavior, disassociating?

11         THE WITNESS:  Not at all.  And his explanation helps

12    that as well.

13         THE COURT:  And I take it these opinions which you

14    have reached, Doctor, are within a reasonable degree of

15    medical certainty?

16         THE WITNESS:  All of them, yes.

17         THE COURT:  One last question, the defendant

18    indicated that by self-representing, he was hoping to keep

19    certain evidence out of the trial.  Did you happen to discuss

20    with him the potential that this information would be

21    released one day?

22         THE WITNESS:  Yes.  He's discouraged about that.

23    He's still trying.  He said that to me.  It's very difficult,

24    but there is a court web page that comes up the day after the

25    court or right after the court, and he realizes there are

1    severe limitations to his strong wish to control what comes

2    out of this and to manage to reduce any negative things about

3    himself, but also about his family, to protect their privacy

4    and protect them from feeling hurt and bothered by this.

5              THE COURT:  Does he understand that much of this

6    psychiatric evidence may well go into the public realm after

7    the trial?

8              THE WITNESS:  Yes.

9              THE COURT:  Okay.  With that the Court has finished

10   it's inquiry.  Mr. Bruck, do you wish to examine the witness

11   or one of your team?

12             MR. BRUCK:  Thank you, Your Honor.

13                         CROSS-EXAMINATION

14   BY MR. BRUCK:

15    Q. Good morning, Dr. Ballenger.

16    A. Good morning, Mr. Bruck.

17    Q. Happy New Year.

18    A. Happy New Year to you.

19    Q. How many hours have you spent on this case so far in all

20   up until today?

21    A. I really don't know.  Since I had to estimate when they

22   called me, I think something around 25 or 30 this time

23   around, and probably twice that the first time, so that's an

24   estimate.

25    Q. Okay.  And the 25 to 30 includes your travel time to get

1    back to Charleston?

2     A. No.

3     Q. The -- on page 1 of your report, and I don't know if you

4    want to look at it, but you stated that the defense expert

5    reports were again made available and rereviewed.  Do you

6    recall which defense expert reports those were?

7     A. No.  My memory of the first time around is not very

8    exact.  I know which ones were submitted with the motion, and

9    I reviewed them.

10     Q. All right.  Well, let me read from your report at page 1:

11    "Although the defense expert reports were again made

12    available and reviewed, they were available and included in

13    the original competency hearing and are not substantially

14    involved in this second competency hearing."  Which expert

15    reports were available and included in the original

16    competency hearing?

17     A. That sentence and -- half of that sentence reflects a

18    misunderstanding on my part.  I had been told that they were

19    part of the original submission.  They were not part of what

20    I reviewed in a substantial way then, but I was told

21    accurately; and the second half of the sentence, they were

22    not substantially involved in the second competency

23    evaluation, and the judge said on questioning -- reiterated

24    that we were not going to do -- use any evidence prior to

25    the -- or accept evidence after the competency finding.

1      Q. So am I to understand that your instructions were not to

2      consider the reports -- the written reports that were made

3      available to you by Dr. Loftin, Dr. Maddox, Dr. Moburg, and

4      Professor Robison?

5      A. That they were not pertinent to this second competency

6      evaluation because they were all from before the decision.

7      Q. Okay.  And you were told that by His Honor Judge Gergel?

8      A. Yes.

9      Q. Okay.  And so you did not consider them?

10     A. I did not involve them.

11     Q. Thank you.  Now, your report reflects -- I would like to

12     start from the beginning.  I will get to the specific

13     questions towards the end.  The beginning, the very first

14     thing the defendant said to you before you said anything to

15     him was to ask you about your suit and the colors of your

16     suit, correct?

17     A. Yes.

18     Q. And the next thing he said was to express irritation with

19     his attorneys?  We are now at page 3.

20     A. Yes.

21     Q. And the third thing he said was to complain about -- or

22     demand to know why Professor -- that Robison's report was --

23     how Mr. Robison could possibly tell if another person was

24     autistic because Professor Robison himself has autism,

25     correct?

1    A. Let me explain that.  The order went, he liked my jacket

2    and wanted to know what the colors were.  And then he said

3    after I -- he went back to my comment that I was asked -- I

4    was here to -- because I had been reordered by the Court to

5    reexamine him, and so it was my understanding in the flow of

6    the conversation, he -- it was my understanding in the flow

7    of the conversation that then he went to the real issue which

8    was that he was irritated that his lawyers were messing with

9    him.

10            He had brought to the interview all of the reports

11    because he wanted, I learned, to point out things that were

12    wrong about them.  So he was holding them, and he said -- he

13    started to talk about them, starting with Robison, because I

14    think that is the one that irritates him the most.

15    Q. I see.  Now, can an autism spectrum disorder have

16    significance for competency to stand trial in your opinion?

17    A. Could you repeat that question, please?

18    Q. Can autism spectrum disorder have significance for the

19    question of a criminal defendant's competency to stand trial

20    in your opinion?

21    A. Yes, and depending on severity and the particular defects

22    of the person involved.

23    Q. All right.  What about autism spectrum disorder without

24    intellectual disability?

25    A. Still yes.

1    Q. And your original report listed as one of your findings

2    possible autistic spectrum disorder?

3    A. Yes.

4    Q. What is your finding now, if you have one, respecting

5    autism spectrum disorder in this case?

6    A. By history, because I -- I have available to me and have

7    read Dr. Loftin's report, that there is enough evidence in

8    the record that she pulled together from many interviews that

9    he certainly came close, if not warranting the diagnosis as a

10   child, autistic spectrum disorder.  Now it's my opinion from

11   the conduct I've had with him that it may -- it's more

12   accurate to describe that he still has some traits as opposed

13   to the full disorder.

14   Q. And is autistic traits a DSM-5 diagnosis?

15   A. No, but it is part of how we talk about it in the

16   profession.

17   Q. All right.  In -- under the DSM, one either has autism

18   spectrum disorder or one does not.  Is that correct?

19   A. That is a level of exactitude I don't think fits the

20   clinical picture in that when somebody -- say someone who has

21   autistic spectrum disorder and has wonderful treatment and

22   gets markedly better so that there is almost no way of

23   recognizing that, I don't personally think it's accurate or

24   reasonable to say they still have the whole disorder.  Now,

25   honest people can disagree about that.  But I would suggest

1    that we should say in some way markedly improved or they just

2    have traits.  It's like somebody who has a diagnosis of

3    schizophrenia, and they have been symptom free for 15 years.

4    And your analogous question in that would be do they still

5    have schizophrenia.

6       Q. Well, there is a diagnosis of schizophrenia in remission,

7    correct?

8       A. Um, yes, and that's part of how we deal with it.

9       Q. Right.

10      A. But the way I might describe it in my own belief that

11   would carry more meaning, I might want to say that there is

12   someone who had that illness and disorder, and now they only

13   have a few traits or symptoms, and formally for billing

14   purposes, the diagnosis would be in remission.

15      Q. But autism spectrum disorder by definition is a

16   developmental disorder which is lifelong, correct?  You do

17   not become cured of autism spectrum disorder?

18      A. No.

19      Q. Right?

20      A. That is true.  But my retort back is how would you then

21   describe somebody who went from having hundreds of symptoms

22   to only having two?

23      Q. Okay.  And in determining whether someone has symptoms of

24   autism spectrum disorder, is it sufficient to rely on the

25   person's own self-report and a clinical evaluation?

BALLENGER - CROSS BY MR. BRUCK      46

1    A. If you will permit me to split it apart, two parts of

2    your double question.  No, it's not sufficient to rely on

3    their own report.

4    Q. And why is that?

5    A. Because they often deny that they have it.

6    Q. They don't want to have it, and they lack insight, both

7    things, correct?

8    A. Yes, and many, many people with various illnesses don't

9    like them, from obesity, bipolar illness and so forth.

10          The second half of whether or not it is sufficiently

11    diagnosable by clinical interview, I would say that sometimes

12    yes, they are very valuable.  Sometimes if it's really mild,

13    it's difficult, but you would like to have collateral

14    information about that.

15    Q. And is it fair to say the high IQ would suggest how more

16    difficult it is to gain information about signs and symptoms

17    of autism in a clinical interview?

18    A. Yes, obviously dependent on how high, and the other

19    ability that is separate from intelligence many times, and

20    that is the ability to put oneself in the situation and to

21    figure out what would be the best way to make themselves look

22    really good, to look like they don't have it.  Do you

23    understand that?  Does that make sense?

24    Q. Yes.

25    A. And what would -- to put themselves in the shoes of the

BALLENGER - CROSS BY MR. BRUCK      47

1    person looking at them and figure out what they want me to

2    say so that I can prove I don't have autism, to be able to do

3    that, to have that ability.  And that is an ability, as you

4    well know, that is central to autism by its generally being

5    absent, not being able to do that kind of fooling of a

6    clinical examiner.

7    Q. But the higher IQ a person has, the more likely they are

8    to be able to effectively deny symptoms?

9    A. Only if they also don't have defects in their language

10   ability because if somebody has a huge IQ, but can't talk --

11   Q. Of course.  But if someone has a verbal IQ, say, of 141

12   and is extremely verbal, you would expect that they would

13   have quite a strong capacity to deny symptoms whether the

14   symptoms are in fact present or not?

15   A. Absolutely.  But then it also cuts the other way, that

16   they are also more competent to be able to handle verbal

17   things like a trial.

18   Q. Right.  Okay.  You said that you had -- now, you told

19   Judge Gergel and you say in your report that he intends --

20   Mr. Roof intends to present evidence at his trial, but not

21   through witnesses, correct?

22   A. I tried to convey that he told me clearly that he plans

23   to present evidence and witnesses, but then he -- he didn't

24   want to tell me what his opening and closing statements were,

25   or how he was going to -- involve witnesses, and he implied

1    an unclear message to me, that the witnesses might not be

2    anybody but himself.  So that's as good as I can answer that

3    question.

4    Q. So when you told Judge Gergel at the very beginning of

5    your testimony this morning that he did not refuse to answer

6    any of your questions, that is not quite accurate?

7    A. That's not 100 percent accurate.  He said he didn't want

8    to tell me what the -- what his opening statement, in

9    particular his closing statement because that was going to be

10   dramatic and he didn't want to -- the thunder to be stolen

11   from that, so -- so that was the extent he wasn't fully

12   cooperative.

13   Q. And he also didn't tell you -- he didn't want to tell you

14   what evidence he was going to present with any specificity?

15   A. He did convey that that was in part because he wasn't

16   entirely sure how it was going to play out.  For instance,

17   it's his belief that the Government will present as many as

18   30 witnesses or less, or he doesn't know exactly, and he

19   doesn't know what they are going to say.

20   Q. So as far as whether his plans to conduct his own defense

21   are rational or not, in the end you don't know because you

22   don't know what those plans are except in a general way?

23   A. In a general way of what he's told me.  If he did only

24   what he's telling me, it is my opinion that they are

25   rational, that he's going to make an opening statement,

1    cross-examine witnesses that he chooses to, and have a

2    dramatic closing statement, and that will be it.  That is

3    consistent with what he wants to do.

4     Q. Now -- but, of course, when you are assessing that as a

5    rational plan, that is without knowing the content of

6    anything that he intends to do and merely the structure, the

7    sequence of it?

8     A. Only that the implied content that he's talked to me

9    about throughout the five times I've seen him, that it is to

10   present the defense, his defense that I described to the

11   Judge earlier, that that would be to do -- that would be

12   consistent with what he said all along, what he told me in, I

13   think, our first interview, that what he would like to

14   present, but he doesn't think he'll be allowed to present.

15   He thinks it will outrage everybody and that that is an issue

16   that he's -- he feels bad about in some ways, not in others.

17   That is logical and connected to what he has said since his

18   arrest.

19    Q. Now, you said that in this connection that he is

20   concerned about his reputation, correct?

21    A. Correct.

22    Q. And the word "reputation," of course, refers to what

23   other people think about him, correct?

24    A. Yeah.

25    Q. What is his reputation?  Did he say?

BALLENGER - CROSS BY MR. BRUCK     50

1      A. What he hopes it to be and what he's fighting to protect

2      that I know involves, he would like 100 years from now to be

3      in the history books saying it was Dylann Roof who did this

4      act that has an influencing effect for correcting white-black

5      relations, and the relations have been changed.  That is the

6      reputation he wants it to be, to have no negatives, no

7      footnote that says that he was found autistic -- to be

8      autistic.

9           And he also doesn't want any photograph that shows

10     him in an unflattering light, that the photograph that comes

11     from this trial to not be embarrassing, which is a term I

12     know he's used with you.  It's the term that socially anxious

13     people talk about all the time.  That it be judged

14     negatively.  So what I used the word and he used the word

15     "reputation" to mean is those -- at least those two large

16     pieces, historical reputation and smaller, more personal.

17     Q. Did he ever describe to you whether there are any living

18     people today with whom he has a good reputation that he needs

19     to protect; and if so, who are they?

20     A. That he needs to protect?  The people or his reputation?

21     Q. No, his reputation among any group of people alive on the

22     earth today.

23     A. He didn't -- he didn't identify anybody like that.

24     Q. Did you ask?

25     A. Not in that exact terms.  He talked about his family, but

BALLENGER - CROSS BY MR. BRUCK     51

1    that -- his reputation with them is not the reputation in the

2    history books 100 years from now.

3    Q. Right.  And he didn't suggest that his family would be

4    disappointed if he did not put forward some sort of a

5    political agenda at his trial, did he?

6    A. No.  I mean he's quite clear that everybody in his family

7    would prefer that he had not done this.

8    Q. Right.  So the answer to my question is no, he has never

9    identified to you any living person with whom he has a good

10   reputation?

11   A. Um, in my last interview with him, in talking to him

12   about the issues of people saying he's rude, he said -- and

13   through my various examinations -- that he can't be rude

14   because all of his family would forgive him anyway.  They

15   like him.  They don't think badly.  They don't feel like it's

16   rude.  And that he has relationships with his grandfather,

17   with his father, with his mother that he cares about, and

18   that they care about him and his sister.  So it's not true to

19   say he has no one that he's concerned about his reputation

20   with them.

21        He -- and I know that he's not part of a group.

22   He's not part of skinheads.  He's not -- has never made

23   contact with anybody in the white nationalist movement.  So

24   no, not in that sense is he concerned about any of those

25   people.

1    Q. Okay.  He said he wants to kill me?

2    A. He did.  And he did -- he did put a proviso in there, if

3    he were to ever get out of jail.

4    Q. Right.  Does that mean that while he's in jail, he

5    doesn't want to kill me, or it's as a practical matter

6    contingent on his getting out of jail?

7    A. I think he sees it as a practical matter.

8    Q. And the reason he wants to kill me is the way I have

9    conducted his defense?

10   A. Um, yes.  And at this point, "the continuing messing with

11   him" is the phrase I put in my report because that was

12   literally the phrase he used.  But as he said this morning,

13   he's not happy about yet another evaluation, yet another

14   doctor, and so forth.  He blames you for extending all of

15   that.

16          I asked him why not just plead guilty and not have

17   any of this which has proved to be so hard on you, and he

18   wondered about that.  Then he got into the complexity of a

19   trial was necessary to create the publicity.  It's also

20   necessary to create the ability when he's in jail afterwards,

21   which he sees as 100 percent certainty, that he needs to be

22   able to have appeals to prolong the -- his life span.

23   Q. And in that connection, you said in your -- I think last

24   time, he told you that his chances of getting the death

25   penalty were 85 percent, and this time they have gone down to

1    50 percent, correct?

2     A. I think that is correct.

3     Q. Did he give any explanation for why his odds have

4    improved by 35 percent in the time between your initial

5    evaluation and this weekend?

6     A. No, and I did not ask him.

7     Q. Are you aware of anything that has happened between now

8    and then that would plausibly give rise to the thought that

9    his likelihood of getting the death penalty is only 50/50?

10     A. No.

11     Q. Or that his chance of getting life have improved?

12     A. No.

13     Q. And he didn't offer any explanation?

14     A. No.

15     Q. Now, he made a lot of factual representations about

16    things that we have done to trick him or to lie to him or to

17    mislead him, correct?

18     A. Well, that's your word, "a lot of."  He mentioned mostly

19    the tricking him by saying doctors were coming to see him to

20    talk about his thyroid when in fact they are mental health

21    experts; tricking him on your visits because he has to have

22    you come to bring him clothes -- sorry -- that he needs you

23    for that.  But that you brought Robison with you in a covert

24    effort to trick him into being evaluated.  He didn't dwell on

25    that, but he presented those couple of examples.

BALLENGER - CROSS BY MR. BRUCK     54

1    Q. Let's take that example.  He represented to you that we

2    brought Professor Robison to see him unannounced, and he was

3    tricked into coming in to see him by the way we did that,

4    correct?

5    A. He didn't say all of those words and make it that clear.

6    It was just -- just that he was along with you.  He didn't

7    say one way or the other whether he knew it, although in

8    retrospect, maybe he did imply that he knew it.  He didn't

9    have any choice about it.

10   Q. The reason I ask is that's how you put it in your report,

11   to be sure I don't mislead you.

12   A. I'm actually a little unclear whether he implied that you

13   had told him ahead of time that Robison was coming with you.

14   I'm actually unclear in my memory about that.

15   Q. All right.  Of course you did not request any additional

16   information from me or the other defense counsel in the

17   course of this second competency evaluation, correct?

18   A. That's correct.

19   Q. Including on any of these factual issues about whether we

20   had lied, misled, or manipulated him or tricked him, correct?

21   You didn't ask that?

22   A. No.

23   Q. And, of course, if you had, you would have found out from

24   us --

25             MR. RICHARDSON:  Objection, Your Honor.

BALLENGER - CROSS BY MR. BRUCK        55

1    Speculation.

2              THE COURT:  It's in front of me.  Go ahead.

3    Overruled.

4    BY MR. BRUCK:

5     Q. You would have found out what our representations were

6    about each of these events, correct? -- if you had asked?

7     A. I would have found expansion of those things that you put

8    in your motion, I assume, that expansion on them.  I did

9    receive your late report after I had found out I was going to

10    report late yesterday afternoon, and so I do have an

11    expansion which I studied last night.

12     Q. You did study that last night?

13     A. Yes.

14     Q. Okay.

15              THE COURT:  Let me just ask you, did it change

16    anything in your report after you studied the report?

17              THE WITNESS:  No.

18    BY MR. BRUCK:

19     Q. I'm not going to go through every one of these factual

20    issues.

21              THE COURT:  Thank you, Mr. Bruck.

22              MR. BRUCK:  You are most welcome, Your Honor.

23    BY MR. BRUCK:

24     Q. But I did want to ask you about a few of them.  He said

25    that -- on page 9, you were asked about -- this is one-third

1    of the way down the page.  "When asked why he wore pants when

2    he worked in the summer, he went on to explain that this was

3    because the edger had lost the rubber shield; that therefore

4    it threw rocks and grass backwards and filled his shoes," and

5    so on.  A logical explanation for wearing pants in the heat

6    of the summer, correct?

7     A. Yes.

8     Q. Were you aware at the time of his arrest he was wearing

9    sweatpants underneath his jeans and that he had quit his job

10   involving the edger a month previously?

11    A. I certainly was aware that he had quit his job.  I was

12   not aware of what he was wearing.

13    Q. Okay.  So this very logical explanation for why he wore

14   two pairs of pants in the heat of the summer sheds no light

15   at all on why he was wearing two pairs of pants on June 17th,

16   correct?

17    A. Which -- this is new information which I haven't had a

18   chance to talk to him about -- I do think some of his

19   clothing issues illustrate remaining autistic spectrum

20   concerns that he has.

21    Q. Okay.  And those can be related to sensory distortions or

22   unusual sensory perceptions, need for pressure, or that are

23   related to your developmental disorder of autism, correct?

24    A. Yes.

25    Q. But that caveat does not appear in your report, nothing

BALLENGER - CROSS BY MR. BRUCK    57

1    with a very logical explanation that he offered, period,

2    correct?

3    A. Which caveat?

4    Q. The caveat that his wearing of these clothes to you today

5    this morning now appears as a symptom of autism spectrum

6    disorder, or a trait as you would put it?

7    A. Potentially, yes.

8    Q. That does not appear in your report?

9    A. I didn't know it until this morning.

10   Q. And that might be true of many facts in this report, that

11   if you had additional data, it would turn out the things that

12   would seem very logical when he explains them are not, in

13   fact, good explanations at all, right?

14   A. I think you are going too far with that.  I already

15   acknowledged that part of the difficulty you have had with

16   your client is related to autistic spectrum traits and

17   concerns about clothes in particular, how his sweaters were

18   washed, with how much detergent leading them to to smell

19   wrong.  That is in my report -- both reports, that I believe

20   that it's part of the problem that you are having, but I do

21   not have it a part of his problem with competency --

22   Q. Okay.

23   A. -- significant problem with his competency.  It may raise

24   questions, but that doesn't come to competency for me.

25   Q. All right.  But, of course, autism spectrum disorder is a

BALLENGER - CROSS BY MR. BRUCK        58

1    disorder of social communication, correct?

2     A. In part, yes.

3     Q. And social communication is what a trial is about, right?

4     A. In part.  It also involves facts and other issues.

5     Q. There's an enormous amount of communication and need to

6    see other people's reactions and thoughts that go on in a

7    criminal trial, right?

8     A. As you well know, many, if not most, defendants in a

9    trial like this never say anything out loud to the ears of

10   the courtroom.  On the other hand, to assist you, their

11   familiarity with the witnesses and input to you I know is an

12   important part of your working relationship.  And you have

13   difficulties in cooperation with any disagreements of what

14   you do and the style of which you do it and the questions.

15   All of those are real issues in my opinion, but in his

16   competence to stand trial and to defend himself, he is

17   sufficiently capable of doing that in my opinion in now two

18   different evaluations.

19    Q. Now, those -- you refer to the competency to stand trial

20   and his capacity or competence to defend himself.  Those are

21   two separate questions, are they not?  I don't mean legally,

22   I mean just factually.

23    A. Yes.

24    Q. There is a great deal more involved in being your own

25   lawyer than there is in being a criminal defendant with a

1    lawyer, right?

2     A. And there is a broad spectrum of quality of being their

3    own lawyers.

4     Q. And I suppose there is a broad spectrum of lawyers as

5    well?

6              THE COURT:  Or psychiatrists.

7              THE WITNESS:  I wouldn't know that.

8    BY MR. BRUCK:

9     Q. But a person with autism spectrum disorder has a lifelong

10    neurodevelopmental disorder of social communication, which is

11    the core feature of a criminal trial, right?

12              MR. RICHARDSON:  Objection, Your Honor.  This

13    witness has already testified that he does not diagnose the

14    defendant with autism spectrum disorder.  We are way beyond

15    the relevance of what this witness is here to testify about.

16    He says he has some traits, but he does not have autism

17    spectrum disorder.

18              THE COURT:  Wait, Mr. Bruck.

19    BY MR. BRUCK:

20     Q. Well, you have not ruled out autism spectrum disorder

21    either, have you, as a correct diagnosis in this case?

22     A. I have not definitively ruled it out.  What I have ruled

23    in is that there is also a wide spectrum of people with

24    autism spectrum disorder ranging from people who never speak

25    to one of the experts you hired to testify in this trial and

BALLENGER - CROSS BY MR. BRUCK    60

1    evaluate Mr. Roof. That is really the question, and Mr. Roof

2    is much closer to Mr. Robison in his difficulties than he is

3    to anybody on the other end in my opinion.

4    Q. Now, before you make a judgment like that, isn't it

5    necessary to gather information not only from Mr. Roof, but

6    from people who know him, from his family, from people who

7    have interacted with him, to review such records as can be

8    gathered that bear on this precise issue, and to in effect

9    have a full autism evaluation?

10    A. As I said in my first report, and I would reiterate here,

11    the evidence that he was on the autistic spectrum was clearer

12    when he was a child, and I have many, many, many pages of

13    records of testimony of people about his childhood, his

14    adolescence. And what I said in that report was from that

15    period, there is considerable evidence that he's on the

16    spectrum. At this point the difficulties which you have made

17    and your team have made part of the record, those shall --

18    the difficulty he is displaying now, even under the

19    microscope and magnifying glass that you are seeing, they, in

20    my opinion, still don't rise to the level of incompetence to

21    stand trial or to defend himself.

22    Q. Correct. But I am trying to -- the first prong of the

23    competency determination is to identify what mental

24    disabilities or defects, if any, the defendant suffers from,

25    and --

1              THE COURT:  Mr. Bruck, he's said that his diagnosis

2    is that he has autism traits.  That is his diagnosis.  Now, I

3    don't think you can keep asking him the same question.  So

4    move on.

5              THE WITNESS:  And -- yeah.

6    BY MR. BRUCK:

7     Q. Is it fair are to say, with all due respect, that autism

8    is not your field?

9     A. True.

10    Q. I'm sorry?

11    A.

12

13    Q. Right.  And if you don't mind my asking, what --

14

15              MR. RICHARDSON:  Objection, Your Honor.  That is

16    wholly irrelevant.

17              THE COURT:  Sustained.

18              MR. RICHARDSON:  Also inappropriate.

19              THE WITNESS:  I wasn't going to answer it anyway.

20    BY MR. BRUCK:

21    Q. And autism, the diagnosis of autism is a subspecialty of

22    psychiatry or psychology, is it not?

23    A. Yes.

24    Q. It's an area of special expertise?

25    A. Yes.

1      Q. That involves specialized training?

2      A. Yes and no.  I mean every single aspect of psychiatry

3      people can specialize in.  It is fair that that has not been

4      a specialty area of mine.

5      Q. And if a person were -- if it was important to ascertain

6      whether someone who you saw, an adult, suffered from autism

7      spectrum disorder, it would be a standard of practice for you

8      to refer that person to a psychologist --

9              MR. RICHARDSON:  Objection, Your Honor.  We've gone

10     over this ground the first time, and we are going back over

11     it again repeatedly now.

12             THE COURT:  Mr. Bruck, sustained.  We are now

13     relitigating the competency issue from  November 23rd.  If

14     you want to ask him questions, ask it.  I've already ruled as

15     to competency.  It's the law of the case as of through the

16     hearing.  Please proceed.

17     BY MR. BRUCK:

18     Q. Did you consider Dr. Loftin's administration of the ADOS,

19     or the standard instrument --

20             MR. RICHARDSON:  This is literally going right back

21     into the same issue.

22             THE COURT:  Sustained.  Focus on the issue.  He said

23     he read those reports.  He had previously made a diagnosis

24     relating to the -- to autism traits.  We are not relitigating

25     the competency issue previously reached.  November 22nd

1    forward.

2            MR. RICHARDSON:  At least for the record, Your

3    Honor, the ADOS test was done way before.

4            THE COURT:  Of course it was.  And we received

5    information from Dr. Loftin about that.

6            MR. RICHARDSON:  Thank you, Your Honor.

7            THE COURT:  I offered to do a Skype to allow her to

8    testify if she wanted to.  We offered.  Instead she submitted

9    the report.

10            MR. BRUCK:  Bear with me just a moment, Your Honor.

11    I would like to confer with counsel.

12            THE COURT:  Go right ahead, Mr. Bruck.

13    BY MR. BRUCK:

14    Q. Can it be hard to distinguish between psychosis and

15    autism in some circumstances?

16    A. Well, anything is possible.  I would make that

17    circumstance extremely small -- I would make that

18    circumstance extremely small when it would be significantly

19    difficult to determine for the reason that psychosis involves

20    cognitive reality distortions that are of a major pervasive

21    in the -- for the experienced examiner are impossible to

22    hide.  A severely ill autistic person would be difficult to

23    examine, but would not -- because of difficulty with speech

24    and intellect perhaps is a good example.  But the positive

25    symptoms of psychosis, the things that make the diagnosis,

1    that cross the bar and say yes versus no are really primarily

2    the positive symptoms of reality distortion like

3    hallucinations and delusions.

4     Q. All right.

5     A. And that just doesn't occur in autism.

6     Q. The differential diagnosis between autism and schizoid

7    personality disorder, which is another diagnosis that you

8    listed in your report originally, correct?

9         MR. RICHARDSON:  Objection, Your Honor.  This is all

10    about things that happened in the last hearing and about his

11    report from the last hearing.  It is not --

12        THE COURT:  Ask him a question if his opinions

13    changed as to that diagnosis.  How about that, Mr. Bruck?

14    BY MR. BRUCK:

15    Q. Your opinion, I gather, from your new report has not

16    changed respecting your diagnoses or -- and opinions

17    concerning the defendant's mental condition on the first

18    report, correct?  Other than your discussion about the

19    lessened anxiety?

20    A. Yes.  They have not changed.

21    Q. And is it fair to say that schizoid personality disorder,

22    which is one of the listed disorders, and autism spectrum

23    disorder are easily -- are difficult to distinguish from each

24    other in the absence of a childhood history that supports

25    autism spectrum disorder?

1          MR. RICHARDSON:  Objection, Your Honor.

2          THE COURT:  It's not -- you are relitigating the

3    competency issue, Mr. Bruck.  Ask it as to questions relating

4    to changes since the Court had ruled on this issue.

5    BY MR. BRUCK:

6    Q. I take it that you have now reviewed more information

7    concerning the defendant's childhood than you had at the time

8    of the original -- of your earlier report.

9    A. This strikes me as a problem with your strategy of

10   submitting things late.  I have an opinion in a report in the

11   first competency hearing.  You submitted that report, which I

12   did read, from Dr. Loftin, but now we are here only to

13   consider changes in his mental status since that competency

14   report, and her report isn't in that.  So --

15   Q. Okay.  There is a reference in your discussion with

16   the -- in your new report in your discussion with the

17   defendant about magical thinking.  Tell me about that.  What

18   did he say about that?  What do you say about that?  Can you

19   clue us in on that?

20   A. He raised a very cogent point, that he disagrees with the

21   way my report was written and he found a missing two letters,

22   which is it should have read ruled out schizoid personality

23   disorder.  He recognized that, and he said, "The correct

24   diagnosis is avoidant personality," which is a good argument.

25   I don't know where he went to psychiatry school, but it's a

BALLENGER - CROSS BY MR. BRUCK    66

1    good argument.  But he said the critical thing on whether or

2    not there is magical thinking there, which is required for

3    the schizoid personality disorder diagnosis, which I wanted

4    it to have read as Dr. Wagner's report, that said he ruled

5    out.

6         We had a discussion then about whether the various

7    potential magical thinking was, in fact, magical thinking or

8    not, and he didn't like any of my examples.  He said, "That's

9    not magical thinking," just sort of disagreed with them.  And

10   I brought up two, maybe three, and he said, "No, that is not

11   magical thinking."  And we stopped because it became an

12   unproductive piece of conversation.

13   Q. Can you tell me what the examples were that you brought

14   up of magical thinking?

15   A. Well, that's just what I was saying.  I'm not sure I

16   remember.  One was how could he know with certainty that

17   things on the Internet were true.  He didn't have a complete,

18   convincing answer.

19   Q. An important question, isn't it --

20   A. Yes.

21   Q. -- in this case?

22   A. That's why I asked it.

23   Q. And he could not give you an answer?

24   A. Um, not that satisfied me.

25   Q. Not a rational answer?

1      A. His answer was rational; it was not complete.  It was not

2      possibly accurate.  But the import is if I retained my

3      opinion, which I mostly do, then it was magical thinking, it

4      goes back to my statement in my first report, ruled out

5      schizoid personality disorder.

6      Q. Okay.  And can you tell us why you thought and continue

7      to think that his belief about the truth of items on the

8      Internet are true is an example of magical thinking?

9      A. It might be an example of magical thinking because --

10     there is no way he can know that everything is true, and so

11     it really comes back to a naive acceptance, acceptance that

12     it's on the Internet and it's consistent, and all of the

13     evidence that people who generated it and created the fact

14     put forth, so it's his belief that they have provided enough

15     evidence.

16             Interestingly, he's well aware that it's not all

17     true and that there are fake things that are put out there,

18     even brought them up.  So he's aware that they don't

19     necessarily tell the whole truth, or that every story is

20     correct.  He believes the ones about -- at least in the

21     overall sense, the ones about black-on-white violence are

22     true.

23     Q. And he believes that unshakably, correct?

24     A. I haven't tried to shake them, but I have asked him, I

25     think, on two occasions, how do you know that?  And he said,

1    "I do.  I just -- there is just so much evidence.  It's

2    everywhere.  All you have to do is search."

3    Q. And in context you found that to be a possible example of

4    magical thinking?

5    A. A possible example, and even if it were a good example,

6    it still falls way short of competence.

7    Q. Any other examples that you can recall now with magical

8    thinking that you asked him about?

9    A. No.  I'm sorry.

10   Q. But there were some?

11   A. There was another one, I think.

12   Q. Okay.  Would that be reflected in your notes?

13   A. No -- I don't know whether it would or not.  I don't

14   remember that it is.  I don't think so.  I don't remember.

15   If I had, I would have put them in the report.

16   Q. When he -- when he -- you -- when he told you that he was

17   not going to present any witnesses or evidence, were you

18   aware of what the witnesses and evidence that the defense had

19   provided notice of was?

20   A. Um, he told me that there were either 28 or 30 victim

21   impact witnesses to be presented in the penalty phase.  And

22   if I'm understanding this correct, each of the 30 could have

23   four witnesses, two family members and two nonfamily, but

24   related people.

25   Q. What I'm asking you about are defense witnesses.  Did

1    he -- were you aware of what -- any of the witnesses who the

2    defense proposed to call were, who he told you he was not

3    going to call any?  Maybe I should --

4     A. I don't think I was because he was going to do it his

5    way.

6     Q. And you have not reviewed the witness list that the

7    defense filed -- which, for the record, is docket entry 563

8    under seal -- listing the exhibits and the defense witnesses

9    that were -- who are under subpoena or -- well, I shouldn't

10   say under subpoena, but who were listed by the defense?

11    A. I was unaware of that document.

12           MR. BRUCK:  If you will bear with me one more time,

13   I appreciate it.

14           Nothing further.  Thank you, Doctor.

15           THE COURT:  We are going to take a break right now.

16   We have been going over two hours.  And we'll be back in

17   about ten minutes for Mr. Roof's questions and the

18   Government.

19           (Thereupon, there was a brief recess.)

20           THE COURT:  Dr. Ballenger, if you can return to the

21   stand, please, sir.

22           MR. BRUCK:  If I may be heard with respect to an

23   objection on cross-examination that was sustained, I think I

24   should be permitted without obviously asking for any names to

25   be given or people to be identified, but I do think I have a

1     right on the issue of bias to pursue the question of the

2     witness's direct personal experience involving a family

3     member.

4               THE COURT:  Overruled.

5               MR. BRUCK:  May I state my grounds briefly?

6               MR. RICHARDSON:  Your Honor, we object to him trying

7     to after the fact bolster an argument that he did not make at

8     the time.  This is exactly --

9               THE COURT:  Mr. Bruck, this is really -- you know,

10    first of all, you know, this is a court examiner, and you are

11    trying to taint him as biased because he has a family member

12    who has autism?

13              MR. BRUCK:  No.  There are two -- there are two

14    aspects to this.  One is that this is an expert with very

15    distinguished experience and credentials in areas other than

16    autism, but --

17              THE COURT:  And he pointed that out.  He's in

18    general psychiatry, former chairman of the Department of

19    Psychiatry at the Medical University.  Also a person that has

20    world class knowledge of schizophrenia and social anxiety.

21    Nobody is going to have everything.

22              MR. BRUCK:  All I'm saying is that there appears to

23    be a very relevant gap in experience involving the issue of

24    autism.  However, the witness volunteered that he has a

25    direct relationship.  We don't know how much observation or

1          knowledge, and we don't know anything about --

2                    THE COURT:  I think it's unimportant.  What else

3          have you got?

4                    MR. BRUCK:  The other reason for bias is of a

5          different sort, which is that any person with a family member

6          who has autism is going to react, or going to -- this is a

7          universal observation about his case -- is that the autism

8          community; that is, family members of people with autism, do

9          not want Dylann Roof to be identified as a person with

10         autism.  And that is something that I think I'm entitled

11         to --

12                   THE COURT:  I disagree.  Those objections of the

13         Government are sustained.

14                   MR. BRUCK:  Very well.

15                   THE COURT:  Mr. Roof?  Come to the podium and

16         question the witness.

17                                CROSS-EXAMINATION

18         BY MR. ROOF:

19          Q. Um, you state in your report that I told you that the

20         only problem with my clothes is whether they are pressed and

21         washed.  Do you remember putting that in your report?

22          A. Um, that as a general idea, yes.

23          Q. Right.  And I told you that these repeated allegations

24         that I have problems with the texture or weight of my clothes

25         are untrue, right?

1      A. Yes.

2      Q. Okay.  I would like to ask you what are the autistic

3      traits that you notice in me today, or when you evaluated me,

4      because you said that there were some that you still see.

5      A. Well, the first point is that I don't see very many at

6      all.  That's the most important.  There is evidence from

7      interviews with lots of people that you have, which I cannot

8      discount entirely.  Just because you say that you don't have

9      issues about texture of clothes or pressure on your sensory

10     aspects, I can't discount the people who say that -- from

11     your past and from your defense team saying that.  As you

12     admitted to me, you have a strong interest in exact

13     phraseology and making absolutely sure that what is quoted of

14     you in particular is quoted exactly accurately.  That's

15     consistent with the autism.  It doesn't prove anything.

16     Q. And could something like that be explained by a different

17     diagnosis or anything else?

18     A. Yes.

19     Q. Okay.  David Bruck asked you about whether you knew that

20     I had quit my job when he was asking you about me wearing

21     sweat pants, but -- so I think it's fair for me to ask you

22     were you aware that I went to work with my dad the previous

23     day?

24     A. I was unaware of that as well.

25     Q. Okay.  You say that the strongest evidence of the autism

1    comes from when I was a child, right?

2     A. Yes.

3     Q. And you are aware of the power of suggestion, right?

4     A. Yes.

5     Q. And that when questions are asked, especially about

6    things from years ago, that it's possible that people's

7    memory might not be correct?

8     A. Yes, as well as influenced by the suggestive nature of

9    the questions.

10     Q. But my question for you is:  The evidence from when I was

11    a child, is it possible that at least a good portion of that

12    could also be explained by other problems, like OCD?

13     A. Um, absolutely.  And, in fact, I think that is part of

14    the difficulty in the -- in telling the difference between

15    things that you did because of OCD versus anything else.

16     Q. David also asked you about why my -- why I think that my

17    chances -- or if I gave you any reason that I think my

18    chances for receiving the death penalty or receiving a life

19    sentence have improved.  And he says that before I said it

20    was an 85 percent chance that I would get the death penalty

21    and that now I've told you that it was a 50 percent chance,

22    but in your report you say, "He knows that he has a greater

23    than 50 percent chance," and that is what I told you.  So a

24    greater than 50 percent chance could be anywhere above

25    50 percent, right?

BALLENGER - CROSS BY MR. ROOF        74

1    A. That is true.

2    Q. Okay.  You were saying during Mr. Bruck's examination

3    that if a person -- or at least I think this is what you were

4    saying, that a person, if they have autism, it would be hard,

5    or difficult for them to pretend like they didn't because of

6    the -- because it requires that person to put themselves in

7    the other person's shoes and because of the social cues

8    involved -- that would be involved in pretending that you

9    didn't have autism.  Do you remember that?

10   A. I do.  I remembered it a little differently.

11   Q. Um, I guess my question is, if someone presents as not

12   autistic, then is it fair to say that they probably aren't

13   autistic because they would have a difficult time pretending

14   that they weren't because of the autism?

15   A. I obviously didn't make that point very clear with

16   Mr. Bruck, but that was in part the point that I was trying

17   to make, that they wouldn't have the ability to fake it, that

18   to fake that they didn't have it because it would be hampered

19   in understanding social cues, putting themselves --

20   Q. That was started by Mr. Bruck implying that I was

21   pretending to not have it?

22   A. Or that I had missed it because you were trying to cover

23   it up.

24   Q. Is magical thinking the only differentiation between

25   personality schizoid disorder?

1     A. I doubt it.

2     Q. Is that the main differential?

3     A. I don't think so.  There is a -- an oddness that -- there

4     are several different ways that people with schizoid

5     personality tend to have an odd presentation as a child

6     versus more purely avoiding people and things.

7     Q. Now, you said that the example you gave for magical

8     thinking was -- or that you could remember was believing that

9     you could -- that a person could tell when something was true

10    or not on the Internet?

11    A. Yes, that was my question.

12    Q. You heard this term "fake news"?

13    A. Yes.

14    Q. And is it safe to say that a lot of people are fooled by

15    fake news, and that if they are fooled, then they think that

16    that fake news is true?  That is not magical thinking?

17    A. No, the magical thinking part -- no, maybe -- it would be

18    magical thinking if they thought that they had x-ray vision

19    and could see this was fake and this was not fake, something

20    like that.  I'm not sure what your question is.

21              THE COURT:  I get it.  I think what he's saying,

22    Dr. Ballenger, is that not everybody who believes fake news

23    on the Internet has magical thinking.

24              THE WITNESS:  Is that your question?

25

1    BY MR. ROOF:

2     Q. Yes.

3     A. I agree with you.  No.

4     Q. I mean -- and some people would believe certain --

5     A. In fact, I would think the overwhelming percentage of

6    people who believe fake news are not involved in magical

7    thinking.

8     Q. Right.  And I know David asked you, but can you think of

9    any -- can you try to remember what the other examples of

10    magical thinking were?

11     A. Well, my memory is not a whole lot better than it was a

12    few minutes ago.  Do you remember what I asked you?

13     Q. Well, I don't think there is any magical thinking.

14     A. But the -- I think I did offer another possibility.  I

15    don't think I stopped at one.  What was the other one?

16     Q. I know we talked about the clouds moving fast, but that

17    was related to psychosis.

18     A. Yeah, that's right, I didn't think of that.  See, your

19    memory is not as bad as mine.

20     Q. I guess my question, though, is you said that even that

21    example of magical thinking is only -- it's not -- it's

22    possible magical thinking, right?

23     A. Correct.

24     Q. And my question is, if the magical thinking is only a

25    possibility, then would -- wouldn't avoidant personality

1    disorder be a safer diagnosis?

2    A. Yes.  I think you've got a good point, that of those two

3    possibilities -- remember I amended my report by saying "rule

4    out."  Yes, you've raised a good point, that maybe avoidant

5    is better.  I would have to go back and study between the

6    two.  My point that I made right after that with Mr. Bruck is

7    that I don't think that differential has any importance in

8    the question of whether you are competent to stand trial.

9    Q. Earlier you said that I told you, um, what I was going to

10   talk about or what my defense would be, and that I was going

11   to talk about black-on-white crime and things like that.  Do

12   you remember that?

13   A. I don't think I said that.  I think what I said was -- or

14   meant to say, certainly, was that you didn't tell me what you

15   were going to put in your opening and closing arguments.  You

16   only said they were going to be good and that at least the

17   closing was going to be dramatic.

18   Q. Um --

19   A. You did tell me that you were going to talk about hatred.

20   Q. Yes.  You mentioned something that I don't think I really

21   understood when you were talking about two letters and ruled

22   out when we were talking about the schizoid personality

23   disorder, and you talked about how I noticed two letters in

24   your report?

25   A. Yes.  That it was missing, that it should have said "rule

1    out."

2              THE COURT:  R/O.

3              THE WITNESS:  That's the way we do it.  It's R/O,

4    rule out.  That was missing in my original report because

5    that is what I -- that means I'm less sure of the schizoid

6    personality disorder, and we have to do continued work to get

7    the right diagnosis in that area.

8    BY MR. ROOF:

9     Q. Well, can I ask you if you remember that when we were

10   going over -- or when I was going over Maddox's report with

11   you, she mentions that Wagner ruled out the schizoid

12   personality disorder, and then I asked you, "Are you saying

13   you disagree with Wagner?"  Because you had told me the

14   previous day that you did think I had schizoid personality

15   disorder, because that is how I remember that coming up.

16    A. Okay.  Well, rule out means not yet certain.  We need to

17   do more work to do that.  Wagner is not saying, "I have ruled

18   it out.  I have eliminated schizoid personality disorder."

19   He's not saying that.  He's saying the same thing I'm saying

20   now.  We need to rule this out with more work, more

21   information.  Neither one of us are definitive about it.

22              THE COURT:  And you are consistent.

23              THE WITNESS:  Yes, and we are consistent.

24   BY MR. ROOF:

25    Q. That's all the questions I have.  The last thing I would

BALLENGER - CROSS BY MR. RICHARDSON    79

1    just ask you is, um, a lot of the symptoms of autism are

2    interchangeable with social anxiety; is that right?

3    A. Some of them are.  Some of them are also close to OCD.

4    Some of them are also close to schizoid personality.  They

5    are different, but they share some characteristics.

6    Q. And is the defining characteristic of autism the lack of

7    recognition of social cues?

8    A. As has been pointed out, I'm not a world expert in that

9    area, but many people would agree that that is correct.  A

10   difficulty recognizing accurately the social cues from others

11   and social conventions, yes.

12   Q. And the last question is throughout our -- the

13   evaluation, you -- would you say that the reasons I gave you

14   for why I don't believe that I have these things were logical

15   and made sense when I explained them?

16   A. Yes.

17           MR. ROOF:  That's all.

18           THE COURT:  Thank you, Mr. Roof.

19           Mr. Richardson?  Cross-examination by the

20   Government.

21           MR. RICHARDSON:  Thank you, Your Honor.

22                       CROSS-EXAMINATION

23   BY MR. RICHARDSON:

24   Q. Thank you for coming back.  I just want to ask you a

25   handful of questions that I think are relatively

1    straightforward.

2            In the course of your recent evaluation, the recent

3    work you've done, has your opinion remained the same, that

4    the defendant does not have any delusions?

5    A. Yes.

6    Q. That, in fact, instead they are not delusions; they are

7    actually just extreme racial views?

8    A. Yes.  And they are all consistent, and they are all in

9    that tight area.  There is no delusional material.

10   Q. And similarly in light of your recent work, do you

11   continue to have the view that he does not have any psychotic

12   processes?

13   A. I have found no evidence anywhere of any psychotic

14   process before and with this recent.

15   Q. You mentioned during the course of your testimony -- I

16   just want to go back through a few of the things that you

17   talked about -- that this most recent go-around, you have

18   become better acquainted with why the defendant is at such

19   loggerheads with his lawyers.  Can you explain how you got

20   better acquainted with that in this more recent go-around?

21   A. Well, one of the experiences I've had is -- an examiner

22   in this case is that it's hard for the average person, even

23   me -- most people don't think psychiatrists are average, but

24   it's hard for us to get our head in the -- where his is.  We

25   just -- it's a very difficult thing for us to do.

BALLENGER - CROSS BY MR. RICHARDSON   81

1       Q. That is because of the racial hatred?  Is that the

2    part -- what is the part of it for us to get in our head?

3       A. There is several of them.  One of them is the starkness

4    of the racial ideas.  They are so clear and extreme and worse

5    than hardly anybody -- any of us have known.  That -- that

6    that would then lead to what it led to, that is

7    incomprehensible to most people; that he would be, um -- to

8    have the attitudes about it, to not care about the feelings

9    of the victims and be proud of his act; and so, therefore, is

10   seemingly blasé about the death penalty and seeing really

11   little to no importance in kicking and scratching and

12   fighting with his attorneys.  He's doing that against them

13   primarily.  All of that is very hard for us to understand.

14          It became more clear to me, just by more exposure,

15   more work, more thinking about it, more explanation from him,

16   how it's largely accurate to say all of what we've seen is

17   simply related to his decision, careful, thought-out, planned

18   decision to do this act, and that he is proud that he

19   accomplished it.  Not remorseful, proud that he accomplished

20   it.  And although he knows the victims -- the direct victims,

21   the people who were killed were good people, that doesn't

22   matter to him, except that was the point.  He carefully chose

23   the best people because that made it more outrageous;

24   therefore more newsworthy, more clear that it is just a

25   racial thing.  Those people didn't do anything wrong.  He's

1    trying to call attention to what other people he believes are

2    doing.

3            All of his difficulties -- as I went through in the

4    motion in their thing, the difficulties they've had, if they

5    could put their -- themselves -- his standby attorneys could

6    put themselves in his -- more than his shoes, in his head and

7    think that way, everything that has happened would be

8    explainable.  And that became more clear as I saw them try to

9    list all of the difficulties they've had, which I know they

10    have -- that they've had those difficulties.  At least I

11    believe it.  All of that is understandable, predictable, and

12    logical -- logical, if I can put it in quotes.  And part of

13    why he's so irritated right now is he -- he knows they are

14    smart, and he believes that they understand it just the way I

15    explained it to you, and they are still doing what they are

16    doing.  He has little to no appreciation that that is what

17    they have to do.  That's their job.

18            Now, that's a -- take that with a grain of salt.

19    But that is why he's so irritated, that he believes they are

20    doing it despite him saying, as he described Saturday, having

21    told them a hundred times when I just told you, ignoring him,

22    blowing him off.  To him he doesn't understand -- he can't

23    get his head around that.  Why would people who are here to

24    defend you, help you, not do it the way -- what you care

25    about?  And his competency in other ways is demonstrated that

BALLENGER - CROSS BY MR. RICHARDSON    83

1    he understands they have the legal right to do that; they

2    have the ethical obligation to do that.  But he doesn't

3    understand it, and it's making him mad, and he's getting -- a

4    part of it is he's getting to the final act, if you will, and

5    he wants it to be able to be done correctly, meaning his way.

6    Q. So a couple of things to pull out of that.  As I

7    understand what you are saying, the difficulty that you, and

8    I think others you recognize have, is the incomprehensibility

9    of his racial views lead people to want to project mental

10   illness on him.  Is that fair?

11   A. Yes.  I put it in my report because it was so astounding.

12   In one of our last conversations, he said, "I think there is

13   a lot of projecting going on here."  And he said, "Doctor, do

14   you know what projection is?"

15   Q. I picked the word intentionally.  Because what we are

16   talking about is that people, you included before you got to

17   know him, who because they can't comprehend the depth of his

18   racist views, they project on him something else to try to

19   explain that, right?  That is what you think is happening in

20   a number of these scenarios?

21   A. Yes, I agree with you.

22   Q. We talked a little bit about his plan and how he was

23   going to conduct himself.  One of the things I meant to talk

24   about, a significant part of the Government's case is victim

25   impact testimony.  And he gave a good explanation for why he

BALLENGER - CROSS BY MR. RICHARDSON    84

1    was not going to cross-examine the victim impact witnesses.

2    Can you tell us what that was and whether that was a logical,

3    rational choice that he is making in that regard?

4     A. On multiple occasions he's talked about the

5    inappropriateness for his team to directly question the

6    victims, to even look at them directly while they are in

7    distress testifying.  He thinks it would be impolite.  From

8    the very first, he described that he has a big problem with

9    being in a courtroom because his expression was that it is

10    messed up for him to be here defending himself with the

11    family members of people he killed.

12         So repeat your question.

13     Q. So I'll rephrase it, maybe get there.  He indicated to

14    you that it didn't help him, as far as his defense goes, to

15    cross-examine the victim impact witnesses?

16     A. Yeah.  I mean, what he said was -- he said it like his

17    defense team had already come to that conclusion, that you

18    would never cross-examine the victims of this type.  And it

19    would -- if he's representing himself, it would be

20    unbelievably inappropriate for him to cross-examine the

21    victims.

22     Q. It's both inappropriate, it's not effective for his

23    defense, and might undermine his defense if he chose to

24    cross-examine some of these victims?

25     A. He just -- he didn't go there.  He's not a lawyer.  He

BALLENGER - CROSS BY MR. RICHARDSON    85

1    went there as a person who just said it's -- he wouldn't have

2    said -- he didn't repeat it -- it's so messed up that for the

3    killer to talk about -- because, you know, he's a killer who

4    says, "I did it."

5     Q. And proud of it?

6     A. "I'm proud of it.  I did it, and I want you to know it

7    and go down in history to know it, but it would be impolite

8    and cruel to inflict that on the victim," which is, again,

9    very hard for people to get their heads around, that he could

10   have such an idea that he wants to protect the victims.  Even

11   though he says another idea that nobody can get their head

12   around is he doesn't care.  He doesn't care about them.  He

13   didn't like -- and, again, I think the analogy of the

14   Palestinian; he didn't care about the Israelis he killed.

15   The example he used -- perhaps one of them was the boss he

16   worked for in the restaurant that he actually really liked,

17   and he was a friend, but he was just a member of a class that

18   he disagreed with.  Palestinian had grown up his whole life

19   hating the idea of an Israeli state.  And that, to me, it is

20   a good example to help understand how he could say such a

21   thing as, "I don't care about them.  I'm not upset about it.

22   I'm not remorseful.  They served my purpose in this, and I

23   don't want anybody to mistake that."

24    Q. In that context tell me -- for purposes of evaluating his

25   mental ability and the lack of any serious mental illness,

1    what does that tell us, that he's able to analogize what he

2    did to the terrorist activities in the Middle East?

3     A. He really believes that that is the nature of what he

4    did.  That it is --

5     Q. That is the nature meaning it was a terrorist act?

6     A. It was a political act.  I don't think he would agree

7    that it was a terrorist act.  It was a political act, making

8    a political statement on purpose and being pleased that he

9    did it and that it worked out.  Does that make sense?

10     Q. Yeah.  You talked a little bit -- and I don't want to go

11    back through it -- in the conversations you had with him

12    recently how he does like to mess with people.  He likes to

13    mess with you.  He particularly likes to mess with his

14    lawyers, and he also -- you've seen through your

15    investigation, and most recently, he likes to mess with his

16    family as well?

17     A. Yes.  He messed with his -- yes.

18     Q. Particularly he likes to mess with his family?

19     A. That could be true.  I don't know that for sure.

20     Q. Are you aware -- and I just can't recall whether you were

21    in the courtroom or not.  Are you aware that the defendant

22    has indicated in video visits that he messes with his family,

23    and he's not his true self because he knows it's likely to be

24    put up on a TV screen one day?

25     A. Yes.

1        Q. And have you had the chance to review some of those video

2    visits?  Not all of them, I understand.

3        A. Yes, some of them, yeah.

4        Q. And do you find that his interactions are different and

5    distinct from the way you see him and you interact with him

6    when it's not being recorded?

7        A. Yes.  One of the things I have struggled with as an

8    evaluator, and I think it's very appropriate for me to share

9    it with you, is exactly -- I have trouble with two things.

10    In particular, this round, in that the examples, particularly

11    in the written statements that I got late yesterday, the

12    examples that the -- that he has apparently said to his

13    standby attorneys that "I don't think I'll get the death

14    penalty because I'm so nice.  I don't think I'll die in the

15    execution because I'll smile, and they'll stop."  I have a

16    difficulty as an evaluator if he said that to them, which I

17    presume he did, that he's never said anything like that to me

18    and his presentation is straightforward and devoid of any of

19    that kind of crazy idea stuff.

20            I tumbled at the idea Saturday and yesterday to the

21    possibility.  This is not my opinion, nor fact or anything,

22    but to the reasonable, maybe even likely, possibility that

23    those are examples where he's messing with his attorneys, to

24    mess -- to bother them.  The word "abuse them" has been

25    thrown in lately.  But for him to, you know, dangle a little

BALLENGER - CROSS BY MR. RICHARDSON    88

1    leg, saying, "You know, I have a crazy idea for this," but to

2    never do any of that with me, now, that's, I mean --

3    Q. And, in fact, consistent with the idea when he begins

4    talking to you, he believes that they are messing with and

5    abusing him, and he's responding in kind?

6    A. And I'm not.  I'm here --

7    Q. As an honest broker?

8    A. As an honest broker.  What he wants to get across is he's

9    competent, and he displayed it in five different interviews,

10   with not -- and the thing that I'm sure is hard for people

11   even in this courtroom to get their head around, with no

12   apparent guile attempt, he had some fun.  But it was

13   acknowledged fun, enjoyment.  It was amazing that that was

14   happening, but his messing was just that.  But, otherwise, it

15   just seemed straightforward and correct.

16        Now, what I would say in my defense in saying such a

17   thing is I have practiced psychiatry for a long time.  I have

18   diagnosed and had -- in the courtroom many times people are

19   malingering, of course, trying to put their case forward.  I

20   didn't see any of that, nor did Dr. Wagner, my colleague, any

21   of that.  It was amazing to us how straightforward.  And so I

22   wonder whether or not it's -- he's putting out these

23   examples -- and it's always to his attorneys, these examples.

24   Now, that's as far as I've gotten.  I can't get any further

25   in understanding.

1    Q. You weren't there when these conversations allegedly took
2    place --
3    A. That's right.
4    Q. -- right?  And you weren't able to understand the manner
5    in which they were said or how they were conveyed or if they
6    were said at all?
7    A. Yes.
8    Q. You did mention, and I just wanted to give you the
9    opportunity -- this is the -- and I apologize.  It's got some
10   markings on it, but this is the declaration of Mr. Bruck, et
11   al.  You mentioned that you reviewed it yesterday, and I just
12   wanted to give you the opportunity, if you were so inclined,
13   to let me know whether there is anything about that --
14   A. Sorry.
15   Q. -- that --
16        MR. RICHARDSON:  I apologize, Your Honor.  It's
17   driving me crazy.
18   BY MR. RICHARDSON:
19   Q. -- if there is anything about that that you found
20   particularly noticeable that you wanted to convey to the
21   Court about this declaration.
22   A. Both that I found it useful, and that I wanted to convey
23   is what I just did, that there were all of those examples in
24   there.  But the other thing that -- as I was trying to think
25   how could I explain the difference of opinion that I had, and

BALLENGER - CROSS BY MR. RICHARDSON    90

1    Mr. Bruck apparently has, and as I -- as I thought about the

2    whole thing, I mentioned earlier that if you have in your

3    head straight what he wants to do, then everything they said

4    in here makes sense.  So that would be one thing I wanted to

5    point out.

6    Q. When you talk about what was in his head, you have

7    straight what was in his head, you are talking about these

8    seemingly incredulous racist ideas?

9    A. Well, what he wants to do in this trial, you have that in

10   your head, then all of these make sense.  Now, the ones that

11   don't make sense to me are some of the examples in here of

12   what appear to be autistic traits or OCD issues.  I mean, for

13   instance, it's very hard to know whether his idea that there

14   has to be a precise amount of detergent put in when you are

15   washing sweaters or otherwise they smell in a way he doesn't

16   like, whether that is an OCD thing or an autistic thing or a

17   mixture, it's very hard to tell.  But those kinds of

18   examples, they jumped on them because they looked like

19   autism, and there is some of those in there.

20           If you understand what he wants to have happen in

21   the trial, and you understand that he is -- probably has

22   autistic traits and definitely has social anxiety concerns,

23   worried about how people will think about him, is watching

24   intently your face, everybody's face, to discern do you like

25   me or not more intensely than hardly anybody.  If you like

BALLENGER - CROSS BY MR. RICHARDSON    91

1    him, that means you don't -- you are not judging him

2    negatively, and he can relax, and he doesn't have to be so

3    anxious.  That's what social anxiety is about, hating being

4    the center of attention because you are fearing you are going

5    to be judged.

6         That, if you add that -- those considerations, so

7    that helps you with all of the photos, the worry about the

8    messy underwear in the back of the car, the Klan pillows, it

9    helps you understand the way he's trying to protect his

10   reputation, and in that regard, maybe you can call them

11   vanity issues.  It's not entirely accurate to do that, but

12   those issues and wanting to protect the act and his

13   histories, the interpretation of the act, then everything in

14   their report makes sense.

15   Q. You talked a little bit about, with Mr. Bruck, the expert

16   reports.  He tried to parse a sentence in your report.  Let

17   me ask you first of all, the motion and the reports that were

18   attached to it, did you read all those?

19   A. Yes.

20   Q. Okay.  And you are also aware, as you indicate in your

21   report, that in the previous hearing that there were

22   affidavits and reports that were submitted by those -- many

23   of those same individuals as part of that separate hearing?

24   A. Yes.  And I think I saw some, but not all.

25   Q. Right.  Depending on the time in which they were

1    submitted?

2     A. Yeah.  Right.  I guess.

3     Q. And you indicate that wasn't the primary focus of what

4    you were doing, but it is also fair to say that you read them

5    and you considered them, and they helped inform the manner in

6    which you conducted the evaluation over the two days this

7    weekend?

8     A. Oh, yes.

9     Q. And indeed, as we can see through your report, you

10    discussed those reports and some details about those reports

11    with the defendant?

12     A. Yes.

13     Q. All right.  So I want to turn -- I just didn't want there

14    to be a confusion about whether you had read and considered

15    those reports.  I want to turn to --

16     A. I just didn't put the data I learned from those reports

17    in my last report.

18     Q. Right.  It is part of what you considered, but you didn't

19    do a point-by-point rebuttal in your own report?

20     A. That is correct.

21     Q. Because that is beyond the scope of what you were asked

22    to do?

23     A. Exactly, and this distinction of staying just with what

24    recently happened.  But I did read them.  I did consider what

25    was in them as part of my evaluation.

BALLENGER - CROSS BY MR. RICHARDSON     93

1     Q. I want to talk to you a little bit about autism, just

2     briefly.  You indicate that there is autism traits by

3     history, right?  And that -- we talked a little about the

4     history is what you got from other individuals, and this is

5     what Mr. Roof asked you about, this idea that -- that

6     information has the power of suggestion behind it, right?

7     A. Yes.

8     Q. And that some of those individuals, be them family

9     members or defense lawyers, they have an inherent bias

10    themselves with respect to the recounting of that

11    information?

12    A. And the bias of -- you know, I'm here.  I'm a world

13    famous expert on autism to talk about Dylann Roof's

14    characteristics, his autism.  Did he ever do this?  There is

15    a bias inherent in that examination.

16    Q. And then you indicated in the --

17    A. The bias that people will answer differently.

18    Dr. Loftin, I know, is well on top of that.  But people will

19    remember, oh, yeah, he really did -- and they might remember

20    something he did one time 14 years ago, and maybe he didn't

21    actually really do it that way.  It's that kind of an issue.

22    Q. And I don't want to focus on that side because that is

23    past.  Really what I'm going to focus on is the more

24    specific, and based on your recent evaluation, what you --

25    what you indicated is he has a very few possible autism

BALLENGER - CROSS BY MR. RICHARDSON    94

1    traits.  You talked about that with the defendant, right?

2    A. Yes.

3    Q. And -- but that it does not rise to the level of the

4    disorder.  That's your opinion?

5    A. Yes, but it may get back into the -- you know, if you are

6    ever -- if you lose 96 percent of it --

7    Q. I'm not trying to rehash --

8    A. But in my opinion, it really is -- it doesn't rise to

9    influencing significantly his competence to stand trial or

10    represent himself.  It may waste time.

11    Q. And it's also fair to say that lots of people have some

12    autism traits.  That's not an unusual thing for people to

13    have?

14    A. No.  One of the things that we have learned, particularly

15    in the last 10, 15 years, is that what you just said is

16    exactly right.  There are people who have a very severe form,

17    but then there is now a spectrum of that, and there -- not

18    uncommon for people to have some -- some of them functioning

19    at very high levels in society, some where the trait helps

20    them, and --

21    Q. Let me ask with respect to the more recent meetings, the

22    two over the course of the weekend.  Did he have the full

23    ability to engage in social communications with you?

24    A. Yes.  That was one of the most surprising things to me,

25    and frankly to Dr. Wagner as well.  And it was on display

1    here.  He looked -- he looked me directly in the eye.  He

2    used facial expressions to talk to me, the tone of his voice.

3    Yes.  And that is part of --

4     Q. The same thing you saw here when he was asking you

5    questions?

6     A. That is what I was referring to.  But when I'm examining

7    him in the comfort and just the two of us, very skilled

8    social interaction.  Jocular, funny, enjoyable to be around,

9    you know, what the guy on the street would say somebody who

10    would be fun to have a beer with.  Now, clearly he was not

11    that comfortable a year ago out in the world where he was

12    having lots of trouble.  But in the structure of the jail, in

13    a structured situation, he displayed a lot of social skills.

14     Q. Just a few more, I'm getting close, I promise.

15          Mr. Bruck asked you about the defendant's

16    reputation.  Did you have conversations with the defendant

17    about all the letters that he's receiving -- fan mail that

18    he's receiving in jail?

19     A. I only recently learned about that, and I saw one video;

20    but no, sir, I didn't make that a focus of any --

21     Q. But you are aware that he's gotten a lot of fan mail,

22    people who are writing to him now that he's in jail?

23     A. Somewhat, yes, I'm aware.

24     Q. You mentioned the video.  You are also aware of at least

25    one young lady who has engaged him in somewhat of a romantic

BALLENGER - CROSS BY MR. RICHARDSON    96

1    way through video?

2     A. That is the one I think I was referring to.

3     Q. In the context, just to come back to this, this affidavit

4    or declaration from Mr. Bruck and his team, was this fairly

5    consistent with the hour-and-a-half-long conversation that

6    you had with them prior to the November competency hearing?

7     A. Very.

8     Q. And there is nothing in here that was surprising to you

9    in light of the extensive communications you had with them

10   about their perceptions prior to the competency hearing?

11    A. The answer is no, but let me expand just a little bit.

12   The only surprising thing was, again, these anecdotes now

13   about conversations long before about, you know, the "I won't

14   get executed because I'll cry, and the jury will like me and

15   vote for" -- there was more of that yesterday in this.

16    Q. That is consistent with the same types of anecdotes and

17   stories they provided you previously?

18    A. Yes, absolutely.

19    Q. We -- you talked with the defendant about how on the

20   morning of June the 17th, he had gone to work with his dad,

21   and that he had worn two pair of pants when he did that.

22   There is also -- you know, Mr. Bruck talked to you about how

23   he quit the different job earlier, but he went to work that

24   day, right?

25    A. I just learned that.

1    Q. Right.  Let me ask you about -- so that is maybe one

2    explanation.  I'm not all that interested in that.  But the

3    other one I wanted to talk to you a second about is how that

4    could well be explained by his social anxiety in so far as

5    someone going to commit this type of attack, wanting to

6    appear bigger, stronger, more imposing, and wearing clothes

7    in order to convey that.  Would that type of approach be

8    consistent with social anxiety disorder, the concern for

9    one's appearance?

10    A. Yes, it would be consistent.  And it wouldn't just be

11    pertinent necessarily at the time of going to an attack, but

12    also just in general to be bigger, stronger looking.  So

13    those are all reasonable hypotheses both, but hypotheses.

14          MR. RICHARDSON:  The Court's indulgence for just one

15    moment.

16    BY MR. RICHARDSON:

17    Q. One of the things the defendant did talk to you about is

18    that he does have some social anxiety.  He agrees with that?

19    A. He readily admits that.  He even sought treatment for

20    that.

21    Q. We talked about how he -- based on your understanding of

22    his belief system, it's understandable to you, if you accept

23    who he is, the statements that he doesn't care about the

24    victims?

25    A. Um, yes.  It's internally very consistent and logical.

BALLENGER - CROSS BY MR. RICHARDSON    98

1    It took a stretch of talk to understand how he could -- to

2    get my head around how he could not care, and to hear the

3    victim impact statements that after the first four, even the

4    jurors are going to get tired of hearing that.  And that I

5    asked him specifically, how hard is it going to be on him to

6    hear that.  And to get my head around the answer of "Not hard

7    at all.  I don't want to identify with these people.  I know

8    it's real.  I understand their pain.  I don't share it" --

9     Q. Because he hates the group of people that they are a part

10    of?

11     A. Yes.  Yes.  Not them, or their grieving families.

12     Q. He hates the group of people that they are a part of.  He

13    hates -- African-Americans is what he hates?

14     A. He hates what he believes African-Americans are doing.

15    Just like the Palestinian, hates what he

16    believes the Jewish state is doing.  Kill a friend to make

17    that point.

18     Q. To make that political point?

19     A. Yes.

20            MR. RICHARDSON:  Nothing further, Your Honor.

21            THE COURT:  Mr. Bruck, anything?

22            MR. BRUCK:  Bear with me for a moment.

23            No further questions.

24            THE COURT:  Very good.  Dr. Ballenger, again, thank

25    you from the Court for your service here.  I appreciate it

1    very much.  And you are free to leave.  Thank you, sir.

2                THE WITNESS:  Thank you.

3                THE COURT:  Okay.  Mr. Bruck, you have a copy of the

4    declaration.  I would like to make it part of the record, if

5    you have not already done that.

6                MR. BRUCK:  Our declaration?

7                THE COURT:  Yes.  Mark that as Defendant's Exhibit,

8    please, Ms. Ravenel.

9                THE CLERK:  Yes, sir.

10               THE COURT:  Okay.  Now, Mr. Bruck, let's do it.

11   What other witnesses you wish to call?  One by one, give me

12   the first name and let's talk about it.

13               MR. BRUCK:  All right.  We wish to call Dr. Loftin.

14               THE COURT:  First of all, are you going to --

15   Dr. Loftin has not examined the defendant since

16   November 22nd?

17               MR. BRUCK:  That's correct.  She has considered

18   additional information not available since November 22nd.

19               THE COURT:  And what information has she considered?

20               MR. BRUCK:  Well, of course, she has reviewed the

21   declaration that --

22               THE COURT:  Yes.

23               MR. BRUCK:  -- that has just been admitted.  She has

24   reviewed two videotapes of about a total of an hour and a

25   half length of visits that the defendant had, one on

1    November 18th with his father and stepsister, and the other

2    on November -- I'm sorry -- excuse me -- December 18th.  That

3    is after the guilty verdict.  And the second on December 27th

4    with his mother and her -- his mother's boyfriend, Mr. Beard,

5    at the jail.

6         She has also reviewed the reports of the other

7    experts that have been filed.  And if I may say a word about

8    the timing of those reports because it has been implied that

9    they were delayed in some way.  Those reports originated as

10    the mitigation evaluation --

11         THE COURT:  I don't have a problem with that,

12    Mr. Bruck.  The point is -- is that the substance, you

13    know -- let's just take Dr. Loftin.  She offered a more

14    abbreviated version of her opinion, the second autism expert

15    at the competency hearing.  I've ruled as to that.  Now,

16    having someone offer me opinions about what you told them is

17    very odd to me.  I don't consider it particularly reliable

18    and professional to come in and give me that opinion.  Now,

19    she wants to talk about two videos she observed, okay, I'll

20    hear her about the two videos.  I want to see the videos.

21    You haven't given them to me.

22         MR. RICHARDSON:  No rush, Your Honor.

23         THE COURT:  I'm glad to look at them.  And perhaps

24    over lunch, we could watch them.  We haven't seen them.  I'm

25    not going to turn -- just have them come in and try to

1    describe something I haven't seen.  You hand it to

2    Ms. Ravenel, please.

3            MR. BRUCK:  Yes.  We propose to have her comment in

4    particular on the second one, the December 27th.

5            THE COURT:  Okay.  I will make a special focus on

6    that.

7            And do you intend -- she has not previously offered

8    opinions as to the defendant's competency or his competency

9    to self-represent.  Are you intending to offer her for that

10   purpose?

11           MR. BRUCK:  Yes.

12           THE COURT:  It's not in any of the reports.  So what

13   is she going to say?

14           MR. BRUCK:  She is going to say that his autism

15   spectrum disorder, which is her field of specialization,

16   would impair his capacity to stand trial.

17           THE COURT:  Because?

18           MR. BRUCK:  Because of the whole complex of deficits

19   involving the capacity to understand social interaction.

20           THE COURT:  Everybody who is an autistic have no

21   responsibility, is that where we are heading?

22           MR. BRUCK:  It does not go to criminal

23   responsibility.  I'm not saying that she has a full-fledged

24   opinion with respect to competency to stand trial based only

25   on autism.  She defers to Dr. Maddox for the overall

1    competency evaluation.

2              THE COURT:  We are down to quadruple hearsay.  You

3    know --

4              MR. BRUCK:  If I may continue?

5              THE COURT:  Yes.

6              MR. BRUCK:  She has another opinion, which is that

7    he is -- by reason of his autism spectrum disorder alone that

8    he -- which is a severe mental illness, or at least mental

9    disorder within the meaning of *Indiana vs. Edwards* -- he

10   lacks the capacity to conduct the trial on his own, and that

11   is without respect to whether -- to other comorbid disorders

12   such as psychosis --

13             THE COURT:  I've already ruled on that as of

14   November 22nd.  If she wants to tell me based on those two

15   videos why he's not competent, I'm glad to hear from her,

16   based on those two videos.  I'm not going to be relitigating

17   the period prior to that.

18             MR. BRUCK:  I cannot represent to the Court that she

19   can pinpoint a fact in those videos alone in isolation from

20   everything else which --

21             THE COURT:  Well, she didn't offer the opinion

22   before, Mr. Bruck.  If -- she had every opportunity to, and

23   she did not.  I have noted in my order she made no opinion

24   regarding competence.  We are not coming in and

25   relitigating -- she had the opportunity to do that.  She had

1    a prior opportunity to testify by -- on Skype.  She elected

2    not to do that.  That is okay.  But don't come back and

3    relitigate the same issue with me.  You know, one bite of the

4    apple here on this thing.  We've got to move on.

5            MR. BRUCK:  I mean, I don't think -- whether this

6    is -- whether I am to blame for this or not, I don't know.  I

7    don't think the issue for competency to stand trial or

8    represent himself is waivable.

9            THE COURT:  It's not waivable.  Defaultable.  We had

10   a two-day hearing.  I delayed jury selection for three weeks.

11   We had an in-court examiner appointed.  We have done this.

12   And to have her come back now and want to show up and

13   relitigate the issue that we have already decided is not what

14   I'm doing.  The law of the case is that the defendant was

15   competent as of the end of his competency hearing.  If she

16   has new information which she believes supports a

17   determination that he is incompetent, I am glad to hear her.

18   I'm not going to hear her again.  I've heard her once.  We've

19   heard her prior declaration.  I'm not doing that again.

20           MR. BRUCK:  We will call her to comment on the tape.

21           Now, I want to make clear her evaluation was the

22   basis of the competency evaluation of -- the competency

23   testimony or part of the basis of the competency testimony of

24   Dr. Maddox.  It is all one testimony.

25           THE COURT:  Dr. Maddox, I've already heard from

1    Dr. Maddox.  You know, she had an hour and 45 minutes or

2    whatever it took in front of me.  I've done that.

3         MR. BRUCK:  If I can finish what I'm saying.  I am

4    explaining why it was not necessary, and indeed perhaps not

5    even appropriate for Dr. Loftin who expressed an opinion on

6    competency back at that time.  She did what we should have

7    had, or if it had been possible or what ideally we would have

8    had in this evaluation, which is an autism evaluation by

9    someone qualified to evaluate autism, which is not, with all

10   due respect, Dr. Ballenger.  We did not have that problem on

11   our side.  We had one of the most eminently qualified

12   evaluators for adults with autism we could have.

13        THE COURT:  And I considered her opinions in the

14   competency hearing.  I did.  You had two experts on autism.

15   I considered those opinions.  I also considered the opinion

16   that Dr. Ballenger had that he had autism -- that the

17   defendant had autism traits.  We are just not going to

18   relitigate that issue.  She had every opportunity to offer

19   whatever opinions she had on -- for the first part.  She

20   offered no opinions.  She gave me information about autism.

21   I considered it and weighed it.

22        Now, we are not -- as I mentioned in the prior

23   order, you know, and I've said to the defendant many times,

24   I'll say it again right now:  I think the jury should hear

25   this information.  I think that the -- that the jury should

1    hear all of it, including Mr. Roof wants to say it has no

2    merit.  I just think the jury should get all the information.

3            But *Faretta vs. California* recognizes the right of a

4    competent defendant to self-represent and to make these

5    decisions.  He's making these decisions.  I had told him it

6    is unwise.  I have the greatest respect for your abilities.

7    I think he should use you throughout.  Mr. Roof is probably

8    tired of me telling him that.  But I keep telling him that,

9    and I'm going to keep telling him that until we start the

10   trial of this thing because I think he should let you put

11   this evidence up.  The question -- and Dr. Ballenger said --

12   potential mitigation evidence, everybody recognizes, but he

13   has the right to make these decisions.  It's the foundation

14   of *Faretta*.

15           Now, we are now talking about what Dr. Loftin can

16   do.  The train has left the station on what Dr. Loftin can

17   offer us.  She had her chance just like everybody else did.

18   I carefully considered the ASD issues in determining

19   competence, and we are now having a follow-up review.  It's

20   not an opportunity for a redo.  I tried to say that as

21   clearly as I could, Mr. Bruck, and believe me, I'm giving you

22   a hard time, but I respect your passion.  I really do.  We

23   are going to do what she can tell us between November 22nd

24   and the present day, and that if she has an opinion, I'm glad

25   to hear it based on this new evidence.

1          Yes, Mr. Roof?

2          MR. ROOF:  Mr. Bruck admitted that she would not be

3    able to pinpoint how these videos -- for what's in the

4    videos -- if she can't pinpoint it, then she shouldn't be

5    able to testify if that's all she's going to be able to be

6    doing.

7          THE COURT:  I intend over lunch to watch the video,

8    okay?  I'm going to watch it.  And I saw the characterization

9    of the video with your parents that was made a big deal about

10   earlier, and I have reached the conclusion that you were

11   messing with your parents, and then a few minutes later, you

12   talk in very sophisticated terms about the proceedings.  You

13   didn't know what a court was.  I want to watch the video,

14   okay?  And I have routinely been told that you mess with

15   people.  You try to play with them.  And I don't know what is

16   on the video.  I haven't seen it, I want to see it.  Let me

17   just say, that is what Dr. Loftin is going to testify about.

18   She's not testifying about her -- she now has opinions based

19   on something that was before November 22nd.  I mean, that is

20   my ruling.  That is the law of the case.

21         MR. BRUCK:  I would like to say also that there is

22   new evidence that has come into existence today from

23   Dr. Ballenger.  For example, his entire characterization, his

24   new description of the defendant's complete and total lack of

25   empathy.

1          THE COURT:  I saw that in the first report.  That is

2    not new.  That is --

3          MR. RICHARDSON:  He didn't say he has a lack of

4    empathy.  He says he has a lack of empathy for this group of

5    people that he killed.

6          THE COURT:  Here is the point:  That is not new to

7    Dr. Ballenger.  That is unfair.  I read -- I have read both

8    of his reports.  He said it in the first report.  He has said

9    it in the second report.  It's not new.  Now what else have

10   you got?

11         MR. BRUCK:  We think he was describing in a way here

12   that can be characterized as a classic symptom of autistic --

13         THE COURT:  You are overstating what he stated.  He

14   has repeatedly said that he has no remorse.  He's proud of

15   what he did.  That is what is going on here.  You know,

16   Mr. Bruck, you are throwing everything you can at us, you

17   know, every moment, that's fine.  But we are going to limit

18   this hearing to -- if you want to get her on the stand to

19   say, I heard he said something.  I heard what Dr. Ballenger

20   said.  I know the history, just like I'm watching Mr. Roof.

21   I have watched him through these proceedings.  So you are not

22   talking about something I haven't seen myself.

23         Y'all are party to things that I don't see.

24   Frankly, Mr. Bruck, I see things you don't see because you

25   are not sitting there looking at everybody, okay?  And I have

1    got to make a judgment in the end, and you know that is a

2    very important part of this determination is my own.  If I

3    thought he wasn't competent, I wouldn't let him self

4    represent.  I reached the conclusion carefully.  I went

5    through a detailed *Faretta* hearing on whatever day I did

6    that, and I intend to have another one.

7         One reason I closed this hearing is I need to have a

8    very detailed discussion with him.  The area I will tell you

9    I'm most focused on -- I want to be honest with you about

10   this -- is whether he takes seriously the death penalty risk.

11   That is the issue that I personally want to spend the most

12   time with, and the one that, frankly, is the reason your

13   statements about that caused me to schedule this hearing

14   because I want to question the defendant myself.  I had

15   questioned him previously about it, Dr. Ballenger questioned

16   him previously.  I specifically asked Dr. Ballenger to

17   question him carefully in the second evaluation on that

18   issue, and I intend to do it myself.

19        MR. BRUCK:  In that connection, Your Honor, when you

20   review the video with the defendant's mother, there is some

21   background I think you should take into account.

22        THE COURT:  I'm glad to hear that.  We are now

23   talking -- you and I are on the same page now.

24        MR. BRUCK:  Okay.  The -- as will be revealed in the

25   video, I would like you to pay special attention to what goes

1     between minute 2:40 or 2:55 and 7:40.  It is the first few

2     minutes of the video that -- to set the stage, and this is

3     the evidence is internal in the video, so I'm not creating

4     new evidence.  That is not what we are now putting in.  But I

5     think the Court may be aware that the defendant's mother was

6     here on the first day of the trial for opening statements and

7     suffered a heart attack in the courtroom, was hospitalized,

8     eventually went home.  She's doing okay.  This meeting on

9     December 27th was the first time that the defendant had seen

10    his mother since that event.  The video --

11          MR. ROOF:  I had talked to her on the phone, though.

12          MR. BRUCK:  The video discloses that she had gotten

13    a message from another relative, I think from the

14    grandfather, Joe Roof, the day before that Mr. Roof -- that

15    Dylann Roof wanted -- needed to see her.  And she describes

16    the emotional effect of that message.  It was unlike anything

17    she had received in this year and a half, that she cried over

18    it, because of what it signified emotionally she thought.

19          She gets down there and discovers that the reason he

20    wanted to see her was to fuss at her for the fact that she

21    was allowing Dylann's lawyers to go shopping for his clothes

22    instead of continuing to try to find some particular pants

23    with different types of gray flecks that he wanted that she

24    had tried and been unsuccessful to find in the stores in

25    Columbia.  And then you can observe the complete lack of

1    emotional perception on his part about her reaction.

2                THE COURT:  He told me that.  I'm going -- I

3    appreciate you giving me the background.

4                MR. BRUCK:  And I know that that should be read in

5    the context of Dr. Ballenger's report and his statement about

6    Dylann's self-perception about his emotional connection and

7    sensitivity to his own parents and how he can't be --

8                THE COURT:  I'm sure Mr. Roof won't be the only

9    person who is not emotionally connected to his mother.

10               MR. BRUCK:  Later on in the tape, there will also be

11   a very lighthearted discussion of his self-representation and

12   how he's not a lawyer, and I think the Court should take that

13   into account on the question about how seriously he takes

14   these proceedings.

15               THE COURT:  Okay.  I appreciate that.  Is that all

16   regarding Ms. Loftin -- Dr. Loftin?

17               MR. BRUCK:  Yes.

18               THE COURT:  Okay.  Let's go to Dr. Maddox.

19               MR. BRUCK:  Dr. Maddox -- I'm sorry -- yeah,

20   Ms. Stevens will address that.

21               MS. STEVENS:  May I approach the podium?

22               THE COURT:  You may.

23               MS. STEVENS:  Happy New Year, Your Honor.

24               THE COURT:  Happy New Year to you.

25               MS. STEVENS:  I was going to call Dr. Maddox, and if

1    the Court recalls you had two questions proposed for the

2    experts last time, and we started the inquiry with the two

3    competency questions.  This time we have a proper copy of her

4    curriculum vitae that reflects her retirement.  I was going

5    to introduce her new report into evidence.  Would the Court

6    now receive her new report?  She's here if the Government

7    wishes to cross-examine her.

8              THE COURT:  I've read it.  I've read it.

9              MS. STEVENS:  So it's in evidence, then, Your Honor?

10             THE COURT:  What we'll do is if you will just gather

11   all the reports, I'm going to let them in for whatever they

12   are worth.  I think the appellate court will have them.  A

13   part of your argument is going to be about whether the

14   mitigation evidence should be offered, and I don't think

15   there is any harm to have it in for that purpose.

16             MS. STEVENS:  Then at this time, I move the

17   admission of the four new reports:  Dr. Maddox, Dr. Loftin,

18   Dr. Moburg, and John Robison.

19             MR. ROOF:  Objection.  Why are they allowed to do

20   this?  It's insane to me.  I don't --

21             THE COURT:  Mr. Roof, let me say this:  Part of my

22   job is to make sure there is a full appellate record for

23   appeals.  And I take it for whatever it's worth.  I think

24   they are largely irrelevant to my determination here today

25   because I've already decided the issue of competency.  But

1    the question is, I've got my colleagues up in the Fourth

2    Circuit who need to hear the appeal on these issues, and I

3    think the record ought to include it.  It's no more than

4    that, Mr. Roof.

5               MS. STEVENS:  Thank you, Your Honor.

6               MR. RICHARDSON:  We similarly object.  We laid out

7    our reasons earlier.  I also think that it is also

8    appropriate if the Court is going to do that, that the Court

9    also unseal Dr. Dietz's report, make it a part of the record

10   today, because it was made in response to these experts.  And

11   so what they are trying to do is put a one-side story on it.

12   It does not accurate --

13              THE COURT:  Wait for a second.  Does the defendant

14   object to Dr. Dietz's report being unsealed?

15              MS. STEVENS:  Yes, Your Honor.

16              MR. RICHARDSON:  I think the question was whether

17   the defendant objected.

18              MS. STEVENS:  Your Honor, there are no mitigating

19   factors discussed in any of these reports.  They all are

20   about competency.  If you look carefully at Dr. Maddox's

21   report, the only conclusion is about competency.

22              THE COURT:  Mr. Roof, do you mind -- do you object

23   to Dr. Dietz's report being part of the record?

24              MR. ROOF:  I have never seen it, so, yes, I would

25   object.

1          THE COURT:  Okay.  Why don't you -- the problem is

2    nobody has seen it because only I've got it.

3          MS. STEVENS:  It does not bear on competency, Your

4    Honor.

5          THE COURT:  And I haven't seen it.  It's sealed.

6          MR. RICHARDSON:  I haven't seen it either.  What I

7    believe it does do, and what they tried to do, is suggest

8    that he has a mental illness.  That is the first question.

9    And that Dr. Dietz's report -- I anticipate, I have no

10   idea -- addresses that issue.  And what they cannot do is try

11   to introduce this one-sided, unfair characterization without

12   getting the flip side.

13         THE COURT:  Will the parties agree for me to unseal

14   the report sufficient for the parties, including Mr. Roof and

15   the Government and the standby counsel, to review it?

16         MS. STEVENS:  We object.

17         THE COURT:  And then let me address it.

18         MS. STEVENS:  We object, Your Honor.  Rule 12.2

19   prohibits this.  We are not at that point yet.  Mr. Roof has

20   declared his intent not to offer any mitigating evidence or

21   call any mental health experts, and it would be improper to

22   unseal that according to the strict limitations of 12.2.

23         THE COURT:  Unless the defendant waived that right.

24         MS. STEVENS:  As --

25         MR. RICHARDSON:  If the defendant waived it, or if

1    they waived it by introducing these expert reports, which

2    were done for mitigation.

3         THE COURT:  They are offered -- they may have been

4    done -- they are offered here for competency.

5         MS. STEVENS:  We are here only on the competency

6    issue.

7         THE COURT:  Would the parties object to me unsealing

8    the Dietz report for the limited purpose of allowing

9    Mr. Roof, standby counsel, and the Government to review the

10   Dietz report so that I can intelligently then respond to, and

11   hear from them?  Let me say this:  I'm not going to unseal it

12   unless Mr. Roof consents to it.

13        MS. STEVENS:  We object.  Rule 12 --

14        THE COURT:  You are standby counsel.  That is not

15   your role.  He's self-representing.  He has objected at this

16   point because he hasn't seen it.

17        MR. ROOF:  I think, um, I think the prosecution made

18   a perfectly good point.  I would object to all of the reports

19   because they were all -- none of them were done for

20   competency.  They were done to present as mental health

21   evidence.

22        THE COURT:  They may have been done for that, but

23   they are relevant to competency, and I think it's proper to

24   present.  You wouldn't go hire new experts to do that.  I

25   don't think there is anything wrong with that, Mr. Roof.  The

1    question is do you want to see the Dietz report, or are you

2    just -- I'm going to let those other reports in for whatever

3    they are worth.  The question is, do you want the Dietz

4    report to be considered as part of the record?  It's your

5    right under the Federal Rules.  I'm not going to do it unless

6    you agree to it.

7            MR. ROOF:  No, I don't agree.

8            THE COURT:  Very good.  That is decided.  Okay.

9            Dr. Maddox -- so you were offering -- I grant your

10    motion to have those four made part of the record.  Yes?

11            MR. RICHARDSON:  Can I make one additional point?

12            THE COURT:  You may.

13            MR. RICHARDSON:  I think the concern that Mr. Roof

14    has and the defense has, is he doesn't know what is in it.

15    The Government is certainly willing to allow him to review

16    his own report and make his own decision without it going to

17    us or anybody else.

18            THE COURT:  Mr. Roof, do you want to see the Dietz

19    report if no one else saw it?

20            MR. ROOF:  That means it's not in evidence?

21            THE COURT:  Correct.  Until you told me you wanted

22    it in evidence.

23            MR. ROOF:  Yes, I would like to see it.

24            THE COURT:  Okay.  I'm going to -- the Government

25    consents to that?

1          MR. RICHARDSON:  Yes, Your Honor.

2          THE COURT:  Mr. Roof consents to it.  We will

3     provide him a copy of the Dietz report to be examined in the

4     courthouse, not leaving, and he can make his determination of

5     whether he wishes to make that part of the record or waive

6     his right.  Right now the view is he does not want it to be

7     part of the record, and I will honor that.

8          MS. STEVENS:  May I note for the record that

9     Rule 12.2 and this Court's order provide that within 24 hours

10    of the defendant declaring a notice to introduce mental

11    health mitigation testimony, at that point he can see the

12    report.  This is contrary to the Court's order and contrary

13    to Rule 12.2.

14         THE COURT:  You know, whose right is it?  It's the

15    defendant's right.  He is self-representing.  I agree with

16    you, those are the rules.  That's why if he waives it, I'm

17    not going to rely on it.  He has a right to

18    self-representation.

19         MS. STEVENS:  He still would have to comply with

20    Rule 12.2.

21         THE COURT:  He can waive his right to 12.2 not to

22    have it disclosed.

23         MS. STEVENS:  He have first has to have contrary

24    mental health evidence.

25         THE COURT:  I understand.  It will remain sealed

1    otherwise, but that right to seal, the parties could agree

2    that not withstanding the rules of 12.2, they would make it a

3    part of the record.  They can agree to that.  As standby

4    counsel, you object to that, but Mr. Roof has a right to do

5    it, and all we are talking about now at this point is having

6    him have a chance to look at it.  Whether he wants it to be

7    part of the record --

8              MS. STEVENS:  As Mr. Bruck --

9              THE COURT:  Would you like to withdraw your effort

10   to get these four reports in?

11             MS. STEVENS:  No, Your Honor.  But I would like to

12   note that we are just --

13             THE COURT:  You can't -- I just feel like I'm trying

14   to get a complete record for the appellate court.  That's all

15   I'm trying to do.  I don't think any of this stuff will make

16   any difference to me here.  I've got to rule as to

17   competency.  I've heard all the folks.  I don't need it.  All

18   I'm trying to do is have my colleagues when they eventually

19   review it to have a full record.  There -- there is a full

20   psychiatric examination that has been done by the Government,

21   and Mr. Roof has the right under 12.2 to keep that sealed.

22   If he wishes to waive it and the Government wishes to waive

23   it, I'm going to allow it.  But it's Mr. Roof's decision.

24             MS. STEVENS:  Yes, Your Honor, but I am only noting

25   that he first has to declare an intent to use the evidence,

1    which he has withdrawn, and only then does he get to see the

2    Government's evaluating report.  That is the --

3        THE COURT:  That is the way the rule works.  The

4    parties could agree to waive that right.  We are not

5    prisoners of --

6        MR. ROOF:  I think this whole conversation is

7    unnecessary because, like you said, all we are talking about

8    is me reading the report first.

9        THE COURT:  Let's do this:  Mr. Roof is going to

10   read the report.  Everybody agrees to do that.  It is an

11   evaluation of him.  We'll make it available.  And then -- I'm

12   not going to read it.  I'm not going to read it right now.

13   And I'm going to let him decide whether he wants to waive his

14   right.  The Government waives its right -- any right under

15   12.2; is that right?

16       MR. RICHARDSON:  I don't think --

17       THE COURT:  I think it's all the defendant.

18       MR. RICHARDSON:  We think it is equitable that if

19   you are going to put in the defense's hired experts that you

20   put in the responsive experts.

21       THE COURT:  They ignore what they want to ignore.

22   There is no harm in this.

23       MR. RICHARDSON:  Absolutely.

24       THE COURT:  I just -- you know, I would put

25   Dr. Dietz's report in the same category I would put all these

1   other reports, that it's about something I've already

2   decided.  He evaluated him before I had the competency

3   evaluation.  Am I right?  Before that -- before?

4              MR. RICHARDSON:  Yes, Your Honor.

5              THE COURT:  So I mean, right now let's reserve the

6   fussing about whether it's in until Mr. Roof decides whether

7   Mr. Roof waives his right.  If he doesn't waive his right,

8   it's --

9              MS. STEVENS:  As the Court pointed out, we are

10  counsel for purposes of the competency proceeding, which is

11  the only purpose we have offered the four reports.  We have

12  requested we see Dr. Dietz's report as well so we can assess

13  whether it has anything to do with competency.

14             THE COURT:  I haven't seen it.  Nobody is going to

15  see it but Mr. Roof initially, okay?

16             MS. STEVENS:  Okay.

17             THE COURT:  Then we'll figure out how to deal with

18  this.  I think it's much ado about nothing.  Now about

19  Maddox.

20             MS. STEVENS:  I would like to address the *Indiana*

21  *vs. Edwards* question of this:  Regardless of whether the

22  defendant does not have the sufficient present capacity to

23  understand the proceedings and/or to assist counsel, do you

24  have an opinion within a reasonable degree of medical

25  certainty that due to a severe mental illness, the defendant

1   is not competent to conduct the trial proceedings by himself.

2   And conducting it by himself is a different inquiry than

3   competence alone.  And that question I was going to pose to

4   Dr. Maddox.

5          THE COURT:  She exhaustively addressed competence

6   that overlaps this.  You know, I just -- you know, I

7   considered her evidence.  I went through -- and this is why I

8   had it separated.  I went through and read it regarding my

9   own evidence on *Edwards*.

10         MS. STEVENS:  I did, too, Your Honor, last night.

11  But I have new things.  I have a list --

12         THE COURT:  Well, she had her chance to testify

13  about competence.  Listen, you know, there are -- *Indiana vs.*

14  *Edwards* talks about the gray things, right?  The gray things

15  that are marginally -- severe histories of mental illness

16  that the defendant in that case -- you and I both know the

17  history in that case.  This defendant doesn't remotely

18  represent someone like that.  And she laid out to me in

19  detail all his deficiencies.  I have ample information on

20  this.  You are try to relitigate her testimony.  I'm not

21  going to allow it.

22         MS. STEVENS:  Your Honor, I have a list of new

23  evidence that factored into --

24         THE COURT:  She can do the new evidence.  That is

25  what I want from her.  What new evidence does she have?

1           MS. STEVENS:  She has looked at a video visit

2    between Amy and Benn Roof that occurred November 19th.  It's

3    three days before the hearing, but we didn't have that tape

4    at that time.

5           THE COURT:  No.  We are doing -- we are not doing

6    that one.  What else?

7           MS. STEVENS:  The visit that the defendant has with

8    his father and his sister on December 18th, the visit with

9    his mother and with his mother's boyfriend on December 27th,

10   which the Court now has on a thumb drive.  She was going to

11   assess the psychiatric conditions she sees evident and in

12   play in that video and the fact that he is not taking his

13   potential sentence appropriately.

14          THE COURT:  How do you know that?

15          MS. STEVENS:  His disabilities, you will see, but

16   she can explain from a psychiatrist standpoint.

17          THE COURT:  She's going to say based on a video?

18          MS. STEVENS:  That is an interaction between the

19   defendant --

20          THE COURT:  That is all it is.  It's a video.

21          MS. STEVENS:  A video of a very significant

22   interaction.

23          THE COURT:  That is fine, and Dr. Ballenger has had

24   interaction with the defendant.  I intend to have an

25   interaction with the defendant today.  I don't want to spend

1    so much time that -- we are not going to do that.  We are

2    going to do this.  And I'm going to talk to him about that.

3    So I'm glad she has an opinion about the video.

4            What else have you got? Because that's all you've

5    got right now that she's going to be able to testify about.

6            MS. STEVENS:  The video and the recent family

7    interaction following the conviction, one of them.  The four

8    new reports --

9            THE COURT:  No.  The four reports are from the past.

10    I'm not going through that again.

11            MS. STEVENS:  Dylann Roof's statements to this Court

12    an December 28th, 2016.

13            THE COURT:  What statements are we talking about?

14            MS. STEVENS:  Where he said on the record that he

15    intends to present no evidence and call no witnesses.

16    Mr. Bruck referred earlier to the extensive evidence list and

17    witness list that we had filed with this Court and intended

18    to call.

19            THE COURT:  So she -- yes, Mr. Richardson?

20            MR. RICHARDSON:  Your Honor, that's exactly what he

21    told Your Honor previously.

22            THE COURT:  November 7th he told me that.

23            MR. RICHARDSON:  This is not anything new, right?

24    That is why --

25            THE COURT:  That's why we had the competency

1    hearing.

2              MS. STEVENS:  It would be nice if I could finish,

3    Your Honor.

4              THE COURT:  Ms. Stevens, I know everybody is jumping

5    up and down like jack rabbits jumping up here.  Let me say

6    this:  I have known Mr. Roof's plan not to call witnesses

7    since November 7th.  He told me that.  That's why I ordered a

8    competency hearing.  Okay?  So to come in and say that this

9    is new information, not new to me.  That's why the filing the

10   last workday before the New Year about claiming new

11   information, which I have had for weeks, if not over a month,

12   that he intended not to call witnesses.  You know, there is a

13   strategy here, Ms. Stevens.  You don't like the strategy.

14   His strategy is he's going to use this opportunity to --

15   self-representation to make an opening statement and closing

16   argument and not be subject to cross-examination.  He doesn't

17   want to cross-examine people who would make him look very bad

18   if he tried to cross-examine the victims.  He recognizes

19   that.  Sounds like a strategy to me.  You know, I --

20             MS. STEVENS:  May I, Your Honor?

21             THE COURT:  I'm just saying -- let me finish.  So

22   the point is that is not a new statement, that he planned to

23   do that.  That was known before the competency hearing.  I

24   weighed that in the competency hearing.

25             What else about Dr. Maddox?

1          MS. STEVENS:  What is new about that is the

2     statement comes after he has been convicted, and it is a very

3     real potential now that he faces the death penalty.  It is

4     the timing.

5          THE COURT:  You think he thought he was going to be

6     acquitted?

7          MS. STEVENS:  It is that he still persists in this,

8     and she has expert statements to offer.

9          THE COURT:  I feel like I heard all from Dr. Maddox.

10    She told me she thought he was competent until he wrote the

11    letter.

12         MS. STEVENS:  There is the fact that yesterday he

13    refused to see her.  She spoke with him briefly.

14         THE COURT:  He feels like y'all are manipulating

15    him.  Now, I frankly think that y'all have done everything

16    you possibly can to manage a difficult client, that I don't

17    share Mr. Roof's views that you have deceived him.  I think

18    you are trying to help him and trying to manage a difficult

19    client.  But as Dr. Ballenger said, his behavior is fully

20    understandable in light of his -- and the fact that he

21    hasn't -- I know that he did not -- he refused to see her.

22    So be it.  So right now, she can talk about the videos, her

23    observation.  I'm glad to hear from her on that.

24         MS. STEVENS:  We further were going to discuss her

25    current diagnoses, which are the same as before, in light of

1    her final review of all of the materials and the complexity,

2    specifically of defending oneself with no lawyers at the

3    penalty phase of a capital case and the type of

4    decision-making that takes, and how his mental illness -- his

5    severe mental illnesses impact her specifically --

6    THE COURT:  You know, I've already reached that he

7    does not have severe mental illness that impacts him.  She's

8    relitigating.  I'm looking at -- this went on Document 707

9    from page 17 to page 147, 140 pages of testimony.  I've heard

10   her.  I've already ruled.  She hasn't seen him since then.

11   I'm going to let the video -- I'm going to hear from her

12   about the video.  I have a lot of respect for Dr. Maddox, I

13   really do, but I've heard her.  Okay?  So she can talk about

14   the video.

15   How about the next person?

16   MS. STEVENS:  We also were going to call Dr. -- or

17   Father John Parker.

18   THE COURT:  And he has seen the defendant since the

19   prior competency finding.  Am I correct?

20   MS. STEVENS:  He has.

21   THE COURT:  I welcome what he has to say.  Anyone

22   else?  Hold on just a second, Mr. Roof.  How about

23   Mr. Robison or Dr. Moburg?

24   MS. STEVENS:  We are not going to offer either of

25   them live in light of the Court's ruling on the reports.

1    We'll rest on the reports.

2              THE COURT:  Okay.  Mr. Roof, what you got?

3              MR. ROOF:  I signed a waiver for the pastoral

4    privilege.

5              THE COURT:  Yes.

6              MR. ROOF:  Does that -- that applies here?

7              THE COURT:  If you waive pastoral privilege, that

8    would apply here.

9              MR. ROOF:  I would ask that they provide a copy of

10   that if they are going to call him.

11             THE COURT:  Anybody got a copy of that?

12             MS. STEVENS:  Yes, we do.

13             MR. ROOF:  The videos, those are part of the

14   report -- the videos that you are going to watch are part of

15   the record?

16             THE COURT:  They are going to be made part of the

17   record, yes.

18             MR. ROOF:  I would like to try to clarify my

19   objection to the -- the objection is that not only does it

20   invade my privacy, which I understand I don't have a right

21   to, but it invades the rights of the privacy of the people

22   visiting me.  You can say they don't have a reasonable

23   expectation of privacy when they are coming to visit you at

24   the jail, but that is for purposes of the security of the

25   jail.  They have a reasonable expectation when they are

 1     visiting at the jail that their visits won't be disseminated.
 2     That is my objection.
 3         THE COURT:  I understand it.  You know, I've got to
 4     weigh -- you heard me earlier today.  I have to weigh all
 5     these rights of different people and different rights, and I
 6     just -- you know, I'm not going to represent to you today.
 7     I'm just reviewing them, and at some point I'm going to have
 8     to make a determination about what is released, and I'm not
 9     going to make that determination today.
10         But, Mr. Roof, I do think one thing is important,
11     and I'm going to -- this is a guess on my part -- that when
12     your lawyers went to speak to you that they were trying to
13     make a point to you that all this information is going to get
14     out anyway -- most of it, I mean, Dr. Ballenger's testimony.
15         Mr. Bruck, am I basically right about that?
16         MR. BRUCK:  Yes.
17         THE COURT:  I thought so.  You need to understand
18     this isn't going to be a secret.  That Dr. Ballenger's report
19     and testimony, the other experts -- the public's right to
20     know in this situation is a very powerful legal right.  I'm
21     protecting the privacy of -- the confidentiality of the
22     record because of my jury.  I don't want to taint my jury.
23     But once the jury has rendered a verdict, it's coming in, and
24     if you are not having counsel because you have some hope that
25     you can keep this a secret, I don't want -- one reason I made

1    that clear today, I wanted you to know that wasn't going to

2    happen.  That -- you understand what I'm saying?

3              MR. ROOF:  I completely understand, but now they are

4    standby counsel, and they are putting more videos in.

5    It's --

6              THE COURT:  Let me say this:  The one area where

7    standby counsel has a special duty is if they have reached a

8    conclusion that you are incompetent, they have to tell the

9    Court that.  In fact, it would be unethical to keep it a

10   secret.

11             Mr. Bruck, would that be right?

12             MR. BRUCK:  Yes.

13             THE COURT:  Even though based on my direct order not

14   to file something, they have an ethical duty to do it.  I

15   agree with that, I'm holding a hearing.  I'm going to issue

16   an order at the end of all of this.  And I said their role as

17   standby counsel is not otherwise modified.  They can't file

18   anything else.  You are representing yourself.  As to this

19   one issue, I need a lawyer to advocate this position.  And

20   I'm giving you a chance to represent yourself at the same

21   time.  It's a little awkward to sit at the same table, but

22   we -- that's the way we are going to work it.  I can handle

23   it.

24             I want to have everyone have their say so I can have

25   a final decision on competency.  That is what we are here

1    about, not Dr. Dietz's report and all this other stuff.  We

2    are about whether this defendant is, A, competent to stand

3    trial; and B, competent to self-represent.

4         Okay.  I want to go take a break because I want to

5    watch the video.  The total of the videos are an hour and a

6    half.  Do I need to watch the whole hour and a half, or are

7    there certain things I need to be watching?

8         MR. BRUCK:  We think it would be best to watch the

9    whole thing.

10        THE COURT:  Okay.  It's now 1:00.  We'll come back

11   at between 2:30 and 2:45.  I will give you a chance -- we

12   will watch it over lunch, and I will -- my staff will work

13   out to get to Mr. Roof a copy of the Dietz report for his

14   personal review.  Okay?  Hearing is adjourned until then.

15        (Thereupon, there was a lunch recess.)

16        THE COURT:  I'm going to raise an issue that I

17   thought about more over lunch.  When this issue came up about

18   these reports, I was thinking they are not in the record for

19   the appellate court to review if they feel it appropriate.

20   Of course it's part of the docket already.  Those reports are

21   at ECF 832, 1234, and the Dietz report is part of the court

22   record, but not visually at this point.  We have it sealed in

23   my chambers, but it's part of the court record.

24        I'm going to reconsider my decision, I'm not going

25   to allow those reports to be part of this record because they

1    are not relevant to this hearing.  They are part of the -- on

2    the ECF.  If the Fourth Circuit on review wishes to have

3    access to them, which I was trying to facilitate, they are

4    there at 832, 1, 2, 3, and 4.  Ms. Ravenel will have -- the

5    court docket will include -- the record will include

6    Dr. Dietz's report, and thus it is unnecessary for any of

7    this to be part of this record on this competency hearing.

8         So I reconsider and I deny -- I sustain the

9    objection of the Government regarding the exhibits of the

10   reports of Loftin, Moburg, Robison, and Maddox being made

11   part of this record, and I need not look any further

12   regarding Dr. Dietz's report.  We do not need to unseal it.

13   It will be available if the Fourth Circuit wishes to see it.

14        Now, let me raise an issue before we go into some of

15   the testimony about -- physically we have self-representation

16   here by Mr. Roof, and I want to define for security purposes

17   where everybody is going to be and what their limits are so

18   we don't have any confusion about this.  All of the opening

19   and closing statements will be made from that podium which I

20   put right there.  The podium will move and will be put there

21   for opening statements.  The Government and Mr. Roof will be

22   making the opening and closing statements from behind that

23   podium.

24        I'm trying to have the marshals discreet, but I

25   don't want my jurors anxious about Mr. Roof being too close

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1     to them.  I want them to hear what he has to say, and I think

2     that's a good balance.  The microphone will be right there,

3     and the Government will give its closing argument from the

4     same position.

5              MR. WILLIAMS:  Your Honor, can we stand next to it

6     instead of having it directly in front of us?

7              THE COURT:  You are going to stand behind it.

8              MR. WILLIAMS:  Thank you.

9              THE COURT:  Get used to it.  In North Carolina they

10     make you cross-examine from a seated position.  I found it

11     maddening.

12              The next issue is where the witnesses are going to

13     be examined.  I want them examined from that podium in the

14     center there.

15              To the extent Mr. Roof wishes to offer an exhibit, I

16     want him to hand it to one of my court security officers, and

17     they will hand it to Ms. Ravenel.  The Government does not

18     have that burden.

19              I think everybody kind of knows the limits.  I'm

20     trying to be discreet to the jury about it, but I want

21     everyone to sort of be basically fed out of the same spoon.

22     I filed a brief order today laying out those basic rules, and

23     before the end of the day, I'm going to hand them out to

24     everyone.  We filed it already.

25              Now let me look at this release.  Does the

1    release -- Mr. Roof, you had a concern about the release.

2    Tell me what you understood the release to stand for

3    regarding the father who proposes to testify here?  Did you

4    understand there was something to do with a signed release

5    Father John --

6         MR. ROOF:  Oh, um, no.  I was just wondering, does

7    that -- does -- did me signing that allow him to testify

8    here, that's all.

9         THE COURT:  Let me read it real quick.  You were

10    asking the question.  Let me read it.

11         (Pause in proceedings.)

12         THE COURT:  Mr. Bruck, I'm only reading this on the

13    fly here.  Am I reading this -- it appears to recognize that

14    the communications between Father John and the defendant are

15    privileged.

16         MR. BRUCK:  Well, they would have been privileged

17    but for the waiver.

18         THE COURT:  And where is the waiver?

19         MR. BRUCK:  "It is expressly understood that this

20    release" -- the second paragraph -- "should apply and

21    encompass any disclosure by Father John Parker."  So it is in

22    the middle of the second paragraph.

23         MR. BURNS:  Is it possible for the Government to get

24    a copy of it?

25         THE COURT:  Absolutely.  Please provide him a copy.

1              MR. BRUCK:  As I understand the statute, the

2        privilege belongs to the priest.

3              THE COURT:  Oh, not the defendant.

4              MR. BRUCK:  Right.  The question is whether the

5        priest may be compelled to testify.  He is willing to

6        testify.

7              THE COURT:  Mr. Roof, do you care whether the priest

8        testifies or not?

9              MR. ROOF:  Yes.  That is the whole reason I brought

10       this up because it's extremely confusing, this -- reading

11       this.

12             THE COURT:  I find it confusing myself.  I'm trying

13       to read it very fast, but it doesn't -- I'm used to a waiver

14       saying "I hereby waive my right to" -- that's not what it

15       says.  It says, "I understand there is a privilege.  It is

16       expressly understood and agreed that this release or

17       discharge shall apply and encompass my disclosure by Father

18       John Parker of any and all communications and exchanges of

19       any nature."  But it doesn't really say the scope of what the

20       release -- that he can testify and all that.  Where does that

21       say that here?

22             MS. STEVENS:  If I may be heard on the context of

23       the signing of this document?  At the time Father Parker

24       brought the release to -- we had requested that Father

25       Parker -- to testify, and then Dylann Roof himself wanted him

1    to testify.  December 17th, Dylann was requesting that Father

2    Parker be allowed to give testimony.

3         THE COURT:  Mr. Roof, is that correct?  Did you want

4    the father to testify?  I mean, he can't testify at the -- at

5    the sentencing phase unless you call him.  But the question

6    is him testifying here in front of me.

7         MR. ROOF:  Right.

8         THE COURT:  That's what we are talking about right

9    now.

10        MR. ROOF:  Yes, I understand.

11        THE COURT:  Did you understand that when you signed

12   this, you were agreeing to let him testify?

13        MR. ROOF:  During the penalty phase.

14        THE COURT:  During the penalty phase or any -- it

15   doesn't say that.  I mean, this is not a quality document.

16   This is a somewhat confusing document.

17        MR. ROOF:  Even with -- even when I was first

18   reading this to sign it, I was confused by the -- by the

19   wording, especially the first part.  It's so -- I mean, I was

20   considering calling him as a witness in the penalty phase.

21   He told me he needed me to sign this so he could tell his

22   parishioners that he had been talking to me.

23        THE COURT:  Did you understand that you were

24   authorizing him to testify at a trial by signing this

25   document?

```
 1                MR. ROOF:  No.

 2                THE COURT:  Mr. Burns, are you looking at the

 3      document?

 4                MR. BURNS:  I'm having a hard time understanding

 5      that second paragraph.

 6                THE COURT:  The first paragraph says, "I recognize

 7      it is a privilege," and the second paragraph says -- I'm not

 8      sure what it says.

 9                MR. BURNS:  It doesn't talk about a waiver, and I

10      don't know.

11                THE COURT:  It's titled "General Release, Liability

12      of Release Consent and Waiver."  There is a thousand, you

13      know, waivers and rights in cases.  I never read one like

14      this.  This is a very ambiguous document.

15                MR. BRUCK:  If I may, Your Honor?  And to be clear,

16      I think we are having a problem with some representation

17      here.  This is a competency hearing.  I'm counsel, and

18      Ms. Stevens, for the competency hearing.  We are offering --

19                THE COURT:  I'm trying to understand what your

20      client -- what you believe to be your client -- and I think

21      what he understood this to mean, because I'm having trouble

22      understanding what it means.

23                MR. BRUCK:  I think the legal issue is between the

24      client and the church and Father Parker.  The legal issue

25      that involves the Court is simply whether or not Father
```

1    Parker can be required not to testify by privilege.

2             THE COURT:  That's a different issue.

3             MR. BRUCK:  And --

4             THE COURT:  I'm not there yet.  Because --

5             MR. BRUCK:  He holds the privilege.

6             THE COURT:  You know, the kind of rule of, that the

7    law of court is entitled to everyman's evidence.  I'm not

8    there.  Don't get too nervous yet.  I'm trying to figure out

9    about this document.  I'm a little narrower than you are

10   because it may well be that I want to hear him, and I'll call

11   him as a witness if I need to.

12            And -- but the question is I find this document

13   confusing and ambiguous.

14            MS. STEVENS:  Your Honor --

15            THE COURT:  I'm not sure what it does.

16            MS. STEVENS:  The circumstances by which the

17   document was signed --

18            THE COURT:  I think that is why I just asked

19   Mr. Roof whether he understood it, and he said he found it

20   confusing.  It's an ambiguous document.

21            MS. STEVENS:  But he was asking Father Parker to

22   testify for him.  Father Parker brings him the document;

23   Dylann Roof signs it.  It's entitled "a waiver."

24            THE COURT:  It may be titled "waiver," but the

25   substance of the document doesn't say that.  That's the

```
 1       problem.  But that doesn't mean that I shouldn't hear from

 2       Father John, okay?  I'm just saying I just think this waiver

 3       is ambiguous.  That is my concern.  But so nobody else has

 4       walked up here with a waiver, so I mean I don't need to have

 5       a waiver to have someone testify.

 6            Yes, Mr. Roof?

 7            MR. ROOF:  It's just -- my understanding is, so for

 8       example, when he comes to visit me, unlike the other visits,

 9       they aren't recorded because we have a --

10            THE COURT:  Priest-penitent relationship.

11            MR. ROOF:  So that is my understanding.

12            THE COURT:  Hold on just one second.  Let me -- we

13       are -- my capable law clerks here are citing me the South

14       Carolina Code Section 19-11-90, which provides that I cannot

15       compel a priest in South Carolina to testify regarding a

16       confidential communication.  But if he elects to provide me

17       that information, there is no privilege to the penitents.  I

18       think that is the law.

19            So I do find the waiver is of no legal effect.  It's

20       an ambiguous document, but if he chooses to testify, I would

21       hear him.  Is that fair enough?  I mean, I think that is

22       what --

23            MS. STEVENS:  Yes, thank you.

24            THE COURT:  Now, folks, I listened to this video.

25       I've seen a number of these videos, obviously.  It's not the
```

1    first one.  How anybody could make a diagnosis off these

2    videos, I am highly, highly skeptical.  They -- there were

3    other videos where he's playing with his parents.  He has

4    this impish style of sort of joking with them, raising

5    things, what is a letter?  I remember one he had, what is a

6    court?  I kind of get Mr. Roof.  Okay?  So I mean I see it,

7    and I have listened to very carefully, Mr. Bruck, I listened

8    to the part you asked me.  I listened to the whole tape.  I

9    listened to all of it.  I took notes on it.

10          He -- now he -- he has this fixation about clothes;

11   in both tapes he's talking about certain pants and so forth.

12   We are not going to say people are not competent because of

13   that.  I think this has been accounted for.  I think whether

14   it's OCD or an autism trait, I don't know.  It's a -- it's

15   present.  But if you want me to -- if you want to put these

16   people on the stand and say what -- how they interpret that

17   video, okay, I'll listen to them.  But I want to express to

18   you my profound skepticism as a professional standard -- I

19   retained and called dozens of psychiatric experts in my

20   career.  I never would have presumed to put anybody on this

21   stand with this thin a basis for an opinion.  But if these

22   folks want to get on the stand and talk about what those two

23   videos mean, which I can watch, have at it.  We are not doing

24   other stuff.  We are not getting into other things, but get

25   on the stand, and they can tell me what they think they see

1    in those videos.

2            MR. BRUCK:  I think Dr. Loftin's testimony about

3    several features of these videos will justify the few minutes

4    that it will take to hear it.

5            THE COURT:  I'm going to let you do it.  I'm just

6    expressing to you my skepticism about it, particularly in

7    light of the fact that I've already had her opinion.  She did

8    not offer an opinion about competence, and I had a competency

9    hearing.  I've already done that.  So if she's going to tell

10   me something special about that video, maybe I don't see what

11   she does, I want to hear it.  Okay?  But I did listen to it.

12   I mean, you know, reminds me of the old joke, are you going

13   to believe me with those lying eyes of yours?  You know.  I

14   just -- you know, I can observe just like everybody else can,

15   and we have different perceptions of the same thing.  It

16   doesn't mean that anybody is not telling the truth or being

17   dishonorable.  They just have different perceptions,

18   sometimes where you sit and where you stand.

19           Now, Father John, I want to hear what Father John --

20   I frankly want to hear what he has to say from his

21   observations since November 22nd, and I don't have any

22   objection to hearing him out.  I think he is exactly the kind

23   of witness that meets the standard I talked about, and I

24   presume that he has a sort of pastoral history, Mr. Bruck,

25   where he has a counseling background or -- as many ministers

1    do.  I would welcome his thoughts.

2              MR. BRUCK:  Very well.  Well, we'll have at least

3    two witnesses then.  We would like to start with Dr. Loftin

4    and then call Father John.

5              THE COURT:  Very good.

6              MR. BRUCK:  Make sure she's in the courtroom.

7              THE CLERK:  Dr. Loftin, please come forward to be

8    sworn.  Place your left hand on the Bible, state your full

9    name for the record, please.

10             THE WITNESS:  Rachel Lynn Loftin.

11   THEREUPON:

12                       RACHEL LYNN LOFTIN,

13   called in these proceedings and being first duly sworn

14   testifies as follows:

15             THE CLERK:  You may be seated.

16             THE COURT:  Mr. Bruck, before we spend a great deal

17   of time, I have read Dr. Loftin's resume, and she's

18   imminently qualified with autism, one of the experts in the

19   country on this subject, and I've read both her initial

20   report she gave and the more lengthy report.  But I read

21   every line of it, and I do recognize her as an expert in

22   autism, so you need not go through her credentials.  I

23   recognize her as an expert.

24                       DIRECT EXAMINATION

25

 1    BY MR. BRUCK:

 2     Q. Your name for the record?

 3     A. Rachel Loftin.

 4     Q. L-o-f-t-i-n?

 5     A. That's right.

 6     Q. One or two details that aren't in your résumé or your

 7    report, I understand you have had a promotion since you filed

 8    your -- since your résumé was submitted.  That would be

 9    Defendant's Exhibit 12 of the competency hearing in November.

10     A. My promotion to associate professor just went through.

11     Q. You are now a tenured professor?

12     A. That's right.

13     Q. Your billing arrangement, of course, you have had a

14    somewhat reduced hourly rate --

15             THE COURT:  I have approved -- I have approved all

16    her bills.

17             MR. BRUCK:  Right.

18    BY MR. BRUCK:

19     Q. I think what the Court may not realize -- do you get any

20    money from the work you do in this case?

21     A. No, the payment for this case goes to Rush University

22    Medical Center.

23     Q. Thank you.  So it would be fair to say that you would be

24    making exactly the same amount of money if you were at home

25    on this holiday, New Year's Monday, in Chicago as if you were

```
 1        here today?
 2         A. Not quite.  It doesn't factor into my bonus structure,
 3        but I always meet --
 4                THE COURT:  You asked one question too many,
 5        Mr. Bruck.
 6                THE WITNESS:  I always meet my bonus.  I always
 7        exceed the maximums.
 8                THE COURT:  The danger of that is, I've had lawyers
 9        ask the expert, aren't you getting paid, and they turn back
10        and just like you --
11        BY MR. BRUCK:
12         Q. As a practical matter, despite the bonus structure, this
13        particular appointment has not increased your remuneration?
14         A. Not at all.
15         Q. I was right the first time?
16         A. You were right.
17         Q. Thank you very much.  Now, I've explained to you, as the
18        Judge -- your report has been reviewed, and he is aware of
19        it.  We want to focus on some information that you have
20        reviewed since November 22nd, specifically two videos which
21        have been of family visits on the -- on December the 18th, I
22        believe, and in particular on December the 27th, involving
23        the defendant and the rest of his family.
24         A. That's right.
25         Q. I would like to ask you what about -- and I'm going to
```

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    ask you primarily -- if you refer to both videos, I'm going

2    to ask you to focus especially on the December 27th video.

3    What, if anything, in these videos contributes to or is in

4    your expert opinion relevant to the question of whether the

5    defendant -- a defendant's mental conditions, specifically

6    autism spectrum disorder, which you diagnosed, as it relates

7    to his competency to stand trial or to his competency to

8    waive counsel and be his own lawyer.  If you could just go

9    through those with us.

10    A. Sure.  There are three themes that come out in his video

11    samples and also came out in a recent communication I had

12    with Father John.

13           THE COURT:  I don't want to hear about your

14    communication with Father John.

15           THE WITNESS:  Three things that came out from the

16    videos:  a detailed focus to the exclusion of seeing the

17    bigger picture; rigidity and difficulty with perspective,

18    taking -- understanding other person's point of view.  I

19    think that detail focus is really important --

20    Q. Let me stop you right there.  These three

21    characteristics, how, if at all, do they relate to any mental

22    disorder and to which medical disorder?

23    A. They are all commonly observed in autism --

24    Q. Okay.

25    A. -- and others.

LOFTIN - DIRECT          144

1    Q. So the first --

2            THE COURT:  And other?

3            THE WITNESS:  And other psychiatric disorders.

4            THE COURT:  Such as?

5            THE WITNESS:  Psychosis.

6            THE COURT:  Such as?

7            THE WITNESS:  Psychosis.

8            THE COURT:  Anything else?

9            THE WITNESS:  Not that I'm aware of, no.

10           THE COURT:  Are you diagnosing psychosis?

11           THE WITNESS:  I am diagnosing autism.

12           THE COURT:  You don't have an opinion within a

13    reasonable degree of medical certainty as to that.

14           THE WITNESS:  I believe attenuated psychosis is

15    appropriate as a diagnosis.

16           THE COURT:  Have you made that in your report, or

17    are you making it for the first time today?

18           THE WITNESS:  I talk about the symptoms of it in my

19    report.  I'm not specific as to it in my report.

20           THE COURT:  Okay.

21    BY MR. BRUCK:

22    Q. So the first item was focus on detail, or I can -- you

23    described it as a bias for detail.  Can you tell us what that

24    means and what you observed through this video?

25    A. This is a well-documented, very common feature in autism

1    spectrum disorder that has a neurochemical basis.  So the

2    chemicals in the brain are affecting how the brain works,

3    causes the individual to be very focused on particular

4    details and to lose salient information in the process.  So

5    because an individual is so fixated on particular scales,

6    they are failing to see the bigger picture, maybe some of the

7    most important features of the larger situation.

8        Q. And how would you -- based on this observation, would you

9    rate this bias for detail as mild, moderate, severe?

10       A. There are portions of this video where it's very severe.

11   In the history it's well-documented.  I agree with the Judge:

12   Some of these things are only observed one time in isolation;

13   it might be a red flag, but you won't base a whole diagnosis

14   on it.  We have a very long history of these exact things

15   happening over and over and over and reported by a number of

16   people and then showing up again in the video.  And that is

17   what I think is remarkable.

18       Q. Okay.  And can you give us the examples of what you are

19   talking about?

20       A. Sure.  I think most clearly demonstrated in about a

21   five-minute sample of the video when Mr. Roof's mother comes

22   to visit and he's fixated on talking about particular details

23   of his clothing.  Not just pants, but gray-flecked pants with

24   a 29-inch inseam.  So highly specific, not just gray pants,

25   gray-flecked pants.  Not just a sweater, a ribbed sweater of

1    a particular color with a crew neck.  There is a level of

2    detail in that that shows he's missing the main point.  He's

3    missing the bigger picture of what is important in the

4    courtroom.  He's focused on irrelevant details.  Certainly we

5    all care about our appearance.  He's going into it to a level

6    that is causing him to miss the bigger picture.

7     Q. Anything -- anything else -- any other items of excessive

8    attention to detail during that one visit?

9     A. Well, another point I would like to make related to that,

10   when an individual has this cognitive style, and they tend to

11   be so fixated on these details, they have difficulty

12   multitasking.  The brain is thinking about gray-flecked

13   pants, the brain isn't noticing other people's expressions

14   and movements and communications.  So I'm concerned -- when

15   we are talking about competence, I'm concerned in a courtroom

16   what else might be happening that Mr. Roof would miss.

17    Q. And is that a concern for his self-representation as well

18   as his competency to stand trial?

19    A. That would concern me for both.

20    Q. Anything else other than the clothes fixation?  Any other

21   examples of excessive attention to detail before we move on

22   to some of the other --

23    A. There's several from Father John that I know I shouldn't

24   go into that.

25    Q. And I'm not going to ask you about them.  But have you

1    also noted in your report numerous other examples of

2    excessive attention to detail of this autistic type?

3    A. Absolutely.

4    Q. Okay.  All right.  You mentioned attention to detail, and

5    then you mentioned -- can you give us any examples for -- for

6    rigidity from those videos?

7    A. Sure.  I really like focusing on that same five-minute

8    sample because I think it's hitting on my main area.  In that

9    same five-minute sample --

10   Q. This is -- just to be clear for the record, it starts at

11   about 2 minutes 40 seconds and goes to about 7 minutes and

12   57 seconds?

13   A. Something like that.  That's right.  This is -- this is

14   related to being detail-focused.  When an individual is

15   detail-focused, they can sometimes get very stuck.  So when I

16   write reports, I use that word "stuck" a lot to indicate this

17   rigid way of thinking and not being able to move on.  And so

18   there is evidence, I think, that Mr. Roof is getting really

19   caught up on some of these details that don't have that much

20   relevance to the bigger picture.

21           So in the video sample we are talking about, his mom

22   is trying very hard to move along to other topics, discuss

23   other things, and he's stuck.  He's continually coming back.

24   So there is that rigidity.  I think, you know, in the

25   history, it's clear that he has a lot of arbitrary rules for

1    things and gets really stuck on things following the rules.

2    And I do think a lot of these fashion requests got back to

3    some rules he has for himself and some rules for how to dress

4    and rules for what clothes should look like.

5    Q. All right.  And then you finally listed perspectives in

6    deficit -- deficits in perspective.  Can you explain what you

7    meant by that and give examples?

8    A. I think this one is the most important.  This is kind of

9    a key deficit when we are talking about autism spectrum

10   disorder.  This is the most important one to really

11   understand.  And difficulty taking another person's point of

12   view means that the individual cannot suppress his own

13   thinking, his own point of view, his own concerns long enough

14   to put himself in another persons' shoes, think from other

15   person's perspective, think what that person might be

16   thinking or feeling, and do that in a way that is reasonably

17   accurate.  None of us is 100 percent, but --

18   Q. And what was the example that you noticed in this video?

19   A. It's very striking in this video and actually hard to

20   watch.  You know, in this video, it's the first time Mr. Roof

21   has seen his mother since she had a heart attack in the

22   courtroom.  And she's coming in and, finally, you know, there

23   they are alone, and she says, you know, "Why did you bring me

24   here?"  You know, "What do you need?"  And you -- you can

25   tell from her perspective, she thinks he's summoned her.  He

1    needs something from his mother.  She looks very expectant.

2            And he says, you know, "Did you find the sweater,"

3    and he goes on to talk about the ribbed pants.  He's missing

4    all these emotional cues in the situation, and he's focusing

5    on those aspects that he's concerned about.

6            I also would like to talk for a second about the

7    joking aspect because it's come up so many times.  Certainly,

8    I love the word "impish," Judge.  I think that was the

9    perfect way to describe the way Mr. Roof can present

10   sometimes.  And I think his use of joking is different than

11   what it looks like on the surface.  I think he uses joking

12   oftentimes to compensate for a lack of social skills and a

13   lack of a breadth of social skills.  His repertory is

14   limited.  So I think --

15   Q. Limited for what reason?  Is this relevant to your

16   diagnosis of autism?

17   A. It's limited because of the autism.  Absolutely.  That is

18   causal.  And I think Mr. Roof is smart.  He can learn, and

19   he's figured out over time that if he says something and it's

20   a little outrageous or it makes people angry or it offends

21   someone or hurts someone's feelings, he can always do that

22   impish smile and say it was a joke, and that gets him through

23   the situation.  And so he makes a lot of outrageous comments

24   and kind of reverts to that style of interaction almost to

25   the exclusion of other modes of social interaction.  That is

1    his default way of interacting with people.

2     Q. Has Mr. Roof explained to you his concept of a joke and

3    why he makes jokes?

4     A. Absolutely.  And it really does --

5          MR. CURRAN:  Objection, Your Honor.  We are getting

6    into the interpretation of the video.

7          THE COURT:  Well, she's -- you are objecting because

8    this comes from a prior evaluator?

9          MR. CURRAN:  Exactly.

10          THE COURT:  Sustained.

11   BY MR. BRUCK:

12    Q. You talk about Mr. Roof's reaction -- Mr. Roof's

13   presentation during the -- when he tells his mother why he

14   wanted her to come.  Did you make any observations about his

15   mother's reaction and his response or lack of response to his

16   mom?

17    A. She's visibly distraught, and this is a woman -- I

18   watched many hours of footage, unfortunately, and I have

19   heard him tell her several times "I love you."  I think this

20   is a woman he does care for.  But she's in front of him

21   visibly distraught, crying, upset, and he smiles.  He doesn't

22   look upset.  He doesn't mirror her affect the way that most

23   of us would automatically mirror that affect, even without

24   thinking.  It's just like a reaction in us, and he doesn't

25   have that reaction, doesn't show that emotional reaction to

1    her.

2     Q. And why, in your expert opinion, is that given his

3    condition?

4     A. I think that is a social cognitive deficit of autism.

5    There is neurological research that shows differences in

6    brain function and difference within the way that mirror

7    neurons function, and I think it's a product of that.

8     Q. If one was not aware of this, if a person simply viewed

9    this video without knowing anything about Mr. Roof, what in

10   your expert professional experience would someone naturally

11   conclude?

12    A. I think a naive person who didn't understand autism would

13   think that he's being cold or distant toward his mother, or

14   maybe that he didn't care.

15    Q. What you are seeing here is a symptom of autism?

16    A. Absolutely.  But I do think it's important to have that

17   whole developmental history in order to put that observation

18   into context.

19    Q. Very well.  If -- and, of course, a jury would need to

20   have the same context in order to understand the

21   presentation?

22    A. Absolutely.

23    Q. Now, these -- these observations that you have made,

24   this, of course, didn't come from you having a one-on-one

25   evaluation interview with Mr. Roof, correct?

1      A. The observations I just made were from the video.  Is

2      that what you are referring to?

3      Q. And, of course, you tried to see Mr. Roof yesterday, and

4      he refused to see you?

5      A. That's correct.

6      Q. But what, if anything, does this interpretation of the

7      video tell you or tell us about the limitations of a clinical

8      interview as a way of assessing autistic symptoms?

9      A. A clinical interview alone is very insufficient for

10     making an autism diagnosis in someone who has a strong

11     motivation to be found free of any mental defects or

12     disabilities.

13     Q. And is Mr. Roof such a person?

14     A. It's my understanding that he is.

15     Q. And can you -- can you explain that a little more.  Why

16     is a clinical interview so insufficient?

17          MR. CURRAN:  This has all been raised previously in

18     the context of the earlier competency hearing.

19          THE COURT:  We've had these issues explored.  I

20     sustain the objection.  You can ask, Mr. Bruck, about based

21     on the video, but --

22          MR. BRUCK:  Here we are in the problem of we've had

23     these issues explored by the -- by Dr. Ballenger at great

24     length.  Why he relied -- his report and his testimony talks

25     about how he couldn't be -- they love him, couldn't be rude

1    to his family, they love him, and so on.  He completely

2    misjudges --

3              THE COURT:  That's your opinion that he misjudges.

4    That is your opinion that Dr. Ballenger misjudges.

5              MR. BRUCK:  No, that Mr. Roof misjudges, and he --

6    Dr. Ballenger, it really recounted at face value

7    Mr. Roof's -- I mean that is what his report says.  He just

8    recites what Mr. Roof said about that, and this is responsive

9    to that.

10             THE COURT:  I'm listening to what Mr. --

11             MR. CURRAN:  I was going to say, Your Honor, she's

12   already expressed an opinion that a clinical interview was

13   insufficient.

14             THE COURT:  I think that is sufficient.

15             MR. CURRAN:  That was raised in the affidavit --

16   raised by Dr. Carpenter when she testified.

17             THE COURT:  Yes.  We have exhaustively explored

18   these issues.  I read Dr. Loftin's initial report as well.

19             THE WITNESS:  May I make one point, Your Honor?

20             THE COURT:  Please.

21             THE WITNESS:  I do think in the reading -- I haven't

22   seen the exhibits, so excuse me if I'm being redundant.

23   Mr. Roof has had the benefit of feedback with me, feedback

24   with Dr. Maddox, discussion with his defense attorneys, and

25   is aware of all of our major points and all of our major

1    symptoms and signs that we are worried about.  Someone of his

2    intelligence would not have difficulty coming up with

3    alternate explanations for those things, and I think he's

4    been able to do that, and when interviewed directly by a

5    clinician is able to give acceptable responses.

6                THE COURT:  That's one theory about what is going

7    on, right?

8                THE WITNESS:  That is my opinion about it.

9                THE COURT:  Okay.  I want to make clear that sort of

10   suggested by Mr. Bruck that you did interview him at an

11   earlier date.  Did you not?

12               THE WITNESS:  I spent many hours with him.

13               THE COURT:  I just want to make sure that was clear.

14               THE WITNESS:  When I went in this week -- when I

15   went yesterday --

16               THE COURT:  I understand.

17               THE WITNESS:  Yeah.

18          MR. BRUCK:  Bear with me just a moment.  I'm having

19   to navigate some fairly narrow constraints.

20               THE COURT:  I wonder who would put those on you.

21          MR. BRUCK:  Somebody did.  Bear with me just a

22   moment.

23   BY MR. BRUCK:

24    Q. You've talked -- I want you to be a little more specific

25   about what you observed of significance, if anything, about

1    Mr. Roof's affect during these interactions, including the

2    interaction with his mother, and also his affect during the

3    discussions, I think that -- about lethal injection and

4    execution.

5     A. Yes.  Absolutely.  In the video with his father and his

6    younger sister, I think that was -- clearly illustrates the

7    unusual affect that I observed.

8              THE COURT:  All of them were laughing about it.

9              THE WITNESS:  Absolutely.  All of them were laughing

10   about it.  He's talking about getting the lethal injection.

11             THE COURT:  They are all laughing about it.  All

12   the -- it seems -- actually, goes to another issue that he

13   didn't really believe that he would get executed, seems to be

14   the thinking.  He was talking about who might attend his

15   execution.  All of them were making light of it.  Are you

16   diagnosing them all with ASD?  I mean, they all are laughing,

17   joking about this very serious matter.  I took it, naive as I

18   am about such matters, they were all trying to sort of avoid

19   the sort of reality of it, and they were trying to all deal

20   with it, make light of it.  His dad, his 17-year-old sister,

21   and he, all three of them were doing that.

22             And there might be -- he's very self conscious of

23   this, and many times during those videos, he says, "We can't

24   talk about this."  He's very conscious of this.  And so I was

25   actually listening to the issue that I'm very concerned about

1    that Mr. Bruck has raised of does he think this is for real,

2    okay?  Is this just play?

3                   THE WITNESS:  Sure.

4                   THE COURT:  And that I have a different reaction,

5    which was he does recognize this is serious business, that he

6    could be facing execution.

7                   THE WITNESS:  So one of the first points you were

8    making, I think facetiously, of asking whether they all have

9    autism, and I certainly don't have any basis --

10                   THE COURT:  No.

11                   THE WITNESS:  I feel confident they all have

12    extremely inappropriate affect to that situation.

13                   THE COURT:  It's an odd situation.

14                   THE WITNESS:  Very odd and very surprising, and I

15    will say that social communication traits are hereditary.

16    And I will say that several family members have told me that

17    ████████████████████ reminds them a lot of Mr. Roof.

18                   THE COURT:  Well, I'll just say there, there is a

19    lot of emotional avoidance going on here.  This is like a

20    pretty powerful thing.  They are trying to persuade him, as I

21    have, to try to get him to not allow him to continue to

22    represent himself.  Both mom and dad, it seems to me, a major

23    part of that mission is to get them -- get him not to

24    continue with his decision to self-represent.  But they are

25    all nervous.  They are all upset.  They are all -- I mean,

1    I'm not quite sure, you know -- so I was asking a little

2    facetiously if they all have ASD, can -- and you are saying

3    maybe they do.

4              THE WITNESS:  I'm not saying -- they all have

5    inappropriate --

6              THE COURT:  It's a very stressful subject, and they

7    are trying to make light of it because the gravity of it is

8    so serious.

9              THE WITNESS:  I don't know that I'm confident from

10   that video sample that his younger sister is kidding.  I

11   think her affect is rather straightforward.  She's very

12   matter of fact when she makes that request.  And that is a

13   joking style that the family tends to use, and certainly

14   Mr. Roof overuses.

15             THE COURT:  And Benn Roof uses.  I've seen him in

16   his multiple videos.  He'll laugh about things, and then

17   he'll come and -- and say, "You need to listen to your

18   grandaddy."

19             THE WITNESS:  If that were the only instant of -- of

20   inappropriate affect, I would agree with you, but even in

21   that video sample, there is some instances of inappropriate

22   affect.  There is some grimacing, and he catches himself, and

23   it turns into a smile.  There is some very unusual affect.

24   If you don't have training to look for that kind of nonverbal

25   communication, it's difficult to spot, and you look right

1    past it, but it's very concerning to me as an autism

2    specialist.

3              THE COURT:  Thank you.

4    BY MR. BRUCK:

5     Q. And I wanted to draw your attention, also, to the

6    discussion of his self-representation with his mother.

7    Anything noteworthy along the lines we have been discussing

8    in that?

9     A. Certainly my three main points of being detail-focused,

10   being rigid, and having difficulty taking other people's

11   points of view all apply in this instance.  I think one of

12   the things I haven't said expressly yet that concerns me

13   greatly is how much perspective-taking is required to be

14   effective in the courtroom:  How much you have to be aware of

15   how other people are hearing the words you say; how other

16   people will interpret your facial expressions; what these

17   things mean to the jury; what they mean to the Judge.  That

18   is of great concern to me.

19              I think that, as I mentioned, with a rigid cognitive

20   style, it can be difficult to multitask.  I think

21   multitasking can be essential in the courtroom.  If you are

22   preoccupied at looking at the gray flecks in your pants or

23   looking at the lawyer's pants, that is going to interfere

24   with your attention to other relevant and important aspects

25   in the courtroom.  You are likely to miss the salient

1    information that you need to run your case.

2                    MR. BRUCK:  Bear with me one moment.

3                    That's all.  Thank you.

4                    THE COURT:  Mr. Roof, do you have a question for

5    this witness?

6                            CROSS-EXAMINATION

7    BY MR. ROOF:

8    Q. I didn't catch what -- you said there was something that

9    I was doing that I would catch myself.  I didn't hear what

10   you said.

11   A. I'm not sure what you are referring to.

12   Q. On the video, sometimes I would --

13                   THE COURT:  She said you were grimacing.  You would

14   catch yourself.  Can you explain that to him?

15                   THE WITNESS:  So there's some facial expressions

16   that happened a couple of times in the videos.  I don't have

17   it written right here what the time points were, but some

18   facial expressions, and it's hard -- I could show you.  Kind

19   of like -- like that.  There are a couple of times where

20   either maybe you are stopping yourself from crying or having

21   a more upset facial expression.  It's not clear.  But that --

22   it's almost as if you kind of take a second, pull it together

23   and switch back to the smiling.

24   Q. Okay.  Um, this video visit with my mom that we are

25   talking about --

LOFTIN - CROSS (ROOF)          160

1    A. Um-hum.

2    Q. -- you say that I was failing to see the bigger picture,

3    right?  And that I was missing the main point.  This is what

4    you said.  I wrote it down.

5    A. Um-hum.

6    Q. What is the bigger picture?  If it's a video visit with

7    my -- what is the bigger picture of the visit?  And why do I

8    necessarily have to be talking about the bigger picture of

9    the case in a particular visit?

10   A. The bigger picture is your mother, who you hadn't seen

11   for a couple of weeks, had had a heart attack, and this is

12   the first time you have seen her.  You don't ask after her

13   health, but rather you spend several minutes asking detailed

14   questions about your clothing for court and her -- what

15   stores she went to, whether she saw regular gray pants or

16   whether the gray pants had flecks.  Those are details that

17   kept you from talking about what other people would say would

18   be the most important communication to have in that moment.

19   Q. And how long was the video altogether?

20   A. I don't recall off the top of my head, maybe half an

21   hour.

22   Q. There were two of them.  There were two visits back to

23   back, so it was actually an hour.

24          THE COURT:  About 45 minutes.

25

1                THE WITNESS:  45 minutes.

2     Q. And how many minutes did I spend talking about clothes?

3     A. I haven't timed it.  I would guesstimate maybe

4     20 percent, 25 percent.

5     Q. Okay.  Have you met my family?

6     A. I have.

7     Q. What members of my family have you met?

8     A. I've met your mother, your father, your paternal

9     grandparents, your uncle Joe, your aunt Erin, and I haven't

10    met Amber in person, but I talked to her on the phone.  We

11    talked about this.

12    Q. Okay.  And how much time have you spent with my mom

13    altogether?

14    A. I think I can check.  Somewhere around maybe three hours

15    total, if you include the phone time as well.

16    Q. And my dad?

17    A. Maybe somewhere between one and two hours.

18    Q. So three hours and one and two hours.  Would you say that

19    you know them better than I do?

20    A. No, of course not.

21    Q. Okay.

22    A. I would say that I have special training as a

23    psychologist that might enable me to understand certain

24    things about them in a different way than their own child

25    would.

1    Q. Were you aware that I had had a conversation with my mom
2    on the telephone before that video visit where I did ask her
3    about her heart attack?
4    A. No, but that is your first time seeing her in person is
5    my understanding.
6    Q. Don't you think that the lawyers might have provided you
7    the phone call?  Don't you think they should have?
8    A. Maybe.  I don't know.  I can't review every piece of
9    information.
10   Q. One of the allegations you are making is that I don't
11   recognize the other person's affect.  Is that right?  But is
12   there any way to say with certainty that I don't -- in other
13   words, how can you say that somebody else doesn't recognize
14   the affect?  In other words, there is no actual way to say
15   that.  You are just saying that I have the wrong reaction to
16   the affect?
17   A. You have been administered several standardized
18   assessments of social cognition and social communication
19   behavior, so my observations are based on what a lot of your
20   family has reported and then also on the scores on the
21   standardized assessments.
22   Q. Right.  But you said I display an improper affect during
23   the video visits, right?
24   A. Yes.
25   Q. In response to the other people's affects, especially my

1    mom's?

2     A. Yes.

3     Q. Okay.  And is it possible -- and you said that it could

4    be taken as being cold, right? -- if you didn't know about

5    autism?

6     A. Sure.

7     Q. But isn't it possible that I was being cold?  I mean, I'm

8    saying isn't that a possibility?

9     A. It's possible for an autistic person to be cold in a

10   moment, sure.

11    Q. Right.  And if somebody is on a recorded video visit, is

12   it possible that they might not want to look like a sap on a

13   recorded video visit?

14    A. Sure.

15    Q. Okay.  Last thing, just so I'm sure, are you diagnosing

16   and you say with psychosis?

17    A. I did not make a formal diagnosis.  I talked about

18   attenuated psychosis, and I do believe that is an appropriate

19   diagnosis.

20          MR. ROOF:  If I could -- I don't know if you will

21   allow me, but there is just one -- just one thing about the

22   report that I wanted to point out.

23          THE COURT:  Why don't you give her the page number.

24   You want to ask her or point it out to me, Mr. Roof?

25          MR. ROOF:  I wanted to ask her about it because I

 1    think it's a --

 2            THE COURT:  Why don't you just tell her.  She's got

 3    her report there as well.

 4    BY MR. ROOF:

 5     Q. On page 47 --

 6     A. Um-hum.

 7     Q. -- under "Unusual Thinking" --

 8     A. Um-hum.

 9     Q. I'm guessing that is related to psychosis, correct?

10     A. Yes.

11     Q. Okay.  You see what that is about, right?

12     A. I do.  I see that paragraph you are referring to.

13            MR. ROOF:  And you say that -- can I read this?

14            THE COURT:  Sure, you can.

15    BY MR. ROOF:

16     Q. It says, "Dylann's thinking seems confused in the most

17    striking instance of this during" --

18     A. There is a period missing after "confused."  Sorry.  That

19    is why it's confusing you.

20     Q. It says, "During the evaluation, Dylann claimed that he

21    once ran a website, was interviewed by someone from the Daily

22    Stormer.  He said that the Daily Stormer ran an article and

23    quoted Dylann as saying white people are responsible for all

24    the ills in the world."  Then you say, "Dylann said that he

25    does not want people to know that he made that statement in

1    the interview.  He then said, maybe it wasn't really me, but

2    it sounded like my voice.  Not only Dylann's confusion about

3    whether his interview was notable, but he referenced a piece

4    on the Daily Stormer as an article, and they went on to say

5    it sounded" -- "and then went on to say that it sounded like

6    my voice as if he could hear it."

7             Now, is it true that you've told me, I think every

8    time that I have met with you, that you have not such a great

9    memory?

10   A. This particular instance I recorded, I wrote it down very

11   carefully because it was very notable to me.

12   Q. Tell me if this reminds you of anything.  What I actually

13   said was that the guy who runs the Daily Stormer previously

14   is on audio saying that white people are responsible for all

15   the ills in the world.  Okay?  He's tried -- as when this is

16   posted online, he tries to get it taken down for obvious

17   reasons because now he runs a white nationalist website, and

18   he wouldn't want people to know about that for obvious

19   reasons.  That's what I was talking about.

20   A. So you are saying I misheard, I misunderstood, and that

21   may certainly be, but that is a couple of lines in an 87-page

22   report.

23   Q. Okay.  That's all.

24             THE COURT:  Mr. Curran?

25             MR. CURRAN:  No questions from the Government, Your

1    Honor.

2            THE COURT:  You may step down.  Thank you,

3    Dr. Loftin.  You may be excused.

4            MS. STEVENS:  Call Father Parker.

5            Your Honor, both Father Parker and I could use a

6    restroom break.

7            THE COURT:  Take one then.

8            MS. STEVENS:  Three minutes.

9            THE COURT:  Absolutely.  We'll wait for you.  Thank

10    you.

11            (Thereupon, there was a brief recess.)

12            THE COURT:  Let me add one other matter to the

13    instructions regarding -- I realize I did not mention.

14            Mr. Roof, I want you to sit in that seat during the

15    trial where you are sitting now.  I just want to avoid any

16    direct contact between witnesses coming down the aisle.

17            Mr. Bruck, will you stay in that seat there?  Thank

18    you.  Mentioned that as well.

19            THE CLERK:  Father Parker, come forward to be sworn,

20    please.  Please place your left hand on the Bible, raise your

21    right.  State your full name for the record, please.

22            THE WITNESS:  John Edgar Parker III.

23

24

25

```
 1      THEREUPON:

 2                        JOHN EDGAR PARKER III,

 3      called in these proceedings and being first duly sworn

 4      testifies as follows:

 5              THE CLERK:  Thank you.  You may be seated at the

 6      witness stand over there.

 7                        DIRECT EXAMINATION

 8      BY MS. STEVENS:

 9       Q. Good afternoon, Father Parker.

10       A. Good afternoon.

11       Q. Please tell us your full name.

12       A. John Edgar Parker III.

13       Q. What do you do, sir?

14       A. I'm an Orthodox Christian priest.

15       Q. Can you tell us how you became an Orthodox Christian

16      priest?

17       A. Meaning did I go to -- I went to seminary.

18       Q. Let's start with the seminary.  Please describe your

19      background for us.

20       A. Okay.  I was raised in the Episcopal Church.  I thought I

21      would be a priest when I grew up.  One day after some time in

22      college away from the church, I returned to the church after

23      college, and eventually became a youth pastor.  From there I

24      went to the Episcopal seminary in Ambridge, Pennsylvania, to

25      become an Episcopal priest.  I served on Sullivan's Island
```

1    for a year and a half.  I -- then, my family and I were

2    received into the Orthodox Church, and I and my family moved

3    to New York where I went to seminary for a second time for a

4    second master's degree in theology, and then returned here in

5    June 2003.

6       Q. If I may back you up just a bit.  Where did you get your

7    undergraduate degree?

8       A. College of William and Mary in Williamsburg, Virginia.

9       Q. You mentioned a first master's.  What was your first

10   master's in?

11      A. Master's of divinity.

12      Q. And your second master's in theology?

13      A. Yes, ma'am.

14      Q. And where did you go from there?

15      A. I have been a pastor here at Holy Ascension Orthodox

16   Church in Mount Pleasant since returning from the seminary in

17   New York.

18      Q. What does training at the seminary involve?

19      A. For the master's of divinity, a variety of coursework and

20   church history, the Scriptures, theology, and so forth.  Part

21   of my studies there for the master's of divinity also

22   included clinical pastoral education, which is 400 hours in a

23   hospital setting.

24      Q. Which hospital was that?

25      A. I worked at the veterans hospital in Pittsburgh in the

1    psychiatric hospital.

2       Q. How long did you spend in the psychiatric hospital?

3       A. 400 hours.

4       Q. What were your duties there?

5       A. We were responsible -- we had two -- a day was broken

6    into two parts.  One part was a meeting with all of the rest

7    of the students, and the -- and the CPE supervisor -- CPE is

8    clinical pastoral education -- where we would discuss what we

9    did in the other half of the day.  And the other half of the

10   day, we were responsible to visit newly-admitted patients to

11   the hospital, and we had to do spiritual assessments on those

12   patients, and we wrote many verbatims as a part of that.  We

13   had to write down to the best of our ability the entire

14   conversations that we had with those patients and then

15   analyze both what we remembered and why, and how it related

16   to us in our pastoral ministry.

17      Q. Half your 400 hours were spent there.  Where did you go

18   next?

19      A. That was the summer of -- I can't remember which year,

20   honestly.  It was the summertime that I did that in one

21   summer.  So it must have been the summer after my first year,

22   and then I had another year of seminary.  I spent the

23   following summer in Spain, and then the following year, I was

24   ordained and came to Charleston.

25      Q. And you have been to Charleston or in Charleston since

```
 1      which year?
 2       A. I spent the summer of -- I spent the summer of 2000 at an
 3      internship here the second half of that summer, and then
 4      returned in March of 2001, and I have been here since from
 5      March 2001 until the present with the exception of one
 6      academic year which was 2002 to 2003.
 7       Q. And you now serve as a priest at Holy Ascension?
 8       A. Yes, ma'am.
 9       Q. People were talking.
10       A. I'm sorry.
11       Q. Please describe for us your duties.
12              THE COURT:  We are doing a competency hearing.
13      Let's get to the issues of the pastoral counseling and so
14      forth.  We don't need to -- I am sure he's well qualified.
15      BY MS. STEVENS:
16       Q. Do you engage in pastoral counseling at Holy Ascension?
17       A. Yes, ma'am.
18       Q. How did you come to know Dylann Roof?
19       A. I'm sorry.  On the following week after the shootings --
20      let me back up a half a sentence.  In the weeks that led up
21      to the shootings in -- our lectionary readings, what we read
22      in the church services, are prescribed each year.  Many of
23      those readings in the weeks leading up to the shootings were
24      related to if you love those who love you, what credit is
25      that to you.  These are Jesus's words:  If someone strikes
```

1    you on one cheek, turn to the other.  Do good to those who

2    persecute you, etcetera.  We had heard those readings in the

3    two weeks prior.

4           When the news came, I -- I asked myself who -- I was

5    certain that the -- that the families of the victims would be

6    surrounded very quickly and in overflowing abundance, and I

7    wondered to myself, who will visit Dylann?  So I believe it

8    was maybe the Monday or Tuesday of the next week I went to

9    the jail to visit him.  I had been there any number of times

10   to visit parishioners and others.  I didn't realize that it

11   would be any different.  I was told I couldn't visit without

12   an attorney's approval.  So I called -- I contacted Ashley

13   Pennington, and after a long conversation, he allowed me to

14   go visit Dylann, which I believe was the Wednesday.  It would

15   be maybe exactly one week after the shootings.

16   Q. Approximately June 24th or so of 2015?

17   A. If that is a Tuesday or Wednesday after, yes, ma'am.

18   Q. What did you find in your first meeting with Dylann Roof?

19          MR. WILLIAMS:  I'm going to object to anything

20   outside the scope of post November 22nd.

21          THE COURT:  Father, I don't know if counsel had made

22   you aware of this.  I had a lengthy competency hearing in

23   November of 2016, and I found the defendant competent.

24          THE WITNESS:  Yes, sir.

25          THE COURT:  And subsequent to that, standby counsel

1    filed a second motion regarding competency relating to events

2    which occurred after November 22nd.

3              THE WITNESS:  Yes, sir.

4              THE COURT:  And I was told that you had the benefit

5    of visits since November 22nd.

6              THE WITNESS:  Yes, sir.

7              THE COURT:  And I found that valuable because I

8    wanted to hear your thoughts.  My findings as to competency

9    as of November 22nd, 2016, and his competency to

10   self-represent as of November 29, 2016, are the law of the

11   case.

12             THE WITNESS:  Yes, sir.

13             THE COURT:  So I am interested in what you may have

14   known, seen, and observed since November 22nd, so I'm going

15   to direct counsel to bring to your attention to those

16   matters.  And I would welcome to hear what you have to say.

17             MS. STEVENS:  If I may just lay a brief foundation

18   of --

19   BY MS. STEVENS:

20   Q. How often have you seen him since June 24th of 2015?

21   A. How often have I seen him?  I visited Dylann, I think I

22   calculated 100 times for a total of 100 hours or more.  I

23   visited him basically once a week every week since the first

24   visit with two or three visits a week in the first month or

25   so, six weeks.

1          THE COURT:  I commend you for that.  That is very

2     touching that you've done that.

3          THE WITNESS:  Thank you, Your Honor.

4     BY MS. STEVENS:

5      Q. And please tell the Court, then, your encounter with

6     Dylann Roof after November the 22nd of 2015.  Describe for us

7     the Dylann Roof you found at that later point in time.

8      A. By contrast to all of the many months before?  Please

9     forgive me.  I'm trying to understand your question.

10     Q. Why were you there to see him after November the 22nd of

11     2016?

12     A. I just continued to visit him.

13          THE COURT:  Why don't you share with us, Father,

14     what your observation is on November 22nd in terms of his

15     mental status, his ability to -- his competency to stand

16     trial, his ability to self-represent.  What did you observe

17     that might give me some insight on that issue?

18          THE WITNESS:  Okay.  I had -- I -- Dylann and I

19     spoke about what I might be asked here, for example, at that

20     time.  Your Honor, I have had some conversation with David

21     Bruck concerning what questions I might be asked.  I have

22     never done this before, so --

23          THE COURT:  You are doing a great job.

24          THE WITNESS:  Thank you.

25          Dylann -- Dylann thought there were too many

```
1    questions that were prepped to be asked and -- though we went

2    through some of those.

3              THE COURT:  Were they your questions you were asking

4    him or --

5              THE WITNESS:  Your Honor, that happened in a number

6    of different ways.  In conversation with his counsel, a list

7    of suggested questions were given.

8              THE COURT:  His counsel gave you questions to ask

9    Mr. Roof?

10             THE WITNESS:  No, sir.  His counsel gave me

11   questions that I might be asked.

12             THE COURT:  You might be asked at trial?

13             THE WITNESS:  Yes, sir.

14             THE COURT:  I got you.  Okay.

15             THE WITNESS:  And I went to meet with Dylann, and he

16   asked me, "What shall I ask you?"  And I shared with him -- I

17   brought the list of questions -- I have it here too.  I

18   brought that list of questions, and we went through those.

19   He found there were too many questions.

20             THE COURT:  Okay.  I got that.

21             THE WITNESS:  We reviewed some of them, and,

22   honestly, I can't recall if it was in that meeting -- I'm

23   pretty sure it was in the next meeting that he had prepared

24   his own questions which were the same questions, basically.

25   They had been reduced by two or three, and a couple of
```

1    questions were inserted into the center related to "At any

2    time have you seen signs of mental illness in me" -- and I'm

3    trying to think of how he phrased it.  "At any time have you

4    seen mental illness in me prior to when my -- when my

5    attorneys poisoned your mind," or something like that.  So

6    that was certainly -- that was an interesting moment.

7              THE COURT:  What was your answer to the question

8    using mental illness?

9              THE WITNESS:  I said to Dylann, as I have said to

10   him on a number of occasions, "First, I'm not a mental health

11   expert.  However, I have" -- this is my answer to him -- "I

12   have served 400 hours in a psychiatric hospital.  I have been

13   pastor of a church for 15 years, and I have some severely --

14   some parishioners who suffer some pretty severe mental

15   illnesses, including untreatable ones.  And so my answer to

16   that is I can't say I haven't seen that in you."  And, you

17   know --

18             THE COURT:  And what was his response to that?

19             THE WITNESS:  His response is, "Can't you just say

20   no?"

21             And I told him, "It's -- it's too complex to say

22   no."  And --

23             THE COURT:  I want you to explain to me that answer

24   to the question.  Why is it too complex to say no?  What

25   would be the more accurate answer?

```
1              THE WITNESS:  Your Honor, please don't ask me that
2       one --
3              THE COURT:  You know, we are all dancing around the
4       question.  I would like to hear.  You spent a lot of time
5       with this man, and --
6              THE WITNESS:  Yes.
7              THE COURT:  -- and recently you spent time with him.
8              THE WITNESS:  Yes, sir.
9              THE COURT:  Do you observe aspects of his mental
10      status that would make him not competent for trial, to go to
11      trial?  I don't know if you feel comfortable offering an
12      opinion on that, or whether he would be competent to
13      self-represent.  If you don't have an opinion, that is fine
14      too.
15             THE WITNESS:  I have my opinion.  I'm hesitant
16      because -- because I recognize that I'm a priest and not a
17      lawyer or a judge.
18             THE COURT:  By the way, they don't mind telling me
19      what to do, so don't hesitate.
20             THE WITNESS:  Your Honor, in my opinion, having
21      spent many, many hours with Dylann, the kinds of questions
22      that he has raised to me, um, with respect to -- even my
23      court appearance, for example, it was -- it was a few days
24      before Christmas -- please forgive me, I don't remember the
25      times exactly -- when the question formally came up would I
```

PARKER - DIRECT                177

1    come here to be a witness sometime later this week after

2    tomorrow, one of -- well, perhaps his main concern was which

3    cross would I wear and what color shoes would I wear.  And

4    maybe that says enough.  I mean, I --

5              THE COURT:  There is no question, we've heard a

6    great deal of evidence about fixation with clothes.

7              THE WITNESS:  Yes, sir.

8              THE COURT:  All the evaluators have identified this.

9              THE WITNESS:  Okay.

10              THE COURT:  And -- but that would not necessarily

11    render him incompetent to go to trial.  Do you understand

12    what I'm saying?

13              THE WITNESS:  I do.

14              THE COURT:  What else other than the fixation with

15    clothes would you point to?  Have you talked about the

16    incident of June 17th, 2015 with him?

17              THE WITNESS:  Yes, sir.

18              THE COURT:  I mean, I would think -- and did he

19    share with you his views about why he did what he did?

20              THE WITNESS:  Many times, yes, sir.

21              THE COURT:  I figure this is a subject that you

22    have, I presume, tried to counsel him that there was a better

23    way to view all this?

24              THE WITNESS:  I have a number of times on that, yes,

25    sir.

1              THE COURT:  And that is, I presume part of your

2      pastoral counseling is to try to move him from those views.

3              THE WITNESS:  Sure.

4              THE COURT:  To this day he hasn't moved?

5              THE WITNESS:  No.

6              THE COURT:  He continues to believe this ideology

7      that motivated his crime?

8              THE WITNESS:  If I may say as a pastor, um, and I --

9      I can't imagine how strange it would be to hear this, so I

10     need to acknowledge that up front, I -- I have a hard time

11     labeling that an ideology in him.  I have told that to him.

12     I mean, I said it point blank to him.  For example, I said to

13     him, "Dylann, you are no white nationalist."  And I've said

14     that to him many times.  We've had many conversations about

15     that.  So with respect to your question, Your Honor, I -- I

16     in my time with him in these many hours, though the externals

17     of it all point to ideology, I personally have not seen that.

18     And --

19             THE COURT:  What did you see?

20             THE WITNESS:  I have seen -- I have seen a

21     remarkably intelligent young man.  When I say "remarkably

22     intelligent," please understand what I mean by that is here

23     is a young man who can tell you go to such and such a site,

24     click on such and such a button.  When you get to the third

25     page and at the bottom of that and read four paragraphs down.

1    He can cite -- he can cite information on all kinds of things

2    that he hasn't seen in more than two years.  A remarkably

3    intelligent person who is like a broken record.

4            Dylann said to me recently -- for example, he said,

5    "I don't hate black people.  I hate the things that they do."

6    For me as a pastor, my experience with him from the

7    beginning, it's the same experience in the day since which

8    I -- November 20th or so that you are asking about, Your

9    Honor.  It just doesn't compute.

10           One way that I have put this is, I have not seen in

11   him -- and I personally have never seen him angry in

12   100 hours of visitations over 100 visits.  I have never seen

13   him in a rage.  Honestly, I've never seen him do much but

14   smile.  And --

15           THE COURT:  Have you seen the video of him using the

16   weapon -- shooting the weapon?

17           THE WITNESS:  I did not see that video, no.  No,

18   Your Honor.  I think I'm rambling.

19           THE COURT:  No, you were actually -- I know that one

20   of the principles of a christian theology is that you may

21   hate the sin, but not the sinner.

22           THE WITNESS:  Yes.

23           THE COURT:  And --

24           THE WITNESS:  That's reasonable.

25           THE COURT:  And I take it that is your feeling about

1    Dylann Roof.

2              THE WITNESS:  Sure.

3              THE COURT:  And you have not come to understand how

4    he could do such an act with the person who you encountered

5    in that hundred hours.

6              THE WITNESS:  My -- my only experience with killings

7    is having visited one fellow who is now in prison for murder,

8    and then every Hollywood movie that I've seen, and --

9              THE COURT:  Well, the description in this case is

10   that a group of most noble human beings of the world were

11   sitting in a Bible study.  They finished the Bible study, to

12   which they had welcomed him.  They held hands and closed

13   their eyes for a benediction, and he shot them --

14             THE WITNESS:  Yes, sir.

15             THE COURT:  -- with their eyes closed.

16             THE WITNESS:  Yes, sir.  Please understand -- allow

17   me just one further sentence.  The point that I was trying to

18   make with that is what I would have pictured in my mind about

19   a person who was capable of doing -- not only capable, but

20   having done such a thing, would not be the person -- would

21   not be a person like Dylann as I have experienced my

22   visitations with him over this time period.  Cold-hearted,

23   angry, I don't -- I don't know what other words to say about

24   that.

25             Please understand what Dylann did was heinous.  I

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    have expressed that to him many, many times, and I'm not

2    trying to defend that at all.  I'm simply saying that my

3    pastoral relationship to him has involved -- I can't

4    understand how A connects to B.  He did it, but --

5                THE COURT:  You can't understand how it happened.

6                THE WITNESS:  The only way I can explain it is

7    mental illness.

8                THE COURT:  But what mental illness and all that is

9    beyond your expertise.

10                THE WITNESS:  It is certainly beyond my expertise,

11    yes.

12                THE COURT:  Okay.  Ms. Stevens, I interrupted your

13    questioning.  I do that every time.  You are so agreeable, I

14    always do that.  I apologize.

15    BY MS. STEVENS:

16     Q. Father Parker, let me back up to the meeting -- the most

17    recent meeting that you've had with Dylann Roof, and you said

18    you went in with a list of questions.

19                MS. STEVENS:  May I approach the witness, Your

20    Honor?

21                THE COURT:  You may.  The rule that I have did not

22    apply to you, Ms. Stevens.

23                MS. STEVENS:  Thank you.

24    BY MS. STEVENS:

25     Q. Is this the list of questions, Father Parker?

PARKER - DIRECT                 182

1    A. Yes, I believe so.

2    Q. A rather simple list of 14 straightforward items?

3    A. Yes, ma'am.

4    Q. In plain English?

5    A. Yes, ma'am.

6    Q. And he said that is too many?

7    A. Yes, ma'am.

8    Q. The last question, "Based on what you know about me from

9    all of the time that we have spent together, do you have any

10   hope for me?"

11   A. Okay.

12   Q. And how would you have answered that question at the

13   penalty phase of his capital trial?

14   A. Well, in a sentence I would say, "Dum spiro spero, while

15   I breathe, I hope."

16         THE COURT:  South Carolina motto.

17   BY MS. STEVENS:

18   Q. And, Father, rather than ask these simple 14 questions,

19   he said, "That is too many."  He narrowed it down to one

20   question, which is -- or it may have been over two meetings,

21   but he ultimately settled on "What would your answer be if I

22   asked you if I have mental illness?"

23   A. Well, Dylann reduced the questions to some number, maybe

24   it's ten.  I would have to look and see.  The majority

25   overlapping questions are who are you, how did you become a

1    priest, etcetera, but he had the question -- one or two

2    questions related to "Have you seen mental illness in me,"

3    and something about with respect to "the poisoning of your

4    mind with my lawyers" or something like that.

5    Q. And when --

6    A. I could cite it directly if I need to.  I wrote it down.

7    Q. It's all right, Father.  But when your answer back to a

8    question along those lines was, "I can't say that."  What is

9    your understanding of what happened next?  Is he intending --

10   or has he announced an intent to call you at the penalty

11   phase of this trial?

12   A. The last time I visited with Dylann personally was on the

13   morning of Christmas Eve, and it was at that time, if I

14   recall correctly, that we reviewed the questions.  And he

15   gave me his list of narrowed questions, and then after

16   Christmas on Monday, I went to Virginia to be with my family,

17   and I got a call from David Bruck on Tuesday.  Dylann had

18   asked him -- I am just relating the conversation.  Dylann had

19   remembered that I would come to visit him that night, but I

20   wasn't intending to come to visit him.  I was coming to visit

21   him tonight as in today.

22   Q. He had the nights wrong?

23   A. He was off by a week minus a day, and David said that

24   Dylann remembered very strongly.  "No, he's coming tonight.

25   Please call him and tell him not to come because I won't be

1    calling him as a witness." So --

2            THE COURT: Father, let me ask you this question:

3    If Mr. Roof wanted to ask you questions at the trial and stay

4    away from the mental illness issue since that's beyond your

5    expertise, and simply to address that last question

6    Ms. Stevens just asked you about redemption -- hope for

7    redemption, you are available to do that, I take it? You are

8    available if asked by Mr. Roof to do that?

9            THE WITNESS: Yes, sir.

10           MS. STEVENS: May I approach and introduce this into

11   evidence?

12           THE COURT: That would be fine. Any objection from

13   the Government?

14           MR. WILLIAMS: No, Your Honor.

15           THE COURT: Very good. What number is that,

16   Ms. Ravenel?

17           THE CLERK: 3, Defense 3.

18           THE COURT: Defense 3 without objection admitted.

19           (Thereupon, Defendant's Exhibit 3 introduced into

20   evidence.)

21           MS. STEVENS: Thank you, Your Honor.

22   BY MS. STEVENS:

23    Q. Father Parker, earlier you said that you didn't see the

24   cold, angry qualities you would have expected. Can you tell

25   us what you did see?

1    A. Well, I suspect it would be important to say that I

2    saw -- Dylann has repeated on many times, on many occasions

3    his rationale for doing what he did, so I did see those

4    things, and we did speak about them.  But I also saw the

5    following things, all of which were intriguing to me:  One, a

6    young man who when it was -- am I able to speak about May?

7            THE COURT:  Go ahead, Father.  Let me hear what

8    you've got to say.

9            THE WITNESS:  Yes, sir.  In around Mother's Day, I

10   went to speak to Dylann -- went to visit with him, and I was

11   considering -- I have not met any of his family members even

12   to this day, but I wondered, I don't know, would his mother

13   come here for Mother's Day?  What would happen to a person

14   who is in jail for this crime with respect to his mom?  Would

15   I -- would he like me to call her and tell her happy Mother's

16   Day, send her a card?  I don't know.  And Dylann told me

17   that, no, and I asked him, "Do you think about your mom?"

18            "No."

19            "Do you think about your family members?"

20            "No."  So I was surprised that with all the time

21   there, those things wouldn't cross his mind.

22            I also found a young man who is -- loves geography,

23   fine art.  I sent him a card about once a week.  I -- maybe

24   two months now, but in the first 16, 14, 15 months, I sent a

25   card every week that I printed on my computer with a

1    different picture every week.  Sometimes it was a place that

2    he wants to see.  He has a tiny little spot he could look

3    out, so he could see someplace in Australia that he wanted to

4    see.  Other times Picasso.  When it was his birthday, I

5    visited him and played him his favorite classical music.  He

6    likes classical music.  I learned this is a boy who, despite

7    all evidence to the contrary, can't stand excessive vulgarity

8    and violence in movies.

9    BY MS. STEVENS:

10    Q. Father, you mentioned, "I have no explanation but mental

11    illness."  What makes you think you might be seeing signs of

12    mental illness?

13    A. I think that maybe it's only fair for me to comment on

14    the fact that it's his central question to me.  When we were

15    reviewing his questions a week or so ago -- Christmas Eve or

16    the day or two before that, whenever I visited, his -- his

17    main questions were related to that.  And in my conversations

18    with him, if I recall correctly, I even said to him, "Dylann,

19    if you would rather the question of mental illness not come

20    into play, why don't you not ask me about that?"  But that

21    question -- and that question in the center of his list, it

22    seems to me -- I can only deduce is the reason why he

23    announced through David to me that I wouldn't come as a

24    witness.

25            So without commenting directly on specific

1    questions, I guess I could try if you asked me another

2    question.  But to me that seems interesting that, as I

3    understand it, I may be the only person who has visited him

4    who is not hired to do so with that amount of consistency

5    over that amount of time, and it was that question that

6    caused this change of course.

7     Q. And your apparent inability to answer the question -- "I

8    can say that you do not have mental illness," you couldn't

9    tell him that, could you?

10    A. I said that specifically to him.

11    Q. Father Parker, in conversations with us, you have

12    mentioned other parishioners with autism and perhaps a

13    correlation that you've seen with some of Dylann Roof's

14    qualities?

15           THE COURT:  I don't think he's qualified for that.

16           MS. STEVENS:  All right, Your Honor.  Can he in a

17    lay sense describe --

18           THE COURT:  No.  I've had all the autism.  He

19    doesn't have the expertise to do it.  He's got a valuable

20    insight that he's offered.

21           MS. STEVENS:  I believe that is all I have.

22           THE COURT:  Mr. Roof, cross-examination.

23                      CROSS-EXAMINATION

24    BY MR. ROOF:

25    Q. My only question is, is it possible for you to try to

```
 1    give some examples of the signs of mental illness that you

 2    notice?

 3              THE COURT:  He asked you a question.

 4     Q. Well, maybe I could start to ask you, when I -- when I

 5    first brought that question up to you, when I had my list of

 6    questions, you said that -- when you told me that you

 7    couldn't -- you couldn't say that you hadn't seen signs, and

 8    then you said that my response was, um, "Well, can't you just

 9    say no," didn't -- before I said that, didn't I ask you the

10    same question that I just asked you, to try to give me some

11    examples, and you were unable to then?  So I'm asking you can

12    you give me some now?

13     A. Yes, Dylann, you did ask me about it, and I did -- and I

14    was not unable at that time to give you answers.  I did not

15    give you answers.  I did say at that time that I would like

16    some time to think about that, to phrase how I would.  I --

17    perhaps I could begin this way:  In --

18              THE WITNESS:  Is it okay if I speak in personal

19    ways?

20              THE COURT:  Go right ahead.

21              THE WITNESS:  I don't know if I'm supposed to say

22    "Mr. Roof."

23              THE COURT:  Whatever would be natural to you.

24              THE WITNESS:  Dylann, in the many, many months that

25    we have had conversations, you have demonstrated to me a
```

1    remarkable capacity to remember and recite many things, and

2    I'm speaking equally about things that I have shared with

3    you, books that I've sent you to read that you've read, and

4    so forth, as I am about your own reported views on life and

5    the world.  And while -- while you have an incredible talent

6    to repeat what I've shared with you on any particular topic,

7    it seems to me that you have not been able to argue another

8    position for even for the sake of argument.

9            What I mean by that, what mental illness might it

10   be?  I couldn't begin to venture to say, but in all of my

11   experience, even with young adults, every young adult has

12   strong opinions.  I was once a young adult myself a thousand

13   years ago.  I have two young adult sons who have strong

14   opinions about all kinds of things, and if I asked them to

15   take an alternative view for the sake of argument, they might

16   take it for the sake of argument.  At the end of the day, we

17   go and have a meal and call it a game.  And in my experience

18   with you, when it would come back to the questions of your

19   views on white nationalism, or related topics, just

20   completely stuck like a record.

21           And please don't misunderstand me.  You express

22   them -- you express your views very articulately, and

23   thoughtfully, but the -- but to come from a different point

24   of view seems to be impossible for you.

25

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    BY MR. ROOF:

2     Q. Okay.  So one thing that you noticed is that I can't take

3    another point of view.  Is that what you are saying?

4     A. That is one thing, yes.

5     Q. Anything else?

6     A. Allow me just a minute to think about that, okay?  I

7    would like to phrase my answer.  I don't -- I don't know once

8    again what to call this, Dylann; however, in a recent

9    conversation that we had, you -- you told me -- I'm going to

10   quote it, and I hope it's an accurate one -- you could

11   correct me, I suspect, um, "I don't hate black people, but I

12   do hate things that they do.  I could even sit down and have

13   a meal with families of the surviving family members."  For

14   me as a pastor and a human being, there are only -- in my

15   mind, there are only two ways that that can be true:  On the

16   one hand there has to be some unexplainable mental condition

17   that I'm not qualified to name, but -- but I can't put my

18   finger on it, or you are an irredeemable monster.  As a

19   pastor who lives in many gray areas, because the world is a

20   gigantic gray area, and dwells very rarely in those extremes,

21   as a pastor who has counseled many people for 15 years, I can

22   only explain those particular sentences, those particular

23   claims about what you hate and don't hate or who you hate and

24   don't hate and with whom you could eat, given what you have

25   been convicted of, I can only explain that in my mind by

1    mental illness on the one hand or monster on the other, and

2    my over a hundred hours of time with you, I've never seen

3    monster.  Not one time.

4    Q. Okay.  And so the question -- the question that I'm

5    trying to ask is really what you are saying is your inability

6    to understand it is what would make you think that I -- is

7    really what would make you think I had a mental illness

8    rather than you seeing visible signs of it when we interact?

9    A. Um, it's well established that I can quote from the DSM

10   about what you may or may not struggle with.  However, as a

11   pastor who hears -- Dylann, I hear, I don't know, 500

12   confessions a year.  That means I've heard 5,000 confessions

13   in my pastoral ministry, maybe 7,000.  I've counseled

14   couples, individuals, young people, old people, who suffered

15   through all kinds of terrible tragedies, joys, and sorrows,

16   and my experience with my -- with you in our conversations

17   over this long period of time with respect to this question,

18   the one of mental illness, I can't come to one of two

19   conclusions.

20        When I factor in all the people that I have met and

21   spoken to at the jail, not at the jail, and other places, I

22   can't bring myself to say after all those many hours with you

23   Dylann Roof is an ideological monster.  What you did was

24   monstrous; but therefore, I can only come to the other side

25   of the question, which is the missing piece.  And I have

1    danced around it many times with you in the detention center

2    for the sake of trying to -- for the sake of the passing of

3    time to allow time to work.  But if that is right now, that

4    is all I have to answer that question, Dylann.

5     Q. So you say that the two things it could be is I either

6    have some kind of mental illness or what you said before, was

7    an irredeemable monster, right?

8     A. Pardon?

9     Q. An irredeemable monster, that is the two with what it

10   could be.  So what you are saying is it is possible that I am

11   an irredeemable monster, right?  And that -- and what

12   somebody would consider a monster is subjective, right?

13    A. Dylann, I'm sure that is a subjective point.  When I --

14   when I am -- when I am observing the time that we have spent

15   together -- maybe I could put it this way:  If I -- if I

16   asked my own mother to come sit with you for a hundred hours

17   on a hundred visits, she would come to the conclusion that

18   you are not a monster.  If I asked an 18 -year-old kid from

19   my parish to come sit you with for a hundred hours and have

20   conversations like we've had, they are going to -- they are

21   going to say, "He's not a monster.  What he did was

22   monstrous."  It's not defensible what you did, but their

23   experience of you would be completely disconnected from the

24   mind's eye picture of monster.

25    Q. Okay.  My last question --

PARKER - CROSS (ROOF)                193

1      A. Therefore, I came to the other conclusion.

2      Q. And my last question is, you say that I -- I was worried

3      about what you would wear in court.  What color necklace you

4      would have on, for example?

5      A. Yes.

6      Q. And did I explain to you why?  Did I explain to you why I

7      was worried or why I was concerned about what color chain you

8      would be wearing?

9      A. I remember an answer or two to that.  I'm not sure what

10     you are asking, though.

11     Q. Well, I mean, when I -- when I said it, I mean, did I

12     explain to you -- in other words, what was the reason that I

13     was concerned with the way you would look?

14     A. I remember two answers to that, Dylann.  So I'll tell you

15     both, and I hope you will remember the same two answers.  One

16     of the answers is a fashion answer, and that answer is "Blue

17     cassock, black vest, who gave you the idea that blue and

18     black go together, Father John?"  That is not a direct quote,

19     but we've had that conversation many times, and I think that

20     the smile on your face tells me that's true.

21              And, honestly, I don't remember why you told me not

22     to wear the wooden cross, but I remember you telling me to

23     wear the brown shoes, which I did for your benefit today.

24              THE WITNESS:  May I show him?

25              THE COURT:  Sure.  Go right ahead.

1              THE WITNESS:  I never wear brown and black, but I

2     did it for you.  So one was a fashion answer, which I found

3     strange.  Another answer you gave me is I think strictly

4     related to an Orthodox priest coming to visit you.  Is that

5     what you are talking about?

6      Q. What I remember telling you is that -- it's not

7     important.  That's all I have.

8              THE COURT:  Very good.  You may sit down.

9              The Government have any other questions?

10             MR. WILLIAMS:  Briefly, Your Honor.

11                        CROSS-EXAMINATION

12    BY MR. WILLIAMS:

13     Q. I want to ask you briefly about your experience with

14    other people who may or may not be similar to the defendant.

15    Have you ever counseled someone who was a mass shooter who

16    killed several people?

17     A. No.

18     Q. And I guess what I'm getting at with that is you had said

19    that it didn't compute, and I guess I want to ask you if you

20    have ever seen somebody like him before.

21     A. Well, I think it's certainly fair to say I've never seen

22    somebody like him before.

23     Q. It's fair to say it's a tremendous challenge to you

24    professionally and probably personally?

25     A. I, um, I spent a number of hours -- I would have to call

1    the detention center to tell me how many hours it was, but I

2    visited a Mexican man who was accused and found guilty of

3    murdering a prostitute by strangulation.  I spent countless

4    hours visiting him in the detention center and likewise at

5    the prison outside of Summerville.

6    Q. How about -- sorry.  Go ahead.  I didn't mean --

7    A. Forgive me.  I'm not sure if that helps at all.

8    Q. I'm trying to see if you have any experience dealing with

9    someone who committed multiple murders or for political

10   reason, but more of a political reason than maybe a personal

11   strangulation of a person, and I ask that because I'm trying

12   to determine whether you are forcing yourself into maybe some

13   false alternatives, if that makes sense.

14   A. Will you please ask me your question one more time?

15   Q. You had said in your direct testimony that you thought

16   there were two options, mental illness or -- and irredeemable

17   monster.  I'm trying to determine whether there would be a

18   third option which is this defendant, who you've never seen

19   somebody like before, and maybe you just don't have a

20   descriptor for it.

21   A. I see.  Forgive me because I'm having a hard time right

22   now.  Ask me the question part.

23   Q. You gave two options to categorize the defendant,

24   irredeemable monster or a mental illness situation, and my

25   question, maybe is there a third option that isn't one of

1    those, which is just who he is, and you've never seen
2    something like that before, so you just don't know the label
3    to put on it?
4      A. Well, that may -- that may indeed be the case.  But one
5    could say that my task as a pastor is people.  In fact, when
6    people say to me, "Father John, I know you are very busy, and
7    I don't want to take up too much of your time," my answer to
8    them is, "You are my time.  My business is you."  So while it
9    is true that I have not -- I have not any personal contact
10   with someone apart from Dylann who shot and killed nine
11   people in a church, I have -- I have worked with and
12   counseled and pastored and heard the confessions of hundreds
13   and hundreds and hundreds of people, including people that I
14   had to take to mental institutions for commitment, including
15   others who have committed themselves to mental institutions.
16          And so, yes, there may be another -- there may
17   indeed be another definition, but in my pastoral observation,
18   after racking my brain for 19 months consecutively, I have
19   not been able to discern any other thing.  I am a layman when
20   it comes to mental illness.  I admit that.  However, I'm a
21   pretty intelligent fellow.  I have two master's degrees.  I'm
22   studying for a doctoral degree right now.  I read the DSM.  I
23   read all that kind of stuff, and so it's also not the same as
24   a person who just sits around and thinks that the world is
25   black and white.

```
 1                    MR. WILLIAMS:  Thank you.  Nothing else, Your Honor.
 2                    MS. STEVENS:  No further questions.  Thank you,
 3      Father.
 4                    THE COURT:  Any further witness -- witnesses from
 5      counsel?  Any further witnesses?
 6                    MR. BRUCK:  Not from us, Your Honor.
 7                    THE COURT:  Very good.  Does the Government wish to
 8      offer any witnesses?  I want to question Mr. Roof.
 9                    MR. WILLIAMS:  We do not, Your Honor.
10                    THE COURT:  The way we did this before at the first
11      competency hearing, I want to see if there is any objection,
12      I would like to do the questioning of Mr. Roof and not have
13      counsel question.  Is there any objection from Mr. Bruck to
14      me doing that?
15                    MR. BRUCK:  No, Your Honor.
16                    THE COURT:  From the Government?
17                    MR. BURNS:  No, Your Honor.
18                    THE COURT:  Very good.
19                    Mr. Roof, why don't you come to the podium if you
20      might.
21                    MR. BRUCK:  Would the Court mind if I stand next to
22      Mr. Roof?  I have a little trouble hearing him.
23                    THE COURT:  Absolutely.  No problem.
24                    Mr. Roof, you and I -- I end up asking you a lot of
25      questions.  Some of these you may have heard before.  But I
```

1     think it's important to establish your understanding of

2     things.  Let's -- one of the issues here is are you competent

3     to stand trial, and there is another issue of whether you are

4     competent to self-represent.  Even though you are, you

5     understand you have a choice.  Even if you are competent to

6     self-represent, you recognize you have the right to have

7     counsel.  You understand that, don't you?

8                THE DEFENDANT:  Yes.

9                THE COURT:  And I know from listening to those

10    videotapes that your grandfather and your parents, both of

11    them have urged you to allow Mr. Bruck to continue to

12    represent you, correct?

13               THE DEFENDANT:  Yes.

14               THE COURT:  And how many times have I told you that?

15    Too many to count, huh?

16               THE DEFENDANT:  Yes.

17               THE COURT:  But I've also told you that I respect

18    your constitutional right to self-represent if that is what

19    you want to do, and I view it, as I've said many times, as a

20    bad decision, but a bad decision you have a right to make.

21    You do understand you have a right to counsel, do you not,

22    sir?

23               THE DEFENDANT:  Yes, I understand.

24               THE COURT:  And you understand that if you changed

25    your mind, Mr. Bruck is in a position to immediately resume

1    representing you.  You understand that, don't you?

2              THE DEFENDANT:  Yes.

3              THE COURT:  And I've told you many times that though

4    I know you have differences with Mr. Bruck because you have

5    goals different than him in some ways -- Dr. Ballenger

6    described those, I think, very ably.  There is no doubt -- I

7    just want to share my view -- there is no doubt that he wants

8    to help you.  It is very clear to me he wants to help you.

9    And it is also clear to me that you are better served with

10   the jury hearing all the evidence.  And that evidence is not

11   just the mental health evidence, but the -- for instance, the

12   evidence of Father John, who has met with you 100 hours, who

13   says why you have hope.  That is one of the mitigating

14   factors that has been asserted that you may change your

15   views.  That's your decision.  I just was very moved by

16   Father John and his devotion to come see you for all those

17   hours; and, you know, I can't make you call him as a witness,

18   but perhaps you could work out something where he could

19   testify in areas even if you self-represent that might allow

20   the jury to hear from him.

21              Do you continue to have your view that you wish to

22   waive your right to counsel and to self-represent?  Does that

23   continue to be your view?

24              THE DEFENDANT:  Yes.

25              THE COURT:  And today is the 2nd, so we are running

1        out of time here.  You are confident that is your view that

2        you wish to self-represent?

3                THE DEFENDANT:  Yes.

4                THE COURT:  And you clearly are asking me to allow

5        you to continue your self-representation; is that right?

6                THE DEFENDANT:  Yes.

7                THE COURT:  You understand, of course, as we have

8        talked about before, that Mr. Bruck has a great deal more

9        experience than you do in handling capital cases.  You

10       understand that?

11               THE DEFENDANT:  Yes.

12               THE COURT:  And he has been highly successful in

13       saving defendants from the death penalty.  You understand

14       that?

15               THE DEFENDANT:  Yes.

16               THE COURT:  Now, I know you have talked to your

17       family.  You talked to Mr. Bruck and others.  You've gotten

18       the -- the advice from me.  Have you weighed all that advice

19       very carefully?

20               THE DEFENDANT:  Yes.

21               THE COURT:  You have thought about it hard?

22               THE DEFENDANT:  Yes.

23               THE COURT:  This is not a rash decision on your

24       part, is it?

25               THE DEFENDANT:  No.

1          THE COURT:  But you wish to waive your right to

2     counsel and to self-represent, no ifs, ands, or buts; is that

3     right?

4          THE DEFENDANT:  That's right.

5          THE COURT:  Okay.  Now I want to talk to you about

6     this issue of recognizing your potential exposure to the

7     death penalty.  When I originally asked you that question,

8     you were charged with 33 counts, 18 of which potentially

9     exposed you to the death penalty, correct?

10          THE DEFENDANT:  Correct.

11          THE COURT:  And you had not yet been convicted,

12     correct?

13          THE DEFENDANT:  Correct.

14          THE COURT:  And I said to you, "Mr. Roof, do you

15     recognize you could get the death penalty?"  You told me you

16     did, correct?

17          THE DEFENDANT:  Correct.

18          THE COURT:  And I asked you then, "Do you think that

19     white nationalists can save you?"  What did you tell me?  Is

20     that real?  Do you really believe that you can be saved by

21     white nationalists if you are convicted and got the death

22     penalty?

23          THE DEFENDANT:  No.

24          THE COURT:  And do you believe that if you smile at

25     the jury, you will not get the death penalty?

1                    THE DEFENDANT:  No.

2                    THE COURT:  Do you believe if you cry right before

3     they give you that lethal injection, you will not get the

4     death penalty?

5                    THE DEFENDANT:  No.

6                    THE COURT:  Do you recognize that you are at high

7     risk for getting the death penalty if the jury imposes it?

8                    THE DEFENDANT:  Yes.

9                    THE COURT:  Do you recognize that you are at high

10    risk of getting the death penalty if you offer no mitigation

11    witnesses?  Do you recognize that?

12                   THE DEFENDANT:  Yes.

13                   THE COURT:  Do you recognize -- nobody knows with

14    certainty.  This is not like a cookbook.  There are no

15    guarantees, but you recognize you may be giving up, by not

16    calling these mental health witnesses, the best chance you

17    have for avoiding the death penalty?  Do you understand that?

18                   THE DEFENDANT:  Yes, I understand.

19                   THE COURT:  But not withstanding that, you still do

20    not wish to call them?

21                   THE DEFENDANT:  That's right.

22                   THE COURT:  Understanding, knowing the risk with

23    your eyes open, you are making that decision; is that right?

24                   THE DEFENDANT:  That's right.

25                   THE COURT:  Dr. Ballenger described that your

1    primary goal was not surviving the death penalty itself, but

2    to preserve your own view regarding why you committed these

3    crimes.  Did he get that right?

4           THE DEFENDANT:  Yes, he got that part right.  And he

5    also talked about preserving a reputation.

6           THE COURT:  Yes.

7           THE DEFENDANT:  And I would like to comment on that

8    if I could.

9           THE COURT:  Please do.

10          THE DEFENDANT:  I told you I think at the last

11   competency hearing that I don't actually have a reputation to

12   preserve because nobody likes me, including other white

13   nationalists, but in my view, what my lawyers wanted to do

14   is -- I have like a corpse of a reputation, and they want to

15   burn it.  You see, they just want to -- I already don't have

16   a reputation, and then they just want to make it worse.  So

17   it's not really about preserving a reputation.

18          THE COURT:  But you understand -- and I know because

19   I recognize -- I did this intentionally this morning.  I want

20   to make it clear to you the content of this hearing is going

21   to be made public.  I mean, I don't want you to think, "Oh,

22   if I just don't have a lawyer, it will all be kept a secret."

23   It won't be kept a secret because the interest of keeping it

24   private is not preserving your privacy, but to protect the

25   jury from being tainted.  I have no idea what you are going

1      to say tomorrow or in closing argument.  That's your right to

2      do that.  You don't need to tell me that.  I'm not going to

3      ask you to do it.  I don't know what is going to come out,

4      and I didn't want this to come out, whatever Dr. Ballenger

5      would say or our exchange here today.  I wanted you to have a

6      chance to tell the jury what you wish and not to hear it

7      secondhand.  You understand that?

8               THE DEFENDANT:  Yes.

9               THE COURT:  But they are going to hear it.  The

10     public will hear this.  You know that, right?

11              THE DEFENDANT:  Yes, I understand.

12              THE COURT:  I know you have mentioned to me before

13     you have some hope that perhaps in the future the death

14     penalty might be overturned in this country, correct?

15              THE DEFENDANT:  Yes.

16              THE COURT:  Now, I take it you are going to want to

17     appeal -- if the death penalty were to be imposed, I take it

18     you would probably want to appeal.  Is that fair?

19              THE DEFENDANT:  That's right.

20              THE COURT:  Okay.  But do you recognize that your

21     risk of getting death is real?  It's not a fantasy.  Do you

22     recognize it's a real risk here?

23              THE DEFENDANT:  Yes.

24              THE COURT:  You have been convicted of 18 counts

25     which are capital offenses, correct?

1          THE DEFENDANT:  Correct.

2          THE COURT:  You heard the testimony.  You were

3    there.  These were, you know, described by everyone as

4    heinous acts.  Did Dr. Ballenger get it right that you were

5    trying to commit the most outrageous crime you could?

6          THE DEFENDANT:  Yes, that's right.

7          THE COURT:  And you could see how a jury might react

8    to that?

9          THE DEFENDANT:  Yes, I can see it.

10          THE COURT:  Now, you made a decision not to offer

11    witnesses in the sentencing phase.  Would you do this for me:

12    Would you meet with Father John one more time and see if you

13    can't at least talk to him about -- y'all might get somewhere

14    where you might consider offering his testimony?

15          THE DEFENDANT:  Um, well, that -- that makes -- I

16    wanted to ask you this anyway.  Um, I was going to ask you at

17    the very end if we could delay it for one day, if we can

18    delay it -- if we can delay the beginning until Wednesday

19    because this -- all this with the competency hearing has sort

20    of sidetracked me and distracted me from my preparation.

21          THE COURT:  Ms. Eunice, can we communicate to the

22    jury to report on Wednesday?

23          THE CLERK:  Yes, sir.

24          THE COURT:  Okay.  I think I'm going to -- I want to

25    hear from the Government before I make that decision, but

1    I'll consider that.  Okay?

2              But would you consider meeting with Father John

3    again and talking to him?

4              THE DEFENDANT:  Yes.

5              THE COURT:  I do think the testimony about

6    redemption and so forth is something that the jury ought to

7    hear.

8              Mr. Bruck, you agree with that?

9              MR. BRUCK:  Yes, sir, Your Honor.

10             THE COURT:  Okay.  I just think it should not --

11   withstanding your differences on other issues -- that is not

12   a mental health issue, you know.  It's a different issue.

13             You -- and the issue of whether you are going to

14   examine or cross-examine witnesses, you know you have the

15   right to do that, correct?

16             THE DEFENDANT:  Right.  And I -- I intend to

17   cross-examine the witnesses from the jail, but not the victim

18   impact witnesses.  That's my --

19             THE COURT:  Because you think that would be

20   counterproductive?

21             THE DEFENDANT:  Yes, and I just couldn't do it.

22             THE COURT:  But in terms of -- for instance, Agent

23   Hamski might testify.  Is it possible you would cross-examine

24   him?

25             THE DEFENDANT:  It would depend on what he said.

ROOF - EXAMINATION BY THE COURT       207

1           THE COURT:  You are not eliminating other witnesses

2       who may testify other than the victim witnesses?

3           THE DEFENDANT:  No.

4           THE COURT:  And your present plan, though you can

5       change, is to make an opening and closing statement?

6           THE DEFENDANT:  (Nodding.)

7           THE COURT:  Is that correct?

8           THE DEFENDANT:  That's right.

9           THE COURT:  Standby counsel had also thought about

10      having family members testify.  You don't wish to have any

11      family members testify?

12          THE DEFENDANT:  Absolutely not.

13          THE COURT:  How about prison officials to talk about

14      good behavior in the jail?

15          THE DEFENDANT:  No.

16          THE COURT:  You don't want them?

17          THE DEFENDANT:  No.

18          THE COURT:  You recognize that in a death penalty

19      case one advantage the defendant has is he only needs one

20      juror not to vote for death.  Do you understand that?

21          THE DEFENDANT:  Yes, I understand.

22          THE COURT:  And that is why usually defendants defer

23      to their lawyers who look for opportunities to persuade one

24      or more jurors, and you recognize, Mr. Roof, I take it, that

25      by eliminating certain witnesses, you may be reducing the

1    risk you could get that one vote.  Do you understand that?

2            THE DEFENDANT:  Yes, I understand.

3            THE COURT:  And though you understand that, why do

4    you insist on not offering that mental health evidence?

5            THE DEFENDANT:  Because it's all a bunch of lies,

6    and just like I refuted everything to Dr. Ballenger, I could

7    pick those reports apart all day long.  It's just the basic

8    issues that it's not true other than the ones that I agreed

9    to, social anxiety, and like I said, I think -- I read the

10   DSM avoidant personality disorder.  I think I absolutely have

11   that.  My point is I am not opposed to a diagnosis if it's

12   true.  I'm opposed to an untrue diagnosis.

13           THE COURT:  Dr. Ballenger describes you as -- a

14   predominant explanation for your difficulties with your

15   lawyers and your view about not offering mental health

16   evidence is that you really are not ashamed of what you did.

17   You are proud of what you did.

18           THE DEFENDANT:  Right.  And that was putting words

19   in my mouth.  I think that is a little bit --

20           THE COURT:  You tell me the proper words.

21           THE DEFENDANT:  Well, I mean I'm not going to say

22   that is necessarily wrong.  I just think it's a little bit

23   strong.  To say "proud" is a little bit --

24           THE COURT:  You don't deny it?

25           THE DEFENDANT:  Right.

ROOF - EXAMINATION BY THE COURT      209

 1                    THE COURT:  You are not ashamed of it?

 2                    THE DEFENDANT:  Right.

 3                    THE COURT:  You are not remorseful about it?

 4                    THE DEFENDANT:  Right.

 5                    THE COURT:  You avow yourself to a political

 6      prisoner like a Muslim Jihadist in Israel.  Is that a fair

 7      analogy?

 8                    THE DEFENDANT:  Or anywhere.

 9                    THE COURT:  Or anywhere.  Is that a fair analogy?

10                    THE DEFENDANT:  Yes, that is fair.

11                    THE COURT:  And because your lawyers don't wish to

12      offer that view, and you do, is that a major point of your

13      differences with your counsel?

14                    THE DEFENDANT:  Well, see, that is the thing.  It's

15      not -- I'm not necessarily intending to offer that view.

16      It's just -- I'm not sure.  It's just -- I'm not planning on

17      saying that.  That's what I'm saying.

18                    THE COURT:  Okay.  But in terms of the differences

19      with your lawyers, you don't want the explanation of why you

20      went into the Emanuel Church to be that you were mentally

21      ill?

22                    THE DEFENDANT:  That's right.

23                    MR. BRUCK:  If Your Honor please, I would ask the

24      defendant's answers to the questions, the affirmative answers

25      about being proud or not having remorse, those be stricken on

                    AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    the grounds of they are beyond the scope of the competency

2    evaluation.  I understand why the Court asked them.

3            THE COURT:  I'm asking because they could go to

4    competency issues, because what you have attributed,

5    Mr. Bruck, to be signs of mental illness, Dr. Ballenger, the

6    Court's examiner, has expressed they are based upon

7    Mr. Roof's political views, and I sought to confirm those.

8    Because they are not what I would normally encounter or you,

9    I needed to confirm that.  I respectfully deny your request

10   to strike those.  I think they are appropriate to ask.

11           MR. BRUCK:  If I may place on the record part of the

12   basis of my objection is that there is no Fifth Amendment

13   protection at a competency hearing; and therefore, the

14   protection is limited.

15           THE COURT:  You see, you make it difficult.  You

16   bring a competency challenge, and I have to address it.  And

17   I can't take this with one arm tied behind my back.  I've got

18   to hear -- I have appointed a court examiner who says, "No,

19   it's not mental illness.  It is a deep, almost pathological

20   feelings about a certain race of people."  And I need to

21   confirm that.  And that is what I have just done.

22           MR. BRUCK:  I wish to note the objection.

23           THE COURT:  Your objection is noted.  I do it with

24   no pleasure.

25           THE DEFENDANT:  Your Honor, I think it was very

1    interesting that Father Parker pretty much confirmed exactly

2    what Dr. Ballenger had said, that if you are unable to

3    understand, then you assume I have a mental illness, and I

4    think --

5           THE COURT:  I caught that myself, Mr. Roof.

6           You know, there was a discussion about you wanting

7    to terminate your standby counsel.  I will not allow you to

8    do that.  I can't make you listen to them.  I'm going to urge

9    you to listen to them, but I'm not going to honor your

10   request to discontinue their services.  You are in control,

11   Mr. Roof.  You are self-representing.  I found standby

12   counsel's assistance in the opening charge helpful to me, and

13   I will have a closing charge.  I would urge you to include

14   them in your response to that.  Those are important for your

15   appeal, and you need to preserve certain issues, and I would

16   urge you to call upon them.

17          And, you know, you don't have to listen to every

18   note they give you or respond to every one, but you've got

19   about a hundred years of experience sitting at that table

20   between all those lawyers.  They are pretty capable people.

21   And I know they might have a different view of things than

22   you do, but they have -- they may have something to offer

23   you.  So I'm going to decline your request that you -- that I

24   terminate them.  But it's up to you on how you use them.  I

25   think they are a richer resource for you than perhaps you

1        find -- you will appreciate right at this moment.

2                Let me make sure that you understand the proceedings

3        because a sentencing proceeding for any person is a challenge

4        because it's not done very often -- at least this Court has

5        never been involved in one, and neither of us have been to a

6        sentencing hearing.  So let's talk about it.  It will begin

7        with an opening charge by me -- I will give you -- you have

8        read that -- and sort of basic introduction to the law.  Then

9        there will be an opening statement first by the Government,

10       and then by you, if you wish to make it.  I won't require you

11       to make it.

12               The Government will then call witnesses.  You will

13       have the right to cross-examine those witnesses.  When the

14       Government rests its case, you have a right to call witnesses

15       and present them.  That is entirely -- you have no burden of

16       proof -- in terms of any mitigation, you have the burden to

17       carry proving by a preponderance of the evidence, but you

18       have no obligation to call witnesses if you do not wish to do

19       so.

20               After you -- your case rests, there will be closing

21       argument of counsel.  First the Government will have a right

22       to counsel -- I mean a right to make a closing argument, and

23       then you will have a right to make a closing argument, and

24       then the Government will have a right to reply.

25               Now, do you understand those proceedings?

1                    THE DEFENDANT:  Yes.

2                    THE COURT:  You are confident you understand them?

3                    THE DEFENDANT:  Yes.

4                    THE COURT:  Are you confident in your ability to

5         self-represent?

6                    THE DEFENDANT:  Yes.

7                    THE COURT:  After the closing argument, there will

8         be a closing charge by the Court, and I will submit before

9         the end of the case a proposed closing charge, and I will

10        again mention as I did at the opening charge that you can

11        meet with standby counsel, that they will have a right to

12        prepare documents in response as long as you sign it just

13        like you did before.

14                   After the closing charge, the jury will deliberate

15        and reach a verdict on the death penalty issue.  And as we

16        discussed, one of the potential verdicts you understand is

17        death?

18                   THE DEFENDANT:  Yes, I understand.

19                   THE COURT:  And you understand the dangers and

20        consequences of self-representation?

21                   THE DEFENDANT:  Yes, I understand.

22                   THE COURT:  And not withstanding that, you continue

23        to express to this Court your desire to waive counsel and to

24        represent yourself through the balance of this case; is that

25        correct?

1              THE DEFENDANT:  That's correct.

2              THE COURT:  Okay.  You may return to your seat.

3         Do you have something you want to say to me first?

4              THE DEFENDANT:  I wanted to ask you about the

5    release of the competency hearing.

6              THE COURT:  Yes, sir.

7              THE DEFENDANT:  I remember when we talked about it

8    at the pretrial hearing, you said something about passing it

9    on to Judge Newman, and --

10             THE COURT:  Judge Nicholson, yes.

11             THE DEFENDANT:  I got it mixed up.  But --

12             THE COURT:  I thought -- I will tell you -- let me

13   explain that because I thought a lot about it.  I have spent

14   a lot of time looking at the law on the issue, and I am

15   persuaded that my obligation is to release it.  It does

16   potentially have an effect on the State proceeding, but Judge

17   Nicholson will have to through change of venue, voir dire,

18   delay the base -- there are other methods to address that

19   issue.  I believe the public right to know is paramount here

20   and would survive those other considerations.  That's my

21   present thinking about it.

22             That, and I would estimate it will be in a matter of

23   days following a verdict I would release, not just the

24   competency hearing, but I mean, all the motions we've sealed

25   in this case.  Our staff is going through and looking at

1    those, and I would probably unseal them, if not all at once,

2    within a few days of each other.

3              THE DEFENDANT:  My only worry with that is there are

4    things that I have said here, and I absolutely wouldn't say

5    in front of a jury, you see?  And that is what makes it

6    complicated for me, and the things that the -- that I said

7    to --

8              THE COURT:  I think what we may do is go through --

9    we are going to -- there will be things that are redacted

10   from any released -- there are issues I need to think about

11   about redaction.  And what I might do, I may think about

12   this, is I may bring you over here, and we may actually show

13   both sides what we are thinking about and let me hear from

14   everyone about whether further redaction might be necessary.

15             I think there's some questions here.  Mr. Bruck

16   raised the Fifth Amendment issue, and there may be that there

17   be questions here that may be substantial to redaction.

18             MR. BRUCK:  I think there are substantial privacy

19   interests, particularly the mental health reports involving

20   third and fourth and fifth parties.

21             THE COURT:  That's right.  One of the things we

22   were -- Mr. Roof raised the issue about his mom, the

23   allegation about your mom, and that would be the kind of

24   issue that I think I would be -- give very serious

25   consideration about redaction.  It's never been an issue.  No

1    one has attributed it to be a factor in any of this, and --

2            MR. BRUCK:  A great deal of that nature, not all of

3    it quite as --

4            THE DEFENDANT:  That is David Bruck's fault because

5    in Loftin's report, she had almost three pages of nothing but

6    things about my mom that had nothing to do with anything, and

7    that is the kind of thing that makes me have a problem, you

8    know.

9            THE COURT:  Well, you know, I've got to -- you know,

10   I have been so focused on trying to give you a fair trial and

11   these competency issues, and what we will redact, I think

12   this discussion helps me with focusing that we need to have

13   some process where we can sit down and say, "Here are the

14   documents we are getting ready to release; here are proposed

15   redactions.  What do y'all recommend?  What does the

16   Government recommend?  What do y'all recommend?"

17           But the bulk of this is coming in.  I'm less

18   concerned, frankly, with getting what you've just told me in

19   the public record.  There has been a lot of public discussion

20   about your mental status.  The public has a right to know

21   that Dr. Ballenger evaluated you and found you competent.

22   There are a lot of people in the newspaper that made a

23   diagnosis of you that have never seen you.  Some did, you

24   know, but -- and I think they are also entitled to know that

25   the defense had mitigation evidence.  I think that is fair

1    public knowledge.

2            THE DEFENDANT:  And, um, just, this is the last

3    thing I have to say; it's just in my mind.  It just seems the

4    idea that someone has no other way to visit their family

5    members and that could be uploaded to the court website, for

6    example, from this competency hearing, and then put on *The*

7    *Post and Courier*'s website, like they did with my confession.

8    It just seems unprecedented.  I've never seen the online

9    video.

10           THE COURT:  We all need to have a discussion about

11   the family videos.  We've got to have a talk.  I want to hear

12   from the Government about this as well.  There is

13   substantial -- here is the problem:  We are doing the

14   public's business here, Mr. Roof.  That's the problem.  It's

15   not a private matter.  It's the public's business.  The

16   public has a right to know.  The crime for which you have

17   been convicted has scarred this community, I'm just going to

18   tell you.  I'm out there.  It is a deep wound on this

19   community.  And it's an understandable desire that the public

20   has a right to know things I have kept confidential.  There

21   are things that should not be made public, I see that, and we

22   are going to continue to redact -- do redactions.  I will

23   hear from y'all.  I think this has been a helpful discussion

24   to me.

25           So after the -- let me say to you, you know, the --

1    after the jury makes whatever decision it makes, I will

2    sentence you.  There is another proceeding.  It would not be

3    the same day.  And after I do that, whatever the sentence is,

4    I will schedule a hearing.  I'll talk to standby counsel and

5    to the Government to work out some process -- some formal

6    process in which we look at redaction, okay?

7              THE DEFENDANT:  Thank you.

8              THE COURT:  Balancing all those interests.

9              THE DEFENDANT:  Can I ask you one question about

10   this, um --

11             THE COURT:  Yes.

12             THE DEFENDANT:  It says if the defendant needs to

13   give a document to a witness or the Court, it will alert the

14   Court and transfer the document from the lectern to the

15   witness stand.

16             THE COURT:  One of these court security officers

17   sitting right here, you just hand it to him, and he will walk

18   it -- he will hand it to you.

19             THE DEFENDANT:  And I would have to have copies for

20   the Government, though, wouldn't I?

21             THE COURT:  Talk to standby counsel.  If you want to

22   offer a document, they'll get copies for you.

23             THE DEFENDANT:  Okay.  Thank you.

24             THE COURT:  Y'all assist him in that, okay?

25             What is the Government's response to the defendant's

1    request to start Wednesday instead of Tuesday?

2              MR. BURNS:  The primary consideration, of course,

3    Your Honor, is the availability of the victims' family and

4    those witnesses that are scheduled.  But I understand the

5    Court's position, and the --

6              THE COURT:  We have tied them up for three days,

7    right?  Dr. Ballenger has spent an enormous amount of time.

8              MR. BURNS:  And for that reason, I believe that we

9    would be able to work with our witnesses to ensure that they

10   will be available to testify starting on Wednesday.

11             THE COURT:  It's not a perfect situation, but I

12   think under the lateness of the hour, I think it's

13   appropriate.  I have considered carefully the evidence

14   offered here today, the filings made, I find --

15             MR. BRUCK:  If Your Honor please, I'm sorry to

16   interrupt, before you issue your ruling from the bench, may I

17   place on the record a procedural issue:  We think we were

18   unduly limited at today's hearing by the exclusion of not

19   only all events that were not newly occurring, but any

20   assessment by experts that did not actually occur after the

21   prior competency ruling, but also by the limitation on almost

22   any reference to evidence that predated the competency

23   finding.

24             We submit that there is no way of responding to

25   the -- Dr. Ballenger's testimony except holistically by

1    calling witnesses or by examining witnesses, the few

2    witnesses that we did call, about the entire clinical

3    picture, including all of the sources of data in order to

4    understand the new evidence that is before the Court; and in

5    particular, the new evidence that we as counsel submitted.

6        To give an example, Dr. Ballenger essentially

7    discounted example after example after example from defense

8    counsel about unrealistic, and we think actually psychotic,

9    misunderstandings or false ideas that the defendant expressed

10   to us in various ways over the last few weeks by saying that

11   he had determined on the basis of his total of less than a

12   dozen hours with Mr. Roof that he was gaming us or teasing us

13   or stringing us along, and that he had seen through all of

14   that, and that Mr. Roof did not do that with him, but gave

15   him the straight proof.

16       Now, the trouble with that is that there is a long,

17   long history of Mr. Roof expressing these similarly extremely

18   unrealistic and counterfactual ideas, not only to us, but to

19   all of the mental health experts beginning back in -- in this

20   record, back in February with Dr. Moburg, including the

21   delusion of rescue that he now completely denies most

22   recently just a few moments ago.  So there is no way to

23   assess Dr. Ballenger's testimony and his dismissal of the

24   seriousness of the concerns that we have raised to trigger

25   this competency hearing without looking at the entire record.

1    And we think in effect that we were denied our ability to

2    present our side of the case today.

3            I understand the Court's rulings.  I'm not here to

4    just go on and on about them, but I do think the record has

5    to reflect that we think our client's right to due process in

6    this hearing were denied by the extremely restrictive nature

7    of the Court's grounds for this hearing.

8            THE COURT:  Mr. Bruck, here is the problem:  You

9    have just had a competency hearing, two days long, less than

10   five weeks ago.  These were exhaustively addressed, these

11   same issues.  I had a real debate whether the new -- the new

12   matters you listed weren't merely an echo of what I had

13   already addressed previously.  Frankly, the one issue that

14   troubled me was your repeated statement he doesn't really

15   believe he could face the death penalty.  I had a real debate

16   whether I should do anything other than just deny it.  But I

17   went -- the man is on trial for his life; I take it very

18   seriously.

19           I dragged Dr. Ballenger back from Virginia -- or

20   North Carolina where he was with his family on vacation, and

21   I had him reassess.  And he had found that the defendant

22   previously was not delusional, was not -- these words are

23   tossed around like they are Chiclets -- and that this is

24   primarily a view of -- a political view, a racial view of the

25   defendant, which he basically voices.  And now you want to go

1    back and basically bring the same evidence we already

2    considered once, and I just said, "I'm not doing this."  It's

3    a waste of time.  It's an abuse in my view to try to make me

4    do it twice because -- and it's not necessary.  It's not in

5    the interest of justice.  It doesn't serve any purpose.

6         Is there new evidence that's material?  Because the

7    law of the case is -- as of late November was the man was

8    competent.  I continue to find him competent.  I don't think

9    anybody can sit here and watch him question the witnesses to

10   doubt for a moment he's competent to self-represent and

11   competent in this case.  He understands these proceedings.

12   He has the ability, perhaps not the willingness, to

13   communicate with counsel.  He understands the consequences of

14   the proceedings, and he has the capacity to self-represent.

15        I think I've given you more than most would have.  I

16   think you have been given a lot.  You have been given a third

17   day of competency hearings and another evaluation by the

18   Court examiner.  More than most would have given.  I feel

19   like it's adequate, and I overrule your objection.

20        So let me proceed back to where I was.  I do find

21   that the Court's original decision regarding competency is

22   unchanged, that the defendant does understand the nature of

23   the proceedings and the consequences of the proceedings, and

24   has the capacity to self-represent.  He does not fall within

25   that narrow exception *Indiana vs. Edwards*.  He is not in that

1    gray defendant area where he has profound mental illness that

2    he may just be insane or just be competent.  He is -- he is

3    not in that category.  I -- so I reaffirm my decision of

4    November 25th that the defendant is competent and reaffirm my

5    decision of November 29th that he is competent to

6    self-represent.

7         I will issue an order to follow probably tomorrow or

8    Wednesday -- actually, I think I will do it after I bring my

9    jury back.  I don't want to do -- I want to admonish the jury

10   not to pay attention to anything.  And the order may be a

11   redacted version.  I've got to sort that out, a public and a

12   private.

13        As to the defendant's request to continue the case

14   one day to allow him more preparation, I grant that motion.

15   We will convene on Wednesday morning at 9:30.  Ms. Ravenel,

16   would you communicate with the jury, please.  Thank you.

17        The hearing is adjourned.  The revised opening

18   charge I will provide the parties.

19

20                   *****      *****      *****

21

22

23        I certify that the foregoing is a correct transcript

24   from the record of proceedings in the above-titled matter.

25

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1

2  _____

3  Amy C. Diaz, RPR, CRR                    January 17, 2017

4

5  /S Amy Diaz

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25