IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| United States of America, ) | Criminal No. 2:15-472-RMG |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | **UNDER SEAL** |
| Dylann Storm Roof. ) | |
| ) | |

This matter was before the Court on Defendant's second motion challenging his competency to stand trial (Dkt. No. 832) and Defendant's motion challenging his competence self-represent at the sentencing phase of his trial (Dkt. No. 841). After a second competency hearing, the Court denied those motions from the bench. (*See* Dkt. No. 847.) This Opinion memorializes the reasons for the Court's decision.

I.  **Background**

Defendant Dylann Roof was accused of killing nine persons and attempting to kill three other persons at Mother Emanuel African Methodist Episcopal Church in Charleston, South Carolina. He was indicted on various federal charges on July 22, 2015, and on May 24, 2016, the Government served notice of intent to seek the death penalty. (Dkt. Nos. 1, 164.)

The Court learned on November 5, 2016 that Defendant had written an unsolicited letter to the prosecution, in which he disavowed Defense Counsel's plan to introduce mental health mitigation evidence in the sentencing phase of his trial. (Dkt. Nos. 545, 546.) Defendant stated that he had only recently learned of the proposed defense. (Dkt. No. 546.) The next day, Defense Counsel moved to delay jury selection and to conduct an *ex parte* hearing to "permit the Court and counsel to address the disruption in the attorney-client relationship that the letter reveals." (Dkt. No. 544 at 1.) Defense Counsel argued Defendant's letter "raises serious questions regarding Defendant's competency." (*Id.* at 3.) In light of the lenient standard for ordering a competency

evaluation and the information provided by Defense Counsel, the Court decided to appoint an examiner to assess Defendant's competency and to conduct a full competency hearing. (Dkt. No. 559.)

The court-appointed examiner, Dr. James Ballenger, submitted his report on November 15, 2016, and the Court held a two-day competency hearing on November 21–22, 2016, receiving live and written testimony from eight witness as well as voluminous documentary exhibits. (Dkt. No. 657 at 2.)

After the hearing, the Court made the following conclusions of law:

> 1.   Defendant does not suffer from any mental disease or defect which renders him unable to understand the nature and consequences of the proceedings against him.
>
> 2.   Defendant does not suffer from any mental disease or defect which renders him unable to assist properly in his defense.
>
> 3.   Defendant is competent to stand trial under the standards set forth in 18 U.S.C. § 4241.

(Dkt. No. 656 at 21–22.) Two days later, on November 27, 2016, Defendant moved to represent himself at trial. (Dkt. No. 666.) The following day, the Court held a *Faretta* hearing. In open court, Defendant confirmed his desire to represent himself. (Dkt. No. 627 at 3.) The Court then examined Defendant, asking a series of questions ensuring Defendant understood the charges against him, the possible consequences of his decision to forego representation by experienced counsel, and the Court's view that his decision was unwise. (*Id.* at 3–9.) Defendant confirmed—unambiguously—his knowing and intelligent decision to represent himself. The Court granted Defendant's motion and appointed former Defense Counsel as Standby Counsel. (*See* Dkt. No. 691.)

Defendant proceeded *pro se* for the entire period of voir dire. On December 2, 2016, the Court completed voir dire and scheduled final jury selection and empanelment for December 7,

2016, with opening statements to follow immediately thereafter. (*See* Dkt. Nos. 724 & 725.) On December 4, 2016—after voir dire but before jury empanelment—Defendant moved for Standby Counsel to be reappointed as his counsel of record only for the guilt phase of his trial and to be allowed to (again) proceed *pro se* during any sentencing proceeding. (Dkt. No. 728.) The Court granted that motion at the pretrial conference held on December 5, 2016. (Dkt. No. 740.)

Defendant was represented for the entire guilt phase of his trial. On December 15, 2016, the jury found Defendant guilty on all counts. (Dkt. No. 817.) The capital sentencing proceeding was scheduled to commence on January 2, 2017. On December 29, 2016, Standby Counsel filed a second motion challenging Defendant's competency to stand trial (Dkt. No. 832). Attached to that motion were reports by Dr. Rachel Loftin, Dr. Paul Moberg, Dr. Donna Maddox, and Mr. John Robison. The Court scheduled a second competency hearing for January 2, 2017, and immediately reappointed Dr. Ballenger to conduct a follow-up competency review to determine whether any change in Defendant's competency had occurred since the end of the first competency hearing on November 22, 2016. (*See* Dkt. No. 838.) Dr. Ballenger completed his report on the afternoon of January 1, 2017. (Dkt. No. 858.) That afternoon, Standby Counsel filed a joint declaration describing the observations of Defendant since end of the first competency hearing on the November 22, 2016 that caused them again to question his competency. (Dkt. No. 840.) Dr. Ballenger did not consider that declaration in his report, but he did review it before the January 2 competency hearing. (Dkt. No. 880 at 55.)

At 7 a.m. on the morning of the competency hearing, Standby Counsel filed a motion challenging Defendant's competency to represent himself "should the Court find the defendant competent to proceed to the penalty phase" because "his developmental disability and mental illness are sufficiently severe as to render him incompetent to conduct trial proceedings by

-3-

himself." (Dkt. No. 841 at 1.) The Court proceeded to hold a full-day competency hearing, and appointed Standby Counsel to prosecute the motion challenging competence as Defendant's counsel of record. (Dkt. No. 880 at 8.) Testimony was received testimony from Dr. Ballenger, Dr. Loftin, and the Reverend John Parker III, rector of Holy Ascension Orthodox Church in Mount Pleasant, South Carolina. The Court also examined Defendant at length. At the conclusion of the hearing, the Court ruled from the bench that Defendant remains competent to stand trial and that Defendant is mentally competent to conduct trial proceedings by himself. (*Id.* at 222–23.)

## II.  Legal Standard

### A.  Competence to Stand Trial

A criminal defendant is incompetent to stand trial only if he "is presently suffering from a mental disease or defect" that renders him "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(d). The standard for competency to stand trial is whether the defendant "has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). A defendant must have the "capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). "Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." *Godinez v. Moran*, 509 U.S. 389, 402 (1993). Thus, "[n]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges. Likewise, neither low intelligence, mental deficiency, nor bizarre, volatile and irrational behavior can be equated with mental incompetence to stand trial." *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000).

The issue of competence often arises when the defendant disagrees with the strategy of counsel, and therefore limits his cooperation or communications with counsel. The critical inquiry is whether the defendant has "the capacity to understand, the capacity to assist, and the capacity to communicate with his counsel"—not whether the defendant decides to assist or communicate with counsel. *See Bell v. Evatt*, 72 F.3d 421, 432 (4th Cir. 1995); *see also United States v. Battle*, 613 F.3d 258, 263 (D.C. Cir. 2010) (a conscious choice to not cooperate with counsel does not demonstrate an inability to communicate); *United States v. Ghane*, 593 F.3d 775, 781 (8th Cir. 2010) (a defendant's dissatisfaction with his defense says little "about the defendant's mental competency to stand trial"); *United States v. Vachon*, 869 F.2d 653, 655 (1st Cir. 1989) ("[T]he legal question before the judge concerned not what [the defendant] did do. It concerned what he was able to do."). "[D]ubious legal views" and "inadvisable strategy" do not provide a reasonable basis, standing alone, to question a defendant's competence to stand trial. *United States v. Perez*, 603 F.3d 44, 47–48 (D.C. Cir. 2010); *see also United States v. James*, 328 F.3d 953, 955 (7th Cir. 2003) ("Airline pilots, dentists, and other persons of unquestioned competence have espoused ludicrous legal positions."). Although, arguably, "a man in perilous circumstances should cooperate with his attorney," it does not follow that the reason for his "failure to do so must be that he was incompetent." *United States v. Tesfa*, 404 F. Supp. 1259, 1270 (E.D. Pa. 1975).

The defendant bears the burden of proving incompetence by a preponderance of the evidence. *United States v. Robinson*, 404 F.3d 850, 856 (4th Cir. 2005).

## B. Mental Competence to Conduct Trial Proceedings

Generally, a defendant competent to stand trial has a constitutional right to represent himself if his waiver of the right to counsel is knowing and voluntary. *Godinez v. Moran*, 509 U.S. 389, 400 (1993). Thus, while '[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts,' a criminal

defendant's ability to represent himself has no bearing upon his competence to choose self-representation." *Godinez*, 509 U.S. at 400 (quoting *Faretta v. California*, 422 U.S. 806, 834 (1975)) (internal citation omitted).

As a narrow exception to that rule, a court may—but is not required to—"insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Indiana v. Edwards*, 554 U.S. 164, 178 (2008). There is no specific standard defining the "gray area between *Dusky*'s minimal constitutional requirement that measures a defendant's ability to stand trial and a somewhat higher standard that measures mental fitness for another legal purpose." *Id.* at 172; *United States v. Bernard*, 708 F.3d 583, 589–90 (4th Cir. 2013). A determination that a competent defendant is competent to stand trial but not to self-represent must rest on an individualized assessment of the defendant's mental competency to self-represent that considers whether the defendant is "unable to carry out the basic tasks needed to present his own defense without the help of counsel." *Bernard*, 708 F.3d at 590 (internal quotation marks omitted). But "*Edwards* does not stand for the proposition that a state must deny the right of self-representation to a defendant of questionable mental competence or that district courts must conduct an additional "*Edwards*" inquiry into the competency of every defendant who requests to proceed *pro se*. *Id.*

### III. Discussion

The district court is "best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Edwards*, 554 U.S. at 177. Over two competency hearings lasting three full days, the Court received copious evidence regarding Defendant's mental health, including two evaluation reports from the Court-appointed examiner, testimony from the Court-appointed examiner, testimony from four experts retained by Standby

Counsel, seven reports from experts retained by Standby Counsel, testimony from a clergyman providing pastoral care to Defendant, declarations from Standby Counsel attesting to their own experiences working with Defendant, and extensive direct examination of Defendant by the Court. The Court also carefully observed Defendant's courtroom behavior throughout these proceedings, including his *pro se* efforts during voir dire and the pre-sentencing conference on December 28, 2016. This Court is "keenly aware of [Defendant's] mental condition." *Cf. Bernard*, 708 F.3d at 591.

As described below, Defendant is plainly competent to stand trial, and, indeed, Defendant is in some respects an exceptionally competent *pro se* litigant. The Court does not mean that it endorses Defendant's dubious legal strategy of presenting no mitigating evidence at his sentencing. Nor does it suggest that Defendant's untrained efforts compare well to Standby Counsel's experienced representation. But the Court has no discretion to deny Defendant's constitutional right to self-representation because it finds Defendant's legal strategy to be unsound, or because Defendant is less able than another available advocate is. *See id.* Defendant is competent to stand trial, so the Court has discretion to deny his right to self-representation only if it finds he has a "severe mental illness" that leaves him "unable to carry out the basic tasks needed to present his own defense." *Id.* at 590. The evidence before the Court conclusively established Defendant had no mental illness leaving him unable to carry out the basic tasks of self-representation. Indeed, if this Defendant were incompetent to represent himself, almost no defendant would be competent to represent himself. That is Standby Counsel's position. (*See* Dkt. No. 718 (arguing Standby Counsel should be reappointed because no defendant should permitted to represent himself in a capital sentencing proceeding).)

Standby Counsel's more recent motion, "Motion to Require Reappointment of Counsel Under *Edwards v. Indiana*" (Dkt No. 841), argued that in a capital case the reasoning of *Edwards* requires, rather than merely permits, a court to appoint counsel "notwithstanding the Sixth Amendment right to self-representation" when the defendant's "developmental disability and mental illness are sufficient severe as to render him incompetent to conduct trial proceedings by himself." (Dkt. No. 841 at 1.) The Court recognized the force of Standby Counsel's argument, but could not reach it in this case. It would indeed raise serious constitutional concerns to allow a capital defendant to proceed *pro se* after finding him incompetent to proceed *pro se*. But as Standby Counsel conceded, *Edwards* does not apply to any mental illness. It applies only to severe mental illnesses that leave a defendant "unable to conduct trial proceedings by himself." (*See id.*) As set forth below, the Court found this Defendant more than capable of carrying out the basic tasks of self-representation.

On November 25, 2016, the Court concluded that "Defendant is competent to stand trial under the standards set forth in 18 U.S.C. § 4241" as a matter of law. (Dkt. No. 656 at 22.) That conclusion is the law of the case. The only factual questions before the Court at the January 2, 2017 competency hearing were whether Defendant's mental condition had changed since November 22, 2016 in a way rendering him presently 1) incompetent to stand trial or 2) competent to stand trial but incompetent to represent himself.

Immediately after Standby Counsel again moved to challenge Defendant's competence to stand trial, the Court reappointed Dr. Ballinger to examine Defendant. Dr. Ballinger examined Defendant for five hours over two days, and reported his conclusions to the Court in a written report and through oral testimony. He stated Defendant was fully cooperative and that his examination was sufficiently thorough. (Dkt. No. 880 at 22–23; Dkt. No. 858 at 21–22.) After

-8-

reexamining Defendant, Dr. Ballenger's opinions did not materially change from those expressed in his first competency report issued in November 2016. (Dkt. No. 880 at 23; Dkt. No. 858 at 21–22.) Dr. Ballenger found no material change in Defendant's competency to stand trial or to represent himself, other than a reduction in anxiety attributable to Defendant's greater exposure to courtroom proceedings. (Dkt. No. 880 at 23; Dkt. No. 858 at 21–22.)

Dr. Ballenger believes, within a reasonable degree of medical certainty, that Defendant has the ability to cooperate with Standby Counsel if Defendant were to choose to do so, and that Defendant's decision not to do so is rational when viewed from within the framework of Defendant's political ideology. (Dkt. No. 880 at 24–39.) Dr. Ballenger reports that Defendant sees little difference between life in prison followed by natural death and life in prison followed by execution, and so Defendant seeks to preserve his reputation even at the cost of having the death penalty imposed. (*Id.* at 26, 37.) His goal is not to avoid the death penalty, but to express his political ideology and to preserve his reputation within the context of that ideology. Defendant has been "completely consistent" in seeking to preserve "his primary racial prejudice . . . as the sole rationale for his crimes." (Dkt. No. 858 at 17.)

Defendant gave Dr. Ballenger "very logical reasons" regarding specific concerns Standby Counsel raised. Defendant is concerned about his clothing because of the high-profile nature of the trial, and not because of an autistic concern for textile textures. (*Id.* at 18.) Defendant admits he has social anxiety that causes him to care, more than most, about what people think of him and about how he appears in photographs. Dr. Ballenger does not believe this issue pertinent to competence. (Dkt. No. 880 at 37.) Defendant asserts that he stared at the floor to hide any emotional response to the intensity of the testimony in the guilt phase of his trial. (*Id.* at 38–39.) He also asserts that he often smiles as way of coping with stress. (Dkt. No. 858 at 8.) Dr. Ballenger

found Defendant's explanations to be more credible than Standby Counsel's suggestion that those behaviors evidenced severe mental illness rendering Defendant incompetent to stand trial or to defend himself.

Dr. Ballenger's opinion of Defendant's mental state, however, has changed in three respects. First, he finds Defendant's anxiety in conducting courtroom proceedings has reduced markedly because he has gained experience with those proceedings. (Dkt. No. 880 at 23.) That improvement was expected. (*Id.*) Second, Dr. Ballenger's original report should have indicated that schizoid personality disorder was not a diagnosis but a possible diagnosis. (*Id.* at 77–78.) Third, Dr. Ballenger conceded under cross-examination by Defendant that avoidant personality disorder is a possible alternative diagnosis. (*Id.* at 76–77.)

Defendant's elicitation of an alternative diagnosis from Dr. Ballenger is worth describing in detail as example of his competence to conduct court proceedings. Dr. Ballenger had earlier testified, under cross-examination by Standby Counsel, that magical thinking "is required for the schizoid personality disorder diagnosis." (*Id.* at 66.) Defendant disputes the possibility of a schizoid personality disorder diagnosis, so when, after Standby Counsel's cross-examination, Defendant proceeded to cross-examine Dr. Ballenger, he had the following exchange with him.

> [Defendant] Right. And I know David [Bruck] asked you, but can you think of any—can you try to remember what the other examples of magical thinking were?
>
> [Dr. Ballenger] Well, my memory is not a whole lot better than it was a few minutes ago. Do you remember what I asked you?
>
> Q. Well, I don't think there is any magical thinking?
>
> A. But the—I did offer another possibility. I don't think I stopped at one. What was the other one?
>
> Q. I know we talked about the clouds moving fast, but that was related to psychosis.
>
> A. Yeah, that's right, I didn't think that. See your memory is not as bad as mine.

Q. I guess my question, though, is you said that even that example of magical thinking is only—it's not—it's possible magical thinking, right?

A. Correct.

Q. And my question is, if the magical thinking is only a possibility, then would—wouldn't avoidant personality disorder be a safer diagnosis?

A. Yes. I think you've got a good point, that of those two possibilities—remember I amended my report by saying "rule out." Yes, you've raised a good point, that maybe avoidant is better, I would have to go back and study between the two. My point that I made right after that with Mr. Bruck is that I don't think that differential has any importance in the question of whether you are competent to stand trial.

(*Id.* at 76–77.)

Standby Counsel presented testimony from one mental health expert, Dr. Loftin, an expert in autism. Dr. Loftin has diagnosed Defendant with autism spectrum disorder and attenuated psychosis[1] (or, rather, states that she feels that is "an appropriate diagnosis"). Dr. Loftin did not offer an opinion regarding competency. (*Id.* at 101–03.) To the extent that there is any conflict between Dr. Ballenger's opinion that Defendant is competent and Dr. Loftin's opinion, the Court credited Dr. Ballenger's opinion on Defendant's competency for three reasons. First, Dr. Loftin has not met with Defendant since November 22, 2016. (Dkt. No. 832-1 at 3.) Her opinions of changes in behavior since then are based on observations of two recordings of video calls between Defendant and his family. (Dkt. No. 880 at 99–100.) The Court found she has insufficient factual basis for opinions regarding any change in Defendant's competency status since November 22,

---

[1] Attenuated psychosis, once known as psychosis risk syndrome, is not a mental disorder diagnosis in DSM-V. It is a condition characterized by subthreshold psychotic symptoms, and is listed in DSM-V Section III as a condition for further study with "insufficient evidence to warrant inclusion as official mental disorder diagnoses" that is not intended for clinical use. It is also a presentation that can be specified using the "other specified schizophrenia spectrum and other psychotic disorder" category provided in DSM-V Section II. DSM-V, 298.8. That category applies to clinically significant symptoms that "do not meet the full criteria for any disorder in the schizophrenia spectrum and other psychotic disorders diagnostic class." *Id.* It is used "to communicate the specific reason that the presentation does not meet the criteria for any specific schizophrenia spectrum and other psychotic disorder." *Id.*

2016. (*See id.* at 100.) Second, Dr. Ballenger has examined Defendant regarding competence for approximately 13 hours in total. (*Id.* at 14.) Dr. Loftin has examined Defendant for approximately 19 hours in total, but she has never examined him since the issue of his competence was first raised. (*See* Dkt. No. 832-1 at 3.) The Court therefore found his clinical diagnoses more credible.

Third and finally, Defendant's effective cross-examination of Dr. Loftin raised concerns about the thoroughness of her evaluation of the videos of Defendant's familial visits. Dr. Loftin's never examined Defendant after November 22; her opinions regarding changes in Defendant's mental status were based on records of two videophone calls between Defendant and his family members. (Dkt. No. 880 at 99–100.) Defendant's mother had suffered a heart attack on the first day of trial, and Dr. Loftin was very concerned that Defendant did not ask her about her health during his videophone call with her.

> [Standby Counsel] All right. And then you finally listed perspectives in deficit— deficits in perspective. Can you explain what you meant by that and give examples?
>
> [Dr. Loftin] I think this one is the most important. This is kind of a key deficit when we are talking about autism spectrum disorder. This is the most important one to really understand. In difficulty taking another person's point of view, means that the individual cannot suppress his own thinking, his own point of view, his own concerns long enough to put himself in another person['s] shoes, think from other person's perspective, think what that person might be thinking or feeling, and do that in a way that is reasonably accurate. None of us is 100 percent, but—
>
> Q. And what was the example that you noticed in this video?
>
> A. It's very striking in this video, and actually hard to watch. You know, in this video, it's the first time Mr. Roof has seen his mother since she had a heart attack in the courtroom. And she's coming in and, finally, you know, there they are alone, and she says, you know, "Why did you bring me here?" You know, "What do you need?" And you—you can tell from her perspective, she thinks he's summoned her. He needs something from his mother. She looks very expectant.
>
> And he says, you know, "Did you find the sweater," and he goes on to talk about the ribbed pants. He's missing all these emotional cues in the situation, and he's focusing on those aspects that he's concerned about.
>
> . . .

> A. I think a naïve person who didn't understand autism would think that he's being cold or distant toward his mother, or maybe that he didn't care.
>
> Q. What you are seeing here is a symptom of autism?
>
> A. Absolutely.

(*Id.* at 148–49, 151.)

But Defendant's cross-examination of Dr. Loftin revealed her key example of what she repeatedly described as Defendant's "most important" cognitive deficit to be a simple mistake.

> [Dr. Loftin] The bigger picture is your mother, who you hadn't seen for a couple of weeks, had had a heart attack, and this is the first time you have seen her. You don't ask after her health, but rather you spend several minutes asking detailed questions about your clothing for court and her—what stores she went to, whether she saw regular gray pants or whether the gray pants had flecks. Those are details that kept you from talking about what other people would say would be the most important communication to have in that moment.
>
> . . .
>
> [Defendant] Were you aware that I had had a conversation with my mom on the telephone before that video visit where I did ask her about her heart attack?
>
> A. No, but that is your first time seeing her in person is my understanding.[2]
>
> Q. Don't you think that the lawyers might have provided you the phone call? Don't you think they should have?
>
> A. Maybe. I don't know. I can't review every piece of information.

(*Id.* at 160, 162.)

As noted above, Dr. Loftin did not have much information to review—certainly not enough to provide a credible basis for an opinion regarding changes in Defendant's condition since November 22, 2016. And assuming, *arguendo*, Dr. Loftin is correct that Defendant is autistic, nothing suggested his autism now prevents him from understanding the proceedings or assisting with his defense. As Dr. Ballenger testified, "there is also a wide spectrum of people with autism

---

[2] Defendant did not see her "in person." Defendant spoke with her via videophone.

spectrum disorder ranging from people who never speak to one of the experts . . . hired to testify in this trial and evaluate Mr. Roof [referring to John Robison, an autistic person who holds university academic appointments]. That is really the question, and Mr. Roof is much closer to Mr. Robison in his difficulties than he is to anybody on the other end in my opinion." (*Id.* at 59–60.)

Standby Counsel also submitted written reports from Dr. Paul Moberg, Dr. Debra Maddox, and Mr. John Robison. Dr. Moberg is a neurologist who diagnosed Defendant with "mild frontal system dysfunction" that could be expected to produce deficits that are components of psychosis spectrum disorders. (Dkt. No. 832-2 at 11.) He also noted Defendant's lack of acute psychotic and mood episodes precludes a more specific psychosis diagnosis. (*Id.* at 12.) Dr. Maddox testified at length at Defendant's first competency hearing. She had diagnosed him with autism spectrum disorder and attenuated psychosis, and asserted that he cannot assist counsel with his defense, but she did not question his competence to stand trial until Defendant objected to mental health mitigation evidence. (Dkt. No. 707 at 107–08.) She did not reevaluate Defendant after that first hearing. Mr. Robison is an autistic author and advocate for the autistic who once met briefly with Defendant, before the issue of competency was raised. His report offers lay speculation regarding the videos of Defendant's familial visits that is not probative of any issue before the Court.

Standby Counsel's final witness was the Reverend John Parker III. Priest Parker has met with Defendant approximately one hundred times since his arrest, attempting to move Defendant away from his extreme ideology. (Dkt. No. 880 at 172, 178.) He believes Defendant must have a significant mental health issue because otherwise he would be "an irredeemable monster." (*Id.* at

190.) Priest Parker's testimony was powerful, but not probative of Defendant's competence to stand trial.

At the end of the competency hearing, the Court directly examined Defendant. Defendant again confirmed his desire to waive his right to counsel and to represent himself. (*Id.* at 213–14.) He acknowledged that if he presents no mitigation witnesses, he is at high risk of receiving the death penalty. (*Id.* at 202.) He nonetheless confirmed his intention to present no mitigation witnesses. (*Id.*) However, he did not state an intent to present no defense. Rather, he stated his intent to present opening and closing statements. (*Id.* at 207.) He said he would not cross-examine victim-impact witnesses because that would be counterproductive and in his view inappropriate. (*Id.* at 206; *see also* Dkt. No. 848 at 12.)

Defendant acknowledged that if he is sentenced to death, there is a high probability that he will be put to death. (Dkt. No. 880 at 202.) He denied having any beliefs that white nationalists will rescue him from the death penalty, or that smiling or crying would rescue him from the death penalty. (*Id.* at 201–02.) He agreed with Dr. Ballenger's observation that his goal is not to avoid the death penalty but to protect his ideological motives for his crimes, which he believes a mental health mitigation defense would bring into question. (*Id.* at 202–03.) He elaborated, that "nobody likes me, including other white nationalists, but in my view, what my lawyers wanted to do is—I have like a corpse of a reputation, and they want to burn it. You see, they just want to—I already don't have a reputation, and then they just want to make it worse." (*Id.* at 203.)

Defendant, however, does not agree that he is defending his ideology by concealing his actual mental health issues. He is "not opposed to a diagnosis if it's true." (*Id.* at 208.) Defendant believes he does have social anxiety disorder and avoidant personality disorder. (*Id.*) But he believes the specific diagnoses Standby Counsel want present to the jury as mitigation suffer from

"just the basic issues that it's not true." (*Id.*) In other words, Defendant does not want to impugn his true motives with what he believes is a fictional mental health defense that is nothing more than a clever stratagem to avoid the death penalty. Defendant stated that he is unashamed and unremorseful for his crimes, though he demurred that "it's a little bit strong to say" he is proud of them. (*Id.*) In Defendant's view, he is a jihadist for white supremacy who is being held as a political prisoner. (*Id.* at 209.) "[I]f you are unable to understand, then you assume I have a mental illness." (*Id.* at 211.)

## IV. Findings of Fact and Conclusions of Law

Based upon the foregoing and upon the Court's close and careful observations of Defendant's behavior during courtroom proceedings since November 22, 2016, the Court made the following findings of fact by a preponderance of the evidence.

1. There has been no material change in Defendant's mental health since the November 21–22, 2016 competency hearing.

2. After the November 21–22 competency hearing, the Court found that Defendant's mental health diagnoses were limited to Social Anxiety Disorder, possible Autistic Spectrum Disorder, Mixed Substance Abuse Disorder, depression by history, and Schizoid Personality Disorder. The Court now finds that Defendant's diagnoses are limited to Social Anxiety Disorder, possible Autistic Spectrum Disorder, Mixed Substance Abuse Disorder, depression by history, possible Schizoid Personality Disorder, and possible Avoidant Personality Disorder. That slight change in diagnoses is due to Dr. Ballenger's clarification of his first report regarding Schizoid Personality Disorder and to a concession Defendant elicited from Dr. Ballenger on cross-examination. It is not due to any material change in Defendant's mental state since November, and it is immaterial to Defendant's competency to stand trial or to represent himself.

-16-

3. Defendant has a reasonable and sufficient understanding of the proceedings, including the possible imposition of the death penalty. He fully understands that he faces a high risk of a death sentence if he presents no mitigation witnesses, and he understands that he faces a high risk of execution if sentenced to death.

4. Defendant's continued resistance to mental health mitigation evidence continues to arise out of his political ideology, rather than any form of mental disease or defect. Defendant does not resist mental health mitigation evidence because he feels embarrassed by mental health issues, but because he believes the particular mental health diagnoses Standby Counsel would present to the jury are untrue and that the assertion of untrue mental health issues would impugn his true ideological motives.

5. Defendant's social anxiety, possible autism, and other diagnoses or possible diagnoses do not prevent him from understanding the proceedings or assisting counsel with his defense. Nor do they prevent him from performing tasks necessary to present his own defense without the help of counsel. Defendant is fully able to address the Court, to address the jury, to question witnesses, and to raise timely objections. Defendant's cross-examinations of Dr. Ballenger and Dr. Loftin demonstrated an aptitude for witness cross-examination that is extraordinary for a *pro se* litigant.

Based upon the foregoing, the Court concluded the following as matters of law.

1. Defendant does not suffer from any mental disease or defect that renders him unable to understand the nature and consequences of the proceedings against him.

2. Defendant does not suffer from any mental disease or defect that renders him unable to assist properly in his defense.

3. Defendant is competent to stand trial under 18 U.S.C. § 4241.

4.  Defendant does not suffer from any severe mental illness to the point where he is not competent to conduct trial proceedings by himself.

## V. Conclusion

For the foregoing reasons, the Court denied Defendant's second motion challenging his competency to stand trial (Dkt. No. 832) and Defendant's motion challenging his competence to self-represent (Dkt. No. 847).

                                                                         _____
                                                                         Richard Mark Gergel
                                                                         United States District Court Judge

January 18 2017
Charleston, South Carolina