IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

UNITED STATES OF AMERICA          :          VOLUME I
                                  :
          vs.                     :
                                  :
DYLANN STORM ROOF                 :          2:15 - CR - 472


          Trial commences in the above matter on Wednesday,

December 7, 2016, commencing at 10:21 a.m., before the

Hon. Richard M. Gergel, in the United States Courthouse,

Courtroom VI, 85 Broad St., Charleston, South Carolina,

29401.


APPEARED ON BEHALF OF THE UNITED STATES:

  JAY N. RICHARDSON, ESQ., 1441 Main St., Columbia, SC.

  NATHAN WILLIAMS, ESQ., P.O. Box 978, Charleston, SC.

  STEPHEN J. CURRAN, ESQ., 601 D Street, NW, Washington, DC.


APPEARED ON BEHALF OF THE DEFENSE:

  DAVID I. BRUCK, ESQ., Washington & Lee School of Law,
  Lexington, VA.

  KIMBERLY C. STEVENS, ESQ., 1070-1 Tunnel Rd., Asheville, NC.

  EMILY PAAVOLA, ESQ., 900 Elmwood Ave., Columbia, SC.


          REPORTED BY DEBRA L. POTOCKI, RMR, RDR, CRR
        Official Court Reporter for the U.S. District Court
                        P.O. Box 835
                   Charleston, SC  29402
                      843/723-2208

2

1                        I N D E X

2

   WITNESS:  FELICIA SANDERS
3
   Direct Examination by Mr. Richardson...................... 49
4  Cross-Examination by Mr. Bruck........................... 89

5
   WITNESS:  JUSTIN KNIESS
6
   Direct Examination by Mr. Williams....................... 90
7

8  WITNESS:  DAVID STEWART

9  Direct Examination by Mr. Williams...................... 114

10
   WITNESS:  ANDREW DELANEY
11
   Direct Examination by Mr. Williams...................... 122
12

13 WITNESS:  EDWARD HENDERSON

14 Direct Examination by Mr. Williams...................... 129

15
   WITNESS:  JOHN LITES
16
   Direct Examination by Mr. Williams...................... 139
17 Cross-Examination by Ms. Stevens........................ 151

18
   WITNESS:  JAMES JACQUES
19
   Direct Examination by Mr. Curran........................ 152
20

21

22
   EXHIBITS:                    Received in Evidence
23
   Government Exhibits 11-19              58
24 Government Exhibit 20                 99
   Government Exhibit 21                105
25 Government Exhibit 22                108

1          (Jury not present.)

2               THE COURT:  Any matters to be raised with the Court

3     before we bring in the jury?

4               MR. RICHARDSON:  Nothing from the Government, Your

5     Honor.

6               MR. BRUCK:  Nothing from the defendant.

7               THE COURT:  Mr. Cargill, bring in the jury.

8          (Jury present.)

9               THE COURT:  Miss Ravenel, will you please administer

10    the juror oath.

11         (Jury was duly sworn by the courtroom deputy.)

12              THE COURT:  Good morning.  Ladies and gentlemen of

13    the jury, I will now give you some preliminary instructions to

14    guide you in your participation in this trial.  First let me

15    discuss with you your duties to find fact and to follow the

16    law.

17         It will be your duty to find the facts from all of the

18    evidence in the case.  To those facts, you must apply the law

19    as I give it to you at the conclusion of the trial.  You must

20    follow the law as I give it to you, whether you agree with it

21    or not.  And you must not be influenced by any personal likes

22    or dislikes, opinions or sympathy.  That means you must decide

23    the case solely on the evidence before you and according to

24    the law.

25         You must not read into anything I may say or do during the

1    course of the trial, any suggestion as to what the verdict

2    should -- you should return.  That is a matter entirely for

3    you, the jury, to decide.

4        Let's talk about different kinds of evidence.  The

5    different types of evidence which may be presented to you in

6    this case and from which you are to decide the facts consist

7    of the following.  First, the sworn testimony of witnesses,

8    both on direct and cross-examination, regardless of who calls

9    the witness.  Here's the witness chair right here, and you

10   will hear it from there.  I guess all of you have actually

11   been in the witness chair yourselves, so you may have some

12   sympathy there for that.

13       A second form of evidence are the exhibits that will be

14   received into evidence, and third, any facts to which all the

15   parties will agree or stipulate, and I will make it clear what

16   those are.

17       Let's talk about what is not evidence.  You may consider

18   only the testimony and exhibits received into evidence.

19   Certain things are not evidence and you may not consider them

20   in deciding what the facts are.  I will list some of these for

21   you.

22       First, arguments made in the opening statement and closing

23   argument are not evidence.  Only testimony from the witness

24   stand, exhibits which are received into evidence and

25   stipulations of the parties are evidence.  What is stated in

opening statement and closing argument are intended to help

you interpret the evidence, but they are not evidence.  If the

facts offered at trial differ from what is stated in the

opening statements or closing arguments, the facts offered at

trial control.

Secondly, questions and objections are not evidence.

Objections often made challenging the admissibility of the

evidence are a normal and proper part of any criminal trial,

and you should not be influenced in any way by the fact that

an objection is made by any party.  You'll hear it, they'll

say objection, and I will -- if I can, I will take up that

objection in your presence.  Usually I understand what it is

and I know the law and I apply it.  Every once in awhile I

will have to send you out because it's just too complicated to

address in your presence, but I'm going to try to minimize

those.

Another area which is not evidence is testimony that may

be excluded or stricken, or that you may be instructed to

disregard.  I'll make that very clear if that should arise,

because that is not evidence and must not be considered.

In addition, if testimony or exhibits are received only

for a limited purpose, I'll make that very clear to you, and

that should -- you should only consider the evidence for that

limited purpose.

Anything you may see or hear when the Court is not in

1    session is not evidence.  You are to decide the case solely on

2    the evidence received at trial.

3        Let's talk about direct and circumstantial evidence for

4    just a moment.  There are two kinds of evidence, direct and

5    circumstantial.  Direct evidence is direct proof of a fact,

6    such as the testimony of an eyewitness.  Circumstantial

7    evidence is indirect evidence, that is, proof of a chain of

8    facts from which you could find that another fact exists, even

9    though it has not been proven directly.

10        It is for you to decide whether a fact has been proven by

11    circumstantial evidence.  In making that decision, you must

12    consider all of the evidence in light of reason, common sense

13    and experience.

14        You're entitled to consider both kinds of evidence, direct

15    and circumstantial.  The law permits you to give equal weight

16    to both, but it is for you to decide how much weight to give

17    any evidence.

18        Let me address for a moment the credibility of witnesses.

19    In deciding what the facts are, you must consider all the

20    evidence.  In doing this, you must decide which testimony to

21    believe and which testimony not to believe.  You may

22    disbelieve all or any part of any witness' testimony.  In

23    making that decision, you may take into account a number of

24    factors.  Let me give you a few examples when you're trying to

25    weigh credibility.  Was the witness able to see or hear or

1   know the things about which that witness is testifying?  How

2   well is the witness able to recall and describe those things?

3   What is the witness' manner while testifying?  Does the

4   witness have an interest in the outcome of the case or any

5   bias or prejudice concerning any party or any matter involved

6   in the case?  How reasonable is the witness' testimony

7   considered in light of all of the evidence?  And was the

8   witness' testimony contradicted by what that witness has said

9   or done at another time or by the testimony of other witnesses

10  or by other evidence?

11      In deciding whether or not to believe a witness, keep in

12  mind that people sometimes forget things.  You need to

13  consider whether a contradiction is an innocent lapse of

14  memory or an intentional falsehood, and that may depend on

15  whether it has to do with an important fact or with only a

16  small detail.

17      In the end, you, the jury, must decide whether to believe

18  a witness' testimony.  And you may use some of the factors

19  I've just mentioned in helping you make that decision.

20      Let me talk to you a moment about the demeanor of

21  nonwitnesses not being evidence.  A person's conduct and

22  demeanor when not on the witness stand is not evidence,

23  because there is no way to determine, other than really by

24  speculation, why the person acts or appears as he or she does.

25  This applies to me and it applies to the defendant and to the

1    attorneys as much as to any witness.  You may not, therefore,

2    treat as evidence the conduct and demeanor of the defendant in

3    the courtroom, nor the conduct and demeanor of his counsel or

4    Government counsel, the Court or courtroom spectators.  It's

5    really what comes from that witness stand, the exhibits and

6    the stipulated facts.

7         Let me address an important issue, which is burden of

8    proof.  The defendant is presumed innocent, and it is the

9    burden of the Government to prove him guilty beyond a

10   reasonable doubt on each of the counts brought against him.

11   The defendant has nothing to prove.  He carries no burden of

12   proof at all.  If the Government fails to prove the defendant

13   guilty beyond a reasonable doubt on any particular count, you

14   must find the defendant not guilty on that particular count.

15        While the Government's burden of proof is a strict or

16   heavy burden, it is not necessary that the defendant's guilt

17   be proven beyond all possible doubt.  It is required that the

18   Government's proof exclude any reasonable doubt concerning the

19   defendant's guilt.  Because the Government has the burden of

20   proving the defendant guilty beyond a reasonable doubt, the

21   defendant has no duty to call witnesses or to testify.  The

22   constitution affords every defendant the right to silence,

23   and, in the event the defendant elects not to testify, no

24   inference or suggestion of guilt should be drawn from his

25   exercise of his constitutional right to silence.

1          Now let me talk to you briefly, provide you some brief

2     instructions on the law.  And I will provide you, at the end,

3     a far more detailed instruction on the law, but I wanted to

4     give you a broad outline of what the pending counts are

5     against the defendant.

6          In this case the defendant is charged with violations of

7     the various provisions of federal criminal law in a 33 count

8     indictment.  An indictment contains only allegations against

9     the defendant.  As I have mentioned, the Government carries

10    the burden of proving each count in the indictment beyond a

11    reasonable doubt.  The indictment charges as follows.

12         Counts one through nine are alleged violations of the Hate

13    Crime Act resulting in death.  And it alleges that on or about

14    June 17, 2015, in the District of South Carolina, the

15    defendant, Dylann Storm Roof, willfully caused bodily injury

16    to the following victims because of their actual and perceived

17    race and color.

18         Those victims are as follows.  The Reverend Sharonda

19    Coleman Singleton, Cynthia Hurd, Susie Jackson, Ethel Lee

20    Lance, Reverend Depayne Middleton Doctor, Reverend Clementa

21    Pinckney, Tywanza Sanders, Reverend Daniel Simmons, Senior,

22    Myra Thompson.

23         The indictment charges that the offenses resulted in the

24    death of each of the individuals in counts one through nine,

25    all in violation of Title 18 of the United States Code Section

1  249(a)(1).

2      Counts ten through 12 allege hate crime involving an

3  attempt to kill.  And it alleges that on or about June 17,

4  2015, in the District of South Carolina, the defendant,

5  through the use of a firearm, a Glock model 41 .45 caliber

6  pistol, attempted to cause bodily injury to the following

7  victims because of their actual and perceived race and color.

8  KM, a minor; Felicia Sanders; Polly Sheppard.

9      The indictment charges that the offenses include an

10  attempt to kill each of the victims in counts ten through 12,

11  all in violation of Title 18 United States Code Section

12  249(a)(1).

13      Counts 13 through 21 address obstruction of the exercise

14  of religion resulting in death.  That's the allegation.  And

15  it alleges that on or about June 17, 2015, in the District of

16  South Carolina, the defendant intentionally obstructed, by

17  force, each victim listed, in the enjoyment of that victim's

18  free exercise of religious beliefs.  Those included Reverend

19  Sharonda Coleman Singleton, Cynthia Hurd, Susie Jackson, Ethel

20  Lee Lance, the Reverend Depayne Middleton Doctor, the Reverend

21  Clementa Pinckney, Tywanza Sanders, the Reverend Daniel

22  Simmons, Senior, Myra Thompson.

23      The indictment charges that the violations listed in

24  counts 13 through 21 resulted in the death of each victim and

25  were in and affected interstate commerce, all in violation of

1    Title 18 United States Code Section 247(a)(2) and 247(d)(1).

2    Counts 22 through 24 allege obstruction of the exercise of

3    religion involving an attempt to kill and the use of a

4    dangerous weapon.  And it alleges, the indictment alleges that

5    on or about June 17, 2015, in the District of South Carolina,

6    the defendant intentionally obstructed by force and threat of

7    force, each victim listed, in the enjoyment of that victim's

8    free exercise of religious beliefs and attempted to do so.

9    Those victims:  KM, a minor; Felicia Sanders; Polly Sheppard.

10   The indictment charges that these acts included an attempt

11   to kill each of the victims in counts 22 through 24, involved

12   the use of a dangerous weapon, a Glock model 41 .45 caliber

13   pistol, and were and affected interstate commerce, all in

14   violation of 18 United States Code 247(a)(2), 247(d)(1) and

15   247(d)(3).

16   Finally, counts 25 through 33 allege the use of a firearm

17   to commit murder during and in relation to a crime of

18   violence.  On or about June 17, 2015, in the District of South

19   Carolina, the defendant knowingly used and discharged a

20   firearm, a Glock model 41 .45 caliber pistol, during and in

21   relation to a crime of violence for which he may be prosecuted

22   in a court of the United States, and caused the death of nine

23   victims through the use of a firearm in such a manner as to

24   constitute murder as defined in 18 United States Code 1111, in

25   that the defendant, with malice aforethought, did unlawfully

1    kill each of the following victims with a firearm.  The

2    Reverend Sharonda Coleman Singleton, Cynthia Hurd, Susie

3    Jackson, Ethel Lee Lance, the Reverend Depayne Middleton

4    Doctor, the Reverend Clementa Pinckney, Tywanza Sanders, the

5    Reverend Daniel Simmons, Senior, and Myra Thompson, all in

6    violation of Title 18 United States Code Section 924(c)(1)(A),

7    924(c)(1)(C) and 914(j)(1).

8        Ladies and gentlemen, the defendant has pled not guilty to

9    these charges.  I will give you detailed instructions on the

10   law at the end of the case, and those instructions will

11   control your deliberations and decisions.

12       Let me talk to you a little bit about the conduct of the

13   jury.  You, as jurors, must decide this case based solely on

14   the evidence presented here within the four walls of this

15   courtroom.  This means that during the trial you must not

16   conduct any independent research about this case.  Let me

17   repeat that sentence.  You may not conduct any independent

18   research about this case.  In other words, you should not

19   consult dictionaries or reference materials, search the

20   internet, website, blogs, or use any other electronic tools to

21   obtain information about this case or to help you decide this

22   case.  Please do not try to find out information from any

23   source outside of the confines of this courtroom.

24       Until you retire to deliberate, you may not discuss this

25   case with anyone.  And here's an interesting rule we have.

1    Even your fellow jurors.  Why would we do that?  This is

2    because you should keep an open mind until you have heard all

3    the evidence and the Court's charge on the law.  After you

4    retire to deliberate, you may begin discussing the case with

5    your fellow jurors, but you can not discuss the case with

6    anyone else until you have returned a verdict and the case is

7    at an end.

8        If anyone should try to talk to you about the case, bring

9    it to my attention promptly.

10       I know that many of you use cell phones, smart phones, the

11   internet and other tools of technology.  You must also not

12   talk to anyone about this case or to use these tools to

13   communicate electronically with anyone about the case.  This

14   includes your family and friends.  You may not communicate

15   with anyone about the case on your cell phone, through e-mail,

16   iPhone, text messaging or on Twitter, through any blog or

17   website, through any internet chatroom or by way of any other

18   social networking sites, including FaceBook, My Space, Linked

19   In and You Tube.  Many of those I have to consult my children

20   to know to give you those sources.

21       I do not presently intend to sequester the jury.  However,

22   I will reconsider this decision if I become concerned that

23   jurors are being exposed to outside information.  And as I

24   mentioned to many of you as we did the individual voir dire,

25   you need to stay away from any media coverage about this.

1    Stay away from the paper, don't go in the room if the TV is on

2    with the news.  You're going to know better than anybody else,

3    first of all.  Any information you're going to hear otherwise

4    that's inconsistent is probably wrong anyway.  Stay away from

5    it.  Can y'all assure me you can do that?

6        Finally, do not form any opinion until all the evidence is

7    heard.  Keep an open mind until you start your deliberations

8    at the end of the case.  If you wish, you may take notes, but

9    if you do, you must leave them on your chair when you leave at

10   the end of each day, and in the jury deliberation room at the

11   end of the trial.  Also, remember that these notes are for

12   your personal use only.  They are not to be given or read to

13   anyone else.  That is, during deliberations you can refer to

14   your notes and help you remember, but don't show it to anyone

15   else to try to prove a fact.  These are for your use.  And

16   because you're going to be leaving your pads, in just a minute

17   Miss Ravenel will give you the pads, put them down, and each

18   day keep your same seat.  You'll return and they'll be there,

19   believe me, there's no place more secure than this courthouse,

20   no one will take your notes or look at them.

21       Now let me discuss for just a moment the partial waiver of

22   counsel.  During jury selection I discussed with some of you

23   the fact that the defendant had chosen to represent himself.

24   Since then, the defendant has requested that his counsel

25   assist him for the guilt phase of the trial only.  He still

1    plans to represent himself at the sentencing phase of his

2    trial, should he be convicted of one or more capital counts.

3    He has a constitutional right to represent himself.  He also

4    has a constitutional right to have the assistance of counsel.

5    Neither the fact that he is now represented by counsel nor his

6    decision to represent himself at the sentencing phase of his

7    trial, if there is one, should weigh against him in any

8    respect.

9        Let me give you a little forecast in terms of the course

10   of the trial, the structure of the trial.  The trial will now

11   begin, as soon as I complete my opening charge.  First, each

12   side has the right, but not the obligation, to make an opening

13   statement.  The Government, since it carries the burden of

14   proof, has the right to make the first opening statement.  The

15   defendant then has a right to make an opening statement, to

16   defer his opening statement until after the Government rests

17   its case, or to make no opening statement at all.

18       Once the initial opening statements have been made, the

19   Government will present its witnesses, and the defendant has

20   the right to cross-examine them.  After the Government rests,

21   the defendant has a right, but not the obligation, to offer

22   evidence.  As I mentioned earlier, the defendant has nothing

23   to prove, and begins the trial with a presumption of

24   innocence.  The Government carries the burden of proving the

25   defendant guilty on each count beyond a reasonable doubt.

1    After the parties have rested, they have the right, but

2    not the obligation, to make closing arguments.  After closing

3    arguments, I will give you instructions on the law.  You will

4    then deliberate on whether the defendant is guilty or not

5    guilty regarding each count charged.

6    Any duty of the jury to address sentencing will arise, if

7    it all, at a later phase of the trial.

8    Finally, let me share with you my plan regarding

9    scheduling.  We begin each morning around 9:30 a.m.  I try to

10    take a break every one and a half hours.  That varies just a

11    little bit, where we are with a witness and that type of

12    thing, but -- and we will take a one-hour lunch break.  To

13    avoid the necessity of you having to find lunch on your own in

14    downtown Charleston, it's never easy on the best of days, we

15    will have lunch brought in for you daily.

16    I plan to end court each afternoon between 5:00 and

17    6:00 p.m.; again, sort of where we are with a witness.

18    And if at any other time you need a break, if you'll just

19    signal one of my court security officers, we will try to

20    accommodate you.

21    Okay.  That is the Court's opening charge.  Is the

22    Government ready for opening statement?

23        MR. RICHARDSON:  We are, Your Honor.

24        THE COURT:  Please proceed.

25        MR. RICHARDSON:  May it please the Court.

1          The afternoon of June the 17th, 2015, was hot and muggy.

2     African-American parishioners gathered together at Mother

3     Emanuel on Calhoun Street here in Charleston.  They first had

4     a business meeting, a quarterly conference during which three

5     aspiring ministers were awarding their preaching certificates.

6          Twelve parishioners remained after the quarterly

7     conference.  They joined together for the weekly Wednesday

8     night Bible study.  This week they were studying Mark 4, the

9     parable of the sower.  It was Myra Thompson's first time

10    leading the Bible study.  With the help of her husband, she

11    was working to become an ordained minister.  Indeed, that

12    afternoon she was one of those who had received her preaching

13    certificate.  She had been working long hours and studying and

14    preparing to lead this constant group of parishioners that

15    joined every Wednesday night.  She was excited.  Her

16    enthusiasm and solicitation encouraged others to stay, to

17    stick around despite the Bible study's late start.

18         Among those that stayed unexpectedly was the Reverend

19    Clementa Pinckney.  Reverend Pinckney was Mother Emanuel's

20    pastor, its lead minister, but he was also a State Senator and

21    heavily involved in the community.  He had come to Mother

22    Emanuel that night with his wife, Jennifer, as well as his

23    youngest daughter, Malana.

24         During the quarterly conference and during the Bible study

25    that Reverend Pinckney remained for, Jennifer and her youngest

1    daughter stayed in the pastor's study.  The pastor's study was

2    separated from the fellowship hall where a conference and the

3    Bible study were to take place by a thin wall and a wooden

4    door.

5        Joining Myra and Reverend Pinckney at the Bible study

6    after the conference that night was the Reverend Daniel

7    Simmons, Senior.  Reverend Simmons was the group's weekly

8    leader, the Bible study's coordinator and organizer.  A

9    long-time AME minister, not just did he lead Bible study, but

10   he took it on himself to be a mentor and a spiritual guide to

11   those seeking to become ministers, including Myra.  Reverend

12   Simmons had a deep faith and a thorough understanding of his

13   religion.  He was a stern and vital part of the Mother Emanuel

14   family.

15       Another of Mother Emanuel's preachers also joined that

16   evening, the Reverend Sharonda Coleman Singleton.  To those

17   around her, Sharonda was a ray of sunshine, a moving preacher.

18   When she was not at the church, as she often was, or called

19   upon by other congregations and groups to speak to them, she

20   was a loving mother to her three children and a track coach at

21   Goose Creek High School.

22       They were also joined that evening by the Reverend Depayne

23   Middleton.  Depayne was an ordained Baptist minister.  She had

24   moved from the Baptist Church to the AME Church earlier in

25   2015.  She was now seeking to become an ordained AME minister.

1    Like Myra, she had received her preaching certificate just

2    that afternoon.  Depayne was most often seen at Mother Emanuel

3    with her four daughters; indeed, often seen walking into Bible

4    study on Wednesday nights, each carrying a milkshake.  Depayne

5    had come straight from work that Wednesday night, because she

6    was going to the conference to get her preaching certificate,

7    and as a result, her four daughters were not with her.

8        Cynthia Hurd joined that night.  Cynthia Hurd had come to

9    the church that Wednesday afternoon to drop something off with

10   the church office.  Convinced by her friendship and love for

11   the group of the people that were there, the excitement they

12   had for being there, she stayed.  Cynthia was a loving wife

13   and sister and served our community as an engaged and

14   committed librarian.

15       Another of the regulars at the Wednesday night Bible study

16   was Miss Ethel Lance.  Miss Ethel Lance was a loving mother

17   and grandmother, utterly devoted to Mother Emanuel, seemingly

18   always at the church, tending to its needs, cleaning and

19   taking care of what was there.  Miss Ethel was also a

20   recognizable usher on Sunday mornings, where she would always

21   be seen strutting through the church.

22       Another of the consistent members of that Wednesday night

23   Bible study was Miss Susie Jackson.  Miss Susie Jackson was

24   the mother to Walter, a proud matriarch of the entire Jackson

25   family, one of the largest families at Mother Emanuel.  She

was engaged with the senior citizens at Mother Emanuel and, despite being 87 years old, trudged up the stairs to the choir loft each and every Sunday morning to share her ministry through her spectacular singing voice.

They were also joined that evening by Tywanza Sanders, Miss Susie's nephew. Tywanza Sanders was a young man, a college graduate, a man just beginning to see the promise of an extraordinarily bright future. He was working multiple jobs. As he had gotten off work that night, as he did most Wednesday nights, he had come to Bible study at Mother Emanuel. He had come to join his mother, Miss Felicia Sanders.

Miss Felicia Sanders was there that Wednesday night as well. She was there, she often was with her 11-year-old granddaughter, devoted to Mother Emanuel. She was a friend, she was a caregiver to so many that were in need, she was a mother, and she was a loving wife to her husband, Tyrone.

The twelfth member that joined that Bible study that night was one of Myra's close friends. She was drawn in, in particular, by Myra's excitement and enthusiasm to be leading the Bible study that night for the first time. Miss Polly Sheppard. Miss Polly was a partner with Myra in ensuring the church continued to operate, a backbone of Mother Emanuel's operation. When she was not at the church helping Myra or others, Miss Polly was a life-long nurse, a mother to her four

1    boys, and a devoted wife to her husband, James.

2        As that group of 12 joined together that Wednesday night,

3    they welcomed a thirteenth person to the Bible study.  They

4    welcomed the defendant, Dylann Storm Roof.  He seemed to the

5    12 to be harmless, yet little did they know what a cold and

6    hateful heart he had.

7        They gathered together around four round tables in the

8    fellowship hall.  When the defendant walked in, the Reverend

9    Pinckney offered him a chair right beside him.  Gave the

10   defendant a Bible to read, a copy of the hand-out that Myra

11   had prepared for him to study.  They sat together for more

12   than half an hour as the parishioners discussed, debated and

13   read about the Good Word.

14       As the Bible study came to draw to a close, the

15   parishioners that were there stood, as they did each time, to

16   close their eyes and offer prayer.  It was at that moment, at

17   that point in time that the defendant made clear what he had

18   been planning for months.  He hadn't come to the Bible study

19   to hear the Good Word, he hadn't come to find the Lord, he

20   hadn't come to seek the help of so many that would have been

21   willing to provide it.  Instead of a Bible for study, the

22   defendant chose to bring a Glock .45 caliber pistol to that

23   hour of worship.

24       The choice to bring that .45 caliber pistol to Bible study

25   that night is not the only decision, not the only choice and

preparation that the defendant made in this race-based attack.
We'll show you the array of choices that he made in the months
leading to that fateful moment, the research he did on the
internet leading to his racist ideology, the efforts he went
to choose a target, ultimately settling on Mother Emanuel,
scouting Mother Emanuel in repeated trips, making a phone call
back in February of 2015 to the church and, just weeks before,
stopping and speaking with an African-American parishioner
about the times for Mother Emanuel's services.

Well aware of Mother Emanuel's significance in the
African-American community, he chose that church because of
the impact it would have, the manner in which it would
resonate across the nation.

He also prepared by buying the gun.  Back in April of 2015
he bought that Glock .45 caliber pistol.  He began stockpiling
ammunition, Winchester .45 caliber hollow point rounds.  He
bought additional magazines to carry all of the ammunition he
wanted to take in with him.

He mentally and physically prepared himself, conducting
target practice and getting himself in a state of mind where
he could do what he believed he had to do.

As the parishioners at Mother Emanuel gathered that
Wednesday afternoon, as they began the quarterly conference
and readied for Bible study that night, the defendant got in
his car and drove from Columbia, South Carolina, down to

1    Charleston, an hour and a half on the road considering where

2    he was going and what he was going to do.

3        Before the defendant entered the church that night, he had

4    loaded that .45 caliber pistol with 11 hollow point rounds in

5    the magazine.  But not just those 11 rounds.  He also loaded

6    seven additional magazines, pushing bullet after bullet into

7    magazine after magazine.  Eleven rounds in eight magazines.

8    Eighty-eight hollow point rounds intended for maximum impact.

9        After he had driven from Columbia to Charleston, he sat

10   outside Mother Emanuel in his car, contemplating.  He chose to

11   enter the religious sanctuary and sit with the parishioners

12   for half an hour, coldly considering what he was about to do.

13       And then that fateful moment.  As the 12 stood to offer

14   their prayers and close their eyes, the defendant pulled the

15   Glock .45 caliber pistol out of his pouch and pulled the

16   trigger.  Still seated in the chair that Reverend Pinckney had

17   provided to him, right beside him, he pulled the Glock .45

18   caliber pistol out and shot the church pastor, shot Reverend

19   Pinckney over and over again.

20       As other parishioners sought cover, dove under tables,

21   Reverend Simmons got up, attempted to get around the tables to

22   where the defendant and Reverend Pinckney were, only to be

23   stopped when the defendant trained a .45 on him and shot

24   Reverend Simmons again and again.

25       The defendant turned on the others, repeatedly pulling the

1    trigger of that Glock .45, feeling the recoil each time as it

2    fired.  As each magazine was emptied, shell casings tumbling

3    across the parish hall, he tossed the magazine aside and

4    loaded yet another into his Glock .45, standing over victim

5    after victim and shooting them repeatedly.

6        The defendant emptied an entire magazine of 11 rounds into

7    matriarch Susie Jackson's 87-year-old body.  He stood over

8    Myra Thompson on the night the first time leading to Bible

9    study and shot her repeatedly.  He executed the church's

10   caretaker, Miss Ethel Lance; its preacher, Sharonda

11   Coleman-Singleton; the community's librarian, Cynthia Hurd;

12   and aspiring minister and sweet vocalist, Depayne Middleton.

13       And the defendant continued with his assault.  Miss Polly

14   Sheppard could see his boots walking closer and closer to her.

15   Even all the while the shots continued to ring out.  As the

16   defendant reached the end of the row of tables, he found Miss

17   Polly doing what Miss Polly knew to do, praying out loud.  The

18   defendant told her to shut up.  Asked her whether she had yet

19   been shot, unaware of whether his assault had yet shot Miss

20   Polly.  When Miss Polly said no, she had not been shot, the

21   defendant explained that she would be the one.  He would leave

22   her alive to tell his story.  He would leave her alive to tell

23   the story of what he had done.

24       As this went on, Tywanza Sanders interjected, sensing

25   those he loved around him were still alive, he interrupted and

1   stood up to the defendant, even though he himself had already

2   been shot.  He told the defendant that he did not have to do

3   this.  We mean you no harm.  The defendant told him he did

4   have to do this.  He explained that y'all, y'all are raping

5   our white women, y'all are taking over the world.  He had to

6   kill them.  Then standing just feet away from Tywanza, already

7   wounded and lying on the ground, the defendant shot Tywanza

8   repeatedly.

9       Lying right next to her son as he was executed, Miss

10  Felicia Sanders.  She laid there clasping her 11-year-old

11  granddaughter, desperately trying to get her to be quiet,

12  desperately trying to keep her from making a sound.  Holding

13  her so tight she feared she would suffocate her.

14  Miraculously, in the hail of bullets that the defendant fired

15  that night, Miss Felicia, the granddaughter, were not harmed.

16  They lay playing dead on the blood-soaked floor between her

17  son and her Aunt Susie.

18      In the pastor's study, just off the fellowship hall where

19  the attack took place, Miss Jennifer Pinckney also huddled,

20  clasping to her six-year-old daughter underneath a desk,

21  seeking to avoid the gunfire, the gunfire that indeed pierced

22  the walls of the fellowship hall, but fortunately had not

23  found Miss Pinckney and her daughter.  They managed to escape

24  physical harm.

25      The defendant left behind a scene that nobody can fathom;

1    yet, he walked out calmly, looking both ways as he exited the

2    church side door, fully expecting law enforcement to have

3    responded to his horrific attack.  Yet as medical personnel

4    and law enforcement responded to the 911 calls and rushed to

5    the church, when the defendant walked out he was met with just

6    a deserted parking lot.  He took his still loaded Glock

7    .45 caliber pistol, got into his car and slipped away into the

8    night.

9        We will prove to you the defendant's attack was cold and

10   calculated, it was done with malice in his heart and in his

11   mind.  Racist retribution for perceived offenses against the

12   white race, just as he told Tywanza.  But not just retaliation

13   for perceived offenses; he hoped, he imagined that it would

14   agitate others, that it would cause unrest, that it would

15   deepen long-standing divisions, it would serve in the minds of

16   others as a catalyst for hate, division, distrust to take

17   hold.

18       We'll show you that this defendant didn't rely on Miss

19   Polly alone to tell the story of what he had done.  He didn't

20   just rely on what he told Miss Polly, what he said during his

21   attack.  He also wrote a manifesto.  He wrote a manifesto he

22   wanted to ensure was read across the world.  So months before

23   the attack, in February of 2015, he bought a website, posted

24   on a Russian internet server.  He named it LastRhodesian.com,

25   in reference to the formerly apartheid country of Rhodesia.

1          On the afternoon of June 17th, before he got in the car

2    and drove to Mother Emanuel, before he entered the church and

3    sat with the parishioners, he went to his father's house, he

4    sat at his father's computer and typed out his manifesto.  He

5    described in that manifesto his racist ideology.  He claimed

6    white superiority, suggesting blacks were merely stupid and

7    violent.  He expressed his wish that over our nation's history

8    that whites had actually treated blacks terribly; instead,

9    claiming segregation and slavery were not all that bad.  He

10   discussed black-on-white crime, claiming it to be a problem

11   ignored by Americans and by media.  He rejected American

12   patriotism, for he believed that America was not somewhere to

13   be proud of, and blacks were killing whites every day.

14         But his manifesto was not just retribution and

15   retaliation, it was a call to arms.  It included the belief

16   that it was not too late, in his mind, it was not too late to

17   take the country back from blacks.  But he explained we, we,

18   the whites, the white supremacists must not wait any longer to

19   take drastic action.

20         He concluded his manifesto by quoting from films, movies

21   that he liked.  He said, I see all these things going on

22   around me and I don't see anybody doing anything about it.  He

23   continued to say that even if his life, even if his life was

24   worth less than a spec of dust, he wanted to use it for the

25   good of society.  You'll learn the defendant's version of

using it for the good of society, the defendant's version of

doing something about it, the defendant's version of drastic

action was to execute good and innocent parishioners engaged

in worship because of the color of their skin.

Alongside this manifesto, alongside the written word that

he wanted to publish, the message he wanted to send, he also

published 60 photographs, a curated set of photographs that he

had selected from thousands that he had taken in the months

leading up to this attack.  He selected the 60 that conveyed

the message he wanted to convey.  The defendant posing with

the murder weapon in a variety of different ways.  The

defendant posing in various places and manners that suggested

and supported his racist hatred.  He stood, on the one hand,

holding a burning American flag, and on the other proudly

displaying a confederate one.  This website, this was the

message that he wanted to send.

There was more.  He left more evidence of his hatred and

planning and preparation behind.  And you'll get to see it.

Among those things he left behind were a journal where he

described many of the racist filth that he included in the

manifesto, he also included in his own journal.  He went even

further, expressing his desire, his hope, his imagination, the

race war was indeed coming.  He included in this journal his

brand, his logo, his self-designed symbol of his hatred, of

his action, of his choices.  It included his initials.  It

1    included white supremacy symbolism like the Nazi swastika.  It

2    included the number 88.  It included the number 88 because,

3    for white supremacists, that stands for Heil Hitler, H being

4    the eighth letter of the alphabet.  Along with other white

5    supremacist symbols, he created this logo, he created this

6    symbol to reflect who he was, what he thought and what he had

7    done.

8        He left behind other items as well, like the digital

9    camera he had used to take thousands of race-based photographs

10   from which he had selected the 60 to put up on the internet.

11   But he left behind the thousands he had not chosen as well.

12       When the defendant left the church that night and drove

13   away, it set off a massive man hunt, calling on the full array

14   of law enforcement's resources to try to find, identify and

15   arrest the perpetrator of this race-based massacre.

16       The defendant was ultimately found the next morning in

17   North Carolina on his way to Nashville, Tennessee.  He was

18   arrested by local Shelby, North Carolina police officers.

19   After he was arrested, you'll learn that he continued to want

20   to spread his message, just as he had done to Miss Polly and

21   Tywanza, as he had done in his manifesto and on his website,

22   the defendant continued to want to tell that story.  So when

23   FBI agents showed up and sat down to interview him, he

24   confessed fully, at least as fully as he wanted those agents

25   and others to know.  He began by describing what he had done.

I went to the church that night, I did it.  I killed them.  I
shot them with my Glock .45.  He described the racist ideology
again that he had expressed in his manifesto and his journal.
He talked about his choice of targets, Charleston, because
there's a historic city, Mother Emanuel because of its history
within the AME faith and the African-American community.  He
described having settled on Mother Emanuel as the church to
attack because he knew he would find African-Americans there,
he knew that an attack there would magnify his message.  And
he also knew that an attack there would pose little risk to
himself.

     He described his planning and preparation, the gun,
ammunition, the magazines, the pouch.  He described the
physical preparations.  He described the mental preparations
as well, how he mentally prepared himself, described sitting
outside the church in his car.  He described sitting with the
parishioners during the Bible study.  As he listened to the
prayer, as he listened to their study of the Good Word, he
admitted that he almost didn't do it.  He almost just walked
out the door.  But in the end, he decided, and he explained
that he had to do it.  So he described killing them.  He
described pulling the gun out, he described firing it over and
over again.  He described pacing around the room shooting
victim after victim as they lay on the floor.  He described
pausing between shooting the victims, thinking about what to

1    do next, considering whether to kill even more.

2         The defendant's description of his actions, that speaks

3    volumes.  But he also went on to explain why.  He went on to

4    explain, as we have talked about, how he had to do it.  That

5    nobody else was doing anything about it.  The white supremacy

6    groups were just talk.  He described knowing the men and women

7    that he had executed were innocent.  He justified himself in

8    finding their lives to be miniscule, the loss of their lives

9    to be miniscule in comparison to the perceived offenses

10   against the white race.

11        Not only, not only had he talked about his retribution,

12   his retaliation, he also talked about the call to arms, the

13   hope that his attack would agitate others, worsen race

14   relations, increase racial tensions that would lead to a race

15   war.  The hope, the hope that he could send a message, a

16   message to other white people to stand up and do something.

17   Didn't even have to be violent, but just do something.

18        The defendant's confession, you'll get to see it, it's

19   recorded, the defendant's confession tells you a lot about

20   this crime.  But for you to even partially comprehend this

21   racist attack, the scene he left behind must be shown.  You

22   will best understand what was in his mind by seeing the

23   calculated actions he took and the catastrophic results that

24   occurred.  He pulled the trigger on that Glock .45 more than

25   70 times that night.  More than 60 times he hit the

1    parishioners that gathered there for Bible study and worship.

2    The gruesome ruins of their bodies only begin to tell the

3    story of loss that he caused.  It was a racist, retaliatory,

4    retributive attack, an attack he hoped would strike at the

5    core of our social fabric.

6        Ladies and gentlemen, we recognize the difficulty and the

7    challenge that you are going to face in seeing, hearing and

8    deliberating about this horrific crime.  We thank you for the

9    effort and energy you're going to put into deciding this

10   important case.

11       Along with my colleagues, I have the honor of representing

12   the United States.  And we are called upon to show you the

13   choices the defendant made, the actions that he took, the

14   catastrophic results that occurred, results that were seen by

15   survivors, first responders, but felt far beyond the walls of

16   Mother Emanuel.

17       When you were first here at the end of September, the

18   judge explained to you that our great nation has the most

19   remarkable and fairest legal system in the entire world.  A

20   critical part of that legal system, of this criminal justice

21   system, is the right to a trial by jury.  A jury is selected

22   by the Court and the parties to be fair and impartial, to be

23   open minded.  You are here, you were selected to do just that,

24   to deliberate and work together, to follow the Court's legal

25   instructions, to abide by your oath and render a truthful

1    verdict in accord with the evidence presented in this

2    courtroom, without prejudice or sympathy.

3        As the Court just explained to you, in our criminal

4    justice system the Government always bears the burden.  We

5    bear the burden of proving to you that this defendant

6    committed each and every one of the charged offenses beyond a

7    reasonable doubt.  When we finish, it will be up to you to

8    decide whether we have kept our promise to prove that to you

9    beyond a reasonable doubt.

10       The Court went over with you the 33 counts the defendant

11   is charged with.  Three counts for each of the nine

12   individuals that this defendant murdered.  Two counts for each

13   of the two -- three, excuse me -- two counts for each of the

14   three survivors that were in the room during the Bible study.

15   The three survivors that the defendant knew about, had

16   knowledge of, had sat with for half an hour while they studied

17   the Gospel of Mark.  That's going to be 12 counts in total of

18   Hate Crime Acts.  That's killing or attempting to kill because

19   of someone's race and color.  That's Section 249.

20       There are 12 counts of obstruction of religion for the

21   forceable obstruction of the free exercise of religion.

22   That's going to be Section 247.

23       And then there are nine counts, one for each of the nine

24   that were killed, for the use of a firearm in furtherance of a

25   crime of violence to commit murder with malice.  That's

1    Section 924.

2        To prove to you these 33 counts, you're going to first

3    hear from Miss Felicia Sanders.  She is going to provide you a

4    firsthand account of the attack that night.  Then you'll hear

5    from first responders, medical personnel, law enforcement,

6    firefighters who responded to the scene that evening.  Then

7    you'll hear from the crime scene investigators who showed up

8    after the first responders, to document, collect and present

9    the evidence that was there, the evidence at Mother Emanuel.

10   You'll then hear from law enforcement officers away from the

11   walls of Emanuel, the efforts that they engaged in, including

12   the man hunt, the arrest and confession of the defendant,

13   searches at his house, his mother's house, his father's house

14   and his car, evidence gathered from stores that he had

15   purchased these items from.  You'll also hear from experts who

16   preserved and analyzed a number of those items.

17       Then you'll hear from lead FBI Agent Joseph Hamski.  Agent

18   Hamski will provide some context for some of those items that

19   were recovered in various searches.  Then you'll hear from the

20   medical examiner who examined each of these nine before

21   finally you'll hear from the survivor, Polly Sheppard.

22       This is going to be a long and difficult trial.  The

23   criminal justice system takes you away from your lives,

24   deprives you of your phones and social media, puts you

25   together in what's a rather small room off the courtroom,

1    gives you the instruction that the one thing you have in

2    common, your service on this jury, you can not yet discuss.

3    We encourage you to get to know each other, talk about where

4    you've been and where you're going.  You're going to spend a

5    tremendous amount of time together, like it or not.

6        In another federal courtroom in Columbia, South Carolina,

7    over the judge's head is a phrase that's written in Latin -- I

8    confess I don't speak Latin -- but I've been told that it says

9    or translates to say, "We who labor here seek only the truth."

10   We who labor here seek only the truth.  You labor here,

11   seeking the truth.  The truth here is that after months of

12   planning and preparation, this defendant chose to enter a

13   religious sanctuary at Mother Emanuel.  He chose to sit with

14   12 parishioners as they studied the Gospel of Mark.  He chose

15   to execute nine of those good and innocent men and women.  And

16   he chose to do so because of a callous hatred for the color of

17   their skin.

18       After we've proven the facts that I've tried to summarize

19   for you this morning, we're going to come back, we're going to

20   ask you to find this defendant guilty.  I submit to you that

21   his hatred, his racism, his violence, his assault on the

22   innocent in a house of worship will not win in this courtroom.

23   Justice instead should prevail.  The kind of justice that

24   judges not based on the color of one's skin, but on choices

25   made and actions taken.  That kind of justice, ladies and

1    gentlemen, I submit to you, will find this defendant guilty of

2    all 33 counts.

3            THE COURT:  Opening statement by the defense.

4            MR. BRUCK:  It's 11:30, Your Honor.

5            THE COURT:  I'm sorry?

6            MR. BRUCK:  It is 11:30, if this would be an

7    appropriate time.

8            THE COURT:  What I was thinking, Mr. Bruck, is that

9    you would do the opening statement and then we would break for

10    lunch, so why don't you proceed.

11            MR. BRUCK:  Thank you.

12        Good morning.  I'm David Bruck, I'm a lawyer.

13        What you just heard, really did happen.  The story that

14    Mr. Richardson just finished telling you, really did occur.

15    And Dylann Roof really is the person who did it.  You're

16    probably wondering, well, so what are we doing here?  Why does

17    there have to be a trial?

18        Well, as you may have guessed from all of the questions

19    that you went through during the selection of this jury, the

20    practical reason is that the Government has asked for the

21    death penalty to be imposed after conviction.  And that means

22    that we have a procedure to go through, and that is the

23    procedure that we are now going through.  The first stage,

24    sometimes called the guilt phase -- you were questioned about

25    all of this, you may remember it -- is the part of the trial

1    where the defendant -- where the jury determines whether the

2    defendant, the person on trial, actually committed the crimes

3    with which he is charged.  Part of that is determining whether

4    these crimes were actually committed by somebody, and then the

5    jury obviously also has to determine whether they have the

6    right person.  And you go through that process regardless of

7    how open and shut the facts may be, and in this case they are.

8        And then the jury returns a verdict which I, along with

9    Mr. Richardson, expect will be guilty, given the facts that

10   you will hear.

11       And then there's a second trial, same jury, same

12   courtroom, same judge.  The second trial is devoted to the

13   question of what should happen to the defendant, what should

14   be done to him.  The issues in the first part of the trial

15   that I've just outlined for you are figuring out were the

16   crimes committed and has the Government charged the right

17   person.

18       The practical question in the second part of the trial is

19   even narrower, because the only choices that can happen for

20   someone who is convicted of the crimes charged in this case

21   are to be sentenced to prison for the rest of his life with no

22   possibility of release ever, or else to be executed by the

23   Government.  Those are the only two choices.  So the

24   sentencing phase issues, the final issues the jury must decide

25   are, in that sense, narrow.

1    But in another sense, the issues at the sentencing phase

2  of the trial are very very broad.  There are dozens, even

3  hundreds of practical questions.  We're no longer dealing at

4  that stage of the case with simply what was the crime and did

5  the right person get charged.  At the end of the sentencing

6  phase, which we have not got to yet, but I want to talk with

7  you where we were going so that you will understand what your

8  job is at this stage, at the sentencing phase everything

9  becomes relevant because the question isn't just did Dylann

10  Roof commit this crime, but who is he.  Why did he do it?

11  Where did it come from?  What can we understand about him, a

12  young man who, on June 17th, 2015, was barely 21 years old,

13  and in some ways much less mature than that, as you will learn

14  from the evidence.

15    And the reason the law requires you to consider all of

16  those things in the sentencing phase of the trial is that, in

17  fairness and in mercy, our society does not invoke the death

18  penalty, does not order it that anyone be put to death, if

19  there are reasons to choose life.  And remember, life means

20  life in prison.  The law errs in favor of life, we err in

21  favor of life.  We do not behave like the person that

22  committed this crime.  Quite the opposite.

23    So you have to know everything.  And more than that, you

24  have to try to understand everything before you exercise, you,

25  as a jury, exercise the god-like power of life and death.

1          So that's the way the case is organized.  But there's a

2     problem.  You're going to want to understand who this person

3     was and why on earth he, of all people, would have caused so

4     much harm and grief.  Now, in a capital trial oftentimes,

5     first phase of the trial deals with what happened, who did it,

6     like I say, and the second part of the trial deals with why.

7     And in that part of the trial everyone who knew the defendant

8     can come -- can be called to testify to describe every detail

9     of his life, his childhood, his origin, his family history,

10    everything.

11         MR. RICHARDSON:  Objection, Your Honor, this is a

12    guilt phase opening.

13         THE COURT:  Mr. Bruck, this is guilt phase.

14    Sustained.

15         MR. BRUCK:  Yes.  And it would typically be the case

16    that you would hear expert testimony --

17         MR. RICHARDSON:  Objection, Your Honor.

18         THE COURT:  Sustained.

19         MR. BRUCK:  But as Judge Gergel just told you, the

20    defendant will not have a lawyer at the --

21         MR. RICHARDSON:  Objection, Your Honor.

22         THE COURT:  Sustained.  Mr. Bruck.

23         MR. RICHARDSON:  He knows what he's doing, Your

24    Honor.

25         THE COURT:  Mr. Bruck, you are to stay on the guilt

1    phase only.

2              MR. BRUCK:  Very well.

3         This is the only phase of the case in which Mr. Roof will

4    be represented by counsel, and for that reason, I need to ask

5    you to pay extreme careful attention to the small things.  And

6    I will try to tell you some of the issues that I would like

7    you to watch for in this phase of the trial.  The reason I say

8    that is that you don't get to hear the evidence twice.  When

9    you get to the penalty phase of the case, the evidence will

10   not be presented again, the Government will not call all the

11   same witnesses.  So that you can look at the evidence through

12   the lens of the penalty phase, you only hear the evidence

13   once, and you need to remember all of the details that will be

14   important later, when you hear them now.  So let me suggest a

15   few things that you may want to look for now.

16        As I've said, we know what happened.  Mr. Richardson's

17   very thorough, eloquent description of this awful crime was

18   accurate.  It was true.  We don't disagree with anything.  But

19   in some ways that really poses the question, doesn't answer

20   it.  You also are going to have to ask the question why, and

21   eventually you're going to have to do the best you can to

22   answer it.  So you are going to need to be detectives.  You're

23   going to need to use not merely your ability to hear facts,

24   but your common sense.  Judge Gergel told you the job of a

25   jury is that you must consider all of the evidence in the

1   light of reason, common sense and experience.  You don't leave

2   your common sense at the courthouse door.  The whole point of

3   having a jury is to have the common sense and the life

4   experience of 12 people to be brought to bear on the issues

5   that you are going to be entrusted with.

6       So what to watch for.  What does this crime and everything

7   that led up to it tell us about this 21 year old.

8           MR. RICHARDSON:  Objection, Your Honor.

9           THE COURT:  Mr. Bruck, the relevance issues on guilt

10  are the only issues to be addressed in the opening of this

11  case.  I direct you not to go into other issues at this time.

12          MR. BRUCK:  I will do that, Your Honor.

13      Among the elements of the crime are racial animus, racial

14  hatred.  The hate crime statute requires that the defendant be

15  motivated by the race of the victims, for example.  In

16  considering that issue, ask yourself where this extraordinary

17  degree, this intense degree of racial feeling may have came

18  from.  Where did he learn it?  Is there any evidence -- you'd

19  think, well, probably from his family, that's where you would

20  expect, for example.  Watch for that.  See if there's evidence

21  of that.  Not that whether there was -- whether anyone in his

22  family may have harbored racial bias, but enough to explain

23  this.  Watch for that.  Think about it as you hear the

24  evidence.

25      Did it come from a group?  Did he learn this from

1    co-conspirators?  Who is behind this attack?  Did he have

2    conspirators?  You'll hear the FBI obviously in the -- it's

3    their job to answer that question, almost before any other,

4    who else is out there.  And during the course of the two-hour

5    confession that he made on videotape that you will get to

6    watch, obviously the agents very properly are focused on that.

7    See if there is any evidence that there is anybody else.  And

8    I mean anybody.  They ask him, who is your best friend?  I

9    don't have a best friend.  I don't have a best friend.  See if

10   he had any real friends at all.  And ask what that tells you.

11   Was there even one person that he plotted or planned this

12   with?

13        And Mr. Richardson outlined what Mr. Roof said about the

14   theory, the plan that underlay this astonishing horrible

15   attack.  But since the Government has gone into it, you go

16   into it, too.  Ask yourself if this really is a logical plan

17   at all.  On what planet would someone have to be to think that

18   you could advance a political agenda by attacking and

19   murdering these nine people who are the most kind and

20   upstanding, I will use the word noble people that you could

21   possibly find, in this community or any other.  What is the

22   likely effect of that?  Ask yourself that.  How much sense

23   does this crime make?  Does this make any sense at all?  And

24   if not, what does that tell you?

25        I had to do it.  Mr. Richardson quoted the defendant's

words when he explained to the FBI why he did it. By my count, he said "I had to do it" about ten times. But there's no explanation beyond that. I had to do it. I had to do it. What does that suggest to you?

Given the fury of this attack, you would expect to hear raging anger, seething rage in the confession or at any other time. Watch carefully for his actual affect for the way he talks and communicates. And ask yourself what that means, applying your common sense and your life experience. Look for things that he talks about in his own history that could explain this racist ideology. And not just the ideology, because there are, unfortunately, other people and many people, probably far too many in this society who share racist ideas. But the idea that one would want to, that one has to act on it in this way, what explains that in this 21-year-old man. Ask yourself those questions as you hear the evidence. Ask yourself if there were any experiences he had in his own life that could explain at any level what he thought, what he believed, what he thought he had to do or what he did. Of course the FBI agents asked him that question, and you'll see his answer on the video. He also addresses that question in his statement that he put on line, and he answered it both times as no, nothing, nothing happened to me. Use your common sense in the light of your own experience. What does that tell you about him, not about this sort of crime in theory.

1          MR. RICHARDSON:  Objection, Your Honor.

2          THE COURT:  Sustained.  Stay on the guilt phase,

3     Mr. Bruck.

4          MR. BRUCK:  Yes, sir.

5      You will see a crime that is driven by a kind of fear.  A

6     fear of what?  Where did it come from?  Where did it come

7     from?  Why would someone be so afraid?  Judge Gergel told you

8     those are the questions, I think, if you go deep, if you do

9     your job, and I know you will, go deeper than the surface of

10    this awful crime.  And it won't be easy to do that, because

11    I'm going to tell you right now, if you haven't already sensed

12    this, and you probably have, that this is going to be hard.

13    This is going to be hard to sit through.  It's going to be

14    almost unbearable at times.  You're going to see things that

15    you are never going to be able to unsee.  This is ugly.  And

16    you will see violence and death, and most of all you will see

17    the most unbearable grief on display in this courtroom, and

18    it's going to be grief from people who did not deserve any of

19    this.  And that is going to be very hard to bear.

20         And you are going to feel enormous sympathy, as well you

21    should, as anyone would, but you have a job to do that no one

22    else has, and that is to go deeper, to go beyond the surface

23    of things, to ask the questions that no one else is required

24    to ask, to think about why, and to try too understand this as

25    best you can.  For your own sake, for the sake of the verdict

1    you're going to render and for the sake of the community.

2             MR. RICHARDSON:  Objection, Your Honor.

3             THE COURT:  Sustained.  Guilt phase, Mr. Bruck.

4             MR. BRUCK:  Yes, sir.

5        Now, there is one exception, I think, to the general rule

6    that you just apply your common sense and everyday experience,

7    and it's one that Judge Gergel instructed you about just a

8    moment ago.  We're always scanning the horizon, people we see,

9    and for clues about what's going on with them and who they are

10   and what they're thinking and how we should evaluate their

11   behavior.  Well, Judge Gergel told you that in a courtroom

12   you're not -- you're only supposed to do that through the

13   witnesses.  And in particular, he told you that the demeanor

14   of people who are not witnesses, and he listed himself and the

15   lawyers and the defendant, is not evidence.  Of course you're

16   going to look at the Dylann Roof and try to figure him out as

17   he sits in the courtroom.  But be mindful of that instruction.

18       Have you ever had the experience of seeing someone on the

19   street or out who you thought --

20             MR. RICHARDSON:  Objection, Your Honor.

21             THE COURT:  Mr. Bruck, let's stay on the 33 counts,

22   let's address the counts.  Sustained.

23             MR. BRUCK:  Yes, sir.

24             THE COURT:  Sustained.

25             MR. BRUCK:  My point is simply that in evaluating the

1    evidence at this stage of the case, Judge Gergel's instruction

2    means that the defendant's demeanor, whether he may smile when

3    it doesn't make sense for someone to smile, whether he is

4    wearing a jail jumpsuit instead of ordinary clothes like

5    everyone else in this courtroom, whether at times he seems

6    frozen or rigid or anything else -- and I'm not predicting

7    what that will be -- none of that is evidence on which you can

8    base your verdict.  And part of the reason for that is that if

9    you were to disregard that instruction, you might very well

10   get it wrong, and that would not be fair.

11       You may have guessed by now that we are not going to call

12   a large number of witnesses, we may not even call any at this

13   stage of the case.  And I will not be the lawyer in the next

14   stage, so that will be that.  We will probably not ask very

15   many questions of most of the Government's witnesses.  The

16   Government's witnesses at this stage of the trial are

17   witnesses, too, and when they are finished on the direct we

18   expect, by and large, the information that those witnesses

19   have to share with you, will have been imparted.

20       At times we may want to fill out a detail that was left

21   unsaid or wasn't clarified or needs to be brought out a little

22   bit more, and if so, we will.  When I say we, I'm talking

23   about myself, also Miss Kim Stevens, who is my co-counsel, and

24   Emily Paavola, who is also helping represent Dylann.  And just

25   to let you know who else is here, Brandi Newman, the young

1    lady at the end of the table, that's our paralegal to keep us

2    organized.

3        But by and large, we are going to listen carefully, as you

4    will, make sure that the evidence is coming in as it should.

5    At times it will be our job to object or make motions about

6    it.  But don't expect us to produce a great deal of evidence,

7    and perhaps none at all, because there is not a great deal of

8    dispute about the facts at this stage, and there's no reason

9    for lawyers to prolong proceedings any more than they need to

10   be.  This case will be hard enough.

11       Thank you for listening to me.  The hard part of this

12   trial starts now, and it will be hard.

13       Unlike the Government, I will not tell you what verdict to

14   reach.  I'm just asking you to be fair and to dig down past

15   the appearances to the causes, as best you can discern.  If

16   you do that, you will be doing your job.

17       Thank you.

18           THE COURT:  Ladies and gentlemen, those were the

19   opening statements of counsel.  We're going to -- it's a few

20   minutes to 12:00, I think it's a good time to break for lunch,

21   and we'll return at 1:00 o'clock.

22       Mr. Cargill, escort the jury back.

23       (Jury excused.)

24           THE COURT:  Now we'll resume at 1:00 p.m.

25       (A recess was held at this time.)

FELICIA SANDERS – DIRECT EXAMINATION

1          (Jury not present.)

2               THE COURT:  Any matter to take up before we bring in

3     the jury?

4               MR. RICHARDSON:  Nothing from the Government, Your

5     Honor.

6               MR. BRUCK:  One matter, Your Honor.  It may be this

7     has been taken care of, but I noticed that in the police body

8     cam video, which the Government intends to offer through the

9     next witness -- second witness to testify, there is very clear

10    images of the face of the child victim, and I just wasn't sure

11    if measures had been taken to ensure that that was not going

12    to be introduced in evidence, or if we needed to interrupt the

13    proceedings to take care of that.  I don't know.

14              THE COURT:  What is the Government's response?

15              MR. RICHARDSON:  Your Honor, that video, although

16    they're not significant, there are images as part of that

17    video that include the deceased victims.  We believe that it

18    falls under the Court's previous order.  It is going to be

19    introduced as evidence, but we would request, and we think it

20    falls within the order, that it not be published on the

21    internet or otherwise.

22              THE COURT:  I think he's saying about there's a

23    surviving child?

24              MR. BRUCK:  Child survivor, that's right.

25              THE COURT:  I mean, what's the Government's response

FELICIA SANDERS - DIRECT EXAMINATION

1   to that?

2           MR. RICHARDSON:  Your Honor, we think it falls within

3   the same idea of the Court's order.

4           THE COURT:  It's evidence in the case.  Whatever it

5   is, it is.  So I overrule it, to the extent there's an

6   objection, I overrule that objection.

7           MR. RICHARDSON:  Thank you.

8           THE COURT:  Anything further?

9           MR. RICHARDSON:  Nothing, Your Honor.

10      (Jury present.)

11          THE COURT:  Government calls its first witness.

12          MR. RICHARDSON:  Your Honor, the Government calls

13  Miss Felicia Sanders.

14      FELICIA SANDERS, a witness called by the Government, first

15  having been duly sworn, testified as follows:

16                      DIRECT EXAMINATION

17  BY MR. RICHARDSON:

18  Q.  Good afternoon.

19  A.  Good afternoon.

20  Q.  Miss Felicia, tell us where were you born?

21  A.  Charleston, South Carolina, downtown Charleston.

22  Q.  And how long have you lived here in Charleston?

23  A.  Fifty-eight years.

24  Q.  Did you have times where you left Charleston and came back

25  home?

FELICIA SANDERS - DIRECT EXAMINATION

1    A.   I left twice, but it's nowhere like Charleston.

2    Q.   Nowhere like home, right?

3    A.   Right.

4    Q.   Where did you go to high school?

5    A.   I went to Columbus Street Elementary and Charles A. Brown

6    High.

7    Q.   And when you graduated from high school, tell me, where

8    did you go?

9    A.   I went to barbering school at first, then I went to

10   cosmetology school.

11   Q.   Then after you finished with cosmetology school, what did

12   you do then?

13   A.   Went directly to work.

14   Q.   And tell me, where did you go to work when you finished?

15   A.   I started at Shawan's Barber, then I opened my own salon

16   after leaving that barber shop, I opened my own salon,

17   Felicia's Styling Boutique.

18   Q.   And approximately when did you open up your own salon?

19   A.   In '88.

20   Q.   Are you married now?

21   A.   Yes.

22   Q.   And you're married to Tyrone, right?

23   A.   Tyrone.

24   Q.   He's sitting in the front row there, right?

25   A.   Yes.

FELICIA SANDERS - DIRECT EXAMINATION

1    Q.  And you've also got a couple kids, right?

2    A.  I have three kids.

3    Q.  Who is your daughter?

4    A.  Shirrene Goss.

5    Q.  She's in the front row too, right?

6    A.  Yes, she is.

7    Q.  And Shirrene's married?

8    A.  Yes, she is.

9    Q.  She has family of her own?

10   A.  Yes, she does.

11   Q.  And where do they live?

12   A.  Duncan, South Carolina.

13   Q.  And you've got an older son as well?

14   A.  Maurice.

15   Q.  And Maurice lives here in Charleston?

16   A.  Yes, he does.

17   Q.  And you have a youngest son?

18   A.  Tywanza.

19   Q.  In addition to the three children that were your own, from

20   time to time did you end up with other children and young

21   people that lived with you, you took care of?

22   A.  I took care of whoever would be in my house.

23   Q.  And from time to time you'd bring in your house and have

24   young people live with you for years at a time?

25   A.  Yes.

FELICIA SANDERS - DIRECT EXAMINATION

1   Q.  Can you estimate for me how many different young people

2   you had living in your house with you at different points?

3   A.  I would say probably over 20.

4   Q.  When you grew up, who mostly raised you?

5   A.  My grandmother.

6   Q.  And your grandmama raised you, and where did your

7   grandmama go to church?

8   A.  Emanuel AME.

9   Q.  And when did you start going to Emanuel AME?

10  A.  As soon as I was old enough to make my own decision.  I

11  went to my grandmother church because we used to go to my

12  father church.

13  Q.  And your father's church was a different church in

14  downtown Charleston?

15  A.  Yes.

16  Q.  When you grew older, now I want to just sort of fast

17  forward to sort of 2015, tell me, were you actively involved

18  at Mother Emanuel?

19  A.  Yes, I was.

20  Q.  Tell me some of the ways in which you were involved in the

21  Mother Emanuel family.

22  A.  I used to be on the trustee board, I used to be on the

23  steward board.  At the time of the killing I was the president

24  of the usher board.  Kitchen committee, church school, Bible

25  study, and everything else that needed to be done.

FELICIA SANDERS - DIRECT EXAMINATION

1    Q.  Let me just talk to you about a few of those.  What does

2    the trustee board do?

3    A.  The trustee take care of the property of the church.

4    Q.  And you mentioned that for awhile you were also on the

5    steward board.  What's the steward board?

6    A.  The steward board take care of the church itself, the

7    spiritual part of it.

8    Q.  And you mentioned the kitchen committee; is that sort of

9    an unofficial one at the church?

10   A.  Right.

11   Q.  Okay.  You have a specialty of frying chicken, right?

12   A.  Yes, I was the chicken fryer.

13   Q.  Something Tyrone appreciates too, right?

14   A.  Yes.

15   Q.  In addition to the boards you talked about, were you also

16   involved, in late 2014, with the revival at Mother Emanuel?

17   A.  Yes, I was the chairperson of the revival, a very

18   successful revival.

19   Q.  Tell us a little bit about what a revival is; what's that

20   include?

21   A.  A revival -- it was a three-day revival.  And what we did,

22   we got spiritual leaders to lead the revival, and we all came

23   together.  And what I did, I got the church directory and I

24   invited everyone who has left the church, back to the church.

25   And I went out by the stores and invited people to come.  So

FELICIA SANDERS - DIRECT EXAMINATION

1    we had a full house for the three days.  What the revival was,

2    you come, you worship and get revived.

3    Q.  And did you have ministers you knew that preached?

4    A.  Yes.

5    Q.  And you had lots of people that helped you put it on,

6    right?

7    A.  Yes.

8    Q.  Tyrone gets sort of drug into whatever it is you're doing,

9    right?

10   A.  Anybody who know me get drug into what I'm doing.

11   Q.  Among those that you had help you for the revival, tell me

12   about what you asked Tywanza to do.

13   A.  I asked Tywanza to do the welcome.  And he went up there

14   to do the welcome, he started reading poetry.  Not reading, he

15   started giving a poetry reading.  And I was in the back, I

16   said, didn't I tell that boy just to do the welcome?  And when

17   he came back he said, Mama, this is my gift from God, he wants

18   me to do it whenever I can.

19   Q.  And Tywanza was big into writing poetry?

20   A.  He did lots of writing, and he left enough poetry for me

21   to read the rest of my life.

22   Q.  You also mentioned that at the time of this you were on

23   the elevator committee?

24   A.  I was on the elevator committee.  I wasn't asked to be on

25   the elevator committee, but I saw the need, so I joined the

FELICIA SANDERS - DIRECT EXAMINATION

1    elevator committee myself, because I know I can pull a lot of

2    people in and raise a lot of money, so that's what I did.

3    Q.  So tell me, why it is that Emanuel, for people that might

4    not have been to Emanuel previously, why is it that an

5    elevator was so needed at Emanuel?

6    A.  Because on Sundays, or any time you have programs upstairs

7    in the main sanctuary, so much of the older people would be

8    left in the fellowship hall.  And I just didn't like seeing

9    them down in the fellowship hall, so I put myself on the

10   elevator committee so I can help this go on, and I -- my

11   uncle, I took my uncle to church one time and he was in a

12   wheelchair, and it was so hard for us to get him upstairs, and

13   that was my motivation.

14   Q.  Okay.  And when you go to Emanuel, the fellowship hall is

15   the first floor?

16   A.  The basement.

17   Q.  Right.  It's the basement, but it's above ground, right?

18   A.  Yes.

19   Q.  And then the actual sanctuary is -- sits above that

20   fellowship hall?

21   A.  Yes.

22   Q.  And were you part of an elevator committee meeting that

23   afternoon of June the 17th?

24   A.  Yes, we had an elevator committee meeting at 5:00 o'clock.

25   Q.  Okay.  And where was that meeting held?

FELICIA SANDERS - DIRECT EXAMINATION

1    A.   In the fellowship hall downstairs.  On the side.

2    Q.   I want to come back to the fellowship hall.  You mentioned

3    a number of other things that you were involved in; you talked

4    about the usher board.

5    A.   Yes.  I was the president of the usher board.

6    Q.   What is the usher board?

7    A.   The usher board is a group of -- in my case it was a group

8    of ladies, I think we had one man, but I share every fourth

9    Sunday.

10   Q.   When you talk about ushering in church, that's sort of a

11   lot of walking and getting people in and out?

12   A.   The starting of your job was to be a greeter.  And once

13   you greeted the parishioners in, you make sure everybody

14   comfortable, pass out programs, water sometimes, and just make

15   sure everything is done correct.  You're actually the

16   overseer.

17   Q.   As part of your job ushering, did you limit yourself to

18   just ushering every fourth Sunday?

19   A.   I would put flat shoes in my car, because somehow I

20   managed to usher most every Sunday.

21   Q.   And you knew there was flat shoes if you were going to be

22   walking around that much, right?

23   A.   Yes.

24   Q.   After the elevator committee meeting took place, tell me

25   how that -- how did that end up?  How did you stop that and

FELICIA SANDERS - DIRECT EXAMINATION

1    head into the next meeting for the day?

2    A.  Well, at the elevator committee, we were almost about to

3    finish the elevator, so we were talking about the first ride

4    party.  And so you have booklets.  And then a preacher

5    interrupted the meeting and said he wanted us to all be at the

6    church conference.

7    Q.  And when you say the preacher, you're referring to

8    Reverend Pinckney?

9    A.  Yes.

10   Q.  And you indicated that y'all were -- you're almost

11   finished with the elevator at that point and you were getting

12   ready to celebrate the first ride party.

13   A.  Yes.

14   Q.  How had you raised the money to fund an elevator at

15   Emanuel?

16   A.  Eighty-five percent of the money came from the

17   parishioners, the members of the church, and the

18   other 15 percent came from outside entities.

19   Q.  When you finished the elevator meeting and moved into the

20   conference meeting, what time was that starting?

21   A.  Six o'clock.

22   Q.  Okay.  And where was that?  Was that in the fellowship

23   hall?

24   A.  That was in the fellowship hall.

25   Q.  You mentioned Reverend Pinckney.

FELICIA SANDERS - DIRECT EXAMINATION

1          MR. RICHARDSON:  Your Honor, at this time we'd move

2     to admit Government's Exhibit 11 through 19.

3          THE COURT:  Any objection?

4          MR. BRUCK:  No objection.

5          THE COURT:  Government Exhibits 11 through 19

6     admitted without objection.

7       (Government Exhibits 11 through 19 received.)

8     BY MR. RICHARDSON:

9     Q.  Miss Felicia, I'm going to put up on the screen for you,

10    if you don't mind, Government Exhibit 11.  You can probably

11    see it well there, I have -- And who is this?

12    A.  Reverend Clementa Pinckney.

13    Q.  And he was the church pastor?

14    A.  Yes, he was.

15    Q.  Was he at the conference?  You said he brought you into

16    the conference that evening?

17    A.  Yes.

18    Q.  And part of the quarterly conference, were there preaching

19    certificates that were awarded?

20    A.  Yes, there was three.

21    Q.  Okay.  And did that include Miss Myra Thompson?

22    A.  That included Myra, Miss Myra Thompson, Reverend Myra

23    Thompson.

24    Q.  As well as Reverend Depayne Middleton?

25    A.  Reverend Depayne Middleton also.

FELICIA SANDERS - DIRECT EXAMINATION

1   Q.  I want to stop before we go to the Bible study that

2   started after the quarterly conference and talk to you a

3   little bit about Bible study in general.

4   A.  Okay.

5   Q.  Were you a regular attending Wednesday night Bible study

6   at Emanuel?

7   A.  Yes, I was.

8   Q.  What time did it normally start?

9   A.  Six to 7:00.

10  Q.  How long did it typically last?

11  A.  One hour.

12  Q.  About an hour?  Who was the normal leader of that

13  Wednesday night Bible study?

14  A.  Reverend Daniel Simmons.

15          MR. RICHARDSON:  If we can put up Government's

16  Exhibit 12, Ms. Baker.

17  Q.  Is that Reverend Simmons?

18  A.  Yes, it is.

19  Q.  Tell me a little bit about what kind of preparation

20  Reverend Simmons had the members of the Bible study doing in

21  advance each week.

22  A.  Reverend Simmons, when he entered the church he would

23  bring about five to six books, including the newspaper, and he

24  would have us to study whatever we were going to study that

25  night, he would tell us about a week before.

FELICIA SANDERS - DIRECT EXAMINATION

1  Q.  So you got homework for Bible study?

2  A.  Yes.

3  Q.  How long had you known Reverend Simmons?

4  A.  I've known Reverend Simmons for about two or three years.

5  Q.  What did Reverend Simmons do before he came to Mother

6  Emanuel here in Charleston?

7  A.  He was a pastor somewhere else.  He was a retired pastor

8  when he came to Mother Emanuel.

9  Q.  Can you tell me a little bit about -- you mentioned he

10 always had a bunch of books with him.  Can you tell me a

11 little bit about his approach to studying the Bible and Bible

12 study?

13 A.  Reverend Simmons was very serious about that Bible study,

14 and any kind of church affair.  When you come in Bible study,

15 he would give you a summary what we was going -- not a

16 summary -- he would tell us what we were going to talk about,

17 then he would ask us if we remembered what we talked about

18 last week, and then we would proceed with the Bible study.

19 Q.  Okay.  You described him from time to time as being a

20 stern guy.

21 A.  He was very stern.  Very stern.  He speak with a loud

22 clear voice.  He wore -- he had a smile, but when it comes

23 down to studying that Bible, he really wanted you to pay

24 attention.

25 Q.  Um-hum.  You mentioned earlier during the Bible studies he

FELICIA SANDERS – DIRECT EXAMINATION

1    always had a newspaper and wanted to talk about the newspaper.

2    How did he work the newspaper into the religious study that

3    you were doing?

4    A.   It was always something in the paper that would relate to

5    the Bible.

6    Q.   In the context of Mother Emanuel in general, tell me how

7    important Reverend Simmons was to the church.

8    A.   Reverend Simmons, to me, was the backbone of the church.

9    So many times at Bible study, even after he had surgery, he

10   would make sure we have Bible study.  I monitor him, he had

11   surgery, and he came to Bible study and I would see him get up

12   and stomp his feet on the floor of the church, and I know he

13   wasn't ready to come back to Bible study, but he wanted to

14   make sure we have it every Wednesday.  We had it every

15   Wednesday.

16   Q.   When he would be at Bible study, he was a man who could

17   get excited?

18   A.   Yes.

19   Q.   What would he do when he'd get excited about preaching and

20   studying the Bible?

21   A.   He would beat on the table.  Either click his teeth or

22   something he used to do.

23   Q.   In addition to seeing him at Bible study, did you also sit

24   beside him at church school?

25   A.   I sit beside him all the time at church school.  I would

FELICIA SANDERS - DIRECT EXAMINATION

1    sit on one side and my son would sit right next to me.

2    Q.  And we talk about church school, sometimes we refer to

3    that as Sunday school?

4    A.  Yes, Sunday school.

5    Q.  You mentioned your son, Tywanza, and his relationship with

6    the Reverend Simmons.  Tell me a little about that.  How did

7    Tywanza and Reverend Simmons get along?

8    A.  Tywanza love Reverend Simmons.  He liked the sternness

9    that Reverend Simmons had.  He learned a lot.  And we would

10   always be talking about what went on in church school on our

11   way home.  Right before Reverend Simmons got killed, he

12   prophesied that Tywanza would be great, and he was going to

13   make a lot of money.

14   Q.  You also often took your 11-year-old granddaughter with

15   you to Bible study.

16   A.  Yes.

17   Q.  Tell me a little bit about how Reverend Simmons would

18   interact with an 11-year-old girl in the context of a Bible

19   study.

20   A.  Well, when we would go to Bible study I would always tell

21   her be quiet.  But when Reverend Simmons would call on one of

22   us to read, her hands would go up first.  And she would read,

23   or either answer the questions about the Bible study, and he

24   would give her a penny.  And I remember saying, golly, he

25   can't give her a quarter?  But he would always give her a

FELICIA SANDERS - DIRECT EXAMINATION

1    penny or a nickel, and she was just as happy with that penny

2    or nickel.

3    Q.  He was old school that way, right?

4    A.  Yes, he was old school.  And that reminded me back in the

5    days that's something they used to give us.

6    Q.  Tell me a little bit about how you felt and feel about

7    Reverend Simmons, your relationship.

8    A.  I called Reverend Simmons my godfather, because he would

9    never get my name right.  He would always call me Falita.  And

10   everybody would say you need to tell him your name is Felicia.

11   I say no, that's fine.  So he would always say Falita, Falita,

12   you know the answer, Falita.

13   Q.  Let me ask you about that night.  I know Reverend Simmons

14   was there, but who was scheduled to lead the Bible study the

15   night of June the 17th?

16   A.  Myra Thompson.

17           MR. RICHARDSON:  Can we put up Government's

18   Exhibit 19, Ms. Baker.

19   Q.  Why was it that Myra was leading the Bible study that

20   night?

21   A.  Myra was into ministry, so Reverend Simmons was preparing

22   her for what to come, and he may have been preparing her to

23   take over the Bible study, because I know he had some illness.

24   Q.  Um-hum.  And had she done it before, had she led the Bible

25   study group previously?

FELICIA SANDERS - DIRECT EXAMINATION

1    A.  She would do the prayer, but this was her first time

2    actually doing the Bible study.

3    Q.  And when you talk about the prayer, Bible study on

4    Wednesday nights, how would y'all start the Bible study?

5    A.  We would always start with the hymn, then a prayer, then

6    we would go right into Bible study.

7    Q.  How long had you known Myra?

8    A.  I known Myra basically all my life.

9    Q.  Y'all grew up together?

10   A.  Yes.

11   Q.  In Charleston as well as in Mother Emanuel?

12   A.  Yes.

13   Q.  As you were older, what kind of roles did Myra play in

14   Mother Emanuel?

15   A.  Myra did everything.  And not to be rude or anything, I

16   used to call Myra the bugaboo.

17   Q.  And why did you refer to her as the bugaboo?

18   A.  Because Myra was everywhere in the church.  Myra wanted

19   everything to be done correct, and Myra made everybody else do

20   what they were supposed to do.  And Myra just -- she was over

21   the top.

22   Q.  What official role did she have?  Did she serve on the

23   trustee board?

24   A.  She was the pro tem on the trustee board.

25   Q.  What's that mean, what is the pro tem's job on the trustee

FELICIA SANDERS - DIRECT EXAMINATION

1    board?

2    A.  Almost like being the president of the organization, she

3    was the go to person.

4    Q.  Given the quarterly conference, it had sort of run on a

5    little longer than planned, tell me a little bit about why

6    y'all decided to go ahead and have the Bible study that night.

7    A.  Myra had prepared the Bible study -- study for that night.

8    She was overwhelmed.  She was so happy that she got an

9    assignment from Reverend Simmons, and she wanted to show

10   Reverend Simmons that she really studied and she was ready for

11   him.

12   Q.  And in the discussions you were having, was there a

13   champion that was really pushing to have the Bible study so

14   Myra would get the chance to do that?

15   A.  Right after the church conference, we went back and forth

16   a couple of times about canceling, staying, canceling,

17   staying, canceling, staying, and as we was getting ready to

18   cancel, Reverend Depayne Doctor said, we are here, we have our

19   Bible and everything, let's just have it at least 30 minutes;

20   where with Myra, there is no 30 minutes.

21   Q.  Those that knew Myra well knew that she was not

22   short-winded on anything.

23   A.  She was long-winded.

24   Q.  That's true whether she was praying or preaching, right?

25   A.  Anything Myra did.

66

FELICIA SANDERS - DIRECT EXAMINATION

1   Q.  Okay.  Was Myra encouraging others, because of her

2   excitement, was she encouraging others to stick around?

3   A.  Yes, Miss Polly.

4   Q.  And tell me just a minute -- and we'll get it more from

5   Miss Polly later -- but fair to say Myra and Miss Polly were

6   close?

7   A.  Yes.

8   Q.  Let me talk to you just a little bit about the few of the

9   others that stayed as well.

10            MR. RICHARDSON:  Put up Government's Exhibit 13,

11  Ms. Baker.

12  Q.  Who is this?

13  A.  That's Cynthia Hurd.

14  Q.  How long had you known Cynthia?

15  A.  I knew Cynthia Hurd for quite a long time.

16  Q.  As you got to be adults in Mother Emanuel, did y'all get

17  to be close?

18  A.  Yes.  She would sit right next to me.  She would be in the

19  middle and I would be on the side aisle.  We would always talk

20  in passing and after church.

21  Q.  And that's in the sanctuary on Sunday morning?

22  A.  In the sanctuary.

23  Q.  Tell me a little bit about what she was like.

24  A.  She was warm, very warm.  Hard working.  She would always

25  just pat you on the back, not a lot of words, but she would

FELICIA SANDERS - DIRECT EXAMINATION

1    pat you on the back.  Her and Sharonda was really best

2    friends.  I kind of feel bad when I talk about Cynthia Hurd,

3    because I asked her to stay to Bible study.

4    Q.  Tell me -- I know this is hard -- tell me how that

5    happened.

6    A.  She came to drop something off at the church.  I don't

7    know what it was.  And her and I got to praying.  And she

8    said, no, I'm leaving.  And she said, I love you, Felicia

9    Sanders.  I said, you love me, you'll stay to Bible study.

10   And she sat right next to Sharonda and stayed.

11   Q.  You mentioned Sharonda, Reverend Coleman-Singleton.

12        MR. RICHARDSON:  Can we put up Government's

13   Exhibit 18.

14   Q.  How did you meet Reverend Coleman Singleton?

15   A.  Sharonda came to us from Atlanta.

16   Q.  And what was her role at the church?

17   A.  Sharonda went into ministry and immediately started

18   preaching.  Sharonda was the apple of everybody eye.  She had

19   a bright smile.  Any time she went into the room, the whole

20   room would light up.  That's the type of person Sharonda was.

21   Sharonda, even though she had her own share of problems, she

22   never let nobody know what she was going through.  She would

23   encourage you.  I would have prayer breakfasts at my house,

24   and Sharonda would always be over to prayer breakfast at my

25   house, and we just got close.  Sharonda was the most sought

FELICIA SANDERS - DIRECT EXAMINATION

1    after minister in Charleston.

2    Q.   What do you mean by that?

3    A.   Once you meet her and hear her preach, you want her to

4    come back to your church and preach.  She would be all over

5    the place.  When I look at her, everybody wanted Sharonda, but

6    for some reason I thought Sharonda needed me.

7    Q.   Sharonda was heavily involved with the young people at

8    Mother Emanuel?

9    A.   Yes.

10   Q.   And did she have a particular relationship with your

11   granddaughter?

12   A.   Yes, she did.

13   Q.   Tell me a little bit about that.

14   A.   They would, even before they started having church school,

15   Sharonda would always come and talk to the kids and how the

16   kids -- and just play with the kids.  Sharonda have a smile

17   that would attract any young person.  I remember one day she

18   gave out her phone number to the entire church, just to let

19   any young person know if they need her, give her a phone call.

20   Q.   Did she, Reverend Sharonda Coleman, did she attend Bible

21   study each and every week?

22   A.   She didn't come each and every week because she have some

23   active kids.  So when she could come, she would be there.

24   Q.   She had three kids that were involved in a variety of

25   different activities?

FELICIA SANDERS - DIRECT EXAMINATION

1    A.  Yes.

2    Q.  Including a son that played baseball?

3    A.  Yes.

4    Q.  Do you know what she did outside of church?

5    A.  Outside of church she was the coach at Goose Creek High.

6    The track coach.

7            MR. RICHARDSON:  Would you put up Government's

8    Exhibit 17, Ms. Baker.

9    Q.  Who is this?

10   A.  Reverend Depayne Middleton.

11   Q.  Who did she typically bring with her to Bible study on

12   Wednesday nights?

13   A.  First she would enter the room, and then the four girls

14   would be right behind her.

15   Q.  The four girls were recognizable?

16   A.  Yes.

17   Q.  They were tall and athletic?

18   A.  Very tall, beautiful girls.

19   Q.  What would they bring with them when they came to Bible

20   study?

21   A.  Each one would have a cup of milkshake.

22   Q.  Why had the four girls not come with Depayne that night?

23   A.  It's so ironic that right before the shooting start, I ask

24   her, where's your girls, because I'm so used to seeing the

25   four girls right behind her.  And she didn't -- she said she

FELICIA SANDERS - DIRECT EXAMINATION

1  needed to come over to the church right away because they had

2  a meeting, she was going to get her preaching certificate, and

3  she didn't trust the car that the girls would be riding in, so

4  she didn't trust them coming down at that time of night to

5  Bible study.

6  Q.  Had you heard Reverend Middleton preach before?

7  A.  Yes, I have.

8  Q.  Have you also heard her sing?

9  A.  Yes, I have.

10  Q.  Can you tell me about her preaching and singing?

11  A.  She had a lot of passion.  She had a lot of passion.  If

12  you look at her, her eyes have a lot of passion.  She had a

13  little sadness about her, but she had a lot of passion for the

14  Word.  When she sang, her voice sound so sweet.  She was a

15  loveable person, a loveable person.  I always admired that she

16  would come with her four daughters, which is important

17  nowadays to bring your kids to church with you.

18        MR. RICHARDSON:  Can we put up Government Exhibit 14,

19  Miss Baker.

20  Q.  Who's this?

21  A.  That's Miss Lance, Miss Ethel Lance.

22  Q.  Tell me, what did Miss Ethel Lance do with the church?

23  A.  Miss Ethel Lance was on my usher board first.  She was the

24  sexton of the church.  She had a walk about her called a swag.

25  Nobody else can do it like Miss Lance could do it.

FELICIA SANDERS - DIRECT EXAMINATION

1    Q.  Was she -- fair to say she seemed to always be there?

2    A.  She was there much too much.

3    Q.  Some might say overworked doing it?

4    A.  She was overworked and underdeserved.

5    Q.  Tell me a little bit about her.  You and I have had the

6    chance to visit about her.  You talk about her sense of humor.

7    Tell me a little bit about how funny Miss Lance was.

8    A.  You can look at her smile now and see how funny she was.

9    She would always have a joke to tell us.  She would always

10   tell about her grandkids and the way each one of her grandkids

11   would talk, walk, whatever.  But she always have a joke.

12   Especially her granddaughter Nadina, she always show you how

13   Nadina bat her eyes and how Nadina so pretty.

14   Q.  She was fairly engaged as a mother and grandmother?

15   A.  Yes.

16   Q.  She talked about her kids and grandkids a fair bit?

17   A.  She loved those grandkids.  She loved each and every last

18   one of them.  She loved her kids.  She was always talking

19   about Gary and Esther.  She wanted to make sure they had

20   everything they needed all the time.

21   Q.  And she had had the unfortunate circumstance of having a

22   child pass away before she did?

23   A.  Terry.

24   Q.  And you mentioned her son Gary, who is with us today.

25   Tell me a little bit about what she would do to help Gary.

FELICIA SANDERS - DIRECT EXAMINATION

1   A.  Gary is a special need young man.  She would always make

2   sure he had food to eat, gas in the car, she would always go

3   check on him, and she would make sure his bills or whatever

4   for that month is paid.  She would just say "I have to go

5   check on Gary" all the time.

6   Q.  And in turn, Gary also helped her at the church?

7   A.  Gary came to the church and helped her a lot.

8   Q.  Miss Lance, did Miss Lance have a song that she loved?

9   A.  Miss Lance, any time we would sing One Day at a Time, we

10  know Miss Lance was going to get started.  She loved One Day

11  at a Time.  She really loved that song.  Soon as the others

12  start, I would say get prepared, you would have to go over to

13  Miss Lance.

14  Q.  Let me ask you a little bit about your aunt that was

15  there.  Who is your aunt that was with you?

16      It's okay, take your time.

17  A.  First of all, my Aunt Susie is my friend.  She was my best

18  friend.  My Aunt Susie.  Sweetest person I know.  Me and Susie

19  did so much together.

20      I found out I have breast cancer, and Aunt Susie and Aunt

21  Eva, my mother-in-law, we went up into the mountains.  And it

22  was scary going up there.  And I can remember Aunt Susie just

23  praying in the car so loud because I had to make a three-point

24  turn up in the mountains and that was so scary.  But when we

25  got there, I asked the doctor, I said, how soon I have to have

FELICIA SANDERS - DIRECT EXAMINATION

1   surgery?  He said, why?  I said, I need to go on vacation.  He

2   said, you need to go on vacation?  I said, yes.

3       So anyway, we got the car full, it was a lot of us, we

4   went up into the mountains, and for one full week we had

5   praise and worship every day.  Every day.  And as soon as I

6   got back to Charleston, I went and I said I'm ready for my

7   surgery.

8       Aunt Susie and Aunt Eva and other sisters, we did a lot of

9   praying and everything.  And I had the nine-hour surgery.  But

10  I was able to set up that same night and talk, and Aunt Susie

11  helped me do all of that.

12  Q.  Tell me about -- I'm trying to think which of the stories

13  I should talk about -- but when, you know, when you talked to

14  Aunt Susie, what would you know that Aunt Susie was never

15  going to do?

16  A.  I would say -- I would know -- I would know Aunt Susie

17  went somewhere, and I would be all ready to hear the story

18  that it wasn't good, the affair wasn't good.  And I would say,

19  Aunt Susie, how was the wedding reception, or how was the

20  banquet or something, she'd say, oh, the affair was so nice,

21  it was beautiful.

22  Q.  Never had a bad word to say about anything?

23  A.  Aunt Susie would never say anything about anything,

24  anybody, even when Aunt Susie know somebody is not right, she

25  would say, oh, he just a little mixed up.

FELICIA SANDERS - DIRECT EXAMINATION

1  Q.  Tell me a little bit about what Aunt Susie did for others

2  every morning when she woke up.

3  A.  Aunt Susie was 87 years old.  Every morning she get up,

4  she would call all of her sisters, all of her friends, all the

5  singing sisters, and make sure they took their medicine.  She

6  would make hair appointments for them, she would make me come

7  and pick them up to take them to the hair appointment and take

8  them back home.  That's what Aunt Susie did.

9  Q.  You tell the story from time to time of Aunt Susie always

10 having $5 in her pocket.  Why did she carry $5 with her all

11 the time?

12 A.  I say, Aunt Susie -- She said, I got $5.  I say, you

13 always have $5.  She say, well, when you know the robbers come

14 and get you, they want money, so I have $5 for them all the

15 time.

16 Q.  I can tell somebody else has heard that story before.

17     What role did Aunt Susie play in the Jackson family?

18 A.  Aunt Susie was the matriarch of the whole bunch.

19 Q.  When you say the whole bunch, it was one of the largest at

20 Emanuel?

21 A.  The largest in Emanuel Church.

22 Q.  When you talk about somebody as a matriarch, tell me what

23 you mean by that.

24 A.  Aunt Susie tell you what to do, when to do it, how to do

25 it, and why to do it, and you got it done.

FELICIA SANDERS - DIRECT EXAMINATION

1    Q.  Not a lot of people asking questions back?

2    A.  Not to Aunt Susie.  I mean, the way she would talk to you,

3    it's hard to tell Aunt Susie no.

4    Q.  Did she serve the church in a variety of ways?  Talk first

5    about the usher board.

6    A.  I believe during the years she did everything there is to

7    do in the church, too.  But she wasn't on the usher board at

8    the time I was on the usher board; she was on the choir.

9    Q.  She was on the choir?

10   A.  Yes.

11   Q.  So tell me a little bit about how she sang.

12   A.  Aunt Susie have a beautiful voice.  Beautiful voice.  But

13   not only she would sing, any time someone died or any time

14   there's a program at the church, Aunt Susie called all the

15   sisters, all the members of the choir, and make sure there was

16   a choir there.

17   Q.  Where in Mother Emanuel, where does the choir sit?

18   A.  To think about it, you would think it's on the third floor

19   of the building.

20   Q.  So you've got to walk up the stairs to get there?

21   A.  Narrow stair, you have to walk up a narrow stair to get to

22   the choir loft.

23   Q.  Ever hear Miss Susie complain about walking up that stair?

24   A.  No.  No, no.

25   Q.  What kind of relationship did Aunt Susie have with your

FELICIA SANDERS - DIRECT EXAMINATION

1   granddaughter?

2   A.  My granddaughter love Aunt Susie.  She just really love

3   Aunt Susie.  She loves to hug Aunt Susie.  When I would take

4   Aunt Susie home at night, she would get out the car, walk Aunt

5   Susie to the house, took all the bags in, tried to tote Aunt

6   Susie in, and they would hug and kiss.  And Aunt Susie would

7   always say, I love you.  And she would get back in the car.

8   Then half the way home, we would talk about Aunt Susie.

9   Before we even get home.

10  Q.  Tell me a little bit about your granddaughter.  How old

11  was she at the time of this attack?

12  A.  Eleven years old.

13  Q.  How long has she been living with you?

14  A.  She been with me off and on since she been a baby.

15  Q.  Tell me a little bit about -- I don't want to spend too

16  much, but tell me a little bit about her.  What did she love

17  to do?

18  A.  She loves to hug.  She loves to hug, she loves to be

19  directly in my face constantly.  She loves to sing.  She loves

20  to come to Bible study, and she's a pretty good person to do

21  some praying.

22  Q.  Does she like to collect things?

23  A.  I call her hoarder.  She call herself the collector.  I

24  tell her she need to organize her collection.

25  Q.  You mentioned that from time to time now she likes to be

FELICIA SANDERS – DIRECT EXAMINATION

1  right in your face.

2  A.  Directly in my face, even when I go to the bathroom, I

3  open the door and her nose was right to the bathroom door.

4  She sleeps in my room.  It's just hard for her to break away

5  from me.  And I understand.  I understand.  But she is really

6  tight with me right now.

7  Q.  That's been something that's really developed since the

8  attack happened?

9  A.  Yes.

10  Q.  Tell me just a little bit about Tywanza's relationship

11  with your granddaughter.

12  A.  Tywanza take on a father role.  He would talk to her all

13  the time.  That what she like.  She said he had a lot of

14  muscles, which I didn't see.  So he used to pick her up on his

15  muscles, she would hang on to his arm and he would pick her up

16  and down.  And then he would take her to the park and they

17  would talk all the time.  But during the summer months it turn

18  into Tywanza Camp.  So Tywanza Camp consists of three or four

19  little girls between the ages of eight and 12.  And me and my

20  daughter would tell them, you have to read, you have to do

21  math, anything, we would get grumbles.  And then Tywanza would

22  come and say, well, y'all going to read this month, and then

23  y'all going to do this amount of math today, and then we're

24  going to go outside and play.  They would sit there and do it.

25  And I said, well, we just told y'all to do this.  Tywanza say

FELICIA SANDERS – DIRECT EXAMINATION

1    for us to do it.

2    Q.  Different when he said it, wasn't it?

3    A.  Yes.

4         MR. RICHARDSON:  Can we put up Government's

5    Exhibit 16.

6    Q.  How did Tywanza end up at Bible study that night?

7    A.  Me and Tywanza was very very close.  Very close.  He would

8    come to Sunday school, he would come to Bible study.  That

9    morning when I dropped him off to the bus stop he said, Mama,

10   are we having Bible study today?  I said, well, you going to

11   have to -- I'm going to have to call you, because I don't

12   know, we may cancel it.  And he said, y'all going to cancel

13   Bible study?  I said, yeah, because we have a church

14   conference meeting.  And then during the day me and him talked

15   back and forth, and we still didn't have any changes on

16   whether we was going to cancel or not.

17        But the last text message I got from him was, are we

18   having Bible study?  And I text him back to say yes.  And he

19   showed up at Bible study.

20   Q.  Where did Tywanza go to high school?

21   A.  Tywanza went to King Solomon Charter.

22   Q.  Where did he graduate from college?

23   A.  Allen University in Columbia.

24   Q.  You talked a little bit about his love of poetry and

25   writing and --

FELICIA SANDERS - DIRECT EXAMINATION

1    A.   Yes.

2    Q.   -- and lyrics.  Was he also into acting?

3    A.   Yes, he was studying.  Tywanza worked so many jobs, he

4    just did a lot of things.  He worked a lot of jobs.  And so

5    during the time he was studying to be in the play, he was

6    working at the barber shop in the morning, Steak and Shake at

7    night, and studying to be a player at Royal Baptist Church

8    during the middle of the day.

9    Q.   And was he viewed in the family, was he the baby in the

10   family?

11   A.   He was everybody's baby, even though he was the tallest

12   one.

13   Q.   He knew how to use that, right?

14   A.   Yes.

15   Q.   I want to turn back and talk to you just a little bit

16   about the Bible study that night.  Tell me how you got

17   started.  After the conference was over, the 12 of you

18   gathered together; tell me how you started.

19   A.   We sang a song, then we did a prayer, and Myra went and

20   right on into Bible study.

21   Q.   And what were you studying that week?

22   A.   We were studying the Book of Mark.

23   Q.   Which of Jesus' parables were you studying?  Were you

24   studying the parable of the sower?

25   A.   Yeah, of the sower.

FELICIA SANDERS – DIRECT EXAMINATION

1  Q.  In this Bible study in this context, how many people

2  brought their Bibles with them?

3  A.  Basically everybody come to Bible study have their own

4  personal Bibles, but we have Bibles at the church also.

5  Q.  And did you bring your own personal Bible with you?

6  A.  Yes.

7  Q.  And when you talk about your personal Bible, how often did

8  you turn to that Bible for wisdom or insight?

9  A.  That's my life.  For everything.  I actually taught my

10  kids the B-I-B-L-E, Basic Instructions Before Leaving Earth.

11  Q.  After you started Bible study that night, did somebody

12  else join that group of 12?

13  A.  Yes.

14  Q.  What did he look like?

15  A.  He looked like the defendant sitting right over there.

16  Q.  A white man?

17  A.  Yes.

18  Q.  Was it unusual to you to have a visitor at the Bible

19  study, even a white guy?

20  A.  No.

21  Q.  In your time at the Bible study, you had experiences where

22  that group, and yourself in particular, offered and helped

23  those that came into the church looking for that help?

24  A.  If that guy over there came in the church and told me that

25  he needed a place to stay, I guarantee you he would have been

FELICIA SANDERS – DIRECT EXAMINATION

1   staying in my house.

2   Q.  Who first mentioned that somebody had walked into the

3   fellowship hall?

4   A.  When he walked in, he asked if we was having Bible study,

5   and basically we all say yes.  And then Sharonda say, Pastor,

6   we have a visitor.

7   Q.  And having Sharonda say that to Pastor Pinckney, what did

8   he do?

9   A.  He sat up and invited him to have a seat right next to

10  him.

11  Q.  And what did he give to the defendant when he got there?

12  A.  He gave him a Bible and a sheet of the paper we were

13  working on.

14  Q.  The sheet that Myra had prepared in preparation?

15  A.  Yes.  Um-hum.

16  Q.  Tell me a little bit about what your impressions were when

17  he walked in.

18  A.  I didn't really have one.  I just thought he was somebody

19  coming in to seek the Word.

20  Q.  You mentioned during the Bible study Depayne told a little

21  story about returning library books.

22  A.  Yes.

23  Q.  Right?  And there was a humorous story.  How did the

24  defendant react to that story?

25  A.  He chuckled.

FELICIA SANDERS - DIRECT EXAMINATION

1   Q.  Was he engaged at other times during the course of the
2   Bible study?
3   A.  Basically the most of the times he hang his head down just
4   the way he's doing right now.
5   Q.  How long was he there, from when he walked in and Reverend
6   Pinckney gave him a seat right beside him, until the Bible
7   study drew to a close?
8   A.  I would say about 45 minutes.  To an hour.
9   Q.  And when Bible study finished up, when it got ready to
10  close, how did you do that?  How did y'all close out Bible
11  study?
12  A.  We stood up, shut our eyes to say a prayer.
13  Q.  And when you shut your eyes to say that prayer, what
14  happened?
15  A.  We shut our eyes, started praying, a loud sound went off.
16  From working on the elevator, I know that we was having
17  construction going on at the church, so at first I assumed
18  something went wrong with the electricity.  The room got dark
19  for a second, and all of a sudden it lit up, and that's when I
20  noticed the defendant with the gun.  And I screamed, he has a
21  gun.  By then he had already shot Reverend Pinckney.
22  Q.  And what did the people around you, what did y'all do when
23  you saw that the defendant had brought a gun with him to Bible
24  study?
25  A.  Right before Depayne -- when I thought the electricity

FELICIA SANDERS - DIRECT EXAMINATION

1    blew or something, because the -- it sounded like a

2    transformer.  I said, everybody get under the table.  Then

3    when the room lit back up, that's when we were already under

4    the table, most of us who could have, and that's when he

5    started shooting up the room.

6    Q.  And were you able to tell, from what you could hear, where

7    Reverend Simmons tried to get?

8    A.  Reverend Simmons stood up.  Reverend Pinckney was the

9    first one got shot.  Reverend Simmons stood up and said, let

10   me check on my pastor, I need to check on my pastor, just let

11   me check on my pastor.  Next thing I know, bullets start

12   flying, Reverend Pinckney went down -- I mean Reverend

13   Simmons.  Reverend Simmons got shot up.  He was trying to -- I

14   don't know what he was trying to do, but I heard him say, I

15   need to check on my pastor.

16   Q.  And did you continue to hear shots after shots?

17   A.  As I lay under the table, it was so many shots, it was so

18   many shots.  I started looking around trying to see if

19   something I could do.  I'm not familiar with guns, so I did

20   not know that he had to reload.  It sounded like almost like a

21   machine gun it was just going off in the room.

22   Q.  You could hear the defendant shooting; what could you feel

23   on your legs and arms?

24   A.  As I heard the defendant shooting all around the room, I

25   grabbed my grandbaby, and she was saying, Granny, I'm so

FELICIA SANDERS - DIRECT EXAMINATION

1    scared, Granny, I'm so scared.  And I said, just be quiet.

2    Just be quiet.  And she said, I'm so scared.  So I had to use

3    a word that would relate to her, I said, just play dead.  I

4    said, play dead.  And so I muzzled -- I muzzled her face to my

5    body.  I muzzled her face to my body so tight that I thought

6    I suffocated her, because I didn't want her to make a sound.

7         And my son was on one side of me, my Aunt Susie was on the

8    other side of me.  And I could feel the warm blood flowing on

9    each side of me.  So what I did, I knew he was coming in my

10   area, so I dragged my feet into my son and my aunt blood so

11   that he would think that he shot me.

12        Then me and my son was communicating under the table, so

13   he know that I was still alive.  So when he came in the back

14   part of the room and he talked to Miss Polly, my son know I

15   was still alive and my grandbaby was still alive.  So when he

16   put the gun at Miss Polly, toward Miss Polly, and asked her,

17   have I shot you yet, she said no.  He say, I haven't shot you

18   yet, right?  She said no.  He said, well, I'm not, because I

19   want you to tell the story.

20        But in between him talking, my son rised up to get the

21   attention of Miss Polly, even though he had already got shot,

22   because he said, Mama, I'm shot.  But he was still alive.  He

23   was still alive.  He stood up and say, why are you doing this?

24   Why are you doing this?  And the defendant, over there with

25   his head hang down, refusing to look at me right now, told my

FELICIA SANDERS - DIRECT EXAMINATION

1    son, I have to do this.  I have to do this because you raping

2    our womens and y'all taking over the world.  My son said, you

3    don't have to do this.  You don't have to do this.  We mean

4    you no harm.  We don't mean you no harm.  And that's when he

5    put about five bullets in my son.

6         And the whole time I'm laying there, I felt the sting up

7    and down my leg.  Nothing but sting.  I couldn't move.  I was

8    just waiting on my turn.  Even if I got shot, I didn't want my

9    granddaughter to be shot.  I was just waiting on my turn.  It

10   was a lot of shots.  Seventy-seven shots in that room, from

11   someone who we thought was there before the Lord, but in

12   return, he just sat there the whole time evil.  Evil.  Evil as

13   can be.

14   Q.  Miss Felicia, are you able to tell when the defendant left

15   the church?  Were you able to tell from the chime on the door

16   when the defendant left the church?

17   A.  (Witness nodded affirmatively.)

18   Q.  Yes?  As the defendant left the church, what was your son

19   trying to do?

20   A.  As the defendant was leaving, had my son started screaming

21   for Aunt Susie.  Aunt Susie, Aunt Susie.  I said, Tywanza, lay

22   down, lay down.  But Miss Polly had found the phone and she

23   had already called the police.  So I could hear the sirens

24   coming.  I said, lay down, they coming, I said, Tywanza,

25   please lay down.  He said, I got to get to Aunt Susie, I got

FELICIA SANDERS - DIRECT EXAMINATION

1    to get to Aunt Susie.  And he start moving across the room.

2    Moving across the room.  I can't get him to stay still, he

3    just -- he knew that we were in the same area, he was -- I

4    guess he was praying that Aunt Susie still been alive.

5        And on his way going toward Aunt Susie he said, I need

6    some water.  I need some water.  I can't breathe.  And I start

7    asking Miss Polly, I said, please help my son.  I said, please

8    help my son.  Because Miss Polly is a nurse.  She grabbed the

9    white tablecloth off the table and she was trying to help him.

10   When he reach Aunt Susie, he grabbed a handful of Aunt Susie

11   hair, and we watched him take his last breath.  I watched my

12   son come in this world and I watched my son leave this world.

13            MR. RICHARDSON:  Can we take a break, Your Honor?

14            THE COURT:  A brief recess.  Miss Lena, could you

15   lead the jury out and we'll take a recess.

16       (Jury excused.)

17            THE COURT:  We'll be in recess for ten minutes.

18       (A recess was held at this time.)

19       (Jury not present.)

20            THE COURT:  Please bring in the jury.

21            MR. BRUCK:  Absolutely no disrespect to Miss Sanders,

22   and our hearts are breaking for her, but I have a job to do.

23   I would like to object to a couple things and put this on the

24   record, if I may.

25            THE COURT:  Okay.

FELICIA SANDERS - DIRECT EXAMINATION

1          MR. BRUCK:  We object to the witness saying that he

2     just sat there, pure evil.  I think the words are, for

3     someone -- for someone who we thought was there before the

4     Lord, but in return he just sat there the whole time evil.

5     Evil.  Evil as can be.

6          THE COURT:  I overrule that objection.  That's her

7     observation.  What's the next one?

8          MR. RICHARDSON:  I'd also like to add that's not a

9     timely objection.  If he has an objection, he ought to make it

10    when the testimony is there and at a time when the judge can

11    address that issue at an appropriate time, not after the fact

12    out of the presence of the jury.

13         THE COURT:  I completely agree with that.  What's the

14    next one, Mr. Bruck?

15         MR. BRUCK:  If I may respond to that for the record?

16         THE COURT:  No.  What's your next one?

17         MR. BRUCK:  The only other is the witness' comment on

18    Mr. Roof's demeanor, and that he was refusing to look at her

19    right now in the courtroom.

20         THE COURT:  She was -- that was the same behavior he

21    had on the night in question, that was a proper statement, and

22    there was nothing improper about that and I overrule that.

23       Mr. Bruck, if you have an objection, they must be timely

24    or they are waived.

25       Anything further?

FELICIA SANDERS – DIRECT EXAMINATION

1          MR. BRUCK:  If I may, may the record reflect that the

2    witness was crying and understandably very upset during parts

3    of her testimony, and it seemed inappropriate to respond.

4          THE COURT:  Let me explain reality here.  Crime

5    victims frequently weep from the witness stand.  I see it all

6    of the time.  And I think it's just one of the realities of

7    being a victim.  So I didn't think it was improper.  If I

8    thought it was improper, I would have dealt with it.  I did

9    not think it was improper.  It's just the natural result of

10   telling a very tragic story.

11         MR. BRUCK:  Very well.  And I would like to apologize

12   to these witnesses for having to make these objections.

13         THE COURT:  You're doing your job, Mr. Bruck, you

14   just keep doing your job.

15       Finished with that, bring in the jury.

16       (Jury present.)

17         THE COURT:  Mr. Richardson, continue direct

18   examination.

19         MR. RICHARDSON:  Thank you, Your Honor.

20   BY MR. RICHARDSON:

21   Q.  When we broke, I apologize, I couldn't get one question

22   out that I know you want to tell us.  Before your son Tywanza

23   passed away, what was he able to tell you?

24   A.  As I watched my son lying across the room, tell the

25   ambulance that they're here, I said, I love you, Tywanza.  I

FELICIA SANDERS - DIRECT EXAMINATION

1   love you, Tywanza.  He said, I love you too, Mama.  And he

2   kept right on hollering for Aunt Susie.  And I watched him

3   die.  I watched him take his last breath.  Me and Miss Polly

4   together watched him take his last breath.

5           MR. RICHARDSON:  I appreciate that.  I know how hard

6   this has been for you, but I appreciate your effort.  If you

7   would answer any questions the defense might have, I sure

8   would appreciate it.

9           THE COURT:  Cross-examination.

10          MR. BRUCK:  Thank you, Your Honor.

11                        CROSS-EXAMINATION

12  BY MR. BRUCK:

13  Q.  Good afternoon, Miss Sanders.  I only have one question to

14  ask you; I'll be done.

15      Do you remember the man who did this saying something

16  about that he was only 21, and then talking about what he was

17  going to do afterwards?

18  A.  Yes.

19  Q.  Could you tell us what he said?

20  A.  He say he was going to kill himself.  And I was counting

21  on that.  He's evil.  There's no place on earth for him except

22  the pit of hell.

23  Q.  He said that he was 21?  And then that he was going to

24  kill himself when he was finished?

25  A.  Send himself back to the pit of hell, I say.

FELICIA SANDERS - CROSS-EXAMINATION

1   Q.  Did -- he didn't say that though.  About hell.  He just

2   said he was going to kill himself?

3   A.  That's where he would go, to hell.

4         MR. BRUCK:  Yes, ma'am.  I'm so sorry.  Thank you.

5         THE COURT:  Please step down, thank you.

6       Government, call your next witness.

7         MR. WILLIAMS:  Thank you, Your Honor, the Government

8   calls Justin Kniess.

9         THE CLERK:  State your full name for the record,

10  please.

11  A.  Justin Robert Kniess.

12      JUSTIN KNIESS, a witness called by the Government, first

13  having been duly sworn, testified as follows:

14                    DIRECT EXAMINATION

15  BY MR. WILLIAMS:

16  Q.  Good afternoon.

17  A.  Good afternoon.

18  Q.  Can you spell your last name?

19  A.  K-N-I-E-S-S.

20  Q.  You pronounce it Kniess?

21  A.  That's correct.

22  Q.  Tell the jury where you work.

23  A.  I work in the central business district, which is the King

24  Street/Market area of Charleston.

25  Q.  What do you do there?

JUSTIN KNIESS - DIRECT EXAMINATION

1   A.  I'm a supervisor.

2   Q.  For a department?

3   A.  For the department of City of Charleston police

4   department.

5   Q.  So say that again.  You work for the city police

6   department, and you said you're a sergeant?

7   A.  That's correct.

8   Q.  And is there a specific area you are a sergeant over?

9   A.  Yeah, central business district, which is the King Street/

10  Market area.

11  Q.  I want to ask you a little bit about your background and

12  how you get to work in law enforcement.  Did you go to college

13  in order to get that job?

14  A.  I went to college at Clemson University, I graduated with

15  a degree in psychology and a minor in microbiology.  That's

16  about my experience in education with --

17  Q.  How did you end up going to law enforcement?  Were you

18  studying -- how did you end up in law enforcement if you

19  studied psychology?

20  A.  Well, honestly, after I graduated I had student loans that

21  were due, and the first job I got was with the City of

22  Charleston police department.

23  Q.  You said you went to Clemson University?

24  A.  That's correct.

25  Q.  What year did you start with the city police department?

92

JUSTIN KNIESS - DIRECT EXAMINATION

1   A.   2005.

2   Q.   What was your first job?

3   A.   I was a patrol officer in team four, which is West Ashley

4   area.

5   Q.   And if you could explain to the jury, how is the City of

6   Charleston broken up into teams, at least for law enforcement

7   purposes?

8   A.   City of Charleston breaks down the different patrol

9   divisions based upon obviously different geographic areas.

10   Team one, which is the peninsula, north of Calhoun Street;

11   team two is south of Calhoun Street towards the Battery; team

12   three is James and Johns Island; team four is West Ashley and

13   five is Daniel Island.  And then different special operation

14   divisions that go on beyond that, in which one of the special

15   operations divisions is team nine, which I work in, which

16   again is a central business district, which we deal with

17   mainly the hospitality areas in Charleston.

18   Q.   I'm going to ask you to pull that microphone a little

19   closer to you; I'm having a hard time picking you up.

20        So when you came out of college and started with the city,

21   what type of job did you have and what work did you do?

22   A.   I was strictly patrol.

23   Q.   What's that mean?

24   A.   Patrol, answer calls for service.

25   Q.   And how long did you work patrol?

JUSTIN KNIESS - DIRECT EXAMINATION

1    A.   I did two years before I went into what they considered

2    was a more directed patrol area, which was still in the same

3    geographic location of team four.  And I did that also

4    sporadically for about a year, year and a half.

5    Q.   Was there a special sort of title for that position?

6    A.   They called it the power shift, just based upon the hours

7    that you worked, which was from 17:00 hours to 02.

8    Q.   That's five --

9    A.   5:00 o'clock till 2:00 a.m., yes.

10   Q.   So after you worked on the power squad, did you end up

11   getting promoted or do any other kind of work?

12   A.   After that I transferred to K-9, and I was a K-9 handler

13   from 2009 to 2 -- middle of 2013.

14   Q.   What happened then?

15   A.   I retired my dog and I went back to team four and

16   continued in the patrol division as a patrol officer.

17   Q.   How long did you do that?

18   A.   When I went back I was a private first class, or senior

19   police officer, which is what we call them.  The sergeant who

20   was in charge of the squad that I was in was going out on

21   medical, which I ended up taking over the supervisory position

22   then as a junior officer.  And I did that for almost a year,

23   and then I got promoted to master patrolman, which is a

24   corporal, which is a -- the next step up in supervision, which

25   then I transferred down to the central business district.

JUSTIN KNIESS - DIRECT EXAMINATION

1   Q.  Did you get promoted any time after that as well?

2   A.  Yes, six months later I got promoted to sergeant in the

3   same unit.

4   Q.  You mentioned earlier the central business district.  Can

5   you explain that a little bit more clearly for people that

6   maybe aren't from Charleston?

7   A.  Central business district encompasses the bars and the

8   hospitality regions of Charleston.  That's where you have your

9   King Street, you have all your restaurants, bars, your night

10  life.  And you also have the market and a little bit of

11  Calhoun, there's a few establishments on there that we also

12  deal with.

13  Q.  As far as the location for where you are -- where you work

14  out of, where is the headquarters or the team office?

15  A.  It's located on George Street, and it's shared with the

16  team two office.

17  Q.  That's in the Gilliard Center?

18  A.  That's correct.

19  Q.  So let me ask you a little bit about those years you are

20  working, just give the jury a brief description of the types

21  of cases you would work, sort of in the time from when you

22  started to when you became a sergeant.

23  A.  When I started, I was team four as a patrolman.  I would

24  handle just about anything.  Any type of call for service,

25  from anything from a car break-in all the way up to a murder

JUSTIN KNIESS - DIRECT EXAMINATION

1    scene, you would have the whole gamut of different types of

2    calls.

3         Power shift, which I got put into about a year and a half,

4    two years after I started, that was dealing with just more of

5    the -- what they would consider more violent type crimes where

6    we dealt with a lot of the areas where you would see robberies

7    in progress type calls.

8    Q.  Did you handle any type of violent crime, specifically

9    murders or death cases?

10   A.  Yes.

11   Q.  Any cases involving multiple deaths?

12   A.  There was a couple that had mul -- more than one victim.

13   Q.  I want to ask you a little bit about the difference in

14   your job descriptions.  What's the difference between sort of

15   a sergeant and another police officer, in terms of your

16   responsibilities?

17   A.  From a patrolman to a sergeant level, supervision, you

18   have the officer who has a specific task which he goes there

19   to handle it to his ability.  The supervisor would then

20   oversee that to make sure that's getting done and organized,

21   and bring everything together in a -- the whole operation.

22   Q.  So back in June of last year, 2015, who were you

23   supervising or who were you responsible for as a sergeant?

24   A.  I would have been supervising the officers in my unit,

25   team nine.

JUSTIN KNIESS - DIRECT EXAMINATION

1  Q.  And how many officers would have been on that team?

2  A.  At that time, probably five or six.  On that given day.

3  Q.  I want to ask you about some of your other training;

4  obviously I'll ask you this first.  You responded to Mother

5  Emanuel on June 17, is that correct?

6  A.  I did.

7  Q.  Had you previously had any kind of sort of training in

8  either crisis response, mass shootings, crisis management type

9  things?

10 A.  I've had basic training in how to handle a -- how to

11 respond to a scene, to a crime scene, and actually deal with

12 the crime scene, but as multiple victims and the crisis such

13 as this, no.

14 Q.  Was that something you'd ever had to deal with case-wise

15 prior to June 17th of last year?

16 A.  No.

17 Q.  I want to ask you about the time leading up to that event

18 or that crime.  Who was on shift with you in the early evening

19 of June 17?

20 A.  I had Officer Delaney, Mr. Gorgeous, Stewart, Sergeant

21 John Lites also is working in the team two capacity alongside

22 of me.  There was several other officers, I -- I mean as far

23 as the total response, but those would have been the closest.

24 Q.  And if you can, explain sort of how team two and your team

25 sort of overlap for purposes of the location of Mother

JUSTIN KNIESS – DIRECT EXAMINATION

1   Emanuel.

2   A.  Team two's heart is the market area and lower half of King

3   Street, so we overlap there.

4   Q.  Go ahead.

5   A.  It is the overlap where you have the market and lower King

6   Street, we both shared those areas.

7   Q.  In terms of who was working that area that night, who

8   would have been responsible for the area where Mother Emanuel

9   was located, specifically that north side of Calhoun Street?

10  A.  That would have been team two.

11  Q.  Do you recall what occurred that night?

12  A.  A shooting at the church.

13  Q.  How familiar are you with sort of Mother Emanuel itself

14  and the area surrounding it?

15  A.  That was the first time I've ever been to the church was

16  that evening.

17  Q.  And how close is it to the headquarters where -- I should

18  say office where y'all work out of?

19  A.  It's about a block south.

20  Q.  Can you, if possible, sort of describe what that area is

21  like, maybe compared to the surrounding areas.  Is it quiet,

22  loud, touristy, not touristy?

23  A.  You're one street off of Meeting Street, basically

24  sandwiched between East Bay Street.  That side of the street

25  you just have a couple of churches, so typically is not a lot

JUSTIN KNIESS - DIRECT EXAMINATION

1   of call volume that you would hear, so it's quiet.

2   Q.  Tell the jury what happened that night regarding the

3   shooting and your involvement.

4   A.  That night I was supervising team nine, and I was sitting

5   in a parking lot off of Washington Street near Laurens, and I

6   was approving reports, which we have a computer system which

7   you have to electronically pull up reports, it's almost like

8   an e-mail type system where you open them up and read them and

9   you have to approve them.  Well, you have to switch between

10  screens to where you see a call screen where the calls are

11  coming up, then you have another screen where you approve

12  this.  So I was on this one screen approving the reports, and

13  I flipped down and I started to see the call come in for

14  Mother Emanuel, which it was an active shooting situation

15  which was coming in.  And that's when the alert tones came

16  over the radio, which is the online version of a call.

17       Multiple units checked in service, and I being a couple --

18  about three blocks away, you know, headed to the church, and I

19  was arriving on scene with several other officers.

20       As I arrived on scene, saw multiple officers going to one

21  side of the church, and I went right, which I found an opening

22  in a fence line right about two buildings over on the right of

23  the church, if you were facing it off of Calhoun.  And I

24  proceeded along the -- if you're facing the church on the

25  right side, with several other officers.

JUSTIN KNIESS - DIRECT EXAMINATION

1   Q.  I hand you what's been marked as Government's proposed

2   Exhibit 20.  Do you recognize that?

3   A.  I do.

4   Q.  Have you reviewed that before?

5   A.  I've seen it before, yes.

6   Q.  Does it fairly and accurately represent the area you were

7   just describing?

8   A.  Yes.

9       MR. WILLIAMS:  Show this to defense counsel.  I'll

10  move to admit Government's Exhibit 20.

11      MS. STEVENS:  No objection for illustrative purposes.

12      THE COURT:  Are you offering it -- you're offering it

13  for illustrative purposes?

14      MR. WILLIAMS:  Offering it as a representation of how

15  the area and --

16      THE COURT:  Is there an objection?

17      MS. STEVENS:  No, no objection.

18      THE COURT:  Government 20 is admitted without

19  objection.

20      (Government Exhibit 20 received.)

21  BY MR. WILLIAMS:

22  Q.  I'm going to have that called up on the screen in front of

23  you, Sergeant.

24      So if you could explain, you said that you went to one

25  side of the building; can you explain that based on this

JUSTIN KNIESS - DIRECT EXAMINATION

1    exhibit?  And if you hit the screen with your finger it will

2    put a mark on there, if that helps.

3    A.  All right.  Where I arrived, my patrol car was positioned

4    right about in this area.  I don't know if that came up or

5    not.

6    Q.  Why don't you just explain it relative to the red

7    buildings and the main building.

8    A.  If you're on Calhoun Street, which is the road right in

9    front of this dark building, which would be Mother Emanuel, if

10   you're facing that, looking at the front, if you see these two

11   smaller red in color buildings, when I responded, there's a

12   fence line between Mother Emanuel and these two houses.  So

13   they were closed, I could not make entry in there.  So I had

14   to go around on the right of this parking lot on the far right

15   side of those two buildings.

16   Q.  So you went around the two red buildings?

17   A.  That is correct.

18   Q.  And you said other people had responded.  Could you tell

19   who else was in any other locations, either by radio calls or

20   by visual?

21   A.  Based upon the radio transmission, you had Officer Delaney

22   and Officer Henderson who responded and they were the first

23   ones on scene.  And based upon where they were talking about

24   on the radio, you could tell they had made entry on the left

25   side, which they went directly to the side of the building.

JUSTIN KNIESS - DIRECT EXAMINATION

1   Q.  Who was in charge at that point in time?

2   A.  Between the radio transmissions, would be myself and

3   Sergeant John Lites.

4   Q.  Do you know where John Lites or Sergeant Lites was at the

5   time?

6   A.  Other than radio, I had no idea where he was.

7   Q.  So let me ask you, you said it had gone out as an active

8   shooter call?

9   A.  Yes.

10  Q.  What does that mean in terms of a response?

11  A.  That means you're going code, that you're getting there as

12  fast as possible as you can get there.

13  Q.  And what's it mean for other officers who would have

14  responded, I think you said Henderson and some others were --

15  A.  The same.  The same.  They're getting there as fast as

16  they can and make an entry.

17  Q.  So as you went around the side, were you able to tell what

18  other people were doing?

19  A.  Yes, I could hear that they had -- Officer Henderson and

20  Delaney had made entry into the church.

21  Q.  And what did you do as a supervisor at that point?

22  A.  Based upon what they were putting over the radio, they

23  said that the suspect had fled out the doors.  I was trying

24  to, before I had made it to the side of the church, I was

25  trying to set up a perimeter that we could get K-9 in to

JUSTIN KNIESS - DIRECT EXAMINATION

1   track, based upon what this said.

2   Q.  Explain why you set up a perimeter to get the K-9 in.

3   A.  When you call K-9 in, the dog tracks the hottest scent in

4   the area from where the suspect left, it follows it to its

5   finality.  But if you don't have a perimeter set up, in

6   theory, a suspect will continue to walk on, and without being

7   encapsulated by a perimeter.

8   Q.  Did you know at that time whether the person was on foot

9   or in a vehicle?

10  A.  Other than fled out the door, that's all the information

11  we had at that time.

12  Q.  So the perimeter was an attempt to secure that area,

13  hoping he would be in that perimeter?

14  A.  That it is correct.

15  Q.  What did you do once you started doing -- Did you instruct

16  people to set that perimeter up?

17  A.  I mean, based upon the radio transmission, I said let's

18  hold.  What I meant by hold was what area, who was coming in,

19  to hold where they are to set up for a K-9 to come in.

20  Q.  And what happened then?

21  A.  I continued back around the side of the church.  And I was

22  relaying information about who had made entry, and I was

23  making my way to the door to go and see what we physically had

24  on the ground.

25  Q.  So did you get around to the side of the building where

JUSTIN KNIESS - DIRECT EXAMINATION

1   the parking lot is, which would be in the top of Exhibit 20?

2   A.  Yes.

3   Q.  What did you find when you got to the other side of the

4   building?  The church.

5   A.  I -- outside I saw Officer Stewart, who was at the door,

6   and --

7   Q.  What did you do at that point in time?

8   A.  I went inside.

9   Q.  Were there any other officers or other officers inside at

10  that point in time?

11  A.  Officer Delaney and Henderson.

12  Q.  I want to ask you about the priorities or what needs to be

13  done in this situation as a sergeant.  What is it that you

14  have to get established, if anything, when you sort of arrive

15  on that scene?

16  A.  You have to secure a location.

17  Q.  Explain what that means.

18  A.  That means if the -- you have to make sure there's no

19  threat still on scene.

20  Q.  How does that get done?

21  A.  I have to go room to room to make sure they're clear, you

22  have to make sure you don't have any threats within that room.

23  Q.  And explain, if you can, how that relates to whether

24  people are injured, and how that may or may not be a priority?

25  A.  The -- in order to get emergency personnel in, they will

JUSTIN KNIESS - DIRECT EXAMINATION

1    not come into a scene that's not secure.  If there's still an

2    active shooter or person inside the building, that has to be

3    established before you relate to them, before they will come

4    into a scene.

5    Q.  So you'd mentioned securing the perimeter.  You also

6    mentioned sort of clearing the building.  Can you explain to

7    the jury, as a supervisor of -- the supervisor on scene, what

8    the priorities were from a law enforcement perspective, when

9    you got in that door.

10   A.  Secure, and then move on to -- we had lot of individuals

11   inside the church that we had had to evacuate to get them out

12   of harm's way.  And at that time, once that's secure, we can

13   bring emergency personnel in to get the victims out.

14   Q.  If you can, tell the jury what you saw when you went

15   through those doors, what was presented to you as a police

16   officer, and more importantly as a sergeant that was

17   supervising at this time.

18   A.  I saw we had multiple victims on the ground, there was

19   multiple shell casings, I remember seeing a child running,

20   screaming on scene.  And it was just chaos when I arrived on

21   scene.

22   Q.  How are you able to deal with that chaos, or what did you

23   do to sort of get through it?

24   A.  I started breaking down what I needed to get done in order

25   to help these people.  And the first thing to do was to secure

JUSTIN KNIESS - DIRECT EXAMINATION

1   that room, get the alive witnesses out and get emergency

2   personnel in to help these victims.

3   Q.  I'm going to show you Government's proposed Exhibit 21.

4   Take a look at it and tell me if you recognize it.

5   A.  I do.

6   Q.  Is that a -- you've seen that before?

7   A.  Yes.

8   Q.  Does that accurately reflect the interior of that

9   building?

10          MS. STEVENS:  No objection to Government's 21.

11          THE COURT:  Government 21 is admitted without

12   objection.

13      (Government Exhibit 21 received.)

14   BY MR. WILLIAMS:

15   Q.  I'm going to put up 21.  Can you briefly explain to the

16   jury what the make-up was, or how it appeared inside relative

17   to furniture and rooms when you entered?

18   A.  I mean, based upon representation, I mean, you had a bunch

19   of tables in the center, and that's where the -- when I

20   entered you would -- you had most of the victims were in that

21   center area.

22   Q.  Were you able to tell, I mean, you mentioned earlier there

23   were victims.  Could you see how many victims when you went

24   in?

25   A.  It was hard to tell how many from basically walking in

JUSTIN KNIESS - DIRECT EXAMINATION

1    there.

2    Q.  So once you went in, which direction did you go?

3    A.  I believe the first direction I headed was straight down

4    the center towards the back of the church.

5    Q.  Had Sergeant Lites shown up at that point in time?

6    A.  I believe we entered pretty much close to the same time.

7    Q.  And if you can, was there some division of responsibility

8    between two separate supervisors at that point?

9    A.  Basically we were backing off each other's play for what

10   he took care of and then I entered.  So he was doing most of

11   the interior work while I did most of the setting up the

12   continued response and trying to finish that.

13   Q.  When you say interior work, what would that be?

14   A.  I'm sorry, such as he was speaking with one of the victims

15   and dealing with what he had right in front of him.  I could

16   hear him putting out the description over the radio, so he was

17   getting further information to help with that response that

18   was coming in there to be on the look out, because I believe

19   he did a description across the radio.

20   Q.  So he was speaking to the survivors inside?

21   A.  Yes.

22   Q.  Did you clear the area?

23   A.  Yes, I took several officers with me and we went room by

24   room and checked.

25   Q.  I want to ask you about body cameras.  Can you tell the

JUSTIN KNIESS - DIRECT EXAMINATION

1   jury what a body camera is?

2   A.  Body camera is a device that we wear, the City of

3   Charleston has moved to that, every officer in the department

4   now carries a body camera.  It's a recording device that fits

5   on uniform.  The type that we used that day had a hood, and

6   when you flip the hood down it automatically started

7   recording.  There was a three- to five-second delay, but it

8   would record from once you flipped the hood down.

9   Q.  In that time back in June of last year, was every officer

10  outfitted with a camera?

11  A.  Not at that time.  We were just rolling that out.  I know

12  we were part of the pilot program, team nine, team five, and I

13  believe team seven, which was the traffic division, was using

14  the cameras at that time.

15  Q.  Did you have one that day?

16  A.  I did.

17  Q.  Do you recall if you flipped up the hood in order to

18  activate it?

19  A.  I flipped it down and it was activated.

20  Q.  You've had a chance to review that video?

21  A.  I have.

22  Q.  And I think it is as recently as today.

23  A.  That's correct.

24  Q.  I'm going to show you Government's proposed 22.  Are you

25  familiar with that?

JUSTIN KNIESS - DIRECT EXAMINATION

1   A.  Yes, sir.

2   Q.  Did you initial that disk?

3   A.  I did.

4   Q.  Does it contain the footage of your body camera?

5   A.  It did.

6   Q.  Does that footage fairly and accurately represent what you

7   saw on June 17th of 2015?

8   A.  Yes.

9           MR. WILLIAMS:  Your Honor, move to admit Government

10  22.

11          MS. STEVENS:  Your Honor, with the exception of our

12  prior objection, which was overruled, we have no new

13  objection.

14          THE COURT:  Very good.  Government Exhibit 22 is

15  admitted.

16      (Government Exhibit 22 received.)

17  BY MR. WILLIAMS:

18  Q.  Before I play that, Sergeant Kniess, can you just give the

19  jury a general idea of where that camera is located and what

20  it captures relative to your actions?

21  A.  It's located -- I had it mounted right here about the

22  middle of my chest, so you have a view from that angle.  And

23  also my shoulder mike is located right next to it.  So all the

24  transmission you're going to hear on the video are going to be

25  relatively very close.

JUSTIN KNIESS - DIRECT EXAMINATION

1    Q.  So it picks up radio transmissions as well as whatever

2    you're saying or hearing?

3    A.  Yes.

4         MR. WILLIAMS:  With the Court's permission, I'm going

5    to publish Government's Exhibit 22.

6         THE COURT:  You may.

7       (Video was played.)

8    BY MR. RICHARDSON:

9    Q.  I'm going to pause it there.  I'm going to pause it there.

10   So that was -- you said you had gone around the side of the

11   building?

12   A.  That is correct.

13   Q.  And this was entrance into the side door into the parking

14   lot?

15   A.  That is the side door to the parking lot.

16   Q.  Okay.  I'm going to start up again.

17      (Video was played.)

18   Q.  I'm going to back up a second; I think it's fast

19   forwarded.

20      (Video was played.)

21        MR. WILLIAMS:  Your Honor, I think we're having some

22   difficulty with the video and the timing.  I'm going to switch

23   over to a different copy, I think this is not -- not picking

24   up the audio.

25        THE COURT:  Okay.

JUSTIN KNIESS - DIRECT EXAMINATION

1          (Video played.)

2     BY MR. RICHARDSON:

3     Q.  I'm going to ask you at this point, Sergeant Kniess, the

4     tail end of that video showed several people sort of coming

5     around the corner and going into the building.  Who are those

6     individuals?

7     A.  The emergency medical services.

8     Q.  So you talked earlier about clearing the scene; were you

9     able to do that in this case?

10    A.  As well enough as what we needed to do to secure that to

11    get them in there.

12    Q.  And at that point in the video were they then making

13    entry?

14    A.  Yes.

15    Q.  Who are the first responders?  When I say first

16    responders, medical people that went in.

17    A.  It appeared to be EMS, and then the one on the video I was

18    talking to is Beyer, Thomas.

19    Q.  Is that normally the people that come in for sort of

20    medical --

21    A.  Yes.

22    Q.  You talked also about sort of these three things, one was

23    clearing, setting up a perimeter, clearing the scene, you were

24    also heard on there talking about getting victims somewhere;

25    can you explain that to the jury?

JUSTIN KNIESS - DIRECT EXAMINATION

1    A.  What I was trying to do is get the live witnesses that we

2    had on scene to a secure location, and that's where I was

3    talking about the hotel, which was across the street, securing

4    that lobby so we could put them there.

5    Q.  And when you say securing it, what do you mean by that?

6    A.  Clearing it so we don't get anyone else that may not have

7    any business in there, get them out of there, because secure

8    location that we can bring in support services for the

9    witnesses.

10   Q.  You had said that you had never dealt with a case that

11   involved this many casualties or this many victims.  What were

12   the unique challenges to you as a supervisor of this

13   situation?

14   A.  The multiple victims that we had on scene and also the

15   response that it invoked.  We had multiple agencies arriving

16   on scene asking if we needed help and trying to coordinate

17   that.  That was one of the major challenges.

18   Q.  Towards the tail end of that video I believe you were

19   talking to another law enforcement officer; he was asking you

20   if you needed anything?

21   A.  Yeah, he asked me where -- that was one of the flex units

22   for the team one, which is the upper peninsula patrol team, he

23   was asking me where do I need his guys.

24   Q.  And you had said that you had you and Sergeant Lites on

25   scene; was it ever handed over to a more senior officer or

JUSTIN KNIESS - DIRECT EXAMINATION

1   supervisor?

2   A.  I believe later in the video we'll get to where I give a

3   briefing to a lieutenant, what has been done to that point.

4           MR. WILLIAMS:  I'm going to pick up then.

5       (Video was played.)

6   BY MR. RICHARDSON:

7   Q.  Did that catch you talking to supervisors about the case?

8   A.  Yes, in the original one.  The individual's telling me

9   what he needed, that was the lieutenant.

10  Q.  In this circumstance would you have then handed off

11  supervision of the case to a more senior officer?

12  A.  Yes.

13  Q.  And on this video looks like you had talked to him and

14  then reported, or you were then going around the perimeter?

15  A.  Yes.

16  Q.  Once you sort of handed off supervision to a more senior

17  officer, what were your responsibilities?

18  A.  I was on the Henrietta Street, which is the street behind

19  the church, and basically that was blocking off traffic.

20  Q.  You had mentioned in there keeping the media away from the

21  perimeter; is that something you did as well?

22  A.  Yeah, I passed that on to another officer to keep that.

23  Q.  I want to ask you about clearing the building again.  Was

24  there a point in time where it was recognized that there were

25  still people still inside the room?

DAVID STEWART - DIRECT EXAMINATION

1   A.  Yes, when you get on to the audio, there was a call that

2   came in which said they were inside the building in a

3   different room.

4   Q.  Were those people then located?

5   A.  I believe so, yes.

6   Q.  You didn't have any part of that?

7   A.  I wasn't a part of that, no.

8   Q.  As far as your transition to, I guess, higher level

9   supervisors, that occurred during that time frame with the

10  video?

11  A.  About that time, yes.

12  Q.  The case would have then been taken over by other

13  supervisor?

14  A.  Yes.

15          MR. WILLIAMS:  No further questions.  Thank you.

16          THE COURT:  Cross-examination.

17          MS. STEVENS:  No questions, Your Honor, thank you.

18          THE COURT:  Sergeant, you can step down.

19      Government, call your next witness.

20          MR. WILLIAMS:  Thank you, Your Honor, Government

21  calls DS Stewart.

22          THE CLERK:  State your full name for the record,

23  please.

24  A.  David Scott Stewart.

25      DAVID STEWART, a witness called by the Government, first

DAVID STEWART - DIRECT EXAMINATION

1    having been duly sworn, testified as follows.

2                        DIRECT EXAMINATION

3    BY MR. WILLIAMS:

4    Q.   Tell the jurors where you work.

5    A.   I work for the Charleston city police department.

6    Q.   What do you do at the police department?

7    A.   I'm patrol officer in team two here downtown on the

8    peninsula.

9    Q.   How long have you worked in law enforcement?

10   A.   Forever.  I took my first oath of office in 1989 at a

11   sheriff's department in North Carolina.

12   Q.   Did you have any experience before that to qualify you to

13   be a police officer?

14   A.   I was in the U.S. Army for six years.  Got out, into

15   Reserve component, was activated for Desert Storm, finished my

16   obligations with the U.S. military after those were started.

17   Q.   You said you started working in North Carolina?

18   A.   Yes, sir.

19   Q.   When did you move to Charleston?

20   A.   In 2007.

21   Q.   What type of jobs have you had in law enforcement?

22   A.   Worked for two sheriff's departments, and then the City of

23   Charleston.  And I did international police training for five

24   years in Afghanistan.

25   Q.   So when you started with the city, was that in 2007 you

DAVID STEWART - DIRECT EXAMINATION

1    said?

2    A.  No, sir, I started with the city in 2014.

3    Q.  What was your first job with the city police department?

4    A.  Here in team two parole.

5    Q.  And can you explain just briefly what patrol means?

6    A.  I'm just a beat captain in downtown, I work in -- the area

7    I was assigned to is more or less Calhoun Street to Broad

8    Street east of King Street.

9    Q.  I'm going to ask you about June of last year; do you

10   remember a call that came out to Mother Emanuel on June 17th?

11   A.  Yes, sir.

12   Q.  Tell the jury where you were patrolling in the time

13   preceding when the call came out.

14   A.  Just before the call went out, I was at the intersection

15   of Smith and Calhoun at a restaurant.  I had just had my

16   dinner break.

17   Q.  Were you with anyone?

18   A.  Ed Henderson.

19   Q.  Is he another police officer?

20   A.  Yes, sir.

21   Q.  How far or how close is that area or that location to

22   Mother Emanuel?

23   A.  Five blocks.

24   Q.  And tell the jury --

25   A.  Across Calhoun Street.

DAVID STEWART - DIRECT EXAMINATION

1    Q.  Tell the jury what happened when the call came in.

2    A.  We got the call, shots fired at the church.  We left, got

3    in the car, went straight across Calhoun Street to the church.

4    Q.  Had you ever been to that church?

5    A.  I've been by it several times.

6    Q.  Had you ever been inside?

7    A.  No, sir.

8    Q.  What was the call that came out?

9    A.  The best I can recall, the call was dispatched as shots

10   fired inside the church.  An active shooter situation.

11   Q.  What does active shooter mean to you as a police officer;

12   does that have any specific meaning?

13   A.  That indicates that you have a person on site that is

14   actively shooting people.

15   Q.  Does it affect your response?

16   A.  Yes, sir.

17   Q.  How?

18   A.  When -- for an active shooter situation we -- first

19   officers on scene, as soon as you get someone there that can

20   watch your back when you go in, you go in to stop the

21   shooting.

22   Q.  How was that different than a nonactive shooter situation?

23   A.  If it's just a shots fired, not actively going on, you

24   would actually stage -- set up perimeter, then have a SWAT

25   team come in to actually make entry with a little better

DAVID STEWART - DIRECT EXAMINATION

1    equipment than what we have.

2    Q.  So what did you find when you arrived on the scene, or

3    tell the jury what happened when you got there.

4    A.  When we got there, Officer Henderson and I got out of the

5    car, we met with Officer Delaney.  There's a small wrought

6    iron fence on Calhoun Street at the church.  We got over the

7    fence, got to the first door.  Our sergeant, Sergeant Lites,

8    told us to treat it as an active shooter.  We real quick -- I

9    had a long gun, AR-15, so we made the decision Delaney would

10   open the door, I would go in, and Officer Henderson would be

11   right behind me.

12   Q.  So it's the three of you?

13   A.  Yes.

14   Q.  And you said you were the first one through?

15   A.  Yes, sir.

16   Q.  Explain, if you can, to the jury, what your

17   responsibilities or what your approach is when you're the

18   first one through the door in an active shooter situation.

19   A.  As the first person into a building, an active shooter

20   situation, your job is to find the shooter.  Period.  Nothing

21   else matters to you.  So Delaney opens the door, I go in, we

22   instantly start scanning the room looking for a person with a

23   weapon.  And my job, like I said, when I go in, is to check

24   any unlocked doors, any open areas where someone could be, and

25   find that person with the weapon.

DAVID STEWART - DIRECT EXAMINATION

1   Q.   Understanding those are your responsibilities, what did

2   you see when you went through the door?

3   A.   As I went in, the door came open, I went in to the right,

4   Officer Henderson went off to my left.  As you come through

5   the doorway, you have a small hallway about this wide that

6   opens up into a big room.  When we got to the end of it where

7   it intersects with the room, I called that one left, because I

8   had the long rifle, I had the better range and the room is

9   large in that direction.  So I crossed that, and as I crossed,

10  I see a magazine for a handgun laying across the room.  So I

11  cross over, Officer Henderson goes behind me, and we start

12  checking rooms as we go across, he's going this way and I'm

13  going this way.

14  Q.   Did you see any people in the room?

15  A.   I could see a person on the other side of the table off

16  maybe ten feet from me, and then another person over here,

17  they're crouched down behind a table, so I really can't see

18  them.  I can just see their heads.  And I hear Officer

19  Henderson engaging with the person at the table, and she -- I

20  can hear her talking to him, but I can't really make out what

21  she's saying.  And then he hollers out and he radios a

22  description that she gives him, so that we know what we're

23  looking for.

24  Q.   As far as victims in the room, were you able to at least

25  get some visual of what the circumstances were?

DAVID STEWART - DIRECT EXAMINATION

1    A.  I can see people lying but I really can't see them, I just

2    see their shapes under the tables.  And as I cross from the

3    room, there is one gentleman as you get back towards the

4    northern end of the room, lying on floor.

5    Q.  Could you tell if anyone was alive?

6    A.  Not that I could tell.  Initially I -- the gentleman that

7    was in the floor, I thought was alive, but I really wasn't

8    paying that close of attention, because I'm looking for

9    someone with a gun.

10   Q.  When you say you think he was, what do you mean?

11   A.  When I -- as I am passing him, I don't know if I heard or

12   just saw, or he seems to be not -- he wasn't really moving,

13   but I -- seems like either I heard him breathe or I saw his

14   chest rise, because there was a movement there that made me

15   think he might still be alive.

16   Q.  As far as your clearing of that room, were you able to do

17   that?

18   A.  Yes, we swept the room, like I said, anything that was

19   unlocked, we opened and looked.  Anything that was locked, we

20   left.  All the way through to the hallway that goes out to the

21   other door into the parking lot where we came in.

22   Q.  Go ahead.

23   A.  Go ahead.

24   Q.  Finish.

25   A.  At that point we fell back and I was instructed to go out

DAVID STEWART - DIRECT EXAMINATION

1   to the parking lot and stand post on the back corner of the

2   building.

3   Q.  Did you then stand post at the exterior of the building?

4   A.  Pardon me?

5   Q.  Did you do that, stand post at the outside?

6   A.  Yes, sir.

7   Q.  Did you maintain the outside to make sure only people that

8   were law enforcement or first responders came in?

9   A.  Initially I was sent to the northwest back corner of the

10  church which overlooks the parking lot.  At some point later

11  Sergeant Kniess came to me there, he was the one that had sent

12  me out there, he came to me, relieved me of my long gun and

13  told me to go to the door.  When I got back around to the door

14  where I had went in initially, Sergeant Jacques met me there,

15  and he posted me on that door to start the crime scene log to

16  control access to the building.

17  Q.  And you did that for the good part of the night?

18  A.  Yes, sir.

19  Q.  Made sure that nobody that wasn't otherwise qualified came

20  in or out?

21  A.  Yes, sir.

22  Q.  Was the scene eventually turned over to another agency?

23  A.  Yes, sir, there was apparently a bomb threat and we were

24  pulled back.  At that -- when we came back, I was no longer in

25  charge of the door of the building.

DAVID STEWART - DIRECT EXAMINATION

1   Q.  So you evacuated for the bomb threat?

2   A.  Yes, sir.

3   Q.  Were you there when crime scene would have shown up?

4   A.  Yes, sir.  Because when they pulled us from the building,

5   after the bomb threat was cleared, I was there at the gate

6   when crime scene started arriving.

7   Q.  As far as medical attention, was medical attention

8   provided to the people that were inside that you recall?

9   A.  There were EMS personnel there, but I -- I had no clue

10  what they were doing.

11  Q.  So you were staying outside.

12  A.  I was in there yelling outside.

13          MR. RICHARDSON:  No further questions.  Thank you.

14          THE COURT:  Cross-examination?

15          MS. STEVENS:  No questions, Your Honor.

16          THE COURT:  Very good.  You may step down.

17  A.  Thank you, sir.

18          THE COURT:  Government, call your next witness.

19          MR. WILLIAMS:  Thank you, Your Honor, Government

20  calls Andrew Delaney.

21          THE CLERK:  State your full name for record, please.

22  A.  Andrew Delaney.

23      ANDREW DELANEY, a witness called by the Government, first

24  having been duly sworn, testified as follows:

25                      DIRECT EXAMINATION

ANDREW DELANEY - DIRECT EXAMINATION

1  BY MR. WILLIAMS:

2  Q.  Sir, tell the jury what your name is.

3  A.  Andrew Delaney.

4  Q.  Where do you currently work?

5  A.  I work for the Savannah River Site up in Aiken, South

6  Carolina.

7  Q.  What do you do there?

8  A.  I'm an emergency management specialist.

9  Q.  How long have you been there?

10  A.  Just a few months.

11  Q.  What did you do before you started working at the Savannah

12  River Site?

13  A.  I was a police officer here in Charleston on the

14  peninsula.

15  Q.  How long were you a police officer at the City of

16  Charleston?

17  A.  I was a police officer for three years.

18  Q.  Did you have any training or any education before you

19  became a police officer in order to get that job?

20  A.  Yes, I finished my criminal justice degree at the Citadel

21  prior to being a police officer.

22  Q.  Did you go from college straight to the police department?

23  A.  I did, I went straight from college straight into the

24  police department.

25  Q.  What year did you start with the police department?

ANDREW DELANEY - DIRECT EXAMINATION

1    A.  I believe that was 2013.

2    Q.  When you started there, what was your job, what were your

3    responsibilities?

4    A.  I started out as a foot patrolman on King Street, the

5    entertainment district.

6    Q.  Did that job change at any point in time?

7    A.  No, after training I pretty much stayed on the King Street

8    the entire time.

9    Q.  Do you recall responding to Mother Emanuel or Emanuel AME

10   Church on June 17 of 2015?

11   A.  I do.

12   Q.  Was that your same job at the time, working patrol?

13   A.  Yes, working foot patrol and driving patrol on King

14   Street.

15   Q.  If you can, explain to the jury where you were when the

16   call came in for the shooting that happened there.

17   A.  Okay.  I was in Marion Square, which is right at King and

18   Calhoun Street, it's a big open area that people go and

19   sunbathe and play soccer, and I was sitting there in my patrol

20   car when the call went out.

21   Q.  Do you recall what the call was for?

22   A.  Possible active shooter.

23   Q.  What did you do when the call came through?

24   A.  When the call came through, I immediately started my

25   vehicle and proceeded onto Meeting Street, down about Calhoun

ANDREW DELANEY - DIRECT EXAMINATION

1    Street to respond to the call.

2    Q.  About how long did it take for you to get to the church?

3    A.  Really fast.  I got there really quick.  Couldn't have

4    been long at all.

5    Q.  What did you find when you got there?

6    A.  When I went into the church?

7    Q.  No, when you first pulled up.

8    A.  When I first pulled up, the outside of the church looked

9    normal, the gate was closed, and other officers were starting

10   to arrive on scene.

11   Q.  Had anybody arrived when you got there or were you the

12   first one?

13   A.  I think my vehicle and maybe one other vehicle were the

14   first on scene.

15   Q.  What happens then when you pull up?

16   A.  When I pull up, myself and other officers are getting out

17   of the cars and starting to hop the fence over onto the church

18   property.

19   Q.  Do you recall who the other officers were?

20   A.  It was myself, NPO Henderson, I think PO Henderson, and

21   Stewart.

22   Q.  So you, Henderson and Stewart are the first ones at the

23   door?

24   A.  First ones at the door, yes, sir.

25   Q.  If you can, tell the jury what your approach was and the

ANDREW DELANEY – DIRECT EXAMINATION

1    reasons why.

2    A.  Our approach was with weapons drawn, because we were told

3    over the radio that it was possible active shooter call.  So

4    that's what we came prepared for.  And as we approached that

5    side door, that's kind of what we were expecting.

6    Q.  How does an approach involving an active shooter differ

7    from a normal approach?

8    A.  Well, immediately we assumed that lives are in danger,

9    including our own, when we respond.  In a normal call we would

10   run -- wouldn't run code, we wouldn't come with weapons drawn.

11   The approach is different, a lot more intense.

12   Q.  What happened then when you sort of got to the door?

13   A.  When we got to the door we heard over the radio a sergeant

14   say, if it's an active shooter call, go ahead and make entry.

15   Q.  So did y'all do that?

16   A.  We did.  At that time I myself, Stewart and Henderson made

17   entry into the church on the side door on the left, if you're

18   looking at it from Calhoun Street.

19   Q.  And where did you go when you made entry into the room?

20   A.  I made entry into the room, and I went left along the long

21   end of the room while NPO Henderson stayed straight kind of in

22   an L.

23   Q.  And when you went into the room, tell the jury sort of

24   what you were looking for and what you saw.

25   A.  Well, we were looking about the active shooter call to see

ANDREW DELANEY - DIRECT EXAMINATION

1   what we were dealing with was that, and we saw several bodies

2   on the ground, blood, shells, and NPO Henderson started to

3   make that notification over the radio that we did have

4   casualties.

5   Q.   When you go in and there's an active shooter situation or,

6   for that matter, an active shooter situation with victims,

7   what are your priorities?

8   A.   My priorities are the lives of any survivors and then the

9   police officers' lives responding.

10  Q.   Were you able to assess whether there were any survivors

11  in the room?

12  A.   I was.  I was able to make a quick assessment of the room.

13  I saw a black female and a young black girl standing somewhere

14  in the center of the room over a young man.

15  Q.   Were you able to see the young man?

16  A.   I was.  The young man looked to be a gunshot wound to the

17  chest area.  He was kind of rolling on the ground in pain,

18  kind of looked up at me and he said, please help me.  I wasn't

19  able to do that at that time because we were clearing the room

20  because we didn't know if the shooter was still in the room or

21  not.

22  Q.   And is that part of your training or reaction, to clear

23  the room before you render aid?

24  A.   It is.  Our training pretty much states that we need to

25  make sure the shooter's not still in the room, because there's

ANDREW DELANEY – DIRECT EXAMINATION

1    still survivors in the room, we have to make sure that they

2    survive.  So unfortunately I had to ignore him for a moment.

3    I told him, I'll come back for you.  I had to clear the rest

4    of the room.  By the time I had gotten back to him, he had

5    succumbed or went unconscious.

6    Q.  As far as who were you working with; were you supervised

7    by anyone at that point?

8    A.  While we were in the building initially, no.  I think

9    Sergeant Lites came in just a little bit after we initially

10   cleared the room.

11   Q.  And you mentioned Sergeant Kniess; was he there as well?

12   A.  Sergeant Kniess came almost at the same time as Sergeant

13   Lites, I believe, yes.

14   Q.  And did you work with him as well?

15   A.  I did.

16   Q.  Do you recall assisting any of the victims that were there

17   after the sergeant showed up?

18   A.  After the sergeant showed up, we went back -- I went back

19   to the young man to see if he was still alive, and he was not.

20   At that point we got the woman and the young girl, started

21   moving them out of the room.  Because we hadn't at that point

22   done a full clearing, there was still several doors that we

23   hadn't gone into, and places that were still kind of dangerous

24   for us and the survivors.

25   Q.  What was the demeanor of the two individuals, the woman

ANDREW DELANEY - DIRECT EXAMINATION

1   and the young girl that you dealt with?

2   A.  I'd say shock, kind of unresponsive, not moving very well,

3   you know, kind of had to pull them along.  I mean --

4   Q.  Were you able to take them to a place of safety?

5   A.  We were.  I wasn't part of that.  I helped get them out of

6   the room itself, and then other officers took over from there

7   as we continued to clear that room.

8   Q.  Once when you cleared the room, what were your sort of

9   following responsibilities?

10  A.  My responsibilities were to clear the rest of that

11  immediate room and then clear the rest of the church.  We

12  didn't know where the active shooter had gone.  And there was

13  still an entire top portion of the church that we hadn't -- we

14  hadn't looked yet.  So --

15  Q.  Did you do that?

16  A.  I did, I followed Sergeant Kniess and some other officers

17  upstairs to clear the entire upstairs portion of the church.

18  Q.  Was the rest of your duties sort of clearing areas and

19  maintaining the perimeter?

20  A.  Yes, my duty as a foot patrolman was clearing the church

21  itself and helping with the perimeter, after we decided that

22  he was no longer inside the church.

23          MR. RICHARDSON:  No further questions, thank you.

24          THE COURT:  Cross-examination.

25          MS. STEVENS:  No questions, Your Honor, thank you.

EDWARD HENDERSON - DIRECT EXAMINATION

1          THE COURT:  Very good.  You may step down.  Thank

2    you.

3       Call your next witness.

4          MR. WILLIAMS:  Thank you, Your Honor, Government

5    calls Ed Henderson.

6          THE CLERK:  State your full name for the record.

7    A.  Edward Christian Henderson.

8       EDWARD HENDERSON, a witness called by the Government,

9    first having been duly sworn, testified as follows:

10                     DIRECT EXAMINATION

11   BY MR. WILLIAMS:

12   Q.  Sir, if you could, tell the juniors where you work.

13   A.  I currently work for the City of Charleston police

14   department.

15   Q.  What do you do at the police department?

16   A.  I'm currently assigned to the team two patrol division,

17   which is down on the peninsula.

18   Q.  How long have you been with the police department?

19   A.  In January it will be five years.

20   Q.  Have you always been in patrol?

21   A.  Yes.

22   Q.  Do you have any experience prior to working with the

23   police department that qualified you to work there?

24   A.  Yes, sir.

25   Q.  Do you have a college degree?

EDWARD HENDERSON - DIRECT EXAMINATION

1    A.  Yes.

2    Q.  Where did you go to school?

3    A.  The University of North Carolina at Asheville.

4    Q.  And you say you started -- I think you said 2000 --

5    A.  2012.

6    Q.  2012?

7    A.  Yes.

8    Q.  Had you been a patrol officer in the same area or

9    different parts of --

10   A.  I started off, when in training on team one, on the

11   peninsula north of Calhoun Street.  I'm now team two, which is

12   south of Calhoun Street.

13   Q.  I'm going to ask you about June 17th of last year.  Do you

14   recall responding to Mother Emanuel Church?

15   A.  Very well, yes.

16   Q.  Explain to the jury where you were when that call came

17   out.

18   A.  I was actually with Officer Stewart, who was in here

19   earlier, he was -- I was training him.  And we were actually

20   eating dinner at Norm's, which is at the intersection of

21   Calhoun and Smith Street, when the call initially came out.

22   Q.  About how far is that from the church?

23   A.  I'd say maybe a mile at most.  If that.

24   Q.  What was it that came out on the call?

25   A.  Initially came out as shooting at 110 Calhoun Street.  At

EDWARD HENDERSON - DIRECT EXAMINATION

1   first they said he had shot the pastor, and so at that point

2   I'm thinking it's just a single-victim incident.  However, as

3   we were responding, Officer Stewart was driving, so I was able

4   to read the notes on our CAD system as coming up in the

5   computer, and I could tell it was a little bit more than just

6   that.

7   Q.  So explain that.  So he's driving and you're the

8   passenger?

9   A.  Yes, sir.

10  Q.  And what's a CAD system?

11  A.  We have our -- in our department computers, we have a CAD,

12  called computer-aided dispatch, we can see actually, as the

13  call's coming in and the call is populating, it's populating

14  on our computer and we can see all the notes that are coming

15  in.

16  Q.  And what was it in the notes that were important to your

17  response?

18  A.  He shot everybody, I think everybody is dead.  Things

19  along those lines.

20  Q.  Would that have been coming in from the call, or is

21  that -- do you know where that came from?

22  A.  That would have been coming from the call taker who is

23  entering it in, and they send it to the dispatcher who

24  ultimately puts it over the air, but we can see it as they're

25  putting it in.

EDWARD HENDERSON - DIRECT EXAMINATION

1    Q.  What did you find when you arrived at the church?

2    A.  We first arrived on scene, myself, Stewart and Officer

3    Delaney, we went to the entrance closest to Calhoun Street on

4    the western side of the church.  We made entry into the

5    church, and at which point we walked in and saw the victims on

6    the ground, to include Tywanza Sanders and Clementa Pinckney

7    and the others.

8    Q.  I'll stop you and go back a little bit.

9    A.  Yes, sir.

10   Q.  When you got there, was there other officers already on

11   scene?

12   A.  No, we all got there at the same time.

13   Q.  That was you, Stewart and Delaney?

14   A.  And Delaney, yes.

15   Q.  And what was the approach you all agreed on taking then in

16   the church?

17   A.  We all kind of lined up.  Stewart, since he was driving,

18   he was able to grab my patrol rifle out of our car, so he was

19   going to go first since he had the long gun, and then I was

20   behind him and Delaney was behind me.  We basically just

21   entered the church that direction.

22   Q.  And what was your responsibility, what were you planning

23   to do when you made entry?

24   A.  Initially as police officers our first and foremost

25   responsibility is to locate the threat.  And if the threat is

EDWARD HENDERSON - DIRECT EXAMINATION

1   still on scene, eliminate that threat, whichever means we deem

2   necessary.  So our initial goal is to get inside the church,

3   make sure there's no more threat, so that fire and EMS and

4   other personnel could come into the church and attempt to

5   render aid, if possible.

6   Q.   What did you find then when you went through the door?

7   A.   Like I said, there were several victims on the ground when

8   we first walked in.  I remember seeing Mr. Sanders was still

9   alive and was talking to us when we first entered the church.

10  Q.   Explain that, if you can, to the jury.

11  A.   When we first went in, basically a large room, and I

12  remember saying the majority of the victims were in the middle

13  of the floor, and that's where Mr. Sanders was when we first

14  walked in, probably about to the distance to where the gallery

15  starts is how far away we were when we first saw the victims.

16  And Mr. Sanders was kind of propped himself up on his hands,

17  and he -- I kind of asked the generalized question, where is

18  the shooter, where is he?  They explained to me that he had

19  already gone out the back, the north side of the church, which

20  would be the back of the church.

21       At this point got a description of him, put it out over

22  the radio as responding officers did to be looking for that

23  individual.  Then we proceeded to --

24  Q.   Let me stop you there; I want to back up.

25  A.   Sorry.

EDWARD HENDERSON - DIRECT EXAMINATION

1    Q.  Was Mr. Sanders talking to you or other people?

2    A.  Mr. Sanders, and then I believe Miss Sanders was talking

3    to us as well.  It was kind of a chaotic scene at that time,

4    as you can probably imagine, but both were talking to us and

5    kind of giving us descriptions of him.

6    Q.  Was Mr. Sanders on the ground?

7    A.  Yes, he was on the ground.

8    Q.  Was he able to talk very well?

9    A.  From what I can remember, sort of, but I didn't really --

10   I didn't really talk to him very much or interact with him, I

11   just kind of remember the initial -- where is the shooter,

12   where did he go, then I was kind of where that -- for me at

13   least that's where that stopped.

14   Q.  You said you spoke with Mrs. Sanders too, the person that

15   was also there.

16   A.  Yes.

17   Q.  Did she give you information as well?

18   A.  She gave me a description of the subject, yes.

19   Q.  Did you radio that out?

20   A.  I did.

21   Q.  So once you got the description and the direction, what

22   did you do?

23   A.  Then at that point myself and Delaney and Stewart began to

24   just check the individual rooms.  They were in the room -- the

25   offshoots of the big room.  I did see maybe he was hiding in

EDWARD HENDERSON - DIRECT EXAMINATION

1    there or trying to set an ambush or something of that nature.

2    Q.   Were you able to sort of clear the church?

3    A.   Yes.

4    Q.   You mentioned there were other victims inside.  Did you

5    deal with any of the other folks that were inside the church?

6    A.   None of the actual victims that were suffered from gunshot

7    wounds.  We did at one point, or about ten minutes after we

8    had been there, we checked the office of the church, which was

9    where we found Miss Pinckney with her, I believe youngest

10   daughter there.  They were hiding underneath the desk.  And

11   she was the 911 caller.  Other than that, no, we do not have

12   no direct contact with any of the victims.

13   Q.   Did you notice another young girl there?

14   A.   Yes, I did.

15   Q.   What do you recall about her?

16   A.   I just remember she was in the middle of the floor,

17   like -- she was standing, and she was kind of in the middle of

18   where the victims were.  I remember initially grabbed her,

19   moved her to the side, and I kind of looked at her and I said,

20   Sweetheart, we're here to help, please stay right here I'll be

21   right back.  And then I -- that's when I kind of took off and

22   did what I was doing as far as searching the room.  Then when

23   I moved back to where I had left her, she had kind of moved

24   back over to the center of the floor where the majority of the

25   victims were.

EDWARD HENDERSON - DIRECT EXAMINATION

1       And that's -- at that point Officer Sheppard had come in

2   and I -- Kniess was asking me, Sergeant Kniess was asking us

3   to get people out of the room.  And so that's when I said,

4   Sheppard, please take her out, and he kind of took her from

5   there and got her out of there.

6   Q.  Did you have any other responsibilities throughout that

7   evening as far as handling the scene or working there?

8   A.  We were -- myself, Stewart and Sergeant Lites were

9   basically guarding the scene, making sure after we had cleared

10  everything, we cleared the upper part of the church, cleared

11  everything else, we took over essentially just crime scene

12  management, taking the names of everybody who went in,

13  detective, crime scene, investigators, things of that nature.

14  And then just making sure that the crime scene was generally

15  safe.

16  Q.  Do you recall there being a bomb threat?

17  A.  I do.

18  Q.  Did you react to that or did you stay or what did you do?

19  A.  We were told to evacuate the scene.  So myself and Stewart

20  left, I know Sergeant Lites stayed.  But then I was -- at that

21  point I was moved to a traffic post for a little while until

22  the bomb threat was cleared.

23  Q.  Do you recall crime scene officers from SLED showing up?

24  A.  Yes, I do.

25  Q.  Were they the ones that processed the crime scene?

EDWARD HENDERSON - DIRECT EXAMINATION

1    A.   Ultimately I believe they were the ones that processed the

2    scene, yes, sir.

3    Q.   What was the last thing you did before you went off shift?

4    Where did you end up working the rest of the night?

5    A.   I basically returned.  After the bomb threat I returned to

6    the scene, then I handled -- myself and Stewart handled doing

7    the initial incident report and then doing the supplementals

8    for the crime scene log, and basically just myself and --

9    myself through what I had seen.

10        MR. WILLIAMS:  No further questions.

11        THE COURT:  Cross-examination?

12        MR. BRUCK:  We have no questions for Officer

13   Henderson.

14        THE COURT:  Thank you, Officer, you can step down.

15     I think this is a good time for our afternoon break.  Take

16   about 15 minutes.

17     (A recess was held at this time.)

18     (Jury not present.)

19        THE COURT:  Mr. Richardson, can I raise a question

20   with you, please, sir?

21        MR. RICHARDSON:  Yes, Your Honor.

22        THE COURT:  Those last several witnesses seem awful

23   cumulative to me.  We don't have to put every witness up who

24   can talk about some fact about the case.

25        MR. RICHARDSON:  We are not, Your Honor, we are

JOHN LITES - DIRECT EXAMINATION

1    getting just ahead, I can assure you, you can imagine the

2    number of officers responded, we have narrowed those down, we

3    are continuing to do that.  We have one more officer who

4    responded.

5              THE COURT:  I just want them to say something unique,

6    because otherwise it's just cumulative.

7              MR. RICHARDSON:  I understand, Your Honor, and we're

8    moving that process along.  We have one more officer, and then

9    we have the firefighter who was rendering medical aid, and I

10   think we'll be through the first responders.

11             THE COURT:  That's fine.  I mean, I don't want to

12   tell you how to try the case, you know the details and I

13   don't.  I just listened to four witnesses that seemed to say

14   almost the same thing to me.

15             MR. RICHARDSON:  Well, we would say there's some

16   differences, Your Honor, and there's a little bit of nuance.

17   We're going to move it along here.

18             THE COURT:  Very good.

19             MR. RICHARDSON:  I think we'll get there pretty

20   quickly.

21             THE COURT:  Very good.  Bring in the jury.

22        (Jury present.)

23             THE COURT:  Call your next witness.

24             MR. WILLIAMS:  Thank you, Your Honor, Government

25   calls John Lites.

JOHN LITES – DIRECT EXAMINATION

1          THE CLERK:  State your full name for the record,
2    please.
3    A.  Sergeant John Lites with the Charleston police department.
4         JOHN LITES, a witness called by the Government, first
5    having been duly sworn, testified as follows:
6                          DIRECT EXAMINATION
7    BY MR. WILLIAMS:
8    Q.  Good afternoon.
9    A.  Hi.
10   Q.  I think you said that when you were sworn in, you work for
11   the city police department?
12   A.  Yes, sir.
13   Q.  What do you do for the police department?
14   A.  I'm a patrol supervisor in team two, which is Calhoun
15   south to the Battery.
16   Q.  How long have you worked in law enforcement?
17   A.  Seventeen years.
18   Q.  What types of different jobs have you had within the
19   police department or in law enforcement?
20   A.  Yes, sir.  I've been in patrol in, I think, every team in
21   the department.  That's West Ashley, Daniel Island, downtown.
22   I've also been a team investigator twice, which investigates
23   crimes such as car break-ins, I've been a central detective, I
24   was a detective for three years.  I ran special units in the
25   department, one of them was on the east side for seven years,

JOHN LITES - DIRECT EXAMINATION

1    had 12 officers working for me.

2    Q.   What is your current rank or current position?

3    A.   I'm a sergeant.

4    Q.   How long have you been a sergeant for?

5    A.   Five years.

6    Q.   What area do you supervise at this point in time, or --

7    last year.

8    A.   Team two is where I work now, and that covers Calhoun

9    Street down all the way to -- south to the water to the

10   Battery.  And I'm a patrol supervisor, so I have officers that

11   work under me.

12   Q.   As a supervisor, how many officers do you supervise?

13   A.   Right now I have six.  It ranges from four to six.

14   Q.   And do you work out of a location with another team or

15   the -- the district team, team nine?

16   A.   Yes.  They're actually -- part of their area is inside of

17   our team, so the King Street, the market, that's the

18   entertainment district.  We cover that also.

19   Q.   I want to go back to June 17th of 2015.  Do you recall

20   responding or getting a call to respond to the Emanuel AME

21   Church?

22   A.   I do.

23   Q.   At that point in time did you have any particular training

24   on active shooters?

25   A.   Yes.

JOHN LITES – DIRECT EXAMINATION

1  Q.  Explain to the jury what the response is as a supervisor

2  to an active shooter situation.

3  A.  Yes, sir.  Over the years, active shooter training,

4  training has changed.  We used to respond and we'd set up a

5  perimeter and call in for special unit like SWAT to come in

6  and make entry into the building.  After several shootings

7  around the country, we've changed the way we respond as

8  officers.  We make a decision when we get there, if we believe

9  there's an active shooter or someone that's still inside

10  actively shooting people, we enter the building, as soon as we

11  get at least two officers on scene, so we try to stop it.

12  Q.  And if you can explain to the jury, what type of call went

13  out on June 17th?

14  A.  Yeah, I was actually on the Battery when the call went

15  out, and I remember hearing it and thinking we get a lot of

16  calls, but I was like, this is a real call.  But the call on

17  the radio was the pastor at the AME Church had been shot in

18  his office.  That was what the call was.

19  Q.  What did you do in response to that call?

20  A.  Okay.  My responsibility is to make sure my officers are

21  doing what they need to be doing, too, but I responded as

22  quickly as I could from the Battery to the church.  On the way

23  to the church I listened to the radio traffic.  Some of my

24  officers got on the scene before I did.  Once they arrived on

25  scene, I assessed that, and I was right behind them, but I

JOHN LITES - DIRECT EXAMINATION

1    just ordered them into the church.  They said when they

2    arrived they didn't hear any gunshots, but I wanted them to go

3    in.  I ordered them into the building and they went in without

4    hesitation.

5    Q.  As far as the Emanuel AME Church, are you familiar with

6    that church?

7    A.  Yes.

8    Q.  How would you describe that area?

9    A.  Almost like a tourist area.  We don't have any crime there

10   to speak of.  It's surrounded by another business and a gas

11   station.  And it's not -- it's a tourist area, I would say.

12   Q.  As far as the response as a sergeant, were there other

13   sergeants that were also involved in the response?

14   A.  Yes, Sergeant Kniess is -- he's in charge of the

15   entertainment district, that's King Street and the Market.

16   And my responsibility is the entire team, which includes that.

17   But he has people that work directly for him, I have people

18   that work directly for me.  But the church would fall into the

19   area that I was responsible for.

20   Q.  Was there any way that you divided up supervisory

21   responsibilities between you and Sergeant Kniess?

22   A.  Right.  Well, we have what's called like an incident

23   command system that's part of our training.  So when you get

24   there, the people that are the highest ranking, they take over

25   the scene, which we do.  On every crime, not just an incident

JOHN LITES - DIRECT EXAMINATION

1    like this.

2        So when we arrived on scene, Sergeant Kniess was on the

3    outside of the church, I took care of the inside of the

4    church, Sergeant Kniess went back on the outside.  So I

5    supervised what was going on inside and Sergeant Kniess

6    supervised what was going on outside.

7    Q.  In terms of supervision, what were the priorities when you

8    arrived or when your officers arrived?

9    A.  Right.  Well, the first part is secure the scene and make

10   sure no one else gets hurt, that was -- that was the priority

11   and that's what we did.

12   Q.  Is there a second priority after that?

13   A.  To secure the scene?  Yeah, secure the evidence.

14   Q.  So what did you find then when you got to the church

15   itself?

16   A.  Yes.  We walked in and -- Do you want me to describe it

17   when I walked in?

18   Q.  Let me ask you this first, had anybody else made entry

19   into the church before you?

20   A.  Yes.

21   Q.  Who had done that?

22   A.  It would have been Stewart and Henderson and Kniess was

23   inside, and I think Delinski.

24   Q.  Delaney?

25   A.  Delaney, sorry.

JOHN LITES - DIRECT EXAMINATION

1    Q.  What did you find then when you went into the church?

2    A.  They had started to clear the church.  Which means they go

3    thoroughly through it to look for the suspect and identify any

4    victims that might need help.  So when I walked in, they had

5    just started doing that.

6    Q.  Since they were clearing the church, what did you do?

7    A.  Yes.  When I walked in I started to assess the situation.

8    I walked in the door, there was two ladies, older ladies and a

9    child.  The child was running around the table, obviously in

10   shock.  And I went up to one of the ladies and started talking

11   to her, trying to figure out exactly what happened, trying to

12   communicate with her to tell us what the suspect looked like,

13   what had happened.  She gave me information.  Once she gave me

14   that information, I relayed it out on the radio so other

15   officers responding could know what to look for and expect.

16   Q.  When you say the child was running around a table, what

17   table?

18   A.  There was a table to the right just straight in front of

19   the door.  When you walk in about 20 feet, there was a table a

20   little bit to the right of me when I walked in.

21   Q.  And as far as you said you saw two women there, were you

22   able to see anybody else, victims or otherwise?

23   A.  Oh, yes.  Yeah.

24   Q.  Explain that to the jury.

25   A.  Yeah.  At that time I didn't count, but there were bodies

JOHN LITES - DIRECT EXAMINATION

1    strung about the whole area of the church.  And they obviously

2    had been shot.  Everybody was bleeding.  There was blood,

3    there was still people that were still alive when I arrived.

4    There specifically was one person that was still alive, and

5    the young man, I talked to him, held his hand when he passed

6    away.

7    Q.  Explain to me what happened, who was there and sort of

8    what you witnessed in that circumstance.

9    A.  Yeah, I was talking to the lady, getting information from

10   her about what happened, and gave that out on the radio.  And

11   then I looked down and there was a young man laying there, and

12   he kind of gasped and he came -- sat up just a little bit.

13   And he said, I got shot.  So I bent down and I grabbed his

14   hand, and he was hurt really bad.  So I mean he knew he was

15   hurt.  And while I was talking to him, he grabbed my hand, he

16   squeezed it, and he kind of smiled and then he passed away.

17   But there were other people that were already dead there that

18   weren't moving, and there was at least five or six bodies

19   right in that area where I was at.

20   Q.  The woman that you were talking to, do you know if she was

21   nearby you at the time, were you aware of --

22   A.  Yes, she was kind of over my shoulder when I was talking

23   to the young man.

24   Q.  Once you had dealt with the young man on the ground, you

25   say he squeezed your hand, what did you do next?

JOHN LITES - DIRECT EXAMINATION

1   A.  I stood up and I started assessing the situation, about

2   clearing the church and making sure it had been cleared.

3   Officer Henderson came back, and asked him if they, you know,

4   have they cleared the entire building.  He said they did.  And

5   I told him to clear the building again for a second time and

6   then a third time to make sure there was no place they didn't

7   look.  Because we didn't want -- wanted to make sure that

8   shooter was not still there.

9   Q.  Were you able to clear the entire sort of ground floor?

10  A.  Yeah, we were.  While I was standing there -- the original

11  call was to the office.  And I noticed, Ed, did y'all clear

12  the office, and they said, we checked the door and it was

13  locked.  So it was on the other wall, and we went over and we

14  kicked the door in and went in and cleared it.  And we found

15  another lady and a child hiding under the desk inside that

16  office.  But the shooter was not there.

17  Q.  As far as the folks that were in the main floor, two women

18  and the child, what happened with them?

19  A.  Yeah.  It's important to get them out of there, I thought,

20  as soon as possible.  Obviously the child was in shock.  So

21  officers came in.  Specifically remember one from the county

22  came in, we gave her the child.  We moved the remaining

23  victims that were still alive, out to a secure area where they

24  could be safe.

25  Q.  What did you do once you had sort of cleared or got to

JOHN LITES - DIRECT EXAMINATION

1    that point in clearing the ground floor?

2    A.  About that time EMS and fire were coming in while we were

3    doing all of this.  We made sure they were safe.  We had an

4    officer stay right there with them, they checked out the

5    victims that were remaining.  They found one gentleman still

6    had some vital signs, so they went ahead and transported him

7    to the hospital.  And then once they were finished, they --

8    they were going to thoroughly check the people, and I just

9    asked them to check the pulses, because obviously they weren't

10   alive, most of them, so -- I didn't just want them disturbed.

11   So once they were finished, I asked everybody to leave, and

12   then I was in there by myself for a good while.

13   Q.  You say that you didn't want the bodies disturbed.

14   A.  Yes, sir.

15   Q.  Did you observe to make sure --

16   A.  Yeah.

17   Q.  -- that evidence wasn't disturbed?

18   A.  Nothing was disturbed.  After -- the firemen went to do --

19   he went to put the heart rate monitor on one of the people, he

20   started to move the body, and I stopped him and said, let's

21   just check everybody for pulses, I don't want everybody moved

22   around.  He agreed with me.  And that's all they did from then

23   on is just -- they didn't move the bodies, they went and

24   checked for a pulse on each person.  And that's important,

25   because it's a crime scene, okay, but it's also respectful not

JOHN LITES - DIRECT EXAMINATION

1   to move people around, in my opinion, if you don't have to.

2   Q.  So you say that fire and EMS arrived.  Were you

3   responsible for -- you say you maintained part of it, not

4   moving bodies around; did you stay and maintain that scene --

5   A.  Yes.

6   Q.  -- so it wasn't tampered with?

7   A.  That's my responsibility is to make sure the crime scene

8   is secure.  That was my function.  Once the area is secure and

9   there's no suspect, then my job is to secure the area and make

10  sure the crime scene doesn't change.

11  Q.  Tell the jury sort of how that progressed overnight and if

12  anything happened.

13  A.  Yeah.  Well, first of all, we secure the access into the

14  building, and I put an officer at the door, and we keep a log

15  of everybody who comes and goes.  Okay?  I control the access

16  to the building.  So no one came into the building that did

17  not need to be in there.  Nobody -- I was there -- that

18  happened 8:00, 9:00 o'clock at night, I was there till 8:00 or

19  9:00 the next morning.  And until the investigation was taken

20  over by SLED, nobody came in and touched the bodies, nobody,

21  you know, crime scene came in and took a video, but -- and a

22  detective came into the building.  But those were the only

23  people, and a few others that we really controlled access and

24  didn't let people come in.

25  Q.  Was there a point where a bomb threat was called in?

JOHN LITES - DIRECT EXAMINATION

1   A.  Yes, sir.

2   Q.  Tell the jury about that.

3   A.  We were told, I don't remember what time it was, but

4   myself and Deputy Chief Taylor were at the door, I had already

5   sent my guys away, so I was at the door myself with Deputy

6   Chief Taylor, one of our lieutenants came up and said there

7   was a bomb scare and we all needed to evacuate.

8       And I refused to leave.  So --

9   Q.  Do you normally -- you say you were ordered to --

10  A.  I was ordered to leave.

11  Q.  Why didn't you do it?

12  A.  Out of respect for the people in the church, and I didn't

13  think it was right to go, sir.

14  Q.  Did anybody stay with you?

15  A.  Yes, Deputy Chief Taylor stayed with me and he said we

16  weren't leaving.

17  Q.  Did anybody else stay there with the victims besides you

18  and Deputy Chief Taylor?

19  A.  No, sir.

20  Q.  How long did the bomb threat last?

21  A.  About an hour, I think.

22  Q.  Once the threat was over, what was your next role?

23  A.  We just stayed on the scene and kept it secure until the

24  decision was made about how we were going to proceed with it.

25  And that was made by somebody else.

JOHN LITES - DIRECT EXAMINATION

1    Q.   You say that SLED came in for the crime scene.

2    A.   Um-hum.

3    Q.   Explain that to the jury.

4    A.   Yeah.  I know that -- well, I was talking about instance

5    of command; at one point I was no longer the senior ranking

6    command there.  So they have a command post set up, and the

7    chief comes and they make decisions about who's going to help

8    us, who has the best equipment, who can do the best

9    processing, who has the best ability to take care of what

10   needs to be taken care of.  And a decision was made that SLED

11   had the best knowledge and could take care of it.  So I guess

12   that's what they did.  And I held the scene -- I was relieved

13   at 8:30, so -- and I know SLED was taking over the scene when

14   I left, but I don't know anything after that.

15   Q.   And what is SLED?

16   A.   South Carolina Law Enforcement Division.  They're like our

17   state FBI.  They have more better equipment, they have better

18   tools, they have more training than some police agencies.  And

19   a lot of agencies will call them in to help when they have a

20   situation that is just overwhelming.  They volunteered to come

21   help us.

22   Q.   And you say that you stayed there until they arrived?

23   A.   Yes, sir.

24   Q.   Did anybody tamper with the scene apart from what you've

25   already explained?

JOHN LITES - DIRECT EXAMINATION

1    A.  No, sir, that scene was controlled, I personally

2    controlled it.  No one came in and did anything.

3            MR. WILLIAMS:  Thank you.  No further questions.

4            THE COURT:  Cross-examination.

5            MS. STEVENS:  Thank you, Your Honor.

6                         CROSS-EXAMINATION

7    BY MS. STEVENS:

8    Q.  Afternoon, Sergeant.

9    A.  Hi.

10   Q.  Thank you for your service.

11   A.  Thank you.

12   Q.  Do you recall what time you initially arrived at Emanuel

13   AME Church on June 17th?

14   A.  I can't give you the exact time.  I believe the call went

15   out around 8:30, so whenever it was dispatched, it was

16   probably three or four minutes later when I got there.

17   Q.  Do you recall, you described the initial page that you

18   heard over your radio.  Do you know what time that came

19   through?

20   A.  I don't know the exact time, I'm just giving an

21   approximation.

22   Q.  Yes, sir.  And do you know what time the initial calls to

23   911 were made from within the church?

24   A.  No, I don't.

25   Q.  And just to clear up one thing, were you made aware later

JOHN LITES – DIRECT EXAMINATION

1   in your investigation that the bomb threat that was called in

2   or may have been called in had nothing to do Dylann Roof?

3   A.  I don't have any knowledge of that.

4            MS. STEVENS:  All right.  That's all I have.  Thank

5   you.

6            THE COURT:  You may step down.  Thank you.

7        Call your next witness.

8            MR. CURRAN:  Government calls James Jacques.

9            THE CLERK:  State your full name for the record.

10  A.  James T. Jacques.

11      JAMES JACQUES, a witness called by the Government, first

12  having been duly sworn, testified as follows:

13                       DIRECT EXAMINATION

14  BY MR. CURRAN:

15  Q.  Afternoon, Captain Jacques.

16  A.  Afternoon.

17  Q.  Where are you from?

18  A.  From City of Charleston.

19  Q.  You were born and raised here?

20  A.  Yes, sir.

21  Q.  And what do you do for a living?

22  A.  I'm a fireman for the City of Charleston fire department.

23  Q.  And how long have you been a firefighter?

24  A.  I've been with the City of Charleston for 16 years now.

25  Q.  And how old were you when you started in firefighting?

JAMES JACQUES - DIRECT EXAMINATION

1    A.  I started with the city when I was 19, straight out of

2    high school.

3    Q.  Right out of high school?

4    A.  Yes, sir.

5    Q.  What is your current position with the Charleston fire

6    department?

7    A.  I'm a captain.

8    Q.  And how long have you been a captain?

9    A.  Going on six years.

10   Q.  And what is your principal responsibility as a captain;

11   what does a captain do?

12   A.  My responsibility is to come in on a daily basis when our

13   shift starts, and I'm in charge of up to three to four guys

14   underneath me.  I'm in charge of their daily routines.  Of

15   course when we are on calls, of being in charge of the call

16   for just making sure everything goes smoothly at the station.

17   Q.  In short, do you run a firefighting crew?

18   A.  Yes, sir.

19   Q.  And does your particular crew have a name or a

20   designation?

21   A.  Yes, sir.

22   Q.  What is that?

23   A.  Our house is Engine 102.

24   Q.  And does that mean you're assigned to Engine 102?

25   A.  Yes, sir.

JAMES JACQUES – DIRECT EXAMINATION

1    Q.  Are you the only crew assigned to Engine 102?

2    A.  Yes, sir, there's three different crews assigned, but

3    we're the only crew assigned for a 24-hour period.

4    Q.  And where is that crew assigned for the Charleston fire

5    department?  Where is your station house?

6    A.  Our station is at the corner of Meeting and Wentworth.

7    Q.  Is that right in downtown Charleston?

8    A.  Yes, sir.

9    Q.  And is that the same station house -- You're Engine 102,

10   correct?

11   A.  Yes, sir.

12   Q.  Is that the same station house as Engine 103?

13   A.  Yes, sir.

14   Q.  So you share the same station house.  Let's shift a little

15   bit to what some of your duties are with the fire department.

16   Is it unusual for you to get called out for things other than

17   fires?

18   A.  No, sir.

19   Q.  For example, is it unusual for you to get called out on

20   calls that are purely medical response?

21   A.  Yes, sir.

22   Q.  And as a result, do firefighters receive medical training?

23   A.  Yes, sir.

24   Q.  All firefighters?

25   A.  All of the City of Charleston firefighters, yes, sir.

JAMES JACQUES - DIRECT EXAMINATION

1    Q.  And what type of training do firefighters receive?

2    A.  All our new firefighters coming in are trained to EMT

3    basic level.  We also have some paramedics that work for the

4    fire department, and then some of the older firefighters that

5    have been there for awhile are just basic first responders.

6    Q.  So first responders, EMT, is that emergency medical

7    technician?

8    A.  Yes, sir.

9    Q.  Then paramedics?

10   A.  Yes, sir.

11   Q.  Is paramedic the highest of those three?

12   A.  Yes, sir.

13   Q.  And first responders is the basic level?

14   A.  Yes, sir.

15   Q.  What is your level?

16   A.  I'm an EMT basic.

17   Q.  And for all three of those levels, does that training

18   including assessing a patient's basic physical condition?

19   A.  Yes, sir.

20   Q.  And that includes the basic level first responder?

21   A.  Yes, sir.

22   Q.  Okay.  And does that training include how to determine

23   whether someone is alive?

24   A.  Yes, sir.

25   Q.  Is it unusual for you to get called out on calls where

JAMES JACQUES - DIRECT EXAMINATION

1    that is an issue, where you might have to determine whether

2    someone is dead or alive?

3    A.  No, sir.

4    Q.  I'm going to turn to the night of June 17th.  You're on

5    duty that night?

6    A.  Yes, sir.

7    Q.  And I should explain.  I should elaborate further.

8    June 17, 2015.

9    A.  Yes, sir.

10    Q.  Last year.  Were you working with Engine 102 that night?

11    A.  Yes, sir.

12    Q.  As a captain?

13    A.  Yes, sir.

14    Q.  Who else was on your crew that evening?

15    A.  On my engine it was -- of course I was the captain, my

16    engineer was Alex Glover, and my two firemen that ride the

17    back of the truck, one was Adam Souter and the other one was

18    Quincy Myers.

19    Q.  You're the captain?

20    A.  Yes.

21    Q.  Alex was the engineer?

22    A.  Yes, sir.

23    Q.  What is an engineer, for folks are not familiar with --

24    A.  Engineer --

25    Q.  Let me stop you for a second.  You need to let me finish

JAMES JACQUES - DIRECT EXAMINATION

1   the question, or else the court reporter is not going to be

2   able to have us talk over each other and figure it all out.

3       So what is an engineer?

4   A.  An engineer is the person that drives our truck.

5   Q.  And you mentioned a couple of individuals, Quincy -- can

6   you tell us their names again?

7   A.  Adam Souter and Quincy Myers.

8   Q.  They're firefighters?

9   A.  Yes, sir.

10  Q.  Now I'm doing it to you; I apologize.  What do

11  firefighters do, what's their role?

12  A.  Basically their role is pretty much the same as all of us,

13  but they're not in charge of anything.  They're pretty much

14  the low guys on the totem pole, they -- they do whatever I ask

15  them to or whatever their engineer asks them to.  And they're

16  also in charge of patient care, any kind of other things we

17  need to do on the fire scene.

18  Q.  All right.  And I think you already told us this;

19  everybody gets medical training?

20  A.  Yes.

21  Q.  Correct?  So everybody on your crew had medical training?

22  A.  Yes, sir.

23  Q.  Correct?  And that included training on how to determine

24  whether someone is alive?

25  A.  Yes, sir.

JAMES JACQUES - DIRECT EXAMINATION

1    Q.  Was your crew one of the crews that was called to Mother

2    Emanuel that night?

3    A.  Yes, sir.

4    Q.  Where were you when you first got that call?

5    A.  We were inside our station at the corner of Meeting and

6    Wentworth.

7    Q.  Were you the first unit dispatched from the fire

8    department?

9    A.  No, sir, we -- the first unit was Engine 103, but we were

10   dispatched immediately right after.

11   Q.  I think you told us earlier Engine 103 is co-located with

12   you, right?

13   A.  In the same house.

14   Q.  And you were dispatched immediately after.  What, if

15   anything, did you know about the call when you were first

16   called out?

17   A.  Well, the -- when it was dispatched across our radio, it

18   was a call to location for trauma.

19   Q.  And did you learn anything else about the call en route --

20   A.  Yes, sir.

21   Q.  -- to the destination?  What did you learn?

22   A.  We have our NBTs, which are computers on our truck that

23   are straight from the dispatch center said -- any kind of

24   notes they're typing in puts it on our computer and we can

25   read it.  So we were reading the notes that it was -- that

JAMES JACQUES - DIRECT EXAMINATION

1    there was eight people had been shot.

2    Q.  So you received on the computer of your truck sort of a

3    dispatch system, notes that eight people had been shot?

4    A.  Yes, sir.

5    Q.  So you responded to the call.  Where did you go?

6    A.  We went to Emanuel AME Church, 110 Calhoun.

7    Q.  Did you pull right up in front or did you go --

8    A.  No, sir, we pulled in on Calhoun Street, but we stopped

9    just before the church.

10   Q.  And I think you already said Engine 103 was dispatched

11   before you; were they already there?

12   A.  They were -- because of us being in the same house and it

13   happened so quick, we actually pretty much pulled up at the

14   same time.

15   Q.  And who was in Engine 103's crew that night?

16   A.  You had Hugo Marchand was the captain that night, Jason

17   Dunnigan was the engineer, you had John Montone was one of the

18   firefighters, and then Steve Ezerela.

19   Q.  So Hugo Marchand was the captain?

20   A.  Yes, sir.

21   Q.  And everybody there had received medical training, you

22   were telling us.

23   A.  Yes, sir.

24   Q.  Were there any other medical personnel there when you

25   arrived?

JAMES JACQUES - DIRECT EXAMINATION

1  A.  Yes, sir.

2  Q.  Who?

3  A.  Charleston County EMS, Medical One was there.

4  Q.  Is Charleston County EMS, that part of the fire

5  department?

6  A.  No, sir, it's a separate entity.

7  Q.  And are they the ambulance people?

8  A.  Yes, sir.

9  Q.  And do you know the names of -- how many EMS people were

10  there when you arrived?

11  A.  It was two.

12  Q.  Do you know their names?

13  A.  No, sir.

14  Q.  Can you describe them generally?

15  A.  It was a male and a female, and of course the male was the

16  paramedic and the female was EMT basic.

17  Q.  The male had the higher level?

18  A.  Yes, sir.

19  Q.  Was he in charge of her then?

20  A.  Yes, sir.

21  Q.  After you arrived, what did you and your crew do?

22  A.  We gathered our medical equipment, our EMS bags, and we

23  gathered up to the front of the church, and we were escorted

24  around to the bravo side of the church to a door.

25  Q.  Let me stop you for a second.  I asked you about your

JAMES JACQUES - DIRECT EXAMINATION

1   crew, so that's you and your three fellow crew next, correct?

2   A.  Yes, sir.

3   Q.  What about the Engine 103 crew members, were they already

4   ahead of you; where were they?

5   A.  No, sir, we pretty much met at the same location at the

6   same time.

7   Q.  So you were all together.

8   A.  Yes, sir.

9   Q.  How about the two EMS people?

10  A.  They were with us also.

11  Q.  So the ten of you, ten medically trained people?

12  A.  Yes, sir.

13          MR. CURRAN:  Exhibit 20, which has already been

14  admitted, Your Honor.

15  Q.  This is a diagram that's already been admitted of Emanuel

16  AME Church.  In the upper left-hand portion of the diagram --

17  Do you recognize this diagram?

18  A.  Yes, sir.

19  Q.  Please indicate, please describe where you went initially

20  when you arrived.  Not when you're in the vehicle, but when

21  you and the other medical people were approaching the church.

22  A.  There's a gate to the left side of the building that goes

23  down that is closing off the bravo side of the structure.  And

24  there's a parking lot there.  Well, we went through that gate,

25  and then on the bravo side was a double door that goes into

JAMES JACQUES - DIRECT EXAMINATION

1    the --

2    Q.  Let me stop you for a second.  You're using a little

3    firefighter jargon there, aren't you.  You called it the bravo

4    side.  So let's refer to this diagram, and what side of the

5    diagram, you see that's Calhoun Street, correct?

6    A.  Yes, sir.

7    Q.  That's where you pulled up?

8    A.  Yes, sir.

9    Q.  And you went through a gate into a parking lot; are you

10   referring to the parking area that appears to be above the

11   church on this diagram?

12   A.  Yes, sir.

13   Q.  Okay.  And is that side of the church what you're

14   referring to as the bravo side?

15   A.  Yes, sir.

16   Q.  Please continue.

17   A.  All right.  As we made it to the gate, the engineer off

18   Engine 103 had to cut a lock on the gate for the gate to open

19   up.  We went inside there and we met up with the law

20   enforcement officer at the double doors on that left side.

21   Q.  All right.  So on this diagram, you said on the left side,

22   are you still talking about on top of the church?

23   A.  Yes, sir, the top.

24   Q.  And you see it shows the map to be -- not to be completely

25   legible, but there's a little disability access insignia?  Do

JAMES JACQUES - DIRECT EXAMINATION

1    you see that?

2    A.  Yes, sir.

3    Q.  Is that where you're referring to?

4    A.  Yes, sir.

5    Q.  All right.  And they just taught me how to do this.  Let's

6    see if I can do it.  Talking about right there?

7    A.  Yes, sir.

8    Q.  Okay.  Were there any police department officers in that

9    area?

10   A.  Yes, sir.  There was a police officer at the door.

11   Q.  And did the officer tell you anything about the scene as

12   you approached the door?

13   A.  He told us the scene was not secure, as in they were still

14   an active shooter and they didn't have the suspect.  And he

15   also told us that everybody was gone.

16   Q.  He told you everybody inside was gone?

17   A.  Yes, sir.

18   Q.  What -- after you approached the door, what did you and

19   your crews do?

20   A.  So we met with him.  At first he was hesitant on letting

21   us come in because of the situation.  We then proceeded inside

22   the doors, the double doors, and it goes into like a foyer.

23   The -- before you go into the social hall.  And the doors were

24   shut behind us at that point.

25   Q.  And when you say us, are you still referring to the ten

JAMES JACQUES - DIRECT EXAMINATION

1   medical people that we were talking about earlier?

2   A.  Yes, sir, the crew of Enging 102 and 103 and Medic One.

3   Q.  And at that point what you've learned en route, what the

4   officer had told you, what was your mission?

5   A.  Our mission was to arrive on scene to see if we could find

6   anybody that was saveable that we could do something for and

7   get them en route to the hospital.

8   Q.  Is that a process that you referred to as triage?

9   A.  Yes, sir.

10  Q.  And as captain of your crew, what was your role in that

11  process?

12  A.  Ultimately my role is I'm supposed to be the supervisor of

13  any call that we go on.  But at first I was along with the

14  rest of the crew in triaging the patients.

15          MR. CURRAN:  I'm now displaying Exhibit 21, Your

16  Honor, which has already been admitted.

17          THE COURT:  Very good.

18  BY MR. CURRAN:

19  Q.  All right.  Do you recognize this diagram?

20  A.  Yes, sir.

21  Q.  What does it show?

22  A.  It shows the social hall.  Of the church.

23  Q.  And is that the area into which you entered?

24  A.  Yes, sir.

25  Q.  And where on this diagram, just to orient the jury, where

JAMES JACQUES - DIRECT EXAMINATION

1    did you enter?

2    A.  If you -- at the top of the diagram towards the left side

3    there's a double door.  Not on the street side.

4    Q.  So not on the street side but on the top side where you're

5    referring to earlier there's a pair of double doors.  I'm

6    going to circle it, tell me if that's --

7    A.  That's the doors right there.

8    Q.  So that's where you entered.  What did you see in the hall

9    when you first entered?

10   A.  When we first entered, of course there was tables and

11   chairs, but we seen bodies on the floor, there was blood

12   everywhere, there was bullet casings, magazines, there's --

13   pretty chaotic.

14   Q.  Had you ever had to respond to a scene like that before in

15   your time at the fire department?

16   A.  No, sir.

17   Q.  Where on Exhibit 21, which is the diagram in front of you,

18   did you first see bodies when you entered?

19   A.  When we first entered, of course we could see across the

20   row of chairs that's over to the round tables, and we could

21   see people were just laying there.  Underneath the tables.

22   Q.  So on this diagram you talked about the circular tables,

23   you were talking about these tables here?

24   A.  Yes, sir.

25   Q.  That's where the bodies were.  What did you and your teams

JAMES JACQUES – DIRECT EXAMINATION

1  do after you entered?  We're going to start very generally
2  then work towards more specifics.  So what was your general
3  plan, what did you -- the teams do?
4  A.  Of course just like we talked about, our main objective
5  there was to triage all the patients.  So in order to do that
6  we all -- we split up.  Engine 102 went to the front of the
7  room, Engine 103 went to the back of the room along with the
8  Charleston County Medic One.
9  Q.  Let me stop you.  When you're talking about the front of
10  the room, the back of the room, this makes sense to you, it
11  may not make sense to the jury, who has only just seen this
12  diagram for the first time today.  On the diagram up the
13  middle there's a shaded area called the altar.  Do you see
14  that?  Is that what you're referring to as the back of the --
15  front of the room?
16  A.  Yes, sir.
17  Q.  And the area where you entered, is that what you're
18  referring to as the back of the room?
19  A.  Yes, sir.
20  Q.  And where did your crew go?
21  A.  My crew went to the front of the room first.
22  Q.  And 103's crew -- yeah, am -- you're 102.
23  A.  Yes, sir.
24  Q.  And 103's went to the front.
25  A.  Went to the rear.

JAMES JACQUES - DIRECT EXAMINATION

1      THE COURT:  Rear.

2  Q.  To the rear.  I got you confused and got that confused,

3  but I think you've explained it clearly for them.  And then

4  did you work to the middle?

5  A.  Yes, sir.

6  Q.  As captain, fairly long-time captain at that point, did

7  you monitor the efforts of the other firefighters?

8  A.  Yes, sir.

9  Q.  For both of your teams?

10  A.  Yes, sir.  Pretty much for the whole scenario, or for the

11  whole incident that was inside.

12  Q.  And what did you do to monitor what they were doing?

13  A.  Of course after I first started the triage process with

14  the whole crew, and I triaged one patient, I backed up and

15  took --

16  Q.  Let me stop you.  That wasn't my question.  How do you

17  monitor the other firefighters?

18  A.  By standing back watching everybody, making sure that they

19  were doing what they needed to do.

20  Q.  And were you communicating with them as well?

21  A.  Yes, sir.

22  Q.  All right.  And what specifically were they trying to do

23  at that point?

24  A.  They were, of course, triaging the patients and seeing who

25  was viable and who wasn't.

JAMES JACQUES - DIRECT EXAMINATION

1   Q.  One of the things they were doing was checking for signs

2   of life, correct?

3   A.  Yes, sir.

4   Q.  And what are you trained to do to check for signs of life?

5   A.  One of the two main things, first main thing to check for

6   signs of life is to check for a pulse or breathing.

7   Q.  And how do you check for a pulse, what do you check?

8   A.  There's a couple different ways you can do it.  You can do

9   it corotid, which is when you check the neck, when you check

10  in your hand, or right here in your arm, so there's a couple

11  different places you can check.

12  Q.  As they were doing this, did they move any of the victims?

13  A.  No, sir.

14  Q.  At some point, and I'm jumping ahead a little bit here --

15  A.  Yes, sir.

16  Q.  -- did Captain Marchand get a pulse off of someone?

17  A.  Yes, sir.

18  Q.  Do you think he did?

19  A.  Yes, sir.

20  Q.  Did he end up having to move that patient?

21  A.  Yes, sir.

22  Q.  We'll talk about that in a little bit as we go through the

23  sequence here.

24      And toward the ends of your time there did you find a

25  ninth patient in addition to the eight that you'd been told

JAMES JACQUES - DIRECT EXAMINATION

1  about?

2  A.  Yes, sir.

3  Q.  And was -- did he have signs of Life?

4  A.  Yes, sir.

5  Q.  And did you have to remove him as well?

6  A.  Yes, sir.

7  Q.  As to the other seven, however, did you or any of your

8  firefighters move them in doing your assessment of their signs

9  for life?

10  A.  No, sir.

11  Q.  And did you and your crews check everybody in the hall?

12  A.  Yes, sir.

13  Q.  And apart from those two that we just talked about, and

14  we'll talk about them shortly, did the other seven people in

15  the hall, the other seven victims in the hall, by the time you

16  arrived, were they exhibiting any signs of life?

17  A.  No, sir.

18  Q.  All right.  We've been talking generally; let's move more

19  specifically into what you did and your path through the hall

20  that evening.

21  A.  Yes, sir.

22  Q.  First of all, why don't you -- you said that you went to

23  the front, correct?

24  A.  Yes, sir.

25  Q.  Were you with anybody from your crews at the time?

JAMES JACQUES - DIRECT EXAMINATION

1    A.  Me and my engineer was pretty much together.

2    Q.  And what was your engineer's name again?

3    A.  Alex Glover.

4    Q.  And you went to the front of the room.  Did you observe

5    any patient in the front of the room, any victims in the front

6    of the room as you moved into that area?

7    A.  Yes, sir.

8    Q.  Describe what you saw.

9    A.  Up towards the front of the room, of course we seen when

10   we first come in we could see all the patients laying

11   underneath the tables.  As we moved through the social hall up

12   to the front table, we noticed that there was a patient in the

13   middle of the exhibit hall up front.  Laying on the ground.

14   Q.  And where was he laying?  You still have an Exhibit 21 in

15   front of you.  Where was he laying?

16   A.  He was laying -- he wasn't -- he was kind of like in the

17   front of the beginning of that row, that front row of seats in

18   front of the altar.

19   Q.  So between the altar and this front row of seats?

20   A.  Yes, sir.

21   Q.  I'm just going to do -- talking about this area.

22   A.  Yes, sir.

23   Q.  So that's where you initially went.

24   A.  Yes, sir.

25   Q.  And you were with Engineer Glover, correct?

JAMES JACQUES – DIRECT EXAMINATION

1    A.   Yes, sir.

2    Q.   Do you know the name of the person that you saw there?

3    A.   Yes, sir.

4    Q.   Did you know who he was at the time?

5    A.   No, sir.

6    Q.   Was it a male?

7    A.   Yes, sir, it was male.

8    Q.   How did you determine his name?

9    A.   The next day with the news, I seen the photos on the news.

10   Q.   And when you saw the photos on the news, were you able to

11   match that up with what you had seen that evening?

12   A.   Yes, sir.

13   Q.   Okay.  What was that victim's name?

14   A.   Senator Pinckney.

15   Q.   Have you seen this person before?

16   A.   Yes, sir.

17   Q.   When?

18   A.   That was the male on the floor in the front of the social

19   hall.

20   Q.   This was the victim that you just described?

21   A.   Yes, sir.

22   Q.   What did you observe with respect to Reverend Pinckney?

23   A.   I observed that he was laying on the ground, head towards

24   the altar.  There was blood all over his body.  And it looked

25   like he had multiple wounds.

JAMES JACQUES - DIRECT EXAMINATION

1    Q.  Did either you or Engineer Glover check him for signs of
2    life?
3    A.  Engineer Glover did.
4    Q.  How did he do that?
5    A.  He checked for a corotid pulse, then checked to see if
6    there was a chest rise and see if he was breathing.
7    Q.  And did he have to move his body to do that?
8    A.  No, sir.
9    Q.  What, if anything, did he report to you about Reverend
10   Pinckney's --
11   A.  That there was no signs of life.
12   Q.  Did you personally observe any signs of life in Reverend
13   Pinckney?
14   A.  No, sir.
15   Q.  What, if anything, did you do after Engineer Glover, in
16   your presence, checked on Reverend Pinckney?
17   A.  I actually checked a patient, it was underneath one of the
18   tables.
19   Q.  All right.  Did you -- where on this diagram did you move
20   at that point?
21   A.  I -- the first table that -- the first circular table that
22   you come to coming back from the altar.
23   Q.  All right.  So you moved from the area where Reverend
24   Pinckney was to between -- was it in the area of the first and
25   second table?

JAMES JACQUES - DIRECT EXAMINATION

1    A.  Yes, sir, it was in between the round tables and the row

2    of chairs.

3    Q.  And what did you observe there?

4    A.  I observed that there was bodies underneath the tables.

5    Q.  And how were the -- how were the bodies positioned?

6    A.  Some of them were -- there was some of them that were on

7    their sides, some of them looked like they were on their

8    knees, looked like they were praying.

9    Q.  Did you check any of those victims --

10   A.  Yes, sir.

11   Q.  -- for signs of life?

12   A.  I checked one.

13   Q.  Do you know the name of the person you checked?

14   A.  Yes, sir.

15   Q.  Did you know -- Was it a man or a woman?

16   A.  It was a female.

17   Q.  Did you know her name before that night?

18   A.  No, sir.

19   Q.  How did you learn her name?

20   A.  In from the news the next day with the pictures.

21   Q.  Same as you did with Reverend Pinckney?

22   A.  Yes, sir.

23   Q.  What was her name?

24   A.  Miss Hurd.

25   Q.  Have you seen this person before?

JAMES JACQUES - DIRECT EXAMINATION

1   A.  Yes, sir.

2   Q.  Who is this person?

3   A.  That was the victim.  From the church that night.

4   Q.  This is the victim that you're describing that you

5   personally checked?

6   A.  Yes, sir.

7   Q.  What did you observe with respect to Miss Hurd?

8   A.  She was underneath the table, she was on her left side,

9   she was covered in blood.  I couldn't observe any actual

10  trauma to her other than there was blood all over.  I checked

11  for a pulse and also I checked to see if she was breathing.

12  Q.  And what did you -- What did you find?

13  A.  That she did not have a pulse and she was not breathing.

14  Q.  Did you have to move Miss Hurd's body at all?

15  A.  No, sir.

16  Q.  What, if anything, did you do after checking on Miss Hurd?

17  A.  At that point in time that's when I actually stepped back

18  and started checking with everybody else about who was

19  checking on to make sure all the patients are being checked.

20  Q.  You stepped back into your supervisor role --

21  A.  Yes, sir.

22  Q.  -- making sure that everybody was getting everybody

23  checked.  Were you still in the same area that we were

24  talking, you showed us before?

25  A.  Yes, sir.

JAMES JACQUES - DIRECT EXAMINATION

1    Q.  Was anybody else in that area, any other firefighters in

2    that area by that time?

3    A.  By that time we pretty much all had made it to the middle

4    right there.

5    Q.  All right.  Because your crew had gone to the front and

6    was moving back.

7    A.  Yes, sir.

8    Q.  Other crew had gone back and was moving front.

9    A.  Yes, sir.

10   Q.  Was the other crew in that area now?

11   A.  Yes, sir.

12   Q.  What were they doing?

13   A.  Checking the patients that were around the tables

14   underneath them.

15   Q.  And did anything unusual happen with regard to those

16   checks?

17   A.  One of the victims was found to have a pulse.

18   Q.  And who made -- who reported that?

19   A.  That was Engineer Hugo, or he was the captain that night.

20   Hugo Marchand.

21   Q.  Is Mr. Marchand actually an engineer, but sometimes acts

22   as a captain?

23   A.  Yes, sir.

24   Q.  And so Captain Marchand reported that he felt a pulse on a

25   victim?

JAMES JACQUES – DIRECT EXAMINATION

1   A.  Yes, sir.

2   Q.  All right.  Who else -- did you personally attend to that

3   victim?

4   A.  No, sir.

5   Q.  Did you observe it?

6   A.  Yes, sir.

7   Q.  Who else was there besides Mr. Marchand?

8   A.  Paramedic off of the Charleston County EMS Medic One, and

9   then one of the firefighters off of Engine 103 is also a

10  paramedic and he was there, too.

11  Q.  And what was his name?

12  A.  John Montone.

13  Q.  So Mr. Montone and Captain Marchand and the medic from

14  Charleston EMS were attending to that person?

15  A.  Yes, sir.

16  Q.  Do you know the name of the person they were checking?

17  A.  Yes, sir.

18  Q.  Did you know her name at that time?

19  A.  No, sir.

20  Q.  Same as what you were telling us before, you learned it

21  the following days on the news?

22  A.  Yes, sir, over the news.

23  Q.  What was the name of that person?

24  A.  Miss Singleton.

25  Q.  You may want to pull the mike a little closer to you.  If

JAMES JACQUES - DIRECT EXAMINATION

1   you look on your screen you'll see a photo displayed, it's

2   Exhibit 18.

3   A.  Yes, sir.

4   Q.  Have you seen this person before?

5   A.  Yes, sir.

6   Q.  Who is it?

7   A.  That was Miss Singleton.

8   Q.  So that is the person you were referring to as the patient

9   who was being attended to by Captain Marchand and the others?

10  A.  Yes, sir.

11  Q.  Please describe for the jury what you observed with

12  respect to what they did.

13  A.  At the point in time when Hugo Marchand felt a pulse, he

14  announced that he had a patient that had a pulse.  At that

15  point in time there was some tables right behind them, that's

16  on the other side of the circular tables that has chairs,

17  those were slid over.  She was rolled over and pulled out from

18  underneath the table.  So that way she could be -- so that she

19  could -- we could work on her, that we had plenty of room.

20  They started to cut her clothes off, so that way they could

21  hook up --

22  Q.  Let me stop you for a second.  Did they cut all her

23  clothes off or a particular item?

24  A.  They started to cut her shirt off.

25  Q.  Why did they do that?

JAMES JACQUES - DIRECT EXAMINATION

1    A.  Because they have to hook an EKG, which is a monitor, up

2    to a person, that way they can read your heart and deliver a

3    shock or something like that if we needed it to be done.

4    Q.  Is that part of your standard practice if you detect a

5    pulse --

6    A.  Yes, sir.

7    Q.  -- is to follow up with an EKG?

8    A.  Yes, sir.

9    Q.  Please, I interrupted you, please continue.

10   A.  They -- so they were removing her shirt, that way they

11   could hook the EKGs up to her chest.  Once they were hooked

12   up, they turned the monitor on and it showed no signs.

13   Q.  This is the diagram again.  If you look at the circular

14   tables, below the circular tables there's a group of

15   rectangular tables, correct?

16   A.  Yes, sir.

17   Q.  And some of them seem to be out of order.

18   A.  Yes, sir.

19   Q.  Do you see that?  Were they like that when you came in or

20   was that related to what you were just describing?

21   A.  That's related to what we just did.  They were all in line

22   with each other, along with the chairs underneath the tables,

23   but we had to move them.

24   Q.  So is this the area in which what you were observing was

25   taking place?

JAMES JACQUES - DIRECT EXAMINATION

1    A.  Yes, sir.

2    Q.  And what did they ultimately -- Well, let me stop.  When

3    they put an EKG on Reverend Singleton?

4    A.  Yes, sir.

5    Q.  And what did they ultimately determine?

6    A.  That she did not have any signs of life with a pulse or

7    any heart rhythm.

8    Q.  So the EKG did not confirm that she was still alive.

9    A.  No, sir.

10   Q.  What, if anything, happened when your crews finished

11   attending to Reverend Singleton?

12   A.  One of the guys noticed what looked like to be a foot up

13   in the -- up in the front corner of the room.  That was tucked

14   away.

15   Q.  So you said the front corner of the room.  If you look on

16   the diagram, tell us where you are describing.

17   A.  All right.  So if you're looking at the diagram, if you go

18   to the top of the diagram all the way to the right where it

19   looks like double doors with the red lines --

20   Q.  In the upper right where the double doors are, and it says

21   on the diagram, back foyer?

22   A.  Yes, sir.

23   Q.  Is that where you're referring to?

24   A.  Yes, sir.

25   Q.  This area here?  And one of your crew members reported

JAMES JACQUES - DIRECT EXAMINATION

1   seeing a foot in the back?

2   A.  Yes.

3   Q.  So this was in addition -- How many people were in the

4   main hall, how many victims?

5   A.  There was eight.

6   Q.  So this was a ninth person?

7   A.  Yes, sir.

8   Q.  What, if anything, did your crews do when they received

9   that report?

10  A.  Immediately all moved over to that area, the room, to

11  check to see what we had over there.

12  Q.  And do you know the name of this person?

13  A.  Yes, sir.

14  Q.  Did you learn the name the same way you've described to us

15  before?

16  A.  Yes, sir.

17  Q.  Not someone you knew beforehand?

18  A.  No, sir.

19  Q.  What was the name of the person, this ninth victim?

20  A.  Mr. Simmons.

21          MR. CURRAN:  Exhibit 12, please.

22  Q.  Have you ever seen this person before?

23  A.  Yes, sir.

24  Q.  Who is this person?

25  A.  Mr. Simmons is the one who was in the back foyer.

JAMES JACQUES - DIRECT EXAMINATION

1    Q.   The individual you've just been describing to us as the

2    ninth victim?

3    A.   Yes, sir.

4    Q.   How is this patient, how was this victim positioned when

5    you -- Let me stop for a second.  Did you go over to Reverend

6    Simmons?

7    A.   Yes, sir.

8    Q.   And how was Reverend Simmons positioned when you arrived?

9    A.   He was laying on the floor, his head was towards the

10   double doors with his feet, of course, was toward the actual

11   social hall.  And he looked like he was actually trying to get

12   out the doors.

13   Q.   What did you observe with respect to his condition at that

14   time?

15   A.   He was covered in blood.  Noticeable traumatic injuries to

16   his chest area and side.  Noticed that he had agonal breath.

17   Q.   I think you slipped into a little medial firefighter

18   terminology there; you said he had agonal breaths.

19   A.   Yes, sir.

20   Q.   What does that mean?

21   A.   He was trying to breathe, but couldn't breathe normal like

22   me or --

23   Q.   Was he able to speak?

24   A.   No, sir.

25   Q.   When you're in agonal breathing, are you able to speak?

JAMES JACQUES - DIRECT EXAMINATION

1    A.  No, sir.

2    Q.  What did your crews do?

3    A.  Of course he was kind of on his side, they rolled him

4    over, started to --

5    Q.  Let me stop you for accuracy.  When you say they, did you

6    personally attend to Reverend Simmons?

7    A.  No, sir.

8    Q.  You were supervising?

9    A.  Yes, sir.

10   Q.  Who was attending to him?

11   A.  It would have been Jason Dunnigan, Adam Souter, John

12   Montone, the paramedic that was off of Charleston County Medic

13   One.

14   Q.  So two paramedics, Mr. Montone and the EMS paramedic, as

15   well as a couple other members of your crews.

16   A.  Yes, sir.

17   Q.  What treatment did they provide?

18   A.  They hooked him up to an oxygen mask, an auto breather,

19   and started giving him oxygen.  They noticed the traumatic

20   injuries that he had to his side, so they went to cover those

21   to try to stop the bleeding.

22   Q.  Stop for a second.  When you say traumatic injury, what

23   did you actually observe?

24   A.  A wound to his side and blood actively pouring out.

25   Q.  What kind?

JAMES JACQUES - DIRECT EXAMINATION

1    A.   Looked like a bullet hole.

2    Q.   And what were they trying to do to treat that?

3    A.   They were trying to stop the bleeding.  They also had

4    another woman that had -- they were trying to put a dressing

5    on, to also stop the bleeding from.

6    Q.   And what were they trying to do, what was the purpose of

7    all this?

8    A.   They were trying to save Mr. Simmons, they were trying to

9    get him stable so that way they could transport him to the

10   hospital.

11   Q.   You mentioned transport to the hospital.  Given the

12   condition in which you observed him, would he have been able

13   to survive if they didn't get him to the hospital?

14   A.   No, sir.

15   Q.   What, if anything, did you observe in the area around him?

16   A.   Of course there was blood all over the place, and I

17   observed -- it was a round divot on the floor by his head when

18   they rolled him over.

19   Q.   So there was a divot in the floor?

20   A.   Yes, sir.

21   Q.   What do you mean by a divot; please describe what you

22   observed.

23   A.   It looked like it was -- it looked like a bullet hole in

24   the floor.

25   Q.   And a little bit of background on you, you're a

JAMES JACQUES – DIRECT EXAMINATION

1    firefighter?

2    A.  Yes, sir.

3    Q.  Do you have any other positions that you hold?

4    A.  Yes, sir.

5    Q.  What are they?

6    A.  I'm a reserve police officer.

7    Q.  So you're a police officer as well as a firefighter.

8    A.  Yes, sir.

9    Q.  Trained and qualified in firearms?

10   A.  Yes, sir.

11   Q.  You mentioned the treatment that they were trying to

12   provide.  What eventually -- take us to the next step on that,

13   what happened next with respect to Reverend Simmons?

14   A.  Mr. Simmons was placed on a back board.  Of course all his

15   wounds that we could observe at the time were being treated,

16   they were being bandaged up and trying to stop the bleeding.

17   He had been moved from just oxygen to a breather mask that we

18   were trying to breathe for him.  They strapped him down to

19   the -- to the back board, he was picked up, moved out of the

20   foyer onto a stretcher.

21   Q.  And what did they do with the stretcher?

22   A.  Took it to the nearest medic unit that was able to get

23   out.

24   Q.  Did any of your crew members, I'm talking about the fire

25   department generally, any of the crew members go with him?

JAMES JACQUES – DIRECT EXAMINATION

1    A.  Yes, sir.

2    Q.  Who went with him?

3    A.  About four of the guys went with the stretcher, two of

4    them come back and two went to the hospital.

5    Q.  And why did the two go to the hospital with him?

6    A.  They needed more hands in the back with him, and plus they

7    needed a driver.

8    Q.  Is that because of the nature of Reverend Simmons'

9    condition at that time?

10   A.  Yes, sir.

11   Q.  So you didn't go with them, correct?

12   A.  No, sir.

13   Q.  You remained in the hall?

14   A.  Yes, sir.

15   Q.  The other two firefighters come back to the hall?

16   A.  Yes, sir.

17   Q.  And let me stop you for a second.  When they --

18        MR. CURRAN:  Exhibit 21, please.

19   Q.  When they brought Reverend Simmons out, did they bring him

20   out those doors by the back foyer?

21   A.  Yes, sir, they took him out of the social hall from the

22   back doors.

23   Q.  All right.  And were you and the other crew members

24   essentially in that area at this point now?

25   A.  Yes, sir.

JAMES JACQUES - DIRECT EXAMINATION

1    Q.  All right.  What did you do when the other two crew

2    members returned to the hall?

3    A.  Basically, of course, everything is happening so quick,

4    when they come back in it was kind of like trying to take a

5    breath, basically we were trying to figure out what we were

6    going to do next.

7    Q.  And when you figured out what you were going to do next,

8    what did you do?

9    A.  Well, we determined that we wanted to -- we were going to

10   go back to the social hall and to the big area of the social

11   hall and get what we call a -- basically check each person

12   with the actual monitor.

13   Q.  When you say an actual monitor, are you referring to the

14   EKG process you were talking about earlier?

15   A.  Yes, sir.

16   Q.  Were you able immediately to go back into the hall?

17   A.  No, sir.

18   Q.  Why not?

19   A.  When -- by the time the two firemen got to us, and we were

20   all gathered right there, one of the police officers had come

21   in and said, hey, we need y'all to hang out right here, we

22   don't need y'all to go anywhere, we're getting reports of

23   somebody inside building.

24   Q.  So they held you in that back area that you -- that you

25   showed us earlier.

JAMES JACQUES - DIRECT EXAMINATION

1   A.  Yes, sir, right by the back foyer.

2   Q.  Were you in that back foyer or in the room to the left of

3   that?

4   A.  Right at the entrance of the foyer is just like a little

5   area, and y'all have it drawn as a room, and we were right

6   there in that --

7   Q.  You're talking about that area right there?

8   A.  Yes, sir.

9   Q.  And what did you observe while they were holding you

10  there?

11  A.  At that point in time some of our officers had come into

12  the social hall, I noticed two of them go to an office --

13  well, to a door right there beside the altar.

14  Q.  Are you talking about the offices on the diagram behind

15  the -- behind the alter?

16  A.  Yes, sir.

17  Q.  Continue.

18  A.  They were trying to get into that room, which it was

19  locked, because -- obviously because they were -- they were

20  trying to kick it open.  By that time as they were doing that,

21  we heard a noise coming from the door of that room that's

22  right there beside the -- adjacent to the foyer, that back

23  foyer.

24  Q.  Is that the room that's labeled church office here?

25  A.  Yes, sir.

JAMES JACQUES - DIRECT EXAMINATION

1    Q.  And what did you observe?  You heard those noises, what
2    did you observe?
3    A.  It was a matter of seconds of hearing the noises, and I
4    was thinking somebody's in that room, that the doors come open
5    and there was a female and a child there.
6    Q.  And what race were they?
7    A.  Black.
8    Q.  African-American woman and her child?
9    A.  Yes, sir.
10   Q.  And what happened?  What happened next?
11   A.  There was a female deputy had come in the back foyer at
12   the same time that the door had opened up, she immediately
13   reached down, grabbed the child, and was escorting them out
14   through the back double doors.
15   Q.  So through the doors over the area where Reverend Simmons
16   had laid?
17   A.  Yes, sir.
18   Q.  And then out the doors through which he was evacuating?
19   A.  Yes, sir.
20   Q.  What, if anything, did any of your -- any members of your
21   crew do anything in particular as that was happening?
22   A.  Yes, sir.  My firefighter, Adam Souter, of course he
23   pretty much tried to like stand in between the victims coming
24   out and the actual social hall to try and shield them from
25   seeing anything back towards the social hall as they come

JAMES JACQUES - DIRECT EXAMINATION

1   through the little foyer out the double doors.

2   Q.  The woman that came out that office, had you ever seen her

3   before?

4   A.  No, sir.

5   Q.  Do you know her name?

6   A.  I was -- Yes, sir.

7   Q.  And how did you learn her name?

8   A.  From the news and from people talking about her.

9   Q.  Okay.  What was her name?

10  A.  Miss Pinckney.

11  Q.  What, after Miss Pinckney was evacuated, what, if

12  anything, did your crews do next, you and your crews do next?

13  A.  After she was evacuated, at the same time I had also

14  notified command of the situation of there was two victims

15  coming out that needed to be checked, they were coming out.

16  It was -- it was about a minute later we were still in that

17  same general area that law enforcement come to us and asked us

18  to exit out of the social hall, that there was nothing more

19  that we could do inside, there was no more people inside that

20  we needed to get out, so they could start doing their job.

21  Q.  When you say law enforcement, you're talking about the

22  Charleston police department?

23  A.  I would assume so, because the one main guy that stayed

24  with us, he was in civilian clothes.

25  Q.  So what did you do in response?

JAMES JACQUES - DIRECT EXAMINATION

1    A.  We gathered our equipment that we had with us, our EMS

2    bags, and then we went back through the social hall through

3    the same doors that we entered into the social hall to begin.

4    Q.  Back out the way you came in?

5    A.  Yes, sir.

6    Q.  Did you have any further involvement with any of the

7    patients, the victims or the survivors that evening?

8    A.  No, sir.

9    Q.  Did you do anything further on the scene prior to

10   departure?

11   A.  They had us in -- they had us in a stage -- as a matter of

12   fact, they made two staging areas for us before they allowed

13   us to leave later on.

14   Q.  So you essentially stayed waiting for a response.  Did

15   anybody actually respond further?

16   A.  No, sir.

17   Q.  What did you do, do you know, when you left the scene that

18   evening?

19   A.  It was later, it was approximately somewhere around 10:30.

20   Q.  And what did you do after you left the scene?

21   A.  They took us back to the station.

22   Q.  And did you go back into duty?

23   A.  No, sir, we were met at the station by some of our command

24   staff, some of our chiefs, we were met with the chaplain and

25   some social workers, and they kept us out of service.

1    Q.  Why did they do that?

2    A.  Because of the call that we just responded to, the nature

3    of the call.

4              MR. CURRAN:  Okay.  Thank you.  No further questions,

5    Your Honor.

6              THE COURT:  Very good.  Thank you, Mr. Curran.

7         Cross-examination?

8              MS. PAAVOLA:  No questions, Your Honor.

9              THE COURT:  Captain, you may step down.

10        Ladies and gentlemen, we're about to depart on our first

11   day going back to our own active jury service, and I want to

12   remind you of several things I've already shared with you, but

13   it's worth -- and I'll say this every day as we depart.

14        You are not to have any discussions with anyone about

15   this.  If your families, spouse, significant other says what

16   happened, you blame me.  You say the judge told me not to talk

17   about it.  I'm glad to take the blame.  You'll be -- at a

18   later time when this is all over, you can share with your

19   loved ones what you have seen and heard, but until then, no

20   discussions.

21        Secondly, avoid all media coverage.  Don't turn on the TV,

22   don't read the newspaper.  Your friends can tell you what

23   happened at the ball games, but y'all don't need to be reading

24   the newspaper.

25        And third, no social media, no FaceBook, anything like

1    that, just -- you will get exposed, because there will be

2    discussions.

3        So with that, I will see you tomorrow morning at 9:30.

4    Please go home safely.

5        (Jury excused.)

6            THE COURT:  Mr. Richardson, do you want to give me a

7    forecast for what tomorrow is going to look like, the kind of

8    witnesses we're expecting?

9            MR. RICHARDSON:  Yes, Your Honor.  Tomorrow we would

10   anticipate -- we moved along quite well today.

11           THE COURT:  You notice I move things.

12           MR. RICHARDSON:  I do not have any doubts about that,

13   although you certainly exceeded our expectations.

14       We have a few individuals who are continuing down the law

15   enforcement theme, an individual who was engaged in sort of

16   more of the investigatory side, and then we'll get into crime

17   scene investigation.  We think that will be a significant part

18   of --

19           THE COURT:  Will you be showing the FARO exhibit

20   tomorrow?

21           MR. RICHARDSON:  Yes, sir, so we do anticipate the

22   FARO exhibit would be a significant part of the --

23           THE COURT:  Let's just have a little discussion about

24   this.  You and I and defense counsel know this.  These are

25   very graphic images.

1          MR. RICHARDSON:  Yes, Your Honor.

2          THE COURT:  They're admissible, ruled they're

3     admissible.  I just want to say to the family members that

4     there's no shame in being in the visitors' room during this,

5     it's going to be -- Everybody has to make their own decision.

6     And I'm sure you and your staff and victims' staff have been

7     counseling the folks, and I want you to continue doing that.

8     It's necessary to put into evidence and you need to do it, but

9     it is, you know, I have obviously seen it, it's very graphic

10    and I'm sure very upsetting to family members.  So everyone

11    sort of be forewarned about that.  That's tomorrow.  Correct?

12         MR. RICHARDSON:  That will be tomorrow, Your Honor.

13    We have obviously had long discussions with quite a number of

14    individuals involved with this, and we do believe some very

15    much want to be here for that and others very much do not.

16         THE COURT:  We have tried to set up with the victims'

17    room for that choice.

18         MR. RICHARDSON:  Absolutely.

19         THE COURT:  So they have the choice about it and they

20    can make an intelligent choice for themselves.

21         MR. RICHARDSON:  Yes, Your Honor.  And then I

22    anticipate from there we will move into additional law

23    enforcement responses away from the church.  I think after we

24    finish with the crime scene investigation, which will be

25    somewhat lengthy, then I think we'll move at that point to the

1    law enforcement activity away from the church, and there are a

2    number of witnesses that will come in that.

3              THE COURT:  That sounds very good.

4         Any other matters to come before the Court?

5              MR. RICHARDSON:  Not from the Government.

6              THE COURT:  From the defense?

7              MS. STEVENS:  Nothing, thank you.

8

9         (Court adjourned at 5:22 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       REPORTER'S CERTIFICATION

2

3          I, Debra L. Potocki, RMR, RDR, CRR, Official Court

4    Reporter for the United States District Court for the District

5    of South Carolina, hereby certify that the foregoing is a true

6    and correct transcript of the stenographically recorded above

7    proceedings.

8

9

10

     S/Debra L. Potocki
11   _____

12   Debra L. Potocki, RMR, RDR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25