```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF SOUTH CAROLINA
 2                        CHARLESTON DIVISION

 3    UNITED STATES OF AMERICA      :      VOLUME II
                                    :
 4              vs.                 :
                                    :
 5    DYLANN STORM ROOF             :      2:15 - CR - 472

 6

 7           Trial continues in the above matter on Thursday,

 8    December 8, 2016, commencing at 9:41 a.m., before the

 9    Hon. Richard M. Gergel, in the United States Courthouse,

10    Courtroom VI, 85 Broad St., Charleston, South Carolina,

11    29401.

12    APPEARED ON BEHALF OF THE UNITED STATES:

13      JAY N. RICHARDSON, ESQ., 1441 Main St., Columbia, SC.

14      NATHAN WILLIAMS, ESQ., P.O. Box 978, Charleston, SC.

15      STEPHEN J. CURRAN, ESQ., 601 D Street, NW, Washington, DC.

16
      APPEARED ON BEHALF OF THE DEFENSE:
17
        DAVID I. BRUCK, ESQ., Washington & Lee School of Law,
18      Lexington, VA.

19      KIMBERLY C. STEVENS, ESQ., 1070-1 Tunnel Rd., Asheville, NC.

20      EMILY PAAVOLA, ESQ., 900 Elmwood Ave., Columbia, SC.

21

22

23          REPORTED BY DEBRA L. POTOCKI, RMR, RDR, CRR
          Official Court Reporter for the U.S. District Court
24                       P.O. Box 835
                     Charleston, SC  29402
25                     843/723-2208
```

1                              I N D E X

2

3      WITNESS:  DANIEL ENGLISH

4      Direct Examination by Mr. Williams........................ 216

5
       WITNESS:  JAMES TALLON
6
       Direct Examination by Mr. Williams........................ 249
7

8      WITNESS:  BRITTANY BURKE

9      Direct Examination by Mr. Williams........................ 279

10
       WITNESS:  KEON GORDON
11
       Direct Examination by Mr. Curran......................... 357
12

13     WITNESS:  BRIAN WOMBLE

14     Direct Examination by Mr. Williams........................ 377

15
       WITNESS:  DANIEL BERNAT
16
       Direct Examination by Mr. Williams........................ 387
17     Cross-Examination by Ms. Stevens......................... 400

18
       WITNESS:  MICHAEL MYERS
19
       Direct Examination by Mr. Williams........................ 410
20     Cross-Examination by Ms. Stevens......................... 423

21

22

23

24

25

| | EXHIBITS: | Received in Evidence |
|---|---|---|
| 1 | | |
| 2 | Government Exhibits 104 | 236 |
| | Government Exhibits 23A – 23V | 240 |
| 3 | Government Exhibits 26 – 35 | 299 |
| | Government Exhibits 87 – 90 | 304 |
| 4 | Government Exhibit 49 | 306 |
| | Government Exhibit 48 | 325 |
| 5 | Government Exhibits 36 and 38 | 327 |
| | Government Exhibit 37 | 329 |
| 6 | Government Exhibit 39 | 329 |
| | Government Exhibits 50, 51, 52 | 331 |
| 7 | Government Exhibits 53 and 54 | 332 |
| | Government Exhibit 55 | 333 |
| 8 | Government Exhibits 40 and 46 | 335 |
| | Government Exhibits 56 and 57 | 339 |
| 9 | Government Exhibits 59 and 59A | 340 |
| | Government Exhibit 98 | 343 |
| 10 | Government Exhibit 58 | 343 |
| | Government Exhibits 60 – 62 | 345 |
| 11 | Government Exhibits 63, 64, 73 – 76 | 347 |
| | Government Exhibits 80 – 86 | 349 |
| 12 | Government Exhibits 91 – 95 | 352 |
| | Government Exhibit 97 | 356 |
| 13 | Government Exhibit 99 | 370 |
| | Government Exhibit 100 | 373 |
| 14 | Government Exhibit 101 | 375 |
| | Government Exhibit 102 | 376 |
| 15 | Government Exhibit 105 | 392 |
| | Government Exhibit 106 | 416 |

16

17

18

19

20

21

22

23

24

25

9:41:05AM

```
9:41:05AM  1          (Jury not present.)

9:41:24AM  2          THE COURT:  I received this morning a motion for a

           3    mistrial by the defense.  Has the Government had a chance to

           4    review that?

9:41:35AM  5          MR. RICHARDSON:  We have had a chance to review it

           6    briefly this morning and happy to respond to it now.

9:41:41AM  7          THE COURT:  That would be welcome.  Thank you, sir.

9:41:43AM  8          MR. RICHARDSON:  Thank you, Your Honor.

9:41:45AM  9      The motion, as the Court is aware, in essence, reargues

          10    the objection made after the fact to Miss Sanders' testimony

          11    yesterday, and suggests a number of ways that it was

          12    problematic.  We do not believe it was at all problematic, as

          13    an initial matter, and we think it is accurate and

          14    appropriate.

9:42:06AM 15      And a couple of things I think are worth pointing out in

          16    that context.  Unlike all the cases and references that the

          17    defense makes, this was an eyewitness survivor, not a family

          18    member who had no personal knowledge of the events, who is

          19    describing what she felt, heard and saw in the room as this

          20    vicious assault took place.  And I won't read the entirety of

          21    the provision --

9:42:34AM 22          THE COURT:  I've read it.  It's a clear comment on

          23    what she had just observed, not a comment on his -- him as a

          24    person.  That particular one during the Government's

          25    questioning.
```

9:42:48AM 1          MR. RICHARDSON:  Correct, Your Honor.  And I think in

2       the context in which it was given, I think it was very clear

3       she's describing laying on the ground as the shots are ringing

4       out, and describing what she felt when she was there.

9:43:00AM 5          THE COURT:  Seems to me it's relevant to malice, it's

6       relevant to a hate crime, it is relevant to the -- she makes a

7       reference of being in the house of God, she -- it's relevant

8       to the obstruction of religion.

9:43:13AM 9          MR. RICHARDSON:  I think all of that is exactly

10      correct, Your Honor.  We don't think this idea of pain and the

11      reference there is at all applicable in a case such as this

12      where you have an eyewitness.  Miss Sanders, to be clear, she

13      is going to provide victim impact testimony.

9:43:29AM14          THE COURT:  And it shouldn't be done in the guilt

15      phase, we all agree with that.

9:43:35AM16          MR. RICHARDSON:  Absolutely.  At an appropriate time,

17      she is going to do that.  That was not this testimony.  This

18      is testimony that's describing what occurred, what she

19      witnessed, what she felt.  And we think that is entirely

20      appropriate in the context.

9:43:49AM21       I also think it's worth adding two additional points.  I

22      think that resolves the issue, but just for the record's sake,

23      one, I think it's readily apparent from the defense motion

24      where they make reference, they made a strategic choice to not

25      object.

9:44:05AM 1          THE COURT:  Well, let's go back, a couple things

2     about that.  First of all, there's this statement that jumbled

3     within the motion is a fact that an event which occurred after

4     opening argument, out of court, which is apparently the

5     defendant's mother had a health issue which was before lunch,

6     and this was after lunch.  And secondly, the claim that it was

7     because of the emotion of that response that led to the

8     recess, that was actually after another question, so that at

9     the moment, Mr. Richardson, you asked that question, the

10    defendant's objection was already untimely.

9:44:51AM11          MR. RICHARDSON:  Correct.

9:44:52AM12          THE COURT:  It was already untimely.  And there's a

13    reason we have this rule.  It's not a -- not like a casual,

14    you know, happenstance rule, it's very important for the

15    orderly function of trial; the Fourth Circuit has repeatedly

16    held that.  You can't have this after-the-fact situation.

17    Now, I think Mr. Bruck wanted to avoid angering the jury.

18    Well, that's just -- I told the jury in the beginning, don't

19    get angry at people for making objections, that's part of --

20    I'm going to tell them that in the closing.  This is the

21    lawyer's job.  But you've got to do it timely.

9:45:30AM22      Anything else?  You said there was a third point.

9:45:32AM23          MR. RICHARDSON:  There is, Your Honor.  We do think

24    that it's appropriate, and I can't recall off the top of my

25    head, we don't think this was a comment on what the sentence

1    ought to be.

9:45:42AM 2         THE COURT:  Let me say this.  I think the second

3    comment, which Mr. Bruck elicited, okay, he elicited that.

4    And he did it three times.  I have the transcript, I re-read

5    it, I remembered it, I had it in my notes, I went back and

6    re-read it.  He -- I mean, I'm going to give -- I have the

7    greatest respect for Mr. Bruck, I appointed him in this case,

8    I've known him for years, I still have a great respect for

9    him.  But I have the impression when he did it, he was trying

10   to produce a mistrial, and I anticipated a motion this

11   morning.  That's frankly how I saw it, he did not make a

12   timely objection, which was -- then it's waived.  I think it's

13   close enough to a family comment that I need to instruct the

14   jury to disregard any family comments about the appropriate

15   punishment, that shouldn't be -- certainly not relevant in the

16   guilt phase, and not proper, you know, in the sentencing phase

17   as to the appropriate punishment.

9:46:43AM 18        MR. RICHARDSON:  Your Honor, I think one thing.  To

19   be very clear, she did not comment on what the appropriate

20   punishment was, although I think from implication --

9:46:50AM 21        THE COURT:  You can read it that way.  I don't think

22   she intended either, but I think as a protection, we have a

23   defendant on trial for his life, I think we bend everything in

24   a way to be as fair as possible.  And I would just propose to,

25   number one, those three -- those questions and the responses,

1    I'm going to ask Mr. Bruck if he wants me to, I'll strike

2    them, but there is questions, and I'm not sure he wants to.

9:47:17AM 3        MR. RICHARDSON:  Your Honor, I do not believe that

4    the Court can or should strike them at this point.  He asked

5    the questions, he got the answers, he did not timely move to

6    strike them.  I do not think the Court can, at this point,

7    after the fact, go back and strike those answers, which

8    themselves were entirely appropriate.  I think that sends a

9    message to the jury that the Court has issued a ruling that's

10   not accurate or fair.  I think Miss Sanders --

9:47:43AM11        THE COURT:  Well, you know, family members should not

12   comment on the punishment, right?

9:47:50AM13        MR. RICHARDSON:  And she was not commenting on the

14   punishment, is what she was describing is if he kills himself,

15   where he was going.  That is also where he's going if he dies

16   of natural causes or the State does it.

9:48:03AM17        THE COURT:  Yeah, you know, I just -- I think I

18   frankly, number one, I agree with you on all that, it's just

19   how do we -- what is the most cautious approach we can take.

20   And I think just simply just telling the jury to disregard any

21   comments from family members regarding appropriate punishment,

22   that is their decision to make.

9:48:28AM23        MR. RICHARDSON:  Your Honor, we think that is -- we

24   do not think it's appropriate at this juncture to do that.

9:48:33AM25        THE COURT:  I can do it in my closing charge.

9:48:35AM 1          MR. RICHARDSON:  To single out this particular

2       testimony or this particular issue, we think it's part of a

3       charge, the Court ought to include the idea, which is

4       appropriate in every case, that the ultimate question, this is

5       true in every criminal case, every civil case, every death

6       penalty case, the ultimate question, that being guilt or not

7       guilt, death or not death, is a question for the jury, to be

8       decided on the facts, and it's not the opinion of the lawyers,

9       the judge, the victims, the defendant's family or anybody else

10      but theirs.  We think that is an appropriate instruction.

9:49:12AM 11         THE COURT:  By the way, that is going to be an

12      instruction.  We already got -- the question is, do we need

13      another instruction now.

9:49:19AM 14         MR. RICHARDSON:  We certainly do not think that we

15      do, particularly in light of what the Court is going to

16      provide that instruction.  Had they made a timely objection,

17      had they asked for a curative instruction at that moment, then

18      that's one thing.  But I think to redraw attention to that at

19      this point and suggest, by doing so, that there was something

20      improper when there was not anything improper by her

21      testimony, we think is not appropriate and not --

9:49:43AM 22         THE COURT:  Let's look -- I hear what you're saying.

23      Let me just walk through this for a second.  Let's take each

24      of these sentences and see if -- where we are in -- I had --

25      in light of what you've just argued.  Mr. Bruck asked the

question, "Do you remember the man who did this saying

something about that he was only 21...?

9:50:04AM 3      Now, first of all, that is not relevant to guilt phase,

that he's 21 years old is not relevant in the guilt phase.

"...and then talking about what he was going to do

afterwards?"  Not relevant in the guilt phase.  "Yes," she

answered.  "Question:  Could you tell me what he said"?  He

said he was going to kill himself.  And I was counting on

that.  He's evil.  There's no place on earth for him except

the pit of hell."

9:50:34AM 11      Now, Mr. Bruck interprets that as a recommendation

regarding sentencing.  I took it that she was making a

religious comment, not a sentencing comment.  I don't think

that this is really Miss Sanders' world, this sentencing

world, it's the religious.  That's how I took it when she said

it.

9:50:56AM 17      Then Mr. Bruck persisted.  "He said that he was 21?  And

that he was going to kill himself when he was finished?

Answer:  Send himself back to the pit of hell, I say."  Again,

Mr. Bruck persisted.  "Did -- he didn't say that though.

About hell.  He just was going to kill himself?  Answer:

That's where he would go, to hell."

9:51:32AM 23      Now, you know, I just -- you know, you wouldn't let well

enough alone, Mr. Bruck, just kept persisting on this issue.

9:51:45AM 25          MR. BRUCK:  May I be heard?

9:51:50AM 1     THE COURT:  You certainly can be heard, that's why

2 I'm going to turn to you right now.  Yes, sir.

9:51:50AM 3     MR. BRUCK:  First of all, if I had done this for

4 anything to provoke a mistrial, the Court's respect for me

5 would be misplaced.  That is not what I was doing.  I --

9:51:59AM 6     THE COURT:  It looked that way, Mr. Bruck, to me.

9:52:02AM 7     MR. BRUCK:  I was holding in my hand a verbatim

8 transcript of an interview with law enforcement and the

9 solicitor, with Mrs. Sanders, for whom I have the greatest

10 respect.  This was two weeks after the event.  And she simply

11 narrated that the defendant said, I am 21 years old, and when

12 I am finished, I am going to kill myself.  That was a fact

13 that was relevant to his state of mind, it was relevant to

14 complete the setting.

9:52:29AM 15     THE COURT:  Why is it relevant to his guilt?  Because

16 that's -- that goes to -- I mean, it's clearly mitigation

17 evidence, you and I would agree that's -- his age is

18 mitigation evidence.

9:52:40AM 19     MR. BRUCK:  It wasn't his age, it was his state of

20 mind about the fact that he --

9:52:44AM 21     THE COURT:  You asked about the age, that's a

22 mitigation fact.

9:52:48AM 23     MR. BRUCK:  The age was simply a lead in to a very

24 short statement.

9:52:51AM 25     THE COURT:  You were getting in mitigation evidence,

1    I'm sorry, that's what you were asking about, and then you

2    wanted to get in that he was planning to commit suicide.

3    That's not an element of the crime, it's not a defense to the

4    crime, the 33 counts he has.  It's not relevant.

9:53:07AM 5         MR. BRUCK:  It is relevant to his overall state of

6    mind.  The prosecution --

9:53:12AM 7         THE COURT:  State of mind about what?  How -- you

8    know, that's looking like that evidence where you know we have

9    a very narrow window of psychological evidence when there is

10   not -- when the defendant is not insane, doesn't claim to be

11   insane and he is legally competent.  It's a very narrow window

12   which this doesn't come remotely close to.  It would not be

13   relevant in the case.  You raised it.  Of course I don't know

14   what's coming, Mr. Bruck, I haven't read these 302s, I don't

15   have access to that.  And then you asked it three times.  I

16   mean, I was looking at you, you saw me looking at you, I was a

17   little perplexed by it myself, frankly.

9:53:49AM18         MR. BRUCK:  There was no unsaying the first one.  I

19   was hoping that she would simply relate what he said.

9:53:54AM20         THE COURT:  You know, if you had turned to me and

21   said objection, I would have given a curative instruction

22   right that moment.  I would have done it.  But then you

23   persisted.  And you saw me looking at you, I looked at you

24   when you did that.  You know that.  And because I just

25   couldn't believe you were persisting in that.  And that's

1    where I thought I'm going to see a mistrial motion.  And I

2    came in this morning and my clerks told me, and I smiled

3    because I saw it coming.

9:54:24AM 4         MR. BRUCK:  The motion would have been the same

5    whether it was said one, two, three times.  That made very

6    little difference.

9:54:29AM 7         THE COURT:  I don't think you can elicit this kind of

8    information, prompt the witness to say something, and then

9    complain that she answered the question.

9:54:41AM10         MR. BRUCK:  She did not answer the question is the

11    problem.  That is exactly the basis of our -- the question was

12    what did he say.  And the answer was, he said that he was 21,

13    and when this was done, he was going to kill himself.  Now, to

14    say that I elicited her opinion about his going to hell is

15    just not true.

9:55:03AM16         THE COURT:  Let me tell you this.  The second and

17    third one, you certainly did.  And, you know, all of us have

18    cross-examined challenging witnesses, right?  I mean, we've

19    all had this experience.  And sometimes, you know, you get --

20    you open up doors you don't intend to open.  That's always,

21    you know, a way you're trading.  I understand what you're

22    saying, Mr. Bruck, but now the only question is, my plan

23    always was to tell the jury at sentencing that this issue is

24    not mine, it's not the lawyers', it's not the families',

25    it's -- either family -- sentencing is their decision.  Is

1    there any more that I need to do now?

9:55:56AM 2              MR. BRUCK:  Yes.

9:55:56AM 3              THE COURT:  What do you want me to do now?

9:55:59AM 4              MR. BRUCK:  I would like the Court to give exactly

5    the instruction that you proposed to give, and to -- prior to

6    Mr. Richardson's argument.  I think the Court should instruct

7    the jury that to the extent that the witness --

9:56:13AM 8              THE COURT:  Could be interpreted.

9:56:15AM 9              MR. BRUCK:  -- could be interpreted as expressing an

10   opinion about what should happen to the defendant, or

11   expressing an opinion about the defendant.  Booth versus

12   Maryland covers both of those.  In Booth, and that's the part

13   that was not overruled --

9:56:29AM14              THE COURT:  Let me do this.  I did not think the

15   first comment which she made on direct was a comment on him,

16   it was his conduct, and she was describing his conduct.  It

17   culminated a description of events.  And she was describing

18   it, I thought, quite -- you know, quite reasonably under these

19   very difficult circumstances.  So that one, I'm not worried

20   about.  It's -- the only comment is, does one infer from the

21   information, from the responses you personally elicited, that

22   something else needs to be said.  I tend to err on the side of

23   caution in these things, that's just my style of presiding in

24   a criminal case, is that I tend -- I don't think it's any

25   great harm to give an instruction which is in accord with the

209

 1    law.  I don't intend to comment on the evidence,

 2    Mr. Richardson, I just think I should say I want to instruct

 3    the jury that the sentencing decision is always a decision of

 4    the jury, it's not the decision of anyone else, and anyone who

 5    comments about it, they should disregard that because it's

 6    their decision.

9:57:39AM 7        MR. BRUCK:  We also request that the statements be

 8    stricken as the Court --

9:57:44AM 9        THE COURT:  You know, it's just kind of funny,

10    because you elicited it.

9:57:49AM11        MR. BRUCK:  I understand that, Your Honor.  I did not

12    elicit the initial response except in the technical sense that

13    it was an answer, an unforeseeable answer to a very simple

14    factual inquiry about what the defendant said, that she had

15    already, in a recorded statement, told law enforcement about.

16    I mean, that's what cross-examination is for, that was a very

17    reasonable inquiry, and no one could have predicted that the

18    gates of hell would open in response to that question.

9:58:15AM19        THE COURT:  You asked it twice more.  That's the --

20    that's the --

9:58:19AM21        MR. RICHARDSON:  Your Honor?

9:58:20AM22        THE COURT:  Yes.

9:58:20AM23        MR. RICHARDSON:  I don't think it was all

24    unforeseeable, in light of her testimony that had come before.

25    I don't think that's a fair characterization.

9:58:27AM 1    Second, counsel had an obligation, if he believed there

2    was a problem, to object to the answer and move to strike in a

3    timely manner.

9:58:39AM 4    THE COURT:  Mr. Richardson, there's always an issue

5    of plain error review, even on a waived objection, right?  So

6    we want to --

9:58:47AM 7    MR. RICHARDSON:  I agree.  That's the third point.

8    It's not error, Your Honor, because she is not commenting on

9    what the appropriate sentence is, she is saying, as I

10    indicated before, no matter when or how he dies, that is where

11    he is going.

9:59:01AM 12    THE COURT:  Yeah.

9:59:02AM 13    MR. RICHARDSON:  That's a different point than a

14    suggestion of instructing this jury what verdict it should

15    reach.

9:59:08AM 16    MR. BRUCK:  If I may?

9:59:10AM 17    THE COURT:  Sure.

9:59:11AM 18    MR. BRUCK:  One other thing I'd like to -- I mean,

19    this may recur, Your Honor, and I -- I mean, it's not going to

20    be recurring exactly the same way.

9:59:21AM 21    THE COURT:  I would urge you not to ask questions

22    that cause it to recur yourself.

9:59:25AM 23    MR. BRUCK:  All I'm saying --

9:59:26AM 24    THE COURT:  Mr. Richardson is aware of the problem,

25    we're all aware of it, this is a very emotionally fraught

1    situation.  One of the important things is for all of us to

2    remain calm, because we have enough emotion and tragedy in

3    this case for everyone.  Right?

9:59:41AM 4         MR. BRUCK:  That gets me to my point, Your Honor.

5    And I mean, it was the very admiration that I personally, and

6    I think by the time she was done, everyone in this courtroom

7    feels for Mrs. Sanders, that made this such a difficult

8    problem.  This witness was an inspirational figure yesterday

9    and has been for the entire time since this awful event befell

10   this community and befell her town.  And under those

11   circumstances, we have to rely on the Court in the end to

12   assure the fairness of the proceedings.  Yes, I could have

13   responded in a lawyerly fashion.

10:00:28AM14        THE COURT:  You -- Let me --

10:00:31AM15        MR. BRUCK:  I should have, but --

10:00:32AM16        THE COURT:  I can't change the rules.  You know, one

17   of the things I keep saying to y'all is just because it's a

18   capital case, we don't change our rules.  Rule 103 is our

19   rule.  Timely objections.  You have got to make it.  All of us

20   sitting in the pit where you guys are now, and I did for over

21   a hundred trials, you have to sit there and you have to make a

22   judgment.  And sometimes you don't make the objection because

23   you worry about jury reaction.  It's just one of the things

24   you do.  But we can't change that rule.  It is unmanageable to

25   not deal with it at the time.

10:01:09AM 1    MR. BRUCK: I'm not --

10:01:10AM 2    THE COURT: And I thought it was a strategic call on

3 your part. And I can't have you second guessing your strategy

4 and coming back later and then -- it makes the trial

5 unmanageable.

10:01:20AM 6    MR. BRUCK: I need to be able to finish, if I may.

10:01:23AM 7    THE COURT: You may, sir.

10:01:24AM 8    MR. BRUCK: Thank you.

10:01:26AM 9  I'm not asking the rules to be changed. Part of our

10 motion asks for prospective relief. I don't know that

11 anything like this will happen again, but as the Court has

12 often remarked, Your Honor is the only participant in this

13 trial who does not have a side. And that gives you an ability

14 to intervene in an emotionally fraught situation without harm

15 to anyone, including to the Court. And I am simply -- I am

16 not asking you to repeal the rules, I am not asking you to

17 give me any special dispensation. I am asking you to

18 acknowledge the reality of the situation we were in, and may

19 be in again, and if that situation should recur, I am asking

20 the Court to take sua sponte action without the necessity of

21 our having to object. I'm not asking you to fashion a rule,

22 I'm not asking you to tell me now that you're going to do

23 that, or to do it or to say anything that I can rely on.

10:02:32AM 24  Your Honor, this courthouse is named for Judge Waring,

25 largely due to Your Honor's efforts. We revered Judge Waring

1   and revered his memory, not because he did right but because

2   he did right when it was hard.  What I am asking you is hard,

3   but we think that it is right, and we are asking you to take

4   an active role in ensuring the fairness of these very

5   challenging and fraught proceedings.

10:03:07AM 6        THE COURT:  See, Mr. Bruck, here's one of the sort of

7   complicated issues and why the courts do not traditionally do

8   this.  You may have your own strategic reason you don't want

9   to object.  You may want a piece of evidence in.  I don't know

10  that.  And people make those strategic calls all the time.

11  And if I step in, I'm stepping out of my role as the neutral

12  presider, and I may be inadvertently injuring your case by

13  doing that, because I think you should object about some

14  evidence.  I don't do that, because I appointed what I

15  regarded as one of the top lawyers in America in this field to

16  handle this client, represent his client.  I can't do that for

17  you.  I can't be that person, because I don't know what's

18  going on regarding your strategy.  So I respectfully decline

19  to assume this role to sort of be the back-up to the defense.

20  That's not my role to do that.

10:04:12AM 21       And I was -- you know, so let me just sort of review where

22  I think we are.  We need to step back, because we have a jury

23  waiting and we need to proceed.

10:04:21AM 24       I find both objections untimely, and that alone will be

25  the basis in which to deny them.  If the first objection

1    otherwise had been timely raised, I would have denied it as I

2    did at the time, because I thought it was a fair comment on

3    the conduct and not on the individual.

10:04:42AM 4    The second comment is -- it can be read, inferred, it's

5    not stated, that it might be a comment on sentencing.  I

6    personally didn't think, listening to it in real time or in

7    reading it here, that it was an actually intended comment on

8    that.

10:05:02AM 9    But out of an abundance of caution, I'm prepared to tell

10    the jury, without referring to it, I'm not going to strike it,

11    because I have trouble striking that the defense counsel

12    elicited three times, but I will instruct the jury simply that

13    this -- I want to remind them that the sentencing decision is

14    always theirs, and it's not the responsibility of any of the

15    parties or any of the witnesses or the Court, it's theirs.

16    That's what I intend to do.

10:05:37AM 17    MR. RICHARDSON:  Can I just add one thing?

10:05:38AM 18    THE COURT:  You may.  Welcome it.

10:05:40AM 19    MR. RICHARDSON:  Thank you.  Instead of just

20    referencing the sentencing decision, we think it applies to

21    the guilt and sentencing decision.  And just in that same vein

22    of not singling out any one group, we think, as the Court did

23    with respect to demeanor, referring it's not the judge, it's

24    not the attorneys, it's not any of the witnesses, it is yours.

25    Right?  I don't think there's a reason to single out any one

          1    group here.  I think referring to the Court, to the attorneys

          2    and to the witnesses is an appropriate way of handling that,

          3    Your Honor.

10:06:17AM 4         MR. BRUCK:  Your Honor, we don't think that making it

          5    so general, the jury will not even realize what it is you're

          6    talking about is going to be adequate.  We also don't think it

          7    is adequate to fail to strike the testimony.

10:06:29AM 8         THE COURT:  Okay.  I deny the motion to strike.  I

          9    think under the circumstances it's not necessary, and it's

         10    untimely in any regard.

10:06:37AM11         Let me think for just a moment here.

10:07:37AM12         (Pause.)

10:07:48AM13         THE COURT:  Very good.  Bring in the jury.

10:08:43AM14         (Jury present.)

10:09:08AM15         THE COURT:  Good morning.  You look more rested than

         16    yesterday.  This is hard work, right?  I'm going to first of

         17    all, every one of you has been incredibly attentive and I want

         18    to thank you for that.  The parties thank you for that.  And,

         19    you know, this is a lot harder work than it looks.  And I

         20    think y'all have just undertaken this with such great

         21    seriousness, and the Court greatly appreciates that.

10:09:35AM22         I want to make a brief instruction to y'all, if I might.

         23    Ladies and gentlemen of the jury, I want to remind you that

         24    the decisions this jury must make, whether the defendant is

         25    guilty or not guilty, and if we come to a sentencing phase,

DANIEL ENGLISH – DIRECT EXAMINATION

1    the appropriate sentence, is always your decision to make.  It

2    is not the decision of this Court or the attorneys or the

3    witnesses.  It always will be yours.

10:10:02AM 4        With that, call your next witness.

10:10:04AM 5              MR. WILLIAMS:  Thank you, Your Honor, Government

6    calls Dan English.

10:10:16AM 7              THE CLERK:  State your full name for the record,

8    please.

10:10:17AM 9    A.  Daniel English.

10:10:19AM10        DANIEL ENGLISH, a witness called by the Government, first

11    having been duly sworn, testified as follows:

10:10:25AM12                          DIRECT EXAMINATION

10:10:25AM13    BY MR. WILLIAMS:

10:10:36AM14    Q.  Morning.

10:10:37AM15    A.  Good morning.

10:10:38AM16    Q.  Can you tell the jurors where you work?

10:10:40AM17    A.  Charleston police department.

10:10:41AM18    Q.  What do you do for the police department?

10:10:43AM19    A.  Currently I'm the sergeant in the patrol division in West

20    Ashley.

10:10:47AM21    Q.  How long have you worked in law enforcement?

10:10:50AM22    A.  I've been with the City of Charleston for a little over

23    nine years.

10:10:53AM24    Q.  Do you have any qualifications or education prior to

25    working at the police department that qualified you to work

DANIEL ENGLISH – DIRECT EXAMINATION

1     there?

10:11:00AM 2     A.  I have a four-year degree from Francis Marion University

3     in Florence, South Carolina, and then I attended the South

4     Carolina Criminal Justice Academy.

10:11:08AM 5     Q.  What did you study in college?

10:11:10AM 6     A.  Political science.

10:11:11AM 7     Q.  You say you started about nine years ago with the police

8     department?

10:11:14AM 9     A.  Yes, sir, August 2007.

10:11:16AM10     Q.  What was your first assignment with the police department?

10:11:19AM11     A.  My first assignment was a patrolman in the downtown team.

10:11:23AM12     Q.  How long did you do that?

10:11:25AM13     A.  I was on patrol for four and a half years or so.  I worked

14     downtown, and then I worked on another team in the suburban

15     area.

10:11:35AM16     Q.  What type of responsibilities did you have?

10:11:38AM17     A.  As a patrolman, you know, just you patrol your area, you

18     respond to calls, write reports, make arrests, things like

19     that.

10:11:46AM20     Q.  When you say downtown, did that cover the area where

21     Mother Emanuel AME Church is?

10:11:51AM22     A.  Yes, sir.

10:11:52AM23     Q.  Are you familiar with that area?

10:11:53AM24     A.  I am.

10:11:54AM25     Q.  That's from patrolling it generally?

DANIEL ENGLISH – DIRECT EXAMINATION

10:11:57AM 1    A.  Yes, sir.

10:11:58AM 2    Q.  So after those years of working patrol, did you take on

3    any other responsibilities or have another job?

10:12:04AM 4    A.  I did.  So after doing the time on patrol, like I just

5    mentioned, I began moving into investigations division of our

6    police department.  I started in the auto theft division, I

7    worked there, I moved over to the robbery division, I did that

8    for two and a half years, and then lastly I moved to the

9    violent crimes or homicide division, and now, like I said, I'm

10    back onto patrol as a supervisor.

10:12:29AM 11    Q.  When were you promoted to, first of all, detective?

10:12:33AM 12    A.  I would say 2012 I was into the detective division.

10:12:38AM 13    Q.  And when were you promoted to sergeant?

10:12:40AM 14    A.  I was just promoted to sergeant in September.

10:12:43AM 15    Q.  You spent several years as a detective?

10:12:45AM 16    A.  Yes, sir.

10:12:46AM 17    Q.  If you can, explain to the jury the role, or at least your

18    experience with using videotape or surveillance in your

19    investigations.

10:12:56AM 20    A.  Sure.  In these days surveillance footage is paramount to

21    investigations now.  It obviously helps you establish what

22    happened before, during, after a crime.  So working cases from

23    any auto theft to homicide, like I told you I was in, you're

24    getting footage for everything you can.  And it's useful in a

25    number of ways, from, you know, corroborating statements given

DANIEL ENGLISH – DIRECT EXAMINATION

1    to you from witnesses all the way to looking at the actions of

2    an actual crime.

10:13:28AM 3    Q.  And explain the type of sources of video surveillance

4    you've used or have experience within investigations.

10:13:36AM 5    A.  Sources as in the locations?

10:13:38AM 6    Q.  Where does the video come from?

10:13:40AM 7    A.  So typically, you know, you have the cameras in the

8    locations, and those cameras feed into surveillance systems.

9    And we will get surveillance systems, and some businesses

10    still have old VCR systems, some have high-tech cloud systems.

11    So it really kind of ranges.  But that's typically what we

12    deal with, and just watching those footages and then

13    retrieving them later.

10:14:03AM14    Q.  And the city itself maintains a type of footage, is that

15    right, meaning different cameras in the city?

10:14:09AM16    A.  Yes, sir.

10:14:10AM17    Q.  And is it part of your responsibility to know how to

18    retrieve footage from that system as well?

10:14:14AM19    A.  Yes, sir, it is.

10:14:15AM20    Q.  And I know you're maybe not an expert in the area, but

21    would you consider yourself experienced in gathering

22    surveillance footage for investigative purposes?

10:14:24AM23    A.  Very.

10:14:25AM24    Q.  So I want to ask you then about June 17th of 2015; were

25    you working that day?

DANIEL ENGLISH – DIRECT EXAMINATION

10:14:32AM 1    A.  I was off that night.

10:14:34AM 2    Q.  Do you recall getting brought into the shooting that

3    happened at the Emanuel AME Church?

10:14:40AM 4    A.  Yes, sir.

10:14:41AM 5    Q.  Tell the jury how you got involved.

10:14:42AM 6    A.  So as I said, I was off sitting at my house on the couch.

7    My lieutenant at the time called in several detectives and

8    said, you know, this is what happened downtown, we've had a

9    shooting, we don't have a whole lot of information at this

10    time, we do need a bunch of detectives to respond.

10:15:02AM 11    So I did.  We had a muster location at 103 Calhoun Street,

12    and we were told to go there, so I did.

10:15:09AM 13    Q.  When you testified earlier that you were sort of familiar

14    with the downtown and the area of Emanuel, can you explain

15    sort of what that area is like?

10:15:20AM 16    A.  So the church basically sits right at the intersection of

17    Meeting and Calhoun Street.  Obviously there's a park right

18    across from it, Marion Square.  So it's a heavily traveled

19    area, there's a lot of foot traffic in that park.  There's a

20    gas station right on the corner, so there's obviously vehicles

21    coming in and out.  Across the street is a hotel.  So again,

22    it's just kind of a tourism section of town, and it's heavily

23    traveled through cars and people.

10:15:48AM 24    Q.  Were you familiar with the immediate surrounding,

25    Henrietta Street behind, and the area surrounding the building

DANIEL ENGLISH – DIRECT EXAMINATION

1    itself?

10:15:57AM 2    A.  Yes, sir.

10:15:57AM 3    Q.  Was that from your patrol?

10:15:59AM 4    A.  Yes, sir.

10:15:59AM 5    Q.  I want to ask you then, you said you were called out and

6    you went to a muster location.  What was your job or what

7    happened once you got there?

10:16:06AM 8    A.  So basically a muster location is just one place where the

9    detectives can go to get on the same page, collect the

10    information known at the time, and then distribute

11    assignments.  So we go to the muster location and we get

12    briefed on the situation and we get given our assignments from

13    that point.

10:16:25AM 14    Q.  And at that point in time what was sort of the interaction

15    between federal and local agencies or, for that matter,

16    different agencies that were cooperating?

10:16:34AM 17    A.  Yeah, with this incident there was a number of different

18    agencies responding.  There was on the scene obviously us,

19    city police, there was fire, there was the county sheriff's

20    office, you know, we were told that state was en route.  You

21    know, federal agencies were obviously coming.  So at that

22    point it was just a pretty massive response in terms of other

23    agencies.

10:16:56AM 24    Q.  When you responded, who was coordinating the investigation

25    at that time?

DANIEL ENGLISH – DIRECT EXAMINATION

10:17:00AM 1    A.  At that particular time the muster location my lieutenant

2    was, you know, giving us our direct assignments.  But a MEOC,

3    which stands for Municipal Emergency Operation Center, that

4    was be started just blocks away.  And that would be where the

5    leaders from the agency that was gathering and would begin to

6    make decisions.

10:17:22AM 7    Q.  So when you first arrived, about how long after the

8    shootings, to the best you can recall, were you showing up on

9    scene?

10:17:29AM10    A.  I got to the muster -- I got called at 9:15, and I mean

11    it -- I got there quick.  So by the time I got there, you

12    know, maybe 9:30, 9:40.

10:17:42AM13    Q.  And so when you showed up at that time, what were you

14    assigned to do, if anything?

10:17:47AM15    A.  When I got to the muster location I was told to go over to

16    the Embassy Suites, which is again in Marion Square, it's a

17    motel there.  Survivors and other people were being staged at

18    that location.  So I was told to go over there and basically

19    just await further assignment.  Mostly just for staging

20    purposes that we weren't directly across from the actual

21    church.

10:18:12AM22    Q.  Did you do anything else there, or how long did you stay

23    there?

10:18:14AM24    A.  I stayed at the muster location for maybe 15 minutes, and

25    then I was told to go to the church.  And I went to the church

DANIEL ENGLISH – DIRECT EXAMINATION

1    and I stayed there for a little while.

10:18:23AM 2    Q.  At the church or at the muster location?

10:18:25AM 3    A.  At the church.

10:18:26AM 4    Q.  Why did you go over to the church?

10:18:28AM 5    A.  So I was told to go there and assist.  There was some,

6    like I said, survivors would be in place there.  And there was

7    some interviews being conducted, and I was basically just told

8    to offer assistance if needed.  For the interviews.  Or just

9    to wait further instruction.

10:18:42AM 10    I was not asked to help with any of the interviews, so I

11    awaited further instruction.

10:18:46AM 12    Q.  Do you recall if there were -- if there was any kind of

13    joint interviewing going on at this time?

10:18:50AM 14    A.  There was, yeah, there was FBI agents there at that time

15    in particular, assisting with the survivor interviews I just

16    mentioned.

10:18:57AM 17    Q.  So if you could explain, you mentioned earlier there was a

18    MEOC set up, a center for command?

10:19:05AM 19    A.  Yes, sir.

10:19:05AM 20    Q.  What was the command structure as those interviews began,

21    what was the role of state and federal agents working

22    together?

10:19:11AM 23    A.  At that point, you know, everyone is trying to help each

24    other and gather as much facts as possible.  And when you're

25    working obviously away from the command system, your job is to

DANIEL ENGLISH – DIRECT EXAMINATION

1    basically report back to back up so that they know they have

2    the latest information that you're getting.  So that's kind of

3    how the structure worked.

10:19:30AM 4    Q.  And so as far as you said you then displaced from the

5    hotel to the church, what happened then as far as your role?

10:19:38AM 6    A.  Okay.  So while I'm at the hotel I was informed that the

7    church may have some surveillance system in place.  I was

8    asked to call a member of the church to confirm that.  I did.

9    When I called that individual, I was told to contact the

10   secretary of the church.

10:19:54AM 11   Q.  Back up a little bit.  So who gave you that assignment

12   about the video?

10:19:59AM 13   A.  Sure.  So the Detective Burckhart was actually working

14   that night, so he was the responding detective.  Like I said,

15   the rest of us were called out to assist.  And so I get there

16   and I learn from Detective Burckhart that the church may have

17   some footage.  He had contact person and he asked me to call

18   them to confirm.

10:20:18AM 19   Q.  Was Detective Burckhart working with any federal agent?

10:20:21AM 20   A.  He was.

10:20:21AM 21   Q.  Who was that?

10:20:22AM 22   A.  There was a Special Agent Durr there, that's one name that

23   stands out to me.  There was a lot of people with him, so --

10:20:32AM 24   Q.  And so Detective Burckhart had you call an individual.

25   Who was the first person you had to call?

DANIEL ENGLISH - DIRECT EXAMINATION

10:20:38AM 1   A.  So the first person I was told to call, his name was

2   Charles Williams, he was a member of the church.  And I got

3   his name and phone number and I called him and asked, you

4   know, I heard the church has footage, is this true.  And he

5   said yeah, the church does have footage; can you please call

6   our secretary, Althea Latham, and get the information from

7   her.

10:20:58AM 8   Q.  And did he give you any other details about where the

9   video may be located or any other information that was

10   helpful?

10:21:05AM11   A.  He passed me on to Miss Latham, and when I called her she

12   provided that information.

10:21:09AM13   Q.  So what did -- I'm assuming you acted upon what

14   Miss Latham told you?

10:21:16AM15   A.  I did.

10:21:16AM16   Q.  So what did she tell you that was helpful to your

17   investigation?

10:21:21AM18   A.  So when I called Miss Latham she told me that the church

19   did, in fact, have a security system in place, that it was

20   located in her office.  She told me where her office was, she

21   told me the best way to access her office.  She told me how I

22   could view the surveillance footage and the password to get

23   into the hard drive.

10:21:42AM24   Q.  Did you write all that down?

10:21:44AM25   A.  I did.

DANIEL ENGLISH - DIRECT EXAMINATION

10:21:45AM 1    Q.  Once you had that information from her, did you -- what

2    did you do at that point?

10:21:49AM 3    A.  So I took the information, like I said, and I passed it up

4    to the command structure so that everyone knew, yes, the

5    church does have footage, we know where it is and how to

6    access it.  So that information was passed up, and then I

7    eventually went to the -- and was given further instruction.

10:22:06AM 8    Q.  How long after you called the information in did you go to

9    the MEOC for further instruction?  You have your notes in

10    front of you?

10:22:12AM11    A.  I do, yes, sir.

10:22:13AM12    Q.  Feel free to refer to them, if you need to.

10:22:16AM13    A.  So I ended up speaking with Mr. Williams at about 11:40.

14    Miss Latham obviously after.  And I went to the municipal --

15    the MEOC, I went to the MEOC at about 1:00 o'clock in the

16    morning.

10:22:30AM17    Q.  Where was the MEOC set up?

10:22:31AM18    A.  It was set up at 77 Calhoun Street, which is the Galliard

19    Auditorium.

10:22:36AM20    Q.  So after you went to the MEOC, were you given further

21    instructions?

10:22:40AM22    A.  I was.  I was asked to go attempt to retrieve the footage

23    that I was told about by Miss Latham.

10:22:46AM24    Q.  I want to ask you about who else was with you, and again

25    that sort of interagency operation or cooperation, who was

DANIEL ENGLISH – DIRECT EXAMINATION

1    then sort of giving out tasks or follow-up assignments?

10:22:57AM 2    A.  So in that particular setting we had some police

3    department command, Major Broughton was there, Brian Womble is

4    a supervisor with the FBI, he was there.  And there was other

5    various commanders there as well, but I was dealing with

6    mostly Mr. Womble.

10:23:13AM 7    Q.  So did Special Agent Womble, did he send somebody else

8    with you or give you any specific instruction?

10:23:21AM 9    A.  Yeah.  So I was sent to the church again to attempt to

10    retrieve the footage, view the footage.  And I was sent with

11    Corporal Van Horn, who works for the city, and Special Agent

12    Durr, who I mentioned earlier.

10:23:34AM13    Q.  Did you have any particular responsibilities with regard

14    to the video?

10:23:39AM15    A.  You know, the responsibility was to access it.  And

16    obviously Miss Latham gave me instructions on how to do so, so

17    that was my responsibility, go to the church, access the

18    footage, report back what you see, and we'll try to retrieve

19    the system.

10:23:51AM20    Q.  Did you go to the church?

10:23:52AM21    A.  I did.

10:23:53AM22    Q.  So it would have been you, Agent Durr, and is it Corporal

23    Van Horn?

10:23:57AM24    A.  Yes, sir.

10:23:59AM25    Q.  When you got to the church, what was the status of the

DANIEL ENGLISH – DIRECT EXAMINATION

1    investigation on site?

10:24:06AM 2    A.   The status of the investigation at this point, they were

3    going to begin the processing inside the church.  So obviously

4    resources were being put in place by SLED, the city, and again

5    the FBI to accomplish that.  You know, us being given specific

6    instructions, you know, we kind of went towards those

7    instructions.  The people that were about to process the

8    church knew we were there to get the footage to further the

9    investigation.

10:24:35AM10    Q.   You testified earlier that you had sort of been -- had

11    some familiarity with the surroundings of the church building.

10:24:43AM12    A.   Yes, sir.

10:24:44AM13    Q.   When you got there that night did they seem familiar to

14    you, had you seen them as you had seen them before?

10:24:48AM15    A.   Yes, sir, yeah.

10:24:50AM16    Q.   Had you ever been inside the church before?

10:24:52AM17    A.   To that point I had not been inside the church.  I had

18    been outside the church and obviously passed it numerous

19    times, but had not been inside.

10:24:59AM20    Q.   How did you know where to go inside the church?

10:25:02AM21    A.   Miss Latham told me the best way to get into her office is

22    to go into the west parking lot door, her office was straight

23    ahead.  And then right behind her office was the pastor's

24    study.  So she gave me very specific directions on where to

25    go.  It was obvious.

DANIEL ENGLISH – DIRECT EXAMINATION

10:25:17AM 1    Q.  When you got to the scene itself did you have any

2    understanding of where the cameras may or may not be located

3    in the building or outside the building?

10:25:26AM 4    A.  Right.  At that particular point I did not know exactly

5    where the cameras were located.  Miss Latham basically told me

6    that there was cameras on the outside of the church, and this

7    is how to access the footage.  So in that moment I did not

8    know where exactly the cameras were, but I did find out.

10:25:40AM 9    Q.  Did she explain to you or were you ever able to determine

10    if there are any cameras inside the church?

10:25:45AM 11    A.  So there's no cameras inside the church.  There are three

12    exterior surveillance cameras.  Two cover the back parking lot

13    that goes out to Henrietta Street, and then one covers the

14    door that I had just mentioned, that was the door that I was

15    to go through to get to her office.

10:26:03AM 16    Q.  I want to bring up Government's 20.  Are you familiar with

17    Government's Exhibit 20?

10:26:19AM 18    A.  Yes, sir.

10:26:20AM 19    Q.  And does that have some indication of where the cameras

20    are, generally speaking, on buildings?

10:26:26AM 21    A.  Yes, sir, it does.

10:26:28AM 22    Q.  And if you could tell the jury.

10:26:31AM 23    A.  Okay.  So you'll see the orange dots on the screen here,

24    this corner, there's a parking lot, like I mentioned.  This

25    corner also has the parking lot view towards Henrietta Street.

230

DANIEL ENGLISH - DIRECT EXAMINATION

1  And then this main camera here, which is the doorway to get to

2  Miss Latham's office.

10:26:51AM 3  Q.  And just to briefly explain, are those visible on the

4  exterior of the building?

10:26:55AM 5  A.  Yes, sir.

10:26:56AM 6  Q.  And those are the only three cameras you were aware of?

10:26:59AM 7  A.  Those are the only three cameras, yes, sir.

10:27:00AM 8  Q.  Can you explain to the jury relative to those cameras

9  where there are access doors?

10:27:07AM 10  A.  So access doors to the church are right there where I kind

11  of covered it up where it says rear.  That's the door that

12  Miss Latham told me to go into, and then the front door.

13  Those are the access points to the church.  Front door is on

14  the Calhoun Street side.

10:27:23AM 15  Q.  Is there a door where the handicap access is to?

10:27:28AM 16  A.  Yes, sir.

10:27:28AM 17  Q.  So two doors to the parking lot, one to the front, but the

18  door in the front and the -- I'm going to say where the

19  handicapped sign is, there's no cameras covering that?

10:27:38AM 20  A.  That's correct, no cameras.

10:27:41AM 21  Q.  So let's get back to your entering the church.  Were her

22  directions accurate, did you find the system?

10:27:47AM 23  A.  Yes, sir, directions were very accurate.  Went straight to

24  the office, saw the TV, saw the remote, and accessed the

25  system from there.

DANIEL ENGLISH - DIRECT EXAMINATION

10:27:55AM 1    Q.  And if you could explain to the jury, what did the system

2    itself, how did it appear or what did it look like?

10:28:02AM 3    A.  So the system was just a box, like I told you, it's -- she

4    told me it was connected to the TV.  So when you walk into the

5    office you can actually turn the TV on and it's showing you

6    the picture of what the cameras are recording.  So that's how

7    the system appeared.

10:28:21AM 8    Q.  So you said you'd been outside and had a chance to observe

9    the exterior of the building?

10:28:26AM10    A.  Yes, sir.

10:28:26AM11    Q.  Did it appear that the camera was accurately recording

12    what was going on outside that you had just seen?

10:28:33AM13    A.  Yes, sir.

10:28:36AM14    Q.  So what did you do once you saw that it was actively

15    operating?

10:28:40AM16    A.  So the first thing that I did, which is what I always do

17    when retrieving surveillance footage from a location, the

18    first thing I do is obviously have a note pad and I check what

19    time it is.  Real time.  And I wrote that down.  And then I

20    immediately checked what the time is on the surveillance

21    system.  That will give me an indication as to whether or not

22    the surveillance system is off time.

10:29:01AM23    Q.  Is that something that is common?  Why do you do that?

10:29:04AM24    A.  It's pretty common that a surveillance system is off time.

25    Sometimes daylight savings time, people forget to change it,

DANIEL ENGLISH – DIRECT EXAMINATION

1    sometimes the power goes out and knocks it off.  And so it is

2    pretty common, and that's why, like I said, I write down what

3    the real time is, I write down what the surveillance is.  That

4    way I can know the time difference I'm looking at.

10:29:24AM 5    Q.  Did you find a disparity in the time being shown on the

6    video and what you had as real time?

10:29:29AM 7    A.  Yes, sir.

10:29:30AM 8    Q.  How did you obtain your real time in that situation?

10:29:32AM 9    A.  So the real time was taken from my cell phone and I wrote

10    that down, and at that time was 1:47 in the morning.  And the

11    surveillance time was indicating that it was 1:50.  So it was

12    obviously 12 hours behind.

10:29:48AM13    Q.  So it was -- you were there at 1:47 a.m.?

10:29:52AM14    A.  Yes, sir.

10:29:53AM15    Q.  And the video is showing 1:50 p.m.?

10:29:55AM16    A.  P.m., yes.

10:29:57AM17    Q.  Same day before or day after?

10:29:59AM18    A.  Surveillance system was showing the 17th at 13:50, so it

19    was approximately 12 hours behind real time.

10:30:07AM20    Q.  So 12 hours and three minutes?

10:30:16AM21    A.  Yes, sir.

10:30:11AM22    Q.  Once you had determined sort of the time issue, what was

23    the next thing you did?

10:30:17AM24    A.  So determining the time issue, I obviously knew what time

25    this incident was said to have happened, so you start going

233

DANIEL ENGLISH - DIRECT EXAMINATION

1    backwards.  And so from that point I went backward and I

2    documented my observations.  And just kept going from that

3    point.

10:30:33AM 4    Q.  Let me ask you about how you were able, was there anything

5    to accessing the system?  I think Miss Latham had described

6    some things to you.  Do you have to do anything to access it?

10:30:42AM 7    A.  So I had to, you know, press the menu button on the remote

8    and go into the function that I could play the surveillance

9    footage back, that required a password.  She had provided that

10    password.  I entered the password and then was able to access

11    the footage itself.

10:30:58AM 12    Q.  Was this system similar to ones you've used in the past?

10:31:01AM 13    A.  Yes, sir, it was.

10:31:04AM 14    Q.  So you didn't have any problems navigating it?

10:31:07AM 15    A.  No, sir.

10:31:09AM 16    Q.  Let me ask you, so once you see that it's working, give

17    the jury sort of an idea of what your plan is, what is your

18    approach to either viewing this, preserving it or otherwise in

19    terms of priority?

10:31:22AM 20    A.  So the priority is obviously to view it for suspect

21    information, and relay that information to your command so you

22    get that going in place.

10:31:31AM 23        The second priority would then be to preserve the system

24    for evidentiary value, and so we -- that was our priority at

25    that point.  Watch the footage for suspect information, and

DANIEL ENGLISH - DIRECT EXAMINATION

1    preserve the footage system.

10:31:45AM 2    Q.  So tell the jury what you were able to obtain for

3    investigative purposes from watching the video in real time.

10:31:54AM 4    A.  All right.  So knowing what time the incident occurred,

5    knowing the nature of the incident and knowing the suspect

6    description that we were given, I watched the footage and I

7    start making observations.  Like I said, I played it

8    backwards.  I later put it in order.  But I watched it

9    backwards initially to get a feel of what happened.  The first

10    thing that I saw when I watched the footage, was -- let me

11    give you the time.  First thing that I saw was a white male

12    exiting the church from that west door that I talked about,

13    holding a firearm.  And that would have been at 21:06 hours

14    real time, based on the time.

10:32:42AM 15    Q.  At that point in time was there a description that had

16    gone out?

10:32:45AM 17    A.  There was.  Yes, sir.

10:32:47AM 18    Q.  And did you -- so you had some basic information.  There

19    was no identity have been --

10:32:52AM 20    A.  There was no identity, but it was a white male had

21    committed a shooting inside this church and fled.

10:32:58AM 22    Q.  Safe to say that was one of your primary responsibilities

23    was to try to ascertain some evidence of identification?

10:33:05AM 24    A.  Yes, sir.

10:33:05AM 25    Q.  And so when you saw that, what did you do once you were

DANIEL ENGLISH – DIRECT EXAMINATION

1    able to find out parts of the video?

10:33:12AM 2    A.   So as I found parts of the video that helped the cause of

3    identifying the suspect, I photographed that for distribution

4    purposes.  We oftentimes will do what's called BOLOs, be on

5    the look out.  But basically our -- if we can identify a

6    suspect in a case to get their image out so we can identify

7    them.

10:33:38AM 8    Q.   Explain that, you said BOLO, what's that mean?

10:33:42AM 9    A.   So it's a be on look out, basically it's a flier.  And we

10    put information that's known about what we're investigating

11    out, and we obviously put the pictures out with the

12    descriptions.  And we ask for, you know, help and, you know,

13    do you recognize this person, if you recognize this car, if

14    you know anything about this, call us.  It's basically us

15    reaching out to the news, other law enforcement agencies,

16    community, asking for help on the situation.

10:34:12AM 17    Q.   And as far as putting it together, did -- you said you

18    took a picture?

10:34:17AM 19    A.   Yes, sir.

10:34:17AM 20    Q.   With what?

10:34:18AM 21    A.   At that time I had my phone, and so as I'm watching these

22    images on the screen, I take pictures with my phone, and I was

23    able to use those pictures later to create the BOLO I talked

24    about.

10:34:28AM 25    Q.   Did you create the BOLO or the document that went out, or

DANIEL ENGLISH – DIRECT EXAMINATION

1    did you just send the pictures?

10:34:34AM 2    A.  I did.  I created the BOLO.  So I alerted obviously the

3    command system to this information, and then later I was

4    tasked with creating a BOLO for distribution.

10:34:44AM 5    Q.  I'm going to show you Government's proposed Exhibit 104.

6    Do you recognize that?

10:34:50AM 7    A.  I do, yes, sir.

10:34:51AM 8    Q.  Were you involved in creating that?

10:34:53AM 9    A.  Yes, sir, I did.

10:34:53AM10    Q.  Are those the images you took?

10:34:55AM11    A.  Yes, sir, they are.

10:34:57AM12        MR. WILLIAMS:  I give those to defense counsel.

10:35:12AM13        MR. BRUCK:  No objection.

10:35:13AM14        THE COURT:  What's the number?

10:35:16AM15        MR. WILLIAMS:  104.

10:35:16AM16        THE COURT:  Government 104 is admitted without

17    objection.

10:35:19AM18        (Government Exhibit 104 received.)

10:35:19AM19    BY MR. CURRAN:

10:35:20AM20    Q.  I'm going to call up then Exhibit 104.  You testified

21    earlier about the cameras that were located at the church.

22    Explain that a little bit more how those cameras work in terms

23    of the video.  Are they all going at the same time or how do

24    you figure that out?

10:35:38AM25    A.  Right.  So in this particular instance at the church these

DANIEL ENGLISH – DIRECT EXAMINATION

1   cameras are motion activated.  So if motion occurs, the camera

2   will turn on.  Began capturing motion.  And after awhile it

3   will turn back off.

10:35:52AM 4   Q.  Explain that a little bit better.  What's motion activated

5   mean?

10:35:56AM 6   A.  I mean to explain it the best I could, if you had a

7   surveillance camera that was always on you, then it would

8   always just be on you and it would always be on and recording.

9   Some cameras are motion activated, so if that door were to

10   have a motion activated camera and nobody was moving toward

11   that door, it wouldn't be recorded.  But when movement gets in

12   front of the camera, then it would turn on to record.

10:36:18AM13   Q.  And does that stay on, what you could tell at least in

14   your investigation, for a specific amount of time?

10:36:24AM15   A.  It does, it seems to stay on for a period of time, I don't

16   know exactly how long it stays on, but it does stay on and

17   then when the motion comes, it turns back on.

10:36:33AM18   Q.  And then if you could also explain from the -- where the

19   cameras were located and the scope of what they captured.

10:36:41AM20   A.  Sure.  So this BOLO actually has pictures taken from each

21   of the three cameras that I had mentioned to you.  This

22   picture here -- in this picture here is the west door that I

23   mentioned.  This picture here is also from the west door.  And

24   these -- this picture is from the parking lot camera that

25   covers Henrietta Street, and this camera would be the one that

DANIEL ENGLISH - DIRECT EXAMINATION

1    captures the parking lot.

10:37:12AM 2    Q.   Once -- if you'd also explain, do they all -- I know

3    they're motion activated, but can they record

4    contemporaneously, meaning if one camera is recording, does it

5    exclude the others, or can they all record at the same time?

10:37:26AM 6    A.   They can all be recording at the same time.

10:37:28AM 7    Q.   So once you were able to take the photos of the screen and

8    send that out, what was the next step in your investigation?

10:37:36AM 9    A.   So once I was able to gather the information in the photos

10   here, I obviously sent that to the MEOC.  And from that point

11   I was told to go back to headquarters and prepare the BOLO

12   that you're looking at now and get that ready for

13   distribution.  So I did.

10:37:54AM14    Q.   You testified earlier that there were several people

15   involved, and that part of your concern as an investigator was

16   to make sure that not just the suspect information was

17   obtained, but also the system was preserved for later

18   evidentiary value.

10:38:10AM19    A.   Yes, sir.

10:38:11AM20    Q.   How did that happen in this case?

10:38:13AM21    A.   So Special Agent Durr and Corporal Van Horn stayed behind

22   to take care of actually retrieving that system from the

23   church and physically putting it into evidence later.

10:38:23AM24    Q.   Was that -- were you able later to -- able to inspect the

25   data that came off of that device?

DANIEL ENGLISH - DIRECT EXAMINATION

10:38:31AM 1    A.  I was, yes, sir.

10:38:32AM 2    Q.  And that was processed through your evidence unit?

10:38:34AM 3    A.  Yes, sir.

10:38:34AM 4    Q.  Was the footage you reviewed later, fairly and accurately

5    depicting what you saw in the video in real time then and what

6    you knew the area was like outside?

10:38:45AM 7    A.  Yes, sir.

10:38:49AM 8    Q.  I'm going to show you a group of exhibits, Government's

9    proposed 23A through V, if you look at those.

10:39:08AM10    A.  Yes, sir.  Yes, sir, these are disks of --

10:39:18AM11    Q.  And you have initialed all of those?

10:39:20AM12    A.  Yes, sir.

10:39:21AM13    Q.  And those are accurate depictions of the footage that you

14    saw at the time and reviewed since?

10:39:29AM15    A.  Yes, sir.

10:39:30AM16    Q.  They fairly and accurately represent the area outside the

17    church detected by the cameras?

10:39:39AM18    A.  Yes, sir.

10:39:41AM19         MR. WILLIAMS:  I'm going to show these to defense

20    counsel.

10:40:03AM21         MR. BRUCK:  No objection.

10:40:06AM22         MR. WILLIAMS:  Your Honor, I'm not going to publish

23    these yet, but I will move to admit Government's 23A to V.

10:40:15AM24         THE COURT:  A to V, as in victory?

10:40:17AM25         MR. WILLIAMS:  Right.

DANIEL ENGLISH – DIRECT EXAMINATION

10:40:18AM 1            THE COURT:  Very good.  No objection from the

2    defense?

10:40:20AM 3            MR. BRUCK:  That's correct.

10:40:21AM 4            THE COURT:  Government's 23A through V admitted

5    without objection.

10:40:24AM 6        (Government Exhibits 23A through 23V received.)

10:40:24AM 7    BY MR. WILLIAMS:

10:40:27AM 8    Q.  I want to ask you first, Detective English -- Sergeant

9    English -- you went back, you said the entire system was

10    seized, is that correct?

10:40:37AM11    A.  Yes, sir.

10:40:37AM12    Q.  About how many days of footage, to your best recollection,

13    were available to you for inspection?

10:40:44AM14    A.  There were several days of footage on the system itself.

15    I don't know the specific number of days, but I believe it was

16    four or five.

10:40:52AM17    Q.  And at some point did you go back and review June 17th,

18    2015?

10:41:00AM19    A.  I did, yes, sir.

10:41:02AM20    Q.  What was your purpose in reviewing, or why would a

21    detective want to review an entire day of video footage?

10:41:09AM22    A.  So obviously thoroughness is the main goal, you want to

23    make sure you document everything.  And all the activity going

24    on at the church, who is coming and going, if you can identify

25    people, whether they be victims, whether they be survivors,

DANIEL ENGLISH – DIRECT EXAMINATION

1    whether they be suspect.  So you watch this footage for the

2    entire period of time so that you can have thorough

3    understanding of what happened before, during and after the

4    incident.

10:41:37AM 5    Q.  So were you the one that sat down and went through that

6    video?

10:41:40AM 7    A.  Yes, sir.

10:41:40AM 8    Q.  Tell the jury how you processed it or found relevant

9    information from that video?

10:41:46AM 10    A.  Sure.  So watching the video, basically my job was at that

11    particular time to just document my observations, what do I

12    see.  You know, this person arrives, this person walks in the

13    door, this person walked out of the door.  So it went on like

14    that obviously for some time, because you're watching a whole

15    day for three cameras.

10:42:10AM 16        So I basically documented my observations and was able to

17    prepare basically just a presentation of what happened during

18    the whole day.

10:42:22AM 19    Q.  Do you catalog effectively every person that was visible

20    on the cameras going in and out of the church?

10:42:28AM 21    A.  Yes, sir.

10:42:28AM 22    Q.  Did you use that information to try to correlate it to

23    known individuals?

10:42:33AM 24    A.  Yes, sir.

10:42:34AM 25    Q.  When I say known, tell me what known individuals you

DANIEL ENGLISH – DIRECT EXAMINATION

1  considered.

10:42:38AM 2  A.   Sure.  So obviously with knowledge of the case and who the

3  victims and the survivors were, I knew who the defendant was,

4  and so I cataloged basically my observations of those

5  individuals, if possible, and put them into a timeline.

10:42:54AM 6  Q.   Were you able to sequence what you thought were relevant

7  parts of the video that sort of are chronologically ordered

8  throughout the day?

10:43:03AM 9  A.   Yes, sir.

10:43:04AM 10  Q.   And you prepared that order for court today?

10:43:06AM 11  A.   Yes, sir.

10:43:07AM 12  Q.   So what I want to do then is start with if you could tell

13  the jury the first video you saw that was relevant to the

14  investigation and what it depicts.

10:43:16AM 15  A.   So the first video and the order is 23U, as in union.  And

16  that would be Sharonda Coleman Singleton entering into the

17  side door.

10:43:51AM 18  Q.   And the time on there was about 1:06, 1:07; that would

19  have been 1:06, 1:07 p.m., not a.m.?

10:43:59AM 20  A.   That's correct.

10:44:00AM 21  Q.   Was that the first video of a victim or survivor that you

22  saw?

10:44:05AM 23  A.   Yes, sir.

10:44:05AM 24  Q.   That was about 1:00 p.m.?

10:44:07AM 25  A.   Yes, sir.

DANIEL ENGLISH – DIRECT EXAMINATION

10:44:07AM 1    Q.  What was the second item that you saw?

10:44:09AM 2    A.  The second item I saw was 23J, as in John, and that is

3    Susie Jackson arriving in the parking lot at about 1:28 p.m.

10:45:05AM 4    Q.  I want to ask you also, was there any audio capability on

5    the system?

10:45:09AM 6    A.  No, sir.

10:45:10AM 7    Q.  No sound was recorded?

10:45:11AM 8    A.  No, sir.

10:45:14AM 9    Q.  Tell the jury what the next section was that you found.

10:45:16AM10    A.  The next one that I found was 23I, as in Ida, and that is

11    Susie Jackson entering the side door at 1:29 p.m.

10:45:26AM12    Q.  That's a continuation of the earlier video?

10:45:28AM13    A.  Yes, sir.

10:45:53AM14    Q.  What was the next section you found relevant?

10:45:56AM15    A.  23K, as in king, is Myra Thompson entering the side door

16    about 4:59 p.m.

10:46:03AM17    Q.  That's at about 5:00 o'clock?

10:46:04AM18    A.  Yes, sir.

10:46:06AM19    Q.  We'll play that.  I'm going to ask you briefly, with some

20    of these videos it's obviously somebody walking through the

21    door.  If there was other video in the parking lot, you didn't

22    necessarily pull every single video, just where they were

23    found, one video that best showed them?

10:46:31AM24    A.  Correct.

10:46:32AM25    Q.  What was the next section you found?

DANIEL ENGLISH - DIRECT EXAMINATION

10:46:33AM 1   A.  Next section, 23O, as in ocean, is Depayne Middleton

2   entering the side door.

10:46:51AM 3   Q.  What was the next section you located?

10:46:52AM 4   A.  The next section I located was Polly Sheppard entering the

5   side door, 23H, as in Henry.

10:46:59AM 6   Q.  That was at about 5:43.

10:47:01AM 7   A.  Yes, sir, 5:43.

10:47:18AM 8   Q.  Was there another video shortly after that?

10:47:20AM 9   A.  There was.

10:47:21AM10   Q.  What was the time and what did it depict?

10:47:23AM11   A.  The next video, 23M, as in Mary, is Myra Thompson entering

12   the side door.

10:47:31AM13   Q.  23M as in Mary?

10:47:32AM14   A.  Yes, sir.

10:47:51AM15   Q.  What was the next area you found that was relevant?

10:47:53AM16   A.  The next video is 23P, as in Paul, and that is Mr. Daniel

17   Simmons arriving in the parking lot.

10:48:02AM18   Q.  I'll play that.  And that was at about 5:48, 5:49?

10:49:00AM19   A.  Yes, sir.

10:49:01AM20   Q.  What was the next section you found relevant?

10:49:02AM21   A.  The next section was 3L, as in Lincoln, and it's Myra

22   Thompson stepping outside at about 6:00 p.m.

10:49:10AM23   Q.  About 6:00 p.m.?

10:49:11AM24   A.  Yes, sir.

10:49:26AM25   Q.  What was the next section you found?

DANIEL ENGLISH - DIRECT EXAMINATION

10:49:28AM 1   A.   The next section is 23G, as in George, and that's Polly

2   Sheppard stepping outside at about 6:07 p.m.

10:49:53AM 3   Q.   I wanted to ask you about the next section; was there one

4   of the cameras that made it hard to determine sort of the

5   exact time?

10:49:59AM 6   A.   Yes, sir.

10:49:59AM 7   Q.   And because it's sort of washed out with the sun?

10:50:03AM 8   A.   Yes, sir.

10:50:03AM 9   Q.   What was the next one you were able to at least put

10   chronologically in order?

10:50:07AM11   A.   Yes, sir, the next video is 23A, as in apple, has Cynthia

12   Hurd arriving in the parking lot.

10:50:56AM13   Q.   And was that -- we see her there walking towards the

14   building.  Was that picked up in other video when she came

15   around the corner?

10:51:03AM16   A.   Yes, sir.

10:51:04AM17   Q.   What video is that?

10:51:05AM18   A.   The next video is 23B, boy, and that's Miss Hurd

19   interacting with Reverend Pinckney in front of the door.

10:51:11AM20   Q.   That was at about 7:35?

10:51:15AM21   A.   Yes, sir.

10:52:02AM22   Q.   Now, that clip had shown, you said, Reverend Pinckney with

23   Miss Hurd.  Was that taken from a section of video where Mr.

24   -- Reverend Pinckney was sort of interacting or walking around

25   outside?

DANIEL ENGLISH – DIRECT EXAMINATION

10:52:15AM 1   A.  Yes, sir.

10:52:16AM 2   Q.  And that's 23V, as in Victor?

10:52:20AM 3   A.  23V, as in Victor, is Reverend Pinckney.

10:52:24AM 4   Q.  That's about a four- or five-minute clip?

10:52:27AM 5   A.  Yes.

10:52:30AM 6        MR. WILLIAMS:  I'm going to show that, Your Honor.

10:52:40AM 7     (Video played.)

10:52:41AM 8  BY MR. WILLIAMS:

10:57:22AM 9   Q.  So that clip ran from 7:35 to about 7:40.

10:57:27AM10  A.  Yes, sir.

10:57:27AM11  Q.  What was the next clip or section that you found that was

12  relevant to individuals involved in this crime?

10:57:33AM13  A.  So the next clip that I found was 23N, as in Nora, Depayne

14  Middleton entering the side door about 7:49.

10:57:51AM15  Q.  So that was 7:49, just after, was there another clip sort

16  of in that same time frame?

10:57:57AM17  A.  Yes, sir, same time frame, 23S, as in Sam, is Daniel

18  Simmons stepping outside.

10:58:24AM19  Q.  23 --

10:58:27AM20  A.  23S, as in Sam.

10:58:31AM21  Q.  23S.  And does that continue to another section?

10:58:38AM22  A.  Yes, sir, and section 23T, as in Tom, Daniel Simmons

23  re-enters the side door.

10:58:54AM24  Q.  And from another location of him on 23Q?

10:58:58AM25  A.  Yes, sir.

DANIEL ENGLISH - DIRECT EXAMINATION

10:58:59AM  1    Q.  I'll publish that.  I want to ask you, that was around

            2    7:50, 7:55, somewhere in that range?

10:59:40AM  3    A.  Yes, sir.

10:59:40AM  4    Q.  You mentioned earlier that there was a separate door at

            5    the front that didn't have any camera surveillance?

10:59:46AM  6    A.  That's correct.

10:59:47AM  7    Q.  In your review of all the video, were you ever able to

            8    locate any video of who you thought to be Ethel Lance?

10:59:53AM  9    A.  No, sir.

10:59:54AM 10    Q.  How about Tywanza Sanders?

10:59:56AM 11    A.  No, sir.

10:59:57AM 12    Q.  Or Felicia Sanders?

10:59:58AM 13    A.  No, sir.

10:59:59AM 14    Q.  So you are familiar with who they were, you just couldn't

           15    find any video; maybe they entered a separate door?

11:00:04AM 16    A.  Correct.

11:00:05AM 17    Q.  I'm going to show you -- I'm going to pull up now

           18    Government's Exhibit 23E and play that.  I'm going to also

           19    publish 23C, as in cat.  That was at 8:17 on the video time?

11:01:13AM 20    A.  Yes, sir.

11:01:14AM 21    Q.  What was the next relevant section time; 9:06?

11:01:18AM 22    A.  Yes, sir.

11:01:19AM 23    Q.  I'm going to display then Government's 23 D, as in dog.

           24    I'm going to play, following that one, 23F.

11:02:46AM 25        (Video played.)

DANIEL ENGLISH – DIRECT EXAMINATION

11:02:46AM 1    Q.  And I believe the earlier clip where the defendant was

2    entering, you said was about 8:16 p.m.?

11:02:51AM 3    A.  Yes, sir.

11:02:52AM 4    Q.  And the time of exit was about 9:07?

11:02:57AM 5    A.  Yes, sir.

11:02:57AM 6    Q.  So about 50 minutes elapsed between the time he entered

7    and left?

11:03:01AM 8    A.  Yes, sir.

11:03:03AM 9    Q.  Did you also screen the video to determine when Dan

10    Simmons was taken out of the church?

11:03:09AM11    A.  I did, yes, sir.

11:03:10AM12    Q.  About what time did you see that video captured?

11:03:13AM13    A.  That is about 9:31.

11:03:22AM14    Q.  From your knowledge of the case, do you know sort of where

15    Mr. Simmons was located?

11:03:26AM16    A.  Generally located in the breezeway off of that west door,

17    and 23R is the clip of him.

11:03:32AM18    Q.  He would have been located where the defendant was walking

19    out?

11:03:35AM20    A.  Yes, sir.

11:03:35AM21    Q.  And if you could, I'm going to publish 23R.

11:04:43AM22          MR. WILLIAMS:  Your Honor, I'm going to try to use

23    the physical exhibit; I think we have some issues with that.

11:05:06AM24          THE COURT:  It's playing now.

11:05:26AM25          MR. WILLIAMS:  Sorry.  We'll publish 23R.

DANIEL ENGLISH - DIRECT EXAMINATION

11:05:28AM 1        (Video played.)

11:05:28AM 2    BY MR. WILLIAMS:

11:06:06AM 3    Q.  Detective English, apart from your role in reviewing that

4    video, did you have much of a substantial role otherwise in

5    the investigation?

11:06:13AM 6    A.  No, sir.

11:06:13AM 7    Q.  You worked with Federal Agent Hamski in identifying these

8    individuals and putting together those clips?

11:06:19AM 9    A.  Yes, sir.

11:06:21AM10        MR. WILLIAMS:  No further questions, Your Honor.

11:06:23AM11        THE COURT:  Cross-examination.

11:06:27AM12        MR. BRUCK:  We have no questions.

11:06:29AM13        THE COURT:  Very good.  Sergeant, you may step down.

11:06:31AM14    A.  Thank you.

11:06:33AM15        THE COURT:  Call your next witness.

11:06:37AM16        MR. WILLIAMS:  Government calls Brittany Burke.  I'm

17    sorry, Your Honor, Government calls Tre Tallon.  Got ahead of

18    myself.

11:07:12AM19        THE CLERK:  State your full name for the record,

20    please.

11:07:13AM21    A.  James Tallon.

11:07:16AM22        JAMES TALLON, a witness called by the Government, first

23    having been duly sworn, testified as follows.

11:07:22AM24                    DIRECT EXAMINATION

11:07:34AM25    BY MR. WILLIAMS:

JAMES TALLON – DIRECT EXAMINATION

11:07:41AM 1    Q.  Sir, if you could, give the jury your name.

11:07:43AM 2    A.  James Tallon, T-A-L-L-O-N.

11:07:48AM 3    Q.  You go by Tre?

11:07:49AM 4    A.  Yes, sir, I do.

11:07:51AM 5    Q.  Can you tell the jury where you work?

11:07:53AM 6    A.  I work for the South Carolina Law Enforcement Division,

7    also known as SLED.

11:07:58AM 8    Q.  Explain to the jury basically or generally what SLED is as

9    an enforcement agency and what their role is in

10    investigations.

11:08:07AM 11    A.  Basically we are an assisting agency, and we assist any

12    agency inside of the State of South Carolina for various

13    calls, whether it be a homicide, burglary, anything in

14    between.

11:08:18AM 15    Q.  And you say the State of South Carolina; is that the

16    entire state?

11:08:21AM 17    A.  Yes, sir, the entire State of South Carolina.

11:08:23AM 18    Q.  Why, or in what circumstances do other agencies need

19    SLED's assistance or help?

11:08:32AM 20    A.  If they need specific expertise or extra equipment, then

21    we can provide that.

11:08:38AM 22    Q.  What's your job at SLED?

11:08:40AM 23    A.  I'm a crime scene special agent.  I work the entire State

24    of South Carolina answering calls for service for various

25    types of crimes.  I also have what's called a plus one, which

JAMES TALLON - DIRECT EXAMINATION

1   is advanced digital photography, where I'm trained in

2   photography and 3-D crime scene.

11:08:59AM 3   Q.  How long have you worked in law enforcement?

11:09:04AM 4   A.  Law enforcement, I've been about eight years.

11:09:07AM 5   Q.  What did you do before you worked in law enforcement?

11:09:10AM 6   A.  I was in college, and I was a pharmacist technician for

7   about 13 years.

11:09:15AM 8   Q.  What did you study in college?

11:09:18AM 9   A.  I was -- I went to the Savannah College of Art and Design

10   in Savannah, Georgia, got a bachelor's in visual effects.

11:09:26AM11   Q.  How did you end up going from art design school to law

12   enforcement?

11:09:29AM13   A.  Great question.  My father was in law enforcement, it's

14   always been in my blood.  And then once I got out of college I

15   started doing a recruitment video for a city local to where I

16   lived, and the chief asked me if I would like to get a job,

17   and here I am.

11:09:50AM18   Q.  What was that agency?

11:09:52AM19   A.  That was the City of Sumter police department.

11:09:54AM20   Q.  What did you do at the Sumter police department?

11:09:56AM21   A.  I started out on patrol, just like a normal police

22   officer, worked on patrol for a year and a half, and then got

23   promoted back into our ISD, which is investigative services

24   division, as a detective, and worked my way into crime scene,

25   where I spent most of my time there.  I did a total of five

JAMES TALLON - DIRECT EXAMINATION

1    years for the City of Sumter.

11:10:17AM 2    Q.  And how many of those years were in crime scene?

11:10:20AM 3    A.  About three and a half, four years.

11:10:21AM 4    Q.  And when did you start with SLED?  Was that your next job?

11:10:25AM 5    A.  I went straight from the City of Sumter to SLED, and I've

6    been here for almost three years now.

11:10:31AM 7    Q.  What was your first assignment at SLED, crime scene?

11:10:35AM 8    A.  Right straight to crime scene.

11:10:36AM 9    Q.  So if you can, explain to the jury, you sort of said you

10    have a plus one.  Is that in addition to traditional crime

11    scene duties, or does that supplant those duties?

11:10:47AM12    A.  Correct, that is -- it's an additional job basically.  We

13    can take photographs if an agency contacts us and they need

14    photographs taken of an object or aerial photography, we can

15    go get on the helicopter and take photos for them.  Or we can

16    respond and take specialized photos for them, or we can also,

17    inside of photography, we have what's called a FARO, and we

18    will do 3-D crime scene scans.

11:11:20AM19    Q.  So I want to ask you though, are you also a crime scene

20    investigator?

11:11:23AM21    A.  Yes, sir.

11:11:24AM22    Q.  Is that your primary duty?

11:11:25AM23    A.  That's my primary job is to answer calls for service.

11:11:28AM24    Q.  If you can, tell the jury what your primary duties are and

25    how crime scene officers respond to scenes or process scenes.

JAMES TALLON - DIRECT EXAMINATION

11:11:38AM 1    A.  Basically how it works is the agency somewhere in the

2    State of South Carolina that needs our assistance will call

3    what we call our OD, which is operations desk, it's basically

4    a dispatch.  And then their dispatch will contact us, whoever

5    is on call.  And they will call you 24 hours a day, and when

6    your phone answers, you ring it -- you answer -- when your

7    phone rings, you answer it.  And they will tell you where they

8    need you to go and what for.

11:12:08AM 9        We get in our trucks, we respond code blue, lights and

10   sirens to wherever it is in the State of South Carolina.  And

11   then once we get there, we get the initial information from

12   the local agency as to what happened.  And then we will go

13   from there as to what we need to take as our next step,

14   whether it be photographs or do an initial walk through.

11:12:29AM15   Q.  And do you -- I'm going to say do you handle traditional

16   type crime scene work in addition to sort of your graphic or

17   sort of collateral duties?

11:12:38AM18   A.  Correct.

11:12:38AM19   Q.  Explain to the jury first sort of how leads get set on

20   cases when calls go out.

11:12:45AM21   A.  How --

11:12:46AM22   Q.  How does somebody end up being a lead crime scene

23   investigator versus somebody on the team?

11:12:50AM24   A.  Gotcha.  It's usually we work in teams of two.  So it

25   would be me and my partner.  Unless it's a larger crime scene,

JAMES TALLON – DIRECT EXAMINATION

1    and then we will request for more crime scene agents.  But if

2    I am the first one up to get a phone call, if it's my team,

3    then I'll take the first case that comes out.  We do a two-

4    week call rotation.  So within that two weeks we're on call

5    24/7.  And so if the first call comes out, I'll get it, and

6    then that will be my case.  And I take that case and I handle

7    it from the beginning to end.  My partner makes –– basically

8    just helps me with the photographs and collecting evidence,

9    things of that nature.

11:13:30AM10    And then the next call that comes out, whenever that is,

11    it will be his case, and then I will help him.

11:13:35AM12  Q.  So I want to ask you about your collateral duties then.

13    With regard to the case you're here for today, were you the

14    lead crime scene investigator, or did you have collateral

15    duties?

11:13:44AM16  A.  Collateral duties.

11:13:45AM17  Q.  Who was the lead crime scene agent?

11:13:47AM18  A.  That would be Brittany Burke.

11:13:49AM19  Q.  So I want to ask you about your collateral duties.  You

20    mentioned a little bit that you had some graphic design or

21    graphics background.  What do you do specifically with SLED

22    that is your specialty, so to speak?

11:14:03AM23  A.  With the FARO.

11:14:06AM24  Q.  Why don't you describe your overall –– I mean your

25    collateral duties are, your plus one.

255

JAMES TALLON - DIRECT EXAMINATION

11:14:11AM 1  A.  In the plus one we take photographs, whether it be on

2  scene, for local agencies.  Or if somebody were to submit this

3  book here and it had a latent fingerprints on it, then it

4  would come back to our photography lab, at which point I would

5  photograph it.  And then we take those photographs and send

6  them to a latent examiner who will determine who the

7  fingerprints belong to.  We also do footwear and tire tread

8  examination at SLED.  So we will take photographs for that and

9  send those where they need to be.  And on the other side of

10  that is where we do our 3-D crime scene scans, where we

11  actually go to a scene and do multiple scans of an area and

12  combine those together and give them to the attorneys for

13  presentation.

11:15:05AM14  Q.  As far as that scanner, do you have any specialized

15  training in that area?

11:15:10AM16  A.  I do.  I have been to several different trainings for the

17  actual FARO.  And when I say FARO, that is the name brand,

18  it's kind of like Honda or Ford.  It's a 3-D laser scanner,

19  but the brand name of it is a FARO.

11:15:29AM20  Q.  And is that something you have either trained in and used

21  as well?

11:15:33AM22  A.  Correct.  Once we purchased it, the company came and gave

23  us training on it, hands-on training, showed us how to use the

24  software that goes along with it, and also had to have -- had

25  to have had a 40-hour course on the FARO itself, using that,

JAMES TALLON – DIRECT EXAMINATION

1    where at the end of that course you have to take a test.  And

2    I've also had a two-week course on the FARO and some of the

3    software that goes with it.

11:16:00AM 4    Q.  Have you testified as an expert in that area before?

11:16:03AM 5    A.  Yes, sir, I have.

11:16:04AM 6    Q.  What is your area of expertise with regard to the FARO?

11:16:08AM 7    A.  Advanced digital photography.

11:16:10AM 8          MR. WILLIAMS:  Your Honor, I'm going to move to

9    qualify Mr. Tallon as an expert in advanced digital

10    photography.

11:16:17AM11          THE COURT:  Any objection?

11:16:18AM12          MR. BRUCK:  No, sir.

11:16:18AM13          THE COURT:  The witness is recognized as an expert in

14    advanced digital photography.  Please continue.

11:16:24AM15    BY MR. WILLIAMS:

11:16:24AM16    Q.  Tell us first of all about this case and how you were

17    involved and what your role was.

11:16:29AM18    A.  On the night we were called, I believe it was the 18th,

19    when we actually received the call at about 1:00 in the

20    morning, I left my home and went to headquarters and picked up

21    the FARO, because I was told that we were more than likely

22    going to need it.  There were several teams going, we had

23    three teams going, so we had six people headed that way.  I

24    went to headquarters, I picked up the machine, got in the

25    truck and drove myself to Charleston.

257

JAMES TALLON – DIRECT EXAMINATION

11:17:01AM 1    Q.   You testified earlier that there was some equipment that

2    maybe you have that the locals may not have.  Is the FARO an

3    example of that?

11:17:11AM 4    A.   That is an example.  It's a fairly pricey piece of

5    equipment.  We have two of them, and they run about 120 to

6    $130,000.

11:17:21AM 7    Q.   For each?

11:17:22AM 8    A.   Per machine.

11:17:23AM 9    Q.   And so do you know if the local officers had the ability

10    to use one of those?

11:17:29AM11    A.   The only agency in the State of South Carolina that I know

12    that has one other than us is Myrtle Beach.

11:17:37AM13    Q.   Do you know if federal agencies have them?

11:17:38AM14    A.   I actually don't know if they have it.

11:17:40AM15    Q.   So did they ask you to bring the FARO, or is that

16    something you knew to take with you?

11:17:45AM17    A.   I was asked.  When I got the phone call from my lieutenant

18    saying what the nature of the crime was, she had asked me if

19    the batteries and all the equipment were ready to go from the

20    machine, at which point I told her that yes, it is ready and

21    I'm already getting dressed.

11:18:03AM22    Q.   So what did you do then once you got the call to respond?

11:18:07AM23    A.   Once I got the call, I went to the headquarters, picked up

24    the machine and headed to Charleston.

11:18:14AM25    Q.   When you got out to Charleston, who was the -- you said, I

258

JAMES TALLON - DIRECT EXAMINATION

1    think, Miss Burke was the lead?

11:18:19AM 2    A.    Correct.

11:18:19AM 3    Q.    What was your role on scene or what did you find when you

4    got there?

11:18:23AM 5    A.    Once we got here, we did a quick walk through just to kind

6    of see what we had.  And then Agent Burke kind of delegated

7    what everybody was going to be doing, and I eventually came to

8    doing the 3-D scans.

11:18:43AM 9    Q.    If you could, give the jury a brief -- you said we went

10    through to see what we had.  What did you have?

11:18:50AM11    A.    Say that again?

11:18:51AM12    Q.    You said that you did a brief walk through to see what you

13    had.  What was it that presented itself or what would you say

14    you had when you first arrived, from a crime scene

15    perspective?

11:18:59AM16    A.    We had a large amount of evidence around the area, mainly

17    on the inside of the building.  And knowing that we had such a

18    large amount of evidence and that the room was somewhat

19    contained, and that the scene was contained to one room, we

20    knew that we would be doing several scans.

11:19:24AM21    Q.    So tell the jury a little bit about the FARO scanner, how

22    it's set up and how it operates.

11:19:31AM23    A.    The scanner is basically -- it's a computer, like anything

24    else these days.  But it sits on top of a tripod, which is a

25    regular camera tripod, and it has a touch screen on one side.

259

JAMES TALLON – DIRECT EXAMINATION

1  On that touch screen you can set up the type of scan you're

2  going to be doing, which at SLED we only have two presets that

3  we use.  And that's an inside scan and an outside scan.  And

4  the only difference between those two is how many points that

5  the scanner collects, how many data points the scanner

6  collects when it runs.

11:20:08AM 7  Q.  I want to ask you about the exhibit in this case.  Is the

8  exhibit that you prepared for court today 2-D or 3-D?

11:20:16AM 9  A.  It is 2-D.

11:20:17AM10  Q.  If you could just explain to the jury what the 2-D

11  capacity is, since the 3-D wasn't utilized.

11:20:22AM12  A.  Okay.  So with that, what happens is that there's a mirror

13  in the middle of the machine.  As that spins and the laser

14  comes out and hits and it goes to a point and it collects the

15  data points and it comes back and says this area is six feet

16  from me or however far it is.  Comes back to the machine.  It

17  also picks up an intensity of power from the laser bouncing

18  off an object coming back, which gives it a representation of

19  a black and white image.  You can do color imagery with it as

20  well, but in this case --

11:21:03AM21  Q.  Let me stop you there.  Does it take pictures as well?

11:21:06AM22  A.  It does.  It takes photographs.

11:21:07AM23  Q.  Okay.  So you set it up; do you get out of the way?

11:21:11AM24  A.  Correct.  Once you hit start on the machine, it handles

25  everything all by itself.

JAMES TALLON – DIRECT EXAMINATION

11:21:18AM 1    Q.  And that's something you then preserve later, once it's

2    taken sort of the photographs?

11:21:25AM 3    A.  Correct.  Once it's completed with that scan, you can move

4    it, do another one, and however many you want to do.  And when

5    it's done, it gets everything saved onto an SD card, just like

6    most cameras.

11:21:38AM 7    Q.  And as far as the determination of location, is that

8    something that you do?  Where the scanner is set up?

11:21:44AM 9    A.  It is.

11:21:45AM10    Q.  Did you do that in this case?

11:21:46AM11    A.  Yes, sir, I did.

11:21:47AM12    Q.  How do you decide the appropriate, or how did you decide

13    the appropriate place to take a scan or a picture?

11:21:54AM14    A.  Basically you want to look at the area and determine what

15    you can see from where you're standing.  If you can not see an

16    object, then the scanner can't see the object.  Just like a

17    camera.  It is a camera.  So if I were to want to scan this

18    room, I would do one in this area and then one over here in

19    this area, and probably several back to get down those aisles.

11:22:19AM20    Q.  And is that something you did in this case?

11:22:21AM21    A.  Yes, sir.

11:22:22AM22    Q.  Do you know about approximately how many different

23    locations you set up the scanner?

11:22:25AM24    A.  Eighteen or 19.

11:22:27AM25    Q.  That was both inside and outside the building?

JAMES TALLON – DIRECT EXAMINATION

11:22:29AM 1    A.   Inside and outside total.

11:22:31AM 2    Q.   And after those scans were done, I think you said that you

3    then turn it in to a type of software, a web scene, I think

4    it's called, that can be presented to a jury?

11:22:41AM 5    A.   Correct.  Once you have the data, you can take it back and

6    place it into the scene software, is what it's called.  And it

7    will export out pretty much automatically web share to go, and

8    when you open it up, it creates a web browser, the Chrome web

9    browser will open up, and at that point you can click on a

10   thumbnail of the image or a top down view of the image,

11   showing where the scans were located, and then spin around

12   inside of the scene and like a panoramic image.

11:23:22AM13    Q.   As far as this case and the exhibit, is that the scanned

14   photos that were taken by the FARO?

11:23:29AM15    A.   Correct.

11:23:30AM16    Q.   So the 30 pictures developed and put into software?

11:23:32AM17    A.   Correct.

11:23:33AM18    Q.   Did you do that yourself?

11:23:35AM19    A.   It does it automatically.

11:23:36AM20    Q.   You ran the software --

11:23:38AM21    A.   Correct, I did, I ran the machine.

11:23:40AM22    Q.   I'm going to show you Government's proposed 10.  Is that a

23   disk that you initialed and produced?

11:23:47AM24    A.   Yes, sir, that's mine.

11:23:49AM25             MR. WILLIAMS:  Your Honor, I think there's an earlier

JAMES TALLON - DIRECT EXAMINATION

1    objection, but I'll move to admit subject to any renewed

2    objection by defense counsel.

11:23:57AM 3            THE COURT:  Government 10.  Is there an objection?

11:23:58AM 4            MR. BRUCK:  Yes, the Court has resolved the

5    objections in docket entry 499.

11:24:05AM 6            THE COURT:  I'm looking at it as we speak.

11:24:08AM 7            MR. BRUCK:  We'd also like to say that your position

8    taken there has to do -- we'd like our objection to

9    incorporate -- Well, actually, may I approach, Your Honor?

11:24:22AM10            THE COURT:  Sure.

11:24:39AM11        (Following discussion held at side bar.)

11:24:40AM12            MR. BRUCK:  I want to make sure our objections relate

13    to the fact that in objecting to the prejudicial effect of

14    this technology in this case, we are not limiting ourselves to

15    the images themselves, but to the way that introducing -- in

16    other words, that the images need to be assessed under

17    Rule 403, in light of the fact that they have this "you are

18    there" quality.  So on appeal, we feel that the images

19    themselves should be reviewed in the preserved form in which

20    they were shown, so that the jury -- so that any reviewing

21    court -- I realize the Court has already ruled -- will be able

22    to assess the emotional impact of the photographs in the way

23    that they were actually viewed in the court.  Because we think

24    that the experience of sort of replicating the experience of

25    the responding officers, which is really what this does, has

JAMES TALLON – DIRECT EXAMINATION

1    an emotional impact which is greater than the images

2    themselves.

11:25:47AM 3         MR. WILLIAMS:  Your Honor, you ordered us to use a

4    certain software.  We are doing that.  So I will conditionally

5    admit 10, then replace it with the video that is created with

6    the recording device.

11:25:57AM 7         THE COURT:  Because I had that concern.

11:25:59AM 8         MR. WILLIAMS:  And we're doing that, Your Honor.

11:26:00AM 9         THE COURT:  Very good.  I think what we'll do is I

10    want to lead you up to showing it, then let's take our morning

11    break.

11:26:06AM12         MR. WILLIAMS:  We're just going to introduce it.

13    But -- It's going to happen pretty soon.

11:26:11AM14         THE COURT:  Why don't you signal me.

11:26:14AM15         MR. WILLIAMS:  Judge, what we plan to do, so you

16    know, is use the recording information.  There's a glitch with

17    that, we're not going to send it to the jury, so it will be

18    demonstrative, if it is not.

11:26:23AM19         THE COURT:  Very good.

11:26:28AM20      (Side bar discussion concluded.)

11:26:28AM21    BY MR. WILLIAMS:

11:26:35AM22    Q.  Agent, I think you said this was a copy of the

23    presentation that you put on a disk?

11:26:40AM24    A.  Correct.

11:26:40AM25         MR. WILLIAMS:  And I'm going to conditionally admit

JAMES TALLON - DIRECT EXAMINATION

1    that, Your Honor, as Government's 10.  I'm understanding we're

2    going to record the actual presentation in the courtroom and

3    then use the courtroom presentation for purposes of this case?

11:26:51AM 4    THE COURT:  And that is admitted over the defendant's

5    objections, which are noted.

11:26:56AM 6    MR. BRUCK:  Thank you.

11:26:56AM 7    MR. WILLIAMS:  Your Honor, just so you know, we're

8    using a recording device on our screen capture, so he may need

9    to help me.

11:27:07AM10    THE COURT:  I want you to know the rule of law in the

11    courtroom, if technology can go wrong, it will, so we'll all

12    be patient with this.

11:27:13AM13    BY MR. WILLIAMS:

11:27:23AM14    Q.  And if you could, Agent Tallon, explain what we're looking

15    at or the jury is looking at for purposes of this software,

16    starting from the top right, there's like an overview with a

17    bunch of red dots on it.  What's that show?

11:27:39AM18    A.  Correct.  Up in the top right-hand corner you'll see that

19    there -- there's several red dots.  Each one of those little

20    red dots is where I placed the scanner in the scene.  So each

21    one of those dots is representative of one scan.  The --

11:27:57AM22    Q.  Go ahead.

11:27:58AM23    A.  The cone angle that you see, the blue cone angle that's

24    coming out from that -- the highest red dot, that represents

25    the viewing angle that you're looking at.  So if you were to

JAMES TALLON – DIRECT EXAMINATION

1    go to the bottom of this where the photo is, and scroll around

2    the photo, you'll notice that the little blue triangle will

3    move, depending where you're looking.

11:28:22AM 4    Q.  So the cone, that blue cone is showing the scope of vision

5    that the -- I guess the lower panel shows as the actual

6    depiction?

11:28:30AM 7    A.  Correct.

11:28:31AM 8    Q.  So if I move that around, the cone moves as well?

11:28:35AM 9    A.  Correct.

11:28:36AM10    Q.  I want to ask you about this shadow.  What's that showing?

11:28:40AM11    A.  That is the FARO in the tripod.

11:28:44AM12    Q.  The light coming from behind it?

11:28:47AM13    A.  That's from a streetlight.

11:28:49AM14    Q.  And if I move that around, it effectively shows, what's

15    that, what's --

11:28:58AM16    A.  Yes.

11:29:02AM17    Q.  And that can be -- that can zoom in and out, correct?

11:29:05AM18    A.  Correct, you can use your mouse wheel or the plus minus on

19    the left-hand side.

11:29:10AM20    Q.  If I click over the actual -- or if I toggle over the

21    actual spot, what is that sort of red area that's being shown

22    the spot?

11:29:18AM23    A.  That's showing the data that the scanner collected, the

24    areas in which the data was collected from the scanner.

11:29:24AM25    Q.  And the photograph obviously has some limitations, right,

JAMES TALLON – DIRECT EXAMINATION

1    it can't see behind the photograph that is used here, doesn't

2    see behind anything, just shows what any normal photograph

3    would do?

11:29:37AM 4    A.    Correct.

11:29:37AM 5    Q.    I want to ask you briefly about these other pins that come

6    up.    For instance, I'm toggling over what looks like 002,

7    outside 002.    What is that pin and what is it picking up?

11:29:52AM 8    A.    Basically that pin is another scan.    So it's an easy way

9    to jump from one scan to another.

11:30:00AM10    Q.    So if I double click on that, that will take me to that

11    point in the scan?

11:30:12AM12    A.    Correct, it will take you to that point in space, then

13    show you that panoramic image.

11:30:13AM14    Q.    As far as the other points that may be inside or in

15    different parts of the building, those aren't restricted by

16    walls, meaning that the pins that are seen there may be pins

17    that are inside the building?

11:30:26AM18    A.    That is correct.

11:30:27AM19    Q.    And that's true for this overhead view in the upper right,

20    that shows where all the pins were located within and outside

21    the building?

11:30:35AM22    A.    Correct, sir.

11:30:36AM23    Q.    And then explain the upper left panel and what that

24    represents relative to those pins.

11:30:42AM25    A.    Those are just thumbnail images, they're just a brief

JAMES TALLON - DIRECT EXAMINATION

1    preview of each scan, and it's another quick way to jump to

2    another scan.

11:30:52AM 3    Q.  And can I also, by hiding this expand button, open up any

4    one of those windows?

11:30:58AM 5    A.  Correct, you can make them all, for the lack of a better

6    word, full screen.

11:31:03AM 7    Q.  So I'm going to go to the full screen, and what does this

8    auto rotation do?

11:31:09AM 9    A.  It will start rotating it.

11:31:12AM10    Q.  I'm going to press that.

11:31:15AM11    A.  It's just kind of an eye level -- well, I say eye level,

12    but it's the level of the scanner.  Spins around 360 degrees.

11:31:28AM13    Q.  Would that be true for every one of the scans?

11:31:31AM14    A.  Correct.

11:31:33AM15    Q.  I'll let that go through.  So that can give you a

16    360-degree image of the location around the scan point?

11:32:14AM17    A.  Correct.

11:32:14AM18    Q.  As far as the ability to go up and down vertically, does

19    it take a picture that's up in the air as well as on the

20    ground?

11:32:25AM21    A.  It does.

11:32:26AM22    Q.  So it could also toggle up and down and pick up items

23    either on the floor or on the ceiling?

11:32:34AM24    A.  Correct, except for that white spot, which is where the

25    tripod is, it can't see underneath itself.

JAMES TALLON – DIRECT EXAMINATION

11:32:39AM 1    Q.  So there's a limitation on the ground, meaning it can't

2    take a picture underneath itself.

11:32:43AM 3    A.  Correct.

11:32:45AM 4    Q.  And then within that context, there's also, I think you

5    said, a zoom factor, which if I hit the plus button, will zoom

6    in as well?

11:32:55AM 7    A.  Correct.

11:32:56AM 8    Q.  Is there a distortion on the outside edges, if you zoom

9    out too far?

11:33:01AM10    A.  It will, it will give you effectively what's called a fish

11    eye look.

11:33:06AM12    Q.  And that's just a function of typical photography when

13    it's 360-degree --

11:33:11AM14    A.  Correct, when you have a panoramic image and zoom out that

15    far, you will get that.

11:33:18AM16    Q.  And so if Special Agent Burke wanted to go through the

17    crime scene, she could go pin to pin and identify items in the

18    church based on photos you took with the FARO scanner?

11:33:35AM19    A.  Yes, sir.

11:33:35AM20    Q.  Apart from your work inside the building taking those

21    scans and those photographs, did you have any other role in

22    the case?

11:33:43AM23    A.  Purely helping with handing bags and any trivial means

24    that I could help Agent Burke.

11:33:55AM25    Q.  About how long did it take you to take all the scans

JAMES TALLON — DIRECT EXAMINATION

1    inside the building?

11:34:00AM 2    A.  Inside and outside it was about three hours.

11:34:04AM 3    Q.  And all of that has been distilled into this web share

4    software that you've tentatively admitted to court?

11:34:11AM 5    A.  Yes, sir.

11:34:17AM 6    Q.  And then finally, you reviewed all of those scans on this

7    disk for presentation, correct?

11:34:22AM 8    A.  Yes, sir.

11:34:23AM 9    Q.  And does it fairly and accurately represent what you saw

10    there that night when you were there yourself?

11:34:28AM11    A.  Yes, sir.

11:34:31AM12    Q.  They're photographs of what you saw personally?

11:34:32AM13    A.  Yes, sir.

11:34:38AM14    MR. WILLIAMS:  I have no further questions from this

15    agent, Your Honor.

11:34:40AM16    THE COURT:  Very good.  Cross-examination?

11:34:45AM17    MR. BRUCK:  No questions.

11:34:47AM18    THE COURT:  Thank you, sir, you may step down.

11:34:54AM19    Ladies and gentlemen, it's time for our morning break.

20    Escort them back to the jury room.

11:35:01AM21    (Jury excused.)

11:35:34AM22    THE COURT:  Mr. Richardson, is the FARO exhibit going

23    to be the next?

11:35:40AM24    MR. RICHARDSON:  Mr. Williams and that will be next.

11:35:42AM25    MR. WILLIAMS:  Your Honor, there is a good amount of

```
            1    items prior to that, but it will be in the next witness.

11:35:47AM  2         THE COURT:  Okay.  And how long will it take him

            3    to -- I'm just trying to give the family some warning,

            4    Mr. Williams.

11:35:53AM  5         MR. WILLIAMS:  I think maybe 20 minutes into her

            6    testimony we'll probably get to the -- I would say between ten

            7    to 20 minutes into the testimony, we'll get to the FARO.

11:36:01AM  8         THE COURT:  Let me just say again that I have, in the

            9    course of addressing evidentiary issues, Mr. Bruck raised

           10    those, that we address thoroughly, I have seen these images.

           11    And for family members and others, it may be very upsetting.

           12    And we have a victims' room and we have areas we can go

           13    that -- for folks who this may be too much to see, and there's

           14    no shame in stepping outside for this.

11:36:35AM 15       So with that, we'll take about a ten-minute break.  Thank

           16    you.

11:36:38AM 17       (A recess was held at this time.)

11:36:38AM 18       (Jury not present.)

11:52:37AM 19         MS. PAAVOLA:  Your Honor, if I may, before this next

           20    witness testifies, we have objections to several exhibits that

           21    we believe may be coming in, and it might be easier to take

           22    those up now.

11:52:47AM 23         THE COURT:  I'm sorry, tell me what your objection

           24    is.

11:52:50AM 25         MS. PAAVOLA:  I believe Exhibits 26 through 112 are
```

1          coming in through this witness, and we have previously filed

2          objections in motions in limine to 13 of those photographs.

11:53:04AM 3          THE COURT:  Let me understand exactly -- we're

4          talking about images, are we talking about something contained

5          within the FARO?

11:53:12AM 6          MS. PAAVOLA:  These are photographs in addition to

7          the FARO.

11:53:15AM 8          THE COURT:  Okay.  So we're now -- I want to make

9          sure I understand, you're talking about photographs.  Okay.

10          And which are the photographs?  What numbers are they?

11:53:25AM11          MS. PAAVOLA:  They are numbers 36, 56, 60, 69, 82,

12          84, 85, 91 through 95, and 96, which is not a photograph, it

13          is an item.

11:53:53AM14          THE COURT:  Those are the ones you're objecting to?

11:53:55AM15          MS. PAAVOLA:  Yes, sir.

11:53:55AM16          THE COURT:  Mr. Williams, can I see those?

11:53:58AM17          MR. WILLIAMS:  We had filed a written response that

18          was --

11:54:01AM19          THE COURT:  But I need to see the images.  It's hard

20          to, as they say, a picture of a thousand words.

11:54:08AM21          MR. WILLIAMS:  Would you like me to hand up the

22          exhibits?

11:54:10AM23          THE COURT:  Yes, just those, if you can do those

24          numbers, or I can -- is there a way I can look at it, that

25          would be fine too, I can find them.

11:55:20AM 1          MR. WILLIAMS:  Your Honor, just to be clear, we have

        2   told the defense we do not intend to offer 96, which is a

        3   physical item, otherwise depicted in the photo in 95.

11:55:32AM 4          THE COURT:  So the Government is not offering 96.

11:55:36AM 5          MR. WILLIAMS:  That's correct, Your Honor.

11:55:37AM 6          THE COURT:  Okay.

11:55:39AM 7          MS. PAAVOLA:  Also for the record, Your Honor, we

        8   previously objected to Exhibit 80, but the Government has now

        9   redacted it, and we no longer have an objection to that.

11:55:48AM10          THE COURT:  All right, Exhibit 36.  What we're going

        11   to do is I'm going to have defense counsel tell me the

        12   objection, then I want to hear from Government counsel about

        13   their response to it.

11:56:03AM14          MS. PAAVOLA:  Your Honor, I may be able to shorten

        15   this a bit.  The nature of our objections to all these

        16   photographs is that they are -- the objection's under

        17   Rule 403.  The exhibits all depict very graphic images, and we

        18   believe they are cumulative, particularly given the large

        19   amount of additional photographs that the Government intends

        20   to introduce and we have not objected to, as well as the

        21   complete FARO cam which is now coming in over our objection.

11:56:34AM22          THE COURT:  You have to understand, however, that I

        23   have to rule on 403, the probative value of it is an important

        24   element, so I need to examine each one of these --

11:56:44AM25          MS. PAAVOLA:  Okay.

11:56:44AM 1            THE COURT:  -- to make a relevance determination,

2       then to make a 403 balancing determination.

11:56:49AM 3       Okay.  36, Mr. Williams, do you want to tell me about that

4       image.

11:56:55AM 5            MR. WILLIAMS:  Yes, Your Honor, that captures the

6       perspective of an item relative to -- I believe relative to

7       where a victim was located, Mr. Dan Simmons.  That angle was

8       not captured by the FARO scan, so it is certainly indicative

9       of intent, and where the defendant --

11:57:13AM10            THE COURT:  Is that item, is that something that the

11       defendant allegedly left?

11:57:17AM12            MR. WILLIAMS:  Yes, Your Honor, I think it's the pack

13       that's around his waist when he walked into the church, where

14       he stored gun and magazines.

11:57:24AM15            THE COURT:  Exhibit 36 motion is denied.  56.  And

16       let's -- okay, go ahead, because I'm giving you general

17       objection.

11:57:35AM18            MR. WILLIAMS:  Your Honor, that's a photo of a spent

19       projectile.  It shows several things, but the first is that

20       type of detail is not available through the FARO scan, it

21       simply doesn't have that level of resolution.

11:57:47AM22            THE COURT:  And it tells you what?

11:57:49AM23            MR. WILLIAMS:  Your Honor, that spent round is

24       located where Mr. Dan Simmons was found.  There's also a

25       floor --

11:57:55AM  1             THE COURT:  I'm satisfied.  56 overruled.  What is

         2    Exhibit 60?

11:58:02AM  3             MR. WILLIAMS:  That's a photo of a fragment that we

         4    intend to introduce as a physical item, but again, because

         5    the --

11:58:09AM  6             THE COURT:  A fragment of a bullet?

11:58:12AM  7             MR. WILLIAMS:  A jacket from a bullet, correct.  And

         8    again, so the witness can explain what the evidence was, some

         9    minute pieces are necessary, and obviously its location near

        10    blood is indicative of the defendant's intent.

11:58:25AM 11             THE COURT:  60 overruled.

11:58:28AM 12             MS. PAAVOLA:  Your Honor, if I could just add one

        13    point to that.  The photographs that the Government is arguing

        14    show positioning relative to the victim's body, the ones we've

        15    looked at so far do not include any victims' bodies, so I

        16    don't understand how it shows you where it is --

11:58:47AM 17             THE COURT:  It's showing blood, which is near

        18    connected to a body; that would be the notion.  So overruled.

11:58:53AM 19        Okay.  Next one I have is 84.  Where is 69 and 82?

11:59:06AM 20             MR. WILLIAMS:  I believe we passed up 69.

11:59:08AM 21             THE COURT:  May not be in the order you gave them.

        22    It's not in order, thank you very much.  And what is this?

11:59:23AM 23             MS. PAAVOLA:  69, the nature of the objection is

        24    simply that it depicts first responder material which were

        25    left after the crime scene had been cleared.

275

11:59:34AM 1            THE COURT:  Your response?

11:59:35AM 2            MR. WILLIAMS:  Your Honor, there's -- underneath the

3       chair that's depicted in photo 69 or Exhibit 69 is a hole in

4       the wall.  And so that picture is necessary for the context of

5       where the chair is located, simply to show the first of two

6       photos where a hole was in the wall.  I believe it just shows

7       rubber gloves that may have been left by --

12:00:00PM 8            THE COURT:  We'll come back to this one.  What's the

9       next one?

12:00:03PM10            MR. WILLIAMS:  Your Honor, I will say we may not

11      admit that, so if we don't get to it --

12:00:07PM12            THE COURT:  Yes, the presence of things, I just need

13      to evaluate.  Doesn't seem that probative, it has these other

14      materials.  I don't know.

12:00:15PM15        So the next one is 82?

12:00:18PM16            MR. WILLIAMS:  Correct, Your Honor.

12:00:23PM17            MS. PAAVOLA:  The same objection, Your Honor, there

18      are some first responder materials as well as graphic material

19      in that photograph.

12:00:31PM20            THE COURT:  What are the first responders?

12:00:33PM21            MS. PAAVOLA:  I believe in the left-hand corner.

22      Perhaps I'm wrong; sorry.

12:00:40PM23            THE COURT:  I don't see any first responder materials

24      there.  Mr. Williams, what's the purpose of 82, what does it

25      show?

12:00:47PM 1          MR. WILLIAMS:  Shows damage under a table from

2     gunfire that would have been captured by the FARO scan.

12:00:52PM 3          THE COURT:  82 is overruled.  84?  What does that

4     show us?

12:01:02PM 5          MR. WILLIAMS:  The same, Your Honor, shows damage to

6     the underside of a table caused by gunfire, and again, that

7     photo, I believe proximity to a victim.

12:01:10PM 8          THE COURT:  It does.  Anything further on that?

12:01:14PM 9          MS. PAAVOLA:  No, Your Honor, the objection is simply

10     the graphic nature of the photograph.

12:01:17PM 11          THE COURT:  84 is overruled.  Next one?

12:01:21PM 12          MS. PAAVOLA:  Same objection.

12:01:22PM 13          THE COURT:  85, what does this demonstrate?

12:01:26PM 14          MR. WILLIAMS:  Your Honor, that shows bullet holes in

15     a tablecloth, indicating that the defendant shot people while

16     they were lying under the table.

12:01:33PM 17          THE COURT:  I do see a glove in there, single glove,

18     and seems an isolated matter.  And the more important thing is

19     what it depicts, so I overrule as to 85.

12:01:48PM 20          MR. WILLIAMS:  Your Honor, I'll have the witness

21     authenticate and explain that there were items left behind

22     by --

12:01:54PM 23          THE COURT:  Yes.

12:01:55PM 24          MR. WILLIAMS:  -- treaters.

12:01:56PM 25          THE COURT:  91.

12:01:58PM 1           MR. WILLIAMS:  Your Honor, there was a series of

2      photos, starting with 91 through, I believe 95, which I'm

3      going to call -- that show floor strikes, which are markings

4      in the tile consistent with a round being fired from above.

5      And obviously they're relevant to the defendant's positioning,

6      his malice, and the fact that he was shooting people while

7      they were on the ground.

12:02:19PM 8           THE COURT:  I've got 91 and 95; I don't have the ones

9      in between, 92, 3 and 4.

12:02:31PM10           MR. WILLIAMS:  Sorry, Your Honor, I'll get those.

11     That's 92, 93 and 94, Your Honor?

12:02:38PM12           THE COURT:  Yes.  So again, tell me what 91 is

13     showing me.

12:02:51PM14           MR. WILLIAMS:  It is a mark in the floor caused by --

12:02:54PM15           THE COURT:  A bullet.

12:02:56PM16           MR. WILLIAMS:  That's what the testimony will be,

17     Your Honor.

12:02:58PM18           THE COURT:  And 91 is overruled.  92.

12:03:03PM19           MR. WILLIAMS:  Same thing, Your Honor.

12:03:05PM20           THE COURT:  92 is overruled.  93?  Same thing?

12:03:11PM21           MR. WILLIAMS:  Same thing.

12:03:12PM22           THE COURT:  Overruled.  There is obviously evidence

23     of blood, but it's adjacent to bullet holes, and I think it's

24     relevant for that reason.  93 is overruled.  94 overruled.

25     95, what is that package?

12:03:32PM 1          MR. WILLIAMS:  Your Honor, that's a cell phone that

2    was on the floor and was shot through, indicating --

12:03:38PM 3          THE COURT:  95 is overruled.

12:03:41PM 4      Let's go back to 69.  This one just doesn't seem to be

5    very probative to me, and it has, you know, seems it has these

6    items that appear to come from -- I'm going to sustain it as

7    to 69.

12:03:56PM 8          MR. WILLIAMS:  Thank you, Your Honor.

12:03:57PM 9          THE COURT:  Let me hand these back to you, sir.

10    Mr. Williams, can I give these back to you, sir?

12:04:05PM11          MR. WILLIAMS:  Yeah, we need those.  Thank you.

12:04:22PM12          THE COURT:  Are we ready?  Bring in the jury.  Thank

13    you.

12:04:26PM14      (Jury present.)

12:05:31PM15          THE COURT:  Ladies and gentlemen of the jury, I want

16    to let you know just about what time is the judge going to let

17    us eat question, we'll go about an hour to 1:00 or shortly

18    after 1:00 we'll break for the hour lunch break.

12:05:44PM19      Government proceed.  Next witness.

12:05:46PM20          MR. WILLIAMS:  Thank you.  Government calls Brittany

21    Burke.

12:06:18PM22          THE CLERK:  State your full name for the record,

23    please.

12:06:20PM24    A.  Brittany Nicole Burke.

12:06:23PM25      BRITTANY BURKE, a witness called by the Government, first

BRITTANY BURKE – DIRECT EXAMINATION

1    having been duly sworn, testified as follows:

12:06:34PM 2                    DIRECT EXAMINATION

12:06:34PM 3    BY MR. WILLIAMS:

12:06:39PM 4    Q.   If you could tell the jury your name.

12:06:40PM 5    A.   My name is Brittany Burke.

12:06:42PM 6    Q.   Where do you work?

12:06:43PM 7    A.   I am currently employed with the Tennessee Bureau of

8    Investigations.

12:06:48PM 9    Q.   What is the Tennessee Bureau of Investigations?

12:06:50PM10    A.   The Tennessee Bureau of Investigations is the state law

11    enforcement agency for the State of Tennessee.

12:06:56PM12    Q.   What did you do before you worked with TBI?

12:07:00PM13    A.   Before I worked with TBI, I was employed with the crime

14    scene unit at the South Carolina Law Enforcement Division here

15    in South Carolina.

12:07:07PM16    Q.   Why did you go from SLED to Tennessee?

12:07:10PM17    A.   Tennessee was where I grew up, so I just moved back closer

18    to my family and back closer to home.

12:07:16PM19    Q.   What did you do at SLED?

12:07:17PM20    A.   I worked as a special agent in their crime scene unit.

12:07:22PM21    Q.   Do you have any qualifications, prior to working at SLED,

22    to sort of get into that work or to do that job?

12:07:28PM23    A.   Prior to working at SLED I was a college student, I was --

24    I did some interning in law enforcement with the -- but that

25    was my first actual job with law enforcement there.

BRITTANY BURKE - DIRECT EXAMINATION

12:07:38PM 1    Q.  Where did you go to college?

12:07:40PM 2    A.  The University of Tennessee Chattanooga.

12:07:43PM 3    Q.  What year did you graduate?

12:07:44PM 4    A.  In 2012.

12:07:46PM 5    Q.  When you graduated from college, you said you started with

6    SLED?

12:07:50PM 7    A.  That is correct.

12:07:50PM 8    Q.  Where did you start when you went to SLED or what was your

9    first job there?

12:07:54PM10    A.  My first job there was as a special agent in the crime

11    scene unit.

12:07:57PM12    Q.  Do you have any special training or did you receive any

13    special training to become a crime scene investigator?

12:08:02PM14    A.  I did, I went through an in-house training course while at

15    SLED that included latent prints, blood splatter analysis, how

16    to properly work and document a crime scene, along with other

17    aspects.  I also received outside training in blood splatter

18    analysis and footwear and tire tread examination as well.

12:08:27PM19    Q.  About how many hours of training would you say you had at

20    SLED for your position as a crime scene investigator?

12:08:35PM21    A.  Well, into the hundreds of hours of training.

12:08:38PM22    Q.  And as far as field work, how many cases would you say you

23    worked on where you were a crime scene investigator while you

24    were at SLED?

12:08:47PM25    A.  Well over 150.

281

BRITTANY BURKE - DIRECT EXAMINATION

12:08:49PM 1   Q.  And with Tennessee Bureau of Investigation, about how many

2   there?

12:08:54PM 3   A.  I have had, as far as crime scenes, I believe about three

4   there so far.

12:08:59PM 5   Q.  When did you start with TBI from SLED?

12:09:02PM 6   A.  I started February of this year, so February 2016.

12:09:09PM 7   Q.  If you could, explain to the jury what crime scene

8   investigating consists of.  What do you do?

12:09:18PM 9   A.  Crime scene investigating consists of going into the crime

10   scene, documenting that crime scene, which includes notes,

11   schedules, photographs, and the -- identifying items of

12   evidence, which can be pretty much anything, but identifying

13   that and collecting it and packaging it so that it can be

14   taken to the laboratory or wherever it needs to be taken for

15   its examination.

12:09:42PM16   Q.  When you say crime scene, what type of places do you

17   respond to?  What is the sort of range of crime scene

18   investigations?

12:09:50PM19   A.  A crime scene can occur anywhere.  It can be on a street,

20   in a field, in a house, in a place of business, it can be

21   absolutely anywhere.

12:10:03PM22   Q.  Can you explain to the jury how SLED interacts with other

23   agencies, whether they be state or federal?

12:10:10PM24   A.  Yes, SLED is requested by -- there will come requests from

25   other agencies, which means that any of the agencies can call

BRITTANY BURKE - DIRECT EXAMINATION

1  and say, hey, we need your help, can you send some people to

2  help assist us in this matter.  And then from there they can

3  tell what type of assistance they need.  So in order for me to

4  get called, they would say we have a crime scene, we need

5  somebody to come help us process this crime scene, and that's

6  how I would get called to respond to something.

12:10:38PM 7  Q.  As the crime scene investigator, in your experience, what

8  resources does SLED offer that other agencies may lack?

12:10:46PM 9  A.  We have numerous personnel that can help, the amount of

10  the equipment that we have, the equipment -- the types of

11  equipment that we have, including the FARO, are just some of

12  the things that we can offer there.

12:11:03PM13  Q.  Do you work with agencies that may not have crime scene

14  offices or investigators?

12:11:07PM15  A.  Yes.  Very often.

12:11:09PM16  Q.  Does the City of Charleston have a fairly built up crime

17  scene unit?

12:11:15PM18  A.  Yes, they do.

12:11:16PM19  Q.  But you sometimes help bigger agencies as well, because of

20  the equipment or maybe the personnel you have, in major cases?

12:11:22PM21  A.  That is correct.

12:11:24PM22  Q.  Do you often work with federal agencies as well?

12:11:27PM23  A.  Yes, we have worked with several federal agencies in the

24  past.

12:11:32PM25  Q.  And is that interaction similar?

BRITTANY BURKE - DIRECT EXAMINATION

12:11:34PM 1    A.  Yes, it's just -- works just the same.

12:11:38PM 2    Q.  So I want to ask you about the case you were involved with

3    that you're here to testify on today.  How did you first get

4    involved in this case?

12:11:48PM 5    A.  I was involved -- first got involved in this case, I

6    received a call from my lieutenant who informed me -- it was

7    about 10:00 o'clock at night -- she informed me that there had

8    been a shooting in which multiple victims were present here in

9    Charleston.  And she told me just be on stand-by.  And then at

10   1:00 o'clock in the morning on June 18th she called me and

11   said, hey, there's been a shooting, it's in Charleston, we've

12   got nine victims, and I'm going to need you to respond to

13   that.  And so that was how I became involved.

12:12:26PM 14   Q.  When the case -- when you get that phone call, how is it

15   determined who is the lead or who is supervising your part of

16   the investigation, meaning the crime scene processing?

12:12:37PM 17   A.  So the way that it works is we work in teams of two.  And

18   each team has a schedule, so it rotates which team is on call.

19   And then it's up to that team to work it out, have who is the

20   lead.  Normally what happens is one person will take the lead

21   on the first case, then the next case that comes in, the next

22   person takes the lead.  So in this case we had a case earlier

23   in the week where my partner had been the lead on a case, so

24   this time it was my turn to be lead on the case.

12:13:10PM 25   Q.  Who was your partner?

284

BRITTANY BURKE - DIRECT EXAMINATION

12:13:11PM 1    A.  Agent Tiffany Hezel.

12:13:15PM 2    Q.  As far as the amount of resources you were dispatched or

3    deployed, who decides how many people show up?

12:13:24PM 4    A.  That is decided by -- typically by our lieutenant, but it

5    is -- there's also the responsibility of the agent on scene,

6    if they need more help, then we can always call and request

7    more help as needed as well.

12:13:38PM 8    Q.  Did you make an initial determination of how many agents

9    were needed when you got that phone call?

12:13:44PM10    A.  No, when I got the phone call, my lieutenant told me that

11    she was sending me, and not just a partner that I always

12    worked with, but other people as well.

12:13:55PM13    Q.  Who were the other people that were sent?

12:13:58PM14    A.  The other people that responded were Agent Dawn Claycomb,

15    Agent Tre Tallon and Agent Patrick Oliphant and Haley Quam.

12:14:08PM16    Q.  So that's four plus you and Tiffany?

12:14:11PM17    A.  That's correct.

12:14:13PM18    Q.  Is that a normal number to dispatch to one case?

12:14:16PM19    A.  No, it would be very rare for us to dispatch that many

20    people to one case.

12:14:20PM21    Q.  And from what your experience is, why would that many

22    crime scene agents be involved?

12:14:25PM23    A.  That many crime scene agents would be involved due to the

24    nature of the scene or the scope of the case.  The only time

25    we would -- we typically -- dispatch that many people is if

BRITTANY BURKE – DIRECT EXAMINATION

1    there's a scene that has a large amount of evidence, victims,

2    or if it spans -- if it were to span a large area outside

3    would be the only reasons.

12:14:47PM 4    Q.  You said the nature and the scope of the criminal

5    activity, what was it about the nature and scope that

6    necessitated it?

12:14:54PM 7    A.  Well, the amount of victims that we had, as well as the

8    reports of the amount of evidence that was related back to us,

9    in Columbia, that's where we were based out of, telling us

10    what we had here in Charleston dictated how many people we

11    sent.

12:15:12PM12    Q.  Who was in charge of that group of people?

12:15:14PM13    A.  I was in charge of the group of people that night.

12:15:18PM14    Q.  And what does it mean to you to be in charge of that

15    group, how do you supervise or coordinate those other crime

16    scene investigators?

12:15:26PM17    A.  What I do, if I have something where we need to supervise

18    or coordinate that many agents, is determine what is there and

19    what needs to be done, and then those responsibilities are

20    delegated out to other agents, and they're done -- while I'm

21    making sure everything is done, one agent can be doing one

22    particular task.

12:15:50PM23    Q.  And as the lead investigator, would you have delegated

24    tasks to other crime scene investigators?

12:15:55PM25    A.  Yes, I would have delegated tasks such as labeling

BRITTANY BURKE - DIRECT EXAMINATION

1    evidence or collecting evidence or taking photographs to

2    another agent, so that I can make sure that all the tasks were

3    done while somebody else was actually completing that

4    particular task.

12:16:08PM 5    Q.  And in this case, at least at the church, as you

6    coordinated or delegated, did you also directly oversee the

7    work of the other agents?

12:16:17PM 8    A.  Yes, I did.

12:16:19PM 9    Q.  I want to ask you, you mentioned you got called in, did

10    you respond then to the church?

12:16:24PM11    A.  Yes, I did.  I got called at approximately 1:00 a.m., and

12    myself and Agent Claycomb responded via helicopter and arrived

13    approximately 3:00 a.m.

12:16:38PM14    Q.  SLED has a helicopter?

12:16:39PM15    A.  Yes.

12:16:40PM16    Q.  Is it used very often?

12:16:41PM17    A.  It is used occasionally, if there's somewhere that is far

18    enough away that warrants it and we can get there.  If we can

19    get there quicker in a helicopter and we need to get there

20    quicker, we will take it.

12:16:55PM21    Q.  Had you taken it before?

12:16:56PM22    A.  Not to a scene, no.

12:16:58PM23    Q.  So you and the other co-case agent were transported, I

24    guess, to Charleston?

12:17:04PM25    A.  Yes, me and one of the other agents were transported.  The

BRITTANY BURKE - DIRECT EXAMINATION

1    rest of the agents drove their vehicles, because of all of our

2    equipment is in the vehicle, so that we had all of the

3    equipment with us as well.

12:17:17PM 4    Q.  And when you arrived to Charleston, where did you go?

12:17:21PM 5    A.  When I arrived in Charleston I went to the Emanuel AME

6    Church.

12:17:27PM 7    Q.  Had you been there before?

12:17:29PM 8    A.  No, I had not.

12:17:30PM 9    Q.  Were you -- are you familiar with Charleston at all?

12:17:32PM10    A.  Not besides coming down for a weekend vacation and walking

11    around, that's about it.

12:17:39PM12    Q.  So when you arrived at the church, what was your initial

13    impression as a crime scene investigator and a supervisor?

12:17:47PM14    A.  My -- well, when I first arrived I stuck outside and

15    talked with agents that are already there and already been in.

16    But my initial response was that something large had happened,

17    because there were multiple agencies on scene, multiple

18    emergency vehicles, what was called -- what we call command

19    center, which is kind of like a mobile home that's a mobile

20    office that can be brought and set up so we have somewhere to

21    work, there was set up outside, and so I knew that something

22    large scale had to have happened at that point.

12:18:27PM23    Q.  And were you already assigned as the crime scene

24    investigator, or had that not been determined yet?

12:18:33PM25    A.  I was already assigned as the lead crime scene

BRITTANY BURKE – DIRECT EXAMINATION

1    investigator prior to us leaving.  And then when I got there I
2    was -- it was unsure on the way there if I was going to be
3    assisting or SLED would be taking the lead on the case.  When
4    I got there, I was told that SLED would be taking the lead on
5    the crime scene investigation at that point.

12:18:54PM 6    Q.  So explain that, if you can, to the jury.  You mentioned a
7    little bit sort of cooperative efforts with other agencies,
8    whether it be the city police department or the FBI.  Were
9    tasks in this case divided up according to resources?

12:19:09PM10    A.  Yes, tasks were divided, but according to resources, I
11    believe that that was made by my supervisors and at a higher
12    level than me.  Those decisions were made, and so tasks were
13    kind of -- there was a lot to do, tasks were delegated where
14    people were needed.

12:19:31PM15    Q.  So what was delegated specifically to you and your team?

12:19:34PM16    A.  The crime scene at the church was delegated to us.

12:19:38PM17    Q.  So when you arrived and were then given that task, what
18    was your first impression of the church and what would need to
19    be done?

12:19:48PM20    A.  Well, the first thing that we start doing is taking
21    overall photographs of the outside of the church.  The outside
22    of the church just looked like the outside of a church you
23    would expect it to look.  But then we began moving inside and
24    seeing numerous items of evidence and all.  And so we knew all
25    that was going to have to be documented and collected and

BRITTANY BURKE - DIRECT EXAMINATION

1    photographed and sketching and notes and all the things that

2    we normally do were going to have to be done there.

12:20:18PM  3    Q.  Let me back up a little bit.  When you first show up, do

4    you start taking photographs or do you do sort of an overall

5    walk through of the area to assess it for resources, needs?

12:20:28PM  6    A.  We walk through and assess the area, and then as we -- as

7    we do that, we're taking -- we'll take photographs of the --

8    as well.  But we walked through to make sure that we know

9    where we can walk, so that there's items of evidence, we know

10   that they're there prior to us walking through trying to take

11   photographs as well.

12:20:47PM 12    Q.  So tell the jury what your initial impression was in that

13   first walk through.  What you saw just generally.

12:20:57PM 14    A.  When I started the initial walk through inside the church,

15   my initial impression was that it was very hectic.  We had

16   multiple victims, multiple items of evidence that there were

17   evidence of gunshots throughout the church, it was actually --

18   mostly contained in one room, but you could see them in walls,

19   in ceilings and things like that nature as well.  So it was

20   very overwhelming the amount of evidence that was there and

21   that would have to be collected at that time.

12:21:35PM 22    Q.  Let me ask you about that first impression with regard to

23   prior activity that may have occurred.  Do you have any

24   experience in identifying whether a scene has or has not been

25   disturbed prior to your arrival?

BRITTANY BURKE - DIRECT EXAMINATION

12:21:49PM 1    A.  Yes, I did.

12:21:50PM 2    Q.  What type of things do you look for or identify to

3    determine whether something has been disturbed or moved on a

4    crime scene?

12:21:57PM 5    A.  There are many different things you can look for.  You can

6    look for if there is blood present on the scene, you can look

7    and see if the -- if there is movement through that blood, or

8    if something has been moved that is not consistent with where

9    the blood is.  Same with dirt or dust or anything like that.

10    And then as well as just what the scene looks like, and does

11    that make sense for what you're seeing, like does the -- are

12    there bullet holes somewhere on a wall, but you have to move a

13    cabinet to get to see them, and there's no bullet hole in the

14    cabinet.  Things like that, that make things make sense how

15    they're supposed to look.

12:22:44PM 16    Q.  And when you arrived, were you debriefed by the local

17    officers about what had occurred regarding the crime scene and

18    its security?

12:22:52PM 19    A.  Yes, I was.  I was -- I spoke with Charleston police

20    department, who stated that they had been through the church,

21    that the building had been cleared to make sure that there was

22    nobody in it.  And they informed me that there was some damage

23    to one of the doors in the church, that they had broken

24    through the door to make sure that nobody was in that office,

25    and the door had been locked prior to them breaking through

BRITTANY BURKE - DIRECT EXAMINATION

1    the door.

12:23:21PM 2    Q.   How about the use of any kind of rescue or emergency

3    services?

12:23:28PM 4    A.   Yes, I believe leads had been placed on all of the victims

5    to determine if they had had a pulse.  I was told that

6    emergency rescue personnel had been there previously and had

7    checked all the victims for signs of life.

12:23:42PM 8    Q.   And what's a lead?

12:23:44PM 9    A.   I call it a lead, it's a little sticky pad that sticks on

10    that they then attach to their machine to that tells me if

11    there are any signs of life present.

12:23:53PM 12    Q.   From your, at least initial assessment, and maybe later

13    assessment, did it appear that the rescue services had moved

14    any of the bodies much, if at all?

12:24:01PM 15    A.   There was evidence that they had moved some of the bodies.

16    There were some that were -- that did appear that they were in

17    their original position, but clothing of some of the victims

18    had been cut, which signified that they had moved the body in

19    order to determine if there was any signs of life.

12:24:21PM 20    Q.   And is that -- I'm going to guess that if a fireman or an

21    EMT is running through there, they could disturb other things,

22    kick a shell casing, step in blood, was there any indications

23    of that from the initial crime scene?

12:24:35PM 24    A.   There -- everything was so chaotic as far as the placement

25    of cartridge casings and all.  It would be hard to tell if

BRITTANY BURKE - DIRECT EXAMINATION

1    something had been kicked around.  However, it is definitely

2    possible.  It is possible, and their first priority is to

3    determine there is nobody else in the building that causes a

4    threat to somebody, and that their -- and to make sure that

5    anybody that needs medical attention gets that medical

6    attention.  So that's their first priority, so it's very

7    possible that things could get kicked during that.

12:25:05PM 8    Q.  When you say chaotic, you mean that there was a lot of

9    activity or that there was a lot of evidence?

12:25:11PM 10   A.  I mean that there was a lot of evidence and it was spread

11   throughout the room, it was not in a central location, as if

12   there had been movement.  During the event that took place.

12:25:25PM 13   Q.  So there was evidence spread around.  When you say -- what

14   do you mean by evidence spread around?

12:25:30PM 15   A.  There were cartridge cases and magazines and projectiles

16   is mainly what I mean by evidence, and they were all around

17   the room, they weren't in one centralized location.  The

18   magazines and the cartridge cases were around the whole room,

19   which was -- which is indicative of somebody that would be

20   moving as they were shooting or changing these magazines.  And

21   so there was a lot of movement and chaos through that portion

22   of it.

12:25:56PM 23   Q.  So your word chaos is reflective of what you perceived had

24   happened in the room, not what was going on when you were

25   there?

BRITTANY BURKE - DIRECT EXAMINATION

12:26:04PM 1    A.  I would call it indicative of both.

12:26:06PM 2    Q.  Okay.  So let me ask you, you say that you did a first

3    general walk through of the scene.  Did anything jump out at

4    you, apart from what you said, which was it was going to take

5    a lot of crime scene processing?

12:26:21PM 6    A.  Aside from the sheer amount of evidence and the number of

7    victims that were there, just the -- just the -- there was a

8    black Messenger bag that was there on the floor, and a belt

9    that stood out as being out of place.  But other than that,

10    there was not anything that jumped out particularly.

12:26:44PM 11    Q.  Is there any -- what is a challenge when you're dealing

12    with that volume of evidence, what is -- how do you account

13    for that specific challenge, if there is any?

12:26:53PM 14    A.  The challenge is that the time that it takes to just

15    document and collect it.  You want to be thorough, and you

16    have to label each item and then photograph it and then

17    collect it and document it at that point in time, would be the

18    main challenge there.

12:27:08PM 19    Q.  Did you feel like you had the adequate personnel and

20    people on hand to get through that process, albeit a long one?

12:27:14PM 21    A.  Yes, we did.

12:27:15PM 22    Q.  So explain to the jury, if you can, what the assignments

23    were for the team members that responded to process that crime

24    scene.

12:27:24PM 25    A.  So Agent Claycomb, Dawn Claycomb, was taking photographs,

BRITTANY BURKE - DIRECT EXAMINATION

1    and Agent Haley Quam was helping me identify evidence within

2    the scene.  They both were then sent and they cleared the

3    scene early, because we -- it became apparent to us that we

4    were going to have autopsies the next morning.  So they both

5    handed off their job to somebody else.  Agent Claycomb handed

6    off taking photographs to Agent Oliphant, and he continued

7    that, and Agent Quam handed off her jobs to Agent Hezel, who

8    helped -- who also helped me document the evidence.  That was

9    in the same -- and they went to get some sleep, so we would

10   have additional personnel to continue the next day.  And Agent

11   Tallon's job was mainly to run the FARO and help with the

12   collection of evidence as well.

12:28:21PM 13  Q.  So if you can, explain to the jury, I think you said that

14   the first step is that sort of walk through to get an overview

15   of the scene and assess what resources are needed.  What is

16   the actual first step in following steps in processing a

17   crime, what's the first thing you do and how is it followed

18   up?

12:28:40PM 19  A.  The first thing we do is take our photographs, we take

20   photographs of the scene, exactly as it is when we get there.

21   This shows what was there, what everything looked like before

22   we touch anything.  Then we start with our identification of

23   evidence, and then we'll place markers beside it.  And in this

24   case we used yellow evidence markers, but we ran out of those,

25   so we then used index cards that were folded into little tents

BRITTANY BURKE - DIRECT EXAMINATION

1    that we wrote on as well.  And so those would -- are then

2    marked and photographed.  And then if we're going to run a

3    FARO, which was 3-D scanner, to scan the scene, then that will

4    be run.

12:29:26PM 5        Any additional evidence is looked for and searched.  This

6    could include anything that's in walls, doors, under anything,

7    things of that nature.  And then evidence is collected and

8    packaged and sealed so it can be taken back to the lab.

12:29:45PM 9    Q.  Let me make sure I have this right.  Photograph everything

10    without any kind of placards or signs, first thing you do?

12:29:52PM11    A.  Yes, that's correct.

12:29:53PM12    Q.  And how do you do that?  Do you just walk the floor and

13    people identify what they think is relevant evidence?  What's

14    the process of locating that evidence in the room?

12:30:02PM15    A.  The process of locating the evidence in the room is by

16    conducting a search.  And the search really depends on what

17    the room -- what the room entails.  So if you're in the middle

18    of an open field, then you can do a line search, but if you're

19    in a room, say a room such as this one that has lots of rows

20    and pews, you might have to conduct your search that you can

21    look under and around more items.

12:30:31PM22        So that's how the -- we do it, we walk around and we

23    determine what the best way to search that room is.  And I

24    believe in this case we each took an area of the room to

25    search and divided it into smaller areas for us to search, and

BRITTANY BURKE - DIRECT EXAMINATION

1    then people would place their markers on the items of evidence

2    they found there.

12:30:50PM 3    Q.  So it's walk through, photograph, set placard down?

12:30:54PM 4    A.  That is correct.

12:30:55PM 5    Q.  And then is it photographed after the placard is down as

6    well?

12:30:59PM 7    A.  Yes, it is.

12:30:59PM 8    Q.  And these placards, you said you ran out, or at least had

9    to create some that aren't typical.  Are those recorded so you

10    can log evidence?  What's the point of putting a placard down?

12:31:11PM11    A.  So the point of putting a placard down, so that in a

12    photograph you can identify it, for one.  Because if I have a

13    small piece of evidence and I want to take a picture of it so

14    you can see as best as possible, that's not going to be able

15    to be able to take it from far away, you're going to have to

16    be close up.

12:31:30PM17        So for photographic purposes, and then also for our

18    sketch, because we do a sketch so that you can -- in this case

19    the -- we use letters.  So you can put an A on your sketch

20    where that item of evidence was, and then B where the next one

21    was, and that kind of helps you to keep from drawing things

22    in, that would -- people have to draw whatever the item of

23    evidence is, and to conserve space on there as well.

12:31:57PM24    Q.  And what was the, just generally speaking, the types of

25    evidence you all were locating as you walked through the crime

BRITTANY BURKE - DIRECT EXAMINATION

1    scene?

12:32:03PM 2    A.   Generally what we found were cartridge cases, bullets or

3    fired projectiles and bullet fragments.  And then magazines,

4    and then a bag and a belt.

12:32:20PM 5    Q.   Were there other personal items around there that you

6    would have attributed to victims as well?

12:32:26PM 7    A.   There were.  There were many other personal items,

8    especially in the area where the victims were located.  They

9    had items that you would expect to find with them such as

10    their bags, their purses, their Bibles, their cell phones,

11    things of that nature were also present.

12:32:45PM12    Q.   And just to go back to the process, once you put a placard

13    down and take a photo, you then pick those items up and bag

14    them?

12:32:54PM15    A.   That is correct.

12:32:55PM16    Q.   And what if you pick something up, like say there's a book

17    on the ground and you pick it up and there's something

18    underneath it, how do you deal with that?

12:33:03PM19    A.   So what we would then do is we photograph everything

20    before we pick it up, so then we would remove that, once we

21    pick up that item we would then take a photograph of the item

22    that is underneath it.  It may not have an evidence marker

23    placed next to it, but would say if it was, say a book, it

24    would be evidence found underneath name of book, so that there

25    you could identify where it came from.

BRITTANY BURKE – DIRECT EXAMINATION

12:33:32PM 1    Q.  And once all those items are collected, you said you

2    preserve them for analysis later?

12:33:38PM 3    A.  That is correct.

12:33:39PM 4    Q.  And that was your job in this case as well?

12:33:41PM 5    A.  Yes.

12:33:45PM 6    Q.  About how long did it take for you all to process the

7    church crime scene?

12:33:49PM 8    A.  I believe it took about eight or nine hours.

12:33:55PM 9    Q.  That was overnight?

12:33:57PM10    A.  Yes, that was overnight.

12:33:58PM11    Q.  And you talked about running out of placards.  Do you have

12    a general idea about how many small pieces of evidence or

13    items you collected from that crime scene?

12:34:09PM14    A.  I believe it was about 117.

12:34:15PM15    Q.  Are some of those pretty small?

12:34:17PM16    A.  Yeah, some of those are very small.  Pieces of evidence

17    can be anything from very large to a really tiny piece the

18    size of a pin head, or sometimes some evidence can even be

19    microscopic in nature.

12:34:31PM20    Q.  So I want to ask you, I want to go back a little bit and

21    talk about the exterior of the church.  You said that was the

22    first area you examined?

12:34:40PM23    A.  It was the first area that we walked around to see what

24    was present.  Yes.

12:34:54PM25    Q.  I show you Government's proposed Exhibits 26 to 36, if you

BRITTANY BURKE – DIRECT EXAMINATION

1    could look through those quickly.  Are those photographs that

2    you took?

12:35:54PM 3    A.  Yes.  Well, they were taken in our division.

12:35:58PM 4    Q.  So you would have seen that area that night?

12:36:00PM 5    A.  That is correct.

12:36:01PM 6    Q.  Do they fairly and accurately represent the way the

7    outside of the church looked on June 17?

12:36:06PM 8    A.  Photo 36 represents the inside of the church.

12:36:09PM 9    Q.  Sorry.  So 26 through 35 are the exterior?

12:36:14PM10    A.  Yes, sir.

12:36:15PM11            MR. WILLIAMS:  I show these to defense counsel.

12:36:26PM12            MS. PAAVOLA:  No objection.

12:36:27PM13            THE COURT:  Government Exhibits 26 through 35 are

14    admitted without objection.

12:36:31PM15        (Government Exhibits 26 through 35 received.)

12:36:32PM16            MR. WILLIAMS:  Thank you, Your Honor.

12:36:33PM17    BY MR. WILLIAMS:

12:36:33PM18    Q.  I'm going to put up on the screen in front of you -- Is it

19    Agent Burke?

12:36:37PM20    A.  Yes, correct.

12:36:38PM21    Q.  Agent Burke, I'm going to put up 26.  Can you explain to

22    the jury what Exhibit 26 shows?

12:36:47PM23    A.  Exhibit 26 shows the outside of the front of the church

24    building.

12:36:53PM25    Q.  Do you know what road that fronts on to?

BRITTANY BURKE – DIRECT EXAMINATION

12:36:56PM 1    A.   Calhoun Street.

12:36:57PM 2    Q.   Do you know if that front door, there's a gate there, do

3    you know if that was, or the -- there's a door up on the

4    stairs and one at the lower.  Do you know if those were open

5    or closed?

12:37:07PM 6    A.   The doors were all closed, and this gate down here at the

7    bottom was also locked.

12:37:13PM 8    Q.   And that when you say this gate, that's the one in the

9    middle of the picture?

12:37:16PM10    A.   Yeah, I'm sorry, the one in the middle of the screen.

12:37:20PM11    Q.   I'm going to go to Government's 27.  What does that show?

12:37:27PM12    A.   This shows the side view of the church.

12:37:30PM13    Q.   And if you were facing the church, is that the right side

14    of the church?

12:37:33PM15    A.   It's the right side of the church.

12:37:37PM16    Q.   Did you look at any evidence or anything of value in this

17    area or the area on 26?

12:37:43PM18    A.   No, we did not.

12:37:47PM19    Q.   I'm going to go to 28.  This is the other direction, the

20    other side of the front of the church?

12:37:55PM21    A.   That is correct.

12:37:56PM22    Q.   And again, facing it?

12:37:57PM23    A.   Yes, it's facing it from Calhoun Street just from the

24    opposite side.

12:38:01PM25    Q.   And there's like a gate there, too, and looks like a door.

BRITTANY BURKE - DIRECT EXAMINATION

1   Was that gate open when you arrived?

12:38:07PM 2   A.  Yes, it was.

12:38:08PM 3   Q.  And were there any other doors in the front that you could

4   tell were open or unlocked?

12:38:12PM 5   A.  No.  There were not.

12:38:14PM 6   Q.  And again, was there any kind of evidence you found in

7   that area or in the front of the church?

12:38:20PM 8   A.  No, there was not.

12:38:23PM 9   Q.  I'm going to go to Government's 29.  This is the side of

10   the church, the other side?

12:38:31PM11   A.  That is correct.

12:38:32PM12   Q.  And explain to the jury what this picture shows.

12:38:35PM13   A.  This picture shows the cross, and then you can see the

14   gate to the left of that cross.  That gate ends in a parking

15   lot that is on the left side of the church.

12:38:50PM16   Q.  Do you recall if there was any evidence located in -- sort

17   of that area of the parking lot?

12:38:54PM18   A.  Not in the front area that can be seen there.

12:38:57PM19   Q.  I'm going to put up Government's 30.  Can you explain to

20   the jury what that shows?

12:39:03PM21   A.  This is again the left side of the church, and that is a

22   door that enters into the fellowship hall or the church down

23   there.

12:39:13PM24   Q.  And it looks like there's two -- I'm going to say porch

25   lights or two lights there, floodlights.  Are those located

BRITTANY BURKE - DIRECT EXAMINATION

1    over doors?

12:39:23PM 2    A.   That is correct, they're located over the two side doors

3    of the church.

12:39:26PM 4    Q.   And those two side doors both lead into -- I think you

5    called it the fellowship hall?

12:39:31PM 6    A.   Yes, that is -- well, the second door leads into an

7    entryway that then leads into the fellowship hall.

12:39:38PM 8    Q.   And at least with regard to this door, was there any

9    evidence located in that area?

12:39:42PM 10    A.   No, there was not.

12:39:44PM 11    Q.   I'm going to put up 31.  Can you explain what that shows?

12:39:51PM 12    A.   This shows the second door of -- on the left side of the

13    church, the one that's furthest from Calhoun Street, as well

14    as back behind it is the parking lot behind the church.

12:40:04PM 15    Q.   I'm going to go to 32.  What does that depict?

12:40:10PM 16    A.   This is the same door that was in the last picture, it's

17    just a view looking directly at it.

12:40:16PM 18    Q.   And you testified earlier that there wasn't any evidence

19    located in the earlier exhibits.  Was there some evidence

20    located in this area?

12:40:24PM 21    A.   Yes, there was.

12:40:25PM 22    Q.   Can you explain just briefly what it was?

12:40:27PM 23    A.   Yes, there was blood located outside this door on -- you

24    can kind of see there's a yellow line and there's a step down.

25    It was up on that step, and then just on that white part below

BRITTANY BURKE - DIRECT EXAMINATION

1    that as well.

12:40:44PM 2    Q.   Do you know if any victims were transported out through

3    that area?

12:40:47PM 4    A.   Yes, EMS provided information that the victim they

5    transported was transported out this door.

12:40:56PM 6    Q.   I'm going to go to Exhibit 33.  What does that show?

12:41:00PM 7    A.   This shows the parking lot that was behind the church.

12:41:04PM 8    Q.   Was there any evidence located back there?

12:41:06PM 9    A.   No, there was not.

12:41:07PM10    Q.   34, same area, different view?

12:41:13PM11    A.   That is correct.

12:41:14PM12    Q.   And then I'm going to go to 35.  What does that show?

12:41:19PM13    A.   This is the rear of the church going back down the left --

14    I'm sorry, if you're looking at it from the street, the right

15    side of the church.

12:41:28PM16    Q.   So that scaffolding that's in the background is the same

17    scaffolding we saw from the earlier exhibits on the side of

18    the church?

12:41:34PM19    A.   That is correct, we take photographs all the way around,

20    so the first -- where you saw the scaffolding would be that

21    side of the church, and we just went all the way back around

22    until you could see the scaffolding again.

12:41:47PM23    Q.   And apart from the blood that was located outside the back

24    door, the back of the parking lot, was there any other

25    evidence you located in the parking lot or the shrubs, garbage

BRITTANY BURKE – DIRECT EXAMINATION

1    can or anything that was helpful?

12:42:00PM 2    A.  No, there was not.

12:42:10PM 3    Q.  I want to ask you a little bit about the interior of the

4    church.  You mentioned personal items that were found in the

5    church.  Were you able to look at tables and see items that

6    were on the tables where the victims were located?

12:42:23PM 7    A.  Yes, we were.

12:42:25PM 8    Q.  I'm going to show you Government's 87, 88, 89 and 90.  If

9    you look at those.  Do you recognize those photos?

12:42:56PM 10   A.  Yes, I do.

12:42:57PM 11   Q.  Are those photos of the table?

12:42:59PM 12   A.  Yes, they are.

12:43:00PM 13   Q.  Does it accurately represent what you saw that night?

12:43:02PM 14   A.  It does.

12:43:04PM 15           MR. WILLIAMS:  Show this to defense counsel, Your

16   Honor.

12:43:12PM 17           MS. PAAVOLA:  No objection.

12:43:14PM 18           THE COURT:  Government Exhibits 87 through 90 are

19   admitted without objection.

12:43:17PM 20      (Government Exhibits 87 through 90 received.)

12:43:18PM 21           MR. WILLIAMS:  Thank you, Your Honor.

12:43:18PM 22   BY MR. WILLIAMS:

12:43:19PM 23   Q.  I'm going to put up Government's 87 first.  We'll get back

24   later to sort of what magazines and things are, but were there

25   several tables, round tables in the center of the fellowship

BRITTANY BURKE – DIRECT EXAMINATION

1    hall?

12:43:34PM 2    A.  Yes, there were.

12:43:35PM 3    Q.  And is that generally where the victims were located?

12:43:38PM 4    A.  Yes, they were generally located around the area where the

5    circular tables were.

12:43:43PM 6    Q.  And in this location at 87, looks like there was a sheet,

7    an open Bible and a magazine?

12:43:50PM 8    A.  That is correct.

12:43:52PM 9    Q.  Go to Government's 88; that was another of the tables?

12:43:59PM10    A.  I'm sorry?

12:44:01PM11    Q.  That was one of the other tables?

12:44:02PM12    A.  Yes, it was.

12:44:03PM13    Q.  And again, looks like notes and Bibles and some papers on

14    the table?

12:44:08PM15    A.  That is correct.

12:44:14PM16    Q.  I'm going to go to Government's 89.  This is a third

17    table, looks like you had some personal items?

12:44:23PM18    A.  Yes, that is correct.

12:44:26PM19    Q.  And the last one is Government's 90.  That again shows one

20    of the tables to the side, and then some Bibles and things on

21    the table?

12:44:42PM22    A.  Yes, that is correct.

12:44:49PM23    Q.  So you talked about personal items that were there.  You

24    also mentioned shell casings, magazines, and what I think you

25    said were fired rounds?

BRITTANY BURKE – DIRECT EXAMINATION

12:44:58PM 1    A.  Yes, that is correct.

12:45:00PM 2    Q.  Can you explain what those things are?

12:45:02PM 3    A.  I can.  So a shell casing or a cartridge case is ejected

4    from a gun after it is fired.  It's the part that actually

5    holds a bullet that you load into the gun and then it's fired.

6    The fired projectile is the part that actually comes out of

7    the gun that is fired from the gun afterwards.

12:45:27PM 8    Q.  I'm going to show you Government's proposed 49.  Would

9    that be helpful to your explanation?

12:45:34PM10    A.  Yes, it would be.

12:45:35PM11            MR. WILLIAMS:  Show this to defense counsel.

12:45:42PM12            MS. PAAVOLA:  No objection.

12:45:43PM13            THE COURT:  Government 49 admitted without objection.

12:45:45PM14        (Government Exhibit 49 received.)

12:45:47PM15    BY MR. WILLIAMS:

12:45:49PM16    Q.  So let me make sure I have this straight.  There's a

17    firearm; is there a difference between a semiautomatic firearm

18    and a revolver?

12:45:57PM19    A.  Yes, there is.  A revolver has a cylinder and you load

20    your bullets or your cartridges into it.  And they do not

21    eject the cartridge cases once they have been fired.

12:46:10PM22    Q.  You say revolver, that's a gun like the middle part spins,

23    right?

12:46:13PM24    A.  That's correct.

12:46:14PM25    Q.  And a semiautomatic is the type that has a slide or a

BRITTANY BURKE – DIRECT EXAMINATION

1            squared top?

12:46:18PM 2    A.  Yes, that is correct.

12:46:19PM 3    Q.  And so explain the difference again about how the

4            cartridge or a casing would be ejected or automatically loaded

5            in those two different types of guns, specifically a

6            semiautomatic.

12:46:35PM 7    A.  So -- Can you repeat that?  I'm sorry.

12:46:42PM 8    Q.  Explain sort of why a casing would be ejected from a

9            semiautomatic handgun versus a revolver.

12:46:47PM10    A.  Okay.  So what happens is, is that when -- semiautomatic,

11            after it is fired, the bullet goes out of the front of the

12            gun, and there's a little pin inside the gun that takes the

13            cartridge case and tosses it out the side of it, so that the

14            next cartridge can go ahead and come into it.  Whereas a

15            revolver, it -- they stay in there and that little spinning

16            part just clicks over to the side that it doesn't eject them.

12:47:18PM17    Q.  And are the rounds loaded into magazines, or clips, as

18            they might be called?

12:47:22PM19    A.  Yes.  In a semiautomatic handgun there's a magazine that

20            has to be inserted in that contains those cartridges, so that

21            the next one can be fit into the gun when the cartridge case

22            ejects.

12:47:38PM23    Q.  Let's talk about Exhibit 49.  At least when it comes to

24            evidence collections, what are the parts of a round or a -- I

25            guess a bullet that you recover?

BRITTANY BURKE - DIRECT EXAMINATION

12:47:51PM 1    A.  The parts that we recover are the cartridge case, and then

2    the bullet itself or the fired projectile.

12:47:58PM 3    Q.  Are there components to a fired projectile?

12:48:01PM 4    A.  Depending on the type of the bullet that is used, or fired

5    projectile or cartridge that's used there, then yes, there can

6    be some -- some fired projectiles have a jacket, it's a copper

7    part that's on the outside of the lead that actually makes up

8    the bullet itself, and those can come apart if the bullet

9    strikes something.  So, therefore, you might have the jacket

10   part and then the actual lead bullet part itself.

12:48:29PM 11   Q.  So in this, in Exhibit 49 looks like there's a copper

12   colored coating over the lead.  That would be a jacketed

13   round, and in this case when it covers it, a full metal jacket

14   for the round?

12:48:43PM 15   A.  This would be a jacketed round there.

12:48:48PM 16   Q.  And so that's the copper color is the jacket and the gray

17   part is the lead, and those two are fired?

12:48:55PM 18   A.  Yes, that is correct.

12:48:56PM 19   Q.  And then the other sort of more the bigger copper part,

20   that's the casing.  Is that right?

12:49:02PM 21   A.  Yes, the bigger golden color part that extends down below

22   and around that copper, that copper colored part is the

23   cartridge case there.

12:49:13PM 24   Q.  And you find evidence of all three of those pieces, and

25   did you find evidence of all three of those parts in this

309

BRITTANY BURKE – DIRECT EXAMINATION

1    case?

12:49:22PM 2    A.  Yes, we did.

12:49:23PM 3    Q.  So you found casings, what I'm going to call the core or

4    bullet, lead, and also jackets?

12:49:29PM 5    A.  That is correct.

12:49:29PM 6    Q.  I'm going to ask you about the idea of a hollow point.

7    Does that make any difference in collecting evidence in terms

8    of how they fragment?

12:49:39PM 9    A.  It does make some difference as far as fragmentation or

10    the shape they can be in when they're found.  A hollow point

11    bullet means that the nose or the tip of it has basically a

12    hole or a hollow point in it which can cause them to deform

13    more when they are -- strike another object.

12:50:05PM 14    Q.  So what I want to ask you about next is the process of

15    going through and documenting the scene, and I think you

16    mentioned that you used a FARO scan?

12:50:16PM 17    A.  Yes, that is correct.

12:50:17PM 18    Q.  Have you reviewed that FARO scan?

12:50:19PM 19    A.  Yes, I have.

12:50:20PM 20    Q.  And Agent Tallon is the one that put that together?

12:50:26PM 21    A.  Yes, he is.

12:50:24PM 22    Q.  Does it represent the scene accurately?

12:50:26PM 23    A.  Yes, it does.

12:50:27PM 24    Q.  And are you generally familiar with how to navigate that

25    software?

310

BRITTANY BURKE – DIRECT EXAMINATION

12:50:31PM 1    A.  Yes, I am.

12:50:32PM 2    Q.  What I'm going to do is go to Government Exhibit 10, and

3    I'm going to have to mess with some software, so if you give

4    me a second.

12:50:45PM 5            THE COURT:  Mr. Williams, how long will this

6    particular portion take?

12:50:48PM 7            MR. WILLIAMS:  Probably a good time to break; it's

8    going to take awhile.

12:50:51PM 9            THE COURT:  Why don't we break for lunch and do this

10    after lunch.  We're going to break for our lunch hour, it's

11    about ten to, we'll reconvene at about ten to 2:00.

12:51:02PM12        (Jury excused.)

12:51:37PM13            THE COURT:  Very good.  We will reconvene in about an

14    hour.

12:51:45PM15        (A recess was held at this time.)

2:00:18PM16        (Jury not present.)

2:00:22PM17            THE COURT:  Yes, sir, Mr. Bruck, you have a matter

18    you need to address?

2:00:25PM19            MR. BRUCK:  Yes, sir.  In light of the colloquy this

20    morning with the Court, I find the need to confer with my

21    client after court this evening, and would, therefore, simply

22    going to ask that, if possible, the Court break earlier rather

23    than later today.  I realize it will depend on the witnesses

24    and the testimony, but we have a particular need to have some

25    time with the client.  I have a particular need to talk with

BRITTANY BURKE - DIRECT EXAMINATION

1  my client this evening, and hope that the Court would be so

2  good as to accommodate that.

2:00:57PM 3           THE COURT:  Well, why can't you speak to him after

4  court?

2:01:01PM 5           MR. BRUCK:  Well, I can, the question is we also have

6  to prepare for tomorrow, and I'm hoping --

2:01:06PM 7           THE COURT:  I understand, but there's a lot of moving

8  parts to this thing, and there are things I can't do during

9  the trial other than during trial, and there are things we can

10  do after trial, and one of them is conferring with our clients

11  and preparing witnesses.  You know, I'm not going to keep us

12  here inordinately, Mr. Bruck, I need to keep this trial

13  moving.  But I'm going to do that, but when the proper time to

14  break, we will break, and I think you should have ample time

15  with your client.

2:01:34PM16      Okay.  Let's bring the jury in.

2:02:23PM17      (Jury present.)

2:02:42PM18           THE COURT:  Government continue its direct.

2:02:45PM19           MR. WILLIAMS:  Thank you, Your Honor.

2:02:45PM20  BY MR. WILLIAMS:

2:02:49PM21  Q.  Agent Burke, I believe before the break we were talking

22  about the FARO scan, and that that was an item that Tre Tallon

23  could use to process the scene?

2:02:59PM24  A.  That is correct.

2:03:00PM25  Q.  And you're familiar with that -- those scans and the

312

BRITTANY BURKE - DIRECT EXAMINATION

1    software used?

2:03:04PM 2    A.  Yes, I am.

2:03:05PM 3    Q.  I'm going to bring up what's a derivative of Government's

4    10.  And does that look familiar to you?

2:03:22PM 5    A.  Yes, it does.

2:03:23PM 6    Q.  And I think there's three screens, right, one shows the

7    overhead, one shows individualized scans, and the other is the

8    blow-up or the active screen of the scan?

2:03:33PM 9    A.  That is correct.

2:03:34PM10    Q.  I'm going to expand the lower screen.  Could you tell the

11    jury what is depicted in this picture?

2:03:46PM12    A.  This is the outside of the church.

2:03:47PM13    Q.  And you had testified earlier through the photographs as

14    to the outside of the church, correct?

2:03:52PM15    A.  That is correct.

2:03:52PM16    Q.  Is there anything additional in these scans and the

17    outside that would be captured, that wasn't in those earlier

18    photos?

2:03:59PM19    A.  No, there is not.

2:04:00PM20    Q.  So I'm not going to go through the whole parking lot, but

21    I'm going to skip over to near the door at pin number two.

22    I'm going to toggle over, I believe you said there was some

23    blood in some items outside the door.  Is that depicted in

24    that scan?

2:04:24PM25    A.  Yes, it is.

BRITTANY BURKE - DIRECT EXAMINATION

2:04:25PM 1    Q.  Can you also explain the yellow marker on the ground

2    there?

2:04:30PM 3    A.  The yellow marker is when those yellow evidence tents that

4    I spoke about earlier, it's what we use to mark evidence.  In

5    this case they were given a letter, so that marker would have

6    a letter on it that lets us know what item of evidence that

7    is.

2:04:50PM 8    Q.  I'm going to go to pin number three.  What does this area

9    depict?

2:04:59PM10    A.  This area depicts just as you enter the door of the

11    church, turns to a little entryway that you step into there.

2:05:08PM12    Q.  I'm going to put this onto the 360 rotation.  I'm going to

13    scroll down to the floor area.  Can you tell the jury what

14    generally was located in that area?

2:06:10PM15    A.  What was located in this area was a pool of suspected

16    blood there, as well as there was a fired projectile located

17    in this area as well.  There were also numerous bullet effects

18    to the wall that were located in this area.

2:06:31PM19    Q.  Let's scroll around to the outside of the door.  I believe

20    you can just see the edge of the placard that you mentioned

21    earlier?

2:06:40PM22    A.  Yes, that is correct.

2:06:41PM23    Q.  And does that also show the blood that was located on the

24    outside of the building near the stair?

2:06:45PM25    A.  Yes, it does.

BRITTANY BURKE – DIRECT EXAMINATION

2:06:56PM 1    Q.  I'm going to go to pin number four.  What's the area?

2:07:04PM 2    A.  This is leading from the entryway into what I have been

3    calling the fellowship hall.

2:07:12PM 4    Q.  I'll do another rotation of this.

2:08:08PM 5        Now again here to the floor, what were the items that were

6    located in this area?

2:08:13PM 7    A.  In this area the black Messenger bag that you can see at

8    marker DD was located there, as well as the area there were

9    some cartridge cases located as well.

2:08:25PM 10   Q.  There's like a blue item above that pouch.  You testified

11   earlier that there were maybe medical items left behind?

2:08:32PM 12   A.  Yes, there were items that were consistent with medical

13   personnel being there.  Purple gloves are one of those items

14   we typically see left behind by persons who attempt to render

15   aid to victims.

2:08:47PM 16   Q.  Also looks like there might be some footprints running

17   through there.

2:08:51PM 18   A.  That is correct, there were some -- what appeared to be

19   possible shoe prints and suspected blood that were located

20   through that area as well.

2:09:00PM 21   Q.  I'm going to go back around to the floor area.  And is

22   that that same area of blood that you talked about earlier?

2:09:16PM 23   A.  Yes, it is the same area of blood there.

2:09:30PM 24   Q.  I'm going to go to pin five.  Is that the same general

25   location that you just testified to?

BRITTANY BURKE – DIRECT EXAMINATION

2:09:37PM 1    A.  Yes, it's the same general location, just through the door

2    frame that the other scan was placed in.

2:09:45PM 3    Q.  I'll do the rotation.  I'll scroll down to the floor in

4    this area.  This is a little bit washed out with the

5    brightness.  Does it look like there were some items in that

6    area?

2:10:42PM 7    A.  There were some items in that area.  You can see a belt

8    located in the floor, as well as evidence markers placed

9    there.

2:10:50PM10    Q.  And looks like there were evidence markers E and F on the

11    floor by this table as well?

2:10:57PM12    A.  That is correct.

2:11:02PM13    Q.  Can you tell what those items are?

2:10:59PM14    A.  Those items are cartridge cases.

2:11:09PM15    Q.  I'm going to go to pin number six.  Let me go to pin six

16    now.  Is this the main area of the sanctuary?

2:11:29PM17    A.  Yes, it is.

2:11:30PM18    Q.  Sorry, the fellowship hall.

2:11:33PM19    A.  Yes, this is the main area there that comprised most of

20    where the evidence was located in the same area.

2:11:44PM21    Q.  Earlier on you had shown four photos of round tables.  Is

22    one of those round tables directly in front of this image?

2:11:55PM23    A.  Yes, that's the front round table, and there were

24    subsequently three in a linear fashion behind it.

2:12:03PM25    Q.  I'm going to go to rotation of this image.  I'm going to

BRITTANY BURKE – DIRECT EXAMINATION

1      now scroll down to the floor, check the evidence there.  Was

2      there anything generally located in this area?

2:13:09PM 3   A.   There were the items that we could see from the previous

4      scan there with the H and I and G there.  There were also some

5      items located underneath and beside the chairs against the

6      front wall there.

2:13:26PM 7   Q.   There's a couple of items, looks like J, M and K?

2:13:30PM 8   A.   Yes, and T as well there.

2:13:52PM 9   Q.   I'm going to go now to pin number 17.  And I'm going to

10     hit the rotation on this.

2:15:08PM11       You testified earlier regarding the tables.  Are these

12     those same tables?

2:15:11PM13   A.   Yes, they are.

2:15:12PM14   Q.   You testified earlier that there was one individual who

15     had looked like they had been treated.  Is that this

16     individual at the bottom?

2:15:20PM17   A.   Yes, it is.

2:15:22PM18   Q.   Going to go to the first table.  Can you tell the jury

19     quickly sort of what -- we don't have to go through every

20     single placard, but what was this item on the table, from your

21     appearances?

2:15:36PM22   A.   The item on the table there located by the thing with all

23     the Bs on it is a magazine.

2:15:49PM24   Q.   Looking at the ground under this seat, do you know

25     generally what these items are scattered across the floor?

BRITTANY BURKE – DIRECT EXAMINATION

2:15:56PM 1    A.  There are cartridge cases there, I can see what's in the

2    front the items closest under the chair appear to be cartridge

3    cases and a magazine.  The ones located further away I can see

4    in this particular picture, but they would be -- I know they

5    are either cartridge cases or fired projectiles or fragments

6    from fired projectiles.

2:16:21PM 7    Q.  I'm going to focus.  Do you note any deformations or marks

8    to the tablecloths?

2:16:31PM 9    A.  Yes, there were what we suspect to be bullet holes that

10    were through the tablecloths, and on multiple of the tables,

11    and some of those did correspond with holes that were present

12    on the tables underneath the tablecloths as well.

2:16:49PM13    Q.  In your experience, are those consistent with gunshots or

14    gunfire going through the table?

2:16:53PM15    A.  Yes, they would be.

2:17:00PM16    Q.  There were several individuals located in this area; were

17    you able to identify who they were?

2:17:07PM18    A.  At the point in time here, we still did not have the

19    identities, that's why you see numbers on them there.  So I

20    identified them with the numbers, and then at a later point in

21    time we were able to identify them based on personal

22    belongings and descriptions of their clothing.

2:17:26PM23    Q.  Do you know who the person number four, at the time known

24    as number four, who that is?

2:17:32PM25    A.  Can I refer to my legend here?

BRITTANY BURKE - DIRECT EXAMINATION

2:17:34PM 1    Q.  Certainly.

2:17:34PM 2    A.  Victim number four would be Sharonda Singleton.

2:17:37PM 3    Q.  And victim number six in the background?

2:17:39PM 4    A.  Tywanza Sanders.

2:17:48PM 5    Q.  It looks like there were a few items sort of located

6    underneath the chairs as well, between the tables?

2:17:54PM 7    A.  Yes, there were items between the tables as well.

2:17:56PM 8    Q.  And you said those were mostly casings, projectiles or

9    fragments?

2:18:04PM10    A.  Yes, they were.

2:18:07PM11    Q.  I'm going to go to number 16.  This is that same area but

12    further back?

2:18:18PM13    A.  That is correct.

2:18:35PM14    Q.  For the record, this is pin 16, that's a rotational view.

15    And just for reference, is this area in the background of pin

16    16 that same entranceway where the pouch was located?

2:19:27PM17    A.  Yes, it is.

2:19:36PM18    Q.  Do you have a record or a note of who number one, the

19    first victim at the time at least was?

2:19:43PM20    A.  Yes, that was Clementa Pinckney.

2:19:55PM21    Q.  If you could explain, there are several placards also in

22    the background around these chairs, were those the -- we'll

23    get to it later more specific, but was that generally the same

24    type of items in that area?

2:20:07PM25    A.  Yes, all of those items are also either a magazines, a

BRITTANY BURKE – DIRECT EXAMINATION

1   cartridge case, a fired projectile or a fragment of a fired

2   projectile of some sort.

2:20:18PM 3   Q.  You said earlier they were fairly evenly spread around.

4   Is that consistent with what's seen in this image?

2:20:24PM 5   A.  Yes, there were cartridge cases, projectiles and fragments

6   all around those tables that we have been looking at, that are

7   located in the center of the room.  They were located on all

8   sides of that.

2:20:54PM 9   Q.  I'm going to go to pin number -- go to pin number 14.  Do

10   you know what area of the church this shows?

2:21:09PM11   A.  Yes, this is the area next to the four circular tables and

12   between the rows of chairs that were placed, it's towards the

13   back of that fellowship hall area looking back towards the

14   front.

2:21:23PM15   Q.  And that's Senator Pinckney on the ground in the

16   background?

2:21:27PM17   A.  Yes, that is correct.

2:21:28PM18   Q.  And these items that are in the immediate foreground, do

19   you have any idea what they are generally?

2:21:34PM20   A.  X and Y are cartridge cases, and A is a magazine.  I can

21   not see what C is, it's behind the placard.

2:21:51PM22   Q.  It looks like there's a number two here; do you know who

23   that individual was?

2:21:55PM24   A.  Yes, that individual was Cynthia Hurd.

2:22:03PM25   Q.  You talked earlier about Tywanza Sanders; he's located

BRITTANY BURKE - DIRECT EXAMINATION

1    there, is that correct?

2:22:08PM 2    A.   That is correct.

2:22:10PM 3    Q.   Do you know who number -- number eight at least at the

4    time was known as?

2:22:14PM 5    A.   Victim eight was Susie Jackson.

2:22:19PM 6    Q.   And again there's -- looks like casings on the floor?

2:22:21PM 7    A.   That is correct.

2:22:25PM 8    Q.   Same thing at the bottom of the screen, several casings

9    sort of scattered there.

2:22:29PM10    A.   Yes, that is correct.

2:22:43PM11    Q.   Go to pin 15.  And the rotational scan of pin 15.  That's

12    Senator Pinckney in the same place you identified before?

2:23:53PM13    A.   That is correct.

2:23:55PM14    Q.   Scan over, I believe you identified earlier that Miss Hurd

15    was next to placard number two?

2:24:03PM16    A.   That is correct.

2:24:04PM17    Q.   Do you know who this individual is?

2:24:06PM18    A.   That individual is Myra Thompson.

2:24:09PM19    Q.   And placard number five, do you know who that individual

20    is?

2:24:13PM21    A.   Depayne Middleton Doctor.

2:24:17PM22    Q.   You talked earlier about defects to tablecloths indicating

23    gunfire.  Were there similar defects in the tablecloth

24    depicted above Miss Hurd?

2:24:28PM25    A.   Yes, there are similar defects to the tablecloth that's

BRITTANY BURKE - DIRECT EXAMINATION

1    depicted there as well.

2:24:38PM 2    Q.  Do you have an indication from your notes who this

3    individual -- I can't see a placard -- but next to

4    Miss Jackson and Miss Depayne?

2:24:48PM 5    A.  Yes, that's Ethel Lance.

2:25:01PM 6    Q.  Then it goes back to pin 14.  You said that there were

7    casings along there; is that true at the end of the hallway as

8    well?

2:25:20PM 9    A.  I'm sorry?

2:25:21PM10    Q.  Are there also casings at the end of the walkway there as

11    well, which is D and C?

2:25:27PM12    A.  C appears to be a casing; D, I'm not certain.  I can refer

13    to my notes, if you like.  It looks like it may be a fragment.

2:25:44PM14    Q.  I'm going to go to pin number 19.  We'll do a rotational

15    scan of 19.  I'm going to ask you if you know what this item

16    might be; looks like it's a subseries of Z.

2:27:11PM17    A.  Items there represented by Z would be a magazine.

2:27:20PM18    Q.  Looking at the ground area here, this is Mr. Sanders as

19    well as Miss Jackson.

2:27:26PM20    A.  That is correct.

2:27:29PM21    Q.  Were you able to examine the tablecloth that's just above

22    Mr. Sanders?

2:27:36PM23    A.  Yes, we were able to look at that.

2:27:39PM24    Q.  What did that appear to you as a crime scene examiner?

2:27:43PM25    A.  It appears to be blood, suspected blood there on the

BRITTANY BURKE - DIRECT EXAMINATION

1    tablecloth.

2:27:47PM 2    Q.  Are you familiar with the idea of a blood transfer?

2:27:49PM 3    A.  Yes, I am.

2:27:50PM 4    Q.  What is a blood transfer?

2:27:51PM 5    A.  A blood transfer is when blood from one object -- when one

6    object has blood on it and it comes in contact with another

7    object and it leaves the blood on that object.

2:28:01PM 8    Q.  And did that appear to be a transfer, a spatter, what type

9    of pattern?

2:28:06PM10    A.  It appears that that blood was on another object prior to

11    being placed on that object.

2:28:18PM12    Q.  I'm going to go to pin 18.  Do a rotation of that.  You

13    talked earlier about damage to tablecloths, but there are also

14    items, medical items and damage in this area as well?

2:29:30PM15    A.  Yes, there were.

2:29:35PM16    Q.  Victim number five was who, again?  Miss Depayne?

2:29:39PM17    A.  Yes.

2:29:40PM18    Q.  And Myra Thompson was three?

2:29:42PM19    A.  That is correct.

2:29:48PM20    Q.  Tywanza Sanders was number six?

2:29:50PM21    A.  That is correct.

2:29:51PM22    Q.  It looks like -- Do you know what these multiple P objects

23    were?

2:29:59PM24    A.  Multiple O and P objects would be fired projectiles that

25    were located on the ground.

BRITTANY BURKE – DIRECT EXAMINATION

2:30:06PM 1  Q.  Do you see some of those defects in the tablecloth in this

2  photo as well?

2:30:12PM 3  A.  Yes, there were defects to that tablecloth as well.

2:30:24PM 4  Q.  Go to pin number 13.

2:30:32PM 5       MR. WILLIAMS:  Do a rotation, Your Honor, of pin 13.

2:31:29PM 6  Q.  I'm going to focus on the immediate foreground here.  I

7  believe you had identified a magazine sort of in the middle of

8  that area before.  What are items Y and Z?

2:31:41PM 9  A.  Those are both magazines.

2:31:53PM10  Q.  Is there an item here as well?

2:31:55PM11  A.  Yes, there is.

2:31:58PM12  Q.  And I'm going to zoom in on the chair that's immediately

13  in front.  Do you know what that item was as well?

2:32:06PM14  A.  That item was also a magazine.

2:32:34PM15  Q.  Then go to pin number 12, I'll do a rotational view of 12.

16  This just shows the back corner of the fellowship hall?

2:33:51PM17  A.  That is correct.

2:33:54PM18  Q.  Go to pin number 11.  And the ground here, I think you

19  testified earlier there were several pieces of items of

20  evidence on the ground as well?

2:34:08PM21  A.  Yes, there were.

2:34:16PM22  Q.  Go to pin ten.  This is similar, there are several items

23  located underneath the chairs?

2:34:29PM24  A.  Correct, there were items located underneath the chairs

25  throughout the area.

BRITTANY BURKE – DIRECT EXAMINATION

2:34:38PM 1   Q.  Go to pin nine.  This is back towards the area where we

2            started with the FARO scan, meaning the area just inside the

3            door where Mr. Simmons and Mr. Pinckney were located, is that

4            correct?

2:34:56PM 5   A.  That is correct.

2:35:05PM 6   Q.  I'm going to go to eight.  This is that same area, just a

7            few steps further?

2:35:14PM 8   A.  Correct.  It is.

2:35:31PM 9   Q.  So does that cover the majority of the FARO scans in that

10           room?

2:35:37PM11   A.  Yes, it covered the majority of them.

2:35:40PM12   Q.  Okay.  Is there anything that you can think of that wasn't

13           captured in there, apart from details?

2:35:45PM14   A.  No, there was not.

2:35:50PM15         MR. WILLIAMS:  Your Honor, if I can have a second,

16           I'm going to save this as the exhibit.

2:35:53PM17   BY MR. WILLIAMS:

2:36:20PM18   Q.  I'm going to give you what's been marked as Government's

19           proposed Exhibit 48.  Do you recognize that item?

2:36:33PM20   A.  Yes, I do.

2:36:34PM21   Q.  Can you tell me what it is?

2:36:36PM22   A.  It is a sketch that I created of what we observed while

23           processing the crime scene that night.

2:36:43PM24   Q.  Did you put this sketch together yourself?

2:36:45PM25   A.  Yes, I did.

325

BRITTANY BURKE – DIRECT EXAMINATION

2:36:45PM 1    Q.  Does it list all those items that you were talking about

2    that were scattered through the crime scene?

2:36:52PM 3    A.  Yes, it depicts them, and it has -- first page depicts

4    them, then the next two pages are a legend that told what each

5    marker represents.

2:37:01PM 6              MR. WILLIAMS:  I show this to defense counsel, Your

7    Honor.

2:37:06PM 8              MS. PAAVOLA:  No objection.

2:37:07PM 9              THE COURT:  Very good.  Government 48 admitted

10    without objection.

2:37:10PM11       (Government Exhibit 48 received.)

2:37:10PM12    BY MR. WILLIAMS:

2:37:10PM13    Q.  I'm going to put up the first page of Government's 48.

14    Explain, if you can, to the jury, first of all, why there's

15    five different colors.

2:37:20PM16    A.  So there was a lot of evidence in various -- or relatively

17    small room, and in order to fit all of them on the page, all

18    of the evidence was labeled from A -- I went through the

19    alphabet one time, two times, three times, up to five letters

20    of the alphabet.  So I go from 1A through to 5N.  And I didn't

21    have enough room to put five Ns in a little square on there,

22    so if you look down in the bottom right corner you see a

23    legend there, and all the markers in green are 1A through 1Z.

24    All the markers in blue are going to be 2A through 2Z, purple

25    is threes, pink is fours and fives are orange.  And that was

BRITTANY BURKE - DIRECT EXAMINATION

1    the best way I could come up with to differentiate which item

2    of evidence was which one on there.  And that's why you see so

3    many different colors on the sketch.

2:38:21PM 4    Q.  So it's not like all the green ones are bullet casings,

5    all the blue ones are fragments?

2:38:27PM 6    A.  No, it's just to denote which series of the alphabet that

7    they were in, and then the letter that's represented inside

8    the square corresponds to that letter.

2:38:39PM 9    Q.  And effectively it would be too hard to put five As on

10    this diagram.

2:38:43PM 11   A.  Correct.

2:38:45PM 12   Q.  So looking at that diagram, there's also what you have as

13    suspected bullet defects.  What does that mean?

2:38:55PM 14   A.  So that is the spot -- if you look, they're going to be in

15    the walls of the church, there are all those little red dots,

16    you can see some up in the area that say entry hall and church

17    office, there's also some down near the area of the vestibule

18    and the kitchen area.  Those are areas where we found a hole

19    in the wall that we believe that a bullet passed through the

20    wall and either entered the wall or passed completely through

21    there.  And that's what those are representing.

2:39:29PM 22   Q.  Approximately how many different bullets did you recall

23    seeing through the walls?

2:39:33PM 24   A.  Through the walls?

2:39:35PM 25   Q.  Correct.  Approximately; doesn't have to be exact number.

BRITTANY BURKE – DIRECT EXAMINATION

2:39:41PM 1   A.   About ten.   There were more holes than that, but I believe

2   there were about ten that we could match, because you might

3   have a hole on one side of the wall and then a hole on the

4   other side of the wall, and those correspond to one bullet

5   versus one hole on one side of the wall, and then none on the

6   other would correspond to a second bullet.

2:40:02PM 7   Q.   Was there a round that you think exited the building?

2:40:05PM 8   A.   We found a defect over in the entry hall that it would be

9   possible that the bullet did exit the building into the back

10   parking lot area.

2:40:17PM 11   Q.   I'm going to show you Government's proposed 36 and 38.   If

12   you can take a look at those.   Are those pictures that were

13   taken that night?

2:40:43PM 14   A.   Yes, they are.

2:40:52PM 15        MR. WILLIAMS:   I show them to defense counsel.

2:40:56PM 16        MS. PAAVOLA:   Your Honor, subject to our earlier

17   objection to 36, which was overruled, we have nothing further.

2:41:01PM 18        THE COURT:   Very good.   Government 36 and 38 are

19   admitted; 36 over the objections of defense.

2:41:08PM 20        (Government Exhibits 36 and 38 received.)

2:41:08PM 21   BY MR. WILLIAMS:

2:41:08PM 22   Q.   I'm going to put up Government's Exhibit 36 first.   Can

23   you explain what that shows?

2:41:15PM 24   A.   This is a picture standing from that front side of what we

25   have been calling the fellowship hall, looking back into the

BRITTANY BURKE - DIRECT EXAMINATION

1    entryway by the front door there, and it shows -- it shows --

2    you can see the black 511 bag up here towards the bottom of

3    the picture, and up at the top of the picture is that entryway

4    where you can see that suspected blood was located there.

2:41:50PM 5    Q.  I hand you Government proposed 37; can you look at that?

2:41:54PM 6    A.  I can.

2:42:09PM 7    Q.  First of all, there's tape on there; is that consistent

8    with evidence collection?

2:42:14PM 9    A.  Yes, it is consistent with evidence collection, it is

10    consistent with me having originally packaged the item, which

11    I can see from the side that has not been cut and has my

12    original tape on it.  And then as it was sent for processing

13    in the lab, any other further departments or anybody else that

14    opened it after me would cut through one side of it, and then

15    place tape across the top of it afterwards and put their

16    initials on it where they sealed it after they had opened it.

2:42:44PM17    Q.  You said several items had gone for processing within

18    SLED.  Is that consistent with that processing?

2:42:48PM19    A.  Yes, it is.

2:42:54PM20    Q.  Can you just say if you recognize it before you --

2:42:58PM21    A.  Yes.

2:42:58PM22    Q.  Do you recognize it?

2:42:59PM23    A.  I do.

2:43:02PM24    Q.  Show it to defense counsel.

2:43:06PM25        MS. PAAVOLA:  No objection, Your Honor.

BRITTANY BURKE - DIRECT EXAMINATION

2:43:06PM 1          THE COURT:  Very good.  Government 37 is admitted

2          without objection.

2:43:09PM 3          (Government Exhibit 37 received.)

2:43:09PM 4    BY MR. WILLIAMS:

2:43:10PM 5    Q.  So this item 37 has also some lettering and numbering on

6          it?

2:43:15PM 7    A.  Yes, it does.

2:43:16PM 8    Q.  Where does that come from?

2:43:17PM 9    A.  I believe that was on there, so that would have come from

10          processing that occurred after it had been submitted to the

11          lab.

2:43:26PM 12    Q.  This was the 36 and 37, the picture and then the item that

13          was located, the pouch that was on the floor, you called it

14          the bag?

2:43:34PM 15    A.  Yes, that is correct.

2:43:39PM 16    Q.  I'm going to show you Government 39 as well.  Do you

17          recognize that, too?

2:44:01PM 18    A.  Yes, I do.

2:44:02PM 19    Q.  What is it?

2:44:02PM 20    A.  It is a brown belt that we collected from the scene.

2:44:11PM 21          MR. WILLIAMS:  Your Honor, I'll move to admit

22          Government 39 as well.

2:44:15PM 23          MS. PAAVOLA:  No objection.

2:44:16PM 24          THE COURT:  Government 39 admitted without objection.

2:44:17PM 25          (Government Exhibit 39 received.)

BRITTANY BURKE - DIRECT EXAMINATION

2:44:17PM 1  BY MR. WILLIAMS:

2:44:18PM 2  Q.  I'm going to put up Government's 38 on the screen.  So 38

3  was located on the floor and then packaged as well?

2:44:43PM 4  A.  That is correct.

2:44:44PM 5  Q.  So the belt, and the we call it the tactical pouch, were

6  they located next to each other?

2:44:54PM 7  A.  They were located a short distance from each other.  The

8  belt was located right here, as you can see in this picture

9  that door frame leads into that little entry area where the

10  bag was located.  Just right clear through the doors.

2:45:15PM 11  Q.  Apart from those two physical items, were there any other

12  sort of clothing items that were located that you seized that

13  you recall from this crime scene?

2:45:25PM 14  A.  No, there were not.

2:45:26PM 15  Q.  So I want to ask you now about some of those smaller

16  items.  You described earlier that there were casings sort of

17  around the room.  Let me go back to the color chart.  I don't

18  want to go through where each one of those casings was

19  located, but did you have a chance to total up the number of

20  casings that were located in this scene or on the crime scene?

2:45:57PM 21  A.  There were 74 that were collected from the scene.

2:46:02PM 22  Q.  And each one of those represent a fired shot?

2:46:05PM 23  A.  Yes, that is correct.

2:46:21PM 24  Q.  I show you Government's Exhibit 50, 51, and 52.

2:46:30PM 25          THE COURT:  50, 51 and 52?

331

BRITTANY BURKE – DIRECT EXAMINATION

2:46:32PM 1          MR. WILLIAMS:  Yes, Your Honor.

2:46:44PM 2   Q.  Are those photos that you were involved with taking?

2:46:46PM 3   A.  Yes, they are.

2:46:49PM 4          MR. WILLIAMS:  I'm going to show this to defense

       5   counsel.

2:47:01PM 6          MS. PAAVOLA:  No objection.

2:47:02PM 7          THE COURT:  Government 50, 51 and 52 are admitted

       8   without objection.

2:47:06PM 9      (Government Exhibits 50, 51 and 52 received.)

2:47:06PM10   BY MR. WILLIAMS:

2:47:06PM11   Q.  I'm going to put up Government's Exhibit 51.  You had

      12   testified earlier during the FARO, that there were some

      13   casings found up near the door area.  Are those the casings

      14   you were talking about?

2:47:19PM15   A.  Yes, they are.

2:47:27PM16   Q.  And are those representative of the rest of the casings of

      17   all the 74, so to speak?

2:47:34PM18   A.  Yes, they were representative of all of them.

2:47:36PM19   Q.  I'm going to show you Government's proposed 53 and 54.

      20   What are those two items?

2:47:54PM21   A.  These are the cartridge cases that we collected from

      22   markers E and F that are depicted in the picture.

2:48:01PM23          MR. WILLIAMS:  I show these to defense counsel.

2:48:03PM24          MS. PAAVOLA:  No objection.

2:48:04PM25          THE COURT:  Exhibits 53 and 54 are admitted without

BRITTANY BURKE – DIRECT EXAMINATION

1    objection.

2:48:07PM 2         (Government Exhibits 53 and 54 received.)

2:48:08PM 3    Q.  I'm going to ask you about do you know what a head stamp

4    is?

2:48:13PM 5    A.  Yes.

2:48:13PM 6    Q.  What is a head stamp?

2:48:14PM 7    A.  A head stamp is what is stamped into the bottom of a

8    cartridge case.  It typically tells about the caliber and the

9    manufacturer of that particular ammunition.

2:48:28PM10    Q.  What was the head stamp on these, if you can tell?

2:48:31PM11    A.  Let me see them.  They are Winchester 45 auto, is what the

12    head stamp reads.

2:48:40PM13    Q.  Do you recall if they were all the same?

2:48:41PM14    A.  Yes, they were all the same head stamp.

2:49:02PM15    Q.  I'm going to show you Government's 55.  Are you familiar

16    with that?

2:49:16PM17    A.  Yes, I am.

2:49:19PM18    Q.  Is that something you assembled?

2:49:21PM19    A.  Yes, it's got the date and my initials here across the

20    top, it's something I helped assemble.

2:49:26PM21    Q.  So you put all of those into that one bag.

2:49:28PM22    A.  Yes, I did.

2:49:29PM23    Q.  You looked at all those items individually?

2:49:31PM24    A.  Yes.

2:49:31PM25    Q.  And so what are they?

BRITTANY BURKE – DIRECT EXAMINATION

2:49:32PM 1    A.  These are the rest of the cartridge cases that were

2    collected from the scene.

2:49:38PM 3    Q.  That would be 72 of them?

2:49:51PM 4    A.  That is correct.

2:49:46PM 5    Q.  Show this to defense counsel.

2:49:50PM 6          MS. PAAVOLA:  No objection.

2:49:50PM 7          THE COURT:  Government 55 admitted without objection.

2:49:52PM 8    (Government Exhibit 55 received.)

2:49:52PM 9    BY MR. WILLIAMS:

2:49:54PM 10   Q.  And that bag was sealed and had your initials on it?

2:49:56PM 11   A.  That is correct.

2:50:08PM 12   Q.  So is that, between those three exhibits, the larger bag

13   and the two smaller bags, that is all of the shell casings

14   that were recovered on the scene?

2:50:17PM 15   A.  Yes, it is.

2:50:18PM 16   Q.  And that was 74 total?

2:50:20PM 17   A.  Yes.

2:50:28PM 18   Q.  You talked a little bit earlier about magazines, and we

19   saw some of these in the FARO scans.  How many magazines total

20   were recovered at the crime scene?

2:50:39PM 21   A.  There were seven total recovered.

2:50:42PM 22   Q.  And I don't want to get too far ahead, but there was a

23   later time where you also searched the defendant's car?

2:50:48PM 24   A.  That is correct.

2:50:48PM 25   Q.  Was there a magazine located there as well?

BRITTANY BURKE - DIRECT EXAMINATION

2:50:51PM 1    A.  Yes, there was.

2:50:51PM 2    Q.  So there were seven magazines located at the crime scene.

2:50:55PM 3    A.  That is correct.

2:51:02PM 4    Q.  I want to ask you briefly about the number of rounds a

5    magazine can hold.  Are there different capacities for

6    magazines?

2:51:10PM 7    A.  There are.  Different guns are different sizes.

8    Therefore, the magazine that goes in them is a different size,

9    and depending on what type of gun it is and what type of

10    magazine, whether it's a magazine that came with the gun or

11    whether they purchased afterwards, can determine how many

12    different cartridges or how many cartridges can go in a gun.

2:51:33PM 13    Q.  What was the capacity for the magazines you located in

14    this case?

2:51:36PM 15    A.  They held 13 cartridges each.

2:51:40PM 16    Q.  I'm going to hand you Government's 40 to 46.  Take a look

17    at that, let me know if you recognize it.

2:52:00PM 18    A.  Yes, I do.

2:52:02PM 19    Q.  What are they?

2:52:02PM 20    A.  These are the magazines that were collected on scene.

2:52:05PM 21    Q.  And you collected those yourself?

2:52:07PM 22    A.  Yes.

2:52:09PM 23         MR. WILLIAMS:  I'm going to show these to defense

24    counsel.

2:52:29PM 25         MS. PAAVOLA:  No objection.

BRITTANY BURKE - DIRECT EXAMINATION

2:52:30PM  1        THE COURT:  Government 40 and 46 admitted without

        2   objection.

2:52:34PM  3      (Government Exhibits 40 and 46 received.)

2:52:34PM  4   BY MR. WILLIAMS:

2:52:34PM  5   Q.  Let me go back to your diagram.  Do you have a record of

        6   which items on this screen were magazines?

2:52:48PM  7   A.  Yes, I do.  It's going to be items marker AA, which is

        8   going to be the blue A that is located -- yes, it's kind of --

        9   in between these two green X and Y there.

2:53:13PM 10   Q.  What color?

2:53:14PM 11   A.  It's the blue A located between the green X and Y.

2:53:20PM 12   Q.  Can you write on that screen, do you know?  Try to.

2:53:25PM 13   A.  I do not know.

2:53:33PM 14   Q.  So can you explain where it is on this screen again?

2:53:36PM 15   A.  Yeah, it's kind of to the top of the screen, it's a blue A

        16   located between a green X and Y on the third line that

        17   represents right there.

2:53:54PM 18   Q.  And what number, what letter was that again?

2:53:57PM 19   A.  That was AA.

2:54:02PM 20   Q.  Where was the next one located?

2:54:04PM 21   A.  The next one was located at YY, which is going to be next

        22   to the table located closest to the center in the bottom

        23   portion, the table that's located or positioned vertically on

        24   the page.

2:54:22PM 25   Q.  Where was the third one?

BRITTANY BURKE - DIRECT EXAMINATION

2:54:23PM 1   A.   The blue -- the blue Z, which was ZZ that is located there

2           next to YY.

2:54:32PM 3   Q.   Those were the same area?

2:54:33PM 4   A.   Yes, they were.

2:54:34PM 5   Q.   And the next one?

2:54:35PM 6   A.   Next one was triple AAA, which is going to be a purple A

7           that was located near the table on the back wall near the

8           kitchen.

2:54:49PM 9   Q.   That was what was behind close to the wall in the back?

2:54:52PM10   A.   That's correct.

2:54:53PM11   Q.   And the next one?

2:54:55PM12   A.   The next one is going to be marker BBBB, which is the one

13           that's on the front round table.

2:55:08PM14   Q.   There was another one located near that as well, is that

15           correct?

2:55:11PM16   A.   There was.  I'm sorry, I skipped one, marker XXX.

2:55:18PM17   Q.   So two in that same area, one on the table and one on the

18           ground?

2:55:23PM19   A.   Yes, and it's the purple X, it's W through X, right there,

20           because all three of them -- W and X were right next to each

21           other there.

2:55:33PM22   Q.   I'm going to ask you about the BBBB, is that the one that

23           was sitting on the table?

2:55:40PM24   A.   That is correct.

2:55:40PM25   Q.   Was there anything particular about that one?

BRITTANY BURKE – DIRECT EXAMINATION

2:55:43PM 1   A.  Yes, that magazine still had cartridges left inside of it.

2:55:47PM 2   Q.  I'm going to hand you Government's 40.  Are those live

3   rounds still in that exhibit?

2:55:53PM 4   A.  Yes, they are.

2:55:55PM 5   Q.  So the magazine that was on the table had how many rounds

6   still remaining in it?

2:56:01PM 7   A.  It still had four rounds remaining in it.

2:56:04PM 8   Q.  Those are the four rounds with the magazine?

2:56:06PM 9   A.  That is correct.

2:56:07PM10   Q.  Did any of the other magazines have any rounds in them?

2:56:11PM11   A.  No, they did not.

2:56:14PM12   Q.  So you recovered 74 casings, correct?

2:56:18PM13   A.  That is correct.

2:56:19PM14   Q.  And then four live rounds?

2:56:21PM15   A.  Yes.

2:56:28PM16   Q.  And does that cover all of the magazines?  Is there one

17   more?

2:56:33PM18   A.  There was one more that is going to be NNNN, which is the

19   one that's located in the chair, it's a pink N located in the

20   chair at the end of the long table.  On the right side of the

21   room.

2:56:48PM22   Q.  So you've seen the FARO evidence.  Were the magazines all

23   located in the area outside from where the victims were

24   primarily located?

2:57:02PM25   A.  They were all located on the outside of where they were

BRITTANY BURKE – DIRECT EXAMINATION

1    primarily located, yes.  With the exception of the one that

2    was located on top of the actual table.

2:57:13PM 3   Q.  And was there fairly consistently located around the room,

4    meaning sort of evenly spaced throughout the room instead of

5    all in one location?

2:57:22PM 6   A.  There were two located towards the back, if you're looking

7    at the diagram, towards the back left, two towards the back

8    right and two towards the front right there.

2:57:39PM 9   Q.  I want to ask you next about projectiles.  Are those also

10    depicted on this?

2:57:46PM11   A.  Yes, they are depicted on this as well.

2:57:49PM12   Q.  Do you know approximately how many projectiles were

13    located on the scene itself?

2:57:53PM14   A.  On the scene itself there were approximately 22

15    projectiles located.

2:58:05PM16   Q.  I want to ask you about the term projectile.  We talked

17    earlier about jackets and sort of lead cores, does that mean

18    both, or something separates them, what's that mean?

2:58:18PM19   A.  When I use the term fired projectile, it can refer to

20    either a jacket or the lead core.  I label them as a fired

21    projectile, which means it's something that was fired from the

22    gun.  And then I turn them over to a firearms examiner and let

23    them determine what component of that fired projectile they

24    are.

2:58:35PM25   Q.  So could one bullet end up being more than one projectile?

BRITTANY BURKE - DIRECT EXAMINATION

2:58:38PM 1   A.  Yes, it could.  It could hit in the core, which would

2   separate, then technically they could both be labeled a fired

3   projectile, especially if they separated and ended up in

4   different areas of the room, they could be labeled a fired

5   projectile and not be associated with one another there.

2:58:56PM 6   Q.  I'm going to show you Government's 56 and 57.  Do you

7   recognize those?

2:59:13PM 8   A.  Yes, I do.

2:59:15PM 9          MR. WILLIAMS:  Show these to defense counsel.

2:59:23PM10          MS. PAAVOLA:  Subject to our prior objection, we have

11   nothing further.

2:59:26PM12          THE COURT:  Government 56 and 57 are admitted.

2:59:29PM13      (Government Exhibits 56 and 57 received.)

2:59:29PM14   BY MR. WILLIAMS:

2:59:29PM15   Q.  I'm going to go to 56.  Was this the area just inside that

16   doorway?

2:59:36PM17   A.  Yes, this is the area just inside as the doorway -- as you

18   exit from outside the church into the entryway.

2:59:45PM19   Q.  And what is item B?

2:59:46PM20   A.  Item B is a fired projectile.

2:59:50PM21          MR. WILLIAMS:  Miss Baker, can you focus on B?

2:59:54PM22   Q.  Was that item seized from the scene as well?

2:59:57PM23   A.  Yes, it was.

2:59:58PM24   Q.  Approximately you said there was 22 total.

3:00:01PM25   A.  That is correct.

BRITTANY BURKE - DIRECT EXAMINATION

3:00:05PM 1    Q.  I'm going to show you 59 and 59A.  Do you recognize those?

3:00:16PM 2    A.  Yes, I do.

3:00:17PM 3    Q.  What are they?

3:00:18PM 4    A.  These are fired projectiles that were collected from the

5    scene.

3:00:22PM 6    Q.  And similar to the casings, did you bag those up so we

7    didn't have to go through them one at a time?

3:00:32PM 8    A.  Yes, I did.

3:00:28PM 9    Q.  So these are the projectiles from the scene?

3:00:31PM10    A.  Yes, that is correct.

3:00:32PM11    Q.  Those have your initials on them?

3:00:33PM12    A.  Yes, they do.

3:00:36PM13           MR. WILLIAMS:  Show this to defense counsel.

3:00:38PM14           THE COURT:  They are 59 and 59A?

3:00:40PM15           MR. WILLIAMS:  Yes, Your Honor.

3:00:49PM16           MS. PAAVOLA:  No objection.

3:00:50PM17           THE COURT:  Government 59 and 59A admitted without

18    objection.

3:00:53PM19       (Government Exhibits 59 and 59A received.)

3:00:53PM20    BY MR. WILLIAMS:

3:01:01PM21    Q.  I'm going to show you Government's 58 as well.  Do you

22    recognize that?

3:01:10PM23    A.  Yes, I do.

3:01:11PM24    Q.  What is it?

3:01:12PM25    A.  It is the fired projectile that is depicted on the screen

BRITTANY BURKE – DIRECT EXAMINATION

1    there that's collected from marker B.

3:01:21PM 2    Q.  Is this typical of the other items, the other items in 59

3    and 59A?

3:01:28PM 4    A.  Yes, it is.

3:01:48PM 5    Q.  I'm going to zoom in on that.  Is that the same fired

6    projectile that was located on the scene?

3:02:01PM 7    A.  Yes, it is.

3:02:03PM 8    Q.  Is that fairly typical of how a round looks when it

9    fragments or mushrooms?

3:02:09PM10    A.  It depends on what the projectile has hit.  If it hits a

11    harder surface, then it may be more deformed.  Or it may

12    fragment more if it hits a softer surface, it does less damage

13    to it.  But that is a good example as to what a bullet can

14    look like after it has been fired.

3:02:28PM15    Q.  You had said that 22 rounds were located in the church.

16    Were fired rounds located from another location?  Collected

17    from another location?

3:02:41PM18    A.  Not -- no, I did not, not by me there were not.

3:02:50PM19    Q.  So you supervised collecting them?

3:02:53PM20    A.  From my location inside the church.

3:02:56PM21    Q.  From autopsy?

3:02:57PM22    A.  Yes.

3:02:59PM23    Q.  Explain how that happens, how are items collected from the

24    medical examiner or from autopsy?

3:03:08PM25    A.  So when a body is sent to be autopsied, the medical

BRITTANY BURKE - DIRECT EXAMINATION

1    examiner collects any fired projectiles that may be present or

2    that they may find.  She will or he will then sign a chain of

3    custody form and hand them to an agent.  If the agent whose

4    case it is, in this case me, is not present, then another one

5    of our agents will go, and then they will then turn them over

6    to me via a chain of custody form.  But that is all documented

7    through the signing of a form as well.  But it's just all the

8    agent that goes to the autopsy does is pick them up, they've

9    already been sealed by the medical examiner, and transport

10   them back to the lab.

3:03:48PM 11   Q.  Were those brought to you?

3:03:50PM 12   A.  Yes, they would have been brought back to me at the lab.

3:03:53PM 13   Q.  And how many rounds, if any, were recovered from the

14   autopsy in total?

3:03:59PM 15   A.  Fifty-four.

3:04:02PM 16   Q.  So 22 on the scene, 54 from the autopsy?

3:04:05PM 17   A.  That is correct.

3:04:08PM 18   Q.  Show you Government's 98.  Do you recognize that?

3:04:13PM 19   A.  Yes, I do.

3:04:14PM 20   Q.  What is it?

3:04:15PM 21   A.  These are the projectiles that were collected from the

22   autopsies of the victims.

3:04:20PM 23   Q.  Do you know how many were collected from the victims?

3:04:23PM 24   A.  If I can refresh my notes, I can tell you.

3:04:26PM 25            MR. WILLIAMS:  Let me first show this to defense

343

BRITTANY BURKE – DIRECT EXAMINATION

1  counsel.

3:04:41PM 2          MS. PAAVOLA:  No objection.

3:04:42PM 3          THE COURT:  Let me just make sure -- What number is

4  that?

3:04:45PM 5          MR. WILLIAMS:  98, Your Honor.

3:04:47PM 6          THE COURT:  That's 98.  And that's admitted without

7  objection.

3:04:51PM 8      (Government Exhibit 98 received.)

3:04:51PM 9          THE COURT:  Was 58 put in?  I think you put it on the

10  ELMO, I wasn't sure.

3:04:59PM 11          MR. WILLIAMS:  If I hadn't, Your Honor, I apologize.

12  Is there an objection?

3:05:03PM 13          MS. PAAVOLA:  No, Your Honor.

3:05:04PM 14          THE COURT:  58 is admitted without objection.

3:05:07PM 15      (Government Exhibit 58 received.)

3:05:08PM 16  BY MR. WILLIAMS:

3:05:08PM 17  Q.  So 98 is the -- all of the rounds that were recovered from

18  the autopsy?

3:05:12PM 19  A.  That is correct.

3:05:13PM 20  Q.  Do you have an idea of how many came from each victim?

3:05:16PM 21  A.  If I may refer to my notes.

3:05:17PM 22  Q.  Go ahead.

3:05:35PM 23  A.  There were four collected from Daniel Simmons, there were

24  five collected from Sharonda Singleton, there were three

25  collected from Pinckney, there were eight from Middleton

BRITTANY BURKE – DIRECT EXAMINATION

1    Doctor, there were six from Hurd, and 11 –– what the medical

2    examiner described as 11 bullets, two jackets and multiple

3    fragments from Jackson.  From Sanders there were four, from

4    Lance there were seven and from Thompson there were eight.

3:06:35PM 5    Q.  I want to ask you about you testified earlier about

6    collecting items after something is moved.  Were any –– is

7    there any evidence collected from underneath victims?

3:06:46PM 8    A.  Yes, there was –– upon moving the victims, there was

9    cartridge cases, fired projectiles and fragments located in

10    their clothing or hair or underneath them, and then at that

11    point in time that was collected.

3:07:01PM 12    Q.  Do you know approximating how many projectiles were

13    located underneath people?

3:07:06PM 14    A.  There were, I believe, six projectiles that were collected

15    upon moving people.  And those would have been found either on

16    their clothing, in their hair or underneath them at that

17    point.

3:07:22PM 18    Q.  And is that part of the 22 that you testified to earlier?

3:07:25PM 19    A.  Yes, it is.

3:07:28PM 20    Q.  I want to ask you finally about fragments.  I think you

21    testified about magazines, fired rounds, and now a little bit

22    about fragments.  Can you explain what those are again?

3:07:41PM 23    A.  When a bullet is fired, if it hits something, especially

24    if it hits something hard, then pieces of it can break off,

25    because that core is made of lead, and the outer –– the jacket

BRITTANY BURKE - DIRECT EXAMINATION

1  can be made of -- is made of copper, and parts of that can

2  break off and leave fragments of a bullet behind.  And those

3  pieces can range from a piece that's the size of the length of

4  the bullet to a little bitty tiny piece as well.  So those are

5  what I mean when I say fragments, just pieces of bullet that's

6  broken off when it's hit something.

3:08:20PM 7  Q.  I'm going to show you Government's 60, 61 and 62.  If you

8  would look at those items.  Do you recognize those?

3:08:50PM 9  A.  I do.

3:08:51PM10  Q.  And let's go over 60 first, that's the photograph?

3:08:54PM11  A.  Yes, it is.

3:08:55PM12  Q.  And does that show one of the items you collected?

3:08:58PM13  A.  Yes, a photograph of a fragment that was from one of the

14  markers on scene.

3:09:03PM15  Q.  And is 61 the physical item, that actual fragment?

3:09:08PM16  A.  Yeah, 61 is the actual fragment that is presented in the

17  photograph.

3:09:13PM18  Q.  What is 62?

3:09:14PM19  A.  It is the rest of the fragments that were collected from

20  the scene.

3:09:16PM21         MR. WILLIAMS:  I show these to defense counsel.

3:09:26PM22         MS. PAAVOLA:  Your Honor, subject to our earlier

23  objections to 60, otherwise we have nothing further.

3:09:32PM24         THE COURT:  Government 60 to 62 are admitted.

3:09:34PM25    (Government Exhibits 60, 61 and 62 received.)

BRITTANY BURKE - DIRECT EXAMINATION

3:09:36PM 1          MR. WILLIAMS:  Thank you.

3:09:36PM 2    BY MR. WILLIAMS:

3:09:37PM 3    Q.  I'm going to put 60 up, if I could get the computer.  And

4    so that QQQQ, is that the fragment that has the number 61?

3:09:54PM 5    A.  Yes, the little copper reflective item there is the

6    fragment, and it's what's represented on -- it's

7    representative of item 61.

3:10:06PM 8    Q.  How small of a size item are you capable of collecting,

9    given the size of that item?

3:10:12PM10    A.  We can collect them as small as we can see them.  They can

11    be tiny.  If you think about anything that you can break and

12    it shatters, it can be the same type concept, and they can be

13    itty bitty pieces, as you see in that picture.

3:10:34PM14    Q.  Did you collect, did you find items sort of smaller than

15    that that you did not collect because of their sort of value?

3:10:39PM16    A.  We did see some pieces that we believed to be fragments

17    that were about the size of a pin head, and they forensically

18    can not do anything, we can not determine anything from them.

19    So due to the -- especially due to the amount of evidence that

20    we already were collecting and had there, and those having no

21    significant value or no forensic value actually, they were not

22    collected on scene.

3:11:11PM23    Q.  I'm going to show you -- Let me ask you this first.  Does

24    that effectively cover the items that were located on the

25    floor of the magazines, the fired rounds, the casings and the

BRITTANY BURKE - DIRECT EXAMINATION

1          fragments?

3:11:22PM 2    A.   Yes, it does.

3:11:23PM 3    Q.   And obviously the two physical items, the belt and the

4          pouch?

3:11:27PM 5    A.   Yes.

3:11:28PM 6    Q.   I'm going to show you now Government's 63, 64, 73, 74, 75,

7          76.  Would you look at those?

3:11:44PM 8    A.   Okay.

3:12:07PM 9    Q.   Are those all photos from the scene?

3:12:09PM10    A.   Yes, they are.

3:12:09PM11    Q.   Do they accurately depict the way they appeared?

3:12:13PM12    A.   Yes, they do.

3:12:14PM13           MR. WILLIAMS:  I show those to defense counsel, Your

14         Honor.

3:12:16PM15           MS. PAAVOLA:  No objection, Your Honor.

3:12:18PM16           THE COURT:  Government's 63, 64, 73, 74, 75 and 76

17         admitted without objection.

3:12:19PM18        (Government Exhibits 63, 64, 73, 74, 75 and 76 received.)

3:12:19PM19    BY MR. WILLIAMS:

3:12:20PM20    Q.   You testified earlier about rounds that hit walls or hit a

21         ceiling.  I don't want to go through all of those; I believe

22         you said you marked them on 48 with red marks?

3:12:32PM23    A.   That is correct.

3:12:34PM24    Q.   But as an example, I'm going to go to Government's 63.

25         Does that show a ceiling defect or a round that hit the

BRITTANY BURKE – DIRECT EXAMINATION

1    ceiling?

3:12:43PM 2    A.  Yes, it does.  Well, in the part that's now magnified

3    there, that is where you can see there's a defect and there

4    was a projectile up in the ceiling there.

3:12:54PM 5    Q.  I'm going to go to 64, which I think is a better close-up

6    of that.  Does that show the same round in the ceiling tile?

3:13:03PM 7    A.  Yes, it does.  That shows where you can see the projectile

8    actually sticking out of the ceiling tile there.

3:13:10PM 9    Q.  That is an example of once it hit the wall?  I'm going to

10    go to Government's 73.  What's that show?

3:13:19PM11    A.  This is the wall up towards the front of the fellowship

12    hall area there where there is a what we called -- or I put

13    earlier suspected bullet defect underneath the light switch

14    there.

3:13:37PM15    Q.  I'm going to go to 74.  I'm going to zoom in on the two

16    taped-off areas.  What does that show?

3:13:46PM17    A.  These are walls in the front office where you can see

18    where the bullet came through.  Those actually correspond to

19    the previous picture, it entered the wall underneath that

20    light switch, came out where there's an actual L shape there,

21    and then where there's more of a T shape, it expands, it hit

22    the wall at that area as well.

3:14:13PM23    Q.  I'm going to go to -- so that's the back side of the same

24    wall we saw in the previous exhibit?

3:14:19PM25    A.  That is correct.

BRITTANY BURKE - DIRECT EXAMINATION

3:14:19PM 1    Q.  73.  I'll go to 75.  Is that the same room?

3:14:27PM 2    A.  This is the same room.  If you're looking at this chair,

3            the last bullet strike we talked about, it would have been on

4            the wall to the left of it and behind it.

3:14:39PM 5    Q.  I'm going to go to 76.  And is that the round that was

6            found inside that room?

3:14:48PM 7    A.  Yes, that is the fired projectile that was found in the

8            room.

3:14:52PM 9    Q.  That's an example of a round that would have gone through

10           a wall and ended up inside an office?

3:14:57PM11    A.  Yes, that is correct.

3:15:02PM12    Q.  I'm going to go to Government's 80 through 86 and show

13           those to you as well.

3:15:11PM14            THE COURT:  What numbers?

3:15:12PM15            MR. WILLIAMS:  80, 81, 82, 83, 84, 85 and 86.

3:15:32PM16    Q.  If you can look at those.  Do those all accurately

17           represent the crime scene?

3:16:08PM18    A.  Yes, they do.

3:16:10PM19            MR. WILLIAMS:  I show these to defense counsel.

3:16:39PM20            MS. PAAVOLA:  Your Honor, subject to our earlier

21           objections.

3:16:42PM22            THE COURT:  Very good.  Government's 80, 81, 82, 83,

23           84, 85 and 86 admitted.

3:16:48PM24        (Government Exhibits 80 through 86 received.)

3:16:48PM25    BY MR. WILLIAMS:

BRITTANY BURKE - DIRECT EXAMINATION

3:16:49PM 1    Q.  I want to take a look at 80 first.  Can you describe

2    what's depicted in that photo?

3:16:56PM 3    A.  This is when the -- one of the chairs that was located in

4    the area near where the victims were located and where those

5    circular tables were located down the center of the room.

3:17:09PM 6    Q.  I'm going to go to 81.  Does that show the damage to that

7    chair?

3:17:15PM 8    A.  Yes, it does.  This is the same chair, and you can see the

9    damage and a projectile that is wedged in between the plastic

10   and metal part of that chair there.

3:17:25PM11    Q.  I'm going to go to 82.  Is there a similar damage shown in

12   that photo?

3:17:32PM13    A.  There is, there's damage that you can see along the cross

14   bar, on the legs of the table, so the leg goes down and then

15   there's a cross bar that goes across there, and you can see

16   some damage to that as well.

3:17:43PM17    Q.  I'm going to go to 83, which I think is a close-up of

18   that.  Is that consistent with a gunshot damage?

3:17:51PM19    A.  Yes, it is.

3:17:53PM20    Q.  Go to 84.  Is that a similar strike underneath the table?

3:18:01PM21    A.  Yes, it is.

3:18:03PM22    Q.  Is that consistent with gunshot damage?

3:18:06PM23    A.  Yes, it is consistent.

3:18:08PM24    Q.  I'm going to go to 85.  I believe you had testified

25   earlier that some of the damage to the tablecloths was

BRITTANY BURKE - DIRECT EXAMINATION

1    visible.  Does it show that damage?

3:18:20PM 2    A.  Yes, this shows the damage that you can see to the

3    tablecloths.

3:18:25PM 4    Q.  I'm going to go to 86.  Is that damage to the table

5    underneath those same bullet holes that were in the

6    tablecloth?

3:18:37PM 7    A.  Yes, this is a picture that shows that there were marks in

8    or defects in the table itself underneath the tablecloths that

9    had the defects in them.

3:18:52PM10    Q.  I want to ask you about the term a floor strike, do you

11    know what that is?

3:18:59PM12    A.  I'm sorry?

3:19:01PM13    Q.  Do you know what the term a floor strike means?

3:19:03PM14    A.  Like a ricochet where a bullet hits the floor.

3:19:07PM15    Q.  Did you see any evidence of that in this case?

3:19:10PM16    A.  There were some spots on the floor that were consistent

17    with a bullet defect, yes.

3:19:16PM18    Q.  And can you explain how that -- what evidence you see of

19    that when you -- I guess what you found in this crime scene

20    that was consistent with it?

3:19:25PM21    A.  So when you look at a defect in the floor, you can look at

22    the directionality in their striations that are actually left

23    by the bullet, and it can be dependent upon the type of

24    flooring that it is or whether or not there was something over

25    the floor like a rug or something like that can have an effect

352

BRITTANY BURKE - DIRECT EXAMINATION

1    on it as well.

3:19:47PM 2    Q.  I'm going to hand you Government's 91, 92, 93, 94 and 95.

3    Are those all photos that fairly and accurately represent the

4    crime scene?

3:20:21PM 5    A.  Yes, they are.

3:20:22PM 6            MR. WILLIAMS:  I show these to defense counsel.

3:20:33PM 7            MS. PAAVOLA:  Subject to our earlier objections, Your

8    Honor, nothing further.

3:20:36PM 9            THE COURT:  Very good.  The Government 91, 92, 93, 94

10    and 95 are admitted.

3:20:42PM11        (Government Exhibits 91 through 95 received.)

3:20:42PM12    BY MR. WILLIAMS:

3:20:43PM13    Q.  I'm going to call up 91 first.  Can you explain to the

14    jury what that is?

3:20:48PM15    A.  This is a bullet defect that was located in the floor of

16    the church.

3:20:54PM17    Q.  I'm going to go to 92.

3:21:00PM18    A.  This is again the defect that was located in the floor.

3:21:06PM19    Q.  And then go to 93.  Different defect?

3:21:11PM20    A.  Yes.

3:21:13PM21    Q.  Same thing though, a strike mark around a victim on the

22    floor?

3:21:18PM23    A.  Yes, it is.

3:21:19PM24    Q.  Go to Government's 94.  Is that a similar mark in a

25    different location?

353

BRITTANY BURKE – DIRECT EXAMINATION

3:21:27PM 1   A.   Yes, it is.

3:21:29PM 2   Q.   And finally 95.  What was that item?

3:21:35PM 3   A.   This item was a cell phone that appeared to have had a

4   bullet defect to it as well.

3:21:43PM 5   Q.   I want to ask you if the holes in the tables, the rounds

6   found under people, the damage to the tablecloths, the floor

7   strikes, are those all consistent with people being shot while

8   underneath those tables?

3:22:00PM 9   A.   It is consistent with the shots going underneath the

10   tables with somebody standing and firing at the tables, with

11   the damage to the table and the damage to the tablecloths,

12   yes.

3:22:16PM13   Q.   And as well as rounds being found under people who may

14   have been laying down when they were shot?

3:22:21PM15   A.   Yes, it is possible.

3:22:25PM16   Q.   So I want to ask you briefly about evidence being sent for

17   testing.  I think you testified about that earlier that you

18   had some responsibility in getting evidence sent out for

19   testing?

3:22:38PM20   A.   That is correct.

3:22:40PM21   Q.   Explain to the jury how that works at SLED.

3:22:46PM22   A.   How the evidence testing process works?

3:22:48PM23   Q.   Yeah, I mean, who makes those decisions and what's the

24   process?

3:22:51PM25   A.   So for when deciding what to process, I will meet with

354

BRITTANY BURKE – DIRECT EXAMINATION

1    whoever is going to be the lead investigator with the case, or

2    in this case, lead investigators.  I met with people from

3    Charleston police department as well as people with SLED, and

4    we decided what items we wanted to be tested and what items to

5    send to the lab and what items we thought would be most

6    beneficial there in order for us to get the best results for

7    testing there.

3:23:26PM 8    Q.  What type of testing are you talking about, what can be

9    done?

3:23:30PM 10   A.  There are all sorts of different things that can be done

11   testing-wise.  You can do DNA, latent prints, we have a

12   firearms unit that can test and do firearms analysis.  There

13   is a trace unit in case you have any trace evidence that can

14   do hairs and fibers and things of that nature, or any type of

15   trace material, as well as other testing that can be done at

16   the lab.

3:23:56PM 17   Q.  Were items in this case sent for fingerprint testing?

3:24:00PM 18   A.  Yes.

3:24:01PM 19   Q.  And I'm talking about items in this case, from this crime

20   scene at the church?

3:24:05PM 21   A.  Yes, the magazines were sent for latent print testing.

3:24:11PM 22   Q.  And I want to ask you, just generally speaking, was items

23   also sent for ballistic testing?

3:24:18PM 24   A.  Yes, they were.

3:24:18PM 25   Q.  Are you familiar with the term chain of custody?

355

BRITTANY BURKE – DIRECT EXAMINATION

3:24:21PM 1    A.  Yes, I am.

3:24:21PM 2    Q.  What's a chain of custody?

3:24:23PM 3    A.  A chain of custody is a document that tells where the

4    evidence went.  So the chain of custody for this evidence all

5    started with me.  I was the lead agent at the crime scene.  I

6    collected all of the evidence and I took it back to SLED.

7    From there, I logged it into our computer system.  That then

8    begins an electronic chain of custody.  And how that works is

9    each agent has a bar code, and when they receive the evidence,

10    they scan the bar code that's assigned to the evidence, and

11    it's from their bar code.  So it keeps up with who touched

12    that evidence and what time they had that there.  But all of

13    that began with me when I submitted the evidence, since I was

14    the one that collected it.

3:25:10PM 15   Q.  Is that all kept in the log?

3:25:11PM 16   A.  It is.  Like I said, it's all -- once it gets to the lab,

17    it's all computer there, so the computer creates a log of each

18    person, and what time they got the evidence and what date and

19    time they gave it to somebody else, and that is all put into a

20    log.

3:25:28PM 21   Q.  Basically every person that's touched the item from the

22    time it came to you till the time it may have been sent back

23    to the appropriate agency?

3:25:35PM 24   A.  That is correct.

3:25:36PM 25   Q.  I'm going to show you Government's 97.  Do you recognize

356

BRITTANY BURKE - DIRECT EXAMINATION

1    that item?

3:25:45PM 2    A.  Yes, this is the chain of custody for the evidence in this

3    case.

3:25:51PM 4    Q.  You said it was a document; is that a pretty long

5    document?

3:25:54PM 6    A.  Yes, it's a very long document.

3:25:55PM 7    Q.  And that would show every person that's handled the item

8    to show its sort of reliability and proof of custody?

3:26:03PM 9    A.  That is correct.

3:26:05PM10         MR. WILLIAMS:  Show this to defense counsel, Your

11    Honor.

3:26:17PM12         MS. PAAVOLA:  No objection.

3:26:18PM13         THE COURT:  Government 97 is admitted without

14    objection.

3:26:21PM15     (Government Exhibit 97 received.)

3:26:21PM16    BY MR. WILLIAMS:

3:26:27PM17    Q.  I asked you earlier, you had some other roles in this case

18    apart from processing this crime scene, is that right?

3:26:33PM19    A.  That is correct.

3:26:33PM20    Q.  You had actually processed a car later on?

3:26:36PM21    A.  Yes.  I did.

3:26:41PM22         MR. WILLIAMS:  Your Honor, I'm going to -- I don't

23    have any further questions.  I would ask the Court's

24    permission to re-call her at the appropriate time to detail

25    other activity she had in the case.

BRITTANY BURKE - DIRECT EXAMINATION

3:26:49PM 1          THE COURT:  Very good.  Cross-examination.

3:26:52PM 2          MS. PAAVOLA:  Your Honor, can we have a short break

3                to confer with our client, please?

3:26:56PM 4          THE COURT:  Sure.  We'll take our afternoon break.

3:27:07PM 5      (Jury excused.)

3:34:59PM 6      (A recess was held at this time.)

3:49:57PM 7          THE COURT:  Okay.  Bring back the jury, please.

3:50:00PM 8      (Jury present.)

3:51:15PM 9          THE COURT:  Cross-examination by the defense.

3:51:16PM10          MS. PAAVOLA:  Your Honor, the Government has advised

11               this witness will be re-called at a later point, so we are

12               going to reserve cross-examination until that time.

3:51:24PM13          THE COURT:  That would be completely proper.  That

14               request is granted.  You may step down.

3:51:30PM15      A.  Thank you.

3:51:40PM16          MR. CURRAN:  Government calls Keon Gordon, Your

17               Honor.

3:51:43PM18          THE COURT:  Very good.

3:52:04PM19          THE CLERK:  State your full name for the record.

3:52:06PM20      A.  Keon Gordon.

3:52:10PM21        KEON GORDON, a witness called by the Government, first

22               having been duly sworn, testified as follows:

3:52:27PM23                      DIRECT EXAMINATION

3:52:27PM24      BY MR. CURRAN:

3:52:33PM25      Q.  Good afternoon, Mr. Gordon.  For the record, your name is

KEON GORDON – DIRECT EXAMINATION

1   Keon Gordon, correct?

3:52:38PM  2   A.   Yes.

3:52:38PM  3   Q.   And how old are you?

3:52:40PM  4   A.   I'm 26.

3:52:42PM  5   Q.   And where are you from?

3:52:45PM  6   A.   I'm from the Summerville area.

3:52:57PM  7   Q.   All right.  You're from the Charleston area generally.

3:52:59PM  8   A.   Yes, sir.

3:53:00PM  9   Q.   Have you lived here more or less all of your life?

3:53:03PM10   A.   Yes, sir.

3:53:04PM11   Q.   Did you go to high school, for example, in Charleston?

3:53:08PM12   A.   I went to Summerville High.

3:53:10PM13   Q.   And did you go to college?

3:53:15PM14   A.   Yes, sir.

3:53:15PM15   Q.   Where did you go to college?

3:53:16PM16   A.   University of South Carolina.

3:53:20PM17   Q.   Which campus?

3:53:21PM18   A.   Columbia.

3:53:22PM19   Q.   Did you get a degree from the University of South

20   Carolina?

3:53:27PM21   A.   Yes, sir, I got a bachelor of science in electrical

22   engineering.

3:53:29PM23   Q.   Are you employed now?

3:53:30PM24   A.   Yes.

3:53:31PM25   Q.   Where do you work?

KEON GORDON – DIRECT EXAMINATION

3:53:32PM 1    A.  I work for Santee Cooper.

3:53:34PM 2    Q.  And what do you do?

3:53:38PM 3    A.  I'm a field engineer.

3:53:39PM 4    Q.  Is that related to your college degree?

3:53:41PM 5    A.  Yes, sir.

3:53:51PM 6          MR. CURRAN:  Your Honor, we're pulling up what's

7    previously been admitted as Government's Exhibit 16.

3:53:57PM 8          THE COURT:  Very good.

3:53:57PM 9    BY MR. CURRAN:

3:53:58PM10    Q.  If you look on your monitor, Mr. Gordon, you'll see a

11    picture of an individual.  Do you know this person?

3:54:04PM12    A.  Yes, sir.

3:54:07PM13    Q.  Have you ever met him before in person?

3:54:09PM14    A.  Yes, sir.

3:54:10PM15    Q.  How many times?

3:54:13PM16    A.  Dozens of times.

3:54:14PM17    Q.  And do you know this person's name?

3:54:16PM18    A.  Yes, it is Tywanza Sanders.

3:54:20PM19    Q.  Is this the same Tywanza Sanders that was killed in the

20    Emanuel AME shootings last year?

3:54:26PM21    A.  Yes, sir, it is.

3:54:31PM22    Q.  When did you first meet Mr. Sanders?

3:54:32PM23    A.  Around 2006 or 2007.

3:54:34PM24    Q.  Is that when you were in high school?

3:54:36PM25    A.  Yes, sir.

KEON GORDON - DIRECT EXAMINATION

3:54:37PM 1    Q.  And how did you meet Mr. Sanders?

3:54:39PM 2    A.  We both had mutual friends.

3:54:43PM 3    Q.  Describe your relationship with Mr. Sanders at that time.

3:54:49PM 4    A.  At the time I met him?

3:54:51PM 5    Q.  Yeah.

3:54:52PM 6    A.  We went to different schools, and I pretty much saw him, I

7    guess you would say on the party scene a good bit and just

8    hanging out through mutual friends.

3:55:00PM 9    Q.  Kind of run in the same crowd?

3:55:02PM10    A.  Yes, sir.

3:55:02PM11    Q.  And did you consider Mr. Sanders to be a friend?

3:55:05PM12    A.  Yes, sir.

3:55:07PM13    Q.  And do you know if Mr. Sanders went to college?

3:55:09PM14    A.  Yes, sir, he did.

3:55:11PM15    Q.  Where did he go to college?

3:55:13PM16    A.  He went to college at Allen, which is also in Columbia.

3:55:19PM17    Q.  Did you maintain your friendship with Mr. Sanders when you

18    both were in college --

3:55:22PM19    A.  Yes, sir.

3:55:22PM20    Q.  -- in Columbia at the same time?

3:55:24PM21    A.  Yes, sir.

3:55:26PM22    Q.  And was it somewhat before part of a mutual group of

23    friends?

3:55:32PM24    A.  Yes.

3:55:34PM25    Q.  And did that friendship continue after you finished

KEON GORDON – DIRECT EXAMINATION

1    college?

3:55:38PM 2    A.  Yes, sir, it did.

3:55:41PM 3    Q.  For example, were you close enough with Mr. Sanders that

4    you knew what he did for a living?

3:55:47PM 5    A.  Yes, he was a barber.

3:55:49PM 6    Q.  And how do you know that?

3:55:51PM 7    A.  Well, I got a few haircuts from him back when I had hair.

3:55:59PM 8            THE COURT:  Pretty good evidence.

3:56:03PM 9    Q.  I suspect he's not responsible for the way you look right

10    now.  Did you go to his barber shop?

3:56:08PM11    A.  No, sir, this was when we were in college, so it was more

12    like going to a friend's house, or him coming over to where we

13    stayed at and just giving a quick haircut.

3:56:17PM14    Q.  So that's the kind of friendship you had with him, you

15    would get your hair cut by him at mutual friends' house?

3:56:24PM16    A.  Yes, sir.

3:56:25PM17    Q.  What about social media?  Do you know what I mean when I

18    talk -- when I say social media?

3:56:31PM19    A.  Yes.

3:56:32PM20    Q.  All right.  Did you maintain your friendship with him

21    through social media?

3:56:36PM22    A.  Yes, sir.

3:56:37PM23    Q.  What forms of social media would you use to maintain your

24    relationship with Mr. Sanders?

3:56:45PM25    A.  FaceBook, Snapchat.

KEON GORDON - DIRECT EXAMINATION

3:56:49PM 1    Q.  I turn to June 17th and June 18th of last year.

2    June 17th was the night of the shootings at Emanuel AME.  When

3    did you first learn that Mr. Sanders had been killed in that

4    shooting?

3:57:05PM 5    A.  It was the morning after the shooting.

3:57:08PM 6    Q.  And how did you learn about that?

3:57:10PM 7    A.  When I woke up to go to work I had a couple text messages

8    from different friends --

3:57:15PM 9    Q.  Go ahead, I'm sorry.

3:57:16PM10    A.  -- telling me what had happened.

3:57:18PM11    Q.  Or that mutual group of friends that you were talking

12    about?

3:57:21PM13    A.  Yes.

3:57:21PM14    Q.  And what did you do when you initially got those texts?

3:57:25PM15    A.  I went and cut the news on to see, you know, what was

16    going on, and trying to get some details about what was

17    happening.

3:57:31PM18    Q.  And what was your reaction when you found out?

3:57:35PM19    A.  I honestly couldn't believe what had happened really.

3:57:38PM20    Q.  Why not?

3:57:40PM21    A.  It just seemed surreal that someone would do something

22    like that.

3:57:44PM23    Q.  Did you go to work that day?

3:57:46PM24    A.  Yes, sir.

3:57:48PM25    Q.  When you went to work that day did you continue to look

KEON GORDON - DIRECT EXAMINATION

1    for updates on what had happened the night before?

3:57:55PM 2    A.  Yes, I did.

3:57:56PM 3    Q.  And did you, as part of that, did you check your social

4    media during the day?

3:58:01PM 5    A.  Yes, I did.

3:58:03PM 6    Q.  And did you notice anything unusual, anything unusual in

7    your social media?

3:58:09PM 8    A.  I noticed that on Snapchat that Tywanza had actually

9    uploaded something on there.

3:58:15PM10    Q.  All right.  So Mr. Sanders had uploaded something on

11    Snapchat?

3:58:21PM12    A.  Yes.

3:58:23PM13    Q.  Let's talk about Snapchat for a second.  Many of the

14    jurors may understand what Snapchat is, some of them may not.

15    What is your understanding of what Snapchat is?

3:58:35PM16    A.  Snapchat is a video application which allows users to take

17    short videos and post them for people to see on the

18    application.

3:58:43PM19    Q.  All right.  So correct me if I'm wrong, but if someone

20    creates a video, they can post it on the Snapchat website, is

21    that correct?

3:58:52PM22    A.  Correct.

3:58:53PM23    Q.  And then somehow you can view it from the Snapchat

24    website; is that how it works?

3:58:58PM25    A.  If you are friends with that person, you can view the

KEON GORDON - DIRECT EXAMINATION

1    content that they post.

3:59:02PM 2    Q.  When you view it, do you receive an actual copy of that

3    video?

3:59:08PM 4    A.  I'm allowed to go on his profile and actually watch what

5    he's uploaded.

3:59:12PM 6    Q.  So the video is not actually on whatever device you are

7    using, a computer, your phone or iPad or tablet, it's not

8    actually on your device.

3:59:21PM 9    A.  Correct.

3:59:24PM10    Q.  At that time -- Strike that.  So all you could do with

11    Snapchat at that time was view it?

3:59:32PM12    A.  Correct.

3:59:33PM13    Q.  For how long in that time frame would you have access to

14    the video?

3:59:39PM15    A.  The videos last for 24 hours and then they delete

16    themselves.

3:59:44PM17    Q.  And why is that?  Is that --

3:59:47PM18    A.  That's just how it works.

3:59:48PM19    Q.  Just a Snapchat rule?

3:59:50PM20    A.  Yes.

3:59:53PM21    Q.  So you mentioned that Mr. Sanders had posted the video,

22    correct?

3:59:59PM23    A.  Correct.

4:00:00PM24    Q.  How did you know that?

4:00:02PM25    A.  When you go through the profile it shows you your friends

KEON GORDON - DIRECT EXAMINATION

1    and if they have posted anything or not.

4:00:08PM 2    Q.  And how does the -- well, how does that work?  Just

3    briefly explain, how do you identify --

4:00:15PM 4    A.  Pretty much you can scroll down and it will just appear in

5    your profile if someone has posted anything recent that you

6    have not looked at yet.

4:00:22PM 7    Q.  So you open up the Snapchat app?  Application.

4:00:26PM 8    A.  Um-hum.

4:00:27PM 9    Q.  And then it will show you what you've gotten from your

10    friends.

4:00:30PM11    A.  Correct.

4:00:32PM12    Q.  When you opened -- on June 18th, when you opened up your

13    Snapchat app and you saw that you had something from

14    Mr. Sanders -- Actually you had had a notification that he had

15    posted something; how many videos had he posted?

4:00:48PM16    A.  There were two in there.

4:00:50PM17    Q.  And did you view them both?

4:00:51PM18    A.  Yes, sir.

4:00:53PM19    Q.  What did you see?  Just generally describe what the two

20    videos were.

4:00:59PM21    A.  The first was him at the barber shop talking with some

22    people, and then the second one was him in Bible study.

4:01:12PM23    Q.  Could you repeat that second answer?  What was the second

24    one?

4:01:14PM25    A.  The second one was snap of him in Bible study.

KEON GORDON - DIRECT EXAMINATION

4:01:24PM 1    Q.  The second one you said was from the Bible study the night

2    before, is that correct?

4:01:29PM 3    A.  Yes, sir.

4:01:30PM 4    Q.  What made you think that it was from the Bible study the

5    night before?

4:01:34PM 6    A.  The time, and also the title across the video.

4:01:38PM 7    Q.  And do you recall right now exactly what the title was

8    across the video?

4:01:44PM 9    A.  It was a reference to Bible study.  I'm not sure

10    completely.

4:01:47PM11    Q.  So within that title there was a reference to Bible study?

4:01:51PM12    A.  Correct.

4:01:55PM13    Q.  Pretty good indicator that it was from the Bible study.

4:01:54PM14    A.  Correct.

4:01:55PM15    Q.  What was your reaction when you received that?

4:01:58PM16    A.  I thought it was very strange to see, you know, the last

17    thing he posted was still there.

4:02:04PM18    Q.  And what did you do in reaction, after you realized that

19    he had posted a video?

4:02:12PM20    A.  Attempted to save the video, since it would delete in a

21    few more hours.

4:02:17PM22    Q.  And what did you do in your attempt to save it?  How did

23    you do that?

4:02:22PM24    A.  I had some --

4:02:23PM25    Q.  Let me stop you.  Could you save it on your phone?

KEON GORDON – DIRECT EXAMINATION

4:02:26PM 1    A.  No, I could not.

4:02:27PM 2    Q.  So when you get -- Snapchat wouldn't allow you to save it

3    to your own phone?

4:02:31PM 4    A.  No, I can not save anyone else's videos to my phone.

4:02:35PM 5    Q.  So what did you do to try to save it?

4:02:37PM 6    A.  I had to use another phone to actually record the video.

4:02:41PM 7    Q.  And did you do that?

4:02:42PM 8    A.  Yes, sir.

4:02:44PM 9    Q.  Why did you want to preserve it?

4:02:48PM10    A.  Just because it was the last thing he posted, I thought,

11    you know, that would be something worth keeping.

4:02:55PM12    Q.  Did you notice anything in the video when you looked at it

13    that made you also want to preserve it?

4:03:01PM14    A.  Yes, sir.

4:03:02PM15    Q.  And what was that?

4:03:03PM16    A.  In the corner of the video you could see the accused

17    killer in it.

4:03:07PM18    Q.  So you believed that you could see the individual accused

19    of carrying out the killings in the video?

4:03:16PM20    A.  Yes, sir.

4:03:17PM21    Q.  All right.  And why did you believe that?  What about the

22    video made you think that?

4:03:23PM23    A.  Just seeing the news reports and kind of seeing the videos

24    they posted about them, and then just noticing that it was a

25    white individual in the actual snap that resembled what the

KEON GORDON – DIRECT EXAMINATION

1   news was posting.

4:03:35PM 2   Q.  And so the person you saw resembled, to you, what you had

3   heard about a description of the killer in the news reports?

4:03:44PM 4   A.  Correct.

4:03:45PM 5   Q.  All right.  So how did you -- well, I think you already

6   stated this, but how -- what did you do with the video to

7   begin the process of saving it?

4:03:56PM 8   A.  Used someone else's phone to actually record the video and

9   then send it to myself.

4:04:00PM10   Q.  How did you send it to yourself?

4:04:02PM11   A.  I believe it was through like a text message.

4:04:04PM12   Q.  So you copied it onto someone else's phone, then texted it

13   to yourself.

4:04:10PM14   A.  Yes, sir.

4:04:10PM15   Q.  What did you do with the file that you had, the video file

16   you had just texted to yourself?

4:04:16PM17   A.  I kept it.

4:04:18PM18   Q.  And did you do anything else on your own phone to attempt

19   to preserve portions of the video?

4:04:29PM20   A.  Yes, I actually took a screen shot of it.

4:04:31PM21   Q.  One screen shot?

4:04:33PM22   A.  Three.

4:04:33PM23   Q.  So you took three screen shots of it as well?

4:04:36PM24   A.  Correct.

4:04:38PM25   Q.  Did you take the screen shots on your own phone or on your

KEON GORDON – DIRECT EXAMINATION

1        friend's phone?

4:04:42PM 2    A.  This is on my own phone.

4:04:43PM 3    Q.  So after you were done with this, and you would have had

4        four files on your phone, the video that you texted to

5        yourself, and the three screen shots, correct?

4:04:53PM 6    A.  Yes, sir.

4:04:56PM 7    Q.  And did you save those screen shots as well?

4:04:58PM 8    A.  Yes.

4:05:17PM 9    Q.  I'm handing you what's been marked for purposes of

10       identification at this point as Government's Exhibit 99.  Just

11       take a quick look at it.  Are you familiar with this exhibit?

4:05:30PM 12   A.  Yes, sir, I am.

4:05:31PM 13   Q.  Did you review that exhibit before you testified today?

4:05:34PM 14   A.  Yes, sir.

4:05:35PM 15   Q.  How do you know that?

4:05:36PM 16   A.  I saw it and I signed and dated it.

4:05:39PM 17   Q.  And did you review what was on that?  Well, it's a DVD

18       that you have in your hand, correct?

4:05:50PM 19   A.  Yes, sir.

4:05:50PM 20   Q.  Did you review the video that's on that DVD?

4:05:54PM 21   A.  Yes, sir.

4:05:55PM 22   Q.  And what is it?

4:05:56PM 23   A.  It is the video that -- it is a video of what I took.

4:05:59PM 24   Q.  Was it a copy of the Snapchat video that --

4:06:03PM 25   A.  Yes, sir.

KEON GORDON - DIRECT EXAMINATION

4:06:03PM 1    Q.  -- that file that you sent to yourself?  All right.  Is it

2    a complete and accurate copy of that video?

4:06:10PM 3    A.  Yes, sir, it is.

4:06:12PM 4            MR. CURRAN:  Your Honor, we'd move for admission of

5    Government's Exhibit 99.

4:06:15PM 6            THE COURT:  Very good.  Is there an objection?

4:06:18PM 7            MS. PAAVOLA:  No objection.

4:06:19PM 8            THE COURT:  Government 99 is admitted without

9    objection.

4:06:21PM10       (Government Exhibit 99 received.)

4:06:38PM11            MR. CURRAN:  If you look on your screen, Your Honor,

12    we are publishing -- we request permission to publish it to

13    the jury, Your Honor.

4:06:46PM14            THE COURT:  You have the Court's permission.

4:06:48PM15    BY MR. CURRAN:

4:06:49PM16    Q.  On your screen is a copy of Government's Exhibit 99, and

17    I'm going to ask Miss Baker to play it through and then I will

18    ask you some questions about it, Mr. Sanders.

4:07:04PM19       (Video played.)

4:07:14PM20    Q.  All right.  Go back, please.  It appears -- the video

21    appears to be about ten seconds long.  Is that consistent with

22    Snapchat videos at that time?

4:07:25PM23    A.  Yes, sir.

4:07:25PM24    Q.  Are they basically ten seconds long --

4:07:27PM25    A.  Around that.

KEON GORDON – DIRECT EXAMINATION

4:07:28PM 1    Q.  -- or shorter?

4:07:29PM 2    A.  Um-hum.

4:07:30PM 3    Q.  We're going to go back to the start, and on your screen

4           you have what is displayed at the beginning of the file.  What

5           is displayed here?

4:07:42PM 6    A.  So when I opened up my -- the application on my phone,

7           this is the list of people that I'm friends with, and this

8           allows me to view their content that they post.

4:07:52PM 9    Q.  So this is the friends list you were talking about before?

4:07:54PM10    A.  Yes, sir.

4:07:55PM11    Q.  And there's -- looks to be a thumbnail or at least a

12           fingernail there.  Is that your fingernail?

4:08:02PM13    A.  Yes, sir.

4:08:02PM14    Q.  And what is it next to on your friend list?

4:08:06PM15    A.  It's next to Wanza's profile.

4:08:09PM16    Q.  And what are you actually doing with your finger at that

17           point?

4:08:14PM18    A.  In order to view what he's posted, I have to actually

19           physically touch it.

4:08:19PM20         MR. CURRAN:  And if you just advance it there.

4:08:33PM21      (Video played.)

4:08:35PM22    Q.  Okay.  Now, across the middle of the video is a banner

23           with some text; you see that?

4:08:44PM24    A.  Correct.

4:08:49PM25    Q.  That's where you're referring to earlier when you said

KEON GORDON - DIRECT EXAMINATION

1    there was something about a Bible study on the video?

4:08:50PM 2    A.  Yes, sir.

4:08:50PM 3    Q.  Did you put that on there?

4:08:52PM 4    A.  No, sir.

4:08:52PM 5    Q.  Did you alter this video in any way other than to text it

6    to yourself and copy it?

4:08:58PM 7    A.  No, sir.

4:08:59PM 8    Q.  So was that on the video as it was posted to Snapchat?

4:09:03PM 9    A.  Yes, sir, it was.

4:09:08PM10    Q.  Do you know any of the individuals in this photo?

4:09:10PM11    A.  No, sir.

4:09:13PM12    Q.  You mentioned that earlier that you believed that one of

13    the individuals in this photo or in this video could have been

14    the killer.

4:09:24PM15    A.  Yes, sir.

4:09:24PM16    Q.  Correct?  Do you see the person you identified as such in

17    this particular frame?

4:09:29PM18    A.  Yes, sir, he looked to the far right of the video.

4:09:35PM19    Q.  And if you look to the far right, about how far down the

20    video were you referring to?

4:09:43PM21    A.  Maybe midway.

4:09:46PM22    Q.  And have you shown me, previous to this, where you believe

23    that person is?

4:09:51PM24    A.  Yes, sir.

4:09:52PM25    Q.  I'm going to circle on the screen, and tell me if I've got

KEON GORDON – DIRECT EXAMINATION

1          it correct.

4:09:58PM 2   A.  Yes, sir.  That is correct.

4:10:08PM 3   Q.  Now, the screen shots, are they a little bit clearer than

4          the video?

4:10:13PM 5   A.  Yes.

4:10:22PM 6          MR. CURRAN:  For the record, I'm handing the witness

7          what's been previously marked as Government's Exhibit 100 for

8          identification.

4:10:29PM 9   Q.  Please review that, Mr. Sanders.  Excuse me, Mr. Gordon.

10          Are you familiar with this exhibit?

4:10:40PM11   A.  Yes, sir.

4:10:41PM12   Q.  Did you review this exhibit before you testified today?

4:10:44PM13   A.  Yes, sir, I did.

4:10:45PM14   Q.  What is it?

4:10:47PM15   A.  It is one of three screen shots that I took.

4:10:51PM16   Q.  Is it a complete and accurate copy of one of those screen

17          shots?

4:10:54PM18   A.  Yes, sir.

4:10:55PM19          MR. CURRAN:  Your Honor, we'd move for its admission

20          at this time.

4:10:59PM21          MS. PAAVOLA:  No objection.

4:11:00PM22          THE COURT:  Government 100 is admitted without

23          objection.

4:11:02PM24      (Government Exhibit 100 received.)

4:11:02PM25   BY MR. CURRAN:

KEON GORDON - DIRECT EXAMINATION

4:11:15PM 1    Q.  And why did you take a screen shot?

4:11:19PM 2    A.  I wanted to get a still picture of who I believed was --

         3    who I thought the killer at the time in the video.

4:11:25PM 4    Q.  And that would be the individual you pointed out earlier?

4:11:28PM 5    A.  Yes, sir.

4:11:29PM 6    Q.  And I'm going to circle again, and tell me if this is the

         7    person you're referring to.

4:11:35PM 8    A.  Yes, sir, that's correct.

4:11:50PM 9         MR. CURRAN:  For the record, Your Honor, if I haven't

        10    moved for admission of this --

4:11:56PM11         THE COURT:  100 is admitted.

4:11:59PM12         MR. CURRAN:  I'm handing the witness what's been

        13    previously marked as Government Exhibit 100.  101, excuse me.

4:12:08PM14    Q.  Please review that exhibit, Mr. Gordon.  Are you familiar

        15    with that exhibit?

4:12:15PM16    A.  Yes, sir.

4:12:16PM17    Q.  Did you review it before you testified today?

4:12:18PM18    A.  Yes.

4:12:18PM19    Q.  And what is that exhibit?

4:12:20PM20    A.  It's another one of the three screen shots that I took.

4:12:26PM21         MR. CURRAN:  We'd move for --

4:12:27PM22    Q.  Is that a complete and accurate copy of the screen shot?

4:12:30PM23    A.  Yes, sir.

4:12:30PM24         MR. CURRAN:  We'd move for its admission, Your Honor.

4:12:33PM25         MS. PAAVOLA:  No objection.

KEON GORDON – DIRECT EXAMINATION

4:12:34PM 1          THE COURT:  Government 101 is admitted without

2      objection.

4:12:36PM 3       (Government Exhibit 101 received.)

4:12:36PM 4          MR. CURRAN:  And publish it to the jury?

4:12:38PM 5          THE COURT:  You may.

4:12:39PM 6    BY MR. CURRAN:

4:12:39PM 7    Q.  Now, is this very similar to the one you took before?

4:12:43PM 8    A.  Yes, sir, it is.

4:12:43PM 9    Q.  Why did you take two?

4:12:46PM10    A.  Just difficult trying to get that particular shot.

4:12:50PM11    Q.  And why were you interested in trying to get that

12    particular shot?

4:12:54PM13    A.  Just trying to get a clearer picture of who that is on the

14    right side of the video.

4:13:08PM15          MR. CURRAN:  I'm now handing what's been marked for

16    purposes of identification as Government's Exhibit 102.

4:13:17PM17    Q.  Mr. Gordon, if you would review that exhibit.  Now, are

18    you familiar with that exhibit?

4:13:30PM19    A.  Yes, sir.

4:13:30PM20    Q.  And what is it?

4:13:31PM21    A.  That's another one of -- it's the third of the three

22    screen shots that I took.

4:13:35PM23    Q.  That's the third of the three screen shots?

4:13:37PM24    A.  Yes, sir.

4:13:37PM25    Q.  Is it a complete and accurate copy of that screen shot?

KEON GORDON – DIRECT EXAMINATION

4:13:40PM 1    A.  Yes, sir.

4:13:43PM 2              MR. CURRAN:  And we'd move for its admission, Your

3    Honor.

4:13:45PM 4              THE COURT:  Any objection?

4:13:46PM 5              MS. PAAVOLA:  No objection.

4:13:47PM 6              THE COURT:  102 is admitted without objection, and

7    permission to publish.

4:13:51PM 8         (Government Exhibit 102 received.)

4:13:52PM 9    BY MR. CURRAN:

4:13:54PM10    Q.  And this appears to be a further in, if you look at the

11    upper right it says eight on the top; does that mean eight

12    seconds left in the video?

4:14:03PM13    A.  Correct.

4:14:03PM14    Q.  And it's very different in terms of people that it

15    pictures in the frame.  Why did you take this screen shot?

4:14:09PM16    A.  I was still attempting to get one of the first two, and it

17    was just difficult to try and get it as soon as the video

18    started.

4:14:16PM19    Q.  So this is essentially a mistake you made while you were

20    trying to get the other two?

4:14:21PM21    A.  Yes, sir.

4:14:22PM22    Q.  What did you do with these videos and screen shots after

23    you saved them?

4:14:28PM24    A.  I then turned them over to the FBI.

4:14:31PM25    Q.  And did you give that on your phone in its entirety so

KEON GORDON – DIRECT EXAMINATION

1    they could copy them?

4:14:36PM 2    A.   Yes, sir, they took my phone and downloaded the

3    information off of it.

4:14:42PM 4           MR. CURRAN:  No further questions, Your Honor.

4:14:44PM 5           THE COURT:  Cross-examination.

4:14:45PM 6           MS. PAAVOLA:  No questions for Mr. Gordon, Your

7    Honor.

4:14:47PM 8           THE COURT:  Thank you, Mr. Gordon, you may step down,

9    sir.

4:15:09PM10           MR. WILLIAMS:  Call the next witness, Your Honor?

4:15:10PM11           THE COURT:  Government call your next witness.

4:15:12PM12           MR. WILLIAMS:  Thank you.  Government calls Brian

13    Womble.

4:15:26PM14           THE CLERK:  State your full name for the record.

4:15:27PM15    A.   Brian S. Womble.  W-O-M-B-L-E.

4:15:33PM16        BRIAN WOMBLE, a witness called by the Government, first

17    having been duly sworn, testified as follows:

4:15:38PM18                    DIRECT EXAMINATION

4:15:38PM19    BY MR. WILLIAMS:

4:15:53PM20    Q.   Sir, can you tell the jurors where you work?

4:15:55PM21    A.   I work for the FBI.

4:15:57PM22    Q.   What do you do at the FBI?

4:15:59PM23    A.   I'm a supervisor of the Charleston FBI office.

4:16:17PM24    Q.   You said -- what did you say your position is with the FBI

25    right now?

KEON GORDON – DIRECT EXAMINATION

4:16:21PM 1    A.  I'm the supervisor of the Charleston office.

4:16:23PM 2    Q.  How long have you been the supervisor in Charleston?

4:16:25PM 3    A.  I've been the supervisor here for the last six and a half

4    years.  Previous to that I was a supervisor in the public

5    corruption unit in Washington, D.C.  I've been with the FBI

6    since 1999.

4:16:36PM 7    Q.  What did you do before you worked for the FBI?

4:16:39PM 8    A.  I was a captain in the United States Marine Corps.

4:16:41PM 9    Q.  Is that what you did right out of high school, the

10    Marines?

4:16:45PM11    A.  No, after I graduated college I went through officer

12    candidate school and became an infantry officer in the

13    Marines.

4:16:52PM14    Q.  So after the Marines did you then go right to the FBI?

4:16:54PM15    A.  I did.

4:16:55PM16    Q.  And what was your first job with the FBI?

4:16:58PM17    A.  I was assigned to the Providence, Rhode Island office, I

18    was there for nine years.

4:17:02PM19    Q.  Were you a special agent there?

4:17:03PM20    A.  I was.

4:17:04PM21    Q.  What type of cases did you investigate and --

4:17:06PM22    A.  I worked primarily criminal investigations.  I was -- also

23    spent 100 days in Baghdad, Iraq, in a terrorism matter, and I

24    was also involved in the 9/11 investigation.

4:17:19PM25    Q.  And how many years were you in Rhode Island?

KEON GORDON – DIRECT EXAMINATION

4:17:22PM 1    A.  Nine years, sir.

4:17:23PM 2    Q.  What did you do after you worked in Rhode Island?

4:17:25PM 3    A.  I went to FBI headquarters, I was promoted to a

4            supervisory special agent position, and I supervised the west

5            region of the United States in the public corruption cases.

4:17:37PM 6    Q.  How many people would you have supervised in that

7            position?

4:17:41PM 8    A.  Directly, just one or two.  It was more of a program

9            oversight.

4:17:46PM10    Q.  How long did you have that position?

4:17:49PM11    A.  Two years.

4:17:49PM12    Q.  What did you do after that?

4:17:51PM13    A.  I came here and took over the Charleston office of the

14            FBI.

4:17:54PM15    Q.  And can you explain to the jury sort of how the resident

16            agency works in the State of South Carolina with the FBI?

4:18:02PM17    A.  Yes.  So one of the FBI's priorities is supporting our law

18            enforcement partners.  We do that through investigations, we

19            do that through the examinations, support of evidence, we do

20            that through training.  So what you see is federal criminal

21            law and state and local criminal law overlap many times.  And

22            many times the best way to investigate cases is to do it

23            jointly.  So we have task force in our office, we have a task

24            force, joint terrorism task force, many of the case

25            investigations we do, we do with our law enforcement partners.

KEON GORDON – DIRECT EXAMINATION

4:18:36PM 1    Q.  Can you explain sort of how the FBI is set up in South

2    Carolina.  Is there an office just in Charleston, or other

3    part of the state?

4:18:44PM 4    A.  The headquarters for South Carolina is in Columbia, seven

5    satellite offices, the two biggest being in Charleston and

6    Greenville.

4:18:51PM 7    Q.  And as a supervisor, what are you in charge of in

8    Charleston?

4:18:59PM 9    A.  I'm in charge of the administrative of the Charleston

10    office, and I'm also in charge of all criminal investigations,

11    and actually also oversee -- we have a small office in Hilton

12    Head with three agents.  I oversee the investigations there as

13    well.

4:19:06PM14    Q.  And how many agents do you directly supervise at this

15    point in time?

4:19:10PM16    A.  I believe it's 15.

4:19:12PM17    Q.  And was that your -- were you doing the same thing back in

18    June of last year?

4:19:16PM19    A.  I was.  That's correct.

4:19:17PM20    Q.  So you talked a little bit about one of the priorities of

21    the FBI being supporting other agencies.  Can you explain how

22    that overlap works in real time in terms of relationships with

23    those agencies?

4:19:31PM24    A.  Sure.  So, you know, we're working with those agencies on

25    a regular basis, a lot of that liaison and building those

KEON GORDON – DIRECT EXAMINATION

1    cases, we do a lot of training with them.  One example of

2    training that we've done with local agencies in 2013, we

3    hosted a –– an active –– an active shooter and mass killing

4    exercise and table top.  Involved over 50 law enforcement

5    executives, first responders, involved the hospitals here in

6    Charleston, and we went through all the things that the FBI

7    can add to those investigations.  We went through scenarios,

8    planning if things happen.  So we do a lot of crisis

9    management as well as our investigations with the local and

10   state authorities.

4:20:19PM 11  Q.  And just in general, on any type of case what type of

12   resources does the FBI offer local agencies?

4:20:25PM 13  A.  Sure.  We –– we offer investigative assistance, we offer

14   laboratory assistance, behavior analysis, tactical assistance

15   in terms of our SWAT teams, our bomb techs.  We have a victim

16   assistance program and a victim assistance deployment program,

17   where if there's a tragedy such as this anywhere in the

18   country, we'll deploy our victim specialist to help with ––

19   work with the victims, and all the logistics that go with

20   that.

4:21:00PM 21  Q.  How would you describe your relationship with other

22   federal agencies as well as local agencies, specifically the

23   Charleston city police department?

4:21:09PM 24  A.  Strong.  Very strong.  I've had a long working

25   relationship with Chief Mullen, with SLED, with North

KEON GORDON – DIRECT EXAMINATION

1    Charleston, all the agencies here.  We spent a lot of time

2    together, there's been a lot of investigations that we've done

3    jointly.  So I had been here for over five years, in June,

4    almost five years in June of 2015, so we had a strong working

5    relationship with the command staff.

4:21:34PM 6    Q.  And you talked a little bit earlier about mass killing and

7    active shooter scenarios.  What do those terms mean to the

8    FBI?

4:21:43PM 9    A.  Yeah.  So an active shooter is essentially an individual

10    trying to kill other individuals in a publicly-populated area.

11    And then mass killing by a federal statute actually is defined

12    as a killing of three or more individuals in an area that's

13    available to public use.

4:22:05PM14    Q.  And so what is the FBI's role in either a mass killing or

15    an active shooting scenario if, as in this case, the locals

16    are already sort of working on the case.

4:22:15PM17    A.  Yes.  So in 2012 Congress passed the Victim Assistance for

18    Violent Crime Act.  And what that did is further defined the

19    FBI's also role in a mass killing or active shooter scenario.

4:22:29PM20         And what it says is the FBI, at the request of local law

21    enforcement, can provide assistance.  And that includes all

22    the things I talked about before, investigative assistance,

23    helping set up a command post, the victim teams, the tactical

24    teams, the evidence response, whatever we can do in a

25    situation like that, that takes up such a massive amount of

KEON GORDON – DIRECT EXAMINATION

1    investigation or manpower.  And in addition to that, sometimes

2    those incidents will have a federal nexus.  So it happens on

3    federal property, it has a terrorism nexus, it has a civil

4    rights nexus.

4:23:03PM 5    Q.  So you may also not just be able to assist the locals,

6    maybe they assist you if there's federal violations?

4:23:09PM 7    A.  Absolutely.  It's a joint effort, a team effort.

4:23:12PM 8    Q.  And you mentioned also that there was particular training

9    sort of with mass casualties or crisis management.  What is

10    the general approach to a mass casualty or a sort of crisis

11    situation?

4:23:25PM12    A.  Yeah, so the idea with that is that we come in and we

13    assist those agencies as they build the command.  Now, if

14    there's a federal nexus or federal law is violated as well,

15    there will probably be more of a joint command post, we're

16    running it together.

4:23:39PM17        And in building up with that there's a lot of training

18    that we try to do, active shooter training, crisis management

19    training.  Ideally we plan for these things and they never

20    happen.  You know, in 2013 when we had a table top exercise,

21    we certainly didn't think that that was going to happen here

22    in Charleston.  But -- and by the way, the Charleston police

23    department brought their whole command staff to that, every

24    lieutenant and above was there, whether active participants,

25    and that certainly came together when we were in a crisis

KEON GORDON – DIRECT EXAMINATION

1    situation working together.

4:24:11PM 2        MR. BRUCK:  If Your Honor please, may I approach?

4:24:26PM 3        THE COURT:  You may.

4:24:22PM 4      (Following discussion held at side bar.)

4:24:24PM 5        THE COURT:  Yes, sir.

4:24:24PM 6        MR. BRUCK:  I'm going to interpose a relevance

7    objection.

4:24:28PM 8        THE COURT:  What is the relevance?

4:24:29PM 9        MR. BRUCK:  Mr. Womble is a wonderful guy, but what's

10   this about?

4:24:33PM11        MR. WILLIAMS:  He's going to talk about the resources

12   that were allocated to the investigation.

4:24:37PM13        THE COURT:  I'm not sure I get that.  I mean, just

14   put the evidence up.  What's the evidence?  I mean, I fussed

15   with Mr. Bruck about talking about the evidence.  I just don't

16   know why -- in some ways what you're doing is you're trying to

17   bolster him, and I just don't think you need to do that.

4:24:53PM18        MR. WILLIAMS:  I will move along to how they set up

19   the command post and assigned the --

4:24:56PM20        THE COURT:  Why is even the command post relevant?

4:24:59PM21        MR. WILLIAMS:  Because it has to go to how the

22   defendant was apprehended, how the defendant was caught.

23   Leads came in, they worked the leads, then they arrested him.

24   The bomb threat.

4:25:10PM25        MR. BRUCK:  That, too, why don't they go to how he

KEON GORDON – DIRECT EXAMINATION

1   was arrested?

4:25:15PM 2       THE COURT:  Why don't you just go to how he was

3   apprehended.

4:25:17PM 4       MR. WILLIAMS:  I can do that.  Yeah.

4:25:19PM 5       MR. BRUCK:  This isn't --

4:25:22PM 6       MR. WILLIAMS:  He can say what --

4:25:24PM 7       MR. BRUCK:  Okay.

4:25:25PM 8       THE COURT:  We okay on that?

4:25:26PM 9       MR. BRUCK:  Yes.  And I have a little bit of cross,

10   but this is dangling about the bomb threat.

4:25:30PM11       MR. WILLIAMS:  Do you want me to cover that?

4:25:32PM12       MR. BRUCK:  You can do that.  Yeah, sure, why not.

4:25:36PM13       THE COURT:  It's been raised; Mr. Bruck's proper to

14   do it.

4:25:40PM15     (Side bar discussion concluded.)

4:25:51PM16       THE COURT:  There's a motion of relevance.

17   Sustained.

4:25:53PM18   BY MR. WILLIAMS:

4:25:57PM19   Q.  Agent Womble, I want to get to the specific activity in

20   this case and I want to ask you specifically about was there a

21   bomb threat that was called in to the church?

4:26:05PM22   A.  There was.

4:26:06PM23   Q.  And was that something you were involved with

24   investigating?

4:26:09PM25   A.  It was something the FBI was involved in investigating.

386

KEON GORDON - DIRECT EXAMINATION

1    An outside -- when we were outside divisions, that subject was

2    actually somebody who was already under investigation and

3    by -- when the phone call came in, we were able to trace it to

4    that subject, and he was later arrested for a bomb threat.  It

5    didn't deal directly with -- that individual had seen what was

6    going on in the news, and had called in the bomb threat

7    relating to it watching there.

4:26:37PM 8    Q.  So it was not anything related to this defendant?

4:26:40PM 9    A.  It was not related at all to this defendant.

4:26:42PM10    Q.  And there was earlier testimony about a BOLO, a picture

11    that was released.  Were you involved in disseminating that?

4:26:50PM12    A.  Yes, I was.

4:26:51PM13    Q.  And were you involved with coordinating leads overnight

14    with other agencies?

4:26:56PM15    A.  Yes, I was.

4:26:57PM16    Q.  And was there eventually an arrest made the next morning

17    in Shelby?

4:27:01PM18    A.  Yes, that's correct.

4:27:02PM19    Q.  And in terms of your role then, you would have been the

20    local supervisor from the time the events occurred, until the

21    arrest in Shelby the next morning?

4:27:12PM22    A.  That's correct.

4:27:14PM23            MR. WILLIAMS:  No further questions, Your Honor.

4:27:15PM24            THE COURT:  Very good.  Cross-examination.

4:27:17PM25            MR. BRUCK:  No questions, thank you.

DANIEL BERNAT - DIRECT EXAMINATION

4:27:18PM 1          THE COURT:  Very good.  Thank you.  Good to have you

2      here.  Call your next witness.

4:27:23PM 3          MR. WILLIAMS:  Thank you, Government calls Dan

4      Bernat.

4:27:49PM 5          THE CLERK:  State your full name for the record.

4:27:52PM 6     A.  Daniel Ryan Bernat.

4:27:56PM 7      DANIEL BERNAT, a witness called by the Government, first

8      having been duly sworn, testified as follows:

4:28:02PM 9                      DIRECT EXAMINATION

4:28:02PM10     BY MR. WILLIAMS:

4:28:16PM11     Q.  Sir, can you tell the jurors where you work?

4:28:19PM12     A.  Police officer with the Shelby police department in

13      Shelby, North Carolina.

4:28:22PM14     Q.  Where is Shelby, North Carolina?

4:28:24PM15     A.  Between Asheville and Charlotte.

4:28:27PM16     Q.  How far outside Charlotte is it?

4:28:29PM17     A.  An hour.  Hour west of Charlotte.

4:28:33PM18     Q.  What do you do with the Shelby police department?

4:28:35PM19     A.  Currently assigned to the problem solving unit.

4:28:38PM20     Q.  Say that again.

4:28:39PM21     A.  I'm assigned to the problem solving unit.

4:28:41PM22     Q.  How long have you worked with the Shelby police

23      department?

4:28:45PM24     A.  Over six and a half years.

4:28:46PM25     Q.  What did you do before you worked with the police

DANIEL BERNAT - DIRECT EXAMINATION

1    department?

4:28:49PM 2    A.  I was an automotive technician.

4:28:51PM 3    Q.  And when you started with the Shelby police department,

4    six and a half years ago, what was your first sort of type of

5    work?

4:28:58PM 6    A.  I was assigned to night shift patrols.

4:29:01PM 7    Q.  And you have worked patrol, and then what you called the

8    problem solving unit since then?

4:29:05PM 9    A.  That's correct.

4:29:07PM10    Q.  I want to ask you about June 18th about 10:30 in the

11    morning.  Do you recall being involved in a traffic stop at

12    that time?

4:29:15PM13    A.  Yes, I do.

4:29:16PM14    Q.  And if you can, tell the jury, had you -- were you aware

15    of or had you heard of anything about a shooting in Charleston

16    that had occurred the night before?

4:29:24PM17    A.  Yes, I was.

4:29:25PM18    Q.  What had you heard and -- What had you heard?

4:29:27PM19    A.  Just that there was an involvement in a church shooting,

20    an individual was not apprehended at this time.

4:29:34PM21    Q.  How did you hear about it?

4:29:38PM22    A.  On the news.

4:29:40PM23    Q.  Did you have any kind of debriefing or anything in your

24    department about the case?

4:29:44PM25    A.  No.  I did not.

DANIEL BERNAT - DIRECT EXAMINATION

4:29:46PM 1    Q.  So tell the jury what you were doing that morning of

2    June 18th.  What -- leading up to that traffic stop.

4:29:55PM 3    A.  It was actually in a patrol car, fuel pumps, my partner

4    and I, when we received a call from dispatch.

4:30:03PM 5    Q.  What was the call that came in?

4:30:05PM 6    A.  That there was a possible citing of Mr. Roof traveling

7    westbound on U.S. 74, coming into the Shelby city limits.

4:30:14PM 8    Q.  Where were you at the time as you were gassing up your

9    car, relative to that location?

4:30:20PM10    A.  It's approximately three and a half, maybe four miles.

4:30:24PM11    Q.  So what did you do?

4:30:26PM12    A.  Officer Buriss and I, I was operating the patrol vehicle

13    on that date, left to travel to U.S. 74.

4:30:34PM14    Q.  Did you obtain any additional information as you drove in

15    that direction?

4:30:39PM16    A.  Yes, that he was passing a dealership known as Carter

17    Chevrolet on U.S. 74 coming into Shelby.

4:30:45PM18    Q.  And where was that information coming from?

4:30:48PM19    A.  Shelby police department dispatch.

4:30:50PM20    Q.  Do you know if there was any callers beyond that?

4:30:53PM21    A.  Yes, there was a female caller on line with our department

22    at that time.

4:30:59PM23    Q.  And so that individual had called, and they were

24    dispatching you, or at least several officers?

4:31:04PM25    A.  That's correct.

DANIEL BERNAT - DIRECT EXAMINATION

4:31:06PM 1    Q.  So explain to the jury what happened as you were

2    dispatched to that area.

4:31:10PM 3    A.  I arrived at the location at U.S. 74, I merged my patrol

4    vehicle on the slow lane shoulder on the highway.

4:31:21PM 5    Q.  Were there other officers responding as well?

4:31:23PM 6    A.  Yes, there were.

4:31:24PM 7    Q.  Who were they?

4:31:25PM 8    A.  Officer Scott Hamrick and Officer McDaniel, which was our

9    traffic officer.

4:31:30PM10    Q.  And so when you pulled into that intersection, what was

11    the sort of the situation as far as the vehicle you were

12    looking for?  What happened?

4:31:41PM13    A.  Recognized the vehicle, black in color four-door sedan.

14    At this time I had received or retrieved a phone from my

15    pocket, attempted to locate a picture of the individual known

16    as Mr. Roof.

4:31:52PM17    Q.  So you were using your personal phone.

4:31:54PM18    A.  Yes, sir.

4:31:54PM19    Q.  And that was to make some kind of identification?

4:31:57PM20    A.  Yes, sir.

4:31:58PM21    Q.  Did you -- were you able to find anything?

4:32:01PM22    A.  I was not.

4:32:02PM23    Q.  What happened next?

4:32:03PM24    A.  My partner, Officer Buriss, advised me that a black in

25    color vehicle had just passed with a South Carolina

DANIEL BERNAT – DIRECT EXAMINATION

1    registration plate.

4:32:12PM 2    Q.  And what did you then do?

4:32:14PM 3    A.  The vehicle passed, it was in the fast lane, the left

4    lane.  I merged my patrol vehicle on to U.S. 74 behind the

5    vehicle.

4:32:22PM 6    Q.  And does -- your vehicle had a dash cam?

4:32:24PM 7    A.  It did not.

4:32:25PM 8    Q.  Were there other officers who had dash cams at the time?

4:32:28PM 9    A.  Yes, there was.

4:32:29PM10    Q.  Have you reviewed their videos?

4:32:30PM11    A.  I did.

4:32:31PM12    Q.  Do they depict your vehicle and what you did?

4:32:34PM13    A.  Yes.

4:32:35PM14    Q.  I'm going to show you Government's exhibit, proposed

15    exhibit 105.  Do you recognize that?

4:32:44PM16    A.  Yes, I do.

4:32:45PM17    Q.  And it has your signature on it?

4:32:47PM18    A.  It does.

4:32:48PM19    Q.  Have you reviewed it to see if it accurately depicts what

20    happened that day from another officer's patrol car?

4:32:55PM21    A.  I have.

4:32:56PM22    Q.  Before I play that, I want to ask --

4:32:59PM23         THE COURT:  Are you offering it into evidence?

4:33:01PM24         MR. WILLIAMS:  Yes, I'll show it to defense counsel.

25    I'll move to admit, I won't publish it quite yet.  That's 105.

DANIEL BERNAT - DIRECT EXAMINATION

4:33:10PM 1          THE COURT:  Do we have an objection?

4:33:11PM 2          MS. STEVENS:  No objection, Your Honor.

4:33:12PM 3          THE COURT:  Government 105 is admitted without

4        objection.

4:33:14PM 5      (Government Exhibit 105 received.)

4:33:14PM 6  BY MR. WILLIAMS:

4:33:16PM 7  Q.  So before we watch that video, tell the jury what

8  happened.

4:33:22PM 9  A.  I merged my patrol vehicle onto U.S. 74.  The black in

10  color vehicle immediately merged into the slow lane of travel.

11  Traffic was heavy on that day.  It took me approximately 30

12  seconds to work my way through traffic behind the vehicle.

4:33:37PM13  Q.  Were you the first car behind the vehicle?

4:33:39PM14  A.  Yes, I was.

4:33:40PM15  Q.  And so explain to me, had any kind of plate been run or

16  did you have any information about who might be driving the

17  vehicle?

4:33:49PM18  A.  Repeat the question.

4:33:50PM19  Q.  Had the plate been run so you might be able to make

20  identification of -- you said you looked on your phone; did

21  you try to determine anything else about the driver?

4:33:58PM22  A.  Not that I recall.  However, when I was behind the

23  vehicle, I did call in the registration plate to our dispatch.

4:34:04PM24  Q.  Was there anything about the vehicle otherwise, apart from

25  the call that came in, that made you think it might be the

DANIEL BERNAT - DIRECT EXAMINATION

1  person involved in the Charleston shootings?

4:34:12PM 2  A.  Not that I recall.

4:34:13PM 3  Q.  So when you pulled over the vehicle, what was your

4  approach or what were you going to do when you pulled the car

5  over?

4:34:19PM 6  A.  Conduct a traffic stop.

4:34:23PM 7  Q.  A normal traffic stop, anything different than how you

8  would normally stop someone for a traffic infraction?

4:34:28PM 9  A.  At that time Mr. Roof had -- the vehicle had got behind a

10  tractor trailer and traveled within a close proximity of that

11  tractor trailer.  We was almost out of our jurisdiction at

12  that time.  I did activate my blue lights and siren.  There

13  was a convenience store which is our last point before we

14  ended our jurisdiction.  As I initiated my blue lights and

15  siren, he pulled into the driveway of a residence.

4:35:00PM16  Q.  And the car pulled over, it didn't -- pulled over quickly

17  once you put on your blue lights?

4:35:05PM18  A.  Yes, he immediately turned on his right turn signal and

19  pulled right into the driveway.

4:35:11PM20  Q.  You've heard of the term felony traffic stop.

4:35:13PM21  A.  Yes, sir.

4:35:14PM22  Q.  Did you conduct a felony traffic stop in this case or just

23  a normal traffic stop?

4:35:18PM24  A.  It was a normal traffic stop.

4:35:19PM25  Q.  At that point did you know who the driver actually was?

DANIEL BERNAT - DIRECT EXAMINATION

4:35:23PM 1   A.  I did not.

4:35:24PM 2   Q.  So explain to the jury what happened when you conducted

3   the traffic stop.

4:35:28PM 4   A.  At the time I actually exited my patrol vehicle, my

5   partner, Officer Buriss, exited the passenger side of my

6   patrol vehicle.  Officer Hamrick and Sergeant Myers had also

7   arrived at the same time I conducted the traffic stop.  I

8   approached the left rear corner of the vehicle.

4:35:46PM 9   Q.  What is the normal approach when you have at least two

10   officers going up to a car, what is -- how do you coordinate

11   your traffic stop and how did you do it in this case?

4:35:56PM12   A.  It's officer discretion, but I chose to make contact on

13   the driver's side of the vehicle on this day.

4:36:01PM14   Q.  And what did Officer Buriss do?

4:36:03PM15   A.  He approached the passenger's side of the vehicle.

4:36:06PM16   Q.  And tell the jury what happened.

4:36:09PM17   A.  I ordered the driver to place his hands on the steering

18   wheel and keep them there, which he complied.

4:36:15PM19   Q.  Were you able to get a look at him at that time?

4:36:18PM20   A.  Not at this moment, no.

4:36:19PM21   Q.  Did he have anything on his lap or in his car with him?

4:36:22PM22   A.  When I approached I did observe a GPS sitting on

23   Mr. Roof's lap.

4:36:28PM24   Q.  And so you walk up to the car, you observe the GPS, he

25   puts his hands on the steering wheel, what happens then?

DANIEL BERNAT - DIRECT EXAMINATION

4:36:34PM 1   A.   I asked him to turn the vehicle off with his right hand.

4:36:37PM 2   Q.   Did that happen?

4:36:39PM 3   A.   Yes, it did.

4:36:40PM 4   Q.   What happened next?

4:36:41PM 5   A.   I asked him to slowly step out of the vehicle.

4:36:44PM 6   Q.   Did you ask him who he was at that point?

4:36:46PM 7   A.   When he stepped out of the vehicle I asked him his name.

4:36:49PM 8   Q.   So he steps out, and what did you ask him?

4:36:52PM 9   A.   Sir, what is your name?

4:36:53PM10   Q.   What did he say?

4:36:54PM11   A.   Dylann Roof.

4:36:55PM12   Q.   Did you recognize at that point who he was?

4:36:57PM13   A.   Yes.

4:36:58PM14   Q.   What did you do?

4:37:00PM15   A.   I then frisked his person, which is open-hand pat down of

16   his person.

4:37:06PM17   Q.   Why do you do that?

4:37:07PM18   A.   For any weapons.

4:37:09PM19   Q.   Did you find anything?

4:37:10PM20   A.   I did not.

4:37:11PM21   Q.   Once you had done the initial pat down, what happened?

4:37:14PM22   A.   I then placed him in handcuffs, advised he was not under

23   arrest, but merely detained.

4:37:20PM24   Q.   Why did you do that?

4:37:21PM25   A.   For further investigation.  And officer safety.

DANIEL BERNAT - DIRECT EXAMINATION

4:37:24PM 1   Q.  Had you confirmed yet that that was -- that Dylann Roof

2   was, in fact, the person that was wanted for the shooting in

3   Charleston?

4:37:31PM 4   A.  Not at that moment.

4:37:32PM 5   Q.  So what did you do once you had him sort of handcuffed and

6   detained?

4:37:39PM 7   A.  Supervisor on scene was Sergeant Myers on that date.  And

8   he had advised me that that's him.  He identified him.

4:37:49PM 9   Q.  Did -- say that again.  So was he moved somewhere?  I'm

10   not sure I understand that.

4:37:55PM 11  A.  No, Sergeant Myers had arrived, and once he observed

12   Mr. Roof, he gave me an identification that that was him.

4:38:02PM 13  Q.  Okay.  So Sergeant Myers told you that?

4:38:04PM 14  A.  Yes.

4:38:04PM 15  Q.  So what did Sergeant Myers say?

4:38:06PM 16  A.  Just that that's him, that's Mr. Roof.

4:38:09PM 17  Q.  Okay.  Where was Sergeant Myers at that point in time when

18   you had the defendant out of the car and towards the back or

19   at the driver's side?

4:38:17PM 20  A.  He was on the right rear side of the vehicle.

4:38:19PM 21  Q.  So what happened at this point in time?

4:38:22PM 22  A.  I then released Mr. Roof to Officer Hamrick.

4:38:26PM 23  Q.  And was he at the back of the vehicle?

4:38:29PM 24  A.  Yes.

4:38:29PM 25  Q.  Were you able to hear or see what they were doing?

DANIEL BERNAT – DIRECT EXAMINATION

4:38:32PM 1    A.  No, I was not.

4:38:34PM 2    Q.  What was the next thing that you did in the case?  I'm

3    sorry, the traffic stop.

4:38:40PM 4    A.  After he was released to Officer Hamrick, I then opened

5    the trunk of the vehicle to make sure no individual was

6    inside.

4:38:50PM 7    Q.  Was there anything in the trunk area of the car?

4:38:52PM 8    A.  No, there was not.

4:38:54PM 9    Q.  And I don't mean by anything, was there items apart from

10    people, just normal items back there?

4:39:00PM11    A.  There were items, no individuals.

4:39:02PM12    Q.  What was the next thing you did after you cleared the

13    trunk area?

4:39:06PM14    A.  Advised by Officer Buriss that a weapon may be inside the

15    vehicle.

4:39:09PM16    Q.  Say that again.

4:39:09PM17    A.  I was advised by Officer Buriss that a weapon may be

18    inside the vehicle.

4:39:13PM19    Q.  Were you told where it might be?

4:39:15PM20    A.  No, I was not.

4:39:16PM21    Q.  What did you do after you heard that?

4:39:18PM22    A.  Officer Ledford opened the right rear door of the vehicle.

23    Once the door was opened, we observed a white in color pillow

24    seated on the seat.

4:39:26PM25    Q.  What happened then?

DANIEL BERNAT - DIRECT EXAMINATION

4:39:28PM 1    A.  Officer Ledford raised the pillow, and I observed a black

2    in color handgun which appeared to be a Glock semiautomatic

3    handgun.

4:39:36PM 4    Q.  Are you familiar with handguns?

4:39:38PM 5    A.  Yes.

4:39:38PM 6    Q.  You know what a semiautomatic is?

4:39:40PM 7    A.  Yes.

4:39:41PM 8    Q.  Can you tell the caliber of it?

4:39:43PM 9    A.  No, I could not.

4:39:45PM10    Q.  Once you saw the gun underneath that pillow, did anybody

11    seize it or do anything with it?

4:39:51PM12    A.  The pillow was placed back on top of the weapon and the

13    door was shut, the vehicle was secured.

4:39:57PM14    Q.  And once -- did you tell your supervisor that you had seen

15    the gun in the back seat?

4:40:02PM16    A.  Yes.

4:40:03PM17    Q.  What was the next role you had at that point?

4:40:06PM18    A.  At that time I placed crime scene tape around the vehicle

19    and secured the crime scene at that time.

4:40:12PM20    Q.  And you say that you have reviewed Exhibit 105.  Can you

21    tell the jury basically what the perspective is or whose car

22    it is?

4:40:21PM23    A.  Same.  I don't recall which in car video --

4:40:25PM24    Q.  And it shows your actions?

4:40:27PM25    A.  Yes.

399

DANIEL BERNAT - DIRECT EXAMINATION

4:40:28PM  1          MR. WILLIAMS:  Your Honor, I'm going to play

        2    Government's Exhibit 105.

4:40:33PM  3          MS. STEVENS:  No objection.

4:40:34PM  4          THE COURT:  Very good.

4:40:41PM  5       (Video played.)

4:40:42PM  6    BY MR. WILLIAMS:

4:41:03PM  7    Q.  I'm going pause it there.  Is that your patrol vehicle

        8    that's in the front?

4:41:06PM  9    A.  No, it is not.

4:41:07PM 10    Q.  You're further down the road?

4:41:08PM 11    A.  Yes.

4:41:09PM 12    Q.  Okay.

4:41:12PM 13       (Video played.)

4:42:05PM 14    Q.  So who are the individuals that we see approaching the

        15    vehicle?

4:42:08PM 16    A.  I'm on the left and in the gray shirt.  Officer Hamrick is

        17    on the right side.

4:42:14PM 18    Q.  Who is the one in the gray shirt?

4:42:15PM 19    A.  That's me.

4:42:16PM 20    Q.  And so Officer Hamrick is the one to the right?

4:42:19PM 21    A.  Yes.

4:42:24PM 22          MR. WILLIAMS:  Go ahead.

4:42:25PM 23       (Video played.)

4:43:37PM 24    Q.  So who are the individuals now that are depicted in that?

4:43:43PM 25    A.  My contact was Mr. Roof, so that's me.  Directly behind

400

DANIEL BERNAT - DIRECT EXAMINATION

1    him would be Officer Hamrick.  Officer Scott Ledford is in

2    gray shirt behind him, then Sergeant Myers is on the right

3    rear of the vehicle.

4:43:56PM 4         MR. WILLIAMS:  All right.  I'll start again.

4:44:03PM 5      (Video played.)

4:44:42PM 6    Q.  And is that when the defendant was then taken to another

7    location?

4:44:47PM 8    A.  Repeat the question?

4:44:48PM 9    Q.  Was he taken to another vehicle at that point in time?

4:44:51PM10    A.  Yes, Officer Hamrick's vehicle.

4:44:53PM11    Q.  And who transported him that day, if you recall?

4:44:57PM12    A.  Officer Hamrick.

4:44:59PM13    Q.  Did he transported almost immediately after he was taken

14    from his vehicle?

4:45:03PM15    A.  Yes.

4:45:17PM16         MR. WILLIAMS:  No further questions.  Thank you,

17    Officer Bernat.

4:45:20PM18         THE COURT:  Cross-examination.

4:45:21PM19         MS. STEVENS:  Thank you.

4:45:27PM20                   CROSS-EXAMINATION

4:45:28PM21    BY MS. STEVENS:

4:45:28PM22    Q.  Officer Bernat.  Is it Officer Bernat?

4:45:33PM23    A.  Correct.

4:45:33PM24    Q.  I want to get your title right.  So on June 18th at about

25    10:33 in the morning, you first heard the radio call saying

DANIEL BERNAT - CROSS-EXAMINATION

1  that perhaps Dylann Roof, or the suspect in the Charleston

2  shooting, was headed westbound on I-74, correct?

4:45:50PM 3  A.  Possible citing, yes, that's correct.

4:45:52PM 4  Q.  And you fell in behind him pretty quickly, didn't you?

4:45:57PM 5  A.  Approximately 30 minutes after the call was given, just an

6  estimation.

4:46:01PM 7  Q.  You pulled him over actually -- you had described the

8  Kangaroo gas station on the corner being the end of your

9  jurisdiction, correct?

4:46:09PM10  A.  That's correct.

4:46:09PM11  Q.  And you were able to get him pulled over just shy of that

12  line?

4:46:13PM13  A.  That's correct.

4:46:14PM14  Q.  And you said he pulled over within ten yards or so,

15  correct, when you turned on your blue light, he pulled over in

16  a very short distance?

4:46:23PM17  A.  I didn't testify to ten yards, but as soon as I activated

18  my blue light and siren, I testified he immediately pulled

19  over.

4:46:30PM20  Q.  And put on his right turn signal and pulled off fairly

21  quickly.

4:46:33PM22  A.  That's correct.

4:46:35PM23  Q.  Now, when you got out of your car, given that you were

24  perhaps pulling over the suspect in the Charleston shooting,

25  you drew your weapon, correct?

DANIEL BERNAT - CROSS-EXAMINATION

4:46:44PM 1    A.  I did remove my duty weapon from the holster, that's

2    correct.

4:46:48PM 3    Q.  And we saw in the video that you approach the car

4    initially with your weapon drawn, correct?

4:46:54PM 5    A.  That's correct.

4:46:55PM 6    Q.  And your partner, Officer Buriss, is it?

4:46:59PM 7    A.  That's correct.

4:47:00PM 8    Q.  Was he behind you as you first approached the car?

4:47:03PM 9    A.  He was on the right side of Mr. Roof's vehicle.

4:47:06PM10    Q.  And who was it that you described the officer immediately

11    to your right that approached the right passenger side of the

12    car?

4:47:13PM13    A.  Officer Hamrick.

4:47:17PM14    Q.  And the car was an older Hyundai vehicle?

4:47:21PM15    A.  That's correct.

4:47:22PM16    Q.  You were able to run the tags and determine that it was,

17    in fact, the car you were looking for?

4:47:29PM18    A.  That's incorrect.  The tag already went to dispatch,

19    dispatch had advised me that it was a different vehicle, not a

20    Hyundai.

4:47:37PM21    Q.  But eventually you determined that you actually had the

22    proper car, right?

4:47:43PM23    A.  Had no information other than what I had, other than a

24    possible sighting of Mr. Roof.  I mean, I conducted a vehicle

25    stop for him following too close to a tractor trailer.  It was

DANIEL BERNAT – CROSS-EXAMINATION

1    my contact with him that then advised me of proof that it was

2    then, in fact, Mr. Roof.

4:48:00PM 3    Q.    And then as we saw in Government's Exhibit 105, you

4    approached initially with your weapon drawn, right?

4:48:07PM 5    A.    My weapon was removed from the duty holster, that's

6    correct.

4:48:10PM 7    Q.    And you had it in your hand?

4:48:12PM 8    A.    That's correct.

4:48:13PM 9    Q.    And then you got close to the driver's door of the car,

10    right?

4:48:16PM11    A.    That's correct.

4:48:17PM12    Q.    And you looked into the window of the driver's door of the

13    car, correct?

4:48:24PM14    A.    That's correct.

4:48:24PM15    Q.    And you put your weapon away, as we saw?

4:48:27PM16    A.    That's correct.

4:48:29PM17    Q.    And you ordered Dylann Roof to put his hands on the

18    steering wheel, didn't you?

4:48:34PM19    A.    My approach to Mr. Roof, that's correct.

4:48:36PM20    Q.    And I imagine you ordered that pretty loudly?

4:48:39PM21    A.    That's correct.

4:48:40PM22    Q.    And he immediately put his hands at the ten and two

23    position on the steering wheel?

4:48:45PM24    A.    That's correct.

4:48:46PM25    Q.    And did he keep them there in your sight as you came up

DANIEL BERNAT - CROSS-EXAMINATION

1    toward the window of the car with his hands on the wheel?

4:48:51PM 2    A.  Yes, he did.

4:48:52PM 3    Q.  And then you ordered him to take his right hand and turn

4    the car off?

4:48:56PM 5    A.  Yes, I did.

4:48:57PM 6    Q.  And he complied with that order?

4:48:59PM 7    A.  Correct.

4:49:00PM 8    Q.  And was it at that point that you had him get out of the

9    car?

4:49:04PM10    A.  That's correct.

4:49:05PM11    Q.  And did you notice at that point the other officers, too,

12    had their weapons put back away, didn't they?

4:49:11PM13    A.  No, I could not see what the other officers were doing, I

14    was focused on Mr. Roof.

4:49:16PM15    Q.  All right.  So you were focused on Dylann Roof personally

16    at that time?

4:49:20PM17    A.  That's correct.

4:49:21PM18    Q.  Now, when he stepped out of the car did you speak with

19    him?

4:49:24PM20    A.  Yes, I did.

4:49:25PM21    Q.  And you asked him, what is your name, right?

4:49:28PM22    A.  That's correct.

4:49:28PM23    Q.  And he said to you, Dylann Roof.

4:49:30PM24    A.  That's correct.

4:49:33PM25    Q.  Did he speak quietly or loudly in that moment, having just

DANIEL BERNAT - CROSS-EXAMINATION

1       been pulled over?

4:49:37PM 2     A.  He was humble, he was quiet.

4:49:39PM 3     Q.  He was quiet?

4:49:40PM 4     A.  Yes.

4:49:42PM 5     Q.  And you asked him, I believe, at some point in this

6       exchange, are you from Charleston?

4:49:50PM 7     A.  No, that's incorrect.

4:49:51PM 8     Q.  Another officer asked him that?

4:49:53PM 9     A.  I can't testify to what other officers asked.

4:49:56PM10     Q.  You established with him that his name was Dylann Roof.

4:49:59PM11     A.  That's correct.

4:50:01PM12     Q.  And was it then that you placed him in cuffs?

4:50:04PM13     A.  After a frisk of his person was completed, that's correct.

4:50:07PM14     Q.  And what did you find on the frisk of his person then?

4:50:11PM15     A.  Nothing.

4:50:13PM16     Q.  How do you conduct a frisk of the person, what do you do?

4:50:16PM17     A.  An open-handed pat down.

4:50:18PM18     Q.  Of what areas?

4:50:20PM19     A.  His entire body area.

4:50:27PM20     Q.  And you said you found nothing?

4:50:29PM21     A.  I did not.

4:50:30PM22     Q.  And then you described that Officer Hamrick took Dylann

23      Roof back toward the trunk of the car, correct?

4:50:36PM24     A.  I released Mr. Roof to Officer Hamrick.  I can't testify

25      to what Officer Hamrick did with him other than placing him

DANIEL BERNAT - CROSS-EXAMINATION

1    into his patrol car.

4:50:45PM 2    Q.  You didn't hear the next thing that was said between

3    Officer Hamrick and Dylann Roof, right?

4:50:51PM 4    A.  I did not.

4:50:52PM 5    Q.  But the next thing you heard was there may be a weapon in

6    the car.

4:50:59PM 7    A.  From Officer Buriss.

4:51:01PM 8    Q.  And your partner, Officer Buriss, told you there may be a

9    weapon in the car, right?

4:51:06PM10    A.  It wasn't immediately, it was after we opened the trunk to

11    look for any individual that may be inside the vehicle.

4:51:12PM12    Q.  So before then you heard there was the weapon in the back

13    seat of the car, you opened the trunk?

4:51:19PM14    A.  Yes, I did.

4:51:21PM15    Q.  When you opened the trunk you were looking for a person?

4:51:23PM16    A.  That's correct.

4:51:24PM17    Q.  And there was nobody in the trunk?

4:51:26PM18    A.  There was not.

4:51:27PM19    Q.  But when you opened the trunk, what did you see in the

20    trunk?

4:51:30PM21    A.  I don't recall.

4:51:32PM22    Q.  Personal items?

4:51:33PM23    A.  I don't recall.

4:51:35PM24    Q.  Was it empty?  Was it full?

4:51:37PM25    A.  I don't recall.

DANIEL BERNAT - CROSS-EXAMINATION

4:51:40PM 1  Q.  After you closed the trunk, that's when you heard there

2  may be a weapon in the passenger area of the car, that is, the

3  passenger compartment of the car?

4:51:49PM 4  A.  Officer Buriss advised me there may be a weapon inside the

5  vehicle.

4:51:52PM 6  Q.  Okay.  And you went to the back passenger seat?  The back

7  passenger door?

4:51:57PM 8  A.  That's correct.

4:51:58PM 9  Q.  You opened up the door?

4:51:59PM10  A.  That's correct.

4:52:00PM11  Q.  And you saw a white pillow.

4:52:02PM12  A.  That's correct.

4:52:03PM13  Q.  Like a standard pillow that a person would sleep with on

14  their bed?

4:52:08PM15  A.  I don't recall.

4:52:09PM16  Q.  Was it little, was it normal sized?

4:52:12PM17  A.  I don't recall.

4:52:13PM18  Q.  You lifted up the pillow?

4:52:15PM19  A.  Officer Ledford lifted the pillow up.

4:52:18PM20  Q.  Were you standing there watching?

4:52:19PM21  A.  Yes, I was.

4:52:20PM22  Q.  Okay.  And underneath the pillow was a gun?

4:52:23PM23  A.  That's correct.

4:52:24PM24  Q.  And did you leave the weapon there, did you leave the gun

25  there or did you pick it up and take it at that time?

DANIEL BERNAT - CROSS-EXAMINATION

4:52:30PM 1    A.  The gun was never touched.

4:52:32PM 2    Q.  So you just put the pillow back down.

4:52:34PM 3    A.  That's correct.

4:52:39PM 4    Q.  At that point you said you placed Dylann Roof in Officer

         5    Hamrick's custody?

4:52:44PM 6    A.  That's not what I testified to.  I testified to is that

         7    immediately after he was taken out of the vehicle, I detained

         8    him, and then he was released to Officer Hamrick.

4:52:53PM 9    Q.  Okay.  And you said he was not under arrest?

4:52:57PM10    A.  That's correct.

4:52:58PM11    Q.  He -- but you handcuffed him?

4:53:05PM12    A.  That's correct.

4:53:01PM13    Q.  Okay.  For safety reasons.

4:53:03PM14    A.  That's correct.

4:53:03PM15    Q.  And then he was sent with Officer Hamrick at that time.

4:53:07PM16    A.  That's correct.

4:53:09PM17    Q.  Did he appear to you to be intoxicated?

4:53:13PM18    A.  My contact with him was very brief.  I could not form an

        19    opinion that he was under any influence at that time.

4:53:20PM20    Q.  Did you smell anything coming off of him?

4:53:22PM21    A.  No, I did not.

4:53:23PM22    Q.  Was he cooperative with you?

4:53:24PM23    A.  Yes, he was.

4:53:26PM24    Q.  Did you have further interaction with him at the police

        25    station?

DANIEL BERNAT – CROSS-EXAMINATION

4:53:30PM 1   A.  I did not.

4:53:31PM 2   Q.  So your last contact was you were standing at the trunk of

3   the car when he was pulled away with Officer Hamrick?

4:53:38PM 4   A.  That was not my last contact with him.  My last contact

5   with him was when we assisted him on the plane.

4:53:44PM 6   Q.  Okay.  You took him later that day to an airplane?

4:53:48PM 7   A.  That's correct.

4:53:48PM 8   Q.  And he was flown with the FBI back to South Carolina,

9   correct?

4:53:52PM10   A.  That's correct.

4:53:53PM11   Q.  And he had voluntarily waived extradition from North

12   Carolina and was flown back that day with the FBI.

4:53:59PM13           MR. WILLIAMS:  Object to hearsay, Your Honor.

4:54:01PM14           THE COURT:  I'm sorry?

4:54:02PM15           MR. WILLIAMS:  Object to hearsay.

4:54:03PM16           THE COURT:  If he knows.

4:54:04PM17   BY MS. STEVENS:

4:54:04PM18   Q.  If you know, sir, did he waive extradition voluntarily

19   from North Carolina, go with the FBI to be placed on an

20   airplane and brought back to Charleston on June 18th?

4:54:15PM21   A.  He did waive extradition.

4:54:17PM22           THE COURT:  Overruled.

4:54:22PM23           MS. STEVENS:  If I may have a moment, Your Honor.

4:54:23PM24           THE COURT:  Yes.

4:54:27PM25           MS. STEVENS:  Nothing further, thank you.

MICHAEL MYERS - DIRECT EXAMINATION

4:54:29PM 1            THE COURT:  Thank you.  Anything else?

4:54:31PM 2            MR. WILLIAMS:  No redirect, Your Honor.

4:54:33PM 3            THE COURT:  Thank you, Officer.  Call your next

4        witness.

4:54:39PM 5            MR. WILLIAMS:  Thank you, Your Honor.  Government

6        calls Sergeant Hamrick.

4:55:08PM 7            THE CLERK:  State your full name for the record,

8        please.

4:55:10PM 9   A.  Michael Myers.

4:55:14PM10        MICHAEL MYERS, a witness called by the Government, first

11        having been duly sworn, testified as follows:

4:55:20PM12                        DIRECT EXAMINATION

4:55:20PM13   BY MR. WILLIAMS:

4:55:33PM14   Q.  Sir, tell the jury where you work.

4:55:36PM15   A.  I'm a -- Shelby police department.

4:55:38PM16   Q.  What do you do for the Shelby police department?

4:55:41PM17   A.  I am a patrol sergeant.

4:55:43PM18   Q.  How long have you been a -- how long have you been in law

19        enforcement?

4:55:47PM20   A.  Going on 19 years.

4:55:49PM21   Q.  What agencies have you worked for?

4:55:51PM22   A.  Just Shelby police department.

4:55:54PM23   Q.  And what is your current rank?

4:55:56PM24   A.  I'm a sergeant in a patrol division.

4:56:00PM25   Q.  How long have you been a supervisor?

MICHAEL MYERS - DIRECT EXAMINATION

4:56:02PM 1    A.   Since 2008.

4:56:03PM 2    Q.   And did you work as a patrol officer prior to that?

4:56:07PM 3    A.   Yes, sir.

4:56:07PM 4    Q.   Were you working on June 18, about 10:30 in the morning,

5    last year?

4:56:12PM 6    A.   Yes, sir.

4:56:13PM 7    Q.   Do you recall a traffic stop that happened that morning?

4:56:16PM 8    A.   Yes, sir.

4:56:19PM 9    Q.   That involved an individual named Dylann Roof, the

10   defendant in this case?

4:56:22PM11    A.   Yes, sir.

4:56:23PM12    Q.   How did you get involved in that traffic stop that

13   morning?

4:56:26PM14    A.   I was notified by our communications center, some

15   information that they have received, and they wanted me to

16   look at a call that they were dispatching other officers to be

17   on the look out for a vehicle that was supposed to be coming

18   in from the east side of Shelby traveling west on U.S. 74.

4:56:49PM19    Q.   Did you have any awareness of the shooting that had

20   happened in Charleston the night before?

4:56:54PM21    A.   Only thing that I had was prior to me coming in or

22   reporting for duty that morning was I did see a -- just a

23   small news clip that morning before I left out to go to work.

4:57:08PM24    Q.   Did you have any kind of briefing within your department?

4:57:11PM25    A.   I did talk to the higher officers that were working that

MICHAEL MYERS - DIRECT EXAMINATION

1    day, but we didn't have a whole lot of information at that

2    time.

4:57:19PM 3    Q.  So it wasn't a case that was on your radar at that point

4    in time at least.

4:57:23PM 5    A.  Other than we knew there had been a shooting incident in

6    Charleston in the church.

4:57:28PM 7    Q.  So you say you were dispatched or a call went out.  Tell

8    the jury what happened.

4:57:33PM 9    A.  Our communications center notified two officers that they

10    have received information that there was a vehicle coming into

11    Shelby on U.S. 74.  And they wanted them to be in the area to

12    look with -- look for the car.  The information that was given

13    to us is that the caller had recognized the vehicle possibly

14    being involved with the church shooting here in Charleston.

4:58:01PM 15    Q.  And was that a civilian, a person that was driving?

4:58:05PM 16    A.  There was some of the information was relayed by an

17    officer from Kings Mountain police department, and there was

18    also some information from a female who also had called in to

19    our department.

4:58:19PM 20    Q.  So you had that call come in; what did you do?

4:58:22PM 21    A.  I looked at the call, I actually listened where the

22    officers were to determine where U.S. 74 is from the city

23    limits to the end of city limits, a little over eight and a

24    half miles, and I listened to where they were checking in on

25    the location on the road.  And I knew that we had cars on the

MICHAEL MYERS - DIRECT EXAMINATION

1    east side of U.S. 74, and we also had cars that were checking

2    en route to the western end of U.S. 74.  I happened to be

3    close to the middle, responding to a area which was Hamrick

4    Street and U. S. 74.

4:58:56PM 5    Q.  So when the call came in, how far were you or how close

6    were you to the area where you thought the suspect car might

7    show up?

4:59:03PM 8    A.  I was within probably two miles of the bypass.

4:59:09PM 9    Q.  Did anybody else respond apart from you with your

10    department?

4:59:12PM11    A.  Yes, sir.

4:59:13PM12    Q.  Who else?

4:59:14PM13    A.  There was one -- traffic officers that responded to the

14    east side of 74, his name was Officer McDaniel.  Then there

15    was Officer Bernat, and then -- who was paired up with Joe

16    Buriss, at that time responded and stated that they were

17    coming in on the western side of U.S. 74.

4:59:35PM18    Q.  And was there an officer with Sergeant Myers involved as

19    well?

4:59:39PM20    A.  That's me.

4:59:40PM21    Q.  I'm sorry, I got the names mixed up.

4:59:43PM22            THE COURT:  I introduce you to your witness.

4:59:44PM23    Q.  Was there Officer Hamrick that was involved as well?

4:59:47PM24    A.  Yes, sir.

4:59:47PM25    Q.  And what -- where did he respond to?

MICHAEL MYERS - DIRECT EXAMINATION

4:59:51PM 1   A.  He responded to the 74 bypass area also.  But I -- he did

2   not give an actual location of where he was at, at that time.

5:00:01PM 3   Q.  So tell me what happened at that point.

5:00:04PM 4   A.  When I was at the Hamrick Street and U.S. 74, I then

5   received information that Officer Bernat and Officer Buriss

6   were at Polkville Road and U.S. 74 west.  And they said that

7   they were in position.

5:00:24PM 8       Short time later when I was sitting at the traffic light

9   there at that intersection, they notified that they had a

10   vehicle matching the description that the caller had

11   recognized that had passed.  And I then was started traveling

12   west on U.S. 74.

5:00:41PM 13   Q.  What occurred then?

5:00:42PM 14   A.  Once I was on 74, I traveled down, Officer Bernat called

15   in a registration plate number that was displayed on the rear

16   of the vehicle.  And I continued traveling west.  Once I

17   passed, there's a shopping center on my right on U.S. 74,

18   continued on, on West Dixon.  I was able to work my way and

19   notify Officer Bernat that I was close behind him there on the

20   West Dixon Boulevard, so he knew that he had an additional car

21   there.

5:01:16PM 22   Q.  And what were the -- how many cars then were following the

23   suspect vehicle?

5:01:20PM 24   A.  There were several cars around, there was probably

25   approximately six or so, there were several on both lanes, the

MICHAEL MYERS - DIRECT EXAMINATION

1    right- and left-hand lane.  As we were traveling up through.

2    And we were actually approaching Plato Lee Road and Beaver

3    Pantry stoplight, when I was still trying to maneuver through

4    the traffic to get up close to Officer Bernat and Joe Buriss.

5:01:43PM 5    Q.  How many Shelby police cars were sort of in that line

6    behind the defendant vehicle?

5:01:49PM 7    A.  Originally I knew that Officer Bernat was the car directly

8    closest to him, then it would have been my vehicle and then

9    Officer Scott Hamrick's vehicle, and then Officer Scott

10   Ledford's vehicle would have been the fourth vehicle that come

11   up.

5:02:06PM 12   Q.  So it was Bernat, then you and then Hamrick?

5:02:10PM 13   A.  Yes.

5:02:12PM 14   Q.  Did you have a dash cam video?

5:02:14PM 15   A.  Yes, sir, I did.

5:02:15PM 16   Q.  And I'm going -- have you reviewed two of the different

17   dash cam videos in this case?

5:02:21PM 18   A.  Yes, sir.

5:02:21PM 19   Q.  Do they both accurately reflect what occurred?

5:02:24PM 20   A.  Yes, sir.

5:02:24PM 21   Q.  I'm going to show you Government's 106.  Is that one that

22   you reviewed?

5:02:31PM 23   A.  Yes, sir.

5:02:32PM 24   Q.  And does it accurately reflect one of those two dash cams

25   or patrol car videos?

MICHAEL MYERS – DIRECT EXAMINATION

5:02:40PM 1  A.  Yes, sir.

5:02:41PM 2        MR. WILLIAMS:  I'm going to show this to defense.

5:02:49PM 3        THE COURT:  Any objection?

5:02:50PM 4        MS. STEVENS:  No objection, Your Honor.

5:02:51PM 5        THE COURT:  Government 106 admitted without

6  objection.

5:02:53PM 7      (Government Exhibit 106 received.)

5:02:53PM 8  BY MR. WILLIAMS:

5:02:54PM 9  Q.  Before I play that, tell the jury what your role was in

10  the traffic stop and what occurred.

5:03:01PM11  A.  My role at that point, due to the fact that Officer Bernat

12  was immediately behind the vehicle, he was the what we call

13  the primary vehicle to initiate the actual traffic stop.  My

14  responsibility at that point is to assist him during the

15  traffic stop procedures.  So I was there as a secondary car,

16  then I realized that Officer Hamrick was there, and then there

17  was also another car, which was Scott Ledford.  But I was

18  there to assist him with the traffic stop.

5:03:30PM19  Q.  And what happened during the traffic stop?

5:03:32PM20  A.  Officer Bernat activated his blue lights, at which time I

21  also activated mine.  When Officer Bernat activated his blue

22  lights, his vehicle was directly behind the defendant's

23  vehicle.  And there was a transfer truck immediately in front

24  of it.  And once he activated the blue lights, the defendant's

25  vehicle actually pulled off to the right-hand shoulder of the

MICHAEL MYERS - DIRECT EXAMINATION

1    roadway from the -- across a right turn lane into a gravel

2    driveway.

5:04:06PM 3    Q.  What happened then?

5:04:07PM 4    A.  Officer Bernat and Officer Buriss exited the vehicle --

5    their vehicle, I also exited my vehicle.  Officer Bernat gave

6    commands to the driver of the vehicle to put his hands on the

7    steering wheel.

5:04:25PM 8    Q.  Where were you when this was happening?

5:04:26PM 9    A.  I was exiting my vehicle approaching the rear of Officer

10    Bernat's and Officer Hamrick's vehicles.

5:04:35PM11    Q.  And did you stay towards the back of the --

5:04:37PM12    A.  I did, I stayed back just a little ways from actually

13    where they were, kind of observing the whole situation.  From

14    a little bit of a distance from them.

5:04:48PM15    Q.  And what did you observe happening?

5:04:50PM16    A.  As Officer Bernat was approaching the vehicle, Officer

17    Buriss actually approached the vehicle also, and then Officer

18    Hamrick.  They originally had their weapons drawn.  However,

19    due to the compliance to the driver, he complied immediately

20    to the commands that the officers gave him, putting his hands

21    on the steering wheel.  They cautiously approached the

22    vehicle.

5:05:17PM23        And when they got to the rear of the vehicle, Officer

24    Bernat proceeded to the driver's side door and Officer Buriss

25    went to the passenger side front door.  And Officer Hamrick

418

MICHAEL MYERS - DIRECT EXAMINATION

1    stayed at the rear, and I kind of stayed in the area.  I had

2    moved up a little distance closer to the vehicle at that time.

5:05:35PM 3    Q.  So as Officer Bernat was at the side, what did you see or

4    hear happening?

5:05:40PM 5    A.  He actually began talking to the driver, the defendant.

6    And he actually got the driver out of the vehicle.

5:05:50PM 7    Q.  What happened then?

5:05:52PM 8    A.  When he got the defendant out of the vehicle, he walked --

9    put him up against the side of the vehicle, done a quick pat

10    down of his person, and then moved him to the rear of the car.

5:06:06PM 11    Q.  And what happened at the rear of the car?

5:06:08PM 12    A.  When we got to the rear of the car he actually -- Officer

13    Bernat actually turned him over to Officer Hamrick, who was

14    there at the rear of the car.  And Officer Hamrick was doing a

15    secondary search of him, and that's where I spoke to Mr. Roof.

5:06:23PM 16    Q.  So had you identified him or gotten his name at that point

17    in time?

5:06:27PM 18    A.  No, sir.  Not -- not -- at that time my communications

19    center was calling me on the radio, they were giving me some

20    information by radio, but at that time I had -- my focus was

21    on Dylann with the situation of the car.

5:06:44PM 22    Q.  So did you -- had Officer Bernat told you that he

23    confirmed his identification or that he --

5:06:51PM 24    A.  No, sir.

5:06:52PM 25    Q.  So when you get to the back of the car, what happens

MICHAEL MYERS - DIRECT EXAMINATION

1    there?

5:06:56PM 2    A.  Officer Hamrick's actually doing another search of

3    Mr. Roof.  While he's doing that, I actually asked him,

4    Mr. Roof, if he was involved in the shooting incident in

5    Charleston.

5:07:09PM 6    Q.  How close were you or far from him were you when you said

7    that?

5:07:12PM 8    A.  Two feet.

5:07:13PM 9    Q.  And did he respond?

5:07:14PM10    A.  He did.

5:07:15PM11    Q.  What did he say?

5:07:16PM12    A.  He said he was the person involved in the shooting in

13    Charleston.

5:07:22PM14    Q.  What happened next?

5:07:24PM15    A.  Asked if he had any identification.  He did say he had

16    identification in his pocket.  He actually told Officer

17    Hamrick where the identification was and Officer Hamrick

18    removed it and handed it to him.

5:07:39PM19    Q.  Did you get his I.D. from him?

5:07:41PM20    A.  I got it from Officer Hamrick, yes, sir.

5:07:43PM21    Q.  It was to the same person, to Dylann Roof?

5:07:45PM22    A.  Yes, sir, it was the South Carolina driver's license of

23    Mr. Roof.

5:07:49PM24    Q.  And what happened then?

5:07:50PM25    A.  And then I -- I advised Officer Hamrick to take him to his

MICHAEL MYERS - DIRECT EXAMINATION

1    vehicle to get him prepared for transport.

5:08:00PM 2    Q.  And did you go with him back to that car?

5:08:03PM 3    A.  I did.  I walked with him, they originally took him back,

4    they actually took him to the patrol car they were going to

5    transport him in, and they began doing a more thorough search

6    of him while we were kind of going back there and they were

7    conducting that one before they put him in the car, I did

8    speak to Mr. Roof.

5:08:24PM 9    Q.  What was your purpose in speaking to him at that point?

5:08:26PM10    A.  I asked him if there was anything in the vehicle that

11    could harm us or anybody else in the area, if there was any

12    weapons, explosives or any other things that -- in the vehicle

13    that could harm us.

5:08:39PM14    Q.  And did he reply to you?

5:08:41PM15    A.  He did.

5:08:42PM16    Q.  What did he say?

5:08:43PM17    A.  He said immediately, once I got -- asked that question,

18    his response to me was -- is, there's a gun in the vehicle.

5:08:50PM19    Q.  Did he say where?

5:08:52PM20    A.  When I responded to him and said, a gun in the vehicle?

21    He said the gun's in the vehicle under a pillow in the back

22    seat.

5:08:59PM23    Q.  And once you had that information, what did you do?

5:09:03PM24    A.  There was actually officer started searching the vehicle,

25    going through --

MICHAEL MYERS - DIRECT EXAMINATION

5:09:08PM 1  Q.  Who searched the vehicle?

5:09:09PM 2  A.  It wasn't a really thorough search, they were actually

3  still clearing to make sure everything was good, and that was

4  Officer Bernat and Officer Scott Ledford, they had opened up

5  the trunk area of the vehicle and the -- at some point opened

6  the right rear door.

5:09:24PM 7  Q.  And what happened then?

5:09:25PM 8  A.  They then ceased, because I remember Officer Ledford

9  looking inside the vehicle, I then told him that we needed to

10  secure the vehicle and to secure the area for -- till we could

11  find out about processing the vehicle.

5:09:43PM 12  Q.  So you identified -- you all saw the gun there, then you

13  ordered it to go no further?

5:09:50PM 14  A.  Apparently Officer Bernat and Officer Ledford I think

15  actually seen it.  I wasn't that close to the vehicle to

16  actually see it.

5:09:57PM 17  Q.  And what was the next thing you did, if anything?

5:10:02PM 18  A.  Once we done that, we actually -- I ordered or asked

19  Officer Hamrick to transport Mr. Roof to our office, to what

20  we call our library area of our police department.

5:10:15PM 21  Q.  And would he have been the one that then took him to the

22  police station?

5:10:19PM 23  A.  That is correct.

5:10:19PM 24  Q.  And that was Officer Hamrick?

5:10:22PM 25  A.  That is Officer Scott Hamrick.

MICHAEL MYERS - DIRECT EXAMINATION

5:10:23PM 1          MR. WILLIAMS:  I'm going to play now Government's

2      106.

5:10:37PM 3      (Video played.)

5:11:15PM 4  Q.  Can you explain who the three different vehicles belong to

5      in terms of law enforcement officers?

5:11:21PM 6  A.  Yes, sir, the vehicle directly behind right now the

7      transfer truck to the left, that's Officer Bernat and Joe

8      Buriss' vehicle.  The vehicle to the right on the right

9      shoulder of the roadway is Officer Scott Hamrick's vehicle.

10      The media was showing from my vehicle.

5:11:39PM 11  Q.  That's Bernat, Hamrick, then your car with the video?

5:11:45PM 12  A.  That's correct, sir.

5:11:46PM 13          MR. WILLIAMS:  Go ahead.

5:11:47PM 14      (Video was played.)

5:15:28PM 15  Q.  So the individual who's at the back of the car there, who

16      is that?

5:15:31PM 17  A.  That's Officer Scott Hamrick.

5:15:35PM 18  Q.  You said that he was then -- the defendant was then

19      transported to the police station?

5:15:41PM 20  A.  That is correct, sir.

5:15:42PM 21  Q.  Who did that transport?

5:15:43PM 22  A.  Officer Scott Hamrick.

5:15:45PM 23  Q.  Was he the only one involved in that transport?

5:15:48PM 24  A.  Yes, sir.

5:15:49PM 25  Q.  And who would have met the defendant back at the police

MICHAEL MYERS - DIRECT EXAMINATION

1    station?

5:15:56PM 2    A.  I had made a call to our sergeant of our criminal

3    investigation division, Detective Benfield, and requested that

4    they have someone to meet him at our police department there

5    in our library.

5:16:10PM 6    Q.  So Hamrick was to transport him back to detectives at the

7    police station?

5:16:17PM 8    A.  That is correct, sir.

5:16:18PM 9    Q.  What was the rest of your responsibilities that day or the

10   rest of that afternoon?

5:16:28PM11   A.  Once I -- Officer Hamrick had started the transport of him

12   back to the police department, I had a communication center

13   make contact with the command post set up here in Charleston,

14   so I could relay the information that we had Mr. Roof in

15   custody.

5:16:46PM16   Q.  And did investigators or agents from the Charleston case

17   then respond later that day to Shelby?

5:16:53PM18   A.  Yes, sir, they did.

5:16:58PM19        MR. WILLIAMS:  No further questions, thank you.

5:17:00PM20        THE COURT:  Cross-examination.

5:17:02PM21        MS. STEVENS:  Thank you, Your Honor.

5:17:03PM22                  CROSS-EXAMINATION

5:17:03PM23   BY MS. STEVENS:

5:17:06PM24   Q.  Good evening, Sergeant.

5:17:11PM25   A.  Good evening.

424

MICHAEL MYERS – DIRECT EXAMINATION

5:17:12PM 1    Q.  So on June 18th, you officers at the Shelby police

2    department were not expecting the Charleston shooter to come

3    driving through Shelby, correct?

5:17:22PM 4    A.  Not specifically, no, ma'am.

5:17:24PM 5    Q.  And then at 10:33 a.m. that call came across your radio

6    that perhaps he was heading westbound on Highway 74, right?

5:17:32PM 7    A.  Yes.

5:17:33PM 8    Q.  And you fell in approximately three cars back in the video

9    that we just saw --

5:17:44PM10    A.  Yes.

5:17:38PM11    Q.  -- on Government's 106.  From that vantage point in

12    Government's 106, we can't very clearly see the back of the

13    trunk, but did you walk up there and were you present in the

14    area when Dylann Roof was first taken from the car?

5:17:57PM15    A.  I was within close proximity, not exactly where the

16    vehicle was, I was more where Officer Hamrick's vehicle was.

5:18:03PM17    Q.  Okay.  And did you see the various officers that were

18    close to the car, the black Hyundai?

5:18:09PM19    A.  The whole time, yes, ma'am.

5:18:11PM20    Q.  All right.  And some of them initially drew their weapons?

5:18:14PM21    A.  Yeah, we all did.

5:18:16PM22    Q.  When the car was first pulled over?

5:18:18PM23    A.  Yes, ma'am.

5:18:19PM24    Q.  Because you didn't know what to expect.

5:18:20PM25    A.  Yes.

MICHAEL MYERS - DIRECT EXAMINATION

5:18:21PM 1    Q.  And when the first officer, Officer Bernat, approached the

2    car, how did it get communicated backward that you all could

3    put your weapons away?

5:18:32PM 4    A.  That kind of transpired automatically.  Nobody made a call

5    or command, it was because based on the situation that we were

6    dealing with, he was compliant with what Officer Buriss was

7    telling him to do.  Once Officer Buriss reached the passenger

8    side, there was always one that had a weapon out until the

9    point that Officer Bernat actually put his hands on Mr. Roof.

5:18:54PM 10    Q.  Okay.  And so Officer Bernat was at the driver's side and

11    Officer Buriss was on the passenger side of the black Hyundai?

5:19:02PM 12    A.  Yes.

5:19:02PM 13    Q.  And Officer Bernat noticed that Dylann Roof had his hands

14    on the steering wheel at ten and two, correct?

5:19:09PM 15    A.  Yes.

5:19:10PM 16    Q.  And he had a GPS machine sitting in his lap?

5:19:13PM 17    A.  I'm not sure about that.  I didn't see that part.

5:19:16PM 18    Q.  Okay.  How was Dylann Roof taken from the vehicle?  Did he

19    voluntarily get out of the car on his own accord or was he

20    taken physically from the car?

5:19:25PM 21    A.  He got out on his own.

5:19:28PM 22    Q.  So he followed a command, he stepped out of the car and

23    then stood beside the car?

5:19:32PM 24    A.  Yes.

5:19:33PM 25    Q.  And was that what you meant when you said that he was

MICHAEL MYERS - DIRECT EXAMINATION

1    compliant there and you all saw that you could put your

2    weapons away?

5:19:40PM 3    A.  Yes, ma'am.

5:19:40PM 4    Q.  Okay.  And was -- who all was there in the vicinity of the

5    back end of the car?  We've talked about Officer Ber --

5:19:49PM 6    A.  Officer Bernat, Officer Buriss, myself, Officer Hamrick,

7    and then Scott Ledford comes up, kind of stays back off there

8    at a little distance.

5:20:04PM 9    Q.  And those various officers would all be visible in

10    Government's Exhibit 105, the video that more closely shows

11    the back area of the black Hyundai?

5:20:13PM12    A.  Yes.

5:20:14PM13    Q.  Okay.  And when Officer Buriss came walking back toward

14    you, do you recall him making any statements about Dylann

15    Roof?

5:20:23PM16            MR. WILLIAMS:  Object to any hearsay, Your Honor.

5:20:26PM17            THE COURT:  Well, what's the purpose?

5:20:30PM18            MS. STEVENS:  It's an excited utterance, Your Honor.

5:20:32PM19    Q.  The officers were there at the back of the car making an

20    arrest, correct?

5:20:38PM21    A.  Yes.

5:20:38PM22    Q.  Okay.  And do you recall a specific statement made in the

23    heat of that moment --

5:20:43PM24            MR. WILLIAMS:  Renew the objection, Your Honor.

25

MICHAEL MYERS – DIRECT EXAMINATION

5:20:46PM 1    Q.  -- by Officer Buriss?

5:20:48PM 2         THE COURT:  Let's hold on just a second.  Do you have

3    any other theories other than excited utterance?

5:20:54PM 4         MS. STEVENS:  No, Your Honor, it's a hearsay

5    exception.  It's also not for the truth of the matter

6    asserted.

5:21:01PM 7         THE COURT:  Now we're sort of where I'm driving at.

8    Just for the purpose of the information he then had.

5:21:06PM 9         MS. STEVENS:  Just for that purpose.

5:21:07PM10         THE COURT:  Overruled.

5:21:08PM11         MS. STEVENS:  What his observation was at that

12    moment.

5:21:10PM13         THE COURT:  Overruled.

5:21:11PM14    A.  Can you define which moment you're trying to --

5:21:15PM15    BY MS. STEVENS:

5:21:15PM16    Q.  Do you recall him, as you all were putting your weapons

17    away, making a statement about the demeanor of Dylann Roof?

5:21:25PM18    A.  Officer Buriss.  Yes.  Officer Burris made a comment, I'm

19    trying to remember exactly, I think -- it may have been a

20    comment that he was a kid.

5:21:41PM21    Q.  Okay.  And at that point you all put your weapons away.

5:21:44PM22    A.  No, ma'am, we had already put our weapons away before

23    then.

5:21:48PM24    Q.  Okay.  Thank you, Sergeant Myers.  And then toward the

25    back of the black Hyundai you personally had the opportunity

MICHAEL MYERS - DIRECT EXAMINATION

1    to speak with Dylann Roof?

5:21:56PM 2    A.   I did.

5:21:57PM 3    Q.   And you described getting to within two or three feet of

4    him while you were talking?

5:22:02PM 5    A.   At the back of the car when they first brought around from

6    Officer Bernat, I was probably even closer at that point at

7    points.

5:22:09PM 8    Q.   And in your observation was he intoxicated or did he

9    appear under the influence of anything?

5:22:14PM10    A.   Not that I'm aware of, no.

5:22:16PM11    Q.   What was your observation of him there at the two to

12    three feet distance?

5:22:22PM13    A.   He didn't have any reaction at all.

5:22:25PM14    Q.   Was he speaking quietly or was he speaking loudly and

15    excitedly there?

5:22:30PM16    A.   No.

5:22:31PM17    Q.   Was he quiet when he spoke to you?

5:22:34PM18    A.   I mean, he talked with a normal voice, which -- or what I

19    believed to be a normal voice.

5:22:39PM20    Q.   Okay.  And you asked him if he was Dylann Roof, right?

5:22:44PM21    A.   I first asked him if he was involved in the shooting

22    incident in Charleston.

5:22:47PM23    Q.   Yes.

5:22:48PM24    A.   But then I did ask him if he had identification on him,

25    which he stated he did in his pocket.

MICHAEL MYERS - DIRECT EXAMINATION

5:22:53PM 1    Q.   Okay.  And when you first asked him if he was the shooter

2    from Charleston, he told you yes, didn't he?

5:23:00PM 3    A.   Yes, ma'am.

5:23:01PM 4    Q.   And then you said you found his identification?

5:23:05PM 5    A.   No, I didn't find it.  Officer Hamrick removed it from his

6    pocket after he said where it was, and Officer Hamrick handed

7    it to him.

5:23:12PM 8    Q.   Was there anything else removed from his pocket?

5:23:17PM 9    A.   There -- I know his identification, he had identification,

10    and then there was a movie ticket of -- attached to it, or not

11    necessarily attached to it but stuck to it.

5:23:39PM 12   Q.   Did you hear or did you talk with him about whether --

13    well, I think you mentioned this already -- is there something

14    in the car we need to know about?

5:23:47PM 15   A.   Yes.

5:23:47PM 16   Q.   That could involve our safety?

5:23:49PM 17   A.   Yes.

5:23:49PM 18   Q.   And what was his answer to that?

5:23:52PM 19   A.   He told me that there was a gun in the car.

5:23:54PM 20   Q.   Did he tell you where you would find the gun?

5:23:56PM 21   A.   Yeah, because when he said the gun was in there, when I

22    asked him, a gun, he said the gun's under a pillow in the back

23    seat.

5:24:06PM 24   Q.   Did you see the gun?

5:24:07PM 25   A.   No.

MICHAEL MYERS - DIRECT EXAMINATION

5:24:08PM 1    Q.  So you weren't at the back passenger area when that

2    happened.

5:24:10PM 3    A.  No, I don't look like that.

5:24:13PM 4    Q.  And what were the rest of your duties with regard to

5    Dylann Roof specifically that afternoon or evening?

5:24:21PM 6    A.  My responsibility is once he was in the car, actually put

7    him in the car with Officer Hamrick, and I knew that he was on

8    the way to the police department, I had conversations with our

9    chief and several other people in our detective division, and

10    I had no other contact with him at all through that whole

11    process.

5:24:41PM12    Q.  We saw in the video as he was escorted to the back car and

13    then searched, that he was wearing pants and they appeared to

14    be pulled up?  Do you recall that?

5:24:51PM15    A.  No, I can't remember if they were pulled up or -- I did

16    notice that one of them, but I don't know if it was pulled up

17    or if they were just short.

5:24:58PM18    Q.  I imagine in June 18th it's hot out?  In Shelby in the

19    summer?

5:25:03PM20    A.  Yeah, I mean, it was probably a warm day.  I don't --

5:25:07PM21    Q.  Do you recall, Sergeant Myers, that he had two pair of

22    pants on at the time he was patted down?

5:25:13PM23    A.  I never searched him, so I am not sure if he had two pairs

24    on or not.

5:25:17PM25    Q.  Yes, sir.

5:25:18PM 1          MS. STEVENS:  That's all, Your Honor, thank you.

5:25:21PM 2          THE COURT:  Thank you, Sergeant, you may step down.

5:25:26PM 3      Ladies and gentlemen, I think we've reached that time when

4    we're calling it a day is a good idea.  I want to remind y'all

5    again, a couple things, that just are very important to go

6    home and this evening.  No discussions with others.  I'm to

7    blame, y'all blame me, if anyone asks you.  No exposure to

8    media, don't watch the news, and no social media.  And drive

9    home safely, we'll see you at 9:30 tomorrow morning.  Thank

10   you.

5:26:03PM 11     (Jury excused.)

5:26:34PM 12         THE COURT:  Mr. Richardson, do you have a forecast

13   for tomorrow?

5:26:41PM 14         MR. RICHARDSON:  I can, Your Honor.  The morning will

15   finish with the Shelby arrest, there are two additional

16   witnesses.

5:26:48PM 17         THE COURT:  I was aware there were probably more

18   Shelby, and I was worried about it, Mr. Bruck had asked to

19   meet with his client, I didn't want to keep him late.

5:26:59PM 20         MR. RICHARDSON:  They're going to be here tonight

21   regardless, Your Honor, if we finished them, they would still

22   be here, so that's not at all an imposition with them.  And I

23   need -- one additional witness will be coming down from Shelby

24   tonight, so we were going to have Shelby witnesses tomorrow

25   morning in any event, the better part of the morning.  Then

1    following that, I anticipate would be the testimony regarding

2    the confession, Special Agent Stansbury will testify.  That is

3    a very long video.

5:27:28PM 4         THE COURT:  How long?  Are you going to play the

5    entire video?

5:27:32PM 6         MR. RICHARDSON:  We will play the entire video, yes,

7    Your Honor.

5:27:34PM 8         THE COURT:  How long does that run?  I watched it

9    once, but I can't remember how long.

5:27:38PM 10        MR. RICHARDSON:  It's almost, if you just played it

11   straight through, it's almost two hours.  It's not quite two

12   hours.  And we're not going to play it straight through, but

13   it's -- you know, it's going to be probably, I would estimate

14   at least three hours in order to introduce that issue, walk

15   through that and fully explain.  That's obviously an important

16   piece of the story here.

5:28:00PM 17        THE COURT:  Obviously, yes.  Okay.

5:28:01PM 18        MR. RICHARDSON:  I think that's probably a good three

19   hours, that probably takes us through lunchtime.

5:28:06PM 20        THE COURT:  Okay.

5:28:07PM 21        MR. RICHARDSON:  And then the afternoon, Your Honor,

22   I anticipate we would start off with Brittany Burke again, she

23   processed the vehicle that we've been seeing in these

24   photographs.  Depending on how long Miss Burke goes, we would

25   then just fill in the rest of that afternoon, to the extent --

1    I don't know how much time we're going to have, we will look

2    at sort of locations of witnesses to try to bring people in.

3    I anticipate we probably won't get much past Miss Burke

4    tomorrow afternoon.  We'll have some additional witnesses that

5    are here staged, if we need to get to them, but it's hard for

6    me to say exactly who they're going to be until we get

7    downstairs and figure out who is in town.  We can't bring

8    people in for Friday afternoon and have them stay.

5:28:57PM 9          THE COURT:  I just don't want to waste my jury's

10   time.

5:29:00PM 11         MR. RICHARDSON:  We will not do that, Your Honor, I'm

12   just not anticipating who they are.  We have several witnesses

13   who are in the Columbia or Charleston area that we can bring

14   in for that purpose, Your Honor.

5:29:09PM 15         THE COURT:  Okay.  Any other matters to come before

16   the Court from the Government?

5:29:13PM 17         MR. RICHARDSON:  Nothing from the -- just beg the

18   Court's indulgence, Your Honor.

5:29:21PM 19    Your Honor, if we could, after we break for the court, if

20   Mr. Bruck and I could meet with one of your staff to discuss

21   the exhibits today, obviously a number of those exhibits

22   included information we think is covered by the Court's order

23   with respect to posting, if we could have that time with

24   counsel to discuss that and ensure we're on the same --

5:29:40PM 25         THE COURT:  My clerks will meet with you and make

1    sure we have that straight.  Mr. Bryant will work with you on

2    that.

5:29:47PM 3          MR. RICHARDSON:  Thank you.  Nothing else from

4    Government, Your Honor.

5:29:49PM 5          THE COURT:  Any from the defense?

5:29:50PM 6          MR. BRUCK:  Nothing from the defense, Your Honor.

5:29:52PM 7          THE COURT:  Very good.

5:29:52PM 8

5:29:53PM 9       (Court adjourned at 5:30 p.m.)

5:29:58PM10

5:29:58PM11

5:29:58PM12

5:29:58PM13

5:29:58PM14

5:29:58PM15

5:29:58PM16

5:29:58PM17

5:29:58PM18

5:29:58PM19

5:29:58PM20

5:29:58PM21

5:29:59PM22

5:29:59PM23

5:29:59PM24

5:29:59PM25

435

REPORTER'S CERTIFICATION

I, Debra L. Potocki, RMR, RDR, CRR, Official Court Reporter for the United States District Court for the District of South Carolina, hereby certify that the foregoing is a true and correct transcript of the stenographically recorded above proceedings.

S/Debra L. Potocki
_____

Debra L. Potocki, RMR, RDR, CRR