1
2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

3    UNITED STATES OF AMERICA      :      VOLUME III
                                   :
4              vs.                 :
                                   :
5    DYLANN STORM ROOF             :      2:15 – CR – 472

6         R E D A C T E D   T R A N S C R I P T

7         Trial continues in the above matter on Friday,

8    December 9, 2016, commencing at 9:33 a.m., before the

9    Hon. Richard M. Gergel, in the United States Courthouse,

10   Courtroom VI, 85 Broad St., Charleston, South Carolina,

11   29401.

12

13   APPEARED ON BEHALF OF THE UNITED STATES:

14       JAY N. RICHARDSON, ESQ., 1441 Main St., Columbia, SC.

15       NATHAN WILLIAMS, ESQ., P.O. Box 978, Charleston, SC.

16       STEPHEN J. CURRAN, ESQ., 601 D Street, NW, Washington, DC.

17   APPEARED ON BEHALF OF THE DEFENSE:

18       DAVID I. BRUCK, ESQ., Washington & Lee School of Law,
         Lexington, VA.
19
         KIMBERLY C. STEVENS, ESQ., 1070–1 Tunnel Rd., Asheville, NC.
20
         EMILY PAAVOLA, ESQ., 900 Elmwood Ave., Columbia, SC.
21

22

23         REPORTED BY DEBRA L. POTOCKI, RMR, RDR, CRR
           Official Court Reporter for the U.S. District Court
24                        P.O. Box 835
                     Charleston, SC  29402
25                      843/723-2208

1                        I N D E X

2    WITNESS:  JEFFREY HAMRICK

3    Direct Examination by Mr. Williams....................... 448
     Cross-Examination by Ms. Stevens......................... 456

4

5    WITNESS:  MATTHEW STYERS

6    Direct Examination by Mr. Curran......................... 461
     Cross-Examination by Mr. Bruck.......................... 472

7

8    WITNESS:  MICHAEL STANSBURY

9    Direct Examination by Mr. Curran......................... 478
     Cross-Examination by Mr. Bruck.......................... 541

10

11   WITNESS:  BRITTANY BURKE

12   Direct Examination by Mr. Williams....................... 547

13

14
     EXHIBITS:                       Received in Evidence
15
     Government Exhibit 107                    470
16   Government Exhibits 108 - 110             489
     Government Exhibit 5                      497
17   Government Exhibit 111                    503
     Government Exhibit 112                    519
18   Government Exhibit 113                    523
     Government Exhibits 118 and 119           548
19   Government Exhibits 120 - 130             552
     Government Exhibits 131 - 134             559
20   Government Exhibits 135 - 139             562
     Government Exhibits 140                   563
21   Government Exhibits 141, 142, 143,
     145, 146, 147, 150                        564
22   Government Exhibit 144                    566
     Government Exhibits 148, 149 and 2        567
23   Government Exhibits 148A and 149A         567
     Government Exhibit 2A                     569
24   Government Exhibits 151 - 157             585
     Government Exhibit 1                      587

25

1          (Jury not present.)

2          THE COURT:  I received this morning a motion

3    regarding state of mind evidence.  Has the Government had a

4    chance to look at that issue?

5          MR. RICHARDSON:  Your Honor, our system was down, I

6    got it about 15 minutes ago, but I'm happy to address a few of

7    the issues, if the Court wouldn't mind.

8          THE COURT:  I would.  Go ahead.

9          MR. RICHARDSON:  Thank you, Your Honor.

10        I think the basic idea here that I think the Court ought

11   to look to is a two-part question.  And one, is it at all

12   relevant, and that seems to be the focus of their brief.  We

13   do not think that it is.  I think the Court has understood

14   that and explained that in a number of ways of the narrow

15   focus here and why it's not relevant.

16        But I also think it's important to analyze the issue under

17   Rule 403.  And even if they're able to articulate some

18   extraordinarily tangential relationship to an issue, that the

19   risk of confusion and misleading the jury here is

20   substantially great.  And particularly in light of the

21   context, and they talk about in the motion attempting to

22   challenge the defendant's intent, right, for example?  They

23   say that, well, we're challenging the defendant's intent.  I

24   think the suggestion that that is what they're actually doing

25   is not a fair reflection of what we've seen so far,

1    particularly in light of the concessions that Mr. Bruck made

2    in his own opening statement that they were not challenging

3    that.

4        And so I think when you look at the probative value, if

5    any, and frankly I don't think they make an argument that it

6    is actually probative, but even if some tangential suggestion

7    could be made, in this case the probative value of what

8    they're trying to do is nonexistent, or at least minimal.  And

9    I think the risk of confusion and misleading the jury is

10   substantial.

11       With respect to the nature of the mental health

12   information as far as state of mind and those types of

13   questions, we think it is appropriate, and I think there's

14   been discussions about how he acted during the crime, as well

15   as how he acted during the confession.  Right?  Those are

16   issues where we talk about his behavior, and that is relevant

17   and we think that does go.

18       We understand from witnesses who, in the last 48 hours,

19   have been subpoenaed, members of the defense team have spoken

20   with their counsel and indicated they're going to have to call

21   those witnesses to discuss things like how he acted in middle

22   school, going back quite some time, and to issues that we

23   think are well well beyond the scope.  This is a case about a

24   crime that occurred on a night, the planning and preparation

25   he did for that, and the confession that came after it.  Those

1    pieces of it, we think his actions at the crime, his actions

2    at the confession, we think those are appropriate.  But

3    anything beyond that, we think is not appropriate.  And I

4    think what the Court sees in balancing that 403, particularly

5    with respect to the confession, is that this is not -- in no

6    way a coercive interview, that the interviewee, the defendant

7    in this case, was effusive, he was eager to explain what he

8    was trying to do, he had a relaxed demeanor, cordial, at

9    various times he was downright jovial as he described what he

10   did.

11           THE COURT:  I'm going to let the interview speak for

12   itself.  But let me just raise some thoughts I have, and then

13   I'm going -- so I can allow the defense team to respond to

14   this.

15       You start this analysis with the Insanity Defense Reform

16   Act, 18 United States Code 17.  And it provides that it is an

17   affirmative defense to a prosecution under any federal statute

18   that at the time of the commission of the acts constituting

19   the offense, the defendant, as a result of a severe mental

20   disease or defect, was unable to appreciate the nature and

21   quality of the wrongfulness of his acts.  That defense has not

22   been made here.  There was a deadline for asserting it, it has

23   not been made.

24       The Act goes on to say, mental disease or defect does not

25   otherwise constitute a defense.  Okay?  Now, the courts have

1    discussed, well, I'm going to find state of mind, that term, I

2    find that to be very unhelpful here, because it covers such a

3    broad range of things, some of which would be admissible and

4    some which are not admissible.  Malice, the presence of

5    malice, premeditation, these are what you might refer to as

6    state of mind, which are highly probative and are admissible

7    evidence.

8        But the line, United States versus Worrell, which is the

9    Fourth Circuit case on point here, makes it very clear that

10   evidence offered to justify a crime, not rebut the presence of

11   an element of the crime but to justify it, or to try to

12   explain it away or -- is not admissible in the guilt phase,

13   it's classic sentencing evidence.  I get it all the time in my

14   sentences, and it would be, in a sentencing phase here, be

15   highly probative.  But it's not admissible, it's not relevant.

16       And, you know, there is clearly an exception from mental

17   health evidence that rebuts the presence of -- if someone does

18   not have the capacity to form intent, an example would be

19   let's say someone had a brain injury and could not formulate

20   an intent.  That is sort of the type of hypothetical, and I

21   say hypothetical because though that narrow rare exception is

22   discussed from time to time, there's like one case in the

23   history of American federal jurisprudence has allowed it,

24   Seventh Circuit case, I'm very familiar with it.

25       So it's one of those things, so taking examples here that

1  have been raised, the fact that he was 21 and can be

2  impulsive, that's in the briefing.  That is just not

3  admissible at this stage.  Certainly age is relevant, his

4  other issues could be relevant at sentencing, whether those

5  are mitigation, but it does not rebut any element of the

6  crime.  And it is a justification evidence, U.S. versus

7  Worrell prohibits that.

8      Another example is of admissible mental health evidence

9  relates to claims that he had contemplated suicide.  Again,

10  that doesn't have anything to do with whether he committed

11  these 33 counts.  It has nothing to do with it.  It does not

12  rebut an element of it.

13     The mental health evidence that we normally deal with is

14  we have insanity defense not asserted here, we have a

15  competency issue that can be raised, which was asserted here

16  and the Court has ruled on that.  And within the range of

17  that, mental health evidence is only going to be allowed if it

18  goes to rebut an element.  They're not present here.

19     I've got to also say, we can not continue this practice of

20  writing a brief the next day, raising issues that weren't

21  objected to at the time.  Now, some of this has been objected

22  to, but we just can't do this after-the-fact thing.  So in the

23  future, to the extent there is a desire to put forward such

24  evidence, I'm glad to consider it, I'm telling -- the U.S.

25  versus Worrell controls, I understand this issue, not the

1    first time I've dealt with this issue.  But it's just not

2    admissible evidence.

3        So we've got to know the evidence, and then I have to rule

4    on whether that falls within it.  I mean, I just can't, in the

5    abstract, call it state of mind.  That's not helpful.

6        So, you know, I'm glad to hear again any more from the

7    defense.  I'm trying to keep this trial moving.  I understand

8    this issue very well, Mr. Bruck, I'm not a novice on this

9    issue.  But do you understand my reasoning?

10        MR. BRUCK:  Yes, I do.  We've set forth our position.

11    There is --

12        THE COURT:  Let me just say you ably set -- it's not

13    like this was something thrown around, I mean, you ably

14    presented your position.  There is -- you know, it's contrary

15    to controlling law, I respect your assertion of it, and you

16    need to turn every stone over when you're representing someone

17    in a capital case, I respect your need to do that.  But we're

18    not -- I mean, I just heard for the first time you've summoned

19    middle school teachers.  I have no idea if that's true or not.

20        MR. BRUCK:  It's not true.  That's completely a red

21    herring.  I can tell you what that is about.

22        THE COURT:  You don't need to.  You tell me you're

23    not doing that, but I'm going to say to you that if there's

24    something that you want to offer, that clearly I've laid out

25    here what it needs to be.  I'm glad to hear you out, outside

1    of the presence of the jury, and I'm glad to address those

2    issues.  But this is sentencing, what I've heard so far, and

3    what I've ruled on so far, age 21, he was going to commit --

4    he wanted to commit suicide, not relevant, doesn't rebut any

5    element of the crime.  As I told you yesterday when you raised

6    it.

7            MR. BRUCK:  I don't want to prolong this.  There are

8    a couple things I need to say.  One is we're about to hear

9    confession testimony.  18 U.S. Code 3501 provides that the

10   defendant be permitted or the Court consider all of the

11   surrounding circumstances, which obviously includes broadly

12   the defendant's mental state.

13           THE COURT:  This is not a back door to insanity lite.

14   I'm glad to -- he was Mirandized, he made the statements, but

15   the idea that we're now going to open the door to mental

16   health testimony about -- we've already done, we don't have

17   insanity, we determined competency, the confession is the

18   confession.  Now, if there's something specific you want to

19   point out, I'm glad to address it, because I don't like this

20   abstract stuff of throwing something and then saying

21   everything that is humanly possible that could fall within

22   that umbrella, I don't know it, but you know, the -- did we

23   have a motion to suppress?  I think we had a motion to

24   suppress the confession.

25           MR. BRUCK:  It has been denied, and that was one

1    procedural matter I wanted to bring up.  I mean, the

2    confession is one aspect.  The first point we make, and I

3    realize I appear to have failed to convince the Court, but the

4    prosecution's opening statement did not stop at arguing the

5    elements of the offense.

6        THE COURT:  Let me tell you, I went through your

7    brief this morning, and I wrote a note on every one of those,

8    and I determined every one of them fell within an element of

9    the guilt phase.  I know what you said, I just went through

10   and I circled them, I then evaluate each one of those

11   examples.  And I don't know if that was an exhaustive example,

12   but they were all elements of malice, premeditation, hate

13   crime, et cetera, you know, so I didn't see an opening of the

14   door here.

15       MR. BRUCK:  I'm not saying that they did not relate

16   to elements of the offense, but they went further.  They

17   provided the most pejorative, most, if you will -- well --

18       THE COURT:  Mr. Bruck, here we go again.  You stand

19   up and you object at the time.  I can't run a trial where

20   three days after something's done, I have a filing about it.

21       MR. BRUCK:  But there was nothing wrong with the

22   argument.  It wasn't objectionable.  But we have a due process

23   right to meet it, that's all.

24       THE COURT:  Let me just say, I found nothing in that

25   that opened the door, these were all elements of guilt,

1   obviously malice, premeditation, these are, you know, these

2   are elements of hate crime, obstruction of religion, these are

3   elements of the crimes.  And that's why I keep saying, come

4   back to me, show me an element.  I say this, I sustained a

5   motion you had yesterday, didn't seem to relate to one of the

6   elements of the crime.  We're in the guilt phase here.  And

7   I'm going to keep us on this track.

8       You know, so anyway, I've got a jury waiting here.  Unless

9   there's something else, I want to keep the trial moving.

10          MR. BRUCK:  The last thing I need to say, we saved

11   our Fifth Amendment right to present a defense.  I also want

12   the record to reflect that we think the Court's ruling

13   impinges upon the Sixth Amendment right to counsel, and the

14   right to be heard by --

15          THE COURT:  I'm sorry, you're throwing terms at me.

16   What are you talking about?

17          MR. BRUCK:  I'm sorry, I misspoke.  The Sixth

18   Amendment right to call witnesses and present a defense.

19          THE COURT:  In what way was that?

20          MR. BRUCK:  Under the Sixth Amendment, Your Honor.

21          THE COURT:  What have I done?

22          MR. BRUCK:  We think the limitations on such things

23   as whether --

24          THE COURT:  Let me make it clear.  If you want a

25   witness, I need to know the specifics.  I've said this to you,

1    you need to give me the specifics.

2            MR. BRUCK:  We will do that.

3            THE COURT:  I will rule just like I did on those

4    pictures yesterday, I went picture by picture.  I will go

5    witness by witness.  And I want to keep my trial moving, but

6    if we need to get here at 8:00 a.m. to do that or do it at the

7    end of the day, I'm delighted to do it, I'm not -- and I

8    don't -- I'm not real good, you know, a lot of standing orders

9    of mine and my colleagues is motions in limine.  It's very

10   common for me not to rule on motions in limine, because I need

11   the context, I need the details.

12       So the answer is nobody -- no rulings have been made

13   beyond what I said here and what you have raised and I have

14   ruled on already.

15           MR. BRUCK:  That's correct.

16           THE COURT:  But I need to do it example by example.

17   Because it may well be you could articulate something that

18   would fall within the rare exception.

19           MR. BRUCK:  Very well.

20       Just a procedural matter, I don't think this will pose a

21   problem, but we're about to get into the confession and the

22   fruits of the search of the car, and later the search of

23   Mr. Roof's home.  We have made motions, the Court has ruled on

24   them, they have been denied.  I assume we are not required,

25   either item by item or witness by witness, to renew the

```
 1   objections.
 2          THE COURT:  Your objections are continuing regarding
 3   that.  I will tell you, I have not heard anything that would
 4   cause me to change those rulings.  If you want to bring
 5   something to my attention that might be unique or different
 6   that you think you'd like me to consider, I welcome you
 7   raising those.  I have listened to the evidence very
 8   carefully, and you know, there's nothing at this point that I
 9   would do to change any of my rulings regarding that.
10          MR. BRUCK:  Very well.  If I may confer for just a
11   moment.  That's all, Your Honor.
12          THE COURT:  Mr. Bruck, there's no question where your
13   talent is in this, it's not just your own, it's in your
14   defense team.
15          MR. BRUCK:  Thank you.
16          THE COURT:  Very good.  Let's bring in the jury.
17      (Jury present.)
18          THE COURT:  Good morning.  You know, the first day
19   you entered, y'all were a little hesitant, second day a little
20   more confident, today you're walking in like pros.
21      Okay.  Call your next witness.  Government case continues.
22          MR. WILLIAMS:  Government calls Scott Hamrick.
23          THE CLERK:  State your full name for the record,
24   please.
25   A.  Jeffrey Scott Hamrick.
```

JEFFREY HAMRICK - DIRECT EXAMINATION

1    JEFFREY HAMRICK, a witness called by the Government, first

2    having been duly sworn, testified as follows:

3                        DIRECT EXAMINATION

4    BY MR. WILLIAMS:

5    Q.  Morning.

6    A.  Good morning.

7    Q.  Can you tell jurors where you work?

8            THE COURT:  Start with a name.

9    Q.  Give the jury your name.

10   A.  Scott Hamrick.

11   Q.  How do you spell your last name?

12   A.  H-A-M-R-I-C-K.

13   Q.  And where do you work?

14   A.  City of Shelby police department.

15   Q.  What do you do for the Shelby police department?

16   A.  I am a patrol officer.

17   Q.  How long have you been a patrol officer?

18   A.  Approximately eight years.

19   Q.  Is that -- do you have any law enforcement experience

20   before you were a patrol officer?

21   A.  No, sir.

22   Q.  What did you do prior to getting into law enforcement?

23   A.  I was in the textile industry.

24   Q.  As a patrol officer, what are your responsibilities, at

25   least with the Shelby police department?

449

JEFFREY HAMRICK - DIRECT EXAMINATION

1    A.   To answer calls, basically traffic enforcement and take

2    care of wrecks.

3    Q.   Do you recall responding to an incident or at least a

4    traffic situation on June 18th of last year?

5    A.   Yes, sir.

6    Q.   At about 10:30 in the morning?

7    A.   That's correct.

8    Q.   Tell the jury how you first got involved with that

9    incident.

10   A.   Dispatch came over the radio and said they had received a

11   call that a person responsible for the Charleston shooting was

12   seen traveling west on Highway 74 entering the city.

13   Q.   Did you get any description of the vehicle?

14   A.   Yes, sir, they said it was a black Hyundai -- or I can't

15   remember the car -- but yes, sir, we got that description of

16   the vehicle.

17   Q.   Did you get a description of the license plate or the

18   state that the plate was from?

19   A.   Yes, sir, they said it was from South Carolina

20   registration plate.

21   Q.   Shelby is in North Carolina, is that right?

22   A.   That's correct.

23   Q.   So where were you when that call came out?

24   A.   I was in the vicinity of 74.  On the west side in Shelby.

25   Q.   What did you do?

JEFFREY HAMRICK - DIRECT EXAMINATION

1    A.   Responded to the location that they said the vehicle was

2    heading.

3    Q.   Were you able to, at least through radio traffic,

4    understand what other officers were doing or who else might be

5    responding?

6    A.   That is correct, yes, sir.

7    Q.   Tell the jury who else was responding, if anyone.

8    A.   There was several officers that said they were en route to

9    the vicinity.  Officer Dan Bernat and Joe Buriss were -- they

10   were in a two-man car, and they had radioed that they were

11   behind the vehicle, and gave out their location.  And I was

12   real close with them.

13   Q.   Was there any other cars following in behind from the

14   defendant's car?

15   A.   Yes, sir, I believe there was two other units that were

16   following us.

17   Q.   Did the car match the description that had been called

18   out?

19   A.   Yes, sir, it did.

20   Q.   So a black vehicle with an out-of-state tag?

21   A.   That's correct.

22   Q.   And so based on that, you began following the vehicle?

23   A.   No, sir, when I came to the vehicle, it was already at a

24   stoplight.

25   Q.   So if you can, explain how that occurred and what happened

JEFFREY HAMRICK - DIRECT EXAMINATION

1   as you all were driving down the road.

2   A.   Okay.  When I arrived, Officer Bernat had initiated a

3   traffic stop, had his blue lights on.  The other vehicle was

4   behind a tractor trailer truck.

5       Once Mr. Bernat activated his blue lights, I pulled up

6   beside his car in the turning lane, and Mr. Roof's vehicle was

7   in front of that.  Mr. Roof then turned just -- pulled into

8   the turning lane that I was in, and then into a driveway.

9   Q.   What happened then?

10  A.   I exited my vehicle, got in front of my patrol car with my

11  weapon drawn, securing our -- or looking in the back window of

12  the suspect's vehicle.

13  Q.   What were the other officers doing, if anything?

14  A.   One officer went to the left and Officer Bernat went to

15  the left, Officer Buriss went to the right, and Officer Bernat

16  made a contact with the person in the vehicle.

17  Q.   Where were you while that was occurring?

18  A.   I was behind the vehicle.

19  Q.   Was there anybody else at the back of the vehicle with

20  you?

21  A.   Yes, sir, Sergeant Myers and Officer Ledford were behind

22  me.

23  Q.   What did you see happen as Officer Bernat went to the

24  driver's side?

25  A.   I can't remember what Officer Bernat said, but Mr. Roof

JEFFREY HAMRICK - DIRECT EXAMINATION

1  had his hands on the steering wheel at ten and two.

2  Q.  What happened then?

3  A.  Officer Bernat made -- got Mr. Roof out of the vehicle and

4  patted him down, and then I patted -- passed him off to me.  I

5  in turn patted him down again.  And got his identification out

6  of his pocket.

7  Q.  Prior to you patting him down, did you know who he was or

8  had you confirmed his identity at all?

9  A.  I wasn't 100 percent sure, but I had seen on TV in the

10 morning a picture of him, and the most outstanding feature

11 that I can remember was his haircut.

12 Q.  So tell the jury what had you seen that morning on TV or

13 any information you had about the crime prior to.

14 A.  I just saw pictures of him like entering the church is

15 what was on the news channel.

16 Q.  When was it that you first sort of recognized him, at the

17 time the car was pulled over or as he was getting out?

18 A.  As he was getting out of the vehicle.

19 Q.  So when he came to the back of the car, what happened?

20 A.  When he came to the back of the vehicle I just patted him

21 down again for weapons, and Sergeant Myers said secure him in

22 the vehicle and take him to the police department.

23 Q.  When you patted him down did you find anything on him?

24 A.  No, sir.

25 Q.  Did you look for an I.D. or anything like that?

453

JEFFREY HAMRICK - DIRECT EXAMINATION

1    A.  No, sir.  The first time I patted him down we found the

2    I.D.  When I took him back to the vehicle one more time we

3    patted him down again and we didn't find anything.  I didn't

4    find anything on him.

5    Q.  Tell me about the first pat down.  Did you say anything to

6    him or did he say anything to you?

7    A.  No, sir.

8    Q.  Did you ask him for his I.D.?

9    A.  I did not ask him for his I.D.  I believe Sergeant Myers

10   may have.

11   Q.  And was Sergeant Myers right next to you?

12   A.  I can't recall.

13   Q.  Do you recall any kind of conversation with the defendant

14   at the back of the vehicle?

15   A.  No, sir, there was no conversation.

16   Q.  So once you left the back of the vehicle, what did you do?

17   A.  When I secured Mr. Roof in the back of the vehicle, I just

18   got in and drove him --

19   Q.  When I say back of the vehicle, I mean at the back of the

20   defendant's car.

21   A.  Oh, yes, we just patted him down, and he was already

22   placed in handcuffs, so we just escorted him to my vehicle.

23   Q.  Did you have any kind of conversation with him at that

24   point in time?

25   A.  No, sir.  I did not.

JEFFREY HAMRICK - DIRECT EXAMINATION

1  Q.  And you say that you placed him into the back of the

2  vehicle?

3  A.  In the back of my police car, yes, sir.

4  Q.  Explain to the jury if there was any kind of conversation

5  or how he was -- did you direct him into the car?  How did

6  that happen?

7  A.  I just opened up the back door and he just sat down.

8  Q.  Did he seem to understand what was going on and what you

9  were --

10 A.  Yes, sir.

11 Q.  -- instructing him to do?

12 A.  Yes, sir.

13 Q.  So what did you do once he was in the back of your patrol

14 car?

15 A.  We just -- I checked with communication, told him we were

16 en route to the PD.

17 Q.  When you say we, who was in your car?

18 A.  Myself and Mr. Roof.

19 Q.  Did you drive him to the police station?

20 A.  Yes, sir, I did.

21 Q.  Did you go directly from the traffic stop to the police

22 station?

23 A.  Yes, sir.

24 Q.  No stops along the way?

25 A.  No stops along the way, no, sir.

JEFFREY HAMRICK - DIRECT EXAMINATION

1   Q.  And what was -- were you instructed to take him somewhere
2   at the police station?
3   A.  Yes, sir, we was instructed to take him to the library,
4   which is our interview room at the police department, we call
5   it the library.
6   Q.  As you were driving to the police station, did you have
7   any kind of conversation or discussions with the defendant?
8   A.  No, sir.
9   Q.  What was -- if you could tell at all, what was he doing in
10  the back of your car?
11  A.  When I would check the rearview mirror, he was just
12  looking out the window.
13  Q.  And then when you got to the police station, what
14  happened?
15  A.  When I got to the police station I was met there with
16  several other officers, and we escorted Mr. Roof up to the
17  library, or the interview room, at which point I turned him
18  over to Captain Seat.
19  Q.  And when you say you took him up to the interview room,
20  was he able to follow your instructions to get him to the
21  interview room and there was no problems along the way?
22  A.  Yes, sir, there was no problems, he followed instructions.
23  Q.  And so you would have left him there with the supervisor
24  at the interview room would have been your last involvement?
25  A.  Yes, sir, that's correct.

456

JEFFREY HAMRICK - DIRECT EXAMINATION

1          MR. WILLIAMS:  Thank you, no further questions.

2          THE COURT:  Cross-examination.

3          MS. STEVENS:  Thank you, Your Honor.

                        CROSS-EXAMINATION

5    BY MS. STEVENS:

6    Q.  Good morning, Officer.

7    A.  Good morning.

8    Q.  When you first approached the cars, they were already --

9    they had already pulled Dylann Roof over, correct?

10   A.  No, ma'am, they were in the process.  They had just

11   activated their blue lights.

12   Q.  And your car was two cars back or one car back from the

13   car that initially activated the blue lights?

14   A.  I was beside the car that activated the blue lights.

15   Q.  Were you to the left of the car or to the right of that

16   car?

17   A.  I was to the right.

18   Q.  And you all pulled off so that traffic could go to the

19   left and Dylann Roof pulled off of a little side street there

20   before the Kangaroo gas station?

21   A.  That's correct.  He pulled into a drive, not a street, it

22   was not a street.

23   Q.  And you saw Officer Bernat go to the left side of

24   Mr. Roof's car and Officer Buriss head to the right side,

25   right?

JEFFREY HAMRICK - DIRECT EXAMINATION

1    A.   That's correct.

2    Q.   And all officers at that point had their weapons drawn,

3    didn't they?

4    A.   Yes, ma'am.

5    Q.   And then you described that his hands were at ten and two

6    on the steering wheel?  Right?

7    A.   That's correct.

8    Q.   And Officer Bernat spoke with Mr. Roof, and Mr. Roof got

9    out of the car voluntarily, didn't he?

10   A.   Yes, ma'am.

11   Q.   And there was no trouble with that, he just got out of the

12   car, correct?

13   A.   That's correct, there was no trouble.

14   Q.   All right.  And you all reholstered your sidearms?  During

15   that time.

16   A.   Yes, ma'am.

17   Q.   Okay.  And then Dylann Roof was brought to the back of his

18   own car, the black Hyundai, right?

19   A.   Yes, ma'am.

20   Q.   And you were standing close by that encounter?

21   A.   I was.

22   Q.   And eventually they turned Dylann Roof in to your custody

23   to transport him back to the Shelby police department?

24   A.   Yes, ma'am.

25   Q.   And before that, you had searched his pocket, and was it

458

JEFFREY HAMRICK - DIRECT EXAMINATION

1   you that found his I.D. in his pocket?

2   A.  Yes, ma'am, I believe so.

3   Q.  Okay.  And when you found that I.D. did you also find a

4   movie theater ticket?

5   A.  No, I don't recall a movie theater ticket.

6   Q.  Okay.  And then he was turned over to you to take back to

7   Shelby, and you placed him in the back seat of your police

8   car, right?

9   A.  Yes, ma'am.

10  Q.  When you transported him back to the Shelby police

11  department, did you have your blue lights and siren on?

12  A.  No, ma'am, we went routine traffic, no blue lights.

13  Q.  So you were following normal speed limits there in Shelby

14  and heading back to the police department?

15  A.  Yes, ma'am.

16  Q.  Okay.  And how far was it from where you pulled Dylann

17  Roof over, back to the Shelby police department?

18  A.  It's approximately three miles.

19  Q.  And was the speed limit 55, 35, it's a busy stretch there

20  along Highway 74 there, isn't it?

21  A.  Yes, ma'am, it's 55 and then it goes to 35 when we exited

22  off of the highway.

23  Q.  And you passed through some traffic lights there in

24  Shelby?

25  A.  Yes, ma'am.

JEFFREY HAMRICK - DIRECT EXAMINATION

1    Q.   Okay.  And during the ride you explained that you would

2    check the rearview mirror and look back at Dylann Roof seated

3    in the back seat, right?

4    A.   Yes, ma'am.

5    Q.   And he was -- was he handcuffed in the front or was he

6    handcuffed in the back as he sat there on the seat?

7    A.   He was handcuffed in the back.

8    Q.   Okay.  So he's seated in the back of your patrol, car

9    hands cuffed in the back, and you seat belted him in, correct?

10   A.   I don't recall if I seat belted him in or not.

11   Q.   Does your patrol car have sort of a cage there or a window

12   separating the -- where you were from where Mr. Roof was?

13   A.   Yes, ma'am.

14   Q.   And when you checked in the rearview mirror, what he was

15   doing during that ride back to Shelby was just looking out the

16   window?

17   A.   That's correct.

18   Q.   And did you speak with him at all during that ride?

19   A.   No, ma'am, I did not.

20   Q.   Okay.  Describe for us how you got him out of your patrol

21   car when you arrived back at the Shelby police department.

22   A.   When I arrived at the police department there was other

23   officers that were already out behind the police department,

24   and they opened the door and got him out.

25   Q.   Okay.  Do you recall how many officers greeted you there

460

JEFFREY HAMRICK - DIRECT EXAMINATION

1    at the police department waiting for you and Dylann Roof to

2    arrive?

3    A.  I'm not exactly sure, but I know there was at least two.

4    Q.  And you kept him safely in your custody and kept him

5    handcuffed, didn't you?

6    A.  That's correct.

7    Q.  And there within the police department you took him to an

8    interview room, or what you all call the library?

9    A.  Yes, ma'am.

10   Q.  Did you speak with him at all as you walked from the car

11   with him up into the library?

12   A.  No, ma'am.

13   Q.  Did you notice anything about him like any odor of

14   alcohol, as --

15   A.  No.

16   Q.  No?  All right.  And once you put him in to the library,

17   did you have any further conversation or contact with Dylann

18   Roof?

19   A.  No, ma'am.

20   Q.  And you said that the most distinctive feature that you

21   saw as you first saw him was the haircut?

22   A.  Yes, ma'am.

23   Q.  And it matched what you saw there in the photographs when

24   they were saying be on the look out for Dylann Roof, right?

25   A.  That's correct.

461

MATTHEW STYERS – DIRECT EXAMINATION

1          MS. STEVENS:  Okay.  Thank you, Officer, that's all I

2     have.

3          THE COURT:  Thank you very much.  You may step down.

4     A.  Okay.

5          MR. CURRAN:  The Government calls Matt Styers.

6          THE CLERK:  State your full name for the record,

7     please.

8     A.  Matthew Thomas Styers.

9       MATTHEW STYERS, a witness called by the Government, first

10    having been duly sworn, testified as follows:

11                         DIRECT EXAMINATION

12    BY MR. CURRAN:

13    Q.  Morning, Detective Styers.

14    A.  Good morning.

15    Q.  I think you just did it, but please tell the jury your

16    name.

17    A.  Matt Styers.

18    Q.  And what do you do for a living, Detective Styers?

19    A.  I'm an investigator with the Shelby police department,

20    Shelby, North Carolina.

21    Q.  And how long have you been a law enforcement officer?

22    A.  Approximately 12 years.

23    Q.  And you work in the Shelby police department in North

24    Carolina, and you just told the jury that, right?

25    A.  Yes.

MATTHEW STYERS - DIRECT EXAMINATION

1    Q.   How long have you been working for the Shelby police
2    department?
3    A.   I've been with Shelby around six years.
4    Q.   And you already mentioned that you're a criminal
5    investigator, correct?
6    A.   Yes.
7    Q.   I'm calling you detective; is that actually your formal
8    title?
9    A.   Yes, it is.
10   Q.   I'd like you to turn to the morning of June 18th, 2015,
11   last year.  Were you on duty that day?
12   A.   I was.
13   Q.   And is that the day that officers from your department
14   arrested the defendant, Mr. Roof?
15   A.   It was.
16   Q.   And were you directly involved in that arrest?
17   A.   Somewhat, yes.
18   Q.   And the arrest itself?
19   A.   No, not the arrest, no.
20   Q.   Where were you -- for example, where were you when you
21   learned that he had been arrested?
22   A.   We were doing a community function on Gardner Street in
23   Shelby when everything took place that morning.
24   Q.   So you were not present at the site of the arrest?
25   A.   I was not.

463

MATTHEW STYERS - DIRECT EXAMINATION

1    Q.  What did you do when you learned of the arrest?

2    A.  Me and my sergeant left that community function and went

3    to the police department.

4    Q.  And why did you do that?

5    A.  Because Sergeant Myers had asked for CID, which is

6    criminal investigation division, to contact him, and they

7    advised us that they were taking Mr. Roof to the police

8    department.

9    Q.  And what time was it when you got back to the police

10   department?

11   A.  It was around 11:00 o'clock.

12   Q.  And where did you go at the police department?

13   A.  It was a -- it's our interview room, on the second floor

14   of our police department.  It's an interview room, it used to

15   be a library that we -- interview slash conference room at our

16   police department.

17   Q.  And you described just generally for the jury what that

18   room is like.

19   A.  It's got a round table, I think it's about six people,

20   some book shelves, TV on the wall, not real big, but it's not

21   real small.  Decent size room.

22   Q.  Relatively normal conference room?

23   A.  Yes.

24   Q.  No bars on the window?

25   A.  No.

MATTHEW STYERS - DIRECT EXAMINATION

1    Q.  No two-way glass like you see on TV?

2    A.  No.

3    Q.  Why was he brought there rather than a cell?

4    A.  We don't have a cell at our police department.

5    Q.  So is the library or the conference room, is that where

6    you do interviews?

7    A.  That's where we do all our interviews.  At the time that's

8    where we did all our interviews.

9    Q.  How long was the defendant held in that conference room?

10   A.  Around four hours.  I believe it was.

11   Q.  And who was guarding him while he was in there?

12   A.  I was in there the majority of the time until he was

13   interviewed.

14   Q.  And who was he interviewed by?

15   A.  The FBI.

16   Q.  Did you remain during the FBI interview?

17   A.  I did not.

18   Q.  Were you with him prior to the FBI interview?

19   A.  Yes, I was.

20   Q.  And you were guarding him at that point, right?

21   A.  Right.  Yes.

22   Q.  As you were doing that, how far away from him were you?

23   A.  Probably three foot, two, three foot.

24   Q.  So you were able to observe him closely?

25   A.  Yeah, I sat right beside him pretty much.

MATTHEW STYERS - DIRECT EXAMINATION

1    Q.  You were with him for more than two hours, correct?

2    A.  That is correct.

3    Q.  And describe how he was situated during the period where

4    you were observing him.

5    A.  I was -- like I said, it's a round table, I was sitting at

6    the end of the table and he was sitting to the right of me,

7    beside me at the table.

8    Q.  How did he appear to you physically?

9    A.  Fine.

10   Q.  Anything unusual about his physical condition at all?

11   A.  No.  Not at all.

12   Q.  Any signs of injury?

13   A.  No.

14   Q.  As you sat with him for those two hours, did you observe

15   anything unusual about his behavior?

16   A.  I did not.

17   Q.  As you observed him, did he give you any indication that

18   he was fatigued?

19   A.  No, he did not.

20   Q.  Droopy eyes?

21   A.  Huh-uh.

22   Q.  Any indications that he was sleepy?

23   A.  No, not at all.

24   Q.  Did he give you, as you observed him, did you observe

25   anything that indicated he was under the influence of any

MATTHEW STYERS - DIRECT EXAMINATION

1   substances or medications?

2   A.  No, I did not.

3   Q.  What did he do during the period?  And when I'm asking

4   during that period, I'm asking during the period you observed

5   him, what did he do during that period?

6   A.  The only thing he did while he was with me was he ate and

7   sat there pretty much.

8   Q.  So he sat there and he ate?

9   A.  Yes.

10  Q.  What did he eat?

11  A.  He had Burger King.  A burger from Burger King.

12  Q.  And that wasn't something he brought with him, is it?

13  A.  It was not.

14  Q.  Is that something that you -- your office gave him?

15  A.  I'm sorry?

16  Q.  Is that something Shelby police department gave him?

17  A.  It is.

18  Q.  And did he eat that in the conference room?

19  A.  He did.

20  Q.  Why was he given food?

21  A.  When he was brought in, my sergeant asked him if he was

22  hungry and wanted anything to eat and he said yes.  And they

23  went to Burger King, it was the closest to our police

24  department, and got him something to eat.

25  Q.  Did they bring you something back also?

MATTHEW STYERS - DIRECT EXAMINATION

1    A.  No, they did not.  I was on a diet.

2    Q.  And the two hours you were with him, you say you started

3    about 11:00, correct?

4    A.  Yes.

5    Q.  You were with him until sometime after 1:00 o'clock?

6    A.  Yes.

7    Q.  That would have been the noon hour, right?

8    A.  Correct.

9    Q.  Standard practice for your department to provide food for

10   detainees --

11   A.  Yep.

12   Q.  -- when they're being held during the noon hour?

13   A.  Yes, it is.

14   Q.  So it's not some sort of special treatment he received?

15   A.  Absolutely not.

16   Q.  Did you speak with him while you were together?

17   A.  Maybe twice.  I asked him if he was okay, if he needed to

18   go to the rest room, and that was it.  That was the only

19   conversation we had really.

20   Q.  And what was his response when you asked him if he wanted

21   to go to the rest room?

22   A.  No, not right now.

23   Q.  When you spoke with him, did he appear to have any problem

24   understanding you at all?

25   A.  No, he did not.

468

MATTHEW STYERS - DIRECT EXAMINATION

1    Q.  When you asked him questions, was he responsive to you?

2    A.  Yes.

3    Q.  You mentioned the FBI came and they did an interview with

4    him.  Let's turn to that.  Were you -- I think you've already

5    addressed that, but you were present when that started,

6    correct?

7    A.  When they entered the room, yes.

8    Q.  You did not remain through that interview?

9    A.  I did not.

10   Q.  Is there a camera in the library?

11   A.  Yes, there is.

12   Q.  Does that camera capture video?

13   A.  It does.

14   Q.  Does it capture audio as well?

15   A.  It does.

16   Q.  How do you know that?

17   A.  Because I've watched it.

18   Q.  And what did you watch?

19   A.  The video from the time that Mr. Roof was brought in till

20   the time he left.

21   Q.  So have you watched that video from the -- for the entire

22   four plus hours?

23   A.  I did.

24   Q.  Start to finish?

25   A.  Yes.

MATTHEW STYERS - DIRECT EXAMINATION

1   Q.  Does your department make a copy of that video?

2   A.  Yes, they do.

3         MR. CURRAN:  I'm going to approach the witness.

4   Q.  Detective Styers, I'm handing you four DVDs that have been

5   marked as Government's Exhibit 107.  I'd ask you to take a

6   look at them, review them.  Now, are you familiar with those

7   DVDs?

8   A.  I am.

9   Q.  And how did you familiarize yourself with them?

10  A.  I watched each one of these DVDs.

11  Q.  And are those the actual copies that you watched?

12  A.  They are.

13  Q.  How do you know that?

14  A.  Because I initialed and dated them after I watched each

15  one of them.

16  Q.  All right.  And I think it's already implicit in your

17  answer, but what are the -- what is contained on the DVDs?

18  A.  The time that Mr. Roof was brought to the Shelby police

19  department, the entire stay through the interview and till the

20  end when he left.

21  Q.  So the record is clear, there's four sequential DVDs that

22  contain the entire video, right?  It's not four copies of one

23  video?

24  A.  Right, that is correct.

25  Q.  Have you compared what is on there with what the Shelby

MATTHEW STYERS - DIRECT EXAMINATION

1    police department holds as the videos in its records?

2    A.  I do.

3    Q.  And is what you possess there and what you reviewed, is

4    that a complete and accurate copy of the video of the time

5    that defendant Roof was in the conference room?

6    A.  Yes, it is.

7    Q.  And that includes the period when he was interviewed by

8    the FBI, correct?

9    A.  That is correct.

10           MR. CURRAN:  Your Honor, at this point we move for

11   admission.

12           MR. BRUCK:  No objection.

13           THE COURT:  Government 107 admitted without

14   objection.

15       (Government Exhibit 107 received.)

16           MR. CURRAN:  The video -- and, Your Honor, we're not

17   going to publish the video with this witness.

18           THE COURT:  Very good.

19   BY MR. CURRAN:

20   Q.  The video has a date and time stamp running in the video

21   frame.  Is that date and time stamp accurate?

22   A.  Yes, it is.

23   Q.  The video also appears to be slightly washed out.  Can you

24   explain to the jury why that is?

25   A.  With our camera system, there's a window to one side of

MATTHEW STYERS - DIRECT EXAMINATION

1   this conference room or slash interview room.  With that light

2   coming in and daylight, it makes the camera a little grainy.

3   At nighttime interviews would be easier to view or a little

4   bit better to view, but the light changes the camera just a

5   little bit.  Of the picture.

6   Q.  And the -- but you're still able to see the individuals in

7   the conference room, correct?

8   A.  Yes, that is correct.

9   Q.  Were you still at the police department when the FBI

10  interview concluded?

11  A.  I was.

12  Q.  And where were you at that point?

13  A.  When the interview was done, I went back into the

14  interview room and we transported him from the police

15  department to our law enforcement center.

16  Q.  And did you have any -- Would you repeat that answer?

17  A.  I'm sorry?

18  Q.  Could you say that again; didn't quite catch it.

19  A.  After the FBI interview was done, I went back in the room

20  and then we transported Mr. Roof to our law enforcement

21  center.

22  Q.  That's what I thought you said.  Did you participate in

23  that transport as well?

24  A.  I did.

25  Q.  Did you observe anything at that point that was unusual

MATTHEW STYERS - DIRECT EXAMINATION

1   about his physical condition?

2   A.  No, I did not.

3   Q.  Did you observe at that point anything that was unusual

4   about his behavior?

5   A.  No.

6          MR. CURRAN:  No further questions of the witness at

7   this time.

8          THE COURT:  Cross-examination.

9          MR. BRUCK:  Thank you, Your Honor.

10                     CROSS-EXAMINATION

11  BY MR. BRUCK:

12  Q.  Morning, Mr. Styers, I'm David Bruck.

13  A.  Hey, how are you.

14  Q.  Just have a few things to ask you.

15  A.  Okay.

16  Q.  Mr. Roof, during the -- you were with him for two hours,

17  give or take?

18  A.  Yes.

19  Q.  And during that whole time he was handcuffed, leg irons

20  and -- I'm sorry, chained on his ankles and wearing handcuffs?

21  Correct?

22  A.  Yes.

23  Q.  In front?

24  A.  Yes.

25  Q.  In fact, he moved the cuffs, he came in the interview room

MATTHEW STYERS - CROSS-EXAMINATION

1    with the cuffs on at the back, and you turned them around and

2    put them in front, is that correct?

3    A.  That is correct.

4    Q.  And he remained like that for the next two hours --

5    A.  That is correct.

6    Q.  -- while you were with him?

7    A.  Yes.

8    Q.  Okay.  And let me ask you about the burger.  He -- I'm

9    sorry, let me ask you about the hamburger.  He didn't raise

10   the issue of wanting something to eat, did he?

11   A.  He did not, no.

12   Q.  You did?

13   A.  I didn't personally, but my sergeant did, yes.

14   Q.  There was a second officer in the room?

15   A.  Yes, that's correct.

16   Q.  Part of the time.  And he said, don't you want something

17   to eat?  Correct?

18   A.  That's correct, yes.

19   Q.  And Mr. Roof said -- and your partner asked Mr. Roof, had

20   he had anything to eat that day, right?

21   A.  That's correct.  Yes.

22   Q.  And Mr. Roof said, well, a bag of chips.  But he wasn't

23   hungry.  Correct?

24   A.  That's correct.

25   Q.  Or words to that effect.

474

MATTHEW STYERS - CROSS-EXAMINATION

1    A.   That's correct.

2    Q.   And then your officer said, come on, we can get you a

3    burger, right?

4    A.   He asked him if he was hungry and did he want a burger or

5    anything like that.

6    Q.   And he said?

7    A.   He said that -- he asked him if he wanted a burger or

8    something.

9    Q.   Right.  And then finally on the second question Mr. Roof

10   said yes.

11   A.   Yes, I'd like a burger.

12   Q.   All right.  And then another officer went out to the

13   nearest fast food restaurant, right?

14   A.   That's correct.

15   Q.   Which was Burger King?

16   A.   Yes, sir.

17   Q.   And brought him a burger.

18   A.   Right.

19   Q.   And that was brought into the room and given to Mr. Roof.

20   A.   Yes.

21   Q.   And he was left in handcuffs?

22   A.   That's correct.

23   Q.   And he ate the hamburger?

24   A.   Yes.

25   Q.   While you sat there and looked at him?

475

MATTHEW STYERS - CROSS-EXAMINATION

1    A.   Right.

2    Q.   And now, you're a detective, you do questioning of

3    suspects, correct?

4    A.   That is correct.

5    Q.   Although you weren't involved in questioning in this case.

6    A.   Correct.

7    Q.   And one of the things that you have to be sure of when

8    you're questioning a suspect is that the person's basic

9    physical needs are taken care of.

10   A.   That's correct.

11   Q.   Right?

12   A.   Yes, sir.

13   Q.   So you check and make sure that they get to go to the

14   bathroom when they need to, you make sure they're not hungry

15   or thirsty, right?

16   A.   That's correct, yes.

17   Q.   And that's a good law enforcement practice, because if you

18   question the suspect who is in physical distress because of

19   hunger or thirst or for whatever reason, that could raise a

20   question of whether or not they voluntarily made a statement,

21   correct?  It could?

22   A.   It could.

23   Q.   Right.  So you try to avoid that by attending to the needs

24   of the suspect in your control.

25   A.   Right.

MATTHEW STYERS - CROSS-EXAMINATION

1    Q.  And you were doing that today.

2    A.  I'm sorry?

3    Q.  You were doing that on the day in question with Mr. Roof.

4    A.  I wasn't, because I didn't intend to interview him, so we

5    were just making sure that he was okay while he was in our

6    custody.

7    Q.  That's right, and he wasn't given any special treatment

8    that wouldn't have been given to anyone else?

9    A.  Absolutely not.

10   Q.  Absolutely not.

11   A.  No.

12   Q.  He was being treated like any other suspect?

13   A.  Yes, he was.

14   Q.  All right.  Then you have described his conduct and his

15   demeanor.  Would it be fair to say that he basically stared

16   straight ahead the whole time he was with you?

17   A.  Pretty much most of the time, yes.

18   Q.  All right.

19            MR. BRUCK:  Miss Baker, could we have Government's

20   Exhibit 107 played from minute ten just for about 60 seconds.

21            THE COURT:  Mr. Bruck, you're going to play a portion

22   of Exhibit 107?

23            MR. BRUCK:  Just a few seconds, then I'd like to ask

24   the witness a few questions.

25            THE COURT:  Permission granted to do that.

MATTHEW STYERS - CROSS-EXAMINATION

1        MR. BRUCK:  Thank you, Your Honor.

2     (Video played.)

3  BY MR. BRUCK:

4  Q.  Can you see the screen?

5  A.  Yes, I can.

6  Q.  Let's just watch it for a few seconds.

7     Officer Styers, you described Mr. Roof as staring straight

8  ahead?

9  A.  Yes.

10 Q.  And that's how he appears there?

11 A.  Correct.

12 Q.  And with the exception of the time when he was eating the

13 burger with his hands cuffed, is that about the way he looked

14 for the entire two hours?

15 A.  Yes, pretty much.

16       MR. BRUCK:  Thank you.

17       THE COURT:  Very good.  Thank you.

18    Mr. Curran, you didn't have any follow-up questions, did

19 you?

20       MR. CURRAN:  No, Your Honor.

21       THE COURT:  Call your next witness.

22       MR. CURRAN:  Government calls Michael Stansbury, Your

23 Honor.

24       THE CLERK:  State your full name for the record

25 please.

478

MICHAEL STANSBURY – DIRECT EXAMINATION

1    A.  Michael E. Stansbury.

2        MICHAEL STANSBURY, a witness called by the Government,

3    first having been duly sworn, testified as follows:

4                         DIRECT EXAMINATION

5    BY MR. CURRAN:

6    Q.  Agent Stansbury, please tell the jury your name.

7    A.  Michael E. Stansbury.

8    Q.  And what do you do for a living?

9    A.  I work for the Federal Bureau of Investigation.

10   Q.  Are you an agent with the --

11   A.  Yes, I am a special agent, I'm actually right now the

12   acting assistant special agent in charge of our criminal

13   branch here in South Carolina.

14   Q.  I'll ask you a question about that in a little bit.  How

15   long have you been an agent with the FBI?

16   A.  I've been with the FBI about 16 and a half years.

17   Q.  And how long have you been in law enforcement generally?

18   A.  Since 1992, so what, 24 years?

19   Q.  I think that works out.  Would you briefly describe for

20   the jury what law enforcement experience you had prior to

21   joining the FBI.

22   A.  In 1992 I was a police officer with the Terrell, Texas

23   police department.  In '96 I became a state trooper with the

24   Texas Department of Public Safety and Highway Patrol, and then

25   in 2000 I was hired by the FBI, went to Quantico, Virginia,

MICHAEL STANSBURY - DIRECT EXAMINATION

1    graduated, and was assigned here in -- Columbia, South

2    Carolina as a special agent.

3    Q.  And is that where you work currently, in Columbia?

4    A.  Yes, I do.

5    Q.  Is that where the regional headquarters is?  For the FBI?

6    A.  Yes, the field office for South Carolina.

7    Q.  How long have you worked for the Columbia field office?

8    A.  Well, 16 and a half years.  Other than my stint in

9    Washington, D.C. for a year and a half.

10   Q.  And you mentioned earlier that you are currently the

11   assistant special agent in charge there.  What does that mean?

12   A.  Well, the field office is run by a special agent in

13   charge.  We had 56.  And then underneath him are the assistant

14   special agent in charge.  Here in South Carolina we have two,

15   one supervisors national security, I supervise the criminal

16   branch right now, I'm just the acting.  What I do is I

17   supervise all the squads.  The supervisor, like Agent Womble

18   is the supervisor here in Charleston, I'm over him right now.

19   And then my normal job is I'm a supervisory special agent just

20   like Agent Womble, and I supervise our violent crime squad in

21   Columbia.

22   Q.  So let's turn from your background to the night of

23   June 17th of last year, the night of the Emanuel AME

24   shootings.  Were you involved that evening in the FBI's

25   response to those shootings?

MICHAEL STANSBURY - DIRECT EXAMINATION

1   A.  Yes, I was.

2   Q.  Would you briefly describe for the jury your initial

3   involvement that evening, what role you played?

4   A.  Initially that evening I went to our field office in

5   Columbia, and -- well, to open up an investigation, open a

6   case file up that we have to do and to set up a secondary or

7   auxiliary command post to start managing FBI resources up in

8   Columbia that we may need to dispatch down to Charleston.

9       I made contact with Agent Brian Womble, who was the

10  supervisor, he gave me the details that he had in the initial

11  details of the event.  We had a discussion about what to open.

12  One of the things we can do is -- to assist is -- mass

13  shootings, we have a certain type of things we do for that,

14  but based on the information he gave me, I felt that the best

15  case we should open was a hate crimes investigation.

16  Q.  So what you were just describing there, sounds as if that

17  involved passing and receiving information about what had

18  happened and what the investigation and early stages was

19  revealing?

20  A.  Yes.

21  Q.  Is that correct?

22  A.  Yes.

23  Q.  Did your involvement -- that was the night of June 17th.

24  Would your involvement continue the next day on June 18th?

25  A.  Yes, it did.  After I went home that night I had spoken

MICHAEL STANSBURY – DIRECT EXAMINATION

1    with the then assistant special agent in charge who actually

2    had come to Charleston, and I was going to come back the

3    following day and relieve people in our command post here in

4    Charleston.

5    Q.  Stop you a second, because you hadn't gone down the night

6    before.

7    A.  I did not, I went home about 2:30 in the morning.

8    Q.  Initially you were going to relieve the people who had

9    been working it since the incident?

10   A.  Yes, sir.

11   Q.  Continue, please.

12   A.  That following morning I woke up, and at about 7:28 I

13   called Agent Brian Jones, a supervisor who was headed to

14   Charleston with me.

15   Q.  Let me stop you for a second just so they understand the

16   context and the names.  Who is Brian Jones?

17   A.  He's a supervisory special agent also in Columbia, he runs

18   the other squad.  We have two.

19   Q.  What squad does he run?

20   A.  White collar crime, civil rights squad.

21   Q.  You already indicated this was being treated already as a

22   civil rights offense?

23   A.  Yes, sir.

24   Q.  Continue.

25   A.  I was advised -- when I called him, he had gotten in early

MICHAEL STANSBURY – DIRECT EXAMINATION

1    because he didn't come out the night before, and he was

2    already in Charleston.  I told him I was getting ready and I'd

3    be down there leaving shortly.  And at that point in time in

4    our conversation he stated that he had just received some tips

5    about a possible suspect up in Columbia.

6    Q.  All right.  So we're going to ask you about that in a

7    minute.  That day did you -- were you working by yourself or

8    working with anybody else?

9    A.  Well, I ended up getting some other agents to work with

10   some other agents that day.

11   Q.  And was there any agent in particular that you worked with

12   for the most part that day?

13   A.  Yes, Agent Craig Januchowski.

14   Q.  Who is Craig Januchowski?

15   A.  Well, Craig Januchowski is a special agent, he used to

16   work on my squad as a violent crime agent investigator, he was

17   assigned as kind of our liaison behavioral analysis unit at

18   the Quantico, Virginia, and had a lot of experience in violent

19   crime investigations.  At the time though he had been

20   transferred and was working on international terrorism squad.

21   Q.  And had you worked with Agent Januchowski before?

22   A.  Yes, I had, on several cases.

23   Q.  You mentioned earlier that you had received some

24   information that you were going to be following up on,

25   correct?

MICHAEL STANSBURY – DIRECT EXAMINATION

1    A.  Yes, sir.

2    Q.  Why don't you describe for the jury what information you

3    initially received regarding the shooting that morning.

4    A.  I received a tip that came in from a Dalton Tyler, that a

5    man named Dylann Roof was the possible AME shooter, as we were

6    calling him at the time.  Or the shooter.  And that he had a

7    possible address in Columbia, and someone needed to go by

8    there and check that place out.

9    Q.  So what did you do in response to that information?

10   A.  Well, I told most everybody in Charleston by this time, I

11   told Agent Jones that I would just stay in Columbia and handle

12   these leads in -- get some other agents to assist me.  So I

13   contacted Agent Januchowski, Task Force Officer DeJesus and

14   some other agents and officers to come with me to follow these

15   leads up.

16   Q.  And where did you go?

17   A.  I went to XXXXXXXXXXXXXXXXX in Columbia, South Carolina.

18   Q.  Who resides at XXXXXXXXXXXXXXXX?

19   A.  That is the home of Bennett -- Ben Roof.

20   Q.  Who is Ben Roof?

21   A.  He is Dylann Roof's father.

22   Q.  And why did -- where does he live, for the people who are

23   not familiar with Columbia area generally, where does he live,

24   not the address.

25   A.  Basically almost downtown, it's just east of downtown in

484

MICHAEL STANSBURY – DIRECT EXAMINATION

1    Columbia.  You would have to go downtown on Elmwood Avenue and

2    back.

3    Q.  And why did you go to his home?

4    A.  A second tip came in while I was en route or we were

5    trying to figure out exactly where Dylann Roof lived, basic

6    information we had.  That tip came from Amber Roof, who is

7    Dylann Roof's sister, who had contact --

8         MR. BRUCK:  If Your Honor please, we'd like the

9    Government to be cautious about getting hearsay.  I realize

10   these are preliminary questions, but at the same time we ask

11   no actual hearsay be admissible.  We don't have a 302 from

12   this witness regarding this part of his testimony.  It's a

13   little hard to anticipate where it's going, but we would like

14   to object prospectively.

15        MR. CURRAN:  None of this is offered for the truth of

16   the matter asserted.

17        THE COURT:  Overruled.  Just background information.

18   BY MR. CURRAN:

19   Q.  Again, I think the question was why did you go to

20   Mr. Roof's, and you were explaining that you had received

21   additional information.

22   A.  Yes, sir.  And in that, Agent Jones back at the command

23   post of the joint command post here in Charleston was able to

24   come up with the address of XXXXXXXXXXXXXXXXX.  I don't know

25   whether he got that specifically from her or through DMV

MICHAEL STANSBURY – DIRECT EXAMINATION

1    records, but he -- Agent Jones provided me with the address.

2    Q.  And did you actually make it to Ben Roof's home?

3    A.  Yes, I did.  I made it to the home, I was the first one

4    there.  While I was waiting for another agent to show up and

5    arrive, I then received information that Ben Roof himself was

6    on the phone with Agent Hamski, the case agent in this

7    investigation, who was at the home and telling him that he

8    also -- what his belief was too.  And at that point in time I

9    had felt confident that Dylann Roof was not at the house, and

10   so I went in and got out and met Ben Roof and the other family

11   members in the front yard.

12   Q.  Let me stop you for a second.  When you arrived, was Agent

13   Januchowski with you?

14   A.  No, he was not.

15   Q.  He was not there at that point.  Did he join you at some

16   point at the home?

17   A.  Yes, he did.

18   Q.  When you arrived, what did you observe?  Or what happened?

19   A.  Well, after I got out of the car and walked out, as I was

20   walking up to the house, Ben Roof; the grandfather, Joseph

21   Roof, Senior; the uncle, Joseph Roof, Junior; and Morgan Roof,

22   a juvenile, half sister of Dylann Roof, had all come outside,

23   and I met with them outside and identified myself.

24   Q.  And did you speak with them?

25   A.  Yes, I did.

MICHAEL STANSBURY – DIRECT EXAMINATION

1    Q.  Did you speak with anybody in particular primarily?

2    A.  Ben Roof pretty much led the conversation from the

3    family's point of view.

4    Q.  And again, that was defendant Roof's father?

5    A.  Yes, sir.

6    Q.  Did any of them -- You were trying to figure out where

7    Mr. Roof was, correct?

8    A.  That's correct.

9    Q.  Did any of them indicate they knew where he was at that

10   point in time?

11   A.  They did not know where he was, he wasn't at the house,

12   and they advised if he was with anyone, most likely be with a

13   guy named Joey Meek.

14   Q.  And who is Joey Meek?

15   A.  A friend of Dylann Roof's.

16   Q.  And did they indicate any other places where Mr. Roof

17   might be?

18        MR. BRUCK:  Objection, Your Honor.  I simply wish to

19   ensure that the addresses of his family not be needlessly

20   disclosed.  It's already been done with respect to the father;

21   I want to make sure it's not done with respect to the mother.

22        THE COURT:  Well, this is a public trial, it's --

23   this is the way things are.  Mr. Curran, just to the extent

24   it's not necessary for you to make a record, I overrule the

25   objection.

MICHAEL STANSBURY – DIRECT EXAMINATION

1      MR. CURRAN:  It is not necessary and we have no

2  objection to the witness just describing where these homes are

3  generally.

4      THE COURT:  You may proceed.

5      MR. BRUCK:  Thank you.

6  A.  The other possible location we received was that the

7  family had a pond house in rural South Carolina.

8  Q.  And did you also discuss with them Mr. Roof's activities

9  in the days before the shooting?

10  A.  Yes, we did.

11  Q.  And did you also discuss with them whether Mr. Roof had a

12  gun?

13  A.  Yes, we did.

14  Q.  And what did they tell you?

15  A.  That he did have a gun.

16  Q.  Did you or -- and did you search the house?

17  A.  I did not.  We asked if Mr. Roof or Dylann Roof had any

18  items in the house; Bennett Roof indicated that he did.

19  Q.  Let me stop you.  You said we.  Was Agent Januchowski with

20  you at that point?

21  A.  At that point Agent Januchowski was with me.  And Mr. Ben

22  Roof indicated that he did have some items.  At that point we

23  asked for consent to go in and get the items, and Mr. Roof

24  consented.  And he took Agent Januchowski inside the house to

25  collect those items at that point while I worked back with

488

MICHAEL STANSBURY – DIRECT EXAMINATION

1   command post trying to identify Joey Meek, so we could try and

2   locate him.

3   Q.  And so you didn't go into the house?

4   A.  I did not.

5   Q.  When Agent Januchowski came back out, what did he have?

6   A.  When he came back out he had retrieved a birthday card

7   that contained a note, I believe it was about six pictures,

8   primarily of Dylann Roof, and a DVD, a video of the -- DVD

9   movie of -- the movie was called Made in Britain with Tim Roth

10  from 1982.

11  Q.  And, Agent Stansbury, I'm handing you what has been marked

12  for purposes of identification as exhibits Government

13  Exhibit 108, 109 and 110.  If you would review each of those.

14  A.  Yes, sir.

15  Q.  Are you familiar with those items?

16  A.  Yes, sir.

17  Q.  How did you become familiar with that?

18  A.  These are the items that we received from Bennett Roof's

19  house that belonged to Dylann Roof.

20  Q.  And what is Exhibit 108?

21  A.  108 is the birthday card that was given --

22  Q.  No need to explain at this point.

23  A.  Yes, sir.

24  Q.  It's a birthday card.

25  A.  Yes, sir.

489

MICHAEL STANSBURY – DIRECT EXAMINATION

1  Q.  Is there a note inside of it?

2  A.  Yes, there is.

3  Q.  And what is Exhibit 109?

4  A.  109 is -- are the photographs that were of Dylann Roof.

5  Q.  And what is Exhibit 110?

6  A.  It's the movie, the DVD movie Made in Britain.

7  Q.  All right.  And did you interview defendant Roof later

8  that day?

9  A.  Yes, sir, I did.

10  Q.  And did you use each of these items during that interview?

11  A.  Yes, sir.

12        MR. CURRAN:  All right.  Your Honor, we'd move for

13  the admission of Government 108, 109 and 110 at this time, and

14  we're going to defer publishing them.

15        THE COURT:  Any objection?

16        MR. BRUCK:  No, sir.

17        THE COURT:  Government 108, 109 and 110 admitted

18  without objection.

19     (Government Exhibits 108 through 110 received.)

20  BY MR. CURRAN:

21  Q.  What did you do next after you received these items?

22  A.  Well, after having received them, pretty much with that I

23  spoke again, asked about a computer, Mr. Bennett -- Ben Roof

24  indicated he had a computer and he consented to us searching

25  and doing a more thorough search of the house and the

490

MICHAEL STANSBURY – DIRECT EXAMINATION

1  computer.  So I made arrangements for our computer analysis

2  response team to come to the house to image that computer and

3  for other agents to come and do a more thorough search of the

4  house.

5  Q.  Did you do anything in particular with the photos that you

6  had received?

7  A.  Yes.  Myself, I then took the notes, the birthday card and

8  note, I took a picture of that, and took a picture of two of

9  the photographs of Dylann Roof, and sent them back to Brian

10  Jones.  I texted them at the command post, because at this

11  time we're trying to verify or get a match that Dylann Roof is

12  the same man in the video going into the church.

13  Q.  And what, if anything, did you do next?

14  A.  After Agent Jones confirmed with me, because I had not

15  seen that video going into the church, that it indeed was

16  100 percent match and everyone else agreed it was the match, I

17  then proceeded to trying to focus on finding Dylann Roof and

18  get the information out.

19  Q.  So did you go somewhere besides the Roof home at that

20  point?

21  A.  Yes, I had made arrangement, other agents had responded to

22  Dylann Roof's mother's house in another location.  At this

23  point we felt Joey Meek was the best place or person he might

24  be with, based on the interviews with the family.  And other

25  law enforcement agents went to Joey Meek's mother's house,

MICHAEL STANSBURY – DIRECT EXAMINATION

1   which was in Lexington, South Carolina, or Lexington County.

2   And then myself and Agent Januchowski and some other agents

3   went to Joey Meek's father's house in Elgin, South Carolina.

4   Q.  What did you find when you got to Joey Meek's father's

5   house?

6   A.  I found Joey Meek's father and stepmother, but did not

7   find Joey Meek, but the other agents did find Joey Meek in

8   Lexington.

9   Q.  So other agents had found him?

10  A.  That's correct, yes, sir.

11  Q.  So that -- Joey Meek's father's house was a bit of a dead

12  end for you.

13  A.  Correct, yes, sir.

14  Q.  What did you do then at that point?

15  A.  At that point in time we then proceeded to go to the pond

16  house which was in rural South Carolina to see if Dylann Roof

17  could be there.  That was at a location much further away, so

18  it was going to take some time to get there, but we started

19  driving up that way.

20  Q.  Was Agent Januchowski still with you at this point?

21  A.  Yes.

22  Q.  Did you remain together essentially for the rest of that

23  day?

24  A.  Yes, we were in separate cars but we were together going

25  to the same location.

492

MICHAEL STANSBURY – DIRECT EXAMINATION

1    Q.  Did you make it to the pond house?

2    A.  No, we did not.

3    Q.  Why not?

4    A.  About, I would say not even halfway there, I received a

5    call from the command post, or Brian Jones, that Dylann Roof

6    had been captured or arrested in Shelby, North Carolina.

7    Q.  And what did you decide to do at that point?

8    A.  At that point in time I then directed another agent with

9    me, Kevin Conroy, to go back to Dylann Roof's father's house

10   to oversee the search that was going on and handle that.  And

11   then I told Agent Januchowski, who had been on the telephone

12   with our behavioral analysis unit in Quantico, Virginia, and

13   been providing them information and getting information from

14   them about for possible interview, to come with me, that I was

15   going to go up to Shelby, North Carolina to coordinate the

16   FBI's response up there.  Because I contacted our Charlotte

17   office, and they sent agents out there, too, to work with

18   them.  And I wanted Agent Januchowski to be up there, because

19   I was told an interview team would be coming later in the day,

20   and I wanted him to be a liaison between our behavioral

21   analysis folks and the interview team, to make sure they had

22   all the information necessary for the interview.

23   Q.  Is North Carolina a separate FBI jurisdiction?

24   A.  Yes, out of the Charlotte field office.

25   Q.  So you were going up to be a liaison between your field

493

MICHAEL STANSBURY – DIRECT EXAMINATION

1   office and that field office with regard to the investigation?

2   A.   Correct.  Although we're one FBI, it's almost like having

3   56 different agencies across the country.  So it'sbest if you

4   can have a liaison go up and work with them.

5   Q.   Did you go up there for the purpose of interviewing

6   Mr. Roof?

7   A.   No, I did not.

8   Q.   What time did you arrive in Shelby?

9   A.   It was just a little bit after noon, after 12:00.

10  Q.   And where did you go when you got to Shelby?

11  A.   I went to the police station.

12  Q.   And had you learned that that's where Mr. Roof was being

13  held?

14  A.   Yes.

15  Q.   And what did you find when you got to the police station?

16  A.   When I first walked to the police station I went in, I was

17  taken up, I believe it was the second floor, could have been

18  the third floor, and I was speaking with an officer that was

19  bringing me up to where the chief and the district attorney

20  were already there.  And we went past a room with a conference

21  room with a table in it, a small conference room.  Inside that

22  room I saw who I later learned to be was Officer Styers, and

23  then Dylann Roof was sitting at a table eating a hamburger.

24  Q.   And how did Mr. Roof appear to you at that point?

25  A.   He appeared fine to me, appeared to be normal, just

MICHAEL STANSBURY - DIRECT EXAMINATION

1    sitting there eating a hamburger.  He was not upset, crying,

2    or showing any emotions.

3    Q.  Did you eventually speak -- you didn't speak with Mr. Roof

4    at that point?

5    A.  No, I did not.

6    Q.  Did you eventually speak with him?

7    A.  Yes, I did.

8    Q.  And describe briefly how that came about.

9    A.  As I kept being -- I was having discussions back and forth

10   with the command post, back and forth with the district

11   attorney in Cleveland County, North Carolina, the chief, and

12   things were going on, and then found out that the interview

13   team that was supposed to have been en route at the same time

14   I was leaving essentially, but by plane, was not now going to

15   leave till 4:30 or 5:00 that afternoon.  That we were wasting

16   a valuable opportunity to try to talk to Mr. Roof to find out

17   exactly what happened.  The longer we waited, the less likely

18   we were going to be able to have had the opportunity to

19   interview him and find out exactly why he did this.

20   Q.  What did you decide to do?

21   A.  I felt that we needed to interview him.  So I talked to my

22   superior back at the command post here in Charleston, and I

23   told him what I felt needed to happen.  And they gave me the

24   go ahead to go ahead and interview Mr. Roof.

25   Q.  And did you subsequently interview him?

MICHAEL STANSBURY – DIRECT EXAMINATION

1    A.  Myself and Agent Januchowski did, yes, sir.

2    Q.  And where did that interview take place?

3    A.  In the Shelby police department in that same small

4    conference room where he had been sitting when I first

5    arrived.

6    Q.  Normal conference room from what you could tell?

7    A.  Yes, sir, it was a normal conference room with windows, a

8    table in the middle with chairs around it.

9    Q.  Do you know whether there's a camera in that conference

10   room?

11   A.  I knew there was a camera in the conference room because

12   the Shelby police officers told me, told me they'd been

13   videoing him ever since they brought him in, gave him his

14   hamburger and turned the recorder on.

15   Q.  Do you know whether that camera and that video also

16   included audio?

17   A.  Yes, it did.

18   Q.  Do you know whether it was -- that camera was recording

19   that day when you interviewed Mr. Roof?

20   A.  Yes, it was.

21   Q.  And how do you know that?

22   A.  Well, because after it was done, I retrieved -- I had them

23   download a -- download the video onto DVDs, and I have since

24   reviewed that DVD and the interview on there.

25          MR. CURRAN:  Your Honor, I'm going to approach the

MICHAEL STANSBURY – DIRECT EXAMINATION

1   witness.

2          THE COURT:  You may.

3   BY MR. CURRAN:

4   Q.  Agent Stansbury, I'm handing you what's been marked for

5   purposes of identification as Government Exhibit 5.  If you

6   would review that, please.

7          THE COURT:  Government 5?

8          MR. CURRAN:  Yes, Your Honor.

9          THE COURT:  Very good.

10  A.  Yes, sir, this is a --

11  Q.  Let me ask the questions.  Are you familiar with those?

12  A.  Yes, I am.

13  Q.  How did you become familiar with this?

14  A.  Well, this specific one is I reviewed this in its entirety

15  with you at the U.S. Attorney's office on November 18th, 2016,

16  to verify that it was indeed the exact recording of the

17  interview, and then I signed and dated it after a completion

18  of reviewing it.

19  Q.  Is that how you know it's the one you reviewed?

20  A.  Yes, sir.

21  Q.  What is it?

22  A.  That contains the video of the entire interview of Dylann

23  Roof on that day in Shelby, North Carolina.

24  Q.  You said the entire interview.  Have you reviewed it to

25  determine whether it's a complete and accurate copy of the

MICHAEL STANSBURY – DIRECT EXAMINATION

1   interview?

2   A.  Yes, I have.

3   Q.  And is it?

4   A.  Yes, it is.

5   Q.  Does it cover the entire time you and Agent Januchowski

6   were in the conference room with Mr. Roof?

7   A.  Yes, it does.

8          MR. CURRAN:  At this point we move for admission of

9   Government's Exhibit 5.

10         THE COURT:  Government -- Defense response?

11         MR. BRUCK:  No objection.

12         THE COURT:  Very good.  Government 5 is admitted

13  without objection.

14     (Government Exhibit 5 received.)

15  BY MR. CURRAN:

16  Q.  So the record is clear, this exhibit is just the FBI

17  agent, correct?

18  A.  That's correct, yes.

19  Q.  Doesn't include any portions of the video from before you

20  entered the room.

21  A.  That's correct.

22  Q.  Not any significant portions before you entered the room.

23  The video includes captioning of the discussion between you

24  and Agent Januchowski and Mr. Roof.  Who prepared the

25  transcript on which that caption was based?

498

MICHAEL STANSBURY – DIRECT EXAMINATION

1   A.  I did.

2   Q.  And does that a transcript accurately reflect your

3   recollection --

4   A.  Yes, it does.

5   Q.  -- of the interview?

6   A.  Yes, sir.

7   Q.  Who is in -- I'm going to retrieve the exhibit.  Who is in

8   the interview room when you first went into the room?

9   A.  It was Officer Matt Styers and Dylann Roof.

10  Q.  And had you ever met the defendant before you entered that

11  conference room?

12  A.  No, I hadn't.

13  Q.  How did he appear to you?  You'd seen him earlier.  How

14  did he appear to you when you entered?

15  A.  He was the same, he was sitting there, he was calm, he

16  showed no real emotion.  Much like people looked at each other

17  sitting in the jury box, just like how y'all are sitting right

18  now, just being attentive to what we had to say when I first

19  walked in.

20  Q.  Any indication of fatigue?

21  A.  No, sir.

22  Q.  Did he appear to be sleepy, eyes drooping, anything like

23  that?

24  A.  No, sir.

25  Q.  Any indication to you, did you observe an indication of

MICHAEL STANSBURY – DIRECT EXAMINATION

1    mental impairment?

2    A.  No, sir.

3    Q.  And did you observe any indication he was under the

4    influence of any substance?

5    A.  No indication he was under the influence of any

6    substances.

7    Q.  How long were you with him?

8    A.  In the interview was approximately two hours.

9    Q.  At any point during the interview did you smell anything

10   like alcohol on his breath or anything like that?

11   A.  No, sir.

12   Q.  Did he object in any way to speaking with you and Agent

13   Januchowski?

14   A.  No, he did not.

15   Q.  And when you entered that room and you sat down with him,

16   you had not planned on doing this, correct?

17   A.  That's correct.

18   Q.  You had not really prepared for doing this?

19   A.  That's -- yes, sir, correct.

20   Q.  Other than your life ex -- law enforcement experience.

21   A.  Yes, sir.

22   Q.  What was your goal, what was your objective when you

23   started?

24   A.  My objective was, one, to get him to confess and admit

25   that he committed this crime, and two was the reason why, the

500

MICHAEL STANSBURY – DIRECT EXAMINATION

1    motive, why he actually committed this crime, why he did it.

2    That was probably almost more important than the fact that he

3    did it.

4            MR. CURRAN:  Your Honor, at this point Government

5    requests permission to begin publishing the exhibit to the

6    jury.

7            THE COURT:  Granted.

8        (Video was played.)

9    BY MR. CURRAN:

10   Q.  Just to orient the jury, there's three individuals in the

11   video, correct?

12   A.  Yes, sir.

13   Q.  One person at the bottom about to sit down.  Not the most

14   flattering aspect of you.  Who is that person?

15   A.  That's me.  About to sit down.

16   Q.  And who is to the left?

17   A.  That is Agent Januchowski.

18   Q.  And who is to the right?

19   A.  Dylann Roof.

20   Q.  Okay.  Now, Agent Stansbury, when you came into the room,

21   you took his cuffs off?

22   A.  Yes, sir.

23   Q.  You gave him a bottle of water?

24   A.  Yes, sir.

25   Q.  And you engaged in some chat with him.

501

MICHAEL STANSBURY – DIRECT EXAMINATION

1   A.   Yes.

2   Q.   Talked about you're from Texas?  You suspected this man of

3   having killed nine people the night before.  Why would you

4   treat him that way?

5   A.   It's part of rapport building.  You come in, you have to

6   be cordial with the people.  You don't want to beat them with

7   a phone book, but you have to be cordial with them, you have

8   to build that rapport with them, and you want them to open up

9   to you and feel like they can just tell you their story.

10       Taking the cuffs off is something I always do, because I

11  want them to feel like I'm not threatened by them, that they

12  can open up.  He still had leg irons on, and I felt that

13  myself and Januchowski, if he tried to do something, could

14  handle him.  I knew he didn't have a weapon at that point.  So

15  I always take the cuffs off.  Just something I want to do when

16  I talk to them, natural thing so they can explain with their

17  hands, make them feel more comfortable.  And the more

18  comfortable they are, the more likely they are to open up and

19  tell us what we want to know.

20  Q.   You were discussing the portion just before we stopped,

21  you were discussing a form with him.  What was that form?

22  A.   It's the advice of rights form or the Miranda form that we

23  have to give to someone and they waive before --

24  Q.   And why do you discuss that form?

25  A.   So it needs to be clear that they have been given their

502

MICHAEL STANSBURY – DIRECT EXAMINATION

1    rights, understood their rights and voluntarily wished to

2    speak to us to allow the confession to come forward.

3         MR. CURRAN:  Your Honor, I'm handing the witness

4    what's been marked as Government's Exhibit 111.

5    BY MR. CURRAN:

6    Q.  Please review that.

7    A.  Yes, sir.

8    Q.  Are you familiar with that document?

9    A.  Yes, I am.

10   Q.  And what is it?

11   A.  This is the advice of rights form that we used for

12   Mr. Dylann Roof.  And we actually had to use a Shelby police

13   department advice of rights form, because we have our own FBI

14   advice of rights form, but I didn't have them with me and I

15   don't think Agent Januchowski had one with him.  And so we

16   grabbed one of theirs.

17   Q.  Is that the actual form that you used that day?

18   A.  Yes, it is.

19        MR. CURRAN:  Your Honor, we'd move to admit

20   Government's Exhibit 111.

21        MR. BRUCK:  No objection.

22        MR. CURRAN:  And publish it to the jury.

23        THE COURT:  Any objection from the defense?

24        MR. BRUCK:  No objection.

25        THE COURT:  Government 111 admitted without

MICHAEL STANSBURY - DIRECT EXAMINATION

1    objection.

2         (Government Exhibit 111 received.)

3    BY MR. CURRAN:

4    Q.  It appears in the video you can see he appears to have

5    signed it.  On your video -- on your screen you should see a

6    highlighted portion of that at the bottom, which are three

7    signatures.  Which signature is that on the right?

8    A.  On the far right is Dylann Roof's signature.

9    Q.  And who are the other two signatures?

10   A.  The one on the far left officer is my signature, and the

11   witness is Craig Januchowski.

12   Q.  In the body of the form there are the Miranda warnings,

13   correct?

14   A.  Yes, sir.

15   Q.  And there are some initials next to those?

16   A.  Yes, sir.

17   Q.  Whose initials are those?

18   A.  Those are Dylann Roof's initials next to each right, to

19   make sure he understood exactly each specific right that he

20   had.

21   Q.  Now, on the video you had him read that final section out

22   loud.

23   A.  Yes, sir.

24   Q.  Why did you do that?

25   A.  It's the waiver part, and it -- we wanted -- it was him

504

MICHAEL STANSBURY – DIRECT EXAMINATION

1   making a verbal waiver out loud that he read it, and so there

2   was no doubt that he read it and he understood it and he

3   voluntarily waived his rights to speak with us.

4   Q.  Were you observing him closely as he did this?

5   A.  Yes, sir.

6   Q.  Did you observe anything that indicated to you that he did

7   not understand what you were telling him?

8   A.  No, sir.

9   Q.  Did he do anything that indicated he was not willing to

10  waive those rights?

11  A.  No, sir.

12          MR. CURRAN:  Okay.  I'm going to resume publishing to

13  the jury, Your Honor?

14          THE COURT:  Yes.

15      (Video was played.)

16  BY MR. CURRAN:

17  Q.  All right.  Defendant appears to have just told you what

18  he did the night before.  That was pretty quick.

19  A.  Yes, sir.

20  Q.  Is that unusual in your experience in an interview?

21  A.  Yes, sir, it was extremely unusual.  I mean, he got right

22  to it.

23  Q.  Why did you decide to broach that topic so quickly?

24  A.  When I was -- when I was talking with him, I just had a

25  feeling that, I mean, he wanted to tell it.  Otherwise he

505

MICHAEL STANSBURY - DIRECT EXAMINATION

1   would have never waived his rights.  And it was -- we needed

2   to get right to the point of what was going on there, so we

3   kind of -- I just nipped the rapport building in the bud there

4   and went right to asking him what happened.  This was not like

5   a six-month homicide investigation where I had a lot of time

6   to prepare and know all kind of details.  I had limited

7   information, and at this point I just felt to ask him what

8   happened.

9   Q.  So you were sitting right next to him, correct?

10  A.  Yes, sir.

11  Q.  So you observed something that indicated to you that he

12  wanted to tell you?

13          MR. BRUCK:  Your Honor, I have to object to the

14  agent's internal thought processes.  The confession speaks for

15  itself, and the reason the agent did what he did is not

16  relevant.

17          THE COURT:  Mr. Curran?

18          MR. CURRAN:  The question actually, Your Honor, is

19  did he observe something.

20          THE COURT:  That's the more proper question.  I

21  sustain the objection as made, but you can ask what he

22  observed.

23          MR. CURRAN:  Thank you.

24  BY MR. CURRAN:

25  Q.  What did you observe that indicated to you that he wanted

MICHAEL STANSBURY – DIRECT EXAMINATION

1  to talk?

2  A.  His body language, and just the way he was sitting there

3  and acting, and the fact that he allowed us to be in there,

4  his movements, gestures, and to have -- the small talk, I

5  guess the rapport building that I was trying to make with him,

6  he wasn't too interested in that.  You saw how fast he went

7  through his education and that was that, where he lived, so it

8  was obvious to me, based on that, that he did not want to make

9  small talk.

10  Q.  He mentioned using a Glock .45.  Are you familiar with

11  that weapon?

12  A.  Yes, sir.

13  Q.  What is it?

14  A.  It's a Glock, I believe a Glock 21.  Glock .45 is a large

15  caliber handgun, very similar to the FBI, we use Glock 22s,

16  which are .40 caliber, a little smaller bullet.  It's just a

17  bigger gun that shoots that and that holds 13 rounds plus one

18  in the magazine.

19  Q.  You say it's a larger caliber, bigger gun; is it a more

20  powerful gun?

21  A.  Yes, sir, shoots a bigger bullet.

22  Q.  Have you fired one?

23  A.  Yes, I have.

24  Q.  What's it like to fire a Glock .45?

25  A.  Well, a Glock .45, or .45 in general, has a lot of kick.

MICHAEL STANSBURY – DIRECT EXAMINATION

1    It's not as much as a .44 Magnum, but it is a larger heavy

2    gun, and the shell comes out, gives a kick, which your hand

3    will go back more so.  You don't -- when you start training to

4    carry -- I carried a .45 as a state trooper in Texas, but we

5    actually started training with .38 caliber pistols and then

6    nine millimeters and worked up to the .45, nonshooters.  And

7    so it takes some practice to be good with a .45, you just

8    don't go out the first time and shoot one.

9          MR. CURRAN:  Your Honor, resume publishing the

10    exhibit.

11       (Video was played.)

12          MR. CURRAN:  Stop it briefly.

13    BY MR. CURRAN:

14    Q.  Agent Stansbury, in the interview he appears to mention

15    having a bag in which he was holding the magazines?

16    A.  Yes, sir.

17    Q.  And then dropping the bag when he left?

18    A.  Yes, sir.

19    Q.  Do you know whether a bag fitting that description was, in

20    fact, found at the scene?

21    A.  Yes, one was.

22    Q.  And you also -- he also mentioned not filling the

23    magazines to their capacity?

24    A.  Yes, sir.

25    Q.  And what was the reason he described for that?

MICHAEL STANSBURY - DIRECT EXAMINATION

1    A.  He said it because -- he said because he didn't want the

2    gun to jam, if he -- his magazine's filled all the way.

3    Q.  And how many bullets does a Glock magazine hold?

4    A.  That gun, that model holds 13, and he said he only loaded

5    11 in each magazine.

6    Q.  And do Glock magazines have a tendency to jam?

7    A.  No, Glock is very good weapon.  The magazines, the factory

8    magazines, which he did, they're quality, they're not going to

9    jam.  We actually -- by policy, we have to keep ours fully

10   loaded.  There's not reason to not load them fully like you

11   would another firearm.  So that did not make any sense for

12   that reason.

13   Q.  And if they did have a tendency to jam, would it matter

14   whether you put 11 or 12 bullets in there instead of 13?

15   A.  No, most people, if they were worried about that last

16   bullet, they just put 12 and leave one out, no reason to leave

17   two out.  Especially if you were going to do this, you'd think

18   you would want all the bullets you could carry.

19   Q.  So 11 bullets per magazine, he told you he had seven

20   magazines, one magazine in the gun.  How many bullets is that?

21   A.  That's 88 bullets.

22   Q.  Okay.  What was his demeanor like as he was describing to

23   you what he had done the night before?

24   A.  He -- it was one of -- like other killers I've

25   interviewed, that he did what he did and he was explaining it.

509

MICHAEL STANSBURY – DIRECT EXAMINATION

1          MR. BRUCK:  Objection, Your Honor.

2          THE COURT:  Sustained.

3          MR. BRUCK:  Move to strike the testimony.

4          THE COURT:  Motion to strike.  The jury will

5   disregard that statement.

6   BY MR. CURRAN:

7   Q.  Just focus on what you observed with respect to his

8   demeanor; there's no need to compare it to others.

9   A.  He was calm, he wasn't upset, and he showed no regret or

10  no remorse.  He just described his actions just like --

11         MR. BRUCK:  Objection, Your Honor.

12         THE COURT:  Sustained.  Let's just say what he said.

13  We have the video, you don't need to have him characterize it.

14         MR. BRUCK:  I would ask the jury be instructed to

15  disregard that.

16         THE COURT:  Jury is instructed to disregard that last

17  statement.

18      Mr. Curran, it's about the time for our morning break; why

19  don't we do that.

20         MR. CURRAN:  Yes, Your Honor.

21         THE COURT:  Very good.  Ladies and gentlemen, go to

22  the jury room.

23      (Jury excused.)

24         THE COURT:  Mr. Curran, let me just say this.  We

25  have a video, this is a very intelligent jury, just let them

MICHAEL STANSBURY – DIRECT EXAMINATION

1    observe it, they can observe these things.  If there's

2    something they can't observe that you need to raise, then

3    that's fine.  But I think there's always a tendency, I had

4    this when I was practicing as well, there's a tendency to

5    overlawyer an incident.  And the evidence is there, and I just

6    think you ought to just let the evidence speak for itself.

7            MR. CURRAN:  Yes, Your Honor.  We would note for the

8    record that the video is slightly washed out, so asking --

9            THE COURT:  Fine, if there was something like you

10    couldn't see or something, but that's not really the issue

11    here, and I just think that we're -- we don't need a running

12    commentary, we're all old enough to say we don't need Howard

13    Cosell there, just watch the incident, and I think the jury

14    will get what it needs to get and we should probably get.  If

15    there's some specific matter that you don't think is

16    observable, but which the witness could fairly comment and

17    observe, I think that's fine.  But obviously commenting about

18    other interviews or all that, I just think that's just beyond

19    what would be appropriate.

20            MR. CURRAN:  I fully understand that, Your Honor, the

21    point I'm trying to make is that his observations regarding

22    his demeanor --

23            THE COURT:  I think that's fair, but I think you

24    can -- you've already done it, and I think in a minimal way,

25    but we can all see this.  Okay?  That's the point is you can

511

MICHAEL STANSBURY – DIRECT EXAMINATION

1    hear his tone, his intonation, you can see it.  And so the

2    commentary is really unnecessary.

3            MR. CURRAN:  We understand, Your Honor.

4            THE COURT:  Very good.  We'll take about a ten-minute

5    break.

6        (A recess was held at this time.)

7        (Jury not present.)

8            MR. BRUCK:  Before the jury comes in, Your Honor?

9            THE COURT:  Yes.

10           MR. BRUCK:  Two matters with respect to what happened

11   just before the break.  I'd like to request a further curative

12   instruction and an admonition to this witness and to the

13   Government generally.

14           THE COURT:  Give me your requested instruction.

15           MR. BRUCK:  The requested instruction is that the

16   jury be told that they have just been asked to disregard

17   certain testimony, and we wish to further explain why.  And

18   then I would like the Court to instruct the jury that a

19   person's demeanor -- and I apologize for not having written

20   the instruction.

21           THE COURT:  I'm listening.

22           MR. BRUCK:  A person's demeanor can denote many

23   things other than lack of remorse.

24           THE COURT:  No, no, no, no, Mr. Bruck, we're not

25   getting into that issue.  That's fine argument.  Go ahead,

512

MICHAEL STANSBURY – DIRECT EXAMINATION

1   because I want to make a comment myself about all this.

2        MR. BRUCK:  All right.  It can be a sign of

3   conditions that are beyond -- that are beyond the control of

4   the individual.

5        THE COURT:  No, no, Mr. Bruck.  Okay.

6        MR. BRUCK:  May I?

7        THE COURT:  Yes, please.

8        MR. BRUCK:  These may include symptoms of mental

9   illness and developmental disability and other factors.  It is

10  for you, not any witness, to characterize and interpret the

11  evidence you see.

12       THE COURT:  Let me -- let's first of all -- excuse me

13  for interrupting you as you went there, I should have let you

14  finish.  Let me explain this for a moment.

15      There is a procedure for challenging the voluntariness of

16  a statement, you and I both know that.  And it's 18 U.S.C.

17  3501.  And the Court first receives the information, and the

18  Court makes a determination on voluntariness.  I have done

19  that.  Nonetheless, the Court always charges a jury when there

20  is a confession, that the jury can hear relevant evidence on

21  the issue of voluntariness -- I'm reading from the statute --

22  and shall instruct the jury to give such weight to the

23  confession as the jury feels it deserves under all the

24  circumstances.  And what that goes to, whether -- and the

25  statute actually lists, at least for the trial judge at this

MICHAEL STANSBURY – DIRECT EXAMINATION

1    stage, the kind of things to consider in regard to

2    voluntariness.  This goes to the circumstances, types of

3    circumstances surrounding voluntariness.  I think that's fine.

4        So these questions that were raised about was he sleepy,

5    all those issues, that goes to voluntariness.  And you have a

6    right on cross-examination to get into the length of time or

7    whatever other issues, that's fair game.

8        It's not a back door into mental health evidence.  It's

9    not another procedure to open the door on what I call insanity

10   lite.  That is, you don't meet the standards for insanity if

11   you're trying to introduce mental health evidence to do that.

12   So generally it's not admissible.

13       And I'll just point out that the -- when we were going

14   through that process on voluntariness, the defense initially

15   reserved the mental health issues, the Court prodded, because

16   I need to deal with these issues first, I knew there was this

17   problem, and the defense indicated that they would not be

18   offering any such evidence.  That's docket 266 at page six,

19   and then docket No. 312 at one.  And that you had no further

20   evidence to present.  But I wouldn't have allowed it.  Let me

21   just say, it's a little academic, because I'm not going to

22   allow evidence in as a back door to asserting insanity.  To

23   the extent it is relevant to whether he's voluntary, I've

24   heard what you've given me, which I'm supposed to be the first

25   one to hear it, and I've heard it.  And I have ruled.  And

514

MICHAEL STANSBURY - DIRECT EXAMINATION

1    then I'm going to allow evidence in, because the jury gets to

2    make a determination of what weight to give that evidence.

3            MR. BRUCK:  Judge, this particular request has

4    nothing to do with the issue of voluntariness, it has to do

5    with the merits of the case and of the jury's judgment of this

6    defendant.  I'm not -- when the witness stated that the

7    defendant exhibited no remorse, that is a statutory -- a

8    nonstatutory aggravating factor alleged with respect to

9    sentencing in this case.  We have been told that we can not go

10   into sentencing, and then the prosecution does it, and it's

11   not fair.  That's a bell that can't be unrung, and we want to

12   at least limit the damage.  Everything we're asking for is

13   entirely defensive.  I am not trying to back door anything,

14   I'm trying to make sure the Government doesn't back door

15   anything.  That's the problem.

16           THE COURT:  You know, sometimes the -- Mr. Curran, do

17   you want to respond?

18           MR. CURRAN:  We obviously object and do not concur

19   and Mr. Bruck's objection.  As I stated before the break, Your

20   Honor, we believe that given the conditions of the video,

21   questions regarding demeanor are entirely appropriate, and we

22   certainly didn't attempt to elicit the specific responses to

23   which Mr. Bruck objected and on which you have ruled.  And we

24   understand your ruling.

25           THE COURT:  I mean, I thought they were valid

515

MICHAEL STANSBURY - DIRECT EXAMINATION

 1   objections, I think I cured it, I instructed them, I'm not

 2   getting into that instruction, the detail about what demeanor

 3   means and all that.  That's not proper here.  But it is the

 4   jury's determination about the voluntariness and what weight

 5   to give it, they're entitled to give it what weight they

 6   deserve.  And there are limits on that, but so -- but let's

 7   go, and I'm sure you -- Let me just instruct the witness that

 8   you should not make comments beyond the direct questions.  And

 9   I really urge everyone not to overlawyer this issue.  The

10   confession speaks for itself.  You're going to have an

11   opportunity for closing argument.  That's when you can get

12   into this.  If there's specific questions on

13   cross-examination, the defense has a right to get into those

14   that go to the issue of whether the statement was, in fact,

15   voluntary or not.

16       The jury's watching, folks, they can see the videotape.

17   They don't really need my help or y'all's help.  They can

18   observe it, and that's the benefit of having this as opposed

19   to having no videotape.  Okay?

20       You know, I think -- I don't think there's any harm for me

21   simply to instruct the jury the law that they have a right

22   to -- that they will get a charge later, that as to any

23   confession, that they have the -- you know, that they make a

24   determination as to the weight given to the confession.  That

25   is -- they're entitled to do that, as I will tell them.  Do

516

MICHAEL STANSBURY – DIRECT EXAMINATION

1   you have a problem me telling them that?

2            MR. CURRAN:  I believe that's already in the final

3   instructions, Your Honor.

4            THE COURT:  Yeah, well, I haven't given them yet, so

5   you don't know exactly what's in them yet, but I --

6            MR. CURRAN:  We think that would be the appropriate

7   place to do that, Your Honor.

8            THE COURT:  Yes, but, you know, I don't know what

9   harm there would be to say it right now, in light of the

10  striking that I've already done.  I just don't think there's

11  any harm to it.  It's just letting the jury know, they're new

12  to this, they just need to know, because they're getting ready

13  to watch this confession, that they will ultimately have to

14  determine the weight given.  I mean, that's all it is.  And

15  then they know that.  Okay?  I mean, that's all I intend to

16  say.  So I am intending to giving them just a further, you

17  know, instruction on this matter at this point.

18           MR. CURRAN:  I understand.

19           THE COURT:  I think appropriate under the

20  circumstances.

21      Anything further?

22           MR. BRUCK:  We would just like to adhere to our

23  original request.

24           THE COURT:  I understand, and that request is noted,

25  Mr. Bruck.

517

MICHAEL STANSBURY – DIRECT EXAMINATION

1          MR. BRUCK:  Thank you.

2          THE COURT:  Bring the jury in.

3       (Jury present.)

4          THE COURT:  Ladies and gentlemen, just for

5    predictability for the schedule today, it's about five to

6    12:00.  We will go to about 1:00 o'clock.  I'm not sure this

7    tape will be finished by then, but we'll break, so we'll keep

8    the normal schedule on such matters.  So we're thinking about

9    1:00 o'clock, probably around that time we will take a break,

10   if the video has not been completed.

11      I want to remind you of my opening charge to you.  I told

12   you that if I struck evidence and told you to disregard it, I

13   meant that.  That is, you should disregard any statements

14   which I have struck, because they are not in evidence any

15   further.  As you remember I told you we only consider what's

16   in evidence, right?  And I've stricken -- matters that I

17   strike are not in evidence.

18      And I want you to appreciate also that one of your many

19   responsibilities as a jury and being the ultimate determiner

20   of facts, is you must determine the weight that must be given

21   to any confession.  You give it the weight you find it

22   deserves under the circumstances.  That's one of your

23   responsibilities as a jury.

24      With that, please continue your examination.

25          MR. CURRAN:  Thank you, Your Honor.  And for the

518

MICHAEL STANSBURY – DIRECT EXAMINATION

1    Court's reference, given where we are in the video, it isn't

2    likely we'll be finished.

3         THE COURT:  I didn't think we would, I just didn't

4    want the jury to think, oh, my God, how much longer are they

5    going to keep us here.

6         MR. CURRAN:  And we'll continue publishing the

7    exhibit at this time, Your Honor.

8         THE COURT:  Yes, please continue.

9      (Videotape was played.)

10   BY MR. CURRAN:

11   Q.  Agent Stansbury, Mr. Roof appears to have mentioned he

12   looked up churches on the internet and a specific website.

13   Are you familiar with the website he mentioned?

14   A.  Yes, sir.

15   Q.  And does it, in fact, have lists of churches?

16   A.  Yes, it does.

17   Q.  And is Emanuel AME one of the churches that it lists?

18   A.  Yes, it is.

19        MR. CURRAN:  Resume publishing, Your Honor.

20      (Video was played.)

21   BY MR. CURRAN:

22   Q.  Agent Stansbury, Agent Januchowski just had the defendant

23   draw a diagram, correct?

24   A.  Yes, sir.

25        MR. CURRAN:  I'm going to approach, Your Honor.

519

MICHAEL STANSBURY – DIRECT EXAMINATION

1          THE COURT:  You may.

2    BY MR. CURRAN:

3    Q.  What's been marked for purposes of identification as

4    Government Exhibit 112, please review that.

5    A.  Yes, sir.

6    Q.  Are you familiar with that document?

7    A.  Yes, I am.

8    Q.  And how do you know what it is?

9    A.  This is the -- my initials, I signed it that day on

10   6/18/2015 on the back, I know I recognize it.

11   Q.  And what is the actual document?

12   A.  This is the drawing that Dylann Roof drew there during the

13   interview.

14   Q.  And that is -- what you have, is that a copy or is that

15   the actual diagram that he drew?

16   A.  It's the actual diagram.

17          MR. CURRAN:  Your Honor, we'd move for admission and

18   publish to the jury.

19          MR. BRUCK:  No objection.

20          THE COURT:  Government 112 is admitted without

21   objection.

22      (Government Exhibit 112 received.)

23   BY MR. CURRAN:

24   Q.  Now, let me back up.  Just before we stopped, he indicated

25   where he had entered, how he had entered and where he and the

520

MICHAEL STANSBURY – DIRECT EXAMINATION

1    others were sitting.  First, on this diagram what did he

2    indicate to you as to where he entered?

3    A.  He entered down at the lower left-hand corner where it

4    says door, right at the bottom of the paper.

5    Q.  That's what he was referring to.

6    A.  Yes.

7    Q.  And as you saw him do in this diagram, what are the --

8    what are the two rectangles and a circle in the middle with

9    circles around them?

10   A.  Those are the tables where they were having the Bible

11   study, then the circles around with people sitting around the

12   table, and then the one at the top of the circular table where

13   he drew the X through it is where he was sitting.

14   Q.  So are you describing the -- as you're looking at the

15   exhibit, the table to the furthest left?  And there's a single

16   circle there with an X through it?

17   A.  Yes, sir.

18   Q.  And is that where he told you he was sitting?

19   A.  Yes.

20   Q.  How many circles did he draw for the other people?

21   A.  Ten.

22           MR. CURRAN:  Your Honor, we'll begin republishing

23   Government's Exhibit 5.

24           THE COURT:  Continue.

25       (Video was played.)

521

MICHAEL STANSBURY – DIRECT EXAMINATION

1          MR. CURRAN:  Your Honor, at this point the Government

2   would like to publish Government's Exhibit 21, which has

3   previously been admitted, it's a diagram of the interior of

4   Emanuel AME fellowship hall.

5          THE COURT:  Any objection?

6          MR. BRUCK:  No, I think it's already admitted.

7          THE COURT:  You're republishing it.  Please proceed.

8   BY MR. CURRAN:

9   Q.  Agent Stansbury, have you been to the Emanuel AME

10  fellowship hall?

11  A.  Yes, I have.

12  Q.  Are you familiar with its basic organization?

13  A.  Yes, sir.

14  Q.  All right.  Mr. Roof appeared to be pointing out to you on

15  the diagram where he entered and exited from the fellowship

16  hall that night?

17  A.  Yes, sir.

18  Q.  Where on this diagram would that be?

19  A.  It would be he entered up here at the top with this

20  doorway, there's a little foyer right there.  I mean, his

21  diagram was very crude, but would have come in, and then these

22  tables is where he would have been sitting.

23  Q.  So in the upper, as this diagram is displaying, it's on

24  the upper right, you've put a dot near a set of doors that

25  have on the chart the word back foyer, is that accurate?

522

MICHAEL STANSBURY – DIRECT EXAMINATION

1    A.  Yes, sir.

2            MR. CURRAN:  Your Honor, we'll republish.

3            THE COURT:  Please continue.

4            MR. CURRAN:  Begin publishing again Government's

5    Exhibit 5.

6        (Video was played.)

7    BY MR. CURRAN:

8    Q.  Agent Stansbury, the defendant just mentioned something he

9    referred to as the Trayvon Martin case.  Very briefly, what

10    does that refer to?

11    A.  It's just referring to the -- where George Zimmerman shot

12    Trayvon Martin in Florida in 2012.  That case had significant

13    media attention, and I guess brought out a lot of emotions in

14    a lot of people.

15    Q.  And when did that incident take place?

16    A.  I believe it was February 2012.

17            MR. CURRAN:  Your Honor, I want to continue

18    publishing the exhibit.

19            THE COURT:  Please do.

20        (Video was played.)

21            MR. CURRAN:  Stopped at 14:14:96 on the screen.

22    BY MR. CURRAN:

23    Q.  Defendant has mentioned that he had a debit card, correct?

24    A.  Yes, sir.

25    Q.  At any point did you search defendant Roof?

523

MICHAEL STANSBURY – DIRECT EXAMINATION

1    A.  Yes, sir, during at the beginning of the interview I

2    searched him.

3    Q.  And at the end of the interview?

4    A.  Yes, sir.

5    Q.  Did you find a debit card on him?

6    A.  Yes, he had a debit card in his pocket.

7            MR. CURRAN:  I'm approaching the witness and showing

8    him Exhibit 113 marked for purposes of identification.

9    Q.  Please review that.

10   A.  Yes, sir, I have.

11   Q.  Are you familiar with that item?

12   A.  Yes, sir, this is the debit card that Mr. Roof had in his

13   pocket at the interview.

14           MR. CURRAN:  We move for its admission.

15           THE COURT:  What number is that?

16           MR. CURRAN:  That is Government's Exhibit 113, Your

17   Honor.

18           THE COURT:  Any objection?

19           MR. BRUCK:  No, sir.

20           THE COURT:  Government 113 is admitted without

21   objection.

22       (Government Exhibit 113 received.)

23           MR. CURRAN:  There's no need to publish it at this

24   point, Your Honor.  And we ask to begin republishing the

25   interview.

524

MICHAEL STANSBURY – DIRECT EXAMINATION

1          THE COURT:  Continue.

2       (Video played.)

3          MR. CURRAN:  I'm approaching the witness with

4    Government Exhibit 109, which has previously been admitted.

5          THE COURT:  Go right ahead.

6    BY MR. CURRAN:

7    Q.  Mr. Stansbury, can you review those.  On the video it

8    appears that you are putting a photo in front of the defendant

9    at that point.

10   A.  Yes, sir.

11   Q.  Is that one of the pictures that we discussed earlier, one

12   of the pictures you got from his home in that -- that are part

13   of Exhibit 109?

14   A.  Yes, it is.

15   Q.  They have exhibit stickers on the back.  Would you review

16   them, please, and identify which of those photos you're

17   placing in front of him at this point?

18   A.  At this point it was 109A, a photograph that I placed in

19   front of him.

20          MR. CURRAN:  We request permission to publish.

21          THE COURT:  You may.

22   BY MR. CURRAN:

23   Q.  This is the first photo that you put in front of him?

24   A.  Yes, sir.

25          MR. CURRAN:  And if we could call back up the video

525

MICHAEL STANSBURY – DIRECT EXAMINATION

1   and just look at the times.  All right.  And that was -- we

2   had stopped at 14:27:43 on the time stamp on the video, Your

3   Honor, we're going to begin replaying it.

4           THE COURT:  Okay.

5      (Video was played.)

6   BY MR. CURRAN:

7   Q.  And we've stopped the video again at 14:28:45 at this

8   point.  Agent Stansbury, it appears that Agent Januchowski has

9   just put two additional photos in front of Mr. Roof.  Is that

10  accurate?

11  A.  Yes, sir.

12  Q.  And are those also from the photos that you had taken from

13  his home and that are part of Exhibit 109?

14  A.  Yes, sir.

15  Q.  Did you review those photos and identify for the Court

16  which of the exhibits you placed in front of him?

17  A.  109B and then 109C, a closer up of the jacket, then

18  another one of him.

19          MR. CURRAN:  Your Honor, we request permission to

20  publish those to the jury.

21          THE COURT:  You may.

22          MR. CURRAN:  109B first.

23  BY MR. CURRAN:

24  Q.  And you were asking about some patches?

25  A.  Yes, sir.

MICHAEL STANSBURY - DIRECT EXAMINATION

1   Q.  Are those the patches that are reflected in this exhibit?

2   A.  Yes, sir.  The black patches on the jacket.

3   Q.  That's what you're asking him about?

4   A.  Yes, sir.

5   Q.  109C, please.  And this is the other --

6   A.  Yes, sir, that's the other picture.

7   Q.  And in this photo he has the same jacket on with the same

8   patches, correct?

9   A.  Yes, sir.

10       MR. CURRAN:  Your Honor, I'll begin republishing

11  Government's Exhibit 5.

12       (Video was played.)

13  BY MR. CURRAN:

14  Q.  Stop at 14:29:54 on the video, it appears that Agent

15  Januchowski is putting a fourth photo in front of Mr. Roof?

16  A.  Yes, sir.

17  Q.  And does he -- shortly after this does he place a fifth

18  photo in front of Mr. Roof?

19  A.  Yes, sir, he does.

20  Q.  And are those also from the pictures that are part of

21  Exhibit 109?

22  A.  Yes, they are.

23  Q.  If you could identify for the Court which pictures those

24  are.

25  A.  109D and then 109E.

MICHAEL STANSBURY – DIRECT EXAMINATION

1          MR. CURRAN:  We'd ask you to publish those to the

2     jury.

3          THE COURT:  You may.

4     BY MR. CURRAN:

5     Q.  109D.  And you have not asked him about this photo at this

6     point in the video, correct?

7     A.  Not yet, correct.

8     Q.  And 109E.

9          MR. CURRAN:  Then, Your Honor, we'll begin

10    republishing.

11         THE COURT:  Continue.

12       (Video was played.)

13    BY MR. CURRAN:

14    Q.  And stopped at 14:31:09.  Mr. Roof appears to have just

15    been discussing something he calls the 14 words.  What is

16    that?

17    A.  It's a white nationalist slogan created by a guy named

18    David Lane several years back, and then the 88.

19    Q.  He also said 88 stands for Heil Hitler, because that's HH.

20    Can you explain that to us?

21    A.  Right.  H is the eighth letter in the alphabet, and so

22    groups and gangs and other things will actually use the

23    alphabet to come up with terms.  HA originally started with

24    the Hell's Angels.  81HA is -- eight is the eighth letter,

25    then one, A is the first letter, and so it's just a copy of

MICHAEL STANSBURY – DIRECT EXAMINATION

1    that, a lot of gangs use now for hate groups.

2            MR. CURRAN:  Your Honor, we'll begin republishing.

3            THE COURT:  Continue.

4        (Video was played.)

5            MR. CURRAN:  Again, Your Honor we're stopping at

6    14:32:31.  And I'm handing to the witness Government's

7    Exhibit 110, which is a DVD that he previously testified to.

8    And for the record, Your Honor, what the exhibit is, is just

9    the DVD cover, there is no DVD inside.

10   BY MR. CURRAN:

11   Q.  In the video Agent Januchowski, I believe, has just handed

12   something to Mr. Roof, correct?

13   A.  Yes, sir.

14   Q.  And what is it?

15   A.  He handed him this DVD box of a movie, Made in Britain,

16   with Tim Roth.

17   Q.  And is that the DVD that came from his father's house?

18   A.  Yes, it is.

19           MR. CURRAN:  Your Honor, if we could publish the

20   front of that for the jury.  And then we'll continue

21   publishing Government's Exhibit 5.

22       (Video played.)

23           MR. CURRAN:  Your Honor, we're stopping at 14:33:12.

24   BY MR. CURRAN:

25   Q.  Agent Januchowski is referencing a movie called American

529

MICHAEL STANSBURY – DIRECT EXAMINATION

1    History X.  Are you familiar with that movie?

2    A.  Yes, I am.

3    Q.  Briefly describe what that movie's about to the jury.

4    A.  It's a movie with Edward Norton where he plays a skinhead

5    in Los Angeles, and the issues of racism, and ultimately he

6    commits crime, goes to prison, befriends an inmate who is

7    black, that helps him out in prison.  He realizes everybody is

8    all the same on inside, everybody has their own struggles.  He

9    changes his ways, gets out of the prison, and his brother is

10   now a skinhead and he's trying to reform him and change him

11   and do the right thing.

12        MR. CURRAN:  Your Honor, we'd begin republishing

13   Government's Exhibit 5 at this point.

14        (Video was played.)

15        MR. CURRAN:  It continues like this for several

16   minutes.  I know you indicated you wanted to take a break.

17        THE COURT:  Ladies and gentlemen, let's take our

18   lunch break.  We'll resume at 2:00 o'clock.

19        (Jury excused.)

20        MR. CURRAN:  For the record, we stopped one minute

21   five seconds -- I've been using the actual time, so 2:01:40.

22        THE COURT:  Very good.  Mr. Bruck, do you want to

23   address a matter?

24        MR. BRUCK:  Yes.  I haven't had a chance to discuss

25   this with Mr. Curran; perhaps we could confer for just a

MICHAEL STANSBURY – DIRECT EXAMINATION

1  moment.

2         (Discussion held off the record.)

3              MR. BRUCK:  We'll need to approach, I think.

4         (Following discussion held at side bar.)

5              MR. BRUCK:  My request is that Mr. Curran and I be

6  able to confer with the witness during the break as to one

7  matter.  In view of the publication of Ben Roof's address, and

8  I'm not raising that as not objecting to it or anything, it's

9  a fact and it's out there.  I know he is very very fearful for

10 his safety, and has been for a year and a half.  I'd like to

11 elicit from the witness, which I hadn't planned on doing, that

12 the family, all of the members of the Roof family that he met

13 that morning, grandfather, the father and the uncle were all

14 upset and surprised and shocked by this.  In other words, just

15 to distance themselves from this crime so there's no thought

16 that the family knew this was happening or proof of it or

17 didn't care or any of that.  I'm not going to -- it's like two

18 to three questions, but I don't want to get zinged.  I know

19 people might say, well, Ben Roof wasn't as shocked and

20 horrified as the father and the uncle, and I can't let that

21 happen.  So I just want Mr. Curran and I to be able to talk to

22 him, find out what his response will be, and then I would go

23 into it very very briefly.

24             MR. CURRAN:  I don't think it's appropriate to talk

25 to the witness while he's on the stand.

531

MICHAEL STANSBURY – DIRECT EXAMINATION

1          THE COURT:  No, yeah, I think you can ask him the

2     question, if you wish, like every other witness, you can ask

3     him that.  I mean, there's no charge against the father,

4     right?  I mean, there's not.

5          MR. BRUCK:  I'm not worried about the charge.

6          THE COURT:  The statement was he said that his father

7     wouldn't have approved.  He made the statement.

8          MR. BRUCK:  I just don't want the witness to say,

9     well, Ben Roof didn't seem as upset.

10         THE COURT:  I didn't hear him say anything like that.

11         MR. CURRAN:  And I think he does say that he didn't

12    tell anybody because they wouldn't approve, and I think as we

13    go through the video, as Your Honor probably recalls, there is

14    a follow-up, I believe --

15         THE COURT:  You asked him a specific question about

16    the father and he says no, I wouldn't talk to my father about

17    that.  I remember this from the -- I was curious about this

18    issue myself, and what -- trying to anticipate what would be

19    coming.  And so I just -- Mr. Bruck, I think I -- I don't

20    think it's a bad question, inappropriate on cross, but I'm not

21    going to start talking to witnesses.

22         MR. BRUCK:  I'm not asking the Court to.

23         THE COURT:  No, we just don't have contact with --

24    when they're on the stand, they're on the stand, the trial's

25    on.

MICHAEL STANSBURY – DIRECT EXAMINATION

1          MR. BRUCK:  The other matter I just wanted to apprise

2    the Court of, having been somewhat reprimanded for filings the

3    next morning or night before on an issue, we do intend to file

4    a request for the remedial measures respecting some things

5    that happened yesterday morning.  It is not an attempt to

6    relitigate or do anything about the existing record, it's a

7    request respecting matters that are not yet ripe, but are

8    coming later on, and I just -- no need to go into it, I just

9    wanted the Court to know --

10         THE COURT:  If you want to make a motion, file a

11   motion.  Somebody on your team filed this notice of some kind

12   of thing with the jury, you know, about the jury pool or

13   something, and I struck it.  I said you've got a motion, make

14   a motion.  I mean, there's a way we make motions, right?  And

15   filing notices about facts of a purported facts are just --

16   that's not the way we do things.  But if you want to make a

17   motion, file your motion, we'll respond to it.

18         MR. BRUCK:  I just wanted you to know it was coming.

19         THE COURT:  As things go earlier a little better to

20   give the Court some chance to anticipate.  The 2:00 a.m.

21   filings are tiresome.

22         MR. BRUCK:  This required some thought.

23         MR. RICHARDSON:  If I can add one thing with respect

24   to Mr. Bruck's request to get into Ben and Joe Roof in

25   particular and their surprise or views, if he does that, I

533

MICHAEL STANSBURY – DIRECT EXAMINATION

1    think it's fair that that opens the door to the discussion

2    that defendant had with Joe Roof about being a Holocaust

3    denier.

4              THE COURT:  Hold, hold, hold.

5              MR. RICHARDSON:  About racism, the discussion that

6    Ben Roof, in asking the defendant to engage in racist violent

7    routes against African-Americans, I think if you're going to

8    get into that issue, it opens the door.

9              THE COURT:  Let's just ask this for a second,

10   Mr. Bruck.  What is the -- always a touchstone to every piece

11   of evidence is what is relevant.  What is relevant.  And why

12   is the -- tell me why, and I'm not asking this rhetorically,

13   I'm asking it sincerely, why is it relevant to our case, 401

14   question, why is it relevant that -- whether the father had an

15   attitude or not about any issue?  And maybe it is, I don't

16   know.

17             MR. BRUCK:  Well, we think --

18             THE COURT:  Might be in mitigation, I get it, it

19   could be mitigation filled with hate, life of hate.  Where is

20   it at this stage?

21             MR. BRUCK:  The immediate concern is -- maybe this is

22   the end of the issue under 401, humanitarian -- Ben Roof has

23   to live at XXXXXXXXXXXXXXXXX in Columbia after this is over.

24   And I would like there to be some public acknowledgment of the

25   fact that he and the other members of the family did not see

534

MICHAEL STANSBURY – DIRECT EXAMINATION

1    this coming, were shocked by it and were upset.

2              THE COURT:  You know, there may be -- I understand

3    your own problem here about that, you may not be representing

4    him.  In a sentencing phase, which I want you to know I'm

5    going to give it another run at trying to persuade him not do

6    that, but I'm going to have to hold another Faretta hearing in

7    which I'm going to try to persuade him.  But let's assume for

8    a minute the status quo remains, which I frankly think it

9    will, and you do too, that's what we both think is going to

10   happen.  I just don't think we're in the business of sort of

11   clearing people and announcing things.  I think the family

12   could make a statement later, after this is over, how much

13   they regret it and that they are not parties to this and all

14   that.

15             MR. BRUCK:  I have --

16             THE COURT:  I just don't -- I just think

17   Mr. Richardson's response just raises the slippery slope about

18   why we don't put irrelevant evidence in.

19             MR. BRUCK:  Okay.

20             THE COURT:  So I respect your desire to do it, but I

21   think it's not what we should do.  Okay?  Very good.

22        (Side bar discussion concluded.)

23             THE COURT:  We will resume at 2:00 o'clock.  Thank

24   you.

25        (A recess was held at this time.)

MICHAEL STANSBURY – DIRECT EXAMINATION

1          THE COURT:  Okay.  Bring in the jury.

2     (Jury present.)

3          THE COURT:  Mr. Curran, continue direct examination

4  by the Government.

5          MR. CURRAN:  Yes, Your Honor, we're going to resume

6  with publishing Government's Exhibit 5, and I believe we left

7  off after lunch at 14:43:33 on the time stamp.

8          THE COURT:  Very good.

9     (Video played.)

10          MR. CURRAN:  14:56:37.

11  BY MR. CURRAN:

12  Q.  Agent, you just asked Mr. Roof whether he was on any

13  medication or any drugs when -- at that time or when he went

14  to the church that night.

15  A.  Yes, sir.

16  Q.  Why did you ask him that?

17  A.  I wanted to verify or make sure that whether he was or

18  not, because it wouldn't be the excuse, the reason I was on

19  medication or on drugs when I did it, that he was of clear

20  mind when he actually committed this act.

21  Q.  And when at this point you've been speaking with him for

22  just under an hour and 20 minutes, had he given you any

23  indications that he was on medications or drugs?

24  A.  No, he had not.

25          MR. CURRAN:  We'll resume publishing, Your Honor.

MICHAEL STANSBURY – DIRECT EXAMINATION

1       (Video played.)

2    BY MR. CURRAN:

3    Q.  Agent, we stopped the video at 15:07:04.  You appear to be

4    showing defendant Roof something.  What are you showing him?

5    A.  I am a showing him a copy of the note that was in the

6    birthday card.  First I'm showing it to him from the picture I

7    took on my cell phone, but then Agent Januchowski actually

8    passes me the actual card with the note and I show it to him.

9    Q.  This is the note you already presented and has already

10   been admitted as Government's 108, correct?

11   A.  Yes, sir.

12       MR. CURRAN:  Your Honor, I would ask to publish that

13   at this point.

14   Q.  So what do you see here in this first page?

15   A.  That's the birthday card, the front and back of the

16   birthday card.

17   Q.  What do you see here?

18   A.  That's the inside of the birthday card and what he wrote

19   on the card himself.

20   Q.  And here?

21   A.  This is the note that was inside the birthday card that I

22   was reading or showing Mr. Roof.  Dylann Roof.

23   Q.  This says, "IOU good for up to $400 towards a pistol and

24   CWP permit."  That's what you're referring to?

25   A.  Yes.

537

MICHAEL STANSBURY – DIRECT EXAMINATION

1          MR. CURRAN:  We'll return publishing from this

2     Exhibit 5, Your Honor.

3          THE COURT:  Very good.

4       (Video played.)

5          MR. CURRAN:  We stopped at 15:20:48.

6     BY MR. CURRAN:

7     Q.  Agent Stansbury, you've gotten up and appear to be leaving

8     the room.  Why did you leave the room?

9     A.  I was going in the next room.  Obviously it's being

10    recorded, and there's a monitor in the next room where I

11    believe the other investigators from the Shelby police

12    department were watching the video, other agents from the FBI

13    who had been there, and I wanted to go in there and ask them

14    is there anything I missed or any questions I need to ask, to

15    get another opinion on the interview of something that I might

16    have not asked correctly or some answer I needed to get from

17    him.

18         MR. CURRAN:  Resume publishing, Your Honor.

19      (Video was played.)

20         MR. CURRAN:  We stopped at 15:24:14.

21    BY MR. CURRAN:

22    Q.  You appear to be leaving the room again, Agent Stansbury,

23    why are you leaving the room?

24    A.  Somebody knocked on the door, and when I stepped outside I

25    met with somebody from the police department, and special

538

MICHAEL STANSBURY – DIRECT EXAMINATION

1   agent in charge from the Charlotte field office was there.

2      (Video was played.)

3   BY MR. CURRAN:

4   Q.  You appear no be telling him that you're about to take

5   pictures of him.  Why do you need to take pictures of him?

6   A.  Because that was the state of condition he was in at the

7   time of arrest, so we would have how he looked after the

8   arrest, I have documented.  I didn't know if they would take

9   those pictures or they were just going to go to the Cleveland

10  County Jail at that point, or if he was going to be flown back

11  to South Carolina, I didn't know.  And I wanted to at least

12  get photographs of how he looked at the interview or at that

13  time after he had been arrested, because no one else had taken

14  pictures of him.

15  Q.  Had he also indicated those were the clothes he was

16  wearing the night before?

17  A.  Yes, he did.

18  Q.  Is that part of your reasoning?

19  A.  Yes, sir, it was.

20  Q.  Is that unusual for you to take pictures?

21  A.  No, that's the common practice, because there's a picture

22  of him walking into the church wearing the clothes, other than

23  having a gray sweat top on, so I wanted a picture of him on

24  right then that he hadn't changed clothes.

25      MR. CURRAN:  And for the record, we stopped at one --

MICHAEL STANSBURY – DIRECT EXAMINATION

1    that's the wrong number.  Should have been about 15:33:44.  Go

2    ahead and resume publishing.

3          (Video was played.)

4    BY MR. CURRAN:

5    Q.  Agent Stansbury, you and Agent Januchowski appear to have

6    left the room it's 15:39:13 at this point.

7    A.  Yes, sir.

8    Q.  And is that the conclusion of your interview --

9    A.  Yes, sir.

10   Q.  -- with Mr. Roof?

11   A.  Yes, sir.

12   Q.  All right.  The video continues for a few more seconds.

13   We'll play it to the end.  But that -- well, let's continue.

14         (Video was played.)

15   BY MR. CURRAN:

16   Q.  So that's the conclusion of the video.  At the end it

17   appears you turn him back over to Shelby police department.

18   Correct?

19   A.  Yes, sir.

20   Q.  Was that Detective Styers, the individual you had met in

21   the room when you first arrived?

22   A.  Yes, sir.

23   Q.  And were you involved at all in taking him to court?

24   A.  No, sir.  They took him to court right from that moment, I

25   stayed at the police department while the videos were -- video

540

MICHAEL STANSBURY – DIRECT EXAMINATION

1    was downloaded onto DVDs.

2    Q.  Were you involved in bringing him back to South Carolina?

3    Personally?

4    A.  Personally, no.  I did go when the plane came in to pick

5    him up, I had made several copies of the actual interview, and

6    I had copies for the agents that came on the plane to give, so

7    they could bring one back to the state prosecutor and federal

8    prosecutor.

9    Q.  But you did not escort him back to South Carolina.

10   A.  I did not escort him, no, sir.

11   Q.  After that interview have you had any further interaction

12   with defendant Roof?

13   A.  No, after that video stopped, the only other thing I told

14   him was you failed.  He had said earlier his goal was to

15   agitate race relations, and I said you failed.  And I told him

16   the people of Charleston had actually come together and were

17   in the streets actually together, there had been no violence

18   or agitation, and his ultimate goal, he just simply failed.

19   Q.  And since that interview have you seen Mr. Roof at any

20   other time?

21   A.  No, this is the first time I've seen him in person since

22   that interview.

23          MR. CURRAN:  No further questions, Your Honor.

24          THE COURT:  Cross-examination.

25          MR. BRUCK:  Thank you.

MICHAEL STANSBURY - CROSS-EXAMINATION

1                          CROSS-EXAMINATION

2    BY MR. BRUCK:

3    Q.  Afternoon, Agent Stansbury.

4    A.  Good afternoon, sir.

5    Q.  I have a very few questions for you.

6    A.  Yes, sir.

7    Q.  You had Mr. Roof at the end of that long interview empty

8    out his pockets?

9    A.  Yes, sir.

10   Q.  And you checked out how much money he had?

11   A.  Yes, sir.

12   Q.  And he had $9.08 in cash, did he not?

13   A.  Yes, sir, he did.

14   Q.  And he also had a receipt for where he had checked what he

15   had in the bank in his account, and that came to $33.79,

16   correct?

17   A.  Yes, sir.

18   Q.  And then he withdrew 20 of that?

19   A.  Yes, sir.

20   Q.  And as far as you were able to determine, that's all the

21   money he had with him?

22   A.  That's correct.

23   Q.  Did you happen to notice that the back of the bank card,

24   Exhibit 113, was never signed?

25   A.  I don't specifically recall that, but -- if you show it to

542

MICHAEL STANSBURY - CROSS-EXAMINATION

1    me -- it may not have been admitted.

2         MR. BRUCK:  Showing the witness Exhibit 113.

3    Q.  Would you take a look at it?

4    A.  Yeah, it's not signed, or if it was signed, it's worn off,

5    but it's not signed.

6    Q.  Appears to be it was never signed?

7    A.  Correct, that's what it looks like to me, yes, sir.

8    Q.  You mentioned on the tape during the interview, the

9    Trayvon Martin case.

10   A.  Yes, sir.

11   Q.  And of course that was the very high-profile shooting of a

12   young black man, a teenager, Trayvon Martin, by a white

13   individual named George Zimmerman?

14   A.  Yes, sir.

15   Q.  And you mentioned that the date of that was 2012.

16   A.  That's when I believe it was.

17   Q.  Right.  But that was the date of the killing.  Correct?

18   A.  Yes, sir.

19   Q.  And then the trial took place in the summer of 2013, would

20   that be correct?

21   A.  That -- sounds correct, yes, sir.

22   Q.  Okay.  And the -- of course the -- at the trial,

23   Mr. Zimmerman was acquitted of murder charges.

24   A.  Yes, sir.

25   Q.  And that would have been the highest profile part of the

543

MICHAEL STANSBURY - CROSS-EXAMINATION

1    case, is that fair to say?  As far as internet activity and

2    public attention?

3    A.  I mean, I -- yeah, I mean, I would say that would be fair.

4    I think the whole thing was -- I believe the whole case was

5    very high profile.  Even the President of the United States

6    commented on it.  I can't remember if he commented when it

7    happened or indicted, when he was acquitted, but it was

8    extremely high profile, yes, sir.

9    Q.  Okay.  But in the summer of 2013 there was a great deal of

10   publicity, news coverage and internet activity surrounding the

11   Trayvon Martin case; is that fair to say?

12   A.  Yes, sir.

13   Q.  Which was just a little less than two years before the

14   events which have brought us here today.

15   A.  Yes, sir.

16   Q.  And at that time Mr. Roof would have just turned 19.

17   Well, 19.

18   A.  Yes, sir.

19   Q.  All right.  He told you that at the time of the Trayvon

20   Martin case he was -- he did on line research?

21   A.  Yes, sir.

22   Q.  And he typed in the words in Google search, correct?

23   A.  Yes, sir.

24   Q.  He typed in the words black-on-white crime and that was

25   it.  Those were his words?

MICHAEL STANSBURY - CROSS-EXAMINATION

1   A.   Those are his words, yes, sir.

2   Q.   I noticed that he did a drawing.  Now, he confessed to you

3   to nine murders.  Right?

4   A.   Yes, sir.

5   Q.   Very very serious charges.

6   A.   Yes, sir.

7   Q.   And he admitted his guilt quite freely.

8   A.   Yes, sir.

9   Q.   But he would not initial the drawing that he made of the

10  diagram.

11  A.   Correct.

12  Q.   And then you asked him to consent to the search of his

13  car.

14  A.   Yes, sir.

15  Q.   And he said, I can't.

16  A.   Yes, sir.

17  Q.   And that's as much as we know, what's revealed on the

18  tape?

19  A.   Are you asking me to form an opinion why he didn't sign?

20  Q.   No, no, I'm just saying that's what the tape shows.

21  A.   That's correct, yes, sir.

22  Q.   He told you that all of his ideas came from the internet.

23  A.   Yes, sir.

24  Q.   And that at some point he had done enough internet

25  research that he didn't even have to do any more, he knew

MICHAEL STANSBURY - CROSS-EXAMINATION

1  everything he needed to know from the internet.

2  A.  About race.

3  Q.  About race.

4  A.  Yes, about -- I mean -- Yes.

5  Q.  All right.  Are you -- as part of your work or for any

6  other reason, do you have to be or are you familiar with the

7  content of white racist internet websites?  I mean, it may not

8  be part of your job.

9  A.  I don't go to white racist internet websites and I don't

10  normally investigate them, and --

11  Q.  Okay.

12  A.  So -- but I'm familiar with the stuff that's put out there

13  that's on them and those type of people, yes, sir.

14  Q.  There are a number of notorious white racist websites

15  operating, are there not?

16  A.  I would believe so, yes, sir.

17  Q.  And the FBI tracks that.  As far as you know.

18  A.  I hope that somebody in the FBI tracks it.

19  Q.  Yes indeed.  But that's not your job.

20  A.  That's correct.

21  Q.  That's not your area of expertise.

22  A.  Correct.  Yes, sir.

23  Q.  You were present when the photographs of his clothing were

24  taken, and his clothing was examined at the end of that --

25  that was part of --

546

MICHAEL STANSBURY - CROSS-EXAMINATION

1   A.  That was related to the pictures.

2   Q.  And I think you read out that he was wearing a pair of

3   Dickies, which is heavy work pants?

4   A.  Yes, sir.

5   Q.  And underneath that was a pair of sweat pants.

6   A.  Yes, sir.

7   Q.  And this was June 18th.

8   A.  Yes, sir.

9   Q.  Summertime.

10  A.  Yes.

11          MR. BRUCK:  I think that's all; just bear with me

12  just for a moment.  Thank you very much, Agent Stansbury,

13  that's all I have.

14          THE COURT:  You may step down, thank you, sir.

15      It's 3:25.  Why don't we take our afternoon break at this

16  point.  Take about a ten-minute break.

17      (Jury excused.)

18          THE COURT:  Ladies and gentlemen, when I excuse the

19  jury, I want y'all to remain silent, because court is still in

20  session until they leave.  And then you're free to talk.

21  We'll be in recess for about ten minutes.

22      (A recess was held at this time.)

23          THE COURT:  Bring in the jury.

24      (Jury present.)

25          THE COURT:  Call your next witness.

BRITTANY BURKE – DIRECT EXAMINATION

1          MR. WILLIAMS:  Government calls Brittany Burke.

2          THE COURT:  I want to remind you you're still under

3    oath.

4    A.  Yes, sir.

5        BRITTANY BURKE, a witness called by the Government, having

6    been previously sworn, testified further as follows:

7                        DIRECT EXAMINATION

8    BY MR. WILLIAMS:

9    Q.  Good afternoon.  When you finished your testimony

10   yesterday, there were a couple questions about the defendant's

11   vehicle.  Were you involved in dealing with the defendant's

12   vehicle?

13   A.  Yes, I was.

14   Q.  Tell the jury where that vehicle first was stopped and how

15   it came into your possession.

16   A.  The vehicle was stopped in North Carolina.  I was then

17   contacted, or SLED was contacted and it was decided that an

18   agent from our crime scene unit would respond and escort the

19   vehicle back to SLED headquarters for processing.  Agent Todd

20   Shank responded to North Carolina along with some other people

21   from SLED, and they put the vehicle on the back of a tow

22   truck, it was covered with a tarp so that nothing would damage

23   the vehicle.  It was secured with evidence tape so you could

24   tell that none of the doors were opened from the time that

25   they secured the vehicle and transported it to SLED and locked

BRITTANY BURKE – DIRECT EXAMINATION

1    in a vehicle bay overnight until I could get there the next

2    morning and process the vehicle.

3    Q.  Were any search warrants obtained for the vehicle?

4    A.  There were.  There was a search warrant obtained from

5    North Carolina, so that the vehicle was at that point in time

6    when the vehicle was in North Carolina there was a search

7    warrant obtained through the State of South Carolina as well,

8    in order for us to search the vehicle.

9    Q.  I show you Government proposed 118 and 119.  Can you look

10   at those?  Do you recognize them?

11   A.  Yes, I do.

12   Q.  Do those show the vehicle?

13   A.  Yes, they do.

14         MR. WILLIAMS:  I show them to defense counsel.

15         MS. PAAVOLA:  No objection.

16         THE COURT:  Government 118 and 119 are admitted.

17      (Government Exhibits 118 and 119 received.)

18   BY MR. WILLIAMS:

19   Q.  I'm going to put up 118 first.  Miss Burke, can you

20   explain to the jury what's depicted in Government's

21   Exhibit 118?

22   A.  What is depicted in this picture is the vehicle with the

23   tarp that I explained that was over it to protect the vehicle

24   while it was transported.  The blue tarp is placed over the

25   vehicle, and the vehicle was on the back of the wrecker at

549

BRITTANY BURKE – DIRECT EXAMINATION

1    this point in time.

2    Q.   Is that how it was transported?

3    A.   That is correct.

4    Q.   I'm going to put up Government's 119.  Can you explain

5    that as well?

6    A.   This is the vehicle after it had been taken off of the tow

7    truck and was sitting in the bay and the tarp had been removed

8    prior to our processing.

9    Q.   And how is the vehicle secured?

10   A.   If you look at the top of the front passenger side and the

11   rear passenger side, you can see a piece of tape that is

12   across there.  There were multiple pieces of tape that were

13   placed across the opening of every door, and it was evidence

14   tape and was marked with initials and the dates of the agent

15   who secured the vehicle, so that I could tell that the vehicle

16   had not been opened prior to me getting there the next day.

17   Q.   Looks like there was one on the hood as well?

18   A.   Yes, there was -- they were on the hood, the trunk, and

19   all of the doors, anywhere that there could be an opening of

20   the vehicle of some sort.

21   Q.   Where did you first view the vehicle?  Where did you see

22   it for the first time?

23   A.   The vehicle was placed in a bomb bay where they keep our

24   bomb truck, that's why we call it that, and it was moved from

25   there into this bay for processing.  But the first time I saw

550

BRITTANY BURKE - DIRECT EXAMINATION

1   the vehicle without the -- and that was with the tarp on it.

2   The first time I saw it without the tarp on was right here

3   where it's pictured here.

4   Q.  Do you know about what day it was when you went to see the

5   vehicle to process it?

6   A.  It was June 19th.

7   Q.  So the day after the shooting?

8   A.  That is correct.

9   Q.  Do you know approximately what time?

10  A.  I arrived there at 7:00 o'clock; we did not begin moving

11  or processing the vehicle until about 7:20.

12  Q.  About how long total did it take you to process the car?

13  A.  About an hour and 20 minutes.

14  Q.  I want to ask you first of all, you testified yesterday

15  about how you processed the crime scene at the church.  Is

16  there a different approach to processing a vehicle?

17  A.  The basic approach is the same.  We start with taking our

18  notes and our photographs and documenting the vehicle as we

19  see it.  Each person might start at a different spot.

20  Personally I like to start in the front driver's side, and we

21  open that door first and photograph there, and then I move to

22  the rear driver, and then around to the passenger, rear

23  passenger and the front, moving in a circle around the car.

24      And then once our overalls are taken, with everything

25  exactly as we saw it, then things start getting removed from

BRITTANY BURKE - DIRECT EXAMINATION

1    vehicle.  And as we remove a layer, we take photographs of

2    what is underneath that.  And then as more things come out,

3    photographing until we get to the floor or the seat or

4    whatever the base layer of the vehicle is there.

5    Q.  You had shown placards yesterday in the church crime

6    scene.  Did you use placards at all for a car?

7    A.  No, in this case we did not.  It's fairly unusual for us

8    to use placards in a car.  Things will be labeled as far as

9    they came from the front driver side seat.  Or the rear

10   passenger floorboard or underneath a seat or in a certain

11   console.  A car provides good ways to describe where things

12   came from, without us having to use the little placards.

13   Q.  You testified yesterday that you were a supervising other

14   people when the church was processed.  Did you do the same

15   thing with the car?

16   A.  Yes, like I said yesterday, we work in teams or a group,

17   and Agent Tiffany Hezel, who was present at the church, was

18   also present with me for the car, and then a field agent from

19   SLED, Agent Casey Collier, was also present during the

20   processing of this.

21   Q.  How late were you at the church the night before?

22   A.  I left the church the day before at, I believe, around

23   11:00 a.m.  I did not leave the office until much later that

24   afternoon.

25   Q.  I want to ask you, you do an external inspection before

BRITTANY BURKE - DIRECT EXAMINATION

1  you internally inspect the car?

2  A.  Yes, we do, we take pictures of the entire outside of the

3  car, and then we look at the outside of the vehicle to see if

4  there is any evidence that is readily present that we need to

5  take off of the vehicle before we start opening doors that

6  might be moved or something like that when the doors are open.

7  Q.  Was there anything you noticed on the outside of the car,

8  at least that was of any evidentiary value?

9  A.  There was nothing on the outside of the car that we got as

10 evidentiary value.  The only thing we took off the outside of

11 the car was the front license plate.

12 Q.  I'm going to hand you several documents, Government

13 exhibits, proposed exhibits 120, 21, 22, 23, 24 and 25, 26,

14 27, 28, 29, and 30.  Take a look at those.

15          THE COURT:  Government 120 to 130?

16          MR. WILLIAMS:  Yes, Your Honor.

17 Q.  Are those all photos you took of the car while you were

18 processing it?

19 A.  Yes.

20          MR. WILLIAMS:  I show these to defense counsel.

21          MS. PAAVOLA:  No objection.

22          THE COURT:  Government Exhibits 120 to 130 admitted

23 without objection.

24    (Government Exhibits 120 through 130 received.)

25 BY MR. WILLIAMS:

553

BRITTANY BURKE - DIRECT EXAMINATION

1  Q.  In Exhibit 119, which is up, can you see that license

2  plate on the front of the car?

3  A.  Yes, I can.

4  Q.  I'm going to go to Exhibit 120.  Is 120 the same plate?

5  A.  Yes, it is.

6  Q.  You said that was collected?

7  A.  Correct, it was.

8  Q.  So you said that was the only item on the exterior of the

9  vehicle that was of any value.  Did you then proceed to the

10 inside of the car?

11 A.  Yes, after we looked at the outside of the vehicle we then

12 proceeded to the inside of the car and searched the inside of

13 the vehicle as well.

14 Q.  You said you started with the driver's side seat, took

15 some overall pictures?

16 A.  That is correct, the front driver side seat.

17 Q.  Put up Government's 121.  Does that show the driver's side

18 front seat?

19 A.  Yes, it does.

20 Q.  I'm going to go to Government's 122.  What area of the car

21 is that?

22 A.  This is the center console near the gear shift between the

23 front driver and passenger side area.

24 Q.  There was -- there's an item in the lower part of the

25 screen, looks like a card.  Do you know what that is?

BRITTANY BURKE - DIRECT EXAMINATION

1   A.  Yes, that is the insert from the packaging of a Glock

2   magazine.

3   Q.  Can you explain what that means?

4   A.  A magazine is the part that holds the bullets that goes

5   into the gun, and the Glock is the brand name of the magazine

6   that was purchased.

7   Q.  Do you have some familiarity with how inserts are a part

8   of the packaging?

9   A.  Yeah, it's like that clear packaging that's like a clam

10  shell and puts together and inserts the cardboard in it that

11  has the writing on it that tells you what it is.  The clear

12  plastic thing having the writing on it, this was the cardboard

13  piece in there that tells you what unit it is that you're

14  purchasing.

15  Q.  I'm going to go to 123.  Can you see those?  Looks like

16  there's more than one at the bottom of that exhibit.

17  A.  Yes, that is correct.  There are two that are visible in

18  this picture.

19  Q.  And then to the top of that photograph, do you recognize

20  what that electronic device is?

21  A.  I believe it is the GPS.

22  Q.  Did you see that inside the vehicle?

23  A.  Yes, I did.

24  Q.  I'm going to go to 124.  Does that show the same item?

25  A.  Yes, it does.

BRITTANY BURKE - DIRECT EXAMINATION

1    Q.  Do you know what a GPS is?

2    A.  Yes, it's -- you put -- a global positioning system is

3    what it stands for.  I know it best by putting the address in

4    the car and it tells me how to get there.

5    Q.  Have you used one before?

6    A.  Yes, I have.

7    Q.  I'm going to go to 125.  Can you tell the jurors sort of

8    what your impression was on your first inspection of what was

9    in the back seat?

10   A.  So in the back seat there was a lot of items.  There was a

11   bag, a pillow, a blanket, clothing, and then a bunch of just

12   mess in the floor, as if it looked like the person had been in

13   the car for awhile, or it's the things you would take with you

14   if you were going somewhere for awhile.

15   Q.  And let's start with the floor.  Looks like there's a

16   plastic bag on the floor?

17   A.  Yes, that is correct.

18   Q.  And the way it's depicted in 125, is that the way it

19   appeared when you first opened the car?

20   A.  Yes, this is the type of picture that we take when we

21   first open the door, so you can see the door frame and the

22   interior of the car to show what it looked like when we first

23   arrived.

24   Q.  Go to 126.  Does that show that same area?

25   A.  Yes, this is still the rear driver's side floorboard.

BRITTANY BURKE - DIRECT EXAMINATION

1    Q.  I'm going to ask you about the far right of that picture,

2    looks like there's some plastic packaging there as well?

3    A.  Yes, there was some packaging present in the center to the

4    passenger side floorboard as well.

5    Q.  Would you have inspected or looked inside the plastic bag

6    that was on the floor?

7    A.  Yes, anything that was in the plastic bag, the bag would

8    have been opened up and it would have been taken out.

9    Q.  Would you have photographed the steps in doing that?

10   A.  Yes, all those steps would have been photographed as well.

11   Q.  I'm going to go to Government's 127.  What does that show?

12   A.  This shows the items that would have been in the plastic

13   bag.  It shows those clear packaging inserts that we were

14   talking about, as well as some of the Glock -- the Glock

15   magazine cardboard that are inside of them.  As well as a tray

16   containing ammunition in the box that the tray would have come

17   from as well.

18   Q.  Looks like there's a box outside and maybe another inside?

19   A.  I'm sorry?

20   Q.  Looks like there's a box outside --

21   A.  And another box inside the bag as well.

22   Q.  I'm going to go to 128.  What does that show?

23   A.  This shows the same thing, there's a box of ammunition

24   inside the bag, the three containers for magazines, the

25   plastic containers, and then the tray containing ammunition.

557

BRITTANY BURKE - DIRECT EXAMINATION

1    Q.  Go to 129.  You talked earlier about one tray that was --
2    looks like on this photo to the right -- is the second tray
3    now shown open?
4    A.  Yes, the second tray is shown open in the bag there, you
5    can see it's been removed from the box and you can see the
6    ammunition in the tray there.
7    Q.  Can you also explain how many rounds were missing or were
8    not missing from the two trays generally?
9    A.  There were none missing from the tray that came inside the
10   box.  And the other one has a round, I believe 39 missing.
11   Q.  I want to ask about two other things in that photo.  The
12   tray to the right has two red items in it; do you know what
13   those are?
14   A.  No, I do not.
15   Q.  I want to ask you about the tray inside the bag, a black
16   item, if we can zoom in on it.  Do you know what that item
17   was?
18   A.  That item is a speed loader.  It comes with the gun or the
19   magazines, sometimes, when you buy them.  And it just -- you
20   place it over the magazine and it helps you load the
21   cartridges into the magazine easier.
22   Q.  Have you ever used one?
23   A.  Yes, I have.
24   Q.  Does it make a difference in the speed, I guess, with
25   loading a magazine?

BRITTANY BURKE - DIRECT EXAMINATION

1   A.  It helps with the tension when you put shells in it,

2   there's a spring in it and it can be -- have a lot of tension

3   on it, and it keeps that tension on it and makes it easier to

4   load it.  And so, therefore, yes, it can make it faster.

5   Q.  I'm going to go to finally 130.  Do you recognize that as

6   well?

7   A.  Yes, I do.

8   Q.  And what is that?

9   A.  This is another picture of the same area, showing the --

10  you can see in the front where the bottom of the picture, one

11  of the clear plastics with the Glock magazine cardboard inside

12  of it.  Towards the top right above that are the three

13  plastics without the cardboard in them.  Underneath them is

14  the tray missing -- with missing ammunition.  The top of the

15  box, so we can see this is Winchester .45 ammunition, and then

16  one of the Glock cardboard inserts, and below that is the

17  other box of ammunition.

18  Q.  I'm going to hand you Government's 131 through 134.  You

19  testified yesterday that when you seized that, you put marking

20  on it.  Did you do that also with items you seized from the

21  car?

22  A.  Yes, all the items seized from the car would be marked as

23  to what they were, and then taped with evidence tape and

24  initialed and sealed.

25  Q.  Take a look at 131 through 134; let me know if those are

BRITTANY BURKE - DIRECT EXAMINATION

1    items you would have seized.

2    A.  Yes, these are all items that I would have seized.

3         MR. WILLIAMS:  I'll show these to defense counsel.

4         MS. PAAVOLA:  No objection.

5         THE COURT:  Government Exhibit 131 to 134 admitted

6    without objection.

7         (Government Exhibits 131 through 134 received.)

8    BY MR. WILLIAMS:

9    Q.  I'm going to start with Government's 131.  How many of the

10   plastic packagings were found inside the car in 131?

11   A.  There were five that were found.

12   Q.  It looks like in that exhibit there's actually two of the

13   cards that go with them?

14   A.  That is correct.

15   Q.  I'm going to put up this black item.  Is that the speed

16   loader?

17   A.  Yes, it is.

18   Q.  Was that the total number of plastic packages that were

19   found in the back seat, five plastic packages?

20   A.  Yes, there were five that were found in the back seat

21   there.

22   Q.  And in this exhibit there were two cards, right?

23   A.  Yes.  Correct.

24   Q.  I'm going to go to 132.  132 looks like there's three of

25   those inserts.

BRITTANY BURKE - DIRECT EXAMINATION

1   A.  Yes, there are.

2   Q.  So with the other two, that would have been five

3   packagings and five inserts?

4   A.  That is correct.

5   Q.  133, these are the two packages of ammunition?

6   A.  That is correct.

7   Q.  Those were seized from the back seat as well?

8   A.  Yes.

9   Q.  There's a lot of sort of residue on this.  Do you know

10  what that came from?

11  A.  The boxes were processed for latent prints, and that would

12  have come from the processing of the boxes.

13  Q.  Is it fair to say several items were inside the vehicle

14  and later sent for fingerprinting or processing?

15  A.  Yes, they were.

16  Q.  I'm going to open up the first box.  That's the one that

17  had the two red items in it?

18  A.  That is correct.

19  Q.  Take a look at those.  Do you recognize what they are now?

20  A.  Yes, these are ear plugs.

21  Q.  Are those common for firing guns?

22  A.  Yes, they are.

23  Q.  So that was the box that had some rounds missing from it,

24  correct?

25  A.  That is correct.

BRITTANY BURKE - DIRECT EXAMINATION

1  Q.  And the second box looks like it's only missing fewer

2  rounds?

3  A.  Yes, it is missing fewer rounds.

4  Q.  And all of that ammo is .45 caliber hollow point?

5  A.  Yes, it is.

6  Q.  Is this ammunition consistent with the ammunition that was

7  found at the church?

8  A.  The head stamps on these were consistent with the head

9  stamps on those that we found at the church, yes.

10  Q.  I think that's 133 and 134.  So those items you would have

11  collected out of the back seat?

12  A.  Yes, those would have come from the back driver's side

13  floorboard.

14  Q.  What is the next area of the vehicle you would have

15  started looking at?

16  A.  After we did the back driver's side floorboard, we would

17  have gone to the seat on that side.

18  Q.  I'm going to hand you Government's Exhibits 135 through

19  139.  Take a look at those.  Are those photos from that back

20  seat?

21  A.  Yes, they are.

22          MR. WILLIAMS:  I show these to defense counsel.

23          MS. PAAVOLA:  No objection.

24          THE COURT:  Government Exhibits 135 to 139 admitted

25  without objection.

BRITTANY BURKE - DIRECT EXAMINATION

1      (Government Exhibits 135 through 139 received.)

2  BY MR. WILLIAMS:

3  Q.  Let's start with 135.  Can you explain to the jury what

4  was located on the back seat in this photograph?

5  A.  In this photograph is looking from the driver's side, and

6  you can see a black toiletry bag located towards the front of

7  the picture there, and then a pillow and blanket towards the

8  rear.

9  Q.  What do you mean by that?

10  A.  Like the bag you pack when you're taking a trip that has

11  razors, tooth brush, tooth paste, anything like that in it.

12  Q.  I'm going to go to 136 next.  Does that show the other

13  side of the vehicle?

14  A.  Yes, it does.  This is a picture that was taken later on

15  after some of the items had been moved, but this was taken

16  from the rear passenger side.

17  Q.  I'm going to go to 137.  What does that show?

18  A.  This shows the toiletry bag.  This is what it looked like

19  when we opened it.  You can see some shampoo and some tooth

20  paste visible in the toiletry bag.

21  Q.  Go to 138.  That's just -- you mentioned earlier that you

22  had to remove items, you take photos of them?

23  A.  Correct, this is just showing as we're removing items so

24  you can see what's underneath it while it's in place.

25  Q.  Go to 139 next.  What does that show?

BRITTANY BURKE - DIRECT EXAMINATION

1   A.  This shows two USB drives or thumb drives that were found

2   inside the toiletry bag.

3   Q.  Do you know what a thumb or USB drive is?

4   A.  It is a portable storage device you use for a computer.

5   So you plug it into your computer and you're able to drag and

6   drop any type of files, videos, pictures, music, anything like

7   that from your computer onto it for storage.

8   Q.  Is that something you collect for evidentiary value?

9   A.  Yes, it is.

10  Q.  The electronic devices in this case, were they processed

11  by a different agency?

12  A.  They were processed by the FBI.

13  Q.  I'm going to show you Government's Exhibit 140.  Is that

14  what -- Do you recognize it?

15  A.  Yes, I do.

16  Q.  What is it?

17  A.  It's the USB drive.

18        MS. PAAVOLA:  No objection.

19        THE COURT:  Very good.  Government 140 admitted

20  without objection.

21     (Government Exhibit 140 received.)

22  BY MR. WILLIAMS:

23  Q.  I'll just put on -- hold them up.  So there was two USB

24  drives that were collected?

25  A.  Yes, there were.

BRITTANY BURKE - DIRECT EXAMINATION

1    Q.  And you said those were submitted to the FBI for

2    processing?

3    A.  That is correct.

4    Q.  Once you had looked on that side of the seat, did you then

5    begin processing across that bench seat?

6    A.  Yes, after the rear driver's side, we then go to the rear

7    passenger side to be processed.

8    Q.  You went ahead and photographed that as well?

9    A.  That is correct.

10   Q.  I hand you Exhibits 141, 142, 43, 45, 46, 47 and 50.  Can

11   you look at those?

12   A.  Thank you.

13   Q.  Are those photos you would have taken while processing the

14   vehicle?

15   A.  Yes, they are.

16   Q.  In the back seat?

17   A.  Correct.

18          MR. WILLIAMS:  I show these to defense counsel.

19          MS. PAAVOLA:  No objection.

20          THE COURT:  Government 141, 142, 143, 145, 146, 147

21   and 150 admitted without objection.

22       (Government Exhibits 141, 142, 143, 145, 146, 147 and 150

23   received.)

24   BY MR. WILLIAMS:

25   Q.  Let's start with 141.  What does that photo show?

BRITTANY BURKE - DIRECT EXAMINATION

1    A.  This photo shows the rear seat of the vehicle looking from

2    the passenger side -- the driver's side towards the passenger

3    side.  In the very bottom of the picture you can see the edge

4    of that toiletry bag that was sitting in the rear driver's

5    side.  On the top you can see some clothing, and you can see a

6    handgun lying underneath the clothing.

7    Q.  And I believe there were -- there was a pillow and other

8    items on top of that previously.  Had those been removed?

9    A.  Correct, there was a pillow and blanket on top of that.

10   Those had been removed, and this was part of us taking our

11   pictures as we removed each layer of items.

12   Q.  I'm going to go to 142 next.  That's a close-up of that

13   same area?

14   A.  Yes, correct, it is.

15   Q.  The shirt that is depicted there, I'm going to go to 143.

16   Is that the same shirt that was on the seat a moment ago?

17   A.  Yes, it is.

18   Q.  I'm going to show you Government's proposed 144.  Do you

19   recognize that item?

20   A.  Yes, I do.

21   Q.  What is it?

22   A.  It's the shirt that is in the picture.

23           MR. WILLIAMS:  I show it to defense counsel.

24           MS. PAAVOLA:  No objection.

25           THE COURT:  Government Exhibit 144 is admitted

BRITTANY BURKE - DIRECT EXAMINATION

1   without objection.

2       (Government Exhibit 144 received.)

3   BY MR. WILLIAMS:

4   Q.  I hold that up for you.  That's Government's 144.  Did you

5   recognize that shirt from another place?

6   A.  It appeared to be consistent with the shirt that was seen

7   of the suspect leaving the church previously.

8   Q.  You had seen that video, at least a still from that video?

9   A.  Yes, I had seen a still shot from that video while at the

10  church processing it.

11  Q.  I want to go to 145 next.  Is that the back seat with the

12  shirt removed?

13  A.  Yes, this is a photo of the back seat after the shirt had

14  been removed from the vehicle.

15  Q.  I want to go to 146.  Is that that same area from the

16  other side of the car?

17  A.  Yes, it is.

18  Q.  Go to 147.  We'd seen the earlier pictures from a side

19  view.  Was there something else visible when you looked closer

20  in?

21  A.  Yes, underneath the jeans that were located in the seat

22  there, there is a journal that is visible, as well as two

23  handwritten notes that were visible on the back seat.

24  Q.  Did you seize those notes?

25  A.  Yes, the notes and the journal were collected.

BRITTANY BURKE - DIRECT EXAMINATION

1    Q.  I'm going to hand you both of these, Government's proposed

2    148 and 149, and Government's proposed 2.  Can you look at

3    both of those?  Are those then the notes and the journal?

4    A.  Yes, they are.

5    Q.  148 and 149 are the notes, 2 is the journal?

6    A.  That is correct.

7              MS. PAAVOLA:  No objection.

8              THE COURT:  Government's 148, 149 and 2 admitted

9    without objection.

10        (Government Exhibits 148, 149 and 2 received.)

11   BY MR. WILLIAMS:

12   Q.  I'm going to show you Government's 148A and 148 -- I'm

13   sorry -- 148A and 149A.  Do you recognize those as well?

14   A.  Yes, they're photographs that were taken of the note or

15   the two notes that were located in the back seat.

16             MS. PAAVOLA:  No objection.

17             THE COURT:  148A and 149A, is that correct?

18             MR. WILLIAMS:  Yes, Your Honor.

19             THE COURT:  Government's 148A and 149A admitted

20   without objection.

21        (Government Exhibits 148A and 149A received.)

22   BY MR. WILLIAMS:

23   Q.  So these are photographs of those paper items, is that

24   right?

25   A.  That is correct.

568

BRITTANY BURKE - DIRECT EXAMINATION

1    Q.  I'm going to put up 148A.  Can you read that to the jury?

2    A.  It says, "Dear Mom, I love you.  I'm sorry for what I did,

3    but I had to do it.  This note isn't meant to be sentimental

4    and make you cry, I just want you to know that I love you.  I

5    know that what I did will have repercussions on my whole

6    family and for this I truly am sorry.  At this moment I miss

7    you very much and as childish as it sounds I wish I was in

8    your arms.  I love you, Dylann."

9    Q.  I'm going to bring up 149A.  Can you read that to the jury

10   as well, once it's zoomed in?

11   A.  It says, "Dear Dad, I love you and I'm sorry.  You were a

12   good dad.  I love you."

13   Q.  And those were found next to another item, is that right?

14   A.  That is correct.

15   Q.  Does it appear like those pages had come from that other

16   item; could you tell?

17   A.  The size of the pages as well as the lining and all on the

18   pages did appear as if they had come from that other item.

19   Q.  I'm going to show you Government Exhibit 2A.

20          THE COURT:  2A?

21          MR. WILLIAMS:  Yes, Your Honor.

22   Q.  Take a look at that.  Is that a copy of something you

23   recognize?

24   A.  Yes, this is a copy of the journal that was located in the

25   back seat.

BRITTANY BURKE – DIRECT EXAMINATION

1        MR. WILLIAMS:  I show this to defense counsel.

2        MS. PAAVOLA:  No objection.

3        THE COURT:  Government 2 -- Exhibit 2A admitted

4   without objection.

5        (Government Exhibit 2A received.)

6   BY MR. WILLIAMS:

7   Q.  I want to ask you first about Government's Exhibit 2.  I'm

8   going to put this on the ELMO.  Is this the journal that you

9   had described finding?

10  A.  Yes, it is.

11  Q.  I'm going to ask you about the condition that it's in.  Do

12  you recognize these markers that are on it?

13  A.  Yes, the item was sent for processing for latent prints,

14  and these sticker rulers are the rulers that are used by our

15  latent print unit.  When they develop latent print, they put

16  this marker next to it so that it can be sent so that the

17  print can be photographed.

18  Q.  And is there a certain type of, I guess, material used to

19  develop prints that can cause some discoloration to paper?

20  A.  Yes, for paper we typically would use ninhydrin to develop

21  prints, and it can cause the paper to become discolored.

22  Q.  I'm going to open to the first page.  Do you see anywhere

23  on here where that's evidenced?

24  A.  Yes, if you can see the purple tint, when ninhydrin

25  reacts, has a reaction, then it does turn a purple tint, and

BRITTANY BURKE - DIRECT EXAMINATION

1    that can be seen some places here on the paper up towards the

2    top, and then kind of in the middle of the page there as well.

3    Q.  And likewise, I believe for the writing on these pages,

4    processing print stickers were placed over it?

5    A.  Yes, the stickers were placed over the writing because

6    they were -- had to be placed next to the print in order for

7    the prints to be documented with photographs and, therefore,

8    preserved.

9    Q.  The two-way copy does not have that interference, is that

10   right?

11   A.  That is correct.

12          MR. WILLIAMS:  Your Honor, I'm going to ask that Miss

13   Burke read through the journal to publish it to the jury.

14          THE COURT:  The entire journal?

15          MR. WILLIAMS:  The two-way copy.

16          THE COURT:  Very good.

17   BY MR. WILLIAMS:

18   Q.  Miss Burke, I want to ask you first of all, does a journal

19   have writing on both sides of the pages?

20   A.  The journal has writing, and sometimes it's one side,

21   sometimes on both sides, and there's not always -- sometimes

22   there's pages in between the entries.  They're not all

23   necessarily right in order in the journal.

24   Q.  But the copies are sequential, there may be some pages in

25   between in Exhibit 2?

571

BRITTANY BURKE - DIRECT EXAMINATION

1   A.   That's correct.

2   Q.   What I'm going to do is I'm going to start with the first

3   page of 2A.  So the cover we had just seen on Exhibit 2 was a

4   symbol?

5   A.   That is correct.

6   Q.   I'm going to go to the next page.  And looks like on the

7   left page, can you read what's on the left page, then read to

8   the jury the right page?

9   A.   There is a e-mail address there on the left page that says

10  last -- I can not make out the next letter, but then the --

11  yeah, thank you.  Last -- I still can't read that.

12  Q.   There's something dot com on the --

13  A.   Yes, something dot com.

14  Q.   Can you read the right page to the jury?

15  A.   Yes, I can.  The right page says, "My name is Dylann Storm

16  Roof.  I was born on the third of April, 1994 in Columbia,

17  South Carolina.  I was not raised in a racist home or

18  environment.  Living in the South, almost every white person

19  has a small amount of racial awareness, simply because of the

20  number of negroes in this part of the country.  But it is a

21  superficial awareness."

22  Q.   I'm going to also ask if you come to any racial slurs,

23  that you skip over those.

24  A.   I'll be happy to.

25  Q.   Go ahead.

572

BRITTANY BURKE - DIRECT EXAMINATION

1    A.   "But it is a superficial awareness.  Growing up in school,

2    the white and black kids would make racial jokes towards each

3    other, but that's all it was, jokes.  Me and my white friends

4    would sometimes watch American History X, or some videos on

5    line of black nationalists talking about killing white people,

6    but there was no real understanding behind it.

7         "The event that truly awakened me was the Trayvon Martin

8    case.  I kept hearing and seeing his name, and eventually I

9    decided to look --"

10   Q.   That goes to the next page?

11   A.   "-- him up.  I read the Wikipedia article and right away I

12   was unable to understand what the big deal was.  It was

13   obvious that Zimmerman was in the right.  But more importantly

14   this prompted me to type the words 'black on white crime' into

15   Google, and I was never the same since.  The first website I

16   came to was the Council of Conservative Citizens.  There were

17   pages upon pages of these brutal, disgusting black on white

18   murders.  I was in disbelief.  At this moment I realized that

19   something was very wrong.  How could the news be blowing up

20   this Trayvon Martin case while hundreds of these black on

21   white murders got no airtime?

22        "From this point I researched deeper and found out what

23   was happening in Europe.  I saw that the same things were

24   happening --"

25   Q.   Go to the next page.

573

BRITTANY BURKE - DIRECT EXAMINATION

1    A.  "-- in England and France.  Again I can't believe it.  As

2    an American, you are taught to accept living in the melting

3    pot, and that blacks and other minorities have just as much

4    right to be here, since we are all immigrants.  But Europe is

5    the homeland of white people, and in many ways the situation

6    is even worse there.  From here I found out about the Jewish

7    problem and other issues facing the white race and today I can

8    say with confidence that I am completely racially aware."

9    Q.  Go to the fourth page, if you could read the header.

10   A.  The header says "Blacks."

11   Q.  Again, if you could skip over any racial slurs that may be

12   in there.

13   A.  I will be happy to.

14   Q.  Go ahead.

15   A.  "I think it is fitting to start off with the group I have

16   the most real life experience with, and the group that is the

17   biggest program for Americans."

18   Q.  Go to the next section.

19   A.  "... are stupid and violent.  At the same time they are

20   very slick and conniving.

21       "Black people view everything through a racial lens.  They

22   are always thinking about the fact that they are black.  This

23   is part of the reason they get offended so easily, and think

24   that some things are racist even when a white person wouldn't

25   even be thinking about race.  And this is part of our problem.

574

BRITTANY BURKE - DIRECT EXAMINATION

1    Black people are racially aware almost from birth, but white

2    people on average don't think about race in their day to day

3    --"

4    Q.  Go to the next page.

5    A.  "-- lives.  But we need to.  That is what racial awareness

6    is.  It is viewing everything that happens through a racial

7    lens.

8        "Now say you were to witness a dog being beat by a man.

9    You are almost surely going to feel very sorry for that dog.

10   But say you are witness to a man being bit by a dog.  You will

11   most likely not feel the same pity you felt for the dog for

12   the man.  Why?  Because dogs are lower than men.

13       "This same analogy applies even today to blacks.  Blacks

14   are viewed as lower beings by white people on a subconscious

15   level.  And this is why we continue to feel sorry for them for

16   no reason.  Blacks are held to a lower standard in general.

17   This is why they are able to get away with things like

18   obnoxious behavior --"

19   Q.  Go ahead.

20   A.  "-- in public, because it is expected.

21       "I wish that ... were treated terribly throughout history

22   by whites, that every white person had an ancestor who owned

23   slaves, that segregation was a evil and oppressive

24   institution, and so on.  Because if it was all true, it would

25   make it so much easier for me to accept our current situation.

BRITTANY BURKE - DIRECT EXAMINATION

1    But it isn't true.  None of it is.  We are told to accept what

2    is happening to us because of our ancestors' wrongdoing.  But

3    it is all based on historical lies, exaggerations, and myths.

4    I have tried and tried to think of reasons we deserve this,

5    and I have only come back more irritated because there are no

6    reasons.

7        "Only a fourth to a third of --"

8    Q.  I'm going to pause at this next page.  This is where it

9    picks up with sort of a separate story or statement on the

10   left, and then a continuation of the narrative on the right.

11   If you could continue the narrative on the right first, then

12   go back to the left, that would help.

13   A.  Yes, I can.  "-- people in the South owned even one slave.

14   Yet every white person in America is treated as if they had an

15   ancestor that was a slave owner.  This applies to people in

16   states that slavery never existed in, as well as people whose

17   family immigrated after slavery was already dissolved.

18       "Segregation was not a bad thing.  It was a defensive

19   measure.  Segregation did not exist to hold back ... It

20   existed to protect us from them.  And I mean that in multiple

21   ways.  Not only did it protect us from having to interact with

22   them, but it protected us from being brought down to their

23   level.  Immigration was -- has done nothing but bring white

24   people down to the level of colored people.  The best example

25   of this is obviously --"

BRITTANY BURKE - DIRECT EXAMINATION

1  Q.  I'll have you go to the left side now.

2  A.  Okay.  "I remember one day I was sitting at a stoplight,

3  and a school bus turned in front of me.  Every face on that

4  bus was as black as coal except a young white boy toward the

5  back.  He looked as if he was in a living hell, and I believe

6  he was.  Why should he have to suffer needlessly?  I felt at

7  that moment even more decided in my decision.

8      "The modern school system covers the whole brain

9  development of a human.  From six, if not earlier, to 18, or

10  24 if college is taken into account, white people are being

11  indoctrinated with anti-white filth."

12  Q.  I think you left off on the right page saying the best

13  example of this is obviously, then it picks up.  Can you pick

14  up on the right page of 001642, that page number?

15  A.  Yes, on the right side.

16  Q.  Yes.

17  A.  Okay.  "-- the school system.  Now white parents are

18  forced to move to the suburbs to send their children to 'good

19  schools.'  But what constitute a good school?  The fact is

20  that how a good school is considered directly -- how good a

21  school is considered directly corresponds to how white it is.

22  I hate with a passion the whole idea of the suburbs.  To me it

23  represents nothing but scared white people running.  And

24  that's what they are doing.  Running because they are too

25  weak, scared, and brainwashed to fight.  Why should white

BRITTANY BURKE - DIRECT EXAMINATION

1   people have to flee the cities they created for the security

2   of the suburbs?  Why are the suburbs secure?  Because they are

3   white.  The pathetic part is that these white people that

4   leave for the suburbs don't even admit to themselves why they

5   want to move.  They tell themselves --"

6   Q.  If you could, then just cover the left side of the page.

7   A.  "Many white people feel as though they don't have a unique

8   traditional culture.  The reason for this is that white

9   culture is world culture.  I don't mean that our culture is

10  made up of other races' cultures, I mean our culture has been

11  adopted by everyone in the world.

12      "This makes us feel as though our culture isn't special or

13  unique.  Say for example that every businessman in the world

14  wore a kimono, that every skyscraper was in the shape of a

15  pagoda, that every door was a sliding one, and that everyone

16  ate every meal with chopsticks.  This would probably make a

17  Japanese man feel as though he had no unique traditional

18  culture.  Forks, hinged doors, tennis shoes, pianos, suits,

19  and countless other things we take for granted are all

20  examples of white culture."

21  Q.  I think on right side you left off with they tell

22  themselves, then it follows up on the right side of page ten.

23  A.  "-- it's better for schools to -- it's better for schools

24  simply to live in a nicer neighborhood.  But it is honestly

25  just a way to escape ... and other minorities.

578

BRITTANY BURKE – DIRECT EXAMINATION

1    "But what about the white people that are left behind?

2   What about the white children who, because of school zoning

3   laws, are forced to go to a school that is 90 percent black?

4   Do we really believe for one minute that that white kid isn't

5   going to be picked on for being white?  Do we really think

6   that he will be able to go one day without being called a

7   'white boy' by some ...?  And who is going to fight for him?

8   Who is fighting for these white people forced to live among

9   ...  No one.  But someone has to."

10   Q.  And page 11, the right side?

11   A.  "Anyone who thinks that white and black people look as

12   different as we do on the outside, but are somehow magically

13   the same on the inside, is delusional.  How could our faces,

14   skin, hair and body structure all be different, but our brains

15   be exactly the same?  This is the nonsense we are led to

16   believe.

17       "They have lower IQs, lower impulse control, and higher

18   testosterone levels in general.  These three things alone are

19   a recipe for violent behavior.  If a scientist publishes a

20   paper on the difference between the races in the U.S., he

21   could expect to lose his job.  There are personality traits

22   within families, so why not within races?  When you go to a

23   doctor they will usually want a record of diseases within your

24   family, yet we still deny the --"

25   Q.  If you could pick up on the right side.

BRITTANY BURKE - DIRECT EXAMINATION

1    A.   "-- differences between the races.

2         "Some white nationalists support the idea of a 'Northwest

3    Front.'  I think this idea is stupid.  Why should I for

4    example, give up the beauty and history of my state to go to

5    the Northwest?  To me the whole idea just parallels the

6    concept of white people running to the suburbs.  The whole

7    idea is pathetic and is just another way to run from the

8    problem without facing it.

9         "Race War.  I would love for there to be a race war.  I

10   won't lie, I think every white nationalist dreams of a race

11   war even if they deny it.  But I'm not sure we even need to

12   have one.  Ideally we could simply take control of the

13   Government and --"

14   Q.   If you could go to the left side of the page and pick up

15   that section.

16   A.   I can.  "Some people feel as though the South is beyond

17   saving, that we have too many blacks here.  This I -- to this

18   I say look at history.  The South had a higher ratio of blacks

19   when we were holding them as slaves.  Look at South Africa,

20   and how such a small minority held the blacks in apartheid for

21   years.

22        "It is far from being too late.  I believe that even if we

23   made up 30 percent of the population of the U.S.  We could

24   take it back completely.  But by no means should we wait any

25   longer to take drastic action.

BRITTANY BURKE - DIRECT EXAMINATION

1    "My blood is mostly from the British Isles, but I have

2    been blessed with a significant amount of German blood and a

3    German surname.  My blood is representative of America."

4    Q.  I think you left off on the left side with the race war

5    section and then started, ideally we could simply take control

6    of the Government, and it picks up.  Go ahead.

7    A.  "-- enact laws in order to get things under control.  I

8    would personally be content with reinstating segregation and

9    punishing certain individuals as need be.  Although we would

10   also need to put a forced sterilization and deportation

11   program in place at the same time.

12      "I have read hundreds of slave narratives from my state,

13   and only about one in 20 had even one negative thing to say.

14   One narrative sticks out in my mind, where this old ex-slave

15   recounts how the day his mistress died was --" I'm sorry, hold

16   on, I lost my place.  Oh "-- was one of the saddest days of

17   his life.  Many others, when asked about whippings, they

18   replied that their masters never whipped his slaves, or that

19   he didn't allow his slaves to be whipped."

20   Q.  I'm going to go to the next page.  The right side is a new

21   header, so if you want to scan to the left side first.

22   A.  Okay.  "In a modern history class, it is always emphasized

23   that, when talking about 'bad' things whites have done in

24   history, the people were white.  But when we learn about the

25   numerous, almost countless wonderful things whites have done,

2:15-cr-00472-RMG    Date Filed 01/24/17    Entry Number 896    Page 147 of 165

BRITTANY BURKE - DIRECT EXAMINATION

1    it is never pointed out that these people were white.  Yet

2    when we learn about anything important a black person did in

3    history, it is always pointed out repeatedly that they were

4    black.  For example when we learn about how George Washington

5    Carver was the first ... smart enough to open a peanut."

6    Q.  And if -- can you make out the part on underneath that on

7    left?

8    A.  Can I make out what?

9    Q.  Can you make out what's written down below that?

10   A.  I can make out the bottom two lines that say, "No one is

11   doing anything.  I don't blame fighting Nazis."

12   Q.  If you could then go to the right side of the page.

13   A.  The header says, "Jews.  Unlike many white nationalists, I

14   am of the opinion that the vast majority of American and

15   European Jews are white.  In my opinion the issue with Jews is

16   not their blood, but their identity.  I think that if we could

17   somehow destroy the Jewish identity, then they would cause a

18   problem.

19       "The problem is that Jews look white, and in many cases

20   are white, yet they see themselves as minorities.  Just like

21   ..., most Jews are always aware and constantly thinking about

22   the fact that they are Jewish.

23       "The other issue is that Jews network.  Because Jews are

24   always thinking about being Jewish, most of the time they feel

25   like outsiders, even when no one treats them that way."

BRITTANY BURKE - DIRECT EXAMINATION

1   Q.  If you could pick up on the right side of the next page.

2   A.  "I think this is part of the reason they don't feel guilty

3   for the disgusting things they do.

4       "If we could somehow turn every Jew blue for 24 hours, I

5   think that people would be able to see what is going on.  What

6   I mean is that one of the main reasons Jews are able to get

7   away with the things they do is that people don't recognize

8   them for what they are."

9   Q.  If you could then read the left side.

10  A.  "I have noticed that one of the things racially aware

11  white men seem to hate the most is race mixing white women.  I

12  personally don't understand this.  These people seem to place

13  the blame only on the white women without thinking about what

14  causes them to do it.  In my eyes these women are nothing but

15  victims.  They are victims of the Jews and their media,

16  telling them that not only is it okay to race mix, it's cool.

17  Then more times than not they end up being the victims of

18  domestic abuse at the hands of their black lovers.  I don't

19  think these women should be killed, or even punished, so long

20  as they repent.  They are not beyond saving.  I personally

21  wouldn't want to have relations with one though, as they are

22  damaged goods."

23  Q.  Go to the next page, there's just an entry on the left.

24  A.  "Religion.  I don't today consider myself a Christian.

25  But obviously Christianity is an extremely important part of

BRITTANY BURKE - DIRECT EXAMINATION

1  white culture historically.  For that reason I believe that

2  Christianity should be in the very least respected.  I don't

3  believe that even if you don't -- I believe that even if you

4  don't believe in Jesus, he deserves to be respected as part of

5  our history and culture."

6  Q.  Then the next page, I believe there's an entry on the

7  right.

8  A.  "I would like to say that unlike ... who blame others for

9  their problems I do not blame black or even Jews for my

10  failures in life.

11      "I also want to state that I am morally opposed to

12  psychology.  It is a Jewish invention, and does nothing but

13  invent diseases and tell people they have problems when they

14  don't."

15  Q.  The next page?  We'll zoom in on that.  Can you read that?

16  A.  "I'm not fighting for what white people are, but what we

17  have the potential to be."

18  Q.  Go to the next page.

19  A.  "I don't respect or feel pity for old white people or my

20  elders as they are the ones who let us get in our situation."

21  Q.  Go to the next page on the right.

22  A.  The title is "Homosexuality doesn't exist.  It is nothing

23  but a fetish that has been turned into a sexuality by the

24  Jews.

25      "This is why so many married men with children come out as

584

BRITTANY BURKE - DIRECT EXAMINATION

1    gay.  They obviously can perform normally, they just prefer

2    men.

3        "Homosexuality should be illegal or reinstated as a severe

4    mental illness."

5    Q.  The next page?

6    A.  "One of my only regrets is that I was never able to fall

7    in love."

8    Q.  Next page?

9    A.  "I have Hashimoto's disease."

10   Q.  Go to the next one.

11   A.  "I am not doing this to fight for what white people are,

12   but rather what I know we have the potential to be.

13       "People joke about prison rape without ever thinking about

14   how sick it really is.  It's a touchy subject I know, but

15   white nationalists need to confront it.

16       "I see so many white women wasting their beauty because

17   they put no effort in how they dress."

18   Q.  Go to the next page on the right.

19   A.  "No one else has any responsibility for what I have done.

20       "I planned and went about it completely alone.

21       "I repeat, do not try and punish other people for my

22   actions because you couldn't punish me.  This is wrong and

23   cruel."

24   Q.  And the last page I believe you said there was a similar

25   line at the front of the book?

BRITTANY BURKE - DIRECT EXAMINATION

1  A.  Yes, it is the same as the website that is listed in the

2  first page.

3  Q.  And so the last page, page 26, was there a symbol at the

4  back of the journal that was the same as the one at the front?

5  A.  Yes, there was.

6  Q.  And that's depicted on this image that's up?

7  A.  That is correct.

8  Q.  So those items were found sitting on the back seat, you

9  said?

10  A.  Yes, on back passenger side seat.

11  Q.  Let's pick up with what was underneath those items on the

12  seat.  I hand you Government's proposed Exhibits 151 to 157.

13  Take a look at those.  Do you recognize those?

14  A.  Yes, I do.

15  Q.  Are those photos you took from the back seat?

16  A.  Correct, they're from the back passenger side seats.

17        MR. WILLIAMS:  Hand these to defense counsel.

18        MS. PAAVOLA:  No objection.

19        THE COURT:  Government Exhibits 151 to 157 admitted

20  without objection.

21     (Government Exhibits 151 through 157 received.)

22  BY MR. WILLIAMS:

23  Q.  Let's go to 151 first.  Does this show then with the

24  journal and the notes removed?

25  A.  Correct, it does.

BRITTANY BURKE - DIRECT EXAMINATION

1   Q.  We'll go to 152.  You testified earlier that items were

2   taken out.  Is it typical, once items are taken out, to sort

3   of hold it up, then photograph it?

4   A.  Correct, it is.  It is typical for us to either lay it out

5   or hold -- if it's like a piece of clothing or a blanket,

6   towel or something like that, for us to hold it up so you can

7   see the items to be photographed.

8   Q.  This shows the jeans that were sitting on the seat?

9   A.  Yes, that is correct.

10  Q.  Go to 153.  Is that with jeans taken off the seat?

11  A.  Yes, it is.

12  Q.  Put up 154.  Is that one of the items that came off the

13  seat as well?

14  A.  Yes, it was a white T-shirt that had came off the rear

15  seat there.

16  Q.  Go to 155.  Is that on the back seat as well?

17  A.  Yes, the shirt was in the back seat.

18  Q.  These are all items that as you go one at a time, you're

19  just taking them out and photographing them?

20  A.  Yes, like I said, we just kind of take things out in

21  layers, and as we take them out, we photograph them as well.

22  But we take them out in layers and photograph the seat again

23  so you can see what was underneath that item.

24  Q.  Go to 156.  Another item that was on the back seat?

25  A.  Correct.

BRITTANY BURKE - DIRECT EXAMINATION

1    Q.   Then 157.  Does this show the back seat with all of those

2    clothing items removed?

3    A.   Yes, this was what the back seat looked like when

4    everything, the pillow, the blanket and all of the clothing

5    items that were obscuring it had been removed so we could see

6    what was underneath.

7    Q.   Hand you Government's proposed Exhibit 1.  Do you

8    recognize that?

9    A.   Yes, I do.

10   Q.   What is it?

11   A.   This is the gun that is depicted on the back passenger

12   side seat of the vehicle.

13           MR. WILLIAMS:  Show it to defense counsel.

14           MS. PAAVOLA:  No objection.

15           THE COURT:  What are those numbers again?

16           MR. WILLIAMS:  No. 1, Your Honor.

17           THE COURT:  Exhibit No. 1 admitted without objection.

18      (Government Exhibit 1 received.)

19   BY MR. WILLIAMS:

20   Q.   That's the handgun that was found on the seat.

21   A.   Correct.

22   Q.   Do you know what a trigger lock is or what this chamber

23   lock is?

24   A.   Yes.

25   Q.   How does this work?

BRITTANY BURKE - DIRECT EXAMINATION

1   A.  So that works by it keeps the chamber of the gun open so

2   that no round can go in it and the slide --- slide that's

3   pulled back, that metal part that's pulled back has to be

4   forward or be able to go forward in order for the gun to fire,

5   and that keeps that from happening.

6   Q.  So this lock disables the gun from being able to fire?

7   A.  That is correct.

8   Q.  Do you know the make and model of this gun?

9   A.  It is a Glock, and I know it's a .45 caliber, I can't tell

10  you the model.

11  Q.  I'm going to hand you the items that were found with --

12  were other items found with the gun?

13  A.  Yes, there was a magazine inserted in the gun, and it

14  contained cartridges as well as there was a cartridge from the

15  chamber.

16  Q.  Are those here as well?

17  A.  That is correct.

18  Q.  Can you take a look at them, see how many -- I have some

19  more here.

20          THE COURT:  What numbers are those?

21          MR. WILLIAMS:  They're all part of Exhibit 1.

22          THE COURT:  All Exhibit 1.

23  A.  Yes, there were ten cartridges from the gun and one from

24  the chamber.

25  Q.  Do you know if any of those rounds were test fired by the

BRITTANY BURKE - DIRECT EXAMINATION

1    examiner?

2    A.  Yes, this is what they use to -- the packaging they use to

3    test this, and they say there were six that were fired.

4    Q.  Is that normal when testing a firearm that you use the

5    ammunition that may be with the gun for a better comparison?

6    A.  Yes, if the gun still has ammunition in it, then they like

7    to use the same type of ammunition that was fired so that they

8    get the same -- have the same substrate or the same item to

9    test on that they're going to be looking at.  So that there

10   are no irregularities between the item that they test fire and

11   the item that they're looking at.

12   Q.  And that gun would have been, based on the packaging, at

13   least in your direction, that gun would have been tested by an

14   expert at SLED?

15   A.  Yes, that would have been sent to our firearms unit for

16   testing.

17   Q.  Tested for fingerprints as well?

18   A.  Yes, it was.

19   Q.  I believe we left off at 157, some other photographs.  Did

20   you then continue photographing the back seat, that area?

21   A.  Yes, we did continue photographing that area and down to

22   the floorboard there.

23          MR. WILLIAMS:  Your Honor, I don't know what time

24   Your Honor wanted to stop to.

25          THE COURT:  Is this a good breaking point?

BRITTANY BURKE - DIRECT EXAMINATION

1          MR. WILLIAMS:  It is, Your Honor, there's a whole

2    bunch of photographs.

3          THE COURT:  Ladies and gentlemen, I'm going to send

4    you back to the jury room for just a moment before I discharge

5    you.  You can step back to the jury room.

6          (Jury excused.)

7          THE COURT:  Please be seated.  I have to take a

8    matter up, but I need Miss Eunice back before I do that.  The

9    witness can come off the witness chair.  Thank you so much.

10         Can I speak to counsel, please.

11         (Following discussion held at side bar.)

12         THE COURT:  I am advised that juror No. 125, who is

13   the last alternate, told one of my court security people that

14   there was a voice of one of the agents sounded familiar to

15   her.  That's all I know.  What I would normally do is I think

16   secret is not the way to do it, I think you bring them in,

17   just ask her to disclose what is she talking about.  And then

18   I'll excuse her to leave, and then we'll talk about what we

19   should do, whether there should be a motion or not.  But I

20   won't do it in her presence.  Does that make sense to

21   everybody?

22         MR. BRUCK:  And you would try to identify who she

23   thinks the person is?

24         THE COURT:  Absolutely.

25         MR. BRUCK:  Get as much information.

BRITTANY BURKE - DIRECT EXAMINATION

1          THE COURT:  I'm going to get as much information,

2     figure out, I have no idea.  It may be she's just trying to

3     get out of this, I don't know.  But we'll -- Okay?  I just

4     want to tell you what we're going to do.

5          MR. RICHARDSON:  Thank you, Your Honor.

6       (Side bar discussion concluded.)

7          THE COURT:  I'm going to ask you to bring Juror 125

8     and to place her in the jury box.

9       (Juror 125 present.)

10          THE COURT:  Juror 125, I had some information that

11     you thought you heard a familiar voice or something, and I

12     wanted to explore that with you, if I could.

13          JUROR:  I just wanted to go on record saying that the

14     FBI Agent Januchowski, I believe, is that correct?  His voice

15     sounds very familiar.  I have known a couple of individuals

16     with a similar name.

17          THE COURT:  Were they -- any of them FBI agents?

18          JUROR:  This would have been years ago.

19          THE COURT:  Here's the question.  Does that affect

20     your -- the way you would weigh the evidence?

21          JUROR:  No.

22          THE COURT:  Would that affect your ability to be

23     impartial, an impartial juror in this matter?

24          JUROR:  No.

25          THE COURT:  So you're not even sure it's the same

BRITTANY BURKE - DIRECT EXAMINATION

1  person?

2          JUROR:  Not 100 percent.

3          THE COURT:  Do you think it might be?

4          JUROR:  Without seeing a face, I really -- I mean,

5  you couldn't tell from the video.

6          THE COURT:  Where did you know the person?

7          JUROR:  I believe we were actually maybe in the

8  military together.

9          THE COURT:  Y'all were in the -- perhaps the military

10 together?

11         JUROR:  Yes.

12         THE COURT:  Do you remember where you might have been

13 stationed?

14         JUROR:  Would have been Great Lakes.

15         THE COURT:  Great Lakes, and what branch of the

16 military?

17         JUROR:  Navy.

18         THE COURT:  Navy.  Do you recall about what years?

19         JUROR:  Would have been '99-2000.

20         THE COURT:  So somebody with that similar name who at

21 least the voice sounded familiar.  How closely did you work

22 with that person?

23         JUROR:  We were just classmates, if anything.

24         THE COURT:  What kind of class was that?

25         JUROR:  Would have been electronics technician

BRITTANY BURKE – DIRECT EXAMINATION

1    training or similar, you know.

2           THE COURT:  Okay.  But to the extent it is that

3    person, would that in any way affect how you would weigh this

4    evidence?

5           JUROR:  No, sir.

6           THE COURT:  Would it in any way affect your ability

7    to be a fair and impartial juror?

8           JUROR:  No, sir.

9           THE COURT:  I'm going to ask you to return to the

10   jury.  Thank you for sharing that with me.

11      (Juror excused.)

12           THE COURT:  Okay.  Does anybody want to share

13   anything with me about this?

14           MR. RICHARDSON:  That is not the Agent Januchowski.

15   Agent Januchowski has an illustrious career, but did not

16   involve the Navy or electrical training in any respect.  So he

17   is from Chicago, he has a distinctive Chicago accent, maybe

18   that's what's drawing her attention.

19           THE COURT:  Down here they all sound alike.

20           MR. RICHARDSON:  They say the same about us, Your

21   Honor.

22           THE COURT:  Mr. Bruck, do you have anything you want

23   to raise about this?

24           MR. BRUCK:  Not at all.

25           THE COURT:  Very good.  Let's send the jury home.

594

BRITTANY BURKE - DIRECT EXAMINATION

1    Thank you.

2        With that, let me tell you what, I need to bring the jury

3    back because I need to tell them about -- bring them back in.

4    I want to warn them about the weekend, no media contact and so

5    forth.

6        (Jury present.)

7            THE COURT:  Again I want to thank everybody for their

8    incredible attention today and throughout the days of the

9    trial.  I just want to remind you a few things as we break for

10   the weekend.  You should have no discussions with anyone about

11   this case in any way.  You may well have people come up to

12   you, they've heard by word of mouth that you're on the jury,

13   you just simply say I can not talk about it.  You need to stay

14   away from newspapers, TV, all of that.  No social media.  And

15   we will resume at 9:30 on Monday morning.  Thank you very

16   much.  Have a great weekend.

17       (Jury excused.)

18           THE COURT:  Please be seated.  Any matters from the

19   Government I need to take up to this point?

20           MR. RICHARDSON:  Yes, Your Honor.  We have been

21   moving along quite well.

22           THE COURT:  Good.

23           MR. RICHARDSON:  I anticipate the Court can tell from

24   the process.  We expect that we will be finished with our

25   case, best information would be Wednesday.  It could well be

BRITTANY BURKE - DIRECT EXAMINATION

1    that that is Tuesday afternoon, it could well be that that is

2    Thursday morning, trying to provide the best information that

3    we can.  We understand that there's some uncertainty with

4    respect to the defense case and how long that might take.

5              THE COURT:  They have no obligation to make a

6    decision.

7              MR. RICHARDSON:  I'm not asking that question at all,

8    Your Honor, I understand that.  The question that I did have

9    for the Court is, were we to finish, and by finish I mean

10   completely finish on, say Thursday or Friday of next week,

11   would the Court anticipate breaking then for the holidays and

12   returning for the penalty phase, assuming we have one, on

13   January 2nd, or would the Court be inclined to try to do a day

14   or two the first part of the following week before then

15   breaking for the holidays?  The reason we ask, Your Honor,

16   obviously for our planning, but also we have victims --

17             THE COURT:  You know, you don't have to justify it,

18   this is a very fair question.  First of all, I believe it

19   would be January 3rd, not January 2nd.  Whatever.  And

20   secondly, that is my inclination.  I would like to hear what

21   the parties would recommend about that, but my inclination

22   would be that we would break.  I had, you know, I had

23   anticipated issues understandably with juries, I've had a lot

24   of dealings with juries around holidays, that if you don't

25   accommodate vacation, family vacations, you lose a tremendous

596

BRITTANY BURKE - DIRECT EXAMINATION

1    number of highly qualified jurors.  So I assured them, if

2    y'all remember, that we would break.  I didn't want people on

3    the road on Christmas Eve trying to race up to get to

4    Grandmama's house and be jeopardized.  So I had anticipated

5    breaking a few days earlier.  So then the question is, what is

6    really the idea about breaking, you know, what's the benefit

7    of starting and then stopping.  And it seems to me a more

8    coherent presentation for everyone would be to do it all at

9    one time.

10        You tell me what your preference is, and I want to hear

11   from Mr. Bruck.

12            MR. RICHARDSON:  We would ask the Court to do that,

13   in particular to allow the victims, many of which are spread

14   out all over the country, to spend some time with their

15   families and focus on what's important during the holiday

16   season.  And then I do believe that that would allow us to

17   present the case coherently after the new year.

18            THE COURT:  We'd also, I'll just remind you, I think

19   we had discussions about victims, Christmas with victims, and

20   being another factor we all --

21            MR. RICHARDSON:  Absolutely, Your Honor.

22            THE COURT:  Mr. Bruck, any thoughts?

23            MR. BRUCK:  We agree completely with the Government.

24            THE COURT:  Very good.  Okay.  So the answer is,

25   whenever we finish, and let's be very clear, this is important

BRITTANY BURKE - DIRECT EXAMINATION

1    work, we don't need to be rushed, we have plenty of time to do

2    it, we're going to do it right.

3        In addition, obviously we need to complete evidence, we

4    have to have a charge conference.  I'm working hard this

5    weekend on that.  There are not really that many differences

6    that are presented here, and I will sort through them.  I'm

7    working on the verdict form and so forth.  And I want to have

8    everyone's response.  The defense did not present a verdict

9    form, and I didn't -- at least I didn't see one, and I welcome

10   that, Mr. Bruck.  And if you look at the Government one and

11   that's sort of fine, that's okay, too, but if you have a

12   suggestion, I'll tell you one thing that I always do, I put

13   categories, so like I would say Hate Crimes Act counts one

14   through nine, and then when the Government had just said count

15   one, I would say in regard to the death of blank, so that

16   they -- I don't send back the indictment, so they need that

17   help.  They will have my charge, which we'll go through that.

18   But I will do that just to help.

19       I see the verdict form as almost like an outline for

20   deliberations for them.  So I define very clearly.  But I

21   would welcome, Mr. Bruck, any recommendations that the defense

22   has on the verdict form.  They want simplicity.  This is not

23   like an exam for the jurors.  I try to make it as clear and

24   simple to follow and so that there's not a lot of guesswork

25   there.  Their thinking is about the evidence and not about how

598

1    to fill the form out.  That's generally my view of these

2    things.  So if you would think, Mr. Bruck, if perhaps Monday

3    you could submit, if you have a proposal or you -- if you just

4    want to make recommendations regarding things you agree with

5    part of the Government's verdict form, but you think some part

6    of it, I would welcome any input you would have on that.

7                MR. BRUCK:  We'll have that by Monday.

8                THE COURT:  Everybody have a restful weekend.

9

10        (Court adjourned at 5:06 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>REPORTER'S CERTIFICATION</u>

I, Debra L. Potocki, RMR, RDR, CRR, Official Court Reporter for the United States District Court for the District of South Carolina, hereby certify that the foregoing is a true and correct transcript of the stenographically recorded above proceedings.

S/Debra L. Potocki
_____

Debra L. Potocki, RMR, RDR, CRR