```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF SOUTH CAROLINA
 2                      CHARLESTON DIVISION

 3   UNITED STATES OF AMERICA      :      VOLUME V
                                   :
 4           vs.                   :
                                   :
 5   DYLANN STORM ROOF             :      2:15 - CR - 472

 6

 7           Trial continues in the above matter on Tuesday,

 8   December 13, 2016, commencing at 9:44 a.m., before the

 9   Hon. Richard M. Gergel, in the United States Courthouse,

10   Courtroom VI, 85 Broad St., Charleston, South Carolina,

11   29401.

12   APPEARED ON BEHALF OF THE UNITED STATES:

13     JAY N. RICHARDSON, ESQ., 1441 Main St., Columbia, SC.

14     NATHAN WILLIAMS, ESQ., P.O. Box 978, Charleston, SC.

15     STEPHEN J. CURRAN, ESQ., 601 D Street, NW, Washington, DC.

16
     APPEARED ON BEHALF OF THE DEFENSE:
17
       DAVID I. BRUCK, ESQ., Washington & Lee School of Law,
18     Lexington, VA.

19     KIMBERLY C. STEVENS, ESQ., 1070-1 Tunnel Rd., Asheville, NC.

20     EMILY PAAVOLA, ESQ., 900 Elmwood Ave., Columbia, SC.

21

22

23         REPORTED BY DEBRA L. POTOCKI, RMR, RDR, CRR
         Official Court Reporter for the U.S. District Court
24                        P.O. Box 835
                      Charleston, SC  29402
25                       843/723-2208
```

1                      I N D E X

2  WITNESS:  ROBERTO BIANCO

3  Direct Examination by Mr. Williams....................... 836

4  WITNESS:  JD KRULL

5  Direct Examination by Mr. Williams....................... 851

6  WITNESS:  WILLIAM MATTHEWS

7  Direct Examination by Mr. Curran......................... 870

8  WITNESS:  DEBRA DAVIS

9  Direct Examination by Mr. Curran......................... 881

10 WITNESS:  JUSTIN BRITT

11 Direct Examination by Mr. Richardson..................... 894

12 WITNESS:  CHRISTINE POLIS

13 Direct Examination by Mr. Richardson..................... 903
   Cross-Examination by Ms. Paavola........................ 916
14
   WITNESS:  FARAND WASIAK
15
   Direct Examination by Mr. Richardson..................... 917
16 Cross-Examination by Mr. Bruck.......................... 942

17 WITNESS:  CHRISTOPHER GARRETT

18 Direct Examination by Mr. Richardson..................... 944

19 WITNESS:  BONITA NAVARRO

20 Direct Examination by Mr. Curran......................... 950

21 WITNESS:  JOEL ALARCON

22 Direct Examination by Mr. Curran......................... 959

23 WITNESS:  JOSEPH HAMSKI

24 Direct Examination by Mr. Williams...................... 967
   Cross-Examination by Mr. Bruck..........................1052
25 Redirect Examination by Mr. Williams....................1062
   Recross-Examination by Mr. Bruck........................1063

| | EXHIBITS: | Received in Evidence |
|---|---|---|
| 1 | | |
| 2 | Government Exhibits 361, 367, 368, | |
| | 385, 391, 413 | 865 |
| 3 | Government Exhibits 243-247 | 874 |
| | Government Exhibits 248-252 | 879 |
| 4 | Government Exhibit 425 | 885 |
| | Government Exhibit 426 | 886 |
| 5 | Government Exhibit 270 | 888 |
| | Government Exhibit 275 | 890 |
| 6 | Government Exhibits 260 and 261 | 901 |
| | Government Exhibits 259-270, 272-275, | |
| 7 | 277-280, 283-284 | 905 |
| | Government Exhibits 285 and 286 | 907 |
| 8 | Government Exhibit 289 | 914 |
| | Government Exhibit 291 | 915 |
| 9 | Government Exhibits 297-299 | 942 |
| | Government Exhibits 310-319, 322-328, 460 | 946 |
| 10 | Government Exhibit 421 | 952 |
| | Government Exhibit 422 | 954 |
| 11 | Government Exhibit 423 | 955 |
| | Government Exhibit 424 | 957 |
| 12 | Government Exhibit 461-465 | 987 |
| | Government Exhibit 7 | 989 |
| 13 | Government Exhibits 427, 432, 438, 439, 440 | |
| | 445, 447, 448, 449 | 1006 |
| 14 | Government Exhibits 362-366, 369-379, | |
| | 381-384, 386-390, 392-412, 414-416 | 1013 |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

 1          (Jury not present.)

 2               THE COURT:  Yes, sir, Mr. Bruck?

 3               MR. BRUCK:  A couple of small matters, Your Honor.

 4     Government's 254 that was offered by Mr. --

 5               THE COURT:  Whoa; you're ahead of me.  Give me just a

 6     second.  Government --

 7               MR. BRUCK:  254 is a Defense Exhibit that was offered

 8     by Miss Paavola during the testimony of Agent Mears.  We

 9     thought it was in, but Miss Ravenel alerted us this morning to

10     a question as to whether it is or not.  If it's not, it should

11     be.  And we --

12               THE COURT:  That will not be -- does the -- to

13     clarify, does the Government object to the exhibit?

14               MR. WILLIAMS:  No, Your Honor.

15               THE COURT:  Is it a Government Exhibit 254.

16               MR. BRUCK:  It's labeled a government's exhibit

17     because --

18               THE COURT:  I understand that.  Mr. Williams, is

19     there an objection to Government 254 being admitted?

20               MR. WILLIAMS:  No, Your Honor.

21               THE COURT:  Very good.  It is admitted.

22               MR. BRUCK:  Thank you.  The second matter, simply to

23     alert the Court, the Government's estimate, of course, was

24     their case would take seven to nine days.  It looks like it

25     may take five.

1          THE COURT:  I was a little skeptical of that.  Those

2     who try cases in front of me, my propensity to say call your

3     next witness.  I never thought it was seven to nine days

4     anyway, Mr. Bruck.

5          MR. BRUCK:  We have subpoenaed our witnesses for

6     Thursday.  We expect that we will have some, but perhaps not

7     every single one of them here tomorrow.  The -- all of the

8     witnesses we are calling are subject to the ruling that the

9     Court issued in docket number 793, and, however, it may appear

10    we do read the Court's rulings, we do listen to the Court's

11    rulings.

12         THE COURT:  You don't have to agree with me, there's

13    no crime not agreeing with the Court, you just have to abide

14    by them, right?

15         MR. BRUCK:  I appreciate that.  I simply wanted the

16    Court to be aware that to the extent that we are able to

17    introduce witness testimony, we have several witnesses, and

18    they are -- they will not all be here, it will -- we're having

19    great difficulty getting them all here on Wednesday.

20         THE COURT:  First of all, I think we need to address,

21    and I know you filed because it was prospective testimony

22    under seal; and, Mr. Richardson, I do think the Government

23    needs to at least advise the Court whether there are any --

24    which, if -- which of these witnesses identified among the

25    defense witnesses, the Government does not object to.  You

1    know, if there's not an objection, that's one issue.  I need

2    to know that.  Have you had a chance to look at the filing?

3            MR. RICHARDSON:  We got it at 9:00 o'clock; I have

4    had 40 minutes to focus on it.

5            THE COURT:  I was reading it myself.

6            MR. RICHARDSON:  We do object to the witnesses that

7    are listed.

8            THE COURT:  I anticipated that.

9            MR. RICHARDSON:  I think there are sort of three

10   different things, and I think it's worth just flagging those

11   to the Court.  I think the first is the Court's ruling in 793,

12   and I don't need to explain that to the Court.  Section 17 and

13   Worrell and the limitations on the introduction of this type

14   of evidence in the guilt phase, we think that's the first

15   hurdle, and we don't think they get over that hurdle.  And

16   you've gone --

17           THE COURT:  U.S. versus Worrell has this very narrow

18   exception about whether the evidence negates an element of the

19   crime, or is it merely justification for the crime.

20   Justification inadmissible, negate admissible, right?

21           MR. RICHARDSON:  Correct.  And I don't believe any of

22   the evidence that they've cited or the testimony that they

23   have pointed to negates an element of the offense, nor would

24   it make sense to, because Mr. Bruck stood up in opening and

25   said he's the guy, he did it.  And so we think in that context

1    we don't think that there's a realistic and straightforward

2    claim that they are offering it for that purpose.  But we

3    don't --

4              THE COURT:  But to the extent it fell with -- I mean,

5    the same way defense complains because some of the elements of

6    the crime may be also relevant to sentencing, if it's relevant

7    to the guilt phase, it comes in.  Even though they may have

8    other purposes as well, as long as it's relevant.  But the

9    question is, does any of this proposed evidence, you know,

10   negate an element of -- and to the extent that it does, which

11   element exactly, which element does it.

12             MR. RICHARDSON:  I think that's exactly right.  I'm a

13   little hesitant to talk about it, given it's filed under seal,

14   but the first witness, for example, right, who had a handful

15   of interactions in a business setting of unknown -- I mean,

16   there's no real suggestion, I can not articulate a possible

17   rational --

18             THE COURT:  Let me tell you one area which kind of

19   got my attention was that there was -- and I don't know if

20   this is, again, I keep saying to you guys I have no idea

21   what's coming, right?  You guys have your case.

22             MR. RICHARDSON:  Nor do we apparently, Your Honor.

23             THE COURT:  That's okay, they're doing their job.

24   There was a discussion about an encounter between the

25   defendant and a local psychologist.  And I haven't heard about

1    that in the case.  It seems to me that if the Government wants

2    to get into that, there's a res gestae problem about

3    completeness, a rule of completeness, and they -- if the

4    Government raises it, then you have to decide whether you want

5    to raise it.  Then there may be a -- just for the rule of

6    completeness to get the whole story out.  Now, that is an area

7    that doesn't go to necessarily -- it may overlap with mental

8    health, but it's the Government opening the door on that.  So

9    I don't know if you're planning to do anything about that,

10   mentioning that person.  I want you to know that when I read

11   that, I kind of said, you know, if the Government opens that

12   door, I think the defense has a right to offer the whole

13   story.

14            MR. RICHARDSON:  I think that's right, Your Honor,

15   but we are not intending to offer that.  We are not going into

16   that.  We don't think it's appropriate to, and I think it's

17   worth adding here in that particular --

18            THE COURT:  But you see where I'm going with that.

19            MR. RICHARDSON:  I understand that precisely, Your

20   Honor.  But I think it's worth adding here, and this is a good

21   example of that, if the Government attempted to offer that

22   evidence, including the defendant's alleged statements to that

23   individual, it would be offering those statements as

24   admissions of a party opponent, and they're admissible in that

25   regard.  If the defense attempts to --

1          THE COURT:  It doesn't fall within that exception.

2          MR. RICHARDSON:  It's self-serving hearsay that's not

3     admissible.

4          THE COURT:  There's what bothered me about that, is

5     that you would be using some of the statements against the

6     defendant, and it just gets into this res gestae rule of

7     completeness, it's a little complicated, the whole history of

8     res gestae was an exception to hearsay, it's not the way it's

9     framed now, it just gets a little more complicated.  And I

10    just wanted to warn you that if you open that door, I've then

11    got to wrestle with what Agent Hamski or anybody else might

12    say, because I've got to deal with that issue, if that

13    happens.

14         MR. RICHARDSON:  We don't intend to mention that

15    individual, we don't intend to have any discussion about that

16    whole set of factual scenario, to the extent that they're

17    accurate, and I think there's some doubt about their full and

18    truthful accuracy.  But regardless, the Government's not

19    introducing that, we don't think it would be appropriate for

20    the defense to interject what alleged self-serving hearsay on

21    an issue that we think under Worrell and Section 17 wouldn't

22    be admissible anyway.  But we also think it's hearsay.

23         THE COURT:  Clearly the defendant could not offer it,

24    because it's self-serving hearsay.

25         MR. RICHARDSON:  Absolutely.  And that's throughout

1    the motion they filed this morning.  If you read the motion

2    with the idea that they are not permitted to introduce

3    self-serving hearsay, their entire motion is a recounting of

4    hearsay effectively.  And so we think that's a second hurdle.

5    We think the Court's order, 793, is the first hurdle; second

6    hurdle is it has to be admissible, it has to be nonhearsay.

7    And so --

8              THE COURT:  And otherwise admissible.

9              MR. RICHARDSON:  And otherwise admissible.  But, for

10   example, with Special Agent Hamski, they can not walk around

11   and talk about various witnesses who may or may not have said

12   various things at different points.  All that's inadmissible

13   hearsay and they can't, in essence, back door that.

14             THE COURT:  They can't raise it with him if it's not

15   been put in on direct.

16             MR. RICHARDSON:  Exactly.  Rule of completeness, if

17   part of the statement has been put in, we can have a

18   discussion of whether it is fair and necessary under 106 to

19   include that, but they can't interject those issues without.

20   So those are two of the hurdles.

21        There's a third hurdle, and we think it's important to

22   point this one out as well, and that's Rule 403, Your Honor.

23   And a number of the cases addressing Rule 17 and the

24   principles in Worrell, also address and indicate strongly that

25   Rule 403 ought to also apply.  In particular, we're talking

1    about U.S. versus Bumagin, which is 136 F.Supp. 3d 361 at 373.

2    This is a 2015 case out of EDNY, and there are a number of

3    others that are of similar type.  And what they do is they go

4    through exactly the analysis the Court went through in 793,

5    Section 17, the Worrell analysis, maybe there's this really

6    narrow thread.  And what they say is after the Court does

7    that, even if there's some arguable line that they have

8    managed to walk, the Court has to look at that under 403, and

9    that type of evidence and type of information --

10            THE COURT:  You're talking about confusion.

11            MR. RICHARDSON:  -- is particularly likely to

12   mislead.  And I think in this case, Your Honor, I think in

13   particular, where the defense has stood up in opening and

14   effectively conceded guilt, then I think we talk about the

15   probative value, if any, and we don't think there is any, but

16   to the extent there even was some, that that probative value

17   is miniscule, and substantially outweighed by the risk of

18   confusing the issues here, which are guilt --

19            THE COURT:  You know, all I can say is that

20   everything is in the abstract.  And one of the things, you

21   notice 793 said that the defense was welcome to offer to the

22   Court, and this is what I took its filing today to be, a

23   response to my invitation to give me the specifics.  And then

24   we can rule on them.  Because I can't deal with the abstract.

25   I've got -- I'm just like, what is the statement?  Now, there

1    was a statement here about the defendant Googling black on

2    white crime.  I mean, y'all talked about that, I think they

3    can get into that.  That's fair enough.  Okay?  I didn't --

4    you know, I think that y'all opened that door, and that's

5    fine.

6        But the problem is, is that a lot of these statements are

7    sentencing statements, right?  They're relevant to sentencing,

8    we all know the scenario here and what is going on.  And, you

9    know, I just regard the defense is doing its best to try to

10   push this as far as it goes, and my job is to rule.  And I

11   know the Government's position, I know the defense position,

12   and I will rule as necessary.

13            MR. BRUCK:  I don't want to belabor this, but there

14   is one final consideration, which is that in light of what we

15   are trying to present, I think the Court should exercise its

16   discretion about the admission of a summary witness at all.

17   Because if it turns out that the summary is taken as a whole,

18   a misleading and one-sided summary of the Government's

19   investigation, and it just so happens that everything that

20   points in one direction, for one reason or another, can not

21   come in at this stage of the trial, and everything that leads

22   in the other direction, that is to say, to validate the

23   Government's opening statement that this was a carefully, well

24   organized, thoughtful, shrewdly executed crime by a person in

25   full control of his faculties, all of that can come in through

834

1    a summary witness, that just isn't right.

2        And so at a minimum, if we can not, for whatever reason,

3    balance the scales through cross-examination of Agent Hamski,

4    then Agent Hamski ought not to summarize and marshal the

5    evidence at all.  Let the jury sort this out.

6        THE COURT:  First of all, cross-examination, you have

7    every constitutional right to cross-examine the witness.  But

8    what you're not allowed to do is to go into areas which are

9    legally impermissible.  So no one is stopping

10   cross-examination.  If you think that -- and summary witnesses

11   are done all the time and that's clearly recognized, it's a

12   proper -- a proper testimony.  To the extent there's something

13   that is objectionable, make an objection.  But there's nothing

14   wrong with a summary witness.

15       See, the problem here is that there are elements of the

16   crime, premeditation, most notably malice, that also bear some

17   resemblance in the sentencing phase.  But the Government has

18   the burden of proving it in the guilt phase.  So yes, you feel

19   like, oh, they're putting up these things that are relevant

20   for sentencing.  Actually, it's the nature of the guilt phase,

21   you've got to put up evidence, and you can't -- Section 17

22   makes very clear the limits on mental health evidence, Worrell

23   refines that, helps give us some further guidance.

24       And, you know, some of that is just not appropriate in the

25   guilt phase.  You can't justify the commission of a crime by

1    mental health testimony that doesn't negate an offense.  But

2    I'm going persist in making it specific and to address these

3    issues.  I'm trying to have as fair a trial as I can possibly

4    have here, but there are rules of law that we have to follow.

5        So with that -- so I take it from the Government, you

6    object to all the defense witnesses listed?

7            MR. RICHARDSON:  We do, Your Honor.  And

8    substantially, we object to the nine areas -- I'm trying to

9    read it on the phone, so -- We object to the nine areas that

10   they suggest for cross-examination of the agent, you know, one

11   after another, what they're asking for is hearsay.  They're

12   not things for which there's been evidence introduced, from

13   which he could draw conclusions, or from which he has

14   firsthand information.

15           THE COURT:  Let me just say, other than number two in

16   that, I think it's all justification evidence that does not

17   negate an offense.

18           MR. RICHARDSON:  Thank you, Your Honor.

19           THE COURT:  Okay.  Let's bring in the jury.

20       (Jury present.)

21           THE COURT:  Government, call your next witness.

22           MR. WILLIAMS:  Government calls Bob Bianco.

23           THE CLERK:  State your full name for the record.

24   A.   Robert Dean Bianco.

25           ROBERT BIANCO, a witness called by the Government, first

836

ROBERT BIANCO - DIRECT EXAMINATION

1  having been duly sworn, testified as follows:

2                         DIRECT EXAMINATION

3  BY MR. WILLIAMS:

4  Q.  Morning.

5  A.  Good morning, sir.

6  Q.  Would you repeat your name for the jury.

7  A.  Robert Bianco.

8  Q.  Where do you work?

9  A.  For the FBI, Federal Bureau of Investigation.

10  Q.  What do you do for the FBI?

11  A.  I'm a special agent.  One of my roles, and as a collateral

12  duty, I'm a forensic examiner.

13  Q.  What is a forensic examiner?

14  A.  Forensic examiner is an individual that's been trained and

15  provided tools and equipment to extract, preserve and display

16  for agents, task force officers, police officers that have

17  investigations that we provide those assistance aspects to

18  them to look at digital evidence as it comes through their

19  investigation.

20  Q.  What is digital evidence?

21  A.  Digital evidence can take many forms.  It could be

22  something from a computer, a desktop, a laptop, it could be

23  documents, could be pictures, could be graphics, it could be

24  from a thumb drive, it could be from a camera, could be from a

25  phone.  There's a lot of different items that contain digital

ROBERT BIANCO - DIRECT EXAMINATION

1  evidence.

2  Q.  How long have you worked with the FBI?

3  A.  Twenty years and three months.

4  Q.  Did you have any law enforcement experience prior to going

5  to the FBI?

6  A.  Yes, sir.

7  Q.  What was that?

8  A.  I had 11 years worth of local police department, I was a

9  patrol officer, I was a detective, and I was a sergeant of the

10  detectives.

11  Q.  Where was that?

12  A.  In Oldham County, Kentucky.

13  Q.  And when you started with the FBI, you said you're a

14  special agent, did you have other responsibilities apart from

15  computer analysis or computer forensics?

16  A.  Yes, sir.

17  Q.  What did you do before you started working in the computer

18  lab?

19  A.  My first field office I was assigned to was the Miami

20  field office, Miami, Florida.  And there, I was assigned first

21  to a foreign counterintelligence squad and a cybersquad.  I

22  worked dual cases and assisted senior agents during my

23  probationary period of working the counterintelligence cases,

24  and then also getting some cybertraining and investigations

25  there.

ROBERT BIANCO – DIRECT EXAMINATION

1    Q.   What did you transition over to working on, on computer

2    forensics or being a forensic examiner?

3    A.   In 1999 the field division was trying to expand its

4    computer forensic unit, and they came to some of the

5    cyberagents and looked at our training, looked at our

6    proficiency, and also did an interview with us to see if we

7    were interested in moving over to a full-time role of not

8    working cases, but becoming a full-time forensic examiner.

9    And I chose to step over to be a forensic examiner at that

10   time.

11   Q.   That was in 1999?

12   A.   Yes, sir.

13   Q.   Do you have any specific training that qualifies you to be

14   a forensic examiner?

15   A.   Yes, sir.

16   Q.   What is it?

17   A.   The FBI puts you through a series of training courses that

18   are outside vendor created, like the National White Collar

19   Crime Center.  We've done some basic and advanced forensic

20   training.  We've also done some access data, N Case, these are

21   third-party vendors, we would have them come in and teach us

22   how to utilize their tools.  We have training in the Windows

23   format, we also can have Windows -- or training in Macintosh,

24   in cell phones, and they put us through a proficiency every

25   time.  So when we take a class, one, two, three weeks' worth

839

ROBERT BIANCO – DIRECT EXAMINATION

1    of training, my first two weeks were in San Diego, kind of a

2    boot camp style course where they showed us our tools, showed

3    us the equipment and the computers, brought us to have a lot

4    hands-on experience, and utilize those tools in removing hard

5    drives, understanding components within a computer system, and

6    then processing that digital material that's found on those

7    hard drives for the case agents to look at.

8    Q.  Have you testified as an expert before?

9    A.  Yes, sir.

10   Q.  In what areas?

11   A.  Areas of forensics, digital forensics.

12   Q.  Specifically digital forensics or computer forensics?

13   A.  Yes, sir.

14   Q.  About how many times have you testified as an expert, if

15   you had to estimate?

16   A.  I think this is my fifth time; four additional times.

17   Previous times.

18        MR. WILLIAMS:  Your Honor, I'll move to qualify Mr.

19   Bianco as an -- Agent Bianco as an expert in computer

20   forensics or forensic examinations of digital evidence.

21        THE COURT:  Any objection from the defense?

22        MS. PAAVOLA:  No objection.

23        THE COURT:  Very good.  The witness is recognized as

24   an expert in computer forensics.

25   BY MR. WILLIAMS:

840

ROBERT BIANCO - DIRECT EXAMINATION

1    Q.  Agent Bianco, I want to ask you about the operation you

2    have in Columbia.  Do you have a certain unit that processes

3    digital evidence?

4    A.  Yes, sir.

5    Q.  What is that unit called?

6    A.  The acronym is CART, C-A-R-T, computer analysis and

7    response team.

8    Q.  And who works in that department?

9    A.  We have, at the time, three people, myself as a full-time

10   special agent forensic examiner, there's another full-time

11   forensic examiner here in the Charleston office, and we have a

12   professional support forensic examiner, Amanda Simmons, that

13   was with me in the Columbia division.

14   Q.  So as of -- before she went to SCANA, you worked with

15   Miss Simmons in the CART department, or analyzing computers?

16   A.  Yes, sir.

17   Q.  Did you work along with her on this case or did she work

18   along with you?

19   A.  Yes, sir.

20   Q.  If you could, explain to the jury what your role was in

21   the case or how you got involved in the case.

22   A.  I began my role with the investigation from a phone call

23   from Amanda Simmons, when she was notified and asked to

24   respond to a residence and asked to do a forensic exam on a

25   computer.  She notified me, I believe this was a Saturday or

841

ROBERT BIANCO - DIRECT EXAMINATION

1    Sunday, I don't think -- I believe that's the time frame --
2    and as she responded to handle this -- I also work as the
3    coordinator for the CART program.  So I assigned some of the
4    cases or the leads that would come in from different agencies
5    or from different officers or special agents, I'll just go
6    ahead and assign either to myself, to the agent in Charleston,
7    or to Miss Simmons, that work to handle it.  So I went into
8    the office to do a paperwork, get the administrative paperwork
9    started, while she went on the road to the residence to start
10   her forensic exam.

11        And that's how we started our involvement basically with
12   this case.

13   Q.  I believe there were about 31 or 32 items, 31 items
14   processed in this case, is that right?

15   A.  Yes, sir.

16   Q.  Did you handle some of those items?

17   A.  I did, yes, sir.

18   Q.  Who handled the bulk of the items for processing?

19   A.  I gave Amanda Simmons the bulk of the amount of items to
20   process.

21   Q.  But you handled about four of them, three and a half?

22   A.  Yes, sir, I had other cases that I already was working on
23   that I had on my bench or my lab table, and felt that it would
24   be a -- it would be too overwhelming to have too many things
25   going at one time.  So I assigned them to her, and she was

842

ROBERT BIANCO – DIRECT EXAMINATION

1    just finishing one of her other cases and had the flexibility

2    to assume -- starting these other items.

3    Q.  I want to ask you briefly about how an item is processed.

4    Can you explain to the jury how a digital item is processed in

5    the cart lab?

6    A.  It varies on the item.  But we all have a set of standards

7    that we follow.  If it's a computer, desktop or computer

8    laptop, that's one way of standards that we utilize, we'll go

9    in and remove the cover, take the screws off, remove the hard

10   drive.  And then we will then attach that source hard drive to

11   devices that protect it from being written to or altered, and

12   we'll make copy of that.  In fact, we make two copies of that.

13       We'll take those copies and we'll process those copies

14   through a third-party software, for example, Access Data or

15   N Case.  Those applications run through and create the Word

16   documents, the spread sheets, the pictures, the items for the

17   case agents to review and see what was on that piece of

18   digital medium.

19   Q.  And that copy, is that commonly referred to as an image?

20   A.  Yes, sir, considered an image.

21   Q.  And you just talked about the case agents.  What is the

22   sort of role of the case agent relative to your processing of

23   evidence?

24   A.  They begin the initial communication with me in our unit.

25   They will send me a service request, either asking for

ROBERT BIANCO - DIRECT EXAMINATION

1    assistance in a search, if we're going out to a location and

2    they need forensic support, or if they have already seized the

3    device and have the desktop, for example, in their possession,

4    or in evidence control, they have it in their chain of custody

5    and they need it examined.

6        The case agent will then submit a service request to our

7    program through an e-mail.  And then I'll look at the device

8    or the devices that he or she has submitted and assign them to

9    one of the examiners.  And then I'll make a communication back

10   to them to make sure there's legal precedence that we have

11   some type of consent form or search warrant.  And that we have

12   the means that they want us to start looking for some

13   processing to be done.  For them to review the evidence.

14   Q.  So once the item is sort of processed, do they have any

15   input on reviewing the information on the device and asking

16   you to either look for it or, more importantly, provide them

17   reports that will reflect what's on the device?

18   A.  Yes, that's correct, they do.

19   Q.  And is that interactive?

20   A.  It is.

21   Q.  And so you would -- who is the case agent you interacted

22   with on this case?

23   A.  Agent Joe Hamski.

24   Q.  So what I want to ask you about now is the items you

25   actually looked at, I believe it was four, maybe actually

844

ROBERT BIANCO - DIRECT EXAMINATION

1   three and a half items, is that fair to say?

2   A.  Yes, sir.

3   Q.  If you could tell the jury, first of all, about what I'm

4   going to call QCO2-1.  Are you familiar with that item?

5   A.  Yes, sir.

6   Q.  Can you just tell the jury briefly what it was?

7   A.  The item was a micro SD card that was extracted from a

8   tablet.  QCO2 was the tablet, and then 2_1 was something that

9   was found inside the tablet, which was a micro SD card.

10  Q.  And so I believe Miss Simmons looked at the tablet, but

11  you would have taken the SD card and looked at that

12  separately?

13  A.  I did, yes, sir.

14  Q.  And that information would have been provided to Special

15  Agent Hamski for his review relevant to this case?

16  A.  Yes, sir.

17  Q.  I want to ask you about QCO3; was that an item that you

18  processed?

19  A.  Yes, sir.

20  Q.  Do you know what that item was?

21  A.  Yes, sir, it was a cell phone.

22  Q.  I'm going to hand you Government's proposed exhibit 348.

23  Do you recognize that?

24  A.  Yes, sir, I do.

25  Q.  Is that the image, so to speak, that you had made of the

ROBERT BIANCO - DIRECT EXAMINATION

1    cell phone?

2    A.  Yes, sir, these are the reports of the processing of the

3    cell phone.

4    Q.  Hand that back to me.  And so essentially Agent Hamski

5    could have taken those reports and located relevant evidence

6    on those reports?

7    A.  Yes, sir.

8            MR. WILLIAMS:  Your Honor, I'm not going to move for

9    the admission for this, I just wanted to get the foundation

10   for a later witness.

11           THE COURT:  Okay.

12   BY MR. WILLIAMS:

13   Q.  So you looked at an SD card, a cell phone.  I want to ask

14   you about the next item you reviewed, that was a QCO7; do you

15   recall that item?

16   A.  Yes, sir.

17   Q.  What was that item?

18   A.  A Garmin GPS.

19   Q.  How do you go about processing a GPS?

20   A.  We have, again, a set of standards from the training that

21   we have been provided to follow.  It's almost a checklist in

22   some sense of simpleness.  We put the GPS inside Faraday bags.

23   These are mesh type of bags that will stop any transmission of

24   signals coming to the device or leaving the device.  We

25   connect the GPS to a computer system within our lab that has

ROBERT BIANCO - DIRECT EXAMINATION

1  software that will process the Garmin device.

2  Q.  Did you have specialized training in processing GPS

3  devices?

4  A.  Yes, sir, I did.

5  Q.  I'm going to show you Government's proposed exhibit 360.

6  Take a look at that.  Do you recognize those items?

7  A.  Yes, sir, they're mine.

8  Q.  What are they?

9  A.  They are DVD disks.

10  Q.  What's contained on those disks?

11  A.  The report of the Garmin examination.

12  Q.  Is that the report you made?

13  A.  Yes, sir.

14  Q.  You took that from the device that was provided to you in

15  this case?

16  A.  Yes, sir.

17          MR. WILLIAMS:  I show this to defense counsel.

18          MS. PAAVOLA:  Your Honor, may we approach?

19          THE COURT:  You may.

20     (Following discussion held at side bar.)

21          THE COURT:  Yes, ma'am.  Good morning.

22          MS. PAAVOLA:  Good morning, Your Honor.  This is the

23  entire digital file for the GPS device.  The GPS did not

24  belong to the defendant; he did use it sometimes.  They want

25  to put this in as a foundation for some maps they'll be

847

ROBERT BIANCO - DIRECT EXAMINATION

1    introducing later.  We're not going to be objecting to those,

2    to the foundation for those maps, but we just don't see a

3    reason to put in the entire --

4            THE COURT:  Mr. Williams, if they don't -- I mean,

5    the reason you would offer it is only to lay the foundation.

6    If they will stipulate the admission of it, we don't really

7    need that, do we?

8            MR. WILLIAMS:  I guess what I can do, Your Honor, is

9    if it becomes an issue, move to admit it later.

10           THE COURT:  You could.

11           MR. WILLIAMS:  I'm a little concerned.  We have an

12   expert coming up, and there's a lot of maps, so --

13           MR. RICHARDSON:  There's also going to be a second

14   phase of the trial in which Miss Paavola may or may not be in

15   a position to stipulate to various things, and so I think Your

16   Honor's position where we need evidence to be introduced so

17   that it can be --

18           THE COURT:  But you could offer it in sentencing, and

19   I can rule on it then.

20           MR. RICHARDSON:  Based on this testimony?

21           THE COURT:  Yes.

22           MR. RICHARDSON:  That's fine.  That's part of the

23   concern we have is we understand and certainly respect their

24   agreement on a variety of things; unfortunately, we may or may

25   not be in a position to continue those agreements throughout

ROBERT BIANCO - DIRECT EXAMINATION

1    the proceeding.

2              THE COURT:  Is the separate one which -- the maps,

3    are -- do they include all the maps used in both phases?

4              MR. WILLIAMS:  Yes.

5              THE COURT:  Then you will stipulate to the

6    authenticity of that?

7              MS. PAAVOLA:  Yes, our only concern is that the GPS

8    data does contain trips that we --

9              THE COURT:  I get that.  So as long as we -- I don't

10   mind keeping this out, as long as we have a stipulation on the

11   record.

12             MS. PAAVOLA:  Yes.

13             THE COURT:  That the excerpt is -- relates to the

14   defendant and is admissible.  Is that correct?

15             MS. PAAVOLA:  Yes, the maps.

16             MR. WILLIAMS:  You filed pretrial objections to that.

17   Do y'all recall filing objections to that stuff pretrial?

18             MS. PAAVOLA:  To the maps?

19             MR. WILLIAMS:  Yes, expert notices.  I want to make

20   sure they understand that's waiving those earlier objections.

21   But that's fine.

22             MS. PAAVOLA:  We did object to some maps, about --

23   the AME, and we understood you to withdraw --

24             MR. WILLIAMS:  I want to make sure that's --

25             THE COURT:  Okay.

ROBERT BIANCO - DIRECT EXAMINATION

1        MR. WILLIAMS:  As a foundation, we move to admit

2   later.

3        THE COURT:  Yes.

4      (Side bar discussion concluded.)

5        MR. WILLIAMS:  Your Honor, consistent with the side

6   bar and consistent with the earlier exhibit in 348, we will

7   just keep this as a foundation, not move to admit it at this

8   time.

9        THE COURT:  But we understand, and the stipulation is

10  that the excerpt from that information is authentic and valid.

11  Is that correct, Mr. Bruck or Miss Paavola?

12       MS. PAAVOLA:  Yes, Your Honor.

13       THE COURT:  Very good.  Please proceed.

14       MR. WILLIAMS:  Thank you, Your Honor.

15  BY MR. WILLIAMS:

16  Q.  Agent Bianco, I want to ask you about the type of data

17  that is extracted from a GPS device.  Can you explain to the

18  jury what type of files come off of a GPS?

19  A.  Yes, sir, we -- the information can be a GPS file, which

20  is a piece of data that can show track points and way points

21  of where that GPS was as it traveled down the road, for

22  example, if it was in a vehicle.  It can also show points of

23  interest.  If somebody wanted to go from point A to a bank,

24  and you know the address, you would put that in, a street, an

25  address, and it would show a route to go to that location.

850

ROBERT BIANCO – DIRECT EXAMINATION

1  Q.  So you get a file that has information about location, is

2  it like longitude, latitude?

3  A.  Yes, sir.

4  Q.  What is the ability for you, or for that matter, anybody

5  else to plot those points on a map, a Google map or some other

6  type of Google Earth software?

7  A.  The results from that extraction is then taken to –– taken

8  to Google Maps or City Navigator software.  And that extracted

9  information is just put into Google Maps, and it plots those

10  points for the user to look at, and shows by dots, where that

11  GPS was.  And where it was located.

12  Q.  And in your experience, and specifically in this case, is

13  that a pretty user-friendly process that doesn't require a

14  whole lot of expertise, if any?

15  A.  I believe so, easy to use.

16  Q.  Did you work with Agent Hamski in plotting those GPX files

17  on maps and creating maps with him?

18  A.  I worked very briefly with –– Agent Hamski is a very

19  capable and very intelligent special agent.  It was very very

20  easy for him to take this information and just drop it right

21  on the software, and it plotted itself for him.

22  Q.  I want to ask you about the final item you've reviewed, I

23  believe that was QCO31?

24  A.  Yes, sir.

25  Q.  That was a Dell computer?

851

ROBERT BIANCO – DIRECT EXAMINATION

1    A.   It was, yes, sir.

2    Q.   And similar to the other items, you would have provided

3    the image to the case agent, and he would have been able to

4    contact you if he needed further information or reports from

5    that device?

6    A.   Yes, sir, the examination results were provided.

7              MR. WILLIAMS:   Thank you, no further questions.

8              THE COURT:   Cross-examination.

9              MS. PAAVOLA:   No questions, Your Honor.

10             THE COURT:   Special agent, you may step down.

11        Call your next witness.

12             MR. WILLIAMS:   Thank you, Your Honor, the Government

13   calls JD Krull.

14             THE CLERK:   State your full name for the record,

15   please.

16   A.   JD Krull.

17        JD KRULL, a witness called by the Government, first having

18   been duly sworn, testified as follows:

19                        DIRECT EXAMINATION

20   BY MR. WILLIAMS:

21   Q.   Morning.

22   A.   Good morning.

23   Q.   Can you give the jury your name.

24   A.   JD Krull.

25   Q.   Where do you work?

852

JD KRULL - DIRECT EXAMINATION

1    A.   Garmin.

2    Q.   What do you do at Garmin?

3    A.   I am currently the director of software excellence for the

4    consumer engineering group.

5    Q.   How long have you worked at Garmin?

6    A.   Just over 27 years.

7    Q.   Can you tell the jury how you got your start at Garmin, or

8    for that matter, what the status of Garmin was when you

9    started there?

10   A.   I was the young software engineer, and I had been working

11   for Dr. Min Kao.  Min, as the M-I-N in Garmin.  He worked for

12   Gary Burrell, the G-A-R in Garmin, at little place called King

13   Radio.  And when they left King, I paid close attention.  And

14   when they advertised for engineering help, I signed up.

15   Q.   What year was it that you started there?

16   A.   It was October of 1989.

17   Q.   What was the status of GPS technology at that time, or GPS

18   devices?

19   A.   It was very much in its infancy.  Sadly, the original

20   space shuttle accident took out two GPS satellites back in the

21   mid 80s, and that shut down the program until they developed a

22   replacement launch vehicle.  So GPS was kind of put on hold.

23   So when Garmin was starting, is when GPS was starting to be

24   replenished, well, populated really for the initial

25   operational state.  So Garmin product came on the market right

853

JD KRULL – DIRECT EXAMINATION

1    before the GPS system was declared operational.

2    Q.  And if you could, explain what the GPS system is.

3    A.  So GPS stands for the global positioning system.  It is a

4    constellation of satellites that are orbiting the earth in

5    four orbital planes.  So actually six orbital planes, four per

6    plane.  So you can get 24 satellites to have a full

7    constellation.  They are half the distance of a communication

8    satellite, or say, satellite TV, a satellite that stays at a

9    constant position above the earth.  So that literally rotates

10   the earth in one revolution, one day.  These are half that

11   distance, so they have to go twice as fast to stay in orbit.

12   So they go around twice a day.  So they're moving fairly fast,

13   relative to anyone on the earth.  A global system is

14   beneficial in that it will work anywhere in the world 24/7.

15   Q.  Is that a system that was created by Garmin or by private

16   industry, or did it sort of pre-exist Garmin?

17   A.  No, global positioning system was developed by the U.S.

18   military.  So all of our tax dollars contribute to the

19   creation and the maintenance of the GPS system.  But it is

20   available for all to use.

21   Q.  So while you are, at least early on, at Garmin, working

22   to, I guess, create consumer or other products, how did you

23   tie in to that GPS or that satellite network in order to

24   create devices such as GPSs?

25   A.  So the way GPS works is published, it's freely available

JD KRULL – DIRECT EXAMINATION

1    to develop receivers.  So our product simply receives the

2    signals that are transmitted by the GPS satellites.  And

3    everything that a receiver needs to know in order to determine

4    location, and actually it's more than just location, it's

5    position, velocity and time of day, very precisely, it's all

6    broadcast from the satellites themselves.  So they transmit

7    not only a signal that you can measure to tell how long it

8    took that signal to travel from satellite to the receiver, but

9    they also transmit data over the carrier of that signal, such

10   that it's like a very very low-speed modem.  And you collect

11   all of the orbital parameters from the satellites into the

12   device.  So then the device uses those orbital parameters in

13   order to compute or triangulate your precise location, speed

14   and time of day.

15   Q.  So it sounds to me like the data or the information from a

16   satellite is publicly available, you just need a device that

17   can receive it or can interpret it?

18   A.  Yes, that's correct.

19   Q.  Sort of like a TV signal that's available, you just get a

20   TV to receive it?

21   A.  That is a very good analogy.

22   Q.  So let me ask you about GPSs, and specifically the GPS in

23   this case, were you involved early on or later in the

24   development of GPS devices at Garmin?

25   A.  Yes, I was.

855

JD KRULL – DIRECT EXAMINATION

1  Q.  Tell the jury sort of what your role was without getting

2  too technical, if you can.

3  A.   In the very beginning I was one of a team of three

4  software engineers that developed our very first product, the

5  GPS 100.  My role was user interface and satellite data

6  management.  One of the other individual's role was

7  controlling all of the hardware interaction, reading buttons

8  and making the display light up.  And the third was

9  responsible for all of the navigation software.

10     Min was a systems engineer at the time, his role, so he

11  designed a few of the overall systems.  He had prior

12  experience in the GPS system.  And so he passed out some

13  implementation duties to each of the three of us.  So the four

14  of us all together made up the entire software team.  And so

15  that was it.  Other than using a floating point library that

16  was off the shelf, we created the entire software package

17  between the four of us.

18  Q.  So you were involved in the initial creation of GPS

19  devices at Garmin?

20  A.  Yes.

21  Q.  And you have been there working in similar capacities for

22  over 20 years?

23  A.  Yes.

24  Q.  Have you testified as an expert in this area before?

25  A.  Yes, I have.

JD KRULL - DIRECT EXAMINATION

1  Q.  And that's in the area of GPS technology and application?

2  A.  Yes.

3          MR. WILLIAMS:  Your Honor, I move to qualify

4  Mr. Krull as an expert in the area of GPS technology and

5  application.

6          THE COURT:  Any objection?

7          MS. PAAVOLA:  No objection.

8          THE COURT:  The witness is recognized as an expert in

9  GPS technology and applications.

10 BY MR. WILLIAMS:

11 Q.  So, Mr. Krull, I think you gave some testimony already

12 about sort of how the GPS network operates.  Can you tell the

13 jury how a GPS device operates?

14 A.  Yeah, so the GPS is the user segment of the overall GPS

15 system.  Right?  There's the space segment, which is

16 satellites, there's a control segment, which is a group of

17 ground stations around the world that monitor the signals from

18 the satellites, and even upload data that they determine to

19 the satellites, we broadcast to the users.  So the receiver

20 simply sits and listens to signals.  Now, the signals

21 themselves are relatively weak and very high frequency, so you

22 have to receive them in a direct line of sight.  If anything

23 comes between you and the satellites, could easily block the

24 signal.  High frequency is -- think of your microwave --

25 anything that you would not put in your microwave oven, metal

JD KRULL - DIRECT EXAMINATION

1    in particular, block or absorb the microwave energy.  So even

2    traveling down the road, if you drive next to a large box

3    trailer, that's sufficient to block a satellite that might be

4    coming from that direction.  So the signal wouldn't reach the

5    receiver.  But beyond that, there are satellites all around us

6    and above us.  So it only takes four to work, and there are

7    generally 12 or more visible at any one time.  So it's a very

8    efficient and very accurate system, such that the GPS receiver

9    can determine its location autonomously without any other

10   assistance to within three meters or ten feet, so think about

11   the -- the width of a lane of traffic.

12   Q.  I'm going to show you Government's Exhibit 417.  Do you

13   recognize this item?

14   A.  I do.  This is a Garmin Newbie.

15   Q.  Is that a model you're familiar with?

16   A.  Yes.

17   Q.  Particularly the functioning of it and sort of the

18   internal components?

19   A.  Yes, I am.

20   Q.  I want to ask you about this specific device.  You just

21   testified that the device would receive signals.  Would it

22   store that information inside the device?

23   A.  Yes.  This type of product will keep an electronic bread

24   crumb trail.  It is literally analogous to Hansel and Gretel.

25   As it travels, it knows where it's at, and it tries to be very

858

JD KRULL - DIRECT EXAMINATION

1  smart and efficient about dropping these bread crumbs such

2  that it doesn't waste memory.  But if you travel this line, it

3  drops to your points, if you turn a corner, it drops more.

4  But each one of these points is not only the location of where

5  the device is, but also the date and time to a one second

6  boundary, for when was the device at that location.  So you

7  can literally connect the dots between these points and tell

8  where you've traveled and when you were there.

9  Q.  What is the value, from a consumer, if not other

10  perspective, of maintaining that data inside the device?

11  A.  Tells a story.  It's where you were.  So from an invention

12  perspective, we likewise produce a desktop application called

13  Base Camp that you can use to load this bread crumb trail that

14  we refer to as a track log, into an application and view it on

15  a big screen of your computer with a background map, and you

16  can see where you traveled and when you were there.  And so

17  it's a way to go relive your experience, much like you would

18  look through a photo album and relive pictures associated with

19  a trip.

20  Q.  Does that also work for different applications of GPS,

21  meaning people are biking or running and other activities

22  apart from driving?

23  A.  Yes.  In fact, we provide multiple types of products for

24  multiple markets with multiple types of maps that would be

25  appropriate for that market.  Or marine use, offshore or

JD KRULL - DIRECT EXAMINATION

1    inland fishing, lakes with bottom contours, to outdoor hiking

2    with hiking trails, to the most common use, automotive with

3    roadmaps.

4    Q.  So as far as that record keeping inside the device, how

5    long are records maintained within the device?

6    A.  It's dependent on the amount of memory available in the

7    device.  So the device memory is organized very much like a

8    USB thumb drive, so a little electronic memory device that you

9    can plug into a USB port on a computer, that looks like just a

10   mass storage image.  So when you plug the device into the

11   computer, the computer can communicate with it and it can

12   transfer updated maps into the device, but it can likewise

13   extract this history information out of the device to be

14   viewed on the computer.

15   Q.  And you mentioned plugging the device in to access the

16   records; is that the most common way for people to access the

17   memory on the GPS?

18   A.  Yes.

19   Q.  Do you know generally, at least for this device,

20   approximately how much memory would be on like a Garmin

21   Newbie?

22   A.  I do not know, but in general they will hold years' worth

23   of travel history.  All depends on the amount of traveling you

24   do.  It's more a matter of the volume, as opposed to the age,

25   and it will keep storing more and more and more until it runs

860

JD KRULL - DIRECT EXAMINATION

1   out of memory.  If it does hit the point where it's starting

2   to use memory, then it will simply overwrite the oldest

3   information in memory with the new information.

4   Q.  So I want to ask you about accessing the device other

5   ways.  You said there's sort of a user friendly plug-and-play

6   approach.  Can it also be extracted through forensic methods,

7   meaning extracted from the drive itself?

8   A.  So the forensic extraction would be no different than the

9   common use of a user like myself to plug the device in.  It's

10  all the same information.  It exists in a very standard

11  format, so you don't have to use a Garmin application, you can

12  use a number of other programs with different purposes to

13  extract that data from the memory.

14  Q.  Let me ask you about that.  You said it's in a standard

15  format.  What is the standard format of the files or the track

16  points on the device and its sort of native format or

17  condition?

18  A.  We refer to it as a GPX format.  Simply looks like a data

19  file on a computer, that ends in dot GPX.  It is a type of XML

20  formatting, which again is a computer readable that you can

21  also humanly read, literally text characters that are

22  formatted specifically to make it easy to interpret by a

23  computer.

24  Q.  You said that it can be easily plotted on other types of

25  maps.  Can you explain what you mean by that?

861

JD KRULL - DIRECT EXAMINATION

1   A.  Yes.  The format literally represents the location and the

2   time of each of the points in this track log or bread crumb

3   trail.  So the computer can take that information and then

4   superimpose it on a background map.  So the most common that

5   I'm familiar with is Google Maps.  So you can use Google Maps

6   or Google Earth, an application that's the same thing, can run

7   on your computer, and it has visualization.  So either roadmap

8   data, or you can click a button that shows the satellite or

9   aerial picture information, so that you can literally see the

10  picture of locations.  And then the GPS data gets plotted on

11  top of that, so you can see where that data exists relative to

12  the picture.

13  Q.  And that's -- does that require any expertise to convert

14  those files over to log those onto a --

15  A.  No, not at all.  In fact, you can use the Garmin freely

16  down -- free for download Base Camp application to easily

17  extract the data from the device.  It's not required, anything

18  could pull it across, it's simply, again, a file that looks to

19  the computer like it's sitting on a thumb drive plugged into

20  the USB port.

21      But from within Base Camp there's literally an interface

22  that says export this data to Google Earth or Google Maps.

23  And that will then display it behind or on top of whatever

24  Google is using for their map and data.

25  Q.  I want to ask you a little bit about what you said, you

JD KRULL - DIRECT EXAMINATION

1   called interference.  Does interference with the satellite

2   signal create something that would be reflected on a map, or

3   when you try to, I guess, download those files?  How would

4   that be represented if there was interference with the signal?

5   A.  So interference would simply block the reception of one

6   satellite.  And since there's more than three times as many

7   satellites available at any one time than are required, it

8   really doesn't make a difference in terms of using the device.

9       As you block more and more, say if you went up and stood

10  next to a tall building, and that would block potentially half

11  of the sky, you'd still see the things that are straight

12  overhead and off to one side, so the result would be that it

13  may reduce the accuracy slightly.  So instead of three meters

14  or ten feet, your uncertainty might grow to a little larger

15  than that.

16  Q.  What if you were to put the GPS under the seat of the car

17  and it just lost connection completely with satellites, how

18  would that be reflected in the track points or the records

19  stored on the device?

20  A.  So if you completely shade the antenna so they can't see

21  any of the satellites, or at least not four that are

22  sufficiently separated to be able to do the math appropriate

23  to determine your location, then the device would simply stop

24  providing the location or speed or time information, and wait

25  until such time that it could see satellite signal.  But

863

JD KRULL - DIRECT EXAMINATION

1    during that time it will not record any bread crumbs.

2    Q.   And are there other ways for that same type of, I'm going

3    to say loss of data or absence of data, to be created, apart

4    from the signal being lost?  Meaning turning it off or

5    shutting it down or anything like that?

6    A.   Yes.  So the device just needs to be on and receiving

7    signals to record this history information.  If the device is

8    off, obviously it's not going to do anything.  If the block --

9    if the device is blocked from the signals, then even if it's

10   on, it's not going to be able to record any information.

11   Q.   And so how would that be represented on a -- when the

12   information is mapped onto a Google Map or Google Earth or

13   Base Camp?

14   A.   There is an indication with each of the points that are

15   stored in a standard format, that tell whether or not this

16   point is the beginning of a new segment.  And by that I mean

17   that if it does lose contact with the satellites and is no

18   longer able to tell where it's at or where it's traveling, it

19   simply sets a flag that says okay, when I start receiving

20   again, mark that point as a begin.  So that when you draw

21   these points on a map and you connect the dots, well, it's

22   fairly confident that the path traveled between the two points

23   is a relatively straight line.  You might be turning a corner

24   and it's dropping points as it goes around the turn, so there

25   might be some subtle error there, but generally speaking is if

864

JD KRULL - DIRECT EXAMINATION

1   you draw this picture and connect the dots, it's

2   representative of the path traveled.

3        So since we don't know where you might have went or what

4   maneuvers you might have done while we're out of sync with the

5   satellites, we simply indicate don't connect those two dots,

6   because we don't know what the path traveled was.  So there

7   will be a separation.

8        So any time you turn the device off, even for overnight or

9   for a week, when you turn it back on, it starts drawing a new

10  set of line segments.

11  Q.  So if it was turned off or if there was a significant

12  interruption, it would essentially start two different tracks,

13  rather than trying to connect those?

14  A.  Yes, as you look at the picture, one track will end at the

15  point where it lost contact with the satellites in between

16  that and the next point.  So it will just be a blank, and a

17  new segment will start up, and it will continue on with

18  whatever it is tracking that has confidence that it knows

19  where it's at.

20  Q.  And in preparation for your testimony, did you have

21  communication with Special Agent Joseph Hamski about maps that

22  he created?

23  A.  Yes, I did.

24  Q.  Did you review some of those maps?

25  A.  I did.

JD KRULL - DIRECT EXAMINATION

1    Q.  Not all of them, but a certain number that were provided

2    to you?

3    A.  Yes.  There were several.

4    Q.  I'm going to show you Government's proposed 367, 361, 368,

5    380, 385, 391 and 413.  Take a look at those.

6    A.  Okay.  Yes, I reviewed all of these exhibits.

7    Q.  And these are all accurate, based on data that you were

8    provided from the case agent?

9    A.  Yes.  I also received the GPX files that were the raw data

10   extracted from the Newbie, and I compared those in Base Camp

11   to these images, to verify the times and the lines traveled

12   that represent the path traveled.

13            MR. WILLIAMS:  Your Honor, I move to admit -- Show

14   them to defense counsel.  I'll move to admit Government 367,

15   361, 368, 380, 385, 391 and 413.

16            THE COURT:  Any objection?

17            MS. PAAVOLA:  No objection.

18            THE COURT:  Very good.  Government's Exhibits 361,

19   367, 368, 380, 385, 391 and 413 admitted without objection.

20        (Government Exhibits 361, 367, 368, 380, 385, 391 and 413

21   received.)

22   BY MR. WILLIAMS:

23   Q.  Let me go to -- I'm going to put up 367 first.  And if you

24   could, Mr. Krull, just sort of explain what is depicted on

25   Exhibit 367 regarding those track points I believe you

JD KRULL - DIRECT EXAMINATION

1    referenced.

2    A.   This is showing an aerial photograph with the red lines

3    representing the bread crumb trail and lines connecting the

4    dots.  So you can see where this device had traveled, and it's

5    indicating the date and time of the end points of those line

6    segments.

7    Q.   And the date and time on this is 12/22/14, looks like

8    about 3:30 in the afternoon.  Can you explain -- it looks like

9    the line that the red line that says 3:33 p.m. is a little bit

10   off.  Is that consistent with the way GPS devices may map, or

11   at least the way it may correlate to Google Maps in terms of

12   down-to-the-foot type accuracy?

13   A.   Yes, what you're observing here from the point that's

14   labeled 3:33 p.m., it appears to be kind of off the edge

15   parking lot.  One of the techniques that's used in a GPS

16   device is referred to as map matching.  So as you're traveling

17   on a road, the map data generally is not as accurate as GPS.

18   But to depict a useable picture, it's important that you show

19   the user location on the map, right?  So on the road.  Should

20   you travel down the road, it uses logic such as the

21   attribution of the map, what's the travel speed on this

22   section of road, what's the direction of travel, if it's a

23   one-way street, all these things get combined to try to

24   identify what is the most likely nearby street that the device

25   is on.  And it will actually move the location to match the

867

JD KRULL - DIRECT EXAMINATION

1    map, not show it as the GPS location.

2        And so for a better review experience, and likewise

3    records that as part of this bread crumb trail.  So when it's

4    showing something on a road, it's because it's matched up to a

5    road.

6    Q.  So when you're driving and your GPS matches it to the

7    road, it's finding the closest road perhaps, not necessarily

8    the pinpoint accuracy that might come from this exhibit?

9    A.  It will always be a very close road.  It may not be the

10   closest, because the map data could literally be off enough

11   that it makes it look like if you say traveling on a frontage

12   road versus an interstate, then the map accuracy may be off

13   enough to fool you into looking at the picture.  But we can

14   use analysis -- while using the computer to identify which one

15   of those roads is the most likely that you're on.  For

16   instance, in this picture if you look at the other line

17   segment, that ends at 3:26 p.m., that one very much lines up

18   with this picture it's on the road.  That's probably because

19   we were matched to that road.  The second line then starts

20   just at the edge of that parking lot.

21   Q.  Right.

22   A.  But my interpretation of this data would be that the

23   device was actually in the parking lot, it was not riding

24   through the grass, it's just that the picture is shifted

25   slightly.  Keep in mind that pictures, as you take them, are

868

JD KRULL - DIRECT EXAMINATION

1    relatively flat, but the earth is not.  And so when the
2    photographer adjusted or geocoded this picture, such that
3    Google could use it to draw and then superimpose other things
4    on top of it, well, there's a couple of points, or maybe even
5    three, that are identified as close as possible to real
6    landmarks.  So the actual location.  But the rest of the
7    picture may be skewed slightly, as you can see here, that the
8    device was most likely to the left of where this line is
9    drawn --
10   Q.  Is that a function of the photography, not the GPS?
11   A.  That is correct.
12   Q.  I don't want to get too far down that road.
13   A.  I understand.
14   Q.  I'm going to put up Government's 361.  And is that an
15   accurate representation of how a GPS device can map a longer
16   distance as opposed to a close-up?
17   A.  Yes.
18   Q.  I'll put up 368, a similar map showing long distances
19   instead of just a close-up representation?
20   A.  Yes.
21   Q.  I'm going to go to Government's 380.  You reviewed this
22   map for accuracy as well, and it shows, again, points in time
23   that you reviewed and that the agent provided, and you found
24   these to be accurate?
25   A.  Yes.

869

JD KRULL - DIRECT EXAMINATION

1   Q.  Go to 385.  Again, another map that you reviewed showing

2   dates and time relative to the Emanuel AME Church?

3   A.  Yes.

4   Q.  Go to 391.  Another close-up.  You found this map to be

5   accurate, that GPS device traveling past the church on 4:25?

6   A.  Yes.

7   Q.  And finally go to 413, this is on June 17 of 2015, I'm

8   showing the track log at 7:48 p.m. nearby the church, and then

9   again at 9:05 behind the church, and you found this to be

10  accurate as well?

11  A.  Yes.

12          MR. WILLIAMS:  Thank you, Mr. Krull, I don't have any

13  further questions.

14          THE COURT:  Cross-examination.

15          MS. PAAVOLA:  No questions, Your Honor.

16          THE COURT:  Thank you, sir, you can step down.

17      Mr. Curran, call your next witness.

18          MR. CURRAN:  Your Honor, the Government calls William

19  Matthews.

20          THE CLERK:  State your full name for the record,

21  please.

22  A.  William Matthews.

23      WILLIAM MATTHEWS, a witness called by the Government,

24  first having been duly sworn, testified as follows:

25                        DIRECT EXAMINATION

WILLIAM MATTHEWS - DIRECT EXAMINATION

1  BY MR. CURRAN:

2  Q.  Mr. Matthews, would you tell the jury your name and where

3  you live just city and state?

4  A.  Yes, William Matthews, Irmo, South Carolina.

5  Q.  And are you employed?

6  A.  Yes, sir.

7  Q.  Where do you work?

8  A.  Work for Wal-Mart.

9  Q.  If you could pull the microphone a little closer to you.

10  A.  I work for Wal-Mart.

11  Q.  So you work for Wal-Mart.  How long have you worked for

12  Wal-Mart?

13  A.  Nineteen years.

14  Q.  And what do you do for Wal-Mart?

15  A.  I'm a market asset protection manager.

16  Q.  Market asset protection manager?

17  A.  Yes, sir.

18  Q.  What are your duties as a market asset protection manager?

19  A.  I investigate crimes against Wal-Mart, safety compliance,

20  I also act as liaison between Wal-Mart and outside agencies,

21  whether law enforcement, attorneys that have issues with

22  Wal-Mart or need assistance from Wal-Mart.

23  Q.  Let's talk about that last one.  Is one of your duties to

24  assist Wal-Mart in responding to law enforcement requests for

25  records and information from Wal-Mart?

871

WILLIAM MATTHEWS - DIRECT EXAMINATION

1    A.  Yes, sir.

2    Q.  Does Wal-Mart maintain electronic records relating to the

3    purchase of items from its stores?

4    A.  Yes, sir.

5    Q.  Does it actual -- those records actually include copies of

6    purchase receipts?

7    A.  Yes, sir.

8    Q.  And do those records also include copies of videos from

9    security cameras at its stores?

10   A.  Yes, sir.

11   Q.  And does Wal-Mart maintain those records as part of its

12   regular course of business?

13   A.  Yes, sir.

14   Q.  Is part of Wal-Mart standard business practices to retain

15   those records?

16   A.  Yes, sir.

17   Q.  And do you have access to those records in your capacity

18   as an asset protection manager?

19   A.  Yes, sir, I do.

20   Q.  And did Wal-Mart receive a request from law enforcement

21   for information relating to this case and to Mr. Roof?

22   A.  Yes, sir.

23   Q.  And did Wal-Mart respond to that request by providing

24   records to the FBI?

25   A.  Yes, sir.

872

WILLIAM MATTHEWS - DIRECT EXAMINATION

1    Q.  And have you personally reviewed those records?

2    A.  Yes, sir, I have.

3    Q.  We're going to talk about some of those, but let's start

4    more generally at first, I'm going to hand you a series of

5    five exhibits that have previously been shown.

6            MR. CURRAN:  Your Honor, for the record, we're

7    approaching with Government Exhibits 243, 244, 245, 246, 247,

8    marked for purposes of identification.

9    Q.  Mr. Matthews, please take a look at each of those, take

10   your time, and when you're ready, we'll ask you some questions

11   about those.  Generally, Mr. Matthews, what are those items?

12   A.  Those are copies of receipts from purchases made at

13   Wal-Mart.

14   Q.  Have you compared those copies that you have that you see

15   there, against Wal-Mart's records, to determine whether

16   they're accurate copies?

17   A.  Yes, sir, I have.

18   Q.  And are they?

19   A.  Yes, sir.

20   Q.  Okay.  What kind of information can you determine from

21   those purchase receipts, correct?

22   A.  Correct.

23   Q.  What kind of information can you, as someone who has

24   knowledge of what's on those receipts, what kind of

25   information can you determine from those?

WILLIAM MATTHEWS - DIRECT EXAMINATION

1   A.  You can determine the store location, the dates of the

2   merchandise was purchased, the times of the purchase, items

3   that were purchased, and typically methods of payment.

4   Q.  And have you looked at the method of payment for each of

5   those items?

6   A.  Yes, sir.

7   Q.  And what method or methods of payment were used?

8   A.  Credit card.

9   Q.  Were they all used with a single credit card?

10  A.  Yes, sir.

11  Q.  And did you review your records to determine what that

12  number was?

13  A.  Yes, sir.

14          MR. CURRAN:  Your Honor, I'm approaching with

15  Government's Exhibit 113, which has already been entered, it's

16  the debit card that was obtained on the defendant's arrest.

17  Q.  Would you please review that, Mr. Matthews?  Is that the

18  card that was used for each of these purchases?

19  A.  Yes, sir.

20  Q.  And what is the name listed on that card?

21  A.  Dylann S. Roof.

22  Q.  Let's talk about some of the individual purchases that you

23  have before you.  First let's start with Exhibit 243.

24          THE COURT:  Have you offered that?  I don't believe

25  you've actually moved for admission.

WILLIAM MATTHEWS - DIRECT EXAMINATION

1          MR. CURRAN:  I have not, and I'm going to move for

2    admission shortly.  I was going to have him talk about it a

3    little more, or I can --

4          THE COURT:  Why don't we go ahead.  Is there any

5    objection?

6          MS. PAAVOLA:  No objection.

7          THE COURT:  Very good.  The Government's Exhibits

8    243, 244, 245, 246 and 247 admitted without objection.

9       (Government Exhibits 243 through 247 received.)

10         MR. CURRAN:  That takes about half of my direct out

11   of the --

12         THE COURT:  That was the intent.

13   BY MR. CURRAN:

14   Q.  What is this, Mr. Matthews?

15   A.  Exhibit 243 is a receipt for purchase at store 12 --

16   Q.  Why don't you just tell us very generally what this is

17   first, and I'll ask you follow-up questions.

18   A.  It's a receipt for a purchase at Wal-Mart.

19   Q.  And from what store is that?

20   A.  Store 1286 on Garners Ferry Road.

21   Q.  Is Garners Ferry Road in the Columbia, South Carolina

22   area?

23   A.  Yes, sir, it is.

24   Q.  And from that receipt can you tell the date of purchase?

25   A.  Yes, sir, I can, it was June 7th, 2015.

875

WILLIAM MATTHEWS - DIRECT EXAMINATION

1  Q.  June 7th of 2015?

2  A.  Yes, sir.

3  Q.  Okay.  And you've already told us that all of these items

4  were purchased with that debit card, correct?

5  A.  Yes, sir.

6  Q.  What was purchased in that purchase?

7  A.  On this purchase it was a 12-by-18 flag, three-by-five

8  American flag, a journal and a two-pack of -- looks like

9  Sharpie pens.

10  Q.  And in preparation for your testimony today did we ask you

11  to check Wal-Mart's stock for any of those items as point of

12  comparison?

13  A.  Yes, sir, you did.

14      MR. CURRAN:  Your Honor, approaching with what's

15  previously been admitted as Government's Exhibit 2, the

16  journal that was taken from Mr. Roof's car.

17  BY MR. CURRAN:

18  Q.  Would you look at that?  And in particular, did you pull

19  this item -- this receipt listed a journal -- did you pull the

20  type of journal from Wal-Mart's stock?

21  A.  Yes, sir, I did.

22  Q.  And how does it compare with what you've just been handed

23  as Government's Exhibit 2?

24  A.  It's the same type journal.

25  Q.  If you turn to Exhibit 244, please.  Now, this is another

876

WILLIAM MATTHEWS – DIRECT EXAMINATION

1    purchase, correct?

2    A.  Yes, sir.

3    Q.  Same debit card, correct?

4    A.  Yes, sir.

5    Q.  When was this purchase made?

6    A.  May 3rd, 2015.

7    Q.  And was this also from a Columbia area store?

8    A.  Yes, sir, it is.

9    Q.  All right.  And what was purchased in this purchase?

10   A.  This is a purchase for Remington ammunition, it's 100

11   count.

12   Q.  So 100 count, does that mean 100 bullets?

13   A.  Yes, sir, 100 rounds.

14   Q.  Remington is the brand, correct?

15   A.  Yes, sir.

16   Q.  What type of ammunition?

17   A.  It was for .45 auto hollow points.

18   Q.  So .45 caliber?

19   A.  Yes, sir.

20   Q.  Hollow point bullets?

21   A.  Yes, sir.

22   Q.  Let's turn to the final three, we're going to look at

23   those collectively, Exhibit 245, 246, 247.  Just display 245.

24   All right.  What are these?

25   A.  These are receipts for purchases for ammunition.

877

WILLIAM MATTHEWS - DIRECT EXAMINATION

1  Q.  All right.  And they're all with the same debit card,

2  correct?

3  A.  Yes, sir.

4  Q.  And what -- are they all for the same type of ammunition

5  or for different types of ammunition?

6  A.  For the same type, sir.

7  Q.  So essentially the three purchases, same ammunition

8  purchased on three different occasions?

9  A.  Yes, sir.

10 Q.  And what ammunition was purchased in these purchases?

11 A.  It was for Winchester .45 hollow point.  Automatic.

12 Q.  So Winchester is a brand, correct?

13 A.  Yes, sir.

14 Q.  How many bullets in each purchase?

15 A.  Fifty count box.

16 Q.  And the .45 caliber, correct?

17 A.  Yes, sir.

18 Q.  Hollow point bullets?

19 A.  Yes, sir.

20 Q.  Accurate?  All right.  What are the purchases for

21 Exhibit 245, please?

22 A.  245 was May 10th of 2015.

23 Q.  How about the purchases reflected on Exhibit 246?

24 A.  May 22nd, 2015.

25 Q.  And the purchases reflected on Exhibit 247?

878

WILLIAM MATTHEWS - DIRECT EXAMINATION

1    A.  June 13th, 2015.

2    Q.  Let's change topic slightly to the video that we were

3    talking about earlier.  Wal-Mart has video cameras at its

4    stores, correct?

5    A.  Yes, sir.

6    Q.  Does that include the stores at which these items were

7    purchased?

8    A.  Yes, sir.

9    Q.  And did the FBI request copies of those videos?

10   A.  Yes, sir.

11   Q.  Were they -- did Wal-Mart provide them?

12   A.  Yes, sir, we did.

13           MR. CURRAN:  I'm approaching, Your Honor, with what

14   has been marked for purposes of identification as 248, 249,

15   250, 251, and 252.

16   Q.  Would you review those, Mr. Matthews.  Are you familiar

17   with these exhibits?

18   A.  Yes, sir.

19   Q.  Have you personally reviewed them before you testified

20   today?

21   A.  Yes, sir, I have.

22   Q.  How do you know that?

23   A.  I -- after I reviewed each of the disks, I initialed the

24   envelopes and the disks with my initials and date.

25   Q.  And what are they?

WILLIAM MATTHEWS - DIRECT EXAMINATION

1   A.  My initials?

2   Q.  No, not the initials, what are the exhibits?

3   A.  I'm sorry, they're videos from the Wal-Mart stores,

4   various Wal-Mart stores of transactions in the surrounding

5   areas.

6   Q.  Are these videos from the Wal-Mart stores from the same

7   stores in time frame that relate to the purchases we were just

8   discussing?

9   A.  Yes, sir.

10         MR. CURRAN:  I move for admission.

11         THE COURT:  Any objection?

12         MS. PAAVOLA:  No objection.

13         THE COURT:  Government Exhibits 248, 249, 250, 251

14  and 252 admitted without objection.

15      (Government Exhibits 248 through 252 received.)

16         MR. CURRAN:  Your Honor, we will be publishing these

17  with a later witness, so there's no need to publish them at

18  this point.  So I would like to establish a couple of

19  additional facts relating to them.

20  BY MR. CURRAN:

21  Q.  The Exhibit 248, what's the date for that particular

22  exhibit?

23  A.  June 17, 2015.

24  Q.  All right.  And Exhibit 249?  The date for that one?

25  A.  May 3rd, 2015.

880

WILLIAM MATTHEWS - DIRECT EXAMINATION

1    Q.   250?

2    A.   May 10, 2015.

3    Q.   Okay.  Let me go back to 248.  What is the date for that

4    one?

5    A.   June 17.

6         MR. CURRAN:  I believe we may have a mistake on our

7    exhibit, Your Honor.  Can you pull up 248, please.

8    Q.   Then if you'd look at the date on this, this is

9    Exhibit 243 that we republished?

10   A.   Yes, sir.

11   Q.   And is 248 actually the video for this purchase, the

12   June 7th, 2015 purchase?

13   A.   Yes, sir.

14   Q.   So what's labeled on that particular exhibit is a mistake,

15   it listed as June 17th, correct?

16   A.   Yes, sir.

17   Q.   And have you reviewed the video to ensure that it

18   corresponds with this particular --

19   A.   Yes, sir.

20   Q.   All right.  So 249, May 3rd of 2015, correct?

21   A.   Yes, sir.

22   Q.   250 is May 10th of 2015, correct?

23   A.   Yes, sir.

24   Q.   251 is May 22nd of 2015?

25   A.   Yes, sir.

WILLIAM MATTHEWS - DIRECT EXAMINATION

1  Q.  And 252 is June 13th of 2015, correct?

2  A.  Yes, sir.

3  Q.  All right.  Is each DVD a single video?

4  A.  No, sir, there's multiple videos on each DVD.

5  Q.  Does that reflect multiple cameras from the store at that

6  time?

7  A.  Yes, sir.

8  Q.  And does one of the videos on each of those capture the

9  counter where the sale actually took place?

10  A.  Yes, sir, they do.

11          MR. CURRAN:  And that's all we have for this witness.

12          THE COURT:  Cross-examination.

13          MS. PAAVOLA:  No questions, Your Honor.

14          THE COURT:  You may step down.  Thank you, sir.

15  A.  Thank you, sir.

16          MR. CURRAN:  Your Honor, the Government calls Debra

17  Davis.

18          THE CLERK:  State your full name for the record,

19  please.

20  A.  Debra Hicks Davis.

21      DEBRA DAVIS, a witness called by the Government, first

22  having been duly sworn, testified as follows:

23                      DIRECT EXAMINATION

24  BY MR. CURRAN:

25  Q.  Miss Davis, good morning.

882

DEBRA DAVIS – DIRECT EXAMINATION

1    A.  Good morning.

2    Q.  Please tell the jury your name and where you live; city

3    and state is fine.

4    A.  Debra Hicks Davis, Garner, North Carolina.

5    Q.  If you can pull the microphone a little closer to you.

6    Are you employed, Miss Davis?

7    A.  Yes.

8    Q.  Where do you work?

9    A.  First Citizens Bank.

10   Q.  And how long have you worked at First Citizens Bank?

11   A.  Seventeen years.

12   Q.  What do you do for First Citizens Bank?

13   A.  I am the supervisor of the court liaison group.  We

14   process legal requests for different entities.

15   Q.  So one of your duties includes responding to law

16   enforcement requests for First Citizens Bank's records,

17   correct?

18   A.  Yes.

19   Q.  And does First Citizens Bank maintain electronic records

20   of the financial accounts for clients?

21   A.  Yes.

22   Q.  Maintain those records as part of its regular course of

23   business?

24   A.  Yes.

25   Q.  Part of its standard business practices?

DEBRA DAVIS - DIRECT EXAMINATION

1  A.  Yes.

2  Q.  And you have access to those records in your capacity as

3  the supervisor of the court liaison group?

4  A.  Yes, sir.

5  Q.  Have you viewed Citizens' records to determine whether

6  defendant, Mr. Roof, has maintained a First Citizens Banking

7  account?

8  A.  Yes.

9  Q.  Did he?

10  A.  Yes.

11  Q.  In what year did he establish that account?

12  A.  2012.

13  Q.  And was that account still active in the winter, fall and

14  spring of 2000 -- summer of -- June -- excuse me -- through

15  June of 2015?

16  A.  Yes.

17  Q.  Did that account have a debit card associated with it?

18  A.  Yes.

19  Q.  I'm going to approach with Government's Exhibit 113

20  previously admitted.  Would you please review that, Miss

21  Davis?  And is that the debit card associated with the

22  defendant's banking account?

23  A.  Yes.

24  Q.  And is it also a card that you can use for debit or credit

25  transactions?

DEBRA DAVIS - DIRECT EXAMINATION

1    A.  Correct.

2    Q.  Did First Citizens Bank receive a request for account

3    summaries for Mr. Roof?

4    A.  Yes.

5    Q.  Did First Citizens provide those --

6    A.  Yes.

7    Q.  -- to the FBI?

8            MR. CURRAN:  I'm approaching with what's been marked

9    for purposes of identification as Government's Exhibit 425.

10   Q.  If you'd review that, Miss Davis.  Are you finished?

11   A.  Yes.

12   Q.  What is Exhibit 425?

13   A.  A series of bank statements.

14   Q.  For whom?

15   A.  For Dylann Roof.

16   Q.  And are they for what period of time?

17   A.  May 23rd, 2014 through May 22nd, 2015.

18   Q.  So basically a year's worth of banking account summaries

19   for Mr. Roof from late May of 2014 to late May of 2015, is

20   that accurate?

21   A.  Yes.

22           MR. CURRAN:  Your Honor, we move for admission at

23   this time.

24           MS. STEVENS:  Your Honor, I have no objection, but we

25   would ask that that be redacted appropriately in --

885

DEBRA DAVIS - DIRECT EXAMINATION

1          THE COURT:  I think that's a reasonable request.

2          MR. CURRAN:  We've already planned on that, Your

3   Honor.

4          THE COURT:  Very good.  Government Exhibit 425 is

5   admitted.

6      (Government Exhibit 425 received.)

7          MS. STEVENS:  Thank you.

8          MR. CURRAN:  And we're not going to publish these,

9   Your Honor, like the others.  They're for use by a later

10  witness.

11  BY MR. CURRAN:

12  Q.  I'm going to approach now with Government's Exhibit 426,

13  marked for purposes of identification, if you would review

14  that, please.  And what is that exhibit?

15  A.  This is a bank statement for the month of -- from May the

16  23rd, 2015 to June 22nd, 2015.

17  Q.  And whose bank statement is it?

18  A.  Dylann Roof.

19  Q.  So First Citizens Banking account statement, correct?

20  A.  Yes.

21  Q.  So it's the month after the previous exhibit that's the --

22  for the month of June of 2015, correct?

23  A.  Correct.

24          MR. CURRAN:  Your Honor, we move to admit at this

25  time.

886

```
 1              THE COURT:  Any objection?

 2              MS. STEVENS:  No objection.  Same request, Your

 3    Honor.

 4              THE COURT:  Same request will be granted.

 5              MR. CURRAN:  The record will be redacted.

 6              THE COURT:  Government 426 is admitted without

 7    objection.

 8         (Government Exhibit 426 received.)

 9              MR. CURRAN:  Your Honor, no further questions of this

10    witness.

11              THE COURT:  Cross-examination?

12              MS. STEVENS:  No questions, Your Honor.

13              THE COURT:  You may step down.  Thank you, ma'am.

14         Ladies and gentlemen, why don't we take our morning break

15    now.

16         (Jury excused.)

17              MR. RICHARDSON:  Your Honor?

18              THE COURT:  Yes.

19              MR. RICHARDSON:  Your Honor, just for the Court's

20    information, I had this conversation earlier, the next witness

21    that we're getting to will be Deputy Britt, but then

22    Investigator Polis has a number of photographs the Government

23    intends to introduce.  I understand from defense counsel that

24    there are a handful of those that they have objections to.  I

25    just want to let the Court know that that was coming, if the
```

1    Court wants to take that up.

2              THE COURT:  I'll take it up right now.

3              MR. RICHARDSON:  That was what I was hoping, Your

4    Honor.  I can hand up what those exhibits are.  Government's

5    Exhibit -- a number of these were part of the motion in

6    limine, and your Court has already, I think, ruled on many of

7    them, or at least in concept.  In fact, we could perhaps put

8    them on the screen.

9              THE COURT:  That would be helpful, thank you.

10             MR. RICHARDSON:  Miss Baker, go first with

11   Government's Exhibit 270.

12             MS. PAAVOLA:  Your Honor, are these being published

13   in the media room?  They're not in evidence.

14             MR. RICHARDSON:  I can hand them up, that's fine.

15             THE COURT:  Hand them up to me.

16             MR. RICHARDSON:  Government's Exhibit 270, Your

17   Honor, this is a pillowcase that's been fashioned into a KKK

18   hood.

19             THE COURT:  Where was this found?

20             MR. RICHARDSON:  This was found in the defendant's

21   room.

22             THE COURT:  Okay.

23             MR. RICHARDSON:  This is Government's Exhibit 271,

24   this is, for lack of a better phrase, a Freddy Krueger mask.

25             THE COURT:  Let's go one at a time.  I had trouble

1    keeping up with these.  Tell me why 270 is relevant.

2           MR. RICHARDSON:  270 is relevant, Your Honor, for the

3    reasons we've articulated throughout the trial.  The

4    defendant's engagement and interest in the Ku Klux Klan, his

5    bemoaning of the fact that the Ku Klux Klan was no longer

6    active in terrorizing African-Americans, and his desire and

7    need to take drastic action, because the Ku Klux Klan was no

8    longer operating as it had throughout our nation's history.

9           THE COURT:  Okay.  And the response?

10          MS. PAAVOLA:  Your Honor, our objection to this,

11   which was out in our motion in Docket No. 738, is simply that

12   the -- it's a 403 objection, Your Honor, and that there's no

13   evidence the defendant was a member of any group like this.

14   We believe the probative value is outweighed by the

15   prejudicial nature of the evidence.

16          THE COURT:  Well, it's directly mentioned in his

17   manifesto which he posted immediately before coming to

18   Charleston.  I overrule that objection.  270 is ruled

19   accepted.

20       (Government Exhibit 270 received.)

21          THE COURT:  What's the next one?

22          MR. RICHARDSON:  Thank you, Your Honor.  271 is the

23   mask that is there.  We think this is evidence the jury can

24   conclude was part of a planning and preparation.  This is not

25   a mask that's used for any other reason than to terrorize, we

1    think --

2              THE COURT:  Was it there?  Was it used?

3              MS. PAAVOLA:  Your Honor, it's a hockey mask.  It was

4    in his bedroom.

5              THE COURT:  Sustained.  Objection 270 is sustained.

6              MR. RICHARDSON:  With respect to Government's 275,

7    this is a yellow pad, which we have narrowed down to two

8    pages, that was found in the defendant's room.  It includes

9    various drawings similar to those found in the journal,

10   various Ku Klux Klan symboling as well as a variety of Nazi

11   symboling, including the SS troops --

12             THE COURT:  Do we have any idea when this was

13   produced?

14             MR. RICHARDSON:  We do not know when it was produced,

15   but we know it was found in his room the morning after the

16   attack.  What we can see from it, I think by comparison to the

17   journal that was found in the defendant's car, is much of the

18   same white supremacist --

19             THE COURT:  I recognize the 1488 symbols that was

20   drawn.

21             MR. RICHARDSON:  Exactly, and the swastikas that are

22   also consistent, the rune, which is sort of tree looking item

23   next to the SS symbols there, the cross that we see drawn in

24   the particular manner that we'll hear more about.  As well as

25   on the second page, obviously the figure who's characterized

1   as a Ku Klux Klan member, I believe, I don't have it in front

2   of me, but I believe he has a swastika also drawn on his

3   chest.

4           THE COURT:  He does.  On the lower part.

5           MR. RICHARDSON:  Lower part of the outfit.  Which is

6   also consistent with the photographs from movies that we saw

7   yesterday, the member of the Klan wearing such an outfit.

8           THE COURT:  Miss Paavola, what's your response?

9           MS. PAAVOLA:  Our objection to this is the same as

10  the objection to 275.

11          THE COURT:  If it was sitting there by itself, that

12  would be one thing, but it ties directly to a document

13  prepared immediately before the events on June 17th, 2015.  I

14  overrule that objection to 275.

15      (Government Exhibit 275 received.)

16          MR. RICHARDSON:  Thank you, Your Honor.  And then the

17  last two, I believe, are Government's Exhibit 281 and 282.  In

18  the context, Your Honor, this is the backyard of the mother's

19  house where the defendant described in his confession engaging

20  in target practice.  These are shell casings that are found

21  back there, there are a number that are found.  Later, we'll

22  also have videos that the defendant took of himself engaging

23  in target practice in the same backyard using the murder

24  weapon, and this is evidence of that ongoing practice.

25          THE COURT:  Miss Paavola?

1            MS. PAAVOLA:  Our objection to these is that they are

2   not particularly relevant and they're also cumulative.  These

3   two photos are to show a swing in the backyard where the

4   homeowner indicated that his granddaughter placed flowers in

5   some shell casings.  They're not directly tied to the

6   defendant.  They have multiple other photographs of shell

7   casings, they have the shell casings themselves, we think

8   they're cumulative and they're not particularly relevant.

9            THE COURT:  Do you contest that he was target

10  practicing back there?

11           MS. PAAVOLA:  No, and they'll be offering multiple

12  exhibits to establish that.

13           THE COURT:  What kind of exhibits do you have that

14  he's target practicing back there?

15           MR. RICHARDSON:  Your Honor, we have a number of

16  videos that will be coming in through a variety of different

17  witnesses where he sets his camera up and videos himself with

18  the murder weapon shooting various --

19           THE COURT:  This very location?

20           MR. RICHARDSON:  In the backyard.  I won't say that

21  very location.

22           THE COURT:  I'm saying in the backyard.

23           MR. RICHARDSON:  Yeah.

24           THE COURT:  I just think it's cumulative, and has

25  these flowers in it.  It's cumulative and unnecessary, so I

892

1    sustain that objection.

2              MR. RICHARDSON:  Thank you, Your Honor.  And I

3    believe, you can correct me if I'm wrong, but I believe that

4    those would be the objections with respect to Miss Polis.

5              MS. PAAVOLA:  That's all.

6              THE COURT:  Thank you.  We'll take a few minute

7    break.

8         (A recess was held at this time.)

9         (Jury not present.)

10              THE COURT:  Yes, sir, Mr. Bruck?

11              MR. BRUCK:  One logistical matter, Your Honor.  With

12    regard to the discussion we had this morning, the Court ruled

13    out all but one of nine areas of cross-examination.  We had a

14    bit of a debate just now among ourselves as to whether the

15    Court also ruled out defense witnesses who are listed --

16              THE COURT:  I'm glad to hear you out more.  I will

17    tell you, I already said the issue about hires is going to be

18    dependent on what the Government does, and told me that

19    there's not -- I wouldn't -- but I don't want to cut you off,

20    if you want to explain if there are any of these that perhaps

21    have more to it than you've explained, but I will say that on

22    the explanation provided thus far, and what I now know -- and

23    again, Mr. Bruck, you have to remember the Government could

24    open the door on something and I would need to address.  So I

25    kind of like not making decisions until I have all the

1    information.

2           MR. BRUCK:  I understand.  There's just one practical

3    problem.  With respect to the first witness, the bank employee

4    that we discussed --

5           THE COURT:  If that's all you have, that, to me, is

6    not admissible in a guilt phase.

7           MR. BRUCK:  Okay.  He is getting on a plane, and we

8    wanted to stop him if we could.

9           THE COURT:  Get him off that plane.

10          MR. BRUCK:  We will do that.

11          THE COURT:  But I do want to -- I don't want to cut

12   you off, if there's something about this I don't understand,

13   but you've got to negate the element, you can't just -- this

14   just can't be diminished capacity, basically, you and I both

15   know that, you can't have a diminished capacity defense.

16       So we'll -- but I'm glad to deal with the thing regarding

17   the bank employee.  If that's the summary of that evidence is

18   what you would offer, I would not allow that.  Okay?

19          MR. BRUCK:  Thank you.

20          THE COURT:  Very good.  Call your next witness.  I'm

21   sorry, I have everybody but my jury.  I want y'all to know

22   that Miss Eunice was about to turn around and just grab me.

23       (Jury present.)

24          THE COURT:  Government, call your next witness.

25          MR. RICHARDSON:  The Government calls Corporal Justin

JUSTIN BRITT – DIRECT EXAMINATION

1    Britt.

2            THE CLERK:  State your full name for the record,

3    please.

4    A.   Justin Britt.

5        JUSTIN BRITT, a witness called by the Government, first

6    having been duly sworn, testified as follows:

7                        DIRECT EXAMINATION

8    BY MR. RICHARDSON:

9    Q.   Corporal, introduce yourself to the jury and tell them

10   where you work.

11   A.   My name is Justin Britt, I'm a corporal on the first line

12   supervisor of the Richland County Sheriff's Department

13   fugitive task force.

14   Q.   And Richland County is the Columbia area?

15   A.   Yes, sir.

16   Q.   Tell me a little bit about what happened on June the 18th.

17   I'm not going to go through background, I know you're an

18   accomplished, very successful law enforcement officer, but

19   tell me about the morning of June the 18th, 2015.  How did you

20   get involved in this case?

21   A.   I was contacted by SLED agent Lieutenant Mike Robinson of

22   the South Carolina Law Enforcement Division, and he notified

23   me that the suspect from Charleston shooting possibly had

24   connections in the Columbia area, which is our area of

25   responsibility for fugitive task force.  And so he gave us the

JUSTIN BRITT - DIRECT EXAMINATION

1   address, and we headed out that direction.

2   Q.  And did you learn that that address was associated with

3   somebody in Mr. Roof's family?

4   A.  Yes, sir.

5   Q.  Who was that?

6   A.  His mother.

7   Q.  Okay.  Tell me, did you have a group of people that got

8   together to go to the house that day?

9   A.  Yes, sir.

10  Q.  And as part of that, did y'all sort of meet up ahead

11  time --

12  A.  Yes, sir.

13  Q.  -- and discuss the sort of plan as to what was going to

14  happen?

15  A.  Yes, sir.

16  Q.  And what was the plan, and tell us a little bit about what

17  the fugitive task force was trying to do, what were the goals

18  that y'all had going into that?

19  A.  All right.  At that point in time nobody had been located

20  at this time, so we still didn't know what we were going into.

21  So typically we do a briefing right across the street, we look

22  at a picture of the suspect, who we're looking for, we have an

23  aerial photo of the house, how we're going to pull in there

24  tactically, how we're going to do things.

25      So of course we briefed across the street, and we decided

JUSTIN BRITT - DIRECT EXAMINATION

1  that we were just going to -- the only way in was to pull into

2  the main driveway and go in.  And we were going to -- normally

3  what we do is surround the house, we have a couple people in

4  the back, then we have an entry team up front to make entry

5  and to see if the suspect's there.

6  Q.  And the plan that day was to make a tactical entrance?

7  A.  With permission.

8  Q.  Right.

9  A.  Yes, sir.

10  Q.  But you went there concerned that you might find the

11  defendant?

12  A.  Absolutely considering, yes, sir.

13  Q.  And then in essence, what was the goal; you're ultimately

14  trying to find the defendant?

15  A.  Yes, sir, at that point we knew that this was a residence

16  of his mother, and so it was very high likelihood that he

17  could have came back here, so we were very heightened and very

18  aware what we could possibly be going into.

19  Q.  Okay.  And in contrast to that sort of heightened

20  awareness, tell us what happened when you got there; what did

21  you see?

22  A.  We pulled into the driveway, and we were exiting our

23  vehicles to approach the house, a male subject came around

24  from the back with his hands up, basically acknowledging that

25  he knew why we were there, he knew what we were there for.

JUSTIN BRITT – DIRECT EXAMINATION

1   And so we introduced ourselves.  And he immediately -- first

2   thing he said is, he's not here, he's not here.  And then the

3   suspect's mother came outside and --

4   Q.  Okay.  So the first person that came around, that was

5   Danny Beard?

6   A.  Yes, sir.

7   Q.  And the defendant's mother is Amy Roof?

8   A.  That's right.

9   Q.  And so once you got there and had this sort of brief

10  conversation, did you then obtain consent to clear the house,

11  just to confirm for yourselves that there was nobody that was

12  presenting a danger to law enforcement?

13  A.  Yes, sir.

14  Q.  And tell me just sort of briefly what did you do.

15  A.  Okay.  Well, you know, obviously he says, "He's not here,"

16  we get that quite often, you know, he's not here.  We just

17  kind of say, you know, well, it's not that we don't want to

18  believe you, but we have to check it anyway.  So he -- they

19  were more than welcome, he -- Mr. Beard was more than welcome,

20  said check what you need to check.  He's not here.  So we went

21  in and tactically cleared the house.

22  Q.  And by that, you're just making sure there's nobody in

23  there that you're not aware of that might pose a danger or a

24  risk?

25  A.  Right, we were strictly checking for the suspect.

JUSTIN BRITT - DIRECT EXAMINATION

1    Q.  And during this time, after you finished that clear, did
2    you then speak with Mr. Beard about obtaining consent to
3    search the residence?
4    A.  Yes, sir.
5    Q.  Okay.  And did you get that consent?
6    A.  Yes, sir, we did.
7    Q.  There came a time when EMS was called out?
8    A.  Right.
9    Q.  Tell me a little bit about that.
10   A.  Well, we were -- we're obviously the fugitive team, so
11   we're -- our goal at this time, you have to understand, is
12   we're still trying to locate the suspect.  So we're in the
13   process of talking to Miss Roof and Mr. Beard about where the
14   suspect could be, these types of things.  And Miss Roof, she
15   collapsed as she was trying to answer our questions and those
16   types things, overwhelmed by the moment, she just collapsed.
17   So immediately we called EMS.
18   Q.  And EMS came out and treated Miss Roof?
19   A.  Yes, sir.
20   Q.  After that happened, you sort of had the chance to speak
21   with Mr. Beard and Miss Roof to get as much information as you
22   could from them about where the suspect might be located.  You
23   indicated you got consent to search the house?
24   A.  Yes, sir.
25   Q.  Tell me, at that point was Miss Roof, Amy Roof, did she

899

JUSTIN BRITT - DIRECT EXAMINATION

1    recover and able to carry on conversations with you?

2    A.  Yes, sir.

3    Q.  And once you got the consent to search the house, tell me

4    what you and Amy Roof did.

5    A.  Okay.  We -- we came in the back door.  Once everything

6    was signed, we came in the back door, she was walking with us,

7    100 percent cooperative, helping us out, whatever.  And as we

8    were walking, of course we asked, you know, where is

9    Mr. Roof's room, where is it at.

10   Q.  Let's use defendant or Dylann, there are lots of Roofs

11   here.

12   A.  Dylann, where's Dylann's room.  And she started to take us

13   there.  And as we were walking, just before we rounded the

14   steps to go upstairs, she said, there's something I think you

15   need to see.  And I said okay.  And so she walks us up into

16   the bedroom, and she walks -- as we enter the bedroom, she

17   walks over to a desk, and on the corner of the desk, almost in

18   this position right at the corner, she goes over and picks up

19   this small camera about this big.  And she cuts it on.  And

20   she says, I think you need to see these pictures.  And so she

21   starts scrolling through the pictures, and I'm looking at them

22   kind of over her shoulder.

23   Q.  And in reviewing those, tell us just generally the -- how

24   many do you think you saw with her before y'all stopped

25   flipping through the camera?

JUSTIN BRITT - DIRECT EXAMINATION

1   A.  Oh, 20, 30.

2   Q.  Okay.  And tell me just a little bit about what types of

3   pictures you saw when you're standing there with Amy Roof.

4   A.  It was pictures of Dylann with a Confederate flag in front

5   of historical sites.  She even made the comment, he goes to

6   historical sites.  And the pictures were of him holding a --

7   few of them holding a black gun in the picture.  And, you

8   know, it was very evident of why she wanted -- she thought

9   these were important for us to see.

10  Q.  And a number of historical sites that you were looking at

11  had suggested racist background?

12  A.  Absolutely.

13  Q.  I'm going to hand you, just for identification purposes,

14  Government Exhibit 257.  Do you recognize this item?

15  A.  Yes, sir.

16  Q.  And what is it?

17  A.  That's the camera.

18  Q.  After you finished looking at the camera with Amy Roof,

19  what did you then do with it?

20  A.  Well, we put it back on the -- put it back on the desk

21  where it was -- where she picked it up from, we just placed it

22  right back where -- in the general area where she had grabbed

23  it from on the desk.

24  Q.  I'm going to hand you Government Exhibits 260 and 261.  Do

25  you recognize these photographs?

JUSTIN BRITT - DIRECT EXAMINATION

1  A.  Yes, sir.

2  Q.  Are they fair and accurate copies of the scene that day?

3  A.  Yes, sir.

4        MR. RICHARDSON:  Your Honor, we move to admit 260 and

5  261.

6        THE COURT:  Any objection?

7        MR. BRUCK:  No objection.

8        THE COURT:  Government Exhibits 260 and 261 are

9  admitted without objection.

10     (Government Exhibits 260 and 261 received.)

11        MR. RICHARDSON:  Thank you.  Miss Baker, if we can

12  just put up 260 briefly.

13  BY MR. RICHARDSON:

14  Q.  Do you see in 260, Corporal, the blue camera that we've

15  been discussing?

16  A.  Yes, sir.

17  Q.  And that's what Miss Baker so helpfully just highlighted

18  for us?

19  A.  Yes.

20  Q.  If we back out, Miss Baker, you see where it's sitting

21  right there?

22  A.  Yes, sir.

23  Q.  Was that where it was sitting when you first walked into

24  the room with Amy Roof?

25  A.  No, sir.

JUSTIN BRITT - DIRECT EXAMINATION

1    Q.  Where was it when you first walked into the room?

2    A.  It was literally on the corner of the desk.  I mean that

3    far from the corner.

4            MR. RICHARDSON:  Can we go to 261, Miss Baker.

5    Q.  This is another picture, we can see the camera where it

6    was located?  Right here?

7    A.  Yes, sir.

8    Q.  That's where you and Amy Roof set it back down after you

9    had looked at it?

10   A.  Yes, sir.

11   Q.  But when you first walked in --

12           MR. RICHARDSON:  Back out, Miss Baker.

13   Q.  -- it's on the corner of this desk?

14   A.  The corner that you can't see.

15   Q.  Right.  And after you finished looking at it and set it

16   back down, were you there when Miss Polis collected this

17   camera?

18   A.  Yes, sir.

19   Q.  You provided it to her?

20   A.  Yes, sir.

21           MR. RICHARDSON:  If you would answer any questions

22   that Mr. Bruck might have, I'd appreciate it, Corporal.

23   A.  Yes, sir.

24           THE COURT:  Cross-examination.

25           MR. BRUCK:  No questions.

903

CHRISTINE POLIS - DIRECT EXAMINATION

1            THE COURT:  Thank you, Corporal, you may step down.

2        Were you intending to offer 257?

3            MR. RICHARDSON:  I was not, Your Honor, we were just

4    offering that for foundational purposes, that that was the

5    camera.  We'll have a witness who later comes and testifies

6    about information that was pulled off of that camera.

7            THE COURT:  That's fine.

8            MR. RICHARDSON:  The Government calls Investigator

9    Polis.

10           THE CLERK:  State your full name for the record,

11   please.

12   A.  Christine Polis.

13       CHRISTINE POLIS, a witness called by the Government, first

14   having been duly sworn, testified as follows:

15                          DIRECT EXAMINATION

16   BY MR. RICHARDSON:

17   Q.  Introduce yourself to the jury and tell them where you

18   work.

19   A.  My name is Christine Polis, I'm a senior crime scene

20   analyst with the Richland County sheriff's office in Columbia.

21   Q.  And tell us a little bit, just briefly, we've had some

22   crime scene investigators or analysts in already, but tell us

23   a little bit about what you do.

24   A.  As a crime scene investigator, my portion of an

25   investigation is to focus on the physical evidence.  So we

CHRISTINE POLIS - DIRECT EXAMINATION

1  respond to various locations as we're requested by deputies or

2  investigators, sometimes coroner's office.  And we handle the

3  physical evidence at that location.  So we may be searching

4  for items, we document what we find through photography,

5  videos, sketching, notes, all those things.  And then probably

6  things you're familiar with, like processing evidence for

7  fingerprints or collecting DNA, that's my responsibility as

8  well.

9  Q.  I want to jump to June the 18th of 2015.  Tell me how you

10 got involved in a search out in Eastover.

11 A.  I was requested by my supervisor to respond to that

12 location and to meet with members of the fugitive task force

13 from the Richland County Sheriff's Department, as well as some

14 representatives from SLED, and to assist in the search at this

15 location.

16 Q.  And Corporal Justin Britt was one of the folks you met

17 with out there?

18 A.  That's correct.

19 Q.  Okay.  I'm going to hand you a number of photographs, and

20 I'll read them for the record.  259, 260, 261, 262, 263, 264,

21 265, 266, 267, 268, 269, 270, 272, 273, 274, 275, 277, 278,

22 279, 280, 283 and 284.  Have you had a chance to look at those

23 earlier this morning?

24 A.  I have.

25 Q.  And those are fair and accurate copies of photographs that

905

CHRISTINE POLIS – DIRECT EXAMINATION

1   you took, or supervised being taken, that day at Amy Roof and

2   Danny Beard's house?

3   A.  Yes, I took these.

4            MR. RICHARDSON:  Your Honor, we'd move to introduce

5   those exhibits.

6            MS. PAAVOLA:  No objection other than the ones at the

7   break, Your Honor.

8            THE COURT:  Very good. Government Exhibits 259, 260,

9   261, 262, 263, 264, 265, 266, 267, 268, 269, 270, 272, 273,

10  274, 275, 277, 278, 279, 280, 283 and 284 admitted without

11  objection.  Admitted subject to the objection of the defense.

12     (Government Exhibits 259 through 270, 272 through 275, 277

13  through 280, 283 and 284 received.)

14           MR. RICHARDSON:  Thank you, Your Honor.

15     Could we go to 259, Miss Baker.

16  BY MR. RICHARDSON:

17  Q.  We're just going to walk through these relatively briefly,

18  but give us just a little bit of a background of what we're

19  seeing here.  259, what is this?

20  A.  This is just a view of the front of the residence taken --

21  photograph from the outside.

22  Q.  Government Exhibit 260?

23  A.  This is up in the bedroom that we were advised belonged to

24  Dylann Roof, and this is a desk that is up against a wall

25  opposite the doors when you enter the bedroom.

CHRISTINE POLIS - DIRECT EXAMINATION

1    Q.  Okay.  And in Government's 260 you see the blue camera

2    that's sitting there.

3    A.  Yes, sir.

4    Q.  And you had a chance this morning to look at Government

5    Exhibit 257; this is that blue camera?

6    A.  That's correct.

7    Q.  Okay.  Did you collect that and provide that to another

8    agent to take for processing?

9    A.  That's right, it was initially collected by Corporal

10   Britt, and then turned over to SLED agent and turned over to

11   me.

12   Q.  Okay.  And then once you got it, you then provided it to a

13   different SLED agent, David Lawrence?

14   A.  It was ultimately given to a SLED crime scene

15   investigator.

16   Q.  Dave Lawrence took it, he's the one that delivered it to

17   the crime scene -- the electronic evidence team that evaluated

18   it?

19   A.  I believe so.

20   Q.  And 261?  This is just another picture of --

21   A.  Same picture of that desk, and had a television on it.

22   Q.  And this is sort of directly across from where the bed is?

23   A.  Correct.

24   Q.  If we can go to Government Exhibit 262.

25   A.  When you walked in the door to this room, the wall along

907

CHRISTINE POLIS - DIRECT EXAMINATION

1    the right-hand side had two closets on it.  So this is a set

2    of shelves that was placed in between those two closet doors.

3    Q.  And you see two boxes of ammunition that are on that

4    table?

5    A.  Yes, sir.

6    Q.  I'm going to hand you Government's Exhibit 285 and 286.

7    Do you recognize those items?

8    A.  Yes, I do.

9    Q.  Show those to defense counsel.  Are those the items that

10   you found that are identified in 262?

11   A.  Yes, sir.

12        MR. RICHARDSON:  Your Honor, we move to admit 285 and

13   286.

14        THE COURT:  Any objection?

15        MS. PAAVOLA:  No objection.

16        THE COURT:  285 and 286 admitted without objection.

17     (Government Exhibits 285 and 286 received.)

18        MR. RICHARDSON:  Thank you, Your Honor.  If we can go

19   to 263.

20   A.  Just a close-up of those two items.

21   Q.  264?

22   A.  That would be the empty tray that came out of the

23   ammunition box.

24   Q.  And that's the empty tray that came out of the box that is

25   the 50-round box.

CHRISTINE POLIS - DIRECT EXAMINATION

1   A.  That's correct.

2   Q.  That's the smaller of the two boxes?

3   A.  That's correct.

4   Q.  We go to 265.

5   A.  This is a close-up of the two trays that came out of the

6   larger box of ammunition, one of them is empty, and then one

7   of them contains bullets, or what we refer to as projectiles,

8   down in those slots of that tray.

9   Q.  And so these are rounds that have been fired and

10  recovered?

11  A.  That's correct.

12  Q.  And were you able to find -- were there little pieces of

13  paper that appeared to be attached to them?

14  A.  There was, it appeared to be paper, but there's definitely

15  a material embedded in there.

16  Q.  If we go to 266, Miss Baker.

17  A.  This is on that same set of shelves, these are -- they're

18  back straps for a Glock handgun.  So it's basically a part of

19  a Glock handgun that can be removed and replaced.  So these

20  are replacement back straps.

21  Q.  If we go to 267.

22  A.  This is just a chair that was against the wall in the room

23  with a shirt draped over the back of the chair.

24  Q.  And this is sort of in the far corner when you walk in the

25  room?

909

CHRISTINE POLIS – DIRECT EXAMINATION

1    A.   That's correct.

2    Q.   If we go to 268?

3    A.   This is a close-up of items that are on, I believe a

4    bedside table, that if you are laying in bed, it would have

5    been on the left-hand side of the bed.

6    Q.   And it's just to the other side of it with the chair we

7    just saw.

8    A.   I believe so, yes, sir.

9    Q.   And during this point in time when you sort of going

10   through and searching the room and you got to this location,

11   tell me what happened.

12   A.   There were multiple individuals in the room who were

13   searching, it wasn't just myself, there were several of us who

14   were in there working in different parts of the room.  So one

15   of the investigators that was searching in the closet, found

16   an item that he believed could be homemade explosives.  So at

17   that point everyone evacuated the residence, and we went

18   outside to a safe location while we waited for the Richland

19   County sheriff's office bomb technician to come out and make

20   sure that it would be safe for us to go back in.

21   Q.   And that was in an abundance of caution; it turned out

22   there were no explosives, there were no bombs that were there?

23   A.   Correct.

24   Q.   But in your work, what we do is engage in an abundance of

25   caution to ensure the safety of the officers involved?

CHRISTINE POLIS – DIRECT EXAMINATION

1    A.   Absolutely.

2    Q.   As a result of that, did the sort of organization of your

3    search change?

4    A.   We did go outside for a period of time, we had to wait for

5    someone to get there.  So I did some work outside while we

6    waited until we could go back in.  So yes, we stopped -- kind

7    of stopped one activity, and I started with something else at

8    that point.

9    Q.   In the bottom left-hand side of this particular screen

10   there's a small bowl, and included there is a -- is what, what

11   is this red and black item here?

12   A.   It's a jump drive.

13   Q.   Okay.  And did you collect that item?

14   A.   No, sir, I did not.

15        MR. RICHARDSON:  I'm going to go to 269, Miss Baker.

16   A.   This is a close-up of a wooden box of unfired cartridges

17   that was located in the room.

18   Q.   And these cartridges are what caliber of ammunition?

19   A.   Just a second.  There are nine millimeter.

20   Q.   And these were found in one of the dressers in his room?

21   A.   That's correct.

22   Q.   If we go to Government Exhibit 270.

23   A.   In this room there was a table, and underneath the table

24   there was a wooden box that had a duck, duck carving on top of

25   a wooden box.  If you opened that box up, it had a tray in it

911

CHRISTINE POLIS - DIRECT EXAMINATION

1   that would lift out, so that this is the lifted out tray

2   portion.  And within that box we found this; it appears to me

3   to be a pillowcase that had been cut into this triangular

4   shape.

5   Q.  Why did you take a picture of a pillowcase cut into a

6   triangular shape?

7   A.  To me it represents what could be a Ku Klux Klan hood.

8   Q.  If we go to Government Exhibit 272.

9   A.  This is a receipt from the Academy Sports Store for gun

10  parts, various gun parts.

11  Q.  And these are -- Are you familiar with firearms?

12  A.  Somewhat.

13  Q.  Okay.  Did you know what types of -- what type of weapon

14  these gun parts were for?

15  A.  Honestly, I can't read in these photos.  I believe

16  everything was for an assault rifle that we collected, but

17  this is a bit of a blurry image.

18  Q.  If we go to 273, maybe that will help us.

19  A.  Yes.  These items were located in the closet, they were

20  all inside of a Palmetto Armory plastic shopping type bag.

21  These are all magazines, extended capacity magazines.  There's

22  some unfired cartridges here, boxes of ammunition.  And then

23  other parts, these would be for an assault rifle.

24  Q.  Okay.  And you found the ammunition here and parts; did

25  you find an actual assault rifle?

912

CHRISTINE POLIS – DIRECT EXAMINATION

1    A.  No, we did not.

2    Q.  274, what do we have here?

3    A.  274 is a close-up of the one magazine.  So everything was

4    in brand new packaging, except for one magazine which was

5    loaded, so this is just a close-up of that magazine.

6    Q.  When you buy a magazine it comes unloaded; you have to

7    push the shells in?

8    A.  That's correct.

9         MR. RICHARDSON:  Can we go to 275, Miss Baker?

10   A.  This is a legal pad that was there in the room with just

11   various hand drawn symbols on there that was collected.

12   Q.  Okay.  And did you notice Mr. Roof's initials, the DSR --

13   A.  I did.

14   Q.  -- indicated here?

15   A.  Yes, sir.

16        MR. RICHARDSON:  Can we go to the second page of

17   this, Miss Baker.

18   Q.  And why did you take a picture of this page?

19   A.  It appears to me to be a representation of a KKK outfit

20   and symbols.

21   Q.  Miss Baker, then go to 277.  And I know these are not in

22   the order in which you took them, because you actually went

23   outside midway through the search.

24   A.  That's correct.

25   Q.  But looking here at Government Exhibit 277, tell us what

CHRISTINE POLIS - DIRECT EXAMINATION

1    we're seeing.

2    A.   This is a picnic table area that's in the backyard.  Of

3    the residence.

4    Q.   You know, I skipped one thing.  Let me jump back to the

5    room.  In the room, did you also find some undeveloped film?

6    A.   Yes, sir, we did.

7    Q.   Okay.  And in essence you found five rolls in a wooden

8    box?

9    A.   That's correct.

10   Q.   And two rolls on the desk shelf?

11   A.   That's right.

12   Q.   Is that Government 287 and 288?

13   A.   Yes, sir.

14   Q.   Once you recovered those, did you turn those over for

15   someone else to process?

16   A.   I did, I just collected these.

17          MR. RICHARDSON:  We'd move the admission of those two

18   items.

19          THE COURT:  Any objection?

20          MS. PAAVOLA:  No action.

21          THE COURT:  Government 287 and 288 admitted without

22   objection.

23          MR. RICHARDSON:  Thank you, Your Honor.

24   BY MR. RICHARDSON:

25   Q.   So I apologize for that.  Back to 277, when you're outside

914

CHRISTINE POLIS – DIRECT EXAMINATION

1  looking at a picnic table in the backyard, what did you notice

2  there?

3  A.   Someone had actually alerted me to the fact that there

4  were two fired cartridge casings or two rounds that were left

5  behind on the top of that table.

6  Q.   We go to 278, which is a close-up of that.

7  A.   That's correct.

8  Q.   And those are the two casings?

9  A.   That's right.

10  Q.   I'm going to hand you what's been marked 289; do you

11  recognize those?

12  A.   Yes.

13  Q.   And what are those?

14  A.   These are the two fired cartridge casings from the picnic

15  table.

16       MR. RICHARDSON:  Government moves admission of 289,

17  the two casings from the picnic table.

18       MS. PAAVOLA:  No objection.

19       THE COURT:  Government 289 is admitted without

20  objection.

21    (Government Exhibit 289 received.)

22       MR. RICHARDSON:  Can we go to 279, Miss Baker.

23  BY MR. RICHARDSON:

24  Q.   Government Exhibit 279, is this another part of the

25  backyard?

915

CHRISTINE POLIS - DIRECT EXAMINATION

1  A.  This is, you can look and see the swing up ahead, it's a

2  partially covered shed that was back there.

3  Q.  Okay.  And can we go to Government Exhibit 280.

4  A.  This is a close-up, there was a metal can that contained a

5  number of fired cartridge casings that were already there in

6  the can.  This is not something I collected, this is how they

7  were.

8  Q.  Okay.  And I believe this is Government Exhibit 291.  Do

9  you recognize this item?

10 A.  Yes.

11 Q.  And what is it?

12 A.  This is the can that contained the fired cartridge

13 casings.

14 Q.  And were you able to determine, looking at these casings,

15 what the majority of these casings are from?

16 A.  This one is a .45 caliber.

17 Q.  Okay.  There do appear to be a small number of other

18 casings in there?

19 A.  Yeah, this one is a 357.

20      MR. RICHARDSON:  Your Honor, at this point we move

21 the admission of 291.

22      MS. PAAVOLA:  No objection.

23      THE COURT:  Government 291 is admitted without

24 objection.

25      (Government Exhibit 291 received.)

CHRISTINE POLIS - DIRECT EXAMINATION

1          MR. RICHARDSON:  Miss Baker, if we can go to 283.

2     BY MR. RICHARDSON:

3     Q.  What do we have here?

4     A.  This is just an area that kind of goes off into the wooded

5     portion of the lot, and there's a tree that you can see there

6     in the background, I was advised by Mr. Beard that they did

7     occasionally go out and use this area for target practice.

8     Q.  Okay.  And 284 is what?

9     A.  A close-up of that tree, it has a board attached at the

10    bottom.

11         MR. RICHARDSON:  Investigator, if you would answer

12    any questions that defense might have, I'd appreciate it.

13                         CROSS-EXAMINATION

14    BY MS. PAAVOLA:

15    Q.  Good morning, Miss Polis.

16    A.  Good morning.

17    Q.  The house where you collected these items, it did not

18    belong to Amy Roof, the defendant's mother, is that right?

19    A.  That's what I understood.  I understood the property

20    belonged to Danny Beard, and that was her boyfriend that she

21    resided there.

22    Q.  And Danny Beard is not related to the defendant in any

23    way, as far as you know.

24    A.  I have no idea.

25         MS. PAAVOLA:  Thank you.  No further questions.

917

FARAND WASIAK - DIRECT EXAMINATION

1    THE COURT:  You may step down.  Call your next

2    witness.

3    MR. RICHARDSON:  Your Honor, the Government calls

4    SLED Agent Wasiak.

5    MR. BRUCK:  While we're waiting for this witness,

6    Your Honor, there are a number of matters to be taken up.  We

7    can do it at the Government's convenience, I just want to

8    alert the Court.

9    THE CLERK:  Please state your name for the record.

10   A.  Farand Wasiak.

11   FARAND WASIAK, a witness called by the Government, first

12   having been duly sworn, testified as follows:

13                         DIRECT EXAMINATION

14   BY MR. RICHARDSON:

15   Q.  Agent, introduce yourself to the jury and tell them where

16   you work.

17   A.  I'm Special Agent Farand Wasiak, I'm with the South

18   Carolina SLED computer crime unit.

19   Q.  Tell me a little bit about what kind of work you do.

20   A.  My job has two roles.  I'm a forensic examiner, I examine

21   digital media on computers, cell phones.  My other part of my

22   job is I'm an investigator, I investigate child exploitation

23   cases, network intrusions, which are your hackings,

24   cyberbullying, on line threats, stuff like that.

25   Q.  And as briefly as you can, I know it's extensive, but give

918

FARAND WASIAK - DIRECT EXAMINATION

1   us a little bit about your background and training that

2   prepared you and permits you to perform those tasks.

3   A.   Basically I have training in the science of forensics, as

4   well as the software.  The science of it would be like

5   learning math by yourself in grade school, and in high school

6   they allow you to use a calculator to do basic arithmetic.

7   Same thing with computer forensics.  The software we use does

8   most of the work for us, just for the amount of data, and it

9   saves on time.  The training I have is by the software itself,

10  I have attended Secret Service's National Computer Crime

11  Institute for five-week training, three-week training, as well

12  as on going training which I maintain about 40 hours a year in

13  ongoing training.

14  Q.   I want to sort of focus in on the work you did related to

15  this case.  Did you work with a group of people at the

16  computer crimes lab for SLED?

17  A.   Yes, that's correct.

18  Q.   And the way that system operates is agents bring you

19  items, your group items, for evaluation to pull that data off?

20  A.   That's correct.

21  Q.   On June the 18th, did the computer crimes section receive

22  what's marked for identification as 257, a camera that had

23  belonged to the defendant?

24  A.   We did receive a digital camera, correct.

25  Q.   And just walk me through sort of how the computer crimes

919

FARAND WASIAK - DIRECT EXAMINATION

1   section manages data.  How did that data ultimately get to you

2   for processing?

3   A.  We have our own evidence intake in a computer crime

4   section.  The camera was brought in, okay, because intake,

5   paperwork, chain of custody.  From there, it is brought back

6   to our evidence room, which is within our lab.  That's a

7   controlled access area.  I do not even have access to that

8   area.

9       Digital cameras have memory cards, so the memory card was

10  taken out and put into what we call a write block, W-R-I-T-E.

11  That write blocker prevents any information to be put onto

12  that memory card, okay?  It's a one-way street.  Information

13  can only leave -- I don't want to say leave, because that

14  means it would be gone -- it is transferred to what we have a

15  server, we call that imaging.  We image that memory card onto

16  a server.  Okay?  An image is a bit-by-bit copy of whatever

17  media we are imaging.  It is a clone.  The DNA would be

18  exactly the same, I guess you could say, if -- as the original

19  media.

20      That SD card, memory card is then placed back into

21  evidence.  Okay?  From that server, where we have an image,

22  okay, the bit-by-bit copy of that memory card, I work off of.

23  That's where I do my analysis.  I never work off the original

24  evidence ever.  I never touch it.

25      And from there, I just complete my analysis off the image.

FARAND WASIAK - DIRECT EXAMINATION

1   Q.  When you talk about completing your analysis in this

2   instance, the -- you got the image on the server that you're

3   able -- what were you doing, what was your role, what were you

4   trying to accomplish on that image?

5   A.  The initial request was they wanted anything and

6   everything off that memory card.  Since it came from a digital

7   camera, obviously I assumed there would be video files and

8   picture files.  So what I did was I told the software to look

9   for and collect any video and picture files.  And that's what

10  the software basically did.

11  Q.  And just taking a half step back, we talk about the memory

12  card, does a camera hold information separate from a memory

13  card?

14  A.  It -- they do; however, with this camera we looked it up,

15  the memory within the camera itself was so small, it was

16  mostly -- the information would have been saved was for the,

17  you know, date and time that you save when you look on your

18  camera, you date time stamp it.  Plus with that camera auto

19  defaults to any picture being taken, has to go to the digital

20  media, which would be the memory card.

21  Q.  You mentioned sort of date and time.  Tell me a little bit

22  about how the camera keeps and records dates and times for

23  photographs and videos that are taken.

24  A.  Particularly this camera, it's the user has to input, it's

25  not like cell phones these days where it's all based off

FARAND WASIAK - DIRECT EXAMINATION

1   whatever cell phone company or network you have.  With a

2   digital camera like that, the user has to input the date and

3   time for it.  And then initially, upon setting it up, putting

4   in a new battery, changing out the battery, something like

5   that.

6   Q.  So you can look at the date, and that's one piece of

7   information to determine when that photograph was taken, but

8   you might need other information as well to actually determine

9   the approximate date and time?

10  A.  That is right.  To corroborate it, yes.

11  Q.  So, for example, you might look at a photograph that has

12  Christmas trees up in it and recognize that's likely in the

13  November-December time frame?

14  A.  That's correct.  Yes.

15  Q.  And so let me back up.  When you got the image on the

16  server, tell me how you went about getting everything off of

17  it that you could then evaluate and have the agents use for

18  their investigation.

19  A.  Okay.  The software I use was called FTK.  That's short

20  for Forensic Tool Kit.  That's a software made by Axis Data.

21  It's one of the two or three industry standard forensics

22  softwares that we use.

23      What I did was I have this image, okay, this copy on our

24  server.  What I do is what the software does, is I acquire it.

25  And the software will by acquire it, it will index it, create

922

FARAND WASIAK - DIRECT EXAMINATION

1    a database for it.  So this way, when I conduct my searches,

2    it puts all the JPGs, which would be picture files in one

3    area, all my movies in another area.  FBD, all my documents,

4    PDFs, all -- they separate it out.  This way, when I'm

5    particularly looking for something, I know exactly where I'm

6    going to go to, what drawer, what cabinet I have to go to look

7    for what I'm looking for.

8         Particularly with this one, since it was any contents of a

9    digital memory card, I pretty much look for pictures and video

10   files.  And when I say look for, I just set the software to go

11   ahead and pull out all those -- all that data for me.

12   Q.  I'm going to hand you what's been marked as 293, and this

13   is identification only, for foundational purposes.  What is

14   Government Exhibit 293?

15   A.  This is my FTK report, Forensic Tool Kit report that you

16   burn to a disk.  Pretty much the software itself puts

17   everything into like a navigating website, so it's easy to

18   view, and whoever is looking at it can go through it with

19   ease, so to speak.

20   Q.  And so that would be -- that would contain everything that

21   was on the camera.

22   A.  That is correct, yes.

23   Q.  And we're not going to go through every one, you'll be

24   glad to know, but there are thousands of different photographs

25   and videos that are included on that?

923

FARAND WASIAK – DIRECT EXAMINATION

1    A.  Yes, that is correct.

2    Q.  In addition to saved or full images, there are also

3    deleted images that are still available through the FTK

4    software?

5    A.  Yes, there are.

6    Q.  Without getting too far into carved images and headers,

7    just briefly tell us what -- how those are there.

8    A.  Yes.  The software is able to get back deleted images, or

9    any kind of files.  Not so much what you put in the recycle

10   bin, but what's actually been emptied from the recycle bin

11   into what we call unallocated space.  The software pretty much

12   looks for file headers that contains information that is --

13   what you would say unique to that particular file.  So if I

14   tell it to carve or parse out for a JPG file, which is a

15   picture file, it will look for any kind of elements of that

16   file in what's unallocated space.  The result is almost I

17   guess you could say a phantom zone or anything like that of

18   the hard drive area.  And it will just take what it can.

19   Sometimes a whole image is not -- picture is not there because

20   it was overwritten or partially overwritten.  And so it does

21   its best to retract or retrieve those images or video files

22   for me.

23   Q.  And it also includes -- no need to describe them, the jury

24   has heard about them before -- it also includes thumbnails as

25   well?

FARAND WASIAK - DIRECT EXAMINATION

1    A.  It will, yeah, if -- so be it, yes.

2    Q.  And once you do your role, which is pulling this data off,

3    then it's sort of provided to agents to try to determine

4    what's relevant or pertinent or necessary for part of that

5    investigation.

6    A.  Yes.  Particularly for this case when they told me just

7    find anything and everything, I pretty much supplied them with

8    everything and anything I possibly could, for them to review,

9    because they would obviously know what they're looking for

10   more so than me.

11   Q.  And then subsequent to that, you were provided a number of

12   photographs and videos and asked to confirm whether those were

13   true and accurate copies of what was on that SD card?

14   A.  That is correct.

15        MR. RICHARDSON:  Your Honor, I believe that there are

16   a number of objections to what may be coming up yet.  Given

17   the time, perhaps now would be a good time for lunch?

18        THE COURT:  Okay.  That's an invitation I can't

19   resist, right?  Ladies and gentlemen, we'll take our lunch

20   break and we'll reconvene in about an hour.

21     (Jury excused.)

22        THE COURT:  Mr. Bruck, you have something you want to

23   address?

24        MR. BRUCK:  Yes.  May we approach?

25        THE COURT:  Yes.

FARAND WASIAK – DIRECT EXAMINATION

1          (Following discussion held at side bar.)

2              MR. BRUCK:  We have not a huge number of objections

3      to these hundreds of exhibits, but we do have some.

4              THE COURT:  Okay.

5              MR. BRUCK:  Where are we starting?  Two --

6              MR. RICHARDSON:  294.  Just so the Court understands

7      what this is, of the thousands of photographs, these are ones

8      that the agent and we selected as pertinent to what we've got.

9              THE COURT:  Okay.

10             MR. RICHARDSON:  Your Honor, the first suggestion was

11     to introduce the entire thousands of images.

12             THE COURT:  I'm pleased you did not do that.  Thank

13     you.  Let's go through the ones, one by one.

14             MR. BRUCK:  Starting with 294, the photos --

15             THE COURT:  Can you hand me 294.

16             MR. BRUCK:  We have a series of photographs which we

17     have enumerated by Bates numbers.  And they are essentially

18     the -- Let's see.  The pictures of Dylann pointing the gun at

19     the camera, and then later we're going to get to videos of

20     actually shooting.

21             THE COURT:  Give me --

22             MR. BRUCK:  So if you can find them.

23             MR. RICHARDSON:  Do you have Bates numbers?

24             MS. PAAVOLA:  Yes.

25             THE COURT:  Think Miss Paavola may know the details

926

FARAND WASIAK - DIRECT EXAMINATION

1  better than you.

2        MR. RICHARDSON:  Here's one example.

3        MS. PAAVOLA:  1688 is the first one on the list.

4        THE COURT:  Let me hold 1688.  And what is your --

5        MR. RICHARDSON:  Here's another.  There are a number.

6        THE COURT:  1688 and 1691.

7        MR. BRUCK:  91 and 92, 1697, 1702, 1725 and 26.

8        MR. RICHARDSON:  1702?

9        MR. BRUCK:  We just got that.  And then 25 to 26.

10       THE COURT:  What is -- what is that?

11       MR. RICHARDSON:  He's in the dark, he's pointing a

12  gun at the camera.

13       THE COURT:  Okay.  Prejudice may be outweighed by the

14  darkness, if that's possible.

15       MR. RICHARDSON:  25 and 26?

16       MR. BRUCK:  Yes, sir.  1735.  1738 to 40.  And then

17  skipping a little bit, I'm sorry, 1728, dropping back, we had

18  not actually identified that in our original motion, but it's

19  the same problem.

20       THE COURT:  Okay.

21       MR. BRUCK:  Now skipping to 2181, 2190, 2195 to 99,

22  2205, 2207 to nine.  2272 to three.  I'm getting there.  2275,

23  2278, and 22 -- 2320.  And maybe not the last one.

24       MS. PAAVOLA:  Right.

25       MR. BRUCK:  We may have missed 2148.  Sorry.  And

FARAND WASIAK – DIRECT EXAMINATION

1    then --

2              MR. RICHARDSON:  You missed 2143 and 44 as well?  46?

3              MR. BRUCK:  2146 to seven, yes, and -- Yes, we did.

4    Good catch.  And then two photos of actually firing the gun,

5    which are 1700 and 1706.

6              THE COURT:  We'll put that aside, a little different

7    character.  Okay.

8              MR. BRUCK:  Then some videos, but we'll do the photos

9    first.

10             THE COURT:  Okay.  Why are they offered?

11             MR. RICHARDSON:  These are all offered as part of his

12   premeditation and malice.  It's also part of -- offered for

13   part of why, which is why he's doing this.  This is part of a

14   message that he's sending.  He leaves the camera sitting on

15   the counter there.  These are the items, and a number of these

16   items are similar to the items seen on the LastRhodesian.  He

17   goes through, and this is part of the important part for us is

18   to show he takes these thousands and thousands of pictures,

19   and he goes to even curates that set down to the set of 60.

20             THE COURT:  Which we've already put in.

21             MR. RICHARDSON:  Which we've put in, and these are

22   additional photographs he left sitting on the counter there

23   that his mother was aware photographs of him engaged in the

24   mental planning and preparation of the case.

25             THE COURT:  And your objection?

928

FARAND WASIAK - DIRECT EXAMINATION

1          MR. BRUCK:  Under 403, these are not photographs that

2     he published and made public.  It is -- they are photographs

3     of thousands and thousands of images.

4          THE COURT:  Which have gotten down now gratefully to

5     several hundred?

6          MR. BRUCK:  Four hundred something.  But it -- this

7     is not something that he expressed to the public or to the

8     world, and under 403 side -- that's 401.  Then on 403, it is

9     shooting at the jury, it is so personal and so direct.

10          THE COURT:  He did that -- you haven't mentioned the

11     word cumulative.

12          MR. BRUCK:  There's that too.  So once we

13     establish --

14          THE COURT:  Let me just say, I do think that they

15     speak to premeditation and planning and so are relevant.  I do

16     think that he was sending a message, I think that's a

17     reasonable inference that could be drawn.  But I am very

18     troubled by the volume, okay, of them.  They are duplicate.

19     And I think you can make the point without what looks like to

20     me like about 75 more pictures.  I think you ought to go

21     through, and let's be selective, a lot of these are very

22     similar to each other.

23          MR. RICHARDSON:  I think that's part of the relevance

24     to us though, Your Honor, right, is that he is going through,

25     in a variety of different outfits --

929

FARAND WASIAK - DIRECT EXAMINATION

1          THE COURT:  I'm okay with that.  But let me just say

2     that.  I'm okay with showing him in different outfits, I think

3     that's a point.  But to show five or six in the same outfit at

4     the same time seems cumulative to me.  You understand what I'm

5     saying?

6          MR. RICHARDSON:  I do, Your Honor, and I'll add, and

7     then I'll stop, I don't want to push too far, I think part of

8     it, the numerosity here is part of the relevance, right?

9     Because as part of showing the degree of malice and the degree

10    of --

11         THE COURT:  But you can do that without just tearing

12    up the concept of being cumulative.  Okay?  And what I'm

13    saying to you is you have a whole block here we're not talking

14    about yet.  And I think there's a point, I agree with you, but

15    you have -- but I think you ought to go through and let me

16    just say that appears to be unique to itself.  Okay?  Here we

17    go, that's 1688, which seems fine.  But then you have 1691 and

18    1692, I think one of those is probably sufficient.  You have

19    1697, he's in the same outfit but a different location, I'm

20    okay with that.  1702 does not mean anything.  1725 is a

21    different outfit but the same room basically, I just don't

22    know.  Why do we need -- you have the same shirt, but a

23    different pair of pants, so like he put his blue jeans on

24    instead --

25         MR. RICHARDSON:  How about we'll take an opportunity

930

FARAND WASIAK - DIRECT EXAMINATION

1    to go through this group at the lunch break.

2              THE COURT:  Yes.

3              MR. RICHARDSON:  Then before we -- what we'll do is

4    we'll bring back up a separate group of this stack.

5              THE COURT:  Yes.  And I think we need to trim it

6    down, but the variety is reasonable, is admissible, the volume

7    is excessive.

8              MR. RICHARDSON:  I understand.

9              MR. BRUCK:  And finally, reviewing this, and it's one

10   of the many frustrations of this case, is that I think the

11   Court is aware that there is evidence of there are alternative

12   explanations other than malice for the perseverative behavior

13   and for the obsession with the defendant's appearance.  I'm

14   not talking about the shooting, I'm talking about the way his

15   face looks to him, which is an alternative explanation for why

16   he takes picture after picture after picture after picture.

17             THE COURT:  That can go in mitigation at sentencing.

18   It's not admissible because it does not negate an element of

19   the crime.

20             MR. BRUCK:  I'm not saying it's admissible, I'm

21   saying if the Court, in the exercise of its discretion, should

22   appreciate that the -- the level of reality, the inferences

23   the Government wishes the jury to draw are not the only

24   inferences, or probably not the most truthful inferences.

25             THE COURT:  And you can argue that to the jury.

931

FARAND WASIAK - DIRECT EXAMINATION

1          MR. RICHARDSON:  In mitigation.

2          THE COURT:  And he could -- if -- he could argue even

3    that the picture doesn't say what you say it is.  He could

4    argue that in close.  Okay?

5          MR. RICHARDSON:  Yes.

6          THE COURT:  But a lot of these pictures seem to speak

7    for themselves, I don't know quite what you would say,

8    Mr. Bruck.  Okay.  Why don't y'all work over and then let's

9    come back a few minutes early and let's take a look and --

10          MR. RICHARDSON:  That's just one class of objections,

11    Your Honor.

12          MR. BRUCK:  We're near the end.

13          THE COURT:  I'm not rushing you, Mr. Bruck, you do

14    what you need to do.

15          MR. BRUCK:  You have already ruled on photographs

16    depicting the desecration of the American flag, but we have

17    those in now from the website.  There are more of them.

18          THE COURT:  Why do we need more?  We got it in.

19          MR. RICHARDSON:  This goes back to the idea that he's

20    selecting photographs out of this group, and so he has a

21    number of these photographs, he is going through and selecting

22    those out.

23          THE COURT:  I think these are cumulative.  I'm not

24    going to allow any more of those.  You have enough.  Point

25    made.

FARAND WASIAK - DIRECT EXAMINATION

1            MR. BRUCK:  There is a series of Heil Hitler salutes,

2    we think are unduly prejudicial.  We've already objected to --

3            THE COURT:  Yeah, let me just address this.  Again,

4    if it was in just isolation, Mr. Bruck, I would have more

5    sympathy to your 403.  We've just got him completing a

6    document hours before his rampage, and that just makes it

7    highly probative.  So I would respectfully disagree with you

8    on this.

9            MR. BRUCK:  We have three photographs, again, the

10   cumulative issue, 185, 67.  We have three photographs of the

11   Heil Hitler salute, Bates number 2085, 6721 and 60 -- slow it

12   down.

13           THE COURT:  Give him the first one.

14           MR. RICHARDSON:  2085.

15           MR. BRUCK:  2085.

16           MR. RICHARDSON:  I think they're all at different

17   locations, but let me -- this is -- confederate cemetery.

18           THE COURT:  Okay.

19           MR. BRUCK:  Then there is 6721.

20           MR. RICHARDSON:  This is the -- the Confederate

21   Women's Memorial at the Statehouse.

22           THE COURT:  6864.

23           MR. BRUCK:  6721 and 6864.

24           MR. RICHARDSON:  6721, I'm not sure that's part of

25   294.

933

FARAND WASIAK - DIRECT EXAMINATION

1        THE COURT:  What's the next one?

2        MR. BRUCK:  Now we have six more --

3        THE COURT:  Hold it.

4        MR. BRUCK:  That's all.

5        MR. RICHARDSON:  Here it is, I'm sorry.

6        THE COURT:  Okay.  Yeah, I think if you pick one of

7   those out of 6864 and 6721, and 2085 is fine.

8        MR. BRUCK:  Then there are now six additional

9   pictures of Mr. Roof with a pillowcase on his head.

10       THE COURT:  Okay.

11       MR. BRUCK:  We have two of those that are already in

12  evidence over our objection, now the Government has six more.

13       THE COURT:  Does he actually have it over his head?

14       MR. BRUCK:  Yes.

15       MR. RICHARDSON:  I don't think we have one --

16       MR. BRUCK:  I'm sorry.

17       THE COURT:  He had one situated in the room.

18       MR. BRUCK:  So we now have six.  6030, 71, then 6030.

19  6492.

20       MR. RICHARDSON:  That can't be right.

21       MR. BRUCK:  6490.

22       MR. RICHARDSON:  You said 60.  6492.

23       MR. BRUCK:  Um-hum.  6505 and 6510.

24       THE COURT:  I was given two here.  Okay.

25       MR. BRUCK:  Is that ten?  And then 66 --

934

FARAND WASIAK - DIRECT EXAMINATION

1          MR. RICHARDSON:  Give me one second.  I don't see a

2    6510.

3          MR. BRUCK:  6510.  No?

4          MR. RICHARDSON:  Unless I've already handed it up.

5          THE COURT:  I have 6071, 6030, 6492, 6505, 6510, I

6    have.

7          MR. BRUCK:  Okay.

8          THE COURT:  And 6652.

9          MR. BRUCK:  So that's all.

10         THE COURT:  These seem to be substantially the same

11   picture to me.  I think you pick -- all look like in the

12   same --

13         MR. RICHARDSON:  What we can do, I think there are

14   two different locations, we'll take one from each.

15         THE COURT:  One from each and get rid of the rest.

16         MR. BRUCK:  Okay.  Then we've got a very serious

17   problem with the video of shooting, the videos of shooting the

18   gun, including aiming towards the camera.  These are short

19   video clips that are -- that include sound, they're extremely

20   loud, they are -- I mean, whatever they accomplish by stills,

21   this overwhelmingly --

22         THE COURT:  Here's the problem.  He left it for

23   everybody to -- he was sending a message, Mr. Bruck, he left

24   it in the camera on the corner of his desk, the best I can

25   tell from the journal, that he was not anticipating returning.

935

FARAND WASIAK - DIRECT EXAMINATION

1    This was like his epitaph.  And I think it's relevant as to

2    his intent.  Now, let's talk about sound for a second.  We can

3    turn the sound down, that's okay, that's something we can

4    control.  To reduce the, you know, if it's unusually loud, I'm

5    open to trying to work it out, and maybe even over lunch y'all

6    might want to --

7                MR. RICHARDSON:  We don't intend to play those

8    through this witness in any event.  In fact --

9                MR. BRUCK:  Maybe we should take it up with the other

10   witness.

11               MR. RICHARDSON:  But we can turn the sound down.

12   This witness is a computer guy, he's going to put the evidence

13   in.

14               THE COURT:  That's all you have to do, show me the

15   pictures.

16               MR. BRUCK:  Since we've been discussing it though,

17   there is no evidence that by leaving the camera at his

18   mother's house he intended to publish it to the world.  If he

19   had wanted to publish it --

20               THE COURT:  Oh, Mr. Bruck, listen, it's in a very

21   obvious location, so obvious to his mother that as soon as the

22   officers appeared on the scene, she says I think I have

23   something here for you.  She kind of knew it.  I think there's

24   a reasonable inference, the location, that it was for that

25   purpose.  But we don't need to go overboard on it.  I'm just

936

FARAND WASIAK - DIRECT EXAMINATION

1    trying to have some balance here where we respect 401 and 403,

2    right?  So I'd have to -- if you want me to look at the video,

3    I'm glad to do that.  If you give it to Chris, I can -- if

4    you'll give it to Chris.

5            MR. RICHARDSON:  You should have them already.

6            THE COURT:  We'll look at it over lunch.

7            MR. BRUCK:  695, 678 -- I'm sorry -- they're not?

8        (Brief interruption in proceedings.)

9            MR. RICHARDSON:  295 to 99, I believe, are the -- are

10   the videos, and we do think that those are -- we've discussed

11   them in opening, but this is his plan, in preparation.

12           THE COURT:  I think it's a message, I think that's

13   fair.  But I don't want to overdo it.  Is there anything on it

14   other than the firing?

15           MR. RICHARDSON:  No, he sets them up, includes him

16   reloading, it includes him firing, includes him walking, but

17   he sets the camera up to video himself.

18           THE COURT:  I'm just wondering whether you need

19   sound.  Do you need sound?

20           MR. RICHARDSON:  I think we do need sound, Your

21   Honor, it indicates what he's doing.  I'm happy to turn the

22   volume down.

23           THE COURT:  We'll look at it.  Is that it?

24           MR. BRUCK:  What else?  Oh, the -- Oh, my goodness.

25   The -- sorry.

FARAND WASIAK - DIRECT EXAMINATION

1            MS. PAAVOLA:  That's a different witness actually.

2            MR. BRUCK:  Are you putting the Statehouse photos?

3     They're in there.

4            MR. RICHARDSON:  There are two sets of Statehouse

5     photos, so there are Statehouse photos that are on the digital

6     camera and one's on grandpa's camera.

7            MR. BRUCK:  You're putting in video camera Statehouse

8     photos?

9            MR. RICHARDSON:  Correct.

10           MR. BRUCK:  And as to these --

11           MS. PAAVOLA:  That's it.  This is all through this

12     witness.

13           MR. RICHARDSON:  294 through 99.

14           MS. PAAVOLA:  That's all we have for this witness.

15           THE COURT:  Thank y'all.  Thank you, Mr. Bruck.

16     We'll reconvene at about 1:30.

17        (Side bar discussion concluded.)

18        (A recess was held at this time.)

19        (Jury not present.)

20           THE COURT:  Yes, sir, Mr. Richardson?

21           MR. RICHARDSON:  Your Honor, in light of the Court's

22     ruling about the duplication, we have removed from

23     Government's Exhibit 294 a number of photos.  I thought I

24     could put those in the record, just so we know what's been

25     removed from what has been previously provided.

938

FARAND WASIAK - DIRECT EXAMINATION

1          THE COURT:  Fair enough.

2          MR. RICHARDSON:  Would you like me to do that by page

3    number or Bates number?

4          THE COURT:  Whatever suits you, I think we probably

5    need to give it an exhibit, some kind of number, so we'll know

6    what it is in the record.  You know, so collectively.

7          MR. RICHARDSON:  What was removed.

8          THE COURT:  What was removed.  Do you want to call

9    that Court's -- just for purposes of Court's Exhibit 1?

10         MR. RICHARDSON:  Sure, Court's Exhibit 1.  And what I

11   can identify for the Court is the page numbers that have been

12   deleted, starting with page 32, 33, 38, 41, 43, 67, 69, 74,

13   76, 80, 81, 82, 84, 86, 87, 88, 89, 91, 92, 93, 94, 95, 200,

14   203, 204, 205, 242, 247, 253, 254, 255, 262, 264, 269, 330,

15   332, 335, 365, 377, 405, 406, 407, 408 and 412.

16      We also withdraw and will not offer videos identified as

17   Exhibit 295 and 296.  We have a number of proposed exhibits,

18   based on the cut down, that we described that we could provide

19   to the Court, if the Court wanted to view them before we were

20   provided --

21         THE COURT:  I don't understand what you're offering.

22   Tell me this.

23         MR. RICHARDSON:  So, for example, with respect to the

24   firearms photo, we have cut those down.  This is the set as we

25   discussed at the table.

FARAND WASIAK - DIRECT EXAMINATION

1        THE COURT:  Hand it to Miss Ravenel, let me --

2        MR. RICHARDSON:  What you see is there are four

3   categories there.

4        THE COURT:  And these others were duplications or

5   otherwise ruled by the Court in furtherance of the Court's

6   at bar rulings, is that correct?

7        MR. RICHARDSON:  Correct, Your Honor.  Such as the

8   first one, page 32, that we deleted, you can see from here.

9        THE COURT:  I can see.  Duplication basically.

10       MR. RICHARDSON:  Yes, Your Honor.

11       THE COURT:  Those are all fine.

12       MR. RICHARDSON:  And I'm handing to Miss Ravenel

13   Court's Exhibit 1, which are the photos that were removed that

14   I just read out, so the Court has those for its purposes.

15       THE COURT:  Very good.

16       MR. RICHARDSON:  Unless there's something else?

17       THE COURT:  Call your next witness.  After we call in

18   the jury.  Bring the jury in.

19       MR. BRUCK:  Well, I'm not sure we have a ruling on

20   the remaining video of the --

21       THE COURT:  The remaining videos are permitted.  I

22   viewed them, and I think they -- I've considered it, the

23   defendant's motion under 401 and 403, and I've determined they

24   are admissible.  We had the discussion regarding sound, and I

25   expect the Government to adhere to.

940

FARAND WASIAK - DIRECT EXAMINATION

1            MR. RICHARDSON:  Yes, Your Honor.

2            THE COURT:  So your motion is denied as to the

3    others.  The ones that are cumulative have been withdrawn by

4    the Government.  Okay.

5        (Jury present.)

6            THE COURT:  Call your next witness.

7    BY MR. RICHARDSON:

8    Q.  I hand you Government 293, which has been marked for

9    identification.  Agent Wasiak, this is the entirety of the

10   data that was pulled off of that camera.

11   A.  Correct.

12   Q.  And from that report, you can identify details about each

13   of the photos that were recovered?

14   A.  That is correct.

15   Q.  And you would be able to determine whether a photograph,

16   for example, had been partially deleted or overwritten?

17   A.  That is correct.

18   Q.  Whether a photograph was a carved image or a thumbnail of

19   any sort?

20   A.  That's correct.

21   Q.  I hand you what's marked 294.  Were you provided this

22   stack of photographs as a selection of photographs from

23   Government's Exhibit 293?

24   A.  I was.

25   Q.  And did you review those to determine that those are

FARAND WASIAK - DIRECT EXAMINATION

1    copies of photographs that were contained on the camera and

2    you recovered as part of your forensic work?

3    A.  I did.

4    Q.  Are they fair and accurate copies of the photos that were

5    on there?

6    A.  They are.

7            MR. RICHARDSON:  Your Honor, we move to admit

8    Government's Exhibit 294.

9            MR. BRUCK:  Subject to our objections.

10           THE COURT:  Very good.  Government 294 is admitted.

11           MR. RICHARDSON:  Miss Baker, if we can play a few of

12    those, starting with page 29.  And these are all photographs

13    that were a part of the camera that you did the forensic work

14    on?

15    A.  That is correct.

16           MR. RICHARDSON:  Go to page 47, Miss Baker.  Can we

17    go to page 66; can we go to page 79; can we go to page 201;

18    can we go to page 238; can we go to page 252; can we go to

19    page 256; can we go to page 265; can we go to page 329; can we

20    go to page 399; can we go to page 401; can we go to page 142;

21    can we go to page 413; can we go to page 358; can we go to

22    page 400; and page 402.

23    Q.  In addition to photographs, Agent Wasiak, did you also

24    identify a number of videos that were on the image of the

25    camera?

FARAND WASIAK - DIRECT EXAMINATION

1   A.  I did.

2   Q.  I'm going to hand you three of those, Government's

3   Exhibit 297, 298 and 299.  Do you recognize those items?

4   A.  I do.

5   Q.  How do you recognize them?

6   A.  They have my signature -- sorry -- my initials, and date I

7   viewed those, the CDs.

8   Q.  Are each of these copies of videos that were recovered

9   from the camera that we've been talking about?

10  A.  Yes.

11  Q.  Are they fair and accurate copies of those videos?

12  A.  They are.

13       MR. RICHARDSON:  Your Honor, at this time we'd move

14  to admit 297, 298 and 299.

15       MR. BRUCK:  Nothing beyond what the record already

16  indicates.

17       THE COURT:  Government Exhibits 297, 298 and 299 are

18  admitted.

19     (Government Exhibits 297 through 299 received.)

20       MR. RICHARDSON:  We will publish those at later time,

21  Your Honor.

22     Agent Wasiak, if you'd answer any questions Mr. Bruck

23  might have, I appreciate it.

24  A.  Yes, sir.

25       THE COURT:  Cross-examination.

FARAND WASIAK – CROSS-EXAMINATION

1                        CROSS-EXAMINATION

2   BY MR. BRUCK:

3   Q.  Just a couple of things.  You saw the camera that -- from

4   which this -- you were provided with the actual camera?

5   A.  I was not provided with the actual camera, no.

6   Q.  But you're aware of the type of camera that this card came

7   from?

8   A.  Yes, correct.

9   Q.  And it may be obvious, but this is a camera with a timer

10  where it's possible for one person to take pictures of

11  himself?

12  A.  I did not research that far into it.  No.  But I believe

13  so.

14  Q.  Okay.  So it -- from what you're aware of this camera, it

15  would not be necessary for a person to have anyone helping him

16  to take all of these distant shots of Mr. Roof, is that

17  correct?  He could do it by himself?

18  A.  My understanding, yes.

19  Q.  Okay.  In addition to the hundreds and hundreds and

20  thousands of pictures that you've testified about, or among

21  them, there were hundreds and hundreds of pictures of

22  Mr. Roof's cat, were there not?

23  A.  I believe so, yeah, I don't know the exact amount, but

24  there was an abundance of a cat, yes.

25  Q.  One cat, photographed over and over again?  It appeared to

FARAND WASIAK - CROSS-EXAMINATION

1    be.

2    A.  Appeared to be, correct.

3    Q.  Okay.  And do those appear to be taken at Mr. Roof's

4    house?

5    A.  I would not know, I do not know the inside of Mr. Roof's

6    residence.

7    Q.  You saw nothing inconsistent with Mr. Roof's residence in

8    those photographs?

9    A.  That's correct.

10            MR. BRUCK:  That's all, thank you.

11            THE COURT:  You may step down.  Thank you.  Call your

12   next witness.

13            MR. RICHARDSON:  Your Honor, the Government calls

14   Agent Chris Garrett.

15            THE CLERK:  State your full name for the record,

16   please.

17   A.  My name is Christopher P. Garrett.

18        CHRISTOPHER GARRETT, a witness called by the Government,

19   first having been duly sworn, testified as follows:

20                        DIRECT EXAMINATION

21   BY MR. RICHARDSON:

22   Q.  Agent Garrett, introduce yourself to the jury and tell

23   them where you work.

24   A.  Good afternoon, my name is Chris Garrett, I work currently

25   out of FBI headquarters.  I'm in our public corruption unit

FARAND WASIAK - CROSS-EXAMINATION

1   there, but before I went to FBI headquarters I was assigned as
2   a special agent here in our Columbia office, which covers
3   generally the whole State of South Carolina.
4   Q.  And so you're sort of on a temporary duty assignment up to
5   the D.C. area.
6   A.  I am.
7   Q.  In -- just to get right to where we want to go, June of
8   2015, did you get involved in some point in the search of Amy
9   Roof and Danny Beard's residence?
10  A.  I did.
11  Q.  And do you recall when that was?
12  A.  I think it was June 28th, sometime after the shootings
13  that took place here in Charleston.
14  Q.  And were you aware there had been a previous search done
15  by Richland County and SLED officers on the 18th of June?
16  A.  I was.
17  Q.  And tell me why the FBI obtained a warrant to search the
18  house again on June the 28th.
19  A.  After we had reviewed the photographs taken during the
20  initial search warrant, there were certain items that we
21  thought may have evidentiary value.  For example, there was a
22  thumb drive on top of a desk that you could see in the
23  pictures that hadn't been seized in the first search warrant.
24  Or first search, excuse me.
25  Q.  I'm going to hand you a number of photographs,

FARAND WASIAK - CROSS-EXAMINATION

1   Government's Exhibit 310 through 19, as well as 322 through

2   328.  And 460.  And ask if you recognize those.

3   A.  Yes.

4   Q.  Are those photographs that were taken that day during the

5   search warrant?

6   A.  Yes.

7   Q.  And tell us just briefly, what was your role as part of

8   this search warrant?

9   A.  I was -- on that day I was the acting supervisor for

10  what -- our squad three, which is our white collar crime,

11  public corruption and civil rights squad in Columbia.  I was

12  also -- I'm part of the squad, and so I was a searcher as well

13  on that day.  So we were -- I was working jointly with Neal

14  Power, who is one of the co-case agents on the case, to keep

15  the search going and kind of identify what we should and

16  shouldn't seize on that day.

17         MR. RICHARDSON:  Your Honor, we'd move to admit the

18  exhibits we just described, that's 310 through 19, as well as

19  322 to 28, and 460.

20         MS. STEVENS:  No objection.

21         THE COURT:  Very good.  Government 310 to 319, 322 to

22  328, and 460 are admitted without objection.

23      (Government Exhibits 310 through 319, 322 through 328 and

24  460 received.)

25         MR. RICHARDSON:  If we could pull up 310, Miss Baker.

947

FARAND WASIAK – CROSS-EXAMINATION

1   BY MR. RICHARDSON:

2   Q.  Tell us briefly, what do we have here?

3   A.  This is the front view of the residence that we searched

4   that day.

5   Q.  And if we go to 311, did you also search other areas

6   around that location?

7   A.  Yes, that's a storage shed that functioned as a workshop

8   behind the home that was pictured previously.

9   Q.  If we go to 312?

10  A.  And that is a picture of the rear of that same storage

11  shed from the previous photo.  In this photo you can see the

12  main residence in the background of this picture.

13  Q.  And 313?

14  A.  More parts of the yard with the boat and the motorcycle.

15  Q.  314.

16  A.  This is a picture of what we identified as Mr. Roof's

17  bedroom.

18  Q.  And was this the focus of the search?

19  A.  Yes.

20  Q.  But you also searched other parts of the house?

21  A.  We searched the entire home.

22  Q.  And we go to 315.

23  A.  Another angle of the bedroom of Mr. Roof.

24  Q.  Looking back toward the door that you were just walking

25  in, in the previous picture?

FARAND WASIAK - CROSS-EXAMINATION

1    A.  Correct.

2    Q.  316.

3    A.  Again, the same bedroom, different angle.

4    Q.  317?

5    A.  A picture of a T-shirt that was found during the search

6    warrant.

7    Q.  318?

8    A.  This is a picture of a disk that indicates that it was a

9    Kodak -- may have had some pictures on it.

10   Q.  And the items you collected, you put into evidence and

11   were then provided to Agent Hamski to do further investigative

12   work?

13   A.  That is correct.

14   Q.  319, what's this?

15   A.  That's a bunny rabbit with a Confederate flag wrapped

16   around it.

17   Q.  322?

18   A.  That's the area, if you see that's kind of small on my

19   screen, but there is a wooden board at the bottom, at the base

20   of that tree, it looked like that board had been used for

21   target practice.

22   Q.  Okay.  323?  Probably easier to tell what we're looking at

23   here if we go to the close-up, which is 324.  What did you

24   find here?

25   A.  So we started finding spent shell casings in the grass

949

FARAND WASIAK – CROSS-EXAMINATION

1    near the area of that wooden board.

2    Q.    Okay.  And that's also 325.

3    A.    Yes.

4    Q.    And then 326, is that a projectile in the same area?

5    A.    Yes, sir.

6    Q.    And 327?

7    A.    Again, another spent shell casing that was found in the

8    backyard area.

9    Q.    Then 328?

10   A.    An additional spent shell casing.

11   Q.    And 460?  Before I get to the computer, in the upper

12   right-hand corner, is that a stack of yellow and white pads?

13   A.    Yes.

14   Q.    Included in the Government Exhibit 460 is a photograph of

15   a computer.  Did you seize a number of computers that day?

16   A.    Yes.

17   Q.    Were you able to locate the electronic media that you had

18   sought out in going to the house that day?

19   A.    No, we were not.

20   Q.    And tell me, did you look in the locations where it had

21   been photographed on June the 18th?

22   A.    Yes, we did.

23   Q.    And was it there?

24   A.    No.

25            MR. RICHARDSON:  Beg the Court's indulgence.

BONITA NAVARRO - DIRECT EXAMINATION

1    Agent Garrett, if you'd answer any questions the defense

2  might have, I'd appreciate it.

3            THE COURT:  Cross-examination?

4            MS. STEVENS:  No questions, Your Honor.

5            THE COURT:  You may step down, thank you, sir.

6            MR. CURRAN:  Your Honor, the Government calls Bonita

7  Navarro.

8            THE CLERK:  State your name for the record.

9  A.  Bonita Navarro.

10    BONITA NAVARRO, a witness called by the Government, first

11  having been duly sworn, testified as follows:

12                    DIRECT EXAMINATION

13  BY MR. CURRAN:

14  Q.  Good afternoon, Miss Navarro.

15  A.  Good afternoon.

16  Q.  Please tell the jury your name and where you live, just

17  city and state.

18  A.  My name is Bonita Navarro, I live in Fayetteville, North

19  Carolina.

20  Q.  And are you employed, Miss Navarro?

21  A.  Yes, I am.

22  Q.  Where do you work?

23  A.  I work for AT&T.

24  Q.  How long have you worked for AT&T?

25  A.  Twenty-nine years.

BONITA NAVARRO - DIRECT EXAMINATION

1   Q.  What do you do for AT&T?

2   A.  I am a senior investigator.  I handle investigations on

3   behalf of the corporation.  I am one of the custodian of

4   records where I testify in court on behalf of our corporation.

5   Q.  Do your duties include responding to law enforcement

6   requests for AT&T business records?

7   A.  Yes, that's correct.

8   Q.  And does AT&T maintain electronic records relating to the

9   accounts of its subscribers?

10  A.  Yes.

11  Q.  And do those records include phone calls that are placed

12  to and from its subscribers' accounts?

13  A.  Yes.

14  Q.  And does AT&T maintain those records in the regular course

15  of its business?

16  A.  Yes, we do.

17  Q.  Part of its standard business practices, correct?

18  A.  Yes.

19  Q.  And you have access to those records by virtue of your

20  current position?

21  A.  That is correct.

22  Q.  We're going to turn to some of those records.  First of

23  all, did you receive -- did AT&T receive a request for records

24  related to two subscriber accounts for purposes of this case?

25  A.  Yes.

BONITA NAVARRO - DIRECT EXAMINATION

1   Q.  And have you personally reviewed those records?

2   A.  Yes, I have.

3         MR. CURRAN:  Your Honor, I'm going to approach with

4   what's been previously identified as Government's Exhibit 421.

5   BY MR. CURRAN:

6   Q.  Miss Navarro, would you review that document, please.

7   Have you had an opportunity to look at it?

8   A.  Yes.

9   Q.  What is that document?

10  A.  This is a subscriber information.

11  Q.  And is it for any particular person?

12  A.  It is.  For Danny Beard.

13        MR. CURRAN:  We would move to admit at this time,

14  Your Honor.

15        MR. BRUCK:  No objection.

16        THE COURT:  Government Exhibit 421 admitted without

17  objection.

18     (Government Exhibit 421 received.)

19  BY MR. CURRAN:

20  Q.  And is that an accurate copy of AT&T's records of the

21  subscriber information for Mr. Beard?

22  A.  Yes, it is.

23  Q.  And does that record reflect the address for that

24  particular account?

25  A.  Yes, it does.

953

BONITA NAVARRO - DIRECT EXAMINATION

1   Q.  We're not going to publish this particular record, but can

2   you tell us whether that address is within the Columbia, South

3   Carolina area?

4   A.  Yes, it is.

5   Q.  And was that account active in February of 2015?

6   A.  Yes, it was.

7   Q.  You know that from reviewing AT&T's records, correct?

8   A.  That's correct.

9   Q.  And is that account a mobile account or is that a land

10  line, a home account?

11  A.  This account is a land line account.

12          MR. CURRAN:  And, Your Honor, I'm going to approach

13  with Government's Exhibit 422 marked for purposes of

14  identification at this point.

15  Q.  Would you review Exhibit 422, please?  And again, what is

16  this exhibit?

17  A.  This is also a subscriber information for Mother Emanuel

18  AME Church.

19  Q.  So this is an AT&T business record for Emanuel AME Church?

20  A.  Correct.

21  Q.  Their subscriber account information?

22  A.  Yes.

23  Q.  Includes phone number and address?

24  A.  That's correct.

25  Q.  Correct?

954

BONITA NAVARRO – DIRECT EXAMINATION

1    A.  Um-hum.

2          MR. CURRAN:  We move to admit.

3          THE COURT:  Admitted without objection.

4      (Government Exhibit 422 received.)

5    BY MR. CURRAN:

6    Q.  Was that account active in February of 2015?

7    A.  It was.

8    Q.  Is that a mobile or a land line account?

9    A.  This is also a land line account.

10          MR. CURRAN:  Your Honor, we approach with what's been

11   marked for purposes of identification as Government's

12   Exhibit 423.

13   Q.  Please review that, Miss Navarro.  And have you reviewed

14   that before your testimony today?

15   A.  Yes.

16   Q.  What is that document?

17   A.  This document is called detailed land line usage.

18   Q.  All right.  And is that essentially a list of calls that

19   were made to and from one of those accounts that you were just

20   talking about?

21   A.  That is correct.

22   Q.  And for what time period?

23   A.  The time period -- I'm sorry.

24   Q.  For what time period are those calls?

25   A.  From January 1st of 2015 through June 19th of 2015.

BONITA NAVARRO - DIRECT EXAMINATION

1   Q.   Okay.

2          MR. CURRAN:   Your Honor, we move to admit 423 at this

3   time.

4          MR. BRUCK:   No objection.

5          THE COURT:   Government 423 admitted without

6   objection.

7      (Government Exhibit 423 received.)

8          MR. CURRAN:   And we would like to publish this one

9   document, Your Honor.   Particularly, Miss Baker, if you could

10  go to page that's Bates stamped US 57002.   And we're going to

11  be looking at items 849 and 850.

12  BY MR. CURRAN:

13  Q.   If you could find those on that exhibit.   Tell us when you

14  have it.   It's also on your screen, but I'm not sure --

15  A.   I have it.

16  Q.   Can you see it on the screen?

17  A.   Yes.

18  Q.   Do the items that are highlighted there, the three items

19  that I just mentioned, 848, 849 and 850, do they reflect a

20  call between the two subscriber accounts we've been talking

21  about?

22  A.   Yes, they do.

23  Q.   All right.   And according to those records, what was the

24  date of that call?

25  A.   February 23rd of 2015.

956

BONITA NAVARRO - DIRECT EXAMINATION

1  Q.  And what time is it placed?

2  A.  The call was placed at 2:43 p.m.

3  Q.  Eastern?

4  A.  Eastern.

5  Q.  Actually shows something different on the record, correct?

6  A.  That's correct.

7  Q.  But you're able to convert that to what it would be

8  Eastern time.

9  A.  Correct.  Correct.

10 Q.  From the record, can you tell whether a connection was

11 made on that call?  Particular call?

12 A.  Yes.  A connection was made.

13 Q.  And how long was that connection?

14 A.  Thirteen seconds.

15 Q.  And that was a call between that -- that involved Danny

16 Beard's land line and Emanuel AME Church's land line, correct?

17 A.  That's correct.

18 Q.  Can you tell from that record which of those land lines

19 initiated that call?

20 A.  Yes.

21 Q.  Which?

22 A.  The originating number was from Danny Beard's number.

23       MR. CURRAN:  And, Your Honor, I'm going to approach

24 with Government Exhibit 424, marked for purposes of

25 identification.

BONITA NAVARRO - DIRECT EXAMINATION

1  Q.  And, Miss Navarro, if you'd review that, please.  And

2  please tell us what that is.

3  A.  This is also a call detail land line usage for the other

4  subscriber.

5  Q.  So is this essentially the same exhibit, but a request

6  that was made for Emanuel AME Church's calls?

7  A.  That's correct.

8  Q.  Same time frame, January 1st until June 19th or so of

9  2015?

10  A.  Well, this one was January 2nd.  Started January 2nd.

11  Q.  January 2nd?

12  A.  2015.

13  Q.  Thank you for that.

14  A.  Um-hum.

15          MR. CURRAN:  Your Honor, we'd also move to admit.

16          THE COURT:  Government 424.  Any objection?

17          MR. BRUCK:  No objection.

18          THE COURT:  Government 424 is admitted without

19  objection.

20      (Government Exhibit 424 received.)

21          MR. CURRAN:  And, Miss Baker, if you would go to the

22  page that's Bates marked 57080 and highlight items 579, 580

23  and 581.

24  BY MR. CURRAN:

25  Q.  Do those items, 579, 580 and 581, do they reflect on

958

BONITA NAVARRO - DIRECT EXAMINATION

1   Emanuel AME's records the same call that we were just
2   discussing?
3   A.  Yes, it does.
4   Q.  So a single call, it lists three items there, but is that
5   one call or is that three calls?
6   A.  It is one call.
7   Q.  It's one call.  Is that a technical thing that AT&T does
8   list as three, but it's actually one call?
9   A.  It just shows there are three legs to one call.
10  Q.  Three legs to a call, so it shows up as three.  So it's a
11  single call placed at 2:43 p.m. Eastern, correct?
12  A.  That's correct.
13  Q.  An actual connection was made?
14  A.  Yes.
15  Q.  Thirteen-second call, and the originator, does that also
16  indicate the originator was the subscriber account for Danny
17  Beard?
18  A.  Yes, it does.
19          MR. CURRAN:  Your Honor, we have no other questions
20  for the witness at this point.
21          THE COURT:  Cross-examination.
22          MR. BRUCK:  No questions for Miss Navarro.
23          THE COURT:  You may step down.
24          MR. CURRAN:  Your Honor, the Government at this time
25  calls Joel Alarcon.

JOEL ALARCON – DIRECT EXAMINATION

1          THE CLERK:  State your full name for the record,

2    please.

3    A.  Joel Alarcon.

4          JOEL ALARCON, a witness called by the Government, first

5    having been duly sworn, testified as follows:

6                      DIRECT EXAMINATION

7    BY MR. CURRAN:

8    Q.  Good afternoon, Mr. Alarcon.  Please tell the jury your

9    name and where you live; city and state is fine.

10   A.  Joel Alarcon, Irvine, California.

11   Q.  And are you employed, Mr. Alarcon?

12   A.  Yes.

13   Q.  What do you do for a living?

14   A.  I work for 511 Tactical.

15   Q.  What is 511 Tactical?

16   A.  We make gear for law enforcement, fire, EMS and military.

17   Professionals.

18   Q.  Do the gear you make for those groups of consumers, is it

19   also available to the general public?

20   A.  Yes, it is.

21   Q.  And what's your actual position with 511?

22   A.  I'm the vice president and general merchandising manager

23   for the consumer division.

24   Q.  And how long have you been vice president for that

25   particular division?

960

JOEL ALARCON – DIRECT EXAMINATION

1   A.  Since February of this year.

2   Q.  Prior to February of 2016, what position did -- Were you

3   also working at 511?

4   A.  I was.

5   Q.  All right.  Prior to February of this year, what position

6   did you hold there?

7   A.  I was the vice president, general merchandise manager for

8   footwear and nylon.

9   Q.  Is that the division that handles for 511 the

10  manufacturing and distribution of tactical bags and pouches?

11  A.  Yes, sir.

12  Q.  We're going to ask you some questions about that.  How far

13  back did you hold that particular position?

14  A.  June of 2013.

15  Q.  So June 2013 to February of 2016 you were responsible for

16  that division?

17  A.  Yes.

18  Q.  Do you have access to 511's business records by virtue of

19  your position?

20  A.  Yes, I do.

21  Q.  And the position you held before February of 2016?

22  A.  Yes, sir.

23  Q.  And as a result -- and by virtue of the fact that you were

24  running that division, do you know where 511's products are

25  manufactured?

JOEL ALARCON - DIRECT EXAMINATION

1   A.  Yes, I do.

2   Q.  And do you know from those records and from your own

3   personal experience how 511's products make it from

4   manufacturer to the end user?

5   A.  Yes, I do.

6   Q.  I'm going to approach with what's previously been admitted

7   as Government's Exhibit 37.  If you would take a look at that

8   and familiarize yourself with it.  Do you recognize this item?

9   A.  I do.

10  Q.  What is it?

11  A.  It's our six-by-ten pouch.

12  Q.  Is that made by the division that you were in charge of

13  between 2013 and February of this year?

14  A.  Yes, it is.

15          MR. CURRAN:  We're going to publish previously

16  admitted Government's Exhibit 233.

17          THE COURT:  Very good.

18  BY MR. CURRAN:

19  Q.  And Mr. Alarcon, would you take a look at this photo,

20  please, and tell us if there's anything in there that you

21  recognize?

22  A.  Yes, I do.  The -- on the right-hand side it's the

23  packaging for the six-by-ten pouch.

24  Q.  And what is the -- what's the six-by-ten pouch, the item

25  that you've identified there?

JOEL ALARCON - DIRECT EXAMINATION

1    A.  It's a pouch that's used for general utility, general

2    carry.

3    Q.  So it's a kind of an all purpose pouch that 511

4    manufactures?

5    A.  Yes, it is.

6    Q.  All right.  Is there anything on Exhibit 37, the pouch

7    itself, that tells you where it is manufactured?

8    A.  Yes.

9    Q.  What?

10   A.  There's a tag, there are two tags actually, so the first

11   tag has the country of origin, and then the second tag has our

12   factory information.

13   Q.  And what can you tell about where it's made from that tag?

14   A.  Well, the first tag, the country of origin says made in

15   Vietnam, so that's the country of origin.  Then in the second

16   tag there's three letters, SHI, and that stands for the

17   factory that we produce it in, which is Shilla.

18   Q.  Is that in Vietnam?

19   A.  Yes, sir.

20   Q.  Is that consistent with your recollection of where bags

21   were made during the time that you were vice president?

22   A.  Yes, it is.

23   Q.  And did you actually review 511's records for the

24   manufacture and distribution information related to this

25   specific bag?

JOEL ALARCON - DIRECT EXAMINATION

1    A.  Yes, I did.

2    Q.  How did -- was it, in fact, manufactured in Vietnam?

3    A.  It was.  Yes.

4    Q.  And when?

5    A.  It was manufactured in October of 2013.

6    Q.  And how did it get to the United States?

7    A.  From the manufacturing in October of 2013, it hit a vessel

8    and landed in the Port of Oakland.

9    Q.  So shipped by boat to Oakland?

10   A.  Yes, it was.

11   Q.  And what happens to the product when it gets to Oakland?

12   A.  Once it gets to Oakland, we then receive it into our

13   warehouse in Lathrop, California, and then from Lathrop,

14   California, we can ship it out to all of our customers.

15   Q.  And what kind of vendors does 511 work with respect to

16   these types of products, this type of product.

17   A.  Traditional blue goods kind of uniformed dealers, to

18   retailers like Amazon, to sporting goods dealers as well.

19   Q.  Does that include individual stores and retail outlets

20   around the country?

21   A.  Yes, it does.

22   Q.  And does 511 ship it from its warehouse to them?

23   A.  Yes.

24   Q.  And between January 1st of 2014 and June of 2015, did it

25   ship any of these items to South Carolina?

JOEL ALARCON - DIRECT EXAMINATION

1    A.  It sure did, yes.

2    Q.  Did it ship any of these, the 16 pouches, to any vendors

3    in the Columbia, South Carolina area?

4    A.  Yes, we did.

5    Q.  What vendors?

6    A.  Palmetto State Armory.

7    Q.  And how many did you ship?

8    A.  Six pouches.

9         MR. CURRAN:  No further questions for this witness,

10   Your Honor.

11        THE COURT:  Very good.  Cross-examination?

12        MS. PAAVOLA:  No questions, Your Honor.

13        THE COURT:  Thank you, you may step down.

14        MR. WILLIAMS:  Your Honor, the Government calls

15   Joseph Hamski.

16        MR. BRUCK:  May we approach?

17        THE COURT:  Yes, you may.

18   (Following discussion held at side bar.)

19        MR. BRUCK:  One was I just wanted to make sure our

20   legal basis for our proposed cross-examination reflected that

21   we also, and I think this is in the written document that we

22   filed this morning, but I did not repeat it in court, that we

23   also think that the cross-examination that we proffered is

24   relevant to go to the issue of bias, both the bias of the

25   summary witness and the bias of the Government investigation.

JOEL ALARCON - DIRECT EXAMINATION

1  So it's cross-examination --

2         THE COURT:  What exactly are you talking about?

3  Again, you have to be specific.  What question are you talking

4  about?

5         MR. BRUCK:  Well, we outlined nine areas of

6  cross-examination, each of which --

7         THE COURT:  Hold a second, let me -- tell me how --

8  so which one do you think is bias?

9         MR. BRUCK:  We're really thinking cumulatively.

10        THE COURT:  No, no, needs to be individual.

11  Defendant's withdrawal from society, how does that go to bias?

12        MR. BRUCK:  We think that the overall investigation

13  that looks at the defendant's mental state and intent and

14  malice, and it is summarized in the way that the summary

15  witness intends to do, overlooked or omitted many areas of the

16  Government's own evaluation, which --

17        THE COURT:  Mr. Bruck, you started your opening

18  statement by saying he's the one.  So what part of this

19  investigation?  They say he's the one and you say he's the

20  one.

21        MR. BRUCK:  They are not presenting -- they are not

22  proving the case through my admission, they are proving their

23  case through evidence.

24        THE COURT:  I understand, but I'm saying how does --

25  how does the defendant's withdrawal from society go to bias?

966

 1            MR. BRUCK:  The Government's omission of each of

 2    these features of evidence about normal psychological

 3    functioning on the part of the defendant, the fact that the

 4    Government basically did a slalom around all of those issues

 5    to focus simply on facts that support a very different and

 6    much more pejorative view of the defendant's mental state

 7    shows a biased investigation.

 8            THE COURT:  I --

 9            MR. BRUCK:  Shows a biased summary.

10            THE COURT:  I rule that as not admissible.

11            MR. BRUCK:  The second point is more fine grained.

12    It's been brought to my attention that Government's 379, which

13    is a Google Map from February 27th, which is part of the

14    Hamski Power Point, shows a path which, although you can't

15    tell it from here, actually terminates near another one of the

16    churches that is listed.  In other words, the course of the

17    car seems to have gone from Mother Emanuel --

18            MR. WILLIAMS:  That's up and back.

19            MR. BRUCK:  It is an up and back, but we wanted to be

20    sure, before it's too late, there's going to be no testimony

21    that this was a reconnoiter to another church.

22            THE COURT:  379, I live on the peninsula, I couldn't

23    tell where that is.  It's unknowable from there.  But you're

24    not going to raise that, Mr. Williams?

25            MR. WILLIAMS:  That's correct.

JOSEPH HAMSKI - DIRECT EXAMINATION

1             THE COURT:  Thank you, Mr. Bruck.

2         (Side bar discussion concluded.)

3             THE COURT:  Government, call your next witness.

4             MR. WILLIAMS:  Government calls Joseph Hamski.

5             THE CLERK:  State your full name for the record,

6     please.

7     A.  Joseph Hamski.

8         JOSEPH HAMSKI, a witness called by the Government, first

9     having been duly sworn, testified as follows:

10                         DIRECT EXAMINATION

11    BY MR. WILLIAMS:

12    Q.  If you could, repeat your name for the record.

13    A.  Joseph Hamski.

14    Q.  Tell the jury where you work.

15    A.  Work for the Federal Bureau of Investigation.

16    Q.  That's the FBI?

17    A.  Yes, sir.

18    Q.  What do you do at the FBI?

19    A.  I'm a special agent.

20    Q.  How long have you been with the FBI?

21    A.  Approximately nine years.

22    Q.  What did you do prior to working at the FBI?

23    A.  I was a captain in the United States Army.

24    Q.  Did you go to school before you were in the Army?

25    A.  Yes, I did.

JOSEPH HAMSKI - DIRECT EXAMINATION

1   Q.  What did you study in school?

2   A.  Criminal justice at the University of Dayton.

3   Q.  How long were you in the military before you went to the

4   FBI?

5   A.  Approximately four years.

6   Q.  What branch was it?

7   A.  Military police.

8   Q.  So after four years in the military police, you went to

9   the FBI?

10  A.  Yes, sir.

11  Q.  What was your first assignment with the FBI?

12  A.  It varied.  After I graduated the FBI Academy I was

13  stationed here in Charleston, a variety of violent crime, bank

14  robbery, then I moved into white collar crime, and then more

15  recently the last five years specifically civil rights, public

16  corruption, some violent crime.

17  Q.  So you were assigned immediately to South Carolina?

18  A.  Yes, I was.

19  Q.  Have you been in the Charleston office since you started

20  in the FBI?

21  A.  Yes, sir.

22  Q.  And so you say you handle a wide variety of cases.  Can

23  you explain to the jury sort of how a lead case agent

24  interacts with other agents when a case is assigned?

25  A.  Sure.  After a case is opened, we will generally work the

JOSEPH HAMSKI - DIRECT EXAMINATION

1   case, oftentimes requires two agents or three agents working

2   on a case.  And then a lot of times we work with other

3   agencies, ATF, DEA, as well as our local agencies on variety

4   of cases.

5   Q.  Are you sometimes lead agent, sometimes the agent that

6   works with a different agent as the lead?

7   A.  Yes, sir.

8   Q.  And what was your role in this case in the shootings that

9   occurred on June 17 of last year?

10  A.  Sir, I was the case agent, which is lead investigator.

11  Q.  So if you can, explain to the jury how you initially got

12  involved in the case or how you were sort of called into it.

13  A.  Yes, sir.  On June 17th, 2015, approximately 9:15 I

14  received notification of active shooter situation in Emanuel

15  AME downtown Charleston area with multiple victims.  I then

16  responded to the incident.

17  Q.  How many FBI agents, or did other FBI agents respond along

18  with you?

19  A.  I'd say at least a dozen.

20  Q.  Were you the lead agent at that point?

21  A.  Shortly thereafter.  After I arrived on scene, evaluated

22  the scene and got direction from my supervisor, I was first

23  tasked with the interviewing the surviving victims and some

24  witnesses, and shortly thereafter I was assigned as a case

25  agent.

JOSEPH HAMSKI - DIRECT EXAMINATION

1    Q.  You testified that other agencies were involved.  Were you

2    paired up with any kind of local detectives or agents

3    otherwise?

4    A.  I was.  In this case I was paired up with Charleston

5    police department Richard Burckhart.

6    Q.  And what was your role early on as the sort of lead agent

7    with the FBI at least, what were your activities when you

8    first showed up?

9    A.  Initially I was tasked with conducting the interviews of

10   the surviving victims, specifically Miss Felicia Sanders,

11   Miss Polly Sheppard.

12   Q.  And did you handle those interviews?

13   A.  Yes, I did.

14   Q.  Let me ask you about other aspects of the case.  Apart

15   from your role of interviewing individuals, were there other

16   aspects of the investigation being conducted by other people?

17   A.  Absolutely.

18   Q.  Go ahead.

19   A.  Because of the way this case occurred, there was --

20   obviously multiple agencies and numerous law enforcement

21   responding.  The tasks were divvied up such as processing the

22   crime scene, interviews to be -- you know, with the witnesses,

23   and location identification of and apprehension of the

24   subject.

25   Q.  How was that investigation coordinated between all those

971

JOSEPH HAMSKI - DIRECT EXAMINATION

1   different moving parts?

2   A.  My supervisor, Brian Womble, worked with the Charleston

3   police department supervisors as well as SLED's, in order to

4   essentially command and control several different law

5   enforcement agencies all at the same time.

6   Q.  Would you have been aware, as a case agent, as to who was

7   handling those other duties, meaning crime scene processing

8   and maybe some other kind of leads being run down?

9   A.  Generally I was.  Once I was -- responded back to the

10  MEOC, or the headquarters where we were operating, I was aware

11  of who was covering which leads.

12  Q.  So early on then, your role was to interview witnesses,

13  survivors on the scene?

14  A.  Yes.

15  Q.  You said you met with Miss Felicia Sanders.

16  A.  Met with Miss Felicia Sanders, Polly Sheppard and

17  Miss Sander's granddaughter.

18  Q.  Is it fair to say since the initiation of this case you've

19  had consistent contact with the victims' families as well as

20  the survivors' families from this case?

21  A.  Yes, absolutely.

22  Q.  Is that one of your, I guess, is that one of the

23  privileges of being the case agent in the case?

24  A.  Yes, it is.

25  Q.  So you did those initial interviews.  Once you've sort of

972

JOSEPH HAMSKI - DIRECT EXAMINATION

1   done those interviews, what was the next thing you did?

2   A.  After conducting initial interviews, I then went to the

3   MEOC, which is where our supervisors and where all our law

4   enforcement was responding to the incident and controlling the

5   incident.

6   Q.  What was going on at the MEOC, or the headquarters?

7   A.  Our supervisors at that point were -- started pushing out

8   leads.  Pushing out leads means that they would send a group

9   of law enforcement to respond to something that had

10  essentially come up, someone that maybe phoned in a tip, or if

11  we were -- we did begin looking at social media for any type

12  of talk or discussion about or someone claiming responsibility

13  for the acts.  We also searched databases for similar vehicles

14  or similar individuals that resembled the subject in this

15  case.  And responded to those.

16  Q.  Let me ask you about that sort of after that initial

17  interview of those witnesses, I believe you had at least a

18  general physical description of the suspect?

19  A.  Yes, we did.

20  Q.  And did you also have any information about the vehicle as

21  far as its appearance?

22  A.  We did.  Just a black four-door sedan.

23  Q.  Where did that come from?

24          MR. BRUCK:  Excuse me, may we approach for just a

25  moment?

973

JOSEPH HAMSKI – DIRECT EXAMINATION

1           THE COURT:  Yes.

2       (Following discussion held at side bar.)

3           MR. BRUCK:  The witness on the -- the juror on the

4   back row, the lady second from the left, is fast asleep, and

5   has been for at least the last five minutes.

6           MR. WILLIAMS:  I hadn't noticed it.

7           THE COURT:  Miss Eunice, just step here for a second.

8   Our juror on the back row, second from the left, is dead

9   asleep.  Do you see her right there?

10          THE CLERK:  On the back row?

11          THE COURT:  Look at the juror.

12          THE CLERK:  Yeah.

13          THE COURT:  What do you suggest?

14          THE CLERK:  That's not good.

15          THE COURT:  Not good.

16          THE CLERK:  She needs to leave.  She can't be on the

17  jury if she's sleeping.

18          THE COURT:  Has this been the only --

19          THE CLERK:  I've seen her nodding before.

20          MR. WILLIAMS:  Question her outside the presence, if

21  we don't have an objection.

22          MR. BRUCK:  We do have an objection.

23          THE COURT:  I share Mr. Bruck's concern, I don't

24  think we've ever had that.

25          THE CLERK:  We've never had that before.  Because I

974

JOSEPH HAMSKI - DIRECT EXAMINATION

1   think when you remind them and tell them that, you know, we

2   watching, you've been attentive, I think that helps, but

3   evidently it's not for sure.

4         MR. BRUCK:  She may have a medical issue.

5         THE COURT:  What do you suggest we do, Miss Eunice?

6         THE CLERK:  Maybe if they don't have any objections,

7   we could talk to her and then --

8         THE COURT:  She's asleep right now.

9         THE CLERK:  I know.

10        THE COURT:  Why don't we take a short break and,

11  Miss Eunice, why don't you -- Well, could you step back there

12  and -- have Miss Eunice step back, make sure there's not a

13  health condition or a problem or something?

14        MR. BRUCK:  If we could be sure, not sending this

15  jury out, making sure that everyone is feeling okay.  But

16  nothing more than that.  I mean --

17        THE COURT:  The other jurors are noticing it now.

18        MR. BRUCK:  I think it would -- I think we better not

19  have any --

20        THE COURT:  Let's just take a brief break.

21     (Discussion at side bar concluded.)

22        THE COURT:  We're going to take a brief break.

23  Return to the jury room.

24     (Jury excused.)

25        THE COURT:  We'll be at ease for about ten minutes.

JOSEPH HAMSKI - DIRECT EXAMINATION

1    (A recess was held at this time.)

2         THE COURT:  Bring in the jury.

3    (Jury present.)

4         THE COURT:  Mr. Williams, continue your direct

5    examination.

6    BY MR. WILLIAMS:

7    Q.  Agent Hamski, I believe before the break we were talking

8    about leads that were coming in overnight after the shootings

9    on June 17, 2015.  And I think you were saying you received a

10   physical description from some of the survivors?

11   A.  Yes, sir.

12   Q.  I was asking you about the vehicle.  Had any videotape

13   been obtained at that point in time?

14   A.  After the incident, it was in the early morning hours, we

15   recovered the surveillance video from the Emanuel AME Church.

16   Q.  Does that provide a description of the vehicle as well as

17   obviously the suspect?

18   A.  Yes, it did.

19   Q.  And so if you could then tell the jury what type of leads

20   were coming in or how you were trying to investigate the

21   information you had at the time.

22   A.  So in the early morning hours what we did is we set up a

23   phone bank, 1-800-CALLFBI, got that set up very quickly.  And

24   at 6:00 a.m. in the morning the BOLO was released via the

25   news.  And what we did is in addition to sending the BOLO out

JOSEPH HAMSKI - DIRECT EXAMINATION

1    to all law enforcement throughout the region, we relied on the

2    media broadcasting the BOLO and receiving tips from the media.

3    Or from the public.

4    Q.  So between the time of the BOLO and sort of the crime

5    itself, you did interviews.  Did you go out and follow up on

6    any leads in between?

7    A.  Yes, I did.  In addition to the database searches, the

8    searches on social media, went out on several leads, one

9    specifically was resemblance of a vehicle that was -- that

10   resembled the subject's vehicle, it ended up being in Awendaw.

11   And I drove up there with another -- two other law enforcement

12   agents to see if that was a direct match to the car on

13   surveillance video.

14   Q.  And it obviously wasn't.

15   A.  It was not.

16   Q.  So fair to say you all were running down leads but not

17   getting any actual traction until the BOLO, the be on the look

18   out went out?

19   A.  Yes, sir.

20   Q.  And that was created by FBI agents as well as detective

21   Dan English?

22   A.  Yes, it was.

23   Q.  So explain sort of this phone bank, I think you said a

24   phone bank was set up.  What's the idea of how leads come in

25   to a phone bank?

JOSEPH HAMSKI - DIRECT EXAMINATION

1    A.  So essentially what it is, is a number that the public can

2    call, 1-800-CALLFBI, the calls are routed through Washington

3    D.C., the FBI have operators up there, they filter out good

4    leads versus bad leads, or essentially hoax calls or people

5    that don't have legitimate information, and they patch only

6    the ones that do appear to have legitimate follow-up or that

7    sound like good information, they patch them down to us.  And

8    we were in the MEOC, and we set up about a dozen phones and

9    fielded calls directly from there.

10   Q.  When you say us, who was fielding the calls, who was

11   picking up the phone and talking to the leads?

12   A.  It with a variety of law enforcement agents, I believe the

13   County, Charleston County deputies had first shift, SLED

14   agents, I think, came in for the second shift.  I was there

15   throughout answering phone calls.

16   Q.  And there was -- was there a way that the calls would then

17   be routed to you if they got to that group and had some value?

18   A.  Yes.

19   Q.  Explain that.

20   A.  After the law enforcement agent took the phone call, they

21   would draft all the notes they had from the caller, and then

22   essentially provide them to me and the supervisors, who

23   evaluate further, and if there was more additional follow-up,

24   we would task agents out to do that follow up.

25   Q.  So about what time, to the best of your recollection, was

978

JOSEPH HAMSKI - DIRECT EXAMINATION

1    the notice sent out to the media and otherwise?

2    A.  It was approximately 6:00 a.m. when the BOLO was released

3    in the media.

4    Q.  Was there a response to that, did calls come in as a

5    result of that information?

6    A.  Eventually there was.  It was approximately 7:00 a.m. when

7    we received a series of phone calls that identified one

8    specific subject.

9    Q.  And if you can, I guess my question is, were there a lot

10   of not pertinent calls, or calls that didn't eventually lead

11   to any value in the case?

12   A.  Yes, there was.  There was dozens of nonpertinent phone

13   calls that came in.

14   Q.  Were there a series of calls that ended up being of value

15   in the case?

16   A.  Yes, there was.

17   Q.  Explain that to the jury, sort of what came in and how it

18   was handled.

19   A.  So the first call came in from an individual named Dalton

20   Tyler.  He recognized, he saw the BOLO on the news, he

21   recognized the individual in the BOLO.

22   Q.  I don't want to get into anything he said, but did he

23   identify the individual?

24   A.  He did, he identified and provided a name to us.

25   Q.  And that was one lead.  Did you get other leads that were

JOSEPH HAMSKI - DIRECT EXAMINATION

1   consistent with that information that made you think that this

2   defendant was a sort of a target worthy of further

3   investigation?

4   A.  Very shortly after that phone call we received another

5   phone call from an unrelated individual who identified the

6   same person.

7   Q.  And did members of the defendant's family call in as well?

8   A.  Yes, sir.

9   Q.  And that was a sister, and I believe his father?

10  A.  That's correct.  Sister and father.

11  Q.  Did you speak to his father personally?

12  A.  I did.

13  Q.  And so based on all of those sort of corroborating

14  accounts, did you develop the defendant as a sort of a primary

15  or a target suspect?

16  A.  Yes, sir.  We used that information, and then we started

17  collecting information specifically on him.  We went to his

18  FaceBook site, looked at his profile picture, matched that to

19  the surveillance video.  We also went to the South Carolina

20  Department of Motor Vehicle website to obtain vehicle

21  information as well as a DMV picture.

22  Q.  Did you get information from the callers as well on

23  possible locations so you could investigate that individual?

24  A.  We did.

25  Q.  Is it fair to say at that point that became the primary

980

JOSEPH HAMSKI - DIRECT EXAMINATION

1    lead that you focused on, rather than other leads that may

2    have been called in?

3    A.  All of the information was very good and led us to believe

4    that this was the individual.  So we focused all our efforts

5    on that -- on the defendant.

6    Q.  When you say you ran the DMV records, would that have

7    given you a photograph as well as the vehicle description?

8    A.  Yes, sir.

9    Q.  And did those match the --

10   A.  Yes, sir, they did.

11   Q.  So once you had the confirmation, what was the next step

12   in terms of trying to locate the suspect or the person that

13   became the defendant?

14   A.  So what we did when we had a name and locations for the

15   residence, we then -- I then worked with Special Agent Brian

16   Jones and worked with task agents out to go to the residence,

17   the defendant's residence.

18   Q.  And which residence, residences did you identify for

19   purposes of trying to locate the defendant?  General area and

20   then specifically.

21   A.  There were two residences in and around Columbia, South

22   Carolina.

23   Q.  And there was testimony earlier in this trial from search

24   warrants and things where those locations were investigated?

25   A.  Correct.

981

JOSEPH HAMSKI – DIRECT EXAMINATION

1  Q.  As far as the aspects of the Columbia site, was that

2  handled by Columbia agents or yourself?

3  A.  The agents that handled -- that went to the residences in

4  Columbia, those were primarily Columbia-based agents.  Many of

5  us in Charleston have been working through the night on this

6  matter, and by that time we were at 30s, 5:30, six hour mark

7  without sleep.

8  Q.  So the case was handled on the Columbia side from Columbia

9  agents.  Did you stay on the case through that morning?

10  A.  Yes, I did.  I stayed there, assisted while other agents

11  went to those residences to locate.

12  Q.  So they were out going to the residences.  Was there any

13  kind of phone number?  What information did y'all have that

14  was, or wasn't helpful?

15  A.  That was one of the first things we followed up with when

16  we spoke with those individuals that had contacted the tip

17  line, they all indicated that the defendant did not have a

18  phone, that was further confirmed by the agents that went up

19  to the residence as well.

20  Q.  So it wasn't like you could find a cell phone number and

21  try to find where it was making calls from or anything like

22  that?

23  A.  No, that would be one of our first things would be to

24  locate a phone and we could ping the phone, attempt to locate

25  where the phone is.

JOSEPH HAMSKI - DIRECT EXAMINATION

1   Q.  And ping is a way of identifying which tower a phone might

2   be using?

3   A.  Yes, sir.

4   Q.  So let me ask you a little bit more about other

5   information that could have come in.  Were there other types

6   of records or other information you all obtained that gave you

7   some idea of his location?

8   A.  Yes, sir, we did.  Later that morning what happened was we

9   had a former employee of First Citizens Bank had contacted the

10  tip line and notified us that the defendant had an account

11  with First Citizens, and that frequented a Columbia branch of

12  First Citizens.  Independent of that, an agent sent out an

13  e-mail to our info guard community, which is a network, or

14  essentially a community of businesses, such as financial

15  institutions, and essentially sent the BOLO out and requesting

16  anybody who has information specific to this defendant, to

17  contact the FBI.

18  Q.  Was there information then that you obtained regarding his

19  bank account and possible use of his bank account in certain

20  areas?

21  A.  Yes, sir.  First Citizens' employee contacted the tip line

22  after they had run their internal checks, notified us that the

23  defendant had withdrawn money from an ATM outside Charlotte,

24  North Carolina, as well as made a purchase at a Shell gas

25  station in Charlotte.

JOSEPH HAMSKI - DIRECT EXAMINATION

1    Q.  Do you know approximately what time those transactions

2    were recorded?

3    A.  Approximately 6:00 a.m., 6:15, on June 18th.

4    Q.  Was that the first sort of tangible evidence you had of

5    his location?

6    A.  Yes, sir.

7    Q.  What was the next thing that happened with regard to his

8    location or him being found?

9    A.  Next thing was the Shelby police department actually

10   making an arrest of the subject.

11   Q.  And that was about how far -- How close is that to

12   Charlotte?

13   A.  Shelby is approximately an hour outside of Charlotte, and

14   they effected arrest approximately 10:00 a.m., 10:30.

15   Q.  You talked a little bit about there being Columbia agents

16   and Charleston agents involved.  Did you go to conduct the

17   interview in Shelby, and if not, why not?

18   A.  No, I did not conduct that interview.  Typically the case

19   agent would conduct interview of the defendant.  Like I said,

20   in this case I had been away for about 36 hours or so,

21   recognizing that fatigue may set in, as well as logistics

22   issue.  I'm in Charleston and the defendant is in Shelby,

23   North Carolina.  It was much easier and expedited for our

24   Columbia agents to respond.

25   Q.  So that was Agent Stansbury and Januchowski?

JOSEPH HAMSKI - DIRECT EXAMINATION

1    A.  Yes, sir.

2    Q.  You talked a little bit about other searches that were

3    going on.  Can you tell the jury a little bit about the search

4    warrants that were sort of contemporaneously going on, or I

5    should say consent searches that were happening?

6    A.  Yes.  There were four in total consent searches relative

7    to this matter that occurred at the residences.

8    Q.  And that was both father's house and mother's house?

9    A.  Yes, sir.

10   Q.  And then I believe also the car was searched as well by

11   SLED?

12   A.  Yes, sir, that was via search warrant.

13   Q.  And SLED also, they really were the agents that processed

14   all of the crime scenes in this case?

15   A.  SLED handled the crime scene as well as the search of the

16   vehicle.  The electronic evidence or the digital evidence was

17   handled by the FBI.

18   Q.  So once the defendant was in custody, did you sort of turn

19   your attention prospectively to trying to ascertain evidence

20   of the crime itself?  Not the crime scenes, but maybe other

21   areas?

22   A.  Yes, sir.  Once the defendant was apprehended and in

23   custody, the focus shifted from reactive to proactive.  And in

24   that case it's not just a response or a case anymore, it

25   becomes an investigation.  We want to determine the

JOSEPH HAMSKI – DIRECT EXAMINATION

1    defendant's role in this matter and collect evidence specific

2    to why he would do this, and --

3    Q.   Approximately how many agents would you say you were

4    coordinating in the sort of proactive investigation of the

5    case?

6    A.   How many agents?

7    Q.   Yes.  How many FBI agents?

8    A.   Approximately maybe 50 different agents probably worked on

9    this case, if not more.

10   Q.   I don't want to go through every single thing you did, but

11   I want you to categorize for the jury the types of steps that

12   were taken to obtain evidence.  Were interviews conducted?

13   A.   Sure.  Numerous interviews, I believe in total 215

14   interviews were conducted.  In this investigation.

15   Q.   And did you utilize subpoenas to obtain evidence, I think

16   we've seen information from Shooter's Choice and Wal-Mart,

17   would you have been responsible for obtaining that evidence?

18   A.   Yes, sir.  I served 65 subpoenas for specific to evidence

19   collection in this case.

20   Q.   We'd also talked about some search warrants during the

21   case on electronic devices or other locations.  Do you know

22   about how many searches, whether they be consent or through a

23   search warrant, were done?

24   A.   Yes, sir, nine search warrants were conducted as well as

25   four consent searches.

JOSEPH HAMSKI - DIRECT EXAMINATION

1  Q.  I also want to ask you if there were items seized and the

2  total amount of items that were seized in this case, if you

3  have a general idea of the number of pieces of evidence, if

4  not items taken?

5  A.  Certainly.  Five hundred thirty evidence items.  Some of

6  those evidence items are -- there's multiple objects contained

7  within, but essentially 530 individual evidence items.

8  Q.  I believe you talked about obtaining bank records; is that

9  an example of the type of subpoena you would issue to obtain

10 evidence in the case?

11 A.  Yes, sir.

12 Q.  All right.  So what I want to ask you about, I don't want

13 to go through every single one of those, but I do want to ask

14 you about some of the key pieces of evidence, and more

15 importantly, maybe their meaning to you as the lead

16 investigator in the case.  And the first thing I want to ask

17 you about is the website that was discovered, was that

18 something that you learned of early in the case?

19 A.  Yes, it was.  Approximately two or three days after the

20 incident occurred, we were conducting the searches on the

21 journal as well as processing some other evidence, and learned

22 of the website through those, through the processing of that

23 evidence.

24 Q.  And you also talked about the journal.  You have read both

25 of those, is that right?

987

JOSEPH HAMSKI - DIRECT EXAMINATION

1    A.  Yes, sir, I have.

2    Q.  And they're fairly similar in content, maybe some

3    distinctions, but the contents are generally the same?

4    A.  The content from the journal and the website?

5    Q.  Yes.

6    A.  Yes, sir.

7    Q.  I want to ask you about the journal then first.  I'm going

8    to show you Government's proposed exhibits 461, 462, 463, 464,

9    and 465.  Take a look at those.  Do you recognize those?

10   A.  Yes, I do.

11           MR. WILLIAMS:  I show these to defense counsel.

12   Q.  Are these stills made from the Wal-Mart videos that were

13   testified to earlier today?

14   A.  Yes, they are.

15           MR. WILLIAMS:  I'll move to admit Government 461 to

16   465.

17           THE COURT:  Any objection?

18           MR. BRUCK:  No, sir.

19           THE COURT:  Government's Exhibit 461 to 465 admitted

20   without objection.

21       (Government Exhibits 461 through 465 received.)

22   BY MR. WILLIAMS:

23   Q.  Why don't we cover those quickly so we can get that out of

24   the way.  I'm going to put up Government's 461.  Do you

25   recognize that as one of the dates where an item was purchased

JOSEPH HAMSKI - DIRECT EXAMINATION

1    at Wal-Mart?

2    A.  Yes, sir.  This is a still captured from May 3rd, 2015,

3    pointing out the -- specifically ammunition.

4    Q.  I'll go to 462.  What does that show?

5    A.  This is also the purchase of ammunition on May 10, 2015.

6    You can see the box of ammunition on the counter.

7    Q.  I'm going to go to 463.  What does that show?

8    A.  This is the defendant walking out of Wal-Mart on May 22nd,

9    2015.

10   Q.  I'm going to put up 465.

11   A.  This is also another purchase of ammunition from Wal-Mart

12   on June 13th, 2015.

13   Q.  So those more cover the ammunition purchases that you

14   would have investigated, or at least run down for Wal-Mart?

15   A.  Yes, sir, it is.

16   Q.  I'm going to go finally to 464.  Do you recognize that?

17   A.  Yes, sir, I do.  This is the defendant purchasing the

18   journal and the flags on June 7, 2015.

19   Q.  I believe if you look closely, you can see the journal on

20   the -- in the hands of the cashier?

21   A.  Yes, you can.

22   Q.  So let me ask you about that journal.  Before I do that,

23   had you created a sort of Power Point that shows some of the

24   issues that you're going to be discussing today?

25   A.  Yes, I did.

JOSEPH HAMSKI - DIRECT EXAMINATION

1          MR. WILLIAMS:  Your Honor, I'm going to show the

2     agent Government's exhibits -- proposed exhibit 7.

3     Q.   Is that contained on Government's proposed Exhibit 7?

4     A.   Yes, it does.

5     Q.   And you've prepared that yourself?

6     A.   Yes, I have.

7          MR. WILLIAMS:  I show this to defense counsel.

8          MR. BRUCK:  Subject to the objections.

9          THE COURT:  Very good.  Government Exhibit 7

10    admitted.

11        (Government Exhibit 7 received.)

12         MR. BRUCK:  If you'll bear with me just a moment,

13    Your Honor.

14        (Brief interruption in proceedings.)

15         MR. BRUCK:  We better approach.

16        (Following discussion held at side bar.)

17         MR. BRUCK:  One remaining objection.  We have

18    objected to all photos of churches other than the -- other

19    than Emanuel AME.  There remains one photograph of Trinity

20    Episcopal Church in Columbia on the timeline, as I understand

21    it, and they've reduced the number, and that's still there,

22    and we want our objection to that noted.

23         THE COURT:  The evidence came in earlier, that was

24    just the tour, his handwritten note that it was just a tour.

25    So that's in evidence.

990

JOSEPH HAMSKI – DIRECT EXAMINATION

1        MR. WILLIAMS:  We've not admitted that photo yet, but

2    I will when we get to that point.

3        THE COURT:  Good.  Thank you.

4      (Side bar discussion concluded.)

5        MR. WILLIAMS:  Your Honor, I'm going to bring up

6    Government Exhibit 7.

7    BY MR. WILLIAMS:

8    Q.  Agent Hamski, are you familiar with this first page of the

9    journal, which is Government's Exhibit 2A?

10   A.  Yes, sir, I am familiar with it.

11   Q.  Let me ask you, as part of your investigation in this case

12   did you become familiar with sort of symbolism of white

13   supremacy or white nationalism?

14   A.  Yes, sir, I did.

15   Q.  Were you -- did you have much experience in that area

16   prior to this case?

17   A.  Not a whole lot, sir, but since then very familiar.

18   Q.  And you have spoken with other FBI agents and done your

19   own independent research into those areas?

20   A.  Yes, sir, I have.

21   Q.  So understanding you're not an expert in the area, can you

22   explain what some of the symbols are, the meaning of some of

23   the symbols on this front page on page 2A?

24   A.  Yes, sir.  This logo here is essentially a compilation of

25   several white supremacy symbols.  What you have at the top is

991

JOSEPH HAMSKI - DIRECT EXAMINATION

1   1488.  Fourteen specifically, I believe, was earlier testimony

2   that 14 stood for the 14 words, which was a popular white

3   supremacist slogan, "We must secure the existence of our

4   people and future for our white children."

5       Eighty-eight was code for HH, being the eighth letter of

6   the alphabet, which is popular for Heil Hitler.

7   Q.  Looks like there's a DSR at the bottom; that's just

8   defendant's initials?

9   A.  Yes, sir, that's the defendant's initials.

10  Q.  I believe there's a swastika.  I think most people may be

11  familiar with that.  Can you explain it briefly?

12  A.  Sure.  The swastika is just a symbol of the Nazi party,

13  and it's probably the most infamous white supremacy

14  antisemitism symbol.

15  Q.  Are you familiar with what a Celtic cross is?

16  A.  Say again?

17  Q.  Are you familiar with a Celtic cross?

18  A.  Yes, sir, I am.

19  Q.  Is that located on this as well?

20  A.  Yes, sir.  Celtic Cross is right above the initials, but

21  below the othala rune.  But specifically, it looks like a

22  target almost on this specific journal.  But it's the Celtic

23  Cross, which is a popular white supremacist symbol as well,

24  sometimes referred to as Odin's Cross.

25  Q.  I want to ask you about the mark that is just above it and

992

JOSEPH HAMSKI - DIRECT EXAMINATION

1   to the left, looks like a Y with a slot going up the middle of

2   it; do you know what that is?

3   A.  Yes, that's called a leben rune or life rune, and that is

4   a popular symbol that was used by the Nazis in Germany, an

5   attempt to glorify an idealize Aryan heritage.

6   Q.  I want to ask you, you mentioned an othala rune; can you

7   tell the jury what that is and if it's located in this

8   diagram?

9   A.  Yes.  The othala rune is essentially the large symbol --

10  well -- it's the diamond with the wings on the bottom, and

11  it's also a popular symbol that was used by the Nazis in

12  Germany in an attempt to promote racial purity.

13  Q.  And that generally covers the symbolism or the combined

14  symbols of that page of the journal?

15  A.  Yes, it does.

16  Q.  I'm going to go to the next page.  Before I do, were there

17  other documents that showed -- sorry, we'll clear that screen.

18  Did you find, in this case, other evidence of similar symbols?

19  A.  Yes, I did.

20  Q.  And those were in note pads?

21  A.  Yes, sir.  Note pads, specifically a yellow legal note

22  pad.

23  Q.  I'm going to go to what are Government Exhibit 275.  Can

24  you explain?

25          MR. BRUCK:  If Your Honor please, with greatest

993

JOSEPH HAMSKI - DIRECT EXAMINATION

1    regard for Agent Hamski, but by his own acknowledgment, he is

2    not an expert.  I think these symbols speak for themselves,

3    and we object to what amounts to expert testimony by a

4    nonexpert witness about --

5              THE COURT:  He's speaking from his own knowledge.

6    I'll overrule that objection, but I think we can move on.

7    He's spoken.

8    BY MR. WILLIAMS:

9    Q.  Fair to say similar symbols were found in -- from the

10   defendant's mother's residence?

11   A.  Yes, sir, the Celtic cross, othala rune, the leben rune

12   and the swastika are all seen on the legal pad page.

13   Q.  I want to go next to the website, you're familiar with the

14   cover page that was fund on that website?

15   A.  Yes.  Yes, sir.

16   Q.  I'm going to go to that now, Government's 344.  Can you

17   explain to the jury, first of all, what LastRhodesian, or what

18   Rhodesia, how that may be relevant to white supremacy?

19   A.  Yeah, Rhodesia is a very popular white supremacy

20   reference, it's a former apartheid state in Africa that was

21   ruled by a white minority rule.

22   Q.  And the actual image that's on 344, do you know what

23   that's from?

24   A.  Yes, sir, I do.  It's an image from the movie Romper

25   Stomper.  Specifically, that is Russell Crowe.  The movie was

994

JOSEPH HAMSKI - DIRECT EXAMINATION

1  about a neonazi group out of Australia and their exploits,
2  specifically violent behavior.
3  Q.  And with regard to the website itself, have you had a
4  chance to go through the images or the photos that were
5  contained on that website?
6  A.  Yes, sir, I did.
7  Q.  Are you familiar with, generally speaking, familiar with
8  the locations or some of the places depicted in those photos?
9  A.  Yes, sir, I am familiar with them.
10  Q.  I want to go through that quickly then.  If you could,
11  were you able to identify the locations depicted in these two
12  photos?
13  A.  Yes, sir, the Boone Hall, which is a plantation home in
14  Mt. Pleasant, South Carolina.
15  Q.  And what is that specific area, the picture on the left,
16  which is US 012310, what's that specific part of Boone Hall?
17  A.  That's an image inside a slave cabin inside Boone Hall.
18  Q.  And just to maybe refresh the jury, the photos that we're
19  looking at were located on the LastRhodesian website, is that
20  right?
21  A.  That's correct.
22  Q.  Then go to the second page.  Were you able to identify or
23  determine where these photos may have been taken?
24  A.  Yes, sir, these photos were taken at the Congaree National
25  Park, which is outside of Columbia, South Carolina.

JOSEPH HAMSKI - DIRECT EXAMINATION

1    Q.  How did you determine that?

2    A.  Essentially beginning with research on line as well as

3    physically going out to these places in order to verify.

4    Q.  Going to go to the next page; do you know what those

5    locations --

6    A.  That's the residences and backyard of the defendant.

7    Q.  I'm going to ask about these next images.  Are you

8    familiar with where those are located?

9    A.  Yes, those are taken at Elmwood Cemetery, which is in

10   Columbia, South Carolina.  Elmwood Cemetery has a specific

11   site for the soldiers of the Confederate army.

12   Q.  Go to the next page.  Is that the different location?

13   A.  That's also the Elmwood Cemetery, then you could see on

14   the sign on the left, it says Confederal soldiers.

15   Q.  Go to the next slide; do you know what those two locations

16   are?

17   A.  Yes, sir.  Top right one is the backyard of the defendant,

18   and the bottom left is Findley Park, which is a park inside

19   Columbia, South Carolina.

20   Q.  Go to the next slide.  Are you familiar with that

21   location?

22   A.  Yes, sir, these two pictures are from Boone Hall in Mt.

23   Pleasant, South Carolina, which is a plantation.  The

24   plantation home is featured on the right, and the defendant

25   posing in the middle of the Avenue of Oaks is the picture on

JOSEPH HAMSKI - DIRECT EXAMINATION

1    the left.

2    Q.  Go to the next slide; do you recognize both those images?

3    A.  Yes, sir, this is the bottom right is the defendant's

4    weapon, .45 caliber Glock 41, with a laser sight attached to

5    it.  And the top left picture is an image of a slave cabins at

6    Boone Hall Plantation.

7    Q.  Are those the same cabins you referenced earlier when

8    there was a photograph inside one of them?

9    A.  Yes, sir, they are.

10   Q.  If you could explain what these two images show.

11   A.  Top left image is the defendant inside his bedroom, and

12   the bottom right image is the defendant at McLeod Plantation,

13   which is another old plantation home in Charleston, South

14   Carolina.

15   Q.  Where is it located in Charleston, if you know?

16   A.  It's very near to the city, I believe it's James Island.

17   You know, potentially West Ashley, but I know it's very close

18   to downtown Charleston.

19   Q.  Go to the next slide.  What does that show?

20   A.  These images are also at McLeod Plantation.  This is

21   defendant in the lawn at the McLeod Plantation, and then

22   posing in font of a sign which is a sacred burial of African

23   ancestors, which is also featured at the McLeod Plantation.

24   Q.  At Boone Hall or McLeod?  You say McLeod.

25   A.  That is McLeod Plantation.

JOSEPH HAMSKI - DIRECT EXAMINATION

1   Q.  The next images, can you tell the jury what those show?

2   A.  These are also McLeod Plantation.  The top left photo is

3   the plantation home at McLeod, and the bottom right photo is

4   the defendant in an image that features the slave homes or the

5   slave residences on McLeod.

6   Q.  Can you explain to the jury where these two photos would

7   have been taken, or where that's located?

8   A.  These two photos are in Greenville, South Carolina.  First

9   top left is a photo of the defendant in front of the Museum of

10  Confederate History, which is this Greenville, South Carolina,

11  and the bottom right is Falls Park, which is in the city

12  center of Greenville.

13  Q.  Go to the next slide.  Can you tell the jury what that --

14  those two photos depict?

15  A.  Top left picture is defendant in his backyard.  And the

16  bottom right photo is a picture of the plantation home at

17  Kensington Plantation.

18  Q.  Where is Kensington Plantation?

19  A.  Kennington is in Eastover, South Carolina.

20  Q.  Is that -- Where is Eastover?

21  A.  Eastover is outside of Columbia, in the same city in which

22  the defendant resides.

23  Q.  Go to the next slide.  Do you recognize those two photos?

24  A.  Yes, sir.  The top left picture is image of the Charleston

25  Harbor, and the bottom right image is a picture of a cannon

JOSEPH HAMSKI - DIRECT EXAMINATION

1    featured at Fort Moultrie on Sullivan's Island.

2    Q.   Where is Sullivan's Island?

3    A.   Sullivan's Island is north of Charleston, South Carolina,

4    it's a small town, an island community about ten minutes north

5    of us.

6    Q.   Go to the next slide.  Do you know where that's located?

7    A.   Yes, sir.  This is the defendant on the beach on

8    Sullivan's Island.  This is right around the beach area behind

9    Fort Moultrie, with the -- posed in front of the 1488, and

10   some symbols that I spoke of earlier, drawn in the sand.

11   Q.   Go to the next slide.  Can you explain where those --

12   first of all, on the left bottom, what's that location?

13   A.   Bottom left picture is the defendant's bedroom.

14   Q.   And in the background on the bed do you notice anything

15   interesting about the items that were sitting there?

16   A.   Yes, sir.  I took a look at this photo; those appear to be

17   components of a computer, specifically the hard drive that was

18   separated from the computer.

19   Q.   And are you --

20   A.   Laptop computer, I'm sorry.

21   Q.   Are you familiar with the laptop that was seized in this

22   case?

23   A.   Yes, sir, I am.

24   Q.   And it was missing a hard drive, is that right?

25   A.   Yes, sir, upon examination it revealed there was -- there

999

JOSEPH HAMSKI - DIRECT EXAMINATION

1    was no hard drive present in that computer.

2    Q.  And is the item that's sitting on the bed consistent with

3    a part or the bottom part of that laptop?

4    A.  Yes, sir, it is.

5    Q.  And the upper right, without getting into that specific

6    location, is that the defendant's car?

7    A.  That's the defendant's vehicle, yes, sir.

8    Q.  I'll go to the next one.  Now, I want to ask you, the

9    license plate that was testified to earlier was a Confederate

10   plate as well?

11   A.  Yes, sir.  And featured the -- between the defendant's

12   legs in this photo.

13   Q.  Going to the next two slides, that's, again, his backyard?

14   A.  Yes, sir.

15   Q.  The upper left one is fairly self-explanatory.  The bottom

16   right, did you ever determine where that was taken?

17   A.  That was at Boone Hall, which is a plantation home in Mt.

18   Pleasant I spoke of earlier.

19   Q.  The next two images are different pictures of the same

20   location, it appears.  Do you know where that is?

21   A.  These two images are the plantation home for Magnolia

22   Plantation, which is another plantation home in Charleston,

23   South Carolina.

24   Q.  I'm going to ask you about these two photographs.  Were

25   you able to identify those?

1000

JOSEPH HAMSKI - DIRECT EXAMINATION

1    A.  Yes, sir, these two pictures are also from the Magnolia
2    Plantation.
3    Q.  The next two, do you know where those are?
4    A.  Those are back at McLeod Plantation.
5    Q.  Go to the next two.  Were you ever able to come to some
6    idea what those might show?
7    A.  I believe that those are on the grounds of Magnolia
8    Plantation.
9    Q.  And the next two, do you know where these may have been
10   taken?
11   A.  The top left -- I'm sorry, the left picture also Magnolia
12   Plantation.  The picture on the right is a picture of Angel
13   Oak, which is a 500-year-old live oak tree on Johns Island,
14   South Carolina.
15   Q.  I'm going to ask about the picture on the left.  Are you
16   familiar with the meaning or what the flags on this
17   defendant's jacket symbolize?
18   A.  Yes, sir.
19   Q.  Can you tell the jury?
20   A.  Yes, sir.  The top patch on the left is a picture of a
21   flag of old South Africa patch.  It's just a flag
22   representative of the apartheid state in old South Africa.
23   Q.  What about the lower one?
24   A.  The lower patch is the flag of Rhodesia, which was a
25   former apartheid state in Africa.

1001

JOSEPH HAMSKI - DIRECT EXAMINATION

1   Q.  Go to the next slide.  Are these the same tree, you
2   believe, Angel Oak?
3   A.  Yes, sir, both these are Angel Oak.
4   Q.  Can you explain what these two photos show?
5   A.  Both pictures are at the Angel Oak.  Bottom right picture
6   is defendant posed in front of the Angel Oak.
7   Q.  These are similar, defendant in front of the same area as
8   well as the same tree?
9   A.  Yes, sir.
10  Q.  And the left one appears to be a repeat, that same area.
11  What is the photo on the right?
12  A.  Photo on the right is a sign on Sullivan's Island, was
13  read earlier in testimony, but it's stationed at Fort
14  Moultrie.
15  Q.  What else is in that area around -- you testified about a
16  cannon before, is that in the same area?
17  A.  Yeah, if you look actually behind on the left halfway up
18  you can see the cannon back there, but there are several
19  cannons on site at Fort Moultrie.
20  Q.  Can you tell the jury what these two photos show?
21  A.  Once again this is Fort Moultrie, you can see more clearly
22  the cannons in the background, and the picture on the right is
23  a picture from the beach at Sullivan's Island.
24  Q.  Now, is it the same location?
25  A.  Yes, sir, the defendant in the picture on the left and

JOSEPH HAMSKI - DIRECT EXAMINATION

1  1488 drawn in the sand on the picture on the right.

2  Q.  I believe you had said -- testified about these photos

3  earlier.  Are these a repetition of those same two, I think

4  the second and third photos in the set?

5  A.  They're actually not.  They're very similar, but different

6  photos.  Those are the Congaree National Park, taken from

7  Congaree National Park.

8  Q.  Was that the end of the posts that were on the

9  LastRhodesian website?

10 A.  Yes, sir.

11 Q.  So I want to ask you a little about that website.  There

12 was some testimony earlier in the case about the actual

13 computer at the defendant's father's house that was searched.

14 How did you or were you able to find evidence attributing the

15 LastRhodesian.com website to the defendant?

16 A.  So in addition to the journal page that listed

17 LastRhodesian.com, there was -- obviously the website's

18 littered with pictures of the defendant.  There was the URL on

19 the -- on his father's computer that accessed or went to the

20 LastRhodesian.com website.  Specifically the web host for that

21 website.  And there was financial records.  Within the

22 defendant's financial records, there was payment to the web

23 host for the LastRhodesian.com.

24 Q.  I'm going to go to that quickly.  This is Government's

25 425.  When you say there was an indication of payment, what do

JOSEPH HAMSKI - DIRECT EXAMINATION

1  you mean by that?  I'm going to zoom -- not going to zoom in,

2  sorry.  Was there an indication of a payment made to a website

3  in his financial records?

4  A.  Yes, sir, there was.  February 10, I believe I can see it

5  correctly, on the screen.

6  Q.  And that was to a web hosting company?

7  A.  Yes, sir.  That was reg.ru.

8  Q.  And is that consistent with the other evidence you had of

9  the website?

10  A.  Yes, sir.

11  Q.  I want to ask you a little bit more about electronics in

12  this case.  And I think there were two FBI analysts who

13  testified about several electronic items that were seized and

14  analyzed.  Were you the agent that was working with them to

15  find relevant evidence off those devices?

16  A.  Yes, sir, I was.

17  Q.  And what I want to do then is sort of go through those

18  items and give a brief description of any relevant items,

19  evidence you may or may not have found.

20  A.  Yes, sir.

21  Q.  So you talked about a computer in the car.  Was there any

22  value, or were you able to get anything from the laptop that

23  was found in the car?

24  A.  So no.  The laptop computer found in defendant's vehicle

25  was the one without the hard drive.  We were unable to process

JOSEPH HAMSKI – DIRECT EXAMINATION

1    that and obtain any information from it.

2    Q.  I'm going to ask you, maybe this is a loaded question, did

3    you try to find the hard drive?

4    A.  Yes, sir.  Painstakingly.  In addition to the nine search

5    warrants, the consent searches, attempt to locate that hard

6    drive, I physically went to many of the places where the

7    defendant frequented, and attempted to look for the hard

8    drive.

9    Q.  And we'll get to the GPS later, but you had some

10   indication of the path the defendant had driven after the

11   shootings?

12   A.  Yes, sir.  Before and after, and that's what I went to, to

13   look for similar places.

14   Q.  You drove that path as well, hoping to maybe find evidence

15   that maybe may have been thrown from the car?

16   A.  Yes, sir, anywhere where there was a stop, to look for any

17   evidence that was discarded.

18   Q.  I want to ask you also about the other computers at the

19   defendant's father's house, I believe there were several

20   computers seized there.  Just generally speaking, apart from

21   the one that had the LastRhodesian information on it, were any

22   of them of any value?

23   A.  No, sir, not the computers at the father's residence.

24   Q.  I want to ask you also about there was some thumb drives,

25   those were analyzed, and you would have looked for evidence on

1005

JOSEPH HAMSKI - DIRECT EXAMINATION

1  them as well?

2  A.  Yes, sir, I did.  And no relevant evidence.

3  Q.  And we talked about the Kodak digital camera that was

4  processed by SLED, is that correct?

5  A.  Yes, sir.

6  Q.  There was also evidence in this case of film that was

7  seized?

8  A.  Yes, sir, there was several rolls of film seized.

9  Q.  Were you responsible for having that film processed?

10  Meaning sending it to the FBI lab to get the images off of

11  that film?

12  A.  Yes, sir.  I sent all the rolls of film to our FBI lab for

13  processing, and they sent the processed images back to me.

14  Q.  I'm going to show you Government's Exhibit 427, 432, 438,

15  439, 440, 445, 447, 448 and 449.  If you'd look at those

16  quickly.  Are those some of the photos that came from the

17  developed film?

18  A.  Yes, sir, that's a compilation of some of the photos that

19  were processed.

20          MR. WILLIAMS:  Show this to defense counsel.

21          MR. BRUCK:  Thank you.  We have noted our objection

22  to 432 at side bar.  We have no objection to any of the

23  others.

24          THE COURT:  Very good.  Government Exhibits 427, 438,

25  439, 440, 445, 447, 448 and 449 admitted without objection.

1006

JOSEPH HAMSKI - DIRECT EXAMINATION

1    432 admitted.

2        (Government Exhibits 427, 432, 438, 439, 440, 445, 447,

3    448 and 449 received.)

4            MR. WILLIAMS:  Thank you.

5    BY MR. WILLIAMS:

6    Q.  I'm going to go to 427 first.  Do you know where that was

7    located?

8    A.  I believe that's at the residence of the defendant.

9    Q.  I'm going to go to 432.  Do you know what that is?

10   A.  Yes, sir, that is Trinity Episcopal Church located in

11   Columbia, South Carolina.

12   Q.  Go to 438.  Are you familiar with that?

13   A.  Yes, sir, that's the Statehouse in Columbia, South

14   Carolina.

15   Q.  Go to 439.  Are you familiar with where that is located?

16   A.  It's at the State Museum or the Confederacy Museum in

17   Columbia, South Carolina.

18   Q.  Go to 440.  Are you familiar with that as well?

19   A.  I believe it's the same place.

20   Q.  445?  Are you familiar with where that's located?

21   A.  Yes, sir, that is at a picture at the Statehouse.  In the

22   middle of the image you can see a Confederate flag.

23   Q.  Go to 447.  Is that the same location?

24   A.  Yes, sir, it's a closer up of the Confederate flag in

25   downtown Columbia, South Carolina.

JOSEPH HAMSKI - DIRECT EXAMINATION

1    Q.  Go to 448.  Same picture?

2    A.  Yes, sir, same picture.  Or different picture, same image.

3    Q.  Finally, 449, do you know where that's located?

4    A.  It's located right outside the Statehouse in Columbia,

5    South Carolina.  This is a part of the African-American

6    monument.

7    Q.  And I believe there were other pictures located on the

8    camera, the digital camera that had images of the defendant

9    posing in front of that monument?

10   A.  Yes, sir, they did.

11   Q.  I want to ask you next about some of those electronic

12   items that were processed, and specifically of whether there

13   was any value to them, to make sure we cover everything that

14   was seized.  There was a -- do you have a listing of the QC

15   numbers?

16   A.  I do.

17   Q.  QC1 was father's computer; you've already covered that,

18   correct?

19   A.  Yes, sir, QCO1 was the father's computer.

20   Q.  I want to ask you about QCO2; what was that, a tablet?

21   A.  That was a tablet that was searched, nothing relevant to

22   this case.

23   Q.  And that belonged to a friend of the defendant's, right?

24   A.  That's correct.

25   Q.  I want to ask you about QCO4, five and six.  Can you tell

JOSEPH HAMSKI - DIRECT EXAMINATION

1    the jury what those two items were?

2    A.   Those were thumb drives.  They were mentioned earlier, the

3    thumb drives found in the backpack of inside his vehicle, two

4    thumb drives found in the toiletry bag inside his vehicle, and

5    an additional thumb drive also in the vehicle.

6    Q.   So let me ask you first of all about the -- Were any of

7    them, did any of them have anything of value?

8    A.   Only QCO6, which is one of the thumb drives that was found

9    in the toiletry bag inside the vehicle.

10   Q.   Could you explain what you found pertinent on that thumb

11   drive?

12   A.   Yes, there were several e-mail addresses listed, but more

13   specifically, there were six images of a Skinheads U.S.A.

14   poster.  Skinheads U.S.A. was an HBO film documentary, I

15   believe in the early 90s, and there were six images from that

16   documentary on that thumb drive.

17   Q.   I believe those images were discussed briefly by

18   Miss Simmons?

19   A.   Yes, sir.

20   Q.   They showed individuals wearing, I guess, white supremacy

21   clothing?

22   A.   Yes, sir, they did.  It was a documentary about a white

23   supremacy group in Alabama.

24   Q.   Was there another movie, or at least a file that appeared

25   to be a movie on there as well?

JOSEPH HAMSKI - DIRECT EXAMINATION

1   A.  Yes, sir, that was the book for The Invisible Empire,

2   which was The Invisible Empire, The Story of the KKK.

3   Q.  And how about a movie, was there a movie on there as well?

4   A.  Yes, sir, also two movie clips, one was for the -- a clip

5   of the Skinheads U.S.A. documentary, and another clip for the

6   Romper Stomper, which was that Russell Crowe image from the

7   website about the neonazi group.

8   Q.  And I want to ask you about QCO8 to 13.  There were

9   several CD and DVDs located, I think in the backpack and

10  different places?

11  A.  Yes, sir, analyzed all of those, nothing pertinent to this

12  case, a lot of them just featured music, different variety

13  music.

14  Q.  I believe there was a QCO17, a Dell Dimension computer,

15  was that one of the older computers that wasn't pertinent?

16  A.  Yes, sir, older computer containing files before 2009.

17  Q.  I believe that's the same for there was some floppy disks

18  that were some older evidence?

19  A.  Yes, sir, same.

20  Q.  Other -- a Gateway desktop computer, again, several items.

21  Apart from those, everything else really didn't have anything

22  of recent value on them?

23  A.  Correct.  Analyzed them all, spent a lot of time looking

24  at them, nothing of value to this matter.

25  Q.  Is it fair to say that when the search warrant was done at

JOSEPH HAMSKI - DIRECT EXAMINATION

1  the defendant's father's house, and for that matter mother's

2  house, y'all would have collected every computer and

3  determined later whether the files were old or relevant?

4  A.  Yes, sir, that is correct.

5  Q.  And that explains a lot of those computers that were

6  seized?

7  A.  Yes, sir.

8  Q.  I want to ask you about a separate item, and that's the

9  GPS that was seized in this case.  Were you responsible for

10  sort of understanding what type of information was on that

11  GPS?

12  A.  Yes, sir, I was.

13  Q.  Tell the jury what process you took in sort of analyzing

14  the data that was retrieved from the GPS.

15  A.  Yes, sir.  After the GPS was seized, went to our CART

16  examiners, processed it and sent me the data into eight GPX

17  files.  What I was able to do then was take those GPX files

18  which contained the data from that specific GPS, and I plugged

19  it into Google Earth, as well as another platform called Arc

20  Map, and was able to import that file and interactively I get

21  the maps for essentially every place that the defendant had

22  been on that map.

23  Q.  I want to ask you briefly about those maps.  Were they

24  helpful to you, apart from just seeing paths, were they

25  helpful to you in understanding other evidence in the case as

1011

JOSEPH HAMSKI - DIRECT EXAMINATION

1   well?

2   A.  Absolutely.  The GPS, analyzing the GPS clued me in to

3   where he was at specific times.  This was instrumental in

4   determining locations he had been and the places that he had

5   normally frequented.

6   Q.  Were you able to integrate the information from the GPS

7   into other evidence you had, to sort of come up with a

8   timeline?  And what I mean by that is if you had a picture of

9   Boone Hall, and the GPS also went to Boone Hall, were you able

10  to sort of cross-reference those two pieces of evidence to

11  make investigative determinations about where the defendant

12  may or may not have traveled?

13  A.  Yes, sir.  What I did was I analyzed the GPS individually,

14  and then I cross-referenced it, once I was complete, with

15  financial records, with pictures that I got from the camera,

16  any other records where I could pin him to a certain location,

17  and corroborate that information via other means, whether

18  that's financial records or other.

19  Q.  And you were able to then sort of create a general

20  timeline which was part of your Power Point presentation

21  that's Exhibit 7?

22  A.  Yes, sir, I was.

23  Q.  Before we get to that, I have a whole stack of things for

24  you to look at.  About how many maps would you say you

25  created?  When I say maps, short trips or long trips

JOSEPH HAMSKI – DIRECT EXAMINATION

1    otherwise.

2    A.   Approximately 60 to 70 individual maps.

3    Q.   And you've reviewed all of these folders?

4    A.   Yes, I have.

5    Q.   And these are the maps that you would have created and put

6    into this Power Point?

7    A.   Yes, sir.  It is.  These are them.

8             MR. WILLIAMS:  Your Honor, some of these have already

9    been admitted; I'm going skip over the ones that were admitted

10   through Mr. Krull.

11            THE COURT:  What numbers are you offering?

12            MR. WILLIAMS:  I'm going to show it to defense

13   counsel, then I'll go through the numbers.

14            MR. BRUCK:  This may take a moment, Your Honor.

15   There are a lot of them.

16            THE COURT:  He gave you a lot, you have some time to

17   look at them.

18            MR. BRUCK:  No objection.

19            THE COURT:  What are the numbers?

20            MR. WILLIAMS:  Your Honor, 362 through 366, then 369

21   to 379, 381 to 384, 386 to 390, 392 through 412, and 414, 415

22   and 416.

23            THE COURT:  Government's 362 to 366, 369 to 379, 381

24   to 384, 386 to 390, 392 through 412, and 414 through 416

25   admitted without objection.

1013

JOSEPH HAMSKI - DIRECT EXAMINATION

1    (Government Exhibits 362 through 366, 369 through 379, 381
2    through 384, 386 through 390, 392 through 412, and 414 through
3    416 received.)
4    BY MR. WILLIAMS:
5    Q.  So I think the last question I asked you was whether you
6    were able to integrate evidence you found from other places
7    with the maps to sort of produce -- not like detailed, but a
8    general timeline about relevant evidence in the case?
9    A.  Yes, sir, I did.
10   Q.  Let me go to the next slide.  Can you talk about there was
11   this book, this KKK book.  Were you able to determine when
12   that was more or less downloaded?
13   A.  Yes, sir, early August of 2014 this book download was the
14   KKK book, Invisible Empire, that was downloaded and accessed
15   on the USB device I spoke of earlier.
16   Q.  And this is the 343, the page of that book that was
17   previously admitted.
18   A.  Yes, sir, that's the front page of it.
19   Q.  I want to ask you about December 22nd.  Were you able to
20   determine what happened on that date?
21   A.  Yes, sir, I was.
22   Q.  I'll go to the next slide.  What does that slide show?
23   A.  What this shows is a map of eastern part of South
24   Carolina, specifically area between Columbia and Charleston,
25   South Carolina.  And what this shows is the red dot on the

1014

JOSEPH HAMSKI - DIRECT EXAMINATION

1   right underneath the A in Columbia, is the defendant's

2   residence.  And the red line indicates the route in which the

3   defendant took to travel to Charleston, South Carolina.

4   Q.  The upper left in the City of Columbia there's another red

5   dot.  Does that represent where one of the other of

6   defendant's, where his father may have lived?

7   A.  Yes, sir, another residence of the defendant.

8   Q.  Do you know approximately what time this trip would have

9   occurred?

10  A.  This is actually at 8:53 in the morning on December 22nd

11  is when the defendant's GPS parted the Columbia South Carolina

12  area.

13  Q.  Go to the next slide, which is 362.  What does the GPS

14  data tell you about his travel downtown that day?

15  A.  Yes, sir, this is a continuation of travel into downtown

16  Charleston, South Carolina.  And what this shows is

17  defendant's GPS traveling through and around downtown

18  Charleston, South Carolina.

19  Q.  Go to the next slide.  Does this -- when you have these

20  two tracks, does that indicate there's a break in time, so to

21  speak?

22  A.  Yes, sir.  Anything on these maps where there's a --

23  the -- an end of a red line, would indicate either when the

24  GPS was turned off or turned on.  And this case this image is

25  the track of the GPS turning on in downtown Charleston, South

1015

JOSEPH HAMSKI – DIRECT EXAMINATION

1    Carolina, driving up Meeting Street, taking a right on Calhoun

2    Street, passing by directly in front of the Emanuel AME Church

3    at 11:52 a.m., and then proceeding northbound on 17 into Mt.

4    Pleasant, South Carolina.

5    Q.  Pick up the next slide, which is 364.  Does that show his

6    path of travel then out of the peninsula, across the peninsula

7    to Mt. Pleasant?

8    A.  Yes, sir, continued path of travel from Charleston into

9    Mt. Pleasant, South Carolina, eventually to Boone Hall

10   Plantation, which is in the upper right corner of this map.

11   Q.  Where the sort of track ends?

12   A.  Yes, sir.

13   Q.  I'm going to put up what's been previously admitted as

14   part of Government's 294, and that's consistent with the

15   photos that were located from Boone Hall?

16   A.  Yes, sir, it is.

17   Q.  Show Government's 365; is this that same day?

18   A.  Yes, sir.  This is that same day, after about an hour and

19   a half at Boone Hall Plantation, defendant departs Boone Hall

20   and proceeds back downtown to Charleston, South Carolina.

21   Q.  Does he go back to the same place?

22   A.  He goes right back downtown, exits at East Bay Street,

23   which is an exit off of 17, and drives to Calhoun Street,

24   travels west on Calhoun Street at 3:26 p.m.  And when the GPS,

25   if you flip to the next slide, when the --

1016

JOSEPH HAMSKI – DIRECT EXAMINATION

1   Q.  So that just shows a close-up of downtown?

2   A.  That's the same route back into downtown, and specifically

3   this is the GPS route ending right in front of the Emanuel AME

4   Church.

5   Q.  Go to the next slide.  Does that show what you were

6   talking about in 326?

7   A.  Yes, sir, even closer image, traveling westbound from the

8   right side of the map at 3:26 p.m., the GPS travel route

9   stops, and then what we see is eight minutes later, at

10  3:33 p.m., the GPS turns back on in the parking lot next to

11  Emanuel AME Church.  And that route of travel proceeds on to

12  Henrietta, and then onto Meeting Street is the egress.

13  Q.  Go to the next slide.  Does this show the route back to

14  Columbia?

15  A.  Yes, sir, it does.

16  Q.  Was there other activity downtown?  I mean, I don't know

17  if we need to show every single street he drove on; was there

18  other activity in the downtown area?

19  A.  Yes, specifically the previous slide.

20  Q.  I'll go back.

21  A.  The route of travel ended on Meeting Street, you can

22  actually see it ending in the top left corner.

23  Q.  So it kind of went back and forth a little?

24  A.  It did, it turned off, and then it was at 4:49 p.m., which

25  is about an hour and 20 minutes, via the last time it was

1017

JOSEPH HAMSKI - DIRECT EXAMINATION

1   registered, it turned back on in front of the building at the
2   intersection of Meeting Street and Calhoun, it's a Shell
3   station at this location.  At that point the GPS turns back on
4   and proceeds out of downtown Charleston.
5   Q.  And map 368 or Exhibit 368 is the one that shows his route
6   from Charleston back to Columbia?
7   A.  Yes, sir, it does.
8   Q.  I want to ask you about February 9th of 2015, you talked
9   about patches that he had on his jacket.  Did you identify a
10  purchase of at least one of those?
11  A.  Yes, sir, I did.  On -- by examining the financial records
12  of the defendant, located that he had purchased a patch from
13  The Patch Shop on line, via Pay Pal, and paid for it via Pay
14  Pal.  Looked into that and learned that the South Africa flag
15  patch was purchased from that patch shop.
16  Q.  Go to the next slide.  Does that show, in Exhibit 4 and
17  425, both the financial purchase of that patch?
18  A.  Yes, sir, if you could zoom in on the 2/9/15 activity,
19  February 9th activity, see the Pay Pal, Flags, via Flag Shop
20  in Georgia?
21  Q.  Yeah, hard to zoom in on the Power Point.
22  A.  And the flag he purchased was the one on the top, the blue
23  and red old South Africa patch.
24  Q.  And on that same page was there another payment to this
25  Regru Moskva Ru?

1018

JOSEPH HAMSKI - DIRECT EXAMINATION

1    A.  Yes, sir, there is.  This is debit of $15.98 to the reg.ru
2    website which hosted the LastRhodesian.com.
3    Q.  And that was for -- this is the next flag is for $15.78?
4    A.  Yes, sir.
5    Q.  That was part of the way you determined -- or attributed
6    the ownership of the LastRhodesian website to the defendant?
7    A.  Yes, sir.
8    Q.  If you can, tell the jury about what you found from
9    February 23rd, 2015.
10   A.  Yes, sir.  Analyzing the call records for both the Emanuel
11   AME Church, as well as the call records for the land line at
12   the defendant's residence, and saw that on February 23rd,
13   2015, the defendant's -- the land line phone at the
14   defendant's residence had contacted Emanuel AME Church.
15   Q.  I'm going to go to the next slide, this is part of
16   Government's Exhibit 424, I know it's hard to see, but did
17   you -- First of all, how did you, I guess, find out that
18   information?
19   A.  Typically in all our cases we will pursue the telephone
20   records for subjects in our -- in our investigations.  It's a
21   common practice.  In this case I subpoenaed the records from
22   First Citizens and examined, line by line, who was making
23   telephone contact, and identified which numbers they were.
24   Q.  So you just took the phone number from Mother Emanuel and
25   the phone number from the land line where the defendant lived,

JOSEPH HAMSKI - DIRECT EXAMINATION

1  and cross-referenced them line by line?

2  A.  Yes, sir.

3  Q.  And you found -- can you give us the date and the time in

4  the -- time the call was made and the elapsed time or the

5  duration of the phone call?

6  A.  There's a 13-second call duration that occurred on

7  February 23rd at 7:43 p.m., the defendant, the land line phone

8  at the defendant's residence contacted Emanuel AME Church.

9  Q.  Go to the next time you plotted on the timeline, that was

10  February 24th, 2015?

11  A.  Yes, sir, it was.

12  Q.  I want to ask you this, as we go through these slides, you

13  didn't plot every single trip the defendant or the GPS took

14  anywhere, is that right?

15  A.  That's correct.

16  Q.  Just ones that were relevant to your investigation,

17  meaning to Charleston, or that -- other areas that were

18  important to the evidence?

19  A.  Yes, sir.  I looked at all the trips.  The ones you're

20  seeing on the screen are the ones pertinent to this

21  investigation.

22  Q.  Let's talk about February 24th.  What's this show in 369,

23  Exhibit 369?

24  A.  This shows the path of travel from the defendant traveling

25  from Columbia, South Carolina to Charleston, South Carolina.

1020

JOSEPH HAMSKI - DIRECT EXAMINATION

1   He departs his home at 9:40 -- 9:42 that morning, which is

2   about a two-hour drive to Charleston.

3   Q.  And the next, 370, is that a close-up of where the GPS

4   would have shut off?

5   A.  Yes, sir, it's the path of travel continuing into downtown

6   Charleston.  At 11:49 is when the GPS shuts off.

7   Q.  And the next section picks up in that same area, that's

8   371?

9   A.  Yes, just continued travel throughout downtown Charleston.

10  Q.  And looks like it ends sort of near what is Battery Park,

11  is that right?

12  A.  Yes, sir.

13  Q.  And I'm going to show now 372, it picks up later on up in

14  the upper -- well, sort of the middle of the peninsula.  Is

15  that just where the GPS would have turned on again?

16  A.  Yes, sir, that's exactly what it is.  GPS turned off

17  inside Battery Park.  Analysis of it just saw that the next

18  time it turned back on was at the intersection of Calhoun

19  Street and Meeting Street, just a short block away from the

20  Emanuel AME church.

21  Q.  Go to 373 to pick up again on the other side of where the

22  church is located.

23  A.  Yeah, approximately three hours later it picks up then at

24  the intersection of Alexander Street and Calhoun Street, and

25  you could see the path of travel out of downtown Charleston.

1021

JOSEPH HAMSKI – DIRECT EXAMINATION

1  Q.  Go to the next slide.  Is that the trip then back out of
2  Charleston?
3  A.  Yes, it is the defendant's GPS departure from Charleston
4  to Columbia.
5  Q.  Go to the next slide.  The next trip you saw then is
6  February 27th?
7  A.  Yes, sir, it is.
8  Q.  If you can, explain what route you found on Exhibit 375.
9  A.  What this shows is the defendant's GPS departs Columbia,
10  South Carolina, travels down I-26 into an area outside of
11  Charleston, South Carolina.
12  Q.  And you talked earlier about cross-referencing other
13  evidence.  Was there other evidence that was relevant to this
14  path of travel and perhaps any stops that would have happened
15  relevant to this map?
16  A.  Yes, sir.  What shows here is there will be approximately
17  a one-hour stop at the Magnolia Plantation.  This route goes
18  right along the Magnolia Plantation, when it gets closer to
19  Charleston, and that coincided with pictures that were taken
20  at the Magnolia Plantation.
21  Q.  I'm going to go to part of Government's Exhibit 4.  Is
22  that a photograph consistent with Magnolia Plantation?
23  A.  Yes, sir, that's the picture of the plantation house.
24  Q.  And that's also where that red bridge photo was taken?
25  A.  Yes, sir, that's on the grounds of the Magnolia

1022

JOSEPH HAMSKI – DIRECT EXAMINATION

1    Plantation.

2    Q.  I want to go back a couple of other -- go back two slides

3    to the map.  Where does the -- where does that trip end?

4    A.  This ends down at the Angel Oak Park, which is just

5    outside of Charleston, indicating the lower right-hand corner

6    of this map.

7    Q.  I'm going to go forward then three slides.  Is this part

8    of Government's Exhibit 4, the picture of him standing in

9    front of the tree, similar with the Angel Oak Park?

10   A.  Yes, sir, it is.

11   Q.  I go to the next slide.  What was the next path of travel

12   you saw the defendant's GPS take?

13   A.  Yes, sir.  The path of travel then proceeded from Johns

14   Island across downtown or through the Crosstown of downtown

15   Charleston and into Mt. Pleasant.  This specifically goes

16   through Mt. Pleasant then.  And what you see in the lower

17   right there is Sullivan's Island path of travel was onto

18   Sullivan's Island, and ends at Fort Moultrie on Sullivan's

19   Island.

20   Q.  I want to ask you, there were multiple photos of

21   Sullivan's Island.  Were you able to determine if there were

22   different clothing worn in some of the pictures maybe, one

23   from the other?

24   A.  Yes, sir.  I saw there were two different trips to

25   Sullivan's Island.  And from reviewing the pictures as well,

JOSEPH HAMSKI – DIRECT EXAMINATION

1    was able to determine the clothing was different in the two

2    different pictures.  The ones attributed to February 27th,

3    he's wearing heavier clothing because it is in winter.

4    Q.  I'm going to go back a slide.  In Government's Exhibit 4

5    he's wearing a black jacket, black boots, black pants.  Is

6    that consistent with what he was wearing at Magnolia as well?

7    A.  Yes, sir, it is.

8    Q.  I'm going to go forward then to Government's Exhibit 4.

9    Is that also the -- at least appear to be similar outfit to

10   what he had on in this picture at Sullivan's Island?

11   A.  Black shirt, black pants, black shoes, this time with the

12   jacket on.

13   Q.  And I believe the placard that's there was read earlier by

14   Agent Sicks.

15   A.  Yes, it was.

16   Q.  What does the next photo show, or the next map, 377?

17   A.  What this map shows is the defendant leaving Fort Moultrie

18   on Sullivan's Island and then proceeding up 17 North.  And at

19   the very top right where this route actually ends is a

20   Chic-fil-A restaurant.

21   Q.  Go to the next exhibit, just 370, does that show a trip

22   backwards as well?

23   A.  Yes, sir, shows a trip right down 17 South back into

24   downtown Charleston.

25   Q.  Go to 379.  That shows where the vehicle went specifically

1024

JOSEPH HAMSKI – DIRECT EXAMINATION

1    on the peninsula.

2    A.  Yes, sir, after a little redirection, the defendant's GPS

3    comes down to Meeting Street and turns left onto Calhoun

4    Street, is where the GPS route ends in front of the Emanuel

5    AME Church.

6    Q.  And more specifically, did you pick up the specific times

7    of the vehicle was downtown at that point?

8    A.  Yes, sir, just a continuation of the route.  You could see

9    he's traveling east now on Meeting Street at -- right when he

10   passes the Emanuel AME Church, the GPS turns off at 8:12 p.m.

11   I then find that it turns on approximately two hours 20

12   minutes later on the other side of Calhoun Street at

13   10:37 p.m.

14   Q.  So that 2/27 trip was Magnolia, Angel Oak, Sullivan's

15   Island, Fort Moultrie area, Chic-fil-A, and then back downtown

16   for about two hours and 20 minutes?

17   A.  Yes, sir.

18   Q.  What was the next leg of the trip?  Government's 381.

19   A.  This was -- this is just his departure out of downtown

20   Charleston and eventually back to Columbia, South Carolina.

21   Q.  Go to the next slide.  That's 382, showing the trip on the

22   27th, back to Columbia?

23   A.  Yes, sir.

24   Q.  I'm going to ask you about the next flag.  Was there

25   another payment on March 12th to that same website?

1025

JOSEPH HAMSKI - DIRECT EXAMINATION

1   A.  Yes, sir, another continuing payment to the reg.ru website

2   that hosted LastRhodesian.com.

3   Q.  That, again, came off the financial records that you would

4   have subpoenaed?

5   A.  Yes, sir.

6   Q.  And this is a number of financial records, 425,

7   Exhibit 425, showing a $5.11 payment?

8   A.  Yes, sir, you can see $5.11 payment being made from the

9   defendant's Visa to that reg.ru website.

10  Q.  Was the initial payment back in February, was that a

11  higher amount?

12  A.  It was.  It was -- I believe we said $15.78, if I recall

13  correctly, it was close to -- the initial payment that I saw

14  was approximately $16, and payments after were a lesser

15  amount.

16  Q.  Go to the next slide, March 20th of 2015.  What occurred

17  regarding downloads on this day, from your investigation?

18  A.  So on this date this was examination of that USB device

19  that I located in the vehicle, the six images from the

20  Skinheads USA documentary film, as well as the movie clips of

21  Romper Stomper and the Skinheads U.S.A. movie clip.

22  Q.  I believe earlier in Exhibit 340, Miss Simmons talked

23  about this.  Can you describe what these images that were

24  found in the drive depict?

25  A.  These are just screen shots or stills from the

1026

JOSEPH HAMSKI - DIRECT EXAMINATION

1    documentary.  On this group.

2    Q.  Go to the next thing we had, April 11th, I believe, Mr.

3    Trillkill came in and talked about the application for the

4    gun, that was April 11th?

5    A.  Yes, sir, April 11th, 2015, I believe, he applied, or

6    defendant applied for the weapon.

7    Q.  I believe 236 showed that application to Mr. Thrillkill,

8    show that as well?

9    A.  Yes, sir.

10   Q.  And I believe the follow-up was the purchase of the gun

11   and the magazine on the 16th?

12   A.  Yes, sir.

13   Q.  And again, in 237 showing the defendant carrying the gun

14   out to his car?

15   A.  Yes, sir.

16   Q.  I want to ask you about April 25th.  Was that the next

17   trip that you found going to Charleston?

18   A.  Yes, it is.

19   Q.  About what time did that trip occur?

20   A.  So this is a trip in which the defendant's GPS shows it

21   departed at 10:54 a.m. from Columbia, en route to Charleston,

22   South Carolina, and arriving in Charleston approximately

23   12:39.

24   Q.  Based on the map 384, what was the first place or the

25   route the defendant took when he arrived in Charleston?

JOSEPH HAMSKI - DIRECT EXAMINATION

1   A.  The direct route of travel was into downtown Charleston,

2   South Carolina, and then to essentially the intersection of

3   Meeting Street and Calhoun Street, taking a left there, and

4   proceeding past the Emanuel AME Church.  And then the route

5   ended at the intersection of Calhoun and Alexander Street,

6   which is just two blocks away from Emanuel AME.

7   Q.  Go to the next map.  Does that show the time close up when

8   he drove by the Emanuel AME Church?

9   A.  Yes, sir, it does.  This -- the time indicates when the

10  defendant's GPS passed the Emanuel AME Church.

11  Q.  And the next -- how long was the car stationary downtown,

12  to the best of your recollection?

13  A.  The route ended at 12:41 p.m., the GPS turned back on at

14  2:28 p.m., so approximately almost two hours.

15  Q.  Go to the -- looks like it started off going across the 17

16  bridge towards Mt. Pleasant?

17  A.  Yes, sir.  Proceeds into Mt. Pleasant across the bridge.

18  Q.  Where did the -- where did the GPS show traffic at that

19  time?

20  A.  What this shows is the GPS traveling into the Patriot's

21  Point area, which is just a section of Mt. Pleasant that

22  features the aircraft carrier.  I can't remember the name of

23  it.

24  Q.  Yorktown?

25  A.  Yorktown, correct.

1028

JOSEPH HAMSKI - DIRECT EXAMINATION

1  Q.  And then the next slide, if you can explain to the jury

2  sort of this circuitous route that is depicted by the GPS?

3  A.  Yes, sir.  This route then picks up at the Patriot's Point

4  Yorktown area, proceeds deeper into Mt. Pleasant, and ends

5  inside or at Boone Hall Plantation.

6  Q.  Looks like it travels briefly across the 17 bridge again.

7  Are you familiar with that area?

8  A.  Yes, I am.

9  Q.  And once you get on that bridge, it's kind of hard to get

10  turned around until you get across it; is that fair to say?

11  A.  Yes, sir.

12  Q.  So the car goes across from downtown, then travels back up

13  17, and where is the end location of this trip?

14  A.  Ends at Boone Hall Plantation.

15  Q.  And going back to the financials, did you highlight with a

16  line there that represents something consistent with that

17  trip?

18  A.  Yes.  Of course to corroborate being at Boone Hall on that

19  day, the financial records indicate that a $20 entrance fee

20  was purchased at 3:04 p.m.  Specifically in that GPS route he

21  arrived at Boone Hall just 20 minutes prior.

22  Q.  And putting up a photo from Government's 4, that's also a

23  photo of that same area?

24  A.  Yes, sir, that's the defendant at Boone Hall on the Avenue

25  of Oaks.

JOSEPH HAMSKI - DIRECT EXAMINATION

1   Q.  Were there several photos sort of that same area?

2   A.  Yes, sir, there was.

3   Q.  The next slide is another route that seems to kind of

4   wander as -- is that what you found off the GPS, that it

5   traveled up, looks like toward Daniel Island?

6   A.  Yes, sir, departed Boone Hall up on 526 towards Daniel

7   Island, turns around on Daniel Island, proceeds back into Mt.

8   Pleasant, and then south again on 17 back into downtown

9   Charleston.

10  Q.  And this is a close-up of that same area?

11  A.  Yes, sir.  Proceeds through downtown Charleston, again

12  almost to the Battery, and then back up Meeting Street, and

13  again passing by -- on Calhoun Street passing by the Emanuel

14  AME Church at 5:20 p.m.

15  Q.  Did the car, or at least the GPS, stay stationary in that

16  area for some time?

17  A.  It did.  At the end of that route near intersection of

18  Alexander and Calhoun, the GPS point -- track point ended, and

19  didn't pick up again till 10:24 p.m.

20  Q.  So he pulls up in that same area in 391.  So it drove by

21  about 5:20, and you say it didn't pick up again until about

22  10:00 o'clock?

23  A.  Yes, sir.  Drove by 5:20, picked up at 10:20 -- 10:24.

24  Q.  And you have testified some about the financials that you

25  reviewed in this case.  Did you see anything in the financials

1030

JOSEPH HAMSKI - DIRECT EXAMINATION

1    that would give you some indication of what the defendant was

2    doing downtown?

3    A.  Yes, sir.  Several purchases were at stores in and around

4    that area.  There was specifically a Starbucks and a -- the

5    Shell Oil gas station, which is that building at the corner of

6    Calhoun and Meeting Street on the left there.

7    Q.  And the next slide, that's the trip back out of downtown?

8    A.  Yes, sir.

9    Q.  Was there a stop at a gas station in Mt. Pleasant as well?

10   A.  There was.  The Shell Oil -- this shows him leaving going

11   into Mt. Pleasant, goes to the gas station, and then comes

12   back across 17, and GPS shows the route out of Charleston.

13   Q.  Go to the next slide.  There was a payment on April 26th,

14   is that right?  Another one of the website payments?

15   A.  Yes, sir, there's approximately another $6 payment to the

16   reg.ru website that hosted LastRhodesian.com.

17   Q.  Can you tell the jury about the laser light that was

18   located in the vehicle?

19   A.  Yes, sir.  This was that little attachment that hooks up

20   to underneath a barrel of your firearm.  And that it was

21   purchased, it's called a laser ray, and that was purchased

22   from Palmetto State Armory on that day for $53.45.

23   Q.  Go to the next flag.  I believe there was also records

24   located either in the vehicle or through subpoena for the

25   purchase of three additional magazines?

JOSEPH HAMSKI - DIRECT EXAMINATION

1   A.  Yes, sir, three magazines purchased at Shooter's Choice in

2   West Columbia.

3   Q.  And that was also reflected on Government's 242, the

4   document showing the purchase of those for, I believe, about

5   $20 each, is that right?  If you can't read it, don't worry.

6   A.  I believe you.

7   Q.  So that was on the -- I believe that was on the 27th?

8   A.  Yes, sir, April 27th.

9   Q.  I want to go to the next flag.  So the next trip you saw

10  was May 9th.

11  A.  Yes, sir, May 9th.  Another trip to Charleston.

12  Q.  If you could explain what that route shows regarding where

13  you started and where he drove to.

14  A.  So what this shows is that at 11:42 a.m. is when the GPS

15  first gets its first track point, which is close to Columbia

16  there on the route down to I-26.  And proceeds down I-26 into

17  Charleston, South Carolina.

18  Q.  And the map here, the next map on 395, what is the end

19  point of that trip?

20  A.  That's McLeod Plantation.  This was that plantation I was

21  referring to that's close to downtown Charleston, but just

22  outside.  I believe that is James Island down there.  So it

23  ends on that McLeod Plantation.

24  Q.  I'm going to go to the next, a few more slides.  294, does

25  that show that same McLeod Plantation?

1032

JOSEPH HAMSKI - DIRECT EXAMINATION

1   A.  Yes, sir.  Consistent with the pictures from the McLeod
2   Plantation.
3   Q.  And again, 294, you testified to this earlier, the burial
4   site, is that that same plantation?
5   A.  Yes, sir.  That is.
6   Q.  And for the third slide, this is the same slave cabins you
7   testified to earlier, is that right?
8   A.  Yes, sir.
9   Q.  What was the -- tell the jury, 396, what was the next path
10  of travel the defendant took?
11  A.  The defendant then leaves McLeod Plantation and proceeds
12  into downtown Charleston, South Carolina.
13  Q.  And this shows where he would have -- at least the GPS
14  would have stopped?
15  A.  Yes, sir.
16  Q.  On 397, map 397, what was the next thing the defendant was
17  shown doing?
18  A.  What this shows is the GPS route picking back up at
19  5:41 p.m., this is at the -- an intersection about two streets
20  behind Emanuel AME Church, and then the route proceeds out of
21  Charleston, South Carolina.
22  Q.  Do you know if he made any stops on the way outside of
23  town?
24  A.  He did.  He stopped at the Northwoods Mall, which is
25  located in North Charleston, South Carolina.

JOSEPH HAMSKI - DIRECT EXAMINATION

1   Q.  And were you able to do any kind of -- take any

2   investigative steps to ascertain what he would have purchased

3   there?

4   A.  Yes, sir, he made a purchase from a store called RU 21.

5   And that was indicated in his financials, for $14.09, I was

6   able to track the item that he purchased to a T-shirt.

7   Q.  And were you able to see that T-shirt in other pictures?

8   A.  Yes, sir, I did.  I was able to locate that T-shirt in

9   other photos, and also found it on RU 21's website, verifying

10  it was sold there.

11  Q.  Go to the next slide.  Is that the 88 T-shirt?

12  A.  That's the 88 T-shirt purchased from RU 21.

13  Q.  You were able to track it back to, on that specific day,

14  in the Charleston area?

15  A.  Yes, sir.

16  Q.  And again, 88 is the symbol for HH?

17  A.  Yes, sir.

18  Q.  As far as the time after he went and purchased the shirt,

19  did he travel back downtown, do you recall?

20  A.  He did.  He goes -- defendant's GPS shows he went right

21  back into downtown Charleston, South Carolina, with the route

22  ending at Meeting Street and Ashmead Street, which is right

23  behind Emanuel AME Church.

24  Q.  I'll go to 398.  Does that show where the vehicle, or at

25  least GPS stopped?

JOSEPH HAMSKI - DIRECT EXAMINATION

1  A.  It shows -- right, the travel back into downtown

2  Charleston.

3  Q.  Was there any other activity that you saw in the downtown

4  area at that point in time?

5  A.  There were a couple of purchases from Starbucks located on

6  King Street, which is just, you know, maybe four blocks away

7  from Emanuel AME Church.

8  Q.  Go to the next slide.  Does this show the travel or path

9  of travel then back to the Columbia area?

10  A.  Yes, sir, it does.

11  Q.  Ask you about the next thing that you found pertinent.

12          THE COURT:  Mr. Williams, we've been going for about

13  an hour 20 minutes.  Let's give the jury a break, and then

14  we'll come back, okay?  Let's take an afternoon break.

15     (Jury excused.)

16          THE COURT:  We'll be in recess for ten minutes.

17          MR. WILLIAMS:  Thank you, Your Honor.

18     (A recess was held at this time.)

19          THE COURT:  Bring the jury back.

20     (Jury present.)

21          THE COURT:  Mr. Williams, continue the Government's

22  direct.

23          MR. WILLIAMS:  Thank you, Your Honor.

24  BY MR. WILLIAMS:

25  Q.  Agent Hamski, I believe right before the break you were

JOSEPH HAMSKI - DIRECT EXAMINATION

1  talking about May 10th.  Was there a purchase at least of
2  Winchester ammunition that day?
3  A.  Yes, sir, there was a purchase of Winchester, 50 rounds
4  worth of ammunition from Wal-Mart.
5  Q.  And is that consistent with the ammunition that was used
6  in the church shooting?
7  A.  Yes, sir.
8  Q.  Those boxes are boxes that were found in the defendant's
9  car?
10 A.  Yes, sir.
11 Q.  I want to ask you about May 10th; did you see a trip on
12 that date?
13 A.  Yes, sir, May 10th there was a trip from Columbia, South
14 Carolina to Greenville, South Carolina.
15 Q.  I'm going to bring up the map.  Does that show the trip to
16 Greenville?
17 A.  Yes, sir, it does.  This shows the defendant's GPS leaving
18 Columbia, South Carolina, at approximately 12:36 p.m., en
19 route to Greenville, South Carolina.
20 Q.  I don't want to get into every street he got on and place
21 the GPS shows he visited in downtown Greenville, but can you
22 summarize about where he may have traveled downtown
23 Greenville, either through photographs or through the GPS
24 data?
25 A.  Yes, sir.  First trip or first stop I noticed was at

1036

JOSEPH HAMSKI - DIRECT EXAMINATION

1  2:38 p.m., which was very near to the Museum and Library of

2  Confederate History, located in Greenville, South Carolina.

3  Q.  Were there photos of that as well, I believe, on the

4  LastRhodesian website?

5  A.  Yes, sir, there was.  Specifically a picture of him

6  standing in front of the Confederate Museum building.

7  Q.  What was the next stop that you noticed, if any?

8  A.  Next stop was at 3:49 p.m., and that was nearby the

9  Sterling statue located at the intersection of West Washington

10  Street and North Main Street in downtown Greenville.

11  Q.  I'm going to go to the next slide.  Is that a photograph

12  of that area?

13  A.  Yes, sir, that is the defendant standing in front of the

14  Sterling statue at that intersection.

15  Q.  Do you know what the Sterling statue relates to?

16  A.  I do.  What it depicts is two African-American children

17  who are commemorating Sterling High School, and essentially

18  symbolized students stepping out into the world.

19  Q.  And if you could, talk about other locations that the GPS,

20  at least, or photographs showed the defendant visited?

21  A.  Yes, sir.  Defendant's GPS travels around Greenville,

22  South Carolina.  The next stop is near the Medusa tree in

23  Falls Park.  Falls Park, there was a picture on the

24  LastRhodesian website from that area.  And some other various

25  places in Greenville as well.

JOSEPH HAMSKI - DIRECT EXAMINATION

1    Q.  And the next slide shows the trip back?

2    A.  Yes, sir.  This shows the path of travel from Greenville,

3    leaving at approximately 6:00 p.m. back to Columbia, South

4    Carolina.

5    Q.  I'm going to go to the next slide.  May 16th was another

6    trip to Charleston?

7    A.  Yes, sir, it was.

8    Q.  I'm going to start out with this first map, which is 402.

9    There's a little tag you can barely see.  Was there a stop in

10   the Columbia area, before the defendant's GPS went to

11   Charleston?

12   A.  Yes, sir.  When defendant's GPS started -- began driving

13   to Charleston, very early on in that process.

14          MR. BRUCK:  Your Honor, may I confer for a moment?

15   With Mr. Williams.

16          THE COURT:  Yes.

17      (Discussion held off the record.)

18          MR. BRUCK:  Thank you.

19          THE COURT:  Please continue.

20   BY MR. WILLIAMS:

21   Q.  I think you were talking about the flag that's there?

22   A.  Yes, sir, there's a stop at Kensington Plantation, which

23   is a plantation home in Eastover, South Carolina.

24   Q.  Go to the next slide.  Does that slide depict the

25   Kensington Plantation?

1038

JOSEPH HAMSKI - DIRECT EXAMINATION

1    A.  Yes, sir, that is the Kensington Plantation home.

2    Q.  I'm going to ask you about one of the documents found in

3    the vehicle search, which is Exhibit 204.  Do you recall that

4    document?

5    A.  I do recall reviewing that document, yes, sir.

6    Q.  Can you tell the jury anything you found, first of all,

7    from the top line where it says Kensington Singleton

8    McCaskill, were you able to obtain any information about what

9    that may or may not be?

10   A.  Yes.  What I did is essentially Googled that -- those

11   words.  And revealed there were two books about an incident

12   that occurred at that plantation in 1820 where three slaves

13   were hung after they were convicted of killing a man named

14   McCaskill.

15   Q.  And was there an overseer hanging, or was he an overseer

16   and there was a hanging involved?

17   A.  Yeah, essentially the four words on this piece of paper

18   are Kensington Singleton McCaskill, overseer and overseer

19   hanging, with the word hanging under it.  So I apologize; five

20   words.

21   Q.  I want to ask you about the rest of this note.  It has

22   this indication where it says 1820, three to one Charleston,

23   Beaufort six to one -- I believe that was read into the record

24   by Miss Burke earlier.

25        Were you able to determine anything about those numbers or

JOSEPH HAMSKI - DIRECT EXAMINATION

1  what their meaning is or where they could originate from?

2  A.  Yes, sir, I did find the source of those ratios.

3  Q.  What do they mean, or where did you find it and what do

4  they mean?

5  A.  So specifically they come up in a book entitled Darby's

6  Universal Gazetteer, authored by a guy named William Darby.

7  On page 836 of that document are ratios of African-American

8  slaves to free white men.  The first one, 18 -- year 1820,

9  with ratio was three to one.  In Charleston.  And Beaufort it

10 was ratio was six to one, in Georgetown eight to one, in

11 Colleton five to one, in Sumter two to one.

12 Q.  Is that consistent with the notes that were taken that the

13 year and the notes taken on that piece of paper?

14 A.  Yes, sir, it is.

15 Q.  As far as the other notes that were on there, was there

16 anything of significance to your investigation regarding

17 Denmark Vesey or Georgetown AME?

18 A.  Yes, sir.  Denmark Vesey was an African-American that was

19 born into slavery, eventually was able to buy his freedom, and

20 he is one of the founding members or founding fathers of the

21 Emanuel AME Church.

22 Q.  And Georgetown AME is another AME Church, as far as you

23 know?

24 A.  Yes, it is.

25 Q.  And what is the South Carolina or SC Historical Society?

JOSEPH HAMSKI - DIRECT EXAMINATION

1   A.   What that is, is a nonprofit dedicated to preserving South
2   Carolina history.
3   Q.   And could you make any -- did you find anything of
4   pertinence from those last two notes, or something that you
5   couldn't really find much information on?
6   A.   I did find some information on the very last note that --
7   the second-to-last one, which is the phrase The Real dow
8   Brown, or at least that's what I believe it says.  I could not
9   find anything.  The very last it says miscaganatiom.
10  Miscegenation.  What came up was the word miscegenation --
11  Q.   Is that nation perhaps, misspelling?
12  A.   Correct, just a misspelling of a word, that essentially is
13  defined as a marriage or relationship between two people of
14  different races.
15  Q.   I want to go to the next slide, I believe.  We'll go back
16  one.  This was the only stop on that trip in -- in Plantation?
17  A.   No.  After the Kensington Plantation he proceeded to
18  Charleston, South Carolina.
19  Q.   I'll go to the map, which is 403.  Does that show where
20  the GPS traveled?
21  A.   Yes, sir, it does.  Travels into downtown Charleston,
22  South Carolina, approximately 3:34 p.m., nearby the opposite
23  side of Calhoun Street, 24 Calhoun Street.
24  Q.   What is in the area where the GPS cuts off?
25  A.   Right there, there's the Aquarium.

1041

JOSEPH HAMSKI – DIRECT EXAMINATION

1    Q.   What was the next thing you saw?

2    A.   The next thing I saw was the defendant's GPS departing

3    then downtown Charleston, South Carolina, a few hours later,

4    and then proceeding to Sullivan's Island.

5    Q.   Go to the next map, this is map 404.

6    A.   Leaving downtown Charleston, traveling northbound to Mt.

7    Pleasant.

8    Q.   Go to map 405.  What does that show?

9    A.   Traveling GPS traveling through Mt. Pleasant onto

10   Sullivan's Island.

11   Q.   I believe in the Kensington Plantation photos he was

12   wearing the same shirt that was worn the night of the

13   shooting.  Did you notice that?

14   A.   Yes, I did.

15   Q.   I'll go then to the next photo, which is part of 294.

16   Does that show activity at Sullivan's Island, at least wearing

17   the same clothing?

18   A.   Yes, sir, it does.  Same clothing, same shirt as the night

19   of the shooting.  And this is obviously in front of the

20   Sullivan's Island sign on Sullivan's Island.

21   Q.   I believe you testified earlier you had evidence of two

22   trips to Sullivan's Island.  Is this the second of the two?

23   A.   Yes, sir, it is.

24   Q.   And this is part of 294, wearing the same outfit again, I

25   think you described this earlier as the beach at Sullivan's

1042

JOSEPH HAMSKI - DIRECT EXAMINATION

1   Island?

2   A.   Yes, sir, just the beach right outside of Fort Moultrie on

3   Sullivan's Island.

4   Q.   Where did you see this defendant travel after he was at

5   Sullivan's Island?

6   A.   After he leaves Sullivan's Island he proceeds to Mt.

7   Pleasant, there's a couple random stops up there.  Once again,

8   you could see travel northbound on 17 with Chic-fil-A location

9   at the top right corner.  Purchases made at the Chic-fil-A

10  versus the bank account analysis.

11  Q.   And that's the same Chic-fil-A that was seen earlier in

12  different slide or different map?

13  A.   Yes, sir.

14  Q.   Where did the GPS then leave after the visit to the

15  Chic-fil-A?

16  A.   It then proceeds southbound through Mt. Pleasant back into

17  downtown Charleston, South Carolina, eventually to the -- near

18  the intersection of East Bay Street and Calhoun Street in

19  downtown.

20  Q.   And this is a close-up of that same area, which is

21  consistent with other trips you'd seen?

22  A.   Yes, sir.

23  Q.   And how long was the car downtown?

24  A.   In this case the route ended at approximately 9:37 p.m.,

25  just down the road from the Emanuel AME.  There were a couple

JOSEPH HAMSKI – DIRECT EXAMINATION

1    purchases made in between that time.  And then at 12:34 a.m.

2    the following day is when the GPS turns back on and proceeds

3    out of Charleston.

4    Q.  So this says May 16th; it may have actually been May 17th,

5    but the early morning hours?

6    A.  Yes, sir.

7    Q.  Where were the purchases downtown, do you recall?

8    A.  They were at the Starbucks on King Street, as well as an

9    ATM that is at the Shell station at the intersection of

10   Meeting Street and Calhoun.

11   Q.  And does the next map, 410, show the trip back to Columbia

12   from Charleston?

13   A.  Yes, sir, it does.

14   Q.  Go to the next slide.  May 22nd was another purchase of

15   ammunition?

16   A.  Yes, sir, this was another purchase from Wal-Mart for a

17   50-count box of .45 Winchester ammunition.

18   Q.  June 13th, another purchase?

19   A.  Yes, sir.

20   Q.  That would cover the three boxes that were located at the

21   car?

22   A.  Yes, sir.

23   Q.  June 16th, another payment to the website?

24   A.  Yes, sir.  This one, I believe, was for approximately five

25   and a half dollars to that website host.

1044

JOSEPH HAMSKI - DIRECT EXAMINATION

1    Q.  Go to the next slide.  This one is at 4:44 p.m.  What

2    information did you have about the LastRhodesian.com activity

3    at 4:44 p.m. on the 17th, the day of the shooting?

4    A.  This was the time of access for that website, from

5    analysis and search of the defendant's father's computer.  And

6    when -- specifically it was around that time when the photos

7    were found uploaded, or at least to the computer.

8    Q.  And at 6:13 did you see movement with the GPS?

9    A.  Yes, sir.  At 6:13 p.m. on June 17th is when GPS departed

10   Columbia en route to Charleston.

11   Q.  And what route did it take?  About 4:11.

12   A.  Similar as the others, eventually to I-26, directly into

13   Charleston, South Carolina.

14   Q.  And it went to the same sort of intersection, I believe,

15   at East Bay and Calhoun?

16   A.  Yes, sir, this route ended very near that intersection.

17   Q.  I'll go to map 413; I believe it was 6:13 when the vehicle

18   departed Columbia?

19   A.  Correct.

20   Q.  Did it make any stops or go anywhere else apart from

21   straight to the point depicted at 7:48 on the map?

22   A.  Straight through and ended at that 7:48 spot.

23   Q.  I want to ask you about the second point at 9:05, is that

24   the next time the GPS activated?

25   A.  Yes, it is.

1045

JOSEPH HAMSKI - DIRECT EXAMINATION

1   Q.  I'm going to ask you about this photo taken off of the --
2   this is a photo you took off of the camera system?
3   A.  Yes, it is.
4   Q.  Does that show the defendant's vehicle in the background
5   at 8:16?
6   A.  Yeah, just right above that white SUV you can see the
7   defendant's vehicle driving down Henrietta Street.
8   Q.  Was that consistent with the camera also showing the
9   vehicle drive in at 8:16?
10  A.  Yes, sir, these images is a few seconds later into the
11  parking lot.
12  Q.  What does 23C depict?
13  A.  This is the defendant entering the church.
14  Q.  That was, again, at 8:16?
15  A.  Yes, sir.
16  Q.  And the next activity was then exiting at 9:06?
17  A.  Yes, sir it is.
18  Q.  That would have been 50 minutes later?
19  A.  Yes, sir.
20  Q.  If you can, tell the jury about the path of travel after,
21  at least according to the GPS, after the defendant was seen
22  leaving the church.
23  A.  The GPS turns on right behind Emanuel AME Church and
24  proceeds directly out of downtown Charleston to I-26
25  westbound.

1046

JOSEPH HAMSKI - DIRECT EXAMINATION

1    Q.  If you can, explain what the path of travel then was at

2    the GPS, this picks up a little bit further up, but explain

3    the path of travel from Charleston up to the Charlotte area;

4    what was the general route?

5    A.  Correct.  What happens here is approximately 30 miles

6    outside of Charleston the route picks up again on small rural

7    highways that skirt major highways.  You can see there's a

8    path of travel via state route that skirts I-26, proceeds

9    north towards Santee, and essentially the travel was on very

10   rural one-lane roads all the way to Charlotte, North Carolina.

11   Q.  Was that path one you had seen him take in any of his

12   prior trips?

13   A.  No, sir.

14   Q.  Let me ask you, was there ever any kind of break in

15   time -- maybe a better question is how long did it take for

16   him to travel that path?

17   A.  This took several hours.  And if I could -- so if he

18   left -- the GPS shows that he left at 9:06 p.m., left Emanuel

19   AME Church.  His arrival in Charlotte is not until

20   approximately 2:21 in the morning, which almost five hours or

21   so.  Generally that distance is about a three- to

22   three-and-a-half-hour drive.

23   Q.  You said from 9:00 p.m. until 2:00 a.m.?

24   A.  Yes, approximately 9:00 to 2:15.

25   Q.  So about seven hours?

1047

JOSEPH HAMSKI - DIRECT EXAMINATION

1    A.  9:00 to 2:00, about -- yeah, about five.

2    Q.  My math's wrong.

3    A.  I think your math is wrong.  I was trying to cover for

4    you.

5    Q.  So about five hours from the area in Charleston to

6    Charlotte.  Did you show any break where he spent time resting

7    or where the car was stationary?

8    A.  Yes, sir.  At approximately 2:00 or 2:15, the GPS turns

9    off outside of Charlotte, North Carolina.  It turns back on

10   about three hours later, southeast of downtown Charlotte.

11   Q.  And was stationary there for those hours?

12   A.  Stationary.  Turns off and turns back on in similar

13   location.

14   Q.  The next route you showed was this little area from

15   Charlotte to an area west of Charlotte?

16   A.  Yes, sir, that -- this picks up in that area I was --

17   southeast of Charlotte.  It then goes right through downtown

18   Charlotte, North Carolina, proceeds westbound, eventually

19   ending in that top left corner there in Shelby, North

20   Carolina.

21   Q.  Is that consistent with where the defendant was stopped

22   and arrested?

23   A.  Yes, sir, it is.

24   Q.  So the final map there is the Shelby arrest was at the

25   final flag, that was at 10:52 a.m.?

1048

JOSEPH HAMSKI – DIRECT EXAMINATION

1    A.  Yes, sir, it was.

2    Q.  I want to ask you a little bit about some of those

3    writings that were found in the car.  You had talked about the

4    one earlier about the Kensington Plantation.  Were you able to

5    review some of the other writings that were admitted into

6    evidence in this case?

7    A.  Yes, sir, I did, I reviewed them.

8    Q.  I want to go first to -- it's a little hard to read, but

9    182.  It has two addresses at the top, Country Club Drive and

10   I think Huntington Avenue.  Do you know what those two

11   locations are?

12   A.  Yes, sir, 325 Country Club Drive is the address for the

13   McLeod Plantation in Charleston, South Carolina.  And 70

14   Cunnington Avenue, Charleston, South Carolina, is the address

15   for the Magnolia Cemetery.

16   Q.  And the bottom half of the page says Good Hope Picnic

17   Elloree.  Are you familiar with what that might mean?

18   A.  Yes, sir, I am.  The Good Hope -- Good Hope Picnic is an

19   African-American festival that is held in Elloree, South

20   Carolina.

21   Q.  Is that -- Where is that generally located?  Is Elloree a

22   city in South Carolina?

23   A.  Elloree is a city approximately between here and Columbia,

24   South Carolina.  Slightly off the path.

25   Q.  Then we go to 204, two pages, I'm going to start on the

JOSEPH HAMSKI - DIRECT EXAMINATION

1    left.  Do you have any familiarity with the list of churches,

2    starting with New Light Baptist?

3    A.  Yes, sir, I do, I am familiar with it.

4    Q.  And just generally speaking, are the churches listed

5    there, Bethel AME, New Light Beula, are those, I guess, more

6    attended by African-Americans or majority of the attendees

7    there African-American?

8    A.  Yes, sir, they are, they're majority of African-American

9    parishioners.

10   Q.  Same thing with the right side, Friendship Baptist,

11   Antioch AME, Salem Presbyterian, I know you're not expert in

12   this, is that generally more populated or attended by black

13   parishioners?

14   A.  Yes, sir, the first three that you mentioned are

15   predominantly African-American parishioners.

16   Q.  I want to ask you about a couple of the notes on the page

17   on the left.  There's one that talks about Millford Sumter?

18   Do you know what Millford Sumter might refer to?

19   A.  Yes, sir, it's a plantation in Pinewood, South Carolina,

20   Sumter County.  And this was a plantation that was essentially

21   saved during the Civil War.

22   Q.  I'm going to ask you also about this chain, I think James

23   Wood Davidson, Anne Royall, Henry Lyons, do those names mean

24   anything or do you find any meaning for those?

25   A.  Yes, sir, I did.  James Wood Davidson is an author, and he

1050

JOSEPH HAMSKI - DIRECT EXAMINATION

1    also served in the Confederate army during the Civil War.

2    Anne Royall is an author from the 1800s that wrote about

3    religious fraud, and was a strong component of separation

4    between church and state.  And Henry Lyons is an

5    African-American man who was the former president of the

6    National Baptist Convention.  He was indicted and convicted on

7    federal charges not too long ago.

8    Q.  I want to ask you about were you able to make any sense of

9    this statement, "As individuals we are as a group."?

10   A.  That saying, I was not, no, sir.

11   Q.  I want to ask you about the Jack Kenny Williams.  Were you

12   able to find any information about that name?

13   A.  Yes, sir, he was another author that wrote about South

14   Carolina history.

15   Q.  And that MFT Branding, did you make any kind of -- learn

16   anything about that that was helpful at all?

17   A.  No, sir, I was unable to determine anything from that.

18   Q.  I want to go to the next slide.  You said earlier about

19   Exhibit 432, what does that depict?

20   A.  432 is the Trinity Episcopal Church located in Columbia,

21   South Carolina.

22   Q.  And that photo was found on the film that was developed.

23   A.  Yes, sir.

24   Q.  And if you can link that, is that church attended more

25   predominantly by African-Americans or by white people or

JOSEPH HAMSKI - DIRECT EXAMINATION

1  Caucasian?

2  A.  Caucasians.  White is the predominant makeup there.

3  Q.  If you can, what was the notation on the right-hand side

4  relative to Trinity Church specifically?

5  A.  Underneath Trinity and the address and phone number it

6  says, "Just to tour."

7  Q.  And was that notation listed by any of the other churches

8  that were seen on this list?

9  A.  No, there was only directly under the Trinity Episcopal

10  Church.

11  Q.  And finally, this other sheet that started with Emanuel

12  AME, were those churches all also largely or -- had large

13  African-American parishioner populations?

14  A.  Yes, sir, each church on this list is predominantly

15  African-American church.

16          MR. WILLIAMS:  Your Honor, I'm going to go into

17  publishing the 297, 298 and 299.  I believe some folks may

18  want to be here for that.  I'm going to switch over quickly.

19  BY MR. WILLIAMS:

20  Q.  Agent Hamski, let me ask you about Exhibits 297, 298 and

21  299.  There was testimony earlier about the blue camera, the

22  Kodak digital camera?

23  A.  Yes, sir.

24  Q.  I believe Agent Wasiak said he located both photographs

25  and also video files on that device?

1052

JOSEPH HAMSKI - DIRECT EXAMINATION

1   A.  Yes, sir.

2   Q.  Have you reviewed those video files?

3   A.  Yes, I have.

4        MR. WILLIAMS:  Your Honor, I'm going to move to

5   publish Government 297, 298 and 299, and -- I'm going to

6   publish first 299.

7        (Video played.)

8        MR. WILLIAMS:  Publish next 297.

9        (Video played.)

10        MR. WILLIAMS:  I publish Government's 298.

11        (Video played.)

12        MR. WILLIAMS:  No further questions, Your Honor.

13        THE COURT:  Cross-examination.

14                    CROSS-EXAMINATION

15   BY MR. BRUCK:

16   Q.  Good afternoon, Agent Hamski.

17   A.  Good afternoon, sir.

18   Q.  How are you doing?  I don't have a great deal I have to

19   ask you, I don't think, we won't be here too much longer, but

20   I do have a few things I'd like to follow up on.

21        The LastRhodesian website has a statement in which the

22   defendant says that he Googled black on white crime, correct?

23   A.  Yes, sir.

24   Q.  And he talked about that in his confession as well; you're

25   familiar with all of that?

1053

JOSEPH HAMSKI - CROSS-EXAMINATION

1    A.  Yes, sir, I am.

2    Q.  Have you ever seen what happens when you Google black on

3    white crime?

4    A.  No, sir.

5    Q.  Never?  Go ahead.

6    A.  No, sir, I've not Googled it myself.

7    Q.  Has anybody involved in the investigation been curious

8    enough to see what happens?

9    A.  I can't speak for what other agents may have done, but I

10   have not Googled that.

11   Q.  Would it surprise you to know that it leads to --

12            MR. WILLIAMS:  Objection to relevance, Your Honor.

13            THE COURT:  Relevance?

14            MR. BRUCK:  There's just -- there's been a great deal

15   of testimony about this is what -- that this is what he did

16   and --

17            THE COURT:  But the witness has said he didn't do it,

18   so I think you're introducing extraneous evidence.

19            MR. BRUCK:  Okay.

20            THE COURT:  Sustained.

21   BY MR. BRUCK:

22   Q.  Now, you're aware from your investigation that the

23   defendant went on websites involving such names as Storm Front

24   or Daily Storm?  Basic websites?

25   A.  Yes, sir, I'm aware.

1054

JOSEPH HAMSKI - CROSS-EXAMINATION

1   Q.  And his middle name is Storm, correct?

2   A.  Yes, sir, his middle name is --

3   Q.  Did you ascertain that that was the name he was given at

4   birth, and it's actually the name of a character on a soap

5   opera that his mother liked?

6   A.  Sir, I didn't make any determination on what his middle

7   name meant.

8   Q.  Okay.  But you did not disclose any connection between any

9   of the political issues in this case and his middle name?

10  A.  I didn't recognize the connection.

11  Q.  The picture on the cover, the front page of the

12  LastRhodesian website, you said that is a picture of the actor

13  Russell Crowe?

14  A.  Yes, sir, that's an image of Russell Crowe from the ending

15  scene of the Romper Stomper movie.

16  Q.  All right.  And let me ask you about the other film that

17  you said was found on --

18          MR. BRUCK:  Actually, would you bring up 340, please?

19  Q.  While she's doing that I'll ask you a couple of questions

20  about it.  The film Skinheads U.S.A. was found on -- in his

21  possession on a thumb drive, correct?

22  A.  Correct.

23  Q.  And you said that that's an HBO movie.

24  A.  Yes, sir.  I was able to view it on YouTube, but it was an

25  HBO documentary.

JOSEPH HAMSKI - CROSS-EXAMINATION

1  Q.  This was not a -- it was a movie about a skinhead group or

2  a race -- white racist group in Alabama?

3  A.  Yes, sir.

4  Q.  A very very small group.  Judging by the movie, a handful

5  of people?

6  A.  Yes, sir, dozens or so.  From what I recall.

7        (Brief interruption in proceedings.)

8  Q.  Okay.  We have it on the screen.  Is that the -- these are

9  posters that were found on one of his devices, is that

10  correct?

11  A.  Yes, sir, that is correct.

12  Q.  And that is a poster made by HBO depicting actually the

13  leader of this skinhead group that is the subject of the

14  movie, correct?

15  A.  Yes, sir, it does.

16  Q.  And he was a man who appeared to be in his early thirties,

17  correct?

18  A.  Yes, sir.

19  Q.  And the rest of the group consisted of teenage boys that

20  he had recruited?

21  A.  I think they were various ages, some were older than that,

22  but I do recall there were some teenagers.

23  Q.  And some of these boys were run-aways and lived in the

24  basement of this man's house and he gave them a place to live?

25  A.  I think that's evidenced by one or two accounts.  Beyond

JOSEPH HAMSKI – CROSS-EXAMINATION

1    that, I don't know.

2    Q.  And there was a great deal of sort of male bonding in this

3    depiction of the group, is that a fair statement?

4    A.  That's a fair statement.

5    Q.  And he sort of was a father figure to some of these young

6    boys?

7    A.  Yes, sir.

8    Q.  All right.  But the movie itself was attempting to be an

9    exposé of this group and of this lifestyle, right?  It was not

10   complimentary to skinheads?

11   A.  Yes, sir, that's fair to say.

12   Q.  Okay.  As part of your investigation, you ascertained and

13   there's already been testimony that Mr. Roof was arrested for

14   possession of a Schedule III narcotics, a narcotic, at the

15   Columbia Mall on February 28, 2015, correct?

16   A.  Yes, sir, I'm aware of that.

17   Q.  All right.  And of course there is -- you were asked about

18   GPS tracking or GPS routes that were relevant and not relevant

19   to this case.  There is a GPS track of his trip to Columbia

20   and a mall that day, is there not?

21   A.  I'm not aware of that.

22   Q.  You didn't look for that?

23   A.  I'm just not aware of that specific trip.

24   Q.  Okay.  And but you are aware that he was arrested and also

25   confessed, admitted to the police that he did, in fact,

JOSEPH HAMSKI - CROSS-EXAMINATION

1  knowingly possess this narcotic substance, correct?

2  A.  Yes, I'm aware that's what he informed.

3  Q.  All right.  And that was recorded in an incident report?

4  A.  Yes, sir.

5  Q.  And based on that alone, he was no longer eligible to

6  purchase a firearm?

7        MR. WILLIAMS:  Your Honor, I'm going to object to

8  that statement.

9        THE COURT:  I believe it's been -- you put up

10  testimony about it.  I overrule that objection.

11        MR. WILLIAMS:  Your Honor, I'm going to object to the

12  characterization of it as being accurate.  I'm not -- well --

13        THE COURT:  Why don't you just rephrase the question

14  to ask it precisely, Mr. Bruck.

15  BY MR. BRUCK:

16  Q.  When a person is arrested for and admits to possession of

17  a Schedule III narcotic, that is disqualifying fact under

18  federal firearms law for the purchase of a firearm, correct?

19  A.  No, sir, the way I understand it is that they have to

20  admit to being a user of that substance.  I do not recall,

21  just on their possession, I do not believe it's just

22  possession, has to be admitting to use.  That's the way I

23  understand it.

24  Q.  Bear with me for just a moment.  Let me ask it this way.

25  Are you saying that Mr. Roof was not, by virtue of his arrest,

JOSEPH HAMSKI - CROSS-EXAMINATION

1  ineligible for -- to purchase a firearm?

2  A.  No, it's not what I'm suggesting, that's just the way I

3  understood that violation.

4  Q.  Okay.  Well, then I asked the question wrong, but that

5  arrest and the facts surrounding it did, in fact, disqualify

6  him from purchasing a firearm.

7  A.  I believe that's fair.  To say, yes.

8  Q.  The answer to my question is yes?

9  A.  Yes, sir.  Yes, it is.

10  Q.  Now, I am sure that it was a very important issue in your

11  investigation to determine if Mr. Roof committed this crime

12  alone or in concert with others?

13  A.  Absolutely.  That is -- that is one of the -- certainly

14  one of the components we'd like to ascertain, did he act alone

15  or were there others.

16  Q.  And did you leave no stone unturned to find out whether he

17  had anyone else working with him in committing this crime,

18  planning it or carrying it out?

19  A.  That's correct.  That is fair.  We conducted a thorough

20  and rigorous investigation.  And made that determination.

21  Q.  And the determination was there was no one else?

22  A.  Yes, sir.

23  Q.  And I notice in the hundreds and thousands of photographs

24  that are part of this -- that Mr. Roof took, that there is

25  almost never, or there is never a friend or anyone else

1059

JOSEPH HAMSKI - CROSS-EXAMINATION

1  depicted in these photographs that he took himself of these

2  sites and his trips and so forth.  Is that a fair summary?

3  A.  I think that's a fair summary, correct.

4  Q.  He takes pictures of himself, right?

5  A.  Yes, sir, not just himself, other things, family pictures,

6  there's a fair amount of family pictures.

7  Q.  Okay.  And of course this is a camera that belonged to his

8  mother, correct?

9  A.  Yes, sir, I believe it was shared within the family.

10  Q.  So earlier on in the course of the photographs there were

11  pictures that his mother took of her boyfriend, and pictures

12  that the boyfriend took of her and so forth.  But -- Right?

13  A.  Yes, sir, there were those pictures.

14  Q.  Okay.  But towards the end, chronologically, there were

15  just pictures that he apparently took?

16  A.  Yes, sir.

17  Q.  So there came a time when he took sole possession of the

18  camera?

19  A.  That would be an assumption.  But I believe it's fair to

20  say that.

21  Q.  Okay.  And from that time on, there -- he's taking

22  pictures of himself, he's taking pictures of trees, he's

23  taking pictures of buildings, he's taking pictures of

24  historical sites, but there are no friends.

25  A.  Correct.

JOSEPH HAMSKI - CROSS-EXAMINATION

1   Q.  And all of these trips to Charleston that you have

2   testified about that were tracked by GPS, so far as your

3   investigation reveals, he went by himself on every last one of

4   them?

5   A.  That's correct.

6   Q.  You testified about the -- about how you researched the

7   meaning of these ratios, the two to one, four to one, and

8   determined that they were the ratios of black people to white

9   people at some point in what, the 19th Century?

10  A.  Yes, sir, I believe it was 1820.

11  Q.  The 1820s in the various counties, several counties of

12  South Carolina?

13  A.  Yes, sir.

14  Q.  And this came from a source called Darby's Gazetteer?

15  A.  Yes, sir, there's a -- on that page there's a chart near

16  that -- identical to the same ratios that were written on that

17  note.

18  Q.  And all of this is on line, isn't it?

19  A.  Yes, sir.

20  Q.  In fact, it isn't very hard to find all of this material

21  by a person sitting alone in their room at a computer?

22  A.  I think you could find a fair amount of it on line, but I

23  was not able to find everything, so certainly there were other

24  sources.

25  Q.  Okay.  You testified a little bit about the history of the

JOSEPH HAMSKI - CROSS-EXAMINATION

1    Emanuel AME Church, and I wanted to just ask you a couple more

2    things about it.

3        You said that you pointed to a -- to a spot where he had

4    written Denmark Vesey, with two Ss, right?

5    A.  Yes, sir.

6    Q.  But that's not the correct spelling of Denmark Vesey's

7    name, is it?

8    A.  I'm not aware of the correct spelling, I thought it was

9    with two Ss.

10   Q.  Would it refresh your memory that Denmark Vesey is spelled

11   V-E-S-E-Y?  Have you seen that before?

12   A.  I don't recall if I've seen one S or two Ss, but I take

13   your word that that is the correct spelling.

14   Q.  However Mr. Vesey's name is spelled, you do know something

15   about the history of the church and about his name?

16   A.  Yes, sir.

17   Q.  All right.  And you know that that is the first AME Church

18   in the South?  Founded in 1818?

19   A.  Yes, sir.

20   Q.  Or more correctly, predecessor to Emanuel AME, that I

21   think was known as the Hempstead Church.  Does that ring a

22   bell, founded in 1818?

23   A.  That detail of history I'm not enough versed in.

24   Q.  All right.  And you do know that in 1822 Denmark Vesey was

25   a member of -- one of the founding members of the AME Emanuel

1062

JOSEPH HAMSKI - CROSS-EXAMINATION

1   Church, was arrested along with many other people in

2   connection with an alleged plot to free the slaves in South

3   Carolina?

4   A.  Yes, sir, I'm aware of that story.

5   Q.  And shortly thereafter, among many other things, the

6   church was burned to the ground.

7   A.  Yes, sir, it was.

8   Q.  And was not rebuilt until freedom came in 1865.

9   A.  I thought it was earlier, but I take your word for it that

10  was rebuilt later.

11  Q.  All right.  And you are aware from your investigation and

12  everything you've learned, that Mr. Vesey and his comrades

13  were put on trial?

14  A.  Yes, sir.

15  Q.  And convicted and sentenced?

16  A.  Yes, sir.  I'm not even aware that there was a trial, but

17  I believe I'm aware of the final outcome.

18  Q.  And the final outcome was what?

19  A.  Mr. Vesey was hung for that alleged crime.

20  Q.  Along with 34 of his comrades?

21  A.  I'm not aware of comrades.

22          MR. BRUCK:  Thank you very much.

23          MR. WILLIAMS:  One issue on redirect, Your Honor.

24          THE COURT:  Yes.

25                      REDIRECT EXAMINATION

1063

JOSEPH HAMSKI - REDIRECT EXAMINATION

1  BY MR. WILLIAMS:

2  Q.  Agent Hamski, Mr. Bruck asked you a series of questions

3  regarding the defendant apparently taking pictures by himself.

4  A.  Yes, sir.

5  Q.  Do you recall a time in his confession where he said he

6  was keeping this information away from other people?

7  A.  Yes.

8  Q.  And he wasn't letting people know about his racism?

9  A.  Yes.

10        MR. WILLIAMS:  Thank you, nothing else.

11        MR. BRUCK:  Just to follow up one question on that,

12  if I might.

13                    RECROSS-EXAMINATION

14  BY MR. BRUCK:

15  Q.  Did your investigation --

16        MR. BRUCK:  If I may?

17        THE COURT:  Why not.

18        MR. BRUCK:  Thank you.

19  Q.  Did your investigation reveal that Mr. Roof was a member

20  of any organization?

21  A.  No, sir.

22        MR. BRUCK:  Thank you.

23        THE COURT:  Agent Hamski, you may step down.

24  A.  Thank you, sir.

25        THE COURT:  Ladies and gentlemen, you've had a full

1  day; what do you think?

2      I want to remind you a couple things, we're not to discuss

3  this case with anyone, we're not to read any media accounts.

4  Y'all have a front row seat right here, right?  You know

5  better than anybody anyway.  And no social media.  I'll see

6  you tomorrow morning at 9:30.  You're excused.

7      (Jury excused.)

8          THE COURT:  Have a seat.  Mr. Richardson, my daily

9  question, what's our forecast?  What witnesses after Agent

10  Hamski?

11          MR. RICHARDSON:  We have Erin Presnell, who is the

12  medical examiner, as we conveyed, with the crime scene, this

13  will be about an hour's worth of testimony.  And we've

14  encouraged those close to the victims to step out --

15          THE COURT:  You're a step ahead of me.

16          MR. RICHARDSON:  -- during the portion of that

17  testimony.  Obviously --

18          THE COURT:  You explained to them it's important for

19  the evidence to establish cause of death.

20          MR. RICHARDSON:  We have explained that, Your Honor,

21  we explained it's necessary, we've explained that.  Those that

22  wish to step out, quite a few of them do not wish, quite a few

23  of them wish to be here.

24          THE COURT:  That's their right.

25          MR. RICHARDSON:  Absolutely, Your Honor.  And then we

1    anticipate that testimony will take about an hour.  And then

2    we will finish with Miss Polly Sheppard, who will testify, and

3    we anticipate her testimony will take about an hour as well.

4    Maybe a little less than that.  And then the Government will

5    rest at that point, Your Honor.  Pursuant to the agreement we

6    had with defense counsel, we've been providing to the Court,

7    but also by e-mail to them, notice of the witnesses that we're

8    calling the next day.  We would ask that they provide the

9    witnesses, since we will finish before lunch tomorrow, that

10   they intend to call.

11            THE COURT:  Very good.  Mr. Bruck, you know, the way

12   that -- I don't know if your -- if you have anything to offer

13   beyond this list of summaries that you have provided to me in

14   Exhibit 795.  Is there additional evidence you wish to offer

15   beyond this, or are these summaries a fair and complete

16   representation of what these witnesses would testify?

17            MR. BRUCK:  I think those are a fair summary of what

18   they would testify to.  I'm not completely sure that I don't

19   want to review it one more time.

20            THE COURT:  I want you to do that.  What I'm going to

21   say is that to the extent you wish to offer any of these, I'm

22   going to want to do it initially outside the presence of the

23   jury, because based on what I have here, if this represents

24   their testimony, I believe it is impermissible mental health

25   testimony in the guilt phase that would not meet the standard

1    of the United States versus Worrell.

2        But if there's more information that you have, I want to

3    hear it.  You know I'm very big on specifics, and to the

4    extent there's something else that you want to add, I want to

5    make sure I have the best information to rule.

6        MR. BRUCK:  Thank you.  I think we may wish to

7    provide a fuller written proffer.  That might expedite

8    matters.  And I'm thinking about two potential additional

9    witnesses.  So why don't we get that to you as quickly as we

10   can, either tonight or in the morning.

11       THE COURT:  I think that would be -- I'm glad to do

12   that.  I'm also glad to let you put them on the stand, if you

13   don't want to do that, you can just put them on the stand, I'm

14   glad to hear it as well, if it suits you better.

15       MR. BRUCK:  My only hesitation is some of them would

16   be coming from a very long way, against very long odds.

17       THE COURT:  Yes.  I'm trying to be up front with you,

18   I've issued a ruling.  I think I'm following, I know I'm

19   following what I think is very strong authority on this issue,

20   but I want to make sure I give you a full hearing on every

21   issue so I make sure I have the best information from which to

22   make my rulings.

23       MR. BRUCK:  Thank you.  I also wanted to say that in

24   light of something that came up rather unexpectedly this

25   afternoon, we may have three or four very short other

1    witnesses, but I think we may be able to solve the problem

2    with a stipulation, once we can confer with the Government.

3              THE COURT:  Very good.  And I'm going to need at some

4    point tomorrow, or whenever we reach the end of your case, to

5    have a colloquy with Mr. Roof about whether he wishes to

6    testify or not to testify and, you know, brief him on that.

7              MR. BRUCK:  We will.

8              THE COURT:  Very good.  Anything further?

9              MR. RICHARDSON:  Your Honor, I'm hesitant to ask, but

10   I am inclined to do so, you raised at some point a charge

11   conference.  Given the number of issues we've got going on

12   potentially with respect to that and the Government's

13   testimony, I think it would be of interest to at least some of

14   our team whether the Court intends to close tomorrow, or

15   whether we would work on the charge and plan on closing,

16   assuming not significant information from the defense being

17   offered, we'd plan on closing on Thursday morning, given the

18   need for a charge conference as well as the potential for

19   motions --

20             THE COURT:  Let me tell you my thinking about that,

21   and I'm glad to hear from both of you.  I've always thought

22   best thing to do for a jury is to give them a good night's

23   sleep, just -- we're wearing them out here, we're working

24   hard.  And so my inclination would be that once we finish the

25   testimony tomorrow, that I send them home, we do the charge

1    conference, give you folks the -- you said you have the

2    remainder of the day, time to work on your close and so forth.

3    I've got my charge done.  I want to hear from y'all, make sure

4    I don't want to rethink parts of it.  But I have it drafted,

5    and can't do a final charge until I hear all the evidence,

6    because there are elements dependent on evidence.  But the

7    answer is, it would be a good exercise of prudence by the

8    Court to send the folks home after we finish the evidence,

9    let's do a charge conference, it's not printed, I am trying to

10   finish, so we can get the jury back in here for closing

11   argument, and then they get the case when they're tired.  Just

12   that's the reality.  So the answer is yeah, I'd like to -- if

13   the scheduling goes as we anticipate, that we have a charge

14   conference tomorrow, we have closing argument and charge

15   Thursday morning.  Mr. Bruck, does that suit you?

16         MR. BRUCK:  That suits me fine.  I think

17   Mr. Richardson and I agreed on something.

18         MR. RICHARDSON:  Miracles happen, Your Honor.

19         THE COURT:  They say a broken clock is right twice a

20   day, you know.

21         MR. BRUCK:  So they say.  The -- I just heard the

22   Court to say that your charge is not complete because you --

23   there's still potentially more evidence.  But I wondered if it

24   would be possible if it's close to complete, if we could be

25   taking a look at the preliminary version of it so we can be

1    thinking a little bit in advance of any issues, rather than

2    have just a few minutes to respond.

3                THE COURT:  Yeah.  Let me go back to chambers and see

4    exactly where we are.  I know I had one additional charge, I

5    want to look at the -- during the day while I've been in court

6    the Government's filed a reply, I'm going to read the cases.

7    I have an impression about it, but I want to read the cases

8    and give it the best and most careful review.  So let me, when

9    I finish that, and so I'm satisfied that -- and whatever I

10   rule on that, I'm going to give the other side, of course,

11   time to argue at the closing charge in the morning.  But I'm

12   going to go back and study that, that's the one issue I

13   haven't spent as much time, because basically y'all were in

14   agreement on that issue originally, people have a right to

15   change their minds, and I want to get it right.  So let me

16   read the case law.  And when we finish, if we do it this

17   evening, we'll -- Mr. Bryant will e-mail it to counsel this

18   evening.  And understanding there will be parts in it that say

19   "if applicable," because we still have elements that --

20        But let me just say, a lot of it, both of you know what's

21   in it because you agreed on it.  Right?

22                MR. BRUCK:  True.

23                THE COURT:  And so the disagreements are relatively

24   small.  There's some important issues, but the bulk of it is

25   the same.  And I appreciate you did not do what some overly

1070

1    officious lawyers do and try to rewrite my standard charge

2    which is perfectly right, but not in the words they would say.

3    And I tell them, that is for their closing argument; don't put

4    their words in my mouth.

5        So let me work on that, I think it's a reasonable request,

6    Mr. Bryant and I will work this evening and see if we can't

7    get that finished.

8        Any other matters?

9            MR. BRUCK:  No, sir.

10           THE COURT:  Very good.  See everybody at

11   9:30 tomorrow morning.

12

13       (Court adjourned at 5:33 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATION

2

3          I, Debra L. Potocki, RMR, RDR, CRR, Official Court

4    Reporter for the United States District Court for the District

5    of South Carolina, hereby certify that the foregoing is a true

6    and correct transcript of the stenographically recorded above

7    proceedings.

8

9

10

     S/Debra L. Potocki
11   _____

12   Debra L. Potocki, RMR, RDR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25