```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF SOUTH CAROLINA
 2                       CHARLESTON DIVISION

 3   UNITED STATES OF AMERICA      :       VOLUME VI
                                   :
 4            vs.                  :
                                   :
 5   DYLANN STORM ROOF             :       2:15 - CR - 472

 6

 7           Trial continues in the above matter on Wednesday,

 8   December 14, 2016, commencing at 9:39 a.m., before the

 9   Hon. Richard M. Gergel, in the United States Courthouse,

10   Courtroom VI, 85 Broad St., Charleston, South Carolina,

     29401.
11

12   APPEARED ON BEHALF OF THE UNITED STATES:

13     JAY N. RICHARDSON, ESQ., 1441 Main St., Columbia, SC.

14     NATHAN WILLIAMS, ESQ., P.O. Box 978, Charleston, SC.

15     STEPHEN J. CURRAN, ESQ., 601 D Street, NW, Washington, DC.

16
     APPEARED ON BEHALF OF THE DEFENSE:
17
       DAVID I. BRUCK, ESQ., Washington & Lee School of Law,
18     Lexington, VA.

19     KIMBERLY C. STEVENS, ESQ., 1070-1 Tunnel Rd., Asheville, NC.

20     EMILY PAAVOLA, ESQ., 900 Elmwood Ave., Columbia, SC.

21

22

23          REPORTED BY DEBRA L. POTOCKI, RMR, RDR, CRR
          Official Court Reporter for the U.S. District Court
24                         P.O. Box 835
                       Charleston, SC  29402
25                        843/723-2208
```

1072

1                               I N D E X

2

3    WITNESS:  SUSAN PRESNELL

4    Direct Examination by Mr. Williams...................... 1076

5

6    WITNESS:  POLLY SHEPPARD

7    Direct Examination by Mr. Richardson.................... 1104

8

9

10

11   EXHIBITS:                        Received in Evidence

12   Government Exhibit 456                    1082
     Government Exhibit 8                      1130
13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present.)

2                MR. BRUCK:  We have one very brief matter.

3                THE COURT:  Yes, sir, Mr. Bruck.  Good morning.

4                MR. BRUCK:  Good morning.  If we could approach

5      briefly with Mr. Williams on one brief matter.

6                THE COURT:  No problem.

7           (Following discussion held at side bar.)

8                MR. BRUCK:  The next witness is the medical examiner.

9                THE COURT:  Yes.

10               MR. BRUCK:  Mr. Williams and I have been working with

11     a view to eliminating x-rays that actually depict the private

12     parts of some of these elderly ladies.  The medical examiner,

13     in response to our concerns and Mr. Williams' request,

14     eliminated some, but not all.  We are concerned that every

15     indignity inflicted on these victims reflects on us.  And

16     there --

17               THE COURT:  What do you mean "us?"

18               MR. BRUCK:  On the defendant.  On the defense.

19               THE COURT:  It should on the defendant, because

20     that's the way it works.

21               MR. BRUCK:  All I mean is that this is a concern that

22     we hope the Government would solve.

23               THE COURT:  Just remember, the issue of prejudice is

24     the -- all relevant evidence should -- if it's relevant, it's

25     prejudicial to one side or the other, right, that's why it's

1    offered.  I mean, this is -- I get it about sensitive

2    evidence, Mr. Bruck, I do.  Okay?  But, you know, they have to

3    establish cause of death.

4            MR. BRUCK:  I know.  All we're saying is that of the

5    many many x-rays showing bullets in the bodies --

6            THE COURT:  Obviously this is an area I'm very

7    familiar with.  Show me the x-rays.

8            MR. WILLLIAMS:  I cut two of them, sort of with an

9    eye toward their concerns.  This is one, Your Honor.

10           MR. BRUCK:  That is not -- oh, I'm sorry, that -- no,

11   51 is okay.  52, 32 and 13.  The numbers are probably changed.

12           THE COURT:  Let's see if we can look at them.  You

13   know, my big thing is I've just got to be specific.  Y'all

14   show me what you're looking at.

15           MR. BRUCK:  I understand.  This may have been changed

16   since the last time.

17           MR. WILLLIAMS:  I took some out.

18           THE COURT:  If we fixed it, we fixed it.  But let's

19   be careful.  Go through each one of them.

20           MR. WILLLIAMS:  That was one I took out you were

21   concerned about.

22           MR. BRUCK:  Thank you.

23           MR. WILLLIAMS:  Is that one of the ones?

24           MR. BRUCK:  I think it used to be, but it -- No.

25   That one has been changed, that's good.

1    (Brief interruption in proceedings.)

2         MR. WILLLIAMS:  These are all --

3         MR. BRUCK:  It looks like -- they were taken care of

4    on the last go-round, that's been taken care of.  We

5    appreciate it.

6         THE COURT:  Very good.

7    (Side bar discussion concluded.)

8         THE COURT:  Bring in the jury.

9         MR. RICHARDSON:  Your Honor, just briefly, we

10   anticipate this witness will take an hour, hour and a half.

11   We would ask the Court, following this witness' testimony,

12   both direct and cross, that the Court consider taking a break

13   at that point.  We have some people who are choosing not to be

14   in the courtroom, including the next witness is one of those

15   individuals, that we would like to be able to transfer up here

16   in between.

17        THE COURT:  No problem.  Generally, that meets our

18   morning break anyway, glad to do it.

19        MR. RICHARDSON:  Thank you.

20        THE COURT:  Bring in the jury.

21   (Jury present.)

22        THE COURT:  Good morning.  Government, call its next

23   witness.

24        MR. WILLLIAMS:  Thank you, Your Honor, Government

25   calls Erin Presnell.

SUSAN PRESNELL - DIRECT EXAMINATION

1      THE CLERK:  State your full name for the record,
2  please.
3  A.  Susan Erin Presnell.
4      SUSAN PRESNELL, a witness called by the Government, first
5  having been duly sworn, testified as follows:
6                      DIRECT EXAMINATION
7  BY MR. WILLLIAMS:
8  Q.  Morning.
9  A.  Good morning.
10 Q.  If you could, repeat your name for the jury.
11 A.  My name is Susan Erin Presnell.
12 Q.  Where do you work?
13 A.  I'm a forensic pathologist at the Medical University of
14 South Carolina, just right down the street.
15 Q.  What is a forensic pathologist?
16 A.  Well, everyone is kind of getting more familiar with
17 forensic pathology, but if I could back up a moment and just
18 explain pathology, pathology is the study of disease.  And so
19 a general pathologist will look at patients' tissue.  So if
20 you go to the doctor and have a biopsy or surgery and have
21 your appendix out, that tissue will go to pathology.  Look at
22 it under the microphone and diagnose disease.  Is it cancer,
23 is it not, is it an infection or is it not.  So I'm trained in
24 general pathology.
25      But then I subspecialized in forensic pathology, where

SUSAN PRESNELL – DIRECT EXAMINATION

1    we're not just looking at a piece of tissue, we're looking at

2    the whole entire body of someone who has passed.  We do look

3    for disease, but we also evaluate trauma, and that process is

4    through the autopsy.  And then ultimately come up with cause

5    and manner of death.

6    Q.  How long have you been a forensic pathologist?

7    A.  I have been board certified since 1999, which is when I

8    was hired as faculty at MUSC.

9    Q.  If you need to get some notes or something, go ahead.

10   Glasses.  Sorry.

11       How long have you been with the Medical University of

12   South Carolina?

13   A.  Well, I went to MUSC in 1989 for medical school, and I

14   basically stayed through my training, but in 1999 was when I

15   was hired as faculty.

16   Q.  And you've been a forensic pathologist since '99?

17   A.  Yes.

18   Q.  Are you a licensed physician as well?

19   A.  I am.

20   Q.  In what state?

21   A.  South Carolina.

22   Q.  And how long have you had that license?

23   A.  '94, '95?

24   Q.  Let me ask you, you mentioned you went to MUSC; is that

25   where you received your training in pathology?

1078

SUSAN PRESNELL - DIRECT EXAMINATION

1  A.  Yes.  So I went to Clemson for undergrad, then to MUSC for

2  medical school.  I stayed there for my -- I chose pathology as

3  my profession, compared to like family medicine or pediatrics.

4  I took pathology.  That was a five-year training program.

5  Then I stayed again and did my forensic pathology training

6  there.

7  Q.  And you'd explained that you conduct autopsies, is that

8  right?

9  A.  Yes.

10 Q.  Can you give the jury sort of a brief description of what

11 an autopsy is?

12 A.  Well, so it's a complete examination of a deceased

13 individual.  Where a coroner states, typically the coroners

14 are the ones that authorize us to do a postmortem examination.

15 So the coroner will contact us and arrange transportation of

16 some -- what we call the decedent, to our institution.  Then

17 when they are brought up for autopsy, we do the full external

18 exam.  We document any disease processes or injuries.  We may

19 do extra things like x-rays, depending on what type of case it

20 is.  And then we do the full internal exam.  And so we're

21 looking at all the inside organs and tissues, and looking for,

22 again, disease and trauma.  In some cases we may sample the

23 tissues to look at under the microphone.  And then we also

24 draw samples for toxicology to test the blood for drugs and

25 alcohol.  And then ultimately, when all the results come back

SUSAN PRESNELL – DIRECT EXAMINATION

1   after we've looked at the slides and put everything together,

2   we issue the final autopsy report with that cause and manner

3   of death.

4   Q.  Are you a member of any kind of specialized medical or

5   scientific groups or associations?

6   A.  Yes.  Just some general pathology groups.  Do you want me

7   to name some of them?

8   Q.  Are you boarded?  You're familiar with that term?

9   A.  Yes.  So I'm board certified by the American Board of

10  Pathologists in anatomical pathology, clinical pathology and

11  forensic pathology.

12  Q.  Does that require taking an exam?

13  A.  Yeah, the boards is what it's called.

14  Q.  And you've taken all of the necessary exams for those

15  three specializations?

16  A.  Yes.

17  Q.  Explain your affiliation with the university; how does

18  your practice as a forensic pathologist work in to teaching or

19  other type of academic studies?

20  A.  So MUSC is an academic institution as well.  So not only

21  do I do the forensic pathology practice, but I also teach.  So

22  I'm involved in teaching the medical students, I'm in their

23  pathology course in the second year.

24  Q.  Do you have any type of title that you have as a teacher?

25  A.  I'm a professor.

1080

SUSAN PRESNELL - DIRECT EXAMINATION

1  Q.  Professor?  And I'm assuming you have articles, textbooks

2  and things in the area of forensic pathology?

3  A.  Yes, we kind of strive to publish at least one to two

4  things a year.

5  Q.  Approximately how many articles, textbooks or papers have

6  you published in this area?

7  A.  So I'm just going to approximate about 25.

8  Q.  I want to ask you, you have a general idea the number of

9  autopsies you may have performed in your career?

10  A.  Again estimate, it would be over 2000.

11  Q.  And approximately how many times have you testified as an

12  expert in the area of forensic pathology?

13  A.  Over 100.

14       MR. WILLLIAMS:  Your Honor, I move to qualify

15  Dr. Presnell as an expert in forensic pathology.

16       THE COURT:  Any objection?

17       MR. BRUCK:  No objection.

18       THE COURT:  The doctor is recognized as an expert in

19  forensic pathology.  Proceed.

20  BY MR. WILLLIAMS:

21  Q.  Doctor, you spent some time preparing for your testimony

22  today?

23  A.  Yes, sir.

24  Q.  I want to ask you to go back to June of 2015.  Did you

25  perform several autopsies related to the case you're here for

1081

SUSAN PRESNELL – DIRECT EXAMINATION

1    today to testify about?

2    A.   Yes, I've performed all of them.

3    Q.   And that was nine total?

4    A.   Nine total.

5    Q.   How many days or over how many days did that work take?

6    A.   It was over a four-day period, so the day after.  On

7    Thursday we examined two, Friday two more, Saturday two more

8    and Sunday the last three.

9    Q.   I want to ask you also, you testified earlier about the

10   process of an autopsy.  Do you document your findings in terms

11   of charts and other things that are helpful to a jury?

12   A.   Absolutely.  So we'll use not only photography, but

13   diagrams as well.

14   Q.   I want to ask you also, are you able to determine sort of

15   bullet path or cause of injuries, entrance wounds, re-entrance

16   wounds, those kinds of things?

17   A.   Yes.

18   Q.   I think you also said that you can use x-rays as well?

19   A.   Yes, we -- and gunshot wound cases we'll use x-rays to

20   help us locate the bullets so we can retrieve them.

21   Q.   And are you able to recover rounds during the autopsy

22   process or fired rounds or other --

23   A.   Right, so that's what the x-rays are to find the rounds or

24   the bullets.

25   Q.   In this case you did those things and put them into a

1082

SUSAN PRESNELL – DIRECT EXAMINATION

1    Power Point presentation for the jury?

2    A.  Well, what I did was I took a diagrams I had and just put

3    the gunshot wounds on the diagrams.  And tried to connect them

4    up so it would be a more straightforward presentation.  Yes, I

5    did that for the jury.

6    Q.  And in that process you would have also determined what

7    the cause of death is for each of those individuals?

8    A.  Yes.

9    Q.  I'm going to show you what's been marked as Government's

10   proposed exhibit 456.  Do you recognize that?

11   A.  This is a CD with the Power Point presentation on that I

12   initialed saying that I reviewed it, prepared it and reviewed

13   it.

14          MR. WILLLIAMS:  Let me show this to defense counsel.

15          MR. BRUCK:  No objection.

16          THE COURT:  Government 456 admitted without

17   objection.

18     (Government Exhibit 456 received.)

19          MR. WILLLIAMS:  What I'm going to do is first of all

20   ask the Court's permission to let Dr. Presnell sort of be the

21   one that handles the slides for this presentation.

22          THE COURT:  That would be fine.

23          MR. WILLLIAMS:  Second, Your Honor, I think there's

24   times it may be convenient for her to come down from the

25   witness stand, if that's okay.

SUSAN PRESNELL – DIRECT EXAMINATION

1    THE COURT:  Any objection from the defense?

2    MR. BRUCK:  No, sir.

3    MR. WILLLIAMS:  As needed.

4    BY MR. WILLLIAMS:

5    Q.  Dr. Presnell, if you could, tell the jury a brief overview

6    of how this presentation is set up relative to the number of

7    victims in the case.

8    A.  So the way that this is set up is that I have the man

9    and/or woman's diagram, and it's in the order that I performed

10   the autopsies.  So we just go through each sequentially.  I'll

11   go through the different gunshot wounds, what the major organs

12   were that were injured.  And then in some instances -- all of

13   them -- there's some x-rays and also a photograph of the

14   projectiles that we recovered.

15   Q.  At the end you have a summary of the injuries to each

16   individual to sort of recap?

17   A.  Yes, when we get to the end we'll go back with just a one

18   snapshot of each case.  Summarizing.

19   Q.  Let's start with the first individual you would have

20   conducted an autopsy on.  What does -- if you can, give the

21   jury an idea what this slide is depicting.

22   A.  Okay.  So this was Mr. Simmons.  And he was the first

23   person that we examined.  And so I wanted to point out a

24   couple of things before we get into the series.  First of all,

25   the marks or the dots on him are his gunshot wounds.  And I'm

SUSAN PRESNELL - DIRECT EXAMINATION

1    going to match them up for you, the entrance and the exits.

2    You can see that we have labeled the gunshot wounds with

3    letters.  It doesn't imply the sequence that the gunshots were

4    received, it's just a way for us to designate them and refer

5    back to them later.

6         The other thing that sometimes can get -- kind of flips

7    your mind is that because we have a two-dimensional diagram,

8    and one is the front and one is the back, remember that -- I'm

9    going to try this writing.  Remember that --

10   Q.  Can you get that to work?

11   A.  Well, I'll just do without that.  All right.  So look at

12   the person's right side and their left side.  So the right

13   side of this person, as on either side of the screen.  The

14   middle part, like the middle section is the left side of the

15   person.  All right?  So Mr. Simmons -- the other thing is I'll

16   go through all the gunshot wounds and then I'm going to

17   describe the least possible number of gunshot wounds he

18   sustained.  Meaning that in some instances a bullet went

19   through something and then re-entered.

20        So Mr. Simmons first.  He has three gunshot wounds to his

21   left arm, so they're going in the C, D and E, they're going in

22   the back of his left arm.  The one at E actually -- or E to

23   G -- and I'm sorry, where the arrows are is where the bullets

24   exit.  The one where exits at G actually causes an elbow

25   fracture, fracture of his elbow.  This other one to the chest

1085

SUSAN PRESNELL – DIRECT EXAMINATION

1    is labeled L, it goes in and actually strikes his left lung

2    and causes left lung injury.

3        We also have over on the right shoulder the H to I, it's

4    just going through soft tissue.  We have the gunshot wound K

5    to his back, which enters his body and goes into his vertebral

6    column or his backbone.

7        Then we also have gunshot wound J, which enters and breaks

8    the -- the humerus is the arm bone in the top of -- upper arm

9    bone.

10   Q.   Is it fair to say that you can't tell which shot would

11   have hit him first necessarily, just that these are the

12   injuries that occurred?

13   A.   Correct.

14   Q.   Okay.

15   A.   And then so what I would like to point out, if you count

16   them, that's actually seven.  But if you look at gunshot wound

17   L, and you hold your left arm up towards your chest, either

18   the -- either of the lower gunshot wounds might have been an

19   entry and -- gunshot wound that exited and re-entered.  So L

20   may be a gunshot wound that was re-entered, making the total

21   count to at least six gunshot wounds.

22   Q.   Does a re-entry wound have a different appearance than an

23   initial entry wound?

24   A.   It can.  It can look more irregular and ragged.  It

25   doesn't have to.

1086

SUSAN PRESNELL – DIRECT EXAMINATION

1  Q.  That's because the bullet sometimes will deform as it
2  travels through one part of the body then re-enters another
3  way?
4  A.  It can deform and change orientation and kind of be weird
5  or different orientation when it enters, yes.
6  Q.  Okay.  Go ahead.
7  A.  All right.  And so this was just backing up to explain the
8  number of gunshot wounds by taking off all the things that
9  were injured.  K, gunshot wound K with the split is an arrow
10  just demonstrating that the bullet split into a jacket and its
11  core.  So that when we look at the x-ray, we'll see an
12  additional projectile.
13      The other thing I wanted to point out before we move on is
14  that all of these gunshot wounds are on his left -- they're
15  not on his left side, they're all left going to right.  So
16  even though he has a gunshot wound J is on the back of his
17  right side of his back, it's still going from his left to his
18  right.  So in this case all six are going from left to right.
19      Here is the x-ray demonstrating that -- let's see -- the
20  top left corner is his right shoulder, showing one of the
21  recovered projectiles, and of course the arm bone that was
22  broken.  The top right has the elbow fracture that G had
23  caused going through.  And then the center diagram -- or
24  x-ray, is his chest cavity, and you can see projectiles one,
25  two and three.  And projectiles two and three are the ones

SUSAN PRESNELL - DIRECT EXAMINATION

1    that go together that are actually one projectile.

2        And then here are the recovered projectiles you saw on the

3    x-rays.  Again, four that are recovered, but the top right and

4    bottom right go together.

5    Q.  And this doesn't count for obviously rounds that would

6    have been located at the church at the crime scene?

7    A.  Correct.  Something I can't remember if I pointed this

8    out, but this is still Mr. Simmons, the red arrows are --

9    indicate bullets that went in and exited the body.  The blue

10   arrows are where the bullet went in and the bullet is still in

11   the body.  So B for blue for bullets, so the blue ones are the

12   bullets that are still in the body.

13   Q.  The one that grazed his shoulder, that wouldn't have

14   stayed, it would have been somewhere else in the crime scene?

15   A.  Correct.  Yes.

16   Q.  Go ahead.  This is the summary you talked about?

17   A.  So these are -- it was a written summary, I wasn't going

18   to go back through it.  At the very end I have that quick

19   diagram summary of each case to put them all together.

20   Q.  So what would have been the sort of cause of death for

21   Mr. Dan Simmons, Senior?

22   A.  His left lung was -- the bullet macerated his lung.

23   Q.  Do you have an opinion as to how long that would -- the

24   onset of death would follow from that type of injury?

25        MR. BRUCK:  May we approach?

SUSAN PRESNELL – DIRECT EXAMINATION

1            THE COURT:  Yes.

2        (Following discussion held at side bar.)

3            MR. BRUCK:  These are the reports, the autopsy

4    reports for the Rule 16 summary includes any opinion as to the

5    time that would be required, nor to pain and suffering, nor to

6    the period in which the person would have remained conscious.

7    And we just think this is beyond the testimony.

8            THE COURT:  Is she going there?

9            MR. WILLLIAMS:  I'll withdraw the question and not go

10   there.

11           THE COURT:  You need to ask the question within a

12   reasonable degree of medical certainty.  This needs to be a

13   not sort of what is -- you sort of reached an opinion

14   question.

15           MR. WILLLIAMS:  I'll stay away from that.

16           MR. BRUCK:  Thank you.

17           THE COURT:  Good.

18       (Side bar discussion concluded.)

19           MR. WILLLIAMS:  Your Honor, I withdraw the last

20   question at this time.

21   BY MR. WILLLIAMS:

22   Q.  Doctor, I asked you about the cause of death.  Do you

23   have, within a reasonable degree of medical certainty, what

24   the cause of death would have been for Mr. Simmons?

25   A.  It was the gunshot wounds to his body, and in particular,

SUSAN PRESNELL – DIRECT EXAMINATION

1    most fatal injury was the lung, lung injury.

2    Q.  If you could go to the -- what was the next individual

3    that you examined?

4    A.  Miss Coleman Singleton we also examined on Thursday.  She

5    has at least five gunshot wounds to her body, all of them are

6    going to be on her right.  So first we have gunshot wounds A

7    and B, which enter into her chest and both of her lungs, as

8    well as her aorta.  Just to make sure everybody's familiar,

9    that aorta is the main blood vessel that's leaving the heart

10   that takes blood to the rest of the body.

11   Q.  Go ahead.

12   A.  Gunshot wound E is to the right breast and just pretty

13   much stays on the soft tissue area, kind of scoots across the

14   chest.  Gunshot wound F enters the right thigh and has a

15   partial exit at G, and it continues up into the abdomen, into

16   the kidney.

17   Q.  How do partial exits occur, at least in your expert

18   opinion?

19   A.  Well -- and this is one example where I'd like to stand.

20   Q.  Go ahead.

21   A.  If you don't mind.  So this gunshot wound is coming in

22   through the thigh, it has a partial exit right here and

23   continues up into her kidney.  If you move, if you put the leg

24   like this, then you can see how the bullet actually exits the

25   skin, the groin area right here, and then continue on.  So

1090

SUSAN PRESNELL - DIRECT EXAMINATION

1    this suggests that the leg was raised.

2         You also have gunshot wound H, which is to the right back

3    shoulder which chips the scapula, also goes through a shoulder

4    blade, then not finally, but the other one is the one to the

5    right wrist area, it actually goes into the pinky side of the

6    wrist and exits the front of the wrist.  So from C to D.  So

7    on the pinky side exits the front.  The possibility exists

8    that this actually -- the arm was up, like again in a crouched

9    or curled type position, that this actually re-entered, and

10   perhaps that was the re-entry at the breast one.  Because that

11   would have been in the easy -- not easy -- reasonable location

12   for that arm to be.

13        So at least five gunshot wounds, six total, but at least

14   five, if E is a re-entry wound.  Obviously the fatal wounds

15   here are A and B to the lungs and the aorta.

16        This is her x-ray demonstrating the projectiles.  They're

17   matched up with the letters of which the gunshot wound was

18   labeled.  You can see on her right upper -- the x-rays are

19   like you're looking at them.  So the top left of the x-ray is

20   her right shoulder.  You can see one of the bullets up there

21   had gone through the shoulder blade, and then the others on

22   the left side of her body.

23   Q.  Go to the next slide.

24   A.  And then here is the recovered projectiles.

25   Q.  And the next slide shows the summary?

1091

SUSAN PRESNELL – DIRECT EXAMINATION

1    A.  Yes.

2    Q.  And did the cause of death, within a reasonable degree of

3    medical certainty, can you --

4    A.  Gunshot wounds again, the ones hitting the aorta and the

5    lungs being most -- being the most fatal.

6    Q.  What was the next person you examined?

7    A.  All right.  So the next day, the following day we examined

8    Miss Middleton Doctor, who has at least eight gunshot wounds.

9    We'll start off with A and B to the neck, which fractures her

10   bone in her neck.  Then -- oh, I popped up CK -- not CK --

11   gunshot wound K is on the back of the right shoulder.  And

12   just for orientation purposes, I'm going to scoot it over so

13   it's on the top, it looks like it's on the front there.

14   That's gunshot wound K.  Then it goes through the aorta.  SVC

15   is superior vena cava, which is the main blood vessel bringing

16   blood back to the heart from the top of the body.  As well as

17   the gunshot wound C goes in and breaks the right upper arm and

18   hits the right lung.  D just goes through soft tissue and

19   actually re-enters right there at the right breast.  That's F.

20   And F continues on and hits the right lung, the liver, which

21   is in that pathway, the pancreas, and also the kidney.

22   There's also one gunshot wound G, which goes through the liver

23   as well and also the intestines.  And this complex on the

24   lower, I'm going to go back to, but we'll go through it first.

25   Gunshot wound I is to the right thigh.  It's just going

1092

SUSAN PRESNELL - DIRECT EXAMINATION

1  through soft tissue.  Gunshot wound J is to the pubis area,

2  which actually goes into the left thigh where the bullet's

3  recovered.  And that's just soft tissue injury.  Then we have

4  gunshot wound N, which is to the back of the left thigh.  So

5  everything else is right.  There is this one on the left, back

6  of the left thigh, it's going through the left thigh and it's

7  going -- looks like going in an upward direction.  But again

8  I'll show you this in just a minute to where L is.  And right

9  where L is, which is an injury on the skin, the bullet's right

10 there.  And then finally we have H, which is a graze wound

11 over the right lower abdomen area.

12 Q.  So you talk about that N wound again, you said that came

13 from a different --

14 A.  Yes.  So if you notice everything is on her right going to

15 her left, except for this one to the back left thigh.  And

16 just the orientation for the back left thigh -- step out

17 again.  N is a little bit lower than M on the left thigh.  So

18 N would be here, M is kind of going upward, and then the other

19 hole and the bullet are right in this area.  So if you raise

20 the leg up again, you can see how it's -- that would be going

21 up, it's going upward direction to the abdomen area where the

22 bullet's recovered.  So again, that injury is suggestive of a

23 prone position.  And then the other complex on the right

24 thigh, again, if you raise the leg up, that would explain the

25 pathway not only from this going through the thigh through the

SUSAN PRESNELL - DIRECT EXAMINATION

1    pubis, but also that graze wound right there.  That all lines

2    up.  So this area, I think, is actually one gunshot wound.

3    Making a total of eight gunshot wounds.

4        And then like I said, all of them right to left except for

5    the one to the left thigh.

6        Here are some of the x-rays demonstrating the projectiles

7    that were recovered.  And the graph of the projectiles that

8    were recovered.

9    Q.  If you could, go to the next slide, what would -- again,

10   was the cause of death, at least within a reasonable degree of

11   medical certainty?

12   A.  The multiple organ injury, the aorta, heart, lots of

13   different injuries, multiple gunshot wounds to the body.

14   Q.  Who is the next person you examined?

15   A.  Mr. Pinckney was examined the next day.  And he has five

16   gunshot wounds.  He also has a laceration above his left

17   eyebrow, you can see there.  Gunshot wound A goes from his

18   left neck, left side of his neck to the right side of his

19   neck, and goes through the hyoid bone, which is a bone right

20   at the base of your tongue at the top part of your neck.  The

21   thyroid cartilage, which is right where your Adam's apple area

22   is, and the epiglottis, which is the entrance to your airway.

23   He also had a gunshot wound to the right back, you see there,

24   and which hits the lungs, both lungs, the aorta and the

25   esophagus.  And gunshot wound D is just to the left back, it

1094

SUSAN PRESNELL – DIRECT EXAMINATION

1  goes forward and breaks the left upper arm.  F comes across

2  the body and strikes the intestines, the pancreas, and ends up

3  through the liver.  And then we have a graze wound in the mid

4  back.  Which is just a superficial injury.

5      So in this instance we have three gunshot wounds, A, D and

6  F, that are to the left side of the body.  We have the gunshot

7  wound E, which is to the right going in the other direction,

8  and then the graze wound, which is really in that same

9  orientation as the -- as C to E, the one that's going to the

10  right.

11  Q.  So with this individual you saw wounds coming from both

12  sides.  Is that consistent with movement either of the gun

13  being fired or the individual being shot at?

14  A.  Correct.  Yes.  Here's the x-rays demonstrating the

15  projectiles up in -- really you can see F is circled, and the

16  other one associated with gunshot wound D is in the left upper

17  arm there, you can see the fracture.  Here are the recovered

18  projectiles.  The one you didn't see on x-ray is the one on

19  the bottom right, which we -- was at his skin, we took off

20  before we took the x-rays.  And here's that summary.

21  Q.  And same question as the earlier victims, what was the

22  cause of death, at least within a reasonable degree of medical

23  certainty?

24  A.  That multiple gunshot wounds, the lungs and the aorta

25  being the most fatal.

1095

SUSAN PRESNELL – DIRECT EXAMINATION

1  Q.  Who was the next individual you looked at?

2  A.  Miss Hurd was next.  Miss Hurd has at least seven gunshot

3  wounds.  I have arrows on this, and I thought it was getting

4  too complicated, so I tried taking the numbers off of it,

5  which probably in hindsight wasn't the best idea, because it's

6  harder to refer to them with our screen setup.  But we'll go

7  through them.

8       So we have at least seven gunshot wounds, one is through

9  the breast and just through soft tissue.  And it looks like it

10  exits and then also goes through the right upper arm.  So we

11  have two there which might actually just be one with a gunshot

12  that exits and re-enters.  We have one to the back of the left

13  arm that exits the shoulder.  And you can see in the x-ray in

14  the top right corner there it hits the right upper arm.  So it

15  breaks that, fractures that bone.  We have two gunshot wounds

16  to the left forearm.  So the one that I just was -- this one I

17  just put up and this one in the front here both are just soft

18  tissue injuries.  We have two to the right upper -- excuse me,

19  left upper chest, which go forward towards the -- back towards

20  the esophagus, and two to the left breast, which enters the

21  lungs and the aorta as well.  And then finally there's a graze

22  wound at the top of her left back.

23  Q.  It appears those all came from the --

24  A.  These are all going from left to right.

25  Q.  Sort of the same general area on her body as well?

SUSAN PRESNELL - DIRECT EXAMINATION

1    A.  Yes.  And then so to consider what's the least number of

2    gunshot wounds, if we look at the one that's on her breast,

3    that could account for also the one through the right upper

4    arm.  Then if you look at the two to the forearm, her left

5    forearm, if you bring the forearm up to your body, then that

6    could easily account for the two to the breast, and enter the

7    arm, exit and re-enter the breast.  So at least seven total.

8    Q.  And you tried to make a determination as to the least

9    number, not the maximum number, is that fair to say?

10   A.  I mean, we can count them, I can count the maximum, too,

11   but I wanted -- some of them are obvious re-entries and some

12   make sense, but in taking into consideration that they might

13   be, I want what is the least possible number of gunshot

14   wounds.

15   Q.  Go ahead.

16   A.  So like I pointed out before, the ones to the breast and

17   the right upper arm could be re-entries.

18       Here are the bullets that were recovered along the top of

19   the chest.  It's just showing some of the directions, kind of

20   going up and to her right.  And the recovered projectiles from

21   her body.

22   Q.  If you could go to the summary.  I'll ask you the same

23   question, what the cause of death was within a reasonable

24   degree of medical certainty.

25   A.  Again, multiple gunshot wounds, although the heart -- the

SUSAN PRESNELL - DIRECT EXAMINATION

1   lungs and the aorta would be the most injuries.

2   Q.  Who is the next person you examined?

3   A.  Miss Jackson was next.  She has at least ten gunshot

4   wounds.  They're all on her left side of her body.  First

5   we're going to look at this diagram to the right, I'm going to

6   go forward one.  Because we're going to look at her two

7   gunshot wounds to her arm.  One is K, which goes in the back

8   of her left arm and exits the inside part of her left arm, and

9   then N, which goes to the -- through her wrist, her left

10  wrist, goes in through the back of it and exits the front of

11  it.  The gunshot wound to the top of the arm is just a soft

12  tissue injury.  The one to the wrist, you can see there it

13  fractures one of the arm bones.

14      So going back to looking at the gunshot wounds to her

15  side, there's ten of them.  We have one to the chest, that's

16  one, two, three, four, five, six, seven, eight -- there's

17  actually two that go in this big complex -- nine and ten.

18  They're all so close together, the pathways converge, that's

19  really difficult to separate out what bullet might have

20  injured what.  So it's a summary of what is injured is here in

21  the spots, which includes the aorta multiple times, the heart,

22  the lungs, et cetera.

23      Again, going back to how many gunshot wounds, it certainly

24  makes sense that the I, in particular, the one to the top left

25  chest, is probably a re-entry from the left upper arm, just

SUSAN PRESNELL – DIRECT EXAMINATION

1   its location.  And then possibly one of the other ones could

2   certainly have been a re-entry from the wrist.

3   Q.  So at least ten, you said there was a lot, sounds like a

4   lot of splitting or fragmenting of the rounds?

5   A.  No?  Maybe?  Some of them are fragmented.  So when we

6   recover them, we're going to label them just number one

7   through whatever number, and then try to match them up after.

8   And so the numbers are arbitrary.  So these are the x-rays of

9   the projectiles that are recovered on her body, and that's --

10  so the other views were from the front, this is a side view.

11  And here's the recovered fragments.

12      I believe this one was eight bullets, two cores and two

13  jackets were recovered, so really all ten projectiles, and

14  then several fragments of such along the way.

15  Q.  If you could go to the summary.

16  A.  So again, for her cause of death it would be multiple

17  gunshot wounds.  And of course the aorta, heart, lungs are the

18  most serious.

19  Q.  That's also to a reasonable degree of medical certainty?

20  A.  Yes.

21  Q.  The next individual is Mr. Tywanza Sanders?

22  A.  Mr. Sanders has five gunshot wounds.  He has four on the

23  left side, one on the right.  First of all, there's one

24  through his left hand, which fractures one of the finger

25  bones, you can see that in the x-ray.  I've added the

1099

SUSAN PRESNELL - DIRECT EXAMINATION

1    numbers -- the letters now, second -- not second one in

2    sequence, but the next one is gunshot wound C to the left

3    upper arm just goes through soft tissue.  Then we have a

4    gunshot wound B to the right side of the neck which goes

5    through his trachea.  Gunshot wound E to his left back, which

6    hits his left lung and goes into his backbone.  Gunshot wound

7    F to the -- also to his back, which hits his right lung and

8    the -- and goes through the liver.

9    Q.  And you talked earlier about, I believe it was

10   Mr. Pinckney, had injuries from different directions.  Is that

11   true of Mr. Sanders as well?

12   A.  Yes, he has four on the left and one on the right.

13   Q.  Go ahead.

14   A.  So again, the gunshot, or excuse me, x-rays demonstrating

15   the projectiles, and also there's one from the side.  And we

16   recovered the projectiles, and here's a photograph of those.

17   Q.  If you could, again, tell the jury what the cause of death

18   was for Mr. Tywanza Sanders to at least a reasonable degree of

19   medical certainty.

20   A.  He would be the multiple gunshot wounds, and his lungs and

21   his liver would have been the fatal injuries.

22   Q.  And it looks like Miss Ethel Lance was the next person you

23   examined?

24   A.  So Miss Lance was next.  She has six gunshot wounds.  You

25   can see they're all grouped on the left side of her body.

SUSAN PRESNELL - DIRECT EXAMINATION

1    They're all going from left to right.  So A goes through the

2    right upper -- excuse me -- the left upper arm and breaks the

3    bone, you can see that on x-ray.  And then number two, three,

4    four, five and six.  So again, they're all kind of going the

5    same direction.  So the injuries along those pathways include

6    the heart, aorta, and you can see the list as to superior vena

7    cava, lungs, et cetera.

8    Q.  Looks like those were all grouped in the same area going

9    in more or less the same direction?

10   A.  Correct.

11   Q.  If you go to the next slide in your analysis.

12   A.  So here the projectiles are recovered.  If you notice,

13   they're -- all the arrows were blue, so all the projectiles

14   are inside of her, and we recovered those.

15   Q.  And --

16   A.  The summary, the gun -- the cause of death is from

17   multiple gunshot wounds.  And she has multiple fatal injuries,

18   heart, aorta, superior vena cava, lungs.

19   Q.  That's within a reasonable degree of medical certainty?

20   A.  Yes.

21   Q.  Go to the next person you examined.

22   A.  And last was Miss Thompson.  She has at least eight

23   gunshot wounds.  All hers are going from left to right.  So

24   there's one that is to the left of her arm which goes through

25   the left upper arm bone, so the left humerus, and fractures

1101

SUSAN PRESNELL - DIRECT EXAMINATION

1    that.  We have C to D, which goes through the left breast.

2    And then actually with the way her breasts are, it's -- I'm

3    confident that it's -- E is a re-entry wound into the right

4    breast, continues into the right chest cavity and hits the

5    lung there.

6        Then we have gunshot wound that's underneath the left

7    breast that goes through, and it looks a little low, but it --

8    it probably is a little higher on her, but it goes through

9    both the lungs and the heart.  Through the liver.

10        Then we have this gunshot wound G at the left thigh, which

11    is another one I'd like to stand up for to demonstrate that I

12    think that G, which just goes through soft tissue, accounts

13    for these in and outs all the way up the left abdomen.

14    Q.  If you could get up and demonstrate?

15    A.  Okay.  So gunshot wound G is here, and it exits here, and

16    then we have this series of in and outs up here.  So again, if

17    you lift your leg to the curled position, that would explain

18    the in and out a little bit.  There's a little bit of roll.

19    So squish your legs together or scrunch your legs together, so

20    it would be in, out, in, out, in, out, and that would explain

21    that series of -- that sequence of gunshot wounds.

22        Another to the left thigh, H, goes into the soft tissue

23    there.  And there's three to the back.  Gunshot wound I is

24    just through soft tissue.  And gunshot wound K, which actually

25    goes through the aorta.  And gunshot wound J, which hits the

1102

SUSAN PRESNELL – DIRECT EXAMINATION

1    pelvis and fractures that.  So if you counted -- the re-entry

2    at the breast and the sequence at G, this would be a total of

3    at least eight gunshot wounds.

4        Here are the x-rays demonstrating some of the projectiles

5    and some of the -- you can see the left upper arm there is

6    fractured.  Again, demonstrating projectiles, and the

7    recovered projectiles are on this photograph.

8    Q.  If you could go to the summary for Miss Myra Thompson,

9    what was the cause of death to a reasonable degree of medical

10   certainty?

11   A.  The multiple gunshot wounds.  The fatal organs injured

12   would be heart, lungs, aorta.

13   Q.  And I believe you said you prepared a summary that

14   captured the number of wounds and the critical wounds for each

15   individual?

16   A.  I did, just because going through each individual wound

17   can be somewhat overwhelming.  I summarized the nine victims.

18       First, Mr. Pinckney, remember, he had five gunshot wounds,

19   three are entering the left side of his body, one is on the

20   right, and then we have the graze wound, which is the same

21   direction as the one on the right.

22       Mr. Sanders has also has five gunshot wounds, four on the

23   left and one entering the right side of his neck.

24       Miss Coleman-Singleton has at least five gunshot wounds,

25   all are on the right side.

1103

SUSAN PRESNELL – DIRECT EXAMINATION

1    Miss Middleton Doctor has at least eight gunshot wounds,
2  all are on her right, except for that one on her left thigh.
3    Mr. Simmons has at least six gunshot wounds, all are going
4  from his left to his right.
5    Miss Hurd has at least seven gunshot wounds, all are going
6  from her left to her right.
7    Miss Jackson has at least ten gunshot wounds, all are on
8  her left.
9    Miss Lance has six gunshot wounds, all are going from left
10  to right.
11    And Miss Thompson has at least eight gunshot wounds, all
12  are going from left to right.
13  Q.  That's, I believe, the final slide in your analysis?
14  A.  Yes.
15        MR. WILLLIAMS:  Thank you, Dr. Presnell, we have no
16  further questions.
17        THE COURT:  Cross-examination.
18        MR. BRUCK:  No questions for the doctor at this time.
19        THE COURT:  Doctor, you may step down.
20        MR. WILLLIAMS:  Your Honor, if I haven't, I'll move
21  the admit Government Exhibits 456.  I don't know if I had done
22  that.
23        THE COURT:  I already admitted 456.
24        MR. WILLLIAMS:  Thank you.
25        THE COURT:  Ladies and gentlemen, I think this is an

1104

POLLY SHEPPARD – DIRECT EXAMINATION

1   appropriate time to take a break at this point.

2       (Jury excused.)

3           THE COURT:  Any matters to take up at this point?

4           MR. RICHARDSON:  Nothing to take up at this point.

5   Thank you for taking a break.

6           THE COURT:  Glad to do it.  Let's take about a ten-

7   minute break.

8           MR. RICHARDSON:  Thank you.

9       (A recess was held at this time.)

10      (Jury not present.)

11          THE COURT:  Let's bring in the jury.

12      (Jury present.)

13          THE COURT:  Government, call your next witness.

14          MR. RICHARDSON:  Government calls Miss Polly

15  Sheppard.

16          THE CLERK:  State your full name for the record,

17  please.

18  A.  Polly Sheppard.

19      POLLY SHEPPARD, a witness called by the Government, first

20  having been duly sworn, testified as follows:

21                      DIRECT EXAMINATION

22  BY MR. RICHARDSON:

23  Q.  Miss Polly, introduce yourself to the jury.

24  A.  My name is Polly Sheppard.

25  Q.  How old are you, Miss Polly?

1105

POLLY SHEPPARD - DIRECT EXAMINATION

1    A.   Seventy-two.

2    Q.   Where were you born?

3    A.   In Florence, South Carolina.

4    Q.   When did you first move down to the Charleston area to

5    live?

6    A.   In 1981.

7    Q.   Where did you move when you moved down here?

8    A.   I moved to Summerville.

9    Q.   You still live in Summerville now?

10   A.   Yes, I do.

11   Q.   Just a little bit of background, before you moved down to

12   Summerville, where did you live before that?

13   A.   I was in New York, Ohio.  And in Philadelphia for awhile.

14   Q.   What were you doing in New York?

15   A.   Nursing.

16   Q.   Did you meet somebody while you were there?

17   A.   I did.

18   Q.   And how did you meet James?

19   A.   Through his sister.

20   Q.   You and James' sister, y'all worked together?

21   A.   Yes.

22   Q.   Did y'all get married?

23   A.   We did.

24   Q.   And you've got four boys, right?

25   A.   Yes.

1106

POLLY SHEPPARD – DIRECT EXAMINATION

1   Q.  Tell us a little bit about your four boys; where are they

2   now?

3   A.  Lorenza is in Georgia; he's a United States Army retiree,

4   and he works for FEMA.  Oscar is a celebrity hair stylist, he

5   does people like Vanessa Williams, Patti LeBelle.

6   Q.  He travels a fair bit doing that, right?

7   A.  Travels a lot.  Kevin is in Columbia, he's a United States

8   Army retired also, and he work for the Post Office.

9   Q.  And then your youngest --

10  A.  Gilbert is -- he's a construction worker.  His specialty

11  is he's an electrician.

12  Q.  He lives right around the corner from you?

13  A.  Right around the corner.

14  Q.  Keeps a close eye on his mama, right?

15  A.  Oh, yeah.

16  Q.  When you moved back to Summerville, back to South Carolina

17  from New York, tell me how you decided what church you were

18  going to go to.

19  A.  I decided to go to church with my husband, I went to visit

20  and I liked the people there.  So I decided to go.

21  Q.  What was your husband's connection to Emanuel?

22  A.  He was like third generation.  His grandmother was in

23  Emanuel, his mother and him.

24  Q.  Before you moved back to Summerville, had you been a

25  member of the AME faith?

1107

POLLY SHEPPARD - DIRECT EXAMINATION

1    A.  I was a Baptist.

2    Q.  But you moved back, you started going with your husband to

3    Emanuel, and you have been there ever since?

4    A.  Yes.

5    Q.  Fair to say you've been a pretty involved member at Mother

6    Emanuel?

7    A.  For awhile, yeah.

8    Q.  Tell us just a little bit, we're not going to go through

9    everything you've done, we'd be here a long time, but tell me

10   a little about your work on the trustee board, for example.

11   A.  On the trustee board we -- we remodeled.  There's another

12   word for that I can't think of.  But anyway, we changed the

13   houses, we did 529 Rutledge, which was in bad condition.  We

14   renovated the houses.  And 106 Calhoun was renovated.  And we

15   did a little work on 9 Henrietta.  And we were getting ready

16   to start work on the church, but we hadn't started yet.

17   Q.  And so part of what your job was on the trustee board was

18   to take care of the various properties that Emanuel owned?

19   A.  Property, yeah.

20   Q.  And some of those properties were used for church

21   purposes?

22   A.  Yes.

23   Q.  And some of them were rented out as sort of, you know,

24   commercial, bring in money?

25   A.  Yes.

POLLY SHEPPARD - DIRECT EXAMINATION

1  Q.  How many people are on the trustee board?

2  A.  Nineteen.

3  Q.  Did you serve on the trustee board with Miss Myra

4  Thompson?

5  A.  I did.

6  Q.  Tell me what role Miss Thompson had on the trustee board

7  at the time of this incident.

8  A.  She was trustee pro tem; in other words, my boss.

9  Q.  And Miss Myra wasn't afraid to be somebody's boss, was

10  she?

11  A.  No, she wasn't.

12  Q.  Tell me a little bit about some of the other things that

13  you did at Mother Emanuel, sort of keep that operating, in

14  addition to working with Myra on the trustee board.

15  A.  I would work in the kitchen, whatever needed to be done, I

16  would do.  I was working to put old papers in the computer.

17  You can find a lot of history from the church, drawn in

18  different places, so I was trying to catalog them in the

19  computer.  And also the graveyard.

20  Q.  Tell me a little bit about the work you did at Emanuel's

21  graveyard.  Is that graveyard, is it right there beside Mother

22  Emanuel or is it in a different place in Charleston?

23  A.  It's a different place, down on Meeting Street.

24  Q.  Sort of in --

25  A.  In the neck area.

POLLY SHEPPARD - DIRECT EXAMINATION

1   Q.  We call it the neck now.

2   A.  Um-hum.

3   Q.  Tell me how you got involved in trying to renovate, if you

4   would, and update the records with respect to the cemetery for

5   Mother Emanuel.

6   A.  I went in -- first I went to Florence and tried to find my

7   sister and brother grave, and I couldn't find it.

8   Q.  How many brothers and sisters did you have?

9   A.  I have five brothers and five sisters.

10  Q.  Where were you in that group?

11  A.  Second.

12  Q.  And so you went to Florence to try to find the grave site

13  for two of your siblings?

14  A.  Yes.

15  Q.  And what happened when you got there?

16  A.  I couldn't find them.

17  Q.  Did you know where they had been buried, what church

18  they'd been buried at?

19  A.  In the general area, I knew the general area they were in,

20  but if you don't have the right marker or tombstone, you're

21  not going to be able to find them after all these years, it's

22  a long time.

23  Q.  As a result of not being able to find your siblings' grave

24  site, what did you set about to do with respect to Emanuel's

25  cemetery?

1110

POLLY SHEPPARD – DIRECT EXAMINATION

1  A.  I went in the cemetery to the names and birthdays and

2  recorded them and tried to put them in the computer, so if

3  somebody come, they wanted to know where their family members

4  were, I could tell them where they were.

5  Q.  And in addition to sort of the records, you also spent a

6  fair bit of time trying to get it cleaned up and updated so

7  that it was more presentable?

8  A.  Yeah, we're still working on that.  Haven't finished that

9  yet.

10  Q.  It's a never-ending process, right?

11  A.  That's right.  Got to have the money.

12  Q.  Got to have time, too?

13  A.  Time and money, yeah.

14  Q.  I want to turn and talk to you just a second about the day

15  of June the 17th.  Given your sort of extensive involvement in

16  various things, what kinds of things did you do for Emanuel

17  that day, from 9:00 o'clock that morning until later in that

18  afternoon?

19  A.  9:00 o'clock I was in the insurance meeting with John

20  Meese, trying to change the church policy for insurance.  And

21  at 12:00 I had a meeting with the air conditioning people.

22  And I didn't go home in between.  In between that I work on

23  different things in the computer.  And I just didn't go home,

24  because we had a quarterly conference meeting at 6:00 o'clock.

25  Q.  And you said you had the quarterly conference meeting at

1111

POLLY SHEPPARD - DIRECT EXAMINATION

1    6:00 o'clock.  What is the quarterly conference meeting, what

2    is that at Emanuel?

3    A.  That's the business part of the church where they give how

4    many they have baptized, how many died, and what your general

5    census is, and how much money you brought in for the quarter.

6    Q.  Okay.  And during that quarterly conference, did they

7    award preaching certificates to a number of aspiring

8    ministers?

9    A.  They did.  Myra got her certificate, Reverend Doctor got

10   her certificate, and Reverend Nelson.

11   Q.  Part of that quarterly conference included sort of the

12   church leadership?

13   A.  Yes.

14   Q.  Right?  That was Reverend Pinckney was the pastor of

15   Mother Emanuel?

16   A.  Yes.

17   Q.  And then sort of overseeing a group of churches or pastors

18   is a presiding elder?

19   A.  Presiding elder, yeah.

20   Q.  And in the AME Church structure there's then a bishop that

21   oversees the presiding elders within a state?

22   A.  Yes.

23   Q.  Let me talk to you just a second about your involvement

24   that day.  Did you plan to stay for this quarterly conference?

25   A.  The quarterly conference, I planned to stay, but I had to

POLLY SHEPPARD - DIRECT EXAMINATION

1    go home afterwards.

2    Q.  And tell me about that, why did you plan to leave

3    afterwards?  Did you typically go to Bible study on Wednesday

4    night?

5    A.  No.  No.

6    Q.  Why did you end up deciding to stay for Bible study that

7    evening?

8    A.  Because Myra asked me to stay.  I went to the bathroom

9    before time to go, and she was in there.  And she said, I know

10   you're going to stay to support me.  I said no, I'm not.  I

11   got diabetes and I'm hungry, I'm going home.  But for some

12   reason, I didn't go home.

13   Q.  Had you eaten that day?

14   A.  Just part of Miss Sacum lunch.  Miss Sacum was the

15   secretary.

16   Q.  You'd eaten part of her lunch, but that was the extent of

17   what you had?

18   A.  Yes.

19   Q.  Why was Myra so excited and wanting you to stay around?

20   What was it about that night that had her so excited?

21   A.  Myra was leading the Bible study that night.  So she

22   wanted me to stay, probably to critique her, because I have to

23   straighten her out sometimes.

24   Q.  Everybody needs it occasionally, right?

25   A.  Yeah.  Yeah.

POLLY SHEPPARD – DIRECT EXAMINATION

1          MR. RICHARDSON:  Can we put up Government Exhibit 19,

2    Miss Baker.

3    Q.  You mentioned that Myra was working to become a minister.

4    How long had she been working to become an ordained minister?

5    A.  This was her second year she was working, her second year.

6    Q.  Second year doing it.  And who was she primarily working

7    with, who at the church was helping her through this process?

8    A.  Reverend Simmons.

9    Q.  How long ago had you -- before that, this time, how long

10   had you known Myra?

11   A.  About 20 years.

12   Q.  Tell me just a little bit, I don't want to get into too

13   much detail about any of these individuals, but fair to say

14   you and Myra were pretty close?

15   A.  We were very close.

16   Q.  All right.  Often would be together at the church doing

17   what needed -- whatever needed to be done?

18   A.  She would be bossing me around.

19   Q.  She had way of getting people to do things that needed to

20   be done?

21   A.  She did.  She did.

22   Q.  Tell me a little bit about -- you've described her as one

23   of the kindest people you know.

24   A.  Yeah.

25   Q.  Tell me a little bit about that.

POLLY SHEPPARD - DIRECT EXAMINATION

1    A.  If somebody was hungry in the street, like she would see

2    somebody begging for money, she would stop and give it to

3    them.  She would say -- I say, Myra, you don't know what

4    they're going to buy with it.  She said, it doesn't matter

5    whatever he does, I gave it to him, I did my part.

6    Q.  We mentioned just a second ago, if we can put up

7    Government Exhibit 12, Reverend Simmons, who was helping Myra

8    and others as a sort of guide in becoming ministers?

9    A.  Yeah.

10   Q.  Tell me, tell me a little bit about how Reverend Simmons

11   looked, what was his -- how did he dress, what did he look

12   like, what stood out to you about him?

13   A.  We called him Dapper Dan.  Shirts be monograms, cuff

14   links, shoes always shined, and always had a nice hat on his

15   head.  Used to dress very nice all the time.  He was tall and

16   stately like.  And had a stride, you know.

17   Q.  Big smile with it, right?

18   A.  Big smile, yeah.

19        MR. RICHARDSON:  Can we put up Government Exhibit 14,

20   Miss Baker.

21   Q.  Who is this?

22   A.  That's Miss Lance.  Miss Lance was the sexton at the

23   church.

24   Q.  And what is a sexton at Emanuel, what does that mean?

25   A.  They clean the church.

1115

POLLY SHEPPARD - DIRECT EXAMINATION

1    Q.  Tell me about sort of Miss Lance's devotion to doing that.

2    A.  She gave it a woman's touch, you know, a man can't clean

3    like a woman.  She had the nice towels in the bathroom, tissue

4    and lotion for your hands.  And we don't have that anymore.

5    Q.  Didn't have it before, right?

6    A.  No.  When she came, then all this started.

7    Q.  And she worked pretty long hours, early in the morning,

8    late at night doing that?

9    A.  She did.  She did.

10   Q.  Tell me a little bit about -- you knew Miss Lance pretty

11   well?

12   A.  Yeah.

13   Q.  Tell me a little bit about her kids and grandkids.  What

14   were they to her?

15   A.  She loved her kids and her grandkids.  If Esther would

16   call, she had to go pick her up, she would leave and go pick

17   her up and come back.  And she has a special needs son that

18   really would help her out sometimes at the church.  They were

19   just very close, very close-knit family.

20   Q.  Seems everybody that talks about her, did she have a

21   favorite song?

22   A.  One Day at a Time.

23   Q.  She loved to sing that one, didn't she?

24   A.  She loved to sing that song.

25   Q.  I'm going to put up Government's Exhibit 11, Miss Baker.

1116

POLLY SHEPPARD - DIRECT EXAMINATION

1   Who is this?

2   A.  My pastor, that's Reverend Pinckney.

3   Q.  Tell me a little bit about what he looked like.  Is he a

4   big guy?

5   A.  Tall, yeah.  I called him a gentle giant.

6   Q.  Had a big baritone voice that went with that frame, right?

7   A.  Yes.

8   Q.  Tell me what -- we've talked about him a bit -- tell me a

9   little bit about what you saw about his heart.

10  A.  Had a good heart.  I noticed during the service, you stay

11  still when you go to church, you don't move.  In the middle of

12  service he would always go downstairs, but that -- he would go

13  downstairs to check on the seniors downstairs and see how they

14  were for the day.

15  Q.  Because at that time, Emanuel, there wasn't an elevator

16  that took you to the main sanctuary?

17  A.  No, you had to go up and down those steps.

18  Q.  For people that couldn't get up and down the steps, they'd

19  watch the service on the closed-circuit TV downstairs?

20  A.  Yes.

21  Q.  And during the each of the services, Reverend Pinckney, as

22  an example, would walk down the stairs and check on those that

23  are down there?

24  A.  Yeah, he was always checking on them.

25  Q.  Tell me about how Reverend Pinckney would help Miss Lance

1117

POLLY SHEPPARD - DIRECT EXAMINATION

1  when she was sticking around late in the evening.

2  A.  He would stay at night until she -- until she left.

3  Q.  Why would he stick around so that he could be there when

4  Miss Lance left?

5  A.  The ladies are not supposed to be out late at night by

6  themselves.

7  Q.  Did you see Reverend Pinckney that night?

8  A.  I did.

9  Q.  Tell me a little bit what you noticed in particular about

10  how he was dressed that particular evening.

11  A.  He was dressed very very nice.  He had on -- I thought

12  maybe it was a new navy blue suit.  His shirt was white white.

13  Had on some pretty socks.  I think he called them happy socks

14  or something.

15  Q.  Happy socks?

16  A.  Yeah, he always wore a special kind of socks.  He said my

17  wife dressed me nice.  Okay.  All right.

18  Q.  During the conference that night, you mentioned his wife,

19  was his wife and one of his children, did they come with him

20  to the conference?

21  A.  They did.

22  Q.  And where were they during the conference and the Bible

23  study afterwards?

24  A.  They were in the office.

25  Q.  And that was the pastor's office and the secretary's

1118

POLLY SHEPPARD - DIRECT EXAMINATION

1    office, which are right there off of the fellowship hall?

2    A.  Yeah, as you come in that back, first back door back

3    there.

4             MR. RICHARDSON:  Can we put up Government Exhibit 18,

5    Miss Baker?

6    Q.  Who do we have here?

7    A.  That's Sharonda.  Sharonda was a track and field coach at

8    Goose Creek High.  She could preach real well.  And she too

9    was tall and stately.  All these people were tall.  Reverend

10   Doctor was tall also.  But she had a -- she could preach.  And

11   sometimes we would go and follow her, we would leave church

12   and go where she was, and otherwise we would skip Emanuel that

13   Sunday, we would go where she was.

14   Q.  Get a chance to go hear her preach?

15   A.  Oh, yeah.

16   Q.  She was pretty sought after by other churches to come in

17   and spread the Word?

18   A.  I could see her making bishop fast.

19   Q.  Tell me about Sharonda's engagement with the youth at

20   Emanuel.

21   A.  She was over on children's church.  We used to have a good

22   time in there, but we couldn't teach like Sharonda.  In other

23   words, if they want us, they would want Sharonda instead of

24   us.  But Myra and I used to go in and help out.

25   Q.  And was Sharonda, was she working on her Ph.D.?

POLLY SHEPPARD - DIRECT EXAMINATION

1    A.  She was.

2    Q.  And did she have children?

3    A.  Three.

4    Q.  And did you --

5    A.  Two boys and one girl.

6    Q.  Did you hear a fair bit about those children when she was

7    around?

8    A.  Yeah, Caleb, Christopher and Cam'ryne.

9           MR. RICHARDSON:  I'm going to put up Government

10   Exhibit 17, Miss Baker.

11   Q.  Who do we have here?

12   A.  That's Reverend Doctor, another tall one.

13   Q.  And she -- how long had she been at Mother Emanuel?

14   A.  I think a little over three months.

15   Q.  And had you heard her preach as well?

16   A.  She could preach real well, too, and could sing like an

17   angel.

18   Q.  Did she have daughters?

19   A.  Four daughters.

20   Q.  You could pick them out when they walked in the room?

21   A.  They were tall too, yeah.

22   Q.  Something about the genetics at Emanuel, I think.

23   A.  Yeah, they were tall.

24          MR. RICHARDSON:  Put up Government's Exhibit 13, Miss

25   Baker.

1120

POLLY SHEPPARD - DIRECT EXAMINATION

1   Q.  Who is this?

2   A.  That's Cynthia Hurd.

3   Q.  And why was she at Emanuel that particular evening?

4   A.  She came to bring something to the secretary.

5   Q.  What did she do for a living, what would she do?

6   A.  She was a librarian.

7   Q.  And when you talked to her, what did she love to do, what

8   was her sort of pastime?

9   A.  She would always be smiling, she would answer you, and she

10  was just a lovely person.

11  Q.  She loved to read?

12  A.  She loved to read.  In fact, she opened a program called

13  Big Read.  I don't remember the year, but we had to read two

14  books, "A Lesson Before Dying," and "Their Eyes were Watching

15  God."  So we read those and we had big discussions on them.

16  But she was real good with children at the library.  She was

17  at the Dodd Library for a long time before she went to another

18  library.

19  Q.  "Their Eyes were Watching God," that was one of her

20  favorites, wasn't it?

21  A.  Yeah.

22      MR. RICHARDSON:  Put up Government Exhibit 15.

23  A.  That's Miss Susie.

24  Q.  How do you know Miss Susie?

25  A.  Miss Susie was always sweet.  She sang on the choir.  And

1121

POLLY SHEPPARD – DIRECT EXAMINATION

1   she would be there with the senior citizens.  And she traveled

2   a lot.  She would do anything for you.  And she could cook.

3   She would ask you, if you're down on Wednesday, are you dining

4   with us today?  And very sweet lady.

5   Q.  Tell me about, you told me a story about you and Miss

6   Susie and the choir chairs --

7   A.  Oh, yeah.

8   Q.  -- upstairs.  Tell me about you and Miss Susie and the

9   choir chairs.

10  A.  She said that choir chairs was tearing up her clothes,

11  they was leather, old theater chairs.  And there were a lot of

12  them raggedy up there, right?  So I fixed them, I put cloth on

13  them.  Same color cloth, right?  So I said, Susie, how you

14  like the chairs?  They're beautiful, but can you do the rest

15  of them?

16  Q.  I'm going to put up Government Exhibit 16.

17  A.  That's Tywanza.

18  Q.  What did you always notice about Tywanza and his smile?

19  A.  Big smile.  Big smile.  He did a lot of poetry.  Tywanza

20  would be there for everything.  Tywanza traveled a lot with

21  his mother, too, went out with the Sunday school children.  He

22  finished Allen University and was getting ready to go to

23  another school.  And he's a barber.

24  Q.  You mentioned Allen University.  That was Reverend

25  Pinckney, Reverend Simmons and Tywanza?

POLLY SHEPPARD - DIRECT EXAMINATION

1    A.  Three Allen University graduates, yeah.

2    Q.  All the men there that night.

3    A.  Um-hum.

4    Q.  Fair to say Tywanza had a pretty close relationship with

5    his mama, didn't he?

6    A.  They were very close.  That's Tyrone and Felicia's baby.

7    Q.  In addition to that group that was there that night, we

8    talked just a second about Miss Felicia.  Who did Miss Felicia

9    bring with her that night?

10   A.  She brought her granddaughter.

11   Q.  And her initials are KM, right?

12   A.  Right.

13   Q.  How long have you known Miss Felicia?

14   A.  About 25 years.

15   Q.  Tell me a little bit about Miss Felicia and what she did

16   around the church.

17   A.  She did everything.  She was the chicken fryer.

18   Q.  Among other things.

19   A.  We would be in the kitchen, she would come from work,

20   change clothes, usher upstairs, and then come down and help us

21   in the kitchen, and then go back to working.  She was

22   dedicated to the church.

23   Q.  Do you know what kind of relationship Miss Felicia seemed

24   to have with both the old people in the church and the young

25   people in the church?

POLLY SHEPPARD - DIRECT EXAMINATION

1   A.  Yeah.  Yeah.  Yeah.  She would pick them up and do their

2   hair and take them back.  Then the young people, she always

3   loved, and Sunday school, she would collect money from

4   everybody going to Sunday school.

5   Q.  We talked a little bit about the quarterly conference, and

6   how you were there and how Miss Myra convinced you to stay.

7   When you decide to stay for Bible study, where did you sit?

8   A.  All the way to the back, because I had planned on sneaking

9   out.

10  Q.  Why didn't you sneak out that night, Miss Polly?

11  A.  Because she kept watching me.  I couldn't sneak out.

12  Q.  After the Bible study got started, and the 12 of you

13  gathered around those tables, tell me what happened.  Who came

14  and joined?

15  A.  The young man at the table over there joined us.

16  Q.  And when he walked in, what did Reverend Pinckney ask him?

17  A.  He asked him, Are you here for Bible study?  And he shook

18  his head.

19  Q.  Did Reverend Pinckney get up and meet him?

20  A.  He met him about halfway through the room.

21  Q.  And when he met with him, where did Reverend Pinckney ask

22  him to sit?

23  A.  Right by him.

24  Q.  What did he provide to the defendant when he sat down?

25  A.  He gave him the pamphlet we were studying from.

POLLY SHEPPARD - DIRECT EXAMINATION

1   Q.  Did he also give him a Bible?

2   A.  Yes.

3   Q.  From where you were sitting, could you see the defendant

4   very well?

5   A.  I was off a distance, but I could see him.

6   Q.  How long after he arrived -- Let me ask you this.  What

7   were you discussing that night?

8   A.  We were discussing the sower of seeds.  That's Mark 4:13.

9   We read from 13 through 20.

10  Q.  And part of that discussion, without getting into the

11  details, was a discussion about how that applied in the daily

12  lives of the people that were there?

13  A.  It mostly tell them how they responds to God's word.

14  Sometimes if it goes on shallow ground, it will stay with you

15  a little while, and you go back to the same old bad ways.  But

16  if it falls on good ground, then you're right with God

17  completely.

18  Q.  As you finished up Bible study that night, how did y'all

19  go about closing out, what was the --

20  A.  We always do a prayer and a Mizpah before we go home.

21  Q.  And what is a Mizpah?

22  A.  The Mizpah is actually the benediction.

23  Q.  And what is the -- Is it a fairly traditional benediction

24  in African-American churches?

25  A.  "Lord watch between me and thee when we absent one from

1125

POLLY SHEPPARD - DIRECT EXAMINATION

1    the other."

2    Q.  You have to say that a little slower.

3    A.  "The Lord watch between me and thee when we are absent one

4    from another."

5    Q.  And that was going to be after the prayer?

6    A.  After the prayer.

7    Q.  Did you get a chance to do that, that evening?

8    A.  No, we didn't.

9    Q.  Tell me what happened as y'all stood to close your eyes in

10   prayer?

11   A.  The defendant started shooting.

12   Q.  And what did you notice first when you heard the sound,

13   what did you notice first?

14   A.  Actually I thought it was the wiring, it's an old church.

15   And we had put an organ in there before and fire had sparked.

16   We knew we needed new wiring in there.  So I thought it was

17   the electrical sparks and stuff flying, until Felicia

18   screamed.  And when Felicia screamed, and I knew it was

19   something different.

20   Q.  What did Felicia scream?

21   A.  She said, Oh, he's shooting everybody, Miss Polly.  So I

22   dove under the table.

23   Q.  Who -- were you able to see who the defendant shot first?

24   A.  Not really.

25   Q.  After those first shots rang out, what did you see

POLLY SHEPPARD - DIRECT EXAMINATION

1  Reverend Simmons do?

2  A.  Reverend Simmons jumped up, and he was going toward him,

3  where the pastor was.  He said, I'm going to see about my

4  pastor.  He asked him, Where you going?  He said, I'm going to

5  see about my pastor.  So he shot Reverend Simmons.

6  Q.  At that point where did you go?

7  A.  I was under the table.

8  Q.  Were you able to hear the gunshots as they were fired?

9  A.  I could hear them, yeah.

10 Q.  Were you able to see the casings as they kicked out of the

11 gun?

12 A.  I did.

13 Q.  As the defendant shot, could you see his boots as he

14 walked closer to you?

15 A.  I did.

16 Q.  When he got to the end of the row of tables, where you

17 were laying, tell us what happened.

18 A.  He told me to shut up.

19 Q.  Why did he -- What were you doing?

20 A.  I was praying out loud.  He told me to shut up.  And he

21 asked me, Did I shoot you yet?  And I said no.  And he said,

22 I'm not going to.  I'm going to leave you here to tell the

23 story.

24 Q.  Let me take one half step back.  Before he got to you,

25 were you able to hear anybody's reaction to being shot?

1127

POLLY SHEPPARD - DIRECT EXAMINATION

1  A.  I heard Myra's voice saying, Oh, Lord, have mercy.

2  Q.  After he had then come around and told you to shut up, and

3  told you he was going to leave you alive, what happened then?

4  A.  Tywanza rose up, because I think he knew his mother was

5  still alive, and I think he was -- Well, I know he was trying

6  to protect us and take the attention off of us.

7  Q.  And when you say he was close to -- how close were you to

8  Miss Felicia, Miss Felicia's granddaughter and Tywanza, how

9  close were you y'all together?

10  A.  Right next to them.

11  Q.  And when you say Tywanza rose up, what do you mean by

12  that?  Was he able to stand up or just prop himself up?

13  A.  He rose up on his elbow and propped up and he started

14  talking to him.

15  Q.  And what did Tywanza, in an effort to distract the

16  defendant, what did he tell him?

17  A.  He said -- he asked him, Man, why are you doing this?  We

18  mean you no harm.  Why are you doing this?  So he said, I have

19  to.  I just have to.  You're raping our women and taking over

20  the nation.

21  Q.  Did he say he had to kill everybody?

22  A.  He said he had to do it.

23  Q.  After that conversation that the defendant had with

24  Tywanza, how close was the defendant to you when that

25  conversation happened?

POLLY SHEPPARD - DIRECT EXAMINATION

1    A.  He was right at my feet.

2    Q.  And what did the defendant do at that point?

3    A.  He shot Tywanza.

4    Q.  In the process where the defendant was standing over you

5    and talking to you, and then turning and talking to Tywanza,

6    what was he doing with the gun?  Where was he pointing the

7    gun?

8    A.  The gun was pointed at Tywanza when Tywanza was talking.

9    Q.  When you were talking, who was he pointing the gun at?

10   A.  It was at me.

11   Q.  After he shot Tywanza, were you able to hear him click the

12   gun twice?

13   A.  He clicked the gun twice.

14   Q.  Like he was trying to fire it again?

15   A.  I thought it was empty.  When it clicked twice, I thought

16   the gun was empty.

17   Q.  When you thought the gun was empty, what was your first

18   thought of what you might do?

19   A.  My first thought was to call somebody.

20   Q.  And did you have a phone with you?

21   A.  No, I didn't.

22   Q.  Did you find a phone?

23   A.  Phone was right at my hand, right at my reach.

24   Q.  Whose phone was it?

25   A.  It was Miss Lance's phone.

POLLY SHEPPARD – DIRECT EXAMINATION

1    Q.  Covered in blood?

2    A.  No, it didn't have any blood on it.

3    Q.  Just sitting there for you, right?

4    A.  Just sitting there for me.

5    Q.  When you picked up the phone, who did you try to call?

6    A.  I tried to call 911, but I hit the wrong button, I hit the

7    button in the middle that you could say okay on those old flip

8    phones?  And I said, something is wrong with this telephone.

9    So I was going to throw it back down.  And I might as well try

10   again, so I try it again, and it was almost like the green

11   phone was blinking, so I hit the green button, and 911 picked

12   up.

13   Q.  Have you had a chance, Miss Polly, to listen to that 911

14   call?

15   A.  I did.

16   Q.  I show you what's marked Government's Exhibit 8.  Do you

17   recognize that?

18   A.  Yeah, that's my initials.

19   Q.  All right.  You initialed that when you and I first

20   listened to this?

21   A.  Yeah.

22          MR. RICHARDSON:  I show it to defense counsel.

23          MR. BRUCK:  No objection.

24          THE COURT:  Government Exhibit 8 admitted without

25   objection.

1130

POLLY SHEPPARD – DIRECT EXAMINATION

1    (Government Exhibit 8 received.)

2         MR. RICHARDSON:  Thank you, Your Honor.

3    Miss Baker, if we can start playing Government's

4    Exhibit 8, which is the 911 call that Miss Polly made that

5    night.

6    (Audio recording was played.)

7    BY MR. RICHARDSON:

8    Q.  Miss Polly, that's your voice on there?

9    A.  That's my voice.

10   Q.  And you mentioned there that you thought he might still be

11   in there.  Were you able to see movement by the back door of

12   the church?

13   A.  I saw a shadow moving.  Yeah.

14   (Audio recording was played.)

15   Q.  Miss Polly, after the defendant left the church that

16   night, did you go around and check on the pastor and the

17   others that had been shot?

18   A.  I checked the pastor's pulse, and another lady, I think it

19   might have been Miss Hurd, was closer to him.  But I didn't go

20   to the other side of the table to see the other people.

21   Q.  You could tell that everybody in there had been killed?

22   A.  Um-hum.  Yeah.

23   (Audio recording was played.)

24   Q.  Miss Polly, in the background you can hear a woman asking

25   someone to calm down.

1131

POLLY SHEPPARD – DIRECT EXAMINATION

1    A.  That's Felicia talking to Tywanza.

2    Q.  Can you hear Tywanza in the background moaning, trying to

3    talk back to her?

4    A.  Yes.

5        (Audio recording was played.)

6    Q.  Miss Polly, that's when law enforcement arrived.

7    A.  Yes.

8            MR. RICHARDSON:  Thank you, Miss Polly.  If you

9    answer any questions defense might have, I appreciate it.

10   A.  Okay.

11           THE COURT:  Cross-examination.

12           MR. BRUCK:  Miss Sheppard, I am so sorry.  I have no

13   questions for you.

14   A.  Thank you.

15           MR. BRUCK:  Yes, ma'am.

16           THE COURT:  Miss Sheppard, you may step down.

17           MR. RICHARDSON:  Your Honor, with the lone exception,

18   we'd like an opportunity to confirm that all the exhibits that

19   we've attempted to offer have been admitted appropriately.

20       At this point, the Government rests.

21           THE COURT:  Very good.  Ladies and gentlemen, this is

22   time for a break.  Thank you.  Go to the jury room.

23       (Jury excused.)

24           THE COURT:  Any motions from the defense?

25           MR. BRUCK:  We would like a moment, if we could

1    respond, make our motions after the recess at this time, Your

2    Honor.

3              THE COURT:  Very good.  We will take a recess.

4              MR. BRUCK:  Thank you.

5         (A recess was held at this time.)

6         (Jury not present.)

7              MR. BRUCK:  If it please the Court.

8              THE COURT:  Mr. Bruck, give me a moment, I've just

9    been handed a motion.

10              MR. BRUCK:  I was going to propose a procedural

11    approach to this now in terms of the timing and time of day.

12              THE COURT:  Okay.

13              MR. BRUCK:  Which would be, as Your Honor is aware,

14    we have just filed, in hard copy form, a written motion under

15    Rule 29 respecting counts 13 through 33.  What we would

16    suggest is that the Court recess early, have an opportunity to

17    review this, decide -- We are content to make this motion on

18    the papers.  We don't see the need for oral argument, but of

19    course, if the Court wishes to hear argument --

20              THE COURT:  Is this your only Rule 29(a) motion?

21              MR. BRUCK:  Yes.  At that point the defense intends

22    to rest, once we're sure that our proffer is in order.  And

23    then we could take up the charge conference.  And I --

24              THE COURT:  We have a few things to do before then,

25    Mr. Bruck.  I'm very familiar with these issues.  Let me just

1    sit here for a moment and let me read it.

2        Mr. Richardson, do you have a copy?

3            MR. RICHARDSON:  I just got a copy.

4            THE COURT:  Why don't you take a minute here.  I

5    think we're all pretty familiar with these.

6            MR. RICHARDSON:  I think so.  Thank you, Your Honor.

7        (Brief interruption in proceedings.)

8            MR. BRUCK:  We should clarify, Your Honor, that the

9    motion is a general one with respect to all counts.  We

10   specified particular shortcomings --

11           THE COURT:  Well, you previously made a motion

12   challenging the indictment which you extensively briefed and

13   which the Court ruled.  And I take it you're renewing all of

14   those matters?

15           MR. BRUCK:  Yes, we are.  Thank you very much.

16           THE COURT:  I just want to make that clear for the

17   record.  I anticipated that's what you were intending.

18       I am sufficiently familiar with these issues, having

19   written extensively on them already, having presided over this

20   trial and having now read this memorandum, and I'm prepared to

21   hear, Mr. Bruck, if you wish to argue any further, I'm glad to

22   hear, or I'm glad to hear argument from the Government.

23           MR. BRUCK:  We are prepared to submit this on the

24   papers; I have no further argument.

25           THE COURT:  Very good.  Mr. Richardson, anything you

1  wish to add?

2        MR. RICHARDSON:  I have a mind to just let Your Honor

3  do it, but maybe I'll give a brief summary of the initial

4  responses, and then allow the Court to give the more fulsome

5  explanation, to the extent it believes necessary.

6    The first argument that they suggest here is that the

7  Government's failed to prove the defendant was hostile to

8  religious beliefs.  We think, as we've indicated --

9        THE COURT:  It's not a requirement of the statute.

10        MR. RICHARDSON:  It's not a requirement of that

11  statute.  I do also think that the evidence has shown that he

12  has extensive hostility to the religious beliefs and

13  practices.

14        THE COURT:  I believe were that an element, it would

15  be present, but it's certainly sufficient to go to the jury;

16  that's all my standard here is.  But I don't read the -- if

17  you particularly read the legislative history of the

18  obstruction of the exercise of free access to religion, it's

19  very clear that it was broader than targeting a specific

20  religious belief.  So I agree with you on that.

21        MR. RICHARDSON:  Thank you, Your Honor.

22    With respect to the claim with respect to interstate

23  commerce that the defense makes, here, this has obviously been

24  fully litigated, briefed, the Court has issued an order.  The

25  Government believes the facts, as proven at trial, reflect the

1    facts that we briefed and that the Court found, and so we

2    would just rely back on those papers with respect to that.

3              THE COURT:  We've addressed that issue.

4              MR. RICHARDSON:  And then the defendant's claim that

5    he -- that the defendant did not attempt to kill Miss Polly,

6    Miss Felicia and KM, we think is flatly inconsistent with the

7    evidence that's been offered.  Pratt and Engle, which are the

8    Fourth Circuit cases governing attempt, we think it's far more

9    than a substantial step.  And any suggestion --

10             THE COURT:  It's a jury question.

11             MR. RICHARDSON:  It's plainly a jury's question, Your

12   Honor.

13             THE COURT:  Well, I do find that the -- You know, my

14   obligation, of course, is to read the evidence in the light,

15   under Rule 29(a) of the Federal Rules of Criminal Procedure,

16   in the light most favorable to the Government here as the

17   nonmoving party, and I do find there's sufficient evidence for

18   a rational trier of the fact to find guilt beyond a reasonable

19   doubt.  And for that reason, I deny the motion for a directed

20   verdict on all counts.

21     Okay.  Now, there's been a motion filed regarding the

22   issue of wanting to offer certain evidence which goes to

23   mental disease or defect, in my view.  And I need some -- I

24   had initially had a filing that had a few individuals, and

25   then this morning I received a filing that includes

1    psychiatric testimony, and sought to offer exhibits not

2    offered during Agent Hamski's testimony, and claiming that

3    that was not offered because of a ruling of mine.  My ruling

4    was very clear that you needed to bring me the evidence,

5    because I needed to determine whether something negated an

6    element of the charge, and that I said it was hard, it was

7    challenging, Fourth Circuit law calls it rare.  And then what

8    I have here is a volume of medical records and other --

9    medical records from a thyroid specialist, Baptist Hospital,

10   time sheets from a termite company, academic records, medical

11   records from South Carolina Oncology, employment records,

12   academic records, library records; I have no idea what they

13   are.

14       Mr. Bruck, if you assert -- First of all, I find it

15   untimely under 103, number one.  It's untimely and waived.

16       Number two, if you want to point out to me exactly which

17   of these records go to negate an element of the crime, I would

18   be more than happy to address it.  I just have no idea, when

19   you simply refer in blocks to me and do not present it at the

20   time of the trial.  And I would have been glad to go through

21   them before Agent Hamski's testimony, you know that.

22       MR. BRUCK:  Your Honor, we do not claim that we are

23   offering any evidence that is outside the Court's prior

24   ruling.  We are simply wishing to fulsomely demonstrate the

25   type of evidence that we would have introduced, but for our

1    proffer.

2            THE COURT:  My difficulty with you sort of describing

3    it generally, and I pushed you to be specific, because there

4    is a narrow sliver of evidence that carries its potential to

5    fall within the category of permissible evidence.  I have not

6    seen anything in all of my -- all the papers and documents I

7    looked at that have remotely approached that area where it

8    would negate an element of any charge.  But to simply, you

9    know, simply give me a list of unprovided documents and tell

10   me, without telling me anything about them, I have no way to

11   fairly evaluate them.  And I just don't think that's the way

12   to do it, Mr. Bruck, that's why we have rules for timely

13   submission.  You know me, I go through every document you give

14   me, I look at everything.  You brought up a bunch of pictures,

15   I looked through every photograph.  So I mean, I'm glad -- I

16   mean, it's a real challenge when you simply back up and give

17   me a list of documents, after the agent's already off the

18   stand.  I don't know how I even do that; we'd have to reopen

19   the case?  But I don't see -- I can't even understand how

20   these records would negate one of the elements.  If you could

21   point it to me and show me the document, I'm open, at least to

22   understanding what's the basis of this.

23           MR. BRUCK:  The documents substantiate the overall

24   mental health submission that we wish to make,

25   circumstantially, through the Government's own evidence.  The

1    Court has ruled that unless that evidence rises to the point

2    that it actually negates the mental elements required --

3             THE COURT:  I have ruled -- and you're conceding to

4    me that it does not negate.

5             MR. BRUCK:  That it does not negate.  We think that

6    it is relevant to, that it tends to rebut, and that these are

7    jury issues.

8             THE COURT:  And but you acknowledge to me, however,

9    that none of the evidence in Exhibit 800 paragraph 2A through

10   K negate any element of any charged crime, is that correct?

11            MR. BRUCK:  In and of themselves, they are not

12   absolute or complete defenses to the element, that's correct.

13            THE COURT:  No, no, I want a yes or no.  Does it

14   negate the charge?  Any element, any piece of document negate

15   the charge, and if so, show me the document.

16            MR. BRUCK:  I can not point to any document that

17   negates the elements of specific intent.  We think that we

18   were entitled to respond to the Government's allegations by

19   fully exploring the defendant's mental state condition, both

20   circumstantially through the Government's own evidence on

21   cross-examination of Agent Hamski, and now secondarily we are

22   also proffering in our own case, a mental health case.

23            THE COURT:  Well, let me just say that 18 United

24   States Code Section 17 makes clear that other than for

25   insanity, which has not been asserted by this defendant, that

1    mental disease or defect evidence is not a defense.

2        United States versus Worrell makes clear that evidence

3    that seems to justify, amounts to diminished -- the ultimate

4    diminished capacity defense, that it's justification type

5    evidence and does not negate an element of the charge.  It

6    falls within 18 United States Code Section 17, there's a

7    narrow sliver of exception that negates.  In light of the fact

8    that you have conceded to me that none of this evidence

9    negates an element of the charge, I would have denied the

10   admission, had you offered it at the time.

11       MR. BRUCK:  In terms of -- for clarification of what

12   we explained in the record, I should just say that our motion

13   regarding cross-examination of Agent Hamski does lay out the

14   relevance of these materials.  These are the materials we

15   would have used as a good faith basis for pursuing issues with

16   Agent Hamski, and now we are secondarily proposing to offer

17   this evidence in our own case.

18       THE COURT:  How would you get it in?

19       MR. BRUCK:  I'm sorry?

20       THE COURT:  How would you get this evidence in, in

21   your own case?

22       MR. BRUCK:  Well, on cross-examination we were

23   limiting ourselves --

24       THE COURT:  I'm talking about in your -- you have not

25   identified these records in any of the witnesses you now

1140

1    identified to me.  Are you now saying you wish to offer A

2    through K in your case as well?

3              MR. BRUCK:  We would propose to call two mental

4    health experts.

5              THE COURT:  Two psychiatrists?  One is a

6    psychiatrist --

7              MR. BRUCK:  A psychiatrist and a psychologist.

8              THE COURT:  Right.  Two mental health experts to

9    testify about mental health.

10             MR. BRUCK:  Yes.  And then they would rely on these

11   materials, all of which were produced by the Government in

12   discovery.

13       In addition, we had a series of lay witnesses --

14             THE COURT:  That went to the same information.

15             MR. BRUCK:  They go to the same information.

16             THE COURT:  And would you acknowledge to me that the

17   lay witnesses, like these documents, do not negate the element

18   of any charge?

19             MR. BRUCK:  Framed in that way, I have to acknowledge

20   that, yes.

21             THE COURT:  Okay.  Very good.  I think the record is

22   clear that -- and let me just, because I think it's important

23   for later review, let me just, in a bit more methodical way --

24       Yes, Mr. Richardson?

25             MR. RICHARDSON:  Can I just add a few brief points

1141

1    that I think are in addition to what the Court has laid out.

2        I also think it's worth acknowledging, as we discussed

3    yesterday, that extensive portions of what's being described

4    here is inadmissible hearsay.

5            THE COURT:  I was making that point; how would you

6    get it in.

7            MR. RICHARDSON:  I'm probably repeating, but just

8    again --

9            THE COURT:  Go ahead.

10            MR. RICHARDSON:  -- abundance of caution.  We again,

11    as we indicated yesterday, we think alternatively, Rule 403,

12    given the concessions here, that they're limited to any

13    relevance, we think is an appropriate way of examining it.

14        And then the third point I just wanted to raise with

15    respect to this morning's attempt to introduce expert

16    testimony, that no notice was provided, as was required, no

17    reports, as required, have been provided.  And so similarly,

18    untimeliness that we've seen in other contexts, we think

19    there's an independent basis for rejecting attempts to do that

20    at this late date.

21            THE COURT:  Mr. Bruck, is it correct you have not

22    given notice or reports for the guilt phase, expert testimony?

23            MR. BRUCK:  That is correct.  And we think that the

24    door to mental health testimony was opened by the FBI

25    confession testimony, which said that the agent observed no

1    signs of mental illness.  And we think we were entitled to

2    respond to that in a way that could not have been foreseen

3    before the testimony was offered.

4         THE COURT:  I disagree.  The voluntariness is an

5    issue in the case, and as it went to voluntariness, you could

6    offer evidence.  That was not a back door into mental health

7    evidence, but was there evidence that he made a voluntary

8    confession.

9         Let's go through the proposed testimony of banker James

10   Grayson.  I do find that that testimony negates no element,

11   goes to justification and diminished capacity, and is not

12   permissible under 18 U.S.C. Section 17 and United States

13   versus Worrell, Fourth Circuit, and many other authorities.

14        The testimony, proposed testimony of Dr. Thomas Ayers had

15   the same problems, same defect, would not be permissible.

16   Further, it sought to use a statement from the defendant which

17   would be self-serving hearsay and inadmissible under the

18   hearsay rule.

19        There were three employees from Clark Pest Controls, Brian

20   Fanning, Brock Pack and John Patton, all of whom testified

21   about observations regarding the defendant at work, which went

22   to mental disease or defect.  None of this evidence negates

23   any element of the crime, involves justification and

24   diminished capacity, and so that's not admissible.

25        I was offered this morning the testimony of Dr. Rachel

1143

1    Loftin.  The Government's correct, no notice was given.  That

2    alone would be the basis not to allow it.  But additionally,

3    it is classic classic mental disease and defect testimony that

4    is not permitted under 18 United States Code Section 17, does

5    not negate the element of any charged offense.  I went through

6    in detail, Dr. Loftin and Dr. Maddox's testimony, and found

7    all of it to fall into the impermissible category, not a

8    permissible category.

9        So I would not permit, under controlling authority, the

10   use of such evidence in the guilt phase.  It is potentially

11   relevant in the sentencing phase.

12       And I do not fault the defense counsel for a moment doing

13   everything it can to put the best record it can forward under

14   these circumstances.  So I don't want any of my rulings to be

15   interpreted to any criticism of their zealous effort on behalf

16   of their client.

17       Mr. Bruck, you mentioned that you are considering resting.

18   And I need to do a colloquy with your client, if that is so,

19   about his right to testify and the right not to testify.  Is

20   that correct?

21              MR. BRUCK:  Yes.

22              THE COURT:  Give me just a moment.

23       Mr. Roof, would you come to the podium, please, sir.

24       Miss Ravenel, please administer the oath.

25       (Defendant was duly sworn.)

1144

1           THE COURT:  Mr. Roof, you are aware that in a

2    criminal trial the defendant has a right to testify and a

3    right not to testify.  Do you understand that?

4           THE DEFENDANT:  Yes.

5           THE COURT:  And you understand that both are a

6    constitutional right, that is, you have a constitutional right

7    to speak at your criminal trial, if you wish to do so, and you

8    have a constitutional right to be silent, not to be a witness

9    against yourself.  Do you understand those two rights?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Have you had a chance to discuss with

12    your counsel whether you should or should not testify?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Have you had a chance to consider that

15    advice?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Now, if you elect not to testify, I want

18    to assure you that I will inform the jury as follows.  That

19    your silence should not be held against you, that you are

20    presumed to be innocent, that the Government has the burden of

21    proof, and must prove you guilty on each count beyond a

22    reasonable doubt.

23     Do you have any questions for me, Mr. Roof?

24          THE DEFENDANT:  No.

25          THE COURT:  Mr. Bruck, anything you want to put on

1    the record?

2              MR. BRUCK:  No, sir.

3              THE COURT:  From the Government, anything to put on

4    the record?

5              MR. RICHARDSON:  Nothing, Your Honor.

6              THE COURT:  Mr. Roof, do you wish to testify or wish

7    not to testify?

8              THE DEFENDANT:  Not to testify.

9              THE COURT:  That is your considered decision after

10   receiving advice of counsel, is that correct?

11             THE DEFENDANT:  Yes.

12             THE COURT:  Very good.  You may return to your seat.

13        Mr. Bruck, you are not intending to call any witnesses, in

14   light of the Court's ruling?

15             MR. BRUCK:  That is correct, Your Honor.

16             THE COURT:  Okay.  I'm going to bring the jury back,

17   call the defense case, you stand and -- Is the jury eating

18   lunch now?

19        (Discussion held off the record.)

20             THE COURT:  Let's bring them back in, and let's talk

21   about this for a second before we do that.  I think I'm going

22   to send them home for the day.  There's really nothing more to

23   do.  The lawyers break over lunch, and then let's do the

24   charge conference about an hour later.

25        Mr. Bruck, you also filed today a motion about having the

1    Court comment on a particular document, that is, the church

2    list, or several documents.

3            MR. BRUCK:  Yes.

4            THE COURT:  And, you know, I don't comment on

5    evidence, I just -- that's a Bridge sort of approach, the

6    judge tells everybody what to think, I don't do that.  No

7    criticism to the Bridge judges, but they kind of tell the jury

8    what to do.  I don't believe in that.  I'm going to go back

9    and look at my charge, to make sure I say something that the

10   defendant should -- that they should consider his guilt only

11   on the charged offenses.  And I think that will take care of

12   those.  We think it's in there, but I'm going to go back, and

13   if not, I may add a sentence to that effect.

14           MR. BRUCK:  I think the Court may recall that we, if

15   I'm remembering correctly, that we asked for an instruction of

16   this nature at side bar, and that determination at that point

17   was in whatever way the Court saw fit, it would be taken care

18   of in the charge, not that you were committed to giving --

19           THE COURT:  Right.  And let me say this.  You want a

20   charge which says that the defendant didn't intend to attack

21   any other church.  I don't know what he intended to do.

22   That's a jury question.  And there is, you know, jury can

23   weigh that evidence.  But I wouldn't comment on that, because

24   that's the province of the jury.  But what I do think is

25   important, that the jury not consider any other possible crime

1    in determining the defendant's guilt for the charged offenses.

2    That is the important element that I --

3            MR. BRUCK:  Our point was precisely that the jury is

4    likely to speculate that there was an actual plan and intent,

5    and that is why it's so prejudicial, and that's why we

6    objected to that.

7            THE COURT:  Mr. Richardson?

8            MR. RICHARDSON:  Your Honor, that part of the motive

9    and the malice was he did, in fact, consider attacking a

10   number of African-American churches.

11           THE COURT:  I don't think that's Mr. Bruck's point.

12   Mr. Bruck's point is, is there a sort of a suggestion that

13   after he attacked Emanuel, he intended to attack some other

14   church?  Is that the sort of concern you have?

15           MR. BRUCK:  Yes.  Or that there may have been an

16   intent that was not fully realized, to attack other churches

17   on the list.

18           THE COURT:  Well, not fully realized is part of the

19   premeditation and planning; I don't think that's appropriate.

20   I wouldn't comment about the future.  I don't know what his

21   plans were, I don't think that's appropriate.  But I do think

22   it's important for the jury to find him guilty of the charges,

23   and not apply some future offense he may have committed, to

24   find him guilty of these.  That's the part that I think is

25   important.

1           MR. RICHARDSON:  We think that's appropriate, Your

2    Honor.  We do know that in his confession, when asked whether

3    he planned to go shoot up additional churches afterwards, he

4    didn't say he never had that plan, what he said was, I'm

5    simply too worn out.  I think that a very reasonable

6    assumption would be the contrary; that, in fact, he did intend

7    to do others.

8           THE COURT:  That's up to you fine lawyers to make

9    those arguments, because each of you have an argument to make,

10   and it's not for the Court to get into the middle of this.  I

11   just simply say the evidence speaks for itself, y'all make

12   closing arguments, and I am going to let the jury decide what

13   it wishes to believe.  But I don't want to find him guilty of

14   these offenses because they thought he might commit some other

15   offense.  That's an appropriate concern.  If it's not stated

16   in the charge now, we'll have a sentence that makes that

17   clear.  I think it's there already.

18       Okay.  So let's bring the jury in, if we could.

19       (Jury present.)

20          THE COURT:  The Government has rested.  I call the

21   defense case.

22          MR. BRUCK:  The defense rests.

23          THE COURT:  Very good.  Ladies and gentlemen, we have

24   reached the end of the evidence in the case, both parties have

25   rested.  And there are some legal matters I need to take up

1    this afternoon with the lawyers.  So what I'm going to do is

2    send you home early today.  I know that will be a great

3    disappointment.  Though Miss Eunice has already ordered you

4    lunch, so you can have lunch before you leave.  But I want you

5    to return at 9:30 tomorrow morning.  The lawyers will make

6    closing arguments, I will charge you, and then you will then

7    render a verdict.

8         So thank you very much.  Return to the jury room.

9         (Jury excused.)

10             THE COURT:  What time would counsel like to reconvene

11   for the charge conference?

12             MR. RICHARDSON:  Perhaps 1:45, Your Honor?

13             THE COURT:  Does that make sense?

14             MR. BRUCK:  Sure.

15             THE COURT:  Give you a chance to prepare for your

16   close.  1:45 we'll reconvene.

17        (A recess was held at this time.)

18        (Jury not present.)

19             THE COURT:  We will now convene the charge conference

20   in United States versus Roof, 2:15-472.  Counsel received from

21   my chambers the most recent revision, in the last hour or so.

22             MS. HAHN:  Your Honor, we have.

23             MR. BRUCK:  Yes.

24             THE COURT:  Good.  Okay.  First of all, let's deal

25   with -- I need eventually to go through every proposed charge

1150

1     that I don't give.  But in the interim, what I'd like to do, I

2     think just as a start, what I'd like to do is to go through

3     the proposed charge, and let's identify any objections we

4     have, and then it may effectively put to bed some of these

5     issues.

6          MS. HAHN:  Your Honor, the Government has some small

7     issues, some is wording, but the primary one that we would

8     like to address deals with the elements related to the --

9          THE COURT:  Give me, if you would help me with the

10    pages, that would be great.

11         MS. HAHN:  That would just be on page 25, and then

12    the attempts is on 31.

13         THE COURT:  Okay.  First of all, let's do 25.  Okay.

14    So tell me, I know you have slightly different charge on this

15    one, is that right?

16         MS. HAHN:  Yes, Your Honor.

17         THE COURT:  Let me have a look at that.  And that was

18    instruction 36?  Am I right about that?

19         MS. HAHN:  Yes, Your Honor.

20         THE COURT:  Tell me your concern about the charge on

21    page 25.

22         MS. HAHN:  Your Honor, elements four and five, we

23    would request that the Court use the statutory language and

24    replace the phrase, Defendant's --

25         (Brief interruption in proceedings.)

1151

1    THE COURT:  Listen, I'm going to get you, if you'll

2    just slow down enough, I really do want to understand what

3    you're saying.

4    MS. HAHN:  In elements four and five.

5    THE COURT:  Says the defendant's intentional

6    obstruction of the identified person's enjoyment.  And what

7    the Government had proposed, let me go to that.

8    MS. HAHN:  Was that the offense was in or affected

9    interstate commerce.

10    THE COURT:  Isn't the offense the intentional

11    obstruction?

12    MS. HAHN:  Well, our concern with the language as

13    it's phrased, is that it might lead the jury to focus on the

14    attack itself.  And as we briefed in the motion to dismiss,

15    the jurisdictional element extends beyond the attack itself.

16    THE COURT:  And what else would it be?

17    MS. HAHN:  The commission of the offense, as well as

18    the planning and preparing to commit the offense.

19    THE COURT:  But that's all part of the intentional

20    obstruction, that's the premeditation of the intentional

21    obstruction.  I kind of liked it -- you went like more

22    advanced than I was, and probably the jury would ever dream

23    of.  I just thought the intentional obstruction was sort of,

24    you know, it's what the offense is.  And when you said the

25    offense, it just wasn't as specific.  I was no more enamored

1  with the issue other than that, I wasn't trying to eliminate

2  premeditated acts, I just think that's all the intentional

3  obstruction, that is the offense.  All of that makes up the

4  intentional obstruction.

5          MS. HAHN:  Okay, Your Honor.

6          THE COURT:  You hear what I'm saying?

7          MS. HAHN:  Yes, I do.

8          THE COURT:  And sometimes we lawyers overthink these

9  things.  And believe me, y'all are like so beyond, you know,

10  one of the things I do, I won't be able to do this until after

11  the -- if we have a sentencing phase, until after this, I go

12  back and talk to every juror.  And I will tell you that where

13  they go is not where you think they're going to go, okay?  I

14  mean, they get to the right place, but they do it in their own

15  way, in their own time and their own method.

16      So anyway, I think, frankly, the charge given by the

17  defense is just slightly better, it's not huge, but I'm

18  inclined to stay with that.

19          MS. HAHN:  Okay, Your Honor.

20      We have one other request.

21          THE COURT:  Okay.

22          MS. HAHN:  And that would be on page 37.

23          THE COURT:  Okay.

24          MS. HAHN:  That's the 924 elements.

25          THE COURT:  Page --

1153

1    MS. HAHN:  Thirty-seven.

2    THE COURT:  Thank you.  Hold on just a second.  Okay.

3    MS. HAHN:  In the first element, the way it's

4    drafted, and it was in our proposed instruction --

5    THE COURT:  This wasn't an objective one.

6    MS. HAHN:  No, it wasn't, but we recognize that there

7    might be a concern --

8    THE COURT:  We want to get it right, so go ahead.

9    MS. HAHN:  Instead of the defendant used or

10   discharged a firearm, the Government would request that "or"

11   be replaced with "and."  And the reason for that is that use

12   is the statutory requirement, and discharge would be the

13   additional.  So in order for there to be a proper conviction,

14   we would need for there to be --

15   THE COURT:  Both.

16   MS. HAHN:  -- a finding on both.

17   THE COURT:  Mr. Bruck, do you have any objection to

18   that one?  That seems to me to be a good edit actually.  Under

19   the first element, instead of saying the defendant used or

20   discharged a firearm, it would be defendant used and

21   discharged a firearm.

22   MR. BRUCK:  We have no objection.

23   THE COURT:  Okay.  We're going to add -- There's

24   also -- my very able clerk, on page 38, points out it should

25   be use and discharge in the title.

1    MS. HAHN:  Yes, Your Honor.

2    THE COURT:  You see again.  So we'll correct that.

3    And with that, the Government's okay with the charge?

4    MS. HAHN:  Yes.  There are -- Yes, with that charge,

5    yes.

6    THE COURT:  Okay.

7    MS. HAHN:  There are small issues, like small

8    typographical issues and things like that.  Would you like me

9    to go through them now?

10    THE COURT:  Yes, I would, we want to get it right.

11    MS. HAHN:  On page seven, my understanding is that

12    this may be an instruction that the defendant -- At the end of

13    paragraph one, the very last sentence refers to the

14    credibility of a defendant as a witness.

15    THE COURT:  Yes.

16    MS. HAHN:  And we would ask that the Court strike

17    that last sentence.

18    THE COURT:  Let me read it.  So is the -- Take out

19    the whole sentence?

20    MS. HAHN:  I believe -- Yes.

21    THE COURT:  Let me read the first sentence.  They

22    can't use the statement made out of court to judge

23    credibility?  You can take it out as a witness, but may be

24    considered for purposes of judging the credibility of the

25    defendant.

1            MS. HAHN:  Yes, Your Honor.

2            THE COURT:  It's not as a witness, but as --

3            MS. HAHN:  It would go to his credibility, yes, Your

4     Honor.

5            THE COURT:  So I think we would insert "the" before

6     defendant, and take out the words "as a witness" on page

7     seven; does that make sense?

8            MS. HAHN:  Yes, Your Honor, it does.

9            THE COURT:  Mr. Bruck, what do you think?

10           MR. BRUCK:  I think the defendant's credibility, the

11    defendant's credibility itself is not an issue, if he does not

12    testify.  I think maybe what the Government really means --

13           THE COURT:  Let me ask you about that, Mr. Bruck,

14    that's an interesting point.  You're saying -- he makes a

15    statement to the FBI.

16           MR. BRUCK:  I'm just getting ready to cover -- I

17    understand the concern.  I think if it read judging the

18    credibility of the statement, then that would --

19           THE COURT:  Okay.  Any such statement -- the

20    credibility of the statement?  Of the defendant's statement?

21           MR. BRUCK:  Yes.

22           THE COURT:  Of the defendant's statement?

23           MR. BRUCK:  Yes.

24           THE COURT:  Any problem with that?

25           MS. HAHN:  Your Honor, a person can have credibility;

1    the statement itself would not have credibility.

2              THE COURT:  You always -- people, you know, smart

3    like you, are always better in English than me.  What was that

4    all about?  I never could get the diagram right, you know, all

5    you probably like drawn the diagram for the teachers.  But

6    it's sort of a -- you know, it may be that the whole sentence

7    isn't worth it.  Let's look at that again.

8              MR. BRUCK:  Yeah.  I think that's right.

9              MS. HAHN:  Your Honor, we would be fine striking it.

10             THE COURT:  Let's just take out the sentence.  Just

11   every time we change it, there's something we don't like about

12   it, and I think that tells us something.  So we're just going

13   to strike that last sentence of that first paragraph on page

14   seven.

15       What else have we got?

16             MS. HAHN:  There is a very minor change to page 20.

17             THE COURT:  Okay.

18             MS. HAHN:  The seventh line, there is a number four

19   after the word color.

20             THE COURT:  Yep.  You know, in my view of it is that

21   every brilliant part of the charge is mine, and that every

22   typo is Chris'.

23             MS. HAHN:  Your honor, we assumed as much.

24             THE COURT:  Yes.  What else have we got?

25             MS. HAHN:  I think the next one would be on page 25,

1    the first element.

2              THE COURT:  Okay.

3              MS. HAHN:  There should be the word in between the

4    word person and identified.  Oh, you know, actually strike

5    that, Your Honor.

6              THE COURT:  I think that's fine.

7              MS. HAHN:  Yeah.  I'm sorry, it's between

8    "identified" and "the."

9              THE COURT:  Yes, I agree with that, that's right.

10   There we go.  Okay.

11             MS. HAHN:  And then on page 31, in element four --

12             THE COURT:  Okay.

13             MS. HAHN:  -- I believe it should read the

14   defendant's intentional obstruction.

15             THE COURT:  Yes.

16             MS. HAHN:  Strike the word offense.

17             THE COURT:  Take out the word offense, intentional,

18   is that right?  First of all, take out the word -- it should

19   read the defendant's intentional obstruction, correct?

20             MS. HAHN:  That is correct.

21             THE COURT:  We'll make that correction.  That's a

22   good catch.

23             MS. HAHN:  Your Honor, I think that's it from us.

24             THE COURT:  Thank you.

25        Okay.  Mr. Bruck, you're more like me, you're not going to

1158

1   be doing proofreading, right?  You would have missed it just

2   like I did.

3        MR. BRUCK:  You're right.  If it's wrong, it's going

4   to stay wrong.

5      Let's see.  Is this the time also to raise requests

6   that -- I think at this point you --

7        THE COURT:  I want to go through these, then I'm

8   going to go through everybody's requests to charge.

9        MR. BRUCK:  Okay.

10        THE COURT:  Obviously there could be some overlap

11   there, you know.

12        MR. BRUCK:  Okay.  Well, we will submit -- we have

13   submitted an additional charge on page 15.

14        THE COURT:  Hold a second.

15        MR. BRUCK:  The second paragraph is the one that Your

16   Honor cited as responsive to our concern about the evidence of

17   other churches.

18        THE COURT:  I'm sorry?

19        MR. BRUCK:  Second paragraph on page 15, Your Honor,

20   I think I'm correct in thinking that that is the instruction

21   that Your Honor indicated was responsive to our concern about

22   the additional churches.

23        THE COURT:  It's also, by the way, on page 11 as

24   well.  It was already there, we actually probably wouldn't

25   have added the one on 15, had we found it.  I knew it was

1    there, I just couldn't find it.  And it's in the presumption

2    of innocence, and it reads, "The defendant is, of course, not

3    on trial for any crime or act not contained in the

4    indictment."  And I asked Chris, why is that word "not"

5    underlined.  He said, Judge, you did that in some other case

6    where I wanted -- the same point was raised, and I underlined

7    the word not.  Okay?  That you're only charged.  So frankly,

8    had I found that, I wouldn't even have the language.  I don't

9    think it does any harm, it's a correct statement of the law.

10            MR. BRUCK:  Respectfully, we don't think it does any

11   good with respect to the particular problem.  We stand on our

12   request to --

13            THE COURT:  I'm going to leave it in both places.  I

14   think it's adequate, and I'm not going to comment, I don't

15   want to comment on the evidence.

16            MR. BRUCK:  Very well.

17            THE COURT:  And also, what is not evidence is also,

18   you know, the part when I go through what is not evidence, you

19   know, things not charged are not evidence.

20            MR. BRUCK:  Very well.  Three different places.

21        Now, on page 25, of course, the Court has ruled, but this

22   is in the elements of the 247 count.

23            THE COURT:  Right.  And just for the record, I don't

24   believe that element -- I've read the proposed -- actually,

25   Mr. Bruck, I'm doing your original charge.  I think I'm

1  actually giving the original charge.  So I'm now picking your

2  first charge over your second charge, okay?  Proposed charge.

3  Because I actually adopted the language of the first.

4          MR. BRUCK:  Very well.

5          THE COURT:  What I'm saying is you got it right the

6  first time; you think you got it right the second time.  We'll

7  see.  I do think it's a correct statement of the law that that

8  element is not required for a violation of the statute.

9          MR. BRUCK:  If we could have just a moment.

10          THE COURT:  Take your time.

11      (Brief interruption in proceedings.)

12          MR. BRUCK:  At the bottom of page 27, the first word

13  in paragraph is conduct.

14          THE COURT:  Yes.

15          MR. BRUCK:  Conduct is in interstate commerce.  We

16  think that a better word is either obstruction is in

17  interstate commerce, which is the statutory, the ground of the

18  offense, or simply an offense is in interstate commerce, as

19  opposed to the more vague and intentionally overly expansive

20  term conduct.  What we're concerned about is the conduct which

21  is not actually part of the offense would be considered.

22          THE COURT:  How about just saying the charged conduct

23  or -- the charged conduct.

24          MR. BRUCK:  Well, it says conduct.

25          THE COURT:  I understand.  The charged conduct,

```
 1   wouldn't that correctly address the issue?
 2            MR. BRUCK:  Yeah, the charged conduct.
 3            THE COURT:  Doesn't that go to right what you're
 4   asking me to do?  The charged conduct is interstate commerce.
 5            MR. BRUCK:  Yes.
 6            THE COURT:  Okay.
 7            MR. BRUCK:  And on the next page, bottom of the --
 8   again, first word of the last paragraph, again, should be --
 9            THE COURT:  The charged conduct?
10            MR. BRUCK:  Charged conduct affects interstate
11   commerce, yes.
12            THE COURT:  Okay.
13            MR. BRUCK:  Page 29, the first full paragraph, or
14   actually it's a pair of paragraphs, the first full paragraph
15   and the second full paragraph.  On balance, we really think
16   that including both of those without giving any yardstick to
17   the jury to choose between them, is more confusing than
18   helpful.
19            THE COURT:  Let me re-read it.
20            MR. BRUCK:  Yes, sir.
21            THE COURT:  You know, it's interesting, the first
22   paragraph proposed by the Government, the second paragraph by
23   the defense, and we added the word "nominally" to the
24   defendant paragraph, this is what I call the second paragraph,
25   and frankly, I thought about this a lot.  I really thought
```

1    that both of them kind of overemphasized the point, and I

2    tried to balance it, and I'm re-reading it and I still feel

3    like it's better than what either party proposed, and it is a

4    balance.  It tells the jury that there are activities at the

5    church and identified some of them that put it in interstate

6    commerce.  But simply just, you know, having the building or

7    whatever is not enough.  And --

8         MR. BRUCK:  If I may make one small editorial

9    suggestion then.

10        THE COURT:  Sure, I welcome it.

11        MR. BRUCK:  Which is that rather than simply say you

12   may find that a church's activities, that it should say

13   something like you may find on proof beyond a reasonable

14   doubt, or you may find on sufficient proof that a church's

15   activities.  In other words, a finding like that has to be

16   based on the evidence and not just --

17        THE COURT:  Well, I think we could say that about

18   everything in the whole record.  We have said over and over,

19   it's beyond a reasonable doubt, that every element is beyond a

20   reasonable doubt.  I don't think we need to do it right in the

21   middle of this.  You're going to just gum up the explanation,

22   that's my concern about it.  I don't think there's any doubt

23   that I have told them over and over that every element of

24   every offense must be beyond a reasonable doubt.

25        MR. BRUCK:  Well, then the final suggestion, and I

1    recognize you may just have denied it before I made it.

2            THE COURT:  Haven't heard it yet to deny it.

3            MR. BRUCK:  I know, but it's responsive to what Your

4    Honor just said.  This interstate commerce element is

5    confusing, it's very novel to the jury, unlike most elements

6    of most crimes.  I think it would be helpful to end this

7    entire section by stating, I remind you that the Government

8    must prove beyond a reasonable doubt that the offenses charged

9    in counts 13 to 21 were in or affecting interstate commerce.

10           THE COURT:  I don't think it's necessary.  We over

11   and over do this.  You know, one of the things that I have

12   seen over the years about charges, is that we just repeat the

13   same thing, and after awhile the jury just kind of zones out.

14   So I am doing my best.  You know, I do something a little

15   different, y'all may have had different experiences, we

16   meticulously prepare this, and I give it to the jury.  They

17   follow me as I read it.  And I allow them to take it back into

18   the jury room.  They tell me later, they use it with my

19   verdict form as the structure for their deliberations, which I

20   think all of us would like, you know, that they methodically

21   go through the elements and all of that.

22        And so I try to write it in a way that is understandable

23   to laypersons, and not written for law professors, and that we

24   don't gum it up with so much information.  No offense to

25   Mr. Bruck, the law professor.

1    MR. BRUCK:  Thank you.

2    THE COURT:  That we don't gum it up so much that we

3    forget its real purpose.  So I feel like the beyond a

4    reasonable doubt concept is like drilled in sufficiently here.

5    What is important is that there are these concepts that don't

6    deal with interstate commerce, and I want to stay focused on

7    that.  So I respectfully decline to add that language.

8    MR. BRUCK:  Very well.  That's all we have.

9    THE COURT:  Let me just, if I might, go through each

10   of the remaining charges.

11   Instruction two, the Government didn't like me referencing

12   reasonable doubt, saying the long-standing admonition of the

13   Fourth Circuit not to define reasonable doubt.  I don't define

14   reasonable doubt, I define -- what I say is, here are the

15   qualities if reasonable doubt is present or not present.  And

16   that way I don't try to define it, it's just something you

17   would feel confident in making a decision.  So it's not what

18   reasonable doubt is, but is a quality of the decision.  I do

19   not presume to define reasonable doubt.  So I decline to

20   remove that language, I use it in every charge.

21   And jurors have told me they found that helpful, sort of

22   the idea if it was something important in my life, I would

23   rely on it, that kind of makes sense to them as the kind of

24   standard you're talking about, and they get that, and that's

25   why I want to keep it in there.

1    Number 19, very similar charge on government obstruction,

2    19, Government as a party.  Defendant used this administration

3    of justice term, I just wasn't that comfortable with, it was

4    ambiguous; and I used the Government's, it's a very similar

5    charge.

6    The instruction 28, Hate Crime Act, willfully section, I

7    think I subsequently charged basically what everybody wanted.

8    I just thought the Government charge read better, so there's

9    very little difference with the defense, and I used the

10   Government charge.

11   Instruction 30, Hate Crime Act or cause of.  The defense

12   wanted me to sort of not only say what "because of" means,

13   which is but for, but what it's not, and I thought introducing

14   what's not is potentially confusing to the jury.  And I have

15   never had problems with jurors sort of understanding but for.

16   They kind of get that.

17   The Government asked me in instruction 32 about some of

18   the elements in the Hate Crime Act, got very specific

19   examples.  Again, I don't want to comment on evidence, so I

20   wasn't going to get into that.

21   We already talked about instruction 36 about the elements

22   on obstruction of religion.  If I had made that change, it

23   would also be instruction 41, because it's another attempt to

24   kill, that was the attempt to kill section on obstruction of

25   religion.

1    Instruction 39, we just talked about the affecting

2  commerce, I tried to combine the best, as we talked about, of

3  both parties' charge.

4    So, you know, truth of it is we all know that about

5  85 percent of this was agreed to by the parties, y'all did an

6  excellent job.  There are really very small differences here

7  between the parties.  I think we got a good potential charge.

8    Okay.  How about the verdict form?

9    MR. BRUCK:  Before we get to the verdict form, Judge,

10 one small point, which is our concerns about the elements on

11 counts 13 to 21 also apply to the attempt.

12    THE COURT:  Yes.

13    MR. BRUCK:  22 to 24.  Same request.

14    THE COURT:  Same issue.  Yes.

15    MR. BRUCK:  Thank you.

16    THE COURT:  Okay.  Verdict form.  Any objections to

17 the Court's verdict form?

18    MS. HAHN:  Your Honor, not from the Government.

19    MR. BRUCK:  Not from the defense.

20    THE COURT:  Very good.  I've got to tell you, I

21 have -- I took -- I've looked at everybody's verdict form,

22 they ended up being fairly similar to each other.  I do think

23 that the jurors, particularly when there are multiple counts,

24 and I've had a number of cases with multiple counts, the

25 verdict form becomes their outline for deliberations.  And you

1    don't want them just sit and checking things.  So you try to

2    do it in a way that slows them down, makes them make a

3    decision on each count.  And it's easy, you know, you want to

4    make sure they do this, you know, there are obviously lots of

5    counts, only because there are lots of victims, right?  I

6    mean -- and it's important to get it right and to treat each

7    of these counts as important, because each one is important.

8        So hopefully that was the effort to try to make this --

9    keep the jury be very deliberative and formal and hopefully

10   sitting in that jury room, number one, they talk about it,

11   talk about the evidence, and then they go back and they do it

12   as to each of the -- all nine counts for the first, and then

13   they understand that's Hate Crimes Act, then they go to intent

14   to kill, Hate Crimes, they go right through all 33.  And it's

15   my hope they will do that, and expectation that they will.

16       Okay.  Are there any other matters to come before the

17   Court?  I believe the charge conference is completed.

18           MS. HAHN:  Your Honor, not from the Government.

19           MR. BRUCK:  One additional instruction we had

20   requested is the same one that -- well, we had asked for a

21   demeanor instruction about the -- that would keep the jury

22   from considering the defendant's in-court demeanor as

23   evidence.  The Court gave a somewhat shortened version of that

24   at page five of the opening --

25           THE COURT:  Okay.

1           MR. BRUCK:  -- instruction.  We would request that it

2    be included in the --

3           THE COURT:  Any problem with that?  I think that's a

4    fine thing to add.  What do y'all think?

5           MS. HAHN:  I'm sorry, I'm not sure I got the very

6    last --

7           THE COURT:  Show her again.  I did it in the opening,

8    I made a request, and I think I had intended to add that.

9           MS. HAHN:  This was from the opening instruction?

10          THE COURT:  Yes.

11          MS. HAHN:  Government's fine.

12          THE COURT:  We'll add the demeanor.  We'll do that

13   after what is not evidence.

14      Anything else?

15          MR. RICHARDSON:  Beg the Court's indulgence one

16   moment.

17          THE COURT:  Yes.

18          MR. RICHARDSON:  You know, one issue, Your Honor,

19   that I was aware of, and I got some help on, was with respect

20   to the alternates.  And I assume the Court has already done

21   this, given that you've done everything else before we've

22   gotten to it, but the law indicates that when these alternates

23   leave for deliberations, they still remain alternates, and

24   when the penalty phase returns --

25          THE COURT:  Here's what we will do.  Only the 12

1    jurors deliberate.  We will send the six alternates into a

2    different room.  They will sit there, stewing that they're

3    not jurors, okay, and then the jury will come back.  And if,

4    in the event the jury convicts on offenses that require a

5    sentencing phase, I will bring the alternates back into the

6    room, I will tell them a decision has been rendered, they are

7    still alternates, I will give them the same discharge

8    instruction about staying away, and that they will be right

9    back in that jury box for the sentencing phase.

10        MR. RICHARDSON:  Thank you, Your Honor.  That's

11   exactly what I was facing.

12        THE COURT:  Yes.  Anything else?

13        MS. HAHN:  No, Your Honor.

14        THE COURT:  Very good.

15        MR. BRUCK:  No, sir.

16        THE COURT:  Very good.  We will see you tomorrow

17   morning at 9:30.

18

19        (Court adjourned at 2:17 p.m.)

20

21

22

23

24

25

1

2                          REPORTER'S CERTIFICATION

3

4              I, Debra L. Potocki, RMR, RDR, CRR, Official Court

5    Reporter for the United States District Court for the District

6    of South Carolina, hereby certify that the foregoing is a true

7    and correct transcript of the stenographically recorded above

8    proceedings.

9

10

11
     S/Debra L. Potocki
12   _____

13   Debra L. Potocki, RMR, RDR, CRR

14

15

16

17

18

19

20

21

22

23

24

25