# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

RECEIVED
USDC CLERK, CHARLESTON, SC
2017 MAY 10 PM 12: 05

| | | |
|---|---|---|
| United States of America, | ) | Criminal No. 2:15-472-RMG |
| | ) | |
| v. | ) | **ORDER AND OPINION** |
| | ) | |
| Dylann Storm Roof. | ) | |

This matter is before the Court on Defendant's motion for a new trial or a judgment of acquittal. (Dkt. No. 916.) For the reasons set forth below, the Court denies the motion.

## I.    Background

On July 22, 2015, a federal grand jury returned a 33-count indictment charging Defendant Dylann Roof with multiple counts of 5 offenses:

- Counts 1–9 allege racially motivated hate crimes resulting in death, in violation of 18 U.S.C. § 249(a)(l);

- Counts 10–12 allege racially motivated hate crimes involving an attempt to kill, in violation of 18 U.S.C. § 249(a)(1);

- Counts 13–21 allege obstruction of religious exercise resulting in death, in violation of 18 U.S.C. § 247(a)(2);

- Counts 22–24 allege obstruction of religious exercise involving an attempt to kill using a weapon, in violation of 18 U.S.C. § 247(a)(2); and

- Counts 25–33 allege use of a firearm to commit murder during a crime of violence prosecutable in federal court, in violation of 18 U.S.C. §§ 924(c) and (j).

(Dkt. No. 1.)

Defendant moved to dismiss the indictment, and the Court denied Defendant's motion. (Dkt. Nos. 233, 735.) After a seven-day trial, the jury returned a verdict of guilty on all counts. (Dkt. No. 817.) In the sentencing phase, the jury returned death sentence verdicts on Counts 13–21 and 25–33 (Dkt. No. 871), and the Court imposed life sentences without the possibility of parole for Counts 1–12 and 22–24 (Dkt. No. 885).

During the January 11, 2017 sentencing hearing, the Court orally granted in part Defendant's motion for an extension of time to file post-trial motions.[1] Defendant filed a motion for a new trial or a judgment of acquittal under Rules 29(c) and 33(b)(2) of the Federal Rules of Criminal Procedure on February 10, 2017. (Dkt. No. 916.) He argues the Government failed to establish the interstate commerce nexus required by § 247(a)(2). Defendant also argues the alleged violations of §§ 247(a)(2) and 249(a)(1) are not crimes of violence within the meaning of § 924(c)(3). Defendant's motion does not challenge his convictions under § 249(a)(1).

## II.     Legal Standards

### A.     Rule 29(c) Motion for a Judgment of Acquittal

Rule 29(c) of the Federal Rules of Criminal Procedure permits a defendant to move for a judgment of acquittal. The Court must determine "whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982). "The jury's verdict must be accepted if, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1402 (4th Cir. 1993).

### B.     Rule 33 Motion for a New Trial

Federal Rule of Criminal Procedure 33(a) permits a court, upon a defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires." Whether a

---

[1] The then-*pro se* Defendant filed a written motion to provide background for his request for an extension of time. (Dkt. No. 874.) Although the Court's subsequent order granting Defendant's request for an extension cites only motions made under Rule 33 of the Federal Rules of Criminal Procedure (Dkt. No. 875), its initial oral extension of the deadline was intended to cover all post-trial motions, including those made under Rule 29. Defendant's motion therefore is timely.

defendant gets a new trial is left to the trial court's discretion. *United States v. Smith*, 451 F.3d 209, 216–17 (4th Cir. 2006). The Fourth Circuit has held that a trial court "should exercise its discretion to grant a new trial sparingly, and that it should do so only when the evidence weighs heavily against the verdict." *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (internal quotation marks omitted). Where the evidence in the record is sufficient to support the jury's verdict, a Rule 33 motion must be denied. *United States v. Singh*, 518 F.3d 236, 250 (4th Cir. 2008).

**III.    Discussion**

**A.    Section 247(a)'s Interstate Commerce Nexus**

The Commerce Clause delegates to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. The Necessary and Proper Clause authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers," which include the Commerce Clause. U.S. Const. art. I, § 8, cl. 18. The Supreme Court has "identified three broad categories of activity that Congress may regulate under its commerce power": (1) the use and channels of interstate commerce; (2) the instrumentalities of interstate commerce; and (3) those activities having substantial relations to interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558–59 (1995).

Defendant was convicted of multiple violations of the Church Arson Prevention Act of 1996, Pub. L. 104-155 § 3, 110 Stat. 1392, 1392–93 (1996) (codified at 28 U.S.C. sec. 247(a)) (the "Church Arson Act"). Section 247 provides, in relevant part,

(a) Whoever, in any of the circumstances referred to in subsection (b) of this section—

. . .

-3-

(2) intentionally obstructs, by force or threat of force, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so;

shall be punished as provided in subsection (d).

(b) The circumstances referred to in subsection (a) are that the offense is in or affects interstate or foreign commerce.

Defendant argues that because his offense was noneconomic, because he did not travel in interstate commerce to commit it, and because he used items purchased in South Carolina, the Government failed to establish that the offense—that is, the intentional, forcible obstruction of the free exercise of religion—was in or affected interstate commerce. (Dkt. No. 916 at 2–5.) This argument repeats Defendant's pretrial as-applied constitutional challenge to § 247(a)(2). (*See* Dkt. No. 735 at 25 ("According to Defendant, a noneconomic crime in South Carolina, committed by a South Carolina resident, and using items purchased in South Carolina, lacks an interstate commerce nexus . . . . The alleged nexuses with interstate commerce are sufficient to survive a motion to dismiss.").)

At trial, the Government presented evidence that Defendant attacked parishioners at Mother Emanuel during a Wednesday-night Bible study. Defendant used the internet to conduct research and identify Mother Emanuel as his target, a telephone to contact the church directly, and GPS navigation satellites to navigate interstate highways on his multiple trips to and from the vicinity of the church. He used a Russia-based service to host the online manifesto he posted shortly before the attack at Mother Emanuel, which explained his motives. In preparation for the attack, Defendant purchased hollow-point bullets, magazines, and a firearm that had all travelled in interstate commerce. Defendant entered Mother Emanuel carrying the firearm and loaded magazines in a tactical pouch that had travelled in interstate commerce. Inside the church, Defendant used the items he procured to kill nine parishioners. Defendant presented no evidence

to counter this evidence, and a rational fact-finder viewing the evidence in the light most favorable to the Government could conclude that the Government established an interstate commerce nexus. *See, e.g.*, *United States v. Morgan*, 748 F.3d 1024, 1034 (10th Cir. 2014) (holding that a GPS device is an instrumentality of interstate commerce); *United States v. MacEwan*, 445 F.3d 237, 245 (3d Cir. 2006) ("[T]he Internet is an instrumentality and channel of interstate commerce."); *United States v. Corum*, 362 F.3d 489, 493 (8th Cir. 2004) ("It is well-established that telephones, even when used intrastate, are instrumentalities of interstate commerce."); *United States v. Gallimore*, 247 F.3d 134, 138 (4th Cir. 2001) ("[T]he Government may establish the requisite interstate commerce nexus by showing that a firearm was manufactured outside the state where the defendant possessed it."); *United States v. Mason*, 993 F. Supp. 2d 1308, 1317 (D. Or. 2014) (rejecting a pretrial as-applied challenge to a § 249 claim because the Government alleged that the weapon used in the attack traveled in interstate commerce).

Defendant argues that the proper test is whether the offense was in interstate commerce, not whether the items used to commit the offense were in interstate commerce. (Dkt. No. 916 at 3.) The Court finds that argument unpersuasive. Congress has plenary authority to regulate use of the channels of interstate commerce and to regulate the use of things in interstate commerce. *United States v. Williams*, 342 F.3d 350, 354 (4th Cir. 2003) ("Under the Commerce Clause, Congress has plenary authority to regulate (1) the use of the channels of interstate commerce, (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities . . . ." (internal quotation marks omitted)). That means Congress may prohibit use of the channels of interstate commerce, like the internet, or use of things in interstate commerce, like an imported Austrian pistol, for criminal purposes like mass murder. As the Court previously held, "Congress has authority to . . . prohibit

use of the interstate highway system, national telecommunications networks, or the interstate market in firearms and ammunition to attack churches." (Dkt. No. 735 at 21.)[2]

## B.  Violations of § 247 and § 249 as crimes of violence under § 924(c)

The jury found Defendant guilty of nine counts of using a firearm during and in relation to a "crime of violence" prosecutable in federal court, in violation of 18 U.S.C. §§ 924(c)(3) and 924(j). A "crime of violence" under 18 U.S.C. § 924(c)(3) is defined by the below language:

> For purposes of this subsection the term "crime of violence" means an offense that is a felony and--
>
> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Courts determine whether a predicate crime qualifies as a crime of violence under § 924(c)(3) by using the "categorical approach."[3] Under the categorical approach, courts rely only on the elements of the charged offenses and not the particular facts of a case to determine whether

---

[2] Equally unpersuasive is Defendant's argument that Congress may prohibit mere possession of a firearm that has traveled in interstate commerce but may not prohibit actual use of the same firearm for mass murder. (*See* Dkt. No. 916 at 4.)

[3] The Court earlier noted that Judge T.S. Ellis, III of the Eastern District of Virginia had recently held "the 'categorical approach' . . . does not apply when determining whether a crime . . . qualifies as a crime of violence pursuant to § 924(c)." (Dkt. No. 735 at 29 n.9 (citing *United States v. Jimenez-Segura*, 206 F. Supp. 3d 1115, 1128 (E.D. Va. 2016).) This Court concluded—and still concludes—that Fourth Circuit precedent requires the categorical approach. *See United States v. McNeal*, 818 F.3d 141, 152 (4th Cir. 2016); *United States v. Fuertes*, 805 F .3d 485, 497–99 (4th Cir. 2015). But the Court notes that the Third Circuit has since agreed with Judge Ellis' reasoning:

> When the predicate offense . . . and the § 924(c) offense are contemporaneous and tried to the same jury, the record of all necessary facts are before the district court. The jury's determination of the facts of the charged offenses unmistakably shed light on whether the predicate offense was committed with "the use, attempted use, or threatened use of physical force against the person or property of another." The remedial effect of the "categorical" approach is not necessary.

*United States v. Robinson*, 844 F.3d 137, 141 (3d Cir. 2016).

the charged offenses are crimes of violence under § 924(c)(3). An offense is a crime of violence if all conduct prohibited by the statute falls within § 924(c)(3)'s definition of a crime of violence. Under § 924(c)(3)(A), the "force clause," an offense is a crime of violence if it requires the use, attempted use, or threatened use of "physical force" against another person. In that context, "the phrase 'physical force' means violent force—that is, force capable of causing physical pain or injury to another person." *[Curtis] Johnson v. United States*, 559 U.S. 133, 140 (2010) ("*Curtis Johnson*").[4] If a statute may be violated without using violent force, then it does not fall within the definition of crime of violence, even if the conduct in a particular case was unquestionably violent.[5]

Defendant again contests the Court's conclusion that his violations of §§ 249(a)(1) and 247(a)(2) are categorically crimes of violence under § 924(c)(3)(A). Defendant argues the Court's previous ruling is in error because controlling authority holds that "causation of injury *does not* necessarily require the use of violent force." (Dkt. No. 916 at 6.) That statement combines two analytically distinct arguments, which the Court will consider separately after analyzing the text of the statutes at issue. The first argument is whether intentionally causing injury necessarily involves the *use by the defendant* of injurious force. The second is whether *violent* force may encompass injurious forces where those forces are indirect, subtle, or attenuated from their effects. Although cases sometimes silently slide between these two issues, whether the defendant used an injurious force is a distinct issue from whether an injurious force is the right kind of force. For

---

[4] *Curtis Johnson* concerned the meaning of "violent felony" under 18 U.S.C. § 924(e). 559 U.S. at 135. The Fourth Circuit, however, has provided that decisions interpreting "crime of violence" or "violent felony" in the context of 18 U.S.C. § 16, 18 U.S.C. § 924(e), U.S.S.G. § 4B1.2, or similar provisions are persuasive as to the meaning of § 924(c)(3). *McNeal*, 818 F.3d at 153 n.9.

[5] Because the Court holds violations of §§ 247 and 249 are crimes of violence under § 924(c)(3)(A), it does not consider any issues related to § 924(c)(3)(B) or *Johnson v. United States*, 135 S.Ct. 2551 (2015).

example, the Fifth Circuit's example of a person intentionally causing physical injury by "telling the victim he can safely back his car out while knowing an approaching car" will hit the victim challenges whether the force of the moving car was "used" by the person directing the victim to back out—but a crashing car is unquestionably a violent force. *See United States v. Villegas-Hernandez*, 468 F.3d 874, 879 (5th Cir. 2006). By contrast, the example of a person surreptitiously giving poison to the victim challenges whether a violent force was used at all—the poison was unquestionably "used" by the person providing it to the victim with intent to cause the victim's death.[6] It is, of course, quite easy to construct hypothetical examples that combine both arguments. *See, e.g., id.* (providing the example of "making available"—rather than administering—"to the victim a poisoned drink while reassuring him the drink is safe"). Such examples can be particularly muddling because if the force used is not a violent physical force under § 924(c)(3)(A), there is no "use" of violent physical force even if some other sort of force was used. Although this Opinion attempts to address these two issues distinctly, it is impossible to address the case law on whether intentionally causing injury necessarily involves the use by the defendant of injurious force or whether violent force may encompasses injurious forces that are indirect, subtle, or attenuated from their effects without discussion of examples that blur the distinction between the two issues.

1.      **Elements of the Charged Violations of 18 U.S.C. §§ 247 and 249**

Before considering Defendant's arguments, the Court examines the text of the statutes at issue to see if they provide that the use of violent force is an element of the offenses they define. *See Leocal v. Ashcroft*, 543 U.S. 1, 8 (2004). Under the plain text of § 924(c)(3)(A), the use of violent force must be an "element" of an offense for that offense to be a crime of violence under

---

[6] Of course, it is possible to construct hypothetical examples that combine both arguments. *See, e.g., Villegas-Hernandez*, 468 F.3d at 879 (providing the example of "making available"—rather than administering—"to the victim a poisoned drink while reassuring him the drink is safe").

§ 924(c)(3)(A). The elements of a crime are "[t]he constituent parts of a crime . . . that the prosecution must prove to sustain a conviction." Black's Law Dictionary 634 (10th ed. 2014). "It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (internal quotation marks omitted).

It is not necessary, however, for a statute explicitly to state that the use of violent force is an element of the offense. The elements actually laid out in the statutory text may logically entail the use of violent force, so that it is impossible to violate the statute without "the use, attempted use, or threatened use of physical force against the person or property of another." *See* 18 U.S.C. § 924(c)(3)(A). If a fact, "*P*," is logically entailed by a set of facts "*S*" that the prosecution must prove to sustain a conviction, then *P* is also a fact that the prosecution must prove to sustain a conviction, because proof of *S* proves *P*, which makes it impossible to prove facts sufficient to sustain a conviction without proving *P*. Thus, the use of violent force is an "element" of any crime that has statutory elements that logically entail the use of violent force. Such crimes are crimes of violence under § 924(c)(3).

The text of § 247(a)(2) provides that the elements of the offenses at issue are: (1) intentional (2) obstruction the victim's enjoyment of the free exercise of religious beliefs (3) by force (4) resulting in death, where the offense (5) is in or affects interstate commerce. 18 U.S.C. § 247(a)(2). The elements are conjunctive; the Government must prove every element. To do something intentionally and "by force" requires an intentional use of force. "By" is a preposition introducing means, instrumentality, or agency. *See* Oxford English Dictionary (2d ed. 1989). To achieve an intended result "by" a means, instrumentality, or agency is to "use" that means, instrumentality, or agency. The statute therefore requires the "use of force" and not merely the "result of injury." *Cf.*

*United States v. Torres-Miguel*, 701 F.3d 165, 169 (4th Cir. 2012). The statute does not require an intent to kill, but force that results in death is by definition deadly force. Proof sufficient to sustain a conviction under the relevant statutory provisions therefore entails proof of an intentional use of deadly force. A crime defined by elements requiring the intentional use of deadly force is a crime of violence under § 924(c)(3)(A), because it entails the use of force against a person.

The elements of the § 249(a)(1) offenses at issue are: (1) willful causation (2) of bodily injury (3) because of actual or perceived race, color, religion, or national origin (4) resulting in death. 18 U.S.C. § 249(a)(1). Further, the statute was enacted with a rule of construction stating, "This [act] applies to violent acts motivated by actual or perceived race . . . ." Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act of 2009, Pub. L. 111-84, div. E, § 4710(3), 123 Stat. 2835 (Oct. 28, 2009) (the "Hate Crimes Act"). A crime defined by elements requiring willful causation of deadly injury and limited by law to "violent acts" also is a crime of violence under § 924(c)(3)(A), because proof sufficient to sustain a conviction for willful causation of deadly injury by violent action entails proof of the use of force against a person.

Defendant at times has argued as if causation of death were not an element of the offenses for which he was convicted.[7] That is simply not true. At trial, the Government was required to prove that Defendant's actions caused the death of nine victims. Those facts were necessary to sustain the conviction. To meet that burden, the Government elicited detailed testimony from

---

[7] Defendant's motion for a judgment of acquittal does not dispute that causation of death is a required element of the offenses. But his motion explicitly incorporates discussion of examples of Hate Crimes Act and Church Arson Act violations purportedly not involving the use of violent force from his motion to dismiss the indictment. (Dkt. No. 916 at 6.) Many of those examples apply only to offenses that do not have the element of causation of death. (*E.g.*, Dkt. No. 233 at 26, 27 (providing as examples of § 247 violations "defacing buildings or religious texts" and as examples of a § 249 violation "anything from a bruise, to an illness, to 'any other injury to the body, no matter how temporary'").)

forensic pathologist Susan Presnell on the victims' causes of death. (Dkt. No. 899 at 6–33.) Moreover, regarding the elements of each count of the indictment alleging a Hate Crime Act violation resulting in death, the Court instructed the jury that the Government must prove that the person's death resulted from the offense beyond a reasonable doubt. Regarding the elements of each count of the indictment alleging a Church Arson Act violation resulting in death, the Court instructed the jury that the Government must prove the offense resulted in the death of that person. Defendant (then represented by counsel) did not object to those jury charges. Indeed, Defendant *proposed* jury charges stating that causation of death is an element of those offenses. (Dkt. No. 431 at 38, 57.)

Defendant argues the relevant statutes nevertheless do not qualify as crimes of violence under § 924(c)(3)(A) for two reasons. First, he argues that willfully or intentionally causing deadly injury does not necessarily involve the *use* of the injurious force. (Dkt. No. 916 at 6.) That argument appears to apply to § 249, which requires "willful causation" of death, but not to § 247, which provides "by force" as an element of the crime. The Court observes the statutory rule of construction for § 249, limiting application of § 249 to "violent acts," appears to foreclose the argument as to § 249 as well, but the Court's conclusions do not rest on the enacted rule of construction. Second, Defendant argues that force used to cause grave injury or death is not necessarily violent force. (*Id.* at 7.)

## 2. Whether Intentionally Causing Injury Necessarily Involves the Use of Injurious Force

It is certainly true that injury may be caused without the *use* of violent force. *McNeal*, 818 F.3d at156 & n.10; *Torres-Miguel*, 701 F.3d at 168. That is irrelevant to this case. The Court previously held that injury is necessarily caused by force. (Dkt. No. 735 at 30.) But it does not follow that a defendant who caused serious or deadly injury necessarily used the injury-causing force, because "use" denotes intentionality. *See Castleman*, 134 S. Ct. at 1415 ("[T]he knowing

or intentional application of force is a 'use' of force."); *Leocal*, 543 U.S. at 9–10; *Fernandez-Ruiz v. Gonzales*, 466 F.3d 1121, 1128 (9th Cir. 2006) ("'[T]he "use" of force means more than the mere occurrence of force; it requires the intentional employment of that force, generally to obtain some end.'" (quoting *Tran v. Gonzales*, 414 F.3d 464, 470 (3d Cir. 2005))). A person may cause injury accidentally or negligently without "using" the kinetic force that injured the victim. *Leocal*, 543 U.S. at 9 ("[T]he 'use . . . of physical force against the person or property of another'—most naturally suggests a higher degree of intent than negligent or merely accidental conduct."). The Court's prior holding is that the *intentional* causation of physical injury or death necessarily involves the "use" of force. As previously discussed, the Court reads *United States v. Castleman* to hold that the knowing or intentional causation of bodily injury necessarily involves the use of force. *See* 134 S. Ct. 1405, 1414 (2014) ("[T]he knowing and intentional causation of bodily injury necessarily involves the use of physical force."); *id.* at 1415 ("[T]he knowing or intentional application of force is a 'use' of force."). This is so because, again, "use" denotes intentionality. The issue is not whether injury may be caused without the use of force. Rather, it is whether the intentional causation of physical injury necessarily entails the use of the injurious force.

The circuits are split on whether the intentional causation of physical injury entails the use of the injurious force. The Third, Sixth, Seventh, Eighth, and Ninth Circuits have held the intentional causation of physical injury does entail the use of the injurious force. *See United States v. Waters*, 823 F.3d 1062, 1065 (7th Cir. 2016) ("[P]roving intentional causation of bodily harm unambiguously requires proving physical force" (internal quotation marks omitted)); *United States v. Rice*, 813 F.3d 704, 706 (8th Cir. 2016) ("'Here, as in *Castleman*, Rice had been convicted of 'intentionally or knowingly . . . caus[ing] physical injury' to another person. His offense of conviction therefore includes the use of physical force as an element." (citation omitted)); *United*

*States v. Anderson*, 695 F.3d 390, 400 (6th Cir. 2012) ("We hold that one can knowingly . . . [c]ause serious physical harm to another only by knowingly using force capable of causing physical pain or injury, *i.e.*, violent physical force . . . ." (internal quotation marks and citation omitted)); *United States v. Horton*, 461 F. App'x 179, 184 (3d Cir. 2012) (holding that a New Jersey statute making it a crime to "cause or attempt to cause significant bodily injury . . . requires, as an element of the offense, the use of force sufficient to cause physical pain or injury"); *United States v. Laurico-Yeno*, 590 F.3d 818, 821 (9th Cir. 2010) (holding that California statute making it a crime to "willfully inflict[] upon a person . . . corporal injury resulting in a traumatic condition" is a crime of violence because "willfully is a synonym for intentionally" and so "a person cannot be convicted without the intentional use of physical force").

The leading contrary case appears to be *Chrzanoski v. Ashcroft*, 327 F.3d 188, 192 (2d Cir. 2003). In *Chrzanoski*, the Second Circuit rejected the Government's argument that a Connecticut statute, Conn. Gen. Stat. § 53a-61(a)(1), which provides that a person is guilty of third-degree assault when "[w]ith intent to cause physical injury to another person, he causes such injury to such person or a third person," is categorically a crime of violence under § 16(a). The *Chrzanoski* court held "that just as risk of injury does not necessarily involve the risk of the use of force, the intentional causation of injury does not necessarily involve the use of force." 327 F.3d at 195. That statement's attractive parallelism, however, conceals a fallacy of false equivalence. The risk of injury certainly does not entail the use of force. A prankster stealing traffic signs creates a risk of injury for motorists, but it would be implausibly strained to say that the prankster "used" violent force against the occupants of whatever vehicles may have collided because of the missing signs. Nothing in "risk of injury" necessarily involves the "use" of anything. But "intentional causation of injury" necessarily does involve the use of force because of the semantic relationship between

"intent" and "use." *See Leocal*, 543 U.S. at 9–10. In other words, "intentional causation of injury" is not a subcategory of "risk of injury" because "intentional causation" means something more than "100% risk."

The *Chrzanoski* court never attempts to explain *how* "the intentional causation of injury does not necessarily involve the use of force" could follow from "risk of injury does not necessarily involve the risk of the use of force." Instead, it proceeds to address whether whatever "force" was used qualifies as an appropriate type of physical force—an issue distinct from whether the injury-causing force was used:

> We find that just as risk of injury does not necessarily involve the risk of the use of force, the intentional causation of injury does not necessarily involve the use of force. Given the elements of section 53a–61(a)(1) under Connecticut law, it seems an individual could be convicted of intentional assault in the third degree for injury *caused not by physical force, but by guile, deception, or even deliberate omission.* Certainly, Connecticut recognizes that even second degree assault, which qualifies as a Class D felony, can be committed without any physical force. In the exercise of prosecutorial discretion, *the same non-forceful conduct at issue in Nunes* [placing a poison in a victim's drink] could presumably be charged as the lesser included offense of third degree assault. Moreover, human experience suggests *numerous examples of intentionally causing physical injury without the use of force*, such as a doctor who deliberately withholds vital medicine from a sick patient. In sum, while there are undoubtedly many ways in which force could be used to commit third degree assault under Connecticut law, the plain language of the statute does not make use of force an explicit or implicit element of the crime. Rather, its language is broad enough to cover myriad other schemes, *not involving force*, whereby physical injury can be caused intentionally.

*Chrzanoski*, 327 F.3d 188, 195–96 (2d Cir. 2003) (citations omitted) (emphasis added). A few other circuits subsequently cited *Chrzanoski* with approval, often for the proposition that statutes criminalizing negligent or reckless infliction of bodily injury are not categorically crimes of violence. *See, e.g.*, *United States v. Perez-Vargas*, 414 F.3d 1282, 1286 (10th Cir. 2005); *United States v. Vargas-Duran*, 356 F.3d 598, 605 & n.10 (5th Cir. 2004) (en banc). The Fifth Circuit, however, emphasized its agreement that the intentional causation of injury does not entail the use of force in *United States v. Villegas-Hernandez*. 468 F.3d 874, 881 (5th Cir. 2006); *but see United*

*States v. Cruz-Rodriguez*, 625 F.3d 274, 276 (5th Cir. 2010) (later Fifth Circuit decision quoting

*United States v. Gutierrez*, 371 F. App'x 550, 551 (5th Cir. 2010), to hold that a California statute

making it a crime to "willfully inflict[] upon a person . . . corporal injury resulting in a traumatic

condition" is a crime of violence because the statute "penalizes the intentional use of force that

results in a traumatic condition"). The Tenth Circuit did likewise in *United States v. Rodriguez-*

*Enriquez*, 518 F.3d 1191, 1195 (10th Cir. 2008), adding the point that "injury effected by chemical

action on the body (as in poisoning or exposure to hazardous chemicals) should not be described

as caused by *physical* force."[8]

> Thereafter, in 2014, the Supreme Court opined that

> the knowing or intentional application of force is a "use" of force. Castleman is
> correct that under *Leocal v. Ashcroft*, 543 U.S. 1 (2004), the word "use" "conveys
> the idea that the thing used (here, 'physical force') has been made the user's
> instrument." Brief for Respondent 37. But he errs in arguing that although
> "[p]oison may have 'forceful physical properties' as a matter of organic
> chemistry, . . . no one would say that a poisoner 'employs' force or 'carries out a
> purpose by means of force' when he or she sprinkles poison in a victim's drink,"
> *ibid*. The "use of force" in Castleman's example is not the act of "sprinkl[ing]" the
> poison; it is the act of employing poison knowingly as a device to cause physical
> harm. That the harm occurs indirectly, rather than directly (as with a kick or punch),
> does not matter. Under Castleman's logic, after all, one could say that pulling the
> trigger on a gun is not a "use of force" because it is the bullet, not the trigger, that
> actually strikes the victim. *Leocal* held that the "use" of force must entail "a higher
> degree of intent than negligent or merely accidental conduct," 543 U.S., at 9; it did
> not hold that the word "use" somehow alters the meaning of "force."

*Castleman*, 134 S. Ct. at 1415 (parallel citations omitted). The Supreme Court's ruling that

employing something "knowingly as a device to cause physical harm" is a "use of force" would

appear to resolve the circuit split on the issue. *See United States v. Rice*, 813 F.3d 704, 706 (8th

---

[8] The counterintuitive position that chemical action is not an example of physical forces appears
contrary to the Supreme Court's later position in *Curtis Johnson* that "physical force" means
"violent force—that is, force capable of causing physical pain or injury to another person." 130
S. Ct. at 1270–72. Chemicals are capable of causing physical pain or injury.

Cir. 2016) (holding *Castleman* resolved the split between *Chrzanoski* and contrary cases). The

Second Circuit itself has addressed the impact of *Castleman* on *Chrzanoski*:

> To the degree that any aspect of *Chrzanoski*'s reasoning suggests that [the act of placing another in fear of injury] does not involve the threatened use of physical force, moreover, the *Chrzanoski* panel did not have the benefit of the Supreme Court's reasoning in *Castleman* to the effect that a use of physical force can encompass acts undertaken to cause physical harm, even when the harm occurs indirectly (as with poisoning) "rather than directly (as with a kick or punch)." *Castleman*, 134 S.Ct. at 1415; *see also Vargas–Sarmiento*, 448 F.3d at 175 (observing, in the context of § 16(b), that "we are not persuaded by [the] argument that first-degree manslaughter is not a crime of violence when it is committed by a person who intentionally poisons the food of an unwitting victim rather than by a person who directly injects the poison into his victim's arm[, as i]n either situation, the killer has intentionally availed himself of the forceful physical properties of poison to cause death"). Accordingly, we are unpersuaded by Hill's reliance on *Chrzanoski*.

*United States v. Hill*, 832 F.3d 135, 143–44 (2d Cir. 2016).

One circuit nonetheless has held *Chrzanoski* survives *Castleman*. The First Circuit in 2015

held that even after *Castleman*, Connecticut General Statute § 53a-61(a)(1)—the same statute

considered in *Chrzanoski*—is not categorically a crime of violence under § 16(a). *Whyte v. Lynch*,

807 F.3d 463 (1st Cir. 2015). The First Circuit "decline[d] to split with the Second Circuit" and

adopted "the same conclusion reached by our sister circuit in *Chrzanoksi*," holding that "[c]ommon

sense, moreover, suggests that there is a 'realistic probability' that, under this statute, Connecticut

can punish conduct that results in physical injury but does not require 'use of physical force.'" *Id.*

at 469–71.

In *United States v. Nason*, the First Circuit held that a statute criminalizing the intentional

causation of bodily injury was a crime of violence under the Domestic Violence Offender Gun

Ban. 269 F.3d 10 (1st Cir. 2001); *see also* 18 U.S.C. § 921(a)(33)(A)(ii) (definition of crime of

violence under Domestic Violence Offender Gun Ban). In *Whyte*, the Government argued the

statute at issue should be considered analogous to the statute at issue in *Nason*, but the First Circuit

rejected the analogy. It reasoned that "the use or attempted use of physical force" in the generic § 16(a) definition of a "crime of violence" means something different from the same language in § 921(a)(33)(A)(ii). *Whyte*, 807 F.3d 470–71. In *Castleman*, the Supreme Court held the degree of force that supports a common-law battery conviction—"mere offensive touching"—sufficient to satisfy the "physical force" requirement in the definition of "misdemeanor crime of domestic violence" at § 921(a)(33)(A)(ii) and it expressly stated that the definition of "physical force" for § 921(a)(33)(A)(ii) is inapplicable to § 924(e), which requires "violent force." *Castleman*, 134 S. Ct. at 1410–13. The *Whyte* court therefore declined to apply *Castleman* to define "crime of violence" outside the context of § 921(a)(33)(A)(ii). *Id.* at 471. The Fifth Circuit has also recently held "*Castleman* is not applicable to the physical force requirement for a crime of violence." *United States v. Rico-Mejia*, 853 F.3d 731 (5th Cir. 2017) (per curiam).

Other circuits considering the issue, however, have held *Castleman* does define the "use" of force more broadly. *See, e.g.*, *United States v. Haldemann*, 664 F. App'x 820, 822 (11th Cir. 2016) ("And whether that use of force occurs indirectly, rather than directly, by way of the defendant's actions is of no consequence because intentional use of indirect force to cause substantial bodily harm still qualifies as a use of violent force within the meaning of § 4B1.2's elements clause." (citing *Castleman*, 134 S. Ct. at 1414–15)); *United States v. Redrick*, 841 F.3d 478, 484 (D.C. Cir. 2016); *United States v. Gorny*, 655 F. App'x 920, 925 (3d Cir. 2016) ("The Supreme Court has explained that 'the knowing or intentional causation of bodily injury necessarily involves the use of physical force.'" (citing *Castleman*, 134 S.Ct. at 1414)); *Waters*, 823 F.3d at 1066 (holding that even "withholding medicine qualifies as the use of force under *Castleman*"); *Rice*, 813 F.3d at 706. The Fourth Circuit has not taken a clear position on this issue. In *McNeal*, it noted,

The government suggests that the Supreme Court's 2014 decision in *United States v. Castleman*, —— U.S. ——, 134 S.Ct. 1405, 188 L.Ed.2d 426 (2014), has abrogated the distinction that we recognized in *Torres-Miguel* between the use of force and the causation of injury. That strikes us as a dubious proposition. Writing for the *Castleman* majority, Justice Sotomayor expressly reserved the question of whether causation of bodily injury "necessarily entails violent force." *See* 134 S.Ct. at 1413; *see also id.* at 1414 (emphasizing that Court was not deciding question of whether or not causation of bodily injury "necessitate [s] violent force, under *[Curtis] Johnson*'s definition of that phrase").

818 F.3d at 156 n.10. Defendant portrays that footnote as a holding that *Castleman* somehow is inapposite on the meaning of "use of force" beyond the context of § 921(a)(33)(A)(ii). (Dkt. No. 735 at 6.) This Court disagrees. The Fourth Circuit merely reinforces *Torres-Miguel*'s uncontroversial point that "a crime may *result* in death or serious injury without involving *use* of physical force." *McNeal*, 818 F.3d at 156 (quoting Torres-Miguel, 701 F.3d at 168–69) (emphasis in original). An obvious example to prove that point would be drunken driving. *Leocal*, 543 U.S. at 13.

The holding in *Castleman* that "the knowing or intentional application of force is a 'use' of force" does not depend upon the type of force used—whether the "violent force" *Curtis Johnson* holds necessary for § 924(e) or the "mere offensive touching" *Castleman* holds sufficient for § 921(a)(33)(A)(ii). That is why this Court's previous holding was that *Curtis Johnson* and *Castleman* read together "hold that the knowing or intentional causation of bodily injury necessarily involves the use of violent physical force": *Castleman* teaches what "use" of force means and *Curtis Johnson* teaches what "kind" of force must be used. (Dkt. No. 735 at 30.)

In *United States v. Rico-Mejia*, which Defendant relies upon heavily (*see* Dkt. No. 935 at 4–5), Judge Ivan L. R. Lemelle of the Western District of Texas asked at sentencing: "[H]ow else would you threaten to kill someone unless you're going to use some type of force to bring about death, the actual killing? You can't wish somebody dead, right?" 853 F.3d 731 (per curiam). The Fifth Circuit responded, "The answer to the district court's question is provided by the analysis set

forth in *Johnson, Villegas–Hernandez*, and *De La Rosa–Hernandez*," *id.*, but this Court cannot agree with Defendant's, the First Circuit's, and the Fifth Circuit's minority position that a statute requiring the intentional infliction of injury can punish conduct that does not require the "use" of some force. *Cf.* Jon Ronson, The Men Who Stare at Goats (2004) (nonfiction work describing U.S. Army research confirming the impossibility of killing goats simply by staring at them and wishing them dead). The Court instead agrees with the majority of circuits addressing the issue and holds that the intentional infliction of physical injury entails the use of the injurious force.

But requiring the use of force is insufficient to make a statute a crime of violence under § 924(c)(3)(A). To be a crime of violence under § 924(c)(3)(A), the force used must be "violent"—i.e., capable of causing a level of "physical pain or injury" traditionally associated with felonious conduct. *Curtis Johnson*, 559 U.S. at 140–41. For that reason, the Court reconsiders its previous holding that "[t]ogether, *Castleman* and *Curtis Johnson* hold that the knowing or intentional causation of bodily injury necessarily involves the use of violent physical force. Any felony having as an element the intentional infliction of bodily injury on another person is a crime of violence under § 924(c)." The intentional infliction of insubstantial bodily injury does not necessarily involve the use of violent physical force, as that term is defined in *Curtis Johnson*. The Court therefore should have held, ""[t]ogether, *Castleman* and *Curtis Johnson* hold that the knowing or intentional causation of *substantial* bodily injury necessarily involves the use of violent physical force. Any felony having as an element the intentional infliction of *substantial* bodily injury on another person is a crime of violence under § 924(c)." *See Curtis Johnson*, 559 U.S. at 140 ("[T]he word 'violent' in § 924(e)(2)(B) connotes a *substantial* degree of force." (emphasis added)). The Court therefore amends its Order and Opinion on Defendant's motion to dismiss the indictment to reflect that correction. The amendment, however, is immaterial to whether the

charged violations of §§ 247 and 249 are crimes of violence, because the relevant statutory provisions require causation of death, which is the most substantial injury possible. Defendant was convicted for offenses that cannot reach the causation of insubstantial injury.[9]

### 3. Whether Violent Force Encompasses Injurious Forces That Are Indirect, Subtle, or Attenuated

For the reasons discussed above, the Court concludes that the intentional infliction of injury necessarily entails the use of the injurious force. But having as an element the use of any type of force to cause injury does not suffice to qualify a crime as a crime of violence under § 924(c)(3)(A). The Supreme Court has held that a crime of violence—outside the context of misdemeanor domestic violence—requires the use of violent, physical force. *Curtis Johnson*, 559 at U.S. 140. Violent physical force is "force capable of causing physical pain or injury to another person." *Id.* The Court previously held the intentional causation of injury necessary involves the use of violent physical force, because all injury is caused by some sort of physical force. *See Castleman*, 134 S. Ct. at 1415. That holding is now amended to hold that the intentional causation of *substantial* injury necessarily involves violent physical force but the Court reads *Curtis Johnson* to mean "violent" force is force capable of causing the "substantial" injuries typically at issue in the context of "the statutory category of violent felony." *Curtis Johnson*, 559 at 140–41. The Court now considers, again, whether it is possible for substantial—in this case, deadly—injury to be caused by a force that is not "violent."

---

[9] In a similar vein, the Court notes that to hold crimes against individuals (such as the § 247 violations charged in this case) to be capital crimes yet not crimes of violence would be incongruous with Supreme Court decisions that go beyond statutory construction of § 924(c)(3). For example, in *Kennedy v. Louisiana*, the Supreme Court provided that "[a]s it relates to crimes against individuals, though, the death penalty should not be expanded to instances where the victim's life was not taken" because of the "distinction between homicide and *other serious violent offenses* against the individual." 554 U.S. 407, 437–38 (2008) (emphasis added).

The approach to this question Defendant urges—and that many courts employ—may be called the "hypothetical approach to the categorical approach." If it is possible to imagine a hypothetical situation where the elements of a given crime are satisfied and where substantial or deadly injury results from a force other than violent physical force, then the crime is not categorically a crime of violence. *E.g.*, *United States v. De La Rosa-Hernandez*, 264 F. App'x 446, 448–49 (5th Cir. 2008) ("Thus, our rule is clear: if the defendant may be found guilty of the offense under a set of facts not involving the actual, attempted, or threatened use of physical force against another, the offense is not a COV [crime of violence]."). If it is not possible to imagine that situation, then the crime is categorically a crime of violence. *E.g.*, *Hill*, 832 F.3d at 141–43.

Reason, however, constrains the range of hypotheticals. The Supreme Court has cautioned against excessive "legal imagination" in cases applying the categorical approach. *Moncrieffe v. Holder*, 133 S.Ct. 1678, 1684–85 (2013); *Gonzales v. Duenas–Alvarez*, 549 U.S. 183, 193 (2007). There must be a "realistic probability, not a theoretical possibility that" a statute could apply to the imagined conduct. *Duenas–Alvarez*, 549 U.S. at 193. "[T]he categorical approach must be grounded in reality, logic, and precedent, not flights of fancy." *Hill*, 832 F.3d at 140. Simply put, courts applying the categorical approach should not consider farfetched hypotheticals. *See, e.g.*, *United States v. Redrick*, 841 F.3d 478, 484–85 (D.C. Cir. 2016) (refusing to consider whether one could commit armed robbery with "lethal bacteria"). Likewise, this Court will not consider farfetched hypotheticals in this case. Perhaps one could intentionally cause death with a non-violent vigil barricading a church, or with the slightest shove cause death through a comedy of errors, or "by using emotional force"—apparently meaning persuasion without threat of actual force—"compel another person to take a cyanide pill." (*See* Dkt. No. 916 at 7.) In the context of

federal prosecutions for hate crimes or attacks on churches, however, examples like those are simply too fanciful to consider.

But even with the requirement of realistic hypotheticals, the Court finds the hypothetical approach to the categorical approach unsatisfactory. Hypotheticals reduce to dueling *ipse dixit* statements with no principled way to resolve the disagreement. Some courts cite poison as an example of deadly non-violent force. *E.g.*, *Rico-Mejia*, 853 F.3d 731 (per curiam). Other courts have stated that use of poison is violence. *E.g.*, *Arellano Hernandez v. Lynch*, 831 F.3d 1127, 1131 (9th Cir. 2016), *petition for cert. filed*, (U.S. Jan. 5, 2017) (No. 16-860). The First Circuit proposed intentional withholding of medicine as an example of a deadly non-violent force. *See* Order, *Whyte v. Lynch*, 14-2357 (1st Cir. Feb. 9, 2016) (ordering briefing on a petition for rehearing to discuss "whether intentionally withholding medicine" would be a "use of 'violent' force under" Curtis Johnson); *see also Whyte v. Lynch*, 815 F.3d 92 (1st Cir. 2016) (denying petition for rehearing). Two months later, the Seventh Circuit held, without much explanation, that withholding medicine is an example of violent physical force. *Waters*, 823 F.3d at 1066.

One solution to this quandary is to employ the categorical approach without use of counterfactual hypotheticals—*i.e.*, to rely simply on analysis of statutory text. The Court attempts to provide such an analysis above. *See* Part III.B.1, *supra*. But that approach, standing alone, is also unsatisfactory. Hypothetical examples are often employed to test analyses, and a hypothetical that seems to describe non-violent conduct proscribed by a statute is a challenge to an analysis claiming the statute requires the use of violent force, which must be addressed.

The Court therefore considers the hypothetical example of poisoning and asks whether poisoning is a use of violent, physical force. As an example, poison is realistic and representative. There is, unfortunately, a realistic probability that a person might utilize poison in hate crimes or

attacks on churches that result in deaths. Poison is a representative example of an indirect, subtle, or attenuated means of causing deadly injury or, in the phrasing of *Chrzanoski*, a means of causing death "by guile, deception, or even deliberate omission." *See* 327 F.3d at 195. If administering deadly poison is violent force, then so is administering deadly disease or any other deadly act sharing the properties that distinguish poisoning from attacks that are more overt. The Court's purpose is not to determine whether poisoning is a violent act—a question immaterial in a case involving no poison—but to discover a principle explaining why poisoning is or is not a violent act.

Whether poisoning is a violent, physical act is not a novel legal issue. The question mirrors a very old debate about the need for a mortal blow under the common law of murder. The need for a mortal strike long ago raised the question of whether poisoning can constitute murder just as today the need for the use of violence raises the question of whether poisoning is a crime of violence under § 924(c)(3). Today courts struggle with the question of whether a crime that can be committed with poison is a crime of violence. Early common-law jurists wrestled with the nearly identical question of whether poisoning is the same "kind of act" as the early meaning of "kill." In medieval England, to "kill" meant to strike or throw. Guyora Binder, *The Meaning of Killing*, *in* Modern Histories of Crime and Punishment 88, 91 (Markus D. Dubber & Lindsay Farmer, eds. 2007) (citing the Oxford English Dictionary). To kill originally was "a kind of act rather than a result" and "[k]illing ordinarily required striking the body and inflicting a fatal wound or injury." *Id.* at 90–91. And the killing blow had to be landed directly and violently. In the early thirteenth century, Henry de Bracton provided that an act *manu hominum perpetrata*—done by the hand of man—was an essential element of murder. Henry de Bracton, 2 On the Laws and Customs

of England 379 (Samuel E. Thorne trans., 1968). "A killing required an act culturally recognizable as a violent assault" and death "from a violently inflicted wound or injury." Binder, *supra*, at 93.

Poisoning at one time perhaps was not considered a mortal blow *manu hominum perpetrata*. In the sixteenth century, Parliament enacted the Poisoning Act 1530, providing that poisoners should be boiled alive, 22 Hen. 8 c. 9 (1530–31), soon replaced with another statute, the Treason Act 1547, which simply declared, "wilful poisoning of any person should be accounted wilful murder of malice prepensed," 1 Edw. 6 c. 12 (1547). Parliament enacted those statutes because "killing by poison did not come under the ancient definition of Bracton"—in other words, the requirement for a violent act committed by the killer's own hand was seen as a loophole in the common law needing a statutory fix. *R. v. Mawgridge* (1707), Kel. 119, 125, 84 Eng. Rep. 1107 (QB) (Holt, C.J.); *see also* Malcom Gaskill, Crime and Mentalities in Early Modern England 207 n.17 (2000).

Unsurprisingly, many common-law jurists did not agree that the common law on murder ever had such a glaring loophole and they disputed the true grounds of the Treason Act's provision regarding poisoning. In 1603, Sir Edward Coke held that poisoning "without question" was "wilful murder" under the common law and therefore ineligible for the benefit of clergy under the Benefit of Clergy Act 1531. *R. v. Powlter* (1603) 11 Co. 32 a. (KB) (Coke, C.J.) (citing 23 Hen. 8 c. 1). In 1665, Sir John Kelyng opined that the Treason Act 1547 "was but declaratory of the Common Law, and an Affirmation of it." Kel. 32 (KB) (Kelyng, C.J.) (memorandum citing a grand jury charge given by Justice Jones circa 1633).

Sir Matthew Hale provided a substantial analysis reconciling the surreptitious nature of poisoning with the common law's need for a visible act of violence in his *History of the Pleas of the Crown*, posthumously published in 1736. He began by accepting the rule that "death without

the stroke or other violence makes not the homicide or murder." Matthew Hale, 1 History of the Pleas of the Crown 426 (1736). A violent act was then a necessary predicate for murder just as it is today a necessary predicate for a § 924(c) violation. Where death resulted but "no external act of violence was offer[e]d" as the cause of death, there could be no murder at common law because "secret things belong to God." *Id.* at 429. Nonetheless, he had no doubt that poisoning was a violent act at common law because it is a physical act intended to cause death. "He that willfully gives poison to another, that hath provoked him or not, is guilty of wilful murder, the reason is, because it is an act of deliberation odious in law, and presumes malice." *Id.* at 455. The external act of violence is the act of giving or administering poison to another with intent to cause death— in other words, the act of using a poison to cause death is legally no different from the act of using a sword to cause death. For example, "[i]f a man lay poison to kill rats, and a man casually take it, whereby he is poisoned, this is no felony, but if a man lay poison to the intent that B. should take it, and C. by mistake takes it, and is poisoned to death, this is murder." *Id.* at 431. A physical act that was intended to cause death and that does cause death is a violent act, even if relationship between the act and the death is more attenuated in time and space than a sword thrust through the heart or other acts "culturally recognizable as a violent assault." Legal causation, not the nature of the force used, was the principle limiting attenuation between cause and effect—for murder, Sir Edward Coke provided the famous year-and-a-day rule. *See* Edward Coke, 1 Institutes of the Laws of England pt. iii. p.47 (16th ed. 1811); *see also* Matthew Hale, 1 History of the Pleas of the Crown 428 (1736) (stating that after a year and a day, it "cannot be discerned, as the law presumes" whether death was violent or natural); D.E.C. Yale, *A Year and a Day in Homicide*, 48 Cam. L.J. 202 (1989) (discussion of historical origins of the year-and-a-day rule).

Soon thereafter, in 1748, Sir Michael Foster held that "it never was doubted, whether wilful poisoning . . . was a capital offence at common law." *R. v. Nicholas* (1748) Fost. 68 (KB) (Foster, J.). He reasoned that by *manu hominum perpetrata* Bracton merely meant human agency, rejecting Sir John Holt's reasoning that at one time that rule was understood to require a mortal blow delivered by a human hand. *Id.* He further reasoned that the Poisoning Act 1530 had abrogated the common law in making poisoning a species of high treason rather than murder, and that the Treason Act 1547 was enacted "not in affirmance of the common law [as it stood in 1547] . . . but by way of revival of it" as it existed before 1530. *Id.* at 69.

Thus, by the mid-eighteenth century, the common law identified violence based on intent and causation rather than through cultural recognition of a particular act as a violent assault, and murder by poison was held to be a violence against the body because it is a physical act perpetuated to cause death. The reasoning of Sir Matthew Hale is essentially identical to reasoning of the Supreme Court in 2014. *Compare* Matthew Hale, 1 History of the Pleas of the Crown 431 (1736) ("If A. gives poison to B. intending to poison him, and B. ignorant of it give it to C. . . . and C. takes it and dies, this is murder in A" even if "the party take the poison himself by the persuasion of another") *with Castleman*, 134 S. Ct. at 1415 ("The 'use of force' . . . is not the act of 'sprinkl[ing]' the poison; it is the act of employing poison knowingly as a device to cause physical harm. That the harm occurs indirectly, rather than directly (as with a kick or punch), does not matter.").

Defendant nevertheless argues that poisoning is not traditionally considered a violent act, and so any crime that could be committed through poisoning is not categorically a crime of violence for purposes of § 924(c)(3). (*See* Dkt. No. 916 at 7.) But in this Court's view, the law on this question has been settled for over two hundred fifty years and nothing in the force clause

of § 924(c)(3) requires departure from time-honored common-law principles that unequivocally define poisoning as an act of violence. To the contrary, the Supreme Court has adopted common-law principles when interpreting § 924(c). *See Castleman*, 134 S. Ct. at 1414–15 (stating "[i]t is impossible to cause bodily injury without applying force in the common-law sense" and noting that the acts of poisoning, infecting someone with a disease, or directing a laser beam toward someone all involve the use of force). "Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *United States v. Texas*, 507 U.S. 529, 534 (1993) (internal quotation marks omitted). Defendant offers no reason to believe Congress meant § 924(c)(3) to break with the long-standing common-law tradition that violence includes acts that intentionally inflict deadly injury.

Defendant's argument that it is possible to cause death without the use of force through poison relies heavily on the reasoning employed in the Fifth Circuit's recent unpublished opinion in *United States v. Rico-Mejia*. 853 F.3d 731 (per curiam). In *Rico-Mejia*, the Fifth Circuit held that "terroristic threatening" does not constitute a crime of violence because a person could cause death or serious physical injury without using physical force. *Id.* Fifth Circuit precedent stating that poisoning an individual does not involve the use of force buttresses that analysis. *Id.* The Fifth Circuit's poisoning-requires-no-force precedent traces its genesis not to foundational common-law principles, which as explained above hold the opposite, but to a relatively recent opinion that may misread a footnote in another relatively recent opinion. *E.g.*, *United States v. Cruz-Rodriguez*, 625 F.3d 274, 276 (5th Cir. 2010) (citing *De La Rosa-Hernandez*, 264 F. App'x at 447–49 (5th Cir. 2008) (citing *United States v. Villegas-Hernandez*, 468 F.3d 874, 879 (5th Cir.

2006) (citing via footnote 6 *United States v. Calderon-Pena*, 383 F.3d 254, 256, 257, 259–60 (5th Cir. 2004) (en banc) (per curiam)))).

In *United States v. Villegas-Hernandez*, the Fifth Circuit noted,

> We recognize that our understanding of the term "use of force" as it appears in subsection 16(a) assigns that term a definition less expansive, and less directly connected to the defendant, than perhaps it arguably could be. See, for example, the following from one of the dissenting opinions in *United States v. Calderon-Pena*, 383 F.3d 254, 270 (5th Cir. 2004) (per curiam):

> "[T]he 'use of physical force' and 'attempted use of physical force' under the crime-of-violence guideline should extend to cover those applications of force that are subtle or indirect . . . .

> [B]atteries and assaults punishable under . . . statutes can involve uses or attempted uses of physical force that are subtle or indirect. For example, a person may be indicted and convicted for Texas assault if he 'intentionally . . . causes bodily injury to another, including the person's spouse.' Tex. Penal Code Ann. § 22.01(a)(1) (Vernon 2003). The bodily injury need not result from a violent physical contact between the defendant and the victims; subtle or indirect means would do, whether by tricking a person into consuming poison, or luring him to walk off a cliff . . . ." *United States v. Calderon-Pena*, 383 F.3d 254, 270 (5th Cir. 2004) (per curiam).

> We conclude that such an expansive view of "use of force" for purposes of § 16(a), which the government does not argue for here, was at least implicitly rejected by the en banc court in *Calderon-Pena* in its construction of the definition of "crime of violence" provided (in language almost identical to that of § (16)(a)) in paragraph (I) of comment n. 1(B)(ii) to § 2L1.2 of the 2001 Guidelines. *See Calderon-Pena* at 256, 257, 259–60.

468 F.3d 874, 879 n.6. But the conclusion that the *Calderon-Pena* majority "at least implicitly rejected" the view that "use of force" does not necessarily require "violent physical contact between the defendant and the victims" is difficult to reconcile with footnote 8 to the *Calderon-Pena* majority opinion:

> Part II.A of Judge Smith's dissent contends that we have fallen into serious error in holding that the "use of force" always requires "bodily contact." This opinion does not so hold. While it is true, as Judge Smith observes, that a perpetrator can injure (or even kill) a person without making bodily contact, that truism is beside the point in this case. The Texas child endangerment statute requires neither contact nor injury; and certainly there is no use of force when both are lacking.

*United States v. Calderon-Pena*, 383 F.3d 254, 260 n.8 (5th Cir. 2004). The Fifth Circuit has nonetheless taken the position that "to poison another . . . [does not] involve 'force' as that term is defined by our court" because "the actual, attempted, or threatened 'use of physical force against the person of another'" requires physical contact between the defendant and the victim. *De La Rosa-Hernandez*, 264 F. App'x at 449; *Villegas-Hernandez*, 468 F.3d at 883. That is precisely the medieval interpretation of *manu hominum perpetrata* that Sir John Holt ascribed to Parliaments of the era of Henry VIII—a mortal blow delivered through bodily contact—and that common law jurists uniformly rejected from the seventeenth century onward.

The Court previously declined to follow a similar hypothetical as unpersuasive *obiter dictum* based on its reading of *Curtis Johnson* and *Castleman* (Dkt. No. 735 at 31),[10] and common-law authorities lead the Court to the same conclusion. The Fifth Circuit's poisoning-requires-no-force precedent traces its genesis not to foundational common-law principles, which as explained above have held the opposite for centuries, but to a footnote in a relatively recent opinion that may misread another footnote in another relatively recent opinion. Nor can the Court reconcile the Fifth Circuit's recently taken position with even more recent Supreme Court precedent. *See Arellano Hernandez*, 831 F.3d at 1131 (noting the Supreme Court's recent statement that "[t]he use of force . . . is the act of employing poison knowingly as a device to cause physical harm"

---

[10] In *Torres-Miguel*, the Fourth Circuit stated, "Of course, a crime may *result* in death or serious injury without involving *use* of physical force. For example, as the Fifth Circuit has noted, a defendant can violate statutes like § 422(a) by threatening to poison another, which involves no use or threatened use of force." 701 F.3d at 168–69. That is the only reference to poison in the opinion. Because the Fourth Circuit's holding that death may be caused without *use* of the force causing death in no way depends upon whether poisoning is a violent act, this Court read the reference to the Fifth Circuit's position on poisoning as *obiter dictum* rather than controlling *ratio decindendi*.

appears to foreclose the Fifth Circuit's position that poisoning is not a use of force and therefore not a crime of violence (citing *Castleman*, 134 S. Ct. at 1415)).

In short, the recent suggestion that one can poison without violence finds support in neither logic nor the common law. Long-standing common-law tradition provides the principle explaining why poisoning is or is not a violent act: Murder by poison is violence because it is a physical act capable and intended to cause death. When a force causing (or capable of causing) death is intentionally employed to cause death, the force used is a violent force under *Curtis Johnson*, even if the force operates indirectly or by subterfuge. *See* 559 U.S. at 140–41. The Supreme Court has recently reached the same conclusion. *Castleman*, 134 S. Ct. at 1415. This Court therefore cannot accept Defendant's argument that a person may kill other persons in violation of the Hate Crimes Act or Church Arson Act without the use of violent force by using "cyanide" or "by distributing anthrax through a building's air conditioning system." (Dkt. No. 916 at 7 (quoting *United States v. Villanueva*, 191 F. Supp. 3d 178, 192 (D. Conn. 2016)).)

\*　　\*　　\*

The Court concludes that the intentional infliction of physical injury entails the use of the injurious force, and deadly force used to cause death is violent force. As the Court previously held and for the further reasons set forth above, the Court holds that the violations of §§ 247 and 249 for which Defendant is convicted are categorically crimes of violence under the force clause of § 924(c)(3). Accordingly, the Court need not consider issues regarding § 924(c)(3)(B) or *Johnson v. United States*, 135 S. Ct. 2551 (2015).

## IV.    Conclusion

For the foregoing reasons, the Court **DENIES** Defendant's motion for a judgment of acquittal or a new trial (Dkt. No. 916).

**AND IT IS SO ORDERED.**

_____
Richard Mark Gergel
United States District Court Judge

May 1͟0͟, 2017
Charleston, South Carolina