DECLARATION OF LINDSEY VANN

I, Lindsey Vann, state as follows:

1. I am over 18 years of age and am competent to make this declaration.

2. I am the Executive Director of Justice 360, which is a nonprofit organization that provides legal representation for people on death row at all levels of the appellate process, including state post-conviction and federal habeas corpus proceedings. I am a graduate of Cornell University and received my law degree from the University of Richmond School of Law. I also worked as a law clerk to the Honorable James R. Spencer in the U.S. District Court for the Eastern District of Virginia. My experience includes federal trial work.

3. I got involved in Dylann Roof's case when, in 2015, David Bruck reached out to Justice 360 to see if we could help. David Bruck looms large in South Carolina. He was also on the Justice 360 advisory board at the time.

4. I had been an attorney for about three years when the crime happened. I was brought on to work as a mitigation specialist. Dylann had separate attorneys for the state and federal cases, but the mitigation team worked as one unit for both teams.

5. In addition to interviewing life history witnesses and gathering records, I also met with Dylann. I initially met with Dylann in a contact room alongside David and Emily Paavola at Al Cannon Detention Center where Dylann was incarcerated. Dylann was strip searched whenever he came out to the contact visit room, which really bothered him. The room was large, with a window and a guard standing by. Dylann would get very easily distracted by everything going on around him and was unable to overcome the stress caused by his anticipation of the strip search. The team decided that continuing to meet Dylann in the contact room would be detrimental to our relationship and that moving forward we would meet him in the non-contact room.

6. The non-contact room was narrower, with one window on each door, but not as much going on outside the windows. It was enclosed on both sides, and there was a glass partition separating Dylann from the team members. However, he didn't have to be strip searched after these visits. There were significantly fewer distractions in the non-contact room, and Dylann seemed more comfortable and better able to carry on conversations.

1

7. I noticed that Dylann struggled when more than one person was in the visiting booth with him. He followed conversation better when it was just one person.

8. Dylann seemed very overwhelmed in the courtroom. I was tasked with documenting Dylann's behavior during the competency hearing. Dylann could not keep up with or recognize what was going on. He would not ask questions about what was happening, who was speaking next, or what his role was. At one point during the competency hearing, he asked attorney Kim Stevens if he could object to his lawyers. David had to tell the judge that Dylann wanted to make an objection, and Dylann then objected to David playing a video from a jail visit. Dylann was incapable of making the objection himself without David relaying it. It was odd, but a very typical reaction from Dylann.

9. When Dylann spoke, he was very quiet. As a result, the judge would sometimes miss his efforts to engage. The judge would skip over him and move along with the hearing. On several occasion, Dylann raised his hand to get the judge's attention, but when the judge did not respond, Dylann would put his hand down. Even though the judge found him competent, it was obvious that he couldn't defend himself in any meaningful way.

10. Since Dylann's case, I've had other clients who have represented themselves and most of them ask the team what was going to happen next and what to expect. Dylann never did.

11. We went to trial very quickly. I wasn't privy to all the conversations regarding the timing of going to trial, but in hindsight Dylann needed more time to understand and work with his attorneys before trial. We had to put a lot on him in a short period of time. He met with experts back-to-back for hours at a time, which was incredibly stressful for him. We were still learning the best ways to communicate with him. Had we had more time, maybe we could have developed a stronger relationship.

12. David Bruck made us all feel like valued members of the team. He had the most experience, so as a young attorney, I deferred to him. This was my first federal trial, and I didn't have a sense of where all the pitfalls were.

13. We were definitely being a bit tricky in trying to get Dylann to see experts. We used his concerns about his thyroid to get him to see the mental health experts we wanted him to see.

14. The team planned to tell Dylann about our mental health diagnoses, but we just did not have time to get this done. So instead, Dylann learned from the government's expert

IFCD 004301

about his diagnosis of autism and the defense team's plan to use that diagnosis at the penalty phase. Dylann's relationship with the defense team never recovered from that.

15. This case was challenging for everyone. The stakes and tension were high. As we got closer to trial because there were so many different things going on at once. It's my understanding that some relationships were permanently ruptured because of this case.

16. Based on my many meetings with Dylann, I think the back and forth at counsel table would have been distracting for Dylann. During the competency hearing, I noted that he struggled to pay attention when there were two things going on at once. There were times when I saw Dylann getting distracted and look around the room when he heard the stenographer or someone else typing, David shuffling papers, or when his attorneys would whisper to each other about something. He was delayed in his responses, which I had previously thought might have been out of fear of saying something he thought would embarrass him. He could not review notes or reports and listen to the judge talking at the same time.

17. I was at team meetings in which an expert we consulted, but did not retain, recommended that we have Dylann evaluated by a speech language pathologist. I don't know why we didn't follow that recommendation, but I suspect it was because of the time pressures we were under.

18. After reviewing Dr. Amy Fritz, Dr. Jay Lucker, and Dr. Robert Ouaou's reports, my observations of Dylann fit in with the professionals' assessments that Dylann experiences auditory processing problems and pragmatic communication problems. I did not fully understand the causes of his impairments at the time of trial.

19. I did not attend the trial because I was managing the case from the offices of Justice 360 in Columbia while Emily and the others were in Charleston.

20. I believe that the testimony of Dylann's grandfather, Joe Roof, would have been compelling to the jurors in a penalty phase. Joe loved Dylann and understood he had limitations, but that didn't diminish his love for Dylann. Joe tried to see Dylann and spend time with him by doing things Dylann liked to do, like take him to Mr. Bunky's, a restaurant right across the street from Dylann's mom's house, for some chicken strips.

21. Joe Roof was the ultimate humanizer. He was a warm, grandfather-like figure and would have been an extremely credible witness. He knew there were issues in his family and

3

IFCD 004302

didn't try to cover them up. He really cared for Dylann even though he didn't understand everything that was going on with him.

22. Dylann's grandmother, Lucy Roof, shared a scrapbook she had made for Dylann that included numerous pictures, including the ones below. She also would have made a compelling penalty phase witness, testifying about her love for Dylann.



*Dylann as a Baby*



*Dylann as a Toddler*

4

IFCD 004303



*Dylann as a Toddler*



*Dylann as a Toddler*



*Dylann as a Kid*

IFCD 004304



*Dylann as a Kid*



*Dylann as a Toddler*

Ex. 9 pg.6 of 10

IFCD 004305



*Dylann as a Kid*



*Dylann and Grandma Lucy Roof*

Ex. 9 pg.7 of 10

IFCD 004306



*Dylann as a Kid*



*Dylann as a kid*

IFCD 004307



*Dylann and Grandma Lucy Roof*     *Dylann and Grandma Lucy Roof*

IFCD 004308



*Dylann as a Kid*



*Dylann and Grandpa Joe Roof*

Pursuant to 28 U.S.C. §1746, I, Lindsey Vann, declare under penalty of perjury under the laws of the United States that the above is true and correct.

3/26/2025  Columbia, SC

Date and Place

Lindsey Vann

11

IFCD 004309