IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

UNITED STATES OF AMERICA

v.

DYLANN STORM ROOF,

Criminal No. 2:15-cr-00472-RMG

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO VACATE UNDER 28 U.S.C. § 2255 AND MEMORANDUM
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

BRYAN P. STIRLING
UNITED STATES ATTORNEY

AARON J. STEWART
Trial Attorney
U.S. Department of Justice
Criminal Division
Capital Case Section
1331 F Street NW
Washington, DC 20530
(202) 353-4385

MARY J. HAHN
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Criminal Section
150 M Street NE/7.1108
Washington, DC 20002
(202) 532-5187

CHRISTOPHER B. SCHOEN
(ID#11421)
Assistant United States Attorney
55 Beattie Pl., Suite 700
Greenville, SC 29601
864-282-2141

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................xiv

INTRODUCTION ...............................................................................................................1

STATEMENT OF THE CASE ...........................................................................................1

I.      PROECEDURAL HISTORY ...................................................................................1

        A.   Trial...............................................................................................................1

        B.   Appeal ...........................................................................................................2

        C.   28 U.S.C. § 2255 Proceedings .....................................................................4

II.     STATEMENT OF FACTS .......................................................................................5

        A.   Facts of the Crime.........................................................................................5

        B.   Pre-trial and Trial Proceedings.....................................................................6

STANDARD OF REVIEW ................................................................................................8

PROCEDURAL DEFAULT...............................................................................................9

SUMMARY OF ARGUMENT ........................................................................................10

        A.   ████████████████████████████████████████ 10

        B.   ████████████████████████████████████████ 10

        C.   Claim Three: Whether trial counsel was ineffective because they chose not to
             investigate potential communication deficits in order to prevent Defendant from
             asserting his Sixth Amendment right to self-representation .....................................11

        D.   Whether trial counsel was ineffective for invoking his right to speedy
             trial as part of a deliberate trial strategy ................................................................11

        E.   Whether trial counsel was ineffective for taking a measured approach to the
             mitigation investigation ..........................................................................................11

        F.   Claim Six: Whether Defendant was constructively deprived counsel when he chose to
             represent himself......................................................................................................12

i

**TABLE OF CONTENTS (continued):**

G.  *Claim Seven: Whether trial counsel was ineffective for pursuing mental health mitigation as part of a strategy to maximize the possibility of a life sentence* ..........12

H.  *Claim Eight: Whether trial counsel was ineffective for not ensuring that Defendant was present during non-critical stages of the case* ..........................12

I.  *Claim Nine: Whether trial counsel was ineffective for not seeking a change of venue*...............................................................................................13

J.  *Claim Ten: Whether this Court should have struck certain venire members* ............13

K.  *Claim Eleven: Whether trial counsel was ineffective because he adduced a statement on cross-examination and failed to timely object* ...................13

L.  *Claim Twelve:* Whether trial counsel was ineffective for failing to zealously argue to dismiss the indictment ...............................................................14

M.  *Claim Thirteen: Whether appellate counsel was ineffective on direct appeal* ..........14

N.  *Claim Fourteen: Whether the elements clause of Section 924 is unconstitutionally vague* ................................................................................................................14

O.  *Claim Fifteen: Whether Defendant's convictions are valid under current law*.........15

P.  *Claim Sixteen: Whether the method of execution violates the Eighth Amendment* ................................................................................................15

Q.  *Claim Seventeen: Whether the Eighth Amendment categorically exempts a 21-year-old offender from the imposition of the death penalty* ...............15

R.  *Claim Eighteen: Whether the death penalty is unconstitutional* ..............................15

S.  *Claim Nineteen: Whether this Court should have recused itself and whether Defendant's trial counsel was ineffective for failing to move for recusal* ................................................................................................................16

**ARGUMENT**.....................................................................................................................**16**

I.  DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM ONE ................................16

**TABLE OF CONTENTS (continued):**



II.    DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM TWO .........................54

**TABLE OF CONTENTS (continued):**

III.  DEFENDANT RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL
IN THOSE INSTANCES IN WHICH HE QUALIFIED FOR IT ..............................73

A.  General Legal Standards for Ineffective Assistance of Counsel Claims .................74

B.  Facts Relevant to Claims 3-12 ............................................................................76

   1.  Pretrial Preparation and Investigation ..........................................................76

   2.  Defendant Expresses Vehement Opposition to Presentation
   of Mental Health Mitigation Evidence ..........................................84

   3.  Preparations for the First Competency Hearing ............................................90

   4.  First Competency Hearing ..........................................................................95

   5.  Invocation of Right to Self-represent ..........................................................100

D.  Individual Voir Dire ............................................................................................105

E.  Guilt Phase of Trial ............................................................................................110

F.  Defendant's Continued Invocation
of the Right to Self-represent ..............................................................................117

G.  Second Competency Hearing ..............................................................................118

H.  Penalty Phase Trial ............................................................................................124

IV.  THE DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM THREE .............126

A.  Specific Legal Standards Regarding Capital Pretrial Investigation .......................127

B.  Argument ............................................................................................................128

**TABLE OF CONTENTS (continued):**

1.  Trial Counsel Did Not Render Deficient Performance...................................128

    a.  Counsel had no duty to challenge their competent client's
        capacity to self-represent ..................................................................129

    b.  Counsel reasonably declined to pursue an investigation
        designed to preclude Defendant from exercising his
        constitutional right of self-representation .......................................131

    c.  Counsel reasonably omitted to
        consult a speech pathologist............................................................135

2.  Defendant Did Not Suffer Prejudice from the Failure to
    Investigate His Auditory Processing Disorder,
    Linguistic Processing speed deficits,
    and pragmatic communication dysfunction ..................................................138

    a.  No reasonable probability exists that the Court
        would have barred Defendant from representing
        himself had it learned of his communication deficits .....................138

    b.  Defendant did not suffer prejudice from trial counsel's failure
        to investigate whether he had processing and communication
        disorders ..........................................................................................147

*C.  Conclusion*.........................................................................................................152

V.    DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM FOUR.......................153

A.  *Argument* ................................................................................................................153

1.  Trial Counsel Made a Reasonable Strategic Choice.....................................153

2.  Defendant Did Not Suffer Any Prejudice.....................................................160

    a.  Defendant waived his right to effective
        representation during the penalty phase..........................................161

        i.  Defendant would have chosen to
            represent himself even if trial counsel
            had not invoked his right to a speedy trial ..............................162

        ii.  None of the unfulfilled tasks affected
           Defendant's trial.......................................................................163

**TABLE OF CONTENTS (continued):**

iii.  Defendant cannot show a reasonable probability that the jury would not have imposed the death penalty had counsel presented his full mitigation presentation ................................165

C. *Conclusion* ................................................................................169

VI.   DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM FIVE...........................168

A. *Argument* ................................................................................169

1.  Trial Counsel Made a Reasonable Strategic Choice in How to Conduct the Mental Health Investigation .......................................169

2.  Trial Counsel's Handling of the Mental Health Investigation did not Prejudice Defendant........................................................176

a.  Defendant would have represented himself even if counsel had not withheld their strategy from him ......................177

b.  Defendant is responsible for the lack of mitigating evidence............180

c.  There is no reasonable probability that the proffered mitigating evidence would have changed the outcome of the sentencing proceeding ............................................................182

B. *Conclusion* ................................................................................182

VII.  DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM SIX ............................182

A. *Legal Standard for Constructive Denial of Counsel*................................183

B. *Argument* ................................................................................184

1.  Defendant's Decision to Represent Himself Bars his Argument..................184

2.  Defendant Cannot Establish an Irreparable Breakdown in Communication that would Amount to Constructive Denial of Counsel................................187

3.  Counsel's Actions Did Not Amount to Constructive Denial of Counsel ......194

a.  Insistence on mental health evidence did not constructively deny counsel................................................................194

**TABLE OF CONTENTS (continued):**

b.  Trial counsel's alleged dishonesty did not amount to constructive denial of counsel........................................195

c.  Trial counsel's failure to withdraw did not amount to constructive denial of counsel....................................196

4.  The Court was Not Required to Further Inquire into the Relationship between Defendant and Counsel ...............................................200

C.  Conclusion ............................................................................202

VIII.  DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM SEVEN.......................202

A.  Argument.................................................................................202

1.  The Claim is Foreclosed Because Defendant Represented Himself.......................................................202

2.  Trial Counsel Made a Reasonable Strategic Choice to Insist on Presenting Mental Health Evidence .................................................203

3.  Defendant Cannot Show Prejudice ..............................................206

B.  Conclusion .............................................................................207

IX.  DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM EIGHT ......................207

A.  Legal Standards Regarding the Right to be Present at Court Proceedings ...................................................................207

B.  Argument .................................................................................208

1.  Trial Counsel Did Not Render Deficient Performance...................................209

2.  Defendant Did Not Suffer Prejudice............................................212

X.  DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM NINE.........................212

A.  Relevant Factual Background ...............................................213

B.  Applicable Legal Standards ..................................................215

1.  Motions to Change Venue ...........................................................215

**TABLE OF CONTENTS (continued):**

    2.  Ineffective Assistance of Counsel Standard ...................................................216

*C.  Argument* ...........................................................................................................216

    1.  Defendant Cannot Show that Counsel's Strategic Decision
        Not to Pursue a Change of Venue or an In-district Transfer
        Constituted Deficient Performance ..............................................................217

        a.  Trial counsel's decision not to challenge venue
            was strategic and reasonable...........................................................217

        b.  Counsel satisfied the performance prong of
            Strickland because a motion to change venue would
            have been meritless ...........................................................................227

    2.  Defendant Cannot Show Prejudice from his Counsel's Decision
        not to Pursue a Change of Venue..................................................................228

        a.  Defendant fails to establish a presumption of prejudice .................228

        b.  Defendant cannot establish actual prejudice
            caused by publicity ...........................................................................235

        c.  Defendant cannot show prejudice under Strickland ........................242

*D.  Conclusion*........................................................................................................243

XI.    DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM TEN...........................243

    *A.  Argument* ..........................................................................................................244

    1.  The Claim is Procedurally Barred.................................................................244

    2.  Defendant Cannot Establish Cause and Prejudice to Excuse the Procedural
        Bar Because the Underlying Claim is Meritless and Would Not Have
        Succeeded on Appeal.....................................................................................244

        a.  The jury claim is meritless because Defendant waived it.................246

        b.  The jury claim is meritless because no unqualified individual
            served on the jury..............................................................................248

**TABLE OF CONTENTS (continued):**

        c.  The jury claim is meritless because the Court did not abuse its discretion in deeming the identified individuals qualified to serve on the jury..........................................................................249

  B. *Conclusion*..........................................................................................257

XII.   THE DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM ELEVEN ..........257

  A. *Testimony of Felicia Sanders* ...........................................................257

  B. *Motion for Mistrial and Curative Instruction* .........................................260

  C. *Argument* ...........................................................................................260

      1.  Trial Counsel Made a Reasonable Strategic Decision to Cross-examine Ms. Sanders..........................................................261

      2.  Defendant Cannot Show that He was Prejudiced by Counsel's Cross-examination of Ms. Sanders..........................................................267

  D. *Conclusion*........................................................................................270

XIII.  THE DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM TWELVE .........270

  A. *Legal Standards*................................................................................272

  B. *Background on the State of Law on the Definition of "Crime of Violence"* ...........275

      1.  Law on Crime of Violence that Existed at the Time of Defendant's Trial ..........................................................275

          a.  What degree of force was required to satisfy 18 U.S.C. § 924(c)(3)(A) at the time of Defendant's trial................276

          b.  Whether indirect force qualified as "physical force" under § 924(c)(3)(A) at the time of Defendant's trial....................................277

          c.  Whether § 924(c)(3)(B) was unconstitutionally vague at the time of Defendant's trial...........................................................278

          d.  Applicability of the realistic probability test at the time of Defendant's trial ..................................................279

      2.  Legal Developments since Defendant's Trial................................279

XIV.   **TABLE OF CONTENTS (continued):**

C.  *Summary of Prior Arguments Raised by Trial Counsel* ..........................................280

    1.  Defendant's Motion to Dismiss (Dkt. Nos. 233, 295)..................................281

    2.  District Court Opinion Denying the Motion to Dismiss (Dkt. No. 735)......283

    3.  Defendant's Post-trial Motion for New Trial on the Constitutionality
       of § 247 and the Definition of Crime of Violence under § 924(c)(3)(A)
       (Dkt. Nos. 916 and 935) ............................................................................286

E.  *Argument* ......................................................................................................287

    1.  The Majority of Defendant's Claims are an Attempt to Relitigate
       Questions of Law Already Resolved by the Fourth Circuit on
       Direct Appeal ..........................................................................................287

        a.  Claim that §§ 247(a) and 249(a)(1) are
           not crimes of violence ....................................................................288

        b.  Claim that § 249 is unconstitutional under the
           Thirteenth Amendment.....................................................................289

        c.  Claim that § 247 is unconstitutional under the
           Commerce Clause..............................................................................290

        d.  Claim that the charges under §§ 247 and 249 counts were
           improperly certified..........................................................................290

    2.  Defendant's Ineffective Assistance of Counsel
       Claims Should be Denied ..........................................................................291

        a.  Section 249 is a crime of violence....................................................293

           i.  Section 249 is a crime of violence under current law ..............293

           ii.  Trial counsel competently argued that § 249
              was not a crime of violence under the law that
              existed at the time of trial........................................................296

        b.  Section 247(a)(2) is a crime of violence ...........................................304

           i.  Section 247(a)(2) is a crime of violence
              under current law ....................................................................304

**TABLE OF CONTENTS (continued):**

a.  Section 247(a)(2) can only be violated by the
    use of force or threat of force against another ................................304

b.  § 247(a)(2) categorically requires the degree of
    force required under current law ......................................................308

    ii.  Trial counsel adequately argued that § 247(a)(2)
         was not a crime of violence under the law that existed
         at the time of trial...................................................................300

c.  The elements clause is not unconstitutionally vague.........................309

    i.   The elements clause is not void for vagueness
         under current law ................................................................310

    ii.  Trial counsel's decision not to raise a vagueness
         challenge to § 924 was reasonable under the law
         that existed at the time of trial..............................................316

d.  Invalidation of the residual clause would not have
    changed the outcome of Defendant's trial .........................................317

e.  Section 249(a)(1) does not violate the First Amendment .................318

f.  Sections 247(a)(2) and 249(a)(1) are constitutional under the
    Commerce Clause and the Thirteenth Amendment and were
    properly certified for prosecution ....................................................323

g.  Trial counsel was not ineffective for failing to challenge
    the charges under the Double Jeopardy Clause .................................326

h.  Trial counsel's performance far exceeded the standards
    of competent counsel ......................................................................330

i.  Defendant's additional claims of prejudice are unsupported
    by the record ...................................................................................331

    E.  Conclusion ............................................................................................333

XIV.  THE DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM THIRTEEN .......333

    A.  Legal Standard for Assessing Claims of Ineffective
        Assistance of Appellate Counsel ............................................................333

**TABLE OF CONTENTS (continued):**

    *B.  Argument* ........................................................................................334

       1.  Many of Defendant's Claims are Barred ......................................334

       2.  Appellate Counsel Provided Effective Assistance in
          Arguing that § 247 was Not Crime of Violence .............................335

       3.  Appellate Counsel Provided Effective Assistance in
          Arguing that § 249 is Not a Crime of Violence .............................336

       4.  Appellate Counsel Provided Effective Assistance by
          Not Arguing Against the "Realistic Probability" Test.....................339

       5.  Appellate Counsel Provided Effective Assistance by
          Not Raising a Double Jeopardy Claim............................................340

       6.  Appellate Counsel Provided Effective Assistance by
          Not Arguing that § 924(c) is Void for Vagueness .........................340

       7.  Appellate Counsel Provided Effective Representation in
          Arguing Whether § 924(c)(3)(A) Requires the Intent to Cause
          Violent Force in a Single Element .................................................340

       8.  Defendant Suffered No prejudice from Any Alleged Errors
           by Appellate Counsel.....................................................................342

    *C.  Conclusion* ...................................................................................343

XV.    THE DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM FOURTEEN......343

XVI.   THE DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM FIFTEEN...........345

XVII.  DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM SIXTEEN..................347

    *A.  Challenges to Methods of Execution are Not Cognizable Under § 2255* ...............347

    *B.  Defendant's Challenge to the Method of His Execution is Not Ripe* .......................348

XVIII.  THE DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM SEVENTEEN ...350

XIX.   DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM EIGHTEEN ...............353

    *A.  Legal Standards* ..........................................................................*353*

**TABLE OF CONTENTS (continued):**

*B. Argument* ....................................................................................................354

XX.   DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM NINETEEN .................356

*A. Facts*..........................................................................................................357

*B. Legal Standards* .......................................................................................359

    1.   Judicial Assignments ........................................................................359

    2.   Recusal ..............................................................................................360

*C. Argument* ..................................................................................................361

    1.   Judge Gergel Presiding over Defendant's Case Did Not
       Violate His Due Process Rights.......................................................362

       a.   Mr. O'Connell's declaration does not establish bias ........................363

       b.   The evidence in the record does not show bias................................364

    2.   Defendant Cannot Show that Trial Counsel was Ineffective for
       Failing to Move to Recuse the Presiding Judge or Make a
       Better Record .................................................................................372

    3.   Defendant Cannot Show Prejudice Because He Has Not Shown
       There was a Basis for Recusal .......................................................374

*D. Conclusion* ................................................................................................374

**CONCLUSION** ........................................................................................................**375**

# TABLE OF AUTHORITIES

**CASES:**                                                                                    **PAGE**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) ........................................................ 348

*Abby v. Howe*, 742 F.3d 221 (6th Cir. 2014) ......................................................... 274

*Adams v. Texas*, 448 U.S. 38 (1980) ..................................................................... 249

*Allen v. United States*,
     No. 2:11CR192, 2016 WL 4385845 (E.D. Va. Aug. 15, 2016) .................................... 268

*Alvarado-Linares v. United States*, 44 F.4th 1334 (11th Cir. 2022) ........................................... 342

*Appel v. Horn*, 250 F.3d 203 (3d Cir. 2001) ......................................................... 185

*Barnes v. Joyner*, 751 F.3d 229 (4th Cir. 2014) .................................................... *passim*

*Baze v. Rees*, 553 U.S. 35 (2008) ..................................................................... 359, 35

*Bell v. Cone*, 535 U.S. 685 (2002) ..................................................................... 183

*Bell v. Ozmint*, 332 F.3d 229 (4th Cir. 2003) ......................................................... 276

*Belue v. Leventhal*, 640 F.3d 567 (4th Cir. 2011) .............................................. 361-362

*Billings v. Polk*, 441 F.3d 238 (4th Cir. 2006) ..................................................... 19

*Black v. Goord*, 419 F. Supp.2d 365 (W.D.N.Y. 2006) ........................................... 209

*Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991) ....................................... 171-172

**CASES (continued)**:                                                                        **PAGE**

*Blockburger v. United States*, 284 U.S. 299 (1932) .............................................. 327

*Boeckenhaupt v. United States*, 537 F.2d 1182 (4th Cir. 1976) .................................... 9, 288

*Bosse v. Oklahoma*, 580 U.S. 1 (2016) (per curiam) ............................................. 354

*Bousley v. United States*, 523 U.S. 614 (1998) .................................................. *passim*

*Braun v. Ward*, 190 F.3d 1181 (10th Cir. 1999) ................................................ 241

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ..................................................... 66, 68

*Brown v. Craven*, 424 F.2d 1166 (9th Cir. 1970) ....................................................... 188

*Bucklew v. Precythe*, 587 U.S. 119 (2019) ................................................................. 353

*Bullock v. Carver*, 297 F.3d 1036 (10th Cir. 2002) .................................................... 137

*Burch v. Corcoran*, 273 F.3d 577 (4th Cir. 2001) ................................................. 58, 65

*Burrage v. United States*, 571 U.S. 204 (2014) ......................................................... 301

*Carter v. Bell*, 218 F.3d 581 (6th Cir. 2000) ...................................................... 170, 172

*Chandler v. McDonough*, 471 F.3d 1360 (11th Cir. 2006) ........................................ 241

*Chapman v. United States*, 500 U.S. 453 (1991) ....................................................... 311

*Cheney v. United States Dist. Ct. for D.C.*, 541 U.S. 913 (2004) ............................. 373

*Christian v. United States*,
    1:16-cr-207, 2020 WL 3244008 (E.D. Va. June 15, 2020) .......................... 245

*City of Boerne v. Flores*, 521 U.S. 507 (1997) .......................................................... 282

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ....................................................... 310

*Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998) .................................................................... 71

*Cole v. Trammell*, 755 F.3d 1142 (10th Cir. 2014) .................................................... 188

*Coleman v. Mitchell*, 268 F. 3d 417 (6th Cir. 2001) .................................................. 171

*Collins v. United States*, 28 F.4th 903 (8th Cir. 2022) ............................................... 274

**CASES (continued):**                                                                    **PAGE**

*Commonwealth v. Baker*, 800 N.E.2d 267 (Mass. 2003) ........................................... 162

*Conaway v. Polk*, 453 F.3d 567 (4th Cir. 2006) ................................................. *passim*

*Cook v. Ryan*, 688 F.3d 598 (9th Cir. 2012) .............................................................. 148

*Cooper v. Oklahoma*, 517 U.S. 348 (1996) ............................................................... 129

*Cox v. Norris*, 133 F.3d 565 (8th Cir. 1997) ............................................................. 218

*Crittenden v. Ayers*, 624 F.3d 943 (9th Cir. 2010) ...................................................... 71

*Cruz v. Abbate*, 812 F.2d 571 (9th Cir. 1987) ..............................................360-361, 363

*Cruz-Garcia v. Guerrero*, 128 F.4th 665 (5th Cir. 2025) ..................................... 57, 68

*Curtis Johnson v. United States*, 559 U.S. 133 (2010) ........................................*passim*

*Cuyler v. Sullivan*, 446 U.S. 335 (1980) ............................................................ 202

*Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005) ...................................... 186, 190

*Darden v. Wainwright*, 477 U.S. 168 (1986) ...................................................... 160

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ..................................................... 78

*DeLisle v. Rivers*, 161 F.3d 370 (6th Cir. 1998) ................................................. 232

*Delligatti v. United States*, 604 U.S. 423 (2025) ...............................................*passim*

*Dennis v. United States*, 339 U.S. 162 (1950) ....................................................... 19

*Duncan v. United States*,
    No. 2:17-CV-00091, 2019 WL 1320039 (D. Idaho Mar. 22, 2019) ............................ 358

*Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998) .................................................... 54

*Eddmonds v. Peters*, 93 F.3d 1307 (7th Cir. 1996) ............................................... 170

*DeBartolo Corp. v. Gulf Coast Trades Counc.*, 485 U.S. 568 (1988) ...................... 310

*Estes v. Texas*, 381 U.S. 532 (1965) ................................................................. 230

*Faretta v. California*, 422 U.S. 806 (1975) .......................................................*passim*

**CASES (continued):**                                                          **PAGE**

*Farmer v. Brennan*, 511 U.S. 825 (1994) ........................................................ 351

*Fields v. Brown*, 503 F.3d 755 (9th Cir. 2007) .................................................72-73

*Fields v. Murray*, 49 F.3d 1024 (4th Cir.1995) (en banc) ..................................... 186

*Fitzgerald v. Greene*, 150 F.3d 357 (4th Cir. 1998) ...................................... 19, 24, 30

*Franks v. GDCP Warden*, 975 F.3d 1165 (11th Cir. 2020) .................................... 208

*Frye v. Lee*, 235 F.3d 897 (4th Cir. 2000) ......................................................... 175

*Gardner v. Ozmint*, 511 F.3d 420 (4th Cir. 2007) ....................................................................... 30

*Glenn v. Holder*, 690 F.3d 417 (6th Cir. 2012) ......................................................................... 321

*Glossip v. Gross*, 576 U.S. 863 (2015) ........................................................................... 351, 355

*Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007) .................................................................. 281

*Goodson v. United States*, 564 F.2d 1071 (4th Cir. 1977) ....................................................... 265

*Gray v. Branker*, 529 F.3d 220 (4th Cir. 2008) ....................................................................... 206

*Graybill v. Clarke*, No. 7:11-CV-00331, 2012 WL 3133691 (W.D. Va. July 31, 2012) .......... 221

*Grecco v. United States*,
     No. 14-CR-760 (KMK), 2023 WL 6294334 (S.D.N.Y. Sept. 27, 2023) ...................... 177

*Green v. French*, 143 F.3d 865 (4th Cir. 1998) ...................................................................... 127

*Gregg v. Georgia*, 428 U.S. 153 (1976) ......................................................................... 224, 355

*Guzman v. Secretary, Dep't of, Corr.*, 73 F.4th 1251 (11th Cir. 2023) ............................ 276, 339

*Hale v. Gibson*, 227 F.3d 1298 (10th Cir. 2000) .................................................................... 168

*Hall v. Florida*, 572 U.S. 701 (2014) ..................................................................................... 354

*Harrington v. Richter*, 562 U.S. 86 (2011) (per curiam) ........................................................... 77

*Harris v. Smith*, 530 F.2d (1976) .......................................................................................... 248

*Helling v. McKinney*, 509 U.S. 25 (1993) .............................................................................. 351

**CASES (continued):**                                                                                **PAGE**

*Higgs v. United States*, 711 F. Supp. 2d 479 (D. Md. 2010) ................................................... 350

*Hill v. Colorado*, 530 U.S. 703 (2000) .................................................................................. 317

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ..................................................................... 323

*Hodgson v. Liquor Salesmen's Union Local No. 2*, 444 F.2d 1344 (2d Cir. 1971) .................. 375

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) .............................. 313

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ....................................................... 313

xvii

*Holloway v. Arkansas*, 435 U.S. 475 (1978) ....................................................202-203

*Honken v. United States*, 42 F. Supp. 3d 937 (N.D. Iowa 2013) ................................ 139

*Hunt v. Lee*, 291 F.3d 284 (4th Cir. 2002) ................................................................ 266

*Hurst v. Joyner*, 757 F.3d 389 (4th Cir. 2014) .................................................... 63, 65

*Hutchins v. Garrison*, 724 F.2d 1425 (4th Cir. 1983) ............................................... 192

*Hyatt v. Branker*, 569 F.3d 162 (4th Cir. 2009) ..................................................... 199

*In re Atamian*, 247 Fed. App'x 373 (3d Cir. 2007) ................................................. 362

*In re Beard*, 811 F.2d 818 (4th Cir. 1987) ............................................................... 363

*In re Irby*, 858 F.3d 231 (4th Cir. 2017) ......................................................... 282, 305

*In re Roof*, Case No. 25-2, 2025 WL 2335967 (4th Cir. Aug. 13, 2025) ............................*passim*

*In re Sittenfeld*, 49 F.4th 1061 (6th Cir. 2022) ......................................................... 56

*In re Tsarnaev*, 780 F.3d 14 (1st Cir. 2015) ...................................................*passim*

*In re United States*, 572 F.3d 301 (7th Cir. 2009) .................................................... 364

*In re Vial*, 115 F.3d 1192 (4th Cir. 1997) ...........................................................349-350

*Indiana v. Edwards*, 554 U.S. 164 (2008) ......................................................*passim*

*Irvin v. Dowd*, 366 U.S. 717 (1961) ..............................................................*passim*

**CASES (continued):**                                                            **PAGE**

*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) ................................................. 65

*Jackson v. Poole*, 06-cv-00188, 2011 WL 4901314 (S.D.N.Y. July 19, 2011) ........................ 211

*Jackson v. United States*, 638 F. Supp. 2d 514 (W.D.N.C. 2009) ............................................. 176

*Jean-Baptiste v. Artus*, 09-cv-5920, 2016 WL 7118280 (S.D.N.Y. Dec. 6, 2016) .................. 211

*Johnson v. Cockrell*, 306 F.3d 249 (5th Cir. 2002) ................................................... 375

*Johnson v. United States*, 576 U.S. 591 (2015) ......................................................... 315

*Johnson v. United States*, 860 F. Supp. 2d 663 (N.D. Iowa 2012) ............................................. 350

*Jones v. Alfred H. Mayer, Co.*, 392 U.S. 409 (1968) ................................................................ 284

*Jones v. Barnes*, 463 U.S. 745 (1983) ..................................................................................... 336

*Jones v. Cooper*, 311 F.3d 306 (4th Cir. 2002) ................................................................... *passim*

*Jones v. Kemp*, 706 F. Supp. 1534 (N.D. Ga. 1989) ............................................................ 73-74

*Keith v. Mitchell*, 455 F.3d 662 (6th Cir. 2006) ...................................................................... 168

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) .......................................................... 77, 138, 275

*Kingdomware Techs., Inc. v. United States*, 579 U.S. 162 (2016) ........................................... 322

*Kolender v. Lawson*, 461 U.S. 352 (1983) ............................................................................... 316

*Kornahrens v. Evatt*, 66 F.3d 1350 (4th Cir. 1995) ................................................................ 320

*Lawrence v. Branker*, 517 F.3d 700 (4th Cir. 2008) ............................................................... 336

*Lawrence v. Secretary, Fla. Dep't of Corr.*, 700 F.3d 464 (11th Cir. 2012) ........................... 227

*Lenz v. Washington*, 444 F.3d 295 (4th Cir. 2006) ................................................................... 61

*Liteky v. United States*, 510 U.S. 540 (1994) ..................................................................... 372-373

*Lockhart v. Fretwell*, 506 U.S. 364 (1993) ........................................................................ 78, 274-275

*Lora v. United States*, 599 U.S. 453 (2023) ............................................................................. 331

**CASES (continued):**                                                                                    **PAGE**

*Lynch v. Polk*, 204 F. App'x 167 (4th Cir. 2006) ................................................................ 60, 74

*Mammone v. Jenkins*, 49 F.4th 1026 (6th Cir. 2022) ............................................................. 230

*Massachusetts Sch. of L. at Andover, Inc. v. American Bar Ass'n*,
    872 F. Supp. 1346 (E.D. Pa. 1994) ................................................................................ 374

*Maxwell v. Mabry*, 672 F.2d 683 (8th Cir. 1982) ................................................................... 221

*Maynard v. Cartwright*, 486 U.S. 356 (1988) ..................................................................... 312-313

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ............................................................................... 357

*McCoy v. Lousiana*, 584 U.S. 414 (2018) .................................................................... 196

*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984) ......................... 17

*McNair v. Campbell*, 416 F.3d 1291 (11th Cir. 2005) ...........................................71-72

*Meeks v. Moore*, 216 F.3d 951 (11th Cir. 2000) ................................................ 219, 230

*Meyer v. Branker*, 506 F.3d 358 (4th Cir. 2007) ..................................................... 206

*Michel v. Louisiana*, 350 U.S. 91 (1955) .................................................................. 77

*Mickens v. Taylor*, 535 U.S. 162 (2002) ................................................................. 203

*Microsoft Corp. v. United States*, 530 U.S. 1301 (2000) ....................................... 364

*Miniel v. Cockrell*, 339 F.3d 331 (5th Cir. 2003) .................................................. 251

*Moncrieffe v. Holder*, 569 U.S. 184 (2013) .................................................... 281, 301

*Moody v. Polk*, 408 F.3d 141 (4th Cir. 2005) ......................................................... 170

*Morgan v. Illinois*, 504 U.S. 719 (1992) .......................................................... *passim*

*Morris v. Slappy*, 461 U.S. 1 (1983) ....................................................................... 191

*Mu'Min v. Pruett*, 125 F.3d 192 (4th Cir. 1997) ............................................. 218, 239

*Mu'Min v. Virginia*, 500 U.S. 415 (1991).......................................................237-238

*Murray v. Carrier*, 477 U.S. 478, 488 (1986)...........................................................9-10

**CASES (continued):**                                                          **PAGE**

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) .................................... 321

*National Park Hospitality Ass'n v. Department of Interior*, 538 U.S. 803 (2003) ................... 350

*Nix v. Whiteside*, 475 U.S. 157 (1986) ...........................................................275-276

*Northwest Austin Municipal Utility District No. One v. Holder*, 557 U.S. 193 (2009) ............. 284

*Ohio v. Johnson*, 467 U.S. 493 (1984) .................................................................. 330

*Oliver v. Quarterman*, 541 F.3d 329 (5th Cir. 2008) .......................................... *passim*

*Owens v. Guida*, 549 F.3d 399 (6th Cir. 2008) ................................................................... 175

*Owens v. Stirling*, 967 F.3d 396 (4th Cir. 2020) ............................................................... 130

*Oyague v. Artuz*, 393 F.3d 99 (2d Cir. 2004) ..................................................................... 267

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973) .....................................................323-324

*Parker v. Levy*, 417 U.S. 733 (1974) .................................................................................. 313

*Parnell v. United States*, 149 F.4th 1268 (11th Cir. 2025) ..........................................*passim*

*Patton v. Yount*, 467 U.S. 1025 (1984) ......................................................................238-239, 242

*Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017) ............................................................ 17

*People v. Berkowitz*, 93 Misc. 2d 873 (N.Y. Sup. Ct. 1978) ............................................ 234

*People v. Manson*, 61 Cal. App. 3d 102 (Cal. Ct. App. 1976) ........................................ 234

*Person v. Miller*, 854 F.2d 656 (4th Cir. 1988) ................................................................. 19

*Porter v. White*, 23 F.4th 322 (4th Cir. 2022) .................................................................... 18

*Porter v. Zook*, 803 F.3d 694 (4th Cir. 2015) ................................................................... 50

*Porter v. Zook*, 898 F.3d 408 (4th Cir. 2018) ..............................................................*passim*

*Powell v. Alabama*, 287 U.S. 45 (1932) ............................................................................. 161

*Powell v. Kelly*, 562 F.3d 656 (4th Cir. 2009) ................................................................... 172

**CASES (continued):**                                                                                  **PAGE**

*Preston v. CitiMortgage*, 522 Fed. App'x 426 (10th Cir. 2013) ...................................... 372

*Provenzano v. Singletary*, 148 F.3d 1327 (11th Cir. 1998) ............................................. 221

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) .........................................................*passim*

*Remmer v. United States*, 347 U.S. 227 (1954) ..........................................................*passim*

*Reynolds v. United States*, 98 U.S. 145 (1878) ................................................................. 217

*Rideau v. Louisiana*, 373 U.S. 723 (1963) ..................................................................*passim*

*Roach v. Martin*, 757 F.2d 1463 (4th Cir. 1985) .......................................................... 77

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) ..................................... 321, 223

*Robinson v. Polk*, 438 F.3d 350 (4th Cir. 2006) ...................................................58-59,

*Rogers v. Zant*, 13 F.3d 384 (11th Cir. 1994) .......................................................... 220

*Romero v. Furlong*, 215 F.3d 1107 (10th Cir. 2000) ........................................190-191

*Rompilla v. Beard*, 545 U.S. 374 (2005) ........................................................ 127, 135

*Roof v. United States*, 143 S. Ct. 303 (2022) ............................................................... 4

*Roper v. Simmons*, 543 U.S. 551 (2005).......................................................... 352, 355

*Rose v. Bauman*, No. 15-11963, 2021 WL 508426 (E.D. Mich. Feb. 11, 2021) ..................... 374

*Rose v. Lee*, 252 F.3d 676 (4th Cir. 2001) ............................................................... 172

*Sampson v. United States*, 13-cr-0357, 2018 WL 3533549 (D. Md. July 23, 2018) ................ 247

*Sanders v. United States*, 341 F.3d 720 (8th Cir. 2003) ............................................ 11

*Schwartz v. Steven Kramer & Assocs.*,
     No. CIV.A. 90-4943, 1995 WL 301363 (E.D. Pa. May 12, 1995) .............................. 374

*Scott v. United States*,
     No. 12-CR-909 (KMK), 2019 WL 6034973 (S.D.N.Y. Nov. 14, 2019) ...................... 177

*Sessions v. Dimaya*, 584 U.S. 148 (2018) ................................................................ 319

**CASES (continued):**                                                          **PAGE**

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ......................................................... 284

*Sheppard v. Maxwell*, 384 U.S. 333, (1966) ......................................................... 230

*Singh v. Garland*, 20 F.4th 1049 (5th Cir. 2021) ................................................... 371

*Sinito v. United States*, 750 F.2d 512 (6th Cir. 1984) ..........................................*passim*

*Skilling v. United States*, 561 U.S. 358 (2010) ...................................................*passim*

*Smith v. Baker*, 983 F.3d 383 (9th Cir. 2020) ...................................................... 174

*Smith v. Goguen*, 415 U.S. 566 (1974) ............................................................ 316

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004) ........................................... 206

*Smith v. Murray*, 477 U.S. 527 (1986) ......................................................... 319

*Smith v. Phillips*, 455 U.S. 209 (1982) ...................................................... 17, 64

*Snyder v. Massachusetts*, 291 U.S. 97 (1934) ............................................. 210

*Spence v. United States*,
    No. 2:11-CR-4-D, 2017 WL 385770 (E.D.N.C. Jan. 26, 2017) .................... 177

*Stamper v. Muncie*, 944 F.2d 170 (4th Cir. 1991) ....................................... 267

*Stanley v. Georgia*, 394 U.S. 557 (1969) ..................................................... 323

*Stockton v. Virginia*, 852 F.2d 740 (4th Cir. 1988) ....................................... 67

*Stokeling v. United States*, 586 U.S. 73 (2019) ...................................... *passim*

*Stokes v. Stirling*, 64 F.4th 131 (4th Cir. 2023) ............................................. 79

*Stokes v. Stirling*,
    No. CV 1:16-845-RBH-SVH, 2018 WL 4941125 (D.S.C. May 9, 2018) ...................... 79

*Stokes v. Stirling*,
    No. 1:16-CV-00845-RBH, 2018 WL 4678578 (D.S.C. Sept. 28, 2018) ........................ 79

*Strickland v. Washington*, 466 U.S. 668 (1984) ...................................... *passim*

*Tackett v. Trierweiler*, 956 F.3d 358 (6th Cir. 2020) .................................. 266

**CASES (continued):**                                                      **PAGE**

*Tafoya v. Tansy*, No. 00-2049, 2001 WL 557971 (10th Cir. May 24, 2001) ........................... 219

*Tanner v. United States*, 483 U.S. 107 (1987) ...................................... *passim*

*Thomas v. Lockhart*, 738 F.2d 304 (8th Cir. 1984) .................................. 162,

*Thomas v. Secretary, Dep't of Corr.*,
    No. 8:17-CV-2205-T-23AAS, 2020 WL 5814332 (M.D. Fla. Sept. 30, 2020) ............. 192

*Thomas v. Wainwright*, 767 F.2d 738 (11th Cir. 1985) ........................... 192

*Thompson v. Wainwright*, 787 F2d 1447 (11th Cir. 1986) ........................................................ 174

*Tucker v. Ozmint*, 350 F.3d 433 (4th Cir. 2003) ....................................................... 127

*United States v. Abney*, 812 F.3d 1079 (D.C. Cir. 2016) ....................................................... 161

*United States v. Addonizio*, 442 U.S. 178 (1979) ....................................................... 9

*United States v. Aiello*, 814 F.2d 109 (2d Cir. 1987) ....................................................... 365-366

*United States v. Allred*, 942 F.3d 641 (4th Cir. 2019) ....................................................... *passim*

*United States v. Altruz*, No. CR 20-207, 2023 WL 3806347 (E.D. Pa. June 2, 2023) ............. 314

*United States v. Angiulo*, 897 F.2d 1169 (1st Cir. 1990) ....................................................... 237

*United States v. Arnold*, 412 F. Supp. 3d 732 (E.D. Mich. 2019) ........................................ 357

*United States v. Avila-Gonzalez*, 757 F. App'x 353 (5th Cir. Dec. 20, 2018) ........................ 150

*United States v. Ayala*, 601 F.3d 256 (4th Cir. 2010) ....................................................... 329

*United States v. Baker*, 719 F.3d 313 (4th Cir. 2013) ....................................................... 276

*United States v. Bakker*, 925 F.2d 728 (4th Cir. 1991) ....................................................... *passim*

*United States v. Baptiste*, 596 F.3d 214 (4th Cir. 2010) ....................................................... 59, 67

*United States v. Barber*, 668 F.2d 778 (4th Cir. 1982) ....................................................... 58

*United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000) ....................................................... 250

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015) ....................................................... 206

**CASES (continued):**                                                                                          **PAGE**

*United States v. Barshov*, 733 F.2d 842 (11th Cir. 1984) ....................................................... 50, 56

*United States v. Battle*, 927 F.3d 160 (4th Cir. 2019) ....................................................... 282, 296

*United States v. Benabe*, 654 F.3d 753 (7th Cir. 2011) ....................................................... 18

*United States v. Bennerman*, 785 F. App'x 958 (4th Cir. 2019) ............................................. 196

*United States v. Benson*,
     No. CIV. 06-CV-13091, 2007 WL 628372 (E.D. Mich. Feb. 27, 2007) ...................... 177

*United States v. Bernard*, 708 F.3d 583 (4th Cir. 2013) ................................................... 126, 133

*United States v. Berry*, 565 F.3d 385 (7th Cir. 2009) ...................................................... 136, 141

*United States v. Birchette*, 908 F.3d 50 (4th Cir. 2018) ......................................................... 20

*United States v. Blackledge*, 751 F.3d 188 (4th Cir. 2014) ............................................. 198, 203

*United States v. Boigegrain*, 155 F.3d 1181 (10th Cir. 1998) ......................................... 132, 187

*United States v. Boone*, 26 F. App'x 162 (4th Cir. 2001) ...................................................... 198

*United States v. Bowers*, 18-cr-292, 2022 WL 825437 (W.D. Pa. Mar. 18, 2022) .................. 234

*United States v. Bowers*,
    CR 18-292, 2022 WL 17718686 (W.D. Pa. Dec. 15, 2022) .................300, 306-307, 311

*United States v. Bowers*,
    CR 18-292, 2020 WL 6119480 (W.D. Pa. Oct. 16, 2020) ............................ 314 317, 347

*United States v. Bran*, 776 F.3d 276 (4th Cir. 2015) ................................................... 331

*United States v. Brazelton*, 557 F.3d 750 (7th Cir. 2009) ........................................... 248

*United States v. Briscoe*, No. 23-3109, 2025 WL 1013389 (10th Cir. Apr. 2, 2025) ................. 69

*United States v. Brown*, 996 F.3d 1171 (11th Cir. 2021) ............................................. 66

*United States v. Burns*, 990 F.2d 1426 (4th Cir. 1993) ................................................ 192

*United States v. Camacho*, 955 F.2d 950 (4th Cir. 1992) ........................................... 210

*United States v. Candelario-Santana*, 368 F. Supp.3d 316 (D.P.R. 2019) ............................... 357

**CASES (continued):**                                                                      **PAGE**

*United States v. Cannon*, 750 F.3d 492 (5th Cir. 2014) ........................................... 323

*United States v. Castleman*, 572 U.S. 157 (2014) ................................................*passim*

United *States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000) ........................... 252

*United States v. Chapman*, 593 F.3d 365 (4th Cir. 2010) ................................... 196, 206

*United States v. Chapman*, 954 F.2d 1352 (7th Cir. 1992) ...................................... 150

*United States v. Chaudhri*, 134 F.4th 166 (4th Cir. 2025) ........................................ 313

*United States v. Cherry*, 330 F.3d 658 (4th Cir. 2003) .................................................. *passim*

*United States v. Chong Lam*, 677 F.3d 190 (4th Cir. 2012) ....................................... 312

*United States v. Collier*, 932 F.3d 1067 (8th Cir. 2019) ............................................ 372

*United States v. Colombo*, 869 F.2d 149 (2d Cir. 1989) ............................................52-53

*United States v. Colvin*, 353 F.3d 569 (7th Cir. 2003) ............................................... 321

*United States v. Connolly*, 341 F.3d 16 (1st Cir. 2003) ............................................. 23

*United States v. Con-Ui*,
    No. 3:CR-13-123, 2016 WL 9331115 (M.D. Pa. Jan. 28, 2016) ...........................357-358

*United States v. Coonce*, 932 F.3d 623 (8th Cir. 2019) ............................................ 357

*United States v. Cooper*, 131 F.4th 127, 133-34 (2d Cir. 2025)................................. 293

*United States v. Cronic*, 466 U.S. 648 (1984) ................................................... *passim*

*United States v. Cuthel*,903 F.2d 1381 (11th Cir. 1990) ........................................... 23

*United States v. David*, 83 F.3d 638 (4th Cir. 1996) ................................................ 248

*United States v. Davis*, 588 U.S. 445 (2019) ......................................................... 282

*United States v. DeShazer*, 554 F.3d 1281 (10th Cir. 2009) .................................... 133

*United States v. DeTemple*, 162 F.3d 279 (4th Cir. 1998) ................................. 364, 371

*United States v. Devine*, 40 F.4th 139 (4th Cir. 2022) ............................................. 330

**CASES (continued):**                                                        **PAGE**

*United States v. Diaz-Ibarra*, 522 F.3d 343 (4th Cir. 2008) ...................... 278, 281, 301

*United States* v. *Doggart*,
    No. 1:15-cr-39, 2016 WL 6205804 (E.D. Tenn. Oct. 24, 2016) ................................ 300

*United States v. Doke*, 171 F.3d 240 (5th Cir. 1999) ............................................54-55

*United States v. Dukes*,
    141 F.3d 1160, 1998 WL 188634 (4th Cir. Apr. 21, 1998) ...................................198-199

*United States v. Dyess*, 730 F.3d 354 (4th Cir. 2013) ............................................ 9, 169, 271, 287

*United States v. Earnest*, 536 F. Supp. 3d 688 (S.D. Cal. 2021) ........................................ 306, 311

*United States v. Ellis*, 340 F. App'x 891 (4th Cir. 2009) ........................................... 198

*United States v. Farmer*, 717 F.3d 559 (7th Cir. 2013) ....................................... 17, 349

*United States v. Forde*, 407 F. App'x 740 (4th Cir. 2011) ...............................................*passim*

*United States v. Frady*, 456 U.S. 152 (1982) ....................................................*passim*

*United States v. Fulks*, 454 F.3d 410 (4th Cir. 2006) ...............................................*passim*

*United States v Fulks*, 120 F.4th 146 (4th Cir. 2024) ............................................ 302

*United States v. Gagnon*, 470 U.S. 522 (1985) (per curiam) ..................................... 210

*United States v. Gallop*, 838 F.2d 105 (4th Cir. 1988) ..................................... 186, 199

*United States v. Garrett*, 42 F.4th 114 (2d Cir. 2022) ............................................. 144

*United States v. Gemar*, 65 F.4th 777 (2023) ................................................. 51

*United States v. Gendron*,
      22-CR-109, 2025 WL 2418902 (W.D.N.Y. Aug. 21, 2025) ........................ 160, 296, 308

*United States v. George*, No. 17-201, 2019 WL 537186 (E.D. La. Feb. 11, 2019) .................. 357

*United States v. Giannone*,
      Crim. No. 3:06-1011, 2011 WL 1576198 (D.S.C. Apr. 26, 2011) ...........................77-78

*United States v. Gonzalez-Flores*, 701 F.3d 112 (4th Cir. 2012) ............................... 210

**CASES (continued):**                                                                    **PAGE**

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006) ........................................ 198

*United States v. Gougher*, 835 F. App'x 231 (9th Cir. 2020) ................................... 192

*United States v. Grassie*, 237 F.3d 1199 (10th Cir. 2001) ....................................... 309

*United States v. Gravely*, 840 F.2d 1156 (4th Cir. 1988) ...............................19, 54-55

*United States v. Green*, 67 F.4th 657 (4th Cir. 2023) .........................................*passim*

*United States v. Guglielmi*, 615 F. Supp. 1506 (W.D.N.C. 1985) ............................................. 372

*United States v. Hagen*, 468 F. App'x 373 (4th Cir. 2012) ....................................................... 192

*United States v. Harbuck*, 146 F.4th 1073 (11th Cir. 2025) .................................................314-315

*United States v. Hari*, No. 18-cr-0150, 2019 WL 7838282 (D. Minn. Sept. 17, 2019)...... 306, 311

*United States v. Harris*, 991 F.3d 552 (4th Cir. 2021) .................................................... 9, 245, 354

*United States v. Hasson*, 26 F.4th 610 (4th Cir. 2022) ............................................................. 313

*United States v. Hatter*, 532 U.S. 557 (2001) .................................................................. 184, 355

*United States v. Hayward*, 6 F.3d 1241 (7th Cir. 1993) ..................................................... 321, 323

*United States v. Hickson*, 506 F. App'x 227 (4th Cir. 2013). .................................................... 194

*United States v. Higgs*, 663 F.3d 726 (4th Cir. 2011)........................................................ 229, 250

*United States v. Hill*, 832 F.3d 135 (2d Cir. 2016)............................................................ 301, 317

*United States v. Hood*, 615 F.3d 1293 (10th Cir. 2010) ........................................................... 202

*United States v. Ianniello*, 866 F.2d 540 (2d Cir. 1989) ............................................................. 56

*United States v. Jackson*, 736 F.3d 953 (10th Cir. 2013) .......................................................... 304

*United States v. Jaensch*, 665 F.3d 83 (4th Cir. 2011) ...................................................... 313, 317

*United States v. Jennett*, 387 F. App'x 303 (4th Cir. 2010) ..................................................... 199

*United States v. John Doe No. 1*, 272 F.3d 116 (2d Cir. 2001) ................................................. 192

**CASES (continued):**                                                                                  **PAGE**

*United States v. Johnson*, 32 F.3d 82 (4th Cir. 1994) ............................................................. 329

*United States v. Johnson*, 114 F.3d 435 (4th Cir. 1997) .............................................191-192, 197

*United States v. Johnson*, 688 F.3d 494 (8th Cir. 2012) ........................................................... 248

*United States v. Johnson*, 954 F.3d 174 (4th Cir. 2020) ....................................................*passim*

*United States v. Jones*, 132 F.3d 232 (5th Cir. 1998) ............................................................. 355

*United States v. Jones*, 287 F.3d 325 (5th Cir. 2002) .................................................... 264

*United States v. Jones*, 608 F.2d 1004 (4th Cir. 1979) ................................................ 30, 39, 41

*United States v. Lara-Ramirez*, 519 F.3d 76 (1st Cir. 2008) ........................................ 71

*United States v. Lawson*, 677 F.3d 629 (4th Cir. 2012) ........................................*passim*

*United States v. Linder*, 552 F.3d 391 (4th Cir. 2009) .................................................. 9, 287, 351

*United States v. Madison*, 337 F. Supp.3d 1186 (M.D. Fla. 2018) ........................... 356

*United States v. Martinez-Salazar*, 528 U.S. 304 (2000) ........................................... 248

*United States v. Mason*, 774 F.3d 824 (4th Cir. 2014) ................................................ 244, 334, 338

*United States v. McDermott*, 29 F.3d 404 (8th Cir. 1994) ........................................ 319

*United States v. McDuffy*, 890 F.3d 796 (9th Cir. 2018) ........................................... 302

*United States v. McKinney*, 60 F.4th 188 (4th Cir. 2023) ............................................. 9

*United States v. McKinney*, 737 F.3d 773 (D.C. Cir. 2013) .......................................... 144

*United States v. McMullen*, 98 F.3d 1155 (9th Cir. 1996) ............................................ 9

*United States v. McNamara*, 74 F.3d 514 (4th Cir. 1996) .....................................*passim*

*United States v. McNeal*, 818 F.3d 141 (4th Cir. 2016) ............................................... 278, 303

*United States v. Mikalajunas*, 186 F.3d 490 (4th Cir. 1999) .................................. 8, 24, 309, 344

*United States v. Mills*, 393 F. Supp.3d 650 (E.D. Mich. 2019) ................................. 355

**CASES (continued):**                                                                                      **PAGE**

*United States v. Moon*, 718 F.2d 1210 (2d Cir. 1983) .......................................... 20, 53

*United States v. Morris*, 917 F.3d 818 (4th Cir. 2019) ........................................*passim*

*United States v. Morrison*, 686 F.3d 94 (2d Cir. 2012) ............................................. 314

*United States v. Moussaoui*, 43 F. App'x 612 (4th Cir. 2002) ................................. 231

*United States v. Mullen*, 32 F.3d 891 (4th Cir. 1994) ........................................ 195, 200

*United States v. Nixon*, 267 F. Supp. 3d 140 (D.D.C. 2017) ..................................... 373

*United States v. Ofomata*, No. 17-201, 2019 WL 527696 (E.D. La. Feb. 11, 2019) ............... 355

*United States v. Olano*, 507 U.S. 725 (1993) .............................................. 64

*United States v. Ole*, 994 F.2d 1519 (10th Cir. 1993) ...................................... 208

*United States v. Palacios*, 982 F.3d 920 (4th Cir. 2020) .......................................... 327

*United States v. Pastore*, 83 F.4th 113 (2d Cir. 2023) ........................................ 342

*United States v. Pearson*, 203 F.3d 1243 (10th Cir. 2000) .................................... 360

*United States v. Pendleton*, 894 F.3d 978 (8th Cir. 2018) ................................312-314

*United States v. Perkins*, 787 F.3d 1329 (11th Cir. 2015) ......................................... 370

*United States v. Pettiford*, 612 F.3d 270 (4th Cir. 2010) ................................243-244

*United States v. Powell*, 134 F.4th 222 (4th Cir. 2025) ..........................................*passim*

*United States v. Powell*, 423 U.S. 87 (1975) .............................................. 311

*United States v. Powell*, 850 F.3d 145 (4th Cir. 2017) ..................................... 19

*United States v. Quiles-Olivo*, 684 F.3d 177 (1st Cir. 2012) ................................... 235

*United States v. Regenos*, 405 F.3d 691 (8th Cir. 2005) ....................................... 8, 364

*United States v. Roane*, 378 F.3d 382 (4th Cir. 2004) .......................................... 9, 135, 288, 363

*United States v. Robbins*, 197 F.3d 829 (7th Cir. 1999) ....................................... 370

**CASES (continued):**                                                    **PAGE**

*United States v. Robinson*, 408 F. Supp. 2d 437 (E.D. Mich. 2005) ......................... 174

*United States v. Robinson*, 913 F.2d 712 (9th Cir. 1990) ........................................ 199

*United States v. Rogers*, 537 F. App'x 273 (4th Cir. 2013) ..................................... 130

*United States v. Roggio*, 863 F.2d 41 (11th Cir. 1989) ..................................... 148

*United States v. Rolle*, 204 F.3d 133 (4th Cir. 2000) ...................................... 207

*United States v. Roof*, 10 F.4th Cir. 314 (4th Cir. 2021) ......................................*passim*

*United States v. Salameh*, 93-cr-0180, 1993 WL 364486 (S.D.N.Y. Sept. 15, 1993) .............. 231

*United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007) .......................................... 355

*United States v. Sandalis*, 14 F. App'x 287 (4th Cir. 2001) .................................... 48

*United States v. Sanders*, 133 F.4th 341 (5th Cir. 2025) ....................................... 328

*United States v. Simms*, 914 F.3d 229 (4th Cir. 2019) .................................... 311, 314

*United States v. Singleton*, 107 F.3d 1091 (4th Cir. 1997) ............................... 148, 184

*United States v. Smith*, 640 F.3d 580 (4th Cir. 2011) ...................................*passim*

*United States v. Smith*, 723 F.3d 510 (4th Cir. 2013) ........................................ 66

United States v. Solomon,
    No. 02:05-CR-385, 2007 WL 1468794 (W.D. Pa. May 14, 2007) .............................. 356

*United States v. Soto Hernandez*, 849 F.2d 1325 (10th Cir. 1988) ..................... 183, 188

*United States v. Stafford*, 782 F.3d 786 (6th Cir. 2015) ..................................... 141

*United States v. Stewart*, 65 F.3d 918 (11th Cir. 1995) ................................. 319, 321

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) ............................... 20, 47, 53

*United States v. Streater*, 70 F.3d 1314 (D.C. Cir. 1995) .................................... 174

*United States v. Suggs,*
    No. 14-CR-30142-MJR, 2016 WL 1555156 (S.D. Ill. Apr. 18, 2016) ........................ 190

**CASES (continued):**                                                          **PAGE**

*United States v. Sun*, 278 F.3d 302 (4th Cir. 2002) .................................... 311

*United States v. Taylor*, 596 U.S. 845 (2022) ......................................*passim*

*United States v. Taylor*, 942 F.3d 205 (4th Cir. 2019) ...........................*passim*

*United States v. Timmreck*, 441 U.S. 780 (1979) ......................................... 9

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996) ................................. 256

*United States v. Toki*, 23 F.4th 1277 (10th Cir. 2022) ............................................................. 342

*United States v. Torres-Miguel*, 701 U.S. F.3d 165 (4th Cir. 2012) ....................................*passim*

*United States v. Tsarnaev*, 595 U.S. 302 (2022) ................................................................*passim*

*United States v. Tsarnaev*, 968 F.3d 24 (1st Cir. 2020) ........................................................... 352

*United States v. Tsarnaev*, 2021 WL 3912236 ........................................................................ *241*

*United States v. Tsarnaev*, No. 13-cr-10200, 2015 WL 45879 (D. Mass. Jan. 2, 2015) .......... 225

*United States v. Tsarnaev*, No. 13-cr-10200, 2015 WL 505776 (D. Mass. Feb. 6, 2015) ........ 226

*United States v. Turner*, 389 F.3d 111 (4th Cir. 2004) ............................................................. 18

*United States v. Umana*, 750 F.3d 320 (4th Cir. 2014) ............................................................. 46

*United States v. Veatch*, 674 F.2d 1217 (9th Cir. 1981) ......................................................... 209

*United States v. Vitale*, 459 F.3d 190 (2d Cir. 2006) ............................................................... 20

*United States v. Walker*, 793 F. App'x 865 (11th Cir. 2019) ............................................ 312, 314

*United States v. Weninger*, 624 F.2d 163 (10th Cir. 1980) ...................................................... 148

*United States v. West*, 877 F.2d 281 (4th Cir. 1989) .............................................................. 196

*United States v. Williams*, 553 U.S. 285 (2008) ...............................................................*passim*

*United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994) ................................................. 308

**CASES (continued):**                                                           **PAGE**

*United States v. Young*, 470 U.S. 1 (1985) ............................................................................ 267

*Vreeland v. Huss*,
   No. 18-CV-00303-PAB-SKC, 2020 WL 4582719 (D. Colo. Aug. 10, 2020)............... 374

*Wainwright v. Witt*, 469 U.S. 412 (1985) ........................................................................248-249

*Warger v. Shauers*, 574 U.S. 40 (2014).......................................................................... 17, 55

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008) ......... 310

*Waters v. Thomas*, 46 F.3d 1506 (11th Cir. 1995) ........................................................ 75

*Weeks v. Jones*, 26 F.3d 1030 (11th Cir. 1994) ........................................................ 218

*Welch v. United States*, 578 U.S. 120 (2016) ........................................................ 313

*Wells v. Murray*, 831 F.2d 468 (4th Cir. 1987) ........................................................ 230

*Wheat v. United States*, 486 U.S. 153 (1988) ........................................................ 200

*Wiggins v. Smith*, 539 U.S. 510 (2003) ........................................................ 127, 131, 151

*Williams v. Stirling*, 914 F.3d 302 (4th Cir. 2019) ........................................................ 128

*Williams v. Taylor*, 529 U.S. 420 (2000) ........................................................ 47

*Wilson v. Parker*, 515 F.3d 682 (6th Cir. 2008) ........................................................ 148

*Winston v. Kelly*, 592 F.3d 535 (4th Cir. 2010) ........................................................ 203, 375

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) ........................................................ 319, 321-322

*Wolf. v. Stewart*, No. 09-cv-1950 (D.S.C. July 22, 2009) ........................................................ 37

*Wood v. Quarterman*, 491 F.3d 196 (5th Cir. 2007) ........................................................ 204

*Yarborough v. Gentry*, 540 U.S. 1 (2003) ........................................................ 74

*Young v. United States*,
     No. 6:07-CR-113-GRA, 2010 WL 4053610 (D.S.C. Oct. 14, 2010) (per curiam) ....... 288

## STATUTES:

18 U.S.C. § 16(b) ........................................................ 280

18 U.S.C. § 242 ........................................................ 324

18 U.S.C. § 245(b)(2) ........................................................ 321

18 U.S.C. § 247 ........................................................ *passim*

18 U.S.C. § 247(a) ........................................................ 290-291, 306, 308

18 U.S.C. § 247(a)(1) ........................................................ 309

18 U.S.C. § 247(a)(2) ................................................................ *passim*

18 U.S.C. § 247(b) ................................................................ 286,

18 U.S.C. § 247(d)(1) ................................................................ 1, 4

18 U.S.C. § 247(e) ................................................................ 293, 308

18 U.S.C. § 247(3) ................................................................ 1, 4

18 U.S.C. § 249 ................................................................ *passim*

18 U.S.C. § 249(a)(1) ................................................................ *passim*

18 U.S.C. § 249(a)(1)(A) ................................................................ 305

18 U.S.C. § 249(a)(1)(B)(i) ................................................................ 295

18 U.S.C. § 249(a)(2) ................................................................ 298

18 U.S.C. § 249(b)(1) ................................................................ 293

18 U.S.C. § 844(i) ................................................................ 309

18 U.S.C. § 922(g) ................................................................ 278-279

18 U.S.C. § 922(g)(9) ................................................................ 278-279

18 U.S.C. § 924 ................................................................ *passim*

18 U.S.C. § 924(c) ................................................................ *passim*

**STATUTES (continued):**                                    **PAGE**

18 U.S.C. . § 924(c)(1)(A) ................................................................ 2

18 U.S.C. . § 924(c)(1)(C ................................................................ 2

118 U.S.C. § 924(c)(1)(D)(ii) ................................................................ 331

18 U.S.C. § 924(c)(3) ................................................................ 280

18 U.S.C. § 924(c)(3)(A) ................................................................ *passim*

18 U.S.C. § 924(c)(3)(B) ................................................................ *passim*

18 U.S.C. § 924(e) ......................................................................................... 280

18 U.S.C. § 924(e)(2)(B)(i) .......................................................................... 278

18 U.S.C. § 924(j) ....................................................................................... *passim*

18 U.S.C. § 1365(h)(4) ........................................................................... 302, 341

18 U.S.C. § 1513(b)(1) .................................................................................. 341

18 U.S.C. § 2113(e) ................................................................................303-304

18 U.S.C. § 2241 .......................................................................... 308, 350, 357

18 U.S.C. § 2241(a) ...................................................................................... 308

18 U.S.C. § 2241(a)(2) .................................................................................. 308

18 U.S.C. § 2255 ....................................................................................... *passim*

18 U.S.C. § 3596(a)-(c) ................................................................................ 357

18 U.S.C. § 3631 .......................................................................................... 321

18 U.S.C. § 249(c) ........................................................................................ 302

18 U.S.C. § 924(c)(1)(A) .................................................................................. 5

18 U.S.C. § 924(c)(1)(C) .................................................................................. 5

18 U.S.C. § 924(j)(1) ........................................................................................ 5

**STATUTES (continued):**                                            **PAGE**

18 U.S.C.§ 4241 ........................................................................................... 201

28 U.S.C. § 137 ............................................................................................ 361

28 U.S.C. § 144 ............................................................................................ 363

28 U.S.C. § 455 ......................................................................................362-363

28 U.S.C. § 455(a) ........................................................................................ 362

28 U.S.C. § 455(b)(1) .................................................................................... 362

28 U.S.C. § 2241 ............................................................................ 308, 350, 357

28 U.S.C. § 2254 ....................................................................................60-61

28 U.S.C. § 2254(d)(1) ............................................................................. 191

28 U.S.C. § 2255 ............................................................................... *passim*

28 U.S.C. § 2255(a) ................................................................................... 11

28 U.S.C. § 2255(b) ................................................................................... 31

34 U.S.C. 30506(2) .................................................................................. 326

34 U.S.C. § 30506(3) ............................................................................... 342

42 U.S.C. § 1981 ...................................................................................... 344

42 U.S.C. 1982 ......................................................................................... 344

42 U.S.C. § 3631 ...................................................................................... 341

**CONSTITUTIONAL PROVISIONS:**

U.S. Const. Amend. VI .......................................................................16-17

**LEGISLATIVE HISOTRY:**

H.R. Rep. No. 456, 115th Cong., 1st Sess. (2017) ................................... 327

**RULES:**                                                             **PAGE**

Fed. R. Crim. P. 12.2 ............................................................................... 192

Fed. R. Crim. P. 12.2(b) .......................................................................... 180

Fed. R. Crim. P. 12.2(c)(1)(B) ........................................................... *passim*

Fed. R. Crim. P. 18 .................................................................................. 238

Fed R. Crim. P. 21 .................................................................................. 215

Fed. R. Crim. P. 21(a) ............................................................................. 238

Fed. R. Crim. P. 43 ................................................................................................................. 230

Fed. R. Crim. P. 43(a) .......................................................................................................... *passim*

Fed. R. Crim. P. 43(b)(3) ......................................................................................................... 208

Fed. R. of Evid. 606(b)(1) ......................................................................................................... 79

## OTHER AUTHORITIES:

Am. Bar Ass'n, *Guidelines for the Appointment and Performance of Counsel in*
    *Death Penalty Cases*, 31 Hofstra L. Rev. 913 (rev. ed. 2003) ................................... *passim*

John Blume, *Forty Years of Death: The Past, Present,*
    *and Future of the Death Penalty in South Carolina,*
    *(Still Arbitrary After All These Years),*
    11 Duke J. Const. L. & Pub. Pol'y 183 (2016) .............................................................. 222

Steven Croley, *Summary Jury Trials in Charleston County, South Carolina,*
    41 Loy. L.A. L. Rev. 1585 (2008) ..................................................................................... 38

## INTRODUCTION

On June 17, 2015, Dylann Storm Roof, a white man, entered the Emanuel African Methodist Episcopal (AME) Church (often called Mother Emanuel), a historic African-American church in Charleston, South Carolina. The parishioners welcomed him to Bible study class, unaware that Roof had been planning for months to attack African Americans and instigate a race war. After sitting with the parishioners for 45 minutes, Roof pulled out a semi-automatic pistol and repeatedly shot them as they closed their eyes to pray. He killed nine parishioners: Reverend Sharonda Coleman-Singleton, Cynthia Hurd, Susie Jackson, Ethel Lee Lance, Reverend DePayne Middleton-Doctor, Reverend Clementa Pinckney, Tywanza Sanders, Reverend Daniel Simmons, Sr., and Reverend Myra Thompson.

After a jury trial, Defendant was convicted of thirty-three counts and was sentenced to death on eighteen capital counts. The Fourth Circuit upheld his convictions and sentence, and he now files this motion under 28 U.S.C. § 2255.

## STATEMENT OF THE CASE

### I.     PROCEDURAL HISTORY

#### A.  Trial

An indictment returned in this district charged Defendant with nine counts of hate crimes resulting in death and three counts of hate crimes involving an attempt to kill, all in violation of 18 U.S.C. § 249(a)(1), nine counts of obstruction of exercise of religion resulting in death, in violation of 18 U.S.C. § 247(a)(2), (d)(1), three counts of obstruction of exercise of religion involving an attempt to kill and use of a dangerous weapon, in violation of 18 U.S.C § 247(a)(2), (d)(1), (3), and nine counts of using a firearm to commit murder during and in relation to a crime

of violence, in violation of 18 U.S.C. § 924(c)(1)(A), (c)(1)(C), (j)(1). (Dkt. No. 2 at 4-10). He

was also charged in South Carolina state court with capital charges. (Dkt. No. 68 at 1).

    Jury selection began November 28, 2016, and the guilt phase of trial began on December

7, 2016. On December 15, 2016, the jury found Defendant guilty of all charges. (Dkt. No. 817 at

1-14). The penalty phase began on January 4, 2017, and on January 10, 2017, the jury

recommended a death sentence for each of the eighteen capital counts charged under §§ 247 and

924. (Dkt. Nos. 854 (minute entry); 871 at 17).

### B. **Appeal**

    On May 23, 2017, Defendant appealed to the United States Court of Appeals for the Fourth

Circuit. (Dkt. No. 965 at 1). He raised twenty claims of error:

1. Whether the district court clearly erred in finding Roof competent to stand trial.

2. Whether the district court abused its discretion by granting only in part defense counsel's request for a continuance of the first competency hearing.

3. Whether the district court abused its discretion by limiting the scope of the second competency hearing to new developments regarding Roof's competency since the first hearing.

4. Whether the district court properly advised Roof that his Sixth Amendment right to counsel did not authorize him to control counsel's presentation of mitigation evidence.

5. Whether the district court correctly determined that the Sixth Amendment applies in capital penalty proceedings.

6. Whether the district court correctly determined that neither the Fifth nor Eighth Amendments nor the Federal Death Penalty Act prohibited Roof from representing himself and withholding mitigation evidence.

7. Whether the district court was required to explain how it would exercise its discretion to limit the role of standby counsel.

8. Whether the district court was required to provide Roof with an option of waiting until the penalty phase to self-represent.

9. Whether the district court correctly recognized that it had discretion to deny Roof's self-representation motion.

10. Whether the district court abused its discretion in finding that Roof had the mental capacity to represent himself.

11. Whether the district court abused its discretion by limiting the role of standby counsel or denying accommodations requested by Roof.

12. Whether the district court reversibly erred by allowing the Government to respond to Roof's mitigating factors that he would not be dangerous in prison and could be safely confined, or by declining to clarify those mitigators for the jury.

13. Whether the district court reversibly erred by declining to strike testimony that Roof was "evil" or would go to the "pit of hell."

14. Whether the district court reversibly erred by allowing the Government to introduce victim-impact evidence about the victims' religious activities and to state during closing argument that the victims were good and devout people.

15. Whether the district court plainly erred by not finding the death penalty unconstitutional as applied to Roof on the grounds that he was twenty-one at the time of the offense and had mental-health issues.

16. Whether Congress had the authority under the Commerce Clause to enact § 247(a)(2).

17. Whether § 247 requires proof of religious hostility.

18. Whether Congress had the authority under the Thirteenth Amendment to enact § 249.

19. Whether the Attorney General properly certified the §§ 247 and 249 counts.

20. Whether the firearms convictions should be vacated because §§ 247 and 249 do not qualify as predicate crimes of violence.

21. Whether the firearms convictions are invalid because the predicate offenses are not crimes of violence.

Br. of Appellant at 4-14, *United States v. Roof*, No. 17-3 (4th Cir. Jan. 28, 2020), ECF No. 85 at

3-7 (hereinafter "Br. of Appellant, Dkt. 85"). On August 25, 2021, the Fourth Circuit affirmed

Defendant's conviction and sentence in a published opinion. *United States v. Roof*, 10 F.4th Cir.

314 (4th Cir. 2021). Defendant sought a writ of certiorari in the United States Supreme Court, which denied the petition on October 11, 2022. *Roof v. United States*, 143 S. Ct. 303 (2022).

### C.  28 U.S.C. § 2255 Proceedings

On February 25, 2025, Defendant moved this Court for discovery in anticipation of filing a motion to vacate his convictions and sentence under 28 U.S.C. § 2255. (Dkt. No. 1044). While that motion was pending, Defendant moved this Court to recuse itself from the § 2255 proceedings. (Dkt. No. 1049). The Court denied both motions (Dkt. Nos. 1050, 1053).

Defendant filed a second motion for recusal on April 8, 2025, which this Court denied. (Dkt. Nos. 1054; 1062).

Nine days later, on April 17, 2025, a date agreed amongst the parties but more than a year after finality of the judgment, Defendant filed a Motion to Vacate, Set Aside, or Correct Conviction and Sentence Pursuant to 28 U.S.C. § 2255. (Dkt. Nos. 1057; 1058). Defendant also successfully requested permission to file a corrected motion by July 21, 2025. (Dkt. Nos. 1056; 1073). The Court set a briefing schedule that allowed the Government to file an answer to "test initially the legal sufficiency of the Defendant's petition before the Court addresses the Defendant's discovery requests." (Dkt. No. 1074 at 2). Defendant filed his corrected § 2255 motion on July 17, 2025. (Dkt. No. 1077).[1] Defendant asserted nineteen claims of error and requested permission to conduct discovery, amend his motion as needed, and for the Court to conduct an evidentiary hearing. The Government now files this answer.

---

[1] When citing documents filed with this Court, the Government cites to the internal pagination of the document. Transcript citations also refer to internal pagination.  All other citations to the trial record refer to the docket number and ECF pagination.

## II.   STATEMENT OF FACTS

### A.  Facts of the Crime[2]

On the evening of June 17, 2015, twelve Black parishioners and leaders of the historic Emanuel African Methodist Episcopal Church ("Mother Emanuel") met for a Wednesday evening Bible study. Defendant entered the church shortly after the meeting began, and the parishioners welcomed him and gave him a Bible and a study sheet. Defendant carried a small bag containing a Glock .45 semi-automatic handgun and eight magazines, each loaded with eleven bullets. After forty-five minutes, as the group stood and bowed their heads to close in prayer, Defendant took out the gun and opened fire. The parishioners dove under tables to hide, but Defendant worked his way through the room, firing around approximately seventy-four times and striking almost all the parishioners multiple times. Defendant approached one parishioner, who was audibly praying, and told her to "shut up." He asked if he had shot her yet, and she said "no." Defendant told her that he would leave her alive to tell the story, and then he left the church. Defendant shot and killed nine individuals: Reverend Sharonda Coleman-Singleton, Cynthia Hurd, Susie Jackson, Ethel Lee Lance, Reverend DePayne Middleton-Doctor, Reverend Clementa Pinckney, Tywanza Sanders, Reverend Daniel Simmons, Sr., and Reverend Myra Thompson.

Police began searching for Defendant and stopped his vehicle in North Carolina. After Defendant identified himself and admitted his involvement in the shooting, police transported him to a nearby police station. There, he waived his *Miranda* rights and spoke to two FBI agents for around two hours. During the interview he admitted his guilt, identified himself as a "white nationalist," and claimed he "had to do it" because "black people are killing white people every

---

[2] The facts are drawn from the Fourth Circuit opinion affirming the Defendant's conviction and sentence. *Roof*, 10 F.4th at 332-33.

day" and "rap[ing] white women." He denied that he believed he could start a race war, but he did say he wanted to "agitate race relations" to cause friction that could lead to one. He claimed that he chose Charleston because of its historic importance and Mother Emanuel for the same reason.

Officials also identified Defendant's website, which he used to disseminate his racist beliefs. He propounded his views on white supremacy and his negative opinion of Black people. He discussed black-on-white crime and said that he took action because "someone has to have the bravery to take it to the real world."

### B. Pre-trial and Trial Proceedings

Defendant was indicted on July 22, 2015. (Dkt. No. 2). The Government announced it would seek the death penalty against him on May 24, 2016. (Dkt. No. 164). At Defendant's request, the Court set him for trial on November 7, 2016. (Dkt. No. 179 at 1). In July of 2016, Defendant provided notice that he would present evidence "relating to a mental disease or defect or any other mental condition bearing on the issue of punishment." (Dkt. No. 245 at 1). In response, the Government moved to examine Defendant under Federal Rule of Criminal Procedure 12.2(c)(1)(B), and the Court granted that motion and held that the examinations would occur no earlier than September 12, 2016. (Dkt. No. 280 at 1).

After the Government's examination, Defendant accused his attorneys, in a letter to the prosecution, of concealing their plan to introduce evidence of his mental health issues. (Dkt. No. 545). On November 7, 2016, the day trial was scheduled to begin, Defendant's counsel challenged Defendant's competency, and the Court ordered a competency hearing and appointed Dr. James C. Ballenger to evaluate Defendant. (Dkt. No. 559 at 1-2).

The Court held a competency hearing on November 21-22, 2016, and found Defendant competent for trial. (Dkt. No. 656 at 1).

The Court also continued jury selection until November 28, 2016. (Dkt. No. 625). On the eve of jury selection, Defendant asked to represent himself (*see* Dkt. 666), and the Court held a *Faretta* hearing and then granted the motion (Dkt. No. 691 at 1, 6). The Court found that Defendant "moved to self-represent to prevent the presentation of mental health mitigation evidence." *Id.* at 6; *see also id.* at 8 (noting that Defendant was "motivated [to represent himself] by disdain for a defense based on mental health evidence").

Individual *voir dire* commenced on November 28, 2016, and finished on December 2, 2016. (Dkt. No. 760 at 1). Defendant represented himself during *voir dire* with his attorneys acting as standby counsel. *Id*. He then requested that his standby counsel be reappointed during the guilt phase of trial and that he be allowed to represent himself during the penalty phase, which the Court granted. (Dkt. Nos. 728; 740 (minute entry)).

The guilt phase began December 7, 2016, during which the Government presented evidence from eyewitnesses, responding law enforcement officials, forensics experts, and a pathologist. (Dkt. No. 775 (minute entry)). The Government also presented Defendant's recorded confession to the crime and his online writings. On December 15, 2016, the jury found Defendant guilty on all charges. (Dkt. No. 817 at 1-14). After the verdict, Defendant confirmed his desire to represent himself during the penalty phase and to forgo mitigating evidence. (Dkt. Nos. 818 at 1-2, 832 at 2 (counsel noting that Defendant "plans to call no witnesses, present no evidence, cross-examine no government witnesses, and do nothing otherwise to defend himself against the government's case for the death penalty").

Before the penalty phase began, Defendant's counsel moved for a second competency examination and hearing. (Dkt. No. 832 at 1). The Court granted the motion, reappointed Dr. Ballenger, and held the second competency hearing on January 2, 2017. (Dkt. No. 881 at 3-4). The

7

Court determined Defendant was competent to stand trial and represent himself, *id.* at 16-18, and the penalty phase began on January 4, 2017. The Government presented friends and family members of the victims and evidence of Defendant's post-crime writings. Defendant did not present any evidence. On January 10, 2017, the jury recommended a death sentence for each capital charge. (Dkt. No. 871 at 17).

After the verdict, Defendant unsuccessfully requested new attorneys to prepare and file a motion for new trial. Sentencing Hrg. Tr., Jan. 11, 2017, at 100-01 (Dkt. No. 949).

## STANDARD OF REVIEW

A petitioner may attack the validity of a conviction or sentence by filing a motion under 28 U.S.C. § 2255, asserting they were "imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). The motion must "allege specific facts which, if true, would [justify] relief." *United States v. McMullen*, 98 F.3d 1155, 1159 (9th Cir. 1996). However, the court need not accept as true allegations that are "contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *United States v. Regenos*, 405 F.3d 691, 694 (8th Cir. 2005) (quoting *Sanders v. United States*, 341 F.3d 720, 722 (8th Cir. 2003)). No hearing is required to resolve a § 2255 motion if the "motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Relief may lie for errors of non-constitutional dimension only on a showing of "'a fundamental defect which inherently results in a complete miscarriage of justice,' or is 'inconsistent with the rudimentary demands of fair procedure.'" *United States v. Mikalajunas*, 186 F.3d 490, 495-96 (4th Cir. 1999) (citations omitted)

(first quoting *United States v. Addonizio*, 442 U.S. 178, 185 (1979); and then quoting *United States v. Timmreck*, 441 U.S. 780, 784 (1979)).

## **PROCEDURAL DEFAULT**

A § 2255 motion is not an opportunity to relitigate claims that were raised during direct appeal. *See United States v. Dyess*, 730 F.3d 354, 360 (4th Cir. 2013); *see also United States v. Frady*, 456 U.S. 152, 165 (1982) (observing that "we have long and consistently affirmed that a collateral attack may not do service for an appeal"); *United States v. Roane*, 378 F.3d 382, 396 n.7 (4th Cir. 2004) (absent "any change in the law," petitioners "cannot relitigate" previously decided issues in a § 2255 motion). Once direct appeals have been exhausted, a presumption exists that a defendant "stands fairly and finally convicted, especially when […] he already has had a fair opportunity to present his federal claims to a federal forum." *Frady*, 456 U.S. at 164. Absent an intervening change in the law, a defendant cannot "circumvent a proper ruling . . . on direct appeal by re-raising the same challenge in a § 2255 motion." *United States v. Linder*, 552 F.3d 391, 396 (4th Cir. 2009); *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976) (holding a criminal defendant cannot "recast, under the guise of collateral attack, questions fully considered by this court [on direct appeal]").

Absent narrow exceptions for their procedural defaults, petitioners also cannot make claims under § 2255 that they could have raised on direct appeal. *See United States v. Harris*, 991 F.3d 552, 558 (4th Cir. 2021). A petitioner can obtain review of procedurally defaulted claims by showing "either 'cause' and actual 'prejudice' or that they are 'actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 622 (1998) (citations omitted). To show "cause," a petitioner must establish that "'some objective factor external to the defense' prevented counsel from raising the claim on direct appeal." *United States v. McKinney*, 60 F.4th 188, 193-94 (4th Cir. 2023) (quoting

9

*Murray v. Carrier*, 477 U.S. 478, 488 (1986)). To show "prejudice," a petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170 (emphasis in original).

## SUMMARY OF ARGUMENT

The Government denies Defendant's specific allegations to the extent they are not admitted within this response. Each of Defendant's claims fail as a matter of law. Below is a brief summary of the defendant's claims and the primary reasons they fail.

**Claim Three: Whether trial counsel were ineffective because they chose not to investigate potential communication deficits in order to prevent Defendant from asserting his Sixth Amendment right to self-representation**

Defendant claims that trial counsel should have investigated whether Defendant has an auditory processing disorder and pragmatic communication deficits to persuade the Court to bar him from representing himself. Counsel have no duty to prevent a competent defendant from exercising his constitutional rights, and the Court thoroughly considered Defendant's mental state and abilities, including his processing speed, before finding him capable of representing himself.

**Claim Four: Whether trial counsel were ineffective for invoking his right to speedy trial as part of a deliberate trial strategy to expedite the federal trial over the state trial**

Defendant claims that trial counsel were ineffective for invoking his right to a speedy trial and seeking a trial date roughly eighteen months after his crime. This claim fails because Defendant's experienced capital counsel made a strategic decision to prioritize trying the federal case to forestall state capital proceedings for which state defense attorneys were unprepared.

**Claim Five: Whether trial counsel were ineffective for taking a measured approach to the mitigation investigation**

Defendant claims that trial counsel were ineffective for not immediately revealing their mitigation strategy, which he contends led him to represent himself and forgo mitigating evidence. Defendant had no right to dictate counsel's mitigation strategy, and he made clear that he would not permit counsel to represent him if they planned to pursue a mental health mitigation strategy. Moreover, once he chose to represent himself, Defendant became responsible for his case, and he deliberately declined any mitigation presentation. He cannot show he suffered prejudice from counsel's actions.

**Claim Six: Whether Defendant were constructively deprived counsel when he chose to represent himself**

Defendant claims an irreparable breakdown in his relationship with his trial attorneys constructively denied him his constitutionally guaranteed counsel. This claim fails because Defendant and counsel maintained a relationship throughout trial. Indeed, Defendant asked counsel to sit with him while he was self-representing and requested their representation during the guilt phase, for which he specifically waived any conflict. His adamant opposition to counsel's mental health mitigation strategy, not a constitutionally irreparable breakdown in the relationship, led to his decision to represent himself during the penalty phase.

**Claim Seven: Whether trial counsel were ineffective for pursuing mental health mitigation as part of a strategy to maximize the possibility of a life sentence**

Defendant claims trial counsel ineffectively insisted on mental health mitigation evidence, causing him to represent himself and forgo mitigating evidence. This claim fails because what mitigation strategy to pursue falls within the discretion of counsel, and based on their professional judgment, they believed mental health mitigation would maximize the likelihood of a life sentence. Moreover, Defendant specifically refused to present *any* available mitigating evidence, regardless of whether it was related to mental health, and therefore cannot establish prejudice.

**Claim Eight: Whether trial counsel were ineffective for not ensuring that Defendant was present during non-critical stages of the case**

Defendant claims that counsel were ineffective for failing to ensure his presence during five hearings. This claim fails because Defendant cannot show that his presence was required at any of those hearings or that the outcome of the hearings or his trial would have been different had he attended.

**Claim Nine: Whether trial counsel were ineffective for not seeking a change of venue**

Defendant claims that his attorneys were ineffective for failing to move for a change of venue or an intra-district transfer based on negative media reports leading up to his trial and for failing to conduct a "community attitude survey," which he speculates would have supported efforts to move his trial. Trial counsel had several rational strategic reasons for not seeking a venue change, including their decision to prioritize trying the federal case before the state trial and their obvious preference for jurors drawn from the Lowcountry rather than from other parts of the state. Moreover, Defendant cannot establish that the media attention resulted in presumptive or actual prejudice. This Court's individualized *voir dire* procedures ensured that the jurors selected for trial were fair, impartial, and unbiased.

**Claim Ten: Whether this Court should have struck certain venire members**

Defendant claims that three potential jurors should have been struck for cause because of their views on the death penalty. This claim fails because it is procedurally defaulted, this Court's decision to qualify these jurors was not erroneous, and none of the challenged individuals in question actually served on the jury.

**Claim Eleven: Whether trial counsel were ineffective because he adduced a statement on cross-examination and failed to timely object**

Defendant claims trial counsel ineffectively cross-examined a guilt phase witness and elicited a prejudicial statement that Defendant was "evil" and would "go to the pit of hell." The claim fails because trial counsel made a strategic decision to cross examine the witness, which should not be second-guessed based on hindsight. Additionally, Defendant cannot show he suffered prejudice as the Fourth Circuit determined on direct appeal that the comments did not undermine the fundamental fairness of trial.

13

**Claim Twelve: Whether trial counsel were ineffective for failing to zealously argue to dismiss the indictment**

Defendant asserts that trial counsel provided ineffective assistance of counsel by failing to adequately litigate dismissal of the charges against him. Defendant already challenged on direct appeal most of the issues he reasserts in his petition—namely, whether §§ 247 and 249 qualify as crimes of violence; whether §§ 247 and 249 are constitutional; and whether the Attorney General's certifications are valid—and the Fourth Circuit squarely rejected those claims. Moreover, Defendant's arguments are meritless under current law, and he therefore cannot establish prejudice. His trial counsel's performance was also entirely reasonable under the law that existed at the time of his trial.

**Claim Thirteen: Whether appellate counsel were ineffective on direct appeal**

Defendant's claims that his appellate counsel provided ineffective assistance of counsel are based on the same arguments that he raised with respect to his trial counsel's performance. Defendant does not identify any substantive arguments that appellate counsel failed to make on direct appeal and thus fails to establish that his appellate counsel performed deficiently. Moreover, Defendant's legal arguments about appellate counsel's performance are foreclosed by current law, therefore he cannot show any prejudice from appellate counsel's alleged failures.

**Claim Fourteen: Whether the elements clause of § 924 is unconstitutionally vague**

Defendant claims that the elements clause, § 924(c)(3)(A), is unconstitutionally vague. This claim should be denied as procedurally defaulted, and Defendant cannot establish cause or prejudice to excuse the default. If this Court were to review the merits of this claim, it should be denied because the Fourth Circuit has squarely held that the elements clause is *not* unconstitutionally vague, a binding precedent that Defendant ignores in his § 2255 motion.

**Claim Fifteen: Whether Defendant's convictions are valid under current law**

Defendant claims that, under current law, §§ 247 and 249 are not crimes of violence; § 249 violates the First Amendment; and charging Defendant with § 924(j) counts and the predicate crimes of violence violates the Double Jeopardy Clause. The First Amendment and Double Jeopardy claims are procedurally defaulted, and the crimes of violence issues have already been decided by the Fourth Circuit. In addition, under current Supreme Court and Fourth Circuit precedent, each of these claims are without merit.

**Claim Sixteen: Whether the method of execution violates the Eighth Amendment**

Defendant claims that his eventual execution will violate the Eighth Amendment. This claim is not ripe for review because there is no existing protocol for federal executions, and Defendant will not be scheduled for execution until he exhausts his post-conviction remedies.

**Claim Seventeen: Whether the Eighth Amendment categorically exempts a twenty-one-year-old offender from the imposition of the death penalty**

Defendant claims the Eighth Amendment bars his death sentence because he committed his crimes at age twenty-one. Defendant raised this claim on direct appeal, and the Fourth Circuit rejected it. Thus, this claim is both unreviewable because it was resolved on direct appeal and also lacks merit. Until the Supreme Court says otherwise, any person eighteen years of age or older may be subjected to the death penalty without offending the Eighth Amendment.

**Claim Eighteen: Whether the death penalty is unconstitutional**

Defendant claims the death penalty is unconstitutional because it relies on arbitrary factors. This claim is procedurally defaulted as Defendant could have raised it on appeal but failed to do so. It also lacks merit, as the Supreme Court has upheld the Federal Death Penalty Act.

**Claim Nineteen: Whether this Court should have recused itself and whether Defendant's trial counsel was ineffective for failing to move for recusal**

Defendant claims, for the fifth time, that this Court was biased against him and therefore should not have presided over his case. As this Court and the Fourth Circuit have found, Defendant has failed to proffer any competent evidence to establish bias, and his claim should be denied. Trial counsel was not ineffective for failing to make a baseless recusal motion.

## ARGUMENT

**I. DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM ONE**











































































51





██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████

## II.  DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM TWO

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████

████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████

████████████████████████████████████████████

are the chances of that one, on that day, at that time on the way, not knowing it was







































### III.   DEFENDANT RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL IN THOSE INSTANCES IN WHICH HE QUALIFIED FOR IT

Defendant asserts a litany of claims that his trial team—which included nationally renowned capital litigators with decades of experience—provided ineffective assistance of counsel. All of these claims should be denied. Trial counsel zealously represented Defendant, even in their capacity as standby counsel, and none of the alleged deficiencies cited in Defendant's § 2255 motion caused him any prejudice. Indeed, this Court repeatedly expressed confidence in trial counsel's performance, describing them as "effective," "competent," and "loyal" and noting that they knew "the record inside and out," were "incredibly diligent about every presumed error," filed motions "frankly every couple of days," and "zealously represented" Defendant. Sentencing Hrg. Tr., Jan. 11, 2017, at 100-01 (Dkt. No. 949). Defendant's claims of ineffective assistance lack merit and should be denied.

## A. **General Legal Standards for Ineffective Assistance of Counsel Claims**

For efficiency, the Government sets out the following operative general legal standards and facts that collectively apply to Defendant's assertions in Claims 3-11 that his trial counsel provided ineffective assistance.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on such a claim, Defendant must show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *Id.* at 687.

Under the first prong, a reviewing court applies a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Courts must not "insist counsel confirm every aspect of the strategic basis for his or her actions" because there is "a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curium)).

A court should also avoid "second-guess[ing]" defense counsel's performance. *Strickland*, 466 U.S. at 689; *Roach v. Martin*, 757 F.2d 1463, 1476-77 (4th Cir. 1985). Instead, it should recognize that "[o]missions are inevitable" and determine what actions are "constitutionally compelled," not just what might appear "prudent or appropriate" in the "the artificial light of hindsight." *United States v. Giannone*, Crim. No. 3:06-1011, 2011 WL 1576198, at *2 (D.S.C. Apr. 26, 2011) (citations omitted). Ineffective assistance claims are not a vehicle to "'grade

counsel's performance' like the critic . . . who points out . . . where the doer of deeds could have done them better.'" *United States v. Powell*, 134 F.4th 222, 228 (4th Cir. 2025) (quoting *Strickland*, 466 U.S. at 697) (alterations in original).

Thus, courts evaluate counsel's performance in light of the circumstances of the representation. *See Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) ("The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential."). "Perfection is not required" and the test is not "whether the best criminal defense attorneys might have done more" but merely whether the attorney's actions fell "within the wide range of reasonable professional assistance." *Giannone*, 2011 WL 1576198, at *2 (quoting *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995)).[20] Counsel need not channel the best of his peers in every statement, question, or action. Rather, the "critical" question in assessing a claim of ineffective assistance of counsel is whether counsel's performance "amounted to incompetence under prevailing professional norms." *Powell*, 134 F.4th at 228.

To establish prejudice, Defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A criminal defendant alleging prejudice must show that counsel's deficiencies "were so serious as to deprive the defendant of a fair trial, a trial whose result is

---

[20] A court evaluating a claim of ineffectiveness must consider "only the commands of the Constitution." *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984). Though courts may take precautions "to ensure that counsel in serious criminal cases are qualified," *id.*, retrospective evaluation of a lawyer's performance under constitutional requirements remains limited. *Cf. Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) ("[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one.").

reliable." *Id.* at 687; *see also Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (holding that the prejudice prong focuses on "the fairness of the adversary proceeding").

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." *The likelihood of a different result must be substantial, not just conceivable.*

*Harrington*, 562 U.S. at 111-12 (emphasis added) (citations omitted)

**B.  Facts Relevant to Claims 3-12**

The following facts, recited in general chronological order, provide context for Defendant's ineffective assistance of counsel claims.

### 1.  Pretrial Preparation and Investigation

After the Government charged Defendant, in July of 2015, the Court appointed David Bruck and Michael O'Connell as trial counsel.[21] (Dkt. No. 21 at 2). The Court described Mr. O'Connell as having significant experience in capital cases. *Id*. The Court stated that Mr. Bruck was a law professor at the Washington and Lee University School of Law and had "extensive experience representing death penalty defendants in trial and appellate courts, as well as the United States Supreme Court." *Id*. The Court cited Mr. Bruck's role as "Federal Death Penalty Resource Counsel to the federal defender program" and his service as "Chair of the National Consortium for Capital Defense Training, and as Director of the Virginia Capital Case Clearinghouse." *Id*. Media reported that Defendant had obtained the assistance of "legendary death penalty lawyer Bruck."

---

[21] The Government refers to Defendant's trial attorneys collectively as "trial counsel," identifying them by name, as appropriate.

John Monk, *Roof gets legendary death penalty lawyer Bruck; Judge Gergel to preside*, THE CHAROLOTTE OBSERVER (July 23, 2015), available at https://www.charlotteobserver.com/news/local/crime/article28473463.html (last accessed Oct. 12, 2025). Mr. Bruck is considered one of the "foremost experts in capital defense in South Carolina." *See Stokes v. Stirling*, No. CV 1:16-845-RBH-SVH, 2018 WL 4941125, at *58 (D.S.C. May 9, 2018), *report and recommendation adopted as modified*, No. 1:16-CV-00845-RBH, 2018 WL 4678578 (D.S.C. Sept. 28, 2018), *vacated and remanded on other grounds,* 64 F.4th 131 (4th Cir. 2023). The team later expanded to include attorneys Kim Stevens, Emily Paavola, and Sarah Gannett, and Mr. O'Connell left the team in the summer of 2016. (Dkt. Nos. 1077 at 11; 1077-5 at 3).

In October 2015, the Court met with the parties and discussed the potential scheduling conflict between Defendant's state and federal trials. It noted, and the Government confirmed, Defendant was set for trial in state court in July of 2016. *See* Bar Meeting Tr., Oct. 1, 2015, at 16 (Dkt. No. 67). The Government said it was in discussions with the state prosecutors but had not agreed which case would proceed first. *Id.* at 17. Trial counsel noted that the state prosecutors were seeking the death penalty. *Id.* at 17. On October 9, a state prosecutor confirmed in a letter to the Court that the state was seeking the death penalty, the state case was set for trial in July of 2016, and the state prosecutors wanted to proceed before the federal trial. (Dkt. No. 68 at 1-2).

In a status conference in February of 2016, the Court noted Defendant could "effectively pick [his] jurisdiction to try the case" by invoking his speedy trial rights. Bar Meeting Tr., Feb. 11, 2016, at 9-10 (Dkt. No. 981). A few months later, the state trial was continued to January of 2017, and trial counsel invoked Defendant's right to a speedy trial in federal court. (Dkt. No. 1077-5 at 1-2). ███████████████████████████████████████████████████████

███████████████████████████████████████████ The next month, trial counsel retained a jury consultant. (Dkt. No. 1077 at 108). On June 3, 2016, the jury consultant recommended a request for more time to complete the jury questionnaire, but counsel decided against that approach. (Dkt. No. 1077-5 at 5).

While trial counsel pushed for a quick trial, they assessed a mitigation case for the penalty phase. Even early in the case, Defendant was extremely skeptical of mental health evidence. In his pre-arrest journal, Defendant wrote he was "morally opposed to psychology. It is a Jewish invention, and does nothing but invent diseases and tell people they have problems when they don't." Guilt Phase Trial Tr. Vol. III, Dec. 9, 2016, at 568-69, 583 (Dkt. No. 896). During a pretrial hearing, Defendant's state court attorney described his client as "nervous that I was going to start analyzing him psychologically or start being critical of him in some way." Suppression Hrg. Tr., Sept. 20, 2016, at 40 (Dkt. No. 437). The attorney explained that Defendant "said explicitly that he really didn't believe in the idea of psychology, or really psychiatry." *Id.* at 58-59. Defendant "didn't want to embarrass himself and he didn't want to embarrass his family by getting some sort of label." *Id.* at 59. Defendant even interfered with trial counsel's ability to gather information from his family. (Dkt. No. 652 at 52).

Nevertheless, trial counsel began investigating Defendant's background, medical issues, and mental health issues. ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



Trial counsel worked with a team of experts, including a forensic psychiatrist (Dr. Donna Schwartz Maddox), a neuropsychiatrist (Dr. George Woods), two neuropsychologists (Drs. Paul Moberg and Erin Bigler), a psychologist specializing in neurodevelopmental disorders (Dr. Rachel Loftin),[23] a neurologist (Dr. David L. Bachman), and an autism expert (Mr. John Elder Robison). (*See* Dkt. Nos. 1077 at 51-53; 1077-2 at 4-5 (Ouaou report (summarizing some of the prior testing and evaluations); 1077-4 at 1 (Bigler report); 832-6 (Loftin report); 832-7 (Moberg report); 832-8 (Maddox report); 832-9 (Robinson report)). The experts administered a battery of standardized neuropsychological tests. (Dkt. No. 1077-2 at 4). Neuroimaging was performed. (Dkt. No. 1077-4 at 1). Two experts, Drs. Woods and Maddox, recommended examination by a speech pathologist, advice made as part of a to-do list that would be used to argue for a continuance in the spring of 2016. (Dkt. Nos. 1077-13 at 2; 1077-15 at 2). Trial counsel ultimately opted not to retain a speech pathologist. (Dkt. No. 1077 at 56).

---

[23] Trial counsel interviewed Dr. Loftin in May of 2016 and retained her as an expert in June of 2016. (Dkt. No. 1077 at 107).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████ *Id.*; Competency Hrg. Tr. Vol. II, Nov. 22, 2016, at 105 (Dkt. No.

707). ████████████████████████████████████████████

███████████████████████████████████████

The experts ultimately diagnosed Defendant with ASD, other specified schizophrenia

spectrum and other psychotic disorder, and anxiety disorder. (Dkt. No. 707 at 24). The experts

wrote reports that were submitted to the Court. (Dkt. Nos. 832-6; 832-7; 832-8). Dr. Loftin noted

in her report that Defendant's test performance showed deficiency in his pragmatic or social use

of language, as he scored at the level of a fourteen-year-old. (Dkt. No. 832-6 at 23). Dr. Loftin

wrote that Defendant displayed "difficulty in back and forth conversation," "lack of initiation or

response to overtones," and "[p]oorly integrated verbal and nonverbal communication." *Id.* at 51.

Dr. Moberg noted Defendant's reduced processing speed, among other issues, and opined that his

impairments have the implications of "disruptions of decision-making, coding and tracking new

information, weighing options, adjusting to new information and modifying thinking and

behavior." (Dkt. No. 832-7 at 11). Dr. Maddox wrote that Defendant "has difficulty interpreting

social cues accurately . . . he has difficulty comprehending the emotional content of language and

situations . . . ." (Dkt. No. 832-8 at 19-20).

On June 7, 2016, amidst trial counsel's pretrial preparations, the Court held a scheduling

conference. The Court questioned the parties about the practicalities of the November date and

noted that trial counsel were asking "to go to trial far faster than most capital defendants go." Bar

Meeting at 35, June 7, 2016, at 3, 35 (Dkt. No. 207). The Court acknowledged that trial counsel

"may have his own reasons to do that." *Id*. at 35. It asked if the Government would be ready for

trial by November, and the Government confirmed it would. *Id.* at 47-48. The Court then had the

following colloquy:

> THE COURT: Okay, Mr. Bruck, your turn. Does [a] November 7 trial start date provide you an adequate time to complete all expert evaluations?
>
> MR. BRUCK: Yes, Your Honor.
>
> THE COURT: Does it provide you adequate time to complete all investigations?
>
> MR. BRUCK: Yes, Your Honor. I should say, with respect to all of these questions, and I have a sense that I know what the rest of them will be—
>
> THE COURT: Good guess.
>
> MR. BRUCK: —that this, by definition, is based on what we know now and what is reasonably foreseeable.
>
> THE COURT: Correct. Mr. Bruck, here's the—you just I think this is important to understand. Obviously a shot out of the dark is one thing.
>
> MR. BRUCK: Yes.
>
> THE COURT: Things that I can figure are reasonably foreseeable are another. And only the shot out of the dark would result in any continuance. And I think the chances of that are extremely remote. So I'm calling upon your knowledge of foreseeability and your vast experience in this area. It wasn't an accident that you were selected for this case, I did not pull your name out of a Fun Book, okay? So the question is, do you have an adequate time to complete all investigations?
>
> MR. BRUCK: Yes.
>
> THE COURT: Do you have an adequate time to prepare and complete all legal research and all motions?
>
> MR. BRUCK: Yes.
>
> THE COURT: Do you have an adequate time to prepare jury charges?
>
> MR. BRUCK: Yes.
>
> THE COURT: Do you have an adequate time to prepare all suppression-related issues?

MR. BRUCK: Yes.

THE COURT: Do you have an adequate time to fully prepare for trial on all aspects of the defense?

MR. BRUCK: Yes.

THE COURT: Are you personally satisfied that a November 7 date does not raise any question regarding ineffective assistance of counsel because of an inadequate time to prepare?

MR. BRUCK: Yes.

THE COURT: Are you aware of any factor that might necessitate a delay in the start of the trial?

MR. BRUCK: I have indicated that we intend to ask for additional assistance for the defense. And I, in answering these questions, I am factoring in my belief—

THE COURT: You think you know the answer to the question, hum?

MR. BRUCK: I think the Court would—

THE COURT: You have a good guess, okay?

MR. BRUCK: Thank you. On that assumption, which perhaps I had no right to make, but I appreciate it, the answer is yes.

THE COURT: And do you understand that if we set the trial for November 7, that will be the beginning date for the trial?

MR. BRUCK: Yes.

*Id.* at 48-50.

In July 2016, Defendant, through counsel, gave initial notice that he would present expert evidence "relating to a mental disease or defect or any other mental condition bearing on the issue of punishment." (Dkt. No. 245 at 1). In response, the Government moved to examine Defendant under Federal Rule of Criminal Procedure 12.2(c)(1)(B), and the Court granted the motion, providing the examinations occur after September 11, 2016. (Dkt. No. 280 at 1). ████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████

On September 30, 2016, the Court held a status conference to discuss scheduling at the request of a group of victims' families. The families asked that the trial start in January of 2017 instead of November of 2016 to avoid holiday conflicts. Hrg. Tr., Sept. 30, 2016, at 3 (Dkt. No. 461). The families' attorney said he had contacted counsel for the parties, and both said that they anticipated a break to accommodate the holidays and would not agree to a continuance. *Id.* at 3-4. The Court explained the trial would begin in November but would pause for the holidays. *Id.* at 4. Trial counsel expressed amenability to beginning testimony after New Year's Day, and the Court responded that it would not take that approach. *Id.* at 7. The Court said it "had a very careful questioning of counsel about wanting to proceed in the November term" and the trial would be "starting as we agreed to." *Id*. The Court also observed that the quality of work from the attorneys was "outstanding" and that trial counsel were "doing first rate work." *Id.* at 10.

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████    *Ex Parte* Hrg. Tr., Nov. 2, 2016, at 5 (Dkt. No. 629). They knew "when the evaluation was done [they] were going to have to discuss with [Defendant] what [their] expert's findings were," and they knew "that he would be very upset about it." (Dkt. No. 629 at 10). Trial

counsel sought expert assistance regarding their eventual discussion with Defendant "for many months." *Id*. ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████

### 2. Defendant Expresses Vehement Opposition to Presentation of Mental Health Mitigation Evidence.

On October 25, 2016, Dr. Park Dietz, the Government's forensic psychiatrist expert, was scheduled to begin his evaluation of Defendant, but this examination immediately hit a roadblock. The Court had ordered videotaping of the examination. Telephone Conference Tr., Oct. 25, 2016, at 3 (Dkt. No. 505). When Dr. Dietz began the exam, Defendant refused to cooperate unless the expert abandoned recording and conducted the testing in a non-contact booth. (Dkt. No. 503 at 1). Dr. Dietz sent a letter to the Court requesting guidance, and the Court conferred with counsel for the parties. *Id*.; (*see generally* Dkt. No. 505). Trial counsel admitted that they were unsurprised, as they believed Defendant suffered from some "confounding psychological factors." (Dkt. No. 505 at 3-4). Trial counsel said they had hoped that Defendant would not fight the recording requirement because he tended to be "compliant in the face of authority," but also revealed that he had refused contact visits with his own experts. *Id.* at 3-5. The Court then conferred with Dr. Dietz and asked whether he could conduct his examination in the non-contact booth without recording. (Dkt. 507 at 1-2). Dr. Dietz said he could conduct an examination in that manner, and the Court ordered it to go forward. *Id*.

During Dr. Dietz's examination, the subject of the ASD diagnosis arose, and Defendant reacted poorly to the revelation that trial counsel intended to present such evidence. (Dkt. No. 629

at 2-5). He became increasingly defiant to trial counsel and told them he planned to accuse them of misconduct in a letter to the prosecution. *Id.* at 9.

During an *ex parte* conference on November 2, 2016, trial counsel informed the Court of the development, explaining they had considered for months how to broach the subject of the mitigation presentation with Defendant. They acknowledged Defendant was resistant to the idea of a mental health presentation, because he did not want to be embarrassed, but opined that his opposition flowed from his mental impairments. *Id.* at 6, 9-13. Trial counsel explained that they had not informed Defendant of some findings for fear that he would refuse to cooperate with the Government's evaluation, which could, as the Court observed, "blow up the defense." *Id.* at 5. The Court said it had anticipated Defendant would resist mental health evidence and believed trial counsel had not fully disclosed the diagnoses to avoid him "blowing up." *Id.* at 13; *see also id.* at 9-10. The Court acknowledged the Defendant's preferred defense would "not be very effective. I did it and I'm proud of it, right?" *Id.* at 20. Trial counsel agreed. *Id*. The Court explained how it anticipated the case could progress:

> Well, here is sort of the scenario. At some point he writes the Government. I would presume the Government would promptly file something with me containing that document. When I have situations arise where a defendant is unhappy with his or her lawyer, I hold a hearing in camera. I send the prosecutor out and I have a hearing, and I allow the defendant to voice concerns, and I hear from counsel, and I make a decision about whether I should remove counsel, if that's his request, right? You know, he is supposed to be the master of his case, right? It's a little complicated, but that generally is the concept, one is the master of his case. So he could attempt to fire you and try to self-represent. You tell me his social anxiety would probably prevent him from doing that, and I would have to make an evaluation whether he has the competency to self-represent.

*Id.* at 12.

Trial counsel opined that Defendant's right to represent himself had "probably run its course," and the Court responded that it might have to resolve the issue. *Id.* at 12-13. They

discussed some accommodations for Defendant during jury selection and Defendant's resistance to the mental health defense. *See id.* at 13-22. The Court then discussed ways in which it could accommodate Defendant's anxiety about the courtroom, as well as certain administrative issues. *Id.* at 23-28. The Court also told trial counsel they had a "right to mount your defense until you are removed." *Id.* at 23. Defendant was not present for this conference.

Defendant followed through on his threat to send a letter to the Government. (Dkt. No. 545). He wrote, "what my lawyers are planning to say in my defense is a lie and will be said without my consent or permission." *Id.* at 2. He claimed his lawyers "purposely kept [him] in the dark" about the defense, and said he was "lied to repeatedly in order to get [him] to speak to mental health experts." *Id*. He alleged his attorneys told him he needed to talk to the experts to obtain medication for a thyroid condition and that he was "never told what they actually specialized in." *Id*. He also claimed the experts had lied and told him that they needed to collect as much material as possible to help him obtain his thyroid medication. *Id.* at 3. After the Government provided the letter to the Court, trial counsel moved for an *ex parte* hearing. (Dkt. No. 544). In that motion, trial counsel argued the letter had ruptured the attorney-client relationship and raised issues regarding Defendant's competency. *Id.* at 2-3.

On November 7, 2016, the Court held the *ex parte* hearing with trial counsel and questioned Defendant at length about the letter. Defendant confirmed writing the letter and said he did not want trial counsel to present evidence of his ASD diagnosis. (Dkt. No. 652 at 4-5). He expressed his belief that he did not suffer from ASD. *Id.* at 5-8. Defendant acknowledged that trial counsel listened to his concerns about the ASD evidence and explained why they believed it was a proper approach. *Id*. at 7-8. Defendant said he did not think trial counsel believed he had ASD, and that they were just asserting that defense because "they don't have anything else to use." *Id.* at 9.

The Court asked Defendant, "If you could control the defense, . . . what would you want to have said?" *Id*. Defendant replied, "I don't want any defense." *Id.* at 9. Asked to explain, Defendant stated, "[W]hat I would do is let the prosecution present their evidence and that's it." *Id.* at 9-10. The Court explained the difference between the two trial phases and asked Defendant "if you did not have to defer to the advice of your lawyers, what would you want to do?" *Id.* at 10-12. Defendant responded, "in the sentencing, I would . . . not present any mitigating evidence." *Id.* at 12. The Court advised Defendant the decision whether to present mitigation was within counsel's discretion and cautioned him that if no mitigation was presented, there was a good chance he would receive the death penalty. *Id.* at 12. Defendant acknowledged the point but said it was not worth presenting mitigating evidence if he was labeled autistic. *Id.* at 12.

The Court asked Defendant if, assuming his lawyers and experts were right about his ASD, he would want the jury to hear the mitigation case, and Defendant responded, "No. No. No." *Id.* at 12-13. When asked why not, Defendant said he did not want the jury to think he was autistic. *Id.* at 13. The Court asked if Defendant would "rather die than be labeled autistic?" and he responded, "Yes." *Id*. He asserted "once you've got that label, there is no point in living anyway." *Id*. Defendant explained that being labeled as autistic "discredits the reason why [he] did the crime." *Id.* at 15.

Defendant told the Court that his lawyers would not accede to his wishes and expressed his belief that "they should do whatever [he told] them to do." *Id.* at 18. The Court explained that trial counsel were entitled to put on the defense. *Id*. When the Court suggested that Defendant had written his letter to undermine a mental health presentation, Defendant responded, "Exactly." *Id.* at 18-19. Defendant acknowledged his attorneys' courteousness but expressed suspicion that they tried not to upset him and sometimes told him what he wanted to hear. *Id.* at 19. The Court stated

the attorneys were "working a lot harder to keep you alive than you may be willing to have them do, but they are working really hard for you, and they are very devoted to your case." *Id.* at 19.

Defendant complained that some experts were not testifying and that counsel was "picking the one that said I had autism." *Id.* at 20. The Court again asked what Defendant would present if ASD were excluded, and he said he would have to think about it. Defendant cautioned, "[i]t would be counterproductive for [his attorneys] to say anything. That would just make it worse." *Id.* at 22. He admitted his preferred defense would "aggravate things." *Id.* at 23. Defendant also acknowledged he could communicate with his attorneys and he understood their position though he disagreed with it. *Id.* at 24.

The Court dismissed Defendant from the hearing and questioned trial counsel, who explained they were in the process of having their client discuss the mitigation case with all the experts but had been waiting until the Government evaluation ended. *Id.* at 25. They represented that they had shown Defendant "every exhibit and told him about every witness, and . . . shared with him a very large number of memos, summaries of witness testimony for the defense." *Id.* at 26. Trial counsel said they had listened to Defendant as he expressed his resistance to the mental health evidence. *Id.* at 26-27. Trial counsel shared that in addition to evidence of ASD, another expert would opine that Defendant suffered from an anxiety disorder, delusions, and psychosis. *Id.* at 27.

Trial counsel explained the scope of their intended mitigation presentation and noted Defendant was "very irate and upset" that they planned to introduce photographs of him after he was assaulted in jail. *Id.* at 28-29. Trial counsel indicated they did not believe Defendant was previously incompetent to stand trial but that his recent behavior indicated his mental status had deteriorated. *Id.* at 29. Trial counsel said they were, prior to Defendant's letter to the Government,

"on a tight rope where [they] felt that any hope of maintaining an attorney-client relationship depended on the greatest discretion," and that they had hoped Defendant's anxiety would allow them to present a mental health mitigation defense without his interference. *Id.* at 31-32. Trial counsel also agreed Defendant would likely disfavor even non-ASD mental health evidence. *Id.* at 32. Trial counsel said that "[r]ecently [Defendant] has said he doesn't want us to do anything," but added he had asked counsel to present statistics of Black-on-white crime. *Id.* at 35, 37.

Trial counsel reiterated that they delayed a reveal of the mitigation case for client management reasons and agreed with the Court that it was their "good faith belief that because of [Defendant's] mental condition, that this approach was necessary to allow the best defense to be asserted." *Id.* at 46. Trial counsel expressed their belief that Defendant's resistance and letter were symptoms of his mental issues and clear signs of incompetence. *Id.* at 29-32. Trial counsel asked to send Defendant for a competency evaluation. *Id.* at 47. The Court mentioned that the delay could cause the state to move forward with its trial, and counsel responded that they did not believe the state would go forward during federal competency proceedings. *Id.* at 34. Trial counsel later explained the extent of Defendant's mental health issues and his desire to avoid a state trial:

> The reason it would be so distressing for the defendant to be tried in state court is television cameras. They have TV in state court and they don't have TV in Federal Court. The reason television cameras . . . . the one the thing we have done right by him is to take steps to increase the likelihood that this case would be tried first in Federal Court. And the reason it mattered to him was that he did not want the television camera trained on his face and his forehead for the public and the world to see. He could not tolerate the anxiety and distress that that causes. He is on a different planet from the rest of us.

*Id.* at 43-44.

Trial counsel also informed the Court that if the letter was allowed into evidence, they would have to withdraw. *Id.* at 41. Trial counsel said the letter would "create an insurmountable conflict with counsel" and could not simply be redacted because it called them "liars and

89

manipulators." *Id.* at 53-54. The Court said it would be "deeply reluctant to remove counsel after the exhaustive work that has been done. That would be, in the experience acquired by doing that, that would be, I think, very contrary to the defendant's interests." *Id.* at 55. The Court, noting uncertainty about the issue, gave trial counsel permission to brief it. *Id.* at 57.

### 3. Preparations for the First Competency Hearing

On November 7, 2016, the Court met with all counsel and ordered a competency examination by a court-appointed psychologist Dr. James Ballenger. Telephone Conference, Nov. 7, 2016, at 4 (Dkt. No. 978).

The Court also told the parties that it was "satisfied from the inquiry I made today there is sufficient relationship with counsel, competence in counsel and so forth and there is no reason at this point that we cannot proceed with jury selection. The issue relates to a matter that would arise later in the trial." *Id.* When trial counsel objected and requested postponement of jury selection to work on their relationship with Defendant, the Court responded, "I have questioned the client regarding his interaction with counsel. The issues are not related to what we are presenting now. He indicated he had a cordial relationship with counsel." *Id.* at 6. The Court then told trial counsel, "I am not going to delay the proceedings in this case. It's not necessary and I'm not going to allow, where it's not necessary, to completely disrupt hundreds of hours of work by your team and the Government regarding jury selection . . . ." *Id.* at 7. The Court scheduled individual *voir dire*— which had been set to begin on November 7, 2016, for November 9. (Dkt. No. 558).

The next day, trial counsel moved to reconsider the competency order and specifically requested a Bureau of Prisons evaluation and a postponement of jury selection. (Dkt. No. 562 at 1-2). Trial counsel emphasized they had not sought a competency evaluation earlier because they believed they had a duty to maintain their relationship with Defendant if possible. *Id.* at 4. They

assertedly made every effort to maintain that relationship and succeeded though Defendant was beset with "delusions, depression, extreme anxiety, and autism spectrum disorder." *Id.* at 4-5. Trial counsel believed their approach "to proceed with a great degree of caution" made a mental health evaluation possible at all. *Id.* at 5. They claimed Defendant's mental state devolved into incompetence only after he openly sabotaged them. *Id.* at 5-6. Trial counsel called Defendant's letter "demonstrably untrue," and said his allegations reflected mental illness and that they maintained hope they could restore a relationship with him. *Id.* at 5-7.

Trial counsel also clarified that when they originally announced they would be ready for trial in November, they anticipated still working on their preparations even after jury selection began and their preparations for the sentencing phase would continue even during the guilt phase of the trial. *Id.* at 8-9. However, "just in the last few days," their plans were derailed by Defendant's rebellion and the need for a competency hearing; thus, they asked for relief from the trial schedule. *Id.* at 9.

At a November 8, 2016 hearing on the continuance request, the Court acknowledged the obvious differences of opinion between Defendant and his counsel on the mitigation evidence. It found the request for time to repair the relationship reasonable. Telephone Conference Tr., Nov. 8, 2016, at 12 (Dkt. No. 993). It granted the motion and set the competency hearing for November 16 and jury selection for November 21. (Dkt. No. 564 at 1).

Dr. Ballenger conducted the competency evaluation and interviewed trial counsel as part of the process. (Dkt. No. 648-2 at 11-17). Trial counsel categorically denied the allegations in Defendant's letter and expressed a belief that Defendant would not have cooperated had they revealed the mental health defense earlier. *Id.* at 13, 16. Dr. Ballenger also interviewed Defendant, who said he thought his attorneys had lied to him to get him to talk to mental health examiners,

and that they were keeping him in the dark about the defense. *Id.* at 21. He claimed to have sent the letter to defuse his attorney's strategy and said he did not believe that "anyone would change his attorneys at this late point." *Id*. He expressed hope "that he will be able to get his attorneys to do what he wants" and "sincerely" believed "his attorneys are 'trying to help him.'" *Id.* at 22. He told Dr. Ballenger his attorneys were "trying to 'humanize me, but I actually don't want to be humanized, I want to be de-humanized.'" *Id.* at 23. He said his attorneys opposed his desire to present evidence to justify his actions and admitted he would personally be too embarrassed to present a defense that his actions were motivated by the dangers posed by Black Americans. *Id.* at 24.

Defendant said he would participate in the trial and suggest ideas to his attorneys if he thought them worthwhile but would otherwise talk as little as possible. *Id.* at 28. He worried a new attorney would come to the same conclusion about his mental health. *Id*. He also told Dr. Ballenger he did not believe his letter "compromise[d] his ability to work with his attorneys" and that he disagreed "on strategy so strongly" he would "fight them on that issue however he can." *Id.* at 30. He said he called his attorneys "liars" because he believed they hid the reason he was being evaluated and withheld information. *Id*. He said he could assist his attorneys "if he agreed with them, but he doesn't." *Id.* at 32.

He asked if he could represent himself because he wanted to "not have a defense presented." *Id.* at 36. He told Dr. Ballenger that "he did not want any evidence . . . he was 'defective' in any way, e.g. had social anxiety or took psychiatric medicines"[24] and claimed if his

---

[24] Defendant later claimed that Dr. Ballenger's notes were incorrect on this point and asserted he never used the term "defective." (Dkt. No. 858 at 5).

attorneys did not acquiesce to his desire to not present a defense at the sentencing phase, he would "*try* to stab his lawyer." *Id*. 41-43 (emphasis in original).

When trial counsel asked to delay the competency hearing, asserting a "breakdown in our relationship with the defendant" (Dkt. No. 615 at 1, 5), the Court held a hearing on November 16, 2016. Status Conference Tr., November 16, 2016 (Dkt. No. 686). It denied trial counsel's request to send Defendant for a BOP evaluation, and trial counsel asked to reset the competency hearing to November 21, and individual *voir dire* to November 28, 2016. *Id.* at 2. When the Government opposed the request, the Court said that trial counsel had "a heck of a problem on their hands, management problems" and granted the motion. *Id.* at 3. The Court then told the parties it intended to close the competency hearing to the public. *Id.* at 4. They discussed how the competency hearing would proceed, what access the Government would have to the mental health evidence, and the applicable legal standards. *Id.* at 9-23. Trial counsel asserted their belief that Defendant would seek to represent himself. *Id.* at 13.

The Court met with trial counsel after that hearing, outside their client's presence, and questioned whether they had considered jettisoning all mental health evidence in light of Defendant's opposition. *Ex Parte* Conference Tr., Nov. 16, 2016, at 2 (Dkt. No. 687). Trial counsel explained that they did not believe Defendant had the "capacity to make that decision rationally" and instead thought his opposition was fueled by his mental health issues. *Id*. The Court expressed concern that counsel's inclination to persist in presenting penalty phase mental health evidence could persuade Defendant to testify to the allegations in his letter. *Id.* at 3-4. Trial counsel assured the Court the "alternative is worse," and also expressed their belief that Defendant would not have the capacity to take the stand. *Id.* at 4. Trial counsel acknowledged they were considering

Defendant's wish to abandon his mental health defense, but they had no reason to believe giving up his "only sentencing defense," was the best course of action. *Id*. 4-5.

The Court asked whether Defendant's social anxiety would prevent him from actively opposing his attorneys in court, and trial counsel responded that Defendant did not think he could do so with the Government, the public, or victims present. *Id.* at 5. The Court noted it would have to question Defendant about his willingness to "be the center of attention" if he moved to represent himself. *Id.* at 6. The Court further announced that it would ask Defendant, upon a finding of competence, whether he wished to plead guilty and advised trial counsel to discuss the matter with him. *Id.* at 7-9. Finally, the Court discussed security issues in light of Defendant's threat to Dr. Ballenger that he would stab his attorney to prevent the presentation of evidence he opposed. *Id.* at 9-13.

On November 17, 2016, the Court held a hearing on the closure of Defendant's competency hearing, that Defendant did not attend. During the proceeding, the Government objected to closure, and the Court allowed victims and their relatives to protest the move. Closure Hearing Tr. at 3, Nov. 17, 2016 (Dkt. No. 988). Those individuals spoke at length, and the Court answered some questions on the procedure and the closure of the competency hearing. *Id.* at 3-21. Afterward, attorneys representing media outlets objected to closure of the hearing. *Id.* at 21-30.

On November 18, 2016, the Court held an *ex parte* teleconference with trial counsel, but not Defendant, to discuss how they would ensure that Defendant had a copy of Dr. Ballenger's report. *Ex Parte* Hrg., Nov. 18, 2016, at 2-3 (Dkt. No. 991). With respect to the competency proceeding, trial counsel stated that Dr. Maddox would travel during the hearing, and the Court said she could testify telephonically. *Id.* at 4-5. Trial counsel also requested permission for briefing after the competency hearing, and the Court said it did not need additional briefing. *Id.* at 5. The

Court also barred the state defense attorneys from attending the competency hearing. *Id.* at 6-8. Finally, the Court and counsel discussed how the attorneys could obtain materials from the competency experts. *Id.* at 8.

### 4. First Competency Hearing

The Court held a competency hearing on November 21 and 22, 2016. On the first day, Dr. Ballenger testified that Defendant did not suffer from a psychotic process but probably had a social anxiety disorder and schizoid personality disorder. Competency Hrg. Tr. Vol I, Nov. 21, 2016, at 23 (Dkt. No. 882-1). Dr. Ballenger also said he did not notice any traits of ASD during his evaluation but allowed that Defendant could suffer from that disorder based on defense materials. *Id.* at 23-24. Dr. Ballenger described Defendant as humorous and easy to talk to but said he could not act the same way in front of 20 people. *Id.* at 27. ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ Trial counsel also expressed an intent to show Dr. Ballenger a video of Defendant's visit with his mother while detained, but Defendant objected. (Dkt. No. 882-1 at 132). Trial counsel decided not to introduce the video based on Defendant's resistance. *Id.* at 133. Defendant also expressed his dissatisfaction with the fact that his family visits were recorded. *Id.*

Trial counsel further asked Dr. Ballenger to confirm that he had learned from trial counsel that Defendant "had gone to great lengths to try to persuade his family not to talk to [trial counsel], his mother in particular?" *Id.* at 136. Dr. Ballenger also testified that Defendant's social anxiety disorder would create difficulties for him in the courtroom, but that he would likely improve over time. *Id.* at 156.

The Government asked Dr. Ballenger about Defendant's letter. *Id.* at 187. Dr. Ballenger agreed that Defendant made a rational, strategic choice to write the letter and envisioned the Government putting it on a screen to contradict trial counsel's presentation. *Id.* at 187-88. The Government also confirmed with Dr. Ballenger that Defendant had spoken that day "with the 23 or so of us that I think were here at that time?" *Id.* at 214. Dr. Ballenger noted that Defendant "seemed relatively calm . . . focused and not distracted by anxious thought that would make him not be able to follow because he was response to the several-way conversation." *Id.* at 215. Finally, the Court asked Dr. Ballenger for an opinion about Defendant's courtroom behavior, observing that he sat rigidly and did not engage in the presence of the venire but interacted with the Court comfortably in subsequent proceedings. *Id.* at 225-27. Dr. Ballenger said Defendant's increasing comfort was consistent with his expectation that Defendant's courtroom anxiety would improve with exposure and experience. *Id.* at 227. At the end of questioning, Defendant attempted to interject with comments about the report, and the Court said he would have an opportunity to speak the next day. *Id.* at 229.

The next day, the Court heard testimony from Dr. Maddox and two other defense-retained experts, Drs. Stejskal and Carpenter. (*See* Dkt. No. 707). A fourth expert, Dr. Loftin, was unavailable, but the Government did not object to the admission of her affidavit. (Dkt. No. 707 at 10).

Dr. Maddox testified Defendant suffered from ASD, other specified anxiety disorder, and other specified schizophrenia spectrum and other psychotic disorder. *Id.* at 24. She explained he was very distractable and displayed "disorganized thinking." *Id.* at 37-38. She described his inappropriate affect and constricted emotions, observing he carefully and deliberately answered questions. *Id.* at 39-41. Dr. Maddox also testified that Defendant had severe impairments in his

96

ability to comprehend and express comprehension of the effects of his behavior on others. *Id.* at 43.

The Court questioned Dr. Maddox about Defendant's consistent opposition to a mental health defense and his ability to assist his attorneys. *Id.* at 80-83. The Court said, "I don't fault the defense counsel the slightest for asserting the defense. But I—I anticipated that the defendant in his own world view would resent it, oppose it in every way he could." *Id.* at 83. Dr. Maddox responded that Defendant had "developed another paranoid level to it." *Id.* at 84.

Dr. Maddox also confirmed that Defendant wanted his attorneys "to present no defense, and he wants [them] to be quiet." *Id.* at 97. The Court again inquired about Defendant's increasing comfort in the courtroom, and Dr. Maddox said his anxiety might decrease with familiarity but other factors were at work. *Id.* at 101. She specifically mentioned that Defendant's attorneys could no longer calm his anxiety. *Id.*

She also "absolutely" agreed that any competent lawyer would "insist" on a "mental health defense in this case" and that "there is no solution to this." *Id.* Dr. Maddox opined that Defendant would get more uncomfortable "if his family members were to testify." *Id.* at 102. She specifically warned that Defendant would decompensate if his mother testified. *Id.* at 104. In fact, Defendant was upset that Dr. Maddox had talked to his mother. *Id.* at 105.

On cross-examination, Dr. Maddox mentioned that Defendant was upset that trial counsel had discussed his competency issues with the Court outside his presence. *Id.* at 129-30. The Court acknowledged allowing trial counsel to speak without Defendant present because it needed their "full report of that because I had to make a determination whether there was a reasonable basis to do an evaluation." *Id.* at 130. On redirect, Dr. Maddox stated that Defendant's history of waiving

appearances was consistent with her observations, as he wanted to avoid being the center of attention. *Id.* at 139-40.

Dr. Carpenter, an ASD expert added to the team for purposes of the competency hearing, testified that people with ASD often give "inappropriate responses," such as "not matching the tone of the greeter, or not saying the right thing at the right time" and "not picking up on the social cues of the situation and understanding the appropriate way to behave." *Id.* at 150, 161. Dr. Carpenter also testified that "conversational breakdowns are a big problem for people with autism." *Id.* at 162. She testified that ASD could cause individuals to miss social cues and "make other people have difficulty understanding what you are trying to communicate." *Id.* at 166-67. Dr. Carpenter opined that the impairment can cause an individual to miss a "lot of really important information," and others "might be missing a lot of information coming from" the individual. *Id.* at 166; *see also id.* at 170-73.

Trial counsel also called Dr. Stejskal, a clinical and forensic psychologist, who testified that Defendant's processing score was significantly lower than his verbal comprehension score and observed that the score profile was a characteristic pattern of performance for people who are schizophrenics or adults on the autism spectrum. *Id.* at 200, 233-34. Dr. Stejskal then opined that the difference in scores could not be explained by "any other psychiatric conditions" barring "some unusual sort of brain injury . . . ." *Id.* Stejskal also testified that Defendant wanted to "waive putting on a defense." *Id.* at 219.

After the experts testified, the Court questioned Defendant, who commented on various parts of the testimony. Defendant said he was "playing" with Dr. Stejskal during his evaluation because he did not want to talk to him. *Id.* at 259-60. He claimed to recognize all "social cues, even if they don't think that I do." *Id.* at 261. Defendant said he had cooperated with his attorneys

before he discovered that they intended to present his mental health issues and that he had believed the experts were brought in to address his thyroid concerns. *Id.* at 261-64. Defendant said his attorneys "take advantage of the fact that I'm cooperative. That—that is what they have been doing this whole time." *Id.* at 262. Defendant repeated his claim that his lawyers had him meet with experts under the guise of seeking treatment for his thyroid. *Id.* at 264.

The Court asked Defendant about his understanding of the proceedings and his situation and then about his ability to work with counsel. *Id.* at 268. Defendant said he would be comfortable writing counsel a note or whispering to them if he wanted to tell them something. *Id.* at 268. He confirmed that he was limiting his communications with his lawyers because he "opposed their mental health defense." *Id.* at 268-269. He agreed he could speak "more freely to [his] lawyers if they would assume" his preferred defense. *Id.* at 269. He said that he "didn't want my act to be discredited." *Id.* at 273. He further explained:

> [T]he main thing is that I don't want . . . I don't want anybody to think that I did [the crime] because I have some kind of mental problem. That's much more important than my reputation because I don't even have a reputation to preserve in the first place. But I also don't want to make it worse than it already is.

*Id.* He further said, "I don't want anybody to think that I have any mental problems because I don't." *Id.*

Although he repeatedly complained that his attorneys had lied to him, *see id.* at 277-78, he also asked if he could keep his lawyers while assuming their decision-making power, *id.* at 279. The Court said he could not. *Id.* The Court advised Defendant his attorneys could not accede to his strategic demands. *Id.* at 281. Defendant responded that he had "a right to represent [himself]," and the Court said he had a right to make a motion to represent himself. *Id.* at 281. Defendant noted that he did not know how he would cooperate with his attorneys after some of the things

99

(such as whether he had emergent schizophrenia) they said about him during the competency

hearing. *Id.* at 284-285. The Court responded by encouraging him to cooperate and then stated:

> [The Court is] persuaded that no lawyer—if I were to replace them today and bring
> another set of lawyers, we would be in exactly the same position. Any competent
> lawyer is not going to do what you want Mr. Bruck to do, which is simply say, "I
> have no defense." They just won't do that. That's not the way lawyers in capital
> cases handle these situations. So I don't think giving you another lawyer is a
> solution. I don't think letting you self-represent is a solution, though I'm willing to
> take that up. If that is something you make that motion, I will consider that.

*Id*. 285. The Court found Defendant competent to stand trial. (Dkt. No. 656 at 21-22).

### 5. Invocation of Right to Self-Represent



Counsel filed the motion, and the Court held a hearing on the matter the next day. (Dkt.

No. 666); Chambers Hrg. Tr., Nov. 28, 2016, at 3 (Dkt. No. 756). The Court discussed the motion

with trial counsel first and noted that it had "nothing but praise for the difficulty, what you have

done under very difficult circumstances." *Id.* at 4. The Court announced its intention to allow

Defendant to represent himself but noted that "if he tells me he can't be ready, then that goes to

the question of his capacity to represent himself, but if he tells me he's ready, we are going to

proceed with jury selection. And if he tells me he needs a day, I will start tomorrow morning." *Id.*

at 5. The Court then held the following exchange with Defendant:

THE COURT: I want to first talk to you about your motion. You understand that you have a right to be represented by counsel. Is that correct?

THE DEFENDANT: Correct.

THE COURT: And you have a right to self-representation under certain circumstances. You understand that as well?

THE DEFENDANT: Yes.

THE COURT: And you understand it is a very serious decision?

THE DEFENDANT: Yes.

THE COURT: And it's something that I take it you have given a lot of thought to?

THE DEFENDANT: Yes.

THE COURT: Before I go any further, are you sure you want to proceed with this motion?

THE DEFENDANT: Yes.

THE COURT: Okay. Let me first of all advise you, I think you know this, but let's -- for the record let's just simply confirm you are aware of the charges against you, sir, and the potential punishment. You have nine counts of violation of the Hate Crimes Act resulting in death with punishment up to life in prison; three counts of violation of the Hate Crimes Act involving intent to kill, punishment up to life in prison; nine counts of obstruction of the exercise of religion resulting in death, punishment up to death; three counts of obstruction of the exercise of religion involving intent to kill with the use of a dangerous weapon, punishment up to life; nine counts of the use of a firearm to commit murder during and in relation to a crime of violence, punishment up to death. I take it, Mr. Roof, you were aware of those charges?

THE DEFENDANT: Yes.

THE COURT: And you understand the potential punishment involved?

THE DEFENDANT: Yes.

THE COURT: Now, let's go through this again: You understand you have a constitutional right to be represented by counsel?

THE DEFENDANT: Yes.

101

THE COURT: And you understand under federal law, only experienced, capital litigation lawyers are allowed to represent defendants like yourself. You understand that, don't you?

THE DEFENDANT: Yes.

THE COURT: And you understand your own attorneys have a great deal of experience in capital representation. You understand that, don't you?

THE DEFENDANT: Yes.

THE COURT: And you understand that they may have experiences and skills you personally do not have. Is that fair?

THE DEFENDANT: Yes.

THE COURT: And you understand that their experience and knowledge potentially could be of assistance in the defense in your defense. You understand that?

THE DEFENDANT: Yes.

THE COURT: And let me say, Mr. Roof, for whatever it is worth, I think it is wise for you to be represented by counsel, to get the benefit of that experience. You know, I think that -- we've talked about that before, correct?

THE DEFENDANT: Correct.

THE COURT: And you've considered that?

THE DEFENDANT: Yes.

THE COURT: You know the Court's belief that you are better served by having lawyers representing you than self-representation. You are aware of that?

THE DEFENDANT: Yes.

THE COURT: And you have -- again, you have carefully considered the Court's advice to you on that?

THE DEFENDANT: Yes.

THE COURT: I want to advise you that if I were to grant your motion that I would appoint your present counsel as standby counsel who would be available to assist you if you desired that assistance. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Now, Mr. Roof, after being fully advised of your right to counsel and knowing the benefits of assistance of counsel, are you making a knowing and intelligent waiver of those rights?

THE DEFENDANT: I am.

THE COURT: And you are making that decision aware of your counsel's superior knowledge and expertise in capital litigation. You are making that decision knowing that, correct?

THE DEFENDANT: Correct.

THE COURT: And you are aware that by taking this step, it is possible that your defense will be less effective. You understand that?

THE DEFENDANT: Yes.

THE COURT: Nonetheless, you wish to go forward and waive your right to counsel, correct?

THE DEFENDANT: Correct.

THE COURT: Is your decision voluntary? That is, has anyone forced you or coerced you to make this decision?

THE DEFENDANT: No.

THE COURT: This is entirely your decision?

THE DEFENDANT: Yes.

THE COURT: After due thought and consideration?

THE DEFENDANT: Yes.

THE COURT: Mr. Roof, do you feel you have the capacity to represent yourself?

THE DEFENDANT: Yes.

THE COURT: Do you feel you can make as-needed motions or objections, ask questions, make arguments? You feel you have the capacity to do that if you need to do that?

THE DEFENDANT: Yes.

THE COURT: You understand you will be performing in a courtroom such as this throughout the trial. You understand that?

THE DEFENDANT: Yes.

THE COURT: And you feel able to do that?

THE DEFENDANT: Yes.

THE COURT: Are you ready to proceed with jury selection and trial if I were to allow you to do this?

THE DEFENDANT: Yes.

THE COURT: You are ready today?

THE DEFENDANT: Yes, I'm ready.

THE COURT: Is there anything else you wish to add, Mr. Roof?

THE DEFENDANT: No.

THE COURT: Mr. Roof, have you had an opportunity to review the order I issued on competency?

THE DEFENDANT: Yes.

THE COURT: You agree with that order?

THE DEFENDANT: Yes.

THE COURT: You feel you are competent?

THE DEFENDANT: Yes.

THE COURT: You agree with the Court's observations and findings?

THE DEFENDANT: Yes.

THE COURT: Mostly, right? Not every one of them.

THE DEFENDANT: (Nodding) we'll see.

THE COURT: But on the ones regarding your competency, you agree with?

THE DEFENDANT: Yes.

(Dkt. No. 919 at 3-9). The Court asked if trial counsel had anything to add, and he said no. *Id.* at 9.

The Court granted Defendant's motion to represent himself. *Id.* at 10. In its written order, the Court noted Defendant's demeanor during the colloquy, finding him "alert, focused, and confident as he expressed his resolve to represent himself." (Dkt. No. 691 at 7). The Court concluded Defendant's assertion of his right to self-represent was "clear, unequivocal, knowing, intelligent, and voluntary." *Id.* at 8. The Court also concluded that Defendant possessed the mental capacity to represent himself based on his responses and "the Court's own observations of the Defendant's courtroom interactions over several weeks." *Id.* at 9.

After granting Defendant's motion, the Court appointed trial counsel as standby counsel and Defendant requested that they sit at the table with him. (Dkt. No. 919 at 10). At the end of the day, the Court met with trial counsel again and permitted them to have the expert witnesses complete their reports in the event that Defendant changed his mind. *Ex Parte* Hrg. Tr. Nov. 28, 2016, at 2-3 (Dkt. No. 979). Counsel informed the Court that Defendant "requested . . . that we still continue to see him at the jail," and also noted that Defendant was still represented in state court by Ashley Pennington. *Id.* at 8-9.

### 6. Individual *Voir Dire*

The Court began individual *voir dire* on November 28, 2016. Defendant represented himself with standby counsel. (Dkt. 919 at 10). The Court questioned each juror and, outside of the juror's presence, asked the Government and Defendant if they had additional queries or objections to the juror's qualification. If the Court agreed to ask the follow-up questions, the juror

would be brought back into the courtroom, and the Court would pose the questions to the juror. *See, e.g.*, *id.* at 24-31.[25]

Defendant's participation in *voir dire* became increasingly more active as the process progressed.[26] Defendant remained fairly passive during the first half of the day, offering no questions, motions, or objections. *Id.* at 18, 23-24, 30-31, 36, 44-45, 50, 54, 63. Later in the day, Defendant successfully requested a juror to be struck. *Id.* at 63. Standby counsel then moved to strike a juror, who had already been excused, on Defendant's behalf. *Id.* at 63-64. The Government objected to the late motion, and the Court denied it, finding the juror qualified. *Id.* 64. The Court instructed standby counsel to sit down and told Defendant he was responsible for objections. *Id*. Later that day, Defendant independently and successfully moved to strike a juror for cause. *Id.* at 140, 142. In a discussion with standby counsel at the end of the day, the Court acknowledged that they might have wanted more comprehensive questioning than the Court found necessary but opined that "we've picked some good jurors." (Dkt. No. 979 at 12). Trial counsel responded, "[O]n average we've done very well." *Id.*

The next day, standby counsel asked whether they could facilitate communication between the Government and Defendant and said they would file a brief addressing their view of their role. Jury Selection Tr., Nov. 29, 2016, at 3-10 (Dkt. No. 920). The Court responded, "[G]enerally when individuals are acting *pro se*, they are their lawyers. They turn and consult with the standby counsel, but the standby counsel isn't like cocounsel. That's not the way it functions." *Id.* at 6.

---

[25] The parties had previously proposed questions for potential jurors based on their written questionnaires.

[26] This pattern is entirely consistent with Dr. Ballenger's prediction that Defendant's courtroom performance would get better as the trial progressed because his social anxiety would abate as he received "in the field exposure." Dkt. No. 882-1 at 155.

Later that morning, after several jurors were questioned, standby counsel announced they had filed a request to pose additional questions based on questionnaire responses. *Id.* at 103-04. Standby counsel stated that Defendant had asked them to interpose objections because he found it "difficult" to do so himself. *Id.* at 104. The Court responded,

> Let me first say that it becomes very complicated when there are instances where counsel is asked are there any follow-up questions, and I'm told there are none. And then I'm later told, "Hold it. We had some other questions." I can observe that counsel -- standby counsel is over there conferring with Mr. Roof. Sometimes he may follow your advice, and sometimes he may not. That is his prerogative because he has exercised his constitutional right to self-representation.

*Id.* at 104-05. The Court ruled Defendant would interpose his own objections during *voir dire* after he was given a chance to consult with standby counsel. *Id.* at 108. Standby counsel said Defendant was concerned about time pressures, and the Court questioned him about that issue. *Id.* at 108-09. The Court told Defendant to let the Court know if he needed additional time and confirmed that Defendant understood the questions suggested by standby counsel. *Id*. Defendant mentioned he needed time to consider the questions, and the Court assured him he would receive any necessary additional time. *Id.* at 109. During the second day of *voir dire*, Defendant independently requested one juror be struck, which the Court denied, and proposed additional questions to three jurors, all of which the Court agreed to ask. *Id.* at 84-85, 164, 194, 226.

Defendant raised standby counsel's role again the next day and asked the Court to allow them to assist him in proposing more questions and making objections. Jury Selection Tr., Nov. 30, 2016, at 3 (Dkt. No. 921). The Court informed Defendant he had waived counsel. *Id*. The Court reiterated that he thought Defendant's decision was unwise and said he would not allow standby counsel to act as co-counsel. *Id*. The Court advised Defendant he could reconsider his decision to self-represent. *Id.* at 3-4. Defendant asked the Court to let standby counsel speak for him, and the Court denied the request. *Id.* at 4. Defendant did not ask the Court to reappoint counsel.

After the lunch break, standby counsel announced that Defendant was concerned about time pressure. (Dkt. No. 921 at 120). The Court ordered Defendant to express his concerns himself, and he said it would "be helpful if we could slow down." *Id*. The Court responded,

> You know, when you say "slow down," it seems—you know, we've had a general questionnaire and a case-specific questionnaire, collectively, with subparagraphs, over 100 questions, and I don't feel rushed at all. On the other hand, I don't feel a need to waste time. After each juror is initially questioned, I ask counsel, "Do you have additional questions?" I listen carefully, and then I ask those questions. And my view is, Mr. Roof, whatever the time is, it is, I feel, perfectly adequate. If you have additional questions you would like me to ask, I'm delighted to consider them. But I'm just proceeding, and I'm not going to slow down just for some abstract reason I should slow down. If we need to ask additional questions, I am delighted to ask them.

*Id.* at 120-21. The Court confirmed with Defendant that it had asked all but one of his proposed follow-up questions and said it would listen to any concerns about a particular juror if the Defendant felt he lacked sufficient time. *Id.* at 121-22. That day, Defendant proposed additional questions for multiple jurors. *Id.* at 26, 43-44, 78-79, 109-10, 179-80, 182-83, 196, 221-22, 246, 255, 268-69. When he needed more time to consider his questions, he communicated that to the Court, which encouraged him to take his time. *See, e.g.*, *id.* at 180, 182-83. He also moved independently to strike five jurors and objected to a Government motion to strike. *Id.* at 112-113, 141, 171, 214, 232, 277. The Court granted four of Defendant's five motions. *Id.* at 141, 173-74, 214, 277-78.

The next day, standby counsel only spoke on Defendant's behalf to raise an issue about a juror's Facebook post. Jury Selection Tr., Dec. 1, 2016, at 77-78 (Dkt. No. 973). The Court allowed the assistance because Defendant was embarrassed by the situation. *Id.* at 77. Standby counsel asked the Court for additional time to discuss objections and questions with Defendant throughout the day, which the Court accommodated. *Id.* at 66, 235, 266. Once again, Defendant proposed multiple additional questions during the proceedings. *Id.* 30, 34, 48, 52, 66, 89, 236, 280. He also

unsuccessfully moved to strike a juror for cause. *Id.* at 139-40. Notably, the Court did not ask Defendant whether he wanted to strike that juror, and instead stated the juror was qualified after Defendant said he did not have any additional questions. *Id.* at 139. Defendant interrupted and told the Court he had a motion and wished to strike the juror. *Id.*

On the final day of *voir dire*, the Court said it was preparing an order on the role of standby counsel. Jury Selection Tr., Dec. 2, 2016, at 2 (Dkt. No. 974). The Court informed Defendant that standby counsel could not act in a co-counsel capacity and advised him to consider carefully his intention to continue to represent himself. *Id.* at 2-3. Later that day, standby counsel asked the Court to allow them to object on Defendant's behalf because he did not understand that he did not have to fully explain his objections. *Id.* at 148-49. The Court explained to Defendant that if he had reasons for his objections the Court would hear them but would not require them. *Id.* at 149-50. Defendant acknowledged the explanation. *Id.* at 150. The Court then noted,

> [A]s to the comment that the defendant is unable to object, I've watched him for four and a half days, he has frequently objected, the record will speak for that. I haven't found him to have any hesitation to object[,] to make recommendations to ask questions, frankly many are very good questions he has asked me to make.

*Id.* at 152. The Court confirmed that Defendant was "comfortable asking [the Court] questions." *Id.* On the final day of *voir dire*, Defendant proposed multiple additional questions. *Id.* at 50-51, 74, 83-84, 170-71, 267. He also successfully moved to strike a juror. *Id*. 177, 179.

After *voir dire*, Defendant moved the Court to reappoint trial counsel for the guilt phase trial. (Dkt. No. 728 at 1). The Government filed a response, asking the Court to ensure (1) that Defendant understood that trial counsel could attempt to present mental health evidence during the guilt phase, and (2) to confirm that Defendant waived any potential conflict of interest based on the allegations in the letter. (Dkt. No. 730 at 1-4). At a subsequent hearing, Defendant told the Court he wanted trial counsel to be reappointed. Motions Hrg., Dec. 5, 2016, at 3 (Dkt. No. 911).

The Government raised the mental health and conflict issues and asked that Defendant have the opportunity to read the Government's filing before reaffirming his desire for representation. *Id.* at 7-9. The Court allowed Defendant to read the brief and then asked if it altered his desire for guilt phase representation. *Id.* at 9. Defendant responded, "No." *Id*.

After their reappointment, trial counsel moved to strike the jury based on Defendant's purported inability to represent himself. Counsel noted Defendant's "long pauses," "stuttering," and "trouble summoning his thoughts." (Dkt. No. 745 at 1-2). The Court denied the motion, observing that Defendant "actively participated in the *voir dire* process by making objections and suggesting follow-up questions for the Court to ask potential jurors." (Dkt. No. 760 at 1).

### 7. Guilt Phase of Trial

The guilt phase began December 7, 2016. During opening statements, trial counsel attempted repeatedly to discuss Defendant's motives. Mr. Bruck told the jurors they would "want to understand who this person was and why on earth he, of all people, would have caused so much harm and grief." (Dkt. No. 893 at 39). Mr. Bruck explained that the second phase of the trial "deals with why" and predicted that Defendant would not be represented by trial counsel during the penalty phase. *Id*. He asserted that the jury would "have to ask the question why, and eventually you're going to have to do the best you can to answer it," and determine what "this crime and everything that led up to it tells us about this 21 year old." *Id.* at 40-41. He encouraged the jury to ask themselves:

> [I]f this really is a logical plan at all. On what planet would someone have to be to think that you could advance a political agenda by attacking and murdering these nine people who are the most kind and upstanding, I will use the word noble people that you could possibly find, in this community or any other. What is the likely effect of that? Ask yourself that. How much sense does this crime make? Does this make any sense at all? And if not, what does that tell you?

*Id.* at 42. The Government objected frequently, and the Court sustained the objections or directed Mr. Bruck to limit his comments to the guilt phase eight times. *Id.* at 39-41, 44-45.

The Government presented its case through several witnesses, establishing that Defendant entered a church, sat through a Bible study with the victims, and shot them when they closed their heads in prayer. (Dkt. Nos. 893 at 80-82; 899 at 1123-25).

Felicia Sanders, a survivor, described the shooting in detail. She told the jury about each of the parishioners who attended the Bible study and described how they sang, prayed, and studied the Parable of the Sower together that night. (*See* Dkt. No. 893 at 55-79). She testified that when Defendant entered, he received a Bible, a worksheet, and a seat beside Reverend Pinckney. *Id.* at 81. She recalled thinking Defendant "was somebody coming in to seek the Word" and even described how he chuckled at a humorous story told by Reverend DePayne Middleton Doctor. *Id.* at 81-82. She said that after about forty-five minutes, as the Bible study ended and the participants stood to pray and closed their eyes, she heard a loud sound. *Id.* at 82. When she opened her eyes, she saw Defendant with a gun. *Id.* She testified that Defendant had shot Reverend Pinckney, and she screamed and sought shelter under tables with her fellow worshipers, including her adult son, Tywanza, and her eleven-year-old granddaughter, K.M. *See id.* at 76, 82-84. She spoke of seeing Reverend Simmons being shot as he ran to Reverend Pinckney's aid. *Id.* at 83. She testified to hearing "so many shots," as her granddaughter said "Granny, I'm so scared." *Id.* at 83-84. Ms. Sanders told her granddaughter to "play dead" and described "muzzl[ing]" her granddaughter's face against her body so tightly that she feared that she would suffocate her granddaughter. *Id.* at 83-84. As Ms. Sanders lay there, Tywanza and her aunt, Susie Jackson, fell on each side of her. Ms. Sanders could feel their blood pooling next to her, and she dragged her feet through the blood of her son and her aunt so that Defendant would believe that she had been shot. *Id.* at 84.

Ms. Sanders recounted how Defendant approached Polly Sheppard, asked if he had shot Ms. Sheppard, and said he was going to leave her alive to recount his attack. *Id.*

Ms. Sanders described seeing her wounded son, Tywanza, stand up to distract Defendant from Ms. Sheppard and asked Defendant why he was shooting at them. *Id.* at 84. Ms. Sanders then testified, "the defendant, over there with his head hang down, refusing to look at me right now, told my son, I have to do this. I have to do this because you are raping our women and y'all are taking over the world." *Id.* at 84-85. Her son Tywanza pleaded, "[Y]ou don't have to do this. You don't have to do this. We mean you no harm. We don't mean you no harm." *Id.* Defendant responded by shooting Tywanza repeatedly. *Id.* at 85. Ms. Sanders recalled,

> I was just waiting on my turn. Even if I got shot, I didn't want my granddaughter to be shot. I was just waiting on my turn. It was a lot of shots. Seventy-seven shots in that room, from someone who we thought was there before the Lord, but in return, he just sat there the whole time evil. Evil. Evil as can be.

*Id.* at 85.

Ms. Sanders explained that even as she begged her son to lie down and await help, Tywanza Sanders crawled toward his great aunt Susie Jackson and grasped a handful of her hair. Ms. Sanders watched as her son took his last breath. She told the jury, "I watched my son come into this world and I watched my son leave this world." *Id.* at 86.

The Government requested a brief recess, which the Court granted. *Id.* During the recess, Mr. Bruck objected to certain aspects of Ms. Sanders' testimony, including her statement that the parishioners had thought that Defendant was "there before the Lord, but in return, he just sat there the whole time evil. Evil. Evil as can be." *Id.* at 85, 87. The Court overruled the objection, finding the statement admissible as the observation of the witness. *Id.* at 87. The Government added that the objection was also untimely, and the Court agreed. *Id.* at 86-87. Responding to the Government's timeliness argument, Mr. Bruck asked that "the record reflect that the witness was

crying and understandably very upset during parts of her testimony," and explained that "it seemed inappropriate to respond." *Id.* at 88.

Ms. Sanders returned to the witness stand and testified that just before her son died, she told him, "I love you, Tywanza," and he replied, "I love you too, Mama." *Id.* at 89.

Mr. Bruck rose to cross-examine Ms. Sanders, explaining that he intended to ask only a single question. He asked, "Do you remember the man who did this saying something about that he was only 21, and then talking about what he was going to do afterwards?" *Id.* at 89. Ms. Sanders answered, "Yes." *Id.* Mr. Bruck then asked, "Could you tell us what he said?" Ms. Sanders responded, "He say he was going to kill himself." *Id.* And then she added, "And I was counting on that. He's evil. There's no place on earth for him except the pit of hell." *Id.* Mr. Bruck repeated the portion of the testimony he was attempting to elicit without Ms. Sanders' commentary, "He said that he was 21? And then that he was going to kill himself when he was finished?" Ms. Sanders replied, "Send himself back to the pit of hell, I say." *Id.* at 89. Mr. Bruck then sought to clarify that Defendant's statement had not included her commentary. "Did—he didn't say that though. About hell. He just said he was going to kill himself?" *Id.* at 90. Ms. Sanders replied, "That's where he would go, to hell." *Id.* At this point Mr. Bruck ended the examination. *Id.*

The next day, trial counsel moved for a mistrial based on Ms. Sanders' comments. (Dkt. No. 776). When the Court noted that Mr. Bruck had elicited some of the comments, he explained he had questioned the witness while holding a transcript of an interview in which the witness said Defendant had told her he was twenty-one years old and was planning on killing himself. Guilt Phase Trial Tr. Vol. II, Dec. 8, 2016, at 205 (Dkt. No. 894). He defended the information as "relevant to his state of mind, it was relevant to complete the setting." *Id*. The Court denied the

motions for mistrial and to strike the testimony, *id.* at 213-14, but did provide a cautionary jury instruction:

> I want to remind you that the decisions this jury must make, whether the defendant is guilty or not guilty, and if we come to a sentencing phase, the appropriate sentence, is always your decision to make. It is not the decision of this Court or the attorneys or the witnesses. It always will be yours.

*Id.* at 215-16.

Another survivor, Polly Shepherd, testified that as Defendant walked around the room shooting the victims, she was audibly praying as she lay under a table, and Defendant stopped in front of her and told her to "shut up." (Dkt. No. 899 at 1126). He asked Ms. Shepherd if he had shot her. When she replied "no," he said he would leave her alive to tell the story. *Id*. Ms. Shepherd told the jury that she called the police and reported the shooting. *Id.* at 1128-29.

A responding police officer told the jury that Reverend Pinckney's wife, Jennifer, and her youngest daughter had huddled in a side office as bullets punctured its walls. (Dkt. No. 893 at 135). An investigator testified to the recovery of four live rounds, seventy-four spent casings, and seven empty handgun magazines, each capable of holding thirteen rounds. (Dkt. No. 894 at 334, 337). A forensic pathologist testified that Defendant shot Reverend Simmons at least six times, Reverend Coleman-Singleton at least five times, Reverend DePayne Middleton-Doctor at least eight times, Reverend Pinckney at least five times, Cynthia Hurd at least seven times, Susie Jackson at least ten times, Tywanza Sanders at least five times, Ethel Lance at least six times, and Reverend Thompson at least eight times. (Dkt. No. 899 at 1080-81, 1102-03).

A forensic expert testified about examining Defendant's website and finding a text file he had written. Guilt Phase Trial Tr. Vol. IV, Dec. 12, 2016, at 755-56 (Dkt. No. 897). The witness read the file, which contained Defendant's virulent white supremacist views, including his opinions that "[n]*ggers are stupid and violent," that "[s]egregation was not a bad thing," and that

"[n]egroes have lower IQs, lower impulse control, and higher testosterone levels." *Id*. at 764-774.

The jury heard Defendant's belief that someone needed to "protect the white race." *Id*. at 773. The

jury heard, in Defendant's own words, why he committed this horrific crime:

> I have no choice. I am not in the position to, alone, go into the ghetto and fight. I chose Charleston because it is the most historic city in my state, and at one time had the highest ratio of blacks to whites in the country. We have no skinheads, no real KKK, no one doing anything but talking on the internet. Well someone has to have the bravery to take it to the real world, and I guess that has to be me.

*Id.* at 773-74.

Finally, the jury heard Defendant confess to the crime in a recorded interview. In it, he

recalled internet research on churches, discussed white nationalist slogans, and shared his goal of

provoking violence between the races. (Dkt. No. 896 at 518, 527, 540); Gov't Trial Ex. 5.

Throughout the guilt phase, trial counsel attempted to adduce evidence that Defendant

struggled with his mental health. (Dkt. No. 783 at 1). On the very first day of trial, during his

opening statement, Mr. Bruck made broad references to Defendant's potential mental health issues

and, despite the Court repeatedly sustaining the Government's objections, repeatedly told the jury

that, in the penalty phase, they should seek to understand whether a reason other than his racist

ideology could explain the reason Defendant committed this crime. (Dkt. No. 893 at 38-46).

Two days into trial, trial counsel filed a motion to admit evidence of Defendant's "state of

mind and personal characteristics." (Dkt. No. 783 at 1). Trial counsel specifically noted that "the

two facts the defense attempted to adduce during the cross-examination of the first witness [Felicia

Sanders] are . . . . that Defendant was 21 years old and expressed suicidal ideation on the night of

the offense." *Id.* at 6. Trial counsel argued that this evidence "bear[s] on intent, particularly the

question of malice aforethought, which requires premeditation and deliberation." *Id.* at 7. The

Court denied that motion. (Dkt. Nos. 896 at 439-45; 793 at 9).

Trial counsel persisted and sought to explore Defendant's mental health while cross-examining Government witnesses. (Dkt. No. 795 at 6-11). They also sought to call witnesses to testify about Defendant's mental health. *Id*. The Court disallowed the proposed cross-examination and indicated it would probably bar mental health testimony in the guilt phase. Guilt Phase Trial Tr. Vol. V, Dec. 13. at 964-66, 1065-66 (Dkt. No. 898). Trial counsel submitted a proffer that included the proposed testimony of mental health experts Loftin and Maddox. (Dkt. No. 800 at 2). Counsel admitted that nothing in the submitted materials specifically negated an element of specific intent but argued the defense was entitled to explore Defendant's mental state. (Dkt. No. 899 at 1137-41). The Court found the evidence inadmissible in the guilt phase. *Id.* at 1142-43.

Trial counsel attempted to discuss Defendant's mental health in closing argument, characterizing his actions as "perseveration," discussing his inability to make small talk, and commenting on his brain processes and irrational actions, which prompted several successful objections. Guilt Phase Trial Tr. VII, Dec. 15, 2016, at 1203, 1211-15 (Dkt. No. 960). Counsel told the jury that the central question was, "why did Dylann Roof do this?" *Id.* at 1201. He suggested that Defendant's statement to the FBI that he was not delusional implied that he was. *Id.* at 1203. He asked the jury, "What could have left [Defendant] so convinced that he was in a war and was required to sacrifice not only the lives of innocent people but his own life as well at the age of 21." *Id.* at 1204. Trial counsel said, "We have the luxury of looking through that interview more carefully" than an FBI agent who did not consider mental illness. *Id.* at 1210. He asked the jury why Defendant would wear sweat pants under jeans in the heat and hinted he might have an abnormal brain. *Id.* at 1212. He pled for the jury to "[c]onsider the mad energy of this project, the irrationality, the senselessness of it. Consider where it came from, how illogical the entire story was." *Id.* at 1213. Trial counsel then said, "I don't for a moment mean to suggest there

has to be something mentally wrong with him." *Id.* The jury ultimately found the Defendant guilty on all counts. *Id.* at 1273-80.

### 8. Defendant's Continued Invocation of the Right to Self-represent

After the guilty verdict, outside the presence of the jury, the Court called Defendant to the podium to discuss his plan for representing himself at the penalty phase. *Id.* at 1284. The Court explained the procedural posture in detail and noted Defendant faced a potential death sentence. *Id.* at 1285. Nonetheless, Defendant confirmed his desire to represent himself during the penalty phase. *Id.* at 1285-88. The Court advised Defendant that standby counsel would be limited in their role and that he would be better served with attorneys who had done "an outstanding job for you during this phase" and had "zealously defended you." *Id.* at 1286-87. Defendant persisted in his desire to self-represent, and the Court gave him until January 3, 2017, to change his mind. *Id.* at 1288-89. The Court also reminded Defendant he needed to announce whether he intended to present any mental health evidence under Rule 12.2. *Id.* at 1290.

On December 28, 2016, the Court held a conference during which it again asked Defendant to carefully consider his request for self-representation, encouraging him to discuss the decision with his grandfather, family and lawyers. Pretrial Conference Tr. at 2, Dec. 28, 2016, at 2 (Dkt. No. 912). Defendant confirmed he would not present evidence under Rule 12.2. *Id.* at 3. The Court explained the procedures for the penalty phase and informed Defendant he could "subpoena witnesses and exhibits," and that standby counsel could assist him in doing so. *Id.* at 13-14, 17. The Court also told Defendant he could call witnesses, cross-examine witnesses, testify himself, and make an opening statement and a closing argument. *Id.* at 13, 17-18. When the Court asked whether he had any matters to address with the Court, Defendant confirmed that he did. First, he

117

informed the Court that he wanted to present an opening statement. *Id*. at 18-19. He also objected to certain evidence being admitted during the penalty phase. *Id.* at 19-20.

Defendant also made clear to the Court that he wanted the competency hearing materials to be sealed. *Id.* at 18-20. ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████. The Court explained it was not sure what would be sealed yet. *Id.* at 22. Defendant then announced that he was "not intending to offer any evidence at all in the sentencing phase or call any witnesses whatsoever." *Id*. The Court asked him to reconsider and talk to his family and counsel, but acknowledged it was Defendant's decision. *Id.* at 22.

## 9. Second Competency Hearing

On December 29, 2016, trial counsel moved for a second competency determination, claiming that Defendant was incompetent and lacked the capacity to represent himself. (Dkt. No. 832 at 1). "In an abundance of caution," the Court ordered Defendant to be re-examined by Dr. Ballenger and scheduled a competency hearing for January 2, 2017. (Dkt. No. 835 at 1).

In support of their motion, trial counsel submitted a declaration recounting observations of Defendant. (Dkt. No. 840). According to counsel's declaration, during *voir dire*, Defendant "insisted that he did not need to do anything during jury selection because he could tell that the jurors like him so he would not get the death penalty." *Id.* at 2. Counsel also claimed they were sparing with their notes because Defendant "was so easily overwhelmed." *Id*. Counsel said Defendant rejected suggestions because he did not know how he would respond if the Court asked for more information and feared the judge would be angry if he could not elaborate. *Id*. Counsel also claimed Defendant told them to stop objecting and to "do nothing." *Id.* at 4. Counsel stated

that Defendant was unhappy with their closing argument, as he had wanted them to present information about interracial crime statistics. *Id.* at 6.

Counsel said that after the guilt phase, Defendant had been open to presenting evidence of his "adaptability to prison conditions" and testimony from Father John Parker, an Orthodox priest who had frequently visited him in jail. *Id.* Trial counsel reported that Defendant changed his mind, however, when Father Parker would not promise to deny seeing signs of mental illness. *Id.* Instead, Defendant began telling them and his mother that he would use the penalty phase "to get back at" his attorneys. *Id.* Finally, trial counsel said that after the Court set the competency hearing, Defendant refused to accept a drafted motion and expressed his desire to no longer have standby counsel, file objections to victim-impact evidence, or otherwise object to the Government's penalty phase evidence. *Id.* at 7. Defendant further informed Mr. Bruck that he "hates him" and planned to kill him if he was ever released from jail. *Id.*

Trial counsel also attached reports by three defense mental health evaluators, Drs. Loftin, Moberg, and Maddox, and by an autism expert, John Robinson. (Dkt. Nos. 832-6, 832-7, 832-8, 832-9). Among other things, the experts opined that Defendant's processing speed index was in the Low Average range and "was significantly reduced relative to his much stronger verbal abilities (Dkt. No. 832-7 at 7 (noting Processing Speed Index was in the 14th percentile), 10).

On December 31, 2016, Dr. Ballenger conducted a second evaluation of Defendant. (Dkt. No. 858 at 3). As part of the evaluation, he reviewed the defense expert reports. *Id.* at 2. Dr. Ballenger documented that Defendant immediately expressed irritation with trial counsel and again stated that he did not intend to call or cross-examine witnesses unless he wanted to adduce evidence through cross-examination. *Id.* at 3. He told Dr. Ballenger he viewed a life sentence and a death sentence as "equally bad" and that "preserving his reputation is the most important issue for

him . . . ." *Id.* at 4. Defendant said he believed his chances of receiving the death penalty were the same whether or not he represented himself. *Id.* at 5. Defendant told Dr. Ballenger that he could not let his attorneys represent him because they would lie about mental health issues. *Id.* at 6. He indicated that he had read the DSM-V Manual and debated one of Dr. Ballenger's diagnoses. *Id.* Defendant told Dr. Ballenger that he believed he did a "reasonably good job" during jury selection and expressly explained to Dr. Ballenger that he disagreed with standby counsel's advice on striking certain jurors. *Id.* at 8.

During his evaluation, Defendant specifically expressed concern about involving his family in the case, because it "would be embarrassing and disrespectful to them." *Id.* at 7. He was especially worried that videos of his family's jail visits, particularly those depicting his visits with his mother, would be publicly released. *Id*. at 7.

The second competency hearing took place on January 2, 2017. At the beginning of the competency hearing, Defendant complained about trial counsel's pursuit of the issue, said he did not want them as standby counsel, and asked the Court to dismiss them. Competency Hrg. Tr., Jan. 2, 2017, at 5-6 (Dkt. No. 880-1). He also raised a question about a motion that trial counsel had filed, and the Court instructed him that "no motion can be filed on your behalf without you signing it as long as you are self-representing." *Id.* at 6.

The Court limited the hearing to information developed after the first competency proceeding, noting it had read the expert reports submitted with trial counsel's motion for the competency evaluation. *Id.* at 16-19, 110-12. Dr. Ballenger testified that he found no material changes from his original assessment and explained that Defendant wanted to represent himself to preserve his reputation and prevent mitigating evidence from diluting his motives. *Id.* at 23, 26-27. Dr. Ballenger noted that Defendant admitted to suffering from social anxiety disorder, which

feeds into a heightened concern with what others think of him. *Id.* at 37. Dr. Ballenger testified that Defendant explained some odd behaviors, such as staring and smiling inappropriately, as attempts to regulate the emotional toll of the proceedings. *Id.* at 38-39. Dr. Ballenger specifically recounted his discussion with Defendant about the diagnoses, noting that Defendant raised "a very cogent point" about the basis of his diagnoses, and joked, "I don't know where he went to psychiatry school." *Id.* at 65.

Trial counsel and Defendant cross-examined the expert. Defendant asked about issues in his report and about Dr. Ballenger's responses to questions trial counsel had already asked. *Id.* at 71-74. Defendant vigorously crossed Dr. Ballenger on whether his diagnosis of schizoid personality disorder was correct and successfully persuaded Dr. Ballenger to concede that avoidant personality disorder might be a "better" diagnosis for him. *Id.* at 74-77. Finally, he elicited testimony that some symptoms of ASD were also symptoms of social anxiety disorder. *Id.* at 78-79.

Before trial counsel called witnesses, the parties discussed the permissible scope of their testimony. The Court restricted testimony to information that was new since the prior competency hearing and discussed counsel's desire to question witnesses about Defendant's capacity to self-represent under *Indiana v. Edwards*. *Id.* at 102-06, 119-20. The Court made clear that "[o]f course I considered the *Indiana v. Edwards* issue at the time I allowed the defendant to self-represent." *Id.* at 15. The Court advised:

> *Indiana vs. Edwards* talks about the gray things, right? The gray things that are marginally—severe histories of mental illness that the defendant in that case—you and I both know the history in that case. This defendant doesn't remotely represent someone like that. And [Dr. Maddox] laid out to me in detail all his deficiencies. I have ample information on this. You are try [sic] to relitigate her testimony. I'm not going to allow it.

*Id.* at 120.

121

Trial counsel sought leave for witnesses to testify to Defendant's actions in recent visits with family, his desire not to present a penalty phase defense, and his refusal to meet with experts, prompting the Court to opine on the conflict between Defendant and his attorneys:

> He feels like y'all are manipulating him. Now, I frankly think that y'all have done everything you possibly can to manage a difficult client, that I don't share Mr. Roof's views that you have deceived him. I think you are trying to help him and trying to manage a difficult client.

*Id.* at 124; *see id.* at 120-24.

When trial counsel proposed that Dr. Maddox could testify about how Defendant's mental illness would affect his self-representation, the Court said it had "already reached [*sic*] that he does not have severe mental illness that impacts him." *Id.* at 125.

The Court permitted trial counsel to call Dr. Loftin, who testified that Defendant's ASD caused him to fixate on irrelevant details and "miss the bigger picture." *Id.* at 146. She noted individuals like Defendant have difficulty multitasking and fail to notice other people's "expressions and movements and communications." *Id.* She said that Defendant often became "stuck" on certain issues because of his rigid way of thinking. *Id.* at 147. As an example, she noted Defendant's fixation on speaking to his mother about his clothing during a video visit. *Id.* at 148-49. Dr. Loftin found the interaction significant because it was the "first time Mr. Roof had seen his mother since she had a heart attack in the courtroom," and he did not pick up on the "emotional cues in the situation." *Id.*

Defendant cross-examined Dr. Loftin on her testimony and report. He asked her if she knew he had spoken to his mother on the phone after her heart attack but before the video visit. *Id.* at 161-62. Dr. Loftin admitted she was not aware of that fact. *Id.* at 162. Defendant asked whether she thought his attorneys should have provided her with that phone call, and she responded that she did not know. *Id.* He also pressed her on references in her report to a discussion with him about

an article on a white supremacist website. *Id.* at 164-65. Defendant questioned her recollection, and Dr. Loftin admitted she might have misheard or misunderstood him. *Id.* at 165.

Trial counsel called Father Parker, who testified about his visits with Defendant, and explained he was a potential witness for the penalty phase. *Id.* at 166. He said that trial counsel had proposed a list of questions for his testimony, but Defendant had reduced the questions by two or three and had added one about whether Father Parker had seen any signs of mental illness in the Defendant. *Id.* at 174-75. Father Parker said that after he told the Defendant he could not say he saw no signs of mental illness, Defendant decided not to call him as a witness. *Id.* at 183-84. Defendant cross-examined Father Parker regarding his testimony. *Id.* at 188-94. Father Parker testified that, in his view, the only two explanations for Defendant's horrific crimes would be either that Defendant had a mental illness or that he was "an irredeemable monster." *Id.* at 192. Defendant followed up by asking, "So what you are saying is it is possible that I am an irredeemable monster, right?" *Id.*

At the end of the hearing the Court called Defendant to the podium and again expressed its opinion that Defendant would be better served with counsel and questioned whether he still wanted to represent himself. *Id.* at 197-206. The Court encouraged Defendant to at least consider calling Father Parker to testify in the penalty phase. *Id.* at 206. Defendant responded that he would. *Id.* The Court also asked Defendant if he wanted any relatives to testify, and he said, "Absolutely not." *Id.* at 207. He also said he would not call any prison officials. *Id.* Defendant confirmed he did not "want the explanation of why [he] went into the Emanuel Church to be that [he was] mentally ill." *Id.* at 209.

The Court found Defendant competent and capable to represent himself. *Id.* at 222-23. The Court stated, "I don't think anybody can sit here and watch him question the witnesses to doubt

123

for a moment he's competent to self-represent and competent in this case." *Id.* at 222. The Court denied Defendant's request to terminate standby counsel but did inform Defendant that he controlled his case. *Id.* 211.

In a written order after the hearing, the Court noted it was "keenly aware of Defendant's mental condition." (Dkt. No. 881 at 7) (citation modified). The Court stated that it could "deny his right to self-representation only if it finds he has a 'severe mental illness' that leaves him 'unable to carry out the basic tasks needed to present his own defense.'" *Id.* at 7 (quoting *United States v. Bernard*, 708 F.3d 583, 590 (4th Cir. 2013)). The Court found that Defendant's diagnoses consisted of Social Anxiety Disorder, possible ASD, Mixed Substance Abuse Disorder, depression by history, Schizoid Personality Disorder, and possible Avoidant Personality Disorder. *Id.* at 16. It held the evidence "established Defendant had no mental illness leaving him unable to carry out the basic tasks of self-representation." *Id.* at 7. The Court found that he "is fully able to address the Court, to address the jury, to question witnesses, and to raise timely objections." *Id.* at 17. Indeed, the Court found that Defendant "demonstrated an aptitude for witness cross-examination that is extraordinary for a *pro se* litigant." *Id.* The Court declared: "Indeed, if this Defendant were incompetent to represent himself, almost no defendant would be competent to represent himself." *Id.* at 7.

### 10. Penalty Phase Trial

During the penalty phase, Defendant did not offer evidence, present witnesses, or cross-examine anyone. Standby counsel nevertheless tried to present evidence by asking to file a motion to call non-mental health witnesses on Defendant's behalf. Penalty Phase Trial Tr. at 770, Jan. 9, 2017, at 770-72 (Dkt. No. 947); Joint App'x Vol. XV at 6521-23, *United States v. Roof*, No. 17-3 (4th Cir. Jan. 28, 2020), Dkt. No. 81-15, attached as Gov't Exhibit 9. Those witnesses included a

124

spiritual advisor, a prison expert, and Defendant's parents and grandparents. *See* Gov't Ex. 9 at 1-2. The Court indicated it would deny the motion because Defendant had not signed or been consulted on it. (Dkt. No. 947 at 770-71). Defendant concurred in the decision. *Id.* at 771-72.

The Government presented extensive penalty phase evidence, including substantial evidence that Defendant was motivated by white supremacist views and that Defendant was wholly unremorseful and continued to adhere to his racist ideology. The jury learned that Defendant had even drawn white supremacist symbols on his shoes and was wearing the marked shoes during his court proceedings just days before the beginning of the penalty phase. (Dkt. No. 946 at 476, 487-88).

In Defendant's manifesto that he wrote after he had been arrested, he made clear that he felt no remorse for the victims, had no regrets for his actions, and contemplated no retreat from his deeply held racial animus. (Dkt. No. 945 at 411-12, 417-35). He called for others to take up his cause of racial violence: "It isn't up to me anymore. I did what I can do, I've done all I could do. I did what I thought could make the biggest wave, and now the fate of our race is in the hands of our brothers to continue to live freely." *Id.* at 423. He claimed that "unless [white people] take real, possibly violent action, [they] will have no future. Literally." *Id.* He declared that "I would like to make crystal clear I do not regret what I did. I am not sorry. I have not shed a tear for the innocent people I killed. . . . " *Id.* at 423-24. He wrote, "I remember how I felt when I did these things . . . . And then I realized it was worth it." *Id.* at 423.

Victim impact witnesses testified about the unique lives their friends and relatives had led before Defendant murdered them. Penalty Phase Trial Tr. Vol. I, Jan. 4, 2017, at 52-223 (Dkt. No. 944); (Dkt. Nos. 945 at 230-59, 272-402; 946 at 489-647; 947 at 651-705).

The jury sentenced the Defendant to death. (Dkt. No. 948 at 902-03).

125

After the jury rendered its verdict, Defendant requested new attorneys to prepare and file a new trial motion, and the Court directed Defendant to be prepared to discuss this request at the final sentencing hearing. *Id.* at 906-08. At the hearing, Defendant stated he did not trust trial counsel. (Dkt. No. 949 at 100). The Court denied the motion for new counsel, observed that trial counsel were effective, competent, loyal, and zealous representatives: "[T]he fact that you may have disagreements with them or you may not trust them is, standing alone, not sufficient." *Id.* at 100-01.

## IV.     THE DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM THREE

Defendant claims trial counsel were ineffective for failing to consult with a specific type of expert, a speech language pathologist, and to investigate and present evidence of his auditory processing disorder and pragmatic communication dysfunction in order to persuade the Court that he lacked the capacity to represent himself.[27]  (Dkt. No. 1077 at 48). Defendant cannot show that trial counsel rendered deficient performance for failing to investigate and present that evidence, nor can he show that the evidence would have persuaded the Court to find him incompetent to represent himself.

Trial counsel was not required to develop evidence to stop Defendant from asserting his constitutional right to self-representation. Nor can they be held responsible for failing to anticipate that Defendant suddenly would assert that constitutional right on the eve of trial, and thus they cannot be deemed deficient for failing to develop evidence they had no reason to believe they might need. Moreover, the issues that trial counsel now claim should have prevented Defendant from self-representing, *i.e.*, lower processing speeds and difficulties communicating, were

---

[27]  For the purposes of this response to Defendant's § 2255, the Government presumes that the habeas experts' diagnoses of auditory processing disorder and pragmatic communication dysfunction are accurate.

presented to this Court through tests conducted by a Government-retained expert (Dr. Wagner), and testimony and reports by multiple experts—including the Court's independent expert (Dr. Ballenger) and defense-retained experts on ASD (Drs. Carpenter and Loftin), psychiatry/psychology (Drs. Maddox and Stejskal), and neuropsychology (Dr. Moberg). The Court determined, based on that expert evidence and its own observations of Defendant's performance, that Defendant was capable of representing himself. Defendant cannot show that counsel's performance was deficient or caused him prejudice, and therefore he is not entitled to relief.

### A. Specific Legal Standards Regarding Capital Pretrial Investigation

Counsel has a duty to conduct a reasonable investigation into a capital defendant's background for the purposes of a mitigation presentation. *See Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003). Courts assess the objective reasonableness of that investigation in the context of counsel's actions and decisions "as seen 'from counsel's perspective at the time.'" *Id.* at 523 (quoting *Strickland*, 466 U.S. at 689).

Courts must consider the "quantum of the evidence already known to counsel" and whether that "evidence would lead a reasonable attorney to investigate further." *Wiggins*, at 527. Counsel need not "investigate every conceivable line of mitigation evidence no matter how unlikely the effort would be to assist the defendant." *Id.* at 533. Likewise, they have no obligation to "uncover every scrap of evidence that could conceivably help their client." *Tucker v. Ozmint*, 350 F.3d 433, 442 (4th Cir. 2003) (quoting *Green v. French*, 143 F.3d 865, 892 (4th Cir. 1998)). The duty to investigate does not "force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 382-83 (2005).

127

There is also no *per se* duty to consult an expert, "let alone a particular kind of expert, in developing a mitigating case." *Owens v. Stirling*, 967 F.3d 396, 416-17 (4th Cir. 2020) (holding that where counsel consulted "an appropriate array of mental health experts," failure to consult a specific kind of expert did not constitute ineffective assistance). Because some mitigation theories are more compelling than others, courts must compare the case presented to any forgone evidence. *See Williams v. Stirling*, 914 F.3d 302, 315 (4th Cir. 2019) (finding counsel ineffective because the investigation uncovered evidence that was less persuasive than that available via another avenue).

## B.  Argument

Defendant cannot show trial counsel acted unreasonably or prejudicially. Counsel was not obligated to prevent Defendant from exercising his constitutional rights or unreasonable in failing to anticipate that he would seek to represent himself. Any argument that Defendant was incompetent to represent himself would have failed: the forgone diagnoses were weak in comparison to the mental health evidence trial counsel pursued, and no reasonable probability exists that those diagnoses would have led to a different outcome at trial or affected Defendant's request for self-representation.

### 1.  Trial Counsel Did Not Render Deficient Performance.

Defendant fails to show that trial counsel rendered deficient performance in omitting to consult a speech pathologist and obtain two additional mental health diagnoses—auditory processing disorder and pragmatic communication dysfunction.

Rather than argue counsel failed to conduct a thorough *mitigation* investigation, Defendant claims they inadequately investigated whether he had the capacity to represent himself. (Dkt. No. 1077 at 49-50, 101-03). Though Defendant cursorily mentions the omitted communication

disorders as bases for mitigation, *id.* at 57, he focuses on a theory that counsel should have investigated, compiled, and presented evidence that he could not represent himself. *Id.* at 101-03; *see also* (Dkt. No. 1077-5 at 9 (lead trial counsel noting that auditory processing disorder "would have been relevant under *Indiana v. Edwards*" and for accommodations during trial, but does not mention mitigation)). The claim fails because counsel had no obligation to obstruct Defendant's constitutional right of self-representation and because their investigation was reasonable regardless of the purpose.[28]

### a. Counsel had no duty to challenge their competent client's capacity to self-represent.

Trial counsel has no duty to investigate and present evidence that a defendant lacks the capacity to self-represent. Defense attorneys have a duty to raise issues of competency when they harbor reasonable doubt about their client's mental capacity to stand trial. *See United States v. Boigegrain*, 155 F.3d 1181, 1188 (10th Cir. 1998) (holding a defendant's lawyer "is not only allowed to raise the competency issue, but, because of the importance of the prohibition on trying those who cannot understand proceedings against them, she has a professional duty to do so when appropriate"). That duty stems from the defendant's fundamental right not to be tried while incompetent. *See Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996). There is no corresponding duty, however, to raise questions of competency to self-represent. Neither the Supreme Court nor the Fourth Circuit have ever imposed such a duty, and Defendant fails to cite any case in which a court has addressed the issue.

---

[28] Defendant does not argue his counsel should have uncovered additional evidence of his incompetence to stand trial, nor could he prevail on such a theory. Trial counsel thoroughly investigated Defendant's mental health and requested two competency hearings, both of which involved the presentation of defense expert testimony.

Defendant premises his argument almost exclusively on *Indiana v. Edwards*, 554 U.S. 164 (2008), which involved a denial—on mental health grounds—of a motion for self-representation in state court though the accused was competent to stand trial. *Id*. at 169. The defendant claimed the ruling violated his right to represent himself under *Faretta v. California*, 422 U.S. 806 (1975). *Edwards*, 554 U.S. at 169. The *Edwards* court reaffirmed *Faretta's* holding that a criminal defendant has a constitutional right to proceed without counsel but examined limitations for mentally ill defendants. *Id*. at 170-71, 178. It held that a state was constitutionally *permitted* to require counsel for a competent defendant who suffers "from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves" though they remain competent for trial. *Id*. at 178. The Court did not establish a particular standard for the right to self-represent. *Id*. Rather, it acknowledged that judges could "take a realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." *Id*. at 177-78.

*Edwards* does not impose an obligation on counsel to seek to prohibit a mentally ill, but otherwise competent, defendant from representing himself. *Edwards* does not even prohibit self-representation by a defendant whose mental illness deprives him of the capacity to act as his own lawyer, so long as he remains competent for trial. *See Bernard*, 708 F.3d at 590 (stating *Edwards* "reaffirmed that a court may constitutionally permit a defendant to represent himself so long as he is competent to stand trial."); *United States v. DeShazer*, 554 F.3d 1281, 1290 (10th Cir. 2009) (same). Flatly stated, trial courts have no obligation to "conduct an additional '*Edwards*' inquiry into the competency of every defendant who requests to proceed pro se." *Bernard*, 708 F.3d at 590. This is true even where a competent defendant may have learning disabilities and difficulties communicating with the jury. *See United States v. Rogers*, 537 F. App'x 273, 275 (4th Cir. 2013)

130

(unpublished). As long as the defendant's waiver of counsel is knowing, intelligent, and voluntary, a competent defendant is qualified to self-represent under *Edwards. Id.*

By extension, *Edwards* does not impose a duty on counsel to obstruct their clients from exercising the right to self-representation. *Accord* ABA Criminal Justice Standards for the Defense Function, Standard 4-5.2(b)(i) (4th Ed. 2017) (recognizing the decision to waive counsel belongs ultimately to a "competent client").

In this case, the Court twice found Defendant competent to stand trial. (Dkt. Nos. 656, 881). The findings were affirmed on appeal. *See Roof*, 10 F.4th at 344. This Court repeatedly warned Defendant about the perils of self-representation, repeatedly encouraged Defendant to reconsider his decision and to consult with his family before making a final decision, and repeatedly provided Defendant the opportunity to reinstate counsel. Accordingly, neither the Court nor counsel had any obligation to obstruct his *Faretta* right, regardless of his capacity to effectively represent himself. Defendant therefore cannot establish that counsel fell below any identifiable standard, much less one of "reasonableness." *Cf. Strickland,* 466 U.S. at 688.[29]

### b. Counsel reasonably declined to pursue an investigation designed to preclude Defendant from exercising his constitutional right of self-representation.

Even if trial counsel were obligated to torpedo Defendant's decision to self-represent, he cannot establish that they acted unreasonably in failing to anticipate his desire to do so in the last few days leading up to trial. Defendant does not have a right to prescient counsel: "an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for

---

[29] Defendant's arguments contain inherent contradictions. In Claim Five, he argues that counsel acted unreasonably by pursuing mental health mitigation in service of his right to a fair trial; here, he contends they acted unreasonably by failing to pursue such evidence to obstruct his right to self-representation.

what appear to be remote possibilities." *Harrington*, 562 U.S. at 110. The question—as it relates

to the adequacy of an investigation—is whether counsel's actions were reasonable "as seen 'from

counsel's perspective at the time.'" *Wiggins,* 539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 689).

Trial counsel had a duty to investigate Defendant's background and reasonably foreseeable

mental health issues in order to pursue a mitigation strategy. ████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ 1077-2 at 4-5; 1077-

4 at 1). The experts' diagnoses included ASD and other specified schizophrenia spectrum and other

psychotic disorder. (Dkt. No. 707 at 24).

At some point in the spring of 2016, Dr. Maddox recommended that the team also retain a

speech pathologist as a possible avenue for mitigation, and Dr. Woods concurred. (Dkt. Nos. 1077

at 53-54; 1077-15 at 2). Trial counsel reasonably declined to retain a speech pathologist in the

search for mitigating evidence.

When the experts recommended a speech pathologist, Defendant had yet to indicate a

desire to represent himself. Trial counsel believed that Defendant ultimately would allow them to

present mental health evidence at the sentencing phase of the trial, though they knew he would not

like the approach. (Dkt. No. 652 at 31-32).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████ And

until Defendant sent a letter to the prosecution team on November 5, 2016—just two days before

the start of trial and months after Drs. Maddox and Woods recommended consulting with a speech

pathologist—trial counsel "enjoyed a workable, if challenging, relationship with the defendant."

(Dkt. No. 562 at 5, 7; *see also* Dkt. No. 652 at 31). Up until then, trial counsel had no reason to believe that Defendant would fire them and choose to represent himself. Thus, they were entirely reasonable in continuing to pursue the mitigation evidence that they believed would provide the greatest impact during the penalty phase and had no reason to hire a speech pathologist in anticipation of an unforeseen rupture in the attorney-client relationship.

On November 2, 2016, the Court first recognized the possibility of a *Faretta* motion after Dr. Dietz's examination during an *ex parte* hearing with trial counsel. (Dkt. No. 629 at 12). Defendant first indicated his desire to represent himself after Dr. Ballenger's evaluation, in the second week of November of 2016. (Dkt. No. 586 at 6). Defendant cannot credibly claim trial counsel should have known that he would seek to represent himself months beforehand, when no apparent conflict over strategy existed.

Even if trial counsel should have intuited some likelihood of a *Faretta* motion, *Edwards* did not obligate them to obstruct it. *Edwards* sets a remarkably high bar to frustrating a defendant's choice to exercise his Sixth Amendment right. *Edwards* applies only to defendants who "suffer from *severe mental illness* to the point where they are not competent to conduct trial proceedings by themselves." *Edwards*, 554 U.S. at 178 (emphasis added); *see also United States v. Berry*, 565 F.3d 385, 391 (7th Cir. 2009) (observing that "'[s]evere mental illness' appears to be a condition precedent" to denying a defendant's right to self-representation). "Severe mental illness" is distinct from "some difficulty communicating with the court and jury," even where the defendant has a "history of depression and learning disabilities, combined with the fact that he spent his school years in special education classes." *Rodgers*, 537 F. App'x at 275. Under these strict standards, Defendant's limitations in processing speeds and communication would be insufficient to satisfy *Edwards*.

Instead, any attempt to prevent Defendant from self-representing under *Edwards* would require counsel to establish that Defendant suffered from a severe mental illness and their investigation would need to focus on whether the Defendant actually suffered from such an illness, not whether Defendant had any "receptive or expressive language deficits." An investigation into potential mental illness would need to include psychiatrists, psychologists, neurologists, neuropsychologists, and neuropsychiatrists—which are exactly the experts trial counsel retained. Trial counsel conducted the very type of investigation necessary to uncover the type of "severe mental illness" that could satisfy the *Edwards* standard.

Assuming trial counsel had some extraordinary duty to predict and hamstring Defendant's desire to represent himself, the record clearly shows that they fulfilled that obligation by investigating his most "severe" deficits, rather than focusing on secondary concerns that would not satisfy any relevant mental health standard. Trial counsel investigated and presented evidence designed to demonstrate Defendant's incompetence—a showing designed to exceed the *Edwards* standard.

Several defense experts, including Drs. Maddox, Loftin, Stejskal, and Moberg, all documented that Defendant had lower processing speeds and/or communication difficulties, in expert reports and/or testimony during the competency proceedings; they just ascribed those issues as symptoms of diagnoses other than auditory processing disorder. However, whatever the specific disorder that could explain Defendant's issues with communication and processing, trial counsel performed reasonably by bringing to this Court's attention the symptoms that they now claim rendered him unable to represent himself. The omission of expert opinions on processing and

expressive abilities—facts inherent in the existing findings about autism—did not render the investigation unreasonable.[30]

### c. Counsel reasonably omitted to consult a speech pathologist.

Defendant argues in Claim Three that counsel's failures affected the Court's decision to permit self-representation. He does not seem to argue, at least in Claim Three, that trial counsel was ineffective in their mitigation investigation by failing to hire a speech pathologist. As a result, any such argument is waived. Out of an abundance of caution, however, the Government addresses trial counsel's investigation in that context as well.

As noted, courts examine the adequacy of a mitigating investigation from counsel's perspective. *See Rompilla*, 545 U.S. at 381 (quoting *Strickland*, 466 U.S. at 689); *see also Roane*, 378 F.3d at 404 (the "reasonableness of a lawyer's trial performance must be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances") (quoting *Kimmelman*, 477 U.S. at 381).

Here, trial counsel represented Defendant with finite time and resources and had to prioritize avenues of investigation. At the time trial counsel were conducting their investigation, they assumed that Defendant would allow them to present evidence of his mental health issues. They also knew that, in light of the significant weight of aggravating evidence, the mitigating

---

[30] Defendant cannot sustain his claims that trial counsel should have retained a speech pathologist after it became clear that he would exercise his right of self-representation. After Dr. Dietz's examination, it is highly unlikely that Defendant would have allowed any further evaluations. Defendant refused to cooperate with Dr. Stejskal, a defense expert retained for the competency proceedings. (Dkt. No. 609 (denying trial counsel's request to order Defendant to cooperate)). Defendant also ultimately refused to meet with Drs. Maddox and Carpenter. (Dkt. No. 880-1 at 12). There is no basis for Defendant's claim that he would have allowed any additional evaluations by a speech language pathologist, especially those designed to prevent him from representing himself.

135

presentation would need to be compelling and substantial. Through their experts, trial counsel gathered evidence that they believed could prove that Defendant suffered from several significant, well-known mental health issues, including ASD and other specified schizophrenia spectrum disorder and other psychotic disorder.

Trial counsel were well aware of what they perceived to be Defendant's communicative abnormalities.[31] Those struggles to communicate or process spoken language did not merit the retention of a speech pathologist:[32] Trial counsel knew of these deficits and pursued experts they believed would best explain them in the context of a major mental impairment that would carry significant mitigating weight. Given that trial counsel knew Defendant would resist if he realized that they were developing mental health evidence about him, it was reasonable to focus him on meeting with and being tested by the experts who could testify about those substantial impairments. In light of that significant investigation and the types of information it was designed to uncover, trial counsel acted reasonably in directing their investigation to develop the mitigation evidence that would be most effective at trial and not wasting time or resources consulting with a speech pathologist.[33]

---

[31] Even assuming Defendant has an auditory processing disorder, the government does not share trial counsel's view that he demonstrated any significant difficulties comprehending and communicating with the Court, conducting *voir dire*, cross examining witnesses, and engaging with defense experts or Dr. Ballenger.

[32] The speech pathologist retained for this proceeding disclaimed any ability to diagnose auditory processing disorder and recommended retention of an audiologist. (Dkt. No. 1077 at 59-60). Counsel is not required to follow breadcrumbs of serial expert recommendations when the ultimate conclusions offer little of mitigating value. *See Harrington*, 562 U.S. at 108-09.

[33] Notably, as trial counsel was diligently pursuing various types of mental health mitigation evidence, they were simultaneously engaged in a comprehensive investigation into all other types of mitigation, including Defendant's childhood, employment, education, and family history. *See* (Dkt. No. 832-6 at 87-97 (listing all documents collected by the defense)).

Trial counsel's decision to forgo consultation with the speech pathologist remains reasonable despite the expert recommendation. "Trial counsel need not follow every recommendation that they receive, especially if there is good reason to believe a mental health evaluation would prove fruitless or harmful." *Honken v. United States*, 42 F. Supp. 3d 937, 1095 (N.D. Iowa 2013). Here, the recommendation concerned only Defendant's "receptive and expressive language deficits." (Dkt. No. 1077-13 at 2).[34] Such information might, in the absence of any other mental health impairments, merit investigation, but it promised *de minimis* mitigating weight in comparison to the theories counsel actually pursued.

In support of this § 2255 motion, trial counsel have submitted affidavits asserting that their decision was not based on a specific strategy. But the affidavits do not actually establish that the decision was anything other than strategic. One trial counsel criticizes their investigation by asserting that the recommendation "just fell through the cracks." (Dkt. No. 1077-5 at 9). Yet in that same affidavit, counsel states the team was "so focused on what we saw as Dylann's delusions and psychosis that we failed to think about the ways his brain was impaired, or ways his cognition was affected." *Id*. In other words, the team prioritized investigating Defendant's more significant mental health issues and concluded that retaining a speech pathologist was not necessary based on those priorities.

Another attorney claims "there was no strategic decision" not to retain a speech pathologist, but that same attorney admits she is "not sure why the team didn't follow the recommendation to hire a speech-language pathologist." (Dkt. No. 1077-7 at 4). The affidavit is inherently inconsistent

---

[34] Dr. Woods asserts that speech and language issues could have indicated "problems spread throughout the brain." (Dkt. No. 1077-15 at 2). But trial counsel retained a neurologist and two neuropsychologists and arranged for brain imaging, a patently adequate investigation of brain structure and function.

and unreliable. It simultaneously asserts an ignorance of the reason behind the decision and utter confidence that the decision was not strategic.

Moreover, these affidavits are, ultimately, irrelevant because even if counsel could credibly establish an absence of strategy, they fail to show a lack of reasonableness. Even where an attorney's actions cannot be characterized as "strategic," the "pertinent question under the first prong of *Strickland* remains whether, after considering all the circumstances of the case, the attorney's representation was objectively unreasonable." *Bullock v. Carver*, 297 F.3d 1036, 1050-51 (10th Cir. 2002). Nothing in trial counsel's affidavits establishes that the investigation was objectively unreasonable. Here, with an avowed white supremacist mass murderer for a client whom they were convinced suffered from major mitigating mental health conditions, trial counsel quite reasonably focused on developing evidence of those conditions and declined to waste precious time and resources on an expert who *might* uncover relatively insignificant evidence of Defendant's struggles with language and auditory processing.

### 2. Defendant Did Not Suffer Prejudice from the Failure to Investigate His Auditory Processing Disorder, Linguistic Processing Speed Deficits, and Pragmatic Communication Dysfunction.

Even if trial counsel had investigated Defendant's language and auditory processing deficits, the outcome of the proceedings would have remained the same.

#### a. No reasonable probability exists that the Court would have barred Defendant from representing himself had it learned of his communication deficits.

Defendant argues that evidence of his auditory processing disorder, linguistic processing speed deficits, and pragmatic communication dysfunction persuasively demonstrated he lacked the capacity to represent himself. (Dkt. No. 1077 at 102). The argument facially fails because the deficits are not "severe" mental illnesses that would permit a bar to self-representation under

*Edwards*. *See Berry*, 565 F.3d at 391. Defendant's experts explain that his auditory processing disorder is a neurodevelopmental disorder that affects his ability to "process linguistic information." (Dkt. Nos. 1077 at 48, 62; 1077-3 at 4; 1077-4 at 6). According to his experts, Defendant struggles to process spoken words and "cannot always 'get' and understand what is spoken." (Dkt. No. 1077-3 at 4). Auditory processing disorder is not listed in the Diagnostic and Statistical Manual of Mental Disorders.[35] (Dkt. No. 1077-2 at 15).

The alleged finding of linguistic processing speed deficits means a person has shortfalls in "speed and accuracy of decision-making skills, short term memory, and attention/concentration." (Dkt. No. 1077-2 at 15). And supposed pragmatic communication dysfunction does not amount to Social Communication Pragmatic Disorder[36] as set out in the DSM because Defendant does not "demonstrate difficulties in understanding indirect or ambiguous language." (Dkt. No. 1077-1) at 19; *see also* American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (2022) 54-55 (hereinafter "DSM-5-TR"). Instead, the expert found Defendant deficient in his "social use of verbal and nonverbal communication." (Dkt. No. 1077-1 at 19). In essence, this expert found that Defendant was socially awkward. It is not clear that either of these alleged conditions even qualify as a mental illness, much less a "severe" one, and Defendant conspicuously omits any argument otherwise. That omission is consistent with the Defendant's personal position that he does *not* suffer from any mental illness, except possibly

---

[35] The Government notes that one of Defendant's experts does categorize it as a type of "language disorder" which is recognized in the DSM However, Defendant appears to use that term as an umbrella to encompass several alleged deficits.  (*See* Dkt. No. 1077 at 48-49, 58).

[36] Defendant refers to his social communication dysfunction as a "disorder," (*see* Dkt. No. 1077 at 49-51, 57), and refers to plural "disorders."  *Id*. at 50, 59.  Yet he admits that his expert was not able to diagnose him with Social Communication Pragmatic Disorder, so the "disorder" moniker is inaccurate for that diagnosis.

social anxiety disorder.[37] Defendant's complete failure to establish a severe mental illness bars any attempt to show the Court would have likely applied *Edwards* to prevent him from representing himself.

Apart from a lack of severity, the additional allegations add nothing substantial to the evidence already before the Court. The symptoms of auditory processing disorder, linguistic processing speed deficits, and pragmatic communication dysfunction duplicate those reported by trial counsel and the Defendant's experts throughout the competency proceedings.[38]   In fact, pragmatic communication disorder—which Defendant's experts stopped short of diagnosing—is a differential diagnosis of both *ASD* and *social anxiety disorder*. *See* DSM-5-TR at 54-55. The only difference between pragmatic social disorder and ASD is that "restricted/repetitive patterns of behavior, interests, or activities" are absent in pragmatic communication disorder. *Id*. at 55. The symptoms of social anxiety disorder and pragmatic communication disorder overlap, distinguished by the timing of the onset of symptoms. *Id*.

The Court heard at length about Defendant's processing speed, his struggles to communicate, and his inability to appropriately adapt his language in social settings. In arguing on direct appeal that Defendant was a "grey-area" defendant who should have been denied the right to self-representation, Defendant's appellate brief noted expert descriptions of his "disorganized thinking, reduced processing speed, memory problems, and difficulty integrating new information." (Br. of Appellant, Dkt. 85, at 141). The experts said Defendant's test results

---

[37] If Defendant argues in reply that the conditions amount to "severe mental illness," the Court should require his personal approval, given his demonstrated opposition to mental health claims. *See generally* Rules Governing 28 U.S.C. § 2255, R. 2 (requiring verification of the motion).

[38] Though Dr. Loftin did not testify about Defendant's capacity to self-represent (*see* Dkt. No. 1077 at 94-95), the Court read her lengthy report.  (Dkt. Nos. 832-6; 880-1 at 18).

indicated a mild frontal system dysfunction that could lead to "disruptions of decision-making, coding and tracking new information, weighing options, adjusting to new information and modifying thinking and behavior." *Id*. The experts also discussed Defendant's "distractibility and preservation on trivial details," which could lead to him "missing crucial information" during court proceedings. *Id*. at 141-42. Trial counsel presented evidence that Defendant suffered from ASD and social anxiety disorder, the symptoms of which subsume those of pragmatic communication disorder. Clearly then, the "new" evidence raised here repackages and relabels information presented during the competency proceedings. Appending different diagnoses would not have changed the weight of the evidence or yielded a different result.

Even if Defendant had presented the additional diagnoses, the Court would not have barred him from representing himself, because it relied heavily on its own observations in reaching its decision. Significantly, "the trial judge—particularly one . . . who presided over one of [the defendant's] competency hearings and his two trials—will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Edwards*, 554 U.S. at 177. As appellate courts frequently recognize, trial courts' experience with defendants provides sound bases for decisions to grant their *Faretta* motions. *See United States v. Garrett*, 42 F.4th 114, 120 (2d Cir. 2022) (upholding decision to allow defendant to self-represent and observing the trial judge had presided over the case for two years and had had "no issues" with the defendant's conduct); *United States v. Stafford*, 782 F.3d 786, 789-91 (6th Cir. 2015) (affirming permission to self-represent despite the movant's "litany of mental health issues" and deferring to the district court's observations of the defendant's conduct and demeanor); *United States v. McKinney*, 737 F.3d 773, 778 (D.C. Cir. 2013) (noting evidence of a severe mental disorder "does not suggest that the district court clearly erred in basing its competency finding on

141

'*all* of the circumstances that have been presented,' including its 'observations of [the defendant], both prior to and during the course of the trial and subsequent to the trial and *all* of the examinations that have been done'") (emphases in original).

This Court observed Defendant represent himself during two competency proceedings and several conferences and concluded that he was "fully able to address the Court, to address the jury, to question witnesses, and to raise timely objections." (Dkt. No. 881 at 17). The Court also noted that Defendant's cross-examinations of Drs. Ballenger and Loftin "demonstrated an aptitude for witness cross-examination that is extraordinary for a *pro se* litigant." *Id*. Defendant's performance during *voir dire* likewise highlighted his proficiency at self-representation. As the Fourth Circuit explained, "[p]erhaps the best evidence that [Defendant] indeed had the mental capacity to perform the basic tasks of self-representation is that he *did* perform them." *Roof*, 10 F.4th at 363 (emphasis in original).

Defendant attempts to explain away his courtroom behavior by cherry-picking certain portions of the proceedings to highlight evidence of incapacity, but the record as a whole contradicts Defendant's narrative. Much of the conduct he focuses on post-dates the initial decision to permit self-representation and therefore does not implicate the correctness of that ruling or the quality of the representation that preceded it. In fact, the record undercuts Defendant's current position that he lacked the capacity to represent himself and buttresses the Court's conclusion after the second competency hearing that Defendant was capable of self-representation. It also demonstrates that the Court acted appropriately and understandably when it permitted Defendant, after accepting representation for the guilt phase, to go it alone during the penalty phase.

Defendant performed ably during *voir dire*. His current assertion that he could not pose questions or objections (Dkt. No. 1077 at 49) conflicts with trial counsel's 2016 affidavit, which

stated that Defendant "refused" to ask questions or make objections because he believed if "[e]veryone likes me and feels sorry for me. I won't get death." (Dkt. No. 840 at 2). It also conflicts with his explanation to Dr. Ballenger that he disagreed with counsel's suggestions on striking jurors. (Dkt. No. 858 at 8). But even if Defendant did not purposely disengage for perceived tactical benefit, the record shows he did not struggle to the extent he now claims. For instance, Defendant contends he only objected to jurors after the court indicated an inclination to strike them and solicited his requests. (Dkt. No. 1077 at 75-76). Defendant cites five instances of such interactions. *Id*. at 76. But the record shows Defendant moved to strike jurors or objected to Government motions to strike on ten occasions without the Court indicating its intent to strike those jurors. (*See* Dkt. Nos. 919 at 140; 920 at 84-85; 921 at 112-113, 141, 171, 214, 232, 277; 973 at 139; 974 at 177). Defendant was far from a helpless bystander. He was in control of his case and objected to jurors when he chose to do so, even if trained counsel might have done so more frequently or effectively.

Defendant also cites a mental health expert's observation that he "repeatedly asked the same follow-up question to prospective jurors." (Dkt. No. 1077 at 76 (referring to an inquiry about the venire member's ability to defend a position)). This observation is inaccurate and irrelevant. The record reflects around 39 additional questions over the course of *voir dire*. *See* (Dkt. Nos. 920 at 164, 194, 203, 226; 921 at 26, 43, 78-79, 109-10, 179-80, 182-83, 196, 221-22, 246, 255, 268-69; 973 at 30, 34, 48, 52, 66, 89, 100, 236, 280; 974 at 50-51, 74, 83-84, 170-71, 267). Only one of those questions came at the Court's prompting. *See* (Dkt. No. 920 at 203). Of those, only 11 of the questions involved the capacity to defend a position. *See* (Dkt. Nos. 920 at 194; 921 at 43-44,

246, 255; 973 at 48, 66, 89, 100, 280; 974 at 74, 83-84).[39] Moreover, the nature of *voir dire* frequently involves repetitive questions, even from attorneys. Indeed, questions about a potential juror's confidence in a position often appear in written questionnaires, demonstrating their centrality to the selection process and importance for every prospective panelist. *See, e.g.*, Def.'s Br. in Supp. of the Def. Version of the Juror Questionnaire at 20-24, *United States v. Bowers*, No. 18-cr-00292 (W.D. Pa.), ECF No. 757. If anything, Defendant's frequent resort to a common line of questioning reflects a firm grasp of his goals in selecting a jury.

Far from a show of incompetence, his questioning during *voir dire* suggests a strategy to seek one unwavering vote for life. He returned to this theme in his closing, telling the jury that "I have been told I have a right to ask you to give me a life sentence" and that "only one of you has to disagree with the other jurors." (Dkt. No. 948 at 834). He reminded the jurors: "I know that at least some of you during the jury selection were asked if you would be able to stand up for your own opinions in deliberation, and if you were asked that, you answered yes." *Id.*; *cf.* Dkt. No. 1077-22 at 1 (juror noting that it appeared to him that Defendant addressed his closing to one particular juror and told them that "he only needs one" of them)). Using *voir dire* to seed core themes with the jury exhibits a level of sophistication that even many experienced trial lawyers lack.

Defendant's additional questioning only serves to further exhibit his grasp of the proceedings. He proposed five follow-ups to jurors' *voir dire* responses. (*See* Dkt. Nos. 920 at 226; 921 at 78, 109; 973 at 48; 974 at 171). Twice the Court noted that Defendant had proposed a "good

---

[39] Defendant requested a similar question to be asked of another juror. In that situation, the juror said during *voir dire* that she had served on another capital jury, and Defendant requested that the Court ask the juror if she genuinely agreed with her fellow jurors in that case, or if she went along with their decision. (*See* Dkt. No. 921 at 180).

question." (Dkt. No. 973 at 48; 974 at 171). The Court even observed that it "ha[dn't] found him to have any hesitation to object or to make recommendations to ask questions, frankly, many are very good questions he has asked me to make." (Dkt. No. 974 at 152). Defendant's performance showed that the Court correctly deemed him competent to self-represent, and any alleged communication deficits clearly did not render him incapable of exercising that right.

Notably, trial counsel attempted to use Defendant's jury selection performance as a basis for striking the panel once they were reappointed for the guilt phase. (*See* Dkt. No. 745). Counsel noted Defendant's "[l]ong pauses," "[s]tuttering," "[r]epeating questions," and "[o]nly occasionally standing to object or pose questions." *Id.* at 2. The Court denied that motion, noting Defendant "actively participated in the *voir dire* process by making objections and suggesting follow-up questions for the Court to ask potential jurors." (Dkt. No. 760 at 1). Though Defendant now tries to recharacterize his behavior through his new experts' opinions, the Court was in the best position to observe Defendant and evaluate his capabilities.

Defendant's penalty phase performance further establishes his capacity to represent himself. Defendant claims that he could not make objections or engage in the proceedings, but the record shows that he *chose* not to engage during the penalty phase. Defendant indicated that he might be open to calling Father Parker as a witness, until Father Parker would not agree to refrain from referring to his opinion that Defendant has a mental illness. (*See* Dkt. No. 1077 at 6). Defendant made very clear that he would not involve his family—not because he did not feel up to the task of calling them as witnesses, but because he did not want to cause them any embarrassment. *See supra* at 120. Defendant repeatedly stated he would not present witnesses, cross-examine victim-impact witnesses, or otherwise present a penalty phase defense. (Dkt. Nos. 840 at 6; 858 at 3; 881 at 15; 912 at 22). He did so because, as he told this Court in November

2016, he knew that the defense he wanted to present would make things worse for him. (Dkt. No. 652 at 22-23). Defendant had, by his own admission, no motivation for presenting a defense. His silence therefore indicates a lack of desire based on an understanding of the proceedings, not a lack of ability to participate.

The Court should consider Defendant's motivation in evaluating his assertion that he performed well only during his competency hearing because that hearing was held in a sealed courtroom with familiar witnesses. (Dkt. No. 1077 at 97-98). In that proceeding, trial counsel actively sought to prevent him from executing his plan to represent himself based on their assertion that he suffered from a severe mental illness and was incompetent to stand trial. Defendant knew trial counsel's success would result in the presentation of expert testimony about his autism—a label that he viewed as worse than death. (Dkt. No. 652 at 12-13). Defendant was, thus, highly motivated to demonstrate his competence and capability. His performance in that proceeding, with control over his defense at stake, clearly demonstrated the ability to represent himself. Indeed, this Court found that Defendant's cross-examinations of two experts "demonstrated an aptitude for witness cross-examination that is extraordinary for a *pro se* litigant." (Dkt. No. 881 at 17).

Contrary to Defendant's claims, he notably demonstrated that aptitude with plenty of people in the courtroom. The competency proceedings were sealed but still well-attended. Taking into account Government counsel, a case-agent, the paralegal and litigation assistant for the Government, standby counsel, the judge, court reporter, courtroom deputy, law clerks, support staff, and court security, there were at least 20 individuals in the courtroom during the hearing. (*See* Dkt. No. 882-1 at 1-2, 5, 214 (Government counsel estimating, with no objection, that approximately 23 people were in the courtroom during the first competency proceeding). Defendant still demonstrated great proficiency in cross-examining witnesses, though he told Dr.

146

Ballenger that it would be extremely difficult for him to perform when "20 people were watching." (Dkt. No. 648-2 at 41).

This Court also found that Defendant performed very well during several days of in-person jury selection. This Court held that Defendant was "actively participating in the *voir dire* process," including by consulting with counsel, proposing additional questions to the Court, and making successful motions to strike. *See Roof*, 10 F.4th at 349. As the record shows, Defendant was initially less active on the first day, but became progressively more active in lodging objections, moving to strike jurors, and proposing follow-up questions to the Court. *See supra* at 105-10. This progression is entirely consistent with Dr. Ballenger's diagnosis of social anxiety disorder, which Dr. Ballenger opined would abate as Defendant got more comfortable in the courtroom. (Dkt. No. 882-1 at 155-56). This pattern does not suggest an organic processing disorder or fundamental incapacity to communicate that compromised Defendant's ability to represent himself. Rather, it merely shows that Defendant, on trial for his life, was understandably nervous as *voir dire* began. Indeed, at the end of the first day of jury selection, even trial counsel remarked that he believed that "on average, we've done very well" in selecting a jury. *Roof*, 10 F.4th at 349.

In sum, Defendant has not identified any new evidence, much less an aspect of the record that calls into question the decision to permit him to represent himself or the efforts of his counsel to prevent him from doing so.

### b. Defendant did not suffer prejudice from trial counsel's failure to investigate whether he had processing and communication disorders.

As noted, Defendant does not advance a substantial argument as to whether he suffered prejudice because the lack of investigation prevented the jury from hearing about his processing and communication disorders in the mitigation context. However, in a section of his motion titled "Prejudice for Claims 3-8," Defendant sets out alleged deficiencies contained in those claims and

argues, "but for these errors, the jury would have heard mitigating evidence . . ." and "[i]f the jury had heard this evidence, there is a reasonable probability at least one juror would have voted for life and Dylann would not have been sentenced to death." (Dkt. No. 1077 at 179, *see generally* 178-97). It therefore appears that Defendant claims, in part, that trial counsel's failure to consult with a speech language pathologist prevented the jury from hearing mitigating evidence.

Defendant cannot show prejudice stemming from trial counsel's actions: he cannot blame counsel for not uncovering and presenting penalty phase evidence because he represented himself during that proceeding. "[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" *Faretta*, 422 U.S. at 834 n.6. In other words, the right to self-representation is "a waiver of the right to 'effective assistance.'" *United States v. Singleton*, 107 F.3d 1091, 1101 (4th Cir. 1997); *accord United States v. Avila-Gonzalez*, 757 F. App'x 353, 355 (5th Cir. Dec. 20, 2018) ("Because a defendant who elects to represent himself waives his Sixth Amendment right to counsel, he has no counsel against which to assert an ineffective assistance claim."); *Wilson v. Parker*, 515 F.3d 682, 696-98 (6th Cir. 2008); *United States v. Chapman*, 954 F.2d 1352, 1363 (7th Cir. 1992); *United States v. Roggio*, 863 F.2d 41, 43 (11th Cir. 1989); *United States v. Weninger*, 624 F.2d 163, 167 (10th Cir. 1980). Any other rule would assume that, despite asserting the right to self-representation, a defendant would continue to have the right to the continued "assistance" of counsel. The Constitution does not mandate such a hybrid arrangement. *See Singleton*, 107 F.3d at 1100.

Ineffectiveness remains a viable claim for actions taken before a defendant begins representing himself, but courts have placed severe limitations on when those claims are cognizable because prejudice assessments in those situations have unique and significant

challenges. For instance, the Ninth Circuit Court of Appeals held that a defendant may not assert ineffective assistance during pretrial proceedings if he "could have corrected those errors once he decided to represent himself." *Cook v. Ryan*, 688 F.3d 598, 609 (9th Cir. 2012). In *Cook*, the Ninth Circuit held that the defendant could not claim prejudice based on his counsel's alleged failure to develop mitigation evidence where the defendant affirmatively chose not to present mitigation evidence. *Id.* at 612.

In *Wilson v. Parker*, the Sixth Circuit held that, even where defense counsel failed to conduct any mitigation investigation before the defendant asserted the right to represent himself, counsel could not be deemed to have caused prejudice where the defendant chose to represent himself and deliberately refused to put on mitigation. 515 F.3d at 696, 698. Although the court found the defendant could conceivably establish that a failure to conduct a mitigation investigation until the eve of trial was deficient conduct, the court noted that a waiver of counsel "makes it virtually impossible to assess whether [counsel's pre-waiver] conduct was prejudicial." *Id*. at 699. It acknowledged the possibility of pre-waiver conduct that "sufficiently prejudiced the defendant to sustain an ineffective assistance claim, this is not such a case." *Id*. In the case before it, the court found the defendant "preempted any of [his attorney's] efforts well before any penalty phase would begin" and "clearly exercised control over the conduct of his trial." *Id*. The defendant made a statement during the penalty phase that he was not guilty but otherwise declined to present mitigating evidence. *Id*. Under the circumstances, "the failure to present mitigation evidence [could not] be attributed to [the defendant's attorney]." *Id*.

Like the Sixth Circuit's defendant in *Wilson*, Defendant in this case asked to represent himself mere days before *voir dire* was scheduled to begin. (Dkt. No. 666 at 1). He likewise declined a mitigation case though, unlike the defendant in *Wilson*, his trial counsel had conducted

an exhaustive investigation and crafted a penalty phase case, complete with expert witnesses and reports, despite Defendant telling his counsel before trial that he did not want any mental illness mitigation evidence to be presented. Trial counsel even received permission to have those witnesses finalize their reports in the event Defendant decided to use them. (Dkt. No. 979 at 2). Defendant had access to all of those expert reports and could have consulted with those experts, including the neuropsychologist who examined him before trial and the experts who recommended evaluation by a speech pathologist. His performance during the competency proceedings makes clear that he was capable of reading and understanding the expert reports. The Court informed Defendant he could subpoena witnesses and present evidence, using standby counsel to do so. (Dkt. No. 912 at 17). He had every opportunity to present the testimony of those experts that he now claims would have turned the tide in his sentencing proceedings.

He decided not to take that approach and cannot blame his former counsel for his own failures.[40] The Court granted Defendant's motion to represent himself on November 28, 2016, and the penalty phase began January 4, 2017, over a month later. During that time, Defendant could have prepared a mitigation case with standby counsel's assistance. But he emphatically and without qualification told this Court, his counsel, Dr. Ballenger, and his own experts that he would refuse to put on a mitigation case. Because he so refused, he cannot now ascribe that failure to trial counsel's actions.

Defendant alone made the decision to prioritize ensuring that his message of racial hatred would not be "discredited" in any way over presenting mental health claims in his defense. In so

---

[40] To the extent that Defendant claims he did not have a reasonable opportunity to pursue those avenues due to time constraints, *Wilson* is again instructive, as it also involved a motion for self-representation at the start of trial, which the court described as "well before any penalty phase would begin." 515 F.3d at 699.

doing, he chose what evidence to present or withhold, having been warned multiple times by this Court that the Court believed the decision was unwise and that a likely potential consequence would be a death sentence. Defendant repeatedly and emphatically told this Court, his counsel, and evaluators that he had no intention of putting on any mitigation evidence. Whether trial counsel had consulted with a speech pathologist would have had no bearing on his penalty phase presentation. Having made the strategic choice to adhere to his racist ideology, Defendant should not be able to claim as a basis for relief that the jury did not hear this mental health evidence.

Even if a claim of ineffectiveness would lie, Defendant cannot establish a reasonable likelihood that his processing and communication disorders would have led to a more favorable verdict. Defendant claims the diagnoses would have revealed why he was isolated, socially awkward, and loath to make eye contact. (Dkt. No. 1077 at 194-95). He claims the jury could then understand that he had a communication impairment that "made making friends and interacting with the world difficult." *Id.* at 195. He claims the jury would see that he was not cold and unfeeling, but rather that he struggled to show proper affect. *Id.*

The proffered evidence is insubstantial and unpersuasive standing alone, but is especially weak in light of the overwhelming aggravation case presented by the Government, and any evaluation of prejudice contemplates the forgone information in light of the prosecution's case. *See Wiggins*, 539 U.S. at 534. On this record, Defendant cannot show that the omission of the evidence was prejudicial.

The jury heard how the Defendant sat through a Bible study with a room full of worshippers and, when they closed their eyes in prayer, opened fire. *See supra* at 5. They heard how he shot the victims multiple times as they fled and hid. *Id.* They saw the chaos and terror of his rampage and heard of the pain and suffering he imposed on the victims' families. *Id.* The jury heard of his

racist beliefs and that he targeted the church to inflame race relations. *Id*. They saw him admit to his crimes. *Id*. They saw his extensive planning, over months, in which he plotted and engaged in target practice. And they saw, in his own words, that he was not sorry at all for what he had done.

Against that evidence, a claim that Defendant was awkward, shy, and isolated would not have altered the outcome. Defendant's distractibility and awkwardness do not diminish his ability to perceive right and wrong or even the nature of his own conduct, much less do they suggest a violent compulsion that might explain his heinous crimes. Nor would the evidence weaken the Government's case. Defendant claims the evidence of his processing disorder and communication disorder would persuade the jury that his behavior during his recorded confession and in the courtroom indicated that he struggled to interact like an ordinary person and would rebut any impression that he was cold and unfeeling. (Dkt. No. 1077 at 195). But the jury was not *only* exposed to Defendant's confession and courtroom behavior. They saw that Defendant planned this attack for months. They learned he purchased a firearm and ammunition to commit this offense. And they saw Defendant's own writings. There is nothing in the proffered expert opinions that indicate his supposed disorders affected his ability to compose the white supremacist manifestos that laid bare his racist motivations and utter lack of remorse. There is no reasonable probability that the jury would not have imposed a death sentence if trial counsel had investigated and presented evidence of Defendant's processing disorder and communication dysfunction.

### C. Conclusion

Trial counsel did not render deficient performance for not uncovering the evidence of two minor impairments that only became minimally relevant when Defendant eventually sought to represent himself, and that evidence would have had no impact on the Court's conclusion that Defendant was capable of self-representation. Trial counsel investigated and was fully prepared to

have experts testify about his low processing speeds, verbal and social deficits, and awkward mannerisms, albeit under the diagnoses of ASD, social anxiety, and other schizophrenia spectrum disorder. Regardless of whether trial counsel had presented any additional diagnoses, the Court still would have concluded that "if this Defendant were incompetent to represent himself, almost no defendant would be competent to represent himself." (Dkt. No. 881 at 7).

Finally, Defendant cannot complain of prejudice when he, and only he, made the choice to refuse to present evidence about any of his impairments during the penalty phase. Even if he had, that evidence would not have made any difference given the gravity of this hate-motivated mass murder of innocent worshippers praying in a historic house of worship.

## V.    **DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM FOUR**

Defendant claims his trial counsel acted ineffectively when, on May 25, 2016, they invoked his right to a speedy trial and asked for the proceeding to commence in November 2016. Defendant argues the trial schedule caused him to represent himself and forgo mitigating evidence because he "was without counsel he could trust." (Dkt. No. 1077 at 103, 119). Defendant is not entitled to relief because trial counsel's affidavits establish that they made a reasonable strategic decision to ensure his federal trial would proceed before his state trial, and he cannot establish a reasonable likelihood that he would have received a more favorable verdict at a delayed trial, given his vehement personal opposition to mental health mitigation evidence.

### A.    **Argument**

#### 1.  **Trial Counsel Made a Reasonable Strategic Choice.**

Counsel unquestionably made a strategic choice to invoke Defendant's speedy trial rights and demand a November 2016 trial date. Mr. Bruck explicitly states in his affidavit, "I decided I wanted to invoke [Defendant's] speedy trial rights and go to trial on the federal case before the

state had a chance to try him." (Dkt. 1077-5 at 2). Trial counsel explained to the Court that a state trial would distress their client, given his apprehensions about attention: "They have TV in state court and they don't have TV in federal Court," and Defendant "could not tolerate the anxiety and distress that that causes." (Dkt. No. 652 at 43-44). Trial counsel knew of their state court counterpart's concern that they would be forced to trial quickly if the federal proceeding did not occur first. (Dkt. 1077-5 at 2). When questioned by the Court, trial counsel expressed "personal[]" satisfaction that it did not raise "any question regarding ineffective assistance of counsel because of an inadequate time to prepare." (Dkt. No. 207 at 49-50; *see also id.* at 48-52).

The decision was objectively reasonable under the circumstances. Contrary to Defendant's assertion that trial counsel were "struggling" to identify experts in May of 2016, he had already undergone examination by a number of experts, including a neuropsychologist, (Dkt. No. 832-7 at 1), a forensic psychiatrist (Dkt. No. 832-8 at 1), an autism expert (Dkt. No. 832-6 at 2), and a neurologist. (Dkt. No. 1077-2 at 4). Counsel had been "closely" consulting with a neuropsychiatrist for about eight months, since September 2015, and had arranged for an MRI, which was completed in March of 2016. (Dkt. Nos. 1077 at 53, 1077-4 at 1). The only mental health experts retained for mitigation purposes *after* May of 2016 were Dr. Loftin and Mr. Robison, and trial counsel had interviewed Dr. Loftin by mid-May. (*See* Dkt. 1077 at 107). Counsel had thus conducted a thorough investigation when they requested a November trial.

Trial counsel's decision remains unassailable despite the fact that they made it without first retaining a jury consultant. As discussed below, *see infra* at 220-27, trial counsel carefully considered the best venue and jury pool for the trial based on their knowledge and experience. Ultimately, counsel chose not to follow a later-hired jury consultant's advice to seek a continuance and investigate a venue challenge, another decision Defendant characterizes as ineffective

assistance. (Dkt. No. 1077 at 198). His claim fails to account for the context of the recommendations and the information known to trial counsel when they chose to proceed in federal court.

Trial counsel retained the jury consultant after the state trial was continued to January of 2017. (Dkt. Nos. 1077 at 108; 1077-5 at 2). The state case was set for trial in South Carolina's Ninth Judicial Circuit, which draws jurors from Charleston or Berkley counties. (*See* Dkt. No. 68 at 1-2); South Carolina Circuit Court Divisions, *available at* https://www.sccourts.org/courts/trial-courts/circuit-court/circuit-map/, last accessed at Oct. 13, 2025. By contrast, the federal jury was selected from Area C, which covers the Charleston and Beaufort Divisions. (*See* Dkt. No. 179 at 2).

A delay in the request for a federal trial date to accommodate a jury consultant's study, analysis, and possible recommendation of a venue motion would likely have resulted an expedited and televised state proceeding in the very area the consultant thought would produce biased venire members. In other words, Defendant would have lost the benefits of proceeding first in federal court without avoiding the portion of the jury pool his consultant was allegedly most concerned about. These circumstances created an eminently reasonable basis for counsel to avoid that risk.

Defendant suggests the state case could have been continued, but trial counsel acted reasonably by not taking that chance. Defendant's counsel from both proceedings acknowledge the state attorneys' concerns that they were unprepared for trial in January 2017 and would have to commence at that time if the federal case did not proceed first. (Dkt. Nos. 1077-5 at 2, 1077-12 at 2). Still, trial counsel now baldly assert that they "did not test that," (Dkt. No. 1077-5 at 2), and the state attorneys now claim they would have "tried much harder to get a continuance" absent the intervening federal proceeding. (Dkt. No. 1077-12 at 2). Of course, none of the attorneys could

155

predict, much less guarantee, that the state court would have granted a continuance. To the contrary, Defendant's state attorneys allege the state judge was receiving directives from South Carolina's chief justice to "get the case tried and resolved within a year." (Dkt. Nos. 1077-10 at 1; 1077-11 at 1). One state attorney claims the state prosecutors also wanted to try the state case first, indicating their predictable opposition to a continuance. (Dkt. No. 1077-10 at 1; *see also* Dkt. No. 68 at 2 (State Solicitor indicating preference for state case to be tried first)).

Trial counsel in this case therefore made an eminently reasonable choice between a federal trial that they could prepare for and the near certainty of a state trial that their counterparts did not believe they could prepare for and which trial counsel worried would potentially traumatize their client. Trial counsel acted reasonably by opting not to test whether the state attorneys could obtain a continuance, opposed by the prosecution and South Carolina's chief justice, especially given the potential consequences of failure. Under the circumstances, trial counsel's approach was a reasonable, strategic choice.

Counsel's decision did not become unreasonable by virtue of unforeseen subsequent events. Counsel had no duty to predict their client's self-defeating personal actions.[41] Though Defendant's attorneys now claim they were not ready for trial in November of 2016, none of their affidavits addresses whether they would have been prepared absent their client's efforts to subvert the planned defense and represent himself. (Dkt. No. 1077-5 at 7). Trial counsel were not

---

[41] Defendant erroneously asserts that trial counsel revealed, on November 8, "that they were never prepared for a November trial date." (Dkt. No. 1077 at 112). Trial counsel told the Court that when they asked for the trial date they expected to continue preparing for the proceeding. (Dkt. No. 562 at 8-9). Trial counsel asked for more time because they had not anticipated that Defendant would rebel against their mitigation plan, thereby raising concerns about his competency and requiring a diversion from trial preparation. *Id.* at 8-11 (indicating that their preparation became diverted "[j]ust in the last few days, since the competency issue has surfaced").

ineffective for not anticipating that their trial preparation would be derailed in that manner. Though one of Defendant's state attorneys did not believe the federal team was ready for trial, she admits that "[a]s the federal trial approached, the state team was increasingly not included in meetings and discussions." (Dkt. No. 1077-12 at 5).

In fact, trial counsel were diligently preparing for trial when Defendant thwarted their efforts. Trial counsel had no obligation to seek a continuance to accommodate the mere possibility that Defendant would rebel. To the extent Defendant blames the conflict on the supposedly rushed timeline, that assertion is baseless, as discussed in Claim Five. *See infra* at 168-81. Defendant would have clashed with counsel regardless of the trial date, and the contention that he did so because he learned their strategy through a Government-retained expert makes no difference.

Further, the trial timeline did not affect counsel's plan to reveal their strategy to Defendant: they always intended to have that discussion after Dr. Dietz examined Defendant. If trial counsel had sought to continue the trial, they would have presumably requested a commensurate delay for disclosures and evaluations under Rule 12.2. Indeed, trial counsel argued that the Government-sponsored mental health evaluations should not take place until *after* the deadline for Defendant to supplement his Rule 12.2 notice, leaving less than two months before trial for the prosecution's investigation. (Dkt. No. 278 at 1-2). In other cases, defense counsel regularly request short timelines between Rule 12.2 notice and the commencement of trial. *See, e.g.,* Mem. in Supp. of Def.'s Proposed Schedule for Litigation Pursuant to Fed. R. Crim. P. 12.2(b) at 5-9, *United States v. Gendron*, Case No. 1:22-cr-00109-LJV (W.D.N.Y. Feb. 16, 2024), ECF No. 138. Crediting trial counsel's contemporaneous statements, they would not have revealed their strategy to Defendant before the Government-sponsored examination regardless of the trial date. While the extra time to

157

work with their client may have resulted in improved rapport, it would not have changed their internal schedule for revealing the mental health strategy, something they purposefully postponed.

Though Defendant's various attorneys disagreed about the need for a continuance, their May decision to advance the trial remains reasonable. As the Supreme Court observed, "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. As such, tactical disagreements amongst professionals do not demonstrate a wholesale failure to meet the standards of a competent attorney.

Finally, trial counsel could have, without having said as much, sought to advance the federal trial to diminish the overall likelihood of execution, given the state's record of imposing death. *See Darden v. Wainwright*, 477 U.S. 168, 186 (1986) (noting "several reasons why counsel reasonably *could have* chosen" a particular approach) (emphasis added). The State of South Carolina had handed down more than 180 death sentences and carried out 43 executions between 1976 and 2016.[42] During that period, the Federal Government imposed 77 death sentences but carried out only three executions,[43] the most recent in 2003, more than 13 years before Defendant's trial. After the 1988 reinstatement of the federal death penalty, Presidents Clinton and Obama both commuted capital sentences.[44] No South Carolina Governor has commuted a death sentence since

---

[42] *See* Death Penalty Information Center (DPIC), Death Penalty Census Database, South Carolina Death Sentences, available at https://deathpenaltyinfo.org/facts-and-research/data/death-penalty-census/sentences?jurisdiction=South+Carolina&sort=year/asc; DPIC, Death Penalty Census Database, South Carolina Executions, available at https://deathpenaltyinfo.org/facts-and-research/data/executions?state=South+Carolina&federal=No.

[43] *See* DPIC, Federal Death Sentences by Year Since 1988, *available at https://deathpenaltyinfo.org/stories/federal-death-sentences-by-year-since-1988*; DPIC, Execution Database, Federal Executions, *available at https://deathpenaltyinfo.org/facts-and-research/data/executions?federal=Yes*

[44] *See* DPIC, List of Clemencies Since 1976, *available at* https://deathpenaltyinfo.org/policy-issues/policy/clemency/list-of-clemencies-since-1976

1976.[45] An experienced capital litigator, especially one who was as intimately familiar with capital punishment as Mr. Bruck, would have considered the advantages of having his client tried first in a jurisdiction that had, in the past, carried out the punishment far less zealously than South Carolina.

The cases Defendant cites do not support his argument that his trial was unreasonably rushed. *Powell v. Alabama* involved the capital trials of defendants who stood trial only six days after their indictment and were not provided definite counsel until the morning of the trial. 287 U.S. 45, 53-59 (1932). *Powell* requires that criminal defendants have time to consult with counsel and prepare a defense. It does not establish a standard timeline for capital cases, nor does it indicate that the timeline of Defendant's case was *per se* unreasonable.

*United States v. Abney*, 812 F.3d 1079 (D.C. Cir. 2016), is also inapposite. There, the D.C. Circuit found trial counsel was ineffective for failing to seek a continuance of the defendant's sentencing until after the First Step Act's enactment. The court noted that defense counsel did not proffer a strategic reason for the omission and found the government's proffered rationales implausible. *Id*. at 1088. Here, in stark contrast, Defendant's trial counsel clearly explained their reasoning for a November 2016 trial date and have not disavowed that analysis. Those concerns were legitimate and reasonable, especially in light of the information they had when they made that decision.

In *Thomas v. Lockhart*, defense counsel met only twice with their client, once on the day he was charged and once a week later, when his attorney told him to plead guilty and accept a 30-

---

[45] *See* Death Penalty Information Center (DPIC), Death Penalty Census Database, South Carolina Death Sentences, *available at* https://deathpenaltyinfo.org/facts-and-research/data/death-penalty-census/sentences?jurisdiction=South+Carolina&sort=year/asc

year sentence. 738 F.2d 304, 306 (8th Cir. 1984). While the court reviewing the ensuing post-conviction case relied in part on defendant's failure to seek a continuance or withdraw to grant relief, the Eighth Circuit rested its holding on defense counsel's complete failure to investigate or familiarize himself with the case. *Id*. at 307-10. *Thomas* therefore offers no support for Defendant's argument, first, because trial counsel in this case met extensively with Defendant, second, because they were intimately familiar with Defendant and his case, and third, because they conducted an extensive investigation into various potential avenues of mental health and non-mental health mitigation on his behalf.

Finally, in *Commonwealth of Massachusetts v. Baker*, a state court found trial counsel ineffective for not seeking more time to hire an expert in response to a last-minute change to the prosecution's theory of the case. 800 N.E.2d 267, 274-75 (Mass. 2003). The state court faulted defense counsel for not requesting a continuance in response to unforeseen circumstances. *Id*. In this case, trial counsel affirmatively requested the accelerated timeline for strategic reasons. When unforeseen circumstances arose, trial counsel actively—and repeatedly—sought continuances to address them. None of the cited cases demonstrate that trial counsel's approach was unreasonable.

Trial counsel invoked Defendant's right to a speedy trial deliberately for strategic reasons. That decision was reasonable and did not amount to deficient performance.

### 2. Defendant Did Not Suffer Any Prejudice.

Even if the Court finds trial counsel acted unreasonably in pursuing a trial in November of 2016, Defendant still cannot show prejudice because (1) any claims of prejudice during the penalty phase were waived by Defendant's choice to self-represent, (2) Defendant would have chosen to represent himself even if counsel had not invoked his right to a speedy trial, (3) none of the

referenced unfulfilled tasks affected the trial, and (4) there is no reasonable probability that the jury would have returned a more favorable verdict if they received the cited mitigating evidence.[46]

### a. Defendant waived his right to effective representation during the penalty phase.

First, to the extent Defendant argues he suffered prejudice during the penalty phase due to the rush to trial, this argument is foreclosed by his self-representation. *See supra* at 148. Defendant had every opportunity to present mitigation on his own. Most of the lay witnesses Defendant claims should have been called were known to him and included on the defense witness list.[47] (Dkt. No. 563 at 5-7). Trial counsel even tried to present some of these witnesses against Defendant's wishes. (*See* Gov't Ex. 9 at JA6521-23). The other witnesses referenced in the motion, namely his aunt's stepdaughter, teachers, two jail employees, the mother of a friend, and a Sunday School teacher, were not listed as witnesses, but Defendant has not claimed they were unavailable to him, nor has he claimed that trial counsel were ineffective in identifying or preparing them for testimony prior to his waiver. (Dkt. No. 1077 at 183-91, 196-97). Defendant could have presented that evidence yet chose not to do so.

As discussed above, *see supra* at 147-51, Defendant also could have pursued his new mitigation theory that he suffered from a processing and a communication disorder. He decided not to take that approach, and he cannot blame his former counsel for his failures after he chose to represent himself. In the time between the beginning of his self-representation and the penalty

---

[46] The argument that Defendant's claims are waived through his self-representation and the lack of overall prejudice apply to several ineffectiveness claims and are incorporated in later sections.

[47] These witnesses include his mother, two grandparents, Sunday school teacher Bonnylin Henry, eighth-grade teacher Darce Cruea, sister's boyfriend Frederick Stork, supervisor Brian Fanning, bank teller James Grayson Hicks, former co-worker Brock Pack, fellow jail inmate Ashley Ireland, and fellow jail inmate Michael Bixby.

161

phase, Defendant could have prepared a mitigation presentation with the help of his standby counsel but decided against that approach. He, therefore, cannot blame the lack of mitigating evidence on counsel's decision to invoke his right to a speedy trial.

Finally, Defendant's time limitations argument is further belied by the fact that he made the conscious decision not to seek a continuance of his trial. When the Court held the *Faretta* hearing, it asked Defendant if he was ready to proceed with the trial. (Dkt. No. 919 at 8). Defendant could have said he was not ready to proceed, and the Court could have granted a continuance.[48] Defendant did not request more time, telling the Court he was ready. *Id.* That was his decision, and he cannot now blame trial counsel for the consequences of his decision. Defendant invoked his rights under *Faretta*, and he received the representation he requested.

### i. Defendant would have chosen to represent himself even if trial counsel had not invoked his right to a speedy trial.

Though somewhat disjointed, it appears Defendant claims the rush to trial led to his self-representation. (Dkt. No. 1077 at 119). That claim is plainly contradicted by the record. Defendant opposed the presentation of ASD evidence. He claimed he would rather die than have trial counsel present it. (Dkt. No. 652 at 13). The Court informed Defendant that the decision to present ASD was not his, but counsel's. *Id.* at 18-19. Defendant's other statements make equally clear that he would have opposed the presentation of any mental health defense. He confirmed during his competency hearing he did not want "anybody to think that [he] did [the crime] because [he had] some kind of mental problem." (Dkt. No. 707 at 273). Defendant wanted to prevent allegations that he was mentally ill from obscuring his ideological reason for committing his crime.

---

[48] The Court may have also considered Defendant's need for more time in deciding whether to grant his motion to self-represent. (*See* Dkt. No. 756 at 5).

That belief led to Defendant's impasse with trial counsel, and that impasse would have occurred regardless of the trial's timing. This Court recognized Defendant's motivation and found he had moved to self-represent "to prevent the presentation of mental health evidence." (Dkt. No. 691 at 6). Defendant affirmed that fact in his opening brief on direct appeal, stating he "chose self-representation for one reason: 'to prevent the presentation of mental health mitigation evidence.'" Br. of Appellant, Dkt. 85 at 107. So long as trial counsel insisted on presenting evidence of his mental impairments, Defendant would have represented himself.[49] That fundamental disagreement, not a rush to trial, resulted in Defendant's decision to represent himself. Therefore, there is no reasonable probability that Defendant would have allowed counsel to represent him had they forgone his right to a speedy trial.

### ii. None of the unfulfilled tasks affected the outcome Defendant's trial.

Defendant does not explicitly state in Claim Four that he suffered prejudice because trial counsel missed a deadline for filing a notice of mitigating factors, delayed in retaining an autism expert, a victim-outreach expert, and a jury consultant, and failed to retain a speech pathologist, but he does claim trial counsel overlooked those issues in the rush to trial. (Dkt. No. 1077 at 106-09). None of the supposed failures prejudiced Defendant.

Defendant notes that trial counsel missed a deadline for filing a notice of mitigating factors, but the notice was filed, albeit late, and the Court did not strike it as untimely. (Dkt. No. 325). Defendant therefore suffered no prejudice from that missed deadline. Defendant also did not suffer prejudice from any delay in retaining an autism specialist, considering his complete opposition to

---

[49] Defense counsel was also not ineffective for insisting on presenting mental health evidence, as discussed in Section VIII.

presenting evidence of ASD.[50] In any event, that ASD expert completed her evaluation and produced an exhaustive report detailing the bases for an ASD diagnosis before the penalty phase. (Dkt. No. 832-6). Though Defendant claims trial counsel did not hire a victim outreach specialist until June of 2016, and the specialist only met with two victims in September of 2016, he does not offer any insight into how the truncated schedule affected that specialist's work, or why they failed to meet any other victims between September 2016 and when the trial began in November 2016, or when the penalty phase began in January 2017.

Defendant cannot demonstrate prejudice from trial counsel's decision to decline a public opinion survey recommended by a jury consultant. The consultant does not offer any indication what such a survey might have found, nor does she indicate whether the results would have been substantively different from a survey taken statewide from another area of South Carolina. She only indicates that she thought a survey was a good idea. (Dkt. No. 1077-17 at 2-4). Given trial counsel's decision to waive a venue challenge, any extra time expended on a survey would have served no purpose.[51]

Finally, as discussed in response to Claims One, Two, and Ten, Defendant was tried by an impartial jury, and did not suffer prejudice from counsel's decision to remain in the Charleston Division. Defendant mentions that two focus groups held before trial showed "intense bias" toward him and blames that bias partly on the fact that an unrelated case was being tried across the street. (Dkt. No. 1077 at 109 & n.34). Of course, the members of those focus groups were not jurors, and

---

[50] Defendant's claim that trial counsel was ineffective for retaining Dr. Loftin even though she had told them that she had a conflict in early November 2016 is meritless. (Dkt. No. 1077 at 107). Trial counsel retained Dr. Loftin for the penalty phase, which all parties reasonably believed would not have started until at least December and, in fact, did not start until January 2017.

[51] To the extent Defendant challenges trial counsel's effectiveness based on this decision, the reasonableness of that decision and the lack of prejudice are discussed below.

their conflation of the two cases in no way establishes that the actual jurors, who were individually vetted by this Court and instructed to consider only the evidence and law in Defendant's case, were impermissibly biased.

Trial counsel's failure to retain a speech pathologist also did not prejudice Defendant, as discussed above. *See supra* at 150. Even if trial counsel had retained that expert and uncovered relevant evidence, the Court still would have allowed Defendant to represent himself or, had trial counsel presented the evidence at trial, the jury still would have imposed a death sentence.

### iii. Defendant cannot show a reasonable probability that the jury would not have imposed the death penalty had counsel presented his full mitigation presentation.

Even if the Court finds that trial counsel's conduct amounted to deficient performance and attributes the lack of mitigating evidence to that conduct, there is still no reasonable probability that the outcome of the trial would have been different had the evidence been presented.

To evaluate prejudice in a capital case, the Court must assess whether, in light of the "totality of evidence," "there is a reasonable probability that ! absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "A reasonable probability is a probability that is sufficient to undermine confidence in the outcome." *Id*. Thus, this Court need not determine whether the presentation of the evidence Defendant proffers would have been more persuasive or more effective than what he actually offered. A capital defendant will almost always be able to produce additional information that could add weight to the mitigating side of the sentencing calculus, however slight that weight might be. And since Defendant decided not to present *anything* during his sentencing proceeding, the mitigation presentation that could have been presented is substantial by comparison.

165

But simply showing that mitigating evidence could have been presented is not sufficient to show prejudice. *See Hale v. Gibson*, 227 F.3d 1298, 1315-17 (10th Cir. 2000) (finding no prejudice where defense counsel failed to put forward any mitigating evidence, including evidence of defendant being a good father, friend, citizen, and student); *see also Keith v. Mitchell*, 455 F.3d 662, 669-70 (6th Cir. 2006) (holding defense counsel's failure to conduct any mitigation investigation or present mitigation evidence aside from information in a presentence report did not prejudice defendant, as additional information about a minor brain dysfunction and disadvantaged childhood would not have swayed the jury). Rather, Defendant must show a reasonable probability that the added weight would have made a difference.

The evidence Defendant proffers falls well short of establishing prejudice. He claims his family members would have testified that they loved him and enjoyed spending time with him. (Dkt. No. 1077 at 158-159, 181-82). Individuals who attended church with Defendant's family would testify that he was well-behaved as a child but asocial. *Id*. at 163, 183-84. Those individuals would also discuss Defendant's family and their observations that his mother was moody. *Id*. at 182-83. Teachers would testify that Defendant was withdrawn, quiet, agreeable, unmemorable, socially awkward, but a good kid. *Id*. at 162-65. His pediatrician would testify that Defendant underwent a childhood procedure to correct a tongue tie and would discuss Defendant's anxiety and insomnia. *Id*. at 165. Co-workers would discuss Defendant's struggles with working and interacting with them. *Id*. at 165-66. The overarching narrative of Defendant's background was that he was loved by his family but was a shy, withdrawn, anxious, and isolated person. Despite references to his parents' divorce, his mother's moodiness, and his father's drinking, there is no evidence of abuse, severe neglect, or childhood trauma.

As to the evidence that Defendant would not pose a danger in prison, Defendant references two employees from the jail where he was housed before trial, who would testify that he thanked them, kept his cell neat, and said the guards were his friends. (Dkt. Nos. 1077-51 at 1; 1077-49 at 1). The information is generic, and the observation of his cell being "neat and orderly" would have had little weight in this mass murder prosecution. (Dkt. No. 1077-49 at 1). Defendant's prison expert would have testified that Defendant would not pose a danger in prison. (Dkt. No. 1077 at 197).

Finally, Defendant offers evidence of his auditory processing disorder and pragmatic communication dysfunction. This evidence is unpersuasive by itself, as discussed in Claim Three. *See supra* at 151-52.

Even aggregating all the mitigating evidence Defendant claims could have been presented, he still cannot show a reasonable probability that the outcome of his penalty phase would have been different when considering it against the countervailing aggravation. The prosecution presented extensive evidence of the beautiful lives that Defendant ended, the horror of the murders, the killing of three particularly vulnerable victims, Defendant's racism, his attempts to incite others to violence and to increase racial tensions, and his decision to target innocent worshippers in an historic Black church. *See supra* at 110-15. The jury learned that even after the guilt phase of trial, during which Defendant heard the testimony of two survivors and saw the graphic crime scene evidence, he defiantly signaled his remorselessness: he drew white supremacist symbols on his shoes and wore those shoes into the courtroom. (Dkt. No. 946 at 488).

Against that evidence, Defendant claims he would have offered evidence that he was awkward, shy, isolated, socially inept, and—despite an above-average IQ—struggled with disorders that caused his lack of sociability. That marginal mitigation would not have overcome

167

the case the Government presented. Witnesses—most of whom only knew Defendant briefly and in limited contexts— discussing his general characteristics or explaining his relatively minor mental health struggles, would have had little impact. In an analogous case, the Seventh Circuit held, "we are certain counsel's failure to throw a few more tidbits from the past or one more diagnosis of mental illness onto the scale would not have tipped it in [Defendant's] favor." *Eddmonds v. Peters* 93 F.3d 1307, 1322 (7th Cir. 1996) (finding no prejudice where defense counsel failed to present additional mental health evidence).

Defendant's diagnoses would not explain his virulent racism or his extreme violence. And any attempt to blame his lack of remorse on processing and communication disorders would have fallen flat in the face of the views he expressed on his website, in his jailhouse manifesto, and through the drawing on his shoes, conduct that persisted even after his arrest.

Indeed, Defendant's forgone evidence had downsides for him. *See Moody v. Polk*, 408 F.3d 141, 151-52 (4th Cir. 2005) (noting the double-edged nature of some mitigation evidence that could have increased the likelihood of a death verdict). Most of the proffered evidence shows that Defendant was raised in a loving environment. Despite allegations that his mother was moody and his father drank heavily, there is no evidence whatsoever that Defendant suffered abuse or deprivation. Indeed, it appears that Defendant's grandparents were virtuous and exemplary people. Defendant would hardly have enhanced his case by demonstrating his virulent hatred sprung from his own mind, not his privileged and supportive background.

In short, there is no reasonable probability that the jury would have returned a sentence other than death with or without the forgone evidence. The omitted evidence was generic, unpersuasive, and double-edged. The aggravating evidence was voluminous, compelling, and undimmed by any possible showing that Defendant's mental health precluded a normal social life.

### B.    Conclusion

Trial counsel made a reasonable strategic decision to invoke Defendant's right to a speedy trial, primarily to avoid a state trial. Defendant did not suffer any prejudice from that decision. Defendant is therefore not entitled to relief on Claim Four.

## VI.    DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM FIVE

Defendant claims that trial counsel were constitutionally ineffective because they deceived him as to their intention to present mental health mitigation evidence. Because Defendant cannot show that trial counsel's strategic choices in investigating, preparing a defense, and managing their difficult client were objectively unreasonable, and because Defendant cannot show that he suffered any prejudice from trial counsel's actions, Defendant is not entitled to relief on this claim. [52]

### A.    Argument

#### 1.    Trial Counsel Made a Reasonable Strategic Choice in How to Conduct the Mental Health Investigation.

Defendant faces a heavy burden in establishing ineffective assistance based on trial counsel's approach to the mitigation investigation because it reflected their strategic choices. When trial counsel makes a "reasonable strategic choice based upon an investigation of the facts" courts must defer to that choice. *Rose v. Lee*, 252 F.3d 676, 693 (4th Cir. 2001). In fact, strategic

---

[52] Though framed as a claim of ineffective assistance of counsel, Defendant's argument contains elements of an attack on his choice to represent himself. He notes that he told this Court he did not want to self-represent but did not know how he could cooperate with his attorneys. (*See* Dkt. No. 1077 at 129-30). He also states he "felt his only option was to represent himself" because he could not trust counsel. *Id*. at 131. In Claim Six, Defendant states his waiver was involuntary due to constructive denial of counsel. *Id*. at 149. Defendant cannot relitigate the validity of his waiver, which the Fourth Circuit found knowing, intelligent, and voluntary. *Roof*, 10 F.4th at 359-60. The court reached that decision despite assertions that Defendant's attorneys lied to him. He cannot challenge the ruling here. *See Dyess*, 730 F.3d at 360.

choices made after an adequate investigation are "'virtually unchallengeable.'" *Powell v. Kelly*, 562 F.3d 656, 670 (4th Cir. 2009) (quoting *Strickland*, 466 U.S. at 690).

The Court can readily conclude that trial counsel's choices were part of an informed strategy because they explicitly explained their plan. Trial counsel told the Court that they believed the mental health defense was the best defense they could offer, but they also anticipated Defendant's resistance. (Dkt. No. 652 at 31-32, 46). They knew that the viability of such a defense depended on Defendant submitting to a Government examination under Fed. R. Crim. P. 12.2. *See id.* at 32; (*see also* Dkt. No. 629 at 5). They were concerned that if they raised the issue with Defendant before the Government's examination, he would refuse to participate and destroy any chance of a mental health mitigation presentation. *Id*. They explained these points in filings and hearings. The contemporaneous records show conclusively that trial counsel's approach was deliberate, careful, and buttressed by a thorough investigation into Defendant's mental state. Trial counsel—led by one of the nation's leading capital defense lawyers—pursued this strategy to maximize the likelihood of a life sentence. The choice was clearly strategic and is virtually unchallengeable.

That strategic choice was also objectively reasonable and consistent with capital counsel's obligations to pursue mitigation strategies, even where their clients might resist the efforts, especially a client whose impairments might undermine his competence. Trial counsel frequently told the Court that they believed that Defendant's negative reactions to the revelation of the mitigation defense, and his steadfast opposition to it, were products of his impairments. (Dkt. No. 652 at 29-32). Thus, they were caught in a dilemma. They could inform Defendant—who they suspected was mentally impaired—that they wanted to investigate his potential mental illness. They would run the risk that he would refuse, leaving them unable to present their best defense.

Or they could wait, conduct the investigation despite Defendant's opposition, and hope to persuade him to present the evidence at trial. They chose the latter course.

Nearly a decade later, Defendant criticizes the approach with the benefit of substantial hindsight, but that criticism does not establish counsel made unreasonable decisions at the time. Indeed, many courts have held that a defense attorney has an obligation to investigate important mitigating evidence even in the face of a recalcitrant client.

In *Carter v. Bell*, the Sixth Circuit found that counsel rendered deficient performance by not investigating a defendant's background and mental health status, even though evidence at an evidentiary hearing showed that the defendant "reacted violently to the idea of a mental health defense . . . never volunteered any information about his family background or childhood . . . and members of [defendant's] family were uncooperative." 218 F.3d 581, 596 (6th Cir. 2000). The court held, "counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility," and that "reluctance on [defendant's] part to present a mental health defense . . . should not preclude counsel's investigation of these potential factors." *Id*. It also cited ABA guidelines that recommended a sentencing investigation "'regardless of any initial assertion by the client that mitigation is not to be offered.'" *Id*. (quoting American Bar Association, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.4.1.c (1989)). The Sixth Circuit reached a similar conclusion in *Coleman v. Mitchell,* finding, a defendant's "resistance to disclosure of information does not excuse counsel's duty to independently investigate." 268 F.3d 417, 449-50 (6th Cir. 2001).

Similarly, in *Blanco v. Singletary*, the Eleventh Circuit held that a "defendant's desires not to present mitigation evidence do not terminate counsels' responsibilities during the sentencing phase of a death penalty trial." 943 F.2d 1477, 1502 (11th Cir. 1991). The defendant in *Blanco* had

become "uncommunicative and easily angered," and after the guilt phase of his capital trial, he "became further depressed and unresponsive . . . noticeably morose and irrational." *Id*. Yet instead of finding that counsel was excused from further investigation because of the defendant's attitude and instructions not to call relatives and acquaintances to the stand, the Eleventh Circuit stated, "[c]ounsel . . . had a *greater* obligation to investigate and analyze available mitigation evidence." *Id*. (emphasis added). The court noted that an attorney "'has expanded duties when representing a client whose condition prevents him from exercising proper judgment.'" *Id*. 1502 n.121 (quoting *Thompson v. Wainwright*, 787 F2d 1447, 1451 (11th Cir. 1986)).

The Ninth Circuit has gone so far as to hold that counsel's performance was deficient for not conducting a mental health mitigation investigation even when the defendant refused to submit to an evaluation. *See Smith v. Baker*, 983 F.3d 383, 396-398 (9th Cir. 2020). In *Smith*, defense counsel "wanted to do a complete psychological work-up" on a defendant who "declined to submit to testing." *Id*. at 397. The Ninth Circuit nevertheless found that "[i]t was incumbent upon counsel to investigate [Defendant's] mental health even though [Defendant] denied mental illness," and found that an expert report could have been prepared even without the defendant's participation. *Id*.

The Fourth Circuit has indicated agreement with the foregoing reasoning. In *Frye v. Lee*, the Fourth Circuit explained that a defendant's objection "to the development of evidence . . . does not necessarily absolve his lawyers from gathering that evidence." 235 F.3d 897, 904 (4th Cir. 2000) (discussing *Carter* and *Blanco*). The Fourth Circuit found an attorney's performance in *Frye* was reasonable: instead of acquiescing to a client's directive, counsel took steps to conduct a

mitigation investigation, including arranging for a psychological investigation and explaining to the defendant the dangers of omitting background information. *Id*. at 904-05.[53]

Here, trial counsel believed Defendant was mentally impaired and concluded that a mental health presentation was the strongest possible mitigation. They also believed their client would oppose that investigation if he understood the import of the plan. And they recognized an independent duty to investigate important avenues of mitigation evidence, because they did not trust Defendant's decision-making abilities. Accordingly, trial counsel executed a plan to conduct the investigation and later reveal their strategy to Defendant with the assistance of his family and experts. That approach was reasonable and defensible under the circumstances.

Defendant characterizes this strategy as lies and deception, much like he did in the letter he wrote to the prosecution. But the assertions are conclusory, with few specific allegations of actual lies told by counsel. These accusations are also belied by the record. When these issues arose, trial counsel "categorically denied" the allegation that they lied to Defendant and stated that the assertions were "demonstrably untrue." (Dkt. Nos. 648-2 at 16; 562 at 6). The record supports counsel's contemporaneous statements. ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

And, indeed, their experts later cited Defendant's concerns about his thyroid condition (which is supported by medical evidence) as "consistent with a pattern of other instances of delusions about medical issues." (Dkt. No. 832-6 at 45, *see also* Dkt. No. 832-8 at 4, 7 (diagnosing Defendant with

---

[53] Some cases indicate that attorneys cannot be found constitutionally ineffective when their clients sabotage the mitigation presentation. *See, e.g.*, *Owens v. Guida*, 549 F.3d 399, 412 (6th Cir. 2008) ("A defendant cannot be permitted to manufacture a winning IAC claim by sabotaging her own defense . . . ."). But these opinions do not undermine the reasonableness of trial counsel's decision to pursue mitigation in the face of their client's opposition.

Hashimoto's Thyroiditis). Thus, although trial counsel may not have planned to present Defendant's thyroid condition as mitigation, their decision to have him evaluated for it flowed from their strategy. ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ And while trial counsel did shield their ultimate goal—to present the experts' findings during the penalty phase—Mr. Bruck specifically told Defendant that they needed to "explore everything." (Dkt. No. 1077-5 at 4). ███

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

Trial counsel has filed affidavits implying that they misled Defendant. But trial counsel's post-hoc efforts fail in the light of a record that includes their "categorical" denial of Defendant's accusations of lying. "[T]rial counsel's statements in affidavits filed years after trial (in which counsel in effect 'fall on their swords') do not create credibility issues when 'trial counsel's documented contemporaneous statements show the contrary.'" *Jackson v. United States*, 638 F. Supp. 2d 514, 528 (W.D.N.C. 2009) (quoting *United States v. Streater*, 70 F.3d 1314, 1321 (D.C. Cir. 1995)).[54] Moreover, counsel's affidavits leave a great deal of room for interpretation. They

---

[54] Defendant relies heavily on his state counsel's affidavits to support his conclusory claim that his attorneys "lied" to him. *See* (Dkt. Nos. 1077-11 at 2; 1077-12 at 6). The state attorneys throw themselves on their swords repeatedly and have no qualms about pulling federal counsel onto the same blades. However, the actions of his state court attorneys cannot be imputed to federal counsel. Indeed, the "law is clear that a defendant cannot use a § 2255 motion to challenge the performance of counsel in a separate state court case." *Grecco v. United States*, No. 14-CR-760 (KMK), 2023 WL 6294334, at *9 (S.D.N.Y. Sept. 27, 2023); *accord Scott v. United States*, No. 12-CR-909 (KMK), 2019 WL 6034973, at *4 (S.D.N.Y. Nov. 14, 2019); *Spence v. United States*, No. 2:11-CR-4-D, 2017 WL 385770, at *3 (E.D.N.C. Jan. 26, 2017); *Johnson v. United States*, No. 1:11-CR-49, 2015 WL 6040306, at *3 (W.D. Mich. Oct. 15, 2015) ("A federal habeas action is not designed to remedy violations in a separate state court action."); *United States v. Benson*,

state that they arranged for experts to see Defendant under the guise of addressing his thyroid and

concerns about his body. (Dkt. No. 1077-5 at 10). When Defendant confronted counsel about a

possible diagnosis, they admit that he "predicted that we would not say that he had autism, but we

just had to explore everything" to keep him "on board." *Id*. at 4. But counsel also stated that they

intended to reveal the plan to Defendant. *Id*. Notably, trial counsel do not disavow their

representations to the Court that Defendant's accusations of dishonesty are "demonstrably untrue."

The record establishes that trial counsel attempted to conduct a full investigation despite

Defendant's resistance. As the Court found, "I frankly think y'all have done everything you

possibly can to manage a difficult client, that *I don't share Mr. Roof's views that you have deceived

him*. I think you are trying to help him and trying to manage a difficult client." (Dkt. No. 880-1 at

124 (emphasis added)). This Court's findings, and the contemporaneous assertions by counsel,

foreclose Defendant's claim of dishonesty.

Trial counsel reasonably decided not to reveal their plan to Defendant until the Government

concluded its mental health evaluation. Trial counsel told the Court that they waited because they

did not want to interfere with the Government's examination. (Dkt. No. 629 at 5; *see also id.* (Court

noting that "[i]f he didn't cooperate, potentially blow up the defense")). Trial counsel knew that if

Defendant reacted badly, he could refuse to meet with Dr. Dietz and derail any mental health

presentation. *Id*. Trial counsel took a conscious and calculated risk that Dr. Dietz would discuss

---

No. CIV. 06-CV-13091, 2007 WL 628372, at *4 (E.D. Mich. Feb. 27, 2007); *United States v.
Robinson*, 408 F. Supp. 2d 437, 441-43 (E.D. Mich. 2005).  The state court attorneys did not
represent Defendant in federal court, and the Court clearly did not view the two defense teams as
one.  It barred the state attorneys from Defendant's first competency hearing, (Dkt. No. 991 at 6-
7) and dismissed them from his second. (Dkt. No. 880-1 at 4). The Court stated, "[o]nly *federal*
counsel of record and parties are allowed to be present." *Id*. (emphasis added).  In evaluating
Defendant's Sixth Amendment allegations, the Court should only consider only federal counsel's
actions, ignoring assertions about how the "team" approached the case.

the defense experts' diagnoses with Defendant to preserve the possibility of presenting mental health mitigation.

Trial counsel now condemn their approach, utilizing the type of backwards-looking nit-picking *Strickland* forbids. Trial counsel represented a client they believed suffered from mental impairments and also opposed presenting evidence of mental impairments. They knew he had medical concerns that, if investigated, could lead to persuasive mitigation evidence and they knew he was open to examination for those issues. Trial counsel used those concerns to conduct a thorough mental health investigation and formulated a plan to persuade Defendant to allow them to present their findings. Though the plan failed, the strategy remains reasonable.

### 2. Trial Counsel's Handling of the Mental Health Investigation Did Not Prejudice Defendant.

This claim also fails because Defendant cannot show prejudice. As noted above, *supra* at 147, Defendant claims that he suffered prejudice because the jury did not hear mitigating evidence. Defendant argues that if trial counsel revealed their mitigation strategy earlier, the outcome of his sentencing proceeding would have been different because the jury would have heard mitigating evidence.

However, Defendant's decision to represent himself severs any causal connection between the claimed ineffectiveness (dishonesty) and any prejudice. Apparently recognizing as much, Defendant speculatively asserts he would not have represented himself if counsel had been honest with him, introducing another layer of the prejudice analysis: whether there is a reasonable probability that Defendant would not have represented himself but for trial counsel's dishonesty.

Regardless of how he frames the prejudice issue, Defendant cannot prevail. First, there is no reasonable probability that Defendant would not have represented himself but for counsel's alleged dishonesty. Second, because Defendant did represent himself, he is responsible for the

176

effectiveness of his mitigation case. Third, there is no reasonable probability that even if he were represented by counsel and allowed limited mitigation evidence to be presented, he would not have received a death sentence.

### a. Defendant would have represented himself even if counsel had not withheld their strategy from him.

Defendant claims that he would have allowed trial counsel to represent him during the penalty phase if they had been more forthright. This claim fails in light of the record. This Court repeatedly warned Defendant about the risk of self-representation, yet he vehemently insisted on it because he fundamentally opposed mental health mitigation evidence. He declared, on the record, that he preferred death to being labeled autistic. (Dkt. Nos. 652 at 12-13). Defendant told the Court he did not "want anybody to think that I have any mental problems because I don't." (Dkt. No. 707 at 273). Defendant repeatedly expressed his desire not to be thought of as mentally ill. (*Id.*; Dkt. No. 880-1 at 209). Trial counsel believed that they could not ethically agree to forgo the only viable defense in this case. (Dkt. No. 687 at 4-5) Thus, Defendant and his counsel were at an impasse.

Defendant faced a significant obstacle to stopping his counsel from presenting the ASD diagnosis to the jury, as the Court informed him that the decision was counsel's. (Dkt. No. 652 at 18-19). Defendant decided to represent himself when he realized the Court would authorize his counsel to undertake their mitigation plan. The Court recognized this fact, and Defendant admitted it in his appellate brief. (Dkt. Nos. 691 at 6; 881 at 15); Br. of Appellant, Dkt. 85 at 107. While Defendant's perception of his trial counsel's candor may have strained their relationship, it was his steadfast determination to prevent the mental health evidence that resulted in his self-representation. Defendant deliberately chose to forgo a mental health defense because of his deep

ideological commitment to white supremacy and his unwavering desire to ensure that nothing would ""discredit[] the reason why I did the crime." *See Roof*, 10 F.4th at 348.

Defendant attempts to rewrite history by claiming the "relationship completely broke down" after trial counsel's plans were revealed. (Dkt. No. 1077 at 127). He says the relationship never recovered from what he perceived as counsel's dishonesty. But his assertions reflect a self-serving narrative and misstatements of the record. For instance, Defendant claims he told the Court "he did not want to self-represent but that he did not know how he could cooperate with his attorneys after their *dishonesty*." *Id*. at 129-30 (emphasis added). But the cited transcript reveals he told the Court, at the end of his competency hearing, that he did not know how he would cooperate with his attorneys "after today, after *all the other things that they have said about me. The other allegations of different mental problems*, it's just, it's not going to happen." (Dkt. No. 707 at 284-85) (emphasis added)). Defendant's obvious point was that he could not and would not brook trial counsel's efforts to cast him as mentally ill.

Defendant's reliance on state trial counsel's affidavit is also misleading. Defendant alleges that after he learned of the mitigation plan, "'[he] rejected all that evidence [that he might have otherwise presented] because he wanted to get back at his lawyers.'" (Dkt. No. 1077 at 148 (quoting Dkt. No. 1077-11, para 12) (emphasis omitted)). But in a declaration filed after the end of the guilt phase and after trial counsel moved for a second competency hearing, trial counsel advised the Court that Defendant had been considering presenting mitigation evidence—even as late as after the guilt phase—but "now" stated his objective was to "get back at" his attorneys. (Dkt. No. 840 at 6). That declaration went on to say that after trial counsel sought another competency hearing, Defendant

> no longer desires to have standby counsel, and he does not want to file any
> objections to victim-impact evidence or any other aspects of the government's case

178

for the death penalty. Defendant informed Mr. Bruck that he hates him, and that if he gets out of jail he plans to come to Mr. Bruck's house and kill him.

*Id*. at 7. At the beginning of the second competency hearing, Defendant asked the Court for the first time to remove trial counsel completely, including as standby counsel. (Dkt. No. 880-1 at 5-6). Defendant now claims an irrevocable breakdown occurred after trial counsel's mitigation plans were revealed, but the record actually shows the relationship failed when counsel sought to have Defendant declared incompetent for a second time.

In fact, Defendant's interactions with trial counsel before the second competency hearing evince a working relationship. Despite any purported lies, Defendant wanted trial counsel to represent him and asked the Court whether he could sign a document that would let him keep the attorneys but require them to follow his directions. (Dkt. No. 707 at 279). ██████████████ ████████████████████████████████████. Counsel served as standby counsel, and Defendant requested that they sit at the defense table with him during *voir dire*. (Dkt. No. 919 at 10). He asked the Court to allow counsel to speak for him during *voir dire* and continued to consult with standby counsel during *voir dire*. (*See, e.g.*, Dkt. Nos. 920 at 103-04; 921 at 3-4; 973 at 66, 77, 235). He asked the Court to reappoint counsel to represent him at the guilt phase, accepted that they would make strategic decisions in the guilt phase, and affirmed that the Government's concerns about a conflict of interest did not alter his decision. (Dkt. No. 911 at 3-4, 7-9). Only after trial counsel's second challenge to Defendant's competence did he actively seek to have them removed, even as standby counsel.

The record establishes that Defendant did not represent himself because of trial counsel's alleged dishonesty. Instead, he harbored an implacable opposition to mental health evidence that trial counsel intended to present over his objection. After he learned that counsel had the right to present the evidence, Defendant represented himself to prevent that presentation. Defendant may

179

have felt deceived, but his decision to represent himself flowed from his intolerance for mental health evidence, not broken trust. There is therefore no reasonable probability that Defendant would have allowed counsel to represent him if they had been more forthcoming with him.

### b. Defendant is responsible for the lack of mitigating evidence.

Even if the Court determines that Defendant would not have represented himself but for trial counsel's alleged dishonesty, he cannot blame them for the lack of mitigating evidence, because he could have presented the evidence without their assistance. As discussed above, Defendant is responsible for decisions he made while acting as his own attorney. *See supra* at 147-50. That includes his decision not to present mitigating evidence that was available to him.

Defendant first argues that if counsel had been honest, he might have allowed them to present evidence of his ASD. (Dkt. No. 1077 at 130). This assertion flies in the face of the record. Regardless, Defendant could have presented that evidence without counsel, since they obtained permission to have the experts finish their reports for his use. (Dkt. No. 979 at 2). The evidence was available and readily presentable, but Defendant consciously decided not to use it.

Defendant also claims that counsel could have put on non-ASD evidence that would have humanized him. Again, most of the witnesses referenced in the motion were either on the defense's witness list or could have been called with assistance of standby counsel. *See supra* at 149-50. Defendant did not call those witnesses and opposed trial counsel's attempt to present them. The argument that Defendant would have allowed mitigating evidence to "humanize" him is directly contradicted by his pre-trial statement to Dr. Ballenger that he wanted to be "de-humanized." (Dkt. No. 648-2 at 23).

Finally, Defendant claims that if counsel had been honest but honored his desire to avoid ASD evidence, he would have cooperated with experts to present a mitigation theory based on

auditory processing disorder and pragmatic communication dysfunction. (Dkt. No. 1077 at 130). However, Defendant made clear to the Court that he did not want anyone to think he committed the crime due to a mental problem. (Dkt. Nos. 648-2 at 41; 707 at 273). Even if Defendant had changed his mind in that respect, he could have investigated and uncovered that evidence. Standby counsel was still in place to help Defendant coordinate his defense and could have arranged for witnesses and expert evaluations if Defendant requested they do so. Defendant is responsible for not presenting a penalty phase case and cannot show he suffered prejudice from his former counsel's actions.

Defendant tries to blame his decision not to present a mitigation case on his anger at trial counsel. (Dkt. No. 1077 at 48, 148). Whatever led Defendant to jettison all mitigating evidence—be it a fit of pique or a considered decision—he made the choice. Moreover, the record shows he did not decline mitigating evidence out of anger or frustration. In November of 2016, he confirmed to the Court he had "no real defense," that he did not "want any defense," that he would "not present any mitigating evidence," that the only defense he wanted to present was one that would "just make it worse" because it would "aggravate things," and that there "isn't any other defense" besides the one that would be aggravating. (Dkt. No. 652 at 9, 12, 22-24). Immediately before the penalty phase, he told the Court he did not intend to offer any evidence or present any witnesses. (Dkt. No. 912 at 22). At that point, Defendant was still open to presenting evidence from Father Parker, but he later decided against it because he feared the witness would opine about his mental state. (Dkt. Nos. 840 at 6). Defendant may have mentioned he wanted to "get back" at his attorneys after they sought to have him declared incompetent a second time, *id*., but the record clearly shows his consistent, oft-expressed insistence not to present mitigation. Trial counsel's alleged dishonesty

181

did not cause Defendant to pass up the opportunity, foreclosing any showing of prejudice attributable to them.

### c. There is no reasonable probability that the proffered mitigating evidence would have changed the outcome of the sentencing proceeding.

Assuming, arguendo, Defendant would have consented to representation and to the presentation of evidence about his communication deficits, there is no reasonable probability he would have received a life sentence. The Government has discussed this lack of prejudice at length in Claim Four and incorporates those same arguments here. *See supra* at 165-68.

### B. Conclusion

Defendant fails to show that trial counsel rendered deficient performance in investigating and preparing his mental health defense and withholding certain information from him. Further, Defendant cannot show any prejudice flowing from counsel's actions. He is therefore not entitled to relief on Claim Five.

## VII. DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM SIX

In Claim Six, Defendant claims he was constructively denied counsel due to a breakdown in the relationship between himself and his attorneys. (Dkt. No. 1077 at 131). He argues the relationship was shattered because trial counsel insisted on presenting mental health evidence over his objections, trial counsel deceived him about their intention to present such evidence, and trial counsel failed to withdraw when the relationship became unworkable. Defendant is not entitled to relief because he invoked his right to self-representation, cutting off any constructive denial of counsel claim for subsequent proceedings. Even if Defendant's self-representation did not bar the claim, he still cannot show the type of irrevocable breakdown that would support it.

At its core, Defendant's claim that he was constructively denied counsel rests on his assertion that his counsel should have been forced to capitulate to Defendant's insistence that they refrain from presenting mental health mitigation. But this Court held, and the Fourth Circuit affirmed, that "[t]he presentation of mental health mitigation evidence is . . . a classic tactical decision left to counsel even when the client disagrees." *Roof*, 10 F.4th at 52-53 (cleaned up). Trial counsel's valid tactical decisions defeat a claim that Defendant was deprived of counsel, regardless of whether he agreed with the decisions.

A.  **Legal Standard for Constructive Denial of Counsel**

While most claims of ineffective assistance of counsel are evaluated under *Strickland v. Washington's* two-part test, the Supreme Court in *United States v. Cronic*, 466 U.S. 648 (1984), identified three situations in which prejudice is presumed. The presumption of prejudice applies when (1) a defendant is denied counsel at a critical stage, (2) if counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing," and (3) when counsel is required to provide assistance in situations where competent counsel simply could not do so. *See Cronic*, 466 U.S. at 659-60; *see also See Bell v. Cone*, 535 U.S. 685, 695-96 (2002).

Some courts have applied *Cronic* to ineffectiveness claims when a defendant argues an irreparable breakdown in communication prevented an adequate defense. *See, e.g.*, *United States v. Soto Hernandez*, 849 F.2d 1325, 1328 (10th Cir. 1988). But most decisions applying the presumption in that context involve defendants who requested new counsel based on a breakdown and courts that denied the request. *See, e.g.*, *United States v. Smith*, 640 F.3d 580, 589-90 (4th Cir. 2011); *Daniels v. Woodford* 428 F.3d 1181, 1197 (9th Cir. 2005). In those situations, appellate courts review the denial for abuse of discretion and examine "(1) the timeliness of the motion; (2) the adequacy of the court's subsequent inquiry; and (3) 'whether the attorney/client conflict

was so great that it had resulted in total lack of communication preventing an adequate defense.'"
*Smith,* 640 F.3d at 588 (quoting *United States v. Gallop*, 838 F.2d 105, 108 (4th Cir. 1988),
*abrogated on other grounds*, *Fields v. Murray*, 49 F.3d 1024, 1028 (4th Cir.1995) (en banc)).

## B. **Argument**

Defendant is not entitled to relief because he waived his right to counsel. Moreover, he
cannot show an irreparable breakdown that would amount to constructive denial of counsel.

### 1. **Defendant's Decision to Represent Himself Bars his Argument.**

Defendant is not entitled to relief on Claim Six because he chose to represent himself, after
counsel had zealously advocated for him.

As discussed above, "a defendant who elects to represent himself cannot thereafter
complain that the quality of his own defense amounted to a denial of 'effective assistance of
counsel.'" *Faretta*, 422 U.S. at 834 n.46. Because the assertion of the right to self-representation
is "a waiver of the right to 'effective assistance,'" *Singleton*, 107 F.3d at 1101, Defendant cannot
claim that he was constructively denied effective assistance of counsel during the proceedings after
the Court permitted him to represent himself. Thereafter, Defendant was the master of his case and
no longer had any right to effective assistance.

Defendant claims his decision was involuntary, as his relationship with counsel had been
destroyed. (Dkt. No. 1077 at 149). This argument is precluded by the Fourth Circuit's holding on
direct appeal that his invocation of his *Faretta* right was knowing, intelligent, and voluntary. *See*
*Roof*, 10 F.4th at 359-60. It is also contradicted by Defendant's statement on appeal that he "sought
to discharge [counsel] solely to control penalty." Br. of Appellant, Dkt. 85 at 107.

This claim is also contradicted by Defendant's statements to this Court. During a colloquy,
the Court asked if anyone had forced or coerced Defendant into the decision to represent himself.

(Dkt. No. 919 at 7). Defendant responded, "no," and affirmed the decision was entirely his. *Id*. Defendant has not cited any authority to support the notion that his invocation of *Faretta* was involuntary because he could not agree with counsel's tactics. Defendant's decision to represent himself was made to foreclose mental health evidence his attorneys had every right to present. Thus, the only portion of the proceedings during which Defendant could potentially claim he was constructively denied counsel due to the alleged breakdown was during his competency hearing and during the guilt phase, as those were the only proceedings in which he was represented by counsel after the alleged breakdown. *See Appel v. Horn*, 250 F.3d 203, 213 (3d Cir. 2001) (holding the invocation of *Faretta* does not relieve courts of examining whether Defendant's right to counsel was properly preserved prior to the acceptance of the waiver of counsel). Defendant cannot establish that he was constructively denied counsel in those proceedings.

Defendant's reliance on *Cronic* is misplaced as it relates to counsel's conduct before Defendant invoked his *Faretta* rights. *Cronic* applies when counsel "*entirely* fails to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659 (emphasis added). It may also apply when an attorney-client relationship is so fractured that it forecloses an adequate defense. *Smith*, 640 F.3d at 588. Neither situation occurred here prior to Defendant representing himself.

During the first competency hearing, trial counsel had an obligation to persuade the Court of incompetence, even if Defendant objected to the assessment. *See Boigegrain*, 155 F.3d at 1188 (holding a defense attorney may raise competency issues regardless of the defendant's wishes and "has a professional duty to do so when appropriate"). Trial counsel discharged that duty by presenting witnesses, cross-examining witnesses, and arguing their position. The record forecloses

the conclusion that Defendant was essentially acting without counsel during the proceedings, and *Cronic* therefore does not apply.[55]

Nor was Defendant acting without counsel during the guilt phase. Defendant told the Court that he wanted counsel to represent him despite their turbulent relationship. (Dkt. No. 911 at 7-9). This fact negates any claim of an irreparably broken relationship during the guilt phase. Moreover, counsel zealously acted as Defendant's advocate during the guilt phase.

The only cited evidence of an irreparable breakdown during the guilt phase stems from Defendant's efforts to micromanage the defense by asking counsel whether they would cross-examine witnesses and offer exhibits and his belief that they were causing him harm and "trying to kill him." (Dkt. No. 1077 at 150). The claims come from a declaration by trial counsel, filed to support their effort to seek a second competency hearing after the end of the guilt phase. (Dkt. No. 840 at 1). That declaration demonstrates that trial counsel continued to act as Defendant's advocate throughout the trial.

The declaration describes Defendant's actions during the guilt phase. *Id*. (citing Dkt. No. 840). The document reveals counsel attempting to put on their case despite Defendant's resistance. Defendant "insisted that counsel should 'do nothing' and 'stop making objections.'" *Id*. at 4. In other words, Defendant wanted his counsel to stop doing their jobs as his advocates. Trial counsel instead provided the best defense they could. There is no basis to conclude Defendant was

---

[55] Defendant's second competency hearing presents a somewhat more complicated factual question. Defendant was acting as his own counsel in that proceeding, but the Court also permitted trial counsel to participate. Still, there is no reasonable argument that trial counsel was not acting as counsel during that hearing. They cross-examined witnesses, sought to introduce evidence, and attempted to prevent Defendant from representing himself during the penalty phase based on their belief that he was not capable of doing so.

186

constructively denied counsel. Therefore, *Cronic* does not apply, and Defendant is not entitled to relief.

### 2. Defendant Cannot Establish an Irreparable Breakdown in Communication that Would Amount to Constructive Denial of Counsel.

Even assuming Defendant can raise a *Cronic* claim despite his invocation of his *Faretta* rights, *Cronic* does not apply in this situation because that holding does not apply where, as here, Defendant never sought new counsel. In this case, Defendant independently asked the Court about his right to represent himself, *id*. at 281, but he never asked for new counsel for the entire duration of the trial.[56] To the contrary, he repeatedly asked whether the Court could order his *current* counsel to comply with his directives.

The Supreme Court's holding in *Cronic* was narrow, and courts are hesitant to broaden *Cronic's* application. *See Smith*, 640 F.3d at 590. The Fourth Circuit has, however, extrapolated *Cronic's* holding to situations involving the substitution of counsel. In *United States v. Smith*, the Fourth Circuit held that the right to counsel can be constructively denied where communication between a defendant and his attorney has "so broken down that an adequate defense could not be maintained," yet trial court refused to remove counsel. *Id*. at 590 (citing *Daniels*, 428 F.3d at 1198). The Fourth Circuit noted that it was typically cautious about broadening the scope of *Cronic* and did so in the substitution context because in those cases the trial court "has already made a *specific factual determination* (or, in a proper case, clearly erred in failing so to find) that communication between a given defendant and attorney had so broken down that an adequate defense could not

---

[56] He repeatedly discussed his complaints with the Court, and expressed his doubts about working with him. (Dkt. No. 707 at 285). During one conference, the Court discussed the issue with him and explained that a new lawyer would not remedy the underlying issue, as no competent counsel would comply with Defendant's preferred course of action of simply not presenting any sentencing defense. *Id*. But Defendant never asked for new counsel.

be maintained." *Id*. (emphasis in original). The Fourth Circuit has therefore only expanded *Cronic* in situations where a trial court actually determined that an irreparable breakdown in communication occurred.[57]

The Fourth Circuit has never applied the *Cronic* presumption in a situation like this, where a defendant claims, post-trial, that an irreparable breakdown in communication deprived him of counsel but never sought new counsel. Instead, the Fourth Circuit jurisprudence focuses on the propriety of district courts' denials of motions to substitute counsel. This is consistent with the Ninth Circuit's approach, which stated in *Daniels v. Woodford* that a court deprives a defendant of the "effective assistance of any counsel whatsoever" when it "compels" a defendant to "undergo a trial with the assistance of an attorney with whom he has become embroiled in [an] irreconcilable conflict . . . ." 428 F.3d at 1197 (quoting *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970)).

Only the Tenth Circuit has indicated that a breakdown in communication could give rise to a presumption of prejudice without the defendant moving for, and the court denying, substitution of counsel. In *United States v. Soto-Hernandez*, the Tenth Circuit observed that "[a] complete breakdown in communication between an attorney and client *may* give rise" to a presumption of prejudice under *Cronic*. 849 F.2d at 1328 (emphasis added). But the Tenth Circuit still evaluates whether the defendant actually made a timely motion to substitute counsel as one of the factors in determining whether that presumption applies. *See Romero v. Furlong*, 215 F.3d 1107, 1113 (10th Cir. 2000). The Government has been unable to identify a single Tenth Circuit case applying that

---

[57] Defendant will likely argue that the Fourth Circuit left open the possibility that it could find in a proper case that a trial court clearly erred in finding an irreparable breakdown. However, the Fourth Circuit did not discuss what that proper case would be, and furthermore the Fourth Circuit was clearly envisioning a situation where a trial court holds a hearing on a motion to substitute and decides the evidence does not establish an irreparable breakdown. No motion was filed in this case and no finding regarding an irreparable breakdown was warranted, therefore there is no factual determination to review, erroneous or otherwise.

presumption where no motion to substitute was ever raised. The Tenth Circuit has also acknowledged that *Cronic* itself did not deal with a "breakdown in communication" between a defendant and his counsel and noted that its own jurisprudence did not supply clearly established law on the point to satisfy 28 U.S.C. § 2254(d)(1). *See Cole v. Trammell*, 755 F.3d 1142, 1152 (10th Cir. 2014).

Defendant asks this Court to expand *Cronic* and *Smith* to a new situation where a defendant never asked for new counsel and there was no factual determination that communication between Defendant and his counsel was irreparably broken. In light of the Fourth Circuit's caution against broadening *Cronic's* scope, the Court should decline to take the unprecedented step of applying *Cronic* in this case. The Supreme Court only listed three scenarios in which the presumption of prejudice would be applied, and the Fourth Circuit has only expanded that presumption to situations where a court actually finds an irreparable breakdown in the context of a motion for substitution. None of those scenarios exist here, therefore the Court should decline to apply the presumption.

In any event, Defendant has failed to establish that his relationship with counsel was irreparably broken. Criminal defendants have a right to counsel, but those who require appointed counsel do not have a constitutional right to representation by counsel of their choice or with whom they share a close rapport. *See Morris v. Slappy*, 461 U.S. 1, 13-14 (1983). Rather, in determining whether a relationship has become irreparably broken, courts in the Fourth Circuit must evaluate "whether the extent of the breakdown prevents the ability to conduct an adequate defense." *Smith*, 640 F.3d at 588 (quoting *United States v. Johnson*, 114 F.3d 435, 443 (4th Cir. 1997)). A total lack of communication is not required, but the breakdown must be "so great that the principal purpose

of the appointment—the mounting of an adequate defense incident to a fair trial—has been frustrated." *Id*.

Not every disagreement, accusation, or complaint amounts to a breakdown such that a defendant is left without effective representation. Disagreement over trial strategy "does not constitute a communication breakdown sufficient to warrant the substitution of counsel." *United States v. Hagen*, 468 F. App'x 373, 385 (4th Cir. 2012) (citing *Johnson*, 114 F.3d at 443-44).

Numerous courts, including the Fourth Circuit, have found that an attorney/client relationship was still workable even in highly tense situations. Indeed, even where a defendant threatens to file a bar complaint—or actually does file a bar complaint—against their attorney, courts have nevertheless found that the relationship is not so broken as to require substitution. *See United States v. Burns*, 990 F.2d 1426, 1437-38 (4th Cir. 1993); *see also United States v. Gougher*, 835 F. App'x 231, 234 (9th Cir. 2020); *Thomas v. Sec'y, Dep't of Corr.*, No. 8:17-CV-2205-T-23AAS, 2020 WL 5814332, at **6-12 (M.D. Fla. Sept. 30, 2020); *United States v. Suggs,* No. 14-CR-30142-MJR, 2016 WL 1555156, at *3 (S.D. Ill. Apr. 18, 2016). Courts have also found that a general loss of trust is insufficient for substituting counsel. *See Hutchins v. Garrison*, 724 F.2d 1425, 1430-31 (4th Cir. 1983)*; see also Thomas v. Wainwright*, 767 F.2d 738, 742 (11th Cir. 1985). The same is true in cases where defendants have attempted to assault their attorneys and accused their attorneys of lying to them. *See United States v. John Doe No. 1*, 272 F.3d 116, 119-21, 124 (2d Cir. 2001). Proving an attorney-client relationship is irreparably broken therefore requires more than simply alleging the parties were at odds, angry with each other, or suspicious.

The Government does not dispute that Defendant's relationship with counsel was fraught after he discovered their mitigation strategy. He and counsel were at loggerheads on a central issue of his defense and his frustration was obvious. But as the preceding authority shows, tension,

frustration, disagreement, and even outright hostility is not sufficient to show the attorney-client relationship is irrevocably broken from a constitutional standpoint. And in this case, the record does not show the type of breakdown in communication that would establish the constructive denial of counsel. In fact, the very statements trial counsel and Defendant made to the Court indicate the relationship was tense but salvageable. Trial counsel frequently noted that the relationship was strained and that if certain events occurred (Defendant's letter being admitted into evidence), there might be a complete breakdown. (Dkt. Nos. 544 at 2-3; 562 at 5-7; 615 at 5; 652 at 41). ██████████████████████████████████████████████████████████

██████. They also repeatedly expressed their belief that the conflict stemmed from Defendant's mental health issues. (Dkt. Nos. 544 at 2-3; 629 at 13; 652 at 29-32).

For his part, Defendant clearly and repeatedly—despite calling his attorneys liars—explained that his primary objective was to undermine mitigation evidence trial counsel sought to offer. (Dkt. Nos. 648-2 at 21; 652 at 17-19; 707 at 278-79). He admitted that he was communicating with them, he admitted that he and counsel could speak to one another, he admitted that he understood what counsel wanted to present, and he admitted that he knew that they genuinely wanted to help him. (Dkt. No. 652 at 8-9, 24). He just disagreed with their position. *Id*. at 24. The Court recognized this dynamic and found that even after Defendant claimed his attorneys were lying to him, there was "sufficient relationship with counsel, competence in counsel and so forth and there is no reason" not to proceed with the trial. The Court even characterized the relationship as "cordial." (Dkt. No. 978 at 4, 6).

Defendant now claims that the relationship was irreparable because his conflict with counsel did not arise from his mental impairments or his opposition to the mitigation presentation, but from counsel's dishonesty. He presents an affidavit in which trial counsel Bruck claims the

relationship was "irreparably damaged by Dr. Dietz's disclosures." (Dkt. No. 1077-5 at 6). Bruck's affidavit does not create a genuine dispute of fact on this issue because the contemporaneous record clearly shows that the parties did not view the relationship as irreparably damaged, as discussed above.

Defendant's actions in the case after those disclosures underscore that he continued to engage in a working relationship with counsel on every issue other than the penalty phase. Courts have frequently found that similarly strained attorney-client relationships were not irrevocably broken based on the actual interactions between a defendant and their counsel. For instance, in *United States v. Hickson*, a defendant sought to dismiss his attorney because he believed the relationship with his attorney was broken and he had lost confidence in him. 506 F. App'x 227, 230 (4th Cir. 2013). The trial court denied the motion and required the defendant to proceed *pro se*. *Id*. On appeal, the defendant claimed the trial court erred in doing so. *Id*. at 231. The Fourth Circuit affirmed the trial court's decision and found that the relationship was "not so broken as to require the district court to have granted substitute counsel" based on the fact that the defendant wanted the same attorney "to be his standby counsel after [the defendant] chose to represent himself and the fact that when [the attorney] was out sick, [the defendant] wanted to delay the trial until [the attorney] was back instead of having another standby counsel." *Id*. at 232-33.

The Fourth Circuit reached a similar conclusion in *Smith*, 640 F.3d at 598. In that case the attorney-client relationship was even more troubled, to the point where the defendant became so belligerent that guards removed him from a meeting with his attorney and took him back to his cell. *Id*. at 597. The attorney told the trial court that he believed "our relationship, such as it has ever been, has obviously broken down to the point where we are not able to sit down and have a rational, reasonable discussion about this case and about the issues in this case." *Id*. The trial court

denied the motion for substitution and the Fourth Circuit affirmed that decision, holding that even though "counsel did not feel he was fully able to dispense advice" to his client, communication was not so broken down as to prevent effective assistance because "counsel and client actually met to discuss sentencing, reviewed (some of) the [pre-sentence report], and communicated just before and during the hearing sufficiently to allow counsel to present his client's concerns to the court cogently and persuasively." *Id.* at 598.

Here, Defendant's interactions with his trial counsel even after discovering their penalty phase plan—and even after being put through the first competency hearing—show that the relationship was not irrevocably broken. Despite calling his attorneys liars in the letter and during his competency hearing and despite allegedly threatening to stab his attorney, Defendant *still* asked the Court if he could keep his trial counsel and force them to handle the penalty phase in the way he requested. (Dkt. No. 707 at 279-81). Defendant still met with trial counsel, he still asked for their help as standby counsel, and he asked for them to resume their representation of him at the guilt phase. ██████████ 919 at 10; 920 at 104; 911 at 2). He even affirmed to the Court that the previous issues between him and counsel did not alter his desire for them to represent him during the guilt phase. (Dkt. No. 911 at 7-9). These were not the actions of a defendant that was so distraught at his attorneys' dishonesty that he could no longer work with them. Instead, they are the actions of a defendant with a strained but workable relationship with his trial team. Because the relationship was not irreparably broken, Defendant cannot show he was constructively denied counsel even under his novel interpretation of *Cronic* and *Smith*.

### 3. Counsel's Actions Did Not Amount to Constructive Denial of Counsel.

Defendant argues prejudice should be presumed because counsel usurped his authority in insisting on the presentation of mental health mitigation evidence, was dishonest with him, and failed to seek substitution of counsel. These arguments fail.

#### a. Insistence on mental health evidence did not constructively deny counsel.

It is unclear whether Defendant claims the interpersonal conflict that flowed from an insistence on mental health evidence constructively denied him counsel, *see* (Dkt. No. 1077 at 132), or whether the insistence alone did so, *see id.* at 134-35. Neither approach warrants relief.

Defendant argues the decision to present mental health evidence fell outside counsel's strategic control. (Dkt. 1077 at 134). He cites *McCoy v. Louisiana*, 584 U.S. 414 (2018), in support of that proposition. *Id.* Defendant inexplicably fails to cite, however, the Fourth Circuit's rejection of this very issue.

On appeal, Defendant argued, citing *McCoy*, that trial counsel should have "been forced to conform to his objective" of not being labeled as mentally ill or autistic and "that he should have been advised that he could constrain his counsel in that way." *Roof*, 10 F.4th at 352. The Fourth Circuit rejected Defendant's view, holding the "presentation of mental health mitigation evidence is, in our view, 'a classic tactical decision left to counsel . . . even when the client disagrees.'" *Id.* at 352-53 (quoting *United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010) (alteration in original)).

The Fourth Circuit's binding authority in this case forecloses Defendant's argument. *See United States v. Bennerman*, 785 F. App'x 958, 962 (4th Cir. 2019) (holding that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent

stages in the same case") (quotation marks omitted). Trial counsel's valid efforts on Defendant's behalf did not deprive him of his Sixth Amendment right. Likewise, Defendant cannot establish that his disagreement with the attorneys' choices created an irreparable breakdown amounting to constructive denial of counsel: disagreements about tactics cannot establish an irreparable breakdown. *See Johnson*, 114 F.3d at 443-44. Indeed, if the Court were to entertain Defendant's argument, every criminal defendant who disagreed with a tactical decision would have a valid reason to replace counsel at will, rendering counsel's professional authority pointless. As such, Defendant cannot establish he was constructively denied counsel.

      **b.  Trial counsel's alleged dishonesty did not amount to constructive denial of counsel.**

Defendant did not suffer constructive denial of counsel based on the attorneys' alleged dishonesty. As discussed above, trial counsel did not act improperly, and any alleged dishonesty did not create their conflict with Defendant. *See supra* at 191-93. Also, Defendant waived any concerns about his relationship with trial counsel when he requested their representation during the guilt phase. Defendant notes that the Government expressed its concerns about trial counsel's relationship with Defendant in a filing. (Dkt. No. 1077 at 140). Defendant fails to mention that when he decided to have counsel reappointed for the guilty phase, the Government requested in its brief that the Court address the stated concerns directly with Defendant. (Dkt. Nos. 730 at 3-4; 911 at 7-9). During the hearing in which the Court considered reappointment of counsel, the Court gave Defendant an opportunity to read the Government's filing, which he did. (Dkt. No. 911 at 7-9). The Court asked Defendant if the Government's arguments altered his decision to request counsel's reappointment, and Defendant responded, "No." *Id*. at 9. Defendant had an opportunity to consider counsel's actions and his allegations against them but still asked for their

reappointment. Defendant cannot now say counsel's dishonesty irreparably damaged their relationship to the point that he acted without counsel and could not mount an adequate defense.

### c. Trial counsel's failure to withdraw did not amount to constructive denial of counsel.

Defendant faults trial counsel for not moving to withdraw or to substitute counsel before he asserted his right to self-representation. Such a motion would have been meritless, and trial counsel were in the best position to adequately pursue Defendant's interests. Accordingly, their decision to remain on the case did not deny him counsel, constructively or otherwise.

A defendant who requires appointed counsel does not have an absolute right to choose the attorney. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006). Therefore, a defendant seeking to substitute appointed counsel must show "good cause." *United States v. Mullen*, 32 F.3d 891, 895 (4th Cir. 1994). When determining whether a district court has abused its discretion in denying substitution of counsel, the Fourth Circuit considers the "[t]imeliness of the motion; adequacy of the court's inquiry into defendant's complaint; and whether the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense." *Id*. (internal quotation marks omitted).

A motion to substitute counsel in Defendant's case would have first been untimely. Courts are "entitled to take into account the . . . public interest in proceeding on schedule" when determining whether a motion to substitute is timely. *Id*. at 891 (quoting *United States v. West*, 877 F.2d 281 286 (4th Cir. 1989)). No bright line rule controls the timeliness of a motion, but the Fourth Circuit generally views those filed less than two weeks before a critical proceeding as untimely. *See United States v. Blackledge*, 751 F.3d 188, 194 (4th Cir. 2014) (motion filed three days before trial was untimely); *United States v. Ellis*, 340 F. App'x 891, 894 (4th Cir. 2009) (motion filed five days before sentencing was untimely); *United States v. Boone*, 26 F. App'x 162,

164 (4th Cir. 2001) (noting a motion filed "only nine days" before sentencing hearing was untimely); *United States v. Dukes*, 141 F.3d 1160, 1998 WL 188634 at *4 (4th Cir. Apr. 21, 1998) (unpublished table opinion) (finding a motion filed ten days before jury selection would significantly impede the "efficient administration of justice."); *Gallop*, 838 F.2d at 108 (denying a motion and noting it was filed five days before trial) (abrogated on other grounds).[58]

In this case, trial counsel informed the Court of a conflict with Defendant on November 2, 2016. (Dkt. No. 629 at 1-2). The venire had completed questionnaires, and jury selection was set to begin five days later. (Dkt. No. 544 at 3). On November 7, the Court reset jury selection for November 9. (Dkt. No. 558). On November 8, the Court set a November 16 competency hearing and postponed jury selection to November 21. (Dkt. No. 564 at 1). It later postponed the competency hearing to November 21 and jury selection to November 28. (Dkt. No. 625 at 1).

If the attorneys had moved to substitute counsel after the alleged conflict arose, the Court would have denied it. This Court considered the possibility of appointing new counsel but stated that no competent attorney would forgo a defense, as Defendant desired. (Dkt. No. 707 at 285). As a result, this Court concluded, "if I were to replace them today and bring another set of lawyers, we would be in exactly the same position." *Id.* Thus, a motion to substitute counsel would have been futile.

Additionally, the Court would have considered the time between the motion and the trial, the time between the motion and the competency hearing, and the time that would have been required to allow new counsel to become familiar with the case. *See Hyatt v. Branker*, 569 F.3d

---

[58] In one case, the Fourth Circuit deemed timely a motion filed two weeks before a sentencing proceeding. *See United States v. Jennett*, 387 F. App'x 303, 306-07 (4th Cir. 2010). There, however, the government could not identify a victim or witness that it anticipated testifying at the hearing. *Id.* at 307. Substituting counsel two weeks before such a limited proceeding is not comparable to substitution on the eve of a trial of this magnitude.

162, 172-73 (4th Cir. 2009) (state trial court acted reasonably in assuming that a mid-trial motion to substitute counsel in a capital case contained an implicit request for a continuance for the new attorney to prepare). When trial counsel learned of the impending conflict with Defendant, on November 2, jury selection was only five days in the future. After the Court granted a short continuance, the competency hearing was eight days away and jury selection thirteen days away. The Court moved the dates again, giving trial counsel five days until the competency hearing and twelve for jury selection. None of these timelines would have permitted lawyers, previously unfamiliar with this case, time to prepare for the substantive proceedings that lay ahead.

Any motion for substitution of counsel would have been untimely, necessitating a continuance for new counsel to prepare, at a minimum, for a competency hearing that implicated mental health issues investigated for nearly a year, to say nothing of a multiple-count capital prosecution. Any motion filed on November 2 or thereafter would have been untimely.

Beyond timeliness, trial counsel could not have established a breakdown that justified substitution, as discussed above. *See supra* at 186-90. In fact, even after the guilt phase, when Defendant asked to dismiss trial counsel completely, the Court denied the request. (Dkt. No. 949 at 100). It observed, "the fact that you may have disagreements with them or you may not trust them is, standing alone, not sufficient." *Id*. And even if the motion might have had some arguable basis in fact, trial counsel still could have reasonably concluded that it was in Defendant's best interests for them to continue to represent him.[59]

---

[59] Only one of Defendant's attorneys says they agreed with a recommendation of substitute counsel, in the hope Defendant would listen to new counsel. *See* (Dkt. No. 1077-71 at 5). None of the other attorneys indicate a belief that substitution was in Defendant's best interests. Rather, they note that the issue was raised but not pursued. (Dkt. Nos. 1077-5 at 5; 1077-6 at 3-4).

Trial counsel had been, by their own admission, carefully investigating Defendant's mental health since the spring of 2016. They had been in close contact with experts and Defendant's family. They had reviewed hundreds of juror questionnaires, prepared *voir dire*, and worked with a consultant in anticipation of jury selection. After they challenged Defendant's competency, counsel worked with their experts to obtain documentation and arrange testimony for the competency hearing. Counsel had met frequently with Defendant and were well acquainted with his views and personality. Counsel believed Defendant was rebelling against their strategy because he was impaired. They therefore could have reasonably concluded that, even if they could have moved to withdraw, it remained in Defendant's best interest for them to remedy the relationship and carry on in their roles.

The conclusion would be especially reasonable given the impending timeline. Counsel knew the Court was unlikely to postpone the trial. Indeed, when counsel asked to have Defendant placed in Bureau of Prisons custody ahead of the competency hearing, a common practice under 18 U.S.C. § 4241, the Court refused and appointed Dr. Ballenger to perform the evaluation. (Dkt. No. 978 at 3-4). The Court told trial counsel it was "not going to delay proceedings." *Id.* at 7. Knowing that the trial and competency hearing were going to move forward within days or weeks, trial counsel would have known that no new attorney could possibly provide anything close to the level of representation that the existing team could provide in the remaining time. Though another attorney—unassociated with the case—recommended that the team withdraw or seek conflict counsel for the competency hearing, that recommendation does not render trial counsel's decision unreasonable: "Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. Counsel reasonably concluded it was in Defendant's interest for them to continue as his attorneys.

199

### 4. The Court was Not Required to Further Inquire into the Relationship between Defendant and Counsel.

Defendant faults the Court for not undertaking a searching inquiry as to the source of Defendant's complaints with counsel. That argument fails legally and factually.

No legal authority requires the Court to conduct an inquiry into the relationship between a defendant and counsel when no party has moved to substitute counsel. In fact, two courts have held specifically that courts are *not* required to inquire *sua sponte* into the relationship between a defendant and counsel in the absence of such a motion. *See United States v. Hood*, 615 F.3d 1293, 1304-05 (10th Cir. 2010); *United States v. Robinson*, 913 F.2d 712, 716 (9th Cir. 1990).

The cases cited by Defendant—which address conflicts amongst jointly represented co-defendants—are inapposite. In *Holloway v. Arkansas*, the Supreme Court found error based on a refusal to "appoint separate counsel or to take adequate steps to ascertain whether the risk [of conflicts of interest] was too remote to warrant separate counsel" for a defendant who did not want to share representation with two codefendants. 435 U.S. 475, 477, 484 (1978). The Court observed, "[j]oint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing," such as negotiating a plea agreement in exchange for testimony. *Id*. at 489-90. The Court warned the physical presence of an attorney "does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters." *Id*. at 490.

Two years later, in *Cuyler v. Sullivan*, the Supreme Court addressed whether a court "must inquire into the propriety of multiple representation even though no party lodges an objection." 446 U.S. 335, 345 (1980). The Court held a trial judge is not required in all situations to inquire into whether multiple representation creates a conflict but must do so only where the court "knows or reasonably should know that a particular conflict exists." *Id*. at 347. In *Wheat v. United States*,

the Court found that a judge could decline a waiver of conflict in instances of multiple representation, which "engenders special dangers of which a court must be aware." 486 U.S. 153, 159-60 (1988).

The *Holloway/Culer/Wheat* line of cases merely establishes that joint representation presents particular concerns that may require inquiry into a possible conflict if not separate representation. Indeed, the Supreme Court has specifically observed that its decision in *Sullivan* dealt only with concurrent representation of multiple defendants, not other situations. *See Mickens v. Taylor*, 535 U.S. 162, 175-76 (2002). None of this jurisprudence addresses the situation here— a single defendant's disagreements with and complaints about his counsel's tactical decisions.

Likewise in *United States v. Mullen* and *United States v. Blackledge*, two opinions cited by Defendant, the Fourth Circuit addressed motions to withdraw or substitute counsel that obligated an inquiry by the trial court. *See Mullen*, 32 F.3d at 893-95; *Blackledge*, 751 F.3d at 191-93. The opinions address only the depth of inquiry a court must conduct when a party seeks to substitute counsel. They do not address whether any inquiry is required when no one has sought substitution. These cases are therefore irrelevant to Defendant's claims that the Court needed to inquire into his relationship with his counsel in this case.

Even if the Court was *required* to investigate friction between Defendant and counsel, a cursory review of the record shows it did so. The Court explored the matter with Defendant and counsel during lengthy conferences, and it reviewed filings and Defendant's letter. Based on that information, the Court could assess the facts and conclude that any conflict between Defendant and his counsel was based on a disagreement whether to present mental health evidence.

Defendant claims that if the Court had conducted further inquiry, it could have discovered that counsel acted "a bit tricky" and "lied." These are characterizations, however, of facts that were

provided to the Court before trial.



Court read Defendant's letter (which openly accused his counsel of dishonesty), listened to Defendant's complaints, and heard his arguments that he wanted counsel's representation so long as they did as he directed. (Dkt. Nos. 652 at 3-25; 707 at 279-81). The Court was armed with all necessary facts and had no obligation to further inquire into Defendant's relationship with counsel.

### C. <u>Conclusion</u>

Defendant is not entitled to relief on Claim Six, and the Court should deny that claim.

## VIII.    <u>DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM SEVEN</u>

Defendant claims that trial counsel were ineffective for persisting in the ASD presentation rather than presenting other mitigating evidence. Defendant is not entitled to relief on Claim Seven, primarily because he represented himself during the sentencing phase and is therefore responsible for any failure to present mitigating evidence. However, the claim also fails because trial counsel acted reasonably, and Defendant cannot show any prejudice.

### A. <u>Argument</u>

#### 1.    **The Claim is Foreclosed Because Defendant Represented Himself.**

Because the Supreme Court has foreclosed defendants from claiming the quality of their defense amounted to ineffective assistance when they represent themselves, *Faretta*, 422 U.S. 806, 834 n.46 (1975), *see also supra* at 147-50, Defendant cannot blame trial counsel for omitting any

mitigating evidence. The record shows that Defendant controlled his defense and refused to present mitigating evidence. He knew that the defense he wanted to present "would aggravate things" and made the tactical decision to put on no defense. (Dkt. No. 556 at 23; *see also* Dkt. No. 545 at 4). He cannot obtain relief from the consequences of his own choices.

Defendant blames his actions on trial counsel's refusal to negotiate with him as to the scope of the planned case. But this Court advised him that trial counsel, not a criminal defendant, enjoys full control over what evidence to present as mitigation. *See Roof*, 10 F.4th at 352. Defendant then voluntarily elected to self-represent, and he was under no illusions as to the consequences: he was responsible for his sentencing proceeding and his were the only decisions that mattered. The Court repeatedly explained as much, and Defendant repeatedly said he understood. (Dkt. Nos. 912 at 17; 919 at 3-9). Indeed, when trial counsel tried to force non-mental health witnesses into the proceedings, Defendant agreed with the Court's refusal to allow them to do so. (Dkt. No. 947 at 770-72). Defendant cannot blame anyone but himself for a lack of mitigating evidence.

### 2. Trial Counsel Made a Reasonable Strategic Choice to Insist on Presenting Mental Health Evidence.

Even assuming trial counsel's actions played some role in Defendant's failure to present any mitigating evidence, he cannot show they acted unreasonably.

Defendant's argument to the contrary rests on the false premise that he was only seeking to preclude counsel from presenting the ASD diagnosis as mitigating evidence during the penalty phase. The record says otherwise. ██████████████████████████ ██████████████████████ 652 at 6, 9), and Defendant himself confirmed as much. He told Dr. Ballenger he did not want any mental health evidence presented. (Dkt. No. 648-2 at 21-22). He told Dr. Maddox he was concerned that people would pay attention to him if "the defense presents any kind of mental illness defenses." (Dkt. No. 707 at 97). He told the Court

he did not want anyone to think he had *"any* mental problems . . . ." *Id*. at 273. He objected to ASD evidence and to mental health evidence generally. The record defeats any post hoc protestations to the contrary from Defendant's counsel. (*Cf.* Dkt. No. 1077-6 at 6).

Trial counsel's insistence on mental health evidence was a reasonable strategic decision. Mental impairments are "exactly the sort of evidence that garners the most sympathy from jurors." *United States v. Barrett*, 797 F.3d 1207, 1231 (10th Cir. 2015) (quoting *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004)). "[E]vidence of mental deficiencies 'can be persuasive mitigating evidence for jurors considering the death penalty, and this evidence can determine the outcome.'" *Winston v. Kelly*, 592 F.3d 535, 571 n.11 (4th Cir. 2010) (Gregory, J., concurring in part) (quoting *Gray v. Branker*, 529 F.3d 220, 235 (4th Cir. 2008)). The ABA guidelines on capital cases describe mental health mitigation as "extremely important." *Meyer v. Branker*, 506 F.3d 358, 371 (4th Cir. 2007). When a "defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas." *Faretta*, 422 U.S. at 820. One such area is the presentation of mental health evidence, which the Fourth Circuit has characterized as a "classical tactical decision left to counsel . . . even when the client disagrees." *Roof*, 10 F.4th at 352 (quoting *Chapman*, 593 F.3d at 369). Although some courts have found an attorney is not ineffective for following a defendant's directives regarding mitigating evidence, *see, e.g.*, *Wood v. Quarterman*, 491 F.3d 196, 203 (5th Cir. 2007), a reasonable attorney could still believe that it was their obligation to exercise the control that was delegated to them.

Apropos of the reasonability of this approach, ABA guidelines assert that "[s]ome clients will initially insist that they want to be executed . . . some clients will want to contest their guilt but not present mitigation," but it would be "ineffective assistance for counsel to simply acquiesce

to such wishes." *See* Commentary to American Bar Association, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 10.5, 31 Hofstra L. Rev. 913, 1009-1010 (2003)            *available*            *at*            https://www.americanbar.org/groups/committees/ death_penalty_representation/resources/aba_guidelines/ (last accessed and downloaded on Oct. 13, 2025). The South Carolina rules of professional conduct also require counsel to consider the client's mental state when strategizing. *See* South Carolina Rules of Professional Ethics Rule 1.14.

Trial counsel's decision to insist on presenting the strongest evidence possible did not amount to deficient performance. Defendant was charged with killing nine worshippers because of their race. *See supra* at 110-15. He confessed to the crime. *Id*. He showed no remorse. *Id*. And trial counsel surely recognized that the Government could present compelling evidence to support a number of aggravating factors. Faced with formidable aggravation, trial counsel thoroughly investigated the best defense they could, identifying experts who would testify that Defendant suffered from significant mental disorders. (Dkt. Nos. 1077 at 51-53; 707 at 24; 832-6; 832-7; 832-8; 1077-2 at 4-5; 1077-4 at 1). But Defendant opposed that evidence despite its recognized capacity to sway verdicts. Trial counsel decided to exercise their authority and attempt to persuade Defendant as to his best interests. The Court even questioned trial counsel about that decision and asked whether they would reconsider that strategy. (Dkt. No. 687 at 2). They stood by the position and expressed a belief that Defendant was impaired. *Id.* The Court later observed that no competent lawyer would agree to Defendant's demands. (Dkt. No. 707 at 285). Trial counsel's decision was strategic, reasonable, and essentially unassailable.

The decision appears all the more reasonable in light of the mitigating evidence Defendant claims his counsel could have presented. The evidence would show that Defendant was quiet, odd, anxious, awkward, but loved by his family. It would also show he had communication deficits

205

consistent with his lack of sociability but that he would not pose a future danger in custody. (Dkt. No. 1077 at 181-97). While such factors could be helpful when combined with other mitigating evidence, they do not—by themselves—tend to persuade capital juries. *See Franks v. GDCP Warden*, 975 F.3d 1165, 1174, 1181-84 (11th Cir. 2020) (characterizing a defendant's abusive childhood, substance abuse, and cognitive deficits as "weak . . . mitigation evidence"). Certainly, in the face of a crime of this magnitude, trial counsel recognized the need to present a compelling case. They therefore insisted—quite reasonably—on the best defense they could muster.

### 3. Defendant Cannot Show Prejudice.

Defendant cannot show he suffered prejudice from trial counsel's insistence on presenting evidence that he suffered from ASD. As noted, the record establishes that Defendant would not have allowed other mental health mitigating evidence to be presented and even opposed non-mental health mitigation. *See supra* at 84-88, 124, 145. Defendant told the Court he did not want to present any penalty defense. He declared that he would not call his relatives as witnesses and when standby counsel tried to present non-mental health witnesses he blocked the attempts. (Dkt. Nos. 912 at 22; 880-1 at 207; 947 at 770-72). Defendant told the Court that his preferred presentation would "make it worse," as it would be designed to justify his actions, and he did not intend to present any defense. (Dkt. No. 652 at 12, 22-23). Thus, the record demonstrates Defendant would not have consented to any of the mitigating evidence he now claims the jury should have heard. That mild evidence, moreover, is so substantially outweighed by the Government's case, that Defendant cannot establish any likelihood it would have led to a more favorable outcome. *See supra* at 166-68.

### B. Conclusion

Trial counsel made a reasonable strategic choice to present the strongest available case for life, which included evidence of Defendant's mental health issues. To defeat his counsel's efforts, Defendant assumed his own representation and chose to forgo mitigating evidence. Trial counsel did not render deficient performance for insisting on a strong case, and Defendant did not suffer prejudice given his own self-defeating choices. He is not entitled to relief on Claim Seven.

## IX.     DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM EIGHT

Defendant claims that counsel was ineffective for not ensuring his presence at certain pretrial hearings. (Dkt. No. 1077 at 171). Defendant is not entitled to relief on these claims, because his right to be present at critical stages of his trial was not implicated by those hearings and he can show no prejudice stemming from his absence.

### A. Legal Standards Regarding the Right to be Present at Court Proceedings

The thrust of Defendant's argument is that he had a right to be present at the referenced proceedings. Ordinarily such a claim would be raised on direct appeal as the basis for the claim is apparent from the trial record. However, Defendant has revived the claim by framing it as one of ineffective assistance of counsel, essentially arguing that trial counsel should have ensured his presence at the proceedings but did not. *Id*. To that end, it is not the specific principles of the right to be present at critical stages of the proceedings that control this claim, but *Strickland's* demanding test of deficient performance and prejudice. Still, as trial counsel's reasonableness depends at least in part on the viability of the underlying claims, the legal standards regarding the right to be present will be briefly discussed.

There are two sources of a federal criminal defendant's right to be present during court proceedings. The first is the Due Process Clause, which guarantees a defendant's right to be present

"at all stages of the trial where his absence might frustrate the fairness of the proceedings." *United States v. Rolle*, 204 F.3d 133, 136 (4th Cir. 2000) (quoting *Faretta*, 422 U.S. at 819 n.15). The defendant's presence must have a "relation, reasonably substantial, to the ful[l]ness of his opportunity to defend against the charge." *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (per curiam) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934)). A defendant's absence is only a due process violation to the extent "a fair and just hearing would be thwarted by his absence, and to that extent only." *Snyder*, 291 U.S. at 107-08, *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964)). The right to be present does not apply where the defendant's "presence would be useless, or the benefit but a shadow." *Snyder*, 291 U.S. at 106-07.

The second source of the right to be present comes from Federal Rule of Criminal Procedure 43. Rule 43 is more expansive than the Due Process Clause and has "traditionally been understood to codify both a defendant's constitutional right and his common law right to presence." *Rolle*, 204 F.3d at 136-37 (quoting *United States v. Camacho*, 955 F.2d 950, 953 (4th Cir. 1992)). Rule 43(a) requires a defendant's presence at his initial appearance, initial arraignment, plea, every trial stage, and sentencing. Rule 43(b)(3) provides that the defendant's presence is specifically not required at a "conference or hearing on a question of law." A hearing involves a "question of law" where it involves "an issue to be decided by the judge, concerning the application or interpretation of the law." *United States v. Gonzalez-Flores*, 701 F.3d 112, 116 (4th Cir. 2012). An issue is still "a question of law" even if it also encompasses factual questions, as "nearly every legal question involves some factual component." *Id.* at 117.

## B.  Argument

There is no basis for granting Defendant relief on this claim. Defendant did not have a constitutional or statutory right to be present at any of the identified hearings, therefore counsel

did not perform deficiently by not ensuring his presence. Also, Defendant cannot show any prejudice flowing from his absence from those proceedings.

### 1.  Trial Counsel Did Not Render Deficient Performance.

Trial counsel did not render deficient performance in not insisting that Defendant be present for the proceedings at issue, as they were not proceedings for which Defendant was required to be present under the Due Process Clause or Rule 43. None of the proceedings are listed in Rule 43(a), and Defendant does not claim that the proceedings fit into any of those categories. It is clear that Rule 43 did not *require* Defendant to be present at these proceedings.

The November 2, 2016, conference was one in which trial counsel informed the Court of issues regarding their representation of Defendant and provided notice that Defendant may send a letter to the prosecution. (Dkt. No. 629 at 2). Conferences about an attorney's representation, even where a court makes a substantive decision about an attorney's representation, are not the types of proceedings at which a defendant has a due process right to be present. *See United States v. Ole*, 994 F.2d 1519, 1525 (10th Cir. 1993) (conference in which potential retained counsel informed the court he would not enter an appearance on Defendant's behalf was "more accurately classified as an administrative conference unrelated to the issues at trial."); *see also Jean-Baptiste v. Artus*, 09-cv-5920, 2016 WL 7118280 at *4 (S.D.N.Y. Dec. 6, 2016) (defendant did not have a right to be present at a hearing on whether defense counsel should be disqualified for a conflict of interest); *Jackson v. Poole*, 06-cv-00188, 2011 WL 4901314 at *15 (S.D.N.Y. July 19, 2011) (petitioner had no right to be present in a hearing on a motion to withdraw by the petitioner's attorney where the petitioner had filed a disciplinary complaint against him); *Black v. Goord*, 419 F. Supp.2d 365, 373-74 (W.D.N.Y. 2006) (defendant did not have a right to be present during a hearing on whether

defense counsel had a conflict of interest, even where the defendant claimed to know of the factual basis of the conflict).

Defendant's presence at the November 2 conference would have had no relation to his opportunity to defend against the charges in his case. The Court did not render any decisions, and no matters were discussed that related to the ultimate issues. To the extent that the Court and trial counsel discussed the issues surrounding the letter, the Court did not take any action, nor did counsel ask the Court to take any action. Indeed, the Court only told counsel what it would do *if* the letter were sent. There was a brief discussion of administrative issues, but nothing that related to any substantive matter in the case. Because the November 2, 2016, conference is best characterized as a discussion of administrative issues, trial counsel were not ineffective for not ensuring Defendant's presence.

The November 16, 2016, hearings also did not involve any substantive matters that required Defendant's presence. The Court addressed a motion for continuance with counsel, which is typically an issue not requiring a defendant's presence. *See United States v. Veatch*, 674 F.2d 1217, 1225 (9th Cir. 1981) (no due process violation where the defendant was not present during a conference that discussed a motion for a continuance, among other things). Trial counsel also informed the Court that they believed the Defendant might want to represent himself, but there was no pending motion on that point, nor had Defendant requested at that point that counsel make such a motion. At that time, the Defendant was still represented by counsel. There was also an *ex parte* hearing the same day but, as with the November 2 conference, it concerned only general discussions of counsel's representation and did not deal with any substantive issues. (Dkt. No. 687).

The November 17, 2016, hearing related only to the closure of the competency hearing. The Court heard from victims and victims' family members, but none of the issues discussed related to the issues of the trial itself. And while Defendant argues that individuals who later testified at his sentencing made statements at the closure hearing, the statements made at the closure hearing were different in substance and purpose, as they related to the witnesses' desire to attend the competency hearing. Further, Defendant can hardly argue that he needed to be present to observe those witnesses to prepare for his sentencing hearing. He made clear he would not cross-examine any of the witnesses or present any evidence. (Dkt. No. 912 at 22). He would have gained no benefit from observing potential witnesses' unrelated statements in opposition to closing the hearing. In any event, Defendant was still represented by counsel at that hearing, regardless of counsel's belief that he may want to represent himself in the future. Trial counsel were therefore not unreasonable in not insisting on his presence.

Finally, the November 18 conference involved purely logistical issues of how to provide materials to Defendant, which witnesses would be called during the competency hearing, which defense team members were allowed to be present for the competency hearing, and how trial counsel could obtain the court-appointed evaluators' materials. (Dkt. No. 991 at 1-10). This conference had nothing to do with any substantive issue, and Defendant's presence would have been of no benefit. And even though by this time Defendant had expressed an interest in representing himself, he had not yet moved to do so and, four days later, he was still trying to figure out a way that counsel could continue representing him. (Dkt. No. 707 at 279-81).

The relevant hearings were not stages of the trial where Defendant's absence would frustrate his criminal proceedings. Defendant's absence did not thwart the fairness of any of the hearings and Defendant's presence would not have offered any benefit to any of the hearings.

Defendant was therefore not required to be at the hearings, and counsel did not render deficient performance by not insisting on his presence.

### 2. Defendant Did Not Suffer Prejudice.

Defendant does not allege any specific prejudice flowing from his absence at the referenced proceedings, although he does argue that his right to be present was violated and his absence exacerbated his mistrust in his attorneys. (Dkt. 1077 at 177-78). As discussed above, Defendant would have moved to represent himself regardless of his difficult relationship with his attorneys because of his insistence to preclude the presentation of mental health evidence, *see supra* at 176-79, and his absence from a handful of proceedings would not have changed that outcome. Further, his presence at the referenced proceedings would not have made any difference in any of the hearings or his trial. The Court did not make any substantive decisions—nor was it considering making any such decisions—in the November 2 and November 18 hearings. The Court's only decisions during the November 16 and 17 hearings were to grant Defendant's motion for continuance and order the competency hearing closed—both results requested by Defendant. Defendant's presence would not have changed the outcome of those hearings. Defendant cannot show any prejudice related to his absence from the referenced proceedings and therefore is not entitled to relief on Claim Eight.

### X.     DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM NINE

In Claim Nine, Defendant argues that his attorneys were ineffective for failing to move for a change of venue or an intra-district transfer based on negative media reports leading up to his trial and for failing to conduct a "community attitude survey," which he speculates would have supported efforts to move his trial. Defendant cannot show deficient performance or prejudice under *Strickland*.

212

As to the first *Strickland* performance prong, trial counsel were not deficient for failing to pursue a change of venue or transfer. They had several reasonable strategic reasons for choosing not to proceed with seeking a venue change. First, they made a strategic decision to prioritize trying the federal case before the state could obtain a verdict, a goal which almost certainly could not have been achieved had counsel pursued a change of venue. Second, trial counsel made a tactical decision to try their case before a jury drawn from the Lowcountry rather than from a statewide venire. Finally, as his trial counsel likely understood, a motion to change venue was unlikely to succeed given the Court's willingness to draw the jury from a statewide venire. Trial counsel cannot be deemed ineffective for failing to pursue a meritless motion.

Defendant cannot establish prejudice under *Strickland* because he cannot show that his counsel could have made the high showing of "presumptive prejudice" that is required to obtain a change of venue based on the nature of the pretrial publicity. Moreover, *voir dire* did not reveal the type of widespread bias that would support a motion to change venue following jury selection. Rather, this Court's individualized *voir dire* procedures, which other jurists have cited as a model for capital *voir dire*,[60] ensured that the jurors actually selected for trial were fair, impartial, and unbiased.

### A.  Relevant Factual Background

Months before the start of trial, on June 7, 2016, this Court informed the parties that it planned to "use a statewide venire, unless somebody tells me that's a bad idea." (Dkt. No. 207 at 10). Lead trial counsel responded that he had assumed that the venire would be drawn from the Charleston Division, indicating that he did not think a statewide venire would provide any advantages because "[t]his is obviously a case that publicity is nationwide, not just statewide."

---

[60] *See* Br. for Retired Federal Judges and Former Federal Prosecutors as Amici Curiae Supporting Respondent, *United States v. Tsarnaev*, 2021 WL 3912236, at *18–21.

*Id.* at 44. The Court noted that it would be willing to defer to the defense on the issue, but warned "what I don't want is for you to get me to agree to the Charleston division, and then move for a change of venue, okay?" *Id.* at 45. Trial counsel agreed, and when the Court emphasized the point, he responded, "loud and clear." *Id.*

About a week later, on June 15, 2016, trial counsel formally requested "that the Court draw the pool of prospective jurors from the Charleston and Beaufort Divisions (Area C of the Amended Jury Selection Plan of the District of South Carolina), rather than using a statewide venire." (Dkt. No. 190 at 2). The Court responded the same day with an order acknowledging Defendant's request that the jury be drawn exclusively from Area C and reiterating its direction that the defense advise the Court whether it intended to move for a change in venue. (Dkt. No. 192 at 1). The Government responded the next day urging the Court to draw its jury from a "district-wide" (statewide) venire unless Defendant affirmatively waived a venue challenge. (Dkt. No. 194 at 1-2). The defense also responded indicating Defendant did "not presently intend to move for a change of venue." (Dkt. No. 196).

On July 3, 2016, the Government reiterated its concern that Defendant would raise "a last-minute venue challenge" if the Court did not use a statewide venire. (Dkt. No. 231 at 3-4). The defense responded on July 13, 2016, and once again affirmed that it did not intend to challenge venue. Trial counsel wrote, "[t]he defense position respecting the drawing of the jury from Area C is the same as the Government's. We believe that a statewide jury is not necessary, and that an impartial jury can be selected from the eight-county Low Country region that comprises Area C. For this reason, we do not intend to move for a change of venue . . . ." (Dkt. No. 249 at 2). They explained that it could not foreclose the necessity of such a motion in the future, but did not anticipate it:

214

> [S]hould *voir dire* examination disclose—contrary to the current expectations of both sides, and to all the available evidence—that twelve impartial jurors and six impartial alternates simply cannot be found in Area C, the defense would be forced by these changed circumstances to reconsider its position respecting venue. We do not expect that to happen, and indeed *are confident that it won't*.

*Id.* (emphasis added).

### B.  <u>Applicable Legal Standards</u>

#### 1.  **Motions to Change Venue**

The Sixth Amendment provides that criminal trial should be held in the "State and district wherein the crime shall have been committed." U.S. Const. amend. VI. The constitutional right to an impartial jury does not include the right to be tried in a venue free of negative publicity. Rather, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it." *Smith*, 455 U.S. at 217. "Sheer volume of publicity alone does not deny a defendant a fair trial." *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991). The Supreme Court has long recognized that "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity," such that "scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States,* 98 U.S. 145, 155-156 (1878); *see also United States v. Tsarnaev*, 595 U.S. 302, 312 (2022) (quoting *Reynolds*). "[P]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*. *Skilling v. United States*, 561 U.S. 358, 381 (2010) (emphasis in original).

Thus, "juror exposure to media coverage cannot by itself establish that a defendant was deprived of a fair trial, even if the publicity was pervasive, adverse, and voluminous." *United States v. Taylor*, 942 F.3d 205, 222 (4th Cir. 2019). "A change of venue is required as a matter of constitutional law only when the jury pool is tainted 'by so huge a wave of public passion' that the

impaneling of an impartial jury is impossible." *Mu'Min v. Pruett*, 125 F.3d 192, 199 (4th Cir. 1997) (quoting *Irvin,* 366 U.S. at 728).

"Motions for a change of venue call for a two-step analysis." *Bakker*, 925 F.2d at 732. At the first step, the reviewing court must determine "whether pretrial publicity" is "so extreme as to give rise to a presumption of prejudice." *Taylor*, 942 F.3d at 223. In these "extreme" instances, the court should grant a motion for a change of venue "before jury selection begins." *Bakker*, 925 F.2d at 732. In most cases, however, "a trial court . . . should take the second step of conducting a *voir dire* of prospective jurors to determine if actual prejudice exists." *Id.* Then, "[o]nly where *voir dire* reveals that an impartial jury cannot be impaneled would a change of venue be justified." *Id.*; *see also Taylor*, 942 F.3d at 223 (noting that the "second inquiry" is whether the defendant "demonstrated *actual* prejudice" (emphasis in original)).

Consistent with a defendant's due process right to an impartial jury, the Federal Rules of Criminal Procedure provide two avenues under which a criminal trial may be transferred to another district. Under Rule 21 of the Federal Rules of Criminal Procedure, a federal criminal case must be transferred to another federal district "[u]pon the defendant's motion" where "the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a)*.* A district court also must, under Rule 18, transfer the trial of a case to another division within the district "with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice." Fed. R. Crim. P. 18.

### 2.  Ineffective Assistance of Counsel Standard

To succeed on Claim Nine, it is not enough for Defendant to establish that a motion for change of venue would have succeeded. He must also establish that his counsel's failure to seek a change of venue satisfies *Strickland's* demanding standard governing ineffective assistance of

216

counsel claims. *See supra* at 73-75. Thus, he must not only establish prejudice from pretrial publicity, but also that his counsel's performance fell below the acceptable professional standards and that there is a reasonable probability that the outcome of trial would be different in the absence of counsel's errors. *See supra* at 75; *see also Parnell v. United States*, 149 F.4th 1268, 1276 (11th Cir. 2025).[61]

### C. Argument

Trial counsel was not ineffective for failing to investigate or seek a change of venue because counsel made an informed, reasonable decision to seek a trial before jurors drawn from Area C, and any motion to transfer venue would have been meritless.

**1. Defendant Cannot Show that Counsel's Strategic Decision Not to Pursue a Change of Cenue or an In-district Transfer Constituted Deficient Performance.**

Defendant cannot establish deficient performance first because trial counsel made a reasonable, strategic choice to seek a federal trial before jurors drawn from Area C. That decision does not support an ineffective assistance claim even if a change of venue motion would have had merit. Further, any such motion would have been meritless, therefore trial counsel cannot be said to have rendered ineffective assistance by failing to advance those doomed arguments.

**a. Trial counsel's decision not to challenge venue was strategic and reasonable.**

Trial counsel's decision not to seek a change in venue or conduct a community attitude survey was a strategic decision based on counsel's extensive experience and particular knowledge.

---

[61] In setting forth the standard, Defendant cites decisions from the Tenth and Eleventh Circuits, as the Fourth Circuit does not appear to have addressed an ineffective assistance of counsel claim predicated on a failure to move for a change of venue in any significant detail. (*See* Dkt. No. 1077 at 215 (citing *Meeks v. Moore*, 216 F.3d 951 (11th Cir. 2000) and *Tafoya v. Tansy*, No. 00-2049, 2001 WL 557971 (10th Cir. May 24, 2001)).

While Defendant now criticizes the decision, his position is nothing more than impermissible second-guessing of counsel's informed approach.

The Eleventh Circuit recently addressed this very issue in *Parnell v. United States*, 149 F.4th at 1274. In that case, the defendants were officials in the Peanut Corporation of America (PCA), whose Blakeley, Georgia plant produced peanut products for major customers, including the Kellogg Company. *Id.* at 1272. The defendants were federally prosecuted after the Food and Drug Administration identified PCA as the source of a salmonella outbreak that sickened more than 700 people and caused nine deaths. *Id*. In addition to causing illness and death, the salmonella outbreak decimated the peanut industry in southwest Georgia. *Id.* at 1273.

On appeal from their denied motions to vacate their convictions and sentences, the defendants argued that their attorneys were ineffective for, among other things, "not conducting a formal survey of the jury pool" and not requesting a change in venue, as they were tried in the very region that was devastated by their public malfeasance. *Id.* at 1273, 1282. The Eleventh Circuit rejected the argument and explained that "'[a] jury trial is, by its nature, an enterprise that is filled with imponderables from the viewpoint of a trial lawyer' and '[t]he truth is that it is often hard for even a good lawyer to know what to do.'" *Id.* at 1282 (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)). Accordingly, defense counsel is entitled to "a high degree of discretion in deciding how far to investigate a potential defensive strategy." *Parnell*, 149 F.4th at 1282. Noting *Strickland's* "strong presumption" that a "challenged action might be considered sound trial strategy," its warning against "second-guess[ing] counsel's assistance," its observation that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way," and its admonition that strategic decisions made after reasonable investigation are "virtually

unchallengeable," the Eleventh Circuit rejected the ineffective assistance claims. *Id.* at 1282, 1287, 1290-91 (quoting *Strickland*, 466 U.S. at 689-90).

Other courts have reached the similar conclusion that counsel's decision regarding venue is one due significant deference. *See, e.g., Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) (denying an evidentiary hearing and refusing to "second guess [counsel's] considered decision about whether [the defendant] stood a better chance, however slim it may have been, with a jury in Orlando than with a jury in St. Augustine"); *Weeks v. Jones*, 26 F.3d 1030, 1044 n.13 (11th Cir. 1994) (characterizing counsel's choice not to seek a change of venue as "the type of tactical decision that the Supreme Court has recognized that a criminal defendant's counsel may elect as a reasonable choice . . . and has cautioned courts against questioning"); *Cox v. Norris*, 133 F.3d 565, 573 (8th Cir. 1997) (holding that counsel's choice not to seek a change of venue based on the belief that "other counties were prone to harsher sentences" was a "tactical decision" which was "not outside the range of professional competence"); *Maxwell v. Mabry*, 672 F.2d 683, 685 (8th Cir. 1982) (concluding that "[c]ounsel's failure to further pursue a change of venue was within the area of trial tactics and judgment which attorneys have to make"); *Graybill v. Clarke*, No. 7:11-CV-00331, 2012 WL 3133691, at *21 (W.D. Va. July 31, 2012) (observing that "[i]t is well established that trial tactics are left to the discretion of counsel, and whether to move for a change of venue is a trial tactic").

The weight of authority shows that claims like the one Defendant raises face an uphill climb because of *Strickland*'s strong presumption of effective representation. Defendant has fallen well short of rebutting that presumption, and the record shows that trial counsel's decision was unimpeachable. There can be no serious dispute based on the record that trial counsel's decision was a considered and deliberate choice, not an inadvertent error. *See supra* at 153-56, 213-14. Trial

counsel had many valid strategic reasons not to seek a change of venue, some of which were explicit, and some which were implicit.

First, the trial record (and the post-conviction record) contains abundant evidence of trial counsel's strategic goal: to try the federal case first and avoid a state trial. Lead trial counsel acknowledged that goal in pretrial proceedings and even confirms it in his post-conviction affidavit. As discussed in the Government's response to Claim Four, Mr. Bruck told the Court that this was a deliberate decision, primarily because Defendant would be extremely distressed if he were tried in a televised proceeding. *See supra* at 89. Mr. Bruck believed that trial counsel had "done right" by Defendant in pursuing that course. *See supra* at 89.

Any attempt to challenge federal venue would likely preclude that goal. While state defense counsel claims that he "would have asked for more time" for the state trial after it was set for January 2017, he concedes that he doesn't know if they "would have gotten more time." (McGuire Decl., Dkt. No. 1077-11 at 3). Mr. Bruck perceived that state counsel was worried that "they would be forced to trial quickly if we didn't go first." (Bruck Decl., Dkt. No. 1077-5 at 2). A state continuance was especially unlikely given that they had already been given a significant extension beyond the timeframe set by the Chief Justice of the South Carolina Supreme Court. (Pennington Decl.. Dkt. No. 1077-10 at 1). Ninth Circuit Solicitor Scarlett Wilson made clear that her team would be prepared to try its case if the federal trial was delayed. On June 8, 2016, she told reporters, "We will be ready to go in January should something change in federal court."[62] If trial counsel wanted to try the federal case first, a motion to change venue was out of the question.

None of Defendant's arguments show that trial counsel's decision was unreasonable. First, although Defendant alleges that Mr. Bruck's decision not to seek a change of venue caused him to

---

[62] *See* https://www.youtube.com/watch?v=PmVB4Aso3S0

be tried in a jurisdiction (Charleston) that was allegedly hostile because of the media coverage, he never explains how a successful motion to transfer venue in federal court would have addressed the problem of the looming state court trial scheduled for January of 2017 *in Charleston*.[63] If the state defense team was not going to seek a change of venue—and there is no evidence to suggest they were—Defendant would face a capital trial in Charleston.

Thus, the only question was whether that trial would be in state or federal court. Mr. Bruck, with his extensive experience representing capital defendants in federal and South Carolina courts, made a strategic decision that it would be better to proceed first in federal court because he believed (correctly) that "if the federal trial went forward," "the state case would likely end in a plea bargain." (Bruck Decl., Dkt. No. 1077-5 at 2). Mr. Bruck's gambit achieved his goal of preventing the state from securing a capital conviction against his client.

The difference between a federal and state death sentence was more than a mere formality. At the time of Defendant's trial, the State of South Carolina had imposed and carried out death sentences at a much higher rate than the federal Government, a fact that an experienced South

---

[63] Defendant has not argued that his state court attorneys would have prevailed on a motion to change venue or that they would have even *wanted* to pursue such a motion. Seeking a change of venue in state court would have created the possibility that the defendant's state trial would be transferred to one of the larger counties in the Midlands or Upstate capable of handling a trial of such magnitude. In the years leading up to the defendant's trial, these counties accounted for a disproportionate number of the death sentences handed down in South Carolina. Between 2006 and 2015, just four South Carolina counties—Lexington, Horry, Spartanburg, and Greenville—accounted for more than half of the states' death sentences. *See* John H. Blume & Lindsey S. Vann, *Forty Years of Death: The Past, Present, and Future of the Death Penalty in South Carolina (Still Arbitrary After All These Years)*, 11 Duke J. Const. L. & Pub. Pol'y 183, 219 (2016). A motion to change venue in state court would likely not have improved Defendant's chances of avoiding a death sentence.

Carolina capital defender like Mr. Bruck almost certainly was aware of and would consider as part of his strategy in choosing venue.[64]

Defendant also criticizes Mr. Bruck for moving too quickly and dismissing the concerns of other lawyers on the team. But his co-counsel Kim Stevens felt that he was taking *too much* time to consider different perspectives on the case. "There were too many voices in the conversation. David wanted to take time and listen to everyone, but it took too much time and kept us from doing the actual work." (Stevens Decl., Dkt. No. 1077-6 at 3). Under these circumstances, it is not surprising that Mr. Bruck did not elect to have the members of his team use the limited resource of their time to research and pursue a motion that was incompatible with the strategy he had elected to pursue. And although other members of Mr. Bruck's team raised the possibility of seeking a change of venue, they understood that Mr. Bruck had determined that it was a higher priority to try the federal case quickly to try to prevent the state from convicting Defendant first. (*See* Gannett Decl., Dkt. No. 1077-71 at 1 (explaining that "the intent was to set the federal case for the November 2016 trial calendar" "so the federal trial would occur before Dylann's state trial")). The attorneys might have disagreed about the strategy, but that disagreement does not render the ultimate decision unreasonable.

Defendant argues that his counsel should have sought a within-district-transfer. The argument presumes that defense counsel would have preferred jurors from another part of the state to jurors from the Lowcountry. Mr. Bruck clearly made a considered decision that he preferred Lowcountry jurors to a mix of jurors from across the state. The Court had proposed drawing the

---

[64] Between 1976, when the Supreme Court decided *Gregg v. Georgia*, effectively reinstating the death penalty, and the summer of 2016, when Mr. Bruck invoked the defendant's speedy trial rights, the State of South Carolina had handed down more than 180 death sentences and carried out forty-three (43) executions. By contrast, the federal government had imposed seventy-seven (77) death sentences but carried out only three (3). *See supra* at 158.

jury from a state-wide venire, and the Government had clearly indicated that it would consent to this suggestion (and, indeed, preferred that choice to avoid any subsequent motions to change venue).

If the defense was actually concerned that jurors from the Lowcountry were going to be less favorably disposed toward their client than jurors from the rest of the state, trial counsel could have easily accepted the Court's suggestion to use a state-wide venire. It would not have required the defense to research and draft a time-consuming motion or to risk compromising their priority of trying the federal case first. The fact that the defense declined this offer clearly indicates that they believed that the jurors they would draw from Area C would be preferable to those they would draw from a state-wide venire.

Nor would this preference be particularly surprising to anyone has practiced criminal law in South Carolina. Of the 22 capital sentences handed down in South Carolina in the years preceding the defendant's crime (2006-2015), only *four* of them came from the nine Lowcountry counties that comprise Area C under the District of South Carolina's jury plan. *See* John H. Blume & Lindsey S. Vann, *Forty Years of Death: The Past, Present, and Future of the Death Penalty in South Carolina (Still Arbitrary After All These Years)*, 11 Duke J. Const. L. & Pub. Pol'y 183, 220 (2016). Trial counsel was well within the bounds of reasonableness in opting to keep the case in Charleston.

Finally, Defendant argues that his counsel's decision to forgo a venue challenge without first following his jury consultant's recommendation to conduct a "community attitude survey" represents a failure to investigate. As an initial matter, the assumption that such a survey would have shown that prospective jurors in Charleston were more hostile to Defendant than jurors in another district or division is based on pure speculation. Additionally, there is no requirement that

223

diligent counsel conduct a "formal survey of the jury pool" or even hire a jury consultant at all. *See Parnell*, 149 F.4th at 1282. The decisions not to conduct the polling allegedly recommended by the defense's jury consultant and not to challenge venue were conscious, strategic decisions that were made in furtherance of the federal trial team's determination that proceeding quickly to beat the state to trial was a higher priority than challenging venue. Mr. Bruck expressly explained that he did not follow the jury consultant's recommendation to conduct a poll to gauge community sentiment or pretrial publicity because he "was concerned about challenging jury selection, given the November [2016] trial date." (Bruck Decl., Dkt. No. 1077-5 at 4).

Additionally, polling data is not the only (or best) way for counsel or a court to gauge the extent to which pretrial publicity may be affecting a jury pool. As noted, courts rarely presume prejudice solely on the basis of pretrial publicity. Instead, in most instances a court faced with a motion to transfer venue "should take the second step of conducting a *voir dire* of prospective jurors to determine if actual prejudice exists." *Bakker*, 925 F.2d at 732.

Unlike polling conducted by a jury consultant, detailed *voir dire* provides the Court and counsel with information about the specific, relatively limited pool of people who may actually sit on the jury. If the responses of these jurors demonstrate that an impartial jury cannot be drawn, defense counsel should seek and a court should grant a motion for a change of venue. *See, e.g., Irvin*, 366 U.S. at 727 ("Here the 'pattern of deep and bitter prejudice' shown to be present throughout the community was clearly reflected in the sum total of the *voir dire* examination of a majority of the jurors finally placed in the jury box.") (internal citation omitted).

Mr. Bruck expressly allowed for this very possibility, even though he indicated that he found it would be unlikely. (*See* Dkt. No. 249 at 2 ("[S]hould *voir dire* examination disclose— contrary to the current expectations of both sides, and to all the available evidence—that twelve

impartial jurors and six impartial alternates simply cannot be found in Area C, the defense would be forced by these changed circumstances to reconsider its position respecting venue.")). Mr. Bruck's express reservation of the possibility of having to change venue depending on *voir dire* demonstrates that he was acutely aware of the need to safeguard Defendant's constitutional rights. In short, declining to conduct a "community attitude survey" did not leave trial counsel flying blind or prevent the defense from making a venue challenge if *voir dire* revealed that one was necessary.

The issue here is not whether a "community attitude survey" might have been useful to the defense, it is whether the failure to conduct one fell below the "wide range of reasonable professional assistance." As the Supreme Court has emphasized, "[t]he question is whether an attorney's representation amounted to *incompetence* under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690) (emphasis added). To hold that defense counsel with the extensive experience and expertise of Mr. Bruck could not make the strategic decisions he made without first conducting a "community attitude survey" would effectively make such surveys mandatory in any high-profile case.

Defendant's arguments fail on their merits because he cannot show that trial counsel's decisions were unreasonable. But those claims fail even more clearly when reviewed in the context of Mr. Bruck's specific experience. As the Eleventh Circuit observed in *Parnell*, the "presumption that an attorney's strategic decision was reasonable is 'even stronger' when we 'examine the performance of an *experienced* trial counsel' because 'experience is due some respect'" *Id.* at 1280 (quoting *Lawrence v. Sec'y, Fla. Dep't of Corr.,* 700 F.3d 464, 478 (11th Cir. 2012) (cleaned up; emphasis in original).

Trial counsel's experience is likewise due respect in this case. Mr. Bruck has tried dozens of capital cases over his career, many of them in South Carolina. He had decades of experience representing capital defendants in the relevant jurisdiction and had just finished representing a defendant in one of the nation's highest profile *federal* capital trials. (Bruck Decl., Dkt. No. 1077-5 at 1)). His expertise extended from trials to post-conviction representation, including numerous successful appeals to the United States Supreme Court.

Mr. Bruck was also no stranger to the concept of challenging venue in a federal capital case. As noted in his declaration, at the time he was appointed to represent Defendant, Mr. Bruck had just finished representing Dzhokhar Tsarnaev on federal capital charges stemming from the April 15, 2013, bombing of the Boston Marathon. (Bruck Decl., Dkt. No. 1077-5 at 1). Mr. Tsarnaev moved to change venue *four times* citing the type of polling data Defendant now claims his attorneys should have obtained and used to try to secure a change of venue in his case. (*See* Docket for *United States v. Tsarnaev*, 1:13CR10200 (D. Mass.), Dkt. Nos. 376 (motion to change venue), 684 (second motion to change venue), 980 (third motion to change venue), and 1108 (fourth motion to change venue)); *see also United States v. Tsarnaev*, No. 13-cr-10200, 2015 WL 45879, at *1 (D. Mass. Jan. 2, 2015) (denying the defendant's second motion to change venue and noting that he had submitted almost ten thousand pages of supporting documents to accompany his first motion to change venue); *United States v. Tsarnaev*, No. 13-cr-10200, 2015 WL 505776, at *1 (D. Mass. Feb. 6, 2015) (denying the defendant's third motion to change venue and noting that the "venue issues" had been "thoroughly briefed and rebriefed"); *In re Tsarnaev*, 780 F.3d 14, 29 (1st Cir. 2015) (discussing the polling data in Tsarnaev's third motion for a change of venue in an opinion denying his second petition for a writ of mandamus to compel a change of venue). Suffice to say, the issue of venue was exhaustively litigated in the *Tsarnaev* case. Mr. Bruck was

226

certainly familiar with the process for seeking a change in venue in federal court, and the reasons why such an approach may or may not be preferable.

In short, Mr. Bruck was experienced and uniquely qualified to make this type of "tactical decision." *See Parnell*, 149 F.4th at 1280; *see also United States v. Higgs*, 663 F.3d 726, 739 (4th Cir. 2011) (deferring to the decision of the petitioner's "experienced, capital defense counsel"). Defendant tries to insinuate negligence by other trial counsel, citing their admissions that they deferred to Mr. Bruck, but that deference was certainly reasonable as well, considering Mr. Bruck's stature among capital defense attorneys in general, his specific experience with high profile, high publicity cases, and his even more specific experience in South Carolina.

Mr. Bruck and his colleagues on the federal defense team made a strategic decision to invoke Defendant's speedy trial rights and try to beat the state to trial. Given this priority, they reasonably chose not to seek a change of venue or an intra-district transfer because they did not want to delay the federal trial. Moreover, Mr. Bruck repeatedly affirmed his belief that an impartial jury could be drawn from Area C, and the defense clearly preferred to draw their jury from the Lowcountry as evidenced by their rejection of the Court's offer to use a state-wide venire. These strategic decisions should not be second-guessed. Defendant has failed to establish that his attorneys were deficient in his representation.

### b. Counsel satisfied the performance prong of *Strickland* because a motion to change venue would have been meritless.

Defendant also cannot show that trial counsel was ineffective for filing a motion to change venue because any such motion would have been meritless. As discussed below, to succeed on a motion to change venue a defendant must show either circumstances that support presumed prejudice, or he must demonstrate actual prejudice after *voir dire* of prospective jurors. *Bakker*,

925 F.2d at 732. Defendant's assertions fail to show either presumed or actual prejudice, therefore any motion to change venue would have been meritless.

> ### 2. Defendant Cannot Show Prejudice from His Counsel's Decision Not to Pursue a Change of Venue.

Regardless of whether trial counsel should have investigated and pursued a motion to change venue, he cannot establish prejudice under *Strickland* because the motion would have failed on its merits. As discussed above, a defendant can only obtain a change of venue due to pretrial publicity by establishing presumed prejudice or actual prejudice. *See Bakker*, 925 F.2d at 732; *see also Taylor*, 942 F.3d at 223. Defendant cannot establish either.

> #### a. Defendant fails to establish a presumption of prejudice.

Defendant first cannot show that he would have been able to establish that the pretrial publicity was "so extreme as to give rise to a presumption of prejudice." *Taylor*, 942 F.3d at 223. Cases where courts have presumed prejudice based solely on the content of media coverage and the breadth of its dissemination are extremely rare. *See, e.g., Skilling*, 561 U.S. at 381 ("A presumption of prejudice . . . attends only the extreme case."); *In re Tsarnaev*, 780 F.3d at 18 (presumption limited to "rare, extreme circumstances"); *Meeks*, 216 F.3d at 961 (the "presumed prejudice standard" is "demanding," "rarely applicable," and "reserved for an extreme situation") (internal quotation marks omitted). Indeed, the Supreme Court has only presumed prejudice based solely on pretrial publicity in a single case, *Rideau v. Louisiana*, 373 U.S. 723 (1963).[65]

---

[65] The Supreme Court also found that trial publicity violated defendants' due process rights in two cases from the same era, *Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell,* 384 U.S. 333, (1966), which the defendant cites along with *Rideau*. However, the Supreme Court later distinguished *Estes* and *Sheppard* as involving "media interference with courtroom proceedings *during* trial." *Skilling*, 561 U.S. at 382 n.14 (emphasis in original); *see also Mammone v. Jenkins*, 49 F.4th 1026, 1043-44 (6th Cir. 2022). Defendant's reliance on these cases is, therefore, misplaced, as he "does not assert that news coverage reached and influenced his jury after it was empaneled." *Skilling*, 561 U.S. at 382 n.14.

In *Rideau*, the defendant's video-taped confession to bank robbery, kidnapping, and murder was repeatedly broadcast over the local television station in the small Louisiana parish where the crime occurred and was viewed by a substantial portion of the 150,000 people who lived there. *Id.* at 724-25. Three members of the jury that convicted Rideau and sentenced him to death had seen the televised confession, and two members of the jury were deputies with the sheriff's office that made the video. *Id.* at 725. The Supreme Court described the ensuing trial, which was held less than two months after the televised confession, as "kangaroo court proceedings" and reasoned that the "interview" was in reality the defendant's trial, conducted without regard for his constitutional rights to counsel, silence, and due process. *Id.* at 726-27. Nothing of the kind happened here.

The Supreme Court's most recent case addressing the issue was *United States v. Skilling*, where former Enron executive Jeffrey Skilling argued that he was denied a fair trial when the district court presiding over his criminal fraud trial in Houston, Texas, where Enron was headquartered, refused to grant his motions for a change of venue. In affirming the district court's decision on the issue of venue, the Supreme Court identified at least four characteristics that distinguished that case from *Rideau*.[66]

---

[66] The defense treats these four distinguishing observations as "factors" to be considered by a trial court weighing a motion for a change of venue, or by extension, courts evaluating claims of ineffective assistance of counsel premised on failure to seek a motion for a change of venue. However, "the *Skilling* approach" is "designed for and best suits appellate review" not "evaluation by trial attorneys (or a trial judge) trying to assess the merits of a motion to change venue based on presumed jury prejudice." *Parnell*, 149 F.4th 1278-79. For example, the fourth *Skilling* factor," which the Supreme Court described as "of prime significance" in its analysis looks at whether the jury acquitted the defendant on any of the charged conduct. *Skilling*, 561 U.S. at 384-85. Obviously, "[t]rial counsel . . . cannot possibly consider that supremely significant factor before the verdict comes in, which is too late for venue motions." *Parnell*, 149 F.4th at 1278-79. Thus, contrary to Defendant's suggestion, *Skilling* does not stand for the broad proposition that courts must presume prejudice in every case where a defendant has been subjected to negative media attention and not every one of the factors identified by the *Skilling* Court is present. If Defendant's

The Court first emphasized "the size and characteristics of the community" where the crime occurred, and specifically, the fact that there were "more than 4.5 million individuals eligible for jury duty" in the Houston area. *Id.* at 382. The Court concluded that "[g]iven this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled" was "hard to sustain." *Id.* Second, the Court considered the nature of the media coverage, observing that "although the news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* Third, the Court considered the time that elapsed between the alleged crime that led to Enron's collapse and Skilling's trial more than four years later. Finally, the Court emphasized that Skilling's jury had acquitted him on nine of the 25 counts charged and concluded that "[i]t would be odd for an appellate court to presume prejudice in a case in which jurors' actions run counter to that presumption." *Id.* at 383. The Court described this final factor as being "of prime significance." *Id.*

Circuit courts have largely followed *Skilling's* example and distinguished *Rideau*, limiting its application to its extreme and unique facts. *See, e.g., In re Tsarnaev*, 780 F.3d at 22; *DeLisle v. Rivers*, 161 F.3d 370, 383-84 (6th Cir. 1998); *Wells v. Murray*, 831 F.2d 468, 472 n.3 (4th Cir. 1987) (describing *Rideau* as the only instance where the Supreme Court found that a presumption of prejudice should apply based solely on the nature of the pretrial publicity).

Defendant takes the opposite approach and misconstrues *Skilling* as representing the outer limits of permissibility. He begins by suggesting that the size of his prospective jury pool, which

---

position were the rule, courts would be required to presume prejudice for every defendant subject to bad publicity going to trial in a venue smaller than Houston less than four years after the alleged crime.

he describes as "just over a million people," favors a presumption of prejudice because it is smaller than Houston. (Dkt. No. 1077 at 210). *Skilling* does not stand for the proposition that the size of any jurisdiction smaller than Houston, which is the fourth largest city in the United States, weighs in favor of presuming prejudice. Rather, the Supreme Court was distinguishing the size of Houston from the Louisiana parish in *Rideau*, in which *a third* of the 150,000 residents had seen the broadcast of the defendant's staged, uncounseled, highly prejudicial confession. This is a far cry from Area C, which contains over a million people spread across the counties that made up Area C.

More importantly, the size of Area C is not the proper comparison in evaluating the strength of Defendant's argument had he attempted to challenge venue. This Court made it very clear to defense counsel that if Defendant was going to challenge venue, the Court would pull the jury from a state-wide venire. (Dkt. No. 207 at 45). Indeed, the Government argued that the Court should use the state-wide venire to preclude the very argument Defendant is now trying to make. The record is clear that the only reason that Defendant's jury was drawn from Area C was because his counsel assured the Court that they had no present intention of seeking a change of venue and believed a fair and impartial jury could be drawn from Area C.

Had Defendant reversed course and moved for a change of venue, there is every reason to believe that the Court would have reverted to its original plan to use a state-wide venire. According to the United States Census Bureau, as of July 1, 2016, shortly before jury selection in this case, the population of South Carolina was 4,963,031, a number much closer to the 2010 population of the Greater Houston area (5,920,416) than it is to the 1961 population of Calcasieu Parish, Louisiana (150,000). *See Rideau*, 373 U.S. at 724.

The nature of the media coverage also fails to support a presumption of prejudice. As the Fourth Circuit noted in *Taylor*, "juror exposure to media coverage cannot by itself establish that a defendant was deprived of a fair trial, even if the publicity was pervasive, adverse, and voluminous." *Taylor*, 942 F.3d at 222. There is no shortage of examples where courts have rejected motions for a change of venue in high profile cases where the crimes alleged had a devastating effect on the communities in which they were tried. *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 29 (allowing the defendant's capital trial for bombing the Boston Marathon to proceed in Boston); *United States v. Bowers*, 18-cr-292, 2022 WL 825437, at *3 (W.D. Pa. Mar. 18, 2022) (allowing the mass shooter who attacked congregants at the Tree of Life Synagogue to be tried in Pittsburgh where the shooting occurred); *Skilling*, 561 U.S. at 385 (allowing the former CEO of Enron to be tried in Houston); *United States v. Moussaoui*, 43 F. App'x 612, 614 (4th Cir. 2002) (per curiam) (allowing the case against the "20th hijacker" in 9/11 attacks to proceed in the Eastern District of Virginia near the Pentagon); *United States v. Salameh*, 93-cr-0180, 1993 WL 364486, at *2 (S.D.N.Y. Sept. 15, 1993), *aff'd,* 152 F.3d 88 (2d Cir. 1998) (allowing the first World Trade Center bomber to be tried in lower Manhattan); *People v. Manson*, 61 Cal. App. 3d 102, 192 (Cal. Ct. App. 1976) (allowing cult leader Charles Manson to be tried in Los Angeles); *People v. Berkowitz*, 93 Misc. 2d 873, 879 (N.Y. Sup. Ct. 1978) (allowing the serial killer known as the "Son of Sam" to be tried in Brooklyn).

While there is no question that Defendant faced significant negative media coverage, it is readily distinguishable from the televised confession that gave rise to the Court's unique ruling in *Rideau*. The *Rideau* Court was clearly concerned about the voluntariness of the defendant's statement and the fact that he had given it without the benefit of an attorney or the advice of his rights. *See Rideau*, 373 U.S. at 726-27. No such concerns are present here. Moreover, many of the

statements attributed to Defendant in this case were published by him immediately before the attack on a website he specifically created to spread his racist views. Other statements were recounted by the survivors, one of whom he intentionally left alive so she could tell the story of what he had done. The fact that Defendant's hateful motives were published was an intentional part of his plan. And although Defendant also confessed, the videotape of his confession was played publicly for the very first time during the guilt phase of trial, not broadcast prior to trial across a small media market. These facts bear no resemblance to the "kangaroo court proceedings" that were publicized in *Rideau*.[67]

Additionally, the way that Defendant has presented his alleged examples of negative media coverage makes it impossible to fairly evaluate the coverage. In support of his claim that his attorneys should have sought a change of venue, Defendant submitted the declaration of Dr. Bryan Edelman, a social psychologist and trial consultant. While Dr. Edelman's declaration is full of citations to academic papers, studies, and even caselaw, the examples he offers of negative statements about Defendant in the "media" are devoid of citations, and, in most instances, any attribution at all. (*See* Dkt. No. 1077-55 at 9-20). The Court cannot determine where those unsourced statements came from, who made them, how widely they were disseminated, and in what context they were published. Dr. Edelman's lengthy lists of examples mix what appear to be quotes from Defendant, victims, various elected and appointed officials, and reporters. *Id.* Many of the most inflammatory statements read like opinion pieces, public comments on news articles, or even social media posts. Dr. Edelman's declaration fails to contextualize the media coverage,

---

[67] Also in stark contrast to *Rideau*, much of the pretrial publicity in this case focused on statements by certain family members of deceased victims expressing mercy and forgiveness for the defendant. *See, e.g.*, ABC News, *Dylann Roof Hears Victims; Families Speak at First Court Appearance: I Forgive You*, June 19, 2015, available at https://abcnews.go.com/US/dylann-roof-hears-victims-families-speak-1st-court/story?id=31896001

as it does not perform any comparable analysis of nationwide media coverage. He highlights the number of articles in the Charleston area, but that number is not particularly meaningful without reference to the number of similar stories in media markets nearby or nationwide. These lists are completely unhelpful and, without proper attribution, should not be given any weight by the Court.

Defendant's arguments regarding the timing of his trial are similarly misplaced. While the 20 months that elapsed between Defendant's crime and his trial are less than the four-plus years in *Skilling*, it is not an unreasonable period of time for the trial of a criminal case where large teams of lawyers on both sides are working primarily or exclusively on that case. It is a far cry from *Rideau*, where all three broadcasts of the defendant's confession occurred prior to his arraignment, and his trial began less than two months after his arrest. *See Rideau*, 373 U.S. at 729 (Clark, J., dissenting) (describing the timeline of events).

Additionally, the compressed timeline in this case was largely within Defendant's control and was a product of his counsel's strategic decision to demand a speedy trial to ensure that the federal case was tried before the state case. As Mr. Bruck acknowledged, he would be in a difficult position complaining that the trial was approaching too rapidly, "since [he] was the one asking for the quick trial date." (Bruck Decl., Dkt. No. 1077-5 at 2).

In any event, *Skilling* does not stand for the proposition that a presumption of prejudice attaches in any high-profile case where the defendant is the subject of negative media attention and faces a trial in less than four years in a jurisdiction smaller than Houston. If this were the rule, venue transfers based on presumed prejudice would be extremely common instead of exceptionally rare.

Finally, Defendant claims that the verdict in the Michael Slager trial somehow tainted the jury pool, but he fails to show that the Court would have presumed prejudice had trial counsel

sought a venue change. As an initial matter, the fact that a Charleston jury deadlocked on the charges against Slager undermines Defendant's suggestion that the city of Charleston was a hotbed of unreasoned passion that swept jurors up in its wake. But most importantly, the same day that the Slager jury announced that it was deadlocked, Mr. Bruck filed a motion seeking a continuance and expanded *voir dire*, expressing concern that jurors might feel pressure to compensate for the fact that the Slager jury had failed to convict him. (*See* Dkt. No. 764). The Court promptly denied the motion, dismissing the notion that the Slager case would influence the jurors in the Roof trial as "utterly farfetched and illogical." (Dkt. No. 767 at 1). The Court's order demonstrates that it did not find the theory that jurors in the federal case would be influenced by developments in the Slager matter to be credible. Thus, even if counsel had raised the Slager case as a basis for a change of venue, the argument is unlikely to have succeeded.

### b. Defendant cannot establish actual prejudice caused by publicity.

If a defendant cannot show that prejudice should be presumed, he must establish "actual prejudice" based on *voir dire* responses or other evidence of bias. *See Bakker*, 925 F.2d at 734 (noting that where there is heavy pretrial publicity, "[t]he proper way to impanel [impartial] jurors is through a careful *voir dire*"). "Actual prejudice hinges on 'whether the jurors seated at trial demonstrated actual partiality that they were incapable of setting aside.'" *United States v. Quiles-Olivo*, 684 F.3d 177, 183 (1st Cir. 2012) (quoting *United States v. Angiulo*, 897 F.2d 1169, 1182 (1st Cir. 1990)). A "trial judge's estimation of a juror's impartiality" is entitled to considerable deference as the judge's "appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." *Skilling*, 561 U.S. at 386. Indeed, "[a] trial court's findings of juror impartiality may be overturned only for manifest error." *Mu'Min v. Virginia*, 500 U.S. 415, 428 (1991) (quotations omitted).

235

There is no constitutional requirement that a district court ask each juror about what he or she has read, heard, or seen about the case in the media. *Tsarnaev*, 595 U.S. at 313. Rather, "the district court's duty is to conduct a thorough jury-selection process that allows the judge to evaluate whether each prospective juror is 'to be believed when he says he has not formed an opinion about the case.'" *Id.* (quoting *Mu'Min*, 500 U.S. at 417). Even where *voir dire* reveals that prospective jurors are familiar with the case and may hold preexisting ideas about a defendant's guilt, the key inquiry remains whether the jurors "can lay aside their impressions or opinions and render a verdict based on the evidence presented in court." *Skilling,* 561 U.S. at 398-99 (cleaned up).

The Supreme Court's decision in *Irvin v. Dowd*, 366 U.S. 717 (1961), illustrates the type of evidence needed to demonstrate prejudice. The *Irvin* Court found that the trial court should have granted the defendant's motion for a change of venue, noting that well over half of the jury pool had to be excused for cause for "having fixed opinions as to the guilt of [the defendant]." *Irvin*, 366 U.S. at 727. Indeed, "almost 90% of those examined on the point… entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty." *Id.* at 727. Eight of the 12 jurors actually seated on the jury had formed an opinion that the defendant was guilty "and were familiar with the material facts and circumstances involved, including the fact that other murders were attributed to him." *Id.* Some of the seated jurors went as "far as to say that it would take evidence to overcome their belief," and one even admitted "that he could not give the defendant the benefit of the doubt that he is innocent." *Id.* (cleaned up).

In contrast, the Supreme Court held in *Patton v. Yount*, 467 U.S. 1025 (1984), that no change of venue was required even though "*voir dire* showed that all but 2 of 163 veniremen questioned about the case had heard of it, and that 126, or 77%, admitted they would carry an opinion into the jury box . . . . [and that] 8 of the 14 jurors and alternates actually seated admitted

that *at some time* they had formed an opinion as to [the defendant's] guilt." *Id.* at 1029-30 (emphasis added). The Court found these facts did not warrant a change of venue and that the trial court's careful *voir dire* was sufficient to ensure that an impartial jury was ultimately seated. *Id.* at 1034.

Defendant's proffered evidence of actual prejudice would not have supported a motion for a change of venue. Defendant first incorporates his arguments from Claim One that the jurors who convicted and sentenced him were "actually biased." (Dkt. No. at 216). The argument fails for all the reasons Claim One fails. *See supra* at 16-54. However, that argument also misconstrues the proper inquiry.

To establish "prejudice" for purposes of ineffective assistance of counsel based on a failure to move for a change of venue, Defendant must "*[a]t a minimum*" show that the "motion for a change of venue would have been successful." *Mu'Min v. Pruett*, 125 F.3d at 199 (emphasis added). That necessarily requires Defendant to show that trial counsel would have been able to support the motion with competent evidence. But Defendant has not alleged that his trial attorneys were aware of the jurors' "lies" that are alleged in Claim One, or that they were deficient in failing to uncover these "lies." Trial counsel could not have prevailed on a motion to change venue "alleging actual prejudice" based on facts they did not know and had no reason to know. Accordingly, Defendant cannot make the "minimum showing" that he would have prevailed on a motion to change venue based on "actual prejudice," which is fatal to his claim of prejudice under *Strickland*.

Defendant's remaining evidence of "actual prejudice" is weak. He argues that "the results of the jury selection process and verdict strongly suggest that some jurors may have shown actual partiality or hostility that they were incapable of laying aside." (Dkt. No. 1077 at 216). As an initial

matter, the verdict rendered at the end of a trial is not evidence of "actual prejudice" that is available to a defense attorney seeking a change of venue before the trial begins, just like the proffered evidence of alleged juror dishonesty. *See Parnell*, 149 F.4th at 1278–79. And even if this were an appropriate consideration, the fact that the jury quickly convicted Defendant and recommended the death penalty is neither surprising nor probative of prejudice given the heinous nature of the crime, Defendant's complete lack of remorse, and his choice to present nothing in the way of mitigation.

The "results of the jury selection process" also would not have supported a motion for a change of venue based on actual prejudice. Defendant begins by observing that "[e]very seated juror knew of the case." (Dkt. No. 1077 at 216). But "[n]otorious crimes are almost, as a matter of necessity, brought to the attention of those informed citizens who are best fitted for jury duty," *Tsarnaev*, 595 U.S. at 312 (cleaned up), and "and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 561 U.S. at 381 (emphasis in original). Nor would a new venue have changed the fact that most reasonably informed people would be aware of this case. As Mr. Bruck himself observed, "[t]his is obviously a case that publicity is nationwide, not just statewide." (Dkt. No. 207 at 45); *see also In re Tsarnaev*, 780 F.3d at 22 (observing that while "there has been ongoing media coverage of the advent of the trial and petitioner's pre-trial motions, both locally and nationally[,]" "that would be true wherever trial is held").

Next, Defendant points out that "[n]early half" of the jurors (5 out of 12) "were from Charleston County." (Dkt. No. 1077 at 217). This is unremarkable. Accepting Defendant's claim that at the time Charleston County had less than 400,000 people and Area C had just over a million, (*see* Dkt. No. 1077 at 210), one would expect to have four or five members of a twelve-person jury be from Charleston County. Defendant has not shown that jurors from Charleston were inherently

suspect or presented any evidence that these five jurors were "actually prejudiced" against Defendant because they were from Charleston.

Defendant claims that "[o]ne seated juror from Charleston, in her questionnaire, expressed her 'disgust' at Dylann 'for commit[in]g such an act of violence and hate." (Dkt. No. 1077 at 217; Dkt. No. 1077-217 at 8-9). However, this same juror (485), indicated in the same questionnaire that she could "set aside what she had previously seen, read, or heard about this case and decide [it] based solely on the evidence presented in court and the judge's instructions on the law." *Id.* at 9. She affirmed that no information that she had received from any source would prevent her from being a fair and impartial juror. *Id.* at 10. She indicated in multiple places on the questionnaire that she did not have strong views about the death penalty. *Id.* at 14-16.

The Court also questioned Juror 485 thoroughly about her views. (*See* Dkt. No. 974 at 135-148). Juror 485 confirmed that she could set aside any information that she had previously heard or seen about the case and could decide the case exclusively on the information she received in court. *Id.* at 141. The Court asked Juror 485 about her statement of disgust at Defendant's crime in depth. *Id.* at 141-143. Juror 485 confirmed that she could put aside her feelings about the crime as it had been reported and judge the case based on the evidence in court. *Id.* at 142. She further indicated that her view of what would be a "fair verdict" would be "dependent on the evidence that's presented" and confirmed that she would not be trying to reach a particular verdict to please anyone. *Id.* at 143. She was asked about specific media reports she had seen and indicated that it would not interfere with her ability to be fair and impartial. *Id.* at 144.

Defendant did not request any follow-up questions and did not move to strike Juror 485 for cause. This is the only seated juror whose *voir dire* response Defendant cites as evidence for his claim of actual prejudice in Claim Nine. In other words, although Defendant appears to suggest

239

that this juror was the conspicuous canary in a coal mine whose responses should have alerted his lawyers to move for a change of venue, he neither requested follow-up questions nor moved to strike her from the jury. This argument strains credulity.

Finally, Defendant cites a few inflammatory comments in case-specific jury questionnaires from prospective jurors (18, 25, 75 & 238) who did not serve on the jury. (*See* Dkt. No. 1077 at 202). The Court struck these jurors for cause without requiring individual *voir dire*. (*See* Dkt. No. 486-1 at 1 (parties agreeing to strike Jurors 18 & 75), 486-3 at (defense moving to strike 25 & 238), 498 (granting joint motions and defense motions to strike)). The fact that Defendant can cherry-pick a few angry comments from four prospective jurors who did not even make it to *voir dire*, when the Court summoned well over a thousand jurors, does not indicate that the jury pool was so tainted by negative media as to require a change of venue. To the contrary, it shows that Mr. Bruck's plan—to use the questionnaires and voir dire to ferret out unsuitable jurors and then move for a transfer only if a fair and impartial jury couldn't be drawn—was reasonable.

Defendant's proffered evidence is a far cry from *Irvin*, where the Supreme Court found prejudice. Defendant has only noted that jurors knew of the case, many were from Charleston, and one juror expressed disgust for Defendant's crimes. Unlike *Irvin*, there were no jurors on Defendant's panel that were not able to presume his innocence. None said that they would have to hear evidence to overcome their beliefs about his guilt.

And unlike *Patton*, Defendant does not credibly or specifically allege that any of the seated jurors had formed a pre-trial opinion as to his guilt.

Defendant concludes that "few safeguards were in place to ensure impartiality" and claims that the jurors "were never fully vetted about the onslaught of coverage they were exposed to." (Dkt. No. 1077 at 217). These bald allegations completely ignore the extensive written

questionnaires that every juror filled out and the detailed, individualized *voir dire* conducted by the Court. Although Defendant complains that the jurors were not "fully vetted" about the media they were exposed to, he does not specifically explain how the Court's approach was constitutionally deficient.

In fact, this Court's procedures far exceeded all constitutional requirements. *See Tsarnaev*, 595 U.S. at 313 ("[T]here is no blanket constitutional requirement that [a trial court] must ask each prospective juror what he heard, read, or saw about a case in the media."). This Court's finding that the jurors it qualified were impartial was based on an extensive screening process that included the district's standard questionnaire, a case-specific questionnaire, and individualized, judge-directed *voir dire*. The Court asked every potential juror about their exposure to media coverage regarding Defendant (see questions 16-18 & 20-22 of the case specific questionnaire). The Court then followed up on the jurors' written responses with in-person questioning.[68] "This face-to-face opportunity to gauge demeanor and credibility, coupled with information from the questionnaires regarding jurors' backgrounds, opinions, and sources of news, gave the court a sturdy foundation to assess fitness for jury service." *Skilling*, 561 U.S. at 395. And if Defendant believed the questioning was truly insufficient, he had every opportunity to propose additional questions to the Court (which he successfully did on several occasions).

In conclusion, any motion to change venue would have failed for lack of presumed or actual prejudice. Because any motion to change venue would have been unsuccessful, Defendant cannot

---

[68] In *Tsarnaev*, a group of retired judges and former federal prosecutors supporting Tsarnaev's argument as amici curiae and argued that the district court did not adequately probe the jurors regarding the media reports to which they had been exposed. That brief specifically highlighted the *voir dire* conducted by this Court in this case as a model for the way it should be done. *See* Brief for Retired Federal Judges and Former Federal Prosecutors as Amici Curiae Supporting Respondent, *United States v. Tsarnaev*, 2021 WL 3912236, at *18–21.

have suffered *Strickland* prejudice from trial counsel's decision not to tilt at that particular windmill. *See Chandler v. McDonough*, 471 F.3d 1360, 1362 (11th Cir. 2006) (noting that *Strickland* prejudice for failure to seek a venue change requires a showing that the trial court would have or should have granted the motion if it were presented).

Trial counsel therefore did not render deficient performance.

### c.  Defendant cannot show prejudice under *Strickland*.

Defendant also did not suffer *Strickland* prejudice because there is no reasonable probability that, even if he were tried in another venue, the jury would have decided the sentence any differently. To resolve the prejudice inquiry, the Court must determine whether, but for counsel's deficient performance, there is a reasonable probability that Defendant would have obtained a different outcome. *See Braun v. Ward*, 190 F.3d 1181, 1189 (10th Cir. 1999) (finding that the state court correctly applied federal law in determining that a defendant could not prevail on his *Strickland* claim because he failed to show a reasonable probability that the outcome of the death penalty would have been different in another venue).

There is no reasonable probability that Defendant would not have been sentenced to death regardless of venue, and Defendant does not even allege that such a probability exists. Defendant's crime was infamous, its effects reverberated nationwide, and there was not a district or division in the country that was not touched by the widespread media coverage. And even if Defendant were able to find a jury pool that somehow escaped hearing about his crimes, there is little probability that, hearing the evidence presented at trial and hearing nothing in mitigation, that jury would not sentence him to death.[69]

---

[69] Defendant may argue that a motion for change of venue would have given trial counsel more time, which would have in turn somehow smoothed the tensions between him and counsel, prevented his motion to represent himself, and led to a fulsome mitigation presentation. The Court

Defendant cannot show any prejudice from trial counsel's decision not to seek a change in venue, because that motion would have been denied and because there is no reasonable probability that a different jury would have declined to impose a death sentence.

### D. Conclusion

Trial counsel made a deliberate, strategic decision to have Defendant tried in federal court with a jury drawn from Area C. That decision is supported by several important considerations. Questions about which venue or jury pool will be most advantageous in a particular case are the type of strategic decisions upon which capable counsel may disagree, and that courts properly refuse to second-guess. And even if the Court were to find that trial counsel's decision was unreasonable, there is no evidence to establish that a motion to change venue would have been successful or that Defendant would not have received a death sentence from a different jury. Defendant is not entitled to relief on Claim Nine.

### XI.     DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM TEN

Defendant claims that his Sixth Amendment right to an impartial jury was violated because the Court did not strike three potential jurors for cause based on their views regarding the death penalty. (Dkt. No. 1077 at 217-18). Defendant is not entitled to relief on this claim because it is procedurally defaulted, and Defendant cannot show cause or prejudice to excuse the default because the claim is meritless.

---

should decline to consider this completely speculative chain of possibilities. And in any event, even if counsel had presented every scrap of mitigating evidence, there is no reasonable probability that a jury would have not imposed a death sentence. *See supra* at 165-68.

### A. <u>Argument</u>

Defendant's claim should be denied as procedurally barred. Further, Defendant cannot establish cause and prejudice to excuse the procedural bar because the underlying claim is meritless and would not have changed the outcome of the appeal.

#### 1. The Claim is Procedurally Barred.

If a defendant could raise a claim on direct appeal but does not do so, he cannot raise the claims in a § 2255 motion. *See United States v. Pettiford*, 612 F.3d 270, 280 (4th Cir. 2010). Record-based claims are the type that can normally be fully and completely resolved on direct appeal. *See Bousley*, 523 U.S. at 622 (claim based completely on a plea colloquy transcript was one that could have been brought on direct appeal and was procedurally defaulted). Here, Defendant bases his entire claim on jurors' answers from the jury questionnaires and during individual *voir dire*, materials that were available at the time he filed his appeal. (Dkt. No. 1077 at 217-41). His claim is therefore entirely record-based and could have been raised during his direct appeal. Because Defendant could have raised the claim on direct appeal but did not do so, the claim is procedurally barred.

#### 2. Defendant Cannot Establish Cause and Prejudice to Excuse the Procedural Bar Because the Underlying Claim is Meritless and Would Not Have Succeeded on Appeal.

A defendant can avoid procedural default by showing cause and prejudice to excuse the default. *Pettiford*, 612 F.3d at 280. "The existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." *United States v. Mikalajunas*, 186 F.3d 490, 493 (4th Cir. 1999). Apparently recognizing that his claim is barred, Defendant attempts to avoid default by asserting,

in one sentence, that appellate counsel was ineffective for not raising the claim on appeal. (Dkt. No. 1077 at 241).

Ineffective assistance of appellate counsel is judged by the same standard as ineffective assistance of trial counsel, which asks whether an attorney's deficient performance was prejudicial to the defendant's case. *See United States v. Mason*, 774 F.3d 824, 828 (4th Cir. 2014) (citing *Strickland*, 466 U.S. at 687-88).[70] Appellate counsel need not raise every meritorious claim on appeal, and counsel will only be found ineffective when they "ignore[] issues [that] are clearly stronger than those presented." *Mason*, 774 F.3d at 828-29 (quoting *Smith v. Robbins*, 528 U.S. 259, 288 (2000)). Furthermore, even if counsel unreasonably ignores a meritorious appellate issue, counsel is not constitutionally ineffective unless there is a reasonable probability that, had counsel raised the issue on appeal, the defendant would have prevailed. *Robbins*, 528 U.S. at 285.

Defendant cannot establish cause and prejudice based on ineffective assistance of appellate counsel. As an initial matter, Defendant only presents one conclusory sentence to support his assertion that appellate counsel was ineffective. He fails to provide any explanation for why appellate counsel was ineffective in not presenting this claim on appeal, nor does he claim that he suffered any prejudice from that omission. The conclusory nature of the allegations alone dooms his attempt to avoid the procedural default. *See Sampson v. United States*, 13-cr-0357, 2018 WL 3533549, at *7 (D. Md. July 23, 2018) (holding that a "single, conclusory sentence" arguing that a claim should not be barred due to ineffective assistance of counsel was insufficient to show cause and prejudice); *Christian v. United States*, 1:16-cr-207, 2020 WL 3244008, at *4 (E.D. Va. June 15, 2020) (stating "only 'Ineffective Assistance of [Appellate] Counsel'" as a reason for not raising a claim on direct appeal was "insufficient to establish cause and prejudice.").

---

[70] The general ineffectiveness standard is discussed above, *see supra* at 73-75.

But aside from the insufficiency of the allegations, Defendant's ineffectiveness argument fails because the underlying jury claim is meritless and would have failed on appeal.

### a. The jury claim is meritless because Defendant waived it.

"Where the basis for a challenge to a juror could be timely shown the failure of the defendant to object at the inception of the trial constitute[s] a waiver of his right to challenge the composition of the jury." *United States v. Harris*, 530 F.2d 576, 579 (4th Cir. 1976); *see also United States v. Johnson*, 688 F.3d 494, 500-01 (8th Cir. 2012) (failure to move for the removal of a juror for cause constituted waiver of the claim); *United States v. Brazelton*, 557 F.3d 750, 752-55 (7th Cir. 2009) (defendant waived challenge to a juror by not making a cause challenge during *voir dire*). Waiver of that right precludes even plain error review on appeal. *See United States v. David*, 83 F.3d 638, 641 n.5 (4th Cir. 1996) (discussing the difference between "waiver" and "forfeiture") (abrogated on other grounds). Because Defendant chose not to challenge any of the identified individuals for cause after *voir dire*, he waived his right to challenge these jurors, and the claim would have been unreviewable on appeal.

Each individual in the venire filled out a standard questionnaire and a case-specific supplemental questionnaire before jury selection commenced. (Dkt. No. 433). The supplemental questionnaire asked several questions related to the death penalty, including open ended questions about the potential jurors' views on the sentences of death and life without the possibility of parole (Questions 28A, 28B, and 29), a question asking them to rate their support for the death penalty on a scale from one to seven (Question 30), questions asking whether they believe that the death penalty should always be imposed in certain circumstances that applied in Defendant's case (Questions 31A through D), a question asking them to select statements regarding the death penalty that most accurately reflects their views (Question 32), and a question asking them if they had an

opinion on whether Defendant should receive a death sentence (Question 33). *Id*. at 14-17. After the individuals filled out their questionnaires but before *voir dire* began, the Court identified several potential jurors, including Jurors 93 and 166, whose questionnaire responses indicated they may not be qualified. (Dkt. No. 566 at 1). The Court asked the parties to confer and provide their positions on whether those jurors should be struck for cause. *Id*. Defendant asked that all listed jurors be struck, but the Government asked that some jurors, including Jurors 93 and 166, be left in the pool and subjected to additional questions. (Dkt. Nos. 610 at 1-3; 611 at 1). The Court ultimately declined to strike Jurors 93 and 166. (Dkt. No. 613 at 1-2). Defendant then asked the Court to specifically question Juror 93 about her responses to Questions 28A, 29, 31B, and 32, and asked for Juror 166 to be questioned about his responses to Questions 28A, 28B, 29, 30, 31, and 33. (Dkt. No. 524-1 at 25, 46).

During individual *voir dire*, the Court questioned each of the challenged jurors, and asked Jurors 93 and 166 about the responses to their questionnaires that Defendant had highlighted. *See* (Dkt. Nos. 919 at 124-25, 128-129; 920 at 92-100).[71] After several questions and answers on those and other subjects, the Court asked whether there was "[a]ny motion from the defense?" as to Juror 93, and Defendant answered "No." (Dkt. No. 919 at 133). After questioning Juror 166 at length, the Court asked Defendant whether he had "any follow-up questions?" and Defendant responded, "No motions." (Dkt. No. 920 at 102). The Court then asked if Defendant had any motions, and Defendant responded, "No motions," and Juror 166 was deemed qualified. *Id*. After the juror was qualified and the Court recessed for lunch, Defendant filed a motion, through standby counsel, requesting additional questioning. (Dkt. No. 684). The Court denied that motion as untimely, based on Defendant's statement during *voir dire* that he had no further questions. (Dkt. No. 733). After

---

[71] Defendant did not propose any questions for the Court to ask Juror 466.

the Court questioned Juror 466, it asked whether the defense had any motions or questions regarding Juror 466, Defendant responded, "No questions, no motions." (Dkt. No. 974 at 111).

After the parties exercised their peremptory strikes, the Court again asked whether the parties had any motions and trial counsel, who was allowed to participate in exercising peremptory challenges on Defendant's behalf, responded "None, your honor, thank you." Jury Selection Tr. at 13, Dec. 7, 2016 (Dkt. No. 976).

Defendant was offered an opportunity to challenge the jurors for cause after knowing their answers on the questionnaires and hearing their answers to questions during *voir dire*. While he asked that Jurors 93 and 166 be struck before *voir dire*, he explicitly declined to challenge any of them for cause after they were questioned in *voir dire*. Other than an untimely request for additional questioning of Juror 166, he did not ask for any additional questions at the end of each juror's interrogation. He therefore waived any challenge to those jurors, and the Fourth Circuit would not have even reviewed it on appeal. As such, appellate counsel cannot be said to have been ineffective for failing to raise a clearly meritless claim and there is no reasonable probability that Defendant would have succeeded on appeal if the claim had been raised.

### b. The jury claim is meritless because no unqualified individual served on the jury.

Appellate counsel was also not ineffective for omitting the jury claim on appeal because Defendant could not show that an unqualified juror sat on his jury. Defendant was entitled to a jury comprised of individuals whose views on the death penalty do not "prevent or substantially impair the performance of [their] duties as [jurors] in accordance with [their] oath[s]." *United States v. Barnette*, 211 F.3d 803, 811 (4th Cir. 2000) (quoting *Wainwright v. Witt*, 469 U.S. 412, 420 (1985)). But the Constitution is only violated if an impaired individual actually serves on the jury. *See United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000). If an unqualified individual

248

is not struck for cause but Defendant exercises a peremptory challenge to oust that individual, there is no constitutional violation. *See id*. at 316-17.

While Defendant identifies three potential jurors that he believes were not qualified to sit on his jury due to their views on the death penalty, none of those individuals sat on the jury that eventually sentenced him to death. (*See* Dkt. No. 779). Defendant states that he would have used his peremptory challenges to remove other jurors that "expressed support for the death penalty" but he does not claim that those other unidentified jurors were unqualified due to their views on the death penalty. (Dkt. No. 1077 at 241). In light of his failure to identify any juror that sat on his jury that should have been removed for cause due to their views on the death penalty, his claim would have failed on appeal.

>           **c. The jury claim is meritless because the Court did not abuse its discretion in deeming the identified individuals qualified to serve on the jury.**

Even if Defendant could overcome the first two hurdles of waiver and the absence of any unqualified juror on his jury, his claim would still be meritless because the Court did not abuse its discretion in finding the three jurors were qualified.

A court may properly excuse a prospective juror for cause because of his or her death penalty views if those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)); *see also Morgan v. Illinois*, 504 U.S. 719, 728 (1992). Both extremes—those who would automatically vote to impose a death sentence and those who would automatically vote to acquit or impose a life sentence—must be eliminated under this standard. *Morgan*, 504 U.S. at 734 n.7. The trial judge must be left with a "definite impression" that the juror would not be able to faithfully and impartially follow the law applicable to capital trials. *Witt*,

469 U.S. at 425-26. But a juror is not partial merely because he or she states personal support or even preference for capital punishment, so long as the juror can distinguish between his personal views and what the law requires. *See Miniel v. Cockrell*, 339 F.3d 331, 340 (5th Cir. 2003).

The trial court's determination that a potential juror would be unqualified to serve in a fair and impartial manner on a capital jury based on juror bias is a finding of fact entitled to great deference or a presumption of correctness. *Witt*, 469 U.S. at 428-29. Trial courts are afforded such deference because the decisions are based in large part on face-to-face credibility assessments of the prospective jurors. *See id.* at 426-29 (noting that the trial court's determination of juror bias "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province," and therefore "deference must be paid to the trial judge who sees and hears the jurors"); *see also United States v. Chanthadara,* 230 F.3d 1237, 1269 (10th Cir. 2000) (noting "the trial judge's unique ability to observe demeanor and assess credibility").

In light of those principles and the record of *voir dire* in this case, appellate counsel was not unreasonable for failing to challenge the qualification of ███████████████













### B. Conclusion

Defendant could have raised this claim on direct appeal but did not, and therefore the claim is procedurally barred. Further, Defendant waived any challenge to those jurors at trial; Defendant does not even contest that all of the jurors who sat on Defendant's jury were qualified; and all three jurors Defendant has identified (none of whom actually sat on the jury) would have been qualified to serve. Appellate counsel was therefore not ineffective for failing to raise the jury claim on direct appeal. Because the claim was not meritorious, there is also no reasonable probability that Defendant would have prevailed on appeal had that claim been raised. Since appellate counsel was not ineffective, Defendant has failed to establish cause and prejudice to excuse the procedural default of Claim Ten.[72]

## XII. THE DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM ELEVEN

In Claim Eleven, Defendant contends that his counsel, Mr. Bruck, provided constitutionally ineffective assistance by choosing to cross-examine the Government's first witness, Felicia Sanders, and by failing to raise timely objections to certain parts of her testimony. This claim should be denied. Trial counsel cross examined Ms. Sanders with the specific purpose of eliciting testimony that, in counsel's view, could serve as potential mitigation evidence for Defendant. This strategy was not unreasonable and caused Defendant no prejudice.

### A. Testimony of Felicia Sanders

Ms. Sanders described the Bible study at Mother Emanuel on the evening of June 17, 2015, and introduced each of the parishioners, including her son Tywanza, her granddaughter K.M., and her aunt Susie Jackson, who were present that night. (*See* Dkt. No. 893 at 55-79). She recounted

---

[72] Even if the Court chooses not to apply the procedural bar, Claim Ten still fails as a matter of law because Defendant waived his challenge to the jurors, no unqualified juror actually served on his jury, and none of the identified jurors were unqualified under the law.

how the congregants welcomed Defendant, offering him a Bible and a seat beside Reverend Pinckney. *Id.* at 81. She recalled thinking Defendant "was somebody coming in to seek the Word" and even described how he chuckled at a humorous story told by Reverend DePayne Middleton Doctor. *Id.* At the end of the Bible study, as participants stood to pray and closed their eyes, she heard a loud sound, saw Defendant holding a gun, and realized that he had shot Reverend Pinckney. *Id.* at 82.

Ms. Sanders described how she covered her granddaughter, K.M., trying desperately to keep K.M. quiet. *Id*. at 83-84. As she lay there, her aunt Susie Jackson and her son Tywanza fell beside her, and she dragged her feet through the blood pooling on the floor so that Defendant would believe that she had been shot as well. *Id.* at 84. Ms. Sanders recounted how Defendant approached the only other surviving congregant, Polly Sheppard, asked her if he had already shot her, and told her he was going to leave her alive because he wanted her to tell the story of what he had done. *Id*.

Although he had already been shot, Tywanza Sanders courageously stood up and asked Defendant why he was doing what he was doing. *Id*. As she testified, Ms. Sanders confronted Defendant, saying, "the defendant, over there with his head hang down, refusing to look at me right now, told my son, I have to do this. I have to do this because you are raping our womens [sic] and y'all taking over the world." *Id.* at 84-85. Tywanza Sanders pleaded, "[Y]ou don't have to do this. You don't have to do this. We mean you no harm. We don't mean you no harm," at which point Defendant shot him approximately five more times. *Id*. at 85. After describing this horrific series of events, Ms. Sanders recalled:

> I was just waiting on my turn. Even if I got shot, I didn't want my granddaughter to be shot. I was just waiting on my turn. It was a lot of shots. Seventy-seven shots in that room, from someone who we thought was there before the Lord, but in return, he just sat there the whole time evil. Evil. Evil as can be."

*Id.* at 85.

Ms. Sanders explained that even as she begged her son to lay down and wait for help, Tywanza crawled toward his great aunt Susie Jackson and grasped a handful of her hair. Ms. Sanders watched as her son took his last breath. As she told the jury, "I watched my son come in this world and I watched my son leave this world." *Id.* at 86.

Ms. Sanders was understandably emotional by this point in her testimony and the Government requested a brief recess, which the Court granted. *Id.* at 86. During this recess, trial counsel Mr. Bruck objected to certain aspects of Ms. Sanders' testimony, including her statement that the parishioners had thought that Defendant was "there before the Lord, but in return, he just sat there the whole time evil. Evil. Evil as can be." *Id.* at 85, 87. The Court overruled the objection, finding that the statement was admissible as the observation of the witness. The Government added that the objection was also untimely, and the Court agreed. *Id.* at 86-87. Responding to the Government's argument about the timeliness of the objection, Mr. Bruck asked that "the record reflect that the witness was crying and understandably very upset during parts of her testimony," and explained that "it seemed inappropriate to respond." *Id.* at 88.

Ms. Sanders returned to the witness stand and testified that just before her son died, she told him, "I love you, Tywanza," and he replied, "I love you too, Mama." *Id.* at 89.

Mr. Bruck cross-examined Ms. Sanders, explaining that he intended to ask only a single question. He asked, "Do you remember the man who did this saying something about that he was only 21, and then talking about what he was going to do afterwards?" *Id.* at 89. Ms. Sanders answered, "Yes." Mr. Bruck then asked, "Could you tell us what he said?" Ms. Sanders responded, "He say he was going to kill himself." And then she added, "And I was counting on that. He's evil. There's no place on earth for him except the pit of hell." Mr. Bruck repeated the portion of the

testimony he was attempting to elicit without Ms. Sanders' commentary, "He said that he was 21? And then that he was going to kill himself when he was finished?" Ms. Sanders replied, "Send himself back to the pit of hell, I say." *Id.* at 89. Mr. Bruck then sought to clarify that the defendant's statement had not included her commentary. "Did—he didn't say that though. About hell. He just said he was going to kill himself?" Ms. Sanders replied, "That's where he would go, to hell." At this point Mr. Bruck ended the examination, saying, "Yes, ma'am. I'm so sorry. Thank you." *Id.* at 89-90.

### B.  Motion for Mistrial and Curative Instruction

The next day, the defense moved for a mistrial on the basis of Ms. Sanders' testimony. The Court denied the motion for a mistrial and a motion to strike the testimony, (Dkt. No. 894 at 213-14), but did provide the jury with the following cautionary instruction:

> I want to remind you that the decisions this jury must make, whether the defendant is guilty or not guilty, and if we come to a sentencing phase, the appropriate sentence, is always your decision to make. It is not the decision of this Court or the attorneys or the witnesses. It always will be yours.

*Id.* at 215-16.

### C.  Argument

Defendant claims that Mr. Bruck rendered ineffective assistance of counsel in his handling of Felicia Sanders' testimony during the guilt phase of the trial. While giving her harrowing eyewitness account of the shooting, Ms. Sanders referred to Defendant as being "evil." (Dkt. No. 893 at 85). Later, Mr. Bruck cross-examined Ms. Sanders and asked her whether the defendant had mentioned his age and what he planned to do after the crime. Ms. Sanders responded that Defendant planned to kill himself and again said he was "evil" and belonged in the "pit of hell." *Id*. at 89. Counsel repeated his question twice more, and she gave similar responses. *Id*. at 89-90.

Defendant claims counsel's conduct and his failure to lodge contemporaneous objections to Ms. Sanders' remarks amounted to ineffective assistance of counsel. Defendant is not entitled to relief on this claim because trial counsel made a reasonable, strategic decision to elicit certain facts on cross-examination of Ms. Sanders, and Defendant did not suffer prejudice from that decision.

### 1. Trial Counsel Made a Reasonable Strategic Decision to Cross-Examine Ms. Sanders.

Mr. Bruck's choice to cross-examine Ms. Sanders was a reasonable, strategic decision that was consistent with the overall theory of the defense mitigation strategy. Trial counsel was well aware during the guilt phase that they would not be representing Defendant during the penalty phase and would be precluded from presenting evidence of his youth and mental health conditions as mitigating evidence. The record shows that trial counsel decided to attempt to lessen the adverse impact of Defendant's decision to self-represent by injecting that evidence into the guilt phase.

There can be no serious question that this was a strategic choice. Trial counsel—in a pleading that was signed by Ms. Gannett and that listed Mr. Bruck, Ms. Stevens, and Ms. Paavola as co-signatories—expressly acknowledged that the defense purposefully crossed Ms. Sanders to elicit "that the defendant was 21 years old and expressed suicidal ideation on the night of the offense." (Dkt. No. 783 at 6). They argued to this Court that they should be permitted to elicit these facts and other mental health testimony during the guilt phase because they were particularly relevant to establish Defendant's state of mind at the time of the offense and to rebut the Government's evidence of his intent. *Id.* at 3-7. Trial counsel's conduct throughout the guilt phase confirms this strategy. Before Ms. Sanders took the stand, Mr. Bruck delivered an opening statement in which he repeatedly attempted to draw the jury's attention to Defendant's mental condition. Mr. Bruck used his opening statement to prompt the jury to consider why his client did

what he did, and what they could infer about his condition based on the apparent senselessness of his crime. *Id.* at 39 ("You're going to want to understand who this person was and why on earth he, of all people, would have caused so much harm in grief."); *id.* at 40 ("You also are going to have to ask the question why, and eventually you're going to have to do the best you can to answer it."); *id.* at 41 ("What does this crime and everything that led up to it tell us about this 21 year old?"); *id.* at 42 ("How much sense does this crime make? Does this make any sense at all? And if not, what does that tell you?"). Mr. Bruck was so committed to driving this point home that he continued to invite the jury to speculate whether Defendant had some mental health issue, despite the Court's repeated admonishments that he limit his arguments to issues relevant to the guilt phase.

Trial counsel continued to try to use the guilt phase witnesses as a vehicle to present evidence of Defendant's mental state, both by seeking to call expert witnesses and attempting to elicit mental health evidence on cross-examination even after admitting that it was not offered to negate any element of the defendant's charged offenses. (Dkt. Nos. 783 at 1; 795 at 5-11; 800 at 2; 899 at 1135-41). The Court foreclosed each attempt. (Dkt. Nos. 793; 896 at 439-45; 898 at 964-66; 899 at 1142-43).

Mr. Bruck returned to the same themes in his closing argument, noting again that he would not be representing Defendant in the penalty phase of the trial and flagging facts that might indicate he suffered from mental deficits. Counsel mentioned that Defendant was "wearing sweat pants underneath heavy jeans on June the 18th in the South Carolina heat," implied that the defendant's brain functioning was abnormal, referenced the irrational and illogical nature of his crime, and hinted that Defendant "might be delusional." (Dkt. No. 960 at 1203, 1212-13). Mr. Bruck made

these arguments despite repeated objections from the Government, which were sustained by the Court in almost every instance.

Counsel's actions show a deliberate and considered strategy. Mr. Bruck knew there was no way to deny that Mr. Roof had killed the nine parishioners at Mother Emanuel, and he was candid with the jury about this fact. (Dkt. No. 893 at 36, 40). He also knew that he would likely have no opportunity to present mitigating evidence at the penalty phase of the trial, as Defendant had made clear that he would be representing himself in that phase.

Faced with no plausible defense on the issue of guilt and no opportunity to present on the issue of mitigation, Mr. Bruck chose to use the guilt phase to present evidence about Defendant's background, youth, and mental health status at every turn.

Part of that approach involved highlighting the fact that Defendant was only 21 years old and that he had claimed to be suicidal, an argument Mr. Bruck specifically advanced during his closing argument. (Dkt. 960 at 1204 ("What could have left him so convinced that he was in a war and was required to sacrifice not only the lives of innocent people, but his own life as well at the age of 21.")). These are the exact facts that Mr. Bruck sought to elicit from Ms. Sanders during his cross-examination. The central thrust of the defense that Mr. Bruck and his colleagues advanced during the guilt phase of the trial was that Dylann Roof was willing to kill innocent people *and himself* at the age of 21 because there was something deeply wrong with him. And while Mr. Bruck made clear that he would probably not have the opportunity in the sentencing phase to present evidence about what that something could be, he wanted the jury to think about and weigh it in reaching their decisions.

That an experienced and respected advocate like Mr. Bruck was willing to persist in these arguments even when the Court had repeatedly ruled that they were improper shows that his

approach was the result of a strategic choice. Courts are appropriately "reluctant to second guess the tactics of trial lawyers." *Goodson v. United States*, 564 F.2d 1071, 1072 (4th Cir. 1977); *see also Tackett v. Trierweiler*, 956 F.3d 358, 374 (6th Cir. 2020) (observing that "trial counsel's tactical decisions are particularly difficult to attack"). "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *United States v. Jones,* 287 F.3d 325, 331 (5th Cir. 2002) (internal quotation marks omitted). "While some attorneys might consider the argument made by [the defendant's] counsel to have been a desperate appeal, it nevertheless was an appeal made with full knowledge of the facts and the law, and the options available to him." *Hunt v. Lee*, 291 F.3d 284, 295 (4th Cir. 2002) (cleaned up; quotation marks omitted).

Mr. Bruck clearly weighed the significant risks involved in questioning Ms. Sanders before he stood to cross-examine her. Defendant has submitted statements from Mr. Bruck's colleagues, attesting that co-counsel Ms. Stevens and a victim outreach expert cautioned Mr. Bruck against this course of action. (Dkt. Nos. 1077 at 244; 1077-6 at 3; 1077-7 at 3; 1077-5 at 11-12). Mr. Bruck's decision to cross-examine Ms. Sanders despite these warnings does not amount to deficient performance. As the Supreme Court has emphasized, the existence of varying strategies among attorneys representing a client is neither unexpected nor indicative of ineffectiveness. *See Strickland*, 466 U.S. at 689 (observing that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way"). Rather, these declarations indicate that Mr. Bruck's decision to cross-examine Ms. Sanders was a carefully considered choice. Proceeding despite objections from his co-counsel and members of his team indicates that Mr. Bruck believed there was substantial value to be gained from the cross-examination—value that, in his judgment,

outweighed the perceived risks raised by his colleagues. This approach reflects precisely the kind of strategic choice that the Supreme Court has described as "virtually unchallengeable." *Id.* at 690.

The strategic decision to cross-examine Ms. Sanders was also not objectively unreasonable. Mr. Bruck could clearly see that Ms. Sanders' testimony was going to have an emotional impact upon the jury. Moreover, Ms. Sanders had already recounted her observation that Defendant "sat there the whole time evil. Evil. Evil as can be." (Dkt. No. 893 at 85). She had already called the defendant out for refusing to even look at her. *Id.* at 84-85. And the Court had already denied Mr. Bruck's motion objecting to these comments. *Id.* at 87. At this point, Mr. Bruck faced a difficult choice. He could allow this powerful testimony from the Government's first witness to go completely unanswered, or he could run the risk inherent in cross examining an emotional, sympathetic witness and try to elicit facts that might persuade the jury that the Defendant was struggling with mental illness during the crime. That decision was reasonable, especially because trial counsel knew he would have no chance to present any such evidence during the penalty phase.

Defendant tries to frame trial counsel's decision as unreasonable by nit-picking the way he cross-examined Ms. Sanders. Defendant first faults Mr. Bruck for giving Ms. Sanders multiple opportunities to express her feelings by persisting in his questions. This "recasting of the pros and cons of trial counsel's decision amounts to Monday morning quarterbacking," *Stamper v. Muncie*, 944 F.2d 170, 178 (4th Cir. 1991), and ignores the reality that cross-examination is conducted one question at a time and requires split-second decision-making. "[A] defendant is not entitled to representation by a modern-day Clarence Darrow—mere competence will suffice." *Oyague v. Artuz*, 393 F.3d 99, 107 (2d Cir. 2004) (citation and quotation marks omitted). Moreover, as Mr. Bruck explained at the hearing on the motion for a mistrial the following morning, his view was that once Ms. Sanders had given her first answer, the damage was done. (*See* Dkt. No. 894 at 207

("The motion would have been the same whether it was said, one, two, three times. That made very little difference.")). It is a basic tenet of trial advocacy that attorneys should seek to avoid ending an examination on a bad note. Thus, it is not surprising that Mr. Bruck would attempt to gently redirect Ms. Sanders to answer his question without additional commentary.

Defendant also claims Mr. Bruck asked his question repeatedly because he could not hear adequately. (Dkt. No. 1077 at 245-46). That argument might explain why he asked the question a second time, but Mr. Bruck obviously heard the second answer because his follow-up question referenced it: "[H]e didn't say that though. About hell. He just said he was going to kill himself?" *Id.* at 90. Thus, Mr. Bruck's decision to persist in questioning Ms. Sanders after he received the initial answer cannot be blamed on his poor hearing. It was a strategic decision about trial tactics made by an experienced advocate, in a situation that any reasonable attorney would admit was difficult.

The same analysis applies to Defendant's argument that Mr. Bruck was ineffective for failing to make a contemporaneous objection to Ms. Sanders' statements. This too was a reasonable strategic choice. As Mr. Bruck explained both after Ms. Sanders' initial statement characterizing the defendant as "evil" and in the motion hearing the following morning, he concluded it would not be wise to lodge a contemporaneous objection given that the witness was an inspirational figure who was struggling through agonizing testimony. (Dkt. Nos. 893 at 88; 894 at 211-213). While the Court correctly refused to alter Rule 103's requirement that objections be made contemporaneously, the presiding judge, drawing on his own extensive trial experience, recognized that defense counsel had to make a difficult strategic choice about whether it was worth it to object:

> All of us sitting in the pit where you guys are now, and I did for over a hundred
> trials, you have to sit there and you have to make a judgement. And sometimes you

don't make the objection because you worry about jury reaction. It's just one of the things you do. . . . And I thought it was a *strategic call* on your part. And I can't have you second guessing your strategy and coming back later and then—it makes the trial unmanageable.

*Id.* at 211-212 (emphasis added). Mr. Bruck made a defensible strategic choice, and Defendant has not provided any compelling argument for second-guessing it now.

### 2. Defendant Cannot Show that He Was Prejudiced by Counsel's Cross-Examination of Ms. Sanders.

Even if Defendant could show that Mr. Bruck's cross-examination of Ms. Sanders constituted deficient performance, he cannot establish prejudice. In this regard, the Fourth Circuit's ruling affirming the defendant's conviction and sentence is highly instructive. On appeal, Defendant argued that Ms. Sanders' comments that he was "evil" and would go "to the pit of hell" were unduly prejudicial and violated his rights under the Eighth Amendment and the due process clause. *Roof*, 10 F.4th at 373. Reviewing this Court's decision not to strike the remarks for plain error, and its decision to deny the motion for a mistrial for abuse of discretion, the Fourth Circuit affirmed. *Id.* at 374-76.

The Fourth Circuit assumed that Ms. Sanders' remarks about Defendant were improper but "were not so egregious as to 'undermine the fundamental fairness of the trial and contribute to a miscarriage of justice.'" *Id.* at 375 (quoting *United States v. Young*, 470 U.S. 1, 16 (1985)). The court explained that, "[g]iven the aggravated and calculated nature of Roof's multiple murders— proven by overwhelming evidence—one victim's characterization of Roof as evil and deserving of hell is unlikely to have had any material effect on the jury's view of the case." *Roof*, 10 F.4th at 375. It also observed that these remarks did not "pervade the trial," and were but a small part of Sanders compelling testimony, which itself was only a portion of the overwhelming evidence against Defendant:

> [Sanders' comments] totaled just eight transcript lines out of forty-one pages of Sanders' eyewitness testimony, which included powerful descriptions of lying in her aunt's and son's blood, holding and fearing for her terrified granddaughter, and hearing her son say that he loved her before watching him take his last breath. The eight lines are further buried in over 2,300 pages of evidence and arguments presented to the jury during the trial at both the guilt phase and the penalty phase, and include testimony from two surviving witnesses and twenty-three victim-impact witnesses, each with his or her own emotional statements to share.

*Id.* Finally, the Fourth Circuit emphasized that the statements in question were never mentioned by the prosecution in either stage of the trial, that almost a month elapsed between the comments and jury's sentencing decision, and that the Court repeatedly instructed the jury that the decisions about guilt and sentencing belonged to the jury alone. *Id.* at 375-76.

While the Fourth Circuit's conclusions do not preclude this Court from conducting its own analysis of prejudice because of the differing review standards for ineffective assistance claims, its holding that it was unlikely that the testimony "had any material effect on the jury's view of the case" is persuasive, especially because the concept of prejudice necessarily encompasses the effect counsel's actions or omissions had on a proceeding. *See Allen v. United States*, No. 2:11CR192, 2016 WL 4385845, at *3 (E.D. Va. Aug. 15, 2016) ("In order to prove prejudice, the petitioner must show that the attorney's . . . poor performance had a material effect on the outcome of the case."). As powerful as it was, Ms. Sanders' testimony was only the first of the many agonizing accounts of loss that were presented to the jury. In the face of the incalculable suffering he inflicted, Defendant offered nothing, not a shred of mitigating evidence, not a hint of remorse. There is no reasonable basis to suggest that the jury would not have imposed a death sentence but for Ms. Sanders' remarks.

Indeed, the only support Defendant has mustered for his prejudice argument is a jurors' statements in his post-trial interview. The defendant quotes the following passage from the juror's remarks in a televised interview with a local news station on April 30, 2018. *Count on 2 News:*

268

*SEE MORE: Jury Foreman during Dylann Roof trial speaks out*, (April 30, 2018), https://www.counton2.com/news/local-news/see-more-jury-foreman-during-dylann-roof-trial-speaks-out/, last accessed on Oct. 12, 2025:

> When she said, I'm not sure the exact words, but it was something to the effect of, 'You deserve to be in the pit of hell,' the only time the entire time of the trial . . . the only time he had any communication from an emotional standpoint, when she said, 'the pit of hell,' he went 'Pfft.' That was it.

*Id.* at 249 (quoting (Dkt. No. 1077-56 at 1)).

Defendant argues that the juror's interview shows that "once [Ms. Sanders] made that statement, any ability he had to remain objective on the issue of both Dylann's guilty and any potential sentence for death was essentially destroyed." (Dkt. No. 1077 at 249). The juror's statements in the interview do not support that argument. It appears that Defendant is misinterpreting the statement, "That was it," to be an indication that this testimony was all he needed to hear to convict and sentence the defendant. However, a review of the live interview belies that notion. Rather, the juror stated that *Defendant* responded to Ms. Sanders' testimony with a dismissive sound ("Pfft") and "that was it." In context, it is clear that the juror was describing that this dismissive response was the only reaction that the defendant displayed to any of Ms. Sanders' emotional testimony.

The live interview indicates that it was Defendant's *response* to Ms. Sanders that caught the juror's attention. Nor was the juror misinterpreting the dismissiveness of that response or improperly assuming that the defendant was not sorry for his actions. The Government presented significant evidence that the defendant had absolutely no remorse for what he had done. (Dkt. No. 945 at 411-12, 417-35).

If the defense were genuinely seeking to identify the piece of evidence that pushed the juror over the edge in favor of the death penalty, they would have pointed out that he expressly identified

the fact was the "turning point" for him—that the defendant callously murdered eighty-seven-year-old Susie Jackson. Speaking of his decision to impose the death penalty, the juror said:

> Probably the one that turned it for me was, you know, Susie Jackson. She's eighty plus years old. I think he shot her six times at point blank range. Over her body. Six times. She was eighty plus. Really? You're done.

*Count on 2 News: SEE MORE: Jury Foreman during Dylann Roof trial speaks out*, (April 30, 2018), https://www.counton2.com/news/local-news/see-more-jury-foreman-during-dylann-roof-trial-speaks-out/ (last accessed Oct. 12, 2025). It was Defendant's horrific actions, not Ms. Sanders' testimony or Mr. Bruck's cross examination, that led this juror to vote for death.

### D.  Conclusion

Despite the overwhelming evidence against him, his total lack of remorse, and his intentional failure to offer a shred of mitigating evidence, Defendant seeks to blame his death sentence on a few harsh words from a grieving mother and the fact that Mr. Bruck was hard of hearing. These arguments are meritless. Mr. Bruck made a risky but understandable strategic decision to try to redirect the jury's attention away from the dramatic testimony to the issues on which the defense wanted the jury to focus during the penalty phase. Ms. Sanders resisted those attempts, and given the circumstances, Mr. Bruck was not in a good position to object to her answers. Trial counsel faced a difficult task because of Defendant's own choices. Defendant has not shown deficient performance by his attorney or resulting prejudice, and his arguments in Claim Eleven should be rejected.

## XIII.   THE DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM TWELVE

In Claim Twelve, Defendant asserts that trial counsel provided ineffective assistance of counsel by failing to adequately litigate dismissal of the charges against him. Specifically, he claims that counsel was ineffective in their arguments that (1) the § 924 counts should have been

dismissed because §§ 247(a)(2) and 249 do not qualify as crimes of violence; (2) § 924 is void for vagueness; (3) § 249 violates the First Amendment; (4) Congress lacked the authority to enact § 247(a)(2) under the Commerce Clause and § 249 under the Thirteenth Amendment, and these statutes are unconstitutional on their face and as applied to Defendant; (5) the Attorney General's certifications of the §§ 247(a)(2) and 249 should be invalidated because the State of South Carolina had charged Defendant with state law charges; and (5) convicting Defendant of the § 924(j) counts and the predicate crimes of violence violates the Double Jeopardy Clause. Each of these ineffective assistance of counsel claims should be denied on both procedural and substantive grounds.

*First*, the vast majority of Defendant's claims are procedurally unreviewable in a collateral attack under § 2255. Defendant already challenged on direct appeal most of the issues he reasserts in his petition—namely, whether §§ 247 and 249 qualify as crimes of violence, whether §§ 247 and 249 are constitutional; and whether the Attorney General's certifications are valid—and the Fourth Circuit squarely rejected those claims. Although framed as ineffective assistance, Defendant's claims will necessarily require the Court to revisit matters of law that the Fourth Circuit has already reviewed. Defendant should not be permitted to revive issues under the guise of a collateral attack on counsel's performance that the Fourth Circuit clearly decided against him. *See Dyess*, 730 F.3d at 360 (holding that a defendant may not relitigate matters that were considered on direct appeal).

*Second*, Defendant cannot show that he suffered any prejudice as required by *Strickland*, because each of his arguments fail under current law. The vast majority of Defendant's arguments are premised on the law that existed at the time of trial. Although those claims were not viable back then, the Supreme Court has issued several opinions since trial that make them wholly

271

meritless now. Defendant therefore cannot establish that he has been prejudiced under current law, and his ineffectiveness claims fail. *See Fretwell*, 506 U.S. at 371-72.

*Third*, Defendant cannot show counsel's performance was deficient because the vast majority of arguments he now advances are identical to the arguments counsel already raised before this Court and the Fourth Circuit.

*Finally*, Defendant fails to identify actual prejudice arising from any alleged deficiency of trial counsel's performance. Instead, his claims of prejudice are based on a cascading set of speculative—and entirely unfounded—assumptions, including that had trial counsel made better arguments in their briefs, Defendant would abandon his unflinching opposition to the presentation of mental health mitigation evidence during the penalty phase. (Dkt. No. 1077 at 303-06). Defendant's baseless conjecture fails to establish any "reasonable probability . . . that the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Defendant's motion to vacate his convictions based on his counsel's performance should be denied.

### A. **Legal Standards**

The Government has already provided the legal standards governing claims that were fully litigated on direct appeal and thus unreviewable. *See supra* at 9-10. The Government also has already provided the general law governing ineffective assistance of counsel claims. *See supra* at 73-75. The Government provides this additional legal section to address the standards applicable to ineffectiveness claims where counsel failed to make an objection that would have been supported by the law that existed at the time of his trial but that, due to intervening changes in the law, is meritless under current law.

To prove that counsel was ineffective, a defendant bears the burden of satisfying the "highly demanding" two-part test articulated by the Supreme Court in *Strickland*. *See Morrison*, 477 U.S. at 382. In assessing the reasonableness of counsel's performance, courts must judge counsel's performance based on their perspective at the time of the alleged error, *i.e.*, courts should "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689; *see also supra* at 74.

However, the prejudice prong is analyzed under the current state of the law. If counsel failed to make an argument at trial that the Supreme Court or an appellate court later holds to be legally invalid, a defendant cannot claim that he was prejudiced based on the counsel's failure to make that argument, even if it would have been successful at the time of trial. *See Fretwell*, 506 U.S. at 369-70. In *Lockhart v. Fretwell*, the defendant argued that his trial court should have judged his claim of prejudice based on the law that existed at the time of trial, under which his counsel's omitted objection that would have been successful, even though the relevant authority was subsequently overruled. *Id.* at 366-68. The Supreme Court rejected that argument, emphasizing that "[u]nreliability or unfairness does not result if ineffective assistance of counsel does not deprive the defendant of any substantial or procedural right to which the law entitles him." *Id.* at 372. Such a claim of prejudice must fail because it is "based not on the allegation that he was denied an advantage the law might permit him[, but rather] . . . on the suggestion that he might have been denied a 'right the law simply does not recognize.'" *Id.* at 374-75 (O'Connor, J., concurring) (quoting *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) (Blackmun, J., concurring)); *see also Nix*, 475 U.S. at 175 (holding that "in judging prejudice and the likelihood of a different outcome, '[a] defendant has no entitlement to the luck of a lawless decisionmaker'" (quoting *Strickland*, 466 U.S. at 695)); *Guzman v. Sec'y, Dep't of Corrs.*, 73 F.4th 1251, 1253 (11th Cir. 2023) (noting that where intervening law adversely resolves an issue against the defendant, "the

result [for the defendant] may have been unlucky, but it was neither unfair nor unreliable"). Thus, courts assessing claims of prejudice under *Strickland* "may not consider the effect of an objection it knows to be wholly meritless under current governing law, even if the objection might have been considered meritorious at the time of its omission." *Fretwell*, 506 U.S. at 374 (O'Connor, J., concurring). To ignore current law "would grant criminal defendants a windfall to which they are not entitled." *Id.* at 366 (majority opinion).

The Fourth Circuit and other circuits have repeatedly applied *Fretwell* and rejected ineffective assistance of counsel claims where current law renders a defendant's arguments meritless. *See, e.g.*, *United States v. Baker*, 719 F.3d 313, 321 (4th Cir. 2013) (rejecting ineffective assistance claim where counsel failed to make an argument that would have been successful under precedent that was overruled after his direct appeal had been concluded; "To avert such windfalls, *Strickland*'s prejudice prong is governed by the law as it stands at the time a court is considering a defendant's ineffective-assistance claim"); *Bell v. Ozmint*, 332 F.3d 229, 244 (4th Cir. 2003) (upholding finding of "no prejudice from trial counsel's failure to request a jury instruction under [prior law], which it knew to be wholly meritless under current governing law" (internal quotation marks omitted)); *see also, e.g.*, *Guzman*, 73 F.4th at 1258 ("*Fretwell* establishes that the result of a defendant's proceeding is neither unfair nor unreliable in the present when current law does not provide the right that the defendant seeks to vindicate."); *Collins v. United States*, 28 F.4th 903, 906 (8th Cir. 2022) (holding that the defendant could not establish prejudice based on counsel's failure to object to a sentencing enhancement for prior conviction of a "crime of violence" where current law made the prior conviction a predicate crime of violence); *Abby v. Howe*, 742 F.3d 221, 228 (6th Cir. 2014) ("[I]n making our prejudice determination, we may not consider the effect of

[counsel's] failure to object because we now know that such an objection would be futile in light of" current law.).

If a defendant's arguments lack merit under current law, the court may deny his ineffective assistance of counsel claims based on his failure to establish prejudice. *See Robbins*, 528 U.S. at 286 n.14 ("The performance component need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'") (quoting *Strickland*, 466 U.S. at 697)).

**B.**  <u>Background on the State of Law on the Definition of "Crime of Violence"</u>

The majority of Defendant's claims in Claim Twelve relate to trial counsel's performance seeking dismissal of the charges under 18 U.S.C. § 924(c)(3)(A), (j), which prohibits the use of a firearm during and in relation to a "crime of violence." (Dkt. No. 2 at 9-10). The death-resulting §§ 247(a)(2) and 249(a)(1) violations served as the predicate crimes of violence for those § 924 counts. In his § 2255 motion, Defendant asserts that his trial counsel failed to effectively argue that those statutes could not qualify as predicate crimes of violence for the § 924(c) counts. Because a proper analysis of Defendant's ineffective assistance claims requires a detailed evaluation of the law regarding these statutes under the law that existed at the time of trial and the law that exists today, the Government provides an overview of the evolution of that law since Defendant's trial.

**1.**  **Law on Crime of Violence that Existed at the Time of Defendant's Trial**

At the time of trial, the Supreme Court and the Fourth Circuit had not squarely decided several issues impacting whether a crime satisfied the definition of "crime of violence" under § 924(c)(3)(A), known as the elements or force clause. Those questions were (1) what degree of force is required to satisfy 18 U.S.C. § 924(c)(3)(A); (2) whether indirect force could constitute

the use of "physical force" under the elements clause; (3) whether 18 U.S.C. § 924(c)(3)(B), known as the residual clause, was unconstitutionally vague. In addition, at the time of trial, the Fourth Circuit had held that in assessing whether a statute qualified as a crime of violence under the elements clause, courts had to determine whether there is "a realistic probability, not a theoretical possibility, that the state would apply its statute to conduct that falls outside the definition of 'crime of violence.'" *United States v. Diaz-Ibarra*, 522 F.3d 343, 348 (4th Cir. 2008) (internal quotation marks omitted). The Government addresses each of these issues below.

### a. What degree of force was required to satisfy 18 U.S.C. § 924(c)(3)(A) at the time of Defendant's trial

To qualify as a crime of violence under the elements clause, the predicate crime must have "as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). That definition is similar to the elements clause in other federal statutes, and the elements clauses in those various statutes have been the subject of significant litigation. For instance, in 2010, the Supreme Court held that the phrase "physical force" in the elements clause in the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B)(i), requires the use of "violent force" and further defined "violent force" as "force capable of causing physical pain or injury to another person." *Curtis Johnson v. United States*, 559 U.S. 133, 140 (2010).

In 2014, the Supreme Court decided *United States v. Castleman*, interpreting 18 U.S.C. § 922(g)(9), which prohibits the use of a firearm in the commission of a "misdemeanor crime of domestic violence." 572 U.S. 157, 159 (2014). The *Castleman* Court held that "physical force" for the purposes of § 922(g) included the "degree of force that supports a common-law battery conviction," and held that "the knowing or intentional causation of bodily injury necessarily involves the use of physical force" for that statutory provision. *Id.* at 168-69.

276

In *Castleman*, Justice Scalia wrote a concurring opinion and noted that deliberately causing injury necessarily involves the use of both battery-level and violent force and that, in his view, § 922(g)(9) requires violent force because intentionally causing any bodily injury necessarily involved the use of "violent force" as required by *Curtis Johnson*. *See Castleman*, 572 U.S. at 175. The majority in *Castleman* declined to decide the issue. *See id.* at 170 (noting that Justice Scalia's concurrence stated that bodily injury as defined under the state law necessitated violent force under *Johnson*). Thus, at the time of the trial in this case, lower courts continued to assess whether *Castleman* should be extended beyond § 922(g) and, specifically, whether statutes that require as an element the intentional causation of any bodily injury categorically involved the requisite level of force to qualify as violent force under *Curtis Johnson*. (*See* Dkt. No. 961 at 15-20 (discussing the circuit split)).

### b. Whether indirect force qualified as "physical force" under § 924(c)(3)(A) at the time of Defendant's trial

The second question was whether indirect force could constitute the use of "physical force" under the elements clause. In *Castleman*, the Supreme Court held that the "common-law concept of 'force' encompasses even its indirect application." 572 U.S. at 170. However, the question remained whether the common-law concept of "force" interpreted in *Castleman* should be extended to § 924(c)(3)(A). Several circuits had held that if statutes could be violated through omission or indirect means, they were not categorically crimes of violence, even if they resulted in bodily injury or death. (*See* Dkt. No. 961 at 20-30 (canvassing caselaw and history of whether murder through indirect means can qualify as a violent, physical act)). The Fourth Circuit had not squarely decided this issue on the merits, but, in *United States v. Torres-Miguel*, it had stated in dicta that a threat to poison someone would not constitute a threat of force because poisoning

277

causes bodily injury through indirect means and thus did not entail the *use* of physical force. 701 F.3d 165, 168-69.

In 2016, two years after the Supreme Court decided *Castleman*, the Fourth Circuit continued to cite approvingly to the dicta in *Torres-Miguel*, holding that it was "dubious" *Castleman* abrogated the dicta in *Torres-Miguel* and stating that "a crime may *result* in death or serious injury without involving *use* of physical force." *United States v. McNeal*, 818 F.3d 141, 156 & n.10 (4th Cir. 2016) (emphases in original).

### c. Whether § 924(c)(3)(B) was unconstitutionally vague at the time of Defendant's trial

The third question was whether the residual clause, 18 U.S.C. § 924(c)(3)(B), was unconstitutionally vague. The Supreme Court had invalidated as unconstitutionally vague the residual clause of § 924(e), which was part of the ACCA, but had not yet addressed whether the same analysis should apply to § 924(c)(3)(B). (*See* Dkt. No. 735 at 28). Two circuit courts had held that the residual clause in 18 U.S.C. § 16(b), which defines a "crime of violence" and which was worded exactly the same as the residual clause of § 924(c)(3)(B), was unconstitutionally vague. (*See* Dkt. Nos. 279 at 68-76 (citing cases); 296 at 1-2 (citing supplemental authority)). On the other hand, three circuit courts to have considered the issue had upheld the constitutionality of § 924(c)(3)(B). *Id.*

Given these conflicting interpretations of the same statutory language, one of the major hurdles that trial counsel had to overcome in arguing the motion to dismiss was whether § 924(c)(3)'s residual clause would be deemed constitutional. If this Court sided with the three circuit courts that had upheld the constitutionality of § 924(c)(3)(B), then §§ 247 and 249 could have been deemed crimes of violence if they satisfied either the force clause or the residual clause of § 924(c).

### d. Applicability of the realistic probability test at the time of Defendant's trial

Finally, at the time of trial, the Fourth Circuit had held that in assessing whether a statute qualified as a crime of violence under the elements clause, courts had to determine whether there is "'a realistic probability, not a theoretical possibility,' that the state would apply its statute to conduct that falls outside the definition of 'crime of violence.'" *Diaz-Ibarra*, 522 F.3d at 348 (quoting *Gonzales v. Duenas–Alvarez*, 549 U.S. 183, 193 (2007)); *see also, e.g.*, *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013) (noting that in applying the categorical approach to the definition of aggravated felonies in the immigration context, "our focus on the minimum conduct criminalized by the . . . statute is not an invitation to apply legal imagination" to the offense) (internal quotation marks omitted)); *see also Roof*, 10 F.4th at 398, 402 (citing *United States v. Allred*, 942 F.3d 641, 648 (4th Cir. 2019)). To make that showing, the defendant had to "at least point to his own case or other cases in which the . . . courts in fact did apply the statute in the . . . manner for which he argues." *Duenas-Alvarez*, 549 U.S. at 193.

At the time of trial, there was no reason to believe that the "realistic probability" test would not apply to § 924(c)(3)(A).

### 2. Legal Developments since Defendant's Trial

The Supreme Court and the Fourth Circuit have since conclusively answered all of these questions. In *Delligatti v. United States*, the Supreme Court held that "although the 'merest touching' is not violent force, *any* force that actually causes injury or death is." 604 U.S. 423, 432 (2025) (emphasis added) (internal quotation marks omitted). *Delligatti* reaffirmed the consistent holdings of Supreme Court and Fourth Circuit decisions, issued while this case was pending on direct appeal, holding that the intentional causation of bodily injury necessarily involves a sufficient degree of force to satisfy the elements clause. *See, e.g.*, *Stokeling v. United States*, 586

U.S. 73, 78-79, 85 (2019) (holding that "physical force" includes any amount of force "sufficient to overcome a victim's resistance," "'however slight' that resistance might be"); *United States v. Battle*, 927 F.3d 160, 166 (4th Cir. 2019) (holding that "a crime requiring the 'intentional causation' of injury requires the use of physical force"); *Allred*, 942 F.3d at 654 (holding that a statute that has as an element the intentional or knowing causation of bodily injury categorically requires the use of 'force capable of causing physical pain or injury to another person'" (quoting *Curtis Johnson*, 559 U.S. at 140)); *In re Irby*, 858 F.3d 231, 236 (4th Cir. 2017) ("*Curtis Johnson* and *Castleman* make it pellucid that second-degree retaliatory murder is a crime of violence under the force clause because unlawfully killing another human being requires the use of force capable of causing physical pain or injury to another person.") (internal quotation marks omitted).

*Delligatti* also resolved the question of whether indirect force and omissions can satisfy the elements clause, holding that an act of omission that causes injury does qualify as the use of physical force. 604 U.S. at 439. The Fourth Circuit had already held invalid the direct-indirect force distinction. *See In re Irby*, 858 F.3d at 236.

Thus, under current law, the intentional use of any force—whether committed directly, indirectly, or by omission—that causes any bodily injury necessarily involves the type and degree of force required by § 924(c)(3)(A).

In 2019, the Supreme Court held that the residual clause of § 924(c)(3)(B) was unconstitutionally vague. *See United States v. Davis*, 588 U.S. 445, 470 (2019).

In 2022, the Supreme Court also clarified that the "realistic probability" test is only operable when interpreting the scope of state laws and therefore does not apply to the interpretation of the elements of federal laws. *See United States v. Taylor*, 596 U.S. 845, 859 (2022).

C. **Summary of Prior Arguments Raised by Trial Counsel**

Having presided over the trial, this Court is very familiar with the pleadings filed by Defendant's trial counsel on these issues. The Government provides this overview of the arguments raised by Defendant's trial counsel to provide relevant context for his current § 2255 motion.

### 1. Defendant's Motion to Dismiss (Dkt. Nos. 233, 295)

Defendant's motion to dismiss and motion for new trial raised numerous arguments about whether §§ 247 and 249 can serve as predicate crimes under both the elements clause and residual clause of § 924(c); whether § 247 was a valid exercise of Congress's Commerce Clause authority; and whether § 249 was constitutional under Congress's authority under the Thirteenth Amendment. *See generally* (Dkt. No. 233).

Trial counsel raised both facial and as-applied constitutional challenges to the § 247 charges. Specifically, trial counsel argued, among other things, that § 247(a)(2) was unconstitutional on its face because the obstruction of religious exercise does not regulate an economic activity or the channels/instrumentalities of commerce, *id.* at 5-6); that § 247(a)(2)'s jurisdictional provision is insufficient to cabin Congress's Commerce Clause authority, *id.* at 7-8; that Congress's findings on § 247(a)(2) were insufficient to justify federal regulation of violence at houses of worship, *id.* at 8-9; that the link between religious obstruction and commerce is too attenuated to establish federal jurisdiction, *id.* at 9-10; and that the jurisdictional element is void for vagueness and is overbroad, *id.* at 14-15.

Trial counsel also asserted an as-applied challenge, arguing that all Defendant's conduct was intrastate and that any connection between his offense and interstate commerce was de minimis and thus insufficient to satisfy the commerce clause. (Dkt. No. 233 at 11-14). After successfully demanding a bill of particulars on the Government's facts in support of the interstate

commerce nexus element (Dkt. No. 251), trial counsel made additional arguments that the statute was unconstitutional as applied to the defendant. (Dkt. No. 295, at 2-3).

Trial counsel also asserted that the state criminal laws adequately addressed criminal religious obstruction and, as such, § 247(a)(2) was an unnecessary federal incursion on state authority. (Dkt. No. 233 at 10-11).

Turning to § 249, trial counsel challenged whether Congress's Thirteenth Amendment powers authorized the enactment of § 249. Among other things, trial counsel argued that the Thirteenth Amendment authorizes Congress to pass "appropriate legislation" and that § 249 was not "appropriate" because the states adequately prosecuted and punished crimes that could also be prosecuted under § 249. (Dkt. Nos. 295 at 3-4; 233 at 15-20). Counsel also argued that *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), the Supreme Court's seminal decision defining the rational basis standard that applies to Congress's power under the Thirteenth Amendment, had been undermined by the Supreme Court's subsequent decisions in *City of Boerne v. Flores*, 521 U.S. 507 (1997), *Shelby County v. Holder,* 570 U.S. 529 (2013), and *Northwest Austin Municipal Utility District No. One v. Holder*, 557 U.S. 193 (2009), and that Congress's Thirteenth Amendment power must be assessed based on the "current needs" for the legislation and whether the legislation is "congruent and proportional" to that need. (Dkt. No. 233 at 15-20).

Trial counsel also argued that § 249 violated the principle that Congress should respect "the sovereign interests of the states" and that "[p]reeminent among those sovereign state interests is the police power." *Id*. at 16. Trial counsel argued that § 249(b), which requires the Attorney General to certify that a federal prosecution is warranted, failed to sufficiently cabin the government's discretion to pursue a federal prosecution and thus failed to show deference to the state's police powers. *Id.* at 20-22.

Finally, Defendant's trial counsel argued that §§ 247 and 249 failed to qualify as predicate crimes of violence for the § 924 counts. (Dkt. Nos. 233, 295). First, counsel argued that § 247(a)(2) did not satisfy the elements clause because it could be violated by the use of a *de minimis* degree of force, such as pushing or restraining the victim, that did not involve sufficiently "violent" force to satisfy *Curtis Johnson*. (Dkt. No. 233 at 22-29). Trial counsel also argued that, although the relevant § 247(a)(2) counts required the government to prove that "death results," death could result through indirect means and that such indirect force did not qualify as the "use of physical force" as required by § 924(c)(3)(A). (*See* Dkt. No. 233 at 26-27 (citing *Torres-Miguel*, 701 F.3d at 168)).

Second, trial counsel argued that § 249, which requires proof that the defendant willfully caused bodily injury, does not satisfy the elements clause for several reasons, including (1) that causing bodily injury, even if death results, could be achieved through indirect means, and thus does not categorically require the "use" of physical force, and (2) that bodily injury could be achieved through *de minimis* force and thus did not qualify as "violent" force under *Curtis Johnson*. (Dkt. Nos. 233 at 27-28; 295 at 9).

Finally, counsel argued that § 924(c)(3)(B), the residual clause, was unconstitutionally vague. (Dkt. No. 233 at 28).

## 2. District Court Opinion Denying the Motion to Dismiss (Dkt. No. 735)

This Court fully considered the arguments made by trial counsel in the motion to dismiss. Although this Court denied this motion, its thorough analysis of each of the defendant's arguments makes clear that trial counsel provided well-reasoned, albeit ultimately unconvincing, arguments.

This Court held that Congress had the authority under the Thirteenth Amendment to enact § 249. This Court rejected the defendant's federalism arguments, holding that § 249 does not

infringe on state powers, even if it criminalizes the same conduct as prohibited under state law, because such parallel laws are "of course commonplace under the dual-sovereign concept." (Dkt. No. 735 at 5 (quotation marks omitted)). This Court also held that the Thirteenth Amendment authorized Congress to target racial violence that it rationally identified as badges and incidents of slavery. *Id.* at 7-15. The Court found Defendant's arguments about the "current needs" and "congruence and proportionality" to be "more substantial but ultimately unpersuasive." *Id.* at 7.

The Court also reviewed the § 249 certification in this case and found that it was valid because this "mass murder at a historic African-American church for the avowed purpose of reestablishing the white supremacy that was the foremost badge of slavery in America" implicated a substantial federal interest. *Id.* at 17-18.

The Court also rejected Defendant's arguments that, on its face and as applied to him, § 247(a)(2) exceeded Congress's authority under the Commerce Clause. With respect to the facial challenge, this Court agreed with Defendant that "attacks on churches are not a type of economic activity." *Id.* at 22. But it held that § 247 is constitutional because Congress included a jurisdictional element, 18 U.S.C. § 247(b), that ensured that § 247 is restricted "to conduct that has a sufficient nexus with interstate commerce." *Id.* at 22 (noting that "[s]tatutes prohibiting noncommercial conduct that include such jurisdictional elements are universally upheld as within Congress's Commerce Clause powers."). This Court also found that the jurisdictional element is not overbroad because it encompassed only the conduct that Congress was authorized to regulate. *Id.* at 22-23. This Court also held that the congressional findings on the impact on commerce caused by attacks on houses of worship were sufficient and, in any event, that such findings are not required. *Id.* at 23. Finally, this Court rejected the defendant's argument that the link between an attack at a church and interstate commerce is too attenuated, finding it possible for attacks to

have a sufficient nexus through, for example, the use of interstate channels and instrumentalities of commerce to carry out the attack. *Id.* at 23-25.

Next, the Court thoroughly reviewed and rejected the defendant's as-applied challenge, holding that the indictment and bill of particulars alleged sufficient links to interstate commerce, including that Defendant attacked a church of national importance, used the internet to plan and publicize the attack, used an interstate highway, and killed nine parishioners using bullets and a firearm that traveled in interstate commerce. *Id.* at 25.

Finally, this Court considered and rejected the defendant's arguments that §§ 247 and 249 are not predicate crimes of violence under § 924(c). With respect to the violations of § 247(a)(2), the Court held that the death-resulting § 247 violations necessarily involved a sufficient degree of force to qualify as a crime of violence. *See id.* at 31. With respect to § 249, this Court acknowledged that *Castleman* did not "precisely" hold that the "intentional causation of bodily is violent force in the context of a felonious crime of violence," but held that *Castleman* and *Curtis Johnson*, taken together, established that "[a]ny felony having as an element the intentional infliction of bodily injury on another is a crime of violence under § 924(c)." *Id.* at 30. The Court noted that § 249 specifically incorporates a rule of construction that states that it "applies to violent acts" and held that there is "no colorable argument that the statute prohibits any nonviolent conduct." *Id.* at 30-31.

This Court noted the then-ongoing litigation over whether the residual clause was unconstitutionally vague. *Id.* at 28-29. Because this Court held that §§ 247 and 249 both satisfy the elements clause, this Court concluded that "issues regarding residual clauses . . . are irrelevant to this case." *Id.* at 29.

### 3. Defendant's Post-Trial Motion for New Trial on the Constitutionality of § 247 and the Definition of Crime of Violence under § 924(c)(3)(A) (Dkt. Nos. 916 and 935)

After trial, Defendant's trial counsel moved for acquittal and a new trial on the §§ 247 and 924 convictions. (Dkt. Nos. 916, 935).

Defendant argued that the evidence supporting the § 247 convictions was insufficient because his "wholly intrastate" activity" could not establish a link to interstate commerce. (Dkt. Nos. 916 at 3; 935 at 2-3). This Court rejected this argument, for the same reasons it denied the motion to dismiss. (Dkt. No. 961 at 3-6 (noting that the defendant raised the same or similar arguments in as-applied challenge to the § 247 charges in his pretrial motion to dismiss)).

Defendant also reiterated his arguments that §§ 247 and 249 were not crimes of violence under the force clause, citing additional cases from the First, Fourth, and Fifth Circuits, to argue that bodily injury caused through indirect force cannot constitute the use of violent physical force as articulated by the Supreme Court in *Curtis Johnson*. (Dkt. Nos. 916 at 5-8; 935 at 4-6). This Court extensively analyzed whether the intentional causation of physical injury through "indirect, subtle, or attenuated" means or through "omission" could constitute the use of force, including by canvassing the different circuits' precedents and reviewing the common law principles defining the use of violent, physical force. (Dkt. No. 961 at 8, 13-17, 20-30). The Court acknowledged that "[t]he Fourth Circuit has not taken a clear position on this issue," and ultimately concluded that murder, even if achieved by indirect means such as poison or distribution of a chemical agent, "is violence because it is a physical act capable and intended to cause death." *Id.* at 17, 30.

In reaching its decision, this Court noted that, based on the law that existed at the time, "courts applying the categorical approach should not consider farfetched hypotheticals." *Id.* at 21. Thus, this Court rejected consideration of farfetched hypotheticals and instead focused on the

hypothetical of committing a § 249 violation by poisoning because it was "realistic and representative" of the type of force that could cause death "by guile, deception, or even deliberate omission." *Id.* at 22-23 (internal quotation marks omitted).

The Court then considered the level of force required by *Curtis Johnson*, and, in light of Defendant's trial counsel's arguments, "reconsider[ed] its previous holding." *Id.* at 19. The Court adopted trial counsel's argument and amended its order, holding that the intentional of infliction of "insubstantial bodily injury does not necessarily involve the use of violent physical force" as required by *Curtis Johnson*. The Court concluded that force sufficient to cause death satisfied this standard. *Id.* at 19, 30.[73] Thus, the Court held that the death-resulting § 249 counts could serve as predicate crimes of violence.

### D.  Argument

Defendant claims that his counsel provided incompetent representation in challenging the charges in the indictment. These claims should be denied.

#### 1.  The Majority of Defendant's Claims are an Attempt to Relitigate Questions of Law Already Resolved by the Fourth Circuit on Direct Appeal.

The majority of Defendant's claims involve arguments that were made—and rejected—by this Court, through a motion to dismiss and a motion for new trial, and by the Fourth Circuit in his direct appeal. Defendant now seeks a fourth bite at the apple by recasting those same claims in the posture of ineffective assistance of counsel. The Court should reject this attempt. Absent an intervening change in the law, a defendant cannot "circumvent a proper ruling . . . on direct appeal by re-raising the same challenge in a § 2255 motion." *Linder*, 552 F.3d at 396; *see also Dyess*, 730

---

[73] The government respectfully submits that, in light of the Supreme Court's holding in *Delligatti*, the definition of force under § 924(c) is satisfied by the intentional causation of any bodily injury; substantial injury is not required. *See Delligatti*, 604 U.S. at 429-30.

F.3d at 360; *Roane*, 378 F.3d at 396 n.7; *Boeckenhaupt*, 537 F.2d at 1183; *Young v. United States*, No. 6:07-CR-113-GRA, 2010 WL 4053610, at *3 (D.S.C. Oct. 14, 2010) (rejecting a § 2255 petitioner's attempt to relitigate legal arguments under the guise of ineffective assistance). Regardless of how he frames these claims, they are nothing more than an attack on the Fourth Circuit's conclusions on his direct appeal.

### a. Claim that §§ 247(a) and 249(a)(1) are not crimes of violence

Defendant argued that §§ 247(a) and 249(a)(1) are not claims of violence in this Court and on his direct appeal. *See* Br. of Appellant, Dkt. 85 at 262; (*see also* Dkt. Nos. 233, 295, 916, 935). Specifically, Defendant argued that § 247 was not a crime of violence because it can be committed by using force against oneself or one's own property; that § 247(a)(2) does not require the intentional use of lethal or sufficiently violent force; that § 249 is not a crime of violence because the intentional causation of bodily injury can be achieved through *de minimis* force and thus does not require the requisite level of force; that the causation of bodily injury through acts of omission does not involve the "use" of violent force; and that the death-resulting §§ 247 and 249 counts do not require a defendant to act with the requisite *mens rea* of intentionally using substantial or lethal force. *See Roof*, 10 F.4th at 397-405 & 405 n.67. The Fourth Circuit rejected all of these arguments and held that both §§ 247(a) and 249(a)(1) were crimes of violence. *Id.* 401-05.

Defendant's present motion merely reasserts those exact same arguments. (*See* Dkt. No. 1077 at 253-77 (Claims 12.B.a-g)). Defendant now frames them as a criticism of his counsel's performance, but if the Court were to address those claims, it would necessarily have to re-evaluate the Fourth Circuit's holdings to determine whether Defendant suffered prejudice and could only grant relief by determining that the Fourth Circuit's holding was, in fact, incorrect.

While this may be permissible under § 2255 where subsequent changes in the law would create a path for relief, the law since his trial and appeal has developed only to the *detriment* of Defendant's claims. *Delligatti* and *Stokeling* squarely foreclose his challenges that §§ 247 and 249 are not crimes of violence, and this Court should therefore decline to address Defendant's arguments.

Defendant may argue that the Supreme Court's decision in *Taylor*, which held that the "realistic probability" test does not apply to federal statutes, is an intervening change in the law. However, under *Delligatti* and *Stokeling*, the realistic probability test has no bearing on the analysis of the death-resulting counts of § 247(a)(2), which requires intentionally using force to obstruct another person in the exercise of their religion, resulting in death, and § 249, which requires the willful causation of bodily injury, resulting in death. Under *Delligatti* and *Stokeling*, the intentional use of any force, even minor or indirect force, that causes bodily injury or death is sufficient to qualify as a crime of violence, and *Taylor* is therefore inapposite to the analysis of either of these statutes and not the type of intervening change of law that would allow Defendant to seek another review of those claims.

### b. Claim that § 249 is unconstitutional under the Thirteenth Amendment

Defendant argued that Congress exceeded its power under the Thirteenth Amendment in enacting § 249(a)(1) in the briefing of his motion to dismiss and in his direct appeal. (*See* Dkt. Nos. 233, 295); Br. of Appellant, Dkt. 85 at 245. The Fourth Circuit considered these arguments and found them meritless, declaring that "[w]e state here emphatically that concluding there is a relationship between slavery and racial violence is not merely rational, but inescapable." *Roof*, 10 F.4th at 391-95 & 392 n.52 (internal quotation marks omitted). The court emphasized that "every

court to address the constitutionality of 18 U.S.C. § 249(a)(1) has upheld it." *Id.* at 392 n.52 (citing cases).

No case since the Fourth Circuit's decision has held that § 249 is invalid or constitutionally infirm, and therefore Defendant's ineffective assistance claim depends on this Court disagreeing with the holding of the Fourth Circuit (and every other court) that § 249(a)(1) is a constitutional exercise of Congress's power under the Thirteenth Amendment. The Court should deny this claim outright.

### c.   Claim that § 247 is unconstitutional under the Commerce Clause

Defendant claimed that § 247(a)(2) was unconstitutional under the Commerce Clause in the briefing of his motion to dismiss and in his direct appeal. (*See* Dkt. Nos. 233, 295); Br. of Appellant, Dkt. 85 at 216. On appeal, Defendant argued that § 247(a)(2) was facially invalid because the statute does not involve "the use of the channels of interstate commerce," "instrumentalities of interstate commerce," or "activities having a substantial relation to interstate commerce." *Roof*, 10 F.4th at 383. The Fourth Circuit rejected that argument, finding that the jurisdiction element of § 247, which requires the targeted conduct to be in or affecting interstate or foreign commerce, to be sufficient. *Id.* at 383-85.

Again, Defendant's ineffectiveness claim strikes at the heart of the Fourth Circuit's decision. The bulk of Defendant's argument has nothing to do with trial counsel—it simply relitigates the same arguments against § 247(a)(2). The Court need not revisit that issue.

### d.   Claim that the charges under §§ 247 and 249 counts were improperly certified

Before a prosecution may be undertaken pursuant to §§ 247 and 249, the Attorney General or her designee must certify that the prosecution satisfies at least one of the conditions identified in the statutes. Here, the certifications included, among other things, that the prosecution is "in the

290

public interest and necessary to secure substantial justice." *See* 18 U.S.C. § 247(e); 18 U.S.C. § 249(b)(1). Defendant claims counsel should have challenged the certifications in this case because South Carolina had charged the defendant with murder. (Dkt. No. 1077 at 299-300).

But he raised the exact same challenge to the certifications before the Fourth Circuit, which rejected it. The Fourth Circuit held that certification of the § 249 charges was valid because South Carolina does not have a hate crimes statute and because "the highly aggravated nature of Roof's crimes (aptly described by the district court as 'a mass murder at a historic African-American church for the avowed purpose of reestablishing the white supremacy that was the foremost badge of slavery in America'), clearly implicated a substantial federal interest." *Roof*, 10 F.4th at 397. The Fourth Circuit held that this reasoning applied with equal force to the § 247(a)(2) certifications. The Fourth Circuit concluded that, "although there might be federal certifications that raise close questions, this case is not one of them." *Id.*

Defendant cites no new law that could justify revisiting these claims under the guise of ineffective assistance of counsel. Given the Fourth Circuit's clear ruling on direct appeal, this issue is foreclosed in these § 2255 proceedings.

In sum, this Court can summarily deny all of Defendant's arguments in Claim Twelve as already fully addressed and rejected by the Fourth Circuit, other than the vagueness claim (Claim 12.B.h), the First Amendment claim (Claim 12.C), and the Double Jeopardy claim (Claim 12.E).

## 2. Defendant's Ineffective Assistance of Counsel Claims Should be Denied.

Even if the Court is inclined to review the claims on their merits, Defendant cannot establish prejudice because the claims all fail under current law. *See Fretwell*, 506 U.S. at 371-72. This alone is sufficient to deny these claims.

But he also fails to establish that his counsel's performance was deficient based on the law that existed at the time of his trial. *See Strickland*, 466 U.S. at 690. With the exception of his Due Process, Double Jeopardy, and First Amendment claims, Defendant's counsel presented to both this Court and the Fourth Circuit each substantive claim that Defendant presents now in his § 2255 motion. Rather than showing that trial counsel omitted significant legal arguments, Defendant claims, in essence, that trial counsel should have argued the same claims, just better. That is insufficient to establish ineffective assistance.

Rather than identifying any constitutional errors by his trial counsel, Defendant raises minor disagreements over the slightly variant lines of potential arguments that his trial counsel could have made. He even quibbles about counsel's use of specific analogies and hypothetical examples. (*See, e.g.*, Dkt. No. 1077 at 255, 261-68, 310-13). But ineffective assistance claims are not a vehicle to "'grade counsel's performance' like "the critic . . . who points out . . . where the doer of deeds could have done them better.'" *Powell*, 134 F.4th at 228 (quoting *Strickland*, 466 U.S. at 697) (alterations in original).

Counsel's efforts—while ultimately unsuccessful—far exceeded the professional standards of competent counsel. *See Powell*, 134 F.4th at 228 (holding that the "critical" question in assessing a claim of ineffective assistance of counsel is whether counsel's performance "amounted to incompetence under prevailing professional norms"); *United States v. Morris*, 917 F.3d 818, 823 (4th Cir. 2019) (noting that counsel does not act deficiently simply "by failing to anticipate changes in the law, or to argue for an extension of precedent"). There is nothing in the record to suggest that Defendant's trial lawyers were ineffective in any way.

### a. Section 249 is a crime of violence.

Defendant asserts that trial counsel was ineffective for not advancing certain arguments in challenging whether § 249(a)(1) is a crime of violence. (Dkt. No. 1077 at 264-77). Under current, binding Supreme Court and Fourth Circuit precedent, there is no question that the death-resulting § 249(a)(1) counts qualify as crimes of violence under § 924(c)(3)(A). As such, Defendant cannot prove prejudice. In addition, based on the law that existed at the time of trial, trial counsel's performance far exceeded the requirements of competent counsel.

### i. Section 249 is a crime of violence under current law.

The elements of the death-resulting § 249 counts are that a defendant must (1) willfully; (2) cause bodily injury to any person; (3) because of that person's race; and (4) death results. 18 U.S.C. § 249(a)(1) and (a)(1)(B)(i). These statutory elements fall squarely within the definition of "crime of violence" that the Supreme Court articulated in *Delligatti* and *Stokeling.*

As discussed above, *Delligatti* and *Stokeling* establish that intentionally causing bodily injury, even if achieved by omission or the use of minimal or indirect force, satisfies the definition of physical force in § 924(c)(3)(A). *See Delligatti*, 604 U.S. at 432; *Stokeling*, 586 U.S. at 83; *see also Battle*, 927 F.3d at 166; *Allred*, 942 F.3d at 655; *United States v. Cooper*, 131 F.4th 127, 133-34 (2d Cir. 2025) ("Under *Johnson* and *Stokeling*, physical force means force capable of causing physical pain or injury. Nothing more, and nothing less.") (internal citation and quotation marks omitted). This binding precedent forecloses Defendant's ineffectiveness arguments related to § 249 as a crime of violence.

Throughout his arguments in Claim Twelve, Defendant inexplicably fails to cite *Delligatti* and *Stokeling* and asserts that under § 924(c)(3)(A), the predicate offense must categorically require that the defendant intend to use substantial or lethal force. But the Supreme Court has

expressly held that "physical force" includes *any* amount of force "sufficient to overcome a victim's resistance," "'however slight' that resistance might be." *Stokeling*, 586 U.S. at 79; *see also Delligatti*, 604 U.S. at 432 ("[A]s we held in *Stokeling*, the minimal force needed to overcome the resistance of 'a feeble or weak-willed victim' still qualifies as sufficiently 'violent' to fall within [the ambit of § 924(c)]."). That includes "force as small as 'hitting, slapping, shoving, grabbing, pinching, biting, and hair pulling,'" all of which are "'capable of causing physical pain or injury.'" *Stokeling*, 586 U.S. at 85 (quoting *Castleman*, 572 U.S. at 182 (Scalia, J., concurring)).

Thus, contrary to Defendant's claims, the Supreme Court has defined "violent force" to include any force that "ultimately caused minimal pain or injury" and does not require "any particular degree of likelihood or probability that the force used will cause physical pain or injury; only potentiality." *Stokeling*, 586 U.S. at 83-84; *see also United States v. Gendron*, 22-CR-109, 2025 WL 2418902 at **3-4 (W.D.N.Y. Aug. 21, 2025) (finding § 249 is a crime of violence; holding that *Stokeling* "demonstrates that force capable of causing a serious injury is not required to meet the elements clause. And . . . *Delligatti* . . . resolve[s] any doubts about that issue").

Defendant seems to suggest that this Court should limit the holdings of *Castleman* and *Stokeling* and find that causing some physical harm does not necessarily require the use of "violent" force under § 924(c)(3)(A). (*See* Dkt. No. 1077 at 336, 340). But the defendant in *Delligatti* made a similar argument, asserting that "there cannot be an 'automatic connection' between injury and the *violent* force § 924(c) requires because even a small degree of force might injure an 'eggshell' victim." *Delligatti*, 604 U.S. at 432. The Supreme Court rejected that claim and held, without qualification, that "[d]eliberately causing injury necessarily involves the use of force in the sense relevant here." *Id.* at 433.

294

Ignoring *Delligatti*, Defendant also asserts that *Castleman*'s definition of common-law force should not apply to § 924(c) and that *Stokeling*'s holding—that it is sufficient that the statute requires any force, including force that causes minimal injury—should be limited to the context of robbery. (Dkt. No. 1077 at 336, 340). But Supreme Court in *Delligatti* explicitly extended the holding of *Castleman* to § 924(c), and nothing in *Delligatti* confines its holding to the robbery context. *See, e.g.*, 604 U.S. at 433 (holding that "'the knowing or intentional causation of bodily injury necessarily involves the use of physical force' under § 924(c) just as it does under § 922(g)(9)"); *id.* at 429 ("*Castleman* establishes that under statutes like the one at issue here it is impossible to deliberately cause physical harm without the use of physical force. Although *Castleman* addressed a different statute, we conclude that its holding extends to § 924(c)."); *id.* at 431 (quoting Justice Scalia's concurrence in *Castleman* and noting that "Justice Scalia's view of violent force eventually garnered a majority" in *Stokeling*).

And although Defendant seems to suggest that causing bodily injury through indirect means, such as causing sickness, does not constitute physical force that qualifies as a crime of violence, the Supreme Court has repeatedly held that it does. *See Delligatti*, 604 U.S. at 432-33 (noting that tricking another into eating rotten food that has become toxic can constitute force); *Castleman*, 572 U.S. at 170 (noting that infecting a person with disease qualifies as the use of physical force).

None of the other concerns identified by Defendant change the analysis of current law in this case. Defendant notes that the use of force necessary to satisfy § 924(c)(3)(A) must include a *mens rea* that is greater than recklessness, (Dkt. No. 1077 at 336), but both of the predicate statutes in this case are specific intent crimes. *See* 18 U.S.C. § 247(a)(2) (requiring the government to prove that the defendant acted "intentionally"); 18 U.S.C. § 249 (requiring the government to prove that

the defendant acted "willfully"). Defendant also argues that attempts to threaten cannot constitute crimes of violence, (Dkt. No. 1077 at 336), but he ignores the obvious: the § 924(c) counts in this case were based on completed acts of murder, not attempts to threaten. *See Roof*, 10 F.4th at 404 ("We are not reviewing an attempt crime; we are reviewing a death-results § 247(a)(2) crime, which by definition is a completed rather than inchoate crime.").

Section 249(a)(2) requires the willful causation of bodily injury. That is all the Supreme Court requires. The arguments Defendant claims should have been advanced are meritless under current law, and he therefore cannot establish any prejudice from counsel's performance. This alone is sufficient to deny this ineffective assistance claim.

### ii. Trial counsel competently argued that § 249 is not a crime of violence under the law that existed at the time of trial.

Defendant also cannot establish that counsel rendered constitutionally deficient performance in arguing that § 249 is not a crime of violence based on the law that existed at the time of trial. From that perspective, trial counsel's performance far exceeded the standards for competent counsel.

Defendant's § 2255 motion asserts arguments almost identical to those that trial counsel made in the motion to dismiss and motion for new trial and judgment of acquittal. *Compare* (Dkt. No. 1077 at 264-73) *with* (Dkt. Nos. 233 at 27-28 (asserting that "'causing' injury is insufficient to establish violent physical force"); 295 at 13-14 (arguing that "'causing' something to happen is not the same as committing violent conduct" and that "although *some* force is required to cause bodily injury, *violent* force is not necessarily required") (emphasis in original); 916 at 6 (arguing that "causation of injury *does not* necessarily require the use of violent force" and that the causing bodily injury "may be committed in ways that do not involve the use or threat of use of violent

force") (emphasis in original); 935 at 4-5 (arguing that "a crime may result in death or serious injury without involving use of physical force" (internal quotation marks omitted)).

Contrary to Defendant's claims, trial counsel thoroughly argued that an offense must categorically involve a substantial degree of force to qualify as a crime of violence and continued to research and argue this issue through the very end of trial. (*See, e.g.*, Dkt. Nos. 295 at 8-14; 916 at 5-8 ("Sections 247(a)(2) and 249(a)(1) are not crimes of violence for purposes of 18 U.S.C. § 924(j), because they do not require the use or threat of use of 'violent physical force' as defined by the Supreme Court and the Fourth Circuit"); 935 at 4-5). Indeed, trial counsel's fulsome briefing led this Court to reconsider and amend an earlier order on the degree of force necessary to qualify as a crime of violence. (Dkt. No. 1077 at 271 (quoting this Court's order filed as Dkt. No. 961 at 19)). Defendant cannot complain about the quality of trial counsel's performance when that counsel successfully persuaded this Court to adopt some of the very arguments he now asserts in the § 2255 motion.

This is especially true where, as this Court acknowledged at the time of its order, "[t]he circuits are split on whether the intentional causation of physical injury entails the use of injurious force" and, importantly, "[t]he Fourth Circuit has not taken a clear position on this issue." (Dkt. No. 961 at 12, 17). Trial counsel marshalled the most effective arguments they could based on the then-conflicting law and the lack of binding authority, and their performance, albeit unsuccessful, was constitutionally proficient. *See Morris*, 917 F.3d at 826 (rejecting ineffective assistance claim where conflicting authority existed).

Indeed, at the time of trial, all courts to have considered the issue had held that § 249(a)(1) was a crime of violence. *See, e.g.*, *United States* v. *Doggart*, No. 1:15-cr-39, 2016 WL 6205804, at *5 (E.D. Tenn. Oct. 24, 2016) ("[W]illfully causing bodily injury" to a person under Section

249(a)(1) "categorically include[s] an element of using or attempting to use physical, violent force sufficient to cause physical pain or injury.").[74] Thus, the performance of trial counsel fell well within the wide range of professional competency under the standards articulated by *Strickland* and its progeny.

Defendant's primary complaint about counsel's performance seems to be that, in his view, trial counsel failed to provide "plausible examples" of how § 249 could be violated by the use of minimal force "which then *un*intentionally resulted in someone's death." (Dkt. No. 1077 at 264 (emphasis in original)). Yet this is precisely the type of Monday morning quarterbacking that the Fourth Circuit has held to be inappropriate in a § 2255 motion. *See Powell*, 134 F.4th at 228. Trial counsel thoroughly argued the law, provided numerous examples in support of their arguments, and far exceeded the minimal standards for competent counsel.

In any event, none of Defendant's proposed hypotheticals would have changed this Court's analysis. For example, Defendant now claims that trial counsel should have argued that a defendant could violate § 249 by leaving bags of excrement at a church to cause the congregants to get ill, thereby resulting in one congregant running from the church, getting struck by a car, and dying. (Dkt. No. 1077 at 265-66; *see also id.* at 267 (positing that a waiter spits into food, the customer catches a cold but is asymptomatic, and the customer transmits the cold to an immune-

---

[74] The only case that has ever held to the contrary is *United States v. Bowers*, CR 18-292, 2022 WL 17718686 at *7 (W.D. Pa. Dec. 15, 2022). In *Bowers*, the district court held that § 249 is not a crime of violence because a defendant could cause bodily injury through acts of omission. But that opinion was decided in 2022—five years after the trial ended in this case and, as a result, trial counsel in this case cannot be faulted for not citing it. Moreover, the district court in *Bowers* was bound by Third Circuit precedent that held that causing bodily injury through omissions does not constitute the "use" of force. That reasoning had been rejected by several other circuits, including the Fourth Circuit. *See id.* And, of course, this portion of the *Bowers* opinion was abrogated by the Supreme Court's decision in *Delligatti*.

compromised elderly mother)). However, these far-fetched hypotheticals epitomize the "legal imagination" that, at the time of trial, did not suffice to establish an offense as categorially overbroad. *See Moncrieffe*, 569 U.S. at 191; *United States v. Hill*, 832 F.3d 135, 140 (2d Cir. 2016) *amended and superseded by United States v. Hill*, 890 F.3d 51 (2d Cir. 2018). This Court expressly declined to consider "farfetched hypotheticals" such as "the slightest shove [that causes] death through a comedy of errors." (Dkt. No. 961 at 21). Thus, even if trial counsel had put forward the hypothetical scenarios that Defendant now proffers, there is nothing in the record to suggest that this Court would have considered them, much less been persuaded by them.

Defendant claims trial counsel were ineffective for failing to object to the Government's arguments that it would not "prosecute anyone for conduct that involved the less violent, or less intentional, acts the statutes seemed to cover." (Dkt. No. 1077 at 273). In essence, Defendant seems to suggest that counsel should have argued that the "realistic probability" test that existed at the time of trial—namely, that in assessing the scope of a statute, there must be "a realistic probability . . . that the state would apply its statute to conduct that falls outside the definition of crime of violence," *Diaz-Ibarra*, 522 F.3d at 343—should not apply to § 924(c) offenses.

Although the Supreme Court in *Taylor* has since clarified that this "realistic probability" test does not apply to the interpretation of the elements of federal laws, *Taylor* was not issued until six years after Defendant's trial. *See Taylor*, 596 U.S. at 859. But the Fourth Circuit had affirmed the use of the "realistic probability" test after trial and before *Taylor*. *See, e.g.*, *Allred*, 942 F.3d at 648. Thus, at the time of trial, Defendant's trial counsel acted reasonably by arguing, within the contours of binding circuit precedent, that the minimum conduct encompassed by § 249 was limited to only those scenarios that had a "realistic probability" of actually being prosecuted by the Government. *See also infra* at 338-39 (responding to Claim 13.C).

299

The Government also notes that several of Defendant's proposed far-fetched hypotheticals, absent additional facts, do not even violate § 249. For example, he claims that someone could lock up the jackets of an Asian-American family in order to cause them "discomfort" in cold weather. However, causing mere "discomfort" is not equivalent to willfully causing "bodily injury" as required by § 249, unless the cold was so extreme that it caused pain or some other physical injury. *See* 18 U.S.C. §§ 249(c); 1365(h)(4). As another example, Defendant cites a case in which a soldier threw a bird carcass into the barracks and prevented a Black soldier from leaving the barracks. Defendant then speculates that he would have violated § 249 if "he had taken that action to nauseate the African American soldier," but the soldier instead fainted (presumably out of disgust at the bird) and hit his head. (Dkt. No. 1077 at 339). Not so. Section 249(a)(1) does not cover attempts, unless those attempts involve the use of a dangerous weapon, fire, firearms, or explosive or incendiary device. But absent actually causing illness or physical injury, the soldier's mere intent to cause nausea would be insufficient to satisfy § 249(a)(1).

Defendant argues that his trial counsel should have provided additional examples to show that § 249 can be committed by acts of omission. (Dkt. No. 1077 at 268). Yet neither the Supreme Court nor the Fourth Circuit had decided this issue at the time of trial, nor was there uniformity in the circuit caselaw that did exist. Thus, counsel cannot be deemed to have performed deficiently given that no clear binding authority existed. And, as noted above, these arguments are foreclosed for having been considered on direct appeal, and are meritless under current law.[75] *See Delligatti*, 604 U.S. at 432, 434.

---

[75] As noted above, the Supreme Court did answer this question in *Delligatti*, squarely establishing that a defendant uses force when he causes bodily injury, whether by direct action or through omission. To the extent that Defendant seems to suggest that *Delligatti* is limited to omissions where the defendant has a legal duty to act, the Supreme Court itself did not so limit its holding. In fact, in *Delligatti*, the Court stressed that "crime of violence" should be given an ordinary

Defendant further claims that trial counsel should have provided examples where a defendant could violate § 249 while intending to cause only minor injury but then accidentally causing a person's death. (Dkt. No. 1077 at 271-72). Defendant conspicuously fails to cite any cases that existed at the time of trial that held that a violation of § 249 resulting in death is not a crime of violence. Instead, he relies only on inapposite cases involving bank robbery and kidnapping to argue that the element of "death results" can include deaths that occur accidentally or recklessly. He then vaguely asserts that "[t]he groundwork for these cases was laid no later than 2013." (Dkt. No. 1077 at 273 n.79). That trial counsel may not have considered this "groundwork" or how entirely unrelated bank robbery and kidnapping cases might be extended to the analysis of whether a civil rights statute is a crime of violence, does not constitute ineffective assistance of counsel.[76]  *See Powell*, 134 F.4th at 228; *United States v. McNamara*, 74 F.3d 514, 516 (4th Cir.

---

[76] meaning, and that all that is required is that the defendant's intentional conduct be the but-for cause of the bodily injury or death. *See Delligatti*, 604 U.S. at 433, 436-37. The "death results" elements of §§ 247 and 249 require "but-for" causation. *See Burrage v. United States*, 571 U.S. 204, 211-14 (2014). The §§ 249 and 247 counts in this case required the government to prove that the defendant willfully caused bodily injury, or intentionally used force, and that conduct was the but-for cause of death. This falls squarely within *Delligatti*'s definition of crime of violence. Moreover, in reaching its decision, the *Delligatti* Court relied on its holding in *Castleman*. The defendant in *Castleman* had assaulted the mother of his child—nothing in the opinion suggested that he had a legal duty to his victim, yet the Supreme Court found that his offense, even if it encompassed omissions, qualified as a crime of violence. 572 U.S. at 161.

[76] Again, Defendant ignores that this argument is foreclosed under *Delligatti.* Moreover, bank robbery and kidnapping cases cited by Defendant are inapposite and easily distinguishable. Some of them analyze a bank robbery statute, 18 U.S.C. § 2113(e), but they did not analyze whether those offenses qualified as crimes of violence. Instead, those decisions merely establish that the element of "death results" for the purposes of § 2113(e) includes accidental deaths that occur during the course of a bank robbery or as the robber flees the scene. *United States v. Jackson*, 736 F.3d 953, 958 (10th Cir. 2013); *United States v. McDuffy*, 890 F.3d 796, 802 (9th Cir. 2018). Defendant also cites a case in which the government agreed that the federal kidnapping statute is not a crime of violence. Yet kidnapping is clearly distinguishable from § 249 because kidnapping can be achieved through inveiglement, which does not involve the use of physical force. *United States v Fulks*, 120 F.4th 146, 161 (4th Cir. 2024). In stark contrast, all § 249(a)(1) violations require proof that the defendant willfully caused bodily injury.

1996) (holding that trial counsel's performance was not deficient despite his being unaware that the Supreme Court had granted certiorari that would have raised the government's burden of proof).

Defendant argues that trial counsel's reliance on the Fourth Circuit's decision in *Torres-Miguel*, 701 F.3d 165, was "badly misplaced." (Dkt. No. 1077 at 274.)  In *Torres-Miguel*, the Fourth Circuit stated that using force indirectly, such as by poisoning another person, did not qualify as physical force. *Id.* at 168-69. Trial counsel was more than reasonable in relying on what was then the clearest statement by the Fourth Circuit about the type of force that might not qualify as "physical force" under § 924. *See Morris*, 917 F.3d at 823 (rejecting ineffective assistance claim where conflicting authorities existed).

As noted above, in *Castleman*, the Supreme Court held that the "common-law concept of 'force' encompasses even its indirect application." 572 U.S. at 170. However, the question remained whether the "common-law concept of 'force'" interpreted in *Castleman* should be extended to § 924. At the time of trial, the Fourth Circuit had not squarely decided this issue, but, in 2012, stated in dicta that a threat to poison someone would not constitute a threat of force because poisoning causes bodily injury through indirect means. *See Torres-Miguel*, 701 F.3d at 168-69.

In 2016, after the Supreme Court decided *Castleman*, the Fourth Circuit continued to cite approvingly to *Torres-Miguel*, holding that it was "dubious" *Castleman* abrogated the dicta in *Torres-Miguel* and stating that "a crime may *result* in death or serious injury without involving *use* of physical force." *McNeal*, 818 F.3d at 156 n.10. The *McNeal* court observed that the *Castleman* majority "expressly reserved the question of whether causation of bodily injury 'necessarily entails violent force.'" *Id.* (quoting *Castleman*, 572 U.S. 170). It was not until June

2017—about five months after the conclusion of trial and one month after this Court issued its ruling on Defendant's post-trial motion for new trial and judgment of acquittal—that the Fourth Circuit expressly held that the distinction drawn in *Torres-Miguel* between direct and indirect means was no longer valid in light of *Castleman*. *See In re Irby*, 858 F.3d at 236. Thus, at the time trial counsel was briefing these issues, trial counsel reasonably cited to the reasoning of *Torres-Miguel* and *McNeal* in arguing that the causation of bodily injury through indirect force did not qualify as the use of physical force under § 924(c)(3)(A). There was nothing deficient in trial counsel's performance, and this Court should deny Defendant's claim of ineffective assistance of counsel.

Finally, Defendant asserts that the lack of a mandatory minimum sentence in § 249 "presumably" means that § 249 can be violated "with no violent force." (Dkt. No. 1077 at 268). There is no basis for this assertion. To the contrary, Congress's sentencing scheme highlights the seriousness of these offenses. All violations of § 249 are felonies, and the lowest sentencing tier in § 249 has a substantial statutory maximum of ten years of imprisonment. 18 U.S.C. § 249(a)(1)(A). Rather than theorize about Congress's intent by making assumptions based on § 249's sentencing structure, this Court should look to § 249's rules of construction, in which Congress made explicit its intent that § 249(a)(1) applies only "to *violent acts* motivated by actual or perceived race [or] color." 34 U.S.C. 30506(2) (emphasis added).

Trial counsel provided more than competent counsel in their arguments about whether § 249 is a crime of violence, and Defendant's ineffective assistance claim fails to satisfy *Strickland's* performance prong.

### b. Section 247(a)(2) is a crime of violence.

Defendant also claims trial counsel should have advanced stronger arguments to show that § 247(a) is not a crime of violence. (Dkt. No. 1077 at 253-277). Yet nowhere in his voluminous § 2255 motion does Defendant point to a single case in which a court has held that § 247(a)(2) fails to satisfy the definition of crime of violence under § 924(c)(3)(A). Nor can he, as every court to have considered this issue—including the Fourth Circuit in the direct appeal of this case—has held that it does. *See, e.g.*, *Roof*, 10 F.4th at 404-05; *Bowers*, 2022 WL 17718686 at **9-14; *United States v. Earnest*, 536 F. Supp. 3d 688, 722-24 (S.D. Cal. 2021); *United States v. Hari*, No. 18-cr-0150, 2019 WL 7838282, at *10-11 (D. Minn. Sept. 17, 2019), *report and recommendation adopted*, No. 18-cr-0150, 2019 WL 6975425 (D. Minn. Dec. 20, 2019). Defendant's ineffective assistance claim should be denied because § 247(a)(2) is a crime of violence under current law, and counsel provided proficient assistance in advancing their arguments.

### i. Section 247(a)(2) is a crime of violence under current law.

Defendant makes two ineffectiveness claims related to § 247(a)(2): (1) trial counsel failed to argue that § 247(a)(2) can be violated by an individual using force against herself, and therefore fails to satisfy § 924(c)(3)(A)'s requirement that the force be used against another; and (2) trial counsel failed to adequately argue that § 247(a)(2) can be violated by the use of *de minimis* force. Neither claim has merit under current law, and therefore Defendant cannot prove prejudice as required by *Strickland*.

### a. Section 247(a)(2) can only be violated by the use of force or threat of force against another.

Section 247(a)(2)'s plain language, structure, and legislative history make clear that an individual cannot violate the statute merely by using force or threatening to use force against himself or his own property. Under the plain text of the statute, an offense under § 247(a)(2)

304

requires that the defendant "intentionally *obstructs*, by force or threat of force, including by threat of force against religious real property, any person in the enjoyment of *that* person's free exercise of religious beliefs. . . ." 18 U.S.C. § 247(a)(2) (emphasis added).

Force and property damage alone can never violate the plain text of § 247(a)(2). Rather, the defendant's use or threatened use of force under § 247(a)(2) must intentionally obstruct someone else's free exercise of religion. As the Fourth Circuit explained on direct appeal, "[e]ven if we assume that a defendant could use force against his own property . . . as a *means* to obstruct *another person* from exercising his or her religious beliefs, that force would *necessarily* amount to *a threat of force against that person* . . . ." *Roof*, 10 F.4th at 405 n.67 (emphases added).

The district court in *United States v. Bowers* likewise rejected the argument that § 247(a)(2) can be violated by use of force against oneself or one's own property. 2022 WL 17718686, at ** 11-13. As the *Bowers* court held: "Force that is intended to, and does, obstruct another person's free exercise is force targeted at another." *Id.* at *12.

The legislative history supports this view. Importantly, threats against religious real property—such as a bomb threat to a church—trigger the statute only when the threat qualifies as a true threat of physical violence that obstructs another person's free exercise of religion. *See* H.R. Rep. No. 456, 115th Cong., 1st Sess. 2 (2017) (explaining that a threat to religious buildings violates § 247(a)(2) if "the threat causes such intimidation to intentionally obstruct an individual's ability to exercise his or her religious beliefs," such as with "a threat so serious that it caused someone to feel fear of bodily harm").

Section 247's certification provision provides additional textual support that the offenses do not cover using force against oneself or one's own property (absent force or a threat of force used against another). That provision requires the Attorney General to attest that every prosecution

under § 247 "is in the public interest and necessary to secure substantial justice." 18 U.S.C. § 247(e). If a defendant were to engage in self-harm or destroy his own property, there would be no public interest in prosecuting him under § 247(a) in particular. The certification provision thus underscores that Congress intended courts to give the natural understanding of § 247's elements as requiring the use or threatened use of physical force against the person or property of another.

Instead of citing to cases interpreting the text of § 247(a)(2), Defendant cites to cases interpreting an entirely different statute, 18 U.S.C. § 2241(a)(2). (Dkt. No. 1077 at 262-63). These cases are inapposite, as the text of § 2241 is plainly distinguishable from the text of § 247(a)(2). *Cf. United States v. Gendron*, 2025 WL 2418902, at *8 n.8 (distinguishing the phrase "any person" in § 2241(a) from "any person" as used in § 249). Section 2241(a)(2) prohibits a defendant from causing the victim to engage in a sexual act "by threatening or placing [the victim] in fear that any person will be subjected to death . . . ." Unlike § 247(a)(2), the text of § 2241(a)(2) specifically encompasses making the victim afraid that "any person"—which can include the defendant—will be subjected to death. In contrast, § 247(a)(2) can be triggered only if a defendant intentionally obstructs another person in "that" person's free exercise of religious beliefs.

Nor do any of Defendant's proffered hypothetical scenarios prove otherwise. (*See* Dkt. No. 1077 at 262-64, 337). For example, Defendant hypothesizes that a person may threaten to engage in self-immolation if congregants enter a church. Yet that threat, in and of itself, would not prevent any congregant from entering their house of worship and exercising her religious beliefs, unless the fire could harm or posed a threat to the congregants. Thus, an act of self-immolation would not violate § 247(a)(2) unless it also included the use of force or threat of force against the congregants.

Defendant fares no better with his hypothetical scenario of an individual who leased her own barn to a congregation and then burned it down because she became disillusioned with the

group. Section 247(a)(2) stands in stark contrast to the federal arson statute, 18 U.S.C. § 844(i), which encompasses the destruction of "any" property. 18 U.S.C. § 844(i) (prohibiting "maliciously damag[ing] or destroy[ing] . . . *any* building, vehicle, or other real or personal property") (emphasis added). In contrast, § 247(a)(2) requires that the use or threat of force against property to obstruct someone else's religious rights. Thus, while burning one's own building may in itself be proof sufficient to satisfy the destruction element of § 844(i), it is *not* enough to prove a violation of § 247(a)(2) *unless* the defendant used or threatened physical force against a person. That is exactly what the Fourth Circuit held on direct appeal. *Roof*, 10 F.4th at 405 n.67; *cf United States v. Grassie*, 237 F.3d 1199, 1201 (10th Cir. 2001) (extensive damage to multiple churches, including arson of one, all charged under § 247(a)(1) (prohibiting defacing, damaging, or destroying religious real property), not § 247(a)(2)).

Finally, application of § 247(a)(2) in the manner suggested by Defendant—to criminalize a defendant's force against oneself or one's property, in the absence of any force or threat of force against another—would raise significant constitutional concerns. For example, if Defendant's hypothetical barn owner decided to destroy the barn (assuming she does so lawfully) because she has become disillusioned with the religious group, the Government could not criminally prohibit her from expressing her disillusionment by disposing of her own property, even if congregants would no longer be able to worship there. The Supreme Court has repeatedly cautioned courts to construe criminal statutes "so as to avoid substantial constitutional concerns." *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994) (requiring that courts read federal statutes to eliminate "serious constitutional doubts" whenever "such a reading is not plainly contrary to the intent of Congress"); *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Const. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise

serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.") (citing cases). This canon of constitutional avoidance requires the Court to reject Defendant's contorted interpretation of § 247(a)(2).

### b.  § 247(a)(2) categorically requires the degree of force required under current law.

Similar to his arguments related to § 249, Defendant claims that § 247(a)(2) is not a crime of violence because it does not require that the defendant intended to cause serious harm or death. As noted above, *Delligatti* and *Stokeling* foreclose this argument; a statute need not require that the defendant specifically intend to cause death. The elements of § 247(a)(2) track the language of § 924(c)(3)(A) and specifically require that the defendant intentionally use "force or threat of force." In addition, the death-resulting § 247(a)(2) requires the intentional use of force sufficient to obstruct another—in other words, sufficient to overcome the resistance of another person, and that such force resulted in death. *See Delligatti*, 604 U.S. at 431-32 (holding that force sufficient to overcome a victim's slightest resistance is sufficient and that "any force that actually causes injury or death" is also sufficient); *Curtis Johnson*, 559 U.S. at 140 (holding that "force *capable* of causing physical pain or injury to another person" is sufficient) (emphasis added)).

Regardless of the arguments trial counsel could have made, the current state of the law shows that those arguments would have fared no better than the arguments counsel did make. Section 247(a)(2) is a crime of violence, and Defendant cannot claim prejudice simply because trial counsel was unsuccessful in persuading the Court to erroneously hold otherwise.

### ii. Trial counsel adequately argued that § 247(a)(2) is not a crime of violence under the law that existed at the time of trial.

In light of the text, history, and cases interpreting § 247, Defendant has failed to establish that trial counsel's performance was deficient in their failure to argue that § 247(a)(2) can be violated by using force against oneself or one's own property. Trial counsel's performance cannot be deemed "outside the wide range of professionally competent assistance" where every other counsel to have litigated the exact same issue has likewise failed to succeed. *Strickland*, 466 U.S. at 690; *see also Mikalajunas*, 186 F.3d at 493 (rejecting ineffective assistance claim where "no controlling authority" would have dictated the opposite result). Ineffective assistance claims cannot be based on mere second-guessing of the performance of trial counsel. And even though his trial counsel did not raise this issue, his appellate counsel did, and the Fourth Circuit ruled against him. Where courts, including the Fourth Circuit on direct appeal, have universally agreed that § 247(a)(2) satisfies the elements clause of § 924(c), trial counsel's omission of this argument in the motion to dismiss cannot be deemed deficient performance. *See, e.g.*, *Roof*, 10 F.4th at 404-05; *Bowers*, 2022 WL 17718686 at **9-14; *Earnest*, 536 F. Supp. 3d at 722-24; *Hari*, 2019 WL 7838282, at *10-11.

### c. The elements clause is not unconstitutionally vague.

Defendant claims that trial counsel was ineffective for not arguing that the elements clause, 18 U.S.C. § 924(3)(c)(A), is unconstitutionally vague. (Dkt. No. 1077 at 277-7834). Defendant's claim of ineffective assistance of counsel fails to establish cause or prejudice for this default because this claim is meritless under current, binding Fourth Circuit precedent. *See United States v. Green*, 67 F.4th 657, 670 (4th Cir. 2023).

### i.  The elements clause is not void for vagueness under current law.

Defendant claims trial counsel should have argued that § 924(c)(3)(A) is unconstitutionally vague. (Dkt. No. 1077 at 277-79). Defendant cannot show prejudice because the current law squarely forecloses this argument.

"Vagueness may invalidate a criminal law . . . [if it] fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (citation omitted); *see also United States v. Williams*, 553 U.S. 285, 304 (2008) (upholding federal criminal child pornography statute; "A conviction fails to comport with due process [i.e., is void for vagueness] if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."); *United States v. Chong Lam*, 677 F.3d 190, 202 (4th Cir. 2012) ("The fact that Congress might have written a statute more clearly does not make that statute unconstitutionally vague.").

"Facial challenges are disfavored for several reasons," among which is that "courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (internal quotes and citations omitted); *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988) (statutes should be evaluated on an as-applied basis). Thus, absent First Amendment concerns, the Fifth Amendment bars enforcement of a criminal statute on vagueness grounds only if the statute is vague as applied to the defendant. *Williams*, 553 U.S. at 304; *Chapman v. United States*, 500 U.S. 453, 467-68 (1991); *Maynard*, 486 U.S. at 361; *United States v. Powell*, 423 U.S. 87, 92 (1975); *United States v. Jaensch*, 665 F.3d 83, 89 (4th Cir. 2011); *United States v. Sun*, 278 F.3d 302, 309

(4th Cir. 2002). The Fourth Circuit has repeatedly admonished that courts should "consider whether a statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Jaensch*, 665 F.3d at 89 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 130 (2010)); *see also Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982) (same); *United States v. Hasson*, 26 F.4th 610, 616 (4th Cir. 2022) (collecting cases); *United States v. Chaudhri*, 134 F.4th 166, 179 (4th Cir. 2025) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness.") (quoting *Parker v. Levy*, 417 U.S. 733, 756 (1974)).

Despite his fulsome briefing on this claim, Defendant fails to cite binding precedent from the Fourth Circuit holding that § 924(c)(3)(A) is not unconstitutionally vague. In *Green*, 67 F.4th at 670, the Fourth Circuit held that "our precedent cannot support [the defendant's] argument that the elements clause is unconstitutionally vague." Similarly, in *United States v. Simms*, 914 F.3d 229, 252 (4th Cir. 2019), the *en banc* Fourth Circuit declared that "there is no colorable argument that the elements-based categorical approach of § 924(c)(3)(A) suffers from any . . . indeterminacy." Thus, the Fourth Circuit has definitively foreclosed Defendant's void-for-vagueness claim. Defendant has provided no explanation for his failure to bring these binding circuit precedents to this Court's attention.

Moreover, as far as the Government is aware, every other court that has addressed vagueness challenges to § 924(c)(3)(A) or similar elements clauses have uniformly upheld them. *See, e.g.*, *United States v. Harbuck*, 146 F.4th 1073, 1080 (11th Cir. 2025) (upholding the ACCA's elements clause); *United States v. Walker*, 793 F. App'x 865, 869-70 (11th Cir. 2019) (upholding the ACCA's elements clause); *United States v. Pendleton*, 894 F.3d 978, 982 (8th Cir. 2018)

311

(upholding the ACCA's elements clause); *United States v. Bowers*, CR 18-292, 2020 WL 6119480, at *2 (W.D. Pa. Oct. 16, 2020) (upholding § 924(c)(3)(A)); *United States v. Altruz*, No. CR 20-207, 2023 WL 3806347, at *5 n.8 (E.D. Pa. June 2, 2023) ("To the extent that [the defendant] is attempting to argue that the 'elements clause,' section 924(c)(3)(A), is unconstitutionally vague, this argument is also meritless."). Defendant likewise failed to cite to any of these precedents.

These courts have uniformly held that the elements clause of § 924 is not impermissibly vague because, as the Supreme Court has explained, it requires courts to undergo a "straightforward job: Look at the elements of the underlying crime and ask whether they require the government to prove the use, attempted use, or threatened use of force." *Taylor*, 596 U.S. at 860; *see also Harbuck,* 146 F.4th at 1080 (holding that *Taylor* "forecloses [the defendant's] vagueness challenge to the elements clause [of the ACCA]"); *Pendleton*, 894 F.3d at 982 (emphasizing that the elements clause of the ACCA "allows the sentencing court to consider the offense of conviction by itself in determining whether the elements involve the use, attempted use, or threatened use of force. . . . We therefore reject [the defendant's] contention that the force clause is unconstitutionally vague.")

Defendant's reliance on *Johnson v. United States*, 576 U.S. 591 (2015), is misplaced. The Supreme Court in *Johnson* held that the ACCA's residual clause was unconstitutional under the void-for-vagueness doctrine but emphasized that "two features of [ACCA's] residual clause conspire to make it unconstitutionally vague." *Id.* at 597. First, it required a judicial assessment of a hypothetical risk posed by a "judicially imagined 'ordinary case,'" and second, it provided no concrete metric or factors for judges and defendants to determine what kind of conduct the "ordinary case" might encompass or how much risk the ordinary case might entail. *Johnson*, 576

U.S. at 597-98; *see also Welch v. United States*, 578 U.S. 120, 124-25 (2016) (noting that the ACCA's residual clause was vague as it "required courts to assess the hypothetical risk posed by an abstract generic version of the offense").

However, even as it struck down the ACCA's residual clause as unconstitutionally vague, the Supreme Court clarified that the decision in *Johnson* did "not call into question . . . the remainder of the Act's definition of a violent felony," which includes the elements clause. 576 U.S. at 606. The *Johnson* Court specifically contrasted the indeterminacy inherent in the residual clause with the concrete statutory elements on which the force clause depends. *See id.* at 596-97 (noting that the residual clause was unconstitutionally vague because it "ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, *not to real-world facts or statutory elements*" (emphasis added)); *see also Harbuck,* 146 F.4th at 1079-80. Unlike the judicial abstraction inherent in the residual clause, the elements clause depends only on a "straightforward" review of the statutory elements of the crime that serve as the predicate for the § 924 charges. *See Taylor*, 596 U.S. at 860; *see also Green*, 67 F.4th at 670 (holding that the elements clause is "very different than the 'substantial risk' language that doomed the residual clause"); *Simms*, 914 F.3d at 252 (holding that there is no "colorable argument" that the elements clause shares the indeterminacy of the residual clause); *Walker*, 793 F. App'x at 869 ("[Defendant's] view is that the elements clause is unconstitutionally vague for the same reasons the Supreme Court has held the residual clause to be invalid. We disagree."); *Pendleton*, 894 F.3d at 982 ("Without the two problematic aspects of the residual clause, the force clause presents a manageable judicial inquiry that provides adequate notice to potential offenders.").

Despite the weight of all this authority, which Defendant ignores, he asserts several meritless claims about why the elements clause is unconstitutionally vague. In essence all these

313

claims boil down to the fact that courts were previously split over the meaning of the phrase "use of physical force." Prior circuit splits over statutory interpretation do not alone render a statute unconstitutionally vague. If that were the rule, then almost every case that is reviewed by the Supreme Court would be subject to void-for-vagueness challenges. *See United States v. Morrison*, 686 F.3d 94, 104 (2d Cir. 2012) ("[I]t is manifest that conflicts between courts over the interpretation of a criminal statute do not in and of themselves render that statute unconstitutionally vague."). Rather, the question under the Due Process Clause is whether the statute itself "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304. One of the "more important aspect[s] of the vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). In other words, a statute is constitutional under the Due Process Clause unless it is so indeterminate and standardless that courts, law enforcement, and defendants lack fair notice as to what the law prohibits. *Williams*, 553 U.S. at 306.

In rejecting a vagueness challenge to the elements clause, the Fourth Circuit explained that "[a]ny indeterminacy in the meaning of the elements clause's reference to 'physical force' is an example of ambiguity, not vagueness." *Green*, 67 F.4th at 670. "Such ambiguity does not prevent the elements clause from 'provid[ing] people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or 'encourage[ ] arbitrary and discriminatory enforcement.'" *Id.* (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). Thus, "[c]ourts can resolve the ambiguity by construing the statute," *Green*, 67 F.4th at 670, which is exactly what the Supreme Court did in *Delligatti*, *Stokeling*, and *Castleman*. The Supreme Court has clarified that statutes that

314

categorically require the intentional use of force that causes any bodily injury—whether through direct force, indirect force, or acts of omission—involve the type and degree of force necessary to qualify as crimes of violence under § 924(c)(3)(A). Equipped with that rule, courts, law enforcement, and defendants can engage in a "straightforward" analysis of the elements of predicate crimes.

Even if the scope of force under § 924(c)(3)(A) were vague, Defendant cannot complain of any vagueness as applied to him and, as such, his vagueness claim fails. *See Jaensch*, 665 F.3d at 89; *Bowers*, 2020 WL 6119480, at *2 (rejecting as-applied vagueness challenge to § 924(c)(3)(A) by a defendant who committed a similar bias-motivated mass murder). The evidence at trial established that Defendant planned this mass shooting for months, armed himself with a Glock handgun, drove to the church, loaded magazines with eighty-eight bullets, sat with unarmed parishioners for nearly an hour in Bible study, and then intentionally and systematically shot at them, killing nine—there was nothing *de minimis* or indirect about his use of force; there was nothing accidental, reckless, or negligent; and this mass shooting did not implicate any hypothetical or marginal case. Any ordinary person would understand that these killings involved violent force under any definition. *Cf. Morales*, 527 U.S. at 56 (a criminal law may be invalidated for vagueness if ordinary people could not understand the conduct it prohibits); *Williams*, 553 U.S. at 304 (emphasizing that the void for vagueness doctrine is grounded in the due process requirement of fair notice).

In sum, Defendant's vagueness claim lacks merit under current law, and therefore he cannot show any prejudice suffered from counsel's failure to argue that the elements clause was unconstitutionally vague.

### ii. Trial counsel's decision not to raise a vagueness challenge to § 924 was reasonable under the law that existed at the time of trial.

Defendant claims that trial counsel should have challenged § 924(c)(3)(A), the elements clause, as being unconstitutionally vague. (Dkt. No. 1077 at 277-79). Defendant is correct that trial counsel did not raise this claim, but that omission does not constitute constitutionally deficient performance. Defendant's § 2255 motion does not identify a single case that held at the time of trial that the elements clause was impermissibly vague, and the Government is aware of none. Counsel cannot be deemed to have provided ineffective assistance of counsel for failing to identify potential arguments for which there is no supporting caselaw. *See Morris*, 917 F.3d at 823; *McNamara*, 74 F.3d at 516.

Moreover, trial counsel's post-conviction declarations suggest that counsel made a strategic choice not to raise this issue. (*See* Dkt. No. 1077-71 at 1-2). In that declaration, trial counsel acknowledges that she worked with a "national expert" on § 924 issues, but did not provide any reason that she or the expert failed to raise a vagueness challenge to § 924(c)(3)(A). This silence is particularly notable because trial counsel explained why she omitted other legal arguments from the briefing, including that she lacked awareness of those arguments. (*See* Dkt. No. 1077-71 at ¶¶ 5-11.) The omission of any reference to the vagueness argument suggests that she was aware of, but strategically chose not to, assert this challenge. Such strategy decisions are presumed to fall within the range of professional competency and cannot excuse procedural default.[77] *See Smith v. Murray*, 477 U.S. 527, 535 (1986) ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." (internal quotation marks and citation

---

[77] Defendant did not file any declarations by appellate counsel to explain their decision not to raise a vagueness challenge on appeal.

omitted)). Thus, Defendant fails to establish that trial counsel performed deficiently by failing to raise a vagueness challenge. Defendant's ineffective assistance claim based on trial counsel's failure to challenge the constitutionality of § 924(c)(3)(A) as void for vagueness should be denied.

### d. Invalidation of the residual clause would not have changed the outcome of Defendant's trial.

Defendant claims that trial counsel was ineffective for not requesting a stay pending the Supreme Court's decision in *Sessions v. Dimaya*, 584 U.S. 148 (2018). Not only is this claim factually inaccurate, (*see* Dkt. No. 935 at 5 (stating "[i]n light of the rapidly developing law on crimes of violence, it would be especially prudent for the Court to await the Supreme Court's decision in *Sessions v. Dimaya* . . . .")), it also fails to establish prejudice even assuming trial counsel failed to request a stay. This Court and the Fourth Circuit held that §§ 247(a)(2) and 249(a)(1) constituted crimes of violence under the *elements* clause, so, as this Court found, "issues regarding residual clauses . . . are irrelevant to this case." (Dkt. No. 735 at 29). As current law confirms that §§ 247(a)(2) and 249(a)(1) are valid crimes of violence, additional wrangling regarding the residual clause would not have affected Defendant's convictions or sentence at all.

Defendant also fails to establish that counsel's performance was constitutionally deficient. The Fourth Circuit has repeatedly held that an attorney's performance is not deemed ineffective simply because the Supreme Court has granted a writ of certiorari on a potentially relevant issue. *See, e.g.*, *McNamara*, 74 F.3d at 516; *Kornahrens v. Evatt*, 66 F.3d 1350, 1360 (4th Cir. 1995) (holding that trial counsel was not ineffective for failing to preserve an issue after the Supreme Court granted certiorari on that issue). Here, counsel's decision to wait until after trial to suggest a stay is a sign of strategy, not incompetency. As noted in response to Claim Four, *see supra* at 153-60, trial counsel deliberately chose to expedite the federal trial, and a continuance would have undermined that overarching trial strategy.

317

Thus, trial counsel's performance cannot be deemed deficient for deciding not to seek a stay based on the Supreme Court's grant of certiorari in *Dimaya*, nor can any alleged deficiency in performance be deemed prejudicial.

### e.  Section 249(a)(1) does not violate the First Amendment.

Defendant claims that trial counsel was ineffective for failing to raise a First Amendment challenge to the constitutionality of § 249. (Dkt. No. 1077 at 280-82).[78] This claim should be denied. Defendant cannot establish prejudice because, under current law, the violent conduct proscribed by § 249 is not covered by the First Amendment. Defendant also fails to establish that he suffered any prejudice by trial counsel's failure to raise this First Amendment challenge to § 249, or that trial counsel performed deficiently, given longstanding Supreme Court and circuit jurisprudence rejecting First Amendment challenges to statutes, like § 249, that target bias-motivated violence. Trial counsel's failure to raise such an unmeritorious claim did not constitute ineffective assistance of counsel.

Section 249, by its plain terms, applies only to willful, violent conduct. It does not prohibit any speech or expressive conduct that is protected by the First Amendment. *See Glenn v. Holder*, 690 F.3d 417, 420 (6th Cir. 2012) ("The [Hate Crime Prevention] Act . . . prohibits violent acts; it does not prohibit constitutionally protected speech or conduct."). The Supreme Court has stated unequivocally: "[A] physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment." *Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993); *see also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982) ("The First Amendment does not

---

[78]  Although the § 2255 motion does not explicitly state whether he claims that trial counsel should have lodged a facial or as-applied challenge, Defendant does not contend, nor could he, that murdering nine parishioners constituted expressive conduct. Thus, his § 2255 motion implicates only a facial challenge to the statute.

protect violence."); *Roberts v. United States Jaycees*, 468 U.S. 609, 628 (1984) ("[V]iolence or other types of potentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no constitutional protection.").

That is why courts have consistently rejected First Amendment challenges to hate crime statutes, all of which require as an element that the defendant acted because of the victim's protected characteristic. *See, e.g.*, *United States v. McDermott*, 29 F.3d 404, 407 (8th Cir. 1994) (upholding hate crime convictions under 18 U.S.C. § 245(b)(2) and finding that "[t]here is no doubt" that throwing rocks, brandishing weapons, and threatening violence to intimidate people because of their race "were not protected by the First Amendment"); *United States v. Hayward*, 6 F.3d 1241, 1250 (7th Cir. 1993) (upholding hate crime conviction under the Fair Housing Act, 42 U.S.C. § 3631, and holding that "the act of cross burning [in that case] . . . promotes fear, intimidation, and psychological injury" and thus "lacks First Amendment protection"), *overruled in part on other unrelated grounds by United States v. Colvin*, 353 F.3d 569, 576 (7th Cir. 2003); *United States v. Stewart*, 65 F.3d 918, 929 (11th Cir. 1995) (rejecting First Amendment challenge to hate crime convictions under 18 U.S.C. § 3631 and holding that, "although § 3631 specifically prohibits intimidation based on race," the defendant's First Amendment facial challenge failed "because such intimidation itself is unprotected conduct"). Defendant shot and killed nine parishioners because of their race—such violence in no way implicates any speech or expression protected by the First Amendment.

Moreover, in enacting § 249, Congress specifically crafted the statute to allow for robust expression under the First Amendment and included several rules of construction to ensure that the statute would not inhibit constitutionally protected speech:

- first, the statute shall not be construed "in a manner that infringes any rights under the first amendment to the Constitution of the United States," 34 U.S.C. § 30506(3);

319

- second, the statute shall not be construed "to diminish any rights under the first amendment to the Constitution of the United States," *id.* § 30506(5);

- third, the statute shall not be construed "to prohibit any constitutionally protected speech, expressive conduct or activities," *id.* § 30506(6);

- fourth, the statute shall not "be construed to allow prosecution based solely upon an individual's expression of racial, religious, political, or other beliefs," *id.* § 30506(4); and

- fifth, the statute generally prohibits courts from considering "evidence of speech, beliefs, association, group membership, or expressive conduct unless that evidence is relevant and admissible under the Federal Rules of Evidence," *id.* § 30506(1).

Where "the statutory language is unambiguous and the statutory scheme is coherent and consistent—as is the case here—the inquiry ceases." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) (cleaned up). The Shepard-Byrd Act is unambiguous on this point: it explicitly excludes constitutionally protected expression from its coverage.

That § 249(a) prohibits violent conduct *motivated* by bias does not alter the analysis. The Supreme Court has held that the government may punish "bias-inspired conduct" without offending the First Amendment because such conduct "inflict[s] greater individual and societal harm." *Mitchell*, 508 U.S. at 487-88; *see also Stewart*, 65 F.3d at 929 (holding that "a statute aimed at constitutionally unprotected conduct may single out a particular motive, including racial animus, for punishment without offending the First Amendment"); *Hayward*, 6 F.3d at 1250 (upholding hate crime statute because it was "aimed at curtailing wrongful conduct in the form of threats or intimidation [against people based on race], and not toward curtailing any particular form of speech"); *cf. United States v. Cannon*, 750 F.3d 492, 508 (5th Cir. 2014) (noting that the use of speech-based evidence to prove racial motive in hate crime prosecution does not violate the First Amendment).

The Supreme Court also has repeatedly upheld non-criminal civil rights statutes against First Amendment challenges—even though they require proof of a bias motive—because they target "unique evils" caused by discriminatory conduct and thus do not punish First Amendment-protected activity. *See Roberts*, 468 U.S. at 628 (upholding civil rights statute and finding that "acts of invidious discrimination . . . cause unique evils that government has a compelling interest to prevent—wholly apart from the point of view such conduct may transmit"); *see also Mitchell*, 508 U.S. at 487 (citing cases); *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984).

The cases cited by Defendant are inapposite. (*See* Dkt. No. 1077 at 281-83). They each address regulation of pure speech or expression, not acts of violence. Notably, in each case, the Supreme Court distinguished regulation of pure speech from regulation of harmful conduct. *See, e.g.*, *Stanley v. Georgia*, 394 U.S. 557, 563-64 (1969) (holding that "mere possession" of obscene film in the privacy of the defendant's home is protected under the First Amendment, but noting that distribution of obscene material can be regulated); *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 69-70 (1973) (holding that the state may regulate the showing of pornographic films); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992) (distinguishing between racially-biased "fighting words" and discriminatory conduct). For example, in *Paris Adult Theatre I*, the Supreme Court differentiated between regulating "drug sales" (conduct), which is permissible, and regulation of "the fantasies of a drug addict" (pure speech), which is not. 413 U.S. at 67-68.

Similarly, in *R.A.V. v. City of St. Paul*, the Supreme Court invalidated an ordinance that prohibited racially-biased "fighting words." 505 U.S. at 391. In reaching its decision, however, the Supreme Court emphasized that the ordinance at issue regulated pure speech and specifically contrasted regulation of such pure speech with federal criminal and civil anti-discrimination laws. The Supreme Court expressly acknowledged that those civil rights statutes proscribed bias-

motivated conduct, but nevertheless cited them as statutes that do not violate the First Amendment because they are "directed at conduct rather than speech." *R.A.V.*, 505 U.S. at 389-90; *see also id.* at 390 ("Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy.").[79] In the very next term, the Supreme Court emphasized that its decision in *R.A.V.* was cabined to the ordinance at issue in that case, which "was explicitly directed at expression (*i.e.*, 'speech' or 'messages')," and that it did not affect the Court's longstanding First Amendment jurisprudence that allows legislatures to enact statutes "aimed at conduct unprotected by the First Amendment." *Mitchell*, 508 U.S. at 487.

Defendant in this case was not, and could not have been, prosecuted under § 249 if he had merely fantasized about committing racially-motivated murders. He was prosecuted because he actually shot and killed parishioners because of their race. In light of the consistent rulings of the Supreme Court and circuit courts holding that statutes that prohibit violence, including bias-motivated violence, do not violate the First Amendment, trial counsel's omission of a First Amendment challenge did not cause any prejudice under existing law, and did not constitute deficient performance.

---

[79] The Supreme Court in *R.A.V.* cited with approval Title VII (which prohibits employment discrimination on the basis of sex), 18 U.S.C. § 242 (which criminalizes the willful deprivation of rights, as well as discrimination in punishment based on citizenship or race), 42 U.S.C. § 1981 (which prohibits discrimination in contracts on the basis of race), and 42 U.S.C. § 1982 (which prohibits discrimination in property transactions on the basis of race) as examples of statutes that appropriately targeted unlawful conduct where the defendant acted because of the victim's protected characteristics. *R.A.V.*, 505 U.S. at 389-90.

### f. Sections 247(a)(2) and 249(a)(1) are constitutional under the Commerce Clause and the Thirteenth Amendment and were properly certified for prosecution.

Defendant summarily asserts that that trial counsel did not adequately litigate whether § 247(a)(2) is constitutional under the Commerce Clause, whether § 249(a)(1) is constitutional under the Thirteenth Amendment, and whether the charges were properly certified for federal prosecution. (Dkt. No. 1077 at 283-300). Although Defendant rehashes many of the same substantive arguments, he does not actually identify what trial counsel should have done differently. He asserts that their arguments "missed the mark" and that counsel was not "seriously" pursuing these arguments. (Dkt. No. 1077 at 295 n.92, 300). Such conclusory allegations fall well short of establishing that trial counsel's arguments were so deficient as to deprive Defendant of his right to effective counsel.

Trial counsel vigorously argued that § 247 was an unconstitutional exercise of Congress's Commerce Clause powers and that § 249 was an unconstitutional use of Congress's Thirteenth Amendment authority. Trial counsel also argued that civil rights prosecutions generally and the prosecution of this defendant in particular constituted an unwarranted incursion on the state's police powers. These are the exact same arguments that Defendant asserts in his § 2255 motion. *Compare* (Dkt. Nos. 233 at 16-20; 295 at 3-4), *with* (Dkt. No. 1077 at 283-94). Defendant cannot complain of trial counsel's performance, where he has not identified a single argument or case that they overlooked.

Defendant fails to cite any basis for prejudice, as every court—including this Court and the Fourth Circuit on direct appeal—has uniformly rejected the arguments he now makes in his § 2255 motion. *See Roof*, 10 F.4th at 382-387 (holding that § 247(a)(2) is constitutional on its face and as

applied); *id.* at 390-95 (upholding the constitutionality of § 249); (*see also* Dkt. Nos. 279 at 3-40, and cases cited therein; 735 at 3-25; 961 at 3-6).

With respect to the constitutionality of § 249, this Court carefully considered and rejected each of these federalism arguments, finding that "§ 249(a)(1) does not interfere with states' police powers" and that "[e]ven if § 249(a)(1) did somehow interfere with state police powers, Defendant does not explain how that could be problematic if the Thirteenth Amendment otherwise authorizes the statute." (Dkt. No. 735 at 6; *see also id.* at 7 ("Whether appropriate legislation in some way touches on police powers is immaterial."); *id.* at 5 ("The Court finds no merit in Defendant's federalism argument."); *id.* at 6 ("It is indeed difficult to imagine how a federal prohibition against hate crimes could interfere with a state's prohibition of the same conduct.").

Defendant has not pointed to a single case holding that § 249 is invalid, a single case that his trial counsel failed to cite, or a single argument that counsel failed to make. For example, just as Defendant now asserts in the § 2255 motion that § 249 was intended as a "backstop" to state criminal prosecutions, trial counsel made the exact same argument—using the exact same word, "backstop." *Compare* (Dkt. No. 233 at 20-22) *with* (Dkt. No. 1077 at 285-94).

Given that this Court, the Fourth Circuit, and every other court to consider the constitutionality of § 249 has upheld it, Defendant's claim that his trial counsel provided incompetent representation in his challenge to the constitutionality of § 249 should be denied. Nor can he establish any prejudice, as any claim that counsel could have made would have been futile.

Defendant's claims about the constitutionality of § 247(a)(2) should likewise be rejected. No court has held that § 247(a)(2) is facially unconstitutional, and the Fourth Circuit thoroughly reviewed and rejected Defendant's facial and as-applied challenges to the § 247(a)(2) counts. *See Roof*, 10 F.4th at 381-89. As this Court previously held, § 247's jurisdictional nexus ensures that

the statute covers only that conduct that Congress is authorized to regulate under the Commerce Clause, and Defendant's specific conduct—including his use of the internet, telephone, GPS navigation, and bullets, magazines, tactical pouch, and firearm that traveled in interstate commerce—sufficiently established an interstate nexus. (Dkt. Nos. 735 at 19-34; 961 at 4-5).

Defendant has failed to establish any deficiencies in trial counsel's representation or any prejudice caused by counsel's performance. Defendant's trial counsel thoroughly argued that § 247(a)(2) was invalid under the Commerce Clause, both facially and as applied to him. (*See* Dkt. Nos. 233 at 3-15; 295 at 1-3; 916 at 2-5; 935 at 2-3). Specifically, trial counsel argued, as Defendant does now, that § 247(a)(2) regulates non-economic activity that does not affect interstate commerce or use the channels or instrumentalities of commerce; that Congress made insufficient legislative findings about the interstate impacts of § 247; and that Defendant's conduct was wholly intrastate and did not involve the use of a channel or instrumentality of commerce. This Court considered and rejected all of these arguments, as did the Fourth Circuit. (*See* Dkt. No. 735 at 19-25); *Roof*, 10 F.4th at 381-89.

Defendant presents no new arguments and cites no caselaw that his trial counsel should have raised. (*See* Dkt. No. 1077 at 295 n.92). Having failed to do so, Defendant cannot establish any deficiencies in counsel's representation, or any prejudice that their representation caused. Defendant's claim of ineffective assistance should be denied.

Finally, Defendant's claim that counsel failed to adequately argue that the §§ 247 and 249 charges were improperly certified also fails. This is the third time he has raised the exact same claim. In reviewing the certifications in this case, this Court held the federal interest in prosecuting this racially-motivated mass shooting "would not be vindicated by an ordinary murder prosecution," (*see* Dkt. No. 735 at 16-18), and the Fourth Circuit held that "although there might

be federal certifications that raise close questions, this case is not one of them, given the character of the crimes and the confessed motives behind them." *Roof*, 10 F.4th at 397. His § 2255 motion simply restates arguments that trial and appellate counsel have already raised and that have already been rejected by this Court and the Fourth Circuit, and therefore he cannot establish either prejudice or deficient performance of counsel.

### g. Trial counsel was not ineffective for failing to challenge the charges under the Double Jeopardy Clause.

Defendant asserts that charging and convicting him in a single trial with violations of §§ 247, 249, and 924(j) violates the Double Jeopardy Clause of the Fifth Amendment, and that his trial counsel was ineffective for failing to raise a Double Jeopardy challenge to his convictions. (Dkt. No. 1077 at 301-02). Although it is unclear from his motion, Defendant seems to argue that convicting him of the § 924(j) counts was improper because §§ 247 and 249 are lesser-included offenses of the firearms charges. Defendant fails to establish that his counsel acted incompetently based on the law that existed at the time or that he suffered any prejudice for failing to raise an unmeritorious Double Jeopardy claim.

This claim lacks merit under current law. The Double Jeopardy Clause of the Fifth Amendment provides that no "person [shall] be subject for the same offence to be put twice in jeopardy of life or limb." As the Fourth Circuit has repeatedly held, the Double Jeopardy Clause "does not . . . prohibit the legislature from punishing the same act or course of conduct under different statutes." *United States v. Ayala*, 601 F.3d 256, 264-65 (4th Cir. 2010). Rather it only prevents courts from imposing "*cumulative sentences* unless Congress intended to authorize such multiple punishment." *United States v. Palacios*, 982 F.3d 920, 924 (4th Cir. 2020) (emphasis added).

"To determine whether the legislature has authorized cumulative punishments, the most unambiguous evidence is the language of the statutes. When the legislature enacts two statutes that apply to the same course of conduct, the critical issue for double jeopardy analysis is whether each statute requires proof of an element not included in the other statute." *United States v. Johnson*, 32 F.3d 82, 83-84 (4th Cir. 1994) (citing *Blockburger v. United States*, 284 U.S. 299 (1932)); *see also Palacios*, 982 F.3d at 924 (holding that "two crimes are the same unless each provision requires proof of a fact which the other does not") (internal quotation marks omitted)).

Defendant does not seem to dispute that the elements of the two substantive offenses are distinct. Section 247 requires the use of force or threat of force to intentionally obstruct a person's religious exercise, whereas § 249 does not. Section 249 requires that the defendant willfully cause bodily injury (or attempt to do so with a dangerous weapon) and that he acted because of race; § 247(a)(2) does not require either bodily injury or bias motive. Thus, Defendant cannot claim that his convictions for those two substantive offenses violate the Double Jeopardy clause.

Instead, Defendant seems to assert that the predicate crimes of violence are lesser-included offenses of the § 924(j) counts. The Government does not dispute this part of Defendant's argument. But Defendant then asserts charging him with the substantive offenses required the Court to dismiss the § 924 counts *before trial*. (Dkt. No. 1077 at 301 (objecting to "charging" Defendant with §§ 247, 249, and 924)).

Decades ago, the Supreme Court unequivocally announced the exact opposite rule: "[T]he [government] is not prohibited by the Double Jeopardy Clause from charging [a defendant] with greater and lesser included offenses and prosecuting those offenses in a single trial." *Ohio v. Johnson*, 467 U.S. 493, 500 (1984). This rule is nothing new—charging and convicting defendants of lesser-included offenses and more aggravated offenses is a common practice that plays out in

327

courtrooms across the nation. Under binding Supreme Court precedent (and common trial practice), charging and convicting Defendant in the same trial of the §§ 924(j), 247(a)(2), and 249 counts did not violate the Double Jeopardy Clause. *See United States v. Devine*, 40 F.4th 139, 150-52 (4th Cir. 2022).

The only case cited by Defendant is a Fifth Circuit opinion—decided in 2025, nearly a decade after the conclusion of trial in this case—that addressed an entirely separate issue, namely whether the Double Jeopardy Clause is violated where a court imposes a *sentence* for a § 924(j) conviction consecutively to the sentence on the substantive predicate crime. (*See* Dkt. No. 1077 at 301-02 (citing *United States v. Sanders*, 133 F.4th 341, 369 (5th Cir. 2025)). Defendant misleadingly asserts that the Fifth Circuit held that the government had violated "[the defendant's] *right not to be tried twice* for the same conduct" and vacated his "*convictions* and sentences for the § 924 offenses." (Dkt. 1077 at 301, 315 (emphases added)). These assertions are false. The Fifth Circuit expressly limited its Double Jeopardy analysis to the issue of cumulative sentencing, stating that the defendant "has been subjected to only one trial, so his right [under the Double Jeopardy Clause] to be free from multiple trials for the same offense is *not at issue."* *Sanders*, 133 F.4th at 369 (emphasis added).[80] The Fifth Circuit only vacated his *sentence* on the § 924(j) count; it never mentioned vacatur of the conviction itself. *Id.* at 371. Nothing in *Sanders* supports Defendant's claim that trying and convicting him of all three offenses in a single trial offends the Double Jeopardy Clause in any way, and therefore trial counsel's failure to raise that argument cannot have caused any prejudice.

---

[80] By acknowledging that the government did not violate the Double Jeopardy Clause by prosecuting the defendant for both the predicate offenses and the § 924(j) offenses in a single trial, the Fifth Circuit's decision in *Sanders* actually undermines Defendant's claim that trying and convicting him of all three statutes violated Double Jeopardy. *See id.* at 369.

Moreover, trial counsel did not perform deficiently by failing to assert a Double Jeopardy claim in light of the Fourth Circuit caselaw that existed at the time of trial. At the time of Defendant's sentencing in this case, the Fourth Circuit—along with every other circuit except one—had held that a conviction under § 924(j) required a mandatory consecutive sentence to the sentences imposed on the predicate crimes of violence. *See United States v. Bran*, 776 F.3d 276, 281 (4th Cir. 2015) (citing cases), overruled in part by *Lora v. United States*, 599 U.S. 453 (2023). That rule remained law in the Fourth Circuit until 2023, seven years after the conclusion of trial in this case.[81]   Given the near universal consensus that district courts must impose a mandatory consecutive sentence for § 924(j) convictions (which presupposes charging and convicting the defendant of the underlying crimes of violence), Defendant's trial counsel acted reasonably by not raising a Double Jeopardy claim. *See Morris*, 917 F.3d at 823 (holding that counsel "does not perform deficiently by failing to raise novel arguments that are unsupported by then-existing precedent"); *McNamara*, 74 F.3d at 516 ("[A]n attorney's failure to anticipate a new rule of law [is] not constitutionally deficient").

Defendant asserts that dismissal of the nine firearms counts "might have convinced" a juror to vote differently during the penalty phase. (Dkt. No. 1077 at 302). But, as noted above, the Double Jeopardy Clause would not have prevented the Government from charging and convicting the defendant of all of the capital charges in a single trial. *See Johnson*, 467 U.S. at 500. Thus, the jury would have considered all of the same evidence, and there is no basis to conclude that the ultimate sentence of death would have been any different.

---

[81] In 2023, the Supreme Court decided *Lora v. United* States, 599 U.S. at 464, and held that the consecutive-sentence requirement in 18 U.S.C. § 924(c)(1)(D)(ii) does not apply to a sentence imposed under 18 U.S.C. § 924(j). Accordingly, a district court now has discretion to order that a sentence for a Section 924(j) offense run consecutively or concurrently to sentences for other offenses, subject to the ordinary rules governing sentencing. *Id.* at 463.

The jury returned death verdicts on nine § 247 counts and nine § 924(c) counts after hearing substantial evidence of the aggravating factors and minimal evidence of mitigating factors. The evidence presented at trial focused on Defendant's decision to target congregants in a historic house of worship, his racial animus and attempt to incite racial violence, his lengthy planning and substantial premeditation, the sheer number of victims and the vulnerability of three of the victims, the callousness with which he executed the parishioners, his lack of remorse, and the pain he caused by murdering nine devout parishioners. None of this evidence distinguished between the firearms counts and the § 247 counts, and there is no basis to conclude that the ultimate sentence of death would have been any different.

### h. Trial counsel's performance far exceeded the standards of competent counsel.

Instead of seeking to satisfy the requirements of *Strickland*, Defendant makes two inapposite arguments in seeking to establish deficient performance. (*See* Dkt. No. 1077 at 300.) First, he claims that trial counsel should have sought a continuance to allow for more time to litigate the issues. But, as addressed with respect to Claim Four, *see supra* at 153-58, trial counsel had strategic reasons for seeking to go to trial in federal court. Such strategic decision-making does not constitute ineffective assistance of counsel, and this strategy did not deprive the defendant of a fair trial. Nor did it prevent his trial team from providing extensive briefing on all relevant arguments.

Second, Defendant claims that trial counsel was ineffective for stating that he was willing to plead guilty to life imprisonment without the possibility of parole and suggests that making that announcement somehow undermined the seriousness with which this Court considered their arguments. (Dkt. No. 1077 at 252-53, 300, 303.) However, learned counsel in other federal capital cases have done the exact same thing, and counsel for capital defendants often publicly announce

330

that their clients are willing to plead guilty to life sentences. *See, e.g.*, Renewed Mot. to Dismiss the Notice of Intent to Seek the Death Penalty at 2 n.2, *United States v. Bowers*, No. 18-cr-00292-RJC, (W.D. Pa. Apr. 4, 2023) ECF No. 757 (capital defendant represented by two experienced learned counsel, stating in a public filing that the defendant was willing to stipulate to life sentences). Making such a pronouncement is a strategic tactic in capital cases and does not represent any deficiencies in counsel's performance.[82] Defendant also failed to establish that he suffered any prejudice. This Court took trial counsel's arguments very seriously and wrote thorough opinions addressing the complex constitutional and statutory arguments that they raised. Nothing in the record suggests that this Court took their arguments less seriously because they indicated that the defendant was willing to plead guilty. Trial counsel "zealously represented" the defendant, and nothing in their actions constituted ineffective assistance of counsel. (*See, e.g.*, Dkt. No. 949 at 100-01).

### i. Defendant's additional claims of prejudice are unsupported by the record.

Aside from the question of whether any additional arguments would have been legally successfully (which, as detailed above, they would not have been), Defendant also asserts several speculative outcomes that he claims could have resulted from stronger arguments. First he argues, without any foundation, that with better briefing by trial counsel, "the government would have seen the legal flaws in the charges . . . and decided it was a safer bet for the state of South Carolina to try [Defendant]," or that the government may have pleaded him to a sentence of life imprisonment. (Dkt. No. 1077 at 303-05). But the Government has consistently won the issues

---

[82] In fact, Defendant asserted as a mitigating factor that he offered to plead guilty to the offenses charged, and the jury unanimously found that mitigating factor in his favor. (*See* Dkt. No. 871 at 16.)

raised in Defendant's § 2255 motion, including the constitutionality of §§ 247 and 249 and the applicability of § 924(c)(3)(A) to violations of §§ 247(a)(2) and 249(a)(1). There is no basis to suggest that the Government would have dismissed the charges, especially in a case of national importance like this one.

Defendant then asserts a series of cascading speculative claims—that had his counsel prevailed on one or more of these legal arguments, he "might have trusted counsel more, and might have been more willing to talk with them, more willing to help them develop a penalty stage strategy, [and] more willing to let them represent him at the penalty phase." (Dkt. No. 1077 at 305). These claims are sheer conjecture and are directly contradicted by the record. The defendant committed this horrific crime to "wake up" white people, Gov't Trial Ex. 5, and he decided to forego a mental health defense because of his deep ideological commitment to white supremacy and his desire to increase racial tensions in this country. As he repeatedly explained to this Court, he would rather face the death penalty than assert a mental health defense because, in his view, such a defense would "discredit[] the reason why I did the crime." *See Roof*, 10 F.4th at 348. The record is clear that he represented himself in order to prevent the presentation of mental health mitigation evidence. *See supra* at 176-79. Even after he was sentenced to death, Defendant attempted to fire his appellate counsel because he disagreed with their presentation of mental health claims on his behalf. *See, e.g.*, Motion Denying Content, Assertions, Approach of Appeal at 1, *United States v. Roof*, No. 17-0003, (4th Cir. Mar. 3, 2020), Dkt. No. 109. Defendant's claim that his unyielding opposition to trial counsel's mitigation strategy would have somehow evaporated if trial counsel had more persuasively briefed technical areas of the law is simply not credible.

### E.  Conclusion

Ineffective assistance looks to whether an attorney has acted in an objectively unreasonable manner in a way that prejudiced their client. It is not a vehicle for retrospective nitpicking, nor is it an avenue to relitigate substantive issues already decided on appeal, nor can it be used to revive caselaw that has since been overturned. But every argument in Claim Twelve fits squarely into those three categories and fails to satisfy the standard for ineffective assistance. This Court should therefore deny relief on Claim Twelve.

## XIV.  THE DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM THIRTEEN

In Claim Thirteen, Defendant's claims that his appellate counsel provided ineffective assistance of counsel are based on the same arguments that he raised with respect to his trial counsel's performance. (Dkt. No. 1077 at 306-20). Although each of those arguments is addressed below, Defendant does not identify any substantive arguments that appellate counsel failed to make on direct appeal. Instead, the defendant merely asserts that his appellate counsel could have raised slightly different hypothetical examples that, in his view, would have better supported his claims. Such picayune disagreements do not constitute deficient performance by appellate counsel. And like his trial counsel ineffectiveness claims in Claim Twelve, Defendant's legal arguments about appellate counsel's performance are foreclosed by current law, and therefore he cannot show any prejudice from appellate counsel's alleged failures.

### A.  Legal Standard for Assessing Claims of Ineffective Assistance of Appellate Counsel

Defendant fails to show any basis for relief under the *Strickland* standard, which applies to appellate counsel ineffectiveness claims. *See supra* at 245. But especially when assessing claims of ineffective appellate counsel based on the omission of issues from appellate briefing, courts have shown particular deference to the choices made by appellate counsel. "Experienced advocates

since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983). Thus, the Supreme Court has held that "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Robbins*, 528 U.S. at 288; *Mason*, 774 F.3d at 828-29 ("Effective assistance of appellate counsel 'does not require the presentation of all issues on appeal that may have merit.'" (quoting *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008)). Identifying and prioritizing arguments that may be most persuasive and thus deserving of more fulsome briefing are quintessentially the type of strategy decisions that competent appellate counsel are permitted to make. A defendant claiming prejudice caused by appellate counsel's performance must demonstrate that "a particular nonfrivolous issue was *clearly stronger* than issues that counsel did present." *Robbins*, 528 U.S. 288 (emphasis added).

Defendant has not submitted any declarations from his appellate counsel suggesting that their briefing choices were anything but sound appellate strategy.[83]

**B. Argument**

**1. Many of Defendant's Claims are Barred.**

Defendant claims that appellate counsel should have provided better arguments to show that §§ 247(a)(2) and 249(a)(1) were not crimes of violence and that neither statute required a showing of intent to use strong physical force. (Dkt. No. 1077 at 307-14, 318-19). The challenge

---

[83] Defendant's complaint that the Fourth Circuit's imposition of page limits may have contributed to appellate counsel choosing to truncate their briefing on certain issues is unavailing. (Dkt. No. 1077 at 306 n.97, 307). Appellate counsel exercised professional judgment on what issues to focus on, and none of the arguments that the defendant claims were insufficiently briefed are clearly stronger than the arguments that appellate counsel chose to focus on.

to § 247(a)(2) was raised before the Fourth Circuit in Defendant's direct appeal, and the Fourth Circuit rejected it. *See Roof*, 10 F.4th at 400-405, 405 n.67 ("Even if we assume that a defendant could use force against his own property—as opposed to the property of another like the elements clause requires, 18 U.S.C. § 924(c)(3)(A)—as a means to obstruct another person from exercising his or her religious beliefs, that force would necessarily amount to a threat of force against that person . . . ."). The same is true of the challenge to § 249(a)(1). *See Roof*, 10 F.4th at 400-405. The argument that §§ 247 and 249 do not require intent to use strong physical force was likewise raised, (*see* Dkt. No. 1077 at 319); Br. of Appellant, Dkt. 85 at 267-70; Reply Br. of Appellant at 127-28, 164-65, *United States v. Roof*, No. 17-0003, (4th Cir. Apr. 22, 2021), ECF No. 159 (hereinafter Reply Br. of Appellant Dkt. 159) and rejected. *See Roof*, 10 F.4th at 401-02. The Court should not revisit the Fourth Circuit's rulings just because they now appear as ineffective assistance of counsel claims. *See supra* at 9-10.

### 2. Appellate Counsel Provided Effective Assistance in Arguing that § 247 was Not a Crime of Violence.

Defendant acknowledges that appellate counsel argued that § 247(a)(2) can encompass force used against one's own person or property and thus should not qualify as a crime of violence. The Fourth Circuit squarely rejected this claim. (*See* Dkt. No. 1077 at 307-09); *see also Roof*, 10 F.4th at 405 n.67 ("Even if we assume that a defendant could use force against his own property— as opposed to the property of another like the elements clause requires, 18 U.S.C. § 924(c)(3)(A)—as a means to obstruct another person from exercising his or her religious beliefs, that force would necessarily amount to a threat of force against that person . . . ."). As noted above, because Defendant's claim fails under current law, it cannot be the basis of a finding of prejudice. *See supra* at 271-75.

Defendant also fails to identify how appellate counsel was ineffective in arguing that § 247(a)(2) is not a crime of violence. Defendant does not cite any § 247 cases or other persuasive authority that appellate counsel failed to cite. Rather, he makes the conclusory assertion that appellate counsel's examples were somehow deficient. Appellate counsel argued that § 247(a)(2) encompasses force used against one's own person or property and provided examples of burning a cross in front of a Black church or burning down "his own shared prayer room or 'house church'" that would "interfere[] with another's exercise of religion . . . but [] does not require force against property of *another.*" Br. of Appellant, Dkt. 85 at 311-12; Reply Br. of Appellant, Dkt. 159 at 162-63. Defendant claims that a different hypothetical—a barn owner who burns down her own barn—is a "more serviceable scenario." (Dkt. No. 1077 at 309).

The Government fails to see any distinction between appellate counsel's "house church" hypothetical and Defendant's current barn-owner hypothetical. But whatever differences might exist between these two hypotheticals, they are presented to make exactly the same point—namely, whether a person can prevent people from engaging in religious services by burning down their own property by using force or the threat of force against those people. Appellate counsel fully argued that § 247(a)(2) could be violated by burning down one's own property (whether that property is a barn or a house church) to obstruct the religious exercise of others, without using force or threat of force against another, and the Fourth Circuit rejected that claim.

### 3. Appellate Counsel Provided Effective Assistance in Arguing that § 249 is Not a Crime of Violence.

Defendant claims that appellate counsel should have better presented the argument that a defendant could violate § 249(a)(1) by causing minimal bodily injury, but only unintentionally cause death. As noted above, this argument has been foreclosed by current law under *Castleman*, *Curtis Johnson*, *Stokeling*, and *Delligatti*. *See supra* at 293-96. Section 249(a)(1) falls squarely

within the elements clause of § 924(c), and the defendant cannot claim that any alleged deficiency by counsel caused him prejudice. *See Guzman*, 73 F.4th at 1256.

Defendant also fails to show how his appellate counsel provided ineffective assistance. He acknowledges that appellate counsel argued "how someone could violate § 249(a) in a way that results in death but does not run afoul of § 924(c)(3)(A)." (Dkt. No. 1077 at 310). Indeed, appellate counsel argued that § 249(a)(1) "can be violated by de minimis force (rather than violent force) or no force at all" and that, "though § 249 has a death results element, that also can be satisfied with no force and no mens rea." Br. of Appellant, Dkt. 85 at 302; *see also id.* at 306-09; Reply Br. of Appellant, Dkt. 159 at 154-58. Appellate counsel specifically argued that "Section 249(a)(1) criminalizes an accidental killing . . . [that] the defendant neither intended nor anticipated. Such an unintentional result falls squarely outside [of] Section 924(c)'s force clause." Br. of Appellant, Dkt. 85 at 309.

These are the exact arguments that Defendant now asserts in his § 2255 motion. He just claims that appellate counsel should have argued them using different hypotheticals. Such post-hoc minor critiques of counsel's performance are not cognizable errors amounting to ineffective assistance of appellate counsel. *See Mason*, 774 F.3d at 829 (rejecting ineffective assistance of appellate counsel claim, where appellate counsel chose to pursue one argument instead of another argument, and holding that "[t]o find otherwise would involve the very course of hindsight and the very faulting of counsel for raising stronger rather than weaker claims that the Supreme Court has insisted we avoid"); *see also Powell*, 134 F.4th at 228.

Defendant's proffered examples are unavailing for two reasons. First, appellate counsel's performance must be assessed based on the existing law at the time of the appeal. The hypotheticals presented by Defendant in his § 2255 motion are precisely the kind of far-fetched scenarios that

337

the Fourth Circuit would not have considered at the time of the appeal. *See, e.g.*, *Roof*, 10 F.4th at 398; *Allred*, 942 F.3d at 648 (citation omitted). As a result, appellate counsel was entirely reasonable in focusing on scenarios that had a "realistic probability, not a theoretical possibility, that the minimum conduct would actually be punished" under § 249. *Roof*, 10 F.4th at 398 (internal quotation marks omitted).

Second, many of Defendant's proffered hypotheticals are inapposite because they do not satisfy § 249's bodily injury requirement. He suggests, for example, that appellate counsel should have argued that § 249(a) could be violated by "unwanted touching," "offensive touching," "offend[ing] the target of his scorn," getting "bitten by a mosquito," providing a minor with a bottle of wine, "inflicting indignities on the targets of their racism," and "locking people's coats in a cloak room so they will get cold." (Dkt. No. 1077 at 311-13). Yet Section 249(a)(1) covers only the *willful* causation of *bodily injury*, which requires that the defendant actually intends to cause the victim pain or other physical injury, not emotional injury. *See* 18 U.S.C. § 1365(h)(4). Absent additional facts, these hypothetical scenarios would not violate § 249(a)(1), and appellate counsel can hardly be faulted for not presenting scenarios that fall outside of the scope of § 249(a)(1).

Defendant has failed to establish that trial counsel's performance was deficient at all, and it certainly was not deficient based on the law that existed at the time of the appeal. Even if appellate counsel's arguments had been deficient at the time, the Supreme Court has since foreclosed the defendant's argument that the elements clause requires the intentional use of lethal force. As such, the defendant has failed to establish any prejudice from appellate counsel's alleged deficiencies in making such a claim, and this Court should deny it.

### 4. Appellate Counsel Provided Effective Assistance by Not Arguing Against the "Realistic Probability" Test.

At the time of his direct appeal, a defendant claiming that an offense was not a crime of violence was required to demonstrate that the least culpable conduct under the statute had a "realistic probability, not a theoretical possibility, that the state would apply its statute to conduct that falls outside the definition of crime of violence." *Roof*, 10 F.4th at 398. Defendant asserts that appellate counsel was ineffective for failing to argue that this "realistic probability" test should not apply to federal statutes. (*See* Dkt. No. 1077 at 314).

Because both statutes are crimes of violence under current law, without regard to the realistic probability test, Defendant cannot claim prejudice. *See supra* at 193-96, 304-09.

In addition, appellate counsel's performance was reasonable given the law that existed at the time. In claiming that counsel's performance was deficient, Defendant ignores that the Fourth Circuit had already held that the "realistic probability" test applied to felony statutes. *See, e.g.*, *Allred*, 942 F.3d at 648 (applying the realistic probability test to 18 U.S.C. § 1513(b)(1)). Defendant does not cite any cases or other persuasive authority that would have strongly signaled that the Fourth Circuit's decision was wrong. Although the Supreme Court in *Taylor* subsequently clarified that the realistic probability test does not apply to federal statutes, appellate counsel did not perform deficiently simply because they "failed to anticipate changes in the law." *Morris*, 917 F.3d at 823; *see also McNamara*, 74 F.3d at 516 ("[A]n attorney's failure to anticipate a new rule of law [is] not constitutionally deficient"). It is not enough under *Strickland* to establish that the law was "unsettled" or that "an objection would have been plausible and non-frivolous." *Morris*, 917 F.3d at 826. Appellate counsel acted reasonably in focusing on arguments within the framework of well-established Fourth Circuit caselaw, and Defendant has failed to establish that they acted incompetently given the law that existed at the time.

### 5. Appellate Counsel Provided Effective Assistance by Not Raising a Double Jeopardy Claim.

Defendant claims that appellate counsel should have raised a challenge to his charges under the Double Jeopardy Clause. (Dkt. No. 1077 at 315). As discussed above, the Double Jeopardy Clause does not prohibit trying and convicting a defendant of multiple offenses in a single trial, and therefore Defendant cannot claim the failure to raise it caused him prejudice. *See supra* at 326-30. In addition, appellate counsel cannot be deemed ineffective where they chose not to advocate for a legally meritless claim. Choosing to focus the appellate brief on those arguments that they deemed had a greater likelihood of success was wise appellate strategy, not ineffective assistance of counsel. *See Jones*, 463 U.S. at 751-52.

### 6. Appellate Counsel Provided Effective Assistance by Not Arguing that § 924(c) is Void for Vagueness.

Defendant claims, as he did with trial counsel, that appellate counsel was ineffective for failing to argue that the elements clause is void for vagueness. (*See* Dkt. No. 1077 at 316-18). As detailed above, the Fourth Circuit has held that the elements clause is not constitutionally vague, so Defendant suffered no prejudice. Moreover, Defendant cannot establish that it is vague as applied to him. *See supra* at 310-16. Defendant's mass shooting and killing of nine parishioners constituted violent force that would satisfy any definition of "physical force." Appellate counsel's decision not to raise a vagueness challenge was eminently reasonable and did not constitute ineffective assistance.

### 7. Appellate Counsel Provided Effective Representation in Arguing Whether § 924(c)(3)(A) Requires the Intent to Cause Violent Force in a Single Element.

Defendant claims that appellate counsel was ineffective in their arguments that for a statute to be considered a crime of violence, the statute must require a *mens rea* greater than recklessness

and that "the requirement that strong physical force be used must be contained within a single element of the offense." (Dkt. No. 1077 at 319). This ineffective assistance claim is meritless.

Defendant cannot claim prejudice based on current law. Contrary to Defendant's claims, § 924(c)(3)(A) does not require "strong physical force" under *Delligatti* and *Stokeling*. Moreover, as previously discussed, §§ 247(a)(2) and 249(a)(1) are crimes of violence because the plain text of the statutes either require that the defendant "intentionally obstructs, by force or threat of force" another person in their free exercise of religious beliefs or that the defendant "willfully causes bodily injury." *See supra* at 289, 304-05. These statutes are both categorically crimes of violence under *Delligatti* and *Stokeling*.

Nor can he establish deficient performance. Defendant concedes, as he must, that counsel "argued this point on direct appeal." *Id.*; *see also* Br. of Appellant, Dkt. 85 at 307-09; Reply Br. of Appellant, Dkt. 159 at 156-57, 164-65. Appellate counsel also argued that because § 249's bodily injury requirement only requires the use of *de minimis* force, and because the willfulness element does not attach to the death results element, the death-resulting § 249 counts do not categorically require the defendant to intend to use violent force. Br. of Appellant, Dkt. 85 at 308-09. Defendant does not take issue with the substance of appellate counsel's arguments—he just claims, with the hindsight of four years, that appellate counsel should have made this argument more persuasively. Such hindsight fails to establish constitutionally deficient performance by counsel. *See Powell*, 134 F.4th at 228.

Defendant asserts that the Fourth Circuit's analysis in this case "conflicts with precedent in all the other Circuits to have considered the same and equivalent issues, and earlier Fourth Circuit cases." (Dkt. No. 1077 at 320). Yet Defendant cites only to out-of-circuit cases that post-

date the Fourth Circuit's decision in this case.[84] At the time the Fourth Circuit decided this appeal, it "often look[ed] at the elements of an offense as a whole when deciding if that offense meets the requirements of the elements clause." *Roof*, 10 F.4th at 402. Although Defendant disputes the Fourth Circuit's analysis, he points to no circuit authority or arguments available to appellate counsel at the time of appeal that they failed to make. Thus, he fails to establish that appellate counsel made any errors based on the law that existed at the time of the appeal.

Tellingly, Defendant concedes that the "vast majority" of crimes of violence do not result in death and, as a result, "only a handful of lawyers nationwide . . . have had to grapple" with the issue of how a "death results" element impacts the analysis of whether the offense constitutes a crime of violence. (Dkt. No. 1077 at 319 n.105). Defendant also concedes that "only a very few courts have had to consider the issue." *Id.* Given the paucity of lawyers and courts addressing this issue, appellate counsel cannot be faulted for not arguing this issue in the exact way that Defendant now claims they should have.

### 8. Defendant Suffered No prejudice from Any Alleged Errors by Appellate Counsel.

Defendant summarily asserts that he suffered prejudice because appellate counsel "*likely* would have succeeded in having at least some of Dylann's convictions vacated, which *could have* resulted in a new sentencing proceeding—one where Dylann was represented by counsel." (Dkt. No. 1077 at 320 (emphasis added)).

---

[84] The out-of-circuit cases cited by Defendant are inapposite. They simply hold that the statutes involving the intentional causation of death, or attempts to do so, qualify as crimes of violence, *see United States v. Pastore*, 83 F.4th 113, 120 (2d Cir. 2023); *Alvarado-Linares v. United States*, 44 F.4th 1334, 1343-44 (11th Cir. 2022);; or that crimes committed with a mens rea of recklessness do not, *see United States v. Toki*, 23 F.4th 1277 (10th Cir. 2022), *vacated by Kamahele v. United States*, 143 S. Ct. 556 (2023). Both §§ 247(a)(2) and 249 are specific intent statutes, so none of these cases are relevant.

Such conjecture does not establish prejudice. All of Defendant's complaints about appellate counsel's performance relate exclusively to his § 924(c) convictions and sentences. (*Id.* at 306-20). Even if any of his complaints about appellate counsel had merit (which, as discussed above, they do not), the jury would have heard the exact same evidence that led them to convict and sentence the defendant to death on nine capital § 247 counts. Defendant's claim that the elimination of § 924(c) counts could have changed a juror's mind is entirely speculative and would not establish any basis for a new sentencing hearing.

**C.  Conclusion**

Much of Claim Thirteen is barred because it seeks to relitigate issues already decided on appeal. Further, Defendant fails to show appellate counsel acted unreasonably or that he suffered any prejudice from their alleged failures. Defendant is therefore not entitled to relief on Claim Thirteen.

**XV.    THE DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM FOURTEEN**

In Claim Fourteen, Defendant repeats his claim that the elements clause, 18 U.S.C. § 924(c)(3)(A), is unconstitutionally vague. This claim should be denied as procedurally defaulted, and Defendant cannot show cause or prejudice to excuse the default.

Defendant procedurally defaulted this vagueness challenge by failing to raise it before this Court or the Fourth Circuit on direct review. *See Frady*, 456 U.S. at 168-70. Where a defendant has procedurally defaulted a claim, he is precluded from raising it in a § 2255 motion unless he can demonstrate either (1) his actual innocence or (2) cause for the default and actual prejudice. *Bousley*, 523 U.S. at 622. Here, Defendant cannot claim actual innocence, and he has not even attempted to argue any grounds to establish prejudice or excuse for this default. "The existence of

cause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." *Mikalajunas*, 186 F.3d at 493.

Defendant did raise ineffective assistance claims related to this argument in Claims Twelve and Thirteen, but as discussed, he completely fails to show trial or appellate counsel rendered ineffective assistance regarding this claim and therefore he cannot rely on ineffectiveness to excuse the default.

Nor was this issue so novel that counsel was incapable of foreseeing it. As Defendant concedes in his § 2255 motion, and as this Court noted in reviewing his post-trial motion, the Supreme Court in *Castleman* expressly left open the question of what degree of force qualified as "violent" force under *Curtis Johnson*; the circuits were split on whether indirect force or omissions could qualify as force; and the Fourth Circuit had not yet taken a definitive position on whether the intentional causation of physical injury necessarily involved the use of violent force. (Dkt. No. 961 at 12, 17). In light of the differing circuit analyses, Defendant had all the tools available to assert the vagueness challenge that he now makes in his § 2255 motion, and nothing prevented appellate counsel from doing the same on direct review. *See Bousley*, 523 U.S. at 623. Because Defendant procedurally defaulted this vagueness claim and has not established any cause for the default or prejudice caused by it, this Court should deny Defendant's arguments that 18 U.S.C. § 924(c)(3)(A) is unconstitutionally vague.

Even if the Court were inclined to address the claim on its merits, it still fails. The Fourth Circuit has held that the elements clause, grounded in an examination of statutory elements, provides defendants with fair notice and ensures that enforcement will be based on a "straightforward" analysis of the elements of the predicate offenses. *See Green*, 67 F.4th at 670;

*see also Taylor*, 596 U.S. at 860; *Bowers*, 2020 WL 6119480, at *2; *see also supra* at 310-15. Based on this binding precedent, the elements clause is not void for vagueness.

This claim is procedurally barred and legally meritless. Defendant is not entitled to relief on Claim Fourteen.

## XVI.   THE DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM FIFTEEN

The Government has already addressed all of the arguments that Defendant raises in Claim Fifteen, in which he claims that the charges should be dismissed based on current law. The Government incorporates those prior arguments and briefly summarizes them below.

*First*, Defendant claims that § 247(a)(2) is not a crime of violence because it can be violated by use of force or threat of force against oneself. (Dkt. No. 1077 at 336-38.) That argument was fully considered and rejected by the Fourth Circuit on direct appeal, and thus should be denied as unreviewable in this § 2255 motion. *See supra* at 9-10, 287-89. Moreover, as courts have consistently held, an individual cannot violate § 247(a)(2) merely by using force or threatening to use force against himself or his own property. *See supra* at 304-08; *see also Roof*, 10 F.4th at 405.

*Second*, Defendants claim that § 249(a)(1) is not a crime of violence because § 249's "bodily injury" requirement does not require a sufficient degree of force. (Dkt. No. 1077 at 338-39). This issue was decided against him on direct appeal and thus cannot be reviewed in these collateral proceedings, *see supra* at 9-10, 287-89, and it is also clearly foreclosed by the Supreme Court's decisions in *Stokeling* and *Delligatti*. *See supra* at 279-80, 287-89, 293-296.

*Third*, Defendant claims that he is entitled to a new sentencing hearing because the § 924(c)(3)(A) charges "were never valid charges in the first place." (Dkt. No. 1077 at 341). Although he does not identify the grounds for the wholesale dismissal of those counts, to the extent that Defendant may claim that the elements clause is unconstitutionally vague, Defendant

procedurally defaulted this vagueness challenge by failing to raise it before this Court or the Fourth Circuit on direct review, and he has failed to demonstrate (1) his actual innocence or (2) cause for the default and actual prejudice. *Frady*, 456 U.S. at 168-70; *Bousley*, 523 U.S. at 622. Here, Defendant cannot claim actual innocence.

Defendant is likely to claim that his procedural default should be excused by ineffective assistance of counsel. However, as explained in the Government's response to Claims Twelve and Thirteen, these ineffective assistance claims lack merit and, as a result, Defendant fails to establish cause for the default. Nor can he establish prejudice because, as discussed above, current Fourth Circuit law forecloses this vagueness challenge. Moreover, he fails to provide a basis for a new sentencing hearing because there is no reason to believe that the jury's sentences on the nine capital § 247(a)(2) counts would have been any different if the § 924(c) counts had been dismissed. *See supra* at 329-32.

*Fourth*, Defendant claims that § 249 violates the First Amendment. (Dkt. No. 1077 at 342-43). This argument is procedurally defaulted and should be summarily denied, as Defendant failed to raise it on direct appeal and provides no cause for that default. Although he argues in Claim 12 that trial counsel was ineffective for failing to raise that First Amendment challenge, he does *not* argue in Claim 13 that his appellate counsel was ineffective for failing to do so. Thus he does not even proffer a reason for the default, and this claim should be denied.

If this Court were to review the merits, the Supreme Court has clearly held that the First Amendment affords no protection to violence, and Defendant's mass murder of congregants because of their race and in order to obstruct their free exercise of religion falls well outside of the bounds of the First Amendment. *See supra* at 318-23.

*Fifth*, Defendant claims that the § 924(j) counts should be vacated as a violation of the Double Jeopardy Clause. This claim is procedurally defaulted because this claim was not raised at trial or on appeal. Defendant cannot establish cause for that default because his ineffective assistance claims lack merit, nor can he establish prejudice, as the Double Jeopardy Clause does not preclude the Government from trying and convicting a defendant for multiple offenses in the same trial. *See supra* at 326-30.

Because all of these claims are clearly foreclosed by the binding precedents of the Supreme Court and Fourth Circuit, Defendant is not entitled to relief on Claim Fifteen.

## XVII.  DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM SIXTEEN

Defendant claims that his eventual execution will violate the Eighth Amendment based on the Government's current execution protocols. This claim should be denied as it is not properly raised in a motion under § 2255 and it is unripe.

### A.  Challenges to Methods of Execution Are Not Cognizable Under § 2255.

Collateral challenges to the validity of a federal sentence must be brought through a motion under § 2255. *In re Vial*, 115 F.3d 1192, 1194 (4th Cir. 1997). Attacks on the execution of a sentence must be raised in a petition under 28 U.S.C. § 2241. *Id.* at 1194 n.5. Specific challenges to methods of execution fall into the latter category and are not cognizable under § 2255. *See Higgs v. United States*, 711 F. Supp. 2d 479, 555 (D. Md. 2010); *Johnson v. United States*, 860 F. Supp. 2d 663, 912 (N.D. Iowa 2012).

Defendant's arguments in Claim Sixteen deal completely with the execution of his death sentence and his request for relief relates solely to the methods by which he is executed. Claim Sixteen is therefore an attack on the execution of his sentence and must be raised through a petition under § 2241, not the current motion under § 2255.

B.  <u>**Defendant's Challenge to the Method of His Execution is Not Ripe.**</u>

The ripeness doctrine prevents "courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also [] protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). Courts have applied this doctrine to method-of-execution challenges brought while post-conviction proceedings are still pending. *See Higgs*, 711 F. Supp. 2d at 555; *Johnson*, 860 F. Supp. 2d at 912.

Defendant's claim is not yet ripe. Defendant has not been scheduled for execution. And the Department is currently reviewing the method by which it will execute inmates under a sentence of death. *See* Office of the Attorney General, *Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions* at 3 (Feb. 5, 2025), https://www.justice.gov/ag/media/1388561/dl. As such, Defendant cannot point to a method of execution that he actually faces. Defendant can offer no definitive allegations as to what procedures the Bureau of Prisons will follow, where they will obtain the execution drugs, and what drugs will actually be used.

Defendant's claim fails on the merits for the same reason. The Supreme Court has stated that when evaluating Eighth Amendment challenges, courts should not act as "boards of inquiry charged with determining 'best practices' for executions," warning that such an approach would "embroil the courts in ongoing scientific controversies beyond their expertise, and would substantially intrude on the role of state legislatures in implementing their execution procedures . . . ." *Baze v. Rees*, 553 U.S. 35, 51 (2008). Rather, courts must determine whether the

execution protocols present a "substantial risk of serious harm." *Id*. at 52 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). To establish this risk, "the conditions presenting the risk must be '*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'" *Id*. at 49-50 (quoting *Helling v. McKinney*, 509 U.S. 25, 33-35 (1993)) (emphasis in original). The fact that a method may result in pain does not establish an Eighth Amendment violation. *Id*. at 50. In addition to showing that a protocol presents a substantial risk of serious harm, an offender must also present a feasible, readily available alternative method of execution. *Glossip v. Gross*, 576 U.S. 863, 878-80 (2015). A prisoner cannot challenge a method of execution "merely by showing a slightly or marginally safer alternative." *Id*. (quoting *Baze*, 553 U.S. at 51). Instead, a prisoner must "*plead and prove* a known and available alternative" that is "feasible, readily implemented, and in fact *significantly* reduce[s] a substantial risk of severe pain." *Id*. at 880-81, 877 (quoting *Baze*, 553 U.S. at 52) (emphasis added).

Defendant cannot meet the requirements of an Eighth Amendment challenge because he cannot provide any comparison between the method of execution to which he will be subjected and a feasible, readily implemented alternative. He provides several requests for the implementation of his execution, but without presenting a method of execution that he actually faces, he cannot make the requisite showing that his proposed alternatives "significantly reduces a substantial risk of severe pain" by comparison. The claim is not ripe, and the Court lacks the necessary information to resolve it.[85]

---

[85] Defendant requests discovery to show compliance with his requests, but that request presupposes a valid Eighth Amendment claim, which he cannot state. And discovery would also not provide the information needed for evaluating this claim, as the Department has not yet established a specific method of execution.

Because Claim Sixteen is not cognizable in a § 2255 proceeding and because the claim is not ripe, Defendant is not entitled to relief.

## XVIII. THE DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM SEVENTEEN

In Claim Seventeen, Defendant moves this Court to create a categorical exemption to capital punishment for those adults who are 21 years of age at the time they commit a capital murder. Relying on social and scientific studies, he suggests that such persons, based solely on their age, are insufficiently culpable to warrant a sentence of death. As set forth below, the Fourth Circuit already considered and rejected this claim on direct appeal, and this Court is prohibited from reconsidering this argument in these collateral proceedings. The Supreme Court's decision in *Roper v. Simmons*, 543 U.S. 551, 574 (2005), which created a categorical exemption from the death penalty for offenders below the age of 18, specifically drew a bright line at 18 as "the age at which the line for death eligibility ought to rest." Unless the Supreme Court revisits this issue, "*Roper* is the controlling precedent," and lower courts lack the authority to expand the exemption. *See Roof*, 10 F.4th at 380.

As an initial matter, this Court should deny this Eighth Amendment claim on procedural grounds. Defendant squarely placed this issue before the Fourth Circuit on direct appeal, and the Fourth Circuit ruled against him. *See id*. Specifically, on direct appeal, Defendant argued that studies (including the report by the Sentencing Commission on which Defendant extensively relies in his § 2255 motion) showed that brain development continued through an individual's twenties and that a national consensus has developed against the execution of youthful offenders. *See id.* (noting that Defendant argued that studies "eroded the justification relied upon in *Roper* for drawing the line for capital punishment at 18") (internal quotation marks and citation omitted)); *see also* Br. of Appellant, Dkt. 85 at 210-11; Reply Br. of Appellant, Dkt. 159 at 97-98). Defendant

350

does not argue that there has been an intervening change in the law, and, as a result, he cannot "circumvent a proper ruling . . . on direct appeal by re-raising the same challenge in a § 2255 motion." *Linder*, 552 F.3d at 396.

In addition to this procedural bar, the Fourth Circuit has held that lower courts lack authority to grant the relief Defendant seeks. In *Roper*, the Supreme Court held that the Eighth Amendment "forbid[s] imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed" based on a "national consensus against the death penalty for juveniles." 543 U.S. at 564, 578. The Court recognized that "[d]rawing the line at 18 years of age" was "subject  . . . to the objections always raised against categorical rules" and acknowledged that "qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Id*. at 574. But the Supreme Court clearly held that "18 is the point where society draws the line for many purposes between childhood and adulthood," and 18 is "the age at which the line for death eligibility ought to rest." *Id.*

In reviewing Defendant's claim on direct appeal, the Fourth Circuit acknowledged that "[t]he Supreme Court chose to draw a line at the generally accepted age of majority, 18, and did so acknowledging that age and culpability were not perfectly linear." *Roof*, 10 F.4th at 379. The Fourth Circuit then concluded: "We have no authority to hold that executing those who are older than 18 violates the Eighth Amendment because . . . whether a change to *Roper* should occur is for the Supreme Court to say." *Id*. "Until then, *Roper* is the controlling precedent." *Id.* at 380. Under this binding directive by the Fourth Circuit, it is up to the Supreme Court to revisit that holding, and lower courts lack authority to deviate from it. *See also Tsarnaev*, 968 F.3d at 96-97 (rejecting claim that the categorical exemption to the death penalty should be extended to those

351

under the age of 21 and concluding that, as an "'inferior' court," "we simply note that whether a change should occur is for the Supreme Court to say – not us").

Defendant's reliance on *Hall v. Florida*, 572 U.S. 701 (2014), is misplaced. *Hall* did not address the propriety of a categorical exemption to the death penalty. Rather, it dealt only with the technical assessment of intellectual disability, *i.e.*, how courts should determine whether a person has an intellectual disability. Specifically, *Hall* held that scientific advancements indicated that it was not appropriate to require a defendant to demonstrate an IQ score of 70 or below as a prerequisite to establishing intellectual disability. *See Hall*, 572 U.S. at 711-12, 723. Defendant wrongly conflates the technical assessment of how a defendant facing the death penalty qualified as a person with an intellectual disability and the propriety of a categorical age-based exemption to the death penalty.

Finally, Defendant asserts that his "cognitive deficits . . . were further complicated by the fact that his brain had not reached 'full maturation'" at the time of his offense. (Dkt. No. 1077 at 377 (quoting Dkt. No. 1077-2 at 17)). But he had the opportunity to present mitigating evidence related to his age and maturity during the penalty proceeding, and he made the deliberate choice not to. (*See* Dkt. No. 871 at 16 (jury verdict form indicating that Defendant asserted a mitigating factor based on his "youth")).[86] Having chosen to forego presenting such mitigating evidence during trial, he cannot now complain that his youth and maturity impacted his sentence.

---

[86] Defendant refused at the trial level to make the argument that he asserts now in his § 2255 motion. Defendant informed the Court that standby counsel had drafted a motion titled "Defendant's Eighth Amendment motion to preclude application of the death penalty under *Simmons* and *Atkins* due to the defendant's youth, autism, and mental illness." (Dkt. No. 880-1 at 6). Defendant chose not to file it. Although the Government did not see the document that Defendant referenced at that hearing, counsel subsequently filed a motion for a second competency evaluation and attached a draft brief with the same name. (Dkt. No. 832-5 at 1-4). This brief raises the same age-related arguments that Defendant now makes in his § 2255 motion.

## XIX.  DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM EIGHTEEN

Defendant claims that the death penalty is *per se* unconstitutional because it is used arbitrarily. (Dkt. No. 1077 at 378). This argument has been employed in death penalty litigation for decades and has been rejected repeatedly. Capital punishment is constitutional; therefore this claim fails.

### A.  Legal Standards

"[I]t is settled that capital punishment is constitutional." *Glossip*, 576 U.S. at 869 (citing *Baze*, 553 U.S. at 47); *see also Gregg v. Georgia*, 428 U.S. 153, 181-87 (1976). The Supreme Court reiterated that principle in *Bucklew v. Precythe*, stating "[t]he Constitution allows capital punishment." 587 U.S. 119, 129 (2019). The Court explained:

> In fact, death was "the standard penalty for all serious crimes" at the time of the founding. S. Banner, The Death Penalty: An American History 23 (2002) (Banner). Nor did the later addition of the Eighth Amendment outlaw the practice. On the contrary—the Fifth Amendment, added to the Constitution at the same time as the Eighth, expressly contemplates that a defendant may be tried for a "capital" crime and "deprived of life" as a penalty, so long as proper procedures are followed. And the First Congress, which proposed both Amendments, made a number of crimes punishable by death. See Act of Apr. 30, 1790, 1 Stat. 112.

*Id.*

Further, the Supreme Court has proclaimed that "it is this Court's prerogative alone to overrule one of its precedents." *United States v. Hatter*, 532 U.S. 557, 567 (2001) (internal quotation and citation omitted). As such, this Court does not have the authority to rule inconsistently with controlling precedent of the Supreme Court. *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (per curiam) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality.") (internal quotation marks and citation omitted).

### B. **Argument**

Defendant's claim fails because it is procedurally defaulted and is at odds with binding authority.

The claim is procedurally defaulted because it could have been raised on direct appeal but was not. *See Harris*, 991 F.3d at 558 (claims not raised during initial criminal proceedings or on direct appeal are procedurally defaulted); *Jackson*, 638 F. Supp. 2d at 609 ("Because the Petitioner did not raise either of these attacks on the constitutionality of the [death penalty] statute on direct appeal, his claims are procedurally defaulted."). A petitioner can only obtain court review of procedurally defaulted claims by showing "either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" *Bousley*, 523 U.S. at 622 (citations omitted).

Defendant offers no excuse for the default. The only conceivable excuse Defendant could assert is that much of his argument is focused on executions that occurred while his direct appeal was pending. (Dkt. No. 1077 at 379-81). But the circumstances of those executions have no bearing on whether the death penalty is unconstitutional in general. First, while Defendant argues the Government acted arbitrarily, there is no authority that restricts the Government's decision as to which death-row inmates to execute, other than the requirement that all "procedures for appeal of the judgment of conviction and for review of the sentence" be exhausted and a prohibition against executing a woman while she is pregnant or a person that lacks the relevant mental capacity for execution. 18 U.S.C. § 3596(a)-(c). As long as an inmate has been properly convicted and sentenced to death and the conviction and sentence have been upheld throughout the appellate and post-conviction process, the execution of the inmate cannot be said to be arbitrary.[87] Second, to

---

[87] Defendant claims that he was sentenced to death based on arbitrary factors and then references the fact that he represented himself and did not present any mitigating evidence. Those claims

354

the extent that Defendant is claiming that he will be scheduled for execution in an arbitrary manner—after his avenues for relief are exhausted—that claim is more properly brought under 28 U.S.C. § 2241, not § 2255. *See supra* at 347-49.

Even if the claim is not procedurally defaulted, the overwhelming weight of authority establishes that the death penalty, especially under the FDPA, is not arbitrary. In fact, Defendant argued that the death penalty was unconstitutional prior to his trial, (Dkt. No. 291), and the Court rejected that argument. (Dkt. No. 539 at 9). Capital defendants have argued that the death penalty is unconstitutional because of arbitrariness in numerous cases since the death penalty was reinstated, and those attempts have uniformly failed. *See McCleskey v. Kemp*, 481 U.S. 279, 296-97, 306 (1987); *United States v. Coonce*, 932 F.3d 623, 646 (8th Cir. 2019); *United States v. Sampson*, 486 F.3d 13, 19-29 (1st Cir. 2007); *United States v. Jones*, 132 F.3d 232, 239-42 (5th Cir. 1998); *United States v. Candelario-Santana*, 368 F. Supp.3d 316, 320-22 (D.P.R. 2019); *United States v. Mills*, 393 F. Supp.3d 650, 666-67 (E.D. Mich. 2019); *United States v. Arnold*, 412 F. Supp. 3d 732, 736-38 (E.D. Mich. 2019); *United States v. Ofomata*, No. 17-201, 2019 WL 527696, at *1-3 (E.D. La. Feb. 11, 2019); *United States v. George*, No. 17-201, 2019 WL 537186, at **1-6 (E.D. La. Feb. 11, 2019); *United States v. Madison*, 337 F. Supp.3d 1186, 1199-1200 (M.D. Fla. 2018); *United States v. Con-Ui*, No. 3:CR-13-123, 2016 WL 9331115 at **4-7 (M.D. Pa. Jan. 28, 2016); *United States v. Solomon*, No. 02:05-CR-385, 2007 WL 1468794, at *2 (W.D. Pa. May 14, 2007); *see also Duncan v. United States*, No. 2:17-CV-00091, 2019 WL 1320039, at **27-28 (D. Idaho Mar. 22, 2019) (rejecting defendant's argument in 28 U.S.C. § 2255 petition that the legal and factual landscape had changed since the district court initially denied the

---

relate to specific alleged errors in his trial, not the death penalty in general, which is the subject of Claim Eighteen.

defendant's pre-trial motions challenging the constitutionality of the FDPA and therefore declining to reconsider its previous denials of those motions).

Defendant's arguments add nothing to the oft-repeated arguments against the death penalty. He argues that he was sentenced based on arbitrary factors because the jury did not hear any mitigating evidence, but that was his choice. *See, e.g.*, *supra* at 86-88, 179-81. Also, a defendant's choice not to present mitigating evidence does not render a jury's verdict arbitrary. Federal capital juries base their decisions on the factors set out in the Federal Death Penalty Act, which repeatedly have been found constitutional. The Supreme Court has spoken clearly on the constitutionality of the federal death penalty, and this Court cannot independently strike down the death penalty absent the Supreme Court's further guidance.

## XX.    <u>DEFENDANT IS NOT ENTITLED TO RELIEF ON CLAIM NINETEEN</u>

Defendant claims that his due process rights were violated because this case was assigned to the presiding judge, and that trial counsel was ineffective for not seeking the presiding judge's recusal. This is the fifth time that Defendant has sought the judge's recusal. Yet he presents no new facts and makes essentially the same arguments he advanced in his recent motion to recuse the presiding judge, a motion to reconsider the denial of the recusal motion, a petition for a writ of mandamus, and petition for rehearing and rehearing *en banc*. Each attempt was rebuffed, and the same analysis that led this Court and the Fourth Circuit to deny those requests applies here as well. But here, at least with respect to the ineffective assistance claim, Defendant faces the additional burden of overcoming the deferential standard governing claims of ineffective assistance of counsel. In other words, he not only has to show that this Court was wrong to deny his motions, but that the merits of these rejected arguments were so strong that no reasonable attorney could fail to advance them. Defendant's arguments are baseless and should be rejected (again).

356

**A. <u>Facts</u>**

On March 26, 2025, Defendant filed a motion to recuse District Judge Richard M. Gergel, who has presided over this case since its inception in July of 2015. (Dkt. No. 1049). In support of the motion, Defendant attached a single-page declaration from his former attorney, Michael P. O'Connell, which he has reattached to his § 2255 motion. (Dkt. No. 1077-8). Mr. O'Connell is a Charleston-based attorney and former federal public defender who was a law school classmate of lead defense counsel David Bruck. *Id.* Mr. O'Connell was appointed to represent Defendant on July 31, 2015, (*see* Dkt. No. 16), and served as co-counsel with Mr. Bruck until July 22, 2016, when he withdrew from the case.

In his declaration, Mr. O'Connell claims that after he agreed to serve as co-counsel for Defendant, he had a telephone conversation with District Judge David Norton, who had also been his law school classmate. (Dkt. No. 1077-8). According to Mr. O'Connell, he asked Judge Norton "what [j]udge was getting the Roof case," to which Judge Norton allegedly responded, "Gergel really wants to do it, so I'm gonna let him have it." *Id*. The declaration does not explain the basis for Judge Norton's alleged belief that Judge Gergel wanted to preside over the case, nor does it contain any claim that Judge Gergel had spoken with Judge Norton about the matter. Mr. O'Connell notes that he believes he informed his wife about this conversation but does not recall discussing it with anyone else until March 2025. *Id*. Furthermore, the declaration does not allege that Mr. O'Connell ever believed—either at that time or subsequently—that Judge Gergel was biased against Defendant or that there was cause to seek Judge Gergel's recusal from the matter.

On April 4, 2025, this Court entered an order denying Defendant's motion to recuse. (Dkt. No. 1053). Additionally, Senior District Judge Terry L. Wooten and District Judge David C. Norton filed statements responding to Defendant's allegations, (Dkt. Nos. 1051, 1052), which

Judge Gergel referenced in his order denying Defendant's motion to recuse. (Dkt. No. 1053 at 1-4).

Judge Wooten's affidavit stated that, as Chief Judge for the District of South Carolina at the time charges were brought against Defendant, he was responsible for assigning cases "based on the caseloads that each district judge carried" and "related cases." (Dkt. No. 1051 at 1). He affirmed that these procedures were followed in the assignment of this case, and that Judge Gergel was assigned the matter "[a]t no time criteria." *Id*. Judge Wooten attested that "[a]t no time did Judge Gergel request of me that Roof's case be assigned to him." *Id*. "He had no role in the assignment of the Roof case." *Id*. "No other judge had any role in the assignment of the Roof case other than me, acting in my role as Chief Judge." *Id*. Finally, he stated, "Any assertion that Judge Gergel sought assignment of the Dylann Roof case to himself is not accurate nor a credible assertion. No information has been provided to me to support that contention." *Id*.

In his statement, Judge Norton explained, "I never had *United States v. Roof* assigned to me. I played no role in the assignment of the case to Judge Gergel. I am unaware of any effort by Judge Gergel to have the case assigned to him." (Dkt. No. 1052 at 1). Judge Norton further stated, "I was not involved in any way in the assignment of the *Roof* case to Judge Gergel. I did not communicate with Chief Judge Wooten or Judge Gergel prior to the assignment of the case and am aware of no facts indicating that this assignment was not handled routinely by Chief Judge Wooten." *Id.* at 2. Judge Norton observed that this was "the first occasion in the nearly ten years since the *Roof* case was assigned to Judge Gergel" that he had been "aware of any claim that [he] played any role in steering the *Roof* case assignment to Judge Gergel." Judge Norton concluded, "This did not happen. Anyone who reached the conclusion that I played a role in the assignment

of the *Roof* case to Judge Gergel based on a conversation with me misunderstood our discussion." *Id.*

After the Court denied the motion, defense counsel filed a motion to reconsider, which was also denied. (Dkt. Nos. 1054, 1062).

Defendant sought a writ of mandamus asking the Fourth Circuit Court of Appeals to remove Judge Gergel from the case and appoint a new judge outside the District of South Carolina, but this request was rejected as well. (Dkt. No. 1080). The Fourth Circuit held that "[n]othing, aside from Roof's conclusory allegation, shows that this alleged interest [in being assigned to the case] resulted in any bias." *In re Roof*, Case No. 25-2, 2025 WL 2335967 at *1 (4th Cir. Aug. 13, 2025). Defendant filed a request for panel rehearing and rehearing *en banc*, which the Court of Appeals summarily denied. *In re Roof*, Case No. 25-2, Dkt. Nos. 176, 177.

In addition to reiterating the arguments that he has now made four previous times, Defendant argues in Claim 19 that Judge Gergel presiding over his case violated his due process right to an impartial procedure for assigning a judge. (Dkt. No. 1077 at 382). This argument also lacks merit.

### B. <u>Legal Standards</u>

Three legal standards apply to this claim. The Government has provided the general standard for ineffective assistance of counsel above, *see supra* at 73-75, and provides the following summary of the applicable legal standards for judicial assignments and for recusal.

#### 1. Judicial Assignments

Title 28 U.S.C. § 137 provides that "[t]he business of a court having more than one judge shall be divided among the judges as provided by the rules and orders of the court." The statute directs that "the chief judge of the district court shall be responsible for the observance of such rules and orders, and shall divide the business and assign the cases so far as such rules and orders

do not otherwise prescribe." *Id.* It does not appear that the Supreme Court or the Fourth Circuit have ever held that a district must employ a particular procedure for determining which judge is assigned a specific case. In the limited cases where other circuit courts have addressed this provision, they have found that "Congress has granted broad discretion to the federal district courts in the assignment of cases to particular judges." *United States v. Pearson*, 203 F.3d 1243, 1256 (10th Cir. 2000); *accord In re Atamian*, 247 Fed. App'x 373, 374 (3d Cir. 2007). "A defendant does not have a right to have his case heard by a particular judge." *Sinito v. United States*, 750 F.2d 512, 515 (6th Cir. 1984). Nor is there a right to "any particular procedure for the selection of the judge." *Cruz v. Abbate*, 812 F.2d 571, 574 (9th Cir. 1987). There is also no requirement that cases be randomly assigned. *Sinito*, 750 F.2d at 515. Even the Ninth Circuit's decision in *Cruz*, which Defendant relies heavily upon, acknowledges that a chief judge may assign cases "for almost any reason, however efficient or intelligent" provided that it is not an "impermissible reason" such as "bias or the desire to influence the outcome of the proceedings." *Cruz*, 812 F.2d at 574.

### 2. Recusal

Defendant alleges that Judge Gergel should have recused himself pursuant to 28 U.S.C. § 455(a) and (b)(1). (Dkt. No. 1077 at 382). Those sections require judges to disqualify themselves from proceedings in which their impartiality "might reasonably be questioned" or where the judge has a personal bias or prejudice against a party, or has "personal knowledge of disputed evidentiary facts concerning the proceeding." *Id.* § 455(a), (b)(1). Section 455 is self-executing and requires

the presiding judge to evaluate the circumstances to determine whether recusal is necessary. *In re Beard*, 811 F.2d 818, 827 n.15 (4th Cir. 1987).[88]

Recusal of the presiding judge is a "drastic remedy." *Belue v. Leventhal*, 640 F.3d 567, 575 (4th Cir. 2011). "A presiding judge is not … required to recuse himself simply because of unsupported, irrational or highly tenuous speculation," rather "the proper test … is whether another with knowledge of all of the circumstances might reasonably question the judge's impartiality." *United States v. Cherry*, 330 F.3d 658, 665 (4th Cir. 2003) (quotation marks and citations omitted). "This inquiry is an objective one, made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances." *Microsoft Corp. v. United States*, 530 U.S. 1301, 1302 (2000) (Rehnquist, C.J., respecting recusal). "[A] reasonable outside observer is not a person unduly suspicious or concerned about a trivial risk that a judge may be biased." *United States v. DeTemple*, 162 F.3d 279, 287 (4th Cir. 1998). "[W]hile recusal motions serve as an important safeguard against truly egregious conduct, they cannot become a form of brushback pitch for litigants to hurl at judges who do not rule in their favor." *Belue*, 640 F.3d at 574 (cleaned up). As the Seventh Circuit has observed, "needless recusals exact a significant toll" as "a change of umpire mid-contest may require a great deal of work to be re-done and facilitate judge-shopping." *In re United States*, 572 F.3d 301, 308 (7th Cir. 2009) (quotation marks, alterations, and citations omitted).

## C. <u>Argument</u>

Defendant claims that his due process rights were violated because Judge Gergel presided over his case, and he also claims that trial counsel were ineffective for not seeking the presiding judge's recusal in this case. Both claims fail because Judge Gergel was not assigned to the case for

---

[88] Section 455 is thus distinct from 28 U.S.C. § 144, which requires a judge to recuse when a party files a timely and sufficient affidavit alleging personal bias or prejudice for or against a party.

any impermissible reason, any request for recusal would have been meritless, and Defendant did not suffer any prejudice from Judge Gergel's presiding over his case.

### 1. Judge Gergel Presiding over Defendant's Case Did Not Violate His Due Process Rights.

Defendant's due process rights were not violated by Judge Gergel presiding over his trial. There is no evidence indicating that the case was improperly assigned to Judge Gergel or demonstrating that Judge Gergel was biased against Defendant. To the contrary, throughout the proceedings, Judge Gergel treated Defendant with respect and sought to ensure the fairness of the proceedings, including by holding a second competency proceeding "out of an abundance of caution," repeatedly advising Defendant to reconsider his decision to self-represent, and encouraging Defendant to present mitigation evidence during the penalty phase. These are hardly the actions of a judge who is biased against Defendant.

No Fourth Circuit or Supreme Court precedent dictates the procedures by which a judge may be assigned to a case. Even the non-binding authority cited by Defendant indicates he did not have a right to a particular procedure for the assignment of a district judge and that a chief judge may assign a case for practically any reason as long as it is not an obviously impermissible reason. *Cruz*, 812 F.2d at 574; *Sinito*, 750 F.2d at 515. Defendant argues that the case assignment to Judge Gergel was infected with bias (*see* Dkt. No. 1077 at 382-87), but he fails to substantiate those claims with competent evidence.

### a. Mr. O'Connell's declaration does not establish bias.

Defendant's primary evidence that Judge Gergel was improperly assigned to his case is Mr. O'Connell's declaration, in which Mr. O'Connell says Judge Norton told him that Judge Gergel "really wants to do [the case], so I'm gonna let him have it." (Dkt. No. 1077-8 at 1).

As an initial matter, the Court need not credit the declaration in any respect. As noted by the Fourth Circuit, *In re Roof*, 2025 WL 2335967 at *1, the declaration is clear hearsay, which is not competent evidence. *See Roane*, 378 F.3d at 400-01 (explaining that "[a]iry generalities, conclusory assertions and hearsay statements" are not enough to warrant an evidentiary hearing or to avoid summary judgment in a § 2255 case); *see also United States v. Aiello*, 814 F.2d 109, 113 (2d Cir. 1987) ("To warrant plenary presentation of evidence, the [§ 2255] application must contain assertions of fact that a petitioner is in a position to establish by competent evidence.").

Beyond the declaration's inherent unreliability, the alleged conversation, by itself, does not indicate bias on Judge Gergel's part. There is no explanation of how Judge Norton formed the impression that Judge Gergel wanted the case, nor any allegation that Judge Norton acted upon this alleged belief. There is no allegation that Judge Norton had already been assigned the case, was going to be assigned the case, or otherwise could have taken any action to assign the case to Judge Gergel. Defendant interprets Judge Norton's comments as an indication that he played some role in the assignment, but the declaration does not support that interpretation. Defendant's interpretation of the alleged conversation is not evidence; it is a conclusion that the Court is not obligated to accept as true. *See United States v. Regenos*, 405 F.3d 691, 694 (8th Cir. 2005).

The statements submitted by Judges Wooten and Norton confirm that Defendant's interpretation is incorrect. According to Judge Wooten's affidavit, he was the district's chief judge when this case was indicted, and he assigned this case to Judge Gergel based on the same routine considerations used to assign all criminal cases in the District of South Carolina, which include consideration of a judge's caseload and any related cases. (Dkt. No. 1051). Additionally, Judge Wooten denied that Judge Gergel requested this case and denied that Judge Gergel or any other judge played any role in the assignment of the case to Judge Gergel. *Id.* Judge Wooten firmly

establishes, based on his personal knowledge, that he alone decided to assign this case to Judge Gergel and that neither Judge Gergel nor Judge Norton influenced the assignment of this case in any way.

Judge Norton's written statement makes clear that he played no role in the assignment of this case and was not aware of any effort by Judge Gergel to request the case. (Dkt. No. 1052). Even if Judge Norton made the alleged comment exactly as Mr. O'Connell recalls (ten years after the fact), there is no explanation of how Judge Norton formed the impression that Judge Gergel wanted the case, nor any allegation that Judge Norton acted upon this alleged belief. Judge Norton's statement clarifies that he was never assigned this case, so he could not have reassigned it to Judge Gergel. *Id.* Even if the Court considers the O'Connell declaration and credits Defendant's interpretation thereof, Judge Gergel's desire to handle the case is not itself evidence of bias. Whatever an "impermissible reason" may be, it must be more than the fact that a judge is interested in the subject matter of a case or is willing to handle a demanding, high-profile matter. Defendant has not alleged any facts showing a financial motive, a relationship with a party or victim, a desire to influence the outcome of the case, or any other evidence that could conceivably support an inference that the case was assigned to Judge Gergel for improper reasons. Indeed, the Fourth Circuit itself concluded that "[n]othing, aside from Roof's conclusory allegation, shows that this alleged interest resulted in any bias." *In re Roof*, 2025 WL 2335967 at *1.

### b. The evidence in the record does not show bias.

Defendant's other allegations fall well short of establishing any bias. Defendant cannot point to a single improper decision on Judge Gergel's part, as the Fourth Circuit has affirmed his decisions in every respect. *See Roof*, 10 F. 4th 314. Instead, the defense distorts the record and offers vague, subjective complaints about Judge Gergel's demeanor and expressions.

364

For example, Defendant cites[89] an instance where Judge Gergel, in referring to a disagreement between Defendant and his then-standby counsel about the role of standby counsel, said "you cannot have a two-headed monster in the representation of a party. You can not have two people making a decision, you must have one person." Jury Selection Tr. at 6, Dec. 2, 2016, (Dkt. No. 974). On its face, the Court's reference to a "two-headed monster" demonstrates no bias, as this common colloquialism was an apt metaphor to underscore that the Court would not permit Defendant and standby counsel to file motions on the same issues.

Defendant also fails to mention that later that same day, when defense counsel objected to the Court's comment, Judge Gergel clarified that he was "describing the—a situation where we have two people making a decision, that that situation is a two-headed monster. I was not referring to y'all personally . . . . It's a euphemism, it has nothing to do with y'all individually." *Id.* at 151. Defendant can only raise a hint of bias from that comment by stripping it of context and omitting Judge Gergel's explanation. That exchange therefore provides no support for Defendant's argument.

Defendant also cites Mr. Bruck's statement that the Court made "a clear moral declaration that Dylann was beyond redemption" and "endors[ed] the view that Dylann would in fact, be headed to hell." (Dkt. No. 1077-5 at ¶ 55). Defendant fails to discuss the portion of the transcript upon which Mr. Bruck's conclusion apparently relies. The Government assumes that Mr. Bruck is referring to the following exchange, which occurred in a hearing on Defendant's motion for a mistrial prior to the start of the second day of trial:

> THE COURT: Well, you know, family members should not comment on the punishment, right?

---

[89] (*See* Dkt. No. 1077 at 386).

AUSA: And she was not commenting on the punishment, is what she was describing is if he kills himself, where he was going. That is also where he's going if he dies of natural causes or the State does it.

THE COURT: Yeah, you know, I just—I think I frankly, number one, I agree with you on all that, it's just how do we—what is the most cautious approach we can take. And I think just simply just telling the jury to disregard any comments from family members regarding appropriate punishment, that is their decision to make.

Guilt Phase Trial Tr. at 201-202, Dec. 8, 2016 (Dkt. No. 894).

Mr. Bruck and Defendant appear to argue that during the exchange the Government expressed its own belief that Defendant was going to hell regardless of whether he was executed or died of natural causes and the Court indicated that it agreed with that belief. However, read in context, these comments were instead conveying the Government's position that Ms. Sanders' comment related to her belief that Defendant would wind up in hell regardless of the manner of his death. The defense had filed a motion for a mistrial arguing that the "clear import" of Ms. Sanders' statement, "He's evil. There's no place on earth for him except the pit of hell," was a recommendation to the jury that Mr. Roof be put to death. (Dkt. No. 777 at 3). It was to this argument that the Government was responding in the exchange quoted above. Immediately before this exchange, the AUSA had begun arguing that Ms. Sanders' comments were not intended as a recommendation about the appropriate sentence, when the Court interjected to express its agreement:

AUSA: Your Honor, I think one thing. To be very clear, she did not comment on what the appropriate punishment was, although I think from implication—

THE COURT: You can read it that way. I don't think she intended either . . .

(Dkt. No. 894 at 201).

This exchange provides important context for the language quoted above, showing that the Government was rejecting the claim that Ms. Sanders intended to comment on the appropriate

punishment, and the Court was agreeing with the Government *about her intent*. To make the point even more explicitly, the Court later reiterated its view that Ms. Sanders was making a religious comment, not commenting on the appropriate sentence:

> THE COURT: Now, Mr. Bruck interprets [Ms. Sanders' comment] as a recommendation regarding sentencing. I took it that she was making a religious comment, not a sentencing comment. I don't think that this is really Miss Sanders' world, this sentencing world, it's the religious. That's how I took it when she said it.

*Id.* at 204.

Considered in this context, it is clear the Government was not expressing *its own opinion* that Defendant belonged in hell. Rather, it was explaining that Ms. Sanders opinion applied regardless of whether Defendant committed suicide, was executed, or died of natural causes, and therefore she was not commenting on the appropriate punishment as Defendant had alleged in his motion for a mistrial. Likewise, when the Court said, "I agree with you on all that," it was agreeing with the Government about Ms. Sanders' intent, not expressing an opinion about the appropriate disposition of Defendant's soul.

This out-of-context line of a transcript does not establish that the Court explicitly expressed its belief in Defendant's eternal destination. Indeed, it is significant that defense counsel did not, at the time the comment was made, object. Defendant would have the Court believe that counsel made a record about Judge Gergel's euphemistic comment about a "two-headed monster" and complained about his allegedly rolling his eyes, but then said nothing about Judge Gergel apparently stating his agreement that Defendant would suffer eternal damnation. The logical conclusion is not that trial counsel simply sat silently, but rather that they understood from context that Judge Gergel was agreeing with the Government's position that Ms. Sanders was not expressing a view on punishment through her comments.

Lines plucked from a cold transcript can support a wide range of bizarre conclusions when manipulated by motivated reasoning. For instance, after Ms. Sanders responded to Mr. Bruck's final question on cross-examination by saying "That's where he would go, to hell," Mr. Bruck responded "*Yes ma'am*. I'm so sorry. Thank you." Guilt Phase Trial Tr. at 90, Dec. 7, 2016 (Dkt. No. 893) (emphasis added). If the Court were to apply to Mr. Bruck the same type of hyper-literal, context-free interpretation that Mr. Bruck and defense counsel have applied to this Court, it could reach the similarly absurd conclusion that *Mr. Bruck* was agreeing with Ms. Sanders that Defendant was going to hell. Context matters, and read in the proper context, nothing in the referenced exchange indicates Judge Gergel was biased.

Defendant further alleges Judge Gergel was biased because he referred to the family members of the victims as "my victims" during (non-jury) hearings over whether the competency proceedings would be sealed. This was nothing more than a common way for the Court to collectively refer to participants in a case—an expression it uses routinely. For instance, in a bar meeting held in October of 2015, the Court referred to the work of defense counsel in another case as "my defense counsel's efforts and strategies." Bar Meeting Tr. at 7, Oct. 1, 2015 (Dkt. No. 67). When prospective jurors were filling out case-specific questionnaires, the Court referenced "my teachers" when discussing potential scheduling conflicts. Jury Selection Tr. at 15, Sept. 26, 2016 (Dkt. No. 982). The Court referred to Dr. Ballenger as "my examiner" during the same hearing in which he referred to victims as "my victims." Hearing Tr. at 13, Nov. 17, 2016 (Dkt. No. 988). A reasonable outside observer would not construe this language as evidence of bias against Defendant or partiality towards the victims but as a neutral, colloquial expression routinely used by this Court. *See DeTemple*, 162 F.3d at 287; *In re Roof*, 2025 WL 2335967 at *2 (holding that the judge's references to the victims as "my victims" was "insufficient to show bias").

368

Defendant faults the presiding judge for "rolling his eyes" at one point during the competency hearing when a defense attorney was continuing to press a point the judge felt had been adequately addressed. (Dkt. No. 1077 at 387). That occurrence hardly presents an appearance of bias. *See Singh v. Garland*, 20 F.4th 1049, 1054 (5th Cir. 2021) (allegation that an immigration judge "smirked and literally rolled her eyes in disbelief" did not establish bias); *United States v. Robbins*, 197 F.3d 829, 848 (7th Cir. 1999) (no evidence of bias or hostility where the judge "sat back in [his] chair and rolled [his] eyes and threw [his] pen down"); *In re Roof*, 2025 WL 2335967 at *2 (holding that the judge's alleged eye rolling was "insufficient to show bias").

Defendant's cited "evidence" of bias pales even in comparison to judicial expressions of displeasure that have been found insufficient to support recusal. *See, e.g.*, *United States v. Collier*, 932 F.3d 1067, 1079 (8th Cir. 2019) (judge's comment that a defendant's case was "stupid" did not show bias); *United States v. Perkins*, 787 F.3d 1329, 1337, 1342-43 (11th Cir. 2015) (judge's comment to a criminal defendant that he should not resist because "we're going to get you anyway" and "[it's] the ones like you that I hate the most" did not show bias); *Preston v. CitiMortgage*, 522 Fed. App'x 426, 428 (10th Cir. 2013) (judge's comment referring to plaintiffs as "state-court losers" did not require recusal); *United States v. Guglielmi*, 615 F. Supp. 1506, 1511 (W.D.N.C. 1985) (judge's comment that the child pornography materials possessed by Defendant were "some of the worst things I've ever even heard of in my life" did not show bias requiring recusal); *see also Belue*, 640 F.3d at 573 ("[E]xpressions of impatience, dissatisfaction, annoyance, and even anger . . . are generally insufficient to support a recusal motion." (citation and quotation marks omitted)).

Even assuming that the judge developed a negative view of Defendant as alleged by his counsel, the Supreme Court has made clear that the fact that a judge comes to have a negative view

of a party as a result of the presentation of evidence or arguments offered by that party is not the type of "bias or partiality" that requires recusal. A "judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards Defendant, who has been shown to be a thoroughly reprehensible person." *Liteky v. United States*, 510 U.S. 540, 550-51 (1994). This does not, however, require the judge to recuse himself as biased as "his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings . . . ." *Id.* at 551.

Defendant also relies on Mr. Bruck's affidavit, in which he makes the incredible assertion that during the November 7, 2016 hearing, the Court "essentially talked Dylann into the idea that what Dylann wanted was for nothing at all to be presented at the penalty phase." (Dkt. No. 1077-5 at ¶ 46). The record flatly belies that claim. This hearing was held because Defendant had sent a letter to the prosecution team. In that letter, Defendant stated, "I have no real defense . . . . that my lawyers would present or that would be acceptable to the court." (Dkt. No. 545 at 4). Thus, before the Court had ever spoken to Defendant, he had independently proclaimed that he did not have a defense. During the hearing, Defendant reiterated this view, stating that he wanted "the prosecution to present all their evidence and then not present any mitigating evidence." Hearing Tr. at 12, Nov. 7, 2016 (Dkt. No. 556).

During the hearing, the Court encouraged Defendant to reconsider his position, informing him that his counsel "are trying to marshal a defense for you," that he would likely receive a death sentence if he did not present mitigating evidence, and that the Court wanted the jury to hear all of the evidence so that it could reach the "best decision." *Id.* at 12-13, 16-17, 20-21. The Court also asked him to consider whether his view that he did not have autism "could be a difference of opinion" and whether the experts "might actually have an insight" that he did not have. *Id.* at 9,

16. Throughout this case, the Court repeatedly encouraged Defendant to reconsider his decision to self-represent and to put on all mitigating evidence during the penalty phase, even if he represented himself. Competency Hearing Tr. at 199, Jan. 2, 2017 (Dkt. No. 880-1). The Court even specifically identified a witness that the Court found particularly moving and reminded Defendant that he could call that witness even if he self-represented. *Id.* The record directly contradicts Mr. Bruck's accusation that this Court did anything to influence Defendant's decision not to present mitigation evidence during the penalty phase.

Having failed to find any specific compelling evidence of bias in thousands of pages of transcripts, Defendant also relies on the declaration of a then-third-year law student, Meredith Childs, who worked as an intern for his state defense team. This declaration is the epitome of "highly tenuous speculation," *Cherry*, 330 F.3d at 665 (citation omitted), complete with ethereal observations about the judge's "vibe" and "air," reflections about the victims' "vibes of love and hate," a concern "that the jury should have had more breaks," and the conclusion that the judge's "tone was over-sanctimonious towards the victims." (Dkt. No. 1077-20 at ¶¶ 2, 24, 25, 28, 29). These statements do not support any implication of bias.

In summary, Defendant's "evidence" of bias amounts to nothing more than vague allegations, speculation, and, in the words of Ms. Childs, "vibe[s]." (Dkt. No. 1077-20 at ¶¶ 25, 28). Those assertions are insufficient to establish that Judge Gergel's assignment of his case violated due process.[90]

---

[90] Defendant does not specifically cite the handling of the earlier motions to recuse as a basis for his claims, but does criticize the Court on that front. (Dkt. No. 1077 at 383 nn. 149-50). The Court's reliance on Judge Norton's and Judge Wooten's statements do not demonstrate any bias. Judges routinely address factual allegations in recusal motions based on their own personal knowledge. *See, e.g.*, *Cheney v. U.S. Dist. Ct. for D.C.*, 541 U.S. 913, 914 (2004) (Justice Scalia providing facts to support the conclusion that a reasonable person would not question his partiality based on a hunting trip with the Vice President); *Rose v. Bauman*, No. 15-11963, 2021 WL 508426, at *2

### 2. Defendant Cannot Show that Trial Counsel was Ineffective for Failing to Move to Recuse the Presiding Judge or Make a Better Record.

Trial counsel did not render ineffective assistance of counsel for failing to seek Judge Gergel's recusal because there was no meritorious basis for him to move to recuse. A motion to recuse a judge is not the type of motion that is lightly made or routinely granted. *See Belue*, 640 F.3d at 575 (describing recusal as a "drastic remedy"). It is a sensitive matter that requires the type of strategic judgment and careful consideration that courts are loath to second-guess. *See Roach*, 757 F.2d at 1477 (observing that courts "should be extraordinarily slow to second-guess" "strategic choices based on informed, professional deliberation"). Trial counsel cannot be deemed ineffective for not raising such a weighty claim on the paltry evidence submitted. *See, e.g.*, *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (noting that counsel is not ineffective for refusing to make frivolous arguments).

Trial counsel was not unreasonable for refraining from seeking recusal. First, Defendant has not presented competent evidence that Judge Norton ever had the conversation with Mr. O'Connell or guided the assignment in any way, as the declaration consists completely of hearsay. *See Hodgson v. Liquor Salesmen's Union Local No. 2*, 444 F.2d 1344, 1349 (2d Cir. 1971) (noting that if "mere rumor, gossip, or general conclusory opinions were sufficient [to support a motion to recuse] any party could reject a judge at will"); *Vreeland v. Huss*, No. 18-CV-00303-PAB-SKC, 2020 WL 4582719, at *2 (D. Colo. Aug. 10, 2020) (declining to accept a party's assertions as true

---

(E.D. Mich. Feb. 11, 2021) (relying on judge's own knowledge to reject recusal motion); *United States v. Nixon*, 267 F. Supp. 3d 140, 148 & n.7 (D.D.C. 2017) (same); *Schwartz v. Steven Kramer & Assocs.*, No. CIV.A. 90-4943, 1995 WL 301363, at *5 (E.D. Pa. May 12, 1995) (same); *Massachusetts Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*, 872 F. Supp. 1346, 1349-1367 (E.D. Pa. 1994), *aff'd*, 107 F.3d 1026 (3d Cir. 1997) (discussing at length the differences between filed affidavits and the judge's own recollections). But here, none of Defendant's allegations regarding the case addressed anything that Judge Gergel said or did, so it is not surprising that he relied on statements from the judges whose words or decisions are actually in question.

when they consisted of "hearsay piled upon hearsay"). Had Mr. O'Connell decided to seek Judge Gergel's recusal based on secondhand information from Judge Norton, the motion would have been rejected out of hand.

Second, Mr. O'Connell's declaration fails to show that trial counsel should have sought recusal even if it were competent evidence. The declaration is notable for what it omits. Mr. O'Connell does not claim in his declaration that he made a mistake in failing to seek Judge Gergel's recusal. He also never expresses any belief that Judge Gergel is or has ever been biased against Defendant, which would have been an important predicate to him believing that recusal was warranted. Mr. O'Connell's actions actually show that he did not believe Judge Gergel was biased. Indeed, on June 9, 2016, roughly a year after Mr. O'Connell's alleged conversation with Judge Norton, Defendant filed a Waiver of Right to Trial by Jury, indicating his willingness to be "tried and sentenced by the Court." (Dkt. No. 181 at 1). The docket entry reflects that this notice was submitted by none other than Michael P. O'Connell. In other words, after allegedly having a conversation with Judge Norton about Judge Gergel's interest in the case, Mr. O'Connell still believed that Defendant would fare better by being tried and sentenced by Judge Gergel than a jury of his peers. The decision not to seek recusal was a strategic, professional judgment that should not be second-guessed based in hindsight. *See Winston v. Kelly*, 592 F.3d 535, 544 (4th Cir. 2010).

That strategic decision was also reasonable. As discussed at length above, there is no evidence in the record that would plausibly indicate that Judge Gergel was biased. *See supra* 366-73. Defendant apparently recognizes that flaw in his argument and now claims that the dearth of evidence in the transcripts actually shows that his trial team was constitutionally ineffective because they should have done a better job of ensuring that the Court's alleged bias was accurately reflected in the record. (Dkt. No. 1077 at 387-88). Of course, Defendant cannot prove the

affirmative merit of a potential recusal motion through absence of evidence. There was no reasonable basis for trial counsel to seek Judge Gergel's recusal in this case. Such a motion would have been completely meritless, especially based on the evidence Defendant presents. Trial counsel was therefore not unreasonable in not filing a motion for recusal.

### 3. Defendant Cannot Show Prejudice Because He Has Not Shown There was a Basis for Recusal.

Defendant cannot show that he suffered any prejudice resulting from Mr. O'Connell's failure to move for Judge Gergel's recusal because there is no evidence that such a motion would have been granted. Indeed, there is very strong evidence that it would have been denied, given that this Court has already rejected Defendant's motion to recuse and motion to reconsider, which were based on the same allegations.

The same is true for Defendant's claim that his counsel failed to document instances of bias. If Defendant cannot identify any specific instances where his counsel failed to document evidence of bias, there is no way he can show that these unspecified instances would have supported a motion to recuse. *See Cherry*, 330 F.3d at 665 (noting that a presiding judge is not required to recuse himself simply because of "unsupported, irrational or highly tenuous speculation." (cleaned up)).

### D.  Conclusion

Defendant has failed to present any competent evidence that Judge Gergel was improperly assigned this case or that Judge Gergel was biased, and even his vague and conclusory allegations fail to establish any claim of bias. His ineffective assistance claims likewise fail because any motion for recusal would have been meritless. Defendant is therefore not entitled to relief on Claim Nineteen.

## <u>CONCLUSION</u>

For the reasons stated above, Defendant's § 2255 motion should be denied and judgment entered in favor of the United States.

Respectfully submitted,

BRYAN P. STIRLING
UNITED STATES ATTORNEY

By:   <u>s/Christopher B. Schoen</u>
CHRISTOPHER B. SCHOEN (ID#11421)
Assistant United States Attorney
55 Beattie Pl., Suite 700
Greenville, SC 29601
864-282-2100

October 15, 2025