UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OFAMERICA, | ) | Case No. 2:15-CR-00472-RMG |
| | ) | DEATH PENALTY CASE |
| Plaintiff-Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DYLANN STORM ROOF, | ) | |
| | ) | |
| Defendant-Petitioner. | ) | |
| _____ | ) | |

**<u>Redacted Reply to the Government's Response in Opposition</u>**

Respectfully submitted,

/s/ Jill E.M. HaLevi
Jill E.M. HaLevi
Mediation and Legal Services
102 Broad Street, Suite C
Charleston, SC 29401
Phone: 843-819-0557
E-Mail: jill@charlestonmediator.com

/s/ Angela S. Elleman
Angela S. Elleman Chief, § 2255 Unit
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Phone: 317-383-3520
E-Mail: angie_elleman@fd.org

Attorneys for Defendant-Petitioner Dylann Storm Roof

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................viii

INTRODUCTION ...................................................................................................................... 1

    A. Standard of Review.......................................................................................................... 4

    B. The Government's Response Relies Heavily on Cases with Dramatically Different Standards of Review. ............................................................................................................ 6

        1. Cases where the record was developed and a hearing was held do not support the argument that no post-conviction hearing should be granted to Dylann. ............................... 6

        2. Section 2254 cases cited by the government require deference to state court record and decision-making, which is not present here........................................................................... 9

    C. Dylann's Claims, on their Face, State Valid Claims for Relief. .......................................... 10

    D. Conclusion ....................................................................................................................... 16

CLAIM 1:

CLAIM 2:

i

B.

CLAIM 3:     Dylann Roof Was Denied The Effective Assistance Of Counsel When His Attorneys Failed To Investigate And Present Readily Available Evidence That He Was Not Competent To Represent Himself Under *Indiana v. Edwards*. ....................................................... 69

A. Trial Counsel Were On Notice In The Months Before Trial That Dylann Might Seek To Represent Himself, And They Failed To Investigate Their Client's Communication And Language Deficits Which Multiple Experts And They Themselves Had Observed— Impairments Directly Relevant To Dylann's Capacity To Carry Out Basic Trial Tasks On His Own.................................................................................................................................... 70

1. Dylann expressed a desire to fire his trial counsel multiple times in the months leading up to trial, yet counsel failed to prepare for a scenario in which he sought to represent himself. ........................................................................................................................... 70

2. *Indiana v. Edwards* recognizes that the *Dusky* competency standard is not "sufficient" to test a defendant's competency for self-representation "given the different capacities needed to proceed to trial without counsel," and trial counsel should have investigated whether Dylann Roof was competent to represent himself. ................................................................. 71

3. Trial counsel knew that Dylann suffered from extreme social anxiety and they observed impairments in his communication and language ability, skills required to carry out the basic tasks needed to present a defense; yet they failed to investigate evidence of these deficits, ignoring the advice of multiple experts.................................................................... 76

B. Dylann Was Prejudiced By Trial Counsel's Failure To Investigate And Present Evidence To The Court Of Dylann's Profound Auditory Processing Disorder, Which, Combined With Impaired Linguistic Processing Speed, Pragmatic Social Communication Dysfunction, And Extreme Social Anxiety, Prevented Dylann From Carrying Out The Basic Tasks Needed To Present His Own Defense Without The Help Of Counsel. ....................................................... 79

1. Dylann's impairments are profound and left him unable to adequately follow the trial proceedings and conduct a defense on his own ................................................................... 79

2. The Court did not hear evidence—or argument—concerning Dylann's incompetency as it related to his ability to represent himself, and a reasonable probability exists that the Court's ruling would have been different. ...................................................................................... 86

3. At the very least, had counsel presented the Court with expert understanding of Dylann's communication-related disorders, it would have granted the accommodations that both standby counsel and Dylann himself sought.......................................................................... 92

C. Dylann Is Entitled To A New Penalty Phase Proceeding. ................................................... 96

CLAIM 4:     Trial Counsel Unreasonably Rushed to Trial, Resulting in Prejudice. ................. 97

A. Trial Counsel Did Not Make A Reasonable Strategic Decision.......................................... 97

ii

B. Counsel's Uninformed Decision To Seek A Speedy Trial Prejudiced Dylann................... 101

CLAIM 5:     Trial Counsel Provided Ineffective Assistance By Repeatedly Deceiving Their Client, Leading To A Total Breakdown In The Relationship.................................................... 105

A. Trial Counsel Unreasonably Destroyed Their Relationship With Dylann By Lying To Him. ...................................................................................................................................... 105

B. Dylann Would Not Have Represented Himself If Trial Counsel Had Not Destroyed Their Relationship. ...............................................................................................................110

C. This Claim Is Properly Raised For The First Time. ......................................................112

D. The Government's Response Demonstrates The Necessity Of A Hearing. .......................112

E. A New Penalty Trial is Required ...................................................................................113

CLAIM 6:     Dylann Was Constructively Denied The Right To Counsel Due To The Dishonesty And Distrust Sowed By His Appointed Counsel. ........................................................................115

A. Dylann Was Constructively Denied His Right To Effective Assistance Of Counsel— *Cronic*'s Presumption Of Prejudice Applies And The Government's Arguments To The Contrary Should Be Rejected.............................................................................................115

B. Contrary To The Government's Assertions, Additional Evidence Of The Irreparable Breakdown In The Attorney Client Relationship Leading To The Constructive Denial Of Counsel Is Demonstrated Because Counsel Failed To Consider Dylann's Objectives........... 120

C. The Trial Court Was Required To Make A Thorough Inquiry Into The Conflict Pursuant To *Holloway v. Arkansas*............................................................................................................ 124

D. The Government Mischaracterizes The Claim To Assert That Dylann's Waiver Of Counsel Bars This Argument. ...................................................................................................... 126

CLAIM 7:     The Complete Lack Of Mitigation Evidence During The Penalty Phase Violated Dylann's Constitutional Rights.................................................................................................... 129

A. The Supreme Court Has Always Emphasized The Importance Of A Balanced Penalty Phase That Includes Mitigation.................................................................................................. 129

B. Trial Counsel's Unreasonable And Ineffective Conduct Left The Jury Without Any Mitigating Evidence About Dylann's Life............................................................................. 130

C. There Is A Reasonable Probability Of A Different Outcome Had The Jury Heard The Available Mitigation. ....................................................................................................... 134

CLAIM 8:     Dylann Was Not Present During Substantive Court Proceedings, In Violation Of His Fifth And Sixth Amendment Constitutional Rights. ............................................................ 136

CLAIM 9:     Despite The Government's Newfound Protestation That Charleston Was An Acceptable Venue, Trial Counsel Were Ineffective In Their Complete Failure To Investigate And Object To The Impact Of Media Saturation On The Trial....................................................... 139

iii

A. Counsel's Decision To Forge Ahead With A Trial In Charleston, With Jurors From The Epicenter Of The Tragedy, And Without Any Investigation, Was Neither Strategic Nor Reasonable. .................................................................................................................. 141

    1. An uninformed strategy is no strategy at all. ................................................. 142

    2. Experience cannot shield counsel's ineffectiveness. ....................................... 145

    3. The government supplies strategic reasons of their own invention with no basis in fact or reality. ........................................................................................................ 149

B. Dylann Was Prejudiced by Trial Counsel's Failures. ....................................... 150

    1. Before trial, the government itself expressed concern that Dylann would be unfairly prejudiced by a trial in Charleston. .................................................................. 150

    2. A presumption of prejudice applies to Dylann's case. ................................... 152

    3. Dylann also has demonstrated actual prejudice. ........................................... 158

CLAIM 10:

CLAIM 11:    Lead Counsel David Bruck Ineffectively Cross Examined Victim Felicia Sanders, Over The Team's Opposition And To Disastrous Result, And He Failed To Timely Object, Resulting In Prejudice To Dylann. ............................................................................... 172

A. Objectively Deficient Performance. .................................................................. 172

    1. Timing of objections. ....................................................................................... 172

    2. Cross-examination. .......................................................................................... 174

B. Ms. Sanders's Testimony Prejudiced the Trial .................................................. 176

C. Testimony That Dylann Was "Evil" Demands A New Trial ............................... 178

INTRODUCTION:    Claims 12 through 15 .............................................................. 179

CLAIM 15:    The Government Makes Incorrect Assertions As To Claim 15. ......................... 183

A. The Government Is Wrong That Convictions For § 924(j) And The Predicate Offense Do Not Violate Double Jeopardy. ........................................................................ 183

B. The Government Is Wrong That § 247 Cannot Be Violated By Threatening Self-Harm; The Statute Can Be Violated By Self-Harm, And Consequently Is Not A Crime Of Violence. .... 187

C. The Government Is Wrong That § 249 Requires A Sufficient Degree Of Force Against Another To Satisfy The Elements Clause. ............................................................. 191

D. The Government Is Wrong That § 249(A)(1) Is Valid Under The First Amendment. ........ 196

CLAIM 14:     The Government Makes Incorrect Assertions As To Claim 14. ........................ 202

A. The Government Is Wrong When It Says Precedent Forecloses Consideration Of The Constitutionality Of The Elements Clause. ........................................................... 202

1. Supreme Court precedent does not preclude but rather encourages a reexamination of the question of whether the elements clause of § 924(c) is unconstitutionally vague. ............. 203

2. Fourth Circuit cases cited by the government likewise do not preclude an examination by this Court of Dylann's argument that the elements clause is unconstitutionally vague ...... 206

B. The Government Is Wrong When It Says That The Elements Clause Cannot Be Unconstitutionally Vague Because It Does Not Suffer From The Same Infirmities As The Residual Clause. ......................................................................................... 209

C. Finally, The Government Is Wrong That These Claims Are Procedurally Defaulted. ........ 215

CLAIM 12:     The Government Makes Incorrect Assertions As To Claim 12. ........................ 217

A. The Government Is Wrong When It Says That Dylann's Claims Are Procedurally Unreviewable. ................................................................................... 218

1. The government is wrong, because the Court can reconsider any trial issues in light of new information, evidence, or arguments that the Court was previously not made aware of. ..................................................................................... 218

2. Relatedly, the government is wrong when it suggests the § 2255 motion does nothing more than provide additional examples to support the arguments trial and appellate counsel already made in arguing that § 247 and § 249 are not crimes of violence. ........................ 222

3. The government is wrong when it asserts Dylann defaulted his claim of ineffectiveness for having failed to challenge the constitutionality § 924(c)'s elements clause and cannot demonstrate cause and prejudice to overcome the default. ................................................ 226

4. The government is also wrong when it says counsel's decisions were based in strategy. ..................................................................................... 227

B. The Government Is Wrong That Convictions Under § 924(j) And The Predicates Do Not Violate Double Jeopardy. ................................................................. 230

v

C. The Government Makes Several Incorrect Points In Response To The Argument  Trial Counsel Was Ineffective For Failing To Challenge The Constitutionality Of § 924(c), Because The Statute (Not Only Its Residual Clause) Is Unconstitutionally Vague. ............................. 233

    1. The government is wrong when it asserts that reasonably competent counsel could not have been expected to raise the claim that § 924(c) is unconstitutionally vague given the state of the law at the time of trial....................................................................................... 233

    2. The government is wrong, and completely ignores the required categorical analysis, when it asserts that Dylann's challenge for vagueness of the elements clause of § 924(c) must fail because Dylann must have known when he committed his crime that killing people was a crime of violence.................................................................................................................. 238

    3. The government is wrong when it says that § 924(c) is not unconstitutionally vague... 243

    4. The government is wrong when it says you can only raise an "as applied" challenge to a criminal statute and Dylann cannot bring such a challenge................................................. 244

D. The Government Is Wrong For Both Of The Reasons It Says Ought To Defeat Dylann's Claim That 18 U.S.C. § 247 Is Not A Crime Of Violence—That § 247 Can Be Violated By A Perpetrator Who Threatens Self-Harm To Obstruct Worshippers From Exercising The Right To The Free Exercise Of Their Religious Beliefs Or By One Who Harms Her Own Property... 245

    1. The government offers two unsupportable reasons for contesting Dylann's assertion that § 247 is not a crime of violence because a perpetrator can use the threat of self-harm to obstruct others' exercise of religious beliefs....................................................................... 245

    2. The government is wrong when it says that constitutional concerns would bar enforcement of § 247 against a person who used force against her own property or threatened self-harm in order to obstruct worshippers. ..................................................... 246

E. The Government Makes Several Incorrect Points In Response To The Argument That Trial Counsel Was Ineffective For Its Failures Challenging Whether § 249 Is A Crime Of Violence. ..................................................................................................................................................... 249

F. The Government Is Wrong That § 249(1) Is Valid Under The First Amendment Because It Prohibits Only Violent Conduct—§ 249(1) Penalizes Violent Conduct Only When That Conduct Is Accompanied By Certain Thoughts, Thereby Penalizing A Person's Thoughts And Feelings. ............................................................................................................................... 249

G. The Government Is Wrong That Dylann's Claims Raising Commerce Clause And 13th Amendment Challenges Merely Repeat Trial Counsel's Arguments. ................................... 249

H. The Government Makes Several Incorrect Points As To The Prejudice Resulting From Trial Counsel's Mistakes. ................................................................................................................. 251

    1. The government is wrong when it says that the superseding laws make prejudice unprovable................................................................................................................................ 251

2. The government is wrong when it says that the prejudice Dylann claims is a cascading set of speculations. ..................................................................................................... 255

CLAIM 13:     The Government Makes Several Incorrect Assertions As To Claim 13; In Particular, The Government Is Wrong That Appellate Counsel's Ineffective Assistance Cannot Be Reviewed Because The Court Cannot Revisit Prior Rulings Despite New Information............ 259

CLAIM 16:     Uncertainty And Lack Of Necessary Safeguards Surrounding The Method Of Execution Create An Unacceptable Risk Of Severe And Unnecessary Suffering In Violation Of The Eighth Amendment; Consequently, The Government Should Take Basic Steps To Ensure That The Execution Is Humane. ............................................................................................... 261

CLAIM 17:     The Eighth Amendment Prohibits Imposing The Death Penalty On A Twenty-One-Year-Old Person With An Undeveloped Brain. ................................................................ 264

A. The Court Should Grant A Hearing And Allow Dylann The Opportunity To Present Evidence That He Is Constitutionally Ineligible For Execution. ........................................... 264

B. This Claim Is Not Procedurally Barred. ................................................................. 266

CLAIM 18:     The Death Penalty Is Unconstitutional. ............................................................. 268

CLAIM 19:     Judge Gergel Presiding Over Dylann's Case Because He "Really Wants To" Violated Dylann's Due Process Right To An Impartial Procedure For Assigning A Judge, And Trial Counsel's Failure To Object Violated Dylann's Sixth Amendment Right To Effective Assistance Of Counsel. .................................................................................................... 272

A. This Claim Has Not Previously Been Decided. ................................................................. 272

B. The Facts Are In Dispute, Necessitating Discovery And A Hearing................................ 274

1. Judicial Assignment ................................................................................................. 274

2. Bias .......................................................................................................................... 276

C. Conclusion.................................................................................................................. 277

**TABLE OF AUTHORITIES**

**CASES**

*Abby v. Howe*, 742 F.3d 221 (6th Cir. 2014) ................................................................ 255

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) ...................................................... 130

*Aiken v. United States*, 296 F.2d 604 (4th Cir. 1961) ...................................................117

*Andrus v. Texas*, 590 U.S. 806 (2020) ........................................................................ 140

*Atkins v. Virginia*, 536 U.S. 304 (2002) ...................................................................... 237

*Ball v. United States*, 470 U.S. 856 (1985) ................................................................. 187

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ........................................................................ 8

*Barnes v. Joyner*, 751 F.3d 229 (4th Cir. 2014) ..................................................... 35, 67

*Barr v. Lee*, 591 U.S. 979 (2020) ........................................................................ 261, 262

*Barrett v. United States*, 146 U.S. 482 (2026) .............................. 181, 183, 185, 187

*Begay v. United States,* 553 U.S. 137 (2008) ............................................................... 239

*Bell v. Ozmint*, 332 F.3d 229 (4th Cir. 2003) .............................................................. 254

*Bender v. United States*, 387 F.2d 628 (1st Cir. 1967) ..................................................... 8

*Bennett v. Stirling*, 842 F.3d 319 (4th Cir. 2016) ....................................................... 173

*Billings v. Polk,* 441 F.3d 238 (4th Cir. 2006) .............................................................. 64

*Bills v. Clark*, 628 F.3d 1092 (9th Cir. 2010) .............................................................. 74

*Black v. Goord*, 419 F. Supp. 2d 365 (W.D.N.Y. 2006) ............................................. 136

*Blackledge v. Allison*, 431 U.S. 63 (1977) ............................................................ passim

*Blystone v. Pennsylvania*, 494 U.S. 299 (1990) ........................................................... 44

*Boeckenhaupt v. United States*, 537 F.2d 1182 (4th Cir. 1976) ................................. 221

*Booth v. Maryland*, 482 U.S. 496 (1987) ................................................................... 173

*Bosse v. Oklahoma*, 580 US. 1 (2016) ........................................................................ 173

*Boumediene v. Bush*, 553 U.S. 723 (2008) ................................................................. 2, 3

*Brewer v. United States*, 89 F.4th 1091 (8th Cir. 2024) ..............................................211

*Bucklew v. Precythe*, 587 U.S. 119 (2019) ................................................................. 262

*Buckner v. Polk*, 453 F.3d 195 (4th Cir. 2006) ........................................................... 142

*Bulger v. McClay*, 575 F.2d 407 (2d Cir. 1978) ........................................................... 66

*Burger v. Kemp*, 483 U.S. 776 (1987) .......................................................................... 17

*Cauthern v. Colson*, 736 F.3d 465 (6th Cir. 2013) ............................................. 173, 177

*Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000) ....................................... 150

*Collins v. United States*, 28 F.4th 903 (8th Cir. 2022) ............................................... 255

*Conaway v. Polk*, 453 F.3d 567 (4th Cir. 2006) ........................................................... 51

*Correll v. Ryan*, 539 F.3d 938 (9th Cir. 2008) ........................................................... 145

*Cox v. Norris*, 133 F.3d 565 (8th Cir. 1997) .................................................................. 7

*Craig v. Garrison*, 549 F.2d 306 (4th Cir. 1977) ....................................................... 163

*Cromer v. Kraft Foods North America, Inc.*, 390 F.3d 812 (4th Cir. 2004) ............... 164

*Cruz v. Abbate*, 812 F.2d 571 (9th Cir. 1987) ............................................................. 274

*Darden v. Wainwright*, 477 U.S. 168 (1986)................................................................ 173

*Davis v. United States*, 588 U.S. 445 (2019)........................................................... passim

*Delligatti v. United States*, 604 U.S. 423 (2025)..................................................... passim

*Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28 (2020) ................................ 182, 198

*Dugas v. Coplan*, 428 F.3d 317 (1st Cir. 2005)................................................................ 4

*Dunn v. Reeves*, 594 U.S. 731 (2021) ...................................................................... 219, 259

*Dusky v. United States*, 362 U.S. 402 (1960)................................................................ 71

*Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998) .......................................................... 51

*Erikson v. Pardus*, 551 U.S. 89 (2007) ....................................................................... 164

*Fields v. Murray*, 49 F.3d 1024 (4th Cir. 1995) ......................................................... 74

*Figueroa Almonte v. United States*, 915 F.2d 1556 (1st Cir. 1990) ................................... 8

*Furnish v. Comm.*, 267 S.W.3d 656 (Ky. 2007) ......................................................... 173

*Glossip v. Gross*, 576 U.S. 863 (2015)....................................................................... 268

*Gordon v. Leeke*, 574 F.2d 1147 (4th Cir. 1978) ....................................................... 163

*Gregg v. Georgia*, 428 U.S. 153 (1976) .................................................................... 270

*Haines v. Kerner*, 404 U.S. 519 (1971)...................................................................... 163

*Hall v.* Florida, 572 U.S. 701 (2014)......................................................................... 262

*Hamilton v. Ayers*, 583 F.3d 1100 (9th Cir. 2009)....................................................... 16

*Hammock v. Watts*, 146 F.4th 349 (4th Cir. 2025) ...................................................... 163

*Harrington v. Richter¸* 562 U.S. 86 (2011) ................................................................. 64

*Harris v. Alabama*, 513 U.S. 504 (1995).................................................................... 236

*Hernandez-Hernandez v. United States*, 904 F.2d 758 (1st Cir. 1990)............................... 9

*Hildwin v. Florida*, 490 U.S. 638 (1998).................................................................... 236

*Hill v. Colorado,* 530 U.S. 703 (2000) ..................................................... 180, 210, 238, 243

*Hinton v. Alabama*, 571 U.S. 264 (2014)................................................................. passim

*Hohn v. United States*, 524 U.S. 236 (1998)............................................................... 205

*Holloway v Arkansas,* 435 U.S. 475 (1978)................................................................. 124

*Horton v. Zant*, 941 F.2d 1449 (11th Cir. 1991)......................................................... 142

*Humphries v. Ozmint*, 397 F.3d 206 (4th Cir. 2005) (en banc) ..................................... 172

*Hurst v. Florida*, 577 U.S. 92 (2016)........................................................................ 237

*In re Roof*, No. 25-2, 2025 LEXIS 345307 (4th Cir. Aug. 13, 2025)................................. 272

*Indiana v. Edwards*, 554 U.S. 164 (2008)............................................................... passim

*Irvin v. Dowd*, 366 U.S. 717 (1961)..................................................................... 153, 158

*Jackson v. Poole*, No. 06-CV-00188, 2011 U.S. Dist. LEXIS (S.D.N.Y. July 19, 2011)............ 137

*Jean-Baptiste v. Artus*, No. 09-CV-05920, 2016 U.S. Dist. LEXIS 168087(S.D.N.Y. Dec. 6, 2016) ............................................................................................................... 137

*Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002).................................................. 141

*Johnson  v. United States*, 576 U.S. 591 (2015) ...................................................... passim

*Johnson v. United States*, 559 U.S. 133 (2010)...................................................... 191, 212

*Jones v. Cooper*, 311 F.3d 306 (4th Cir. 2002) ........................................................ passim

*Justus v. Clarke*, 78 F.4th 97 (4th Cir. 2023) ................................................................ 74

*Kimmelman v. Morrison*, 477 U.S. 365 (1986)............................................................. 234

*King v. United States*, 965 F.3d 60 (1st Cir. 2020) .......................................................211

*Kyles v. Whitley*, 514 U.S. 419 (1995) ......................................................................... 17

*LaGrand v. Stewart,* 133 F.3d 1253 (9th Cir. 1998)...................................................... 146

*Lockhart v. Fretwell*, 506 U.S. 364 (1993) ................................................................. 254

*Lynch v. Polk*, 204 F. App'x 167 (4th Cir. 2006) ........................................................... 64

*Machibroda v. United States*, 368 U.S. 487 (1962) .................................................. 5, 8, 9

*Massaro v. United States*, 538 U.S. 500 (2003) ...................................................... passim

*Mathis v. United States*, 579 U.S. 500 (2016)............................................................ 213

*Mattox v. United States*, 146 U.S. 140 (1892).............................................................. 66

*Maxwell v. Mabry*, 672 F.2d 683 (8th Cir. 1982) ........................................................... 7

*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984)............................. 31

*McKaskle v. Wiggins*, 465 U.S. 168 (1984) ..................................................... 72, 92, 94

*Meeks v. Moore*, 216 F.3d 951 (11th Cir. 2000)......................................................... 150

*Miller v. United States*, 564 F.2d 103 (1st Cir. 1977) ...................................................... 6

*Murphy v. Florida*, 421 U.S. 794 (1975) .................................................................... 161

*Nix v. Whiteside,* 475 U.S. 157 (1986)....................................................................... 255

*Norris v. United States*, 820 F.3d 1261 (11th Cir. 2016)................................................. 5

*Padilla v. Kentucky*, 559 U.S. 356 (2010)................................................................... 235

*Parnell v. United States,* 149 F. 4th 1268 (11th Cir. 2025) ......................... 147, 148, 152

*Patton v. Yount,* 467 U.S. 102 (1984)................................................................. 155, 161

*Payne v. Tennessee*, 501 U.S. 808 (1991) .................................................................. 205

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ..................................................................... 237

*Person v. Miller*, 854 F.2d 656 (4th Cir. 1988) ............................................................. 49

*Phillips v. Joint Legislative Comm. on Performance & Expenditure Rev. of State of Miss.,* 637 F. 2d 1014 (5th Cir. 1981)............................................................................................ 273

*Porter v. White*, 23 F.4th 322 (4th Cir. 2022)......................................................... 32, 35

*Porter v. Zook*, 898 F.3d 408 (4th Cir. 2018) ............................................................... 32

*Provenzano v. Dugger*, 561 So. 2d 541 (Fla. 1990)......................................................... 7

*Provenzano v. Singletary*, 148 F.3d 1327 (11th Cir. 1998) ............................................. 7

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992)..................................................................... 198

*Remmer v. United States*, 347 U.S. 227 (1954)............................................................. 34

*Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2009) ............................................... 143

*Rideau v. Louisiana*, 373 U.S. 723 (1962) ......................................................... 151, 152

*Ring v. Arizona*, 536 U.S. 584 (2002)........................................................................ 205

*Rivera v. United States*, 915 F.2d 1557 (1st Cir. 1990)................................................... 8

*Robinson v. Polk*, 438 F.3d 350 (4th Cir. 2006) ........................................................... 35

*Robinson v. Polk*, 444 F.3d 225 (4th Cir. 2006) ........................................................... 65

x

*Rompilla v. Beard*, 545 U.S. 374 (2005) .............................................................................. 78

*Roper v. Simmons,* 543 U.S. 551 (2005) .......................................................... 237, 264, 265

*Rosalez-Lopez v. United States*, 451 U.S. 182 (1981) ..................................................... 18, 41

*Sampson v. United States*, 724 F.3d 150 (1st Cir. 2013) ................................. 41, 46, 49, 60

*Schlup v. Delo*, 513 U.S. 298 (1995) .................................................................................. 215

*Scott v. Lawrence*, 36 F.3d 871 (9th Cir. 1994) ................................................................. 19

*Sessions v. Dimaya*, 584 U.S. 148 (2018) ......................................................................... 245

*Shaw v. Foreman*, 59 F.4th 121 (4th Cir. 2023) .............................................................. 163

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) ..................................................................... 157

*Shinn v. Kayer*, 592 U.S. 111 (2020) .................................................................................. 63

*Smith v. Lockhart*, 923 F.2d 1314 (8th Cir. 1991) ........................................................... 125

*Smith v. Phillips*, 455 U.S. 209 (1982) ............................................................................. 161

*Spaziano v. Florida*, 468 U.S. 447 (1984) ....................................................................... 236

*Stanford v. Kentucky,* 492 U.S. 361 (1989) .............................................................. 237, 265

*Stokeling v. United States*, 586 U.S. 73 (2019) ........................................................... passim

*Strickland v. Washington*, 466 U.S. 668 (1984) .......................................................... passim

*Sykes v. United States*, 564 U.S. 1 (2011) ........................................................................ 204

*Taylor v. United States*, 495 U.S. 575 (1990) .................................................................. 239

*Taylor v. United States*, 596 U.S. 845 (2022) ............................................................. passim

*Torres v. Lynch*, 578 U.S. 452 (2016) ....................................................................... 192, 223

*Townes v. United States*, 371 F.2d 930 (4th Cir. 1961) ................................................... 117

*United State v. Butt*, 731 F.2d 75 (1st Cir. 1984) ............................................................... 8

*United States Roane*, 378 F.3d 382 (4th Cir. 2009) ......................................................... 221

*United States v. Ahemeid*, 20-cr-0502, 2026 U.S. Dist. LEXIS 25317 (E.D.N.Y. Feb. 5, 2026)
............................................................................................................................. 212, 240

*United States v. Altruz*, CR 20-207, 2023 U.S. Dist. Lexis 96130 (E.D. Pa. June 2, 2023) ....... 208

*United States v. Anderson*, 981 F.3d 565 (7th Cir. 2020) .................................................... 5

*United States v. Armstrong*, 122 F.4th 1278 (11th Cir. 2024) .......................................... 211

*United States v. B.J.S.*, 147 F.4th 837 (8th Cir. 2025) ............................................... 188, 193

*United States v. Banks*, -- F.4th --, 2025 U.S. App. LEXIS 3659 (4th Cir. Feb. 18, 2025)......... 150

*United States v. Barrett*, 985 F.3d 1203 (10th Cir. 2021) ................................................ 129

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002) .................................................. 172

*United States v. Bernard*, 708 F.3d 583 (4th Cir. 2013) ................................................... 74

*United States v. Birchette*, 908 F.3d 50 (4th Cir. 2018) ..................................................... 34

*United States v. Blackledge,* 751 F.3d 188 (4th Cir. 2014) ...........................................115, 123, 125

*United States v. Boman*, 873 F.3d 1035 (8th Cir. 2017) ...................................................211

*United States v. Boney*, 977 F.2d 624 (D.C. Cir. 1992) ................................................ 51, 58

*United States v. Bowers*, CR 18-292, 2020 US Dist. Lexis 191861 (W.D. Pa. Oct. 16, 2020) .. 208

*United States v. Boyd*, 767 F. Supp. 905 (N.D. Ill. 1991) ................................................. 48

*United States v. Bran*, 776 F.3d 276 (4th Cir. 2015) ....................................................... 231

*United States v. Burwell*, 122 F.4th 984 (D.C. Cir. 2024) ........................................................211

*United States v. Casellas-Toro*, 807 F.3d 380 (1st Cir. 2015) ............................ 150, 153, 155, 156

*United States v. Castleman*, 572 U.S. 157 (2014)............................................................ 192, 212

*United States v. Chitolie,* No. 1:09-CR-0026, 2010 U.S. LEXIS 56646 (D.V.I. June 8, 2010).. 158

*United States v. Colombo*, 869 F.2d 149 (2d Cir. 1989) ...................................................... 51, 58

*United States v. Connolly*, 341 F.3d 16 (1st Cir. 2003)................................................................ 32

*United States v. Cronic,* 466 U.S. 648 (1984).......................................................115, 116, 122, 146

*United States v. Cuthel*, 903 F.2d 1381 (4th Cir. 1990) ............................................................. 34

*United States v. Dyess*, 730 F.3d 354 (4th Cir. 2013) .............................................................. 220

*United States v. Fell*, 224 F. Supp. 3d 327 (D. Vt. 2016)................................................... 266, 271

*United States v. Fernandini*, 652 F. App'x 4 (2d Cir. 2015) ..................................................... 231

*United States v. Flanders*, 635 F. App'x 74 (3d Cir. 2015)........................................................ 48

*United States v. Forde,* 407 F. App'x 740 (4th Cir. 2011)................................................... 31, 35

*United States v. Freeman*, 24 F.4th 320 (4th Cir. 2022)................................................... 142, 143

*United States v. Fulks*, 454 F.3d 410 (4th Cir. 2006) ...................................................... 31, 32, 49

*United States v. García-Ortiz*, 657 F.3d 25 (1st Cir. 2011)..................................................... 231

*United States v. Giardino*, 797 F.2d 30 (1st Cir. 1986)..................................................... 5, 6, 13

*United States v. Glover*, 8 F.4th 239 (4th Cir. 2021)............................................................... 127

*United States v. Gonzales*, 841 F.3d 339 (5th Cir. 2016) ........................................................ 231

*United States v. Gooding*, 594 F. App'x 123 (4th Cir. 2014) ....................................................... 3

*United States v. Gravely*, 840 F.2d 1156 (4th Cir. 1988) .......................................................... 34

*United States v. Green*, 67 F.4th 657 (4th Cir. 2023) .............................................................. 226

*United States v. Harbuck*, 146 F.4th 1073 (11th Cir. 2025) .................................................... 207

*United States v. Hayman*, 342 U.S. 205 (1952) .......................................................................... 9

*United States v. Jackson*, 32 F.4th 278 (4th Cir. 2022) ........................................................... 212

*United States v. James,* 550 U.S. 192 (2007)........................................................................... 204

*United States v. Johnson*, 92cr68, 2021 U.S. Dist. LEXIS 388 (E.D. Va. Jan. 2, 2021)............. 237

*United States v. Johnson*, 954 F.3d 174 (4th Cir. 2020)...................................................... 31, 35

*United States v. Jones*, 608 F.2d 1004 (4th Cir. 1979)............................................................. 42

*United States v. L. Cohen Grocery Co.,* 255 U.S. 81 (1921) ..................................................... 205

*United States v. Lancaster*, 96 F.3d 734 (4th Cir. 1996) ..................................................... 18, 19

*United States v. Linder*, 552 F.3d 391 (4th Cir. 2009) ............................................................ 220

*United States v. Luigi Mangione*, 25-CR-00176, 2026 U.S. Dist. LEXIS 18890 (S.D.N.Y. Jan. 30, 2026) .................................................................................................................... passim

*United States v. Magini*, 973 F.2d 261 (4th Cir. 1992) ............................................................ 124

*United States v. Mayhew*, 995 F.3d 171 (4th Cir. 2021) ........................................................... 17

*United States v. McCorkle*, 248 F.2d 1 (3d Cir. 1957) ............................................................... 43

*United States v. McKinney*, 60 F.4th 188 (4th Cir. 2023) ........................................................ 215

*United States v. McNeil*, 126 F.4th 935 (4th Cir. 2025) ...................................................... 13, 17

*United States v. McVeigh*, 918 F. Supp. 1467 (D. Colo. 1996) ................................................. 158

*United States v. Misla-Aldarondo*, 478 F.3d 52 (1st Cir. 2007) .......................................... 150, 157

*United States v. Morris*, 917 F.3d 818 (4th Cir. 2019) ............................................................... 233

*United States v. Mullen*, 32 F.3d 891 (4th Cir. 1994) ................................................................ 124

*United States v. Oles*, 994 F.2d 1519 (10th Cir. 1993) .............................................................. 137

*United States v. Ortiz-Orellana*, 90 F. 4th 689 (4th Cir. 2024) ................................................. 232

*United States v. Palacios*, 982 F. 3d 920 (4th Cir. 2020) ......................................................... 232

*United States v. Pendleton*, 894 F.3d 978 (8th Cir. 2018) ......................................................... 208

*United States v. Poole*, 450 F.2d 1082 (3d Cir. 1971) ............................................................ 42, 43

*United States v. Ragin*, 820 F.3d 609 (4th Cir. 2016) .............................................................. 133

*United States v. Reed*, 719 F.3d 369 (5th Cir. 2013) ................................................................... 5

*United States v. Rojas*, 520 F.3d 876 (8th Cir. 2008) ......................................................... 188, 193

*United States v. Roof*, 10 F.4th 314 (4th Cir. 2021) ................................................................ 94, 95

*United States v. Runyon*, 994 F.3d 192 (4th Cir. 2020) .................................................5, 13, 107, 211

*United States v. Sampson,* No. CR 01-10384-MLW, 2015 WL 7962394 (D. Mass. Dec. 2, 2015)
    ............................................................................................................................................. 265

*United States v. Sanders*, 133 F.4th 341 (5th Cir. 2025) ..................................................... passim

*United States v. Sean Combs*, No. 1:24-cr-00542 (S.D.N.Y.) ...................................................... 59

*United States v. Simms*, 914 F.3d 229 (4th Cir. 2019) ............................................................... 207

*United States v. Skilling*, 561 U.S. 358 (2010) .................................................................... passim

*United States v. Slocum*, 106 F.4th 308 (4th Cir. 2024) ............................................................ 142

*United States v. Smith*, 640 F.3d 580 (4th Cir. 2011) ..........................................................115, 119

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) ............................................................... 33

*United States v. Sweeney*, 833 F. App'x 395 (4th Cir. 2021) ..................................................... 215

*United States v. Taylor*, 942 F.3d 205 (4th Cir. 2019) ........................................................ 150, 152

*United States v. Taylor*, 979 F.3d 203 (4th Cir. 2020) .............................................................. 212

*United States v. Umana*, 750 F.3d 320 (4th Cir. 2014) ....................................................... 42, 49, 50

*United States v. Walker*, 793 F. App'x 865 (11th Cir. 2019) ..................................................... 208

*United States v. Wilson*, 579 F. App'x 338 (6th Cir. 2014) ....................................................... 231

*Vinson v. True*, 436 F.3d 412 (4th Cir. 2006) .................................................................... 142, 143

*Wall v. Kholi*, 562 U.S. 545 (2011) ......................................................... 219, 220, 266, 267

*Walton v. Arizona*, 497 U.S. 639 (1990) ................................................................................... 205

*Warger v. Shauers*, 574 U.S. 40 (2014) ..................................................................... 19, 33, 34, 62

*Weeks v. Jones*, 26 F.3d 1030 (11th Cir. 1994) .............................................................................. 7

*Weeks v. State*, 568 So. 2d 864 (Ala. Crim. App. 1989) ................................................................ 7

*Wellons v. Hall*, 558 U.S. 220 (2010) ........................................................................................... 3

*Wiggins v. Smith*, 539 U.S. 510 (2003) .............................................................................. passim

*Williams v. Taylor*, 529 U.S. 362 (2000) ........................................................................... passim

*Wisconsin v. Mitchell,* 508 U.S. 476 (1993) ............................................................................. 198

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ............................................................. 129, 146

*Woodward v. Alabama*, 571 U.S. 1045 (2013) .......................................................................... 236

xiii

*Young v. United States*, Cr. No. 6:07-cr-113-GRA, 2010 US Dist. Lexis 109755 (D.S.C. Oct. 14, 2010) ................................................................................................................ 221

## STATUTES

18 U.S.C. § 1111 ................................................................................................................ 202
18 U.S.C. § 1365 .......................................................................................... 196, 200, 201
18 U.S.C. § 2241 ................................................................................................................ 194
18 U.S.C. § 247 ........................................................................................................... passim
18 U.S.C. § 249 ........................................................................................................... passim
18 U.S.C. § 924 ........................................................................................................... passim
28 U.S.C § 2254 ..................................................................................................................11
28 U.S.C. § 2255 ........................................................................................... 10, 18, 221
28 U.S.C. § 455 ................................................................................................................ 278
S.C. Code § 16-3-10 ........................................................................................................ 202
S.C. Code § 16-3-600 ...................................................................................................... 203

## OTHER AUTHORITIES

2003 ABA Guidelines ...................................................................................................... 250
American Bar Association, Model Rules of Professional Conduct, Rule 1.4 .........................117
Diagnostic and Statistical Manual of Mental Disorders ...................................................... 88
Exec. Order No. 14164, 90 Fed. Reg. 8463 (Jan. 20, 2025) .................................................. 286
Indiana v. Edwards, Brief for the American Psychiatric Association, No. 07-208, Feb. 11, 2008 ................................................................................................................................ 78
Response in Opposition to Plaintiff's Motion for A Stay of Execution Pending Appeal, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 20-5206, 2020 WL 6778420 (D.C. Cir. July 22, 2020) ................................................................................................................ 278
Response to Emergency Motion for Stay of Execution, *Walls v. Sec'y, Dep't of Corr*., 161 F.4th 1281 (11th Cir. 2025) (No. 25-14302) ............................................................................ 279

## FEDERAL RULES OF PROCEDURE

Fed. Rule Civ. Pro. 8 ........................................................................................................ 168
Rules Governing 2255 Proceedings ......................................................................... 5, 6, 16

## ACADEMIC ARTICLES AND RESEARCH

John Blume, Theodore Eisenberg, Stephen P. Garvey, *Lessons from the Capital Jury Project*, Beyond Repair? America's Death Penalty, Duke University Press (2003) ............................ 101
Mitzi M.S. White & Thomas G. Guthiel, *A Proposed Model for Assessing Defendant Competence to Self-Represent*, 44 J. Am. Acad. Psychiatry Law 425 (2016) .......................... 78
N. Vidmar, *Case Studies of Pre-and Midtrial Prejudice in Criminal and Civil Litigation*, 26 L. & Hum. Behav. 73 (2002) .................................................................................................. 171

Shari Seidman Diamond & Valerie P. Hans, *Fair Juries*, 2023 U. Ill. L. Rev. 879 (2023) .... 101

Theodore Eisenberg, Stephen Garvey & Martin Wells, *The Deadly Paradox of Capital Jurors*, 74 S. Cal. L. Rev. 371 (2001) ........................................................................................ 100

Valerie P Hans & Alayna Jehle, *Avoid Bald Men and People with Green Socks? Other Ways to Improve the Voir Dire Process in Jury Selection*, 78 Chi.-Kent L. Rev. 1179 (2003) ............ 101

William J. Bowers, Marla Sandys & Benjamin Steiner, *Foreclosing Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and  Premature  Decision-Making*, 83 Cornell L. Rev. 1476 (1998) ........................................................................................ 101

**INTRODUCTION**

There is little doubt that the government's preference is for this Court to summarily dismiss all claims without any additional factual development, briefing, or evidentiary hearings. In other words, dismiss as a matter of course without considering potentially critical information about the profound problems that plagued Dylann's trial or the opportunity to meaningfully develop and address that evidence. Not only would this approach subvert the Constitution, it advocates for an unacceptable abdication of the important work required of a judge presiding over § 2255 proceedings. When deciding § 2255 motions, judges must take a detached perspective on a trial over which they presided, and consider not just information they knew at the time of trial but—critically—what they did *not* know at the time of trial. In this case, several claims rely on evidence and information that the Court did not have at the time of trial.

For example, this Court was previously unaware that

*See* Claim 1. The Court also had been led to believe that trial counsel had not been dishonest with Dylann. Tr. 11/07/17 at 48-49 (Bruck statement that Dylann claiming they lied to him was part of the basis for Bruck's opinion that Dylann was not competent, rather than being based in fact). However, the Court now has information from Mr. Bruck and other members of the defense team that confirm Dylann's allegations of dishonesty. *See* Ex. 11 (McGuire Dec.) ¶¶ 13, 10; Ex. 12 (Norris Dec.) ¶ 43; Ex. 10 (Pennington Dec.) ¶ 8; Ex. 5 (Bruck Dec.) ¶¶ 20-21; Claims 5 and 6. The Court was also not aware, and could not have been aware, that trial counsel ignored their experts' advice to obtain a speech language pathologist, to promptly discuss with Dylann their proposed penalty phase diagnosis, and to conduct additional research about community attitudes in the case. *See* Ex. 15

1

(Woods Dec.) ¶ 15; Ex. 17 (de La Rue Dec.); Claims 3, 4, 5, 6, and 9. This was the product of trial counsel's unreasonable rush to trial—leaving counsel, and the Court, without critical information, including the existence of Dylann's auditory processing disorder.

New facts matter and, indeed, are at the heart of § 2255 proceedings. New facts are relevant to many of the Court's prior rulings—which were based solely on information it had at the time—making those rulings non-dispositive of the questions before the Court today. This is through no fault of the Court, but is simply the nature of post-conviction litigation that has revealed additional information. The new facts detailed in Dylann's § 2255 motion reveal a trial record that is incomplete and deeply troublesome. The Court must have the opportunity to explore the boundaries of these claims, the facts that were previously unknown, and the scope of the arguments raised by Dylann's § 2255 motion. The § 2255 motion raises claims that require discovery, an opportunity to amend the motion, and a hearing to address their complexity.

The process—discovery, amendment, a hearing—that Dylann seeks is required not just by the gravity of this case and the significance of the Great Writ of habeas corpus, "a fundamental precept of liberty," *Boumediene v. Bush*, 553 U.S. 723, 739 (2008), but by the rules governing § 2255 motions. The rules governing habeas procedure do not permit a court to summarily dismiss a § 2255 petition that presents facially valid claims. *See, e.g.*, *Blackledge v. Allison*, 431 U.S. 63 (1977).

Nor does the government's unrelenting effort to put Dylann to death negate, in any way, the necessity of this Court's comprehensive review of Dylann's claims. *See Boumediene*, 553 U.S. at 769. Dylann does not bring his § 2255 motion for purposes of obstruction or delay. He brings it to ensure that his sentence of death was imposed in a trial that fully met the requirements of the Constitution and the laws of the United States. This type of collateral review

2

is especially warranted in capital cases such as this one. *See Wellons v. Hall*, 558 U.S. 220, 220 (2010) (per curiam) ("From beginning to end, judicial proceedings conducted for the purpose of deciding whether a defendant shall be put to death must be conducted with dignity and respect.").

Counsel intends to file additional pleadings following this reply, including a proposed scheduling order for the next steps. There are a number of approaches this Court could take to review and resolve the issues raised. The resolution of many of the claims require discovery and a hearing. Other claims can be resolved without the intermediate steps of discovery and a hearing, such as Claims 12-15. For example, Claim 12 makes clear that nine of Dylann's convictions and sentences of death plainly violate Double Jeopardy. This Court should immediately grant the § 2255 on Claim 12 and remand to the Court's trial docket for a resentencing. Some claims have overlapping needs for discovery and testimony, such that testimony of prior counsel and experts would be necessary for the resolution of a number of claims, such as Claims 3 through 8, among others. Some claims can be granted on the currently undisputed facts, but any hearing held would be much narrower. *See* Claim 1(A).

Habeas corpus proceedings are generally the only opportunity to  test the effectiveness of trial counsel with information that was previously unknown to the trial Court (and to the petitioner). That is certainly true here. As the Fourth Circuit has affirmed, the preferred procedure is for a defendant to raise any claim for ineffective assistance of counsel in a § 2255 proceeding, rather than on direct appeal, because "collateral review provides an opportunity for a full airing of the ineffectiveness issue." *United States v. Gooding*, 594 F. App'x 123, 125 (4th Cir. 2014); *see also Boumediene*, 553 U.S. at 786 ("Federal habeas petitioners long have had the means to supplement the record on review, even in the postconviction habeas setting."); *Massaro*

*v. United States*, 538 U.S. 500, 504-05 (2003) (noting that habeas forum is best suited to develop facts for claims, such as ineffective assistance of counsel, for which a record may be "incomplete or inadequate" to decide the claim on direct appeal). The § 2255 legal scheme contemplates, then, that factual development is generally essential to claims of ineffective assistance of counsel.

The government repeatedly argues that the § 2255 motion's claims are fanciful because Dylann's trial counsel are experienced and lauded litigators. *See*, *e.g.*, Resp. at 111, 114, 197, 259, 263-65, and 301. In essence, the government argues that trial counsel's accolades are so great that trial counsel could not possibly have been ineffective in *this* case. Not only is the government's position nonsensical and untenable, it is contradicted by a basic principle long recognized by courts: even the most experienced and able counsel can nevertheless be found ineffective in the context of a particular case. *See, e.g.*, *Dugas v. Coplan*, 428 F.3d 317, 328 (1st Cir. 2005) (expressing "no doubt that [trial counsel] is an experienced attorney," but focusing inquiry on particular facts of case at bar to determine whether counsel's conduct fell below constitutional standard because of inadequate investigation).

## A. Standard of Review

The Rules Governing § 2255 Proceedings require a preliminary review to determine only whether Dylann's claims, on their face, can support relief. *See* Rule 4(b), R. Gov'g 2255 Proceedings ("If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion . . . ."). The standard here is important. The Court cannot dismiss claims that the government deems unlikely or speculates are not prejudicial. Instead, this Court must accept all of Dylann's allegations as true unless conclusively refuted by the record. "The critical question is

4

whether these allegations, when viewed against the record . . . were so '*palpably incredible*,' so '*patently frivolous or false*' as to warrant summary dismissal." *Blackledge*, 431 U.S. at 76 (emphasis added) (citations omitted).

The government's response provides no reasonable basis for the summary dismissal of Dylann's claims. Quite the contrary, their response, which repeatedly disputes facts and makes assumptions, strengthens the case for why, at the very least, discovery and a hearing are necessary. *See Massaro*, 538 U.S. at 504; Rule 5, R. Gov'g 2255 Proceedings advisory committee note; *Machibroda v. United States*, 368 U.S. 487, 494-95 (1962); *United States v. Runyon*, 994 F.3d 192, 209 (4th Cir. 2021); *United States v. Anderson*, 981 F.3d 565, 578 (7th Cir. 2020); *Norris v. United States*, 820 F.3d 1261, 1265-66 (11th Cir. 2016); *United States v. Reed*, 719 F.3d 369, 374 (5th Cir. 2013).

The government's goal is for the Court to make factual and credibility determinations without any meaningful review. The Court, however, cannot make the requested determinations at this stage, since review is limited to the facial sufficiency of the motion in light of the record. If the record of the case does not conclusively rebut the allegations of a claim pled in the petition, and if the allegations (if true) would support relief as a matter of law, the claim may not be summarily dismissed and instead it must proceed to further fact-finding. *See, e.g.*, *United States v. Giardino*, 797 F.2d 30, 32-33 (1st Cir. 1986) (reversing summary dismissal where motion and record did not conclusively show petitioner entitled to no relief; "[t]he district court must take further steps to determine the truth and significance of what is alleged" (citing *Blackledge,* 431 U.S. at 80-83; Rules 5-8, R. Gov'g 2255 Proceedings)); *see also Blackledge*, 431 U.S. at 82 n.25 ("[B]efore dismissing facially adequate allegations short of an evidentiary hearing, ordinarily [the court] should seek *as a minimum* to obtain affidavits from all persons

5

likely to have firsthand knowledge. . . . When the issue is one of credibility, resolution on the basis of affidavits can rarely be conclusive. . . ." (emphasis added) (internal quotation marks and citation omitted)); *Miller v. United States*, 564 F.2d 103, 106 (1st Cir. 1977) ("The court may not, however, resolve critical factual questions against the petitioner simply on the basis of ex parte government affidavits." (citing *Blackledge*, 431 U.S. at 82 n.25)).

Dylann has made factual allegations which the government disputes without offering any evidence to the contrary. Dylann should be provided an opportunity to expand the record, conduct discovery, amend his petition, and prove his claims in an evidentiary hearing.

While the government would prefer to skip the important step of Rule 4 review, the Federal Rules and the § 2255 statute do not allow this Court to do so. It is only after any permitted discovery, any permitted expansion of the record, and any required evidentiary hearing that this Court can make the factual and credibility determinations that the government asks this Court to make based solely on the incomplete record before it. *See Giardino*, 797 F.2d at 32 (expansion of the record required before the court may make factual determinations based on occurrences outside the courtroom and not reflected in the record).

## B. The Government's Response Relies Heavily on Cases with Dramatically Different Standards of Review.

The government cites a plethora of cases arising in other contexts and therefore applying standards of review that are inapplicable here. While the standard of review that must guide this Court at this stage is laid out above, we briefly address the government's red herrings.

### 1. Cases where the record was developed and a hearing was held do not support the argument that no post-conviction hearing should be granted to Dylann.

The government argues that no hearing, discovery, or expansion of the record is required, but relies on cases that are inapposite. The government suggests that this Court should deny

Dylann's claims summarily, yet cites cases where claims were denied only *after* the expansion of the record and/or evidentiary hearings.[1] In each of these cases, deference was given to tactical decisions of trial counsel only *after* the record was expanded, an evidentiary hearing held, and testimony from trial counsel taken—critical information that the government omits. Clearly a court can make determinations about decisions of trial counsel where there has been testimony on that question. Here, there has been no opportunity yet for testimony about trial counsel's decisions in this case. Nonetheless, the government wants Dylann to be executed without any of these procedural safeguards.

Despite a glaring lack of testimony or evidence to support their argument, the government hopes that the Court will simply adopt their assumptions about trial counsel's

---

[1]*See, e.g.*, Resp. at 257 (relying on *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998); *Weeks v. Jones*, 26 F.3d 1030, 1044 n.13 (11th Cir. 1994); *Cox v. Norris*, 133 F.3d 565, 573 (8th Cir. 1997); *Maxwell v. Mabry*, 672 F.2d 683 (8th Cir. 1982)). In *Provenzano,* however, the state supreme court required an expansion of the record before denying an evidentiary hearing. *See Provenzano v. Dugger*, 561 So. 2d 541 (Fla. 1990). In *Weeks,* an evidentiary hearing was actually held in state court to develop the record. *See Weeks v. State*, 568 So. 2d 864 (Ala. Crim. App. 1989). Similarly, the federal district court in *Cox* held two evidentiary hearings, in addition to an evidentiary hearing during state postconviction proceedings. *Cox*, 133 F.3d at 569 n.1. *Maxwell* also held an evidentiary hearing. *Maxwell*, 672 F.2d at 684-85.

supposed effectiveness.[2] These assumptions should be rejected.[3] The courts "need not, and should not . . . fail to give non-frivolous claims of constitutional error the careful attention that they deserve." *Barefoot v. Estelle*, 463 U.S. 880, 888 (1983); *see also Blackledge*, 431 U.S. at 72 ("[A]rrayed against the interest in finality is the very purpose of the writ of habeas corpus to safeguard a person's freedom from detention in violation of constitutional guarantees."). Accordingly, this Court should allow Dylann the opportunities provided in the cases cited by the government and only then judge the truth and credibility of the claims presented.

---

[2] *See also Machibroda* 368 U.S. at 494-95 (noting that a district court cannot reconcile competing affidavits of petitioner and government to conclusively determine factual disputes, and that a hearing was required because "[t]he factual allegations contained in the petitioner's motion and affidavit, and put in issue by the affidavit filed with the Government's response, related primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light."); *Rivera v. United States*, 915 F.2d 1557 (1st Cir. 1990) (unpublished table decision) (per curiam) ("The [petitioner's trial counsel's] affidavit by itself does not warrant summary dismissal of petitioner's claim."); *Figueroa Almonte v. United States*, 915 F.2d 1556 (1st Cir. 1990) (unpublished table decision) (per curiam) (citation omitted) ("Petitioner's factual contentions, to be sure, are directly contradicted by his trial attorney's affidavit. But such an affidavit is 'not the record of the case.' By contradicting petitioner's allegations, the Roman affidavit does not resolve these factual issues but rather places them in dispute."); *United State v. Butt*, 731 F.2d 75, 77-78 (1st Cir. 1984) (citations omitted) ("[M]aterial issues of fact may not be resolved against the petitioner solely by relying on *ex parte,* sworn or unsworn, statements of the government or defense counsel."); *Bender v. United States*, 387 F.2d 628, 630 (1st Cir. 1967) (per curiam) ("While the affidavits of petitioner's attorneys are persuasive, they are not the record of the case; and even if they were, they could not conclusively disprove petitioner's allegations of extra-record misrepresentations."). While the government does not proffer any competing affidavits in this case, it does suggest that declarations from trial counsel are internally contradictory or contradicted by the record. This argument represents the governments' failure to understand the substance of Dylann's claims, the failure to believe trial counsel's declarations, or judgments on the credibility of trial counsel. The Court must hold a hearing in order to entertain these arguments by the government.

[3] Indeed, the fact that the government makes numerous arguments attacking the merits of Dylann's claims suggests that Dylann's claims are sufficiently substantial to require more than summary dismissal without consideration of the merits.

**2. Section 2254 cases cited by the government require deference to state court record and decision-making, which is not present here.**

This is Dylann's first post-conviction proceeding.  The § 2255 petition of a federal inmate seeking relief on grounds not generally cognizable on direct appeal is the first—and only— opportunity for review of the claims presented.  *See*, *e.g.*, *United States v. Hayman*, 342 U.S. 205, 219 (1952) (§ 2255 requires a hearing to be held to review claims not "determined by the files and records in the trial court" (internal quotation marks omitted)).  Because the factual record has not been developed for these claims, if they are facially valid, further fact-finding is required.  *See Hernandez-Hernandez v. United States*, 904 F.2d 758, 762 (1st Cir. 1990) ("This was not a case where the issues raised by the [§ 2255] motion were conclusively determined either by the motion itself or by the 'files and records' in the trial court.  The factual allegations in the petitioner's motion and affidavit, . . . related primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light." (second alteration in original) (quoting *Machibroda*, 368 U.S. at 494-95)).

The distinctions between a first-time 28 U.S.C. § 2254 petition and a first-time § 2255 motion are critical.[4]  Unlike a state petitioner seeking habeas relief under § 2254 following state collateral review, Dylann has not yet been afforded any review of his claims of constitutional defect and no habeas record has been developed previously.  Moreover, a § 2254 petition is reviewed with a high degree of deference to the state court's findings and cannot be granted unless the prior state court decision was based on an unreasonable interpretation of the facts or an unreasonable application of clearly established federal law as determined by the Supreme

---

[4] Similar distinctions can be drawn between successive and first-time § 2255 motions, rendering reliance on cases considering successive § 2255 motions equally inapplicable to the standard of review in this instance.

9

Court. *See* 28 U.S.C § 2254(d). That law does not apply here. The government simply ignores these significant distinctions.

Despite the clear differences, the government repeatedly relies on cases applying the law governing § 2254 petitions. Indeed, most of the cases the government relies on for its *Strickland* analysis address § 2254 petitions—not *one* involves the consideration of a federal capital conviction. The government's legal analysis races past the question of discovery, and even evidentiary review, to the merits of Dylann's petition, then lumps together all habeas petitions—state and federal, first-time and successive—into one category, ignoring the meaningful distinctions between them, the implications for this Court's standard of review, and the particular scrutiny long required of a death sentence.

## C. Dylann's Claims, on their Face, State Valid Claims for Relief.

A reply is made pertaining to each claim below. But a few points merit emphasis. The government alleges that Claim 1

Likewise, in evaluating whether Dylann's claims for ineffective assistance of counsel clear the threshold of Rule 4, the Court must determine whether the allegations in Dylann's petition—assuming their truth—could meet the *Strickland* standard.  That is, Dylann must have adequately pled facts suggesting that (1) trial counsel's performance "fell below an objective standard of reasonableness," *Strickland v. Washington,* 466 U.S. 668, 688 (1984),  and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id*. at 694.  In a capital case, this means that there is a "reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Id*. at 695. The reviewing court must consider the "totality of the evidence—'both that adduced at trial, *and the evidence adduced in the habeas proceeding[s]*.'" *Wiggins v. Smith*, 539 U.S. 510, 536 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000)) (emphasis and alterations in original).

The Fourth Circuit reversed the district court's refusal to grant an evidentiary hearing in *Runyon*, holding,

> To be sure, placing reasonable limits on further investigation might have been sound had counsel made a strategic choice in favor of pursuing other arguments that might reasonably have been undermined by evidence of brain damage and mental illness, *but the record remains unclear* whether such a strategic choice was made. . . .
>
> In its present state, the record does not sufficiently support the government's argument that [counsel] made a strategic choice not to pursue the potentially mitigating evidence after a reasonable investigation. Given that the relevant evidence is murky, we conclude that an evidentiary hearing should be conducted to resolve the issue.

*United States v. Runyon*, 994 F.3d 192, 208 (4th Cir. 2021); s*ee also United States v. McNeil*, 126

F.4th 935 (4th Cir. 2025) (internal quotation and citation omitted) ("Although whether to hold a

hearing ordinarily is a matter of district court discretion, a hearing is required when a movant

presents a colorable Sixth Amendment claim showing disputed facts beyond the record, or when

a credibility determination is necessary to resolve the claim.")

Further, the First Circuit in *Giardino* described an ineffective assistance of counsel claim

sufficient to survive Rule 4 review as follows:

> the statements in [petitioner's] affidavits may not be true. Or, they may be literally
> true yet omit other facts or circumstances that make them less significant. Still, we
> cannot say that the statements are inherently incredible. Nor are they mere
> conclusory allegations unsupported by specifics. And, nothing in the record before
> us conclusively contradicts what [petitioner] says. Rather the factual allegations . .
> . relate . . . primarily to purported occurrences outside the courtroom and upon
> which the record could, therefore, cast no real light.

797 F.2d at 32 (reversing summary dismissal) (ellipses in original) (quotation marks and internal

citations omitted). Dylann has met the standard. His claims for ineffective assistance of counsel

are neither "palpably incredible" nor "patently frivolous or false" and should therefore be granted

or proceed to discovery and expansion of the record. *Blackledge*, 431 U.S. at 76.

In other instances, the government's response misrepresents the claims proffered by

Dylann in his motion. For example, the government indicates that "[c]ounsel have no duty to

prevent a competent defendant from exercising his constitutional rights." Dkt. No. 1087

(hereinafter, "Resp.") at 49.[7] The government, however, fails to acknowledge that counsel did

*not* believe their client was competent to stand trial or competent to self-represent and therefore

had ethical and legal obligations to make reasonable investigations about Dylann's abilities.

---

[7] The pages cited from the government's response refer to the pages assigned by the
ECF/Pacer electronic filing system.

Further, the obligation to investigate Dylann's disabilities was present long before Dylann sought to proceed pro se. Counsel had reason to believe efforts to proceed pro se were a very real possibility. A reasonable investigation required counsel to follow the advice of experts and explore how Dylann would fair in the courtroom environment, one almost entirely conducted aurally. This duty would have led reasonable counsel to evaluate his auditory processing abilities, something not done by the trial team.

The government also accuses Dylann of claiming "that trial counsel were ineffective for not *immediately* revealing their mitigation strategy." Resp. at 49 (emphasis added). Dylann has made no such claim. Of course, reasonable counsel would have conducted a mitigation investigation that included Dylann, gauged Dylann's ability to participate in that process, and explained the importance and content of mitigation evidence during their representation. Trial counsel did none of this. Instead, trial counsel permitted *the government's expert* to be the person to share with Dylann their mitigation diagnosis. Trial counsel's deception led to a complete breakdown, leaving Dylann unable to accept mitigation evidence that he otherwise would have allowed. The error was not failing to "immediately reveal" anything; the error was the dishonesty that destroyed their ability to function as counsel—whether as appointed or as standby counsel. Dylann never raises the government's strawman argument that they purport to defeat. The result is the government's failure to address the claims that Dylann *actually* has raised.

Finally, the government simply misstates basic law and facts. For example, the government claims bluntly that Dylann's § 2255 motion "misleadingly" characterized the holding of *United States v. Sanders*, 133 F.4th 341 (5th Cir. 2025), and made "false" statements. Resp. at 366. To the contrary, the government, not Dylann's § 2255 motion, mischaracterizes *Sanders*. *Id*. Based on the untrue premise that multiple convictions were not at issue in *Sanders*,

14

the government argues that "[n]othing in *Sanders* supports Defendant's claim that trying and convicting him of all three offenses in a single trial offends the Double Jeopardy Clause in any way." *Id*. This is plainly wrong.

The government's argument relies on its error in reading the Sanders case, arguing "[t]he Fifth Circuit only vacated [Mr. Sanders's] *sentence* on the § 924(j) count; it never mentioned vacatur of the conviction itself." *Id*. But the opening paragraph of the opinion states: "We now vacate Sanders's *conviction* and sentence under Count Two of his indictment, which was based on 18 U.S.C. § 924(c) and (j). . . ." *Sanders*, 133 F.4th at 356 (emphasis added). The opinion also concludes: "We VACATE the conviction and sentence imposed based on Count Two of the indictment." *Id.* at 391; *see also* Claim 15.

In arguing that trial counsel was effective, the government applauds the trial team's "strategy" of going to federal court first. The term "strategy," however, necessarily means choosing one of several possible courses of action after reasonable investigation and determination of relative strengths and weaknesses. *See Wiggins v. Smith*, 539 U.S. 510, 526 (2003) ("The record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment."). Here, trial counsel never investigated whether federal court was actually a better venue than state court, whether venue in federal court should be changed or expanded, or whether an extension may have been granted in state court. Had trial counsel acted in conformity with its obligations under the Constitution, it would have reviewed and investigated these possible scenarios prior to going all in on federal court.

The government contends that the decision to proceed in federal court before a state court trial was tactical and thus not evidence of trial counsel's deficient performance. This is a merits-

15

based argument improperly asserted in a motion for summary dismissal. The government's argument alone about which venue it might prefer is a concession that Dylann's claim has sufficient merit to survive summary dismissal.

A tactical decision, to be reasonable, must be made after adequate investigation into the alternatives counsel could employ. *See id.* at 522-23; *Strickland*, 466 U.S. at 690-91; *Hamilton v. Ayers*, 583 F.3d 1100, 1122 (9th Cir. 2009). In this case, trial counsel's choice was not a reasonable tactical decision; instead, it was the result of inadequate preparation. Despite invoking speedy trial rights, counsel was unprepared for trial. The decision to rush to trial was not made with the benefit of the entire legal team's input. Ex. 71 (Gannett Dec.) ¶¶ 18-19. Nor did trial counsel's decision consider the recommendations of several key experts. Ex. 15 (Woods Dec.) ¶ 6; Ex. 17 (de La Rue Dec.) ¶¶ 7-9; Ex. 13 (Maddox Dec.) ¶ 11.

The cumulative error in this case requires reversal. Cumulative error is not a separate legal claim but rather a statement of law in how this Court should approach the various errors, particularly in the prejudice analysis, in this case.

While Dylann asserts that each error carries prejudice, the Court may not summarily dismiss a claim solely for lack of prejudice unless it also concludes that the error, combined with other errors, could never rise to the level of prejudicial cumulative error.

## D. Conclusion

There are several steps the government conveniently ignores. First, this Court must determine whether to dismiss claims pursuant to Rule 4(b) of the Rules Governing § 2255 Proceedings. Second, for the claims that survive preliminary review, the parties may engage in discovery upon a showing of good cause, Rule 6, and expand the record as necessary, Rule 7. Third, Dylann is then entitled to amend his § 2255 motion. Finally, the Court holds an

16

evidentiary hearing to determine whether, based on the facts, credibility, and merit of the claims, habeas relief is warranted.  Rule 8, R. Gov'g 2255 Proceedings; *Wellons*, 558 U.S. at 223.

The government repeatedly seeks to have this Court reach and reject the merits of Dylann's claims now.  As explained below, the only concern, at this stage, is whether Dylann's allegations, taken as true, are "palpably incredible" or "patently frivolous or false." *Blackledge*, 431 U.S. at 76 (quotation marks omitted); *see also* Rule 4, R. Gov'g 2255 Proceedings.

The government does not, and indeed could not, dispute the basic law set by Congress in the § 2255 statute and emphasized in numerous cases. This Court must grant an evidentiary hearing "[u]nless the motion and the files and records of the case *conclusively* show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b) (emphasis added); *see also United States v. McNeil*, 126 F.4th 935, 942-43 (4th Cir. 2025) ("Although 'whether to hold a hearing ordinarily is a matter of district court discretion, a hearing is required when a movant presents a colorable Sixth Amendment claim showing disputed facts beyond the record, or when a credibility determination is necessary to resolve the claim.'" (quoting *United States v. Mayhew*, 995 F.3d 171, 176-77 (4th Cir. 2021). Moreover, in all stages of review, the court must be guided by the principle that its "'duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'" *Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (quoting *Burger v. Kemp*, 483 U.S. 776, 785 (1987)).

**CLAIM 1:**

19

22

39

43

2:15-cr-00472-RMG     Date Filed 04/03/26     Entry Number 1109     Page 61 of 293

45

12

,

[28] Exhibit numbers reference all exhibits filed by Petitioner in support of his § 2255 motion. Exhibits 1 through 233 were filed with the initial motion and are not reduplicated here, though they are cited.  Exhibits 234 through 253 are new exhibits filed with the Reply.

65

66

**CLAIM 3:     Dylann Roof Was Denied The Effective Assistance Of Counsel When His Attorneys Failed To Investigate And Present Readily Available Evidence That He Was Not Competent To Represent Himself Under *Indiana v. Edwards*.**

Dylann Roof lacked the mental capacity to represent himself under *Indiana v. Edwards*. Dylann suffers from an auditory processing disorder, pragmatic communication dysfunction, linguistic processing speed deficits, and anxiety, all of which made him unable "to play the significantly expanded role required for self-representation." *Indiana v. Edwards*, 554 U.S. 164, 176 (2008). But this Court did not have evidence of Dylann's *Edwards* incompetency when it addressed his motion to discharge counsel and proceed as his own attorney. Trial counsel, experiencing a dysfunctional relationship with their client and aware that he had expressed interest in representing himself, failed to investigate the communication and language impairments they observed and that multiple experts warned were there.

Because of counsel's ineffective assistance, the Court deemed Dylann competent to proceed to trial as his own lawyer. The result was disastrous. Dylann was not able to follow what was happening in the courtroom in real time and thus could not make rational or timely decisions for his defense. Jury selection, which required Dylann to listen to juror responses, summarize key elements from their testimony and questionnaires, form follow-up questions in real time, prepare to answer follow-up questions in an adversarial environment, and simultaneously listen to standby counsel's advice, proved too challenging. At the penalty phase, he struggled to make objections in real time, instead filing written motions with the assistance of standby counsel after the fact. He called no witnesses and presented no mitigation evidence in his defense, even though he did not want the death penalty and was not opposed to a mitigation defense.

Had trial counsel investigated and presented evidence that Dylann lacked the capacity to conduct trial proceedings because of his language and communication disorders, a reasonable

69

probability exists that the Court's decision would have been different. Dylann is entitled to a new penalty phase proceeding.

**A. Trial Counsel Were On Notice In The Months Before Trial That Dylann Might Seek To Represent Himself, And They Failed To Investigate Their Client's Communication And Language Deficits Which Multiple Experts And They Themselves Had Observed— Impairments Directly Relevant To Dylann's Capacity To Carry Out Basic Trial Tasks On His Own.**

**1. Dylann expressed a desire to fire his trial counsel multiple times in the months leading up to trial, yet counsel failed to prepare for a scenario in which he sought to represent himself.**

Dylann told his lawyers he might seek to discharge them long before he filed his motion on November 27, 2016, the eve of trial. Toward the end of October 2016, after Dr. Dietz met with Dylann and exposed the mental health defense his attorneys were developing, the concern that Dylann might self-represent escalated. Angry with his lawyers, Dylann threatened to send a letter to the prosecution to prevent his attorneys from presenting evidence of autism. During a November 2, 2016, ex parte hearing, the Court and counsel discussed the possibility of Dylann going pro se. Tr. 11/02/15 at 12. The Court recognized that in a scenario in which Dylann "was unhappy with his . . . lawyer . . . he could attempt to fire you and try to self-represent." Tr. 11/02/15 at 12. Mr. Bruck's response revealed that he did not consider this a possibility, even while the Court did: "it's probably too late" for Dylann to assert his *Faretta* right. *Id*. And ultimately, Mr. Bruck believed that "Dylann's social anxiety and non-confrontational nature during our visits would lead him to be compliant during the trial." Ex. 5 (Bruck Dec.) ¶ 61.

But even before Dr. Dietz interviewed him in late October 2016, Dylann had expressed a desire to discharge counsel. Dylann would from time to time tell his attorneys he planned to fire them, doing so at least once in early September 2016, months before trial was scheduled to begin. Dylann had become suspicious of his attorneys over the summer of 2016, when he learned through state counsel that his federal team believed he had autism. Ex. 5 (Bruck Dec.) ¶¶ 20-21.

70

He was angry and upset, insisting that he did not have autism. *Id*. Federal trial counsel knew how Dylann felt. Failing to understand their client, however, the team simply did not think Dylann would go through with his threats to fire them. Ex. 5 (Bruck Dec.) ¶ 61.

The government asserts that counsel could not be faulted for failing to anticipate Dylann's desire to self-represent "in the last few days leading up to trial," Resp. at 169, and that "no apparent conflict over strategy existed" in the months before trial, Resp. at 171. This is simply wrong on both accounts, and further demonstrates the need for factual development.

Dylann's desire to represent himself did not emerge "in the last few days" before trial. This was not a situation in which counsel failed to prepare for a "remote possibility." Resp. at 169-70. The possibility presented itself multiple times months before trial and became a more serious risk after the Dietz evaluation. *See* Tr. 11/02/15 at 12. Although, as the government notes, trial counsel described their relationship with Dylann as "workable, if challenging" before the letter to the prosecution, this idea was based on trial counsel's incorrect assumption that their client's "non-confrontational nature" would make him compliant during trial. Ex. 5 (Bruck Dec.) ¶ 61. This faulty assumption led counsel to minimize and ignore Dylann's clear statements of frustration with them, which he repeatedly voiced in the lead-up to trial.

> **2. *Indiana v. Edwards* recognizes that the *Dusky* competency standard is not "sufficient" to test a defendant's competency for self-representation "given the different capacities needed to proceed to trial without counsel," and trial counsel should have investigated whether Dylann Roof was competent to represent himself.**

In articulating a different standard for determining whether a defendant is competent to represent himself at trial without the assistance of counsel, the Supreme Court has recognized that mental competency is not a unitary concept—different competencies are required for different purposes. *Indiana v. Edwards*, 554 U.S. 164, 175 (2008). The Court's decision in *Dusky v. United States*, 362 U.S. 402 (1960), articulates the "minimal constitutional requirement that

71

measures a defendant's ability to stand trial." 554 U.S. at 172. But to determine "whether a defendant who goes to trial must be permitted to represent himself" under *Faretta*, a different standard is required. *Edwards*, 554 U.S. at 175-76. This is because although a defendant may be competent to proceed to trial with counsel, self-representation requires a "significantly expanded role." *Id*. at 176-77. The Court concluded that, "given the different capacities needed to proceed to trial without counsel, there is little reason to believe that *Dusky* alone is sufficient" to determine competency for self-representation. *Id*. at 177.

When the symptoms of mental illness leave a defendant "unable to carry out the basic tasks needed to present his own defense without the help of counsel," he is not competent to represent himself. *Edwards*, 554 U.S. at 175-76. The "basic tasks" required for self-representation include "organization of defense, making motions, arguing points of law, participating in voir dire, questioning witnesses, and addressing the court and jury." *Edwards*, 554 U.S. at 176 (citing *McKaskle v. Wiggins*, 465 U.S. 168, 174 (1984)). A mental illness is severe in the context of *Edwards* if it interferes with a defendant's capacity to carry out these basic tasks.

The basic tasks of trial proceedings are inherently and heavily communication driven. "Language is the primary medium through which legal disputes are mediated in civilized society. Without language, the current legal system would not exist. Thus, almost every task a defendant must perform in the course of representing himself involves the ability to use oral and written language for purposes of communication and writing motions." Mitzi M.S. White & Thomas G. Guthiel, *A Proposed Model for Assessing Defendant Competence to Self-Represent*, 44 J. Am. Acad. Psychiatry Law 425, 433 (2016).

72

In its *Edwards* amicus brief, the American Psychiatric Association emphasized the importance of communication in the courtroom—and how the need for those capabilities is more demanding than a defendant's ability to communicate with counsel:

> Much more pervasive is the need for oral communication capabilities—in the public, pressured setting of the trial courtroom (rather than in quiet private conversations with counsel). The pro se defendant's speaking role commonly includes voir dire, opening argument, objections, cross-examination of prosecution witnesses, direct (and re-direct) examination of defense witnesses, and closing argument. Cognitive or communication deficiencies can severely impair the essential functions of getting legitimate points across at all those stages.

Brief for the American Psychiatric Association, No. 07-208, Feb. 11, 2008, at 24. Trial counsel knew that Dylann presented with communication difficulties, written processing delays and extreme anxiety. Moreover, multiple defense experts had recommended consulting a speech language pathologist to explore potential impairments. In light of Dylann's expressed interest in representing himself, counsel should have investigated these impairments, as they relate directly to Dylann's competency to carry out basic trial tasks on his own. Counsel failed to do so.

At a minimum, counsel should have told the Court, upon Dylann's request to represent himself, of the recommendations for an evaluation by a speech language pathologist that they had received and not heeded. They requested more time, belatedly, but did not articulate to the Court at all what value the additional time could bring by assessing the contours of his observed communication difficulties and the extent of his processing delays.

The government asserts that trial counsel has "no duty to challenge their competent client's capacity to self-represent." Resp. at 167. First, the government's label of Dylann as "competent" disregards the fact that competence is not a "unitary concept." Dylann was deemed competent to proceed to trial with counsel. But a client who is competent to proceed to trial with counsel may nonetheless lack the competency to represent himself, without the assistance of

73

counsel. "The competency standard does not exist in a vacuum—it varies in relation to the task the defendant is expected to perform." *Justus v. Clarke*, 78 F.4th 97 (4th Cir. 2023) (quoting *Bills v. Clark*, 628 F.3d 1092, 1099 (9th Cir. 2010)); *Edwards*, 554 U.S. at 175 ("Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways.").

Second, the government's framing of the issue is disingenuous. Dylann's § 2255 motion does not assert that trial counsel has an obligation to "obstruct" or "hamstring" or "torpedo [his] decision to self-represent." Resp. at 169, 172. It argues that trial counsel has a duty to consider relevant law and the implications for their client. The right to self-representation is not absolute. *Fields v. Murray*, 49 F.3d 1024, 1035 (4th Cir. 1995) ("it is universally recognized that the self-representation right is not absolute"). Although *Edwards* does not require trial courts to hold a separate hearing into pro se competency, the Fourth Circuit has recognized that *Edwards* did announce new and different competency questions to consider when a client requests to represent himself.

> [A]fter *Edwards*, *at least one relevant consideration* for a district court in determining whether or not to force counsel on a mentally ill defendant is whether defendant who is otherwise able to satisfy the competence standard may nevertheless be "unable to carry out the basic tasks needed to present his own defense without the help of counsel."

*United States v. Bernard*, 708 F.3d 583, 589-90 (4th Cir. 2013) (quoting *Edwards*, 554 U.S. at 175) (emphasis added).

Investigating and seeking expertise to inform this "relevant consideration" in assessing a capital client's capacities does not amount to "obstructing" his right to self-representation. If a client who wishes to represent himself has mental impairments that interfere with his ability to understand and follow the proceedings such that he cannot conduct trial proceedings on his own,

74

defense counsel cannot sit silent. Yet trial counsel evidently did not appreciate *Bernard*'s "relevant consideration"—i.e., whether Dylann was unable to carry out the basic tasks needed to present his own defense without the help of counsel—in the weeks and months before the competency hearing, when Dylann expressed interest in representing himself.

Trial counsel were admittedly unprepared for the competency proceedings. They scrambled in just two weeks to prepare experts who had evaluated Dylann in the context of a penalty phase mitigation case to opine on competency to proceed to trial. The short timeframe meant key experts were either unavailable to testify—like autism expert Dr. Rachel Loftin—or inadequately prepared—like Dr. Schwartz Maddox. Ex. 13 (Maddox Dec.) ¶¶ 21, 25. On the first day of the competency hearing, counsel admitted to the Court: "We feel we are unprepared to proceed," despite working "around the clock to prepare for Dr. Ballenger's testimony and this hearing as a whole." Tr. 11/21/16 at 10.

Trial counsel focused on Dylann's somatic delusions, psychosis, and autism. They did not ask their experts about—nor did they prepare to present—evidence of Dylann's skill deficits in the context of self-representation competency. Ex.13 (Maddox Dec.) ¶ 26; Ex. 72 (Stejskal Dec.) ¶ 7; Ex. 5 (Bruck Dec.) ¶ 37. Trial counsel did not attempt to present evidence from a neuropsychologist who could have explained Dylann's delays in language processing speed as they related to his capacity to self-represent. Ex.13 (Maddox Dec.) ¶¶ 26-27. And Dr. Schwartz Maddox could have testified, had she been asked, about the skill deficits she observed: "that Dylann needed more time to process things than is typical"; "that Dylann had difficulty with give and take conversational turn taking"; "[h]e was not able to interject at appropriate times"; he "had a tendency to get stuck on small things and not see the bigger picture"; and that the stress of trial would compromise his already impaired ability to stay focused and on task. *Id*.

75

**3. Trial counsel knew that Dylann suffered from extreme social anxiety and they observed impairments in his communication and language ability, skills required to carry out the basic tasks needed to present a defense; yet they failed to investigate evidence of these deficits, ignoring the advice of multiple experts.**

The trial team knew Dylann suffered from the mental illness of extreme social anxiety and autism. In fact, they attributed most of his odd courtroom behavior to his anxiety. During a pretrial hearing, in response to a question from the Court about whether Dylann might testify, David Bruck responded that he would not: "He is in court paralyzed with anxiety" and "afraid to look up during the proceedings." Tr. 11/02/2016 at 6. Indeed, before November 2016, Dylann waived his presence at most in-court proceedings, due in part to his social anxiety. Ex. 5 (Bruck Dec.) ¶ 24.

Exacerbating the effects of Dylann's anxiety, especially in the context of a courtroom setting, was language and communication-related dysfunction. Multiple experts observed Dylann's impairments, as did trial counsel, and urged the team to consult a speech language pathologist.

During the many hours she spent with Dylann, defense psychiatrist Dr. Schwartz Maddox observed first-hand many characteristics that indicated cognitive deficits relating to speech and language dysfunction, corroborating what she'd initially noted in the records. For example when she "interviewed Dylann, he often took a long pause to process before greeting me with a 'thumbs up' motion to signal that I could continue." Ex. 13 (Maddox Dec.) ¶ 9. This was significant because "Dylann's use of a 'thumbs up' rather than verbalizing his needs is one obvious sign of a pragmatic language deficit." *Id*. ¶ 15. Dylann was also "slow to respond" and "found open-ended questions difficult to answer at times. It was much easier to communicate if I asked yes or no questions." *Id*.

Dr. Schwartz Maddox conveyed to trial counsel her suspicions of communication deficits and recommended that Dylann be evaluated by a speech language pathologist who could "conduct a quantitative assessment of his receptive and expressive language deficits. I believed that a speech language pathologist should assess Dylann for, among other things, an auditory processing disorder (APD)." *Id*. ¶ 11. Dr. Schwartz Maddox also noted that the neuropsychological evaluation by defense expert Paul Moberg supported the need for a speech language evaluation. Dr. Moberg's testing revealed that Dylann has significant written processing speed delay and reductions in semantic fluency, which measures a person's ability to retrieve words from memory based on a specific category. *See* Ex. 239 (Dkt. No. 832-7 Moberg Report-redacted).

The trial team's consulting expert, psychiatrist Dr. George Woods, also urged them to consult a speech language pathologist in light of Dr. Moberg's findings, which suggested to Dr. Woods the presence of speech language dysfunction. Ex. 15 (Woods Dec.) ¶ 11.

Trial counsel likewise observed speech-language-related impairments in their interactions with Dylann, which should have prompted them to follow the recommendations of their experts. They "knew that talking with Dylann was challenging." Ex. 5 (Bruck Dec.) ¶ 39. He would take "very long pauses before answering simple questions," and struggled to engage in a "typical give and take exchange." *Id*; Ex. 6 (Stevens Dec.) ¶ 23. The team sometimes wondered if he understood what they said to him. Ex. 6 (Stevens Dec.) ¶ 23. When visiting Dylann in a contact visit room, with a window and a guard standing nearby, Lindsey Vann noticed that he "would get very easily distracted by everything going on around him." Ex. 9 (Vann Dec.) ¶ 5. Ms. Vann also "noticed that Dylann struggled when more than one person was in the visiting booth with him. He followed conversation better when it was just one person." *Id*. ¶ 7.

77

At no point in their representation did trial counsel follow up on the recommendations of multiple experts and the many red flags from their own observations. Not even when it became possible that Dylann would seek to represent himself—proceeding as his own lawyer to conduct his defense, a communication-heavy task. The expert advice may have been intended to guide the development of mitigating evidence and to assist counsel in better understanding their client. But the urgency and importance of consulting with an speech language pathologist became essential when faced with the possibility that Dylann would seek to represent himself at trial. Because counsel failed to heed this advice, they were left without the ability to explain to the Court the extent of Dylann's impairments.

To be sure, trial counsel are not required to "scour the globe on the off chance something will turn up." Resp. at 165 (quoting *Rompilla v. Beard*, 545 U.S. 374, 382-83 (2005)). But consulting with a speech language pathologist—when multiple experts recommended they do so, when trial counsel observed language and communication impairments in their interactions with Dylann, and when Dylann had expressed interest in firing counsel months before the trial— would hardly require scouring the globe; nor was this merely an "off chance" that something would turn up, especially as it related to Dylann's competency to conduct trial proceedings on his own.[32]

The government argues that trial counsel satisfied their obligation to investigate Dylann's most "severe deficits" for purposes of *Edwards* and characterizes Dylann's language disorders as

---

[32] The government claims that audiological assessment would be akin to "follow[ing] breadcrumbs of serial expert recommendations." Resp. at 174, n.32. Speech language pathologists treat auditory processing disorders, and they conduct initial testing to rule out the possibility of an APD. But once an APD is suspected, an official diagnosis must be made by an audiologist. It is inaccurate to characterize this two-step process as following a trail of breadcrumbs.

"secondary concerns." Resp. at 172. The government misses the mark. The *Edwards* question is whether the symptoms of a defendant's severe mental illness interfere with the ability to carry out the basic tasks of self-representation. Speech and language disorders are central to that inquiry. As noted above, the basic tasks of trial proceedings are inherently and heavily communication driven. Dylann's language disorders, co-occurring with his severe anxiety, are not secondary concerns in the *Edwards* context.

**B. Dylann Was Prejudiced By Trial Counsel's Failure To Investigate And Present Evidence To The Court Of Dylann's Profound Auditory Processing Disorder, Which, Combined With Impaired Linguistic Processing Speed, Pragmatic Social Communication Dysfunction, And Extreme Social Anxiety, Prevented Dylann From Carrying Out The Basic Tasks Needed To Present His Own Defense Without The Help Of Counsel.**

**1. Dylann's impairments are profound and left him unable to adequately follow the trial proceedings and conduct a defense on his own**

Had trial counsel investigated the red flags of their client's communication and language impairments, including consulting with the appropriate experts, they would have discovered that their client's impairments are profound and interfere with his capacity to conduct his own defense. A speech language evaluation and auditory processing assessment reveal that Dylann has a profound auditory processing disorder—a neurodevelopmental language disorder which impairs his ability to process and understand what is spoken to him in real time. A comprehensive auditory processing evaluation found that "Dylann has very significant APD problems," making him unable at times to understand spoken language. Ex. 3 (Lucker Report) at 3-4. While Dylann demonstrates strong language content and verbal comprehension skills, his APD makes it difficult for him to process and understand what is spoken, especially in an environment with other distractions, like a courtroom, and when listening to complex information. Ex. 3 (Lucker Report) at 4. During the audiological evaluation, Dylann "often took longer than expected to respond, even if he responded appropriately. Typically, an adult takes

79

about one second to repeat what he has to repeat on the auditory processing tests. However, Dylann often took two or more seconds to repeat the words or sentences he heard." Ex. 3 (Lucker Report) at 3. The audiologist opined that Dylann "may have a problem pulling out the appropriate response from his brain as he is taking in information," which is exacerbated by his APD. *Id*. at 4.

Indeed, targeted neuropsychological testing conducted in post-conviction evaluated Dylann's linguistic speed of processing, both aurally and in writing. These tests revealed that Dylann has significant impairments in his ability to process verbal information in an efficient manner. Dr. Ouaou, the neuropsychologist who evaluated Dylann in post-conviction, noted that Dylann's "most significant" impairment was his "exceptionally low" comprehension speed (below the 1st percentile). Ex. 2 (Ouaou Report) at 15. These results show that Dylann has significant deficits "in his ability to process verbal information (reading and aurally presented) in an efficient manner based on speed." *Id*. These findings are consistent with Dylann's self-assessment during his evaluation with speech language pathologist Dr. Amy Fritz. Dylann explained to Dr. Fritz that "he has difficulties understanding what is being said when 'thinking in my own head at the same time that someone is speaking' or there is background noise." Ex. 1 (Fritz Report) at 6, 9.

Dylann's difficulty comprehending and responding to verbal information without increased processing time was exacerbated in the capital trial courtroom setting and prevented him from carrying out the basic tasks of self-representation. Dr. Fritz opined that Dylann's auditory processing disorder and linguistic processing delays made it "highly unlikely that [he] could 'keep up' with the communicative demands of the courtroom." Ex. 1 (Fritz Report) at 8. In addition, Dylann's "ability to integrate and respond to testimony in real time to meet the

80

expectations of a pro se trial is grossly complicated by [his] profound social communication deficits." *Id*. Even outside the context of a capital trial courtroom, Dylann has difficulty communicating both verbally and nonverbally in social situations; most notably, he struggles to initiate verbally on any topic and typically only speaks in response to prompting from others. Ex. 1 (Fritz Report) at 5-6. According to Dr. Fritz, Dylann "simply does not have the communicative abilities to competently serve as his own trial attorney." Ex. 1 (Fritz Report) at 21.

Dr. Ouaou agreed that Dylann's impairments—especially his deficits in processing verbal information efficiently—would have made him unable to perform the tasks associated with representing himself at trial. Ex. 2 (Ouaou Report) at 15. "Given the speed of communication and information being presented in a typical courtroom, Mr. Roof would not be able to meaningfully process that information, provide effective responses or objections, and simultaneously interact with support counsel." *Id*. at 17. Furthermore, Dylann's longstanding anxiety disorder "would both compound the auditory processing problems and be compounded by the auditory processing problems." *Id*. This is especially true in the chaotic and stressful environment of a courtroom. Indeed, Dylann spent most of the time during trial staring down at the table, avoiding eye contact, daydreaming and focusing on issues that were not relevant to the proceedings. "Daydreaming, anxiety and distractibility are expected responses for a person unable to process the events occurring in the courtroom in a timely manner." Ex. 2 (Ouaou Report) at 16-17

The government questions whether linguistic processing speed deficits and Dylann's communication impairments qualify as a "severe" mental illness for purposes of *Edwards*. Dkt. Resp. at 177. First, the government ignores that Dylann has been diagnosed with serious mental

81

illnesses: social anxiety, depression, autism, and personality disorders.[33] *Edwards* is concerned with various symptoms of mental illness that interfere with a defendant's self-representation capacity. The Court endorsed non-exhaustive examples of such symptoms from the American Psychiatric Association, including "deficits in sustaining attention and concentration," "impaired expressive abilities" and "anxiety," in addition to "other common symptoms of severe mental illnesses." *Edwards*, 554 U.S. at 176 (quoting Brief for the American Psychiatric Association, No. 07-208, Feb. 11, 2008, at 26). Dylann has all of these symptoms.

The government also misrepresents Dr. Fritz's diagnosis, erroneously suggesting that she did not diagnose him with any disorder.  Resp. at 177 & n.36. In fact, Dylann's diagnosis is indeed in the Diagnostic and Statistical Manual of Mental Disorders: Symbolic Dysfunction relating to Pragmatic Communication, DSM R48.9 (ICD-10-CM). Ex. 1 (Fritz Report) at 19, 28. Dr. Fritz concluded that Dylann demonstrates performance deficits closely related to Social Communication Pragmatic Disorder. But because Dylann has prior diagnoses of social anxiety disorder and ASD, the more appropriate diagnosis for Dylann is Symbolic Dysfunction relating to Pragmatic Communication. Ex. 1 (Fritz Report) at 19.

Perhaps most importantly, the government's skepticism of Dylann's impairments misses the point of *Edwards*. The *Edwards* inquiry asks whether symptoms of mental illness "impair the defendant's ability to play the significantly expanded role required for self-representation." *Edwards*, 554 U.S. at 176 (quoting Amicus Brief for the American Psychiatric Association at 26). Considering his crippling social anxiety combined with his profound APD, processing delays and pragmatic communication deficits, Dylann could not adequately follow the trial

---

[33] During the first competency hearing, when the Court asked Dr. Ballenger if Dylann "suffers from a mental disease or defect," Dr. Ballenger conveyed his expert opinion that Dylann suffers from social anxiety disorder and schizoid personality disorder. Tr. 11/21/16 at 23.

82

proceedings and interject when needed to conduct his defense. As a whole, Dylann's myriad impairments left him "unable to carry out the basic tasks needed to present his own defense without the help of counsel." *Edwards*, 554 U.S. at 175-76.

Dylann's performance at trial reflects his incompetence under *Edwards*. As discussed in the § 2255 motion, Dylann's participation in jury selection was minimal (and was not wholly reflective of the tasks he would be required to carry out as his own lawyer in the penalty phase). During jury selection, Dylann spoke only in response to prompts from the judge, which provided Dylann a "clear indication of conversational turn." Ex. 1 (Fritz Report) at 20. For example, after initial questioning of each juror, the Court asked the prosecution if it had any follow-up questions or objections and then turned to Dylann to pose the same question to him. When prompted, Dylann was sometimes able to repeat questions his standby counsel had passed along to him. Ex. 1 (Fritz Report) at 27 (noting that Dylann "can often effectively send messages in 1:1 interactions when knowledge of turn is well-defined."). The Court thus observed that Dylann did participate on occasion.

However, his level of participation in jury selection was nonetheless impaired. Trial counsel recounted that when jury selection started Dylann refused to ask questions or make objections and believed he didn't need to do anything because the jurors liked him. As the jury selection process wore on, Dylann began "to request that the Court ask a few of our suggested questions." Dkt. No. 840 at 2. But Dylann became overwhelmed with the notes from counsel. "Counsel would suggest at least 5 or 6 follow-up questions per juror, and the defendant would reject most of these suggestions." *Id*. So counsel then began selecting only one or two of their most important questions, aware that Dylann's self-representation abilities were impaired.

83

Even that didn't help. Dylann was overwhelmed by the pace of jury selection and asked the Court to slow down. Standby counsel Bruck, having sat with Dylann for a day and a half of jury selection, advised the Court that Dylann "is very concerned about time. He feels great time pressure." Tr. 11/29/16 at 108. When the Court asked Dylann if he was able to understand the suggestions from his standby counsel and then pose questions, Dylann responded that "Yes, I just—sometimes it takes me a minute to figure out—to figure it out." *Id*. at 108-09. During a recess the next day, standby counsel Bruck again "express[ed] Mr. Roof's concern about the— the proceedings" and "time pressure." Tr. 11/30/16 at 120. The Court asked to hear from Dylann. Dylann responded, "Yes, um, it would be helpful if we could slow down." *Id*. But the Court did not "feel rushed at all," and stated it was "not going to slow down just for some abstract reason." *Id*. at 120-21. Having failed to investigate their client's capacities, counsel could not explain to the Court that, far from being an "abstract reason," Dylann struggled with the pace of the proceedings on account of his myriad impairments.

Dylann also repeatedly asked for standby counsel's assistance, which the Court rejected. After discussing with Dylann, Mr. Bruck attempted to lodge an objection to a juror's disqualification under *Witherspoon* and *Witt*, but the Court denied the request. At another point, Dylann asked standby counsel to request additional voir dire of certain jurors who gave "facially disqualifying answers" to questions about their opinions on the death penalty. Tr. 11/29/16 at 103 (*see* Dkt. No. 684). The Court denied the request, instead stating that standby counsel could suggest questions and Dylann could choose to ask them. Tr. 11/29/16 at 108. The Court was unaware of the medical and mental health reasons why this was too difficult for Dylann to do. Dylann continued to ask the Court for standby counsel's assistance. *See, e.g.*, Tr. 11/30/16 at 3

84

(asking "if you would let my standby counsel assist me in proposing more questions to the jurors and making objections to strike jurors.").

On the last day of jury selection, standby counsel Sarah Gannett was so concerned about "Dylann's inability to make important objections" that she emailed the team urging them to renew their competency motion and make a motion under *Indiana v. Edwards*. Ex. 71 (Gannett Dec.) ¶ 40. The team did not respond. Ms. Gannett repeatedly expressed a concern to Ms. Stevens and Mr. Bruck about failing to create a record of Dylann's difficulties in court. Ex. 71 (Gannett Dec.) ¶¶ 41-42. Ms. Gannett recounted that "Dylann appeared virtually paralyzed by his inability to make an objection. When he managed to speak, it was painful to watch. He was stuttering, halting, looking down." Ex. 71 (Gannett Dec.) ¶ 42. Ms. Gannett urged the team to make a record of "his stuttering, his long pauses, and his inability to keep up with what was happening." Ex. 71 (Gannett Dec.) ¶ 43.

When Dylann again proceeded pro se at the penalty phase, he rarely participated during the five-day proceeding. He presented no mitigating evidence and conducted no cross-examination. He was incapable of making contemporaneous objections, instead filing written motions with standby counsel's help long after witnesses had concluded their testimony. The Court repeatedly admonished Dylann to "stand up and say, 'Objection,'" instead of waiting to file a written motion. *See, e.g.*, Tr. 01/04/17 at 159; Tr. 01/05/17 at 335. Without information about Dylann's impairments, the Court could not appreciate that Dylann struggled to voice objections in the moment no matter how he was assured of his right to do so.

The government cites Dylann's performance at the second competency hearing—specifically, his cross-examination of Drs. Ballenger and Loftin—as an example of his capabilities.  Resp. at 180, 184. Dylann's cross-examination of these two doctors is not

85

representative of the range of trial tasks he was required to carry out to conduct a defense on his own. Dylann knew very intimately what Drs. Ballenger and Loftin would testify about, and he had time to consider what questions to focus on. Dylann was familiar with these experts; he had interviewed with them multiple times. He had also reviewed Dr. Ballenger's report. He had time to prepare in advance, so that his linguistic processing speed delays were not an issue. There was very little that was unexpected in this one-on-one examination, and it didn't carry the emotional weight that, for example, questioning a family-member mitigation witness might. In many ways, Dylann could control what was said and knew the script. Moreover, Dylann is more capable in an examination with "clear indication of conversational turn" Ex. 1 (Fritz Report) at 20. This arrangement—examination of a familiar witness in which specific questions generate expected answers—would not necessarily have been the norm in other aspects of his defense. Importantly, the reduced emotion and reduced background noise due to the closed nature of the courtroom during competency hearings was also significant—there were no jurors, no members of the victims' families, no members of the public. Dylann was relatively familiar with the twenty or so people in the closed courtroom: members of the defense and prosecution teams as well as court staff.

>   **2. The Court did not hear evidence—or argument—concerning Dylann's incompetency as it related to his ability to represent himself, and a reasonable probability exists that the Court's ruling would have been different.**

Although *Edwards* does not impose a requirement that trial courts conduct a separate hearing on self-representation competency, the Court in this case *did* conduct an *Edwards* inquiry in determining whether Dylann had the capacity to represent himself.[34] The Court did so without

---

[34] During an in-chambers conference after Dylann filed a motion to discharge counsel on November 27, 2016, the Court reflected on the standard for adjudicating a defendant's motion to self-represent: "my thought about his wisdom, or lack of wisdom, in deciding to self-represent is

critical information that it would have had but for counsel's failures to conduct a reasonable investigation.

In an opinion memorializing the decision, the Court noted that it had "inquired into Defendant's mental capacity to represent himself" under *Indiana v. Edwards* and relied on its "own observations of Defendant's courtroom interactions over several weeks." Dkt. No. 691 at 9; *see also* Dkt. No. 691 at 4-5. The Court was convinced by Dylann's high IQ, lack of any apparent cognitive impairment, and his perceived ability to communicate with his lawyers, as well as the Court's observation of Dylann as "cogent and articulate" when he addressed the Court on November 7, 2016. Dkt. No. 691 at 9. The Court's observations are of course relevant, and as the government points out, *Edwards* indeed recognizes that the trial judge, especially one who has presided over the defendant's competency hearing "will often prove best able to make more fine-tuned mental capacity decisions."  Resp. at 179 (citing *Edwards*, 554 U.S. at 177). But trial judges rely on expert opinion in helping them understand the competencies of defendants who appear before them. And in this case, the Court was missing critical expert evidence.

One of the government's central arguments in opposition to this claim for relief is its contention that the symptoms Dylann now claims rendered him incompetent to represent himself "add nothing substantial to the evidence already before the Court."  Resp. at 178. The government points to Dylann's "lower processing speeds" and "communication difficulties," which it claims were documented during the competency hearing.  Resp. at 172, 178. For the reasons that follow, the government is incorrect.

---

not the issue, the issue is his capacity to represent under [*Indiana v.*] *Edwards*." Tr. 11/28/16 at 3 (Dkt. No. 756). Yet no testimony was offered that would shed light on his capacity to self-represent.

a. **The Court did not hear about Dylann's auditory processing disorder and how it interfered with his ability to adequately follow the trial proceedings**

Most glaringly, the government's contention that this evidence was before the Court ignores Dylann's most severe impairment as it relates to self-representation—his profound auditory processing disorder. No one told the Court that, despite Dylann's high verbal intelligence, his auditory processing disorder makes it difficult for him to process and understand what is spoken in real time especially in an environment with other distractions, like a courtroom, and when listening to complex information. Dylann's APD interfered with his ability to adequately follow along with the trial proceedings, an impairment that was exacerbated by the complexity of the information and the emotional nature of the courtroom.

b. **The Court did not hear about how Dylann's pragmatic communication dysfunction interfered with his ability to lodge timely objections and participate in his defense without prompts.**

The first competency hearing did not address Dylann's "communication difficulties" as they relate to what would be expected of him in the trial setting; that is, "the need for oral communication capabilities—in the public, pressured setting of the trial courtroom." Brief for the American Psychiatric Association, No. 07-208, Feb. 11, 2008, at 24. As Dr. Fritz summarized, the communication and language skills required to conduct trial proceedings include listening to witness testimony, summarizing key points, and forming follow-up questions in real time, presenting live arguments to the Court, interrupting Court proceedings to audibly object, and answering potential follow-up questions in an adversarial environment. Ex. 1 (Fritz Report) at 20-21.

The limited testimony around Dylann's ability to communicate with counsel (discussed pursuant to the *Dusky* standard) focused on whether his social anxiety interfered with his ability to communicate and the distinction of being unable versus unwilling to communicate with

88

counsel. Dr. Ballenger testified that although Dylann had no difficulties communicating with him during his evaluation it was "quite private, and no one was watching." Tr. 11/21/16 at 29. Dylann's pragmatic communication dysfunction was not presented to the Court. While it is true that an autism diagnosis includes social communication difficulties, no expert provided information on the nature of this communication dysfunction and how it might relate to Dylann's capacities in the courtroom. Trial counsel's autism expert, Dr. Rachel Loftin, was not available to testify at the first competency hearing and a brief declaration was submitted in lieu of her testimony. The only thing Dr. Loftin's declaration said relating to Dylann's communication impairments is that autism is diagnosed "based on the presence of symptoms of social-communication challenges." Ex. 240 (2016.11.19 Loftin disclosure).

Thus no one told the Court that Dylann's pragmatic communication dysfunction prevented him from interrupting proceedings to lodge objections and prevented him from speaking unless prompted in a clear indication of turn. Contrary to the government's dismissal of Dylann as "socially awkward," Resp. at 177, his communication challenges are considered a mental illness and are severe. Pragmatic communication dysfunction cannot be "cured" by continued exposure to trial proceedings. Ex. 1 (Fritz Report) at 23; Ex. 2 (Ouaou Report) at 7.

**c. The Court did not hear about Dylann's severe processing speed delay and how the interplay with APD made it unlikely that he could follow along with the trial and communicate in a timely manner in conducting a defense.**

When the Court determined that Dylann was competent to represent himself on November 28, 2016, the only evidence before it of Dylan's "lower processing speeds" was Dr. Wagner's report documenting Dylann's performance on the WAIS-IV. Ex. 238 (Dkt. No. 649-1 Wagner Report - redacted) at 6. In that report, Dr. Wagner noted that "[h]is relative weakness was a score of 100 for Processing Speed," placing him "at the 50th percentile relative to his normative

89

age peers."[35] Ex. 238 (Dkt. No. 649-1 Wagner Report - redacted) at 6. Dr. Stejskal testified briefly about those results, explaining that the differential spread across the four index scores on the WAIS-IV (perceptual reasoning, working memory, verbal comprehension and processing speed) is the "characteristic pattern of performance . . . for schizophrenic individuals and adults on the autism spectrum." Tr. 11/22/16 at 233-35. Dr. Stejskal testified that Dylann's perceptual reasoning and working memory indices were incrementally lower than Dylann's superior verbal comprehension score and significantly *higher* than Dylann's score on the processing speed index. *Id*. at 234. This "array of deficits" on the WAIS was a red flag indicative of some sort of condition or disease. *Id*. at 234. There was no testimony explaining what this might mean—and because trial counsel had not pursued these unusual results, either through consultation with an speech language pathologist or more targeted neuropsychological testing, the Court did not learn the extent of Dylann's language processing impairments.

Importantly, Dylann's "relative weakness" on a processing speed measure and difficulties communicating only scratched the surface of Dylann's disorders. They functioned as red flags for further testing. And counsel admitted that they did not have "an adequate opportunity. . . to study the test results" in preparation for the competency hearing. Tr. 11/21/16 at 10.

While it is true that expert testing at trial revealed reduced processing speeds (although the impact  was not explained), trial experts measured Dylann's processing speed using only visually presented information (i.e., written tests), not information presented aurally. As a result, the profound nature of his processing speed delays—and the way in which they directly relate to

---

[35] Since Dylann had taken many of the same tests with Dr. Moberg just months before, one would expect that Dylann would learn and do better on the tests the second time. This is called the "practice effect." This renders Dr. Wagner's tests inaccurate to the extent that they are artificially inflated. Ex. 2 (Ouaou Report) at 5.

self-representation competency—was missed. At trial, Dylann's processing speed was measured using the WAIS-IV IQ test. Ex. 238 (649-1 Wagner Report - redacted); Ex. 239 (Dkt. No. 832-7 Moberg Report - redacted) at 8. Processing speed on the WAIS is measured through symbol search and coding subtests, both of which are conducted with pencil and paper and don't require any auditory processing.

Notably, targeted neuropsychological testing designed to further understand these delays show Dylann's extreme impairment in speed of comprehension of aurally presented information. Dr. Ouaou administered the Speed and Capacity of Language Processing Test (SCOLP), which "measures an individual's rate of information processing and speed of comprehension." Ex. 2 (Ouaou Report) at 13. On a reading presentation of the speed of comprehension test, Dylann performed in the lowest 25th percentile of the population; but "on an aural presentation of the same" he was in the only 9th percentile. Ex. 2 (Ouaou Report) at 14. When considering Dylann's relatively high verbal intelligence, Dylann's language processing impairment becomes even more extreme: his speed of comprehension is "exceptionally low (below the 1st percentile) with both visually and aurally presented verbal information."[36]

There was no evidence offered at the time of trial that Dylann had "exceptionally low" comprehension speed (below the 1st percentile), Ex. 2 (Ouaou Report) at 15, or that the interplay of Dylann's APD with his processing speed delays made it difficult for him to follow what was being said and "pull[] out the appropriate response from his brain as he is taking in information."

---

[36] SCOLP contains two subtests, the speed of comprehension test and the spot the word test. Dr. Ouaou explains that the spot the word test "provides a framework for interpreting" the speed of comprehension test because "it relates to one's core verbal abilities regardless of aural processing." Ex. 2 (Ouaou Report) at 13-14. In order to "obtain a more fine-tuned estimate of whether a genuine decrement in speed of comprehension is present," Dr. Ouaou subtracts "the scaled score on the Speed of Comprehension Test from the scaled score on The Spot the Word Test," in which Dylann scored in the exceptionally high range. Ex. 2 (Ouaou Report) at 14.

Ex. 3 (Lucker Report) at 4. If given such evidence, a reasonable probability exists that Dylann would have been found not competent to self-represent.

> **3. At the very least, had counsel presented the Court with expert understanding of Dylann's communication-related disorders, it would have granted the accommodations that both standby counsel and Dylann himself sought.**

Soon after Dylann was permitted to represent himself, he requested through his trial team that the Court grant them permission to assume a larger role as standby counsel: "The defendant requests here merely that stand-by counsel be permitted to participate at the defendant's request and with his prior authorization." Dkt. No. 679 at 1 (citing *McKaskle v. Wiggins*, 465 U.S. 168 (1984)). Dylann's defense team may not have investigated Dylann's impairments to understand what underlay his lack of capacity, but having spent sustained time with him, they knew he was not able to adequately conduct his own defense. And although Dylann deeply distrusted his lawyers, he also wanted help. Ex. 5 (Bruck Dec.) ¶¶ 50, 52.

On several occasions during jury selection, standby counsel addressed the Court in an attempt to assist Dylann. *See, e.g.*, Tr. 11/28/16 at 63-64; Tr. 11/29/16 at 103-04; Tr. 12/02/16 at 148-49. But the Court would not allow it, concerned that standby counsel would become co-counsel. Because the Court was not presented with the relevant information—that the defendant before him, despite his relatively high IQ, could not process verbal information properly and needed additional time—it was able to opine that, "For now the system seemed to be working just fine, I think. Mr. Roof has a chance to consult with you, and if he wants to ask additional questions, just suggest them to him. He understands English. Just suggest to him. If he thinks it advisable, he can ask me those questions." Tr. 11/29/16 at 108.

Dylann himself asked the judge to "let my standby counsel assist me in proposing more questions to the jurors and making objections to strike jurors." Tr. 11/30/16 at 3. The Court

92

denied the request. Later Dylann asked if they could "slow down." Tr. 11/30/16 at 120. Unaware of Dylann's severe impairments, the Court stated, "I'm not going to slow down just for some abstract reason I should slow down." Tr. 11/30/16 at 120-21.

During the penalty phase, Dylann could not make timely objections aloud in court. Instead, he filed a few written motions with the help of standby counsel, objecting to the extent of victim impact testimony and the nature of questioning. Dkt. No. 853; Tr. 01/04/17 at 158-59; Dkt. No. 856. The Court again told Dylann to stand up in court and say "objection" so that the Court could address the issue in the moment. Tr. 01/04/17 at 159; Tr. 01/05/17 at 266. Eventually, Mr. Bruck asked the Court for "an accommodation for the defendant" because "[h]e is not capable of intervening to object to protect his rights." Tr. 01/05/17 at 267. Mr. Bruck urged the Court to "appoint standby counsel for the limited purpose of this testimony, since it has already become a runaway freight train, to allow us to protect his rights by intervening at the appropriate time." Tr. 01/05/17 at 269. Without evidence to explain and support standby counsel's claim about why Dylann was not "capable" of intervening at the appropriate times in his defense, the Court rejected Mr. Bruck's request, "fully satisfied he has the capacity to make objections when in his good judgment they are appropriate." Tr. 01/05/17 at 271.

A reasonable probability exists that had the Court known about Dylann's communication disorders, it would have at the very least permitted standby counsel to take on a larger role during jury selection and penalty phase. Such an accommodation for Dylann's impairments would not have interfered with his *Faretta* right. In fact, an accommodation would have facilitated Dylann's right to present a defense "in his own way."[37] *Faretta* places "no absolute

---

[37] "In determining whether a defendant's *Faretta* rights have been respected, the primary focus must be on whether the defendant had a fair chance to present his case in his own way." *McKaskle v. Wiggins*, 465 U.S. at 177.

93

bar on standby counsel's unsolicited participation," let alone participation that a pro se defendant affirmatively seeks, as Dylann did here. *McKaskle v. Wiggins*, 465 U.S. at 176. Indeed, as the Fourth Circuit recognized in this case, *Faretta* permits "a more substantial, visible role" for standby counsel.[38] *United States v. Roof*, 10 F.4th 314, 364 (4th Cir. 2021). Only where *unsolicited* participation interferes with a defendant's right to speak for himself is there a potential *Faretta* problem. *Id*. at 177. In this case, of course, standby counsel sought to interject with Dylann's express authorization but was denied time and time again.

Standby counsel's assistance during jury selection would have been critical. As discussed in Claim 10, often jurors hold "dogmatic" beliefs about the death penalty and meaningful voir dire by lawyers—not the judge—is essential to rooting out potential bias. Research has shown that support for the death penalty tends to be ideological and relatively immune to evidence and argument that run contrary to a juror's initial position. *See* Theodore Eisenberg, Stephen Garvey & Martin Wells, *The Deadly Paradox of Capital Jurors*, 74 S. Cal. L. Rev. 371, 377-78 (2001). Even after receiving instructions on the law, jurors often misperceive or fail to correctly apply those instructions. John Blume, Theodore Eisenberg, Stephen P. Garvey, *Lessons from the Capital Jury Project*, Beyond Repair? America's Death Penalty, Duke University Press, 151-52 (2003) (14% of South Carolina jurors who sat in capital cases believed that the death penalty was the only acceptable punishment for any murder and 57% believed the death penalty was the only acceptable punishment for a planned, premeditated murder); William J. Bowers, Marla Sandys & Benjamin Steiner, *Foreclosing Impartiality in Capital Sentencing: Jurors' Predispositions,*

---

[38] *Faretta* does not prohibit standby counsel from "argu[ing] with the defendant, mak[ing] motions to the court contrary to the defendant's wishes, and tak[ing] other steps not specifically approved by the defendant." *McKaskle v. Wiggins*, 465 U.S. at 176.

94

*Attitudes and Premature Decision-Making*, 83 Cornell L. Rev. 1476, 1504 (1998) (more than half of the jurors believed death was the only appropriate punishment for premeditated murder and multiple murders).

Typical voir dire proceedings inadequately identify and explore these biases and misperceptions, primarily because jurors are unaware of the effect of their own biases or worry about appearing biased and prejudiced. Shari Seidman Diamond & Valerie P. Hans, *Fair Juries*, 2023 U. Ill. L. Rev. 879, 915-16 (2023)); Valerie P. Hans & Alayna Jehle, *Avoid Bald Men and People with Green Socks? Other Ways to Improve the Voir Dire Process in Jury Selection*, 78 Chi.-Kent L. Rev. 1179, 1181-82 (2003). Importantly, jurors are more likely to share honest beliefs, respond more candidly, and are less likely to give socially desired answers, when they are being questioned by lawyers, instead of the judge. Susan E. Jones, *Judge-Versus Attorney-Conducted Voir Dire: An Empirical Investigation of Juror Candor*, 11 Law & Hum. Behav. 131, 143 (1987).

A reasonable probability also exists that with greater assistance of standby counsel Dylann might have called at least one witness in mitigation during the penalty phase. Dylann undoubtedly wanted to avoid the death penalty. In his very brief closing argument, he reminded the jury "that only one of you has to disagree with the other jurors" to return a life sentence. Tr. 01/10/17 at 834. Dylann also submitted nine mitigating factors to the jury that defense counsel had prepared before trial. *United States v. Roof*, 10 F.4th 314, 356 & n.23 (4th Cir. 2021). Dylann

95

did not present evidence to support those mitigating factors, but several of them "were unrebutted and effectively treated as stipulated facts."[39] *Id*. at 356 n.24.

Even if a primary motivating factor for Dylann was avoiding the admission of certain mental health evidence, he was not opposed to the presentation of other mitigating evidence. The interplay of his impairments—his anxiety and processing deficits—simply made the task too difficult to accomplish on his own. If Dylann's request for standby counsel's assistance were accommodated, they might have helped him call at least one witness in his defense. One witness whom Dylann would not have been opposed to presenting was his paternal grandfather, Joe Roof. Dylann's trial mitigation specialists agreed that Joe Roof would have been a credible and humanizing witness. Ex. 7 (Paavola Dec.) ¶ 10; Ex. 9 (Vann Dec.) ¶¶ 20-21. Joe was a warm grandfatherly figure who truly loved Dylann and was heartbroken over what he had done; Joe's human connection with his grandson was something that jurors could have witnessed. *Id*. There's a reasonable probability that hearing from just one witness in mitigation might have persuaded at least one juror to reject the death penalty.

**C. Dylann Is Entitled To A New Penalty Phase Proceeding.**

Dylann is entitled to a new penalty phase proceeding as a result of trial counsel's failure to investigate and present evidence of his competency to represent himself. The Court did not hear evidence of Dylann's language and communication impairments and their interplay with his anxiety disorder. At the very least the Court would have enabled standby counsel's greater assistance as an accommodation to support his *Faretta* rights.

---

[39] Unrebutted mitigating factors that the jury found to exist included, for example, Dylann's young age, lack of serious criminal history, and cooperation with arresting authorities. Dkt. No. 871 (Sentencing Verdict). Other mitigating factors that Dylann presented—but did not support with evidence—included hope for redemption and ability to be safely confined for life. *Id*.

**CLAIM 4:     Trial Counsel Unreasonably Rushed to Trial, Resulting in Prejudice.**

**A. Trial Counsel Did Not Make A Reasonable Strategic Decision.**

Rather than being strategic, trial counsel's decision to hold fast to the speedy trial schedule they requested was based on incomplete information and a cursory investigation in service of an unrealistic trial deadline. The government contends that "trial counsel's affidavits establish that they made a reasonable strategic decision to ensure his federal trial would proceed before his state trial." Resp. at 191. The government cites Mr. Bruck's statement that he was pursuing a federal trial before a scheduled state court trial. *Id.* at 191-92 (citing Dkt. No. 1077-5 at 2). What the government ignores, however, is trial counsel's admission that "the decision to go to trial in November 2016 was made based on incomplete information and prior to having secured the assistance of critical experts and key members of the defense team." Ex. 5 (Bruck Dec.) ¶ 15. Far from an informed decision, the choice to accelerate the trial date went against the weight of the evidence bearing on the issue. For example, as Mr. Bruck acknowledged in his post-trial affidavit:

> Dr. George Woods, our consulting psychiatrist whom I greatly respect, had told us as early as March 2016 that we were going to have to begin the difficult process of sharing our penalty phase mental health defense with Dylann soon. He advised that this would take time. We did not appreciate the need for that time.

*Id.* ¶ 19.

Trial counsel's decisions are reasonable only insofar as they are informed. Here, the decision to accelerate the trial schedule predated several critical steps in the trial preparation process and, in turn, foreclosed potential avenues for the defense. As the Supreme Court has made clear, "even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

In addition to the late onboarding of experts that trial counsel did retain—and the failure to adequately prepare or use them, there are also the experts they failed to retain altogether as a direct result of the compressed timeline they faced, and which was of their own making. As Ms. Stevens notes in her declaration, counsel should have followed the recommendations of their experts to enlist a speech language pathologist in the case, especially in the months before the competency hearing when counsel were on notice that Dylann might seek to represent himself and his observable communication and language deficits raised serious questions about his self-representation capacity. But retaining an speech language pathologist was "one of several potential issues that fell by the wayside." Ex. 6 (Stevens Dec.) ¶ 28. Counsel's ineffectiveness for their failure to investigate Dylann's competency to represent himself, particularly their failure to consult with and retain a speech language pathologist, is detailed in Claim 3 of Dylann's § 2255 motion. Dkt. No. 1078 at 48-102.

The government misstates the status of trial counsel's preparation for trial at the time a speedy trial was invoked. The government explicitly claims that by May 2016, Dylann had undergone examination by "an autism expert." Resp. at 192 (citing Dkt. No. 832-6). However, Dkt. No. 832-6 is the report of Dr. Rachel Loftin, which was not written until late December 2016. Her report further makes clear that she did not meet Dylann until late June 2016. The record is clear: Dylann had not undergone any evaluation for autism at the time of the decision to invoke speedy trial rights; nor had counsel retained a jury consultant, a DVO expert, a speech language pathologist, or an audiologist; and counsel were nowhere near prepared for trial.

The government also claims that trial counsel's decision to fast track the federal trial "did not become unreasonable by virtue of unforeseen subsequent events." Resp. at 194. They suggest that Dylann's firing his attorneys and proceeding pro se, first during jury selection and later

98

during the sentencing phase, was unforeseeable. Not so. As detailed in the Claim 3 reply, trial counsel were on notice in the months before trial that Dylann might seek to represent himself. As early as September 2016, Dylann told his attorneys he planned to fire them, as his frustration with them was growing. The concern that Dylann might self-represent escalated a month before trial when Dr. Dietz exposed trial counsel's deceit. Yet counsel ignored the clear possibility that Dylann would fire them and failed to investigate their client's communication and language deficits, which were directly related to his competency to self-represent.

Calling those events "unforeseen" mischaracterizes the facts and utterly ignores the ways in which counsel's errors prompted Dylann to fire them when he felt he had no other choice. *See* Claim 6. The government also states that, while trial counsel concedes that they were not ready for a November 2016 trial, "none of their affidavits addresses whether they would have been prepared absent their client's efforts to subvert the planned defense and represent himself."[40] Resp. at 194. This ignores the interrelatedness of trial counsel's premature and ill-informed decision to pursue speedy trial and the crash course that decision precipitated, including but not limited to the ultimate implosion of counsel's relationship with their client. The government contends that Dylann's learning of trial counsel's mitigation strategy from the prosecution expert, Park Dietz, "makes no difference" in assessing the breakdown of the attorney client relationship, but nothing could be further from the truth. *Id.* at 195. The government's treatment of these things as separate and distinct belies the realities of the situation. *See* Claims 5 and 6.

---

[40] In another instance, the government suggests that federal trial counsel was ready for trial until their client put a wrench in the plans. Resp. at 194 n.41. This is not true. The federal trial team indicated in their pleadings at the time that they were still intending to conduct investigation and see witnesses after trial began. This is unreasonable and demonstrates trial counsel knew they were not prepared for trial. They were indeed already on a "mission impossible" prior to Dylann's discovery of their deception and subsequent actions. Ex. 5 (Bruck Dec.) ¶ 13.

The government speculates that "a delay in the request for a federal trial date . . . would likely have resulted [in] an expedited and televised state proceeding" causing Dylann to "lose the benefits of proceeding first in federal court." Resp. at 193. It is unclear what "benefits" the government is referring to here. Citing only misleading statistics, the government presupposes that trial counsel's decision to place the federal trial first was based in part on a potentially higher risk of execution by the state than by the federal government. This inference, however, is not only pure speculation, but inaccurate as well. While there are historically more sentences of death and executions in South Carolina than in the federal system, there are also exponentially more prosecutions. Further, 49% of death sentences in South Carolina have been overturned and the defendant subsequently sentenced to less than death.[41] Finally, a state death sentence would allow additional layers of appeal, both state and federal postconviction review, rather than just the one layer provided in the federal system.

The government argues that the jury pool in the state court would have been more tainted by bias than a federal jury pool. *Id.* at 193. This argument fails to consider that trial counsel, whether state or federal, should have explored venue and sought to hold Dylann's trial in a location free of such bias. *See* Claim 9.

Any claim by the government that Dylann fared better by virtue of pursuing trial in federal court over state court and that such a belief informed trial counsel's decision to expedite trial is unsupported by facts.

Lastly, the government's contention is moot. Dylann was sentenced to death in his federal trial. There is no worse outcome for him. The very real possibility of a federal death sentence

---

[41] Justice 360, *South Carolina Death Penalty Fact Sheet*, (Updated March 11, 2020), https://justice360sc.org/wp-content/uploads/2017/04/SC-Death-Penalty-Fact-Sheet-2020.03.11-1.pdf

was, or at least should have been, clear to counsel, given that Mr. Bruck's client,

Dzhokhar Tsarnaev, received a death sentence in a Massachusetts federal court just as Mr. Bruck

began his representation of Dylann.

Any reasonably effective state trial team would have litigated vigorously to keep cameras

out of the courtroom and to get the time needed to adequately prepare for trial. Even if a

continuance had not been granted, effective counsel, at a minimum, would have made a record of

their lack of preparedness. Instead, federal trial counsel actively sought to accelerate Dylann's

trial, indicating that they were ready for trial, despite the fact that they were not. This was error.

**B. Counsel's Uninformed Decision To Seek A Speedy Trial Prejudiced Dylann.**

The government claims that Dylann cannot show prejudice because "(1) any claims of

prejudice were waived by defendant's choice to self-represent, (2) Defendant would have chosen

to represent himself even if counsel had not invoked his right to a speedy trial, (3) none of the

referenced unfulfilled tasks affected the trial, and (4) there is no reasonable probability that the

jury would have returned a more favorable verdict if they received the cited mitigating

evidence." Resp. at 198-99. Dylann stands by the arguments and evidence presented in his

§ 2255 Motion. To make their arguments, the government frames the issues in this case as

separate and distinct, but trial counsel's hasty and ill-informed decision to seek speedy trial in

federal court shaped this case in its entirety and all of the claims raised herein. Several issues—

pursuing speedy trial, failing to secure necessary experts, failing to prepare a thorough mitigation

case, failing to establish a trusting relationship with Dylann, failing to investigate and present

evidence of Dylann's competency to self-represent, Dylann's firing counsel and representing

himself—are inextricably linked.

101

In assessing this case, this Court must view counsel's errors in combination, not—as the government would have it—in isolation. *See Strickland*, 466 U.S. at 694. The government's position that Dylann waived his right to effective representation overlooks the unique situation in this case and the central role trial counsel played in the breakdown in the attorney-client relationship that resulted in self-representation. Here, trial counsel made a premature and ill-informed decision to accelerate the time to trial. They did so without retaining important experts, and without establishing the trust of their client. As trial counsel rushed toward a trial they were not prepared for, more and more "fell by the wayside." Ex. 6 (Stevens Dec.) ¶ 28. When Dylann learned, from a prosecution expert shortly before jury selection, that his lawyers planned to say he had autism despite their statements to the contrary, Dylann's trust in his team crumbled. Dylann then found himself in an impossible position: he did not want to be pro se, but he could not abide the broken word of his supposedly trusted counsel. Betrayal led Dylann to self-represent.

The government then argues that Dylann would have made the identical decision to waive counsel, proceed pro se, and not present any evidence whatsoever, regardless of counsel's actions. First, Dylann was not competent to proceed pro se, as an adequate investigation into his *Edwards* competency would have uncovered. *See* Claim 3. But even assuming he was, the government's argument about Dylann's decisions belies credulity, suggesting that the trust and rapport between counsel and their client has no impact on a client's choices. The government suggests that Dylann was always rationally acting in his own best interest. Instead, his decisions were all tainted by the fact that he was unable to heed advice and counsel from standby counsel, in whom he had lost all trust. At a minimum, effective counsel would have understood that

102

working with Dylann would take time. Instead, counsel rushed to trial and invoked his speedy trial rights.

The total breakdown of Dylann's relationship with his attorneys (*see* Claim 6) was fomented by counsel's self-imposed compressed timeline. Trial counsel's decision early in Dylann's case to fast track the federal trial proceedings precipitated the cascade of other errors that infected Dylann's case and contributed to his eventual death sentence. By the time the prosecution's expert met with Dylan and revealed the defense's intent to present autism as part of the penalty phase mitigation, the start of trial was just days away. Counsel had not allotted sufficient time to develop trust with their client such that they could weather that storm, nor was there enough time remaining to repair the damage done. The government claims, without support, that Dylann's decisions would have been identical regardless of the timeline or the trust his counsel could have earned. This fails to fundamentally understand the relationship between counsel and a capitallycharged client. How could Dylann trust his counsel to save his very life if he could not trust them to tell him the truth about the evidence they planned to present?

Arguing, as the government has, that the available mitigating evidence would have been inconsequential "against the countervailing aggravation," Resp. at 205, ignores those cases in which life sentences have been obtained despite substantial aggravation. Every capital case carries with it its own uniquely tragic circumstances, to be sure. However, to the extent that the government is contending that the facts of the crime rendered a life sentence impossible irrespective of the available mitigating evidence, that is not accurate. As myriad cases demonstrate, even where there are multiple victims and even in instances where racial animus may have been part of the motive for a crime, defendants can and do secure life sentences. See

103

United States v. Saipov[42] (Life without parole sentence for alleged ISIS-motivated murder of eight victims, following jury deadlock); State v. Cruz[43] (Life sentence for Marjory Stoneman Douglas High School shooter who killed seventeen people).

Viewed through the lens of counsel's prioritization of an expedited trial over virtually all other considerations, this Court should reject the government's view that counsel's decision was both reasonable and inconsequential. The outcome of this trial and the trajectory that resulted in that outcome all began with counsel's myopic decision to go to trial in federal court as quickly as they could. Because Dylann's self-representation flowed from circumstances which were set in motion by counsel having invoked speedy trial, to conclude Dylann has waived his Sixth Amendment right to counsel would constitute a miscarriage of justice. But for counsel's decision to pursue a speedy trial in Dylann's federal proceedings, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

---

[42] Death Penalty Information Center, *Federal Jury Returns a Life Verdict in New York for Sayfullo Saipov*, (Updated March 14, 2025), https://deathpenaltyinfo.org/federal-jury-returns-a-life-verdict-in-new-york-for-sayfullo-saipov

[43] Gareth Evans, *Parkland school shooting: Why the gunman was spared the death penalty*, BBC, Oct. 13, 2022, https://www.bbc.com/news/world-us-canada-63237156.

104

**CLAIM 5:    Trial Counsel Provided Ineffective Assistance By Repeatedly Deceiving Their Client, Leading To A Total Breakdown In The Relationship.**

The government cannot choose what is true and what is false as a matter of convenience. The reality is that Dylann's trial counsel lied about a critical aspect of his case—and that decision had profound consequences. It is unclear how deceiving Dylann for months into believing that mental health professionals were there to evaluate a genuine concern for his thyroid is anything but a lie. *See* Ex. 5 (Bruck Dec.) ¶ 30. Even when Dylann confronted trial counsel about their lies, his lawyers continued to lie by reassuring him that it was unlikely that his potential autism diagnosis would come up at trial. Their lies did not reflect a viable plan or reasonable strategy. Indeed, choosing to deceive Dylann was an objectively unreasonable course of action considering the circumstances. *See Strickland*, 466 U.S. at 688. Trial counsel's own experts told them as early as March 2016 that they needed to start discussing mental health evidence with Dylann. *See* Ex. 15 (Woods Dec.) ¶ 15. Their expert explained that this process would take time and needed to begin as early as possible. *See id*.; Ex. 5 (Bruck Dec.) ¶ 19. Yet trial counsel failed to heed this advice. And then it was too late because counsel unreasonably failed to appreciate that the government's expert would tell Dylann his purpose for evaluating him. As this Court plainly put it: "one would reasonably expect that [Dylann] would have been asked [by Dr. Dietz] about [trial counsel's] claimed mental health conditions." Dkt. No. 770 at 2. The consequences of Dylann learning, for the first time and from someone outside his defense team, of trial counsel's lies and the true nature of their plan could not, in any way, be lost on trial counsel.

**A. Trial Counsel Unreasonably Destroyed Their Relationship With Dylann By Lying To Him.**

The government, in its response, refuses to accept that trial counsel was dishonest with Dylann. This Court was also skeptical that trial counsel would allow the government's expert to be the first to reveal the defense's mitigation plan. And yet it is clear now that is exactly what

105

happened. *See* Ex. 11 (McGuire Dec.) ¶ 10 ("Our relationship with Dylann was really wrecked when he discovered we had been dishonest with him"); Ex. 5 (Bruck Dec.) ¶ 30 "The first competency hearing confirmed for Dylann that we had been dishonest with him for months"); Ex. 9 (Vann Dec.) ¶ 14 ("Dylann learned from the government's expert about his diagnosis of autism and the defense team's plan to use that diagnosis at the penalty phase. Dylann's relationship with the defense team never recovered . . . .)"; Ex. 12 (Norris Dec.) ¶ 42 ("I was concerned that we were approaching ethical lines by misleading Dylann to some extent").

Against the clarity of trial counsel's deception, the government points to trial counsel's previous generic denial of the accusations in Dylann's letter that they lied to him. Resp. at 211. The government, however, ignores the context for why—at the time—trial counsel may have wanted to sidestep or downplay their dishonesty. First, trial counsel was trying to put back together the pieces of their completely broken relationship with Dylann. Conceding that they lied to him for months would have made that all but impossible. Additionally, trial counsel had ample incentive to portray Dylann's allegations as a function of his delusions and mental health rather than as a response to their ethically dubious actions. Lastly, Dylann's letter to the government placed trial counsel in an untenable position. Confirming the claims in Dylann's letter would have only exacerbated, ethically and strategically, an already impossible situation. Trial counsel's confirmation would not only have provided the prosecution with a window into defense strategy, but would have given the government an opportunity to raise conflict questions that would have certainly driven a larger wedge between Dylann and the defense team.

The government's claims about when and how Dylann's relationship with his lawyers deteriorated are detached from the record. Their contention that the relationship was not destroyed after Dylann learned of his defense team's mitigation plans from Dr. Dietz, but

106

unraveled instead after a second round of trial counsel-initiated competency proceedings (after the conclusion of the guilt phase) is implausible. If there was any doubt that trial counsel's deception irreparably destroyed the relationship, Dylann's letter to the government makes it abundantly clear. In the letter, Dylann accused his lawyers of using "threats, manipulation, and *outright lies*"; he explained that "words cannot express how sick they are in their *lies*"; and he closed by declaring that "they all . . . should be disbarred." Dkt. No. 545 (emphasis added). Once Dylann sent this letter to the prosecution, there was no coming back from it.

The government claims that trial counsel were "concerned" that if they raised the issue of autism with Dylann, he would refuse to participate and "destroy any chance of a mental health mitigation presentation." Resp. at 208. This logic fails for several reasons. First, counsel did not just fail to share information with their client, they actively deceived him. Second, the Court cannot presume that this alleged "strategy" of trial counsel is complete or accurate without a hearing. *See United States v. Runyon*, 994 F.3d 192, 208 (4th Cir. 2021) (hearing required when record did not sufficiently support the government's argument that trial counsel made strategic choice). Trial counsel's dishonesty with Dylann bears on the Court's assessment of what they described in the past as their plans. Third, trial counsel created this dilemma by waiting until the very end to consider sharing their plans with Dylann, despite their consulting mental health expert advising them to begin sharing this plan well in advance of trial. Finally, even if this was a significant consideration, there are flaws in the reasoning of both defense counsel and of the government. Defense counsel would have been able to continue to litigate the admissibility of any mental health evidence. But most certainly all mitigation evidence would not have been barred, even if mental health evidence were limited. The vast majority of mitigation evidence, including everything presented in the § 2255 motion, would still have been admissible.

Had counsel not been dishonest with Dylann, there are two possible outcomes. Trial counsel may have been able to slowly convince Dylann to allow them to present evidence of mental health mitigation. Alternatively, trial counsel would have been able to litigate the scope of mental health evidence admissible in the absence of a government evaluation. Trial counsel may have been limited in their ability to present mental health evidence (which was not a certain result) but could have offered other mitigation, including Dylann's intense isolation for years prior to the offense, the love and concern his family has for him, the incredible loss his death would be to his family, the anxiety and paranoia he began expressing to his pediatrician in his teen years, his intense social anxiety, and many other mitigating facts. The attorneys who developed relationships with Dylann were certain he would have permitted non-autism related mitigation. Both scenarios would have resulted in counsel representing Dylann and pleading with a jury to save his life. There is a reasonable probability that at least one juror would have voted for life.

The government appears to misunderstand the issue raised in Claim 5, arguing that counsel was reasonable in conducting a mental health investigation even in the face of opposition from their client. The issue is not whether trial counsel was reasonable in conducting a mental health investigation. The issue is that trial counsel spent close to a year lying to Dylann about his defense, depriving him of any voice whatsoever on the matter. They did so against their own experts' advice and with an understanding that Dylann eventually would discover their plan anyway. He did so in the worst possible manner—learning from a government expert—which that imperiled their relationship with him. There was nothing strategic about this plan. Quite the opposite, had trial counsel consulted with Dylann early on as they were advised, they would have had time to try to persuade him on the issue of autism or, alternatively, they would have had

108

clarity on whether a different approach to mitigation was warranted. Indeed, the team "fel[t] confident that even if he had not wanted the jury to hear about any diagnosis of autism, he would have allowed other [mitigation]." Ex. 11 (McGuire Dec.) ¶ 12. The reality, however, is the same: "If [trial counsel] had not lied to him, [they] would not have been in that situation." Ex. 11 (McGuire Dec.) ¶ 13.

Defense attorneys have to work with complicated and resistant clients every day. This is especially true for appointed counsel, who must enter a relationship with a client that neither the attorney nor client may have wanted to begin with. Lawyers, however, understand that building trust takes time and effort. Indeed, it is a critical demand of the work and informs their ability to competently represent clients. They must meet their client where they are and work together to achieve their common goal: a morally just and fair resolution. What lawyers cannot do is deprive their clients of the necessary information to make decisions—let alone actively lie to them about that information. *See* American Bar Association, Model Rules of Professional Conduct, Rule 1.4 ("A lawyer shall: (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent . . . is required; (2) reasonably consult with the client about the means by which the client's objectives are to be accomplished; (3) keep the client reasonably informed about the status of the matter; (4) promptly comply with reasonable requests for information; and . . . (5)(b) explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation"; Ex. 57 (Lying to Clients) at 661 ("Lawyers are not supposed to lie to their clients. Ever.").

Certainly, a basic tenet of capital representation is that "[c]ounsel at every stage of the case should discuss with the client the content and purpose of the information concerning penalty that they intend to present . . ., means by which the mitigation presentation might be

109

strengthened, and the strategy for meeting the prosecution's case in aggravation." 2003 Guideline 10.11(D).

**B. Dylann Would Not Have Represented Himself If Trial Counsel Had Not Destroyed Their Relationship.**

The government attempts to reduce the complete breakdown in the relationship between Dylann and his attorneys to a simple disagreement of the minds. It insists that Dylann elected to represent himself not because of the broken trust between him and his attorneys, but because of his narrow objection to evidence of autism. While Dylann did not want evidence of autism on display for the world to see, his inability to trust or work with his assigned lawyers ultimately led to his self-representation. Dylann did not believe his lawyers were interested in building consensus or having him participate in the defense strategy—an unacceptable premise for someone whose very life hung in the balance.

The question of whether to present evidence of autism would not have destroyed an otherwise healthy attorney-client relationship. Trial counsel was unable to navigate that question because they had so thoroughly damaged the relationship by lying to Dylann for months. Dylann could not trust anything coming from his lawyers, including what a mitigation strategy—even one that did not mention autism—could look like.

The government downplays the breakdown in order to argue that there is no reasonable probability that Dylann would not have represented himself even if trial counsel had not spent months lying about an issue that was not only vital to Dylann's case, but to Dylann personally.[44]

---

[44] The government attempts to distort the prejudice argument by claiming that Dylann's assertion that he would not have represented himself absent trial counsel lying to him and destroying their relationship "introduce[es] another layer of the prejudice analysis." Resp. at 214. This is incorrect. The prejudice has always been the same. Absent the complete breakdown of the attorney-client relationship, Dylann would not have sought to represent himself, and in turn the jury would have heard the wealth of mitigation evidence that he would have allowed. *See* Claim 7.

110

This is simply not true and their own arguments undermine this theory. The government correctly states that Dylann, after firing trial counsel, acquiesced to their help during voir dire and asked for their reappointment during the guilt phase. What the government ignores, however, is that all of this is in the context of a twenty-two-year-old with neuro-developmental and anxiety disorders and language-related impairments who was completely unprepared and overwhelmed by the herculean task of representing himself in a trial where he faced execution. *See* Ex. 5 (Bruck Dec.) ¶ 51 ("During jury selection it appeared to me that Dylann's anxiety was acute, as he could not stand being looked at by others."); Ex. 6 (Stevens Dec.) ¶ 22 ("Dylann simply didn't have the time to process what was going on and respond. We'd try to get him to object, but by the time he could read the note and think, the court had moved on, and Dylann's chance to object was lost. . . . Everything in the courtroom was happening too fast for him to keep up."); Ex. 71 (Gannett Dec.) ¶ 39 ("He warned the team he could not object. He was worried about being looked at when he objected and said he would be embarrassed if the Court asked him the reason for his objection and he couldn't give a good answer."). Simply put, Dylann lacked the capacity to represent himself. *See* Claim 3.

Dylann did not want to represent himself. He did so only because he felt he had no choice. As explained by lead counsel, David Bruck: "Our relationship with Dylann was irreparably damaged by Dr. Dietz's disclosures. . . . [It] was devastating. . . . We did not have time to work with him to repair the damage to our relationship." Ex. 5 (Bruck Dec.) ¶ 27. Prior to the breakdown, Dylann spent months working with his attorneys and discussing mitigation. *See* Ex. 10 (Pennington Dec.) ¶ 13. ("I had spoken with Dylann for months about mitigation evidence generally and stayed away from discussing specific mental health diagnoses. I had no reason to think Dylann would not let us present general mitigation evidence to tell the story of

111

his life.").

The government's suggestion that trial counsel's dishonesty with Dylann was not a source for the breakdown in the relationship is disingenuous at best. Dylann's own letter to the prosecution, which set in motion his ultimate pro se status, makes it clear that he was concerned about honesty. Speaking to the Court directly, Dylann said of trial counsel:

> [T]hey are serial liars. They lie over and over and over again to me, to everyone. They lie to my family about who is going to be testifying. They try to make them think that they are not really going to have to testify. Trying to do the same thing they do to me. All of this is my lawyer's fault. I mean, not the crime, but I'm saying what is happening now, this competency hearing, all of it is my lawyer's fault. You know, it's not -- you could say it's because I wrote the letter, but they are the ones that made me write the letter. And I am not trying to be difficult at all.

Tr. 11/22/16 at 277-78 (Dkt. No. 707).

## C. This Claim Is Properly Raised For The First Time.

The government argues that Claim Five is non-cognizable because the Fourth Circuit found Dylann's waiver valid "despite assertions that Defendant's attorneys lied to him." Resp. at 207 n.52. This is incorrect. The Fourth Circuit opinion does not account for trial counsel's dishonesty with Dylann, *Roof*, 10 F.4th at 359-60, and does not address their ineffectiveness. This claim is raised here for the first time. Trial counsel's deficient performance led to Dylann's waiver, which undoubtedly prejudiced him. The government assumes, incorrectly, that the Fourth Circuit's ruling on one legal claim can be presumed to answer a different legal question. Their belief that Dylann's waiver nullifies the impact of the ineffectiveness of counsel, rather than being *the result* of that ineffectiveness, is simply wrong.

## D. The Government's Response Demonstrates The Necessity Of A Hearing.

The government repeatedly questions the credibility of defense counsel, at times claiming that trial counsel's declarations "leave a great deal of room for interpretation," Resp. at 212, or are factually untenable, Resp. at 211. By disputing the facts alleged in the § 2255 motion and

112

challenging the credibility of both federal and state trial counsel, the government makes a clear case for why a hearing is required.

The government also alleges that a § 2255 motion is not the proper vehicle to challenge the state lawyer's ineffectiveness. Resp. at 212 n.54. Again, the government fails to understand the point. The effectiveness of state counsel is not at issue, but obviously they are in possession of facts relevant to the effectiveness of federal trial counsel. This is significant since the two teams essentially functioned as one team under the leadership of Mr. Bruck. Ex. 5 (Bruck Dec.) ¶ 5; Ex. 12 (Norris Dec.) ¶ 9. The state team's declarations, and testimony at a hearing, are relevant to the determination of the federal trial team's ineffectiveness.

The government wants this Court to simply assume that trial counsel's choices were part some informed strategy, despite their dishonesty with Dylann and their failure to fully understand his impairments. The request for this Court to make fact and credibility findings in the absence of a hearing asks the Court to ignore the law. *See* Introduction.

### E. A New Penalty Trial is Required

Absent months of trial counsel lying to Dylann about a critical part of his defense, things may have been very different. With trust and time, Dylann may have allowed trial counsel to put on evidence of autism or, at the very least, the jury would have heard the wealth of mitigating evidence that did not include autism. *See* Claim 7. Instead, trial counsel unreasonably, and against their own experts' advice, pursued a plan that was never going to work, but was certain to lead to a disastrous ending. And it did. Dylann represented himself and the jury learned nothing about him. Had the jury learned about Dylann's anxiety, isolation, and neuro-developmental disorders and/or heard from all the people in his life who loved and cared for him, there is a reasonable probability that at least one juror would have voted for life.

The government claims that is Dylann's fault that the penalty phase was not

113

representative of an adversarial process in any way. Unsurprisingly, the government, which is seeking to execute Dylann, has no reservations about why a twenty-two-year-old who only has a General Education Development (GED) certificate and is suffering from significant neuro-developmental issues was completely unequipped to handle a federal death penalty case—a task that decades of Supreme Court opinions makes clear is extremely complex and difficult even for many trained attorneys. Dylann's unique auditory processing disorder, anxiety, and communication disability rendered him incapable of carrying out the necessary trial functions. *See* Claim 3.

**CLAIM 6:     Dylann Was Constructively Denied The Right To Counsel Due To The Dishonesty And Distrust Sowed By His Appointed Counsel.**

Dylann's letter and statements to the Court revealed a distrust of counsel so pervasive that they could no longer operate as effective counsel. Where trust is fully undermined by counsel's dishonesty, as it was here, effective representation is impossible. *Blackledge*, 751 F.3d at 196. The complete breakdown in the attorney client-client relationship which occurred between Dylann and his attorneys constituted a constructive denial of counsel and resulted in precisely the type of devastating consequences that the Sixth Amendment is designed to prevent, warranting *Cronic's* presumption of prejudice. When the attorney-client relationship breaks down so completely that "the principal purpose of the appointment—the mounting of an adequate defense incident to a fair trial—has been frustrated," as in this case, the resulting harm to the defendant's case is not speculative. *United States v. Smith*, 640 F.3d 580, 588 (4th Cir. 2011). Given counsel's failures and egregious behavior, the harm was inevitable, as the record below demonstrates. Because the breakdown was so severe that it precluded counsel's effective assistance, prejudice is presumed. *Strickland*, 466 U.S. at 692. Further, counsel and the Court failed to remedy this problem by seeking conflict-free counsel, heeding Dylann's concerns, and further inquiring into the failed attorney-client relationship.

Dylann is entitled to a new penalty phase or, at minimum, a hearing is warranted on the conflict between Dylann and trial counsel. The government's arguments to the contrary should be rejected by this Court. *United States v. Cronic*, 466 U.S. 648, 658 (1984).

**A. Dylann Was Constructively Denied His Right To Effective Assistance Of Counsel—*Cronic*'s Presumption Of Prejudice Applies And The Government's Arguments To The Contrary Should Be Rejected.**

A complete breakdown in the attorney-client relationship occurred prior to trial and constituted the constructive denial of Dylann's Sixth Amendment right to effective assistance of

115

counsel, requiring automatic reversal under *Cronic*. Because of his attorneys' deception, the attorney-client relationship blew up in the days leading up to trial, but it had been fractured before that time. Dylann ultimately concluded that "I don't know how in the world I'm going to cooperate with my lawyers today . . . if I hated them before, I really hate them now." Tr. 11/22/16 at 284-85. Likewise, his lawyers acknowledged their relationship was "irreparably damaged." Ex. 5 (Bruck Dec.) ¶ 27; *see also* Ex. 11 (McGuire Dec.) ¶ 10; Ex. 10 (Pennington Dec.) ¶ 12.

Because of counsel's failures, the adversarial criminal process envisioned and protected by the Sixth Amendment "los[t] its character as a confrontation between two adversaries," *Cronic*, 466 U.S. at 656-57, with counsel "acting in the role of an advocate," *id.* at 656, and it instead warped into a confrontation between Dylann and his trial counsel. Dylann and his counsel's relationship suffered a breakdown so severe it precluded counsel's effective assistance. Prejudice is thus presumed. *Strickland*, 466 U.S. at 692.

The government asserts that *Cronic* applies only to ineffective assistance of counsel claims where a defendant specifically requests new counsel based on a breakdown in communication and courts deny that request within the context of a substitution of counsel motion. Resp. at 221-22; 225-27. The government wrongly asserts that because Dylann only "asked the Court about the right to represent himself" and never explicitly requested new counsel, *Cronic*'s presumption of prejudice does not apply. *Id.* at 225; 225-27. The Court should reject the government's incorrect reading of *Cronic*. The defendant in *Cronic* also did not make a contemporaneous objection to his appointed counsel. In fact, the opinion notes that during trial, in response to a question from the bench, Mr. Cronic expressed his satisfaction with counsel's performance. *Cronic*, 466 U.S. at 652 n.6. Only after the substitution of new counsel on appeal did Mr. Cronic, through new counsel, raise concerns about the actions of trial counsel. Even then,

116

the district court did not entertain this issue until the appellate courts so mandated. *Id.* at 652. The government's proposed rigid and brightline rule requiring an explicit request is contrary to the Court's precedent.

The government also fails to consider Dylann's unique deficiencies. Dylann was twenty-two at the time of trial, only held a G.E.D. after failing the ninth grade repeatedly, and had virtually no experience with the criminal justice system. He was functioning with an undiagnosed auditory processing disorder, significant language processing delays, and pragmatic communication deficits that left him unable to carry out basic trial tasks as his own attorney and prevented him from fully participating in his trial in a meaningful way. *See also* Claim 3. It is well established that courts should consider a defendant's background and experience with the criminal justice system in determining whether a defendant has waived a constitutional right such as the right to counsel. *See Aiken v. United States*, 296 F.2d 604, 607 (4th Cir. 1961) (Court considered, *inter alia*, defendant's "superior intelligence and extensive prior criminal experience" in finding the defendant had knowingly waived right to counsel); *see also Townes v. United States*, 371 F.2d 930, 934 (4th Cir. 1961) (instructing district court judges to "develop on the record the educational background, age, and general capabilities of an accused" for determination of whether waiver of counsel knowing and intelligent). Dylann's background, including deficits that counsel failed to investigate and uncover because they failed to follow up on red flags and their experts' recommendations, as well as his lack of experience with the justice system, prevented him from asserting his right to counsel.

117

Even had Dylann thought he could request new counsel, it was made clear by the Court—and his trial counsel's silence on the matter—that this was not an option in his case:

> Any competent lawyer is not going to do what you want Mr. Bruck to do, which is simply to say, "I have no defense." They just won't do that. That's not the way lawyers in capital cases handle these situations. *So I don't think giving you another lawyer is a solution.* I don't think letting you self-represent is a solution, though I am willing to take that up. If that is something you make that motion I will consider that.

Tr. 11/22/16 at 285 (emphasis added). As a result, Dylann was left with the clear (albeit mistaken) impression that there was no point in requesting new counsel.

That Dylann didn't use the specific language for which the government advocates demonstrates Dylann's lack of experience with the legal system. It is not clear whether Dylann even knew that he *could* ask for counsel, when he could make the request, or even whether he had to ask his lawyers for permission or consent before doing so. One could imagine there would be many more questions for a young and inexperienced defendant.

The government argues that there has been no "factual determination that communication between [Dylann] and his counsel was irreparably broken." Resp. at 227. The government is, of course, correct: this issue is, appropriately, now before the Court for such a finding for the first time. Trial counsel failed to reveal their deceit to the Court in a timely manner, and mischaracterized the relationship breakdown as a result of mental illness rather than Dylann being justifiably angry with them because of their deceit. *See* Dkt. No. 1078 at 151-60. There was no complete inquiry into the nature of the conflict, thus no finding that the relationship was broken. Of course, there was also no finding that the relationship was *not broken.*

The government also misreads *Smith* to assert that applying *Cronic's* presumption of prejudice to this case would "broaden[] *Cronic*'s scope" since the district court made no finding into whether the attorney-client relationship was broken. Resp. at 225-27. The government is

118

wrong. The government is correct that the Fourth Circuit in *Smith* "cautioned against broaden[ing] the per-se prejudice exception to *Strickland*" set forth in *Cronic* to all Sixth Amendment violation claims. *Smith*, 640 F.3d at 590 (internal quotations omitted). However, it was not a pronouncement that a reviewing court would *only* consider *Cronic* claims where a district court made a finding into whether the attorney-client relationship was broken as the government posits. In fact, the Fourth Circuit in *Smith* did review the issue of whether Mr. Smith was constructively denied counsel even though "*the district court made no findings on this point.*" *Id.* at 596 (emphasis added). As such, applying *Cronic* here would not broaden its scope.

In sum, Dylann has provided the Court with specific facts demonstrating that Dylann was constructively denied counsel. The complete breakdown in the attorney-client relationship constituted the constructive denial of Dylann's constitutional right to effective assistance of counsel, requiring automatic reversal under *Cronic*. This Court should reject the government's misguided and unduly narrow reading of *Cronic.*

The legal claim could stop here. The government misconstrues this entire claim as being reliant on further arguments, such as the claim that trial counsel should have heeded Dylann's desired objectives of the litigation. This is an additional claim or subclaim, further demonstrating the failures of trial counsel. However, the complete denial of counsel presented in this claim due to Dylann's complete inability to trust counsel's advice and counsel's refusal to act once it became clear the relationship was irreparable, is sufficient to grant relief to Dylann. In the alternative, the Court should grant discovery, a hearing, briefing and then relief to Dylann. Because of counsel's dishonesty, Dylann was forced to represent himself, something he never wanted to do. However, there are additional reasons that further demonstrate the failures of trial

119

counsel, and their failure to take steps to remedy the breakdown in the attorney client relationship.

**B. Contrary To The Government's Assertions, Additional Evidence Of The Irreparable Breakdown In The Attorney Client Relationship Leading To The Constructive Denial Of Counsel Is Demonstrated Because Counsel Failed To Consider Dylann's Objectives.**

Trial counsel betrayed their role as advocates and counselors, deceived their client, failed to take any actions to remedy the breakdown in the attorney-client relationship, and ignored expert advice to withdraw or request conflict counsel. The result of this was irreparable damage to the attorney-client relationship and the constructive denial of counsel pursuant to *Cronic*. The government's arguments to the contrary and mischaracterizations of the record should be rejected by this Court. Resp. at 224-33.

Trial counsel betrayed their role as Dylann's advocates, which caused Dylann to see them as his adversaries rather than counselors. Dylann repeatedly told his attorneys that he opposed being characterized as mentally ill or disabled. *See* Ex. 12 (Norris Dec.) ¶ 43 (Dylann was "fearful that his attorneys will try to offer evidence indicating that [he] is 'crazy' or mentally deficient"). Counsel understood this and yet ignored it. *See* Ex. 10 (Pennington Dec.) ¶ 12 ("Dylann would not be a huge fan of any mental health diagnosis . . . ."); *see also* Ex. 5 (Bruck Dec.) ¶ 20 ("He was insistent that he did not have autism and became more suspicious at that point that the doctors we were sending to see him were not there just to treat his medical condition."). Instead of listening to their client's fundamental wishes, they plowed forward and assumed they could override their client's directive through deceit by presenting evidence of autism which he specifically and repeatedly rejected. The trial team was "relying on Dylann's social anxiety and lack of experience in the courtroom, hoping that would stifle any protests he had to [their] mental health presentation." Ex. 5 (Bruck Dec.) ¶ 31.

120

Even this Court questioned counsel whether it was a "good idea" to continue insisting upon a certain line of defense when confronted with Dylann's extreme opposition and letter to the prosecution. Tr. 11/16/2016 at 4 (Dkt. No. 687). Mr. Bruck's response revealed counsel's false belief that an autism defense was the only course of action: "the alternative" would be to give up "his only sentencing defense." *Id*. Even assuming the presentation of certain mental health mitigating evidence is a tactical decision left to counsel, what is really at issue here is counsel's decision to plow ahead at the expense of preserving the attorney-client relationship, and more disturbingly, to deceive Dylann.[45] Trial counsel deceived their client by pursuing a trial theory that Dylann explicitly rejected and—crucially—by incorrectly telling Dylann that the experts he was meeting with were looking into something other than that theory. This deceit permanently damaged the attorney-client relationship. Once Dylann learned from the government expert, Dr. Park Dietz, that his counsel planned to present evidence of autism at trial, he wrote to prosecutors, calling his attorneys "liars" who "tricked" him into seeing mental experts under false pretenses. Dkt. No. 545. He knew that his lawyers had misled him into seeing mental health experts under the guise of getting his thyroid condition checked out. Tr. 11/22/16 at 263-64.

---

[45] The government asserts that the appellate court bars this Court from reviewing Dylann's claim, as it relates to counsel's failure to function as Dylann's advocates by usurping Dylann's express directives of not presenting evidence of mental illness or disability at penalty phase. Resp. at 232-33. First, this claim is different, because it is about counsel's deceit. Second, and relatedly, whether an issue is procedurally unreviewable does not depend on whether the § 2255 motion "will necessarily require the Court to revisit matters of law that the Fourth Circuit has already reviewed." Resp. at 309. Rather, it depends on whether the § 2255 motion presents new facts that constitute new claims not previously decided. *See, e.g.*, *Massaro v. United States*, 538 U.S. 500, 505 (2003) (explaining that the trial record generally "will not disclose the facts necessary to decide either prong of the *Strickland* analysis"). Dylann has presented new facts and evidence which the appellate court did not consider, and indeed could not have considered, in its prior review of the case. As such, the government's arguments are misplaced.

Dylann told prosecutors that there was no way he could trust his lawyers in light of their "scare tactics, threats, manipulation, and outright lies to further their own . . . agenda." Dkt. No. 545 at 2. Dylann told the Court he was not cooperating with counsel since he believed they had taken advantage of him and he explained that he was "limiting" communication with counsel. Tr. 11/22/16 at 263-64; 270. Dylann fired his attorneys on the eve of trial rather than proceed with the lawyers who had deceived him, which is unambiguous evidence that the relationship had been irreparably damaged.

The government relies on evidence of Dylann's request for counsel to be re-appointed after he represented himself during jury selection, as commonsensical evidence demonstrating an intact attorney-client relationship. Resp. at 224. The government argues that because "Defendant told the Court that he wanted counsel to represent him despite their turbulent relationship," it therefore "negates any claim of an irreparably broken relationship during guilt phase." *Id*. The government reads this portion of the record in a vacuum and is thus misguided.

The government is correct that Dylann told the Court he wanted counsel to represent him at the guilt phase. Tr. 12/05/16 at 7-9. However, the government ignores Dylann's actions before—which was to fire his attorneys and go forward without counsel for jury selection where he represented himself—and after guilt phase, where he asked the Court again to self-represent for the penalty phase. He reluctantly allowed counsel to briefly represent him because of his earnest desire *not* to proceed pro se. And he generally did not follow their advice when they were standby counsel, since he could not trust them and because of his impairments. This demonstrates the dysfunctionality and irreparable break in the relationship which the government plainly ignores. Moreover, even if it was the case that Dylann was represented by counsel through trial and penalty, given the severity of the breakdown, "the likelihood that any lawyer . .

122

. could provide effective assistance [was] so small that a presumption of prejudice is appropriate." *Cronic*, 466 U.S. at 659-60.

Dylann believed his lawyers' efforts "were causing him harm" and that they were "trying to kill" him. Dkt. No. 840 at 4. Contrary to the government's assertions, this demonstrates anything but clear evidence of a functioning attorney-client relationship.

While acknowledging that trial counsel stated Dylann, "insisted that counsel should 'do nothing' and 'stop making objections'" during guilt phase, Resp. at 224; Dkt. No. 840, the government argues that counsel's contemporaneous declaration, Dkt. No. 840, is a document that "reveals counsel attempting to put on their case despite Defendant's resistance." Resp. at 224. But they fail to see that Dylann's resistance was in large part due to trial counsel's deliberate deceit. Counsel's declaration is evidence of the irreparable harm and counsel's continuing pattern of acknowledging the breakdown and yet still consistently declining to address it, despite clear advice from one of the most preeminent capital attorneys in the country to withdraw or at a minimum obtain conflict counsel. Ex. 5 (Bruck Dec.) ¶ 28. Counsel had multiple opportunities to address the breakdown with the Court and failed to do so. Dkt. No. 1078 at 162-64. The decision not to address the breakdown demonstrates the severity of the constitutional violation, not a sign of an intact relationship as the government argues. The relationship between Dylann and his trial counsel was plainly dysfunctional and broken. When trust is fully undermined by counsel's dishonesty, effective representation becomes impossible. *See Blackledge*, 751 F.3d at 196 (noting that conflicts arising from attorney conduct that undermines client trust and "strain[s]" communication renders continued representation ineffective).

Finally, the government asserts that new evidence presented in Dylann's § 2255 motion does not create a genuine issue of fact because of the contemporaneous record below. Resp. at

123

229-30. Dylann has met the burden of alleging specific facts which entitle him to relief pursuant to 28 U.S.C. § 2255, and show that he was constructively denied his right to counsel. Dylann has presented new evidence, outside of the contemporaneous record, which demonstrates the breakdown in communications. *See* Ex. 5 (Bruck Dec.); Ex. 11 (McGuire Dec.); Ex. 12 (Norris Dec.); Ex. 10 (Pennington Dec.); Ex. 71 (Gannett Dec.); Ex. 6 (Stevens Dec.). As such, the Court should grant Dylann's prayer for relief and conduct an evidentiary hearing to resolve the factual issues raised by the government's response. *See United States v. Magini*, 973 F.2d 261, 264 (4th Cir. 1992) ("When a colorable Sixth Amendment claim is presented, and where material facts are in dispute involving inconsistencies beyond the record, a hearing is necessary.")

**C. The Trial Court Was Required To Make A Thorough Inquiry Into The Conflict Pursuant To *Holloway v. Arkansas*.**

The failures of trial counsel resulted in a lack of trust and a denial of the opportunity for Dylann to have an attorney-client relationship based on honesty. The Court failed to make an adequate inquiry to explore the nature of the breakdown between counsel and client, which could have remedied the error and led to the appointing of conflict-free counsel.

The government asserts that *Holloway v. Arkansas*, 435 U.S. 475 (1978) is limited to cases of joint representation and that because "no party . . . moved to substitute counsel," the Court was not required to conduct an inquiry into the evident breakdown in the attorney-client relationship. Resp. at 238-40. The government's arguments are misguided. In *Holloway*, the Supreme Court considered the trial court's failure to address the issue of counsel's purported conflict. The trial court's failure either to appoint separate counsel or to inquire into whether the risk of conflict warranted separate counsel led the court to hold that defendants in that case were denied effective assistance of counsel and that prejudice was presumed. *Holloway*, 435 U.S. at 484. The Fourth Circuit has further stressed that "[w]hen a defendant raises a seemingly substantial

124

complaint about counsel, the judge 'has an obligation to inquire thoroughly into the factual basis of defendant's dissatisfaction.'" *United States v. Mullen*, 32 F.3d 891, 896 (4th Cir. 1994) (quoting *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991)). A court's inquiry must be particularly searching, "prob[ing] deeply into the basis [of the conflict]," when a conflict involves allegations of attorney misconduct and deception that go to the heart of the attorney client relationship. *See Blackledge*, 751 F.3d at 195.

Here, the trial court failed to conduct a thorough inquiry into the conflict, despite receiving plain and repeated warnings. Trial counsel made the Court aware of the breakdown in communication and made several statements acknowledging the crisis, though did not provide the Court with the facts that the Court now has regarding counsel's dishonesty. *See* Dkt. No. 615 at 5 (counsel alerted the Court that it "experienced a breakdown in our relationship with defendant"); see also Dkt. No. 665 at 3 (alerting Court counsel were "unable to rebuild it"). Further, trial counsel moved to withdraw, informing the Court that "[w]ithout resolution of the conflict . . . there is no way to proceed." Dkt. No. 667 at 3. In addition, Dylann's letter to prosecutors and statements to the Court triggered the Court's duty to inquire. Yet the Court simply accepted counsel's mischaracterization of the breakdown—a crisis caused by counsel lying to their client—without questioning trial counsel's presumptions and representations.

It is also worth noting that the pre-emptive statement that "*I don't think giving you another lawyer is a solution*," Tr. 11/22/16 at 285, fails to consider the scope of the attorney client relationship. The Court's ruling demonstrates its belief that appointing new counsel would have been futile because he believed any reasonable counsel would have ultimately also sought to introduce evidence of a diagnosis of autism, to which Dylann objected. However, at that point, the Court did not (and could not have) understand the damage done by trial counsel's dishonesty.

125

Trial counsel made myriad recommendations during jury selection, objections, introductions of motions, and offering other evidence, but Dylann was unwilling to trust that his appointed counsel would honestly discuss with him or would give him frank advice not based on some ulterior agenda. This concern was created and then exacerbated by counsel's repeated failures to be honest with Dylann. It is also untrue, as counsel seemed to believe, that Dylann's only sentencing defense would be evidence of autism or other mental health evidence. But the irreparable relationship breakdown meant Dylann could not trust his attorneys to present *any* defense. If non-conflicted counsel had been appointed,

would have presented evidence like that presented in the prejudice section, and would have requested more time from this Court to prepare. However, Dylann need not demonstrate prejudice because this is based on a total and complete denial of trial counsel that Dylann could trust. As such, prejudice is presumed.

Though this is a single defendant case (unlike in *Holloway*), it is the Court's conduct and its failure to act which make *Holloway* applicable to the case at hand. That the Supreme Court has not had the occasion to apply *Holloway* to a case under these circumstances, where there is a single defendant, is not dispositive to the issue in this instance: The Court failed to conduct a constitutionally adequate searching inquiry into a conflict despite receiving repeated warnings of the conflict. The government's arguments to limit *Holloway* should be rejected.

### D. The Government Mischaracterizes The Claim To Assert That Dylann's Waiver Of Counsel Bars This Argument.

The government asserts that Dylann's decision to represent himself bars relief on Claim 6, claiming that his waiver of counsel was voluntary and that he cannot complain he was constructively denied counsel during the proceedings. Resp. at 222. In doing so, the government misconstrues the claim, which is fundamentally about trial counsel's dishonesty leading to a

126

breakdown in the attorney-client relationship and counsel's subsequent refusal to withdraw or seek substitute, conflict-free counsel. The government further mischaracterizes the issue by claiming that Dylann's invocation of *Faretta* was not involuntary just "because he could not agree with counsel's tactics" regarding the presentation of mental health evidence. Resp. at 223. This case involves a breakdown in the adversarial process on account of counsel's dishonesty and the complete lack of trust, not a simple disagreement on tactics.

The complete breakdown in the attorney-client relationship forced Dylann into the untenable position of choosing between counsel he could not trust or work with, or self-representation. The government's assertion that Dylann cannot relitigate the voluntariness of waiving counsel is a distraction. The issue raised here was not, in fact, raised on direct appeal. Even if it were, that would not bar additional review of the claim in light of new facts and additional information. Certainly a choice cannot be knowing and voluntary where it is made due to manipulation and misconduct by a defendant's attorney. *See, e.g.*, *United States v. Glover*, 8 F.4th 239, 248 (4th Cir. 2021) (finding defendant's plea involuntary where conflict of interest was plain in light of attorney's misconduct).

But the key point here is that because of counsel's deception and failure to recognize the broken relationship, Dylann was placed in an impossible Hobson's choice: to proceed with counsel compromised in their honesty and trustworthiness, or to proceed pro se (with such compromised counsel as stand-by counsel). And Dylann's reluctant decision to bring counsel back for the guilt phase does not negate the deep-seated conflict that positioned counsel as Dylann's adversaries, not his advocates; it reflects Dylann's struggles to carry out basic trial tasks during jury selection. *See* Claim 3. In turn, it is not surprising that Dylann decided to once

127

again forgo counsel at the penalty phase—and sit silently through that part of trial—to avoid the very arguments his counsel insisted upon, and which brought about the conflict in the first place.

New facts presented in Dylann's § 2255 show that when Dylann confronted Mr. Bruck about the purpose of the mental health evaluations, Mr. Bruck misled Dylann and provided an answer that would "satisfy" Dylann. Ex. 5 (Bruck Dec.) ¶ 21. Mr. Bruck nonetheless told Dylann that he "predicted that we would not say that he had autism, but we just had to explore everything." *Id.* ¶ 21. And though, as the government repeatedly asserts, counsel expressed some "hope" at the time of trial that the relationship could be repaired, lead counsel now unequivocally acknowledges that counsel "did not have time to work with [Dylann] to repair the damage to our relationship." Ex. 5 (Bruck Dec.) ¶ 27. This claim is not barred. Rather, it merits relief. In the alternative it requires discovery and a hearing for the Court to reach the merits of this claim in light of new evidence.

128

**CLAIM 7:     The Complete Lack Of Mitigation Evidence During The Penalty Phase Violated Dylann's Constitutional Rights.**

For the government, which is seeking to execute Dylann, no amount of mitigation would have ever been persuasive. Not Dylann's mother begging for her son's life; not the dozens of people that would have testified to how much they loved and cared for Dylann; not the evidence making clear that Dylann was a model prisoner, who could have been incarcerated for life safely and securely; and not information about how the combination of near-total isolation, anxiety, and neurodevelopmental disorders laid the groundwork for the crime he committed. But the government's self-serving skepticism about the power of mitigation cannot be a substitute for the much more reasonable standard that governs this case. "In a system . . . where only a unanimous jury may impose the death penalty, the question is [simply] whether it's 'reasonably probable that at least *one juror* would have struck a different balance.'" *United States v. Barrett*, 985 F.3d 1203, 1221 (10th Cir. 2021) (quoting *Wiggins*, 539 U.S. at 537) (emphasis added). Given the wealth of available mitigating evidence—none of which was presented—it is reasonably probable that at least one juror would have voted for life. Due to trial counsel's ineffectiveness, however, the jury was instead left with nothing about whether Dylann was a person deserving of life. Their sentence was but a mere reflection of that nothingness.

**A. The Supreme Court Has Always Emphasized The Importance Of A Balanced Penalty Phase That Includes Mitigation.**

Since the reinstatement of the death penalty, the Supreme Court has made clear that "the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). This is because "death is qualitatively different from a sentence of imprisonment, however long," and that requires a "corresponding

129

difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Id.* at 305.

A bedrock principle underpinning capital sentencing proceedings is the Supreme Court's "firmly established" understanding that juries not only be presented with mitigating evidence but that they "must be able to give *meaningful consideration and effect* to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007). With this in mind, the Supreme Court has always envisioned a penalty phase where juries are provided with sufficient information not just about the crime, but about the individual who committed it. Where the jury hears only the exceedingly aggravating circumstances of an offense and absolutely no mitigating information about the accused individual, there can be no reliable assurance that death is the appropriate sentence. *See Woodson*, 428 U.S. at 305.

## B. Trial Counsel's Unreasonable And Ineffective Conduct Left The Jury Without Any Mitigating Evidence About Dylann's Life.

Dylann did not want a death sentence. Prior to trial counsel unreasonably destroying their relationship with him, Dylann never expressed that he wanted no defense at all or that he just wanted to die. The government's effort to suggest otherwise is simply unavailing. Dylann's aversion to presenting evidence of autism does not mean he was closed off to *all* mitigating evidence. Indeed, Dylann worked with his lawyers for months in preparation for trial with the understanding that there would be a defense during the penalty phase. He objected to a particular version of mitigation that was laid out by his lawyers, whose dishonesty prevented the team from achieving full consensus about an appropriate mitigation defense. Had trial counsel not forced

130

Dylann to self-represent, he would have allowed them to present the dozens of witnesses that would have told the jury who he was as an individual and why he deserved a chance to live.

Dylann's lawyers spent "months [discussing] mitigation evidence" and they "had no reason to think Dylann would not let [them] present general mitigation evidence to tell the story of his life." Ex. 10 (Pennington Dec.) ¶ 13. "At one point Dylann even [communicated] that he would let [trial counsel] put on evidence about psychosis." Ex. 6 (Stevens Dec.) ¶ 31. Although he opposed evidence of autism, trial counsel knew "there was important [mitigation] evidence that the jury needed to hear and that Dylann would [have] allow[ed]." *Id*. Up until they wrecked their relationship with Dylann, the team was "confident" that he "would have allowed other [mitigation]." Ex. 11 (McGuire Dec.) ¶ 12. Even when Dylann saw the team actively conducting their mitigation investigation, he never attempted to interfere with the interviews. Ex. 12 (Norris Dec.) ¶ 30. In fact, "[h]e was interested in what [the team] learned from [them]." *Id*.

The government hopes that the words of an angry and betrayed twenty-two-year-old will distract from the obvious: trial counsel destroyed their relationship with Dylann and then doubled down by refusing to consider the available mitigation beyond evidence of autism. Dylann's words in the courtroom regarding what he did or did not want for purposes of mitigation require context. As explained, prior to Dylann's learning that his lawyers had been lying to him about their mitigation plan, he shared a working relationship with them and was prepared to allow them to present a mitigation case. Anything Dylann said to the contrary was only *after* he discovered the lies. At that point, Dylann could no longer trust his attorneys and had no reason to believe that any mitigation presented to the jury would not include evidence of autism—which was the core of his objection. Additionally, trial counsel did not discuss with Dylann the possibility of presenting alternative mitigation. *See* Ex. 5 (Bruck Dec.) ¶ 49. This left

131

him with the false impression that he either had to allow evidence of autism or no mitigation at all. When trial counsel made a last-minute, haphazard, attempt to get the Court to introduce mitigation witnesses, they did so without any consultation with Dylann. When trial counsel made a last minute, haphazard, attempt to get the Court to introduce mitigation witnesses, they did so without consulting Dylann. Tr. 01/09/17 at 770-72. The Court admonished trial counsel, reminding them that Dylann was representing himself, and struck the motion requesting that it call mitigation witnesses. *Id*. Prior to striking the motion, the Court asked Dylann if he agreed with that course of action. *Id*. at 772. As Mr. Bruck tried to interject, Dylann agreed that the Court should strike the motion. *Id*. Without any discussion with Dylann about these witnesses and with the trust between the counsel and Dylann nonexistent, the response from the Court and from Dylann surprised no one.

Trial counsel's ineffectiveness and insistence on wrecking the attorney-client relationship infected every decision Dylann was making. Unable to trust the few people he thought had his best interest in mind, and struggling with significant neurodevelopmental disorders, Dylann could not bring himself to call even Father Parker as a witness. Dylann did not call Father Parker because he would not commit to testifying that Dylann did not exhibit any symptoms of mental illness. The absurdity of this, of course, is that Dylann could have called Father Parker and simply not elicited any information about mental illness. Certainly, the government had no incentive to bring out any sympathetic evidence regarding Dylann's mental health. Despite there being no reasonable likelihood that evidence of mental illness would come up, Dylann did not call Father Parker. Not only does this demonstrate how deeply Dylann mistrusted everyone but also his profound inability to understand and consider the process and situation he was in.

132

The government claims that trial counsel's pursuit of presenting mental health evidence was reasonable given the aggravated nature of the offense. But this is precisely why trial counsel's decisions were *unreasonable*. Trial counsel understood that the case involved particularly aggravating facts and that the jury needed to hear as much mitigating evidence as possible. They understood what trial would look like if Dylann, a shy and nervous 22-year-old, represented himself. And they understood the consequence of pursuing evidence of autism at the risk of presenting no mitigation whatsoever.

Given the circumstances, the only reasonable course of action was to present the alternative mitigation that Dylann would have allowed. At least two of his federal attorneys—Kimberly Stevens and Sarah Gannett—were convinced of this and believed that the team should have continued to represent Dylann and present mitigation evidence that did not include autism. *See* Ex. 6 (Stevens Dec.) ¶¶ 31-32; Ex. 71 (Gannett Dec.) ¶ 54. The team, however, did not even discuss with Dylann what mitigation he was open to presenting after the rupture in their relationship. They just simply assumed he would not allow any of it. Tr. 11/07/16 at 32.

The government continues their attempt to blame Dylann for the disastrous sequence of events that culminated with the jury learning nothing about him. In doing so, they ignore the fundamental problem: Dylann, a twenty-two-year-old with neurodevelopmental disorders and severe anxiety was simply out of his depth and unequipped to represent himself in a case where the United States Government brought all their might with the goal of killing him. *See* Claim 3. Despite the government's claims, the reality remains that because of trial counsel's ineffective assistance, this "was not a confrontation between adversaries in which any reasonable person can have confidence." *United States v. Ragin*, 820 F.3d 609, 624 (4th Cir. 2016).

133

**C. There Is A Reasonable Probability Of A Different Outcome Had The Jury Heard The Available Mitigation.**

Contrary to trial counsel's assumptions that Dylann would not allow any mitigation, there was an abundance of mitigation evidence that the jury could have learned about and that Dylann would have let them present. The jury could have heard from an expert witness, Dr. James Austin, who would have contextualized Dylann's pre-trial model behavior and explained why this, along with several other factors, meant he could be sentenced to life imprisonment without posing any future danger. *See* Ex. 21 (Austin Dec.). Dr. Austin would have also described how Dylann's imprisonment and interactions with the outside world would be severely restricted. This was an important consideration for the jury, yet they did not hear a word of it.

It was also important for the jury to hear evidence that humanized Dylann as more than his worst conduct—for them to understand that his life indeed had value and purpose. To that end, Dylann's mother and grandparents would have told the jury how much they loved him and what he meant to them. Dylann's mom would have testified about how excited she was when she found out she was pregnant; how she had to kiss Dylann three times every night before he went to sleep; and how much Dylann loved his grandparents and wanted to be like his father. *See* Ex. 38 (Roof Dec.).

Dylann's grandfather, a respected attorney, would have also been a powerful mitigation witness. His sincerity and genuine love for Dylann would have resonated with the jury. *See* Ex. 9 (Vann Dec.) ¶ 21; Ex. 7 (Paavola Dec.) ¶ 10. Similarly, Dylann's grandmother would have made a compelling case for saving Dylann's life. *See* Ex. 9 (Vann Dec.) ¶ 22; Ex. 38 (Roof Dec.) ¶¶ 9, 28.

Teachers would have provided a window into Dylann's childhood. They would have talked about a child who was incredibly shy and quiet, but also so sweet that a vice principal

134

would have adopted him. *See* Ex. 39 (Livingston Dec.) ¶ 4.

And it was also important for jurors to understand Dylann's challenges. Additional witnesses and experts would have told the jury the impact of Dylann's near-total isolation during his teenaged years, when he barely came out of his room to eat, coupled with his anxiety and undeveloped brain.

In the end, the jury could have heard from numerous experts and "roughly 80 witnesses that could have testified and developed substantial mitigation." Ex. 6 (Stevens Dec.) ¶ 31. Trial counsel's ineffectiveness, however, resulted in the jury not hearing from a *single* witness on behalf of Dylann. In this case particularly, "[a]ny mitigation at all would have been better than what the jury heard, which was nothing." Ex. 71 (Gannett Dec.) ¶ 54. Despite having a clear understanding of what was at stake, they pushed an unreasonable and unworkable plan until they forced Dylann to represent himself.

Only one juror needed to vote for life. Given that the jury heard zero mitigating information, it is more than reasonably probable that if the jury heard any of the available mitigating evidence, at least one would have arrived at a different conclusion.

135

**CLAIM 8:     Dylann Was Not Present During Substantive Court Proceedings, In Violation Of His Fifth And Sixth Amendment Constitutional Rights.**

The government's response emphasizes an obvious point: a defendant does not have the right to be present at *every* hearing regardless of topic. While accurate, this does not resolve the question of whether Dylann had the right to attend the hearings at issue. He did.

The government repeatedly—and incorrectly—asserts that the hearings "did not involve any substantive matters"; that "no matters were discussed that related to the ultimate issues"; and that the hearings "had nothing to do with any substantive issue." Resp. at 248-49. To dismiss these hearings as merely "administrative" and inconsequential is simply disingenuous. In fact, one of the hearings included testimony from several victims' family members who later testified at the penalty phase. *See* Tr. 11/17/16 at 3 (Dkt. No. 638 (minute entry); Dkt. No. 988 (transcript)). At a separate hearing, the Court and trial counsel discussed "which witnesses would be called during the competency hearing." Resp. at 249; *see also* Tr. 11/18/16 at 2 (Dkt. No. 991 (transcript)). Contrary to the government's assertions, the selection of witnesses for a hearing about Dylann's mental status is intimately related to substantive issues in the case. Similarly, the importance of having access to testimony from central penalty phase witnesses cannot be overstated. And, indeed, in these hearings, counsel shared information about Dylann's mental health, which was Dylann's primary concern and the source of his ongoing conflict with trial counsel.[46]

---

[46] The cases the government cites do nothing to rebut the point that Dylann had the right to be present when witnesses were testifying and his mental health was being discussed. They are inapposite.

In *Black v. Goord*, 419 F. Supp. 2d 365 (W.D.N.Y. 2006), the defendant was present for the hearing—his arraignment—but the conversation at issue took place as a "side-bar discussion at arraignment." *Black*, 419 F. Supp. 2d at 373. In the courtroom just prior to the arraignment, the prosecutor informed the court that "there might be a conflict of interest with the public defender's office because several witnesses to the crime, including Robert Carlos, also were represented by that office." *Black*, 419 F. Supp. 2d at 373. Black's argument was that if he had been present for

More broadly, the government fails to acknowledge that these hearings occurred as the relationship between Dylann and his lawyers was imploding. *See, e.g.*, Ex. 12 (Norris Dec.) ¶ 18. The team had badly damaged their relationship with Dylann by giving him inaccurate and incomplete information about their investigation and plans for presenting mental health evidence. *See, e.g.*, Ex. 5 (Bruck Dec.) ¶¶ 21, 47; Ex. 11 (McGuire Dec.) ¶ 9; Ex. 10 (Pennington Dec.) ¶ 8. Eventually, when the government's expert revealed Dylann's lawyers' deceit, Dylann lost all

---

the sidebar discussion, he could have confirmed that Robert Carlos was represented by the public defender. The court held that Black's right to be present at the sidebar was not violated just because Black knew who represented Carlos, because "[c]ertainly, the public defender's office and the court would have been remiss if they had resolved the conflict of interest issue based solely on petitioner's say-so." *Black*, 419 F. Supp. at 374.

In *Jean-Baptiste v. Artus*, No. 09-CV-05920, 2016 U.S. Dist. LEXIS 168087(S.D.N.Y. Dec. 6, 2016), the hearing about disqualification took place in a separate case: "at a pretrial proceeding for an unrelated case against an individual named Ali Grant, attorney Weiss informed the court that his representation of Grant presented a conflict of interest with respect to his representation of Jean-Baptiste, because Grant intended to cooperate in Jean-Baptiste's prosecution to try to secure a reduced sentence." *Jean-Baptiste*, 2016 U.S. Dist. LEXIS 168087, at *2-3. At that hearing (in Grant's case) the court determined that the conflict was not waivable and informed Weiss that he could not represent Jean-Baptiste, either. At a hearing in Jean-Baptiste's case, the court simply ruled that Weiss was disqualified and appointed new counsel. Jean-Baptiste, U.S. Dist. LEXIS 168087, at *3. So while the government summarizes the holding as "defendant did not have a right to be present at a hearing on whether defense counsel should be disqualified for a conflict of interest," Resp. at 247, in fact, the holding is that Jean-Baptiste did not have a right to be present at a hearing that took place *in a separate case*.

*Jackson v. Poole*, No. 06-CV-00188, 2011 U.S. Dist. LEXIS (S.D.N.Y. July 19, 2011), is about a different issue—appellate counsel's failure to obtain transcripts. In that case, the allegation was that "because appellate counsel failed to obtain transcripts of the pre-trial proceedings before Justice Scherer, Petitioner was unable to support his claims that . . . Justice Scherer denied Petitioner his right to be present at all material stages of the proceedings against him. . . ." *Jackson*, 2011 WL 4901314, at *15. The question of a defendant's right to be present at a particular hearing was not squarely before the court. The hearing in that case was a far cry from the hearings at issue in Dylann's case, but the key point is that, in *Jackson*, the question of a defendant's presence was tangential.

In *United States v. Oles*, 994 F.2d 1519 (10th Cir. 1993), "[t]he meeting involved nothing more than potential retained counsel informing the Judge that he did not intend to enter an appearance on behalf of Mrs. Oles." *Oles*, 994 at 1525. No change of counsel actually occurred, and the meeting was just to confirm that the status quo would remain in place. As such, this meeting was truly just about logistics, and not comparable to the hearings at issue in Dylann's case, where witnesses testified and counsel discussed Dylann's mental health.

137

trust in his defense team. The fragile state of the relationship required the defense team to take special care to rebuild trust with Dylann, not to discuss his mental health with the Court outside his presence. As such, excluding Dylann from these hearings without a valid waiver exacerbated his mistrust at a time when the team desperately needed to rebuild his confidence in them. Part of counsel's deficiency is in completely failing to recognize this reality—they ruined their relationship with Dylann and then at every turn made it worse, not better.

**CLAIM 9:     Despite The Government's Newfound Protestation That Charleston Was An Acceptable Venue, Trial Counsel Were Ineffective In Their Complete Failure To Investigate And Object To The Impact Of Media Saturation On The Trial.**

Before and during Dylann's trial, the city of Charleston was blanketed with statements about the crime. The city itself was a focus of these statements. "'Charleston Strong' bracelets were visible throughout the courtroom during the trial." Ex. 20 (Childs Dec.) ¶ 17. Charleston Strong flags, signs, and banners were "displayed all over the Charleston area from the time of the offense until the trial," and visible when exiting the courthouse. *Id.* There was also "hateful stuff displayed on signs on the street about Dylann." *Id.* ¶ 20. Media coverage included suggestions that: "The eyes of the nation are on Charleston to see if our justice system will respond appropriately" and "[a] death sentence is the only way to ensure that justice is served." Ex. 55 (Edelman Dec.) at 18.

The scene around the courthouse was "chaotic" and "intense." Ex. 20 (Childs Dec.) ¶ 11; Ex. 12 (Norris Dec.) ¶ 38. "Downtown the news crews were everywhere—huge vans and antennas everywhere." Ex. 20 (Childs Dec.) ¶ 19. The jury trial of Michael Slager, a white police officer charged with killing an unarmed Black man, was occurring at the state courthouse across the street from Dylann's federal trial. *Id.* ¶ 8. Because of the Slager trial, which "also generated a lot of strong feelings and significant publicity," Ex. 20 (Childs Dec.) ¶ 8, there were snipers visible upon entering the federal courthouse, Ex. 12 (Norris Dec.) ¶ 38. "[T]here was a lot going on in downtown Charleston." Ex. 20 (Childs Dec.) ¶ 8.

There is no dispute that, as the government puts it, Dylann's "crime was infamous," with effects that "reverberated nationwide." Resp. at 280. But nowhere was like Charleston. Indeed, the government has acknowledged that the "most significant impact" was in Charleston itself. *See* Dkt. No. 231 at 2.

139

Trial counsel had a duty to *at least investigate* whether their client could be tried before a local impartial jury. But lead counsel refused to heed the advice of his expert (or use common sense) to investigate the community sentiment *See* Ex. 5 (Bruck Dec.) ¶ 22 ("Our jury consultant recommended conducting a poll to understand the community sentiment in Area C, but I did not follow that recommendation. I was concerned about challenging jury selection, given the November trial date."). Counsel refused to even explore the possibility of moving for a change of venue—or at the very least, draw jurors from a state-wide pool, rather than from the epicenter of this tragedy.[47] *See* Ex. 5 (Bruck Dec.) ¶ 22 ("On June 3, 2016, we had a recommendation from our jury consultant to request more time to complete the jury questionnaire to have a better understanding of the pool's exposure to media closer in time to the trial. I did not follow this advice.").

In their response, the government attempts to argue that rushing to trial in federal court absolves counsel from the duty to investigate the possibility of a tainted jury pool, even though their jury expert repeatedly advised them to conduct this investigation. *See* Resp. at 258-60; *see also* Ex. 5 (Bruck Dec.) ¶ 22; Ex. 17 (de La Rue Dec.) ¶¶ 7, 16, 21. A decision made without any investigation can never be a reasonable, strategic decision. "Counsel in a death-penalty case has "'a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Wiggins v. Smith*, 539 U. S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 691); *see also Andrus v. Texas*, 590 U.S. 806, 814 (2020); Ex. 17 (de La Rue Dec.)

---

[47] Counsel informed the Court on July 13, 2016, that it did not "intend to move for a change of venue" and went on to assert without any factual basis, that it "[did] not expect" that a change of venue would be necessary and was "indeed [] confident" that no such motion would be necessary. Dkt. No. 249 at 2.

140

¶ 12 ("It is not possible to make informed decisions without bothering to do the work to become informed. We simply didn't do the work.").

Nor does counsel's experience render the lack of investigation unimpeachable or reasonable, as the government asserts. *See Strickland*, 466 U.S. at 681 ("Experience" is but *one* factor "relevant to deciding whether particular strategic choices are reasonable."). Despite trial counsel's experience, they ushered their client quickly to a sentence of death without first investigating whether a fair trial could be conducted in Charleston. For the government now to assert that Dylann suffered no prejudice from trial counsel's inactions—after it expressed its own concern about counsel about proceeding to trial with a venire from the Charleston area (Area C)—is ironic.

**A. Counsel's Decision To Forge Ahead With A Trial In Charleston, With Jurors From The Epicenter Of The Tragedy, And Without Any Investigation, Was Neither Strategic Nor Reasonable.**

The government argues that trial counsel's performance was not deficient because counsel made a reasonable and informed decision not to seek a change in venue or even summon an expanded jury pool, as this Court offered. It asserts that any effort to do so would have prevented trying the case in federal court first, which counsel wanted to do. *See* Resp. at 255-65. The government contends that such "strategy" must be given deference, especially in light of counsel's experience.

Their argument has no merit, as counsel's actions were uninformed, and an uninformed decision can never be strategic. *See Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002) ("Although defense counsel is empowered to make such strategic decisions, *Strickland* demands that such decisions be reasonable and informed."). The lack of investigation into venue was unreasonable and illogical. Counsel did not strategize about venue—counsel simply ignored the

141

issue, despite numerous red flags, not to mention the explicit advice of their jury consultant. Though courts have not imposed a mandatory duty on defense counsel to investigate a change in venue, this Court should do so here, given that counsel's jury expert recommended it and given the unmistakable barrage of prejudicial pretrial publicity which permeated the Charleston area.

Even if counsel's motivation was to speed the case along, investigating community sentiment would have been the purview of their jury consultant, not members of the trial team working on other issues, and she could have accomplished the task in just three to four weeks. Ex. 17 (de La Rue Dec.) ¶¶ 6, 11. The investigation would not have slowed the case down.

### 1. An uninformed strategy is no strategy at all.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland* 466 U.S. at 691. As such, counsel's conduct "is not reasonable to the extent that the choice of strategy does not rely upon either a full investigation of the law and facts.'" *Buckner v. Polk*, 453 F.3d 195, 201 (4th Cir. 2006) (*citing Strickland*, 466 U.S. at 690-91)). Counsel's actions enjoy deference only when the "strategic choices [are] made *after* thorough investigation of law and facts relevant to plausible options." *Strickland,* 466 at 690 (emphasis added).

"[C]ase law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991). "[A] decision made by counsel cannot have been tactical 'if it made no sense or was unreasonable.'" *United States v. Freeman*, 24 F.4th 320, 330 (4th Cir. 2022) (quoting *Vinson v. True*, 436 F.3d 412, 419 (4th Cir. 2006)); *United States v. Slocum*, 106 F.4th 308, 317 (4th Cir. 2024); *see also Strickland*, 466 U.S. at 690-91. Courts "are not required to condone unreasonable decisions parading under the umbrella of

142

strategy, or to fabricate tactical decisions on behalf of counsel when it appears that counsel made no strategic decision at all." *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) (internal citations and quotations omitted).

To begin with, summoning a jury pool from the epicenter of the offense without at least investigating the jury pool "made no sense." *Freeman*, 24 F.4th at 326 (quoting *Vinson*, 436 F.3d at 419). Mother Emanuel is located a mere mile from the federal courthouse. Charleston is the place where the impact of this offense was felt the strongest. Prior to trial, even the government repeatedly acknowledged this fact: "While the attack on parishioners of Mother Emanuel on June 17, 2016, affected the entire state - and indeed, the nation - its effects have been felt most strongly in and around Charleston . . . Quite naturally, Charleston-area news outlets have spent more time focused on coverage related to the attack and its consequences." Dkt. No. 194 at 2; Dkt. No. 231 at 2.

Because of this concern for potential jurors' exposure to prejudicial media and the threat that the defense would "attempt to challenge venue because the venire was only drawn from the Charleston area," the government urged that the Court draw jurors from the entire state. *See, e.g.*, Dkt. No. 194 at 2. This Court appeared to be concerned with selecting jurors from the Charleston area as well, proposing the use of a statewide pool. *See* Dkt. No. 207 at 44-45. Yet in a status conference to discuss scheduling and jury selection, counsel conceded that he did not "know what the advantage would be" of a statewide pool because he "*had not discussed or thought about the question*" of a statewide or Charleston venire. Dkt. No. 207 at 44 (emphasis added). Still, even after the government and the Court raised the issue, counsel did nothing to investigate. Nor did counsel investigate even after their own expert was retained and urged them to.

143

Concerned about the incessant media coverage and the deep impact of the offenses on the Charleston community, the defense's expert—an attorney and jury consultant with over thirty years' experience who has worked on many high profile capital cases in state and federal courts—advised counsel of likely bias within the area and the need for a community survey to gauge public sentiment. *See* Ex. 17 (de La Rue Dec.) ¶¶ 1, 6-7. But even as the case progressed, the indicia of prejudice to the jury pool continued to manifest and the jury consultant continued to note glaring red flags, but trial counsel took no action to investigate. Counsel himself confessed he was aware of the "community bias" and "had concerns about pretrial publicity," especially after Dylann's "manifesto" was leaked to the press and the *Slager* trial commenced. Ex. 5 (Bruck Dec.) ¶ 23. Yet counsel forged ahead to trial—without conducting the necessary investigation, without requesting either an interdistrict or an intradistrict transfer, and without summoning jurors from a state-wide pool (which the government favored and the Court offered).[48] Ex. 5 (Bruck Dec.) ¶ 22.

In sum, the government raised concerns about convening a jury from the epicenter of the tragedy; the Court indicated it had concerns with selecting a jury from the Charleston area; counsel's expert recommended researching the jury pool; and lead counsel was himself aware of the troubling press coverage following Dylann's leaked "manifesto." Yet counsel conducted no investigation.

---

[48] Specifically, the Court said: "I've talked to a lot of folks, my jury coordinator for the district, [], has been talking to folks around the country about jury selection procedures in capital cases . . . A couple ideas I have right now . . . I would use a statewide venire, unless somebody tells me that's a bad idea." Dkt. No. 207 at 10. Later on when discussing jury selection procedures during the same colloquy, the Court again proposed a statewide venire and proposed moving the trial to another courthouse in Columbia, South Carolina. *See* Dkt. No. 207 at 11-12.

144

Ignoring expert advice and failing to conduct *any* investigation of the venue issue, despite red flags, is not strategic. It is axiomatic that "[a]n uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at all." *Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008); *Cf. Strickland*, 466 U.S. at 690-91.

### 2. Experience cannot shield counsel's ineffectiveness

In an about face, the government now professes that prejudicial media was of no concern in Charleston at the time of trial. The government wishes to excuse counsel's ineffectiveness by relying on trial counsel's experience. The government speculates that counsel rushed to trial in federal court based on the premise that a federal death sentence was favorable to a state death sentence—and that this "fact" was "certainly" known to "an experienced South Carolina defender" like counsel.[49] *See* Resp. at 259-60. But that is wholly irrelevant to whether counsel has a duty to investigate. He did. An opinion survey could have been completed in "three or four weeks" and "[b]etween July 2016 and November 2016, there certainly would have been enough time to do an opinion survey, both in the trial venue and other potential venues for comparison." Ex. 17 (de La Rue Dec.) ¶ 11. This process would not have taken time away from other trial preparations but could have been conducted by the retained jury consultant while the trial lawyers continued their other preparations. And without completing this process, trial counsel could not and did not make an informed strategic decision about whether to proceed to trial with a Charleston jury.

---

[49] Notwithstanding the unprecedented facts and circumstances of this case, Dylann's case was Mr. Bruck's first federal capital trial in South Carolina. In terms of his state capital trial experience, Mr. Bruck's last South Carolina trial had been a decade before the case at hand and was non-capital.

145

Counsel's concern about a November trial date does not usurp his constitutional obligation to provide competent representation. When a defendant's life is at stake, more is certainly owed by counsel. *Cf. Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) ("[T]he penalty of death is qualitatively different.").

The government argues that counsel is, in essence, immune from any possibility of ineffectiveness based on his experience as a tenured capital litigator. It is well established that inexperience alone is insufficient to warrant a finding of ineffectiveness. *See Cronic* (rejecting ineffective assistance of counsel claim involving "inexperienced counsel"). By the same token, experience alone is insufficient to insulate one from a finding of ineffectiveness. Courts must focus on the actual performance of counsel under the totality of the circumstances: "In considering a claim of ineffective assistance of counsel, it is not the experience of the attorney that is evaluated, but rather, his performance." *LaGrand v. Stewart,* 133 F.3d 1253, 1275 (9th Cir. 1998); *see also Strickland*, 466 U.S. at 690. Just as inexperience does not automatically equate to ineffectiveness, experience alone does not absolve counsel from making reasonable, informed decisions based on necessary investigation.

And while this was not counsel's first trial, it was unlike any trial he (or any other lawyer) had ever handled. The case involved the murder of nine innocent Black parishioners by a young white outsider, inside a revered and prestigious African-American institution, where jurors would hear race-based motivations for the crime, (e.g. he "had to do it" because "[B]lack people are killing white people every day.") and had to bear the burden of going back to a community where the barrage of media coverage "equated justice with execution and . . . a life sentence as a failure of the justice system." Ex. 55 (Edelman Dec.) at 18; Dkt. No. 266-1 at 11. Indeed, the sitting President of the United States offered the eulogy for Rev. Pinkney in front of thousands of

146

people. Public sentiment following the crime conceptualized it partly as an attack on the Charleston community—the flags, signs, and banners that could be seen everywhere around town bore the slogan "Charleston strong," not the name of the church or specific victims. Given the unprecedented facts, complexity, and circumstances of this case, there is no possibility that counsel's experience alone was sufficient to make a judgment about venue without any research or investigation. Counsel is not entitled to a heightened standard of deference because of the notches on his belt.

Specifically, the government's reliance on *Parnell* to indicate that counsel's experience absolves him from the responsibility to make informed decisions is misplaced. In *Parnell*, the Court held counsel's decision not to pursue a change of venue was "a carefully conceived and thoroughly thought-out strategic decision . . . after a full investigation." *Parnell v. United States,* 149 F. 4th 1268, 1290 (11th Cir. 2025). Venue was a "constant topic of conversation" among the legal team of six attorneys. *Id.* at 1281. They gave "a lot of time and thought" to their decision"—they tracked the media coverage, finding nothing of concern, and they assessed the sentiment of the community, hiring an investigator to speak to community members. *Id*. at 1279-81. Parnell's counsel themselves repeatedly spoke to community members, with one attorney actually relocating to the town so as to "absorb[ ] the people and . . . what they had to say." *Id.* at 1281. They scoured social media. *Id.* They conducted legal research. *Id.* at 1284. With all of that information in hand, given their defense strategy, they *all* ultimately concluded a change of venue was not in the "best interests" of their client. *Id.* at 1281-83. While those attorneys were experienced, the mere fact of their experience is not what made their decision strategic and reasonable. Rather, they brought their experience to bear, thoroughly investigating the community sentiment. In *Parnell*, experience was not some freestanding factor that made

147

counsel adequate. It was a feature of a legal team that conducted a thorough investigation. Here, despite experience, counsel did not investigate. Certainly experience should have *prevented* that enormous error, but it did not, and no amount of experience can make up for it.

Thus, the touchstone principle that emerges from *Parnell* is that counsel—be they experienced or not— must investigate in order to make a "thoroughly thought-out" strategic decision. *Parnell*, 149 F.4th at 1290. Such decisions are "virtually unchallengeable," as the government correctly points out. But no such decision was made here. Here, lead counsel "was uninterested in pursuing the issue," "did not follow [the] advice" of the jury consultant he retained," and "did not conduct[] any research related to" or even "consider" a transfer in venue. Ex. 17 (de La Rue Dec.) ¶ 21; Ex 5 (Bruck Dec.) ¶ 22.

Nor does counsel's alleged experience with the issue of venue in United States v. Tsarnaev[50] exculpate counsel for failing to investigate and move for one in Dylann's case. The government appears to insinuate that because the court denied multiple venue motions in Tsarnaev, where Mr. Bruck was co-counsel alongside lead counsel Judy Clarke, it was reasonable to forgo investigating the merits of pursuing a similar course here. To the contrary, it makes counsel's failure to do so here even more glaring and unreasonable.[51]

---

[50] The defendant there was charged with crimes related to the Boston Marathon bombing in 2013.

[51] Counsel was still finishing his representation of Mr. Tsarnaev when the crimes in this case occurred. Similar to the case at hand, it was yet another demanding, high-profile and complex federal death case. Counsel admitted he was "hesitant to take another federal capital case so soon," given that he was assigned by the Court while finishing his representation of Mr. Tsarnaev. Indeed, his co-counsel, another tenured death case attorney, Judy Clarke, advised counsel "not to take on Dylann's case," but he did not heed the advice. Ex. 5 (Bruck Dec.) ¶ 4. Given the government's speculation regarding reasonableness of counsel's actions as to this claim and his "familiari[ty] with the process for seeking a change in venue" and his "reasons why such an approach may or may not be preferable," despite any factual basis to assert such, Dylann is entitled to a hearing.

**3. The government supplies strategic reasons of their own invention with no basis in fact or reality.**

The government suggests it was a strategic decision to proceed quicky to trial in federal court because it was supposedly a preferred venue over state court. First, the government is not entitled to invent strategic reasons. Secondly, the government's invented strategic reason is based on inaccurate facts and is nonsensical.[52] Finally, even if were true, this could not justify failing to investigate at all whether *this case* could be fairly tried in light of overwhelming media coverage and community sentiment. Counsel, despite his experience, made no strategic decision because he conducted no venue-related investigation, despite the expert's recommendation, many red flags, and the saturation of prejudicial pretrial publicity. "Deference is due to [counsel's]

---

[52] The government cites the higher number of death sentences and executions at the state level compared to the federal level as evidence that federal court was the preferable venue. Resp. at 260.

This is by no means a sound comparison. The sheer number of state capital prosecutions is exponentially higher than federal prosecutions. Indeed, based on data from 1995 to 2007, South Carolina solicitors sought death in 226 cases, or an average of 17.4 cases per year. See Ex. 242 (Eighth Amendment Handbook) at 34. Whereas, in the nearly three decades between the reinstatement of the federal death penalty in 1988 and 2015, only *three* notices of intent were filed in the District of South Carolina. See Ex. 243 (Notices of Intent- Federal Death Penalty Resource Counsel). And of those three cases that were charged capitally in federal court, each proceeded to trial, with two resulting in a death sentence. *See* United States v. Fulks et al., No. 4:02-DR-00992 (D.S.C.); United States v. Hans, No. 6:10-CV-70247 (D.S.C.).Thus, no sound inference can be drawn.

The government also intimates that counsel, because of his experience practicing in South Carolina, knew that jurors from the Charleston area were preferable to jurors from other parts of the state. *See* Resp. at 261. In support of this "fact," the Government notes that "[o]f the 22 capital sentences handed down in South Carolina in the years preceding the defendant's crime (2006-2015), only four of them came from . . . Area C." Resp. at 261. The government, however, fails to cite how many cases were actually charged and tried capitally in the Charleston area or in the other counties. Without this data, these numbers are meaningless.

'strategic decision' only if the evidence indicates that he made one." *Chandler v. United States*, 218 F.3d 1305, 1349 n.12 (11th Cir. 2000). Here, counsel did not make one.

## B. Dylann Was Prejudiced by Trial Counsel's Failures.

Dylann was prejudiced by counsel's failure to investigate venue and make appropriate motions based on a thorough (or any) investigation because "[b]ut for counsel's failure to move the court for a change of venue, the result of the proceeding would have been different." *Meeks v. Moore*, 216 F.3d 951, 961 (11th Cir. 2000). In turn, Dylann must demonstrate that the trial court would have or should have granted a change of venue motion. *Id.* A reasonable probability of a different outcome is not, as the government argues, that Dylann would get a life sentence. A reasonable probability of a different outcome here means showing that the trial court would have or should have granted a change of venue motion, which in turn requires a showing of presumed or actual prejudice. When a trial court considers a transfer, it must "consider first whether pretrial publicity was so extreme as to give rise to a presumption of prejudice" and "[i]f there is no presumption of prejudice, the court must then consider whether the publicity caused the defendant actual prejudice." *United States v. Banks*, -- F.4th --, 2025 U.S. App. LEXIS 3659, *11-12 (4th Cir. Feb. 18, 2025) (quoting *United States v. Taylor*, 942 F.3d 205, 223 (4th Cir. 2019)). Dylann has demonstrated both presumed and actual prejudice.

### 1. Before trial, the government itself expressed concern that Dylann would be unfairly prejudiced by a trial in Charleston.

When "a degree of inflammatory publicity ha[s] so saturated the community such as to make it virtually impossible to obtain an impartial jury," prejudice is presumed. *United States v. Casellas-Toro*, 807 F.3d 380, 386 (1st Cir. 2015) (quoting *United States v. Misla-Aldarondo*, 478 F.3d 52, 58 (1st Cir. 2007)) (citing *United States v. Skilling*, 561 U.S. 358, 381-84 (2010)). Under

150

such circumstances, the failure to change venue violates due process. *See Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1962).

Months before trial, the government acknowledged that a Charleston-area jury would judge this case differently than any other jury. Prior to trial, the government urged this Court to use a state-wide venire. Dkt. No. 231. It wrote to the Court: "*The Charleston area, as compared to the rest of the district, has particularly felt the effects of Roof's attack.*" Dkt. No. 231 at 3 (emphasis added).

The government further explained:

Quite naturally, Charleston-area news outlets have spent more time focused on coverage related to the attack and its consequences. Moreover, most of the parishioners who were murdered and those who survived Roof's attack, as well as others directly impacted by Roof's crimes, have strong ties to the Charleston area. As a result of both the degree of publicity and the potential for a personal relationship with an individual substantially impacted by the attack, a jury venire from Area C likely will have a higher proportion of individuals whose personal situation may lead to the conclusion that they could not set aside their own experiences to be a fair and impartial juror.

Dkt. No. 231 at 3.

The government asked the Court to "utilize a district-wide venire now to insulate this case from a later venue challenge." *Id.* at 3; *see also* Dkt. No. 194 at 2 (similarly requesting that the Court utilize a state-wide venire to "help mitigate" potential issues if the case is tried "in Charleston before a Charleston-area jury"). The implication was clear: Dylann's right "to a public trial, by an impartial jury'" would otherwise be violated. *See* Dkt. No. 194 at 2 n.1.

The government admits that had counsel moved for a change of venue, "there is every reason to believe that the Court would have reverted . . . to us[ing] a statewide venire." Resp. at 269. Even the government saw that Dylann's right to a fair trial by an impartial jury was in jeopardy, given the saturation of prejudicial media.

151

**2. A presumption of prejudice applies to Dylann's case.**

In *Skilling v. United States*, the Supreme Court outlined several factors relevant to determining whether a presumption of prejudice applies. *Skilling,* 561 U.S at 379, 382-84. Dylann does not assert that the factors examined by the Court in *Skilling* are an exclusive or exhaustive list, contrary to the government's characterization of his arguments. The *Skilling* Court "weigh[ed] the four factors together to determine whether in the *Skilling* case itself a presumption of jury prejudice had been established. *Parnell*, 149 F.4th at 1278. Here, Dylann asks this Court to do no different.

Nor is Dylann arguing, as the government suggests, that "juror exposure to media coverage by itself establish[es] that a defendant was deprived of a fair trial." *See* Resp. at 270 (quoting *United States v. Taylor*, 942 F.3d 205, 222 (4th Cir. 2019)).[53] Rather, the nature and extent of the media coverage is critical. *See Rideau*, 373 U.S. at 726-27; *Skilling*, 561 U.S. at 382-83. Here, there was a relentless stream of prejudicial media. Dr. Edelman's research shows that the community was bombarded with highly "emotionally charged" media coverage.[54] Ex. 55 (Edelman Dec.) at 3. Coverage filled with language "evok[ing] fear, disgust, and anger" toward Dylann. *Id.* And coverage that demanded jurors reach the "correct verdict"—a sentence of death. Ex. 55 (Edelman Dec.) at 18, 31. The unyielding and inflammatory nature of the media in the

---

[53] In *Taylor*, the Fourth Circuit's review of *three* newspaper articles "reveal[ed] they were predominately factual . . . nor did the articles contain 'inflammatory information' that 'depicted [defendant] as an evil man.'" *Taylor*, 942 F.3d at 223 (quoting *United States* v. *Gray*, 788 F.2d 1031, 1033 (4th Cir. 1986).

[54] In its Response, the government takes aim at the reliability of Dr. Edelman's research and his credibility. The defense will gladly provide the government with the approximately 2,600 pages of news media collected by Dr. Edelman if this Court orders discovery. Moreover, given the government's allegations with respect to Dr. Edelman's credibility, Dylann is entitled to a hearing. The Court cannot make findings regarding credibility without a hearing and testimony from Dr. Edelman.

Charleston area warrants a presumption of prejudice. *See Irvin v. Dowd*, 366 U.S. 717,725 (1961) (underscoring the "barrage of newspaper headlines, articles, cartoons and pictures [] unleashed against [defendant] during the six or seven months preceding trial" warranted a change of venue).

The presumption of prejudice is reinforced by the other *Skilling* factors—"the size and characteristics of the community," the recency of the media coverage, and the jury's verdict. *Skilling*, 561 U.S. at 382-83; *United States. v. Casellas-Toro*, 807 F.3d 380 (1st Cir. 2015) (finding prejudice presumed).

Although the government also previously acknowledged that the "size and characteristics" of the Charleston area may warrant a change of venue, it now reverses course. *Compare* Dkt. No. 231 at 4 *with* Resp. at 269. Prior to trial, the government was understandably concerned about drawing jurors from the Charleston area, given the ubiquity and intensity of the media coverage and the impact of Dylann's crime on community members. *See* Dkt. No. 231 at 3-4. The government argued "[a] district-wide venire's broader geographic scope, more varied publicity exposure, and overall characteristics" would "insulate this case from a later venue challenge." *Id.*

The government now contends that the area this Court should use to evaluate this factor is *not* the Charleston area (Area C), but the entire district of South Carolina. That is because *if* Petitioner had moved to change venue, the Court would have, at a minimum, utilized a state-wide venire. *See* Resp. at 231. It is the size and the characteristics of the community in which jurors are actually drawn, where the crime occurred, that is relevant—and that is the Charleston area (Area C). *See Skilling*, 561 U.S. at 382; Fed. Rule Civ. Pro. 18.

The government similarly misconstrues the *Skilling* factor that considers the recency of the media—that is, the time between the publication of the prejudicial media and the defendant's trial. The government claims that "[w]hile the 20 months that elapsed between Defendant's crime and his trial are less than the four plus years in *Skilling*, it is not an unreasonable time for the trial of a criminal case . . . ." Resp. at 272. The jury questionnaires were sent out in July 2016, only 13 months after the offense. Dkt. No. 254. Less than 20 months elapsed until trial. Jury selection in Dylann's case began in September 2016, 15 months after the tragedy at Mother Emannuel, with trial testimony commencing in December 2016, eighteen months after. Dkt. Nos. 254, 893.

Second, and most importantly, what was of concern to the *Skilling* Court was the prevalence of prejudicial media close to the start of trial. In *Skilling*, "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Skilling*, 561 U.S. at 383. It did not diminish here. Perhaps it would have, if four years had elapsed, as in *Skilling*. But in Dylann's case, in the 18 months between the crime and trial, if anything, media coverage only intensified as the trial drew closer. The one-year anniversary, leaking of Dylann's so-called "jailhouse manifesto" and the trial itself triggered increased media scrutiny. And media attention was then further intensified by the *Slager* trial. Prospective jurors reporting to the courthouse for individual voir dire were met with a heavy presence of media and armed security, including rooftop snipers, because of the *Slager* trial. Ex. 17 (de La Rue Dec.) ¶ 19; Ex. 12 (Norris Dec.) ¶¶ 38-39.[55] The government also insinuates that this factor should not be given consideration because the timing of Dylann's trial was "largely within [the defense's] control." *See* Resp. at

---

[55] *See also* Sam Tyson and Bill Burr, Nearly 300 sent on to next phase of jury selection in Dylann Roof's case, Fox28 Savannah (updated March 23, 2016), https://fox28savannah.com/news/nation-world/attorneys-begin-process-of-selecting-jury-in-dylann-roofs-federal-trial

154

272. But that is entirely the point: the defense was ineffective for rushing to trial with no consideration or investigation into the need for a venue change. The rush to trial only magnified the need to consider a broader or different venue because it failed to let the intense media attention on Dylann's case subside and passions diminish. As counsel's jury expert advised, "individuals [in the community] are not as intensely affected by the press that they hear or read after some time has passed." Ex. 17 (de la Rue Dec.) ¶ 18. And because of the rush, trial occurred at a time when the pretrial prejudicial publicity had not "greatly diminished," nor had the "community sentiment [] softened." *Casellas-Toro*, 807 F.3d at 389; *see also Patton v. Yount,* 467 U.S. 1025, 1029, 1032, 1034-35 (1984) (observing that time "soothes and erases" and reduces jurors' "fixed opinions"). As such, the government's argument that timing was within counsel's control does nothing to undercut Dylann's arguments. Dylann has alleged that counsel was ineffective for failing to investigate venue. That this failure was part of an unreasonable rush to trial, if anything, supports Dylann's ineffective-assistance argument.

As to the last *Skilling* factor, the jury's verdict, the government appears to argue that *Parnell* disavowed reliance on this factor. *See* Resp. at 267 n.66. This is inaccurate. *See Parnell*, 149 U.S. at 1278. As the Eleventh Circuit unequivocally stated in *Parnell*, this "supremely significant factor" may "be put in the mix . . . in . . . post-conviction proceedings." *Id.* Here, the jury's return of a death sentence—after less than three hours of deliberations— should unquestionably be "in the mix" and indicates that the jury was biased against Dylann.

Social media is another key consideration. Given technological advances, broadcast, print and electronic media have incredible power via the internet to shape and influence community opinion of a defendant accused of a horrific crime. Any member of the public can comment and share these stories, or create their own content about the crimes. The proliferation of news

155

dissemination via social media was not yet at issue in *Rideau*, a 1963 decision about a 1961 trial. *Rideau* provides the "'foundation[al] precedent' for presumed-prejudice analysis." *Casellas-Toro*, 807 F.3d at 386. That decision is about a then newly popular and influential medium: local television news. In Dylann's case, every seated juror but one disclosed that they participated in social media. Any consideration of pretrial publicity for a 2017 trial must take social media into account, just as the role of television could not be ignored in the 1960s.

In the weeks and months leading up to trial, Charleston-area media outlets reported about the case with intense fervor, not only in traditional media sources, like television and radio, but also via social media. In the years between *Skilling* and Dylann's trial, a sharp increase occurred in the number of Americans who used social media sites. In 2005, only 7% of American adults reportedly used at least one social networking site. *See* Ex. 246 (Social Media Usage: 2005-2015). That number rose to nearly 65% (or two-thirds of American adults) by 2015. *Id.* With this increase in social media usage, Americans also began to rely on social media to get their news. In 2016, the majority of Americans adults, nearly 62%, were getting their news via social media. *See* Ex. 245 (2016 Social Media Update). Two-thirds of Facebook users and nearly 60% of Twitter users (now "X"), got their news from these platforms. *See* Ex. 244 (News Use 2016).

It is readily apparent from the social media activity—by news outlet and community members at large—that this case generated an immense wave of anger. *See* Ex. 80 (P & C Facebook Page post 12-07-16) (comments from the community, including "OMG Felicia. I am so sorry. There should be a fast train to Hell for people like him."). The degree of inflammatory publicity, which Dr. Edelman's research reveals, "saturated the community such as to make it

156

virtually impossible to obtain an impartial jury." *See United States v. Misla-Aldarondo*, 478 F.3d 52, 58 (1st Cir. 2007) (internal quotations omitted).

Like *Rideau*, *Sheppard* is instructive. "Given the pervasiveness of modern communications"—referring to the rapid changes in how people consumed information taking place in the 1960s, but a prescient point that is *especially* true in the digital age—"and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused." *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966).

Nor should the mobilizing of community reaction in light of the attacks be ignored. In the wake of the shooting the Charleston community galvanized to show a deep outpouring of support for Mother Emanuel and the greater African American community. [56] "'Charleston Strong' bracelets were visible throughout the courtroom during the trial. Charleston Strong was displayed all over the Charleston area from the time of the offense until the trial. Flags were at houses and businesses and hanging from the light poles around town and the Emmanuel church. There were also yarn creations hanging on light poles (with hearts, the date, or other things signifying connection to Charleston Strong) around town." Ex. 20 (Childs Dec.) ¶ 17; *see also* Ex. 104 (P&C Facebook Comments). In light of the situation in Charleston at the time of trial,,

---

[56] The attack on Mother Emmanuel amounted to a desecration of one of the most prestigious and beloved African-American institutions in Charleston. *"*Emanuel has always been a focal point of social activity, religious activity, because churches were the only place in antebellum times where black people could assume leadership," a local historian and parishioner said. Jennifer Berry Hawes, *Emanuel AME, symbol of faith, liberty, has endured. Church at heart of tragedy a place of prayer steeped in history*, Post and Courier, June 17, 2015. The church is "one of the oldest black congregations in the South and was already culturally significant." *Id.*

157

the incredible local impact and the galvanizing community reaction should be given particular consideration. *See United States v. McVeigh*, 918 F. Supp. 1467 (D. Colo. 1996).

Dylann recognizes that a presumption of prejudice will only arise in "extreme" cases. *Skilling*, 561 U.S. at 361. This case—where signs declaring "Charleson Strong" were visible around the courthouse and bracelets declaring "Charleston Strong" were visible in the courtroom, and where at least 1,182 articles appeared in the local press between June 2015 and September 2016—is an extreme case. Ex. 55 (Edelman Dec.) at 8. As outlined here and in Dylann's motion, the *Skilling* factors or any analysis of the saturated media environment compel a presumption of prejudice in Dylann's case.

### 3. Dylann also has demonstrated actual prejudice.

Dylann has also shown actual prejudice. Actual prejudice arises when a prospective juror has formed a pretrial opinion and cannot "lay aside [their] impression or opinion and render a verdict based on the evidence presented in the court." *Irvin*, 366 U.S. at 723. The problem is that jury selection, no matter how it is conducted, cannot root out unconscious bias nor jurors that actively seek to hide their biases.

As the government concedes, prejudice can be shown where a change of venue motion would have been granted by the trial court if trial counsel had made such a motion. Resp. at 275. The trial court, in this instance, actually told counsel the Court was inclined to choose the jury from a statewide venire. At a minimum, this would have been granted. The moving party at trial would "not [be] required to show truly compelling circumstances for change of venue, but rather that all relevant things considered, the case would be better off transferred to another [division]" *United States v. Chitolie,* No. 1:09-CR-0026, 2010 U.S. LEXIS 56646, at *10-11 (D.V.I. June 8, 2010) (assessing request for intra-district transfer).

158

The government further argues that voir dire in this case satisfied any concerns about the bias present in the media saturated venue, misconstruing Dylann's claim as one that the voir dire in the case was "constitutionally deficient." Resp. at 279. This is not the claim at all. The suggestion, to the contrary, is that voir dire was *incapable* of curing such a saturation of media. Voir dire simply cannot force a fair trial in an area saturated with media exposure.

First, jurors are not always aware of their biases.[57]

Second, jurors may continue to recall their media exposure as they learn more about the case through the trial itself.

Third, jurors aim to please judges and will often agree with a judge that they will be "fair" despite deeply held beliefs to the contrary.[58]

The fact that a juror affirms their

---

[57] Unconscious bias is a deeply ingrained way of thinking that operates below conscious thought, but can be formed by social norms. Where a social norm has been accepted that Dylann is a "monster," that notion is not easily set aside. It becomes even harder, if not impossible, to set aside a bias of which one is unaware but has been absorbed over months of unrelenting media coverage.

[58] This is discussed in detail in Claim 10. Dkt. No. 1078 at 240-42.

[59]

159

impartiality is not all that matters, as the government contends, *see* Resp. at 277; rather, a "juror's protestation of impartiality" must also be believable. *Patton,* 467 U.S. at 1036; *Murphy v. Florida*, 421 U.S. 794, 800 (1975) ("[A] juror's assurances that he is equal to this task cannot be dispositive of the accused's rights."). Ascertaining juror bias is "difficult, partly because the juror may have an interest in concealing [their] own bias and partly because the juror may be unaware of it." *Smith v. Phillips*, 455 U.S. 209, 221-222 (1982) (O'Connor, J., concurring).

Fourth, jurors who are biased may seek to be dishonest and suppress their bias in order to be seated on the jury, or simply because they see that their bias is not what the judge wants to hear.[60]

Finally, jurors continue to be exposed to unrelenting media and community sentiment for the duration of the trial. Jurors in this case arrived and left the courthouse in a van that would have gone by media outlets stationed around the courthouse, signs and banners throughout town, and snipers on the roof at the courthouse intersection. *See* Ex. 20 (Childs Dec.) ¶ 18; Ex. 12 (Norris Dec.) ¶ 38. Even if jurors made every effort to put their media exposure out of their minds, it was so unrelenting that they would have been reminded of it at every turn.

Research has demonstrated the danger of the fear of community disapproval for rendering an unpopular verdict, and the limitations of voir dire to root out jurors biased by adverse publicity. *See* N. Vidmar, *Case Studies of Pre-and Midtrial Prejudice in Criminal and Civil*

161

*Litigation*, 26 L. & Hum. Behav. 73, 81-82 (2002). Further, as discussed at length in Claim 10, jurors have a desire to please the judge, often simply giving the "right" or "acceptable" answers.

The jurors in this case were convened from the epicenter of the tragedy, despite even the government suggesting that at least a statewide jury pool would be preferable. Counsel did no research into venue. An expert declaration now confirms that Charleston was saturated with media coverage and "[t]he coverage frequently equated justice with execution and rejected a life sentence as a failure of the justice system." Ex. 55 (Edelman Dec.) at 18. Dr. Edelman notes, "This type of reporting puts implicit pressure on jurors to reach the 'correct' verdict to help heal the community." *Id*. Examples of coverage include: "Roof's crimes are so depraved, so racially charged, that no punishment but death would suffice"; "The families of the victims deserve closure, and that closure can only come with a death sentence"; "The eyes of the nation are on Charleston to see if our justice system will respond appropriately"; "A death sentence is the only way to ensure that justice is served." *Id*. Juror questionnaires reveal that this coverage succeeded in convincing potential and ultimately actual jurors that a "death sentence is the only way to ensure that justice is served." *Id*. As such, Dylann was prejudiced by counsel's failure to even investigate venue and, based on what they would have learned had they investigated, seek a change in venue or at least a statewide jury pool.

162

**CLAIM 10:**

168

**CLAIM 11:     Lead Counsel David Bruck Ineffectively Cross Examined Victim Felicia Sanders, Over The Team's Opposition And To Disastrous Result, And He Failed To Timely Object, Resulting In Prejudice To Dylann.**

Felicia Sanders's statements that Dylann was "evil" and belongs in "the pit of hell" were devastating to Dylann's case. Comments about Dylann going to "hell" were elicited by Dylann's lead counsel, David Bruck, who did so three times. Mr. Bruck himself admits that Ms. Sanders's statements elicited by him on cross-examination were "damaging," "awful," and "inflammatory." Ex. 5 (Bruck Dec.) ¶ 53.

Trial counsel's performance was objectively deficient, not the result of any legitimate strategy, and the comments elicited were prejudicial.

### A. Objectively Deficient Performance

The government insists that Mr. Bruck's decisions regarding Ms. Sanders's testimony were all strategic decisions, noting Mr. Bruck had consulted with colleagues and asserting that he rejected their counsel. Resp. at 302. Even if Mr. Bruck's decision-making could be called a strategy, it was an objectively unreasonable strategy. Further, even if it were strategy to ask the question one time, it cannot be reasonable strategy to elicit such information repeatedly or to fail to timely object to such statements.

#### 1. Timing of objections.

The law is clear that Ms. Sanders's comments about Dylann being "evil" and destined for "hell" should not have been admitted as evidence. *See Humphries v. Ozmint*, 397 F.3d 206, 217 (4th Cir. 2005) (en banc) ("admitting evidence of the victims' opinions of the crime and of the appropriate sentence for the defendant violates the Eighth Amendment"); *United States v. Bernard*, 299 F.3d 467, 480 (5th Cir. 2002) (finding plain error when victims "characterize[d] the Appellants, and offer[ed] opinions about the nature of their crime"). There is "no place in a courtroom for such personal vilification of a defendant [including calling him 'evil'], no matter

172

how vile the charges against him." *Furnish v. Comm.*, 267 S.W.3d 656, 663 (Ky. 2007); *see also Cauthern v. Colson*, 736 F.3d 465, 474-78 (6th Cir. 2013) (granting habeas relief, in part, for comments calling capital defendant "evil"). The "admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." *Bosse v. Oklahoma*, 580 U.S. 1, 2 (2016). Such testimony "is irrelevant," "serve[s] no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence," and "creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Booth v. Maryland*, 482 U.S. 496, 503-08 (1987), overruled on other grounds by *Payne v. Tennessee*, 501 U.S. 808 (1991). Courts have stressed that dehumanizing comments about a capital defendant may render a trial fundamentally unfair, violating due process. *Darden v. Wainwright*, 477 U.S. 168, 179-81 (1986); *Bennett v. Stirling*, 842 F.3d 319 (4th Cir. 2016). In reviewing Dylann's case, the Fourth Circuit acknowledged that Ms. Sanders's remarks were "improper." *Roof*, 10 F.4th at 375.

Because of the clear prohibition against a witness's use of derogatory terms, Mr. Bruck should have immediately objected to Ms. Sanders's repeated statements that Dylann was "evil," so that his objections would have been timely. Instead, Mr. Bruck waited to object until the government requested a break, and even then he objected only at the end of the break, as the jury was about to return to the courtroom. Tr. 12/07/16 at 85-87. When Mr. Bruck himself elicited additional derogatory comments from Ms. Sanders, he did not object at all (other than through his motion for a mistrial). The Court repeatedly admonished Mr. Bruck about the importance of timeliness regarding these objections, and ultimately denied his objections to Ms. Sanders's statements based on lack of timeliness. *Id*. at 87; Tr. 12/08/16 at 200-01, 206, 213 ("I find both

173

objections[61] untimely, and that alone will be the basis in which to deny them"). The lack of timely objections to Ms. Sanders's direct testimony was objectively unreasonable in light of the clear position under the law that those statements were inappropriate and inadmissible.

### 2. Cross-examination.

Mr. Bruck never should have questioned Ms. Sanders on cross-examination, especially after she had already said on direct examination that Dylann was "evil." His unreasonable decision resulted in her adding (three times) that he belonged in "the pit of hell." The fact that Mr. Bruck is "an experienced and respected advocate," Resp. at 301, does not mean that—in light of extensive evidence to the contrary—his decisions should be deemed sound. Even the best of attorneys can err, and in Dylann's case, Mr. Bruck erred grievously.

Mr. Bruck himself now admits that his strategy regarding Ms. Sanders's testimony was not reasonable. He referred to his eliciting of damaging testimony from Felcia Sanders and his repetition of his questions to her as "major errors." Ex. 5 (Bruck Dec.) ¶ 53. Three defense team members had urged Mr. Bruck not to question Ms. Sanders, which is strong evidence of the unreasonableness of his decision to conduct the cross-examination. *See* Ex. 6 (Stevens Dec.) ¶ 20; Ex. 7 (Paavola Dec.) ¶ 14.

Regarding Ms. Sanders's statements that Dylann should go to "the pit of hell," this Court noted that "family members should not comment on punishment," Tr. 12/08/16 at 202, and told Mr. Bruck: "You know, if you had turned to me and said objection, I would have given a curative instruction right at that moment. I would have done it. But then you persisted." *Id*. at 206. The Court went on to say—in response to Mr. Bruck's request that Ms. Sanders's

---

[61] The objections referred to are regarding Ms. Sanders's comments on December 7, 2016, that Dylann should go to "hell" and that he was "evil." The Court's ultimate denial of these objections based on lack of timeliness were the subject of a motion for mistrial, which was filed on December 8, 2016.

174

statements be stricken (after his mistrial motion failed)—"You know, it's just kind of funny, because you elicited it." *Id*. at 209. Unfortunately, it is not at all funny in terms of the impact Mr. Bruck's errors had on Dylann.

The government contends that Mr. Bruck's handling of Ms. Sanders's testimony was part of a coherent and reasonable strategy, Resp. at 298-305, even going so far as to assert that "Mr. Bruck clearly weighed the significant risks involved in questioning Ms. Sanders before he stood to cross-examine her." *Id*. at 302. The record, however, shows that Mr. Bruck did not appear to absorb, let alone to "weigh" the advice of the three members of his team who urged him not to cross-examine Ms. Sanders or the risks involved in his decision-making. Co-counsel Kim Stevens felt that her voice was "ignored by David." Ex. 6 (Stevens Dec.) ¶ 19. Despite this, she made concerted efforts twice, once on the morning before Ms. Sanders's testimony and once at counsel table just prior to Mr. Bruck's launching into the cross-examination, to ensure that he not cross-examine Ms. Sanders. *Id*. ¶ 20. Both of her attempts to persuade him were futile. Attorney Emily Paavola noted that Mr. Bruck seemed to suffer from a significant hearing impairment. Ex. 7 (Paavola Dec.) ¶ 15. Ms. Paavola understood that Mr. Bruck was the "unofficial leader" of the entire defense team, and that he made all the crucial decisions. *Id*. ¶¶ 3, 7-8. Like Ms. Stevens, Ms. Paavola believed that Mr. Bruck should not cross-examine Ms. Sanders. *Id*. ¶¶ 14-15.

Even Mr. Bruck's own statement acknowledging his faulty choice to engage in cross-examination did not mention the strong admonitions he received from his co-counsel and the team's defense victim outreach (DVO) expert, Tammy Krause. This suggests either that he did not "weigh" the advice or perhaps that he did not even hear it. Mr. Bruck acknowledged that at the time of the trial he did not recognize that he had a significant hearing problem. Ex. 5 (Bruck Dec.) ¶ 54. This difficulty in hearing, he wrote in his declaration, is what caused him to repeat

175

the question he asked of Ms. Sanders, *Id.*, which had already elicited the response that "There's no place on earth for him except the pit of hell." Tr. 12/07/16 at 89.

**B. Ms. Sanders's Testimony Prejudiced the Trial**

Ms. Sanders's statements about Dylann being evil and belonging in the pit of hell were not only improper, they were also highly prejudicial.

Viewing Ms. Sanders's statements as "the first of [] many," Resp. at 306, does not reduce their impact. Rather, it affirms the importance of Ms. Sanders's statements, which set the tone for the entire trial, materially impacting the jury that later decided to sentence Dylann to death. The

176

government argues that Dylann must establish that "the jury would not have imposed a death sentence but for Ms. Sanders's remarks," *id.*, but provides no legal citation for this clearly incorrect premise. In fact, earlier within the very same paragraph of its response, the government acknowledges that the correct standard is whether the testimony "had *any* material effect on the jury's view of the case," *id*. at 305 (emphasis added), which it clearly

Further, Dylann's attorneys' poor performance "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Cauthern v. Colson*, 736 F.3d 465, 478 (6th Cir. 2013) (quantity of misconduct, in addition to severity, forms the basis for granting of habeas petition).

The government seems to ignore the very real impact of Ms. Sanders's testimony,

but also on the prosecution and the Court, which directed the course of the trial and sentencing. Mr. Richardson, on behalf of the government, in fact, declared in open Court before the press and victims his own belief of the destination of Dylann's eternal soul: "she was describing is if he kills himself, where he was going. *That is also where he's going if he dies of natural causes or the State does it*." Tr. 12/08/2016 at 202 (emphasis added). This is wildly inappropriate. Mr. Bruck himself admitted that the impact of his errors regarding Ms. Sanders's testimony was far-reaching:

> I was horrified when both the prosecution and the Court thereafter appeared to endorse the view that Dylann would in fact, be headed to hell. … The Court and the prosecution were making clear a moral declaration that Dylann was beyond redemption. These statements by the prosecution and the court, while made outside the presence of the jury, were made in front of unsequestered witnesses who had not yet taken the stand. This emboldened these witnesses, was widely reported in the press, and changed the mood of the proceedings. I believe that these caused

177

harm to the trial and increased the likelihood that Dylann would get the death penalty.

Ex. 5 (Bruck Dec.) ¶ 55.

## C. Testimony That Dylann Was "Evil" Demands A New Trial

Ms. Sanders's testimony that Dylann was "evil" and should be sent to the "pit of hell" were improper and prejudicial. Trial counsel's failure to timely object, exacerbated by the eliciting of additional even more damaging comments on cross-examination, constituted deficient performance resulting in prejudice. This Court should conduct an evidentiary hearing preceded by an order of discovery so that a reasoned decision can be made based on all relevant evidence. The Court should then grant Dylann a new trial, or a new penalty phase, based on this prejudicial error.

178

**INTRODUCTION:  Claims 12 through 15**

Claims 12 through 15 of the § 2255 motion challenge the constitutional and statutory bases on which the federal government prosecuted Dylann, specifically 18 U.S.C. §§ 247, 249, 924(c) and 924(j).

Claims 12 and 13 explain how trial and appellate counsel failed in a constitutionally competent manner to address both the unconstitutionality of and the legal deficiencies in the federal statutes under which the government prosecuted Dylann, thereby depriving Dylann of his Sixth Amendment right to the effective assistance of counsel. The government's assertions to the contrary notwithstanding, post-conviction review under § 2255 has long been considered the appropriate vehicle for litigating such claims. *See Massaro*, 538 U.S. at 504-05; Claim 12(A). Also contrary to the government's assertions, mistakes of law can never be strategically made; misunderstanding the law always constitutes ineffective assistance of counsel if the mistakes render the outcome of trial unreliable, *Hinton v. Alabama*, 571 U.S. 264, 247 (2014), as they did here. *See* Claim 12(A)(4).

Claims 14 and 15 challenge the constitutionality of these statutory provisions directly. A § 2255 motion is an appropriate vehicle to alert the Court of the unconstitutionality of statutes of conviction—and thereby, of the defendant's legal innocence. Asserting that a person is imprisoned as a result of invalid laws is the raison d'etre of habeas corpus and post-conviction review. *See* Claim 14, Section C.

The Religious Obstruction Act (18 U.S.C. § 247) and the Hate Crimes Act (18 U.S.C. § 249) are indeed unconstitutional, for multiple reasons. Congress lacked the authority to enact them, both statutes punish beliefs and thought in violation of the First Amendment, and prosecuting under either one in combination with prosecuting under 18 U.S.C. § 924(j) violates the Double Jeopardy Clause by punishing a second time the same conduct the predicate crime

179

makes illegal. *See* Claim 15(A), (D); Claim 12(F), (G). The unconstitutionality of these statutes is apparent on their faces and from their legislative histories.

By contrast, the unconstitutionality of the elements clause of 18 U.S.C. § 924(c) because it is vague became glaring only after years-long attempts by courts and prosecutors to interpret and apply it in a consistent and even-handed manner. *See* Claim 14(A)(1). While its language may have appeared precise at the time it was enacted, its wording has engendered continuing confusion and has resulted in ever-changing interpretations. The constant and diverging interpretations invite misuse by prosecutors and mean that no criminal defendant (i.e., person of ordinary intelligence) can be expected to understand what the statutes criminalize, the two hallmarks of a statute that is void for vagueness. *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

In its efforts to discredit Dylann's arguments that the statutes under which Dylann was prosecuted are unconstitutional and that §§ 247 and 249 are not crimes of violence, the government makes unsupportable arguments that, inter alia: incorrectly claim procedural default (*see* Claim 14(C); Claim 12(A); misrepresent the holding of a recent case that fully supports Dylann's Double Jeopardy claim (*see* Claim 15(A); Claim 12(B)); falsely claim that the § 2255 motion only presents new examples, rather than new legal arguments trial and appellate teams failed to raise (*see* Claim 12(A)(2)); incorrectly claim decisions in cases decided since the time of trial foreclose the possibility of any finding of prejudice; baselessly accuse post-conviction counsel of failing to cite "controlling" law; and claim as "binding" precedent cases that are inapplicable to the matters at hand (*see* Claim 12(H)).

Among its most egregious assertions, the government insists that Dylann must have understood that he was committing crimes of violence when he went out with a gun and killed nine people. In doing so, the government demonstrates that even it is unable to understand how

180

this legal analysis must proceed. Per well-established Supreme Court precedent, analyzing crimes of violence under § 924(c)(3)(A) requires use of the *categorical approach* that focuses only on the elements of the crime, not on the facts on the ground. *See* Claim 12(C)(2). By exhibiting this most basic lack of understanding and implicitly acknowledging that it bases its prosecutions under § 924(c) on the facts of the crime rather than a categorical analysis of the predicate offense, the government demonstrates that it has been using its authority arbitrarily and proves the elements clause must be deemed unconstitutionally void for vagueness. *See* Claim 14.

Also among its most egregious assertions, the government insists that *United States v. Sanders*, 133 F.4th 341 (5th Cir. 2025), which held that Mr. Sanders's multiple convictions violated Double Jeopardy, is inapplicable because the Court only vacated Mr. Sanders's sentences, not convictions. However, the Court explicitly vacated Mr. Sanders's unconstitutional conviction, not just the sentence, an outcome it announced in the first paragraph of its opinion. *Id.* at 356. The Double Jeopardy issue in Dylann's case is identical to *Sanders*. And indeed, at oral argument in a recent Supreme Court case, *Barrett v. United States*, 146 U.S. 482 (2026), the Solicitor General's office *conceded* that the exact scenario presented in *Sanders* and Dylann's case *is a Double Jeopardy violation. See* Claim 15, Section A; Claim 12(B).

Dylann's responses to each of the government's misleading arguments are set forth below. Before moving to the government's misleading arguments, though, there is one last point that cannot be overstated. No matter when a statute is declared unconstitutional, whether the argument was made at time of trial or in post-conviction, a defendant tried under it is innocent of the offense it describes and redress must be available. In like manner, if §§ 247 and/or 249 are deemed at any time not to be crimes of violence, a defendant convicted and sentenced under § 924(c) and (j) is also innocent of those § 924 offenses and redress must also be available.

181

Nothing will ever set right the tragic loss of life and human suffering Dylann has caused. But it remains the responsibility of the federal courts to ensure in every instance, no matter how villainous the offense, that the rule of law is observed and upheld, and that invalid laws be struck down no matter to whom they are applied, because "[o]ur oath to uphold the Constitution is tested by hard times, not easy ones." *Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28, 30 (2020) (Gorsuch, J., concurring in denial of application to vacate stay).

**CLAIM 15:     The Government Makes Incorrect Assertions As To Claim 15.**

The statutes under which Dylann was convicted are unconstitutional under the law as it exists today.[62] That means the federal crimes Dylann was convicted of are non-existent and invalid. The unconstitutionality of these provisions under the law that exists now is discussed immediately below. Dylann has also argued that counsel was ineffective for raising these arguments based on law at the time of trial (in Claims 12 and 13). Trial counsel's failures to challenge these provisions based on the cases that had already been decided at the time of trial (Claims 12 and 13) are discussed in subsequent sections.

**A. The Government Is Wrong That Convictions For § 924(j) And The Predicate Offense Do Not Violate Double Jeopardy.**

Prosecuting Dylann for violating both § 924(j) and for the predicate offenses on which 924(j) rests violates the Double Jeopardy Clause. The government, through the Solicitor General's Office, conceded this point in a Supreme Court oral argument in 2025. *See* Oral Argument Transcript, *United States v. Barrett*, No. 24-5774, at 48 (Oct. 7, 2025) ("there's no language in 924(j) that authorizes those cumulative punishments for the predicate offense of (c) or (c)'s own predicate.").[63] But here, the government has offered a misleading statement about the holding of *United States v. Sanders*, 133 F.4th 341 (5th Cir. 2025).

---

[62] This reply addresses these claims out of order, discussing Claims 15 and 14 before Claims 12 and 13. Claims 14 and 15 discuss why the statutes at issue are unconstitutional without discussing trial counsel's ineffectiveness. If these statutes are unconstitutional, Dylann's convictions and/or sentences must be vacated, whether or not the Court finds that trial counsel was ineffective. Claims 12 and 13 also discuss the statutes' unconstitutionality, but include additional arguments to establish trial counsel's ineffectiveness. As such, Claims 12 and 13, which add an additional layer of argument, are discussed after Claims 14 and 15.

[63] https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/24-5774_6jf7.pdf

The government's argument relies on the false premise that in *Sanders* "[t]he Fifth Circuit only vacated [Mr. Sanders's] *sentence* on the § 924(j) count; it never mentioned vacatur of the conviction itself." Resp. at 366. But the opening paragraph of the opinion states: "We now vacate Sanders's *conviction* and sentence under Count Two of his indictment, which was based on 18 U.S.C. § 924(c) and (j). . . ." *Sanders*, 133 F.4th at 356 (emphasis added). The opinion also concludes: "We VACATE the conviction and sentence imposed based on Count Two of the indictment." *Id.* at 391.

So while the government says that the § 2255 motion "misleadingly" characterized the holding of *Sanders* and made "false" statements, in fact the government, not Dylann's § 2255 motion, mischaracterizes *Sanders*. Resp. at 366. Based on the untrue premise that multiple convictions were not at issue in *Sanders*, the government argues that "[n]othing in *Sanders* supports Defendant's claim that trying and convicting him of all three offenses in a single trial offends the Double Jeopardy Clause in any way[.]" Resp. at 366. This is plainly wrong.

In *Sanders*, the Fifth Circuit explained: "The Supreme Court held in *Blockburger* that the *government is prohibited* from charging a defendant *in a single trial* with '*two distinct statutory provisions*' for the '*same act or transaction*' unless 'each provision requires proof of a fact which the other does not.'" *Sanders*, 133 F.4th at 369 (emphasis added) (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). "An indictment violating *Blockburger*'s requirements is said to be multiplicitous." *Sanders*, 133 F.4th at 369 (citing *United States v. Nguyen*, 28 F.3d 477, 482 (5th Cir. 1994)).

The Fifth Circuit then analyzed whether the indictment against Mr. Sanders was multiplicious, concluding that it was. Mr. Sanders was charged with "one count of interstate kidnapping resulting in death under 18 U.S.C. § 1201(a), and one count under 18 U.S.C.

184

§ 924(c)(1)(A) and (j)(1) for murdering a person through the use of a firearm during a crime of violence." *Sanders*, 133 F.4th at 369. But "as a predicate offense, the kidnapping charge did not require proof of a fact that § 924 did not." *Id.* at 70. "Accordingly," the Fifth Circuit held, "the offenses fail the elements test under *Blockburger*." *Id*.

The Fifth Circuit next determined that even though the offenses fail the *Blockburger* test, if Congress had specifically authorized cumulative punishments for § 1201(a) and § 924(j), cumulative punishments would be permissible. *Sanders*, 133 F.4th at 369. According to the Fifth Circuit, the *Blockburger* test is a presumption rebuttable by a clear Congressional statement.

However, the Fifth Circuit concluded that Congress did not specifically authorize cumulative punishments for § 1201(a) and § 924(j). *Id.* at 369-70. As such, the Fifth Circuit "conclude[d] that Sanders's two sentences do violate the Double Jeopardy Clause." *Id.* at 371. The court vacated "the conviction and sentence imposed based on Count Two of the indictment." *Sanders*, 133 F.4th at 391.

The Double Jeopardy issue in Dylann's case is exactly the same as in *Sanders*. Dylann was indicted, tried, convicted, and sentenced for violations of both § 924(j) and predicate offenses: nine counts each of violating 18 U.S.C. § 247 and 18 U.S.C. § 249, and nine counts for "use of a firearm to commit murder during and in relation to a crime of violence" in violation of §§ 924(c) and (j)(1). *See* Dkt. No. 2 (Indictment) at 4-6, 9. According to the reasoning in *Sanders*, the nine counts convicting Dylann of violating § 924(j) were multiplicitous, in violation of the Double Jeopardy Clause.

Indeed, the Supreme Court recently agreed, in a unanimous opinion, that the Double Jeopardy Clause prohibits convictions and sentences for the same act under both § 924(c) and § 924(j). *See Barrett v. United States*, 146 S. Ct. 482, 497 (2026). *Barrett* held that "Congress has

185

not authorized convictions under both 18 U.S.C. §§924(c)(1)(A)(i) and (j) for one act that violates both provisions" because § 924(j) contains no language authorizing consecutive sentences, nor does § 924(c) contain language specifically authorizing sentences consecutive to § 924(j). *Barrett*, 146 S. Ct. at 497.

*Barrett* does not directly address the question at issue in Dylann's case, whether convictions and sentences for § 924(j) and the predicate offense violate Double Jeopardy. But *Barrett's* holding that convictions and sentences for § 924(j) and § 924(c) violate Double Jeopardy means there is only one possible answer to the question. Because § 924(j) contains no language rebutting the *Blockburger* presumption that punishment for both § 924(j) and the predicate is unconstitutional, the presumption stands. The government conceded this point at oral argument in *Barrett*.[64]

As such, convictions and sentences under both § 924(j) and the predicate offense violate Double Jeopardy. This is precisely what *Sanders* held. *Barrett* makes clear that *Sanders* is the only correct reading of § 924(j).

Justice Gorsuch's concurrence also points to an additional basis for a Double Jeopardy argument. He notes that the Supreme Court has "sometimes said that, in the concurrent-

---

[64] *See* Oral Argument Transcript, *United States v. Barrett*, No. 24-5774, at 48 (Oct. 7, 2025). https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/24-5774_6jf7.pdf
Justice Kagan asked "Do you think that there are cumulative punishments authorized for both (j) and the predicate offense?" Counsel for the government responded, "We don't, no, because there's no language in 924(j) that authorizes those cumulative punishments for the predicate offense of (c) or (c)'s own predicate. It's like they're not stacked at all." Justice Kagan clarified, "your position is consistent all the way through, we're going to make you have language, and because there's no language for the original predicate offense, let's say, a robbery or something . . . that cumulative punishment is not authorized?" and counsel responded, "We think that that is the necessary implication of the language in the -- in the text of the statute here."

prosecution context, the [Double Jeopardy] Clause merely directs courts to ascertain statutory meaning accurately," meaning that a statute can authorize multiple convictions or punishments for offenses that fail the *Blockburger* test so long as the statute does so explicitly. *Barrett*, 146 S. Ct. at 498 (Gorsuch, J., concurring). On the other hand, the Supreme Court has also "held that multiple convictions for the same offense—even when secured in a single proceeding—count as multiple punishments." *Id.* at 498 (Gorsuch, J., concurring) (quoting *Ball v. United States*, 470 U.S. 856, 865 (1985)). "From this," Justice Gorsuch reasoned, "it would seem to follow that Congress *cannot authorize multiple convictions for the same offense in concurrent prosecutions*"—suggesting that *Blockburger* ought not be merely a presumption, but that if two statutes fail the *Blockburger* test and define the same offense, a defendant cannot be convicted or sentenced for both, regardless of any language Congress may include in the statute. *Id.* (Gorsuch, J., concurring).

Justice Gorsuch went on to suggest that, because the prohibition against twice prosecuting someone for the same offense is a constitutional mandate, the answer could easily be that, "two charges amount to the same offense under the Double Jeopardy Clause if they fail the *Blockburger* test—full stop." *Id.* at 499 (Gorsuch, J., concurring).

Therefore, convictions for § 924(j) and the predicates violate Double Jeopardy. Particularly in light of *Barrett*, this is the only possible way to understand § 924(j). As such, Dylann cannot be convicted for both § 924(j) and the predicate offenses under the law as it stands today.

**B. The Government Is Wrong That § 247 Cannot Be Violated By Threatening Self-Harm; The Statute Can Be Violated By Self-Harm, And Consequently Is Not A Crime Of Violence.**

The government makes two unsupportable arguments for why § 247 must be a crime of violence: (1) that, despite its clear language, the statute requires the threat of force be made

187

against the worshipper; and (2) that a perpetrator threatening self-harm obstructs worshipers only if the worshipers themselves also feel threatened. Resp. at 345. The government's arguments are wrong.

First, the government is wrong when it argues that because the statute says the offender must intentionally obstruct any person in the enjoyment of "*that*" person's free exercise of religion, the force or threat of force used to create the obstruction must also be used against that other person. But the language of the statute leads to exactly the opposite conclusion. Clearly, the use of "that" person refers back to "any person" who has been obstructed. Nothing compels a reading that the force or threat of force be directed at that same person. Nor would such a result comport with the plain language of the statute, because the force can be directed against property, which could never be "that person." [65]

Dylann offered further support in his § 2255 motion than merely the plain language of the statute for his contention that § 247 covers the threat of self-harm as well as harm to others. He noted, for example, that the term threat of force "against any person" has been interpreted in a sex abuse statute to include the threat of self-harm. *See United States v. B.J.S.*, 147 F.4th 837, 841 (8th Cir. 2025)*; see also United States v. Rojas*, 520 F.3d 876, 882 (8th Cir. 2008).[66] In its

---

[65] The language of the statute makes it a felony if someone:
intentionally obstructs, by force or threat of force, including by threat of force against religious real property, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so...
18 U.S.C. § 247(a)(2).

[66] As the Court in *Rojas* explains:
"Any person" is not inherently exclusive of the offender, and Congress commonly employs the words and phrases "another," "another person," and "other person" when they intend to identify an act or threat directed at persons other than the offender.

188

response, the government complains that language from a "civil rights" statute cannot meaningfully be compared to language in a sex abuse statute. But this is how the law works. We look to similar language in other statutes to provide guidance and consistency of interpretation.

The government offers no reason the language in the two statutes should not be interpreted in a similar manner. And here, the analogy between the two statutes is a close one. Just as § 247 criminalizes the act of using the threat of force to obstruct people from the free exercise of their religion, so, too, the sex abuse statute criminalizes the attempt by abusers to silence their victims, thereby obstructing their victims from telling on them—by threatening to harm themselves.

Second, again without support in law or logic, the government insists that someone's threat "to engage in self-immolation if congregants enter a church" would matter only if the congregants *themselves* were threatened, saying "that threat, in and of itself, would not prevent any congregant from entering their house of worship and exercising her religious beliefs, *unless the fire could harm or posed a threat to the congregants*." Resp. at 344.

This is not a legal argument at all. It is merely an unsupported (and unsupportable) belief the government asserts that has no basis in common sense. Many people would decide not to enter their house of worship, if not entering would prevent another person from lighting herself on fire. Even where the congregants knew they themselves would be safe, for many people, the motivation to prevent someone else from self-immolating would be sufficient reason not to enter. Few people possess such a high degree of religious fervor that when faced with a person

---

*Id.* at 882 (citing 18 U.S.C. § 2241(a) ("knowingly causes another person to engage in a sexual act"); 18 U.S.C. § 2241(a)(1) ("by using force against that other person")) (emphasis removed).

189

threatening self-immolating, or some other bodily self-harm, they would choose to enter their house of worship anyway.[67]

The illogic in the government's position becomes apparent when one considers another hypothetical. Suppose, for example, person A, seeking to obstruct the free exercise of religion of members of a congregation, contacts congregants and tells them that he will kill person B—who has no connection to any of the congregants and does not practice the "offending" religion—if they engage in their planned religious activity. Person A has threatened no use of force against the people whose religious practice he seeks to obstruct and the congregants themselves experience no fear for their own safety. Out of concern, however, that Person A will carry out his threat to kill Person B, the congregants refrain from their religious activity. Surely person A is as guilty of violating § 247 for this conduct as he would have been had the threat of force been made directly against the congregants. It meets all the elements of the offense.

In like fashion, all the elements of § 247 are met if Person A threatens use of force to himself, and congregants are obstructed from worshiping by that threat of self-harm, not because they have experienced fear of harm to themselves.

Nothing in the language of § 247 requires the victims themselves to experience personal harm or a threat of harm against themselves. The statute only requires that the victims be obstructed in the enjoyment of their free exercise of religion. Consequently, § 247 is not a crime of violence and not a valid predicate for § 924(c).

---

[67] In fact, deeply religious people might have a heightened sense of conscience and be more inclined to want to prevent harm to other persons than to insist on entering a place of worship.

**C. The Government Is Wrong That § 249 Requires A Sufficient Degree Of Force Against Another To Satisfy The Elements Clause.**

Section 249 does not satisfy § 924(c)'s elements clause and therefore is not a valid predicate for a § 924(c) charge. The government argues that this argument is "clearly foreclosed by the Supreme Court's decisions in *Stokeling* and *Delligatti*." Resp. at 383. But the government is incorrect.

After Dylann's trial, the Supreme Court issued opinions in *Stokeling v. United States*, 586 U.S. 73 (2019), and *Delligatti v. United States*, 604 U.S. 423 (2025). The government argues that these cases, taken together, mean that § 249 defines a crime of violence because it is impossible to willfully cause any bodily injury—even the minimal injury sufficient to satisfy 18 U.S.C. § 1365(h)(4) to which § 249 is tied—by any means to any person, *even oneself*, without employing the strong physical force required by the elements clause. The government is wrong for at least three reasons.

First, as explained in the § 2255 motion, while *Stokeling* and *Delligatti* do weigh in on the definition of the use of force, which has implications for whether § 249 constitutes a crime of violence that can serve as a predicate for a § 924(c) charge, neither of them directly addresses whether § 249 itself is a crime of violence. The government interprets these cases too broadly, and reaches the wrong conclusion about § 249. *Stokeling* expands the concept of force only to include those statutes where the terms of the predicate offense require the victim's resistance to be overborne, as it was defined by a Florida robbery statute.[68] *Delligatti* expands the concept of

---

[68] "Construing the language of the elements clause in light of the history of ACCA and our opinion in *Johnson v. United States,* 559 U.S. 133 (2010), we conclude that the elements clause encompasses robbery offenses that require the criminal to overcome the victim's resistance." *Stokeling*, 586 U.S. at 77. The Court's opinion, in fact, uses the word "resistance" 33 times. It is an unmistakable feature of the decision.

191

force only to include a failure to act where the predicate statute's terms are tied directly to a duty of care, as in an instance where parents withhold food from their children. Neither case addresses the fact that § 249 can be violated using the sort of *de minimis* force the Supreme Court in *Castleman* described as a "comical misfit" to the force necessary to satisfy the ACCA or its § 924(c) counterpart. *United States v. Castleman*, 572 U.S. 157, 163 (2014).

Second, § 249 is not a crime of violence because it can be committed by willfully causing harm to oneself. *Stokeling* and *Delligatti* do not weigh in at all on this specific issue. At least one district court case decided since the Supreme Court's opinions in *Stokeling* and *Delligatti*— *United States v. Luigi Mangione*, 25-CR-00176, 2026 U.S. Dist. LEXIS 18890 (S.D.N.Y. Jan. 30, 2026)—has determined that an offense that can be committed by self-harm (in that case, stalking) is not a crime of violence under § 924(c)'s elements clause.[69]

As an initial matter, there is no doubt that an offense that can be committed by force against oneself or one's own property does not satisfy § 924(c)'s definition of a crime of violence. *See* § 924(c)(2)(3)(A) (requiring "as an element the use, attempted use, or threatened use of physical force *against the person* or property *of another*") (emphasis added); *see also Mangione*, 2026 U.S. Dist. LEXIS 18890, at *52; *Torres v. Lynch*, 578 U.S. 452, 466 (2016) (18 U.S.C. § 16's identical definition of crime of violence would not cover arson in states where destruction of one's own property qualifies as arson).

---

[69] There was no suggestion in this case that the actual manner in which the predicate offense was committed was non-violent. Mangione was alleged to have shot and killed the CEO of a major medical insurance company on a public street in broad daylight. Nevertheless, the stalking statute under which he was charged could be violated by threats of harm to oneself. Employing the required categorical approach, the court was forced to conclude that the stalking statute under which Mangione was charged is not a crime of violence under § 924(c)'s elements clause definition of crime of violence. The government has chosen not to appeal this decision.

Section 249 can be violated through force against oneself. Section 249(a)(1) states: "Whoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to *any person*, because of the actual or perceived race, color, religion, or national origin of *any person*" shall be subject to specified penalties. § 249(a)(1) (emphasis added).

Two key points about the language of § 249: First the injured person need not be the person whose characteristic the perpetrator has targeted. Otherwise, the statute would say, "because of the actual or perceived race, color, religion, or national origin of" *that* person, rather than "*any* person." Second, § 249 does not state that force must be used "against the person . . . *of another*" as 924(c) does. *See* § 924(c)(3)(A) (emphasis added). *See United States v. B.J.S.*, 147 F.4th 837, 841 (8th Cir. 2025) (use of the term "any" person can refer to the perpetrator and can include self-harm); *see also United States v. Rojas*, 520 F.3d 876, 882 (8th Cir. 2008) (same). Under § 249, therefore, the perpetrator may willfully cause bodily injury to any person, including him- or herself, because of the characteristics of any person, whether that is the same person whose characteristics are targeted or not. "Plainly, a threat to use force against oneself or one's own property does not meet Section 924(c)'s force requirement." *Mangione*, 2026 U.S. Dist. LEXIS 18890, at *52 (citing *Torres*, 578 U.S at 466). Just as plainly, the use of actual force against oneself does not satisfy it, either.

Instances of this are not hard to imagine: A person purposefully injures herself and accuses someone else of committing the injurious act, in the belief that others will be more likely

193

to take seriously an accusation that crosses racial, religious or cultural lines.[70] At different times in the past, and in today's xenophobic climate, someone might also commit such an act in order to foment racism, anti-immigrant sentiment or religious hatred.

Section 249 never requires that a death be caused by the perpetrator's intentional act, only that someone's—anyone's—death "result" from that initial act. A death could result here in any number of ways: the victim of the hate crime could run from the perpetrator so as not to be falsely identified for having committed an assault, and be hit by a car, or be shot by the police, or be attacked by a vigilante who thinks he's stopping a fleeing criminal. The victim of the hate crime might angrily approach the person who self-inflicted the harm, and be restrained by a bystander who accidentally applies lethal force. The victim of the hate crime might offer help,

---

[70] Consider the events in *To Kill A Mockingbird*. Young, white Mayella Ewell is beaten by her father when he catches her trying to seduce Tom Robinson, a Black man. Mayella and her father then accuse Tom of raping Mayella. Tom is tried for the rape and convicted. Surely it is not much of a stretch to imagine a young unmarried woman—perhaps fearing she may wind up pregnant and giving birth to a biracial child—bruising herself in order to make a credible accusation of rape against someone, rather than face her family's censure for having voluntarily engaged in pre-marital sex across racial lines. In Boston in 1990, Matthew Stuart told police his (white) family had been the victims of an armed Black gunman, who had shot and killed his wife and shot him in the stomach during an attempted robbery. The accusation set off high racial tensions and resulted in an intensive police crackdown, targeting Black men, one of whom was eventually arrested and held without bail for the crime. It was later revealed that Stuart had killed his wife and had shot himself. Christopher B. Daly, *Victim, to Suspect, to Suicide*, Wash. Post, Jan. 4, 1990, https://www.washingtonpost.com/archive/politics/1990/01/05/victim-to-suspect-to-suicide/d8cb73bd-b43c-4d29-a1c3-6dfacb1820d6/. There was no reason to claim the imaginary attacker was a Black man, other than Stuart's belief that this made his claim more credible and would result in bad consequences for someone because of that other person's race.

It is easy to imagine that Stuart's accusation might have resulted in physical harm to someone as a result of his self-harm and accusation. One Black man was in fact imprisoned as a suspect.

Following Susan Smith's false accusation that her two young sons had been carjacked by a Black man, a massive manhunt targeted Black men and racially-charged searches. Don Terry, *A Woman's False Accusation Pains Many Blacks*, N.Y. Times, Nov. 6, 1994, https://www.nytimes.com/1994/11/06/us/a-woman-s-false-accusation-pains-many-blacks.html.

194

thinking the perpetrator needed assistance, and be attacked while acting as a Good Samaritan, by others who think he is harming the perpetrator. A bystander could run from the scene, believing the victim to be dangerous, fall and hit his head and die. In a place where crowds have gathered and tensions are already high, interactions with law enforcement could result in someone's death, triggered by the perpetrator.

The point is that the resultant death would not have been willfully caused, even though the initial self-harm is the "but-for" cause of it.

Third, as additional examples in the § 2255 motion demonstrate, § 249 can be committed by a deception that willfully causes bodily injury or by a perpetrator choosing not to carry out a task which they have no legal obligation to perform, without employing force of any kind. And that deception or choice not to act can result in death even when the perpetrator intends to cause only minor discomfort or injury, not death. 18 U.S.C. § 1365(h)(4)(E) (defining bodily injury).

Take two situations: In one, an anti-Asian coat-check person locks the coat closet at the end of her shift and leaves the premises on a frigid day before a meeting of Korean americans concludes, willfully causing the participants the temporary physical pain that walking coat-less to their cars will entail. She has violated § 249. Unbeknownst to her, a Korean american patron's life-sustaining medication is in his coat pocket. The patron does experience physical pain from the cold which is enough to satisfy § 1365's definition of bodily injury. But he also dies because he cannot access his medication. The choice of the coat check clerk to lock the closet and leave involves an intent to cause injury because of other persons' national origin.

In the other instance, a Black guest at a hotel willfully causes bodily injury to a white guest by purposely misreporting the daily weather prediction of extreme heat and intense sun so the white guest will suffer sunburn. As a result of this purposeful deception, the white guest does

195

suffer sunburn which, again, is enough to satisfy § 1365's low bar for bodily injury. But the white guest also gets heat stroke and dies. The Black guest had no duty of care and used deception, not force or violence, to willfully cause injury.

In both of these cases, the perpetrators have violated § 249 by willfully causing bodily injury, as defined by § 1365(h)(4), to victims because of the victims' perceived race, color, or national origin. The perpetrators' actions in both cases result in death. The perpetrators in both of these cases have violated the elements of § 249 and are subject to prosecution under the statute and to being punished to the fullest extent § 249 permits.

But in neither case did the perpetrators lay a hand on the victims, or use any instrument as proxy. The perpetrators did not deliver anything to the victims, such as poison. The perpetrators did not overcome any resistance by the victims, as *Stokeling* demands. They did not owe a duty of care to their victims, as *Delligatti* mandates. Thus, there was no force employed in the violation of § 249—directly, indirectly, or by omission. Section 249 was violated and resulted in death. But in both examples, § 249's elements were satisfied in a manner that did not constitute a crime of violence as defined by the elements clause.

Accordingly, under the categorical approach which considers only whether a federal predicate offense can be committed in any manner that fails to meet the elements clause definition, § 249 is not a crime of violence, *Stokeling* and *Delligatti* notwithstanding.

**D. The Government Is Wrong That § 249(A)(1) Is Valid Under The First Amendment.**

The government argues that "the First Amendment affords no protection to violence, and Defendant's mass murder of congregants because of their race and in order to obstruct their free exercise of religion falls well outside of the bounds of the First Amendment." Resp. at 384 (citing *id*. at 318-23). There is no question that violent conduct can be criminally prosecuted

196

without raising any First Amendment concerns. The government's authority to prosecute acts of violence is not in dispute. Still, the government's assertion is incorrect.

Just because violent actions can be criminally prosecuted consistent with the First Amendment does not mean perceptions, thoughts, and biases can be. While the First Amendment does not insulate violent conduct from prosecution, at the same time, prosecuting violent conduct does not sweep away all First Amendment protections for thoughts and feelings surrounding that conduct.

Federal law defines murder as (1) "the unlawful killing" (2) "of a human being" (3) "with malice aforethought." 18 U.S.C. § 1111(a). South Carolina law defines murder as (1) "the killing" (2) "of any person" (3) "with malice aforethought, either express or implied." S.C. Code § 16-3-10. It is obvious that these statutes do not violate the First Amendment.[71]

Section 249, by contrast, criminalizes: "Whoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person . . ." § 249(a)(1). This statute does not criminalize "willfully caus[ing] bodily injury" or "attempt[ing] to cause bodily injury"—it criminalizes causing or attempting injury *because of the actual or perceived race, color, religion, or national origin of any person*." Criminalizing

---

[71] South Carolina also criminalizes "assault and battery of a high and aggravated nature," defined as "unlawfully injur[ing] another person, and: (a) great bodily injury to another person results; or (b) the act is accomplished by means likely to produce death or great bodily injury," along with other degrees of assault and battery and myriad other crimes involving killing or injuring a person. *See, e.g.*, S.C. Code § 16-3-600(B)(1). It is equally obvious that these statutes, and the many federal statutes that criminalize killing or injuring a person without mention of the perpetrator's beliefs or perceptions, do not violate the First Amendment.

197

motivation, not criminalizing causing bodily injury, is why the statute runs afoul of the First Amendment.

The Supreme Court has "long held" that "nonverbal expressive activity can be banned because of the action it entails, *but not because of the ideas it expresses*." *R.A.V. v. St. Paul*, 505 U.S. 377, 385 (1992) (emphasis added). The government may not regulate conduct "based on hostility—or favoritism—towards the underlying message expressed." *Id.* at 386. The key distinction the Supreme Court made is that "burning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not." *Id.* at 385.[72] And criminalizing thoughts and motivations violates the First Amendment, even thoughts and motivations that are abhorrent. Permitting people the freedom of expression to harbor highly racist views is decidedly one of the hard tests Justice Gorsuch spoke of, challenging jurists' oaths to uphold the Constitution. *See Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28, 30 (2020) (Gorsuch, J., concurring in denial of application to vacate stay).

Part of the government's response is to offer assurances that Congress included guardrails to prevent abuse of § 249. Resp. at 357-60. But if the danger of attaching criminal penalties to a person's thoughts and motivations despite supposed guardrails were not obvious enough, recent examples abound.[73]

---

[72] *Wisconsin v. Mitchell,* 508 U.S. 476 (1993) does not undermine *R.A.V.*'s key holding. There is, to be sure, tension between those cases. But ultimately *Mitchell* focuses on specific findings in support of Wisconsin's statute, whereas *R.A.V.* sets out the general distinction between criminalizing an action versus criminalizing an idea, which is more relevant here than the precise contours of a Wisconsin statute.

[73] A prominent recent example is the federal criminal case "in connection with what Attorney General Pam Bondi described in a post on X as a 'coordinated attack on Cities Church in St. Paul, Minnesota,'" in which protestors and journalists, including Don Lemon, were

198

Violence can be prosecuted as violence. But the fact that violence can be prosecuted as violence has no bearing on the question of whether thoughts, perceptions, and biases can be prosecuted, even if they are connected to acts of violence. Section § 249 violates the First Amendment.[74]

---

charged with violating 18 U.S.C. § 248. Ryan J. Reilly et al., *Don Lemon arrested after covering protest at Minnesota church*, NBC News, Jan. 30, 2026, https://www.nbcnews.com/news/us-news/don-lemon-arrested-federal-authorities-attorney-says-rcna256680. Section 248 criminalizes: "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." § 248(a)(2). In addition to the Attorney General referring to the events as a "coordinated attack" and "riot" on social media, in a court hearing, a lawyer with the federal government asked that three of the individuals arrested remain in custody because they committed a crime of violence. *See* Hamed Aleaziz et al., *Don Lemon Released Without Bond Over Minnesota Protest Charge*, N.Y. Times, Jan. 31, 2026, https://www.nytimes.com/2026/01/30/us/don-lemon-arrest-minnesota-church-protest.html; Eric Henderson et al., *Independent Minnesota journalist Georgia Fort, others released after arrests over church protest*, CBS News, Jan. 30, 2026, https://www.cbsnews.com/minnesota/news/independent-journalist-georgia-fort-arrested-cities-church-protest-minneapolis/. Numerous individuals and organizations have raised First Amendment concerns about the prosecution, despite the government's allegations of violence. Neither an allegation of violence nor actual proof of violent conduct makes any potential prosecution compatible with the First Amendment. There are other recent examples. *See, e.g.*, Megan Forrester, *Trump suggests Tesla vandals should face 20 years in jail, be sent to El Salvador*, ABC News, Mar. 24, 2025, https://abc7.com/post/president-trump-suggests-tesla-vandals-should-face-20-years-jail-sent-el-salvador/16064219/ ("'I look forward to watching the sick terrorist thugs get 20 year jail sentences for what they are doing to Elon Musk and Tesla,' Trump said in a posting. 'Perhaps they would serve them in the prisons of El Salvador, which have become so recently famous for such lovely conditions.'").

[74] Consider, for example, the hypothetical offered in Claim 15(C). A coat check clerk locks patrons' coats in a closet and then leaves the premises with the only key. She does so in full knowledge that this will cause the patrons to suffer as they brave sub-zero temperatures, going to their cars. What she has done is some form of assault. Maybe she did this, as was posited earlier, because that evening's guests are Korean americans, and she hates Asians. But maybe she did this because she was simply a misanthrope and was tickled at the idea of causing anyone discomfort. Or maybe the patrons treated her in a manner she considered rude or humiliating. Maybe they also happened to be Korean americans. The coat check clerk could be prosecuted for assault no matter what her motivation but the only way to prosecute her under § 249 would be to ferret out her particular beliefs. A jury might need to decide whether, despite her hatred of Asian-Americans, she had locked the coat room on this particular occasion because she had to get to an

199

In fact, in a different section of the response, the government acknowledges the unconstitutionality of criminalizing motivations or biases. Arguing that § 247(a)(2) can be violated only by force against another, not against oneself or one's own property,[75] the government says that prosecuting someone for burning her own barn to prevent religious gatherings would run afoul of the First Amendment. Resp. at 345. This argument presupposes that criminalizing motivation, separate and apart from action, violates the First Amendment. As such, in a different section of its response, the government acknowledges the problem that renders § 249 unconstitutional.[76]

As to the government's assertion that this claim has been procedurally defaulted, the government is wrong. If § 249 violates the First Amendment, the statute itself ceases to exist and is deemed invalid from the time it was first enacted. This means the government never had authority to prosecute this nonexistent crime, nor did this Court have jurisdiction to try it. In this circumstance, Dylann (and any defendant charged with this nonexistent crime) must be deemed

---

appointment and had been reprimanded in the past by her supervisor for leaving valuables unguarded. Perhaps she had expressed glee over social media at the outcome of her actions but had not been motivated by them to act in the first place. Such inquiries cross the line from regulating conduct to infringing on and policing freedom of thought. This is a prosecution based on her beliefs, not based on her conduct.

[75] The argument that § 247(a)(2) can be violated only by force against another is incorrect. *See* Claim 15(B) for a discussion of this issue.

[76] Moreover, as to the government's argument on procedural default, this claim alleging trial counsel's ineffectiveness is supported by an affidavit explaining that trial counsel did not consider raising the argument. *See* Ex. 71 (Gannett Dec.) ¶ 14. An ineffective assistance claim is not procedurally defaulted because appellate counsel did not raise it. As such, the government's argument that the claim is procedurally unreviewable has no merit.

Additionally, if § 249 is unconstitutional and therefore invalid, there is no crime to prosecute, and anyone prosecuted under § 249, including Dylann, is actually innocent of the nonexistent crime of violating § 249. As such, the argument that § 249 violates the First Amendment is not subject to procedural default.

actually innocent of committing this offense. Dylann has also asserted that prior counsel was ineffective, which constitutes cause for his failure to pursue this claim at trial. His actual innocence of the nonexistent crime constitutes prejudice. Dylann has not procedurally defaulted this claim.

Dylann was convicted of federal crimes that are unconstitutional and therefore null and void.

**CLAIM 14:    The Government Makes Incorrect Assertions As To Claim 14.**

The § 2255 motion explained that, in addition to not being a valid charge in this case for lack of a valid predicate, § 924(c) is unconstitutional because both of its definitions of crime of violence are unconstitutionally vague—not only the residual clause, as the Supreme Court held in *Davis*, but the elements clause, as well. In the response, the government makes several incorrect statements regarding Dylann's arguments.

**A. The Government Is Wrong When It Says Precedent Forecloses Consideration Of The Constitutionality Of The Elements Clause.**

The government's insistence that this Court reject Dylann's claim that the elements clause is unconstitutionally vague because precedent precludes a "re-examination" is wrong for several reasons, and none of the cases cited by the government address or foreclose the bases for Dylann's vagueness argument. *Johnson  v. United States*, 576 U.S. 591 (2015), the case that held the residual clause unconstitutionally vague, itself makes the point that experience in applying a statute may demand the court revisit earlier decisions.

First, the Supreme Court is always at liberty to re-examine its earlier precedent, as the *Johnson* Court makes clear. It may do this when time or experience has shown the Court that its earlier decision was in error. It may do this when the Court previously announced something in dicta, or without benefit of full briefing or argument. Such reconsideration is especially appropriate, according to the *Johnson* Court, in cases of challenges to the vagueness of a statute when, over time, the repeated attempts by the courts to fashion workable definitions reveal the futility of those efforts. *Johnson,* 576 U.S. at 605. This point has now been reached with regard to the elements clause.

Second, as explained in subsection 2 below, each of the Fourth Circuit and out-of-district cases the government cites as precedent for the constitutionality of the elements clause is

202

inapposite, either because it pre-dates significant changes in the legal landscape, or because the issues briefed and argued were different from those Dylann has put forward. Not one of the cases the government cites is grounded in the arguments Dylann makes here.[77]

**1. Supreme Court precedent does not preclude but rather encourages a reexamination of the question of whether the elements clause of § 924(c) is unconstitutionally vague.**

Despite the government's insistence that this Court is precluded by precedent from considering the validity of Dylann's claim that the elements clause is unconstitutionally vague, the Supreme Court has never issued such a definitive ruling. In the course of its many decisions discussing the definitions of crimes of violence, the Supreme Court has offered opinions about the elements clause only twice, and then, only glancingly. In *[Samuel] Johnson v. United States,* the Court contrasted the indeterminacy of the residual clause with the "concrete" language of the elements clause. *Johnson*, 576 U.S. at 596-97. In *Taylor v. United States*, the Court said analysis of the elements clause was "straightforward" by comparison to the residual clause. *Taylor*, 596 U.S. 845, 860 (2022).[78] There was no briefing

---

[77] Most of the cases cited by the government argue that the elements clause suffers from the same type of indeterminacy that spelled the demise of the residual clause --that it requires judges to assess the potential risk of abstract "ordinary" crimes. Dylann makes very different claims about the problems with the elements clause, all focused on whether an ordinary person (or the courts themselves) could have consistently predicted whether various predicate crimes were "crimes of violence" as defined by the elements clause.

[78] *Taylor* generated two dissenting opinions, suggesting the analysis is not as straightforward as the majority claimed. Justice Thomas excoriated the majority, saying

> This holding exemplifies just how this Court's "categorical approach" has led the Federal Judiciary on a "journey Through the Looking Glass," during which we have found many "strange things." Rather than continue this 30-year excursion into the absurd, I would hold Taylor accountable for what he actually did and uphold his conviction.

*Id.* at 861 (Thomas, J., dissenting) (quoting L. Carroll, *Alice in Wonderland and Through the Looking Glass* 227 (J. Messner ed. 1982)). He describes the three years between deciding *Borden*

on the issue of the unconstitutionality of the elements clause and virtually no discussion of it. Even if there had been, to conclude that the elements clause is *less* vague than the unconstitutionally vague residual clause is not to conclude that the elements clause is necessarily constitutional.

Even assuming that these cursory comments were precedential, and even assuming they can be construed as a holding that the elements clause is not vague, they do not preclude reconsideration. Pronouncements that the residual clause was constitutional before *Johnson* did not prevent the Supreme Court from reconsidering those earlier opinions. To the contrary.

When, in *Johnson v. United States*, 576 U.S. 591 (2015), the Supreme Court held that the residual clause of the ACCA was unconstitutionally vague, it acknowledged that it had twice before announced that the clause was *not* unconstitutionally vague. In 2007, the Court's majority was "not persuaded by [the principal dissent's] suggestion ... that the residual provision is unconstitutionally vague." *United States v. James*, 550 U.S. 192, 210 n.6 (2007). Several years later, the Court *again* rejected a dissenting opinion that the residual clause was unconstitutionally vague. *Sykes v. United States*, 564 U.S. 1, 15-16 (2011).

---

and this decision in *Taylor* as ones that had left prosecutors and judges "in a bind" and urges the Court of overrule *Johnson* and *Davis. Id.*

Justice Alito dissented separately and contended that so long as some conduct that violates the predicate offense also satisfies the elements clause, it should not matter that not every manner in which the predicate offense can be violated satisfies the elements clause. This, of course, is in direct contradiction to the categorical approach. The opinion of the Court squarely meets Justice Alito's invitation to give this new reading to the elements clause by explaining that such a reading would collapse the elements clause back into the problems occasioned by the residual clause of deciding what the "ordinary case" for committing a particular offense is and what the risk is that it would "likely" be committed in a violent manner. *Id.* at 877 (Alito, J., dissenting). Clearly, applying the elements clause is not as straightforward as the majority says it is.

But four years after *Sykes*, the Court was forced to acknowledged that its repeated efforts to fashion a consistent description of crimes of violence as defined by the residual clause had proved unsuccessful:

> This Court has acknowledged that the failure of "persistent efforts . . . to establish a standard" can provide evidence of vagueness. Here, this Court's repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause confirm its hopeless indeterminacy.

*Johnson*, 576 U.S. at 598 (quoting *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 91 (1921) (alteration in original)). The Court explained further that

> [t]he doctrine of *stare decisis* allows us to revisit an earlier decision where experience with its application reveals that it is unworkable. Experience is all the more instructive when the decision in question rejected a claim of unconstitutional vagueness. *Unlike other judicial mistakes that need correction, the error of having rejected a vagueness challenge manifests itself precisely in subsequent judicial decisions: the inability of later opinions to impart the predictability that the earlier opinions forecast.*

*Johnson*, 576 U.S. at 605 (citing *Payne* v. *Tennessee*, 501 U.S. 808, 827 (1991)).[79]

Moreover, the Court has far fewer constraints when a matter has been addressed by the parties either peripherally or not at all:

> *James* and *Sykes* opined about vagueness [of the residual clause] without full briefing or argument on that issue—a circumstance that leaves us "less constrained to follow precedent," . . . And departing from those decisions does not raise any concerns about upsetting private reliance interests.

*Johnson*, 576 U.S. at 606 (quoting *Hohn v. United States*, 524 U.S. 236, 251 (1998)).

---

[79] Similarly, in *Ring v. Arizona,* the Supreme Court overruled *Walton v. Arizona*, 497 U.S. 639 (1990), noting that

> Although the doctrine of *stare decisis* is of fundamental importance to the rule of law[,] . . . [o]ur precedents are not sacrosanct. We have overruled prior decisions where the necessity and propriety of doing so has been established.

*Ring v. Arizona*, 536 U.S. 584, 608 (2002) (alterations in original) (internal quotation marks and citations omitted).

This is precisely the situation with the two Supreme Court decisions that so lightly touch upon the constitutionality of the elements clause. In both *Johnson* and *Taylor*, the Court's weak endorsement of the elements clause was given without benefit of briefing or argument.

Moreover, *Johnson* was decided before *Stokeling,* which upended the definition of "force" in ways that were not predictable in 2015. Similarly, *Taylor* predated both *Borden* and *Delligatti*, cases that changed fundamental precepts used to apply the elements clause. *Delligatti*, in particular, in unexpectedly adding crimes of omission to the list of "acts" that constitute "force," exploded the legal landscape.

Thus, no incidental dicta in *Johnson* or *Taylor* can be deemed precedential on the question of whether a  person of ordinary intelligence had notice of what constituted a crime of violence as defined by the elements clause or whether the changes in its use have led to arbitrary application by prosecutors and the courts.

### 2. Fourth Circuit cases cited by the government likewise do not preclude an examination by this Court of Dylann's argument that the elements clause is unconstitutionally vague.

No Fourth Circuit case has addressed the issues Dylann raises in challenging the constitutionality of 924(c)'s elements clause on grounds of vagueness in his § 2255 motion. In fact, given the fact that the *Delligatti* case was decided on March 26, 2025, as Dylann was in the midst of preparing his Motion, it would have been impossible for the Fourth Circuit to have considered the implications of that holding on anyone else's vagueness arguments. In any event, neither the Fourth Circuit nor the other cases the government cites involve the arguments Dylann makes here.

According to the government's own briefing, the Fourth Circuit in *Green v. United States,* 67 F.4th 657 (4th Cir. 2023), held merely that the elements clause is "very different than the 'substantial risk' language that doomed the residual clause." *Id.* at 670. The Fourth Circuit

206

confined its analysis to this narrow consideration because, in *Green*, the defendant sought to overcome a procedural default by arguing that the Fourth Circuit had recently employed a "risk of harm" analysis to determine if the predicate crime met the definition of a crime of violence under the elements clause. Using a risk analysis, the defendant argued, left the elements clause on the same unstable footing as the residual clause. The Fourth Circuit rejected this argument, saying that this level of indeterminacy was not akin to the double level of indeterminacy that had invalidated the residual clause. Dylann's claim of unconstitutionality has never tried to analogize the elements clause flaws with the residual clause flaws, and *Green* never discussed the flaws in the elements clause that Dylann has highlighted.

In *United States v. Simms*, the Fourth Circuit extended the holdings in. *Johnson* and *Dimaya*, which invalidated the residual clauses in the ACCA and in 18 U.S.C. § 16(b) to § 924(c)'s residual clause. *United States v. Simms*, 914 F.3d 229, 236 (4th Cir. 2019). The Fourth Circuit briefly noted the limits of its decision—that § 924(c) remained applicable to drug-trafficking crimes and to crimes that satisfied the elements clause. In the course of doing so, the Fourth Circuit noted (without analysis) that the elements clause did not suffer from a "*similar indeterminacy*" to that which plagued the residual clause. But a "similar indeterminacy" is not the basis for Dylann's challenge.

The government's reliance on decisions in other Circuits—none binding on this Court—is equally misplaced.[80]

---

[80] In *United States v. Harbuck*, 146 F.4th 1073 (11th Cir. 2025), the defendant challenged the ACCA's overall constitutionality on the basis that, despite his having been sentenced to ten years' imprisonment for a prior conviction in South Carolina, the offense was nevertheless labelled a state misdemeanor. He argued the ACCA enhancement was void for vagueness as applied to his sentence because he was not given fair notice that his assault conviction could be considered a felony. *Id.* at 1077. The Eleventh Circuit rejected this argument. The court also noted more generally that it was bound by precedent to uphold the constitutionality of the

elements clause against a claim that it suffered from the same indeterminacy problems as the residual clause by the fact that the Supreme Court had not discarded the elements clause in *Johnson* in 2015 or in *Taylor* in 2019. The Eleventh Circuit's analysis extends no further than this and did not touch upon the bases Dylann has argued.

This vagueness challenge was secondary to Harbuck's central challenge, which was that one of his previous convictions, for assault with intent to kill, did not qualify under the elements clause as a crime of violence because it could be committed with a *mens rea* of recklessness. The Eleventh Circuit held that this offense did satisfy the element clause's *mens rea* requirement because, although the Supreme Court in *United States v. Borden* had announced that recklessness was insufficient under the elements clause, the Supreme Court had left open the question of whether *extreme* recklessness was sufficient and the Eleventh Circuit deemed this sufficient.

As Dylann argued in his § 2255 motion, the fact that the necessary *mens rea* remains an open question is yet another aspect of the vagueness that plagues the elements clause.

The defendant's challenge in *United States v. Walker*, 793 F. App'x 865 (11th Cir. 2019) was to the constitutionality of the ACCA, again by analogy to the indeterminacy analysis of the residual clause with only fleeting mention of his belief that the Supreme Court's decision in *Stokeling* had rendered the elements clause unworkable. In this unpublished opinion, the Eleventh Circuit quickly disposed of this part of the challenge on the basis that Walker's Florida conviction required a showing of sufficient force to overcome someone's resistance, the touchstone of the *Stokeling* opinion.

In *United States v. Pendleton*, 894 F.3d 978 (8th Cir. 2018), the Eighth Circuit likewise considered and then rejected a claim only that the elements clause of the ACCA suffered from the same indeterminacy flaws as the residual clause, again never touching upon the bases Dylann argues. *Id.* at 982.

*United States v. Bowers*, CR 18-292, 2020 US Dist. Lexis 191861 (W.D. Pa. Oct. 16, 2020) is a pre-trial order denying a motion to dismiss. There, the court said only that

> Defendant has pointed to no caselaw that has accepted an argument such as his, and does not suggest that his own alleged conduct was not clearly proscribed by Section 924(c). Further, I note that a Court should not demand "*absolute* unambiguity in evaluating a criminal statute," and may not invalidate a statute merely because its provisions are ambiguous to *some* degree.

*Bowers* at *6. (internal citations omitted). Dylann, of course, argues that the elements clause of § 924(c) is riddled with ambiguity.

*United States v. Altruz*, CR 20-207, 2023 U.S. Dist. Lexis 96130 (E.D. Pa. June 2, 2023), is a district court order dismissing the petition of a pro se applicant for § 2255 relief which the court found so meritless, it did not even require the government to file a response. In n.8, cited by the government, the court notes that,

> Altruz mistakenly states in his motion that "both [clauses in 18 USC 924(c)(3)(A) and (c)(3)(B)] have been ruled unconstitutionally vague by the U.S. Supreme Court." The Court has only held that the "residual clause," section 924(c)(3)(B), is unconstitutionally vague.

Thus, contrary to the government's claim, none of these cases addressed the fact that the constantly moving targets in the elements clause—of *mens rea*, realistic probability, self-harm vs. harm of others, what constitutes the "use of force," how much force equates to violent force— leave persons of ordinary intelligence no way to know what conduct § 924(c) criminalizes.[81] This is the hallmark of an unconstitutionally vague statute.

## B. The Government Is Wrong When It Says That The Elements Clause Cannot Be Unconstitutionally Vague Because It Does Not Suffer From The Same Infirmities As The Residual Clause.

The government is wrong not only in its procedural argument that the elements clause's vagueness cannot be considered here, but also on the substance. The government is wrong when it insists that the elements clause—§ 924(c)(3)(A)—cannot be constitutionally infirm because it does not suffer from the same flaws that spelled the demise of the residual clause.

If a law is vague, it is unconstitutional. When the Supreme Court determined that the residual clause of § 924(c) was void for vagueness, it did not mince words:

> In our constitutional order, a vague law is no law at all. Only the people's elected representatives in Congress have the power to write new federal criminal laws. And when Congress exercises that power, it has to write statutes that give ordinary people fair warning about what the law demands of them. Vague laws transgress both of those constitutional requirements. They hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges, and they leave people with no sure way to know what consequences will attach to their conduct. When Congress passes a vague law, the role of courts under our

---

*Id.* at *14 n.8 (alteration in original) (internal record citations omitted). Without engaging in any other analysis, the district court then merely cites *Green*, *Simms*, and *Taylor* for the proposition that the elements clause is not unconstitutionally vague.

[81] In its Response, the government chides counsel for failing to cite these cases. Aside from the fact that a § 2255 motion is not a brief, there is also no reason for counsel to cite cases that do not address their client's claims.

Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again.

*Davis v. United States*, 588 U.S. 445, 447-48 (2019).

A law is vague: "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732.

The residual clause was deemed unconstitutionally vague because of one set of problems. The elements clause has its own set of problems. These problems are unrelated to the residual clause. The problems unique to the elements clause make it vague and constitutionally invalid.

The residual and elements clauses do share one similarity, as Dylann has argued in his § 2255 motion. As to both clauses, the courts have been engaged in a continuous struggle for the 45 years since § 924(c)'s enactment to apply them in any consistent fashion. In *Johnson, Dimaya,* and *Davis*, the Supreme Court acknowledged that this enterprise had failed as to the residual clause. It has also failed as to the elements clause.

Seeking to apply § 924(c)'s elements clause, the nation's courts, including the Supreme Court, have tried unsuccessfully: to define "force"; to decide whether force must be direct; to decide the degree of *mens rea* that is required; to decide whether the *mens rea* must apply to the use of force itself or can be gleaned from the fact that harm resulted; to decide whether the *mens rea* can be gleaned from the fact that harm resulted even if the resulting harm was accidental (i.e., where the merest battery-level touch or intent to inflict minimal harm nevertheless results in unexpected injury or death); to decide whether it is necessary to demonstrate a reasonable probability that someone would be prosecuted for the least criminalized manner in which the offense may be committed.

210

Before *Johnson* (and then *Dimaya* and *Davis*) invalidated their respective residual clauses, there was little need to parse the elements clause because the residual clause was broad and vague enough to encompass most criminal offenses. *Davis*, 588 U.S. at 467 ("the residual clause, read categorically, 'sweeps more broadly' than the elements clause . . .") Thus, the elements clause was rarely the sole support for a finding that a predicate statute was a crime of violence. Only after *Johnson*, with no residual clause to fall back on, were courts forced to try to apply the elements clause to determine whether an offense was a crime of violence as it was the only definition that remained.

The ensuing splits that arose in the district and circuit courts reveal just how unworkable the definition of "crime of violence" is under the elements clause. The consequence of the many splits has been an untenable result: different outcomes for people who committed the same predicate offense, depending on when and where they were tried.

For example, bank robbery is a crime of violence in the First and Eleventh Circuits. *United States v. Armstrong*, 122 F.4th 1278, 1288 (11th Cir. 2024); *King v. United States*, 965 F.3d 60, 71 (1st Cir. 2020). But not in the D.C. Circuit. *United States v. Burwell*, 122 F.4th 984, 986-87 (D.C. Cir. 2024).

As to intentional killings: The Eighth Circuit has held that voluntary manslaughter is a crime of violence. *Brewer v. United States*, 89 F.4th 1091, 1092-93 (8th Cir. 2024). The Eighth Circuit held that murder for hire is not a crime of violence under the force clause. *United States v. Boman*, 873 F.3d 1035, 1042 (8th Cir. 2017). But the Fourth Circuit has held that conspiracy to commit murder for hire is a crime of violence "if death results," pursuant to the modified categorical approach. *United States v. Runyon*, 994 F.3d 192, 203 (4th Cir. 2020). The Eastern District of New York recently held that first-degree murder is not a crime of

211

violence because the statute is not divisible and felony murder does not require force. *United States v. Ahemeid*, 20-cr-0502, 2026 U.S. Dist. LEXIS 25317, at \*28 (E.D.N.Y. Feb. 5, 2026). This holding disagreed with the Fourth Circuit, which held that the first-degree murder statute is divisible and is a crime of violence when the felony-murder rule is not at issue. *United States v. Jackson*, 32 F.4th 278, 287 (4th Cir. 2022).

And until the Supreme Court decided *Taylor* in 2022, there was a circuit split as to whether attempted Hobbs Act robbery was a crime of violence. *Taylor*, 596 U.S. at 850 (citing *United States v. Taylor*, 979 F.3d 203, 208 (4th Cir. 2020)) (holding that attempted Hobbs Act robbery is not a crime of violence and acknowledging that the Seventh, Ninth, and Eleventh Circuits had held that attempted Hobbs Act robbery is a crime of violence). Though eventually resolved, this split allowed for enormous sentencing disparities. Attempted Hobbs Act robbery carries a maximum sentence of twenty years. In the Fourth Circuit, neither § 924(c) nor § 924(j) could increase the penalty. But in the circuits where attempted Hobbs Act robbery was considered a crime of violence and thus a valid predicate for a § 924(c) or (j) charge, the same conduct would automatically mandate imposition of a consecutive sentence of five additional years and, depending on the nature of the firearm, whether it was carried, brandished or discharged, and what the resulting harm was, could mandate a far longer consecutive sentence.

The unworkability of the elements clause is manifest, too, in the number of times the Supreme Court has changed the definition of force. In the ten years since *[Curtis] Johnson*, which defined force as violent or strong physical force necessary to commit a felony, *[Curtis] Johnson v. United States,* 559 U.S. 133, 138-39 (2010), the Supreme Court has not coalesced around a consistent definition. For example, in *United States v. Castleman*, 572 U.S. 157

212

(2014)[82] the Court commented that the use of *de minimis* force is a "comical misfit" to the violent felony-level force required by the elements clause as described in 2010 [*Curtis*] *Johnson*, and thus a statute requiring only battery-level *de minimis* force was not a crime of violence. *Castleman*, 572 U.S. at 167.[83] But in *Stokeling*,[84] the Court required only a minimal level of force for a crime to constitute a violent felony so long as the predicate statute requires a level of force necessary to overcome a victim's resistance. 586 U.S. at 87. In heated dissents, Justices Alito, Kavanaugh, and Thomas have called for the Court to ditch the categorical approach altogether, because it is unworkable. *See, e.g.*, *Mathis v. United States*, 579 U.S. 500, 537-38 (2016) (Alito, J., dissenting); *Davis*, 588 U.S. at 498 (Kavanaugh, J., dissenting). In similarly heated dissents to the 2025 *Delligatti* decision, Justices Gorsuch and Jackson have argued that the sudden adoption of an omission-equals-force standard has no grounding in the plain language or legislative history of the elements clause, nor in the Court's precedent. *Delligatti*, 604 U.S. at 439, 442-43 (Gorsuch, J., dissenting)[85]

---

[82] *Castleman* was a unanimous 2014 opinion.

[83] Note, too, that, as of 2014, when *Castleman* was decided, while explaining that "mere offensive touching" did not constitute the use of force, the Court had not determined whether causing bodily injury could satisfy the "violent force" necessary under *[Curtis] Johnson*. *Castleman* at 167. One must wonder then how a criminal defendant would have known what qualified under the categorical approach as use of force.

[84] *Stokeling* was decided 5-4 in 2019, but not on familiar ideological lines. Justice Thomas authored the opinion, with Justices Breyer, Alito, Gorsuch, and Kavanaugh joining. Justice Sotomayor dissented, with Chief Justice Roberts and Justices Ginsburg and Kagan joining.

[85] Thus, three members of the Court's majority in *Delligatti* have previously expressed their belief that the categorical approach should be abandoned because it prevents prosecution under the elements clause of crimes that have actually been committed by violent means. Given the strongly worded disagreements about the meaning and application of § 924(c), it is inconceivable that anyone really understands how to apply it or how it will be applied next. At

Such debates go to the heart of the elements clause's unconstitutional vagueness. Section 924(c)(3)(A) has returned over and over again to the Supreme Court because the "person of ordinary intelligence" cannot understand the conduct it actually prohibits—even the judges authorized to interpret cannot agree on what it means.[86] This ambiguity makes enforcement arbitrary. All of this makes the clause, and therefore the statute as it applies to crimes of violence, unconstitutionally vague.

Perhaps most disturbingly, the government itself has demonstrated that it doesn't understand the categorical approach by which § 924(c) must be applied. By contending in its response that Dylann must have known §§ 247 and 249 were crimes of violence because he used a gun to shoot and kill nine people—using the facts of Dylann's crime rather than an analysis of the elements of the predicate offenses themselves—the government does precisely what the categorical approach prohibits.[87] Under the circumstances, enforcement of the statute can be nothing other than arbitrary.

The public may not care if this law is arbitrary when it is applied to Dylann. But a punishment-enhancing law that can be arbitrarily applied may as easily be used tomorrow against the very community that seeks its application today.

It should also be noted that, if § 924(c) is declared unconstitutional, the convictions for the predicate offenses of every single person convicted under it will still be valid. In Dylann's particular case, his convictions under § 247 and his convictions under § 249 will all still stand.

---

this moment, a full third of the Court would like to overturn 35 years of precedent and simply do away with the categorical approach.

[86] Section 924 also criminalizes committing a drug-trafficking crime by use of a firearm. Finding the definition of crimes of violence in the elements clause to be unconstitutionally vague would have no implications for convictions for drug-trafficking crimes committed with firearms.

[87] See Claim 12(C)(2) for Dylann's full rejoinder to this argument.

**C. Finally, The Government Is Wrong That These Claims Are Procedurally Defaulted.**

"In our constitutional order, a vague law is no law at all." *Davis*, 588 U.S. at 447. Thus, Dylann could not have defaulted his claim that § 924(c)'s elements clause is unconstitutionally vague. If the law is vague, it is a nullity, and there is no crime to prosecute. In this circumstance, Dylann (and any defendant charged with this nonexistent crime) is actually innocent of violating the nonexistent law. Dylann has also asserted that prior counsel was ineffective, constituting cause for any failures to previously raise these claims, and his actual innocence of the nonexistent crime constitutes prejudice. As such, Dylann has not procedurally defaulted this claim. *See, e.g.*, *Schlup v. Delo*, 513 U.S. 298, 315-16 (1995); *United States v. McKinney*, 60 F.4th 188, 192-95 (4th Cir. 2023); *United States v. Sweeney*, 833 F. App'x 395, 397 (4th Cir. 2021).

Indeed, § 2255 is always available to challenge a conviction and sentence imposed under an unconstitutional statute. The language of § 2255 is explicit that you can mount such a challenge—which is the essential notion of habeas corpus:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). Dylann is in custody under a federal statute—*i.e.*, an Act of Congress. He claims that his conviction, and thereby his sentence, was imposed pursuant to an unconstitutional statute. Moreover, if the statute is unconstitutional, no court has jurisdiction to impose a sentence based on it, and since the law is invalid, any sentence imposed is in excess of the maximum authorized by law. No other obstacle to pursuing § 2255 relief exists. Dylann raised his claim

215

within the statute of limitations, and this is his first § 2255 action so he is not subject to the rules that apply to successive Motions.

Moreover, in logic and in fairness, this has to be the case. If the courts declared the statutes under which Dylann was prosecuted unconstitutional in somebody else's case, Dylann would be entitled to relief even if he had never raised the claim himself at trial or in post-conviction. The thousands of petitioners who were able to obtain relief after *Johnson*, *Dimaya*, and *Davis* determined the residual clauses of the ACCA, § 16(b) and § 924(c) to be unconstitutional attest to this. It would be entirely anomalous if Dylann himself were not permitted to challenge the constitutionality of the statutes under which he was convicted in this —his first opportunity to bring such a challenge in post-conviction.

216

**CLAIM 12:    The Government Makes Incorrect Assertions As To Claim 12.**

Whereas Claims 14 and 15 are straightforward challenges to the statues Dylann was charged under, Claim 12 focuses on trial counsel's ineffectiveness for failing to raise available and appropriate challenges. The § 2255 motion explained that each of the federal charges against Dylann is either constitutionally infirm, or, in the case of charges under § 924(c), that the predicate crimes charged were not crimes of violence, and that trial counsel was constitutionally ineffective in failing to make arguments that would have been successful (and would still be successful) for why each count, and ultimately the entire federal case, should have been dismissed or tried noncapitally. In their Motion to Dismiss the Indictment and Motion for New Trial,  trial and appellate counsel failed in their most basic job as lawyers: to know the law and make legal arguments that would help their client. Trial counsel failed to make available, persuasive arguments for why § 247 and § 249 are not crimes of violence, meaning they could not serve as predicates for § 924(c) charges, meaning the counts charging violations of § 924(c) and (j) should have been dismissed. Trial counsel even failed to request a stay while this law was developing, despite the fact that stays pending the outcome of numerous issues, including the applicability of *Johnson v. United States,* which involved only the ACCA's residual clause, were being reviewed. Trial counsel also: failed to make available, persuasive arguments for why § 247 and § 249 are unconstitutional federal overreach; failed to argue that § 247 and § 249 violate the First Amendment, even though they create federal jurisdiction solely based on a defendant's thoughts:, and failed to argue that convictions for both § 924(j) and the predicate offense violate Double Jeopardy, even though a lawyer who represented Dylann made this argument in another case, and ultimately prevailed. *See* 15-31114 5th Cir. Dkt. No. 13 (Attorney Appearance in United States v. Sanders); *see also* Ex. 71 (Gannett Dec.) ¶ 9.

217

**A. The Government Is Wrong When It Says That Dylann's Claims Are Procedurally Unreviewable.**

> **1. The government is wrong, because the Court can reconsider any trial issues in light of new information, evidence, or arguments that the Court was previously not made aware of.**

The government's primary complaint about Dylann's claims regarding the constitutional and statutory deficiencies that plague his case is that they were previously litigated on direct appeal and cannot be re-litigated here. Had Dylann merely raised the same arguments prior counsel had made, the government would be right. But that is not the case. Dylann has presented this Court with new materials, law, and facts to which this Court has never previously had access, including declarations from trial counsel, acknowledging that they entirely missed legal arguments and had no strategic reason for doing so.

The government's argument that Dylann's "claims are procedurally unreviewable in a collateral attack under § 2255" because the "claims will necessarily require the Court to revisit matters of law that the Fourth Circuit has already reviewed" sweeps far too broadly, and misconceives the nature of what Dylann has argued in his § 2255 motion. Resp. at 309. Contrary to what the government claims, Dylann has not "revive[d] issues under the guise of a collateral attack on counsel's performance that the Fourth Circuit clearly decided against him." Resp. at 309. To the contrary, Dylann has submitted new information and evidence that were never previously presented to this Court or to the Fourth Circuit, and which call prior rulings of both courts into question. Reexamination of the bases for a defendant's convictions, premised on new information, is the essence of collateral review under § 2255. Such inquiries can only be accomplished in post-conviction.

As the Supreme Court has explained: "'collateral review' of a judgment or claim means *a judicial reexamination of a judgment or claim* in a proceeding outside of the direct review

218

process." *Wall v. Kholi*, 562 U.S. 545, 553 (2011) (emphasis added). As this definition makes clear, prior rulings are frequently revisited and reexamined in § 2255 proceedings.

Whether an issue is procedurally unreviewable does not depend, as the government claims, on whether the § 2255 motion "will necessarily require the Court to revisit matters of law that the Fourth Circuit has already reviewed." Resp. at 309. Rather, it depends on whether the § 2255 motion presents new material, previously unknown to the court—including both facts and law that had not been presented to the court by trial or appellate counsel—that raises doubts about the prior denial of relief. *See, e.g.*, *Massaro*, 538 U.S. at 504 (explaining that the trial record generally "will not disclose the facts necessary to decide either prong of the *Strickland* analysis"); *see also, e.g.*, *Dunn v. Reeves*, 594 U.S. 731, 739-40 (2021) (§ 2254 case emphasizing the importance of evidence from outside the trial record in collateral review proceedings).[88] This is what Dylann has done in his § 2255 pleadings.

What seems to confuse the government with regard to Dylann's claims is that trial and appellate counsel did bring some challenges questioning the constitutionality of the charging statutes and did make some arguments seeking to show that §§ 247 and 249 are not crimes of

---

[88] *See also Hinton v. Alabama*, 571 U.S. 263 (2014) (holding that trial counsel was constitutionally ineffective for doing insufficient legal research and, as a result, failed to realize his client had a right to additional funds to hire expert witnesses critical to the defense).

In *Hinton*, a well-regarded defense attorney was tasked with defending a client against murder charges. The sole evidence against his client came from state forensic experts who claimed that six projectiles had come from a single gun, found in the defendant's mother's house. Hinton's attorney sought funding for an independent forensics expert but received an inadequate amount to hire one who was fully qualified. The attorney failed to conduct research that would have made him aware that a statutory change now entitled him to far greater funds for experts than the court had granted. The Supreme Court determined that Hinton's lawyer fell below an objective standard of reasonableness because he had made an "inexcusable mistake of law." *Id.* at 275. The Court was careful to explain that the ineffectiveness here was not the failure to secure the expert witness but the failure to do adequate legal research to discover Hinton had the statutory right to the necessary funding. *See id.* at 274-75.

219

violence. In response to these, this Court and the Fourth Circuit Court of Appeals did consider

these matters to the limited extent they were raised. But Dylann's contention in these § 2255

proceedings is that trial and appellate counsel missed important legal bases for these claims and

that, as a result of counsel's failure to present these arguments, they were never considered by

this Court or the Fourth Circuit.[89]

United States v. Dyess, 730 F.3d 354 (4th Cir. 2013), and United States v. Linder, 552

F.3d 391 (4th Cir. 2009), cited as controlling authority by the government, do not touch upon

these points. Dyess raised in post-conviction the exact same claim that he had raised on direct

review, whereas challenging a prior ruling with new information is the very definition of a

collateral attack. See Wall, 562 U.S. at 553 ("'collateral review' of a judgment or claim means *a*

*judicial reexamination of a judgment or claim* in a proceeding outside of the direct review

process").

United States v. Linder is about a distinct procedural issue that has no bearing on

Dylann's case. As part of a plea deal, Linder waived his right to a direct appeal. He then filed a

---

[89] Refusing to review claims brought in this posture would amount to a highly problematic irony where ineffective trial counsel could raise a claim at trial and again on appeal, and argue it without citing any appropriate legal precedent and without making significant arguments, though they existed. Under the government's logic, a litigant who sought to challenge prior counsel's representation would be precluded from doing so *because* prior counsel had raised the claims ineffectively.

This would be akin to Hinton's lawyer asking for more money for experts at trial and complaining on appeal that the judge should have provided more, but failing to cite the statutory provisions that showed he was entitled by law to these additional funds. The trial and appellate courts would have reviewed Hinton's requests but Hinton would lose because his lawyer would still have failed in his most fundamental duty to provide the court with the legal basis for granting his request.

If, as the government urges in Dylann's case, such a mistake in law could not be reviewed in post-conviction, Hinton would have been prevented from having a § 2255 tribunal consider his claim.

direct appeal. The appeal was rejected because of the plea agreement. Then Linder tried yet again to avoid his waiver by filing a § 2255 motion. The issue in his case was not even that he had tried to re-litigate issues in post-conviction, but that he tried to circumvent the plea agreement waiving these claims. *Linder*, 552 F.3d at 392 (holding "Linder simply may not avoid the consequences of his knowing and voluntary appeal waiver and our prior judgment by re-raising his . . . claim on collateral review.") Thus, *Linder* has no bearing on the reviewability of an ineffective assistance claim that depends on new facts and information and alleges prior counsel's failure to present crucial arguments and evidence to the courts.[90]

Dylann's claims rely on new information outside the trial record, and therefore previously unknown to this Court. The new information includes arguments that trial counsel failed to make and declarations from trial counsel acknowledging that there was no strategic reason for these omissions.[91]

---

[90] The government also directs the Court to language from *United States Roane*, 378 F.3d 382, 396 n.7, 399 (4th Cir. 2009) and *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183-84 (4th Cir. 1976), holding that "identical" claims raised on direct appeal are unreviewable in post-conviction. In the instances in which claims are deemed non-reviewable in these cases, nothing in the opinions suggests that the litigants provided the courts with new facts or raised them in any new light. In both cases, the courts permitted ineffectiveness claims to go forward in § 2255.
  *Young v. United States*, Cr. No. 6:07-cr-113-GRA, 2010 US Dist. Lexis 109755 (D.S.C. Oct. 14, 2010), makes the equally uncontroversial point that "very thinly" cloaking prior arguments as ineffective assistance claims does not make claims reviewable. *Id.* at *7. Dylann's ineffectiveness claims are not thinly cloaked. He has submitted declarations from trial counsel acknowledging that they failed to make important legal arguments and that they had no strategic reasons for those failures.

[91] For example, a declaration from trial counsel attests that while counsel "correctly identified some problems with § 924's application in Dylann's case," counsel nonetheless "missed others that would have strengthened the motion to dismiss." Ex. 71 (Gannett Dec.) ¶ 7. "There was no strategic reason for failing to raise these claims." Ex. 71 (Gannett Dec.) ¶ 10.

Dylann's claim that trial and appellate counsel were ineffective for failing to present meritorious arguments is precisely the kind of claim that must be litigated in a § 2255 proceeding, not on direct appeal.

**2. Relatedly, the government is wrong when it suggests the § 2255 motion does nothing more than provide additional examples to support the arguments trial and appellate counsel already made in arguing that § 247 and § 249 are not crimes of violence.**

The government is wrong when it suggests the § 2255 motion merely offers different examples from those used by trial and appellate counsel. Dylann's pleadings assert that trial and appellate counsel completely missed legal arguments they should have made, showing that §§ 247 and 249 could be violated without use of force, threat of force, or attempted use of force against the person or property of another necessary to prove the statutes are crimes of violence and were, therefore, not valid predicates for a § 924(c) charge.

The § 2255 motion explains that, although courts have given broad interpretations to the terms "use of force," "attempted use of force," and "threatened use of force" "against the person or property of another," even with the courts' broad interpretations, those terms do not cover every manner in which § 247 or § 249 can be violated. Because the way in which the statutes might be violated without satisfying the elements clause requirements may not be immediately obvious, the Motion and this reply do offer a number of hypotheticals to support its arguments, just as the Supreme Court did in *Taylor v. United States*, 596 U.S. 845 (2022).[92]

---

[92] While a litigant need not show that the government has actually prosecuted someone for committing a federal crime in the nonviolent fashion the predicate statute proscribes, providing credible scenarios can help courts visualize how such a violation might occur. In *Taylor* itself, the Supreme Court illustrated how attempted Hobbs Act robbery could be committed without running afoul of the elements clause, noting, "A hypothetical helps illustrate the point." 596 U.S. at 851.

222

The deficiency in trial and appellate counsel's performance, though, is not that they failed to use helpful examples (although they did). The deficiency is that they failed to make arguments that establish that § 247 and § 249 can be violated without the use, attempted use, or threatened use of force against the person or property of another. Examples are an important way to make such arguments.

Both the § 2255 motion and this reply highlight at least five categories of predicate offenses that do not satisfy the elements clause of § 924(c), even after *Stokeling* and *Delligatti* were decided.[93] These are:

- statutes that can be violated by harm inflicted upon oneself;[94]

- statutes that can be violated by harm inflicted on one's own property;

---

[93] For Dylann to prevail on his claim, it is only necessary for the Court to agree: 1) that *one* of these categories represents a way predicate felony can be violated without *necessarily* involving the use, threatened use, or attempted use of force against the person or property of another; and 2) that § 247 and § 249 can be violated in such a manner. As the Supreme Court made clear in *Taylor*:

> To determine whether a federal felony qualifies as a crime of violence, § 924(c)(3)(A) doesn't ask whether the crime is *sometimes* or even *usually* associated with communicated threats of force (or, for that matter, with the actual or attempted use of force). It asks whether the government must prove, as an element of its case, the use, attempted use, or threatened use of force.

*Taylor*, 596 U.S. at 857-58.

To engage in consideration of whether a federal offense "sometimes" or "usually" involves the use or threat of use of force revives the very problem that rendered the residual clause unconstitutionally vague. That is, it requires a court to make suppositions about what the "normal" way is that an offense is committed and to speculate as to the degree of likelihood the offense will be committed in one manner versus another. Requiring a court to speculate about whether a federal offense "sometimes" or "usually" requires force against another would replicate the work of the residual clause, thereby collapsing the definition of the elements clause into the residual clause and rendering it unconstitutionally vague, too. *Taylor*, 596 U.S. at 856-57.

[94] "Plainly, a threat to harm oneself or one's own property does not meet Section 924(c)'s force requirement." *Mangione*, 2026 U.S. Dist. LEXIS 18890, at *37 (citing *Torres*, 578 U.S. at 466).

- statutes that can be violated by deception;

- statutes that can be violated by someone who willfully causes harm by choosing not to take action, thereby harming someone to whom he has no duty of care; and

- statutes that can be violated by someone using *de minimis* force without requiring that the victim's resistance be overborne.

For example, Section 924(c)'s elements clause clearly says force must be used against the person (or property) of "another." This means that use of force against oneself does not qualify, regardless of how forceful or intentional the conduct against oneself is. But neither trial nor appellate counsel ever argued that § 247 could be violated by threat of force to oneself. The § 2255 motion and this reply highlight counsel's omission. The pleadings then describe possible scenarios in which the perpetrator threatens to self-immolate if worshipers enter a church. Likewise, neither trial nor appellate counsel ever argued that § 249 could be violated by a perpetrator willfully causing physical injury to herself. Again, Dylann's pleadings illustrate this point by using a plausible hypothetical situation to show how someone could willfully engage in self-harm to add realism to a false accusation of assault or rape against another because of that person's race, color, religion or national origin.

Because both predicate offenses at issue can be violated by self-harm, they do not meet the elements clause's definition of a crime of violence. The core deficiency that the § 2255 motion points to is not failure to use helpful examples. Rather, the core deficiency is that counsel *completely neglected* this argument.

Nor did trial or appellate counsel consider the fact that § 249 could be violated by acts of deception that willfully caused bodily injury to others or by willfully choosing not to do something that caused bodily injury to someone to whom the actor had no duty of care. Again,

224

the § 2255 pleadings supply the argument trial and appellate counsel neglected to make and provide examples so this Court could see how such illegal acts could occur. Again, the core deficiency is not prior counsel's failure to use helpful examples, but the fact that they completely failed to make this argument.

To be sure, there were also instances in which the § 2255 motion supplied better hypotheticals to highlight how thoughtless and flimsy the examples—typically consisting of a few words that failed to put the conduct in a realistic frame—used by trial and appellate counsel were, even when their legal theory was sound.[95] The contrast of these examples to the ones offered in these post-conviction pleadings help illustrate prior counsel's cursory treatment of this serious legal issue that eliminates the death penalty in federal court for Dylann. Even if this were a case involving an insignificant criminal penalty, such perfunctory arguments might rise to the level of ineffectiveness. In a capital case, even prior counsel's use of careless and ineffective illustrations constitutes a Sixth Amendment violation if counsel's deficiency prejudiced the defendant by failing to convince the Court. In any event, the use of better examples for these points does not take away from the fact that counsel's ineffectiveness also involved the more egregious problem of completely missing key arguments.

---

[95] The Supreme Court's own example, used in *Taylor* to demonstrate how attempted Hobbs Act robbery could be committed without satisfying the elements clause, consisted of a full paragraph, replete with details, so one could clearly see how the predicate offense could be committed in a way that met the elements of that predicate but failed to satisfy the elements of 924(c). *Taylor*, 596 U.S. at 851. In *Mangione*, 2026 U.S. Dist. LEXIS 18890, following many pages explaining the categorical approach and the elements necessary to make out a violation of the elements clause, the court provides a highly-detailed hypothetical to demonstrate how the federal stalking statute could not only be violated but could result in death without being a crime of violence under the definition of the elements clause contained in § 924(c). The court prefaces this scenario by saying, "A hypothetical case proves the point." *Id.* at *47. So too, in Dylann's pleadings, the hypotheticals are used to prove the points they are making—that trial and appellate counsel failed to make legal arguments that would have prevailed.

The government's criticism of the § 2255 motion is baseless.

**3. The government is wrong when it asserts Dylann defaulted his claim of ineffectiveness for having failed to challenge the constitutionality § 924(c)'s elements clause and cannot demonstrate cause and prejudice to overcome the default.**

Despite the government's assertion to the contrary, Dylann's claim that prior counsel was ineffective for failing to challenge the constitutionality of the elements clause is not barred by procedural default. Claims of ineffective assistance of trial are properly brought in an initial § 2255 motion. *Massaro*, 538 U.S. at 504-05.

The government's reliance on *United States v. Green*, 67 F.4th 657 (4th Cir. 2023), to support its assertion of procedural default is misplaced. Green was convicted and sentenced for violating § 924(j) based on a Hobbs Act robbery predicate after pleading guilty in 2011 to the charge. *Id.* at 670.[96] When he pleaded guilty, he specifically waived his right to appeal his conviction and sentence. He then later challenged this conviction in § 2255 proceedings. This was a direct challenge; Green did not claim counsel had been ineffective for advising him to accept the plea deal. Thus, it was only in this context that the Fourth Circuit said he had defaulted his claim. *See id.* at 667-68.[97]

---

[96] He pled guilty to another § 924(j) charge, as well, but that charge was based on conspiracy and attempt to commit Hobbs Act robbery, both of which were later determined not to be crimes of violence so the conviction was vacated.

[97] Even in this context, the Court found Green had established cause for the default because his claim was reasonably unavailable in 2011. The Court declined to find prejudice because Hobbs Act robbery was a crime of violence under the elements clause. Had it not been—as conspiracy to commit and attempted Hobbs Act robbery were not—prejudice would also have been established as was the case with Green's other conviction under § 924(j). As the Court noted:

> In *McKinney*, we held that the petitioner suffered prejudice as a result of his defaulted claim because his § 924(c) conviction, which was predicated on an offense that does not satisfy the elements clause (Hobbs Act conspiracy), "subjects him to imprisonment for conduct that the law does not make criminal." Other circuits have similarly found prejudice when a § 924 conviction or sentence is not "authorized by law" in light of invalidated predicates because a legally invalid

226

Having never waived his rights of appeal, Dylann properly brought his ineffectiveness claim, asserting prior counsel failed to argue that the elements clause of § 924(c) was unconstitutionally vague. Dylann's ineffectiveness claim is not procedurally defaulted.

Moreover, the "cause and prejudice" standards for overcoming procedural default map directly onto the standards for showing deficient performance and prejudice with a claim of ineffective assistance of counsel. Accordingly, a court must necessarily engage in the same analysis in determining whether a litigant has made a showing of cause and prejudice as it would in determining the merits of an ineffectiveness claim.

### 4. The government is also wrong when it says counsel's decisions were based in strategy.

Finally, the government's assertion that trial counsel's failures were the result of the team's strategic decisions is plainly mistaken. The standard by which to judge the deprivation of a defendant's constitutional right to counsel is a familiar one:

> a criminal defendant's Sixth Amendment right to counsel is violated if his trial attorney's performance falls below an objective standard of reasonableness and if there is a reasonable probability that the result of the trial would have been different absent the deficient act or omission.

*Hinton*, 571 U.S. at 264 (citing *Strickland,* 466 U.S. at 687-88, 694).

Courts will generally not second-guess decisions made by trial counsel to choose one course of action over another where those decisions are strategic, *but only if those decisions are based on adequate information*:

> Under Strickland, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the

---

conviction or sentence "certainly [creates] an 'actual and substantial disadvantage' of 'constitutional dimensions.'"

*Green*, 67 F.4th at 667-68 (alteration in original) (internal citations omitted).

227

extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."

*Hinton*, 571 U.S. at 274 (quoting *Strickland*, 466 U.S. at 690-91).

A lawyer's ignorance of the law regarding a matter critical to the client's defense cannot be strategic. In *Hinton*, a well-regarded defense attorney was tasked with defending a client against murder charges. The sole evidence against his client came from state forensic experts who claimed that six projectiles had come from a single gun, found in the defendant's mother's house. Hinton's attorney sought funding for an independent forensics expert but received an inadequate amount to hire one who was fully qualified. The attorney failed to conduct research that would have made him aware that a statutory change now entitled him to far greater funds for experts than the court had granted. The United States Supreme Court determined that Hinton's lawyer fell below an objective standard of reasonableness because he had made an "inexcusable mistake of law." *Id.* at 275.[98]

In like manner, trial counsel in Dylann's case made inexcusable mistakes of law. Counsel was, or should have been, aware that, if successful, the arguments the defense was putting forth

---

[98] The rejoinder might be made to the failure of any lawyer to make valid arguments to a court that it is of little moment since the court itself will recognize all the bases that underlie a claim. Clearly, this Supreme Court does not believe that to be true or Hinton would have lost his ineffectiveness claim. After all, Hinton's lawyer had requested the funding in the first place and the court could theoretically have discovered the correct standard under which to allocate expert funds.

So, too, the government seems to argue that because Dylann's prior counsel challenged these statutes on some basis, it makes no difference in an ineffectiveness claim that they failed to challenge them on legally valid, supportable bases because, even without such arguments, the reviewing court would reach the right conclusions. If that were the case, a lawyer's job could be reduced to throwing up an unsupported broad claim challenging the statutory and constitutional bases for prosecutions with the expectation that the courts would do the work of figuring out why those claims were valid or not. This is not, and never has been, the way legal representation works.

in the Motion to Dismiss would either render 18 U.S.C. §§ 247 and 249 unconstitutional, thereby invalidating the entire federal case against Dylann, or would remove §§ 247 and 249 from the designation of "crimes of violence," under § 924(c), thereby eliminating the bases for nine sentences of death. There could be no reasonable strategic basis for failing to make the strongest, most thoroughly researched arguments possible.

Trial counsel's declarations back this up. Sarah Gannett was the author of the Motion to Dismiss, a pleading whose significance she should have understood at the time, and certainly does now. "The claims in the motion would have eliminated the bases on which the federal government could prosecute Dylann." Ex. 71 (Gannett Dec.) ¶ 6. Nevertheless, she filed the motion just three weeks after being appointed to the case. *Id.* ¶ 6. Gannett acknowledges that she neglected to make consequential arguments of law, and that she had no strategic reason for missing these critical arguments. *Id.* ¶¶ 7-10.

Perhaps the most glaring example of this is that Gannett was appointed as appellate counsel for another federal capital client on January 28, 2016, six months before filing the Motion to Dismiss the Indictment in Dylann's case. *See* 15-31114 5th Cir. Dkt. No. 13 (Attorney Appearance in *United States v. Sanders*); *see also* Ex. 71 (Gannett Dec.) ¶ 9. In Mr. Sanders's case, Gannett argued successfully to the Fifth Circuit that the Double Jeopardy Clause of the federal constitution precluded trying a defendant for both a predicate statute and 18 U.S.C. § 924(j). *See Sanders*, 133 F.4th at 356. Yet she never raised this claim in Dylann's case, even though the legal claims were identical. There could have been no strategic reason to assert this claim in Sanders's case and not in Dylann's. Such an oversight can only be considered an inexcusable mistake. There was nothing strategic about it.

229

Understanding the law, researching the law, making relevant arguments of law, and carefully thinking through the ways the law can be challenged are the hallmarks not of extraordinary lawyers but of everyday lawyers acting reasonably. As those burdens become heavier due to the weighty responsibility of representing an unpopular, death-eligible client, so too do the demands on counsel. There can be no strategic reason that ever justifies failing to conduct the legal research and analysis necessary to protect one's client.

**B. The Government Is Wrong That Convictions Under § 924(j) And The Predicates Do Not Violate Double Jeopardy.**

A Double Jeopardy challenge to Dylann's conviction is also discussed above, as to Claim 15. Claim 15 raises a direct challenge under current law and Claim 12, addressed here, raises an ineffective assistance of counsel argument. *See* Claim 15, Section A above for the substance of the claim. This section addresses counsel's ineffectiveness in failing to raise this argument.

As noted above, the Fifth Circuit held that convictions and sentences for both § 924(j) and the predicate offense violate the Double Jeopardy Clause. *Sanders*, 133 F.4th at 356, 371, 391. Additionally, the government recently conceded this point, effectively agreeing with the outcome in *Sanders*. *See* Oral Argument Transcript, *United States v. Barrett*, No. 24-5774, at 48 (Oct. 7, 2025),[99] The Double Jeopardy issue in Dylann's case is the same as in *Sanders*.

---

[99] Justice Kagan asked "Do you think that there are cumulative punishments authorized for both (j) and the predicate offense?" Counsel for the government responded, "We don't, no, because there's no language in 924(j) that authorizes those cumulative punishments for the predicate offense of (c) or (c)'s own predicate. It's like they're not stacked at all." Justice Kagan clarified, "your position is consistent all the way through, we're going to make you have language, and because there's no language for the original predicate offense, let's say, a robbery or something . . . that cumulative punishment is not authorized?" and counsel responded, "We think that that is the necessary implication of the language in the -- in the text of the statute here." https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/24-5774_6jf7.pdf.

As to the government's argument that Dylann "fails to establish that his counsel acted incompetently based on the law that existed at the time," the case the government points to as "Fourth Circuit caselaw that existed at the time of trial"—*United States v. Bran*, 776 F.3d 276 (4th Cir. 2015)—does not address Double Jeopardy at all. Resp. 364, 367. *Bran* held that consecutive sentences for a § 924(j) charge and the predicate offense are mandatory, not discretionary. *Bran*, 776 F.3d at 281-82. *Bran* did not say anything about Double Jeopardy.[100]

But by the time of Dylann's trial in 2016 and sentencing in 2017, other cases had addressed Double Jeopardy and § 924(j). By 2016, four circuits had held that convictions and sentences for both § 924(j) and § 924(c) do violate Double Jeopardy, frequently following the government's concession. *See United States v. García-Ortiz*, 657 F.3d 25, 28 (1st Cir. 2011); *United States v. Wilson*, 579 F. App'x 338, 348 (6th Cir. 2014); *United States v. Fernandini*, 652 F. App'x 4, 6 (2d Cir. 2015); *United States v. Gonzales*, 841 F.3d 339, 357-58 (5th Cir. 2016). Although these cases are about § 924(j) and *§ 924(c)*, not § 924(j) and the *predicate*, the holding that convictions for both § 924(j) and § 924(c) violate Double Jeopardy necessarily implies that convictions for both § 924(j) and the predicate do as well—which is precisely what the government acknowledged during the *Barrett* oral argument.

First, these cases held that § 924(c) and § 924(j) fail the *Blockburger* test: "Every element of section 924(c) is also an element of section 924(j); therefore, a person who violates section 924(j) necessarily violates section 924(c). As such, section 924(j) amounts to the 'same offense'

---

[100] *Bran*'s holding that consecutive sentences for a § 924(j) charge and the predicate offense are mandatory was also abrogated by *Lora v. United States*, 599 U.S. 453 (2023), which held that consecutive sentences were discretionary. As the § 2255 motion and this reply, as well as the government's Response, have repeatedly noted, the law around 18 U.S.C. § 924 is constantly shifting.

as section 924(c) for purposes of the Double Jeopardy Clause." *Gonzales*, 841 F.3d at 356 (citing *Blockburger*, 284 U.S. at 304).

Second, as the Fifth Circuit later would do in *Sanders*, these Courts treated the *Blockburger* test as a presumption rebuttable by a clear Congressional statement. So, although § 924(c) and § 924(j) are the same offense, these courts acknowledged that, "Congress could have authorized cumulative punishments for convictions under sections 924(c) and 924(j) had it chosen to do so." *Garcia-Ortiz*, 657 F.3d at 28. But "the plain language of section 924(j) indicates no such desire." *Id.* That is, § 924(j) does not specifically allow for punishment that duplicates punishment for any other charge that is the same offense. *Id*. Separate convictions for violating § 924(c) and § 924(j) violate the Double Jeopardy Clause. Because this conclusion is based on the language of § 924(j), it means that separate convictions for violating the predicate and § 924(j) necessarily violate the Double Jeopardy Clause, as well (as, again, the government acknowledged in the *Barrett* oral argument).

Although the Fourth Circuit had not addressed the question prior to Dylann's trial, by 2024, the Fourth Circuit reached the same conclusion that the First, Second, Fifth, and Sixth Circuits had reached prior to Dylann's trial. *See United States v. Ortiz-Orellana*, 90 F.4th 689, 705 (4th Cir. 2024) ("[A] sentencing court may not impose cumulative punishments for §924(c) and §924(j) if those violations are based on the same conduct") (citing *United States v. Palacios*, 982 F. 3d 920, 924-25 (4th Cir. 2020)). Certainly, by the time of Dylann's trial, the law was predictably headed in this direction, foreshadowing the decision in *Sanders* that convictions for both § 924(j) and a predicate offense would also constitute Double Jeopardy. The Fourth Circuit has made clear that a movant "can demonstrate ineffective assistance under *Strickland* if 'existing case law' 'sufficiently foreshadowed' the double jeopardy challenge such that trial

232

counsel's failure to raise it rendered his performance constitutionally deficient." *United States v. Palacios*, 982 F.3d at 925 (quoting *United States v. Morris*, 917 F.3d 818, 824 (4th Cir. 2019)).[101]

Notably, the government's response entirely ignores that Dylann's trial counsel also litigated *Sanders*. Resp. at 326. Sarah Gannett was appointed as appellate counsel for Mr. Sanders on January 28, 2016, six months before filing the Motion to Dismiss the Indictment in Dylann's case. *See* 15-31114 5th Cir. Dkt. No. 13 (Attorney Appearance in *United States v. Sanders*); *see also* Ex. 71 (Gannett Dec.) ¶ 9. There is no excuse, nor any strategic basis, for counsel failing to raise a legal argument on behalf of one client when she had already raised it on behalf of another client to whom it applied equally. Indeed, trial counsel acknowledges that they mistakenly failed to raise strong arguments in Dylann's case. Ex. 71 (Gannett Dec.) ¶ 17.

Prior counsel inexcusably failed to assert this Double Jeopardy challenge, which was foreshadowed by caselaw and which proved successful in a case in which it had already been raised and argued by a member of Dylann's legal team in a legally-identical framework. Counsel for Dylann was ineffective.

**C. The Government Makes Several Incorrect Points In Response To The Argument  Trial Counsel Was Ineffective For Failing To Challenge The Constitutionality Of § 924(c), Because The Statute (Not Only Its Residual Clause) Is Unconstitutionally Vague.**

**1. The government is wrong when it asserts that reasonably competent counsel could not have been expected to raise the claim that § 924(c) is unconstitutionally vague given the state of the law at the time of trial.**

The standards of performance for capital counsel are more exacting than those that apply to non-capital counsel, including expectations that competent counsel will raise all non-frivolous

---

[101] While the Fourth Circuit held that a § 924(c)/§ 924(j) Double Jeopardy challenge had not been "sufficiently foreshadowed" by Mr. Palacios's trial in 2008, by the time Dylann's trial nearly ten years later, it certainly had been. And the fact that by the time of Dylann's trial, his lawyer had already mounted a Double Jeopardy challenge in the § 924(j) /predicate crime context, there is no doubt counsel believed this to be a timely, non-frivolous claim.

233

legal and constitutional claims. Because death is the ultimate punishment after which a client's

rights can never be vindicated, counsel in capital cases operate under a more stringent set of

standards than those that govern the conduct of lawyers in any other criminal context.[102] In

addition to the additional investigation counsel is obligated to pursue, capital defense counsel is

also obligated to pursue and preserve all possible legal claims, even those that seem unlikely to

prevail at the time. *See generally, e.g.*, 2003 Guidelines.

Having an experienced, well-meaning set of lawyers is better than having an

inexperienced team, but it does not insulate counsel from being constitutionally ineffective.

Dylann's team is the perfect and unfortunate example of a team that failed to provide

constitutionally competent counsel.[103]

---

[102] The most basic service a lawyer provides his client in any criminal case is to simply know the law: "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton*, 571 U.S. at 274 (citing *Williams* v. *Taylor*, 529 U.S. 362, 395 (2000) (finding deficient performance where counsel "failed to conduct an investigation that would have uncovered extensive records [that could be used for death penalty mitigation purposes], not because of any strategic calculation but because they incorrectly thought that state law barred access to such records"); *Kimmelman* v. *Morrison*, 477 U.S. 365, 385 (1986) (finding deficient performance where counsel failed to conduct pretrial discovery and that failure "was not based on 'strategy,' but on counsel's mistaken belie[f] that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense")).

[103] According to the many accounts detailed in the trial lawyers' declarations, Dylann's team was in complete disarray for at least the six months immediately prior to trial. One hand did not know what the other was doing. An important deadline to file non-mental health mitigation was entirely missed. Legal claims were missed. Experts were not retained who should have been. No one challenged the venue in a traumatized city saturated with publicity about the crime and its aftermath. On top of all this, unbeknownst to lead counsel, one lawyer from the team told Dylann's father that defense experts had concluded Dylann was autistic, which Dylann's father then repeated to Dylann. Lead counsel assured Dylann no decision had yet been made to raise this argument or mental health evidence—a misleading representation at best. Dylann learned this was not true from the government's mental health expert—an outcome that was virtually certain to happen because of the nature of the examination the government expert was conducting. Because no one had thought through these very real contingencies, no one on the defense team prepared Dylann for the fact that the team did plan to use mental health evidence at penalty phase. When Dylann learned the truth, he understandably felt he had been deceived and

This is for sound reason. The law is not static. Legal claims that aren't obvious winners today must still be raised so they are preserved for later litigation. According to the 2003 ABA Guidelines, it is the responsibility of counsel to consider all legal claims even "potentially" available and evaluate each potential claim in light of the "unique characteristics of death penalty law and practice" and "the importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited." 2003 Guideline 10.8.[104]

Concerns about forfeiting a client's rights are quite real, as the arguments in the government's response underscore. With so much at stake for their clients, competent capital defense attorneys are obligated to file more pre-trial motions than the average criminal defense lawyer, on a wider variety of topics, and with more thorough legal arguments. Competent capital defense attorneys are expected to challenge every provision of law being used to prosecute their client, even if the efforts to do so seem futile at the time. Competent capital defense attorneys are taught (or learn over time) that a claim that has no legs when first raised may nevertheless become a successful claim over the course of the trial or the post-conviction litigation to follow—this is a process the capital defense bar has watched unfold time after time.

Examples are not hard to find. The very statute at issue provides one. Constitutional challenges to § 924(c)'s residual clause might have seemed futile in 2010, after the Supreme

---

betrayed, resulting in a complete breakdown of the attorney-client relationship. *See, e.g.*, Ex. 5 (Bruck Dec.) ¶¶ 11-14, 20-22, 41-43; Ex. 6 (Stevens Dec.) ¶¶ 5-13; Ex. 7 (Paavola Dec.) ¶ 21; Ex. 71 (Gannett Dec.) ¶¶ 7-10.

[104] The Supreme Court has relied on these Guidelines and similar guidelines for defenders in both capital and non-capital contexts. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 366-67 (2010) (collecting cases).

Court had twice rejected challenges to its constitutionality. In 2015, *Johnson* changed the landscape, and four years later, *Davis* held § 924(c)'s residual clause unconstitutional. Thus, two seemingly offhand comments saying the elements clause was not constitutionally infirm should not have deterred competent capital counsel.

In capital cases specifically, illustrations abound of laws deemed constitutional—until they weren't. To name just a few: for many years, pursuant to Florida law,[105] a jury's sentencing determination was a recommendation which the trial judge could accept or reject, meaning that even if the jury recommended a life sentence, the judge could sentence defendant to death. The Supreme Court initially upheld the constitutionality of Florida's capital sentencing scheme in 1984, in *Spaziano v. Florida*, 468 U.S. 447 (1984), and again in 1989, in *Hildwin v. Florida*, 490 U.S. 638 (1998). In 1995, the Supreme Court upheld the constitutionality of Alabama's override provisions *Harris v. Alabama*, 513 U.S. 504 (1995). Then, in 2013, dissenting from denial of certiorari, Justice Sotomayor opined that, "Eighteen years have passed since we decided *Harris*, and in my view, the time has come for us to reconsider that decision." *Woodward v. Alabama*, 571 U.S. 1045, 1048 (2013) (Sotomayor, J., dissenting from denial of certiorari).[106] In 2016— three years after *Woodward*, more than twenty years after *Harris*, more than thirty years after

---

[105] Alabama, Delaware, and Indiana had similar laws, called "judicial override" statutes.

[106] Justice Sotomayor pointed out that since *Spaziano* and *Harris*, the Court's Sixth Amendment jurisprudence has "developed significantly." *Id.* at 1052. In 2000, the Court held "that the Sixth Amendment does not permit a defendant to be 'expose[d] . . . to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone.'" *Id.* at 1053 (alterations in original) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 483 (2000)). In 2002, the Court "applied the *Apprendi* rule in *Ring v. Arizona* to invalidate Arizona's capital sentencing scheme, which permitted the trial judge to determine the presence of aggravating factors required for imposition of the death penalty." *Id.* at 1053 (citing *Ring v. Arizona,* 536 U.S. 584, 609 (2002)).

*Spaziano*, and more than forty years after the statute was enacted—the Court declared Florida's statute unconstitutional. *See Hurst v. Florida*, 577 U.S. 92 (2016). The opinion declared that "[t]ime and subsequent cases have washed away the logic of *Spaziano* and *Hildwin*" and held that the statute violated the Sixth Amendment. *Hurst*, 577 U.S. at 102.[107]

For decades, courts denied Eighth Amendment claims by defendants with intellectual disabilities. *See Penry v. Lynaugh*, 492 U.S. 302 (1989). Then, the Supreme Court declared imposing the death penalty on someone who is intellectually disabled unconstitutional. *See Atkins v. Virginia*, 536 U.S. 304, 307 (2002). Courts also denied Eighth Amendment claims brought by defendants who committed their crimes before the age of eighteen. *See Stanford v. Kentucky*, 492 U.S. 361 (1989). Then, the Supreme Court declared imposing the death penalty on someone who committed a crime as a child, while under the age of eighteen, unconstitutional. *See Roper v. Simmons*, 543 U.S. 551 (2005).

In these circumstances, attorneys who failed to challenge the matters in question, or failed to develop evidence in support of them, risked defaulting or waiving the claims.[108] This is a risk capital defense attorneys are obligated to protect against.

Dylann's counsel was—or should have been—aware that the residual clause had shielded the elements clause from judicial scrutiny. Dylann's counsel was—or should have been—aware that after the residual clause was invalidated, courts were reaching wildly different results when

---

[107] By 2016, Alabama was the only state other than Florida that still permitted judicial override. The Alabama legislature abolished the practice in 2017, after the *Hurst* decision.

[108] Corey Johnson, executed in 2021, is an example. His trial attorneys had failed to develop evidence of intellectual disability, which continued to impact the case even after subsequent counsel did develop such evidence. *See generally, e.g., United States v. Johnson*, 92cr68, 2021 U.S. Dist. LEXIS 388 (E.D. Va. Jan. 2, 2021).

237

analyzing the predicate crimes under the elements clause. Courts in different jurisdictions—and sometimes within the same jurisdiction—disagreed on fundamental concepts such as the level of force that satisfied the elements clause; whether direct and/or indirect force sufficed; whether a failure or omission of action could constitute a crime of violence; what the necessary *mens rea* was to satisfy the elements clause; whether a predicate offense that did not require the use of force turned into a "crime of violence" if death resulted. Dylann's counsel was aware of all the information necessary to see, clearly, that the elements clause should be challenged as unconstitutionally vague.

Preserving legal claims is a core function of capital defense counsel. The § 924(j) claims carried the potential for, and ultimately resulted in, nine death sentences. In failing to raise this claim, counsel failed to provide effective assistance of counsel, counsel had no reasonable strategic reason for this failure, and Dylann was prejudiced thereby.[109]

> **2. The government is wrong, and completely ignores the required categorical analysis, when it asserts that Dylann's challenge for vagueness of the elements clause of § 924(c) must fail because Dylann must have known when he committed his crime that killing people was a crime of violence.**

A law must be deemed void for vagueness "[f]irst, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732. In arguing that Dylann cannot challenge § 924(c) for vagueness because he must have known that his acts were violent, the government demonstrates both that it thoroughly misunderstands the categorical approach and that the elements clause is unconstitutionally vague.

---

[109] If trial counsel is *not* deemed to have been ineffective for failing to assert this claim at trial because reasonably competent counsel would not have raised the claim, then the claim has not been defaulted and bringing the claim in post-conviction should not require a demonstration of cause and prejudice.

The categorical approach, adopted by the Supreme Court more than 35 years ago in *Taylor v. United States*, 495 U.S. 575 (1990), is the Supreme Court's mandated approach for determining whether an offense is a "crime of violence." The categorical approach requires considering only the abstract definition of a crime. It prohibits considering case-specific facts.[110] This is because the definition speaks only to whether an "*offense* that is a felony has as an element the use, attempted use, or threatened use of physical force" against the person or property of another, § 924(c)(3)(A), not whether a defendant committed an offense that employed force.[111]

As the courts have repeated in case after case, when determining whether a predicate statute is a crime of violence, a court can never consider the manner in which the defendant actually committed the crime. *See, e.g.*, *Begay v. United States,* 553 U.S. 137, 141 (2008) (holding that the court's task in determining whether a predicate offense is a crime of violence is to consider it "in terms of how the law defines the offense and *not in terms of how an individual offender might have committed it on a particular occasion*") (emphasis added); *United States v. Taylor*, 596 U.S. 845, 850 (2022) (the categorical assessment demanded by the elements clause "does not require—in fact, *it precludes—an inquiry into how any particular defendant may commit the crime*") (emphasis added).

---

[110] The categorical approach applies when analyzing a predicate offense under the ACCA, 18 U.S.C. § 16(b), and, as relevant here, § 924(c).

[111] "As originally enacted in 1968, § 924(c) prohibited the use of a firearm in connection with *any* federal felony." *Davis*, 588 U.S. at 461-62 (citing § 102, 82 Stat. 1224). In 1984, Congress amended the statute to limit its reach to drug-trafficking crimes and "crimes of violence" as specifically defined in subsection (c), clearly indicating that some felony offenses, even those that someone might violate in a violent fashion, were not specifically "crimes of violence" under the then new [now current] statutory definitions.

As the Supreme Court pointed out in *Davis*, it is for Congress, not the courts, to fix the problems it has created, lest the courts violate the separation of powers. *Id.* at 448.

239

A court confronted with the question whether a predicate offense is a crime of violence under § 924(c)'s elements clause may examine *only* the elements of the predicate offense to see what the least criminalized conduct is that satisfies those elements. The categorical approach means that if there is *any* way to commit the crime without intentionally using violent force against another person or another person's property, the predicate offense is "categorically" not a crime of violence.

Completely misunderstanding the categorical approach, the government says Dylann must have known he was committing a crime of violence, because he used a gun to kill nine people. But the facts of the crime, per the categorical approach, have no bearing on whether the predicate offense is a "crime of violence" per § 924(c)'s elements clause. Knowing whether he had committed a "crime of violence" that could serve as a valid predicate for § 924(c) would have required Dylann to figure out whether, based on their elements, either of the predicate crimes—violations of the statutes prohibiting hate crimes and religious obstruction—could be committed without the use, attempted use, or threatened use of physical force against the person or property of another.

As a consequence, it makes no difference at all if Dylann (or any person of ordinary intelligence) understands that killing people entails violence. Of course they do. But whether a predicate crime that results in someone being killed is categorically a crime of violence is a horse of a different color.[112]

---

[112] In *United States v. Ahemeid*, 20-cr-0502, 2026 U.S. Dist. LEXIS 25317 (E.D.N.Y. Jan. 6, 2026), the district court has determined that the federal murder statute does not satisfy the requirements of the elements clause under § 924(c) so is not a "crime of violence" under its terms. The court takes great pains to explain how this is a legally necessity, but completely counter-intuitive, result.

Yet showcasing just how complex this analysis is, even in that court's careful analysis, it made a mistake. The court applied the "realistic probability" test, citing *United States v. Hill*, 890

*Johnson* itself refutes the government's implicit contention that the statute must be constitutionally acceptable because there are some instances in which it can be applied to crimes that are violent in the colloquial sense. The Court notes that just because some conduct comes within the purview of the "crimes of violence" definition does not mean the statute is clear enough to pass constitutional muster. As the Court explained:

> *[O]ur holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp. For instance, we have deemed a law prohibiting grocers from charging an "unjust or unreasonable rate" void for vagueness*—even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable. We have similarly deemed void for vagueness a law prohibiting people on sidewalks from "conduct[ing] themselves in a manner annoying to persons passing by"—even though spitting in someone's face would surely be annoying. These decisions refute any suggestion that the existence of *some* obviously risky crimes establishes the residual clause's constitutionality.

*Johnson*, 576 U.S. at 602-03 (emphasis added) (alterations in original) (internal citations omitted). This is as true for the elements clause as it was for the residual clause discussed in

---

F.3d 51, 56 (2d Cir. 2016). *See Ahemeid*, 2026 U.S. Dist. LEXIS 25317, at *16-17. But in 2022, the Supreme Court's opinion in *Taylor* held that the "realistic probability" test does not apply when analyzing federal statutes, saying: "First, the immigration statute at issue in *[Gonzales v.] Duenas-Alvarez*[, 549 U.S. 183 (2007)] required a federal court to make a judgment about the meaning of a state statute. Appreciating the respect due state courts as the final arbiters of state law in our federal system, this Court reasoned that it made sense to consult how a state court would interpret its own State's laws. Meanwhile, no such federalism concern is in play here. The statute before us asks only whether the elements of one federal law align with those prescribed in another." *Taylor*, 596 U.S. 858-59 (citing *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709, n.8 (1985)).

    This error does not undermine *Ahemeid'*s holding. Indeed, the court improperly *raised* the standard by requiring itself to find a "realistic probability." And even under this heightened standard, the court found that federal first-degree murder was not a crime of violence because there was a realistic probability that a felony murder committed without force would be prosecuted as first-degree murder (whereas, per *Taylor*, it only had to find that such a crime could be prosecuted according to the language in the statute, § 1111). But this error does underscore the ever-changing nature of this area of law, and that even highly-trained, thoughtful jurists continue to misunderstand because this body of criminal law is so complex.

241

*Johnson*. The history of the application of the elements clause bears this out.[113]

The predicate crimes—religious obstruction and racial bias[114]—on which Dylann's § 924(c) and (j) charges and death sentences are based are even less straightforward than most state murder statutes or the federal kidnapping statute.[115] To the extent a person of ordinary intelligence had tried to guess what the elements clause criminalized[116] in the context of §§ 247 and 249 under *Curtis Johnson*, *Castleman*, and *Torres-Rodriguez*, he would almost certainly have failed, because the definition of force, the required level of *mens rea* to use that

---

[113] For several years after the residual clause of the ACCA was deemed unconstitutional, the Fourth Circuit held some state and federal murder statutes *not* to be crimes of violence under the ACCA and § 924(c) because the predicate murders could be accomplished by use of indirect means like poison, which the Fourth Circuit believed failed to satisfy the elements clause. In the years since Dylann was charged and tried, several defendants in the Fourth Circuit—Kenneth Lighty, Chadrick Fulks and Brandon Basham—have been granted relief from their § 924(j) death sentences because courts determined that their federal kidnapping-resulting-in-death predicate crimes were not crimes of violence under the categorical analysis required by the elements clause. Kenneth Lighty had been convicted in Maryland on federal charges of two kidnappings resulting in the death of a D.C. police officer, and sentenced to death pursuant to § 924(c) and (j). Chadrick Fulks and Brandon Basham had been convicted in South Carolina, and sentenced to death on federal charges that included kidnapping resulting in death of two women, also pursuant to § 924(c) and (j).

[114] The government refers to them as "civil rights" statutes. Resp. at 339.

[115] As has been noted in other sections, the religious obstruction statute (§ 247) can be satisfied (1) by force used against one's own property, (2) by threats or actual use of force to oneself, and (3) by a degree of force that, especially at the time of trial, would not be sufficient to satisfy the elements clause. While the racial bias statute (§ 249) requires the intent to cause injury, that injury can include injury to oneself and—by the terms of the incorporated statutory definition of injury—includes *any* type of illness, *any* bruise or abrasion (*i.e.*, a scraped knee), *any* degree of physical pain (a term which itself is never defined or quantified), or "*any other injury* to the body, *no matter how temporary*." 18 U.S.C. §1365(h)(4)(E) (definitions). Under such a definition, tricking someone into thinking they were using sunscreen when they were actually using plain lotion, would violate § 249 if racial animus prompted the hoax.

[116] As separate and apart from what § 247 or § 249 criminalized.

242

force, and the type of examples necessary to demonstrate the least conduct criminalized by the predicate statute, are concepts the use of which have shifted year by year, jurisdiction by jurisdiction.

The courts themselves have struggled mightily with making these determinations, and at different times have reached vastly different results. A person of ordinary intelligence would not have known what constituted a crime of violence under the elements clause.

And the government's own argument, that the facts of Dylann's conduct prove he committed crimes of violence as defined by the elements clause demonstrates two things. First, the government itself misunderstands what constitutes a crime of violence as defined by three and a half decades of Supreme Court law.

Second, and critically, if the government itself—the only authority under which this federal statute can be prosecuted—so thoroughly misunderstands how to interpret it, the statute clearly "encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732.

While a statute need only fail one of the two tests described in *Hill* by which to judge whether a statute is unconstitutionally void, the elements clause of § 924(c) fails them both.

**3. The government is wrong when it says that § 924(c) is not unconstitutionally vague.**

In Claim 14, Section A, Dylann has explained that § 924(c) is unconstitutionally vague. As to whether counsel was ineffective, if the law is vague now, it was vague at the time of Dylann's trial. Perhaps the vagueness is more demonstrable now, with more cases pointing to the utter confusion surrounding its meaning. But it has not become vague since trial. Trial counsel failed in their most basic duty as lawyers by failing to raise this argument. *See Hinton*, 571 U.S. at 274 (holding that counsel's most basic function is to research and present the available law so that a court has the legal arguments at its disposal on which to base its decisions)

243

**4. The government is wrong when it says you can only raise an "as applied" challenge to a criminal statute and Dylann cannot bring such a challenge.**

The government also, incorrectly, argues that Dylann cannot challenge the elements clause because any vagueness challenge must be an as-applied challenge. Arguing that "the Fifth Amendment bars enforcement of a criminal statute on vagueness grounds only if the statute is vague as applied to the defendant," Resp. at 348, the government misconstrues the relationship between the void for vagueness doctrine, facial challenges, and the categorical approach. This error is similar to the government's mistake, discussed above, in saying that § 924(c)'s elements clause cannot be vague because Dylann must have known that he was committing a crime of violence. Here again, the government shows that it misunderstands the categorical approach.

As a different district court recently explained, and as discussed extensively above, "crimes of violence under Section 924 must be felonies that by definition involve force." *Mangione*, 2026 U.S. Dist. LEXIS 18890, at *10. If the categorial approach "reveals that the offense could, in at least one conceivable factual scenario, be committed without force, then the offense is not a crime of violence in <u>any</u> case, regardless of how obviously violent a particular defendant's alleged conduct may be . . . ." *Id.* at 9. And if a crime is not categorically a crime of violence, then it is never a valid predicate for a § 924(c) conviction.

All of which is to say, the categorical approach is about the categorial definition of crimes, and not about the specifics of any given case. As such, regardless of how vagueness challenges to other criminal statutes operate, when the question is whether a definition of crime of violence is vague, and when assessing the definition of crime of violence requires the categorical approach, a facial challenge is appropriate.

The problem with § 924(c)'s elements clause is that there is no way to consistently and predictably determine whether an offense is a crime of violence and thus a valid predicate. This

244

was precisely the problem with the residual clauses struck down in *Johnson*, *Dimaya*, and *Davis* (including § 924(c)'s residual clause, struck down by *Davis*). Those cases were facial challenges to the residual clauses' definitions of crimes of violence. *See Johnson*, 576 U.S. at 597 ("We are convinced that the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges."); *Sessions v. Dimaya*, 584 U.S. 148, 152 (2018) ("The question in this case is whether a similarly worded clause in a statute's definition of 'crime of violence' suffers from the same constitutional defect. Adhering to our analysis in *Johnson*, we hold that it does."); *Davis*, 588 U.S. at 447-48. A facial challenge is appropriate because, as *Davis* explains, "In our constitutional order, a vague law is no law at all." *Davis*, 588 U.S. at 447. The government is thus incorrect when it asserts that only an as-applied challenge can be made to § 924(c)'s elements clause.

**D. The Government Is Wrong For Both Of The Reasons It Says Ought To Defeat Dylann's Claim That 18 U.S.C. § 247 Is Not A Crime Of Violence—That § 247 Can Be Violated By A Perpetrator Who Threatens Self-Harm To Obstruct Worshippers From Exercising The Right To The Free Exercise Of Their Religious Beliefs Or By One Who Harms Her Own Property.**

**1. The government offers two unsupportable reasons for contesting Dylann's assertion that § 247 is not a crime of violence because a perpetrator can use the threat of self-harm to obstruct others' exercise of religious beliefs.**

The issue of whether § 247 qualifies as a crime of violence is discussed above, as to Claim 15. Claim 15 raises a direct challenge under current law and Claim 12 raises an ineffective assistance of counsel argument. For the explanation of why § 247 does not qualify as a crime of violence, see Claim 15, Section B, above. As to counsel's ineffectiveness, here again trial counsel failed in their most basic duty as lawyers by failing to raise this argument. *See Hinton*, 571 U.S. at 274.

245

**2. The government is wrong when it says that constitutional concerns would bar enforcement of § 247 against a person who used force against her own property or threatened self-harm in order to obstruct worshippers.**

In its response, the government has argued that "application of § 247(a)(2) in the manner suggested by Defendant—to criminalize a defendant's force against oneself or one's property, in the absence of any force or threat of force against another—would raise significant constitutional concerns." Resp. at 345. The government does not expound on why this would be so or what the constitutional concerns might be. Instead, it just points to cases that say that the courts should interpret statutes to avoid infringing constitutional rights whenever possible. *Id.*

There is no instance, however, in which a court has restricted application of § 247 to avoid constitutional concerns. The idea that a court might do so is complete speculation on the government's part. In any context other than arguing that § 247 categorically meets the definition of "crime of violence," surely the government would strenuously object to a court dismissing a criminal indictment on § 247 charges where a defendant, by threatening self-harm or destroying her own property, had obstructed the free exercise of religion where harm resulted.

The cynicism of the government's argument goes one step further inasmuch as the government strongly objects to Dylann's assertion that § 249 is unconstitutional because that statute bases criminal prosecution on a person's beliefs. In response to *that* argument, the government insists that, even if the criminal offense includes a provision that the perpetrator acted on the basis of religious, racial or ethnic hostility, Congress can properly punish criminal acts that cause harm. With regard to § 247, however, the government seems to be saying a person could *not* be prosecuted if she burned her own barn or threatened to use force against herself

246

unless the targets of her actions themselves felt threatened because then the government would be solely basing punishment on a person's beliefs.[117]

While Dylann is loath to make better arguments for the government than it has made for itself, we can only presume that the government (here) agrees with at least that portion of Dylann's argument that a person cannot be prosecuted for his beliefs alone and that the harm the statute seeks to punish is the physical harm or the fear of physical harm caused by the use or threat of use of force.

What the government leaves out of this equation, however, are the punishment sections of the Act, which require the infliction of harm, albeit harm that can occur recklessly, negligently or accidentally. Punishment for violations of § 247 is tied directly to the degree of harm suffered as the result of the perpetrator's actions (with the exception of subpart(5) which carries punishment even if no person or property is harmed but is not at issue here). The statute says:

> **(d)** The punishment for a violation of subsection (a) or (c) of this section shall be—
>
> **(1)** if death results from acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, a fine in accordance with this title and
> imprisonment for any term of years or for life, or both, or may be sentenced to death;

---

[117] 18 U.S.C. § 247(a)(2) says that whoever:
intentionally obstructs, by force or threat of force, including by threat of force against religious real property, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so
is subject to punishment.
18 U.S.C. § 249(a) says that whoever:
whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person . . .
is subject to punishment.

247

**(2)** if bodily injury results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this section, and the violation is by means of fire or an explosive, a fine under this title or imprisonment for not more that 40 years, or both;

**(3)** if bodily injury to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this section, results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, a fine in accordance with this title and imprisonment for not more than 20 years, or both;

**(4)** if damage to or destruction of property results from the acts committed in violation of this section, which damage to or destruction of such property is in an amount that exceeds $5,000, a fine in accordance with this title, imprisonment for not more than 3 years, or both; and

**(5)** in any other case, a fine in accordance with this title and imprisonment for not more than one year, or both.

18 U.S.C. § 247(d).

In other words, if the government's argument with regard to § 249 is right, that Congress can fashion a criminal law that punishes someone for their beliefs as long as it is tied to criminal conduct, then both the people in Dylann's hypotheticals have committed offenses that, based on the government's own arguments, can be criminalized by federal statute because they have committed acts that resulted in death. The perpetrator: 1) intentionally used force (conduct), 2) people are obstructed in the free exercise of their religion because of that use or threat of use of force, and 3) someone dies as a result (harm for which the conduct is the but-for cause). Section 247 is thus satisfied. Section 924(c), which requires the intentional use or threat of use of force[118] against the person or property of another, is not.

---

[118] The use of the language "death results" in subpart (1) means the harm can happen as the result of accident, negligence, or recklessness, also insufficient to satisfy § 924(c), which requires something more than recklessness. Note that this language is different even from subparts (2) and (3) which require the bodily injury to be a direct or proximate result of the perpetrators obstructive conduct.

Unless § 247 is unconstitutional in all instances, it can certainly be applied to prosecute the conduct suggested in these hypotheticals but it cannot serve as a predicate offense for § 924(c) because the elements clause is not satisfied.

**E. The Government Makes Several Incorrect Points In Response To The Argument That Trial Counsel Was Ineffective For Its Failures Challenging Whether § 249 Is A Crime Of Violence.**

The issue of whether § 249 qualifies as a crime of violence is discussed above, as to Claim 15. Claim 15 raises a direct challenge under current law and Claim 12 raises an ineffective assistance of counsel argument. For the explanation of why § 249 does not qualify as a crime of violence, see Claim 15, Section C, above. As to counsel's ineffectiveness, here again trial counsel failed in their most basic duty as lawyers by failing to raise this argument. *See Hinton*, 571 U.S. at 274.

**F. The Government Is Wrong That § 249(1) Is Valid Under The First Amendment Because It Prohibits Only Violent Conduct—§ 249(1) Penalizes Violent Conduct Only When That Conduct Is Accompanied By Certain Thoughts, Thereby Penalizing A Person's Thoughts And Feelings.**

The issue of whether § 249 is unconstitutional because it penalizes a person's thoughts and beliefs is discussed above, as to Claim 15. Claim 15 raises a direct challenge under current law and Claim 12 raises an ineffective assistance of counsel argument. For the explanation of why § 249 is unconstitutional, see Claim 15(C), above. As to counsel's ineffectiveness, here again trial counsel failed in their most basic duty as lawyers by failing to raise this argument. *See Hinton*, 571 U.S. at 274.

**G. The Government Is Wrong That Dylann's Claims Raising Commerce Clause And 13th Amendment Challenges Merely Repeat Trial Counsel's Arguments.**

As to the unconstitutionality of §§ 247 and 249 and the adequacy of the certification process, the government misses the point of Dylann's argument. Faulting the § 2255 for making similar legal arguments as trial counsel, the government ignores the factual context that the

249

§ 2255 motion provides for these claims: Although trial counsel was ostensibly challenging federal jurisdiction, trial counsel's pleadings and conduct evidenced that it accepted the inevitability of federal jurisdiction and completely undermined its own legal arguments by expressing—in the same pleading in which it contested federal jurisdiction—a willingness for Dylann to subject himself to the punishment Dylann was claiming was invalid.

Primary police power rests with the state; federal authority to prosecute exists primarily to fill in gaps where a state's police power is unable to reach the conduct in question because of the crime's interstate reach or where the state refuses its responsibility to prosecute. Dylann's crimes were not interstate in nature and there was no question that South Carolina intended to prosecute Dylann. Nor was there any question that South Carolina had the legal means to do so and to seek the ultimate punishment. The state brought charges within a day of the crime and quickly announced plans to seek the death penalty. The state prosecutor made clear that she preferred to proceed to trial before the federal government. Dkt. No. 68. Indeed, even the U.S. Attorney, William Nettles, objected to the DOJ's decision to prosecute, explaining, "[m]y view of federalism was that we should be like good dinner guests: We should come when we're invited, help clean up and leave, and that our role was to do what the state was unwilling or unable to do."[119]

The DOJ's insistence on prosecuting Dylann first undermined the State's effort to try the case in its own courts, showing that § 247 and § 249 are an unnecessary and inappropriate extension of federal criminal law that violates the Constitution and that the certification was

---

[119] Kevin Sullivan and Matt Zapotosky, *We are just looking for justice: Charleston prepares for Dylann Roof's trial*, Wash. Post, Dec. 6, 2016, https://www.washingtonpost.com/national/we-are-just-looking-for-justice-charleston-prepares-for-dylann-roofs-trial/2016/12/06/4396d6a0-bbba-11e6-ac85-094a21c44abc_story.html.

invalid. Although trial counsel made some arguments that these statutes constituted unconstitutional exercises of federal power and the definition of "appropriate legislation" to enforce the Thirteenth Amendment, as to § 249, trial counsel made these arguments while themselves exacerbating the problem.

Nor can one attribute to trial counsel any reasonable strategic basis for its failure to press these arguments with an eye towards actually winning them. Counsel had every reason to know that its arguments regarding the Commerce Clause had legs. Counsel had every reason to know that time only helps capital litigants. Counsel had every reason to know that state prosecutions are subject to multiple layers of review as they proceed through both state and federal court, while federal prosecutions consist only of direct appeal and § 2255 proceedings. Federal trial counsel's failure to take the time to raise viable legal arguments was inexcusable.

## H. The Government Makes Several Incorrect Points As To The Prejudice Resulting From Trial Counsel's Mistakes.

In its response, the government makes a number of wrong assertions with regard to the law this Court should apply in assessing Dylann's claims regarding 18 U.S.C. §§ 247, 249 and 924(c)'s elements clause. The government also makes wrong assertions when it argues that Dylann cannot show that his counsel performed deficiently, that counsel's decisions were based on reasonable strategy, and that Dylann suffered no prejudice. The government also accuses Dylann of failing to cite appropriate cases when in fact, the cases to which it refers either were cited, or were inapposite to the points he was discussing.

### 1. The government is wrong when it says that the superseding laws make prejudice unprovable.

#### a. Dylann's arguments would still succeed today as they would have at time of trial.

The government's prejudice argument sweeps too broadly. The government suggests that a § 2255 movant cannot demonstrate prejudice if the legal claim counsel failed to raise has been

narrowed by the time of post-conviction review, even if the claim would have succeeded at the time of trial. However, the cases the government cites reach a much more limited result. In each case cited in the government's response, the rule counsel failed to argue at trial had been explicitly overruled by the time of postconviction review. Not so in Dylann's case. Dylann's argument does not allege failure to argue any rule or law that has since been overturned.

To begin with, no ruling from the Supreme Court or any other court has altered the requirement under the elements clause that the use of force, the threat of force, or the attempted use of force be "against the person . . . of another." § 924(c)(3)(A). This was a legal argument prior counsel neglected to make, and it is a legal point as relevant and valid today as it was at the time of trial.

The state of the law regarding other aspects of § 924(c)'s elements clause has rapidly evolved since the Supreme Court declared ACCA's nearly identical elements clause void for vagueness in *Johnson v. United States*, 576 U.S. 591 (2015). Cases clarifying, extending, or narrowing prior rules have consumed a substantial portion of federal appellate court dockets since *Johnson*. While the Supreme Court has narrowed some of the legal issues that Dylann's trial counsel should have raised, the Court has broadened others. For example, in *United States v. Taylor*, 596 U.S. 845 (2022), which was being litigated concurrently with Dylann's case, the Supreme Court jettisoned the use of the reasonable-probability test under § 924(c) because, unlike with the ACCA, the predicate offenses under § 924(c) are defined by federal statutes. *See Taylor*, 596 U.S. at 858-59.[120] Thus, *Taylor* strengthens Dylann's contentions that §§ 247 and 249 fail the elements test, because he is not required to show that the government has actually

---

[120] See also above, explaining how a court recently, in its otherwise painstakingly careful decision in *United States v. Ahemeid*, 20-cr-0502, 2026 U.S. Dist. LEXIS 25317 (E.D.N.Y. Jan. 6, 2026), erroneously applied the reasonable probability test.

252

prosecuted a case that doesn't involve violent conduct—only that under the predicate statute, it could. Likewise, in *Borden v. United States*, 593 U.S. 420 (2021), the Court determined that the *mens rea* necessary to demonstrate that an offense is a crime of violence is now something more than recklessness. *Borden*, 593 U.S. at 423. Like *Taylor*, *Borden* strengthens Dylann's arguments. And contrary to the government's suggestion, even in this ever-evolving area of law where rules are regularly narrowed or broadened by new cases, none of the cases Dylann's trial counsel should have relied on has been explicitly overruled.

Dylann's trial counsel unreasonably failed to put forward important legal arguments, and to harness the best examples available at the time of trial to help their client. Counsel's failures prejudiced Dylann because had they made those arguments at the time of trial, they would have won. Those same arguments would fare as well today. For example, the elements clause has never covered statutes that can be violated by self-harm or threats of self-harm, and still does not today, under any of the case law decided between the time of trial and now. The elements clause, in fact, requires that force, or the threat of it, be used against another. Sections 247 and 249 can be violated by threat of self-harm and by actual self-harm, arguments never made by prior counsel. Likewise, convictions for both the predicate crimes and for § 924(f) constituted Double Jeopardy at the time of trial, but prior counsel never made that claim. Today, that legal challenge is only stronger than it was in 2016 and 2017. So, too, the cases interpreting the elements clause have only gotten further and further afield from the language and earlier interpretations of the elements clause, buttressing, not diminishing, Dylann's claim that the clause is too vague for a person of ordinary intelligence or the government to understand. None of the government's cases dispute these points.

253

### b. The cases the government cites are inapposite.

In every case the government cites for the proposition that a post-conviction petitioner cannot prove prejudice where the law no longer provides relief, the law or case on which the petitioner relied had been specifically overruled by the highest court in the jurisdiction between the time of trial and the time of the post-conviction review.[121] In *Lockhart v. Fretwell*, 506 U.S. 364 (1993), counsel at capital sentencing in state court failed to argue then-current law that an aggravating factor could not duplicate an element of the crime itself. By the time of federal post-conviction review, intervening law specifically did away with the "no-duplication-of-aggravating-factors" principle. *Fretwell*, 506 U.S. at 366. Likewise, in *Bell v. Ozmint*, 332 F.3d 229 (4th Cir. 2003), counsel at capital sentencing failed to insist on an instruction that life imprisonment meant the defendant would serve at least thirty years before being considered for parole. The law that entitled a defendant to such a jury instruction had been specifically overturned by the time of post-conviction review. *Bell*, 332 F.3d at 243-44.[122] In *Abby v. Howe*, 742 F.3d 221 (6th Cir. 2014), state trial counsel failed to object to the prosecution's comment on the defendant's post-arrest silence. By the time of federal post-conviction review, the Supreme Court had ruled that a prosecutor was only prohibited from commenting on a defendant's silence if the defendant had invoked his Fifth Amendment right to remain silent, which this defendant had not done. *Abby*, 742 F.3d at 228. In *Collins v. United States*, 28 F.4th 903 (8th Cir. 2022),

---

[121] Moreover, the results in three of the cases the government relies on—including *Lockhart v. Fretwell*, the case described as being "seminal"—actually turn on *Teague* considerations and matters of comity, not some broader rationale. There are no *Teague* or comity concerns in Dylann's case where a federal court is reviewing proceedings in federal court involving a federal statute.

[122] In *Bell*, the reviewing court also noted its skepticism that it had been a mistake, not a strategic decision on counsel's part to request this instruction, because this instruction would have highlighted the fact that a sentencing verdict of life imprisonment did not necessarily mean the defendant would remain in prison his entire life. *Id.* at 243.

254

trial counsel failed to tell the federal sentencing court that, under Missouri law, defendant's prior conviction was not considered a crime of violence. By the time the defendant's ineffectiveness claim was being considered in federal post-conviction review, the Eighth Circuit had determined that the Missouri state offense was indeed a crime of violence. *Collins*, 28 F.4th at 906. Finally, *Nix v. Whiteside*, 475 U.S. 157 (1986), is hardly supportive of the government's point. There, the petitioner claimed he would have won at trial if counsel had put him on to testify and allowed him to perjure himself. *Nix*, 475 U.S. at 176. Little wonder that claiming one's lawyer should have engaged in illegal conduct to secure an acquittal would prove a losing point in post-conviction.

These cases bear no resemblance to Dylann's, who claims that, if argued in a reasonably competent manner under the law that existed at the time of his trial, he would have won his claims at trial and on appeal, and that he still should win them now.

### 2. The government is wrong when it says that the prejudice Dylann claims is a cascading set of speculations.

The government mischaracterizes Dylann's prejudice arguments when it asserts that Dylann's "claims of prejudice are based on a cascading set of speculative—and entirely unfounded—assumptions, including that had trial counsel made better arguments in their briefs, Defendant would abandon his unflinching opposition to the presentation of mental health mitigation evidence during the penalty phase." Resp. at 310.

First, as the § 2255 motion argued first and foremost, had prior counsel made appropriate legal arguments, they would have been *winning* arguments and the outcomes of trial and appeal would have been different in the most straightforward manner possible. This is the most fundamental definition of prejudice. The clearest example of this is that prior counsel failed to argue the Double Jeopardy implications of the government's multiplicitous indictment, even after

255

counsel raised the same successful arguments on behalf of another client, resulted in nine constitutionally-invalid convictions and death sentences. This was prejudicial.

Likewise, prior counsel failed to argue that §§ 247 and 249 could be committed by self-harm or threat of self-harm, and were, therefore, not "crimes of violence," arguments that would have succeeded in the trial court or the Fourth Circuit. The law was then, and still is, perfectly clear that § 924(c)'s elements clause can only be satisfied by use of force or threat of force against another, not against oneself. Counsel's deficient performance, which resulted in the imposition of nine legally invalid convictions and death sentences under § 924(c) and nine legally invalid convictions and sentences under § 924(j), was again prejudicial.

The government brushes past these and all other prejudice resulting from prior counsel's failures to research and present the best available legal arguments by making specious claims that post-conviction counsel failed to cite relevant precedent (*see* Claim 14) and got the holding of *Sanders v. United States* wrong (*see* Claim 15(A)). It is easy to claim prior counsel's deficient performance caused no prejudice after making baseless arguments about the likely success sound arguments would have generated. But given that the government's arguments about the likelihood of success are baseless, so too are their arguments about the lack of prejudice.

Second, and critically, the § 2255 motion does not argue that Dylann would have "abandon[ed] his unflinching opposition to the presentation of mental health mitigation evidence." Resp. at 310. Rather, the motion argues that: "Had counsel properly argued any of these points, Dylann himself might have trusted counsel more, and might have been more willing to talk with them, *more willing to help them develop a penalty phase strategy, more willing to let them represent him at penalty phase*." Dkt. No. 1078 at 325 (emphasis added).

256

As the § 2255 motion repeatedly points out, Dylann representing himself at the penalty phase was disastrous. He represented himself despite an auditory processing disorder that severely impaired his capacity to conduct trial proceedings and a severe anxiety disorder that exacerbated these problems further. Even without taking these impairments into account, Dylann was a twenty two year-old who had failed the ninth grade repeatedly before finally getting his GED.

Arguing that building trust with Dylann and being able to represent him at the penalty phase does not equate to arguing that he would have abandoned his opposition to certain mental health evidence. Even if counsel did not present certain types of mitigation evidence, there were still obvious benefits to being represented by counsel.

For one, a lawyer handling jury selection would have made an enormous difference, given how badly Dylann botched jury selection, as he was unable to follow the proceedings or process standby counsel's advice.

For another, it is likely Dylann would have permitted some mitigation evidence. As state trial counsel Mr. Pennington recounts:

> I had spoken with Dylann for months about mitigation evidence generally and stayed away from discussing specific mental health diagnoses. I had no reason to think Dylann would not let us present general mitigation evidence to tell the story of his life. The level of isolation he had in the years leading up to the crime was really shocking and demonstrated something very sad about Dylann's life, regardless of any diagnosis. I felt that he was a confused and vulnerable person who had been misled and seduced by false information. He knew I believed that and that the defense team intended to present it at trial as mitigation. I had no reason to believe that information would not be presented.

Ex. 10 (Pennington Dec.) ¶ 13. Ms. Norris was developing evidence of his adjustment to incarceration, crucial evidence in a capital penalty phase, that she had every reason to believe Dylann would have allowed. Ex. 12 (Norris Dec.) ¶¶ 30-32. And Ms. Stevens saw that her

257

relationship with Dylann was strengthening and foresaw productive conversations about what mitigation evidence to present. Ex. 6 (Stevens Dec.) ¶ 9.

There is nothing controversial about the observation that winning fosters trust with clients. The § 2255 motion simply argues that winning a motion to dismiss counts of the indictment would have built trust with Dylann. Lack of trust between Dylann and his counsel resulted in Dylann representing himself—where he botched jury selection and presented no mitigating evidence. Even if counsel did not present all the mitigating evidence they considered, there is a world of difference between counsel presenting a body of agreed-upon mitigating evidence and no counsel and no mitigation at all. The arguments for prejudice are not mere speculation. However, dismissing counts from the indictment is itself all the prejudice required. Thus, this Court should grant relief on this claim and resentence Dylann.

**CLAIM 13:   The Government Makes Several Incorrect Assertions As To Claim 13; In Particular, The Government Is Wrong That Appellate Counsel's Ineffective Assistance Cannot Be Reviewed Because The Court Cannot Revisit Prior Rulings Despite New Information.**

The § 2255 motion explained that appellate counsel similarly failed their client by failing to make important arguments that trial counsel had neglected to make. In the response, the government makes several incorrect statements regarding Dylann's arguments. As with its response to Claim 12, the government's primary argument as to Claim 13 is that "[t]he Court should not revisit the Fourth Circuit's rulings just because they now appear as ineffective assistance of counsel claims." Resp. at 335.

Again, whether an issue is procedurally unreviewable does not depend on whether the § 2255 motion requires the Court to revisit prior rulings, but on whether the § 2255 motion presents new facts or, in this case, law that appellate counsel should have researched and been aware of, that raise doubts about the prior ruling. *See, e.g.*, *Hinton*, 571 U.S. at 274 (holding that counsel's most basic function is to research and present the available law so that a court has the legal arguments at its disposal on which to base its decisions); *Massaro*, 538 U.S. at 504 (explaining that the trial record generally "will not disclose the facts necessary to decide either prong of the *Strickland* analysis"); *see also, e.g.*, *Dunn*, 594 U.S. at 739 (§ 2254 case emphasizing the importance of evidence from outside the trial record in collateral review proceedings).

The government's argument, that no claim of ineffective assistance of counsel can ask a court to re-visit legal claims that were deficiently argued in the first instance, is contrary to the entire notion of the Sixth Amendment right to legal representation. If the government were right, it would mean appellate counsel could file a brief, simply list general headings such as § 247 is

259

not a crime of violence, and expect the Court of Appeals to do the research and think through all the possible ways this might be correct.

But that is not the way the system works. Just as in *Hinton v. Alabama,* the Supreme Court did not reject Hinton's post-conviction claim of ineffectiveness because his lawyer had asked for more funds. The lawyer was obligated to provide a sufficient legal basis for his request, explaining why a grant of funds was authorized by law. Under the government's theory, no court should have revisited that request. Yet the Supreme Court unanimously found in favor of Mr. Hinton.

So too here. It was not enough for appellate counsel to challenge the statutory or constitutional validity of various statutes and expect the Court would supply one's counsel had never offered. That failure by counsel is what proves deficient performance; that such claims would have been successful proves prejudice. The fact that the Fourth Circuit reviewed a deficiently made claim does not provide a procedural bar to Dylann's claim.

260

**CLAIM 16:   Uncertainty And Lack Of Necessary Safeguards Surrounding The Method Of Execution Create An Unacceptable Risk Of Severe And Unnecessary Suffering In Violation Of The Eighth Amendment; Consequently, The Government Should Take Basic Steps To Ensure That The Execution Is Humane.**

The way the United States kills people sentenced to death is a matter of tremendous importance nationally and internationally. It is an indication of whether we as a country accept the practice of torture by our government, or not. Lethal injection, particularly as it has been carried out, carries a significant risk of suffering. Yet the government has not responded to the facts alleged in Dylann's § 2255 motion. The government instead argues that the litigation of this claim is premature because no execution date has been set.

The government, since the Trump administration's second tenure began, has sought to expedite this § 2255 at every step. This administration apparently instructed counsel for the government to attempt to renege on their agreement to extend the statute of limitations and to object to every continuance request, even when lead counsel for Dylann was recovering from major surgery. *See* Dkt. Nos. 1040, 1070, 1092, 1096. The government has also asked this Court to summarily deny every claim presented to this Court without regard to the law.

This Court should allow for discovery and a hearing on the method of execution the government would use, including the source of drugs, dosages, and protocol. The government suggests that this claim should be brought only after an execution date is set. No doubt, however, that the government will then argue that the execution should go forward without consideration of such claims, as it did in the executions of Danny Lee, Dustin Honken, and the others executed under the first Trump administration. *See Barr v. Lee*, 591 U.S. 979, 981 (2020); Response in Opposition to Plaintiff's Motion for A Stay of Execution Pending Appeal, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 20-5206, 2020 WL 6778420 (D.C. Cir. July 22, 2020).

261

The government seeks to delay consideration on the merits of this claim, hoping that no court will ever consider it on the merits.

In fact, the government frequently argues when an execution is set that it is "gamesmanship" to wait until the eleventh hour to litigate such claims. This is a common government swindle: allege that the claim is not ripe during initial post-conviction proceedings, and then, when an execution is set, claim the movant cannot meet the high bar to litigate matters as a successive petition, that the movant has defaulted the claim, and that the movant has been dilatory in not raising the claim earlier. Further, courts have repeatedly held that "'last-minute stays [of executions] should be the extreme exception, not the norm.'" *Lee*, 591 U.S. at 981 (quoting *Bucklew v. Precythe*, 587 U.S. 119, 150 (2019).[123]

The government also states that this claim, as presented in Dylann's § 2255 motion, is insufficient for failure to present a "feasible, readily implemented alternative." Resp. at 387. This assertion is simply not true. Dylann's motion offered a detailed and feasible alternative that would require straightforward and easily made adjustments to the existing protocol for lethal injection. Dkt. No. 1078 at 364-83. "The Eighth Amendment's protection of dignity reflects the Nation we have been, the Nation we are, and the Nation we aspire to be." *Hall v. Florida*, 572 U.S. 701, 708 (2014). We know that the executions of federal inmates during the first Trump administration were of significant concern due to observed anomalies and episodes of pulmonary edema. This Court should not acquiesce to the government's rush to kill regardless of the

---

[123] This pattern has continued beyond the Trump administration, even in recent months. The government in Florida has argued that the execution of Frank Walls should proceed without any consideration of his concerns about lethal injection based on his "years long" delay in bringing the claim. *See* Response to Emergency Motion for Stay of Execution at 15, *Walls v. Sec'y, Dep't of Corr.*, 161 F.4th 1281 (11th Cir. 2025) (No. 25-14302). Mr. Walls was executed on December 18, 2025.

likelihood of extreme physical pain to be inflicted. Instead, the Court should allow discovery and

order a hearing on the undue risk of suffering created by the government's method of execution.

**CLAIM 17:    The Eighth Amendment Prohibits Imposing The Death Penalty On A Twenty-One-Year-Old Person With An Undeveloped Brain.**

As part of his § 2255 motion, Dylann urges the Court to consider that twenty years of scientific research since the Supreme Court's holding in *Roper v. Simmons*, 543 U.S. 551 (2005) underscore that the same considerations in favor of not executing youth who commit offenses under the age of eighteen also apply to a twenty-one-year-old individual. Particularly, a twenty-one-year-old, such as Dylann, who suffers from neurodevelopmental disorders. *See* Ex. 2 (Ouaou Report) at 17. Decades of research have led to a consensus in the scientific community that twenty-one-year-olds "lack [] maturity and an underdeveloped sense of responsibility"; twenty-one-year-olds are "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and the character of a twenty-one-year-old "is not as well formed as that of an adult." *Roper*, 543 U.S. at 569-70. The legal community around the country has reviewed and responded to these scientific findings by reducing criminal culpability and in many cases rejecting the option of the death penalty for those under the age of 22. Dkt. No. 1078 at 388-393. Given these significant factual and legal developments since *Roper,* an evidentiary hearing must be held to develop the factual record in support for why executing a twenty-one-year-old is beyond the bounds of the Eighth Amendment.

**A. The Court Should Grant A Hearing And Allow Dylann The Opportunity To Present Evidence That He Is Constitutionally Ineligible For Execution.**

Most telling of the government's argument on this issue is the lack of dispute regarding the post-*Roper* developments in the science of late-adolescence brain development nor the move away, in jurisdictions across the country, from capital punishment for persons under the age of twenty-two. Instead, the government attempts to divert focus to the arbitrary line-drawing at the age of eighteen, hoping to deprive this Court of authority to

grant the relief requested. The government, however, misconceives the nature of the claim, and its approach would, essentially, encase the Constitution in amber and deprive Dylann and this Court of the opportunity to develop the factual record necessary to litigate his claim.

First, the Supreme Court's Eighth Amendment analysis in *Roper* expressly employed the "evolving standards of decency" analysis, which rests on an understanding that the country's mores may evolve over time and that a consensus, with constitutional implications, may develop that previously acceptable punishments have become disproportionate—cruel and unusual within the meaning of the amendment's prohibition. *Roper*, 543 U.S. at 560-61. In *Roper* itself, the Missouri Supreme Court, cognizant that *Stanford v. Kentucky*, 492 U.S. 361 (1989) had expressly rejected a broader categorial exemption for juveniles, reviewed the changes in the legal and scientific landscape over the intervening fourteen years, and concluded that "evolving standards" had reached a consensus against executing persons under the age of eighteen at the time of their capital offenses. *State ex rel. Simmons v. Roper*, 112 S.W.3d 397, 413 (Mo. 2003). The United States Supreme Court affirmed that determination with no hint that the state court had engaged in impropriety or encroached on a prerogative reserved uniquely to the high court.

Dylann's claim is not one addressed in *Roper*. Rather, he argues that in the twenty years since, science has evolved and a new consensus against capital punishment for late adolescents and youth has developed: His claim rests on the assertion of new facts not available to the *Roper* Court. *See United States v. Sampson,* No. CR 01-10384-MLW, 2015 WL 7962394, at *4 (D. Mass. Dec. 2, 2015) ("[I]f there has been a material change in facts relevant to the evolving standards analysis—a question initially for the trial courts—an issue is not foreclosed by Supreme Court precedent because the Supreme Court has not decided

265

the matter in dispute. Rather, the district court is deciding a distinguishable case and controversy.").

Second, even if the Supreme Court had, implicitly, reserved to itself the ultimate choice of whether or when to extend *Roper*'s protections to youth older than eighteen, an evidentiary hearing in this Court would be vital to permit development of the factual record necessary for evaluation by that Court. This was the procedure followed by the district court in *United States v. Fell*, 224 F. Supp. 3d 327 (D. Vt. 2016). Although it may not overrule the Supreme Court, "a trial court has its own contribution to make to the debate. The court can hold a hearing and permit witnesses to testify." *Id.* at 329. To fully litigate Dylann's claim, an evidentiary hearing, where the parties could call expert witnesses to testify about the new brain-development science and its relationship to behavior and culpability, after which this Court could make findings of fact, is necessary.

**B. This Claim Is Not Procedurally Barred.**

The government contends that Dylann's claim is procedurally barred because of prior consideration by the Fourth Circuit on direct appeal. This argument is misplaced. As the Supreme Court has explained: "collateral review of a judgment or claim means *a judicial reexamination of a judgment or claim* in a proceeding outside of the direct review process." *Wall v. Kholi*, 562 U.S. 545, 553 (2011) (internal quotations omitted) (emphasis added). As this definition makes clear, prior rulings are frequently revisited and reexamined in § 2255 proceedings.

The government relies on *Linder* for the proposition that Dylann cannot "circumvent a proper ruling . . . on direct appeal by re-raising the same challenge in a § 2255 motion." Resp. at 389 (quoting *Linder*, 552 F.3d at 396). But the holding that a collateral attack cannot

266

"circumvent" a direct appeal in no way suggests that a collateral attack cannot *challenge* a prior ruling with new information. Challenging a prior ruling with new information is the very definition of a collateral attack. *See Wall*, 562 U.S. at 553. Indeed, *Linder* is about a distinct procedural issue—the effect of an appeal waiver—and its holding is about that procedural issue, not about § 2255 cases in general.

Dylann's § 2255 claim regarding the unconstitutionality of executing twenty-one-year-olds presents new information from outside the trial record that could not have been presented on direct appeal. The § 2255 claim contains information from several scientific studies explaining the diminished culpability of youth in their early twenties. Additionally, the claim provides important data about the evolving standards of the death penalty in this country, leading to a uniform march away from executing youth who committed offenses when they were under the age of twenty-two. Lastly, the claim raises policy reasons for why there is little penological purpose for imposition of the death penalty on youth slightly older than eighteen. Accordingly, this claim is not procedurally defaulted.

267

**CLAIM 18:    The Death Penalty Is Unconstitutional.**

Despite the Supreme Court's hope and belief "that the constitutional infirmities in the death penalty could be healed," *Glossip v. Gross*, 576 U.S. 863, 909 (2015) (Breyer, J., dissenting), capital punishment has become an arbitrary game of politics. No clearer example demonstrates this than the Department of Justice's 180-degree shift on the death penalty. Prior to the last year, the death penalty was in sharp decline—and has, for years, been falling out of favor with the general public.[124] Indeed, even with an uptick in executions since President Trump's second term began, forty percent of which are attributed to the State of Florida,[125] new "research found that when capital juries were asked to decide between a life sentence and a death sentence this year, more than half (56%) recommended a life sentence over a death sentence." *Id.* Additionally, "[n]ew death sentences declined [in 2025] (23), reflecting the growing reluctance of juries to impose death sentences. Only 15 juries nationwide were able to unanimously agree to impose death sentences." *Id*.

This trend is applicable to both state and federal cases. Outside of the first Trump administration's late-stage rush of executions, when thirteen people were killed in six months, only three other individuals have been executed by the federal government in the modern era.[126]

At the state level, studies have shown "how capital punishment intersects with electoral politics, and how the demands of political campaigns have pushed some officials toward a more

---

[124] Ian Millhiser, *The long decline of the American death penalty, explained*, Vox (Dec. 23, 2024), https://www.vox.com/criminal-justice/392570/death-penalty-supreme-court-joe-biden

[125] Death Penalty Information Center, *The Death Penalty in 2025*,

[126] Death Penalty Information Center, *Executions Under the Federal Death Penalty*, https://deathpenaltyinfo.org/state-and-federal-info/federal-death-penalty/executions-under-the-federal-death-penalty

268

aggressive posture."[127] For prosecutors, "at least one study found sentence lengths grow in election years" and for studies that did not show an increase, it was "because prosecutors [brought] more cases to trial in an effort to improve their conviction rates." *Id*. State supreme courts also "affirmed two times the number of death sentences in election years as opposed to non-election years." *Id*.

Although judges and prosecutors are not elected at the federal level, the current administration has ensured that politics are front and center when it comes to the death penalty. To the individuals who received a commutation on their death sentence by President Biden, then President-elect Donald Trump opened Christmas Day 2024 by telling them to "GO TO HELL."[128] That was followed by directives to federal prosecutors to seek the death penalty whenever possible and a vow to work with state prosecutors to do the same—a stark contrast to previous administrations. Exec. Order No. 14164, 90 Fed. Reg. 8463 (Jan. 20, 2025). And indeed, that call has been answered. Not only have federal prosecutors already turbo charged new death penalty authorizations, compared to *one* authorized case in the entire previous administration, they have aggressively sought to *reauthorize* cases where the death penalty was previously taken off the table.[129] The administration has sought to reauthorize cases without any

---

[127] Nick Evans, *New report explores the connection between the death penalty and electoral politics,* Ohio Capital Journal, July 9, 2024, https://ohiocapitaljournal.com/2024/07/09/new-report-explores-the-connection-between-the-death-penalty-and-electoral-politics/

[128] Robert Tait, *Trump tells 37 people on death row with commuted sentences to "go to hell,"* The Guardian, Dec. 26, 2024, https://www.theguardian.com/us-news/2024/dec/26/trump-biden-death-penalty-commuted

[129] Holly Ramer, *Trump's death penalty push faces setbacks as judges block efforts to reverse prior decisions*, PBS News, Aug. 22, 2025, https://www.pbs.org/newshour/politics/trumps-death-penalty-push-faces-setbacks-as-judges-block-efforts-to-reverse-prior-decisions; *see also* Ex. 251 (*Their death sentences were commuted*

269

regard for the havoc the practice would bring to the criminal justice system. It is also no surprise that state governors who are sympathetic to the current administration's cause have unleashed a wave of executions that has gone unmatched in almost fifteen years—despite evidence showing that the appetite for the death penalty has waned. Indeed, Florida has gone out of its way to demonstrate its allegiance to the President when it comes to the death penalty. Ron Desantis, Florida's Governor, recently "signed a law that mandates the death penalty for undocumented immigrants who commit capital crimes, despite its apparent violation of a 1987 Supreme Court ruling prohibiting automatic death sentences for any category of crime. What is the name of this Florida law? The TRUMP Act." Ex. 250.

A system of capital punishment that is so dependent on which way the political winds are blowing creates "a substantial risk that it [will] be inflicted in an arbitrary and capricious manner." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976) (plurality opinion). Our system is further undermined by geographical disparities, disparities based on race, class and ethnicity, and by a set of aggravating factors that does not narrow the class of murders as required. *See id*. Accordingly, such a system cannot be accepted under our Constitution.

The government argues that this claim is procedurally defaulted because it was not raised on direct appeal. However, this claim is squarely presented as a constitutional bar to the death penalty and the arbitrary process by which death sentences are imposed. If the substance of this claim is correct, that the death penalty is unconstitutional, then killing Dylann would constitute a fundamental miscarriage of justice that would make moot any question of procedural default. The government's assertion that the rules of procedural default would apply and require this

---

*by Biden. They could face execution again*, N.Y. Times), Ex. 250 (*The Death Penalty is Even More Horrifying Than You Think*)

270

Court to affirm a death sentence and the execution of Dylann in violation of the constitution further demonstrates the absurdity and arbitrariness of the death penalty.

Given the evidence of the death penalty's arbitrary use and our society's evolving standards of decency supporting its decline, the Court should hold an evidentiary hearing in order to fully litigate this claim. *See United States v. Fell*, 224 F. Supp. 3d 327 (D. Vt. 2016). As the Supreme Court has long recognized, death, in its finality, is "qualitatively different" and requires a heightened need for reliability in its assessment as an appropriate punishment. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). An evidentiary hearing is a modest request in the pursuit of this endeavor.

271

**CLAIM 19:    Judge Gergel Presiding Over Dylann's Case Because He "Really Wants To" Violated Dylann's Due Process Right To An Impartial Procedure For Assigning A Judge, And Trial Counsel's Failure To Object Violated Dylann's Sixth Amendment Right To Effective Assistance Of Counsel.**

The government argues that because earlier recusal motions were denied, the current ineffective assistance claim premised on judicial bias must also fail based on "the same analysis." Resp. at 394. This assertion is circular and must fail, as it is not supported by the law or the facts of this case. Because there is an appearance of bias in both the judicial selection process and in the conduct of the trial that impacted the outcome of the case, trial counsel was ineffective in failing to raise this issue.

**A. This Claim Has Not Previously Been Decided.**

The previous denial of Dylann's motion for recusal in these proceedings does not answer whether trial counsel was ineffective for failing to request recusal during the trial itself. The standard for mandamus relief is onerous and requires that there is no other means available for relief. The Fourth Circuit's mandamus denial order relied in significant part on the fact that Dylann would have the opportunity to pursue his recusal claim at this stage as part of an ineffective assistance of counsel claim:

> Roof cannot show that he has no other means available for relief. In his § 2255 motion, he argues that Judge Gergel's bias violates his due process rights and that his attorneys were constitutionally ineffective for failing to move for recusal at trial. *If the district court rejects these arguments, he may appeal to this Court for review.*

*In re Roof*, No. 25-2, 2025 LEXIS 345307, at *4 (4th Cir. Aug. 13, 2025) (emphasis added).

The Fourth Circuit Court's ruling on the Mandamus petition presumes that, should the trial court again deny this request for recusal as part of the § 2255 motion, the claim will be available to be raised on appeal. Further, it is imbedded in this reasoning that the Court of

272

Appeals anticipated that this Court would have the benefit of a record that includes testimony and cross-examination on disputed issues. That testimony must result from a process that includes discovery as a means of allowing for adequate preparation (on both sides) for the § 2255 hearing.

The government argues that because the trial verdict was upheld on appeal and none of the lower court's rulings were deemed to be reversible error, this proves there was no bias. Resp. at 402. This assertion is incorrect under the law. "[A] motion for disqualification ordinarily may not be predicated on the judge's rulings in the instant case or in related cases, nor on a demonstrated tendency to rule any particular way, nor on a particular judicial leaning or attitude derived from his experience on the bench." *Phillips v. Joint Legislative Comm. on Performance & Expenditure Rev. of State of Miss.*, 637 F.2d 1014, 1020 (5th Cir. 1981) (internal citations omitted).

This Court's prior ruling on Dylann's recusal motion also did not consider trial counsel's ineffectiveness in failing to raise this claim. The motion for recusal previously before this Court was decided based on the written statements made by two of Judge Gergel's judicial colleagues. Relying solely on the existing record and two written statements from these colleagues—that were filed twenty-three minutes before the issuance of the four-page denial order, with no opportunity for cross-examination of these witnesses—this Court held at the time of the ruling on the recusal motion that there was no basis to conclude that its "impartiality could 'reasonably be questioned.'" Dkt. No. 1053 at 4 (quoting 28 U.S.C. § 455). There was no opportunity for discovery or testimony. It was therefore not possible for the parties to truly explore and analyze the basis for Dylann's recusal claim when it was initially raised. Now is the time for a full vetting of that claim *and* for determining whether trial counsel was ineffective for failing to raise the

273

claim. As noted by the Fourth Circuit, this will require a different and more thorough analysis than was previously conducted.

Given the seriousness of the allegations regarding bias, Dylann is entitled to cross examine the witnesses who submitted these statements. If this claim is denied after discovery is concluded and the witnesses have testified, as noted by the Fourth Circuit, a complete record will have been created and can be reviewed and ruled on by an impartial panel of judges at the appellate level.

## B. The Facts Are In Dispute, Necessitating Discovery And A Hearing

Two primary factual disputes are at the center of this claim: (1) the system for judicial assignment; and (2) the appearance of bias (actual or perceived). The government's brief reflects and highlights the need for real fact-finding—discovery and an evidentiary hearing—regarding both of these disputes.

### 1. Judicial Assignment

The process for judicial assignment is the critical gateway to this claim, based on its constitutional importance:

> The selection of a judge to preside at a criminal trial is a matter of considerable significance to the criminal defendant. . . . While a defendant has no right to any particular procedure for the selection of the judge—that being a matter of judicial administration committed to the sound discretion of the court—he is entitled to have that decision made in a manner **free from bias or the desire to influence the outcome of the proceedings**. . . . Even the broadest discretion is capable of abuse if exercised in a manner that impairs **rights guaranteed by the constitution**. . . . We must take great pains to avoid any inference that assignments are being made for an improper purpose, particularly where criminal cases are concerned."

*Cruz v. Abbate*, 812 F.2d 571, 573-74 (9th Cir. 1987) (emphasis added).

Despite the vital importance of this issue, it is still not clear what process was used to assign Dylann's case. Regarding this urgent question, the government completely discounts

274

Michael O'Connell's statement as "inherent[ly] unreliab[le]," Resp. at 401, but then proceeds to rely on Judge Wooten's statement, which discussed "routinely assigning" this case without specifying what "caseload" or "related cases" existed at the time. Dkt. No. 1051. Judge Norton's statement expressed that he did not improperly communicate with Judge Wooten and was not aware of anything other than a routine assignment being made in this case, but like Judge Wooten he gave no description of what a routine assignment process at the time involved. Dkt. No. 1052 at 2.

The government's critique of Mr. O'Connell's declaration, noting that "there is no explanation of how Judge Norton formed the impression that Judge Gergel wanted the case," Resp. at 401, serves to *support* Dylann's request for an order of discovery and an evidentiary hearing. In analyzing Judge Norton's statement, the government asserts that "[e]ven if Judge Norton made the alleged comment exactly as Mr. O'Connell recalls (ten years after the fact), there is no explanation of how Judge Norton formed the impression that Judge Gergel wanted the case." *Id.* at 402. Clearly the basis for how Judge Norton formed his impression that Judge Gergel wanted the case is an important question, and one that must be posed to Judge Norton himself, in an evidentiary hearing.

Dylann's Mandamus Petition states the facts that are missing from Judges Wooten's and Norton's statements, including any meaningful description of an impartial system for the assignment of cases. Petition for Writ of Mandamus at 27-28, *In re Roof*, No. 25-2, 2025 LEXIS 345307 (4th Cir. Aug. 13, 2025). Equally significant, however, is the fact that the judges did not address the question of what information was provided to them prior to the drafting of their statements and how their statements were drafted and filed. This information is highly relevant to the question of ongoing bias and it will only become available through cross-examination.

275

The government's response essentially adopts the content of the judges' statements as "fact" while discrediting the contents of Mr. O'Connell's sworn affidavit. Resp. at 395. The government suggests that Mr. O'Connell never believed Judge Gergel was biased or that there was cause to seek Judge Gergel's recusal. *Id*. This assertion is something the government could attempt to establish at a hearing through cross-examination; currently there is nothing in the current record to support the government's conclusion regarding Mr. O'Connell's beliefs.

The many unknowns at the center of this dispute demonstrate the need for discovery and an evidentiary hearing, as the statements do not address the underlying question of how judicial selection process works generally in the District of South Carolina or how it was done in this case. Further, none of the statements have been subject to any fact-checking by way of contemporaneous documentation or cross-examination. The judicial assignment process is relevant to this issue because Mr. O'Connell has alleged that the case was assigned to Judge Gergel at least in part because he "really want[ed] to do it." Ex. 8 (O'Connell Dec.) ¶ 6. If true, this suggests that there was no unbiased system for assigning cases. Contrary to the government's assertions, Judge Wooten's statement is not conclusive evidence that there was an unbiased system of assigning judges to cases. Only through an order of discovery and a hearing, which would reveal the actual distribution of cases at the time of the assignment, can this matter be known.

### 2. Bias

In addition to the serious and unanswered questions about the judicial selection process, there are many examples provided of bias by Judge Gergel against Dylann and in favor of the government. The government dismisses all allegations of bias in the courtroom, calling them

276

"vague, subjective complaints." Resp. at 402. In actuality, the allegations are quite specific and objective and should be fully vetted through discovery, testimony and cross-examination.

The government dismisses Meredith Childs's statement regarding her observations of bias, mocking some of the vocabulary she used in her statement and highlighting the fact that she was not yet a law school graduate. Resp. at 409. The government's arrogance is not a valid basis for blanket rejection of a witness' statement, particularly as to a witness who sat and observed every day of the entire trial and sentencing hearings. Ex. 20 (Childs Dec.) ¶ 6. The government similarly discounted or outright ignored the reliability of other sworn declarations submitted on Dylann's behalf. Resp. at 394-412. Dylann deserves to have declarants Bruck, Childs, Gannett, McGuire and Paavola take the witness stand to be heard and cross-examined regarding their observations of bias, rather than summarily dismissed. The matter at hand involves both perceptions and facts, which require fact-finding in a courtroom, with all witnesses testifying under oath.

## C. Conclusion

Dylann was entitled to have an impartial judge at his trial and sentencing hearings. Because of the appearance of bias both at the assignment level and during trial, Dylann's trial counsel should have moved for Judge Gergel to be recused. Trial counsel's failure to make that motion was ineffective. The proper remedy is for Judge Gergel to now recuse himself from hearing the § 2255 motion, or at least to submit this one narrow claim to an impartial judge for

277

discovery and a hearing and to render an objective decision on this matter. In the alternative,

Judge Gergel should order discovery and a hearing on this matter.


Respectfully Submitted,

/s/ Jill E.M. HaLevi
Jill E.M. HaLevi
Mediation and Legal Services
102 Broad Street, Suite C
Charleston, SC 29401
Phone: 843-819-0557
E-Mail: jill@charlestonmediator.com


/s/ Angela S. Elleman
Angela S. Elleman
Indiana Federal Community Defenders
Capital § 2255 Unit
111 Monument Circle,Suite 3200
Indianapolis, IN 46204
Phone: 317-383-3520
Email: angie_elleman@fd.org

278