**Mark Wagner, Ph.D.**
**Private Consulting Practice**

November 14, 2016

Competency Evaluation

Re: Dylann Roof

Dear Dr. Ballenger,

At your request, I performed a psychological evaluation of the defendant Dylann Roof at the Al Cannon Detention Center on November 12, 2016 with a particular focus on cognitive abilities, malingering and presence of psychosis. My examination of him began at 1:00 pm and ended at 5:30 pm. I understand that you are in the process of evaluating Mr. Roof's competence to stand trial for his criminal charges. I have not been able to review any documents other that what is available in the public domain for this case and should additional information be provided to me, I reserve the right to amend my opinions.

At the beginning of my examination of the defendant, I explained the purpose of the examination and that my findings would not be confidential. I explained that my findings would be released to Dr. Ballenger, Judge Gergel, and in any hearings that might occur. I explained that I would not be treating him and that I am not his treating psychologist. I explained that the usual doctor-patient confidentiality does not exist in this examination. The defendant did sign a consent allowing me to examine him and to release my findings to you.

The following are my findings and conclusions regarding my psychological evaluation of this defendant.

**Identifying Data**

The defendant is a 22 year old, single, white, male currently incarcerated accused of a crime he allegedly committed on June 17, 2015 at Emanuel African Methodist Episcopal Church.

**Data Regarding Competence to Stand Trial**

Perhaps because of the time constraints on this case, I was not given any documents to review. As a resident of Charleston, I was aware of his case and did read some public domain material relevant to this case including Mr. Roof's manifesto; Wikipedia's biography about Mr. Roof; material relating to Daily Stormer Internet site; and material about talk show host Michael Savage. I also interviewed Mr. Roof and examined him using the Wechsler Adult Intelligence Scale, version IV (WAIS-IV) test; Hopkins Verbal Learning Test-Revised (HVLT-R); Brief Visuospatial Memory Test-Revised (BVMT); and

the Personality Assessment Inventory (PAI). Raw data is in the attachment.

According to public documents, I understand that the defendant does have 33 federal criminal charges pending against him including nine counts of murder, three counts of attempted murder, and possession of a firearm during the commission of a felony. He also has separate State charges pending against him. The pleadings available to the defendant include not guilty. If the defendant is found guilty, the maximum sentence he faces is the death penalty or life in prison without the possibility of parole.

## History of Incident in Question

The following is the information given by the defendant Dylann Roof regarding the incident in question. I discussed with Mr. Roof his motive for the shootings. He stated that he first started thinking about the murders in October 2014. Around October 2014, he told me that he spent nearly all of his time reading an Internet site called *Dailystormer.com*, described as a neo-Nazi and white supremacist news and commentary website. He said he also frequently listened to Michael Savage, a nationally syndicated talk show. I was to later learn Michael Savage characterizes his political philosophy as "conservative nationalism" where he considers key elements of nation as borders, language, and culture. According to *Wikipedia*, Savage has been barred from entering the United Kingdom for "seeking to provoke others to serious criminal acts and fostering hatred."

In October 2012, Mr. Roof said that he was living at his mother's home. He had no aspirations to move out, further his formal education, or seek to pursue a career. Instead, he spent much of his time on the Internet or listening to the previously mentioned talk show. He said that he was pressured by his mother and her boyfriend to find a job. As such, he would leave the house periodically and lie about having submitted applications for employment at various business establishments in an effort to get them off his case.

Mr. Roof said that he wrote a manifesto that crudely outlines his ideology. He was quick to point out that he is embarrassed about the quality of his manifesto as it was written in haste on the day he left for the Charleston shootings. Much of his manifesto that I read after the fact was highly consistent with what he described to me. In particular, he described that he was "truly awakened" by the Trayvon Martin shooting case of February 26, 2012 and statistics he read when he searched the term "black on white crime" on the Internet. The theme of Mr. Roof's manifesto is that blacks are taking over and compromising the country by driving whites out of the cities into the suburbs. He wrote, "I see all this stuff going on, and I don't see anyone doing anything about it. And it pisses me off." He went on to quote a saying in a film he had seen as, "Even if my life is worth less than a speck of dirt, I want to use it for the good of society." Further, he wrote, "I have no choice. I am not in the position to, alone, go into the ghetto and fight. I chose Charleston because it is the most historic city in my state, and at one time had the highest ratio of blacks to whites in the country. We have no skinheads, no real KKK, no one doing anything but talking on the Internet. Well someone has to have the

bravery to take it to the real world, and I guess that has to be me."

Mr. Roof explained to me that he wanted to avenge the crimes committed by blacks against whites and thought carefully about how best to accomplish this task. He said that a mass church murder seemed to be the best choice. He had considered other options such as mass murder at a black festival, but did not think that this would create the same media attention. He had considered different scenarios with acronyms the media might grasp onto. He ultimately thought that a mass murder in a black church on Christmas Eve would be the ideal venue, but at the time (i.e. Christmas 2014) said that he was not ready.

Mr. Roof said that he had previously driven to Charleston and visited Emanuel African Methodist Episcopal Church. He told me that this was an ideal location as it was centrally located in historic downtown Charleston. A plus was that Charleston is nationally known as an important destination. He obtained the worship service schedule, which he used to plan his attack.

Mr. Roof said that he funded his weapon and ammunition with savings, Christmas gifts and birthday money. He bought parts for the handgun with his saving. He started with the clips and other parts before the actual gun was purchased as a part of a "forced savings plan." In total, he spent in excess of $1000.

On the day of the attack, Mr. Roof drove himself to downtown Charleston. Things did not go as he had expected. When he entered the church, a parishioner met him and escorted him to a seat. He said he did not think it would happen that way. He had expected that they would have resisted his attendance at the service and that is when he would open fire. He was shocked and said he did not know what to do, so he sat down as instructed. Throughout the prayer session he was wondering if he should carry out his mission. He said to himself, "Well if you don't do it now, you are never going to do it."

Towards the end of the worship service, Mr. Roof stood up and open fired. He said that he walked up and down the isle firing his gun at the parishioners. He said he fired about 77 rounds. He had reloaded his weapon a number of different times. He said he killed 9 people. Three were spared. When asked why he spared the 3, he stated one was too young. He said he thought this person was around 5 years old and he did not feel that was right. Another had looked him in the eye and for some reason he felt he could not kill this person. The third was playing dead. He said he knew this person wasn't dead, but at that point he said, "I was done" and ready to leave.

Mr. Roof said that he was shocked that there were no police present when he left the church. He had fully expected to be gunned down by the police. He wondered why there were no police. Since there was no one there to stop him, he walked to his car and drove off. He said he was heading to Nashville and figured he might go to listen to some music.

Mr. Roof explained to me that he had accomplished his mission. He discussed with me how nobody has approved of his actions, not even some of the extremist groups. He recognizes that many people are now out to get him. Even so, he said, "I am a hero to myself." He felt that he did his part to start a race war. He is convinced that at some point in US history, there will be a race war and they will look back at Dylann Roof and say, "He was right." When asked about other alternative actions that he might have used, he said that politics have not, and will not work, but "my actions will."

Mr. Roof said that he takes full responsibility for his actions. He said that he did commit these acts and that his attorneys that have plead "not guilty for me." We discussed the pending trial. He is angry with his attorneys and feels that they are manipulating him. He is particularly concerned that his attorneys want to portray him as autistic. He adamantly denies that he is autistic and said that he had previously known students who were autistic from his schools and claims he does not have this disorder. He further argued that if he were found to be autistic, this would take the responsibility of his crime from him. He said he is troubled by this and feels if this were to happen, it would minimize his "heroic act" by "discrediting me." He talked about a letter that he sent to the prosecution outlining that his lawyers are liars. I did not have this letter to review.

We discussed the potential penalties for his alleged crime. We also discussed the defense plan to obtain life without parole verses the death penalty. He said that he committed this act and whether it be the death penalty or life without parole, "Those outcomes are equally bad, aren't they?" He again came back and said, "I am my own hero."

## Present Symptoms

The following is further information given by the defendant in today's examination. He denies any particular symptoms. Mr. Roof said that he sleeps well and is rested afterwards. His appetite is reportedly good. He said he is able to concentrate. He maintains his interests. He has no sense of guilt. He has normal levels of energy. He denied any sensory deficits. He denies any confusion or memory problems. He denies any loss of interest or other depressive symptomatology. He denies any pain. He explained that he was attacked by another inmate, but was not hurt. He is aware that there are many people that would attack him because of his act if given the chance.

## Physical Health History

The following is the information given by the defendant regarding his physical health history. Mr. Roof said that he has been in good physical health. He said he has a diagnosis of Hashimoto's disease, has had borderline TSH and has not required treatment. He has not had any surgeries.

## Medications

Mr. Roof is not taking any medications.

### Psychiatric History

Mr. Roof denies any psychiatric history or treatment.

### Family History

Mr. Roof said that ███████████████████████████████. He thinks his mother is healthy. He has a sister who is in good health and is a teacher. He has a stepsister who is in good health. He denied any psychiatric disorder or neurological disease in the family or extended family.

### Social History

Mr. Roof stated that he was born and raised in the Columbia/Lexington area. He has lived in both Columbia and Lexington. He went to two elementary schools, 2 middle schools and 2 high schools. He quit school in the 10th grade. He said he hated school and found it boring. He has a history of refusing to do homework or projects. He said he did some online schooling. He finally took the GED and said it was ridiculously easy. He had been living with his mother and her boyfriend. He said his parents were separated when he was 5 years old. His work aspirations were to do as little as possible. He said that he only wanted to be a cashier because it was easy. He worked for landscaping company doing manual labor very briefly. He denied any significant substance abuse history. Other than the current charges he denied any significant legal history.

### Observations

The following are my observations regarding this defendant. Mr. Roof was alert, oriented, appropriate, calm, cooperative, and friendly. I felt that he was free of psychosis, depression, mania, and confusion. He appears quite intelligent and able to think clearly and critically. When he was faced with a difficult problem-solving task on an untimed item on the IQ exam, I asked, "Should we move on?" His response was, "I don't give up." He was able to carry on an articulate conversation and answer questions thoughtfully. He denied any close friends and reported that most of his normal pre-incarceration activities where highly introverted. He was particularly emotionally aloof and detached when describing the murder scene and his behavior immediately afterwards. The same was true when talking about the death sentence or life in prison without parole.

### Examination

Mr. Roof completed several psychological tests including the Wechsler Adult Intelligence Scale, version IV (WAIS-IV) test, Hopkins Verbal Learning Test-Revised (HVLT-R), Brief Visuospatial Memory Test-Revised (BVMT) and the Personality Assessment Inventory (PAI). I had considered administering effort testing such as the TOMM and/or Word Memory Test, but deferred because of outstanding effort. I had also considered the SIRS to assess for feigning of psychiatric symptomatology, but deferred

because he was very forthcoming and for the purposes at hand there are validity indices on the PAI.

The results of the IQ test revealed an outstanding intellect with a full-scale score of 125. This score places Mr. Roof in the Superior range of intellectual function with a score at the 95th percentile relative to his national standardized age-peers. There are four major factors that make up the full-scale IQ score. Mr. Roof's Verbal Compression facet was his area of relative cognitive strength with a composite score of 141. This score is at the 99.7th percentile relative to his normative national peers. This score on this index is in a category labeled Very Superior. His relative weakness was a score of 100 for Processing Speed. This score is at the 50th percentile relative to his normative age-peers. He has previously been tested and knew this was an area of relative weakness. He seemed to work very had to do his personal best. When factoring out Working Memory and Processing Speed, his General Ability Index score was 132. This score is in the Very Superior range of intellectual function and is at the 99th percentile for his national age cohort.

To further investigate Mr. Roof's capacity for recall, both the HVLT-R and the BVMT-R were administered. Again, his performance was well above average on both indices. Immediate total recall was a t-score of 56 and delayed recall was a t-score of 60. The mean score for his age-cohort is a t-score of 50 that is at the 50th percentile. Recognition recall was 100% with no false positives. Visual recall was also tested with similar scores. Total recall was a t-score of 58 and delayed recall was a t-score of 59. Recognition was 100% with no false positives. There were no significant differences between these two measures. The memory scores were at approximately the 85th percentile relative to his age-cohort.

Finally, the PAI was administered. Mr. Roof asked me some questions to clarify during the test and appeared very thoughtful in his responses. This is a widely used measure to assess for the presence of psychopathology. There are 344 psychological questions that the respondent answers in four ways: 1.) False, not at all true, 2.) Slightly true, 3.) Mostly true, or 4.) Very true.

The PAI provides a number of validity indices that are designed to provide an assessment of factors that could distort the results of testing. Such factors could include failure to complete test items properly, carelessness, reading difficulties, confusion, exaggeration, malingering, or defensiveness. For this protocol, the number of uncompleted items was none and acceptable. Also evaluated is the extent to which the respondent attended appropriately and responded consistently to the content of test items. Mr. Roof's scores showed that he did attend appropriately to item content and responded in a consistent fashion to similar items.

The degree to which response styles may have affected or distorted the report of symptomatology on the inventory is also assessed. An indicator trended outside of the normal range, suggesting that he may not have answered in a completely forthright manner.

With respect to positive impression management, there is no evidence to suggest that Mr. Roof was unduly defensive or motivated to portray himself as being relatively free of common shortcomings or minor faults, which was my major concern. On another validity index that I had the least concern (negative impression), Mr. Roof had a subtle suggestion that he may have attempted to portray himself in a negative or pathological manner. As recommended, I reviewed the critical items, as well as aspects of the clinical history, to evaluate the possibility of such distortion. I did not see any evidence to support the concern of possible symptom over endorsement or feigning a psychiatric disorder. Instead, I was impressed that Mr. Roof was unusually forthcoming with information.

After considering the validity of the profile, I examined the clinical scales. Notably, there were no clinical elevations suggestive of certain forms of psychopathology. That is not to say that Mr. Roof is free of psychological issues, but rather a number of forms of psychopathology were ruled out. Specifically, a total of 27 PAI items reflecting serious pathology have very low endorsement rates in normal samples. These items have been termed "critical items." In this case, Mr. Roof did not endorse any of the critical items.

According to Mr. Roof's self-report, he describes no significant problems in the following areas: unusual thoughts or peculiar experiences; problems with empathy; extreme moodiness and impulsivity; unhappiness and depression; unusually elevated mood or heightened activity; marked anxiety; problematic behaviors used to manage anxiety; difficulties with health or physical functioning. Also, he reports no significant problems with current alcohol or drug abuse or dependence. His scores ruled out the presence of symptoms supportive of diagnosis of somatization disorder, anxiety related disorders, depression, bipolar affective disorder, paranoia, schizophrenia, and certain personality disorders such as borderline or antisocial personality disorder. Also consistent with my clinical impressions, there was no evidence of psychosis.

While the PAI clinical profile revealed no marked clinical elevations that would be considered to indicate the presence of different forms of psychopathology, scores on one or more scales do, however, show moderate elevations. Mr. Roof described personality traits of being more wary and sensitive to interpersonal relationships than the average adult.

The PAI characterized Mr. Roof's interpersonal style as being very uncomfortable in social situations. He appears to have little interest or need for interacting with others and, for the most part, takes a passive, submissive stance when dealing with others. This passivity may lead to feelings of resentment when others attempt to secure his cooperation. It would be expected that he would avoid most social interactions rather than run the risk of being forced to make an active commitment to a relationship.

In considering the social environment of Mr. Roof, with respect to perceived stressors and the availability of social supports with which to deal with these stressors, his responses indicated that he experiences his level of social support as being lower than

that of the average adult. Scores suggest that he probably has relatively few close relationships or is dissatisfied with the quality of these relationships. However, he reported little stress arising from this major life area.

Additional findings indicated no reporting of distress from thoughts of self-harm. In general, he described himself as a very meek and unassertive person who has trouble standing up for himself. Findings showed that he has difficulty with the appropriate expression of anger. Lastly, his level of interest or motivation for psychotherapy is much lower than is typical of individuals being seen in the treatment setting. He is satisfied with himself as he is; he is not experiencing marked distress about his situation; and he sees little need for changes in his behavior.

In summary, the computerized algorithm best matched his personality profile with a rule out diagnosis of schizoid personality disorder. I likewise found support from his history and my clinical impression for this diagnosis.

## Discussion and Conclusions

The following are my thoughts regarding this case. Federal law states that a defendant is incompetent to stand trial if the defendant lacks the ability to understand the proceedings and assist in the preparation of a defense.

The following are my conclusions regarding this defendant, to a reasonable degree of psychological certainty, based upon the above history and findings. Mr. Roof has Superior intellectual function and is free of psychopathology that would interfere with the court proceedings.

If I can address any further issues for you or clarify any questions, I will be glad to do so in writing or on record. I thank you for the opportunity to examine this case and to address these interesting questions. I do give you my consent to release this report to any appropriate party.

Respectfully submitted,

Mark Wagner, Ph.D.
Clinical Neuropsychologist
Professor of Neurology
Medical University of South Carolina



# Score Report

| | |
|---|---|
| Examinee Name | Dylann Roof |
| Examinee ID | |
| Date of Birth | 4/3/1994 |
| Gender | Male |
| Race/Ethnicity | White |

| | |
|---|---|
| Date of Report | 11/14/2016 |
| Grade | |
| Home Language | English |
| Handedness | Right |
| Examiner Name | Mark Wagner |

Test Administered  WAIS–IV (11/11/2016)    Age at Testing  22 years 7 months    Retest?  No

## WAIS–IV Comments

## Composite Score Summary

| Scale | Sum of Scaled Scores | Composite Score | | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|---|
| Verbal Comprehension | 50 | VCI | 141 | 99.7 | 134-145 | Very Superior |
| Perceptual Reasoning | 39 | PRI | 117 | 87 | 110-122 | High Average |
| Working Memory | 26 | WMI | 117 | 87 | 109-123 | High Average |
| Processing Speed | 20 | PSI | 100 | 50 | 92-108 | Average |
| Full Scale | 135 | FSIQ | 125 | 95 | 120-129 | Superior |
| General Ability | 89 | GAI | 132 | 98 | 126-136 | Very Superior |

Confidence Intervals are based on the Overall Average SEMs. Values reported in the SEM column are based on the examinee's age.

The GAI is an optional composite summary score that is less sensitive to the influence of working memory and processing speed. Because working memory and processing speed are vital to a comprehensive evaluation of cognitive ability, it should be noted that the GAI does not have the breadth of construct coverage as the FSIQ.

Scores based on U.S. normative data copyright © 2008 by NCS Pearson, Inc. All rights reserved. Produced in the United States of America.

Ex. 238 pg.9 of 26

## WAIS-IV

### Composite Score Profile

| Composite | Score | SEM |
|---|---|---|
| VCI | 141 | 3 |
| PRI | 117 | 3.67 |
| WMI | 117 | 4.24 |
| PSI | 100 | 4.74 |
| FSIQ | 125 | 2.12 |
| GAI | 132 | 2.6 |



The vertical bars represent the standard error of measurement (*SEM*).

## Analysis

### Index Level Discrepancy Comparisons

| Comparison | Score 1 | Score 2 | Difference | Critical Value .05 | Significant Difference Y / N | Base Rate Overall Sample |
|---|---|---|---|---|---|---|
| VCI - PRI | 141 | 117 | 24 | 9.29 | Y | 4.2 |
| VCI - WMI | 141 | 117 | 24 | 10.18 | Y | 3 |
| VCI - PSI | 141 | 100 | 41 | 10.99 | Y | 1 |
| PRI - WMI | 117 | 117 | 0 | 10.99 | N | |
| PRI - PSI | 117 | 100 | 17 | 11.75 | Y | 13.4 |
| WMI - PSI | 117 | 100 | 17 | 12.46 | Y | 13.1 |
| FSIQ - GAI | 125 | 132 | -7 | 6.58 | Y | 8.1 |

Base rate by overall sample.
Statistical significance (critical value) at the .05 level.

Version 1.0.0

Scores based on U.S. normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved.  Produced in the United States of America.

Dylann Roof
Page 2 of 5

Ex. 238 pg.10 of 26

 WAIS-IV

## Verbal Comprehension Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | SEM |
|---|---|---|---|---|---|
| Similarities | 33 | 16 | 98 | 15 | 1.16 |
| Vocabulary | 55 | 19 | 99.9 | 18 | 0.73 |
| Information | 21 | 15 | 95 | 15 | 0.9 |

## Perceptual Reasoning Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | SEM |
|---|---|---|---|---|---|
| Block Design | 52 | 11 | 63 | 11 | 1.2 |
| Matrix Reasoning | 22 | 12 | 75 | 13 | 1.04 |
| Visual Puzzles | 24 | 16 | 98 | 16 | 0.95 |

## Working Memory Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | SEM |
|---|---|---|---|---|---|
| Digit Span | 35 | 13 | 84 | 13 | 0.9 |
| Arithmetic | 18 | 13 | 84 | | 1.2 |

## Processing Speed Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | SEM |
|---|---|---|---|---|---|
| Symbol Search | 36 | 11 | 63 | 11 | 1.31 |
| Coding | 67 | 9 | 37 | 9 | 1.16 |

## Subtest Level Discrepancy Comparisons

| Subtest Comparison | Score 1 | Score 2 | Difference | Critical Value .05 | Significant Difference Y / N | Base Rate |
|---|---|---|---|---|---|---|
| Digit Span - Arithmetic | 13 | 13 | 0 | 2.57 | N | |
| Symbol Search - Coding | 11 | 9 | 2 | 3.41 | N | 27.4 |

Statistical significance (critical value) at the .05 level.

Version 1.0.0    Scores based on U.S. normative data copyright © 2008 by NCS Pearson, Inc. All rights reserved. Produced in the United States of America.    Dylann Roof
Page 3 of 5

Ex. 238 pg.11 of 26



## Subtest Scaled Score Profile



The vertical bars represent the standard error of measurement (*SEM*)

# Determining Strengths and Weaknesses

## Differences Between Subtest and Overall Mean of Subtest Scores

| Subtest | Subtest Scaled Score | Mean Scaled Score | Difference | Critical Value .05 | Strength or Weakness | Base Rate |
|---|---|---|---|---|---|---|
| Block Design | 11 | 13.50 | -2.5 | 2.85 | | 15-25% |
| Similarities | 16 | 13.50 | 2.5 | 2.82 | | 15-25% |
| Digit Span | 13 | 13.50 | -0.5 | 2.22 | | >25% |
| Matrix Reasoning | 12 | 13.50 | -1.5 | 2.54 | | >25% |
| Vocabulary | 19 | 13.50 | 5.5 | 2.03 | S | <1% |
| Arithmetic | 13 | 13.50 | -0.5 | 2.73 | | >25% |
| Symbol Search | 11 | 13.50 | -2.5 | 3.42 | | >25% |
| Visual Puzzles | 16 | 13.50 | 2.5 | 2.71 | | 25% |
| Information | 15 | 13.50 | 1.5 | 2.19 | | >25% |
| Coding | 9 | 13.50 | -4.5 | 2.97 | W | 5% |

Overall: Mean = 13.5, Scatter = 10, Base rate = 8.9.
Base Rate for Intersubtest Scatter is reported for 10 Full Scale Subtests.
Statistical significance (critical value) at the .05 level.

Version 1.0.0     Scores based on U.S. normative data copyright © 2008 by NCS Pearson, Inc.     Dylann Roof
All rights reserved. Produced in the United States of America.     Page 4 of 5


## WAIS-IV
## Process Analysis

### Working Memory Process Score Summary

| Process Score | Raw Score | Scaled Score | Percentile Rank | Base Rate | SEM |
|---|---|---|---|---|---|
| Digit Span Forward | 14 | 14 | 91 | -- | 1.34 |
| Digit Span Backward | 13 | 16 | 98 | -- | 1.34 |
| Digit Span Sequencing | 8 | 9 | 37 | -- | 1.27 |

### Process Level Discrepancy Comparisons

| Process Comparison | Score 1 | Score 2 | Difference | Critical Value .05 | Significant Difference Y / N | Base Rate |
|---|---|---|---|---|---|---|
| Digit Span Forward - Digit Span Backward | 14 | 16 | -2 | 3.65 | N | 31.5 |
| Digit Span Forward - Digit Span Sequencing | 14 | 9 | 5 | 3.6 | Y | 8.5 |
| Digit Span Backward - Digit Span Sequencing | 16 | 9 | 7 | 3.56 | Y | 2 |

Statistical significance (critical value) at the .05 level.

Version 1.0.0    Scores based on U.S. normative data copyright © 2008 by NCS Pearson, Inc. All rights reserved. Produced in the United States of America.    Dylann Roof
Page 5 of 5

Ex. 238 pg.13 of 26

# HVLT-R™/BVMT-R™

## Discrepancy Report

**Developed by**

**Ralph H. B. Benedict, PhD, Jason Brandt, PhD**

**And PAR Staff**

## Examinee Information

**Name:** Dylann Roof
**Birthdate:** 04/03/1994
**Sex:** Male
**Education:** 12

**BVMT-R Test Information**
**Test Date:** 11/12/16
**Test Description:**
**Age:** 22

**HVLT-R Test Information**
**Test Date:** 11/12/16
**Test Description:**
**Age:** 22

PAR Psychological Assessment Resources, Inc. / 16204 North Florida Ave. / Lutz, FL 33549 / 1.800.331.8378 / www.parinc.com
HVLT-R™/BVMT-R™: Discrepancy Report Copyright © 2007 by Psychological Assessment Resources, Inc. All rights reserved. May not be reproduced in whole or in part in any form or by any means without written permission of Psychological Assessment Resources, Inc.
Version: 1.10.031

# Interpretive Caveats

Use of this computer-generated report requires a complete understanding of the Hopkins Verbal Learning Test-Revised (HVLT-R) and the Brief Visuospatial Memory Test-Revised (BVMT-R) as well as the interpretation, applications, and limitations as presented in the presented in the HVLT-R Professional Manual, the BVMT-R Professional Manual, and the HVLT-R/BVMT-R Professional Manual Supplement. This report contains results from both the HVLT-R and the BVMT-R. Users should refer to the HVLT-R Professional Manual, the BVMT-R Professional Manual, and the HVLT-R/BVMT-R Professional Manual Supplement for guidelines on the interpretation of this report. Users also should refer to the Professional Manuals for information about the psychometric characteristics of the BVMT-R.

This report is only one source of information about the individual being evaluated. No clinical decisions should be based solely on the information contained in this report. The results contained in this report should be integrated with other sources of information when making decisions about this examinee.

This report is confidential and is intended for use by qualified professionals who have sufficient knowledge of the HVLT-R, BVMT-R, and psychometric testing. Release of this report should be governed by the American Psychological Association's *Ethical Principles of Psychologists and Code of Conduct*, as well as state and federal law.

Ex. 238 pg.15 of 26

# HVLT-R/BVMT-R Score Summary Table

| Score | Raw score | | T score | | Percentile | |
|---|---|---|---|---|---|---|
| | HVLT-R | BVMT-R | HVLT-R | BVMT-R | HVLT-R | BVMT-R |
| Trial 1 | 7 | 8 | 45 | 53 | 31 | 62 |
| Trial 2 | 12 | 12 | 63 | 61 | 90 | 86 |
| Trial 3 | 12 | 12 | 59 | 58 | 82 | 79 |
| Total Recall | 31 | 32 | 56 | 58 | 73 | 79 |
| Delayed Recall | 12 | 12 | 60 | 59 | 84 | 82 |
| Percent Retained | 100 | 100 | 53 | | 62 | |
| Recognition Hits | 12 | 6 | | | | |
| Recognition False Alarms | 0 | 0 | | | | |
| Recognition Discrimination Index | 12 | 6 | 58 | | 79 | |

Note: Percentiles are based on non-normalized $T$ scores.

# Discrepancy Scores Between the HVLT-R and BVMT-R

| Score | Discrepancy Score | Score Comparisons | Significance Level | Cumulative Percentage Among the Normative Sample |
|---|---|---|---|---|
| Total Recall | 2 | HVLT-R < BVMT-R | ns | 90.50 |
| Delayed Recall | 1 | HVLT-R > BVMT-R | ns | 96.20 |

# HVLT-R/BVMT-R *T*-Score Profile



# PERSONALITY ASSESSMENT INVENTORY™

## Clinical Interpretive Report

by

Leslie C. Morey, PhD
and PAR Staff

## Client Information

| | | |
|---|---|---|
| Client Name | : | Dylann Roof |
| Client ID | : | -Not Specified- |
| Age | : | 22 |
| Gender | : | Male |
| Education | : | 12 |
| Marital Status | : | Single |
| Test Date | : | 11/12/2016 |
| Prepared For | : | -Not Specified- |

The interpretive information contained in this report should be viewed as only one source of hypotheses about the individual being evaluated. No decisions should be based solely on the information contained in this report. This material should be integrated with all other sources of information in reaching professional decisions about this individual.

This report is confidential and intended for use by qualified professionals only. It should not be released to the individual being evaluated.

PAR Psychological Assessment Resources, Inc. • 16204 North Florida Ave. • Lutz, FL 33549 • 1.800.331.8378 • www.parinc.com
Personality Assessment Inventory™ copyright © 1989, 1990, 1991 by Psychological Assessment Resources, Inc. All rights reserved. PAI Clinical Interpretive Report copyright © 1990, 1991, 1993, 1995, 1998, 2000 by Psychological Assessment Resources, Inc. All rights reserved. May not be reproduced in whole or in part in any form or by any means without written permission of Psychological Assessment Resources, Inc. "Personality Assessment Inventory" is a trademark and "PAI" is a registered trademark owned by Psychological Assessment Resources, Inc.

Client ID  :  -Not Specified-
Test Date  :  11/12/2016

# Full Scale Profile



Plotted *T* scores are based upon a census matched standardization sample of 1,000 normal adults.
■ indicates that the score is more than two standard deviations above the mean for a sample of 1,246 clinical patients.
◆ indicates that the scale has more than 20% missing items.

Personality Assessment Inventory™ Clinical Interpretive Report                      Page 3
Client ID  :  -Not Specified-
Test Date  :  11/12/2016

# Subscale Profile



Missing Items = 0

Plotted *T* scores are based upon a census matched standardization sample of 1,000 normal adults.
■ indicates that the score is more than two standard deviations above the mean for a sample of 1,246 clinical patients.
◆ indicates that the scale has more than 20% missing items.

Client ID   :   -Not Specified-
Test Date  :   11/12/2016

# Additional Profile Information

## Supplemental PAI Indexes

| Index | Value | *T* Score | |
|---|---|---|---|
| Defensiveness Index | 4 | 58 | |
| Cashel Discriminant Function | 107.30 | 29 | |
| Malingering Index | 0 | 44 | |
| Rogers Discriminant Function | 0.27 | 62 | |
| Suicide Potential Index | 4 | 53 | |
| Violence Potential Index | 1 | 47 | |
| Treatment Process Index | 0 | 44 | |
| ALC Estimated Score | --- | 53 | (1*T* lower than *ALC*) |
| DRG Estimated Score | --- | 50 | (2*T* higher than *DRG*) |
| Mean Clinical Elevation | --- | 49 | |

## Coefficients of Fit with Profiles of Known Clinical Groups

| Database Profile | Coefficient of Fit |
|---|---|
| All "False" | 0.638 |
| PIM Predicted | 0.327 |
| All "Slightly True" | 0.312 |
| Schizophrenia | 0.296 |
| Paranoid delusions | 0.294 |
| Cluster 2 | 0.285 |
| Fake Bad | 0.257 |
| Cluster 3 | 0.252 |
| Cluster 4 | 0.249 |
| Auditory hallucinations | 0.219 |
| Cluster 10 | 0.215 |
| Antipsychotic medications | 0.212 |
| NIM Predicted | 0.208 |
| Random responding | 0.188 |
| Suicide history | 0.177 |
| Self-Mutilation | 0.159 |

Client ID  :  -Not Specified-
Test Date  :  11/12/2016

| Database Profile | Coefficient of Fit |
| --- | --- |
| Cluster 6 | 0.158 |
| Alcoholic | 0.148 |
| Cluster 7 | 0.135 |
| Prisoners | 0.135 |
| Major Depressive Disorder | 0.131 |
| Dysthymic Disorder | 0.122 |
| Antisocial Personality Disorder | 0.121 |
| Rapists | 0.118 |
| Assault history | 0.117 |
| Drug abuse | 0.108 |
| Anxiety Disorder | 0.099 |
| Posttraumatic Stress Disorder | 0.094 |
| Current suicide | 0.091 |
| Cluster 9 | 0.086 |
| Borderline Personality Disorder | 0.074 |
| Schizoaffective Disorder | 0.021 |
| Somatoform Disorder | -0.012 |
| All "Mainly True" | -0.017 |
| Current aggression | -0.022 |
| All "Very True" | -0.085 |
| Adjustment reaction | -0.091 |
| Mania | -0.101 |
| Cluster 1 | -0.101 |
| Cluster 8 | -0.107 |
| Spouse abusers | -0.157 |
| Cluster 5 | -0.180 |
| Fake Good | -0.357 |

Ex. 238 pg.22 of 26

Client ID  :  -Not Specified-
Test Date  :  11/12/2016

# Validity of Test Results

The PAI provides a number of validity indices that are designed to provide an assessment of factors that could distort the results of testing.  Such factors could include failure to complete test items properly, carelessness, reading difficulties, confusion, exaggeration, malingering, or defensiveness.  For this protocol, the number of uncompleted items is within acceptable limits.

Also evaluated is the extent to which the respondent attended appropriately and responded consistently to the content of test items.  The respondent's scores suggest that he did attend appropriately to item content and responded in a consistent fashion to similar items.

The degree to which response styles may have affected or distorted the report of symptomatology on the inventory is also assessed.  Certain of these indicators fall outside of the normal range, suggesting that the respondent may not have answered in a completely forthright manner; the nature of his responses might lead the evaluator to form a somewhat inaccurate impression of the client based upon the style of responding described below.  With respect to positive impression management, there is no evidence to suggest that the respondent was unduly defensive or motivated to portray himself as being relatively free of common shortcomings or minor faults.

With respect to negative impression management, there are subtle suggestions that the client attempted to portray  himself in a negative or pathological manner in particular areas.  Some concern about distortion of the clinical picture must be raised as a result; the respondent presents with certain patterns or combinations of features that are unusual or atypical in clinical populations but relatively common among individuals feigning mental disorder.  It is suggested that the critical items, as well as certain aspects of the clinical history, be reviewed to evaluate the possibility of such distortion.  Although this pattern does not necessarily indicate a level of impression management that would render the test results uninterpretable, the clinical hypotheses presented in this report should be reviewed with these considerations in mind.  The clinical scale elevations may overrepresent the extent and degree of significant test findings in certain areas.

# Clinical Features

The PAI clinical profile reveals no marked elevations that should be considered to indicate the presence of clinical psychopathology.  Scores on one or more scales do, however, show moderate elevations that may reflect sources of difficulty for the person.  These potential problem areas are described below.

The respondent describes himself as being more wary and sensitive in interpersonal relationships than the average adult.  Others are likely to see him as tough-minded, skeptical, and somewhat hostile.

According to the respondent's self-report, he describes NO significant problems in the following areas: unusual thoughts or peculiar experiences; problems with empathy; extreme

Client ID  :  -Not Specified-
Test Date :  11/12/2016

moodiness and impulsivity; unhappiness and depression; unusually elevated mood or heightened activity; marked anxiety; problematic behaviors used to manage anxiety; difficulties with health or physical functioning. Also, he reports NO significant problems with alcohol or drug abuse or dependence.

# Self-Concept

The self-concept of the respondent appears involve a reasonably stable and positive self-evaluation that, as is the case with most individuals, may be occasionally punctuated by periods of self-doubt or pessimism. He describes approaching life with a clear sense of purpose and distinct convictions, with a well-articulated sense of who he is and what his goals are.

# Interpersonal and Social Environment

The respondent's interpersonal style seems best characterized as being very uncomfortable in social situations. He appears to have little interest or need for interacting with others and, for the most part, takes a passive, submissive stance when dealing with others. This passivity may lead to feelings of resentment when others attempt to secure his cooperation. It would be expected that he would avoid most social interactions rather than run the risk of being forced to make an active commitment to a relationship.

In considering the social environment of the respondent with respect to perceived stressors and the availability of social supports with which to deal with these stressors, his responses indicate that he experiences his level of social support as being somewhat lower than that of the average adult. He may have relatively few close relationships or be dissatisfied with the quality of these relationships. However, he reports relatively little stress arising from this or other major life areas.

# Treatment Considerations

Treatment considerations involve issues that can be important elements in case management and treatment planning. Interpretation is provided for three general areas relevant to treatment: behaviors that may serve as potential treatment complications, motivation for treatment, and aspects of the respondent's clinical picture that may complicate treatment efforts.

With respect to suicidal ideation, the respondent is not reporting distress from thoughts of self-harm.

With respect to anger management, the respondent describes himself as a very meek and unassertive person who has difficulty standing up for himself, even when assertiveness is warranted. Thus, he may have some difficulty in the appropriate expression of anger.

The respondent's interest in and motivation for treatment is somewhat below average in comparison to adults who are not being seen in a therapeutic setting. Furthermore, his level of treatment motivation is substantially lower than is typical of individuals being seen in

Ex. 238 pg.24 of 26

Client ID  :  -Not Specified-
Test Date  :  11/12/2016

treatment settings.  His responses suggest that he is satisfied with himself as he is, that he is not experiencing marked distress, and that, as a result, he sees little need for changes in his behavior.  However, the respondent does report a number of strengths that augur well for a relatively smooth treatment process if he made a commitment to treatment.

If treatment were to be considered for this individual, particular areas of attention or concern in the early stages of treatment could include:
- He may not be experiencing sufficient distress to feel that treatment is warranted.
- He may be somewhat defensive and reluctant to discuss personal problems, and as such he may be at-risk for early termination.
- He may have initial difficulty in placing trust in a treating professional as part of his more general problems in close relationships.

## *DSM-IV* Diagnostic Possibilities

Listed below are *DSM-IV* diagnostic possibilities suggested by the configuration of PAI scale scores.  The following are advanced as hypotheses; all available sources of information should be considered prior to establishing final diagnoses.

Axis I:     799.9     Diagnosis or Condition Deferred on Axis I

Axis II Diagnostic Considerations:

        301.20     Schizoid Personality Disorder

## Critical Item Endorsement

A total of 27 PAI items reflecting serious pathology have very low endorsement rates in normal samples.  These items have been termed critical items.  Endorsement of these critical items is not in itself diagnostic, but review of the content of these items with the respondent may help to clarify the presenting clinical picture.  In this case, the respondent did not endorse any of the critical items.

Personality Assessment Inventory™ Clinical Interpretive Report                    Page 9
Client ID  :  -Not Specified-
Test Date  :  11/12/2016

# PAI Item Responses

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1. MT | 44. F | 87. F | 130. F | 173. MT | 216. MT | 259. VT | 302. F |
| 2. MT | 45. F | 88. MT | 131. F | 174. VT | 217. MT | 260. F | 303. F |
| 3. F | 46. F | 89. F | 132. F | 175. MT | 218. MT | 261. F | 304. MT |
| 4. ST | 47. F | 90. F | 133. ST | 176. F | 219. MT | 262. F | 305. F |
| 5. ST | 48. ST | 91. MT | 134. F | 177. F | 220. F | 263. F | 306. MT |
| 6. F | 49. F | 92. F | 135. F | 178. MT | 221. VT | 264. F | 307. F |
| 7. F | 50. F | 93. ST | 136. MT | 179. F | 222. F | 265. MT | 308. ST |
| 8. F | 51. F | 94. VT | 137. F | 180. F | 223. F | 266. F | 309. F |
| 9. F | 52. F | 95. F | 138. F | 181. F | 224. VT | 267. MT | 310. F |
| 10. ST | 53. ST | 96. F | 139. MT | 182. MT | 225. MT | 268. F | 311. F |
| 11. F | 54. F | 97. F | 140. F | 183. F | 226. F | 269. F | 312. F |
| 12. F | 55. F | 98. F | 141. F | 184. VT | 227. ST | 270. ST | 313. MT |
| 13. ST | 56. F | 99. F | 142. MT | 185. F | 228. F | 271. ST | 314. F |
| 14. F | 57. F | 100. F | 143. F | 186. MT | 229. MT | 272. F | 315. ST |
| 15. F | 58. ST | 101. F | 144. F | 187. F | 230. F | 273. F | 316. F |
| 16. F | 59. F | 102. F | 145. ST | 188. VT | 231. MT | 274. F | 317. ST |
| 17. ST | 60. F | 103. VT | 146. ST | 189. VT | 232. F | 275. F | 318. VT |
| 18. MT | 61. F | 104. F | 147. F | 190. ST | 233. F | 276. F | 319. VT |
| 19. F | 62. F | 105. F | 148. F | 191. ST | 234. F | 277. ST | 320. VT |
| 20. F | 63. VT | 106. ST | 149. F | 192. F | 235. MT | 278. F | 321. F |
| 21. F | 64. MT | 107. F | 150. MT | 193. ST | 236. F | 279. F | 322. F |
| 22. F | 65. F | 108. F | 151. ST | 194. F | 237. MT | 280. F | 323. MT |
| 23. F | 66. F | 109. ST | 152. VT | 195. ST | 238. F | 281. MT | 324. F |
| 24. MT | 67. F | 110. MT | 153. F | 196. F | 239. F | 282. MT | 325. F |
| 25. F | 68. F | 111. F | 154. F | 197. ST | 240. VT | 283. F | 326. F |
| 26. MT | 69. ST | 112. MT | 155. F | 198. ST | 241. F | 284. F | 327. F |
| 27. F | 70. F | 113. F | 156. F | 199. F | 242. VT | 285. MT | 328. F |
| 28. MT | 71. F | 114. F | 157. F | 200. F | 243. F | 286. MT | 329. F |
| 29. F | 72. F | 115. VT | 158. F | 201. VT | 244. F | 287. VT | 330. MT |
| 30. F | 73. F | 116. F | 159. F | 202. MT | 245. MT | 288. ST | 331. F |
| 31. F | 74. F | 117. F | 160. VT | 203. F | 246. MT | 289. F | 332. F |
| 32. F | 75. F | 118. F | 161. MT | 204. F | 247. F | 290. VT | 333. F |
| 33. F | 76. F | 119. F | 162. F | 205. ST | 248. VT | 291. VT | 334. F |
| 34. F | 77. MT | 120. F | 163. F | 206. F | 249. F | 292. F | 335. F |
| 35. F | 78. F | 121. MT | 164. MT | 207. F | 250. F | 293. F | 336. F |
| 36. F | 79. F | 122. F | 165. MT | 208. F | 251. F | 294. MT | 337. F |
| 37. MT | 80. MT | 123. F | 166. F | 209. F | 252. VT | 295. MT | 338. F |
| 38. F | 81. MT | 124. MT | 167. F | 210. F | 253. VT | 296. VT | 339. F |
| 39. F | 82. F | 125. F | 168. ST | 211. F | 254. F | 297. F | 340. F |
| 40. F | 83. F | 126. ST | 169. F | 212. F | 255. F | 298. VT | 341. VT |
| 41. ST | 84. F | 127. MT | 170. F | 213. MT | 256. ST | 299. VT | 342. VT |
| 42. F | 85. ST | 128. ST | 171. ST | 214. F | 257. MT | 300. F | 343. VT |
| 43. F | 86. F | 129. F | 172. MT | 215. F | 258. F | 301. MT | 344. VT |

**\*\*\* End of Report \*\*\***