https://justice360sc.org/wp-content/uploads/2016/01/eighth-ammendment-handbook1.pdf

EIGHTH AMENDMENT HANDBOOK:

# An Overview of Constitutional Principles Relevant to Capital Cases in South Carolina

A PUBLICATION BY:

John H. Blume
*Professor of Law*
Director of the Cornell Death Penalty Project
Cornell Law School • Myron Taylor Hall
Ithaca, New York 14853 • (607) 255-1030

AND

Emily C. Paavola
*Executive Director*
Death Penalty Resource & Defense Center
1247 Sumter Street • P.O. Box 11311
Columbia, SC 29211 • (803) 765-1044

SEPTEMBER, 2011



John H. Blume • Emily C. Paavola

# Table of contents

I.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. Guided Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    A.  Vague and Overbroad Aggravating Circumstances . . . . . . . . . . . . . 7
    B.  Other Challenges to Aggravating Circumstances . . . . . . . . . . . . . .14

III. Individualized Sentencing: The *Lockett* Doctrine . . . . . . . . . . . . . . . . 16

IV. Due Process and Heightened Reliability . . . . . . . . . . . . . . . . . . . . . . . 18
    A.  The Right to Fair Rebuttal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    B.  Lesser Included Offenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    C.  Expert Assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    D.  State Mental Health Evaluations . . . . . . . . . . . . . . . . . . . . . . . . . . 23

V. Categorical Bans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    A.  Proportionality of Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    B.  Proportionality of Offender . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VI. Victim Impact Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

VII. Appellate Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

---

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

United States Constitution
Amendment VIII

"Excessive bail shall not be required, nor shall excessive fines be imposed, nor shall cruel, nor corporal, nor unusual punishment be inflicted, nor shall witnesses be unreasonably detained."

South Carolina Constitution
Article I, § 15

# I. Introduction

This handbook is the fourth installment in our Handbook Series.[1] It is intended to serve as a brief introduction to the basic constitutional principles relevant to capital cases and to offer practical advice to capital defense practitioners on how to deal with constitutional issues. The Eighth Amendment to the United States Constitution is the key provision. Thus, this handbook primarily discusses the Eighth Amendment principles developed by the United States Supreme Court in the modern era of capital punishment (i.e., post-1972) and relevant South Carolina-specific jurisprudence.[2]

In 1972, the United States Supreme Court held in *Furman v. Georgia*, 408 U.S. 238 (1972), that all then-existing state capital punishment schemes violated the cruel and unusual punishments clause of the Eighth Amendment. Although the Court did not hold that the infliction of the death penalty *per se* violates the Constitution's ban on cruel and unusual punishments, a plurality of the Court did recognize that the penalty of death is different in kind from any other punishment imposed under our system of criminal justice. Because death is different, the Court held that it cannot be imposed under sentencing procedures that create a substantial risk that it will be inflicted in an arbitrary and capricious manner.[3]

---

[1] *See Objection Handbook: Preserving Your Trial Objections For Appellate Review (September 2008); Statement Handbook: Questions To Ask About The Admissibility Of A Criminal Defendant's Statements (August 2009); and, Unstacking The Deck: A Handbook For Capital Defense Attorneys On Challenging The State's Case In Aggravation* (December 2009), all available at www.deathpenaltyresource.org/recentpubs.aspx.

[2] Although the language used in the South Carolina Constitution, Article I, § 15 differs slightly from its federal constitutional counterpart, the South Carolina Supreme Court has held that "the analysis we employ is the same under both constitutions." State v. Wilson, 306 S.C. 498, 512, 413 S.E.2d 19, 27 (1992).

[3] Furman, 408 U.S. 238 (1972).

8th AMENDMENT HANDBOOK: An Overview of Constitutional Principles Relevant to Capital Cases in SC

John H. Blume • Emily C. Paavola

To avoid that risk, the Court has since held that capital sentencing schemes must meet two objectives: (a) to be "consistent and principled;" but also, (b) "humane and sensible to the uniqueness of the individual."[4] The first of these principles is often referred to as guided discretion. In *Gregg v. Georgia*, 428 U.S. 153 (1976), and four other cases decided on July 2, 1976,[5] the Court determined that the guided discretion objective is "best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprized of the information relevant to the imposition of sentence and provided with standards to guide its use of the information."[6] Accordingly, death penalty schemes must "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'"[7]

The second principle – individualized sentencing – demands that the process give proper significance to the "relevant facts of the character and record of the individual offender."[8] In *Woodson v. North Carolina*, 428 U.S. 280 (1976), the Court rejected a North Carolina statute that made a death sentence mandatory for all convicted first-degree murderers because it "fail[ed] to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death."[9] The Court explained the need for individualized sentencing:

> A process that accords no significance to relevant facets of the character and record of the individual offender or for the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind.[10]

The principle of individualized sentencing first set forth in *Woodson* underlies the concept of mitigation – an expansive evidentiary presentation at capital sentencing proceedings that is tailored to the background and character of the individual defendant.

[4] Eddings v. Oklahoma, 455 U.S. 104, 110 (1982).

[5] Proffit v. Florida, 428 U.S. 242 (1976); Jurek v. Texas, 428 U.S. 242 (1976); Woodson v. North Carolina, 428 U.S. 280 (1976); and Roberts v. Louisiana, 428 U.S. 325 (1976), considered the death penalty schemes of four other states. The Court rejected the mandatory death-sentencing schemes of North Carolina and Louisiana, but upheld the statutes of Florida and Georgia, as well as the uniquely structured Texas statute.

[6] Gregg, 428 U.S. at 195.

[7] Godfrey v. Georgia, 446 U.S. 420, 428 (1980) (quoting Gregg, 428 U.S. at 198).

[8] Woodson, 428 U.S. at 304.

[9] *Id.; see also*, State v. Rumsey, 267 S.C. 236, 226 S.E.2d 894 (1976) (striking down South Carolina's mandatory death penalty statute as constitutionally defective in light of *Woodson*).

[10] Woodson, 428 U.S. at 304.

The following sections discuss the key constitutional principles of capital punishment jurisprudence in more detail, beginning with the two principles of guided discretion and individualized consideration.

## II. Guided Discretion

Guided discretion is one of most fundamental principles of death penalty jurisprudence.[11] It is, in essence, the core holding of *Furman*:

> where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

Thus, state death penalty statutes must "define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.'"[12] In other words, the state death penalty statute must provide some narrowing criteria for defining when a homicide qualifies for the death penalty. Such narrowing criteria are commonly called aggravating circumstances or aggravating factors – they are typically facts or circumstances related to the nature of the crime or the conduct of the defendant that tend to support imposition of a death penalty. To render a defendant death-eligible, the trier of fact must find at least one aggravating circumstance proven beyond a reasonable doubt. The United States Supreme Court has consistently adhered to and reinforced the constitutional requirement that statutory aggravating circumstances must meaningfully narrow the class of murder defendants eligible for a death sentence.[13]

[11] See, e.g., Gregg, 428 U.S. at 193 (holding sentencing decision-makers must "be carefully and adequately guided in their deliberations.").

[12] Godfrey v. Georgia, 446 U.S. 420, 423 (1980) (quoting Gregg, 428 U.S. at 196, n.47) (alteration in original).

[13] *See, e.g.,* Kansas v. Marsh, 548 U.S. 163, 173–74 (2006) ("[A] state capital sentencing system must: (1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime."); Buchanan v. Angelone, 522 U.S. 269, 275 (1998) ("In the eligibility phase, the jury narrows the class of defendants eligible for the death penalty, often through consideration of aggravating circumstances."); Tuilaepa v. California, 512 U.S. 967, 972 (1994) ("the [aggravating] circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder."); Arave v. Creech, 507 U.S. 463, 474 (1993) ("If the sentencer fairly could conclude that an aggravating circumstance applies to *every* defendant eligible for the death penalty, the circumstance is constitutionally infirm."); Lowenfield v. Phelps, 484 U.S. 231, 244 (1988) ("The use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion."); Spaziano v. Florida, 468 U.S. 447, 460 (1984) ("If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not."); Zant v. Stephens, 462 U.S. 862, 878 (1983) ("Our cases indicate . . . that the statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty.").

https://justice360sc.org/wp-content/uploads/2016/01/eighth-amendment-handbook1.pdf

8th AMENDMENT HANDBOOK: An Overview of Constitutional Principles Relevant to Capital Cases in SC

John H. Blume • Emily C. Paavola

---

### SOUTH CAROLINA FOCUS

In 1997, South Carolina passed a death penalty statute essentially identical to the one that the Supreme Court approved of in *Gregg*.[14] Since that time, the legislature has dramatically expanded South Carolina's list of aggravating factors.[15] Moreover, the South Carolina Supreme Court has adopted sweepingly broad judicial constructions of some of those factors.[16] These two events have resulted in a modern-day set of death-eligibility criteria that can be met in nearly all murder cases in South Carolina.[17] We recently collected data in Charleston and Richland Counties that showed 76% and 77% of all homicides, respectively, were death-eligible; however, the State sought the death penalty in less than 4% of all death-eligible cases.[18] Thus, South Carolina's statute does not perform the constitutionally mandated narrowing function. Instead, the task of selecting who will live and who will face the prospect of dying rests exclusively with individual solicitors who make the charging decisions – decisions which are inscrutable, unreviewable, and susceptible to arbitrariness and bias. With the data and research from our study, we developed a sample *Motion To Prohibit The Death Penalty As A Sentencing Option*. The motion argues that S.C. Code Ann. § 16-3-20 (2003) violates the Eighth and Fourteenth Amendments to the United States Constitution because it fails to genuinely narrow the class of individuals eligible for a death sentence. The motion is designed to be filed pre-trial in capital cases and can be tailored to the individual needs of each particular case.[19] We suggest that anyone defending a capital defendant consider raising this kind of global challenge to South Carolina's statute. In addition to a broad-based challenge, you should consider whether any individual aggravating factors in your case may be vague or overbroad.

---

[14] *See* State v. Shaw, 273 S.C. 194, 199, 255 S.E.2d 799, 802 (1979) (describing South Carolina's 1977 death penalty statute as "patterned after the death penalty statutes of our sister state Georgia.").

[15] The original statute contained seven statutory aggravating factors. The first of these aggravating factors included a list of subparts making a murder death-eligible if it occurred during the commission of any one of eight different offenses: rape, assault with intent to ravish, kidnapping, burglary, robbery while armed with a deadly weapon, housebreaking, and killing by poison. Act of June 8, 1977, sec. 1, § 16-52(C)(a), 1997 S.C. Acts 407, 408. In the three decades since the original death penalty statute was passed, the legislature has expanded the list of aggravating factors on numerous occasions. As it currently stands, South Carolina's death penalty statute enumerates twelve statutory aggravating factors, the first of which now includes ten individual subparts for a total of twenty-one circumstances that can make a murder death eligible. S.C. CODE ANN. §§ 16-3-20(C)(a)(1)(a)-(j) (2009).

[16] See specific discussion of vague and overbroad aggravating circumstances in subsection II.A., below.

[17] See John H. Blume, Sheri L. Johnson, Emily C. Paavola and Keir M. Weyble, *When Lightning Strikes Back: South Carolina's Return to the Unconstitutional, Standardless Capital Sentencing Regime of the Pre-Furman Era*, 4 CHARLESTON L. REV. 479 (2010).

[18] *Id.*

[19] If you are interested in using this sample motion in your case, please contact Emily Paavola at the Death Penalty Resource & Defense Center, (803) 765-1044, for more information.

---

## A. Vague and Overbroad Aggravating Circumstances

As we have already explained, the Eighth Amendment does not permit a death sentence for any and all murders. Rather, the state's statutory aggravating circumstances must "genuinely narrow the class of death-eligible persons" in a way that reasonably "justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder."[20] This means that both facially and as applied, the statutory aggravating factors must guide the sentencer to make a "principled distinction between those who deserve the death penalty and those who do not."[21] It is impossible for an aggravating circumstance to make this required distinction if the circumstance is vague or overbroad.

In *Maynard v. Cartwright*, 486 U.S. 356 (1988), a unanimous United States Supreme Court set out the legal principles that control vagueness challenges to statutory aggravating factors. The Court held that Oklahoma's statutory aggravating circumstance that the murder was "especially heinous, atrocious and cruel," was unconstitutionally vague. In doing so, the Court explained the difference between the "as applied" approach to vagueness challenges under the Due Process Clause and vagueness considerations under the Eighth Amendment:

> Objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk. . . . Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman v. Georgia*.

*Id.* at 361-62.

In other words, under a due process approach, a statutory aggravating circumstance is not unconstitutionally vague *as applied* to a particular defendant if

---

[20] Zant v. Stephens, 462 U.S. 862, 877 (1983).

[21] Lewis v. Jeffers, 497 U.S. 764, 774 (1990); *see also*, Clemons v. Mississippi, 494 U.S. 738, 758 (1990) (finding aggravating circumstance invalid because it provided "no principled way to distinguish the case in which the death penalty is imposed, from the many cases in which it was not."); Maynard v. Cartwright, 486 U.S. 356 (1988) ("The construction or application of an aggravating circumstance is unconstitutionally broad or vague if it does not channel or limit the sentencer's discretion in imposing the death penalty."); McConnell v. State, 102 P.3d 606, 624 (Nev. 2004) (rejecting state's felony murder aggravating factor, N.R.S. § 200.033, which included all but four felonies in felony–murder statute and therefore "theoretically" narrowed but did not "genuinely" narrow the death-eligible class of defendants).

https://justice360sc.org/wp-content/uploads/2016/01/eighth-ammendment-handbook1.pdf

8th AMENDMENT HANDBOOK: An Overview of Constitutional Principles Relevant to Capital Cases in SC

John H. Blume • Emily C. Paavola

any reasonable person would recognize that defendant's conduct as squarely covered by the circumstance, even if the language of the circumstance fails to give adequate notice that it covers other conduct as well. However, under an Eighth Amendment analysis, the aggravating circumstance must be evaluated *on its face*, entirely apart from the facts of the particular case in which it is applied. This is because a vague or overbroad statutory aggravating circumstance vests the sentencing body with the sort of "open-ended discretion" condemned in *Furman*, and where a death sentence is imposed under such a regime of unbridled discretion, the state may not save the sentence by demonstrating that the result would have been the same even if the sentencer's discretion had been properly narrowed and guided. *Id.* at 361-63.

If a statutory aggravating circumstance is facially (by its language) vague or overbroad, it may nevertheless be deemed valid if the state court has provided an acceptable "narrowing construction" and the State has applied that construction to the facts of the particular case.[22] A state court's narrowing construction is adequate if it narrows the circumstance's scope such that it actually guides the sentencer in the case under review.[23] In *Arave v. Creech*, 507 U.S. 463 (1993), the Court considered the Idaho Supreme Court's limiting instruction of the State's "utter disregard for human life" aggravating circumstance.[24] The state court's narrowing construction provided that "the phrase is meant to be reflective of acts or circumstances surrounding the crime which exhibit the highest, the utmost,

callous disregard for human life, i.e., the cold-blooded pitiless slayer."[25] The Supreme Court upheld the factor, finding that the state court's construction defined a "state of mind that it is ascertainable from surrounding facts," and, because some murderers do exhibit feeling, thus genuinely narrowed the class of persons eligible for the death penalty. *Creech* was the Court's last decision directly addressing a vagueness challenge to a statutory aggravating factor.[26]

To summarize, a capital defender considering whether an aggravating circumstance (or set of circumstances) is vague or overbroad should ask the following set of questions:

> 1. Is the aggravating circumstance vague or overbroad as *applied* – i.e., does the language of the aggravating circumstance fail to give adequate notice that it covers the conduct of this particular capital defendant?
>
>> a. If so, the aggravating circumstance is unconstitutionally vague or overbroad in violation of the Due Process Clause of the Fourteenth Amendment.
>
> 2. Is the circumstance vague or overbroad *on its face* – i.e., does the language of the aggravating circumstance fail to adequately inform the sentencing body what it must find to impose the death penalty, resulting in open-ended discretion?

---

[22] *See e.g.,* Walton v. Arizona, 497 U.S. 639, 653 (1990) ("When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face."); Lewis v. Jeffers, 497 U.S. 764 (1990) ("if a State has adopted a constitutionally narrow construction of a facially vague aggravating circumstance, and if the State has applied that construction to the facts of the particular case, then the 'fundamental constitutional requirement' of 'channeling and limiting . . . the sentencer's discretion in imposing the death penalty,' has been satisfied") (internal citation omitted); Godfrey v. Georgia, 466 U.S. 420 (1980) (Georgia Supreme Court failed to apply its previously recognized limiting instruction and, as such, adopted such a broad and vague construction of the death sentence statute as to violate the Eighth and Fourteenth Amendments, since there was nothing in the words "outrageously or wantonly vile, horrible or inhuman," standing alone, that implied any inherent restraint on the arbitrary and capricious infliction of a death sentence).

[23] Godfrey v. Georgia, 466 U.S. 420 (1980).

[24] Many of the aggravating circumstances invalidated by the Court have involved similar factors. *See, e.g.,* Richmond v. Lewis, 506 U.S. 40, (1992) (holding that Arizona's "especially heinous, cruel or depraved" aggravating circumstance did not satisfy the Eighth Amendment); Shell v. Mississippi, 498 U.S. 1 (1990) (summary reversal) (holding that Mississippi's "especially heinous, atrocious or cruel" aggravating factor was not constitutionally adequate); Godfrey v. Georgia, 446 U.S. 420 (1980) (holding that aggravating circumstance that offense was "outrageously vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim" was unconstitutionally vague). The most common limiting construction of this type of aggravating factor states that the crime must involve serious physical abuse or torture. *See, e.g.,* 18 U.S.C. § 3592(c)(6) (Federal Death Penalty Law statute defining the "heinous," "cruel" and "depraved" aggravating factor to require serious physical abuse or torture).

[25] *Id.* at 472-74.

[26] Subsequently, in Tuilaepa v. California, 512 U.S. 967 (1994), the Court concluded that California's death penalty special circumstances—requiring a sentencer to consider circumstances of the crime, the defendant's prior criminal history, and the defendant's age—were not unconstitutionally vague even though the jury was not told whether the presence or absence of these circumstances was aggravating or mitigating. With regard to age, the Court held, "difficulty in application is not equivalent to vagueness." *Id.* at 976.

Ex. 242 pg.5 of 20

a. If so, has the state court provided an acceptable narrowing construction – i.e., a construction that actually guides the sentencing body and genuinely narrows the class of death-eligible defendants?

  i. If not, then the aggravating circumstance is unconstitutionally vague or overbroad under the Eighth Amendment.

  ii. If so, has the state applied that construction to the facts of the particular case?

    1. If the sentencing body is a judge, he or she is presumed to know the law unless there is some indication otherwise.

    2. If the sentencing body is a jury, the jurors must be properly instructed regarding all facets of the sentencing process. "It is not enough to instruct the jury on the bare terms of an aggravating circumstance that is unconstitutionally vague on its face." *Walton v. Arizona*, 497 U.S. 639, 653 (1990).

---

### SOUTH CAROLINA FOCUS

South Carolina's death penalty statute contains a total of twenty-one circumstances that can make a murder death eligible.[27] Many of these circumstances are vague and/or overbroad on their face. Moreover, the South Carolina Supreme Court has exacerbated this problem on several occasions by adopting broad, sweeping constructions. Four examples are discussed below.

**Physical Torture**
Pursuant to S.C. Code Ann. § 16-3-20(c)(1)(h) (1976), a murder is death-eligible if it occurs during the commission of "physical torture." The statute does not define the conduct or circumstances which constitute "physical torture." In 1983, the South Carolina Supreme Court adopted Georgia's definition of that term, holding in *State v. Elmore* that "'[t]orture occurs when the victim is subjected to serious physical abuse before death,'" or "'when the victim is subjected to an aggravated battery.'"[28]

Since *Elmore*, the South Carolina Supreme Court has carried out a significant expansion of what was already a very inclusive definition of physical torture. For example, in *State v. Davis*, the court endorsed the following description

---

of "aggravated battery" constituting physical torture:

  What is aggravated battery? An aggravated battery is an unlawful act of violent injury to the person of another, accompanied by circumstances of aggravation, such as the use of a dangerous, or deadly, object; the infliction of serious bodily injury with intent to commit a felony; a great disparity between the ages and physical condition of the parties; a difference in the sexes.[29]

On its face, this definition encompasses—and therefore renders death-eligible—the vast majority of murders committed with weapons and all murders involving defendants and victims of opposite sexes. If taken literally, this definition encompasses all murders because any object used to murder someone is inherently "a dangerous or deadly object."

Additionally, in *State v. Johnson*, the court further expanded the circumstances in which physical torture can be found, this time to include cases in which the victim had no conscious awareness of pain. According to the court, "[p]hysical torture is not predicated upon the amount of pain suffered by a murder victim. Although conscious awareness of pain may buttress the conclusion that the victim was subjected to serious physical abuse before death, its absence does not foreclose a finding of physical torture."[30]

In 1989, the South Carolina Supreme Court considered an argument that the state's then-existing definition of physical torture was so broad as to violate the Eighth Amendment.[31] The Court acknowledged that "[t]he construction and application of an aggravating circumstance is unconstitutionally broad or vague if it does not channel or limit the jury's discretion in imposing the death penalty."[32] The Court then restated the lower court's charge, taken from *State v. Elmore*, and simply concluded: "This charge complies with the 'channeling' requirement of the Eighth Amendment."[33] The Court conducted a similarly perfunctory analysis when it endorsed the broad language used in *Davis*, noting, again in a conclusory fashion, that "[i]n our opinion, the definition of 'physical torture' utilized by the trial judge complies with the limiting requirements of the eighth amendment."[34] *Johnson* was the Court's last word on the physical torture aggravating circumstance, but the Court did not consider an Eighth Amendment challenge in that case. Rather, Johnson argued that there was no evidence that the victim experienced physical pain and, thus, the trial

---

[27] S.C. Code Ann. §§ 16-3-20(C)(a)(1)(a)-(j) (2009).

[28] State v. Elmore, 279 S.C. 417, 422, 308 S.E.2d 781, 785 (1983) (quoting Hance v. State, 268 S.E.2d 339, 345 (Ga. 1980); Hardy v. State, 275 S.E.2d 319 (Ga. 1981)).

[29] 309 S.C. 326, 349, 422 S.E.2d 133, 147 (1992).

[30] 338 S.C. 114, 127-28, 525 S.E.2d 519, 526 (2000).

[31] State v. Smith, 298 S.C. 482, 381 S.E.2d 724 (1989).

[32] *Id.* at 485, 381 S.E.2d at 726.

[33] *Id.*

[34] Davis, 309 S.C. 326, 351, 422 S.E.2d 133, 148 (1992).

https://justice360sc.org/wp-content/uploads/2016/01/eighth-ammendment-handbook1.pdf

8th AMENDMENT HANDBOOK: An Overview of Constitutional Principles Relevant to Capital Cases in SC

John H. Blume • Emily C. Paavola

court should not have submitted the physical torture aggravator for the jury's consideration.[35] The Court held that physical pain was not required to support the torture aggravator, but it did not address whether its holding rendered the aggravating circumstance overbroad in violation of the Eighth Amendment.

**Kidnapping**

Under South Carolina law, a murder is death-eligible if it occurs during the commission of a kidnapping.[36] As with "physical torture," the statute is silent with respect to the definition of kidnapping. The South Carolina Supreme Court filled this definitional void by reference to South Carolina's kidnapping statute, which provides that "[w]hoever shall unlawfully seize, confine, inveigle, decoy, kidnap, abduct or carry away any other person by any means whatsoever without authority of law"[37] is guilty of kidnapping.[38]

In *State v. Tucker*,[39] the court expanded the definition of kidnapping when it accompanies a murder. In *Tucker*, the defendant challenged the trial court's finding of kidnapping[40] based on evidence that he duct-taped the victim to a bed while he searched for things to steal, then shot and killed the victim while he packed to leave.[41] Relying on a non-murder case, the South Carolina Supreme Court explained that, "[k]idnapping is a continuing offense. The offense commences when one is wrongfully deprived of freedom and continues until freedom is restored."[42] Applying this view to the facts in *Tucker*, the court concluded that "[the victim] was unquestionably deprived of her freedom once appellant bound her with the duct tape," and added that "restraint constitutes kidnapping within the meaning [of the statute], regardless of the fact that the purpose of this seizure was to facilitate the commission of a [crime other than murder]."[43]

In *State v. Stokes*,[44] the court utilized the kidnapping statute's references to inveigling and decoying to further expand the range of conduct satisfying § 16-3-20(C)(a)(1)(b). Relying on the *New Webster's Dictionary and Thesaurus*, the court defined "decoy" as "'to lure successfully'"[45] and defined

"inveigling" as "'enticing, cajoling, or tempting the victim, usually through some deceitful means such as false promises.'"[46] Based on these definitions, the court concluded that the defendant kidnapped the victim by luring her into the woods for the ostensible purpose of facilitating her willing participation in the killing of a third party.[47]

This expansive definition of kidnapping created by the South Carolina Supreme Court has substantially broadened the range of conduct capable of elevating a murder to death-eligibility.[48] The Court has considered arguments that the kidnapping aggravator is unconstitutionally vague and overbroad on a number of occasions but, as with similar challenges to the physical torture aggravating circumstance, the Court has offered virtually no analysis on its reasoning. In *State v. Smith*, 275 S.C. 164, 268 S.E.2d 276 (1980), a non-capital appellant challenged the constitutionality of South Carolina's kidnapping statute and the life sentence he received pursuant to its terms. Smith argued that the statute was vague and overbroad in violation of due process requirements. The court held that the statute did not offend due process *as applied* to Smith because its terms were not unconstitutionally vague and Smith's conduct fell squarely within the language of the statute. Smith therefore lacked standing to assert any overbreadth.[49] Naturally, *Smith* did not involve a discussion of whether or not the kidnapping factor is vague and overbroad on its face under an Eighth Amendment analysis because it was a non-capital case. Since then, the South Carolina Supreme Court has repeatedly made short shrift of constitutional challenges to kidnapping as an aggravating circumstance in capital cases by simply citing back to *Smith*, or the subsequent capital cases in which the Court first relied upon *Smith*, without any further discussion.[50]

---

[35] 338 S.C. 114, 127-28, 525 S.E.2d 519, 525-26 (2000).

[36] S.C. CODE ANN. § 16-3-20(C)(1)(b) (1976).

[37] See S.C. CODE ANN. § 16-3-910 (1976).

[38] See, e.g., State v. Copeland, 278 S.C. 572, 577, 300 S.E.2d 63, 66 (1982).

[39] 334 S.C. 1, 512 S.E.2d 99 (1999).

[40] *Id.* at 13, 512 S.E.2d at 105.

[41] *Id.* at 8, 512 S.E.2d at 102.

[42] *Id.* at 13, 512 S.E.2d at 105 (citing State v. Hall, 280 S.C. 74, 310 S.E.2d 429 (1983)

[43] *Id.*

[44] 345 S.C. 368, 373-74, 548 S.E.2d 202, 205 (2001).

[45] *Id.* at 373, n.6, 548 S.E.2d at 204 n.6 (quoting NEW WEBSTER'S DICTIONARY AND THESAURUS 250 (1993)).

[46] *Id.* (quoting United States v. Macklin, 671 F.2d 60, 66 (2d Cir. 1982)).

[47] *Id.* at 373, 548 S.E.2d at 204.

[48] *See, e.g.,* State v. Vasquez, 364 S.C. 293, 613 S.E.2d 359 (2005) (murder during commission of kidnapping found where defendant locked two people in restaurant freezer, from which they escaped five minutes later and fled the scene unharmed); State v. Kelly, 343 S.C. 350, 540 S.E.2d 851 (2001) (murder during commission of kidnapping found where defendant duct-taped victim's hands behind her back); State v. Cheeseboro, 552 S.E.2d 300, 304 (S.C. 2001) (kidnapping found where defendant forced victims to walk from back of a barbershop to front, then back again, during holdup).

[49] Smith, 275 S.C. at 166, 268 S.E.2d at 277.

[50] *See, e.g.,* State v. Plath, 277 S.C. 126, 133, 284 S.E.2d 221, 225 (1981) (kidnapping statute in death penalty case was not unconstitutionally vague or overbroad, citing *Smith*); State v. Copeland, 278 S.C. 572, 577, 300 S.E.2d 63, 66 (1982) (death sentence for murder in the commission of a kidnapping does not violate the Eighth Amendment; the statutory definition of kidnapping is not overbroad or ambiguous, citing *Plath and Smith*); State v. Koon, 278 S.C. 528, 537, 298 S.E.2d 769, 774 (1982) (kidnapping statute, as used in defining statutory aggravating circumstance, is not so overly broad that it virtually encompasses all cases of murder, citing *Copeland*); State v. Davis, 309 S.C. 326, 348, 422 S.E.2d 133, 147 (1992) (stating that the Court has previously rejected overbreadth attacks on the kidnapping aggravating circumstance, citing *Copeland* and *Koon*); State v. Ray, 310 S.C. 431, 437, 427 S.E.2d 171, 174 (1993) (stating that the Court has previously rejected overbreadth attacks, citing *Copeland*).

Ex. 242 pg.7 of 20

John H. Blume • Emily C. Paavola

---

### Attempted Armed Robbery

South Carolina also provides for death-eligibility where a murder takes place while in the commission of an armed robbery.[51] In *State v. Humphries*,[52] the South Carolina Supreme Court construed the statutory phrase "while in the commission of" to encompass any "acts that are concurrent with the murder."[53] Consequently, both uncompleted attempts to commit accompanying crimes and accompanying crimes completed only after the murder are sufficient to elevate a murder to a death-eligible offense under § 16-3-20(C)(a)(1). The Court has never considered a constitutional challenge to the vagueness and overbreadth of this interpretation.

### Prior Conviction for Murder

South Carolina recognizes prior murder convictions as aggravating circumstances.[54] This provision, too, has been construed expansively by the South Carolina Supreme Court. In *State v. Locklair*,[55] the Court held that "prior," as set forth in South Carolina's death penalty statute, means "prior to trial, rather than prior to the time of the crime."[56] As a result, death-eligibility can be established on the basis of a murder conviction that did not exist at the time of the murder for which the death sentence is sought.

## B. Other Challenges to Aggravating Circumstances

Apart from vagueness and overbreadth, the United States Supreme Court has decided a variety of other challenges to statutory and non-statutory aggravating circumstances, thereby providing further insight into the principle of guided discretion. For example, the Court has held that aggravating circumstances may not encompass rights guaranteed to defendants facing criminal prosecutions. A defendant's "lack of remorse" may not be treated as an aggravating factor because it would infringe upon a defendant's right not to testify as guaranteed by Fifth and Fourteenth Amendments.[57] Similarly, a defendant's assertion of innocence and insistence upon a trial may not be turned into an aggravating circumstance.[58]

---

51 S.C. CODE ANN. § 16-3-20(C)(a)(1)(d) (1976).

52 325 S.C. 28, 479 S.E.2d 52 (1996).

53 *Id.* at 33, 479 S.E.2d at 55 ("That the murder may occur before an armed robbery actually is completed does not mean that a robbery was not taking place.").

54 S.C. CODE ANN. § 16-3-20(C)(a)(2) (1976).

55 341 S.C. 352, 535 S.E.2d 420 (2000).

56 *Id.* at 370-71, 535 S.E.2d at 429-30.

57 Griffin v. California, 424 U.S. 944 (1976) (holding that prosecutor's and trial court's improper comment on defendant's failure to testify violated Fifth Amendment right to remain silent).

58 *See* State v. Cockerham, 294 S.C. 380, 365 S.E.2d 22 (1988).

14

---

Likewise, a defendant's *abstract* beliefs or associations, religious or otherwise, may not be used in aggravation of punishment. In *Dawson v. Delaware*, 503 U.S. 159 (1992), the Court held that the defendant's membership in a prison gang similar to the Aryan Nation was not sufficiently connected to the crime or to the prison environment in which the defendant would be placed to establish its relevance and justify its use to support an aggravating factor.[59] The Court has also recognized that aggravating circumstances cannot encompass factors "that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness."[60] This was a driving force behind the Court's decisions in *Penry v. Lynaugh*, 492 U.S. 302 (1989) and *Atkins v. Virginia*, 536 U.S. 304 (2002).[61]

Further, an aggravating circumstance cannot be based upon evidence that is inadmissible under state law or the federal constitution, or on evidence that is "materially inaccurate or misleading."[62] The clearest application of this principle is the Court's decision in *Johnson v. Mississippi*, 486 U.S. 578 (1988). Johnson was sentenced to death after a jury found three aggravating circumstances outweighed the mitigating factors. One of the aggravating factors—that Johnson had been previously convicted of a felony involving the use or threat of violence to another person—was supported solely by a 1963 New York conviction of second degree assault with intent to commit first degree rape. After his Mississippi conviction, Johnson successfully challenged the assault conviction in the New York courts on the basis that he was not informed of his right to appeal. Johnson then sought post conviction relief from the Mississippi Supreme Court, which was denied. Subsequently, the United States Supreme Court granted certiorari to determine whether the reversal of the New York conviction affected the validity of the death

---

59 *See also*, State v. Vasquez, 338 S.C. 447, 696 S.E.2d 561 (solicitor's references to domestic terrorism and 9/11 attacks in a case involving Muslim defendant rendered resulting death sentence in violation of defendant's due process rights).

60 Zant v. Stephens, 462 U.S. at 885.

61 In *Penry*, the former Texas statute required a trial judge to sentence a defendant to death if the jury answered the following two questions (referred to by statute as "special issues") affirmatively: (1) Did the defendant commit the act "deliberately?"; and (2) Is the defendant likely to be dangerous in the future? A sharply divided Court held that the limited Texas framework created the risk that some types of evidence that should be mitigating, e.g., evidence that a defendant has intellectual disability (mental retardation) or severe mental illness, could actually result in a death sentence, because, in the Texas system, the evidence supported an affirmative answer to the future dangerousness special issue. In *Atkins*, the Court again focused on the likelihood that jurors will misinterpret symptoms of intellectual disability (mental retardation) as aggravating, and found this "special risk of wrongful execution" weighed in favor of creating a categorical exemption from the death penalty for persons who have intellectual disability. 536 U.S. at 321 ("As *Penry* demonstrated, moreover, reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury.").

62 Zant v. Stephens, 462 U.S. at 887 & nn.23, 24.

15

sentence and concluded that since the conviction was ultimately vacated, evidence regarding it was entirely irrelevant to the Mississippi jury's sentencing decision. Because the jury was allowed to consider evidence that had been revealed to be materially inaccurate, Johnson's death sentence violated the Eighth Amendment.[63]

## III. Individualized Sentencing: The *Lockett* Doctrine

Anyone involved in capital litigation must have a firm grasp of the *Lockett* doctrine.[64] This doctrine emanates from the "the fundamental respect for humanity underlying the Eighth Amendment," which "mandates consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death."[65] In *Woodson*, the Court recognized that capital defendants can only be treated "as uniquely individual human beings," if the sentencing process requires the sentencer to consider "the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind."[66] As Justice O'Connor noted in her concurring opinion in *California v. Brown*, evidence about the defendant's background and character is relevant "because of the widely held belief in this society that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable."[67]

The North Carolina statute in *Woodson* was unconstitutional because it allowed *no* consideration of the relevant facets of the offender and of the offense. But *Woodson* did not indicate (1) *which* facets of offender and offense are relevant; or (2) *what degree* of consideration of relevant facets the constitution requires. The Court answered these questions in *Lockett*. Sandra Lockett challenged an Ohio statute that did not permit a sentencing judge to consider as mitigating the defendant's prior record, age, lack of specific intent, and minor role in the offense.[68] The Court held that the Ohio statute violated the Eighth Amendment because the sentencer must not be precluded "from considering, as a *mitigating factor*, any aspect of the defendant's character or record and any of the

circumstances of the offense that the defendant proffers as a basis for a sentence less than death."[69]

Since *Lockett*, the Court has repeatedly made clear that the scope of mitigating evidence is extremely broad and encompasses: (a) any aspect of a defendant's character or record; (b) any of the circumstances of the offense; or, (c) anything else relevant that would support a sentence less than death. For example, in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), the Court reversed a death sentence because the trial court refused to consider the defendant's violent background and unhappy childhood. In *Skipper v. South Carolina*, 476 U.S. 1 (1986), the Court held that evidence of the defendant's good behavior during his pretrial incarceration was "'mitigating' in the sense that [it] might serve 'as a basis for a sentence less than death.'"[70] More recently, in *Tennard v. Dretke*, 542 U.S. 274 (2004), the Court reaffirmed that mitigating evidence need not have any nexus to the crime itself, and need not meet any particular level of persuasiveness before a jury must consider it.[71] The Court also reiterated that mitigation includes any "[e]vidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value."[72]

*Lockett* also demands that the sentencer be permitted to give "independent mitigating weight," to all evidence offered in mitigation.[73] This is true for statutory and non-statutory mitigating circumstances.[74] Additionally, the jury instructions must be sufficient to provide the jury "with a vehicle for expressing its reasoned moral response to that [mitigating] evidence in rendering its sentencing decision."[75] Furthermore, each individual juror must be free to consider and give effect to every mitigating factor, regardless of whether other members of the jury agree as to its existence.[76] In sum, it is not enough "simply to

---

[63] Johnson, 486 U.S. at 590.

[64] *See* Lockett v. Ohio, 438 U.S. 586 (1978).

[65] Woodson, 428 U.S. at 304; *see also* Roberts (Harry) v. Louisiana, 431 U.S. 633 (1977); Roberts (Stanislaus) v. Louisiana, 428 U.S. 325 (1976).

[66] 428 U.S. at 304.

[67] 479 U.S. at 545.

[68] 428 U.S. at 593-94.

---

[69] *Id.* at 604 (emphasis in original).

[70] 476 U.S. at 7 (quoting Lockett, 438 U.S. at 604).

[71] In *Tennard*, the Court rejected the state court's novel threshold test for mitigation, which required a defendant to establish (a) a severe permanent handicap and (b) a nexus between that handicap and the crime. *See also*, Smith v. Texas, 543 U.S. 37 (2004) (reversing where Texas appeals court applied the same threshold test).

[72] Tennard, 542 U.S. at 284-85.

[73] Lockett, 438 U.S. at 605.

[74] *See* Hitchcock v. Dugger, 481 U.S. 393 (1987) (sentencing judge improperly refused to consider nonstatutory mitigating circumstances); Delo v. Lashley, 507 U.S. 272, 275 (1993) (*per curiam*) (implicitly acknowledging that it would violate the Eighth Amendment for a state trial court to refuse to submit to the jury a statutory mitigating circumstance that was supported by record evidence).

[75] Penry v. Lynaugh, 492 U.S. 302, 318 (1989) (Penry I).

[76] Mills v. Maryland, 486 U.S. 367 (1988) (confirming that jury unanimity is not a precondition to considering mitigating evidence); *see* McKoy v. North Carolina, 494 U.S. 433 (1990) ("[E]ach juror [must] be permitted to consider and give effect to mitigating evidence.").

8th AMENDMENT HANDBOOK: An Overview of Constitutional Principles Relevant to Capital Cases in SC
John H. Blume • Emily C. Paavola

allow the defendant to present mitigating evidence."[77] Rather, there must be *no impediment* – by statute (*Lockett*), by a sentencing judge's mistaken interpretation of the law (*Eddings*), by improper jury instructions (*Hitchcock; Skipper*), by prosecutorial argument (*Penry*), or by evidentiary rules (*Green; Sears*)[78] – to the sentencer's full consideration and ability to give effect to mitigation.

# IV. Due Process and Heightened Reliability

The United States Supreme Court has consistently recognized that death is different from any other kind of punishment.[79] Accordingly, the Court has recognized a corresponding difference in the need for reliability in the determination that death is the appropriate punishment. The heightened need for reliability in capital cases has served as a rationale for the Court's decisions in a variety of contexts beyond *Woodson* and *Lockett*. For example, in *Gardner v. Florida*, 430 U.S. 349 (1977), the Court held that all information contained in a confidential presentence investigation report must be disclosed to the defendant in sufficient time to allow a meaningful opportunity to respond. In *Green v. Georgia*, 442 U.S. 95 (1979), the Court held that due process forbade the exclusion of relevant mitigating evidence under a state hearsay rule. In *Simmons v. South Carolina*, 512 U.S. 154 (1994), the Court held that due process entitled a defendant an opportunity to respond to misleading argument by the state regarding the meaning of life imprisonment. And in *Beck v. Alabama*, 447 U.S. 625 (1980), the Court held that due process required instructing the jury on lesser included offenses supported by the evidence in the guilt phase of a capital trial. Most of the Court's opinions calling for heightened reliability in capital proceedings—including *Gardner, Green, Simmons*, and *Beck*—rely on the Due Process Clause of the Fifth and Fourteenth Amendments. We discuss several of the most significant categories in more detail below.

## A. The Right to Fair Rebuttal

The Supreme Court has consistently maintained that a capital defendant must be given a fair opportunity to meet, rebut or explain any evidence that the state offers as a reason the defendant should be sentenced to death. In the lead case establishing this "fair rebuttal" principle, *Gardner v. Florida*, 430 U.S. 349 (1977), the Court invalidated the death sentence because the judge who imposed it relied upon a confidential pre-sentence report that had not been disclosed to defense counsel. The Court reasoned:

> Our belief that that debate between adversaries is often essential to the truth seeking function of trials requires us also to recognize the importance of giving counsel an opportunity to comment on facts which may influence the sentencing decision in capital cases.[80]

In *Skipper v. South Carolina*, 476 U.S. 1 (1986), the Court further expounded on this principle:

> Where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule of *Lockett* and *Eddings* that requires the defendant be afforded an opportunity to introduce evidence [of good prison behavior]; it is also the elemental due process requirement that a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.[81]

Another example is *Simmons v. South Carolina*, 512 U.S. 154 (1994), in which the plurality reversed the defendant's death sentence on due process grounds after finding that the trial court's failure to tell the jury that Simmons would be ineligible for parole if he was sentenced to life imprisonment violated Simmons' right of fair rebuttal, especially in light of fact that the prosecutor stressed the defendant's future dangerousness in his sentencing phase argument. Over the years, the Court has reaffirmed this "basic due process right" in a variety of contexts.[82]

---

[77] Penry I, 492 U.S. at 327-28.

[78] *See* Green v. Georgia, 442 U.S. 95 (1979) (holding state cannot inflexibly apply hearsay rule to exclude from penalty phase reliable hearsay evidence relevant to capital defendant's relevant culpability); Sears v. Upton, 130 S.Ct. 3259, 3263 (2010) ("we have . . . recognized that reliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded by rote application of a state hearsay rule").

[79] *See, e.g.*, Woodson v. North Carolina, 428 U.S. 280 (1976): Thompson v. Oklahoma, 487 U.S. 815, 856 (1988) ("Under the Eighth Amendment, the death penalty has been treated differently from all other punishments").

[80] *Id.* at 360.

[81] 476 U.S. at 5, n.1 (citing Gardner).

[82] See, e.g., Presnell v. Georgia, 439 U.S. 14 (1978) (state court's affirmance of death judgment based upon evidence in the record which would support a finding of aggravation not made by the jury, violates due process); Skipper v. South Carolina, 476 U.S. 1 (1986) (due process entitles capital defendant to introduce evidence of good conduct in custody to rebut prosecutor's reliance on future dangerousness in prison as aggravation); Lankford v. Idaho, 500 U.S. 110 (1991) (trial judge's imposition of death penalty upon a defendant in a case in which: the prosecution formally advised the court and the defense that it would not recommend the death penalty; the sentencing hearing focused solely on the possible prison terms that might be imposed; and, the judge gave no prior indication that he was considering imposing the death penalty did not afford the defendant adequate notice that he might be sentenced to death and therefore violated due process).

https://justice360sc.org/wp-content/uploads/2016/01/eighth-ammendment-handbook1.pdf

8th AMENDMENT HANDBOOK: An Overview of Constitutional Principles Relevant to Capital Cases in SC

John H. Blume • Emily C. Paavola

---

## SOUTH CAROLINA FOCUS

The right to fair rebuttal is a constitutional protection that is frequently violated in capital cases in South Carolina, often without objection by defense counsel. Here are two examples.

### State v. Holmes

Bobby Holmes proffered extensive third party guilt evidence at a pre-trial hearing before his capital trial for the York County murder of Ms. Mary Stewart, an elderly woman who lived in his neighborhood. Ms. Stewart was attacked and beaten in her home. She lived long enough to describe her attacker as "a short, dark skinned fellow, chunky wide," but a head injury she sustained during the assault eventually caused her to fall into a coma. She died ten weeks later, having never regained consciousness. Holmes' third party guilt evidence included statements from witnesses who saw another man, Jimmy White, near the scene of the crime shortly before Ms. Stewart was attacked. White had given police an alibi for the time of the crime that was later determined to be false. Other witnesses stated that White had confessed to them that he was, in fact, Ms. Stewart's killer. Moreover, White more closely resembled Ms. Stewart's description than Holmes. All of this evidence was excluded by the trial court on the basis of South Carolina's evidentiary restrictions on third party guilt evidence. Once Holmes' ability to point to another person as the guilty party was eliminated, the solicitor then capitalized on the situation by arguing to the jury: "If Bobby Holmes didn't do this, where is the raping, murdering, beating fellow that actually did this thing?"[83]

### State v. Mercer

Kevin Mercer was charged with an armed robbery and shooting that occurred during a carjacking.[84] At his 2002 capital trial, Mercer's defense team attempted to call Dr. John Steedman, a neurologist and psychiatrist, to testify that a SPECT scan of Mercer's brain showed a significant abnormality.[85] Dr. Steedman was prepared to testify that the scan showed reduced blood flow and activity in the left orbitofrontal cortex of the brain, an area that "a lot of experts in the field of functional brain imaging" have identified as being "associated with memory problems, emotional problems, and judgment and planning problems." The State objected to Dr. Steedman's proposed testimony, claiming unfair surprise based on the radiologist's report that the defense had previously disclosed. The radiologist reported that the purpose of the SPECT scan was to look for "dementia" and as to

this inquiry the scan showed a "[q]uestionable abnormality." The State argued that the report essentially said that nothing was wrong with Kevin Mercer's brain, but now the defense expert planned to testify to the opposite conclusion. The court sided with the State, ruling that Dr. Steedman could not give his opinion that the SPECT scan showed an abnormality. Once Dr. Steedman's opinion had been excluded, the State then repeatedly cross-examined him about the fact that the radiologist's report said that Mercer's brain was "normal." The State further argued in closing that nothing was wrong with Mercer's brain. The South Carolina Supreme Court later ruled that the trial court's exclusion of Dr. Steedman's opinion was error, but found the error harmless in light of other expert testimony. Trial counsel did not object to the State's cross-examination of Steedman or closing argument on the basis that those events infringed upon Mercer's right to fair rebuttal.

## B. Lesser Included Offenses

The Supreme Court has also made clear that the Due Process Clause of the Fourteenth Amendment is violated in capital cases when a refused jury instruction, amply supported by the evidence presented at trial, results in a substantially increased risk of error in the fact-finding process. *Beck v. Alabama*, 447 U.S. 625, 637 (1980). When a jury is only given the option of either convicting or acquitting a defendant of capital murder and where the evidence tends to show that the defendant, at a minimum, committed *some* violent crime – the possibility arises that the jury may convict on capital murder solely due to its belief that the defendant should not go unpunished. In *Beck*, the defendant was tried for the capital crime of "intentional killing in the course of a robbery."[86] At trial, the defendant offered evidence that supported a jury charge on the lesser-included offense of felony murder, a non-capital crime in Alabama. The trial judge refused to grant the requested lesser-included offense instruction because Alabama law did not permit a lesser-included offense instruction in capital cases. The *Beck* Court found this possibility constitutionally unpalatable, and mandated that the jury be given a "non-capital, third option," rather than simply guilt or acquittal of a capital crime when the evidence supports it.[87]

---

[83] The United States Supreme Court later overturned South Carolina's third party guilt evidentiary restrictions. See Holmes v. South Carolina, 547 U.S. 319 (2006).

[84] State v. Mercer, 381 S.C. 149, 672 S.E.2d 556 (2009).

[85] The information in this section is taken from the State v. Mercer Trial Transcript, on file with authors.

[86] 447 U.S. at 631.

[87] *Id.* at 637, 641.

In *Schad v. Arizona*, 501 U.S. 624 (1991), the Court reiterated its "fundamental concern in *Beck* . . . that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all."[88] The Court stated:

> The goal of the *Beck* rule . . . is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence.[89]

## C. Expert Assistance

The Court held in *Ake v. Oklahoma*, 470 U.S. 68 (1985), that "the Constitution requires that an indigent defendant have access to the psychiatric examination and assistance necessary to prepare an effective defense based on his mental condition."[90] After discussing the important assistance that a mental health professional such as a psychiatrist might provide to the defense, the Court explained that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the state must, at a minimum, assure the defendant access to a *competent* psychiatrist who will conduct an *appropriate* examination and assist in evaluation, preparation and presentation of the defense."[91] *Ake* is based upon the due process requirement that the fact-finding process be reliable in criminal proceedings. In other words, due process requires the state to make mental health experts available because "the potential accuracy of the jury's determination is...dramatically enhanced" by providing indigent defendants with competent psychiatric assistance.[92] Under *Ake*, a defendant is entitled to an expert that is *independent* of and *confidential* with respect to the State.[93] In *Tuggle v. Netherland*, 516 U.S. 10, 13 (1995) (*per curiam*), the Court applied *Ake*, finding that the defendant was prevented "from developing his own psychiatric evidence to rebut the Commonwealth's evidence and to enhance his defense in mitigation."

---

[88] 501 U.S. at 646.

[89] *Id.* at 646-47. But the Court distinguished *Beck* from the facts in *Schad*: the jury in *Schad* was not faced with an all-or-nothing choice because it was given a third, noncapital option.

[90] 470 U.S. at 70.

[91] *Id.* at 83 (emphasis added).

[92] *Id.* at 81-83.

[93] *See* United States v. Sloan, 776 F.2d 926, 929 (10th Cir. 1985) (noting that "essential benefit of having an expert in the first place is denied the defendant when the services of the doctor must be shared with the prosecution").

The constitutional entitlement announced in *Ake* obviously extends beyond mental health professionals, and the decades since *Ake* have witnessed expansion of expert funding for indigent defendants. Significantly, both state and federal courts have recognized that *Ake* requires courts to provide indigent defendants with funds to retain psychiatric, psychological, medical, forensic, investigative, mitigation and other types of expert assistance.

## D. State Mental Health Evaluations

Another set of issues relating to psychiatric examinations conducted by the State deserves mention. In *Estelle v. Smith*, 451 U.S. 454 (1981), the Court held that the Fifth Amendment right against self-incrimination and the Sixth Amendment right to counsel apply to the penalty phase of a capital trial. State-retained psychiatrist Dr. James Grigson interviewed Smith, allegedly to determine his competency to stand trial. At the sentencing phase of the proceedings, however, Dr. Grigson exceeded the scope of a mere competency determination and testified that Smith was a "severe sociopath" who had demonstrated no remorse and who would continue to commit violent acts in the future. The Court concluded that a "criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding."[94] Because Smith had not received *Miranda* warnings prior to answering Dr. Grigson's questions, and because defense counsel was never notified that the scope of Grigson's examination would extend beyond trial competence, Grigson's testimony violated Smith's Fifth and Sixth Amendment rights.

The Court has since reaffirmed, and expanded upon, the protections afforded by *Estelle v. Smith*. In *Satterwhite v. Texas*, 486 U.S. 249 (1988), the Court held that petitioner's Sixth Amendment right to counsel was violated by a psychiatrist's testimony on the issue of future dangerousness after the psychiatrist examined petitioner without notifying counsel of the scope of the examination. Constructive notice to counsel via the state's motions and the court's *ex parte* orders regarding the examination in the court file did not satisfy the Sixth Amendment. Similarly, in *Powell v. Texas*, 492 U.S. 680 (1989) (*per curiam*), the Court held that a state's use of future dangerousness evidence violated the Sixth Amendment because no notice was given to defense counsel that a psychiatric examination of the defendant would be used for that purpose. In *Powell*, the Court reiterated that the defendant did not waive his Sixth Amendment right to notice of the purpose of the examination by introducing psychiatric testimony in support of an insanity defense.

---

[94] 451 U.S. at 468.

8th AMENDMENT HANDBOOK: An Overview of Constitutional Principles Relevant to Capital Cases in SC

John H. Blume • Emily C. Paavola

---

> ### SOUTH CAROLINA FOCUS
>
> The South Carolina Supreme Court has twice considered whether a court-ordered psychiatric examination, over the defendant's objection, violates a defendant's Fifth Amendment right against self-incrimination. In *State v. Locklair*, 341 S.C. 352, 535 S.E.2d 420 (2000), the Court held that a trial judge is authorized under S.C. Code § 44-23-410 to a order a psychiatric examination even if a defendant provides no notice of and does not plead guilty but mentally ill. Furthermore, the trial judge has the inherent, discretionary authority to order an evaluation "if he believed Locklair was not fit to stand trial or if he believed that Locklair's mental competency would be an issue at trial." The court held that defense counsel opened the door to the issue of Locklair's mental health by stating that Locklair may offer evidence of his mental illness at trial. Finally, the Court held that Locklair suffered no prejudice from the evaluation because the court-appointed examiner's testimony was corroborated by testimony from the defense social worker. More recently, the South Carolina Supreme Court considered whether Steven Bixby's Fifth Amendment right was abridged when the trial court ordered a state evaluation where there was no issue of competency and Bixby only intended to offer mental health evidence as mitigation in the penalty phase of the trial. The Court noted that this was a "novel issue," but found no error because the trial court utilized several procedural safeguards to protect against any self-incrimination, including: (1) ordering that the report be sealed from the state until mental health evidence had been presented by the defense in sentencing; (2) permitting defense counsel to attend the evaluation and object to any question posed; and, (3) ordering that any inculpatory statements made by defendant would not be included in the report. *State v. Bixby*, 338 S.C. 528, 698 S.E.2d 572 (2010).

# V. Categorical Bans

The Eighth Amendment's cruel and unusual punishments clause places substantive limitations on the use of the death penalty. The Court has identified categorical bans based on: (a) the proportionality of the offender (i.e., there are some classes of individuals whom the state cannot execute); and, (b) the proportionality of the offense (i.e., there are some types of crimes for which execution is a disproportionate and excessive punishment).

In determining whether a punishment for a particular offender or for a particular offense falls within the Eighth Amendment's prohibition against cruel and unusual punishment, the Court is guided by two significant principles. First, a proportionality principle: "It is a precept of justice that punishment for a crime should be graduated and proportioned to the offense."[95] Second, a dignity principle, that the Eighth

---

[95] Weems v. United States, 217 U.S. 349, 367 (1910); *see also*, Roper v. Simmons, 543 U.S. 551, 560 (2005).

Amendment must "draw its meaning from the evolving standards of decency that mark the progress of a maturing society."[96] In the context of the death penalty, both principles serve to "ensure restraint and moderation in use of capital punishment."[97]

The Court's analysis of the constitutionality of the death penalty for a particular offender charged with a particular offense involves two inquiries. First, the Court assesses contemporary standards of decency by focusing on "objective indicia of society's standards . . . with respect to executions."[98] This includes "the historical development of the punishment at issue, legislative judgments, international opinion, and the sentencing decisions juries have made."[99] Second, the Court "bring[s] its own judgment to bear on the matter."[100] The proportionality assessment "depends as well upon the standard elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose."[101]

Part of this analysis is to take into account the penological justifications commonly offered for the death penalty – retribution and deterrence of capital crimes:

> Unless the death penalty when applied to one in [petitioner's] position *measurably contributes* to one or both of these goals, it is "nothing more than the purposeless and needless infliction of suffering . . . ."

*Enmund v. Florida*, 458 U.S. at 798 (quoting *Coker v. Georgia*, 433 U.S. at 592) (emphasis added).

## A. Proportionality of Offense

Applying the proportionality and dignity principles articulated in *Weems* and *Trop* to the exercise of the death penalty, the Court has held that the punishment must be reserved for aggravated homicides. The Court's first decision to limit the category of offenses eligible for capital punishment was *Coker v. Georgia*, 433 U.S. 584 (1977), which held that the death penalty is a disproportionate punishment for the rape of an adult woman. The second decision was *Enmund v. Florida*, 458 U.S. 782 (1982). Earl Enmund was the "wheel man" (or getaway driver) in a

---

[96] Trop v. Dulles, 356 U.S. 86, 101 (1958); *see* Kennedy v. Louisiana, 129 S. Ct. 2641, 2649 (2008) ("Evolving standards of decency must embrace and express respect for the dignity of the person.").

[97] Kennedy v. Louisiana, 128 S. Ct. 2641, 2658-59 (2008).

[98] Roper v. Simmons, 543 U.S. 551, 563 (2005); *see* Gregg v. Georgia, 428 U.S. at 173.

[99] Enmund v. Florida, 458 U.S. 782, 788 (1982); *see* Kennedy, 128 S. Ct. at 2650; Simmons, 543 U.S. at 578; Atkins, 536 U.S. at 316.

[100] Enmund v. Florida, 458 U.S. at 788-89.

[101] Kennedy, 128 S. Ct. 2650.

8th AMENDMENT HANDBOOK: An Overview of Constitutional Principles Relevant to Capital Cases in SC

John H. Blume • Emily C. Paavola

robbery felony-murder. The Court found Enmund's death sentence disproportionately severe because he did not kill, attempt to kill, intend to kill, or know that a killing would take place. Several years later, the Court modified *Enmund* in *Tison v. Arizona*, 481 U.S. 137 (1987). *Tison* held that the death penalty is permissible for a defendant who did not kill or intend to kill if the defendant was a major participant in a felony resulting in death and demonstrated a reckless disregard for human life.

---

SOUTH CAROLINA FOCUS

In *State v. Peterson*, 287 S.C. 244, 335 S.E.2d 800 (1985), overruled on other grounds by *State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991), the South Carolina Supreme Court adopted the *Enmund* instruction. Specifically, the court held:

During the penalty phase of death penalty cases which involve conspiracy liability the trial judge should charge that the death penalty can not be imposed on an individual who aids and abets in a crime in the course of which a murder is committed by others, but who did not himself kill, attempt to kill, or intend that a killing take place or that lethal force be used. *Id.* at 248, 335 S.E.2d at 802.

South Carolina has never adopted the *Tison* modification, nor has *Peterson* ever been called into question. *See, e.g., Cartrette v. State,* 323 S.C. 15, 20, 448 S.E.2d 553, 556 (1994) (citing *Peterson* with approval and explaining that it "embraced [*Enmund*] for application in South Carolina."). Thus, as a matter of state law, *Peterson* sets forth the appropriate instruction for capital cases involving issues of conspiracy liability.

---

In *Kennedy v. Louisiana*, 128 S. Ct. 2641 (2008), the United States Court revisited the issue of whether the Eighth Amendment permits the death penalty as punishment for a crime that does not result in death. Whereas *Coker* involved the rape of an adult woman, *Kennedy* involved the rape of the petitioner's eight-year-old stepdaughter. Kennedy was death sentenced under a Louisiana statute that allowed the death penalty for the rape of a child under 12. The Louisiana statute was the first after *Gregg* to apply the death penalty for child rape. Five other states (Georgia, Montana, Oklahoma, South Carolina, and Texas) followed. No prisoner convicted of child rape has been executed in the modern era. In a 5-4 decision penned by Justice Kennedy, the Court declined to extend application of the death penalty to the crime of child rape. The Court held that the objective

data demonstrated neither consensus among the States in favor of the death penalty as punishment for the rape of a child nor a consistent current of change. Any deterrent or retributive function served by the death penalty for child rape, the Court determined, was more than offset by other risks of an arbitrary or capricious death sentence in child rape cases. The Court concluded:

In most cases justice is not better served by terminating the life of the perpetrator rather than confining him and preserving the possibility that he and the system will find ways to allow him to understand the enormity of his offense. Difficulties in administering the penalty to ensure against its arbitrary and capricious application require adherence to a rule reserving its use, at this stage of evolving standards and in cases of crimes against individuals, for crimes that take the life of the victim.[102]

## B. Proportionality of Offender

The Court has also restricted the use of the death penalty upon several classes of offenders—specifically (a) juveniles; (b) individuals with severe intellectual and developmental disability ("mental retardation"); and, (c) prisoners who are incompetent at the time of execution.

The first categorical exemption for offenders recognized by the Court was for prisoners who are incompetent at the time of execution. *Ford v. Wainwright*, 477 U.S. 399 (1986). The Court clarified in *Panetti v. Quarterman*, 551 U.S. 930 (2007), that a prisoner is not competent for execution under *Ford* unless he or she rationally understands the circumstances of the execution and that the execution is punishment for the prisoner's crime.

The other two categorical exemptions apply to the status of the offender at the time of the crime (rather than at the time of execution). Both reconsider – and reverse – earlier rulings by the Court that were delivered on the same day in 1989. *Roper v. Simmons*, 543 U.S. 551, 562 (2005), reversing *Stanford v. Kentucky*, 492 U.S. 361 (1989); *Atkins v. Virginia*, 536 U.S. 304 (2002), reversing *Penry v. Lynaugh*, 492 U.S. 302 (1989). In both *Simmons* and *Atkins*, the Court relied heavily on evolving standards of decency.

Having allowed the death penalty for defendants with mental retardation in *Penry*, the Court changed course thirteen years later in *Atkins*, declaring a

[102] *Id.* at 2665.

Ex. 242 pg.14 of 20

John H. Blume • Emily C. Paavola

categorical exemption for individuals with severe intellectual disability (formerly referred to as "mental retardation"). Objective data showed that 30 of 37 states with the death penalty prohibited is application to defendants with intellectual disability; that only five prisoners with a qualifying IQ had been executed since *Penry*; and, since then sixteen states that once allowed the death penalty for defendants with intellectual disability no longer did. The Court noted that, in assessing evolving standards, it is "[n]ot so much the number of states that is significant but the *consistency of the direction of change*."[103] The Court recognized that individuals with mental retardation have diminished capacity to understand, abstract from mistakes and learn from experience, a diminished ability to control impulses, are unlikely to premeditate, and tend to be followers rather than leaders. These qualities do not exempt them from criminal liability, but do diminish their culpability.[104] As a result, individuals with intellectual disability are less culpable than the average murderer and are not inhibited by increased severity of punishment due to cognitive and behavioral impairments—thus, deterrence and retribution serve little purpose.[105] Further, as result of diminished capacities, the risk of wrongful sentences is enhanced because there is a higher possibility of false confessions and a relative inability of the defendant to assist counsel; and there is a higher risk of unreliable death sentences due to the increased potential for unwarranted impressions of lack of remorse and jury interpretations of mitigating attributes as aggravating.[106]

The Court also reversed course on the death penalty for juveniles. Previously, in *Thompson v. Oklahoma*, 487 U.S. 815 (1988), the Court held that the death penalty could not be imposed on offenders less than 16 years of age at the time of the crime; however, a year later, in *Stanford v. Kentucky*, 492 U.S. 361 (1989), the Court ruled that there was no per se ban against the execution of sixteen and seventeen year olds convicted of murder. In *Simmons*, markedly swayed by international opinion disfavoring the execution of juvenile offenders, the Court declared the death penalty off limits as punishment for homicides committed by offenders less than eighteen years old at the time of the offense. The Court recognized that juvenile executions are infrequent (only six states had executed juveniles since *Stanford*), thirty states prohibit the practice, and five states had disallowed the practice since *Stanford*.[107] The Court identified three principal differences between juveniles under 18 and adults: (a) "[a] *lack of maturity* and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions"; (b) "*more vulnerable or susceptible* to negative influences and outside pressures, including peer pressure"; and, (c) the "*character of a juvenile is not as well formed* as that of an adult. The personality traits of juveniles are more transitory, less fixed."[108] Based on these differences, the Court concluded that "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed."[109] Executing juveniles, whose culpability and blameworthiness (and ability to engage in risk-benefit analysis before acting) is diminished, the Court reasoned, serves neither retributive nor deterrent purpose.[110]

One significant aspect of the decisions in *Atkins* and *Simmons*—particularly, *Simmons*—is the Court's expressed consideration of objective indicia beyond legislative enactment and jury sentencing trends. In *Atkins*, the Court took into account objective evidence from public opinion polls, professional or religious organizations, and international opinion.[111] In *Simmons*, the Court emphasized that "[t]he opinion of the world community, while not controlling our outcome, does provide respected and significant confirmation for our own conclusions," and devoted a subsection to "[t]he overwhelming weight of international opinion against the juvenile death penalty."[112] The Court was visibly moved by the "stark reality" that prior to *Simmons* "the United States [wa]s the only country in the world that continue[d] to give official sanction to the juvenile death penalty."[113]

---

### SOUTH CAROLINA FOCUS

Much of the Supreme Court's reasoning in *Atkins* and *Simmons* applies with equal, and in some cases greater, force to other categories of offenders such as those with severe mental disabilities like mental illness, dementia, traumatic brain injury, and other developmental disorders. Such individuals are less culpable than other offenders. Indeed, "if anything, the delusions, command hallucinations, and disoriented thought process of those who are mentally ill represent greater dysfunction than that experienced by most

---

[103] Atkins, 536 U.S. at 315 (emphasis added).
[104] Id. at 317.
[105] *Id.* at 319-320.
[106] *Id.* at 320.
[107] Roper v. Simmons, 543 U.S. at 565-567.

[107] Roper v. Simmons, 543 U.S. at 565-567.
[108] *Id.* at 569-70.
[109] *Id.* at 570.
[110] *Id.* at 571-75.
[111] Atkins, 536 U.S. at 316.
[112] Roper v. Simmons, 543 U.S. at 578.
[113] *Id.* at 575.

https://justice360sc.org/wp-content/uploads/2016/01/eighth-ammendment-handbook1.pdf

'mildly' retarded individuals (the only retarded people likely to commit crime)." Christopher Slobogin, *Mental Illness and the Death Penalty*, 1 CAL. CRIM. L. REV. 3 (2000). Thus, the goals of retribution and deterrence are not met for such a category of offenders. Moreover, persons with severe mental disabilities are often unable to assist their attorneys or participate meaningfully in their defense. For example, defendants with severe mental disability can be unable or unwilling to cooperate with their attorneys in the investigation and preparation of their case. A mentally disabled defendant may insist on representing himself or may waive important rights because of the effects of his illness. If a defendant is taking psychotropic drugs during trial, he may give the jury the impression that he is not remorseful or does not care, when in reality, the effects of his medications are to blame for his demeanor. On the other hand, if a serious mental illness is left untreated, a defendant may be belligerent, confusing or frightening to a jury. South Carolina law clearly defines the presence of a mental disability as mitigating evidence. Despite the law, however, empirical studies conclusively demonstrate that, much like mental retardation, juries tend to view mental illness and disability as an *aggravating* factor rather than a reason to spare the defendant from death. Thus, the risk of arbitrary and unreliable death sentences remains high for this category in much the same way as those categories excluded in *Atkins* and *Simmons*.

In 2008, The Death Penalty Resource & Defense Center conducted a study on mental disabilities among prisoners on South Carolina's death row. The study focused on serious mental disabilities, including: (1) mental illness; (2) dementia; (3) developmental disorders; and, (4) traumatic brain injury that causes the same kinds of impairment as mental retardation. Information regarding these categories was collected regarding 62 inmates housed on South Carolina's death row at that time. The study found that 25 of the 62 inmates exhibited evidence of a severe mental disability, or slightly more than 40%. This figure is consistent with other state and national research demonstrating the prevalence of severe mental illness among death row inmates. The most often reported problems were schizophrenia and organic brain damage, followed by limited intellectual functioning, post-traumatic stress disorder, major depressive disorder, and bipolar disorder. Counsel for capital defendants who may fall into one or more of these categories should raise and preserve an Eighth Amendment challenge whenever possible.[114]

---

[114] For more information on this issue, see Mental Disability and The Death Penalty: A Report on Why South Carolina Should Ban The Execution of The Severely Mentally Disabled, available at http://www.deathpenaltyresource.org/recentpubs.aspx.

# VI. Victim Impact Evidence

Under the Supreme Court's current precedent, the Eighth Amendment does not preclude victim impact evidence and statements in capital sentencing proceedings. *Payne v. Tennessee*, 501 U.S. 808 (1991). According to the *Payne* Court, "victim impact evidence serves entirely legitimate purposes," because it enables the jury to have before it all information necessary to a determination of punishment.[115] However, the state does not have free reign to introduce anything or everything about the victim. *Payne* condones only "a quick glimpse of the life" of the victim.[116] In addition, the Court affirmed that victim impact evidence "is not generally offered to encourage comparative judgments."[117] The rule against comparative judgments between the life of the victim and the life of the defendant has been applied in a number of jurisdictions.[118] In addition, *Payne* left undisturbed the Court's prior ruling in *Booth v. Maryland*, 482 U.S. 496 (1987), prohibiting the victim's family from offering its opinion about the crime, the defendant, and the appropriate punishment.[119] Furthermore, the Court recognized that the quantity or quality of certain victim impact statements or evidence may potentially render the sentencing proceeding fundamentally unfair in violation of the Due Process Clause.[120]

Dissents from the denial of certiorari in *Kelly v. California*, 129 S.Ct. 564 (2008), indicate that some former and current members of the Court have an interest in revisiting the scope of admissibility of victim impact evidence and providing lower courts with more guidance. In response to the petitioner's request that the Court consider whether 15-20 minute victim impact videos violated the Due Process Clause, three Justices would have granted certiorari.[121]

---

[115] Payne, 501 U.S. at 825.

[116] Id. at 822 (cite omitted); see also id. at 864 (O'Connor, J. concurring).

[117] Id. at 823.

[118] *See* Humphries v. Ozmint, 366 F.3d 266, 273-74 (4th Cir. 2004); Hall v. Catoe, 360 S.C. 353, 601 S.E.2d 335 (2004); State v. Koskovich, 776 A.2d 144, 509 (N.J. 2001); State v. Storey, 901 S.W.2d 886, 902 (Mo. 1995).

[119] Payne, 501 U.S. at 830 n.2.

[120] *Id.* at 825; id. at 831 (O'Connor, J., concurring); *id.* at 836 (Souter, J., concurring). For more on what courts have permitted (and not permitted) as victim impact evidence since *Payne*, *see* generally *Symposium: Victims and the Death Penalty*, 88 CORNELL L. REV. (2003).

[121] *See* Kelly v. California, 129 S.Ct. at 567 (Stevens, J., dissenting from denial of certiorari) ("As these cases demonstrate, when victim impact evidence is enhanced with music, photographs, or video footage, the risk of unfair prejudice quickly becomes overwhelming. While the video tributes at issue in these cases contained moving portrayals of the lives of the victims, their primary, if not sole, effect was to rouse jurors' sympathy for the victims and increase jurors' antipathy for the capital defendants. . . . These videos are a far cry from the . . . brief oral testimony condoned in Payne."); *id.* (Souter, J., dissenting from denial of certiorari on one of two cases); *id.* (Breyer, J., dissenting from denial of certiorari) ("The film, in my view, is poignant, tasteful, artistic, and, above all, moving. On the other hand, the film's personal, emotional, and artistic attributes themselves create the legal problem.").

https://justice360sc.org/wp-content/uploads/2016/01/eighth-ammendment-handbook1.pdf

8th AMENDMENT HANDBOOK: An Overview of Constitutional Principles Relevant to Capital Cases in SC

John H. Blume • Emily C. Paavola

In dissent, Justice Breyer explained, "I understand the difficulty of drawing a line between what is, and is not, constitutionally admissible in this area. But examples can help elucidate constitutional guidelines."[122]

For more information on raising challenges to victim impact evidence in South Carolina, see *Unstacking The Deck: A Handbook For Capital Defense Attorneys On Challenging The State's Case In Aggravation* (December 2009).[123] This Handbook includes a sample motion to preclude or limit the state's use of victim impact evidence.

# VII. Appellate Review

In *Gregg* and its companion cases, the Court stressed that each of the statutes the Court upheld required meaningful appellate review. As the Court explained, appellate review provides "a means to promote the evenhanded, rational, and consistent imposition of death sentences."[124] Meaningful proportionality review can "substantially eliminate[] the possibility that a person will be sentenced to die by the action of an aberrant jury."[125] A robust proportionality review helps to ensure that capital punishment is "limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'"[126] In 2008, Justice Stevens dissented from the denial of certiorari in *Walker v. Georgia*, which challenged the state appellate court's failure to conduct meaningful proportionality review and apply other statutory requirements of appellate review.[127]

---

[122] 29 S.Ct. at 568.

[123] Available at http://www.deathpenaltyresource.org/recentpubs.aspx.

[124] Jurek v. Texas, 428 U.S. at 276; see Parker v. Dugger, 498 U.S. 308 (1991) (reiterating "the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally").

[125] Gregg v. Georgia, 428 U.S. 153, 206 (1976).

[126] Kennedy v. Louisiana, 554 U.S. 407, 420 (2008) (quoting Roper v. Simmons, 543 U.S. 551, 568 (2005)).

[127] 129 S.Ct. 453, 455 (2008) ("I find this case, which involves a black defendant and a white victim, particularly troubling. . . . Rather than perform a thorough proportionality review to mitigate the heightened risks of arbitrariness and discrimination in this case, the Georgia Supreme Court carried out an utterly perfunctory review. Its undertaking consisted of a single paragraph, only the final sentence of which considered whether imposition of the death penalty in this case was proportionate as compared to the sentences imposed for similar offenses.").

---

### SOUTH CAROLINA FOCUS

South Carolina's death penalty statute mandates that the South Carolina Supreme Court review all death sentences to determine "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."[128] The statutorily required proportionality review is intended to serve as "[a]n additional check against the random imposition of the death penalty."[129] Notwithstanding its statutory obligation to compare sentences imposed in "similar" cases, the South Carolina Supreme Court has determined that it will only consider other cases in which the death penalty was imposed, thereby ignoring hundreds of other cases involving similar crimes and similarly situated defendants. *See, e.g., State v. Copeland*, 278 S.C. 572, 591, 300 S.E.2d 63, 75 (1982). The court has rejected the view of other jurisdictions that the appropriate universe of cases for purposes of proportionality review includes both those in which the death penalty was not imposed as well as those in which it was. *Id.* The court's method is illogical and tautological. Since the death penalty was reinstated in South Carolina in 1977, the court has *never* determined that a death sentence was excessive or disproportionate. Each case that is affirmed decreases the likelihood that any subsequent sentence will be found disproportionate because of the fact that another case, to which some future case may be similar, has entered the comparison pool.

A survey of the court's proportionality analysis reveals an utterly perfunctory inquiry. Its undertaking uniformly consists of the same, single sentence, or a slight variation thereof, repeated at the end of every opinion affirming a sentence of death: "A review of similar cases illustrates that imposing the death sentence in this case would be neither excessive nor disproportionate in light of the crime and the defendant."[130] The court routinely supports this single-sentence analysis with a string cite of approximately three cases, on average, in which death sentences were upheld and the cases involved the same aggravating circumstance as the case under review. The court makes no effort to compare the circumstances of the defendants' lives and backgrounds in even the limited pool of cases

---

[128] S.C. CODE ANN. § 16-3-25(C)(3) (2003).

[129] State v. Shaw, 255 S.E.2d 799, 807 (S.C. 1979).

[130] E.g., State v. Stanko, 376 S.C. 571, 579, 658 S.E.2d 94, 98 (2008); State v. Stone, 376 S.C. 32, 37, 655 S.E.2d 487, 489 (2007) (same); State v. Evins, 373 S.C. 404, 422, 645 S.E.2d 904, 913 (2007) (same); State v. Bryant, 372 S.C. 305, 318, 642 S.E.2d 582, 589 (2007) (same); State v. Bennett, 369 S.C. 219, 233, 632 S.E.2d 281, 289 (2006) (same); see e.g., State v. Mercer, 672 S.E.2d 556, 567 (2009) ("We further find that the evidence supports the jury's finding of a statutory aggravating circumstance, and that the sentence of death is proportionate to sentences imposed under similar situations"); State v. Owens, 378 S.C. 636, 641, 664 S.E.2d 80, 82 (2008) ("a review of other decisions demonstrates that appellant's sentence was neither excessive nor disproportionate").

that it does consider. The court's inquiry is constitutionally and statutorily deficient because it fails to meaningfully consider similarly situated defendants convicted of similar crimes.

Collecting and analyzing the data necessary to conduct a thorough, meaningful proportionality review in South Carolina is not a difficult task. Indeed, a small team of our researchers were able to compile the necessary information in a only a few days. The team created a comprehensive database of cases between the years 1995 and 2007 in which the state sought the death penalty and the outcome of the case was a sentence of life or less.[131] The resulting database produced the following information:

- From 1995 to 2007, South Carolina solicitors sought death in 226 cases, or an average of 17.4 per year.
- The greatest concentration of death-noticed cases came from the following counties: Calhoun, Charleston, Clarendon, Dillon, Florence, Greenville, Greenwood, Horry, Lexington, Richland, Spartanburg, and Sumter. In these counties alone, the state sought death in 124 cases during the relevant years. The research team collected comprehensive data on each death-noticed case in these counties.
- Of the 124 cases from the selected counties, 115 resulted in a sentence of life or less. Thus, nearly 93% of the total cases in which the state sought death in these counties resulted in a sentence of life or less.

This data can be used for comparison purposes. For example, Kevin Mercer was charged with armed robbery and murder as a result of his participation in a carjacking in Lexington County. The state sought and obtained a death sentence. A closer look at the facts of the cases in our database shows no meaningful difference from the facts of Mr. Mercer's case. For example, out of the 115 cases that resulted in life or less:

- 68 (or 59%) involved an armed robbery aggravator
- 49 (or 43%) involved a purpose of receiving money or a thing of monetary value as an aggravating circumstance.

When a South Carolina solicitor serves notice that he or she intends to seek the death penalty in a particular case, the South Carolina Supreme Court issues an order appointing a particular circuit judge to have exclusive jurisdiction over that case. Since late 1994, these appointment orders have been kept by the Office of Court Administration. Thus, the research team began by reviewing the files at the Office of Court Administration and compiling a list of all death-noticed cases in South Carolina from 1995 to 2007. (Because the Office of Court Administration did not begin collecting the appointment orders until late in 1994, the data for that year were incomplete they were excluded from the analysis.) Next, the researchers sorted the cases by county and traveled in teams to select county courthouses where they reviewed the individual case files and collected data about the facts and circumstances of the crime, the characteristics and background of the defendant and the victim, and the ultimate outcome of the case.

Kevin Mercer's case is, in many respects, an un-aggravated homicide compared to the majority of cases in this data set. For example, none of the defendants in this dataset received a death sentence, but:

- 100 (or 87%) cases involved more than one aggravating circumstance
- 17 cases involved six or more aggravating circumstances in a single case.
- 16 of the defendants in this group killed more than one person
- 2 defendants dismembered their victims

The state's evidence against Mr. Mercer was not any stronger in his particular case than in the 115 cases resulting in a sentence of life or less. The state's case for guilt against Mr. Mercer involved eyewitness identification and inconclusive gunshot residue testing. Many of the cases in the sample, however, involved much stronger guilt evidence than was presented in Mr. Mercer's case:

- in 37 cases the defendant gave a full confession directly to the police
- in 7 cases the defendant confessed to another witness who was not involved in the crime
- 9 cases had DNA evidence tying the defendant to the crime
- 1 case included a videotape of the crime

Moreover, our research team also compiled data from death-eligible cases in which the state did not seek death. As explained in Section II, above, researchers collected data on all homicides in Richland County for the years 2000 to 2008. During this period of time, there were 152 homicide profiles collected. One-hundred and seventeen (117), or 77%, of these cases involved facts that made them death-eligible, yet Richland County solicitors sought the death penalty in only 4 of these cases. With regard to the remaining 113 cases in which the state could have, but elected not to seek the death penalty, a comparison with the facts of Mr. Mercer's case again reveals no meaningful difference that would render him more deserving of death:

- 38 of the 113 cases involved armed robbery
- 4 involved physical torture
- 85 involved facts that would support more than one aggravating circumstance
- 57 cases involved three or more aggravating circumstances.

A comparison to the data collected in Charleston County produces similar results. There were 151 homicide profiles collected in Charleston County for the years 2002 to 2007. One-hundred and fourteen (114), or 76%, of these

cases were death-eligible. Charleston County solicitors sought death in four (4) of those cases. In the remaining 110 case in which the state could have, but elected not to seek the death penalty:

- 31 of the 110 cases involved kidnapping
- 36 involved robbery
- 10 involved larceny with the use of a deadly weapon
- 28 involved physical torture
- 36 were committed for the purpose of receiving money or a thing of monetary value
- 3 involved the killing of a law enforcement officer
- 10 of these cases involved facts supporting five or more aggravating circumstances.

Thus, there is no meaningful basis of distinction—either by comparing Mr. Mercer's case to others in which the state sought but failed to obtain a death sentence, or by comparing his case to others in which the state could have but opted not to seek a death sentence—that would prove Mr. Mercer is somehow the worst of the worst and therefore more deserving of death than any other defendant charged with murder. Instead, he is simply one of the capriciously selected few who has had the misfortune of being struck by lightning.

Counsel representing individuals facing the death penalty in South Carolina should raise and preserve a proportionality challenge pre-trial. As explained above, the necessary information is not difficult to collect. It merely involves collecting cases with similar basic facts and aggravating circumstances where either: (a) the state did not seek the death penalty at all; or, (b) a death sentence was not imposed. If you are interested in using our current databases or need help collecting additional information specific to your particular case, please contact us.

**Notes**

Ex. 242 pg.19 of 20

https://justice360sc.org/wp-content/uploads/2016/01/eighth-ammendment-handbook1.pdf

