UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** *Plaintiff,* v. **DYLANN STORM ROOF,** *Defendant.* | ) ) ) ) ) ) ) ) ) ) | **Case No. 2:15-CR-00472-RMG** |

**MOTION FOR DISCOVERY**

Comes now, Movant, Dylann Roof, by counsel, and moves the Court for leave to conduct discovery pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts ("Habeas Rule 6"). The requested discovery is necessary to guarantee Mr. Roof a full and fair opportunity to develop and present facts in support of his § 2255 motion and ensure a fully developed factual record for judicial review of his claims for relief. Mr. Roof's specific discovery requests and the corresponding reasons for them are explained in the attached memorandum of support.

In accord with Local Rule of Civil Procedure 7.02, undersigned counsel has conferred with opposing counsel in an effort to resolve the matters contained in this motion. Local Civ. Rule 7.02 (D.S.C.). The parties are unable to reach agreement at this time, despite a good faith attempt.

Respectfully submitted,

_/s/ Angela Elleman_
Angela S. Elleman
Chief, § 2255 Unit
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Phone: 317-383-3520
E-Mail: angie_elleman@fd.org

_/s/ Jill E.M. HaLevi_
Jill E.M. HaLevi
Mediation and Legal Services
102 Broad Street, Suite C
Charleston, SC 29401
Phone: 843-819-0557
E-Mail: jill@charlestonmediator.com

Date: September 25, 2026

**UNITED STATES DISTRICT COURT**
**DISTICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| ***Plaintiff*,** | ) | |
| | ) | **Case No. 2:15-CR-00472-RMG** |
| **v.** | ) | |
| | ) | |
| **DYLANN STORM ROOF,** | ) | |
| | ) | |
| ***Defendant.*** | ) | |
| | ) | |

## REDACTED[1] MEMORANDUM IN SUPPORT OF MOTION FOR DISCOVERY

Mr. Roof respectfully moves the Court for leave to conduct discovery in support of the claims raised in his § 2255 Motion. This request is authorized by Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts ("Habeas Rule 6") and is consistent with the Supreme Court's directive that a federal habeas corpus petitioner is "entitled to careful consideration and plenary processing of [his claims,] including full opportunity for presentation of the relevant facts. *Harris v. Nelson*, 394 U.S. 286, 298 (1969); *see also Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977) (same).

In his § 2255 Motion, Mr. Roof raised numerous claims for relief, including claims of and ineffective assistance of counsel. Because this is Mr. Roof's first § 2255 motion and he sets forth well-supported claims alleging deprivations of his constitutional rights which, if proved, would require a new trial or sentencing, governing law requires that he be permitted to discover the evidence requested below.[2] Mr. Roof respectfully submits that initial

---

[1] Mr. Roof has requested permission to file a redacted copy of this Motion on the Record, which is pending. In an abundance of caution, Mr. Roof files the redacted version at this time.

[2] This is Mr. Roof's preliminary request for discovery. Information that comes to light as the result of discovery obtained pursuant to this motion, and/or the nature of objections and responses given by parties from whom discovery is currently being requested, may require and provide grounds for Mr. Roof to seek leave to conduct further discovery pursuant to Habeas Rule 6, including but not limited to additional requests for production, subpoenas *duces tecum*, and

discovery is appropriate and necessary at this time.

## I. Capital § 2255 Cases are Governed by Liberal Standards that Encourage the Opportunity for Discovery

### *a. The Good Cause Standard Governing Discovery in § 2255 Cases*

The filing of the § 2255 motion is only the first step in a procedure that tests the reliability and lawfulness of the litigation that resulted in Mr. Roof's death sentences. It is merely the document that puts all parties and the Court on notice of the cognizable claims. Mr. Roof has made specific allegations warranting relief which this Court has refused to summarily dismiss, finding them not to be "frivolous," "false," or "patently incredible." Dkt. 1126 at 1. Discovery is now necessary to provide Mr. Roof a full and fair opportunity to prove his well-pled allegations.

Although a grant of discovery requested herein is not a matter of right, this Court may order parties to provide discovery if Mr. Roof meets the liberal "good cause" standard. Pursuant to Habeas Rule 6(a), "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Good cause is established "where specific allegations . . . show reason to believe that [the movant] may, if the facts are fully developed, be able to demonstrate" that he is entitled to relief. *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quoting *Harris*, 394 U.S. at 300); *see also Royal v. Taylor*, 188 F.3d 239, 249 (4th Cir. 1999) (same); *Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998) (same). "In fact, where specific allegations demonstrate that the petitioner may be able to show that he is 'entitled to relief, it is the *duty* of the courts to provide the necessary facilities and procedures for an adequate inquiry.'" *Cherrix v.*

---

depositions of persons believed to have relevant knowledge about Mr. Roof's § 2255 claims and/or information disclosed pursuant to his requests for discovery. Mr. Roof also intends to submit a motion for an evidentiary hearing following the close of discovery and any amendment to the motion.

*True*, 177 F. Supp. 2d 485, 491 (E.D. Va. 2001) (quoting *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000) (emphasis added)).

Discovery is appropriate even if the allegations are, as they were in *Bracy*, “quite speculative” or “only a theory at this point.” 520 U.S. at 905, 908; *see also Rippo v. Baker*, 580 U.S. 285 (2017) (“[D]espite the ‘speculative’ nature of that theory, the petitioner was entitled to discovery because he had also alleged specific facts suggesting” he may be entitled to relief) (internal citation omitted). A court must provide Habeas Rule 6 discovery even when it believes the claim will not ultimately prevail. *See Bracy*, 520 U.S.at 909 (“It may well be . . . that petitioner will be unable to obtain evidence sufficient to support [his claim], but we hold that he has made a sufficient showing…to establish ‘good cause’ for discovery.”).[3]

Moreover, discovery is often more necessary where, as here, there are obvious contested facts. Courts in the Fourth Circuit have routinely considered whether a fact is disputed in determining whether discovery is appropriate. *See, e.g.*, *Owens v. Stirling*, No. 16-cv-02512-TLW-PJG, 2017 WL 3084152, at *2 (D.S.C. July 20, 2017) (considering which facts the government disputed in determining whether the petitioner required discovery to establish a fact); *Carthorne v. United States*, No. 14-cv-447, 2014 WL 12798573, at *1 (M.D.N.C. June 5, 2014) (denying discovery because “it is not clear that the materials Petitioner requests will be needed to decide his claims” in light of the government’s concessions). Here, the government’s response to Mr. Roof’s § 2255 motion repeatedly disputes facts alleged in the motion. *See, e.g.*,

[3] In this respect, the scope of Habeas Rule 6 discovery is similar to the scope of discovery in conventional civil actions. A plaintiff who makes specific allegations which, if proven, would entitle him to legal relief is entitled, *without more*, to access the fact-development procedures necessary to flesh out his claims without undue interference. *Cf. Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (“What [Fed. R. Civ. P.] 12(b)(6) does not countenance are dismissals based on a judge’s disbelief of a complaint’s factual allegations.”).

Dkt. 1087 at 54-92 (

); *id*. at 92-111 (

); *id*. at 111-308 (the government disputes counsel's effectiveness and Mr. Roof's deficiencies in representing himself); *id*. 394-412 (the government disputes facts related to the assignment of a judge to Mr. Roof's case). Thus, Mr. Roof's requested discovery is required to establish the veracity of these facts.

Finally, this Court has broad power in the type of discovery it can grant, including those types provided for "under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Habeas Rule 6. Habeas Rule 6 has been interpreted across the country to authorize a court, for example, to issue subpoenas to produce documents, information or objects; to allow depositions of the prosecution team; or to order release of physical evidence.[4]

---

[4] *See*, *e.g*., *Payne v. Bell*, 89 F. Supp. 2d 967, 970, 971-76 (W.D. Tenn. 2000) (granting petitioner's requests to serve interrogatories on state, obtain documents in state's possession, and depose assistant district attorney: "Once good cause is shown [under Habeas Rule 6(a)], a habeas petitioner may avail himself of the discovery procedures permitted by the Federal Rules of Civil Procedure, including the use of interrogatories, depositions, document requests, and requests for tangible evidence."); *O'Neal v. Lampert*, 199 F. Supp. 2d 1064, 1065 (D. Or. 2002), *abrogated on other grounds by Lee v. Lampert*, 610 F.3d 1125 (9th Cir. 2010) (granting motion for subpoenas to produce records under Habeas Rule 6); *In re Braxton*, 258 F.3d 250, 255 (4th Cir. 2001) (noting that district court granted petitioner's motion under Habeas Rule 6 for state production of physical evidence for purposes of DNA retesting); *Warden v. Gall*, 865 F.2d 786, 787 (6th Cir. 1989) (state police crime lab ordered to produce laboratory and field notes, and other physical items); *Ross v. Kemp*, 785 F.2d 1467, 1469, 1478-79 (11th Cir. 1986) (subpoenas issued to clerk of jury commission); *Rice v. Black*, 112 F.R.D. 620, 625-26 (D. Neb. 1986) (granting motion for discovery of FBI records of audiotape analysis).

Mr. Roof's discovery requests satisfy the good cause standard because his specific allegations show reason to believe that when the facts are fully developed, he will be entitled to relief. Under *Bracy*, he must be allowed the opportunity to obtain evidence to support his claims.

**a. Capital § 2255 Cases Differ from the Standards for § 2254 Cases and Non-Capital § 2255s**

Although governed by the same Eighth Amendment jurisprudence, capital § 2255 and § 2254 proceedings vary in ways critical to federal practice, including discovery. The most important of these is that in a capital § 2254 case, the main post-conviction process, including fact-finding and discovery, should occur in state court. By the time the petitioner has entered federal court, the primary opportunity to develop extra-record facts in support of the petition has already taken place. If the § 2254 petitioner does not succeed in state court, he has a chance to pursue federal claims for relief in the federal system, but the opportunity for new factual development, the ability to obtain a hearing, and the possibilities of relief are limited by the extent to which he availed himself of, and was granted, process in state court. *See*, *e.g.*, 28 U.S.C. § 2254(e)(2) (setting forth conditions for evidentiary hearings in § 2254 cases).

For a capital § 2255 litigant, the federal district court is both the first and last place where he can develop facts necessary to support his constitutional claims. Because there are no prior state court proceedings, the federal prisoner is not constrained by exhaustion requirements or state procedural rulings like his state counterpart, and the federal district court has much more latitude in § 2255 litigation as a forum for fact-development.[5]

[5] Additionally, motions under § 2255 can be based on violations of federal statutory criminal law and criminal procedure codes as well as the federal Constitution, and accordingly are subject to a wider range of potentially available federal legal claims than are state prisoner actions under § 2254. *See* 28 U.S.C. § 2255(a) ("A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed

Capital § 2255 litigation also differs significantly from non-capital § 2255 litigation. In capital cases, the prospect of the death penalty affects every aspect of trial, from indictment to pretrial motions to jury selection to instructions and finally, of course, to the penalty phase of the proceedings. Counsel, therefore, must examine every aspect of the trial against the backdrop of complex capital jurisprudence.

Accordingly, the policies favoring discovery are even stronger in capital cases than in noncapital cases because the "finality" of death and its "qualitative[] differen[ce] from a sentence of imprisonment, however long," magnify the "need for reliability" and the corresponding need for reliable fact-determination procedures. *Woodson v. North Carolina,* 428 U.S. 280, 305 (1976). Because habeas corpus discovery is designed to aid courts in determining the validity of the movant's claims, it is indispensable to the reliability of habeas corpus proceedings in capital cases. For this reason, liberal use of discovery is appropriate in such cases. *See Bracy*, 520 U.S. at 904-09 (denial of capital habeas corpus petitioner's discovery request abused district court's discretion).[6]

---

in violation of the Constitution *or laws of the United States* . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence") (emphasis added). Thus, a § 2255 investigation must be more far-ranging because the potential cognizable claims can be statutory in nature as well as constitutional.

[6] *See also Wilson v. Butler,* 825 F.2d 879, 883 (5th Cir. 1987) ("[I]f death is involved, the petitioner should be presented every opportunity possible, consistent with the interests of the state, to present facts relevant to his constitutional claims."); *Payne*, 89 F. Supp. 2d at 971 ("more liberal discovery is appropriate in capital cases where the stake for petitioner are so high"); *United States ex rel. Brisbon v. Gilmore*, No. 95 C 5033, 1997 WL 321862, at *3 (N.D. Ill. June 10, 1997) ("The Court agrees that, in light of the heavy burden Brisbon bears in petitioning for habeas relief from his death sentence, potentially corroborating evidence constitutes good cause for limited discovery").

### *b. Mr. Roof Has Made Efforts to Obtain Discovery Directly from the Relevant Parties*

Although not required to do so prior to seeking Habeas Rule 6 discovery, Mr. Roof attempted to secure the requested records, where appropriate, without burdening the Court. He now seeks records that he cannot access through any other avenue.

Prior to filing the instant motion, Mr. Roof requested discovery materials directly from the relevant parties through informal discussions with the Government and Freedom of Information and public records requests. As described in detail below, these attempts have been unsuccessful. Mr. Roof has exhausted the available avenues for obtaining the requested discovery without court assistance, and thus Habeas Rule 6 is the only process remaining for Mr. Roof to obtain this necessary evidence. Mr. Roof's attempts are further described in the discussion of each relevant request. Mr. Roof has sought the FBI file in this case from counsel for the government, which has been repeatedly refused. Mr. Roof has requested to speak with various witnesses who would not agree to speak with him in efforts to obtain their files and develop facts (such as Dr. Ballenger). Other witnesses freely spoke to counsel for Mr. Roof but declined to provide a written statement (such as Andy Savage). Other records simply cannot be obtained without the consent of the party or a subpoena, such as

## II. Mr. Roof has Established Good Cause for Specific Discovery

In the following sections, Mr. Roof identifies his specific current discovery requests and the claims to which they relate. Mr. Roof also summarizes the specific facts he has alleged that, once fully developed, will demonstrate that he is entitled to relief on each such claim. In this motion, Mr. Roof also refers to the specific claims and subparts of his § 2255 Motion, which

provide more detailed information regarding each claim which he incorporates here by reference. In some instances, a request is related to more than one claim. Accordingly, Mr. Roof incorporates each section into all of the arguments presented in the other sections.

To the extent the U.S. Attorney's office denies that the requested documents are in its files, Mr. Roof requests the Court order the government to certify that no such responsive materials are in its possession, and, if applicable, the dates on which any responsive materials were destroyed.[7] To the extent that the government has already provided all responsive documents for particular requests, Mr. Roof requests the Court order the government to submit a verification to that effect. To the extent privilege is claimed, Mr. Roof asks that the government be required to identify specific documents for which privilege is invoked. If the U.S. Attorney's Office does not possess or have control over files of the agencies cooperating in the investigation, the defense requests that the Court issue subpoenas *duces tecum* to compel the production of these files from these agencies.

Mr. Roof has good cause to request the following discovery:

### ***a. Discovery required by Claim 1***

[7] The absence of requested documents in the U.S. Attorney's files does not necessarily mean such documents do not exist, and Mr. Roof has accordingly moved for discovery, in the form of subpoenas *duces tecum*, of the files of other agencies and third parties who investigated this case and may be in possession of the requested documents.

8

9

10

11

### *b. Discovery required by Claim 2*

### *c. Discovery required by Claims 3-11*

Claims Three through Eleven are claims about trial counsel's ineffective assistance, including the "mission impossible" plan to try the case quickly, the failure to heed their experts' advice and hire a speech language pathologist to assess Mr. Roof, the failure to investigate and litigate Mr. Roof's impairments and inability to represent himself pursuant to *Indiana v. Edwards*, the choice to deceive their client and allow the government's expert to reveal the autism defense strategy to their client, and the failure to work with Mr. Roof to present mitigating evidence he would have allowed. Ultimately, these errors resulted in Mr. Roof representing himself in the voir dire and sentencing phases of his capital trial.

Now, in post-conviction, Mr. Roof has been diagnosed with Auditory Processing Disorder (APD) and pragmatic communication dysfunction, in addition to various diagnoses he had received prior to trial. In his § 2255, Mr. Roof asserts that his APD and pragmatic communication dysfunction impacted his competency to self-represent at trial, particularly as it

hindered his ability to stay present, process aurally received information, formulate answers, and respond appropriately and timely. These diagnoses and impairments explain why he was so incapable of making objections and why he requested additional time from the Court. Due to trial counsel's ineffectiveness, however, the Court did not have this critical information as it considered whether to allow Mr. Roof to represent himself. Mr. Roof has asserted that trial counsel's decision to rush to trial, ignore the advice for further testing, deceive their client, and ultimately overlook investigation relevant to Mr. Roof's competence amounted to deficient performance. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). These errors prejudiced Mr. Roof as he was left to represent himself during jury selection and again at the penalty phase, despite his incompetence to do so. As a result, the jury heard no mitigating evidence, despite the existence of substantial mitigation that Mr. Roof would have permitted counsel to present. But for counsel's errors, there is a reasonable likelihood this mitigating evidence would have convinced at least one juror to vote for a life sentence. *See id.*

Mr. Roof now requests the discovery necessary to support his collective ineffectiveness claims. These requests are necessary for Mr. Roof to obtain relevant evidence to corroborate his symptoms and the mitigating evidence that could have been presented at trial. Once these facts are developed, Mr. Roof would be able to show that he is entitled to a new penalty phase. Thus, he has established good cause for the discovery sought.

**Seven**, Dr. Ballenger was the expert appointed by the Court to evaluate Mr. Roof for competency to stand trial. Mr. Roof's post-conviction team has reached out to Dr. Ballenger to obtain a copy of his file and ask questions, but he has never returned any of their messages. Mr. Roof now requests a subpoena for Dr. Ballenger's file, including his billing records and all notes and memoranda in Dr. Ballenger's file. These documents would establish what records Dr.

Ballenger received before conducting his examination of Mr. Roof, his communications with either party in Mr. Roof's case, as well as the evidence he relied upon in drawing conclusions relevant to Mr. Roof's skill deficits in trial proceedings. These records are necessary for Mr. Roof to establish the parameters of information known to Dr. Ballenger at the time, and how the scope of that information affected his conclusions, including how they differ from the current findings that Mr. Roof's APD and pragmatic communication dysfunction affected his ability to represent himself. If granted leave to conduct discovery, a subpoena would be served upon Dr. James Ballenger, 192 E Bay St Ste 204, Charleston, SC 29401, for his complete file related to Mr. Roof. This file is a necessary first step; a deposition of Dr. Ballenger will be requested following the receipt of this file.

**Eight,** Mr. Roof requests business records between the court-appointed expert, Dr. Ballenger, and the office of the government's expert, Dr. Dietz and Associates, that establish the nature of their relationship and any communications (including notes or emails) they may have had during Mr. Roof's trial proceedings. The requested records include contracts, memoranda of understanding, letters establishing the nature of their relationship, and fee sharing agreements. This information is relevant to show potential motivations or influence underlying Dr. Ballenger's assessment of Mr. Roof, especially as they relate to his conclusions relevant to Mr. Roof's self-representation competency. Counsel has reached out to Dr. Ballenger numerous times, including by voicemail message and email messages. Dr. Ballenger has never returned counsel's messages. Only with a subpoena *duces tecum* can counsel obtain the requested information. This subpoena would be sent to Dr. James Ballenger, 192 E Bay St Ste 204, Charleston, SC 29401.

**Nine,** This Court should order production of audio tapes made during pretrial and trial

proceedings in this case. The audio recordings are highly relevant to claims about Mr. Roof's ability to represent himself, as they will shed light on Mr. Roof's oral presentation during trial in a way not captured by the trial transcript. Mr. Roof's post-conviction team has been told that Mr. Roof had many pauses, stutters, and difficulty during trial that is not captured on the cold transcript of the proceedings. The government indicates that it "does not share trial counsel's view that [Mr. Roof] demonstrated any significant difficulties comprehending and communicating with the Court, conducting voir dire, cross examining witnesses, and engaging with defense experts or Dr. Ballenger." Dkt. 1087 at 174 n.31. Experts evaluating Mr. Roof in post-conviction have identified communication impairments, unknown at the time of trial, that refute the government's position. These recordings are the best evidence available for the experts to assess Mr. Roof's performance in the context of their clinical evaluations. Although the Court (and parties) were present during trial proceedings and observed Mr. Roof, their lay observations were not informed by an SLP's assessment. As new evidence about Mr. Roof's Auditory Processing Disorder and his pragmatic communication dysfunction has become available to post-conviction counsel, these recordings take on critical importance in Mr. Roof's case. Experts can listen to Mr. Roof's actual voice—its intonation, pitch, tone, inflection or cadence, all of which are relevant to his diagnoses—not just the cold transcript, and further assess his ability to self-represent.

One of two Court Reporters that worked this trial was contacted by post-conviction counsel and has indicated that she has audio recordings from the proceedings in this matter. The other court reporter has neither confirmed nor denied that any tapes are in her possession. The Clerk of Court may also be in possession of audio recordings but has informed counsel for Mr. Roof that she is unwilling to look in the basement for any such recordings absent an Order from

the Court. Thus, counsel requests that this Court order the Clerk of Court to provide counsel for Mr. Roof with any audio recordings in its possession. Additionally, Mr. Roof seeks to send Subpoenas *duces tecum* to Court Reporters Amy Diaz and Debbie Potocki for any existing audio tapes of the pretrial and trial proceedings. Mr. Roof has demonstrated good cause for these recordings, as they will assist in developing the factual record on disputed facts before this Court. These subpoenas would be sent to Amy Diaz, 350 W 1st St. Room 4455, Los Angeles, CA 90012; and Debbie Potocki, 85 Broad Street, Charleston, SC 29401.

**Ten**, Mr. Roof would like to issue Requests for Production for the Department of Justice FBI records. Mr. Roof has a pending FOIA request for the FBI file in this case. The records custodian for the FBI has responded that Mr. Roof's file is a "large" case—meaning the file contains between 500 and 4,999 responsive pages—and that it has been placed on the "complex" track, with the FBI estimating it will take 2,010 days to process this request and disclose any records to Mr. Roof. Undersigned counsel has apprised the FBI of Mr. Roof's ongoing § 2255 litigation and the urgency of this request. They sought expedited review and attempted to negotiate a more reasonable disclosure schedule, including disclosure in batches so that they are obtaining at least some of the files much sooner than estimated. So far, however, those attempts have been futile, and the FBI has failed to respond to undersigned counsel's request for batch processing. While this request is still pending, Mr. Roof seeks a production order from this Court now in the interest of judicial economy and to ensure Mr. Roof's FBI file is available to him as he continues his § 2255 litigation.

The FBI records in this case are necessary and are highly likely to produce voluminous mitigating information as well as mitigation leads that reasonably effective counsel would have investigated further. The mitigating information and red flags within the FBI file contain

evidence which Mr. Roof would have allowed counsel (or conflict-free counsel) to present in his defense and are reasonably likely to have changed the outcome of the sentencing phase of his trial. Some examples of the FBI records that exist, which no counsel for Mr. Roof has ever seen, but that would prove the legal claims pending before this court include 1) handwritten or contemporaneous notes for any and all interviews conducted by the FBI in the course of their investigation of this case and 2) audio and/or video recordings of any and all interviews conducted by the FBI in the course of their investigation of this case.

Counsel knows that these handwritten notes and audio recordings are generally produced when requested by trial counsel; however, the file indicates that trial counsel did not have such notes for most witnesses. Counsel's experience, both from the instant case, as well as from similar litigation, is that the written FD-302 typically captures only a fraction of the information provided in an audio recording or contemporaneous notes from the interview. [12]

Mr. Roof has demonstrated good cause to show that discovery of these handwritten notes and recordings likely reveal symptoms or mitigating evidence that could have been presented at his competency hearing and at his sentencing phase trial.[13]

Another example of materials expected to be in the entire FBI file, yet never provided to counsel, includes copies of any and all text messages between Paige Sinclair Hastings Mann and

[12] Trial counsel for Mr. Roof had the audio recording of one witness, for example, that was 20 minutes long. Much potentially mitigating information was revealed in that interview that was not included in the FD-302 generated to memorialize the interview. Certainly an FBI agent may not understand the scope of relevant mitigating information she has received, and it may not be directly relevant to the agent's immediate desire to determine if there are unindicted co-conspirators. It remains, however, the government's obligation to reveal mitigating information in its possession. *Brady v. Maryland*, was, after all, a sentencing case. 373 U.S. 83 (1963). There are countless interviews for which trial counsel, and therefore undersigned counsel, have never had access to the notes or audio recordings.

[13] Claim 7 of Mr. Roof's § 2255 motion addresses the complete lack of mitigation presented at trial due to counsel's ineffectiveness.

Bennett Roof obtained by the FBI in the course of their investigation of this case. Provided discovery documents that Paige Mann, Dylann Roof's stepmother, showed the FBI drug-related text messages between her and Benn Roof. However, the fact that she showed them messages is not mentioned in her FD-302's. These text messages are relevant information as to Mr. Roof's mitigation, and are evidence that could have been presented at his trial. This constitutes good cause for this court's authorization of discovery.

Another example includes the missing FD-302, and accompanying notes and/or recordings, for Hiram "Thomas" Wages. Wages was a neighbor to the Roof family. Undersigned counsel's investigation has revealed that Wages had been interviewed by the FBI. However, there is no record of this interview in discovery. Given that Wages was a neighbor to the Roof family for years and owned property with Dylann Roof's only maternal uncle, Carson Cowles, it is highly likely that he was interviewed by the FBI. Mr. Roof has demonstrated good cause for this discovery.

A final example of the materials expected in the complete FBI file is any and all FD-302s for FBI interviews with David Wayne Sprayberry. Mr. Sprayberry reported to Mr. Roof's current legal team that he spoke with the FBI on multiple occasions. Only one FD-302, however, was provided in trial discovery. Mr. Sprayberry was a paramour of Mr. Roof's mother, Amy Roof. He was arrested for assaulting Ms. Roof while Mr. Roof was a minor living in their home. What else Mr. Sprayberry conveyed to the FBI about Mr. Roof is highly relevant to claims before this Court.

The requested FBI records correspond to interviews with people who personally knew or interacted with Mr. Roof and would have conveyed their knowledge and impressions of him at the time. This information is highly relevant to demonstrating trial counsel's failures to

understand their own client's impairments and to present those to this Court. Further, they are likely to reveal information that Mr. Roof would have allowed his trial counsel to present in mitigation, if counsel had obtained the information and sought to present mitigation that Mr. Roof could accept.

**Eleven**, in support of Mr. Roof's ineffective assistance of counsel claim regarding the failure to request a change of venue, Mr. Roof requests a subpoena for data regarding jurors summoned to trial, including their demographics. Mr. Roof would also subpoena data from local news outlets regarding the volume of published or broadcast segments regarding Mr. Roof and his case. Mr. Roof would seek to obtain the reach/circulation of local news outlets over time and around the time of relevant events: the crime, his arrest, his indictment, jury selection, trial, and verdicts. And Mr. Roof seeks to obtain from social media companies the number of stories about Mr. Roof posted at relevant times, as well as the number of clicks or user engagement in such posts. The social media and media subpoenas would be directed to Meta Platforms, Inc. 1 Meta Way, Menlo Park, CA 94025; The Post and Courier, 148 Williman Street, Charleston, SC 29403; WCSC-TV (Live 5 News), 2126 Charlie Hall Blvd, Charleston, SC 29414; WCIV-TV (ABC News 4), 888 Allbritton Blvd, Mount Pleasant, SC 29464; WITV (South Carolina ETV), Post Office Box 11000, Columbia, SC 29211; and WCBD (WCBD-TV), 210 West Coleman Blvd., Mount Pleasant, South Carolina 29464). Any and all material about the demographics of jurors summoned in 2015 to this trial should be ordered from the Clerk of Courts.

The requested information is relevant to whether trial counsel's decision was a reasonable one, which the government disputes.

**Twelve**, as to Claim 11, that lead trial counsel was ineffective for his cross examination of Felicia Sanders, Mr. Roof seeks discovery. In order to demonstrate that lead counsel was

advised by those in contact with Felicia Sanders that he should not conduct any cross examination of her, counsel seeks to depose Andy Savage and Tammy Krause.

Mr. Roof has shown good cause for discovery regarding these claims.

#### *d. Discovery required by Claim 16*

Claim 16 alleges that lethal injection, as it has been administered by the federal government, creates an unacceptable risk of severe and unnecessary suffering. On April 24, 2026, acting Attorney General Todd Blanche released a document entitled "Restoring and Strengthening the Federal Death Penalty."[14] This document disputes the previous findings issued by the Department of Justice on January 8, 2025.[15] While former Attorney General Garland revoked the existing execution protocol based on concern of it imposing "unnecessary pain and suffering," acting Attorney General Blanche recommends reinstating the prior lethal injection protocol as well as expanding the protocol to include any method of execution authorized by the states, including firing squad and electrocution. Clearly, there is a factual dispute among the parties—indeed, between the last two administrations—as to whether lethal injection as it has been carried out by the federal government causes flash pulmonary edema, which may result in the executed experiencing "air hunger" and the sensation of drowning. This is a factual dispute best settled by the factfinder, after discovery and a hearing. Mr. Roof has demonstrated good cause for discovery as to Claim 16.

In order to prove this claim, Mr. Roof would need to establish details about the executions carried out by the federal government in 2020 and 2021, as well as plans and

---

[14] U.S. Dep't of Justice, *Restoring and Strengthening the Federal Death Penalty*, April 24, 2026, https://www.justice.gov/ag/media/1437806/dl?inline

[15] U.S. Dep't of Justice, *Review of the Federal Execution Protocol Addendum and Manner of Execution Regulations*, Jan. 8 2025, https://www.justice.gov/archives/ag/media/1384566/dl

resources to carry out Mr. Roof's prospective execution.

**Thirteen**, Mr. Roof requests discovery relating to Claim 16 in the form of subpoenas, requests for admission; interrogatories; and, eventually, depositions. Mr. Roof has made FOIA requests of the Bureau of Prisons related to lethal injection in an effort to obtain publicly available documents without intervention from the Court. Both requests were assigned to the "complex" track. These FOIA requests remain pending with no estimate from the Bureau of Prisons as to when the materials might be provided.

Mr. Roof seeks to obtain the identity of individuals who participated and/or witnessed the 2020 and 2021 executions. Mr. Roof seeks documents related to the execution of each of those 13 individuals, including the documentation of each step taken in the executions; the drugs used; and information about the source, quality, cost and expiration of such drugs.

Mr. Roof additionally seeks the identities of staff, including the legal department, who procured the drugs and the documentation surrounding those procurements, both for the drugs previously used in executions and any drugs in the current possession of the Bureau of Prisons. If the drugs have been compounded, Mr. Roof seeks documents related to the creation of the drugs, the quality controls in place for the compounding pharmacy, lab inspection reports, licensing and permitting materials, and the qualifications of staff compounding the drugs.

Mr. Roof seeks the protocols in place for a federal lethal injection execution, including any changes that have been proposed or made since January 20, 2025. Mr. Roof seeks documentation of the qualifications of the past and prospective execution teams, whether staff or contractors.

Mr. Roof seeks information related to any execution drugs currently in the possession of the Bureau of Prisons, including information related to their procurement, the source, the cost,

any quality assurance documentation, and the expiration dates for such drugs. He seeks the name of any company or compounding pharmacy the Bureau of Prisons or Department of Justice has communicated with since January 20, 2025, about the procurement of execution drugs, including the names of those corresponding. He seeks any contracts or documentation related to the creation of any contracts around the procurement of execution drugs.

After the above documentation is secured, Mr. Roof would request to depose and/or provide interrogatories to individuals participating in the procurement and quality control of such drugs, as well as those who participated or witnessed the prior executions.

The government, which is the same Department of Justice that contains the Bureau of Prisons, should be ordered to provide the above information.

#### *e. Discovery required by Claim 18*

Mr. Roof requests discovery pertaining to Claim 18. This claim alleges that the death penalty is unconstitutional. Among the reasons that the death penalty is unconstitutional is the arbitrariness in its application. The government disputes this claim.

**Fourteen**, Mr. Roof seeks records, documents, and information regarding how the government selected which death sentenced inmates would be executed during the first Trump administration in 2020 and 2021. These records will support the allegation that the death penalty was administered in an arbitrary way, undermining its effectiveness and fairness. The Court should order the government to provide such information.

#### *f. Discovery required by Claim 19*

In order to prove this claim, Mr. Roof must establish the normal plan or system for assigning cases in the District of South Carolina and any aberrations to the usual plan that may have occurred in this case. The government disputes this claim.

**Fifteen**, Mr. Roof requests subpoenas for documents in the possession of the Clerk of Court that establish and describe the District's assignment plan. If there are any usual exceptions made to the plan, particularly for large or high-profile cases, Mr. Roof would request subpoenas for documents outlining those exceptions as well. Mr. Roof seeks any documentation or communications among court staff or those responsible for assigning cases in 2015 about the assignment of this case.

After obtaining these documents, Mr. Roof would seek interrogatories and/or depositions in order to identify the identities of any and all staff and persons that participated in or documented the assignment of cases in 2015.

The government disputes numerous facts contained in Michael O'Connell's declaration, and those disputes could be resolved through the discovery requested here.

## CONCLUSION

Discovery pursuant to Habeas Rule 6 is both critical and routine in a federal capital case. The discovery that Mr. Roof seeks is necessary to allow him to develop facts to present to this Court to allow it to make a full and fair review of his claims. For the reasons stated above, Mr. Roof moves this Court to grant his request for leave to conduct discovery including orders or subpoenas for the following:

1. ;
2. ;
3. ;
4. ;
5.

;

6. ;

7. Dr. Ballenger's complete file on Mr. Roof;

8. Communications and contracts pertaining to Dr. Ballenger and Dietz and Associates;

9. Audiotapes created of the courtroom proceedings in this case;

10. The complete FBI file in this case;

11. Details about the quantity and reach of media pertaining to this crime and case;

12. Depositions of Andy Savage and Tammy Krause;

13. BOP materials related to the lethal injection executions carried out by the federal government in 2000 and 2001, including about the quality and procurement of drugs, and information related to the quality and procurement of drugs for any future execution of Mr. Roof;

14. Records related to the government's process for determining which death row inmates were subject to execution dates in 2020 and 2021, and which were not;

15. Information relating to the usual assignment plan for federal cases in the District of South Carolina, as well as any records relating to the assignment of this case in 2015; and

16. The opportunity to conduct depositions and/or further request additional records once the discovery requested here has been completed.

Respectfully submitted,

_/s/Angela Elleman_
Angela S. Elleman
Chief, § 2255 Unit
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Phone: 317-383-3520
E-Mail: angie_elleman@fd.org

_/s/ Jill E.M. HaLevi_
Jill E.M. HaLevi
Mediation and Legal Services
102 Broad Street, Suite C
Charleston, SC 29401
Phone: 843-819-0557
E-Mail: jill@charlestonmediator.com

Date: September 25, 2026